# Exhibit 18

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**Encavis AG and others**

**v.**

**Italian Republic**

**(ICSID Case No. ARB/20/39)**

---

# AWARD

**Members of the Tribunal**
Professor Juan Fernández-Armesto, President of the Tribunal
Ms. Wendy Miles KC, Arbitrator
Mr. Alexis Mourre, Arbitrator

**Secretary of the Tribunal**
Ms. Anneliese Fleckenstein

**Assistant to the Tribunal**
Ms. Sofía de Sampaio Jalles

---

*Date of dispatch*: 11 March 2024

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

# <u>REPRESENTATION OF THE PARTIES</u>

*Encavis AG and others:*

Mr. Kenneth R. Fleuriet
King & Spalding
1700 Pennsylvania Ave., N.W.
Washington, D.C. 20006
United States of America

Ms. Amy Roebuck Frey
Ms. Héloïse Herve
King & Spalding
48 bis, rue de Monceau
75008 Paris
France

Mr. Reginald R. Smith
Mr. Kevin D. Mohr
King & Spalding
1100 Louisiana St., Ste. 4100
Houston, TX 77002
United States of America

Ms. Emma Iannini
King & Spalding
1185 Avenue of the Americas
34th Floor
New York, NY 10036
United States of America

*Italian Republic*:

Avv. Giacomo Aiello
Avv. Pietro Garofoli
Avv. Laura Delbono
Avv. Gaia Iappelli
Prof. Ludovica Chiussi Curzi – External Consultant
Avvocatura Generale dello Stato
Via dei Portoghesi, 12
00186 Rome
Italy

Prof. Maria Chiara Malaguti
External Consultant
Ministero degli Affari Esteri e della
Cooperazione Internazionale (MAECI)
Servizio per gli affari giuridici del
contenzioso diplomatico e dei trattati
Piazzale della Farnesina
00135 Rome
Italy

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

# TABLE OF CONTENTS

REPRESENTATION OF THE PARTIES..............................................................2

TABLE OF CONTENTS ........................................................................................3

GLOSSARY OF TERMS AND ABBREVIATIONS ...........................................5

LIST OF CASES......................................................................................................8

I.    INTRODUCTION......................................................................................11

1.    The Parties ................................................................................................11

2.    The dispute................................................................................................11

II.    PROCEDURAL HISTORY ......................................................................12

1.    Request for arbitration ...........................................................................12

2.    Constitution of the Arbitral Tribunal ..................................................12

3.    First Session .............................................................................................12

4.    Main Submissions ....................................................................................13

5.    European Commission's Application.....................................................14

6.    Hearing......................................................................................................15

7.    Post-Hearing Phase .................................................................................16

III.    FACTS.........................................................................................................17

1.    Italy's renewable energy commitments.................................................17

2.    Italy's implementation of the 2001 EU Directive (*Conti* I-II and MGP)........21

3.    Italy's municipal response to the 2009 EU Directive ..........................26

4.    The Disputed Measures ..........................................................................32

IV.    REQUEST FOR RELIEF ..........................................................................37

1.    Claimants' request for relief ..................................................................37

2.    Respondent's request for relief...............................................................37

V.    JURISDICTIONAL OBJECTIONS ........................................................39

      V.1.   DIVERSITY OF NATIONALITY OBJECTION                    43

1.    Respondent's position ..............................................................................43

2.    Claimants' position ..................................................................................44

3.    Analysis by the Tribunal ........................................................................44

      V.2.   MUNICIPAL LAW OBJECTION                               50

1.    Respondent's position ..............................................................................50

2.    Claimants' position ..................................................................................53

3.    Analysis by the Tribunal ........................................................................56

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| | **V.3. INTRA-EU OBJECTION** | **68** |
|---|---|---|
| **1.** | Respondent's position | **68** |
| **2.** | The European Commission's position | **72** |
| **3.** | Claimants' position | **74** |
| **4.** | Analysis by the Tribunal | **78** |
| **VI.** | **LIABILITY** | **121** |
| **1.** | Introduction | **121** |
| **2.** | Claimants' investments | **123** |
| **3.** | Summary of the Parties' positions | **125** |
| **4.** | The proper interpretation of Art. 10(1) ECT | **126** |
| **5.** | Discussion | **128** |
| **6.** | Conclusion | **192** |
| **VII.** | **COSTS** | **194** |
| **1.** | Claimants' position | **194** |
| **2.** | Respondent's position | **194** |
| **3.** | Decision of the Tribunal | **195** |
| **VIII.** | **DECISION** | **198** |
| | **ANNEX** | **202** |

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

# GLOSSARY OF TERMS AND ABBREVIATIONS

| | |
|---|---|
| **Achmea** | Achmea B.V. (formerly Eureko B.V.) |
| **Administrative Costs** | Lodging fee and advances on costs paid to ICSID |
| **AEEG** | *Autorità per l'Energia Elettrica e il Gas* |
| ***Amicus Curiae* Brief or EU-Brief** | Written submission as non-disputing party lodged by the Commission on 30 June 2022 |
| **Arbitration Rules** | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| **Art(s).** | Article(s) |
| **Bacchiocchi I** | First witness statement of Mr. Daniele Bacchiocchi |
| **Bacchiocchi II** | Second witness statement of Mr. Daniele Bacchiocchi |
| **BGH** | German *Bundesgerichtshof* |
| **C-[#]** | Claimants' Exhibit |
| **Capital Stage** | Capital Stage AG |
| **Capital Stage Group** | Group of companies related to Capital Stage |
| **CD-[#]** | Claimants' Demonstrative Exhibit |
| **CHORUS** | CHORUS Solar GmbH & Co. KG |
| **CHORUS Group** | Group of companies related to CHORUS |
| **CHORUS Solar 3** | CHORUS Solar 3 S.r.l. & Co. S.a.S. |
| **C-I** | Claimants Memorial on the Merits dated 20 July 2021 |
| **C-II** | Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction dated 27 April 2022 |
| **C-III** | Claimants' Rejoinder on Jurisdiction dated 5 September 2022 |
| **CJEU** | Court of Justice of the European Union |
| **CL-[#]** | Claimants' Legal Authority |
| **Claimants** | Entities listed in para. 2 *infra* |
| **Commission** | European Commission |
| **Commission's Application** | Commission's Application for Leave to Intervene as Non-Disputing Party, dated 11 May 2022 |
| **Constitutional Court** | Italian Constitutional Court |
| **Constitutional Court Decision** | Decision No. 16/2017 of the Constitutional Court, published on 24 January 2017 |
| ***Conti*** | Ministerial Decrees passed by the Italian government |
| ***Conto* I** | Ministerial Decree of 28 July 2005 (Doc. C-34, as amended on 6 February 2006) |
| ***Conto* II** | Ministerial Decree of 19 February 2007 (Doc. C-59) |
| ***Conto* III** | Ministerial Decree of 6 August 2010 (Doc. C-139) |
| ***Conto* IV** | Ministerial Decree of 5 May 2011 (Doc. C-166) |
| ***Conto* V** | Ministerial Decree of 5 July 2012 (Doc. C-195) |
| ***Conto* Program** | Program composed of five Ministerial Decrees (*Conto Energia*) |
| ***Contratto per il Ritiro*** | *Contratto per il ritiro dell'energia elettrica* signed between the GSE and the plant operator for the off-take of electricity |
| ***Convenzione*** | *Convenzione per il riconoscimento delle tariffe incentivanti* signed between the GSE and the plant operator |
| **C-PHB** | Claimants' Post Hearing Brief dated 28 November 2022 |
| **C-SC** | Claimants' Statement of Costs |
| **Defense Expenses** | Expenses incurred by the Parties in connection with their respective legal defenses |
| ***Destinazione Italia* Decree** | Law Decree No. 145/2013 of 23 December 2013 |
| **Disputed Measures** | Changes to MGP Regime and to the *Conto* Program |

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| EC | European Communities |
|---|---|
| **ECT** or **Treaty** | Energy Charter Treaty, which entered into force on 16 April 1998 |
| **European Energy Charter** | Charter signed on 17 December 1991 |
| **Edwards I** | First expert report of Mr. Richard Edwards, FTI Consulting |
| **Edwards II** | Second expert report of Mr. Richard Edwards, FTI Consulting |
| **Encavis** | Encavis AG |
| **ENEA** | *Agenzia nazionale per le nuove tecnologie, l'energia e lo sviluppo economico sostenibile* |
| **EU** | European Union |
| **FET** | Fair and equitable treatment |
| **FiP** | Feed-in premium |
| **FiT** | Feed-in tariff |
| **Fork-in-the-Road** | Art. 26(3)(b) of the ECT |
| **Fundamental Basis Test** | Test suggested by Respondent to evaluate whether the Fork-in-the-Road is triggered |
| **GSE** | *Gestore dei Servizi Energetici* |
| **Hearing** | Hearing on Jurisdiction and the Merits held on 10-13 October 2022 |
| **ICSID Convention** | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| **ICSID** or the **Centre** | International Centre for Settlement of Investment Disputes |
| **IDRC** | International Dispute Resolution Centre |
| **ILC Articles** | International Law Commission's Articles on Responsibility of States for Internationally Wrongful Acts |
| **Implementation Decrees** | Decrees of the Ministry of Economic Development of 16 and 17 October 2014 implementing the *Spalma-incentivi* Decree |
| **Italy**, the **Republic** or **Respondent** | The Italian Republic |
| **kW** | Kilowatt |
| **kWh** | Kilowatt-hour |
| **Member States** | EU Member States |
| **Member States Declaration** | Declaration of the representatives of the Governments of the Member States, on the legal consequences of the judgment of the Court of Justice in Achmea and on investment protection in the European Union of 15 January 2019 |
| **MGP Regime** | Regime related to the MGP |
| **MGP Resolution** | AEEG Resolution No. 280/2007 of 6 November 2007 |
| **Minimum Guaranteed Price** or **MGP** | Minimum price guaranteed annually to plants under 1 MW |
| **Miraglia I** | First witness statement of Mr. Luca Miraglia |
| **Miraglia II** | Second witness statement of Mr. Luca Miraglia |
| **MW** | Megawatt |
| **New MGP Resolution** | AEEG Resolution No. 618/2013/R/EFR of 19 December 2013 |
| **National Plan** | Italian National Action Plan for RES |
| **Operating Companies** | Claimants that are the operating companies that acquired the PV plants |
| **Parties** | Claimants and Respondent |
| **PO 1** | Procedural Order No. 1 |
| **PV** | Photovoltaic |
| **R-[#]** | Respondent's Exhibit |

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| | |
|---|---|
| **RD-[#]** | Respondent's Demonstrative Exhibit |
| **REIO** | Regional Economic Integration Organization |
| **Request for Arbitration** | Request for Arbitration filed by Claimants on 21 September 2020 |
| **RES** | Renewable Energy Sources |
| **R-I** | Respondent's Counter-Memorial on the Merits dated 14 November 2021 |
| **R-II** | Respondent's Rejoinder on the Merits dated 22 July 2022 |
| **Romano I** | First expert report of Prof. Avv. Anna Romano |
| ***Romani* Decree** | Legislative Decree No. 28 of 3 March 2011 |
| **Roques I** | First expert report of Dr. Fabien Roques, Compass Lexecon |
| **Roques II** | Second expert report of Dr. Fabien Roques, Compass Lexecon |
| **R-PHB** | Respondent's Post Hearing Brief dated 28 November 2022 |
| **RL-[#]** | Respondent's Legal Authority |
| **R-SC** | Respondent's Statement of Costs |
| ***Salva Alcoa* Decree** | Law Decree No. 105 of 8 July 2010 |
| **Sapienza I** | First expert report of the Department of Law and Economics of Production Activities of Sapienza University of Rome |
| **Sapienza II** | Second expert report of the Department of Law and Economics of Production Activities of Sapienza University of Rome |
| **SCC** | Stockholm Chamber of Commerce |
| **Scharrer I** | First witness statement of Mr. Martin Scharrer |
| **Scharrer II** | Second witness statement of Mr. Martin Scharrer |
| ***Spalma-incentivi* Decree** | Law Decree No. 91/2014 of 24 June 2014 (converted into law by Law No. 116/2014 of 11 August 2014) |
| **Tariff Confirmation Letter** | Official communication by the GSE confirming the incentive tariff to which a plant is entitled |
| **Termination Treaty** | Agreement for the termination of bilateral investment treaties between the Member States of the European Union of 5 Mau 2020 |
| **TEU** | Treaty on the European Union |
| **TFEU** | Treaty on the Functioning of the European Union |
| **HT, Day [#], p. [#], l. [#]** | Transcript of the Hearing, Day, page and line |
| **Tribunal** | Arbitral tribunal constituted on 16 February 2021 |
| **Triple Identity Test** | Test suggested by Claimants to evaluate whether the Fork-in-the-Road is triggered |
| **UNCTAD** | United Nations Conference on Trade and Development |
| **UNFCCC** | United Nations Framework Convention on Climate Change |
| **VCLT** | Vienna Convention on the Law of Treaties |
| **1996 EU Directive** | Directive No. 96/92/EC of the European Parliament and Council |
| **2001 EU Directive** | Directive No. 2001/77/EC of the European Parliament and Council |
| **2009 EU Directive** | Directive No. 2009/28/EC of the European Parliament and Council |
| **2003 Legislative Decree** | Legislative Decree No. 387 of 29 December 2003 |

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

# LIST OF CASES

| | |
|---|---|
| ***Achmea* Judgment** | *Republic of Slovakia/Achmea BV.* Case C-284/16, dated 6 March 2018 (RL-24) |
| ***Achmea Jurisdiction*** | *Achmea B.V. (formerly Eureko) v. Slovak Republic*, PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension, dated 26 October 2010 (CL-118) |
| ***AES*** | *AES Summit Generation Ltd. and AES-Tisza Erömü Kft. v. Republic of Hungary*, ICSID Case No. ARB/07/22, Award, dated 23 September 2010 (CL-7) |
| ***Aguas del Tunari*** | *Aguas del Tunari S.A. v. Republic of Bolivia* ICSID Case No. ARB/02/3, Decision on Respondent's Objections to Jurisdiction, dated 21 October 2005 (RL-31) |
| ***Antaris*** | *Antaris GMBH and Michael Goede v. The Czech Republic*, PCA case No 2014-01, Award, dated 2 May 2018 (RL-53) |
| ***Antin*** | *Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar B.V. (formerly Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.) v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, dated 15 June 2018 (CL-87) |
| ***Belenergia*** | *Belenergia v. Italy*, ICSID Case No. ARB/15/40, Award, dated 6 August 2019 (CL-45) |
| ***BIVAC*** | *Bureau Veritas, Inspection, Valuation, Assessment and Control, BIVAC B.V. v. Republic of Paraguay*, ICSID case ARB/07/9, Decision on Objections to Jurisdiction, dated 29 May 2009 (RL-32) |
| ***Blusun*** | *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, dated 27 December 2016 (RL-42) |
| ***Blusun (Annulment Decision)*** | *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No.ARB/14/3, Decision on annulment, dated 13 April 2020 (RL-43) |
| ***Cavalum*** | *Cavalum SGPS, S.A. v. Kingdom of Spain*, ICSID Case No. ARB/15/34, Decision on Jurisdiction, Liability, and Directions on Quantum, dated 31 August 2020 (CL-90) |
| ***CEF Energia*** | *CEF Energia v. Italy*, SCC Case No. 2015/158, Award, dated 16 January 2019 (CL-44) |
| ***Charanne*** | *Charanne B.V. and Construction Investments S.a.r.l. v. Kingdom of Spain*, SCC Arb. No. 062/2012, Award, dated 21 January 2016 (CL-89) (RL-46) |
| ***Eastern Sugar*** | *Eastern Sugar B.V. v. Czech Republic*, SCC Case No. 088/2004, Partial Award, dated 27 March 2007 (CL-95) |
| ***EDF*** | *EDF (Servs.) Ltd. v. Romania,* ICSID Case No. ARB/05/13, Award, dated 8 October 2009 (CL-26) |
| ***Eiser*** | *Eiser Infrastructure Limited and Energia Solar Luxembourg S.à.r.l v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, dated 4 May 2017 (RL-44) |
| ***El Paso Energy*** | *El Paso Energy Int'l Co. v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, dated 31 October 2011 (CL-25) |
| ***Electrabel*** | *Electrabel v. Hungary*, (Decision on Jurisdiction, Applicable Law and Liability), ICSID Case No. ARB/07/19, dated 30 November 2012 (CL-41) (RL-4) |

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| | |
|---|---|
| ***Enron*** | *Enron Corp. Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3, Award, dated 22 May 2007 (CL-34) |
| ***Eskosol* (Award)** | *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Award, dated 4 September 2020 (RL-50) |
| ***Eskosol* (Jur.)** | *Eskosol S.p.A. in liquidazione v. Italy*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection Based on Inapplicability of the Energy Charter Treaty to *Intra*-EU Disputes, dated 7 May 2019 (CL-99) |
| ***ESPF*** | *ESPF and others v. Italy*, ICSID Case No. ARB/16/5, Award, dated 14 September 2020 (CL-8) |
| ***FREIF*** | *FREIF Eurowind Holdings Ltd. v. Kingdom of Spain*, SCC Case No. 2017/060, Final Award, dated 8 March 2021 (CL-124) |
| ***Green Power*** | *Green Power Partners and SCE Solar don Benito v. Spain,* SCC Case No. V. 2016/135, Award, dated 16 June 2022 (RL-60) |
| ***Greentech*** | *Greentech Energy Systems A/S, NovEnergia II Energy & Environment (SCA) SICAR, and NovEnergia II Italian Portfolio SA v. Italy*, SCC Arbitration V (2015/095), Award, dated 23 December 2018 (CL-9) |
| ***Hulley Enterprises*** | *Hulley Enterprises Ltd (Cyprus) v. Russia*, PCA Case No. 2005-03/AA226, Interim Award on Jurisdiction and Admissibility, dated 30 November 2009 (CL-142) |
| ***Infracapital*** | *Infracapital F1 S.à.r.l. and Infracapital Solar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/16/18, Decision on Respondent's Second Request for Reconsideration, dated 19 August 2022 (CL-194) |
| ***InfraRed*** | *InfraRed Environmental Infrastructure GP Limited et al. v. Kingdom of Spain*, ICSID Case No. ARB/14/12, Award, dated 2 August 2019 (CL-129) |
| ***Isolux*** | *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, SCC Arb. V 2013/153, Award, dated 12 July 2016 (CL-88) |
| ***Komstroy* Judgment** | *République de Moldavie v Société Komstroy.* C-741/19, ECLI:EU:C:2021:655, dated 2 September 2021 (RL-27) |
| ***Komstroy* (Szpunar Opinion)** | *République de Moldavie c Société Komstroy,* Opinion of Advocate General Szpunar, dated 3 March 2021 (RL-30) |
| ***Kruck (Jurisdiction)*** | *Mathias Kruck et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/23, Decision on Jurisdiction and Admissibility, dated 19 April 2021 (CL-107) |
| ***LG&E*** | *LG&E Energy Corp. and others v. Argentine Republic*, ICSID Case No. ARB/02/1, Decision on Liability, dated 3 October 2006 (CL-16) |
| ***LSG*** | *LSG v. Romania*, ICSID Case No. ARB/18/19, Decision on Jurisdiction, Liability and Principles of Reparation, dated 11 July 2022 (CL-190) |
| ***Masdar*** | *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, dated 16 May 2018 (CL-98) |
| ***Mathias Kruck (Reconsideration Decision)*** | *Mathias Kruck et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/23, Decision on the Respondent's Second Request for Reconsideration of the Tribunal's Decision, dated 19 April 2021 (CL-196) |
| ***Novenergia II*** | *Novenergia II—Energy & Env't (SCA) (Grand Duchy of Luxembourg), SICAR v. Kingdom of Spain*, SCC. Arb. No. 2015/063, Final Award, dated 15 February 2018 (CL-97) |
| ***OperaFund*** | *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No. ARB/15/36, Award, dated 6 September 2019 (CL-101) |

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| **Pantechniki** | *Pantechniki S.A. Contractors & Engineers (Greece) v. The Republic of Albania*, (Award), ICSID Case No. ARB/07/21, dated 30 July 2009 (RL-35) |
|---|---|
| **Plama** | *Plama Consortium Ltd. v. Bulgaria*, ICSID Case No. ARB/03/24, Award, dated 27 August 2008 (CL-54) |
| **PV Investors** | *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14, Final Award, dated 28 February 2020 (CL-128) |
| **PV Investors (Jurisdiction)** | *PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction, dated 14 October 2014 (CL-85) |
| **Renergy** | *RENERGY S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/14/18, Award, dated 6 May 2022 (CL-187) |
| **RREEF** | *RREEF Infra (G.P.) Ltd. and RREEF Pan-European Infra. Two Lux S.a.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, dated 6 June 2016 (CL-96) |
| **RWE** | *RWE Innogy GmbH & RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability, and Certain Issues of Quantum, dated 30 December 2019 (CL-130) |
| **Saluka** | *Saluka Investments B.V. v. Czech Republic*, UNCITRAL-PCA, Partial Award, dated 17 March 2006 (CL-27) (RL-33) |
| **Sevilla Beheer** | *Sevilla Beheer B.V. and others v. Kingdom of Spain*, ICSID Case No. ARB/16/27, Decision on Jurisdiction, Liability, and Principles of Quantum, dated 11 February 2022 (CL-84) |
| **Silver Ridge** | *Silver Ridge Power BV v. Italy*, ICSID Case No. ARB/15/37, Award, dated 26 February 2021 (CL-47) |
| **SolEs** | *SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38, Award, dated 31 July 2019 (CL-131) |
| **Stadtwerke** | *Stadtwerke Munchen, RWE Innogy GmbH, and others v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, dated 2 December 2019 (CL-86) |
| **SunReserve** | *SunReserve Luxco Holdings SRL v. Italy*, SCC Case No. 132/2016, Award, dated 25 March 2020 (CL-46) |
| **Vattenfall** | *Vattenfall AB et al. v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, dated 31 August 2018 (CL-94) |
| **Vivendi I Annulment** | *Compañia de Aguas del Aconquija S.A. & Vivendi Universal v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, dated 3 July 2002 (CL-123) |
| **Waste Management** | *Waste Management v. United Mexican States*, ICSID Case No. ARB(AF)/00/3, Award, dated 30 April 2004 (CL-28) |
| **Watkins** | *Watkins Holding S.à.r.l. et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/44, Award, dated 21 January 2020 (CL-17) |
| **Yukos** | *Yukos Universal Ltd (Isle of Man) v. Russia*, PCA Case No. 2005/AA227, Interim Award on Jurisdiction and Admissibility, dated 30 November 2009 (CL-144) |

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

# I.   **INTRODUCTION**

1.   This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ["**ICSID**" or the "**Centre**"] on the basis of the Energy Charter Treaty, which entered into force on 16 April 1998 [the "**ECT**" or "**Treaty**"], and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 [the "**ICSID Convention**"].

## 1.   THE PARTIES

2.   The Claimants are Encavis AG ["**Encavis**"], a company organized under the laws of Germany, and a series of companies organized under the laws of Italy, which are owned by Encavis, namely: DE Stern 10 S.r.l., Solar Farm FC1 S.r.l., Solar Farm FC3 S.r.l., Alameda S.r.l., Casette S.r.l., Solar Energy S.r.l., Oetzi S.r.l., Vallone S.r.l., Fano Solar 1 S.r.l., Fano Solar 2 S.r.l., Notaresco Solar S.r.l., Sant'omero Solar S.r.l., Polesine Energy 1 S.r.l., Polesine Energy 2 S.r.l., MTS 4 S.r.l., Sun Time Renewable Energy Di CHORUS Solar 3. S.r.l. & Co. S.A.S., Treponti S.A.S. Di CHORUS Solar S.r.l. & Co. S.A.S., Atlantis Energy Di CHORUS Solar Italia Centrale 5. S.r.l. & Co. S.A.S., Cagli Solar Di CHORUS Solar Italia Centrale 5. S.r.l. & Co. S.A.S., Collecchio Energy S.r.l., Energia & Sviluppo S.r.l., La Rocca Energy Di CHORUS Solar 3. S.r.l. & Co. S.A.S., Le Lame S.r.l., Lux Energy S.r.l., San Giuliano Energy S.r.l., San Martino S.r.l., CHORUS Solar Torino Due S.r.l., CHORUS Solar Torino Uno S.r.l., CHORUS Solar Ternavasso Uno 1 S.r.l., CHORUS Solar Ternavasso Due S.r.l., CHORUS Solar Casarano S.r.l., CHORUS Solar Puglia 3. S.r.l. & Co. Matino S.A.S., CHORUS Solar Nardo S.r.l., CHORUS Solar Foggia Due S.r.l., CHORUS Solar Foggia Tre S.r.l., CHORUS Solar S.r.l. Foggia Quattro S.r.l., CHORUS Solar Foggia Cinque S.r.l., CHORUS Solar Foggia Sei S.r.l., CHORUS Solar Foggia Sette S.r.l., CHORUS Solar Foggia Otto S.r.l., CHORUS Solar Foggia Nove S.r.l., Centrale Fotovoltaica Santa Maria in Piana S.r.l., Centrale Fotovoltaica Treia 1 S.A.S. Di Progetto Marche S.r.l., GE.FIN Energy Oria Division S.r.l., Piemonte Eguzki 2 S.r.l., Piemonte Eguzki 6 S.r.l., Ribaforada 3 S.r.l., Ribaforada 7 S.r.l., Centrale Fotovoltaica Camporota S.r.l., SP 07 S.r.l., SP 09 S.r.l., SP 10 S.r.l., SP 11 S.r.l., SP 13 S.r.l., SP 14 S.r.l., De-Stern 15 S.r.l., De-Stern 1 S.r.l., and De-Stern 4 S.r.l. [together, the "**Claimants**"]. Each of the Claimants is involved in the renewable energy industry.

3.   The Respondent is the Italian Republic ["**Italy**", the "**Republic**" or "**Respondent**"].

4.   Claimants and Respondent are collectively referred to as the "**Parties**". The Parties' representatives and their addresses are listed on page 2 *supra*.

## 2.   THE DISPUTE

5.   This dispute relates to Italy's legal and regulatory framework for development of renewables. It arises out of Italy's 2013 and 2014 amendments to the support scheme that it had previously enacted to incentivize investment in the then emerging renewable energy sector.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

# II. **PROCEDURAL HISTORY**

**1.   REQUEST FOR ARBITRATION**

6.   On 21 September 2020, ICSID received a request for arbitration of the same date from Claimants against Italy [the "**Request for Arbitration**"].

7.   On 6 October 2020, the Secretary-General of ICSID registered the Request for Arbitration in accordance with Art. 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

**2.   CONSTITUTION OF THE ARBITRAL TRIBUNAL**

8.   The Parties agreed to constitute the Tribunal in accordance with Art. 37(2)(a) of the ICSID Convention, as follows: the Tribunal would consist of three arbitrators, one to be appointed by each Party and the third, presiding arbitrator to be appointed by agreement of the Parties.

9.   The Tribunal is composed of:

-     Prof. Juan Fernández-Armesto, a national of Spain, President, appointed by agreement of the Parties;

-     Ms. Wendy Miles, KC, a national of New Zealand, appointed by Claimants; and

-     Mr. Alexis Mourre, a national of France, appointed by Respondent.

10.   On 16 February 2021, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings [the "**Arbitration Rules**"], notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Ms. Ella Rosenberg, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal. On 14 January 2022, ICSID's Secretary-General informed the Parties and the Tribunal that due to a rebalancing of cases, Ms. Anneliese Fleckenstein, ICSID Legal Counsel, would be designated to serve as Secretary of the Tribunal.

**3.   FIRST SESSION**

11.   In accordance with ICSID Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 19 March 2021 by video conference.

12.   Following the first session, on 21 May 2021, the Tribunal issued Procedural Order No. 1 ["**PO 1**"] recording the agreement of the Parties on procedural matters and the decision of the Tribunal on disputed issues. PO 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

procedural language would be English, and that the place of proceeding would be Paris, France. PO 1 also sets out the agreed schedule for the jurisdictional and merits phase of the proceedings.

13. In accordance with PO 1, on 21 May 2021, after considering the Parties' comments to the draft Procedural Order No. 2 circulated by the Tribunal to the Parties, the Tribunal issued Procedural Order No. 2 setting out specific instructions on the production of documents.

## 4.    MAIN SUBMISSIONS

### A.    Claimants' Memorial

14. On 20 July 2021, Claimants filed a Memorial on the Merits ["**C-I**"], together with:

- The witness statement of Mr. Martin Scharrer ["**Scharrer I**"];

- Exhibits C-10 through C-687;

- Legal authorities CL-3 through CL-82; and

- The expert reports of Dr. Fabien Roques of Compass Lexecon ["**Roques I**"] (with Exhibits FR-1 through FR-110) and Mr. Richard Edwards of FTI Consulting ["**Edwards I**"] (with Exhibits RE-1 through RE-160 and Appendix 6).

### B.    Respondent's Counter-Memorial

15. On 15 November 2021, Respondent filed a Memorial on Jurisdiction and Counter-Memorial on the Merits ["**R-I**"], together with:

- The witness statements of Mr. Daniele Bacchiocchi ["**Bacchiocchi I**"] and Mr. Luca Miraglia ["**Miraglia I**"];

- Exhibits R-1 through R-30;

- Legal authorities RL-1 through RL-50; and

- The expert reports of Prof. Avv. Anna Romano ["**Romano I**"] (with Exhibits 1 through 16) and of the Department of Law and Economics of Production Activities of Sapienza University of Rome ["**Sapienza I**"].

### C.    Claimants' Reply

16. On 27 April 2022, Claimants filed a Counter-Memorial on Jurisdiction and a Reply on the Merits ["**C-II**"], together with:

- The second witness statement of Mr. Martin Scharrer ["**Scharrer II**"];

- Exhibits C-688 through C-881;

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

- Legal authorities CL-83 through CL-178; and

- The second expert reports of Dr. Fabien Roques of Compass Lexecon ["**Roques II**"] (with Exhibits FR-111 through FR-194 and Appendixes D, F and G) and of Mr. Richard Edwards of FTI Consulting ["**Edwards II**"] (with Exhibits RE-161 through RE-194 and Appendix 7).

### D.    Respondent's Rejoinder

17. On 22 July 2022, Respondent filed a Reply on Jurisdiction and a Rejoinder on the Merits ["**R-II**"], together with:

- The second witness statements of Mr. Daniele Bacchiocchi ["**Bacchiocchi II**"] and Mr. Luca Miraglia ["**Miraglia II**"] (with Annexes 1 through 8);

- Exhibits R-31 through R-45;

- Legal authorities RL-51 through RL-62; and

- The second expert report of the Department of Law and Economics of Production Activities of Sapienza University of Rome ["**Sapienza II**"] (with Exhibits 1 through 7).

### E.    Claimants' Rejoinder

18. On 5 September 2022, Claimants filed a Rejoinder on Jurisdiction ["**C-III**"], together with:

- Exhibits C-883 through C-916; and

- Legal authorities CL-190 through CL-222.

### 5.    EUROPEAN COMMISSION'S APPLICATION

19. On 11 May 2022 the Tribunal received the European Commission's Application for Leave to Intervene as Non-Disputing Party [the "**Commission's Application**"]. On 12 May 2022 the Tribunal granted the Parties the opportunity to file comments to the Commission's Application.

20. On 26 May 2022 the Tribunal received Claimants' Response to the European Commission's Application and Respondent's Position on the European Commission's Application.

21. On 15 June 2022 the Tribunal issued its Decision on the Commission's Application, deciding:

- To grant the Commission's request for leave to file a written submission as a non-disputing party on the European Union ["**EU**"] law issues concerning the Tribunal's jurisdiction, to focus solely on the Respondent's intra-EU objection;

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

- To set the date for the Commission's submission to 1 July 2022;

- To reject the Commission's request to access the case file, subject to the possibility of accessing the Parties' main written submissions and requesting specific documents in the future;

- To reject, *pro tem*, the Commission's request to attend and present oral arguments at the hearing;

- To reject, *pro tem*, Claimants' request to order the Commission to bear the costs associated with its participation in this arbitration.

22.    As instructed by the Tribunal, on 1 July 2022 the Commission filed a written submission as a non-disputing party ["***Amicus Curiae* Brief**" or "**EU-Brief**"].

## 6.    <u>HEARING</u>

23.    As agreed, and recorded in PO 1, the evidentiary hearing was scheduled to take place at the World Bank Conference Centre in Paris, France. However, on 28 April 2022, the Parties were informed that the Centre would not be available in October 2022 due to major renovations. After exploring alternative venues with the Parties, the Tribunal confirmed on 15 June 2022 that the hearing would take place at the facilities of the International Dispute Resolution Centre ["**IDRC**"] in London.

24.    On 24 August 2022, the Tribunal circulated to the Parties draft Procedural Order No. 3 regarding the organization of the hearing for the Parties to discuss and confer, and to revert to the Tribunal with their comments. On 9 September 2022, the Parties submitted their comments to the draft. Given the Parties' agreements and that there were no outstanding procedural or administrative matters in preparation for the hearing, the Tribunal saw no need to organize a pre-hearing meeting.

25.    On 15 September 2022 the Tribunal issued Procedural Order No. 3 regarding the organization of the hearing. The hearing on jurisdiction and merits was held at the IDRC in London, England from 10 to 13 October 2022 [the "**Hearing**"]. In addition to the Members of the Tribunal, the Secretary of the Tribunal and the Assistant to the Tribunal, the following persons were present at the Hearing:

<u>For Claimants:</u>
| | |
|---|---|
| Mr. Kenneth Fleuriet | King & Spalding |
| Mr. Kevin Mohr | King & Spalding |
| Mr. Christopher Smith | King & Spalding |
| Ms. Violeta Valicenti | King & Spalding |
| Ms. Natalie Grüber | Encavis AG |

<u>For Respondent:</u>
| | |
|---|---|
| Mr. Pietro Garofoli | Avvocatura dello Stato |
| Prof. Maria Chiara Malaguti | Ministry of Foreign Affairs |
| Prof. Ludovica Chiussi Curzi | Avvocatura dello Stato |
| Ms. Laura Delbono | Avvocatura dello Stato |
| Mr. Gaia Iappelli | Avvocatura dello Stato |

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| | |
|---|---|
| Ms. Linda Paglierani – trainee | Avvocatura dello Stato |
| Ms. Greta Grasso – trainee | Avvocatura dello Stato |
| Mr. Valerio Venturi | GSE |
| Mr. Paolo Berisio | GSE |
| Prof. Michele Galeotti | Sapienza University |
| Prof. Paola Paoloni | Sapienza University |
| Prof. Gianluca Vagnani | Sapienza University |
| | |
| *Court Reporters:* | |
| Ms. Diana Burden | English Court Reporter |
| Ms. Laurie Carlisle | English Court Reporter |
| | |
| *Interpreters:* | |
| Ms. Francisca Geddes | English/Italian Interpreter |
| Ms. Daniela Ascoli | English/Italian Interpreter |
| Ms. Monica Robiglio | English/Italian Interpreter |

26.    During the Hearing, the following persons were examined:

| | |
|---|---|
| *On behalf of Claimants:* | |
| *Witness* | |
| Mr. Martin Scharrer | Encavis AG |
| *Experts* | |
| Dr. Fabien Roques | Compass Lexecon |
| Mr. Richard Edwards | FTI |
| | |
| *On behalf of Respondent:* | |
| *Witnesses* | |
| Mr. Daniele Bacchiocchi | GSE |
| Mr. Luca Miraglia | GSE |
| *Expert* | |
| Prof. Corrado Gatti | Sapienza University |

**7.    POST-HEARING PHASE**

27.    As agreed during the Hearing, on 24 October 2022, the Tribunal sent a list of questions to the Parties to be answered in their respective Post-Hearing Briefs.

28.    After two agreed extensions by the Parties, the Parties filed simultaneous post-hearing briefs ["**C-PHB**" and "**R-PHB**"] on 28 November 2022.

29.    The Parties filed their statements of costs on 18 January 2023.

30.    The proceeding was closed on 4 March 2024.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

# III.  FACTS

31.  Encavis is an investment fund registered in Hamburg, Germany[1]. Previously named Capital Stage AG ["**Capital Stage**"], it merged with another German company called CHORUS Solar GmbH & Co. KG in August 2016 ["**CHORUS**"] and was later renamed Encavis[2]. Encavis owns all the remaining 58 Claimants[3], which are all local Italian operating companies owning one or more photovoltaic plants in Italy[4].

32.  The present dispute relates to the support scheme for photovoltaic power plants adopted by Italy as part of its efforts to meet the targets for energy produced from renewable sources set at the level of the European Union ["**EU**"]. Claimants contend that between 2009 and 2013 they invested in 78 photovoltaic plants[5], each enrolled in the support scheme. According to Claimants, in 2013 and 2014 Italy adopted a series of measures modifying the original support scheme and negatively impacting Claimants' investments.

33.  The general background of this case is not disputed. The Parties have prepared a joint regulatory chronology[6], which serves as the basis of the present section. In the jurisdiction and liability sections the Tribunal will delve into the contested facts (including with regards to the timing of Claimants' investments[7]), as relevant.

**1.   ITALY'S RENEWABLE ENERGY COMMITMENTS**

34.  Since the 1980s, Italy – a country located in Southern Europe and one of the founding members of the EU – has been committed to developing renewable energy sources ["**RES**"] as an alternative to fossil fuels. In May 1982, Italy passed Law No. 308 to establish that the use of RES was a matter of public interest[8]. Six years later, Italy adopted its 1988 National Energy Plan, recognizing the potential of RES to help Italy[9]:

-    Achieve energy independence; and

-    Meet the country's goals of safeguarding the environment, developing domestic resources, and enhancing the competitiveness of the domestic industry.

---

[1] Parties' Pre-Hearing Joint Submission – *Dramatis Personae*, p. 7; Doc. C-1.

[2] Parties' Pre-Hearing Joint Submission – *Dramatis Personae*, p. 7.

[3] Encavis Annual Report for 2018, pp. 150-154 (Exhibit 7 to Sapienza II); Parties' Pre-Hearing Joint Submission – *Dramatis Personae*, p. 7.

[4] Parties' Pre-Hearing Joint Submission – *Dramatis Personae*, p. 7; C-I, paras. 26-27; C-PHB, para. 73.

[5] C-I, para. 19; Roques II, Table 4; CD-3, p. 3. Claimants refer to 78 PV plants, even though the *Dramatis Personae* only seems to list 75 PV plants.

[6] Parties' Pre-Hearing Joint Submission – Regulatory Chronology.

[7] See section VI.2 *infra* and Annex to this Award.

[8] Doc. C-13, Art. 1.

[9] Docs. C-14 and C-15.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

35. Keeping with its decision to invest in RES, in 1991 Italy promulgated Law No. 9, guaranteeing that all RES facilities would benefit from competitive pricing[10].

### A.    The 1992 United National Framework Convention on Climate Change

36. On 5 June 1992 Italy signed the United Nations Framework Convention on Climate Change ["**UNFCCC**"], together with 153 other nations, in Rio de Janeiro, Brazil. The UNFCCC entered into force in Italy on 15 April 1994[11].

37. Among other things, the UNFCCC recognized the need for developed countries to take immediate action in a flexible manner on the basis of clear priorities, as a first step towards comprehensive response strategies at the global, national and, where agreed, regional levels to take into account all greenhouse gases, with due enhancement of the greenhouse effect.

### B.    The 1994 Energy Charter Treaty

38. In December 1994 the ECT was signed and it entered into force in April 1996. Both Italy and the EU are signatories.

39. The ECT recitals, among other things, recalled the UNFCCC and other international environmental agreements with energy-related aspects, and recognized[12]:

> "[…] the increasingly urgent need for measures to protect the environment, including the decommissioning of energy installations and waste disposal, and for internationally-agreed objectives and criteria for these purposes."

### C.    The 1996 EU Directive

40. In 1996 the European Parliament and Council adopted Directive 96/92/EC [the "**1996 EU Directive**"], which established rules for a common electricity market and required EU member States [the "**Member States**"] to take measures to liberalize their electricity systems. Furthermore, the 1996 Directive highlighted that "for reasons of environmental protection, priority may be given to the production of electricity from renewable sources"[13].

41. EU Directives are binding on the Member States they address, as to the result to be achieved. It is for the Member State national legislature to determine the form and method of achieving the result through its own municipal law.

### D.    The UNFCCC Kyoto Protocol

42. In 1998, Italy and 83 other States signed the Kyoto Protocol, an international treaty within the UNFCCC that imposed national targets on developed countries to reduce greenhouse gas emissions within their territories. In response, Italy committed to

---

[10] Doc. C-16.
[11] Information available at: https://unfccc.int/process-and-meetings/what-is-the-united-nations-framework-convention-on-climate-change (last consulted on: 4 March 2024).
[12] Doc. CL-1, Preamble, p. 39.
[13] Doc. C-23.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

reduce its $CO_2$ emissions by 8% by the end of 2012. Italy's *Agenzia nazionale per le nuove tecnologie, l'energia e lo sviluppo economico sostenibile* ["**ENEA**"] issued the "White Paper for the Development of Renewable Energy Sources", identifying Italy's goals to reduce greenhouse gas emissions through each renewable source[14].

### E.    The 1999 Italian Legislative Decree

43.    In March 1999, Italy passed Legislative Decree No. 79, which, in accordance with the 1996 Directive, provided that RES plants would enjoy priority access to the country's electricity grid[15]. RES producers were required to execute off-take agreements with the *Gestore della Rete di Trasmissione Nazionale SpA*, a State-owned company (predecessor of the *Gestore dei Servizi Energetici* ["**GSE**"])[16].

44.    Legislative Decree No. 79/1999 implemented both the 1996 EU Directive and the Kyoto Protocol in Italian municipal law.

### F.    The 2001 EU Directive

45.    In September 2001 the European Parliament and Council enacted Directive 2001/77/EC [the "**2001 EU Directive**"] to establish an EU plan to promote the production of electricity from RES and to meet the international targets set by the Kyoto Protocol[17]. In its Directive, the EU expressly recognized that new renewable energy producers would have difficulty competing with fossil fuel energy generators and initially would need incentives to enter into new renewable markets[18].

46.    Under the 2001 EU Directive, Italy's target was to have 25% of its total energy consumption produced from RES by 2010[19]. On 1 March 2002 the Italian Parliament enacted Law No. 29/2002, instructing the Government to issue one or more legislative decrees granting additional incentives for RES within the next 18 months[20].

### G.    The 2003 Italian Legislative Decree

47.    On 29 December 2003 the Italian Government enacted Legislative Decree No. 387 [the "**2003 Legislative Decree**"], on the promotion of electricity produced from RES[21]. The 2003 Legislative Decree implemented the 2001 EU Directive for the Italian market.

48.    By the early 2000s, Italy's main source of renewable energy was hydropower. Italian hydropower had little margin for further growth as the best locations were

---

[14] Doc. C-25.
[15] Doc. C-27. See also Roques I, para. 5.32.
[16] Doc. C-27.
[17] Doc. C-28.
[18] Doc. C-28, Recitals 12-19; Roques I, para. 4.40.
[19] Doc. C-28, Annex.
[20] Parties' Pre-Hearing Joint Submission – Regulatory Chronology, p. 1. Law No. 29/2002 is not on the record of the arbitration.
[21] Doc. C-31.

already exploited[22]. To meet the 2001 EU Directive targets, Italy needed to generate investment opportunities from non-hydropower technologies, which at the time were less established, including wind, biomass and solar energy[23]. The approach was to create additional incentives to attract investment and support growth for new RES in Italy, decreasing over time as the new RES became more competitive and less reliant on government support.

49.  Therefore, the 2003 Italian Legislative Decree, *inter alia*, directed the Italian Ministries of Economic Development[24] and Environment to define criteria to incentivize the production of electricity from new RES in the form of solar energy. In particular, Art. 7.2(d) of the 2003 Legislative Decree provided that, for new RES from solar energy, the Ministerial Decrees should[25]:

> "[…] foresee a specific incentive tariff, [in a] decreasing amount and [for a] duration [so] as to ensure fair remuneration of investment and operating costs."

50.  As will be seen in the following sections, in order to implement Art. 7.2(d), the Italian Government enacted a series of Ministerial Decrees – which became known as the "Conto Program" – defining a range of incentive tariffs to be granted to eligible photovoltaic ["**PV**"] power plants, which would decrease over time[26].

51.  In addition to incentives, the Italian Government recognized that grid connection and permitting were critical for attracting and growing new RESs. Therefore, it additionally created an "off-take regime" (also known as "*ritiro dedicato*"), pursuant to which the grid operator to which a RES facility was connected had to purchase the electricity injected into the grid, provided that such facility was "not in a condition to participate in the market" due to high costs and technological immaturity[27].

52.  Italy placed the Italian *Autorità per l'Energia Elettrica e il Gas* [the "**AEEG**"][28] regulatory authority in charge of the incentive schemes, requiring it to establish the rules for the off-take regime, taking into account the "economic conditions of the market"[29] and, in turn, appointed the GSE to manage the different mechanisms and to deal with the operators[30].

---

[22] Doc. C-183, pp. 8, 32-35; Roques I, para. 3.28; HT, Day 1, p. 16, ll. 5-20.

[23] Roques I, para. 3.28.

[24] At the time called *Ministero delle Attivitá Produvite* (or "Ministry of Productive Activities").

[25] Doc. C-31, English translation, p. 2. The Tribunal has complemented the translation of Doc. C-31 on the basis of Doc. C-59, English translation, p. 1 and Doc. C-139, English translation, p. 1.

[26] Roques I, para. 1.9.

[27] Doc. C-31, Arts. 13(3) and (4); Parties' Pre-Hearing Joint Submission – Regulatory Chronology, p. 2; Roques I, para. 5.8; Doc. FR-48.

[28] Since January 2018, the AEEG is called is called *Autorità di Regolazione per Energia Reti e Ambiente* (or ARERA) (Roques I, fn. 87).

[29] Doc. C-31, Art. 13(3).

[30] Roques I, paras. 5.6-5.7; R-I, para. 232.

2.   **ITALY'S IMPLEMENTATION OF THE 2001 EU DIRECTIVE (*CONTI* I-II AND MGP)**

53.   Pursuant to the 2001 EU Directive, the EU granted Member States broad discretion to determine the form and method by which they met their national RES targets[31] (as did the Kyoto Protocol). Italy determined that it would stimulate investment in RES PV power plants by granting eligible plants price-based market incentives, namely feed-in tariffs ["**FiT**"] and feed-in premia ["**FiP**"][32]:

-   In the case of FiT, RES producers receive a fixed price for the production of electricity, which is defined *ex ante* and applies over a predetermined period, irrespective of the price of electricity on the wholesale market;

-   In the case of FiP, RES producers receive a payment (a premium) that is defined *ex ante*, in addition to the wholesale market price[33].

54.   Between 2005 and 2012, Italy enacted five successive Ministerial Decrees[34] [each known as "*Conto Energia*" and in plural "*Conti*"] to promote the production of electricity by PV power plants [the "***Conto* Program**"][35]. These five Decrees granted an incentive payment for each kilowatt hour ["**kWh**"] of electricity produced by eligible PV plants, for a period of 20 years, via essentially three mechanisms[36]:

-   A fixed FiP, *i.e.*, the PV plant received a payment per unit of electricity produced, in addition to the wholesale price of electricity (under *Conti* I to IV);

-   An "all-inclusive tariff" (which is essentially a FiT), where the PV plant received a fixed amount per unit of electricity produced (applicable to certain plants in *Conto* V); and

-   A floating FiP, where the incentive was calculated as the difference between the all-inclusive tariff and the actual national wholesale market price at which the PV plant sold its electricity (introduced by *Conto* V for plants above 1 MW).

55.   A PV operator wishing to benefit from the *Conto* Program had to make an application. To qualify, the PV plant had to be built and connected to the grid by a specific deadline or before a certain capacity cap was reached, which varied between each *Conti*. The GSE then confirmed the incentive tariff rate which the PV

---

[31] According to Dr. Roques, there are broadly four categories of incentives: price-based market instruments (including feed-in tariffs and price premia), quantity-based market instruments (including green certificates), tendering procedures and fiscal incentives (see Roques I, para. 4.40).

[32] Roques I, paras. 4.40; Doc. FR-12, pp. 4-5.

[33] Dr. Roques explains that *Conti* I to IV established a fixed FiP, while *Conto* V established a floating FiP (Roques I, fn. 65).

[34] The five Ministerial Decrees were issued by the Ministry of Economic Development (named *Ministero delle Attivitá Produvite* until 2006, *Ministero dello Sviluppo Economico* between 2006 and 2022, and currently *Ministero delle imprese e del made in Italy*) jointly with the Ministry of Environment (*Ministero dell'Ambiente e della Tutela del Territorio e del Mare*).

[35] Roques I, para. 5.15.

[36] Roques I, para. 5.23.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

plant was entitled to receive for 20 years. From the outset, the *Conto* Program was designed to provide higher incentives to first movers and to decrease over time as the market matured[37].

56. In addition, recognizing the role of smaller investments in the establishment of PV power plant RES, the Italian government also introduced a minimum price guarantee for smaller producers.

## A.   *Conto* I (July 2005 – amended in February 2006)

57. On 28 July 2005 Italy passed the first Ministerial Decree that defined the initial tariff incentive program applicable to electricity generated by PV plants ["***Conto* I**"][38]. *Conto* I provided that, starting from the date they were connected to the grid, eligible PV plants would have the right ("*diritto*") to receive an incentive tariff for a 20-year period[39].

58. To benefit from the program, PV plants had to make an application detailing their characteristics, after which the responsible authority would confirm the tariff rate to which they were entitled[40]. Eligible plants would be entitled to a tariff rate per kWh of electricity produced, <u>plus</u> whatever sale price they could obtain on the electricity market. The tariff rates – which were indexed to the consumer price index[41] – for PV plants connected to the electricity grid between 2005 and 2006 were as follows[42]:

- EUR 0.445/kWh for plants between 1 kW and 20 kW[43];

- EUR 0.460/kWh for plants between 20 kW and 50 kW[44]; and

- EUR 0.490/kWh for plants between 50 kW and 1 MW[45].

59. From 2007 onwards, the value of the incentive tariff was reduced by 2% per year[46].

60. Initially, the scheme aimed to attract a maximum of 100 MW of installed solar capacity[47]. In February 2006, Italy amended *Conto* I to increase the maximum capacity threshold to 500 MW[48].

---

[37] Doc. C-31, Art. 7.2(d).
[38] Doc. C-34. Conto I was later amended on 6 February 2006 (Doc. C-35).
[39] Doc. C-34, Art. 5(2) and Art. 6(2).
[40] Doc. C-34, Art. 7.
[41] Doc. C-34, Art. 6(6).
[42] Doc. C-34. See also Roques I, para. 5.25.
[43] Doc. C-34, Art. 5(2)(a).
[44] Doc. C-34, Art. 6(2).
[45] Doc. C-34, Art. 6(3).
[46] Doc. C-34, Art. 5(2)(b) and Art. 6(2).
[47] Doc. C-34, Art. 12(1); Roques I, para. 5.25.
[48] Doc. C-35, Art. 2(1); Roques I, para. 5.25.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

61.    None of Claimants' plants was established under *Conto* I[49].

**B.    *Conto* II (February 2007)**

62.    On 19 February 2007, once the (extended) maximum capacity threshold was reached under *Conto* I[50], Italy enacted the second Ministerial Decree regarding the tariff incentive program for PV generated electricity ["***Conto* II**"][51]. *Conto* II acknowledged that the tariff scheme adopted in *Conto* I was complex and gave place to "excessive imbalances in favour of the realization of large-scale land constructed plants"[52]. Therefore, *Conto* II improved the tariff scheme, to make it more stable and durable[53].

63.    Under *Conto* II, PV plants that qualified for the new tariff scheme, and were connected to the grid after 13 April 2007, would have the right ("*diritto*") to an incentive tariff for a 20-year period starting from the date of the plant's connection to the grid[54]:

> "The tariff […] is awarded for a period of twenty years commencing from the date of entry into operation of the plant and shall remain constant in current currency for the entire twenty year period."

64.    The tariff rate varied depending on the PV plant's date of entry into operation and installed capacity[55]:

-    Plants entering into operation from mid-April 2007 to 31 December 2008 received a FiP ranging between EUR 0.360/kWh and EUR 0.400/kWh (depending on the plant's installed capacity), not indexed to inflation;

-    Plants entering into operation between 1 January 2009 and 31 December 2010, saw the FiP reduced by 2% for each calendar year subsequent to 2008; this reduced amount was paid for 20 years, without indexation to inflation.

65.    *Conto* II was initially intended to attract a maximum 1,200 MW of additional installed capacity[56]. However, as will be seen in para. 80 *infra*, the connection date was extended to 30 June 2011[57], ultimately increasing the total additional capacity installed under *Conto* II to 6,791 MW[58].

---

[49] See Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022. See also Annex to this Award.
[50] HT, Day 1, p. 29, ll. 16-19.
[51] Doc. C-59.
[52] Doc. C-59, p. 2 (Considering).
[53] Doc. C-59, p. 2 (Considering).
[54] Doc. C-59, Art. 6(1) and 6(2).
[55] Doc. C-59, Art. 6; Roques I, para. 5.26.
[56] Doc. C-59, Art. 13(1).
[57] Doc. C-63; Roques I, para. 5.26.
[58] Doc. FR-110, Figure 18; Roques I, para. 5.26.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

66. 24 Claimants registered PV plants under the *Conto* II regime, all of which entered into operation between September 2010 and June 2011[59].

67. As to the procedure for qualification, in order to benefit from the incentive tariff under *Conto* II the following steps were required:

   - A prospective plant operator would submit a preliminary project proposal to the grid manager ("*gestore di rete*")[60];

   - Upon completing construction works, the operator would notify the grid manager for connection;

   - 60 days after connection – the entry into operation of the plant – the operator would request the incentive tariff, providing all necessary documentation, to the implementing body ("*soggetto attuatore*")[61] *i.e.*, the GSE; and

   - The GSE then had 60 days to notify the plant operator of its awarded tariff[62].

68. Therefore, any eligible PV plant received an official communication ("*comunicazione della tariffa incentivante*") from the GSE, confirming the incentive tariff to which the plant would be entitled for a 20-year period starting from the date of its entry into operation [the "**Tariff Confirmation Letter**"][63].

69. To obtain the tariff payment, the plant operator was required to subscribe an agreement ("*convenzione per il riconoscimento delle tariffe incentivanti*") with the GSE [the "***Convenzione***" or in plural "*Convenzioni*"][64]. The *Convenzione* recognized the plant's right to benefit from a tariff incentive for a period of 20 years from the date of entry into operation[65], and defined the method of payment of the tariff incentive[66]. In addition, the *Convenzione* had a dispute resolution clause, providing for the exclusive competence of the Roman jurisdiction ("*Foro di Roma*")[67].

70. This same process of qualification, with Tariff Confirmation Letters and *Convenzioni*, continued to apply under subsequent *Conti*[68].

---

[59] Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022, pp. 1-9. See also Annex to this Award.
[60] Doc. C-59, Art. 5(1).
[61] Doc. C-59, Art. 5(3) and (4).
[62] Doc. C-59, Art. 5(5).
[63] See, e.g., Doc. C-222, with the Tariff Confirmation Letter obtained by the Caputo Alessandro 1 plant (owned by Claimant CHORUS Solar Foggia Due S.r.l.).
[64] The Tariff Confirmation Letter required the signature of a *Convenzione* (see, e.g., Doc. C-222, the Tariff Confirmation Letter of the Caputo Alessandro 1 plant). See, e.g., Doc. C-640 for the *Convenzione* signed between the GSE and Claimant CHORUS Solar Foggia Due S.r.l. for the Caputo Alessandro 1 plant.
[65] See, e.g., Doc. C-640, Art. 2.
[66] See, e.g., Doc. C-640, Art. 3.
[67] See, e.g., Doc. C-640, Art. 9.
[68] Albeit with modifications in the content of the *Convenzioni*, which will be discussed in the merits section.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

## C.    Minimum Guaranteed Price regime (November 2007)

71.    In addition to the *Conto* Program, Italy established a complementary support scheme for PV plants with less than 1 MW capacity: the "**Minimum Guaranteed Price**"[69] [or "**MGP**"]. Under this regime, PV plants with less than 1 MW were provided with a MGP, which was set by the AEEG annually. It was anticipated in the 2003 Legislative Decree, introduced by Resolution adopted by the AEEG in 2005[70] and formalized by Resolution No. 280/2007 dated 6 November 2007 [the "**MGP Resolution**"], entering into force on that same date[71].

72.    Under the MGP, eligible operators would sign an off-take agreement ("*contratto per il ritiro dell'energia elettrica*") ["***Contratto per il Ritiro***"] with the GSE whereby:

-    The first two million kWh produced would enter the grid[72];

-    The GSE would act as commercial intermediary between the producers and the market;

-    The GSE purchased the electricity that entered the grid at an hourly zonal price ("*prezzo zonale orario*"), determined daily based on negotiations within the Italian Power Exchange (IPEX)[73]; and

-    If at the end of each year, the hourly zonal prices were lower than the MGPs, the GSE committed to pay the difference to producers up to the MGP on up to two million kWh[74].

73.    The *Contratto per il Ritiro* was tacitly renewed annually[75], with the GSE reserving the right to modify it in the event of amendment to the MGP Resolution[76]:

> "*Il GSE si riserva di modificare le clausole del presente Contratto in conformità alle eventuali modifiche ed aggiornamenti apportati alla delibera AEEG 280/07, ferma restando la possibilità per il Produttore di recedere dal presente rapporto contrattuale in conformità a quanto previsto dal precedente Articolo 14.*"

> [Tribunal's informal translation:

> "The GSE reserves the right to amend the clauses of this Contract in accordance with any amendments and updates made to AEEG Resolution No. 280/07, without prejudice to the Producer's right to withdraw from this

---

[69] Doc. C-217, Art. 7: "*Prezzi minimi garantiti*".
[70] Doc. C-216. Italy had charged the AEEG with defining the modalities of the off-take regime in Law No. 239/2004 (Doc. C-215).
[71] Doc. C-217, with reference *inter alia* to Art. 13, para. 3 and 4 of the 2003 Legislative Decree.
[72] See Doc. C-217, Italian version, pp. 5-6.
[73] Doc. C-217.
[74] Doc. C-217, Italian version, Art. 7.4.
[75] See, e.g., Doc. C-229, Art. 13.
[76] See, e.g., Doc. C-229, Art. 16 (Italian version; Claimants have not provided an English version).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

contractual relationship in accordance with the provisions of Article 14 above."]

74. Any dispute arising out of the *Contratto per il Ritiro* was to be resolved in the Roman jurisdiction ("*Foro di Roma*")[77].

75. Most of Claimants' plants qualified for this MGP support regime and executed *Contratti per il Ritiro* with the GSE[78].

**3.    ITALY'S MUNICIPAL RESPONSE TO THE 2009 EU DIRECTIVE**

76. Although by 2009 Italy already had a legal and regulatory framework in place to increase RES, as an EU Member State it was also required to implement any new EU Directives.

**A.    The 2009 EU Directive and Italy's 2010 NREAP**

77. On 23 April 2009 the European Parliament and Council enacted Directive 2009/28/EC [the "**2009 EU Directive**"] on the promotion of the use of energy from RES, amending the 2001 EU Directive[79].

78. The 2009 EU Directive established a new EU-wide target of 20% of total energy gross consumption to be produced from RES by 2020. The 2009 EU Directive:

- Established binding national targets for each Member State, including a mandatory target for Italy of 17% of its total energy consumption from RES by 2020 (up from 5.2% for 2005)[80]; and

- Required each Member State to present a National Renewable Energy Action Plan, setting out the actions that the State proposed to adopt to meet the 2020 target[81].

**B.    Italy's 2010 National Action Plan for RES**

79. In June 2010, Italy finalized its National Action Plan for RES ["**National Plan**"], summarizing the strategy to reach its binding target[82]. In the National Plan, Italy noted that the *Conto* Program[83]:

"[…] is a support scheme which <u>guarantees constant remuneration at current currency values for the electricity produced by plants for a set period of time (20 years for photovoltaic plants</u>, 25 years for solar thermal plants).

---

[77] See, e.g., Doc. C-229, Art. 15.
[78] Parties' Pre-Hearing Joint Submission – *Dramatis Personae*, pp. 7 *et seq.*; Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022. See also Annex to this Award.
[79] Doc. C-123.
[80] Doc. C-123, Art. 1 and Annex I; Roques I, para. 3.22.
[81] Doc. C-123, Art. 4.
[82] Doc. C-137.
[83] Doc. C-137, p. 102.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

Moreover, the scheme is subject to regular adjustments which take into account the trends in the prices of energy products and components for photovoltaic plants as well as the results of monitoring and promoting technology used to create the plants, with the intention of limiting the medium- and long-term costs to the community.

In any case, the incentive tariff paid when the plant becomes operation[al] remains fixed for the whole entitlement period." [Emphasis added]

### C.    The *Salva Alcoa* Decree (July 2010)

80.    By June 2010 Italy had reached the 1,200 MW capacity target under *Conto* II (six months before the 31 December 2010 deadline)[84].

81.    As a consequence, grid operators were inundated with requests for connection submitted by developers of PV plants[85]. To deal with the excessive demand, on 8 July 2010 Italy enacted Law Decree no. 105 [the "***Salva Alcoa* Decree**"], which, *inter alia*[86], extended the availability of the *Conto* II incentives tariffs to all PV plants which would enter into operation before 30 June 2011 (instead of 31 December 2010), *provided* that by 31 December 2010 construction was complete and the competent authorities had been notified[87].

### D.    *Conto* III (August 2010)

82.    Following the completion of *Conto* II, on 6 August 2010, the Italian Government issued the third Ministerial Decree on the tariff incentives program for electricity generated by PV plants ["***Conto* III**"][88]. *Conto* III also expressly stated that qualifying PV plants would have the right ("*diritto*") to receive a specific tariff[89]:

"[…] for a period of 20 years commencing from the operational date of the plant and shall remain constant in current currency for the entire incentive period."

83.    The tariff rate varied depending on the PV plant's date of entry into operation and installed capacity:

---

[84] Doc. C-138.
[85] HT, Day 2, p. 393, l. 24 to p. 394, l. 10 (Mr Mohr: "And the reason the Italian Parliament passed the Salva Alcoa law was because, at that point in time in 2010, the grid manager was running behind schedule connecting PV plants to the grid, isn't that right?" Mr. Miraglia: "It's just partially right, because they were not late with the planned increment increase of connection capacity. They were late with a huge amount of requested capacity that was over—over by multiples factors the feasible capacity that could have been installed onto the grid."). See also HT, Day 2, p. 395, ll. 11-20 (Mr Miraglia: " The truth, in my opinion, is that the investors made a huge pressure on the government in order to change this rule […]. [The government] could […] continued going on with the previous scheduling of Conto II. So the main reason was this huge pressure by the investors to the government in order to get the most profitable tariff […]."
[86] Claimants explain that: "The main purpose of the decree was to assist a struggling aluminum plant in Sardinia owned by Alcoa, hence the name Salva Alcoa ('*save Alcoa*'). The portion of the decree relating to the extension of Conto II for PV plants was unrelated to Alcoa, but simply appended to that decree." (see C-I, fn. 121).
[87] Doc. C-63; Roques I, para. 5.26.
[88] Doc. C-139.
[89] Doc. C-139, Art. 8(2) and (4).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

- Plants entering operation between 1 January 2011 and 31 December 2011 were entitled to receive a FiP ranging between EUR 0.251/kWh and EUR 0.362/kWh (depending on the plant's installed capacity), not indexed to inflation[90];

- Plants entering operation between 2012 and 2013, saw the FiP reduced by 6% for each calendar year after 2011, without indexation to inflation[91].

84. *Conto* III provided that the maximum capacity of additional PV plants that could benefit from it was 3,000 MW[92]. However, as a consequence of the subsequent *Romani* Decree, this decreased to 1,567 MW (1,433 MW less than originally envisioned)[93].

85. Nine Claimants registered PV plants that entered into operation between April and 31 May 2011, and benefitted from the *Conto* III regime[94].

### E.    The *Romani* Decree (March 2011)

86. Prior to the completion of *Conto* III, on 3 March 2011 Italy implemented the 2009 Directive by enacting Legislative Decree No. 28 [the "***Romani* Decree**"][95]. The *Romani* Decree instructed the Italian Ministries of Economic Development and Environment to issue revised incentive schemes for PV plants which would be connected to the grid after 31 May 2011.

87. The *Romani* Decree applied to PV plants that came into operation from 31 May 2011, distinguishing those dating from *before* 31 December 2012[96] from those dating *after*[97] 31 December 2012. It limited the application of *Conto* III to plants that entered into operation by 31 May 2011 (with a three-month grace period for plants that were already in the process of construction)[98], and substantially reduced the total additional capacity originally included under *Conto* III.

88. In particular, for PV plants that entered in operation after 31 May 2011 and prior to 31 December 2012, the *Romani* Decree specifically established that the Ministries of Economic Development and Environment would adopt a new incentives scheme, on the basis of the following principles[99]:

---

[90] Doc. C-139, Art. 8(2).
[91] Doc. C-139, Art. 8(2).
[92] Doc. C-139, Art. 3(1) and (2).
[93] Roques I, para. 5.27.
[94] Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022, pp. 10-13. See also Annex to this Award.
[95] Doc. C-163.
[96] Doc. C-163, Art. 25(1): "The production of electricity from plants powered by renewable sources, which came into operation by December 31, 2012, is incentivized with the mechanisms in force on the date of entry into force of this decree, with the corrections set forth in the following paragraphs."
[97] Doc. C-163, Art. 24(1): "The production of electricity from plants powered by renewable sources that came into operation after December 31, 2012 shall be incentivized through the tools and on the basis of the general criteria in paragraph 2 and the specific criteria in paragraphs 3 and 4."
[98] CD-1, slide 49.
[99] Doc. C-163, Art. 25(10).

"a) <u>determination of a cumulative annual electric capacity limit</u> of photovoltaic power plants that can obtain the incentive tariffs;

b) <u>determination of the incentive tariffs taking into account the reduction of technological and installation costs</u> and the incentives applied in the Member States of the European Union;

c) prediction of incentive tariffs and differentiated quotas on the basis of the nature of the site area;

d) application of the provisions of Article 7 of [the 2003] Legislative Decree […], insofar as they are compatible with this paragraph." [Emphasis added]

89.    For PV plants that entered into operation *after* 31 December 2012, the *Romani* Decree provided that the production of electricity should be incentivized on the basis of the following criteria[100]:

"a) The incentive has the purpose of ensuring a <u>fair remuneration of the investment and operational costs;</u>

b) The period for which a right to the incentive is given is equal to the average conventional useful life of the specific type of power plant and runs from the start-up date of the same;

c) The <u>incentive remains constant for the entire period for which the right to the incentive is given</u> and can take into account the economic value of the energy produced;

d) <u>The incentives are assigned by means of private law contracts between GSE and the party who is responsible for the power plant</u>, on the basis of a model contract defined by the [AEEG], within three months of the date of effectiveness of the first of the decrees [referred] in paragraph 5." [Emphasis added]

F.    <u>*Conto* IV (May 2011)</u>

90.    In accordance with the *Romani* Decree, on 5 May 2011 the Ministry of Economic Development, together with the Ministry of Environment, adopted a fourth *Conto* under the existing *Conto* Program, ["***Conto* IV**"][101]. *Conto* IV applied to PV plants that entered into operation after 31 May 2011, but before 31 December 2016[102]. The preamble of *Conto* IV set out the intention to introduce a progressive reduction in tariffs going forward, in order to reflect the establishment and growth of the Italian PV market[103]:

"It being held that promotion of the production of electricity by solar photovoltaic plants operational <u>subsequent to 31 May 2011 must be implemented by means of a progressive reduction in tariffs which both intends to achieve gradual alignment of the public incentive with the current cost of</u>

---

[100] Doc. C-163, Art. 24(1) and (2).
[101] Doc. C-166.
[102] Doc. C-166, Art. 1(2).
[103] Doc. C-166, p. 3.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

technologies, in line with policies adopted in the principal European States, whilst maintaining market stability and certainty;

Considering that, due to developments in technology costs, it is predicted that within a few years grid parity will be achieved, or rather photovoltaic electricity will be levelised in cost with electricity available on the grid, for the most efficient installations, which leads to the belief that it is no longer necessary to maintain a public support scheme commencing from the date of fulfilment of that condition." [Emphasis added]

91.  As in previous *Conti*, *Conto* IV provided that eligible PV plants would be entitled ("*diritto*") to a tariff[104]:

"[…] for a period of twenty years commencing from the operational date of the plant and shall remain constant in current currency for the entire incentive period."

92.  The tariff rate varied depending on the PV plant's date of entry into operation and installed capacity:

- Plants entering into operation between 1 June 2011 and 31 December 2011 were entitled to receive a FiP ranging between EUR 0.172/kWh and EUR 0.344/kWh (depending on the *month* of entry into operation and the plant's installed capacity), not indexed to inflation[105];

- Plants entering into operation between 1 January 2012 and 30 June 2012 were entitled to receive a FiP ranging between EUR 0.148/kWh and EUR 0.240/kWh, whereas those entering into operation between 1 July 2012 and 31 December 2012 were entitled to receive a FiP ranging between EUR 0.133/kWh and EUR 0.221/kWh (depending on the plant's installed capacity)[106];

- Plants entering into operation from 2013 to 2016 would benefit from a decreasing "all-inclusive" FiT, which would be reduced progressively every six months from 2013 to 2016[107].

93.  Finally, the Italian Government envisioned that the *Conto* Program would apply to a total capacity of 23,000 MW, and that its total annual cost would range between EUR 6 billion and EUR 7 billion[108].

94.  19 Claimants registered PV plants that entered into operation between June 2011 and December 2012, and were subject to the *Conto* IV regime[109].

---

[104] Doc. C-166, Art. 12(1) and (2).
[105] Doc. C-166, Annex 5, Tables 1 and 2 ("Other PV plants").
[106] Doc. C-166, Annex 5, Table 3 ("Other PV plants").
[107] Doc. C-166, Annex 5, Tables 4 and 5 ("Other PV plants").
[108] Doc. C-166, Art. 1(2); Roques I, para. 5.28.
[109] Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022, pp. 13-20. See also Annex to this Award.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

### G. *Conto* V (July 2012)

95.    On 5 July 2012 Italy enacted the fifth and final Ministerial Decree regarding the tariff incentives program for electricity generated by PV plants ["***Conto* V**"], in application of Art. 25 of the *Romani* Decree[110]. *Conto* V would become applicable once the total aggregate annual cost of the *Conto* Program reached EUR 6 billion[111]. In the *Conto* Preamble, the Italian Government recognized that[112]:

> "[…] there are significant margins for the reduction of incentives with respect to those paid over past years, in consideration of the levels of incentives in other European countries and typical investment returns;
>
> […] it is necessary to ensure that further deployment of photovoltaics takes place in a manner compatible with the need to control the growth of charges on electricity tariffs and that, for such purpose, it is necessary to define in advance the amount of annual resources earmarked for photovoltaic incentives, thereby establishing a booking system for the incentive by means of enrolment in a specific register." [Emphasis added]

96.    As soon as the total aggregate cost of EUR 6 billion/year was reached, the AEEG was required to publish a resolution and 45 days thereafter the termination provisions of *Conto* V would be triggered[113]. The *Conto* Program benefits would cease to apply once the total aggregate annual cost of the Program had reached EUR 6.7 billion[114]. This meant that the additional incentives granted under *Conto* V could not exceed EUR 700 million per year[115].

97.    The EUR 6 billion threshold was reached in July 2012 and the AEEG issued its resolution on 12 July 2012[116]. By September 2012 *Conto* V became applicable.

98.    Like for previous *Conti*, under *Conto* V the support scheme was awarded[117]:

> "[…] for a period of twenty years commencing from the entry into operation of the plant and shall remain constant in current currency for the entire support period."

99.    The support scheme differed from previous *Conti* in that instead of a system of FiP, the incentives were "all-inclusive" FiT or floating FiP, as follows[118]:

-    Plants applying to the scheme in the second half of 2012 with a capacity less than 1 MW received all-inclusive tariffs ranging between EUR 0.113/kWh

---

[110] Doc. C-195.
[111] Doc. C-195, Art. 1(1).
[112] Doc. C-195, pp. 2-3.
[113] Doc. C-195, Art. 1(2) and (3).
[114] Doc. C-195, Art. 1(5).
[115] Doc. C-195, Preamble, pp. 2-3: "Whereas, due to the high level of charges accrued and the state of and prospects for technologies, it is sufficient to commit a further 700 million €/year approximately in incentive costs, for the purpose of accompanying pv energy in its progress towards competitiveness […]". See also Roques I, para. 5.29.
[116] Doc. FR-68; Roques I, para. 5.28.
[117] Doc. C-195, Art. 5(4).
[118] Doc. C-195, Art. 5 and Annex 5.

and EUR 0.201/kWh (depending on the plant's installed capacity), not indexed to inflation;

- Plants applying to the scheme in the second half of 2012 with a capacity above 1 MW received a floating FiP calculated as the difference (if positive) between the all-inclusive tariff and the actual hourly zonal price;

- Plants entering into operation between the first half of 2013 and the second half of 2014 received lower all-inclusive tariffs or floating FiP (depending on their capacity).

100. Two Claimants registered PV plants that benefitted from the *Conto* V regime[119]. However, Claimants make no claims associated to this regime[120].

\* \* \*

101. The *Conto* Program attracted significant investment into the Italian solar energy market[121]. By June 2013 – less than a year after *Conto* V entered into force – the total aggregate annual cost of the *Conto* Program had reached the EUR 6.7 billion cap[122]. Commensurately, by 2014, Italy was the second largest market in Europe in terms of installed PV capacity[123], with solar PV covering more than 7% of the country's electricity demand[124].

## 4.   THE DISPUTED MEASURES

102. Claimants recognize that since its inception the *Conto* Program and MGP scheme were subject to decreasing adjustments over time, as the market became established and matured. However, Claimants argue that none of those adjustments was to have retroactive effect, and therefore affect plants already in operation[125]. Their claims arise from the alleged retroactive effect of two measures that impacted their investments [the "**Disputed Measures**"][126]:

- <u>First</u>, Italy's December 2013 measure to end the MGPs granted to existing plants (**A.**);

- <u>Second</u>, Italy's June 2014 measure to reduce tariff rates for the remaining period of the 20 year term for existing plants (**B.**).

---

[119] Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022, p. 20.
[120] At the Hearing, Claimants clarified that their claims do not concern plants under the *Conto* V regime, either with respect to the *Spalma-incentivi* Decree or to the MGP Regime; HT, Day 1, p. 44, l. 2 – p. 45, l. 24. See also R-PHB, para. 5.
[121] Roques I, para. 5.47.
[122] Doc. FR-70; Roques I, para. 5.29.
[123] Doc. FR-71, pp. 20 and 23.
[124] Doc. FR-71, pp. 5 and 26.
[125] HT, Day 1, p. 33, l. 18 – p. 34, l. 6; p. 40, ll. 7-10; p. 41, l. 21 – p. 42, l. 19 (Claimants' Opening).
[126] CD-1, slide 8.

## A.    Alteration of Minimum Guaranteed Prices (December 2013)

103. <u>As set out above</u>, in 2007 Italy had established an MGP scheme for the first 2 million kWh produced by PV plants with less than 1 MW capacity: the GSE executed a *Contratto per il rittiro* with the PV producer, undertaking to off-take this amount of electricity at a minimum price, set annually by the AEEG.

104. During its period of operation, from 2008 and 2013[127], the annual MGPs varied between EUR 72.2/MWh and EUR 105/MWh as follows[128]:

| Annual energy purchased | Year 2008 | Year 2009 | Year 2010 | Year 2011 | Year 2012 | Year 2013 |
|---|---|---|---|---|---|---|
| *Photovoltaic energy* | | | | | | |
| | [€/MWh] | [€/MWh] | [€/MWh] | [€/MWh] | [€/MWh] | [€/MWh] |
| up to 3.750 kWh | 98,0 | 101,1 | 101,8 | 103,4 | 102,7 | 105,8 |
| beyond 3.750 kWh e up to 25.000 kWh | 98,0 | 101,1 | 101,8 | 103,4 | 92,4 | 95,2 |
| beyond 25.000 kWh e up to 500.000 kWh | 98,0 | 101,1 | 101,8 | 103,4 | 78,3 | 80,6 |
| beyond 500.000 kWh e up to 1.000.000 kWh | 82,6 | 85,2 | 85,8 | 87,2 | 78,3 | 80,6 |
| beyond 1.000.000 kWh e up to 2.000.000 | 72,2 | 74,5 | 75,0 | 76,2 | 78,3 | 80,6 |

105. On 19 December 2013 the AEEG enacted Resolution No. 618/2013/R/EFR [the "**New MGP Resolution**"], providing that the MGP would be fixed at EUR 38.5/MWh[129], indexed annually to inflation, and limited in volume to the first 1.5 million (reduced from 2 million) kWh produced per year[130].

106. The AEEG subsequently set the MGP for 2014 at EUR 38.9/MWh (including EUR 0.4/MWh to set-off inflation)[131] and for 2015 and 2016 at EUR 39/MWh (with a EUR 0.1/MWh further adjustment for inflation)[132].

107. On 23 December 2013 Italy passed Law Decree No. 145/2013 [the "***Destinazione Italia* Decree**"], which further modified the MGP support scheme[133] to provide that:

  -  PV plants not enrolled in the *Conto* Program, would continue to benefit from the MGP scheme, and be able to sell electricity to GSE at the prices established in the New MGP Resolution; and

  -  PV plants enrolled in the *Conto* Program, would no longer benefit from the MGP support regime, preventing them from selling energy to GSE in excess of the market price.

108. Claimants submit that, in practice, the effect of the *Destinazione Italia* Decree was to abolish the MGPs for facilities benefitting from the *Conto* Program tariffs – virtually all of Claimants' PV facilities[134].

---

[127] Doc. C-218.
[128] Docs. C-609 to C-615.
[129] Doc. C-616, p. 11 and Tabella 1 (Italian version).
[130] Doc. C-616, p. 10 and Tabella 1 (Italian version).
[131] Doc. C-615, p. 2. See also Doc. FR-88.
[132] Docs. C-617 and C-618.
[133] Doc. C-619.
[134] C-I, para. 270.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

## B. The *Spalma-incentivi* Decree

109. Six months later, on 24 June 2014 Italy enacted Law Decree No. 91/2014 (converted into Law No. 116/2014 of 11 August 2014) [the "***Spalma-incentivi Decree***"], which, *inter alia*, purported to "optimize" ("*ottimizzare*") the original tariff scheme[135].

110. Pursuant to Art. 26 of the *Spalma-incentivi* Decree, from 1 January 2015, existing PV plants with a capacity higher than 200 kW[136] were required to elect one of three future tariff options[137]:

- <u>Option A</u>: 17% to 25% tariff reduction over a 24 year period, starting from date of entry into operation;

- <u>Option B</u>: 10% to 31% tariff reduction for a limited period from 2015 to 2019, with the promise of increased tariffs in the remaining years;

- <u>Option C</u>: a "straight cut" tariff reduction of 6% to 8% over the 20-year period; this fixed percentage depended on the PV plant's nominal capacity:

  o  For plants with a nominal capacity between 200 kW and 500 kW, the new tariff was set to be 6% less than the original one;

  o  For plants with a nominal capacity between 500 kW and 900 kW the new tariff was set to be 7% less than the original one; and

  o  For plants with a nominal capacity over 900 kW the new tariff was set to be 8% less than the original one.

111. Italy gave PV generators until 30 November 2014 to elect one of the three options and, absent election, Option C would apply by default[138].

112. The *Spalma-incentivi* Decree also amended the tariff payment modalities: the GSE would no longer pay the tariff on a monthly basis but rather in monthly instalments, amounting to 90% of the PV plant's average monthly production of electricity in the previous year[139].

113. The *Spalma-incentivi* Decree introduced several "safeguards"[140] to mitigate the effects of the tariff reduction:

- The *Cassa Depositi e Prestiti* would provide loans to PV plants suffering from losses or deficits due to the *Spalma-incentivi*[141];

---

[135] Doc. C-624. See also Doc. FR-73.
[136] All of Claimants' PV plants had an installed capacity equal to or higher than 200 kW (Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022).
[137] Doc. C-624, Art. 26(3). See also Roques I, paras. 6.2 to 6.14.
[138] Doc. C-624, Art. 26(3).
[139] Doc. C-624, Art. 26(2).
[140] Parties' Pre-Hearing Joint Submission – Regulatory Chronology, p. 6; R-I, paras. 312 *et seq*.
[141] Doc. C-624, Art. 26(5).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

-    The validity of local authorizations, permits and licenses would be extended to align them with the extended time periods under the *Spalma-incentivi* Decree[142]; and

-    RES producers would be able to sell up to 80% of their incentives to a buyer selected amongst the "primary European financial players"[143].

114. On 16 and 17 October 2014 the Ministry of Economic Development issued two decrees, aimed at implementing the *Spalma-incentivi* Decree[144] [the "**Implementation Decrees**"].

115. On 30 November 2014 Claimants – like most investors[145] – defaulted into Option C as afforded by the *Spalma-incentivi* Decree[146], and the new tariff regime became applicable on 1 January 2015. The majority of Claimants' plants have over 900 kW installed capacity[147], with the consequence that these plants saw their original tariff rates reduced by 8%[148].

## C.   <u>Local remedies</u>

116. Most Claimants pursued domestic claims against the Implementation Decrees and other measures adopted by the GSE pursuant to *Spalma-incentivi* Decree before the Administrative Tribunal for the Lazio Region (Rome)[149], but withdrew these procedures before conclusion[150] (see section V.2.3 *infra*).

117. Other plant operators had also started administrative proceedings against the Implementation Decrees before the Administrative Tribunal for the Lazio Region. Since these actions put in question the compatibility of Art. 26 of the *Spalma-incentivi* Decree with the Italian Constitution, the Administrative Tribunal decided to raise a constitutionality question with the Italian Constitutional Court [the "**Constitutional Court**"].

118. On 24 January 2017 the Constitutional Court released its decision No. 16/2017 of 7 December 2016 ruling that the *Spalma-incentivi* Decree did not represent a violation of the Italian Constitution[151] [the "**Constitutional Court Decision**"].

\* \* \*

119. Three years later, on 8 January 2020 Claimants filed a notice of legal dispute with the Italian Republic on the basis, *inter alia*, of the Disputed Measures, offering to

---

[142] Doc. C-624, Art. 26(6).
[143] Doc. C-624, Art. 26(7) to (12).
[144] Doc. R-15 and Doc. R-16.
[145] R-I, para. 311; CD-1, slide 84.
[146] Parties' Pre-Hearing Joint Submission – Regulatory Chronology, p. 6.
[147] Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022. See also Annex to this Award.
[148] See Edwards I, Table 5-1.
[149] See, e.g., Docs. R-5 to R-9.
[150] C-PHB, para. 5. See also C-II, section II.B.2.a; C-III, section III.B.1.
[151] Doc. R-18. See also R-I, para. 317.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

settle the dispute amicably[152]. On 3 June 2020 Claimants filed a supplementary notice of legal dispute[153]. Given Italy's lack of a positive response to the amicable resolution of the dispute, on 21 September 2020 Claimants filed their Request for Arbitration[154].

---

[152] Doc. C-8.
[153] Doc. C-9.
[154] See Request for Arbitration, para. 78.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

# IV. <u>REQUEST FOR RELIEF</u>

1. <u>CLAIMANTS' REQUEST FOR RELIEF</u>

120. In their Memorial, Reply and Rejoinder on Jurisdiction, Claimants request that the Tribunal grant them an Award containing the following relief[155]:

> "• A declaration that the Tribunal has jurisdiction over this dispute under the ICSID Convention and the Energy Charter Treaty;
>
> • A declaration that Italy has violated the Energy Charter Treaty and international law with respect to Claimants' investments;
>
> • Compensation to Claimants for all damages they have suffered, as set forth in Claimants' submissions and as may be further developed and quantified in the course of this proceeding;
>
> • All costs of this proceeding, including but not limited to Claimants' attorneys' fees and expenses, the fees and expenses of Claimants' experts, and the fees and expenses of the Tribunal and ICSID;
>
> • Pre-award and post-award compound interest at the highest lawful rate from the Date of Assessment until Italy's full and final satisfaction of the Award; and
>
> • Any other relief the Tribunal deems just and proper."

2. <u>RESPONDENT'S REQUEST FOR RELIEF</u>

121. Italy, in turn, asks the Tribunal to[156]:

> "a. Decline jurisdiction to decide, as the ECT does not cover intra-EU disputes.
>
> b. Alternatively, decline jurisdiction over the totality of claims, since the requirement of unconditional consent under Article 26 ECT is not satisfied as the GSE Conventions contain an exclusive jurisdiction clause.
>
> c. In a further alternative, decline jurisdiction over the totality of claims, since the requirement of unconditional consent under Article 26 ECT is not satisfied because Claimants have addressed domestic courts for the same pretenses."

---

[155] C-II, para. 639; C-III, para. 237. See also C-I, para. 428, with minor wording variations.
[156] R-I, para. 662, (a) to (c); R-II, para. 660.

37

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

122. Should the Tribunal decide that it has jurisdiction over the present case, Italy requests that the Tribunal declare, on the merits, that[157]:

> "a. the Respondent did not violate Article 10(1) ECT, first and second sentence, since it did not fail to grant fair and equitable treatment to the Claimants' investment.
>
> b. the Respondent did not violate Article 10(1) ECT, fourth sentence, either, since it always adopted reasonable and non-discriminatory measures to affect The Claimants' investment.
>
> c. Article 10(1) ECT, last sentence (the so-called "umbrella clause") does not apply in the case at stake, or, alternatively, that the Respondent did not violate it neither through statutory or regulatory measures, nor the GSE Conventions.
>
> d. Consequently, declare that no compensation is due."

123. In the event that the Tribunal were to recognize that Claimants' griefs are legitimate Italy requests that the Tribunal declare[158]:

> "[…] that damages were not adequately proved."

124. Finally, Italy asks the Tribunal to[159]:

> "a. declare that both the methods for calculation and the calculation itself of damages proposed by the Claimants are inappropriate and erroneous.
>
> b. Order the Claimants to pay the expenses incurred by the Italian Republic in connection with these proceedings, including professional fees and disbursements."

---

[157] R-I, para. 662, (d) to (g); R-II, para. 661.
[158] R-I, para. 662, (h); R-II, para. 662.
[159] R-I, para. 662, (i) and (j); R-II, para. 663.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

# V.   JURISDICTIONAL OBJECTIONS

125.  One of the issues put before this Tribunal is whether it has jurisdiction over this dispute pursuant to the terms of the ECT and of the ICSID Convention[160].

126.  Art. 26 of the ECT, concerning the settlement of disputes between an investor and a Contracting Party to the ECT, provides, in its relevant part, that[161]:

> "(1) Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.
>
> (2) If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution:
>
> > (a) to the courts or administrative tribunals of the Contracting Party party to the dispute;
> >
> > (b) in accordance with any applicable, previously agreed dispute settlement procedure; or
> >
> > (c) in accordance with the following paragraphs of this Article.
>
> (3)    (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.
>
> > (b) (i) The Contracting Parties listed in Annex ID do not give such unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).
>
> […]
>
> (4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor shall further provide its consent in writing for the dispute to be submitted to:
>
> > (a) (i) The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention; or

---

[160] See Parties' Pre-Hearing Joint Submission – Regulatory Chronology, p. 20. See also R-PHB, para. 4.
[161] Doc. CL-1.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

[…]

(5) (a) The <u>consent given in paragraph (3)</u> together with the <u>written consent of the Investor given pursuant to paragraph (4)</u> shall be considered to <u>satisfy the requirement for</u>:

> (i) <u>written consent of the parties to a dispute for purposes of Chapter II of the ICSID Convention</u> and for purposes of the Additional Facility Rules;

[…]

(6) A tribunal established under paragraph (4) <u>shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law</u>.

(7) An Investor other than a natural person which has the nationality of a Contracting Party party to the dispute on the date of the consent in writing referred to in paragraph (4) and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party, <u>shall for the purpose of article 25(2)(b) of the ICSID Convention be treated as a "national of another Contracting State"</u> and shall for the purpose of article 1(6) of the Additional Facility Rules be treated as a 'national of another State'. […]" [Emphasis added]

127. Art. 25 of the ICSID Convention, in turn, establishes the jurisdiction of the Centre by providing in its relevant part that[162]:

> "(1) The <u>jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State</u> (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) <u>and a national of another Contracting State</u>, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally.
>
> (2) "National of another Contracting State" means:
>
>> (a) any natural person who had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration as well as on the date on which the request was registered pursuant to paragraph (3) of Article 28 or paragraph (3) of Article 36, but does not include any person who on either date also had the nationality of the Contracting State party to the dispute; and
>>
>> (b) any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration and any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the

---

[162] Doc. CL-2.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

parties have agreed should be treated as a national of another
Contracting State for the purposes of this Convention. […]"

128.  Claimants say that pursuant to Art. 26 of the ECT and Art. 25 of the ICSID
Convention there are five basic requirements for jurisdiction[163]:

-    Claimants must be covered "Investors": nationals or companies of a
     Contracting Party to the ECT and of a Contracting State to the ICSID
     Convention;

-    Respondent must be a "Contracting Party" to the ECT and a "Contracting
     State" to the ICSID Convention;

-    The Parties must have consented to ICSID jurisdiction;

-    The dispute must arise out of a covered "Investment"; and

-    The dispute must be a legal dispute concerning an alleged breach of Part III
     of the ECT.

129.  Claimants claim that they meet these requirements in the present case, given that[164]:

-    Claimants are each a protected "Investor of a Contracting Party" to the ECT
     and a "National of another Contracting State" to the ICSID Convention;

-    Italy is a "Contracting Party" to the ECT and a "Contracting State" to the
     ICSID Convention;

-    The Parties consented to ICSID arbitration;

-    Claimants own covered "Investments" under the ECT;

-    This is a legal dispute relating to Part III of the ECT; and

-    Claimants attempted, unsuccessfully, to settle this dispute amicably.

130.  Respondent, however, challenges the Tribunal's jurisdiction on three grounds[165]:

-    <u>First</u>, Italy claims that Claimants cannot be considered as "Investor[s] of
     another Contracting Party" because they do not meet the diversity of
     nationality criterium under Art. 26(1) of the ECT, with the consequence that
     they are not protected investors[166] (**V.1**);

-    <u>Second</u>, Italy argues that the dispute resolution provision contained in the
     *Convenzioni* requires Claimants to submit this dispute to the courts of Rome
     and that, in any case, Claimants are barred from seeking this Tribunal's
     determination of their claims since they triggered the ECT's fork-in-the-road

---

[163] C-I, para. 29.
[164] C-I, paras. 30-57.
[165] R-I, para. 7.
[166] R-I, paras. 30-37; R-II, paras. 267-272; RD-1, slides 4-5.

provision (Art. 26(3)(b) of the ECT) when they submitted the dispute to the Italian courts before commencing this arbitration[167] (**V.2**); and

- <u>Finally</u>, Italy submits that Art. 26 of the ECT does not apply to intra-EU claims such as the present one, that is, claims brought by EU investors against a host State that is an EU Member State[168] (**V.3**).

131. In the following sections, the Tribunal will examine and solve Respondent's jurisdictional objections.

---

[167] R-I, paras. 167-214; R-II, paras. 321-337; RD-1, slides 15-18.
[168] R-I, paras. 38 *et seq.*; R-II, paras. 273-320; RD-1, slides 6-13.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

# V.1. DIVERSITY OF NATIONALITY OBJECTION

132. Art. 26 of the ECT provides a right to arbitrate disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III of the ECT. It is imperative to the Tribunal's jurisdiction that the Investor of a Contracting Party (the Claimants) and the Contracting Party where the investment occurred (the host State Italy) have different nationalities.

## 1. RESPONDENT'S POSITION

133. As the EU is also a party to the ECT, Respondent argues that Claimant Encavis and Italy belong to the same "Contracting Party" to the ECT as members of the EU, for three separate reasons[169]:

- Pursuant to Art. 1(2) of the ECT, a "Contracting Party" includes either a State or a Regional Economic Integration Organization ["**REIO**"]; the EU being a REIO signatory to the ECT[170] means that Encavis, as a company established under the laws of Germany, and Italy both belong to the same Contracting Party because Germany and Italy are both EU Member States[171];

- Pursuant to Art. 20 of the Treaty on the Functioning of the European Union ["**TFEU**"] "every person holding the nationality of a Member State shall be a citizen of the Union", which according to Respondent proves that both Encavis and Italy hold European nationality[172]; the fact that both Italy and Germany share the membership in a REIO recognized by the ECT implies a common EU citizenship[173]; and

- Art. 25(2)(a) of the ICSID Convention provides that investors who hold the nationality of the host State in addition to the nationality of another Contracting State are excluded from the scope of protection of the Convention[174], which means that both Parties share a "co-existing" nationality to exclude the application of the ECT in cases between a State and an investor whose State of nationality share the membership in the same international organization[175].

134. <u>In view of the above</u>, Respondent avers that Claimants lack the necessary requirements to be considered "Investors of another Contracting Party" under Art. 26(1) of the ECT and are not protected investors[176].

---

[169] R-I, para. 30; RD-1, slide 5.
[170] R-I, paras. 33, 34.
[171] R-I, para. 35.
[172] R-I, para. 36.
[173] R-II, para. 269.
[174] R-II, para. 270.
[175] R-II, para. 271.
[176] R-I, para. 37; R-II, para. 272; RD-1, slides 4-5.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

2.    **CLAIMANTS' POSITION**

135.    Claimants counter that they are investors of "another" Contracting Party from Italy because they are either investors from Germany – a "Contracting Party" to the ECT – or are entitled to be treated as such[177].

136.    According to Claimants, the text of the ECT is simple: both Italy and Germany are Contracting Parties to the ECT and therefore investors of one of those States can commence arbitration against the other State relating to an investment[178]. It is immaterial that both Italy and Germany are members of the EU, or that the EU is a REIO signatory to the ECT, for the main reason that Claimants' claims are not against the EU but against Italy[179]. Italy's contention that Encavis and Italy belong to the same Contracting Party finds no basis in the plain text of the ECT nor in prior awards[180].

137.    To support their argument, Claimants submit that dozens of ECT tribunals have confirmed explicitly that the status of the EU as an ECT Contracting Party has no bearing on whether an investor of a Member State can bring an arbitration against another Member State[181]. Claimants refer, in particular, to the recent decision in *LSG v. Romania* where the arbitral tribunal dismissed Romania's argument that intra-EU investors failed to meet the *ratione personae* criteria set forth in Art. 26(1) of the ECT, after finding that EU investors investing in other Member States acted as citizens of their respective Member States and not as EU citizens[182].

3.    **ANALYSIS BY THE TRIBUNAL**

138.    It is undisputed that Encavis is an *Aktiengesellschaft* with legal personality registered in Hamburg, Germany[183]. Encavis is the ultimate shareholder in all the other 58 Claimants[184], which are all local Italian operating companies owning one or more PV plants in Italy[185].

139.    Art. 26(1) of the ECT provides that[186]:

> "Disputes <u>between a Contracting Party</u> and <u>an Investor of another Contracting Party</u> relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably." [Emphasis added]

140.    Art. 26(1) of the ECT applies to disputes between a Contracting Party and a foreign investor from another Contracting Party, thereby excluding claims by domestic

---

[177] C-II, para. 46.
[178] C-II, para. 47.
[179] C-II, para. 48; C-III, para. 150.
[180] C-III, para. 149.
[181] C-II, paras. 48-50.
[182] C-III, para. 151, referring to Doc. CL-190, *LSG*, paras. 634, 643-646.
[183] Parties' Pre-Hearing Joint Submission – *Dramatis Personae*, p. 7; Doc. C-1.
[184] Encavis Annual Report for 2018, pp. 150-154 (Exhibit 7 to Sapienza II); Parties' Pre-Hearing Joint Submission – *Dramatis Personae*, p. 7; C-I, para. 27.
[185] Parties' Pre-Hearing Joint Submission – *Dramatis Personae*, p. 7; C-I, paras. 26-27.
[186] Doc. CL-1.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

investors under the ECT. The issue for this Tribunal is not whether or not Encavis is domestic but, instead, whether or not Germany's and Italy's shared membership in the same REIO means that Encavis (in its own right and as controlling entity of the remaining Claimants) should be considered an EU national and as such excluded from ECT protection. In particular:

-    Italy submits that Encavis and Italy belong to the same Contracting Party – the EU, and

-    Claimants aver that the status of the EU as an ECT Contracting Party has no bearing on whether or not an investor of one EU Member State can bring an arbitration against another EU Member State.

141.    The Tribunal is called upon to interpret the terms "Investor of another Contracting Party", in accordance with the general rule of treaty interpretation set forth in Art. 31(1) of the Vienna Convention on the Law of Treaties ["**VCLT**"], guided "in good faith" by the "ordinary meaning" of the terms, "in their context" and "in light of [the Treaty's] object and purpose"[187]. In doing so, the Tribunal must start by elucidating the meaning of the text, which is the best expression of the intention of the Parties[188].

## A.    Interpretation pursuant to Art. 31(1) of the VCLT

"Investor" and "Contracting Party"

142.    The meaning of the terms "Investor" and "Contracting Party" is neither ambiguous, nor disputed by any of the Parties. In fact, both terms are defined in the ECT.

143.    The definition of "Investor" is found in Art. 1(7)(a) of the ECT[189]:

"**Article 1: Definitions**

(7) 'Investor' means:

(a)  With respect to a Contracting Party:

(i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law;

(ii) a company or other organization organized in accordance with the law applicable in that Contracting Party." [Emphasis added]

144.    In the present case Art. 1(7)(a)(ii) is applicable since Claimants are all companies. Therefore, to be considered "Investors" Claimants must be organized in accordance with the law applicable in a Contracting Party.

---

[187] Doc. CL-10.
[188] Doc. CL-195, p. 2.
[189] Doc. CL-1.

45

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

145. Significantly, Art. 26(7) of the ECT also provides that companies that have the nationality of a Contracting Party but are controlled by an "Investor of another Contracting Party" shall be treated as a "national of another Contracting State" for the purpose of Art. 25(2)(b) of the ICSID Convention[190]:

> "An Investor other than a natural person which has the nationality of a Contracting Party party to the dispute on the date of the consent in writing referred to in paragraph (4) and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party, shall for the purpose of article 25(2)(b) of the ICSID Convention be treated as a "national of another Contracting State.""

146. "Contracting Party", in turn, is defined in Art. 1(2) of the ECT as[191]:

> "(2) '[…] a state **or** Regional Economic Integration Organisation which has consented to be bound by this Treaty and for which the Treaty is in force." [Emphasis added]

147. Thus, as appropriate, a State *or* a REIO can be considered a Contracting Party. Both Parties recognize that the EU is a REIO and a Contracting Party to the ECT[192].

"Another"

148. The term "another" is not defined by the ECT and must therefore be interpreted pursuant to its ordinary meaning in its context. "Another" can be defined as "different or distinct from the one first considered"[193] – in the present context different or distinct from the Contracting Party first considered, *i.e.*, the Contracting Party that is party to the dispute:

> "Disputes between a Contracting Party and an Investor of another Contracting Party […]"

**B.  Analysis**

149. To be considered an "Investor of another Contracting Party" Claimants must be:

-    A national or a company "organized in accordance with the law applicable",

-    In "a state or REIO which has consented to be bound by [the ECT] and for which [the ECT] is in force",

-    That is different or distinct from the State or REIO that is involved in the dispute,

---

[190] Doc. CL-1.
[191] Doc. CL-1.
[192] R-I, para. 34; C-III, para. 150.
[193] Merriam-Webster Dictionary, available at: https://www.merriam-webster.com/.

46

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

- Except if such national or company is controlled by an "Investor of another Contracting Party", in which case they can be organized in accordance with the law applicable in the Contracting Party that is involved in the dispute.

These are the only requirements.

150. In the present case, the Respondent State is Italy (and not the EU), a Contracting Party to the ECT in its own right. Claimants, on the other hand, are:

- Encavis, a company that is organized in accordance with the laws of Germany[194], which in turn is a Contracting Party to the ECT that is different from Italy; it can therefore be considered an "Investor of another Contracting Party"; and

- 58 other companies that are organized under the laws of Italy[195], but owned and controlled by Encavis[196], thus fulfilling the requirement of Art. 26(7) of the ECT.

151. It is thus clear that Claimants meet the requirements to be considered "Investor[s] of another Contracting Party" under Art. 26(1) of the ECT and "national[s] of another Contracting State" under Art. 25(2)(b) of the ICSID Convention[197].

152. The fact that the EU is also a Contracting Party to the ECT is irrelevant in this case; indeed, Claimants are not bringing their case against the EU, but against Italy, a Contracting Party to the ECT in its own right.

153. Furthermore, the fact that Art. 20(1) of the TFEU[198] awards EU citizenship to every national of an EU Member State is equally irrelevant for three reasons:

- <u>First</u>, because Art. 20(1) seems to apply to natural persons[199] – not to corporations –, as demonstrated by the rights and duties described under Art. 20(2);

- <u>Second</u> because, even if Art. 20(1) applied to companies, Encavis and the other Claimants are companies created and organized under the laws of Germany and Italy – not under EU law[200];

---

[194] Doc. C-1.
[195] Docs. C-2.1 to C-2.58.
[196] Encavis Annual Report for 2018, pp. 150-154 (Exhibit 7 to Sapienza II). See also Doc. C-306; Doc. C-364; Doc. C-587; Doc. C-653.
[197] Doc. CL-2.
[198] Doc. C-759, Art. 20(1): "Citizenship of the Union is hereby established. Every person holding the nationality of a Member State shall be a citizen of the Union. Citizenship of the Union shall be additional to and not replace national citizenship."
[199] See also Doc. CL-91, p. 93.
[200] There are companies that could potentially be considered created and organized under EU law, e. g. the *Societas Europaea* (SE) or the European Economic Interest Group (EEIG). Encavis, however, is a German *Aktiengesellschaft* (AG).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

- Lastly, because Italy is a sovereign Member State and not an EU citizen, and therefore Respondent's argument that the Parties "share a 'co-existing' nationality"[201] is a *non sequitur*.

## C.    Prior awards

154. The Tribunal's findings are reinforced by the fact that numerous other ECT investment tribunals[202] reached similar conclusions in prior awards – even if such conclusions are not binding upon this Tribunal.

155. For instance, the tribunal in *Charanne* found that the fact that the EU is a Contracting Party to the ECT does not mean that Member States have ceased to be Contracting Parties in their own right[203]:

> "Based on Article 26 of the ECT, disputes between a Contracting Party and an investor of another Contracting Party relating to an investment in the territory of the former may be submitted to arbitration. It can be deduced that, as correctly raised by the Kingdom of Spain, there must be a diversity of nationality between the parties. The Arbitral Tribunal has already decided that the Claimants are legal persons of the Netherlands and Luxembourg respectively, and not Spanish investors. The issue that the Arbitral Tribunal has to resolve is whether, in the context of this dispute, the Claimants can be considered as investors of the Netherlands and Luxembourg respectively or whether they should be considered as investors of the EU. In the latter case, since Spain is part of the EU, the dispute would cease to oppose a contracting party and an investor of another contracting party within the meaning of Article 26(1) of the ECT as it would be the case of an investment by an investor of the EU in the territory of the EU.

> 429. In the opinion of the Arbitral Tribunal, this argument ignores that, although the EU is a Contracting Party of the ECT, the States that compose it have not ceased to be Contracting Parties as well. Both the EU, as its Member States, may have legal standing as Respondent in an action based on the ECT." [Emphasis added]

156. The same conclusion was reached by the *Sevilla Beheer* tribunal[204]:

> "[T]he fact that EU is a party to the ECT […] does not deprive Spain and the Netherlands of their status as Contracting Parties and as potential parties to a dispute that may be initiated pursuant to Article 26 […]. Consequently, the ECT, when interpreted "in good faith in accordance with the ordinary meaning to be given to" its terms does not exclude the EU Member States from the application of Article 26. Therefore, the Claimants should be considered as being from "another Contracting Party" under Article 26 of the Treaty regardless of whether the respondent State is a member of the EU or not." [Emphasis added]

---

[201] See R-I, para. 36 and R-II, para. 271.
[202] See, e.g., Doc. CL-87, *Antin*, para. 218; Doc. CL-88, *Isolux*, paras. 633-634; Doc. CL-90, *Cavalum*, paras. 314, 322-328.
[203] Doc. CL-89, *Charanne*, paras. 428-429.
[204] Doc. CL-84, *Sevilla Beheer*, para. 632.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

157. More recently, the tribunal in *LSG* had to deal with the issue of diversity of nationality and found that[205]:

> "As pointed out by the *Stadtwerke* tribunal, the fact that Claimants, by virtue of conducting their activities within the EU, are operating to some degree under EU law, does not mean that they were created or organized under EU law – rather they were created and are organized under the laws of their respective States (Germany, Austria, Cyprus and the Netherlands).
>
> In sum, a plain reading of Art. 26(1) of the ECT, in accordance with the ordinary meaning of its terms, leads to the conclusion that Claimants qualify as 'Investors of another Contracting Party'." [Emphasis added]

158. Finally, even the tribunal in *Green Power* – which eventually upheld Spain's *ratione voluntatis* jurisdictional objection – accepted that it had jurisdiction *ratione personae*, given that[206]:

> "The fact that the EU itself, as a REIO, is also a Contracting Party to the ECT and that Denmark and Spain are EU Member States, does not affect the reality that Denmark and Spain are also Contracting Parties to the ECT in their own right. […]
>
> […] there is nothing in Article 26(1) of the ECT that prevents Denmark and Spain as EU Member States from constituting a 'Contracting Party' under the ECT in respect of each other."

\* \* \*

159. In view of the above, the Tribunal dismisses Respondent's first jurisdictional objection.

---

[205] Doc. CL-190, *LSG*, paras. 645-646, referring to Doc. CL-86 *Stadtwerke*, para. 128.
[206] Doc. RL-60, *Green Power*, paras. 186-187.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

# V.2. <u>MUNICIPAL LAW OBJECTION</u>

160.  As set out above, the *Conto* Program required the PV plant producer to sign an agreement with the GSE [previously defined as the "*Convenzione*" or in plural "*Convenzioni*"][207], which recognized its right to benefit from the relevant tariff for a period of 20 years from the date of entry into operation[208], and defined the method of payment[209].

161.  Each *Convenzione* contained a dispute resolution clause, providing for the exclusive competence of the Roman jurisdiction[210].

162.  When Italy enacted the *Spalma-incentivi* Decree, most Claimants in this arbitration pursued administrative review proceedings before the Administrative Tribunal for the Region of Lazio (Rome), seeking to annul the Implementation Decrees and other measures adopted by the GSE pursuant to *Spalma-incentivi* Decree[211].

163.  Italy's second jurisdictional objection on the basis of municipal law is based on:

-   The *Convenzioni* exclusive forum choice clause, which excludes the jurisdiction of this Tribunal over Claimants' claims (**1.A**); and

-   The Claimants' choice to pursue their claims before the Italian courts, which precludes them from subsequently arbitrating (**1.B**).

164.  Claimants reject Italy's objections, arguing that they have not consented to submit the present ECT disputes to any forum other than this ICSID Tribunal (**2.A**) and that they have not triggered the fork-in-the-road provision under the ECT (**2.B**).

165.  The Tribunal summarizes the Parties' positions below, followed by its decision (**3.**).

**1.    RESPONDENT'S POSITION**

### A.    The *Convenzioni*'s exclusive jurisdiction clause

166.  Respondent submits that the *Convenzioni* contain exclusive jurisdiction clauses for the Court of Rome (*foro di Roma*), as follows[212]:

> "<u>For any dispute arising out of, or in any way related to</u> the interpretation and/or execution of this Convention and <u>the acts it refers to</u>, the Parties agree on the <u>exclusive jurisdiction of the Court of Rome</u>." [Emphasis added]

---

[207] The Tariff Confirmation Letter required the signature of a *Convenzione* (see, e.g., Doc. C-222, the Tariff Confirmation Letter of the Caputo Alessandro 1 plant). See, e.g., Doc. C-640 for the *Convenzione* signed between the GSE and Claimant CHORUS Solar Foggia Due S.r.l. for the Caputo Alessandro 1 plant.
[208] See, e.g., Doc. C-640, Art. 2.
[209] See, e.g., Doc. C-640, Art. 3.
[210] See, e.g., Doc. C-640, Art. 9.
[211] See, e.g., Docs. R-5 to R-9.
[212] R-I, paras. 170-172; R-II, paras. 322-323; RD-1, slide 16.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

167. Italy interprets this clause as establishing exclusive jurisdiction of the Court of Rome for any dispute related to the *Convenzioni* and incentives received by PV plants[213]. Its broad language encompasses any claim that is in any way connected to the *Convenzioni* or "the acts it refers to" falls under the contractual dispute resolution clause – including any measures challenged by Claimants that may affect the *Convenzioni*. Italy avers that the scope of the clause is not limited to issues arising under Italian law[214].

168. According to Italy, independent of the effect of the fork-in-the-road provision in the ECT, the fact that Claimants submitted claims before the Regional Administrative Tribunal of Lazio against the *Spalma-incentivi* Decree based on the *Convenzioni* and the ECT, evidences the Claimants' own understanding that the exclusive jurisdiction clause applied to the matters raised in the present proceedings[215].

169. Italy submits that no provision in the ECT can be interpreted as overriding contractual forum clauses; on the contrary, Art. 26(2)(b) and Art. 26(3) of the ECT prove that there is no unconditional consent to international arbitration if the State has opted for an alternative dispute settlement procedure[216].

170. Respondent concludes that the existence of the exclusive forum clauses puts Claimants' claims outside the Tribunal's jurisdiction[217].

## B.    Claimants have triggered the Fork-in-the-Road provision

171. Italy further argues that the present dispute has already been submitted to the local courts in Italy[218], triggering Art. 26(3)(b) of the ECT[219] [or the "**Fork-in-the-Road**" provision, a reference to the Latin maxim *electa una via non datur recursus ad alteram*]. Consequently, Claimants are precluded from resorting to arbitration pursuant to the terms of the ECT.

172. Italy explains that the Fork-in-the-Road provision establishes that the Contracting Parties that are listed in Annex ID to the ECT – including Italy – have not given their consent to arbitrate disputes that have already been submitted to the local courts[220]. According to Italy, the provision requires investors to make a choice, which is irrevocable[221].

173. Italy acknowledges that the text of the ECT does not establish any specific test for determining what constitutes the "same dispute". Italy suggests that the Fork-in-the-Road provision must be interpreted in line with Art. 31 of the VCLT[222].

---

[213] R-I, para. 173.
[214] R-I, para. 176; R-II, paras. 324-325.
[215] R-I, para. 176; R-II, para. 325.
[216] R-I, para. 175.
[217] R-I, paras. 177-178.
[218] R-II, para. 326.
[219] R-I, para. 184; RD-1, slide 17.
[220] R-I, para. 187.
[221] R-I, para. 188.
[222] R-I, para. 189.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

Fundamental Basis Test

174. Italy argues that the purpose of the Fork-in-the-Road provision is to ensure that the same dispute is not litigated in multiple fora[223], relying on a note of the United States' State Department in the ECT's *travaux préparatoires*[224]. According to Respondent, the note implies that the Tribunal must determine whether claims brought through different legal actions aim to vindicate the same underlying rights. Thus, the Tribunal must assess whether Claimants are pursuing a claim that is "equivalent in substance" to a claim already brought before another forum[225] [the "**Fundamental Basis Test**"].

175. Italy rejects the idea that treaty claims only exist under international law, since this would mean that no claim brought before a municipal court could ever fall under the Fork-in-the-Road provision[226]. Thus, Italy submits that "absolute formal identity of legal actions" is not required, as this would contradict the *effet utile* of the Fork-in-the-Road provision[227]. Indeed, if absolute identity of legal actions were required, the Fork-in-the-Road provision would have no effective scope of operation, producing a "manifestly absurd or unreasonable" result and contravening Art. 32(b) of the VCLT[228]. Italy therefore rejects the test proposed by Claimants to determine whether two disputes are "the same"[229].

176. Finally, Italy argues that the language of the ECT makes clear that the Fork-in-the-Road provision applies if the investor has previously submitted the dispute to the courts of the Contracting Party, *regardless* of the outcome of such dispute[230].

Application of the Test to the present case

177. It is Italy's position that Claimants have already submitted the dispute to the administrative courts of Italy under the exclusive jurisdiction clauses contained in the *Convenzioni*[231]. Indeed, at least 39 Claimants commenced domestic proceedings against the GSE between 2014 and 2016[232]. Italy was unable to rule out that more Claimants submitted additional claims[233].

178. Italy refers, for instance, to the *Alameda SRL v. GSE* case[234] where one of the Claimants challenged the Implementation Decrees which adjusted the incentives for the PV industry and argues that several other Claimants have filed similar claims, always mentioning the breach of standards like "legitimate expectations",

---

[223] R-I, paras. 189-190; R-II, paras. 331-333.
[224] R-II, paras. 332-333.
[225] R-I, para. 191-195; R-II, para. 328.
[226] R-I, para. 195; R-II, para. 329.
[227] R-I, paras. 194-195.
[228] R-I, para. 195.
[229] R-II, paras. 330-331.
[230] R-II, paras. 334-336.
[231] R-I, para. 198; R-II, para. 327.
[232] R-PHB, pp. 22-23.
[233] R-PHB, pp. 21-22.
[234] Doc. R-5, *Alameda SRL v. GSE and Ministry of Economic Development*.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

"legal certainty" or "fair and equitable treatment", and partially basing their claims on violations of the ECT provisions[235].

179. Italy avers that Claimants' grievances in this case arise out of the same alleged entitlement invoked before domestic courts and that the Tribunal is therefore precluded from hearing the dispute[236].

180. <u>In sum</u>, it is Italy's position that Claimants are estopped from bringing their claims before the Tribunal by the principle *electa una via* enshrined in Art. 26(3) of the ECT and further reinforced by the general prohibition of abuse of process[237].

## 2. CLAIMANTS' POSITION

### A. **Claimants have not agreed a dispute resolution mechanism other than ICSID arbitration**

181. Claimants submit that the Tribunal should reject Italy's choice of exclusive jurisdiction arguments because[238]:

- In this arbitration Claimants are bringing claims for violation of the ECT and relevant principles of public international law – not claims for breach of contract under the *Convenzioni* or Italian domestic law;

- Encavis is, in any case, not a party to the *Convenzioni*.

182. With regard to the first point, Claimants argue that their claims are based on Italy's breach of Art. 10(1) of the ECT and not on breach of the provisions of the *Convenzioni*[239]. The *Convenzioni* are relevant only because they evidence the Claimants' understanding of the *Conto* Program and their legitimate expectations thereunder. It follows that the *Convenzioni*'s dispute resolution clauses are irrelevant to this Tribunal's jurisdiction[240].

183. Claimants point out that Italy's consent to arbitration under Art. 26(3)(a) of the ECT is unconditional and predates the *Convenzioni* by many years[241]. The dispute resolution clause of the *Convenzioni* cannot be considered a "previously agreed dispute settlement procedure" within the meaning of Art. 26(2) of the ECT, because:

- It does not allow investors to seek remedies uniquely available under the ECT and public international law (such as the award of full compensation at fair

---

[235] R-I, paras. 199-205; RD-1, slide 18.
[236] R-I, paras. 207-208.
[237] R-I, para. 206.
[238] C-III, para. 213.
[239] C-II, para. 179; C-III, para. 214.
[240] C-II, para. 180; C-III, para. 214.
[241] C-II, para. 185; C-III, para. 216.

market value for damages caused by Italy's breach of the ECT's fair and equitable treatment, umbrella or non-impairment requirements)[242]; and

- A contractual forum selection clause cannot function as a waiver of the right to ICSID arbitration[243].

184. Claimants point to the decision of the *Vivendi I* annulment committee, which decided that the tribunal had manifestly exceeded its powers when invoking the exclusive jurisdiction clause of a concession contract between the parties as a reason not to examine the claimants' claims on the merits[244].

185. Finally, and in any event, Claimants note that Encavis is not a party to any of the *Convenzioni* and is consequently not subject to the dispute resolution mechanism provided for in those contracts. Therefore, Encavis does not have *locus standi* to pursue claims based on the *Convenzioni* before Italian courts and did not pursue such claims[245].

## B.  Claimants have not triggered the ECT's Fork-in-the-Road provision

186. Claimants submit that the Fork-in-the-Road provision is not applicable for several reasons.

187. First, there is no factual predicate for Italy's objection regarding Encavis, because the latter was not a party to any of the disputes before the Italian courts and did not even have standing to lodge such a claim[246]. Furthermore, Piemonte Eguzki 2 S.r.l., Piemonte Eguzki 6 S.r.l., Ribaforada 3 S.r.l. and Ribaforada 7 S.r.l. never challenged the *Spalma-incentivi* Decree in the Italian courts, and thus Italy's objection cannot apply to those four Claimants[247].

188. Second, Claimants acknowledge that most of the operating companies initially pursued domestic claims against the *Spalma-incentivi* Decree under Italian law[248]. However, all Claimants that filed domestic actions have withdrawn them or caused them to expire before final resolution, precisely because they were choosing to submit the dispute to international arbitration instead[249].

189. In this regard, Claimants point to Italy's explanatory statement to the ECT's Annex ID, which clarified that if a resolution of a dispute between an investor and Italy[250]:

---

[242] C-II, para. 186.
[243] C-II, paras. 186-187.
[244] C-II, para. 184, referring to Doc. CL-123, *Compañía de Aguas del Aconquija* (Decision on Annulment), para. 93.
[245] C-II, paras. 188-189; C-III, para. 218.
[246] C-II, para. 188; C-PHB, para. 3.
[247] C-PHB, para. 5.
[248] C-PHB, para. 5.
[249] C-II, para. 190; C-III, paras. 221-222.
[250] C-II, para. 191; C-III, para. 220.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

"[…] has not yet been made by internal judicial or conciliation bodies, the Investor may revoke his judicial action or arbitral procedure by procedural or lateral renouncement."

190. Claimants infer from this statement that the Fork-in-the-Road provision does not apply when the investor withdraws the domestic action before the final resolution of the dispute[251].

191. <u>Third</u>, and in any event, Claimants argue that the applicable test to determine whether the Fork-in-the-Road provision applies is the "**Triple Identity Test**" – not the Fundamental Basis Test proposed by Italy. This test requires the shared identity of[252]:

- The parties,

- The causes of action asserted, and

- The relief sought.

192. Claimants refer to several decisions of arbitral tribunals that adopted the Triple Identity Test[253], and argue that prior awards on which Italy relies are partially misleading or misconstrued[254]. Likewise, the reliance on the statement of the United States' State Department is unpersuasive[255].

193. <u>Finally</u>, Claimants argue that Italy cannot satisfy the Triple Identity Test because the necessary preconditions are not fulfilled because[256]:

- The **identity of parties** requires a showing of *complete* identity, which is not satisfied because only 43 Claimants filed claims concerning the *Convenzioni* before the Administrative Tribunal of Lazio[257];

- The **causes of action** are different, because the domestic administrative claims arose from individual *Convenzioni*, while the present claims are based on provisions of Part III of the ECT[258], and the petitions before the Administrative Tribunal only mentioned the ECT "*en passant*" as additional justification, not as the basis for compensation for the harm caused by the *Spalma-incentivi* Decree[259];

- The **relief sought** in the domestic proceedings is different from that sought in the present case: none of the relevant Claimants claimed specific compensation or relief under the ECT, but rather sought relief such as an interim injunction against the *Spalma-incentivi* Decree, the referral of their

---

[251] C-II, paras. 191-192.
[252] C-II, para. 195; C-III, paras. 223 *et seq*.
[253] C-II, paras. 196-200; C-III, para. 225.
[254] C-II, para. 195; C-III, paras. 226-230.
[255] C-III, para. 234.
[256] C-II, para. 202; C-III, para. 236.
[257] C-II, paras. 203-206.
[258] C-II, paras. 207-210.
[259] C-II, para. 209.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

petitions to the Italian Constitutional Court or to the CJEU, or compensation under the respective *Convenzioni* [260]; none of the Claimants reserved the "right to claim compensation" under the ECT[261].

194. <u>Therefore</u>, Claimants submit that they have not triggered the ECT's Fork-in-the-Road provision, and the Tribunal should dismiss Italy's objection[262].

### 3. ANALYSIS BY THE TRIBUNAL

195. The Tribunal has carefully considered the positions of Claimants and Respondent, including as summarized above.

196. The Tribunal must determine both whether or not the forum selection clause contained in the *Convenzioni* excludes claims before this Tribunal and, if not, whether or not the ECT's Fork-in-the-Road provision is triggered so as to preclude jurisdiction.

197. To solve this jurisdictional objection, the Tribunal must distinguish between Encavis (**3.1**) and the other Claimants (**3.2**).

### 3.1 CLAIMANT ENCAVIS

198. Despite the manner in which Respondent has framed its objection – directing it against all Claimants[263] – it is clear that neither of the Respondent's municipal law jurisdictional objections concerns Claimant Encavis:

- As to forum selection, this is because Encavis never entered into a *Convenzione* with the GSE and could therefore never be bound by its forum selection clause;

- As to the ECT's Fork-in-the-Road provision, Encavis was never party to any municipal law proceedings against Italy – only the present investment arbitration.

199. <u>Therefore</u>, both municipal law jurisdictional objections are dismissed with regard to Claimant Encavis.

### 3.2 OTHER CLAIMANTS

200. Art. 26 of the ECT is applicable to the Respondent's municipal law objections to the non-Encavis Claimants both based on the *Convenzione* choice of forum clause and the ECT's Fork-in-the-Road provision.

---

[260] C-II, paras. 211-213.
[261] C-II, para. 214.
[262] C-II, para. 190.
[263] See, e.g., R-I, para. 662(b) and (c).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

201. Art. 26(1) to (3) of the ECT provides (as relevant) as follows[264]:

> "(1) <u>Disputes</u> between a Contracting Party and an Investor of another Contracting Party <u>relating to an Investment</u> of the latter in the Area of the former, <u>which concern an alleged breach of an obligation of the former under Part III</u> […]
>
> (2) If such disputes cannot be settled […] the Investor party to the dispute may choose to submit it for resolution:
>
> > (a) <u>to the courts or administrative tribunals of the Contracting Party party to the dispute;</u>
> >
> > (b) in accordance with any applicable <u>previously agreed</u> dispute settlement procedure; or
> >
> > (c) in accordance with the following paragraphs of this Article.
>
> (3) (a) <u>Subject only to subparagraphs (b) and (c)</u>, each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.
>
> > (b) (i) The Contracting Parties listed in Annex ID do not give such unconditional consent <u>where the Investor has previously submitted the dispute under subparagraph 2(a) or (b).</u>
> >
> > (ii) For the sake of transparency, <u>each Contracting Party that is listed in Annex ID</u> shall provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with Article 39 or the deposit of its instrument of accession in accordance with Article 41." [Emphasis added]

## A.    The *Convenzioni*'s forum selection clauses

202. All Claimants[265] other than Encavis signed *Convenzioni* with the GSE[266]; this was a requirement of the *Conto* Program in order to benefit from the tariffs. Each

---

[264] Doc. CL-1.

[265] Except Claimants SP 07 S.r.l., SP 09 S.r.l., SP 10 S.r.l., SP 11 S.r.l., SP 13 S.r.l. and SP 14 S.r.l., which, the Tribunal understands, have not signed *Convenzioni* (Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022), but did not file claims before the Lazio Administrative Tribunal either (see C-II, fn. 238).

[266] Annex to this Award. See also Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022; Docs. C-278, C-283, C-284, C-292, C-298 to C-299, C-305, C-311, C-314, C-321, C-322, C-331, C-332, C-339, C-344, C-350, C-360 to C-363, C- 366, C-369, C-384 to C-391, C-397, C-403 to C-406, C-417, C-450, C-461, C-472 to C-476, C-490 to C-495, C-524, C-527 to C-530, C-538, C-556, C-561, C-574, C-579 to C-581, C-639 to C-649, C-651 to C-652, C-668, C-669 to C-672, C-673, C-675 to C-679, C-685, C-686.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

*Convenzione* contains a forum selection clause (Art. 9) that provides, in its original language that[267]:

> "*Per qualsiasi controversia derivante o comunque connessa all'interpretazione e alla esecuzione della presente Convenzione e degli atti da essa richiamati, le Parti convengono la competenza esclusiva del Foro di Roma.*" [Emphasis added]

203. The wording of the forum selection clause is not identical in every *Convenzione*, but there is no material difference between the different versions; in fact, they all provide for the "*competenza esclusiva del Foro di Roma*". Respondent has provided an English translation of this provision (not contested by Claimants), as follows[268]:

> "For any dispute arising out of, or in any way related to the interpretation and execution of this Convention and the acts it refers to, the Parties agree on the exclusive jurisdiction of the Court of Rome." [Emphasis added]

204. According to Italy, this Tribunal's competence over the present dispute would be precluded by the exclusive choice of jurisdiction clause in the *Convenzione* in favor of the *Foro di Roma*.

205. The Tribunal does not accept that the *Convenzione* choice of forum clause prevents this Tribunal from exercising its competence over the Parties' disputes arising under the ECT for three reasons.

206. First, as a matter of interpretation of the ECT, the *Convenzione* choice of forum clause is not an "applicable previously agreed dispute settlement procedure" within the meaning of Art. 26(2)(b). Therefore, it is only relevant to the Claimants' claims under the ECT if Respondent were able to establish that such claims under the ECT had been submitted to the Italian courts or tribunals in accordance with Art 26(2)(c), including but not limited to in accordance with the *Convenzione* choice of law clause, so as to trigger the Fork-in-the-Road provision as discussed below.

207. Second, the *Convenzione* in any event does not extend to claims under the ECT. Claims arising out of or relating to the interpretation of the *Convenzione* are claims under a municipal law contract. These are fundamentally different to investor-State claims arising under a bilateral or multilateral investment treaty. The two categories of claims may co-exist in parallel proceedings and even arise out of a similar factual background[269]. However:

- Contract claims under the *Convenzione* pertain to contractual rights and obligations in accordance with the contractual governing law (or potentially municipal public law in the case of administrative contracts); and

---

[267] See, e.g., Doc. C-278, Art. 9. The *Convenzioni* have slight variations in language depending on the year they were signed.
[268] R-II, para. 322 and fn. 93.
[269] See, e.g., Doc. RL-32, *BIVAC*, para. 127; Doc. RL-31, *Aguas del Tunari*, para. 114; Doc. CL-123, *Vivendi I* Annulment, paras. 95-96; Doc. CL-8, *ESPF*, para. 376.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

- Investment treaty claims under the ECT arise out of additional foreign investment protections of fair and equitable treatment and no unlawful expropriation that have been agreed in advance between States for the benefit of their nationals investing in counterparty State territory.

208. <u>Third</u>, it is accepted that this Tribunal has no jurisdiction to determine contractual or administrative claims pursuant to the *Convenzione* or Italian law. Such disputes fall within the exclusive jurisdiction of the *Foro di Roma*. This Tribunal is instead asked to determine investment treaty (not contractual or domestic administrative law) claims. These are distinct from claims under the *Convenzione*, because:

- The ECT claims are against the Italian Republic not the GSE (the *Conzenvioni*'s counterparty) and the Italian Republic is not a party to the *Convenzioni*;

- Claimants seek relief for Italy's alleged breaches of protections afforded by the ECT[270], not for an alleged violation of the clauses of the *Convenzioni* by the GSE and Italy accepts that there is no allegation by Claimants in this arbitration that the GSE breached obligations under the *Convenzioni*[271];

- The present dispute does not "arise out of" and is not "in any way related to the interpretation and execution" of the *Convenzione* or "the acts it refers to" thereunder or in relation to; it concerns the measures by Italy, in the exercise of its sovereign powers, to amend its incentives scheme for the PV sector and whether or not such measures breached the ECT protections and caused loss to Claimants' investments; and

- Although raised in the context of the umbrella claim under the ECT, the *Convenzioni* obligations and alleged breach by the GSE are only relevant to the claims under the ECT as issues of fact, given that Claimants submit that these contracts served as confirmation of the legislative and regulatory guarantees offered by Italy[272].

209. <u>In sum</u>, the Tribunal's competence over the present treaty dispute is not barred by the existence of the exclusive jurisdiction clause contained in the *Convenzioni*.

### B.    The ECT's Fork-in-the-Road provision

210. As to the Fork-in-the-Road provision, Art. 26(2) of the ECT expressly introduces an exception to State consent to arbitrate by granting investors a choice of forum when submitting a dispute under the ECT. Investors – not Contracting Parties – are free to submit a dispute either to arbitration, or to another forum pursuant to a previously agreed dispute settlement procedure, or, in the terms of Art. 26(2)(a), to the courts or administrative tribunals of the Contracting Party that is a party to the dispute:

---

[270] See, e.g., C-I, paras. 2, 24 and 51-54. See also R-PHB, para. 7, whereby Respondent recognizes that Claimants are challenging the *Spalma-incentivi* Decree on treaty grounds.
[271] R-PHB, p. 23.
[272] See, e.g., C-I, para. 15.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

> "(2) <u>If such disputes cannot be settled according to the provisions of paragraph (1)</u> within a period of three months from the date on which either party to the dispute requested amicable settlement, <u>the Investor party to the dispute may choose to submit it for resolution) to the courts or administrative tribunals of the Contracting Party party to the dispute;</u> […]" [Emphasis added]

211. Pursuant to Art. 26(3)(a), the Contracting Parties to the ECT otherwise "give their unconditional consent to the submission of a dispute to international arbitration". The Art. 26(3)(b)(i) Fork-in-the-Road provision establishes that the Contracting Parties listed in Annex ID do not give unconditional consent to international arbitration if an investor has previously submitted a dispute under Art. 26(2)(a)[273]:

> "(a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article.
>
> (b) (i) The <u>Contracting Parties listed in Annex ID do not give unconditional consent where the Investor has previously submitted the dispute under subparagraph (2)(a) or (b).</u>" [Emphasis added]

212. Thus, in principle, if an investor elects to submit the dispute for resolution to the courts or the administrative tribunals of the Contracting Party, it is barred from submitting that same dispute to arbitration, due to the lack of unconditional consent by the Contracting Party in question. In other words, *electa una via non datur recursus ad alteram*.

213. In the present case, Claimants have recognized that at least 43 of them elected to commence claims against the *Spalma-incentivi* Decree before the Administrative Tribunal for the Region of Lazio in Italy[274].

214. The Tribunal must determine whether or not the 43 Claimants' election to commence claims in Italy invalidated Italy's consent to arbitrate the present dispute (**a.**) and whether or not the dispute submitted before the Italian administrative tribunal is the same as the one brought before this Tribunal (**b.**).

### a.    Italy's intention

215. Italy is one of the Contracting Parties listed in Annex ID to the ECT, which is entitled "List of Contracting Parties Not Allowing an Investor to Resubmit the Same Dispute to International Arbitration at a Later Stage under Article 26"[275].

216. Art. 26(3)(b)(ii) of the ECT provides that:

> "(b) […] (ii) For the sake of transparency, <u>each Contracting Party that is listed in Annex ID shall provide a written statement of its policies, practices and conditions in this regard</u> to the Secretariat no later than the date of the deposit of its instrument of ratification, acceptance or approval in accordance with

---

[273] Doc. CL-1. See also Doc. CL-91, p. 100.
[274] C-II, para. 205; C-III, para. 220; C-PHB, para. 5.
[275] Doc. CL-1, p. 126.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

Article 39 or the deposit of its instrument of accession in accordance with Article 41." [Emphasis added]

(i)    Italy's written statement

217.  Italy provided its written statement pursuant to Art. 26(3)(b)(ii) of the ECT on the day it ratified the ECT, via the Italian Embassy in Lisbon. The original Italian version states that[276]:

> "*L'Italia, ai sensi dell'articolo 26, comma 3, lettera b, sub ii), dichiara di non prestare il consenso a sottoporre le controversie, sorte tra un investitore ed una Parte contraente, all'arbitrato o alla conciliazione internazionale, allorchè l'investitore stesso abbia già sottoposto la controversia:*
>
> *a) alle Corti o ai tribunali amministrativi italiani;*
>
> *b) o abbia esperito una procedura applicabile per la soluzione della controversia già concordata in precedenza.*
>
> *A tal proposito occorre distinguere due ipotesi:*
>
> *1) se il giudizio sulla controversia è ancora pendente davanti ad organi giurisdizionali o di conciliazione interni, l'investitore potrà abbandonare, con la rinuncia processuale od extraprocessuale, l'azione giurisdizionale o la procedura arbitrale, ricorrendo ad altre forme di ipotesi conciliativa;*
>
> *2) se, sulla controversia, sia già intervenuto un giudicato o comunque un accertamento avente natura esecutiva non può più essere ammessa una conciliazione o arbitrato internazionale.*
>
> *Le affermazioni sopra esposte trovano la loro ragione sia nel principio del "ne bis in idem" (evitandosi che sulla stessa istanza siano emessi due giudicati: lodo e sentenza), sia in quello della incontrovertibilità del decisum, che fa stato anche nei rapporti sostanziali tra le parti , salva la possibilità per le stesse, nell'ambito processuale ed in quello extraprocessuale, di esperire i normali mezzi di impugnativa.*"

218.  The Italian Embassy provided an English translation of its statement, as follows[277]:

> "In accordance with Article 26(3)(b)(ii), Italy declares that it does not allow for a dispute between an Investor and a Contracting Party to be submitted for international arbitration or conciliation, provided that an Investor has:
>
> a) already submitted the dispute [to] Italian courts or administrative tribunals; or
>
> b) followed an applicable, previously agreed procedure for the settlement of disputes.
>
> In this respect a distinction must be made between two options:

---

[276] Doc. C-760, p. 33.
[277] Doc. C-760, pp. 32-33.

1) <u>if a resolution of the dispute has not yet been made by internal judicial or conciliation bodies, the Investor may revoke his judicial action</u> or arbitral procedure by procedural or lateral renouncement <u>and apply to other forms of dispute settlement;</u>

2) if a resolution or any formal or legal document of execution has already been made to settle the dispute, conciliation or international arbitration is no longer possible.

The above statements are based either on the principle of "*ne bis in idem*" (to avoid two judgments being awarded for the settlement of the same dispute: one by the arbitration and the other by the court of law), or on the principle of incontrovertibility of "*decisum*" which is binding on the parties in their substantial relations without giving them any possibility, during the procedure or after it, to use the normal means of appeal." [Emphasis added]

219. It is clear from Italy's statement when it decided to be listed in Annex ID that it intended to avoid having two judgments on the same matter awarded in different fora: one by an arbitral tribunal and another by a local court. This is why Italy declared that a dispute *already submitted* by an investor of another Contracting Party before the "Italian courts or administrative tribunals" could not be resubmitted to international arbitration.

220. Italy recorded an express exception to this: it clarified that a "distinction" needed to be made between cases where the Italian court or tribunal has already adjudicated the dispute and those where the resolution is still pending. In the former, the investor is barred from accessing international arbitration; in the latter, however, the investor is still authorized to:

"[…] <u>revoke his judicial action</u> or arbitral procedure by procedural or lateral renouncement <u>and apply to other forms of dispute settlement</u>." [Emphasis added]

221. "Other forms of dispute settlement" includes arbitration. It follows that Italy's consent to arbitration in cases where the investor decides to revoke its judicial action before the Italian courts or tribunals have issued a formal resolution of the dispute is unequivocal. This consent was reflected in the Italian Republic's interpretative statement of the Fork-in-the-Road provision, made *in tempore insuspecto*.

(ii)    <u>Application to the present case</u>

222. In the present case, there is no debate that several Claimants challenged the *Spalma-incentivi* Decree before the Regional Administrative Tribunal of Lazio.

223. Claimants argue, however, that those who filed complaints against the *Spalma-incentivi* have withdrawn or caused their claims to expire before final resolution of the dispute by the Administrative Tribunal[278].

---

[278] C-II, para. 193; C-III, para. 220.

224. The evidence on the record supports Claimants' assertion. Italy (who bears the burden of proof on this issue) has failed to marshal any evidence that the Italian administrative tribunals issued any resolution adjudicating any of the disputes submitted by Claimants prior to their withdrawal or expiry.

225. Claimants, on their part, have submitted documentary evidence showing that the Regional Administrative Tribunal of Lazio:

- Has published "notices of expiry" for 43 of Claimants' claims, in accordance with Art. 82 of the Italian Code of Administrative Procedure[279]; and

- Has issued "*aviso di perenzione*" (or expiry warnings) informing that the claims of several of the Claimants would expire under Art. 82 of the Italian Code of Administrative Procedure if they did not file a request to schedule a new hearing 120 days after the receipt of said warning[280] – which Claimants did not do.

226. It follows from the evidence that, even if the dispute brought by some Claimants before the Lazio Administrative Tribunal were the same as the dispute before this Tribunal (and in the next section the Tribunal will conclude that both disputes are different), the Fork-in-the-Road would not be triggered, because Italy gave its express consent to arbitrate disputes where the investor submitted the same dispute to local courts or tribunals and subsequently withdrew or let it expire prior to adjudication.

   b.    **Not the same dispute**

227. In any event, for the reasons explained below, the Tribunal finds that the dispute before it is not the same dispute that some of the Claimants submitted to the Lazio Administrative Tribunal.

   (i)    Applicable test

228. The Parties agree that, to determine whether the Fork-in-the-Road provision applies, the Tribunal must assess whether or not the dispute in the arbitration is the "same" as the one submitted to the Italian local courts[281]; but they disagree on the applicable test for such assessment:

- Italy prefers the Fundamental Basis Test to determine whether the claims brought through different legal actions aim to vindicate the same underlying rights, focusing on claims being "equivalent in substance"[282]; and

---

[279] Docs. C-739 to C-753, C-762 to C-765, C-887 to C-911.
[280] Docs. C-912 and C-913.
[281] R-I, para. 189; C-II, paras. 194-195.
[282] R-I, paras. 191-195, referring to Doc. RL-34, para. 4.108; R-II, para. 328, referring to Doc. RL-35, *Pantechniki*, para. 61.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

-    Claimants prefer the Triple Identity Test[283], which requires the identity of the parties, causes of action, and the relief[284] – and which Italy argues would render ineffective the Fork-in-the-Road provision's scope of operation, producing a result which is "manifestly absurd or unreasonable" and contrary to the principle of *effet utile*[285].

229.    The Tribunal considers that proper interpretation of Art. 26 of the ECT, in accordance with Art. 31 of the VCLT, requires more than claims that are "equivalent in substance", as advocated by Respondent.

230.    Art. 26(1) of the ECT provides as follows:

> "(1) <u>Disputes</u> between a Contracting Party and an Investor of another Contracting Party <u>relating to an Investment</u> of the latter in the Area of the former, <u>which concern an alleged breach of an obligation of the former under Part III</u> […]" [Emphasis added]

231.    This provision, read together with the Fork-in-the-Road provision at Art. 26(3), deals with disputes "relating to an investment" and which concern "an alleged breach of an obligation" under Part III of the ECT. It is precisely "such disputes" that the "Investor party to the dispute may choose to submit" for resolution to the administrative tribunals of the Contracting Party party to the dispute (Art. 26(2)(a)).

232.    It is also such a dispute that the Contracting Party unconditionally consents to arbitrate (Art. 26(3)(a)), unless the "Investor" has previously submitted it to resolution to the domestic administrative tribunals (Art. 26(3)(b)(i)).

233.    The ordinary meaning of the terms shows that the purpose of Art. 26(3)(a) was to avoid having a dispute "relating to an investment" and concerning "an alleged breach of an obligation under Part III of the ECT" submitted simultaneously to arbitration and to the local courts. In this regard, the text of Art. 26(3)(b)(i) refers simply to "the dispute" and not to a "similar dispute" or a dispute "equivalent in substance", although Art 26(2) refers to "such dispute" within the meaning of Art. 26(1) (as above).

234.    The phrase "the Investor" in Art. 26(3)(b)(i) must be understood as "the Investor party to the dispute" previously identified in Art. 26(2)(a), *i.e.*, the Investor with the claim under the ECT. It is at that party's sole election to submit or not to submit "such dispute" to local courts or tribunals or to international arbitration.

235.    The references in the language of Art. 26 to "such dispute" and to the parties to "such disputes" strongly indicate that one should look to the identity of the parties in any allegedly duplicate proceedings and to the identity of claims. Broader principles of customary international law, and most domestic laws, separately preclude double recovery for the same loss, even if it arises from breach of a different legal framework or obligation.

---

[283] C-II, paras. 202-214; C-III, para. 236.
[284] C-II, paras. 196-200.
[285] R-I, para. 195.

236. Accordingly, this Tribunal considers it appropriate for it to consider, instead of an overall "equivalence in substance" test preferred by Respondent, a more precise review as to whether or not the parties, causes of action and relief sought are the same in this arbitration as in the administrative tribunal proceedings for the purpose of the Fork-in-the-Road requirement.

237. This conclusion is further reinforced by the general purpose of the Fork-in-the-Road provision: its goal is not to prevent an investor from starting multiple proceedings based on the same factual constellation, but rather to preclude an investor from bringing the same case (*i.e.*, cause of action) before multiple fora, hoping to improve its chances to obtain a favorable result in any one of them. This is precisely what is reflected in Italy's interpretative statement to Annex ID[286]:

> "The above statements are based either on the principle of "*ne bis in idem*" (to avoid two judgments being awarded for the settlement of the **same dispute**: one by the arbitration and the other by the court of law), […]." [Emphasis added]

238. This approach has been adopted in other investment treaty awards, sometimes characterized as the so-called Triple Identity Test[287].

    (ii)    The parties, causes of action and relief sought is not the same

239. The identity of the parties, the causes of action and the relief sought in both disputes is not the same.

240. First, there is no identity of parties. Not all Claimants submitted disputes before the Regional Administrative Tribunal of Lazio and, in particular, Encavis (both as First Claimant and controlling entity of all other Claimants) was not a party. Furthermore, the respondents in those proceedings were the Italian Ministry of Economic Development, the ENEA or the GSE[288] – not the Italian Republic *per se*.

241. Second, the causes of action are not the same. Even if the factual background of both disputes were similar, in the present case the claims are based on an alleged violation of the ECT; in the local courts dispute, Claimants were challenging and seeking the annulment, on the basis of the *Convenzioni*, Italian administrative law and European law, of several measures adopted by the Italian authorities[289].

242. Third, the relief sought is also different. In the dispute submitted to the Lazio Administrative Tribunal, Claimants were seeking essentially[290]:

---

[286] Doc. C-760.
[287] Doc. CL-124, *FREIF*, paras. 417 *et seq.*; Doc. CL-142, *Hulley Enterprises*, paras. 597-599 ; Doc. CL-144, *Yukos*, paras. 598-600 ; Doc. CL-85, *PV Investors* (Jurisdiction), paras. 305, 321-325; Doc. CL-89, *Charanne*, paras. 401 *et seq.*
[288] Docs. R-5, R-6, R-7, R-8, R-9.
[289] Docs. R-5, R-6, R-7, R-8, R-9.
[290] Docs. R-5, R-6, R-7, R-8, R-9. The appeals to the Regional Administrative Tribunal of Lazio are not identical, but they essentially seek the same types of relief, the principal one being the annulment of the measures adopted by the Italian authorities.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

- The suspension and subsequent "annulment" of the 16 and 17 October 2014 Ministerial Decrees that sought to implement the *Spalma-incentivi* Decree [previously defined as the "Implementation Decrees"], as well as of other measures adopted by the GSE pursuant to the *Spalma-incentivi* Decree;

- The referral of a question on the constitutionality of the *Spalma-incentivi* Decree to the Italian Constitutional Court;

- A declaration that they were not obliged to choose any of the three options for the reduction of incentives provided for the *Spalma-incentivi* Decree and that the conditions contained in the *Convenzioni* were maintained; and

- An order for the relevant authorities to pay compensation for the damages suffered by Claimants as a result of the Implementation Decrees and other measures adopted by the GSE.

243. In some of their pleadings before the Lazio Administrative Tribunal, Claimants referred to provisions of the ECT[291]. However, they articulated no cause of action and sought no relief arising out of the ECT protections. They merely noted that Italy's decision to retroactively change the incentives scheme conflicted with the principles enshrined in the ECT; or, alternatively, that the measures adopted by the Italian authorities could not apply to foreign investors because they are covered by the ECT[292].

244. In this arbitration, on the other hand, Claimants seek, *inter alia*[293]:

- A declaration that Italy has violated the provisions of the ECT and international law with respect to Claimants' investments; and

- Compensation for the damages that Claimants have suffered as a result of such alleged breaches of the ECT.

245. Irrespective of what the Tribunal's decision may be regarding the alleged breaches of the ECT, the Tribunal will never be empowered to annul the acts adopted by the Italian authorities in the exercise of their sovereign powers. Likewise, the Tribunal is not empowered to refer the issue to the Italian Constitutional Court or to declare whether Claimants are or not obliged to comply with the measures adopted by the Italian authorities. This Tribunal is only called upon to determine whether the measures adopted by Italy violated the ECT; and, if so, to establish the compensation to which Claimants are entitled on the basis of the ECT.

246. Therefore, the Respondent has not established that the parties, causes of action or relief sought is the same in the two relevant sets of proceedings.

* * *

---

[291] Doc. R-6, pp. 5-6; Doc. R-7, pp. 7-8; Doc. R-8, pp. 7-8.
[292] Doc. R-9, pp. 11-12.
[293] C-II, para. 639; C-III, para. 237. See also C-I, para. 428, with minor wording variations.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

247.   <u>In view of the above</u>, the Tribunal declares that Claimants' claims are admissible and dismisses Respondent's second jurisdictional objection.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

# V.3. <u>INTRA-EU OBJECTION</u>

248. Italy further submits that the ECT does not apply to intra-EU investments disputes – *i.e.*, disputes that arise out of investment claims brought by EU nationals against a host State that is an EU Member State[294] – and that these are therefore not arbitrable under Art. 26 of the ECT[295]. The Court of Justice of the EU [the "**CJEU**"] avers that Art. 26(2)(c) of the ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State[296] (**1.**). Italy's position is supported by the European Commission (**2.**), but rejected by Claimants (**3.**).

249. The Tribunal summarizes the Parties' positions below followed by its reasoning and decision (**4.**).

**1.** <span style="font-variant: small-caps;">RESPONDENT'S POSITION</span>

### A. <u>Effect of pre-existing EC Treaties on the ECT</u>

250. Germany and Italy were members of the European Communities [the "**EC**"] (which eventually became the EU) when they signed and ratified the ECT[297]. Therefore, Italy submits that the ECT must be interpreted in light of the pre-existence of the EC's foundational treaties [the "**EC Treaties**", later the "**EU Treaties**"], pursuant to Arts. 31 and 32 of the VCLT[298].

251. <u>First</u>, Italy argues that the text of the ECT shows that the Contracting Parties considered the EU as a unified and pre-existing legal system, which prevailed over the ECT provisions on the same subject-matter[299]. Indeed:

- Art. 25 of the ECT recognizes the peculiar nature of the relations between members of the same "Economic Integration Agreement" ["**EIA**"] such as the EU[300], and

- Art. 16 of the ECT provides that nothing in Part III or V of the ECT must be interpreted so as to derogate from any provision of the EC Treaties with respect to investment promotion and protection, or from any right to dispute resolution under the EC Treaties[301].

252. <u>Second</u>, Italy refers to the context, purpose, and objectives of the ECT. The declarations related to Art. 25 of the ECT demonstrate that the Member States,

---

[294] R-I, para. 39.
[295] R-I, para. 38.
[296] R-I, para. 40, referring to Doc. RL-27, *République de Moldavie v Société Komstroy, venant aux droits de la société Energoalians*, Judgment of September 2, 2021 [GC], ECLI:EU:C:2021:655.
[297] R-I, paras. 47-48; R-II, para. 292.
[298] R-I, para. 51.
[299] R-I, para. 57.
[300] R-I, paras. 52, 54-55.
[301] R-I, para. 56.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

when signing the ECT, understood that the EC Treaties provided a preferential treatment to investors, protecting them irrespective of their nationality; Italy contends that this implies that, to avoid double protection of the same situation, the investor has no right to investment protection under the ECT as it already benefits from existing legal protections under EU law[302].

253. <u>Third</u>, Respondent alludes to the preparatory works and circumstances of adoption of the ECT, arguing that the goal of the ECT was to regulate relations between the European and the Eastern Europe energy markets and not to regulate the EU Internal Market[303]; thus, the ECT's main purpose was to guarantee peaceful dispute settlement with third countries outside the EU[304]. The recitals of the European Energy Charter distinguish between the adoption of the ECT and the completion of the Internal Energy Market within the EU[305].

254. <u>Lastly</u>, Respondent argues that the practice of the EU and its Member States has always been consistent with the reading that the ECT does not apply to intra-EU disputes. Indeed, until 2007 no investor-State dispute settlement claim concerning solely intra-EU parties had been instituted under the ECT. The first was *Electrabel*[306], where the issue of jurisdiction in intra-EU disputes was immediately raised by the respondent, the Republic of Hungary[307]. Thereafter, the EU and its Member States have consistently objected to the jurisdiction of arbitral tribunals. Italy interprets this as proof that both the EU and the Member States maintained a behavior that confirmed their intention for the ECT not to cover intra-EU situations[308]. According to Respondent[309], this view is confirmed by the declaration of 22 Member States[310] after the CJEU's *Achmea* Judgment[311].

## B.    <u>Evolution of the EU Treaties and consequences for the ECT</u>

255. Italy avers that should the Tribunal find that the above considerations do not sufficiently prove the intent of the Contracting Parties to exclude *ab initio* intra-EU disputes from the scope of the ECT arbitration clause, the inapplicability of the latter can still be derived from the posterior adoption of the Treaty of Lisbon[312]. Italy makes three points in this regard.

256. <u>First</u>, Italy recognizes that the ECT was originally concluded as a "mixed agreement", which fell within the competence of both the EU and its Member States. It argues, however, that foreign direct investment was shifted to the sole

---

[302] R-I, paras. 61-63; R-II, paras. 282-284.
[303] R-I, para. 65.
[304] R-II, paras. 288-290.
[305] R-I, para. 66.
[306] Doc. RL-4, *Electrabel*.
[307] R-I, paras. 68-69.
[308] R-I, para. 70.
[309] R-I, para. 71.
[310] Doc. RL-26, *Declaration of the Member States of 15 January 2019 on the Legal Consequences of the Achmea Judgment and on Investment Protection*, 15 January 2019, 2.
[311] Doc. RL-24, *Republic of Slovakia v. Achmea B.V.*, Case C-284/16 ["***Achmea Judgment***"].
[312] R-I, para. 74.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

competence of the EU upon the entry into force of the Treaty of Lisbon[313], and accordingly[314]:

- The allocation of competences between the EU and its Member States changed following the signing of the ECT, and many subject-matters covered by the ECT – including foreign direct investment within EU Member States – shifted to the exclusive competence of the EU; and

- The EU enjoys international legal personality and relies on the unity of its legal order; this implies that the EU fully recognizes the ECT by incorporating it into EU law and applying it throughout its territory, under the judicial authority of the CJEU.

257. Italy adds that granting the citizens and corporations of some of the EU Member States the right to resort to international arbitration, while excluding citizens and corporations of other EU Member States, would seriously jeopardize the core principle of non-discrimination within the EU[315].

258. <u>Second</u>, Italy argues that Art. 30 of the VCLT is applicable and has the following effect:

- The Treaty of Lisbon and the ECT relate to the same subject matter[316];

- Both treaties level the playing field, ensure development and offer protection to foreign investors from illegal discrimination[317];

- EU law is more favorable to investors and investments than the ECT;

- Art. 30(2) of the VCLT applies to the interplay between the ECT and the Lisbon Treaty[318]; and

- The same conclusion can be reached by Art. 16 of the ECT, which determines that for subsequent international agreements covering the same subject matter as Parts III and V of the ECT, nothing in those Parts must be construed to derogate from any provision of the other agreement, or from any right to dispute resolution with respect thereto under that agreement where any such provision is more favorable to the investor or investment[319].

259. <u>Third</u>, Italy says that the Treaty of Lisbon is a legitimate *inter se* agreement that derogates from the general rules of the ECT by reinforcing the treatment of investors and investments within the EU – as permitted by Art. 16 of the ECT. Art. 41 of the VCLT therefore applies, without the need for Member States to have notified the other parties to the ECT when adopting the Treaty of Lisbon, since the

---

[313] R-I, paras. 75-78; see also Doc. RL-7.
[314] R-I, paras. 84-86.
[315] R-I, para. 87.
[316] R-I, paras. 89-90.
[317] R-I, para. 94.
[318] R-I, para. 95.
[319] R-I, paras. 96-98.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

latter did not affect the other parties' enjoyment of rights and performance of obligations under the ECT[320].

## C.    Autonomy of the EU legal order

260.  Italy submits that the EU is an autonomous legal order, that has primacy over the municipal law of the Member States and is based on the fundamental premise that each Member State shares a set of common values with all other Member States[321]. This justifies the existence of mutual trust between the Member States, which requires all Member States to comply with EU law[322].

261.  Italy further explains that the CJEU and the courts and tribunals of the Member States are the guardians of the EU autonomous legal order. They cooperate by way of the preliminary ruling mechanism established by Art. 267 of the TFEU, which aims to ensure uniform application of EU law in all Member States[323].

262.  According to Italy, EU law provides for a set of remedies that ensure its proper application; and national courts and tribunals, in their function as ordinary courts within the EU legal order, have jurisdiction to hear actions for damages brought against Member States that have violated EU law[324]. Both the EU Treaties and the ECT allow EU investors to have recourse to domestic courts and tribunals in the EU[325]. Therefore, intra-EU investors are already adequately protected by the judicial system of the EU, which guarantees an adequate and fair dispute settlement mechanism, based on the efficient dialogue between domestic judges and the CJEU[326].

263.  Based on Arts. 267 and 344 of the TFEU, the power to resolve disputes involving EU law is reserved exclusively for dispute settlement mechanisms that belong to the EU's legal order and that can guarantee the autonomy and primacy of EU law. Investor-State dispute settlement under the ECT is not one such mechanism and is not conceivable in the relationship of mutual trust between Member States[327].

264.  In sum, Italy avers that the autonomy and primacy of EU law exclude the Tribunal's jurisdiction over intra-EU disputes[328]. Italy relies on the CJEU's findings in the *Republic of Moldova v. Komstroy LLC* case [the "***Komstroy* Judgment**"][329] that[330]:

    -    International agreements cannot infringe upon the principle of autonomy of the EU, the cornerstone of which is represented by its judicial system;

---

[320] R-I, paras. 101-104.
[321] R-I, paras. 111-112.
[322] R-I, para. 112.
[323] R-I, para. 113.
[324] R-I, para. 114.
[325] R-I, para. 115.
[326] R-II, para. 291.
[327] R-I, paras. 139, 144.
[328] R-I, para. 142.
[329] Doc. RL-27.
[330] R-I, paras. 158-162, referring to Doc. RL-27, *Komstroy* Judgment, paras. 42-45, 49, 64.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

- The ECT belongs to EU law, since the EU is a Contracting Party to the ECT, and therefore any dispute must be solved within the EU judicial system; and

- The fact that the ECT is a multilateral treaty does not alter the two previous conclusions.

### D.    Respondent's rejection of Claimants' motions

265. Italy rejects Claimants' motion that, so far, no arbitral tribunal has upheld an intra-EU objection, arguing that this is an erroneous trend that appears to be on the mend, as demonstrated by the fact that in the *Green Power Partners K/ and SCE Solar Don Benito APS v. Kingdom of Spain* case ["**Green Power**"] the arbitral tribunal found that it lacked jurisdiction to decide an intra-EU ECT dispute[331]. In any event, Italy says that this Tribunal is not bound by the decisions of other arbitral tribunals[332].

266. Italy also rebuts Claimants' position that the Tribunal should ignore EU law when determining its jurisdiction. According to Respondent, the *iuria novit curia* principle established by Art. 26(6) of the ECT requires the Tribunal to apply EU law to decide on its jurisdiction[333].

267. Finally, Italy submits that intra-EU investment arbitration contravenes the autonomy of EU law, as enshrined in Art. 344 TFEU[334]. Respondent argues that contrary to Claimants' submission, in the *Komstroy* Judgment the CJEU confirmed that the grounds for its decision in *Slovak Republic v. Achmea BV* [the "**Achmea Judgment**"] were not limited by the bilateral nature of the applicable treaty – rather, the same reasoning must be applied to arbitration under the ECT[335]. The *Komstroy* Judgment unequivocally demonstrates that investment tribunals do not have jurisdiction over intra-EU disputes under the ECT[336].

* * *

268. <u>In sum</u>, Italy argues that given its lack of consent to arbitrate disputes regarding the ECT with investors of other Member States, the appropriate forum for Claimants to bring their action are the competent national courts of the Italian Republic. Accordingly, the Tribunal should decline jurisdiction over the present dispute[337].

### 2.    THE EUROPEAN COMMISSION'S POSITION

269. In its *Amicus Curiae* Brief [or "EU-Brief"] the Commission addresses the Tribunal's jurisdiction and Respondent's intra-EU objection[338].

---

[331] R-II, paras. 276-287, referring to Doc. RL-60, *Green Power*.
[332] R-II, para. 275.
[333] R-II, paras. 294-298.
[334] R-II, para. 303.
[335] R-II, paras. 306-309.
[336] R-II, para. 310. See also paras. 311-316.
[337] R-I, paras. 164-166; R-II, paras. 319-320.
[338] EU-Brief, para. 5.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

270.  The Commission argues that prior to the *Komstroy* Judgment, there was no final and binding authentic interpretation as to whether Art. 26 of the ECT applies intra-EU; now, the CJEU has ruled that, properly construed, Art. 26 does not apply intra-EU[339]. The Commission asks this Tribunal to consider the approach taken by the tribunal in *Green Power*, which declined jurisdiction based on the *Komstroy* Judgment[340].

271.  The Commission submits that, in accordance with the *Komstroy* Judgment, Art. 26 must be interpreted as not applying to intra-EU disputes[341] for two major reasons[342]:

-  <u>First</u>, intra-EU investment arbitration violates the essential features of the EU autonomous legal order – which means that the reasoning set out in the *Achmea* Judgment also applies to Art. 26 of the ECT, and

-  <u>Second</u>, despite the multilateral nature of the ECT, a provision such as Art. 26 intended to govern bilateral relations between two Contracting Parties, just like a BIT, which means that the question of the intra-EU application of Art. 26 is also a matter internal to the EU legal system, which does not touch upon the rights of third countries that are Contracting Parties to the ECT.

272.  According to the Commission, public international law distinguishes, in the context of multilateral treaties, between bilateral legal relations (reciprocal obligations), *erga omnes partes* legal relations (interdependent obligations), and *erga omnes* legal relations (independent or self-standing obligations). The Commission submits that Art. 26 of the ECT creates a bundle of bilateral relations between Contracting Parties and, when both Contracting Parties are EU Member States, it must be interpreted as not being applicable[343].

273.  Furthermore, the Commission says that, in the hierarchy of EU legal norms, international agreements that are part of the EU legal order – such as the ECT – come below the EU Treaties and the general principles of EU law. The ECT must be interpreted so as to avoid a conflict with the rules of primary law[344]. The Commission concedes that while the interpretation reached by the CJEU in the *Komstroy* Judgment may not be the only possible interpretation of Art. 26 of the ECT, it is the only interpretation that prevents a conflict with primary law (*i.e.*, EU law) and therefore must be preferred as an expression of the principle of conformity through interpretation[345].

274.  Furthermore, the Commission contends that the CJEU's interpretation of Art. 26 of the ECT is binding on the Parties, because the CJEU was designated by the Member States as the competent body to rule on matters of interpretation of EU law. As the ECT does not itself entrust any other international court with authority to give

---

[339] EU-Brief, para. 6.
[340] EU-Brief, para. 9.
[341] EU-Brief, para. 23, referring to Doc. RL-27, *Komstroy* Judgment, para. 64.
[342] EU-Brief, paras. 15-22.
[343] EU-Brief, paras. 24-36.
[344] EU-Brief, paras. 38-39.
[345] EU-Brief, para. 40.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

binding interpretations of it[346], it follows that two Member States are obliged to rely on the mechanisms provided for by the EU Treaties, with the consequence that the CJEU has exclusive jurisdiction to interpret the ECT[347].

275. The Commission submits that the CJEU's interpretation in *Komstroy* applies retroactively (*ex tunc*) to rescind Italy's consent to arbitration; indeed, the CJEU and the Permanent Court of International Justice recognize that a rule when interpreted always had the content given to it by the competent international court[348].

276. In sum, the Commission argues that the *Komstroy* Judgment shows that Art. 26(2) of the ECT must be interpreted as inapplicable to intra-EU disputes, this finding being an authentic, binding and final interpretation of Art. 26 for the Contracting Parties concerned, Claimants and the Tribunal, which applies *ex tunc*.

277. Therefore, Italy did not validly consent to investor-State arbitration in relation to the present dispute and the Tribunal lacks competence to hear the case[349].

## 3.    CLAIMANTS' POSITION

278. Claimants' position is that the ECT applies to intra-EU disputes; in fact, despite the intra-EU objection having been raised by EU respondent States in over 40 arbitration matters, virtually no tribunal or annulment committee has ever accepted it[350] – except the tribunal in *Green Power*, which decision is, in any case, inapposite (**D.**). This is because the intra-EU objection finds no support in either[351]:

-    The text of the ECT (**A.**);

-    The negotiating history and object and purpose of the ECT (**B.**); or

-    International law rules of treaty interpretation (**C.**).

### A.    The express terms of the ECT

279. Claimants note that the ECT has not been modified since its entry into force in 1997[352]. Art. 26 of the ECT is applicable when its requirements are satisfied and does not contain any language indicating that investors from certain Contracting Parties cannot resolve their disputes with certain other Contracting Parties through the dispute resolution mechanism provided therein[353].

280. Claimants argue that a plain language interpretation of the ECT is sufficient to confirm the Tribunal's jurisdiction. According to Claimants, Italy gave its

---

[346] EU-Brief, paras. 43-45.
[347] EU-Brief, paras. 45-46.
[348] EU-Brief, paras. 55-59 (referring to, e.g., ECJ, *Vent de Colère*, C-262/12, EU:C:2013:851, para. 39; *Rights of Minorities in Upper Silesia,* 1928 P.C.I.J. (ser. A) No. 15).
[349] EU-Brief, paras. 65-71.
[350] C-II, para. 53.
[351] C-II, paras. 56-57.
[352] C-II, paras. 58, 59.
[353] C-II, paras. 60-63.

unconditional consent to ICSID arbitration under Art. 26 and cannot point to any concrete provision of the Treaty supporting an interpretation that would exclude intra-EU disputes[354].

281. Claimants reject Respondent's arguments that, by the terms of Art. 16 of the ECT, EU law prevailed over the ECT at the time of its conclusion, or that Art. 25 excludes intra-EU disputes[355].

## B.    The ECT's drafting history

282. Claimants further submit that the ECT's drafting history refutes Italy's objection for four reasons.

283. <u>First</u>, Claimants note that during the drafting of the ECT, the EU proposed a disconnection clause that would have limited the Treaty's intra-EU application, which was never adopted. The fact that the proposed clause was never adopted proves that the ECT was meant to apply intra-EU[356].

284. <u>Second</u>, Claimants submit that the aim of the ECT was to create an energy "community" in which all members would be subject to the same provisions, rules and obligations[357]. Furthermore, the *travaux préparatoires* prove that there were Member States who acknowledged that the ECT would be applicable between Member States[358].

285. <u>Third</u>, Claimants reject Respondent's argument that the Contracting Parties meant to apply the ECT only to disputes involving at least one party from outside the EU. Claimants say that Italy mischaracterizes the circumstances in which the Contracting Parties adopted the ECT[359].

286. <u>Fourth</u>, Claimants contend that the ECT's recitals do not create a distinction between the EU Internal Market and the ECT[360]. Claimants add that Italy does not specify which EU practice it believes should be considered to replace Art. 26 of the ECT; instead, Italy simply encourages investors to seek vindication of their rights before EU courts[361]. The alternative remedies that may be available to Claimants under EU law in domestic or regional courts are irrelevant to Italy's unconditional consent under Art. 26[362].

287. <u>In sum</u>, Claimants ask the Tribunal to apply the ECT "as it is written" since nothing about its drafting history, its *travaux préparatoires*, or its broader context, object, and purpose supports Italy's intra-EU objection[363].

---

[354] C-II, paras. 64-66; CD-1, slides 170-171.
[355] C-II, paras. 67-72.
[356] C-II, paras. 73-80; C-III, paras. 130-140; CD-1, slide 172.
[357] C-II, para. 81.
[358] C-II, paras. 82-83; C-III, paras. 142-143.
[359] C-II, para. 86.
[360] C-II, paras. 87-89.
[361] C-II, paras. 90-91.
[362] C-III, paras. 162-168.
[363] C-II, para. 92.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

### C.   No primacy of EU law over the ECT

#### a.   The evolution of EU law did not affect ECT's *intra*-EU application

288.  Claimants argue that Italy misrepresents the principle of primacy under EU law[364]. Claimants argue that the primacy of EU law only relates to the law of the Member States, but not to the ECT and other international law instruments[365].

289.  Furthermore, Claimants rebut Italy's argument that the adoption of the Treaty of Lisbon in 2009 prohibited the application of the ECT to intra-EU disputes in light of Art. 30 of the VCLT or, alternatively, under Art. 16 of the ECT[366]. Claimants further deny that the Treaty of Lisbon and the ECT share the same subject matter[367].

290.  Even if the Treaty of Lisbon and the ECT did share the same subject matter and the Treaty of Lisbon were considered the subsequent treaty, Arts. 30(3) and (4)(a) of the VCLT confirm that the earlier-in-time treaty applies unless it is incompatible with the subsequent treaty[368]. And even if Art. 30 of the VCLT were applicable, its application would be limited by Art. 41 of the VCLT, which prohibits the modification of the ECT in the present case[369].

291.  In any case, if there was a conflict between the ECT and the Treaty of Lisbon, Art. 16 of the ECT would resolve such conflict in favor of the ECT since Italy fails to illustrate how EU law would grant a higher level of protection than the ECT[370].

292.  In sum, Claimants argue that Italy has not demonstrated that the ECT became incompatible with EU law [371].

#### b.   The *Komstroy* Judgment is irrelevant

293.  Claimants say that the *Komstroy* Judgment is irrelevant for the Tribunal's decision on jurisdiction for five reasons.

294.  First, the CJEU's statement about Art. 26 of the ECT is an *obiter dictum* and the CJEU did not conduct an analysis under relevant international law[372].

295.  Second, the Tribunal's jurisdiction is exclusively governed by the ECT and the ICSID Convention[373]. The Tribunal is obliged to exercise its jurisdiction once the jurisdictional requirements of Art. 26 of the ECT are satisfied[374]. Claimants add that the provisions of Art. 26(6) of the ECT are not applicable to questions of jurisdiction, and even if they were, do not include EU law as a body of law that may

---

[364] C-II, para. 102.
[365] C-II, paras. 93-94.
[366] C-II, paras. 103 *et seq*.
[367] C-II, paras. 104-106.
[368] C-II, paras. 107-110.
[369] C-II, paras. 111-115
[370] C-II, paras. 117-122
[371] C-II, para. 123.
[372] CD-1, slide 177.
[373] CD-1, slide 177.
[374] C-II, para. 131.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

be applied to ECT disputes[375]. It is not possible to interpret Art. 26(6) of the ECT in accordance with Arts. 31 and 32 of the VCLT and conclude that the former includes EU law – it can only refer to public international law[376].

296.  Third, even if EU law and the *Komstroy* Judgment were relevant to the question of the Tribunal's jurisdiction under the ECT, this would merely mean that there is a conflict between EU law as interpreted by the CJEU in *Komstroy* and the ECT – which Art. 16 of the ECT resolves[377].

297.  Fourth, the CJEU's decisions are not binding upon nor relevant to an ECT Tribunal constituted under the ICSID Convention[378].

298.  Finally, every ECT tribunal post-*Komstroy* (except one) has rejected the intra-EU objection[379].

299.  In any case, Claimants contend that neither the *Komstroy* Judgment nor the EU law principles of autonomy and uniformity apply retroactively to annul Italy's consent to ICSID arbitration under the ECT[380]. The *Komstroy* Judgment does not apply *ex tunc* and does not retroactively rescind Italy's and Germany's consent to investment arbitration under Art. 26, given that this would violate the customary international law rule that jurisdiction is determined by reference to the date of a claimant's filing of its request for arbitration or notice letter[381].

300.  In sum, Claimants conclude that the *Komstroy* Judgment has done nothing to resurrect the intra-EU objection in ECT practice and ask the Tribunal to reject Italy's objection for all the foregoing reasons[382].

**D.    The *Green Power* decision is inapposite**

301.  Claimants note that several tribunals dismissed requests for reconsideration based on the *Green Power* decision[383]. According to Claimants, the *Green Power* decision is unpersuasive in five respects[384].

302.  First, unlike the present arbitration, which is governed by the ICSID Convention, *Green Power* was a Stockholm Chamber of Commerce ["**SCC**"] arbitration seated in Stockholm, Sweden, where EU law applied to the dispute as the *lex arbitri*[385]. The tribunal itself recognized that its decision was based on the fact that the

---

[375] C-II, para. 132-141.
[376] C-II, paras. 142-144.
[377] C-II, paras. 145-148.
[378] CD-1, slide 177.
[379] C-II, paras. 124-175; CD-1, slides 157-164.
[380] C-III, paras. 169-193.
[381] C-III, paras. 183-185.
[382] C-II, paras. 175-176.
[383] C-III, paras. 28-32, referring to Doc. CL-196, *Mathias Kruck*, p. 2; Doc. CL-194, *InfraCapital*, paras. 40, 41, 44, 45.
[384] C-III, para. 34.
[385] C-III, paras. 36-41.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

arbitration had its seat in a Member State and was not subject to the ICSID Convention[386].

303. <u>Second</u>, Claimants submit that the *Green Power* tribunal wrongly found that its interpretative analysis should extend beyond the express terms of the ECT, contradicting, in Claimants' view, Art. 31 of the VCLT[387].

304. <u>Third</u>, the *Green Power* tribunal misconstrued two key documents from the ECT's *travaux préparatoires*[388].

305. <u>Fourth</u>, Claimants allege that the *Green Power* tribunal erred in its analysis and application of the EU principle of primacy by extending it to the ECT and general international law[389].

306. <u>Lastly</u>, Claimants submit that the *Green Power* tribunal failed to apply the conflicts provision in Art. 16 of the ECT, contradicting once again Art. 31 of the VCLT[390].

307. <u>In sum</u>, Claimants request the Tribunal to dismiss Italy's intra-EU objection and to find that it has jurisdiction over the present dispute.

**4.    ANALYSIS BY THE TRIBUNAL**

308. Before discussing the Parties' arguments (**4.2**), the Tribunal summarizes below the chronology of key facts concerning the establishment of the EU and EU autonomous legal order, which inform Italy's Intra-EU Objection, as supported by the EU (**4.1**).

**4.1    CHRONOLOGY OF RELEVANT FACTS**

**A.    1952-1958: The creation of the European Communities**

309. In 1952 the European Coal and Steel Community was formed by six European countries, including Italy and the Federal Republic of Germany, by signing the Treaty of Paris. In 1957, these six founding States signed two other treaties (known as the Treaties of Rome), which established the European Economic Community and the European Atomic Energy Community. These three Communities became known as the European Communities ["**EC**"].

**B.    1970s: The ICSID Convention**

310. The ICSID Convention entered into force on 18 May 1969 for Germany and on 28 April 1971 for Italy.

---

[386] CD-1, slide 187.
[387] C-III, paras. 54-76.
[388] C-III, paras. 77-98.
[389] C-III, paras. 99-114.
[390] C-III, paras. 115-124.

### C.    1992: The Treaty of Maastricht

311.  In 1992, the EC Member States concluded the Treaty on the European Union ["**TEU**"] which united the three pillars of European integration (the EC, the Common Foreign and Security Policy and the Police and Judicial Cooperation in Criminal Matters) into the EU. The Treaty of Maastricht entered into force on 1 November 1993.

### D.    1994-1998: The ECT

312.  After the fall of the Iron Curtain and the collapse of the Soviet Union, European States started to negotiate a framework to promote East-West cooperation in the energy sector. On 17 December 1991 the "**European Energy Charter**", a non-binding declaration of principles, was signed by more than 50 States and the EC itself.

313.  Based on this declaration, and after extensive negotiations, on 17 December 1994 41 States and the EC signed the ECT in Lisbon, with the goal of ensuring[391]:

> "[…] the creation of a 'level playing field' for energy sector investments throughout the Charter's constituency, with the aim of reducing to a minimum the non-commercial risks associated with energy-sector investments."

314.  Both Italy and Germany were signatory States, and both deposited their instruments of ratification on 16 December 1997[392]. So did the EC. When submitting its ratification instrument to the ECT Secretariat, the EC expressly affirmed that[393]:

> "The European Communities and their Member States have both concluded the Energy Charter Treaty and are thus internationally responsible for the fulfilment of the obligations contained therein, in accordance with their respective competences.
>
> The Communities and the Member States will, if necessary, determine among them who is the respondent party to arbitration proceedings initiated by an Investor of another Contracting Party. In such case, upon the request of the Investor, the Communities and the Member States concerned will make such determination within a period of 30 days."

315.  A footnote to this latter statement reads that "[t]his is without prejudice to the right of the investor to initiate proceedings against both the Communities and their Member States"[394].

316.  Note that the declaration made by the EC when ratifying the ECT refers "to the right of the investor to initiate proceedings against both the Communities and their

---

[391] Doc. CL-15, p. 14.
[392] Doc. C-330.
[393] Although this statement is not on the case record, it has been transcribed in other investor-State decisions and in doctrinal works. See, e.g., Doc. RL-4, *Electrabel*, Part V, p. 8; Doc. CL-190, *LSG*, para. 505; Doc. CL-91, p. 101.
[394] See Doc. CL-190, *LSG*, para. 505.

Member States" – and that there is no reference at all limiting this right to investors who are not national of EU States.

317.  The ECT entered into force on 16 April 1998.

### E.    2006: The Commission's position in *Eastern Sugar*

318.  The issue of the compatibility between intra-EU BITs and EU law was raised for the first time in the case of *Eastern Sugar v. Czech Republic*[395]. The partial award rendered in 2007 appears to be the first published investment arbitration award addressing this issue.

319.  Eastern Sugar was an UNCITRAL arbitration seated in Paris, under the Czech-Netherlands BIT of 1991. The Dutch investor, Eastern Sugar, alleged that certain regulatory measures adopted by the Czech Republic between 2000 and 2003 had breached the BIT. The Czech Republic raised the objection that upon the Republic's accession to the EU in May 2004, the EU Treaties had superseded the Czech-Netherlands BIT, since both agreements regulated the same subject-matter.

320.  The *Eastern Sugar* tribunal dismissed the jurisdictional objection raised by the Czech Republic, noting that the BIT had not been expressly terminated by the Accession Treaty of the Czech Republic, nor by the Contracting States pursuant to the termination procedure of the BIT[396].

321.  The Czech Republic consulted the European Commission, who filed an opinion in January 2006. In its opinion, which is reproduced in the *Eastern Sugar* partial award[397], the Commission stated the following:

> "a) EC law prevails in a Community context as of accession
>
> Given that the rights and obligations of membership come into force on accession rather than on signature or ratification, the applicable date can be considered as 1 May 2004.
>
> Based on [CJEU] jurisprudence Article 307 EC is not applicable once all parties of an agreement have become Member States. Consequently, such agreements cannot prevail over Community law.
>
> For facts occurring after accession, the BIT is not applicable to matters falling under Community competence. Only certain residual matters, such as diplomatic representation, expropriation and eventually investment promotion, would appear to remain in question.
>
> Therefore, where the EC Treaty or secondary legislation are in conflict with some of these BITs' provisions – or should the EU adopt such rules in the

---

[395] Doc. CL-95; *Eastern Sugar B.V. v. Czech Republic*, SCC Case No. 088/2004, Partial Award, 27 March 2007 ["***Eastern Sugar***"].
[396] Doc. CL-95, *Eastern Sugar*, paras. 143-146, 153.
[397] Doc. CL-95. *Eastern Sugar*, para. 119.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

future – Community law will automatically prevail over the non-conforming BIT provisions.

As you mention correctly, the application of intra-EU BITs could lead to a more favourable treatment of investors and investments between the parties covered by the BITs and consequently discriminate against other Member States, a situation which would not be in accordance with the relevant Treaty provisions.

The [C]ommission therefore takes the view that intra-EU BITs should be terminated in so far as the matters under the agreements fall under Community competence.

b) Effect on existing BITs

However, the effective prevalence of the EU acquis does not entail, at the same time, the automatic termination of the concerned BITs or, necessarily, the non-application of all their provisions.

Without prejudice to the primacy of Community law, to terminate these agreements, Member States would have to strictly follow the relevant procedure provided for this in regard in the agreements themselves. Such termination cannot have a retroactive effect.

c) Dispute settlement procedures

As mentioned above, Community law, including the jurisdiction of the Court of Justice, in principle prevails from the date of accession. However, the transitional situation until the BITs are formally terminated may result in complex questions of interpretation with regard to jurisdiction in particularly [sic] with regard to pending arbitration procedures but also in relation to rules such as Article 13 in the BIT between the Czech Republic and the Netherlands, which provides for an extended application of the agreement in a certain period after termination.

In so far as conflicts between Member States are concerned, it follows from Article 292 EC that the Member States cannot apply the settlement procedures provided for in the BITs in so far as the dispute concerns a matter falling under Community competence.

On the other hand, if the dispute concerns an investor-to-state claim under a BIT, the legal situation is more complex. Since Community law prevails from the time of accession, the dispute should be decided on basis of Community law (which indirectly also follows from Article 8(6) first bullet point in the agreement between the Czech Republic and the Netherlands). However, it may be argued that the private investor could continue to rely on the settlement procedures provided for in the agreement until formal termination of the BIT if the dispute concerns facts which occurred before accession. The primacy of Community law should in such instance be considered by the arbitration instance.

The primacy of EU law and its definite interpretation by the European Court of Justice would not necessarily preclude a legal instance (arbitration) in

another jurisdiction arriving at a different conclusion, even in an international agreement between two Member States.

In particular, in order to avoid any legal problem with regard to an arbitration procedure, <u>existing BITs between Member States should, as mentioned above, therefore be terminated. The formal termination can only be done according to the provisions of the agreement in question.</u> I would note that this principle would not only apply to the Czech BIT with the Netherlands, which would seem to have given rise to a significant amount of litigation, but also those of the Czech Republic with 21 other Member States. <u>Without prejudice to the primacy of Community law, termination of the BIT would take effect according to the respective provisions of each such BIT.</u>" [Emphasis added]

322. Thus, in 2006 the view of the Commission was that, even though EU law prevails over international agreements between Member States, accession to the EU did not automatically terminate BITs. The Commission found that Member States should take steps to terminate such agreements, as far as they interfered with EU competences, by "strictly" following the relevant procedure thereunder. The Commission acknowledged that "such termination cannot have a retroactive effect"[398].

323. This opinion was ratified in a Note dated November 2006 (from the Internal Market and Services DG to the Economic and Financial Committee), by which the Commission recommended that Member States "exchange notes to the effect that such [intra-EU] BITs are no longer applicable, and also formally rescind such agreements"[399].

### F.    <u>2009: EU Commission position in *Electrabel*</u>

324. The first time the intra-EU objection was raised in an ECT case was in *Electrabel v. Hungary*, which arose out of the termination of a power purchase agreement[400]. Even though Hungary did not question the jurisdiction of the tribunal to decide claimant's claims[401], the Commission asked to appear as *amicus curiae*. In its *amicus curiae* submission, dated 12 June 2009, the Commission noted that[402]:

"45. […] in international law, the ECT has fully legally binding effects upon both the Community and its Member States alike.

46. However, this does not mean that both the Community and its Member States have become internally competent for all matters falling under the ECT. Rather, since such a declaration on competences would only have stated the existing distribution between the two, nothing can be inferred from its absence either. Notably, the absence of such declaration does not mean that any conduct by an EU-Member State automatically and exclusively concerns

---

[398] This position was reiterated by the Commission and the Netherlands in the *Achmea* arbitration (see Doc. CL-118, *Achmea B.V. (formerly Eureko) v. Slovak Republic*, PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension [hereinafter "***Achmea* Jurisdiction**"], paras. 156, 180, 187).
[399] Doc. CL-95, *Eastern Sugar*, para. 126.
[400] Doc. RL-4, *Electrabel*.
[401] Doc. RL-4, *Electrabel*, part V, pp. 13-14, paras. 5.26-5.29.
[402] Doc. RL-4, *Electrabel*, part V, pp. 7-12, citing paras. 45-46 and 66-67 of the Commission's submission.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

matters falling under its own competence. If the Member States were competent for all matters covered by the ECT, it would have sufficed if they alone had concluded the ECT. This is not the case. Rather, <u>in particular for intra-European disputes, it always needs to be determined whether the EC or the Member State is internationally responsible for a certain conduct in accordance with their respective competences.</u> […]

66. […] <u>it is not reasonable to assume that the Community and its Member States granted access to international litigation against Community measures to their own investors by concluding the Energy Charter Treaty</u>. Accordingly, <u>Article 26(1) ECT excludes that a Community investor may bring a case against the Community before an international arbitration tribunal against a Community measure</u>. Such rights are reserved for non-EU investors.

67. In sum, the European Commission is of the view that <u>the Tribunal lacks jurisdiction over the termination claim because the latter fails [sic] under the competence of the Community, but was brought by an EU investor</u>. The proper avenue for the EU investor is to seek protection for this claim before Community courts, and this is indeed what most of the operators, including as it appears Dunamenti, have done." [Emphasis added]

325. Thus, in the *Electrabel* case, the Commission mainly took issue with the fact that claimant's claim against Hungary (that the power purchase agreement had been unduly terminated) constituted a direct challenge to the Commission's authority on State aid policy. Hungary did not share the view of the Commission. In the words of the tribunal, summarizing Hungary's position[403]:

"5.29 The Respondent does not however make any jurisdictional objection to the PPA Termination Claim because <u>the Respondent acknowledges that the Claimant's claim is narrowly limited to whether the Respondent's own actions in terminating the PPA violated the ECT, rather than attempting to hold the Respondent liable for the actions of the European Commission and the direct effects of its Final Decision</u>. The Respondent considers that, in contrast, the European Commission's Submission treats the Claimant's PPA Termination Claim as constituting a direct challenge to European Commission's Final Decision and the Commission's legal authority to implement State aid policy within the EU. Thus, unlike the Respondent, the Commission submits that this claim should be dismissed on grounds of jurisdiction as impugning a Community measure." [Emphasis added]

326. The tribunal eventually dismissed the Commission's jurisdictional submissions, after finding that the investor was not bringing a claim against the Commission, but rather against Hungary. Claimant was not impugning any act by an EU institution, nor alleging liability of the EU, or seeking to attribute liability to Hungary for any act of the EU[404]. The tribunal noted that[405]:

"5.36 […] the European Commission's jurisdictional submissions […] may rest (at least in part) upon a <u>significant misunderstanding of the scope of the Claimant's case as regards its PPA Termination Claim in this arbitration</u>.

---

[403] Doc. RL-4, *Electrabel*, part V, p. 14, para. 5.29.
[404] Doc. RL-4, *Electrabel*, part V, pp. 15-22.
[405] Doc. RL-4, *Electrabel*, part V, p. 16, para. 5.36.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

> Contrary to the European Commission's Submission, <u>this arbitration is not</u>
> <u>"international litigation against Community measures"</u> (see paragraph 66,
> cited above). In the circumstances, the Tribunal does not here address what
> the position might be if the Claimant were impugning a Community measure,
> e.g. the European Commission's Final Decision of 4 June 2008." [Emphasis
> added]

327. <u>In sum</u>, in *Electrabel* the Commission did not question that an intra-EU investor
could start an investment dispute under the ECT against a Member State, but rather
against the EU itself.

### G.    2009: The Treaty of Lisbon

328. The last substantial EU reform was implemented through the Treaty of Lisbon,
signed in December 2007 and in force since December 2009. The Treaty of Lisbon
amended the Treaty of Maastricht and replaced the Treaty of Rome with the TFEU.

### H.    2009-2013: Claimants' investments in Italy

329. Claimants' investments in Italy are explained in detail under section VI.2 *infra*,
together with the applicable framework for renewables under international law and
EU Directives and their implementation into Italian legal and regulatory
frameworks by Italy. For the purposes of this section the Tribunal simply notes that
the Claimants operating companies acquired their PV plants in Italy between July
2009 and July 2013[406].

### I.    2014-2016: Italy's withdrawal from the ECT

330. Italy withdrew from the ECT on 31 December 2014, effective as of 1 January
2016[407]. The ECT termination provisions provide a 20-year sunset protection
following termination for existing investments.

### J.    March 2018: The *Achmea* Judgment

#### a.    Background

331. The *Achmea* Judgment concerns a preliminary ruling submitted to the CJEU on
23 May 2016 by the German *Bundesgerichtshof* (Federal Court of Justice)
["**BGH**"][408], after the BGH was asked to decide an appeal from the Slovak Republic
regarding an application to set aside the award rendered in the UNCITRAL
arbitration between Achmea B.V. (formerly Eureko B.V.) ["**Achmea**"], a Dutch
insurance company, and Slovakia, under the Czechoslovakia-Netherlands BIT[409].

---

[406] See Section VI.2 *infra*. See also Annex to the Award; Key Dates for Claimants' Investments and Plant
Enrollment, dated 30 September 2022.
[407] Doc. C-12.
[408] Doc. RL-24, *Achmea* Judgment, para. 13.
[409] Doc. CL-118, *Achmea* Jurisdiction, para. 46.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

### b.    Arbitration

332. Following the liberalization of the insurance market in the Slovak Republic in 2004[410], Achmea established a subsidiary in Slovakia to market private health insurance products[411]. In 2006, the Slovak Republic reversed the liberalization process of the insurance sector, allegedly affecting Achmea's investment[412].

333. Achmea initiated an arbitration against the Slovak Republic pursuant to the Czechoslovakia-Netherlands BIT (in force since October 1992[413]) and the UNCITRAL Rules. The parties agreed on Frankfurt as the seat of the arbitration.

334. Particularly significant is the fact that Art. 8(6) of the Czechoslovakia-Netherlands BIT provided that when deciding a dispute between an investor and a Contracting Party to the BIT, the arbitral tribunal should decide on the "basis of the law" taking into account[414]:

> "– the law in force of the Contracting Party concerned;
>
> – the provisions of this Agreement, and other relevant agreements between the Contracting Parties;
>
> – the provisions of special agreements relating to the investment;
>
> – the general principles of international law." [Emphasis added]

335. On 28 October 2010 the tribunal in the *Achmea* arbitration issued a partial award on jurisdiction, dismissing Slovakia's jurisdictional objections according to which:

- The Czechoslovakia-Netherlands BIT had been terminated or was inapplicable pursuant to Arts. 59 and 30 of the VCLT, due to Slovakia's accession to the EU in 2004[415]; and

- The Czechoslovakia-Netherlands BIT was incompatible with the EU Treaties, the autonomy of the EU legal order and the supremacy of EU law[416].

336. On 7 December 2012, the tribunal issued its final award, finding Slovakia liable for breaching its obligations under the Czechoslovakia-Netherlands BIT.

### c.    Set aside proceeding

337. During an action to set aside the award in the German courts, the Slovak Republic raised doubts as to the compatibility of the arbitral clause in Art. 8 of the

---

[410] Doc. CL-118, *Achmea* Jurisdiction, paras. 7 and 51-53.
[411] Doc. CL-118, *Achmea* Jurisdiction, paras. 7 and 51-53.
[412] Doc. CL-118, *Achmea* Jurisdiction, para. 54.
[413] Doc. CL-118, *Achmea* Jurisdiction, para. 46.
[414] Doc. RL-24, *Achmea* Judgment, para. 64.
[415] Doc. CL-118, *Achmea* Jurisdiction, paras. 265 and 277.
[416] Doc. CL-118, *Achmea* Jurisdiction, paras. 278-283.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

Czechoslovakia-Netherlands BIT[417] with Arts. 18, 267 and 344 of the TFEU[418]. Although the BGH did not consider such an incompatibility to exist[419], the BGH decided to stay the set aside proceedings and refer certain questions to the CJEU for a preliminary ruling[420].

### d.   The *Achmea* Judgment

338. On 6 March 2018, the CJEU (Grand Chamber) issued its ruling on the *Achmea* case, after hearing submissions from Achmea, the Slovak Republic, the Advocate General, the Commission and 15 Member States. The CJEU found that[421]:

> "Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept." [Emphasis added]

339. The CJEU found that arbitral clauses in intra-EU BITs that provide jurisdiction to investment arbitration tribunals such as in the Czechoslovakia-Netherlands BIT are precluded by Arts. 267 and 344 of the TFEU.

340. According to the CJEU, an international agreement cannot affect the allocation of powers fixed by the EU Treaties or the autonomy of the EU legal system, observance of which is ensured by the CJEU[422]. The CJEU recalled that EU law is characterized by the fact that it stems from an independent source of law, has primacy over the domestic laws of Member States, and its provisions have a direct effect on nationals and Member States[423]. National courts and tribunals and the CJEU have an obligation to ensure the full application and respect of EU law in all Member States[424]. To ensure the uniform interpretation of EU law, courts and tribunals of Member States can request a preliminary ruling from the CJEU, pursuant to Art. 267 of the TFEU[425].

341. In light of these principles, the CJEU examined whether arbitral tribunals in arbitrations based on intra-EU BITs could apply or interpret EU law. The CJEU

---

[417] Significantly, Art. 8(6) of the Czechoslovakia-Netherlands BIT provides that: "The arbitral tribunal shall decide on the basis of the law, taking into account in particular though not exclusively: the law in force of the Contracting Party concerned; the provisions of this Agreement, and other relevant agreements between the Contracting Parties; the provisions of special agreements relating to the investment; the general principles of international law." (Doc. RL-24, *Achmea* Judgment, para. 46).
[418] Doc. RL-24, *Achmea* Judgment, para. 14.
[419] Doc. RL-24, *Achmea* Judgment, paras. 14-23.
[420] Doc. RL-24, *Achmea* Judgment, para. 23.
[421] Doc. RL-24, *Achmea* Judgment, para. 62.
[422] Doc. RL-24, *Achmea* Judgment, para. 32.
[423] Doc. RL-24, *Achmea* Judgment, para. 33.
[424] Doc. RL-24, *Achmea* Judgment, para. 36.
[425] Doc. RL-24, *Achmea* Judgment, para. 37.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

found that, although investment arbitration tribunals are called upon to rule on alleged breaches of the Czechoslovakia-Netherlands BIT provisions, to do so they must, in accordance with Art. 8(6) of the Czechoslovakia-Netherlands BIT, take into account "the law in force in the Contracting [State] concerned" and "other relevant agreements between the Contracting [States]". As EU law forms part of the law in force in every Member State and derives from an international agreement between Member States[426], it follows that investment arbitration tribunals may be called upon to interpret or apply EU law[427].

342. In answering the second question – whether an investment tribunal is a court or tribunal of a Member State within the meaning of Art. 267 of the TFEU – the CJEU concluded that an investment arbitration tribunal does not form part of the judicial system of the respective Member States and therefore does not qualify as a court or tribunal of a Member State for the purposes of Art. 267 of the TFEU[428].

343. The CJEU also turned to the subsidiary question: whether an award made by an investment arbitration tribunal is subject to review by a court of a Member State, which would ensure that the questions of EU law addressed by the tribunal can be submitted to the CJEU through a reference for a preliminary ruling[429]. The CJEU acknowledged that, whilst in the case under review German law permitted the German court to request a preliminary ruling from the CJEU, such judicial review could only be exercised if and to the extent that the national law in question so permits[430].

344. Therefore, the CJEU found that[431]:

> "[B]y concluding the BIT, the Member States parties to it established a mechanism for settling disputes between an investor and a Member State <u>which could prevent those disputes from being resolved in a manner that ensures the full effectiveness of EU law, even though they might concern the interpretation or application of that law</u>." [Emphasis added]

345. In addition, the CJEU added that BITs concluded between two Member States without participation of the EU that provide the possibility to submit investment disputes to a body which does not form part of the EU judicial system[432]:

> "[C]all into question not only the principle of mutual trust between the Member States but also the preservation of the particular nature of the law established by the Treaties, ensured by the preliminary ruling procedure provided for in Article 267 TFEU, and is not therefore compatible with the principle of sincere cooperation referred to in paragraph 34 above [which references Article 4(3) TEU].

---

[426] Doc. RL-24, *Achmea* Judgment, paras. 40-41.
[427] Doc. RL-24, *Achmea* Judgment, para. 42.
[428] Doc. RL-24, *Achmea* Judgment, paras. 45, 46 and 48, 49.
[429] Doc. RL-24, *Achmea* Judgment, para. 50.
[430] Doc. RL-24, *Achmea* Judgment, para. 53.
[431] Doc. RL-24, *Achmea* Judgment, para. 56.
[432] Doc. RL-24, *Achmea* Judgment, paras. 58-59.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

In those circumstances, Article 8 of the BIT has an adverse effect on the autonomy of EU law."

346. Based on this reasoning, the CJEU concluded that[433]:

"Consequently, the answer to Questions 1 and 2 is that Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept."

### K.   July 2018: The Commission's post-*Achmea* position

347. In July 2018, following the *Achmea* Judgment, the Commission issued a communication to the EU Parliament and the Council noting that[434]:

"Following the *Achmea* judgment, the Commission has intensified its dialogue with all Member States, <u>calling on them to take action to terminate the intra-EU BITs, given their incontestable incompatibility with EU law.</u> The Commission will monitor the progress in this respect and, if necessary, may decide to further pursue the infringement procedures. […]

This implies that all investor-State arbitration clauses in intra-EU BITS are inapplicable and that <u>any arbitration tribunal established on the basis of such clauses lacks jurisdiction due to the absence of a valid arbitration agreement.</u> As a consequence, <u>national courts are under the obligation to annul any arbitral award rendered on that basis and to refuse to enforce it.</u> Member States that are parties to pending cases, in whatever capacity, must also draw all necessary consequences from the *Achmea* judgment. Moreover, pursuant to the principle of legal certainty, they are bound to formally terminate their intra-EU BITs." [Emphasis added]

348. However, and even though the *Achmea* Judgment contained no reference to the ECT, the Commission went on to make a specific finding regarding the ECT[435]:

"The <u>*Achmea* judgment is also relevant for the investor-State arbitration mechanism established in Article 26 of the Energy Charter Treaty as regards intra-EU relations</u>. This provision, if interpreted correctly, does not provide for an investor-State arbitration clause applicable between investors from a Member State of the EU and another Member States of the EU. Given the primacy of Union law, <u>that clause, if interpreted as applying intra-EU, is incompatible with EU primary law and thus inapplicable.</u> Indeed, the reasoning of the Court in *Achmea* applies equally to the intra-EU application of such a clause which, just like the clauses of intra-EU BITs, opens the possibility of submitting those disputes to a body which is not part of the judicial system of the EU. <u>The fact that the EU is also a party to the Energy Charter Treaty does not affect this conclusion: the participation of the EU in</u>

---

[433] Doc. RL-24, *Achmea* Judgment, para. 60.
[434] Doc. RL-25, pp. 2-3.
[435] Doc. RL-25, pp. 3-4.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

that Treaty has only created rights and obligations between the EU and third countries and has not affected the relations between the EU Member States." [Emphasis added]

349. The position of the Commission in 2018 is significantly different from that stated in 2006 in *Eastern Sugar*. Although the Commission had called on Member States to formally terminate their intra-EU BITs in 2006, it considered that "[s]uch termination cannot have retroactive effect". Accordingly, investors could continue to rely on BITs as instruments to protect their investments. In 2018, the Commission took a Copernican turn: it held that arbitral tribunals in pending arbitrations were required, as a matter of law, to decline jurisdiction and that national courts "are under an obligation to annul any arbitral award" – and that this would apply to any agreements between Member States (not only BITs), including multilateral agreements such as the ECT.

**L.    2019: The Member States' Declaration**

350. On 15 January 2019, 22 Member States (including Italy and Germany) issued a joint "Declaration of the representatives of the Governments of the Member States, on the legal consequences of the judgment of the Court of Justice in *Achmea* and on investment protection in the European Union"[436] [the "**Member States Declaration**"]. The Declaration, however, was not signed by all Member States due to divergences regarding the application of the *Achmea* Judgment to the ECT.

351. The Declaration expressed the position that EU law takes precedence over intra-EU BITs, and consequently, all arbitral clauses providing for investor-State arbitration in such BITs are contrary to EU law and are thus inapplicable and do not produce effects, with the result that arbitral tribunals established based on such clauses lack jurisdiction on account of an invalid offer of consent in the treaty[437]. Regarding the application of the *Achmea* Judgment to the ECT, the declaration expressed that[438]:

> "Arbitral tribunals have interpreted the Energy Charter Treaty as also containing an investor-State arbitration clause applicable between Member States. Interpreted in such a manner, that clause would be incompatible with the Treaties and thus would have to be disapplied. […]
>
> Beyond actions concerning the Energy Charter Treaty based on this declaration, Member States together with the Commission will discuss without undue delay whether any additional steps are necessary to draw all the consequences from the *Achmea* judgment in relation to the intra-EU application of the Energy Charter Treaty." [Emphasis added]

---

[436] Doc. RL-26.
[437] Doc. RL-26, p. 1.
[438] Doc. RL-26, p. 2 and para. 9.

**M.    2018-2021: ECT decisions after the *Achmea* Judgment**

352. Following the CJEU's *Achmea* Judgment, 29 investment arbitral tribunals or annulment committees constituted in ECT cases rejected the intra-EU objections brought by the State party[439].

**N.    May 2020: The Termination Treaty**

353. On 5 May 2020, 23 Member States (including Germany and Italy) signed an "Agreement for the termination of bilateral investment treaties between the Member States of the European Union"[440] [the "**Termination Treaty**"].

354. The Termination Treaty is an international agreement that purports to terminate all intra-EU BITs, together with their sunset clauses, "as soon as this Agreement enters into force for the relevant Contracting Parties", *i.e.*, 30 days after their ratification by the particular Member State. However, the Termination Treaty expressly provides that it only[441]:

> "[…] addresses intra-EU bilateral investment treaties; it does not cover intra-EU proceedings on the basis of Article 26 of the Energy Charter Treaty. The European Union and its Member States will deal with this matter at a later stage." [Emphasis added]

**O.    September 2020: Claimants' Request for Arbitration**

355. On 21 September 2020 Claimants filed their Request for Arbitration against Italy.

**P.    2021: The *Komstroy* Judgment**

**a.    Background**

356. The *Komstroy* Judgment concerns a request for a preliminary ruling submitted to the CJEU on 24 September 2019 by the *Cour d'appel de Paris*. The Paris Court was asked – for the second time – to set aside the award rendered in an UNCITRAL arbitration under the ECT between an Ukrainian company (Energoalians, predecessor in law of Komstroy) and the Republic of Moldova (note that neither claimant nor the respondent State form part of the EU)[442].

357. The background for the *Komstroy* Judgment arises from a series of contracts concluded between 1999 and 2000: Energoalians, an Ukrainian distributor, signed a contract with Ukrenegro, a Ukrainian State-owned enterprise, for the purchase of electricity. Energoalians resold this energy to Derimen, a company registered in the British Virgin Islands, which in turn resold that electricity to Moldtranselectro, a Moldavian State-owned company. In May 2000, Derimen assigned to Energoalians a claim it had against Moldtranselectro for payments due for the purchase of

---

[439] C-III, pp. 8-10.
[440] Doc. CL-214.
[441] Doc. CL-214, p. 2.
[442] Doc. RL-27, *Komstroy* Judgment.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

electricity. Moldtranselectro settled this debt in part, by assigning to Energoalians certain claims that it held[443].

### b.    Arbitration

358.    After unsuccessfully attempting to pursue these claims before Moldovan and Ukrainian courts, Energoalians initiated an *ad hoc* arbitration procedure against the Republic of Moldova, arguing a breach of certain undertakings under the ECT during Energoalians' attempt to obtain payment of the assigned claims. In October 2013, the tribunal seated in Paris issued its award, holding that it had jurisdiction and finding Moldova liable for breaching its obligations under the ECT[444].

### c.    First set aside proceeding

359.    During an action to set aside the award in the French courts, Moldova invoked a breach of a compulsory public policy provision, arguing that the arbitral tribunal lacked jurisdiction[445].

360.    By a decision of 12 April 2016, the Paris Court of Appeal annulled the arbitral award on the ground that the tribunal had wrongly declared that it had jurisdiction. The Court of Appeal found that the dispute between Energoalians and the Republic of Moldova concerned a claim assigned to Energoalians, resulting from the sale of electricity, and that in the absence of any economic contribution by Energoalians in Moldova, such claim could not be regarded as an "investment", within the meaning of the ECT[446].

### d.    Appeal on a point of law

361.    Komstroy, as successor in law to Energoalians, lodged an appeal on a point of law before the French *Cour de Cassation*. On 28 March 2019, the *Cour de Cassation* set aside the annulment decision, after finding that the Paris Court of Appeal had interpreted the concept of investment by adding conditions that were not provided for in the ECT. The parties were referred back to the Court of Appeal, sitting in a different composition[447].

### e.    Second set aside proceeding

362.    During the second action to set aside the award, Moldova submitted that the arbitral tribunal should have declined jurisdiction for three reasons[448]:

-    <u>First</u>, Moldova alleged that the claim acquired by Energoalians from Derimen was not an investment within the meaning of the ECT;

---

[443] Doc. RL-27, *Komstroy* Judgment, paras. 8-11.
[444] Doc. RL-27, *Komstroy* Judgment, paras. 12-13.
[445] Doc. RL-27, *Komstroy* Judgment, para. 14.
[446] Doc. RL-27, *Komstroy* Judgment, para. 15.
[447] Doc. RL-27, *Komstroy* Judgment, para. 16.
[448] Doc. RL-27, *Komstroy* Judgment, para. 17.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

-     <u>Second</u>, even if the claim could constitute an investment, it was not an investment of a company of a Contracting Party to the ECT, as Derimen was a company registered in the British Virgin Islands;

-     <u>Third</u>, that the claim related to a transaction for the sale of electricity that was not made in the "area" of Moldova, as the electricity was sold and transported only to the border between Ukraine and Moldova, on the Ukrainian side.

363.    The Court of Appeal decided to stay the proceedings and refer the following questions to the CJEU for a preliminary ruling[449]:

> "[(1)] Must [Art. 1(6) ECT] be interpreted as meaning that a claim which arose from a contract for the sale of electricity and which did not involve any economic contribution on the part of the investor in the host State can constitute an "investment" within the meaning of that article?
>
> [(2)] Must [Art. 26(1) ECT] be interpreted as meaning that the acquisition, by an investor of a Contracting Party, of a claim established by an economic operator which is not from one of the States that are Contracting Parties to that treaty constitutes an investment?
>
> [(3)] Must [Art. 26(1) ECT] be interpreted as meaning that a claim held by an investor, which arose from a contract for the sale of electricity supplied at the border of the host State, can constitute an investment made in the area of another Contracting Party, in the case where the investor does not carry out any economic activity in the territory of that latter Contracting Party?"

**f.    The preliminary ruling procedure**

364.    During the preliminary ruling procedure, the CJEU heard submissions from Komstroy, the Republic of Moldova, the Council of the EU, the Commission, the Advocate General and nine Member States (including Germany and Italy)[450].

365.    Both Germany and Italy supported the position that the CJEU's reasoning in the *Achmea* Judgment applied to the compatibility of the dispute settlement mechanism provided for in Art. 26 of the ECT[451].

<u>Opinion of the Advocate General</u>

366.    The Advocate General, Mr. Maciej Szpunar, delivered his opinion to the CJEU on 3 March 2021. The Advocate General started by analyzing the jurisdiction of the CJEU, because the case was unprecedented[452]:

-     The questions raised concerned the interpretation of certain provisions of the ECT which had never been analyzed by the CJEU; and

---

[449] Doc. RL-27, *Komstroy* Judgment, para. 20.
[450] Doc. RL-27, *Komstroy* Judgment, p. 2.
[451] Doc. RL-30, Szpunar Opinion, para. 72.
[452] Doc. RL-30, Szpunar Opinion, paras. 1-3.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

- The dispute did not concern Member States and therefore appeared to be unconnected with the EU.

367. Although the Advocate General acknowledged that CJEU case law would lead to the conclusion that the CJEU had no jurisdiction over this matter, he argued that where a provision can apply both to situations falling within the scope of EU law and to situations falling outside its scope, it is clearly in the EU's interest that such provision be interpreted uniformly[453].

368. According to the Advocate General, the CJEU was being asked to interpret provisions of an international agreement (the ECT) that are not interpreted uniformly and which could, in principle, also be applied to situations in the EU legal order. Thus, the Advocate General found that the CJEU should assume jurisdiction to answer the questions referred for a preliminary ruling[454].

369. The Advocate General considered that the CJEU should examine the implications of the *Achmea* Judgment on the applicability of Art. 26 of the ECT. The Advocate General submitted that the dispute settlement mechanism provided for in Art. 26 of the ECT, insofar as it allows recourse to an arbitral tribunal, undoubtedly leads to a similar result as in *Achmea*, for several reasons[455]:

- <u>First</u>, Art. 26 allows disputes which may involve the interpretation of EU law to be brought before an investment arbitration tribunal; and

- <u>Second</u>, the arbitral tribunal established under Art. 26 of the ECT falls outside the EU judicial system and is not entitled to refer to the CJEU for a preliminary ruling as it cannot be regarded as a "court or tribunal of a Member State", within the meaning of Art. 267 of the TFEU.

370. This led the Advocate General to conclude that Art. 26 of the ECT had an adverse effect on the autonomy of EU law and was incompatible with EU law.

g. **The *Komstroy* Judgment**

(i) <u>CJEU's jurisdiction to consider the questions raised</u>

371. On 2 September 2021, the CJEU found that it had jurisdiction to hear the case as the agreement to join the ECT was an act of an EU institution and[456]:

- In accordance with Art. 267 of the TFEU, the Court has jurisdiction to interpret the acts of the institutions, bodies, offices or agencies of the EU; and

- An agreement concluded by the Council, pursuant to Arts. 217 and 218 of the TFEU constitutes an act of an EU institution; this grants the CJEU jurisdiction to give a preliminary ruling on the interpretation of said agreement.

---

[453] Doc. RL-30, Szpunar Opinion, paras. 28 *et seq*.
[454] Doc. RL-30, Szpunar Opinion, para. 45.
[455] Doc. RL-30, Szpunar Opinion, paras. 73-76.
[456] Doc. RL-27, *Komstroy* Judgment, paras. 22-38.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

372. The CJEU acknowledged that, in principle, it seemed that the CJEU did not have jurisdiction to interpret an international agreement in the context of a dispute not covered by EU law. However, the CJEU found that, where a provision of an international agreement can apply both to situations falling within the scope of EU law and to situations falling outside its scope, such provision should be interpreted uniformly, whatever the circumstances in which it is to apply. The CJEU noted that the questions raised by the Paris Court of Appeal could be relevant for a case falling directly within the scope of EU law.

373. Additionally, the CJEU observed that the parties to the dispute agreed that the seat of the arbitration was Paris. The CJEU found that the establishment of the seat of arbitration on the territory of a Member State entails the application of EU law. Courts of the underlying Member State are obliged to ensure compliance with EU law, in accordance with Art. 19 of the TEU[457].

374. <u>Therefore</u>, the CJEU concluded that it had jurisdiction over the questions referred to it.

    (ii)   <u>First question</u>

375. When addressing the first question, the CJEU found it necessary to specify which disputes between one Contracting Party and an investor of another Contracting Party concerning an investment made by the latter in the area of the former may be brought before an arbitral tribunal pursuant to Art. 26 of the ECT[458].

376. To answer this question, the CJEU reiterated the principles that it applied in the *Achmea* Judgment[459]:

-   An international agreement cannot affect the allocation of powers laid down by the EU Treaties, and hence, the autonomy of the EU legal system, observance of which is ensured by the Court;

-   EU law is characterized by the fact that it stems from an independent source of law (the EU Treaties), by its primacy over the laws of the Member States and by the direct effect of a series of provisions which are applicable to the Member States and to their nationals;

-   National courts, tribunals and the CJEU have an obligation to ensure the full application of EU law in all Member States; and

-   To this end, the system includes the preliminary ruling procedure provided for in Art. 267 of the TFEU, allowing the CJEU to exercise its exclusive jurisdiction to interpret EU law.

377. In light of these principles, the CJEU sought to answer the same questions as the ones raised in the *Achmea* Judgment, arriving to the following conclusion:

---

[457] Doc. RL-27, *Komstroy* Judgment, paras. 32-34.
[458] Doc. RL-27, *Komstroy* Judgment, para. 40.
[459] Doc. RL-27, *Komstroy* Judgment, paras. 42 *et seq*.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

378. <u>First</u>, in accordance with Art. 26(6) of the ECT, an arbitral tribunal constituted under the ECT is to rule on disputed issues in accordance with the ECT and with the applicable rules and principles of international law. As the ECT itself is an act of EU law, the CJEU concluded that an arbitral tribunal constituted under the ECT is required to interpret, and even apply, EU law[460].

379. <u>Second</u>, a tribunal constituted under the ECT does not constitute a component of the judicial system of a Member State (in that case the French Republic). This means that arbitral tribunals are not subject to mechanisms capable of ensuring the full effectiveness of the EU rules. If an arbitral tribunal were to be considered a court of a Contracting Party to the ECT, it would have been included within the courts referred to in Art. 26(2)(a) of the ECT and thus Art. 26(2)(c) of the ECT would lose any effectiveness. Thus, arbitral tribunals cannot be classified as a court or tribunal "of a Member State" within the meaning of Art. 267 of the TFEU and, therefore, are not entitled to make a request to the CJEU for a preliminary ruling[461].

380. <u>Third</u>, the CJEU argued that it remained to be ascertained whether an award made by an arbitral tribunal is, in accordance with Art. 19 of the TEU, subject to review by a court of a Member State, and whether such review is capable of ensuring full compliance with EU law. The CJEU acknowledged that the case at hand permitted a judicial review, as the parties to the dispute had chosen to submit the dispute to an *ad hoc* arbitral tribunal, with a seat of the arbitration in Paris. However, the CJEU submitted that such judicial review could be carried out only insofar as the domestic law of the Member State permitted it[462].

381. As such, the CJEU found that in light of the characteristics of an investment arbitral tribunal, it should be concluded – by analogy with the *Achmea* Judgment – that[463]:

> "[…] if the provisions of Article 26 ECT allowing such a tribunal to be entrusted with the resolution of a dispute were to apply as between an investor of one Member State and another Member State, it would mean that, by concluding the ECT, the European Union and the Member States which are parties to it established a mechanism for settling such a dispute that <u>could exclude the possibility that that dispute, notwithstanding the fact that it concerns the interpretation or application of EU law, would be resolved in a manner that guarantees the full effectiveness of that law</u>." [Emphasis added]

382. The CJEU stressed that, although the ECT may require Member States to comply with the arbitral mechanisms set forth in the ECT in their relations with investors "from third States" who are also Contracting Parties to the ECT as regards investments made by the latter in those Member States, preservation of the autonomy and of the particular nature of EU law precluded the same obligations under the ECT from being imposed on Member States as between themselves[464].

---

[460] Doc. RL-27, *Komstroy* Judgment, paras. 48-50.
[461] Doc. RL-27, *Komstroy* Judgment, paras. 51-53.
[462] Doc. RL-27, *Komstroy* Judgment, paras. 54-57.
[463] Doc. RL-27, *Komstroy* Judgment, para. 60.
[464] Doc. RL-27, *Komstroy* Judgment, para. 65.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

383. Therefore, the CJEU concluded that[465]:

> "In the light of the foregoing, it must be concluded that Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State." [Emphasis added]

## Q.    2021-2023: ECT decisions after the *Komstroy* Judgment

384. Since the *Komstroy* Judgment, at least 18 investment arbitral tribunals or annulment committees constituted under the ECT have rejected intra-EU objections brought by Member States or requests for reconsideration[466]. The exception is the *Green Power* tribunal, which ruled in line with the *Komstroy* Judgment[467].

## R.    June 2022: The *Green Power* decision

385. The *Green Power* decision constitutes the first time that an investor-State tribunal held that the ECT does not include a valid offer to arbitrate intra-EU disputes.

### a.    Background

386. The *Green Power* case was brought by two Danish companies that had invested in PV plants in Spain between 2008 and 2011[468]. When Spain enacted changes to its regulatory framework, claimants argued that Spain had breached its obligations under the ECT and international law[469]. Therefore, claimants filed a request for arbitration against Spain before the SCC, with seat in Stockholm[470].

### b.    Arbitral award

387. On 16 June 2022 the *Green Power* tribunal rejected jurisdiction over claimants' claims, upholding Spain's *ratione voluntatis* jurisdictional objection[471]. The tribunal observed that it was called upon to determine[472]:

> "[…] whether Article 26 ECT can operate in the relations between Denmark and Spain, two EU Member States bound by a complex network of legal relations, as a basis for investors from Denmark, whose action unfolds within this network of legal relations taken as whole, to rely on as a valid unilateral offer by Spain to arbitrate a dispute raising specific matters regulated by EU law in proceedings based in Stockholm, Sweden, another EU Member State."

388. First, the tribunal found that it had to determine the law applicable to its jurisdiction. The tribunal took Art. 26 of the ECT as a starting point[473]. The tribunal noted that

---

[465] Doc. RL-27, *Komstroy* Judgment, para. 66.
[466] C-III, pp. 10-11.
[467] Doc. RL-60, *Green Power*.
[468] The Kingdom of Spain and the Kingdom of Denmark are both EU Member States.
[469] Doc. RL-60, *Green Power*, para. 5.
[470] Doc. RL-60, *Green Power*, paras. 8 and 12.
[471] Doc. RL-60, *Green Power*, para. 478.
[472] Doc. RL-60, *Green Power*, para. 334.
[473] Doc. RL-60, *Green Power*, paras. 159 *et seq*.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

its case was not governed by the ICSID Convention and Rules, but rather by the SCC Arbitration Rules and had its seat in Stockholm, Sweden. The tribunal thus determined that in accordance with the Swedish Arbitration Act, the law of the seat governs the arbitration agreement and therefore the issue of jurisdiction[474]. This led the tribunal to conclude that to determine its jurisdiction, it had to resort to EU law, which was "unquestionably part of the Swedish legal system"[475].

389. Second, the tribunal noted that an interpretation of Art. 26 of the ECT based on its ordinary meaning led to the conclusion that the Contracting Parties' offer to arbitrate was unqualified and unconditional[476]. Nevertheless, the tribunal decided to analyze the purpose of the ECT and the parties' intentions. By conducting a further analysis under Art. 31 of the VCLT, the tribunal concluded that interpreting Art. 26 without resorting to EU law was inconclusive as to whether the offer to arbitrate was or not valid in intra-EU cases[477].

390. Third, applying EU law to its analysis, the tribunal gave full deference to the conclusions of the CJEU in the *Achmea* and *Komstroy* Judgments[478]. The tribunal concluded that Spain's offer to arbitrate under the ECT was not applicable in intra-EU relations and that there was no valid offer to arbitrate[479].

391. The *Green Power* tribunal also found that Swedish law recognized the primacy of EU law and precluded, pursuant to the CJEU's decisions in *Achmea* and *Komstroy*, the unilateral offer to arbitrate in Art. 26 of the ECT because it is inconsistent with the autonomy and primacy of EU law[480]. The tribunal concluded that[481]:

> "It is therefore the unanimous view of the Tribunal that the same considerations apply to the offer to arbitrate by Spain under Article 26 ECT. Seated in an EU Member State, it likewise cannot apply the consent to arbitrate by the Respondent and affirm its jurisdiction. Following the reasoning of the CJEU Grand Chamber in the *Achmea Judgment* and subsequently confirmed in the *Komstroy Judgment*, this Tribunal considers that the offer of the Respondent, as an EU Member State, to arbitrate under Article 26 ECT a dispute with investors of another EU Member State which would, of necessity, require this Tribunal to interpret and apply the EU Treaties, is precluded. Therefore, there is no unilateral offer by the Respondent which the Claimants could accept." [Emphasis added]

---

[474] Doc. RL-60, *Green Power*, paras. 161-171.
[475] Doc. RL-60, *Green Power*, para. 172.
[476] Doc. RL-60, *Green Power*, para. 341.
[477] Doc. RL-60, *Green Power*, para. 412.
[478] Doc. RL-60, *Green Power*, paras. 421-436.
[479] Doc. RL-60, *Green Power*, para. 445.
[480] Doc. RL-60, *Green Power*, paras. 475-476.
[481] Doc. RL-60, *Green Power*, para. 477.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

### S.   2023: Germany's withdrawal from the ECT

392.   On 22 March 2023 Germany announced its withdrawal from the ECT, with effect on 21 December 2023[482].

393.   In July 2023 the Commission called for a coordinated withdrawal from the ECT by the EU and its Member States[483]. No such coordinated withdrawal has taken place.

### 4.2   DISCUSSION

394.   The Tribunal has carefully considered the Parties' submissions and the Commission's *Amicus Curiae* Brief in relation to the intra-EU jurisdiction objection. For the reasons set out below, the Tribunal finds that Claimants and Italy validly consented to this investment dispute being adjudicated through ICSID arbitration and that such consent remains in force. It follows that the Centre has jurisdiction and the Tribunal competence to adjudicate the present dispute, and that Italy's Intra-EU Objection must be dismissed. The Tribunal's conclusion is based on the following findings:

-   Italy gave its unconditional and irrevocable consent to arbitrate the present dispute, regardless of its withdrawal from the ECT (**A.**);

-   Interpretation of Art. 26 of the ECT, in accordance with the relevant provisions of the VCLT, does not support Italy's contention (**B.**);

-   Art. 26 of the ECT does not conflict with the TFEU (**C.**); and

-   The *Komstroy* and *Green Power* decisions are inapposite (**D.**).

### A.   Unconditional and irrevocable consent to submit the dispute to arbitration

395.   Claimants started this arbitration under the ICSID Convention and the ECT[484], two international multilateral treaties that were validly entered into by both Italy and Germany as Contracting Parties.

396.   Pursuant to Art. 41(1) of the ICSID Convention[485]:

"The Tribunal shall be the judge of its own competence."

397.   The Tribunal is thus empowered to establish whether or not the Centre has jurisdiction and its own competence accordingly. Both derive directly from the

---

[482]   Information available at: https://www.energycharter.org/media/news/article/written-notifications-of-withdrawal-from-the-energy-charter-treaty/ (last consulted on 4 March 2024).
[483]   Information available at: https://energy.ec.europa.eu/news/european-commission-proposes-coordinated-eu-withdrawal-energy-charter-treaty-2023-07-07_en (last consulted on 4 March 2024).
[484]   Request for Arbitration, p. 1.
[485]   Doc. CL-2.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

Parties' consent, without which there can be no valid arbitration. And Art. 25(1) of the ICSID Convention requires that consent be given in writing[486]:

> "The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State […] and a national of another Contracting State, <u>which the parties to the dispute consent in writing to submit to the Centre.</u>" [Emphasis added]

398. Both Italy (**a.**) and Claimants (**b.**) have consented in writing to submit this dispute to the jurisdiction of the Centre and the competence of the Tribunal.

### a.    Italy's consent to the submission of a dispute to arbitration

399. Italy signed the ECT on 17 December 1994, ratified it on 5 December 1997 and deposited its instrument of ratification on 16 December 1997[487]. Italy's consent to submit disputes relating to protected investments to international arbitration under the ICSID Convention was contained in writing in Art. 26 of the ECT[488]:

> "(1) <u>Disputes between a Contracting Party</u> and <u>an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former,</u> <u>which concern an alleged breach of an obligation of the former under Part III</u> shall, if possible, be settled amicably.
>
> (2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, <u>the Investor party to the dispute may choose to submit it for resolution</u>: […] (c) in accordance with the following paragraphs of this Article.
>
> (3) (a) Subject only to subparagraphs (b) and (c), <u>each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration</u> or conciliation in accordance with the provisions of this Article. […]
>
> (4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), <u>the Investor shall further provide its consent in writing for the dispute to be submitted to:</u>
>
> (a) (i) <u>The International Centre for Settlement of Investment Disputes, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States</u> opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention; […]." [Emphasis added]

400. On 16 April 1998, when the ECT came into force, Italy made an open-ended offer to submit disputes with investors of other Contracting Parties regarding an alleged breach of Part III of the ECT to the Centre. Italy's consent to ICSID arbitration was

---

[486] Doc. CL-2.
[487] Doc. C-330.
[488] Doc. CL-1.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

"unconditional", in the terms of Art. 26(3)(a) of the ECT. Only "consent in writing" by the "Investor" was lacking.

<u>Italy remains bound by the ECT's "sunset clause"</u>

401. Italy withdrew from the ECT on 31 December 2014, effective as of 1 January 2016[489] – *i.e.*, four years prior to the filing of Claimants' Request for Arbitration.

402. This does not mean that Italy's consent to arbitration was no longer valid when Claimants accepted the offer to arbitrate. Pursuant to the ECT "sunset clause", Italy remains bound to the ECT for 20 years from the date its withdrawal takes effect[490]:

> "The provisions of this Treaty <u>shall continue to apply</u> to Investments made in the Area of a Contracting Party by Investors of other Contracting Parties or in the Area of other Contracting Parties by Investors of that Contracting Party <u>as of the date when that Contracting Party's withdrawal from the Treaty takes effect for a period of 20 years from such date</u>." [Emphasis added]

403. Italy's withdrawal from the ECT has not yet impacted on Italy's consent to submit disputes to arbitration under the ICSID Convention, because under the ECT's sunset clause the consent remains valid until 2036.

### b.    Claimants' consent to settle the dispute through ICSID arbitration

404. On 21 September 2020 Claimants filed their Request for Arbitration, arguing that Italy had breached Part III of the ECT, expressly declaring in writing that[491]:

> "Claimants notified Italy of their consent to arbitrate the dispute pursuant to Article 26 of the ECT in letters dated January 8, 2020 and June 3, 2020. <u>Claimants further confirm their consent to settle this dispute through ICSID arbitration through this Request for Arbitration.</u>" [Emphasis added]

405. In doing so, Claimants unequivocally accepted Italy's offer to arbitrate, pursuant to Art. 26(4) of the ECT. At this time, consent was perfected.

\* \* \*

406. Pursuant to Art. 26(5)(a)(i) of the ECT, the State's unconditional consent, and that of an investor, when choosing to submit a dispute to the Centre, satisfy the requirement for written consent of the Parties to a dispute for the purposes of Art. 25(1) of the ICSID Convention[492]:

> "(5) (a) The consent given in paragraph (3) together with the written consent of the Investor given pursuant to paragraph (4) <u>shall be considered to satisfy the requirement for</u>:

---

[489] Doc. C-12.
[490] Doc. CL-1, Art. 47(3).
[491] Request for Arbitration, para. 77.
[492] Doc. CL-1, Art. 26(5)(a).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

> (i) <u>written consent of the parties to a dispute for purposes of Chapter II of the ICSID Convention</u> and for purposes of the Additional Facility Rules;" [Emphasis added]

407. Once consent was perfected on 21 September 2020, it became irrevocable under Art. 25(1) *in fine* of the ICSID Convention[493], which provides that[494]:

> "When the parties have given their consent, <u>no party may withdraw its consent unilaterally.</u>" [Emphasis added]

408. <u>In sum</u>: Italy's offer to arbitrate was perfected when Claimants filed their Request for Arbitration on 21 September 2020, irrespective of Italy's withdrawal from the ECT in 2014-2016; once consent was given, it became irrevocable, because under Art. 25(1) of the ICSID Convention, a provision which creates internationally binding obligations, Italy is forbidden to withdraw, for any reason, a consent already locked.

## B.  <u>Interpretation of Art. 26 of the ECT</u>

409. The Tribunal accepts the parties' position that it should interpret Art. 26 of the ECT pursuant to Arts. 31 and 32 of the VCLT. As to the impact of the VCLT, the Tribunal is unpersuaded by Italy's argument that the application of the VCLT means that the Tribunal can only conclude that the EU Treaties prevail over the ECT provisions, with the consequence that investors from EU Member States cannot submit arbitral disputes against other Member States[495].

410. As previously noted[496], pursuant to Art. 31 of the VCLT, the Tribunal must interpret Art. 26 of the ECT guided "in good faith" by the "ordinary meaning" of the terms, "in their context" and "in light of [the Treaty's] object and purpose"[497].

411. In doing so, the Tribunal must first elucidate the meaning of the text, which is the best expression of the intention of the Parties[498]. Indeed, as noted by the *ESPF* tribunal, "[c]ontext and purpose cannot be used to override the clear wording of a treaty"[499] (**a.**). In any case, the broader context, object and purpose of the ECT also do not support the intra-EU objection (**b.**).

### a.  The text of the ECT

412. Respondent's argument lacks support in the wording of the ECT.

413. Respondent has failed to point to any wording, contained in Art. 26 of the ECT or in any other provision of the Treaty, to support its position that the Contracting Parties excluded from the settlement of disputes any claim by an investor from an EU Member State (e.g., Germany) against a host State that is also a Member State

---

[493] Doc. CL-198, C. H. Schreuer, *The ICSID Convention: A Commentary*, Article 25, paras. 419, 475.
[494] Doc. CL-2, Art. 25(1).
[495] R-I, paras. 49 *et seq.*
[496] See para. 141 *supra*.
[497] Doc. CL-10, Art. 31(1) of the VCLT.
[498] Doc. CL-195, p. 2.
[499] Doc. CL-8, *ESPF*, para. 292.

(e.g., Italy). The plain language of Art. 26 makes no exclusion in respect of certain investors or certain Contracting Parties. The only two conditions to the Contracting Parties' otherwise unconditional consent to arbitration are clearly stated in Art. 26(3), including:

-   The Contracting Parties listed in Annex ID do not give their unconditional consent to arbitration where the investor has previously submitted the dispute to the courts or administrative tribunals of the Contracting Party, party to the dispute, or in accordance with any applicable, previously agreed dispute settlement procedure[500]; and

-   The Contracting Parties listed in Annex IA do not give their unconditional consent with respect to a dispute arising under the last sentence of Art. 10(1) (*i.e.*, the umbrella clause)[501].

414. Neither Italy nor Germany (nor the EU for that matter) is listed in Annex IA. While Italy is listed in Annex ID, the Fork-in-the-Road provision has no direct bearing on the question whether the EU Treaties prevail over the ECT.

415. There is simply no support in the language of Art 26 for the interpretation put forward by the Respondent.

416. This conclusion aligns with the findings of the *ESPF* tribunal[502]:

"Article 26(3) goes so far as to indicate that Contracting Parties seeking to avail themselves of the exceptions to that unconditional consent '[for the sake of transparency] … provide a written statement of its policies, practices and conditions in this regard to the Secretariat no later than the date of the deposit of its instrument of ratification … [or] accession.' The Contracting Parties expressly intended that any exceptions to the unconditional consent to international arbitration or conciliation be transparent and articulated before the ECT was in force." [Emphasis added]

417. In sum, there is no intra-EU exception in the plain terms of Art. 26 of the ECT[503].

418. Nevertheless, Italy points to Arts. 16 and 25 of the ECT to argue that, if interpreted in good faith, the ECT shows that the Contracting Parties understood that EU-law was a pre-existing legal system, which provisions prevail over the ECT ones on the same subject matter[504].

419. The Tribunal is unconvinced on both grounds.

---

[500] Doc. CL-1, Art. 26(3)(b).
[501] Doc. CL-1, Art. 26(3)(c).
[502] Doc. CL-8, *ESPF*, para. 293.
[503] This has also been recognized by the *Green Power* tribunal (see Doc. RL-60, *Green Power*, paras. 341-343), on which Italy relies for its analysis of the Intra-EU Objection.
[504] R-I, paras. 52-57.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

(i)    Art. 16 of the ECT

420.  Art. 16 of the ECT concerns the "relation to other Agreements", *i.e.*, when two or more Contracting Parties have entered into a prior or subsequent international agreement that concerns the same subject matter as Part III ("Investment Promotion and Protection") or V ("Dispute Settlement") of the ECT. It establishes that[505]:

> "Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,
>
> > (1)  nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and
> >
> > (2)  nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty,
>
> where any such provision is more favourable to the Investor or Investment."

421.  Under this rule, the provisions of Part III and V of the ECT cannot "be construed to derogate" from those of a prior or subsequent treaty that concerns the subject matter of Parts III and V, to the extent that they are more favorable to the Investor. As noted by the *Silver Ridge* tribunal, this provision is close to a conflict rule, that applies in case provisions of two treaties are not compatible – Art. 16 appears to be *lex specialis* vis-à-vis Art. 30 of the VCLT[506].

422.  Italy argues that the EC Treaties were adopted prior to the ECT, concern the same subject matter, and are more favorable because they offer investors a higher level of protection – with the consequence that Art. 26, which is contained in Part V of the ECT, finds no application in intra-EU relations[507].

423.  The Tribunal disagrees.

424.  While the EC Treaties may be considered "prior international agreement(s)", and the TFEU can be considered a "subsequent international agreement", these treaties do not relate to the same subject matter as the ECT as applicable in the current dispute, for at least two reasons:

425.  First, the overall scope and purpose of the provisions of the ECT and the EU Treaties relied on by the Respondent are distinct:

-      The ECT is a multilateral treaty whose objective is to govern the co-operation between Contracting Parties (not only EU Member States) in the energy

---

[505] Doc. CL-1, Art. 16.
[506] Doc. CL-47, *Silver Ridge*, para. 207.
[507] R-I, paras. 56-57.

field[508], with specific goals such as "the most efficient exploration, production, conversion, storage, transport, distribution and use of energy"[509];

- The EU Treaties, on the other hand, only bind the Member States and have a much broader purpose: these treaties were concluded to create an internal market, and then evolved to foster political integration between Members States in the areas of common foreign and security policy and judicial and home affairs.

426. <u>Second</u>, the ECT and the EU Treaties do not share the same substantive protections relating to this dispute:

- The ECT established a legal framework to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the principles of the Energy Charter, including the need for developed countries to take immediate action at the global, national and, where agreed, regional levels to take into account all greenhouse gases, with due enhancement of the greenhouse effect, expressly providing for specific promotion, protection and treatment of investments in the energy sector, which are subject to dispute settlement by way of international arbitration;

- The EU Treaties do not include any specific protections for investors in the energy sector which are subject to dispute settlement by way of international arbitration.

427. The subject matter of the dispute in this arbitration is the alleged removal of specific investment protections in the renewable energy sector, giving rise to alleged breach of specific protections afforded by the ECT. There is no allegation of such breach under the EU Treaties. The *Eskosol* tribunal observed that the fact that two treaties may apply simultaneously to the same set of facts or share very broadly some stated goals (e.g., "integration", "cooperation") does not mean that they are two treaties with the same subject matter[510]. The difference between subject matter has been recognized by numerous investment tribunals[511].

428. But even if this were not the case, Italy has failed to point to any specific provisions in the EU Treaties that are allegedly more favorable to the investor than the provisions of Part III and V of the ECT. And in fact, they are not. Art. 26 of the ECT – which is the relevant provision under discussion – grants investors the choice of submitting their dispute against the host State either to:

- The "courts or administrative tribunals of the Contracting Party party to the dispute" (Art. 26(2)(a)); or

---

[508] Doc. CL-1, Art. 2.
[509] Doc. CL-1, Preamble.
[510] Doc. CL-99, *Eskosol* (Jur.), para. 146, citing to *European American Investment Bank AG* v. Slovak Republic, PCA Case No. 2010-17, Award on Jurisdiction, paras. 168-169.
[511] Doc. CL-97, *Novenergia II*, para. 439; Doc. CL-9, *Greentech*, para. 346; Doc. CL-98, *Masdar*, para. 327; Doc. CL-101, *OperaFund*, para. 383.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

- International arbitration, either *ad hoc* or administered (Art. 26(2)(b) and Art. 26(4)).

429. Having the choice of resorting to local tribunals or to international arbitration is more favorable than not having the choice of resorting to arbitration at all[512] – a choice which the ECT grants and the EU Treaties deny.

(ii) <u>Art. 25 of the ECT</u>

430. Art. 25 of the ECT, in turn, concerns "Economic Integration Agreements" [previously defined as "EIA"]. It establishes in its relevant part that[513]:

> "(1) The provisions of this Treaty shall not be so construed as to oblige a Contracting Party which is party to an Economic Integration Agreement (hereinafter referred to as "EIA") to extend, by means of most favoured nation treatment, to another Contracting Party which is not a party to that EIA, any preferential treatment applicable between the parties to that EIA as a result of their being parties thereto.
>
> (2) For the purposes of paragraph (1), "EIA" means an agreement substantially liberalising, inter alia, trade and investment, by providing for the absence or elimination of substantially all discrimination between or among parties thereto through the elimination of existing discriminatory measures and/or the prohibition of new or more discriminatory measures, either at the entry into force of that agreement or on the basis of a reasonable time frame."

431. According to Italy, the EU is an EIA, and the definition of an EIA as "an agreement substantially liberalising, [...] trade and investment" proves that the EC Treaties have the same purpose as the ECT[514].

432. The Tribunal accepts Italy's averment that the EU is an EIA. But the consequence which Italy tries to draw is a *non sequitur*: the broad language of Art. 25(2) simply states that the benefits of belonging to an EIA cannot be extended by means of a most-favored nation clause; it does not imply that, when it comes to investor protection, the EU Treaties and the ECT have the same subject matter.

433. Furthermore, Art. 25 gives no guidance whatsoever as to the applicability of Art. 26 to intra-EU disputes. Art. 25 merely confirms that a Contracting Party that is party to an EIA (e.g., Italy) is not obliged to extend, through the "most favoured nation treatment" provision, any preferential treatment applicable between the parties to that EIA (*i.e.*, the Member States) to a Contracting Party that is not a party of the same EIA (e.g., Azerbaijan). The Tribunal fails to see how this could be interpreted to conclude that intra-EU disputes are excluded from the scope of Art. 26[515].

\* \* \*

---

[512] Doc. CL-98, *Masdar*, para. 332; Doc. CL-47, *Silver Ridge*, paras. 211-212; Doc. CL-190, *LSG*, para. 753.
[513] Doc. CL-1, Art. 25.
[514] R-I, para. 53.
[515] See also Doc. CL-98, *Masdar*, para. 330.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

434. <u>In sum</u>, a good faith reading of the ordinary meaning of the terms of the ECT does not support at all Italy's position. Once again, the Tribunal's analysis could stop here, given that there is no obscurity or ambiguity in the ECT; yet, for the sake of completeness, the Tribunal will go through Italy's remaining arguments.

**b.     Context, object and purpose**

435. Italy submits that the Tribunal should look at the context of the ECT, as well as the declarations and understandings of the Contracting Parties to the ECT[516]. Italy further suggests that the Tribunal look at the preparatory works and the circumstances of conclusion of the ECT to understand its object and purpose[517].

436. The Tribunal notes that Art. 32 of the VCLT makes it clear that a tribunal should only look to the preparatory work of the treaty and circumstances of its conclusion in order to "confirm the meaning resulting from the application of article 31" or if the interpretation under Art. 31 leaves the meaning ambiguous or obscure or leads to a result which is manifestly absurd or unreasonable[518] – *quod non*.

437. In its submissions, Italy points to two declarations by the EU that would supposedly support its Intra-EU Objection, (**i.** and **ii.**). The Tribunal finds that these two declarations do not have the meaning that Italy purports to ascribe to them. In fact, the absence of a disconnection clause in the ECT is much more relevant to understand the Contracting Parties' intentions (**iii.**).

(i)     <u>Declaration No. 5 in connection with Art. 25 of the ECT</u>

438. First, Italy points to Declaration No. 5 of the Final Act of the European Energy Charter Conference[519], which concerns Art. 25 of the ECT and states as follows[520]:

> "The European Communities and their Member States recall that, in accordance with article 58 of the Treaty establishing the European Community:
>
> a) companies or firms formed in accordance with the law of a Member State and having their registered office, central administration or principal place of business within the Community shall, for the right of establishment pursuant to Part Three, Title III, Chapter 2 of the Treaty establishing the European Community, be treated in the same way as natural persons who are nationals of Member States; companies or firms which only have their registered office within the Community must, for this purpose, have an effective and continuous link with the economy of one of the Member States;
>
> (b) "companies and firms" means companies or firms constituted under civil or commercial law, including cooperative societies, and other legal persons

---

[516] R-I, paras. 58 *et seq.*
[517] R-I, paras. 64 *et seq.*
[518] Doc. CL-10, Art. 32 of the VCLT.
[519] R-I, paras. 62-63; R-II, para. 282.
[520] Doc. CL-1, p. 76, Declaration No. 5 to Art. 25.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

> governed by public or private law, save for those which are non-profitmaking.
>
> The European Communities and their Member States further recall that:
>
>> Community law provides for the possibility to extend the treatment described above to branches and agencies of companies or firms not established in one of the Member States; and that, the application of Article 25 of the Energy Charter Treaty will allow only those derogations necessary to safeguard the preferential treatment resulting from the wider process of economic integration resulting from the Treaties establishing the European Communities."

439. Italy argues, relying on the *Green Power* award in support, that Declaration No. 5 is evidence that Art. 25 of the ECT was specifically intended to apply to the EU as a process of economic integration[521], and that this "wider process of economic integration includes matters relating to the internal electricity market [...] and the need for autonomy and primacy of EU law guaranteed by the system laid out in the EU Treaties"[522].

440. The Tribunal finds that Declaration No. 5 must be read in connection with Art. 25, transcribed in para. 430 *supra*. As already mentioned, Art. 25 confirms that a Contracting Party that is party to an EIA is not obliged to extend, through the "most favoured nation treatment" provision, any preferential treatment applicable between the parties to that EIA to a Contracting Party that is not a party of the same EIA. The EU recalled in Declaration No. 5 that its foundational treaties granted companies of Member States certain privileges – and that it was possible, under Community law, to extend such privilege to companies not established in one of the Member States.

441. But once again, nothing in this provision implies that the EU or its Member States wanted to exclude intra-EU disputes from the scope of Art. 26 of the ECT. The interpretation made by Italy (and the *Green Power* tribunal) is an *ex-post* rationalization of their argument, without any support in the text of the ECT.

(ii)    Statement submitted by the European Communities to the Secretariat of the Energy Charter pursuant to Art. 26(3)(b)(ii) of the ECT

442. The second declaration to which Italy points[523] is the 1997 statement submitted by the EC to the Secretariat of the Energy Charter pursuant to Art. 26(3)(b)(ii) of the ECT [the "**EC Statement**"]. This is the statement that the Contracting Parties listed in Annex ID were required to provide for the sake of transparency, reflecting their interpretation of the ECT's Fork-in-the-Road provision (which content is discussed

---

[521] R-I, paras. 62-63; R-II, para. 282; Doc. RL-60, *Green Power*, paras. 357-358.
[522] Doc. RL-60, *Green Power*, para. 358.
[523] R-II, para. 283.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

in detail by this Tribunal in section V.2.3.2B *supra*). The relevant part of the EC Statement reads as follows[524]:

> "Given that the Communities' legal system provides for means of such action, the European Communities have not given their unconditional consent to the submission of a dispute to international arbitration or conciliation."[525]

443. Both Italy and the *Green Power* tribunal argue that the EC Statement is[526]:

> "[...] a clear and unequivocal indication that the EU saw the EU legal system as the natural means of dispute settlement of investor claims, and therefore withheld its unconditional consent to arbitration."

444. The Tribunal strongly disagrees. Italy is misconstruing the EC Statement, by taking a single phrase out of its context. The entire EC Statement reads as follows[527]:

> "**Statement submitted by the European Communities to the Secretariat of the Energy Charter pursuant to Article 26(3)(b)(ii) of the Energy Charter Treaty**
>
> The European Communities, as Contracting Parties to the Energy Charter Treaty, make the following statement concerning their policies, practices and conditions with regard to disputes between an investor and a Contracting Parties and their submission to international arbitration or conciliation:
>
> The European Communities are a regional economic integration organisation within the meaning of the Energy Charter Treaty. The Communities exercise the competences conferred on them by their Member States through autonomous decision-making and judicial institutions.
>
> The European Communities and their Member States have both concluded the Energy Charter Treaty and are thus internationally responsible for the fulfilment of the obligations contained therein, in accordance with their respective competences.
>
> The Communities and the Member States will, if necessary, determine among them who is the respondent party to arbitration proceedings initiated by an Investor of another Contracting Party. In such case, upon the request of the Investor, the Communities and the Member States concerned will make such determination within a period of 30 days.
>
> The Court of Justice of the European Communities, as the judicial institution of the Communities, is competent to examine any question relating to the application and interpretation of the constituent treaties and acts adopted thereunder, including international agreements concluded by the

---

[524] This document does not appear to be on the case record (only the updated statement filed by the EU in 2019 – Doc. C-883). It is, however, partially cited in the *Green Power* award, and relied upon by Italy in its submissions (see Doc. RL-60, *Green Power*, para. 360; R-II, para. 283).

[525] The *Green Power* tribunal added the words "claims brought by an investor" after "for means of such action", which is absent from the original Statement (see Doc. RL-60, *Green Power*, para. 360).

[526] Doc. RL-60, *Green Power*, para. 360; R-II, para. 283, citing to Doc. RL-60, para. 360.

[527] This document is available in: https://eur-lex.europa.eu/resource.html?uri=cellar:bb5339f8-f387-4c05-a895-1a64f898413c.0006.02/DOC_6&format=PDF. (last consulted on 4 March 2024)

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

Communities, which under certain conditions may be invoked before the Court of Justice.

<u>Any case brought before the Court of Justice of the European Communities by an investor of another Contracting Party in application of the forms of action provided by the constituent treaties of the Communities falls under Article 26(2)(a) of the Energy Charter Treaty.</u> Given that the Communities' legal system provides for means of such action, <u>the European Communities have not given their unconditional consent to the submission of a dispute to international arbitration or conciliation.</u>

As far as international arbitration is concerned, it should be stated that the provisions of the ICSID Convention do not allow the European Communities to become parties to it. The provisions of the ICSID Additional Facility also do not allow the Communities to make use of them. Any arbitral award against the European Communities will be implemented by the Communities' institutions, in accordance with their obligation under Article 26(8) of the Energy Charter Treaty." [Emphasis added]

445. The EC Statement unequivocally states that the:

"Communities and the Member States will, if necessary, determine among them who is the respondent party to arbitration proceedings initiated by an Investor of another Contracting Party".

Significantly, no qualification is added to the words "Investor of another Contracting Party". This can only mean that in 1997 the EC and its Member States understood that *any* investor, from *any* Contracting Party, including Member States, could bring arbitration claims against other Member States. *Ubi lex non distinguit nec nos distinguere debemus.*

446. The phrase partially cited by Italy (and the *Green Power* tribunal):

"Given that the Communities' legal system provides for means of such action, the European Communities have not given their unconditional consent to the submission of a dispute to international arbitration or conciliation",

cannot be read in isolation, but must be construed taking into consideration the whole paragraph:

"Any case brought before the Court of Justice of the European Communities by an investor of another Contracting Party in application of the forms of action provided by the constituent treaties of the Communities falls under Article 26(2)(a) of the Energy Charter Treaty. Given that the Communities' legal system provides for means of such action, the European Communities have not given their unconditional consent to the submission of a dispute to international arbitration or conciliation."

447. If read in context, the aforementioned paragraph of the EC Statement clearly refers to, and can only be understood in the context of, the Fork-in-the-Road provision at Art 26(3)(b)(i). The EC states that if an "investor of another Contracting Party"

109

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

(again, without any qualification) elects to bring a case before the CJEU, this would fall within Art. 26(2)(a) of the ECT – which establishes that:

"[…] the Investor party to the dispute may choose to submit it for resolution:

(a) to the courts or administrative tribunals of the Contracting Party party to the dispute;"

448.  It is precisely in the case of such election by the investor (not the Contracting Party), and only in this case, that the EC, as one of the Contracting Parties listed in Annex ID to the ECT, did not give its unconditional consent to the subsequent and additional submission of the same dispute to international arbitration – as is its right under Art. 26(3)(b)(i) of the ECT, *i.e.*, the Fork-in-the-Road provision.

449.  <u>In sum</u>, the EC Statement does not support Italy's position – to the contrary, it supports the finding that in 1997 the position that the EC was that intra-EU investors were entitled to the dispute resolution system envisaged in Art. 26 of the ECT.

(iii)    <u>Absence of a disconnection clause</u>

450.  There is a final point that further reinforces this Tribunal's conclusions: the ECT contains no disconnection clause that provides that intra-EU disputes fall outside the scope of the Treaty. The EU and its Member States could have inserted a carve-out to Art. 26, excluding the application of this provision to disputes between investors of a Member State and a host State that is also a Member State; yet they did not do so. Moreover, as noted above, Member States specifically turned their minds to such a provision and ultimately concluded the ECT without including it.

451.  Italy argues, relying on the *Green Power* award[528], that there was no need for an explicit disconnection clause, because Art. 25 of the ECT already provides a carve-out for EIAs[529]. This Tribunal, however, has already dismissed the Respondent's intra-EU arguments based on Art. 25 of the ECT.

452.  The conduct of the Contracting Parties in negotiating the ECT demonstrates that, when they sensed that there could be a conflict between the ECT and a previous treaty, they agreed to insert a disconnection clause, clarifying that the previous treaty would prevail. This is the case of the Svalbard Treaty, which has a specific disconnection clause inserted in the ECT[530]:

"<u>In the event of a conflict</u> between the treaty concerning Spitsbergen of 9 February 1920 (the Svalbard Treaty) and the Energy Charter Treaty, <u>the treaty concerning Spitsbergen shall prevail to the extent of the conflict, without prejudice to the positions of the Contracting Parties in respect of the Svalbard Treaty</u>. In the event of such conflict or a dispute as to whether there is such conflict or as to its extent, Article 16 and Part V of the Energy Charter Treaty shall not apply." [Emphasis added]

---

[528] Doc. RL-60, *Green Power*, para. 352.
[529] R-II, para. 281.
[530] Doc. CL-1, Art. 16, p. 65; Part V, p. 78.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

453. It is telling that the Contracting Parties considered it necessary to include a disconnection clause with regard to a very minor treaty (executed in 1920 and affecting Spitsbergen), but not to the recent EU Treaties, which created a completely new legal regime, fundamentally affecting the legal order of the very countries which were promoting the ECT. As the tribunals in *PV Investors*[531] and *Masdar*[532] observed:

> "It would seem striking that the Contracting Parties made an express exception for the Svalbard Treaty, which concerns an archipelago in the Arctic, but somehow omitted to specify that the ECT's dispute-settlement system did not apply in all of the EU member states' relations. Compared to the Svalbard Treaty Exception, an exception with regard to the intra-EU relations would be of much greater significance. It would be extraordinary that an essential component of the Treaty, such as investor-State arbitration, would not apply among a significant number of Contracting Parties without the Treaty drafters addressing this exception." [Emphasis added]

454. The reality is that the ECT contains no intra-EU disconnection clause because the Contracting Parties saw no need for one. This was also the conclusion of the *Charanne* tribunal[533]:

> "[…] The role of a disconnection clause would be, in effect, to resolve a conflict between the ECT and the TFEU. However, there is no conflict between the two treaties."

455. Again, the fact that during the negotiation of the ECT, the EU actually proposed the insertion of a disconnection clause[534], but that it was ultimately dropped from the final draft[535], further reinforces the point. This led the *Vattenfall* tribunal to conclude that[536]:

> "[…] a disconnection clause was intentionally omitted from the ECT. The absence of such a clause confirms that the ECT was intended to create obligations between Member States of the EU, including in respect of potential investor-State dispute settlement."

## C.    No conflict between Art. 26 and the TFEU

456. Italy goes on to argue that the inapplicability of Art. 26 of the ECT to intra-EU disputes can also be derived from the subsequent adoption of the Treaty of Lisbon[537], which has certain provisions (namely Arts. 216, 267 and 344 of the

---

[531] Doc. CL-85, *PV Investors*, para. 183.
[532] Doc. CL-22, *Masdar*, para. 311, citing to *PV Investors*.
[533] Doc. CL-89, *Charanne*, para. 438.
[534] Doc. CL-173, p. 86, para. 6. See also Doc. CL-94, *Vattenfall*, paras. 203 and 205; Doc. RL-43, *Blusun*, para. 280(4).
[535] Doc. CL-174.
[536] Doc. CL-94, *Vattenfall*, para. 206.
[537] R-I, para. 74.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

TFEU) allegedly incompatible with Art. 26[538]. Italy invokes Art. 30 of the VCLT[539], which provides that[540]:

> "1. Subject to Article 103 of the Charter of the United Nations, the <u>rights and obligations of States parties to successive treaties relating to the same subject-matter</u> shall be determined in accordance with the following paragraphs.
>
> 2. [...]
>
> 3. <u>When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.</u>
>
> 4. [...] [Emphasis added]

457. Pursuant to this provision, if there are successive treaties that relate to "the same subject-matter", the earlier treaty, "applies only to the extent that its provisions are compatible" with those of the later treaty.

458. The Tribunal has already concluded that the ECT and the TFEU do not deal with the same subject matter in the context of this dispute[541], a conclusion that is consistent with prior awards[542].

459. For instance, in *Eskosol* (a prior award under the ECT involving Italy), the tribunal rejected Italy's arguments related to Art. 30 of the VCLT, finding that[543]:

> "The Tribunal thus arrives at the same place as several prior tribunals, even if it adopts Italy's suggestion to examine the 'same subject matter' issue by way of the ILC's 2006 Report on Fragmentation. For example, similarly to the analysis of VCLT Article 59 by the *EURAM v. Slovak Republic* tribunal, the Tribunal considers that <u>a good faith interpretation of VCLT Article 30 does not support the conclusion that two treaties deal with the same subject matter simply because they may apply simultaneously to the same set of facts.</u> Two different treaties may apply simultaneously to the same set of facts, or even share very broadly stated goals (such as 'integration' or 'cooperation' with other States) but approach the achievement of those goals from different perspectives. The Tribunal likewise agrees with the *EURAM* tribunal that the subject matter of a treaty 'is inherent in the treaty itself and refers to the issues with which its provisions deal, *i.e.* its topic or substance.' <u>Using those standards, however, the Tribunal likewise sees no reason to depart from consistent case law finding that the EU Treaties deal with a different subject matter than investment treaties.</u> As noted above, the topic or substance of the EU Treaties was the creation of a common market between EU Member States, governed by EU law, whereas the topic or substance of the ECT was

---

[538] R-I, para. 79; R-II, paras. 302-303, 312.
[539] R-I, para. 79.
[540] Doc. CL-10, Art. 30 (Art. 30(5) is omitted).
[541] See paras. 423-426 *supra*.
[542] See, e.g., Doc. CL-41, *Electrabel*, para. 4.176; Doc. CL-9, *Greentech*, para. 346; Doc. CL-98, *Masdar*, para. 327; Doc. CL-101, *OperaFund*, para. 383.
[543] Doc. CL-99, *Eskosol* (Jur.), paras. 146-147.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

the creation of a broader multilateral network of energy cooperation, liberalization and investment, including through embracing certain reciprocal undertakings as a matter of international law. Moreover, <u>although the 'same subject matter' test in Article 30 is stated in terms of treaties as a whole, the key parts of the ECT for present purposes (ECT Parts III and V) address very specific topics of investment promotion and protection, and involve substantive and procedural protections that are not coincident with (or arguably, even of the same nature as) those offered under the EU Treaties' internal market provisions</u>, which Italy itself admits 'do not 'deal' technically with promotion and protection of investments.' Not surprisingly given these different regimes, the content of the standards is far from coextensive. The mere fact that protections under both regimes could be afforded in certain circumstances to the same investors – at least in the context of direct rather than indirect investment – does not conclusively demonstrate that the ECT and the EU Treaties themselves have the same subject matter for purposes of international law.

For these reasons, the Tribunal concludes that the EU Treaties, and in particular the Lisbon Treaty, are not 'successive treaties relating to the same subject matter' within the meaning of VCLT Article 30(1)." [Emphasis added]

460. But even assuming, *arguendo*, that the ECT and the EU Treaties were considered "successive treaties relating to the same subject-matter" for the purpose of this dispute (*quod non*), the second requirement for the application of Art. 30(3) of the VCLT is also not met. Contrary to Italy's contention[544], there is no incompatibility between Art. 26 of the ECT and Arts. 267 and 344 of the TFEU.

461. Art. 267 of the TFEU sets up the preliminary ruling procedure and provides that[545]:

"The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:

(a) the interpretation of the Treaties;

(b) the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union;

Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling thereon.

Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.

If such a question is raised in a case pending before a court or tribunal of a Member State with regard to a person in custody, the Court of Justice of the European Union shall act with the minimum of delay."

---

[544] R-I, paras. 144-149; R-II, paras. 302-303, 312.
[545] Doc. C-759, Art. 267.

113

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

462. Art. 344 of the TFEU establishes that[546]:

> "Member States undertake not to submit a dispute concerning the
> interpretation or application of the Treaties to any method of settlement other
> than those provided for therein."

463. The Tribunal does not dispute that these provisions are mandatory for Member
States, nor that they guarantee the CJEU's exclusive jurisdiction within the EU
regarding EU law matters. Likewise, Art. 344 deals with the submission of disputes
concerning the interpretation or application of the EU Treaties, and its goal is to
guarantee that the CJEU has the last word on the interpretation of the EU Treaties
(which do not include the ECT).

464. There is, however, no conflict between the ECT's dispute settlement provision and
Arts. 267 and 344 of the TFEU for the reasons set out below.

465. <u>First</u>, there is no conflict because these provisions concern the settlement of
different types of disputes[547]. While Art. 26 of the ECT concerns the "Settlement
of Disputes between an Investor and a Contracting Party" regarding the
interpretation and application of the ECT, Art. 344 of the TFEU deals with the
settlement of disputes between Member States related to the interpretation and
application of the EU Treaties (not between a private party and a Member State[548]).

466. <u>Second</u>, there is no conflict because the CJEU's conclusion in the *Komstroy*
Judgment that, pursuant to Art. 26(6) of the ECT the Tribunal may be called upon
to interpret or apply EU law[549], is not only *obiter dictum* (as discussed below) but
is not relevant in the current case. Art. 26(6) of the ECT provides that[550]:

> "A tribunal established under paragraph (4) shall decide the issues in dispute
> in accordance with this Treaty and applicable rules and principles of
> international law."

467. The goal of Arts. 267 and 344 of the TFEU is to ensure the uniform interpretation
and application of EU law by the CJEU. In the current case, the Tribunal is required
to consider Italian and EU laws only by way of background facts. The legal issues
center on whether or not the measures by the Italian government comply with the
fair and equitable treatment protections under the ECT as a matter of international
law. In so doing, the Tribunal is not required to interpret or apply Italian (or EU)
law and will not express a view on the legality under such laws of measures adopted
by Italy (or the EU authorities). The Tribunal is also not entrusted with the task of
judging whether Italy breached its obligations under the EU Treaties. The Tribunal
will simply consider and establish municipal law as a matter of fact, following the
prevailing interpretation given to municipal law by the courts or authorities of Italy
and the EU, including the decisions of the CJEU.

---

[546] Doc. C-759, Art. 344.
[547] Doc. CL-96, *RREEF*, para. 79; Doc. CL-85, *PV Investors* (Jurisdiction), para. 189.
[548] Doc. CL-89, *Charanne*, para. 441.
[549] R-II, paras. 296-298; Doc. RL-27, *Komstroy* Judgment, paras. 48-50.
[550] Doc. CL-1, Art. 26(6).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

468. This Tribunal is responsible only for determining whether or not Italy, by enacting certain measures, breached its international obligations under a specific instrument: the ECT. Consequently, as the substantive claims in this particular arbitration do not engage Italian (or EU) law, CJEU case law considering whether or not any conflict may arise under those laws is irrelevant.

Prior awards

469. In *Antin* the tribunal, analyzing Art. 26(6) of the ECT, concluded that[551]:

> "[…] nothing in the text, context, purpose and object of the ECT suggests that the inclusion of the reference to 'rules and principles of international law' in the applicable law clause was intended to mean that the treaties creating the EEC and the EU and allocating competences among European institutions and their Member States, the EU's internal legislation, as subsequently interpreted by the CJEU, could be interpreted in a manner such that a development in the EU's *acquis* could be employed to undermine the prior consents to submit to arbitration under the ECT given by each of the EU Member States and the EU itself. The alleged problem of incompatibility between EU law and the ECT, if there is one, is to be sorted out by the EU and the EU States counterparties to the ECT."

470. Similarly, in its 2018 award the *Greentech* tribunal found[552]:

> "[…] no inconsistency, however, between the ECT and EU law, in accord with prior ECT jurisprudence. The Tribunal here refers to the contention by Respondent and the EC that the ECT and TFEU Article 344 are in conflict. TFEU Article 344 provides that EU member states 'undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.' The Tribunal considers that Claimants are correct in their assertion that Article 344 relates to disputes involving Member States or EU institutions, not investor-State disputes. Nor does the present arbitration concern the interpretation or application of the EU treaties, but instead concerns rights and obligations under the ECT. Thus, the Tribunal finds no inconsistency between the ECT and TFEU Article 344."

471. In *Novenergia*, the tribunal determined that[553]:

> "[…] there is no incompatibility between the dispute resolution mechanism in Article 26 ECT and EU law. […]
>
> Article 344 TFEU is not applicable to ECT disputes, as it refers to disputes between EU Member States themselves, not disputes between EU Member States and private parties such as investors. This conclusion is clearly supported by the wording of Article 344 TFEU, EU legal documents, as well as investment treaty tribunals."

---

[551] Doc. CL-87, *Antin*, para. 224.
[552] Doc. CL-9, *Greentech*, para. 350.
[553] Doc. CL-97, *Novenergia II*, paras. 440-441.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

472.  Finally, although in *Eskosol* the tribunal found that there was no need to determine whether the provisions of the Treaty of Lisbon were incompatible with those of the ECT (given its conclusion that the treaties were not "successive treaties relating to the same subject-matter"), it nevertheless noted that such incompatibility[554]:

> "[…] would be unlikely given [the tribunal's] conclusion in Section V.B.1.a above that the ECT does not command application of EU law in order to resolve disputes. As the Tribunal discusses further below in Section V.B.2, in the context of the *Achmea* Judgment, it is entirely possible to have two coexisting systems of law applicable to a particular fact scenario, in which the State conduct's may be adjudged independently by different authorities assessing obligations owed under different bodies of law. Indeed, this is frequently the case for States that are party to investment treaties, and as such have undertaken obligations to foreign investors governed by international law, separate from whatever obligations they already may owe such investors under their own domestic laws. The two regimes (international law and domestic law) exist independently, with neither necessarily usurping the role of the other."

\* \* \*

473.  <u>In view of the reasoning set out above</u>, which is aligned with most prior awards, the Tribunal concludes that there is no conflict between the ECT and EU law.

**D.   *Komstroy* and *Green Power* are inapposite**

474.  Finally, Italy argues that the *Komstroy* Judgment unequivocally demonstrates that ECT investment tribunals do not have jurisdiction over intra-EU disputes, as recognized also by the *Green Power* tribunal[555].

475.  The Tribunal finds that both the *Komstroy* Judgment and the *Green Power* decision are inapposite to its decision in these proceedings.

**a.   The *Komstroy* Judgment is inapposite**

476.  The CJEU's *Komstroy* Judgment is inapposite for several reasons.

477.  <u>First</u>, the *Komstroy* Judgment did not involve any parties from an EU Member State; this is why when referring the case for a preliminary ruling to the CJEU, the Paris Court of Appeal did not ask whether Art. 26 of the ECT was compatible with the TFEU. The questions referred to the CJEU were the following[556]:

> "[(1)] Must [Article 1(6) ECT] be interpreted as meaning that a claim which arose from a contract for the sale of electricity and which did not involve any economic contribution on the part of the investor in the host State can constitute an "investment" within the meaning of that article?

---

[554] Doc. CL-99, *Eskosol* (Jur.), para. 147.
[555] R-II, paras. 276-287, 310 *et seq*.
[556] Doc. RL-27, *Komstroy* Judgment, para. 20.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

> [(2)] Must [Article 26(1) ECT] be interpreted as meaning that the acquisition, by an investor of a Contracting Party, of a claim established by an economic operator which is not from one of the States that are Contracting Parties to that treaty constitutes an investment?

> [(3)] Must [Article 26(1) ECT] be interpreted as meaning that a claim held by an investor, which arose from a contract for the sale of electricity supplied at the border of the host State, can constitute an investment made in the area of another Contracting Party, in the case where the investor does not carry out any economic activity in the territory of that latter Contracting Party?"

478. This is the reason why the CJEU's conclusion concerning the alleged incompatibility between Art. 26(2)(c) of the ECT and intra-EU disputes was not set out in the operative part of the *Komstroy* Judgment; on the contrary, the operative part only answers the questions referred by the Paris Court of Appeal[557]:

> "On those grounds, the Court (Grand Chamber) hereby rules:

> Article 1(6) and Article 26(1) of the Energy Charter Treaty, signed at Lisbon on 17 December 1994, approved on behalf of the European Communities by Council and Commission Decision 98/181/EC, ECSC, Euratom of 23 September 1997, must be interpreted as meaning that the acquisition, by an undertaking of a Contracting Party to that treaty, of a claim arising from a contract for the supply of electricity, which is not connected with an investment, held by an undertaking of a third State against a public undertaking of another Contracting Party to that treaty, does not constitute an 'investment' within the meaning of those provisions."

479. Therefore, the CJEU's finding that

> "Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State"[558]

is *obiter dictum*.

480. Second, the CJEU's decision contains no conflict analysis under international law, or interpretation of the ECT under the principles of international law established in the VCLT – the legal framework under which the Tribunal operates.

481. Third, the Tribunal has already determined why it considers that there is no conflict between EU law and the ECT. Since the Tribunal is the judge of its own competence, the Tribunal is not bound by the CJEU's *obiter dictum*.

---

[557] Doc. RL-27, *Komstroy* Judgment, last paragraph.
[558] Doc. RL-27, *Komstroy* Judgment, para. 66.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

482. As noted by the *Eskosol* tribunal with regards to the *Achmea* Judgment[559]:

> "[…] the *Achmea* Judgment, accepted as a valid decision concerning certain intra-EU BITs in the European legal order, does not disturb [the tribunal's] jurisdiction to decide a dispute in the international legal order under the ECT."

483. The same reasoning can be transposed to the *Komstroy* Judgment.

484. This is because, as well explained by the *Eskosol* tribunal, the international legal system is a general system without any central authority, composed of different and independent legal sub-systems that sometimes interact. Although this international legal system is bound by general principles of international law, below the level of general principles there are various sub-systems, with no clear hierarchy between the different norms established in each sub-system.

485. The EU Treaties are one such sub-system, which vests dispute resolution authority in various organs, including the Commission and the CJEU. The ECT, in conjunction with the ICSID Convention, is another sub-system, which vests dispute resolution authority in arbitral tribunals such as this one. And each authority is empowered in its sub-system to render decisions within its sphere, such as the CJEU's *Achmea* or *Komstroy* Judgments under the EU Treaties, and the awards of various arbitral tribunals under the ECT[560]. This is why Italy may simultaneously be subject to obligations arising from the decisions of the CJEU and decisions of arbitral tribunals under the ECT and the ICSID Convention. And as noted by the *Eskosol* tribunal[561]:

> "[…] the bottom line is that in a case of contradiction, each legal order remains bound by its own rules, for purposes of its own judgments. The CJEU's conclusions regarding the EU legal order are addressed to EU Member States and European institutions, and they accordingly may have no choice but to take steps consistent with the CJEU's ruling, including submitting arguments to international tribunals based on the EU legal order. But the CJEU's conclusions derived from EU law do not alter this Tribunal's mandate to proceed under the legal order on which its jurisdiction is founded, namely the ECT."

486. <u>Finally</u>, even if the *Komstroy* Judgment had the weight that Italy seeks to ascribe to it, it was issued after the Parties' consent to arbitration had been locked. Under Art. 25(1) of the ICSID Convention, "when the parties have given their consent, no party may withdraw its consent unilaterally". The *Komstroy* Judgment cannot retroactively invalidate Italy's consent to arbitrate.

---

[559] Doc. CL-99, *Eskosol* (Jur.), para. 154.
[560] Doc. CL-99, *Eskosol* (Jur.), para. 181.
[561] Doc. CL-99, *Eskosol* (Jur.), para. 184.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

### b. The *Green Power* decision is inapposite

487. The Tribunal has summarized the findings of the *Green Power* tribunal in paras. 387 to 391 *supra*. The *Green Power* award is distinguishable from the current arbitration, and has no relevance for this Tribunal's findings, for several reasons.

488. <u>First</u>, the *Green Power* arbitration was seated in Stockholm and Swedish law applied as the *lex arbitri*. The *Green Power* arbitration was not conducted under the ICSID Rules, and the tribunal acknowledged that ICSID arbitration is performed under a separate regime. The current proceedings are governed by the ICSID Convention and Rules, the seat of the arbitration is not in an EU Member State and neither EU Member State nor EU law applies as the *lex arbitri*.

489. <u>Second</u>, the *Green Power* tribunal acknowledged that the ordinary meaning of the terms of Art. 26 of the ECT was clear and did not leave margin to an intra-EU objection[562].

490. <u>Third</u>, this Tribunal has already analyzed some of the findings of the *Green Power* tribunal in section B.b *supra* and was unpersuaded by those findings.

491. <u>Finally</u>, the *Green Power* case appears as an outlier in an otherwise consistent approach in prior awards that have dismissed similar intra-EU objections. Although the Tribunal is not bound by the decisions of other arbitral tribunals, it is still relevant to note that over 50 ECT tribunals have followed similar reasoning to that adopted by this Tribunal; only the *Green Power* tribunal has taken a different view and in unique circumstances as explained above.

\* \* \*

492. <u>In sum</u>, nothing in the text of the ECT, its context, object or purpose, leads to the conclusion that when signing the ECT the Contracting Parties wished to exclude intra-EU arbitration. A good faith reading of the ECT simply does not permit to reach the conclusion that Italy and the Commission wish, *i.e.*, that Art. 26 of the ECT is incompatible with EU law. As the *Kruck* tribunal put it[563]:

> "The 'incompatibility' of the ECT and the TFEU may have been the result of an oversight at the time that the ECT was adopted or at the time that the TFEU was adopted. But if a treaty does not say what one or more of the parties wished (or has come to wish) it to mean, the remedy cannot be for one or some of the parties to impose a different meaning upon the treaty by a unilateral declaration of its position."

493. In fact, the remedy is for the Member States (and the EU) to amend, terminate or withdraw from the ECT, if they consider that the incompatibility between this Treaty and the EU Treaties is as manifest as they suggest – as Italy and Germany in fact have done. But when the Member States decide to do so they will remain

---

[562] Doc. RL-60, *Green Power*, paras. 339-343.
[563] Doc. CL-107, *Kruck*, para. 291.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

bound to the provisions of the ECT – including to Art. 26 – for 20 years after the withdrawal, by force of the sunset clause.

494. It follows that when Claimants filed their Request for Arbitration, Italy's standing offer to arbitrate disputes related to Part III of the ECT in ICSID arbitration was valid. When Claimants accepted Italy's unconditional offer, consent was perfected and became irrevocable – a manifestation of the maxim *pacta sunt servanda* and of the clear words in Art. 25(1) of the ICSID Convention[564].

495. <u>In view of the above</u>, the Tribunal dismisses Italy's Intra-EU Objection.

---

[564] Doc. CL-198, C. H. Schreuer, *The ICSID Convention: A Commentary*, Article 25, para. 598.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

# VI. <u>LIABILITY</u>

497. Having dismissed Respondent's jurisdictional objections, the Tribunal must now turn to the merits of this dispute.

## 1. <u>INTRODUCTION</u>

498. From the early 2000s, Italy adopted a support scheme to incentivize the transition from fossil fuels to RES, including initially to implement the UNFCCC, the Kyoto Protocol and the 2001 EU Directive. To promote the production of solar PV energy in particular, Italy initially adopted two sets of measures[565]:

- The *Conto* Program, and

- The MGP Regime.

499. In December 2003 the Italian Government enacted the 2003 Legislative Decree. Art. 7.2(d) provided that the Italian Ministries of Economic Development and Environment had to adopt Ministerial Decrees defining the criteria to incentivize the production of solar electric energy. In particular, these Decrees should[566]:

> "[…] foresee a specific incentive tariff, [in a] decreasing amount and [for a] duration [so] as <u>to ensure fair remuneration</u>[567] of investment and operating costs." [Emphasis added]

500. The 2003 Legislative Decree thus required that the implementing decree (or decrees) provide for an incentive tariff for solar energy, which "ensure[d] fair remuneration" of investment and operating costs. Such fair remuneration was determined in the context of a then relatively immature and undeveloped PV market in Italy.

501. This Legislative Decree also created a regime of "*ritiro dedicato*", that obliged the GSE to purchase electricity from PV facilities which, due to their high costs and technological immaturity, were not in a position "to participate in the market"[568].

502. The 2003 Legislative Decree forms the legal basis of what became the *Conto* Program and the MGP Regime.

The *Conto* Program

503. Between 2005 and 2012, Italy enacted five successive Ministerial Decrees, known as "*Conti*", granting an incentive payment for each kWh of electricity produced by

---

[565] See section III *supra*.
[566] Doc. C-31, English translation, p. 2. The Tribunal has complemented the translation of Doc. C-31 on the basis of Doc. C-59, English translation, p. 1 and Doc. C-139, English translation, p. 1.
[567] Respondent uses indistinctively the word "remuneration" or return" (R-I, para. 231; R-II, para. 361). The Tribunal, notes, however, that the Italian original refers to "*equa remunerazione*".
[568] Doc. C-31, Art. 13(4); Parties' Pre-Hearing Joint Submission – Regulatory Chronology, p. 2; Roques I, para. 5.8; Doc. FR-48.

eligible PV plants for a period of 20 years; in the present case only *Conti* II, III and IV[569] are relevant:

- *Conto* II (of February 2007) applied to PV plants that entered into operation from mid-April 2007 until 30 June 2011 (*provided* that such plants had completed construction by 31 December 2010)[570];

- *Conto* III (of August 2010) applied to PV plants that completed construction and entered into operation between 1 January 2011 and 31 May 2011[571];

- *Conto* IV (of May 2011) applied to PV plants that completed construction and entered into operation after 31 May 2011 until August 2012[572];

504. All *Conti* Decrees contained analogous language: the applicable incentive tariff (which varied depending on the date of connection to the grid and the plants' installed capacity), was[573]:

> "[…] awarded for a period of twenty years commencing from the date of entry into operation of the plant and shall remain constant in current currency for the entire incentive period."

505. To benefit from the incentive tariff, the PV producer had to obtain, after the plant's entry into operation[574],

- A Tariff Confirmation Letter from the State-owned entity GSE, and thereafter

- Subscribe a *Convenzione* with the GSE, formalizing the plant's right to benefit from the incentive tariff for a period of 20 years.

The MGP Regime

506. In November 2007 the AEEG also adopted the MGP Resolution, establishing that the GSE would sign off-take agreements with operators of PV plants with less than 1 MW capacity. Under these *Contratti per il Ritiro*, the GSE undertook to pay a certain price, to be defined annually by the AEEG (the so-called "MGP"), for the electricity produced – but reserved the right to modify such *Contratto* if the conditions of the MGP Resolution changed[575].

---

[569] At the Hearing, Claimants clarified that their claims do not concern plants under the Conto V regime, either with respect to the *Spalma-incentivi* Decree or to the MGP Regime; HT, Day 1, p. 44, l. 2 – p. 45, l. 24. See also R-PHB, para. 5.
[570] Doc. C-59. See also Doc. C-63; Roques I, para. 5.26.
[571] Doc. C-139, Art. 8(2). See also Doc. C-163, Art. 25(9).
[572] Doc. C-166, Art. 1(2).
[573] Doc. C-59, Art. 6(1) (*Conto* II); Doc. C-139, Art. 8(4) (*Conto* III); Doc. C-166, Art. 12(2) (*Conto* IV).
[574] See paras. 68-70 *supra*.
[575] See para. 73 *supra*.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

The Disputed Measures

507.  On 19 December 2013 the AEEG enacted the New MGP Resolution, providing that the MGP would be fixed at EUR 38.5/MWh[576] annually indexed to inflation. And a few days later, on 23 December 2013, Italy passed the *Destinazione Italia* Decree, which established that PV plants that benefitted from the *Conto* Program would be entitled to a MGP equal to the market price[577].

508.  Six months later, on 24 June 2014, Italy enacted the *Spalma-incentivi* Decree, providing that PV plants with a capacity higher than 200 kW (a category which included all plants operated by Claimants)[578] had to choose between one of three options (A to C), each of which implied a reduction in the incentive tariff[579]. Claimants defaulted into Option C[580], which became applicable on 1 January 2015, which implied reductions in the incentive tariff rates of between 6% (for smaller plants) and 8% (for plants with a nominal capacity of more than 900 kW). The majority of Claimants' plants fell into the 8% reduction category[581].

**2.    CLAIMANTS' INVESTMENTS**

509.  There are 59 Claimants in this case[582].

510.  The first Claimant is Encavis, an investment fund adopting the form of an *Aktiengesellschaft* registered in Hamburg, Germany[583]. It is the result of the 2016 merger of two other German companies, specialized in investments in the renewable energy sector[584]:

-    Capital Stage AG [previously defined as "Capital Stage"; the group of companies related to Capital Stage is referred to as "**Capital Stage Group**"], and

-    CHORUS Solar GmbH & Co. KG [previously defined as "CHORUS"; the group of companies related to CHORUS is referred to as "**CHORUS Group**"].

511.  As a result of this merger, Encavis owns and controls all the other Claimants[585], which are the "**Operating Companies**", which between July 2009 and July 2013

---

[576] Doc. C-616, p. 11 and Tabella 1 (Italian version).
[577] Doc. C-619.
[578] All of Claimants' PV plants had an installed capacity equal to or higher than 200 kW (Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022).
[579] Doc. C-624, Art. 26(3). See also Roques I, paras. 6.2 to 6.14.
[580] Parties' Pre-Hearing Joint Submission – Regulatory Chronology, p. 6.
[581] Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022.
[582] See the complete list in para. 2 *supra*.
[583] Doc. C-1; Parties' Pre-Hearing Joint Submission – *Dramatis Personae*, p. 7.
[584] Scharrer I, paras. 4-7; Parties' Pre-Hearing Joint Submission – *Dramatis Personae*, pp. 7 and 17; Encavis Annual Report for 2018, p. 2 (Exhibit 7 to Sapienza II).
[585] Encavis Annual Report for 2018, pp. 150-154 (Exhibit 7 to Sapienza II).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

acquired over 70 PV plants in Italy[586], all enrolled in the *Conti* II, III or IV programs, and 56 also qualifying for the MGP Regime[587].

> [Five Operating Companies (SP 07 S.r.l., SP 09 S.r.l., SP 11 S.r.l., SP 13 S.r.l and SP 14 S.r.l.[588]) qualified for a tariff under *Conto* V[589]. Claimants, however, do not make any claims regarding the plants qualified under *Conto* V[590], so that any examination of the *Conto* V regime is unnecessary].

512. Italy does not contest that Claimants invested in Italy; but it claims that Claimants started investing in 2010 and continued until 2017 – with the consequence that Claimants must have been aware of the developments that were occurring in the Italian market and could not ignore the context in which they were investing[591].

513. Claimants reject this argument[592].

514. The Tribunal agrees that the timing of Claimants' investments is an essential element when considering whether Italy breached its obligations under Art. 10(1) of the ECT.

515. In an Annex to this Award the Tribunal has examined when and how each of Claimants made their respective investments in Italy, and what rights they obtained under Italy's support scheme. After carefully considering the evidentiary record, the Tribunal does not accept Italy's contention that Claimants continued their investments until 2017. The evidence available on the record (further developed in the Annex and in further sections) demonstrates that:

- Each of the Operating Companies built one or more PV plants in Italy between 2009 and, at the latest, early 2012;

- Each of the Claimants' PV plants qualified for the *Conto* Program, either under *Conto* II, III or IV, obtained a Tariff Confirmation Letter and signed a *Convenzione* with the GSE between August 2010 and March 2013; and

- The majority of the Claimants' PV plants also qualified for the MGP regime and executed a *Contratto per il Ritiro* with the GSE between December 2010 and February 2013.

---

[586] Parties' Pre-Hearing Joint Submission – *Dramatis Personae*, pp. 7-16; Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022, pp. 1-20. See also Encavis Annual Report for 2018, p. IV (Exhibit 7 to Sapienza II).
[587] Annex to the Award. See also C-I, paras. 19 and 175; C-PHB, paras. 72-75; Scharrer I, paras. 16-40; Scharrer II, para. 4. The Operating Companies are registered currently at the *Camera di Commercio Industria Artigianato e Agricoltura di Bolzano*.
[588] It is unclear whether or not SP 10 S.r.l. also made investments under *Conto* V, because it is neither mentioned in the *Dramatis Personae* nor in the Key Dates for Claimants' Investments; but the Tribunal understands that this was the case.
[589] Parties' Pre-Hearing Joint Submission – *Dramatis Personae*, pp. 15-16; Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022, p. 20.
[590] HT, Day 1, p. 44, l. 2 – p. 45, l. 24; HT, Day 4, p. 805, ll. 5-6. See also R-PHB, para. 5.
[591] R-I, paras. 375-376; HT, Day 1, p. 174, l. 22 – p. 175, l. 17; R-PHB, para. 50.
[592] C-II, fn. 278; Scharrer II, paras. 3-5; C-PHB, para. 72.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

516.  The Capital Stage Group and the CHORUS Group acquired most of the Operating Companies between 2010 and 2016, the time when both groups merged, forming Encavis, the first Claimant in this dispute. Encavis then bought certain additional Operating Companies between 2016 and 2017 and currently owns (and has owned at the start of the arbitration) all the Operating Companies[593].

517.  Claimants have clarified that the only investments at issue in this dispute are the investments by each Operating Companies in the PV plants – not the investment of Encavis in the Operating Companies[594]. Encavis did acquire shares in certain Operating Companies in 2016 and 2017; but this does not mean – contrary to Italy's submission – that the relevant investments were made in 2016 and 2017: the PV plants were all built or acquired by the Operating Companies well before the end of 2013 – when the first Disputed Measures were adopted.

3.  **SUMMARY OF THE PARTIES' POSITIONS**

518.  According to Claimants, Italy induced foreign investment through the *Conto* Program and the MGP Regime and, in reliance on these incentive schemes, between 2009 and 2013 they invested in over 70 PV plants[595]. Claimants take issue with Italy's decisions to:

-    Reduce the incentive tariff in accordance to the *Spalma-incentivi* Decree, and

-    Eliminate the MGP Regime,

and ask for a declaration that Italy has violated the ECT and international law with respect to Claimants' investments (plus compensation for the damage they claim to have suffered as a consequence)[596].

519.  Claimants' claim is based on an alleged breach of the legal protections afforded by Art. 10(1) of the ECT[597]:

-    The host State's obligation to provide stable and transparent conditions to Claimants' investments;

-    Its obligation to respect the investor's "legitimate expectations" under the fair and equitable treatment ["**FET**"] standard;

-    Its obligation not to impair by unreasonable or discriminatory measures Claimants' investment; and finally

-    Its obligation to respect any commitments entered into with an investor or an investment [the "**Umbrella Clause**"].

---

[593] Encavis Annual Report for 2018, pp. 150-154 (Exhibit 7 to Sapienza II).
[594] C-PHB, para. 74 and fn. 107.
[595] C-I, paras. 19, 172. Claimants refer to 78 PV plants, even though the *Dramatis Personae* only seems to list 75 PV plants.
[596] C-I, para. 428; C-II, para. 639; C-III, para. 237.
[597] C-I, para. 24.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

520. Italy disagrees and requests that the Tribunal dismiss all the claims. Italy submits that States have a right to regulate and that the incentives enacted by Italy were subsidies put in place in a highly regulated market. Any prudent investor should know that in the absence of a stabilization clause, the State was free to fine-tune its scheme, in a reasonable and proportionate manner. Italy denies that it enticed and then ripped-off investors. Italy adopted a stable support scheme, that was never fundamentally altered – simply re-modulated, considering the general interest and legitimate macro-policy stances[598].

521. Therefore, Italy argues that there was no violation of any of the provisions contained in Art. 10(1) of the ECT because[599]:

- Italy did not fail to grant FET to Claimants' investments, either by frustrating legitimate expectations under the FET standard or by failing to act transparently and consistently under the stable conditions requirement;

- Italy never adopted unreasonable or discriminatory measures, in violation of the non-impairment requirement; and

- Italy did not breach the Umbrella Clause.

**4.    THE PROPER INTERPRETATION OF ART. 10(1) ECT**

522. Having established that Encavis, the first Claimant, is a German investment company, which owns and controls the other 58 Claimants, which in turn are the Operating Companies, which between July 2009 and July 2013 built or acquired over 70 PV plants in Italy[600] enrolled in the *Conto* II, III and IV programs, and 56 of which also qualified under the MGP Regime[601], the Tribunal turns its attention to the proper interpretation of the rule of international law which, in Claimants' submission, the Italian Republic has breached: Art. 10(1) of the ECT.

523. Art. 10 of the ECT concerns the "promotion, protection and treatment of investments". Art. 10(1) of the ECT provides that[602]:

> "(1) Each Contracting Party shall, in accordance with the provisions of this Treaty, encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area. Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment. Such Investments shall also enjoy the most constant protection and security and no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or

---

[598] R-II, paras. 251-252.
[599] R-II, paras. 255-261.
[600] See Annex to this Award. See also Parties' Pre-Hearing Joint Submission – *Dramatis Personae*, pp. 7-16; Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022, pp. 1-20; Encavis Annual Report for 2018, pp. IV and 150-154 (Exhibit 7 to Sapienza II).
[601] C-I, paras. 19 and 175; C-PHB, paras. 72-75; Scharrer I, paras. 16-40; Scharrer II, para. 4. All the Operating Companies are registered currently at the *Camera di Commercio Industria Artigianato e Agricoltura di Bolzano*.
[602] Doc. CL-1.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

disposal. In no case shall such Investments be accorded treatment less favourable than that required by international law, including treaty obligations. <u>Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party</u>." [Emphasis added]

524. Italy submits that there is substantial overlap between the different and separate standards enshrined in this provision, in particular between the FET standard and the impairment element of Art. 10(1)[603]. Claimants disagree[604].

525. Pursuant to Art. 31(1) of the VCLT, the Tribunal must interpret the terms of Art. 10(1) of the ECT in good faith, in accordance with the ordinary meaning to be given to the terms of the Treaty in their context and in light of the Treaty's object and purpose[605].

526. A plain reading of Art. 10(1) of the ECT shows that this provision can be divided into, at least, four separate obligations[606]:

- The first is the stable conditions requirement contained in the first sentence of Art. 10(1)[607]:

   "Each Contracting Party shall […] encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area."

- The second and third obligations represent two special situations, derived from the general obligation[608]: the obligation to provide FET – which raises the question of whether investors are entitled to rely on any "legitimate expectations" – and the prohibition of impairment of investments of investors by unreasonable or discriminatory measures under the non-impairment requirement of Art. 10(1)[609]:

   "Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment."

   "[N]o Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal."

- Finally, the fourth obligation, the so-called Umbrella Clause, requires the host State to "observe" any obligations it has entered into either with an investor or an investment[610]:

---

[603] R-I, paras. 531-536; R-II, para. 522.
[604] C-I, para. 352; C-II, para. 462.
[605] Doc. CL-10. See also Doc. CL-195, pp. 2-3.
[606] Doc. CL-17, *Watkins*, para. 482; Doc. CL-190, *LSG*, para. 1005.
[607] Doc. CL-1.
[608] Doc. CL-8, *ESPF*, para. 751; Doc. CL-190, *LSG*, para. 1005.
[609] Doc. CL-1.
[610] Doc. CL-1.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

"Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party."

## 5. DISCUSSION

527. The thrust of Claimants' argument is that Italy, by adopting the Disputed Measures, *i.e.*,

- The New MGP Resolution and the *Destinazione Italia* Decree, which modified the MGP regime, and

- The *Spalma-incentivi* Decree, which reduced the incentive tariff between 6% and 8%,

breached Art. 10(1) of the ECT, causing prejudice to Claimants' investments. Italy rejects Claimants' claims.

528. The Parties agree that the Tribunal must determine the following[611]:

- Has Italy, by promulgating the Disputed Measures, failed to provide stable and transparent conditions towards Claimants' investments in breach of the stable conditions requirement under Art. 10(1) of the ECT?

- Has Italy, by promulgating the Disputed Measures, breached the ECT's non-impairment requirement under Art. 10(1)?

- Has Italy, by promulgating the Disputed Measures, breached Claimants' legitimate expectations in violation of the ECT's FET standard under Art. 10(1)?

- Has Italy, by promulgating the *Spalma-incentivi* Decree, breached the ECT's Art. 10(1) Umbrella Clause[612]?

529. The Tribunal will address the four questions in turn, starting with the last question (**5.1**), then addressing the first and second questions, which are interrelated in a single section (**5.2**) and the third question in a final section (**5.3**).

## 5.1 HAS ITALY, BY PROMULGATING THE *SPALMA-INCENTIVI* DECREE, BREACHED THE UMBRELLA CLAUSE?

530. The Tribunal will first summarize the Parties' position, as explained in the oral presentations during the Hearing, and in their PHBs (**A.** and **B.**). Thereafter the Tribunal will provide its own analysis (**C.**).

---

[611] Parties' Pre-Hearing Joint Submission – Regulatory Chronology, p. 20. See also R-PHB, para. 4.
[612] As amended at the Hearing (HT, Day 4, p. 904, ll. 15-20 and p. 905, ll. 3-8).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

### A.   <u>Claimants' position</u>

531.   Claimants aver that the *Convenzioni* under *Conti* I through IV ["**Convenzioni I – IV**"] are binding private law contracts, rather than just "accessory contracts" or merely procedural instruments, and that they created an obligation, incumbent on GSE, to pay to the Operating Companies the incentive tariff for a fixed period of 20 years[613]. The obligations created in those contracts are obligations of Italy, because the GSE, a State-owned company, was exercising governmental authority under the direction of Italy: the GSE had no discretion and was required to sign the *Convenzioni* with investors that satisfied certain regulatory requirements[614].

532.   As regards the legal nature of the *Convenzioni* I – IV, Claimants say that when they made their investments between 2009 and 2013, no one understood the *Convenzioni* to be anything less than binding private law agreements between the GSE and the Operating Companies – no one thought about accessory contracts. The *Convenzioni* I – IV had all the hallmarks of an ordinary private law contract, while the *Convenzioni* under *Conto* V ["**Convenzioni V**"] and the *Contratti per il ritiro* had the hallmarks of an accessory public law agreement[615]. In support of their position, Claimants invoke:

-   The *Romani* Decree, which refers to private law contracts[616];

-   A statement by the Italian Procurer General, that PV plant operators had acquired "a subjective right to the exact performance of the incentive payment promise"[617];

-   The fact that no provision of the *Convenzioni* or of the underlying Italian legislation explicitly characterizes the *Convenzioni* as accessory contracts[618];

-   The fact that the *Convenzioni* explicitly state the exact tariff rate that would apply for 20 years, rather than cross-referencing to regulation[619];

-   The fact that the *Convenzioni* V explicitly added the unilateral modification language in Art. 17.3, absent in those under *Conti* I through IV[620]; and

-   The fact that in clause 16 of the *Contratti per il ritiro* the GSE retains the right to modify the agreement, if there is any change in the underlying regulation[621].

533.   Italy's reliance on the 2017 Constitutional Court Decision is, in Claimants' opinion, misplaced:

---

[613] C-II, para. 492; C-PHB, para. 9.
[614] C-PHB, para. 8.
[615] C-PHB, para. 58.
[616] C-PHB, para. 9, by reference to Art. 24.2(d) of Doc. C-163.
[617] C-II, para. 494; C-PHB, para. 9; HT, Day 4, pp. 858-861.
[618] C-PHB, para. 52.
[619] C-PHB, para. 53.
[620] C-PHB, para. 53; HT, Day 4, p. 804, ll. 4-23.
[621] HT, Day 4, p. 812, ll. 13.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

- The finding that the *Convenzioni* are accessory contracts is an *obiter dicta*[622];

- The Constitutional Court only referred to contracts under *Conto* V, which have a different nature[623];

- Art. 26(6) of the ECT requires that the Tribunal decide the merits of the case using the terms of the Treaty and rules and principles of international law[624]; the classification of the obligation under municipal law is irrelevant in interpreting the meaning of "obligation" in international law[625]; and

- The determination in 2017 by the Constitutional Court cannot be used by Italy to argue that the *Convenzioni* did not create obligations when Claimants invested; a State cannot rely upon the characterization of its conduct under its own municipal law to escape liability under international law[626].

534. Claimants say that Italy guaranteed a specific tariff rate for 20 years, and investors were entitled to rely on that specific commitment, without an additional "promise to keep the promise" meeting some formal definition of stabilization clause[627]; by adopting the *Spalma-incentivi* Decree, which reduced the value of the incentives, Italy failed to "observe" these obligations[628].

## B.    Respondent's position

535. The starting point of Italy's arguments is that "accessory contracts" ("*contratti accesori*" or "*accessivi*") is a long-standing and consolidated legal category under Italian law, elaborated by legal doctrine and applied by Italian courts for decades[629]. Italy adds that under Italian law, contracts of public law can be divided into three categories:

- Accessory contracts to public measures;

- Auxiliary contracts to public measures; and

- Contracts substituting public measures.

536. Italy explains that a phase of authoritative exercise of public powers is followed by a phase built under the scheme of a contractual relationship: the authoritative exercise establishes the legal situation, while the contract regulates its operation[630]. Accessory contracts are structurally different from voluntary sources of obligations[631] and simply establish the operational rules to implement the relevant public measure it is connected to, but depend on the vicissitudes of the public

---

[622] C-PHB, para. 11, para. 64.
[623] C-PHB, para. 12; HT, Day 4, p. 824, l. 3, by reference to *ESPF*, para. 823.
[624] HT, Day 4, p. 817, l. 3.
[625] C-PHB, para. 15.
[626] C-PHB, para. 14, invoking Art. 27 of the VCLT and Art. 3 of the ILC Articles.
[627] C-PHB, para. 26.
[628] C-I, para. 382.
[629] R-PHB, para. 32.
[630] R-I, fn. 102, invoking Art. 133 of Legislative Decree of 2 July 2010.
[631] R-I, para. 582.

measure, which can be subject of revision, self-defense or revocation because of public interest[632]. In these contracts the parties do not autonomously determine the essential elements of the agreement, which are established outside the contract by the legislative and/or regulatory act they depend on[633].

### The *Convenzioni* under *Conti* I through IV are accessory contracts

537. Italy avers that the *Convenzioni* I – IV are accessory contracts, which simply transpose legal provisions and are structurally different from voluntary sources of obligations[634]. The parties did not autonomously determine the essential elements of the *Convenzioni*, which were imposed by the legislative or regulatory act they depend on[635]. The *Convenzioni*, as accessory agreements, are unable to embed autonomous obligations by Italy to ensure a certain tariff[636]. These are agreements of regulatory nature, with the purpose of establishing the rules for the concrete disbursement of the subsidy[637]. The necessary consequence is that the Umbrella Clause does not apply to the *Convenzioni* I – IV.

### The situation is different for *Contratti per il ritiro* and *Convenzioni* V

538. Italy submits that the situation is different as regards the *Contratti per il ritiro* and the *Convenzioni* V; both are contracts of mixed nature, where, within a private law contract, provisions of a regulatory nature are embedded[638]. (*Pro memoria*: Claimants are not invoking a breach of this type of contracts). In the *Contratti per il ritiro* the only aspect of administrative law is the MGP[639]. The reason for the difference between *Convenzioni* I – IV and *Convenzioni* V lies in the difference in the way incentives are granted under *Conto* V against the previous *Conti*: under the previous *Conti*, the incentive tariff is paid on top of the price of the electricity sold, while under *Conto* V GSE pays an all-inclusive tariff, which includes the price of the electricity plus the subsidy[640].

539. Italy draws the Tribunal's attention to Art. 1 of the *Convenzioni*, which define the "purpose of this Agreement" as the "granting by GSE to the Producer" of the incentive tariff[641]. As regards Art. 10, Italy explains that these clauses were inserted to refrain the GSE from unilaterally modifying the agreement in the absence of a general regulatory change, but do not apply to the legislative branch of the Italian Republic, which remains free to exercise its regulatory powers[642].

540. This has been confirmed by the Constitutional Court Decision, which has ruled on the accessory nature of the *Convenzioni*, and it has done so by referring to all types

---

[632] R-I, para. 262.
[633] R-I, para. 582.
[634] R-I, para. 579.
[635] R-I, para. 582; R-II, para. 557.
[636] R-PHB, para. 19(ii).
[637] R-PHB, para. 23.
[638] R-PHB, para. 26, para. 2 and (clearer) para. 31(vii).
[639] HT, Day 4, p. 856, l. 9.
[640] HT, Day 4, p. 856, l. 18; R-PHB, para. 31(vii) *in fine*.
[641] HT, Day 4, p. 842, l. 18.
[642] HT, Day 4, p. 846, l. 21.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

*Convenzioni*, irrespective of the *Conto* they are linked to. The Court does not address the specificity of the language in the *Convenzioni* V[643].

## C.    Analysis by the Tribunal

541.    Claimants say that the *Convenzioni* I – IV are binding private law contracts, rather than just accessory contracts, which gave rise to an obligation, mandatory upon the GSE, to pay to the Operating Companies the incentive tariff for a fixed period of 20 years[644]. This obligation falls on Italy, since the GSE, a State-owned company, was exercising governmental authority under the direction of the Republic.

542.    Claimants conclude that by issuing the *Spalma-incentivi* Decree, Italy breached the obligations assumed in these *Convenzioni* and incurred in a violation of the Umbrella Clause[645].

543.    The Tribunal notes that Claimants do not argue that the changes in the MGP regime, which Italy introduced by adopting the New MGP Resolution and the *Destinazione Italia* Decree, amount to a breach of the Umbrella Clause. The underlying reason is that Art. 4 and 10 of the *Contratti per il ritiro* authorize the GSE, upon a regulatory change, to amend the MGP; Claimants accept that, given their language, the *Contratti* do not create obligations in favour of the investors that Italy could have breached in violation of the Umbrella Clause[646].

544.    Respondent holds the opposite view regarding the *Convenzioni* I – IV: in Italy's submission, the *Convenzioni* I – IV are accessory contracts, which do not create autonomous obligations, with the necessary consequence that the Umbrella Clause, which only mandates the Republic to observe the obligations it has actually entered into, never comes into application.

545.    The Tribunal has carefully considered all of the Parties' arguments concerning the Umbrella Clause, including as summarized above. Ultimately, the Tribunal concludes that the *Convenzioni* were accessory contracts and do not give rise to any specific obligation under the ECT Umbrella Clause. The Tribunal sets out its reasons below by:

-    Briefly recapitulating the meaning of the Umbrella Clause (**a.**);

-    Explaining the concept of accessory contracts under Italian law (**b.**);

-    Addressing the question whether the *Convenzioni* I – IV constitute accessory contracts, concluding that they do (**c.**);

-    Dismissing Claimants' counterarguments (**d.**); and

-    Considering conclusions in prior awards (**e.**).

---

[643] R-II, para. 557; R-PHB, para. 31(vii); HT, Day 4, p. 893, l. 12.
[644] C-II, para. 492; C-PHB, para. 9
[645] C-PHB, para. 8.
[646] C-PHB, paras. 57, 64; HT, Day 4, p. 812, ll. 10-15; p. 904, ll. 15-20; and p. 905, ll. 3-8.

### a.    The Umbrella Clause

546. The Umbrella Clause contained in Art. 10(1) *in fine* of the ECT reads as follows:

> "Each Contracting Party shall observe any obligations it has entered into with
> an Investor or an Investment of an Investor of any other Contracting Party."

<u>The Parties' positions</u>

547. The Parties dispute whether or not the ECT Umbrella Clause covers not only contractual obligations, but also non-contractual obligations (e.g., those contained in general legislation); Claimants argue it does, and Italy avers that it does not[647].

548. Claimants submit that the wording of the Umbrella Clause does not differentiate between contractual obligations and other undertakings, including those in laws, regulations or correspondence; they submit that the wording "any obligations" is sufficiently broad to encompass any type of obligation[648]. Claimants also contend that the words "entered into" are not restricted to entering into contracts but may relate to any agreement or commitment[649].

549. Italy argues that the Umbrella Clause covers only contractual obligations – not statutory and regulatory obligations[650]. It says that the term "enter into" implies an activity of negotiation between two parties, giving rise to contractual obligations[651] and that a broad interpretation of the Umbrella Clause would substantially reduce the meaning of the FET provision[652] and derogate from the international law principle of separation between municipal and international law obligations[653].

<u>Discussion</u>

550. The Tribunal accepts the Claimants' proposition that "any obligations" has broad reach. But these words cannot be read in isolation; they must be read in light of the words that follow and qualify the type of "any obligations" the Treaty is referring to: *i.e.*, obligations the State "has entered into with" an investor or an investment.

551. A good faith reading of the ordinary meaning of the terms indicates that the Umbrella Clause only encompasses obligations of a contractual nature: the Merriam-Webster dictionary defines "to enter into" as meaning "to make oneself a party to or in", "to form or be part of", "to participate or share in"; and it specifically gives as an example the wording to "enter into an agreement"[654]. Any of these definitions requires an interaction between the State and the investor, a bilateral legal relationship that gives rise to an obligation, where the State agrees to become

---

[647] C-II, paras. 475 *et seq.*; R-I, paras. 569-573.
[648] C-I, para. 375; C-II, paras. 475-476; C-PHB, para. 7.
[649] C-II, para. 477.
[650] R-I, para. 556; R-II, paras. 535, 542.
[651] R-I, para. 570; R-II, para. 538.
[652] R-I, para. 576.
[653] R-I, para. 578.
[654] See Merriam-Webster Dictionary, "enter into", available at: https://www.merriam-webster.com/.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

the debtor and the investor (or the investment) assumes the position of creditor. The instrument that typically records such a legal relationship is a contract.

552. By contrast, norms of general applicability or unilateral administrative acts adopted by the State, are incapable of creating contractual obligations "entered into with" an investor or an investment. This does not mean they do not mirror existing legal obligations created by law. They arise however as a result of unilateral acts performed by the State, which do not require any action from the investor (or investment), who is merely the addressee of such norms or acts.

553. It follows that the obligations invoked by Claimants which do not imply a bilateral legal relationship between the investor/the investment and the State (e.g., the 2001 and 2003 Legislative Decrees, the *Conti*, or the Tariff Confirmation Letters[655]) fall outside the scope of protection of the Umbrella Clause. Therefore, the Tribunal will proceed to analyze only whether or not Italy breached the ECT Umbrella Clause in relation to the *Convenzioni*, the contractual character of which is undisputed[656].

554. This approach is consistent with that of the tribunal in *Eskosol*[657], which noted that:

> "The very notion of 'enter[ing] into' an obligation 'with an investor' implies, as a matter of ordinary meaning, that there has been some interaction between the State and the investor, from which a particular obligation results. In most cases, that interaction presumably would be direct, such as through a contract or an investment authorization."

**b.  Accessory contracts under Italian law**

555. Italy has proven that accessory contracts ("*contratti accesori*" or "*accessivi*") represent a long-standing and consolidated legal category under Italian law, elaborated by legal doctrine and applied by Courts since decades[658]. As Italy has explained, its public administration can enter into three types of contracts[659]:

- Ordinary contracts, subject to civil law, in which the parties act on strictly equal footing;

- Special contracts, which follow the general principles of private law, but where the public administration retains special powers; and

- Public law contracts, which complement public measures and are entered into in the exercise of public power.

556. Accessory contracts form one of the categories of public law contracts in Italy. Their existence is acknowledged by legislation: Art 3(1)(d) of Decree 351 of 25 September 2001 refers to "accessory contracts" in the area of privatization of

---

[655] C-PHB, para. 7.
[656] See also Doc. CL-47, *Silver Ridge*, paras. 367 and 370.
[657] Doc. RL-50, *Eskosol* (Award), para. 462.
[658] R-PHB, para. 32.
[659] R-I, fn. 102.

real estate property[660], while Art. 133 of the Legislative Decree of 2 July 2010, provides that "agreements accessory or substitute to administrative measures" are subject to the jurisdiction of the Administrative Courts[661]. Prof. D'Atena has thus defined accessory contracts, when deposing before the *SunReserve* tribunal[662]:

> "[T]here are certain contracts that, despite the fact that they have a private law form, they are subject to the logic of administrative law because they are ancillary to an administrative concession."

557. The fundamental characteristics of accessory public law contracts under Italian law, as explained by Italy, are the following[663]:

- Accessory contracts are always dependent on a legislative and/or regulatory measure, which precedes their execution;

- Accessory contracts are structurally different from other contracts in that they do not constitute a source of contractual obligations, because the parties cannot autonomously determine the essential elements of their agreement, these elements having been established, outside the contractual frame, by the legislative and/or regulatory act they depend on[664];

- The purpose of accessory contracts is to define the operational rules necessary to implement the relevant public measure; and

- Accessory contracts do not create autonomous obligations as any obligations arise as a consequence of the public measure adopted by the administration and depend on the vicissitudes affecting such public measure: if, for reasons of public interest, the administration decides to revisit, to amend or to terminate the legislative and/or regulatory measure, the obligations acknowledged in the accessory contract suffer the same fate[665].

### c.     Do the *Convenzioni* constitute accessory contracts?

558. *Pro memoria*: Operators of PV plants, which benefitted from the *Conti* I through IV, were required to sign a *Convenzione* for each PV plant. These *Convenzioni* I – IV had the following substantive provisions[666]:

- Art. 1 defined their "purpose" as "the acknowledgement by the GSE to the Producer" of an "incentivized contribution" pursuant to "Art. 7 of the [2003 Legislative Decree]" and the Ministerial Decree corresponding to each *Conto*;

---

[660] R-PHB, p. 38.
[661] Quoted in R-I, fn. 102 *in fine*.
[662] Doc. CL-46, *SunReserve*, para. 822.
[663] See also Doc. CL-46, *SunReserve*, paras. 822 and 823.
[664] R-I, para. 582.
[665] R-I, para. 262.
[666] The Tribunal uses Doc. C-283 as an example; all *Convenzioni* under *Conti* I through IV follow the same structure and have analogous wordings.

- Art. 2 stated that "for a period of twenty years" from the date when the PV plant became operational, "the incentive rate, which is constant in current money […] is equal to" a certain figure expressed as EUR/kWh;

- Art. 10 provides that the *Convenzione* is formalized "as soon as the GSE accepts" the declaration by the producer, and thereafter "any modifying or supplementary agreements to the content of this Agreement must be agreed in writing, on penalty of nullity".

559. The Tribunal accepts Italy's submission (confirmed by the Decision adopted by Constitutional Court, Italy's highest tribunal – see paras. 562-566 *infra*), that the *Convenzioni* I – IV share the fundamental characteristics of accessory contracts[667]:

- Their purpose is simply to reflect an incentive tariff for a certain PV plant, which has already been established by existing legislative and regulatory measures; this is confirmed by:

  o Art. 1, which defines the "purpose" of the *Convenzione* as "the acknowledgement by the GSE to the Producer" of an "incentivized contribution" pursuant to Art. 7 of the 2003 Legislative Decree and subsidiary legislation; and

  o Art. 2, which simply acknowledges that the incentive tariff "is equal" to a certain value;

- Neither the GSE nor the producer autonomously consented to the incentive tariff – this essential element of the *Convenzione* was established outside the contract by legislative and regulatory measures adopted by the Italian State;

- The relationship between the GSE and producer is not synallagmatic; the producer does not assume any obligation vis-à-vis the GSE and there is no *quid pro quo*; the *Convenzione* does not formalize the producer's obligation to build and operate the PV plant, against the GSE's obligation to pay an incentive tariff; its purpose is different: it is to define the operational rules necessary to pay the subsidy, which has already been granted to the plant by general regulation; and

- Finally, under the *Conto* Program the nature of the GSE is that of an implementing body which acts in a purely executory role[668].

560. These conclusions as to the legal nature of the *Convenzione* were shared by the tribunal in *Silver Ridge*, which found that[669]:

"[T]he GSE submitted the [*Convenzioni*] for signature by the renewable energy producer only at the end of a process that included several previous steps (namely the [*Conti*] themselves as well as the [Tariff Confirmation Letters], which are both unilateral in character) and at a moment in time when

---

[667] See also Doc. CL-47, *Silver Ridge*, para. 373, which comes to the same conclusions.
[668] Doc. CL-46, *SunReserve*, para. 825.
[669] Doc. CL-47, *Silver Ridge*, para. 376.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

the core elements of the incentivization scheme for the individual PV plant [...] had already been fixed. <u>In fact, the [*Convenzioni*] only reflect a legal relationship whose existence and essential features have been determined before</u>." [Emphasis added]

561. This contrasts with the *Contratti per il ritiro*, which do not meet the requirements to be considered as accessory contracts. The purpose of the *Contratti* agreement is to regulate electricity off-take between the GSE and the producer – a synallagmatic relationship, in which the payment of the price by the GSE acts as the *quid pro quo* for the delivery of electricity by the producer. The purpose of the *Contratti* is not simply to acknowledge the existence of a subsidy, and to regulate the operational rules for the payment, but to formalize the reciprocal obligations of each party.

<u>The Constitutional Court Decision</u>

562. The Italian Constitutional Court in its seminal Decision No. 16/2017 (previously defined as the "Constitutional Court Decision") treated the *Convenzioni* I – IV as accessory contracts[670].

563. The Decision examined the constitutionality of the *Spalma-incentivi* Decree, which had been impugned by the Administrative Tribunal of the Lazio Region and by numerous individual claimants, as being contrary to the Italian Constitution[671]. *Inter alia*, the challenging parties argued that the Decree violated the constitutional principle of private autonomy, because "the reduction of the incentives has affected 'private law' contracts"[672].

564. The GSE, the State-owned company that executed the *Convenzioni*, appeared in the proceedings and defended the constitutionality of the *Spalma-incentivi* Decree. It argued that "that the agreements are merely accessory to the administrative provisions which grant the incentives, which therefore are dependent on public interest exigencies"[673].

565. The Constitutional Court dismissed the challenging parties' case, confirming the constitutionality of the Decree; as regards the argument that the Italian Republic had violated the constitutional principles of respect for private autonomy, the Court's reasoning was twofold:

-   The Court first confirmed that the *Convenzioni* were "accessory to the provisions granting the incentives"[674], that they "cannot be qualified as contracts meant to determine the exclusive profit of the operator [...] they are instead regulatory instruments [...]"[675], and

-   Because of their legal nature as accessory contracts, which do not create autonomous obligations, the Court found that the *Spalma-incentivi* Decree

---

[670] Doc. R-18.
[671] Doc. R-18, Facts, para. 1.
[672] Doc. R-18, Law, para. 11.
[673] Doc. R-18, Facts, para. 4.
[674] Doc. R-18, Law, para. 11.
[675] Doc. R-18, Law, para. 8.3.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

did not violate the principle of freedom of economic initiative (which embeds the principle of private autonomy); the Court added that for a measure to be unconstitutional it would have to be arbitrary or incongruous – a threshold which the *Spalma-incentivi* Decree did not meet[676].

566. <u>Summing up</u>: the Constitutional Court, Italy's highest judicial authority, has concluded that the legal nature of the *Convenzioni* was that of accessory contracts, and for this reason dismissed a constitutional challenge against the *Spalma-incentivi* Decree (there were other challenges, which were dismissed with different arguments).

567. The conclusion of the Italian Constitutional Court as to the legal nature and effect of the *Convenzioni* as a matter of Italian administrative law accords with the Tribunal's view in these proceedings.

568. The conclusion was also shared by the tribunal in *Silver Ridge*, which stated that[677]:

> "[T]he question of whether or not the [*Convenzioni*] are private law contracts under Italian law or not and the corresponding question of the correct interpretation of the afore-cited provision within the Italian legal order are not issues for the Tribunal to decide. Precisely as they concern matters of Italian law, the Tribunal defers in this regard to the qualification made by the Italian Constitutional Court."

<u>Consequence</u>

569. What is the implication for the present case that, under Italian law, the *Convenzioni* I – IV constitute accessory contracts?

570. Pursuant to the ECT Umbrella Clause, Italy undertook to "observe any obligations it has entered into" with a protected investor (or investment). Claimants submit that under the *Convenzioni* I – IV Italy "entered into" an obligation to pay the incentive tariff to the Operating Companies for a period of 20 years – and that by issuing the *Spalma-incentivi* Decree, Italy reneged on this commitment, in breach of the Umbrella Clause.

571. The effect of the Tribunal's finding – supported by the Decision of the Italian Constitutional Court – that the *Convenzioni* I – IV constitute accessory contracts, is that these agreements, as a matter of Italian law, are incapable of creating autonomous obligations that the Italian Republic is bound to observe.

572. The necessary consequence is that by executing the *Convenzioni* I – IV, Italy never assumed vis-à-vis the investors an autonomous obligation to pay the incentive tariff and that, not having entered into any obligation, the Republic cannot have breached the ECT's Umbrella Clause (which only affects obligations which States "ha[ve] entered into" for the benefit of a protected investor or investment).

---

[676] Doc. R-18, Law, para. 11, *in fine.*
[677] Doc. CL-47, *Silver Ridge*, para. 378.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

### d. Claimants' counterarguments

573. Claimants submit a number of counterarguments against Respondent's arguments (and the Tribunal's conclusions above). The Tribunal considers each of these further below.

(i) The text of the Constitutional Court Decision

574. <u>First</u>, Claimants submit that the Constitutional Court Decision finding that the *Convenzioni* are accessory contracts is *obiter dicta*[678] and only relates to contracts under *Conto* V, which have a different nature from those under *Conti* I through IV[679].

575. The Tribunal disagrees.

576. The Constitutional Court's finding regarding the nature of the *Convenzioni* is brief – it is a one-phrase declaration that "such 'contracts' [*i.e.*, the *Convenzioni*] are accessory to the provisions granting the incentives".

577. The fact that the Court's decision is brief does not mean that the finding is *obiter dictum*. The albeit brief declaration forms part of the Court's *ratio decidendi.* The GSE, appearing as a party in the procedure, submitted the argument "that the agreements are merely accessory to the administrative provisions which grant the incentives"[680], and therefore the constitutional principle of respect for party autonomy in contractual relations had not been breached. The Court adopted this argument, agreeing with the GSE, and dismissed the constitutional challenge. As its determination to that effect was in response to and in accordance with the GSE's argument, the Court's decision forms a binding determination.

A further counterargument

578. Claimants submit a second counterargument: that the Constitutional Court Decision related only to contracts under *Conto* V, which have a different nature from those under *Conti* I through IV[681].

579. Claimants are correct in that the Constitutional Court Decision quoted a section from the *Convenzione* under *Conto* V, a section in which GSE reserves the right to unilaterally modify the contract if there is a regulatory change, and which is absent from *Convenzioni* I – IV[682].

580. But the inclusion of the quote from *Convenzione* V was not preclusive of the Constitutional Court's consideration of earlier *Convenzioni*; rather it was included in the context of the Constitutional Court's description of the "evolution of the sectorial legislation", where it took into account that the regulation suffered frequent changes and concluded, for that reason, that investors never obtained an

---

[678] C-PHB, paras. 11 and 64.
[679] C-PHB, para. 12; HT, Day 4, p. 824, l. 3 by reference to *ESPF* para. 823.
[680] Doc. R-18, Facts, para. 4.
[681] C-PHB, para. 12; HT, Day 4, p. 824, l. 3 by reference to *ESPF* para. 823.
[682] Doc. R-18, Law, para. 8.3.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

acquired right to the incentive tariff[683]. It is in that broader background that the Court refers to the *Convenzione* V and quoted one of its clauses.

581. The Constitutional Court's reference to the *Convenzioni* evolution, culminating in *Convenzione* V, does not imply that its findings only relate to *Convenzione* V. To the contrary: the purpose of the Decision was to examine the constitutionality of the *Spalma-incentivi* Decree in its totality – a Decree which affected all types of *Convenzioni*.

(ii)    The application of international law

582. Second, Claimants say that Art. 26(6) of the ECT requires that the Tribunal decide the merits of the case applying the terms of the ECT and rules and principles of international law[684] and that consequently the classification of the obligation by the Constitutional Court under municipal law is irrelevant to its determination[685].

583. The Tribunal disagrees.

584. Art. 26(6) of the ECT mandates this Tribunal to "decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law", while Art. 10(1) obliges Italy to "observe any obligation it has entered into with an Investor".

585. For Italy to breach its commitment under the last sentence of Art. 10(1), a necessary prerequisite is that the Republic "has entered into" an obligation – a question which can only be adjudicated applying the appropriate municipal law. International law does not have rules regarding the creation of contractual obligations entered into between investors and host States: this is a question which must be established by the governing law of the contract, determined applying the appropriate conflict of law rules.

586. In the present case, all conflict of law rules point to Italian law: the parties to the *Convenzioni* are Italian, the place of execution and of performance is in Italy, and the parties submitted to the Italian jurisdiction.

587. It is Italian law that the Tribunal must apply to determine whether Italy has entered into obligations, and the Tribunal, echoing the Constitutional Court Decision, has already found that, under Italian law, the *Convenzioni* I – IV are simple accessory agreements, incapable of creating autonomous obligations.

A subsidiary counterargument

588. Claimants submit a subsidiary counterargument: the investments were made between 2009 and 2013, and Italy cannot use the determination made by its Constitutional Court in 2017, to deny protection to the investors: a State cannot rely

---

[683] Doc. R-18, Law para. 8.3.
[684] HT, Day 4, p. 817, l. 3.
[685] C-PHB, para. 15.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

upon the characterization of its conduct under its own municipal law to escape liability under international law[686].

589. The Tribunal does not accept this argument.

590. The Tribunal recognizes that Art. 27 of the VCLT prohibits a State from "invok[ing] the provisions of its internal law as justification for its failure to perform a treaty"[687]. But that is not what Italy is doing.

591. Rather than invoking its municipal law to avoid compliance with the ECT, Italy instead relies on the effect of Italian law, as affirmed by the Republic's highest Court, that when the GSE executed the *Convenzioni* I – IV, it never entered into any autonomous obligation vis-à-vis the investors.

592. The Constitutional Court Decision merely affirmed the status of the *Convenzioni* as accessory contracts; it did not grant such status to the *Convenzioni*: the findings of the Constitutional Court reflect what was the state of the law in Italy for many decades. There was, therefore, no change in the internal law. Consequently, the factual underpinning (the *Tatbestand*) for the application of the last sentence of Art. 10(1) of the ECT (that Italy has "entered into an obligation") has not been met.

(iii)   The text of the *Convenzioni*

593. Third, Claimants argue that no provision of the *Convenzioni* I – IV or of the underlying Italian legislation explicitly characterizes the agreements as accessory contracts[688]. The Tribunal accepts this, but the legal nature of a contract depends on it meeting the requirements established by the applicable legal system and law. Therefore, absence of a label, expressly designating the contract as accessory, is not preclusive.

594. As an additional counterargument, Claimants invoke the fact that the *Convenzioni* I – IV explicitly state the exact tariff rate applicable for 20 years, instead of cross-referencing to the applicable regulation[689]. The Tribunal does not follow Claimants' reasoning: Art. 1 of the *Convenzioni* I – IV contains a cross-reference to the underlying regulation, while Art. 2 states that the incentive tariff "is equal" to a certain amount. Whether the cross-reference to the applicable regulation is contained in the same article that defines the incentive tariff (as advocated by Claimants), or whether it is inserted in the preceding article, seems to the Tribunal to be irrelevant: *de minimis non curat lex.*

595. Finally, Claimants make a further textual comparison between, on the one hand, the *Convenzioni* I – IV and, on the other hand, the *Contratti per il ritiro* and the *Convenzioni* V in support of the argument that the former were also private contracts. They submit that although the *Convenzioni* I – IV state in Art. 10 that modifications must be agreed between the parties, the *Contratti per il ritiro* and the

---

[686] C-PHB, para. 14, invoking Art. 27 of the VCLT and Art. 3 of the ILC Articles.
[687] Doc. CL-10, Art. 27.
[688] C-PHB, para. 52.
[689] C-PHB, para. 53.

141

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

*Convenzioni* V include language permitting unilateral modification by the GSE if there is any change in the underlying regulation. The Claimants infer that the necessary consequence is that changes in regulation do not affect the obligations assumed by the GSE under the *Convenzioni* I – IV[690].

596. The Tribunal does not accept this argument, for the following two reasons.

597. First, Art. 10 of the *Convenzioni* I – IV provides that consent is locked when the producer has declared its consent and the GSE has accepted the offer; thereafter, "any modifying or supplementary agreements to the content of this Agreement must be agreed in writing, on penalty of nullity". Italy says that the purpose of this clause is to prevent the GSE from unilaterally modifying the agreement absent a general regulatory change, but that the provision does not apply to the legislative branch of the Italian Republic, which remains free to exercise its regulatory powers[691]. In the Tribunal's view, Italy's explanation is persuasive.

598. Second, a textual comparison between the *Convenzioni* I – IV and the *Contratti per il ritiro* and the *Convenzioni* V, as proposed by Claimants, does not shed additional light on the question of the legal nature of the former. This is because, in Italy's submission, the legal nature of the *Contratti per il ritiro* and *Convenzioni* V is different from the legal nature of the *Convenzioni* I – IV:

- The *Contratti per il ritiro* and *Convenzioni* V are private law contracts, entered into between the GSE and the Operating Companies with the purpose of formalizing the sale and delivery of electricity, where the only element established by regulation is the purchase price[692]; whereas

- The *Convenzioni* I – IV are accessory contracts, whose only purpose is to document the operating terms for the payment of a subsidy, fully defined by regulation.

599. Italy adds that this different legal nature explains why the *Contratti per il ritiro* and the *Convenzioni* V include language permitting the GSE to modify unilaterally its obligations if required by regulatory changes – if such language had not been inserted, the principle of *pacta sunt servanda* would have trumped any regulatory change imposed by new regulation. The language is unnecessary in *Convenzioni* I – IV precisely because the nature of these agreements is that of accessory contracts.

600. The Tribunal, again, finds Italy's explanation persuasive.

(iv)    Contradictory statements by Italian authorities

601. Finally, Claimants refer to two instances, where Italian authorities have referred to the *Convenzioni* as private law agreements, creating binding obligations for the GSE and for the Republic, namely:

---

[690] C-PHB, para. 53; HT Day 4, p. 804, l. 4; p. 812, l. 10.
[691] HT, Day 4, p. 846, l. 21.
[692] R-PHB, para. 26; see also para. 2 and (clearer) para. 31(vii).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

- The statement, contained in the *Romani* Decree, that the incentive tariff is established by private law contracts; and

- The statement made by the Italian Procurer General before the Italian Supreme Court, that PV plant operators had acquired "a subjective right to the exact performance of the incentive payment promise"[693].

602. The Tribunal is unpersuaded by Claimants' argument.

603. As to the content of the *Romani* Decree, Art. 24(2)(d)[694] does state that, for PV plants starting operation *after* 31 December 2012, the "incentives are assigned by means of private law contracts", to be executed between GSE and the producer. But the PV plants referred to are subject to the *Conto* V regime, and Italy acknowledges that the *Convenzioni* under that regime constitute private law agreements (albeit with some elements of public law)[695]. Consequently, the text in the *Romani* Decree is not incompatible with the consideration of the *Convenzioni* I – IV as accessory contracts.

604. As to the content of the statement of the Procurer General[696], this was made in the same proceeding that eventually led to the Constitutional Court Decision, albeit at an initial phase. The issue was whether or not jurisdiction belonged with the Judicial or Administrative Courts. The Procurer General submitted a brief to the Supreme Court, stating that jurisdiction belonged with the former. In his reasoning, he described the case filed by multiple PV plant operators against the *Spalma-incentivi* Decree, and in that context referred to "a subjective right to the exact performance of the incentive payment promise"[697]. But from the context, it seems that the Procurer General was paraphrasing the position of the PV plant operators – not stating his own opinion.

605. Whatever the opinion of the Procurer General, it is in any case irrelevant to this Tribunal's determination. The Tribunal has the benefit of the Constitutional Court Decision, which is Italy's highest Court, having affirmed with finality that, as a matter of applicable Italian law, the *Convenzioni* are accessory contracts, and as such incapable of creating autonomous obligations binding upon the Republic.

**e. Prior awards**

606. Both Parties have relied on prior awards in other cases to support their positions, either to conclude that the same solution should be adopted in the present case or in an effort to explain why this Tribunal should depart from that solution.

---

[693] C-II, para. 494; C-PHB, para. 9; HT, Day 4, pp. 858-861.
[694] Doc. C-163.
[695] RPHB, para. 31(vii) *in fine*. The reason for the difference between *Convenzioni* under *Conti* I through IV and under *Conto* V lies in the difference in the way the incentives are granted under *Conto* V against the previous *Conti*: in the previous *Conti*, the GSE paid the incentive tariff on top of the price for the electricity obtained by the PV plant operator, while in *Conto* V the GSE pays an all-inclusive incentive tariff, which includes the price of the electricity.
[696] Doc. C-638.
[697] Doc. C-638, para. 6(c) *in fine.*

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

607. As previously noted[698], the Tribunal is not bound by prior awards. There is no system of *stare decisis* in investment arbitration, and the Tribunal is free to reach a conclusion different from those of other tribunals. That said, legal certainty is enhanced when subsequent tribunals, applying the same treaty and confronted with an analogous factual situation, strive to reach the same conclusions already established by their predecessors. Unnecessarily contradictory decisions only cause confusion, increase the risk for investors and thus operate contrary to the very purpose of investment treaties.

608. The application of the ECT investment protections to the specific measures by the Italian government arising out of the *Spalma-incentivi* Decree and changes in the MGP Regime has been considered in six prior arbitrations. In three awards the tribunals at least partially found for the investor, albeit with very different reasoning[699]. In the remaining three, the tribunals found for the Italian Republic and dismissed claimants' claims in their entirety[700].

  (i)   Decisions which support the present Award

609. As to this Tribunal's finding that the *Convenzioni* I – IV were not agreements that would permit the relevant investors to invoke the Umbrella Clause:

  -   This is in line with the thrust of the majority of the prior decisions or awards;

  -   The tribunals in *Silver Ridge*[701] (by majority) and in *SunReserve*[702] (unanimously) reached the same conclusion as the present Tribunal, with similar reasoning;

  -   The *CEF* tribunal (unanimously) dismissed the claims filed under the Umbrella Clause[703] (although it found that Italy had breached other obligations under Art. 10(1) of the ECT); and

  -   The *Belenergia* tribunal (unanimously) rejected the claim based on the Umbrella Clause but using a different reasoning[704].

  (ii)  Decisions which contradict the present Award

610. The remaining two prior awards on point, *Greentech*[705] and *ESPF*[706], accepted (by majority) that the ECT's Umbrella Clause could operate under these circumstances:

---

[698] See para. 154 *supra*.
[699] Doc. CL-9, *Greentech*; Doc. CL-44, *CEF Energia*; Doc. CL-8, *ESPF*.
[700] Doc. CL-45, *Belenergia*; Doc. CL-46, *SunReserve*; Doc. CL-47, *Silver Ridge*. There are two further cases [Doc. RL-43, *Blusun* and Doc. RL-50, *Eskosol* (Award)] in which the factual situation was different, because the power plants had not been built and the *Spalma-incentivi* Decree had not been issued.
[701] Doc. CL-47, *Silver Ridge*, para. 383.
[702] Doc. CL-46, *SunReserve*, para. 1002.
[703] Doc. CL-44, *CEF*, para. 255.
[704] Doc. CL-45, *Belenergia*, paras. 618-19.
[705] Doc. CL-9, *Greentech*, para. 466.
[706] Doc. CL-8, *ESPF*, para. 756.

- The *Greentech* majority took a holistic approach, and concluded that[707]:

> "[…] taken as whole, the *Conto Energia* Decrees, the [Tariff Confirmation Letters] and the [*Convenzioni*] amounted to obligations 'entered into with' specific PV operators."

- In the same vein, the *ESPF* majority found that Italy[708]:

> "[…] converted the conditional offer of specific tariff rates to an obligation entered into with a specific plant by confirming the obligation in the [Tariff Confirmation Letter] addressed to the plant and, later in the [*Convenzione*], which was entered into with each individual plant. To the extent that those agreements were entered into with an Investor or its Investment, failure to observe those obligations gives rise to protection under the Umbrella Clause."

611. The Tribunal has carefully reviewed the reasoning in the *Greentech* and *ESPF* awards that support these findings and finds it less persuasive than that of the tribunals in *Silver Ridge* and *SunReserve*.

**5.2   HAS ITALY, BY PROMULGATING THE DISPUTED MEASURES, BREACHED THE STABLE CONDITIONS REQUIREMENT OR THE NON-IMPAIRMENT REQUIREMENT?**

612. Pursuant to the ECT stable conditions requirement, Italy is bound to "encourage and create stable, equitable, favourable and transparent conditions". Pursuant to the non-impairment requirement, Italy must refrain from adopting any "unreasonable or discriminatory measures" that may impair the ownership or enjoyment of protected investments. These two elements together imply that all regulatory measures adopted by Italy, so as not run afoul of the requirements of Art. 10(1), must meet the standard of being stable, equitable, favourable, transparent, reasonable and non-discriminatory.

613. Claimants' submission is that the Disputed Measures breached four of these requirements, those requiring regulatory measures to be stable, transparent, reasonable and non-discriminatory – something which Respondent disputes.

614. The Tribunal will again summarize the Parties' positions (**A.** and **B.**) before providing its own analysis (**C.**).

### A.   Claimants' position

#### a.   Stable conditions

615. Claimants submit that a key aspect of Art. 10(1) of the ECT is the requirement that host States "encourage and create stable conditions" for investors[709]. This

---

[707] Doc. CL-9, *Greentech*, para. 466.
[708] Doc. CL-8, *ESPF*, para. 756.
[709] C-I, para. 341.

constitutes an autonomous standard, which States must comply with under the ECT[710].

616. In Claimants' view, Italy has violated its duty to provide stable investment conditions in two aspects:

617. First, Italy's retrospective "remodulation" of the entire *Conto* framework with the *Spalma-incentivi* Decree was inconsistent with the framework that Italy had developed, promoted and granted to Claimants' facilities. The *Spalma-incentivi* Decree was particularly harmful given that, only a few years into the investment period, it undermined the support Claimants expected would apply to their investments for two decades[711]. Furthermore, Italy's treatment of Claimants' investments was egregiously inconsistent: for seven years, Italy repeatedly promised PV plants fixed tariffs for 20 years; once the EU targets were met and Claimants' investments were sunk, Italy changed its policies and cut the very tariffs that induced the investments[712]. Italy replaced what was originally a stable regime, with uncertainty that undermined the economic predictions Claimants (and their lenders) when they decided to invest[713].

618. Second, Italy's mistreatment of investors with respect to the MGP regime was also contrary to the obligation to create stable conditions: for six years the AEEG consistently established MGPs between EUR 72 and EUR 106 per MWH, before changing course in 2014 and setting the price well below market, at EUR 39/MWH. Furthermore, the *Destinazione Italia* Decree abolished outright the MGPs for any PV facility that also received the *Conto* incentive tariffs[714].

**b.   Lack of transparency**

619. According to Claimants, the duty of transparency requires the State to act without ambiguity or opacity. It also requires the legal framework for the investment to be readily apparent at the outset as well as throughout its operation. Claimants aver that a State violates the standard if it fails to clarify uncertainties that develop in a regime and to adequately inform investors regarding possible changes to a legal regime[715]. Italy has failed to meet this requirement in two respects:

- Italy's failed to produce evidence demonstrating how it set the incentive tariffs and the reductions, which highlights that the regime was not transparent[716]; and

---

[710] C-II, para. 413.
[711] C-I, para. 349.
[712] C-II, para. 415.
[713] C-I, para. 349.
[714] C-I, para. 350; C-II para. 585.
[715] C-I, para. 346.
[716] C-PHB, para. 45.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

- Italy failed to be transparent with investors if it always understood it could retroactively reduce the tariffs it had granted for 20 years, despite repeatedly affirming that those tariffs would be "constant"[717].

### c.    Unreasonable or discriminatory measures

620.  According to Claimants, the term "impairment" means "any negative impact or effect," caused by measures (or omissions) adopted by the State which are either unreasonable or discriminatory – both requirements do not need to be met[718].

### (i)    Unreasonable measures

621.  Claimants say that a measure is unreasonable if it is taken without due consideration of the potential negative effects it will have on foreign investors; the reasonableness must be judged mostly from the standpoint of an investor, in contrast to what the State might have viewed as "reasonable" *ex post* and from a policy perspective[719].

622.  In particular, Claimants contend that the unilateral cuts to the *Conto* Program tariffs and the MGP Regime were unreasonable measures, which Italy adopted in breach of the non-impairment requirement, because[720]:

- Italy did not provide meaningful notice of the tariff reductions, and no amount of notice would have made the reductions reasonable[721];

- The *Spalma-incentivi* Decree was enacted without regard to the proper procedure to modify a contract, which requires the agreement of both parties[722];

- The three options contained in the *Spalma-incentivi* Decree did not make the measure reasonable[723];

- Italy did not enact "safeguards" designed to assist investors and soften the blow of retroactive cuts[724];

- The *Spalma-incentivi* was not a "small remodulation" of the incentive regime[725]; it inflicted a significant harm on Claimants' investments without serving a legitimate purpose[726];

- Italy's failure to produce evidence demonstrating how it established the reductions in the incentive tariffs in the *Conti* and how it defined Options A,

---

[717] C-II, paras. 270 and 416.
[718] C-I, para. 355.
[719] C-I, paras. 356-357; C-II, para. 467.
[720] C-I, para. 358.
[721] C-II, paras. 353-358.
[722] C-II, para. 469.
[723] C-II, paras. 359-369.
[724] C-II, paras. 370-376.
[725] C-II, paras. 377-381.
[726] C-II, para. 465.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

B and C in the *Spalma-incentivi* Decree demonstrates the unreasonableness of the measures[727].

623. Claimants argue that no burden on electricity consumers warranted the *Spalma-incentivi*, because the impact of the *Conto* Program on end-consumers was minimal, accounting for about 10% of the total of a consumer's electricity bill in 2014. It would not have increased further in any significant way in subsequent years because Italy offered no new subsidies to additional PV plants after reaching the targets established in *Conto* V[728].

624. The Disputed Measures barely reduced these minimal costs. The cost reduction benefitted SMEs and only amounted to a reduction in the electricity bills of consumers by 2% to 4%[729]. Claimants consider such reduction in electricity bills to be unreasonable justification because Italy had designed the *Conto* Program to offer incentives to a cap of EUR 6.7 billion per year and therefore the impact on customers was known from the beginning. They argue that subsequent cuts were a political measure to curry favor with SMEs[730]. In any case, the *Spalma-incentivi* Decree did not achieve its purported goal of reducing energy costs for SMEs in Italy[731].

The MGP Regime

625. Claimants submit that the "effective abolition" of the MGP Regime also unreasonably impaired their investments. The MGPs were changed drastically, and two different Italian entities took conflicting decisions[732]:

-    While first the AEEG set the MGP for all eligible facilities at the rate of EUR 39/MWh,

-    A few days later the government enacted a Law Decree that outright abolished the MGPs for any PV facility that also benefitted from the tariffs under the *Conto* Program.

626. Italy's justification for the reduction on the basis that operating costs for small plants had decreased was flawed for several reasons:

-    The data from the one report underlying Italy's justification was insufficient to support this conclusion;

-    There was no decrease to any of Claimants' operating costs commensurate with the decrease Italy made to the MGP;

---

[727] C-PHB, para. 45 *in fine.*
[728] C-II, para. 326; C-PHB, paras. 43-45.
[729] C-I, para. 359.
[730] C-I, para. 360.
[731] C-I, para. 361.
[732] C-I, para. 350; C-II, para. 581.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

-    The new reduced price that Italy established was insufficient to cover actual operating costs of PV facilities enrolled in the MGP Regime;

-    The original goal of the MGP Regime was to entitle smaller plants to additional support for reasons of competitiveness – the drastic reduction of the MGPs to levels that were below market was thus unreasonable[733]; and

-    Italy has not demonstrated that the investors' operating costs decreased over time; in fact, the reduction that Italy imposed was arbitrary and unrelated to the actual operating costs of PV facilities[734].

(ii)    Discriminatory measures

627.    Claimants submit that the *Spalma-incentivi* Decree was also discriminatory, because it only applied to PV investors, while Italy maintained or increased support to other renewable and traditional energy providers. In prior awards, other tribunals accepted that it is possible for a State to violate the discrimination standard by treating "different sectors of the economy" in a discriminatory manner[735].

B.    **Respondent's position**

a.    **Stable conditions**

628.    Italy refutes that the ECT creates an autonomous standard, requiring States create a stable regulatory environment, independently of the FET standard[736].

629.    It further submits that, even if it does, Italy has not breached that standard. The Italian regulatory framework remains sufficiently stable to this day, the incentives regime has not disappeared and follows the same patterns as when it was conceived[737]. Italy did not abolish or substantially reduce its incentives regime; rather, it merely re-modulated the tariffs, fine-tuning its support mechanism[738]. Indeed, it is uncontroverted that[739]:

-    The *Spalma-incentivi* Decree did not abrogate the tariff incentive scheme;

-    PV plants still receive tariffs for 20 years;

-    The disbursements are still stable;

-    There is not a new regime, just a limited re-modulation of tariffs; and

-    The incentive tariffs in Italy were high compared with other EU countries and represented an excessive burden for consumers.

---

[733] C-I, para. 367; C-II, paras. 581, 587.
[734] C-II, para. 564.
[735] C-II, para. 468, referring to Doc. CL-34, *Enron*, para. 282 and Doc. CL-25, *El Paso Energy*, para. 315.
[736] R-I, para. 514.
[737] R-I, para. 373.
[738] R-I, para. 388.
[739] RD-1, slides 89-90.

149

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

<u>Italy's right to regulatory change</u>

630. Italy takes issue with Claimants' contention that Italy could not modify its incentives scheme. States have an inherent right to modulate public policies. No investor could reasonably read the Italian legislation to imply that no modifications would occur[740]. Furthermore, Italy contends that no prudent investor would ever assume that there was zero regulatory risk in a highly regulated market such as that of RES[741].

631. Italy insists that "stability" does not mean immutability; stability does not require incentives to remain constant throughout time[742]. Claimants should have understood that, as long as the principle of fair remuneration was respected, the State was free to change its tariffs[743].

632. When Claimants invested in Italy, they were aware that the Italian legislator had already intervened on the market. They should have considered the general economic context and the fact that other Member States had already started to remodulate their incentives schemes[744]. Claimants could not simply rely on the favorable aspect of the incentives and ignore the context in which they were acting[745].

**b. Lack of transparency**

633. As to transparency, Italy notes that the *Spalma-incentivi* Decree was a public act, fully motivated, accessible to the public, and enacted in accordance with due process of law. It was also deemed legitimate by the Italian Constitutional Court. Therefore, Claimants' claim of a violation of the transparency standard seems misplaced[746].

634. Overall, Italy submits that the Disputed Measures were adopted consistently and in full transparency and that no specific benefits were ever abruptly revoked; Italy simply modulated their implementation[747].

**c. Unreasonable and discriminatory measures**

635. Italy argues that – as suggested by the *Electrabel* tribunal – for the non-impairment requirement to be breached the impairment caused by the discriminatory or unreasonable measures must be *significant*[748].

(i)   <u>Unreasonable measures</u>

---

[740] R-I, paras. 369-370.
[741] R-I, para. 371.
[742] R-I, para. 380.
[743] R-II, paras. 363-364.
[744] R-I, para. 374.
[745] R-I, para. 376.
[746] R-I, paras. 525-526; R-II, para. 519.
[747] R-I, para. 530.
[748] R-I, para. 539, referring to Doc. RL-4, *Electrabel*, para. 7.152; R-II, para. 523.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

636. To determine whether a measure was "unreasonable", Italy suggests that the Tribunal should follow the test provided by the *AES* tribunal, which places the regulatory power of the State at the core of the assessment of reasonableness. Thus, the Tribunal should determine[749]:

  - Whether or not there is a rational policy by the State; and

  - Whether or not the State action seems reasonable in relation to the policy.

637. Italy submits that the *Spalma-incentivi* Decree is a reasonable and proportionate modification of the regime, because it was not excessive, took place within the parameters of the Legislative Decrees and attempted to find alternatives for investors[750]:

  - First, the rationale behind the incentive regime was to support PV energy production; the amount of incentives had to be reduced over time, in parallel with the reduction in the cost for producing PV energy[751]; it follows that Italy was entitled to reduce the incentives when technological progress and scale economies reduced Claimants' operational costs[752];

  - Second, the *Spalma-incentivi* Decree was enacted to end "excessive and cost-disproportionate burdens on consumers", an objective that had to be balanced against the need to grant PV producers an equitable remuneration of the costs of investment and operation; this is in line with the 2003 Legislative Decree, and simply reacts to a "changed and unforeseen" situation, caused by the significant growth of PV energy in Italy[753];

  - Third, the *Spalma-incentivi* gave investors three options to choose from[754]; thus, the incentive tariffs were reshaped in a way that had a limited impact on PV investors, maintaining optionality and the overall structure of incentives[755].

638. Italy argues that the sustainability of the system was always one of its fundamental concerns, as demonstrated by documents going back to 2012[756]. The mechanism, as it stood, was not sustainable and a public policy choice had to be made to avoid the disruption of the whole system[757]. The Disputed Measures were taken to ensure the sustainability of the scheme, and to reduce pressure on energy consumers, whose burden was becoming unbearable[758]. The *Spalma-incentivi* Decree was proportional to the goal and did not represent an unsustainable burden for

---

[749] R-I, paras. 541-542, referring to Doc. CL-7, *AES*, para. 10.3.7.
[750] R-I, para. 480; R-II, paras. 495-505; HT, Day 1, p. 211, ll. 12-20 (Prof. Malaguti).
[751] R-I, para. 471.
[752] R-I, para. 473.
[753] R-I, paras. 482-487.
[754] R-I, para. 479.
[755] R-I, para. 481.
[756] RD-1, slide 95; HT, Day 1, p. 211, ll. 4-11 (Prof. Malaguti).
[757] RD-1, slide 93; HT, Day 1, p. 210, ll. 5-20 (Prof. Malaguti).
[758] R-I, para. 547; HT, Day 1, p. 210, ll. 5-20 (Prof. Malaguti).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

Claimants, with the consequence that it was reasonable and did not impair Claimants' investments[759].

639. In the *ESPF* award, the tribunal noted that the changes to the MGP Regime were also not unreasonable, and, even if investors could complain about such changes, they did not amount to a breach of the non-impairment requirement[760].

(ii)    Discriminatory measures

640. As to the argument that the *Spalma-incentivi* was discriminatory because it only applied to PV investors (while Italy maintained or increased support to other RES), Italy argues that discrimination cannot be based on the difference between two situations that are not of comparable nature[761]. In this case, the PV sector had benefitted from sharper growth and required a change in the system of economic incentives; different situations require different regulation[762].

**C.    Analysis by the Tribunal**

641. The initial sentence of Art. 10(1) contains the stable conditions requirement, according to which Italy shall "encourage and create stable, equitable, favourable and transparent conditions" for protected investors to make investments in Italy. In a separate sentence the ECT prohibits Italy from "in any way impair[ing] by unreasonable or discriminatory measures" the investors' management, maintenance, use, enjoyment or disposal of their investments.

642. Claimants say that Italy has failed to create stable, transparent, reasonable, and non-discriminatory conditions, and thus has breached Art. 10(1) – something which Italy denies. To decide the issue, the Tribunal will first summarize the relevance of the stable conditions requirement (**a.**) and then determine whether the Disputed Measures fail to meet the requirements of stability and transparency (**b.**). The Tribunal will then turn to the non-impairment requirement (**c.**) and will examine whether the Disputed Measures are unreasonable or discriminatory (**d.**). Finally, the Tribunal will take into account prior awards (**e.**).

**a.    The stable conditions requirement**

643. The Parties dispute whether the undertaking contained in the first sentence of Art. 10(1) constitutes an autonomous obligation of Italy, or is instead subsumed in the general FET standard.

644. In the Tribunal's opinion, the first sentence of Art. 10(1) of the ECT is better treated as an additional obligation to the FET standard. Art. 31 of the VCLT emphasizes the relevance of the "ordinary meaning of the terms" of a treaty; and the terms used in Art. 10(1) of the ECT indicate that States are assuming a free-standing obligation to create "stable, equitable, favourable and transparent conditions", adding that

---

[759] R-I, paras. 548-549; R-II, paras. 525-527.
[760] R-I, para. 552, referring to Doc. CL-8, *ESPF*, paras. 719-720.
[761] R-II, para. 528.
[762] R-II, para. 529.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

"such conditions shall include a commitment to accord" FET to protected investments.

645. The terms used in the ECT show that Italy assumed a broad obligation to create stable, equitable, favourable and transparent conditions in its regulatory framework, within the overall obligation to grant protected investments a treatment which meets the FET standard[763]. The necessary consequence is that regulatory instability and lack of transparency can breach the stable conditions requirement even in the absence of a breach of the FET standard[764].

    (i)    <u>Stable legal framework</u>

646. In accordance with its Foreword, the ECT is a "unique instrument for the promotion of international cooperation in the energy sector"[765] – a sector of strategic importance, which directly affects the performance of all economic activities and the day-to-day life of citizens; it is a hallmark of sovereignty that nations develop and implement proprietary energy policies and submit the energy sector to extensive regulation and supervision.

647. The "Purpose of the Treaty" is broadly defined in Art. 2, which includes a cross-reference to a "Charter"[766]:

> "This Treaty establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter."

648. The "Charter" to which Art. 2 alludes is the European Energy Charter adopted in 1991, a document which preceded the ECT and can provide guidance for its proper interpretation. The Charter already required its signatories to provide stability and ensure legal security for foreign investments[767]:

> "In order to promote the international flow of investments, the <u>signatories will at national level provide for a stable, transparent legal framework for foreign investments</u>, in conformity with the relevant international laws and rules on investment and trade." [Emphasis added]

649. The precise words used in the 1991 European Energy Charter referred to the States' obligation to create a "stable, transparent <u>legal framework</u>"; Art. 10(1) of the ECT refers to "stable, equitable, favourable and transparent <u>conditions</u>".

---

[763] Doc. CL-130, *RWE*, para. 429.
[764] Doc. CL-54, *Plama*, paras. 163-174.
[765] Doc. CL-1, Foreword, p. 3.
[766] Doc. CL-1, Art. 2.
[767] Doc. CL-1, Concluding Document of the Hague Conference on the European Energy Charter, p. 218.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

<u>The importance of a stable legal framework</u>

650. In a highly regulated sector such as energy, legal security and regulatory stability are permanent concerns for investors[768]. Depending on the energy source, the energy sector may require investors to make long-term capital commitments, which are sunk into fixed assets that cannot be removed from the host State[769].

651. Once an investor makes an investment into a national energy sector, relying on the legal and regulatory framework at the date of investment for its financing and economic feasibility analysis, it is vulnerable to regulatory change going forward[770]. The purpose of Art. 10(1) of the ECT is to assuage investors' fears: the Contracting States undertake to promote a "stable" legal framework commensurate with the relevant energy sector or source. This is why the ECT places greater emphasis on stable conditions for investments than other treaties[771].

(ii)    <u>The State's right to regulate</u>

652. That said, the undertaking to "encourage and create stable […] conditions" is not absolute. National legislation and regulation are by nature dynamic. States enjoy a sovereign right to amend their laws and regulations and to adopt new ones in furtherance of the public interest[772]. In the global energy transition necessary to achieve the climate change mitigation and adaptation goals pursuant to the UNFCCC and agreements thereunder, it is critical that States are understood to continue to enjoy such sovereign right. The ECT's stable conditions requirement therefore does not operate as a stabilization clause requiring States to freeze their regulatory framework or economic benefits for foreign investors[773].

653. This understanding has been expressed similarly by tribunals in prior awards.

654. The *Silver Ridge* tribunal explained that[774]:

> "In order to draw the proper line between acceptable adaptations and non-acceptable alterations of the legal framework, in the Tribunal's view, the ECT requires that a balance be struck between two principles […]: on the one hand, the interest of the investors in a stable and transparent legal framework […], and on the other, the host State's sovereignty, notably including the ability to adopt its legislative and regulatory framework to new developments, which are unavoidable in a long-term cooperation."

---

[768] Doc. RL-44, *Eiser*, para. 379 (Both Parties have relied on the findings of the *Eiser* award, even though it was annulled in 2020, for reasons unconnected with the argument now under discussion. To the extent it is persuasive, the Tribunal will also rely on the *Eiser* award.)
[769] Roques I, paras. 2.12- 2.13.
[770] Doc. RL-44, *Eiser*, para. 382.
[771] Doc. CL-128, *PV Investors*, para. 566; Doc. CL-190, *LSG*, para. 1007.
[772] Doc. CL-30, R. Dolzer & C. Schreuer, p. 148; Doc. CL-128, *PV Investors*, para. 570; Doc. CL-7, *AES*, paras. 9.3.29-9.3.30; Doc. CL-90, *Cavalum*, paras. 406-407.
[773] Doc. CL-187, *Renergy*, Dissenting Opinion, para. 27.
[774] Doc. CL-47, *Silver Ridge*, para. 411.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

655. The *Antaris* tribunal added the following qualification, with which this Tribunal agrees[775]:

> "The host State is not required to elevate the interests of the investor above all other considerations, and the application of the FET standard allows for a balancing or weighing exercise by the State and the determination of a breach of the FET standard must be made in the light of the high measure of deference which international law generally extends to the right of national authorities to regulate matters within their own borders."

(iii)    Weighing of the two factors

656. The State's undertaking to "encourage and create stable […] conditions" within its legal framework, and the State's sovereign right to manage and modify its regulatory regime and adapt it to changing circumstances may be seen as two contradictory principles. In prior awards, tribunals adjudicating investors' claims that the stable conditions requirement was breached have variously considered and weighed these principles[776]. Prior awards routinely consider various factors, including as follows:

-    One factor of special relevance is whether or not the regulatory change is radical or fundamental in character; if the amendment provokes a radical change in an existing regulatory regime, it is more likely to result in a violation of the stable conditions requirement; the assessment of whether a change meets these characteristics is not a mathematical test nor a determination to be made in the abstract, but a judgement which requires that the tribunal consider the specific circumstances of the case[777];

-    A second factor is whether or not the State acted in the public interest and exercised its regulatory powers proportionally[778] (overlapping with the non-impairment requirement): measures which breach the proportionality requirement also tend to be unreasonable; regulatory changes adopted proportionally to respond to public interest concerns will not fall afoul of the stable conditions requirement.

657. As the *Eiser* tribunal said (quoting *Charanne*) regarding proportionality of regulatory modifications[779]:

> "[…] the proportionality requirement is fulfilled inasmuch as the modifications are not random or unnecessary, provided that they do not suddenly and unexpectedly remove the essential features of the regulatory framework in place."

---

[775] Doc. RL-53, *Antaris*, para. 360(9).
[776] Doc. CL-47, *Silver Ridge*, para. 411.
[777] Doc. CL-47, *Silver Ridge*, para. 421.
[778] Doc. CL-90, *Cavalum*, para. 406.
[779] Doc. RL-44, *Eiser*, para. 370. See also Doc. CL-89, *Charanne*, para. 517 ("As for proportionality, the Arbitral Tribunal considers that this criterion is satisfied as long as the changes are not capricious or unnecessary and do not amount to suddenly and unpredictably eliminate the essential characteristics of the existing regulatory framework.")

658. The tribunal in *Antin* made a similar finding, linking the requirement of proportionality of regulatory modifications to the State's general obligation to provide regulatory stability[780]:

> "[…] considering the context, object and purpose of the ECT, the Tribunal concludes that the <u>obligation under Article 10(1) of the ECT to provide FET</u> to protected investments <u>comprises an obligation to afford fundamental stability in the essential characteristics of the legal regime relied upon by the investors in making long-term investments</u>. This does not mean that the legal framework cannot evolve or that a State Party to the ECT is precluded from exercising its regulatory powers to adapt the regime to the changing circumstances in the public interest. It rather <u>means that a regulatory regime specifically created to induce investments in the energy sector cannot be radically altered —i.e., stripped of its key features—</u> as applied to existing investments in ways that affect investors who invested in reliance on those regimes." [Emphasis added]

659. <u>Summing up</u>, the ECT's obligation to "encourage and create" a "stable [and] transparent" regulatory framework does not affect the State's right to introduce regulatory changes, provided that the State acts proportionally in the public interest and does not provoke a radical change in the existing regulation.

#### b.    Do the Disputed Measures breach the stable conditions requirement?

660. The Tribunal has already explained the particular relevance of a stable legal framework in the energy sector[781]. It has also explained that stability does not equate to immutability or stabilization; the State retains the right to regulate for the common good, in a proportionate manner not involving radical change[782].

661. The *quaestio vexata* is whether the regulatory changes that Italy adopted in the present case – *i.e.*, the reduction in the incentive tariff under the *Spalma-incentivi* Decree and the effective abolition of the MGP Regime for plants that benefitted from the *Conto* Program – amount to a violation of Italy's obligation to encourage and create stable conditions. When adopting its decision, the Tribunal must consider whether these regulatory changes:

-    Radically altered the Italian RES framework for PV, including the *Conto* Program (**i.**) and/or the MGP Regime (**ii.**);

-    Were adopted in the public interest (**iii.**); and

-    Were proportional to the goal pursued (**iv.**).

662. The Tribunal will also analyze whether Italy's conduct was transparent (**v.**).

---

[780] Doc. CL-87, *Antin*, para. 532.
[781] See paras. 650-651 *supra*.
[782] See paras. 652-659 *supra*.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

(i)    Radical change in the RES framework through the *Conto* Program

663.    Claimants aver that the Disputed Measures fundamentally altered the *Conto* Program in breach of Art. 10(1)[783].

664.    The Tribunal is unconvinced.

665.    First, Italy did not abolish its *Conto* Program; it continues in force and continues to apply to all of Claimants' plants. Neither the original duration of the incentives, nor the criteria to benefit from them has changed: Claimants' plants continue to benefit from a specific incentive tariff, for a duration of 20 years, as provided in Art. 7.2(d) of the 2003 Legislative Decree and in the various *Conti*.

666.    The Claimants' PV plants have seen an incentive tariffs reduction of 7% to 8% for the duration of the *Conto* Program starting from 1 January 2015[784]. But the Tribunal does not consider this reduction to constitute a radical or fundamental change in the regulatory framework; it does not put into question the subsidy *per se*, only the level of subsidy. In a regulated energy sector involving medium and long-term investments, absent a negotiated contractual stabilization clause, investors must expect that over time the regulator will fine-tune and indeed modify its subsidy regime.

667.    Second, the basis for the *Conto* Program is the 2003 Legislative Decree, issued with the aim of promoting RES electricity in Italy. Art. 7.2(d) provided that for electricity produced by PV solar power, the Italian Ministries of Economic Development and Environment had to adopt Ministerial Decrees that[785]:

> "[…] *prevedono una specifica tariffa incentivante, di importo decrescente e di durata tali da garantire una equa remunerazione dei costi di investimento e di esercizio.*" [Italian original]

> […] should foresee a specific incentive tariff, [in a] decreasing amount and [for a] duration [so] as to ensure fair remuneration of investment and operating costs." [Tribunal's translation[786]]

668.    The concept of "fair remuneration of investment and operating costs" is thus essential when analyzing whether or not there has been a radical or fundamental change of the regime – Claimants themselves recognize that a basic aim of the incentive regime was to provide fair remuneration to PV investments[787].

669.    The Legislative Decree does not define what is meant by "fair remuneration" – and in fact, Italy never provided any guidance to the market as to what it perceived as "fair remuneration"[788]. As noted by Claimants, "remuneration" means plainly

---

[783] C-I, paras. 261, 286, 306; C-II, paras. 11, 20.
[784] Edwards I, Table 5-1.
[785] Doc. C-31, Art. 7.
[786] Doc. C-31, English translation, p. 2. The Tribunal has complemented the translation of Doc. C-31 on the basis of Doc. C-59, English translation, p. 1 and Doc. C-139, English translation, p. 1.
[787] C-II, para. 295.
[788] See C-PHB, para. 40.

"money paid for work or services"[789]. It follows that the aim of the support scheme was to grant PV plant producers an incentive rate that was fair in relation to their investment and operating costs.

670. The question is whether the *Spalma-incentivi* Decree deprived Claimants of a fair remuneration, thus radically changing the underlying premise of the *Conto* Program.

671. The answer is negative: Claimants have never claimed in this arbitration that they are not receiving a fair remuneration; on the contrary, it seems that despite the 7% to 8% reduction in tariffs, Claimants are still capable of generating a "fair remuneration" for their investment and operating costs. This is proven by the fact that:

- Claimants' plants continue to be operational and Claimants do not argue that they are no longer capable of covering their investment and operating costs;

- Claimants continue to derive profits from their investments in Italy[790];

- Capital Stage and CHORUS acquired some of the Operating Companies after the enactment of the *Spalma-incentivi* Decree[791], showing that they still viewed investment in the Italian PV sector as profitable.

672. Finally, Claimants place significant emphasis on the fact that the various *Conti* (and the *Convenzioni* and Tariff Confirmation Letters) required the incentive tariffs to remain "constant" (in Italian, "*costante*")[792].

673. The original Italian version of the *Conti* provides that[793]:

"*La tariffa individuata sulla base della […] tabella […] è riconosciuta per un periodo di venti anni a decorrere dalla data di entrata in esercizio dell'impianto ed è costante in moneta corrente in tutto il periodo di venti anni.*" [Emphasis added]

---

[789] C-II, para. 296.
[790] Capital Stage Annual Report for 2014, p. 36 (Exhibit 3 to Sapienza II): "Thanks to Capital Stage's strict investment criterio and the fact that country risk was factored into the return expectations for photovoltaic installations in Italy, the Italian solar parks in the Capital Stage portfolio are still financially attractive and able to operate at a profit after the retroactive reduction in the feed-in tariff. The cut in the feed-in tariff basically corroborates the higher country risk that Capital Stage assigns to Italy and thus the higher return on capital required for its Italian acquisitions". See also p. 46. The same statement is included in Capital Stage Annual Report for 2015, p. 32 (Exhibit 4 to Sapienza II). See also RD-2, pp. 14 *et seq*; Edwards II, para. 5.14. See also Sapienza II, paras. 470-476.
[791] See, e.g., Doc. C-587; Doc. C-364; Doc. C-306; Doc. C-653.
[792] See C-II, paras. 231, 408; C-PHB, paras. 93 *et seq*.
[793] Doc. C-59, Art. 6(1) (*Conto* II). See also Doc. C-139, Art. 8(4) (*Conto* III); Doc. C-166, Art. 12(2) (*Conto* IV).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

674. The *Convenzione*, on the other hand, establishes that[794]:

> "*La tariffa incentivante, costante in moneta corrente, da riconoscere all'impianto fotovoltaico oggetto della presente Convenzione,* […]" [Emphasis added]

675. And the Tariff Confirmation Letter sets out that[795]:

> "*La tariffa incentivante Vi sarà riconosciuta per un periodo di venti anni continuativi a decorrere dalla data, da Voi comunicataci, di entrata in esercizio dell'impianto: 31/05/2011; la tariffa è costante, in moneta corrente per tutto il periodo di venti anni.*" [Emphasis added]

676. The Parties debated at length the meaning of the word "*costante*":

- According to Claimants, "constant" meant that the incentive tariffs could not be subject to change; this implies a sort of "stabilization" language that permitted Claimants to expect regulatory stability[796];

- Italy, on the other hand, argues that the fact that the incentive would remain "constant" does not imply that the measures should remain unchanged and immune to changes for 20 years; rather, it means that their monetary value would not be subject to updates based on inflation rates[797]; Italy adds that the Constitutional Court Decision confirms this reading[798].

677. The Tribunal finds the interpretation advanced by the Italian Constitutional Court and supported by Italy to be persuasive: the expression "*costante in moneta corrente*" seems to imply that inflation or deflation would not affect the tariff, and that its nominal amount in Euros would not be increased or decreased for these reasons; not that the tariff rate was immutable.

678. This seems to have also been the understanding of Italian advisors who in 2011 prepared a due diligence report for the acquisition of one of the Operating Companies, when explaining that[799]:

> "The financial model must take into consideration the incentive value set at €0.346/kWh, based on the procedure conducted pursuant to Law no. 129/2010.
>
> For the purposes of evaluating revenue from the "Feed-in Tariff", it should be noted that the recognized incentive tariff is at a constant level in current values for the entire incentive period equal to 20 years." [Emphasis added]

---

[794] See, e.g., Doc. C-146, Art. 2.
[795] See, e.g., Doc. C-65, p. 1.
[796] C-PHB, paras. 93-96
[797] R-I, paras. 241(c), 253.
[798] R-I, paras. 327 *et seq.*; R-II, paras. 234-235.
[799] Doc. C-293, p. 52 of 67.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

Italian original: "*Il modello finanziario deve prendere in considerazione un valore di incentivo fissato in 0,346 €/kWh, sulla base della procedura condotta ai sensi della L. n. 129/2010.*

*Ai fini della valutazione dei ricavi da "Conto Energia" è opportuno evidenziare che la tariffa incentivante riconosciuta è costante in moneta corrente per l'intero periodo di incentivazione pari a 20 anni.*" [Emphasis added]

679. <u>Therefore</u>, the Tribunal concludes that the *Spalma-incentivi* Decree has not altered the essential characteristics of the *Conto* Program.

    (ii)    <u>Radical or fundamental change in the MGP Regime</u>

680. Claimants also submit that the Disputed Measures fundamentally or radically changed the MGP Regime[800]. Regarding this measure, the Tribunal is also unpersuaded that it breached the ECT stable conditions requirement at Art. 10(1).

681. Pursuant to the 2003 Legislative Decree[801], the grid operator was required to purchase the electricity produced by facilities that were "not in a condition to participate in the market" due to high costs and technological immaturity[802]; it required the AEEG to define the modalities of the off-take regime considering the "economic conditions of the market"[803].

682. The purpose of the off-take regime was thus to support technologies that were too immature and would incur high costs burdening smaller plant operators in particular. An investor in such plants could foresee that as technologies matured and costs decreased, the underlying purpose of the off-take regime would fall away. Accordingly, the regime likely would be re-evaluated and adapted. Nothing in the 2003 Legislative Decree required the Italian authorities to pay a minimum price for the electricity, or to maintain this scheme for a determined period.

683. The MGP Resolution adopted by the AEEG went a step further than the 2003 Legislative Decree, and created a minimum guaranteed price for small plants, with less than 1 MW of capacity, to be defined annually by the AEEG at its discretion[804]. The MGP Resolution did not guarantee that this scheme would have a certain

---

[800] C-I, paras. 261, 306; C-II, paras. 11, 20.

[801] Doc. C-217, Art. 2.1: "This document set forth the terms and conditions for the purchase of the electricity generated by plants pursuant to article 13, para 3 and 4 of legislative decree 29 December 2003, no. 387, and para 41 of law 23 August 2004, no. 239."

[802] Doc. C-31, Art. 13(3) and (4); Parties' Pre-Hearing Joint Submission – Regulatory Chronology, p. 2; Roques I, para. 5.8; Doc. FR-48.

[803] Doc. C-31, Art. 13(3): "*L'Autorità per l'energia elettrica ed il gas determina le modalità per il ritiro dell'energia elettrica di cui al presente comma facendo riferimento a condizioni economiche di mercato.*"

[804] Doc. C-217, Art. 7.1: "The Authority sets the minimum guaranteed prices under the off-take regime with reference to the electricity generated and annually injected into the grid by up to 1 MW hydro power plants and plants based on other renewable energy sources with a capacity up to 1 MW, with the exclusion of hybrid facilities.Minimum guaranteed prices are differentiated according to the relevant source, based on progressive [energy] thresholds and related to the relevant solar year".

duration or amount, nor did it guarantee that plants supported by the *Conto* Program would be eligible for the MGP Regime.

684. It follows that the New MGP Resolution (which established that the MGP would be equal to EUR 38.5/MWh, indexed annually to inflation) and the *Destinazione Italia* Decree (which provided that plants already enrolled in the *Conto* Program would start selling their energy to the GSE at the market price) could not have fundamentally altered the essential characteristics of the MGP Regime.

(iii)  The changes were adopted in the public interest

685. The next question is whether or not, when adopting the Disputed Measures, Italy was pursuing a legitimate public interest.

686. Italy has referred to two main goals[805]:

- Reducing the excessive burden that the different incentive schemes placed on end consumers;

- Guaranteeing the long-term sustainability of the support schemes – indeed, an excessive burden on end consumers would imply a reduction in consumption, which, in the long-run, would jeopardize the soundness of the whole mechanism.

687. The Tribunal is satisfied that the evidence on the record shows that, when Italy adopted the Disputed Measures, it was indeed pursuing these goals.

688. <u>First</u>, the *Spalma-incentivi* Decree is not simply a measure that reduced the incentive tariffs applicable to PV operators. It was a much broader package of economic measures, adopted in a context of economic challenges[806] and with the purpose of strengthening competitiveness and sustainability of the Italian RES sector. The title of the Decree is, in fact[807]:

> "<u>Urgent measures for</u> the agricultural sector, <u>environmental protection</u> and improvement of energy efficiency of school and university buildings, <u>the revitalization and development of businesses</u>, <u>the containment of costs burdening electricity rates</u>, as well as for the immediate fulfilment of duties arising from European legislation." [Emphasis added]

689. Thus, amongst the main concerns of the State when adopting the *Spalma-incentivi* Decree was the "containment of costs burdening electricity rates". Furthermore, Art. 26(1) of the Decree expressly refers to the "purpose of implementing a better

---

[805] R-I, paras. 271-296; R-II, paras. 114(a), 252-254.
[806] R-I, para. 289; R-II, para. 411; Sapienza II, para. 108; Doc. CL-45, *Belenergia*, paras. 518 *et seq.*; Doc. CL-9, *Greentech*, para. 451; Doc. CL-47, *Silver Ridge*, para. 452; *Greentech*, Prof. Sacedorti's dissenting opinion, paras. 39 *et seq*.
[807] Doc. C-624, unofficial translation of the Italian original: "*Disposizioni urgenti per il settore agricolo, la tutela ambientale e l'efficientamento energetico dell'edilizia scolastica e universitaria, il rilancio e lo sviluppo delle imprese, il contenimento dei costi gravanti sulle tariffe elettriche, nonche' per la definizione immediata di adempimenti derivanti dalla normativa europea*".

sustainability of the renewable energy support policy"[808]. Art. 23 also notes that the purpose of Art. 26 is to achieve a more equitable distribution of tariff charges among the different categories of electricity consumers[809].

690.    These concerns are also set out in the Report presented by the President of the Council of Ministers to the Senate of the Italian Republic, when the *Spalma-incentivi* Decree was to be converted into law[810]:

> "Cost of energy is one of the main heading in the budget of enterprises and families and is considered an important factor of competitivity for Italy. For these reasons the priority is to start a wide process of revision of energy bills, both of electricity and of gas, with immediate and near-future effects, with two objectives. On the one hand enhance the economy, especially referred to small and medium-size enterprises which are the backbone of the Italian economic system. On the other hand guarantee fair tariffs in the electric sector, rebalancing the charges among the different categories of consumers and reducing forms of levying which are excessive or unjustified."

691.    <u>Second</u>, the *Destinazione Italia* Decree was also broader in scope than just remodeling of the MGP Regime; its aim was to reduce the overall energy cost for end users[811]. The *Destinazione Italia* Decree states that the MGP Regime would cease to be applicable to PV plants that benefit from the *Conto* Program:

> "<u>For the purpose of containing the annual burden on prices</u> and <u>on the electric rates of the incentives for renewable energy</u> and for the <u>purpose of maximizing the medium-long term production</u> contribution from the existing power plants […]" [Emphasis added]

692.    <u>In sum</u>, the stated purpose of the Disputed Measures was to rebalance the cost of renewable energy sources in the electricity system and to reduce costs for end users. These are precisely the same goals that Italy now identifies as the basis for its actions. International arbitral tribunals must give broad deference to States when they regulate matters within their own borders. Italy, after considering the public interest at stake, made the decision to reduce the levels of incentives it had initially adopted, without abolishing those incentives altogether. It did so after considering that the market conditions had changed and that, while costs for PV operators had rapidly dropped, the costs of the different support schemes was becoming too burdensome on end consumers.

693.    These are legitimate public interests.

---

[808] Doc. C-624, Art. 26(1).
[809] Doc. C-624, Art. 23(1): "*Al fine di pervenire a una piu' equa distribuzione degli oneri tariffari fra le diverse categorie di consumatori elettrici, i minori oneri per l'utenza derivanti dagli articoli da 24 a 30 del presente decreto-legge, laddove abbiano effetti su specifiche componente tariffarie, sono destinati alla riduzione delle tariffe elettriche dei clienti di energia elettrica in media tensione e di quelli in bassa tensione con ((potenza disponibile superiore a 16,5 kW)) diversi dai clienti residenziali e dall'illuminazione pubblica*".
[810] Doc. R-13.
[811] Doc. C-619, Art. 1(1) and (3).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

Claimant's counterargument

694. Claimants dispute that the alleged reduction of consumers' electricity bills was a satisfactory justification for the adoption of the *Spalma-incentivi* Decree: the increase in costs for end consumers was foreseeable, and Italy did not deem that the costs of the support scheme were too high when it set the total cost of the *Conto* Program at EUR 6.7 billion[812].

695. The Tribunal does not accept this. As part of its broad right to regulate, a State is entitled to change its initial position, if economic conditions have changed and the public interest is subject to new challenges – provided, always, that the State's reaction is proportionate.

696. The tribunal in the prior award in *SunReserve*[813] took a similar approach:

> "[…] the foreseeability of the rise in the consumers' electricity costs/bills is irrelevant to determine the reasonableness of the measure taken to offset this rise. The Tribunal finds that the objective of reducing the burden on the consumers by reducing the incentive tariffs was a rational policy objective."

(iv)    The changes were proportionate

697. The final question is whether or not the measures adopted were proportional to the public purpose that was being pursued. The Tribunal finds that they were proportionate for the reasons set out below.

698. First, the Tribunal must balance, on the one hand, the State's right to regulate in the public interest and to protect the interests of the public at large, and, on the other hand, the investor's right to a stable legal framework. In the current case, the Tribunal has already found that, despite the 7% to 8% reduction of tariffs, Claimants continue to receive fair remuneration, as foreseen in Art. 7.2(d) of the 2003 Legislative Decree[814]. Rather than crippling the incentives scheme, Italy reduced the incentives in a manner that ensured that Claimants continued to obtain fair remuneration, while decreasing the burden placed on end consumers. This was a proportionate response to the public interest that was being pursued.

699. Second, Italy acted in a proportional manner when it adopted the *Spalma-incentivi* Decree for at least three reasons:

-    *One*, rather than outright reducing the incentive tariffs, Italy gave investors a choice between the type of reduction that would be applied and gave them a deadline of several months to choose between one of the three options[815];

---

[812] C-I, paras. 359-360; C-II, paras. 30, 317-325 and fn. 394.
[813] Doc. CL-46, *SunReserve*, para. 951(ii).
[814] See para. 667 *supra*.
[815] Doc. C-624, Art. 26(3).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

- *Two*, Italy gave investors notice of the reductions it intended to apply six
  months before they entered into force[816], thus giving them time to make any
  necessary arrangements to mitigate the fallback;

- *Three*, Italy enacted safeguards to minimize the effects of these measures,
  such as the provision of loans by the *Cassa Depositi e Prestiti*, the extension
  of local authorizations, permits and licenses or the possibility for producers
  to sell their incentives to third-party buyers[817].

700. <u>Overall</u>, the Tribunal finds that Italy introduced proportionate changes, in the
pursuit of the public interest, without radically changing the applicable legal and
regulatory framework. Therefore, there is no breach of Italy's obligation to
encourage and create stable conditions for investors.

    (v)   <u>The Disputed Measures were transparent</u>

701. Italy also had an obligation to encourage and create transparent conditions for
investors to make investments.

702. The Tribunal is not persuaded that there was a lack of transparency in Italy's actions
when it enacted the Disputed Measures, for the reasons set out below.

703. <u>First</u>, the legal and regulatory framework underlying the *Conto* Program and the
MGP Regime was transparent, adopted in accordance with proper procedures,
through Legislative and Ministerial Decrees approved by the Parliament or the
Government; Claimants in fact never questioned the formal appropriateness of such
measures.

704. The same applied to the Disputed Measures: the *Spalma-incentivi* Decree is a Law
Decree, later converted into Law, that complied with all publicity requirements, was
adopted under proper procedures and was duly motivated; the Constitutional Court
reviewed it and found it compliant with the Italian Constitutional. Likewise, there
is no dispute that the New MGP Regulation and the *Destinazione Italia* Decree were
adopted in accordance with the proper procedures.

705. <u>Second</u>, the Disputed Measures were not adopted in isolation and cannot be viewed
as such: the *Conto* Program was always a varying support scheme, subject to
multiple amendments over time, to adjust to the competing needs of promoting
investment in RES and controlling costs for consumers.

706. For instance, the 2011 *Romani* Decree already alerted PV plant producers to the
fact that Italy intended to limit incentive tariffs, bearing in mind that technological
costs were falling and that their ultimate purpose was to maintain a fair
remuneration of investments and operating costs[818]. Likewise, the preamble of

---

[816] Doc. C-624.
[817] Doc. C-624, Arts. 26(5) to (12).
[818] Doc. C-163, Arts. 24(1) and 25(10).

*Conto* V alerts that growth of electricity tariff charges must be controlled and that there[819]:

> "[…] [is] significant margin for the reduction of incentives with respect to those paid over past years, taking into account the levels of incentives in other European countries and typical returns on investment."

707. As noted by the tribunal in *SunReserve*[820]:

> "[…] the *Spalma-incentivi* Decree was not a solitary or unexpected instance of remodulation of the incentive tariff regime. It was preceded by numerous versions of the incentive schemes that Italy had offered to photovoltaic producers starting from the early 1990s […]. More recently, it was preceded by (i) the Fourth *Conto Energia* Decree […], which already contained elements of some remodulation […]; (ii) the Fifth *Conto Energia* Decree […], which set the national indicative cumulative cost of incentives at EUR 6.7 million; and (iii) the *Destinazione Italia* Decree […].
>
> Accordingly, the Spalma-incentivi Decree was not inconsistent with Italy's prior conduct, nor is there any indication of it having been issued in a non-transparent manner. Indeed, the Decree granted photovoltaic plant operators approximately five months to choose between the three options of remodulation presented by the Decree, as opposed to directly imposing any remodulation scheme that the host State considered fit without consulting producers."

708. Likewise, the AEEG always made it clear that the minimum guaranteed prices were subject to its discretion and would be yearly reviewed[821]. Considering that prices had regularly varied, it cannot be said that further changes (increasing or reducing the MGP) were unforeseen.

709. Finally, Claimants take issue with the fact that Italy has failed to produce evidence proving precisely how it set the incentive tariffs and the reductions[822]. But the fact that a State has not performed a detailed economic analysis which supports certain of its decisions does not necessarily subvert the duty of transparency. If the State enjoyed broad discretion when establishing the levels of subsidies that it was granting to PV operators (and investors willingly benefitted from such subsidies), it must enjoy equal discretion when deciding to reduce the levels of such subsidies.

Claimants' counterargument

710. Claimants argue that if Italy knew that it had the right to introduce changes to the incentives regime and failed to inform investors, it was deliberately acting without transparency[823].

---

[819] Doc. C-195, pp. 2-3.
[820] Doc. CL-46, *SunReserve*, paras. 913-914.
[821] Doc. C-217, Art. 7.1.
[822] C-PHB, paras. 45, 114.
[823] C-II, paras. 270 and 416.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

711. It is true that the regulatory framework underlying the *Conto* Program did not expressly stipulate that the regulation was subject to change. But nor did it state that it was not. The framework was designed to attract investment into new technologies by subsidizing costs when higher at early stages, and to reduce those over time as the sector matured and costs reduced. An experienced investor should be aware of the economics of energy transition and their effect on investors and States. All regulatory risk is not eliminated for the benefit of the investor unless there is an explicit contractual stabilization clause that provides for such additional protection. Art. 10(1) of the ECT is not such a clause. In the absence of an expressly agreed stabilization clause, a seasoned and responsible investor would recognize the investment risk that a State may change the regulatory framework in the defense of the common good.

712. The obligation to encourage and create transparent conditions for investments in the ECT does not imply that States must expressly and affirmatively remind investors subject to protection under the ECT that States retain a right to regulate and to introduce changes to their systems.

\* \* \*

713. <u>In sum</u>, the Tribunal concludes that when it enacted the Disputed Measures, Italy did not breach the obligation contained in the first sentence of Art. 10(1) of the ECT, to "encourage and create stable, equitable, favourable and transparent conditions" for investors.

### c.    The non-impairment requirement

714. Art. 10(1) of the ECT also creates the obligation for the Contracting Parties not to "impair by unreasonable or discriminatory measures [the] management, maintenance, use, enjoyment or disposal" of protected investments. A literal interpretation of the rule shows that, for a measure to amount to a violation of this provision, it suffices that it be either unreasonable *or* discriminatory; it need not be both.

(i)    <u>Unreasonable measures</u>

715. What are "unreasonable measures"? Are they synonymous of "arbitrary measures"?

716. The ECT, however, does not refer to "arbitrary" measures, but rather prohibits "unreasonable" measures, *i.e.*, measures adopted by the host State that are irrational in themselves or result from an irrational decision-making process. All arbitrary measures are, by definition, unreasonable, because rational State action cannot result in the substitution of the rule of law by prejudice, preference or bias[824]. The opposite is not necessarily true: an irrational decision-making process may result in an unreasonable measure, but the content of the measure does not have to be arbitrary (although in most cases, unreasonable decision-making will result in arbitrary results).

---

[824] Doc. CL-190, *LSG*, paras. 1054.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

717. Irrespective of the minor semantical differences, in investment arbitration treaties the term "unreasonable" is often used interchangeably with the terms "unjustified" or "arbitrary".

718. In a prior award in *EDF v. Romania*, Prof. Schreuer, appearing as an expert, defined as "arbitrary"[825]:

> "a. a measure that inflicts damage on the investor without serving any apparent legitimate purpose;
>
> b. a measure that is not based on legal standards, but on discretion, prejudice or personal preference;
>
> c. a measure taken for reasons that are different from those put forward by the decision maker;
>
> d. a measure taken in willful disregard of due process and proper procedure."

719. The *EDF* tribunal accepted this definition in the tribunal's analysis and ultimately rejected the claim that Romania had adopted arbitrary measures[826].

(ii)    Discriminatory measures

720. Discrimination is a relative standard, which requires a comparative analysis between the measures applied to the protected investment and the measures applied to other investments in similar situations.

721. Discrimination means unequal or different treatment. But this, in itself, is insufficient. To amount to discrimination, the protected investment must be treated differently from similar cases without reasonable justification[827], such that the host State "exposes the claimant to sectional or racial prejudice"[828] or "target[s] [c]laimants' investments specifically as foreign investments"[829].

**d.    Do the Disputed Measures breach the non-impairment requirement?**

(i)    The Disputed Measures were reasonable

722. The Tribunal has established that all arbitrary measures are, by their very nature, unreasonable. But in the present case, none of the characteristics of arbitrariness identified by Prof. Schreuer are met[830]:

723. First, the Tribunal has already determined that the Disputed Measures served a legitimate public purpose[831].

---

[825] Doc. CL-26, *EDF*, para. 303.
[826] Doc. CL-26, *EDF*, para. 303.
[827] Doc. CL-27, *Saluka*, para. 313.
[828] Doc. CL-28, *Waste Management*, para. 98.
[829] Doc. CL-16, *LG&E*, para. 147.
[830] See para. 716 *supra*.
[831] See paras. 687-692 *supra*.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

724.  <u>Second</u>, Claimants have failed to demonstrate that the Disputed Measures were based not on legal standards but rather on discretion, prejudice or personal preference; in fact, the evidentiary record seems to prove the contrary. Not only did the Measures serve a legitimate public interest[832] but, as it will be seen in paras. 740-742 *infra*, they were also not discriminatory or biased.

725.  <u>Third</u>, there is no evidence that the Measures were taken for reasons other than those put forward by the decision maker; on the contrary: the Italian legislator made it clear that the *Spalma-incentivi* Decree and the *Destinazione Italia* Decree were aimed at decreasing the burden of the incentives on end consumers and ensuring the sustainability of the support scheme[833] – the same goals that Italy now claims motivated the Measures. These are plausible public policy objectives; as noted by the tribunal in the prior award in *Silver Ridge*[834]:

> "In the context of its reasonableness assessment, it is not for the Tribunal to decide whether the host State made the right choice in selecting and prioritizing public policy objectives, but rather to determine whether the reasons relied upon by the host State in order to justify its conduct are, under the circumstances, plausible public policy objectives."

726.  The *Silver Ridge* tribunal went on to determine that it was[835]:

> "[…] satisfied that the Respondent, when adopting the *Spalma-incentivi* Decree, could plausibly claim to have acted on the basis of legitimate public policy objectives, notably strengthening the sustainability of the incentive tariff scheme for renewable energy in a situation of economic difficulty. In that sense, the measures taken by the Respondent in response to these challenges, in particular the *Spalma-incentivi* Decree, can claim to be reasonable."

727.  <u>Lastly</u>, Claimants have failed to point the Tribunal to any evidence that Italy disregarded due process or proper procedures when adopting the Disputed Measures. Claimants simply argue that the *Spalma-incentivi* Decree was enacted without regard to the proper procedure for modifying a contract (namely, the *Convenzioni*), which requires the agreement of both parties[836]. But the Tribunal has already determined that the *Convenzioni* were accessory contracts[837], whose modification did not require the investor's consent.

<u>The Disputed Measures were proportionate</u>

728.  To be reasonable, measures must also be proportionate. In the present case, the Tribunal has already found that the Dispute Measures were proportionate to the goal that was being pursued[838]:

---

[832] See paras. 687-693 *supra*.
[833] See paras. 687-693 *supra*.
[834] Doc. CL-47, *Silver Ridge*, para. 450.
[835] Doc. CL-47, *Silver Ridge*, para. 452.
[836] C-II, para. 469.
[837] See section VI.5.1C.c *supra*.
[838] See paras. 697-700 *supra*.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

- The cut imposed on the tariff incentives did not impact Claimants' ability to obtain a fair remuneration;

- Italy gave PV producers a choice when adopting the *Spalma-incentivi* Decree and sufficient notice;

- Italy adopted measures to mitigate the negative impact of the tariff cuts.

<u>The Disputed Measures did not violate the rationale behind the support schemes</u>

729. Claimants argue that, fundamentally, the Disputed Measures were unreasonable because they violated the rationale (or basic premise) behind the support schemes that Italy had enacted specifically to encourage investment: "to ensure revenue streams for PV investors for a fixed duration"[839].

730. The Tribunal has already found that by enacting the Disputed Measures, Italy did not fundamentally alter the essential characteristics of the support schemes[840]: Claimants continue to benefit from subsidies, that provide them with a revenue stream other than the price for the sale of electricity, for a period of 20 years; this allows Claimants to obtain a fair remuneration on their investment and operating costs. Furthermore, the GSE continues to offtake electricity from smaller plants, as envisioned in the 2003 Legislative Decree.

731. <u>Therefore</u>, the Tribunal does not see a fundamental departure from the rationale behind the support schemes.

<u>The Disputed Measures were not retroactive</u>

732. Finally, Claimants take issue with the fact that the Disputed Measures were retroactive; they aver that even though Italy had introduced changes to its regulatory framework in the past, such changes had never had retroactive effects like the Disputed Measures do[841].

733. As to the meaning of retroactive, the Cambridge Dictionary explains that a law or decision is retroactive if it has effect from a date before it was approved. The Tribunal accepts that improper retroactivity would be a sign of unreasonableness: reasonable measures should not impair rights that were already acquired or vested.

734. But this is not the case here: Claimants have not seen their acquired rights affected. In fact, Claimants did not have to return any of the incentives received before the Disputed Measures were adopted. Therefore, the Disputed Measures were not retroactive: they produced effects only from the date they were adopted onwards[842].

735. Claimants say that these Measures affected future rights that they expected to receive. This is a different issue is and not a question of retroactivity; it is merely a change of the regulatory framework for the future, that going forward affects

---

[839] C-I, para. 370.
[840] See paras. 665-684 *supra*.
[841] C-II, paras. 217, 257, 528, 547-548, 633.
[842] See also Doc. CL-47, *Silver Ridge*, para. 462.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

existing plants that have already made investments. As observed by the *SunReserve* tribunal[843]:

> "[T]he fact that the modifications applied to plants in existence does not render them retroactive in application, since such modifications fell within Italy's regulatory regime."

736. <u>In sum</u>, the Tribunal concludes that the Disputed Measures were reasonable, as Claimants have failed to demonstrate that such Measures were arbitrary, were disproportionate, were adopted in violation of the basic premise of the support schemes and/or were improperly retroactive.

(ii)    <u>The Disputed Measures were not discriminatory</u>

737. Claimants also argue that the Disputed Measures were discriminatory because they applied only to PV investors, while Italy maintained or increased support to other renewable or traditional energy producers[844].

738. As noted above[845], to amount to discrimination, the Disputed Measures must treat or affect the protected investors or investments in a different way from similar cases without a reasonable justification – in other words, for there to be discrimination, an investor in a similar situation must have been treated better without reason[846].

739. It follows that proof of discrimination requires a valid comparator.

740. In the present case, Claimants do not argue that they were discriminated based on their nationality. In fact, the Disputed Measures applied to all investors in PV plants, whether Italian or foreign; there was no targeting of foreign investors.

741. Rather, Claimants say that producers of other types of energy (*i.e.*, producers in the same sector – energy – but in completely different segments) were not affected by the Measures. But these are not comparable situations:

-    Solar producers are different from hydropower, biomass or wind producers: the cost of investment is different, as is the cost of maintenance and operation, and cost of production[847]; this is precisely why Art. 7 of the 2003 Legislative Decree envisioned "specific provisions for <u>solar energy</u>", including a "specific incentive tariff"[848]; therefore, other RES producers are not valid comparators;

-    Likewise, PV investors are different from non-RES energy producers, because these are mature and established energy sector segments, in a different position within the energy transition, and subject to different

---

[843] Doc. CL-46, *SunReserve*, para. 815.
[844] C-II, para. 468.
[845] See paras. 720-721 *supra*.
[846] See Doc. CL-46, *SunReserve*, para. 955.
[847] This is clearly consigned in a presentation by the GSE of June 2013 (Doc. R-4).
[848] Doc. C-31, Art. 7 (emphasis added).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

economic factors and subsidy regimes; therefore, they are not directly comparable.

742. Given that Claimants have failed to point to any valid comparator, the discrimination claim cannot succeed.

\* \* \*

743. <u>In view of the above</u>, the Tribunal dismisses Claimants' claim that the Disputed Measures breached the non-impairment requirement: such Measures were neither unreasonable nor discriminatory.

### e.    Prior awards

(i)    <u>Decisions which support the present Award</u>

744. The Tribunal's conclusion that Italy did not breach either the stable conditions or non-impairment requirements has been espoused by three other investment tribunals.

745. In *Silver Ridge* the tribunal, while acknowledging that "an 8 % reduction in incentive tariff payments for the bulk of the 20-year incentivization period must have resulted in a relevant reduction in income" for the investor, did not consider such reduction to "be excessive or disproportionate"[849]. It went on to conclude that the changes brought about by the *Spalma-incentivi* Decree were[850]:

> "[…] reasonable, foreseeable and proportionate and did therefore not constitute a fundamental or radical alteration of the applicable legal framework to the detriment of the investor."

746. Likewise, the tribunals in *Belenergia* and *SunReserve* (both unanimously) found that the 8% reduction in the tariff incentives was rather modest[851] and did not impact on the prospects of fair remuneration for PV plants[852]. Both tribunals also concluded that there was no breach of the non-impairment requirement.

747. The *Belenergia* tribunal noted that Italy's changes to its regulatory and legislative framework were neither unreasonable nor disproportionate, let alone unpredictable. The tribunal also found that to reduce the cost of subsidies was a sufficiently legitimate public interest goal[853].

748. Likewise, the tribunal in *SunReserve* dismissed a breach of the non-impairment requirement because[854]:

- The investors had not proven that there was a significant enough impact to qualify as an impairment under Art. 10(1), considering that the impact of the

---

[849] Doc. CL-47, *Silver Ridge*, para. 469.
[850] Doc. CL-47, *Silver Ridge*, para. 474.
[851] Doc. CL-45, *Belenergia*, para. 595.
[852] Doc. CL-46, *SunReserve*, para. 867.
[853] Doc. CL-45, *Belenergia*, paras. 602-610, 630, 634-635.
[854] Doc. CL-46, *SunReserve*, para. 951.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

*Spalma-incentivi* Decree was not sufficient for their remuneration to have decreased to anything lesser than a "fair remuneration";

- The investors had not established that the *Spalma-incentivi* Decree was unreasonable, "inasmuch as it was either bereft of a rational policy, or unrelated to the policy objective that the host State desired to achieve", *i.e.*, to offset the increase in the costs paid by end consumers as a result of the incentive tariff regime.

749. Both tribunals equally dismissed the investors' claims of discrimination, after finding that the situation of the PV energy market was distinct from that of other sources of energy in many respects[855].

(ii)   Decisions which contradict the present Award

750. But tribunals in prior awards are not unanimous. The tribunals in *Greentech* and *ESPF* concluded that Italy had breached the non-impairment requirement[856]. In both cases the decisions were reached by majority, with dissenting opinions by Prof. Sacerdoti and Prof. Boisson de Chazournes, respectively.

751. After carefully reviewing the arguments provided in the *Greentech* and *ESPF* awards, the Tribunal finds the reasoning set-forth in its own decisions more convincing.

*Greentech*

752. In *Greentech* the tribunal concluded (by majority) that the *Spalma-incentivi* Decree breached Art. 10(1), *inter alia*, because:

- It failed to "encourage and create [...] transparent conditions for Investors of other Contracting Parties"[857],

- It was an unreasonable measure, thus contrary to the non-impairment requirement[858].

753. Prof. Sacerdoti dissented. As to the stable conditions requirement, Prof. Sacerdoti found that even though Italy was actively engaged in promoting the use of RES, it was not bound to freeze its regulatory framework[859]. In fact, a series of measures that predated the Disputed Measures, including the *Romani* Decree and *Conto* V, already foresaw the need to decrease the burden of the incentives for the State and the consumers[860]. After exhaustively examining the political and economic context

---

[855] Doc. CL-45, *Belenergia*, para. 631; Doc. CL-46, *SunReserve*, paras. 955-956.
[856] C-II, para. 471.
[857] Doc. CL-9, *Greentech*, para. 458.
[858] Doc. CL-9, *Greentech*, para. 462.
[859] *Greentech*, Prof. Sacerdoti's dissenting opinion, paras. 12-24.
[860] *Greentech*, Prof. Sacerdoti's dissenting opinion, paras. 25-31.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

that Italy was facing when it adopted the *Spalma-incentivi* Decree, Prof. Sacerdoti concluded that the changes were[861]:

> "[…] reasonable and proportionate to their aims and results; transparent as to their enactment; balanced and limited as to their impact on the operators."

754. Furthermore, as regards the non-impairment requirement, Prof. Sacerdoti found that the *Spalma-incentivi* Decree was not an unreasonable measure, because it was "legitimate, justified by a public purpose, transparent, adopted pursuant to due process, proportionate to [its] aim"[862]. In any case, Prof. Sacerdoti concluded that there was no impairment, considering (as this Tribunal did *supra*[863]) that[864]:

> "Every aspect of the Conto mechanism has remained in place, except for the tariff reduction: the duration, the role of GSE, and the payment system have remained unaffected since the establishment of the relevant regime. This cannot be defined as an impairment of investments made in Italy's PV plants. Moreover, the absence of impairment is evidenced by the fact that the tariff reduction of the *Spalma-incentivi* was and has been a *una tantum*, an isolated occurrence due to them particular economic situation of Italy in 2013-2014. The tariff structure has remained untouched since, so that the first PV operators under the first Conto have by now (the end of 2018) operated under the system for 14 over the 20 years provided by the incentivizing regime."

755. As to the MGP Regime, the *Greentech* tribunal (by a different majority) found no evidence that the investors "were treated inconsistently, or that the laws were opaque or arbitrary, notwithstanding a change in the regulations"[865], and ultimately considered the measures reasonable and non-discriminatory[866].

*ESPF*

756. The *ESPF* tribunal, by majority, found that Italy had breached the non-impairment requirement of Art. 10(1) because the *Spalma-incentivi* Decree was neither reasonable nor proportionate[867].

757. Prof. Boisson de Chazournes dissented, noting that she disagreed with the majority[868]:

> "[…] when it considers that the *Spalmaincentivi* Decree constitutes an unreasonable conduct that breached the Impairment Clause. The majority should have assessed the existence of a rational policy as well as the reasonableness of the State act in relation to the policy pursued by the host State, in the overall regulatory context of the case. Given that the investors' remuneration is principally made of public subsidies, the minority finds it difficult to see how reducing the cost of electricity to consumers by reducing

---

[861] *Greentech*, Prof. Sacerdoti's dissenting opinion, paras. 39-49.
[862] *Greentech*, Prof. Sacerdoti's dissenting opinion, para. 56.
[863] See paras. 665-666 *supra*.
[864] *Greentech*, Prof. Sacerdoti's dissenting opinion, paras. 54-55.
[865] Doc. CL-9, *Greentech*, para. 503.
[866] Doc. CL-9, *Greentech*, para. 505.
[867] Doc. CL-8, *ESPF*, para. 594.
[868] Doc. CL-8, *ESPF*, para. 709.

the incentive tariffs for producers cannot be considered as a rational policy
goal." [Emphasis added]

### 5.3 HAS ITALY, BY PROMULGATING THE DISPUTED MEASURES, OTHERWISE BREACHED THE FET STANDARD?

758. Under the FET standard in the ECT, Italy has undertaken to "accord at all times" fair and equitable treatment (already defined as "FET") to investments of protected investors. Both Parties agree that the FET standard includes an obligation to respect the investor's legitimate expectations, and Claimants say that the Disputed Measures breached this obligation – an averment which Italy denies.

759. The Tribunal will summarize the Parties' positions (**A.** and **B.**) before providing its own analysis (**C.**).

### A. Claimants' position

760. Claimants allege that Italy made specific promises so that investors would help develop its PV sector and meet the EU targets for renewable energy[869]. Once these targets were met, Italy went back on its promises and cut the promised tariffs. By reducing the MGP and enacting the *Spalma-incentivi* Decree, Italy fundamentally altered the incentives scheme and outrightly reduced the level of support that it had promised to Claimants' PV plants for 20 years[870].

761. According to Claimants, investment treaty prior awards confirm that a State cannot act in ways that undermine the "legitimate expectations" created vis-à-vis the investor. The protection of "legitimate expectations" is one of the "major components" of the FET standard[871]. Many tribunals faced with nearly identical claims as this Tribunal have confirmed that this legal principle is applicable[872].

### a. The *Spalma-incentivi* Decree

762. Claimants aver that Italy's commitments in the *Conto* Program contained clear and specific promises regarding the tariff rates that would be awarded to qualifying PV plants for 20 years – and that Italy backtracked on its promises[873]. According to Claimants, when an investor's expectations are based on explicit assurances from the State – as in the present case – the latter must abstain from regulating in ways that undermine those assurances[874]. Claimants do not claim that Italy had to freeze its regulatory framework, but rather that it was obliged to honor its express commitments[875].

763. If the Tribunal were inclined to require some specific "stabilization" language to find that Claimants had a legitimate expectation of regulatory stability, Claimants

---

[869] C-II, para. 415.
[870] C-I, paras. 261, 279.
[871] C-I, para. 316.
[872] C-I, paras. 317-329; 334-336.
[873] C-I, para. 331.
[874] C-II, para. 258.
[875] C-II, para. 411.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

argue that Italy repeatedly represented to investors that the tariffs would be "constant" for the entire 20-years duration of the program; it did so in the *Romani* Decree, in the *Conto* Program, the Tariff Confirmation Letters and the *Convenzioni*[876]. Contrary to Respondent's argument, the word "constant" meant "not subject to change" and the phrase "in current currency" meant without an inflation adjustment[877].

764. Claimants argue that they relied on the express terms of the *Conto* Program, which offered a constant tariff rate on the electricity produced by PV plants for 20 years[878]. Claimants knew that the terms contained in the different *Conti* would be confirmed by Italy by means of the Tariff Confirmation Letters and the *Convenzioni*. And, indeed, Italy expressly confirmed the eligibility and right of each of Claimants' PV plants to receive a specific tariff rate for 20 years through the Tariff Confirmation Letters and the *Convenzioni*[879].

765. In Claimants' view, these two specific documents merely confirmed what Italy had already offered to each operator under the *Conto* Program[880]. The single unified process by which Claimants' plants entered the *Conto* Program formed the basis of the investors' legitimate expectation that they would benefit from the pre-determined tariff, at a constant (fixed) rate, for 20 years[881].

Promotional campaign

766. In addition to the clear terms of each *Conto*, Italy entered into a promotional campaign to attract new investment in the PV sector, and repeatedly confirmed the stability of its incentives scheme[882]. Italy made explicit statements in:

- The regulatory framework,

- The Tariff Confirmation Letters,

- The *Convenzioni*,

- Verbal representations by State officials, and

- Reports or presentations from State authorities and local bodies.

767. There were also statements by the European Commission, and the general policy goals of the incentives regime assured that Claimants could rely on the stability of the tariff regime for 20 years[883].

---

[876] C-PHB, paras. 93-96.
[877] C-PHB, para. 94.
[878] C-II, paras. 228 and 243.
[879] C-II, paras. 234 and 241.
[880] C-II, para. 241.
[881] C-II, para. 235.
[882] C-I, Sections IV.B to E; C-II, para. 245.
[883] C-II, para. 245.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

768. Claimants argue that they were careful and diligent when investing in Italy[884]. They did not misunderstand Italy's regulatory framework; on the contrary: the regime put in place by Italy was clear, well-defined, and designed specifically with the intent of promoting certainty to encourage investors to invest[885].

### b. The MGP Regime

769. Claimants equally relied on the modalities and the purpose of the MGP Regime[886]; indeed, the MGPs aimed to ensure the economic survival of small plants even if market prices were to fall significantly. Eligible producers wishing to benefit from the off-take regime and the MGPs executed *Contratti per il Ritiro* with the GSE for the purchase of their electricity at those prices, which further confirmed that producers would receive the MGPs as established in the MGP Resolution. 56 of Claimants' PV plants benefitted from the MGP Regime and signed *Contratti* confirming their right to do so[887].

770. Claimants aver that the modifications to the MGP Regime are inconsistent with Italy's previous conduct and with Claimants' "legitimate expectations"[888]. Indeed, Italy's unexpected and drastic measures (the reduction of the MGPs to levels that were well below market price, followed by its elimination of the program entirely for most plants, including 56 of Claimants' plants, only days later), were contrary to the purpose of the regime and violated the expectations that Italy had created[889].

### B. Respondent's position

771. Italy considers that when considering the FET standard in international law, tribunals must consider investors' expectations in the context of the State's regulatory powers[890]. According to Italy, a "legitimate expectations" standard does not require a State to freeze its legislation in favor of foreign investors, because that would contravene the fundamental principle of State sovereignty[891]. As demonstrated by the practice of investment arbitration tribunals[892], States remain free to modify their general legislation reasonably[893].

772. Therefore, Italy argues that the Tribunal must assess the measures adopted by the State as allegedly violating the investor's expectations in light of the standards of fairness and reasonableness[894].

773. Italy argues that the due diligence reports prepared by Claimants prior to their investments demonstrate that they were fully aware of the existence of a regulatory

---

[884] C-II, paras. 270-272.
[885] C-II, para. 272.
[886] C-I, paras. 171-172; C-II, para. 277.
[887] C-I, para. 166; C-II, paras. 557-559.
[888] C-II, para. 581.
[889] C-II, para. 586.
[890] R-I, para. 428.
[891] R-I, para. 433; R-II, para. 462.
[892] R-I, paras. 436-447 and R-II, para. 464, citing to Doc. RL-33, *Saluka*, para. 305; Doc. RL-4, *Electrabel*, para. 7.77; Doc. RL-46, *Charanne*, para. 503; Doc. RL-44, *Eiser*, para. 363; Doc. RL-43, *Blusun*, para. 319.
[893] R-I, paras. 434, 464; R-II, paras. 108, 460.
[894] R-II, paras. 465469.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

risk, and that this risk could materialize in a reduction of tariffs[895]. In fact, Claimants kept investing after some of the Disputed Measures had been adopted; it follows that Claimants either considered the Measures fully legitimate, or they simply ignored such Measures when assessing the risk of investing[896].

### a.    The *Spalma-incentivi* Decree

774.  It is Italy's position that investors could only legitimately have expected that the incentives regime would guarantee a fair remuneration – not that tariffs would remain unchanged for 20 years[897].

775.  Italy submits that the incentive regime contained in the *Conto* Program was not a concrete promise to Claimants; it was simply a State regulation, subject to the Italian and EU legal order, which did not freeze Italy's regulatory activity. In fact, before Claimants invested there was no specific commitment directed to Claimants – no letter of intent, no individual promise, no specific contractual assurance[898].

776.  Italy denies that it promised that the conditions of the *Conto* Program would remain unchanged[899]; the only expectation that investors could have was that of macro-stability of the regime in the long term, progressively reduced in line with the reduction of costs. And, in fact, the scheme remains stable to this day[900].

777.  Italy also avers that the Tariff Confirmation Letters and the *Convenzioni* could not have generated "legitimate expectations", because they post-date the making of the investments[901]. In any case, the *Convenzioni* are not susceptible of forming "legitimate expectations", because they are only "accessory contracts" to public acts[902]. There were no "specific commitments" not to modify the tariffs. The *Convenzioni* are mere accessory contracts, whose provisions are mandatorily modified once the legislation changes[903].

778.  Furthermore, Italy rejects Claimants' argument that various representatives of central and local authorities made specific commitments that the tariff rates and duration would be fixed. Said declarations were generic, not addressed specifically to Claimants, merely reflected applicable legislation, and did not create specific "legitimate expectations" beyond the *Conto* Program. Ultimately, such declarations do not bind the State as to its future actions[904].

---

[895] R-II, paras. 367-369.
[896] R-I, para. 377.
[897] R-I, para. 457; R-II, paras. 363-364.
[898] R-II, paras. 487-489.
[899] R-I, para. 461.
[900] R-II, paras. 373-379; HT, Day 1, 11. 17-20 (Prof. Malaguti).
[901] R-II, paras. 391-392, 492.
[902] R-I, paras. 453-455; R-II, para. 492.
[903] RD-1, slide 65.
[904] R-I, paras. 382-386; R-II, paras. 382-389.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

### b.    The MGP Regime

779. Italy argues that the MGP Regime contained no guarantee regarding its duration or amount. In fact, at the time Claimants made their investments, the MGPs were established in an autonomous regulation adopted by the AEEG, within the broader framework of the off-take regime. The primary rules underlying such regulations were limited to creating the off-take regime – they did not refer to the mechanism of MGP[905].

780. When in 2007 the AEEG passed the MGP Resolution, it provided that the AEEG would yearly determine MGPs; but this power was established without providing limits or ranges. Therefore, there could not be any expectation by investors[906]. Italy submits that the fact that for a few years the prices followed a certain trend is not sufficient to consolidate legitimate expectations[907].

781. In any case, Italy avers that the preamble of the MGP Resolution makes it clear that the goal was to ensure the "economic survival" of smaller plants – not to grant investors a high and durable profitability, detached from the economic conditions of the investment[908].

### C.    Analysis by the Tribunal

782. To adjudicate Claimants' claim that Italy has violated the FET standard on the basis of "legitimate expectations", the Tribunal will first summarize the relevance of "legitimate expectations" in the FET standard (**a.**), and thereafter will examine the merits of the claim with regard to the *Spalma-incentivi* Decree (**b.**) and the changes to the MGP Regime (**c.**). Finally, the Tribunal will consider prior awards in this context (**d.**).

### a.    "Legitimate expectations" under the FET standard

783. Art. 10(1) of the ECT, like most investment treaties, does not make any reference to "legitimate expectations". The Parties did make arguments as to the FET standard under the ECT encompassing an obligation to protect the "legitimate expectations" of investors[909]. Indeed, in various prior awards, ECT tribunals have assessed breaches of the FET standard under Art. 10(1) of the ECT against the investor's "legitimate expectations"[910].

784. Those prior awards characterize "legitimate expectations" as comprising three elements[911]:

---

[905] R-II, paras. 607-609.
[906] R-II, paras. 610-611.
[907] R-II, paras. 614-616.
[908] R-II, para. 612.
[909] C-I, para. 316; C-II, para. 251; R-I, para. 421; R-II, para. 454-456.
[910] Doc. CL-8, *ESPF*, para. 444; Doc. CL-129, *InfraRed*, para. 365; Doc. CL-17, *Watkins*, para. 483; Doc. CL-128, *PV Investors*, para. 565; Doc. CL-41, *Electrabel*, paras. 7.74-7.75; Doc. CL-89, *Charanne*, para. 486; Doc. CL-87, *Antin*, para. 535.
[911] See, e.g., Doc. CL-187, *Renergy*, Award, para. 611, and Prof. Sands' dissenting opinion, para. 6.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

- Behavior by the State, or by persons whose conduct is attributable to the State, which has given rise to legitimate expectations on the part of the investor, to be assessed at the time the investor decided to make the investment[912];

- Reliance by the investor on those expectations when making the investment; and

- Subsequent measures adopted by or attributed to the State which frustrate the investor's expectation.

785. Tribunals in prior awards [913], have determined that an investor's expectations must be analyzed objectively, considering all relevant circumstances, and not subjectively. In other words, what is relevant are the expectations of a prudent investor in the same circumstances, taking into account the information that the investor had or ought to have had at the time of making the investment. The investor must also prove that it exercised appropriate due diligence when analyzing the legal and regulatory framework and that it did not ignore signs that its expectations were unfounded.

786. The Parties in these proceedings also refer to a 2012 study by the United Nations Conference on Trade and Development ["**UNCTAD**"] regarding the FET standard[914], which considers the discussion in prior awards as to "legitimate expectations". The Parties appear to agree with the statement made in the UNCTAD study, that any "legitimate expectations" must arise either from specific commitments addressed by the State to the investor, or from general legislation created with the purpose of attracting investments[915].

787. The tribunal in the prior award in *Silver Ridge* also acknowledged the possibility that a State create "legitimate expectations" by promulgating general legislation[916]:

"[A] State may make specific commitments to investors also by virtue of legislative or regulatory acts which are not addressed to particular individuals, provided that these acts are sufficiently specific regarding their content and their object and purpose. In this context, the Tribunal considers the creation of legitimate expectations more likely where a State has adopted legislative or regulatory acts 'with a specific aim to induce […] investments'." [Emphasis added]

The State's right to regulate

788. In the context of FET protection, an investor's "legitimate expectations" cannot be converted (at least not absent a specific contractual stabilization clause) into a host

---

[912] Doc. CL-41, *Electrabel*, para. 7.76; Doc. CL-44, *CEF Energia*, para. 186; Doc. CL-46, *SunReserve*, paras. 706-716; Doc. CL-87, *Antin*, para. 537; Doc. CL-97, *Novenergia II*, paras. 538-539; Doc. CL-128, *PV Investors*, para. 575; Doc. CL-17, *Watkins*, para. 517. See also Doc. CL-148, UNCTAD, p. 9.
[913] Doc. CL-8, *ESPF*, para. 513; Doc. CL-41, *Electrabel*, para. 7.76; Doc. CL-46, *SunReserve*, paras. 709-710; Doc. CL-89, *Charanne*, para. 495; Doc. CL-87, *Antin*, para. 536; Doc. CL-88, *Isolux*, paras. 777-778; Doc. CL-131, *SolEs*, para. 312; Doc. CL-128, *PV Investors*, paras. 573-574.
[914] Doc. CL-148. See C-II, para. 251; R-II, para. 31 and fn. 18.
[915] Doc. CL-148, p. 69.
[916] Doc. CL-47, *Silver Ridge*, para. 408.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

State obligation to freeze its regulatory regime. As a matter of sovereignty, States retain the right to introduce regulatory changes, provided that they respect the overall structure of their regulatory regime and any obligations in international law, including that they act proportionally in the public interest. The Tribunal's analysis of the stable conditions requirement (see section 5.2C.a *supra*) is also applicable in this context.

789. The general proposition that the State is entitled to introduce regulatory change does not depend on the presence or absence of specific commitments. In the words of the *SunReserve* tribunal[917]:

> "[T]he presence of specific commitments, contractual or otherwise, cannot automatically eliminate or diminish the significance of the host State's regulatory powers."

**b.    Does the *Spalma-incentivi* Decree breach the FET standard?**

790. Claimants aver that Italy breached their "legitimate expectations" for stable and guaranteed incentive payments of fixed amounts for 20 years when it enacted the *Spalma-incentivi* Decree[918]. Claimants say these were based on the following assurances, on which they relied when making their investments[919]:

- The general promise of a "fair remuneration", contained in the 2003 Legislative Decree (**i.**);

- The specific tariffs defined in each *Conto*, which were said to be "constant" (**ii.**);

- The *Convenzioni* and the Tariff Confirmation Letters, which confirmed the right of Claimants' PV facilities to benefit from a specific fixed tariff for 20 years (**iii.**); and

- Public statements made by the Italian authorities, including State bodies, State officials, regional and local authorities, and the general State conduct (**iv.**).

791. The Tribunal will analyze each in turn.

(i)    The 2003 Legislative Decree

792. According to Claimants, the 2003 Legislative Decree gave a specific instruction to the Government to set tariff rates that result in "fair remuneration". Thus, every time that Italy guaranteed a specific tariff rate in a *Conto* decree, it was representing that such rate and duration constituted fair remuneration – something on which Claimants relied[920].

---

[917] Doc. CL-46, *SunReserve*, para. 703.
[918] C-I, para. 23.
[919] C-II, para. 245.
[920] C-II, paras. 294 *et seq*.; C-PHB, paras. 39 *et seq*.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

793. The Tribunal has already found that the concept of "fair remuneration of investment and operating costs" was an essential component of the regulatory framework[921]. It was therefore reasonable for investors to expect that they would be entitled to receive fair remuneration for the term at the time of making their capital commitments to build and operate PV plants in Italy.

794. The Tribunal, however, disagrees that the "fair remuneration" was static or fixed based on tariff rates established in any particular *Conti*. The fact that Italy did not define what it meant by "fair remuneration" in the 2003 Legislative Decree (or anywhere else) implies that the Government was free to interpret this concept over time and to adapt it to the circumstances, taking into account the deployment of PV solar plants and the evolution of the actual costs of investment and operation.

795. As the Tribunal has already concluded, Claimants have not made an allegation or pointed the Tribunal to evidence that the *Spalma-incentivi* Decree has impaired their right to receive a fair remuneration of their investment and operating costs[922]. It follows that no "legitimate expectations", as alleged, could have been violated.

    (ii)    The *Conti*

796. Claimants argue that the *Conti* stated explicitly that facilities meeting certain eligibility criteria would be entitled to tariffs at "constant" rates for 20 years and defined such rates[923]. From Claimants' perspective, the reference to a "constant" tariff is a commitment not to change these defined rates for 20 years – in other words, it is a sort of stabilization language[924].

797. Under *Conti* II, III and IV, PV plants eligible for the scheme that were connected to the grid by a certain date had the right ("*diritto*") to receive an incentive tariff defined in a table attached to such *Conti*[925]. This tariff was[926]:

> "[…] *riconosciuta per un periodo di venti anni a decorrere dalla data di entrata in esercizio dell'impianto ed è costante in moneta corrente per*[927] *tutto il periodo di incentivazione*[928]." [Italian original]

> "[…] awarded for a period of twenty years commencing from the date of entry into operation of the plant and shall remain constant in current currency for the entire incentive period."

798. Thus, any prudent investor could reasonably expect:

    -    To be awarded an incentive tariff;

---

[921] See section VI.5.2C.b(i) *supra*.
[922] See section VI.5.2C.b(i) *supra*.
[923] C-II, paras. 243-245.
[924] C-PHB, para. 96.
[925] Doc. C-59, Art. 6(1) (*Conto* II); Doc. C-139, Art. 8(2) (*Conto* III); Doc. C-166, Art. 12(1) (*Conto* IV).
[926] Doc. C-59, Art. 6(1) (*Conto* II); Doc. C-139, Art. 8(4) (*Conto* III); Doc. C-166, Art. 12(2) (*Conto* IV).
[927] *Conto* II uses the word "*in*", while *Conti* III and IV use the word "*per*".
[928] *Conto* II uses the words "*periodo di venti anni*", while *Conti* III and IV use the words "*periodo di incentivazione*".

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

-     For a 20-year period starting from the plant's date of entry into operation; and

-     "*Costante in moneta corrente*".

799. The Tribunal has already established that the wording "*costante in moneta corrente*" should be interpreted as implying that inflation or deflation would not affect the tariff, and that its nominal amount in Euros would not be increased or decreased for these reasons; not that the tariff rate was immutable or subject to some sort of stabilization[929] – a conclusion also espoused by the *SunReserve*[930] and *Silver Ridge*[931] tribunals.

800. Since no stabilization clause can be found in the *Conti*, there was no indication that the tariffs defined therein could not be subject to reasonable regulatory modifications, even if applied to plants already in operation. As previously noted, in a highly regulated sector, when dealing with long-term investments, and in the absence of a stabilization clause, investors must expect that over time regulators will fine-tune the system[932].

    (iii)   The *Convenzioni* and the Tariff Confirmation Letters

801. The *Conti* also defined the modalities for qualifying for the *Conto* Program. They established a procedure in which prospective plant operators had to submit a preliminary project, and upon completion of the works, had to notify the operator of the plant's entry into operation. The GSE would then notify the plant operator of the awarded tariff[933].

802. Investors thus expected that, if they complied with the proper procedure, they would obtain a confirmation from the GSE that their plants were entitled to a certain tariff, in force as of the plant's date of the entry into operation, for a period of 20 years. This was precisely the Tariff Confirmation Letter.

803. The Tariff Confirmation Letter, in turn, provided that, to formalize the incentive, the PV operator had to access the incentives portal and "activate" the relevant agreement "governing the contractual relationship for the disbursement of the incentive" and accept the text of the agreement[934] – *i.e.*, the *Convenzione*. Once they obtained the Tariff Confirmation Letter, investors could thus expect to sign a *Convenzione* with the GSE.

804. The fact that the Tariff Confirmation Letter and the *Convenzione* were issued after the plants had been built and the investment made is irrelevant: when the Claimants invested, they already understood that, if they complied with their end of the bargain (*i.e.*, building and connecting to the grid an eligible plant that complied with the

---

[929] See section VI.5.2C.b(i) *supra*.
[930] Doc. CL-46, *SunReserve*, paras. 791, 805-808.
[931] Doc. CL-47, *Silver Ridge*, paras. 433-435.
[932] See section VI.5.2C.b(i) *supra*.
[933] Doc. C-59, Art. 5(5); Doc. C-139, Art. 4(2); Doc. C-166, Art. 10(3).
[934] See, e.g., Doc. C-65, with the Tariff Confirmation Letter of the Alameda 1 plant.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

requirements to benefit from the tariff), they would receive a Tariff Confirmation Letter and sign a *Convenzione* with the GSE.

805.  And this was complied with by Italy; all of the plants of the Operating Companies obtained Tariff Confirmation Letters and were authorized to sign *Convenzioni* with the GSE[935]. Therefore, the Italian Republic did not frustrate the investor's expectations.

806.  A different question is the entitlement that derives from such documents. According to Claimants, since the Tariff Confirmation Letter and the *Convenzione* also recognize that the plants would be entitled to a specific tariff "*costante, in moneta corrente per tutto il periodo di venti anni*"[936], they could expect that said tariffs would remain unchanged for the whole 20-year period.

807.  But the Tribunal has already established that:

- The wording "*costante in moneta corrente*" implies that the nominal amount of the tariff in Euros will not be increased or decreased because of inflation or deflation - not that the tariff rate was immutable[937];

- The *Convenzioni* are accessory contracts, which simply acknowledge the existence of a subsidy and regulate the operational rules for the payment; these contracts, however, are automatically adjusted if the underlying regulation is changed[938].

808.  The same applies to the Tariff Confirmation Letters, which were merely meant to confirm the applicability of the *Conto* Program to a certain plant. As noted by the *SunReserve* tribunal[939]:

> "If the [*Convenzioni*] are characterized as acts accessory to administrative acts, there is no reason to not qualify GSE's [Tariff Confirmation Letters] similarly."

(iv)  Public statements of Italian authorities

809.  Finally, Claimants argue that Italy's promise to pay fixed tariff rates for 20 years was reinforced time and again through both statements from State representatives (including the GSE and other State officials) and governmental conduct[940].

810.  Such statements referring to an existing regulatory regime cannot give rise to "legitimate expectations" when they simply reiterate the content of the regulatory regime itself. The Tribunal shares the assessment of the *SunReserve* tribunal[941]:

---

[935] See Annex to this Award.
[936] See e.g., Doc. C-222, with the Tariff Confirmation Letter of the Alameda 1 plant, or Doc. C-640, with the *Convenzione* of the Alameda 1 plant.
[937] See section VI.5.2C.b(i) *supra*.
[938] See section VI.5.1C.c *supra*.
[939] Doc. CL-46, *SunReserve*, para. 828.
[940] C-I, paras. 118, 132, 318; C-II, para. 386.
[941] Doc. CL-46, *SunReserve*, para. 817.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

> "These public statements cannot bind the State to commitments above and beyond the legal regime in existence."

811.  In this case, the public statements were only intended to reiterate the regime that existed by virtue of general regulation, including the *Conti*. Given that the overall regulatory framework did not provide that incentive tariff rates would be fixed for 20 years, the public statements corresponding to this regulatory regime could not have done so.

### c.    Do the changes to the MGP Regime breach the FET standard?

812.  Claimants further argue that the changes to the MGP Regime violated their "legitimate expectations"[942]. In particular, Claimants say that they could legitimately expect that Italy would provide minimum guaranteed prices above market price on average to ensure the economic survival of plants under 1 MW, as it in fact did from 2008 to 2013[943].

813.  The Tribunal does not consider this to be persuasive for the reasons set out below.

814.  <u>First</u>, as previously explained[944], the MGP Resolution, which created the minimum guaranteed prices for small plants with less than 1 MW of capacity, did not quantify such prices, did not establish any range and did not represent that such prices would always be above market price. In fact, the AEEG retained broad discretion to change the MGPs on a year-by-year basis[945]. Likewise, the *Contratti per il Ritiro* had an annual duration and did not define the prices to which plants were entitled (making a simple cross reference to the MGP Resolution)[946]; it follows that they could not have been the source of any legitimate expectation of stability of the prices.

815.  <u>Second</u>, as the regulatory framework contained no guarantees as to how prices would vary, it follows that the fact that the AEEG set the MGPs at certain levels between 2008 and 2013 in accordance with that framework could not create guarantees that prices would be fixed at those levels. The Tribunal shares the view of the tribunal in *Greentech*[947]:

> "[...] a majority of the Tribunal has not been persuaded that Claimants formed such expectations that, after 2013, they would continue to receive minimum prices at levels similar to those which they received from 2008 to 2013. In the view of a majority of the Tribunal, it was not demonstrated that Italy made any explicit or implicit assurance that would warrant such expectations. Nor, in the majority's view, could the Preamble to [the MGP Resolution], mentioning prices 'to ensure the economic survival of smaller plants, even in case the market prices were to fall significantly', without more, suffice to

---

[942] C-II, para. 581.
[943] C-II, paras. 583-586.
[944] See section VI.5.2C.b(ii) *supra*.
[945] Doc. C-217, Art. 7.1.
[946] See, e.g., Doc. C-229, Arts. 4 and 13 (*Contratto per il Ritiro* of the Caputo Alessandro 1 plant).
[947] Doc. CL-9, *Greentech*, para. 501.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

engender legitimate expectations, given that the power to set prices annually remained with the AEEG."

816. <u>Finally</u> neither the 2003 Legislative Decree nor the MGP Resolution contained any type of guarantee that investors would always be able to cumulate the incentives under the *Conto* Program with those under the MGP Regime. As pointed out by the tribunal in *SunReserve*[948]:

> "[…] if the values of the minimum guaranteed prices could fluctuate as a consequence of the [AEEG]'s power to regulate these prices based on market conditions, the same oscillations in the market conditions could also trigger changes in the eligibility criteria for minimum guaranteed prices."

\* \* \*

817. <u>Summing up</u>, the Tribunal concludes that the FET protection under the ECT entitled investors in PV plants that qualified under the *Conto* Program to receive an incentive tariff from the date of entry into operation for 20 years, in order to ensure that those plants received fair remuneration for investment and operating costs.

818. There was no guarantee, however, that the existing regulatory framework would remain frozen for 20 years and not be subject to reasonable changes, adopted in the public interest. A prudent investor, investing in the long-term in the highly regulated energy sector in Italy, could not reasonably assume, either on the basis of the *Conti*, the Tariff Confirmation Letters, the *Convenzioni* or statements by public authorities, that the regulatory system would be immune to change. Minor adjustments to the system, proportionate and aimed at ensuring the protection of the public interest, were foreseeable. The Tribunal agrees with the following observation made in *Silver Ridge*[949]:

> "[…] a prudent investor acting in a highly regulated market such as the electricity market must, in the course of its risk assessment, analyze and take into consideration the whole range of potential advantages and disadvantages associated with the dynamics of the market which might also call for policy adjustments on the part of the host State. Having said that, this does not mean that every turn of policy must be anticipated. In particular, even the reasonable and circumspect investor must not anticipate radical change […]."

819. As this Tribunal has already concluded that there was no radical change of the regulatory framework put in place by Italy, and that the changes were reasonable, proportionate and adopted in the public interest[950], it follows that Claimants' claim regarding the violation of the FET protection under the ECT must be dismissed.

---

[948] Doc. CL-46, *SunReserve*, para. 903.
[949] Doc. CL-47, *Silver Ridge*, para. 457.
[950] See section VI.5.2C *supra*.

### d.    Prior awards

820. In six prior awards, tribunals also reviewed claims by investors that Italy's RES-related Disputed Measures breached their "legitimate expectations". The Tribunal will analyze these decisions chronologically.

### (i)    *Greentech* (December 2018)

821. The award in *Greentech* – the first of the series – was issued at the end of 2018. The tribunal (by majority, with Prof. Sacerdoti dissenting) found that Italy had breached the FET standard because the reduction of tariffs caused by the *Spalma-incentivi* Decree undermined claimants' legitimate expectations[951]. The tribunal recognized that Italy had a right to regulate, but considered that Italy had waived its right to reduce the tariffs through its repeated and specific assurances that the tariffs would remain fixed for two decades[952].

822. Prof. Sacerdoti, in turn, found that as to legitimate expectations, an investor protected by Art. 10(1) is only entitled to expect that it will be treated fairly and equitably, in particular by enjoying stable conditions[953]. Furthermore, Prof. Sacerdoti noted that[954]:

> "'Legitimate expectation' includes also the expectation that even when authorities are empowered under their domestic law to modify an existing regulation, affecting thereby negatively holders of rights who do not benefit from a stabilization protection against such changes, these authorities should take care to effect the changes in a way that does not hurt unreasonably or arbitrarily the right holders."

823. Ultimately, Prof. Sacerdoti found that there was no breach of the FET provision[955]. Indeed, Prof. Sacerdoti was of the view that a prudent investor should have foreseen that a limited tariff modification might have been subsequently enacted, notwithstanding the tariff provisions in place at the making of the investment[956].

### (ii)    *CEF Energia* (January 2019)

824. One month later, the *CEF Energia* tribunal issued its award (by majority, with Prof. Sacerdoti also dissenting)[957]. The outcome was strikingly different.

825. Claimant CEF Energia controlled three project companies (Megasol, Phenix and Enersol), which each owned a PV plant[958]. The Tribunal distinguished between the three investments, depending on when the Tariff Confirmation Letters and the *Convenzioni* had been executed: the tribunal essentially distinguished between

---

[951] Doc. CL-9, *Greentech*, para. 455.
[952] Doc. CL-9, *Greentech*, paras. 450-453.
[953] *Greentech*, Prof. Sacerdoti's dissenting opinion, para. 5.
[954] *Greentech*, Prof. Sacerdoti's dissenting opinion, para. 6.
[955] *Greentech*, Prof. Sacerdoti's dissenting opinion, paras. 47-48.
[956] *Greentech*, Prof. Sacerdoti's dissenting opinion, para. 48.
[957] Doc. CL-44. Arbitral tribunal: Mr. Klaus Reichert (Pr.), Prof. Dr. Klaus Sachs, Prof. Giorgio Sacerdoti.
[958] Doc. CL-44, *CEF Energia*, paras. 151-162.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

greenfield and brownfield investments, finding that brownfield investments generated legitimate expectations, while greenfield investments did not[959].

826. The brownfield investment was Enersol: the plant's Tariff Confirmation Letters and the *Convenzioni* pre-dated the investment. The tribunal found that in this case the reduction of tariffs under the *Spalma-incentivi* Decree violated claimant's legitimate expectations – in breach of Art. 10(1) of the ECT[960]. The tribunal, however, did not find any further breach of Art. 10(1)[961].

827. The greenfield investments were those in Megasol and Phenix; here the investor had acquired the investment before the Tariff Confirmation Letters and the *Convenzioni* had been issued, at a time when none of the plants had been connected to the grid. The tribunal found that when making these investments, claimant still had a number of steps to take before it knew for certain that the incentives would be awarded to the plants[962]. Claimant "enjoyed no guarantee of success at the time of investment, and nothing in any of Respondent's *Conti* could infer that a party in Claimant's position as of such dates was inevitably going to be awarded incentives" [963], and consequently claimant was barred from assessing a claim for legitimate expectations.

828. The tribunal in *CEF Energia* did not discuss the changes in the MGP Regime[964].

(iii) *Belenergia* (August 2019)

829. Six months later, the tribunal in *Belenergia* rendered its (unanimous) decision[965]. It disagreed with the decisions in the previous two awards, sided with Prof. Sacerdoti's dissent in *CEF Energia* and found for Italy.

830. In *Belenergia* the investor argued that Italy had undertaken explicit and implicit specific commitments under the 2003 Legislative Decree, the *Romani* Decree, the *Conto* Program, the *Convenzioni* and the MGP Regime[966]. The tribunal, however, found that the regulatory changes enacted by Italy did not amount to a breach of Art. 10(1) of the ECT[967] for several reasons:

- Belenergia could not have derived legitimate expectations from purported commitments granted under the *Convenzioni*, since these post-dated the Tariff Confirmation Letters (which had first confirmed the tariff to which the plants would be entitled), and in any case, the changes in the *Convenzioni* had been made as part of the exercise of *puissance publique*[968];

---

[959] Doc. CL-44, *CEF Energia*, paras. 188-190.
[960] Doc. CL-44, *CEF Energia*, paras. 189-191 and 244.
[961] Doc. CL-44, *CEF Energia*, para. 255.
[962] Doc. CL-44, *CEF Energia*, paras. 187-188.
[963] Doc. CL-44, *CEF Energia*, paras. 188-189.
[964] Doc. CL-44, *CEF Energia*, para. 260.
[965] Doc. CL-45. Arbitral tribunal: Mr. Yves Derains (Pr.), Prof. Bernard Hanotiau, Prof. José Carlos Fernández Rosas.
[966] Doc. CL-45, *Belenergia*, para. 573.
[967] Doc. CL-45, *Belenergia*, para. 611.
[968] Doc. CL-45, *Belenergia*, para. 579.

-    The contractual 20-year term, which originally applied to the tariffs, and the prohibition of unilateral changes contained in the *Convenzioni* could not be considered a stabilization clause[969];

-    The *Contrati per il Rittiro* could also not give rise to legitimate expectations because they had a yearly duration and were subject to modifications pursuant to Art. 4[970];

-    The legal and regulatory framework before the *Spalma-incentivi* Decree and the *Destinazione Italia* Decree could not have created legitimate expectations in relation to the tariffs and the MGP, because any prudent investor should have expected that the legal and regulatory scheme would change – particularly if such investor compared the Italian PV incentives scheme with those of other European countries, which were much lower[971];

-    The due diligence reports presented by Belenergia did not show that it had considered the regulatory risks in Italy[972];

-    When Belenergia invested, Italy had already enacted the *Romani* Decree and *Conto* IV, and both provided for a need to reduce the burden on consumers through the progressive reduction in tariffs[973];

-    The reduction in tariffs in the *Spalma-incentivi* Decree was "not surprising in light of Italy's previous significant reductions of incentives to new plants entering into operation before Belenergia first invested in Italy in September 2011"[974];

-    Any prudent investor should have predicted that Italy would abrogate the possibility for an investor to cumulate MGP and FiT[975].

  (iv)   *ESPF* (September 2020)

831.    Six months thereafter, the tribunal in *ESPF* issued its award[976]. The decision was analogous to that reached by the tribunal in *Greentech*: the tribunal (by majority) found that Italy had breached the investor's legitimate expectations, while Prof. Boisson de Chazournes dissented, with similar arguments to those of Prof. Sacerdoti's opinion in *CEF Energia.*

832.    As regards the *Conto* Program, the *ESPF* tribunal found that *Conti* II, III and IV gave rise to a specific commitment that the tariffs would remain unaffected for 20 years, that such assurances were repeated in the Tariff Confirmation Letters and the

---

[969] Doc. CL-45, *Belenergia*, para. 580.
[970] Doc. CL-45, *Belenergia*, para. 581.
[971] Doc. CL-45, *Belenergia*, paras. 583-584 and 596.
[972] Doc. CL-45, *Belenergia*, para. 585.
[973] Doc. CL-45, *Belenergia*, paras. 588-589.
[974] Doc. CL-45, *Belenergia*, para. 594.
[975] Doc. CL-45, *Belenergia*, para. 600.
[976] Doc. CL-8. Arbitral tribunal: Mr. Henri Alvarez (Pr.), Dr. Michael C. Pryles, Prof. Laurence Boisson de Chazournes.

*Convenzioni*, and, therefore, formed the basis of the investor's legitimate expectations; the regulatory change brought by the *Spalma-incentivi* violated such legitimate expectations[977].

833. With regard to the MGP Regime, however, the tribunal found for Italy: the investors could not have any legitimate expectations that the MGPs would remain unaltered[978].

(v)   *SunReserve* (March 2020)

834. Nine months thereafter, it was the turn of the *SunReserve* tribunal to issue its award[979]. It came to the same conclusion as the *Belenergia* tribunal, unanimously dismissing the investors' claims.

835. The three Luxembourg claimants in this arbitration had invested at different times and all argued that Italy had breached the FET standard in Art. 10(1). The tribunal again distinguished between different claimants, depending on the timing of the investment:

836. (i) Certain claimants could not have relied upon any expectations from the Tariff Confirmation Letters or *Convenzioni*, because such documents did not exist at the time claimants decided to invest in the PV plants. Their expectations when deciding to invest could only be derived from three sources:

-     The EU Directives,

-     The relevant *Conti*, and

-     The public statements made by Italian public officials to promote the tariff regime[980].

837. These three sources did not create any legitimate expectation that the tariffs would be fixed for 20 years; the only expectation that claimants could have when acquiring their shares in the operating companies was that, once the plants qualified for the incentives scheme, they would be ensured a "fair remuneration" in accordance with the 2003 Legislative Decree[981].

838. (ii) The reasoning was different for the claimant which had acquired the plant after the Tariff Confirmation Letter had been issued[982]; its expectations were also limited to receiving a fair remuneration, because the Tariff Confirmation Letter and the *Convenzione* were of an "accessory" nature and could not have created any expectations beyond what the overall regulatory regime had created[983]. The

---

[977] Doc. CL-8. *ESPF*, para. 566.
[978] Doc. CL-8. *ESPF*, para. 638.
[979] Doc. CL-46, *SunReserve*. Arbitral tribunal: Prof. Dr. Albert Jan Van den Berg (Pr.), Prof. Dr. Klaus Sachs, Prof. Andrea Giardina.
[980] Doc. CL-46, *SunReserve*, paras. 778, 785.
[981] Doc. CL-46, *SunReserve*, paras. 819 and 830.
[982] Doc. CL-46, *SunReserve*, para. 786.
[983] Doc. CL-46, *SunReserve*, paras. 821-830.

*Spalma-incentivi* Decree did not frustrate the investor's legitimate expectations of a fair remuneration[984] and was justified by public interest[985], carried out transparently and consistently (it was not a solitary or unexpected instance of remodulation of the incentive tariff regime)[986], in accordance with the principle of good faith[987]; thus, there was no breach of the FET standard[988].

839. As regards the MGP Regime, the tribunal concluded that the investors could not have formed any legitimate expectations that would have remained unaffected in terms of range and eligibility criteria; the regulatory changes were in any case justified[989].

(vi) *Silver Ridge* (February 2021)

840. *Silver Ridge*[990] is the most recent decision on the record, taken by majority (Judge Thomas Johnson dissenting); in this case, the award, which echoes the previous decisions in *Belenergia* and *SunReserve*, dismissed claimant's claims and found for Italy.

841. Silver Ridge, a Dutch company, indirectly owned a company incorporated in Italy, which in turn controlled ten local development companies, that owned and operated 25 PV plants[991]. The tribunal was called upon to analyze whether the *Spalma-incentivi* Decree, the *Romani* Decree, the *Conto IV* and the *Conto V* had breached Art. 10(1) of the ECT. As to the alleged breach of the FET standard, the tribunal found that:

- Specific commitments by a State can give rise to legitimate expectations of investors and, in the absence of specific commitments, the FET standard protects foreign investors from fundamental or radical modifications to the legal framework in which the investment was made[992];

- For a specific commitment to create legitimate expectations, there must be an individual agreement between the host State and a specific investor[993]; however, a State may make specific commitments to investors also by virtue of legislative or regulatory acts which are not addressed to particular individuals, provided that these acts are sufficiently specific regarding their content and their object and purpose – particularly if such acts were adopted "with a specific aim" to induce investments[994];

---

[984] Doc. CL-46, *SunReserve*, paras. 863-871.
[985] Doc. CL-46, *SunReserve*, para. 855.
[986] Doc. CL-46, *SunReserve*, paras. 911-913.
[987] Doc. CL-46, *SunReserve*, para. 920.
[988] Doc. CL-46, *SunReserve*, para. 871.
[989] Doc. CL-46, *SunReserve*, paras. 889 *et seq*.
[990] Doc. CL-47. Arbitral tribunal: Judge Bruno Simma (Pr.), Judge O. Thomas Johnson, Prof. Bernardo Cremades.
[991] Doc. CL-47, *Silver Ridge*, para. 107.
[992] Doc. CL-47, *Silver Ridge*, para. 402.
[993] Doc. CL-47, *Silver Ridge*, para. 407.
[994] Doc. CL-47, *Silver Ridge*, para. 408.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

- Italy did not make any specific commitment in its regulatory framework to maintain the duration or amount of the incentives set forth in the *Conto* Program; however, this framework did give rise to a legitimate expectation for all PV investors that the tariff regime would not be completely eradicated or fundamentally altered[995].

842. The *Spalma-incentivi* Decree's tariff reduction did not amount to a radical or fundamental alteration of the regulatory framework, given that the change was reasonable, foreseeable and proportionate. Therefore, the tribunal found that there was not a violation of the FET standard[996].

\* \* \*

843. <u>In sum</u>, of the six cases that analyzed whether the *Spalma-incentivi* Decree and the MGP Regime had breached the "legitimate expectations" of investors:

- Three tribunals (*Belenergia*, *SunReserve* and *Silver Ridge*) have found for the Republic and have dismissed the investors' claims (in the first two cases by unanimity, in the last by majority);

- Two tribunals have adopted the contrary position, finding for claimants (*Greentech*, *ESPF*) and deciding that the *Spalma-incentivi* Decree had breached the FET standard; in both cases there was a dissent;

- There is a third way, adopted by the majority in *CEF Energia,* which distinguishes between greenfield and brownfield investments, accepts that brownfield investments with existing Tariff Confirmation Letters and the *Convenzioni* can invoke legitimate expectations (but not breaches of the Impairment or the Umbrella Clauses) and dismisses all claims for greenfield investments;

- The prior awards are unanimous in dismissing all claims based on changes in the MGP Regime.

844. The relevant prior awards are divided but also not binding on subsequent adjudicators. This Tribunal in any case has conducted its own analysis and, on that basis, and after carefully considering the Parties' arguments, has come to the conclusion that Claimants' claim that the Republic has breached the ECT's FET standard must be dismissed.

---

[995] Doc. CL-47, *Silver Ridge*, paras. 437 and 444.
[996] Doc. CL-47, *Silver Ridge*, paras. 474-475.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

6.    **CONCLUSION**

845.    The Parties had agreed that, to solve this dispute, the Tribunal had to answer the following four questions[997]:

-    Has Italy, by promulgating the Disputed Measures, failed to provide stable and transparent conditions towards Claimants' investments in breach of the stable conditions requirement under Art. 10(1) of the ECT?

-    Has Italy, by promulgating the Disputed Measures, breached the ECT's non-impairment requirement under Art. 10(1)?

-    Has Italy, by promulgating the Disputed Measures, breached Claimants' "legitimate expectations" so as to constitute violation of the ECT's FET standard under Art. 10(1)?

-    Has Italy, by promulgating the *Spalma-incentivi* Decree, breached the ECT's Art. 10(1) Umbrella Clause[998]?

846.    After carefully analyzing the Parties' arguments and reviewing the evidence marshalled, and considering that "the overall standard to establish a breach of the FET obligation is high"[999], the Tribunal has concluded that all the questions must be answered in the negative – the result being that Claimants' claim that Italy has violated Art. 10(1) of the ECT is dismissed.

847.    There are four factors which have weighed heavily in the Tribunal's overall finding:

-    The first is that the Disputed Measures were all general regulatory enactments made by a sovereign, properly approved and enacted in accordance with municipal administrative law, intended to apply to an entire, heavily regulated sector, and promulgated in the furtherance of the common good;

-    The second is that the Disputed Measures were not targeted at Claimants specifically and not intended to abuse, harass, or discriminate against foreign investors – in fact they applied equally to Italian and non-Italian investors[1000];

-    The third is that the Constitutional Court of the Italian Republic reviewed a constitutional challenge against Art. 26(2) and (3) of the *Spalma-incentivi* Decree, and in its seminal Decision No. 16/2017 dismissed such challenge: the Court confirmed that the *Convenzioni* were "accessory to the provisions granting the incentives"[1001], that they "cannot be qualified as contracts meant to determine the exclusive profit of the operator […] they are instead

---

[997] Parties' Pre-Hearing Joint Submission – Regulatory Chronology, p. 20. See also R-PHB, para. 4.
[998] As amended at the Hearing (HT, Day 4, p. 904, ll. 15-20 and p. 905, ll. 3-8).
[999] Doc. CL-46, *SunReserve*, para. 688; Doc. CL-47, *Silver Ridge*, para. 469.
[1000] Doc. RL-50, *Eskosol* (Award), paras. 381-382.
[1001] Doc. R-18, Law, para. 11.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

regulatory instruments [...]"[1002], and do not create autonomous obligations[1003];

- The fourth and final one is that prior investment awards, although not unanimous, to a large extent support the findings of this Tribunal; the Tribunal has drawn inspiration and largely agrees with the reasoning in *Sunreserve*, in *Silver Ridge* and in Prof. Sacerdoti's dissenting opinion in *Greentech*.

---

[1002] Doc. R-18, Law, para. 8.3.
[1003] Doc. R-18, Law, para. 11, *in fine*.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

# VII. <u>COSTS</u>

849. Both Parties seek an award of costs[1004] and they have each filed statements of costs, pursuant to Art. 28(2) of the ICSID Arbitration Rules and the Tribunal's instructions [Claimants' will be referred to as "**C-SC**" and Respondent's as "**R-SC**"].

850. The Tribunal will summarize the Parties' requests (**1.** and **2.**) and will then adopt its decision (**3.**).

## 1.  CLAIMANTS' POSITION

851. Claimants argue that the Tribunal enjoys wide discretion to allocate costs between the Parties. If Claimants prevail in this arbitration, they are entitled to full compensation for all the consequences of Italy's breaches, including the costs Claimants have had to incur with this arbitration[1005].

852. Claimants argue that their costs, fees and expenses are reasonable, considering the length of the proceedings, the complexity of the case, the amount in dispute, and the harm caused by Italy's violations. Such costs amount to EUR 2,431,566[1006] plus USD 525,000, divided as follows[1007]:

| Category | Amount |
|---|---|
| **Legal fees and expenses** | |
| King & Spalding's legal fees | EUR 1,600,000 |
| FTI Consulting's fees and expenses | EUR 708,166 |
| Claimants' costs and expenses (travel, translation, etc.) | EUR 123,400 |
| **Total** | **EUR 2,431,566** |
| **Administrative Costs** | |
| ICSID lodging fee | USD 25,000 |
| Initial advance on costs | USD 150,000 |
| Second advance on costs | USD 250,000 |
| Third advance on costs | USD 100,000 |
| **Total** | **USD 525,000** |

853. Claimants ask that Italy be ordered to pay all these costs and expenses, plus post-award interest, at a compound rate of interest to be determined by the Tribunal, until the date of Italy's full satisfaction of the Tribunal's award[1008].

## 2.  RESPONDENT'S POSITION

854. Respondent, in turn, asks that the Tribunal order Claimants to pay the expenses incurred by Italy in connection with these proceedings, including professional fees

---

[1004] C-I, para. 428; C-II, para. 639; C-III, para. 237; C-SC, para. 2; R-I, para. 662(j); R-II, para. 663(b).
[1005] C-SC, paras. 3-5.
[1006] All figures have been rounded.
[1007] C-SC, paras. 7-9.
[1008] C-SC, paras. 10-11.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

and disbursements[1009]. Respondent has quantified its costs and expenses as follows[1010]:

| Category | Amount |
|---|---|
| **Legal fees and expenses** | |
| **Jurisdiction** | |
| Attendances (personal attendances, telephones, letters, e-mails) | EUR 150,000 |
| Legal fees | EUR 350,000 |
| **Merits** | |
| Attendances (personal attendances, telephones, letters, e-mails) | EUR 500,000 |
| Legal fees | EUR 500,000 |
| Costs (translation, expertise, other expenses) | EUR 250,000 |
| Attendance at hearing (travel, hotel, etc.) | EUR 15,000 |
| **Total** | **EUR 1,765,000** |
| **Administrative Costs** | |
| Initial advance on costs | USD 150,000 |
| Second advance on costs | USD 250,000 |
| Third advance on costs | USD 100,000 |
| **Total** | **USD 500,000** |

## 3. DECISION OF THE TRIBUNAL

855. Pursuant to Art. 61(2) of the ICSID Convention:

> "In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award."

856. Neither the ICSID Convention nor the ICSID Arbitration Rules contain any further guidance on how costs should be allocated between the Parties. The ECT is equally silent.

857. There are two types of costs incurred by the Parties with these proceedings:

- The expenses incurred in connection with their respective legal defenses (counsel's fees, expenses with expert witnesses, disbursements, travel and accommodation, etc.) ["**Defense Expenses**"]; and

- The lodging fee and advances on costs paid to ICSID (including the fees and expenses of the members of the Tribunal and the Tribunal's Assistant, ICSID's administrative fees and direct expenses) ["**Administrative Costs**"].

---

[1009] R-I, para. 662(j); R-II, para. 663.
[1010] R-SC (Jurisdiction and Merits).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

Criteria for cost allocation

858. ICSID tribunals enjoy broad discretion when deciding how and by whom the expenses incurred by the Parties in connection with the proceedings shall be borne. Many investment tribunals have decided that each party shall bear half of the Administrative Costs and its own Defense Expenses[1011]; when departing from this criterium, tribunals generally take into account, *inter alia*, the relative success of the parties on the issues presented, the conduct of the parties throughout the proceedings, and the nature of the different costs[1012].

Decision

859. In the present case, the Parties have each succeeded and failed in certain respects:

- The Tribunal has dismissed all jurisdictional objections put forward by Italy;

- The Tribunal has also dismissed Claimants' case on the merits on all grounds, with the consequence that no compensation is due to Claimants.

860. Italy seems like the overall winner of the arbitration, since its thesis – that it has not breached the ECT and international law – has ultimately prevailed. Nevertheless, the Tribunal must also consider that:

- Italy's jurisdictional objections added a further layer of complexity to the proceedings; and

- Claimants' claims were not frivolous; it may not have been readily apparent to a foreign investor that the *Convenzioni* were accessory contracts, and it is possible that Claimants may have misunderstood the protections that were being afforded to them – even more so when prior awards that analyzed Italy's conduct in an analogous factual situation have reached different conclusions and outcomes.

861. After duly considering all circumstances of this case, the Tribunal orders each Party to bear (i) half of the Administrative Costs (except that Claimants shall bear the entirety of the lodging fee) and (ii) its own Defense Expenses.

862. The Administrative Costs, including the fees and expenses of the Tribunal and the Tribunal's Assistant, ICSID's administrative fees and direct expenses, amount to a total of USD 828,426.91, as follows:

Arbitrators' fees and expenses
Prof. Juan Fernández-Armesto        USD 287,290.40
Ms. Wendy Miles KC                  USD 94,200.00
Mr. Alexis Mourre                   USD 152,006.77

---

[1011] See, e.g., Doc. CL-45, *Belenergia*, paras. 642 and 647; Doc. CL-47, *Silver Ridge*, paras. 634-636; Doc. RL-50, *Eskosol* (Award), paras. 493-494; C. H. Schreuer et al., *The ICSID Convention – A Commentary*, Second Edition (2009), Cambridge University Press, pp. 1232-1235.
[1012] See, e.g., Doc. CL-8, *ESPF*, para. 943; C. H. Schreuer et al., *The ICSID Convention – A Commentary*, Second Edition (2009), Cambridge University Press, pp. 1228-1232.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| | |
|---|---|
| Assistant to the Tribunal's expenses | USD 4,312.15 |
| ICSID administrative fees | USD 178,000.00 |
| Direct Expenses (estimated) | USD 112,617.59 |
| **Total** | **USD 828,426.91** |

863. These Administrative Costs have been paid out of the advances made by the Parties in equal parts[1013]. As a result, each Party's share of the Administrative Costs amounts to USD 414,213.45[1014].

---

[1013] In addition, Claimants have paid a lodging fee of USD 25,000.
[1014] The remaining balance will be reimbursed to the Parties in proportion to the payments that they advanced to ICSID.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

# VIII. <u>DECISION</u>

864.  For the reasons set forth above, the Arbitral Tribunal unanimously rules as follows:

1.   Declares that the Center has jurisdiction and the Tribunal competence over this dispute under the ICSID Convention and the Energy Charter Treaty;

2.   Declares that the Italian Republic did not violate Art. 10(1) of the Energy Charter Treaty, first, second, fourth or last sentences or international law;

3.   Declares that no compensation is due to Claimants;

4.   Orders each Party to bear (i) half of the Administrative Costs and (ii) its own Defense Expenses;

5.   Dismisses any other prayers for relief by the Parties.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

[signed]

_____          _____
Ms. Wendy Miles, KC                                    Mr. Alexis Mourre
Arbitrator                                                       Arbitrator

Date: 24 February 2024                              Date:

_____
Prof. Juan Fernández-Armesto
President of the Tribunal

Date:

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award


[signed]

_____        _____
Ms. Wendy Miles, KC                                Mr. Alexis Mourre
Arbitrator                                                    Arbitrator


Date:                                                           Date: 26 February 2024



_____
Prof. Juan Fernández-Armesto
President of the Tribunal

Date:

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

_____          _____
Ms. Wendy Miles, KC                              Mr. Alexis Mourre
Arbitrator                                              Arbitrator

Date:                                                  Date:

[signed]

_____
Prof. Juan Fernández-Armesto
President of the Tribunal

Date: 6 March 2024

201

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

# ANNEX

## A.    Claimants CHORUS Solar Foggia Due/Nove S.r.l.

### a.    The investments

865.  Eight of the Operating Companies in this arbitration are Italian companies, incorporated between April and June 2009, and named "CHORUS Solar Foggia", each distinguished with numbers "*Due*" (two) to "*Nove*" (nine)[1015].

866.  On 28 July 2009, each of these Claimants – then named Winch Puglia Foggia Due to Nove S.r.l. – concluded a "Contract for Work and Services on Engineering Services for the Installation, Construction and Commissioning of a Photovoltaic Power Plant" with a German developer (named a+f GmbH, through its sister company a+f Italia S.r.l.) for the construction of nine PV plants, each under 1 MW[1016]:

| Claimant | Plant name | EPC Contract | Installed capacity |
|---|---|---|---|
| CHORUS Solar Foggia Due S.r.l. | Caputo Alessandro 1 | **Doc. C-220**<br>EPC Contract (28 July 2009) | 999 kW |
| | Placentino Arcangela | **Doc. C-221**<br>EPC Contract (28 July 2009) | 994.5 kW |
| CHORUS Solar Foggia Tre S.r.l. | Placentino Nunziata 2 | **Doc. C-231**<br>EPC Contract (28 July 2009) | 994.5 kW |
| CHORUS Solar Foggia Quattro S.r.l. | Francavilla Giuseppe | **Doc. C-234**<br>EPC Contract (28 July 2009) | 985.8 kW |
| CHORUS Solar Foggia Cinque S.r.l. | Francavilla Nicola | **Doc. C-238**<br>EPC Contract (28 July 2009) | 988.98 kW |
| CHORUS Solar Foggia Sei S.r.l. | Salvatore Patrizia | **Doc. C-243**<br>EPC Contract (28 July 2009) | 985.8 kW |
| CHORUS Solar Foggia Sette S.r.l. | Caputo Alessandro 2 | **Doc. C-248**<br>EPC Contract (28 July 2009) | 993 kW |
| CHORUS Solar Foggia Otto S.r.l. | Placentino Giuseppe | **Doc. C-251**<br>EPC Contract (28 July 2009) | 994.5 kW |
| CHORUS Solar Foggia Nove S.r.l. | Schiavone Francesco 2 | **Doc. C-256**<br>EPC Contract (28 July 2009) | 998.52 kW |

867.  On 29 December 2009 CHORUS entered into project agreements with a+f GmbH, by which the latter undertook to ensure that the sale and transfer of all shares in Winch Puglia Foggia Due to Nove would be irrevocably offered to CHORUS. The conclusion of the purchase and transfer agreement was conditional, *inter alia*, on each project company obtaining a "power purchase contract", with the right to a specific tariff under *Conto* II for 20 years. The transfer of shares between Winch

---

[1015] Prior to their acquisition by the CHORUS Group, these Claimants were named "Winch Puglia Foggia" with the respective number "*Due*" to "*None*" (See Doc. C-2.45, p. 8 [CHORUS Solar Foggia Due S.r.l.]; Doc. C-2.57, p. 7 Italian version [CHORUS Solar Foggia Tre S.r.l.]; Doc. C-2.51, p. 7 [CHORUS Solar Foggia Quattro S.r.l.]; Doc. C-2.43, p. 7 [CHORUS Solar Foggia Cinque S.r.l.]; Doc. C-2.53, p. 7 [CHORUS Solar Foggia Sei S.r.l.]; Doc. C-2.55, p. 7 [CHORUS Solar Foggia Sette S.r.l.]; Doc. C-2.49, p. 7 [CHORUS Solar Foggia Otto S.r.l.]; Doc. C-2.47, p. 7 [CHORUS Solar Foggia Nove S.r.l.], with the register of each of these companies).
[1016] Docs. C-220, C-221, C-231, C-234, C-238, C-243, C-248, C-251, C-256; Scharrer I, para. 16. See also Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

Energia S.r.l. and CHORUS seems to have occurred little less than a year later, in November 2010:

| Claimant | Project Agreements | Deed of transfer |
|---|---|---|
| CHORUS Solar Foggia Due S.r.l. | **Doc. C-224** Project Contract between a+f GmbH and CHORUS (29 December 2009) | See **Doc. C-2.45, p. 7** (Italian version) Date of deed: 3 November 2010 |
| CHORUS Solar Foggia Tre S.r.l. | **Doc. C-687** Project Contract between a+f GmbH and CHORUS (29 December 2009) | See **Doc. C-2.57, p. 7** Date of deed: 3 November 2010 |
| CHORUS Solar Foggia Quattro S.r.l. | **Doc. C-235** Project Contract between a+f GmbH and CHORUS (29 December 2009) | See **Doc. C-2.51, p. 7** Date of deed: 3 November 2010 |
| CHORUS Solar Foggia Cinque S.r.l. | **Doc. C-239** Project Contract between a+f GmbH and CHORUS (29 December 2009) | See **Doc. C-2.43, p. 7** Date of deed: 3 November 2010 |
| CHORUS Solar Foggia Sei S.r.l. | **Doc. C-244** Project Contract between a+f GmbH and CHORUS (29 December 2009) | See **Doc. C-2.53, p. 7** Date of deed: 3 November 2010 |
| CHORUS Solar Foggia Sette S.r.l. | **Doc. C-645** Project Contract between a+f GmbH and CHORUS (29 December 2009) | See **Doc. C-2.55, p. 7** Date of deed: 3 November 2010 |
| CHORUS Solar Foggia Otto S.r.l. | **Doc. C-252** Project Contract between a+f GmbH and CHORUS (29 December 2009) | See **Doc. C-2.49, p. 7** Date of deed: 3 November 2010 |
| CHORUS Solar Foggia Nove S.r.l. | **Not on case record** Project Contract between a+f GmbH and CHORUS (29 December 2009[1017]) | See **Doc. C-2.47, p. 7** Date of deed: 3 November 2010 |

Due diligence

868. Prior to the acquisition, CHORUS requested Latham & Watkins to prepare due diligence reports regarding several of the plants[1018]. Latham & Watkins noted that the decisive factor for the value of the tariff was the date of commissioning of the plant, adding[1019]:

> "The feed-in tariff is legally recognized under Article 6 No. 1 of the Ministerial Decree of February 19, 2007 for a period of 20 years from the date of commissioning."

869. And on 22 December 2010 each of these Claimants contracted with Commerzbank in Hamburg for a facilities agreement of approximately EUR 43 million to finance

---

[1017] C-I, fn. 322.
[1018] See Doc. C-225, p. 2; Doc. C-226; Doc. C-227; Doc. C-228; Doc. C-236; Doc. C-240; Doc. C-245; Doc. C-253.
[1019] See, e.g., Doc. C-226, p. 38; Doc. C-227, p. 40; Doc. C-228, p. 40; Doc. C-236, p. 36; Doc. C-240, p. 36; Doc. C-245, p. 37; Doc. C-253, p. 39.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

their nine PV plants[1020]. The facilities agreement required that Claimants provide the bank with[1021]:

"(a) [...] (i) evidence of the due execution of the [*Convenzione*] related to each Plant, showing that the Tariff provided under Article 6 of the Solar Decree has been granted; and (ii) evidence that the Commercial Operation Date has occurred in respect of its Plant.

(b) Each Borrower shall maintain in place and renew from time to time the [*Contratti per il Ritiro*] with the GSE in respect of its Plant from no later than the date on which the [*Convenzione*] mentioned in paragraph (a) above is signed up to, at least, the last Termination Date and shall promptly provide copies of each signed [*Contratto per il Ritiro*] to the Agent."

### b.    Rights obtained

(i)    *Conto* Program

870.    Each of the PV plants of CHORUS Solar Foggia Due to Nove was constructed and connected to the grid between May 2010 and May 2011. Each Operating Company received a Tariff Confirmation Letter from the GSE, confirming that their PV plants would be entitled to receive a tariff of EUR 0.3460/kWh, per *Conto* II, for a period of 20 years. Thereafter, each of these Operating Companies – already with their new denomination, CHORUS Solar Foggia Due to Nove – executed a *Convenzione* with the GSE:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | Tariff | *Convenzione* |
|---|---|---|---|---|---|
| CHORUS Solar Foggia Due S.r.l. | Caputo Alessandro 1 (999 kW) | 23 September 2010 | **Doc. C-222** (3 January 2011) "With reference to the photovoltaic plant in question, named CAPUTO ALESSANDRO 1, we hereby inform you of acceptance for the incentive rate established by the Interministerial Decree of February 19, 2007 in the amount of Euro 0.3460/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 09/23/2010; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3460/kWh (*Conto* II) | **Doc. C-640** (31 March 2011) Art. 2: "For a period of twenty years from 09/23/2010, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh" |
| | Placentino Arcangela (994.5 kW) | 20 December 2010 | **Doc. C-223** (16 June 2011) "With reference to the photovoltaic plant in question, named PLACENTINO ARCANGELA, we hereby inform you of acceptance for the incentive rate established by the Interministerial Decree of February 19, 2007 in the amount of Euro 0.3460/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 12/20/2010; the rate is at a | EUR 0.3460/kWh (*Conto* II) | **Doc. C-641** (4 July 2011) Art. 2: "For a period of twenty years from 12/20/2010, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |

---

[1020] Doc. C-257. On 22 February 2011 the parties amended the original facilities agreement to add CHORUS Solar Foggia Due S.r.l., CHORUS Solar Foggia Tre S.r.l., CHORUS Solar Foggia Otto S.r.l., and CHORUS Solar Foggia Quattro S.r.l. as additional borrowers (Doc. C-258).
[1021] Doc. C-257, Art. 28.3(a) and (b). See also Doc. C-258, Art. 6.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| | | | constant level in current values for the entire twenty-year period." | | |
|---|---|---|---|---|---|
| CHORUS Solar Foggia Tre S.r.l. | Placentino Nunziata 2 (994.5 kW) | 27 December 2010 | **Doc. C-232** (16 June 2011) Missing from case record. | EUR 0.3460/kWh (*Conto* II) | **Doc. C-642** (4 July 2011) Art. 2: "For a period of twenty years from 12/27/2010, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |
| CHORUS Solar Foggia Quattro S.r.l. | Francavilla Giuseppe (985.9 kW) | 3 May 2011 | According to Claimants, CHORUS Solar Foggia Quattro S.r.l. obtained a Tariff Confirmation Letter on 10 November 2011; this letter, however, is not on the case record. The *Convenzione* (Doc. C-639) does recognize that the GSE did send a Confirmation Letter: "*che il GSE, con propria lettera ha comunicato al Produttore il valore della tariffa incentivante, riconosciuta all'impianto fotovoltaico di cui sopra, pari a 0,3460 €/kWh.*" | EUR 0.3460/kWh (*Conto* II) | **Doc. C-639** (29 November 2011) Art. 2: "For a period of twenty years from 05/03/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |
| CHORUS Solar Foggia Cinque S.r.l. | Francavilla Nicola (988.98 kW) | 28 May 2010 | **Doc. C-241** (11 August 2010) "*Con riferimento all'impianto fotovoltaico in oggetto, denominato FRANCAVILLA NICOLA, Vi comunichiamo l'ammissione alla tariffa incentivante prevista dal Decreto interministeriale 19 febbraio 2007 nella misura di 0,3460 euro/kWh. La tariffa incentivante Vi sarà riconosciuta per un periodo di venti anni continuativi a decorrere dalla data, da Voi comunicataci, di entrata in esercizio dell'impianto: 28/05/2010; la tariffa è costante, in moneta corrente per tutto il periodo di venti anni.*" | EUR 0.3460/kWh (*Conto* II) | **Doc. C-643** (26 August 2010) Art. 2: "For a period of twenty years from 05/28/2010, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |
| CHORUS Solar Foggia Sei S.r.l. | Salvatore Patrizia (985.8 kW) | 14 May 2010 | **Doc. C-246** (4 August 2010) "*Con riferimento all'impianto fotovoltaico in oggetto, denominato SALVATORE PATRIZIA, Vi comunichiamo l'ammissione alla tariffa incentivante prevista dal Decreto interministeriale 19 febbraio 2007 nella misura di 0,3460 euro/kWh. La tariffa incentivante Vi sarà riconosciuta per un periodo di venti anni continuativi a decorrere dalla data, da Voi comunicataci, di entrata in esercizio dell'impianto: 14/05/2010; la tariffa è costante, in moneta corrente per tutto il periodo di venti anni.*" | EUR 0.3460/kWh (*Conto* II) | **Doc. C-644** (26 August 2010) Art. 2: "For a period of twenty years from 05/14/2010, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |
| CHORUS Solar Foggia Sette S.r.l. | Caputo Alessandro 2 (993 kW) | 23 September 2010 | **Doc. C-249** (27 December 2010) "*Con riferimento all'impianto fotovoltaico in oggetto, denominato CAPUTO ALESSANDRO 2, Vi comunichiamo l'ammissione alla tariffa incentivante prevista dal Decreto interministeriale 19 febbraio 2007 nella misura di 0,3460 euro/kWh. La tariffa incentivante Vi sarà riconosciuta per un periodo di venti anni continuativi a decorrere dalla data, da Voi comunicataci, di entrata in esercizio dell'impianto: 23/09/2010; la tariffa è costante, in moneta corrente per tutto il periodo di venti anni.*" | EUR 0.3460/kWh (*Conto* II) | **Doc. C-646** (11 November 2011) Art. 2: "For a period of twenty years from 09/23/2010, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |
| CHORUS Solar Foggia Otto S.r.l. | Placentino Giuseppe (994.5 kW) | 29 December 2010 | **Doc. C-254** (9 September 2011) "*Con riferimento all'impianto fotovoltaico in oggetto, denominato PLACENTINO GIUSEPPE, Vi comunichiamo l'ammissione alla tariffa incentivante prevista dal Decreto* | EUR 0.3460/kWh (*Conto* II) | **Doc. C-647** (18 October 2011) Art. 2: "For a period of twenty years from 12/29/2010, the incentive |

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| | | | | | |
|---|---|---|---|---|---|
| | | | *interministeriale 19 febbraio 2007 nella misura di 0,3460 euro/kWh.*<br>*La tariffa incentivante Vi sarà riconosciuta per un periodo di venti anni continuativi a decorrere dalla data, da Voi comunicataci, di entrata in esercizio dell'impianto: 29/12/2010; la tariffa è costante, in moneta corrente per tutto il periodo di venti anni."* | | rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |
| CHORUS Solar Foggia Nove S.r.l. | Schiavone Francesco 2 (998.52 kW) | 14 May 2010 | **Doc. C-648** (3 August 2010)<br>"With reference to the photovoltaic plant in question, named SCHIAVONE FRANCESCO 2, we hereby inform you of acceptance for the incentive rate established by the Interministerial Decree of February 19, 2007 in the amount of Euro 0.3460/kWh.<br>The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 05/14/2010; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3460/kWh (Conto II) | **Doc. C-649** (26 August 2010)<br>Art. 2: "For a period of twenty years from 05/14/2010, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |

    (ii)   <u>MGP Regime</u>

871. Furthermore, each of the Claimants CHORUS Solar Foggia Due to Nove signed a *Contratto per il Ritiro* with the GSE, regulating the conditions in which the GSE would off-take electricity from their PV plants (all under 1 MW), and granting them access to the MGP Regime:

| Claimant | Plant name | *Contratto per il Ritiro* |
|---|---|---|
| CHORUS Solar Foggia Due S.r.l. | Caputo Alessandro 1 (999 kW) | **Doc. C-229** (31 May 2011)<br>Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| | Placentino Arcangela (994.5 kW) | **Doc. C-230** (31 May 2011)<br>Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| CHORUS Solar Foggia Tre S.r.l. | Placentino Nunziata 2 (994.5 kW) | **Doc. C-233** (31 May 2011)<br>Art. 4: "*I prezzi riconosciuti dal GSE al Produttore, per il ritiro dell'energia oggetto del presente Contratto, sono definiti dagli articoli 6 e 7 della delibera AEEG n. 280/07 ed eventuali successive modifiche ed integrazioni.*" |
| CHORUS Solar Foggia Quattro S.r.l. | Francavilla Giuseppe (985.9 kW) | **Doc. C-237** (17 June 2011)<br>Art. 4: "*I prezzi riconosciuti dal GSE al Produttore, per il ritiro dell'energia oggetto del presente Contratto, sono definiti dagli articoli 6 e 7 della delibera AEEG n. 280/07 ed eventuali successive modifiche ed integrazioni.*" |
| CHORUS Solar Foggia Cinque S.r.l. | Francavilla Nicola (988.98 kW) | **Doc. C-242** (31 May 2011)<br>Art. 4: "*I prezzi riconosciuti dal GSE al Produttore, per il ritiro dell'energia oggetto del presente Contratto, sono definiti dagli articoli 6 e 7 della delibera AEEG n. 280/07 ed eventuali successive modifiche ed integrazioni.*" |

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| | | |
|---|---|---|
| CHORUS Solar Foggia Sei S.r.l. | Salvatore Patrizia (985.8 kW) | **Doc. C-247** (1 December 2011) Art. 4: "*I prezzi riconosciuti dal GSE al Produttore, per il ritiro dell'energia oggetto del presente Contratto, sono definiti dagli articoli 6 e 7 della delibera AEEG n. 280/07 ed eventuali successive modifiche ed integrazioni.*" |
| CHORUS Solar Foggia Sette S.r.l. | Caputo Alessandro 2 (993 kW) | **Doc. C-247** (31 May 2011) Art. 4: "*I prezzi riconosciuti dal GSE al Produttore, per il ritiro dell'energia oggetto del presente Contratto, sono definiti dagli articoli 6 e 7 della delibera AEEG n. 280/07 ed eventuali successive modifiche ed integrazioni.*" |
| CHORUS Solar Foggia Otto S.r.l. | Placentino Giuseppe (994.5 kW) | **Doc. C-255** (31 May 2011) Art. 4: "*I prezzi riconosciuti dal GSE al Produttore, per il ritiro dell'energia oggetto del presente Contratto, sono definiti dagli articoli 6 e 7 della delibera AEEG n. 280/07 ed eventuali successive modifiche ed integrazioni.*" |
| CHORUS Solar Foggia Nove S.r.l. | Schiavone Francesco 2 (998.52 kW) | **Doc. C-650** (1 December 2011) Art. 4: "*I prezzi riconosciuti dal GSE al Produttore, per il ritiro dell'energia oggetto del presente Contratto, sono definiti dagli articoli 6 e 7 della delibera AEEG n. 280/07 ed eventuali successive modifiche ed integrazioni.*" |

### B.    Claimants CHORUS Solar Matino, Nardo and Casarano

#### a.    The investments

872. On 14 September 2009 Claimants CHORUS Solar Matino S.r.l.[1022], CHORUS Solar Nardo S.r.l.[1023] and CHORUS Solar Casarano S.r.l.[1024] each concluded a "Contract for Work and Services on Engineering Services for the Installation, Construction and Commissioning of a Photovoltaic Power Plant" also with a+f GmbH (through its sister company a+f Italia S.r.l.) for the construction of three PV plants, each under 1 MW[1025]:

| Claimant | Plant name | EPC Contract | Installed capacity |
|---|---|---|---|
| CHORUS Solar Matino S.r.l. | Matino | **Doc. C-259** EPC Contract (28 July 2009) | 972 kW |
| CHORUS Solar Nardo S.r.l. | Nardo | **Doc. C-738** EPC Contract (28 July 2009) | 972 kW |
| CHORUS Solar Casarano S.r.l. | Casarano | **Doc. C-266** EPC Contract (28 July 2009) | 997.92 kW |

873. On 11 and 12 January 2011, CHORUS Solar 3 S.r.l. & Co. S.a.S. ["**CHORUS Solar 3**"], a company of the CHORUS Group, entered into project agreements with a+f GmbH, by which the latter undertook to ensure that the sale and transfer of all shares in CHORUS Solar Matino, Nardo and Casarano would be irrevocably offered to CHORUS Solar 3 by 14 November 2011. The conclusion of the purchase

---

[1022] At the time named Matino S.r.l. (Doc. C-2.58, p. 23).
[1023] At the time named Figlia del Sole S.r.l. (Doc. C-2.39, p. 20).
[1024] At the time named Girasole Puglia S.r.l. (Doc. C-2.42, p. 19).
[1025] Scharrer I, para. 18. See also Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022.

and transfer agreement was conditional, *inter alia*, on each Operating Company obtaining (i) a Tariff Confirmation Letter, (ii) a *Convenzione* and a (iii) a *Conttrato per il Ritiro* from the GSE.

874. By late December 2011, Latham & Watkins delivered a due diligence report for each of the PV plants[1026]. The transfer of shares occurred by the end of 2011:

| Claimant | Project Agreements | Deed of transfer |
|---|---|---|
| CHORUS Solar Matino S.r.l. | **Doc. C-260** Project Contract between a+f GmbH and CHORUS Solar 3 (11 January 2011) | See **Doc. C-2.58**, p. 21 |
| CHORUS Solar Nardo S.r.l. | **Doc. C-263** Project Contract between a+f GmbH and CHORUS Solar 3 (12 January 2011) | See **Doc. C-39**, p. 21 |
| CHORUS Solar Casarano S.r.l. | **Doc. C-267** Project Contract between a+f GmbH and CHORUS Solar 3 (12 January 2011) | See **Doc. C-2.51**, p. 21 |

875. And on 22 December 2011 these Claimants entered into a facilities agreement with Commerzbank for EUR 11 million to finance their three PV plants[1027]. This facilities agreement required that[1028]:

> "(a) Each Borrower shall maintain in place and renew from time to time the [*Contratti per il Ritiro*] with the GSE in respect of its Plant up to, at least, the last Termination Date and shall promptly provide copies of each signed [*Contratto per il Ritiro*] to the Agent."

876. Furthermore, each company had to pledge the receivables obtained under the *Contratto per il Ritiro* to Commerzbank[1029].

**b.    Rights obtained**

(i)    *Conto* Program

877. Claimants CHORUS Solar Matino, Nardo and Casarano[1030] each received a Tariff Confirmation Letter from the GSE, confirming that their PV plants would be entitled to receive a tariff of EUR 0.3460/kWh (as per *Conto* II) for a period of 20 years. They also each executed a *Convenzione* with the GSE:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | Tariff | *Convenzione* |
|---|---|---|---|---|---|
| CHORUS Solar Matino S.r.l. | Matino (972 kW) | 29 March 2011 | According to Claimants[1031], CHORUS Solar Matino S.r.l. obtained a Tariff Confirmation Letter on 31 October 2011; this letter, however, is not on the case record. The *Convenzione* (Doc. C-574) does recognize that the GSE did send a Confirmation Letter. | EUR 0.3460/kWh (*Conto* II) | **Doc. C-574** (30 November 2011) "For a period of twenty years from 03/29/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by |

[1026] Doc. C-261; Doc. C-264; Doc. C-268.
[1027] Doc. C-271.
[1028] Doc. C-271, Art. 28.3(a).
[1029] Doc. C-271, Art. 28.8.
[1030] At the time named CHORUS Solar Puglia 3 S.r.l. & C.o. Matino / Nardo / Casarano S.A.S., respectively.
[1031] See Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022, p. 3.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| | | | | | |
|---|---|---|---|---|---|
| | | | | | this Agreement is equal to €0.3460/kWh." |
| CHORUS Solar Nardo S.r.l. | Nardo (972 kW) | 1 April 2011 | According to Claimants[1032], CHORUS Solar Nardo S.r.l. obtained a Tariff Confirmation Letter on 9 November 2011; this letter, however, is not on the case record. The *Convenzione* (Doc. C-651) does recognize that the GSE did send a Confirmation Letter. | EUR 0.3460/kWh (*Conto* II) | **Doc. C-651** (30 November 2011) "For a period of twenty years from 04/01/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |
| CHORUS Solar Casarano S.r.l. | Casarano (997.92 kW) | 18 April 2011 | **Doc. C-269** (6 September 2011) "*Con riferimento all'impianto fotovoltaico in oggetto, denominato CASARANO, Vi comunichiamo l'ammissione alla tariffa incentivante prevista dal Decreto interministeriale 19 febbraio 2007 nella misura di 0,3460 euro/kWh. La tariffa incentivante Vi sarà riconosciuta per un periodo di venti anni continuativi a decorrere dalla data, da Voi comunicataci, di entrata in esercizio dell'impianto: 18/04/2011; la tariffa è costante, in moneta corrente per tutto il periodo di venti anni.*" | EUR 0.3460/kWh (*Conto* II) | **Doc. C-652** (18 October 2011) "For a period of twenty years from 04/18/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |

(ii)    MGP Regime

878.    Furthermore, each of these Claimants executed a *Contratto per il Ritiro* with the GSE, regulating the conditions in which the GSE would off-take electricity from their PV plants (all under 1 MW), and granting them access to MGPs:

| Claimant | Plant name | *Contratto per il Ritiro* |
|---|---|---|
| CHORUS Solar Matino S.r.l. | Matino (972 kW) | **Doc. C-262** (31 May 2011) Art. 4: "*I prezzi riconosciuti dal GSE al Produttore, per il ritiro dell'energia oggetto del presente Contratto, sono definiti dagli articoli 6 e 7 della delibera AEEG n. 280/07 ed eventuali successive modifiche ed integrazioni.*" |
| CHORUS Solar Nardo S.r.l. | Nardo (972 kW) | **Doc. C-265** (31 May 2011) Art. 4: "*I prezzi riconosciuti dal GSE al Produttore, per il ritiro dell'energia oggetto del presente Contratto, sono definiti dagli articoli 6 e 7 della delibera AEEG n. 280/07 ed eventuali successive modifiche ed integrazioni.*" |
| CHORUS Solar Casarano S.r.l. | Casarano (997.92 kW) | **Doc. C-270** (15 June 2011) Art. 4: "*I prezzi riconosciuti dal GSE al Produttore, per il ritiro dell'energia oggetto del presente Contratto, sono definiti dagli articoli 6 e 7 della delibera AEEG n. 280/07 ed eventuali successive modifiche ed integrazioni.*" |

C.    **Claimants De-Stern 1, 4 and 15 S.r.l.**

a.    **The investments**

879.    De-Stern 1 S.r.l., De-Stern 4 S.r.l. and De-Stern 15 S.r.l. are three companies incorporated in Italy in 2008[1033]. De-Stern 15 S.r.l. fully owns De-Stern 1 and De-Stern 4 S.r.l.[1034]. On 23 December 2009 these three companies entered into a

---

[1032] See Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022, p. 3.
[1033] Docs. C-2.25 (De-Stern 15 S.r.l.), C-2.26 (De-Stern 1 S.r.l.) and C-2.27 (De-Stern 4 S.r.l.).
[1034] Docs. C-2.26 (De-Stern 1 S.r.l.) and C-2.27 (De-Stern 4 S.r.l.). See also Doc. C-653, p. 2.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

loan agreement with the German bank LBBW, pursuant to which LBBW would provide up to EUR 23 million for the construction and development of five PV plants[1035]. As collateral, the companies, *inter alia*, had to assign their rights deriving from the *Convenzione* to LBBW[1036].

880. Each of these Claimants then entered into EPC contracts for the construction and development of five PV plants, in which the contractor (Energiequelle GmbH) undertook to complete and connect to the grid the PV plants by 31 December 2010[1037]:

| Claimant | Plant name | EPC Contract | Installed capacity[1038] |
|---|---|---|---|
| De-Stern 4 S.r.l. | Parabita Sarcinella | **Doc. C-273** (27 January 2010) | 989.16 kW |
| | Copertino Mariano | **Doc. C-274** (27 January 2010) | 987.84 kW |
| De-Stern 15 S.r.l. | Leverano Tumulo | **Doc. C-281** (27 January 2010) | 992.64 kW |
| | Neviano Gianna | **Doc. C-282** (27 January 2010) | 928.8 kW |
| De-Stern 1 S.r.l. | Galatina Lattane | **Doc. C-442** (27 January 2010) | 979.44 kW |

881. On 7 March 2017 Capital Stage Solar IPP GmbH (a company of the Capital Stage Group) concluded a sale and purchase agreement with Energiequelle GmbH, De Energy S.r.l. and Stern Energy S.p.A. by which it acquired De-Stern 15 S.r.l., and therefore indirectly De-Stern 1 and 4 S.r.l.[1039].

**b.    Rights obtained**

(i)    *Conto* Program

882. Claimants De-Stern 4 and 15 each received a Tariff Confirmation Letter from the GSE, confirming that their PV plants would be entitled to receive a tariff of EUR 0.3460/kWh (as per *Conto* II) for a period of 20 years; while De-Stern 1 received a Tariff Confirmation Letter confirming a tariff of EUR 0.2760/kWh (as per *Conto* IV). They each also executed a *Convenzione* with the GSE:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | Tariff | *Convenzione* |
|---|---|---|---|---|---|
| De-Stern 4 S.r.l. | Parabita Sarcinella (989.16 kW) | 17 January 2011 | **Doc. C-275/C-279** (15 June 2011) "*Con riferimento all'impianto fotovoltaico in oggetto, denominato DE STERN 4 SRL PARABITA, Vi comunichiamo l'ammissione alla tariffa incentivante prevista dal Decreto interministeriale 19 febbraio 2007 nella misura di 0,3460 euro/kWh.* | EUR 0.3460/kWh (*Conto* II) | Not on case record. |

---

[1035] Doc. C-272, p. 7.

[1036] Doc. C-272, Art. 14.

[1037] See Doc. C-273, p. 3; Doc. C-274, p. 3; Doc. C-281, p. 3; C-282, p. 3; Doc. C-442, p. 4

[1038] See Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022, pp. 3-4, 13.

[1039] Doc. C-653. See also Docs. C-2.25, p. 6 (De-Stern 15 S.r.l.), C-2.26, p. 6 (De-Stern 1 S.r.l.) and C-2.27, p. 6 (De-Stern 4 S.r.l.).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| | | | | | |
|---|---|---|---|---|---|
| | | | *La tariffa incentivante Vi sarà riconosciuta per un periodo di venti anni continuativi a decorrere dalla data, da Voi comunicataci, di entrata in esercizio dell'impianto: 17/01/2011; la tariffa è costante, in moneta corrente per tutto il periodo di venti anni."* | | |
| | Copertino Mariano (987.84 kW) | 9 March 2011 | **Doc. C-280** (3 October 2011) *"il [GSE] comunica l'ammissione alla tariffa incentivante prevista dal Decreto interministeriale 19 febbraio 2007 nella misura di 0,3460 euro/kWh. La tariffa incentivante Vi sarà riconosciuta per un periodo di venti anni continuativi a decorrere dalla data, da Voi comunicataci, di entrata in esercizio dell'impianto: 09/03/2011; la tariffa è costante, in moneta corrente per tutto il periodo di venti anni."* | EUR 0.3460/kWh (*Conto* II) | **Doc. C-278** (24 October 2011) Art. 2: *"Per un periodo di venti anni a decorrere dal 09/03/2011 la tariffa incentivante, costante in moneta corrente, da riconoscere all'impianto fotovoltaico oggetto della presente Convenzione è pari a 0,3460 €/kWh."* |
| De-Stern 15 S.r.l. | Leverano Tumulo (992.64 kW) | 11 August 2010 | **Doc. C-285** (20 September 2010) "With reference to the photovoltaic plant in question, named DE STERN 15 SRL, we hereby inform you of acceptance for the incentive rate established by the Interministerial Decree of February 19, 2007 in the amount of Euro 0.3460/kWh. The incentive rate will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 08/11/2010; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3460/kWh (*Conto* II) | **Doc. C-283** (28 April 2011) Art. 2: "For a period of twenty years from 08/11/2010, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |
| | Neviano Gianna (928.8 kW) | 30 December 2010 | **Doc. C-286** (28 April 2011) "With reference to the photovoltaic plant in question, named DE STERN 15 SRL - NEVIANO, we hereby inform you of acceptance for the incentive rate established by the Interministerial Decree of February 19, 2007 in the amount of Euro 0.3460/kWh. The incentive rate will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 12/30/2010; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3460/kWh (*Conto* II) | **Doc. C-284** (31 May 2011) Art. 2: "For a period of twenty years from 12/30/2010, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |
| De-Stern 1 S.r.l. | Galatina Lattane (979.44 kW) | 30 July 2011 | **Doc. C-441** (24 January 2012) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of May 5, 2011 in the amount of Euro 0.276/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 07/30/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.2760/kWh (*Conto* IV) | **Doc. C-686** (6 February 2012) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.2760/kWh, a value granted by GSE and communicated to the Subject Responsible with the communication of acceptance to the incentive rate. The value of the incentive rate already granted shall be re-defined under the conditions mentioned in Article 12, paragraph 5 of the Ministerial Decree of May 5, 2011, as a result of which several photovoltaic plants built by the same Party in Charge or attributable to a single Party in Charge and located in the same |

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

| | | | | | cadastral parcel or on contiguous cadastral parcels are understood as a single plant with a cumulative capacity equal to the sum of the individual plants. Any on-site modifications of the plant configuration cannot lead to an increase in the incentive rate, under Article 6, paragraph 5 of the Ministerial Decree of May 5, 2011." |
|---|---|---|---|---|---|

(ii)    MGP Regime

883.  Furthermore, each of these Claimants signed a *Contratto per il Ritiro* with the GSE, regulating the conditions in which the GSE would off-take electricity from their PV plants (all under 1 MW), and granting them access to the MGP Regime:

| Claimant | Plant name | *Contratto per il Ritiro* |
|---|---|---|
| De-Stern 4 S.r.l. | Parabita Sarcinella (989.16 kW) | **Doc. C-276** (31 May 2011) Art. 4: "*I prezzi riconosciuti dal GSE al Produttore, per il ritiro dell'energia oggetto del presente Contratto, sono definiti dagli articoli 6 e 7 della delibera AEEG n. 280/07 ed eventuali successive modifiche ed integrazioni.*" |
| | Copertino Mariano (987.84 kW) | **Doc. C-277** (31 May 2011) Art. 4: "*I prezzi riconosciuti dal GSE al Produttore, per il ritiro dell'energia oggetto del presente Contratto, sono definiti dagli articoli 6 e 7 della delibera AEEG n. 280/07 ed eventuali successive modifiche ed integrazioni.*" |
| De-Stern 15 S.r.l. | Leverano Tumulo (992.64 kW) | **Doc. C-287** (13 December 2010) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| | Neviano Gianna (928.8 kW) | **Doc. C-288** (31 May 2011) Art. 4: "*I prezzi riconosciuti dal GSE al Produttore, per il ritiro dell'energia oggetto del presente Contratto, sono definiti dagli articoli 6 e 7 della delibera AEEG n. 280/07 ed eventuali successive modifiche ed integrazioni.*" |
| De-Stern 1 S.r.l. | Galatina Lattane (979.44 kW) | **Doc. C-443** (5 September 2011) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |

**D.    Claimants Fano Solar 1 and 2 S.r.l.**

**a.    The investments**

884.  Fano Solar 1 S.r.l.[1040] and Fano Solar 2 S.r.l.[1041] are two companies incorporated in Italy in May 2010. On 30 April 2010 Fano Solar 1 S.r.l. and Fano Solar 2 S.r.l.

---

[1040] Doc. C-2.9, p. 1.
[1041] Doc. C-2.10, p. 1 (Italian version).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

entered into "turnkey tender" contracts with CPL Concordia Soc. Coop. for the construction and development of two PV plants with a capacity under 1 MW[1042]:

| Claimant | Plant name | EPC Contract | Installed capacity |
|---|---|---|---|
| Fano Solar 1 S.r.l. | Fano Fenile | **Doc. C-444** (30 April 2010) | 1 MW |
| Fano Solar 2 S.r.l. | Fano Ripe | **Doc. C-289** (30 April 2010) | 990 kW |

885. On 13 December 2013 Capital Stage acquired Fano Solar 1 and 2 S.r.l. from Intenergia Quattro S.r.l., an Italian company[1043]. In connection with this transaction, Watson Farley & Williams prepared a due diligence report, in which it recognized that the plants were entitled to perceive the tariffs for 20 years[1044].

**b.    Rights obtained**

(i)    *Conto* Program

886. Claimant Fano Solar 2 S.r.l. received a Tariff Confirmation Letter from the GSE, confirming that its PV plants would be entitled to receive a tariff under *Conto* II for a period of 20 years and executed a *Convenzione* with the GSE:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | Tariff | *Convenzione* |
|---|---|---|---|---|---|
| Fano Solar 2 S.r.l. | Fano Ripe (990 kW) | 17 June 2011 | **Doc. C-291** (25 October 2011) "With reference to the photovoltaic plant in question, named FANO SOLAR 2, we hereby inform you of acceptance for the incentive rate established by the Interministerial Decree of February 19, 2007 in the amount of Euro 0.3460/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 06/17/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3460/kWh (*Conto* II) | **Doc. C-292** (11 November 2011) Art. 2: "For a period of twenty years from 06/17/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |

887. As for Claimant Fano Solar 1 S.r.l., it connected its plant to the grid by 28 June 2011, which would mean that, in principle, it would be entitled to receive a tariff under *Conto* II – and it did. On 25 October 2011 the GSE sent Fano Solar 1 S.r.l. a Tariff Confirmation Letter granting its plant a tariff of EUR 0.3460/kWh[1045] and on 11 November 2011 GSE and Fano Solar 1 executed a *Convenzione*[1046]. However, the GSE decided to transfer the plant from *Conto* II to IV – a decision which, according to Claimants, has been challenged before the Administrative Tribunal of

---

[1042] See Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022, pp. 4, 14.
[1043] Doc. C-294 (Fano Solar 2 S.r.l.) and Doc. C-407 (Fano Solar 1 S.r.l.); See also Scharrer I, para. 21; Docs. C-2.9, p. 5 (Fano Solar 1 S.r.l.) and C-2.10, p. 6 (Fano Solar 2 S.r.l.).
[1044] Doc. C-295, p. 27.
[1045] Doc. C-674, p. 1: "*con comunicazione del 25/10/2011 (prot. FTV_276359), il GSE notificava al Soggetto Responsabile, l'ammissione alle tariffe incentivanti di cui al D.M. 19 febbraio 2007, in misura pari a 0,346 euro/kWh per un periodo di venti anni continuativi a decorrere dal 28/6/2011, data di entrata in esercizio dell'impianto.*"
[1046] Doc. C-445 (original *Convenzione* of 11 November 2011): Art. 2: "For a period of twenty years from 06/28/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh."

213

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

Lazio and remains pending[1047]. It is, nevertheless, uncontroversial that Fano Solar 1 S.r.l. obtained a Tariff Confirmation Letter and executed a *Convenzione* with the GSE under *Conto* IV:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | Tariff | *Convenzione* |
|---|---|---|---|---|---|
| Fano Solar 1 S.r.l. | Fano Fenile (1 MW) | 28 June 2011 | **Tariff confirmation Letter after recategization – Doc. C-674** (5 June 2017): *"alla società Fano Solar 1 a r.l., per l'impianto identificato con il n. 815439, l'ammissione agli incentive di cui al D.M. 5 maggio 2011, nella misura pari a 0,291 euro/kWh a partire dal 28/6/2011, data di entrata in esercizio ai sensi del succitato Decreto […] La tariffa è costante, in moneta corrente per tutto il periodo di incentivazione."* | EUR 0.2910/kWh (*Conto* IV) | ***Convenzione* after recategorization – Doc. C-524** (5 June 2017): Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.2910/kWh, a value granted by the GSE and communicated to the Party in Charge with the communication of acceptance to the incentive rate." |

(ii)   MGP Regime

888.   Furthermore, each Claimant signed a *Contratto per il Ritiro* with the GSE, regulating the conditions in which the GSE would off-take electricity from their PV plants, and granting them access to MGP Regime:

| Claimant | Plant name | *Contratto per il Ritiro* |
|---|---|---|
| Fano Solar 1 S.r.l. | Fano Fenile (1 MW) | **Doc. C-446** (5 September 2011) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| Fano Solar 2 S.r.l. | Fano Ripe (990 kW) | **Doc. C-290** (5 September 2011) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |

**E.   Claimant Notaresco Solar S.r.l.**

**a.   The investments**

889.   Notaresco Solar S.r.l. is a company incorporated in Italy in May 2010[1048]. On 18 May 2010 and 1 September 2010, it entered into "turnkey tender" contracts with CPL Concordia Soc. Coop. for the construction of two PV plants[1049]:

| Claimant | Plant name | EPC Contract | Installed capacity |
|---|---|---|---|
| Notaresco Solar S.r.l. | Notaresco I | **Doc. C-296** (18 May 2010) | 990 kW |
| | Notaresco II | **Doc. C-297** (1 September 2010) | 990 kW |

---

[1047] C-I, para. 228 and fn. 481.
[1048] Doc. C-2.5.
[1049] See Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022, p. 5.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

890. On 13 December 2013 Capital Stage acquired Notaresco Solar S.r.l. from Internergia Quattro S.r.l.[1050].

**b.     Rights obtained**

891. The two plants of Notaresco Solar S.r.l. each obtained a tariff of EUR 0.3460/kWh under *Conto* II, and each benefitted from the MGP Regime:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | *Convenzione* | *Contratto per il Ritiro* |
|---|---|---|---|---|---|
| Notaresco Solar S.r.l. | Notaresco 1 (990 kW) | 19 May 2011 | **Doc. C-302** (11 October 2017) "With reference to the photovoltaic plant in question, named Notaresco Solar FV 1, we hereby inform you of acceptance for the incentive rate established by the Interministerial Decree of February 19, 2007 in the amount of Euro 0.3460/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 05/19/2011; the rate is at a constant level in current values for the entire twenty-year period." | **Doc. C-298** (16 November 2011) Art. 2: "For a period of twenty years from 05/19/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." | **Doc. C-300** (25 July 2011) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| | Notaresco 2 (990 kW) | 22 June 2011 | Not on case record, but mentioned in the *Convenzione*, p. 1. | **Doc. C-299** (11 January 2012) "For a period of twenty years from 06/22/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." | **Doc. C-301** (25 July 2011) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |

**F.     Claimants Ribaforada 7 and 3 S.r.l.**

**a.     The investments**

892. Claimants Ribaforada 3 S.r.l.[1051] and Ribaforada 7 S.r.l.[1052] are two companies incorporated in Italy in December 2009. Both companies entered into turnkey contracts for the construction of PV plants in Italy with OPDE Italy S.r.l., as contractor: Ribaforada 7 S.r.l. on 19 May 2010, for a PV plant of approximately 6.58 MW capacity; and Ribaforada 3 S.r.l. on 9 September 2011, for a PV plant of approximately 4.1 MW capacity:

| Claimant | Plant name | EPC Contract | Installed capacity |
|---|---|---|---|
| Ribaforada 7 S.r.l. | Bosco Marengo | **Doc. C-304** (19 May 2010) | 6.58 MW |
| Ribaforada 3 S.r.l. | Pozzolo | **Doc. C-536** (9 September 2011) | 4.1 MW |

---

[1050] Doc. C-303.
[1051] Doc. C-2.17.
[1052] Doc. C-2.18.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

893. On 10 February 2016 Capital Stage IPP acquired both Ribaforada companies from OPDE Investment España S.L., a company incorporated under the laws of Spain[1053].

**b.    Rights obtained**

894. Claimant Ribaforada 7 S.r.l. connected its plant to the grid on 26 May 2011 and qualified for a tariff of EUR 0.3460/kWh under *Conto* II. As for Claimant Ribaforada 3 S.r.l., its plant was connected to the grid on 28 December 2011, and therefore benefitted from a tariff of EUR 0.1810/kWh under *Conto* IV. Due to their size, none of these plants qualified for the MGP Regime:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | Tariff | *Convenzione* |
|---|---|---|---|---|---|
| Ribaforada 7 S.r.l. | Bosco Marengo (6.58 MW) | 26 May 2011 | Not on case record. The Tariff Confirmation Letter is nevertheless mentioned in the preamble of the Convenzione[1054]. | EUR 0.3460/kWh (*Conto* II) | **Doc. C-305** (27 January 2012) Art. 2: "For a period of twenty years from 05/26/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |
| Ribaforada 3 S.r.l. | Pozzolo (4.1 MW) | 28 December 2011 | **Doc. C-537** (9 March 2012) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of May 5, 2011 in the amount of Euro 0.181/kWh. The incentive rate will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 12/28/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.1810/kWh (*Conto* IV) | **Doc. C-538** (23 May 2012) Art. 2: "*La tariffa incentivante, costante in moneta corrente, da riconoscere all'impianto fotovoltaico oggetto della presente Convenzione, è pari a 0,1810 Euro/kWh, valore riconosciuto dal GSE e reso noto al Soggetto Responsabile con la comunicazione di ammissione alla tarifa incentivante..*" |

**G.    Claimant Sant'Omero Solar S.r.l.**

**a.    The investments**

895. Claimant Sant'Omero Solar S.r.l. was incorporated under the laws of Italy in May 2010[1055]. On 3 June 2010 Sant'Omero Solar S.r.l. entered into a "turnkey tender" contract with CPL Concordia Soc. Coop. for the construction of one PV plant, with a capacity of 990 kW[1056].

896. On 13 December 2013 Capital Stage concluded a sale and purchase agreement with Intenergia Quattro S.r.l. for the sale of Sant'Omero Solar S.r.l.[1057].

---

[1053] Doc. C-306.
[1054] Doc. C-305, p. 1: "*che il GSE, con propria lettera ha comunicato al Produttore il valore della tariffa incentivante, riconosciuta all'impianto fotovoltaico di cui sopra, pari a 0,3460 €/kWh.*"
[1055] Doc. C-2.8.
[1056] Doc. C-307. See also Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022, p. 6.
[1057] Doc. C-657.

###### b.    Rights obtained

897.  Sant'Omero Solar S.r.l.'s PV plant was connected to the grid on 20 May 2011, and
the GSE recognized that it was entitled to receive a premium of EUR 0.3460/kWh
by means of a Tariff Confirmation Letter and a *Convenzione*. The plant also
qualified for the MGP Regime:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | *Convenzione* | *Contratto per il Ritiro* |
|---|---|---|---|---|---|
| Sant'Omero Solar S.r.l. | Sant'Omero (990 kW) | 20 May 2011 | **Doc. C-310** (11 October 2011) "With reference to the photovoltaic plant in question, named Sant'Omero Solar FV 1, we hereby inform you of acceptance for the incentive rate established by the Interministerial Decree of February 19, 2007 in the amount of Euro 0.3460/kWh. The incentive rate will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 05/20/2011; the rate is at a constant level in current values for the entire twenty-year period." | **Doc. C-311** (16 November 2011) Art. 2: "For a period of twenty years from 05/20/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." | **Doc. C-309** (25 July 2011) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |

## H.    **Claimant De-Stern 10 S.r.l.**

###### a.    The investments

898.  Claimant De-Stern 10 S.r.l. is a company incorporated in Italy in May 2008[1058],
which on 30 June 2010 entered into a contract for the construction and development
of a PV plant with an installed nominal capacity of approximately 6 MW, with a
German contractor[1059]. The contractor was obliged to support De-Stern 10 in
creating the necessary documentation required by the GSE for the application to the
incentive tariffs[1060]. The EPC contract also provided that in case the completion of
construction was delayed and resulted in the obtention of a "lower feed-in-tariff per
kWh", De-Stern 10 S.r.l. would be entitled to rescind the contract[1061].

899.  On 5 December 2010 Rödl & Partner delivered a due diligence report[1062] and on 6
December 2010 De-Stern 10 S.r.l. concluded a financing agreement for a line of
credit of EUR 20 million with two German banks[1063].

900.  On 1 March 2012 Capital Stage acquired De-Stern 10 S.r.l.[1064]

---

[1058] Doc. C-2.32.
[1059] Doc. C-312.
[1060] Doc. C-312, Art. 4(12).
[1061] Doc. C-312, Art. 11(2).
[1062] Doc. C-313.
[1063] Doc. C-659.
[1064] Doc. C-316.

**b.    Rights obtained**

901.  On 28 January 2011 De-Stern 10 S.r.l.'s plant was connected to the grid. Thereafter, De-Stern 10 S.r.l. obtained a Tariff Confirmation Letter, granting its plant a premium of EUR 0.3460/kWh, and executed a *Convenzione* with the GSE. Given that the plant was largely over 1 MW, it did not qualify for the MGP Regime:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | Tariff | *Convenzione* |
|---|---|---|---|---|---|
| De-Stern 10 S.r.l. | Parma Casalora 1 (6 MW) | 18 January 2011 | **Doc. C-315** (15 September 2011) "[…] *riconosce all'energia prodotta dall'impianto in oggetto la tariffa incentivante in misura pari a 0,346 euro/kWh. La tariffa incentivante Vi sarà riconosciuta per un periodo di venti anni continuativi a decorrere dalla data, da Voi comunicataci, di entrata in esercizio dell'impianto: 18/01/2011; la tariffa è costante, in moneta corrente per tutto il periodo di venti anni.*" | EUR 0.3460/kWh (*Conto* II) | **Doc. C-314** (11 October 2011) Art. 2: "For a period of twenty years from 01/18/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |

**I.    Claimants related to the Alameda, Oetzi and Solar Energy plants**

**a.    The investments**

902.  Alameda S.r.l.[1065] is a company incorporated in Italy in March 2008, while Casette S.r.l.[1066] and Vallone S.r.l.[1067] are two companies incorporated in Italy in November 2009. Oetzi S.r.l.[1068] and Solar Energy S.r.l.[1069] are two Italian companies incorporated in April 2010.

903.  As part of a larger project to build eight solar plants[1070], each of these Operating Companies entered into a "*contratto d'appalto*" or EPC contract with REC Systems Italy S.r.l., as contractor, for the construction of seven PV plants[1071]. Before entering into the EPC contracts, REC Systems obtained due diligence reports regarding each of these Operating Companies from Russo de Rosa Bolleta & Associati[1072].

| Claimant | Plant name | EPC Contract | Installed capacity |
|---|---|---|---|
| Alameda S.r.l. | Alameda 1 | **Doc. C-319** (6 August 2010) | 1.2 MW |
| | Alameda 4 | **Doc. C-320** (6 August 2010) | 200 kW |
| Casette S.r.l. | Alameda 6 | **Doc. C-328** (6 August 2010) | 1 MW |
| | Alameda 7 | **Doc. C-329** (6 August 2010) | 500 kW |

---

[1065] Doc. C-2.1.
[1066] Doc. C-2.2.
[1067] Doc. C-2.3.
[1068] Doc. C-2.6.
[1069] Doc. C-2.7.
[1070] Only seven plants are at stake in the present arbitration.
[1071] See Preamble to Doc. C-319 (Alameda S.r.l.); Doc. C-320 (Alameda S.r.l.); Doc. C-328 (Casette S.r.l.); Doc. C-329 (Casette S.r.l.); Doc. C-338 (Vallone S.r.l.); Doc. C-342 (Oetzi S.r.l.); Doc. C-348 (Solar Energy S.r.l.). See also Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 202, pp. 6-8.
[1072] Doc. C-660; Doc. C-661; Doc. C-662; Doc. C-663; Doc. C-664; Doc. C-665; Doc. C-666; Doc. C-667; Doc. C-563; Doc. C-393.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| Vallone S.r.l. | Alameda 5 | **Doc. C-338** (6 August 2010) | 990 kW |
| Oetzi S.r.l. | Oetzi | **Doc. C-342** (20 October 2010) | 850 kW |
| Solar Energy S.r.l. | Solar Energy | **Doc. C-348**[1073] (20 October 2010) | 800 kW |

904. On 20 January 2011, Capital Stage acquired Alameda S.r.l.[1074], Casette Srl.[1075] and Vallone S.r.l.[1076]. Ten days later, on 1 February 2011, Capital Stage acquired Oetzi S.r.l.[1077] and Solar Energy S.r.l.[1078].

**b.    Rights obtained**

(i)    *Conto* Program

905. Each of these Operating Companies connected their plants to the grid between April and May 2011, obtained a Tariff Confirmation Letter for a tariff of EUR 0.3460/kWh under *Conto* II and executed a *Convenzione* with the GSE:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | Tariff | *Convenzione* |
|---|---|---|---|---|---|
| Alameda S.r.l. | Alameda 1 (1.2 MW) | 31 May 2011 | **Doc. C-65** (12 October 2011) "With reference to the photovoltaic plant in question, named Alameda 1, we hereby inform you of acceptance for the incentive rate established by the Interministerial Decree of February 19, 2007 in the amount of Euro 0.3460/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 05/31/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3460/kWh (*Conto* II) | **Doc. C-321** (27 October 2011) Art. 2: "For a period of twenty years from 05/31/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh" |
| | Alameda 4 (200 kW) | 30 May 2011 | **Doc. C-326** (12 October 2011) "*Con riferimento all'impianto fotovoltaico in oggetto, denominato Alameda 4, Vi comunichiamo l'ammissione alla tariffa incentivante prevista dal Decreto Interministeriale 19 febbraio 2007 nella misura di 0,3460 euro/kWh. La tariffa incentivante Vi sarà riconosciuta per un periodo di venti anni continuativi a decorrere dalla data, da Voi comunicataci, di entrata in esercizio dell'impianto: 30/05/2011; la tariffa è costante, in moneta corrente per tutto il periodo di venti anni.*" | EUR 0.3460/kWh (*Conto* II) | **Doc. C-322** (27 October 2011) Art. 2: "For a period of twenty years from 05/30/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |
| Casette S.r.l. | Alameda 6 (1 MW) | 31 May 2011 | **Doc. C-335** (25 October 2011) "With reference to the photovoltaic plant in question, named Alameda 6, we hereby inform you of acceptance for the incentive rate established by the Interministerial Decree of February 19, 2007 in the amount of Euro 0.3460/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 05/31/2011; the rate is at a | EUR 0.3460/kWh (*Conto* II) | **Doc. C-331** (2 November 2011) Art. 2: "For a period of twenty years from 05/31/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |

---

[1073] As amended by Doc. C-349.
[1074] Doc. C-327.
[1075] Doc. C-337.
[1076] Doc. C-2.3, pp. 15-16 of 51.
[1077] Doc. C-347.
[1078] Doc. C-353.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| Claimant | Plant name | | EUR | |
|---|---|---|---|---|
| | | constant level in current values for the entire twenty-year period." | | |
| | Alameda 7 (500 kW) | 31 May 2011 | **Doc. C-336** (25 October 2011) "With reference to the photovoltaic plant in question, named ALAMEDA 7, we hereby inform you of acceptance for the incentive rate established by the Interministerial Decree of February 19, 2007 in the amount of Euro 0.3460/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 05/31/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3460/kWh (*Conto* II) | **Doc. C-332** (7 November 2011) Art. 2: "For a period of twenty years from 05/31/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |
| Vallone S.r.l. | Alameda 5 (990 kW) | 31 May 2011 | **Doc. C-341** (25 October 2011) "With reference to the photovoltaic plant in question, named ALAMEDA 5, we hereby inform you of acceptance for the incentive rate established by the Interministerial Decree of February 19, 2007 in the amount of Euro 0.3460/kWh. The incentive rate will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 05/31/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3460/kWh (*Conto* II) | **Doc. C-339** (7 November 2011) Art. 2: "For a period of twenty years from 05/31/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |
| Oetzi S.r.l. | Oetzi (850 kW) | 20 April 2011 | **Doc. C-346** (25 October 2011) "With reference to the photovoltaic plant in question, named FV OETZI SRL, we hereby inform you of acceptance for the incentive rate established by the Interministerial Decree of February 19, 2007 in the amount of Euro 0.3460/kWh. The incentive rate will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 04/20/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3460/kWh (*Conto* II) | **Doc. C-344** (4 November 2011) Art. 2: "For a period of twenty years from 04/20/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |
| Solar Energy S.r.l. | Solar Energy (800 kW) | 20 April 2011 | **Doc. C-352** (21 November 2011) "With reference to the photovoltaic plant in question, named FV SOLAR ENERGY SRL, we hereby inform you of acceptance for the incentive rate established by the Interministerial Decree of February 19, 2007 in the amount of Euro 0.3460/kWh. The incentive rate will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 04/20/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3460/kWh (*Conto* II) | **Doc. C-350** (30 November 2011) Art. 2: "For a period of twenty years from 04/20/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |

(ii)    MGP Regime

906. All the plants – except Alameda 1 which was over 1 MW – also qualified for the MGP Regime:

| Claimant | Plant name | *Contratto per il Ritiro* |
|---|---|---|
| Alameda S.r.l. | Alameda 1 (1.2 MW) | **Not applicable** |
| | Alameda 4 (200 kW) | **Doc. C-324** (6 October 2011) "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the |

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| | | |
|---|---|---|
| | | AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| Casette S.r.l. | Alameda 6 (1 MW) | **Doc. C-333** (12 August 2011) "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| | Alameda 7 (500 kW) | **Doc. C-334** (12 August 2011) "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| Vallone S.r.l. | Alameda 5 (990 kW) | **Doc. C-340** (12 August 2011) "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| Oetzi S.r.l. | Oetzi (850 kW) | **Doc. C-345** (15 June 2011) "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| Solar Energy S.r.l. | Solar Energy (800 kW) | **Doc. C-351** (15 June 2011) "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |

## J.   Claimant Centrale Fotovoltaica Treia 1 S.a.s di Progetto Marche S.r.l.

### a.   The investments

907. Centrale Fotovoltaica Treia 1 S.a.s di Progetto Marche S.r.l. is a company incorporated in Italy in September 2010[1079]. On 8 November 2010 it entered into three EPC turn-key contracts with the German contractor M+W Germany GmbH for the construction of four PV plants[1080]:

| Claimant | Plant name | EPC Contract | Installed capacity |
|---|---|---|---|
| Centrale Fotovoltaica Treia 1 S.a.s di Progetto Marche S.r.l. | Case Luzi (or Treia 1) | **Doc. C-354** (8 November 2010) | 970.2 kW |
| | Collevago 1 (or Treia 6A) | **Doc. C-355** (8 November 2010) | 2.15 MW |
| | Collevago 2 (or Treia 6B) | **Doc. C-355** (8 November 2010) | 970.2 kW |
| | Santo Eunero (or Treia 7) | **Doc. C-356** (8 November 2010) | 9.99 MW |

908. According to Mr. Scharrer, Capital Stage acquired Central Fotovoltaica Treia 1 on 12 June 2015[1081].

---

[1079] Doc. C-2.14.
[1080] See also Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022, p. 9.
[1081] Schrarrer I, fn. 8. This affirmation has not been disputed by Respondent.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

### b.    Rights obtained

(i)    *Conto* Program

909.  Three of the plants were connected to the grid in March 2011, while the fourth was connected to the grid by the end of May 2011. All four plants therefore registered under the *Conto* II regime and were granted a tariff of EUR 0.3460/kWh. Centrale Fotovoltaica Treia 1 S.a.s di Progetto Marche S.r.l. obtained a Tariff Confirmation Letter and executed a *Convenzione* with the GSE for each of these plants:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | Tariff | *Convenzione* |
|---|---|---|---|---|---|
| Centrale Fotovoltaica Treia 1 S.a.s di Progetto Marche S.r.l. | Case Luzi (or Treia 1) (970.2 kW) | 23 March 2011 | The Tariff Confirmation Letter is not on the case record but is mentioned in the *Convenzione* (Doc. C-360): "GSE, with its own letter, communicated to the Producer the value of the incentive rate, as granted for the photovoltaic plant mentioned above, equal to €0.3460/kWh." | EUR 0.3460/kWh (*Conto* II) | **Doc. C-360** (19 December 2011) Art. 2: "For a period of twenty years from 03/23/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |
| | Collevago 1 (or Treia 6A) (2.15 MW) | 23 March 2011 | **Doc. C-358** (27 September 2011) "With reference to the photovoltaic plant in question, named TREIA 6A - COLLEVAGO, we hereby inform you of acceptance for the incentive rate established by the Interministerial Decree of February 19, 2007 in the amount of Euro 0.3460/kWh. The incentive rate will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 03/23/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3460/kWh (*Conto* II) | **Doc. C-361** (3 November 2011) Art. 2: "For a period of twenty years from 03/23/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |
| | Collevago 2 (or Treia 6B) (970.2 kW) | 23 March 2011 | The Tariff Confirmation Letter is not on the case record but is mentioned in the *Convenzione* (Doc. C-362): "GSE, with its own letter, communicated to the Producer the value of the incentive rate, as granted for the photovoltaic plant mentioned above, equal to €0.3460/kWh." | EUR 0.3460/kWh (*Conto* II) | **Doc. C-362** (19 December 2011) Art. 2: "For a period of twenty years from 03/23/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |
| | Santo Eunero (or Treia 7) (9.99 MW) | 30 May 2011 | **Doc. C-359** (27 September 2011) "With reference to the photovoltaic plant in question, named TREIA 7 - SANTO EUNERO, we hereby inform you of acceptance for the incentive rate established by the Interministerial Decree of February 19, 2007 in the amount of Euro 0.3460/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 05/30/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3460/kWh (*Conto* II) | **Doc. C-363** (3 November 2011) Art. 2: "For a period of twenty years from 05/30/2011, the incentive rate, at a constant level in current values, to be granted for the photovoltaic plant covered by this Agreement is equal to €0.3460/kWh." |

(ii)    MGP Regime

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

910. Only the two smaller plants under 1 MW qualified for the MGP Regime, after Central Fotovoltaica executed a *Contratto per il Ritiro* with the GSE:

| Claimant | Plant name | *Contratto per il Ritiro* |
|---|---|---|
| Centrale Fotovoltaica Treia 1 S.a.s di Progetto Marche S.r.l. | Case Luzi (or Treia 1) (970.2 kW) | **Doc. C-357** (15 June 2011)<br>Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| | Collevago 2 (or Treia 6B) (970.2 kW) | **Doc. C-392** (17 June 2011)<br>Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |

## K.    Claimants CHORUS Solar Ternavasso Uno and Due S.r.l.

### a.    The investments

911. Claimants CHORUS Solar Ternavasso Uno S.r.l.[1082] and CHORUS Solar Ternavasso Due S.r.l.[1083] are two companies incorporated in Italy in June 2009. On 17 November 2010 they entered into general contractor contracts with a German contractor for the construction of two multi-sectional PV plants[1084]:

| Claimant | Plant name | EPC Contract | Installed capacity |
|---|---|---|---|
| CHORUS Solar Ternavasso Uno S.r.l. | Ternavasso 1 (multi-sectional) | **Doc. C-368** (17 November 2010) | 2.62 MW |
| CHORUS Solar Ternavasso Due S.r.l. | Ternavasso 2 (multi-sectional) | **Doc. C-373** (17 November 2010) | 4.78 MW |

912. On 2 April 2013 these two Operating Companies were acquired by companies of the CHORUS Group[1085]. On 15 April 2013 CHORUS obtained a legal due diligence report from the law firm Watson, Farley & Williams regarding the two Ternavasso projects[1086]. In this report, the firm recorded its understanding that[1087]:

> "The incentive tariff will be paid for an incentive period of 20 years starting from the date when the plant starts operations and will remain unvaried, in the legal tender applicable from time to time, for the entire incentive period.
>
> The tariffs provided under the Third *Conto Energia* vary on the basis of type of plant, plant capacity and date of start of operations."

---

[1082] At the time, the company was named Quattordicesimasun S.r.l. (Doc. C-2.37, p. 19).
[1083] At the time, the company was named Quindicesimasun S.r.l. (Doc. C-2.44, p. 19).
[1084] See also Key Dates for Claimants' Investments and Plant Enrollment, dated 30 September 2022, p. 10.
[1085] Doc. C-372 (CHORUS Solar Ternavasso Uno S.r.l.); Doc. C-395 (CHORUS Solar Ternavasso Due S.r.l.).
[1086] Doc. C-371.
[1087] Doc. C-371, p. 39.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

**b.     Rights obtained**

(i)     *Conto* Program

913.  Both PV plants were connected to the grid on 29 April 2011, with the consequence
that they were entitled to receive a tariff of EUR 0.3130/kWh under the regime of
*Conto* III. This was confirmed by the GSE for each of the sections of the respective
plants by means of Tariff Confirmation Letters and *Convenzione*:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | Tariff | *Convenzione* |
|---|---|---|---|---|---|
| CHORUS Solar Ternavasso Uno S.r.l. | Ternavasso 1 (multi-sectional) (2.62 MW) | 29 April 2011 | **Doc. C-370** (4 October 2011) "Communication of the incentive rate, pursuant to the Ministerial Decree of August 6, 2010, relating to the PV plant named TERNAVASSO 1, <u>with a power capacity of 686.40 kW</u> [...] With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of August 6, 2010 in the amount of Euro 0.3130/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 04/29/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3130/kWh (*Conto* III) | **Doc. C-369** (2 February 2012) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.3130/kWh, a value granted by the GSE and communicated to the Party in Charge with the communication of acceptance to the incentive rate." |
| CHORUS Solar Ternavasso Due S.r.l. | Ternavasso 2 (multi-sectional) (4.78 MW) | 29 April 2011 | **Doc. C-375 (Section 1)** (12 January 2012) **Doc. C-376 (Section 2)** (12 January 2012) **Doc. C-377 (Section 3)** (12 January 2012) **Doc. C-378 (Section 4)** (12 January 2012) **Doc. C-379 (Section 5)** (12 January 2012) **Doc. C-380 (Section 6)** (12 January 2012) **Doc. C-381 (Section 7)** (12 January 2012) **Doc. C-382 (Section 8)** (12 January 2012) **Doc. C-383 (Section 9)** (12 January 2012) | EUR 0.3130/kWh (*Conto* III) | **Doc. C-374 (Section 1)** (2 February 2012) **Doc. C-384 (Section 2)** (2 February 2012) **Doc. C-385 (Section 3)** (2 February 2012) **Doc. C-386 (Section 4)** (2 February 2012) **Doc. C-387 (Section 5)** (27 January 2012) **Doc. C-388 (Section 6)** (27 January 2012) **Doc. C-389 (Section 7)** (2 February 2012) **Doc. C-390 (Section 8)** (2 February 2012) **Doc. C-391 (Section 9)** (2 February 2012) |

(ii)     MGP Regime

914.  Each section of the PV plants of CHORUS Solar Ternavasso Uno and Due S.r.l.
benefitted from the MGP Regime:

| Claimant | Plant name | *Contratto per il Ritiro* |
|---|---|---|
| CHORUS Solar Ternavasso Uno S.r.l. | Ternavasso 1 (multi-sectional) (2.62 MW) | **Doc. C-766** (6 October 2011) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| CHORUS Solar Ternavasso Due S.r.l. | Ternavasso 2 (multi-sectional) (4.78 MW) | **Doc. C-394** (11 October 2011) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |

224

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

## L.    Claimants Piemonte Eguzki 2 and 6 S.r.l.

### a.    The investments

915.  Piemonte Eguzki 2 S.r.l.[1088] and Piemonte Eguzki 6 S.r.l.[1089] are two companies incorporated under the laws of Italy in August 2009.

916.  On 19 March 2010 Piemonte Eguzki 6 S.r.l. entered into a contract with the company OPDE Italy S.r.l. for the construction and development of a PV plant with an installed nominal capacity of approximately 1.26 MW. And on 14 January 2011, it was Piemonte Eguzki 2 S.r.l.'s turn to enter into a contract with OPDE Italy S.r.l. for the construction of a PV plant with a capacity of approximately 5 MW:

| Claimant | Plant name | EPC Contract | Installed capacity |
|---|---|---|---|
| Piemonte Eguzki 6 S.r.l. | Casale | **Doc. C-365** (19 March 2010) | 1.26 MW |
| Piemonte Eguzki 2 S.r.l. | Fossano | **Doc. C-396** (14 January 2011) | 5 MW |

917.  On 10 February 2016 Capital Stage IPP acquired Piemonte Eguzki 2 S.r.l. and Piemonte Eguzki 6 S.r.l. from OPDE Investment España S.L.[1090].

### b.    Rights obtained

918.  Both plants of the Piemonte Eguzki Operating Companies were connected to the grid and qualified for the incentive tariffs under the *Conto* III regime, but due to their size, none of them qualified for the MGP Regime:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | Tariff | *Convenzione* |
|---|---|---|---|---|---|
| Piemonte Eguzki 2 S.r.l. | Fossano (5 MW) | 30 April 2011 | **Doc. C-398** (21 October 2011) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of August 6, 2010 in the amount of Euro 0.3290/kWh. The incentive rate will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 04/30/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3290/kWh (*Conto* III) | **Doc. C-397** (20 December 2011) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.3290/kWh, a value granted by the GSE and communicated to the Party in Charge with the communication of acceptance to the incentive rate." |
| Piemonte Eguzki 6 S.r.l. | Casale (1.26 MW) | 12 May 2011 | **Doc. C-367** (10 April 2012) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of August 6, 2010 in the amount of Euro 0.289/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 05/12/2011; | EUR 0.2890/kWh (*Conto* III) | **Doc. C-366** (23 May 2012) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.2890/kWh, a value granted by the GSE and communicated to the Party in Charge with the communication of acceptance to the incentive rate." |

---

[1088] Doc. C-2.15.
[1089] Doc. C-2.16.
[1090] Doc. C-306.

| | | | the rate is at a constant level in current values for the entire twenty-year period." | | |
|---|---|---|---|---|---|

### M.     Claimants Centrale Fotovoltaica Santa Maria in Piana S.r.l., GE.FIN Energy Oria Division S.r.l. and Centrale Fotovoltaica Camporota S.r.l.

#### a.     The investments

919.  GE.FIN Energy Oria Division S.r.l. is a company constituted in Italy in October 2009[1091]. Centrale Fotovoltaica Santa Maria in Piana S.r.l. is a company constituted under the laws of Italy in April 2010[1092], while Centrale Fotovoltaica Camporota S.r.l. is a company constituted under the laws of Italy in June 2010[1093].

920.  On 18 February 2011 the companies Centrale Fotovoltaica Santa Maria in Piana S.r.l., Centrale Fotovoltaica Berta S.r.l., Centrale Fotovoltaica Schito S.r.l., Centrale Fotovoltaica Botonto S.r.l., Centrale Fotovoltaica Camporota S.r.l. and GE.FIN Energy Oria Division S.r.l., each executed an EPC turn-key contract with M+W Solar GmbH, a German contractor, for the construction of a PV plant in Italy (the contracts were updated on 15 March 2012, once the plants had already been built):

| Claimant | Plant name | EPC Contract | Installed capacity |
|---|---|---|---|
| Centrale Fotovoltaica Santa Maria in Piana S.r.l. | Botonto / Macerata 1 | **Doc. C-399** (15 March 2012) | 750.2 kW |
| | Berta / Tiglio / Treia 2 | **Doc. C-400** (15 March 2012) | 1.19 MW |
| | Santa Maria / Treia 5 | **Doc. C-401** (15 March 2012) | 1.97 MW |
| | Schito / Treia 8 | **Doc. C-402** (15 March 2012) | 972.4 kW |
| Centrale Fotovoltaica Camporota S.r.l. | Camporota | **Doc. C-415** (15 March 2012) | 4.33 MW |
| GE.FIN Energy Oria Division S.r.l. | Oria | **Doc. C-444** (18 February 2011) | 5.77 MW |

921.  In July 2014 Centrale Fotovoltaica Santa Maria in Piana S.r.l. acquired Centrale Fotovoltaica Berta S.r.l., Centrale Fotovoltaica Schito S.r.l. and Centrale Fotovoltaica Botonto S.r.l., together with their three PV plants[1094].

922.  And one year later, on 27 July 2015, Capital Stage IPP became the sole owner of the three Operating Companies Centrale Fotovoltaica Santa Maria in Piana S.r.l., Centrale Fotovoltaica Camporota S.r.l. and GE.FIN Energy Oria Division S.r.l., as evidenced in the Companies' business registry[1095].

---

[1091] Doc. C-2.12.
[1092] Doc. C-2.11.
[1093] Doc. C-2.13.
[1094] Doc. C-2.11, p. 8.
[1095] See Doc. C-2.11, p. 7 ("*Socio Unico: CSG IPP GMBH […] dal 27/07/2015.*"); Doc. C-2.12, p. 6 ("*Socio Unico: CSG IPP GMBH […] dal 27/07/2015.*"); Doc. C-2.13, p. 6 ("*Socio Unico: CSG IPP GMBH […] dal 27/07/2015.*").

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

b.    **Rights obtained**

(i)    *Conto* Program

923.    Each of the plants qualified for the *Conto* Program under *Conti* III and IV:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | Tariff | *Convenzione* |
|---|---|---|---|---|---|
| Centrale Fotovoltaica Santa Maria in Piana S.r.l. | Botonto / Macerata 1 (750.2 kW) | 28 April 2011 | **Doc. C-412** (21 November 2011) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of August 6, 2010 in the amount of Euro 0.3140/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 04/28/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3140/kWh (*Conto* III) | **Doc. C-403** (19 December 2011) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.3140/kWh, a value granted by the GSE and communicated to the Party in Charge with the communication of acceptance to the incentive rate." |
| | Berta / Tiglio / Treia 2 (1.19 MW) | 22 April 2011 | **Doc. C-411** (19 January 2012) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of August 6, 2010 in the amount of Euro 0.3130/kWh. The incentive rate will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 04/22/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3130/kWh (*Conto* III) | **Doc. C-406** (20 February 2012) Art. 2: "The incentive tariff, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.3130/kWh, a value granted by the GSE and communicated to the Party in Charge with the communication of acceptance to the incentive rate." |
| | Santa Maria / Treia 5 (1.97 MW) | 31 May 2011 | **Doc. C-414** (21 October 2011) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of August 6, 2010 in the amount of Euro 0.2890/kWh. The incentive rate will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 05/31/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.2890/kWh (*Conto* III) | **Doc. C-405** (29 November 2011) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.2890/kWh, a value granted by the GSE and communicated to the Party in Charge with the communication of acceptance to the incentive rate." |
| | Schito / Treia 8 (972.4 kW) | 29 April 2011 | **Doc. C-413** (8 November 2011) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of August 6, 2010 in the amount of Euro 0.3140/kWh. The incentive rate will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 04/29/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3140/kWh (*Conto* III) | **Doc. C-404** (30 November 2011) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.3140/kWh, a value granted by the GSE and communicated to the Party in Charge with the communication of acceptance to the incentive rate." |
| Centrale Fotovoltaica Camporota S.r.l. | Camporota (4.33 MW) | 30 May 2011 | **Doc. C-416** (21 October 2011) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of August 6, 2010 in the amount of Euro 0.2890/kWh. | EUR 0.2890/kWh (*Conto* III) | **Doc. C-417** (29 November 2011) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.2890/kWh, a value granted by the GSE and communicated to the Party in |

| | | | | | |
|---|---|---|---|---|---|
| | | | The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 05/30/2011; the rate is at a constant level in current values for the entire twenty-year period." | | Charge with the communication of acceptance to the incentive rate." |
| GE.FIN Energy Oria Division S.r.l. | Oria (5.77 MW) | 26 August 2011 | **Doc. C-449** (27 January 2012) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of May 5, 2011 in the amount of Euro 0.2380/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 08/26/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.2380/kWh (*Conto* IV) | **Doc. C-450** (17 July 2012) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.2380/kWh, a value granted by the GSE and communicated to the Party in Charge with the communication of acceptance to the incentive rate." |

(ii)    MGP Regime

924.  Only the two smaller plants of Centrale Fotovoltaica Santa Maria in Piana S.r.l. qualified for the MGP Regime:

| Claimant | Plant name | *Contratto per il Ritiro* |
|---|---|---|
| Centrale Fotovoltaica Santa Maria in Piana S.r.l. | Botonto / Macerata 1 (750.2 kW) | **Doc. C-408** (25 July 2011) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| | Schito / Treia 8 (972.4 kW) | **Doc. C-409** (8 July 2011) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |

## N.    Claimants linked to CHORUS Solar 3

### a.    The investments

925.  Sun Time Renewable Energy di CHORUS Solar 3. S.r.l. & Co. S.a.s., La Rocca Energy di CHORUS Solar 3. S.r.l. & Co. S.a.s. and Treponti S.a.s. di CHORUS Solar 3. S.r.l. & Co. S.a.s. are three companies incorporated in Italy in February 2009, November 2009, and February 2011, respectively.

926.  Each of these companies concluded EPC contracts in April 2011 for the construction of four PV plants of less than 1 MW each:

| Claimant | Plant name | EPC Contract | Installed capacity |
|---|---|---|---|
| Sun Time Renewable Energy di CHORUS Solar 3. S.r.l. & Co. S.a.s. | Cerqua Bella 2 | **Doc. C-435** (15 April 2011) | 796.18 kW |
| La Rocca Energy di CHORUS Solar 3. S.r.l. & Co. S.a.s. | Cerqua Bella 1 | **Doc. C-425** (15 April 2011) | 992.64 kW |
| | Montalto di Castro | **Doc. C-424** (15 April 2011) | 992.64 kW |

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

| Treponti S.a.s. di CHORUS Solar 3. S.r.l. & Co. S.a.s. | Treponti | **Doc. C-418** (8 April 2011) | 992.64 kW |

927. Almost at the same time the Operating Companies executed the EPC contracts, they were acquired by CHORUS Solar 3[1096]. CHORUS Solar 3, however, had the right to withdraw from the transaction if the plants did not qualify for an incentive tariff under *Conto* III[1097]. CHORUS conducted a due diligence regarding each of the plants[1098].

**b.    Rights obtained**

(i)    *Conto* Program

928. Each of the plants qualified for the *Conto* III regime and obtained an incentive tariff of EUR 0.3030/kWh from the GSE, which was consigned in the Tariff Confirmation Letters and the *Convenzione*:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | Tariff | *Convenzione* |
|---|---|---|---|---|---|
| Sun Time Renewable Energy di CHORUS Solar 3. S.r.l. & Co. S.a.s. | Cerqua Bella 2 (796.18 kW) | 31 May 2011 | **Doc. C-439** (4 November 2011) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of August 6, 2010 in the amount of Euro 0.3030/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 05/31/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3030/kWh (*Conto* III) | **Doc. C-672** (11 November 2011) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.3030/kWh, a value granted by GSE and communicated to the Subject Responsible with the communication of acceptance to the incentive rate." |
| La Rocca Energy di CHORUS Solar 3. S.r.l. & Co. S.a.s. | Cerqua Bella 1 (992.64 kW) | 31 May 2011 | **Doc. C-427** (4 November 2011) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of August 6, 2010 in the amount of Euro 0.3030/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 05/31/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3030/kWh (*Conto* III) | **Doc. C-670** (11 November 2011) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.3030/kWh, a value granted by GSE and communicated to the Subject Responsible with the communication of acceptance to the incentive rate." |
|  | Montalto di Castro (992.64 kW) | 30 May 2011 | **Doc. C-426** (4 November 2011) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of August 6, 2010 in the amount of Euro 0.3030/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into | EUR 0.3030/kWh (*Conto* III) | **Doc. C-671** (11 November 2011) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.3030/kWh, a value granted by GSE and communicated to the Subject |

---

[1096] Doc. C-419 (Treponti S.a.s.); Doc. C-428 (La Rocca S.r.l.); Doc. C-436 (Sun time Renewable Energy).
[1097] Doc. C-419, section 6 (Treponti S.a.s.); Doc. C-428, section 6 (La Rocca S.r.l.); Doc. C-436, section 6 (Sun Time Renewable Energy).
[1098] Doc. C-421; Doc. C-429; Doc. C-430; Doc. C-431; Doc. C-432; Doc. C-437; Doc. C-438.

229

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| | | | | | |
|---|---|---|---|---|---|
| | | | operation, which you communicated to us: 05/30/2011; the rate is at a constant level in current values for the entire twenty-year period." | | Responsible with the communication of acceptance to the incentive rate. |
| Treponti S.a.s. di CHORUS Solar 3. S.r.l. & Co. S.a.s. | Treponti (992.64 kW) | 31 May 2011 | **Doc. C-422** (24 November 2011) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of August 6, 2010 in the amount of Euro 0.3030/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 05/31/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.3030/kWh (*Conto* III) | **Doc. C-669** (14 December 2011) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.3030/kWh, a value granted by GSE and communicated to the Subject Responsible with the communication of acceptance to the incentive rate." |

(ii)   MGP Regime

929.   Each of these plants qualified for the MGP Regime:

| Claimant | Plant name | *Contratto per il Ritiro* |
|---|---|---|
| Sun Time Renewable Energy di CHORUS Solar 3. S. r.l. & Co. S.a.s. | Cerqua Bella 2 (796.18 kW) | **Doc. C-440** (11 October 2011) "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| La Rocca Energy di CHORUS Solar 3. S.r.l. & Co. S.a.s. | Cerqua Bella 1 (992.64 kW) | **Doc. C-433** (11 October 2011) "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| | Montalto di Castro (992.64 kW) | **Doc. C-434** (11 October 2011) "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| Treponti S.a.s. di CHORUS Solar 3. S.r.l. & Co. S.a.s. | Treponti (992.64 kW) | **Doc. C-423** (6 October 2011) "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |

### O.   **Claimants CHORUS Torino Uno and Due S.r.l.**

#### a.   **The investments**

930.   CHORUS Solar Torino Uno S.r.l.[1099] and CHORUS Torino Due S.r.l.[1100] are two companies incorporated in Italy in June 2009. On 29 April 2011 they each entered into contracts for work and services for the turnkey construction of two multi-sectional PV plants with solarhybrid AG as contractor:

| Claimant | Plant name | EPC Contract | Installed capacity |
|---|---|---|---|
| CHORUS Torino Uno S.r.l. | Banna 1 (multi-sectional) | **Doc. C-462** (29 April 2011) | 4.15 MW |
| CHORUS Torino Due S.r.l. | Banna 2 (multi-sectional) | **Doc. C-478** (29 April 2011) | 4.94 MW |

---

[1099] Doc. C-2.46; at the time CHORUS Solar Torino Uno was named Quintasun S.r.l. (p. 24).
[1100] Doc. C-2.40; at the time CHORUS Solar Torino Due was named Sestasun S.r.l. (p. 22).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

931. On that same day each of these Operating Companies were acquired by two companies of the CHORUS Group (CHORUS CleanTech Management GmbH and CHORUS Solar 3)[1101].

932. Furthermore, between September and October 2011 each of these Operating Companies entered into a loan agreement to finance the project with UniCredit, by which the latter agreed to finance the projects with up to EUR 10.8 million each, assuming that the plants would qualify for the tariff under *Conto* IV[1102]. For the purposes of this loan agreement, in June 2011 UniCredit obtained a due diligence report from Rödl & Partner. The "basic risk" identified by this firm with regards to the tariffs was that the plants failed to register in time to benefit from *Conto* IV[1103].

   **b.    Rights obtained**

   (i)    *Conto* Program

933. Both PV plants, however, were connected to the grid on 15 July 2011, with the consequence that they were entitled to receive a tariff of EUR 0.2640/kWh under the regime of *Conto* IV. This was confirmed by the GSE for each of the sections of the respective plants by means of Tariff Confirmation Letters and *Convenzione*:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | Tariff | *Convenzione* |
|---|---|---|---|---|---|
| CHORUS Torino Uno S.r.l. | Banna 1 (multi-sectional) (4.15 MW) | 15 July 2011 | **Doc. C-466 (Section 1)** (20 February 2012) **Doc. C-467 (Section 2)** (25 January 2012) **Doc. C-468 (Section 3)** (4 January 2012) **Doc. C-469 (Section 4)** (21 December 2011) **Doc. C-470 (Section 5)** (3 February 2012) **Doc. C-471 (Section 6)** (3 February 2012) | EUR 0.2640/kWh (*Conto* IV) | **Doc. C-465 (Section 1)** (19 April 2012) **Doc. C-472 (Section 2)** (19 April 2012) **Doc. C-473 (Section 3)** (27 February 2012) **Doc. C-474 (Section 4)** (1 February 2011) **Doc. C-475 (Section 5)** (20 March 2012) **Doc. C-476 (Section 6)** (20 March 2012) |
| CHORUS Torino Due S.r.l. | Banna 2 (multi-sectional) (4.94 MW) | 15 July 2011 | **Doc. C-483 (Section 1)** (25 January 2012) **Doc. C-484 (Section 2)** (5 June 2012) **Doc. C-485 (Section 3)** (21 December 2011) **Doc. C-486 (Section 4)** (25 January 2012) **Doc. C-487 (Section 5)** (5 June 2012) **Doc. C-488 (Section 6)** (21 December 2011) **Doc. C-489 (Section 7)** (25 January 2012) | EUR 0.2640/kWh (*Conto* IV) | **Doc. C-482 (Section 1)** (19 April 2012) **Doc. C-490 (Section 2)** (8 June 2012) **Doc. C-491 (Section 3)** (27 February 2012) **Doc. C-492 (Section 4)** (19 April 2012) **Doc. C-493 (Section 5)** (6 June 2012) **Doc. C-494 (Section 6)** (27 February 2012) **Doc. C-495 (Section 7)** (19 April 2012) |

   (ii)    MGP Regime

934. Each of the plants also qualified for the MGP Regime:

| Claimant | Plant name | *Contratto per il Ritiro* |
|---|---|---|
| CHORUS Torino Uno S.r.l. | Banna 1 (multi-sectional) (4.15 MW) | **Doc. C-477** (27 December 2011) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| CHORUS Torino Due S.r.l. | Banna 2 (multi-sectional) (4.94 MW) | **Doc. C-496** (17 January 2012) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined |

---

[1101] Doc. C-463 (CHORUS Solar Torino Uno S.r.l.); Doc. C-479 (CHORUS Solar Torino Due S.r.l.).
[1102] Doc. C-464, section 17.10 (CHORUS Solar Torino Uno S.r.l.); Doc. C-480, section 17.10 (CHORUS Solar Torino Due S.r.l.).
[1103] Doc. C-481, p. 11.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

|  |  | by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
|---|---|---|

### P.  Claimants Solar Farm FC1 and FC3 S.r.l.

#### a.  The investments

935. Claimants Solar Farm FC1 S.r.l.[1104] and Solar Farm FC3 S.r.l.[1105] are two companies incorporated in Italy in November 2010. On 25 August 2011 they each entered into "direct construction" contracts with a German contractor and the Raiffeisenlandesbank Niederösterreich-Wien AG, as the project's lender[1106]:

| Claimant | Plant name | EPC Contract | Installed capacity |
|---|---|---|---|
| Solar Farm FC1 S.r.l. | Cesena Field 1 & 2 | **Doc. C-520** (25 August 2011) | 2 MW |
|  | Cesena Field 3 | **Doc. C-520** (25 August 2011) | 900 kW |
|  | Cesena Field 4 | **Doc. C-520** (25 August 2011) | 930 kW |
| Solar Farm FC3 S.r.l. | Forli | **Doc. C-530** (25 August 2011) | 990 kW |

936. Solar Farm FC1 entered into a subsequent agreement with Raiffeisenlandesbank Niederösterreich-Wien AG for EUR 11.1 million financing[1107], while Solar Farm FC3 S.r.l. entered into a similar agreement for EUR 2.83 million[1108].

937. On 2 March 2012 Capital Stage IPP acquired both Operating Companies[1109].

#### b.  Rights obtained

##### (i)  *Conto* Program

938. Each of the plants of Solar Farm FC1 S.r.l. qualified for a tariff of EUR 0.2640/kWh under *Conto* IV, while the plant of Solar Farm FC3 S.r.l. obtained a tariff of EUR 0.2910/kWh under *Conto* IV:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | Tariff | *Convenzione* |
|---|---|---|---|---|---|
| Solar Farm FC1 S.r.l. | Cesena Field 1 & 2 (2 MW) | 22 July 2011 | **Doc. C-522** (29 March 2012) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of May 5, 2011 in the amount of Euro 0.264/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 07/22/2011; the rate is at a constant | EUR 0.2640/kWh (*Conto* IV) | **Doc. C-527** (3 May 2012) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.2640/kWh, a value granted by the GSE and communicated to the Party in Charge with the communication of acceptance to the incentive rate." |

---

[1104] Doc. C-2.30.
[1105] Doc. C-2.31.
[1106] Prior to that, the German contractor had obtained a due diligence report from Rödl & Partner (Doc. C-521).
[1107] Doc. C-525.
[1108] Doc. C-534.
[1109] Doc. C-526 (Solar Farm FC1 S.r.l.); Doc. C-535 (Solar Farm FC3 S.r.l.).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| | | | | |
|---|---|---|---|---|
| | | level in current values for the entire twenty-year period." | | |
| | Cesena Field 3 (900 kW) | 22 July 2011 | **Not on case record.** | EUR 0.2640/kWh (*Conto* IV) | **Doc. C-528** (3 May 2012) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.2640/kWh, a value granted by the GSE and communicated to the Party in Charge with the communication of acceptance to the incentive rate." |
| | Cesena Field 4 (930 kW) | 22 July 2011 | **Not on case record.** | EUR 0.2640/kWh (*Conto* IV) | **Doc. C-529** (3 May 2012) "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.2640/kWh, a value granted by the GSE and communicated to the Party in Charge with the communication of acceptance to the incentive rate." |
| Solar Farm FC3 S.r.l. | Forli (990 kW) | 30 June 2011 | **Doc. C-531** (23 November 2011) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of May 5, 2011 in the amount of Euro 0.2910/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 06/30/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.2910/kWh (*Conto* IV) | **Doc. C-533** (29 November 2011) "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.2910/kWh, a value granted by the GSE and communicated to the Party in Charge with the communication of acceptance to the incentive rate." |

    (ii)   <u>MGP Regime</u>

939. Furthermore, each of the plants qualified for the MGP Regime and executed a *Contratto per il Ritiro* with the GSE, except Solar Farm FC1 S.r.l.'s larger plant:

| Claimant | Plant name | *Contratto per il Ritiro* |
|---|---|---|
| Solar Farm FC1 S.r.l. | Cesena Field 3 (900 kW) | **Doc. C-323** (4 January 2012) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| | Cesena Field 4 (930 kW) | **Doc. C-317** (4 January 2012) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| Solar Farm FC3 S.r.l. | Forli (990 kW) | **Doc. C-532** (5 September 2011) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

### Q.   Claimants Polesine Energy 1 and 2 S.r.l.

#### a.   The investments

940. Polesine Energy 1 S.r.l.[1110] and Polesine Energy 2 S.r.l.[1111] are two companies incorporated in Italy in October 2010. They both entered into turnkey tender contracts with CEIF Soc. Coop as contractor on 19 December 2011, for the construction of two PV plants of 2.3 MW installed capacity[1112]:

| Claimant | Plant name | EPC Contract | Installed capacity |
|---|---|---|---|
| Polesine Energy 1 S.r.l. | Polesine 1 | **Doc. C-554** (19 December 2011) | 2.3 MW |
| Polesine Energy 2 S.r.l. | Polesine 2 | **Doc. C-559** (19 December 2011) | 2.3 MW |

941. Both contracts provided that if the plants were not connected to the grid by 28 February 2012 and did not reach a certain capacity, the contractor would have to pay a daily penalty to the owners of the plant. Furthermore, the contractor was required to use materials suitable to allow the plants to qualify for the *Conto* Program[1113].

942. On 21 December 2012 Capital Stage IPP acquired Polesine Energy 1 S.r.l. and Polesine Energy 2 S.r.l. from Ceif Società Cooperativa[1114].

#### b.   Rights obtained

943. Both plants entered into operation on 28 March 2012[1115] and qualified for a tariff of EUR 0.1720/kWh under the *Conto* IV; due to their size, neither of the plants qualified for the MGP Regime:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | Tariff | *Convenzione* |
|---|---|---|---|---|---|
| Polesine Energy 1 S.r.l. | Polesine 1 (2.3 MW) | 28 March 2012 | **Doc. C-555** (21 June 2012): "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of May 5, 2011 in the amount of Euro 0.1720/kWh. The incentive rate will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 03/28/2012; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.1720/kWh (*Conto* IV) | **Doc. C-556** (26 June 2012) Art. 2: "The incentive tariff, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to 0.1720 Euro/kWh, a value granted by the GSE and communicated to the Responsible Subject with the communication of admission to the incentive tariff." |

---

[1110] Doc. C-2.28.
[1111] Doc. C-2.29.
[1112] Doc. C-554, p. 42 (Polesine Energy 1 S.r.l.) and Doc. C-559, p. 42 (Polesine Energy 2 S.r.l.).
[1113] Doc. C-554, Arts. 5(3), 8(3) and 12(1); Doc. C-559, Arts. 5(3), 8(3) and 12(1).
[1114] Doc. C-557 (Polesine Energy 1 S.r.l.) and Doc. C-562 (Polesine Energy 2 S.r.l.).
[1115] See also Doc. C-557, p. 2, recital (B); Doc. C-562, p. 2, recital (B).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| Polesine Energy 2 S.r.l. | Polesine 2 (2.3 MW) | 28 March 2012 | **Doc. C-560** (21 June 2012) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of May 5, 2011 in the amount of Euro 0.1720/kWh. The incentive rate will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 03/28/2012; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.1720/kWh (*Conto* IV) | **Doc. C-561** (26 June 2012) "The incentive tariff, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to 0.1720 Euro/kWh, a value granted by the GSE and communicated to the Responsible Subject with the communication of admission to the incentive tariff." |

### R.     Other Claimants qualified under *Conto* IV

#### a.     The investments

944. Eight other Operating Companies incorporated in Italy registered plants under the *Conto* IV. All of them signed EPC contracts with REC Systems Germany GmbH, a German Contractor, for the construction of several PV plants in Italy, and all of them were then acquired by companies of the CHORUS Group:

| Claimant | Date of incorporation in Italy | Plant name | EPC contract | Date of acquisition |
|---|---|---|---|---|
| Cagli Solar di CHORUS Solar Italia Centrale 5. S.r.l. & Co. S.a.s. | 18 January 2011 (**Doc. C-2.36**) | Baldaccioni (998.28 kW) | **Doc. C-451** (15 April 2011) | 21 July 2011 (**Doc. C-452**, Project Purchase Agreement between Eneri PV S.r.l. and CHORUS CleanTech Management GmbH) |
| Atlantis Energy di CHORUS Solar Italia Centrale 5. S.r.l. & Co. S.a.s. | 2 April 2010 (**Doc. C-2.38**) | Atlantis Narni (834.72 kW) | **Doc. C-497** (29 June 2011) | 10 June 2011 (**Doc. C-498**, Project Purchase Agreement between Eneri PV S.r.l. and CHORUS CleanTech Management GmbH) |
| Collecchio Energy S.r.l. | 18 June 2010 (**Doc. C-2.41**) | Girasole (998.6 kW) | **Doc. C-501** (7 July 2011) | 21 July 2011 (**Doc. C-502**, Project Purchase Agreement between Eneri PV S.r.l. and CHORUS CleanTech Management GmbH) |
| Energia & Sviluppo S.r.l. | 4 November 2009 (**Doc. C-2.48**) | Bellante (996.48 kW) | **Doc. C-516** (7 July 2011) | 21 July 2011 (**Doc. C-517**, Project Purchase Agreement between Eneri PV S.r.l. and CHORUS CleanTech Management GmbH) |
| Lux Energy S.r.l. | 6 September 2010 (**Doc. C-2.56**) | Giulianova (990.72 kW) | **Doc. C-509** (7 July 2011) | 21 July 2011 (**Doc. C-511**, Project Purchase Agreement between Eneri PV S.rl. and CHORUS CleanTech Management GmbH) |
| | | Mosciano (990.72 kW) | **Doc. C-509** (7 July 2011) | |
| San Martino S.r.l.[1116] | 11 January 2010 (**Doc. C-2.54**) | Montgabbione (967.68 kW) | **Doc. C-505** (7 July 2011) | 21 July 2011 (**Doc. C-506**, Addendum Agreement to the Project Purchase Agreement, which refers to an original Project Purchase Agreement of 21 July 2011) |
| San Giuliano Energy S.r.l. | 14 April 2011 (**Doc. C-2.52**) | San Giuliano (720 kW) | **Doc. C-539** (19 October 2011) | 13 April 2012 (**Doc. C-542**, Addendum Agreement to the Project Purchase Agreement, |

---

[1116] Prior to its acquisition by the CHORUS Group, San Martino S.r.l. was named San Martino Energy S.a.s. (Doc. C-2.54, p. 22).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*

Award

| | | | | |
|---|---|---|---|---|
| | | | | which refers to an original Project Purchase Agreement of 13 April 2012) |
| Le Lame S.r.l.[1117] | 20 December 2010 (**Doc. C-2.50**) | Le Lame (multi-sectional) (4.62 MW) | **Doc. C-544** (21 October 2011) | 13 April 2012 (**Doc. C-545**, Project Purchase Agreement between Eneri PV S.r.l. and CHORUS Solar 5 and CHORUS CleanTech 7) |

945. On 27 September 2011, Watson, Farley & Willliams produced a due diligence report at the request of CHORUS CleanTech for several of these plants[1118]. San Giuliano and Le Lame also obtained due diligence reports from Rödl & Partner[1119].

**b.    Rights obtained**

(i)    *Conto* Program

946. Each of the plants of these eight Operating Companies qualified for the *Conto* Program and obtained incentive tariffs under *Conto* IV:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | Tariff | *Convenzione* |
|---|---|---|---|---|---|
| Cagli Solar di CHORUS Solar Italia Centrale 5. S.r.l. & Co. S.a.s. | Baldaccioni (998.28 kW) | 20 July 2011 | **Doc. C-459** (9 March 2012) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of May 5, 2011 in the amount of Euro 0.2760/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 07/20/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.2760/kWh (*Conto* IV) | **Doc. C-461** (22 March 2012) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.2760/kWh, a value granted by GSE and communicated to the Subject Responsible with the communication of acceptance to the incentive rate." |
| Atlantis Energy di CHORUS Solar Italia Centrale 5. S.r.l. & Co. S.a.s. | Atlantis Narni (834.72 kW) | 7 July 2011 | **Doc. C-499** (24 February 2012) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of May 5, 2011 in the amount of Euro 0.2760/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 07/07/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.2760/kWh (*Conto* IV) | **Doc. C-675** (19 March 2012) Art. 2: "The incentive tariff, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to 0.2760 Euro/kWh, a value granted by GSE and communicated to the Subject Responsible with the communication of admission to the incentive tariff." |
| Collecchio Energy S.r.l. | Girasole (998.6 kW) | 29 July 2011 | **Doc. C-503** (20 February 2012) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive | EUR 0.2760/kWh (*Conto* IV) | **Doc. C-676** (15 March 2012) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant |

---

[1117] Prior to its acquisition by the CHORUS Group, Le Lame S.r.l. was named Le Lame di ESB S.r.l. & Co. S.a.s. (Doc. C-2.50, p. 22).
[1118] Doc. C-453. See also Docs. C-454 to C-458, with due diligence performed by Studio Legale Donella.
[1119] Doc. C-543; Doc. C-553.

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| | | | | | |
|---|---|---|---|---|---|
| | | | rate established by the Ministerial Decree of May 5, 2011 in the amount of Euro 0.2760/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 07/29/2011; the rate is at a constant level in current values for the entire twenty-year period." | | under this Agreement, is equal to Euro 0.2760/kWh, a value granted by GSE and communicated to the Subject Responsible with the communication of acceptance to the incentive rate." |
| Energia & Sviluppo S.r.l. | Bellante (996.48 kW) | 29 July 2011 | **Doc. C-518** (21 February 2012) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of May 5, 2011 in the amount of Euro 0.2760/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 07/29/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.2760/kWh (*Conto* IV) | **Doc. C-678** (15 March 2012) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.2760/kWh, a value granted by GSE and communicated to the Subject Responsible with the communication of acceptance to the incentive rate." |
| Lux Energy S.r.l. | Giulianova (990.72 kW) | 30 July 2011 | **Doc. C-513** (29 February 2012) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of May 5, 2011 in the amount of Euro 0.276/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 07/30/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.2760/kWh (*Conto* IV) | **Doc. C-668** (20 March 2012) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.2760/kWh, a value granted by GSE and communicated to the Subject Responsible with the communication of acceptance to the incentive rate." |
| | Mosciano (990.72 kW) | 30 July 2011 | **Doc. C-512** (22 December 2011) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of May 5, 2011 in the amount of Euro 0.2760/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 07/30/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.2760/kWh (*Conto* IV) | **Doc. C-673** (15 March 2012) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.2760/kWh, a value granted by GSE and communicated to the Subject Responsible with the communication of acceptance to the incentive rate." |
| San Martino S.r.l. | Montgabbione (967.68 kW) | 10 August 2011 | **Doc. C-507** (25 February 2012) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of May 5, 2011 in the amount of Euro 0.263/kWh. The incentive tariff will be granted to you for a continuous twenty-year | EUR 0.2630/kWh (*Conto* IV) | **Doc. C-677** (19 March 2012) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.2630/kWh, a value granted by GSE and communicated to the Subject Responsible with the |

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| | | | | | |
|---|---|---|---|---|---|
| | | | period, starting from the plant's date of entry into operation, which you communicated to us: 08/10/2011; the rate is at a constant level in current values for the entire twenty-year period." | | communication of acceptance to the incentive rate." |
| San Giuliano Energy S.r.l. | San Giuliano (720 kW) | 28 October 2011 | **Doc. C-540** (28 February 2012) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of May 5, 2011 in the amount of Euro 0.233/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 10/28/2011; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.2330/kWh (*Conto* IV) | **Doc. C-679** (20 March 2012) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.2330/kWh, a value granted by GSE and communicated to the Subject Responsible with the communication of acceptance to the incentive rate." |
| Le Lame S.r.l. | Le Lame (multi-sectional) (4.62 MW) | 17 November 2011 | **Doc. C-546 (Section 1)** (27 February 2012) **Doc. C-547 (Section 2)** (29 February 2012) **Doc. C-548 (Section 3)** (6 March 2012) **Doc. C-549 (Section 4)** (8 March 2012) **Doc. C-550 (Section 5)** (27 February 2012) **Doc. C-551 (Section 6)** (20 February 2012) | EUR 0.2010/kWh (*Conto* IV) | **Doc. C-680 (Section 1)** (19 March 2012) **Doc. C-681 (Section 2)** (20 March 2012) **Doc. C-682 (Section 3)** (22 March 2012) **Doc. C-683 (Section 4)** (22 March 2012) **Doc. C-684 (Section 5)** (19 March 2012) **Doc. C-685 (Section 6)** (19 March 2012) |

    (ii)   <u>MGP Regime</u>

947. Given their size under 1 MW, all the plants qualified for the MGP Regime:

| Claimant | Plant name | *Contratto per il Ritiro* |
|---|---|---|
| Cagli Solar di CHORUS Solar Italia Centrale 5. S.r.l. & Co. S.a.s. | Baldaccioni (998.28 kW) | **Doc. C-460** (6 October 2011) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the resolution no. 280/07, as subsequently amended and supplemented." |
| Atlantis Energy di CHORUS Solar Italia Centrale 5. S.r.l. & Co. S.a.s. | Atlantis Narni (834.72 kW) | **Doc. C-500** (11 October 2011) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the resolution no. 280/07, as subsequently amended and supplemented." |
| Collecchio Energy S.r.l. | Girasole (998.6 kW) | **Doc. C-504** (6 October 2011) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the resolution no. 280/07, as subsequently amended and supplemented." |
| Energia & Sviluppo S.r.l. | Bellante (996.48 kW) | **Doc. C-519** (11 October 2011) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the resolution no. 280/07, as subsequently amended and supplemented." |
| Lux Energy S.r.l. | Giulianova (990.72 kW) | **Doc. C-514** (21 December 2011) |

238

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

| | | |
|---|---|---|
| | | Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the resolution no. 280/07, as subsequently amended and supplemented." |
| | Mosciano (990.72 kW) | **Doc. C-514** (21 December 2011) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the resolution no. 280/07, as subsequently amended and supplemented." |
| San Martino S.r.l. | Montgabbione (967.68 kW) | **Doc. C-508** (19 January 2012) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the resolution no. 280/07, as subsequently amended and supplemented." |
| San Giuliano Energy S.r.l. | San Giuliano (720 kW) | **Doc. C-541** (9 February 2012) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the resolution no. 280/07, as subsequently amended and supplemented." |
| Le Lame S.r.l. | Le Lame (multi-sectional) (4.62 MW) | **Doc. C-552** (19 January 2012) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the resolution no. 280/07, as subsequently amended and supplemented." |

**S.    Claimant MTS4 S.r.l.**

**a.    The investments**

948. MTS4 S.r.l. is an Italian company incorporated in Italy on 26 March 2009, who signed a turnkey agreement with Martifer Solar S.r.l., an Italian contractor, for the construction of three PV plants:

| Claimant | Plant name | EPC contract | Installed capacity |
|---|---|---|---|
| MTS4 S.r.l. | Partitore 1 | **Doc. C-570** (24 September 2012) | 2.4 MW |
| | Partitore 2 | **Doc. C-571** (24 September 2012) | 990 kW |
| | Partitore 3 | **Doc. C-572** (24 September 2012) | 990 kW |

949. On 20 December 2013 Capital Stage acquired MTS4 S.r.l.[1120]. In the share purchase agreement, the seller – Martifer Solar S.r.l. – confirmed that the three plants benefitted from tariffs under the *Conto* IV regime and that it was "not aware of any reasons why" such tariffs "should be reduced or revoked"[1121].

**b.    Rights obtained**

(i)    *Conto* Program

950. Each of Partitore plants entered into operation on 28 December 2012 and was entitled to obtain an incentive tariff of EUR 0.1470/kWh under *Conto* IV, as

---

[1120] Doc. C-582.
[1121] Doc. C-582, Art. 6.8(vi).

*Encavis AG and others v. Italian Republic*
*(ICSID Case No. ARB/20/39)*
Award

recognized by the GSE in Tariff Confirmation Letters and *Convenzioni* signed with
MTS4 S.r.l.:

| Claimant | Plant name | Date of entry into operation | Tariff Confirmation Letter | Tariff | *Convenzione* |
|---|---|---|---|---|---|
| MTS4 S.r.l. | Partitore 1 (2.4 MW) | 28 December 2012 | **Doc. C-573** (5 March 2013) "With reference to the photovoltaic plant in question, we hereby inform you of acceptance for the incentive rate established by the Ministerial Decree of May 5, 2011 in the amount of Euro 0.147/kWh. The incentive tariff will be granted to you for a continuous twenty-year period, starting from the plant's date of entry into operation, which you communicated to us: 12/28/2012; the rate is at a constant level in current values for the entire twenty-year period." | EUR 0.1470/kWh (*Conto* IV) | **Doc. C-579** (8 March 2013) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.1470/kWh, a value granted by the GSE and communicated to the Party in Charge with the communication of admission to the incentive rate." |
| | Partitore 2 (990 kW) | 28 December 2012 | **Doc. C-577** (22 March 2013) This is not a Tariff Confirmation Letter, but a "*dichiarazione di accettazione delle condizioni contrattualli*". | EUR 0.1470/kWh (*Conto* IV) | **Doc. C-580** (28 March 2013) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.1470/kWh, a value granted by the GSE and communicated to the Party in Charge with the communication of admission to the incentive rate." |
| | Partitore 3 (990 kW) | 28 December 2012 | **Doc. C-578** (16 March 2013) This is not a Tariff Confirmation Letter, but a "*dichiarazione di accettazione delle condizioni contrattualli*". | EUR 0.1470/kWh (*Conto* IV) | **Doc. C-581** (27 March 2013) Art. 2: "The incentive rate, at a constant level in current values, to be granted to the photovoltaic plant under this Agreement, is equal to Euro 0.1470/kWh, a value granted by the GSE and communicated to the Party in Charge with the communication of admission to the incentive rate." |

(ii)    MGP Regime

951. Finally, the two smaller Partitore plants also qualified for the MGP Regime:

| Claimant | Plant name | *Contratto per il Ritiro* |
|---|---|---|
| MTS4 S.r.l. | Partitore 2 (990 kW) | **Doc. C-575** (19 February 2013) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |
| | Partitore 3 (990 kW) | **Doc. C-576** (19 February 2013) Art. 4: "The prices paid by the GSE to the Producer for the off-take of energy under this Agreement are defined by Articles 6 and 7 of the AEEG resolution no. 280/07, as subsequently amended and supplemented." |