# Exhibit 19

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

**Gabriel Resources Ltd. and Gabriel Resources (Jersey) Ltd.**

**v.**

**Romania**

**(ICSID Case No. ARB/15/31)**

---

**AWARD**

---

**_Members of the Tribunal_**
Prof. Pierre Tercier, President of the Tribunal
Prof. Horacio A. Grigera Naón, Arbitrator
Prof. Zachary Douglas KC, Arbitrator

**_Secretary of the Tribunal_**
Ms. Sara Marzal Yetano

**_Assistant to the Tribunal_**
Ms. Maria Athanasiou

---

_Date of dispatch to the Parties_: 8 March 2024

**In the arbitral proceedings between**

**Gabriel Resources Ltd. and Gabriel Resources (Jersey) Ltd.**

**Claimants**

represented by

*Ms. Abby Cohen Smutny*, *Mr. Darryl S. Lew*, *Mr. Brody Greenwald*, *Mr. Petr Polášek* and *Mr. Hansel Pham* of **WHITE & CASE LLP**, *701 Thirteenth Street NW, Washington, DC 20005, USA: asmutny@whitecase.com; dlew@whitecase.com; bgreenwald@whitecase.com; ppolasek@whitecase.com; hpham@whitecase.com;*

and

*Ms. Levana Zigmund*, *Ms. Anca Puscasu, Ms. Oana Ureche* and *Ms. Ruxandra Nita* of *ȚUCA ZBÂRCEA & ASOCIAȚII*, *Victoriei Square, 4-8 Nicolae Titulescu Ave. America House, West Wing, 8th Floor, Sector 1, Bucharest 011141, Romania: levana.zigmund@tuca.ro; anca.puscasu@tuca.ro; oana.ureche@tuca.ro; ruxandra.nita@tuca.ro*

**and**

**Romania**

**Respondent**

represented by

*Dr. Veijo Heiskanen*, *Mr. Matthias Scherer*, *Ms. Lorraine de Germiny*, *Ms. Noradèle Radjai* and *Ms. Emily McConaughey* of *LALIVE*, *35, Rue de la Mairie, PO Box 6569, 1211 Geneva 6, Switzerland: vheiskanen@lalive.law; mscherer@lalive.law; ldegerminy@lalive.law; nradjai@lalive.law; emcconaughey@lalive.law;*

and

*Prof. Crenguta Leaua*, *Prof. Ştefan Deaconu*, *Ms. Andreea Simulescu*, *Ms. Liliana Deaconescu*, *Ms. Corina Tănase* and *Ms. Andra Soare-Filatov* of *LEAUA DAMCALI DEACONU PAUNESCU – LDDP*, *10, Zborului Street, sector 3, Bucharest 030595, Romania: cleaua@lddp.ro; sdeaconu@lddp.ro; asimulescu@lddp.ro; ldeaconescu@lddp.ro; ctanase@lddp.ro; asoarefilatov@lddp.ro.*

Claimants and Respondent are hereinafter jointly referred to as "**the Parties**".

**TABLE OF CONTENTS**

TABLE OF CONTENTS ........................................................................................................iii

TABLE OF ABBREVIATIONS ............................................................................................ x

TABLE OF MAIN SUBMISSIONS ..................................................................................xiv

A.    SUMMARY OF THE FACTS AND PROCEDURE ...................................................... 1

I.    The Parties and other concerned entities............................................................. 1
   1.    The Parties ..................................................................................................... 1
   2.    Other concerned entities................................................................................ 3

II.   Overview of the facts ................................................................................................ 3
   1.    The inception of the mining Project and the joint venture with the State.................. 4
   2.    The mining licenses ....................................................................................... 4
       a.    The Roşia Montană License ................................................................. 4
       b.    The Bucium Exploration License ......................................................... 6
   3.    The Environmental Permitting process ......................................................... 7
       a.    The process ........................................................................................... 8
       b.    The main TAC meetings and assessment............................................ 11
       c.    The technical or other elements .......................................................... 15
           i.     The Waste Management Plan ..................................................... 15
           ii.    The Water Law and the Water Framework Directive................. 16
           iii.   The surface rights ...................................................................... 17
           iv.    The zoning or urbanism plans ................................................... 18
           v.     The cultural heritage issues ...................................................... 19
               1.    The 2000 Archaeological Feasibility Study......................... 19
               2.    The Archaeological Discharge Certificates ........................ 20
               3.    The termination of the Alburnus Maior National Research Program................ 21
               4.    The Cârnic ADC and SEA Endorsement.............................. 22
               5.    The Historical Monuments ................................................ 24
           vi.    The financial guarantees ........................................................... 25
   4.    The 2011 renegotiation of the financial terms of the Project....................... 26
   5.    The Roşia Montană Law or the Draft Law ................................................... 31
       a.    The background .................................................................................... 32
       b.    The Draft Law and its rejection .......................................................... 33
   6.    The events that followed .............................................................................. 35
       a.    The adoption of the 2015 LHM........................................................... 36
       b.    Romania's application to UNESCO..................................................... 37
       c.    The TAC meetings ............................................................................... 39
       d.    The recapitalization of RMGC ........................................................... 40
       e.    The Exploitation Licenses in relation to Bucium ............................... 40

f.   The investigations...........................................................................................41
g.   The 10-year cyanide moratorium ...........................................................41

III.  The arbitral proceedings ...................................................................................42
1.   The institution of the proceedings ..............................................................42
2.   The written phase of the proceedings ........................................................42
3.   The Hearing on Jurisdiction and the Merits ..............................................70
4.   The steps following the Hearing on Jurisdiction and the Merits ..............73
5.   The Hearing on Technical Issues and Damages.........................................87
6.   The steps following the Hearing on Damages and Technical Issues .........90
7.   The closing of the proceedings ..................................................................95

B.   LEGAL CONSIDERATIONS ...........................................................................96

I.   In general ...........................................................................................................96
1.   The arbitration agreements .........................................................................96
2.   The constitution of the Arbitral Tribunal ................................................100
3.   The arbitral proceedings ..........................................................................101
4.   The Parties' prayers for relief .................................................................104
a.   Claimants ............................................................................................104
b.   Respondent ..........................................................................................105
5.   The roadmap .............................................................................................105

II.  Preliminary considerations ............................................................................106
1.   Applicable law ..........................................................................................106
2.   Rules on treaty interpretation ..................................................................107
3.   Relevance of prior decisions or awards ...................................................108

III. Jurisdiction and Admissibility ......................................................................108
1.   The issue ...................................................................................................108
2.   EU law objection ......................................................................................111
a.   The issue ..............................................................................................111
b.   The Parties' positions .........................................................................111
i.   Respondent ......................................................................................111
ii.  Claimants .........................................................................................113
c.   The EU Commission's position ...........................................................116
d.   The Tribunal's analysis ......................................................................119
i.   In general .........................................................................................119
ii.  In specific ........................................................................................120
1.   Does the *Achmea* Judgment apply to an arbitration agreement with Gabriel Jersey
as an investor incorporated in the Bailiwick of Jersey?............................120
2.   The other aspects of Respondent's objection....................................122
e.   The conclusion .....................................................................................122
3.   Investment under the UK-Romania BIT ....................................................123
a.   The issue ..............................................................................................123
b.   The Parties' positions .........................................................................123
i.   Respondent ......................................................................................123

*ii.   Claimants* ........................................................................................... *124*
   **c.   The Tribunal's analysis** ................................................................. **125**
   *i.   In general* ........................................................................................ *125*
   *ii.   The definition of "investment"* ..................................................... *125*
   *iii.   The facts* ......................................................................................... *127*
   **d.   The conclusion** .............................................................................. **129**
**4.   Notice of Dispute under the Canada-Romania and UK-Romania BITs** ................ **129**
   **a.   The issue** ........................................................................................ **129**
   **b.   The Parties' positions** .................................................................... **129**
   *i.   Respondent* ...................................................................................... *129*
   *ii.   Claimants* ......................................................................................... *130*
   **c.   The Tribunal's analysis** ................................................................. **131**
   *i.   In general* ........................................................................................ *131*
   *ii.   The notice requirements* .................................................................. *131*
   *iii.   The facts* ......................................................................................... *133*
   **d.   The conclusion** .............................................................................. **136**
**5.   Waiver under the Canada-Romania BIT** ................................................................ **136**
   **a.   The issue** ........................................................................................ **136**
   **b.   The Parties' positions** .................................................................... **136**
   *i.   Respondent* ...................................................................................... *136*
   *ii.   Claimants* ......................................................................................... *137*
   **c.   The Tribunal's analysis** ................................................................. **137**
   *i.   In general* ........................................................................................ *137*
   *ii.   The waiver requirements* ................................................................. *138*
   *iii.   The facts* ......................................................................................... *139*
   **d.   The conclusion** .............................................................................. **141**
**6.   Time-bar objections under the Canada-Romania BIT and otherwise** ................... **141**
   **a.   The issue** ........................................................................................ **141**
   **b.   The Parties' positions** .................................................................... **141**
   *i.   Respondent* ...................................................................................... *141*
   *ii.   Claimants* ......................................................................................... *143*
   **c.   The Tribunal's analysis** ................................................................. **146**
   *i.   In general* ........................................................................................ *146*
   *ii.   The time-bar requirements* .............................................................. *146*
     1.   Article XIII(3)(d) of the Canada-Romania BIT ............................ 146
     2.   Article XVIII(6) of the Canada-Romania BIT .............................. 147
     3.   Temporal limitation of the obligations under the Canada-Romania BIT ........... 149
     4.   Composite act .............................................................................. 149
   *iii.   The facts* ......................................................................................... *150*
   **d.   The conclusion** .............................................................................. **151**
**7.   Substantive obligations under the Canada-Romania BIT** ...................................... **152**
   **a.   The issue** ........................................................................................ **152**
   **b.   The Parties' positions** .................................................................... **152**
   *i.   Respondent* ...................................................................................... *152*
   *ii.   Claimants* ......................................................................................... *152*
   **c.   The Tribunal's analysis** ................................................................. **153**

  **d. The conclusion** ............................................................................... **153**
 **8. Jurisdiction under the ICSID Convention** ................................. **154**
 **9. Conclusion on jurisdiction** ....................................................... **154**

**IV. Liability** ................................................................................................... **155**
 **1. The issue** ...................................................................................... **155**
 **2. The Project** .................................................................................. **156**
 **3. The principal claim** .................................................................... **160**
  **a. The issue** ................................................................................. **160**
  **b. The Parties' positions** ........................................................... **160**
   *i. Claimants* .......................................................................... *160*
   *ii. Respondent* ........................................................................ *163*
  **c. The Tribunal's analysis** ....................................................... **166**
   *i. The approach* .................................................................... *166*
   *ii. The law* .............................................................................. *166*
    1. Introduction ................................................................. 166
    2. Composite act ............................................................. 167
     a) The issue ............................................................. 167
     b) The Parties' positions ....................................... 167
     c) The Tribunal's analysis ..................................... 169
    3. The standards of the BITs ......................................... 174
     a) Introduction ....................................................... 174
     b) Fair and equitable treatment ........................... 175
      *i. The issue* ..................................................... *175*
      *ii. The Parties' positions* ................................ *175*
      *iii. The Tribunal's analysis* .............................. *178*
     c) Full protection and security ............................. 182
      *i. The issue* ..................................................... *182*
      *ii. The Parties' positions* ................................ *182*
      *iii. The Tribunal's analysis* .............................. *183*
     d) Unreasonable or discriminatory measures ...... 185
      *i. The issue* ..................................................... *185*
      *ii. The Parties' positions* ................................ *185*
      *iii. The Tribunal's analysis* .............................. *187*
     e) Observance of obligations (umbrella clause) .... 189
      *i. The issue* ..................................................... *189*
      *ii. The Parties' positions* ................................ *189*
      *iii. The Tribunal's analysis* .............................. *191*
     f) Expropriation ..................................................... 192
      *i. The issue* ..................................................... *192*
      *ii. The Parties' positions* ................................ *192*
      *iii. The Tribunal's analysis* .............................. *196*
    4. Conclusion on the standards ..................................... 199
   *iii. The relevant facts* ............................................................ *200*
   *iv. The assessment* ................................................................. *200*
    1. The renegotiation of the economic terms of the Project ...................... 201
     a) The issue ............................................................. 201

b) The facts ........................................................................................... 202
c) The analysis .................................................................................... 208
2. The EIA Process ................................................................................... 212
a) The issue ......................................................................................... 212
b) The TAC meeting(s) ......................................................................... 213
    i. *The facts: the process* ................................................................. 213
    ii. *The facts: The 29 November 2011 TAC Meeting* ......................... 215
        1. Before the 29 November 2011 meeting ................................. 215
        2. During the 29 November 2011 meeting .................................. 217
        3. Following the 29 November 2011 TAC meeting ...................... 220
    iii. *The analysis* ............................................................................ 234
    iv. *The conclusion on the TAC meeting* .......................................... 240
c) Technical or other elements ............................................................ 240
    i. *In general* ................................................................................. 240
    ii. *The Waste Management Plan* ..................................................... 240
        1. The issue ............................................................................... 240
        2. The facts ............................................................................... 240
        3. The analysis .......................................................................... 242
    iii. *The Water Law and the Water Framework Directive* ................. 243
        1. The issue ............................................................................... 243
        2. The facts ............................................................................... 243
        3. The analysis .......................................................................... 250
    iv. *The zoning or urbanism plans and the urban certificate* ........... 251
        1. The issue ............................................................................... 251
        2. The facts ............................................................................... 252
        3. The analysis .......................................................................... 256
    v. *The cultural heritage issues* ...................................................... 258
        1. The issue(s) ........................................................................... 258
        2. The facts: the ADCs ............................................................... 258
        3. The facts: the Ministry of Culture Endorsement .................... 260
        4. The facts: The 2010 List of Historical Monuments ................ 263
        5. The analysis .......................................................................... 264
    vi. *The conclusion on the technical or other elements* ................... 268
3. The Draft Law ....................................................................................... 269
a) The issue ......................................................................................... 269
b) The facts .......................................................................................... 269
c) The analysis .................................................................................... 302
d) The conclusion on the Draft Law ..................................................... 305
4. The Bucium Exploration License and applications ............................. 306
a) The issue ......................................................................................... 306
b) The facts .......................................................................................... 306
c) The analysis .................................................................................... 307
d) The conclusion ................................................................................ 309
v. *The conclusion* .................................................................................... *309*
d. **The conclusion on the principal claim** .................................................. **310**
4. **The first alternative claim** ........................................................................... **310**

  a. **The issue**................................................................................................**310**
  b. **The Parties' positions**......................................................................**310**
   i. *Claimants*........................................................................................*310*
   ii. *Respondent*......................................................................................*311*
  c. **The Tribunal's analysis**..................................................................**312**
  d. **The conclusion on the first alternative claim**.............................**318**
 5. **The second alternative claim**....................................................................**318**
  a. **The issue**................................................................................................**318**
  b. **The Parties' positions**......................................................................**318**
   i. *Claimants*........................................................................................*318*
   ii. *Respondent*......................................................................................*319*
  c. **The Tribunal's analysis**..................................................................**320**
   i. *The approach*..................................................................................*320*
   ii. *The relevant facts*..........................................................................*320*
   iii. *The law*............................................................................................*321*
   iv. *The assessment*...............................................................................*322*
    1. Jurisdiction and admissibility .........................................322
    2. The factual issues and analysis ........................................323
     a) TAC meetings in 2014-2015.........................................324
      i. *The issue*....................................................................*324*
      ii. *The facts*....................................................................*324*
      iii. *The analysis*..............................................................*328*
      iv. *The conclusion*..........................................................*332*
     b) The 2015 LHM ..............................................................332
      i. *The issue*....................................................................*332*
      ii. *The facts*....................................................................*332*
      iii. *The Tribunal's analysis*...........................................*336*
      iv. *The conclusion*..........................................................*340*
     c) The UNESCO application and inscription......................340
      i. *The issue*....................................................................*340*
      ii. *The facts*....................................................................*340*
      iii. *The Tribunal's analysis*...........................................*344*
      iv. *The conclusion*..........................................................*347*
    3. The conclusion ...................................................................347
  d. **The conclusion on the second alternative claim**.........................**348**
 6. **Causation considerations**.........................................................................**348**
 7. **The conclusion on liability**......................................................................**350**

V. **Arbitration and Legal Costs**............................................................................**352**
 1. **The issue**........................................................................................................**352**
 2. **The Parties' positions**..............................................................................**352**
  a. **Claimants**.............................................................................................**352**
  b. **Respondent**..........................................................................................**354**
 3. **The Tribunal's analysis**...........................................................................**355**
  a. **The legal framework**.........................................................................**356**
  b. **The arbitration costs**........................................................................**357**
  c. **The legal costs**....................................................................................**357**

**d.   The allocation of the costs** ........................................................................**358**
**4.   The conclusion**.............................................................................................**359**

**C.   AWARD** .................................................................................................................**360**

## TABLE OF ABBREVIATIONS

| | |
|---|---|
| ADC | Archaeological Discharge Certificate |
| Alburnus Maior | *Asociaţia Aurarilor Alburnus Maior Roşia Montană,* an NGO established by Roşia Montană residents in September 2000 to represent the interests of families in Roşia Montană and Bucium *vis-à-vis* the Project |
| ANAF | Romanian National Agency of Fiscal Administration (Agenţia Naţională de Administrare Fiscală) |
| ANAR | National Administration of Romanian Waters (*Administraţia Naţională Apele Române*) |
| BITs | The Canada-Romania BIT and the UK-Romania BIT |
| Bucium Exploration License | Concession License for Exploration within the "Bucium Complex" Perimeter No. 218/1999 |
| County Council | Deliberative authority of the local public administration of a county |
| Draft Agreement | Draft "Agreement on Certain Measures Regarding the Mining of Gold and Silver Ores in the Roşia Montană Perimeter" that was submitted by the Government to Parliament as an attachment to the Draft Law in August 2013 |
| Draft Law or Roşia Montană Law | Draft "Law on Certain Measures Regarding the Mining of Gold-Silver Ores in the Roşia Montană Perimeter and on Stimulating and Facilitating the Development of Mining Activities in Romania" submitted by the Government to Parliament in August 2013 |
| EIA | Environmental Impact Assessment |
| EIA Process | Procedure for the environmental impact assessment of construction projects for purposes of obtaining an environmental permit |
| EIA Report | Report on Environmental Impact Assessment |
| EU | European Union |
| FET | Fair and equitable treatment |

| | |
|---|---|
| FPS | Full protection and security |
| Gabriel Canada | Gabriel Resources Ltd. |
| Gabriel Jersey | Gabriel Resources (Jersey) Ltd |
| ICDER | The Independent Centre for the Development of Environmental Resources (*Centrul Independent pentru Dezvoltarea Resurselor de Mediu*) |
| ICOMOS | International Council on Monuments and Sites |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| ICSID Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| IFC | International Finance Corp. |
| IGIE | Independent Group of International Experts |
| IGIE Report | Report of the Independent Group of International Experts dated 15 November 2006 |
| ILC Articles | International Law Commission's Draft Articles on Responsibility of States for Internationally Wrongful Acts |
| Inter-Ministerial Commission | A commission established by the Government in March 2013 under the coordination of the Department for Infrastructure Projects of National Interest and Foreign Investments to mediate between the State and Roşia Montană Gold Corporation S.A. |
| LHM | List of Historical Monuments |
| License | Roşia Montană exploitation license No. 47/1999 |
| Local Council | The deliberative authority of the municipality |

| | |
|---|---|
| MFN clause | Most Favored Nation clause |
| Minvest | This name designates both Regia Autonomă a Cuprului Deva (which became Companiei Nationale a Cuprului, Aurului si Fierului "Minvest" S.A. in 1998) and SC Minvest Roşia Montană SA, a new company established in October 2013, to which Regia Autonomă a Cuprului Deva transferred some of its assets and liabilities, including its shares in RMGC |
| NAMR | National Agency for Mineral Resources (*Agentia Nationala pentru Resurse Minerale*) |
| Negotiation Commission | Governmental commission established in May 2013 to negotiate with RMGC the economic terms of the Project |
| NGO | Non-Governmental Organization |
| NIH | National Institute for Heritage |
| Project | The Roşia Montană Project |
| Project Area | Area within the License perimeter corresponding to the industrial area of the PUZ |
| PUG | General Urban Plan (*planul urbanistic general*) |
| PUZ | Zonal Urban Plan (*planul urbanistic zonal*) |
| RMGC | SC Roşia Montană Gold Corporation SA |
| SEA | Strategic Environmental Assessment |
| SEA Directive | Directive 2001/42/EC of the European Parliament and of the Council of 27 June 2001 on the assessment of the effects of certain plans and programmes on the environment |
| SEA Procedure | Procedure for the environmental impact assessments of urban plans (such as a PUZ) |
| Special Commission | Joint Parliamentary Special Commission of the Chamber of Deputies and of the Senate established on 17 September 2013 to review the Draft Law and to draft a report for the debate in the plenary sessions of each chamber |
| TAC | Technical Assessment Committee |

| | |
|---|---|
| TMF | Tailings Management Facility |
| UC | Urban Certificate |
| UNESCO | United Nations Educational, Scientific and Cultural Organization |
| Water Framework Directive | Directive 2000/60/EC of the European Parliament and of the Council of 23 October 2000 establishing a framework for Community action in the field of water policy |

# TABLE OF MAIN SUBMISSIONS

| | |
|---|---|
| RfA or Request for Arbitration | Request for Arbitration dated 21 July 2015 |
| Memorial | Claimants' Memorial dated 30 June 2017 |
| Counter-Memorial | Respondent's Counter-Memorial dated 22 February 2018 |
| Reply | Claimants' Reply and Counter-Memorial on Jurisdiction dated 2 November 2018 |
| Rejoinder | Respondent's Rejoinder dated 24 May 2019 |
| Surrejoinder | Claimants' Surrejoinder on the New Jurisdictional Objection dated 28 June 2019 |
| C-PO 27 | Claimants' Responses to the Tribunal's Questions set out in Procedural Order No. 27 dated 11 May 2020 |
| R-PO 27 | Respondent's Response to Claimants' Answers to the Tribunal's Questions in Procedural Order No. 27 dated 14 July 2020 |
| C-PHB | Claimants' Post-Hearing Brief dated 18 February 2021 |
| R-PHB | Respondent's Post-Hearing Brief dated 18 February 2021 |
| Reply C-PHB | Claimants' Reply Post-Hearing Brief dated 23 April 2021 |
| Reply R-PHB | Respondent's Reply Post-Hearing Brief dated 23 April 2021 |
| C-Post-2013 | Claimants' Response to the Tribunal's Questions Regarding Post-2013 Events dated 14 June 2022 |
| R-Post-2013 | Respondent's Reply to Claimants' Response to the Tribunal's Questions Regarding Post-2013 Events dated 19 September 2022 |
| C-Costs | Claimants' Submission on Costs dated 16 December 2022 |
| R-Costs | Respondent's Submission on Costs dated 16 December 2022 |
| C-Reply Costs | Claimants' Reply Submission on Costs dated 6 January 2023 |

R-Reply Costs      Respondent's Reply Submission on Costs dated 6 January 2023

## A.    SUMMARY OF THE FACTS AND PROCEDURE

### I.    The Parties and other concerned entities

#### 1.    The Parties

1.    ***Claimants*** are the following:

-    ***Gabriel Resources Ltd.***, a publicly traded company with shares listed on the Toronto Stock Exchange ("***Gabriel Canada***"). In 1997, Gabriel Canada became a 100% equity shareholder of Gabriel Resources (Jersey) Ltd.[1]

-    ***Gabriel Resources (Jersey) Ltd.***, a company incorporated under the laws of the Bailiwick of Jersey ("***Gabriel Jersey***"). Gabriel Jersey was registered on 28 May 1996. It has been an indirectly wholly owned subsidiary of Gabriel Canada since 1997.[2]

2.    Collectively, Gabriel Canada and Gabriel Jersey are referred to as ***Gabriel***.

3.    ***Respondent*** is the ***State of Romania***. Several Romanian governmental authorities are implicated in the present case. These include the following:

-    The ***Senate of Romania***, which is the upper chamber of Parliament of Romania.

-    The ***Chamber of Deputies of Romania***, which is the lower chamber of Parliament of Romania.

-    The ***General Secretariat of the Government of Romania***, which is a public body subordinated to the Prime Minister.

-    The ***Joint Parliamentary Special Commission***, a 19-member commission established on 17 September 2013 by Parliament (the "Special Commission") to analyze the draft "Law on Certain Measures Regarding the Mining of Gold and Silver Ores in the Roşia Montană Perimeter and on Stimulating and Facilitating the

---

[1] Request for Arbitration, dated 21 July 2015 ("RfA"), para. 16; Claimants' Memorial, dated 30 June 2017 ("Memorial"), paras 1, 56; Witness Statement of Jonathan Henry, dated 30 June 2017 ("Henry WS I"), para. 3; Expert Report of Compass Lexecon, dated 30 June 2017, para. 43.

[2] RfA, para. 9; Memorial, para. 1.

Development of Mining Activities in Romania" (the "Draft Law" or the "Roşia Montană Law") and prepare a report for both chambers of Parliament.[3]

- The **National Agency for Mineral Resources** ("**NAMR**"), the State mining authority responsible for granting exploration and exploitation licenses.[4]

- The **Ministry of Environment of Romania**, responsible, among other things, for deciding on environmental permits.[5]

- The **Technical Assessment Committee** ("**TAC**"), a committee that participates in the environmental impact assessments of large-scale mining projects by reviewing reports on the subject and issuing recommendations to the Government on the issuance of environmental permits.[6]

- The **Inter-Ministerial Commission**, a commission established by the Government in March 2013 under the coordination of the Department for Infrastructure Projects of National Interest and Foreign Investments to mediate between the State and Roşia Montană Gold Corporation S.A. The Commission included the Ministry of Environment, Department of Waters, Forests, and Fisheries, Ministry of Culture, Ministry of Agriculture, Ministry of Regional Development, NAMR, Ministry of Public Finance, Ministry of Justice, and the Romanian Waters National Administration.[7]

- The **Ministry of Culture of Romania**, responsible, among other things, for issues concerning cultural heritage.

- The **National Administration or Romanian Waters** ("**ANAR**"), the authority responsible for issuing water management permits.[8]

---

[3] Memorial, para. 500; Respondent's Counter-Memorial, dated 30 June 2018 ("Counter-Memorial"), para. 358; Exh. C-909 (Parliament decision establishing the Joint Special Commission, dated 17 September 2013).

[4] RfA, para. 15; Memorial, para. 93. See also Memorial, paras 103-104, 115-116.

[5] Memorial, paras 193-195.

[6] RfA, para. 28; Memorial, paras 14, 190; Counter-Memorial, para. 77; Exh. C-1770 (Ministry of Environment, Order 171/2005 on establishing and functioning of central level TAC); Exh. C-1771 (Ministry of Environment, Order 405/2010 on establishing and functioning of central level TAC); Exh. C-1772 (Ministry of Environment, Order 794/2007 on establishing and functioning of central level TAC).

[7] Memorial, paras 414-415; Counter-Memorial, para. 290; Exh. C-553 (Draft Informative Note on the activity of the Inter-Ministerial Working Group convened for the Roşia Montană mining project ████████████████████).

[8] Respondent's Rejoinder, dated 24 May 2019 ("Rejoinder"), paras 273-274, fn. 355.

### 2. Other concerned entities

4. ***Roşia Montană Gold Corporation S.A.*** ("***RMGC***") (formerly Euro Gold Resources S.A.), the joint venture between Gabriel and Romania, a Romanian joint-stock company established in August 1997 and in which Gabriel Jersey holds 80.69% and the Romanian State, through Minvest Roşia Montană S.A., holds 19.3%.[9]

5. ***Minvest Roşia Montană S.A.*** ("***Minvest***") (formerly ***Regia Autonomă a Cuprului Deva*** or ***RAC Deva***) is a State enterprise under the subordination of the Ministry of Industry, established for the exploration of copper, gold, silver, and other non-ferrous metal deposits and the upgrading of the existing mines through which the Romanian State owns 19.31% in RMGC.[10]

## II. Overview of the facts

6. The present dispute concerns Romania's treatment of Claimants' alleged investment in relation to a mining project to exploit gold and silver deposits at Roşia Montană, a mining town in Transylvania (the "Roşia Montană Project" or the "Project"), as well as a project to exploit gold, silver and copper deposits in the neighboring Bucium area (the "Bucium Projects").[11] Specifically, the Parties disagree on whether this treatment was made in accordance with the rule of law or based on political considerations and without regard to the applicable legal processes and respect for vested rights.

7. The following section contains a brief summary of the facts of the dispute. This account is, to the extent possible, chronological. However, because of the volume of the record and the complexity of the case, the manner in which the Parties have presented their claims and defences, and the specific issues to be decided by the Tribunal, the Tribunal deems it appropriate also to organize this narrative by subject matter. Thus, other than the presentation of the background of the dispute, the Tribunal will focus on the principal factual issues underlying this case. Specifically, the Tribunal will set forth the genesis of the Project and the joint venture with the State (see section 1 below), the licenses for the Project (see section 2 below), the process to obtain the environmental permit for the Project (see section 3 below), the renegotiation of the economic terms of the Project (see

---

[9] Exh. C-821 (Euro Gold Resources S.A. Certificate of Registration, dated 25 August 1997); RfA, paras 15-17; Memorial, paras 7, 57, 94-95, 127; Henry WS I, para. 1; Second Witness Statement of Dragoş Tănase, dated 30 June 2017 ("Tănase WS II"), para. 7.

[10] RfA, paras 3, 17; Memorial, paras 89, 103.

[11] Memorial, paras 2, 4 and 5.

section 4 below), the Draft Law for the Project (see section 5 below), and subsequent events (see section 6 below).

8.  This summary of facts does not purport to be complete. Where necessary, the material facts will be presented in detail when the Tribunal addresses the different claims.

### 1. The inception of the mining Project and the joint venture with the State

9.  <u>In the early 1990s</u>, Romania, through a State enterprise called *Regia Autonomă a Cuprului din Deva* ("RAC Deva"), took steps to attract foreign investment for the conduct of mining operations at *Roşia Montană* (located in a region known as the Golden Quadrilateral in the Apuseni portion of the Carpathian Mountains in Transylvania, in northwest Romania) and *Bucium* (a neighbouring property).[12] In this connection, it received an interest *from Gabriel Resources NL (Australia)* ("Gabriel Australia") with whom it entered into a *Cooperation Agreement* for this purpose <u>in September 1995</u>. Gabriel Australia assigned its rights under said Cooperation Agreement to *Gabriel Jersey* <u>in June 1996</u>.[13]

10. <u>In August 1997</u>, RAC Deva and Gabriel Jersey established a joint venture company, Euro Gold Resources S.A., later renamed as *Roşia Montană Gold Corporation S.A.* ("RMGC"), with the object to develop and exploit mining projects in Roşia Montană and Bucium. Gabriel Jersey and the State are RMGC's principal shareholders.[14] <u>In April 1997</u>, Gabriel Canada had become the 100% equity shareholder of Gabriel Jersey. Gabriel Jersey has remained a wholly owned subsidiary of Gabriel Canada since that time. Subsequently, RAC Deva was reorganized and reconstituted as *Minvest S.A.*, a wholly State-owned enterprise.[15]

### 2. The mining licenses

#### a. The Roşia Montană License

11. Following the enactment of the Mining Law No. 61/1998 <u>in March 1998</u>,[16] the *National Agency for Mineral Resources* ("NAMR") – the State mining authority – Minvest and

---

[12] Exh. C-239 (Environmental Impact Assessment (EIA) Study Report, Ch. 9, dated May 2009), Sect. 1.1; Memorial, paras 68, 89.

[13] Exh. C-1645 (Cooperation Agreement between RAC Deva and Gabriel Australia, dated 4 September 1995); Exh. C-1625 (assignment of Cooperation Agreement to Gabriel Jersey, dated 1 June 1996); Memorial, paras 90, 92.

[14] Exh. C-821 (Euro Gold Resources S.A. Certificate of Registration, dated 25 August 1997); Memorial, paras 94-95.

[15] Exh. C-1647 (Second Addendum to Cooperation Agreement, dated 1 April 1997); Exh. C-144 (Articles of Association and Bylaws, Addendum No. 1, dated 8 August 1997); Memorial, paras 7, 95.

[16] Exh. C-1629 (Mining Law No. 61/1998, published in the Official Gazette of Romania, Part I, No. 113, dated 16 March 1998), Art. 46 (requiring national mining companies to obtain licenses for carrying out mining activities previously under their administration). The Mining Law entered into force on 14 June 1998. See Memorial, para. 103.

RMGC entered into the *Roşia Montană License*, which is a concession contract.[17] The Roşia Montană License was approved by Government Decision 458/1998 on 21 June 1999 and published in the Official Gazette.[18] It was issued to Minvest as the titleholder with RMGC as the affiliated company.[19]



12.    In this context, Gabriel funded and RMGC completed a pre-feasibility study, which was delivered to Minvest in 2000.[25] Given the positive results, Minvest requested the transfer of the Roşia Montană License to RMGC, which was approved by NAMR in October 2000.[26] ███████████████████████████████████████.[27]

13.    The Project included two open pits called Cetate and Cârnic containing most of the mineral resources and two smaller open pits called Jig and Orlea.[28] Minvest continued its open pit mining operations at Cetate and Cârnic, and RMGC continued to fulfill its obligations to complete the five-year initial development phase. Thereafter, Gabriel

---

[17] Exh. C-403-C (Exploitation Concession License No. 47/1999 approved by Government Decision No. 458/1999, published in the Official Gazette of Romania, Part I, No. 285, dated 21 June 1999 ("Roşia Montană License")), at 1; In addition to the concession license contract signed by the parties, nine annexes initially formed a part of the Roşia Montană License, to which seven addenda have since been added. See Memorial, paras 8, 58, 104.

[18] Exh. C-982 (Government Decision No. 458 on the approval of the concession license for the exploitation of gold-silver ores in the Roşia Montană perimeter, dated 10 June 1999); Memorial, paras 104, 107.

[19] Exh. C-403-C (Roşia Montană License), Preamble; Memorial, para. 106.

[20] Exh. C-403-C (Roşia Montană License), Art. 17; Memorial, para. 106.

[21] Exh. C-403-C (Roşia Montană License), Arts 3.1.1, 5.1.2 and Art. 6.1.1; Memorial, para. 107.

[22] Exh. C-403-C (Roşia Montană License), Arts 4.1.2, 4.3.3, 17.1.4; Memorial, para. 107.

[23] Exh. C-406-C (Roşia Montană License Annex D: Exploitation Development Plan), p. 64; Memorial, paras 107, 123; RAC Deva and Gabriel Jersey had amended RMGC's Articles of Association to provide, among other things, for the preparation of a pre-feasibility study. See Exh. C-147 (Addendum No. 3 to Articles of Association and Bylaws of Euro Gold, authenticated under No. 2541, dated 27 October 1998), p. 2.

[24] Exh. C-403-C (Roşia Montană License), Art. 17.1.4; Memorial, para. 108.

[25] Minvest delivered the executive summary of the study to NAMR. Witness Statement of Cecilia Szentesy, dated 30 June 2017 ("Szentesy WS I"), para. 23; Memorial, para. 128.

[26] Exh. C-1000 (Letter from Minvest to NAMR requesting transfer, dated 4 October 2000); Exh. C-1007 (Ministry of Industry Note No. 2443, dated 9 October 2000); Exh C-1089 (NAMR Order No. 310/2000 on the Transfer of the Concession License for Exploitation No. 47/1999, published in the Official Gazette of Romania, Part I, No. 504, dated 13 October 2000); Memorial, paras 131-132.

[27] Exh. C-410-C (Addendum No. 3 to Roşia Montană License, dated 14 October 2000).

[28] Memorial, para. 65; Expert Report of Dr. Mike Armitage and Nick Fox of SRK, dated 30 June 2017, para. 5.

funded and RMGC completed the work that progressively defined a large resource and reserve estimate for the Cetate, Cârnic, Jig and Orlea deposits.[29]

14.    In June 2004, RMGC submitted a full feasibility study to NAMR, [30]

The feasibility study was accompanied by a mine development plan, technical reports and documents reflecting the feasibility analysis and the design of a mine plan.[31] 

The license perimeter is required by law and must be included in the urbanism plan for the Project area.[32]

15.    RMGC updated the feasibility study in 2006 to reflect changes made to the Project after public consultations, which resulted in a reduction of the Project area.[33] In 2010, RMGC submitted another updated feasibility study along with additional technical documentation.[34] In March 2013,

[35]

16.    The Roșia Montană License was extended in response to an application that was made by RMGC during the course of this arbitration. It therefore is still in force.

### b.  The Bucium Exploration License

17.    NAMR, Minvest and RMGC also entered into the *Bucium Exploration License*, which is also a concession contract.[36] This occurred in April 1999, with the license awarded to

---

[29] Szentesy WS I, para. 36; Memorial, para. 135.

[30] Szentesy WS I, para. 44; Memorial, para. 139.

[31] Exh. C-991-C (Mine Development Plan, dated June 2014); Exh. C-739-C (Social Impact Study and Social Impact Mitigation Plan Upon Closure of The Rosia Montana Mine, Alba County, dated 27 March 2008); Exh. C-986-C (Closure Technical Project for Roșia Montană Mine and Environmental Rehabilitation Plan); Exh. C-988-C (Environmental Monitoring Program for the Post-Closure Period of Roșia Montană Mine Project); Exh. C-990-C (Management of Mining Waste / Residues Resulted at the Exploitation and Processing of Gold and Silver Reserves of Roșia Montană Concession, Alba County); Exh. C-994-C (Technical Documentation Referring to the Location and Justification of Roșia Montană Mining – Development Perimeter, Alba County); Memorial, para. 139.

[32] Exh. C-413-C (Addendum No. 6 to Roșia Montană License, dated 21 June 2004); Memorial, para. 140.

[33] Exh. C-977-C (Feasibility Study, dated October 2006).

[34] Exh. C-976-C (Feasibility Study, dated January 2010).

[35] Exh. C-1012-C (NAMR Decision No. 11-13, dated 14 March 2013 on the verification and registration of the resources/reserves of gold and silver ores in the Roșia Montană deposit as of 1 January 2013).

[36] Exh. C-397-C (Exploration Concession License No. 218/1999 approved by NAMR Order No. 60/1999, published in the Official Gazette of Romania, Part I, No. 222, dated 20 May 1999 ("Bucium License")). In addition to the

Minvest as the titleholder and with RMGC as an affiliate and transferred to RMGC in accordance with its terms.[37] ███████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████████████████████ The term of the license was extended for an additional three years. ██████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████[42]

### 3. The Environmental Permitting process

18.  The main issue in this case concerns the "Environmental Permit" for the Project, the conditions for such Permit, and whether the Environmental Permit was or should have been issued. The Tribunal will set forth, *first*, the process relating to that Environmental Permit and events until its suspension (see section a below); *second*, the main meetings of the committee charged with conducting a technical evaluation for purposes of that Environmental Permit (see section b below); and *third*, any technical or other elements that the Parties (jointly or unilaterally) identify as relevant to that process (see section c below).

---

concession license contract signed by the parties, seven annexes initially formed a part of the Bucium License, to which five addenda were later added. Memorial, paras 61, 116. See also, Exh. C-1090 (MR Order No. 60/1999 on the Approval of the Concession License for the Exploration of Bucium Perimeter, Concluded Between the National Agency for Mineral Resources and the National Company of Copper, Gold and Iron "Minvest" - S.A., published in the Official Gazette of Romania, Part I, No. 222, dated 20 May 1999).

[37] Exh. C-397-C (Bucium License), Preamble, Art. 15; Exh. C-1088 (NAMR Order No. 123/1999 on the Transfer of the Concession License for the Exploration of Bucium Perimeter, concluded with the National Company of Copper, Gold and Iron "Minvest" - S.A., published in the Official Gazette of Romania, Part I, No. 383, dated 12 August 1999); Exh. C-398-C (Addendum No. 1 to Bucium License, dated 28 July 1999); Memorial, paras 117-118.

[38] Exh. C-397-C (Bucium License), Arts 3.1.1, 4.1.4, 5.1, 5.2, Annex B; Memorial, para. 119.

[39] Exh. C-401-C (Bucium License, Addendum No. 4, dated 18 May 2004), Arts 3-5.

[40] Szentesy WS I, paras 121-123; Memorial, para. 287.

[41] Exh. C-1126 (Letter No. 1590 from RMGC to NAMR, dated 16 July 2007); Memorial, para. 290.

[42] Exh. C-1056-C (NAMR Findings Note, dated 7 October 2008); Exh. C-1082 (Letter from NAMR to RMGC, dated 23 February 2009 requesting resubmission of environmental reports without classified information); Exh. C-1146 (Letter from RMGC to NAMR, dated 3 April 2009).

### a. The process

19.     The environmental permitting process or the "Environmental Impact Assessment" (or "EIA") process is an administrative procedure that leads to a decision on an *environmental permit* ("EIA Process"). The procedure is carried out by the *Ministry of Environment* in consultation with a *Technical Assessment Committee* ("TAC"), which is composed of central public authorities chaired by a Ministry of Environment State Secretary. It involves the review of an *environmental impact assessment report* ("EIA Report"), prepared by independent experts (retained by the developer), after considering the views of the members of the TAC. The EIA Report is made public, and the public is given the opportunity to comment during a public consultation procedure. The Ministry of Environment must then instruct the developer to address relevant comments received from the public in an annex. Thereafter, the Ministry of Environment convenes a TAC meeting, and if divergent views exist, a conciliation meeting. The Ministry of Environment proposes to the Government to grant or to reject an environmental permit for a project. The environmental permit is issued by government decision which gives it legal effect.[43]

20.     An environmental permit is issued for the entire development. A *construction permit*, on the other hand, which is required for the construction of mining facilities and the start of mining, may be issued for a phased development.

21.     In the present case, RMGC applied for the Environmental Permit in December 2004.[44] The Ministry of Environment convened the TAC and provided RMGC in May 2005 with Terms of Reference for the EIA Report.[45] Based on the Terms of Reference, RMGC prepared the EIA Report for the Roşia Montană Project. In this context, they engaged independent Romanian experts to provide a thorough assessment of the environmental impacts of the Project.[46] RMGC submitted the EIA Report to the Ministry of Environment in May 2006. The EIA Report consisted of multiple volumes and 10 separate chapters covering each of the topics prescribed in the Terms of Reference.[47] Specifically, the EIA Report included:

---

[43] Legal Opinion of Professor Lucian Mihai, dated 30 June 2017 ("Mihai Opinion I"), Sect. IV; Legal Opinion of Professor Lucian Mihai, dated 2 November 2018 ("Mihai Opinion II"); Tănase WS II, para. 25; Memorial, paras 14, 190, 192-195, 199. To the extent necessary, the detailed EIA process will be set out below in the Tribunal's analysis of Claimants' claims.

[44] Witness Statement of Horea Avram, dated 30 June 2017 ("Avram WS I"), paras 31-34; Memorial, para. 188.

[45] Avram WS I, paras 35-36; Witness Statement of Adrian Gligor, dated 30 June 2017 ("Gligor WS I"), para. 50; Szentesy WS, para. 47; Mihai Opinion I, Sect. V.B; Memorial, para. 201.

[46] Avram WS I, paras 36-37; Gligor WS I, paras 50-55; Witness Statement of Elena Lorincz, dated 30 June 2017 ("Lorincz WS I"), paras 24-29; Memorial, para. 201.

[47] Avram WS I, para. 38; Memorial, para. 203.

- General information about the Project (Chapter 1);

- Technological processes employed in the Project, including the use of cyanide as a chemical to process ore (Chapter 2);

- Waste management, including the storage of tailings in the tailings management facility ("TMF") designed for the Project (Chapter 3);

- Potential impacts of the Project (Chapter 4);

- Potential alternatives to development of the Project (Chapter 5);

- Environmental monitoring during all phases of the Project (Chapter 6);

- Risk assessment and management (Chapter 7);

- Description of challenges in preparing the EIA Report (Chapter 8);

- Non-technical summary of the EIA Report (Chapter 9); and

- Potential cross-border impact (Chapter 10).[48]

22. The EIA Report also included 14 detailed management plans. In total, it exceeded 4,500 pages.[49]

23. Following the submission of the EIA Report, RMGC commissioned the Independent Group of International Experts ("IGIE") to assess the Project's potential transboundary impacts, technological processes and proposed mining and processing facilities. The IGIE prepared its report in November 2006.[50]

24. As required by the EIA Process, RMGC also conducted extensive public consultations on the EIA Report under the direction of the Ministry of Environment. Following the consultation process, the public submitted 5,610 questions and 93 comments. In May 2007, RMGC submitted a 91-volume EIA Report Annex totaling more than 25,000 pages in response to the public comments as well as comments received from the IGIE report.[51] This included the accounting for the results of the archeological research that had been undertaken in the area.[52]

---

[48] Avram WS I, para. 38; Memorial, 203.

[49] Avram WS I, para. 38; Memorial, paras 203-205.

[50] Exh. C-502 (Independent Group of International Experts (IGIE) Report, dated 30 November 2006); Avram WS I, paras 39-47; Memorial, paras 246-247.

[51] Avram WS I, paras 48-52; Mihai Opinion I, Sect. IV.C.3.3; Memorial, paras 15, 18, 251-252.

[52] Szentesy WS I, paras 46-49; Avram WS I, paras 35-38; Gligor WS I, paras 38-41, 50-60; Memorial, para. 206.

25.     <u>From June to August 2007</u>, the Ministry of Environment convened four TAC meetings to review and assess the EIA Report and accompanying Annex.[53]

26.     <u>On 30 July 2007</u>, the Ministry of Environment informed RMGC that the Ministry was unable to continue the EIA Process because the urbanism certificates issued to RMGC by the Alba County Council ("UC 78/2006") had been suspended by a court in Cluj following a challenge by a non-governmental organization ("NGO") that opposed the Project.[54]

27.     <u>On the same date</u>, RMGC objected to the Ministry of Environment's claim and attached to its letter the decision of Alba County Council dated 27 July 2007, by which it issued a new urbanism certificate to ("UC 105/2007") to RMGC.[55]

28.     Also on the same date, Romania published an amendment to its Administrative Litigation Law, which took effect <u>on 2 August 2007</u>, providing that a newly issued administrative deed was suspended *ipso jure* if it had the same contents as an earlier administrative deed that had been suspended by a court.[56]

29.     <u>On 12 September 2007</u>, the Ministry of Environment informed RMGC that it had suspended the EIA Process on the basis of the new amendment of the Administrative Litigation Law.[57]

30.     <u>In the same month</u>, RMGC filed an administrative complaint against the Ministry of Environment, Minister Korodi, and State Secretary, Silviu Stoica (the TAC President), requesting that the court order the Ministry to resume the EIA Process and order the defendants to pay damages incurred by RMGC.[58]

---

[53] Avram WS I, paras 53-59; Memorial, para. 255. These TAC meetings were held on 26 June, 10 July, 19 July and 9 August 2007.

[54] Exh. C-1754 (Letter No. 12117 from Ministry of Environment to RMGC, dated 30 July 2007); Memorial, para. 262.

[55] Exh. C-1764 (Letter from RMGC to Ministry of Environment, dated 30 July 2007, enclosing Urbanism Certificate No. 105/2007, dated 27 July 2007); Memorial, para. 264.

[56] Mihai Opinion I, Sect. VII.C.2; Memorial, para. 265.

[57] Exh. C-548 (Letter No. 12371 from Ministry of Environment to RMGC, dated 12 September 2007); Memorial, para. 266.

[58] Exh. C-818 (Preliminary Administrative Complaint from Mușat & Asociații on behalf of RMGC to Ministry of Environment, dated 21 September 2007); Exh. C-918 (RMGC Administrative Complaint filed with Bucharest Court of Appeal, dated 16 November 2007); Tănase WS II, paras 25-26; Avram WS I, para. 60; Memorial, para. 270.

31.     <u>On 30 April 2010</u>, the Alba County Council issued a new urbanism certificate ("UC 87/2010") which the Ministry of Environment accepted for the purposes of restarting the EIA Process. RMGC withdrew its claims for damages and the process resumed.[59]

32.     After the process resumed <u>in September 2010</u>, the EIA Report was updated, and additional public consultations were held to consider the updates.[60]

### b. The main TAC meetings and assessment

33.     As mentioned above, the EIA Process was suspended <u>from September 2007 to September 2010</u> (see para. 29). Following the resumption of the process, several TAC meetings were held and the TAC continued its assessment.[61] In presenting these TAC meetings and events surrounding them, the Tribunal shall focus on (i) the meeting of 29 November 2011 which is alleged by Claimants to be the meeting that resolved all outstanding issues in relation to the Environmental Permit, as well as (ii) the facts in relation to the endorsement of the Project by the Ministry of Culture.

34.     At the <u>22 December 2010</u> meeting, the TAC reviewed the first seven chapters of the EIA Report. At the end of the meeting, the TAC President, a State Secretary from the Ministry of Environment, Marin Anton, stated: "*we have two more chapters left, Chapter 8 and 9, and until this future meeting of the TAC where we will analyze the last two chapters, we are to clarify any outstanding matters.*"[62]

35.     <u>On 13 September 2011,</u> [63]

36.     <u>On 26 September 2011</u>, the Ministry of Environment sent RMGC the final list of 102 questions.[64] RMGC responded to these questions <u>on 11 October 2011</u>, after which the TAC members visited the project site in Roșia Montană.[65]

---

[59] Exh. C-808 (Urbanism Certificate No. 87, dated 30 April 2010); Avram WS I, paras 60-63; Tănase WS II, paras 43-50; Mihai Opinion I, Sects VII.C.3, V.D.1; Memorial, paras 18, 254, 271-272, 297-298.

[60] Avram WS I, paras 64-84; Second Statement of Horea Avram, dated 31 October 2018 ("Avram WS II"), para. 2; Memorial, paras 299-302.

[61] Exh. C-487 (Transcript of TAC meeting, dated 22 September 2010); Exh. C-476 (Transcript of TAC meeting, dated 22 December 2010); Exh. C-483 (Transcript of TAC meeting, dated 9 March 2011); Memorial, para. 303.

[62] Exh. C-476 (Transcript of TAC meeting, dated 22 December 2010), p. 84.

[63] Exh. C-574 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆, p. 4.

[64] Exh. R-215 (Letter from Ministry of Environment to RMGC, dated 22 September 2011).

[65] Exh. C-441 (Letter from RMGC to Ministry of Environment, dated 11 October 2011); Exh. C-631 (TAC minutes of site visit to Roșia Montană, dated 20 October 2011); see also Exh. C-447 (List of TAC members attending Roșia Montană site visit).

37.    <u>On 4 November 2011</u>, an agenda for the 29 November 2011 TAC meeting was sent out.[66]

38.    By letter dated <u>25 November 2011</u>, the Ministry of Environment also requested that TAC members submit written comments on RMGC's responses prior to the 29 November 2011 TAC meeting.

39.    A TAC meeting was held <u>on 29 November 2011</u>. For Claimants, this was the last TAC meeting that would result in a decision to issue the Environmental Permit. During the meeting, among other things, RMGC was asked to provide certain documents, i.e., in relation to the EU Water Framework Directive,[67] the Ministry of Culture, biodiversity and Piatra Despicata. At the end, the TAC President stated that a check list for the EIA Report would be prepared to be sent to each Ministry for analysis and that the next TAC meeting would be convened in the near future for a final decision.[68]

40.    RMGC provided a copy of the Alba County Council's decision the next day, <u>30 November 2011</u>.[69] The Parties disagree as to whether that decision was sufficient to declare the Project of outstanding public interest for purposes of compliance with the Water Framework Directive.

41.    The Ministry of Culture sent <u>on 7 December 2011</u> a letter to the State Secretary of the Minister of Environment and Chairman of the TAC, Marin Anton, stating its point of view on the development of the Roşia Montană Project.[70]

42.    The Romanian Geological Society gave its endorsement to the relocation of Piatra Despicata on <u>8 December 2011</u>.[71]

43.    The Romanian Geological Institute issued a favourable point of view <u>on 9 December 2011</u>, in which it supported "*the issuance of the environmental permit for Roşia Montană project*".[72]

---

[66] Exh. C-835 (Letter from Ministry of Environment to RMGC, dated 28 October 2011).

[67] Directive 2000/60/EC of the European Parliament and of the Council of 23 October 2000 establishing a framework for Community action in the field of water policy (the "Water Framework Directive").

[68] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), pp 48 and 51.

[69] Exh. C-632 (Letter from RMGC to the Ministry of Environment, dated 30 November 2011, enclosing Alba County Decision on the Application of Certain Provisions of the Waters Law No. 107/1996, dated 29 September 2011).

[70] Exh. C-446 (Letter No. 2193 from the Ministry of Culture to the Ministry of Environment, dated 7 December 2011); Gligor WS I, paras 111-112; Avram WS I, paras 103-104; Tănase WS II, paras 58, 110.

[71] Exh. C-634 (Letter from RMGC to the Ministry of Environment, dated 8 December 2011) enclosing Exh. C-635 (SGR Romanian Geological Society Endorsement No. 1, dated 5 December 2011); Avram WS I, para. 100; Tănase WS II, para. 109.

[72] Exh. C-636 (Point of view of the Geological Institute of Romania regarding the geological data presented in the EIA report for the Roşia Montană Project, dated 9 December 2011); Szentesy WS I, para. 83; Avram WS I, para. 101; Tănase WS II, para. 109.

44.    On 19 December 2011, the TAC President sent a letter to the Ministry of Culture, requesting that the Ministry confirm whether its "point of view" sent on 7 December 2011 was an endorsement of the issuance of the Environmental Permit, emphasizing that this endorsement was required by law to be taken into account in setting the conditions for the permit. The Ministry of Culture did not respond to this letter.[73]

45.    On 16 March 2012, the Ministry of Environment sent another letter to the Ministry of Culture requesting it to confirm that the letter sent on 7 December 2011 was an endorsement to issue the Environmental Permit.[74]

46.    On 11 March 2013, the Ministry of Environment confirmed in an Inter-Ministerial Commission meeting that the TAC had concluded that all technical issues had been resolved at its November 2011 TAC meeting.[75] In relation to the Ministry of Culture's endorsement, the Inter-Ministerial Commission stated in a report that there were no obstacles for the Ministry to issue a favourable endorsement in relation to the development of the Roşia Montană Project.[76]

47.    An identical document to the 7 December 2011 letter entitled "Endorsement" was issued by the Ministry of Culture on 10 April 2013.[77]

48.    In May 2013, the Government informed the Aarhus Convention[78] Compliance Committee that the TAC had confirmed at its November 2011 meeting that no technical issues remained outstanding.[79]

49.    On 10 May 2013, the TAC met again. The TAC Vice President, Octavian Pătraşcu, introduced the items that "remained to be clarified", i.e., issues regarding the Waste Management Plan, the financial guarantee, the Water Framework Directive and the status of the zonal urbanism plans.[80] At the end of the meeting, Octavian Pătraşcu stated that another meeting would take place on 23 May 2013.[81]

---

[73] Exh. C-445 (Letter No. 10857 from Ministry of Environment to Ministry of Culture, dated 19 December 2011); Gligor WS I, para. 113; Tănase WS II, paras 110-111; Avram WS I, paras 103-105; Memorial para. 370.

[74] Exh. C-1381 (Letter No. 10857 from Ministry of Environment to Ministry of Culture, dated 16 March 2012).

[75] Exh. C-471 (Transcript of Inter-Ministerial Commission Meeting, dated 11 March 2013), p. 20.

[76] Exh. C-2162 (Letter from Department for Infrastructure Projects and Foreign Investment to Secretary General, dated 26 March 2013, forwarding Informative Note regarding the activity of the Inter-Ministerial Commission), p. 4.

[77] Exh. C-655 (Letter from Ministry of Culture to Ministry of Environment, dated 10 April 2013).

[78] The Convention on Access to Information, Public Participation in Decision-Making and Access to Justice in Environmental Matters. Aarhus, Denmark, dated 25 June 1998.

[79] Exh. C-2907 (Romanian Government Submission to Aarhus Convention Compliance Committee, dated 22 May 2013), p. 3.

[80] Exh. C-484 (Transcript of TAC meeting dated, 10 May 2013), pp 3-4.

[81] Exh. C-484 (Transcript of TAC meeting dated, 10 May 2013), p. 22.

50.     Another TAC meeting was held <u>on 31 May 2013</u>, where the acting TAC President, Octavian Pătrașcu, stated that there were several issues raised by institutions that were not present at the last TAC meeting and proposed to continue the discussion. At the end, the President asked each member to express their point of view and noted that a date for a new meeting would be communicated.[82]

51.     <u>On 10 June 2013</u>, the Ministry of Environment sent a letter to all TAC members, scheduling another TAC Meeting for 14 June 2013 and inviting them to submit in writing "*the conditions for project implementation, the measures for diminishing the impact according to your field of competence, as well as the monitoring indicators which are mandatory for the purpose of project implementation*".[83] These conditions were published in a detailed note for public consultation <u>on 11 July 2013</u>. It invited the public to submit its comments by 30 July 2013.[84]

52.     <u>On 13 June 2013</u>, the Romanian Geological Institute submitted that RMGC should "[c]*arry out a complex geological study for the entire area*" of the TMF site at Corna Valley.[85]

53.     During the TAC meeting <u>of 14 June 2013</u>, the two contradictory points of views of the Romanian Geological Institute were primarily discussed.[86]

54.     Then, <u>on 26 July 2013</u>, the Ministry of Environment convened a conciliation meeting of the TAC, which had to be convened to give all dissenting members an opportunity to reconsider their views. At the end of the meeting, Octavian Pătrașcu recalled the initiation of the public consultation procedure by the Ministry of Environment and the deadline of 30 July 2013. He added that upon receipt of the observations, the TAC would meet again to discuss the final decision that must be adopted for the Project.[87]

55.     The public consultation period for the terms of the draft Environmental Permit expired <u>on 30 July 2013</u>, and no public comments or questions were forwarded to RMGC. As a result, the Ministry of Environment prepared a 44-page draft decision. The draft decision referred to the TAC's acceptance of the EIA Report and proposal to issue the Environmental Permit.[88]

---

[82] Exh. C-485 (Transcript of TAC meeting, dated 31 May 2013), p. 23.

[83] Exh. C-554 (Letter No. 22149 from Ministry of Environment to TAC members, dated 10 June 2013).

[84] Exh. C-555 (Ministry of Environment Note for Public Consultation, dated 11 July 2013).

[85] Exh. C-659 (Letter No. 1182 from Geological Institute of Romania to Ministry of Environment, dated 13 June 2013).

[86] Exh. C-481 (Transcript of TAC meeting, dated 14 June 2013), pp 5-11.

[87] Exh. C-480 (Transcript of TAC meeting, dated 26 July 2013), pp 2-15.

[88] Exh. C-2075 (Ministry of Environment Draft Decision concerning the Request for Issuance of the Environmental Permit), p. 2.

### c. The technical or other elements

56.    Several technical and other elements were the subject of discussions that took place within as well as outside the environmental permitting process. The relevance of most of these elements to the granting of the Environmental Permit and whether they were met are disputed by the Parties. The Tribunal will proceed in its presentation of the facts, describing the Waste Management Plan (see section i below), the Water Law and the Water Framework Directive (see section ii below), the surface rights (see section iii below), the zoning or urbanism certificates (see section iv below), the cultural heritage elements (see section v below), and financial guarantees (see section vi below).

### i.    The Waste Management Plan

57.    The Parties disagree on whether a Waste Management Plan was required for the issuance of the Environmental Permit and whether the Government had promptly reacted in relation to its approval.

58.    The Ministry of Environment requested RMGC to update its Waste Management Plan. A Waste Management Plan was submitted with the EIA Report <u>in 2006</u> and discussed and reviewed as part of the EIA Process in accordance with the new regulations then in effect.

59.    <u>In September 2011</u>, the Ministry of Environment requested RMGC to update again this Plan.[89]  RMGC submitted an updated Waste Management Plan <u>in December 2011,</u>[90] which was later approved by NAMR.[91]

60.    <u>In April 2012</u>, the Ministry of Environment requested additional information from RMGC.[92] RMGC complied with this request and received NAMR's approval <u>in May 2012</u>.[93]

61.    <u>In June 2012</u>, the Ministry of Environment again requested additional information.[94]

62.    Nothing happened until RMGC was notified that the Ministry of Environment was ready to receive the Waste Management Plan for review. RMGC then resubmitted the Waste Management Plan <u>on 22 March 2013</u>, which was not significantly different from the

---

[89] Avram WS II, para. 55.
[90] Avram WS II, paras 56-58.
[91] Avram WS I, para. 114.
[92] Memorial, para. 392; Avram WS I, para. 114; Exh. C-646 (Letter from Ministry of Environment to RMGC, dated 17 April 2012).
[93] Memorial, para. 392; Exh. C-658 (Letter from Ministry of Environment, dated 7 May 2013).
[94] Avram WS I, para. 116; Exh. C-652 (Letter from Mureş Water Basin Administration to RMGC, dated 7 June 2012).

earlier version submitted in December 2011.[95] Both NAMR and the Ministry of Environment approved the Waste Management Plan in <u>April</u> and <u>on 7 May 2013</u>.[96]

63.    At the <u>10 May 2013</u> TAC meeting, the Head of the Department of Waste Management of the Ministry of Environment, Ana Nistorescu, confirmed that the Waste Management Plan complies with all requirements and standards and best available techniques.[97]

### ii.    The Water Law and the Water Framework Directive

64.    The Project required the diversion of two small rivers, the Corna River and the Rosia River. The Corna River is where the tailings facility was to be built.[98] The Rosia River, which according to Claimants was polluted by wastewater containing fine acids, had to be diverted because a dam was to be built to capture and treat the water and improve its quality.[99] For this reason, Romanian water legislation implementing the Water Framework Directive had to be complied with.

65.    One requirement was the declaration of a mining project as being of outstanding public interest. Romanian law, however, does not specify which level of government should declare that a mining project is of outstanding public interest.[100] This is the only requirement that is being challenged between the Parties.

66.    <u>On 18 July 2011</u>, 

67.    As noted above, at the <u>29 November 2011</u> TAC meeting, the Ministry of Environment requested RMGC to supplement its response in compliance with the EU Water Framework Directive (which was transposed into Romania law through Waters Law No. 107/1996 and which required a declaration of "outstanding public interest") by providing a copy of the 29 September 2011 Alba County Council resolution (see para. 39).[101] RMGC provided the resolution the following day.

---

[95] Exh. C-780 (Waste Management Plan, dated March 2013).

[96] Exh. C-656 (Alba NAMR Endorsement No. 189, dated 4 April 2013); Exh. C-657 (NAMR Endorsement No. 4320, dated 11 April 2013); Exh. C-658 (Letter No. 21251 from Ministry of Environment to RMGC, dated 7 May 2013).

[97] Exh. C-484 (Transcript of TAC meeting dated, 10 May 2013), pp 11-12.

[98] Exh. C-880 (RMGC responses to Inter-Ministerial Commission questions, dated 22 March 2013), pp 13, 14, 15.

[99] Avram WS I, Annex A, pp 11, 14, 17, 18.

[100] Mihai Opinion II, paras 287-291.

[101] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), p. 25; see also, Claimants' Reply and Counter-Memorial on Jurisdiction, dated 2 November 2013 ("Reply"), fn 163.

68.     However, <u>from early 2012 to March 2013</u>, the question arose as to whether the Alba County Council decision of 29 September 2011, declaring the project to be of outstanding public interest, was sufficient to satisfy the outstanding public interest requirement, or whether it would be advisable to make this declaration at the national level through a government decision.

69.     <u>On 22 March 2013</u>, Dragoș Tănase stated at the Inter-Ministerial Commission meeting that RMGC understood that it had been asked to provide a decision from a higher level, which was not legally grounded, and that the only competent body to decide on this matter was the Ministry of Environment or the Ministry of Waters and Forests. A protracted exchange on this topic ensued.[102]

70.     In its final report <u>of the same day</u>, the Inter-Ministerial Commission stated that the decision of the Alba County Council was sufficient.[103]

71.     In a meeting held <u>on 25 March 2013</u> between the representatives of the Project and the legal team assisting the Ministry of Environment, the same conclusions were reached.

72.     <u>In July 2013</u>, the Ministry of Environment stated the following: "*The mining Project observes the provisions of the Waters Law no. 107/1996 and the Water Framework Directive (Directive 2000/60/EC).*"[104]

### iii.    The surface rights

73.     In addition to a mining license, which gives the licensee the right to develop and exploit the mineral resources within a specified area, the licensee must also acquire surface rights.[105] The Parties disagree as to whether surface rights were required for the issuance of the Environmental Permit or for the construction permit.

74.     The Mining Law grants the licensee the right to access land.[106] It requires that land use in an area subject to a mining license be limited by urbanism plans and provides various ways in which the licensee can obtain the right to use the required land.[107] For example, the licensed area can no longer be zoned for residential use. The Mining Law thus acts

---

[102] Exh. C-472 (Transcript of Inter-Ministerial Commission Meeting, dated 22 March 2013), pp 9-15.

[103] Exh. C-2162 (Letter from Department for Infrastructure Projects and Foreign Investment to Secretary General, dated 26 March 2013, forwarding Informative Note regarding the activity of the Inter-Ministerial Commission), p. 6.

[104] Exh. C-2075 (Ministry of Environment Draft Decision concerning the Request for Issuance of the Environmental Permit), p. 3.

[105] Legal Opinion of Professor Corneliu Bîrsan, dated 28 June 2017 ("Bîrsan Opinion I"), Sect IV.C.1; Memorial, para. 174.

[106] Exh. C-11 (Mining Law No. 85/2003), Art. 38.

[107] Exh. C-11 (Mining Law No. 85/2003), Art. 6; Legal Opinion of Professor Corneliu Bîrsan, dated 2 November 2018 ("Bîrsan Opinion II"), para. 35

as a *de facto* expropriation of the affected land. This results in the State's obligation to compensate the landowners. If the owners do not want to sell to the licensee, the State carries out the expropriation procedures for the mining project and compensates the owners.[108] Specifically, Article 6 of the Mining Law provides that access to the land required for the license may be obtained through expropriation for reasons of public utility.[109]

75.     In the present case, RMGC undertook to acquire surface rights and to relocate or resettle affected households, small businesses, public facilities, churches, and cemeteries. It therefore developed a Resettlement and Relocation Action Plan for this purpose.[110] Most of the lands in the Roșia Montană area were acquired based on the willingness of the buyer and the seller either through a sale or agreed relocation.[111] Specifically, <u>beginning in 2002</u>, RMGC acquired land from approximately 78% of the affected households, leaving 500 hectares to be acquired (200 of which were owned by various, mostly State, institutions, and 300 by private owners). RMGC stopped land acquisitions <u>in early 2008</u> after the environmental permitting process was suspended with the intention of resuming it after the Environmental Permit was issued.[112]

### iv.     The zoning or urbanism plans

76.     Before a mining project may be built, the project area must be zoned for industrial use in the applicable zoning or urbanism plans. Such plans are issued by decisions of the relevant local authorities. General urbanism plans ("PUGs") are applied at the town or commune level, and zonal urbanism plans ("PUZs") are applied to specific zones.[113] The process of approving urbanism plans is set out in Article 41 of the Mining Law. This process requires the NAMR to advise the local authorities as to the mining activities that have been authorized and the local authorities are directed to modify the relevant urbanism plans accordingly.[114]

---

[108] Bîrsan Opinion II, paras 41, 52-56, 107.

[109] Exh. C-11 (Mining Law No. 85/2003), Art. 6; Exh C-1628 (Expropriation Law No. 33/1994), Arts 6-7.

[110] Lorincz WS I, paras 14, 31; Exh. C-463 (Resettlement and Relocation Action Plan Vol. 1, dated February 2006); Memorial, para. 175.

[111] Lorincz WS I, paras 14, 21-29, 33-37, 47-52; Second Statement of Elena Lorincz, dated 30 October 2018 ("Lorincz WS II"), paras 121-138.

[112] Lorincz WS I, paras 49-53; Lorincz WS II, para. 121; Memorial, paras 179, 280-283

[113] Memorial, para. 185.

[114] Exh, C-11 (Mining Law No. 85/2003), Art. 41; Bîrsan Opinion I, para. 253.

77.     There were a number of urbanism plans in place for the Project. As RMGC updated the design of the Project after 2002, it initiated the process of requesting an updated PUZ for the Project's industrial areas.[115]

78.     As discussed above, on 30 April 2010, the Alba County Council issued a new urbanism certificate, UC 87/2010, which the Ministry of Environment accepted for the purposes of restarting the EIA Process (see para. 31).[116]

79.     In March 2013, the Inter-Ministerial Commission concluded that the maintaining of valid urbanism certificates for the entire duration of the procedure was not necessary for the EIA Process.[117] Concerning the PUZ, the Commission stated that the existence of a court dispute in relation to this permit did not affect its validity and could not be a reason for delay or suspension of the EIA Process.[118]

*v.    The cultural heritage issues*

80.     Cultural heritage issues were an important aspect of the discussion between the Parties at the time (either as part of or in parallel with the environmental permitting process) and is also part of their current dispute. Namely, these issues concerned the protection of certain areas for their cultural value and permission to conduct activities such as mining in such areas. This section sets out the archaeological research and studies that RMGC was required to carry out and submit as part of its license obligations (see section 1 below), the so-called archaeological discharge certificates (see section 2 below), the termination of the research program (see section 3 below), the status in relation to the Cârnic area (see section 4 below), and the classification as historic monuments (see section 5 below).

1.    The 2000 Archaeological Feasibility Study

81.     When the Government approved the Roșia Montană License in 1999, Roșia Montană was an area known to contain remains of mining activities dating back to Roman times although archeological research had never been conducted in the area. It was thus known to be an area of archaeological interest. The Roman settlement of *Alburnus Maior* and Roman mining in Alburnus Maior are listed in a draft *List of Historical Monuments and Archaeological Sites* that was prepared in 1991 and 1992. Roșia Montană is listed there

---

[115] Exh. C-1413 (Letter from RMGC to the Department of Infrastructure Projects and Foreign Investments, dated 18 March 2013); Memorial, para. 187.

[116] Exh. C-808 (Urbanism Certificate No. 87, dated 30 April 2010); Tănase WS II, paras 25-26, 43-50; Memorial, paras 18, 254, 271-272, 297.

[117] Exh. C-553.02 (Informative Note on the Activity of the Inter-Ministerial Working Group convened for the Roșia Montană Mining mining project (resubmitted)), p. 6.

[118] Exh. C-553.02 (Informative Note on the Activity of the Inter-Ministerial Working Group convened for the Roșia Montană Mining mining project (resubmitted)), p. 6.

as an area within two kilometres. This listing was considered compatible with mining in the 1990s and until 2006, as the State, through Minvest, continued mining in Roşia Montană, especially in the Cârnic Massif and in the Cetate Massif, without archeological intervention.[119]

82.    In order to develop the project in Roşia Montană, RMGC was required by law to invest in *archaeological research*. The purpose of the archaeological research was to assess whether the area should be cleared for mining.[120] Therefore, <u>in 2000</u>, RMGC funded an archaeological feasibility study to evaluate areas of archaeological potential in the planned Project area. The study was conducted pursuant to an agreement between RMGC and the Ministry of Culture's Design Centre for National Cultural Heritage, a government agency that later became the *National Institute for Heritage* ("NIH").[121] The entire area, *including Orlea*, was preliminarily surveyed and evaluated with respect to the proposed Project. A Historical Building Study was also prepared.[122]

83.    Based on the results of the archaeological feasibility study, RMGC funded an intensive archaeological research program to support the archaeological discharge decisions to be made by the Ministry of Culture.[123] The so-called *Alburnus Maior National Research Program* was established by a Ministry of Culture Order <u>in March 2001</u>. The Order set out the requirements and obligations of the various State authorities that were to oversee and implement the program, with RMGC acting as developer and providing funding. The Ministry of Culture recognized that the research was well done and gave an award to the National History Museum of Romania ("NHMR") for its role in coordinating the program.[124]

2.    The Archaeological Discharge Certificates

84.    The Ministry of Culture made the discharge decisions based on the extensive archaeological research results. The issuance of *Archaeological Discharge Certificates* ("ADCs") is an administrative act that removes the protections previously afforded to the site as an area with archaeological value, and allows the area to be used for industrial

---

[119] Gligor WS I, paras 8-10; Expert Report of David Jennings, dated 30 June 2017 ("Jennings Report I"), paras 3-6; Memorial, para. 141.
[120] Gligor WS I, paras 16, 25; Jennings Report I, paras 7, 43; Legal Opinion of Professor Ioan Schiau, dated 30 June 2017 ("Schiau Opinion I"), Sect. III.B.2; Memorial, para. 143.
[121] Gligor WS I, paras 17-31; Memorial, paras 144-145.
[122] Exh. C-1412 (Archaeological Feasibility Study, dated September 2000); Exh. C-1409 (Historical Building Study (Settlement Record), dated July-August 2000); Memorial, para. 146.
[123] Gligor WS I, paras 17-31; Memorial, paras 13, 144-145.
[124] Exh. C-1306 (Ministry of Culture Order No. 2504, dated 7 March 2001); Exh C-1375 (NHMR Summary Report on the Alburnus Maior National Research Program conducted between 2001 and 2006, dated 2 October 2006), Sect. 5.

activities, such as mining.[125] A site with "significant" or "remarkable" archaeological value, as determined through appropriate research, warrants *in situ* protection; an archaeological site of determined significance may also be classified additionally through an order of the Ministry of Culture as a "historical monument" and included on a "List of Historical Monuments" (or "LHM").[126]

85.     The archaeological team prepared expert reports based on the research results and made recommendations for preservation and discharge. These recommendations were submitted to the Archaeological Department of the Ministry of Culture. The documentation was presented to the National Commission on Archaeology, a State body, in a plenary session for analysis. This body also heard from NHMR, the program coordinator, before making a decision, and the ADC was subsequently issued by the Ministry of Culture.[127]

86.     In this case, the Ministry of Culture issued ADCs for 90% of the Project area <u>between 2001 and 2008</u>, including for three of the four pits (Cârnic, Cetate and Jig) and the Corna Valley tailings dam.[128] RMGC adjusted the Project area to reflect the areas designated for on-site protection. There are several protected areas, including the historic centre of Roşia Montană and several other important areas.[129]

                    3.    The termination of the Alburnus Maior National
                          Research Program

87.     <u>In October 2006</u>, the NHMR prepared, at the request of the Ministry of Culture, a report on the *Alburnus Maior National Research Program*, recommending, among other things, extending the preventive archeological research program to Orlea, where the Project's plans included mining in year 7 of operations, and to the neighboring Bucium property.[130] <u>Two days later</u>, the Ministry of Culture discontinued the research programme.[131]

88.     <u>In February 2007</u>, the Ministry of Culture announced that it would "*no longer issue administrative acts in its field of competence, concerning the documentations for the*

---

[125] Schiau Opinion I, Sects II.2, III.C; Memorial, para. 158.

[126] Schiau Opinion I, Sects II.3, IV.A-B; Memorial, para. 158.

[127] Gligor WS I, para. 39; Memorial, para. 159.

[128] Exh. C-669 (Archaeological Discharge Certificate No. 1320/2001); Gligor WS I, para. 39, n. 55, para. 102, n. 160; Schiau Opinion I, paras 90-91; Memorial, para. 160; Exh. C-1283 (Map of Project Area showing Archaeological Discharge Certificates issued, dated 2004).

[129] Gligor WS I, paras 40-41.

[130] Exh, C-1375 (NHMR Summary Report on the Alburnus Maior National Research Program conducted between 2001 and 2006, dated 2 October 2006), Sects 2-5; Gligor WS I, paras 66-70; Memorial, para. 162.

[131] Exh. C-1373 (Ministry of Culture Order No. 2407, dated 4 October 2006); Gligor WS I, paras 71-73; Memorial, para. 163.

*Roşia Montană area, until the Ministry of Environment and Water Management endorses the environmental impact assessment study*".[132]

89.  The NHMR applied <u>in March 2007</u>, on behalf of RMGC, for permits to perform preventive archaeological research in, *inter alia*, the Orlea area. The Ministry of Culture authorized a "field survey" which would not support the issuance of an ADC.[133]

90.  It is undisputed that an ADC had not been issued for Orlea.

### 4.  The Cârnic ADC and SEA Endorsement

91.  As mentioned above, the Ministry of Culture issued ADCs for 90% of the Project area between 2001 and 2008 (see para. 86).

92.  The ADC for the Cârnic underground area was issued <u>in 2004</u> (ADC No. 4/2004) but annulled by court order <u>in 2008</u> following a challenge by an NGO.[134]

93.  <u>In June 2010</u>, RMGC filed an application for renewal.[135]

94.  <u>In July 2010</u>, the Ministry of Culture issued a LHM which had listed, *inter alia*, all mining galleries in the Cârnic massif.[136]

95.  <u>On 7 March 2011</u>, the Ministry of Culture issued the Strategic Environmental Assessment Endorsement ("SEA Endorsement") that prevents the approval of urbanism plans in the Project area or the endorsement for the Industrial Area PUZ.

96.  <u>On 15 July 2011</u>, RMGC and the NIH (an academic and research institution under the Ministry of Culture responsible for preparing the LHM) signed a Cooperation Protocol, pursuant to which Gabriel would invest nearly USD 140 million.[137]

97.  <u>In the same month</u>, the National Archaeology Commission and the Minister of Culture confirmed that the Cârnic galleries would be removed from the LHM if a new ADC for

---

[132] Exh. C-911 (Ministry of Culture Press Release, dated 28 February 2007); Gligor WS I, para 72; Memorial, para. 164.

[133] Gligor WS I, para. 75; Memorial, para. 165.

[134] Gligor WS I, para. 100; Memorial, para. 321.

[135] Gligor WS I, para. 100; Tănase WS II, para. 59; Henry WS I, para. 22; Memorial, para. 322.

[136] Exh. C-1266 (2010 List of Historical Monuments approved by Order No. 2361 of the Ministry of Culture published in the Official Gazette 670bis, dated 1 October 2010); Gligor WS I, para. 91; Memorial, paras 315-318.

[137] Exh. C-695 (Protocol of Cooperation between NIH and RMGC, dated 15 July 2022); Henry WS I, para. 26; Memorial, para. 326.

Cârnic was issued.[138] This was also stated by the Alba County and national culture authorities, including the Ministry of Culture.[139]

98.    Thereafter, the National Archaeology Commission unanimously approved issuance of the Cârnic ADC and the Alba County Directorate for Culture and the NIH issued on 14 July 2011 a new discharge certificate, ADC No. 9/2011 for the Cârnic underground area.[140]

99.    On 26 September 2011, the SEA Endorsement was challenged by NGOs.[141]

100.    ADC No. 9/2011 for Cârnic was also challenged by NGOs in court. On 30 January 2014, the court decided to suspend the effects of this second ADC pending a final decision on the request for its annulment.[142]

101.    Meanwhile, in 2014, RMGC had challenged the LHM in 2010 and upon the issuance of a LHM in 2015 the court dismissed the case as moot.[143]

102.    In March 2016, the Brasov Court of Appeal annulled the SEA Endorsement.[144]

103.    On 10 December 2020, the Buzau Tribunal issued its decision rejecting the application to annul ADC No. 9/2011, stating that the decision was final and irrevocable. The Buzuau Tribunal accepted the State authorities' position in the challenge and rejected the arguments presented by the NGO against the ADC decision.[145]

104.    On 16 February 2022, the appellate court decided to annul ADC No. 9/2011.[146]

---

[138] Exh. C-1377 (National Archaeology Commission Meeting Minutes, dated 12 July 2011); Exh. C-1345 (News Article, dated 14 July 2011).

[139] Exh. C-1001 (Government notification to RMGC, dated 12 June 2013); see also Exhs C-1336, C-1325, C-1331, C-1333, C-1330, C-2359 (letters from the Ministry of Culture's National Institute of Heritage) and Exhs C-1327, C-1332, C-1335 and C-1376 (letters from the Alba County Culture Directorate).

[140] Exh. C-1377 (National Archaeology Commission Meeting Minutes, dated 12 July 2011); Exh. C-680 (Archaeological Discharge Certificate No. 9/2011 (Cârnic underground)).

[141] Exh. C-1407 (ICDER *et al*. Administrative Challenge, dated 26 September 2011).

[142] Schiau Opinion I, para. 93.

[143] Exh. C-1727 (RMGC's Objection of unlawfulness of 2010 LHM, dated 20 May 2014); Exh. C-1347 (RMGC's Objection of unlawfulness of 2010 LHM, dated 1 November 2014).

[144] Exh. R-211 (Brasov Court of Appeal decision, dated 10 March 2016); Exh. C-1721 (Brasov Court of Appeal Certificate, dated 29 March 2016).

[145] Exh. C-2990 (Letter from the Buzau Tribunal to the Alba County Culture Department, dated 27 May 2021, enclosing Decision No. 770/2020 of Buzau Tribunal, dated 10 December 2020).

[146] Exh. R-694 (Ploiesti Court of Appeal Decision No. 187, dated 16 February 2022).

### 5.   The Historical Monuments

105.   While archaeological sites are protected by law and discharged by an ADC, archaeological sites that have exceptional value may be classified as historical monuments. Historical monuments are subject to special legal protection that can only be removed through a declassification process. The Law specifically provides that when an ADC is issued for a site that had been classified as an historical monument, the Ministry of Culture must *ex officio* declassify a site that has been classified as a historical monument. A national LHM is updated and published every five years.[147]

106.   In 2004, the Ministry of Culture issued the first LHM. The 2004 LHM reflects the results of completed archaeological research and discharge decisions for the Project area. This list specifically identified areas of significance; it did not include areas that were the subject of ADCs, including ADC No. 4/2004 for Cârnic.[148]

107.   As mentioned above, in July 2010, the Ministry of Culture issued the 2010 LHM. It was published in the Official Gazette in October 2010. The 2010 LHM contained some differences from the 2004 LHM with respect to Orlea and Cârnic. For Orlea, the so-called address was changed to "*the entire locality within a two kilometer radius,*" and for Cârnic, all mining galleries in the Cârnic Massif were listed, including the so-called medieval and modern galleries, not previously designated as historical monuments.[149]

108.   In July 2011, Minister of Culture Kelemen Hunor (who took office in December 2009) publicly stated that the Cârnic Massif would be removed from the 2010 LHM when the ADC was issued, as the second Cârnic ADC was to be issued at that time. As mentioned above, ADC No. 9/2011 was issued the same month.[150]

109.   The NGOs then relied on the inclusion of Orlea and Cârnic in the 2010 LHM to seek the cancellation of the SEA Endorsement. The NGOs argued in their lawsuits that the SEA Endorsement does not take into account historical monuments described in the 2010 LHM.

110.   In June 2014, RMGC formally requested the NIH to correct the 2010 LHM.

111.   In July 2014, the NIH responded to RMGC and indicated that the errors would be corrected in the 2015 LHM, which was expected to be released shortly.

---

[147] Schiau Opinion I, Sect. V; Legal Opinion on Heritage Law Issues Related to Roșia Montană Project of Professor Ioan Schiau, dated 2 November 2018 ("Schiau Opinion II"), Sect. IV.
[148] Schiau Opinion I, para. 210; Schiau Opinion II, Sect. C; Gligor WS I, para. 44; Memorial, para. 161.
[149] Exh. C-1266 (2010 List of Historical Monuments approved by Order No. 2361 of the Ministry of Culture published in the Official Gazette 670bis, dated 1 October 2010); Gligor WS I, para. 91; Memorial, paras 315-318.
[150] Exh. C-680 (Archaeological Discharge Certificate No. 9/2011 (Cârnic underground)).

112.    <u>In August 2014</u>, RMGC initiated administrative and legal proceedings against the NIH
and the Ministry of Culture to obtain the correction of the 2010 LHM.[151] ███████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
██████████████████████████████████████[152]

113.    As mentioned above, the Court overturned the SEA Endorsement <u>in March 2016</u>, ██████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
█████████████ This annulment frustrated the then-approval of the urbanism plan for the
Project area (see para. 102).[153]

<em>vi.     The financial guarantees</em>

114.    RMGC committed in the EIA Report to provide guarantees to cover mine closure costs
and any unplanned environmental liabilities.

115.    At the <u>29 November 2011</u> TAC meeting, TAC President Marin Anton stated that the
guarantees were "a next step" after the Environmental Permit was issued.[154]

116.    Environment Minister Borbély confirmed <u>in December 2011</u> that Gabriel had agreed to
provide the necessary financial guarantees.[155]

117.    The Inter-Ministerial Commission asked at its <u>March 2013</u> meeting whether not
providing the guarantees could be an obstacle to the Project. The TAC President at the
time, Elena Dumitru, stated, "*No, of course not.*"[156] The issue of the financial guarantees
was extensively discussed during the <u>10 May 2013 TAC meeting</u>.[157]

---

[151] Exh. C-1342 (RMGC administrative complaint to NIH, dated 5 August 2014).

[152] Rejoinder, para. 697.

[153] Exh. R-211 ██████████████████████████████████; Exh. C-1721 ████████████████
████████████████

[154] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), pp 49-51.

[155] Exh. C-637 (Interview of László Borbély, TVR, dated 27 December 2011), p. 2.

[156] Exh. C-472 (Transcript of Inter-Ministerial Commission meeting, dated 22 March 2013), p. 16; see also Exh. C-2162 (Letter from Department for Infrastructure Projects and Foreign Investment to Secretary General, dated 26 March 2013, forwarding Informative Note regarding the activity of the Inter-Ministerial Commission), p. 7.

[157] Exh. C-484 (Transcript of TAC Meeting, dated 10 May 2013), pp 14-17.

118.    The amounts of USD 146 million for closure and USD 25 million for environmental liability were agreed in a draft agreement submitted to Parliament on 27 August 2013.[158]

### 4. The 2011 renegotiation of the financial terms of the Project

119.    During the time of the discussion on environmental permitting, the Parties also discussed revisiting the financial terms of the Project and, in particular, the State's participation in it. The Tribunal will present these discussions in the present Section. The outcome of these discussions will be seen later in the context of the presentation of the law drafted for the Project (the Draft Law).

120.    As of August 2011, the State held 19.31% of RMGC's shares through Minvest, in accordance with RMGC's Articles of Association. Gabriel held the remaining 80.69%. Under the Roşia Montană License, as amended, the royalty on the gross revenue from eventual production of the Roşia Montană Project was 4%.[159]

121.    August 2011 was also the beginning of a series of public statements by State officials on the financial terms of the Project, as well as on the support of the Project itself.[160]

122.    On 21 September 2011, Minister of Economy Ion Ariton requested that the Ministry of Economy be authorized to renegotiate with Gabriel.[161] Prime Minister Emil Boc granted such authorization and instructed Minister Ariton to approach RMGC and Gabriel to renegotiate and increase the State's benefits.[162] The mandate was formalized two days later, and an urgent deadline set for renegotiation and reporting to the Government.[163]

---

[158] Exh. C-519 (Draft Law on Certain Measures Regarding the Mining of Gold and Silver Ores in the Roşia Montană perimeter and on Stimulating and Facilitating the Development of Mining Activities in Romania, dated 17 August 2013 ("Draft Law") & Draft Agreement on Measures for the Mining of Gold and Silver Ores in the Roşia Montană Site, dated 27 August 2013 ("Draft Agreement")), Art. 6(2)(c)-(d), (f).

[159] Exh. C-414-C (Addendum N. 7 to Roşia Montană License, dated 14 October 2009), Art. II.

[160] Exh. C-537 (Interview of Emil Boc, TVR1, dated 1 August 2011); Exh. C-2912 (Verespatak: Romanian government to make a decision this year, dated 11 August 2011); Exh. C-628 (Traian Băsescu: Romania needs the Roşia Montană Project, provided the terms for sharing of benefits are renegotiated, Agerpres.ro, dated 18 August 2011); Exh. C-508 (Roşia Montană stirs up tensions in UDMR: Kelemen Hunor shows the door to Eckstein-Kovacs, Ecomagazin.ro, dated 24 August 2011); Exh. C-791.02 (Emil Boc: The decision on the Roşia Montană mining project must be substantiated based on documents, not stories, Agerpres ro, dated 2 September 2011); Exh. C-2914 (Transcript B1 TV, dated 29 August 2011); see also Exh. C-1430 (Agerpre.ro, dated 3 September 2011); Exh. C-2155 (Interview with Environment Minister L. Borbély, Radio România Actualităţi, dated 5 September 2011); Memorial, paras 338, 339, 341.

[161] Exh. C-2156 (Government Memorandum from Minister of Economy I. Ariton to Prime Minister E. Boc, dated 21 September 2011), p. 3.

[162] Witness Statement of Ion Ariton, dated 13 May 2019 ("Ariton WS"), para. 33; Exh. C-2635 (Letter No. 20 from the General Secretariat of the Government to Minister of Economy Ariton, dated 23 September 2011 enclosing Tasks established at the Government meeting, dated 21 September 2011).

[163] Exh. C-2635 (Government Mandate to Ministry of Economy, dated 23 September 2011), p. 2.

123.    On 22 September 2011, the Ministry of Economy, through Sorin Mihai Găman, called
Gabriel and RMGC to renegotiate. An email sent on 22 September 2011 ██████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████ The first renegotiation took place five days later, on 27 September 2011.
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████ [165]

124.    On 29 September 2011, the Parties resumed their meeting. ██████████████████
████████████████████████████████████████████████████████████████████
██████████████████ Gabriel wrote letters to senior government officials reminding them of
the excellent deal they already had under the existing agreements and, at the same time,
began drafting its initial offer to the State.[166]

125.    On the same day, Minister Ariton decided to establish a *Negotiation Commission*
composed of officials from the Ministry of Economy.

126.    On 5 October 2011, Culture Minister Hunor confirmed to Parliament that the
Government's decision on the Project would also include economic considerations.

127.    On the same day, ████████████████████████████████████████████
████████████████████████████ ████████████████████████████████████████
████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████
██████████ [167]

128.    On 6 October 2011, RMGC met with the Negotiation Commission. ████████████
████████████████████████████████████████████████ ███████████████████████
████████████████████████████████████████████████████████████████████

---

[164] Exh. C-2915 ██████████████████████████████████████████████████; Exh. C-
2916 █████
[165] Tănase WS II, paras 88-89; Henry WS I, paras 44-45; Memorial, para. 348.
[166] Exh. C-799 ████████████████████████████████████████████████████████████
██████████████████; Exh. C-2920 █████████████████████████, p. 1.
[167] Exh. C-2919 ████████████████████████████████████████████████████████████
████████, p. 2.



129. <u>On 31 October 2011,</u> ██████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
███████████████████████[169]

130. <u>On 3 November 2011,</u> ███████████████████████████████
████████████████████████████████████████████

████████████████████████████████████████████
█████████████████████████[170]

131. <u>On 9 November 2011,</u> █████████████████████████████
████████████████████████████████████████████

██████████[171]

132. <u>On 25 November 2011,</u> █████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
██████████████████, [172]

133. <u>On 27 November 2011,</u> █████████████████████████████
███[173]

---

[168] Exh. C-2920 ████████████████████████████; Exh. R-403 (Roşia Montană exploitation license No. 47/1999).
[169] Exh. C-2637 ████████████████████████████, p. 1.
[170] Exh. C-2921 ████████████████████.
[171] Exh. R-680 ████████████████████████████████
████████████████████.
[172] Exh. C-914 ██████████████████████.
[173] Exh. C-914 ██████████████████████.

134.   <u>On 28 November 2011,</u> ███████████████████████████
███████████████████████████████████████████
██████[174]

135.   <u>The same day,</u> ███████████████████████████████████
████████████████████████████[175]

136.   <u>On 29 November 2011,</u> ██████████████████████████
████████████████████████████████████████
██████████████████████████[176]

137.   <u>The next day,</u> ████████████████████████████████
██████████████████████████████████████████
██████████████[177]

138.   <u>On 30 November 2011,</u> █████████████████████████
██████████████████████████████████████████
███████████████████████████████

139.   <u>On 30 November 2011,</u> █████████████████████████
██████████████████████████████████████████
███████████████████████

140.   <u>On 1 December 2011,</u> ███████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████[178]

141.   <u>On 5 December 2011,</u> ████████████████████████████
██████████████████████████████████████████
███████████████████████████████████

[174] Exh. C-877 ███████████████████████████████; Exh. C-841 ██████
████████████████████.
[175] Exh. C-841 ███████████████████████████████████.
[176] Exh. C-797 █████████████████████████████████.
[177] Exh. C-775 ███████████████████████████████████████████
██████████████████; Memorial, para. 368.
[178] Exh. C-915 █████████████████████████████████; Memorial,
para. 369.



[179]

142. ████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████ [180]

143. <u>On 14 December 2011,</u> ████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████ [181]

144. <u>On 15 December 2011,</u> ████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
███████████████████████████████. [183]

145. <u>On 18 December 2011,</u> Environment Minister Borbély said that while technical approval could be obtained by January 2012, economic renegotiations had not yet been completed.[184]

---

[179] Exh. C-2923 ██████████████████████████████████
████████.
[180] Exh. R-405 (Note on the status of renegotiation in regard to the economic clauses of the Agreement signed with Gabriel Resources/RMGC under the Roşia Montană mining project, dated December 2011).
[181] Exh. C-2924 ███████████████████████████████████.
[182] Exh. C-2925 ████████████████████.
[183] Exh. C-774 ████████████████████████████████████████.
[184] Exh. C-633 (Interview of László Borbély, ProTV, dated 18 December 2011), p. 2.

146. <u>On the same day</u>, the Government announced that it would double the precious metals royalty from 4% to 8%. The 8% royalty never went into effect. At the end of 2013, a 6% royalty was adopted, which took effect in 2014.[185]

147. <u>On 26 January 2012,</u> ████████████████████████████
████████████████████████████████████████████
████████████████████████████████████████████
████████████████████████████████████.[186]

148. <u>On 6 February 2012</u>, Prime Minister Boc resigned due to mass street protests. President Băsescu appointed a new Prime Minister, Mihai Răzvan Ungureanu, to form a new government with the same PDL (i.e., the Liberal Democratic Party) and UDMR (i.e., the Democratic Union of Hungarians in Romania) coalition partners that had formed the Boc Government.[187] Minister Hunor remained Minister of Culture, and Minister Borbély remained Minister of the Environment. Minister Borbély resigned sometime <u>in April 2012</u>. The Ungureanu Government did not withdraw its demand for renegotiation. The new Economy Minister, Lucian Nicolae Bode, was briefed on the status of renegotiations and permits and met once with RMGC, but took no action because the Ungureanu Government was ousted by a parliamentary vote of no confidence <u>on 17 April 2012</u>.[188] An interim Government led by Victor Ponta took power and maintained the demand for renegotiation to move the Project forward, but refused to take any action before the year-end elections.

149. <u>On 8 June 2012</u>, Interim Prime Minister Ponta told Bloomberg that the Government's stance on the Project was unchanged. He specified that, before going forward, RMGC had to observe the highest environmental standards and guarantees, offer a larger share of the Project to the State, and give up political lobby activities.[189]

### 5. The Roșia Montană Law or the Draft Law

150. The Roșia Montană Law or the Draft Law was a law prepared and discussed between the Parties and dealt with many elements related to the Project. The Draft Law was submitted

---

[185] Exh. C-1539 (Government Emergency Ordinance (No. 102/2013) for the amendment and supplementation of Law No. 571/2003 on the Fiscal code and for the regulation of certain financial and fiscal measures, dated 15 November 2013), Art. VI.

[186] Exh. C-876 (Letter from RMGC to Ministry of Economy, dated 26 January 2012, enclosing draft Agreement).

[187] Exh. C-922 ("Romanian prime minister Emil Boc resigns," The Guardian, dated 6 February 2012); Exh. C-2795 ("Nine injured in Bucharest anti-austerity protest," The Journal.ie, dated 15 January 2012).

[188] Exh. R-406 (Ministry of Economy Note from Sorin Gaman to Minister Bode, dated March 2012); Bode WS I, para. 25.

[189] Exh. C-641 ("The Government postpones the decisions regarding Roșia Montană and the shale gas until the elections that are going to be organized in autumn," Realitatea.net, dated 8 June 2012).

to Parliament for discussion and vote and had an impact on the start of the Project. In this section, the Tribunal explains the background of the Draft Law (see section 151a below) and the circumstances of its discussion and rejection (see section b below).

### a. The background

151.　In June 2012, Prime Minister Ponta announced that no decisions would be made on the Project until after the 2012 year-end elections.[190]

152.　On 14 February 2013, [191]

153.　In March 2013, the Government established an Inter-Ministerial Commission (see para. 3 above) under the coordination of the Department of Infrastructure Projects, to "*mediate an efficient dialogue*" between the State and RMGC "*considering that the permitting process for the Roşia Montană mining project has been stagnating since November 2011.*"[192] The Inter-Ministerial Commission met with RMGC on 11 and 22 March 2013.[193] The Inter-Ministerial Commission prepared its report and provided it to RMGC on 25 March 2013. The report was approved by the Government on 27 March 2013.[194]

154.　To renegotiate the economic aspects of the Project and prepare the Draft Law, the Government established a Negotiation Commission on 28 April 2013.[195]

155.　On 27 May 2013, 

---

[190] Exh. C-641 ("The Government postpones the decisions regarding Roşia Montană and the shale gas until the elections that are going to be organized in autumn," Realitatea.net, dated 8 June 2012), p. 1.

[191] Exh. C-779 (　　　　　　　　　　　　　　　　　　　　　); Tănase WS II, paras 138-146; Henry WS I, paras 73-79.

[192] Exh. C-553 (Draft Informative Note on the activity of the Inter-Ministerial Working Group convened for the Roşia Montană mining project　　　.

[193] Exh. C-471 (Transcript of Inter-Ministerial Commission meeting, dated 11 March 2013); Exh. C-472 (Transcript of Inter-Ministerial Commission Meeting, dated 22 March 2013).

[194] Tănase WS II, paras 149-160; Avram WS I, paras 123-124; Henry WS I, paras 82-83; Exh. C-451 (Information Note attached to Meeting Minutes of the Commission for Negotiation of All Aspects related to the Implementation of Roşia Montană Mining Project, dated 28 April 2013), pp 2-3.

[195] Exh. C-451 (Information Note attached to Meeting Minutes of the Commission for Negotiation of All Aspects Related to the Implementation of Roşia Montană Mining Project, dated 28 April 2013), p. 4; Art. 2(1).

[196] Exh. C-873 (Letter from RMGC to Department for Infrastructure Projects, dated 27 May 2013).

156.    At the <u>31 May 2013</u> TAC meeting, Secretary Năstase of the Ministry of Large Projects, under Minister Şova, discussed what would be the content of the Draft Law and the process surrounding it.[197]

157.    <u>On 5 June 2013</u>, the Negotiation Commission rejected Gabriel's offer and requested as "minimum conditions" the same 25 and 6 ratios that were included in the outstanding January 2012 offer.

158.    <u>On 11 June 2013</u>, [198]

159.    <u>On 14 June 2013</u>, ██████████████████████████████████████████
████████████████████████████████████████████████████
██████████████████████[199]

**b.   The Draft Law and its rejection**

160.    <u>On 27 August 2013</u>, the Government announced that it had submitted to Parliament the Draft Law for the Project and an accompanying draft "*Agreement on Certain Measures Regarding the Mining of Gold and Silver Ores in the Roşia Montană Perimeter*" ("Draft Agreement") as an attachment.[200] The Draft Agreement provided, among other things, that RMGC and Gabriel would increase the State's shareholding in RMGC from 19.31% to 23% after issuance of the Environmental Permit and from 23% to 25% after issuance of authorizations required to begin the operational stage of the Project, and also increase the royalty rate from 4% to 6% for the duration of the Project.[201] The Draft Law anticipated parliamentary approval of the Draft Agreement, declared the Project to be of "outstanding national public interest" and of public utility, authorized NAMR to extend the validity of the License by 20 years and contained provisions that would have amended or supplemented the Mining Law for all mining projects of outstanding public interest to facilitate and expedite the implementation of such mining projects

---

[197] Exh. C-485 (Transcript of the TAC meeting, dated 31 May 2013), p. 20.
[198] Exh. C-0781 (Letter from RMGC to Department of Infrastructure Projects, dated 11 June 2013 enclosing Letter from Gabriel to Department of Infrastructure Projects, dated 10 June 2013), p. 9.
[199] Exh. C-1536 ████████████████████████████, pp 64-67.
[200] Exh. C-1475 (Romanian Government Press Release dated 27 August 2013); Memorial, para. 32.
[201] Exh. C-519 (Draft Law & Draft Agreement), Arts 1(1), 3(1).

generally.[202] The Government submitted the Draft Law together with a detailed explanatory memorandum signed by Prime Minister Ponta and all relevant ministers.[203]

161.     On 31 August 2013, Prime Minister Ponta stated that he would vote against the Project but that it was the Parliament who would ultimately decide.[204]

162.     Meanwhile, mass street protests began in the Romanian urban centres of Bucharest and Cluj on 1 September 2013.

163.     On 5 September 2013, Prime Minister Ponta reiterated his view on the Draft Law.[205] Similar statements ensued.

164.     Two days later, Environment Minister Plumb stated that, through the new conditions imposed, the Roșia Montană Project could become "*the safest project of Europe*". When asked whether she would vote against the Draft Law, she stated that she cannot vote as a "*natural person*" but that she would cast her vote after consulting her voters.[206]

165.     Another mass protest took place on 8 September 2013.

166.     Senate committees held hearings on the Draft Law on 10 September 2013. That same day, the Senate committees unanimously rejected the Draft Law.[207]

167.     On 11 September 2013, miners in Roșia Montană began protesting underground. These miners remained underground for four days in protest.[208]

168.     On 15 September 2013, Prime Minister Ponta convinced the miners to end their underground protest by promising to set up a Special Commission in Parliament.[209]

---

[202] Exh. C-519 (Draft Law & Draft Agreement), Arts 1(2), 3, 4(1), 5.

[203] Exh. C-519 (Draft Law & Draft Agreement); Exh. C-817 (Exposition of Reasons, dated 27 August 2013); Exh. C-2461 (Exposition of Reasons on the Draft Law on certain measures regarding the mining of gold and silver ores in the Roșia Montană perimeter and on stimulating and facilitating the development of mining activities in Romania).

[204] Exh. C-789 (Adevarul.ro, dated 31 August 2013), p. 1.

[205] Exh. C-460 (Transcript of B1 TV, dated 5 September 2013).

[206] Exh. C-556 ("Rovana Plumb: The approval of Ministry of Environment for Roșia Montană, depending on the decision of Parliament", Hotnews.ro, dated 7 September 2013).

[207] Memorial, para. 40.

[208] Lorincz WS I, Annex A, p. 9.

[209] Exh. C-1483 ("Victor Ponta's statements regarding Roșia Montană," B1 TV, dated 15 September 2013), pp 1-2; Memorial, para. 497.

169. <u>On 17 September 2013</u>, the House established a Special Commission to study the Draft Law and prepare a report.[210] The Commission held hearings <u>from 23 September to 15 October 2013</u>, which were open to the public and broadcast on TV.

170. <u>On 18 October 2013</u>, Minister Plumb submitted a written statement to the Senate setting forth the opinion of the Ministry of Environment for the Roșia Montană Project at the request of the former, noting that the Environmental Permit would only be issued provided that Parliament approved the Draft Law and that the decision rested with Parliament.[211]

171. Before the vote, Prime Minister Ponta and Senate President Crin Antonescu held a joint press conference and called for the rejection of the Draft Law. On the evening of this joint press conference, the Special Commission voted 17-0, with two abstentions, to reject the Draft Law.[212] The Senate voted 119-3 with six abstentions to reject the Draft Law <u>on 19 November 2013</u>.[213] The House of Representatives also voted 302 to 1 against it <u>in June 2014</u>. Meanwhile, the Special Commission also issued a report including recommendations that various technical issues related to the Project be analyzed further, including the suitability of the Corna Valley for the Project's TMF, in light of the Geological Institute of Romania's comments in the prior TAC meetings.[214]

### 6. The events that followed

172. Certain events took place after the rejection of the Draft Law, the relevance of which to the issuance of the Environmental Permit is not agreed upon by the Parties. These include the adoption of the 2015 LHM (see section a below), the UNESCO application and listing (see section b below), additional TAC meetings (see section c below), the issue in relation to the recapitalization of RMGC (see section d below), the issue in relation to the Bucium Licenses (see section e below), investigations against RMGC (see section f below) and the proposal for a cyanide moratorium (see section g below). The Tribunal sets out these events below.

---

[210] Exh. C-909 (Decision No. 56, dated 17 December 2013, on the establishment of the Special Joint Committee of the Chamber of Deputies and of the Senate for the issuance of an opinion on the Draft Law on certain measures related to the exploitation of the gold and silver ores in the Roșia Montană perimeter and the stimulation and facilitation of the development of mining activities in Romania), Arts 1, 6.

[211] Exh. C-1529 (Letter from Minister Rovana Plumb to Senator Dan Mihai Marion, dated 18 October 2013), p. 2.

[212] Exh. C-664 (Special Commission Vote, dated 11 November 2013), p. 1; Memorial, para. 510.

[213] Exh. C-878 (Voting Roll of Senate on Draft Law, dated 19 November 2013); Memorial, para. 42.

[214] Exh. C-557 (Parliamentary Special Commission Report, dated November 2013).

### a. The adoption of the 2015 LHM

173.    As noted above, after a challenge by RMGC, the court found the 2010 LHM to be lawful (see para. 112).

174.    In October 2014, the NIH sent a draft of the 2015 LHM to the Alba Culture Directorate for comment. The Alba Culture Directorate responded on 22 December 2014 stating, among other things, that the correct description is the one provided in the 2004 LHM and that such should be reflected in the draft 2015 LHM. The Directorate enclosed the 2015 LHM as proposed by it.[215]

175.    In late December 2015, the Ministry of Culture issued the State's 2015 LHM. This new LHM (a) removed the precise geographical "STEREO" coordinates indicating the location of several archaeological sites in Roşia Montană, and (b) included a new "address" for the Alburnus Maior historical monument in Roşia Montană, which it described as "*the entire locality*" of Roşia Montană within a "*2 km radius*" and which would be a protected historical monument where no industrial activities may be undertaken.[216]

176.    The 2015 LHM was first announced on Culture Minister Vlad Alexandrescu's Facebook page on 9 January 2016, flagging NGOs that opposed the project. [217]

177.    In January 2016, Adrian Balteanu, the Romanian Ministry of Culture's Cultural Heritage Advisor, is quoted as saying that mining activities are prohibited in light of this LHM.[218]

178.    Also in January 2016, Minister of Culture Alexandrescu gave an award to the NGO Alburnus Maior, the main opponent of the project, for organising the Fânfest and opposing the Project.[219]

---

[215] Exh. C-1376 (Letter No. 1265 from the Alba Culture Directorate to NIH and the Ministry of Culture No. 1265, dated 22 December 2014).

[216] Exh. C-1267 (Minister of Culture Order No. 2828, dated 24 December 2015, published in the Official Gazette of Romania, Part I, No.113, dated 15 February 2016); Memorial, paras 49, 582.

[217] Exh. C-822 (Facebook post – Vlad Alexandrescu, dated 9 January 2016); Exh. C-823 (Facebook post – Vlad Alexandrescu, dated 16 January 2016).

[218] Exh. C-1356 ("Romanian village blocks Canadian firm from mining for gold," The Guardian, dated 14 January 2016).

[219] Exh. C-965 ("Vlad Alexandrescu, at the festivity of AFCN: FânFest, the biggest activist cultural event from Romania," Agerpres.ro, dated 15 January 2016).

### b. Romania's application to UNESCO

179.    In a report <u>of November 2013</u>, the Special Commission recommended that the Ministry of Culture initiate a public debate on the advisability and eligibility of Roșia Montană to be included as a UNESCO World Heritage site.[220]

180.    The inclusion of Roșia Montană in the World Heritage List of UNESCO had been considered and rejected before, including <u>in 2013</u>.[221]

181.    <u>On 11 January 2016</u>, Minister of Culture Vlad Alexandrescu publicly stated that the Ministry was considering the inclusion of Roșia Montană as a UNESCO World Heritage Site.[222] On 5 February 2026, he announced that the Government would initiate such a process on his Facebook page.[223]

182.    <u>On 18 February 2016</u>, the Government, through the Ministry of Culture, applied to UNESCO to have the entire "Roșia Montană Mining Cultural Landscape" declared a UNESCO World Heritage Site.[224] This had the effect of adding the site to Romania's UNESCO "Tentative List" of Romanian World Heritage reflecting Romania's commitment to preserving the site in accordance with the standards of the World Heritage Convention.[225] The subject of Romania's application included the historical monument of Alburnus Maior – Roșia Montană as listed on the 2015 LHM, which covered the entire Project footprint.[226] As summarized on UNESCO's website, Romania's application stated that the "*cultural landscape is threatened by irreversible changes following the ending of traditional mining operations* […] *and the proposed resumption of open cast mining with modern quarrying techniques would inevitably entail the quasi-total and irreversible destruction of the cultural heritage and its setting*".[227] It is not disputed that Romania's application triggered special protections under Romanian law.[228]

183.    <u>On 25 November 2016</u>, the Ministry of Culture sent a letter to the Prime Minister and the Mayor of Roșia Montană, emphasizing that the delimitation of the Roșia Montană Historic Monument must be reflected in the urban development plan in light of the

---

[220] Exh. C-557 (Parliamentary Special Commission Report, dated November 2013).

[221] Memorial, paras 310-314, 469-470; Gligor WS I, paras 136-140.

[222] Exh. C-1354 (Interview with Vlad Alexandrescu, dated 11 January 2016).

[223] Exh. C-1365 (Facebook Post – Vlad Alexandrescu, dated 5 February 2016).

[224] Exh. C-1275 (UNESCO Application, dated 18 February 2016); Memorial, para. 50.

[225] Memorial, paras 603-604.

[226] Exh. C-1892 (Nomination for Inclusion in the World Heritage list, Roșia Montană Mining Landscape); Exh. C-897 (Ministry of Culture website: Cultura.ro, The Roșia Montană file was submitted to UNESCO, dated 5 January 2017); Memorial, para. 609.

[227] Exh. C-1275 (Screenshot of UNESCO website).

[228] Exh. C-2350 (GO No. 47/2000).

UNESCO application and that, according to the law, cultural properties must be given priority over mining.[229]

184.     On 28 December 2016, the Ministry of Culture sent a letter to the Mayor's Office of the Municipality of Roşia Montană and the Cultural Department of Alba County, transmitting the delineation of the area of the designated historical monument. The documents refer to the previously issued ADCs but suggested that a different approach could now be considered.[230]

185.     On 5 January 2017, Romania submitted the Roşia Montană file to UNESCO in support of its application.[231]

186.     On 28 June 2018, Romania formally requested that the World Heritage Committee defer consideration of its application until the settlement of the present arbitration case.[232] The UNESCO Committee granted Romania's request for deferral.[233]

187.     On 31 January 2020, the Ministry of Culture issued a press release quoting Minister of Culture Bogdan Gheorghiu announcing that "*with close communication and consultation with the Romanian Prime Minister, Mr. Ludovic Orban,*" Romania gave notice to UNESCO that it decided "to resume the procedure" to list Roşia Montană as a UNESCO World Heritage Site. In the same press release, the Minister stated that "*by registration in the UNESCO List, the legal protection regime already established is not changed*".[234] The Ministry of Culture further confirmed this in a press release on 5 February 2020 that described the steps taken to implement urbanism plans in the area of Roşia Montană to protect the historical monuments and to complete the classification procedures for additional buildings and structures. It quoted Minister of Culture Cheorghiu stating that "[t]*he preservation of the Roşia Montană heritage is a pressing necessity, not just an intangible concept that will wait for resolution in international forums.*"[235] On 28 February 2020, the Ministry of Culture mentioned in a letter to the UNESCO World Heritage Centre that RMGC's License is still valid and that "*RMGC has not met to date*

---

[229] Exh. C-2517 (Letter from the Minister of Culture to the Prime Minister and Mayor of Roşia Montană, dated 25 November 2016), p. 2.

[230] Exh. C-2370 (Letter from the Minister of Culture to the Prime Minister and Mayor of Roşia Montană, dated 11 January 2017).

[231] Exh. C-897 (Ministry of Culture website: Cultura.ro, The Roşia Montană file was submitted to UNESCO, dated 5 January 2017); Jennings Report I, para. 137.

[232] Exh. C-1918 (Letter from Permanent Delegation of Romania TO UNESCO, dated 28 June 2018); Exh. C-1917 (Ministry of Culture press release, dated 28 June 2018).

[233] Exh. C-1920 (World Heritage Committee, Decisions adopted by the 42nd Session, dated 4 July 2018), p. 6.

[234] Exh. C-2982 (Ministry of Culture Press Release, dated 31 January 2020), p. 1.

[235] Exh. C-2983 (Ministry of Culture Press Release, dated 5 February 2020).

*but may still meet the requirements under Romanian law to obtain the environmental and other permits necessary for the Roşia Montană mining project.*"[236]

188.  On 27 July 2021, the site was inscribed on UNESCO's World Heritage List and simultaneously onto the List of World Heritage in Danger. The UNESCO announcement stated that it was inscribed on this list "*pending the removal of threats to its integrity posed by possible extractive activities*" and "*due to threats posed by plans to resume mining which would damage a major part of the inscribed Mining Landscape.*"[237] On the same date, the Ministry of Culture announced the news of the UNESCO inscription and Romania's President, Prime Minister and Deputy Prime Minister also made public statements concerning this development.[238]

### c.  The TAC meetings

189.  As mentioned above, in November 2013, the Special Commission also issued a report including recommendations that various technical issues related to the Project be analyzed further, including the suitability of the Corna Valley for the Project's TMF, in light of the Geological Institute of Romania's comments in the prior TAC meetings (see para. 169).[239]

190.  The Ministry of Environment convened another TAC meeting on 2 April 2014, to discuss the Special Commission's report.[240]

191.  The Ministry of Environment convened a subsequent TAC meeting on 24 July 2014 to discuss the requirements for a TMF study, i.e., a study on a TMF to store and manage tailings that was to be sited in the Corna Valley and that was included in the design of the Roşia Montană Project. The TAC President, Mihail Fâcă, asked the TAC members (orally and in writing) to submit the conditions they considered should govern the third party to be selected to conduct the TMF study.[241]

192.  The Ministry of Environment convened another TAC meeting in April 2015. At that meeting, the TAC President, Mihail Fâcă, confirmed that all TAC members had not

---

[236] Exh. R-693 (Letter from Minister of Culture to UNESCO World Heritage Centre and ICOMOS Evaluation Unit dated 28 February 2020), p. 2.
[237] Exh. C-2984 (UNESCO's announcement, dated 27 July 2021), pp 1, 3.
[238] Exh. C-2985 (Ministry of Culture Press Release, dated 27 July 2021); Exh. C-2987 (President Klaus Iohannis Facebook Post, dated 27 July 2021); Exh. C-2988 (Interview of Prime Minister Flori Citu, Jurnalul de Seara, Digi24 TV, dated 27 July 2021); Exh. C-2989 (Deputy Prime Minister Dan Barna, Facebook Post, dated 27 July 2021).
[239] Exh. C-557 (Parliamentary Special Commission Report, dated November 2013).
[240] Avram WS I, para. 170; Szentesy WS I, paras 95-96; Henry WS I, paras 138-139.
[241] Avram WS I, paras 173-174; Szentesy WS I, para. 98; Henry WS I, para. 140. See also, Memorial, para. 219.

39

proposed conditions for commissioning a further TMF study and the Ministry accordingly decided not to pursue it.[242]

### d. The recapitalization of RMGC

193.  <u>In 2013,</u> 

194.  <u>In November 2013,</u> .[243]

### e. The Exploitation Licenses in relation to Bucium

195.  The Bucium Exploration License expired <u>on 19 May 2007</u>. In anticipation of the expiration of this license, RMGC had prepared and submitted to NAMR <u>on 16 May 2007</u> a work program for the period between the expiration of the Bucium Exploration License and the issuance of subsequent licenses.[244]

196.  <u>In July 2007,</u>  .[246]

197.  RMGC then applied for exploitation licenses for these two areas <u>on 11 October 2007</u>.[247]

198.  RMGC's Bucium applications are still pending.[248]

---

[242] Avram WS I, para. 177; Szentesy WS I, paras 99-100; Henry WS I, para. 142.

[243] Claimants' Reply to Respondent's Observations on Claimants' Second Request For Provisional Measures, dated 24 August 2016 ("C- RPM Reply"), para. 89; Henry WS I, para. 135; Tănase WS II, paras 224-225.

[244] Counter-Memorial, para. 424.

[245] Counter-Memorial, para. 425.

[246] Counter-Memorial, para. 426.

[247] Counter-Memorial, para. 426.

[248] Counter-Memorial, para. 433.

### f.   The investigations

199.   <u>On 18 and 19 November 2013,</u> [249]

200.   <u>In May 2014,</u> [250]

201.   <u>In October 2015,</u> the State, through the National Agency for Fiscal Administration of Romania ("ANAF"), initiated an "anti-fraud" audit of RMGC.[251]

202.   <u>In March 2016,</u> the State initiated an audit of RMGC's VAT payments from 2011 to 2015, which resulted in a VAT assessment of RON 27 million (approximately USD 6/7 million) plus interest and penalties.

203.   The VAT assessment was administratively rescinded on the eve of the provisional measures hearing held in this arbitration proceedings on 23 September 2016, [252]

### g.   The 10-year cyanide moratorium

204.   <u>In December 2016,</u> the Government proposed to Parliament that a ten-year moratorium be placed on the use of cyanide in gold and silver mining projects.[253]

---

[249] Memorial, para. 558; Tănase WS II, paras 239-241; C-RPM Reply, para. 70.
[250] Memorial, para. 563.
[251] Memorial, paras 563, 572.
[252] Memorial, para. 572; Exh. C-1416 █████ ; Exh. R-294 ████.
[253] Memorial, para. 614.

### III.    The arbitral proceedings

#### 1.    The institution of the proceedings

205.    On 21 July 2015, the *International Centre for Settlement of Investment Disputes* (the "Centre") received a ***Request for Arbitration*** filed by Claimants against Respondent (the "Request for Arbitration").

206.    The Request for Arbitration concerned the alleged expropriation and other violations by Respondent of the *Agreement between the Government of Canada and the Government of Romania for the Promotion and Reciprocal Protection of Investments* (the "***Canada-Romania BIT***") and the *Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of Romania for the Promotion and Reciprocal Protection of Investments* (the "***UK-Romania BIT***") (jointly, the "***BITs***"),[254] in relation to Claimants' alleged investment in the Project through their Romanian subsidiary RMGC..

207.    The Request for Arbitration was registered by ICSID's Secretary-General on 30 July 2015 pursuant to Article 36(3) of the ICSID Convention.

#### 2.    The written phase of the proceedings

208.    On 16 June 2016, Claimants filed a ***First Request for Provisional Measures*** (the "First Request for Provisional Measures") requesting the Tribunal to recommend that Respondent grant Claimants unrestricted access to and use of certain confidential and classified documents for the purposes of this arbitration.

209.    In a cover letter of the same date, Claimants also requested that the time limits for the Parties to present observations on the First Request for Provisional Measures be fixed by the Tribunal once constituted, and not by the Secretary-General pursuant to paragraph 5 of ICSID Arbitration Rule 39.

210.    On 21 June 2016, the Tribunal was constituted in accordance with Article 37(2)(a) of the ICSID Convention. Its members were: Teresa Cheng (Chinese), President, appointed by the Secretary-General pursuant to the Parties' agreement; Horacio Grigera Naón (Argentine), appointed by Claimants; and Zachary Douglas (Australian), appointed by Respondent.

---

[254] The Canada-Romania BIT was signed on 8 May 2009 and entered into force on 23 November 2011. The UK-Romania BIT was signed on 22 March 1999 and entered into force on the same date.

211.  On 20 July 2016, the Tribunal invited (i) Respondent to file observations on the First Request for Provisional Measures, (ii) Claimants to file their response to Respondent's observations and (iii) Respondent to file any further observations it may have to the First Request for Provisional Measures.

212.  On 28 July 2016, Claimants submitted a ***Second Request for Provisional Measures*** that included a ***Request for Emergency Temporary Provisional Measures*** pending the determination of this Second Request for Provisional Measures.

213.  On 3 August 2016, the Tribunal invited Respondent's comments on Claimants' Request for Emergency Temporary Provisional Measures.

The Tribunal also invited: (i) Respondent to file observations on Claimants' Second Request for Provisional Measures, (ii) Claimants to file observations in reply and (iii) Respondent to file observations by way of rejoinder.

214.  On the same date, Respondent submitted its observations to Claimants' First Request for Provisional Measures.

215.  On 10 August 2016, Respondent submitted its comments on Claimants' Request for Emergency Temporary Provisional Measures.

216.  On 11 August 2016, Claimants sent a letter to the Tribunal in which they informed the Tribunal of recent developments relating to the Second Request for Provisional Measures and Request for Emergency Temporary Provisional Measures.

217.  On 12 August 2016, the Tribunal held its ***first session*** by teleconference.

218.  On the same date, and after the first session was finalized, Claimants submitted a letter with further observations on their Request for Emergency Temporary Provisional Measures.

219.  On 14 August 2016, both Parties submitted letters with further observations on the Request for Emergency Temporary Provisional Measures.

220.  On 17 August 2016, Respondent submitted its observations to the Second Request for Provisional Measures.

221.  On the same date, Claimants submitted their reply to Respondent's observations to the First Request for Provisional Measures.

222.  On 19 August 2016, the Tribunal informed the Parties that the Request for Emergency Temporary Provisional Measures was rejected. The Tribunal indicated that they had

decided to communicate their decision to the Parties, with the full reasons for that decision to follow as soon as possible, in light of Claimants' allegations concerning RMGC's need to post a guarantee by 25 August 2016.

223.  On 25 August 2016, Claimants submitted their reply to Respondent's observations on the Second Request for Provisional Measures.

224.  On 26 August 2016, the Tribunal issued its ***Procedural Order No. 1***, setting out the procedural rules that govern the present arbitration, together with a tentative Procedural Calendar ("PO No. 1").

225.  On 31 August 2016, Respondent submitted further observations on the First Request for Provisional Measures as well as its Rejoinder on the Second Request for Provisional Measures.

226.  On 16 September 2016, Claimants submitted a letter updating the Tribunal on a number of items relating to both requests for provisional measures.

227.  On 22 September 2016, Claimants submitted a letter further updating the Tribunal on events related to the First Request for Provisional Measures.

228.  On the same date, Respondent submitted new evidence and legal authorities relating to both requests for provisional measures.

229.  Claimants objected to the introduction of such evidence by letter of the same date.

230.  On 23 September 2016, a ***Hearing on the Requests for Provisional Measures*** was held in Washington, DC.

231.  On 20 October 2016, the Tribunal issued ***Procedural Order No. 2***, deciding on the Requests for Provisional Measures ("PO No. 2"):

> *In light of the Parties' amended requests for relief, the progress made in the declassification of the remaining classified documents, as well as the Parties' current negotiations regarding the terms of the amended Custody Agreement and draft confidentiality order, the Tribunal hereby orders:*
>
> *a) Claimants to cause RMGC to provide NAMR with copies of the documents that remain to be declassified;*
>
> *b) Respondent to declassify such documents and/or cause the relevant third parties to declassify such documents in accordance with the relevant laws;*

44

*c) Both Parties to continue to apply their best efforts to agree on a draft confidentiality order and amended Custody Agreement;*

*d) Both Parties to report on the status of the previous items within 30 days from the date of this order; the Tribunal may issue further directions upon receipt of the Parties update on the status; and*

*e) Claimants to cause RMGC to grant both Parties simultaneous access to the documents in RMGC's custody once the terms of the amended Custody Agreement and draft confidentiality order have been defined.*

*The Tribunal reserves its decision on the costs incurred in relation to the First Request for Provisional Measures for a later date. (PO No. 2, paras 35-36).*

232.    On 21 October 2016, the Tribunal transmitted its Reasoned Decision on Claimants' Request for Emergency Temporary Provisional Measures.

233.    On 14 November 2016, the Tribunal issued **Procedural Order No. 3**, governing issues of confidentiality in the present arbitration ("PO No. 3" or the "Confidentiality Order").

234.    On 10 January 2017, the Tribunal adopted the Procedural Calendar, issued as Annex A to **Procedural Order No. 4** ("PO No. 4").

This Procedural Calendar was amended twice by the Parties. First, by their respective letters of 7 and 13 of February 2018, and later, by their 11 April 2018 communications.

235.    On 10 and 17 January 2017, the Parties submitted their differences in relation to the confidentiality of certain information and documents submitted by the Parties in the proceedings.

236.    On 14 March 2017, Alburnus Maior, Greenpeace CEE Romania and Independent Centre for the Development of Environmental Resources (the "Prospective *Amici*") sent a letter to the Tribunal, by which they requested the Tribunal to provide, *inter alia*, "*information detailing under what circumstances expert reports and witness statements may at all be released to the general public or to prospective Amici alone*".

237.    On 5 April 2017, both Parties submitted their comments on the Prospective *Amici's* letter of 14 March 2017.

238.    On 10 May 2017, the Tribunal noted the significance and extensive number of differences both in the approach and application of the confidentiality principles laid down in PO No.3. To narrow such differences, the Tribunal provided its preliminary views on the matter and invited the Parties to reconsider their positions on this basis.

239.    On 1 June 2017, the Parties informed the Tribunal of the agreements reached with respect to the redaction of their submissions, Tribunal decisions and hearings transcript.

240.    On 16 June 2017, the Tribunal issued its **Procedural Order No. 5**, deciding that the general public and non-disputing parties (prospective or not) may not have access to witness statements or expert reports, unless (i) both Parties agree otherwise, or (ii) the Tribunal decides to amend or derogate from Section 2.8 of the Confidentiality Order in accordance with its Section 3.14 ("PO No. 5").

241.    On 23 June 2017 and 14 July 2017, the Parties submitted to the Tribunal their remaining differences with respect to the confidentiality of witness statements and factual exhibits. On 30 June 2017, Claimants filed their **Opening Memorial**, together with witness statements, expert reports and exhibits.

242.    On 29 August 2017, the Tribunal issued its **Procedural Order No. 6**, in which it decided on the confidentiality of the witness statements and exhibits filed prior to Claimants' Opening Memorial ("PO No. 6").

243.    On 30 August 2017, and pursuant to the Parties' agreement, the Tribunal provided a schedule for the Parties' confidentiality designations for Claimants' Opening Memorial and supporting documentation.

244.    On 14 September 2017, Claimants requested an extension for the submission of confidentiality designations, which was granted by the Tribunal on 15 September 2017.

245.    On 22 September 2017, Claimants filed their proposed confidentiality designations for their Memorial, pursuant to PO No. 3

246.    Claimants also submitted that the witness statements, expert reports and exhibits (that were not already in the public domain) filed in support of the Memorial should be kept confidential.

247.    On 6 October 2017, Respondent objected to certain confidentiality designations proposed by Claimants for the Memorial.

        Respondent also proposed to reclassify as non-confidential certain exhibits and certain portions of the witness statements and expert reports.

248.    On 13 October 2017, Claimants submitted observations in response to Respondent's 6 October 2017 letter, including their opposition to Respondent's reclassification proposal.

249.    <u>On 1 November 2017</u>, Respondent submitted certain observations to Claimants' letter of 13 October 2017 and the interpretation of PO No. 3.

250.    <u>On 6 November 2017</u>, Claimants submitted observations in response to Respondent's 1 November 2017 letter.

251.    <u>On 16 January 2018</u>, the Tribunal issued ***Procedural Order No. 7***, in which it decided on the disputed confidentiality designations for Claimants' Opening Memorial ("PO No. 7").

The Tribunal's decision on the disputed confidentiality designations concerning the exhibits, expert reports and witness statements accompanying Claimants' Opening Memorial was left for a subsequent procedural order.

252.    <u>On 22 January 2018</u>, Claimants objected to the Tribunal's rulings on certain disputed confidentiality designations in the Opening Memorial in PO No. 7 and requested, *inter alia*, a revision of such rulings.

253.    <u>On 30 January 2018</u>, the Tribunal issued ***Procedural Order No. 8***, ruling on Respondent's proposal to reclassify certain exhibits as non-confidential and leaving Respondent's request to reclassify certain portions of witness statements and expert reports as non-confidential for a subsequent Procedural Order ("PO No. 8").

254.    <u>On the same date</u>, Respondent submitted its reply and objection to Claimants' submission of 22 January 2018.

255.    <u>On 6 February 2018</u>, the Tribunal informed the Parties that the Opening Memorial would not be published on the Centre's website until it had decided on Claimants' requests in its letter of 22 January 2018.

256.    <u>On 7 February 2018</u>, Ms. Teresa Cheng, the President of the Tribunal, resigned.

257.    <u>On 22 February 2018</u>, Respondent filed its ***Counter-Memorial***, together with witness statements, expert reports and exhibits.

258.    <u>On 22 March 2018</u>, the Parties filed their ***document production requests*** in the form of Redfern Schedules, in conformity with the Procedural Calendar as amended.

259.    <u>On 5 April 2018</u>, Prof. Pierre Tercier was appointed as President of the Tribunal, replacing Ms. Cheng.

260.    <u>On the same date</u>, Claimants requested certain clarifications in the Tribunal's decisions in PO No. 7 and PO No. 8.

261.  <u>Also, on the same date</u>, Claimants provided their comments on the publication of PO No. 8.

262.  <u>On 12 April 2018</u>, Respondent submitted its comments to Claimants' letter of 5 April 2018 and noted the Parties' agreement to defer submission of the proposed redactions and confidentiality designations with respect to the Counter-Memorial.

263.  <u>On the same date</u>, Respondent indicated its agreement with Claimants' approach on the publication of PO No. 8 and redactions of Annex A of PO No. 8, noted in the latter's letter of 5 April 2018.

264.  <u>On 19 April 2018</u>, the Parties filed their ***objections to the other Party's document production requests*** and produced documents to which they did not object, again in conformity with the Procedural Calendar as amended.

265.  <u>On 23 April 2018</u>, Claimants reiterated the Parties' agreement on the publication of PO 8 and confirmed their agreement also on the approach concerning the proposed redactions and confidentiality designations in connection with the Counter-Memorial.

266.  <u>On 25 April 2028</u>, with the consent of the Parties, the Tribunal appointed Ms. Maria Athanasiou as the Assistant to the Tribunal. Her *curriculum vitae* and a declaration of impartiality and independence were circulated to the Parties.

267.  <u>On 27 April 2018</u>, the Parties submitted a joint proposal to amend the Procedural Calendar.

268.  <u>On 30 April 2018</u>, Respondent noted that it does not have further comments in relation to Claimants' letter of 23 April 2018.

269.  <u>On 8 May 2018</u>, the Tribunal asked the Parties to reserve the weeks of 2 and 9 December 2019 for the hearing on jurisdiction and the merits (the "Hearing" or the "Hearing of December 2019").

Both Parties confirmed their availabilities, and the Tribunal acknowledged such confirmation <u>on 18 May 2018</u>.

270.  <u>On 10 May 2018</u>, the Parties filed their replies to the objections to the other Party's document production requests.

With their replies in the form of Redfern Schedules, the Parties filed also their general comments on the other Party's document production requests and objections. Specifically, Claimants filed a table annexed to its Redfern Schedule by which they submitted their "Preliminary Responses" to "Respondent's Preliminary Comments".

Respondent filed its comments in the form of a letter to the Tribunal, together with three Annexes.

271.   On 16 May 2018, the Tribunal invited the Parties to note whether they wished for another opportunity to comment on the pending confidentiality issues, specifically referring to the first request of Claimants' letter of 22 January 2018.

272.   On 18 May 2018, Respondent informed the Tribunal that it did not have any further comments in relation to the pending confidentiality issues.

273.   On 21 May 2018, Claimants asked the Tribunal to be given an opportunity to comment further on the Tribunal's rulings in PO No. 7 and its Annex A, prior to the publication by Centre of the redacted Opening Memorial.

274.   On 23 May 2018, the Tribunal gave the Parties a further and final opportunity to make comments on PO No. 7 and its Annex A, specifically as those may relate to references to the witness statements and/or other references.

The Tribunal clarified that the Parties would not be given a further occasion to comment on the Tribunal's decision on confidentiality once rendered.

275.   On 25 May 2018, Respondent submitted an Additional Preliminary Objection over Gabriel Jersey's claims under the UK-Romania BIT or, alternatively, to the admissibility of those claims.

276.   On 28 May 2018, Claimants filed certain observations in relation to Respondent's document production Requests nos. 49 to 52.

277.   On 29 May 2018, the Tribunal and the Parties held a conference call, during which they discussed several items, including that the Tribunal's decision on confidentiality was forthcoming.

The merits of the Parties' positions on the open confidentiality issues were not discussed during the call.

The amendments to the Procedural Calendar as proposed on 27 April 2018 by the Parties were also confirmed.

278.   On 30 May 2018, Claimants filed their further comments on PO No. 7 and its Annex A, pursuant to the Tribunal's letter of 23 May 2018.

279.   On 4 June 2018, Respondent submitted its comments to Claimants' observations in relation to Respondent's document production Requests nos. 49 to 52.

280.    On 5 June 2018, the Tribunal issued **Procedural Order No. 9** adopting the amended Procedural Calendar of the present arbitration ("PO No. 9").

281.    On 6 June 2018, Respondent filed its observations on Claimants' comments of 30 May 2018, pursuant to the Tribunal's letter of 23 May 2018.

282.    On 8 June 2018, Claimants submitted their comments in response to Respondent's letter of 4 June 2018, concerning Respondent's document production Requests nos. 49 to 52.

283.    On the same date, the Tribunal issued **Procedural Order No. 10**, together with Annexes A and B, ruling on the Parties' document production requests and giving specific directions in relation thereto ("PO No. 10").

284.    On 12 June 2018, PO No. 10 was revised to correct a typographical mistake.

285.    On 14 June 2018, the Parties informed the Tribunal that they had agreed to extend the deadlines set out at paragraphs 55(3) and 55(4) of PO No. 10.

286.    On the same date, Respondent submitted its clarifications regarding its objections to Claimants' document production Request no. 13, pursuant to paragraph 55(5) of PO No. 10.

        Respondent confirmed that it did not have any documents responsive to this request in its custody, possession or control. It noted that it could not therefore at this stage further substantiate its objection under Article 9(2)(f) of the 2010 IBA Rules on the Taking of Evidence in International Arbitration (the "IBA Rules"), but reserved the right to do so, should any responsive documents come within its custody, possession or control, if and as appropriate. In any event, Respondent maintained its objections to production based on the absence of relevance and materiality of the requested documents.

287.    Also, on the same date, the Tribunal issued **Procedural Order No. 11**, ruling on several outstanding issues in relation to confidentiality ("PO No. 11"), namely (i) Respondent's request to reclassify certain exhibits and portions of expert reports and witness statements as non-confidential the, (ii) Claimants' request of 22 January 2018 concerning PO No. 7; and (iii) Claimants' clarification request of 5 April 2018 concerning PO No. 7 and PO No. 8.

288.    Additionally, the Tribunal confirmed "*the Parties' agreement to make any proposed redactions and confidentiality designations in connection with the Counter-Memorial following the issuance of* [PO No. 11]" (PO No. 11, Decision No. 10).

289.    On 22 June 2018, Respondent submitted Claimants' Privilege and Redaction Logs containing Respondent's comments thereto, pursuant to paragraphs 55(3) and (4) of PO No. 10.

290.    On the same date, Claimants submitted Respondent's Privilege Log containing Claimants' comments thereto, pursuant to paragraph 55(3) of PO No. 10.

291.    On 28 June 2018, and after considering Respondent's clarifications of 14 June 2018, the Tribunal rejected Claimants' document production Request no. 13.

292.    On the same date, Claimants sent a letter to the Tribunal referring to the latter's decision rejecting Claimants' document production Request no. 13.

        Claimants requested that the Tribunal clarify that (i) Claimants' document production Request no. 13 is not rejected and (ii) Respondent's statement that it has not located any responsive documents is noted.

293.    Also, on the same date, Respondent sent an email to the Centre, noting the Parties' agreement on the redaction process for the Counter-Memorial. Claimants confirmed their agreement via an email to the Centre of the same date.

294.    On 2 July 2018, the Tribunal provided its clarifications in relation to its decision of 28 June 2018 concerning Claimants' document production Request no. 13.

        It noted, among other things, that it "*does indeed take note of all of Respondent's comments in its letter of 14 June 2018*" and that "[n]*either Party is therefore prevented from resubmitting a document production request, if circumstances so necessitate*".

295.    On the same date, the Tribunal rendered **Procedural Order No. 12**, together with Annexes A and B, ruling on Claimants' Privilege and Redaction Logs and on Respondent's Privilege Log ("PO No. 12").

296.    On 12 July 2018, Respondent provided the portions of the supporting documentation of the Counter-Memorial that it proposed to classify as non-confidential.

297.    On 14 July 2018, Claimants informed the Tribunal that they provided Respondent with Supplemental Privilege and Redaction Logs on 22 June 2018, to which Respondent commented on 11 July 2018.

        Claimants noted that the Parties were in agreement as to the redaction of the documents listed in Claimants' Supplemental Redaction Log, but that they had not reached an agreement regarding certain documents listed in Claimants' Supplemental Privilege Log. Claimants therefore asked the Tribunal to rule that the documents described in such Log

are privileged and should not be produced. According to Claimants, the disputed items consist of minutes of meetings between Gabriel's Board of Directors and its advisors and legal counsel and reflect discussion of two issues: (i) information on recent political events in Romania, and (ii) legal counsel providing legal advice.

298.    On 18 July 2018, Respondent submitted its comments on Claimants' letter of 14 July 2018, noting the Parties' disagreement regarding the scope of the attorney-client privilege.

According to Respondent, the non-privileged portions of the documents should be disclosed, notwithstanding any general confidentiality designations on the documents.

299.    On 20 July 2018, the Tribunal issued *Procedural Order No. 13*, together with Annex A, deciding that the documents listed in Claimants' Supplemental Privilege Log and responding to Respondent's Request no. 35 are privileged and shall not be produced ("PO No. 13").

300.    On 26 July 2018, Claimants provided their comments on Respondent's proposals regarding the non-confidentiality of the Counter-Memorial witness statements, expert reports and exhibits.

Claimants enclosed the Parties' agreed redactions to the list of exhibits and to the witness statements of (i) Ms. Dorina Simona Mocanu and (ii) Mr. Sorin Mihai Găman and to the expert reports of (i) Mr. Bernard J. Guarnera, Mr. Mark K. Jurgensen and Dr. Robert E. Cameron (Behre Dolbear & Company (USA) Inc.), (ii) Dr. Dacian Cosmin Dragoş, (iii) Dr. Ian Thomson, and Ms. Larraine Wilde (CMA Partners LLP), including the accompanying appendices.

They also enclosed a Log concerning their disagreement on the redactions to the expert report of Dr. James C. Burrows of Charles Rivers Associates ("CRA Report"), as well as a letter from the Ontario Securities Commission dated 31 October 2013 in support of their objection to Respondent's proposed reclassification.

301.    On 30 July 2018, Respondent sought leave to respond to Claimants' letter of 26 July 2018 concerning the redactions to the CRA Report, arguing that Claimants were seeking redactions on an entirely new basis not envisaged under PO No. 3.

302.    On the same date, Claimants objected to Respondent's request to comment further on Claimants' proposed redactions to the CRA Report set forth in the Log submitted by Claimants on 26 July 2018.

Claimants enclosed two items of email correspondence between the Parties on the issue.

303.    On 31 July 2018, the Tribunal afforded both Parties a final opportunity to submit their comments in relation to the proposed redactions to the supporting documentation of the Counter-Memorial. It noted that it would render its decision by the agreed deadline of 10 August 2018 or with a few days of delay.

304.    On 3 August 2018, Respondent responded to Claimants' comments in the Log of disputed redactions to the CRA Report and to Claimants' letter of 30 July 2018.

305.    On 8 August 2018, Claimants submitted their response to Respondent's letter of 3 August 2018, regarding Respondent's request to reclassify as non-confidential passages in the CRA Report.

306.    On 15 August 2018, and following an exchange of correspondence between the Parties, the Tribunal issued *Procedural Order No. 14* and its Annex A, deciding on the Parties' dispute in relation to the redaction of 11 headings and statements in the CRA Report – submitted by Respondent with its Counter-Memorial ("PO No. 14").

307.    On 4 September 2018, Claimants sent an email to the Centre, noting that the Parties agreed in substantial part to the redaction of confidential information from PO No. 14 and its Annex A, but that they disagreed on the treatment of certain short passages in the text of PO No. 14 itself.

        Claimants, therefore, enclosed a Confidentiality Log in support of the redactions they proposed and on which the Parties disagreed.

308.    On 12 September 2018, Respondent submitted its comments to Claimants' proposals for redactions in PO No. 14 in the Confidentiality Log of 4 September 2018.

        Meanwhile and pursuant to the Parties' agreement of 28 June 2018, the Parties exchanged among themselves correspondence concerning the redactions to the Counter-Memorial. This correspondence ended with Respondent's comments on Claimants' identification of additional portions of the Counter-Memorial for redaction set out in a Confidentiality Log, on 14 September 2018.

309.    On 18 September 2018, and following an exchange of correspondence between the Parties, the Tribunal issued *Procedural Order No. 15* and its Annex A, deciding on the confidentiality of PO No. 14 ("PO No. 15").

310.    On the same date, Claimants sent a letter to the Tribunal requesting it to order Respondent to produce, or to make a clear statement confirming it does not have possession, custody or control of three categories of documents.

Claimants enclosed to their letter the Parties' exchange of letters of 10 and 14 September 2018 concerning the Parties' disagreement on this issue.

311. On 24 September 2018, the Tribunal issued **Procedural Order No. 16**, together with Annex A, deciding that the redactions of the disputed items in the Counter-Memorial shall take place pursuant to the Tribunal's decisions enclosed in said Annex ("PO No. 16").

312. On 26 September 2018 and following an invitation from the Tribunal, Respondent provided its comments on Claimants' letter of 18 September 2018 and requested that Claimants' request therein be dismissed.

313. On 11 October 2018, the Tribunal issued **Procedural Order No. 17**, deciding that Respondent shall either produce or specifically confirm that it has no possession, custody or control of certain categories of requested documents by 19 October 2018 ("PO No. 17").

314. On 18 and 19 October 2018, the Parties submitted an agreement to amend the Procedural Calendar to the Tribunal.

315. On 23 October 2018, the Tribunal issued **Procedural Order No. 18**, adopting the amended Procedural Calendar which was issued as Annex A ("PO No. 18").

316. On 2 November 2018, the Centre received from Alburnus Maior, Greenpeace CEE, Romania and Independent Centre for the Development of Environmental Resources (ICDER) an application for non-disputing parties submission.

   The non-disputing parties' application (or "*Amici* Application") and their submission ("*Amici* Submission") were forwarded to the Tribunal on the next day and to the Parties on 10 November 2018.

317. Also on 2 November 2018, Claimants filed their **Reply and Counter-Memorial on Jurisdiction**, together with witness statements, expert reports and exhibits.

318. On 23 November 2018, Claimants submitted their Comments on the *Amici* Application, together with factual exhibits C-2865 to C-2891 and legal authorities CL-274 to CL-293.

319. On the same date, Respondent submitted its Comments on the *Amici* Applications.

320. On 29 November 2018, Respondent sent a letter together with an attachment to the Tribunal, replying to Claimants' allegations in their Comments insofar as they concerned the conduct of counsel for Respondent.

321.   On 30 November 2018, Claimants provided their comments to Respondent's letter of 29 November 2018, denying Respondent's allegations made therein.

322.   On 4 December 2018, Claimants sent a letter to the Tribunal requesting that it "*confirm that its ruling in PO 11 in relation to the witness statements and expert reports accompanying the Memorial should be applied equally to those accompanying the Reply so that the witness statements and expert reports should not be reclassified as non-confidential and that the Parties may proceed with the Reply redaction procedure accordingly*".

Claimants also enclosed relevant correspondence on the issue exchanged between the Parties.

323.   On 7 December 2018, the Tribunal issued ***Procedural Order No. 19***, granting the *Amici* Application and admitting their Submission ("PO No. 19"). The Tribunal specifically held as follows:

> *1. The Application is granted and the Submission is admitted with the following limitations:*
>
> *(a)The Applicants shall rectify immediately the formal defects identified in paragraph 58 above in their Application and Submission within 10 days of this Procedural Order. A failure to do so will result in the non-admittance of the Submission.*
>
> *(b) Section I (Introduction), Section II (The claimant failed to comply with investor responsibilities under both international investment and international human rights law) and Section III (The company failed to comply with domestic and EU Laws) are admitted, but only to the extent that they refer to factual issues within the specific knowledge of the Applicants and in relation to the interests the Applicants claim should be protected. Arguments on the law, as well as references to or reliances on testimonies are excluded.*
>
> *(c) Section IV (Legal implications of the Amici's perspective for the present arbitration) of the Application is not admitted.*
>
> *2. The non-disputing parties shall not participate in the Hearing. They may however observe the Hearing through the broadcasting facilities to be arranged at the ICSID, subject to appropriate measures taken by the Tribunal pursuant to Section 20.6.2 of PO 1.*

324.   On 12 December 2018, and following an opportunity provided by the Tribunal, Respondent sent a letter to the Tribunal commenting on Claimants' letter of 4 December 2018 and requesting that "*the* Tribunal *adopt the process first proposed by Respondent in its email of 13 November 2018 to the Claimants, as adjusted*".

325.   On 13 December 2018, Claimants requested an extension until 28 February 2019 to file their comments on the Non-Disputing Parties' Submission.

These comments were due, simultaneously with those of Respondent, on 18 January 2019.

326.   On 17 December 2018, the Tribunal issued **Procedural Order No. 20**, rejecting Respondent's request for reclassification of the witnesses and expert reports accompanying Claimants' Reply ("PO No. 20"). The Tribunal ordered that any references to such statements and reports in the Reply were therefore redacted and that the Parties were to liaise and proceed with the redaction process in relation to the exhibits and the subsequent redactions to the Reply in accordance with PO No. 3.

327.   On 26 December 2018, and following relevant correspondence from Respondent and the Tribunal, Respondent accepted Claimants' request for extension.

328.   On 27 December 2018, the extension was confirmed by the Tribunal.

329.   On 3 January 2019, the Tribunal issued **Procedural Order No. 21**, adopting the further amended Procedural Calendar in the present arbitration ("PO No. 21").

330.   On 2 May 2019, the Parties communicated their agreed amendments to the Procedural Calendar of the present arbitration.

331.   On 3 May 2019, the Tribunal confirmed and agreed with the Parties' amendments to the Procedural Calendar.

332.   On the same date, the Tribunal issued **Procedural Order No. 22**, together with Annex A, adopting the amended Procedural Calendar ("PO No. 22").

333.   On 24 May 2019, Respondent filed its **Rejoinder**, together with factual exhibits, legal authorities, witness statements, expert reports, legal opinions and a "declaration" from Mr. Victor Ponta.

334.   On 28 June 2019, Claimants filed their **Surrejoinder on the New Jurisdictional Objection**, together with legal authorities.

335.   On 19 July 2019, Claimants sent a letter to the Tribunal, requesting to (a) exclude from the record testimony that they have no opportunity to confront through cross-examination and (b) submit focused rebuttal evidence in response to the new evidence first submitted by Respondent with its Rejoinder.

336.  <u>On 9 August 2019</u>, Respondent sent a letter providing its comments to Claimants' request of 19 July 2019.

337.  After being afforded an opportunity for another round of submissions by the Tribunal, <u>on 20 August 2019</u>, Claimants filed their comments to Respondent's comments of 9 August 2019 and <u>on 27 August 2019</u>, Respondent filed its comments to Claimants' comments of 20 August 2019.

338.  <u>On 6 September 2019</u>, the Tribunal issued **Procedural Order No. 23**, deciding on Claimants' request to exclude from the record testimony that they had no opportunity to confront through cross-examination and on their request for an opportunity to submit focused rebuttal evidence in response to the new evidence first submitted by Respondent with its Rejoinder ("PO No. 23"). The Tribunal specifically decided as follows:

> *1.  Respondent may resubmit Mr. Ponta's statement as a "witness statement" by 20 September 2019 and such statement, including any references thereto, shall form part of the record and the procedure set out in paragraph 43 of the present Procedural Order shall apply. Otherwise, Mr. Ponta's "declaration" and any reference thereto shall be stricken from the record altogether.*

> *2.  Ms. Reichardt's expert report, including any references thereto, shall remain part of the record.*

> *3.  Respondent may resubmit Exhibits CMA-122 and CMA-123 as "witness statements" or "expert reports" by 20 September 2019 and such statements or reports, including any references thereto, shall form part of the record. In this case, the procedure set out in paragraph 43 of the present Procedural Order shall apply. Otherwise, Exhibits CMA-122 and CMA-123 and any references thereto shall be stricken from the record altogether.*

> *4.  A limited and focused opportunity of rebuttal shall take place as follows:*

> *(i)  Claimants shall submit limited rebuttal documents in response to the new issues presented in Respondent's Rejoinder witness statements and expert reports (50 pages maximum) by 4 October 2019.*

> *(ii)  Respondent shall submit any rebuttal documents testimony (50 pages maximum) by 1 November 2019.*

> *(iii)  The timing and scope of the direct examination of both Parties' witnesses and experts shall be handled by the Tribunal with flexibility. The general timing of the Hearing will be decided, after consulting with the Parties, during the Pre-Hearing Organization Meeting. In case the Parties wish to extend the scope of the direct examinations, they should*

*indicate the subject-matters by the dates on which their rebuttal documents are due.*

*(iv)    Both Parties shall have, if necessary, a further opportunity for rebuttal of these documents, during the Hearing and during post-Hearing submissions.*

*5.    All other requests are rejected.*

*6.    The costs associated with Claimants' application shall be referred to a later stage in the proceedings.*

339.    <u>On 10 September 2019</u>, Claimants sent a letter to the Tribunal seeking its clarification concerning Section 18 of PO No. 1 relating to the procedures for the examination of witnesses, as discussions between the Parties have revealed a disagreement between the Parties on that issue.

340.    <u>On 11 September 2019</u>, Respondent sent its comments to Claimants' letter of 10 September 2019, noting its disagreement with Claimants' interpretation of Section 18.2 of PO No. 1.

341.    <u>On 18 September 2019</u>, the Tribunal sent a letter to the Parties concerning the interpretation of Section 18.2 of PO No. 1.

It proposed the following procedure:

*i. **By 19 September 2019**, each Party is invited to notify a list of witnesses and  experts of the other Party it wishes to cross-examine at the Hearing. This list shall be communicated simultaneously to the Arbitral Tribunal by the Secretary of the Arbitral Tribunal upon receipt of both Parties' notifications.*

*ii. **By 26 September 2019**, each Party is invited to submit to the Arbitral Tribunal, if it wishes to do so, an application to call on direct examination specific witnesses and experts that have not been called for cross-examination by the other Party. The application shall be a maximum of two pages and shall indicate to the Arbitral Tribunal the arguments in support of this application and the main object that would be addressed during the direct examination.*

*iii. **By 3 October 2019**, and in case of an application by a Party (see item (ii) above), the other Party shall have an opportunity for a short response (maximum two pages) to such application. The Arbitral Tribunal shall then decide.*

342.    <u>On 19 September 2019</u>, the Parties filed separately their lists of the other Party's witnesses and experts that they wished to call for cross-examination at the Hearing.

343.  <u>On 20 September 2019</u>, Respondent sent a letter to the Tribunal by which it submitted the Witness Statement of Mr. Victor Ponta dated 16 September 2019 and the Witness Statement of Dr. Amalia Șerban dated 20 September 2019, pursuant to PO No. 23.

Respondent noted that these statements replaced the Declaration of Mr. Ponta dated 1 May 2019 and Exhibit CMA-122.

Respondent also noted that the evidence of Dr. Șerban in her Witness Statement is based in part on legal regulations and, therefore, requested leave to produce the relevant regulations.

Finally, it noted that it was not resubmitting as a witness statement Exhibit CMA-123 (a letter signed by Romania's Deputy Prime Minister and Minister of Environment Ms. Grațiela Leocadia Gavrilescu).

344.  <u>On 23 September 2019</u>, Claimants sent a letter to the Tribunal, referring to Respondent's letter of 20 September 2019 and requesting that the Tribunal (i) exclude Victor Ponta's witness statement and all references thereto, (ii) exclude Exhibit CMA-123 and all references thereto, and (iii) reject Respondent's request to submit two new fact exhibits.

345.  <u>On 24 September 2019</u>, the Tribunal sent a letter to the Parties, by which it communicated its decisions on the Parties' requests in their correspondence of 20 and 23 September 2019.

Concerning Mr. Ponta's Witness Statement, the Tribunal took note that Mr. Ponta would be unavailable to testify during the Hearing for personal reasons that he could not disclose. It decided that his Witness Statement is admissible, but that it would need to assess the evidentiary value of this statement at a later stage in the proceedings and in light of the entire record.

Concerning Exhibit CMA-123, it took note that Respondent confirmed in its letter of 20 September 2019 that it was not resubmitting Exhibit CMA-123 as a witness statement. Therefore, and pursuant to its decision in PO No. 23, the Tribunal noted that Exhibit CMA-123 and any references thereto were to be stricken from the record.

Concerning the documents referred to in the Witness Statement of Dr. Șerban, the Tribunal took note that Respondent resubmitted Exhibit CMA-122 as a Witness Statement of Dr. Șerban and decided that such documents may be produced.

346.  <u>On 26 September 2019</u>, Respondent sent a letter to the Tribunal, ***requesting the bifurcation of the Hearing of December 2019***, so as to ensure that the Parties have sufficient time to conduct a proper examination of witnesses and experts.

Respondent noted that a further hearing of five days would ensure this, as it would allow the Parties to postpone the examination of some of their witnesses and experts, notably quantum experts and experts of related disciplines, as well as the legal experts, to a subsequent hearing, at a date to be determined in consultation between the Tribunal and the Parties.

347.    <u>On the same date</u>, the Parties sent separately their letters concerning the direct examination of witnesses and experts.

Claimants noted that, in view of Respondent's letter of 19 September 2019 and in accordance with the Tribunal's proposed procedure, Claimants did not make an application to call on direct examination either of the two individuals not called by Respondent. This, however, was subject to Claimants' understanding, in accord with PO No. 23, that Claimants were to indicate by 4 October 2019 the subject matters of rebuttal testimony that could be presented on direct examination, together with which witnesses and experts it would call on direct for purposes of presenting such rebuttal testimony. For the avoidance of doubt, Claimants reserved the right to indicate by 4 October 2019 whether they would call Ms. Cecilia Szentesy and/or Mr. David Jennings for purposes of rebuttal testimony on direct examination. Claimants also reserved the right to address the Tribunal regarding direct examination of specific witnesses and/or experts in the event that Respondent ultimately declined to call for cross-examination any of those listed in its 19 September 2019 letter.

Respondent noted that, at that time, it did not call for direct examination its witnesses whom Claimants had not called for cross-examination, but reserved its right to do so, should this be required to rebut Claimants' new evidence to be produced as rebuttal evidence pursuant to PO No. 23.

348.    <u>On 27 September 2019</u>, Respondent sent a message to the Secretary of the Tribunal, noting that since there was no need to resubmit the Rejoinder without references to Mr. Ponta's witness statement, there was no reason to further postpone the publication of the redacted version of the Rejoinder.

Respondent therefore requested that the Rejoinder be published at the Secretariat's earliest convenience.

349.    <u>On the same date</u>, Respondent sent a letter to the Tribunal, referring to Claimants' letter of 26 September 2019 in which they reserved the right until 4 October 2019 to call Ms. Szentesy and Mr. Jennings for direct examination.

Respondent requested the Tribunal to find that Claimants have waived the right to call Ms. Szentesy and Mr. Jennings for direct examination.

350.    <u>On 30 September 2019</u>, Claimants sent to the Tribunal their ***response to Respondent's request to bifurcate the Hearing of December 2019***.

Specifically, Claimants objected to such request and noted that they considered that the time allocated in the procedural schedule was sufficient to conduct the oral hearing. Accordingly, Claimants requested that the Tribunal reject Respondent's request.

351.    <u>On the same date</u>, Claimants sent another letter to the Tribunal responding to Respondent's request in its letter of 27 September 2019 that the Tribunal find that Claimants had waived their rights in relation to the possibility of calling Ms. Szentesy and Mr. Jennings for the purposes of offering rebuttal testimony. Claimants noted that such request was meritless and had to be denied.

352.    <u>On 1 October 2019</u>, the Tribunal sent a message to the Parties, inviting them to submit their separate proposals on the schedule of the Hearing of December 2019 as originally contemplated, before deciding on Respondent's request for bifurcation of such Hearing.

353.    <u>On 2 October 2019</u>, the Tribunal sent a letter to the Parties, by which it communicated its decision that the cut-off date of 26 September 2019 provided for in its letter of 18 September 2019 did not prevent Claimants from calling Ms. Szentesy and Mr. Jennings for the purposes of direct rebuttal testimony.

It therefore rejected Respondent's request of 27 September 2019 that the Tribunal find that Claimants had waived the right to call for direct examination Ms. Szentesy and Mr. Jennings.

354.    <u>On 7 October 2019</u>, Claimants sent a message to the Tribunal noting that, subject to their objection to the acceptance into the record of the challenged evidence reflected in the Rejoinder, Claimants did not have any comments to Respondent's request of 27 September 2019 concerning the publication of the redacted version of the Rejoinder.

355.    The Tribunal, therefore, invited the Secretariat to publish the Rejoinder as redacted <u>on 8 October 2019</u>.

356.    <u>Also on 8 October 2019</u>, the Tribunal Secretary communicated to the Parties the agenda for the Pre-Hearing Conference Call, inviting them to provide their joint proposals and/or separate respective positions.

357.    <u>Also on the same date</u>, the Parties communicated their separate proposals for a schedule of the Hearing of December 2019 in accordance with the Tribunal's direction of 1 October 2019.

Respondent maintained its request for bifurcation and also communicated an alternative indicative schedule that bifurcated the hearing into a two-week hearing in December 2019 as originally contemplated and into an additional week to be scheduled at a subsequent date.

358.   <u>On 11 October 2019</u>, and following an agreed extension by the Parties, Claimants filed their rebuttal documents and notification of the anticipated subject matter of rebuttal testimony.

Claimants noted that, despite their best efforts, they could not fairly respond within the 50-page limitation set out in PO No. 23 to the amount of new evidence Respondent saved for its Rejoinder. Claimants therefore asked the Tribunal to accept the exhibits as proposed.

359.   <u>On 14 October 2019</u>, Respondent sent a letter to the Tribunal by which it submitted Exhibits R-664 and R-665, pursuant to the Tribunal's letter dated 24 September 2019 allowing production of the documents referred to in the Witness Statement of Dr. Şerban dated 20 September 2019.

Respondent also submitted certain corrected and/or complete versions of certain exhibits and expert report appendices, following a request from Claimants.

360.   <u>On 15 October 2019</u>, the Tribunal sent a letter to the Parties by which it decided on Respondent's request for bifurcation of the Hearing.

The Tribunal proposed to bifurcate the Hearing into (i) two weeks as originally scheduled from 2 to 13 December 2019 (without Saturdays); and (ii) one additional week as soon as possible.

It therefore invited the Parties to liaise and agree if possible, on the criteria that should be followed for the bifurcation.

361.   <u>On 16 October 2019</u>, and following an invitation from the Tribunal, Respondent sent its comments to Claimants' request that the Tribunal accept their exhibits as proposed in their rebuttal submission of 11 October 2019.

Respondent noted that Claimants had failed to comply with the Tribunal's directions in PO No. 23. It requested that the Tribunal enforce its procedural order and order Claimants to comply with its directions set out therein.

Specifically, Respondent noted that (i) Claimants failed to comply with the 50-page limit in relation to Claimants' rebuttal documents, which also included videos and excel files. They noted that Claimants should also be ordered to file a transcript of those videos that

count toward the 50-page limit and to prepare excel files in printable format and in a manner that the number of pages could be assessed against the page limit.

In relation to resubmitted exhibits, Respondent noted that Claimants did not seek the Tribunal's leave to do so and that such exhibits, which were of significant volume, comprised *de facto* new rebuttal evidence. Respondent therefore requested that the Tribunal reject Claimants' resubmitted exhibits.

Concerning Claimants' envisaged rebuttal evidence during the direct examination of their witnesses, Respondent noted that Claimants only provided vague descriptions of the subject matters that would be addressed. It thus requested the Tribunal to direct Claimants to summarize the new rebuttal evidence that their witnesses intended to provide on direct examination such that Respondent and its witnesses would be able to prepare their rebuttal.

362. <u>On 18 October 2019</u>, and following an invitation from the Tribunal, Claimants filed their comments to Respondent's objections to Claimants' rebuttal evidence.

363. <u>On the same date</u>, the Parties communicated their separate comments on the agenda items for the Pre-Hearing Conference Call of 25 October 2019.

364. <u>On 22 October 2019</u>, the Tribunal issued ***Procedural Order No. 24***, deciding on the appropriateness of Claimants' rebuttal testimony filing of 11 October 2019 ("PO No. 24"). Specifically, the Tribunal decided as follows:

> *1. Claimants' rebuttal documents are admissible. Respondent shall have an equal opportunity (in terms of length) to respond to Claimants' submission by 14 November 2019. Such equal opportunity shall not be interpreted as an unlimited freedom in relation to the length and scope of its submission.*
>
> *2. Claimants shall resubmit: (a) the transcripts of the exact minutes of the videos which they purport to file in rebuttal (as these are indicated in the list of Claimants' letter of 18 October 2019); (b) the excel files in a readable format. Claimants shall do so by 25 November 2019.*
>
> *3. Claimants' rebuttal submission, as supplemented in their letter of 18 October 2019, sufficiently presents the subject-matter of the new evidence as required by PO 23.*
>
> *4. Claimants shall file their purported resubmitted documents as new documents and in the manner set out in paragraph 58 of the present Procedural Order by 25 October 2019. Respondent shall have an equal opportunity (in terms of length) to respond to Claimants' new documents by 14 November 2019. Such equal opportunity shall not be interpreted*

> *as an unlimited freedom in relation to the length and scope of its submission.*

365. <u>On the same date</u>, the Parties communicated their separate positions on the criteria for the bifurcation of the Hearing pursuant to the Tribunal's directions of 15 October 2019.

366. <u>On 25 October 2019</u>, the Parties and the Tribunal held a ***Pre-Hearing Conference Call***, during which they discussed the items of the agenda circulated on 8 October 2019. Specifically, the Parties discussed at length the question on the principles that would govern the bifurcation of the hearing in the present case as well as other matters in relation to the Hearing of December 2019.

   The Tribunal informed the Parties that it would decide on all the points on which the Parties were in disagreement.

367. <u>On 25 the same date</u>, Claimants sent a letter to the Tribunal, by which they resubmitted exhibits as directed pursuant to PO No. 24, as well as additional comments concerning the manner in which resubmitted exhibits would be relied upon by Claimants, in rebuttal argument and/or witness examination at the Hearing of December 2019.

   Claimants also enclosed an updated consolidated list of exhibits.

368. <u>On 29 October 2019</u>, the Tribunal issued ***Procedural Order No. 25*** ("PO No. 25"), deciding on the Parties' disagreements concerning the organization of the Hearing of December 2019, including the allocation of time for the examination of witnesses.

   The Tribunal also confirmed the Parties' points of agreement and invited the Parties to confirm and agree on a schedule of the Hearing of December 2019.

369. <u>On the same date</u>, Claimants sent a letter requesting leave from the Tribunal to submit one additional page of the same document submitted by Respondent to supplement the record in rebuttal to Dr. Serban's witness statement.

370. Following an invitation from the Tribunal, Respondent consented to Claimants' request of 29 October 2019, <u>on 1 November 2019</u>. In view of the Parties' agreement, the Tribunal granted Claimants the right to submit their requested document <u>on 4 November 2019</u>. Claimants submitted Exhibit C-2954 <u>on the same date</u>.

371. <u>Also on 4 November 2023</u>, Claimants sent a letter to the Tribunal requesting it to reconsider paragraph 28 of PO No. 25, in relation to the time allocated to the opening statements of the first hearing and subject-matter of the opening statements of the second hearing.

372. <u>On 5 November 2019</u>, Respondent asked the Tribunal to direct Claimants to indicate the order in which they wished to present their factual and expert witnesses, in the understanding that there would not be a joint proposal on the Hearing schedule.

373. Claimants agreed <u>on 6 November 2019</u> to communicate their order to the Centre, provided that Respondent did the same and that both proposals be communicated simultaneously by the Centre.

374. <u>Also on 6 November 2019</u>, the Centre communicated the Parties' respective order of presentation of their witnesses and experts.

375. <u>On 7 November 2019</u>, Respondent provided its comments to Claimants' request for reconsideration of PO No. 25 of 4 November 2019.

376. <u>On the same date</u>, Respondent sent a letter to the Tribunal, objecting to Claimant's proposal that Prof. Henisz, Claimants' social license witness, be heard with Claimants' social license expert Prof. Boutilier, and requesting that the Tribunal direct Claimants that Prof. Henisz, as a fact witness, be heard together with the other fact witnesses before the experts.

377. <u>On 8 November 2019</u>, and following an invitation from the Tribunal, Claimants provided their comments to Respondent's request of 7 November 2019, concerning the order of examination of Prof. Henisz at the Hearing.

378. <u>On 12 November 2019</u>, the Tribunal issued ***Procedural Order No. 26*** ("PO No. 26"), deciding on Claimants' request for reconsideration of PO No. 25 and the order of examination of Prof. Henisz as follows:

> *The Parties shall have a maximum of six hours for their opening statements during the first hearing.*
>
> *2. The opening statements of the second hearing shall in principle be focused on matters to be presented during the second hearing; that said, a Party's freedom to present its case in the manner that it deems appropriate and reasonable is not limited so long as that broad principle is respected.*
>
> *3. The order of examination of Prof. Henisz is maintained.*
>
> *4. The Parties shall complete Annex A to the present Procedural order by 18 November 2019.*

379. <u>On 14 November 2019</u>, Respondent filed its surrebuttal evidence pursuant to PO No. 24. With its filing, Respondent also filed supplemental witness statements, a supplemental expert report, as well as a new expert report.

380.    On 15 November 2019, Claimants sent a letter to the Tribunal objecting to Respondent's surrebuttal filing and requesting an opportunity to formally submit their objection, as well as that the Tribunal refrain from reviewing Respondent's proposed rebuttal documents until a decision on the objection is made.

381.    The Tribunal afforded Claimants the opportunity to formally object, as well as granted their request to refrain from reviewing Respondent's proposed rebuttal documents on 18 November 2019.

382.    Also on 18 November 2019, the Centre communicated the Parties' respective lists of participants to the Hearing of December 2019.

383.    Also on the same date, Claimants sent a letter to the Tribunal objecting to Respondent's notification in its list of participants that Messrs Boc and Bode would not testify in person but instead would appear for examination by video conference.

384.    Again on the same date, the Centre transmitted the Parties' separate proposals on the timing of examinations in Annex A to PO No. 26. Claimants specifically objected to Respondent's indication of general times for cross-examinations per group of witnesses and experts as opposed to individual times.

385.    On 19 November 2019, Respondent sent a letter to the Tribunal objecting to Claimants' proposed Annex A to PO No. 26 and, specifically, to the time that Claimants proposed to devote to their direct examinations.

386.    On the same date, Respondent requested authorization to respond to Claimants' letter of 18 November 2019 concerning the video testimony of Messrs Boc and Bode.

387.    On 20 November 2019, Claimants sent a letter to the Tribunal, filing their formal objection to Respondent's rebuttal filing of 14 November. In said letter, Claimants specifically objected to the admissibility of the new expert report.

388.    On the same date, Claimants requested permission to respond to Respondent's letter of 19 November 2019 on Claimants' Annex A to PO No. 26.

389.    Also on the same date, the Tribunal sent a letter to the Parties deciding on the latest organizational disagreements between the Parties as follows:

> [T]he Arbitral Tribunal firmly invites Respondent to make all efforts to have Messers Boc and Bode available in person at the hearing and inform the Arbitral Tribunal.
>
> […] it decides that the time allocated by Claimants for its direct examinations shall be accepted, but in no circumstances extended. This

*said, neither Party may elicit new evidence during such examination or prejudice the other Party's procedural rights and especially, the right to be heard.*

*The Arbitral Tribunal reiterates that what is important is that each Party has a full opportunity to present its case. In this respect, it recalls that in Procedural Order No. 23, the Arbitral Tribunal contemplated the possibility of further opportunities to address the Parties' "rebuttal documents" even following the hearing.*

*[…] The Parties and the Arbitral Tribunal shall […] consult the enclosed schedule for the purposes of the hearing of December 2019.*

*The Arbitral Tribunal recalls that each Party has an equal total time at its disposal (to be handled with flexibility by the Arbitral Tribunal) and that the allocation of such time by each Party could be adapted, <u>so long as it does not encroach on the other Party's overall time and so long as the examination of all indicated witnesses and experts finishes on 13 December 2019</u>*. (underlining as in the original)

390.    <u>On 21 November 2019</u>, the Tribunal sent a letter to the Parties deciding on Claimants' objection to Respondent's rebuttal filing as follows:

*[T]he Arbitral Tribunal has no choice but to reconsider its decisions in Procedural Orders Nos 23 and 24 and to decide that the only appropriate and fair manner to proceed is the following:*

*1. Both Parties shall resubmit only their rebuttal documents that will be used/discussed during their Opening Statements and in direct or cross examinations, together with the list enclosed herein and as completed by the Parties. The Parties shall resubmit such documents in a readable format (i.e., transcripts in case of videos, pdf formats in case of excel sheets etc.). This resubmission shall include any "resubmitted" documents that the Parties wish to use, i.e, Exhibit C-2924 for Claimants and Exhibits R-449 and R-450 for Respondent.*

*These documents shall not exceed 100 pages.*

*Claimants shall do so by Monday, 25 November 2019. Respondent shall do so by Wednesday, 27 November 2019. 3*

*The Arbitral Tribunal is aware of the fact this could disrupt the Parties' preparation for the hearing. It considers nonetheless that the Parties were fully aware of this risk when filing their rebuttal documents.*

*2. Respondent's supplemental witness statements and expert reports are, in light of Claimants' proposal in their letter of 19 November 2019, admissible.*

*3. Respondent's new expert report of Dr. Brady is inadmissible.*

*4. If need be, during the hearing, the Arbitral Tribunal will discuss with the Parties to examine whether they should have an opportunity to submit additional documents on the rebuttal issues during the phase following the hearing.*

*5. All other requests are rejected.*

*6. The Arbitral Tribunal considers that the above procedure will ensure the preservation of the integrity of the proceedings and the hearing and the Parties' due process rights. It shall therefore not accept any further correspondence or objections on the issue either before or during the hearing.*

391. <u>On 25 November 2019</u>, Claimants resubmitted their rebuttal documents.

392. <u>On 27 November 2019</u>, Claimants requested permission to submit the corrected version of Exhibit C-575 into the record.

393. <u>On the same date</u>, Respondent resubmitted its surrebuttal documents.

394. <u>Also on the same date</u>, the European Commission ("EC") applied for leave to intervene as a non-disputing party (the "EC Application"). The EC Application was communicated to the Parties <u>on 28 November 2019</u>. The Tribunal invited the Parties to submit any comments they may have by 29 November 2019, noon. Meanwhile, the Tribunal informed the EC that it had communicated its Application (but not the actual *amicus* brief or "EC Brief") to the Parties inviting them for comments.

395. <u>On 29 November 2019</u> and following an invitation from the Tribunal to do so, Respondent provided its comments to Claimants' request to submit the corrected version of Exhibit C-575. Respondent objected to such request and noted that the purported corrected version of Exhibit C-575 was produced by Respondent as Exhibit R-215.

396. <u>On the same date</u>, the Tribunal invited Claimants to confirm that the corrected version of Exhibit C-575 was Exhibit R-215. The Tribunal reserved its decision on the issue until 2 December 2019.

397. <u>Also on the same date</u>, the Parties communicated their comments on the EC Application. Respondent confirmed that it had no objection to the EC Application. Claimants noted that the EC Application should be rejected in its entirety. The Tribunal informed the Parties and the EC <u>on the same date</u> that, in light of the tight time frame, it would defer its decision on the EC Application to the following week. It added that the EC representatives could be present as observers in the room where the Hearing would be broadcasted.

398.  On 30 November 2019, Claimants took note of "*Respondent's apparent acknowledgement that Exhibit R-215 is the letter sent by the Ministry of Environment to RMGC on September 26, 2011 by email in replacement of the earlier version of the letter sent by email on September 22, 2011*" and confirmed that "*Exhibit R-215 appears to be an accurate copy of the letter received by RMGC by email from the Ministry of Environment on September 26, 2011.*" Claimants reserved the right to address these exhibits further during the course of the Hearing.

399.  On the same date, Respondent confirmed that the matter raised by "*Claimants in their letter of 27 November 2019* [was] *indeed important, and that the existence of two versions of one and the same letter* [was] *'material to the positions argued by both Parties,' as acknowledged by the Claimants. Exceptional circumstances therefore exist*[ed] *within the meaning of Section 16.3 of Procedural Order No. 1.*" It strongly disagreed with Claimants' contention that Exhibit R-215 was "*the letter sent by the Ministry of Environment to RMGC on September 26, 2011 by email in replacement of the earlier version of the letter sent by email on September 22, 2011.*" Respondent therefore sought leave to produce into the record "*the internal, official version of Exhibit C-575 (which preceded Exhibit R-215)*" and added that these two documents "[would] *shed further light on the issue of why there* [were] *two versions of one and the same letter*".

400.  Also on the same date, Claimants noted that they "[had] *not been provided what Respondent claims* [was] *'the internal, official version' of the subject letter*" and reserved their rights in relation to whatever Respondent sought to submit in that regard. They noted that if such evidence, which was not currently available to Claimants, was allowed, it was essential that Claimants were provided a copy in advance. Claimants added that it "[was] *also essential that the emails in their native format to which Claimants referred in their letter of November 27, 2019 (and to which Respondent necessarily already* [had] *access) also* [were] *accepted into the record*".

401.  Respondent replied on the same date noting that it had no objection to Claimants providing the two emails to which they referred in their letter of 27 November 2019 as long as Respondent was also granted leave to file the document that it sought to produce. Respondent clarified that it did not accept that it had to provide an advance copy of this exhibit to Claimants.

402.  On the same date, Claimants sent a letter concerning Respondent's surrebuttal documents and noted that Respondent submitted a large section of untranslated Romanian language documents bringing the total of the submission to more than 100 pages. Claimants noted that they did not object to this only if it was made clear that the untranslated portions of

Respondent's surrebuttal documents were not to be used or referenced in this arbitration in any way.

403.   Also on the same date, Respondent submitted its demonstratives for its Opening Statement. It pointed that it had not received Claimants' demonstratives and that it would object if Claimants intended to use any during their Opening Statement.

### 3. The Hearing on Jurisdiction and the Merits

404.   Between 2 and 13 December 2019, a Hearing was held at the premises of the Centre in Washington DC. Specifically:

405.   On 2 December 2019:

- The Tribunal and the Parties discussed several issues concerning the procedure of the hearing, including the schedule, the EC Application, issues of confidentiality and Claimants' demonstrative exhibits, the possibility for a further submission of rebuttal documents and the scope of direct examination.

- In addition, they discussed the issue of Exhibit C-574 and Exhibit R-215 and the Tribunal invited both Parties to produce the relevant document.

- Further, they discussed the issue of the untranslated Romanian rebuttal documents submitted by Respondent.

- The Tribunal invited each Party to submit to the Tribunal and the other Party a bullet point list of issues and documents that it would use in the direct examination concerning the rebuttal issues.

- Claimants delivered their Opening Statement.

406.   On 3 December 2019:

- Respondent delivered its Opening Statement.

- Respondent communicated its Exhibit R-689 (a marked-up version of the Ministry of Environment's 22 September 2011 letter to RMGC).

- Claimants communicated Exhibits C-2955 and 2956.

- The Parties filed a joint list of exhibits with confidential status.

- Claimants filed a list of issues and rebuttal exhibits for the direct examinations of Mr. Jonathan Henry and Mr. Dragoş Tănase.

- The EC sent a letter noting its willingness to appear before the Tribunal at a future hearing.

- Claimants provided their observations to the EC's letter objecting to the Commission's intervention.

- The examination of Mr. Jonathan Henry took place.

407.  On 4 December 2019:

- Claimants filed the list of issues and rebuttal exhibits for the direct examination of Mr. Horea Avram.

- The examination of Mr. Dragoş Tănase took place.

408.  On 5 December 2019:

- The examinations of Mr. Horea Avram, Mr. Adrian Gligor and Ms. Elena Lorincz took place.

409.  On 6 December 2019:

- Respondent filed a list of issues and rebuttal documents for the direct examination of Mr. Sorin Mihai Găman and Mr. Ion Ariton.

- The examination of Ms. Elena Lorincz continued.

- The examination of Mr. Sorin Mihai Găman took place.

410.  On 7 December 2019:

- The Tribunal informed the EC (via letter) and the Parties that it would grant the EC's Application for leave to intervene as a non-disputing party and therefore allow the EC Brief. It noted that it would provide the Parties an opportunity to submit their comments if they wished to do so. It also noted that it would not permit the EC to participate during any subsequent hearing but that the EC could be present among the public. The Tribunal communicated its decision on the EC Application to the EC and the Parties. The EC Brief together with its Annexes were communicated to the Parties on the same date.

- The examination of Mr. Emil Boc took place.

411.  On 9 December 2019:

- Claimants communicated the rebuttal documents for the direct examination of Professors Lucian Mihai and Ovidiu Podaru.

- The examinations of Mr. Ion Ariton, Ms. Dorina Simona Mocanu, Ms. Amalia Lucia Serban and Mr. Ioan Sorin Jurca took place.

412.    On 10 December 2019:

- Respondent submitted a demonstrative exhibit for Prof. Dragoş' examination.

- Respondent communicated a .zip file containing an update to the record, which provided corrected versions of Exhibit C-876.01 (whose Romanian original had been omitted) and Exhibit R-55 (which previously contained the 1991 Romanian Constitution instead of the 2003 Constitution), as well as Exhibit R-690 (submitting the 1991 Romanian Constitution). Claimants agreed to such updating.

- Respondent informed Claimants and the Tribunal that Mr. Bode would be accompanied for his examination by his personal assistant. Claimants objected.

- The Tribunal Secretary informed the Parties that the Centre for International Environmental Law and 5 other organizations were organizing a rally "*against ISDS in Solidarity with Roşia Montană, Romania*". The rally was scheduled to take place 13 December 2019 in front of the Centre's premises in which the Hearing was held.

- The examination of Mr. Ioan Sorin Jurca continued.

- The examinations of Mr. Corneliu Bîrsan, Prof. Lucian Mihai, Mr. Ioan Schiau and Prof. Ovidiu Podaru took place.

413.    On 11 December 2019:

- Claimants communicated the rebuttal documents for Dr. Robert Boutilier's direct examination.

- The examination of Prof. Ovidiu Podaru continued.

- The examinations of Ms. Dana Tofan, Mr. Lucian Nicolae Bode (via video) and Mr. Dacian Cosmin Dragoş took place.

414.    On 12 December 2019:

- The examinations of Mr. Witold Henisz, Dr. Robert Boutilier and Mr. Ian Thomson took place.

415.    <u>On 13 December 2019</u>:

- The examination of Mr. Ian Thomson continued.

- The examinations of Mr. Augustin Stoica and Ms. Alina Pop took place.

- The Tribunal and the Parties discussed the question of post-hearing briefs and closing arguments (Tr. 13.12.19, 3417:3-3429:22) and the possibility of holding the second hearing at the World Bank premises in Paris.

- The non-confidential parts of the Hearing were broadcasted on closed-circuit television at an overflow room of the World Bank premises in Washington D.C., pursuant to Section 20.6 of PO No. 1, Section 4 of PO No. 3, the Protocol of Confidentiality communicated by the Tribunal Secretary on 8 October 2019 and Section D of PO No. 25. The Hearing was broadcasted with a 60-minute delay to protect potential information. Further, rules on cameras and other recording devices were applied (see paras 51-52, PO No. 25).

### 4. The steps following the Hearing on Jurisdiction and the Merits

416.    <u>On 17 December 2019</u>, the Tribunal sent a letter to the Parties, directing them as follows in connection with the "rebuttal documents":

> *The Arbitral Tribunal refers to its letter of 21 November 2019, deciding, among other things that, "[i]f need be, during the hearing, the Arbitral Tribunal will discuss with the Parties to examine whether they should have an opportunity to submit additional documents on the rebuttal issues during the phase following the hearing".*
>
> *If the Parties wish to file such documents, they shall do so in the form of a simultaneous filing not exceeding fifty pages for each Party. The Parties are invited to confer and agree on the deadline for the purposes of this filing, if any, and inform the Arbitral Tribunal accordingly.*

The Tribunal also invited the Parties to "*if they deem*[ed] *useful, comment on the European Commission's* submission *on the jurisdictional issues*". The Tribunal noted that "*any such comments must be limited to the EC's filed submission and must be brief, taking into consideration the arguments already submitted*".

417.    <u>On 6 January 2020</u>, and after consulting the Parties, the Tribunal set the second hearing for the week of 28 September 2020 at the World Bank offices in Paris ("Second Hearing").

418.    On 9 January 2020, Respondent sent a letter to the Tribunal, requesting that the Tribunal sets a page limit for the responses to the questions it intended to provide the Parties. According to Respondent, the page limit would ensure that the Parties' submissions would be directly responsive to the Tribunal's questions and would not be inappropriately converted into post-hearing submissions.

419.    On the same date, Claimants sent a letter to the Tribunal objecting to Respondent's request that a page limit be imposed for responses to questions the Tribunal intended to present. According to Claimants, the Parties were to be permitted to exercise judgment in how to respond to the Tribunal questions and that they intended, in any event, to be concise and focused in their responses.

420.    On 28 January 2020, the Tribunal sent another letter to the Parties concerning the next steps of the proceedings, noting, among other things, that it would revert to the Parties concerning the questions it intended to ask, as well as any page limit in this connection.

421.    On 5 February 2020, Claimants sent a letter together with annexes concerning recent developments relevant to this case, *i.e.* Romania's decision to reinitiate the UNESCO process. The Tribunal took note of its content on 6 February 2020 and granted Respondent's request of 5 February 2020 for leave to respond. The Tribunal also noted that there would be no further correspondence on this issue. Respondent provided its comments on 13 February 2020.

422.    On 17 February 2020, the Tribunal took note of the Parties' letters of 5 and 13 February 2020. It added that "*as it* [was] *evident from Claimants' letter of 5 February 2020, no application for the admission of documents* [was] *at present being made pursuant to paragraph 16.3 of Procedural Order No. 1. Accordingly, the Annexes to Claimants' letter* [would] *not form part of the record of this case for the time being.*" Further, that "*in any event, it* [was] *up to the Parties, in consultation with the Tribunal, to decide whether, and if so, in which form and at which time they* [would] *address the issue which* [arose] *from Claimants' letter of 5 February 2020, always in accordance with the rules applicable to this proceeding.*"

423.    On 10 March 2020, the Tribunal issued **Procedural Order No. 27**, deciding on the list of questions that it invited the Parties to reply ("PO No. 27"). Specifically, the Tribunal invited the Parties to provide answers to the following questions:

> *(a) For each of Claimants' BIT claims, at what exact point in time was the breach consummated? What precise measure attributable to Respondent resulted in the alleged breach for each claim?*

> *(b) Did Claimants' alleged losses occur (or begin to occur) at the same point in time that the breach is said to have been consummated in respect*

*of each claim? Should Claimants' alleged losses be quantified on the date upon which each breach is alleged to have occurred? If not, is the point in time when Claimants' alleged losses occurred relevant to establishing liability for a breach in respect of each claim?*

*(c) Does conduct attributed to Respondent equate to a systematic State policy or practice that may be characterized as a composite act in breach of the relevant BIT pursuant to Article 15 of the Articles on Responsibility of States for Internationally Wrongful Acts? The Parties may refer to commentary on state responsibility and/or Article 15 of the Articles on Responsibility of States for Internationally Wrongful Acts in developing their answers.*

*(d) How and to what extent should public opinion and its impact upon the political situation in Romania be factored into the assessment of liability and damages under the relevant BIT?*

*(e) Do Claimants maintain that the process leading to the submission of a draft law to Parliament in August 2013 and its subsequent rejection by Parliament was a standalone breach of the relevant BIT or an element of a wider course of conduct that resulted in a breach of the BIT? Was there any breach of Romanian law in the process leading to the submission of the draft law and its ultimate rejection by Parliament?*

*(f) Do Claimants maintain that there was a breach of the relevant BIT after the rejection of the draft law by Parliament by reference to acts of Respondent occurring solely during the period after that rejection (i.e., independently of any acts leading up to that rejection)? If so, what precise act/s are said to constitute the breach?*

The Tribunal noted that save for the Parties' answers to question (c), and only if necessary, the Parties could not submit new legal exhibits. It also decided on the format and sequence of the answers to such questions. Specifically, it decided that Claimants and Respondent were to file their answers by 10 April 2020 and 11 May 2020, respectively. The Tribunal also reserved the possibility of having an additional round of answers to the relevant questions (PO No. 27, paras 13-14).

424.   On 11 March 2020, Claimants sent a letter, requesting the Tribunal to move the date for the submission of Claimants' responses to its questions to one month after the submission of the Parties' comments on the EC Brief and the supplemental rebuttal document submissions, *i.e.*, to 27 April 2020, and the date for the submission of Respondent's responses to one month thereafter, *i.e.*, to 27 May 2020.

425.   On the same date, Respondent sought leave from the Tribunal to respond to Claimants' letter also of the same date.

426.    <u>Also on the same date</u>, the Tribunal invited Respondent to submit any comments it may have on Claimants' letter.

427.    <u>On 13 March 2020</u>, Respondent sent a letter, objecting to Claimants' request for an extension of time from 10 April to 27 April 2020 to file their answers to the Tribunal's questions and to the proposal for a sixteen-day extension of Respondent's deadline.

Respondent specifically stated that Claimants' proposal was also unacceptable because "*it create*[d] *a fundamental imbalance between the Parties*". This was because Claimants would have 47 days to prepare their answers, whereas Respondent would only have 30 days. An equal extension of time to Respondent of 47 days, *i.e.*, up to 15 June 2020, would not be appropriate given Respondent's counsel's other commitments. Respondent would thus not be in a position to file its answers prior to 22 June 2020.

428.    <u>On 15 March 2020</u>, Claimants sent a letter, noting that Claimants' lead counsel, Ms. Smutny, was involved in an accident and, therefore, requested that: (i) Claimants' deadline to respond to the Tribunal's questions in PO No. 27 be extended to 15 May 2020; (ii) the deadline for the Parties' comments on the EC Brief be postponed by two weeks from 27 March 2020 to 10 April 2020; and (iii) the Parties' supplemental rebuttal document submissions also be postponed by two weeks to 10 April 2020.

Because the timeline for Ms. Smutny's recovery remained uncertain, Claimants reserved the right to seek further accommodation to the procedural schedule as could be needed.

429.    <u>On 16 March 2020</u>, the Secretary of the Tribunal sent an email to the Parties concerning the organization of the Second Hearing of the week of 28 September 2020 in Paris. The Secretary noted that the World Bank office in Paris did not offer the option to broadcast the hearing in an overflow room. She therefore invited the Parties to consider the following alternative options:

-    Option 1: broadcasting the Second Hearing with a 2-3 day delay in an overflow room in the World Bank facilities in Washington D.C.

-    Option 2: streaming the Second Hearing on the ICSID website with a 2-3 day delay.

-    Option 3: broadcasting the Second Hearing in real time in another location in Paris (hotel or another *private* facility) to be agreed upon by the Parties. In this case ex-post moderation of the video feed would not be available.

430.    Following an invitation from the Tribunal, Respondent sent its comments to Claimants' letter of 15 March 2020 <u>on 17 March 2020</u>. Respondent agreed to Claimants' request to extend the deadlines for the Parties' comments on the EC Brief and the Parties'

supplemental rebuttal document submissions, currently set for 27 March 2020, to 10 April 2020.

Respondent maintained its objection to the extension of Claimants' deadline to file their answers to the Tribunal's questions in PO No. 27. It noted that, if the Tribunal would grant Claimants' requested extension until 15 May 2020, this would require an extension of Respondent's deadline until 23 July 2020 (thereby granting each of the Parties 66 days to prepare their answers). This extension would interfere with summer holidays and Respondent's preparation for the Second Hearing and hinder a possible further round of submissions on the questions in advance of that hearing.

Respondent submitted that if the Tribunal was inclined to grant Claimants' request, the extension had to be at most until 27 April 2020 (as per Claimants' previous request) in order to mitigate the disruption to these proceedings. In that case, Respondent's deadline would need to be extended, as previously indicated, until 22 June 2020.

431.    Also on 17 March 2020, Claimants sent a message, urging "*the Tribunal to grant the modest extensions as requested in full on the basis of the correspondence already presented by the Parties or to grant leave to Claimants to respond to Respondent's most recent letter*".

432.    On the same date, Respondent sent a message, noting that it took issue with Claimants' qualification of their extension as "modest" and that such extension would disrupt the proceedings.

433.    Also on the same date, the Tribunal informed the Parties that it considered that it had received all necessary information in relation to Claimants' request and that it would render its decision shortly.

434.    On 18 March 2020, the Tribunal issued **Procedural Order No. 28** ("PO No. 28"), deciding to extend the dates for answering the Tribunal's questions set out in PO 27 to 5 May 2020 for Claimants and 30 June 2020 for Respondent.

435.    On 31 March 2020, Claimants sent their comments to the Tribunal Secretary's email of 16 March 2020 and noted their preference for Option 1. According to Claimants, this option, which is consistent with PO No. 1, would offer the same public access and conditions as those in Washington D.C. (*i.e.*, no phones etc. in the room). Further, Claimants noted that Option 2 was contrary to PO No. 1 and would be impossible for the Centre to prevent recording and publication of the broadcast on another website, which would aggravate the dispute between the Parties. Further, Option 3 was not acceptable as it would not permit the safeguard of confidential information that would be discussed and would entail additional expenses in renting another space.

436.    <u>On 2 April 2020,</u> Respondent sent its comments to the Tribunal Secretary's email of 16 March 2020 and noted its preference for Option 2. According to Respondent, this option was in line with Section 20.6 of PO No. 1 and Annex C of the Canada – Romania BIT. It noted that since the first hearing served those based in North America, the Second Hearing had to allow those based in Europe to follow the proceedings. Further, opting for Option 1 would be a mockery of the transparency provisions of PO No. 1 and the BIT. Respondent added that, given the safeguards put in place by the Tribunal on the protection of confidential information, Claimants' position on the real time broadcast was misguided. In fact, there was no evidence of risk of aggravation.

437.    <u>On 8 April 2020,</u> the Tribunal issued ***Procedural Order No. 29*** ("PO No. 29"), deciding that Option 1 (*i.e.*, broadcasting the hearing with a 2-3 day delay in an overflow room in the World Bank facilities in Washington D.C.) would apply for the Second Hearing of the week of 28 September 2020 in Paris.

438.    <u>On 10 April 2010,</u> the Parties simultaneously filed (a) their rebuttal documents and (b) their respective comments on the EC Brief.

*Claimants* incorporated in their 11-page letter an Annex describing rebuttal documents C-2957 to C-2981, such documents totalling 50 pages.

*Respondent* submitted two categories of documents to rebut new evidence tendered by Claimants on direct examination: i) a supplemental expert report by Behre Dolbear, authored by Mr. Michael (Mike) McLoughlin and its exhibits BD-24 to BD-30, and ii) the Expert Opinion of Dr. Thomas Brady.

439.    <u>On 13 April 2020,</u> each Party requested leave to comment on the other Party's rebuttal document submission of 10 April 2020. The Tribunal granted the Parties leave to comment, in a maximum of three pages.

440.    <u>On 24 April 2020,</u> the Parties filed their comments to the other Party's rebuttal document submission.

*Claimants* commented on the Parties' respective rebuttal submissions and requested the Tribunal to (a) admit Claimants' 50 pages of rebuttal documents and (b) exclude the two new expert reports by the two new expert witnesses Respondent had proffered.

With its comments, *Respondent* filed a nine-page Annex commenting on each of Claimants' rebuttal documents. Respondent argued that, with one exception, none of the documents filed by Claimants on 10 April 2020 fell within the scope of admissible evidence. Respondent submitted that allowing these documents into the record would

constitute a serious departure from a fundamental rule of procedure within the meaning of Article 52(1)(d) of the ICSID Convention.

Respondent also objected to Claimants' submission of 22 new legal authorities with Claimants' comments to the EC Brief.

441.   On the same date, Claimants sent an email, objecting to Respondent's nine-page "unauthorized Annex" to their letter submitting further comments on Claimants' list of rebuttal documents and requesting that such Annex be disregarded.

Claimants also objected to Respondent's arguments regarding legal authorities referenced in Claimants' observations on the EC Brief. They argued that Respondent's arguments on that issue were to be summarily rejected or else Claimants had to be given an opportunity to address Respondent's objection.

442.   On 25 April 2020, Respondent sent an email, noting that Claimants are in direct breach of the Tribunal's direction that "[t]*here shall be no further correspondence on the issue*" and that Respondent has complied with the Tribunal's directions since its letter of 24 April 2020 only comprised three pages. The Annex was the same as Claimants' Annex to their rebuttal evidence submission of 10 April 2020. Respondent had merely added a few comments. This was necessary due to the massive volume of Claimants' rebuttal evidence.

443.   On 28 April 2020, the Tribunal issued **Procedural Order No. 30** ("PO No. 30"), deciding on the admissibility of the Parties' further rebuttal documents and Claimants' legal authorities in connection with the EC Brief, as follows:

> *1. Claimants' rebuttal documents and Respondent's rebuttal documents filed on 10 April 2020 are inadmissible.*
>
> *2. The Parties shall resubmit their further rebuttal documents as follows:*
>
> *(i) The Parties shall simultaneously address the rebuttal issues addressed in the December hearing in general. This can be done by way of arguments and / or documents but not new expert or witness testimony. To the extent that a Party needs to reply to any such argument and / or document, it can do so in the context of the Post-Hearing Briefs following the September hearing. The Parties shall do so by 12 May 2020 and in a maximum of 25 pages.*
>
> *(ii) The Parties shall consecutively address the rebuttal issues to be discussed in the September Hearing. This can by way of arguments and / or documents, as well as by new expert or witness testimony. The Parties shall follow the format that was implemented for the December hearing documents (see template in Tribunal's letter dated 21 November*

> *2019). Claimants shall do so <u>by 12 May 2020</u> and in a maximum of 25 pages. Respondent shall do so <u>by 26 May 2020</u> and <u>in a maximum of 25 pages</u>.*
>
> *3. Claimants' legal authorities filed with their observations on the EC's submission are admissible.*
>
> *4. All other requests are rejected.*

444.    <u>On the same date</u>, Claimants requested a further two-week extension, *i.e.*, until 19 May 2020, to submit their responses to the Tribunal's questions set forth in PO No. 27. Claimants referred to Ms. Smutny's injuries that had impeded her ability to work since her accident on 12 March 2020, as well as to the material disruptions caused to Claimants' legal team by the emergency shutdowns due to the Covid-19 pandemic. The Tribunal invited Respondent to provide their comments on Claimants' request <u>on 29 April 2020</u>.

445.    <u>Also on 29 April 2020</u>, Claimants sent a letter referring to the Tribunal's decision in PO No. 30 that the Parties' 25 pages of further rebuttal documents relating to the issues to be discussed at the Second Hearing in September 2020 could include new expert or witness testimony.

Claimants, without waiving any objection and reserving all of their rights, requested that the Tribunal "*confirm that PO 30* [was] *not intended to, and* [did] *not, replace or limit its earlier decisions to allow rebuttal direct testimony, as at the December hearing, for the witnesses and experts scheduled to testify at the upcoming September hearing for whom Claimants already* [had] *provided notice*".

446.    <u>On the same date</u>, Respondent applied for the Tribunal to reconsider certain decisions in PO No. 30 and to decide anew as follows:

> *First, that "the Parties may only submit rebuttal evidence pertaining to the December 2019 hearing if such evidence may still be examined with the relevant witnesses and experts during the September 2020 hearing".*
>
> *Second, that "Respondent is allowed to submit the Behre Dolbear supplemental expert report, and its exhibits, in response to the new rebuttal evidence given by Ms. Lorincz at the December 2019 hearing" ("Respondent's Application for Reconsideration").*

447.    <u>On 30 April 2020</u>, the Tribunal sent a letter to the Parties, acknowledging receipt of Claimants' letter of 29 April 2020, <u>and</u> noting that it would revert on Claimants' request shortly. The Tribunal also acknowledged receipt of Respondent's letter of the same date and invited Claimants to submit their comments, if any.

448.     <u>Also on 30 April 2020</u>, Respondent sent a letter to the Tribunal, objecting to Claimants' request for a two-week extension to file its answers to the Tribunal's questions in PO No. 27.

449.     <u>On 4 May 2020</u>, the Tribunal issued **Procedural Order No. 31** ("PO No. 31"), deciding to reject Claimants' request for a further two-week extension to answer the Tribunal's questions set out in PO No. 27.

450.     <u>On the same date</u>, Claimants sent an email to the Tribunal, urging the latter to reconsider its decision in PO No. 31 and to allow Claimants until 11 May 2010 to file their responses.

451.     In light of the Parties' disagreements on the schedule, the rebuttal documents and the tight schedule leading up to the Second Hearing, the Tribunal sent a letter to the Parties <u>on 5 May 2020</u>, strongly inviting them to confer and to agree on the following:

> *A. Claimants' request for an extension of time*
>
> *− As decided above, Claimants shall file their answers to the Tribunal's questions in PO 27 <u>by 11 May 2020</u>.*
>
> *− The Parties shall confer and agree on a joint schedule on all pending steps between now and the hearing in September. They shall do so <u>by 14 May 2020</u>. In the unfortunate case of disagreement, which will necessarily impact the schedule, each Party shall state its proposal by the same date. In such case, the Tribunal will decide and its decision will be final.*
>
> *B. Procedural Order No. 30*
>
> *− It is recalled that the entire rebuttal phase was set up in order to mitigate any imbalance caused by the filing of Respondent's Rejoinder. It is indeed an ad hoc procedure which gives <u>ample opportunity and room to both Parties</u> to plead additionally their case. However, the Tribunal feels that <u>there is no good will from either Party</u> behind this difficult process concerning the "rebuttal issues".*
>
> *− The Tribunal attempted, again, to ensure that both Parties have adequately pleaded their case in this respect, taking into consideration the fact that the hearing has been bifurcated and the need to go forward. This is why the Tribunal, always in consultation with the Parties, discussed the possibility of "rebuttal documents", "rebuttal submissions", "rebuttal evidence" etc. It did so in a one-sided good intended attempt to assist the Parties in this respect.*
>
> *The Tribunal however finds that the Parties are not amenable to its efforts to address this difficult situation and balance the competing rights*

*in play: i.e., the right to rebut new evidence, the right to plead last and the right to be adequately heard. It therefore strongly invites both Parties to confer and agree on the form and scope of the "rebuttal phase" addressing the December 2019 and the September 2020 issues. The Parties shall do so <u>by 14 May 2020</u>.*

*− In the unfortunate case of disagreement, which will impact the schedule further, Claimants shall provide their comments to Respondent's Application for Reconsideration of PO 30 (originally due on 7 May 2020) <u>by 14 May 2020</u>. The Tribunal shall then decide and its decision shall be final. In this event, there shall be no further discussion or phases on the "rebuttal issues".*

*C. September hearing*

*− Considering the above, as well as the current difficulties caused by Covid-19, the Parties are strongly invited to confer and agree on the way we shall proceed in relation to the September hearing.*

*− The Tribunal is amenable to holding the hearing virtually. However, the Parties must confer and discuss the possibility of doing so, taking into consideration the fact that it is a one week-hearing comprising of witness and expert examinations. This can be done also in consultation with the Tribunal Secretary.*

*− The Parties shall come back with a joint proposal in this respect <u>by 21 May 2020</u>.* (emphasis in the original)

452.     <u>On 11 May 2020</u>, Claimants filed their ***Responses to the Tribunal's Questions set out in PO No. 27***, together with legal authorities.

453.     <u>On 18 May 2020</u>, Claimants sent a message to the Tribunal, informing that the Parties had agreed on the schedule and the rebuttal documents and communicating the text of the agreement. Respondent confirmed the Parties' agreement set out in Claimants' message <u>on the same date.</u>

454.     <u>On 19 May 2020</u>, the Tribunal took note of the Parties' agreement of 18 May 2020 and stated that its decision in PO No. 30 concerning the admissibility of the Parties' rebuttal documents was no longer pertinent and that Claimants' request for a confirmation in relation to the Tribunal's decision in PO No. 30 and Respondent's Application for Reconsideration of PO No. 30, both dated 29 April 2020, were now moot.

455.     <u>On 20 May 2020</u>, Respondent sent a message to the Tribunal proposing "*in the interests of providing an accurate public record of the procedural developments in this case*" that "*insofar as Procedural Order No. 30* [was] *indeed published, the Tribunal re-issue its*

*communication of 19 May 2020 in the form of a procedural order that would also be subsequently published on the ICSID website.*"

456.    The Tribunal agreed with the joint proposal made by the Parties and integrated it in a **Procedural Order No. 32** ("PO No. 32") issued on 26 May 2020.

457.    On 29 May 2020, the Parties communicated their agreement to hold the Second Hearing of September 2020 virtually, if it was determined on or by 29 June 2020 that an in-person hearing could no longer be envisaged. The Parties also made certain proposals on the procedure to be followed in this connection. The Tribunal acknowledged receipt of the Parties' joint proposal on 2 June 2020.

458.    On 3 June 2020, Respondent submitted a corrected version of Christine Blackmore's expert report of 10 May 2019, submitted with Respondent's Rejoinder.

459.    On 4 June 2020, Claimants noted that they did not object to the submission of the proposed corrections to Ms. Blackmore's expert report, on the condition that the report previously signed by her and submitted with the Rejoinder remained in the record and subject to examination at the Second Hearing.

460.    The Tribunal acknowledged receipt of the Parties' correspondence of 4 June 2020 concerning the expert report of Ms. Blackmore on 5 June 2020.

461.    On 19 June 2020, the Parties communicated their agreement on the notification procedure pursuant to the Tribunal's letter of 28 September 2019. Specifically:

> *On June 19, 2020, Claimants shall notify whether they wish to cross-examine Dr. Brady and/or Mr. McLoughlin, and both Parties shall confirm whether they indeed call for cross-examination the witnesses and experts whom they previously called. The Parties agree that they may not add witnesses and experts who were previously not called for examination. The Parties shall make these communications simultaneously to the Tribunal Secretary, and both Parties' notices shall be transmitted together to the other Party and to the Tribunal in accordance with Section 18.2 of PO 1.*

> *By June 26, 2020, Respondent shall submit to the Tribunal, if it wishes to do so, an application to call Dr. Brady and/or Mr. McLoughlin on direct examination, in the event they are not called for cross-examination by Claimants. Either Party also may submit by June 26 an application to call for direct examination any witness or expert previously called for cross-examination whom the other Party decided not to cross-examine on June 19. In either case, the application shall be a maximum of two pages and shall indicate to the Tribunal the arguments in support of this*

*application and the main object that would be addressed during the direct examination.*

*By July 3, 2020, and in case of such an application by either Party, the other Party shall have an opportunity for a short response (maximum two pages) to such application.*

*By July 10, 2020, the Tribunal shall then decide. If the application of either Party is granted for any witness or expert, the other Party may cross-examine that witness or expert in accordance with Section 18.2 of PO 1.*

462.  On the same date, Respondent confirmed that it would no longer call for cross-examination the following witnesses testifying on behalf of Claimants: Mr. Patrick G. Corser, Prof. Dr. Dirk van Zyl, and Dr. Christian Kunze.

463.  Also on the same date, Claimants communicated that they called Dr. Thomas Brady for cross-examination at the Second Hearing. In addition, Claimants confirmed that they still called for cross-examination all witnesses and experts whom they had previously called on 19 September, *i.e.*: Ms. Christine A. Blackmore, Ms. Cathy Reichardt, Mr. Bernard J. Guarnera and Mr. Mark K. Jorgensen, Mr. Karr McCurdy and Dr. James C. Burrows. Claimants also noted that, while Respondent had indicated that Ms. Reichardt was not available to be examined for unspecified personal reasons, Ms. Reichardt's LinkedIn page (attached as Annex 1 to Claimants' letter) showed that she remained active as a mining professional and indeed had been commenting publicly on mining disputes. Claimants therefore maintained their request to cross-examine Ms. Reichardt.

464.  The Tribunal approved the Parties' agreed procedure and took note of the Parties' respective notifications on 22 June 2020.

465.  On 26 June 2020, Claimants confirmed that they would not call for direct examination Mr. Corser, Prof. van Zul or Dr. Kunze, *i.e.*, the witnesses and experts that Respondent notified it no longer requested to cross-examine.

466.  On 29 and 30 June 2020, the Parties communicated their agreement to hold the Second Hearing virtually.

467.  On 1 July 2020, the Tribunal confirmed the Parties' agreement to hold the Second Hearing virtually. The Tribunal also noted, among other things, that while Claimants had notified their intention not to call for direct examination Mr. Corser, Prof. van Zyl, or Dr. Kunze on 26 June 2020, no notification had been made by Respondent and that there were no issues to decide in that respect.

468.    On 3 July 2020, the Parties submitted their proposed *Joint Hearing Protocol for Virtual Hearing*.

469.    On 13 July 2020, Respondent filed its **Response to Claimants' Answers to the Tribunal's Questions in PO No. 27**, together with a list of legal authorities.

470.    On 14 July 2020, the Tribunal communicated its proposals to the Parties' Joint Hearing Protocol for Virtual Hearing.

471.    On 6 August 2020, the Parties communicated their indicative joint hearing schedule for the Second Hearing and noted that they would revert to the Tribunal with more details. The Tribunal acknowledged receipt of the Parties' agreement on 10 August 2020.

472.    On 10 August 2020, the Centre communicated the Parties' respective lists of participants to the August 2020 Pre-Hearing Conference Call.

473.    On 20 August 2020, the Tribunal Secretary addressed the Parties' request in sections 66 and 68 of the Joint Hearing Protocol for Virtual Hearing regarding the transparency measures for the Second Hearing. She stated that the broadcasting of the hearing in an overflow room in the World Bank facilities in Washington DC was not an option given the Covid-19 restrictions and therefore invited the Parties to consider the following alternative options:

  - Option 1: Upload the pre-edited video recording of the Second Hearing on the Centre's website.

  - Option 2: Stream the pre-edited video recording of the Second Hearing on the Centre's website.

  - Option 3: Stream the pre-edited video recording of the Second Hearing through the World Bank's videoconference platform (Webex).

474.    On 21 August 2020, the Tribunal Secretary communicated to the Parties a Draft Agenda for the Pre-Hearing Conference Call.

475.    On 24 August 2020, the Parties and the Tribunal held a **Pre-Hearing Conference Call**, during which they discussed the items of the agenda circulated on 21 August 2020.

476.    On 26 August 2020, the Tribunal Secretary sent a letter to the Parties to remind them of the points discussed during the Pre-Hearing Conference, the points to be decided by the Tribunal and the ones to be communicated by the Parties.

477.    On 27 August 2020, the Parties jointly submitted their updated list of confidential documents.

478.    On 3 September 2020, the Parties jointly submitted their amendment to para. 49 of the Parties' Joint Hearing Protocol for Virtual Hearing.

479.    On 7 September 2020, the Parties agreed on amendments to the Hearing schedule.

480.    On 8 September 2020, Claimants submitted a letter by which they disagreed with Respondent's proposal regarding the examination of experts as recalled in the Tribunal Secretary's letter of 26 August 2020. During the Pre-Hearing Conference, Respondent proposed that experts who had co-authored reports would be free to decide who would answer the counsel's questions but only one expert would be allowed to provide a response. Claimants agreed that one single expert would take the lead in answering the questions but requested that the examination be dealt with flexibility and not prevent a co-expert from supplementing or elaborating the lead expert's testimony.

481.    On 10 September 2020, the Tribunal Secretary sent an email to the Parties, clarifying some points related to the confidentiality protocol and the sharing of video recordings.

482.    On the same day, Respondent sent its comments on the issue of the examination of experts. It disagreed with Claimants' proposal of 8 September 2020 and requested that only one expert would answer each question.

483.    On 14 September 2020, the Parties updated the Tribunal on the location of their witnesses and experts for the purpose of their examination.

484.    On 17 September 2020, the Centre communicated the Parties' respective lists of participants to the Second Hearing of September 2020.

485.    On 18 September 2020, the Tribunal issued *Procedural Order No. 33* ("PO No. 33") (Virtual Hearing Protocol) deciding on the Parties' disagreements concerning the organization of the Second Hearing of September 2020, including on the way of examining experts who co-authored reports.

486.    On the same day, Claimants sent a letter to the Tribunal, by which they submitted a list of rebuttal exhibits and the subject matter of rebuttal testimony that they expected could be presented during the direct examination of several of Claimants' witnesses and experts as directed pursuant to PO No. 33 para. 59.

487.    On 22 September 2020, the Centre communicated the Parties' respective updated lists of participants to the Second Hearing of September 2020.

488.    On 26 September 2020, the Parties submitted their demonstratives for their Opening Statements.

489.    On the same day, Respondent submitted Dr. Burrow's corrections regarding his expert report in the form of an errata list. Respondent further submitted new exhibits in connection with the expert report after having sought Claimants' approval.

490.    On 27 September 2020, Claimants requested that Respondent submit a clean and redlined version of Dr. Burrow's reports and exhibits showing what was proposed to be changed. The requested documents were sent by Respondent on the same day.

### 5. The Hearing on Technical Issues and Damages

491.    Between 28 September 2020 and 4 October 2020, a virtual Second Hearing was held. Specifically:

492.    On 28 September 2020:

- The Government of Canada requested a copy of PO No. 33 from ICSID on the basis of Canada's alleged right to attend the Hearing pursuant to Annex C of the Canada-Romania BIT.

- The Tribunal and the Parties discussed several issues concerning the conduct of the Second Hearing among which was the request from the Government of Canada.

- The Parties delivered their Opening Statements.

- Respondent raised an objection with respect to Claimants' Opening Statement and alleged that it sought to introduce a new claim (a new valuation date).

- Following the Tribunal's instructions, the Centre transmitted the Tribunal's PO No. 33 including its tentative Second Hearing schedule to the Government of Canada.

493.    On 29 September 2020:

- The Tribunal gave directions to the Parties for them to comment on Respondent's objection. Claimants were invited to prepare a short submission elaborating on the question of valuation for the next day. Respondent would then have the opportunity to comment also within 24 hours after the receipt of Claimants' position.

- The Parties agreed to modify section 66 of PO No. 33 as follows:

> *The link for the live transcription shall be password-protected and restricted to the approved list of hearing participants, excluding those witnesses who have not yet testified. When testifying, both witnesses and experts shall have access to the live transcription.*

- The Government of Canada asked the Centre to be provided with the transcripts of the Hearing as it could not participate in it.

- The examination of Dr. Mike Armitage and Nick Fox took place.

494.    On 30 September 2020:

- Claimants submitted a letter containing their observations on Respondent's objection as instructed by the Tribunal the previous day.

- The examination of Bernard J. Guarnera and Mark K. Jorgensen took place.

- Claimants raised an objection during the presentation of Behre Dolbear's experts stating that there was evidence provided for the first time in their presentation.

495.    On 1 October 2020:

- Respondent submitted its letter responding to Claimants' letter dated 30 September 2020.

- The examination of Barry Cooper and Charles Jeannes took place.

- Respondent requested a ruling of the Tribunal stating that experts may comment on any new evidence/comments made by Claimants/Claimants' experts during their opening statement and during cross-examination.

- Following Respondent's request and after considering both Parties' arguments, the majority of the Tribunal ruled that:

> *The Tribunal considers that it has discretion to handle the conduct of the proceedings in a manner which it considers appropriate and that complies with due process.*

> *It was agreed that Claimants would have an opportunity to address certain issues raised in Respondent's Rejoinder, by submitting new evidence in rebuttal, what has been done. This was a special procedure. However it is also clear and agreed between the Parties that Respondents' experts shall be afforded the opportunity to respond to this new evidence during their own direct testimonies (PO 33 §59).*

*In any event, while the rule on direct testimony of experts only sets out that experts provide the key points of their presentation (PO 1, §18.5.3), there is no rule against permitting experts to reply on any points raised during the hearing and especially when there is a disagreement with another expert that was heard and to the extent that the issues fall within their reports. This is why experts are in principle present during the entire hearing and have access to the record of the case (comprising also the oral testimonies).*

*Further, Respondent, as the responding party, should have the opportunity to provide its responses to any such evidence. If the Tribunal would decide the contrary, it would allow Claimants to have the last say and deprive Respondent of a possibility to comment, which is contrary to general principles and practice.*

*Accordingly, the Tribunal will allow Respondent's experts to comment on any matters raised during the hearing that fall within the scope of their reports.*

- Following the Tribunal's instructions and without objection from the Parties, the Centre accepted the Government of Canada's request to be provided with the transcripts of the Second Hearing on the basis of Section II of Annex C of the Canada-Romania BIT. As requested by Claimants, the Centre drew the Government of Canada's attention to PO No. 3 which established the procedures for the protection of confidential information in the present proceedings.

496.    On 2 October 2020:

- The examination of Karr McCurdy and Dr Thomas Brady took place.

- Claimants submitted a letter by which they objected to the Tribunal's ruling and urged it to reconsider.

- The Tribunal gave Respondent the opportunity to respond to Claimants' request for reconsideration, which it did on the same day.

- As discussed during the Second Hearing, Claimants provided their response to Respondent's letter dated 1 October 2020.

- The Government of Canada asked the Centre to be sent the consolidated transcript at the end of the Second Hearing and confirmed having taken note of PO No. 3 as it relates to the protection of confidential information.

497.    On 3 October 2020:

- The examination of Pablo T. Spiller and Santiago Dellepiane took place.

498.  On 4 October 2020:

- The examination of Dr. James C. Burrows took place.

- Respondent sent a letter responding to Claimants' letter dated 2 October 2020 regarding the alleged new claim introduced on 28 September 2020.

499.  On 5 October 2020, the Parties informed the Tribunal of their agreements with respect to the modalities of the Post-Hearing Briefs.

### 6. The steps following the Hearing on Damages and Technical Issues

500.  On 6 October 2020, the Tribunal sent a letter to the Parties to recall the main decisions and agreements taken at the end of the Second Hearing.

501.  On 7 October 2020, Claimants submitted their final comments on Respondent's letter of 4 October 2020 concerning the admissibility of Claimants' alleged new claim.

502.  On the same day, the Centre sent the Second Hearing transcripts to the Government of Canada.

503.  On 22 October 2020, the Tribunal issued ***Procedural Order No. 34*** ("PO No. 34") by which it declared Claimants' new arguments concerning the valuation date of 6 September 2013 admissible.

504.  On 30 October 2020, Respondent sent a letter to the Tribunal by which it expressed its disagreement with the Tribunal's determination in PO No. 34 and reserved its rights in connection to it. Respondent further informed the Tribunal that it would respond to Claimants' new claims in its Post-Hearing Brief.

505.  On the same day, Claimants sent a letter to the Tribunal by which it confirmed to the Tribunal that the Parties should address the issues raised in PO No. 34 in their Post-Hearing Briefs.

506.  On 23 January 2021, the Parties submitted to the Tribunal their agreement to extend the deadlines of the Post-Hearing Briefs.

507.  On 27 January 2021, the Tribunal approved the Parties' agreed extension of time for filing their Post-Hearing Briefs.

508.  On 18 February 2021, the Parties' submitted their first round of Post-Hearing Briefs.

509.    On 23 April 2021, the Parties' submitted their second round of Post-Hearing Briefs.

510.    On 28 May 2021, Respondent asked the Tribunal if it could, in consultation with the Parties, give directions as to the submission of cost statements. It further made some proposals in that respect.

511.    On the same day, Claimants submitted that they understood that the Tribunal would invite the Parties to confer regarding the submission of cost statements when it considered the time appropriate to do so and reserved their rights to comment at that time on Respondent's proposals.

512.    On 1 June 2021, the Tribunal responded to the Parties that it would send clear instructions in due time but that it considered premature to do so at that point of the proceedings.

513.    On 5 August 2021, Claimants sent a letter concerning developments relevant to the case, *i.e.* the addition of "Roşia Montană Mining Landscape" to UNESCO's World Heritage List and to the List of World Heritage in Danger. Claimants sought leave under PO No. 1 to submit certain documents into the record.

514.    On 9 August 2021, the Tribunal invited Respondent to provide comments by 19 August 2021. On 17 August 2021, Respondent requested an extension until 26 August 2021 to submit its comments. On 18 August 2021, the Tribunal granted the extension.

515.    On 26 August 2021, Respondent provided its comments on the issue, objecting to the addition of the new evidence into the record. The Tribunal invited Claimants to submit any comments by 7 September 2021 and Respondent to submit any further observations by 14 September 2021.

516.    On 7 September 2021, Claimants filed their comments on the addition of the new evidence into the record.

517.    On 14 September 2021, Respondent submitted its observations on Claimants' comments.

518.    On 30 September 2021, the Tribunal issued its ***Procedural Order No. 35***, in which it allowed the introduction of the new documents into the record and invited the Parties to agree on a procedure for dealing with the documents by 14 October 2021 ("PO No. 35").

519.    On 5 October 2021, Claimants submitted the documents admitted into the record pursuant to PO No. 35 as Exhibits C-2982 to C-2990.

520.    On 14 October 2021, the Parties communicated their agreement regarding the procedure and timeline for presenting arguments on the new documents pursuant to PO No. 35. The

Parties agreed that Claimants would submit their arguments <u>by 29 October 2021</u> and that Respondent would submit its arguments <u>by 6 December 2021</u>.

521. <u>On 29 October 2021</u>, Claimants submitted their observations on the new evidence.

522. <u>On 26 November 2021</u>, Respondent made an application to submit three exhibits into the record in rebuttal of the documents admitted pursuant to PO No. 35.

523. <u>On 29 November 2021</u>, the Tribunal invited Claimants to comment on Respondent's application within 48 hours.

524. <u>On 30 November 2021</u>, Claimants submitted their comments on Respondent's application, agreeing to the admission of the documents into the record, but requesting an opportunity to comment on the documents.

525. <u>On 2 December 2021</u>, the Tribunal allowed Respondent to introduce the exhibits. The Tribunal invited Claimants to submit any comments <u>by 13 December 2021</u> and Respondent to submit any further observations <u>by 20 December 2021</u>.

526. <u>On 6 December 2021</u>, Respondent submitted its response to Claimants' observations on the new evidence. Respondent also submitted three new documents admitted into the record as Exhibits R-0691 to R-0693.

527. <u>On 13 December 2021</u>, Claimants submitted comments on the three rebuttal exhibits submitted by Respondent.

528. <u>On 20 December 2021</u>, Respondent submitted further observations on the three rebuttal exhibits.

529. <u>On 7 January 2022</u>, Claimants enquired with the Tribunal whether it intended to pose any further questions to the Parties or hold a further hearing and enquired about the timing of these potential further steps.

530. <u>On 10 January 2022</u>, the Tribunal communicated to the Parties that it was in deliberations and would inform the Parties about any further steps and the relevant timing in due course.

531. <u>On 12 April 2022</u>, the Tribunal sent a letter to the Parties, requesting them to answer certain questions on post-2013 events. Claimants were invited to file their submission <u>by 14 June 2022</u> and Respondent was invited to file its submission <u>by 15 August 2022</u>.

532.    On 20 April 2022, Respondent wrote to the Tribunal objecting to its invitation to answer questions on post-2013 events and requesting the Tribunal to reconsider and withdraw the invitation.

533.    On 21 April 2022, the Tribunal invited Claimants to submit comments on Respondent's letter by 28 April 2022.

534.    On 26 April 2022, Claimants submitted their comments on Respondent's letter.

535.    On 27 April 2022, the Tribunal rejected Respondent's request and invited the Parties to submit answers to the questions according to the timeline indicated in its letter of 20 April 2022.

536.    On 14 June 2022, Claimants submitted their ***Response to the Tribunal's Questions Regarding Post-2013 Events***, together with Exh. C-2991.

537.    On 14 July 2022, Respondent requested an extension to submit its response to Claimants' submission of 14 June 2022, until 19 September 2022. Upon an invitation by the Tribunal, Claimants filed their comments, objecting to Respondent's extension request on 14 July 2022. Respondent provided its comments thereon on 15 July 2022 and Claimants their reply on 20 July 2022. The Tribunal granted Respondent's extension request on 22 July 2022.

538.    On 16 September 2022, The Tribunal informed the Parties that: (i) on 13 September 2022, *Centrul Independent pentru Dezvoltarea* and *Greenpeace Romania* communicated to the Tribunal an additional submission and Annex to their *Amici* Submission of 2 November 2018; and (ii) on 16 September 2022, the Tribunal invited said *Amici* to, if they wished so, file an application in this connection in compliance with the terms of the Canada-Romania BIT.

539.    On 19 September 2022, Respondent filed its ***Reply to Claimants' Response to Tribunal's Questions Regarding Post-2013 Events***, together with Exh. R-0694 and Exh. CRA-307.

540.    On 20 September 2022, the Secretary of the Tribunal communicated to the Parties an email received on 18 September 2022 from Mr. Dan Marcea, submitting the second non-disputing application and submission on behalf of *Centrul Independent pentru Dezvoltarea Resurselor de Mediu* and Greenpeace *Romania* (the "Second *Amici* Application and Submission"), as well as the Tribunal's invitation to agree on a suitable timetable to address the admissibility of the submission, and if admitted, comments thereon. The Parties filed their agreed timetable in this connection on 29 September 2022.

541.     On 30 September 2022, the Parties simultaneously filed their comments on the admissibility of the Second *Amici* Submission, agreeing to its admission. The Tribunal confirmed the Parties' agreement on 3 October 2022.

542.     On 18 October 2022, the Parties simultaneously filed their ***comments on the Second Amici Submission***.

543.     On 8 November 2022, the Tribunal asked the Parties to confer and agree on a ***schedule for the filing of their cost submissions***. On 17, 21 and 25 November 2022 and 1 December 2022, the Parties provided their separate positions in relation thereto.

544.     On 2 December 2022, the Tribunal decided that each Party would have the opportunity to make submission in support of their Statement of Costs and structure such submission as the Party prefers. The Tribunal also decided that there would be two rounds of simultaneous costs submissions. These ***costs submissions*** were filed by the Parties on 16 December 2022 and on 6 January 2023, following an agreement by the Parties on the dates.

545.     On 5 April 2023, Claimant sought an update from the Tribunal concerning the status of the Award. The Tribunal informed both Parties on 6 April 2023, that it had held its latest deliberation (one of several) in March 2023 and that it was working intensively towards the preparation of its Award.

546.     On 30 May 2023, the Secretary of the Tribunal communicated to the Parties an email received on 18 September 2022 from Mr. Marcea, submitting a third non-disputing party application and submission (the "Third *Amici* Application and Submission") on behalf of *Centrul Independent pentru Dezvoltarea Resurselor de Mediu* and *Greenpeace Romania*, as well as the Tribunal's invitation to agree on a suitable timetable to address the admissibility of the submission, and if admitted, comments thereon. The Parties filed their agreed timetable in this connection on 2 June 2023. Mr. Marcea submitted a revision of the Third *Amici* Submission on 5 June 2023. The Parties filed their comments on the admissibility of the Third *Amici* Application on 13 June 2023. Upon an invitation by the Tribunal, the Parties filed reply comments on 19 June 2023. The Tribunal issued ***Procedural Order No. 36*** on 27 June 2023 (hereinafter "PO No. 36"), rejecting the Third *Amici* Application.

547.     On 20 July 2023, the Secretary of the Tribunal communicated to the Parties an email received on 14 July 2023 from *Ms. Elena Bibescu* submitting a non-disputing party application, as well as the Tribunal's invitation to agree on the steps to address it. The Parties filed their agreed timetable in this connection on 25 July 2023 and their simultaneous comments to the application on 27 July 2023. The Tribunal decided on 31 July 2023 to dismiss Ms. Bibescu's application as inadmissible and informed the Parties

and Ms. Bibescu that it does not require further information from potential non-disputing parties at this stage of the proceedings.

### 7. The closing of the proceedings

548.    On 14 September 2023, the Tribunal declared the proceeding closed as of that date in accordance with Arbitration Rule 38(1).

549.    On 20 December 2023, the Tribunal informed the Parties that, in accordance with Arbitration Rule 46, it had extended the period to draw up and sign the award for a further 60 days.

## B.    LEGAL CONSIDERATIONS

## I.    In general

### 1.  The arbitration agreements

550.   *Gabriel Canada* submitted this dispute to arbitration pursuant to ***Article XIII of the Canada-Romania BIT***.

Article XIII provides the following:[255]

> *Settlement of Disputes between an Investor and the Host Contracting Party*
>
> *1. Any dispute between one Contracting Party and an investor of the other Contracting Party, relating to a claim by the investor that a measure taken or not taken by the former Contracting Party is in breach of this Agreement, and that the investor has incurred loss or damage by reason of, or arising out of, that breach, shall, to the extent possible, be settled amicably between them.*
>
> *2. If a dispute has not been settled amicably within a period of six months from the date on which it was initiated, it may be submitted by the investor to arbitration in accordance with paragraph 4. For the purposes of this paragraph a dispute is considered to be initiated when the investor of one Contracting Party has delivered notice in writing to the other Contracting Party alleging that a measure taken or not taken by the latter Contracting Party is in breach of this Agreement, and that the investor has incurred loss or damage by reason of, or arising out of, that breach. It is agreed, subject to the provisions of this Article, that the Contracting Parties encourage investors to make use of domestic courts and tribunals for the resolution of disputes.*
>
> *3. An investor may submit a dispute as referred to in paragraph 1 to arbitration in accordance with paragraph 4 only if:*
>
> *(a) the investor has consented in writing thereto;*
>
> *(b) the investor has waived its right to initiate or continue any other proceedings in relation to the measure that is alleged to be in breach of*

---

[255] Exh. C-1 (Agreement between the Government of Canada and the Government of Romania for the Promotion and Reciprocal Protection of Investments, done at Bucharest on 8 May 2009, entered into force on 23 November 2011 (as corrected by an Exchange of Notes dated 12 and 19 April 2011) ("Canada-Romania BIT"), Art. XIII.

*this Agreement before the courts or tribunals of the Contracting Party concerned or in a dispute settlement procedure of any kind;*

*(c) if the matter involves taxation, the conditions specified in paragraph 5 of Article XII (Taxation Measures) have been fulfilled; and*

*(d) not more than three years have elapsed from the date on which the investor first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that the investor has incurred loss or damage.*

*4. The dispute may, at the election of the investor concerned, be submitted to arbitration under:*

*(a) the International Centre for Settlement of Investment Disputes (ICSID), established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, done at Washington on 18 March 1965 (hereinafter referred to as the "ICSID Convention"), provided that both the disputing Contracting Party and the Contracting Party of the investor are parties to the ICSID Convention.*

*b) the Rules Governing the Additional Facility for the Administration of Proceedings by the Secretariat of the International Centre for Settlement of Investment Disputes (hereinafter referred to as the "Additional Facility Rules of ICSID"), provided that either the disputing Contracting Party or the Contracting Party of the investor, but not both, is a party to the ICSID Convention; or*

*(c) the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL).*

*5. Each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration in accordance with the provisions of this Article.*

*6. (a) The consent given under paragraph 5, together with either the consent given under paragraph 3, or the consents given under paragraph 12, shall satisfy the requirements for:*

*(i) written consent of the parties to a dispute for purposes of Chapter II (Jurisdiction of the Centre) of the ICSID Convention and for purposes of the Additional Facility Rules of ICSID, and*

*(ii) an "agreement in writing" for purposes of Article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards, done at New York on 10 June 1958 (hereinafter referred to as the "New York Convention").*

*(b) Any arbitration under this Article shall be held in a state that is a party to the New York Convention, and claims submitted to arbitration shall be considered to arise out of a commercial relationship or transaction for the purposes of Article I of that Convention.*

*7. A tribunal established under this Article shall decide the issues in dispute in accordance with this Agreement and applicable rules of international law.*

*8. A tribunal may order an interim measure of protection to preserve the rights of a disputing party, or to ensure that the tribunal's jurisdiction is made fully effective, including an order to preserve evidence in the possession or control of a disputing party or to protect the tribunal's jurisdiction. A tribunal may not order attachment or enjoin the application of the measure alleged to constitute a breach of this Agreement. For purposes of this paragraph, an order includes a recommendation.*

*9. A tribunal may award, separately or in combination, only:*

*(a) monetary damages and any applicable interest:*

*(b) restitution of property, in which case the award shall provide that the disputing Contracting Party may pay monetary damages and any applicable interest in lieu of restitution.*

*A tribunal may also award costs in accordance with the applicable arbitration rules.*

*10. An award of arbitration shall be final and binding and shall be enforceable in the territory of each of the Contracting Parties.*

*11. Any proceedings under this Article are without prejudice to the rights of the Contracting Parties under Articles XIV (Consultations and Exchange of Information) and XV (Disputes between the Contracting Parties).*

*12. (a) A claim that a Contracting Party is in breach of this Agreement, and that an enterprise that is a juridical person constituted or duly organized under the applicable laws of that Contracting Party has incurred loss or damage by reason of, or arising out of, that breach, may be brought by an investor of the other Contracting Party acting on behalf of an enterprise which the investor owns or controls directly or indirectly. In such a case:*

*(i) any award shall be made to the affected enterprise,*

*(ii) the consent to arbitration of both the investor and the enterprise shall be required,*

*(iii) both the investor and enterprise must waive any right to initiate or continue any other proceedings in relation to the measure that is alleged to be in breach of this Agreement before the courts or tribunals of the Contracting Party concerned or in a dispute settlement procedure of any kind, and*

*(iv) the investor may not make a claim if more than three years have elapsed from the date on which the enterprise first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that it has incurred loss or damage.*

*(b) Notwithstanding subparagraph 12(a), where a disputing Contracting Party has deprived a disputing investor of control of an enterprise, the following shall not be required:*

*(i) a consent to arbitration by the enterprise under sub-subparagraph 12(a)(ii), and*

*(ii) a waiver from the enterprise under sub-subparagraph 12(a)(iii).*

*13. With respect to:*

*(a) financial institutions of a Contracting Party, and*

*(b) investors of a Contracting Party, and investments of such investors, in financial institutions in the other Contracting Party's territory,*

*Article XIII (Settlement of Disputes between an Investor and the Host Contracting Party) applies only in respect of claims that the other Contracting Party has breached an obligation under Article VIII (Expropriation). Article IX (Transfer of Funds) or paragraph 1 or 2 of Article XVIII (Final Provisions and Entry into Force).*

551.    A footnote to the provision notes that "*Annex C (Settlement of Disputes between an Investor and the Host Contracting Party) shall apply to proceedings under this Article*".

552.    *Gabriel Jersey* submitted this dispute to arbitration pursuant to **Article 7 of the UK-Romania BIT**.

Article 7 provides the following:[256]

*(1) Disputes between a national or company of one Contracting Party and the other Contracting Party concerning an obligation of the latter*

---

[256] Exh. C-3 (Agreement between the Government of the United Kingdom of Great Britain and Northern Ireland and the Government of Romania for the Promotion and Reciprocal Protection of Investments, done at London on 13 July 1995, entered into force on 10 January 1996, UK Treaty Series No. 84 (1996); Exchange of Notes relating to the UK BIT, UK Treaty Series No. 54 (1999), indicating that the UK BIT was extended to the Bailiwick of Jersey effective 22 March 1999) ("UK-Romania BIT"), Art.7.

*under this Agreement in relation to an investment of the former which have not been amicably settled shall, after a period of three months from written notification of a claim, be submitted to international arbitration if the national or company concerned so wishes.*

*(2) Where the dispute is referred to international arbitration, the national or company concerned may choose to refer the dispute either to:*

*(a) the international Centre for the Settlement of Investment Disputes (having regard to the provisions, where applicable, of the Convention on the Settlement of Investment Disputes between States and Nationals of other States, opened for signature at Washington DC on 18 March 1965 and the Additional Facility for the Administration of Conciliation, Arbitration and Fact-Finding Proceedings);*

*or*

*(b) an international arbitrator or ad hoc arbitration tribunal to be appointed by a special agreement or established under the Arbitration Rules of the United Nations Commission on International Trade Law.*

*(3) Nothing in this Article shall prevent a national or company of one Contracting Party from referring a dispute concerning an investment to the domestic courts of the other Contracting Party, where it has the right to do so under the domestic law of that other Contracting Party.*

## 2. The constitution of the Arbitral Tribunal

553.    On 21 June 2016, the Tribunal was constituted in accordance with Article 37(2)(a) of the ICSID Convention.

Its members were: Teresa Cheng (Chinese), President, appointed by the Secretary-General pursuant to the Parties' agreement, Horacio Grigera Naón (Argentine), appointed by Claimants; and Zachary Douglas (Australian and Swiss from August 2023), appointed by Respondent (see para. 210 above).

554.    On 7 February 2018, Ms. Cheng, the President of the Tribunal, resigned (see para. 255 above).

555.    On 5 April 2018, Prof. Pierre Tercier (Swiss) was appointed as President of the Tribunal, replacing Ms. Cheng (see para. 258 above).

Accordingly, the members of the present Tribunal are: Prof. Pierre Tercier, President appointed by the Secretary-General, Horacio Grigera Naón, appointed by Claimants; and Zachary Douglas, appointed by Respondent.

Ms. Maria Athanasiou was appointed, with the agreement of the Parties, as Assistant to the Tribunal <u>on 25 April 2018</u>.

### 3.  The arbitral proceedings

556.  The details of the arbitral proceedings were described above (see paras 205 *et seq.*). The important steps can be summarized as follows:

- <u>On 26 August 2016</u>, the Tribunal issued ***PO No. 1***, setting out the procedural rules that govern the present arbitration, together with a Procedural Calendar (see para. 223 above).

- <u>On 20 October 2016</u>, the Tribunal issued ***PO No. 2***, deciding on the Requests for Provisional Measures (see para. 231 above).

- <u>On 14 November 2016</u>, the Tribunal issued ***PO No. 3***, governing issues of confidentiality in the present arbitration (see para. 232 above).

- <u>On 10 January 2017</u>, the Tribunal adopted the Procedural Calendar, issued as Annex A to ***PO No. 4*** (see para. 35 above).

- <u>On 16 June 2017</u>, the Tribunal issued ***PO No. 5***, deciding on the access of the general public and non-disputing parties (prospective or not) to witness statements or expert reports (see para. 241 above).

- <u>On 29 August 2017</u>, the Tribunal issued ***PO No. 6***, deciding on the confidentiality of the witness statements and exhibits filed prior to Claimants' Opening Memorial (see para. 242 above).

- <u>On 16 January 2018</u>, the Tribunal issued ***PO No. 7***, deciding on the disputed confidentiality designations for Claimants' Opening Memorial (see para. 250 above).

- <u>On 30 January 2018</u>, the Tribunal issued ***PO No. 8***, ruling on Respondent's proposal to reclassify certain exhibits as non-confidential (see para. 252 above).

- <u>On 5 June 2018</u>, the Tribunal issued ***PO No. 9***, adopting the amended Procedural Calendar of the present arbitration (see para. 279 above).

- <u>On 8 June 2018</u>, the Tribunal issued ***PO No. 10***, together with Annexes A and B, ruling on the Parties' document production requests and giving specific directions in relation thereto (see para. 282 above).

- <u>On 14 June 2018</u>, the Tribunal issued ***PO No. 11***, ruling on several outstanding issues in relation to confidentiality (see para. 287 above).

- On 2 July 2018, the Tribunal issued **PO No. 12**, together with Annexes A and B, ruling on Claimants' Privilege and Redaction Logs and on Respondent's Privilege Log (see para. 295 above).

- On 20 July 2018, the Tribunal issued **PO No. 13**, together with Annex A, deciding on whether documents listed in Claimants' Supplemental Privilege Log are privileged and shall be produced (see para. 298 above).

- On 15 August 2018, the Tribunal issued **PO No. 14** and its Annex A, deciding on the Parties' dispute in relation to the redaction of 11 headings and statements in the CRA Report submitted by Respondent with its Counter-Memorial (see para. 305 above).

- On 18 September 2018, the Tribunal issued **PO No. 15** and its Annex A, deciding on the confidentiality of PO No. 14 (see para. 309 above).

- On 24 September 2018, the Tribunal issued **PO No. 16**, together with Annex A, deciding on the redactions of the disputed items in the Counter-Memorial (see para. 311 above).

- On 11 October 2018, the Tribunal issued **PO No. 17**, deciding on the production of certain categories of requested documents (see para. 312 above).

- On 23 October 2018, the Tribunal issued **PO No. 18**, adopting the amended Procedural Calendar which was issued as Annex A (see para. 314 above).

- On 7 December 2018, the Tribunal issued **PO No. 19**, granting the Non-Disputing Parties Application and admitting their Submission (see para. 323 above).

- On 17 December 2018, the Tribunal issued **PO No. 20**, deciding on Respondent's request for reclassification of the witnesses and expert reports accompanying Claimants' Reply (see para. 326 above).

- On 3 January 2019, the Tribunal issued **PO No. 21**, adopting the further amended Procedural Calendar in the present arbitration (see para. 328 above).

- On 3 May 2019, the Tribunal issued **PO No. 22**, together with Annex A, adopting the amended Procedural Calendar (see para. 331 above).

- On 6 September 2019, the Tribunal issued **PO No. 23**, deciding on Claimants' request to exclude from the record certain testimony and to submit focused rebuttal evidence (see para. 337 above).

- On 22 October 2019, the Tribunal issued ***PO No. 24***, deciding on the appropriateness of Claimants' rebuttal testimony filing of 11 October 2019 (see para. 363 above).

- On 29 October 2019, the Tribunal issued ***PO No. 25***, deciding on the Parties' disagreement concerning the organization of the Hearing of December 2019, including the allocation of the examination of witnesses (see para. 368 above).

- On 12 November 2019, the Tribunal issued ***PO No. 26***, deciding on Claimants' request for reconsideration of PO No. 25 and the order of examination of Prof. Henisz (see para. 377 above).

- Between 2 and 13 December 2019, a ***Hearing on Jurisdiction and the Merits*** was held in the seat of the Centre at Washington, D.C. (see paras 404-415 above).

- On 10 March 2020, the Tribunal issued ***PO No. 27***, deciding on the list of questions for the Parties (see para. 422 above).

- On 18 March 2020, the Tribunal issued ***PO No. 28***, deciding to extend the dates for answering the Tribunal's questions set out in PO No. 7 (see para. 433 above).

- On 8 April 2020, the Tribunal issued ***PO No. 29***, deciding that Option 1 (i.e., broadcasting the hearing with a 2-3 day delay in an overflow room in the World Bank facilities in Washington D.C.) would apply for the hearing of the week of 28 September 2020 in Paris (see para. 436 above).

- On 28 April 2020, the Tribunal issued ***PO No. 30***, deciding on the admissibility of the Parties' further rebuttal documents and Claimants' legal authorities in connection with the EC Brief (see para. 442 above).

- On 4 May 2020, the Tribunal issued ***PO No. 31***, deciding to reject Claimants' request for a further two-week extension to answer the Tribunal's questions set out in PO No. 27 (see para. 448 above).

- On 26 May 2020, the Tribunal issued ***PO No. 32***, integrating the Parties' joint proposal concerning the schedule of the proceedings and the rebuttal document issues (see para. 455 above).

- On 18 September 2020, the Tribunal issued ***PO No. 33*** (Virtual Hearing Protocol), deciding on the Parties' disagreements concerning the organization of the Second Hearing of September 2020 (see para. 485 above).

- Between 28 September 2020 and 4 October 2020, a ***virtual Second Hearing*** was held (see paras 491-499 above).

-   On 22 October 2020, the Tribunal issued ***PO. No. 34***, by which it declared Claimants' new arguments concerning the valuation date of 6 September 2013 admissible (see para. 503 above).

-   On 30 September 2021, the Tribunal issued its ***PO No. 35***, in which it allowed admission of the new documents into the record (see para. 518 above).

-   On 12 April 2022, the Tribunal sent a letter to the Parties, requesting them to answer certain questions on post-2013 events (see para. 531 above).

-   On 3 October 2022, The Tribunal confirmed the Parties' agreement to admit the submission on behalf of *Centrul Independent pentru Dezvoltarea Resurselor de Mediu* and *Greenpeace Romania* (see para. 541 above).

-   On 31 July 2023, the Tribunal decided to dismiss Ms. Bibescu's *amicus curiae* application as inadmissible (see para. 547 above).

557.    The Parties expressly confirmed that they had no objections to the way the proceedings have been conducted.[257]

### 4. The Parties' prayers for relief

#### a. Claimants

558.    ***Claimants*** request the Tribunal for the following relief:[258]

> [Claim. 1]    *Hold that Respondent breached its obligations under Article II* [of the Canada-Romania BIT]*;*

> [Claim. 2]    *Hold that Respondent breached its obligations under Article III* [of the Canada-Romania BIT]*;*

> [Claim. 3]    *Hold that Respondent breached its obligations under Article VIII* [of the Canada-Romania BIT]*;*

> [Claim. 4]    *Hold that Respondent breached its obligations under Article 2* [of the UK-Romania BIT]*;*

> [Claim. 5]    *Hold that Respondent breached its obligations under Article 5* [of the UK-Romania BIT]*;*

> [Claim. 6]    *Award Claimants compensation in the total amount of US$ 3,285,656,649 plus interest compounded annually running from July 29,*

---

[257] Tr. Day 11 (13.12.2019) p. 3431:3-21; Tr. Day 7 (04.10.2020) pp 1441:14-1442:1.
[258] Reply, para. 749.

*2011 up through the date of payment of the Award so established at the rate of 12-month LIBOR + 4%;*

[Claim. 7]    *Award Claimants compensation on such other basis as the Tribunal may deem warranted;*

[Claim. 8]    *Award Claimants the amount of legal fees and costs incurred in these proceedings; and*

[Claim. 9]    *Award Claimants interest on the amount of legal fees and costs awarded running from the date of the Award up through the date of payment.*

### b.  Respondent

559.    ***Respondent*** requests that the Tribunal:[259]

[Resp. 1]    *Dismiss the claims of Gabriel Canada and Gabriel Jersey for lack of jurisdiction; or*

[Resp. 2]    *Dismiss the claims of Gabriel Canada and Gabriel Jersey as inadmissible; and/or*

[Resp. 3]    *Should the Tribunal determine that any of the claims of Gabriel Canada or Gabriel Jersey fall within the Tribunal's jurisdiction: dismiss the claims as unfounded;*

[Resp. 4]    *And in any event: order the Claimants to bear, jointly and severally, the Respondent's costs of the arbitration on a full indemnity basis, including attorney's fees and expenses and all fees and other expenses incurred in participating in the arbitration, including internal costs.*

### 5.  The roadmap

560.    The Tribunal will proceed as follows:

-   *First*, it will make some preliminary considerations regarding the applicable law, the rules of treaty interpretation, and the relevance of previous decisions or awards (section II).

-   *Second*, it will rule on Respondent's jurisdictional and admissibility objections (section III).

---

[259] Rejoinder, para. 1192. See also Respondent's Post-Hearing Brief dated 18 February 2021 ("R-PHB"), para. 862.

- *Third*, to the extent it finds that it has jurisdiction over the present dispute and that the claims are admissible, it will rule on the merits of Claimants' claims (section IV).

- *Fourth*, and in any case, the Tribunal will decide on the issue of costs of the arbitration (section V).

561.    After careful consideration of all arguments and evidence presented by the Parties in the course of the proceedings, the Tribunal does not consider it necessary to repeat them in the Award. In its reasoning, the Tribunal will address only the decisive factors necessary to rule on the Parties' claims. In summarizing the Parties' positions, the Tribunal shall primarily reflect the positions as presented in the first rounds of pleadings on jurisdiction and merits; reference will be made to all other pleadings to the extent necessary for the Tribunal's analysis.

## II.    Preliminary considerations

### 1.  Applicable law

562.    Turning *first* to jurisdiction, it is undisputed that the jurisdiction of the Tribunal is governed by the Canada-Romania BIT, the Canada-UK BIT, and the ICSID Convention, the relevant provisions of which are reproduced below in addressing each jurisdictional objection. The interpretation of these instruments is governed by the principles of customary international law on the interpretation of treaties, as codified in the *Vienna Convention on the Law of Treaties of 23 May 1969* ("VCLT"). It is also undisputed that, pursuant to Article 41(1) of the ICSID Convention, the Tribunal has the power to rule on its own jurisdiction.[260]

563.    *Second*, with respect to the merits, Article 42(1) of the ICSID Convention provides that "[t]*he Tribunal shall decide a dispute in accordance with such rules of laws as may be agreed by the parties*" and that "[i]*n the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable*".

564.    In the present case, Article XIII(7) of the Canada-Romania BIT provides that "[a] *tribunal established under this Article shall decide the issues in dispute in accordance with this Agreement and applicable rules of international law*". Accordingly, the Tribunal will apply the Canada-Romania BIT itself and the applicable rules of international law to decide Gabriel Canada's claims in this arbitration.

---

[260] Article 41(1) of the ICSID Convention provides that "[t]*he Tribunal shall be the judge of its own competence*".

565.    The UK-Romania BIT does not contain a choice of law clause. Therefore, pursuant to the second sentence of Article 42(1) of the ICSID Convention (set out in para. 563 above), in deciding Gabriel Jersey's claims in this arbitration, the Tribunal shall apply Romanian law and such rules of international law as may be applicable.

566.    This being said, Romanian law may also be considered generally to determine, where appropriate, the scope and extent of the rights and obligations of the Parties alleged to give rise to the existence of an "investment" for jurisdictional purposes, as well as those alleged to give rise to the claims on the merits.

### 2.    Rules on treaty interpretation

567.    On the principles of treaty interpretation, the Tribunal refers to Article 31 of the VCLT, which states that a treaty "*shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose*".[261] Thus, the starting point for interpretation is the "ordinary meaning" of the text. The latter must be determined considering the context and object and purpose of the treaty, any subsequent agreement or practice of the Contracting Parties relating to the interpretation of the treaty, and any other relevant rules of international law applicable in the relations between the Contracting Parties.

568.    Article 32 of the VCLT provides that recourse may be had to supplementary methods of interpretation to (i) confirm the meaning resulting from the application of Article 31, or (ii) determine the meaning where the interpretation under Article 31 "*leaves the meaning ambiguous or obscure*", or "*leads to a result which is manifestly absurd or unreasonable*".[262] Accordingly, the primacy of the treaty text means that recourse to

---

[261] Exh. RLA-1 (*Vienna Convention on the Law of Treaties of 23 May 1969* ("VCLT")), Article 31 on "General rule of interpretation" provides in full the following: "1. *A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose. 2. The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes: (a) any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty; (b) any instrument which was made by one or more parties in connection with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty. 3. There shall be taken into account, together with the context: (a) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions; (b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation; (c) any relevant rules of international law applicable in the relations between the parties. 4. A special meaning shall be given to a term if it is established that the parties so intended.*"

[262] Exh. RLA-1 (VCLT), Article 32 on "Supplemental means of interpretation" provides in full the following: "*Recourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion, in order to confirm the meaning resulting from the application of article 31, or to determine the meaning when the interpretation according to article 31: (a) leaves the meaning ambiguous or obscure; or (b) leads to a result which is manifestly absurd or unreasonable*".

supplementary means (including the *travaux preparatoires* and the circumstances of the conclusion of the treaty) is permitted only in certain circumstances.

### 3. Relevance of prior decisions or awards

569.    Both Parties have relied on previous decisions or awards to support their positions, either to conclude that the same solution should be adopted in the present case or to explain why the Tribunal should depart from that solution. The Tribunal wishes to emphasize that it has reached all its conclusions after careful study of the Parties' pleadings in this case, without being bound by prior decisions of other tribunals on similar arguments. Nevertheless, there are instances where the Tribunal refers to or cites a decision to support its independent conclusion on a particular point.

## III.    Jurisdiction and Admissibility

### 1. The issue

570.    The issue is whether this Tribunal has **_jurisdiction_** over the present dispute and whether the claims are **_admissible_**.

571.    **_The Tribunal's decision on jurisdiction and admissibility is taken unanimously._**

572.    **_Respondent_** requests that the Tribunal "[d]*ismiss the claims of Gabriel Canada and Gabriel Jersey for lack of jurisdiction*" [Resp. 1] or "*as inadmissible*" [Resp. 2]. Respondent raises objections both in relation to Gabriel Canada under the Canada-Romania BIT and Gabriel Jersey under the UK-Romania BIT.

573.    In relation to Gabriel Canada under the Canada-Romania BIT, it submits that:

-   Gabriel Canada is not an investor of Canada.

-   Gabriel Canada cannot claim both on its own behalf and on behalf of RMGC.

-   Events that post-date the notice of treaty dispute delivered by Claimants to Respondent on 20 January 2015 (the "Notice of Dispute") fall outside the Tribunal's jurisdiction.

-   Events that post-date Claimants' waiver fall outside the Tribunal's jurisdiction or are otherwise inadmissible.

- Claims presented do not fall within the three-year limitation period and are therefore outside the Tribunal's jurisdiction.

- Alleged breaches would have occurred prior to the entry into force of the Canada-Romania BIT and are therefore outside the Tribunal's jurisdiction.

- The umbrella clause claims fall outside the Tribunal's jurisdiction.

- Claims are limited by substantive provisions of the Canada-Romania BIT regarding environmental and taxation measures.

574.    In relation to Gabriel Jersey under the UK-Romania BIT, Respondent submits that:

- Gabriel Jersey does not qualify as an investor under the UK-Romania BIT.

- There are no covered investments.

- Events that post-date the Notice of Dispute fall outside the Tribunal's jurisdiction.

- The umbrella clause claims fall outside the Tribunal's jurisdiction.

- There is no jurisdiction considering the judgment of the Court of Justice of the European Union ("CJEU") in the case *Slovak Republic v. Achmea BV* (the "*Achmea* Judgment").

575.    In general, it also submits that to the extent that Claimants have failed to establish the Tribunal's jurisdiction over Gabriel Canada's claims under the Canada-Romania BIT, or over Gabriel Jersey's claims under the UK-Romania BIT, they have also failed to establish jurisdiction under the ICSID Convention.

576.    *Claimants* dispute Respondent's objections and submit that the Tribunal has jurisdiction over their claims and that such claims are admissible.

577.    *The Tribunal* notes the following.

578.    *First*, the Parties agree that Respondent's objections on whether Gabriel Jersey is a covered company under the UK-Romania BIT,[263] whether Gabriel Canada is a covered

---

[263] Counter-Memorial, para. 487-489; Reply, Sect. VII; Claimants' Response to EC Brief, dated 10 April 2020 ("Claimants' Response to EC Brief"); Claimants' Post-Hearing Brief dated 18 February 2021 ("C-PHB"), para. 15.

investor under the Canada-Romania BIT[264] and whether Gabriel Canada's claims are presented on behalf of RMGC[265] have now been abandoned.

579.    *Second*, Respondent's objection that Claimants' umbrella clause claims are not within the Tribunal's jurisdiction was further addressed by the Parties in connection with their discussion of the merits of the case.[266] The Tribunal therefore deems it appropriate to address this issue when, if at all, it addresses the umbrella clause claim on the merits.

580.    *Third*, jurisdictional objections to claims alleged to be outside the limitation period of the Canada-Romania BIT or outside the time frame related to the entry into force of this BIT are herein treated together as common temporal issues.

581.    *Fourth*, because some jurisdictional objections relate to both the UK-Romania BIT and the Canada-Romania BIT, the Tribunal will address each jurisdictional objection by subject matter and not by BIT.

582.    *Fifth*, at Respondent's request, the Tribunal will address Respondent's EU law objection to Gabriel Jersey's claims before addressing other jurisdictional objections to such claims. It will do so because Respondent's objection allegedly concerns Gabriel Jersey's ability to consent to the arbitration at hand.[267]

583.    *Finally*, the Tribunal will, as appropriate, draw any conclusions related to its jurisdiction under the ICSID Convention after addressing the objections under the two BITs.

584.    In light of the foregoing, the Tribunal will address the following questions:

    (a)    Whether the Tribunal lacks jurisdiction over Gabriel Jersey's claims because of the CJEU's *Achmea* Judgment on intra-EU disputes (see section 2 below).

    (b)    Whether Gabriel Jersey has covered investments under the UK-Romania BIT (see section 3 below).

    (c)    Whether events that post-date the Notice of Dispute fall outside the Tribunal's jurisdiction under the Canada-Romania BIT and the UK-Romania BIT (see section 4 below).

---

[264] Counter-Memorial, paras 439-442; Memorial, para. 834; Reply, paras 312-324.

[265] Counter-Memorial, paras 443-451; Rejoinder, paras 38-41; Memorial, paras 835-836; Reply, paras 325-330.

[266] Counter-Memorial, paras 494-495; Reply, paras 410, 532-558; Rejoinder, paras 70, 805-835.

[267] Rejoinder, paras 110-118.

(d)   Whether events that post-date Claimants' waiver fall outside the Tribunal's jurisdiction under the Canada-Romania BIT or are otherwise not admissible (see section 5 below).

(e)   Whether Gabriel Canada's claims are time-barred under the Canada-Romania BIT or otherwise (see section 6 below).

(f)   Whether Gabriel Canada's claims are limited by the substantive provisions on taxation and environmental measures of the Canada-Romania BIT (see section 7 below).

(g)   To the extent necessary, whether the Tribunal's jurisdiction under Article 25 of the ICSID Convention has also been established (see section 8 below).

### 2.   EU law objection

#### a.   The issue

585.   The *issue* is whether the *Achmea* Judgment – that EU law must be interpreted as precluding a provision in an intra-EU BIT under which an investor from a Member State may bring proceedings against another Member State before an arbitral tribunal – requires this Tribunal to dismiss Gabriel Jersey's claims for lack of jurisdiction.

#### b.   The Parties' positions

##### i.   *Respondent*

586.   Respondent argues that the Tribunal does not have jurisdiction over Gabriel Jersey's claims under the UK-Romania BIT because of the *Achmea* Judgment.[268] Specifically:

587.   *First*, Gabriel Jersey must be equated to an investor from an EU Member State and it is thus affected by the *Achmea* Judgment, holding that an arbitration clause contained in an intra-EU BIT is incompatible with Articles 267 and 344 of the Treaty on the Functioning of the European Union ("TFEU"). Jersey's limited relationship with the EU is established in Article 355(5)(c) of the TFEU and Protocol 3 of the UK's 1972 Accession Treaty. In particular, Jersey can be equated to "a Member State" alongside the UK for the purpose of the application and interpretation of EU law. Under Article 267(2) of the TFEU, only a court or tribunal of a Member State can request a preliminary ruling on the interpretation of EU law from the CJEU. Given that Article 267 is at the center of the *Achmea* Judgment and that Jersey courts are bound by this article as evidenced by

---

[268] Respondent's Additional Preliminary Objection, dated 25 May 2018, paras 6 and 100; Rejoinder, paras 98-99. See also R-PHB, para. 6.

Jersey's previous referrals to the CJEU, the *Achmea* Judgment affects Jersey and companies incorporated there, including Gabriel Jersey.[269]

588.    *Second*, it must be first ascertained that Claimants could have validly consented under the law applicable to their capacity, which in this case includes EU law. EU law has direct effect under the laws of the Member States, which in this instance also extends to Jersey. Only after this step can the Tribunal see whether it is empowered under the ICSID Convention and the UK-Romania BIT to hear the dispute. When considering whether Claimants' consent is valid, this Tribunal must apply international law. The TFEU is a treaty within the meaning of the VCLT. EU law is therefore international law because it is routed in international treaties, which are the main source of international law. Gabriel Jersey lost the right to consent to arbitrate under the UK-Romania BIT at the latest when the TFEU came into force in 2009. This is because the dispute resolution clause in the UK-Romania BIT is not compatible with Articles 267 and 344 of the TFEU as held by the CJEU. Therefore, the Tribunal was deprived of jurisdiction as a result of the *Achmea* Judgment retroactively effective at the date of entry into force of the TFEU.[270]

589.    *Third*, Romania's consent to arbitrate in Article 7 of the UK-Romania BIT is incompatible with the TFEU and accordingly the provision does not apply. In the present case, Article 30(3) of the VCLT, which deals with the situation when a subsequent treaty between the same Member States is incompatible with an earlier treaty, applies, because the UK-Romania BIT has not yet been terminated. The UK and Romania entered into the TFEU, subsequent to the BIT, and the TFEU contains provisions incompatible with the BIT, notably Articles 267 and 344. This Tribunal should not ignore the true meaning of Articles 267 and 344 of the TFEU as interpreted by the CJEU. When examining the relevance of the decision of the CJEU, this Tribunal should consider that EU law is still part of the international legal order. Accordingly, despite not being bound by EU law *per se*, this Tribunal should apply international law (which includes EU law) and acknowledge that the court tasked with the interpretation of one of the two relevant treaties at issue in this arbitration is incompatible with these arbitration proceedings. This was clearly accepted by EU Member States, including the UK and Romania in a series of declarations dated 15 and 16 January 2019. Such an agreement on the interpretation of a treaty by the parties is provided for in Article 31(3)(a) of the VCLT. The Tribunal should consider these declarations persuasive. Further the competency of EU institutions as determined under Articles 267 and 344 of the TFEU started to conflict with the competency of investment tribunals under intra-EU BITs only after the enactment of the TFEU. In addition, Romania became a party to the EU Treaties on 1 January 2007 when

---

[269] Rejoinder, paras 102-109, 121.
[270] Rejoinder, paras 110-118.

it became an EU Member State. This also postdates the adopting of the UK-Romania BIT, making the TFEU the later treaty.[271]

590.    *Fourth*, and regardless of when and how the UK leaves the EU, Respondent's jurisdictional objection on this matter still stands.[272]

*ii.    Claimants*

591.    Claimants submit that the *Achmea* Judgment does not nullify this Tribunal's jurisdiction and Respondent's arguments in relation thereto are without merit.[273] Specifically:

592.    The *Achmea* Judgment is a decision on the interpretation of the TFEU.[274]

593.    Respondent's *Achmea* objection is premised on an incorrect characterization of Gabriel Jersey as a company incorporated in the UK. Gabriel Jersey is eligible to claim the protection of the UK-Romania BIT not by virtue of being incorporated in the UK (which it is not) but because it is a company incorporated in the Bailiwick of Jersey, a "territory" to which the UK-Romania BIT was extended by an Exchange of Notes between the Contracting Parties. By its plain words, Article 1(d)(i) of the UK-Romania BIT, which defines "companies" in respect of the UK, provides for two distinct categories of "companies", i.e., those qualifying as such by virtue of their incorporation in "any part of the United Kingdom", and those qualifying by way of their incorporation in "any territory" to which the UK-Romania BIT is extended by an Exchange of Notes. The Bailiwick of Jersey is not part of the UK and is not an EU Member State but has a limited relationship with the EU. Companies incorporated in Jersey are subject to the laws of Jersey. Thus, Respondent's references to Gabriel Jersey as a company "incorporated in the UK" and as a "UK investor" are mistaken. The Bailiwick of Jersey has a limited relationship with the EU, which is set forth in Article 355(5)(c) of the TFEU. Thus, although the Bailiwick of Jersey is part of the customs territory of the EU, other European Rules do not apply to it. As such, Gabriel Jersey is not an investor from an EU Member State.[275]

594.    There is no basis for Respondent's contention that Gabriel Jersey lost the right to consent to arbitrate pursuant to the terms of the UK-Romania BIT. *First*, it is based on the mistaken assumption that Gabriel Jersey is a UK company, incorporated in the UK and

---

[271] Rejoinder, paras 119-132.

[272] Rejoinder, para. 133.

[273] Reply, paras 411-412; Claimants' Surrejoinder on the New Jurisdictional Objection, dated 28 June 2019 ("Surrejoinder"), paras 6-7. See also C-PHB, para. 23 and Claimants' Reply Post-Hearing Brief dated 23 April 2021 ("Reply C-PHB"), para. 8.

[274] Reply, paras 413-416.

[275] Reply, paras 417-423.

as such a company incorporated in an EU Member State. This is incorrect. *Second*, nothing in the UK-Romania BIT establishes a condition that the treaty must be received or incorporated into the internal law of the Contracting States. Unless the BIT itself provides that the right to submit a dispute to arbitration must be consistent with the law of the home State of the company, the *lex societatis* is not relevant to that inquiry. Gabriel Jersey's "right to consent" is not derived from the law of Jersey, but rather from the terms of the UK-Romania BIT and the ICSID Convention. In addition, Respondent fails to demonstrate that the *Achmea* Judgment is directly applicable to persons in the UK, let alone to persons in the Bailiwick of Jersey. The Judgment is premised on the obligations based on Member States in relation to the EU legal order and the onus is on Member States, not on individual investors, to take any actions that may be required to comply with the *Achmea* Judgment.[276]

595.    Respondent's argument that in view of the *Achmea* Judgment and following the entry into force of the TFEU, Article 7 of the UK-Romania BIT should be interpreted as inapplicable is without merit and should be rejected.[277]

596.    Specifically, VCLT Article 30(3), which sets out the residual rule reflecting customary international law for addressing conflicts arising from successive treaties that relate to the same subject matter, applies in very limited circumstances. When considering the temporal order of the two treaties for purposes of this rule, the relevant date is the date of adoption of the respective treaties, not their entry into force. The rule applies only when there is a determination both that the two treaties relate to the same subject matter and that their provisions are incompatible; and these are two separate requirements. Incompatibility is not to be lightly assumed; this is in keeping with the most basic principle of the law of treaties, set forth in Article 26 of the VCLT, of *pacta sunt servanda*. There is a presumption against incompatibility of treaties.[278] The UK-Romania BIT and the TFEU are not successive treaties relating to the same subject matter within the meaning of VCLT Article 30.[279]

597.    In addition, the *Achmea* Judgment did not rule that the conditions for applying VCLT Article 30(3) were met. The *Achmea* Judgment is a ruling interpreting Article 167 and 344 of the TFEU. It did not declare that intra-EU BITs are nullified, nor did it declare investor-State arbitration clauses in intra-EU investment treaties as null or void. There is

---

[276] Reply, paras 423-432; Surrejoinder, paras 37-44.
[277] Reply, para. 433; Sur-Rejoinder, para. 8.
[278] Reply, paras 434-440.
[279] Reply, paras 444-448; Surrejoinder, paras 9-15.

no dispute that the UK-Romania BIT remains in effect. In any event, this Tribunal must be the judge of its own competence pursuant to Article 31(1) of the ICSID Convention.[280]

598.    Moreover, the *Achmea* Judgment did not rule that Article 7 of the UK-Romania BIT as extended to the Bailiwick of Jersey is incompatible with the TFEU, which it is not. The *Achmea* Judgment was expressly addressed to provisions permitting an investor from one EU Member State to submit disputes to arbitration against another EU Member State. Even if Article 7 of the UK-Romania BIT were considered inapplicable to the extent that it permits an investor from the UK to submit a dispute to arbitration against Romania, that inapplicability would not relate to Article 7 as extended to companies of the territories covered by the UK-Romania BIT that are not EU Member States. Articles 267 and 344 in substance pre-dated other intra-EU investment treaties with analogous investor-State arbitration provisions. Thus, there is a distinction between, on the one hand, an organ of the EU deciding, even with a binding effect for EU Member States, that certain arbitration provisions are precluded by the TFEU, and concluding, on the other hand, as a matter of the principle reflected in Article 30 of the VCLT, that the TFEU is a later treaty relating to the same subject and incompatible with an earlier treaty such that the earlier treaty must be deemed to have been intentionally rendered inoperable in part with effect from the date of conclusion or effectiveness of the TFEU. In any event, any incompatibility associated with the UK-Romania BIT in relation to the TFEU will be eliminated upon the UK's withdrawal from the EU.[281]

599.    Furthermore, the declarations made by EU Member States are political statements not relevant to treaty interpretation.[282]

600.    What is more, Romania gave its consent to ICSID arbitration in Article 7 of the UK-Romania BIT and Gabriel Jersey gave its consent by initiating this arbitration with consequences under Article 25 of the ICSID Convention. It is fundamental that jurisdiction is evaluated as of the date when the Parties have given their consent; as such, retroactive nullification of Romania's consent cannot be given effect.[283]

601.    Accordingly, Respondent's objection to jurisdiction on the basis of the claimed effects of the *Achmea* Judgment must be rejected.[284]

---

[280] Reply, paras 441-443; Surrejoinder, paras 16-26.
[281] Reply, paras 441-443.
[282] Surrejoinder, paras 27-33.
[283] Reply, paras 456-458; Surrejoinder, paras 34-36.
[284] Surrejoinder, para. 45.

### c.  The EU Commission's position

602.  The EC argues that judgments of the CJEU contain authoritative and binding interpretations of EU law for EU Member States and are, as part of international law, applicable to the dispute and intra-EU arbitral tribunals.[285] According to it, the legal consequence of the judgment in *Achmea* is that the offer of Romania and that of the UK to investors from the other Contracting Party to enter into investment arbitration is no longer valid.[286] The EC specifically argues the following.

603.  *First*, the Tribunal is faced with a conflict between Article 7 of the UK-Romania BIT and EU law.[287]

604.  Specifically, pursuant to the *Achmea* Judgment, the general principle of autonomy of EU law, Article 19 of the Treaty on European Union, and Articles 267 and 344 TFEU preclude any intra-EU investment arbitration.[288] Furthermore, the January 2019 interpretative declarations issued by EU Member States pursuant to Article 31(3)(a) of the VCLT confirm the common understanding of all EU Member States that any arbitration clause in intra-EU investment treaties is inapplicable. Indeed, the recent case law of the CJEU has confirmed this position. The EC refers to Opinion 1/17 in this respect.[289]

605.  According to the EC, the Tribunal may have to apply and interpret EU law pursuant to Article 7 of the Romania-UK BIT and Article 42(1) of the ICSID Convention; indeed EU law is both part of the law of Romania and international law applicable between Romania and the UK. By virtue of Article 355(5)(c) TFEU, the Treaties apply to the Channel Island of Jersey, although not to a full extent. Yet, as the CJEU ruled in *Achmea* and later confirmed in Opinion 1/17, arbitral tribunals established under intra-EU BITs do not form part of the EU judicial system and cannot make a reference to the Court of Justice for a preliminary ruling. This creates a situation which is contrary to EU law.[290] The same conflict exists in relation to the sunset clause contained in Article 13(1) of the UK-Romania BIT.[291]

---

[285] European Commission Submission, dated 27 November 2019 ("EC Brief"), para. 2.
[286] EC Brief, para. 3.
[287] EC Brief, para. 17.
[288] EC Brief, paras 5-6.
[289] EC Brief, paras 7-8.
[290] EC Brief, paras 8-13.
[291] EC Brief, paras 15-16.

606.    *Second*, the Tribunal must find that it lacks jurisdiction because the UK-Romania BIT, as a whole, but at the very least Article 7 thereof, has been terminated on the basis of Article 59 of the VCLT with effect from 1 January 2007.[292]

607.    Specifically, the UK-Romania BIT parties intended for protection to be governed by EU law. The EC points to a Communication from the EC to the EU Parliament and Council titled "Protection of Intra-EU Investment" dated 19 July 2018 noting that the types of investments listed in Article 1 of the UK-Romania BIT fall within the ambit of fundamental freedoms guaranteed by the TFEU. The intention of Romania and the UK when signing the Treaty of Accession was that the protection of intra-EU investments would be governed by EU law. In any event, the UK-Romania BIT would have to be deemed incompatible with the obligations arising from the TFEU as investors having the nationality of any Member State other than the UK or Romania do not enjoy the protection offered by the BIT. Accordingly, the condition under Article 59(1)(a) of the VCLT is met and the UK-Romania BIT was terminated.[293]

608.    Moreover, the substantive rules of intra-EU BITs constitute a parallel system overlapping with internal market rules, thereby preventing the full application of EU law. As a result, the UK-Romania BIT is in its entirety incompatible with EU law so that the condition of Article 59(1)(d) of the VCLT is also fulfilled.[294]

609.    Alternatively, Article 59 of the VCLT can also lead to partial termination of an international agreement.[295]

610.    Concerning the question of the "same subject matter" under Article 59(1) of the VCLT, the test is whether the two treaties govern the same legal situation; that is clearly the case here where any investment made by an investor from one Member State in another Member State falls under the scope of application of EU law. Thus, the intra-EU BIT and EU law are both designed to govern the treatment of that investment by the host State.[296]

611.    In addition, Article 59 of the VCLT deals with implied termination and one that has not followed the formal steps foreseen by Articles 65 *et seq.* of the VCLT.[297]

---

[292] EC Brief, para. 37.
[293] EC Brief, paras 23-29.
[294] EC Brief, paras 30-31.
[295] EC Brief, para. 32.
[296] EC Brief, paras 33-35.
[297] EC Brief, para. 36.

612.    *Third*, and in the alternative, EU law prevails over Article 7 of the UK-Romania BIT under all conflict rules.[298]

613.    If the Tribunal considers that the conflict is governed by EU law as part of the law of the host State, i.e., Romania, it is self-evident that the primacy of EU law is the applicable conflict rule. If the Tribunal considers that the conflict is governed by international law, the starting point is that the conflict rule in Article 30(3) to (5) of the VCLT was conceived as a residual rule and it must first be determined whether a special conflict rule exists.[299] EU law provides for a special conflict rule, namely the primacy of EU law *vis-à-vis* other international agreements concluded between Member States. On this basis, if Article 7 of the UK-Romania BIT is contrary to Articles 267 and 344 of the TFEU, it cannot apply and no effective arbitration agreement has been concluded between the Parties.[300] In the alternative, the conflict rule of Article 30(3) of the VCLT leads to the same conclusion.[301]

614.    Concerning Article 25(1) of the ICSID Convention, the EC notes that consent mentioned therein must be perfected which was not in this case because there was no valid offer for arbitration as of 1 January 2007.[302]

615.    *Finally*, Gabriel Jersey cannot rely on Article 70 of the VCLT to invoke legitimate expectations. Article 70 is not concerned with the rights of individuals but solely with the rights of States as contracting parties to international treaties.[303]

616.    Thus, according to the EC, the Tribunal lacks jurisdiction to hear the case because there was not a valid consent to arbitration.[304]

617.    In their comments on the EC Brief, *the Parties* state the following:

   -    In their Response to the EC Brief, *Claimants* set forth the reasons why the *Achmea* Judgment does not impact this Tribunal's jurisdiction in relation to Gabriel Jersey's claims and state that nothing in the EC Brief detracts from this conclusion.[305] Claimants argue that the EC presents arguments that without exception have been rejected by investment tribunals.[306] In addition, the EC's arguments about alleged

---

[298] EC Brief, para. 38.
[299] EC Brief, paras 39-41.
[300] EC Brief, paras 41-44.
[301] EC Brief, paras 45-49.
[302] EC Brief, paras 50-52.
[303] EC Brief, paras 54-55.
[304] EC Brief, paras 4 and 56.
[305] Claimants' Response to EC Brief, para. 2.
[306] Claimants' Response to EC Brief, paras 3-13.

conflicts should also be rejected.[307] Specifically, Claimants argue that the UK-Romania BIT and the TFEU do not relate to the same subject matter and that Article 7 of the UK-Romania BIT is not incompatible with the TFEU.[308] Finally, according to Claimants, the UK-Romania BIT has not been terminated.[309]

- *Respondent* takes note of the position of the EC on the issue of consent to arbitration under the UK-Romania BIT. Respondent's position on this issue remains that presented in its Additional Preliminary Objection, as further supplemented in its Rejoinder. None of the arguments presented on the issue after the Rejoinder by the EC and Claimants in their Surrejoinder or at the Hearing have caused Respondent to adjust its position. Under Article 41(1) of the ICSID Convention, the Tribunal is the judge of its own competence, and the Tribunal is in a position to assess in its Award all submissions on the issue of consent to arbitration (or lack thereof) under the UK-Romania BIT.[310]

### d.  The Tribunal's analysis

#### i.  In general

618.  The question for the Tribunal to resolve with respect to the jurisdictional objection before it is whether its jurisdiction over Gabriel Jersey's claims is affected by the *Achmea* Judgment.

619.  Specifically, Respondent argues that: (i) Gabriel Jersey should be treated in the same way as an investor from an EU Member State affected by the *Achmea* Judgment; (ii) Gabriel Jersey lost the right to consent to arbitration under the UK-Romania BIT no later than the entry into force of the TFEU in 2009; and (iii) Romania's consent to arbitration in Article 7 of the UK-Romania BIT is incompatible with the TFEU and the provision is therefore inapplicable.

620.  The Tribunal must therefore assess whether and how the CJEU's decision affects the Parties' agreement to arbitrate under the UK-Romania BIT.

621.  With respect to the position of the EC, the Tribunal notes that the EC is indisputably not a party to these proceedings, does not intervene in the role of Respondent, and does not act as its co-counsel in these proceedings. Accordingly, the Tribunal will consider the

---

[307] Claimants' Response to EC Brief, paras 14-18.

[308] Claimants' Response to EC Brief, paras 19-33.

[309] Claimants' Response to EC Brief, paras 34-44.

[310] Respondent's letter to the Tribunal, dated 10 April 2020.

submissions of the EC, which reflect the position of the EU itself, in the context raised by the Parties, as appropriate.

ii.    *In specific*

1.  Does the *Achmea* Judgment apply to an arbitration agreement with Gabriel Jersey as an investor incorporated in the Bailiwick of Jersey?

622.    The Tribunal will address the first limb of Respondent's argument as set out above, which is that the *Achmea* Judgment applies with equal force to Gabriel Jersey as an investor incorporated in the Bailiwick of Jersey.

623.    Respondent accepts Claimants' point that "[t]*he Bailiwick of Jersey is not part of the United Kingdom and is not an EU Member State. Rather, the Bailiwick of Jersey has a limited relationship with the European Union.*"[311]

624.    Gabriel Jersey is a company incorporated under the laws of the Bailiwick of Jersey pursuant to the Companies (Jersey) Law 1991. Article 1(d)(i) of the UK-Romania BIT defines "companies" in respect of the UK as:

> *corporations, firms and associations incorporated or constituted under the law in force in any part of the United Kingdom or in any territory to which this Agreement is extended in accordance with the provisions of this Article.*[312]

625.    This provision obviously envisages that two distinct categories of "companies" can potentially qualify as "investors". Gabriel Jersey cannot, therefore, be equated as an investor from the United Kingdom and thus from a Member State of the EU at the relevant time.

626.    Article 1(e)(i) of the UK-Romania BIT then defines "territory" in respect of the United Kingdom as follows:

> *Great Britain and Northern Ireland, including* […] *any territory for whose international relations the Government of the United Kingdom is responsible and to which this Agreement is extended after its entry into force by an Exchange of Notes between the Contracting Parties* [.]*[313]

---

[311] Rejoinder, para. 102.
[312] Exh. C-3 (UK-Romania BIT), Art. 1(d)(i).
[313] Exh. C-3. (UK-Romania BIT), Art. 1(e)(i).

627.    By the Exchange of Notes dated 25 February and 22 March 1999, the UK and Romania agreed to extend the UK-Romania BIT to the Isle of Man and the Bailiwicks of Guernsey and Jersey.[314]

628.    The Bailiwick of Jersey, as a British Crown Dependency, is not part of the UK but instead a self-governing dependency that has its own elected legislature and court system as well as independent administrative, fiscal and legal systems. The UK is responsible for the international relations of British Crown Dependencies such as the Bailiwick of Jersey.

629.    The Bailiwick of Jersey (one of the Channel Islands) had a limited relationship with the EU, which was set forth in Article 355(5)(c) of the TFEU:

> [T]*his Treaty shall apply to the Channel Islands and the Isle of Man only to the extent necessary to ensure the implementation of the arrangements of those islands set out in the Treaty concerning the accession of new Member States to the European Economic Community and to the European Atomic Energy Community signed on 22 January 1972.*[315]

630.    The arrangement for the Channel Islands was agreed in Protocol 3 of the UK's 1972 Accession Treaty, as referred to in the above provision. Prior to the UK's departure from the EU, this provided that the Channel Islands were part of the EU Customs Union and within the Single Market for purposes of trade in goods, but were "third countries" in all other respects.[316] This means that, apart from the rules relating to the customs union and certain rules relating to the single market, other aspects of EU law did not apply to the Bailiwick of Jersey.

631.    Respondent submits that, regardless of this limited relationship, the Bailiwick of Jersey was still bound by Articles 267 and 344 of the TFEU, dealing with the jurisdiction of the CJEU to give preliminary rulings and the exclusivity of those methods of settling disputes regarding EU law prescribed by the EU Treaties. Indeed, Respondent cited two occasions where the courts of the Bailiwick of Jersey have requested preliminary rulings from the Court of Justice.[317] According to Respondent, this means that "Jersey can be equated to 'a Member State' alongside the UK for the purposes of the application and interpretation of EU law".[318] Respondent concludes:

> *Even though Jersey is not an EU Member State, its status as a Crown Dependency as well as the provisions of Protocol 3 imply at least a partial application of EU law. Given that the Achmea Decision is partly*

---

[314] Exh. C-3. (UK-Romania BIT).
[315] RLA-93 (Treaty on the Functioning of the European Union).
[316] CL-200 (Documents concerning the Accession to the European Communities of the Kingdom of Denmark, Ireland, the Kingdom of Norway and the United Kingdom of Great Britain and Northern Ireland), pp 164-165.
[317] Respondent's Rejoinder, para. 106.
[318] Respondent's Rejoinder, para. 108.

> *due to the CJEU's concerns over the application and interpretation of*
> *EU law as a whole, it includes EU law as applicable in Jersey and to*
> *Jersey nationals.*[319]

632.    The Tribunal agrees with Claimants that this argument is "*merely speculation as to how the CJEU might interpret its ruling in a context involving the Bailiwick of Jersey*".[320] Certainly on the face of the *Achmea* Judgment, the ruling is limited to the situation where an offer to arbitrate under an intra-EU investment treaty is made by a Member State and accepted by the investor of another Member State. The CJEU's reasoning is also strictly limited to that scenario. The extension of the CJEU's ruling to a situation where the investor is from a non-Member State that applies EU law in a limited manner would require a separate and independent justification. It certainly does not follow logically from the CJEU's reasoning in *Achmea*.

633.    The Tribunal is fortified in its conclusion by the fact that the EC, in its Brief submitted in these proceedings, did not seek to explain how the *Achmea* Judgment applied to a situation where the investor is from a non-EU Member State but where EU law is applicable to a limited extent either.

### 2.   The other aspects of Respondent's objection

634.    It follows from the Tribunal's conclusion in relation to the non-applicability of the *Achmea* Judgment to Gabriel Jersey as an investor from the Bailiwick of Jersey that it need not consider the broader aspects of Respondent's objection based on the *Achmea* Judgment.

### e.   The conclusion

635.    The Tribunal concludes that

> ***Its jurisdiction over the dispute submitted to arbitration by Gabriel Jersey is not***
> ***affected by the Achmea Judgment as Gabriel Jersey is a company incorporated***
> ***in the Bailiwick of Jersey, which has never been a Member State of the EU.***

---

[319] Respondent's Rejoinder, para. 109.
[320] Claimants' Surrejoinder on New Jurisdictional Objection, para. 21.

### 3. Investment under the UK-Romania BIT

#### a. The issue

636. The *issue* is whether Gabriel Jersey made investments in Romania that fall under the UK-Romania BIT, such that the Tribunal has jurisdiction *ratione materiae* over Gabriel Jersey's claims.

#### b. The Parties' positions

##### i. Respondent

637. According to Respondent, Gabriel Jersey has not proven that it has made any investments in Romania.[321] Specifically, Gabriel Jersey appears to be merely a mailbox company, passively holding shares in RMGC. Claimants have not established that this passive shareholding constitutes a legitimate "investment" under the UK-Romania BIT.[322] There is no evidence of any commitment of Gabriel Jersey's own funds to the Project. It is a mere conduit of Gabriel Canada's funds since 1997. Gabriel Jersey was also not involved with the Project.[323]

638. Under Article 1(a) of the UK-Romania BIT, protection is afforded, in accordance with Article 2(2) to "[i]*nvestments of nationals or companies of each Contracting Party*". Respondent refers to the tribunal's analysis in *SCB v. Tanzania* brought under the UK-Tanzania BIT (with the same wording as the UK-Romania BIT) which concluded that a mere passive ownership of company shares did not qualify as an investment and that a claimant must demonstrate that (i) the investment was made at its direction, (ii) that it funded the investment or that (iii) it controlled the investment in an active and direct manner.[324] As such, Gabriel Jersey cannot claim, as its own, investments "made" by Gabriel Canada or Minvest.[325]

639. For the same reasons, according to Respondent, the Roşia Montană License and Bucium Exploration License are not protected assets of Gabriel Jersey under Romanian law; only RMGC has rights under them. These Licenses involved no international transfer; instead,

---

[321] Counter-Memorial, para. 486; Rejoinder, para. 96; R-PHB, para. 6.

[322] Counter-Memorial, para. 490; Rejoinder, para. 86.

[323] Respondent's Reply Post-Hearing Brief, dated 23 April 2021 ("Reply R-PHB"), para. 57.

[324] Rejoinder, paras 88-91, referring and quoting Exh. RLA-131 (*Standard Chartered Bank v. United Republic of Tanzania*, ICSID Case No. ARB/10/12, Award, dated 2 November 2012). See also Rejoinder, paras 92-93, referring and quoting Exh. RLA-132 (*Flemingo DutyFree Shop Private Limited v. Republic of Poland*, Award, 12 August 2016), Exh. RLA-133 (*Alapli Elektrik B.V. v. Republic of Turkey*, ICSID Case No. ARB/08/13, Award, 12 July 2012), Exh. RLA-134 (*Clorox España S.L. v. Bolivarian Republic of Venezuela*, PCA Case No. 2015-30, Award, dated 20 May 2014) and Exh. RLA-135 (*Toto Costruzioni Generali S.P.A. v. Republic of Lebanon*, ICSID Case No. ARB/07/12, Decision on Jurisdiction, dated 11 September 2009); Reply R-PHB, para. 57.

[325] Rejoinder, para. 93.

Minvest obtained and transferred those assets to RMGC and are thus an investment Minvest and subsequently of RMGC, not of Gabriel Jersey.[326]

640.    ████████████████████████████████████████████████
        ████████████████████████████████████████████████
        ████[327]

## ii.    Claimants

641.    Claimants maintain that Respondent's objection was not timely and is without merit.[328] Gabriel Jersey has covered investments, which include its shares in RMGC.[329] These investments include contract rights under RMGC's Articles of Association and rights under loan agreements with Minvest; substantial intellectual property rights, including in technical and engineering know-how relating to and developed in connection with the Roşia Montană Project and the Bucium Projects; mining licenses and associated project development rights held by RMGC; and assets acquired by RMGC in connection with the development of the Projects. Thus, there is no basis to dispute that Gabriel Jersey made the investment in RMGC in the sense understood by the *SCB v. Tanzania* tribunal.[330]

642.    Although the UK-Romania BIT does not define investment expressly as including investments held "indirectly", the broad definition of investment and the general references throughout the treaty as relating to investments "of" covered companies, without limitation, is interpreted as including investments that are indirectly held. Respondent's argument concerning Gabriel Jersey being merely a mailbox company is without merit and has been rejected by investment tribunals each time it has been raised.[331] In this case, the UK-Romania BIT defines a covered "company" without regard to its level of activity in the home State and a covered investment without regard to the source of capital.[332]

---

[326] Rejoinder, para. 94.

[327] Rejoinder, para. 95.

[328] C-PHB, para. 16.

[329] Reply, para. 400.

[330] Reply, para. 401; C-PHB, para. 19; see also C-PHB, para. 20.

[331] Reply, paras 401-406 referring and quoting Exhs CL-81 (*Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, dated 22 September 2014), CL-138 (*ADC Affiliate Limited and ADC & ADMC Management Limited v. Republic of Hungary*, ICSID Case No. ARB/03/16, Award, dated 2 October 2006), CL-97 (*Saluka Investments BV v. Czech Republic*, UNCITRAL, Partial Award, dated 17 March 2006) and CL-243 (*Hulley Enterprises Ltd. v. Russian Federation*, CA Case No. AA 226, Interim Award on Jurisdiction and Admissibility, dated 30 November 2009); C-PHB, para. 17.

[332] Reply, para. 407.

### c. The Tribunal's analysis

#### i. In general

643.    The Tribunal first notes that Respondent raised this jurisdictional objection in its Counter-Memorial. It does not consider that this was untimely or that there was any basis to have brought the objection under ICSID Arbitration Rule 41(5), which provides for an expedited procedure to dispose of meritless claims at the preliminary stage of proceedings. Accordingly, the Tribunal rejects Claimants' objection in this regard (see para. 641 above) and proceeds to consider the jurisdictional objection itself.

644.    The Parties disagree on whether Gabriel Jersey has made an investment within the meaning of the UK-Romania BIT, such that this Tribunal has jurisdiction *ratione materiae* over Gabriel Jersey's claims. To determine this issue, the Tribunal will consider *first*, the definition of an "investment" under the UK-Romania BIT and *second*, whether the facts established by Claimants meet the relevant definition.

#### ii. The definition of "investment"

645.    The definition of an "investment" is found in Article 1 of the UK-Romania BIT. In interpreting this definition, the Tribunal will be guided by the rules of treaty interpretation and in particular Article 31 of the VCLT. It is recalled that Article 31 of the VCLT provides that "[a] *treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in the context and in the light of its object and purpose*". Thus, the starting point is the "ordinary meaning" of the term "investment".

646.    Article 1(a) of the UK-Romania BIT defines an "investment" as follows:

> For the purposes of this Agreement:
>
> (a) "investment" means every kind of asset admitted in accordance with the laws and regulations in force in the territory of the Contracting Party in which the investment is made and in particular, though not exclusively, includes:
>
> (i) movable and immovable property and any other related rights such as mortgages, liens or pledges;
>
> (ii) shares in and stock and debentures of a company and any other form of participation in a company;
>
> (iii) claims to money or to any performance under contract having a financial value;

*(iv) intellectual property rights, goodwill, technical processes and know-how;*

*(v) business concessions conferred by law or under contract, including concessions to search for, cultivate, extract or exploit natural resources.*

*A change in the form in which assets are invested does not affect their character as investments;*[333]

647.   According to Article 1(a) of the UK-Romania BIT, an "investment" means "every kind of asset" made "in accordance with the laws and regulations in force in the territory of the Contracting Party", including, "though not exclusively", "shares in […] a company and any other form of participation in a company". The UK-Romania BIT therefore undoubtedly contains a rather broad definition, meaning that to the extent Gabriel Jersey's investment includes assets such as those enumerated in Article 1(a), those assets may be considered an "investment" for purposes of the BIT. Indeed, the UK-Romania BIT does not compel a different conclusion.

648.   Moreover, although the wording of Article 1(a) of the UK-Romania BIT does not explicitly refer to indirect investments, its broad terms do not justify limiting its scope to direct investments. To understand the meaning of Article 1(a), one must also consult the rest of the text of the UK-Romania BIT, which refers generally to investments "of" covered companies, implying that such investments may be held indirectly.[334]

649.   However, the ordinary meaning of the term "investment", whether directly or indirectly held, has certain inherent characteristics that must be taken into account when determining jurisdiction *ratione materiae* under a BIT, including the present one. Indeed, rather than mechanically applying the categories listed in Article 1(a), one should look for a concept of investment that distinguishes ordinary commercial transactions from genuine investments. This is consistent with Article 31 of the VCLT and thus the object and purpose of the UK-Romania BIT, which is to promote and enhance investment and to provide protection in this regard.

650.   Accordingly, this Tribunal should consider whether Claimants' investment meets the inherent meaning of an investment, which is an economic term of art, i.e., a cross-border activity that requires some type of contribution and generates an expectation of a

---

[333] Exh. C-3 (UK-Romania BIT), Art. 1(a).

[334] For example, Art. 2(2) of the UK-Romania BIT provides for fair and equitable treatment to "[i]*nvestments of nationals or companies*"; the same holds true for the expropriation provision found in Art. 5(1). See Exh. C-3 (UK-Romania BIT). See also Exh. CL-239 (*Siemens AG v. Argentine Republic*, ICSID Case No. ARB/02/8, Decision on Jurisdiction, dated 3 August 2004), para. 137 (ruling that where "*there is no explicit reference to direct or indirect investment such as in the Treaty,*" and "*the definition of 'investment' is very broad,*" covered investment includes investments indirectly held); Exh. CL-240 (*Ioannis Kardassopoulos v. Georgia*, ICSID Case No. ARB/05/18, Decision on Jurisdiction, dated 6 July 2007), paras 123-124; Exh. CL-241 (*Tza Yap Shum v. Republic of Peru*, ICSID Case No. ARB/07/6, Decision on Jurisdiction and Competence, dated 19 June 2009), para. 111.

commercial return. On this point, the Tribunal does not accept Respondent's argument that, according to the *SCB. v. Tanzania* tribunal, the absence of active control implies passive control.[335] Indeed, the *SCB v. Tanzania* tribunal considered that while active control may be a strong indication of an investment activity, other factors, such as those considered by that tribunal, may also be indicative of such activity.[336]

651.    Therefore, taking into account the ordinary meaning of the terms of the UK-Romania BIT in its context and considering its object and purpose, the Tribunal finds that an investment in the present case includes the assets referred to in Article 1(a) in the legal sense that are "made" under Romanian law. More specifically, an investment within the meaning of the UK-Romania BIT would include, directly or indirectly, an interest in a company (Article 1(a)(ii)) or claims to money having a financial value (Article 1(a)(iii)) made under Romanian law. Proof of the cross-border transaction is also required, as well as the expectation of a commercial return.[337]

### iii.    The facts

652.    Having established the definition of an investment, the Tribunal applies that definition to the facts of this case.

653.    *First*, as set out above (see para. 1), Gabriel Jersey is a company incorporated under the laws of the Bailiwick of Jersey. It has been an indirect wholly-owned subsidiary of Gabriel Canada since April 1997.

654.    *Second*, Gabriel Jersey owns 80.69% of the shares of RMGC, the joint stock company established by Gabriel and the Romanian State, which is the holder of the Roşia Montană License.[338] The State holds the remaining 19.31% stake through Minvest.

655.    *Third*, Gabriel Jersey, through Minvest, was the party to the joint-venture agreements with the State to establish RMGC, including RMGC's Articles of Association.[339]

---

[335] See Rejoinder, para. 91.

[336] Exh. RLA-131 (*Standard Chartered Bank v. United Republic of Tanzania*, ICSID Case No. ARB/10/12, Award, dated 2 November 2012), para. 230.

[337] Exh. CL-143 (A. Newcombe & L. Paradell, Law and Practice of Investment Treaties (2009)), pp 65-66.

[338] Exhs C-143 to C-192 (RMGC Articles of Association and Addenda, dated 11 June 1997 as amended over time through 5 January 2016); Exh. C-1625 (Agreement for Sale and Assignment, dated 1 June 1996) (agreement for sale and assignment, dated 1 June 1996 transferring Gabriel Australia's rights under obligations under the Cooperation Agreement with Minvest to Gabriel Jersey); Exh. C-1646 (Addendum to Cooperation Agreement, dated 17 October 1996) (first addendum to the Cooperation Agreement between Gabriel Jersey and Minvest); Exh. C-1647 (Second Addendum to Cooperation Agreement, dated 1 April 1997) (second addendum to the Cooperation Agreement between Gabriel Jersey and Minvest).

[339] Exhs C-143 to C-192 (RMGC Articles of Association and Addenda, dated 11 June 1997 as amended over time through 5 January 2016).

656.     *Fourth*, Gabriel Jersey and Minvest entered into loan agreements to fund Minvest's capital contributions to RMGC, and also made capital contributions to RMGC.[340]

657.     In light of the foregoing, the Tribunal finds that Gabriel Jersey's indirect interest in the Project through its ownership interest in RMGC, including its transactions relating to the Project that have economic value in expectation of a commercial return (specifically, its contractual rights under RMGC's Articles of Association, the capital contributions and the loans made to Minvest), fall within the broad terms of Article 1(a)(ii) through (iii) of the UK-Romania BIT (in particular, indirect shareholding and claims to money) and meet the inherent definition of "investment". Respondent concedes this and has not alleged that Gabriel Jersey's transactions were not carried out on Romanian territory or in accordance with Romanian law.[341] The same holds true for the assets in relation to the Bucium Exploration License.

658.     Moreover, in light of the Tribunal's finding, it is not required that Gabriel Jersey also controlled the investment or used its own financial resources or put its capital at risk for the transactions with RMGC. Nor is it necessary that managerial control was exercised over RMGC or that Gabriel Jersey participated in the Project in any other way. Therefore, the Tribunal does not accept Respondent's argument that Gabriel Jersey was merely a shell company passively holding shares in RMGC.[342]

659.     The Tribunal is therefore satisfied that Gabriel Jersey has a covered investment within the meaning of Article 1(a) of the UK-Romania BIT and that the Tribunal has jurisdiction *ratione materiae* over Gabriel Jersey's claims.

660.     At this point, the Tribunal recalls that Respondent has dropped the objection that Gabriel Jersey is not an investor.

---

[340] Exh. C-86 (Loan Agreement between Gabriel Jersey and Minvest dated 13 December 2004); Exh. C-91 (Loan Agreement between Gabriel Jersey and Minvest dated 16 December 2009); Exh. C-1662 (Letter No. 1324 from RAC Deva to NAMR dated 4 June 1997 with approval by NAMR, dated 4 June 1997); Exh. C-1958 (Jersey Financial Services Department Certification Company Registry, Declaration dated 24 June 1997, as filed with the Romanian Trade Registry); Exh. C-1625 (Agreement for Sale and Assignment, dated 1 June 1996); Exh. C-1664 (Addendum to Cooperation Agreement dated 17 October 1996); Memorial, para. 540; Reply, paras 400-401; See also Counter-Memorial, para. 490.

[341] Counter-Memorial, para. 490; Exhs C-143 to C-192 (RMGC Articles of Association and Addenda, dated 11 June 1997 as amended over time through 5 January 2016); Exh. C-1625 (Agreement for Sale and Assignment, dated 1 June 1996).

[342] Counter-Memorial, para. 490. Other Tribunals have found the same: see Exh. CL-81 (*Gold Reserve Inc. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/09/1, Award, dated 22 September 2014), para. 252; Exh. CL-138 (*ADC Affiliate Ltd. and ADC & ADMC Management Ltd. v. Republic of Hungary*, ICSID Case No. ARB/03/16, Award, dated 2 October 2006), paras 355, 359; Exh. CL-97 (*Saluka Investments BV v. Czech Republic*, UNCITRAL, Partial Award, dated 17 March 2006), para. 210.

#### d. The conclusion

661. The Tribunal concludes that

> *Gabriel Jersey has a covered investment within the meaning of Article 1(a) of the UK-Romania BIT and that the Tribunal has jurisdiction ratione materiae over Gabriel Jersey's claims.*

### 4. Notice of Dispute under the Canada-Romania and UK-Romania BITs

#### a. The issue

662. The *issue* is whether Gabriel Canada's and Gabriel Jersey's claims satisfy the notice provisions in Article XIII(2) of the Canada-Romania BIT and in Article 7(1) of the UK-Romania BIT respectively. Specifically, the issue is whether Claimants' claims relating to facts or events occurring after the 20 January 2015 Notice of a Dispute are outside the Tribunal's jurisdiction or, alternatively, are inadmissible.

#### b. The Parties' positions

##### i. *Respondent*

663. Respondent alleges that Gabriel Canada's claims fall outside the Tribunal's jurisdiction or are alternatively inadmissible to the extent they fail to comply with Article XIII(2) of the Canada-Romania BIT. Specifically, only measures that Gabriel Canada alleged in its Notice of Dispute to have been in breach of the BIT are in compliance with Article XIII(2) and can be submitted to arbitration. Insofar as Gabriel Canada's claims are based on events that took place after Gabriel Canada notified Romania of its claims, they fall outside the Tribunal's jurisdiction. Claimants complain about an array of alleged actions and omissions of Romania that occurred well after its Notice of Dispute of 20 January 2015 and thus cannot have been included in the notification. Gabriel Canada never notified these claims to Romania and they were never subject to negotiations between the Parties.[343]

664. Claimants' approach is impermissible, because it defeats Romania's rights under Article XIII(2) of the Canada-Romania BIT to make an informed decision as to whether it should remedy the alleged breach, negotiate with the investor, or defend the claims in the arbitration. That right cannot be meaningfully exercised when all allegations of breach have not been raised in the Notice of Dispute.[344]

---

[343] Counter-Memorial, paras 456-457; Rejoinder, paras 42-47, 49. See also R-PHB, para. 6.

[344] Rejoinder, para. 48 referring and quoting Exh. RLA-120 (*Burlington Resources Inc. v. Republic of Ecuador*, ICSID Case No. ARB/08/5, Decision on Jurisdiction, dated 2 June 2010).

665.     Respondent also contends that Gabriel Jersey's claims based on measures taken after the service of the Notice of Dispute on 20 January 2015 fall outside the Tribunal's jurisdiction, or alternatively, are inadmissible. This is because they do not satisfy the notice provision under Article 7(1) of the UK-Romania BIT as its claims were not properly notified to Romania in Gabriel Jersey's Notice of Dispute. This applies to claims that have allegedly arisen only during these arbitration proceedings which have not been properly notified and have not been subject to settlement negotiations in accordance with Article 7(1). In this connection, Respondent refers to its position concerning the notice provision of the Canada-Romania BIT.[345]

*ii.    Claimants*

666.     In relation to Gabriel Canada's claims, Claimants submit that the dispute submitted to arbitration by Gabriel Canada complies with the notice required by Article XIII(2) of the Canada-Romania BIT.[346] On 20 January 2015, Claimants sent a "Formal Notice Requesting Consultation" to Romania. They sent a further letter on 22 April 2015. Romania did not respond to either letter. Claimants' notice of dispute included a description of the "measure taken or not taken" pursuant to Article XIII(2) and the resulting loss. In this case, the measure Claimants alleged was in breach of the treaties was the practice of the Romanian authorities to prevent the Roşia Montană Project from advancing and proceeding to implementation and of denying Claimants' rights to develop the Project.[347] In this connection, the terms of reference to arbitration set forth in the Canada-Romania BIT are broader than Respondent suggests and later facts or events, including following commencement of the arbitration may form part of or extend the dispute. This has also been recognized by other tribunals.[348]

667.     Here, the continuation of Romania's conduct following the commencement of this arbitration is a mere factual extension of the dispute submitted to arbitration and has not altered its general character. Therefore, it is not credible to suggest, and Respondent does

---

[345] Counter-Memorial, paras 486, 491-493; Rejoinder, para. 97; see also Rejoinder, Sect. 2.1.2. See also R-PHB, para. 6.

[346] Memorial, para. 837; Reply, paras 331-332. See also C-PHB, paras 26-27.

[347] Reply, paras 333-340 referring and quoting Exh. CL-211 (*RREEF Infrastructure (G.P.) Ltd. & RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, dated 6 June 2016).

[348] Reply, paras 339-341 referring and quoting Exh. CL-211 (*RREEF Infrastructure (G.P.) Ltd. & RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, dated 6 June 2016) and Exh. CL-227 (*Pope & Talbot Inc. v. Government of Canada*, NAFTA/UNCITRAL, Award Concerning the Motion by Government of Canada Respecting the Claim Based Upon Imposition of the "Super Fee," dated 7 August 2000).

not, that Respondent was not effectively put on notice as to the dispute with Gabriel or that it was deprived of the opportunity to engage in settlement discussions.[349]

668.    Relevant to this are the ICSID Arbitration Rules that permit a party to present incidental or additional claims during the course of the arbitration provided that they "*aris*[e] *directly out of the same subject-matter of the dispute*" and fall within the scope of consent of the parties.[350]

669.    Finally, it is not a good interpretation of the treaty to conclude that it requires an additional notification or new arbitration, where further notice and opportunity to engage in amicable discussions would have been futile.[351]

670.    In relation to Gabriel Jersey's claims, Claimants also submit that Gabriel Jersey's claims satisfy the notice provision and otherwise fall within the Tribunal's jurisdiction under the UK-Romania BIT. Romania received notice of claims in January 2015 and again in April 2015 and did not respond to either. That fact is sufficient to reject Romania's jurisdictional objection on this ground because there is no requirement in the UK-Romania BIT to provide advance written notification of all claims and allegations that may be presented in the arbitration.[352]

### c.    The Tribunal's analysis

#### i.    In general

671.    The Parties disagree as to whether certain events relating to Gabriel Jersey's and Gabriel Canada's claims that occurred after the Notice of Dispute are within the Tribunal's jurisdiction or, alternatively, inadmissible. In order to decide, the Tribunal must consider, *first*, the notice requirements under the Canada-Romania BIT and the UK-Romania BIT and, *second*, whether the facts of this case satisfy those requirements.

#### ii.    The notice requirements

672.    The relevant provisions on notification of a dispute are found in Article XIII(2) of the Canada-Romania BIT and Article 7(1) of the UK-Romania BIT. As before (see para. 645 above), the Tribunal will be guided by Article 31 of the VCLT in determining the requirements set forth in these provisions, taking as its starting point the ordinary meaning of the terms of the provisions themselves.

---

[349] Reply, paras 339-342.
[350] Reply, para. 343 quoting ICSID Arbitration Rule 40.
[351] Reply, para. 344.
[352] Reply, paras 408-410. See also C-PHB, para. 22.

673.    *First*, in relation to Article XIII(2) of the Canada-Romania BIT, Article XIII(2) reads as follows:

> *If a dispute has not been settled amicably within a period of six months from the date on which it was initiated, it may be submitted by the investor to arbitration in accordance with paragraph (4).* **For the purposes of this paragraph, a dispute is considered to be initiated when the investor of one Contracting Party has delivered notice in writing to the other Contracting Party alleging that a measure taken or not taken by the latter Contracting Party is in breach of this Agreement, and that the investor has incurred loss or damage by reason of, or arising out of, that breach.** *It is agreed, subject to the provisions of this Article, that the Contracting Parties encourage investors to make use of domestic courts and tribunals for the resolution of disputes.*[353] (emphasis added)

674.    Article XIII (2) reflects the so-called "cooling-off period" clause of the Canada-Romania BIT. It essentially obliges the investor to refrain from initiating arbitration proceedings against the host State for a certain period of time and to try to settle the dispute amicably. The cooling-off period begins upon written notice of the existence of a dispute. The purpose of the notification requirement is to inform the State of the existence of the dispute and to give it the opportunity to attempt an amicable settlement. It is therefore an important feature of the BIT, which must be fulfilled in order for a Tribunal to decide the dispute in question.

675.    Article XIII(2) speaks of "[a]*ny dispute* [...] *relating to a claim by the investor that a* ***measure*** *taken or not taken* [...] *is in breach of this Agreement*" (emphasis added). A "measure" in this regard is defined in Article I(i) of the Canada-Romania BIT to include "*any law, regulation, procedure, requirement, or practice*". Given the ordinary meaning of the provision itself and the definition of "measure", the Tribunal considers that the Canada-Romania BIT does not require that a measure be a particular event. Instead, the term is broader and may include a particular course of conduct that is continuous with respect to an investment.[354]

676.    Accordingly, while Respondent is correct that the notice of dispute defines the scope of the dispute to be submitted to arbitration,[355] such notice under Article XIII(2) of the Canada-Romania BIT does not have to state each and every fact constituting a claim that might arise after the filing of the notice of dispute. Indeed, the jurisdiction of the Tribunal cannot be limited to the matters expressly mentioned in the notice of dispute. Subsequent facts or events may be part of or extend the dispute and therefore within the Tribunal's

---

[353] Exh. C-1 (Canada-Romania BIT), Art. XIII(2).
[354] Reply, para. 336.
[355] Counter-Memorial, para. 453.

jurisdiction and admissible if they "*do not change the general character of the case submitted to the Tribunal*".[356] Otherwise, and to follow Respondent's suggestion, this would mean filing new notices of dispute every time something new happens (but which is *de facto* an extension of the original dispute) while the arbitration is ongoing and even if amicable discussions appear futile.[357] This is not a good faith interpretation of the text of the provision.

677.    *Second*, in relation to Article 7(1) of the UK-Romania BIT, Article 7(1) provides as follows:

> *Disputes between a national or company of one Contracting Party and the other Contracting Party concerning an obligation of the latter under this Agreement in relation to an investment of the former which have not been amicably settled shall, after a period of three months **from written notification of a claim**, be submitted to international arbitration if the national or company concerned so wishes.*[358] (emphasis added)

678.    Article 7(1) is a similar "cooling-off period" clause. It speaks generally of disputes over treaty breaches "*in relation to an investment*" and of a "*written notification of a claim*". The definition of the scope of the dispute subject to arbitration under the UK-Romania BIT is even broader than that of Article XIII(2) of the Canada-Romania BIT. Therefore, given the ordinary meaning of the provision itself, the Tribunal considers that Article 7(1) does not require that all claims and allegations that may be raised in the arbitration be notified in advance. Rather, given the purpose of the provision itself, which is to provide an opportunity to consider the prospect of amicable settlement and to proceed where such settlement is futile, a claim under Article 7(2) may include facts that occurred after notification but do not change the character of the claim itself.

### iii.    The facts

679.    Having established the notice requirements under the two BITs, the Tribunal applies those requirements to the facts of this case.

680.    Claimants sent a "Formal Notice Requesting Consultation" to Romania on 20 January 2015.[359] In that notice, Claimants stated that they were "*ready to engage at a senior level with the Government and other authorities in Romania, at the earliest possible*

---

[356] Exh. CL-211 (*RREEF Infrastructure (G.P.) Ltd. & RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, dated 6 June 2016), paras 223, 231.

[357] See also Exh. CL-211 (*RREEF Infrastructure (G.P.) Ltd. & RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, dated 6 June 2016), para. 230.

[358] Exh. C-3 (UK-Romania BIT), Art. 7(1).

[359] Exh. C-8 (Letter from Gabriel to the President of Romania and to the Prime Minister of Romania, dated 20 January 2015).

*opportunity, in a process of consultation focused on resolving amicably the issues at dispute to the benefit of all stakeholders in the Project.*" Claimants set forth the following:[360]

> [T]*he Romania authorities have prevented the Project from advancing and proceeding to implementation. The Investors are able to evidence a substantial number of persistent delays in permitting activities erroneously instituted by the Romanian authorities. Ultimately, the Project is no longer the subject of routine, regulatory analysis set out by the competent administrative bodies charged with its assessment; instead it has become hostage to conflicts between rival political factions and misinformation that has further unnecessarily damaged the ability for development of the Project.*

> *In view of the substantial losses that the Investors will incur if the Project is not permitted to proceed in accordance with all applicable laws, the Investors have been left with no alternative but to file this notice which requests the Romanian State to engage formally in a process of consultation as contemplated by the relevant treaties to which Romania is a party* […].

> [T]*o protect their interests, the Investors are formally issuing this notice pursuant to the provisions of the previously mentioned international bilateral investment protection treaties entered into by Romania* […].

> [T]*he Investors are prepared to present their claims to international arbitration in order to compensate fully for their rights to develop the Project hat have been denied by Romania's treaty violations.*

681.   Claimants sent another letter on 22 April 2015 "*implor*[ing] *the Government to engage immediately in a formal and transparent consultative process directly with Gabriel Resources and RMGC in order to resolve amicably the issues at dispute.*"[361] It is undisputed that Respondent did not respond to the notice or the letter. It is also undisputed that Claimants in this case rely on facts relating to Respondent's treatment of their investment by Respondent that occurred after the notice or letter and/or are ongoing,[362] to support their treaty claims.

---

[360] Exh. C-8 (Letter from Gabriel to the President of Romania and to the Prime Minister of Romania, dated 20 January 2015), p. 2.

[361] Exh. C-9 (Letter from Gabriel addressed to the President of Romania and to the Prime Minister of Romania dated and delivered on 22 April 2015).

[362] See facts enumerated by Respondent in Counter-Memorial, para. 456 dating between April 2015 and January 2017, and relating to a TAC meeting, the Bucium exploration licenses, Claimants' VAT assessments, the 2010 LHM, the Roșia Montană License, the cyanide use, the recapitalization of RMGC and the UNESCO World Heritage site. See also Rejoinder, para. 46.

682.  Claimants submitted their Request for Arbitration six months later, in July 2015.

683.  In light of its considerations regarding the notice provisions in the UK-Romania BIT and Canada-Romania BIT (see paras 672-678 above) and the above facts (see paras 680-682 above), the Tribunal considers the following:

684.  The "dispute" before this Tribunal involves allegations that Romania breached its treaty obligations when it acted in a manner that prevented the implementation of the Roşia Montană Project and prevented RMGC from exercising its right to develop the Project in an arbitrary manner, without due process and without compensation. As a result of this alleged prevention, the dispute includes the denial of RMGC's rights with respect to the Bucium Projects and the abandonment of the State's joint venture with Gabriel in RMGC. The measure itself is the alleged "practice" of the Romanian authorities to bring about these consequences,[363] which may include a specific act or series of acts or continued conduct that could extend even after the filing of the notice. Indeed, Claimants' notification refers to the Romanian authorities "*prevent*[ing] *the Project from advancing and proceeding to implementation*" and interfering with the ability to develop the Project.[364] As described above (see paras 679 *et seq.*), Romania received notice of the claims in January 2015 and again in April 2015 and did not respond to either. The Tribunal therefore considers that Claimants' description of the "measure" is broad enough to cover events that took place after this notification. The Tribunal does not consider that Respondent was in any way deprived of the opportunity to meaningfully exercise its right to make an informed decision as to "*whether it should remedy the alleged breach, negotiate with the investor, or defend the claims in the arbitration*".

685.  Accordingly, the Tribunal finds that the notice requirements under Article XII(1) of the Canada-Romania BIT and Article 7(1) of the UK-Romania BIT have been satisfied.

686.  Because the Tribunal rejects Respondent's objection, it need not consider whether it concerns the Tribunal's jurisdiction (Respondent's main plea with respect to the notice provisions) or the admissibility of the claims (Respondent's alternative plea with respect to the notice provisions).

---

[363] Reply, para. 342.
[364] Exh. C-8 (Letter from Gabriel addressed to the President of Romania and to the Prime Minister of Romania dated and delivered on 20 January 2015), p. 2.

### d.  The conclusion

687.  The Tribunal concludes that

> *the notice requirements under Article XII(1) of the Canada-Romania BIT and Article 7(1) of the UK-Romania BIT have been satisfied.*

## 5.  Waiver under the Canada-Romania BIT

### a.  The issue

688.  The *issue* is whether Gabriel Canada's claims in relation to events that occurred after Gabriel Canada filed its Notice of Dispute satisfy the waiver clause in Article XIII(3)(b) of the Canada-Romania BIT. Specifically, the issue is whether these claims fall outside the Tribunal's jurisdiction or are otherwise inadmissible for not complying with the requirements of such waiver provision.

### b.  The Parties' positions

#### i.    Respondent

689.  Respondent contends that Gabriel Canada failed to waive its right to initiate or continue parallel proceedings relating to multiple claims in the present case. Gabriel Canada's claims are based on facts and events many of which took place months and even years after Romania waived its right to initiate or continue parallel litigation on 17 July 2015. Accordingly, in light of Article XIII(3)(b) of the Canada-Romania BIT, those claims fall outside the Tribunal's jurisdiction or are inadmissible. Claimants have effectively acknowledged the validity of Respondent's objection to the sufficiency of the waiver in the Request for Arbitration and have produced a new purported waiver for all measures alleged both in the Memorial and the Reply. This new waiver is insufficient.[365]

690.  Specifically, Article XIII(3)(b) sets an additional bar which the investor must pass to establish jurisdiction over its claims. Through Article XIII(3)(b), Romania expressed its interest in not having to defend parallel claims relating to the same conduct before different *fora* and conditioned its consent to arbitration.[366] In addition, the new waiver comes too late to expand Romania's consent and this Tribunal's jurisdiction, not least considering that RMGC continues to litigate before Romanian courts. Jurisdiction must exist on the date when the arbitration is commenced and cannot be unilaterally amended

---

[365] Counter-Memorial, paras 454-457; Rejoinder, paras 50-51, 55. See also R-PHB, para. 6.

[366] Rejoinder, paras 52-53 referring to and quoting Exhs. RLA-121 (*Infinito Gold Ltd. V. Republic of Costa Rica*, ICSID Case No. ARB/14/5, Decision on Jurisdiction, dated 4 December 2017) and RLA-122 (*The Renco Group Inc. v. Republic of Peru*, ICSID Case No. UNCT/13/1, Partial Award on Jurisdiction, dated 15 July 2016).

later.[367] Thus, this new waiver cannot cure the jurisdictional defect that existed when this arbitration was commenced.[368]

### ii. *Claimants*

691.     Claimants submit that the dispute submitted to arbitration by Gabriel Canada complies with the waiver requirement of Article XIII(3) of the Canada BIT as the waiver fully covers the claims presented.[369] Gabriel Canada submitted a waiver together with its Request for Arbitration. The Request for Arbitration described the measures that breached the Canada-Romania BIT as relating to Romania's practice of refusing to permit the Roșia Montană Project and of taking RMGC's license rights, including in relation to Bucium, without compensation, including by failing to take action and by rendering implementation impossible. Gabriel Canada's waiver extended to any other proceedings in relation to the measures alleged to be in breach in this arbitration. Nevertheless, and without accepting Respondent's objection on this ground, Gabriel Canada submitted in its Reply Memorial through counsel an additional waiver that expressly extends to its right to initiate or continue other proceedings in relation to the measures that are alleged by Gabriel Canada in any of its written or oral submissions in the course of conduct of this arbitration to be in breach of the BIT. Other tribunals have accepted a later filed waiver as satisfying the waiver requirement.[370]

692.     Gabriel Canada therefore waived the right in an unqualified manner to initiate or continue any other dispute resolution proceeding in relation to the measures at issue in this arbitration. It has acted consistently with its waiver and has not pursued any proceedings in this respect.[371]

### c. **The Tribunal's analysis**

### i. *In general*

693.     The Parties disagree on whether Claimants' claims relating to events that occurred after the Notice of Dispute are outside the jurisdiction of this Tribunal or, in the alternative, are inadmissible because they allegedly fail to satisfy the waiver clause in Article

---

[367] Rejoinder, para. 54 referring to and quoting Exh. RLA-123 (*Railroad Development Corporation* (*RDC*) *v. Republic of Guatemala*, ICSID Case No. ARB/07/23, Decision on Jurisdiction, dated 17 November 2008).

[368] Rejoinder, para. 55.

[369] Memorial, para. 837 referring to RfA, paras 46-47; Reply, paras 331-332 referring to Exh. C-6 (Gabriel Canada's Waiver in Support of Its Request for Arbitration, dated 17 July 2015).

[370] Reply, paras 345-348 referring to Exh. C-1935 (Gabriel Canada's Waiver in Support of the Dispute Submitted to Arbitration in ICSID Case No. ARB/15/31 dated 10 October 2018), Exh. RLA-66 (*International Thunderbird Gaming Corp. v. United Mexican States*, UNCITRAL, Award, dated 26 January 2006) and Exh. CL-231 (*Ethyl Corp. v. Government of Canada*, NAFTA/UNCITRAL, Award on Jurisdiction, dated 24 June 1998).

[371] C-PHB, paras 28-29.

XIII(3)(b) of the Canada-Romania BIT. The present issue is related to the issue of the notice of dispute under Article XIII(2) of the Canada-Romania BIT, as it concerns the same facts on which the objection of proper notification was based (see above Section B.III.4). In order to decide, the Tribunal must consider, *first*, the waiver requirements under the Canada-Romania BIT and, *second*, whether the facts of this case satisfy those requirements.

*ii.    The waiver requirements*

694.    The relevant provision on waiver is found in Article XIII(3)(b) of the Canada-Romania BIT. As before (see above para. 645), the Tribunal will be guided by Article 31 of the VCLT in determining the requirements set forth in this provision, taking as its starting point the ordinary meaning of the terms of the provision itself.

695.    Article XIII(3)(b) provides as follows:

> *An investor may submit a dispute as referred to in paragraph 1 to arbitration in accordance with paragraph 4 only if:* […] *(b) the investor has waived its right to initiate or continue any other proceedings in relation to the measure that is alleged to be in breach of this Agreement before the courts or tribunals of the Contracting Party concerned or in a dispute settlement procedure of any kind;*[372]

696.    Article XIII(3)(b) requires that the investor waive its right to pursue parallel proceedings with respect to claims filed with the Contracting Party in other fora. In the absence of such a waiver, the claims cannot be submitted to arbitration. It is intended to curb the multiplicity of lawsuits relating to essentially similar or identical matters and to protect the State from having to defend itself against such lawsuits.

697.    The manner in which a waiver is to be made is found in the language of Article XIII(3)(b) itself which refers to a submission of a dispute to arbitration referred to in paragraph 1 and in accordance with paragraph 4.

698.    First, Article XIII(1) states that "[a]*ny dispute between one Contracting Party and an investor of the other Contracting Party, relating to a claim by the investor that a measure taken or not taken by the former Contracting Party is in breach of this Agreement*, […]". It thus refers to a dispute over a claim relating to a "measure" that violates the BIT. The term "measure" also appears in Article XIII(3) itself, which refers to the waiver of the right to initiate or continue proceedings "*in relation to the **measure** that is alleged to be in breach*" of the BIT (emphasis added). It can be inferred that the waiver requirements are linked to those of the notification requirement of Article XIII(2). This means that the

---

[372] Exh. C-1 (Canada-Romania BIT), Art. XIII(3)(b).

Tribunal's findings on what constitutes a measure under Article XIII(2) (see paras 675-676 above) are also applicable here.

699.    *Second*, Article XIII(4) states that "[t]*he dispute may, at the election of the investor concerned be submitted to arbitration under: the* [ICSID] [...]". This means that a waiver should be submitted together with the Request for Arbitration, i.e., that the waiver requirement is formally complied with. This does not mean that the Tribunal lacks jurisdiction or that the claim is inadmissible if language to that effect is not included at that time but later. Instead, what is important is that no other proceedings relating to the measure alleged to be in violation of the Canada-Romania BIT have commenced or are ongoing at the time of the Request for Arbitration. Accordingly, the Tribunal will accept any subsequent waiver for the purposes of Article XIII(3)(b) if it has been substantively complied with at the time of filing the Request.

*iii.    The facts*

700.    Having established the waiver requirements under the Canada-Romania BIT, the Tribunal applies those requirements to the facts of this case.

701.    In the present case, Gabriel Canada notified Romania of its claims in its Notice of Dispute on 20 January 2015,[373] and filed its waiver of the right to initiate or continue parallel proceedings together with its Request for Arbitration on 17 July 2015.[374] In its Request for Arbitration, Gabriel Canada waived "*its right to initiate or continue other proceedings in relation to measures alleged to be in breach of the BIT referred to in the Request for Arbitration*". In the Request for Arbitration, the measures alleged to have violated the Canada-Romania BIT were described as measures relating to Romania's practice of denying approval for the Roşia Montană Project and depriving RMGC of license rights, including with respect to Bucium, without compensation, including by failing to take action and making implementation impossible.

702.    In addition and in response to Respondent's waiver objection, Gabriel Canada, through its counsel in this arbitration and in its Reply, has stated that it made "*an additional waiver that expressly extends to its right to initiate or continue other proceedings in relation to the measures that are alleged by Gabriel Canada in any of its written or oral submissions in the course of the conduct of this arbitration to be in breach of the BIT*".[375]

---

[373] Exh. C-8 (Letter from Gabriel addressed to the President of Romania and to the Prime Minister of Romania, dated 20 January 2015).

[374] Exh. C-6 (Gabriel Canada's Waiver in Support of Its Request for Arbitration, dated 17 July 2015).

[375] Reply, para. 348.

703.    In light of its considerations regarding the waiver provision in the Canada-Romania BIT (see paras 696-699 above) and the aforementioned facts (see paras 701-702 above), the Tribunal considers the following:

704.    *First, with respect to the formal compliance with the provision:* Claimants' waiver in their Request for Arbitration is undeniably broad and refers to measures that allegedly violate the Canada-Romania BIT. The Request for Arbitration itself sufficiently describes these measures. With respect to facts that are not mentioned therein because they occurred after Claimants' notice of dispute,[376] it has already been established that these facts are part of or an extension of the present dispute (see paras 683-685 above). Accordingly, the Tribunal considers that Gabriel Canada's waiver fully covers the claims asserted and thus satisfies the formal aspect of Article XIII(3)(b) of the Canada-Romania BIT.

705.    *Second, with respect to the substantive compliance with the provision:* As noted above (see para. 699), what matters is that the waiver was substantially complied with at the time the Request for Arbitration was filed. The Tribunal finds no evidence in the record before it that, at such time, Claimants ever initiated or continued any other proceeding with respect to the measures on which Respondent bases its present objection at the time of filing the Request for Arbitration. Concerning Respondent's assertion that "*RMGC continues to litigate before Romanian courts*" referring to RMGC's challenge of its VAT assessment by the State,[377] the Tribunal notes that these proceedings were initiated after the present dispute was filed in arbitration. In any event, the Tribunal considers that the subject matter of the VAT assessment proceedings is different from that of the present investment arbitration. The former concerns the tax laws of the State and their application, while the latter concerns allegations relating to the activities of the tax authorities as part of Romania's alleged unjustified treatment of Claimants' investments. On this basis, the VAT challenge does not fall within the necessary scope of the waiver itself. Therefore, the Tribunal finds that Claimants complied with the substantive aspect of the waiver provision of the Canada-Romania BIT.

706.    In any event, the Tribunal also considers that Claimants' additional waiver in their Reply is appropriate and sufficient for purposes of Article XIII(3)(b) of the BIT and at any rate consistent with the Tribunal's ruling above that events that post-date the Notice of Dispute can form the basis of claims and within the jurisdiction of the Tribunal (see paras 684-685).

---

[376] See facts enumerated by Respondent in Counter-Memorial, para. 456 dating between April 2015 and January 2017, and relating to a TAC meeting, the Bucium exploration licenses, Claimants' VAT assessments, the 2010 LHM, the Roşia Montană License, the cyanide use, the recapitalization of RMGC and the UNESCO World Heritage site. See also Rejoinder, para. 46.

[377] Memorial, para. 53; Reply, para. 290; C-Opening 8, 17. See also Counter-Memorial, Sect. 6.3.2.

707.    The Tribunal therefore finds that Gabriel Canada has satisfied the waiver condition set out in Article XIII(3)(b) of the Canada-Romania BIT.

708.    In addition, as the Tribunal rejects Respondent's objection, it need not consider whether it concerns the Tribunal's jurisdiction (Respondent's main plea with respect to the waiver provision) or the admissibility of the claims (Respondent's alternative plea with respect to the waiver provision).

#### d.  The conclusion

709.    The Tribunal concludes that

> *Gabriel Canada has satisfied the waiver condition set out in Article XIII(3)(b) of the Canada-Romania BIT.*

### 6.  Time-bar objections under the Canada-Romania BIT and otherwise

#### a.  The issue

710.    The *issue* is whether Gabriel Canada's claims are time-barred by virtue of:

-    the three-year limitation period of Article XIII(3)(d) of the Canada-Romania BIT, and/or

-    the date of entry into force of the Canada-Romania BIT itself,

as Claimants rely on facts in connection with those claims that are outside of that three-year limitation period or predate the entry into force of the BIT.

#### b.  The Parties' positions

##### i.    Respondent

711.    Respondent argues that Gabriel Canada's claims fall outside the Tribunal's jurisdiction for being time-barred.

712.    *First*, under Article XIII(3)(d) of the Canada-Romania BIT, claims are time-barred if more than three years have elapsed from the date of the alleged breach which, on Claimants' own case, was the beginning of August 2011. This date is more than three years prior to the registration of the Request for Arbitration on 30 July 2015. Gabriel Canada's claims therefore fall to be dismissed.[378]

---

[378] R-PHB, para. 6.

713.    Specifically, Claimants' case is based on a theory of a composite act that allegedly extended over a period of time, consisting of alleged actions and omissions of Respondent that took place in part before and in part after 30 July 2012, which does not assist Gabriel Canada. According to the International Law Commission's Draft Articles on Responsibility of States for Internationally Wrongful Acts (the "ILC Articles"), in the case of a composite act, the breach of an international obligation occurs "*when the action or omission occurs which, taken with the other actions or omissions, is sufficient to constitute the wrongful act*". Claimants' most serious allegations relate to alleged actions and omissions of the Romanian Government (the "ultimatum" and the "blocking" of the environmental permitting process) that took place well before 30 July 2012, in the second half of 2011. It follows that the alleged composite act occurred well before 30 July 2012, the critical jurisdictional date. Gabriel Canada's case therefore falls in its entirety outside the jurisdiction of the Tribunal.[379] Respondent subsequently points to a commentary to the ILC Articles noting that if the alleged breaches of the BIT are caused by a composite act, the first measure identified by Claimants as the "*beginning of the end*" is the effective date of the breach of the BIT.[380] Claimants admit that the Government allegedly "*blocked Project permitting and demanded to renegotiate the Project economics*" prior to 30 July 2012 and that allegedly this "*was the beginning of the measure*". As such, the first measure of the composite act took place before 30 July 2012, which means that the Tribunal has no jurisdiction over the alleged composite act under Article 15(2) of the ILC Articles.[381]

714.    Should the Tribunal conclude that no composite act took place, the test under Article XIII(3) does not help Claimants, as they were, contrary to their contention, aware of both the alleged breach and loss before 30 July 2012.[382] As the *Berkowitz v. Costa Rica* tribunal concluded, a claimant is not entitled to wait and see if a breach and/or the damage becomes more significant. The limitation period will start from the first appreciation of a breach and/or the damage.[383] In the present case, Claimants' claims are in substance based on the alleged attempt by the Romanian Government to extort Claimants to agree to amend the terms of the License and to "block" the environmental permitting process if the terms of the License were not amended. All of these events took place before 30 July 2012. Given that the claims in this arbitration are in substance based on the Government's alleged "ultimatum" and its alleged "blocking" of the environmental

---

[379] Counter-Memorial, para. 464. See also Counter-Memorial, paras 13, 458-459; Rejoinder, paras 56-57.

[380] Rejoinder, paras 58-61 referring to Exh. RLA-33 (International Law Commission Draft articles on Responsibility of States for Internationally Wrongful Acts, with commentaries, 2001).

[381] Rejoinder, para. 62.

[382] Rejoinder, paras 66-67.

[383] Rejoinder, para. 68 referring to and quoting CL-236 (*Aaron C. Berkowitz, Brett E. Berkowitz & Trevor B. Berkowitz (former Spence International Investments & others) v. Costa Rica*, ICSID Case No. UNCT/13/2, Interim Award, dated 30 May 2017).

permitting process, both of which took place already in 2011, it is manifest that more than three years had elapsed from "*the date on which* [Gabriel Canada] *first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that* [Gabriel Canada] *has incurred loss or damage*" until 30 July 2015.[384] Similarly, the claims arising out of RMGC's 2007 application for exploitation licenses for the Bucium area are equally time-barred.[385]

715.   *Second*, and to the extent that Gabriel Canada's claims relate to facts or events that took place prior to 23 November 2011, they fall outside the jurisdiction of the Tribunal on the further basis that the Canada-Romania BIT only entered into force on 23 November 2011. Indeed, Claimants accept that conduct preceding 23 November 2011 "*cannot give rise to liability*".[386] Moreover, pursuant to its Article XVIII(6), the Canada-Romania BIT applies to any dispute that arose not more than three years prior to its entry into force (23 November 2008). Consequently, for instance, the dispute relating to the Bucium Applications, which were filed in October 2008, fall outside the Tribunal's jurisdiction under Article XVIII(6) of the Canada-Romania BIT. The same applies to all other claims and allegations that Gabriel Canada makes or may make in relation to any fact or event that took place before 23 November 2008.[387]

### ii.   Claimants

716.   Claimants submit that Gabriel Canada's claims arose within the three-year limitation period set forth in Article XIII(3)(d) of the Canada-Romania BIT.[388]

717.   The three-year period is triggered by knowledge of both the breach and the resulting loss. There is no dispute in this case that as Claimants' Request for Arbitration was registered by ICSID on 30 July 2015, the relevant date for purposes of Article XIII(3)(d) of the BIT is thus 30 July 2012.[389] Further, while Article XIII(3)(d) does not invite a hindsight analysis, a hindsight analysis may be done when considering liability.[390] Moreover, knowledge of the risk of loss is not sufficient to trigger Article XIII(3)(d). Article XIII(3)(d) requires knowledge of actual loss, which requires that the loss has been incurred.[391]

---

[384] Counter-Memorial, paras 461-463.
[385] R-PHB, para. 6. See also, Rejoinder, para. 69.
[386] Reply R-PHB, para. 56; see also Rejoinder, fn. 1036.
[387] Counter-Memorial, para. 465.
[388] Memorial, para. 838; Reply, para. 349.
[389] Reply, paras 350-355.
[390] C-PHB, para. 33.
[391] C-PHB, para. 34.

718.    Gabriel Canada's claims in this arbitration are based on a course of treatment of its investments that began in August 2011 and, following the Parliamentary rejection of the Draft Law in late 2013, culminated in the political rejection and effective arbitrary termination of the Roşia Montană Project, ultimately encompassing the rejection of the Bucium Projects and of RMGC itself, thus resulting in the complete deprivation of the value of Gabriel's investments contrary to law, without due process and without compensation.[392]

719.    Gabriel acquired knowledge of the breach at issue and resulting loss after 30 July 2012. Prior to 30 July 2012, the Government blocked Project permitting and demanded to renegotiate the Project economics. Although that conduct was in breach of Respondent's obligations under the BIT, it is not without more the measure to which the dispute submitted to arbitration relates; it was the beginning of the measure. As it was not evident until after the Parliamentary rejection of the Draft Law in 2013 that Romania would entirely reject and effectively terminate the Roşia Montană Project, Gabriel could not have acquired knowledge of the breaches until after that time. For the same reason Gabriel could not have acquired knowledge that it had incurred loss associated with these breaches until it actually incurred the loss following the Parliamentary rejection of the Draft Law in 2013.[393]

720.    The State's conduct viewed as of 30 July 2012, and not now in hindsight, although improper, would not have been considered sufficiently improper so as to constitute a breach of the Canada-Romania BIT. Indeed, no investment treaty tribunal would have found a breach of the Canada-Romania BIT on the basis of the facts as they were as of that point in time because the facts were then still equivocal.[394] Moreover, by 30 July 2012 events had not advanced to a point where Claimants knew there was a breach and that they had suffered a recoverable loss.[395]

721.    Claimants also submit that prior conduct is not claimed as a stand-alone breach. Therefore, even if the Tribunal were to find (which it should not) that Gabriel acquired knowledge prior to 30 July 2012, both that Romania's conduct was in breach of the Canada-Romania BIT and that Gabriel incurred some loss as a result, that would not defeat the Tribunal's jurisdiction over the claims presented in this arbitration. There is no jurisdictional impediment to the Tribunal's consideration of whether the course of treatment of Gabriel Canada's investments that commenced in August 2011 and that developed over time, culminating in the complete rejection of RMGC's project

---

[392] Reply, paras 356-358. See also C-PHB, para. 31.
[393] Reply, paras 359-365.
[394] C-PHB, para. 33.
[395] C-PHB, para. 35.

development rights, taken as a whole, constituted as a composite act, a breach of Article II(2), Article III and Article VIII of the Canada-Romania BIT.[396]

722.   The temporal considerations are the same in relation to Gabriel Canada's claims arising from Romania's refusal to issue exploitation licenses to RMGC in relation to the Bucium deposits, as Gabriel Canada acquired knowledge of the breaches and of its consequential losses after 30 July 2012.[397] Gabriel's claims are not that the competent authorities delayed acting on RMGC's 2007 applications to obtain exploitation licenses, but rather that following the State's political repudiation in 2013 of the Roșia Montană Project and its joint-venture with Gabriel, the State would not issue any further mining licenses to RMGC, notwithstanding RMGC's legal rights in relation to Bucium.[398]

723.   Claimants also argue that, in any event, if the Tribunal were to conclude that as of 30 July 2012 Gabriel Canada must have recognized that (i) Romania's conduct was in breach of the Canada-Romania BIT and that (ii) that breach had caused Gabriel Canada to incur certain loss, such that a claim on the basis of that conduct would fall outside the Tribunal's jurisdiction in view of Article XIII(3)(d) of the Canada-Romania BIT, the Tribunal would not be precluded from taking that earlier conduct into consideration in its assessment of Romania's conduct after that date.[399]

724.   As regards the State's obligations under the Canada-Romania BIT, the fact that some conduct occurred prior to 23 November 2011 does not prevent the Tribunal from taking those acts into account to establish the factual basis for the conduct that followed and as evidence of the State's intent.[400] Temporally, the commentary to the ILC Articles clarifies that where the relevant obligation did not exist at the beginning of the course of conduct but came into being thereafter, the "first" of the actions or omissions of the series for purposes of State responsibility will be the first occurring after the obligation came into existence. In this case, the Tribunal may take into account earlier actions or omissions in order to establish a factual basis for the later breaches or to provide evidence of intent.[401]

---

[396] Reply, paras 367-370.

[397] Reply, paras 371-375.

[398] C-PHB, para. 36.

[399] C-PHB, para. 37.

[400] Claimants' responses to the Tribunal's questions set out in PO No. 27, dated 11 May 2020 ("C-PO 27"), para. 57 referring to Exh. CL-61 (International Law Commission, Draft Articles on Responsibility of States for Internationally Wrongful Acts, with commentaries, 2001) ("ILC Articles").

[401] C-PO 27, para. 105 referring to and quoting Exh. CL-61 (ILC Articles) and Exh. CL-340 (*Chevron Corporation (U.S.A.) and Texaco Petroleum Corporation (U.S.A.) v. Republic of Ecuador*, UNCITRAL, Interim Award, dated 1 December 2008).

### c.  The Tribunal's analysis

#### i.  In general

725.  The Parties disagree as to whether Gabriel Canada's claims fall within the jurisdiction of the Tribunal because they are based on facts that occurred before 30 July 2012, i.e., before the commencement of the three-year limitation period under Article XIII(3)(d) of the Canada-Romania BIT, and on one instance before 23 November 2011, i.e., before the entry into force of the Canada-Romania BIT on that date. There is also a disagreement concerning whether the dispute arose prior to 23 November 2008, which would entail that it is outside the Tribunal's jurisdiction pursuant to Article XVIII(6) of the Canada-Romania BIT. In this context, the Parties also disagree as to whether Claimants' composite act claim fails because it is based on facts that fall outside these time limits.

726.  To decide, the Tribunal must, *first*, examine the relevant time-bar requirements. In doing so, the Tribunal will apply the express wording of the Canada-Romania BIT. In the absence of such wording, it will rely on customary international law. *Second*, the Tribunal shall consider whether the facts of this case satisfy those requirements.

#### ii.  The time-bar requirements

##### 1.  Article XIII(3)(d) of the Canada-Romania BIT

727.  The relevant provision on time-bar is Article XIII(3)(d) of the Canada-Romania BIT. As before (see para. 645 above), the Tribunal will be guided by Article 31 of the VCLT in determining the requirements set out in that provision, taking as its starting point the ordinary meaning of the terms of the provisions themselves.

728.  Article XIII(3)(d) reads as follows:

> *An investor may submit a dispute as referred to in paragraph 1 to arbitration in accordance with paragraph 4 only if:* […] *not more than three years have elapsed from the date on which the investor first acquired, or should have first acquired, knowledge of the alleged breach and knowledge that the investor has incurred loss or damage.*[402]

729.  Article XIII(3)(d) establishes a time limit for submitting claims to arbitration. According to this provision, an investor may submit the dispute to arbitration no later than three years after the date on which it became aware or should have become aware of the alleged

---

[402] Exh. C-1 (Canada-Romania BIT), Art. XIII(3)(d).

breach and damage. Claims brought outside this period do not fall within the Tribunal's jurisdiction or are inadmissible.[403] Specifically, the Tribunal considers the following.

730.    *First*, it is clear that the relevant time frame set forth in the provision is three years.

731.    *Second*, for the purpose of calculating this time frame, the provision itself refers to the submission of the dispute to arbitration. This means that the relevant time is the date of submission and registration of the Request for Arbitration.

732.    *Third*, with respect to the "knowledge" requirement, the provision provides for two possibilities: (a) the time when knowledge was first obtained; or (b) the time when knowledge should have been first obtained. The latter is usually more relevant, as the time of actual knowledge is often difficult to determine. The test for determining such knowledge is the reasonable person test, i.e., the time when a reasonable person in comparable circumstances would have first become aware.

733.    *Fourth*, the language of Article XIII(3)(d) is clear in that it requires both "*knowledge of the alleged breach **and** knowledge that the investor has incurred loss or damage*", not just one or the other (emphasis added). Thus, the relevant time must include both knowledge of the BIT breach and knowledge of the resulting consequences, i.e., that loss or damage has occurred. This does not require quantification of the damage itself.[404]

734.    In light of the foregoing, the Tribunal considers that Gabriel Canada must have acquired knowledge of the alleged breach and actual damage after 30 July 2012 in order to have jurisdiction over Gabriel Canada's claims under Article XIII(3)(d).

### 2.    Article XVIII(6) of the Canada-Romania BIT

735.    It is recalled that Claimants primarily allege a breach in September 2013, based on facts beginning in August 2011. However, Claimants refer to events post-dating September 2013 in relation to their primary claim, first and second alternative claims, although they confirm that the first two are not directly based on such events.[405] They maintain that such post-2013 events are nevertheless relevant for their principal and first alternative claims because they (a) "*establish that the measure culminating in the repudiation of the Project Rights on September 9, 2013 was definitive and permanent and, therefore was a*

---

[403] See also Counter-Memorial, para. 459.

[404] Exh. CL-149 (*Rusoro Mining Limited v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/12/5, Award, dated 22 August 2016), paras 210, 213; Exh. CL-234 (*Mobil Investments Canada, Inc. v. Government of Canada*, ICSID Case No. ARB/15/6, Decision on Jurisdiction and Admissibility, dated July 13, 2018), paras 148 and 155.

[405] Claimants' Response to the Tribunal's Questions Regarding Post-2013 Events, dated 14 June 2022 ("C-Post-2013"), para. 4 ("*Thus, neither Claimants' principal nor first alternative claim is based directly on what may be referred to as the 'post-2013 events.'*").

*measure with effects equivalent to a taking of the Project Rights*"; (b) "*show that there was no formal act terminating the Project Rights or any compensation paid to Gabriel and, therefore, that the de facto taking of the Project Rights through what was effectively an oral edict issued by the Government on September 9, 2013 was unlawful*"; and (c) "*include acts and omissions that confirm that the scope of the taking on September 9, 2013 extended generally to RMGC, the State's joint venture with Gabriel, and to the Bucium Projects as well as the Roşia Montană Project*".[406] Concerning their second alternative claim, Claimants rely on post-2013 events and submit that "*the date when Romania's treatment most clearly completed the effective taking of the Project Rights in breach of the BITs was July 27, 2021, when, following Romania's application, the Roşia Montană Mining Landscape was inscribed on the UNESCO World Heritage List.*"[407] The Tribunal must therefore also consider whether some of Claimants' claims are also time-barred under Article XVIII(6) of the Canada-Romania BIT.

736.     The Canada-Romania BIT entered into force on 23 November 2011. Article XVIII(6) of the BIT provides as follows:

> *Each Contracting Party shall notify the other in writing of the completion of the procedures required in its territory for the entry into force of this Agreement. This Agreement shall enter into force on the date of the latter of the two notifications. Upon the entry into force of this Agreement, the Agreement between the Government of Canada and the Government of Romania for the Promotion and Reciprocal Protection of Investments, done at Bucharest on the 17 April 1996, shall be terminated except that its provisions shall continue to apply to any dispute between either Contracting Party and an investor of the other Contracting Party that has been submitted to arbitration pursuant to that Agreement by the investor prior to the date that this Agreement enters into force. Apart from any such dispute, **this Agreement shall apply to any dispute which has arisen not more than three years prior to its entry into force**.*[408]
> (emphasis added)

737.     Pursuant to Article XVIII(6), any dispute that arose three years before the entry into force of the Canada-Romania BIT, i.e., on 23 November 2008, is not subject to the BIT and is thus beyond the jurisdiction of this Tribunal. In the present case, Claimants submitted the dispute to arbitration in 2015. The origins of this dispute lie in events that took place before 2015, i.e., from 2011 onwards. It is therefore undisputed that the origins of the dispute did not arise prior to 23 November 2008. As to the Bucium Exploration License, the Parties' dispute also concerns the alleged "political blocking" of these licenses as of September 2011 and thus falls within the category of facts within the Tribunal's

---

[406] C-Post-2013, paras 5-7.
[407] C-Post-2013, para. 47.
[408] Exh. C-1 (Canada-Romania BIT), Art. XVIII(6).

jurisdiction. Indeed, it is Claimants' submission that NAMR should have decided on the applications following the homologation of resources and reserves in March 2013. This is notwithstanding the fact that the applications for these licenses were filed in October 2008 and Respondent's argument that a decision on the application and contract should have been concluded 90 days thereafter, i.e., still in 2008. Therefore, the claims in this regard are not time-barred.

3.  Temporal limitation of the obligations under the Canada-Romania BIT

738.  In addition to Article XVIII(6), there is a more general temporal limitation that arises by virtue of the principle that claims cannot be founded upon obligations that were not in force at the time of the alleged breaches. This means that no claim can be asserted by Claimants under the Canada-Romania BIT in relation to events occurring before 23 November 2011; *i.e.* when the BIT came into force. Nevertheless, the Tribunal notes that it is not precluded from considering facts arising before that date to provide context or evidence of intent with respect to claims of alleged violations after that date. In this connection, the Tribunal agrees with the *Mondev* tribunal which stated that: "*events or conduct prior to the entry into force of an obligation for the respondent State may be relevant in determining whether the State has subsequently committed a breach of the obligation. But it must still be possible to point to conduct of the State after that date which is itself a breach.*"[409]

739.  It is important to be clear on the distinction between Article XVIII(6) and the temporal scope of the obligations under the Canada-Romania BIT. Article XVIII(6) relates to the *dispute*, whereas the temporal scope of the obligations relates to the *claims*. It is possible that a dispute can arise prior to a claim: parties may be in dispute about aspects of their relationship before a claim crystallizes upon a breach of one party's obligation towards the other party.

4.  Composite act

740.  With respect to Claimants' composite act claim (their primary claim in the present case), the Tribunal finds that Claimants do not clearly or consistently refer or rely on Article 15 of the ILC Articles in support of this claim. Accordingly, the Tribunal considers it premature to decide at this stage whether this composite claim fails based on the timing

---

[409] Exh. CL-145 (*Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, dated 11 October 2002), para. 70. See also Exh. CL-51 (*RosInvestCo. UK Ltd. v. Russian Federation,* SCC Arbitration V (079/2005), Final Award, 12 September 2010), paras 407-408; Exh. CL-87 (*Bayindir Insaat Turizm Ticaret Ve Sanayi A.S. v. Islamic Republic of Pakistan*, ICSID Case No. ARB/03/29, Award, dated 27 August 2009), paras 132, 283; Exh. CL-122 (*Técnicas Medioambientales Tecmed, S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, dated 29 May 2003), para. 68.

considerations and findings of the Tribunal under the Canada-Romania BIT set out above (paras 725 *et seq.*). Instead, it deems it more appropriate to rule on this issue when it addresses the composite act as part of the merits below.

741.   Accordingly, the Tribunal will defer its decision on jurisdiction over the composite act claim when it addresses Claimants' main claim (see paras 810 *et seq.*).

*iii.    The facts*

742.   Having established the time-bar requirements and the temporal limitation of the obligations under the Canada-Romania BIT, the Tribunal applies those requirements to the facts of this case.

743.   In the present case, Claimants submitted the dispute to arbitration on 30 July 2015. This means that the Tribunal's jurisdiction under Article XIII(3)(d) is limited to claims based on alleged breaches that occurred after 30 July 2012. This makes the limitation based on the temporal scope of the obligations under the Canada-Romania BIT somewhat redundant: claims cannot be pleaded in relation to breaches occurring before the BIT came into force on 23 November 2011, but that is earlier than the time-bar established by Article XIII(3)(d) in any case.

744.   With respect to the temporal scope of the obligations under the Canada-Romania BIT as well as Article XVIII(6), the Tribunal recalls that it may consider facts prior to 23 November 2011 (when the treaty obligations entered into force) and 23 November 2008 (the earliest date when a dispute can arise), respectively, to provide context and determine intent with respect to claims following that date, and in this case, following 30 July 2012, taking into account the BIT's applicable time-bar.

745.   From the outset, Claimants have alleged a breach of the two BITs based on the "composite act" theory. In their pleadings following the first hearing on the merits, they specified their claims as follows:

> [T]*he subject conduct commencing in August 2011 is properly characterized as a composite act that breached several provisions of both BITs. Alternatively, if not viewed as a composite act, Romania's treatment of Gabriel's investment breached the same several provisions of the BITs as of September 9, 2013, the date of the political repudiation of the Project Rights. Alternatively, if not considered in breach of the BITs as of September 9, 2013, the conduct that followed demonstrates that there has been a repudiation of RMGC and the Project Rights in*

*breach of the same several provisions of both BITs.*[410] (underlining as in original)

746.    *First*, it is clear that, as to the time-bar of the Canada-Romania BIT and the date of entry into force of said BIT, the Tribunal has jurisdiction over Claimants' <u>second alternative claim</u>, which relates to an alleged breach after 9 September 2013, based on subsequent conduct. In any event, this will be examined further, if and when the Tribunal deals with Claimants' second alternative claim on the merits.

747.    *Second*, it is clear that the Tribunal also has jurisdiction over Claimants' <u>first alternative claim</u>, which relates to an alleged breach as of 9 September 2013 based on conduct that began in August 2011, but that the Tribunal may only consider the conduct between August 2011 and 30 July 2012 in order to provide factual background as to a breach occurring after that date. This will also be examined further, if and when the Tribunal deals with Claimants' first alternative claim on the merits.

748.    *Third*, in the context of Claimants' principal claim, the Tribunal has already decided that it will defer a decision on its jurisdiction in this regard when it addresses the merits of the composite act claim (see para. 741 above). In any event, the Tribunal recalls that it has the authority to consider acts or measures prior to 30 July 2012 in order to provide the necessary background or context for deciding the composite act claim.

749.    The Tribunal therefore finds that, subject to the deferral of its decision on jurisdiction over the composite act claim (i.e., the principal claim), it has jurisdiction over Claimants' claims, for the purposes of Article XIII(3)(d) and Article XVIII(6) of the Canada-Romania BIT.

### d.  The conclusion

750.    The Tribunal concludes that

> **subject to the deferral of its decision on jurisdiction over the composite act claim (i.e., the main claim), it has jurisdiction over Claimants' claims, for the purposes of Article XIII(3)(d) and Article XVIII(6) of the Canada-Romania BIT.**

---

[410] C-PHB, para. 231.

### 7. Substantive obligations under the Canada-Romania BIT

#### a. The issue

751.    The *issue* is whether Gabriel Canada's claims are excluded by the Canada-Romania BIT's provisions regarding environmental and taxation measures.

#### b. The Parties' positions

##### i.    *Respondent*

752.    Respondent submits that Gabriel Canada's claims are limited by the substantive provisions of the BIT.[411]

753.    Claims relating to environmental measures are governed by a special regime. In particular, Gabriel Canada's principal claims arise out of the environmental permitting process conducted by the Ministry of Environment. Because the underlying allegations fall within the meaning of Articles XVII(2) and (3) of the Canada-Romania BIT, this Tribunal has no jurisdiction over the claims.[412]

754.    Claims relating to taxation measures are also governed by a special regime. In particular, certain claims relate to tax fraud investigations into the Kadok companies and RMGC, the VAT Assessment, the ANAF audits and the ANAF investigations. Given that Article XII(1) of the Canada Romania BIT establishes that "[e]*xcept as set out in this Article, nothing in this Agreement shall apply to taxation measures*" these claims manifestly fall outside the Tribunal's jurisdiction.[413]

##### ii.    *Claimants*

755.    Claimants argue that Gabriel Canada's claims fall within the substantive protections of the BIT.[414]

756.    With respect to the environmental measures, one may question the relevance of Articles XVII(2) and (3) of the Canada-Romania BIT referred to by Respondent to the claims presented in this arbitration. This is because the power of an arbitral tribunal constituted under Article XIII of the Canada-Romania BIT is limited to awarding monetary damages and so cannot prevent a Contracting Party from adopting, maintaining or enforcing measures relating to the environment. In this light, there is no basis to argue that these provisions bear on the questions presented to this Tribunal. Even if it were otherwise,

---

[411] Counter-Memorial, para. 478; Rejoinder, paras 71-72.

[412] Counter-Memorial, paras 479-482; Rejoinder, paras 73-82.

[413] Counter-Memorial, paras 483-484; Rejoinder, paras 83-85.

[414] Reply, para. 378.

nothing in Articles XVII(2) and (3) supports the conclusion that there is an "additional" or "heightened" "burden" of proving that measures relating to the environment may be in breach of Articles II(2), III and/or VIII of the BIT. In any event, there is no basis in this case for Respondent to claim that Romania's rejection and effective termination of the Roşia Montană Project, and ultimately of all of Gabriel Canada's investments, was a measure taken in good faith to address environmental concerns.[415]

757. With respect to the tax measures, Gabriel Canada does not contest the substance of any of Romania's tax laws, but rather that Romania has abused its tax authority to seek to harass and intimidate RMGC employees, to seek in bad faith to gain advantage for the State in the arbitration, and to use its authority in relation to alleged "anti-fraud" investigations of matters not even purporting to relate to taxation. Thus, Article XII(1) of the Canada-Romania BIT does not bar Gabriel Canada's claims in regard to ANAF and does not prevent the Tribunal from considering the allegations relating to ANAF's activities as part of the wrongful treatment by Romania of Gabriel Canada's investments.[416]

### c. The Tribunal's analysis

758. The Tribunal must resolve the issue of whether Gabriel Canada's claims qualify either as environmental or taxation claims, such that they are subject to a special regime and therefore excluded from the scope of the Canada-Romania BIT.

759. The Tribunal considers that it is more appropriate to join Respondent's objection to the merits of the present dispute. This is because it is only when one analyses a specific measure that is alleged to violate the Canada-Romania BIT that it may be possible to classify it as an environmental or a tax measure.

760. The Tribunal therefore decides to join Respondent's objection to the merits (see para. 1322 below).

### d. The conclusion

761. The Tribunal concludes that

***it will join Respondent's objection to the merits.***

---

[415] Reply, paras 379-390.
[416] Reply, paras 391-393.

### 8.   Jurisdiction under the ICSID Convention

762.    It is recalled that Respondent submits that to the extent the Tribunal finds that there was no consent under the BITs, there is automatically no consent under the ICSID Convention.[417]

763.    Since the Tribunal rejected Respondent's jurisdictional objections with respect to the BITs, it must in principle also reject the argument with respect to the ICSID Convention.

764.    Further, the Parties do not make any submissions on or raise any objections to the Tribunal's jurisdiction or the existence of a dispute or an investment under Article 25(1) of the ICSID Convention.[418] The Tribunal nevertheless affirms its jurisdiction under this provision, in particular in light of its finding that Claimants' investment fulfils the inherent meaning of an investment (see para. 650 above).

### 9.   Conclusion on jurisdiction

765.    In light of the foregoing, the Tribunal ***unanimously*** finds that

   ***it has jurisdiction over Claimants' claims and that such claims are admissible.***

766.    It is recalled that the finding of the Tribunal is subject to its decision on jurisdiction with respect to issues that it has decided to join to the merits (see paras 579 (i.e., umbrella claims), 750 (i.e., composite act claim) and 760 (i.e., substantive obligations) above).

---

[417] Counter-Memorial, paras 496-497; Rejoinder, para. 37.

[418] Article 25(1) of the ICSID Convention provides the following: "*The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally.*"

## IV.    Liability

### 1.  The issue

767.    *The issue* is whether the allegedly politicized treatment of RMGC's application for permitting of the Roşia Montană Project was a measure that resulted in breaches of the UK-Romania and Canada-Romania BITs.

768.    ***The Tribunal's decision on liability is taken by majority.***

769.    ***Claimants*** request the Tribunal to hold that Respondent breached its obligations under Article II [Claim. 1], Article III [Claim. 2] and Article VIII [Claim. 3] of the Canada-Romania BIT and under Article 2 [Claim. 4] and Article 5 [Claim. 5] of the UK-Romania BIT.

770.    **Respondent** requests the Tribunal to "*dismiss the claims as unfounded*" [Resp. 3].

771.    The Tribunal notes that in their responses to the Tribunal's questions set out in PO No. 27 and Post-Hearing Brief submissions, Claimants formulated their claims as follows:

-    *First*, that the politicized treatment of the permitting process ending with the rejection of the Project and termination of the joint venture was a "composite act" that breached the UK-Romania and Canada-Romania BITs on or about 9 September 2013 (the "**principal claim**"); or

-    *Second*, and alternatively, that the same treatment breached the same provisions of the UK-Romania and Canada-Romania BIT as of 9 September 2013, the date of the political repudiation of the Project rights (the "**first alternative claim**"); or

-    *Third*, and in the further alternative, that the conduct that followed demonstrates that there has been a repudiation of RMGC and the Project rights in breach of the same provisions of the UK-Romania and Canada-Romania BITs (the "**second alternative claim**").

772.    Accordingly, in addressing each of the alleged breaches of the UK-Romania and Canada-Romania BITs, the Tribunal will structure its analysis in accordance with Claimants' presentation of the three alternative claims.

773.    The Tribunal will address any objections to the admissibility of Claimants' claims (i.e., whether the first and second alternative claims are time-barred and whether the BIT claims are excluded by the Canada-Romania BIT's provisions regarding environmental and taxation measures) below (see para. 1322).

774.     In addition, it is important to briefly describe the Project at issue in this case, as the Tribunal believes it provides the proper context when addressing the Parties' claims and defenses.

775.     Moreover, the Tribunal considers it of the utmost importance to note the following. The record in this case is overly voluminous, sometimes repetitious, and sometimes unnecessarily complicated. While it has extensively reviewed and discussed all submissions and all documents in the record, the Tribunal will not focus or refer to all of them. This is because it considers that there is a subset of important documents that undoubtedly shed light on the events that led to the developments in this case and on which the Parties could have focused to present their case more effectively. What is clear, however, is that many issues come down to a decision on the interpretation of the specific document or documents. The Tribunal has endeavoured to do so objectively, impartially and always in accordance with the law.

776.     The Tribunal will therefore proceed as follows:

-     *First*, it will provide an ***overview of the Project*** (see section 2 below).

-     *Second*, it will decide Claimants' ***principal claim*** (see section 3 below).

-     *Third*, and to the extent necessary, it will decide Claimants' ***first alternative claim*** (see section 4 below).

-     *Fourth*, and to the extent necessary, it will decide Claimants' ***second alternative claim*** (see section 5 below).

-     *Fifth*, it will ***conclude*** on the issues of liability (see section 6 below).

## 2. The Project

777.     In the following section, the Tribunal briefly describes the Project and its significance in order to set forth what it believes to be the proper context in which to address Claimants' claims.

778.     Roşia Montană is a municipality with an area of 4,200 hectares and 16 villages, one of which is also called Roşia Montană. Since its origins, Roşia Montană has been associated with the gold that lies in its rocks. Gold mining, which has been going on almost continuously for the last 2000 years, has affected the social, economic, cultural and environmental conditions of Roşia Montană both positively and negatively.

779.     The Roşia-Montană Project involves the mining and processing of gold and silver ore deposits in the Roşia-Montană Valley, in Alba Iulia County, in the Apuseni Mountains

in Transylvania (a large mountainous area) in Romania. The Project area also contains two important water courses, namely the Roșia and Corna streams, but their water quality is poor due to past mining activities. The Project envisages that mining would take place in four open pits, with the mined ore processed on site. The four pits correspond to the four main deposits of Cetate, Cârnic, Orlea and Jig.

780.    The Project consists of *two components*:

-    The metal production and technology used, which includes the development, operation, closure and post-closure care for the mining and processing of gold and silver ores, as well as the subsequent closure and post-closure care activities; and

-    The social and environmental management of the Project, which addresses the positive and negative social, environmental, and economic impacts, some of which would only affect the site area, while others could have broader impacts.

781.    The Project would provide the opportunity to revive or improve the benefits of mining (e.g., employment and income opportunities for citizens and local authorities, promotion of tourism) and eliminate the associated disadvantages (e.g., elimination of pollution, improvement of the condition of roads, water supply, wastewater treatment, electricity supply, and waste disposal). It was thus both an important and delicate Project considering its location, the history of the area, the opportunities it would provide to Romania and its people, as well as the potential social, environmental and economic impacts caused by its activities.

782.    To address these potential impacts, an EIA was required. The EIA is a method by which a development project is evaluated from social, environmental, and economic perspectives. This gives all interested parties the opportunity to understand and comment on the proposed development and participate in the decision-making process. It includes:

-    the analysis of the likely environmental and public impacts of a proposed project;

-    the identification of avoidance and/or mitigation measures;

-    recording these impacts and measures in a report (the EIA Report);

-    holding a public hearing on the project and the EIA Report;

-    considering the EIA Report and comments received on it in making the final decision; and

-    informing the public of that decision.

783.   For a large-scale construction project like the Roşia Montană Project, an EIA can be a very extensive and technically very challenging undertaking. And because of the nature of the potential impacts, many internal and external stakeholders also influence the direction of the EIA process. This was also the case in this instance, where the EIA Process began in 2000. Therefore, to understand the Project and the EIA Process, in particular, one must consider the following:

- The EIA Process is led by the central or territorial authorities for environmental protection, with the participation of the central public or local authorities that have specific tasks and responsibilities. The participation of these authorities takes place in a ***Technical Assessment Committee (TAC)***. The TAC is composed of representatives of the central and/or local public authorities, including the departments coordinating spatial planning and urban planning activities, the health authority, the competent water management authority, the competent authority for the protection of cultural heritage, the inspection for emergencies, the public territorial authorities for inspection and control in the field of environmental protection, representatives of the competent structures for territorial forest inspections, the county departments for agriculture and the departments for agriculture, and other authorities as appropriate, depending on the nature of the project. This meant that ***all ministries in Romania*** were involved and represented in the EIA and Project discussions; and, at the municipal level, the ***Alba County Council*** was also involved.

- The concession for the project was granted in 1998, but with Romania's accession to the EU in 2007, and while the EIA Process was ongoing, all ***EU legislation*** had to be adopted and transposed into Romanian law. This meant that the EIA Process had to be carried out not only under Romanian law, but also within a legal framework that was consistent with EU requirements and standards.

- An important aspect of the socio-economic impact and a recurring theme related to the Project was the direct or indirect impact on the people in the village and municipality of Roşia Montană and in the towns of Abrud and Câmpeni (e.g. the ***resettlement or relocation*** of about 974 households). This was a main point of discussion, which also required compliance with Romanian and European laws.

- Regarding ***cultural heritage***, the Project area undeniably included areas of cultural value, especially given the Roman presence in the vicinity, and that had to be considered in zoning and planning measures, also in accordance with EU law.

- In terms of technology, the Project would use technologies containing hydrochloric acid and ***cyanide***. The handling of these and other toxic chemicals also required

compliance with Romanian and European laws and the application of modern, international best safety practices to prevent pollution.

- Upon completion of the EIA Process and approval of the Project, the Project would include three distinct phases: *(i) construction, (ii) operation, and (iii) closure and post-closure*. However, the EIA discussed the details, requirements, and approximate schedules for these three different phases, which was also a point of discussion in many cases.

- A recurring topic of discussion was also the potential environmental impacts, which raise important issues for *neighboring countries*, particularly related to impacts on water quality of streams and rivers feeding major transboundary rivers and potential transport of construction materials and chemicals.

- In addition, two *NGOs* were active in Roşia Montană: (i) Alburnus Maior was founded in 2000 and opposed the Project, while (ii) the Pro Roşia Montană association, founded later, supported the Project. Alburnus Maior instituted a number of proceedings contesting various aspects of the Project before the courts in Romania.

- The process was also influenced by the *negative public perception* of the Project due to the impact of current and past mining activities in Roşia Montană and previous accidents in the precious metals industry. In particular, there were concerns about cyanide pollution associated with dam failure in light of the disaster at Baia Mare in Romania in 2000, when a dam holding waters contaminated with cyanide burst, thereby releasing cyanide into the Tisza river, which then flowed into the Danube and thus caused pollution in Hungary and Serbia as well.

- The EIA Process also took place at a time when gold prices were significantly different from those at the time the concession was granted, which was consistent with the desire of government officials to review the *economics* of the Project.

- Finally, the EIA Process was also marked by several changes in government and was intrinsically linked to *politics*; politics that were driven by the positions of the political representatives and their constituents on all of the above impacts.

784. The preparation of the EIA was therefore a complex process, both in a national and transboundary context, as it concerned an unprecedented project touching not only on environmental, social and cultural issues, but also on legal, economic and political ones.

785. Considering this context, the Tribunal will address Claimants' three alternative claims.

### 3. The principal claim

#### a. The issue

786.    *The issue* is whether the alleged politicized treatment of RMGC's application for the Environmental Permit which led, according to Claimants, to the rejection of the Project and the effective termination of the State's joint venture with Gabriel, was a composite act that breached the provisions of the UK-Romania and Canada-Romania BITs on or about September 2013.

787.    To decide, the Tribunal will <u>first</u> set out a summary of the Parties' respective positions (see section b below), <u>second</u>, assess the principal claim by applying the relevant law to the facts of the case (see section c below), and <u>third</u>, conclude (see section d below).

#### b. The Parties' positions

##### i. *Claimants*

788.    Claimants' principal case is that Respondent's conduct culminating in the political rejection of the State's joint venture agreement with Gabriel in RMGC together with the Roşia Montană and Bucium Projects, albeit without any formal decision rejecting them, without due process, and without compensation was a composite act in breach of multiple articles of the BITs, as of the date that the political rejection was announced on 9 September 2013.[419] In particular, Claimants submit the following:

789.    As the legal requirements for the Environmental Permit for the Roşia Montană Project were nearing completion, the Government adopted a politicized approach to permitting evidenced by the repeated public statements of senior members of the Government beginning in August 2011. These statements disparaged the Project economics, given the higher gold prices prevailing at that time, and it made clear that a decision on permitting required a new economic agreement with Gabriel and a political decision by the Government.[420]

790.    The Government's refusal for these reasons to take steps that would advance the Roşia Montană Project included, but was not limited to, the Environmental Permit. It extended to steps by the Ministry of Culture needed for the Project, such as its refusal for political reasons to confirm its endorsement for the Environmental Permit, its failure to correct and update the 2010 LHM to align with the ADCs issued in relation to the Project, and its failure to issue its endorsement of the PUZ for the Project area. The Ministry of Culture's failure to reconcile the 2010 LHM with the ADCs issued in relation to the

---

[419] C-PO 27, para. 204.
[420] C-PHB, para. 232; C-PO 27, para. 12.

Project provided a basis for NGOs to challenge the urbanism plans in the Project area because the 2006 PUZ (as well as the SEA Endorsement) that were to accommodate the Project did not reflect the historical monuments listed (erroneously) in the 2010 LHM.[421]

791.    Thus, the Government would not allow permitting of the Project to advance, delaying progress until the Government reached agreement with Gabriel on improved economic terms and made a political decision as to the Project. Although Gabriel ultimately was willing to agree to the economic terms demanded by the Government, the Government insisted that Parliament decide whether the Project would be done by means of a vote on a special law (the Roşia Montană or Draft Law). When the Draft Law sparked mass protests against the Government for failing to follow the rule of law and for supporting what many considered to be a corrupt deal to benefit RMGC and the Project, the political leaders rejected the law and with it the Project and RMGC.[422]

792.    In hindsight, one may conclude that it was on or about 9 September 2013 that the Government decided in effect to terminate RMGC's license rights and the State's obligations in relation to its joint venture with Gabriel in RMGC. The impact of the State's political repudiation of RMGC and the Roşia Montană Project, however, was not fully evident at the time because there was no formal decision or implementing legal process of any kind to accompany the political reality. It was only following subsequent events that the fact and the scope of the effective repudiation of RMGC's rights in relation to both the Roşia Montană Project and the Bucium properties became clear.[423]

793.    Romania's unlawful treatment of Gabriel's investment thus was not marked by formal decrees or other expressed government decisions to which the Tribunal can cite to "bookend" the beginning and the end of the politicized process. The absence of formal signposts marking the Government's decisions, however, does not diminish their existence and effects.[424]

794.    The evidence starting in August 2011 unmistakably shows that the Government imposed requirements on permitting not grounded in law, effectively adopting a policy approach toward RMGC and the Roşia Montană Project that it thereafter maintained and acted upon consistently. The conduct breached the State's obligations under the two BITs when, in furtherance of its "policy", the Government for political reasons alone decided that the Roşia Montană Project would not be done and abandoned RMGC, its joint-

---

[421] C-PHB, para. 233; C-PO 27, paras 12.j-k, 24-25, 183; Reply, paras 258-261.
[422] C-PHB, para. 234.
[423] C-PHB, para. 235; C-PO 27, Questions (a) and (f).
[424] C-PHB, para. 237.

venture with Gabriel, repudiating also its obligations under the law in relation to the Bucium properties.[425]

795.    As such, the course of actions and omissions in connection with the Government's "policy" of politicizing permitting decisions relating to the Roşia Montană Project and RMGC was a composite act that breached several provisions of the BITs as of the date of the political rejection (9 September 2013).[426] Specifically, according to Claimants, the composite act consists of:

-    Coercing renegotiation of the State's interest in the Roşia Montană Project and its joint-venture with Gabriel by threatening not to (and then failing to) advance permitting decisions concerning the Project on the basis of applicable legal requirements.

-    In that context, publicly denouncing the terms of the Project and the State's agreement with Gabriel as not beneficial for the State; on this point, Claimants submit that, although not an issue for Gabriel Jersey's claim, insofar as Romania's conduct commenced before the entry into force of the Canada-Romania BIT on 23 November 2011, such conduct may be considered for "*purposes of understanding the background, the causes, or scope of the violation of the BIT that occurred after the entry into force*".[427]

-    Failing to act on permitting decisions concerning the Project on the basis of applicable legal requirements pending a political decision by the Government as to whether the Project would be done, including within the EIA Process leading to the Environmental Permit, as well as with regard to the Ministry of Culture's endorsement, Waste Management Plan approval, updates and corrections to the 2010 LHM relating to the areas subject to ADCs, and issuance and renewal of PUZ endorsements.

-    Subjecting not only the decision on the Environmental Permit for the Roşia Montană Project to a Draft Law, but also the decision of whether the Project would be done at all.

-    In that context, taking a public position against and preventing the adoption of the Draft Law.

---

[425] C-PHB, para. 237; C-PO 27, question (c), paras 50-52, 59-70, 118, 168, 194-224; Memorial, Sec. IX.B.3; Reply, Sect. VI.
[426] C-PHB, para. 238.
[427] C-PHB, para. 238; C-PO 27, para. 57.

- Repudiating and in effect taking RMGC's Project rights upon and as a consequence of the rejection of the Draft Law without a valid public purpose, without due process and without any compensation.

- Subjecting Gabriel's investment to a politicized permitting process while undertaking to treat other mining projects according to law.[428]

796. This was not a hodgepodge of disjointed events as Respondent suggests. Rather, it was a consistently applied political policy that the Government, starting in August 2011, announced and thereafter followed until it reached the point of the Government's political rejection of the Roşia Montană Project and its joint-venture with Gabriel.[429]

797. Following the rejection of the Draft Law by Parliament and with it the repudiation of RMGC's Project rights, the State consistently and overtly acted to confirm the fact and scope of its repudiation of RMGC's Project rights in breach of the BITs.[430]

798. There is no dispute that to constitute a composite act there must be "*some link of underlying pattern or purpose*" between the acts and/or omissions at issue. The evidence proves contrary to Respondent's argument that the conduct at issue is disparate and unrelated and that it is unlikely that so many State actors would act with a consistent policy approach. It overwhelmingly shows a consistent policy approach by the Government commencing in August 2011 to the permitting of the Projects, which moreover was ensured by the fact that each significant permitting decision required political support at the ministerial level and could not be decided by technical staff.[431]

*ii.    Respondent*

799. Respondent submits that the impugned acts and omissions of Romania do not, taken together as a composite act, amount to a breach of the BITs. Claimants have failed to demonstrate that the alleged acts and omissions of which they complain were "*part of a State policy aimed at gaining control of the object of investment*" or that they were driven by a conspiracy, a deliberate campaign, or an underlying pattern or purpose. Nor can Claimants make such a claim given the material scope of their claims, the time span of those claims, and the breadth of State actors at which they are directed. Claimants have not demonstrated a link between the alleged acts and omissions of which they complain.

---

[428] C-PHB, para. 238.
[429] C-PHB, para. 239.
[430] C-PO 27, paras 50-53, 204-207. See also C-PHB, para. 240.
[431] C-PHB, para. 241.

Thus, their request that the Tribunal find a composite act breach must be dismissed.[432] Specifically, Respondent argues the following:

800. *First*, the Ministry of Environment's alleged failure to issue the Environmental Permit in 2012 does not amount to a breach of the BIT.[433] Specifically, the EIA Process was not finalized by 29 November 2011.[434] In 2012, RMGC had not met permitting requirements and the Ministry of Environment was not in a position to issue the Environmental Permit. For example, RMGC needed but had not yet obtained the Ministry of Culture's endorsement of the *Project*, the approval of the Waste Management Plan, valid urban plans, a valid urban certificate, was not in compliance with the Water Framework Directive, did not have the surface rights to the Project area and needed but had not obtained all ADCs.[435] Further, contemporaneous evidence demonstrates that State officials considered that the EIA Process was ongoing.[436] Moreover, Gabriel Canada's public disclosures and RMGC's annual reports from late 2011 and 2012 show that the EIA Process was ongoing.[437] In addition, RMGC did not file an administrative or court complaint concerning the Ministry of Environment's alleged failure to issue the Environmental Permit.[438]

801. *Second*, the Government's allegedly coercive attempt to amend the State's level of participation in the Project does not amount to a breach of the BITs.[439] State officials' public statements between August 2011 and December 2011 did not reflect an intent to coerce RMGC into amending the existing contracts.[440] Claimants' representatives freely and willingly *negotiated* with the Ministry of Economy in late 2011.[441] Gabriel Canada's public disclosures form late 2011 and 2012 confirm that RMGC's representatives freely and willingly negotiated with the Ministry of Economy.[442] The Government's alleged failure to issue the Environmental Permit following RMGC's January 2012 offer confirms that the EIA Process was ongoing and that it was separate from the economic negotiations.[443]

---

[432] Counter-Memorial, paras 632-638; Rejoinder, paras 194-207, 747-750, 776-779, 803, 834-835, 841-845, 903-929.
[433] Rejoinder, paras 208-219.
[434] Rejoinder, paras 220-228.
[435] Rejoinder, paras 229-316.
[436] Rejoinder, paras 317-326.
[437] Rejoinder, paras 327-339.
[438] Rejoinder, paras 340-347.
[439] Rejoinder, paras 348-356.
[440] Rejoinder, paras 357-383.
[441] Rejoinder, paras 384-427.
[442] Rejoinder, paras 428-435.
[443] Rejoinder, paras 436-439.

802.    *Third*, the Government's submission and Parliament's rejection of the Roșia Montană Law to Parliament does not amount to a breach of the BITs.[444] More specifically, RMGC actively sought the legislative changes included in the Roșia Montană Law.[445] In addition, by introducing the Roșia Montană Law, the Government was implementing the legislative amendments that Claimants had requested.[446] Claimants supported the Roșia Montană Law and never contemporaneously objected to its introduction.[447] The Government did not call on Parliament to reject the Roșia Montană Law.[448] The Parliament's review and rejection of the Roșia Montană Law complied with Romanian Law.[449]

803.    *Fourth*, following the rejection of the Roșia Montană Law, the State did not breach the BITs.[450] The Ministry of Environment was under no obligation to issue the Environmental Permit. Indeed, RMGC did not submit the requisite Waste Management Plan until March 2013; the Ministry of Culture did not endorse (albeit conditionally) the Project until April 2013; RMGC did not secure the approval of its urban plans; RMGC did not have an urban certificate that was not the subject of court challenges; RMGC did not have the surface rights to the Project Area; RMGC did not have its Water Management Permit, and RMGC did not obtain all archaeological discharge certificates. Claimants continue to mischaracterize and accord undue weight to the March 2013 Note of an Inter-Ministerial Commission. The TAC meetings between May and July 2013 demonstrate that the EIA Process was ongoing and the Ministry of Environment's publication in July 2013 of a note for public consultation did not mean that the Ministry of Environment had decided to issue the Environmental Permit. Gabriel Canada's public disclosures and RMGC's annual report from 2013 and 2014 confirmed that the EIA Process was ongoing, and the Ministry of Environment's alleged failure to issue the Environmental Permit since Parliament's rejection of the Roșia Montană Law does not amount to breaches of the BITs.[451] Further, the Ministry of Culture did not block or reject the Project.[452]

804.    *Lastly*, NAMR's alleged failure to issue the exploitation license for the Bucium Projects does not amount to a breach of the BITs.[453]

---

[444] Rejoinder, paras 440-451.
[445] Rejoinder, paras 452-467.
[446] Rejoinder, paras 468-495.
[447] Rejoinder, paras 496-506.
[448] Rejoinder, paras 507-513.
[449] Rejoinder, paras 514-528.
[450] Rejoinder, paras 527-528.
[451] Rejoinder, paras 529-672.
[452] Rejoinder, paras 673-719.
[453] Rejoinder, paras 720-746.

### c. The Tribunal's analysis

#### i. The approach

805. To decide Claimants' principal claim, the Tribunal will <u>first</u> set out the relevant law to determine this claim (see section ii below), <u>second</u> briefly refer to the relevant facts (see section iii below), <u>third</u> assess the principal claim by analyzing the relevant facts in the view of the applicable law (see section iv below), and <u>finally</u> conclude (see section v below).

#### ii. The law

##### 1. Introduction

806. It is recalled that Claimants' principal claim is the *"composite act"* claim, specifically, that Respondent's acts or omissions constituted a composite act leading to a breach of several provisions of the two BITs, namely, fair and equitable treatment ("FET"), full protection and security ("FPS"), non-impairment by unreasonable and discriminatory measures, failure to observe obligations and non-expropriation measures of the Canada-Romania BIT and/or UK-Romania BIT.

807. The way in which this claim is formulated requires a two-step analysis.

- *First*, an analysis of the elements relevant to determining the claimed "composite act".

- *Second*, an analysis of the relevant norms of the treaty provisions to determine whether the composite act, if established, violated those norms.

808. To the extent that the analysis of the relevant facts does not establish a composite act, the Tribunal may nevertheless proceed on the basis of its analysis of the relevant treaty standards and rule on Claimants' first alternative claim, which does not rely on the existence of a composite act.

809. Accordingly, the Tribunal will begin with the elements relevant to the "composite act" theory (see section below 2), proceed with requirements relevant to the alleged breaches of the two treaties (see section below 3), and conclude on the applicable law to the principal claim (see section below 4).

2.   Composite act

a)   The issue

810.   The Parties disagree on what is required for a series of acts and/or omissions to constitute a composite act capable of breaching an investment treaty obligation.

b)   The Parties' positions

811.   **Claimants** have argued from the outset that Respondent's conduct, which culminated in September 2013, constituted a "composite act" within the meaning of Article 15 of the ILC Articles in violation of the two BITs. They submit that to constitute a composite act, there must be "*some link of underlying pattern or purpose*" between the acts and/or omissions at issue in contrast to a scattered collection of disjointed harms.[454] For Claimants, while systematic policy or practice in breach of an obligation could be characterized as a composite act, the commentary to Article 15 of the ILC Articles refers more broadly to a series of acts or omissions defined in the aggregate as wrongful.[455] Respondent is wrong to suggest that the Tribunal must find that the conduct at issue was "*carried out in an organized and deliberate way*".[456]

812.   In this case there is an undeniable link of pattern and purpose that may be considered as a systematic State policy or practice in the State's conduct directed to the politicization of RMGC's permit applications, and in particular in the treatment of RMGC's application for an Environmental Permit for the Roșia Montană Project. The acts and omissions that form this composite act were in no sense disparate, isolated, or unrelated but instead comprised a course of treatment undertaken by the Government with the object and purpose of assessing whether allowing the Project to be permitted and implemented was politically acceptable to the Government.[457]

813.   The commentary to the ILC Articles clarifies that where the relevant obligation did not exist at the beginning of the course of conduct but came into being thereafter, the "first" of the actions or omissions of the series for purposes of State responsibility will be the first occurring after the obligation came into existence. In this case, while the UK-Romania BIT entered into force on 10 January 1996, the Canada-Romania BIT entered into force on 23 November 2011. This, however, need not prevent the Tribunal from

---

[454] C-PHB, paras 238, 240-241; C-PO 27, paras 88, 103.
[455] C-PO 27, para. 103.
[456] C-PHB, para. 243.
[457] C-PO 27, para. 104.

taking into account earlier actions or omissions in order to establish a factual basis for the later breaches or to provide evidence of intent.[458]

814.    ***Respondent*** submits that under Article 12 of the ILC Articles, a breach of an international obligation occurs or is consummated when an act of the State is not in conformity with what is required of it; this is the date when a claim arises. This rule applies to any act of the State, regardless of whether it qualifies as an instantaneous, continuing, or composite act. Articles, 13, 14 and 15 of the ILC Articles build on this definition in Article 12.[459]

815.    Claimants cannot distinguish between "*a series of acts or omissions defined in aggregate as wrongful*" and "*a systematic State policy or practice in breach of an obligation*" under the law of State responsibility.[460] A series of acts or omissions can be defined in aggregate as wrongful under Article 15(1) of the ILC Articles when there is a systematic State policy or practice that justifies treating that systematic conduct as more than the sum of its individual parts. State conduct can be "defined in aggregate as wrongful" if composed of "systematic policy or practice".[461] Accordingly, a composite breach can only occur when a series of actions or omissions, when grouped together, cumulatively amount to a breach of an obligation, and not at any earlier point in time.[462]

816.    The systematic practice required for a composite act stands in contrast to simple repeated acts, which may form a practice but remain unconnected by a systematic policy. "*A practice does not of itself constitute a violation separate from such breaches*". In that case there is no basis under international law to cumulate the effect of the conduct, as there is not "*a different legal animal from the several acts that comprise it*".[463] Thus, a creeping expropriation can generate a composite act only if there is systematic violation carried out in an organized and deliberate way.[464]

817.    Irrespective of the words used to describe the requirement of orchestration, a systematic policy or practice linking all disjointed conduct is a condition *sine qua non* to establish a composite act under Article 15 of the ILC Articles.[465]

---

[458] C-PO 27, para. 105.

[459] Respondent's response to Claimants' Answers to the Tribunal's Questions in PO No. 27, dated 14 July 2020 ("R-PO 27"), para. 18.

[460] R-PHB, para. 12; R-PO 27, para. 196.

[461] R-PO 27, para. 197.

[462] R-PO 27, para. 19.

[463] R-PO 27, para. 204.

[464] R-PO 27, para. 205.

[465] R-PO 27, para. 207.

818.    Further, according to Respondent, the conduct attributed to Romania does not involve a systematic State policy or practice and therefore cannot be characterized as a composite act. If Claimants' position were correct, any accumulation of State conduct in relation to one investment would amount to a composite act.[466] The evidence does not support Claimants' allegation that the actions and omissions of, *inter alia*, President Traian Basescu, multiple Governments and of multiple Prime Ministers, individual Ministers, all members of Parliament and civil servants of multiple ministries and State agencies were part of a systematic State policy or practice.[467] Claimants have also failed to show any interference in the conduct of the Ministry of Environment and of the TAC by officials of any other Ministry, Prime Minister, President or other senior official throughout the period 2011-2013. This undermines Claimants' theory of an organized and deliberate State campaign targeting RMGC during this period.[468] Accordingly, Romania's conduct cannot be characterized as a composite act.[469]

c)   The Tribunal's analysis

819.    The starting point for the Tribunal's analysis of the "composite act" and the elements required for it is Article 15 of the ILC Articles. Indeed, although not cited by Claimants in their requests for relief, this provision is referred in Claimants' pleadings on its principal claim as well as their pleadings for their FET and expropriation claims generally.

820.    Article 15 of the ILC Articles entitled "Breach consisting of a composite act" reads as follows:

> *1. The breach of an international obligation by a State through a series of actions or omissions defined in aggregate as wrongful occurs when the action or omission occurs which, taken with the other actions or omissions, is sufficient to constitute the wrongful act.*
>
> *2. In such a case, the breach extends over the entire period starting with the first of the actions or omissions of the series and lasts for as long as these actions or omissions are repeated and remain not in conformity with the international obligation.*[470]

821.    Article 15 rests upon a distinction between composite acts and composite obligations. There is no doubt that an investment treaty obligation can be breached by a composite act. It is far less certain whether investment treaty obligations can be accurately described

---

[466] R-PO 27, paras 208-209.
[467] R-PO 27, para. 210.
[468] R-PO 27, para. 211.
[469] R-PO 27, para. 212.
[470] Exh. CL-61 (ILC Articles), Art. 15.

as composite obligations along side the paradigm examples of genocide, apartheid or crimes against humanity in international law. As the ILC noted in its commentary to Article 15, "[i]*t is necessary to distinguish composite obligations from simple obligations breached by a 'composite' act*." The Tribunal will return to this point below (see paras 823 *et seq.*).

822.     In this context, the Tribunal will first look to the commentary to the provision itself (relied upon by both Parties) for guidance. That commentary states, *inter alia*, the following:

> *Composite acts give rise to continuing breaches, which extend in time from the first of the actions or omissions in the series of acts making up the wrongful conduct.*[471]

> *Composite acts covered by article 15 are limited to breaches of obligations which concern some aggregate of conduct and not individual acts as such.* […] *Examples, include the obligations concerning genocide, apartheid or crimes against humanity, systematic acts of racial discrimination, systematic acts of discrimination prohibited by a trade agreement, etc. Some of the most serious wrongful acts in international law are defined in terms of their composite character. The importance of these obligations in international law justifies special treatment in article 15.*[472]

> *Even though it has special features, the prohibition of genocide, […] may be taken as an illustration of a 'composite' obligation. It implies that the responsible entity (including a State) will have adopted a systematic policy or practice. […]. Once that threshold is crossed, the time of commission extends over the whole period during which any of the acts was committed, and any individual responsible for any of them with the relevant intent will have committed genocide.*[473]

> *It is necessary to distinguish composite obligations from simple obligations breached by a 'composite' act. Composite acts may be more likely to give rise to continuing breaches, but simple acts can cause continuing breaches as well. The position is different, however, where the obligation itself is defined in terms of the cumulative character of the conduct, i.e., where the cumulative conduct constitutes the essence of the wrongful act. Thus, apartheid is different in kind from individual acts of racial discrimination, and genocide is different in kind from individual acts even of ethnically or racially motivated killing.*[474]

---

[471] Exh. CL-61 (ILC Articles), Commentary to Art. 15, para. 1.
[472] Exh. CL-61 (ILC Articles), Commentary to Art. 15, para. 2.
[473] Exh. CL-61 (ILC Articles), Commentary to Art. 15, para. 3.
[474] Exh. CL-61 (ILC Articles), Commentary to Art. 15, para. 4.

[…]

*A consequence of the character of a composite act is that the time when the act is accomplished cannot be the time when the first action or omission of the series takes place. It is only subsequently that the first action or omission will appear as having, as it were, inaugurated the series. Only after a series of actions or omissions take place will the composite act be revealed, not merely as a succession of isolated acts, but as a composite act, i.e., an act defined in the aggregate as wrongful.*[475]

*Paragraph 1 of article 15 defines the time at which a composite act 'occurs' as the time at which the last action or omission occurs which, taken with the other actions or omissions, is sufficient to constitute the wrongful act, without it necessarily having to be the last in the series. Similar considerations apply as for completed and continuing wrongful acts in determining when a breach of international law exists; the matter is dependent upon the precise facts and the content of the primary obligation. The number of actions or omissions which must occur to constitute a breach of the obligation is also determined by the formulation and purpose of the primary rule. The actions or omission must be part of a series but the article does not require that the whole series of wrongful acts has to be committed in order to fall into the category of a composite wrongful act, provided a sufficient number of acts has occurred to constitute a breach.* […].[476]

*While composite acts are made up of a series of actions or omissions defined in aggregate as wrongful, this does not exclude the possibility that every single act in the series could be wrongful in accordance with another obligation.* […].[477]

*Paragraph 2 of article 15 deals with the extension of time of a composite act. Once a sufficient number of actions or omissions has occurred, producing the result of the composite act as such, the breach is dated to the first of the acts in the series. The status of the first action or omission is equivocal until enough of the series has occurred to constitute the wrongful act; but at that point the act should be regarded as having occurred over the whole period from the commission of the first action or omission. If this were not so, the effectiveness of the prohibition would thereby be undermined.*[478]

*The word 'remain' in paragraph 2 is inserted to deal with the intertemporal principle set out in article 13. In accordance with that*

---

[475] Exh. CL-61 (ILC Articles), Commentary to Art. 15, para. 7.

[476] Exh. CL-61 (ILC Articles) Commentary to Art. 15, para. 8.

[477] Exh. CL-61 (ILC Articles) Commentary to Art. 15, para. 9.

[478] Exh. CL-61 (ILC Articles) Commentary to Art. 15, para. 10.

> *principle, the State must be bound by the international obligation for the period during which the series of acts making up the breach is committed. In cases where the relevant obligation did not exist at the beginning of the course of conduct but came into being thereafter, the 'first' of the actions or omissions of the series for the purposes of State responsibility will be the first occurring after the obligation came into existence. This need not prevent a court taking into account earlier actions or omissions for other purposes (e.g. in order to establish a factual basis for the later breaches or to provide evidence of intent).*[479]

823. The Tribunal considers that the commentary to Article 15 is essential and informative in the following respects.

824. *First*, as noted in the general commentary to the ILC Articles, these Articles "*do not attempt to define the content of the international obligations, the breach of which gives rise to responsibility*" but this would be "*the function of the primary rules*". As such, as the Tribunal has already noted, the elements of the "composite act" should be more concerned with the question of the type of conduct that should be sought, while the requirements of the treaty provisions are concerned with the question of the content of the State's international obligation.

825. *Second*, the context addressed in Article 15 of the ILC Articles should be viewed with caution. While it is true that Article 15 cites specific, non-exhaustive examples such as genocide, apartheid, or crimes against humanity, and therefore should not be considered limited to these types of cases, it should be noted that certain principles derived from this provision apply specifically to these examples, which are referred to as "composite obligations". For example, genocide is a composite obligation that requires a systemic policy or practice, with the first act as such being unlawful or illegal, thus justifying the backdating of the violation to the first unlawful act. The situation in the investor-State context is certainly different. FET is not a composite obligation.[480]

826. *Third* and nonetheless, a simple obligation which can indeed be found in many of the international obligations in an investor-State treaty can be breached by a composite act, i.e., a series of acts or omissions defined in aggregate as wrongful. This has been

---

[479] Exh. CL-61 (ILC Articles) Commentary to Art. 15, para. 11.

[480] See also Prof. Crawford's opinion in Exh. RLA-215 (State Responsibility, DOCUMENT A/CN.4/498), para. 124 ("[I]*f composite acts are to be dealt with, a distinction needs to be drawn between simple and composite or systematic obligations. Just because a simple obligation is breached by a composite act seems no reason for treating the breach as different in kind. [...] The position is different, however, where the obligation itself (and thus the underlying primary rule) fixes on the cumulative character of the conduct as constituting the essence of the wrongful act. Thus apartheid is different in kind from individual acts of racial discrimination, and genocide is different in kind from individual acts even of ethnically motivated killing.*").

recognized by commentators as well as many investor-State tribunals.[481] Some of these tribunals made references to Article 15 of the ILC Articles, yet without any reference to the requirements of composite obligations contemplated by this provision. What this means is that in investor-State arbitration there is no requirement of systemic policy or practice (and hence not in an organized and deliberate way), meaning that the first act could possibly not be wrongful independently.[482] At the same time, a series of acts or omissions could in the aggregate constitute a composite act, but equally one such act or omission, be it the first, the middle or the last one, could independently and separately violate an investor-State treaty obligation.[483]

827.    *Fourth* and as such, the Tribunal finds the following definitions / approaches of investor-State tribunals (relied also by Claimants) appropriate:

-    There must be a "*clear link between these series of events and that they all culminated in the taking over*" of the investment;[484]

-    There must be "*some link of underlying pattern or purpose between them*".[485]

828.    Accordingly, in the present case, the Tribunal must find that the series of acts or omissions of Respondent between August 2011 and September 2013 were clearly

---

[481] Exh. CL-337 (Brigitte Stern, In Search of the Frontiers of Indirect Expropriation, in Contemporary Issues in International Arbitration and Mediation: The Fordham Papers (Arthur Rovine ed. 2007)), p. 36; Exh. CL-339 (Andrew Newcombe and Luís Paradell, Law and Practice of Investment Treaties: Standards of Treatment (2009)), Sect. 7.15; Exh. CL-338 (Christoph Schreuer, The Concept of Expropriation Under the ECT and other Investment Protection Treaties, in Investment Arbitration and the Energy Charter Treaty (2006)), p. 109; Exh. CL-62 (*Chrystallex International Corporation v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB(AF)/11/2, Award, dated 4 April 2016); Exh. CL-113 (*Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, dated 20 August 2007); Exh. CL-102 (*Siemens A.G. v. Argentine Republic*, ICSID Case No. ARB/02/8, Award, dated 6 February 2007); Exh. CL-132 (*Biloune and Marine Drive Complex Ltd. v. Ghana Investments Centre and Government of Ghana*, Award on Jurisdiction and Liability, dated 27 October 1989, reprinted in 95 INT'L L. REP. 183 (1994)); Exh. CL-152 (*El Paso Energy Int'l Co. v. Argentine Republic*, ICSID Case No. ARB/03/15, Award, dated 31 October 2011); Exh. CL-255 (*Walter Bau Ag (In Liquidation) v. Kingdom of Thailand*, UNCITRAL, Award, dated 1 July 2009); Exh. CL-53 (*Swisslion DOO Skopje v. Macedonia*, ICSID Case No. ARB/09/16, Award, dated 6 July 2012); Exh. CL-260 (*OAO Tatneft v. Ukraine*, UNCITRAL, Award on the Merits, dated 29 July 2014); Exh. CL-122 (*Técnicas Medioambientales Tecmed S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, dated 29 May 2003); Exh. CL-151 (*Rompetrol Group N.V. v. Romania*, ICSID Case No. ARB/06/3, Award, dated 6 May 2013).

[482] Exh. CL-255 (*Walter Bau Ag (In Liquidation) v. Kingdom of Thailand*, UNCITRAL, Award, dated 1 July 2009), para. 9.85 ("*there might be situations in which each act considered in isolation will not result in a breach of a treaty obligation, but if considered as part of a series of acts leading in the same direction they could result in a breach at the end of the process of aggregation.*"); Exh. CL-151 (*Rompetrol Group N.V. v. Romania*, ICSID Case No. ARB/06/3, Award, dated 6 May 2013), at 271 ("*the cumulative effect of a succession of impugned actions by the State of the investment can together amount to a failure to accord fair and equitable treatment even where the individual actions, taken on their own, would not surmount the threshold for a Treaty breach.*").

[483] Contrast Respondent's argument.

[484] Exh. CL-260 (*OAO Tatneft v. Ukraine*, UNCITRAL, Award on the Merits, dated 29 July 2014), para. 330.

[485] Exh. CL-151 (*Rompetrol Group N.V. v. Romania*, ICSID Case No. ARB/06/3, Award, dated 6 May 2013), para. 271.

related, connected by an underlying pattern or purpose such that are collectively characterized as wrongful. While pattern or purpose does not necessarily require that the conduct at issue be "*carried out in an organized and deliberate way*"[486] or with malicious intent, some sort of proof of motive or purpose is called for.[487]

829.     *Fourth* and consequently, as far as the intertemporal element is concerned, as investment treaty obligations are not defined as composite obligations, in the event that a breach on the basis of a composite act can be established, there is no justification for backdating the date of the breach to the first act in the series that constitutes the composite act. Indeed, Claimants do not plead otherwise: they submit that the breach for their principal claim is consummated on the date of the "last" act in the series that constitutes the composite act. It should also be noted that if the breach were said to be backdated to the first act in the series relied upon by Claimants to establish a composite act (i.e. August 2011), then the claim would fall outside the jurisdiction of the Tribunal under the Canada-Romania BIT due to the limitation period in Article XIII(3)(d), which establishes a cut-off of 30 July 2012 for breaches of any obligations under the BIT. Nonetheless, there is nothing preventing this Tribunal from taking into account earlier acts not within its jurisdiction as part of the factual matrix establishing a pattern or underlying purpose that links the acts in the series together, where those acts occur within the scope of the Tribunal's temporal jurisdiction.[488]

830.     Accordingly, the Tribunal will decide on Claimants' composite act claim taking into account the aforementioned principles.

### 3.   The standards of the BITs

#### a)   Introduction

831.     Claimants allege that the composite act resulted in a breach of several provisions of the Canada-Romania and UK-Romania BITs. Specifically, Respondent's acts and omissions were a composite act that breached the FET, FPS, "non-impairment by unreasonable and discriminatory measures", "failure to observe obligations" and prohibition of "expropriation" provisions of the Canada-Romania and/or UK-Romania BITs.

---

[486] This is the definition of systemic nature set out in the commentary to Article 40 of the ILC Articles applying to composite obligations.

[487] Exh. CL-151 (*Rompetrol Group N.V. v. Romania*, ICSID Case No. ARB/06/3, Award, dated 6 May 2013), para. 273 ("*There is much force in the Respondent's argument. The Tribunal starts from the proposition that, whether the conduct in question is stigmatized as 'conspiracy' or as 'organized harassment,' some proof is required, even if all of the actors have the status of State agencies, that different actions pursued on different paths by different actors are linked together by a common and coordinated purpose. This was clearly the view taken by the Rosinvest tribunal, a view which the present Tribunal shares.*").

[488] Exh. CL-340 (*Chevron Corporation (U.S.A.) and Texaco Petroleum Corporation (U.S.A.) v. Republic of Ecuador*, UNCITRAL, Interim Award, dated 1 December 2008).

Accordingly, the Tribunal will proceed and determine the relevant standards of Respondent's international obligations under the two BITs in order to assess Claimants' claims.

832.    In terms of structure, the Tribunal will begin with Claimants' FET claim. The Tribunal does so for the following reasons: In their *Memorial* and *Reply*, Claimants have presented their FET claim first and their expropriation claim last. The same is true in their *Prayers for Relief*, which were set forth only in these two pleadings. Following a comment by Respondent that the expropriation claim was not serious because otherwise it would have been presented first, Claimants presented their expropriation claim first in their later pleadings, namely in their *Answers to the Tribunal's Questions in PO No. 27* and their *Post-Hearing Brief*, followed by their FET claim. In their *Reply Post-Hearing Brief*, Claimants discussed FET first, followed by expropriation. In their final pleading, i.e., their *Answers to the Tribunal's Questions Regarding the Post-2013 Events*, Claimants argued that there had been a violation of FET and a threat of a taking, culminating in the UNESCO inscription. In light of the foregoing, as well as for reasons of judicial economy, the Tribunal considers that it is most appropriate to follow the order of Claimants' Prayers for Relief. All the more so as Claimants' arguments and related claims primary focus on whether Claimants' investment was treated fairly and equitably by Respondent.

b)  Fair and equitable treatment

i.    *The issue*

833.    The Parties disagree on whether the FET obligation is the same in both BITs, as well as on certain aspects of the obligation generally and specifically as far as the Canada-Romania BIT is concerned.

ii.    *The Parties' positions*

834.    According to **Claimants**, Romania failed to accord FET to Gabriel's investment.[489]

835.    Concerning the content of the FET standard, Claimants submit that several tribunals have emphasized that FET is unrelated to whether Respondent has had any deliberate intention or bad faith in adopting the measures in question; while such intention and bad faith can aggravate the situation, they are not an essential element of the standard. Further, the fact that State action may be in furtherance of a legitimate public policy such as environmental protection does not make investment protections inapplicable.[490] Thus, while there is no dispute that States retain the right to exercise regulatory powers when

---

[489] C-PHB, para. 223; Memorial, Sect. X; Reply, Sect. VIII; C-PO 27, paras 61-62.
[490] Memorial, paras 647-648.

they conclude investment treaties, by entering into such treaties, States undertake to exercise those powers in accordance with the standards set forth in these treaties.[491] A breach of the standard need not necessarily arise out of individual isolated acts but can result from a series of circumstances.[492]

836.     Arbitrary modifications to the legal framework on which the investor reasonably relied could give rise to a breach of the standard.[493] Similarly, arbitrary modifications to the standards and criteria that apply to permitting decisions not grounded in the applicable laws may violate the obligation to accord FET.[494] Further, administrative decisions must respect due process rights.[495] In addition, international tribunals have recognized that in some circumstances, maladministration or feckless or negligent regulatory conduct can constitute a failure to accord FET.[496] Moreover, coercive renegotiations and otherwise acting to undermine investments, is a breach of FET.[497]

837.     A review of investment treaty tribunal decisions shows that there is a significant convergence regarding the content of the FET standard regardless of whether the standard is expressed as being tied to the customary international law minimum standard of treatment. Respondent mischaracterizes the standard under the Canada-Romania BIT. As many tribunals have observed, the content of the customary international law minimum standard of treatment has evolved over time and, as such, is not materially different in practice from the standard of FET applied by investment treaty tribunals today.[498] To the extent that the Tribunal interprets Article II(2) of the Canada-Romania BIT as being more limited in relation to FET, Gabriel Canada also is entitled to the Most Favored Nation ("MFN") treatment provided by Article II(1)-(2) of the Canada-Romania BIT which includes the level of treatment provided by Romania in this respect to investors pursuant to the UK-Romania BIT.[499] Thus, Respondent's contention that treatment must be "egregious" and even "shocking" to breach the standard cannot be accepted, but even if it were, Romania's treatment of Gabriel's investment is nothing short of egregious and shocking.[500]

---

[491] Memorial, para. 649.
[492] Memorial, para. 651.
[493] Memorial paras 656-659.
[494] Memorial, paras 660-665.
[495] Memorial, paras 666-669.
[496] Memorial, paras 670-673.
[497] Memorial, paras 674-676.
[498] Reply, paras 462-479.
[499] Reply, paras 479-481.
[500] C-PHB, para. 224.

838.    Concerning the UK-Romania BIT standard, Claimants agree that the Tribunal must determine whether in view of the facts of this case, Romania's conduct was unfair or inequitable.[501]

839.    In addition, Respondent's repeated argument that the failure to issue the Environmental Permit falls within a "margin of appreciation", that the Tribunal should "defer" to the "decision" of the State authorities, and that consideration should be given to the precautionary principle, has no relevance to this case. This is not a case where a decision on the merits of an environmental assessment was taken and is subject to challenge. The evidence is overwhelming that the competent authorities concluded that the conditions for the Environmental Permit were met, but that the Government decided to terminate the Project on political grounds.[502]

840.    **Respondent** submits that there could not have been a breach of FET on 9 September 2013. To prove the consummation of a breach of FET on 9 September 2013 under Article II(2) of the Canada-Romania BIT, Gabriel Canada needed to establish that Romania's treatment of Gabriel Canada's investment was egregious, thus falling short of "*the customary international minimum standard of treatment of aliens.*" In turn, a breach of the standard under Article 2(2) of the UK-Romania BIT could only occur if Romania's treatment of an investment were deemed unfair and inequitable.[503]

841.    Respondent does not dispute the content of the standard as it relates to the UK-Romania BIT. It nonetheless argues that the Canada-Romania BIT incorporates a materially lower standard of treatment as the BIT refers to the customary international law minimum standard such that only conduct considered as "egregious" (*Neer* standard) will be considered as a breach. Even if the Tribunal considered that the FET standard in the Canada-Romania BIT should be interpreted in light of the standard of FET applied in investment treaty tribunals today, tribunals still regard the *Neer* case formulation – limiting the potential liability of a State under the FET standard to egregious conduct – as relevant to inform the contents of the FET standards.[504] Further, Claimants cannot rely on the MFN provision of the Canada-Romania BIT to import Article 2(2) of the UK-Romania BIT.[505]

842.    Even assuming Claimants' extensive interpretation of the FET standard under the UK-Romania BIT, Claimants have failed to demonstrate a breach. Romania did not act arbitrarily (arbitrariness requires a willful disregard of due process of law, an act which

---

[501] Reply, paras 482-484.
[502] C-PHB, para. 225.
[503] R-PO 27, para. 29.
[504] Rejoinder, paras 139-152.
[505] Rejoinder, paras 152-157.

shocks or at least surprises a sense of judicial propriety), did not violate Claimants' legitimate expectations (which require specific promises or representations and not reliance on a BIT as a kind of insurance policy), did not fail to act transparently (pretense of process), and did not breach due process (wilful neglect of duty, an insufficiency of action falling far below international standards, even subjective bad faith) with respect to Claimants. In assessing if Romania's alleged conduct breached the BIT's FET standards, the Tribunal should have regard to the margin of appreciation (discretion and deference) under which Romanian State organs legitimately operated.[506]

843.    There could not have been a consummation of a breach of either standard on 9 September 2013, because there was no conduct attributable to Romania affecting Claimants' investment on that date. Claimants refer to two speeches of two individuals (Senator Antonescu and Prime Minister Ponta) on 9 September 2013 (but allege that these two speeches anticipated Romania's future conduct) or refer to an alleged "rejection" and "repudiation" of rights of Gabriel Canada and Gabriel Jersey on that date but do not designate the perpetrator(s) of such actions. Either way, Claimants have failed to prove any conduct or "treatment" by Romania on that date, let alone treatment below the international law minimum standard of treatment.[507]

844.    Claimants' characterization of the alleged breaches as "creeping" does not change the fate of their FET claims, as there cannot be any such breach without "*a series of cumulative acts and omissions*". On 9 September 2013 there needed to be at least conduct of Romania creating a "watershed moment" for an otherwise immaterial series of previous acts to convert the interference on 9 September 2013 into one with more or less irreversible effect. Here, there was no effect on 9 September 2013, let alone irreversible effect.[508]

845.    Further, Claimants do not identify a precise measure attributable to Respondent that resulted in a breach of FET.[509]

                                                        *iii.    The Tribunal's analysis*

846.    The requirement of FET is found in Article 2(2) of the UK-Romania BIT & Article II(2)(a) of the Canada-Romania BIT.

---

[506] Rejoinder, paras 160-193.
[507] R-PO 27, para. 30.
[508] R-PO 27, para. 31.
[509] R-PO 27, Sect. 2.2.1.

847.    Article 2(2) of the UK-Romania BIT provides that "[i]*investments of nationals or companies of each Contracting Party shall at all times be accorded fair and equitable treatment.*"

848.    Article II of the Canada-Romania BIT provides that "[e]*ach Contracting Party shall accord investments or returns of investors of the other Contracting Party treatment in accordance with the customary international law minimum standard of treatment of aliens including fair and equitable treatment*".

849.    Annex D of the Canada-Romania BIT provides "[f]*or greater certainty, 'fair and equitable treatment' includes the obligation not to deny justice in criminal, civil or administrative adjudicatory proceedings in accordance with the customary international law minimum standard of treatment of aliens*".

850.    In order to decide which standard is appropriate in the present case, *the Tribunal* must interpret the two provisions according to the ordinary meaning of their wording and in light of their context (that is, Article 31 of the VCLT).

851.    Starting *first* with <u>Article 2(2) of the UK-Romania BIT</u>, the FET standard therein is an autonomous standard. This means that its meaning must be determined by the Tribunal taking into account its wording and the factors that are relevant to case at hand.[510]

852.    Article 2(2) speaks only of "fair and equitable treatment" and provides no further details or definitions in this regard. The Tribunal must therefore first determine what is meant by "fair and equitable treatment" in its ordinary meaning. There is a consensus in investor-State arbitration that "fair" and "equitable" refer to concepts such as justice, legitimacy, impartiality, and lack of arbitrariness, as well as treatment that is acceptable from an international perspective.[511] They presuppose elements of good faith, due process, non-discrimination, and proportionality.[512] And while good faith requires the absence of bad faith, bad faith or intent is not necessarily required to establish a violation of this provision. There are two reasons for this: first, there is nothing in the wording of Article 2(2) or in the UK-Romania BIT to suggest the requirement of bad faith or intent; second, a State's acts or omissions could negligently violate the protections afforded to

---

[510] Exh. CL-107 (*Joseph Charles Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, dated 14 June 2010), paras 284-285 ("*The FET standard defined in the BIT is an autonomous treaty standard, whose precise meaning must be established on a case-by-case basis. It requires an action or omission by the State which violates a certain threshold of propriety, causing harm to the investor, and with a causal link between action or omission and harm. The threshold must be defined by the Tribunal, on the basis of the wording of Article II.3 of the BIT, and bearing in mind a number of factors, […].*").

[511] Exh. CL-97 (*Saluka Investments BV v. Czech Republic*, UNCITRAL, Partial Award, dated 17 March 2006), para. 297.

[512] Exh. CL-86 (*MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/7, Award, dated 25 May 2004), para. 109 (quoting Judge Schwebel).

an investor by an investor-State treaty without them having to be egregious or outrageous.[513]

853.  In the present case, the questions that become relevant in the context of the interpretation of Article 2(2) of the UK-Romania BIT are the following:

- Whether the State acted arbitrarily or discriminatorily or inconsistently (be it wilfully or not);

- Whether the investor was denied due process;

- Whether the State has acted inconsistently with the specific assurances made to the investor and thus with the investor's legitimate expectations;

- Whether the State or its officials abused their power.

854.  Mere inconsistency or mere lack of transparency without anything further (such as the above) is not sufficient for a breach to be established. In any event, consistent behaviour and transparency, as well as non-arbitrariness and non-discrimination, all require due process to be followed at all times when the investor is present in the host State. While bad faith and intent or egregious conduct are not required to violate these requirements or due process generally, simple error, controversial decisions, inconsistent application of a policy, and/or a misapprehension of facts are not sufficient in principle to establish a violation. Ultimately, what matters is an objective assessment of the facts in a particular case.[514]

855.  As for the investor's legitimate expectations, these may refer to assurances and representations made by the host State to the investor itself at the time of the investment.

---

[513] Exh. CL-85 (*Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award, dated 14 July 2006), para. 372 (citing *CMS Gas Transmission Company v. The Republic of Argentina*, ICSID Case No. ARB/01/8, Award, dated 12 May 2005), para. 280 ("*Except for Genin, there is a common thread in the recent awards under NAFTA and Tecmed which does not require bad faith or malicious intention of the recipient State as a necessary element in the failure to treat investment fairly and equitably. As recently stated in CMS, it is an objective standard 'unrelated to whether the Respondent has had any deliberate intention or bad faith in adopting the measures in question. Of course, such intention and bad faith can aggravate the situation but are not an essential element of the standard.' It is also understood that the conduct of the State has to be below international standards but those are not at the level of 1927. A third element is the frustration of expectations that the investor may have legitimately taken into account when it made the investment. The standards of conduct agreed by the parties to a BIT presuppose a favorable disposition towards foreign investment, in fact, a pro-active behavior of the State to encourage and protect it. To encourage and protect investment is the purpose of the BIT. It would be incoherent with such purpose and the expectations created by such a document to consider that a party to the BIT has breached the obligation of fair and equitable treatment only when it has acted in bad faith or its conduct can be qualified as outrageous or egregious.*").

[514] Exh. CL-163 (*Cargill Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/05/2, Award, dated 18 September 2009), para. 292.

They do not concern a general expectation of compliance with the law nor the subjective expectations of the investor.[515]

856.    Indeed, in evaluating the State's actions, the Tribunal must consider certain prevailing factors. In particular, it must consider the State's right to regulate and to issue decisions to protect the public interest, as well as socioeconomic and political factors prevailing at the time.[516] However, at no time may a State or its officials abuse their official powers and act in a manner inconsistent with the above conditions.

857.    With regard to the so-called margin of appreciation, i.e., the deference that an international tribunal grants to domestic authorities in relation to matters falling within their jurisdiction when applying an international standard, the Tribunal takes the following view:

-    First, the Tribunal applies the law (i.e., international law) to the facts of the case in accordance with its objective assessment of the relevant legal norms and evidence before it.

-    Second, in doing so, it is not required to substitute itself for Respondent or the State or State entities in deciding whether a decision made was wrong in law or fact. Instead, it must consider whether the State acted in accordance with international law with respect to a decision, or act, or omission. This is not only because States are sovereigns with the primary responsibility to regulate, but also because the mandate of this Tribunal, and any investor-State tribunal, is different in scope to that of a State's regulatory agency or court.

-    Third and therefore, while this exercise could be seen as applying a kind of deference or discretion, the Tribunal will never proceed in a blunt or abstract manner; instead, it will proceed with the above principles in mind and in accordance with the law.

858.    In order to find a breach of Article 2(2) of the UK-Romania BIT, the Tribunal will consider whether: Romania has acted in an arbitrary, discriminatory or inconsistent manner with respect to Claimants' investments; whether it has denied due process to Claimants; whether it has acted inconsistently with specific representations made to Claimants; and finally whether it or its officials have abused their power in doing so.

859.    *Second*, <u>Article II(2)(a) of the Canada-Romania BIT</u>, treats FET as part of the customary international law minimum standard of treatment. The Tribunal nonetheless considers

---

[515] Exh. CL-103 (*EDF Services Ltd. v. Romania*, ICSID Case No. ARB/05/13, Award, dated 8 October 2009), para. 219.

[516] Exh. CL-107 (*Joseph Charles Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Jurisdiction and Liability, dated 14 June 2010), paras 284-285.

that the correct approach is not to interpret the reference to the minimum standard of treatment rigidly, but instead to take into account the evolution of customary international law, which, as is clear from the wording of Article II(2)(a) of the Canada-Romania BIT "*includ*[es]" FET.[517] It therefore does not require "egregious" conduct, and is indeed the position taken by many arbitral tribunals.[518] Moreover and accordingly, it cannot deprive the reference to the standard of any meaning.[519]

860.     Accordingly, the Tribunal considers that the FET standard is the same in both BITs and as developed above (see para. 856).

861.     In addition, FET can generally be violated by a conduct characterised as a composite act, as discussed above (see paras 827 *et seq.*).

862.     In light of the above findings, there is no need for the Tribunal to address Claimants' MFN argument.

### c)   Full protection and security

#### i.   The issue

863.     The Parties disagree on whether the requirement of FPS found in the two BITs is limited or not to physical protection of the investor and its investments.

#### ii.   The Parties' positions

864.     According to **Claimants**, Romania failed to provide FPS to Gabriel's investment. FPS is, according to Claimants, a standard of due diligence. It is not limited to police protection against physical harms; although many authorities focus on that prominent aspect, the standard also encompasses legal protection and security, including against wrongful conduct taken by State actors. The series of arbitrary and unlawful acts and omission attributable to the State in this case constituted a failure to exercise the basic due diligence required by the FPS standard to provide essential protection for Gabriel's investment.[520]

---

[517] Exh. RLA-66 (*International Thunderbird Gaming v. United Mexican States*, UNCITRAL, Award, dated 26 January 2006), para. 194.

[518] Exh. CL-139 (*Waste Management, Inc. v. United Mexican States*, ICSID Case No. ARB(AF)/00/3, Award, dated 30 April 2004), paras 98-99; Exh. CL-145 (*Mondev International Ltd. v. United States of America*, ICSID Case No. ARB(AF)/99/2, Award, dated 11 October 2002), paras 115-123.

[519] Exh. CL-47 (*OKO Pankki OYJ, VTB Bank (Deutschland) AG, Sampo Bank Plc v. Republic of Estonia*, ICSID Case No. ARB/04/6, Award, dated 19 November 2007), para. 237.

[520] C-PHB, para. 226; Memorial, Sect. XI; Reply, Sect. IX; C-PO 27, para. 63.

865.    Through its acts and omissions, Romania failed to provide physical or legal protection and security to Gabriel's investments.[521]

866.    According to **Respondent** the Canada-Romania BIT does not provide for broader legal security and does not require treatment beyond the customary international law standard.[522] Respondent also maintains that it is an obligation to provide protection and security only from harm caused by third parties and not by the State's own conduct.[523]

867.    Respondent submits that to establish that on 9 September 2013 Romania consummated a breach of FPS under Article II(2) of the Canada-Romania BIT, Gabriel Canada was required to prove that as of that date Romania did not maintain the "*level of police protection required under the customary international law minimum standard of treatment of aliens*" or otherwise failed to exercise due diligence in the prevention of physical harm suffered by Gabriel Canada's investments in breach of the minimum standard of treatment of aliens. Gabriel Canada does not allege any physical harm on 9 September 2013 (or indeed at any point in time); thus Romania did not breach this standard. That conclusion applies *mutatis mutandis* to Romania's obligation of due diligence in the physical protection of Gabriel Jersey's investments under Article 2(2) of the UK-Romania BIT.[524]

868.    Claimants' arguments as to the date of breach of the FPS standards under the treaties repeat the same arguments as for FET, repackaged as a "denial of procedural justice". To the extent that the arguments are not materially distinguishable, the reasons justifying a rejection of the date of breach of FET apply to FPS too.[525]

                                            *iii.    The Tribunal's analysis*

869.    The relevant provisions for FPS are, like the FET provision, found in Article 2 of the UK-Romania BIT and Article II of the Canada-Romania BIT.

870.    Article 2(2) of the UK-Romania BIT provides that "[i]*nvestments of nationals or companies of each Contracting Party shall at all times [...] enjoy full protection and security in the territory of the other Contracting Party.*"[526]

871.    Article II(2) of the Canada-Romania BIT provides that "[e]*ach Contracting Party shall accord investments or returns of investors of the other Contracting Party treatment in*

---

[521] Memorial, paras 708-713.
[522] Counter-Memorial, para. 644.
[523] Counter-Memorial, Sect. 9.3.2.
[524] R-PO 27, para. 33.
[525] R-PO 27, para. 34.
[526] Exh. C-3 (UK-Romania BIT), Art. 2(2).

*accordance with the customary international law minimum standard of treatment of aliens, including* […] *full protection and security*" and that "[t]*he concept*[] *of* […] *'full protection and security' […] do[es] not require treatment in addition to or beyond that which is required by the customary international law minimum standard of treatment of aliens.*"[527]

872. Annex D of the Canada-Romania BIT provides further that "*'full protection and security' requires the level of police protection required under the customary international law minimum standard of treatment of aliens.*"[528]

873. In order to determine the content of the standard(s), *the Tribunal* will proceed, as in the case of the FET, with the interpretation of the clear wording of the two provisions in light of their context as contemplated by the VCLT.

874. With respect to <u>Article 2(2) of the UK-Romania BIT</u>, a good faith interpretation of the meaning of the term "full protection and security" leads to the conclusion that, as in the case of FET, it is an autonomous norm that must be interpreted according to its terms and the circumstances of the individual case.[529] Traditionally, the phrase "full protection and security" referred to the protection of investors from physical interference with their investments caused by third parties.[530] And although the use of the word "full" makes the term broad, the Tribunal does not consider that this protection has evolved to include legal or commercial protection. This is because legal protection is in any event covered by FET and there would have been no purpose served in including two standards with exactly the same scope. Further, the inclusion of commercial protection within the scope of the BIT and in particular the FPS provision would significantly lower the requirements for establishing liability and run counter to the objective of the BIT, which is to protect investors and investments from conduct that is wrongful under international law and not under domestic law. Moreover, the inclusion of an obligation to protect investors from commercial harm caused by third parties is an obligation that would be impossible for any State to fulfil.

875. Accordingly, the failure to provide physical security and protection would breach FPS. Thus, the relevant question for the Tribunal would be whether Respondent failed to provide physical protection and security to Claimants and/or their investments in respect of the acts of third parties.

---

[527] Exh. C-1 (Canada-Romania BIT), Art. II(2).

[528] Exh. C-1 (Canada-Romania BIT), Annex D.

[529] Exh. CL-113 (*Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Award, dated 20 August 2007), para. 7.4.15.

[530] Exh. CL-106 (*Biwater Gauff Ltd. v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, dated 24 July 2008), para. 730.

876.    As for as <u>Article II(2) of the Canada-BIT</u>, the Tribunal reaches the same conclusion as with Article 2(2) of the UK-Romania BIT (see paras 874-875 above), particularly as in Article II(2) reference is also made to "police protection".

877.    Similar to FET, conduct may as a composite act also breach FPS.

d)  Unreasonable or discriminatory measures

i.    <u>*The issue*</u>

878.    The Parties are in principle in the same line as far as the non-impairment standard of the UK-Romania BIT and national treatment standard of the Canada-Romania BIT. Where they fundamentally disagree is on the application of these standards to the facts of the case.

ii.    <u>*The Parties' positions*</u>

879.    According to **Claimants**, Romania's conduct constituted an unreasonable or discriminatory measure that impaired Gabriel's investment in breach of obligations under both BITs.[531]

880.    The standard of treatment incorporated in Article 2(2) of the UK-Romania BIT as regards unreasonable measures reflects the principle of customary international law that the legal rights of aliens must not be impaired arbitrarily. With regard to discriminatory measures, the obligation set forth in the Canada-Romania BIT for the Contracting Parties to grant covered investments treatment that is no less favorable than the treatment provided to investors of its own investors in like circumstances, sometimes referred to as "national treatment", is analogous insofar as it prohibits discriminatory treatment. Measures which include both acts and omissions, that impair the management, maintenance, use, enjoyment or disposal of investments may result in a significant or even total deprivation in the value of an investment. When those measures are unreasonable or discriminatory, they violate this standard of treatment. For discriminatory measures, there is no requirement of discriminatory intent.[532]

881.    Pursuant to the MFN treatment provision in Article III(1)-(2) of the Canada-Romania BIT, Gabriel Canada is entitled to the benefits of the non-impairment standard obligation in the UK-Romania BIT and to any other more favorable substantive guarantees contained in Romania's BITs with third party States.[533] With regard to discriminatory

---

[531] C-PHB, para. 227; Memorial, Sect. XII; Reply, Sect. X; C-PO 27, paras 64-69.
[532] Reply, para. 519; Memorial, paras 714-731.
[533] Memorial, para. 716.

measures, the standard makes clear that it refers to treatment in a different manner in similar circumstances without reasonable or justifiable grounds.[534]

882.    In stark contrast to its political repudiation of Gabriel's investment, between 2011-2015 Respondent issued (i) 100 exploitation licenses based on exploration results under exploration licenses, (ii) an environmental permit for the Certej project approximately 35 kilometers from Roşia Montană (accepting conclusions of a cumulative environmental impact study of that project and of the Roşia Montană Project that RMGC commissioned during the EIA Process), and (iii) water and environmental operating permits to the large, accident-prone neighboring State-run Roşia Poieni copper mine, which is the region's most significant polluter. While Respondent cannot and so does not deny that RMGC's Projects received treatment that was different in material respects from the others discussed, Respondent offers the proposed justification that Roşia Poieni, for example, was subject to a different legal regime for environmental permitting. The facts show, however, that while other projects may have been treated in accordance with the applicable legal regime, RMGC's projects unjustifiably were not, leading Prime Minister Ponta to explain that his "Plan B" was to state in respect of Roşia Montană that "*only this project was rejected on a political criterion*".[535]

883.    According to ***Respondent***, Claimants fail to establish the legal standards to assess whether the measures complained of amount to breaches of Article II(3) of the Canada-Romania BIT and Article 2(2) of the UK-Romania BIT. To demonstrate a breach of the national treatment standard under Article III(3) of the Canada-Romania BIT, or the non-impairment standards by way of discriminatory measures under Article 2(2) of the UK-Romania BIT, Claimants must show, cumulatively, that economic operators are in like circumstances.

884.    Respondent submits that Claimants repeat the same allegations of breach of FPS when discussing the alleged breach on 9 September 2013 of the non-impairment standard under the UK-Romania BIT. Nonetheless, to establish the consummation of a breach of the non-impairment standard under Article 2(2) of the UK-Romania BIT on 9 September 2013, Claimants need to prove that Gabriel Jersey suffered on that date an impairment of its protected investment in Romania as to the management, maintenance, use, enjoyment or disposal thereof. They must also show that the impairment was caused by a "measure" of Romania, and that such measure was unreasonable or discriminatory. Claimants do not allege, let alone prove, an impairment affecting any rights of Gabriel Jersey on 9 September 2013. Accordingly, the claim fails.[536]

---

[534] Reply, para. 526; Memorial, paras 716-719, 731-733.
[535] C-PHB, para. 227; Memorial, Sect. XII; Reply, Sect. X; C-PO 27, paras 64-69.
[536] R-PO 27, para. 35; Rejoinder, paras 782-793; Counter-Memorial, paras 665-669.

885.    Claimants have also failed to identify a measure occurring on that date (and thus, *a fortiori* an unreasonable or discriminatory measure) and the reasons justifying a rejection of the date of breach of FET on this date apply to the non-impairment standard under Article 2(2) of the UK-Romania BIT as well. That applies to both the Project and the Bucium perimeter, which Claimants now allege was similarly affected on that date.[537]

886.    As to the latter, Romania could not have breached the non-impairment standard on 9 September 2013 for the additional reason that on that date, Gabriel Jersey did not own a protected investment in the Bucium perimeter; to the extent that they refer to the Bucium Exploration License owned by RMGC (not Gabriel Jersey), that license lapsed in 2007. RMGC's alleged right to obtain exploitation licenses for the Rodu-Frasin and Tarniţa deposits could not have been impaired on 9 September 2013 even if such right had existed (which is denied).[538]

887.    To establish that Romania breached Article 2(2) of the UK-Romania BIT through discriminatory treatment on 9 September 2013, Claimants were required to prove that on that date there was another company in like circumstances as compared to RMGC, which received different treatment and that no rational justification existed for that different treatment. Claimants allege that the Certej, Roşia Poieni, and Cernavoda projects were treated in accordance with the law in relation to their applications for environmental permits, but they do not show that any discriminatory act occurred, let alone on 9 September 2013. Their allegation of breach of Article III(3) of the Canada-Romania BIT on 9 September 2013 must thus be rejected.[539]

### iii.    *The Tribunal's analysis*

888.    The unreasonable or discriminatory measures standard is found in Article 2(2) of the UK-Romania BIT and Article III(3) of the Canada-Romania BIT.

889.    Article 2(2) of the UK-Romania BIT provides that "[n]*either Contracting Party shall in any way impair by unreasonable or discriminatory measures the management maintenance, use, enjoyment or disposal of investments in its territory of nationals or companies of the other Contracting Party.*"

890.    Article III(3) of the Canada-Romania BIT provides that "[e]*ach Contracting Party shall grant to investments or returns of investors of the other Contracting Party treatment no less favourable than that which, in like circumstances, it grants to investments or returns*

---

[537] R-PO 27, para. 36.
[538] R-PO 27, para. 37; Rejoinder, paras 94-96, 804; Counter-Memorial, paras 428-433 505, 580-583.
[539] R-PO 27, para. 38; Rejoinder, paras 794-802; Counter-Memorial, paras 658-696.

*of its own investors with respect to the expansion, management, conduct, operation and sale or disposition of investments.*"

891.   Although the Parties may not necessarily disagree on the elements of the two standards, the Tribunal will nonetheless examine the two provisions and set forth the relevant requirements. In doing so, it will again refer to the wording of the two provisions, taking into account their context.

892.   Article 2(2) of the UK-Romania BIT contains the requirement of reasonableness and non-discrimination; a requirement that also applies to other BIT provisions examined by the Tribunal, namely the provisions on FET and FPS. It is clear from the wording of the provision that measures, which include both acts and omissions, that are unreasonable or discriminatory and which impair the management, maintenance, use, enjoyment, or disposal of investments and result in a significant or even total deprivation in the value of an investment violate this standard.

893.   While the terms "unreasonable" or "discriminatory" are not defined in the BIT itself, their meaning has almost always been uniformly recognized in the investor-State context. Specifically, unreasonable, or arbitrary or unjustifiable conduct,[540] occurs when the State fails to observe due process and legitimacy.[541] As to discrimination, the term is clear in that it is treatment that is less favorable than that accorded to others in similar situations without a legitimate basis for the distinction. No intent is required to conclude that a State's measures are discriminatory.[542]

894.   Article III(3) of the Canada-Romania BIT contains a national treatment clause that is intended to require a host State not to make a negative distinction between foreign and domestic investors in the enactment and application of its rules and regulations, thereby elevating the position of the foreign investor to that of nationals.[543] National treatment,

---

[540] Exh. CL-98 (Christoph Schreuer, Protection Against Arbitrary or Discriminatory Measures, in Catherine A. Rogers & Roger P. Alford (Eds.), The Future of Investment Arbitration (2009)), p. 183.

[541] Exh. CL-103 (*EDF (Services) Ltd. v. Romania*, ICSID Case No. ARB/05/13, Award, dated 8 October 2009), para. 303; Exh. CL-104 (*Toto Costruzioni Generali S.p.A. v. Republic of Lebanon*, ICSID Case No. ARB/07/12, Award, dated 7 June 2012), para. 157; Exh. CL-85 (*Azurix Corp. v. Argentine Republic*, ICSID Case No. ARB/01/12, Award, dated 14 July 2006), para. 393.

[542] Exh. CL-109 (*Electrabel S.A. v. The Republic of Hungary*, ICSID Case No ARB/07/19, Decision on Jurisdiction, Applicable Law, and Liability, dated 30 November 2012), para. 7.152; Exh. CL-106 (*Biwater Gauff Ltd. v. United Republic of Tanzania*, ICSID Case No. ARB/05/22, Award, dated 24 July 2008), para. 695 (citing *U.S. v. Italy* (Elettronica Sicula Spa [ELSI]), 1989 ICJ Reports 15, 20 July 1989), para. 128); Exh. CL-177 (*Plama Consortium Ltd. v. Republic of Bulgaria*, ICSID Case No. ARB/03/24, Award, dated 27 August 2008), para. 184.

[543] Exh. CL-88 (Rudolf Dolzer & Christoph Schreuer, Principles of International Investment Law (2012)), p. 198.

which is also a feature of FET, guarantees equality before the law and equal protection under the law.[544] Intent is not required here either.

895.    Accordingly, the same elements set out for FET apply here as well. In addition, the Tribunal will address the question of whether Claimants and/or their investments were treated differently (and negatively) by Respondent as compared to other investors in similar circumstances.

896.    In light of the above, and similar to FET, conduct that is unreasonable or discriminatory or that differentiates between foreign and national investors may also violate this provision as a composite act.

e) Observance of obligations (umbrella clause)

i. *The issue*

897.    The Parties' disagreement is whether the observance of obligations requirement of the UK-Romania BIT requires that such obligations had been entered into specifically between the two Parties.

ii. *The Parties' positions*

898.    According to **Claimants**, Romania failed to observe obligations entered into with regard to Gabriel's investment. Romania entered into obligations with regard to Gabriel's investment through RMGC's Articles of Association, the Roşia Montană License, and the Bucium Exploration Licenses. The State repeatedly acknowledged that it was party to the joint-venture agreements with Gabriel (reflected in RMGC's Articles of Association), as it demanded a greater shareholding percentage of that venture. The State also entered into obligations with regard to Gabriel's investment by entering into the license agreements with RMGC, Gabriel's investment. ███████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████[545]

899.    Romania has repudiated its obligation to Gabriel in relation to its joint-venture, RMGC, and has repudiated and disavowed in effect the Roşia Montană License and its obligation

---

[544] Exh. CL-143 (Andrew Newcombe & Lluís Paradell, Law and Practice of Investment Treaties: Standards of Treatment (2009)), Sect. 4.6.

[545] C-PHB, para. 228; Memorial, Sect. XIII; Reply, Sect. XI; C-PO 27, para. 70.

to grant the exploitation licenses for Bucium. The terms of Article 2(2) of the UK-Romania BIT are clear that it covers obligations entered into with regard to investments of covered investors; there is nothing in the treaty requiring "contractual privity" as Respondent argues. Moreover, this is not a case of simple commercial breach of contract, but of the State's repudiation of the very agreements themselves, which is a most fundamental failure to observe obligations.[546]

900. Finally, Respondent's argument that the MFN clause in Article III(1) of the Canada-Romania BIT does not attract the more favorable treatment accorded to Gabriel Jersey under the UK Romania BIT in Article 2(2) is without merit. While "treatment" in Article III(1) is not defined in the Canada-Romania BIT, the assumption of a treaty obligation towards a third State is a sufficient manifestation of treatment. As a matter of general international law, a treaty obligation assumed towards a third State may constitute treatment for the purpose of the MFN clause.[547]

901. Article 2(2) of the UK-Romania BIT by its terms refers to any obligation the State "*may have entered into with regard to investments of nationals or companies of the other Contracting Party*." It is not limited to obligations entered into with nationals or companies themselves.[548]

902. **Respondent's** position is that Article 2(2) of the UK-Romania BIT could only apply to obligations entered into by the State with Gabriel itself. In addition, Gabriel does not have standing to present such claims under a contract to which it is not a party.[549]

903. According to Respondent, to establish that on 9 September 2013 Romania consummated a breach of the umbrella clause under Article 2(2) of the UK-Romania BIT, Claimants need to prove that on that date an underlying contract existed between Romania and Gabriel Jersey. No such contract ever existed and thus there was no "repudiation" thereof under Romanian law, let alone one that could have been elevated to a breach of the UK-Romania BIT. Claimants refer to RMGC's Articles of Association but Romania is not a party thereto. They also refer to the Roşia Montană License, but Claimants are not a party thereto (and neither is Romania). They refer to the Bucium License presumably as a reference to the Bucium Exploration License, but that license expired in 2007 and thus did not exist on the critical date. Also, neither Romania nor Claimants are party thereto under Romanian law (only RMGC and NAMR are).[550]

---

[546] C-PHB, para. 229.
[547] C-PHB, para. 230; Memorial, para. 655, fn. 1313.
[548] Reply, para. 537.
[549] Counter-Memorial, para. 495.
[550] R-PO 27, para. 39; Rejoinder, paras 831-832, 932-937; Counter-Memorial, para. 424.

<em>iii.     The Tribunal's analysis</em>

904.    The requirement to observe obligations entered into with regard to investments is found in Article 2(2) of the UK-Romania BIT. Article 2(2) of the UK-Romania BIT provides that "[e]*ach Contracting Party shall observe any obligation it may have entered into with regard to investments of nationals or companies of the other Contracting Party.*"[551]

905.    To resolve the Parties' disagreement which, as set out above, also concerns the admissibility of Gabriel Jersey's claims, the Tribunal will examine the wording of the provision in light of its context.

906.    In the present case, Article 2(2) of the UK-Romania BIT requires States to observe any obligations or commitments entered into with regard to investments of the investor. This provision, also known as the "umbrella clause", places "obligations" under the protective umbrella of an investment treaty.[552] The provision itself is broad, in that it does not define the term "obligations" and does not clearly state whether the obligations or commitments must contractually bind the host State and the investor. However, an interpretation of the provision and its terms in accordance with Article 31 of the VCLT would lead to the conclusion that "obligations" are limited in that they do not cover all possible contractual relationships entered into between State organs and private parties. This is because when a State enters into a BIT, it does so as a sovereign from the perspective of international law and not as a government that can conclude contracts with private entities under domestic law. Accordingly, elevating any contractual relationship into a treaty obligation contradicts the aim and purpose of the BIT itself. The "umbrella clause" is therefore aimed at the conduct of the State as a sovereign, particularly when that State interferes with any obligations entered into between State organs and private parties. This is also consistent with the term "observe", which means to "follow", to "pay attention to", to "conform to", but which does not mean to "perform". The obligation to "perform" is a different one and is only imposed on the contracting parties themselves. Accordingly, the scope of an umbrella clause covers claims of sovereign interference by the State in respect of obligations entered into by a manifestation of the State.

907.    In any case, the destination of the obligation is the investment itself, which means that the underlying contractual relationships can also be with a person other than the investor, provided that it concerns the investor's investments.[553]

---

[551] Exh. C-3 (UK-Romania BIT), Art. 2(2).

[552] Exh. CL-88 (Rudolf Dolzer & Christoph Schreuer, Principles of International Investment Law (2012)), p. 166.

[553] Exh. CL-84 (*Continental Casualty Co. v. Argentine Republic*, ICSID Case No. ARB/03/9, Award, dated 5 September 2008), para. 297 ("*provided that these obligations have been entered 'with regard' to investments, they*

191

908.    In light of the foregoing, the Tribunal need not address Claimants' MFN argument.

909.    Accordingly, Claimants' (and in particular, Gabriel Jersey's) "umbrella" claims are admissible insofar as they relate to Claimants' investments, and the Tribunal will apply the principles set out above in reaching its decision (see para. 906).

f) Expropriation

i.   *The issue*

910.    The Parties do not seem to dispute the content of the applicable legal standards: that the expropriation provisions in both BITs extend to measures having an effect equivalent to expropriation, that measures may affect an expropriation incrementally and indirectly, and that the State's intention is not dispositive. Where they do disagree is on whether the facts support a finding of expropriation.[554]

ii.   *The Parties' positions*

911.    **Claimants** submit that the politicized permitting process that ended with the repudiation of the Roșia Montană Project and RMGC, the State's joint-venture with Gabriel, including RMGC's rights to obtain exploitation licenses for the Bucium deposits, was a measure having an effect equivalent to expropriation that was implemented contrary to Article 5 of the UK-Romania BIT and Article VIII(1) of the Canada-Romania BIT, including its Annex B.[555]

912.    Specifically, with regard to the Roșia Montană Project, Claimants argue that the evidence is overwhelming that although the Project met the legal requirements for the Environmental Permit, the Government ultimately decided the Project would not be done. This was effectively an expropriation of the Roșia Montană License contrary to the terms of both BITs. The fact that the Government is not willing to allow the Project to be implemented is dispositive. The fact that RMGC obtained a five-year extension of the Roșia Montană License does not detract from that conclusion.[556]

---

*may have been entered with persons or entities other than foreign investors themselves, so that an undertaking by the host State with a subsidiary such as CNA is not in principle excluded.*"). See also Exh. CL-155 (*EDF International S.A., SAUR Int'l S.A. and León Participaciones Argentinas S.A. v. Argentine Republic*, ICSID Case No. ARB/03/23, Award, dated 11 June 2012), paras 938-939 ("*The 'umbrella clauses' in question are broadly worded. A clear and ordinary reading of these dispositions covers commitments undertaken with respect to investors, or undertaken in connection with investments. The Tribunal notes that Article 10(2) of the Argentina-Luxemburg BIT covers commitments 'undertaken with respect to investors' while Article 7(2) of the German BIT, even broader in scope, covers 'commitment undertaken in connection with the investments.'*").

[554] Memorial, Sec. XIV; Counter-Memorial, Sect. 9.

[555] C-PHB, para. 214; C-PO 27, paras 58-60; Reply, Sect. XII; Memorial, Sect. XIV.

[556] C-PHB, para. 215; Memorial, paras 762-765, 767.

913.    With regard to the Bucium Projects, the evidence is clear that notwithstanding RMGC's contractual and legal rights to obtain exploitation licenses for the valuable Rodu Frasin and Tarnița Bucium deposits, the State was unwilling to issue those licenses to RMGC, has repudiated RMGC's rights in that regard, and thus has effectively expropriated RMGC's legal entitlement to the Bucium exploitation licenses. While NAMR's failure to act leaves no written decision for the Tribunal to review, the State's repudiation of RMGC's rights in relation to the Bucium licenses is no less real. The fact that six years now have passed with no word from NAMR regarding the Bucium exploration licenses for Rodu Frasin and Tarnița cannot be disregarded. In contrast, NAMR had issued comparable licenses within seven months when there was no political obstruction. The argument that it remains open whether RMGC's applications will be successful is misguided and the argument that such applications remain open lacks credibility. Respondent's failure to present any witness from NAMR and its failure to call Ms. Szentesy for cross-examination is telling and the argument that the applications remain open lacks credibility.[557]

914.    The State's repudiation of the Project rights included an effective expropriation of Gabriel's loans to Minvest, of Gabriel's contract right to obtain management fees from RMGC, of RMGC's goodwill, and of the intellectual property, technical processes and know-how reflected in the numerous technical and engineering studies and reports prepared by RMGC for use as licenses in relation to the Roşia Montană Project and the Bucium Projects.[558]

915.    Having taken those investments, Romania also effectively expropriated Gabriel's shareholding in RMGC and the property acquired by RMGC to develop the Project, as the value of these assets was derived from the prospect that the Project would be developed.[559]

916.    Moreover, the evidence shows that the State repudiated RMGC, its joint venture with Gabriel, as it rejected the agreement whereby Gabriel remained the 80.69% shareholder and the State's shareholding stood at 19.31%. The State's failure to cooperate with Gabriel as a shareholder in RMGC, its launching and maintaining of retaliatory and abusive criminal and purported anti-fraud investigations of RMGC, and its failure to issue the Bucium exploitation licenses despite RMGC's right to obtain them under both its license and the law, is further evidence of the State's repudiation of its joint venture with Gabriel.[560]

---

[557] C-PHB, para. 216; Memorial, Sect. IX.B.3, para. 761 n. 1530; Reply, para. 306.

[558] C-PHB, para. 217; Memorial, paras 540, 770-772, 626-629.

[559] C-PHB, para. 218; Reply, paras 596-597; Memorial, paras 795-796.

[560] C-PHB, para. 219; Memorial, Sect. VII; Reply, Sect. II; C-PO 27, paras 15-27, 206.

917.     Respondent incorrectly argues that Claimants must show that the value of their shares directly and indirectly in RMGC have been affected "*to an extent that engages with the standard of expropriation*". Claimants submit that the severe deterioration in the value of Gabriel Jersey and Gabriel Canada's shares, respectively, supports the conclusion that the shares themselves in effect have been expropriated. That conclusion however is not necessary to support Claimants' expropriation claims in this case.[561]

918.     Respondent's argument conflates the object of the unlawful expropriation (the investment that was subjected to the expropriatory measure) and the resulting loss and/or damages incurred by the claimant investor that was caused by that wrongful act. Investments of Gabriel Jersey and Gabriel Canada, some of which were held indirectly through RMGC, were subjected to a measure equivalent to expropriation in breach of the UK-Romania and Canada-Romania BITs, respectively. As a result of that breach, Gabriel Jersey and Gabriel Canada each suffered losses in the form of the diminution in the value of the shares they held.[562]

919.     Respondent's further argument that the fact that Gabriel did not write down the value of its assets before 2015 as reflected in its securities disclosures shows that Gabriel recognized there was no expropriation and that its assets could be sold on an advantageous basis is incorrect. This is because it was not fully evident in real time that the rights associated with the Project were repudiated and would not be honored, including because there was never any formal decision taken or indeed any due process accorded. Only after the passage of time and viewed in hindsight did the fact and the scope of the State's conduct become clear. Nor is there any merit to Respondent's argument that Gabriel and/or RMGC could sell "on an advantageous basis" the rights to develop the Projects or the assets that derived their value from those rights because, as Dr. Burrows acknowledged on cross-examination, doing so would require the State to be willing to allow the Projects to be implemented, which the evidence demonstrates it is not.[563]

920.     ***Respondent*** argues that there could not have been an expropriation on 9 September 2013. To prove the consummation of an indirect expropriation on 9 September 2013, Gabriel Canada needed to establish *inter alia* that Romania enacted by that date "*a measure or series of measures*" that had "*an effect equivalent to direct expropriation without formal transfer of title or outright seizure*" as required under Article VII and Annex B of the Canada-Romania BIT. A "measure" is defined in Article I(i) of the BIT as including "*any law, regulation, procedure, requirement, or practice.*" The same requirement of "measures" with expropriatory effect applies to the claims of Gabriel Jersey: under the

---

[561] C-PHB, para. 220; Reply, paras 630, 632.

[562] C-PHB, para. 221; Reply, paras 327-329, 633-634.

[563] C-PHB, para. 222.

UK-Romania BIT, an indirect expropriation is only consummated when investments are "*subjected to measures having effect equivalent to nationalization or expropriation.*"[564]

921.    The expropriatory effect must also be proven in the case of a creeping expropriation, which is how Claimants describe Romania's conduct. With a creeping expropriation the date of consummation of the breach must always be when the last step necessary to create an effect equivalent to expropriation takes place because "[i]*f the process stops before it reaches that point, then expropriation would not occur.*" Accordingly, the claim arises when the creeping expropriation takes effect.[565]

922.    Claimants do not refer to any expropriatory effect on Gabriel Canada or Gabriel Jersey on 9 September 2013. They do not allege, let alone demonstrate, that on 9 September 2013, Gabriel Jersey's shares in RMGC and Gabriel Canada's shares in Gabriel Jersey were "*substantially or completely deprived of the attributes of property.*"[566] Claimants' allegation that the "*shares in RMGC*" owned by Gabriel Jersey "*are worth nothing*" does not refer to the date of 9 September 2013 but presumably to the alleged current value of the shares. The shares that Gabriel Canada owns in Gabriel Jersey are not mentioned. Claimants have therefore failed to show that Romania's conduct amounted to a creeping expropriation that "*eroded the investor's rights to its investment to an extent that it violated of the relevant international standard of protection against expropriation*" on 9 September 2013.[567] Concerning Claimants' argument that they suffered a political repudiation of rights on 9 September 2013 and that their investments made in and through RMGC were fully expropriated, Claimants show no expropriatory effect, even assuming that Respondent enacted a measure on that date (which is denied). The allegation that the licenses issued to RMGC for the Projects have no value is unproven and unfounded, as shown *inter alia* by the five-year extension of the Roşia Montană License in June 2019. Moreover, although Claimants refer to a plurality of licenses, RMGC's only license as of September 2013 was the Roşia Montană License.[568]

923.    Claimants' failure to show an expropriatory effect over RMGC's shares (and a consequential expropriatory effect up the ownership chain) is dispositive of the allegation of expropriation.[569]

---

[564] R-PO 27, para. 23.
[565] R-PO 27, para. 24.
[566] R-PO 27, para. 25.
[567] R-PO 27, para. 26.
[568] R-PO 27, para. 27.
[569] R-PO 27, para. 28.

924.  Further, Claimants do not identify a precise measure attributable to Romania on 9 September 2013 that resulted in an alleged expropriation.[570]

*iii.  The Tribunal's analysis*

925.  Although the Parties' disagreement refers to the application of the expropriation standards in the two BITs in the present case, the Tribunal will nevertheless consider these provisions in order to set out the principles that it will follow when addressing this claim (if at all). It will thus consider the wording of the two relevant provisions in light of their context.

926.  The relevant provisions for expropriation are found in Article 5 of the UK-Romania BIT and Article VIII(1) of the Canada-Romania BIT. Article 5 of the UK-Romania BIT provides as follows:

> *(1) Investments of nationals or companies of either Contracting Party shall not be nationalized, expropriated or subjected to measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "expropriation") in the territory of the other Contracting Party except for a public purpose related to the internal needs of that Party on a non- discriminatory basis and against prompt, adequate and effective compensation. Such compensation shall amount to the genuine value of the investment expropriated immediately before the expropriation or before the impending expropriation became public knowledge, whichever is the earlier, shall include interest at a normal commercial rate until the date of payment, shall be made without delay, be effectively realizable and be freely transferable. The national or company affected shall have a right, under the law of the Contracting Party making the expropriation, to prompt review, by a judicial or other independent authority of that Party, of his or its case and of the valuation of his or its investment in accordance with the principles set out in this paragraph.*

> *(2) Where a Contracting Party expropriates the assets of a company which is incorporated or constituted under the law in force in any part of its own territory, and in which nationals or companies of the other Contracting Party own shares, it shall ensure that the provisions of paragraph (1) of this Article are applied to the extent necessary to guarantee prompt, adequate and effective compensation in respect of their investment to such nationals or companies of the other Contracting Party who are owners of those shares.[571]*

---

[570] R-PO 27, Sect. 2.2.1
[571] Exh. C-3 (UK-Romania BIT) Art. 5.

927.     Article VIII(1) of the Canada-Romania BIT provides as follows:

> *Investments or returns of investors of either Contracting Party shall not be nationalized, expropriated or subjected to measures having an effect equivalent to nationalization or expropriation (hereinafter referred to as expropriation") in the territory of the other Contracting Party, except for a public purpose, under due process of law, in a non-discriminatory manner and against prompt, adequate and effective compensation. Such compensation shall be based on the genuine value of the investment or returns expropriated immediately before the expropriation or at the time the proposed expropriation became public knowledge, whichever is the earlier, shall be payable from the date of expropriation at a normal commercial rate of interest, shall be paid without delay and shall be effectively realizable and freely transferable.[572]*

928.     The Canada-Romania BIT, Annex B, which applies to Article VIII, provides further:

> *The Contracting Parties confirm their shared understanding that:*
>
> *(a) The concept of "measures having an effect equivalent to nationalization or expropriation" can also be termed "indirect expropriation." Indirect expropriation results from a measure or series of measures of a Contracting Party that have an effect equivalent to direct expropriation without formal transfer of title or outright seizure;*
>
> *(b) The determination of whether a measure or series of measures of a Contracting Party constitute an indirect expropriation requires a case-by- case, fact-based inquiry that considers, among other factors:*
>
> *(i) the severity of the economic impact of the measure or series of measures, although the sole fact that a measure or series of measures of a Contracting Party have an adverse effect on the economic value of an investment does not establish that an indirect expropriation has occurred,*
>
> *(ii) the extent to which the measure or series of measures interfere with distinct, reasonable, investment-backed expectations, and*
>
> *(iii) the character of the measure or series of measures including their purpose and rationale; and*
>
> *(c) Except in rare circumstances, such as when a measure or series of measures are so severe in the light of their purpose that they cannot be reasonably viewed as having been adopted and applied in good faith, nondiscriminatory measures of a Contracting Party that are designed and applied to protect legitimate public welfare objectives, such as*

---

[572] Exh. C-1 (Canada-Romania BIT), Art. <u>VIII(1).</u>

> *health, safety and the environment, do not constitute indirect expropriation.*[573]

929.    Both Article 5 of the UK-Romania BIT and Article VIII(1) of the Canada-Romania BIT contemplate that expropriation may result from measures having effect equivalent to nationalization or expropriation. As confirmed also by Annex B of the Canada-Romania BIT, this means that expropriation can be indirect. It is also generally accepted that the term measure can include both actions and omissions.[574]

930.    This means that an indirect expropriation is the result of a measure or series of measures (or acts or omissions) that have an equivalent effect to a direct expropriation, without necessarily resulting in a transfer of ownership. The decisive factor in this case is the degree of impact of the measure(s) on the investment itself and, in particular, the interference with the use of the investment and the enjoyment of its benefits.[575] The duration of the impact is also relevant in this case.

931.    As with the other provisions, while the intent to deprive a foreign investor of the use, benefit, or value of its investment may be relevant in determining whether there has been an unlawful interference, it is ultimately the effect of a State's measures rather than its intent that determines whether the interference rises to the level of an expropriation.

932.    At this point, the Tribunal refers to the legality requirements set forth in the two BITs, which distinguish lawful from unlawful expropriation. The basic requirements for lawful expropriations are that they (i) have a public purpose, (ii) are not discriminatory or arbitrary, (iii) are conducted in accordance with due process and (iv) are accompanied by adequate compensation for the expropriated investor. The State is held internationally responsible if any of these requirements are not met. These requirements are also found in other provisions of the two BITs, such as the provision on FET. Thus, the principles established by the Tribunal with respect to these requirements apply here as well.

933.    An indirect expropriation that occurs through a series of measures over time and in the aggregate destroys the property rights constituting an investment is referred to as a

---

[573] Exh. C-1 (Canada-Romania BIT), Annex B.

[574] Exh. CL-89 (*Eureko B.V. v. Republic of Poland*, UNCITRAL, Partial Award, dated 19 August 2005), paras 185-186.

[575] Exh. CL-83 (*Middle East Cement Shipping and Handling Co. S.A. v. Arab Republic of Egypt*, ICSID Case No. ARB/99/6, Award, dated 12 April 2002), para. 107; Exh. CL-122 (*Técnicas Medioambientales Tecmed S.A. v. United Mexican States*, ICSID Case No. ARB(AF)/00/2, Award, dated 29 May 2003), para. 114 (stating that although indirect expropriation does "*not have a clear or unequivocal definition, it is generally understood that* [it] *materialize*[s] *through actions or conduct, which do not explicitly express the purpose of depriving one of rights or assets, but actually have that effect.*").

creeping expropriation[576] and the deprivation as such may only be apparent after the fact.[577] Such creeping expropriation could therefore also be classified as a composite act.

934.    Accordingly, the Tribunal will evaluate Claimants' expropriation claims in light of the foregoing considerations.

### 4.    Conclusion on the standards

935.    In light of the above, the Tribunal will assess the facts of Claimants' principal claim as follows.

936.    *First*, it will assess whether Respondent's series of acts or omissions between August 2011 and September 2013 are clearly related and connected by an underlying pattern or purpose such that they must be characterized as wrongful in the aggregate, regardless of Respondent's intent.

937.    *Second*, and to the extent that there is such a connection of an underlying pattern or purpose, it will determine whether these acts or omissions, as a composite act, violate either of the provisions of the two BITs as set forth above because either:

-    Respondent acted arbitrarily, discriminatorily, or inconsistently or denied Claimants due process; contradicted specific assurances made to Claimants and with Claimants' legitimate expectations; abused its powers (FET, arbitrary and unreasonable measures, failure to observe obligations and expropriation standards);

-    Respondent failed to provide physical protection and security to Claimants (FPS standard);

-    Respondent treated Claimants and/or Claimants' investments differently than other investors in similar circumstances without legitimate justification (arbitrary and unreasonable measures standard);

-    Respondent failed to "observe" any of the commitments it made with respect to Claimants' investments (failure to observe obligations standard);

-    Respondent deprived Claimants of the reasonable use of Claimants' investment and the benefits thereon (expropriation standard).

---

[576] Exh. CL-133 (Burns H. Weston, "Constructive Takings" Under International Law: A Modest Foray into the Problem of "Creeping Expropriation," 16 VA. J. INT'L L. 103 (1975)).
[577] Exh. CL-123 (W. Michael Reisman & Robert D. Sloane, "Indirect Expropriation and its Valuation in the BIT Generation," 74 BRIT. Y.B. INT'L L. 115 (2003)), pp 123-124.

938.  It is clear from the Tribunal's analysis above that the features of the various provisions of the BITs are predominantly features of the FET provision. This means that the Tribunal's analysis of these elements under the FET provision will also guide (if not govern) its analysis and findings on other standards, albeit with some exceptions. This is all the more true because Claimants rely on virtually the same facts to allege violations of each of the BIT standards.

*iii.     The relevant facts*

939.  The facts on which Claimants rely to support their principal claim are the following:

-  The renegotiation of the economic terms of the Project and the State officials' public statements concerning the continuation of the Project;

-  The EIA Process and, namely, the issues in connection with the Ministry of Culture's endorsement, the 29 November 2011 TAC meeting, the Waste Management Plan, the Water Framework Directive, Urbanism Certificates and PUZs and the 2010 LHM; and

-  The Draft Law.

940.  The Tribunal notes that, in their initial submissions, Claimants alleged that Respondent breached its obligations under the two BITs by allegedly blocking RMGC's Bucium applications for political reasons and in violation of Romanian law, and by failing to respect RMGC's rights under the Bucium Exploration License and its alleged rights in relation to the Rodu Frasin (gold and silver) and Tarnița (copper, gold and silver) deposits. This claim was not dominant in the presentation of the principal claim in Claimants' final pleadings. The Tribunal will nevertheless consider the issue of political interference in relation to the Bucium Exploration License in the same manner as the other factual themes relied on by Claimants in relation to their principal claim.

941.  Claimants also rely on facts post-2013 which are outside the scope of the principal claim, but which are argued to confirm the State's alleged course of action in relation to Claimants' investment.

942.  The Tribunal has already set out briefly the facts in relation to these themes. It will nevertheless consider such facts in more detail in its analysis of the relevant questions below and its application of the law to such facts, to determine if there is a composite act in breach of any provision of the two BITs.

*iv.     The assessment*

943.    The Tribunal will consider whether Romania's acts or omissions in the renegotiation of the economic terms of the Project (see section 1 below), throughout the EIA Process (with particular attention to some elements), in making public statements concerning the status / progress of the Project throughout the process[578] (see section 2 below), and/or in proposing and rejecting the Draft Law (see section 3 below), as well as in connection with the Buicum Exploration License and applications (see section 4 below) fulfil the following criteria:

-    first, are related and connected by an underlying pattern or purpose to terminate the Roșia Montană Project, such that together they must be considered a composite act; and

-    second, whether those acts or omissions, if found to be a composite act, violate any of the elements of the provisions of the two BITs, as set forth above.

944.    In undertaking this Project with all its known risks, Claimants could expect that the process for such undertaking, including the issuance of the Environmental Permit for the Project, would be fair, just, and in accordance with the law. The decisive factor for assessing the international liability of Respondent is not the outcome, i.e., whether or not the Permit should have been granted or whether the Project should have gone ahead, but rather the process itself.

945.    This is consistent with the Tribunal's reasoning above that it is adjudicating the present case **under international law**; as such, its mandate is not to review the merits of a State's decision by reference to the applicable domestic law and the facts, but to determine whether the State acted in accordance with its international obligations insofar as Claimants' investments are concerned.

1.   The renegotiation of the economic terms of the Project

a)   The issue

946.    One of the main factual issues relied upon by Claimants to establish unlawful conduct by Romania under international law, and as part of their theory of a composite act, concerns the renegotiation by the Parties of the economic terms of the Project.

---

[578] These statements appear in all three factual topics and shall therefore be treated in these topics in general and not separately.

b)  The facts

947.  As seen in the description of the facts above (paras 119 *et seq.*), the discussions on and statements surrounding the economic terms of the Project started following the resumption of the permitting process, i.e., sometime in August 2011 (and the start of Claimants' alleged composite act).[579] It is recalled that, at that point in time, under the terms reflected in the Roșia Montană License in 1999, the State held 19.31 % of RMGC's shares and was entitled to a royalty of 4%.[580] At that same time, the State acknowledged that gold prices were significantly higher than before and were expected to rise even further.[581] Indeed, the President of Romania, Traian Băsescu, noted in one of his statements "*What country sits on such a treasure in its underground and does not find solutions to benefit from it?*"[582] There was thus a consistent line of public statements from the government side that pertained to the economic terms of the Project and the need to revisit them in light of the situation. Specifically, in relation to this issue, the following was declared by public officials as of that time:

-  On 1 August 2011: "*Now, I have said on a number of occasions that **I am not a fan of this project, and there are two major considerations: one of them pertains to the environment – and I am waiting for those in the field to state their opinion, for this is, first of all, the specialists' job, both national and international specialists, with competence in the area, to state their opinion – and, second the benefit to the Romanian State. I believe that the current form of the contract is not the most favourable one to the Romania state. These are the observations I made even before being prime-minister. I will see how discussions evolve on this subject and I will reach a point of view**. For the moment, they are at ministry level.*" **Prime Minister Emil Boc**.[583] (emphasis added)

-  On 11 August 2011: "***László Borbély, Minister of Environment** told Kossuth Rádió that he will **recommend accepting the proposal only if he is convinced that the investors take EU requirements into consideration to the fullest extent and do not pose a threat to the environment**. The Minister asks the mining venture to decrease the concentration of cyanide in the tailings below the measurable level. In addition, he also requested guarantee that the resources for recultivation will be available as soon as possible. **There are still a number of requirements that need to be clarified before the acceptance of the environmental permit, because the contract in its current form is not advantages enough for the Romanian State.***

---

[579] Exh. C-537 (Interview of Emil Boc, TVR1, dated 1 August 2011).

[580] Exh. R-403 (Roșia Montană exploitation license No. 47/1999); Exh. C-184 (RMGC Articles of Association, dated 22 July 2011).

[581] Exh C-628 (Traian Băsescu: Romania needs the Roșia Montană Project, provided the terms for sharing of benefits are renegotiated, Agerpres.ro, dated 18 August 2011).

[582] Exh. C-628 (Traian Băsescu: Romania needs the Roșia Montană Project, provided the terms for sharing of benefits are renegotiated, Agerpres.ro, dated 18 August 2011).

[583] Exh. C-537 (Interview of Emil Boc, TVR1, dated 1 August 2011); Memorial, para. 338.

*[…] The Ministry will only recommend granting the permit if it is fully convinced that the investment will not harm the environment.*"[584] (emphasis added)

- On 18 August 2011: "*I believe that the Roșia Montană project must be done. Romania needs it, provided the terms of the sharing of benefits from the exploitation of the gold and silver deposits in the area are renegotiated. I was looking at the gold prices in the last five years: five years ago the gold price was 600 dollars per ounce, now it is 1,700 dollars per ounce and could well exceed 2,000-2,500 per ounce by the end of the year.* […] *What country sits on such a treasure in its underground and does not find solutions to benefit from it? Because this is not the NGO's harvest, not Hungary's, which must give I don't know what endorsements to Romania.* It does not need to give any endorsement. We are still a sovereign state.*" "*The environmental protection must be very well planned, however, and those who talk about destroying the environment I invite them to go to Roșia Montană now. I have been there three times. It is true, never as President of Romania.* […] *I have supported and I support the project just as I support any type of industrial development*". **President of Romania, Traian Băsescu**.[585] (emphasis added)

- On 24 August 2011: "*I was not the one who signed the Archaeological Discharge Notice; it is indeed the first step regarding the responsibility of the Ministry of Culture. The National Archaeology Commission unanimously approved and, under these conditions, I provided the judicial, legal, financial framework to save 80 per cent, or as much as we can, from the cultural and archaeological heritage, because that is my responsibility. But I have not taken the next step, I have not signed, and the removal of the Cârnic Mountain from the List of Historical Monuments is something that I have to sign, not the Director from Alba. It is on List A. This means an increased and strong protection, and at this moment the Cârnic Mountain is on List A, the order to downgrade its archaeological monument status has not been signed*". "*I have not signed the order yet because there are many aspects that need to be discussed. First of all, the level of participation of the Romania state in that company, and I am not going further until this aspect is clarified, and the Minister of Environment cannot go further either; this must be decided at the governmental level. It is not the Minister of Environment and the Minister of Culture that give this project the go-ahead.*" "*I went there many times, I stayed there without the press so that I wouldn't be accused of building my image on Roșia Montană, and I know the situation there for the most part, it is a disaster in regard to the cultural heritage and the environment. At this moment, things are under control at the Ministry of Culture; I want to reassure you that Cârnic Mountain is on List A, it is protected by law. We will discuss if we support the investment over there; we have discussed these things in DAHR and many support this project, while others do not. I can only tell that, if*

---

[584] Exh. C-2912 (Verespatak: Romanian government to make a decision this year, dated 11 August 2011) (emphasis added).

[585] Exh. C-628 (Traian Băsescu: Romania needs the Roșia Montană Project, provided the terms for sharing of benefits are renegotiated, Agerpres.ro, dated 18 August 2011); Memorial, para. 339.

*the exploitation project starts, a very, very large portion of the cultural heritage will be saved.*" ***Culture Minister Kelemen Hunor***.[586] (emphasis added)

- <u>On 2 September 2011</u>: "***two problems, one with the environment and the other with the benefits for the State***"; "*all the documentations and all the necessary materials are prepared, because the decision must be substantiated on documents, not on stories*"; "***I am not a fan of this project, for several reasons. One of these reasons is also that, in my opinion, the benefit for the State in this project, as the Romanian State negotiated it so far with the investors, is not yet sufficient, and certainly it should be revised just like I wait for other conclusions on the environmental aspect*** *and I will state my position after I have all this data*". ***Prime Minister Boc***.[587] (emphasis added)

- <u>On 29 August 2011</u>: "*My position has been and remains the same. I have not changed it in the last 10 years. **I believe that the project has 2 large issues for which specialists must provide very precise and specific answers**. […] The first problem concerns the environment, because it must be studied, in detail, by the specialists, and with full transparency, the conditions, European regulations, what things are allowed, what it means for the safety of the population right now and in the future, for environmental safety, for preventing difficult situations […] No. Ultimately, we must listen to those that have the … decisive conclusion. […] Within the Ministry of Environment, the specialized structures. […] Specialists must be listened to and, ultimately, a majority position must be formed. […] The voice of all domestic and international specialists in this field to assure us that we do are not dealing with an exploitation that would endanger the environment and everything else relating to the future evolution of the environmental aspect. […] So it is a very serious matter that must be viewed with maximum responsibility. I will not draw conclusions on it because I do not know. I do not know what that percentage of cyanide means, nor how much it should be, how much is within controllable limits, how much … the current exploitation technique around the world. […] As long… as they deem necessary, but without, obviously prolonging this discussion indefinitely. […] Specialists must have the responsibility for making a decision … that is substantiated… and that is based on facts. So we have the environmental component. […] The second component refers to economics. The contract in its current form does not bring the benefits that the state should have from such a contract. […] I have not seen it. But I know the percentage for the state. […] Especially now, in the context of an increased price for gold. So, definitely, there the contract must be renegotiated from the perspective of benefits for the state, from such a dealing. **So, after we have the answer to these two questions, we can move on and discuss.** […] I am only saying that these two large topics must first have an answer. **So that afterwards, a final decision can be made***

---

[586] Exh. C-508 (Roșia Montană stirs up tensions in UDMR: Kelemen Hunor shows the door to Eckstein-Kovacs, Ecomagazin.ro, dated 24 August 2011); Memorial, para. 341.

[587] Exh. C-791 (Emil Boc: The decision on the Roșia Montană mining project must be substantiated based on documents, not stories, Agerpres ro, dated 2 September 2011).

*whether to continue the project or not.* […]". ***Prime Minister Boc.***[588] (emphasis added)

- On 5 September 2011: "*I don't think these are contradictory statements. You can be a fan of this project or not, you still have to observe EU law, which now stipulates very clearly what the maximum amounts of cyanide concentration are -I'm talking about environmental concerns now. The PM said he wants to clarify the environmental aspect, as well as the provisions of the contract. I've said this before, I think I've been saying it for a year, you can search through my statements; I said that although this does not concern the Ministry of Environment, to my opinion, the State could have concluded a more advantageous contract. And I stand by this. That's probably why the Minister of Economy said he would like to discuss the contract. As Minister of the Environment, I'm saying the same thing I said when I took over this job: I will not propose a Government Resolution for the issuance of the Environmental Permit before I am convinced that this project is in line 100% with best practices in the EU, and that it will not pollute the environment. Why do I say this? It's very simple. What does the citizen need to know? He needs to know one thing, especially after what happened -you know what I'm referring to -the environmental disaster in Baia Mare in 2000, which means that we have to be extra careful now. I mean there's no comparing the two; what happened there was completely different. There are a series of closed processes, we went all the way to Sweden to verify this, by which this cyanide concentration is reduced in the sterile by the time it reaches the basin -even if, God forbid, the basin were to give out, the water would still not be polluting to the rivers, domestic and abroad -you know very well what Hungary's position in regard to this project is. We must prove this to the regular citizen, as well as to the Government. So what we asked, compared to 10, which is the maximum concentration allowed in the EU, they proposed 5, we said make that lower, because it's possible, and prove -not to me, obviously, but to the experts -prove that the water won't pollute, even if, as I said, the basin were to have a fissure or something of the sort. This is the most important thing. And then there are other issues regarding the reconstruction of the environment, with the money down in the first years, not the last, but if they prove this -and I told you: in Sweden there are four gold mines based on cyanide, in Finland there are three other, so mines like that exist -obviously, in our case we have an area that has been exploited for two thousand years; if you've been to Roşia Montană you know what state it is in; unfortunately there's pollution there; however I will not bring about this Government Resolution unless I'm certain that the environmental aspects are on par with the best practices in the EU.* […] *There are things to consider. Clearly, the area won't look like it did before. Obviously, even if the mountain doesn't disappear altogether, it will still be... Cârnic, there are talks about its archaeological discharge. It's clear that it won't keep looking like it does now -same thing in Sweden and everywhere else where they do mining like this. But, again: in my capacity as Minister of the*

---

[588] Exh. C-2914 (Transcript B1 TV, dated 29 August 2011); see also Exh. C-1430 (Agerpre.ro, dated 3 September 2011).

*Environment, all I can do is follow the best practices in the EU. Until EU prohibits it. If the EU prohibits this technology based on cyanide -but for now, from what specialists tell me, we haven't come up with a different procedure to be used in such cases. So as Minister of the Environment, I will follow best practices, if we get there. I don't know that; the impact study is still being discussed.* […] ***This interests me as member of the Government, but the Contract is negotiated; it was negotiated by the Ministry of Economy. Evidently, this must be negotiated between the Parties, with an advantage... and, again, the Romanian State has this "talent" of dragging things like this, decisions like this, for 10-12 years, because... I mean, why does the State issue a mining license? To have mining activity in the area. In that case, the State should have said back in 98-99, "we must move 80 houses from here, there's no other way." So then the State would have handled the move, instead of letting the investor come here and buy those houses and end up with a phantom town, or almost -very few people still live there now. So I believe the Romanian State should have negotiated a better contract, and then, obviously, make the steps that haven't been made yet. We are in an advanced phase now; we'll see what happens when we finish this technical analysis of the project****.* […] ***That's more difficult, I think. It can be done, but there are economic arguments there, environmental ones too, so it would be very difficult to come up with a question to ask at the referendum, since the matter is so complex.*** *So, as I said: the renegotiation of the contract -and look, even the opposition, although they ask for additional data, this declassification thing -personally I don't have anything against it; I don't know what the contract stipulates, either. But it depends on other things also; when a contract is concluded between two parties, both of them have to agree on things like that, I guess. But as far as I am concerned, I have no qualms with the Contract being declassified.* […] ***I am of the opinion that the Romanian State made a mistake when it failed to clarify it position and dragged this issue for 14 years; the issue is highly politicized, and it's become a defining element of some people's discourse. The only thing I can say, because I'm also the Minister of the Environment, is that I have a responsibility -in two years, in ten years, for the coming generations – so I cannot sign off a project unless I am convinced, 101% if you will, that this project will not be harmful to the environment*.*"* ***Minister of Environment Borbély***.[589] (emphasis added)

- <u>On 5 October 2011</u>, Culture Minister Hunor confirmed to Parliament that the Government's decision on the Project would also include economic considerations.

- <u>On 27 December 2011</u>, Minister of Environment Borbély stated the following when asked in an interview about the status of the Project: "*You know, I always enjoy it, I have said it many times before, so Roșia Montană reminds me, I don't know whether this is among the Romanian stories, but* **in Hungarian there is the story of the red rooster, which never ends. So, this is the spirit of the story, that it never ends. Roșia Montană, is also a story that never ends**. *So, the Romanian State, when it decided to grant the license, around 2000, and* **when it concluded that**

---

[589] Exh. C-2155 (Interview with Environment Minister L. Borbély, Radio Romãnia Actualități, dated 5 September 2011).

*contract, which I say is disadvantageous to the Romanian State. So it could have concluded a more advantageous contract, not to let it slip through their fingers. That is when it should have said: look folks, we need to move 80 houses. I will move you, the investor will not be the one to come and buy the houses. And an entire story which has been unfolding and which, in fact, unfortunately, I have to say it, indicated the incapacity of the Romanian state, to manage this problem.* Well, and this is in a place where there has been mining for 2,000 years, right? So the people there have been mining. Fine, not at this scale, but it was mining. **When a state has 300 tonnes of gold and 1,600 tonnes of silver, no one can come and tell me that there are not thinking of exploiting that deposit.** At this time, we have had discussions in the Government and with the President and I have said it very clearly, well, **over these 2 years a lot more has happened than over 10 years, right?** […] It's just that I, as Minister of the Environment, have to take a stand from the point of view of the environment, **and I have said it very clearly that I will not grant this endorsement unless I am 100% convinced that it corresponds to the provisions of the European Union, which are the highest standards, and that it will not harm the environment**." (emphasis added)

In a question of how convinced he was, Minister Borbély said: "**90%. We will have another technical commission, 2 at most, but I am thinking one, for we have clarified these problems along the away. I have imposed, no one else has, after having gone to Sweden and I looked, this is a country which I believe is famous for defending its environment, I have seen that there are closed, monitored systems, 100% safe, which reduce the cyanide level when it reaches the basin and the dilution, indeed, you can pretty much drink water from that basin**. And then I imposed it, they had a higher percentage, which complied with the provisions of the Union, for it is 10. They had 5 to 7. **I said no, reduce it below 3 or even less, because it is diluted, so that you can prove it to me and so that I can keep my head up high before Hungary, before everyone there in the area because even if a crack occurs, although this is a complex system of dikes by recirculation, so I will not go into the technical details. Well, that thing has happened, although there is more important investment for them, therefore more money, with assurances that the company will not just vanish, that it will provide the money for environmental recovery in the first years of the investment and not in the last years. These things were accepted by the investors.** […] **The contract, I was not the one to take care of the contract. The Minister of Economy was. I know that there is another area that pertains not to the endorsement, but it is important, related to the renegotiation of the agreement. They are under renegotiation. So, I say, if the Romanian State manages to get a more advantageous contract, if these environmental conditions are fulfilled, I will propose the endorsement to the Government**. […] **Now, obviously, we cannot neglect the fact that there will be a huge worksite here, that a mountain will practically disappear, the Cârnic, so this pertains to the exploitation. But if someone has gone there, they have seen that they have been disappearing for 2000 years**. […] It is not necessary that we feel pressured. As I said in the beginning, it has been discussed for 11 years. A decision will have to be taken. […] I believe, as far I am concerned, unless other elements*

*interfere. I am yet to have a discussion with the commission, I am not part of the technical commission. We can have a verdict at the end of January.* **I am still expecting an answer from the Ministry of Culture. The other component is a political one. You have seen that we are also under attack from within the Hungarian community, that we are the ones with the cyanide and so on. We must assume this responsibility**." (emphasis added)

When asked how he viewed the protests against the Project he stated: "*Justice is independent. Clearly, anyone can resort to justice. There was a time when the process was also stopped because of this. Obviously, according to the data that I have and which is confirmed, currently there is no trial preventing us from moving on*".[590]

c)   The analysis

948.    The above-mentioned statements are the statements relied on by Claimants to argue that the Government linked the issue of the economics of the Project or, in other words, the financial benefits for the State from the implementation of the Project, with the permitting process itself. Having reviewed these statements in their entirety and in light of the nature of the process for implementing the Project as described above as well as that of the permitting process specifically, the Tribunal makes the following observations.

949.    The fact that these statements come from Ministers or State officials other than those of the Ministry of Economy (for example, the President, the Prime Minister, the Minister of Environment and the Minister of Culture) is not in and of itself evidence of abuse of their power or of inappropriately linking the environmental permitting process to the economics of the Project. This is because of the following:

950.    *First*, they are statements made in the wider discussion of the implementation of the Project, not just or specifically on the issue of permitting.

951.    *Second*, these statements were made at a time (i.e., July/August 2011) when matters were being considered by the different Ministries independently, who were also aware of the various open or pending issues surrounding the Project's implementation. Indeed, the Project was multifaceted and the Ministries of the Economy, Culture, and the Environment, in particular, all had important roles to play and each had to work through the issues within its particular competence. Economics, in addition to environmental or

---

[590] Exh. C-637 (Interview of László Borbély, TVR, dated 27 December 2011).

legal permitting issues, was one important aspect of the Project. That is not evidence of coercion.[591]

952.    *Third*, they were made in reply to reporters' specific questions, and at a time when the process had resumed after a two-year suspension and the public wished to be informed of the status of things. They were not statements made with a specific purpose to affect such status. What is more, the fact that a Minister of Culture expresses a view on the economic aspects of the Project, for instance, is not an admission that he will abuse his regulatory powers to help his colleagues at the Ministry of Economy achieve a favourable renegotiation.[592] It is also rather unlikely that the Ministers in question understood their comments in this way: why would they declare to the public their future intention to violate the law if that is what they really meant?

953.    *Fourth*, the majority of these statements actually make clear that, first and foremost, it is the legal permitting requirements that must be met in order for the Project to proceed. This is indeed confirmed by the official internal memorandum from the Minister of the Economy to the Prime Minister, which states the following: "*subject to the issuance of all endorsements and permits relevant to the construction and operation of the Project and subject to its commencement, MECBE is authorized to negotiate with Gabriel a possible increase of the share held by Minvest in RMGC*".[593] This memorandum evidences the fact that the Government distinguished the permitting process under the law from the negotiation of the commercial terms.

954.    *Fifth*, as the content of these statements is concerned, it is clear that, upon resumption of the process and the realization that the price of gold was much higher than when the License was signed and that the State could benefit much more from the implementation of the Project,[594] the State needed to revisit the issue; and this was one aspect that had to be clarified.

955.    *Sixth*, the most that can be demonstrated by reference to these statements is that some Ministers (the Minister of Culture and Minister of Environment in particular) considered that the outstanding issues relating to the Project (principally the environmental issues

---

[591] See for example Exh. C-2914 (Transcript B1 TV, dated 29 August 2011); Exh. C-439 (Interview of Minister of Culture Hunor, Debate of the Midday Journal, dated 19 December 2011); Exh. C-1310 ("Roșia Montană stirs up tensions in UDMR: Kelemen Hunor shows the door to Eckstein Kovacs," Ecomogazin, dated 24 August 2011).

[592] See for example Exh. C-2155 (Interview with Environment Minister L. Borbély, Radio România Actualități, dated 5 September 2011).

[593] Exh. C-2156 (Government Memorandum from Minister of Economy Ion Ariton to Prime Minister Emil Boc dated 21 September 2011), p. 14.

[594] Exh. C-628 (Traian Băsescu: Romania needs the Roșia Montană Project, provided the terms for sharing of benefits are renegotiated, Agerpres.ro, dated 18 August 2011).

and the economic issues) needed to be addressed at a Governmental level before further progress could be made.[595]

956. *Seventh*, obviously there would have been no need to renegotiate anything if the Project was destined not to go ahead; and to go ahead, the Project had to first meet the legal permitting requirements. In other words, the State would only benefit from a renegotiation if the Project were ultimately to be implemented.

957. *Eighth*, and in any event, some of these press articles reflecting the statements themselves must be treated with great care as they are not quoting the speaker directly and some are internet news sources that cannot be properly verified.

958. *Ninth,* there is also no evidence based on these statements that actual steps were taken to interfere unlawfully with the permitting processes. In other words, even if one were to draw the inference that Claimants have requested, there is no evidence that these statements of intent in the press articles translated into any steps to frustrate or delay the permitting processes unlawfully. Specifically, the Tribunal notes the following:

- These statements were made in July/August 2011. At the next major TAC meeting on 29 November 2011, no one raised the economic aspects of the Project as a possible obstacle to the permitting process. Indeed, the representative of the Ministry of the Economy (i.e., the Ministry responsible for renegotiating the economic terms) gave the following statement at the TAC meeting: "*Referring to the Ministry of Economy and not only to the answers received today: having a double quality of TAC member and representatives of the nationa*l *[interest], of the Romanian State that is, we paid attention to the development of the project. From our point of view, the Project complies with our legislation, and the external, European legislation, and the answers to the questions which were raised by the TAC members today – we consider that they are covering and satisfactory, more than satisfactory, answering to each uncertainty and each request of the members*."[596] The representative of the Ministry of the Economy said nothing further during the meeting.

- In the Parties' exchange of communications and in person discussions on the issue starting from 21 September 2011 and extending to 26 January 2012 with Gabriel's final proposal acceding to the State's offer but ending there on the eve of Prime

---

[595] See for example, Exh. C-537 ("Interview of Emil Boc," TVR1, dated 1 August 2011); Exh. C-2914 (Transcript B1 TV, dated 29 August 2011); see also Exh. C-1430 (Agerpre.ro, dated 3 September 2011).

[596] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), p. 23.

Minister Boc's resignation (see paras 119-149 above),[597] the Tribunal sees no suggestion of any improper linking of the issuance of the permit with the renegotiation of the terms of the License let alone any inappropriate coercion from Respondent's side. These communications do not suggest that the Government was planning to use its regulatory powers to achieve its objectives in the negotiation; instead, they are evidence of a pure negotiating process. In particular, one need only look at Gabriel's detailed offer to the Government about improving the economic terms for the State sent on 10 June 2013 where there is no suggestion in this letter that it is made under duress or coercion or that Gabriel reserves its rights.[598]

959.    Thus, the Tribunal cannot conclude on the basis of this evidence that there was an inappropriate link between the environmental and financial aspects of the Project. Indeed, what is clear is that they were two issues of importance for the implementation of the Project, where the status of one could also affect the other. They nonetheless remain two issues that had to be separately addressed and the record is clear that they were separately addressed.

---

[597] Exh. C-2156 (Government Memorandum from Minister of Economy Ion Ariton to Prime Minister Emil Boc, dated 21 September 2011), p. 3; Ariton WS, para. 33; Exh. C-2635 (Government Mandate to Ministry of Economy, dated 23 September 2011), p. 2; Exh. C-2915 ██████████████████████████████████████████████████; Exh. C-2916 ████████████████████████████████████████████; Tănase WS II, paras 88-89; Henry WS I, paras 44-45; Exh. C-2920 ████████████████████████████, p. 2; Memorial, para. 348; Exh. C-2919 ████████████████████████████████████████, p. 2; Exh. C-799 (Letters from RMGC to President Băsescu, Prime Minister Boc, and Minister Udrea dated 30 September 2011); Exh. C-2637 ████████████████████████████████████████; Exh. C-2921 ████████████████████; Exh. R-680 ████████████████████████████████████████████; Exh. C-914 ████████████████████████████████████████████; Exh. C-877 (Letter from Gabriel to Ministry of Economy, dated 27 November 2011); Exh. C-841 █████████████████████; Exh. C-797 ████████████████████████; Exh. C-775 ████████████████; Memorial, para. 368; Ariton WS, para. 99; Exh. C-915 ████████████████████████████████████; Memorial, para. 369; Exh. C-2923 ████████; Exh. R-405 (Note on the status of renegotiation in regard to the economic clauses of the Agreement signed with Gabriel Resources/RMGC under the Roșia Montană mining project, dated December 2011); Exh. C-2924 ████████████████████████████████████; Exh. C-2925 ████████████████; Exh. C-774 ████████████████; Exh. C-633 (Interview of László Borbély, ProTV, dated 18 December 2011); Exh. C-439 (Interview of Minister of Culture Hunor, Debate of the Midday Journal, dated 19 December 2011); Exh. C-637 (Interview of László Borbély, TVR, dated 27 December 2011); Exh. C-1509 (For whom does Victor Ponta "save Roșia Montană", Daciana Sarbu alias Leana Ceausescu, Rovana Plumb and Magor Csibi, in the yard at GDS? Socialism with a "civilian" face, totalitarianism with cracked teeth, Roncea ro, dated 7 June 2012); Exh. C-1539 (Government Emergency Ordinance (No. 102/2013) for the amendment and supplementation of Law no. 571/2003 on the Fiscal code and for the regulation of certain financial and fiscal measures, dated 15 November 2013); Exh. C-876 ████████████████.

[598] Exh. C-1286 (Letter No. 35559 from RMGC to the Department of Infrastructure Projects, dated 10 June 2013).

960.     The Tribunal does not therefore find any improper linking of the permitting process with the renegotiation of the economics of the Project.

## 2.  The EIA Process

### a)  The issue

961.     Another major factual theme on which Claimants rely in support of their principal composite act claim is the EIA Process and the manner in which it took place. Specifically, they submit that the State should have granted the Environmental Permit but has inappropriately not done so because the entire process was politicized. Claimants point to the fact that already at the TAC meeting in November 2011 the prerequisites for such permit were met and the permit should have been granted at that point or immediately thereafter. Further, they submit that all prerequisites were ready, including the endorsement of the Ministry of Environment, and that other elements were only relevant to the construction permit.

962.     The Tribunal recalls that, for the Environmental Permit to be issued, there were essentially three steps: first, the recommendation by the TAC following the conclusion of an EIA Process, second, the Ministry of Culture's endorsement, and third, the decision or approval of issuance by the Ministry of Environment (see para. 19 above).

963.     Concerning the EIA Process and the TAC, it is also recalled that this was a method by which a development project is evaluated from social, environmental, and economic perspectives. The economics perspective referred to in the EIA Report is not concerned with the economics of the License (discussed in the context of the renegotiations above) but with other economic elements of the Project. The environmental perspective concerns an assessment of the impact of the Project on the environment. The social perspective concerns naturally the social impact of the Project, such as for example the resettlement of residents or cultural heritage issues implicated with the Project (see paras 780-783 above).

964.     Therefore, by its own nature, this process, which is managed by the TAC, inevitably touches issues beyond the technical issues relating to the environment. Adding to this, and as mentioned above, the TAC members themselves are experts from various branches of the Government and not just from the Ministry of Environment. Each had its own separate role and responsibility as far as the Project was concerned (see para. 783). For example, the Ministry of Culture's endorsement, which was not a technical environmental issue as such, was nonetheless part of the process required for the issuance of the Environmental Permit. Furthermore, certain social elements, such as explaining the project to the people or obtaining the necessary surface rights, were also not environmental technical elements but were elements that had to be addressed and were

indeed discussed in parallel or in connection with the EIA Process. This meant that, while some issues were not necessarily prerequisites for the Environmental Permit, they inevitably impacted the progress of the EIA Process because of the very nature of the Project itself.

965.    As such, what the Tribunal must consider is not necessarily whether certain prerequisites were relevant to the Construction Permit as opposed to the Environmental Permit, nor whether the prerequisites for obtaining the Environmental Permit were met at different points in time such that the non-issuance would expose Romania to international liability. Instead the Tribunal must focus on whether the process met the minimum standards under international law as set out in the aforementioned treaty provisions.

966.    The Tribunal will therefore consider <u>firstly</u> the TAC meetings (see section b) below) and <u>secondly</u> the technical and other elements (see section c) below).

### b)  The TAC meeting(s)

#### i.    *The facts: the process*

967.    Concerning the process of the TAC itself, the Tribunal notes from the outset that, while there is no evidence that unanimity was required, the point of view of all TAC members was necessary, whether positive or negative. Specifically, at the end of each TAC meeting, the TAC President sought the views of all TAC members as follows:

-    At the start of the <u>29 November 2011</u> meeting, TAC Chairman, Marin Anton, started the discussion as follows: "*As for procedure, we'll allow the Roşia Montană team to do the presentation then the TAC members will have their say and express opinions about each chapter.*"[599] Towards the end, Marin Anton stated as follows: "***From my point of view, and I would like to ask one last thing – all technical discussions, all the questions, all the solutions were discussed within the TAC; and if any of the TAC members, of those in the TAC, still have issues to raise, let's raise them now, in this moment. Because we can no longer … All issues must be clarified now … if there are any issues left please raise them so that we can clarify them … There are no more issues. All things***....." Dorina Simona Mocanu then asked Marin Anton to ask each TAC member individually which Marin Anton refused to do. Dorina Simona Mocanu also pointed to the fact that the Institute of Geology had left and entered into a short discussion with Marin Anton concerning the issues the Institute had to sort out.[600] The discussion continued and Marin Anton then stated: "***OK, we'll prepare a checklist for today for the EIA***

---

[599] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), p. 2.
[600] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), p. 47.

*quality report, it will be sent to each Ministry, for you to have it, to analyze. I still need the following answer: please refer to the management plans because there are annexes for each ministry and I will need those answers. And, with this, the technical discussions about the Roșia Montană project come to an end. Please expect a next TAC meeting in the near future.* If there is anything else…."[601] (emphasis added)

- At the end of the 10 May 2013 meeting, Octavian Pătrașcu commented as follows: "*This is the first technical assessment meeting of 2013, which is held after the reorganizations that took place due to the 2012 electoral process. Our activity… let me say a few things about our, the [TAC] Committee's activity. The activity of the Technical Analysis Committee is based on the Ministry Order 405/ 2010; there are also a Regulation in place -- you, as TAC members, know very well that this Regulation was elaborated during the first meeting the TAC held in April 2013, for a different project. For this reason, and given that there are a few colleagues from certain ministries who are not yet here, but have confirmed will arrive later during the meeting…* **in the TAC, when representatives cannot attend for some reason, an official point of view can be sent.** *Anyway, we shall return to these details at the end of the meeting.* […] **this my kind request to you, if there are any more points of view from the TAC member institutions, please send them within 5 days from this meeting. If there are any more points of view strictly related to the project and strictly related to the specialty of each TAC member institution, please send these points of view of us, at the Secretariat, at the Directorate, at the Ministry of Environment. I must tell you the next TAC meeting will take place on May 23, 2013.**"[602] (emphasis added)

- At the end of the 31 May 2013 meeting, Octavian Pătrașcu commented as follows: "**I think that by taking and analyzing each and every point from... let's say it, all the chapters in the Environmental Impact Assessment Report, we've reached our objectives.** […] *The long and the short of it, you know it too, I do not have to repeat it, each domain, each chapter was endorsed by a Romanian institution, so professionalism is not in question here. I would like to ask you, in the order you prefer, each TAC member to express their point of view on the aspects discussed*".[603] (emphasis added)

- Then, on 26 July 2013, the Ministry of Environment convened a conciliation meeting of the TAC, which had to be convened to give all dissenting members an opportunity to reconsider their views. At the beginning of the meeting, the TAC

---

[601] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), p. 48.
[602] Exh. C-484 (Transcript of TAC meeting dated, 10 May 2013), pp 3, 22.
[603] Exh. C-485 (Transcript of TAC meeting, dated 31 May 2013), pp 18-19.

Vice President and acting president, Octavian Pătrașcu, stated the following: "*Good afternoon and welcome to the Technical Analysis Committee for the Roșia Montană Project. We convened this meeting for the reconsideration of opinions. I want to let you know that during the analysis procedure, as well as more recently, **after the TAC meetings we held starting with May 2013, we received on behalf of the Romanian Academy and the Romanian Geological Institute, certain points of view related to the Roșia Montană Project. We have already gone through these points of view before in this procedure, but, for the sake of clarity, we convened the meeting of today***."[604] (emphasis added)

968.    It follows from the above that, while there was no consensus requirement, the views or point of views of everyone represented at the TAC was desired if not necessary.[605] This is particularly the case as we have seen that towards the "end" of the process, the TAC reconvened a reconciliation meeting to tackle any dissenting opinions on the issues.

ii.    *The facts: The 29 November 2011 TAC Meeting*

969.    It will be recalled that Claimants submit that all the prerequisites for the Environmental Permit were met at the 29 November 2011 TAC meeting and hence that the Environmental Permit should have been issued immediately thereafter. The Tribunal will now set out what happened (1) before the said meeting, (2) during the actual meeting and (3) following the meeting.

1.    Before the 29 November 2011 meeting

970.    What can be seen from the factual record is that, at this point in time, the review of the EIA Report was ongoing and a future meeting was scheduled for 29 November 2011 with the objective of finalizing or dealing with any outstanding matters related to the work of the TAC. The agendas that were circulated for this upcoming meeting listed many items for discussion including the remaining chapters of the EIA Report. But that was indeed just one item. Just shortly before the said meeting, there is an intense expression of the need to speed up things and have them finalized and hence certain steps were taken, such as the preparation and dispatch of a list of 102 questions for RMGC to reply to in advance, as well as a proposal for the visit of the site. Specifically:

---

[604] Exh. C-480 (Transcript of TAC meeting, dated 26 July 2013), p. 1.

[605] See also Exh. C-1771 (Order No. 405/2010 on the establishment and functioning of the technical assessment Commission at central level) (Article 4(2)(j) provides as follows: "*In the environmental impact assessment procedure, the TAC exercises the following attributions:* […] *j) proposes, on the basis of the points of view expressed by TAC members, as well as of the grounded opinions of the public, the position to be taken with regard to the project that was subjected to the trans-boundary environmental impact assessment procedure.*").

- At a meeting held on <u>22 December 2010</u>, the TAC reviewed the first seven chapters of the EIA Report. At the end of the meeting, the TAC President, a State Secretary from the Ministry of Environment, Marin Anton, stated: "*we have two more chapters left, Chapter 8 and 9,* [and] *until this future meeting of the TAC where we will analyze the last two chapters, we are to clarify any outstanding matters.*"[606]

- <u>On 13 September 2011,</u> ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████[608]

- <u>On 26 September 2011</u>, the Ministry of Environment sent RMGC the final list of 102 questions.[609] RMGC responded to these questions <u>on 11 October 2011</u>, after which the TAC members visited the Project site in Roșia Montană.[610]

- An agenda for the 29 November 2011 TAC meeting was circulated <u>on 28 October 2011</u>. That agenda stated the following: "***The Agenda of the meeting consists of***: *1. analysis of the answers submitted by the titleholder at the questions requested by MMP [Ministry of Environment and Forests] on 26 September 2011, including the analysis of the revised chapters 4.1 Water and 4.6 […] 2. Report prepared by the Independent Group of International Experts (IFIEJ), 3. Information on the visit to Romania by the representatives of the European Parliament Committee on Petitions, which took place between 24-25 November 2011 and their request. 4. Issues arising from visit to the Project site on 20 October 2011.*"[611] (emphasis added)

---

[606] Exh. C-476 (Transcript of TAC meeting, dated 22 December 2010), p. 84.
[607] Exh. C-574 ████████████████████████████████████████, p. 2.
[608] Exh. C-574 ████████████████████████████████, p. 4.
[609] Exh. R-215 (Letter from Ministry of Environment to RMGC, dated 22 September 2011).
[610] Exh. C-441 (Letter from RMGC to Ministry of Environment, dated 11 October 2011); Exh. C-631 (TAC minutes of site visit to Roșia Montană, dated 20 October 2011); see also Exh. C-447 (List of TAC members attending Roșia Montană site visit).
[611] Exh. C-835 (Letter from Ministry of Environment to RMGC, dated 28 October 2011).

-    Another agenda for that meeting was sent out on <u>4 November 2011</u>. The agenda was as follows: "*Assessment of chapters 8 and 9 of the Report on the environmental impact study elaborated for Roşia Montană mining project*".[612] The Tribunal notes that neither of these agendas circulated before the TAC meeting included any proposal for the TAC members to adopt a final point of view on the Project at the meeting on 29 November 2011.

-    By letter dated <u>25 November 2011</u>, the Ministry of Environment also requested that TAC members submit written comments on RMGC's responses prior to the 29 November 2011 TAC meeting.

2.   During the 29 November 2011 meeting

971.   As far as the actual 29 November 2011 meeting is concerned, there is no dispute as to what was said or not said. The record reflected in the meeting's minutes is clear. What is disputed nonetheless is how certain sentences or even words should be interpreted and specifically whether that meeting signalled the end of the EIA Process or permitting process for the project such that a decision was either taken at the meeting itself or was about to be or should have been taken immediately thereafter. During this meeting, the TAC Chairman, Marin Anton, started the discussion as follows:

*In the past I had another image of the project, now I have a completely different perspective than the one I imagined. **The Agenda of the TAC meeting of today has 5 topics. The first topic refers to the last two chapters, the analysis of the Chapter 8 and 9 of the procedure; Chapter 8 refers to the Description of difficulties, and Chapter 9 to the Conclusions and the Summary. Then we have a second topic: the analysis of the answer submitted by the Titleholder in response to the questions raised by the Ministry of Environment and Forests on 26 September 2011, including the analysis of the done chapters – 4.1. Water and 4.6 Biodiversity. The third topic – The report of the independent group of international experts in relation with the project - we have a number of questions about this, too. Topic 4: Debriefing on the visit the European Parliament's Commission on Petitions made to Romania between 24-25 November this year – last week, and I will inform you about the questions they raised and the answers they were given. And the last topic: topics raised following the site visit of 20 October 2011. Let's start with the first topic on the Agenda. There are two chapters left for analysis**. As for procedure, we'll allow the Roşia Montană team to do the*

---

[612]Exh. C-790 (Letter from Ministry of Environment to RMGC, dated 4 November 2011).

*presentation then the TAC members will have their say and express opinions about each chapter.*[613] (emphasis added)

- Horea Avram (RMGC) first discussed Chapters 8 and 9 and answered questions from the TAC.[614] Following that, Marin Anton, stated: "*Any questions? Any opinions related to Chapter 9 – Non-technical summary. Any issues? Comments? There is none? Everything is clear? Thank you very much. We reviewed all the 9 chapters of the procedure. Let us resume*".[615] Horea Avram (RMGC) then proceeded to address the list of 102 questions and the main issues therein. Christian Kunze, Amec (RMGC), Pat Corser, MWH (RMGC), Cecilia Szentesy (RMGC) also took part in the discussion.[616]

- On the specific point of compliance with the Water Framework Directive, Dorina Mocanu (Ministry of Environment) stated the following: "*we do not talk about a compliance, but about a derogation, if I remember well. So, we are talking about a derogation which has 4 conditions; one of them is to have it declared as an objective of special public interest, right? The other one is to maintain a good status of the water quality, of the surface waters – these are the questions that you should have answered point by point: there is a County Council Decision, this is the status of the water quality, now – in writing*".[617]

- Marin Anton asked RMGC to provide a copy of the 29 September 2011 Alba County Council decision (i.e., the decision designating the Project as of outstanding public interest).[618] Dragoş Tănase (RMGC) also stated that they would submit documents for Piatra Despicata.[619]

- In relation to the zonal urbanism plans, Dragoş Tănase stated that RMGC still needs two endorsements for each zonal urbanism plan from the Ministry of Culture. When asked by Csilla Hegedus (Ministry of Culture) whether they had been submitted to the Ministry of Culture, Dragoş Tănase stated that they had not. When asked why, Marin Anton stepped in and said "*but it is not related to the environmental procedure*". Dragoş Tănase then stated, that "[t]*he environmental assessment procedure is not related to the urban planning procedure.*" Marin Anton stated: "*Yes, they are two different procedures*". Dorina Simona Mocanu then stated: "***Yes, only that if the PUZ is approved in a different form than the one considered now,***

---

[613] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), p. 2.

[614] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), p. 2 *et seq.*

[615] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), p. 7.

[616] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), p. 7 *et seq.*

[617] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), p. 25.

[618] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), p. 25.

[619] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), p. 28.

218

*during the project stage, so, if something is changed in the PUZ, we will have to resume this process – that's what Mr. State Secretary emphasized. So, if the PUZ is changed or it's not approved in the form we took into consideration during this stage of the procedure of environmental impact assessment for the Roşia Montană project, any amendment to the PUZ will turn us back, because you know very well….*" (emphasis added) A man's voice was then heard saying "*if they are relevant*".[620]

- Dragoş Tănase then explained that there are two zonal urbanism plans, one for the Industrial Area and one for the Roşia Montană Historical Centre. The two need to be taken to a final approval stage, endorsements in this respect have been obtained but RMGC is short of two permits for each. He added that this procedure is parallel to the environmental assessment procedure and that the two things must be correlated to the Construction Permit.

- Marin Anton stated at the end that "[f]*rom the technical stand point, all is clear with the Ministry of Development*".[621]

- Towards the end, Marin Anton stated as follows: "***From my point of view, and I would like to ask one last thing – all technical discussions, all the questions, all the solutions were discussed within the TAC; and if any of the TAC members, of those in the TAC, still have issues to raise, let's raise them now, in this moment. Because we can no longer … All issues must be clarified now … if there are any issues left please raise them so that we can clarify them … There are no more issues. All things….***"[622] (emphasis added) Dorina Simona Mocanu then asked Marin Anton to ask each TAC member individually which Marin Anton refused to do. Dorina Simona Mocanu also pointed to the fact that the Institute of Geology had left and entered into a short discussion with Marin Anton concerning the issues the Institute had to sort out.[623]

- The discussion continued and Marin Anton then stated: "***OK, we'll prepare a checklist for today for the EIA quality report, it will be sent to each Ministry, for you to have it, to analyze. I still need the following answer: please refer to the management plans because there are annexes for each ministry and I will need those answers. And, with this, the technical discussions about the Roşia Montană***

---

[620] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), p. 42.

[621] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), pp 41-43.

[622] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), p. 47.

[623] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), p. 47.

*project come to an end. Please expect a next TAC meeting in the near future.* If *there is anything else….*"[624] (emphasis added)

- Further discussions ensued and at the very end, Marin Anton stated the following: "*Things are finalized in the TAC, I repeat, there will be a next TAC meeting after you sort out those details, three details, with the Ministry of Culture, with the biodiversity, Piatra Despicata* […] *there is a biodiversity issue with the Institute as well. After I will have all these, I will convene another TAC meeting for a final decision*."[625] (emphasis added)

3. Following the 29 November 2011 TAC meeting

972.    After the meeting of 29 November 2011 many things ensued. <u>First</u>, relevant actors had provided certain missing information or documents discussed in the meeting itself. <u>Second</u>, certain issues, such as the endorsement of the Ministry of Culture, were still prominent issues of discussion and clarification. <u>Third</u>, there was still a discussion on the continuation of the permitting process and, finally, further TAC meetings as well as a conciliation meeting within the TAC took place right up to 2015. Those meetings had the same scope and mandate as the previous ones, i.e., the approval or endorsement or recommendation concerning the Environmental Permit and hence continuation of the Roşia Montană Project. Specifically:

- RMGC provided a copy of the Alba County Council's decision the day after the 29 November 2011 meeting, i.e., <u>on 30 November 2011</u>.[626] The Parties disagree as to whether that decision was sufficient to declare the Project of outstanding public interest for purposes of compliance with the Water Framework Directive. This is addressed further below (see paras 1010 *et seq.*).

- The Ministry of Culture sent <u>on 7 December 2011</u> a letter to the State Secretary of the Minister of Environment and Chairman of the TAC, Marin Anton, stating the following: "***With regard to your Letter no. 10543/M/A//06 December 2011, issued by the Ministry of Environment and Forestry registered with the Ministry of Culture and National Heritage under no. 2193/VT/06 December 2011, whereby the Ministry of Culture and National Heritage was requested to issue a point of view about the issuance of the environmental permit*** *for the Roşia Montană mining exploitation project, proposed by S.C. Roşia Montană Gold Corporation*

---

[624] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), p. 48.

[625] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), p. 51.

[626] Exh. C-632 (Letter from RMGC to the Ministry of Environment, dated 30 November 2011, enclosing Alba County Decision on the Application of Certain Provisions of the Waters Law No. 107/1996, dated 29 September 2011).

*S.A.*" and taking into account, among other things, Article 2, paragraph 10 of GO no. 43/2000 on the protection of the archaeological heritage and the declaration of certain archaeological sites as areas of national interest, "[i]*n connection to the issuance of the environmental permit for the Roşia Montană mining exploitation project, proposed by SC Roşia Montană Gold Corporation SA we consider that the applicant for the environmental permit must fulfil the following obligations arising from the legislation applicable to the project* […] *SC Roşia Montană Gold Corporation SA will have to complete, before beginning exploitation and construction, the preventive archaeological research in the areas of the project perimeter currently containing archaeological heritage (including for the industrial facilities planned to be open in the Orlea area in year 8 of the project).* **Therefore, the Roşia Montană mining exploitation project may be developed in the Orlea area only depending on the conclusions of the archaeological research report and its approval by the National Archaeology Commission, as well as after the declassification of the Orlea Massif from the List of Historical Monuments approved by Order of the Ministry of Culture and National Heritage no. 2361/2010.** […] *If the competent authority will adopt the decision to issue the environmental permit for the Roşia Montană mining exploitation project proposed by SC Roşia Montană Gold Corporation SA, we want to be actively involved, alongside the competent environmental protection authority in the drafting of the measures and the conditions for the protection of the heritage elements to be imposed on the titleholder under the environmental permit.*"[627] (emphasis added)

- The Romanian Geological Society gave its endorsement to the relocation of Piatra Despicata on <u>8 December 2011</u>.[628]

- The Romanian Geological Institute issued a favourable point of view <u>on 9 December 2011</u>, in which it supported "*the issuance of the environmental permit for Roşia Montană project*".[629]

- <u>On 19 December 2011</u>, the TAC President sent a letter to the Ministry of Culture, requesting that the Ministry confirm whether its "point of view" sent on 7 December 2011 was an endorsement of the issuance of the Environmental Permit, emphasizing that this endorsement was required by law to be taken into account in

---

[627] Exh. C-446 (Letter No. 2193 from the Ministry of Culture to the Ministry of Environment, dated 7 December 2011), pp 1-3; Gligor WS I, paras 111-112; Avram WS I, paras 103-104; Tănase WS II, paras 58, 110.

[628] Exh. C-634 (Letter from RMGC to the Ministry of Environment, dated 8 December 2011) enclosing Exh. C-635 (SGR Romanian Geological Society Endorsement No. 1, dated 5 December 2011); Avram WS I, para. 100; Tănase WS II, para. 109.

[629] Exh. C-636 (Point of view of the Geological Institute of Romania regarding the geological data presented in the EIA report for the Roşia Montană Project, dated 9 December 2011), p. 5; Szentesy WS I, para. 83; Avram WS I, para. 101; Tănase WS II, para. 109.

setting the conditions for the permit. The Ministry of Culture did not respond to this letter.[630]

- <u>On the same date</u>, Minister of Culture Hunor stated in an interview when asked whether the paper received from the Ministry of Culture was an endorsement, the following: "***As far as the Ministry of Culture is concerned, there is an archaeological discharge for the Cârnic Massif given by the Alba County Directorate and the documentation for Orlea is prepared at this time, but this documentation has never been discussed, because I have the impression that – I have not studied it, I have just received it – but it will not be discussed at least until next year. We have sent to the TAC, the Technical Assessment Committee, a point of view on the projects, the problems and responses to these problems in terms of cultural and archaeological heritage. This file, this documentation is at the Ministry of Environment, they need all the endorsements or points of view, all the documents from all the institutions, but it all lies with the assessment of the Commission of the Ministry of Environment***. *I don't know when they will make a final decision. At this moment,* ***Cârnic Massif is a historical monument, it has not been declassified, this massif is still class A. There are discussions, because the Minister of Economy, Mr. Ariton went… to talk with the representatives of Gold Corporation about the State holdings and everything related to that contract that everyone talks about – but very few have read; probably somewhere early next year we will also have the results after these discussions. We also need to make a decision in the Government.*** *All I can tell you is that as far as we are concerned we have ensured protection of 80-85% of the archaeological heritage and of the heritage buildings; at this moment, if you go there, you will see what is going on and we will also ensure the necessary funds for this protection. Because one cannot protect the heritage buildings or archaeological heritage without money. But, of course, we are just a small part of this process.*"[631] (emphasis added)

- <u>In March 2012,</u> ████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████
████████████████████████████████████████

---

[630] Exh. C-445 (Letter No. 10857 from Ministry of Environment to Ministry of Culture, dated 19 December 2011); Gligor WS I, para. 113; Tănase WS II, paras 110-111; Avram WS I, paras 103-105; Memorial para. 370.

[631] Exh. C-439 (Interview of Minister of Culture Hunor, Debate of the Midday Journal, dated 19 December 2011), pp 1-2.

█████████ ", [632]

- <u>On 16 March 2012</u>, the Ministry of Environment sent another letter to the Ministry of Culture requesting it to confirm that the letter sent on 7 December 2011 was an endorsement to issue the Environmental Permit.[633]

- <u>On 8 June 2012</u>, Prime Minister Ponta stated in an interview that the Government wished to postpone a decision on shale gas and the Roșia Montană Project for after the parliamentary elections.[634]

- Minister Șova stated in a report to Prime Minister Ponta <u>on 6 March 2013</u> that the "*main following steps in the implementation of the Roșia Montană project are: The Government's issuance of a decision regarding the Roșia Montană Project - So far, all the information required by the Government has been provided -* **Continuation of permitting efforts by RMGC - Continuation of the TAC assessment and the recommendation of the Ministry of Environment and Climate Change on the issue of the environmental permit - Continuation of the endorsement process from other relevant authorities, including the Ministry of Culture - Complete important endorsement steps by July 2013 -** *Completing the renegotiation of the conditions of partnership between the Canadian investor, RMGC and the Government in the summer of 2013 - Final approval of the Roșia Montană mining project (December 2013)*".[635] (emphasis added)

- <u>On 11 March 2013</u>, the Ministry of Environment confirmed in an Inter-Ministerial Commission that the TAC had concluded and that all technical issues had been resolved at its November 2011 TAC meeting.[636] In relation to the Ministry of Culture's endorsement, the following was stated in a report of the Inter-Ministerial Commission: "*In conclusion, the Ministry of Culture deems there are no obstacles for the Ministry of Culture to issue a favorable endorsement as regards to the development of the Roșia Montană mining project, to be submitted to the Technical Assessment Committee according to Art. 2 para. (10) of GO 43/2000 when the Ministry of Environment and Climate Change will request it. This endorsement will detail upon the measures that must be taken and the conditions that must be*

---

[632] Exh. R-406 (Ministry of Economy Note from Sorin Gaman to Minister Bode, dated March 2012), p. 1.

[633] Exh. C-1381 (Letter No. 10857 from Ministry of Environment to Ministry of Culture, dated 16 March 2012).

[634] Exh. C-641 (The Government postpones the decisions regarding Roșia Montană and the shale gas until the elections that are going to be organized in autumn, Realitatea.net, dated 8 June 2012).

[635] Exh. C-1903 (Note from Minister Șova to Prime Minister Ponta, dated 6 March 2013), pp 37-38.

[636] Exh. C-471 (Transcript of Inter-Ministerial Commission Meeting, dated 11 March 2013), p. 20.

*observed in view of protecting cultural heritage, established by reference to the phases of implementation of the mining project.*"[637]

- An identical document to the 7 December 2011 letter entitled "Endorsement" was issued by the Ministry of Culture <u>on 10 April 2013</u>.[638]

- <u>In May 2013</u>, the Government informed the Aarhus Convention Compliance Committee that the TAC had confirmed at its November 2011 meeting that no technical issues remained outstanding.[639]

- <u>On 10 May 2013</u>, the TAC met again. At that meeting, the acting TAC President, i.e., the TAC Vice President, Octavian Pătrașcu, said the following: "***I want to remind the Technical Assessment Committee that the last meeting took place on November 29, 2011, and the conclusion of the representative was that the Environmental Impact Assessment Report complies with the requirements from a technical point of view, and only certain aspects remained to be clarified, aspects regarding … aspects that we find today on our Agenda – issues regarding the Extractive Wastes Management Plan, the Financial Guarantee, several aspects regarding compliance with the provisions of the Water Framework Directive, several aspects presented by the Titleholder regarding the status of the Zonal Urbanism Plans [PUZs] and of course points of view that you expressed.***"[640] At the end of the meeting, Octavian Pătrașcu commented as follows: "*I believe the objective we set for ourselves for today's TAC meeting was achieved. **We analyzed point by point the aspects left to be clarified, as I said at the beginning, after the last TAC meeting held in November 2011. I repeat – and this my kind request to you, if there are any more points of view from the TAC member institutions, please send them within 5 days from this meeting. If there are any more points of view strictly related to the project and strictly related to the specialty of each TAC member institution, please send these points of view of us, at the Secretariat, at the Directorate, at the Ministry of Environment. I must tell you the next TAC meeting will take place on May 23, 2013***.*"[641] (emphasis added)

- Another TAC meeting was held <u>on 31 May 2013</u>, where the acting TAC president, Octavian Pătrașcu, stated, "*I will present today's proposed topics. In general you received together with your invitation the materials required for today's topic and*

---

[637] Exh. C-2162 (Letter from Department for Infrastructure Projects and Foreign Investment to Secretary General, dated 26 March 2013, forwarding Informative Note regarding the activity of the Inter-Ministerial Commission), p. 4.
[638] Exh. C-655 (Letter from Ministry of Culture to Ministry of Environment, dated 10 April 2013).
[639] Exh. C-2907 (Romanian Government Submission to Aarhus Convention Compliance Committee, dated 22 May 2013), p. 3.
[640] Exh. C-484 (Transcript of TAC meeting dated, 10 May 2013), pp 3-4.
[641] Exh. C-484 (Transcript of TAC meeting dated, 10 May 2013), p. 22.

*additionally,* **we have several issues raised by representatives of the institutions that were not present at the last TAC meeting. That is why, we propose, for an agenda, that we continue the discussion from the last meeting,** *[…]".*[642] Octavian Pătrașcu added the following: "***I think that by taking and analyzing each and every point from... let's say it, all the chapters in the Environmental Impact Assesment Report, we have reached our objectives. Surely, we will ask the titleholder to send us answers in writing, officially, so that we can convey them to the colleagues in the Ministry of Health or to the other colleagues that came with observations. I remind you that, as always, it is my duty to, that those present or the persons that are missing from these sessions must within 5 days express their points of view,*** *and I would conclude that, from the technical point of view, the part and the chapters included in the Environmental Impact Assessment were completed. The long and the short of it, you know it too, I do not have to repeat it, each domain, each chapter was endorsed by a Romanian institution, so professionalism is not in question here. I would like to ask you, in the order you prefer, each TAC member to express their point of view on the aspects discussed*"*.[643] (emphasis added) Octavian Pătrașcu noted at the end that the next date for a meeting would be communicated.[644]

- On 10 June 2013, the Ministry of Environment sent a letter to all TAC members, scheduling another TAC Meeting for 14 June 2013 and inviting them to submit in writing "*the conditions for project implementation, the measures for diminishing the impact according to your field of competence, as well as the monitoring indicators which are mandatory for the purpose of project implementation*".[645] These conditions were published in a detailed note for public consultation on 11 July 2013. It invited the public to submit its comments by 30 July 2013.[646]

- On 13 June 2013, the Geological Institute of Romania submitted that RMGC had to "[c]*arry out a complex geological study for the entire area*" of the TMF site at Corna Valley.[647]

- During the TAC meeting of 14 June 2013, the TAC president, Elena Dumitru, stated the following: "*for the Romanian Geological I have a question to ask, because we want some clarifications. In the file containing the objectives, **there are***

---

[642] Exh. C-485 (Transcript of TAC meeting, dated 31 May 2013), p. 4.

[643] Exh. C-485 (Transcript of TAC meeting, dated 31 May 2013), pp 18-19.

[644] Exh. C-485 (Transcript of TAC meeting, dated 31 May 2013), p. 23.

[645] Szentesy WS I, paras 84-85; Exh. C-554 (Letter No. 22149 from Ministry of Environment to TAC members, dated 10 June 2013).

[646] Exh. C-555 (Ministry of Environment Note for Public Consultation, dated 11 July 2013).

[647] Exh. C-659 (Letter No. 1182 from Geological Institute of Romania to Ministry of Environment, dated 13 June 2013), p. 2.

*two contradictory points of view issued by the Romanian Geological Institute.
Through Letter no. 1905 of December 9, 2011, the Institute sent to Ministry of
Environment a favourable endorsement for the development of this Project, based
on measurements and analyses conducted within the site in December 2011. And
through Letter no. 1040 of May 28, 2013, the same Institute is expressing its
reserves and concerns. I underline here that the endorsement of the Institute issued
in December 2011 is accompanied by maps and measurements. That is why I want
you to clarify this situation.*"[648] (emphasis added)

Ştefan Marincea from the Institute stated the following: "*I find myself in an
unpleasant situation. Historically speaking, the position of our institute has been
known even from the TAC [meetings] of 2010 and 2011, when there were two such
meetings organized and we stated very clearly that we don't consider it normal that
a tailings management pond of the size of the one in the Corna Valley, which in the
end will have an area of 363 ha, does not benefit on its entire surface of cross-
sections made through vertical geophysical survey, of a map of 1:5000 detailing
the fissure plans and the respective plans, of a* **supplementation of the map
developed by the Romanian Geological Institute at 1:50,000 scale, where there
are some faults very clearly marked, a map that we assume. It is a map printed
and used even by the company in its research, it is a map of the Geological
Institute of Romania. To my stupefaction, during my absence from the
management of the Institute, and without passing it through the scientific council
as well as without presenting it to the relevant experts, this study was prepared, a
study we cannot find in our archives.** *I know that a team from the Institute, with
vertical geophysical survey equipment, went for two weeks in Roşia Montană in
December 2011. We found a geological aberration in the answer the company sent
to Ministry of Health, according to which there are no fissures and faults on 363
ha. Sir, we are still geologists, and there is no area of 363 ha of land in Romania
with no fissures at all.* **So, I seriously doubt that this document underwent the
legal means of drafting within my institute. The former director has enough
criminal law issues, so we want to see and study this material which we ask
officially from the company, and we continue to believe that it is necessary for us
to have a map, because at this magnitude of a tailing pond, which after all will
be full of hazardous wastes, regardless the concentrations of cyanide on site,
these are classified by the European Union as dangerous waste. We need to
conduct an extremely, extremely exigent study. Moreover,** *I can say, ok, I am in
an unfortunate position because I stated my view on the project when I was
director, I stated my view on the project in the press. Yes, there is a scientific
council, we still have experts on metallogeny and structural geology, and of course*

---

[648] Exh. C-481 (Transcript of TAC meeting, dated 14 June 2013), p. 6.

there are fractures and faults on this designed map. So, I cannot see how the Institute would claim that there aren't any, contradicting its own published documents. Because of this reason, as well as because of another reason which is also notorious... there is no other project in the world... a project to produce, alone, such a quantity of cyanide slurry. Why, in all the other projects, and if we consider... projects under development, active [...] the technological process includes two additional steps, which we have systematically required to be imposed. It is not a very significant cost, and, moreover, the company gains a lot from it. These two steps are significantly decreasing the quantity of ... cyanide slurry and are resulting in smaller investments during the post-mining stage, because it is one thing to maintain a dam of 600 m in height on 85 m, behind which you have the cyanide slurry, and another thing to maintain a 30 m dam. So, these two steps, regardless of the technologies employed... are a concentration step through flotation or through decantation after grinding, in the case of the Turks or Canadians from Kisladag; and a second step that is very critical and consists in the oxidation of the refractory ore. Another issue that we constantly raised is the fact that there is ore... because in the analyses submitted by the company the sulphur existing in the ore is of 1.2, 82%, thus there are sulphides, and sulphocyanides shall be formed and that is why all the mining projects in the world, and I want to stress that, all the other mining projects in the world have included an oxidation step, regardless of their processing flow. Through leaching, it is the case of the Kisladag Project of the first Certej Project, through oxidation under high pressure within closed tanks, as it is the case in Kittila, Finland, if we reduce it only to the nearby Projects. This step allows first a better recovery of the gold, it does not remove the subsequent cyanidation, but it reduces the slurry quantity 12 times. And it is one thing to manage 363 ha of cyanide slurry, even it has a reasonable concentration and it is another thing to manage 12 or 14 ha. So, this was the view of the Institute. **I want to see that map, because in our archives there are 2 memoranda made by former employees where maps are included which are incompatible with what I am seeing and which are also prepared by our employees, one of them is still working with us.** And I would like to see them for myself so as to send a team to see, because currently the satellite maps present a fractures system and that can be seen from the satellite through remote detection and I see that the Institute claimed that there aren't any such results. I want to see that report. This is because this can be added to the long list of criminal law issues of my predecessors. But, anyhow, I cannot commit my institution because first we did not... as geological service, we cannot be on the market, so we are not players on the market, we prepare strategies. **We are not against mining projects; on the contrary, we support them, because we support the balance between investors. But neither can we go against the public opinion, so we have to say the truth. The truth is this: a better project would allow**

227

*us to reduce the slurry quantity, that study must be very explanatory, and so we cannot afford to play with this hazardous waste on 363 hectares. And this opinion is passed through the scientific council and if the first one was also passed through the council I would like to see who signed it.* […] *We have presented in writing the two conditions.* […] *I am telling you, we don't ... as far as I have seen from the inquiry we made, me and my colleagues, that study cannot be found. So, apparently the director worked within a close group. Usually, such a study which is involving us in... which gives us responsibilities for the future, needs to be passed through the scientific council. There was no scientific council at that time. There is one now.*"[649] (emphasis added)

Elena Dimitru (TAC President) then stated: "*But, we cannot ask something retroactively, but, very well, this problem... that is why I told you that we were surprised by the two endorsements: **one favourable, accompanied by maps, and the second one not favourable**.*"[650] (emphasis added)

Ştefan Marincea then stated: "*I do not have the favourable one, accompanied by maps*". Cecilia Szentesy (RMGC) then started talking stating first: "***What I believe we have here is a dispute between a former and a current director of the Romanian Geological Institute and we are somehow stuck in the middle**, but leaving aside this dispute, I would first like to underline that an extraordinary number of drill holes have been drilled within the Roşia Montană area – approx. 1,200 surface drill holes and 74 underground drill holes.* […]".[651] (emphasis added)

When RMGC finished explaining, Francise Senzaconi (IGSU (General Inspectorate for Emergency Situations)) stated: "*It appears to me that what was discussed now, in this last part, is a sort of Gordian Knot, because pros and cons were given, some of them based on certain documents, as I said, which are already on file, and others not yet proven. So, I believe that, for the good progress of this activity within the TAC, we should have both versions and we all should study these two versions and to settle this issue once and for all. **My simple request is that upon receiving the opinions released by Geological Institute we should receive them too so as to form our own opinion on the doubts that the Institute has. Thank you**.*" (emphasis added)

Elena Dumitru said that they would make them available.[652]

---

[649] Exh. C-481 (Transcript of TAC meeting, dated 14 June 2013), pp 6-8.

[650] Exh. C-481 (Transcript of TAC meeting, dated 14 June 2013), p. 8.

[651] Exh. C-481 (Transcript of TAC meeting, dated 14 June 2013), p. 8.

[652] Exh. C-481 (Transcript of TAC meeting, dated 14 June 2013), pp 5-11.

- Then, <u>on 26 July 2013</u>, the Ministry of Environment convened a conciliation meeting of the TAC, which had to be convened to give all dissenting members an opportunity to reconsider their views. At the beginning of the meeting, the TAC Vice President and acting president, Octavian Pătrașcu, stated the following: "*Good afternoon and welcome to the Technical Analysis Committee for the Roșia Montană Project. We convened this meeting for the reconsideration of opinions. I want to let you know that during the analysis procedure, as well as more recently, **after the TAC meetings we held starting with May 2013, we received on behalf of the Romanian Academy and the Romanian Geological Institute, certain points of view related to the Roșia Montană Project. We have already gone through these points of view before in this procedure, but, for the sake of clarity, we convened the meeting of today*.*"[653] (emphasis added)

The TAC President, Elena Dimitru, then stated: "*Good morning, I apologize once again for the delay but there are other matters to solve, quite a few. Thank you kindly for accepting our invitation. We also expect the Romanian Academy to join us, they were invited by letter by the Ministry at the same time we sent your invitation. We have not received any confirmation, nor an excuse that they might not be able to attend, which must mean they will be here. Therefore, in order to be able to start the meeting and not prolong the waiting, I'll ask one of my colleagues to call the Academy and see what is going on. I would give the floor to the gentlemen from the Geological Institute of Romania to present their point of view. As my colleague informed you already, today's agenda is the reconsideration by the Geological Institute of Romania and by the Romanian Academy of their points of view.*"

Gabriel Bindea from the Geological Institute of Romania then stated: "***I would like to say from the very beginning, that the Institute is not represented today by its management. The invite arrived two days ago, and the management is out on a mission on site. We informed about this, but, still, we came here to strengthen what the Geological Institute declared on several occasions. Which is, that the Geological Institute of Romania maintains its point of view expressed on May 29, 2013 and again on June 13, 2013, namely that it does not agree to the permitting of the Roșia Montană Project, in its current form***.*"[654] (emphasis added)

When asked to explain, Gabriel Bindea stated the following: "*I have just found out, on this occasion, that there was this point of view, belonging however not to the Institute, but to a one-time representative of the Institute. I can tell you that there was then a merely 2-day trip to Roșia Montană, teams of geological researchers*

---

[653] Exh. C-480 (Transcript of TAC meeting, dated 26 July 2013), p. 1.
[654] Exh. C-480 (Transcript of TAC meeting, dated 26 July 2013), p. 2.

*who, nevertheless, when we asked them individually, told us that a report was issued concluding that the research must continue. Moreover, none of the researchers who participated in that trip to Roşia Montană signed that report, in protest against the manner in which the researches were carried out. One cannot draw conclusions after a 2-day visit on site on a matter as serious as the location of a 353 ha tailings pond. Right. I only saw that conclusion for the first time yesterday, sent by you, on this occasion; I have it here with me.*"[655]

Octavian Pătraşcu then stated: "*No, once again, so: Two days ago we transmitted the points of view of the Academy and the Institute. The invitations were sent on Friday. These points of view and statements from the Institute and the Academy are the same as circulated this last period – indeed, for the past 5 years, if I am not mistaken. So, I kindly ask you – please don't think I am asking you to explain yourself, I would like to... I understand. You have a point of view on the location of the tailings pond and the other points of view, briefly. You also have an opinion in geology and metal, contents and processing*".[656]

Gabriel Bindea then answered: "*We want to start from the beginning and tell you that I only saw this report for the first time yesterday. You sent it the day before yesterday, it's very true, gentlemen. This report, which actually looks like the conclusion of another report, which does not exist... [Octavian Pătraşcu: What report are you referring to?] ...this report, that you sent by facsimile and email... we personally did not receive it... Perhaps the Director. The Director is not present in this meeting, I'm telling you....*"[657]

When told by Octavian Pătraşcu that this is the Institute's report, Gabriel Bindea stated: "*And I'll go on telling you that this report, as you sent it, was not signed by the specialists who participated in this work. I asked them yesterday, one by one, those I could contact, and they told me that they do not acknowledge either the conclusion, or the form of this summary. […] Perfect, so my opinion is not to discuss this point of view and refer only to the points of view issued between May 29 and June 13, that the Geological Institute [...] far from ideal. In that area, according to the maps we have, according to our data, there are at least three sensitive points. Namely: the right-side slope of the Corna Valley, which is a sandstone formation, and we all know about sandstone, this is a rock with high porosity, very penetrable. Alongside the Corna Valley, there is a lithological limit between two lithological formations Maastrichtian and Aptian. This in turn is also a gate access for seepage; while in the upper third of the proposed basin, there is*

---

[655] Exh. C-480 (Transcript of TAC meeting, dated 26 July 2013), p. 3.
[656] Exh. C-480 (Transcript of TAC meeting, dated 26 July 2013), p. 3.
[657] Exh. C-480 (Transcript of TAC meeting, dated 26 July 2013), p. 3.

*a very important faultline which separates two geological formations, Maastrichtian and sedimentary volcano formation. Given these conditions, we can't say that the pond will be without problems for many years, also given this huge volume, 185 meters and 363 ha. Let's renumber these figures.* […] *And I think this is less related to the Environmental Permit, but refers more generally to the issue of this entire exploitation.* **There is a huge quantity of material that is subject to cyanidation. Even during the former regime, the material which was subjected to cyanidation used to be enriched. In other words, less tailings [unintelligible] we would have less reasons to worry. The quantity of material subject to cyanidation is huge and the Geological Institute believes that, in its current form, it's not even close to being accepted, it's an abnormal situation. Sure, we can also question the fact that elements of special importance for industry are not extracted. This way, the possibility of a secondary exploitation of, for example, the feldspar or the Tellurium, Selenium, Germanium is compromised. But, once again, these are secondary issues. As far as the Environmental Permit is concerned, I believe that we should strictly refer to the TMF site which we believe to be a bad choice. Thank you**.”[658] (emphasis added)

Cecilia Szentesy from RMGC was then given the floor to comment. At some point, Gabriel Bindea objected to the statement of Cecilia Szentesy that the point of view of the Institute issued in 2011 was signed by the General Director of the Institute at that time, Engineer, Ştefan Grigorescu, saying it was not made by him. Octavian Pătraşcu then stated: “*Before moving to the points of view and asking the IGR to comment or, well, make appreciations in relation to your presentation, I would like to read the point of view of the Romanian Academy. My colleagues contacted them, they called the secretariat. Their point of view was officially sent by mail yesterday, they had it sent to us, and they were kind enough to resend it now by facsimile, so I will bring it to your attention. It is a letter signed by Academician Ionel Haiduc, President of the Romanian Academy. The Romanian Academy carried out a detailed analysis of the Roşia Montană mining project, regarding the environment and the sustainable development of the area, using the competence of the specialists from its own research institutes. This analysis was personally presented to Ms. Rovana Plumb, Minister [of Environment], at the Romanian Academy, on June 20, 2013. Also, the representatives of the Gold Corporation company requested a discussion with Mr. Academician Ionel Haiduc, the President of the Romanian Academy. This interview took place, but could not remove the important differences of position and change our opinion as regards the Roşia Montană mining project. Therefore, we consider that our consultative role established by law was fulfilled and our presence at the TAC meeting set for June 26, 2013 at the Ministry of*

---

[658] Exh. C-480 (Transcript of TAC meeting, dated 26 July 2013), pp 3-4.

***Environment and Climate Change is no longer justified, the role and
responsibility for making the decisions being with the competent persons. This is
the point of view of the Romanian Academy and further on I'll ask the colleagues
from the IGR, should they have comments on the answers given by the titleholder
on the items referred to in their letter. Please.***"[659] (emphasis added)

Gabriel Bindea then commented on the presentation of RMGC as follows: "*We
thank you for the very beautiful presentation you held. We are impressed by the
incredible list of personalities and companies you cited. However, at some point
you say that the geotechnical, not the geological studies are fundamental. Yes, it is
true, these are very important, but I want to remind you that these geotechnical
studies must be designed based on a geological map. We believe that the geological
map that our colleagues analyzed at your site in 2011 is insufficient, it is a 1:5000
scale, but for such study you would need a more detailed map. In addition, this is
a close copy of a 50,000 map, the official map of the Institute, of this country,
ultimately, which, as you said yourself, you bought lawfully from us. Yes... You are
saying that those sandstones are enveloped in clay, in a colluvium. On our map,
the colluvium appears upstream of the dam, so downstream I believe you will have
to line it fully with clay, which is a very complicated enterprise. Well, going further,
as regards the large mass of leached material, you gave the example of the richest
mine in the world, Carlin. Well, you forgot to mention the contents there. I remind
you that we had a Uranium deposit here, the richest in Europe, maybe the richest
in the world, the Stei deposit, which was taken away, tailings and all, by the
Russians, with railway cars. It is a totally different thing. You cannot compare with
what happens at Roşia Montană. Roşia Montană was a gold-rich area, fed four
empires, this is true, but now it's an area if not yet fully depleted, almost so. The
contents we have to consider as representative there we don't think exceed... so
they cannot be compared to Carlin, 1 gram per ton – 1 gram per ton is very little.
At the time this exploitation was abandoned in the Cetate pit, we were spending 3
million Lei for 1 million Lei gold production. That's why it was stopped. So, in these
conditions* […] *No. It's not viable.* **Since you kept citing that report of 2011, I told
you at the beginning of this discussion that that is not a report; that is truncated
point of view. It only refers to two octometric profiles made by some colleagues
of ours who did not sign that report***. And now I would like to give the floor to my
colleague, our expert in electrometry, who can tell you how many profiles you
would need to be able to reach the conclusions in that report.*"[660] (emphasis added)

---

[659] Exh. C-480 (Transcript of TAC meeting, dated 26 July 2013), pp 9-10.
[660] Exh. C-480 (Transcript of TAC meeting, dated 26 July 2013), p. 10.

A discussion on this ensued and at the end Gabriel Bindea stated: "*Thank you! You ask what are the grounds of the IGR point of view. The point of view of the IGR, as written also in this letter to the Minister of Environment says, is based on the heritage of the IGR. May I remind you that the IGR is the largest institution of this kind in our country, and not from today or yesterday, but for over one hundred years. In this context, the question, including the map you purchased, you said it yourself that you bought it from the IGR. Obviously, because you couldn't have bought it from somewhere else. **And because it's the last time when we have the floor, we tell you again that the IGR maintains its point of view formulated back in 2013, that is, that the permit for this exploitation cannot be granted under these conditions**. Thank you!*"[661] (emphasis added)

Other TAC Members expressed their point of view, some disagreeing with the approach of the Institute. Then Grigore Pop from NAMR stated the following: "*I am Grigore Pop, General Director in the Agency for Mineral Resources and of the Security Structures. I express for the third time the final point of view of the institution I represent under mandate in front of you, in the Technical Analysis Committee. From the point of the view of the authority competent to manage the natural resources of the Romanian State, from the point of view of the institution that reviewed the project, the proposed project elaborated by the RMGC team, **we identified no impediment in implementing this project**.*"[662] (emphasis added)

At the end, Octavian Pătrașcu stated: "*Thank you, General Director! Other TAC members? If there are no other opinions or observations, please allow me to inform you on an aspect related to the Roșia Montană Project. On July 11, 2013 the Ministry of Environment initiated a public consultation, it can be found on the website of the Ministry, about the conditions and measures which must be taken into consideration in taking the final decision for the issuance of the Environmental Permit for the Roșia Montană mining Project. So, as I said, this note is on the Ministry's website, you may find it under the public consultations section. The deadline for receiving observations is July 30, 2013. **As soon as we will receive the observations, we will probably meet again to discuss the final decision, which must be adopted for this mining project. I think we can conclude that the analysis on the quality and conclusions of the EIA Report has been finalized during all these TAC meeting this year and, once again I remind you that the deadline for public consultation, as published on the Ministry of Environment's website, is July 30. I will close by telling you that you will be informed in due time about the meeting for the taking of the decision and then, according to the regulatory***

---

[661] Exh. C-480 (Transcript of TAC meeting, dated 26 July 2013), p. 13.

[662] Exh. C-480 (Transcript of TAC meeting, dated 26 July 2013), p. 15.

> *procedure, all the TAC members must be present and have mandates. Anyone unable to participate, must appoint a replacement. Thank you for your presence here. I conclude by wishing you a nice weekend and I invite you for a coffee, sandwich and thank you!"*[663] (emphasis added)

- The public consultation period for the terms of the draft Environmental Permit closed <u>on 30 July 2013</u>, and no public comments or questions were forwarded to RMGC. As a result, the Ministry of Environment prepared a 44-page draft decision. The draft decision referred to the acceptance of the EIA Report and the proposal to grant the Environmental Permit by the TAC.[664]

### iii.     *The analysis*

973.   Having reviewed the entire context, i.e., discussions before, during, and after the 29 November 2011 TAC meeting, the Tribunal reaches the following conclusions regarding Claimants' claim of finality within the TAC.

974.   *First*, in the days and weeks leading up to the meeting, neither RMGC nor Gabriel Canada indicated in public statements or otherwise that they expected the TAC to complete its review by the end of 2011 and that they considered the requirements of the Environmental Permit to have been met. The letter from the Department of the Environment to RMGC inviting them to a meeting on 29 November 2011 did not state that this meeting would be the last or final one. As indicated in the letter, the TAC wanted to discuss not only RMGC's responses to the 102 questions, but also Chapters 8 and 9 of the EIA Report, the Independent Group of International Experts ("IGIE") report, and recent visits by the Committee and the PETI[665] European delegation. The same is true for the two circulated agendas for this meeting, as well as the list of 102 questions to RMGC. There was no mention of a meeting being final or that things were close to being finalized.

975.   While Minister Borbély spoke in September 2011 of the need to take steps and actions to move things forward and make a final decision and to discuss any remaining issues at the November meeting, it appeared that such meeting would be a step in that direction, but not the intended final step. There is no circumstantial evidence to refute such a conclusion. On the contrary, given the size, importance and sensitivity of the Project, it would have been extremely unprofessional and premature to rush to a final decision.

---

[663] Exh. C-480 (Transcript of TAC meeting, dated 26 July 2013), pp 2-16.
[664] Exh. C-2075 (Ministry of Environment Draft Decision concerning the Request for Issuance of the Environmental Permit), p. 2.
[665] EU Parliament Committee on Petitions.

976.    *Second*, as for the discussions at the actual meeting, there is nothing in the statements of the TAC Chairman, Marin Anton, to indicate, let alone clearly state, that this would be the last TAC meeting, that everything was settled, and that approval was imminent. This is also true of Marin Anton's statement that things were finalized at the TAC and that another meeting would be called to finalize issues, etc. There is no evidence for the Tribunal to conclude that the EIA Process was complete or that everything was resolved at that meeting. Statements that "*all technical issues have been clarified*" in certain documents does not mean that the work of the TAC had reached an end.[666] Rather, there were outstanding issues, discussion continued, and the TAC President continued to ask for written comments from all stakeholders. Specifically:

- When introducing the agenda of the meeting, the TAC President made no indication that a decision would be made following the discussion. His reference to one item of the agenda concerning the review of the final chapters of the EIA Report cannot alter this conclusion. Indeed, the EIA Report review was in principle one of the main if not the ultimate tasks of the TAC. But it is evident from the evidentiary record that the discussions at the TAC and hence the development of the EIA Process went beyond that. Given the nature of the Project and the development of the discussions, the EIA Report as such was just one item and several things needed to be clarified and addressed.

- In addressing RMGC's responses to the 102 questions and the resulting issues, several matters were debated at length with no hint of insincerity from either side. Such issues were indeed RMGC's compliance with the Water Framework Directive and the provision of the Alba County's decision declaring the Project as having outstanding public interest. Another was the provision of documentation on Piatra Despicata. Similarly, it was pointed out that RMGC still needed two confirmations from the Ministry of Culture for each zonal development plan (i.e., one for the industrial area and one for the historic center). While the TAC participants disagreed on the relevance of such plans to the environmental process, there is no evidence that either position was baseless regardless of whether one item was in theory or in principle more relevant for the Construction Permit. Indeed, Dragoș Tănase of RMGC pointed out that the process concerning the zoning plans runs in parallel to the environmental process and that both must be related to the Construction Permit. At the same time, Dorina Simona Mocanu from the Ministry of Environment signaled that it was vital to obtain them at some point during the EIA Process because if they were to be approved in a different form than the one

---

[666] See for example Exh. R-406 (Ministry of Economy Note from Sorin Gaman to Minister Bode, dated March 2012).

endorsed, or if something were to change (because things had to be made in line with EU laws), then the procedure would have to be restarted.

- While Marin Anton, the TAC President, stated towards the end that there were no more questions to be clarified, Dorina Simona Mocanu from the Ministry of Environment felt that each TAC member should be questioned individually and that there were still representatives from the Romanian Institute who had left and had questions to clarify. Marin Anton then stated that a checklist for the EIA quality report would be prepared and sent to each Ministry for analysis so that specific answers could be obtained. Thus, even if Marin Anton stated that the technical discussion on the Project had come to an end and that things were finalized in the TAC, the Tribunal cannot conclude from this that things were finalized with respect to the Environmental Permit. In fact, Marin Anton stated that there would be a next meeting to clarify certain issues and then another meeting for a final decision. Although there was progress and almost final agreement on the agenda items for the meeting, the TAC was not yet ready to make a decision and recommend to the Ministry of Environment that the Environmental Permit be issued.

977.  *Third*, it is true that, immediately after or soon after the 29 November 2011 TAC meeting, some of the issues that were identified as outstanding were dealt with. In particular, RMGC provided the Alba County decision declaring the Project to be of outstanding public interest for the purposes of complying with the Water Framework Directive on 30 November 2011. The Ministry of Culture sent its point of view to the Ministry of Environment on 7 December 2011. The Romanian Geological Society gave its endorsement to the relocation of the Piatra Despicata on 8 December 2011 and the Romanian Geological Institute forwarded its point of view on 9 December 2011. Things nonetheless were far from settled and discussion, including further TAC meetings, ensued. Specifically:

- Concerning the *Alba County's decision declaring the Project as of outstanding public interest*, it was not clear between the stakeholders at the time whether such was sufficient or whether a declaration from the Government itself was needed. Indeed, while some thought that the issue was straightforward and one that had to be dealt with by the Ministry of Environment (i.e., to decide who should declare the Project as such), others believed that the Ministry of Foreign Affairs after consulting representatives from the EC should be implicated. The reason for the disagreement was that there was the opinion that the EC itself might in the future deem the declaration of the Alba County insufficient. During the discussions on the issue, it was agreed that it would be explored further to get to a finality as far as that was concerned.

- *Concerning the Ministry of Culture's point of view* communicated on 7 December 2011, discussions continued on its appropriateness as an endorsement. Correspondence ensued from 19 December 2011 seeking to obtain a confirmation from the Ministry of Culture as to whether its point of view was the sought after "endorsement". Correspondence on the issue also focused on the fact that the delay on this was due to the uncertainty surrounding the classification of the Cârnic Massif in the LHM. The actual "endorsement" in form, but one which was identical to the 7 December 2011 point of view, came only in April 2013. This issue will further be addressed below (see paras 1078 *et seq.*).

- *Concerning the Geological Institute's point of view communicated on 9 December 2011*, that was amended in May 2013 on the allegation that the original point of view was not provided by a representative of the Institute and was not based on proper studies. Indeed, in further TAC meetings, the issue was discussed extensively with serious concerns being expressed about the legitimacy of the original point of view.[667]

- Following the suspension of the process until after the Parliamentary elections, *further TAC meetings* were held between May and July 2012 and although some expressed the view that the technical aspects of the process had already been finalized in the 29 November 2011 meeting, matters were still being discussed at length and the EIA Process was still ongoing.

- That things were still pending is evidenced by a *report communicated by Minister Șova from the Ministry of Infrastructure to Prime Minister Ponta on 6 March 2013* referring specifically to, among other things, the ongoing work of the TAC, specific steps to be undertaken by RMGC as well as the ongoing status of the disputed points discussed above (see present para.) and importantly about completion of endorsements including that of the Ministry of Culture.[668]

- It was only following the report of the *Inter-Ministerial Commission* dated March 2013 that matters started to go in a specific direction. Indeed, the Commission was set up by the Government in an effort to assist the Project to go forward. Its purpose was to "*identify potential solutions for the future development of the mining project.*" The Commission had made findings on several aspects of the process and had concluded that "*there* [we]*re no impediments or significant obstacles, legislative or institutional to hinder a possible future development*" of the Roșia

---

[667] Exh. C-481 (Transcript of TAC meeting, dated 14 June 2013).
[668] Exh. C-1903 (Note from Minister Șova to Prime Minister Ponta, dated 6 March 2013).

Montană Project.[669] But the language of the report itself and the conclusions therein show that the Inter-Ministerial Commission was proposing possible solutions and recommendations that were not binding and did not finally resolve the outstanding matters.

- Moreover, *further TAC meetings* were held in May, June and July 2013 referring to the conclusions of the November 2011 meeting and the compliance of the EIA Report with technical requirements, as well as the items left for clarification. During those meetings, the TAC members were always asked to provide their points of view orally at the end and subsequently in writing. In fact, in June 2013, the Ministry of Environment had specifically asked the TAC members to submit in writing the conditions relating to the measures for diminishing the impact of the Project according to each one's field of competence, as well as the monitoring indicators which were mandatory for the Project's implementation. Such conditions would be published in a detailed note for public consultation scheduled for 11 July 2013 whereby the public would also have an opportunity to submit answers by 30 July 2013. The public consultation deadline passed and nothing was forwarded to RMGC, so the Ministry of Environment prepared a draft decision accepting the EIA Report and proposing to publish the Environmental Permit with the same conditions as those in the public consultation. It pointed out that issues remained to be discussed, i.e., the Waste Management Permit, the Water Framework Directive, the urbanism plans, the urban certificate and the financial guarantees.

- Meanwhile the TAC meetings were followed by a "conciliation meeting", which was convened in July 2013 by the Ministry of Environment to provide any dissenting members an opportunity to reconsider their views. The Romanian Academy was not properly represented at such meeting; further, participants representing the Romanian Geological Institute had voiced their concerns, one relating to cyanide, and the other about the validity of the original point of view that had endorsed the Project, whereas a later report from the Romanian Geological Institute did not endorse the Environmental Permit in its current form. Others participating in the TAC meetings identified no impediments to the Project.

978.   Having examined the entire context of the 29 November 2011 TAC meeting, and thus an important part of the EIA Process, the Tribunal must reiterate that the issue here is not to decide or assess whether each individual matter raised was critical to the EIA Process, the Environmental Permit or the Construction Permit in accordance with the minutiae of the applicable regulations. Rather, what is essential is whether the entire

---

[669] Exh. C-2162 (Letter from Department for Infrastructure Projects and Foreign Investment to Secretary General, dated 26 March 2013, forwarding Informative Note regarding the activity of the Inter-Ministerial Commission), pp 2, 9.

process, as far as the TAC is concerned, was conducted professionally and in a manner that took into account the scale, complexity, gravity, and sensitivity of the Project and without evidence of egregious delay or negligence such that the derailment of the process would be inevitable, whether intentional or not. Whether the position of the Ministry of Culture was already available in December 2011, or whether the original position of the Romanian Geological Institute was the valid one, or whether the validity of the land use plans was relevant to the EIA Process, or whether the decision of Alba County declaring the project to be of extraordinary public interest was sufficient, is not what is at stake here in determining whether Respondent acted unreasonably with respect to the Environmental Permit and thus the development of the Project. Rather, the issue is whether the discussions and/or disagreements on all of these points, which undeniably occurred during the TAC meetings or the EIA Process and thus impacted the process, whether right or wrong, were genuine and whether due process was respected at all times. The Tribunal sees no evidence that this was not the case.

979.    Rather, the entire process and discussions among the TAC members were comprehensive, professional, and serious, recognizing that there were important issues to be resolved and that the "buy-in" of all stakeholders was required because much was at stake. This is evident in all "three phases" i.e., before, during, and after the 29 November 2011 meeting. In the TAC meeting of 14 June 2014, it was said that they were not opposed to mining projects, but there were concerns, and those concerns, whether valid or not, needed to be addressed given the public's interest in the Project.[670] The fact that there was evidence that the matter was closed or addressed does not change the fact that there was indeed disagreement.

980.    In this case, one cannot limit the EIA Process to its technical aspects and conclude that those matters were resolved and therefore the TAC, followed by the Ministry of Environment, followed by the Government should have recommended, approved or granted the Environmental Permit. This was by no means a simple process, and Claimants, as serious investors in this case, were certainly aware of this. As has been repeatedly noted, this was a massive project with much at stake, the public interest was important, and the process was therefore influenced by all sides, whether ultimately justified or not.

981.    Accordingly, based on the record before it, the Tribunal cannot conclude that the 29 November 2011 meeting was the last TAC meeting, that matters were resolved at that time, and that Romania should have issued the Environmental Permit but did not. Nor can it point to any impropriety, intentional or otherwise, on the part of the State during this and the subsequent meetings.

---

[670] Exh. C-481 (Transcript of TAC meeting, dated 14 June 2013), pp 5-11.

*iv.*   *The conclusion on the TAC meeting*

982.   In light of the above, the 29 November 2011 meeting was not the last TAC meeting such that matters were resolved at that time. There was also no impropriety, intentional or otherwise, on the part of the State during this and subsequent meetings.

c)   Technical or other elements

*i.*   *In general*

983.   As shown above, several technical and other elements were the subject of discussions that took place both inside and outside the environmental permitting process (see paras 56 *et seq.*). The relevance of most of these elements to the issuance of the Environmental Permit and/or whether they were met as conditions are disputed between the Parties. However, the Tribunal has held that these elements cannot be considered in isolation or separate from the environmental permitting process. If the process itself was not compromised, whether or not they were a condition of the Environmental Permit or whether they were satisfied is not the proper question in this case. In any event, the Tribunal has concluded that the process and the manner in which it was managed or handled by the State, and in particular in the context of the TAC meetings, was not manifestly unreasonable. To that extent, the Tribunal's analysis with respect to these elements should theoretically end here. Nonetheless, for completeness and review, the Tribunal will re-examine these elements.

984.   In its review, the Tribunal will set forth the relevant facts in each case, describing the Waste Management Plan (see Section ii below), the Water Law and Water Framework Directive (see Section iii below), the Zoning and Urbanism Certificates (see Section iv below), and the Cultural Heritage elements (see Section v below).

*ii.*   *The Waste Management Plan*

1.   The issue

985.   The Parties disagree on whether a Waste Management Plan was required for the issuance of the Environmental Permit and whether the State had promptly reacted in relation to its approval.

2.   The facts

986.   The relevant facts have already been set out above (see paras 57-63). However, the Tribunal will repeat, and where necessary, supplement these facts, before proceeding with its analysis.

987.    It is recalled that the Ministry of Environment asked RMGC to update its Waste Management Plan. A Waste Management Plan was submitted with the EIA Report in 2006 and discussed and reviewed as part of the EIA Process in accordance with the new regulations which were then in effect.

988.    In September 2011, the Ministry of Environment requested RMGC to update this plan.[671] RMGC resubmitted an updated Waste Management Plan in December 2011.[672] NAMR approved the updated plan, after it was submitted in December 2011.[673]

989.    In April 2012, the Ministry of Environment requested additional information from RMGC.[674] RMGC complied with this request and received NAMR's approval in May 2012.[675]

990.    In June 2012, the Ministry of Environment requested additional information.[676]

991.    Nothing happened until RMGC was informed that the Ministry of Environment was ready to receive the plan for review. Thereafter, RMGC resubmitted the plan on 22 March 2013, which was not significantly different from the earlier version submitted in December 2011.[677] Both NAMR and the Ministry of Environment approved the plan in April and on 7 May 2013.[678]

992.    At the 10 May 2013 TAC meeting, the Head of the Department of Waste Management of the Ministry of Environment, Ana Nistorescu, confirmed that the plan complied with all requirements and standards and best available techniques. Towards the end of her statement, Ana Nistorescu concluded as follows:

> To conclude, we would like to mention that this **Waste Management Plan for extracting industry wastes will have to be amended so as to comply with changes in the national and EU legislation, whenever such changes appear and are published**; and that the storage operation will begin only after all the investment works described in the Waste Management Plan for the wastes generated by the gold-silver exploitation in Roşia Montană are finalized, and only after all the

---

[671] Avram WS II, para. 55.

[672] Avram WS II, paras 56-58.

[673] Avram WS I, para. 114.

[674] Memorial, para. 392; Avram WS I, para. 114; Exh. C-646 (Letter from Ministry of Environment to RMGC, dated 17 April 2012).

[675] Memorial, para. 392; Exh. C-658 (Letter from Ministry of Environment, dated 7 May 2013).

[676] Avram WS I, para. 116; Exh. C-652 (Letter from Mureş Water Basin Administration to RMGC, dated 7 June 2012).

[677] Exh. C-780 (Waste Management Plan, dated March 2013).

[678] Exh. C-656 (Alba NAMR Endorsement No. 189, dated 4 April 2013); Exh. C-657 (NAMR Endorsement No. 4320, dated 11 April 2013); Exh. C-658 (Letter No. 21251 from Ministry of Environment to RMGC, dated 7 May 2013).

*endorsements of the Integrated Environmental Permit are obtained.* **The Waste Management Department considers that RMGC complied with all our requests as regards the preparation of the Waste Management Plan for the wastes in the Roșia Montană mining perimeter**.[679] (emphasis added)

### 3. The analysis

993.    As to the Waste Management Plan, the Tribunal considers the following.

994.    *First*, the Tribunal recalls that a waste management plan outlines the strategy for managing the waste generated by the proposed development and for avoiding landfills by ensuring that all waste generated is appropriately recycled or reused whenever possible. The responsible government agencies for this plan are the Ministry of Environment and the NAMR.

995.    *Second*, it is not disputed that this plan is relevant to the Construction Permit as it relates to the management and control of waste during the construction itself.

996.    *Third*, it is also relevant from an environmental point of view, as it concerns the protection of the environment through the reduction of waste. Thus, it was undeniably discussed as part of the overall environmental process. In fact, the environmental process had two aspects: one that had to do with the EIA and was therefore relevant to the Environmental Permit, and the other that had to do with the Construction Permit in parallel. So it was only natural that these elements, which were more relevant to the Construction Permit, were discussed in parallel and sometimes simultaneously.

997.    *Fourth*, and more importantly, the reason for updating and approving such a plan seemed to be changes in EU legislation and the need to comply with them. Indeed, the EU regulates such activities through a directive aimed at protecting the environment and public health. And one related concern, which was prominent, despite conflicting views, was indeed the risk of cyanide contamination.[680] As such, it does not appear that the Ministry of Environment's or the NAMR's requests for clarifications and/or updates were unreasonable or out of context. The Tribunal does not see any abuse or undue delay of the procedure (caused by Respondent) in this context.

998.    In light of the above, the Tribunal does not find an abuse of process from the part of Respondent as far as the Waste Management Permit is concerned.

---

[679] Exh. C-484 (Transcript of TAC meeting dated, 10 May 2013), pp 11-12.
[680] Exh. C-506 (Transcript of Parliamentary Special Commission hearing, dated 24 September 2013).

*iii.* *The Water Law and the Water Framework Directive*

1. The issue

999.    The Parties disagree on which level of government should declare that a mining project is of outstanding public interest, which was relevant for the Project's compliance with Romanian water legislation implementing the EU Water Framework Directive.

2. The facts

1000.    The relevant facts have been set out above (see paras 64-72). The Tribunal will, nevertheless, repeat, and where necessary, supplement these facts, before proceeding with its analysis.

1001.    It is recalled that <u>on 18 July 2011</u>, ██████████████████████████ ████████████████████, held a meeting with RMGC where the Ministry of Environment and the Water Department required either a County Council decision or the three local council decisions to satisfy the outstanding public interest requirement.

1002.    At the <u>29 November 2011</u> TAC meeting, the Ministry of Environment requested RMGC to supplement its response in compliance with the Water Framework Directive by providing a copy of the 29 September 2011 Alba County Council resolution.[681]

1003.    <u>Between early 2012 and March 2013</u>, the question arose as to whether the Alba County Council decision of 29 September 2011, declaring the Project to be of outstanding public interest, was sufficient to satisfy the outstanding public interest requirement, or whether it would be advisable to make this declaration at the national level through a government decision.

1004.    <u>In March 2012</u>, Marin Anton, the TAC President, publicly stated the following:

> ***Personally, I am in favor of this project****. […] Currently I am the president of a technical analysis commission. **This technical analysis commission does not consist only of the Ministry of Environment, where I am State Secretary, but it is an inter-ministerial commission which includes the Ministry of Transport, the Ministry of Agriculture […]. Currently, the permit is given when all specialists in this committee say: "Yes, it's ok" from each one's point of view.** […] **The environmental permit is a first step in getting in the end the integrated environmental authorization, which leads to the gold mining from the deposit. After this step, the construction permit has to be obtained. Again, it takes some time to get the construction permit. Which means**

---

[681] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), p. 25.

243

> *other approvals, including an environmental approval. And in the end, after all these approvals are received and the construction permit is obtained,* […]. *The decision is at the commission. The technical analysis is ongoing, it is at the end, towards the end. We are waiting now for an opinion from the Ministry of Culture. And depending on it the environmental permit will be issued or not. In principle, I personally believe that the environmental permit will be issued, even if it bothers the NGOS that it is issued.* […] *Probably in the near future. A month or two.* […] *Water Framework Directive …* **There is the Corna river, the tailings pond is made on the Corna river. And the European Directive generally says such a pond can be placed on a river if 4 exceptions are met. And that 4 exceptions are met in my opinion**. (emphasis added)

When asked whether approval from the County Council is sufficient, Marin Anton said:

> *In my opinion, yes, it's sufficient, because it is a work of local importance*. (emphasis added)

Ioan Popescu then stated:

> *I don't know why a Government Decision is needed, as Mr. Borbély said, because the Government is you. They are all in this commission, right? All, meaning from the Ministry of Transport, from the Ministry of Culture ….*

Marin Anton then stated: "*Mr. Borbély also said it could be*".[682]

1005.   <u>On 22 March 2013</u>, Dragoş Tănase stated at the Inter-Ministerial Commission meeting that RMGC now understood that it was being asked to provide a decision from a higher level which is not legally grounded and that the only competent body to decide on this matter is the Ministry of Environment or the Ministry of Waters and Forest.

1006.   Maya Teodoroiu, from the Department for Infrastructure Projects and Foreign Investments ("DPIIS"), then asked whether there was "*any legal ground or request for this kind of enactment, for promoting the project through a higher-ranking deed than a decision of the Local Council.*"[683] RMGC stated that there was no such legal ground or request.

Gheorghe Constantin from the Ministry of Environment then stated:

> *I believe that what emerges from the way things were described is that* **we have been looking for a solution. That is why in the previous discussions we agreed with … the Decision of the County Council, the**

---

[682] Exh. C-778 (Incisive TV Show, dated 8 March 2012), pp 5-6.
[683] Exh. C-472 (Transcript of Inter-Ministerial Commission Meeting, dated 22 March 2013), p. 10.

***Decision of the Local Council. The problem is that a new review was required, meaning that, let me put it this way, not everyone was convinced, when they saw this decision, that it was the right way to do when one declares***... *The issue that the Ministry of Environment decides whether something is of outstanding public interest is particularly relative and hard to be decided on from the perspective of the Ministry of Environment. I do not believe that it is for the Ministry of Environment to decide whether there is outstanding public interest in that ... let me tell you what the ministry deems of outstanding public interest: flood prevention works, that is indeed outstanding public interest, large infrastructure to supply water to the people, which we consider ... but an operation of this kind and extent, well, I do not thing the Ministry of Environment can decide on that or it is not the institution that should decide this. You are well aware that we have discussed this topic before and that we suggested it should be an initiative from the Ministry of Economy, after all it is rather a matter linked to the enhancement of natural resources* […] ***The problem is now to see whether this Decision of the Council is enough and we are afraid of a possible violation of the Directive. That is why we asked the Ministry of European Affairs…because we are in a position where can agree with what you already have and then the Commission comes to tell us we did wrong. What will happen then? So… we will issue the permit, they will start the operations and then the Commission comes and asks us to do what? To stop… we have seen this before and… do not get me wrong we do not have a problem with that. We must only make things clear.***[684]
(emphasis added)

Maya Teodoroiu then stated:

> *I think a representative of the Department of European Affairs would have to say essentially ... but let me ask you one thing, since you know how the Government interacts with the European Commission.* ***Is not there a procedure to ask for a prior opinion from the Commission, something of the kind that can help avoiding an infringement procedure or anything?***[685] (emphasis added)

Dragoş Tănase then stated:

> *If you allow me, following ...* ***in 2011, when we had this kind of discussion with the Ministry of Environment, we asked to meet someone from the European Commission and we did meet Nicola Notaro, the man who fathered the Water Framework Directive. We saw him and told him "This is what the Romanian authorities worry about …" He answered that it was not a matter for the European***

---

[684] Exh. C-472 (Transcript of Inter-Ministerial Commission Meeting, dated 22 March 2013), pp 10-11.
[685] Exh. C-472 (Transcript of Inter-Ministerial Commission Meeting, dated 22 March 2013), p. 11.

> *Commission to decide, that it simply the decision of the Romanian Ministry of Environment, the decision of the local authorities, that the Commission does not interfere with the regulation and authorization issues of the Member States and that we should address the Ministry of Environment, the ministry in Romania should make this decision and in case we are not content with it we can challenge it in Romania and the seek remedy to the European Justice. That was the discussion, the formal answer … The informal answer of Nicola Notaro was that there were hundreds, maybe thousands such dams, such works across Europe, some tens or hundreds of them in Romania, dams that were built on valleys or riverbeds, since there is no other place to build them, as it is about building dams… and that we must continue the discussion in Romania, with the Romanian authorities, as they do not see a problem, informally speaking. Let's move on. As to what Mr. Constantin has said, let me point out a slight nuance there … He says we went to the Ministry of Environment to ask them to declare the Project as an outstanding public interest project … it is not really so … What we say is this: Alba County Council declared the project as an outstanding public interest project. Even the Ministry of European Affairs … if we carefully read the letter from the Ministry of European Affairs, the first thing in their conclusions says: "It is not within our powers, it is of the competence of the Ministry of Environment in its capacity of water management authority. They should either be satisfied or not with the project being declared as an outstanding public project by the County Council's decision." We went to the Ministry of Environment back in 2011, they asked us for a Decision of the Local Council at first, and we came with a Decision of the County Council. The Ministry of Environment accepted it, including in a TAC meeting, they said it was enough and the issue was closed. Even in the letter from the Ministry of European Affairs emphasizes this. If you read the conclusion, you will see that the first thing in the conclusion reads that "the Ministry of Environment is competent", so the European authorities, Nicola Notaro from the Commission, the Ministry of European Affairs and the law says that the Ministry of Environment should deem the condition satisfied, which the Ministry of Environment did in 2011. That is why we do not understand why we should reopen the issue in 2013.*[686] (emphasis added)

Gheorghe Constantine then stated:

> *I have told you that this aspect was agreed within the framework in which the verification has been requested, this is our point of view. You are right. We also informally discussed with the Commission. Informally, they told us that if we had a procedure to define this notion of outstanding public interest… they had no objection. But we do not have*

---

[686] Exh. C-472 (Transcript of Inter-Ministerial Commission Meeting, dated 22 March 2013), p. 12.

*one. We have a proposal for the modification of the Water Law, it was about to pass in the plenary, but then it was sent back to the commissions… Right now, this is a matter that is likely to be further discussed in the Ministry together with the law firm and not only … that is why I also mentioned the Ministry of Justice or the Department of European Affairs.* […] *If we conclude that it is all enough … let me tell you, so far, we have seen three such positions, it is not just us, the ministry, but three institutions that said…and argued that we should not… But ok, we are open to a solution. It is not just a matter of… it is a matter we should see in the light of the effects, after the issuance of this permit, we are afraid that … It is true! The Commission could not have said something else. Indeed, there are dams already in place, but let me tell you that very few have been built after 2000, when the directive came into force. We have a dam blocked in Azuga, precisely for such reasons. There are many, for all our flood defence infrastructure were required to perform this kind of and send it to the Commission based on article 4.7. It is true that there is public interest or security, general state of health and … which we used to promote our works, but even the State needs to present to the arguments for every project; ok, that's it.*[687]

Then Ştefan Damian (RMGC's lawyer) stated:

*We only have one technical comment, we have also checked the case law of the European Court of Justice and we have found a lot of rulings, true, not precisely on this particularly case, but rulings where the court basically decided and ruled that the local authorities can have the right to decide in matters within their competence, including related to public interest, which, by the way, can be local or national. We are now speaking of local public interest, because it is obviously about Alba County and it is in Alba where the project will be implemented, where it will be authorized… that is where the construction permit will be issued, or it can be national, as we see it in the case law of the European Court, no doubt about that, we can bring up many examples. As for competence, of course it is good we can cooperate also with the Ministry of European Affairs, but in reality, only the Ministry of Environment may decide on this matter, because otherwise we will reach a situation where the Ministry of Justice or rather the Ministry of European Affairs will be asked by the Ministry of Finance: "there is a directive on taxation, how do we implement it?" Not, the directives or regulations regarding specific issues are… are applied by the authorities in the field, because otherwise we would have a Ministry of European Affairs which is a "factotum", we would need specialists from all the fields to…, some sort of supra-Government, which is in fact impossible.* […] *what they have actually said, they said in our opinion it could be so; we believe they haven't understood entirely and in detail. Unfortunately, we have not*

---

[687] Exh. C-472 (Transcript of Inter-Ministerial Commission Meeting, dated 22 March 2013), p. 13.

> *had the chance to enter a dialogue with them, the Ministry of European Affairs, I mean, maybe it would be also necessary – back then, however… I am quite sure that it is for the Ministry of Environment to enforce or implement these provisions, because, as I have already said, we would otherwise have a supra-Government which would be the Ministry of European Affairs, which should have experts in all the fields, which is practically impossible.*[688]

Maya Teodoroiu then stated:

> *Let me say two things. **From what I see in the light of the duty we have for the Government, first … or rather three things: two of them are organizational matter: let us try to meet today or Monday at the latest the team of lawyers representing the Ministry of Environment, in case you do not know how to contact them, perhaps we can ask for the help of the colleagues from the Environment. Second, together with one person or a team from the Department of European Affairs, since we already have their point of view, I will contact Mr. State Secretary Geamba, he is abroad today, but he is back on Monday and we will find a way to meet for final clarifications. On the merits, from what I have understood so far, please correct me if I am wrong, I cannot see the legal ground based on which we should change that the issues that were finalized or agreed in 2011, when you had that Decision not of the Local Council, actually of the County Council, whereby the Project was declared a project of outstanding public interest, so I do not see whey, but then I may miss something, why we should complicate the procedure? Is there another legal provision now saying otherwise? I understand there is not. Then why? I am simply asking to get clear and understand what I should write in terms of suggestions in the report to the Government.**[689] (emphasis added)*

Ştefan Damian then stated:

> *I think the only thing we should do, and we all agree on that, is to see what the Directive provides in this respect, what is transposed in our legislation from there; it provides for outstanding public interest, it says nothing of local or national either. We say local is enough, national…which… I simply do not understand why should national be better than local?*[690]

---

[688] Exh. C-472 (Transcript of Inter-Ministerial Commission Meeting, dated 22 March 2013), pp 13-14.
[689] Exh. C-472 (Transcript of Inter-Ministerial Commission Meeting, dated 22 March 2013), p. 14.
[690] Exh. C-472 (Transcript of Inter-Ministerial Commission Meeting, dated 22 March 2013), p. 14.

Maya Teodoroiu then stated:

> *No, if it is outstanding interest, it may be outstanding at the local level.*

Dragoș Tănase then stated:

> **We are open to dialogue, the issue is clear in our point of view, but again, we may have consultations with the Ministry of European Affairs or somebody else, but** ....[691] (emphasis added)

Maya Teodoroiu added:

> **So, let us try to discuss with the ministry and we will definitely succeed with the Department of European Affairs on Monday morning and, before that, or maybe the same day, please meet the team of lawyers from the Ministry of Environment, too, so that we can draw some conclusions.**[692] (*emphasis added*)

Dragoș Tănase said:

> *Gladly but we would like to emphasize again that the first point in the conclusions of the Ministry of European Affairs was: 'the decision lies with the Ministry of Environment'.*[693]

1007.    In its final report <u>of the same day</u>, the Inter-Ministerial Commission stated,

> *We note that a Decision of the Alba County Council ascertaining that the objective "Roșia Montană Project" is of outstanding public interest exists at the time being. **In our opinion, de lege lata, there is no legal ground calling for a need to pass a special enactment with a view to classifying the Roșia Montană Project in the category of works of outstanding public interest, and the decision of the Alba County Council is sufficient.** Within the Inter-Ministerial Working Group, the representatives of the Ministry of Environment and Climate Change failed to indicate the legal grounds (legal provision) on which they base their opinion, but requested a meeting between the representatives of the Roșia Montană Project and the legal team assisting the Ministry of Environment and Climate Change. The meeting was held on 25 March 2013, and the conclusions were the same, namely that the legal team of the Ministry of Environment and Climate Change could not* provide *the legal grounds calling for an enactment in order to classify the project as works of outstanding public interest but, as matter of advisability, the Ministry of Environment and Climate Change's legal team indicated that*

---

[691] Exh. C-472 (Transcript of Inter-Ministerial Commission Meeting, dated 22 March 2013), p. 15.
[692] Exh. C-472 (Transcript of Inter-Ministerial Commission Meeting, dated 22 March 2013), p. 15.
[693] Exh C-472 (Transcript of Inter-Ministerial Commission Meeting, dated 22 March 2013), pp 9-15.

*it would be a good idea for the future to have such enactment passed, even though this aspect cannot prevent further development of the project. The Ministry of Foreign Affairs (formerly of European Affairs) issued a point of view in the matter at hand. The powers to decide in this matter belong exclusively to the national central authority on environment (namely the Ministry of Environment). The Ministry of Foreign Affairs did not require as necessary a Government Decision declaring the project of public interest. The Ministry of Foreign Affairs deems itself to have neither sufficient information nor the necessary competence to decide which is the necessary level of decision needed to declare the project of outstanding public interest.*[694] (emphasis added)

1008.    In a meeting held on 25 March 2013 between the representatives of the Project and the legal team assisting the Ministry of Environment, the same conclusions were reached.

1009.    In July 2013, the Ministry of Environment stated the following: "*The mining Project observes the provisions of the Waters Law no. 107/1996 and the Water Framework Directive (Directive 2000/60/EC).*"[695]

3.    The analysis

1010.    As to the Water Framework Directive, the Tribunal considers the following.

1011.    *First*, it is recalled that for an exemption from the Water Framework Directive, the Project had to be declared to be of outstanding public interest. The issue in dispute between the Parties is by whom and whether this was already decided and legally effective in December 2011, when RMGC submitted a September 2011 Alba County decision declaring the Project as such.

1012.    *Second*, the Tribunal notes that it is not here to decide the merits of a question of Romanian or EU law. This is not its mandate. Instead, it will look at the facts and determine whether the discussions on this issue were genuine or whether the record indisputably demonstrates that Alba County's decision was sufficient such that the discussions were specious with the objective or the effect of derailing the environmental permitting process.

1013.    *Third*, some TAC members felt that the Alba County decision was sufficient, while others did not. The discussion and disagreement also raised the question of who would decide whether this decision was adequate. Some opined that this would be the Ministry of Environment, while others pointed to the Ministry of Economy and/or the Ministry of

---

[694] Exh. C-2162 (Letter from Department for Infrastructure Projects and Foreign Investment to Secretary General, dated 26 March 2013, forwarding Informative Note regarding the activity of the Inter-Ministerial Commission), p. 6.
[695] Exh. C-2075 (Ministry of Environment Draft Decision concerning the Request for Issuance of the Environmental Permit), p. 3.

Foreign Affairs. Importantly, a possible violation of a directive from the EC was behind the push by some for clarification on this point. In particular, it was mentioned that there had been difficulties with the EC in similar situations in the past. Therefore, the question was raised as to whether there was a process to consult with the EC in order to avoid a potential violation. RMGC responded that this issue had already been discussed in 2013, when they were asked by the Ministry of Environment to meet with someone from the EC (the person who drafted the Water Framework Directive). The answer given at that time was that this was a matter for Romania, and in particular, the Ministry of Environment. However, it was agreed that a clarification should be sought and RMGC stated that they were open to dialogue. Although none of the TAC members sought such clarification following the aforementioned discussions, the report of the Inter-Ministerial Commission stated that the decision of Alba County was sufficient but that the power to decide this matter belonged exclusively to the Ministry of Environment.[696] It was only thereafter, in July 2013, that the Project was found to comply with the provisions of the Water Act and the Water Framework Directive.

1014.    *Fourth*, and therefore, the Tribunal cannot infer any impropriety with respect to the Government's handling of this issue and, in particular, its insistence on clarifying the sufficiency of the decision of Alba County. Of course, it would have been better if this issue had been clear from the beginning. However, Romania was a new EU Member State and had to start things afresh; therefore, any inquiries that took place to clarify and confirm facts and that may have prolonged the discussions on this issue are not of such a nature as to justify the conclusion that they were improperly made with the aim or effect of derailing (albeit unintentionally) the process.

1015.    Accordingly, the Tribunal finds nothing objectionable, from the perspective of international law, in relation to the proceedings or to Respondent's part with respect to the Water Framework Directive issue.

iv.    *The zoning or urbanism plans and the urban certificate*

1.    The issue

1016.    The Parties disagree on whether a number of zoning and urban plans and certificates were required for the issuance of the Environmental Permit and in any event whether the issue surrounding their status was used as a pretext to delay the environmental permitting process and to derail the Roşia Montană Project.

---

[696] Exh. C-2162 (Letter from Department for Infrastructure Projects and Foreign Investment to Secretary General, dated 26 March 2013, forwarding Informative Note regarding the activity of the Inter-Ministerial Commission).

2.  The facts

1017.   A summary of relevant facts has already been set out above (see paras 76-79). However, the Tribunal will repeat, and where necessary, supplement these facts, before proceeding with its analysis.

1018.   *As to the zoning and urban plans*, it is recalled that RMGC submitted to the Abrud and Roşia Montană Municipalities the necessary documentation for the PUG and for the PUZ for the future industrial area of the Project. Their Local Councils approved them on <u>18 and 19 July 2002</u> respectively.[697] The Ministry of Culture approved the PUZ on the condition, among others, that RMGC secure approval of a separate PUZ for the Roşia Montană protected areas, including the historic centre.[698] Once the PUZ was approved <u>in July 2002</u>, constructions, housing and commercial activities other than for mining purposes were prohibited within the Project area.[699] As will be seen below, NGOs later successfully challenged the Local Council decisions approving the 2002 PUG and PUZ which were declared unlawful due to a finding that members of the Roşia Montană Local Council had been working for RMGC and had a conflict of interest (see paras *1044 et seq.*).

1019.   RMGC's urban certificate from 2004 required RMGC to amend its PUZ.[700] For instance, the 2002 PUZ only envisaged two mining pits, at Cârnic and Cetate, whereas the Project set out in RMGC's feasibility study of 2001 envisaged four pits.

1020.   *As to the urban certificate*, it is recalled that RMGC secured the Urban Certificate 68/2004 for the construction works in the Roşia Montană mining industrial area <u>on 20 August 2004</u> ("UC 68/2004"), which was valid for 24 months. RMGC needed to obtain on the basis of this certificate approvals and endorsements listed therein including the Environmental Permit and endorsement of the Ministry of Culture.[701]

1021.   In 2004, Romania implemented EU Directive 2001/42/CE (the "Strategic Environmental Assessment Directive" or "SEA Directive") which governs environmental impact assessments of urban plans (the "SEA Procedure"). As a result, to apply for new and amended urban plans, RMGC needed to obtain permits, approvals and endorsements

---

[697] Exh. C-1418 (Abrud Local Council Decision, dated 18 July 2002); Exh. C-1414 (Roşia Montană Local Council Decision 45, dated 19 July 2002); Exh. C-1419 (Roşia Montană Local Council Decision 46, dated 19 July 2002). The Local Council had approved a prior PUG in March 2001. See Exh. C-728 (2000 PUG prepared by Birou Proiectare Strajan).

[698] Exh. R-103 (Ministry of Culture Approval of 2002 PUZ, dated 20 June 2002), p. 2.

[699] Exh. R-98 (General Urban Planning Regulation, dated 27 June 1996, p. 2 (Art. 6(1)); Exh. R-101 (RMGC (Proiect Alba) PUZ Presentation and Local Regulations, dated 1 April 2002), p. 62 *et seq*.

[700] Exh. C-525.04 (C 68/2004), p. 4; see Avram WS, paras 78-84.

[701] Exh. C-525.04 (UC 68/2004).

from various authorities, including an environmental endorsement specifically relating to the PUZ from the local Environmental Protection Agency ("EPA").[702]

1022.   Starting in January 2005, NGOs launched a litigation campaign to challenge the validity of these documents. Alburnus Maior and other NGOs challenged UC 68/2004 by simultaneously filing different court proceedings against the local authorities.[703] First, on 25 January 2005, they applied to annul UC 68/2004.[704] The first instance court dismissed the application, on 6 March 2006, however the appellate court quashed the lower court's decision and remanded the case to the Alba Tribunal.[705]

1023.   On 29 April 2005, they applied to suspend UC 68/2004. On 15 June 2005, the Alba Tribunal upheld the request.[706]

1024.   As seen above, in these proceedings, the NGOs also challenged the legality of the PUZ and PUG. They argued that the Roşia Montană Local Council's decisions of 19 July 2002 to approve the PUZ and PUG were illegal, in part because certain Local Council members had ties with RMGC. The first instance court dismissed the application, but on 12 March 2007, the Alba Iulia Court of Appeal upheld the claimants' appeal, quashed the lower court's decision and remanded the case for retrial.[707] Ultimately, on remand, on 21 January 2008, the Alba Iulia Court of Appeal declared the Local Council's 2002 decisions (that had approved the PUZ) illegal.[708]

---

[702] Exh. RLA-36 (Directive 2001/42/EC of the European Parliament and of the Council of 27 June 2001 on the assessment of the effects of certain plans and programmes on the environment (SEA Directive)); Exh. R-109 (GD 1076/2004 on SEA Procedure). See Exh. C-1768 (Law 137/1995 on environment protection (excerpts)), p. 2 (Art. 7) ("*The environmental assessment is intended to integrate environmental protection objectives and requirements in preparation and adoption of certain plans and programs that may have a significant environmental impact.*") and id. p. 2 (Art. 7); see also Exh. R-99 (Law 350/2001 on land development), p. 48 (Sect. 6) (public consultation).

[703] Exh. R-155 (Alburnus Maior *et al*. Motion for annulment, dated 25 January 2005); see also Exh. C-525 (Letter from RMGC to Alba EPA, dated 14 December 2004) (enclosing UC 68/2004); Exh. R-156 (Letter from Alburnus Maior to Alba County Council, dated 8 March 2004); Exh. R-157 (Letter from Alburnus Maior to Alba County Council, dated 31 August 2004) (requesting disclosure of information of public interest, under Law 544/2004, in relation with RMGC's urban certificate); Exh. R-158 (Alburnus Maior et al. Administrative challenge, dated 8 October 2004).

[704] Exh. R-155 (Alburnus Maior et al. Motion for annulment, dated 25 January 2005); See Exh. R-159 (Alburnus Maior Final appeal, dated 16 August 2010), p. 3.

[705] Exh. R-160 (Alba Iulia Court of Appeal decision, dated 6 March 2006), p. 3. Ultimately, the NGOs' request was dismissed on the grounds that it had been untimely filed. See Exh. R-161 (Alba Iulia Court of Appeal decision, dated 16 December 2010).

[706] Exh. R-162 (Alba Tribunal decision, dated 15 June 2005).

[707] Exh. C-1419 (Roşia Montană Local Council Decision 46, dated 19 July 2002); see Exh. R-163 (Alba Iulia Court of Appeal decision, dated 21 January 2008), pp 1, 4 *et seq*; Exh. R-164 (Alba Iulia Court of Appeal decision, dated 12 March 2007), p. 4.

[708] Exh. R-163 (Alba Iulia Court of Appeal decision, dated 21 January 2008), p. 6.

1025.   RMGC applied and obtained a second urban certificate <u>on 26 April 2006</u> ("UC 78/2006").[709] UC 78/2006 was also successfully challenged by the NGO ICDER.[710] <u>On 20 July 2007</u>, the Cluj Tribunal suspended UC 78/2006.[711]

1026.   <u>On 30 April 2010</u>, the Alba County Council issued a new urbanism certificate, UC 87/2010, which the Ministry of Environment accepted for the purposes of restarting the EIA Process.[712]

1027.   <u>In March 2011</u>, RMGC obtained from the EPA of Sibiu, the environmental endorsement for its amended PUZ (the so called "SEA Endorsement" or Industrial Area PUZ).[713] <u>On 26 September 2011</u>, the SEA Endorsement was challenged by NGOs.[714]

1028.   As seen above within the discussions of the TAC, concerns in relation to the status of the urbanism plans and certificate and their impact on the environmental process were raised (see paras 967 *et seq.*).

1029.   <u>In March 2013</u>, the Inter-Ministerial Commission stated the following:

> *A special issue brought to the attention of and discussed by the Inter-Institutional Working Group was: the Urbanism Certificate No. 87/30/04/2010, issued by the Alba County Council on 30 April 2010, and valid for 24 months expired on April 30, 2012 and was extended until 30 April 2013. It has been indicated that the urbanism certificate shall have to be renewed. To this effect, on 1 February 2013, RMGC submitted a request for the issuance of a new urbanism certificate for the Roşia Montană Mining Project of the Alba County Council. This request is pending settlement.* ***Nevertheless, we consider that the maintaining of a valid urbanism certificate for the entire duration of the procedure is not necessary for conducting the Environmental Impact Assessment procedure with respect to the Roşia Montană Project, initiated in 2004. According to Article 2 para. (1) of Directive 85/337/EEC, the purpose of the procedure is to assess the impact of a project on the environment, all details presented by the applicant for the Environmental Permit***

---

[709] On 10 November 2005, the Ministry of Environment had written to RMGC regarding the expiration of the prior certificate, UC 68/2004. Exh. R-165 (Letter from Ministry of Environment to RMGC, dated 10 November 2005). See also Exh. R-166 (UC 78/2006).

[710] Independent Centre for the Development of Environmental Resources (*Centrul Independent pentru Dezvoltarea Resurselor de Mediu*).

[711] UC 78/2006 was ultimately cancelled. Exh. R-167 (Cluj Court of Appeal decision, dated 27 March 2008); see also Exh. R-168 (Cluj Tribunal decision, dated 20 July 2007).

[712] Exh. C-808 (Urbanism Certificate No. 87, dated 30 April 2010); Avram WS I, paras 53-59; Tănase WS II, paras 25-26, 43-50; Mihai Opinion I, Sects VII.C.3, V.D.1; Memorial, paras 18, 254, 271-272, 297.

[713] Exh. C-598 (Sibiu EPA decision on environmental endorsement for PUZ, dated 7 March 2011); Exh. C-623 (Letter from Sibiu EPA to RMGC, dated 29 March 2011).

[714] Exh. C-1407 (ICDER et al. Administrative Challenge, dated 26 September 2011).

*referring to the impact of the proposed project on the environment.*"[715]
(emphasis added)

1030.    The Inter-Ministerial Commission stated further concerning the Zonal Urbanism Plan:

> *Existence of a dispute still pending with the courts: the Zonal Urbanism Plan for the Roşia Montană Industrial Area approved, in accordance with the provisions of Urbanism Certificate No. 87/2010, and granted Environmental Approval by Sibiu Environmental Protection Agency on 23 April 2011, was challenged and the case is being tried with a hearing set for 26 April 2013. From this perspective, the following clarifications must be made: The Environmental Approval No. 04 SB on 28 March 2011, issued by Sibiu Regional Environment Protection Agency is valid, since there is no court decision so far ordering its suspension or annulment. **The existence of dispute before the courts of law in relation to this permit cannot affect its validity and cannot be a cause for delaying/suspending the Environmental Impact Assessment Procedure for Roşia Montană mining project**.[716] (*emphasis added*)

1031.    <u>On 24 September 2013</u>, during the meeting of the Special Commission, Minister of Environment, Romana Plump, stated the following:

> *Moreover, the Ministry of Environment has two filters in terms of environmental compliance for this exploitation. In the first stage, we have an environmental permit which is adopted by Government Decision and is subject to an analysis made by the Technical Assessment Committee that includes all ministries, including the Institute of Geology and the Romanian Academy. The second filter: the environmental permit is given for construction, because for the actual exploitation stage there is a second filter which is called operational environment integrated approval, which is also adopted by way of Government Decision, at the proposal of the competent regulatory authority in the environmental field.*
>
> *Consequently, there are two filters until this exploitation can start, regardless who will be the operator - the environmental permit, which is based on the views of experts, through this Technical Assessment Committee, and which imposes environmental standards and conditions so that constructions may begin in view of starting activity; the second filter is the operational environment integrated approval, based on the same procedure and which imposes the necessary environmental standards and conditions for the activity as such to begin.*

---

[715] Exh. C-553.02 (Informative Note on the Activity of the Inter-Ministerial Working Group convened for the Roşia Montană Mining mining project (resubmitted)), p. 6.

[716] Exh. C-553.02 (Informative Note on the Activity of the Inter-Ministerial Working Group convened for the Roşia Montană Mining mining project (resubmitted)), p. 6.

*The operational environment integrated approval must take into account the PUZ and all the other elements.*

*The environmental permit only deals with imposing the environmental conditions and standards for launching the project, meaning the construction phase. So, there are two filters. The reason why we did not issue the environmental permit so far: because the Technical Assessment Committee needs a few more sessions for the specialists to express their points of view, for the Academy to state its point of view, for the Geological Institute, the other ministries that are members to the Technical Assessment Committee express their points of view on the project, and we have not granted it because it is conditional upon the financial guarantees for the environment imposed by this Draft Law.*[717]
(emphasis added)

### 3.   The analysis

1032.   In light of the above, the Tribunal considers the following.

1033.   As mentioned earlier, these urbans plans provide the framework for any construction project. Both types of urban plans should therefore be in place before any construction project can be approved in the geographic area in question. The question for the Tribunal is not so much whether such plans must be in place before the Environmental Permit is issued but whether the discussions and questions surrounding them inappropriately impacted the environmental permitting process.

1034.   *First*, the Tribunal notes that the Parties and their legal experts have indeed made extensive submissions on this issue and on the relevant legal framework governing urban plans in Romania. As noted above, the Tribunal must consider whether the procedure with respect to the urban plans (and the requirement that they be valid for purposes of the EIA Process) was reasonable from the perspective of international law, regardless of whether such plans were a prerequisite for the Construction Permit or the Environmental Permit (see paras 945, 965, 1015, 1034).

1035.   In light of the facts set forth above and the evidence in the record, the urban plans must be in place for the Construction Permit. This is supported by both the documents exchanged between the Parties and the relevant legal framework. Therefore, their status or any challenges by NGOs should not in principle affect the EIA Process for obtaining the Environmental Permit. However, this is not the end of the discussion.

1036.   *Second*, as is also evident from the record, there were disagreements and concerns within the TAC that do not appear to be disingenuous in terms of their relevance and/or impact

---

[717] Exh. C-506 (Transcript of Parliamentary Special Commission hearing, dated 24 September 2013), p. 21.

on the environmental permitting process. This occurred for two reasons. The <u>first</u> reason is that the environmental process itself has two aspects, one that clearly addresses environmental impacts and a second aspect that addressed the Construction Permit and overlapped with it (see para. 996 above). Therefore, the discussion of urban design plans (both as part of the TAC and as part of the EIA Process) was not unwarranted. <u>Second</u>, because things were not clear, there was a legitimate concern that the EIA Process would have to be reopened if the plans were not completed and approved before the Environmental Permit was issued and then changed thereafter.[718]

1037.    *Third*, the above conclusions are supported by the fact that discussions about the Ministry of Culture's approval, which was a prerequisite for the issuance of the Environmental Permit, revolved at least around the status of the urban development plans.

1038.    *Fourth*, it is undisputed that the relevant urbanism and zoning plans and urbanism certificates have been the subject of ongoing litigation after being challenged by NGOs and ultimately invalidated by Romanian courts. One of the main reasons for the challenges, and thus for the change in their status by the various courts, was the impact on the Project area and the environment there. They therefore remained a dominant issue in the discussion. However, it is important to note at this point that the Romanian Government itself defended their validity before the Romanian courts.

1039.    *Fifth*, in its 2013 report, the Inter-Ministerial Commission found that the maintenance of valid urbanism plans and certificates throughout the environmental permitting process was not required. The Tribunal recalls that the Commission did not provide any binding conclusions or justification for its proposals. The proposals do not, therefore, suggest that the discussions and concerns regarding these plans and certificates and their status were unreasonable. The Tribunal's reasoning in this regard is not affected by the public statements made by the Minister of Environment, Rovana Plump, during the meeting of the Special Commission, which did not appear to dispel the concerns that led to the discussions on this issue.

1040.    In light of the foregoing, there is no evidence for the Tribunal to conclude that Respondent's approach in relation to the urbanism plans and certificate was politically influenced, or that the proceedings in this regard were tainted with injustice or in any way unlawful from the perspective of international law.

---

[718] Exh. C-487 (Transcript of TAC meeting, dated 22 September 2010), pp 4, 16; Exh. C-506 (Transcript of Parliamentary Special Commission hearing, dated 24 September 2013).

*v.    The cultural heritage issues*

1. The issue(s)

1041.    Except for the issue briefly addressed above of the endorsement of the Ministry of Culture (see paras 1057 *et seq.* above) that is relevant to Claimants' main and first alternative claims, as well as the issue of the correctness of the 2010 LHM (which will be addressed below; see paras 1085 *et seq.*), cultural issues are mainly relevant to the period after 2013, and thus to Claimants' second alternative claim, when the discussions on the LHM and the UNESCO listing took place.

1042.    However, in respect of their main and first alternative claims, Claimants refer to and/or rely on such events to argue that their occurrences, or Respondent's acts or omissions in this regard, support their claims relating to events prior to 2013. The Tribunal will also, therefore, set forth the relevant facts in the section herein.

1043.    The relevant facts have already been set out above (see paras 84 *et seq.*). However, the Tribunal will repeat and supplement these facts, before proceeding with its analysis.

2. The facts: the ADCs

1044.    It is recalled that the Ministry of Culture issued ADCs for 90% of the Project area between 2001 and 2008, including three of the four pits (Cârnic, Cetate and Jig) and the Corna Valley tailings dam.[719] RMGC adjusted the Project area to reflect the areas designated for on-site protection. There are several protected areas, including the historic centre of Roșia Montană and several other important areas.[720]

1045.    Specifically, the ADC for the Cârnic underground area was issued in 2004 (ADC No. 4/2004) but annulled by court order in 2008 following a challenge by an NGO.[721]

1046.    In June 2010, RMGC filed an application for renewal.[722]

1047.    In July 2010, the Ministry of Culture issued a LHM which had listed, *inter alia*, all mining galleries in the Cârnic massif.[723]

---

[719] Exh. C-669 (Archaeological Discharge Certificate No. 1320/2001); Gligor WS I, para. 39, n. 55, para. 102, n. 160; Schiau Opinion I, paras 90-91; Memorial, para. 160; Exh. C-1283 (Map of Project Area showing Archaeological Discharge Certificates issued).

[720] Gligor WS I, paras 40-41.

[721] Gligor WS I, para. 100; Memorial, para. 321.

[722] Gligor WS I, para. 100; Tănase WS II, para. 59; Henry WS I, para. 22; Memorial, para. 322.

[723] Exh. C-1266 (2010 List of Historical Monuments approved by Order No. 2361 of the Ministry of Culture published in the Official Gazette 670bis, dated 1 October 2010); Gligor WS I, para. 91; Memorial, paras 315-318.

1048.  <u>In March 2011</u>, the regional environmental authority, the Sibiu EPA, issued the SEA Endorsement of the proposed updated zonal urbanism plan (PUZ). This process took place in parallel to the EIA Process and was required in order to receive the endorsement of the updated land planning documentation for the Project's industrial area.[724] Project opponents sought annulment of the SEA Endorsement on the ground that it was not prepared in accordance with the 2010 LHM.[725]

1049.  <u>On 15 July 2011</u>, RMGC and the NIH signed a Cooperation Protocol, pursuant to which Gabriel would invest nearly USD 140 million.[726]

1050.  <u>In the same month</u>, the National Archaeology Commission and the Minister of Culture confirmed that the Cârnic galleries would be removed from the LHM if a new ADC for Cârnic was issued.[727] This was also stated by the Alba County and national culture authorities, including the Ministry of Culture.[728]

1051.  Thereafter the National Archaeology Commission unanimously approved issuance of the Cârnic ADC and the Alba County Directorate for Culture and the NIH issued a new discharge certificate <u>on 14 July 2011</u>, ADC No. 9/2011, for the Cârnic underground area.[729]

1052.  ADC No. 9/2011 for Cârnic was also challenged by NGOs in court. <u>On 30 January 2014</u>, the court decided to suspend the effects of this second ADC pending a final decision on the request for its annulment.[730]

1053.  Meanwhile, <u>in 2014</u>, RMGC had challenged the LHM in 2010 and, upon the issuance of a LHM <u>in 2015</u>, the court dismissed the case as moot.[731]

---

[724] Exh. C-598 (Decision No. 2849 of Sibiu EPA regarding issuance of the environmental endorsement dated 7 March 2011); Exh. C-623 (Letter from Sibiu EPA to RMGC, dated 29 March 2011); Memorial, paras 306-307.

[725] C-Post-2013, para. 24.

[726] Exh. C-695 (Protocol of Cooperation between NIH and RMGC, dated 15 July 2022); Henry WS I, para. 26; Memorial, para. 326.

[727] Exh. C-1377 (National Archaeology Commission Meeting Minutes, dated 12 July 2011); Exh. C-1345 (News Article, dated 14 July 2011).

[728] Exh. C-1001 (Government notification to RMGC, dated 12 June 2013); see also Exhs C-1336, C-1325, C-1331, C-1333, C-1330, C-2359 (letters from the Ministry of Culture's National Institute of Heritage) and Exhs C-1327, C-1332, C-1335 and C-1376 (letters from the Alba County Culture Directorate).

[729] Exh. C-1377 (National Archaeology Commission Meeting Minutes, dated 12 July 2011); Exh. C-680 (Archaeological Discharge Certificate No. 9/2011 (Cârnic underground)); Tănase WS II, paras 60, 64; Gligor WS I, para. 102; Henry WS I, para. 27; Memorial, paras 324, 328.

[730] Schiau Opinion I, para. 93.

[731] Exh. C-1727 (RMGC's Objection of unlawfulness of 2010 LHM, dated 20 May 2014); Exh. C-1347 (RMGC's Objection of unlawfulness of 2010 LHM, dated 1 November 2014).

1054.  In March 2016, the Brasov Court of Appeal annulled the SEA Endorsement.[732]

1055.  On 10 December 2020, the Buzău Tribunal issued its decision rejecting the application to annul ADC No. 9/2011, stating that the decision was final and irrevocable. The Buzau Tribunal accepted the State authorities' position in the challenge and rejected the arguments presented by the NGOs against the ADC decision.[733]

1056.  Following an appeal to the Buzău Tribunal's decision, on 16 February 2022, the Ploiești court of appeal decided to annul ADC No. 9/2011. The basis of the court of appeal's decisions was (i) the lack of proof that the ADC for Cârnic was issued and (ii) that RMGC did not obtain an urbanism certificate reflecting that the 2010 LHM included the entire Cârnic massif as a historical monument.[734]

3.  The facts: the Ministry of Culture Endorsement

1057.  It is recalled that on 19 December 2011, the TAC President sent a letter to the Ministry of Culture, requesting that the Ministry confirm whether its "point of view" sent on 7 December 2011 was an endorsement of the issuance of the Environmental Permit, emphasizing that this endorsement was required by law to be taken into account in setting the conditions for the permit. The Ministry of Culture did not respond to this letter.[735]

1058.  On the same date, Minister of Culture Hunor stated the following in an interview when asked whether the document received from the Ministry of Culture was an endorsement:

> *As far as the Ministry of Culture is concerned, there is an archaeological discharge for the Cârnic Massif given by the Alba County Directorate and the documentation for Orlea is prepared at this time, but this documentation has never been discussed, because I have the impression that – I have not studied it, I have just received it – but it will not be discussed at least until next year. We have sent to the TAC, the Technical Assessment Committee, a point of view on the projects, the problems and responses to these problems in terms of cultural and archaeological heritage. This file, this documentation is at the Ministry of Environment, they need all the endorsements or points of view, all the documents from all the institutions, but it all lies with the assessment of the Commission of the Ministry of Environment. I don't*

---

[732] Exh. C-211 (Brasov Court of Appeal decision, dated 10 March 2016); Exh. C-1721 (Brasov Court of Appeal Certificate).

[733] Exh. C-2990 (Letter from the Buzau Tribunal to the Alba County Culture Department, dated 27 May 2021, enclosing Decision No. 770/2020 of Buzau Tribunal, dated 10 December 2020).

[734] Exh. C-694 (Ploiesti Court of Appeal Decision No. 187, dated 16 February 2022).

[735] Exh. C-445 (Letter No. 10857 from Ministry of Environment to Ministry of Culture, dated 19 December 2011); Gligor WS I, para. 113; Tănase WS II, paras 110-111; Avram WS I, paras 103-105; Memorial para. 370.

*know when they will make a final decision. At this moment, **Cârnic Massif is a historical monument, it has not been declassified, this massif is still class A. There are discussions, because the Minister of Economy, Mr. Ariton went… to talk with the representatives of Gold Corporation about the State holdings and everything related to that contract that everyone talks about – but very few have read; probably somewhere early next year we will also have the results after these discussions. We also need to make a decision in the Government.** All I can tell you is that as far as we are concerned we have ensured protection of 80-85% of the archaeological heritage and of the heritage buildings; at this moment, if you go there, you will see what is going on and we will also ensure the **necessary** funds for this protection. Because one cannot protect the heritage buildings or archaeological heritage without money. But, of course, we are just a small part of this process.*[736]
(emphasis added)

1059.   <u>In March 2012</u>, Sorin Mihai Găman sent a memorandum ███████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
██████████████████████████████████████████
████████████████████████████.[737]

1060.   <u>On 16 March 2012</u>, the Ministry of Environment sent another letter to the Ministry of Culture requesting it to confirm that the letter sent on 7 December 2011 was an endorsement to issue the Environmental Permit.[738]

1061.   <u>On 8 June 2012</u>, Prime Minister Ponta stated in an interview that the Government wished to postpone the decision on shale gas and the Roșia Montană Project until after the parliamentary elections.[739]

1062.   Minister Șova stated in a report to Prime Minister Ponta <u>on 6 March 2013</u>, that the

> *main following steps in the implementation of the Roșia Montană project are:*
> -   *The Government's issuance of a decision regarding the Roșia Montană Project*
>     *So far, all the information required by the Government has been provided*

---

[736] Exh. C-439 (Interview of Minister of Culture Hunor, Debate of the Midday Journal, dated 19 December 2011), pp 1-2.

[737] Exh. R-406 (Ministry of Economy Note from Sorin Gaman to Minister Bode, dated March 2012), p. 1.

[738] Exh. C-1381 (Letter No. 10857 from Ministry of Environment to Ministry of Culture, dated 16 March 2012).

[739] Exh. C-641 (The Government postpones the decisions regarding Roșia Montană and the shale gas until the elections that are going to be organized in autumn, Realitatea.net, dated 8 June 2012).

- ***Continuation of permitting efforts by RMGC***
***Continuation of the TAC assessment and the recommendation of the Ministry of Environment and Climate Change on the issue of the environmental permit***
***Continuation of the endorsement process from other relevant authorities, including the Ministry of Culture***
***Complete important endorsement steps by July 2013***
- *Completing the renegotiation of the conditions of partnership between the Canadian investor, RMGC and the Government in the summer of 2013*
- *Final approval of the Roşia Montană mining project (December 2013).*[740]
(emphasis added)

1063.  <u>On 11 March 2013</u>, the Ministry of Environment confirmed in an Inter-Ministerial Commission that the TAC had concluded that all technical issues had been resolved at its November 2011 TAC meeting.[741] In relation to the Ministry of Culture's endorsement, the following was stated in the report of the Inter-Ministerial Commission:

> *In conclusion, the Ministry of Culture deems there are no obstacles for the Ministry of Culture to issue a favorable endorsement as regards to the development of the Roşia Montană mining project, to be submitted to the Technical Assessment Committee according to Art. 2 para. (10) of GO 43/2000* **when** *the Ministry of Environment and Climate Change will request it. This endorsement will detail upon the measures that must be taken and the conditions that must be observed in view of protecting cultural heritage, established by reference to the phases of implementation of the mining project.*[742] (emphasis added)

1064.  An identical document to the 7 December 2011 letter entitled "Endorsement" was issued by the Ministry of Culture <u>on 10 April 2013</u>.[743]

1065.  <u>In May 2013</u>, the Government informed the Aarhus Convention Compliance Committee that the TAC had confirmed at its November 2011 meeting that no technical issues remained outstanding.[744]

---

[740] Exh. C-1903 (Note from Minister Şova to Prime Minister Ponta, dated 6 March 2013), pp 37-38.

[741] Exh. C-471 (Transcript of Inter-Ministerial Commission Meeting, dated 11 March 2013), p. 20.

[742] Exh. C-2162 (Letter from Department for Infrastructure Projects and Foreign Investment to Secretary General, dated 26 March 2013, forwarding Informative Note regarding the activity of the Inter-Ministerial Commission), p. 4.

[743] Exh. C-655 (Letter from Ministry of Culture to Ministry of Environment, dated 10 April 2013).

[744] Exh. C-2907 (Romanian Government Submission to Aarhus Convention Compliance Committee, dated 22 May 2013), p. 3.

4. The facts: The 2010 List
of Historical Monuments

1066.    It is recalled that <u>in 2004</u>, the Ministry of Culture issued the first LHM. The 2004 LHM reflects the results of completed archaeological research and discharge decisions for the Project area. This list specifically identified areas of significance; it did not include areas that were the subject of ADCs, including ADC No. 4/2004 for Cârnic.[745]

1067.    As mentioned above, <u>in July 2010</u>, the Ministry of Culture issued the 2010 LHM. It was published in the Official Gazette <u>in October 2010</u> (see para. 94). The 2010 LHM contained some differences from the 2004 LHM with respect to Orlea and Cârnic. For Orlea, the so-called address was changed to "*the entire locality within a two kilometer radius,*" and for Cârnic, all mining galleries in the Cârnic Massif were listed, including the so-called medieval and modern galleries, not previously designated as historical monuments.[746]

1068.    <u>In July 2011</u>, Minister of Culture Kelemen Hunor (who took office in December 2009) publicly stated that the Cârnic Massif would be removed from the 2010 LHM when the ADC was issued, as the second Cârnic ADC was to be issued at that time. As mentioned above, ADC No. 9/2011 was issued the same month (see para. 98).[747]

1069.    The NGOs then relied on the inclusion of Orlea and Cârnic in the 2010 LHM to seek the cancellation of the SEA Endorsement. The NGOs argued in their lawsuits that the SEA Endorsement did not take into account historical monuments described in the 2010 LHM.[748]

1070.    <u>In June 2014</u>, RMGC formally requested the NIH to correct the 2010 LHM.

1071.    <u>In July 2014</u>, the NIH responded to RMGC and indicated that the errors would be corrected in the 2015 LHM, which was expected to be released shortly.

1072.    <u>In August 2014</u>, RMGC initiated administrative and legal proceedings against the NIH and the Ministry of Culture, to challenge and obtain correction of the 2010 LHM.[749] The NIH stated in Court that the Roșia Montană area "*comprises hundreds of kilometers of mining galleries from the Roman era*". The NIH also stated that RMGC wanted to mine the area without an archaeological discharge and without the required endorsements. The

---

[745] Schiau Opinion I, para. 210; Schiau Opinion II, Sect. C; Gligor WS I, para. 44; Memorial, para. 161.

[746] Exh. C-1266 (2010 List of Historical Monuments approved by Order No. 2361 of the Ministry of Culture published in the Official Gazette 670bis, dated 1 October 2010); Gligor WS I, para. 91; Memorial, paras 315-318.

[747] Exh. C-680 (Archaeological Discharge Certificate No. 9/2011 (Cârnic underground)); Tănase WS II, paras 60, 64; Gligor WS I, para. 102; Henry WS I, para. 27; Memorial, paras 324, 328.

[748] Exh. C-1901 (Letter No. 395 of Alba County Culture Department to Sibiu Regional EPA, dated 19 April 2010).

[749] Exh. C-1342 (RMGC administrative complaint to NIH, dated 5 August 2014).

Court found that the 2010 LHM was lawful because it was issued by the competent authorities. It based its decision on the finding that mining in the area was not compatible with the obligation to protect the Roman mining galleries.[750]

1073. As mentioned above, the Court overturned the SEA Endorsement in March 2016, finding that the approval was based on a description of historic monuments contained in the 2004 LHM. Among other things, the Court found that the historical monument described in the 2010 LHM as being within a two-kilometer radius of Orlea meant that the historical monument encompassed the entire two-kilometer area and, on that basis, cancelled that endorsement. This annulment frustrated the then-approval of the urbanism plan for the Project area (see para. 102).[751]

5.    The analysis

1074. At the heart of the Parties' dispute over cultural issues is, first, whether the Ministry of Culture gave its endorsement as early as December 2011; second, whether the 2010 LHM and, in particular, the 2015 LHM were flawed; and, third, whether Romania's request to list the Roşia Montană as a UNESCO World Heritage Site was also designed to frustrate the Project.

1075. The Tribunal will initially address those issues that are within the scope of Claimants' principal claim, that is, the Ministry of Culture's endorsement and the 2010 LHM. To the extent necessary, it will discuss cultural issues that post-date 2013 thereafter.

1076. Having considered the Parties' arguments and the evidentiary record as to the cultural issues, the Tribunal considers the following.

1077. *First*, *and in general*, the Tribunal recalls that the Ministry of Culture could decide on the archaeological clearance of a site based on archaeological research carried out by RMGC. In this case, ADCs were issued for more than 90% of the Project area. For Orlea, it is undisputed that there was no ADC because the Ministry of Culture stopped research for this site and RMGC had not completed its research. For Cârnic, the ADC was rescinded in 2008 after being challenged by NGOs.

1078. *Second, concerning the endorsement from the Ministry of Culture:* It is recalled that the Ministry of Culture's approval was a cultural issue, but it was discussed in the TAC and was a prerequisite for granting the Environmental Permit. As seen at the 29 November 2011 TAC meeting, this approval was specifically requested. However, it is also

---

[750] Rejoinder, para. 697.

[751] Exh. C-211 (Brasov Court of Appeal decision, dated 10 March 2016); Exh. C-1721 (Brasov Court of Appeal Certificate).

noteworthy that in almost all, if not all TAC meetings, the TAC President always requested written points of views from each TAC member at the end of this meeting.[752]

1079.  It is also recalled that the Ministry of Culture in reply to the TAC President's invitation sent a point of view on 7 December 2011.[753] This point of view stated the following:

> *With regard to your Letter no. 10543/M/A//06 December 2011, issued by the Ministry of Environment and Forestry registered with the Ministry of Culture and National Heritage under no. 2193/VT/06 December 2011,* **whereby the Ministry of Culture and National Heritage was requested to issue a point of view about the issuance of the environmental permit for the Roșia Montană mining exploitation project, proposed by S.C. Roșia Montană Gold Corporation S.A.** *[a]nd, [t]aking into account [among other things] […] (6) […] Art. 2, para. 10 of GO no. 43/2000 on the protection of the archaeological heritage and the declaration of certain archaeological sites as areas of national interest, republished;* […] *In connection to the issuance of the environmental permit for the Roșia Montană mining exploitation project, proposed by SC Roșia Montană Gold Corporation SA we consider that the applicant for the environmental permit must fulfil the following obligations arising from the legislation applicable to the project:* […] SC Roșia Montană Gold Corporation SA will have to complete, before beginning exploitation and construction, the preventive archaeological research in the areas of the project perimeter currently containing archaeological heritage (including for the industrial facilities planned to be open in the Orlea area in year 8 of the project). **Therefore, the Roșia Montană mining exploitation project may be developed in the Orlea area only depending on the conclusions of the archaeological research report and its approval by the National Archaeology Commission, as well as after the declassification of the Orlea Massif from the List of Historical Monuments approved by Order of the Ministry of Culture and National Heritage no. 2361/2010. […]** *If the competent authority will adopt the decision to issue the environmental permit for the Roșia Montană mining exploitation project proposed by SC Roșia Montană Gold Corporation SA, we want to be actively involved, alongside the competent environmental protection authority in the drafting of the measures and the conditions for the protection of the heritage elements to be imposed on the titleholder under the environmental permit.*[754] (emphasis added)

---

[752] Exh. C-486 (Transcript of TAC meeting, dated 29 November 2011), pp 29, 45.

[753] Exh. C-446 (Letter No. 2193 from the Ministry of Culture to the Ministry of Environment, dated 7 December 2011).

[754] Exh. C-446 (Letter No. 2193 from the Ministry of Culture to the Ministry of Environment, dated 7 December 2011); Gligor WS I, paras 111-112; Avram WS I, paras 103-104; Tănase WS II, paras 58, 110.

1080.    Beginning on 19 December 2011, correspondence was exchanged to obtain confirmation from the Ministry of Culture as to whether its point of view was the desired "endorsement." The correspondence on this issue also focused on the fact that the delay in this matter was due to the uncertainty regarding the classification of the Cârnic Massif in the LHM. This classification was particularly affected by the situation in Orlea, where no surveys had been carried out, and by the situation in Cârnic, whose ADC was contested by NGOs.[755] In addition, the minutes of the TAC meeting in March 2013 shows that the Ministry of Culture was expecting a specific written request for an endorsement from RMGC itself and that this had to be redone due to changes in government.[756]

1081.    It is undisputed that the two documents, i.e., the December 2011 position and the April 2013 note, are identical. It is also undisputed that it was not clear in the correspondence whether the 7 December 2011 document was an element of the environmental permitting process or a more general position requested by the TAC President at the end of each TAC meeting. In any event, what is important for the Tribunal to note is that the "endorsement" itself (whether in the 7 December 2011 letter or the April 2013 letter) is not unqualified. Rather, it reflects concerns that were still being seriously debated with respect to the cultural issues that inevitably played a role in the TAC and EIA Process. The fact that there was a change in government and that things seemed to move more quickly under one government does not mean that the process was politicized in a negative way and does not change the seriousness in which the issues had been addressed. Indeed, in an interview dated 23 February 2012, the representative of the Ministry of Culture, Vasil Timis, stated that, following the views of all Ministries, including that of the Ministry of Culture, it is the Government that takes the political decision:

> *I tell you some things about the attitude of the Ministry of Culture. There have been often circulated opinions for or against. The Ministry is not for or against. The Ministry should and must say what is there, what are*

---

[755] Exh. C-439 (Interview of Minister of Culture Hunor, Debate of the Midday Journal, dated 19 December 2011).

[756] Exh. C-472 (Transcript of Inter-Ministerial Commission Meeting, dated 22 March 2013) pp 6-7 ("*Dragos Tanase, RMGC: We have no further comments on the endorsement of the Ministry of Culture, it is an item in the impact assessment procedure; in order to come to the last stage and obtain the environmental permit, we need the approval of the Ministry of Culture, an endorsement from the Ministry of Culture. I believe everyone agrees on this point of view. [...] Dinela Pineta, ME: I am Daniela Pineta, Head of the Impact Assessment Department. With regard to this aspect, and we actually submitted our point of view in the last letter we set to the Government, we request this endorsement of the Ministry of Culture for Orlea Massif. Dragos, Tanase, RMGC: The colleagues said they were waiting for a request in writing. Mircea Angelescu, MC: Our answer was that we were waiting for a written request and that we saw no impediment in issuing the endorsement. But we want to see within which procedure is requested and to have a request in this regard. We can issue an endorsement, but without a request...Daniela Pineta, ME: We have already submitted a written request, but we can do it again, if you want us to. [...] Mircea Angelescu, MC: You submitted a request under another government, other state secretaries in office and you received different answers. In short, if you ask for it now, you will receive it.*").

> *the preservation methods or, where appropriate, after analysis and discussion in the National Archaeology Commission and the National Commission for Historic Monuments, to issue its endorsement, as appropriate. I want to say it simply that it is about a political decision to be made after the environmental agreement, whether issued or not, and, obviously, this decision is a matter of the decision and views of several ministries.*[757]

1082. What is more, at the Inter-Ministerial Commission's meeting of 11 March 2013, the representatives of RMGC did not criticize the position of the Ministry of Culture who set forth the process that was relevant to it at the time:[758]

> *Radu Boroianu, from the Ministry of Culture. In our opinion, the latest version of the project is greatly improved and, therefore, joining with NAMR, we hope to reach the final stage. In connection with archaeological discharge Mrs Elena Dumitru mentioned, I can tell you that we completed the first stage, the approval of the research project. The rest are mandatory stages following after they will conduct the research, no discharge is possible until then.*

1083. The Tribunal therefore considers that, whatever the impact of the two documents, nothing in the proceedings in this regard appeared to have a negative impact on the Roşia Montană Project or to affect the progress of the proceedings. There were serious elements raised by all parties at the relevant time.

1084. Accordingly, the Tribunal finds no misconduct in the proceedings as far as the approval by the Ministry of Culture is concerned.

1085. *Third, concerning the LHM:* It is recalled that Claimants contend that the 2010 LHM incorrectly included the Cârnic Massif and that Respondent refused to correct the errors in the 2010 LHM or take steps to declassify the Cârnic Massif.

1086. It is also recalled that the 2010 LHM, which lists sites of high archaeological significance as historic monuments, included both Orlea and Cârnic. This is due to the fact that no research was conducted for the former site and the ADC for the latter site was successfully challenged by NGOs. RMGC initiated an administrative action against the LHM in 2010. The court found the 2010 LHM to be lawful because it was issued by a competent authority.

1087. In 2011, a new ADC was issued for Cârnic. Both this and the 2011 SEA Endorsement were subsequently challenged by NGOs. In 2014, the court decided to suspend the ADC

---

[757] Exh C-438 ("Judeca Tu!," TV R1, dated 23 February 2012), p. 11.

[758] Exh. C-471 (Transcript of Inter-Ministerial Commission Meeting, dated 11 March 2013), p. 26.

pending a final decision on the petition for annulment. In 2014, RMGC challenged the 2010 LHM. RMGC requested that the NIH correct the 2010 LHM. The NIH indicated that the errors in the 2010 LHM would be corrected. However, in 2015, the LHM was published and the court dismissed the challenge as moot. The SEA Endorsement was invalidated in 2016. In 2020, the court declined to invalidate the ADC, but then later on appeal the court invalidated it in 2022.

1088.   It is undisputed that, first, the 2010 LHM reflects the invalidation of ADC 4/2004 and the lack of an ADC for Orlea. It is not for the Tribunal to decide whether the court's decision to annul the ADC following a challenge by an NGO is legally or factually correct. In fact, the litigation in this regard has gone all the way to the highest judicial instance in Romania, and the Government itself defended the ADCs in court. There is no claim of denial of justice or other breach of international law in relation to these court proceedings and, in this context, nothing wrongful can be attributed to Respondent.

1089.   As to the research on Orlea, it is true that the programme was discontinued. It is also true that Claimants have acknowledged that they needed to conduct further research to procure an ADC for Orlea. At this point the Tribunal notes that the discussion surrounding the authenticity of the letter sent by the Ministry of Environment to RMGC containing a list of questions and possibly a request for an ADC for Orlea does not change the Tribunal's conclusion in relation to Orlea.

1090.   Accordingly, the Tribunal cannot see how any actions or omissions by Respondent in connection with the 2010 LHM were somehow politically motivated to frustrate the Project.

1091.   At this point, and in light of its findings above, it is unnecessary for the Tribunal to address Claimants' arguments in relation to the 2015 LHM and the UNESCO application, which fall within the scope of Claimants' second alternative claim.

vi.   *The conclusion on the technical or other elements*

1092.   In sum the Tribunal recalls that:

-   There is no evidence of an abuse of process or other wrongful conduct on the part of Respondent in relation to the Waste Management Permit or the Water Framework Directive issue.

-   There is no evidence of any abuse of power as far as the approval by the Ministry of Culture is concerned.

- There is no evidence of any acts or omissions by Respondent in connection with the 2010 LHM being politically motivated to frustrate the Project.

1093. Further, the Tribunal does not consider that any other arguments concerning the above or other technical or other elements, including issues related to post-mining land use (for example, financial guarantees), change its conclusion.

1094. Based on these findings, the Tribunal concludes that Romania's treatment of the technical and/or other elements as part of the environmental permitting process was not wrongful.

### 3. The Draft Law

#### a) The issue

1095. The Parties disagree as to whether the Government's proposal to submit the Project to a vote of the Parliament through the Draft Law, and the Parliament's decision to reject the Draft Law were, according to Claimant, "politically motivated" and had the effect of terminating the environmental approval process as well as the continuation of the Project. At this point, the Tribunal considers it important to note that any action of the Parliament is by definition "politically motivated" and that it therefore understands the issue to be that there was an alleged illegitimate political influence over the decisions of the Parliament.

#### b) The facts

1096. The relevant facts have already been set out above (see paras 151 *et seq.*). The Tribunal will nonetheless repeat and supplement these facts before proceeding with its analysis.

1097. It is recalled that, in June 2012, Prime Minister Ponta announced that no decisions would be made on the Project until after the 2012 year-end elections.[759]

1098. In late January 2013, Prime Minister Ponta stated that when the following three conditions are met, the Project can start: "*environmental standards, royalties and participation of the Romanian state.*"[760]

---

[759] Exh. C-641 (The Government postpones the decisions regarding Roșia Montană and the shale gas until the elections that are going to be organized in autumn, Realitatea.net, dated 8 June 2012).

[760] Exh. C-831 (Victor Ponta: Roșia Montană will move to Large Projects Ministry, Hotnews.ro, dated 15 January 2013).

1099. <u>On 8 February 2013</u>, Minister of Environment Plumb stated the following when asked in an interview whether the start or end of the work on Roșia Montană depended on the Environmental Permit:[761]

> *No. The start of such a major project depends on several factors. If you wish, as regards the institutions that have to take part in the decision, which will eventually be made by the Government, the institutions are not just the Ministry of Environment, the Ministry of Economy, the Ministry of Finance, the Ministry of Culture, there are many more institutions involved in the decision, but concerning this project at Roșia Montană what I can tell you with certainty is this. First, the environmental protection area is an area which is very well regulated from the point of view of the European norms and regulations. Practically, the entire environmental area is regulated to a 100% rate by the community decisions: directives, regulations and so on. As long as the project does not meet all the standards and conditions on environmental protection, it can never start, as far as we are concerned. Second, you have seen that the decision was for this project to go in the management of Large Projects, and it is only natural, as it represents a significant and major natural resource for Romania.* […] *Concerning the environmental protection as it is from the point of view of this area that I am speaking, at the current time* ***we cannot move forward, as there is no clearly-established procedure concerning the financial guarantees referring to the preservation of the environment conditions after the respective exploitation is closed, and it is generally valid for the entire area*** *concerning the exploitation of natural resources, and, also, there is currently no procedure on environmental responsibility. When I say these things, environmental responsibility means the procedure which financially covers the entire exploitation period so that no accident exists, as you know it has been the case before.* ***Well, it is these two, the financial guarantee and the environmental responsibility, for which a procedure needs to be issued. Concerning the environmental responsibility, which is a component part, or it is the redundant of a European Directive which has been transposed into national law since 2008, and concerning which nothing has been done until now, we have asked for technical assistance from some of the Member States which have such procedures. And, concerning the financial guarantee for the environmental area, this one is also the redundant of a directive, which was also transposed in 2008 under Romania law, but for which this procedure has not been developed.*** […] ***They got stuck at a certain time, because at the respective time there were certain standards and regulations because Romania was not a Member State; in 2007 Romania had become a Member State***

---

[761] Exh. C-1478 (Interview of Rovana Plumb, B1TV, dated 8 February 2013), p. 2.

*and other regulations intervened, which had to be adjusted in the national law.* (emphasis added)

In replying to this question, "*But that was in 2007, until now, could the ministries have not said: come on, let's finish*", Rovana Plumb stated:[762]

> Yes, but there were other types of issues. **If you want me to tell you what they are, I will, but they do not relate to the environment, here were other types of issues and, for this reason, with us is the getting close to… practically we are granting the environmental permit. The environmental permit, which means a government decision. To grant this environmental permit, we must comply with certain standards, these two do not exist at the current time – the procedure on the financial guarantees and the procedure on environmental responsibility. Only when we have these two procedures will we start the assessment**. […] *I would like to ask you to disconnect the Roșia Montană project from political lobby and political decision*. […] ***So, this is practically a discussion about the protection of the citizens' health***. (emphasis added)

1100.    <u>On 14 February 2013</u>, RMGC met Minister Șova of the Department for Infrastructure Projects of National Interest and Foreign Investments at government headquarters to discuss, among other things, the legislative activities with potential impact on mining and Roșia Montană and the status of the EIA Process and next steps. ███████████
██████████████████████████ ████████████████████████████████
████████████████████████████████████

████████████████████████████████
████████████████

████████████████████████████████
████████████████████████████████
██████████████████████

████████████████████████████████
████████████████████████████████
████████████████████

██████████████████████████████

████████████████████████████████
████████████████████████████████
████████

██████████████████████████████

[762] Exh. C-1478 (Interview of Rovana Plumb, B1TV, dated 8 February 2013), pp 2-3.





- 

[763] (emphasis added)

1101.    <u>On 14 March 2013</u>, Minister Şova stated the following in relation to the Project and the vote before Parliament:

> *There are many more projects. There is Roşia Montană, copper, shale gas, Cenavoda, Tarnita, Siret – Danube canal –* **these are projects with regard to which, unfortunately, we have not been able to make a political decision in the past 20 years,** *to say "look, his will be done under these terms" or "it's not going to be done, full stop". We were just not capable, we have been delaying a decision. Let me highlight a big merit of Prime Minister Ponta – maybe you will suspect me of being biased, I can assume that – he said "I want this government to make a decision. Yes or No". What I mean is that the decision will not be made behind the closed doors.*
>
> **It will be a governmental decision, and all the projects I am telling you about will be subject to a law in the parliament. So, the parliament will have to vote. And the entire political spectrum will be able to criticize, to say whether they agree or not, to express their positions. Maybe the government will approve a project and the parliament will say no. We want the political class to make a decision. Of course, the majority will decide, that's clear, but they have to make a decision one way or another.**[764] (emphasis added)

1102.    As mentioned above (see para. 153), <u>in March 2013</u>, the Government established an Inter-Ministerial Commission under the coordination of the Department of Infrastructure Projects to "*mediate an efficient dialogue*" between the State and RMGC "*considering that the permitting process for the Roşia Montană mining project has been stagnating*

---

[763] Exh. C-779 (████████████████████████████████████████; Tănase WS II, paras 130-146; Henry WS I, paras 73-79.F

[764] Exh. C-824 (Dan Şova: Construction of Comarnic – Braşov motorway starts in October; three big construction companies interested in the motorway crossing Transylvania, Financiarul.ro, dated, 14 March 2013), p. 7.

*since November 2011*." [765] The Inter-Ministerial Commission met with RMGC <u>on 11 and 22 March 2013</u>. [766] The Inter-Ministerial Commission prepared its report and provided it to RMGC <u>on 25 March 2013</u>. The report was approved by the Government <u>on 27 March 2013</u>. [767]

1103.     To renegotiate the economic aspects of the Project and prepare the Draft Law, the Government established a Negotiation Commission <u>on 28 April 2013</u>. [768]

1104.     <u>On 12 May 2013</u>, Minister Șova stated that:

> [t]***here can be no political decision if the environmental conditions are not met, for example***. […] *As a personal opinion I say "Yes, I think the most normal way would be to pass a law in the Parliament regarding this project, to have a framework for debate."* ***So, I advocate for the total transparency of a project, something that I said also in the opposition. As long as it is about the natural resources of the country and a decision, it must be assumed by a Parliament in a transparent manner and I think the greatest transparency is ensured by a parliamentary debate***. [769] (emphasis added)

1105.     <u>The next day</u>, Minister Șova reiterated the following:

> *Our attributions, as a ministry within this project, will be strictly administrative.* ***Namely, to pursue the obtaining of endorsements, but not obtaining their endorsements, but instead, only to see whether, according to the specialists, this project can be achieved by observing the environmental conditions and the conditions imposed by the Ministry of Culture for the archeologically conservation of the area. If these conditions are met, I will not hide to tell you that what is under discussion is not the political decision, but the economic decision of the exploitation.*** *I refuse to talk about a political decision because, if investments of this extent are made, this is clearly an economic decision, which pertains to the economic future of this country. No economic decision, not at Roșia Montană, and not concerning the shale gas, shall*

---

[765] Exh. C-553 (Draft Informative Note on the activity of the Inter-Ministerial Working Group convened for the Roșia Montană mining project ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, p. 1.
[766] Exh. C-471 (Transcript of Inter-Ministerial Commission meeting, dated 11 March 2013).
[767] Tănase WS II, paras 149-160; Avram WS I, paras 123-124; Henry WS I, paras 82-83; Exh. C-451 (Information Note attached to Meeting Minutes of the Commission for Negotiation of All Aspects related to the Implementation of Roșia Montană Mining Project, dated 28 April 2013).
[768] Exh. C-451 (Information Note attached to Meeting Minutes of the Commission for Negotiation of All Aspects Related to the Implementation of Roșia Montană Mining Project, dated 28 April 2013), Art. 2(1).
[769] Exh. C-871 (Interview of Minister Delegate Șova, Pro TV, dated 12 May 2013), pp 2-3.

*be made, unless the environmental conditions are observed.*[770] (emphasis added)

In the same interview, Prime Minister Ponta stated the following:

> **This Government must do what no other government has done over the past many years, just as we are doing with Rompetrol, we are doing with other things, namely unblocking some projects, negotiating them in the best formula that can be negotiated and then, the Parliament, following a debate that cannot have and which is nowhere as transparent and ultimately contradictory as it is in Parliament, to decide: whether it's white or black.** *The fact that we did not have, perhaps it was not even the context, there weren't the political people to have the courage to assume responsibility, to say Yes, we will do it or No, we won't do it anymore ... I think that's where all the bad part was.* **Other than that, I have different opinions according to each project, but I only have one vote in the Parliament. My power as prime-minister is to present the legal status, the impact assessments, the regulation at European level, and then the decision is to be made by the Parliament of Romania.** […] *In all the cases of great economic and political projects, it's not that the Government is running from responsibility, because, in the end, I am also in the Parliament, and I am not only responsible for my vote as, in the end, I am leader of the party with the largest group. The issue is that such important decisions should not be reached by a government which, for sure, only reflects a part of the Parliament and an interest unavoidably limited in time, but I believe that they must be debated within a framework, the one that is the most democratically possible. In the Government we are only members of the USL (the Social-Liberal Union),* **in the Parliament there are all the political forces and the people from the USL, who are in favour or against, and in the end the decision to be reached by the Parliament must be assumed by the largest political spectre, whether a decision to accept, or a decision to dismiss, I am excluding neither.**[771] (emphasis added)

1106. <u>On 23 May 2013</u>, Prime Minister Ponta publicly stated the following:

> *The stage is as follows.* **First of all, this is a project on which nobody has been making any official decision for over 12 or so years. We accept it or reject** *it. Based on our discussions, we have stated our position. We reject its initial form.* **This current Government does not agree with its development. What this means is: it meant some investments in environment which we did not deem satisfactory, it meant the participation of the state to this project and 3, it meant the**

---

[770] Exh. C-772.02 (Realitatea TV, dated 13 May 2013), pp 1-2.
[771] Exh. C-772.01 (Realitatea TV, dated 13 May 2013), p. 1.

> ***level of the royalties. So, three items in this order. First of all, the warranties for the environment, second of all, the Romanian state participation, through Minvest, and third, the level of the royalties. We have set up a negotiation commission which must go and see if it is possible that all environmental conditions were request are met and that is item number one. Item number two, we should have a more substantial participation of the State and a higher level of royalties. After that, these conclusions will be passed to the Parliament and the Parliament shall decide, because, personally, I vote against the acceptance… but here I am talking about my vote as a deputy, but at the same time, as prime-minister I have the obligation, as I have already done with Rompetrol, as we are now doing with the renewable forms of energy, as we no doing with Sidex, my obligation is not to pretend I don't see the issues which have been postponed for many years. Either because of a lack of political will, or a lack of*** […] *what I believe is that for the first time a place to argue all pros and cons should be founded, because usually, those favoring it talk with each other and those opposite it also talk between themselves and the two camps never meet. There is no other more legitimate place to meet than the Romanian Parliament.* ***As I have said, I personally will not take part or vote in favor of this project***.[772] (emphasis added)

1107.   On 27 May 2013, ███████████████████████████████████████████
███████████████████████████████████████████████████████████████
████████████████████████████

1108.   At the 31 May 2013 TAC meeting, Secretary Năstase of the Ministry of Large Projects, under Minister Șova, told the TAC the following:

> ***Together with all the conditions in the environmental permit and all the agreements that must be involved in this Project, leaving aside that we will also make a financial-economic negotiation of this Project, not only from the point of view of the royalty and of the State's share in this company Roșia Montană Gold Corporation, but also from the point of view of other economic-financial aspects that are of particular relevance for the Romanian State. All of these will part of the law that will be submitted to the Parliament for approval as the final deciding factor whether this project will be done or not. In Parliament it will be possible to make observations and analyses in the commissions and we are certain that, in the end, the Parliament will take the final decision if Romania will make this project or not.***[774] (emphasis added)

[772] Exh. C-421 (B1 TV, dated 23 May 2013), pp 1, 3.
[773] Exh. C-873 ███████████████████████████████████████████████
[774] Exh. C-485 (Transcript of the TAC meeting, dated 31 May 2013), p. 20.

1109.   <u>On 5 June 2013</u>, ███████████████████████████████
███████████████████████████████████████████████████
███████████████████.

1110.   <u>On 8 June 2013</u>, Minister Șova publicly stated the following:

> **The decision to say "yes or no" is not a matter of courage, it is a matter of service obligation**. That is why we go to the Government, to be able to say yes or no. We now have very simple issues that are related to the observance of the environmental conditions and the compliance with the conditions imposed by the Ministry of Culture with respect to the conservation of archaeological sites. If it will result from the project that all this may be complied with, then a draft bill would certainly be advanced in the Parliament. During the debates in the parliamentary commissions and in the plenary of the Parliament there will be the opportunity to express all opinions, **total transparency will be used and an economic decision or a decision assumed by the entire political class in Romania will be made either with a yes or no.** In a specific manner […] I have no opinion. **My opinion is very simple – if jobs may be created or direct investment may be done while complying with the environmental conditions, with the conditions of archaeological sites conservation and those of further development of the area after the exploitation is finalized, then the discussions may be resumed. If these prerequisites are not met, these discussions cannot happen.** […] First, we need to see the prerequisites and then see if the Parliament finally agrees with it. If these conditions are met and we introduce a bill in the Parliament to be debated, there will be a moment when all parliamentarians, from all parties, in all corners of the country, will give their opinion on this matter.[775] (emphasis added)

1111.   <u>On 11 June 2013</u>, ██████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████

---

[775] Exh. C-842 (Interview of Dan Șova, Adevarul.ro, dated 8 June 2013).

███████████████████████████████████████████████████
█████████████████████████████ [776]

1112.   <u>On 13 June 2013</u>, Prime Minister Ponta stated the following concerning a decision on Roșia Montană:

> ***The decision entails the following steps. First, we must finalize the environmental studies and the need for investments, because we must have all the environmental guarantees for anything that may happen there. Secondly, we will complete the negotiation with the investor, because the participation conditions for the Romanian state and the royalties were unacceptable.*** *[…] Yes, they will be changed, what I mean is that we will demand it, but I don't know if they will be accepted and [...] I can say something else, that the Government will not take any kind of decision with respect to this project; it will gather together all the environment investments offering all the environmental guarantees, the best offer regarding the royalties and the participation of the Romanian state, we will initiate a draft law that the Parliament, in the most transparent manner, will debate. If it approves it fine, if it rejects it, fine as well. But at least, we don't have to wait 11 more years or for them to potentially event start a law suit against us. [...]* ***I will be honest and say that as a deputy I will vote against the project. On the other hand, as Prime Minister, I don't have the right to disagree….*** [777]
> (emphasis added)

1113.   <u>On 14 June 2013,</u> ███████████████████████████
███████████████████████████████████████████████████
███████████████████████████████████████████████████
████████ [778]







1114.    <u>On 11 July 2013</u>, the Government included the Project in its National Plan for Strategic Investment. At his press conference on the plan, Prime Minister Ponta said that:

> *I want to make* some *progress on unblocking the Deva Gold and Roşia Montană projects, in compliance with all the environmental regulations,*

---

[779] Exh. C-1536 ███████████████████████████████████████████.
[780] Exh. C-1536 ███████████████████████████████████████████.

*following that the Romanian Parliament decides on unblocking some projects and the final decision is yours.*

When asked when he saw the Roșia Montană Project starting, he stated the following:

*When the Parliament decides to, if it is started. From the point of view of the Government, the negotiation and the draft law will be completed at the beginning of the parliamentary session. […] I cannot speak on behalf of the Parliament, I am only speaking on behalf of the Government. I believe 13 years – it's 13 years, I think? – of going round various governmental structures is enough! The fact that we are again being sued is not a good thing. We will end up being forced to do something and I believe the final decision in such a controversial project, with advantages and disadvantages, may only be made by the Parliament. I am certain everybody here, including the president, will find it appropriate to have choices, to not steal with the law, but on the contrary, to support with the law. But, I repeat: we have taken all the measures, first and foremost those regarding the environmental standards, and then those regarding the royalty level and the interest of the Romanian State, which we consider all three unsatisfactory, in the initial form of the project. If satisfactory standards were negotiated and exist, we will send it to the Parliament and the Parliament will decide.*[781]

1115.   <u>On 18 July 2013</u>, Prime Minister Ponta reiterated the following when discussing the national investment plan as unblocking the Roșia Montană Project:

*The environmental permit, after the negotiations that were conducted concerning the environmental investments, because in the first offer the investments were definitely insufficient, and also the guarantees were not provided. What will happen with the respective area? So, after all the negotiations, the environmental guarantees have changed, the State participation has changed, the royalties level as well. But I don't want to say here that it's good or bad, I say one thing, we've kept the project for 13 years without the Government of Romania saying if it's black or white. Left or right. **Furthermore, they, of course, sue us and they are likely to win, which is why the Government, as it did with Rompetrol, and in other circumstances, sends the project to the Parliament – there is no place more transparent, where discussions represent all points of view - after which the Parliament will decide either to do the project or not to do the project. And then the decision is closed**.* (emphasis added)

---

[781] Exh. C-910 (National Plan of Strategic Investment and Job Creation, Romanian Government), pp 2, 6-7; Exh. C-462 (Prime Minister Victor Ponta: 2013 targets: Investments of minimum EUR 10 billion and 50,000 jobs, Government of Romania, dated 11 July 2013), pp 4, 8.

When asked whether the Parliament can make a different decision from the one made in Government, Prime Minister Ponta said "*Yes*".

When asked also "*A Parliament in which you have 70% majority*?", Prime Minister Ponta stated:

> **Yes, because this is such a debated issue concerning which I, for instance, will not ask the members of PSD** [the Social-Democrat Party] **to vote in a disciplined manner. I will not vote for the project, I have my own convictions**. (emphasis added)

When a comment was made about Prime Minister Ponta having stated that he was against the Project, Prime Minister Ponta said:

> *I never changed that belief but I think I have a responsibility as a Prime Minister not to keep the project in the drawer as so many Governments did. Let's put it on the table! There is no authority over the Parliament. If the Parliament following debates will decide to reject it, the case is closed.*

When a comment was made that this situation was "*at least paradoxical*", Prime Minister Ponta said that it was "*very difficult*" and added:

> **No, the project of the Government comes out with the following: here, that's the current situation, that's what the Government negotiated. You decide! Because it is a far too important decision in order to be assumed by a minister or a general director or even a prime minister. It's the only place where you can have all the views; the only place where, I repeat, a legitimate decision can be made is the Romanian Parliament**. (emphasis added)

When asked whether this constituted a shifting of responsibility, Prime Minister Ponta said:

> *There are many responsibilities that I assume on a daily basis. And I do this for both good things and bad things. There are, however, certain responsibilities which go beyond the* Government. **Actually, the Government can't decide alone and it's not good for it to decide alone. Also concerning the manner in which the new agreement with the IMF will look. I want to inform the Parliament, I want to ask for a vote if this is the case, because there are things which the Government cannot decide on its own. The most legitimate authority, the supreme authority is the Parliament.** (emphasis added)

When asked whether the Environmental Permit was possible or not, Prime Minister Ponta answered as follows:

> *No, that will be incorporated in the draft law and if the law is approved then it will go further for approvals, if not, it doesn't*.[782] (emphasis added)

1116.    On 27 August 2013, the Government announced that it had submitted to Parliament the Draft Law for the Project and the accompanying Draft Agreement.[783] The Draft Agreement provided, among other things, that RMGC and Gabriel would increase the State's shareholding in RMGC from 19% to 23% after issuance of the Environmental Permit and from 23% to 25% after issuance of authorizations required to begin the operational stage of the Project, and also increase the royalty rate from 4% to 6% for the duration of the Project.[784] The Draft Law, among other things, provided parliamentary approval of the Draft Agreement, declared the Project to be of "outstanding national public interest" and of public utility, authorized NAMR to extend the validity of the License by 20 years and contained provisions that would have amended or supplemented the Mining Law for all mining projects of outstanding public interest to facilitate and expedite the implementation of such mining projects generally.[785] The Government submitted the Draft Law together with a detailed explanatory memorandum signed by Prime Minister Ponta and all relevant ministers.[786]

1117.    On 31 August 2013, Prime Minister Ponta reiterated his position as follows:

> *I will vote against this project of considerations that you know. There is no other solution than that absolutely all the elements to be put on the table of the Parliament where hall* [sic] *be represented all social categories. The pros and cons should be presented to Parliament which shall decide if we will make such a project or we reject it* […]. *Substantially everyone will vote according to his own conscience, as everyone thinks is best for his constituents*.[787] (emphasis added)

1118.    Meanwhile, mass street protests began in the Romanian urban centres of Bucharest and Cluj on 1 September 2013.

1119.    On 5 September 2013, Prime Minister Ponta stated the following:

> *I was obligated, under the law, and I am trying to explain this to those who want to hear me, that under the current law I had to give approval*

---

[782] Exh. C-813 (Interview of Victor Ponta, Digi 24, dated 18 July 2013), pp 2-3.

[783] Exh. C-1475 (Romanian Government Press Release, dated 27 August 2013); Memorial, para. 32.

[784] Exh. C-519 (Draft Law & Draft Agreement), Arts 1(1), 3(1).

[785] Exh. C-519 (Draft Law & Draft Agreement), Arts 1(2), 3, 4(1), 5.

[786] Exh. C-519 (Draft Law & Draft Agreement); Exh. C-817 (Exposition of Reasons); Exh. C-2461 (Exposition of Reasons on the Draft Law on certain measures regarding the mining of gold and silver ores in the Roșia Montană perimeter and on stimulating and facilitating the development of mining activities in Romania).

[787] Exh. C-789 (Adevarul.ro, dated 31 August 2013), p. 1.

> *and the Roșia Montană Project had to start. They have met all the conditions required by the law. Precisely because I considered that I should not do this, I sent the law to Parliament to submit it to a real debate. That's the situation and this is why, had I done absolutely nothing, I would have then had to pay I don't know how many billions in compensation to the company in question. I don't want to pay from your money, from the taxpayer's money, compensation for contracts concluded starting with 1998. I want the decision to be made by the Parliament.*[788]

1120. <u>Two days later</u>, Environment Minister Plumb stated that, through the new conditions imposed, the Roșia Montană could become "*the safest project of Europe*". She added that:

> *following the debates in Parliament a point of view on this investment will emerge. We had the courage to bring this critical Project in Parliament for debates, together with the project on shale gas, which contributed to Romania's energetic independence.* […] ***We devised a new project, we have negotiated in such a manner as to secure a permit that, from my point of view, as Minister of Environment, may address all requirements under the European and not only, international standards, Practically, we have taken all European environmental standards and we have observed all conditions imposed by the relevant European legislation***. (emphasis added)

With respect to the financial guarantees, Minister Plumb is purported to have stated that:

> *the environmental guarantee increased from US$ 76 million up to US$ 146 million*" and that it "*shall cover the progressive closure and mine rehabilitation at the highest environmental standards, closure under safe conditions of the extractive waste installations and post-closure monitoring.*

At the same time, she stated that:

> *higher safety measures have been taken, including in case of accident; the protection of biodiversity and continuous monitoring of air, soil and water quality have also been considered; the cyanide use has been cut down to a third from the accepted limit of 10 ppm, i.e., down to a concentration of 3ppm at the tailings pond; the newest technology in this field was brought in.*

Minister Plumb added that:

---

[788] Exh. C-460 (Transcript of B1 TV, dated 5 September 2013).

> *The Ministry of Environment, through the Government, made a proposal that was sent to the Parliament and imposed al the environmental standards. The Environmental Permit for Roşia Montană will be granted depending on the decision taken by the Parliament of Romania after public debates.*

When asked whether she would vote against the Draft Law, she stated that she could not vote as a "*natural person*" but that she would cast her vote after consulting her voters.[789]

1121.    Another mass protest took place on 8 September 2013.

1122.    On 9 September 2013, the co-chair of the ruling coalition, Senate President Antonescu made the following statement:

> *I am telling you from the beginning that I want to make a strictly personal statement. Of course, given my capacity as chairman of the National Liberal Party, chairman of the Senate and probably a presidential candidate. But this is a statement that does not engage, of course, the Senate and not even the National Liberal Party.*
>
> *Today, although the discussions in Parliament have not yet started, I* **have a firm and definitive point of view on the Roşia Montană project. I consider that my obligation, as a political leader, is to make it known. And I will explain why this point of view and this public position emerged even before the commission debates, even before the inventory of pros and cons at a technical level.**
>
> **I believe that Roşia Montană mining project cannot be supported. The project should either be withdrawn, which is probably not the case, since the government sent it, or I think it should be rejected.**
>
> *And I believe this,* **I have reached this conclusion not for technical reasons, not because this project does not have the chance to be feasible or useful, but because there are major consequences and realities, which at this moment prevent the approval of this project.**
>
> **First of all, we are talking about a nationwide project. It is a nationwide project not because it was debated nationally, but because it deals with one of the most important natural resources of this nation. That is why the public debate is so ample and not the other way around.**
>
> **When talking about a project involving important natural resources of a nation, it is very important to have a public support. This is more important than the technical data of that project. First of all, today we**

---

[789] Exh. C-556 (Rovana Plumb: The approval of Ministry of Environment for Roşia Montană, depending on the decision of Parliament, Hotnews ro, dated 7 September 2013), pp 1-2.

*discover, as I was saying, that the project, the debate on it, is producing a significant breach in the Romanian society.*

*We find out that a significant number of citizens do not trust that such a project will be useful, that it will use the resources of this nation for its benefit. It is an ample public feeling, that cannot be ignored and which is more important than a technical data or another.*

*Second of all, there is a huge amount of suspicion, not only in the political environment, press circles, the online environment, but simply in the Romanian public opinion. The suspicion that policy-makers in this action would not act in accordance with legitimate national public interests.*

*Unfortunately, the top politicians have thrown accusations that deepened or amplified this feeling. I personally do not think any of the important policy-makers - the president, prime minister, other political leaders, are involved in a specific lobby of Gold Corporation Company, that they were, with a very tough word which unfortunately was used by them, bribed. Extremely serious accusations were thrown, I have never made such accusations, neither in the middle of the fiercest political polemic, nor during the electoral campaign. But the feeling that, for most of the Romanian public opinion, the suspicion that such a thing might happen is a second very strong reason, which, in my opinion, requires the project to be stopped.*

*Third of all, there are some fragilities of this project itself. It is a government-initiated project, but the prime minister tells us that he will vote against it as a parliamentarian. It is a project that has an endorsement report with numerous and extremely important objections to its very content from the Ministry of Justice.*

*Finally, it is a project which, in terms of the environmental permit, which is essential for such a subject, is giving us a novel situation in which, on behalf of the initiator, on behalf of the government, the minister in charge tells us that whether or not he will give his approval depends on the outcome of the vote in parliament. Such a project, should be supported at least by the initiator, if the initiator decides to sustain it with the utmost determination, with strong, public, political and technical arguments, because it is his nature to generate an intense public debate.*

*For all these reasons, my position is that this project, at this moment, must be rejected. I have mentioned that, for now, I do not speak on behalf of the National Liberal Party, because we did not have a debate and a decision as a party, on this subject. I think that my position as party chairman, and my situation, as I was saying, of a possible presidential candidate, obliges me to assume a position of my own. I*

*cannot and do not want to hide either behind the majority vote of the Parliament, whichever it may be, or behind the majority vote of a commission, whichever it may be, and not even behind the majority vote in my own party.*

*The National Liberal Party will decide. Obviously, this is the position that I will sustain during the party debates. The party has the force to make any decision, regardless of my position. I wish and will do my best that this point of view be shared in the decision-making forum of the party, but I felt it was my duty to say this.*

**I would like to add something: I am not an ecologist. I respect ecologists, I respect environmental organizations, I respect the efforts of everyone in the civil society or the political scene, those concerned with a healthy environment, a climate in all respects that is in line with European standards in the XXI century. But I am not an ecologist.**

**I believe that Romania' major priorities are economic development, in balance and by reference to environmental conditions, I repeat, with all that civilized exploitation of resources in Europe means in the European Union, in the 21st century. But I am not an ecologist. The point is that here we are not talking about industry or ecology, here we are not just talking about the technical data which one or the other party may plead with.**

**We are talking about a national project that does not have enough public support, which, on the contrary, generates public positions against it that cannot be ignored. That generates suspicions, ambiguity, which has too much vagueness to be clearly, strongly and responsibly assumed.**

*This is my position, I wanted to make it public, and as I was saying, things will take their natural course in the National Liberal Party, in the Parliament and elsewhere.*

*I remain convinced, not less, that investments, major investments, major national investment projects must be a priority for today's and tomorrow's governments of Romania. But, at the same time, they must be loud and clear communicated, well-argued in such a way as to have public support, so that behind them there is indeed a support exceeding a certain number of votes in the Parliament or a Government's decision. I take into account and I seriously consider the arguments and interests of many, apparently, of a majority of the inhabitants of the Roşia Montană area who support the project. I take into account their arguments, their interests, in the most correct sense of the word, and I respect them.*

288

> *But we are dealing here with a problem that is not only local, we are dealing with a national problem that needs to be answered nationally. Which does not mean that the Government of Romania, the current government, future governments, are not responsible for finding solutions for Roşia Montană area, for the people who need jobs there, as well as for all areas.*[790] (emphasis added)

1123.  <u>Later that day</u>, Prime Minister Ponta made the following statement:

> We saw the statement, that of Mr. Blaga and that of Mr. Antonescu, and you know very well there was not a very clear direction in PSD either, the things are split, so this is why I even came to the Parliament. I want to make sure that the President of the Senate, Mr. Antonescu, will quickly include the draft law on the agenda of the Senate, and this will be rejected, as it will at the Chamber, and thus, this project is closed. As a Prime Minister I must find other solutions for foreign investments and creation of new jobs.

> […] *After all, President Băsescu supported in 2009 the Roşia Montană project before the presidential elections, Mr. Antonescu no longer supports it in 2014 because he has presidential elections. This is politics. What matters is that, as long as there is not or, better said, as long as there is clearly a majority against the project, there is no point in losing too much time.* The project is at the Senate, the new President will include it on the agenda it will be rejected, it will be submitted to the Chamber and again rejected and we put an end to this discussion which, honestly, was no longer meaningful, since, as we see, the majority, including a parliamentary majority, is against it. *The most critical thing for me was that this vote be given by Parliament, as there will obviously be lawsuits, and I do not want that the Government or the ministers, we, be held accountable for contracts and commitments undertaken by Mr. Băsescu and the previous governments.* (emphasis added)

When asked whether the protests in the country had any role in the decision made by Senate President Antonescu and by Prime Minister Ponta, the latter replied as follows:

> *Of course, the protests are very important. Maybe it would have been better to have a longer debate but, if the decision was made, it was made, and, I repeat, we will get to the Senate today – I am convinced that the President of the Senate will take all measures to start the rejection procedure immediately, then it will also be rejected by the Chamber, and that is that.*

> […] *We also* **have the statement made by President Blaga, if I am not mistaken, who is also against the project and you have PSD's position**

---

[790] Exh. C-2690 (Crin Antonescu statement, B1TV, dated 9 September 2013), pp 2-3.

> *very clear, which was not a unitary position in the sense that we are*
> *for or against. Therefore, things in PSD were after all divided, When*
> *the majority is clearly against, there is no point in dragging things.*
> (emphasis added)

When asked whether Prime Minister Ponta would speak to PSD members of the Parliament so that they clearly vote, politically "no", Prime Minister Ponta stated the following:

> *Of course, as long as this is the majority decision, yes. Not all of them,*
> *there will probably be PSD members of the Parliament who will vote for,*
> *but it is very clear that the decision has now been made, then let's go to*
> *the Senate and close the project as soon as possible […]. We will have*
> *lawsuits nevertheless, but, I repeat, I do not want that I personally, or*
> *other ministers, be accused of undermining the national economy. I want*
> *that the Parliament decides and here you go, the political leaders have*
> *decided and only the vote must be given so that we can close this*
> *procedure.*

When asked what the solution was, Prime Minister Ponta stated:

> "*the Senate, which now has the draft law, should reject it in an*
> *emergency procedure, then it will be sent to the Chamber where it is*
> *rejected as well and that is that.*"[791]

1124.    Senate committees held hearings on the Draft Law <u>on 10 September 2013</u>. That same day, the Senate committees unanimously rejected the Draft Law.[792] The following was reported in the press:

> *Minister of the Environment, Rovana Plumb, declared within the*
> *Administration Committee of the Senate that, in case of an exploitation*
> *in Rosia Montana, **there is no danger of cyanide infiltration in the***
> ***groundwater**, as she claimed there is no other technology related to the*
> *rock component in there but the cyanide based one.*[793]

> *According to the Minister of Culture, no **other private investor has***
> ***invested so much in preserving the area** and stressed that his position*
> *is the same as that of the Government – the initiator of the project in the*
> *form to be debated in the Parliament. Ştefan Harsu, general manager*
> *within NAMR, said that the articles of the Mining Law currently on the*

---

[791] Exh. C-872 (Interview of Prime Minister Victor Ponta, B1TV, dated 9 September 2013); Exh. C-793 (Statements made by Prime Minister Victor Ponta, Digi TV, dated 9 September 2013), pp 1-3.

[792] Memorial, para. 40.

[793] Exh. C-510 (UPDATE Rovana Plump: For Rosia Montanta there is no other technology in the whole world than the cyanide-based ore / A negative report for the project and in the Senate Administration and Environmental Committee, HotNews ro, dated 10 September 2013), p. 1.

*agenda of the Senate, are "correct" and declared himself convinced by the increase of the royalty to 6%. "As to the environmental guarantee, the Minister of Environment had a very good approach", he said. Nevertheless, the representative of NAMR drew attention to the "only problem" raised by the mining exploitation – the cyanide. "Mining there cannot be done efficiently other than by cyanidation […]* **Some say that there are gold mines that use other methods. Yes, but they don't have this type of mining. This deposit is of gold and silver** *[…] The uranium is beyond the hill. I have never seen a better project. It is one of the best projects in Romania". […] The PSD Senator Nicolae Mog said the parliamentarians are facing a very important situation.* **"I am a politician who wants to vote in an informed manner, so we want more clarifications"***, said Nicolae Moga, who asked the Government representatives about the cyanidation method. 'I have not come prepared for this', replied the NAMR general manager. 'But such a deposit can only be exploited by cyanidation'. […] Nicolae Moga also raised the issue of cultural heritage. "Sure, we risk losing, but we have a political choice to make" answered Minister Babu, who argued that if this project is not implemented the future generations of Romania will only learn about the 140 kilometres of underground galleries "from pictures". […] The Liberal believes that the situation related to this subject is delicate, sensitive, especially in relation to the contract, and expressed his concern in the context about the damages that Romania will have to pay. The secretary of the Administration Commission, the Social-Democrat Senator Mihai Fifor, expressed his concern about two major topics – the environment and the cultural heritage. At the same time, he asked the Minister of Culture who will be supervising archaeological discharges after the exploitation begins.* **"The ecological disaster is happening now! We are not talking about a paradise on idyllic pastures! We are talking about four excavated mountains, there are abandoned installations at Gura Rosie, scrap metal"***, replied Daniel Barbu. He added that ten years ago, when the [archaeological] excavations began, nobody knew about the existence of Roman galleries – really important in that area. "Does anyone want to go on a family weekend in Roșia Montană?" added the Minister of Culture.* **The PDL Senator Marius Balue asked Rovana Plumb what she wanted to say when she conditioned the environmental permit on the Parliament's decision, arguing that he does not understand such statement as long as the Legislature does not have the role to validate agreements between state bodies and private parties. "This is running away from responsibility"***, said Barbu. "We* **will issue the environmental permit after the Parliament's decision […] The environmental permit is not an approval to let pollution loose***!" stressed the Minister of Environment, who reaffirmed that all the internal and international*

*standards according to the relevant directives are observed.*[794]
(emphasis added)

1125.  <u>On 11 September 2013</u>, miners in Roșia Montană began protesting underground. These miners remained underground for four days in protest.[795]

1126.  <u>On 15 September 2013</u>, Prime Minister Ponta convinced the miners to end their underground protest by promising to <u>set</u> up a Special Commission in Parliament. In an interview, he specifically stated the following:[796]

> *There's something more, under the current laws and according to the endorsement, you've probably seen that there was a statement by the European Commissioner on an environmental policy, we should, under current laws, issue the environmental permit and the exploitation should begin. It was a huge responsibility, which I do not run away from, but which cannot be assumed by a minister or a prime minister, but by the representative forum of this people, namely the Parliament.*
>
> *[…]*
>
> *You cannot ignore the rallies […] but you cannot make decisions based on rallies.*
>
> *[…]*
>
> *This is why, in a democratic and civilized country, the people in Piata University, are protesting against Roșia Montană, the people protesting for it in Alba need to have a democratic framework and that framework can only be the Romanian Parliament. I was angry with those who said "I'm against" before looking at these papers, before asking one or another to join them.*

1127.  <u>On 17 September 2013</u>, the House established a Special Commission to study the Draft Law and prepare a report.[797] The Commission held hearings <u>from 23 September to 15 October 2013</u>, which were open to the public and broadcast on TV. <u>On 30 September 2013</u>, Minister Șova began presenting a short history and the intentions and objectives

---

[794] Exh. C-1482 (The senators of the Administrative Committee voted against the Roșia Montană Project, Agerpres ro, dated 10 September 2013), pp 1-3.

[795] Lorincz WS I, Annex, pp 5, 8.

[796] Exh. C-437 (Interview with Prime Minister Victor Ponta, Antena 3, dated 11 September 2013), pp 3, 10; Memorial, para. 31.

[797] Exh. C-909 (Decision No. 56, dated 17 September 2013, on the establishment of the Special Joint Committee of the Chamber of Deputies and of the Senate for the issuance of an opinion on the Draft Law on certain measures related to the exploitation of the gold and silver ores in the Roșia Montană perimeter and the stimulation and facilitation of the development of mining activities in Romania), Arts 1, 6.

taken into account by the Government upon drawing up the Draft Law. Minister Şova explained the situation up to 2000. He stated the following:

> *Since 2000 to the present, nothing significant, so to say, has happened, so we find ourselves in front of a license belonging to Roşia Montană Gold Corporation with an interest of 19.31% for the Romania state, the remaining of 81.69 or whatever it is, 80.69%, I apologize held by Gabriel Resources.* [...] *Gabriel Resources has purchased all the minority interests from all the minority shareholders, so that there is currently no other minority shareholder. Only Minvest and Gabriel Resources, the two shareholders of Roşia Montană Gold Corporation, exist." "Now, the Ponta Government was facing a very simple matter. Namely to concretely say to the Romanians and to the people in Roşia Montană, and to all those interested, whether we are doing this project or not. We've studied the exploitation license, the articles of incorporation, we've studied the concrete situation related to the benefits of the Romanian State and the possibilities the Romanian State has. Then the idea emerged to have a legal enactment to improve the position of the Romanian State. With the regulation we proposed, which will of course, be subject to amendments and improvements proposed by the Commission, we only aimed at improving this and I don't know whether it will be in this meeting or the next one, but I personally am willing to discuss every paragraph of this law, of course together with my colleagues from the other ministries. The second thing I want you to know is that this law has been drafted by an interministerial group including specialists from the Ministries of Environment, Culture, from Mineral Resources, Agriculture, Development, and form us, from the Department for Infrastructure Projects, so specialists who discussed all the aspects. And there were multiple aspects. What I want you to know is that, before the discussions had started on this draft, the concrete situation of the Romania State in the Roşia Montană Project was as follows. There are no environmental guarantees in the exploitation license. So, we cannot discuss the content of the exploration license in front of the media, but I can tell you what there is not in the exploitation license.* **So, the license, the way it was issued in 1999 and transferred in 2000, contains no environmental guarantees.** *There are three very general articles referring to the environment, without any express mention and without financial environmental guarantees. There is nothing at all in the license. There is no reference in the exploration license or any other document to the preservation of the cultural heritage. Neither the exploitation license nor any other document set out any advantages for the community in Roşia Montană. Advantages for the community in Roşia Montană which have been negotiated on the one hand by the Ministry of Culture, with the renovation of the 341 buildings and, on the other hand, by the Ministry of Agriculture.* **In the Roşia Montană project, as inherited by the Ponta Government, there is no**

*obligation about the rehabilitation of the historical pollution by Roşia Montană on its own account, that is, with Gabriel Resources' money. In its form today, if anyone would do this project before this law and before addressing it ourselves, the burden of the historical pollution would fall on the Romanian state, and I am talking about 470 million dollars, at least, according to the specialists' evaluations for the environmental reconstruction of the area, for the environmental problems created before 1997. **In the current form of the Articles of Incorporation of Roşia Montană, there is no guarantee for the Romania State about keeping its participation quota to the share capital. We introduced it.** There is no guarantee about the actual cashing in of dividends. We introduced it. There is no provision about the existence and exploitation of other rare metals which might be found there. As you know there is a report from the '80s saying there could be. **Well, according to current data, apparently there are no commercially exploitable quantities in the area. But, in any case, there was no provision on rare metals. We introduced it.** This aspect was also set out in the law. Moreover and I want to insist on this because I confess I was somewhat upset that this has been said. It has been said a lot that the Romanian government drafted a law that serves the interests of a private company, of a private investor. I am happy to be in front of you because this is the appropriate framework for me to tell you, to emphasize and respectfully ask you to check what I say about the agreement, enclosed to the law, which is proposed to be approved by the law, that it has 12 articles which entirely exclusively in favor of the interests of the Romanian state. There is no provision in the agreement, no paragraph – and we can check, we are open to discuss with anybody, there is no paragraph in favor of the private investor, whether Roşia Montană, or Gabriel Resources. **The agreement contains only provisions in favor of the Romanian State, things we considered that the Romanian State should have benefited from the very beginning, in 1997, when the company was set up, and which the Romanian State has never benefited from. Of course, from those you heard in this commission, from the proposals, from the amendments which may come from parliamentarians, I think any document in this world may be permanently improved. So, if anyone has ideas to add so as to further support the interests of the Romanian State, I at least will be the first to support his. I will make another observation. Someone said, many said that Mining Law no. 85 was amended in favor of the private investor.** However, they did not see, by mistake probably, that, in art.4 letter d) we proposed that the Mining Law is supplemented with two other cases of cancellation of the exploitation license. […] We have art. 33 and 34 in Mining Law no. 85/2003 which set out the cases for license suspension and cancellation and we made sure that all the obligations we find here fall under these two articles, so that, if there is any obligation not complied with, the license is either suspended or*

cancelled. […] *And the second case we provided for refers to the transfer of the exploitation license.* […] *I also want to mention here that there are two amendments, also in this matter of maintaining the quota of the share capital, the intention that the Government had and regulated, and, when we will discuss each article I will take the liberty to present to you all the articles related to this aspect.* […] *In order to protect that 25%, there are the two amendments in the law, one to the Fiscal Code, Law no.571/2003, and one to Law no. 31/1990. This because many have asked what is the reason behind these amendments. So, these two amendments to Law no. 31 and Law no. 571, amendments which, of course, do not apply only to the Rosia Montana Project, but to mining exploitations in general, as it could not have been otherwise, are to the advantage of the Romanian State.* **As a matter of fact, you will not find provisions in the law or in the agreement that favor Gabriel Resources or Roșia Montană, where the Romanian state also holds its share, and I uphold and emphasize this strongly. You will find certain provisions not in their favor, but which facilitate the development of the project, from expropriations, to concessions on lands that are connected with the mining exploitation. There is no provision in favor, but only provisions that facilitate the project development, of course, if such a decision is eventually made. I would have a lot to point out by articles and paragraphs, but I would also want to make some observations I was very keen on. As a matter of fact, I have not publicly insisted much on this aspect precisely because I thought this commission is the most competent forum to hear, maybe for the first time, this complete explanation about the concrete situation of the project and the concrete situation in which the Parliament would decide not to pass this legal regulation. So, we now have a license valid until 2019, and it is an exploitation license issued for a period of 20 years, I emphasize: in compliance with the legal requirements. All the laws that have regulated the mining activity in Romania from 1990 to the present have provided that the licenses is issued in a first phase for 20 years, with subsequent successive extensions of five years each. So, we now have a license valid until 2019. The only endorsement able to effectively block this project is the environmental permit followed by the [operational] environmental approval. The way the project looks today – setting aside this law, I can proudly emphasize here that the Ponta Government made the decision to call upon the Parliament and the public to debate the manner in which the previous agreements chose to handle the interests of the Romanian State. We now have a project, I repeat, without environmental guarantees, without guarantees for cultural heritage, without the elimination of the historical pollution, without advantages for the community in Roșia Montană, without guarantees for maintaining the dividends, meaning the Romanian State's participation quota and benefits, there is no protection in the general meeting of Roșia Montană, no provision about other rare**

*metals, no provision about the transfer of Gabriel Resources' shares to third party, which would mean losing control over this project, possibly after it started. This means we have a very weak position. Maybe all criticisms brought lately were worth at least in terms of the possibility to discuss how we choose to treat this topic and the Romanian State's interest of all natures – there are financial interests, environmental interests, interests related to the protection of the cultural heritage, sustainable development interests, in the most strict meaning of the notion in the EU legislation. This is the situation without this law. I want to tell you, dear colleagues, that I was very hurt when I heard the idea that somebody could support the interests of a private investor against the interests of the Romanian State. The way it has been drafted, this law would not only turn the Roşia Montană mine into the most modern exploitation in Europe, and toughest in terms of the conditions imposed on the license titleholder. But the negotiation drew blood, I don't know how else to describe it, for the interest of the Romanian State, as we tried to cover everything possible, to look into the future from all points of view – environment, culture, sustainable development, protection of the benefits, increase of royalties, absolutely everything. Of course, and I tell you, I am convinced that the people who will be appearing in front of you – and I am counting very much on those who oppose this project, because they will obviously come here with ideas in support of further improving the position of the Romanian State. However, we wanted by this law to have the Romanian State's interests represented at the highest level and I think that what the Government could have done at its level with the experts has been achieved. Now, naturally, the task is yours. Now coming back to the main idea, the idea was falsely created that a rejection of this law puts an end to the exploitation at Roşia Montană. There is nothing more wrong, I repeat: there is a license valid until 2019 which, according to its own provisions, and I can tell you this despite its confidential character, will be extended by 5 years at a simple request formulated by Gabriel Resources 60 days before the expiry of the license. This is the provision and you should be aware of it, in the sense that if Gabriel Resources wants to remain in Roşia Montană for gold exploitation based on this license, we have no legal possibility to chase them out. The rejection of this law would bring us back in a situation to renegotiate with Roşia Montană and implicitly Gabriel Resources, from the very weak position that we have had so far and from the very good position they have had and still have until this law. Moreover, the hypothesis has been put forward, and I want to strengthen this, what would happen if the Romanian State decides, for any reason, that this project is no longer done. I was often asked: what is all this talk about damages based on? Things are very simple: if we decide tomorrow, as a state, with no reason – for if we decide with a reason that is another discussion, for example, if the Technical*

*Assessment Committee of the Ministry of Environment finally decides tomorrow that Roșia Montană Gold Corporation does not meet the environmental conditions, the case is closed. We don't do the exploitation, But if we are not in such a hypothesis and we still decide, for whatever reason, objective, subjective, related to political decisions, not to do this project, I am telling you that we will be in breach of several agreement on the promotion and mutual protection of foreign investments.* *Under Art. 11 of the Constitution, these agreements are treated as international treaties, incorporated into domestic law, meaning they give rise to direct obligations for the Romanian State.* […] *But let's take the agreement on the promotion and mutual protection of investments with Canada. All these agreements, including the one with Canada, use two terms that maybe we, as laymen but also as lawyers, might have thought long gone: "expropriation and nationalization". So, the agreements use the term "expropriation of a foreign investment" and "nationalization of a foreign investment" and they say that if the State decides to expropriate or nationalize a foreign investment, it must pay damages, besides providing that the compensation for expropriation is paid in advance. I will not insist on this.* […] *What can happen – and I say this form my point of view as a lawyer, so I am not saying this as a politician, but as a lawyer: It may happen that the investor who is denied the issuance of the environmental permit or other approvals will go before an arbitral tribunal,* […] *and ask them to oblige the Romania State to issue the approval which is missing to start the exploitation. And it is not excluded that they win this case. If, God forbid, something like this happens – and I feel obliged to draw this alarm signal – we would be in a situation where Roșia Montană could start the exploitation in Roșia Montană in the present conditions, which are very favourable to them and very unfavourable to us. Please understand me very clearly: this is not a pleading I make – and I emphasize this - to convince you that this law must be voted, far from me, this though. We did our job, at the Government to propose a law that improves the situation of the Romanian State, if the Parliament decides to do this project. If the Parliament decides not to do this project, of course, we will all show solidarity with this decision and, like men and like responsible persons, we will fight, if the investor chooses to go to court against us, we will fight in such a way as to win. This means we will fight them to the end; we will not give up and we do give this waning because we are afraid, or because they will certainly win. No. It is very possible for the investor to lose; but if it comes to fighting, we will fight them, just that I am pointing out here, how to put it, the vulnerabilities and dangers. Because they exist. It is not that they will necessarily come to pass.* **As such, what I am trying today and I think also my colleagues have tried, each on their area of competence like I did on mine, you saw I did not go into environmental issues, or into issues for the Ministry of Agriculture, or**

> *the Ministry of Culture, we have tried to create the most favourable*
> *situation for the Romanian State.*[798] (emphasis added)

1128.  Romania's President Băsescu was asked about the protests in a nationally televised interview <u>on 29 September 2013</u>. In that interview, President Băsescu criticized the Government for its attempt to transfer responsibility for deciding whether to approve the Project from the Government to Parliament.

1129.  <u>On 5 October 2013</u>, Prime Minister Ponta made the following statements concerning the Project:

> *Certainly, there has been, and it is **normal to have a division in the*** ***society**, between those who say that jobs and investments are more* ***important and those who say that environmental protection is more*** ***important**. […] **Meanwhile, people understand the contract better. The*** ***political class was not divided, the political class, Mr. Traian Băsescu,*** ***and Mr. Crin Antonescu, and I and others have studied and have*** ***various positions, generally in favor of jobs and investments. When the*** ***public protests appeared, there were people who changed their… the*** ***strangest case, for example is that of PDL, which has always supported*** ***the Roșia Montană Project and now they say they will vote against, just*** ***because there are people protesting on the street. This is a gesture of*** ***political hypocrisy which produces no effects**. I mean, the people in the* *street know that PDL is for the project and ... don't you worry.* […] *No, I don't think my mandate is at stake. I think something more important is at stake. **We are not only talking about Roșia Montană, but about a*** ***certain thinking in Romania in the future. We are either exploiting our*** ***natural resources, whether it's gold, silver, copper, uranium, gases, or*** ***we say we are no longer exploiting anything, and then we will all be*** ***working as much as we can in front of our computers, which is not*** ***feasible, not serious, and we will keep importing natural resources.*** ***What do I mean and what's my position? There are people who are*** ***saying it clearly, don't do anything, we must preserve the environment*** ***no matter what and turn Romania into a botanical garden – this is an*** ***extreme point of view and I don't share it, it's not convincing. I can't*** ***convince those people we have to do mining, we have to do gas*** ***exploitations. In exchange, there are many Romanians, a great part of*** ***them, who are in the middle, so to speak, who say they want jobs and*** ***investments but they need assurances that this doesn't mean destroying*** ***the environment. This is why I believe that the main concern about all*** ***these projects, Roșia Montană, Cuprimin or others is to explain that*** ***these are the European standards observed today in Finland, Sweden,*** ***Poland. We observe them all, we make a system, and this was correct,*** ***we make a monitoring system, so that we don't only observe them on***

---

[798] Exh. C-507 (Transcript of Parliamentary Special Commission hearing, dated 30 September 2013) 1-10.

*paper, and we observe the standards applied today in Europe, let alone the USA and other countries, then lets create jobs and make investments.*

[…] *The special commission will only draft a report. Maybe the Senate plenum… **If the vote is purely political, no, it will not pass. Because PNL announced they would vote against – they never said why but they said they would be against. PDL announced they would vote against without explaining why they were in favor until now and now they've changed their mind. I think UDMR were the only ones which were consistent, in the sense they have always said they are against. Again, I don't know their arguments. So, if it's a purely political vote, it's clear that the Senate will reject the project. If this Commission manages to explain and give all guarantees, possibly by amending the draft law, that they agree with the amendment of the draft law, since jobs are created, investment's, benefits for the Romania State but it also complies with all environmental standards in Europe, then the project will probably move forward. But I do not know and cannot anticipate this.***

[…] *The Green MEP from Finland is against the Finnish Government which is exploiting. **After all, there are** genuine **ecologists whom I believe, who say that cyanide should no longer be used anywhere**. Sweden is exploiting today and the ecologists in Sweden are against, Finland is exploiting and the ecologists in Finland are against – as the MEP said. **There are exploitations in Romania today as well. But there have been no protests against other exploitations, only against Roșia Montană. So in the end, I repeat, there are genuine ecologists, correct people who say no, no to any such … Let me tell you one thing. After all, the traditional coal mining in Oltenia, nobody can say it does not affect the environment. Surface exploitations destroy the environment, but there is a certain process, reforestation takes place afterward. In the end, any natural exploitation… the oil we are extracting today in Prahova – you can't say it does not affect the environment. The problem is to comply with the European standards and not to deny the right to development, as a country. Otherwise, you know how we will be, we will remain the poorest country in Europe, with the largest unexploited resources. It's a bit illogical, this thing***.

[…] ***The project is not the same as the initial one. A lot was changed first of all for this purpose, which I support, to ensure that all European environmental standards are observed. The initial license of 1999-2000 did not comply with all the European standards, So, we first renegotiated the environmental terms, then the royalties. And there is also something else after the environmental part. According to the current business plan, the Romania State collects 3.7 billion dollars from taxes and royalties, which we would use only for regional***

*projects, which is clearly stated in the law … I did not understand the opposition of Mr. Emil Boc. With this money, we can build Transylvania highway, which Boc Government did not build, nor did Calin Popescu Tariceanu Government for that matter, in all these years. So, it would be for regional projects. And the company would cash 2 point something billion.*

*[…] My plan B, and there is such a plan, is to explain to all national and foreign investors, to all those which are involved in large projects, gas, offshore, submarine cable, uranium mines, to tell them that this, only this project was rejected on a political criterion, but that Romania remains a country open to investments, to major projects. There has been a lot of speculation and the manipulation is huge...*

*[…] It's clear that if the Parliament rejects the law, nothing will be done in Roșia Montană. Do you know why I have no backup? I don't have the money and I don't know where we could take the money from. for the current environmental rehabilitation of Rosia. Everybody is talking about the future. Those who are against don't talk about what is there today. I was there, there are ponds I wouldn't wish on the protesters in Bucharest to actually see.*[799] (emphasis added)

1130.  <u>On 18 October 2013</u>, Minister Plumb submitted a written statement to the Senate setting forth the opinion of the Ministry of Environment for the Roșia Montană Project at the request of the former, as follows:

> *The mining project in Roșia Montană is a project of major interest for the Romanian society and a controversial topic which has been under debate for 15 years, without any government taking the responsibility of making a decision on this matter.*
>
> *The government I am a member of has rejected the previous project and drafted a new project which includes environmental requirements to the highest European standards and improved benefits for Romania. As Minister of Environment, I was particularly tasked with inserting the strictest standards demanded by the European legislation in this project.*
>
> *This draft law was proposed before the Parliament – the representative forum – in the hope that this will enable a wider, more transparent and detailed debate to clarify all aspects related to this topic.*
>
> *It was not the wish of the Government to make a decision – whether in favor or against – concerning such a topic, as it wouldn't had been proper for a topic of this importance and controversy to be closed with a decision made only by the members of the executive. We wanted to*

---

[799] Exh. C-1504 (Interview with Prime Minister Victor Ponta, Antena3 TV, dated 5 October 2013).

> *allow the entire society to participate in the debate and decision-making process.*
>
> *The environmental agreement will only be issued provided the Parliament's approval of this draft law. This agreement will account for an endeavor of a committee which will include almost all Ministries, including the Academy of Romania.*
>
> *The decision thus rests with the Parliament of Romania. Please accept my invitation to become involved in this debate!*[800] (emphasis added)

1131.   Before the vote, Prime Minister Ponta and Senate President Antonescu held a joint press conference and called for the rejection of the Draft Law. On the evening of this joint press conference, the Special Commission voted 17-0, with two abstentions, to reject the Draft Law. The Senate voted 119-3 with six abstentions to reject the Draft Law <u>on 19 November 2013</u>.[801] The House of Representatives also voted 302 to 1 against it <u>in June 2014</u>. Meanwhile, the Special Commission also issued a report including recommendations that various technical issues related to the Project be analyzed further, including the suitability of the Corna Valley for the Project's TMF, in light of the Geological Institute of Romania's comments in the prior TAC meetings.[802]

1132.   <u>A day after</u> the Special Commission's vote to reject the Draft Law, Minister Plumb confirmed that the Environmental Permit would not be issued:

> *Parliament's decision means the last word for us, and we will observe it. The **Ministry of Environment['s] role in this draft bill was to have set the highest environmental standards to protect people, to mitigate the risks for such an investment, fully observing all the European and international criteria and standards for this type of investment that involves exploiting an ore deposit of our country*. (emphasis added)

When asked if she was for or against the Roşia Montană mining exploitation, Minister Plumb stated:

> *I support a country that can develop, paying attention to the environment because all standards must be observed, I am for Romania's development, because in terms of economy we need this development, we need investments, we need jobs. But all this should be combined with everything that environmental protection represents.*[803] (emphasis added)

---

[800] Exh. C-1529 (Letter from Minister Rovana Plumb to Senator Dan Mihai Marion, dated 18 October 2013), p. 2.

[801] Exh. C-878 (Voting Roll of Senate on Draft Law, dated 19 November 2013); Memorial, para. 42.

[802] Exh. C-557 (Parliamentary Special Commission Report, dated November 2013).

[803] Exh. C-828 (Minister Plumb's public statements on Antena 3, Sinteza Zilei, dated 12 November 2013).

1133.    Almost a year later, in an interview <u>in October 2014</u>, Prime Minister Ponta stated the following concerning the Project:

> *After I became the Prime Minister, negotiations were carried out with the said company for one year and a half, and the environmental requirements were, first of all, changed. Secondly, the interest of the Romanian State was changed and, thirdly the royalties we are about to obtain.* ***Meanwhile, however, the Parliament rejected the law, so the exploitation will not be made.*** (emphasis added)

In response to a question on whether this was because of protests, Prime Minister Ponta replied as follows:

> *But you see... You know what happens, you see ... exploitations are made everywhere in Romania. Except for Rosia.* […] *Do you want me to tell you the truth?* […] *You, who live in Italy, will not suffer. Those in Romania...* […] *If you come home, then prepare your wallet, because the people who no longer work there will be unemployed, of course and, if God forbidden, the Romanian State loses the lawsuit, we will all pay.*[804]

c)    The analysis

1134.    In light of the above, the Tribunal considers the following.

1135.    *First*, when Victor Ponta took office (May 2012), he decided to submit the "decision" on whether the Project should move forward to Parliament. The reasons for this decision were made public several times, both by Prime Minister Ponta and by other politicians who supported the move. Since the Project was of great national interest and a sensitive matter, no one wanted to take the responsibility for saying yes or no. Instead, it was felt that the process through Parliament would be open and transparent and interested parties/public/voters could participate in a debate and a democratic decision could be made. Indeed, in his interview of 11 September 2013, Prime Minister Ponta appears to rather defend than oppose the Project and sets out a balanced opinion and reasoning to support also the involvement of Parliament.[805]

1136.    [806] it publicly supported the law; it told the Government in

---

[804] Exh. C-416 (Informal interview of Prime Minister Ponta, Realitatea TV, dated 19 October 2014), p. 6.
[805] Exh. C-437 (Interview with Prime Minister Victor Ponta, Antena 3, dated 11 September 2013).
[806] Exh. C-2433 ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮; Exh. C-826.02 ▮▮▮▮▮▮▮▮

███████████████████████████████████[807] For example, Gabriel's President and CEO stated the following in August 2013:

> *We are encouraged by the recent momentum within the Technical Analysis Committee review process and look forward to the positive completion of the parliamentary debate on the Project in the near future, together with finalisation of the environmental permitting process.*[808]

1137.   And the following in September 2013:

> *We look forward to the Romanian Parliament's review of the Rosia Montana Project. The Parliamentary approval and enactment of the Draft Law will enable Gabriel to partner the Romanian State in building Romania's first modern mine which will match or exceed EU and Romanian environmental laws, create substantial direct and indirect employment opportunities, and provide significant cultural, environmental and economic benefits. We send an open invitation to all stakeholders to visit Rosia Montana and see for themselves why the development of the Project is needed and how Romania can benefit should it take the opportunity to become Europe's largest gold produce.*[809]

1138.   Gabriel did advocate in favor of a general law, but since the renegotiated economic conditions would be part of the Draft Law, this was obviously not possible. Against this background, it cannot be said that Claimants did not support the Draft Law; they were actively involved in drafting proposals to be included in the Draft Law, and the Draft Law itself reflects Claimants' proposals on a number of issues.

---

[807] Exh. C-1536 ████████████████████████████████████

[808] Exh. R-520 (Gabriel Canada press release, dated 2 August 2013), p. 2.

[809] Exh. R-256 (Gabriel Canada press release, dated 5 September 2013). See also Exh. C-1436 (Gabriel Press Release, dated 28 August 2013) ("*Gabriel Resources Ltd. ('Gabriel' or the 'Company') is pleased to announce that the Romanian Government ('Government') has approved draft legislation relating to the Rosia Montana Project ('Project'). If adopted by the Romanian Parliament ('Parliament') in its next session, commencing September 2, 2013, this legislation will set the framework to significantly accelerate the development of Europe's largest gold mine at Rosia Montana and other mining projects in Romania. [...] Jonathan Henry, Gabriel's President and Chief Executive Officer, stated: 'The Romanian Government's decision to approve a law specific to the Rosia Montana Project represents a significant milestone for all stakeholders. We are extremely encouraged by this major step towards progression of the permitting process and consider it to be a clear sign of endorsement by the Government for investment into Romania. A Parliamentary adoption of the proposed law will enable Gabriel to build Romania's first modern mine, creating direct and indirect employment, and providing significant cultural, environmental and economic benefits. We remain fully committed to constructing what will be Europe's largest gold mine.*'").

1139.    *Third*, while it is true that the Draft Law was beneficial to the State, it also helped to advance the Project and ostensibly protect it from legal attack.[810] Indeed, Claimants place much emphasis on the statements and the fact that such a law would be beneficial to the State, but they omit the statements that undeniably confirm that it would assist the Project to move forward and to be implemented. As for the benefit to the State, the Draft Law would reflect the Parties' agreement reached during renegotiation which the Tribunal has already found not to have been inappropriately conducted.

1140.    *Fourth*, it appears that other projects have gone the same route of being authorised by a law passed by Parliament[811] and that this was the only way to overcome obstacles related to outstanding issues, such as cultural issues, water management permit, surface rights and the ability to secure necessary land for project implementation by automatically declaring the project as one of "public utility". The Draft Law itself would eventually authorize environmental permitting.

1141.    *Fifth*, the process itself from the inception of the idea of the Law up to the vote was public and transparent at all times, allowing all stakeholders (beyond politicians) to participate and voice their opinions. It was a lengthy, extensively negotiated, and professional process with no evidence that is was tainted by bad faith.

1142.    *Sixth*, the Special Commission ultimately recommended the rejection of the Draft Law. However, it did not reject the Project. It made a number of recommendations assuming that the Project would go ahead, i.e., a number of recommendations that were specific to the Project and not just to the mining sector in general.[812] In fact, as will be seen below, discussions on the Project's implementation continued (see paras 1228 *et seq.*).

1143.    As to the Special Commission's consideration of the need for a broader legal framework, the Tribunal does not consider that conclusions as to the deficiencies of the Draft Law or the existing legal framework in relation to investments of this nature[813] are sufficient in themselves, or in the light of the circumstances of the case, to establish misconduct on the part of Respondent. In any event, and as noted above, the Draft Law, whether successful or not, was intended to advance the Project (see para. 1139); and the legal system, such as it was, was known to Claimants when they decided to invest in Romania.

---

[810] Exh. C-507 (Transcript of Parliamentary Special Commission hearing, dated 30 September 2013), p. 9.

[811] Exh. C-772.01 (Realitatea TV, dated 13 May 2013).

[812] Exh. C-557 (Parliamentary Special Commission Report, dated November 2013).

[813] Exh. C-557 (Parliamentary Special Commission Report, dated November 2013), p. 44 ("*The The Commission considers that a broader legal framework is required to be subject to a parliamentary debate, concerning gold and silver mining projects, which would enable the development of the mining industry in Romania and attracting investors.*")

1144.  *Seventh*, the final vote in Parliament to reject the Draft Law was undoubtedly a political decision. All votes in a parliament are political decisions. There is nothing reprehensible about that – that is just how democracy works, for better or worse. The relevant question was whether this final vote was the result of illegitimate government influence. There is no evidence on the record that leads to this conclusion. It is important to recall that both the Special Commission completed its work and all the votes occurred well after Claimants' date of the alleged breach of 9 September 2013. By Claimants' own admission, therefore, the decision to reject the Draft Law cannot be the basis for an alleged breach of the two BITs at issue.

1145.  *Eighth*, it is also clear from the record that the discussions that led to the Special Commission's report concluding that the Draft Law should be rejected were based on concerns that existed during the EIA Process after thorough review and discussion.[814]

1146.  *Finally*, as to Prime Minister Ponta's conflicting statements on the Project, it is recalled that Prime Minister Ponta made various statements on the vote against the Draft Law and on the implications of a negative vote. The question is whether Prime Minister Ponta wrongfully tainted the parliamentary process or the permitting procedure more generally. Based on the above, as well as the fact that the process resumed following the rejection of the Draft Law, there is no evidence of such tainting. In fact, while there were many comments to the effect that the rejection of the Draft Law would mean the rejection of the Project, there were many other statements to the contrary as well.

1147.  In any case, the Tribunal cannot infer too much from these statements. There are two reasons for this: <u>First</u>, although Victor Ponta as Prime Minister had submitted the approval of the Project to the Parliament, he was also a Member of Parliament and a political party and was entitled to express his opinion in that capacity when voting in Parliament. <u>Second</u>, the rejection of the Draft Law meant that the Project would not reflect the renegotiated environmental, economic, cultural and other conditions; instead, the Project and the permitting process would continue on the basis of the original conditions reflected in the Roşia Montană License, which were obviously less favourable to the Government.

### d) The conclusion on the Draft Law

1148.  In light of the foregoing, the Tribunal finds no evidence of an abuse of power in the manner in which Respondent handled the conduct of the permitting process and the Project in particular when the Government submitted the Draft Law to Parliament and when Parliament rejected that Draft Law.

---

[814] Exh. C-557 (Parliamentary Special Commission Report, dated November 2013).

4. The Bucium Exploration License and applications

a) The issue

1149. The Parties disagree on whether Respondent beached its obligations under the two BITs by allegedly blocking RMGC's Bucium applications for political reasons and in violation of Romanian law, and by failing to respect RMGC's rights under the Bucium Exploration License and its alleged rights in relation to the Rodu Frasin and Tarniţa deposits.

b) The facts

1150. A brief summary of the facts has already been set out above (see paras 17, 195-198). The Tribunal will nonetheless repeat and supplement these facts before proceeding with its analysis.

1151. The activity of RMGC within the Bucium complex perimeter was conducted on the basis of the exploration license no. 218/1999 (i.e., the Bucium Exploration License) concluded on 6 April 1998 within an initial license validity of five contractual years, further extended by addendum no. 4 of 18 May 2004 by another three contractual years. By Addendum no. 5, the surface area of the Bucium complex exploration perimeter was reduced. The Bucium Exploration License expired on 19 May 2007.[815]

1152. On 15 May 2007, RMGC requested by letter the registration with NAMR of two exploitation licenses within the Rodu-Frasin and Tarniţa perimeters, which are included in the former Bucium complex exploration perimeter. A work schedule for the period from the exploration license expiry to the issue of exploitation licenses was also prepared, which was submitted to NAMR for an opinion.

1153. On 16 July 2007, RMGC filed to NAMR its Final Report for Bucium for the period between 1999 and 2007, comprising 12 volumes.[816]

1154. On 7 October 2007, NAMR suggested that the following step was the registration/homologation of the mineral reserves identified in Rodu-Frasin and Tarniţa perimeters and the issuance of exploitation licenses for the two periods.[817]

1155. On 11 October 2007, RMGC submitted to NAMR the documentation necessary to obtain 2 exploitation licenses for the mineral resources evidenced within the Bucium perimeter (i.e., the Bucium Applications).[818] Certain documents were returned by NAMR on 23

---

[815] Exh. C-1056-C (NAMR Findings Note, dated 7 October 2008).
[816] Exh. C-1126 (Letter No. 1590 from RMGC to NAMR, dated 16 July 2007); Memorial, para. 290.
[817] Exh. C-1056-C (NAMR Findings Note, dated 7 October 2008).
[818] Exh. C-2180 (Letter from RMGC to NAMR, dated 11 October 2007).

<u>February 2009</u>, requesting their resubmission without classified information.[819] RMGC resubmitted the documents <u>on 6 March 2009</u>. NAMR confirmed receipt <u>on 3 April 2009</u>.[820]

1156.    <u>In March 2011</u>, the issue was still pending as confirmed in one of the TAC meetings.[821]

1157.    <u>On 23 July 2014</u>, Cecilia Szentezy of RMGC followed up on the Bucium Applications.[822]

1158.    <u>On 6 February 2015</u>, NAMR requested RMGC to update its environmental impact studies and other documents for the Rodu-Frasin and Tarnița perimeters in accordance with an intervening legislative modification.[823] RMGC submitted the revised documentation on 2 March 2015.[824]

1159.    <u>On 9 April 2015</u>, ██████████████████████████████████████████[825]

1160.    
[826]

c)    The analysis

1161.    In light of the above, the Tribunal considers the following in relation to the Bucium Exploration License and Applications.

1162.    *First*, the Tribunal cannot find that the Bucium Applications were mishandled by Respondent as a result of the alleged political blocking of the Rosia Montana Project. In fact, in its analysis of the evidence that is part of Claimants' principal claim (that is, the renegotiation of the economic terms of the Project, the EIA Process, and the Draft Law) the Tribunal has found that there is no evidence of an abuse of power in the way Respondent handled the permitting process and the Project.

---

[819] Exh. C-1082 (Letter from NAMR to RMGC, dated 23 February 2009).
[820] Exh. C-1146 (Letter from RMGC to NAMR, dated 3 April 2009).
[821] Exh. C-483 (TAC meeting transcript, dated 9 March 2011).
[822] Exh. C-1138 (Letter No. 49060 from RMGC to NAMR, dated 23 July 2014).
[823] Exh. C-1077 (Letter No. 1448 from NAMR to RMGC, dated 6 February 2015).
[824] Exh. C-1141 (Letter No. 51855 from RMGC to NAMR, dated 2 March 2015).
[825] Exh. C-1142 ██████████████████████████████████████
[826] ████████ WS I, para. 131.

1163.     *Second* and in any event, the Tribunal will examine whether Romania has in any way mishandled the Bucium Applications. In this regard, the Tribunal considers the following:

-     It is undisputed that, as of 2011, the Bucium Applications, including the process of the homologation of the relevant areas, were pending. Specifically, at the 9 March 2011 TAC meeting, Dragoş Tănase stated that there was still work to be done:

> *RMGC does indeed hold two exploration licenses in Bucium area. We have an exploration program there and, at the end of the exploration program we will determine whether those perimeters are commercially exploitable and decide whether to propose mining projects to be authorized, but we haven't made this decision yet.*

> *We are talking only about the Roşia Montană project today. This is the project under discussion, it does not have anything to do with the licenses for Bucium, those licenses will be discussed separately and we do not even know whether the deposits there are exploitable or not from a commercial point of view. For this, we still need to carry out a series of works. If we are ever to reach this conclusion, they will follow the legal authorization way, just like Roşia Montană did.*[827]

Further, at other TAC meetings where both RMGC and NAMR representatives were present, there was no evidence of any delay or misconduct on the part of NAMR in relation to the Bucium Applications.[828] The first time RMGC pursued the topic was in 2014.

In its disclosures from 2012, Gabriel Canada also noted that "*RMGC has applied to the NAMR to upgrade the exploration concession license relating to the Bucium Project into two exploitation concession licenses, however no formal decision is expected until further progress has been made on permitting the Project at Roşia Montană.*"[829]

---

[827] Exh. C-483 (TAC meeting transcript, dated 9 March 2011), p. 66.
[828] Exh. C-565 (Minutes of TAC meeting, dated 23 June 2010); Exh. C-487 (TAC meeting transcript, dated 22 September 2010); Exh. C-476 (TAC meeting transcript, dated 22 December 2010); Exh. C-483 (TAC meeting transcript, dated 9 March 2011); Exh. C-486 (TAC meeting transcript, dated 29 November 2011); Exh. C-484 (TAC meeting transcript dated 10 May 2013); Exh. C-485 (TAC meeting transcript, dated 31 May 2013); Exh. C-481 (TAC meeting transcript, dated 14 June 2013); Exh. C-473 (TAC meeting transcript, dated 2 April 2014); Exh. C-480 (TAC meeting transcript, dated 26 July 2013).
[829] Exh. C-1810 (Gabriel Canada 2012 Annual Information Form), p. 15; Exh. C-1811 (Gabriel Canada 2013 Annual Information Form), p. 20; Exh. C-1812 (Gabriel Canada 2014 Annual Information Form), p. 24.

-   There is no evidence of any wrongdoing by NAMR. Indeed, NAMR has repeatedly expressed its support for the Roşia Montană Project and RMGC.[830]

### d) The conclusion

1164.   In light of the foregoing, the Tribunal does not find that Romania mishandled the Bucium Applications in breach of international standards.

### *v.    The conclusion*

1165.   The Tribunal refers to its findings with respect to the three main factual themes supporting Claimants' principal claim.

-   ***First*, there was no improper linking of the permitting process with the renegotiation of the economics of the Project.**

-   ***Second*, Romania's treatment of the technical or other elements as part of the environmental permitting process was not wrongful.**

-   ***Third,* there is no evidence of any abuse of power in the manner in which Respondent handled the conduct of the permitting process and the Project, and in particular, when it proposed and rejected the Draft Law.**

-   ***Fourth,* Romania did not mishandle the Bucium Applications.**

1166.   In light of these findings, the Tribunal cannot discern a clearly cohesive pattern or purpose on the part of Respondent to politicise the permitting process and/or to terminate the Project and drive away Claimants' investment. As such, it cannot conclude that there was a series of wrongful acts or omissions that might constitute a composite act. The Tribunal also does not find that Respondent: acted arbitrarily, or discriminatorily; denied Claimants due process; contradicted specific representations made to Claimants or Claimants' legitimate expectations; abused its powers; failed to provide physical protection and security to Claimants; treated Claimants and/or Claimants' investments differently than other investors in similar circumstances; failed to honour any of the promises it made with respect to Claimants' investments; or deprived Claimants of the reasonable use of Claimants' investments and the resulting benefits. Accordingly, with respect to the principal claim, the Tribunal cannot conclude that Respondent failed to

---

[830] Exh. C-486 (TAC meeting transcript, dated 29 November 2011), p. 25; Exh. C-2196 (Letter from NAMR to the Ministry of Public Finance, dated 15 March 2012), p. 1; Exh. C-1012 (NAMR decision, dated 14 March 2013); Exh. C-485 (TAC meeting transcript, dated 31 May 2013), p. 19; Exh. C-557 (Parliamentary Special Commission Report, dated Nov. 2013), p. 7.

provide Claimants with the required protection of the two BITs or that it breached the provisions of the two BITs.

1167. At this point, the Tribunal also notes the fact that Claimants did not object to the way things were going at the time, and that it was only "after the fact" or "in hindsight" that they understood that things were allegedly going in the wrong direction. While the legal argument of hindsight, if proven to be true, is plausible, and the failure to object is by no means a waiver of one's BIT claims, from a factual perspective, the Tribunal cannot ignore the reality that Claimants failed to object contemporaneously in respect of many, if not most, of the points they now rely on to support their theory of liability. In some instances, Claimants actually publicly supported the developments that they now complain about.

1168. Accordingly, the Tribunal decides to reject Claimants' principal claim.

### d. The conclusion on the principal claim

1169. The Tribunal decides that

**_Claimants' principal claim is rejected._**

### 4. The first alternative claim

### a. The issue

1170. The issue is whether Romania's treatment of Gabriel's investment otherwise breached the two BITs as of 9 September 2013 even if there were no composite act on the part of Romania.

1171. To decide, the Tribunal shall <u>first</u>, set out a summary of the Parties' respective positions (see section b below), <u>second</u>, assess the first alternative claim by applying the relevant law to the facts of the case (see section c below), and <u>third</u>, conclude (see section d below).

### b. The Parties' positions

### i. Claimants

1172. If the Tribunal were to conclude, contrary to the evidence, that Romania's treatment of Gabriel's investment in RMGC starting in August 2011 and culminating in the repudiation of the Project rights in September 2013 cannot be characterized as a

composite act, the conclusion remains that Romania's treatment of Gabriel's investment breached both BITs.[831]

1173.    In particular, even if not considered as a composite act, the conclusion remains that the Romanian Government repudiated the Project rights, in hindsight as of September 2013, without due process and without any compensation, in breach of both BITs. Moreover, the repudiation of the Project rights cannot be seen as justified by any valid public purpose as it was the Government's wrongful failure to make permitting decisions the law required coupled with numerous unwarranted and irresponsible accusations of corruption implicating Gabriel and RMGC that created the circumstances that led to the mass protests.[832] The conduct that followed the rejection of the Draft Law moreover demonstrated that the Project rights thereby had been effectively taken.[833]

1174.    The unlawful repudiation of the Project rights followed wrongful conduct that included coercive demands for renegotiations and an extended refusal to advance any permitting decision relating to the Roşia Montană Project in accordance with applicable legal standards and procedures, coupled with numerous public statements that put the Government's willingness to permit the Project, including to take decisions relating to historical monuments in the Project area, into question. That earlier conduct, if not considered as an aspect of a larger composite act, in the alternative, must be recognized as a failure to accord FET.[834]

*ii.    Respondent*

1175.    As with the principal claim, the Tribunal lacks jurisdiction over the first alternative claim insofar as it is based on claims and events that post-date the Notice of Dispute.[835] For the principal and first alternative claims, Claimants admit that "post-2013 events … were not the events that gave rise to the breach and were not the cause of Gabriel's losses." The principal and first alternative claims are not based on post-2013 events.[836]

1176.    In any event, Claimants do not point to any post-2013 acts or omissions by Romania that would support the principal or first alternative claims, i.e., that would support the argument that a breach occurred in September 2013.[837]

[831] C-PO 27, Question (e); C-PHB, para. 247.

[832] Reply, Sect. IV.C; C-PO 27, paras 144-150, 161-163, 204-207; C-PHB, para. 248.

[833] C-PO 27, paras 204-207; C-PHB, fn. 513.

[834] C-PHB, para. 249; C-PO 27, paras 50-53 and questions (a) and (e); Memorial, Sect. X; Reply, Sect. VIII.

[835] Counter-Memorial, Sects 8.1.3 and 8.2.; Rejoinder, Sects 2.1.2 and 2.2.2; R- PHB, para. 6; Respondent's Reply to Claimants' Response to Tribunal's Questions Regarding Post-2013 Events, dated 19 September 2022 ("R-Post-2013"), para. 5.

[836] R-Post-2013, para. 6.

[837] R-Post-2013, para. 7.

1177.  The first alternative claim is also inadmissible on a separate and independent basis. Claimants only introduced their first alternative claim (which was based on an entirely new date of alleged breach of the BITs) in their responses to the Tribunal's questions following the December 2019 hearing. Respondent strongly objected, noting that it was "too late to introduce new claims" and further complained in correspondence and its post-hearing briefs, noting that the admission of the claim would constitute a serious departure form a fundamental rule of procedure under Article 52(1)(d) of the ICSID Convention. To this day, Claimants have failed to provide any justification for their belated submission.[838]

### c.  The Tribunal's analysis

1178.  The Tribunal finds that Claimants' first alternative claim is identical to their principal claim in that it is based on exactly the same facts and the same alleged breaches of the two BITs. However, this claim is not based on the composite act theory and assumes a date of breach beginning on 9 September 2013 ("as of 9 September 2013"), which implies that a later date of breach could also be chosen.

1179.  The Tribunal considers the following with respect to this first alternative claim.

*First, in general terms*:

1180.  The Tribunal cannot conceal the fact that the presentation of this first alternative claim (which was indeed presented only after the hearing on the merits and in response to the questions raised by the Tribunal in PO No. 27) was not clear. It is true that it is similar in many respects to the principal claim, but it remains somewhat vague, particularly with respect to how the evidence should be evaluated as well as the date of the violation, since this first alternative claim refers to "post-9 September 2013 events" (that form the basis of second alternative claim), but clarifies that these events only confirm the violation allegedly taking place "as of 9 September 2013"; the date on which the political repudiation is said to have taken place.

1181.  This is therefore a difficult undertaking, which the Tribunal sought to clarify from the Parties in *further* briefs during the course of the proceedings. The Tribunal therefore proceeds as follows with respect to the first alternative claim.

-  The facts: it relies on the same facts as the principal claim, beginning on 1 August 2011 and "ending" on 9 September 2013, as well as later facts, namely the post-2013 events, but only to confirm the alleged violations "as of 9 September 2013".

---

[838] R-Post-2013, para. 8.

- <u>The law</u>: the claim does not rely on the composite act theory; it merely references the same treaty provisions as in the principal claim.

- <u>The date of the breach</u>: it is alleged that the breach occurred "as of 9 September 2013," but Claimants do not point to a specific date after 9 September 2013, as they do with their second alternative claim. Moreover, as noted above, events after 2013 are not considered part of the alleged "breach" (see para. 940). Instead, Claimants specifically argue that subsequent conduct demonstrates that their rights under the Project were in fact taken.

1182. Accordingly, the Tribunal treats Claimants' first alternative claim as one for breach of the UK-Romania and/or Canada-Romania BITs either individually or collectively (but not under a composite act theory), based on Respondent's alleged acts or omissions between 1 August 2011 and 9 September 2013. Although Claimants point to a breach of several provisions of the two treaties, they in fact focus on FET and expropriation.

*Second, in relation to jurisdiction and admissibility*:

1183. It is true that Claimants did not file their first claim in the alternative until after the Tribunal's questions in PO No. 27. As argued by Respondent, this first alternative claim came late and after the Hearing of December 2019. It should therefore, in principle, be inadmissible. Since then, however, the Tribunal has given both Parties ample opportunity to develop their claims and defenses in light of the complexity of the case and the importance of the interests at stake. For this reason, and due to the fact that due process was not violated, the Tribunal decides to allow this claim to proceed.

1184. The main objection regarding jurisdiction concerns facts that occurred after the Notice of Dispute or before the entry into force of the Canada-Romania BIT. On this point, the Tribunal refers to its findings on jurisdiction set out above, namely that facts that occurred after the Notice of Dispute are within the Tribunal's jurisdiction and facts that predate the entry into force of the Canada-Romania BIT are not within the Tribunal's jurisdiction in terms of providing the constituent elements of any claim based on the BIT but may be used to establish context and evidence of intent (see paras 725 *et seq.*).

1185. It is clear that Claimants do not allege a breach prior to 9 September 2013, and based on Claimants' submissions on their first alternative claim, they rather allege a breach up to 9 September 2013 (as explained by the Tribunal above; see paras 1180 *et seq.*).

*Third, in relation to the law*:

1186. The basis for Claimants' first alternative claim is the provisions of UK-Romania BIT and Canada-Romania BIT, which Claimants rely on in their principal claim and which

the Tribunal has discussed in more detail above (see paras 806 *et seq.*). Accordingly, in assessing this claim, the Tribunal must determine whether:

- Respondent acted arbitrarily, discriminatorily, or inconsistently or denied Claimants due process; contradicted specific assurances made to Claimants or Claimants' legitimate expectations; abused its powers (FET, FPS, arbitrary and unreasonable measures, failure to observe obligations and expropriation standards);

- Respondent failed to provide physical protection and security to Claimants (FPS standard);

- Respondent treated Claimants and/or Claimants' investments differently than other investors in similar circumstances (arbitrary and unreasonable measures standard);

- Respondent failed to honour any of the commitments it made with respect to Claimants' investments (failure to observe obligations standard);

- Respondent deprived Claimants of the reasonable use of Claimants' investment and the benefits thereon (expropriation standard).

1187. The Tribunal reiterates that the first alternative claim is not based on the composite act theory, but is an independent claim, meaning that each act or omission of Respondent, whether individually or collectively, must be examined to determine whether there was a breach of an international treaty obligation on 9 September 2013. How the "collective" aspect is addressed here is whether there was a "creeping" violation, i.e., a violation that involves a series of acts or omissions over time that requires the Tribunal to also examine the last act to find a breach.

*Fourth, in relation to the facts:*

1188. As noted above, the same facts relied upon by Claimants in their principal claim are also relied upon in *their* first alternative claim (see para. 1181). These facts are essentially those relating to (i) the economic renegotiation of the Project, (ii) the environmental permitting process, and (iii) the Draft Law. The Tribunal has already assessed these facts and will not repeat them here.

1189. There are, however, some facts that Claimants rely on (mostly in their initial pleadings) when specifically addressing some of the alleged BIT violations. These relate to the following:

314

- The alleged failure to act on RMGC's exploitation licenses for the Bucium Projects;[839]

- The failure to cooperate to recapitalize RMGC and placing RMGC at risk of dissolution;[840]

- Maintaining abusive, harassing and unending investigations of RMGC that create legal uncertainty for RMGC and that are tied to and motivated by this arbitration;[841]

- Discriminating between the Roșia Montană and other projects as evidenced by Prime Minister Ponta's statements that the former is the only one decided on a political basis and as demonstrated by the fact that Romania approved other projects in 2014.[842]

1190. These allegations will be specifically addressed below.

*Fifth, the assessment:*

1191. The Tribunal reiterates its *findings* on the three main themes relied upon by Claimants in their principal claim, namely that:

- First, there was no improper linking of the permitting process with the renegotiation of the economics of the Project.

- Second, Romania's treatment of the technical or other elements as part of the environmental permitting process was not wrongful.

- Third, there is no evidence of any abuse of power in the way in which Respondent handled the conduct of the permitting process and the Project, in particular when it proposed and rejected the Draft Law.

1192. *With respect to the Bucium licenses*, the *Tribunal* refers to its finding above that there is no evidence that Romania mishandled the Bucium Applications (see para. 1163).

1193. *As for the recapitalization of RMGC*, these are allegations that post-date the rejection of the Draft Law and are therefore outside the scope of the first alternative claim.

---

[839] Reply, Sect. VI.
[840] Reply, Sect. V.C; see also Memorial, Sect. XII. B.
[841] Reply, Sect. V.D.
[842] Reply, paras 526-531.

1194.  *As to the actions taken against RMGC in tax and audit investigations*, again, these are allegations that post-date the rejection of the Draft Law and are therefore outside the scope of the first alternative claim.

1195.  *Concerning possible discrimination due to Prime Minister Ponta's statement* that "[i]*t's clear that if the Parliament rejects the law, nothing will be done in Rosia Montana*" and that he needs "*to explain to all national and foreign investors, to all those which are involved in large projects, gas, offshore, submarine cable, uranium mines, to tell them that this, only this project was rejected on a political criterion, but that Romania remains a country open to investments, to major projects*".[843]

1196.  The Tribunal reiterates its considerations above (see paras 1134 *et seq.*):

-   There is no dispute that this Project was influenced by "politics" or that a decision to accept or reject the Draft Law was guided by "political" considerations. However, this does not mean that the process was "politically" influenced in the manner alleged by Claimants, i.e., in violation of fundamental notions of justice and in violation of due process and Claimants' rights. Politics were at play here, as this was a complex project with national and transboundary implications, touching on environmental, social, legal, and economic issues, as discussed above.

-   Moreover, there is no evidence that the entire process leading to the rejection of the Draft Law was tainted by an abuse of power or conspiracy to undermine Claimants' investments. Politicians say what they want to say in interviews with the media; what is more important is how the State in its various manifestations actually treated the Project.

1197.  *With respect to possible discrimination based on the alleged disparate and favourable treatment of other projects*, the Tribunal again refers to its reasoning above that the State proceeded as it did with respect to certain elements of the environmental assessment process, such as ADCs, etc., due to specific considerations that applied to the Project itself. It has not been shown that any action was taken in respect of the Project without a legal or rational basis. There is simply no evidential foundation for concluding that this Project was treated less favourably than other projects, which in any event were not on like terms with the Roşia Montană Project. Specifically:

---

[843] Exh. C-1504 (Interview with Prime Minister Victor Ponta, Antena3 TV, dated 5 October 2013), pp 6-7.

- The Roșia Poieni copper mine is subject to regulations governing operational industrial sites; Roșia Montană, on the other hand, was subject to laws on permitting that were being applied for the first time.[844]

- The Certej project owned by the joint venture between Canadian company Eldorado Gold and Minvest was smaller in size and subject to local permitting.[845]

- There is no evidence of similarities between the mining license granted to Romanian company SAMAX within three years, in 2015, and the situation concerning the Bucium License. The Tribunal has already found that there is no evidence that Romania mishandled the Bucium Applications.

1198.    In any event, even if the Tribunal were to conclude otherwise, one important consideration would remain, namely, that there is no evidence of a connection between what is alleged to have occurred with the Bucium Licence, the recapitalization of RMGC, the actions taken against RMGC, possible discrimination and the decision of the Parliament to reject the Draft Law, as well the "statements" made by politicians about the fate of Draft Law or the Project on 9 September 2013. It is also the case that the culminative effect of these disparate acts does not rise to the level of a breach of the FET standard or other obligation under the Canada-Romania or UK-Romania BITs.

*Sixth, the conclusion:*

1199.    In light of the foregoing, the Tribunal does not find that Respondent: acted arbitrarily, or discriminatorily; denied Claimants due process; contradicted specific representations made to Claimants or Claimants' legitimate expectations; abused its powers; failed to provide physical protection and security to Claimants; treated Claimants and/or Claimants' investments differently than other investors in similar circumstances; failed to honour any of the promises it made with respect to Claimants' investments; or deprived Claimants of the reasonable use of Claimants' investments and the resulting benefits.

1200.    The Tribunal cannot conclude that there has been a breach of any of the provisions of the UK-Romania and/or Canada-Romania BITs. The Tribunal therefore rejects Claimants' first alternative claim.

---

[844] Second Expert Report of Larraine Wilde of CMA, paras 265-286.

[845] Exh. C-2256 (Deva Gold environmental permit, dated 28 November 2013); Second Statement of Dorina Simona Mocanu, dated 23 May 2019, para. 21.

#### d.  The conclusion on the first alternative claim

1201.    Therefore, the Tribunal decides that

**Claimants' first alternative claim is rejected.**

### 5.  The second alternative claim

#### a.  The issue

1202.    The issue is whether the conduct that followed the rejection of the Draft Law in September 2013 demonstrates a repudiation of the Project in breach of the two BITs.

1203.    To decide, the Tribunal will <u>first</u>, set out a summary of the Parties' respective positions (see section b below), <u>second</u>, assess the claim by applying the relevant law to the facts of the case (see section c below), and <u>third</u>, conclude (see section d below).

#### b.  The Parties' positions

##### i.  Claimants

1204.    If the Tribunal were to conclude that the evidence does not establish, in hindsight, a complete and permanent frustration of Claimants' investment in RMGC as of the date of the political rejection (9 September 2013), or as of the formal rejection of the Draft Law in Parliament that followed, subsequent events demonstrate that, contrary to the law, RMGC's Project rights have not been and will not be honored, and that Gabriel's investment thus effectively has been taken and otherwise subjected to treatment in breach of both BITs.[846]

1205.    If the Tribunal were to conclude that Gabriel's investment was not entirely frustrated as of 9 September 2013 or on another date associated with the rejection of the Draft Law, the subsequent dates on which events made clear that RMGC's Project rights have been frustrated include the following:

-    The Ministry of Culture's issuance on 24 December 2015 of the 2015 LHM, declaring, without regard to the ADCs that had been issued in the Project area, the entirety of Roşia Montană as a historical monument where no mining can be permitted;[847] and

-    Romania's submission on 18 February 2016 of its application to UNESCO to list the "Roşia Montană Cultural Landscape" as a UNESCO World Heritage site,

---

[846] C-PO 27 question (f), paras 50, 58-70; C-PHB, para. 250.

[847] Memorial, Sect. IX.D.1; Reply, Sect. V.B.5; C-PO 27, paras 213, 216-217, 221, 223; C-PHB, para. 251.a.

without any regard to RMGC's Roşia Montană License or to Gabriel's massive investments to develop the Project through RMGC.[848]

1206.  In their submission on the post-2013 events, Claimants submitted that, after 9 September 2013, the date when there was an effective taking by Respondent of the Project rights in breach of the BITs was 27 July 2021 when, following Romania's application, the Roşia Montană Mining Landscape was inscribed on the UNESCO World Heritage List.[849] For the purposes of this second alternative claim, Claimants maintain that Romania's treatment of Gabriel's investment in RMGC and of the Project, beginning in August 2011 (and on 23 November 2011 for Gabriel Canada), breached Romania's obligation to accord FET and clearly included the threat of a taking that negatively impacted the value of the Project rights. This impact was most evident after 31 January 2012, when a decision on the Environmental Permit should have been, but was not, made.[850]

1207.  The failure since March 2015 to take any action on RMGC's Bucium Exploitation License applications and the failure by the Government to complete the environmental permitting process for Roşia Montană notwithstanding the patently pretextual TAC meetings held in 2014-2015 may be considered as well.[851]

### *ii.    Respondent*

1208.  Respondent submits that post-2013 events do not support Claimants' second alternative claim. As with the principal and first alternative claims, the Tribunal lacks jurisdiction over the second alternative claim insofar as it rests on events that post-date the Notice of Dispute,[852] and more broadly, the second alternative claim is inadmissible. Its admission would amount to a breach of a fundamental rule of procedure under Article 52(1) of the ICSID Convention.[853]

1209.  Claimants do not plead their case with sufficient particularity, as it is not clear whether they are alleging that the acts cumulatively resulted in a breach of the BITs, or whether these acts individually breached them. In any event, whether considered individually or cumulatively, the evidence does not establish a breach of the BITs at any point before November 2013 or thereafter.[854]

---

[848] Memorial, Sect. IX.D.2; Reply, Sect. V.B.6; C-PO 27, paras 214-217, 222-223; C-PHB, para. 251.b.
[849] C-Post 2013, paras 47, 53, 74-76.
[850] C-Post 2013, para. 48.
[851] Memorial, Sects IX.B.3 and IX.D.2; Reply, Sects V.B.6 and VI, paras 303-309, 562; C-PO 27, paras 206(d), 214-217; C-PHB, para. 252.
[852] R-Post-2013, para. 54.
[853] R-Post-2013, paras 55-59.
[854] R-PO 27, question (f).

1210.    On the merits, there is not a single post-2013 event that could conceivably amount to a breach of the BITs. Specifically, Claimants are still unsure as to when the purported breach of the BITs occurred in respect of their second alternative claim.[855] In addition, there has never been a government policy to take or frustrate the Project rights.[856] In fact, none of the late/post-2013 events selected by Claimants (i.e., the "*voting down of the* [Draft] *Law*", alleged "*failures to take administrative actions that were due*", the issuance of the 2015 LHM, and the UNESCO inscription) are wrongful under Romanian or international law.[857]

1211.    In any event, as with the principal and first alternative claims, post-2013 events confirm that the Project was not viable and that there is no causal link between the alleged breach and the alleged losses.[858]

### c.   The Tribunal's analysis

#### i.   The approach

1212.    To decide Claimants' second alternative claim, the Tribunal will <u>first</u>, set out briefly the relevant facts (see section ii below), <u>second</u>, set out the relevant law to determine this claim in connection with the various treaty breaches (see section iii below), <u>third</u>, assess the second alternative claim by analyzing the relevant facts in view of the applicable law (see section iv below), and <u>finally</u>, conclude (see section v below).

#### ii.   The relevant facts

1213.    Claimants' second alternative claim is based on conduct that occurred after the rejection of the Draft Law by Parliament, which, according to Claimants, was motivated by an intention not to implement the Project. This conduct includes, first, the enactment of the 2015 LHM and, second, the application and registration of Roșia Montană at UNESCO. However, Claimants argue that the Tribunal may also consider conduct related to the Bucium license explorations and TAC meetings in 2014-2015.

1214.    In their original submissions and prior to the formulation of their second alternative claim, Claimants also referenced subsequent events after 2013 to support the argument that Respondent terminated the Project and thus Claimants' investment. These events were the recapitalization of RMGC, the investigations into RMGC, and the cyanide

---

[855] R-Post-2013, paras 60-64.
[856] R-Post-2013, paras 66-68.
[857] R-Post-2013, paras 64-85.
[858] R-Post-2013, paras 86-88.

moratorium proposal. Because these allegations are not part of Claimants' second alternative claim, the Tribunal will not address them.

1215.     As to the allegation regarding the Bucium Exploration License, the Tribunal refers to its findings above when it examined the issues as part of its analysis of Claimants' first alternative claim (see paras 1160 and 1161 *et seq.*). Accordingly, the Tribunal will address Claimants' second alternative claim by examining the facts with respect to the following issues:

-    The TAC meetings of 2014-2015;

-    The 2015 LHM; and

-    The UNESCO application and inscription.

1216.     The Tribunal will set forth the facts relating to these issues in detail in its analysis of Claimants' claim below.

*iii.     The law*

1217.     In their post-hearing submissions, Claimants argue in connection with their second alternative claim that "*RMGC's Project Rights have not been and will not be honoured, and that Gabriel's investment thus effectively has been taken and otherwise subjected to treatment in breach of both BITs.*"[859] In this regard they refer to their brief in response to the Tribunal's questions in PO No. 27, in which they state that this treatment violates the same provisions of the two treaties as in the case of the principal and first alternative claims, namely, the provisions on expropriation, FET, FPS, non-impairment by unreasonable and discriminatory measures and failure to observe obligations.

1218.     Accordingly, the Tribunal reiterates its analysis of the relevant standards set out above (see paras 806 *et seq.*). In particular, it will determine whether Respondent's acts or omissions post-2013 violate either of the provisions of the two BITs as set forth above because either:

-    Respondent acted arbitrarily, discriminatorily, or inconsistently; denied Claimants due process; contradicted specific assurances made to Claimants or Claimants' legitimate expectations; abused its powers (FET, FPS, arbitrary and unreasonable measures, failure to observe obligations and expropriation standards);

---

[859] C-PHB, para. 250.

- Respondent failed to provide physical protection and security to Claimants (FPS standard);

- Respondent treated Claimants and/or Claimants' investments differently than other investors in similar circumstances (arbitrary and unreasonable measures standard);

- Respondent failed to honour any of the commitments it made with respect to Claimants' investments (failure to observe obligations standard);

- Respondent deprived Claimants of the reasonable use of Claimants' investment and the benefits thereon (expropriation standard).

*iv.     The assessment*

1219.   Having set out the relevant facts and law, the Tribunal will <u>first</u> assess Claimants' second alternative claim by addressing Respondent's jurisdictional and admissibility objections (see Section 1 below). To the extent that it rejects these objections or under an "even if" analysis, the Tribunal will <u>secondly</u> analyze the relevant factual issues in accordance with the applicable law (see Section 2 below).

1.   Jurisdiction and admissibility

1220.   It will be recalled that Respondent argues that the Tribunal lacks jurisdiction over this second alternative claim because it is based on events that occurred after the Notice of Dispute was issued. Respondent also argues that the claim is inadmissible because it was filed out of time. Respondent further challenges the manner in which this claim is presented, arguing that it has not been presented with sufficient particularity because it is not clear whether the acts or omissions alleged give rise to a breach of the two BITs cumulatively or independently.

1221.   *With respect to the jurisdictional argument*, the Tribunal refers to its jurisdictional findings set out above, namely that facts that occurred after the Notice of Dispute was issued fall within the Tribunal's jurisdiction (see paras 725 *et seq.*). Accordingly, Claimants' second alternative claim falls within the jurisdiction of the Tribunal.

1222.   *With respect to the admissibility argument*, the Tribunal reiterates its above reasoning here as well (see para. 1183), particularly with respect to the timing of the filing of Claimants' second alternative. This means that the claim, although belated, was prompted by the Tribunal's questions in PO No. 27, and that the Tribunal was careful to give both Parties sufficient opportunity to develop their claims and defences given the complexity of the case and the importance of the interests at stake. On this basis and in general, the second alternative claim is admitted.

1223.    This being said, the Tribunal notes the fact that even long after the filing of this claim and as part of their answers to the Tribunal's questions, this time in relation to the events after 2013, Claimants cite a new alleged date of breach, namely 27 July 2021, when the Roşia Montană Mining Landscape was inscribed on the UNESCO World Heritage List. In principle, this new "claim" should also be rejected as inadmissible. However, the Tribunal understands that in May 2020, when Claimants first brought their second alternative claim, the facts on which the newly claimed date of violation is based had not yet occurred. And because this is a continuation of an argument that was made earlier in the case (i.e., the UNESCO application), the Tribunal will allow this claim to proceed.

1224.    *With respect to Claimants' presentation of this claim*, the Tribunal again faces challenges as it did in the case of the first alternative claim. It is true that, from the outset, Claimants have relied on acts and/or omissions by Respondent that allegedly occurred after the rejection of the Draft Law. However, as Respondent argues, the presentation of this claim, particularly under the umbrella of the "second alternative claim," is brief, if not incomplete. It is not explained how these post-2013 events led to the termination of the Project, both factually and legally, and the Tribunal has repeatedly sought this clarification through its questions to both Parties. Instead, Claimants appear merely to rely on three main themes and do not attempt to demonstrate the extent to which the subsequent events that ultimately led to the alleged demise of their investment were a natural consequence of Parliament's rejection of the Draft Law. Claimants fail to analyze their case in terms of the treaty provisions allegedly violated, particularly with respect to expropriation and the FET provisions.

1225.    Despite this difficulty, the Tribunal recognises the arguments presented and their importance (both for Claimants and Respondent). It will therefore proceed and consider, on the basis of the record before it, whether a breach of the BITs could nonetheless be established on the basis of Respondent's acts or omissions in the events that followed the rejection of the Draft Law and in the manner presented by the Parties. It will do so by looking at those acts or omissions both individually and collectively.

2.    The factual issues and analysis

1226.    As noted above, the three main topics or questions relate to the 2014-2015 TAC meetings, the 2015 LHM, and the UNESCO application and listing (see para. 1215). The Tribunal will address each of these issues below, including a detailed overview of the relevant facts related to each.

a)  TAC meetings in 2014-2015

i.  *The issue*

1227.  The Parties are in dispute as to whether the events that followed the rejection of the Draft Law, and namely the reconvening of further TAC meetings, were pretextual and with no true intention to continue the discussion on the implementation of the Project.

ii.  *The facts*

1228.  A brief summary of the facts has been set out above (see paras 189-192). The Tribunal will nonetheless repeat and supplement these facts before proceeding with its analysis.

1229.  It is recalled that, in November 2013, the Special Commission issued a report including recommendations that various technical issues related to the Project be analyzed further, including the suitability of the Corna Valley for the Project's TMF, in light of the Geological Institute of Romania's comments in the prior TAC meetings.[860]

1230.  The Ministry of Environment convened another TAC meeting on 2 April 2014, to discuss the Special Commission's report.[861] During the meeting, TAC Vice President and Director of EIA Department, Octavian Pătrașcu, presented the agenda as follows:

> *The first topic refers to the analysis of issues raised, following the hearings and field trips, in the report on the Draft Law concerning certain measures for gold-silver mining in the RM site, as well as the stimulation and facilitation of the development of mining operations in Romania, issued by the Joint Special Commission of the Chamber of Deputies and the Senate.*
>
> *And the second topic on the agenda consists of information to be presented by the Titleholder and a point of view to be presented by the Ministry of Culture in relation to the ongoing lawsuits concerning the suspension of an administrative deed, lawsuits which are pending at the courts in Suceava, Bacău, as far as we know. In short, as you well know, throughout 2013 we held several TAC meetings where we continued the Impact Assessment Procedure, as well as the procedure for the analysis of the quality of the Impact Assessment Report, including the analysis of the financial guarantees, the analysis of the environmental liability, risk scenarios. This process was interrupted due to the situation which occurred once the Draft Law and Agreement for this investment were promoted - a Draft Law which, as you well know, should have had nothing to do with the procedure that we are carrying out since 2004. But, besides the aspects which relate to the*

---

[860] Exh. C-557 (Parliamentary Special Commission Report, dated November 2013).
[861] Avram WS I, para. 170; Szentesy WS I, paras 95-96; Henry WS I, paras 138-139.

*law, as well as the economic aspects and the contract between the two Parties, certain issues were raised in the Special Commission that can be found in our analysis as well. I would like to make a short presentation, not long, I don't want to... we sent this report to all the TAC members, I think that all the institution members in the TAC received it; we requested points of view; some of the TAC members sent them and we will ask them to present, during this meeting, the point of view of the institution they represent; if this point of view cannot be communicated today due to, I don't know, the fact that the appointed members could not attend, then they must send it in no more than five days from today. To continue, briefly: the Joint Commission Report included, in the first part, a summary of the hearings conducted between September 23 and October 15, and in the second part, certain aspects and points of view issued by the Commission in relation to the Draft Law. These are aspects referring to the granting of the mining license, aspects regarding the benefits the project brings to the Romanian State, the royalty and ways to share it, the State's participation to the shareholding of the company and the duty towards Gabriel Resources, the legal status of Minvest Roşia Montană SA, aspects concerning the production take over – in short, aspects which ultimately relate to the contract between the two Parties. I would like to insist here on the issues included in both the Commission Report and in the procedures carried out by us, about environment protection, the use of cyanide, TMF and dam safety, aspects concerning the impact on the quality of the environmental factors (water, air, soil, biodiversity), the existence of other types of metals within the deposits, the pits closure and rehabilitation – so these are aspects of environment protection. There are also some aspects concerning the patrimony, heritage preservation and, to conclude – I will read them out, they are not many. The conclusion of the Report*: the Commission believes that the Draft Law subject to scrutiny does not cover in a satisfactory manner all the complex requirements regarding the framework for carrying out mineral resources exploitation activities, and consequently proposes its rejection. Considering the shortcomings of the legislation, the supplementation of the legal framework is proposed; the Commission appreciates the modifications in the Agreement, so these are strictly on the agreement between the parties; actions regarding the negotiation position of the State of Romania, alternative scenarios regarding the royalty; certain aspects regarding potential violations of the existing laws during the performance of the mining exploitation project in Roşia Montană and, as a last conclusion, the Commission asks the competent ministries and institutions involved in the assessment of RM Project, to analyses all aspects raised during the hearings and included in this... in this report. So, this would be, in short, the presentation of the report; I believe all those involved, all the TAC members had the report available to them and they are able to formulate points of view concerning the

*aspects included in the report that relate to their respective institution.*[862]
(emphasis added)

Mihai Fâcă, the TAC President, then stated:

> *So, please, in the documents you will send us, please refer strictly to environment issues, because, as you could see, the Special Parliamentary Commission approached many more issues, such as contractual issues or issues related to the relationship with the Romanian State, royalties, etc. These are issues there is no point for us to discuss here in the TAC, as we only deal with the environment protection; the only deviation we allow today relates to these lawsuits, so that we are accurately informed about what happens and what the timeline is. Mr Director Pătrașcu, please.*

Dragoș Tănase from RMGC then emphasized the fact that during the Special Commission meetings, the time given to RMGC and the experts was not enough and that the conclusions of the experts are not reflected in the Special Commission's report. Dragoș Tănase also testified to the independence of the experts, as well as the fact that RMGC filed a restructuring plan which included the firing of employees and suspension of grants among other things. Dragoș Tănase added that:

> *There have been innumerable debates on the aspects raised in the Parliamentary Commission Report, from all points of view, from the point of view of the technologies proposed. Experts from the European Commission were brought in. All possible assurances were give[n] as regards the environmental guarantees, the technologies, the funds, and so on. **We essentially demonstrated that this project complies with the European legislation and with the Romanian legislation and we must proceed to the final phase**.* (emphasis added)

RMGC's lawyer, Gabriel Zbarcea, then addressed specific points of the Commission's report. At some point, Dragoș Tănase stated:

> *Our point of view is very clear. There is no issue mentioned in the Parliamentary Commission report, be it technical or environmental in its nature, that has not been covered in very much detail both in the EIA Report and in the discussions held within the TAC. This is the answer, briefly.*

The Ministry of Economy representative, Sorin Gaman, also stated:

---

[862] Exh. C-473 (Transcript of TAC meeting, dated 2 April 2014), pp 2-3.

> These is .... the Ministry's point of view. **We believe that the decisions that were taken and the discussions that were held in the TAC up to the date when it was established that all technical matters were finalized, are sufficient, and the point of view of the Ministry – true, also as shareholder with 19.3% in this Project - is in favor of a decision being taken, because we believe it took too much, in terms of time, the submission of the documents**. (emphasis added)

Grigore Pop, from NAMR, also stated that NAMR's point of view is that "*the Project does not entail any major issues that would not allow its implementation. Consequently, we continue to support the implementation of Roșia Montană Project. Thank you.*"

Marcel Maruntiu, from the Institute of Geology of Romania, stated that "*mineral resources should be mined in a rational and complex manner*" and that they supported "*the initiation of legislative measures which would clearly define the characteristics of a mineral accumulation irrespective of its useful contents, the exploitation of which is an operation of public utility and special national interest*" and that "[c]*urrently, this is a concern of the European community*".

Towards the end, TAC President Mihail Fâcă stated:

> **Thank you very much. My conclusion from what happened so far is that there a few points of divergence among various specialists. We assume the role of identifying and mediating. As you proposed, we will organize meetings with specialists who worked for Roșia Montană and with those who have divergent opinions and, I repeat, following these meetings, if it is the case that we supplement the studies or generate something new, it will be the Ministry of Environment and Climate Change to do it this time, funded from the identified source we told you about. And we will start as soon as possible these meetings so as to make progress, because this is our intention. I mean, honestly, I don't want for us to be meeting here 3 years from now, as the director was saying, and discuss the same points of divergence**. *This would not be at all productive. Thank you*. (emphasis added)

The TAC President then asked RMGC to brief the TAC on the administrative deeds issued during the EIA Process, which were suspended for being subject to ongoing lawsuits, namely in relation to ADC 9/2011. RMGC reiterated its view that this litigation does nothing to change the situation of the EIA Process, i.e., it does not affect the issuance of the Environmental Permit.[863]

1231.  The Ministry of Environment convened a subsequent TAC meeting <u>on 24 July 2014</u> to discuss the requirements for the TMF study, i.e., a study on a TMF to store and manage

---

[863] Exh. C-473 (Transcript of TAC meeting, dated 2 April 2014), pp 3, 6-7, 11-12, 15-16.

tailings that was to be sited in the Corna Valley and that was included in the design of the Roşia Montană Project. The TAC President, Mihail Fâcă, asked the TAC members (orally and in writing) to submit the conditions they considered should govern the third party eventually selected to conduct the TMF study.[864]

1232.    The Ministry of Environment convened another TAC meeting <u>in April 2015</u>. At that meeting, TAC President, Mihail Fâcă, confirmed that all TAC members had not proposed conditions for commissioning a further TMF study and the Ministry accordingly decided not to pursue it.[865]

1233.    The Tribunal has examined the evidence above and the Parties' arguments in this respect and considers the following.

### iii.    *The analysis*

1234.    *First*, it is undisputed that TAC meetings were held in 2014 and 2015 after the Draft Law was rejected. RMGC fully participated in those hearings.

1235.    *Second*, the minutes of these meetings indicate that there was continued support for moving forward with the Project, but that certain issues remained unresolved. For example, at the first TAC meeting in 2014 to discuss the Special Commission's report (including whether the Draft Law adequately addressed several concerns), it was made clear that the Draft Law could not interfere with the independent TAC process, which had been on hold but was now continuing. The TAC President emphasized that there continued to be disagreement among experts on environmental issues.

1236.    At this meeting, RMGC reiterated its position that the Project was consistent with applicable law and stated that it had not had sufficient opportunity to present its views during the parliamentary process or that this process did not benefit from sufficient expert testimony. It is instructive to the Tribunal that Claimants raised no such objections during the legislative process, nor do Claimants argue in their submissions that they were denied due process when it occurred. Instead, they focus on alleged "political" interference with the process by various government agencies or individuals. Claimants may have felt that way in hindsight, but there is no evidence substantiating that allegation.

1237.    *Third*, there is no statement in any of these meetings by any of the governmental bodies or by Claimants that they believed that the Project was in fact rejected by the State. In

---

[864] Avram WS I, paras 173-174; Szentesy WS I, para. 98; Henry WS I, para. 140.
[865] Avram WS I, para. 177; Szentesy WS I, paras 99-100; Henry WS I, para. 142.

fact, with respect to the 2014 TAC meetings, Gabriel itself made the following comment in its regulatory report to the Toronto Stock Exchange:

> On 02 April 2014, a TAC meeting was held to discuss the issues noted following the hearings and field trips in the Report on the Draft Law regarding certain measures related to gold and silver mining in the Rosia Montana perimeter and the stimulation and facilitation of the development of mining activities in Romania, drawn up by the Special Joint Commission of the Chamber of Deputies and of the Senate. During that meeting, a briefing was delivered on behalf the Ministry of Culture regarding the process for the Archaeological Discharge Certificate no. 9/2011.

> The central level Technical Assessment Committee (TAC) met again on 24 July 2014, in a meeting which addressed the opportunity to perform an independent study on the permeability of the bottom of the TMF situated on Corna Valley, taking into account the recommendations included in the report on the Draft Law regarding certain measures related to gold and silver mining in Rosia Montana perimeter and the stimulation and facilitation of the development of mining activities in Romania, drawn up by the Special Joint Commission of the Chamber of Deputies and of the Senate.

> During this meeting, the TAC member authorities were asked for points of view and suggestions regarding the requirements which should be included in such a study. Following this meeting, RMGC sent an official document to the Ministry of Environment and Climate Change and the TAC member institutions, presenting the company's position regarding the legality, opportunity and utility of conducting the respective study in this phase of the procedure for the environmental impact assessment of Rosia Montana mining project.[866]

1238.   *Fourth*, Claimants also have not indicated that these TAC meetings were in any way convened in bad faith.

1239.   *Fifth*, the Project continued to progress in various respects after September 2013. Specifically, the Tribunal points to the following:

   - RMGC applied for an endorsement for the design of the "*Corna Dam of the Corna Tailings Management Facility*" on 28 November 2016. The Ministry of Waters and Forests issued the safety permit and endorsement on 26 October 2017, and they

---

[866] Exh. C-1570.03 (2014 RMGC Annual Financial Statements, Internal Auditor's Report, and Management Report), pp 5-6.

remained valid for two years (i.e., until October 2019).[867] Gabriel commented on this development in its regulatory filing with the Toronto Stock Exchange in 2015 as follows:

> *In December 2013, the technical documentations necessary for the reissuance of the endorsements related to the technical documentations and the safety permits for Corna and Cetate dams were drawn up and subsequently submitted to the Ministry of Environment and Climate Change in January 2014. On 26 November 2014, a CONSIB meeting was held to analyse the requests for the extension of the endorsements and permits, as well as the documentations drawn up and submitted for the reissuance of the endorsements and permits. Following this Assessment, the members of the CONSIB commission had unanimously agreed the issuance of new endorsements for the technical documentations and safety permits, and these documents will be issued within the legal deadline.*[868]

- Gabriel also noted in its 2015 Toronto Stock Exchange regulatory filing that RMGC had succeeded in extending the validity of the Urbanism Certificates in 2015:

> *On 22 April 2013, the Alba County Council issued the Urbanism Certificate no. 47, based on the application submitted by RMGC, following the expiration of the validity period of the Urbanism Certificate no. 87, previously held by the Company. The Urbanism Certificate issued has a validity period of 24 months. On 6 March 2015, the validity period of the Urbanism Certificate was extended by another 12 months, until 22 April 2016. The document provides the documentation required for the permitting of construction works for the Rosia Montana mining site.*[869]

- RMGC also received the necessary permits from Electrica in 2014 to reroute a high voltage electricity line to the Project.[870]

- The Roșia Montană Licence was renewed on 18 June 2019 by joint agreement of the NAMR and RMGC.[871]

---

[867] Exh. C-2213 (Dam Safety Permit No. 27/4, dated 26 October 2017 with Endorsement No. 27/4 by the Central Commission, dated 20 October 2017).

[868] Exh. C-1570.03 (2014 RMGC Annual Financial Statements, Internal Auditor's Report, and Management Report), p. 8.

[869] Exh. C-1570.03 (2014 RMGC Annual Financial Statements, Internal Auditor's Report, and Management Report), p. 3.

[870] Exh. C-1570.03 (2014 RMGC Annual Financial Statements, Internal Auditor's Report, and Management Report), p. 9.

[871] Exh. R-666 (National Agency for Mineral Resources, Addendum No. 8 to the Exploitation License No. 47/1999, dated 18 June 2019).

1240.    *Sixth*, Claimants were also unequivocal in their own public statements following the Parliament's rejection of the Draft Law. In late 2013, Gabriel stated the following in its regulatory filing to the Toronto Stock Exchange:

> *On September 5, 2013, the Draft Law was formally presented to Parliament for consideration by both the Senate and Chamber of Deputies (the "Parliamentary Review"). On September 17, 2013, Parliament established a Special Joint Committee of the Senate and of the Chamber of Deputies (the "Special Committee").*

> *The Special Committee was given an objective to (a) examine the Draft Law initiated by the Government, as well as any amendments submitted by the Government, deputies and senators; (b) prepare a report for discussion in each Parliamentary chamber; and (c) facilitate a decision on the adoption of the Draft Law in a plenary session of each Parliamentary chamber.*

> ***On November 11, 2013 the Special Committee published its report on the Draft Law (the "Report") and voted in favour of a recommendation for the rejection of the Draft Law.*** *This recommendation is now expected to be debated in the Senate of the Parliament, before the Draft Law is sent to the Chamber of Deputies, as the decision-making body charged with voting on its adoption.*

> ***The conclusions of the Report do not propose a rejection of the Project by the Parliament.*** *One of the other key recommendations in the Report is that Parliament creates a new general legal framework applicable not only to the Project but more widely all gold and silver mining projects in Romania in order to stimulate the implementation of such projects and attract investment, acknowledging that the existing mining law is not sufficient to legislate for the scale and complexity of the Project.*[872]
> (emphasis added)

1241.    A few months later, on 12 March 2014, Gabriel submitted its commentary on its annual results and report for the fourth quarter of 2013. At no point in this 9-page document does Gabriel state that the Government made a political decision to reject the Project in September 2013 or that the Parliament's rejection of the Draft Law resulted in the end of the Project. Instead, it states the following:

> *Whilst some of the conclusions and recommendations of the Special Committee may be positive for the development of the Project, certain conclusions and recommendations, if acted upon, may cause unspecified*

---

[872] Exh. R-539 (Gabriel Canada MD&A, Third Quarter 2013), p. 39.

*delay in the permitting process and/or necessitate changes to the terms of the License and/or the existing joint venture arrangements* […].[873]

1242.    Gabriel concluded its report by stating that one of its "key objectives" going forward would be to "[u]*nderstand and progress to finalization and completion the measures required to obtain approval of the EP*".[874]

1243.    In light of the foregoing, the Tribunal cannot accept Claimants' theory that what followed the rejection of the Draft Law was not a genuine or *bona fide* regulatory process, at least with respect to the further meetings that took place at the TAC, and instead was consistent with Respondent's intent not to proceed with the Project.

*iv.    The conclusion*

1244.    The Tribunal cannot accept Claimants theory that what followed the rejection of the Draft Law was not a genuine or *bona fide* regulatory process, at least with respect to the further meetings that took place at the TAC.

b)  The 2015 LHM

*i.    The issue*

1245.    The Parties disagree as to whether Respondent's failure to correct the "errors" of the 2010 LHM in the 2015 LHM or, alternatively, the alleged continued failure of the Ministry of Culture to declassify the listed historical monuments, was part of Respondent's overall effort to terminate the Project.

*ii.    The facts*

1246.    A brief summary of the facts has already been set out above (see paras 105-112, 173-178). The Tribunal will nonetheless repeat and supplement these facts before proceeding with its analysis.

1247.    It is recalled that the ADC for the Cârnic underground area was issued <u>in 2004</u> (ADC No. 4/2004).

1248.    <u>In 2004</u>, the Ministry of Culture issued the first LHM. The 2004 LHM reflects the results of completed archaeological research and discharge decisions for the Project area. This list specifically identified areas of significance; it did not include areas that were the subject of ADCs, including ADC No. 4/2004 for Cârnic.[875]

---

[873] Exh. R-540 (Gabriel Canada Press Release, dated 12 March 2014), p. 5.
[874] Exh. R-540 (Gabriel Canada Press Release, dated 12 March 2014), p. 8.
[875] Schiau Opinion I, para. 210; Schiau Opinion II, Sect. C; Gligor WS I, para. 44; Memorial, para. 161.

1249.   ADC No. 4/2004 was annulled by court order <u>in 2008</u> following a challenge by an NGO.[876]

1250.   <u>In June 2010</u>, RMGC filed an application for renewal.[877]

1251.   <u>In July 2010</u>, the Ministry of Culture issued the 2010 LHM. It was published in the Official Gazette <u>in October 2010</u>. The 2010 LHM contained some differences from the 2004 LHM with respect to Orlea and Cârnic. For Orlea, the so-called address was changed to "*the entire locality within a two kilometer radius*," and for Cârnic, all mining galleries in the Cârnic Massif were listed, including the so-called medieval and modern galleries, not previously designated as historical monuments.[878]

1252.   <u>On 7 March 2011</u>, the Ministry of Culture issued the SEA Endorsement that prevents the approval of urbanism plans in the Project area or the endorsement for the Industrial Area PUZ.

1253.   <u>In July 2011</u>, Minister of Culture Kelemen Hunor (who took office in December 2009) publicly stated that the Cârnic Massif would be removed from the 2010 LHM when the ADC was issued, as the second Cârnic ADC was to be issued at that time. ADC No. 9/2011 was issued the same month.[879]

1254.   The declassification process for Cârnic began <u>on 6 November 2012</u> by a request from Alba Directorate to the NIH.[880] RMGC had not made any request for declassification earlier. The Ministry of Culture informed the Alba Directorate that an expert historical study was required;[881] whereas the Alba Directorate took the contrary view that the study underling ADC 9/2011 was sufficient.[882]

1255.   The NGOs then relied on the inclusion of Orlea and Cârnic in the 2010 LHM to seek the cancellation of the SEA Endorsement. The NGOs argued in their lawsuits that the SEA Endorsement does not take the historical monuments described in the 2010 LHM into account.[883]

---

[876] Gligor WS I, para. 100; Memorial, para. 321.

[877] Gligor WS I, para. 100; Tănase WS II, para. 59; Henry WS I, para. 22; Memorial, para. 322.

[878] Exh. C-1266 (2010 List of Historical Monuments approved by Order No. 2361 of the Ministry of Culture published in the Official Gazette 670bis, dated 1 October 2010); Gligor WS I, para. 91; Memorial, paras 315-318.

[879] Exh. C-680 (Archaeological Discharge Certificate No. 9/2011 (Cârnic underground)); Tănase WS II, paras 60, 64; Gligor WS I, para. 102; Henry WS I, para. 27; Memorial, paras 324, 328.

[880] Exh. C-1332 (Alba Culture Directorate Letter No. 1185 to National Heritage Institute, dated 6 November 2012).

[881] Exh. C-1328 (Ministry of Culture Letter No. 4587 to Alba Culture Directorate, dated 23 November 2012).

[882] Exh. C-1329 (Alba Culture Directorate Letter No. 1301 to the Ministry of Culture, dated 28 December 2012).

[883] Exh. C-1901 (Letter No. 395 of Alba County Culture Department to Sibiu Regional EPA, dated 19 April 2010).

1256.    ADC No. 9/2011 for Cârnic was also challenged by NGOs in court. On 30 January 2014, the court decided to suspend the effects of this second ADC pending a final decision on the request for its annulment.[884]

1257.    In June 2014, RMGC formally requested that NIH correct the 2010 LHM.

1258.    In July 2014, the NIH responded to RMGC and indicated that the errors would be corrected in the 2015 LHM, which was expected to be released shortly.

1259.    RMGC initiated administrative and legal proceedings against the NIH and the Ministry of Culture, to challenge and obtain the correction of the 2010 LHM. The NIH stated in court that the Roşia Montană area "*comprises hundreds of kilometers of mining galleries from the Roman era*". The NIH also stated that RMGC wanted to mine the area without archaeological discharge and without the required endorsements. The court found that the 2010 LHM was lawful because it was issued by the competent authorities. It based its decision on the finding that mining in the area was not compatible with the obligation to protect the Roman mining galleries.[885]

1260.    In October 2014, the NIH sent a draft of the 2015 LHM to the Alba Culture Directorate for comment.[886] The Alba Culture Directorate responded on 22 December 2014, stating, among other things the following:

> *Therefore, it is not justified to add an "address" to the generic name under code [...] – Archaeological Site of Alburnus Maior – Roşia Montană, and therefore the phrase "The entire locality, on a radius of 2km" should be eliminated. Such a location does not correspond to reality and would create many problems for the inhabitants in the area.*[887]

Concerning the Galleries from Cârnic Massif, the Directorate stated the following:

> *We note that, compared to the 2010 LHM, this historical monument was identified more accurately in the Draft 2015 LHM, through STEREO coordinates. However, as specified under "Observations", the perimeter thus delimitated also includes areas for which archaeological discharge certificates were issued, and they are included in the protection area as the declassification procedure has not been completed. As you certainly*

---

[884] Schiau Opinion I, para. 93.
[885] Rejoinder, para. 697.
[886] Schiau Opinion I, paras 119, 121-125, 278.
[887] Exh. C-1376 (Letter No. 1265 from the Alba Culture Directorate to NIH and the Ministry of Culture No 1265, dated 22 December 2014) p. 3.

*know, the relevant classification procedures were started already in 2011, but we are not aware of their current status.*

***We also note that the indicated area is substantially larger than the area protected through the 2004 LHM, which only mentioned: "Carnic Massif – Piatra Corbului point" and indicated the exact location of the protected area through STEREO coordinates. We are not aware of any classification procedure carried out in the period 2004-2010, which would justify the extension of the protected area from Carnic Massif through the 2010 LHM, or the extension of the historical eras with relevance for Carnic area.***

***For all these reasons, we consider that the correct description and precise delimitation of the historical monument under code […] – Galleries from Carnic Massif are the ones stated in the 2004 LHM, in the absence of classification procedural acts, and therefore should be reflected as such in the Draft 2015 LHM.***[888] (emphasis added)

The Directorate enclosed the 2015 LHM as proposed by it.[889]

1261.    <u>In late December 2015</u>, the Ministry of Culture issued the State's 2015 LHM that (a) removed the precise geographical "STEREO" coordinates indicating the location of several archaeological sites in Roşia Montană, and (b) included a new "address" for the Alburnus Maior historical monument in Roşia Montană, which it described as "*the entire locality*" of Roşia Montană within a "*2 km radius*"; this would be a protected historical monument where no industrial activities may be undertaken.[890]

1262.    The 2015 LHM was first announced on Culture Minister Alexandrescu's Facebook page <u>on 9 January 2016</u>, flagging NGOs that opposed the Project.[891]

1263.    <u>In January 2016</u>, Adrian Balteanu, the Romanian Ministry of Culture's Cultural Heritage Advisor, is quoted as saying that mining activities are prohibited in light of this LHM.[892]

---

[888] Exh. C-1376 (Letter No. 1265 from the Alba Culture Directorate to NIH and the Ministry of Culture No 1265, dated 22 December 2014) p. 3.

[889] Exh. C-1376 (Letter No. 1265 from the Alba Culture Directorate to NIH and the Ministry of Culture No 1265, dated 22 December 2014).

[890] Exh. C-1267 (Minister of Culture Order No. 2828, dated 24 December 2015, published in the Official Gazette of Romania, Part I, No.113, dated 15 February 2016); Memorial, paras 49, 582-583.

[891] Exh. C-822 (Facebook post – Vlad Alexandrescu, dated 9 January 2016).

[892] Exh. C-1356 (Romanian village blocks Canadian firm from mining for gold, The Guardian, dated 14 January 2016).

1264.    Also <u>in January 2016</u>, Minister of Culture Alexandrescu gave an award to the NGO Alburnus Maior, the main opponent of the Project, for organising the Fânfest and opposing the Project.[893]

1265.    The court overturned the SEA Endorsement <u>in March 2016</u>, finding that the approval was based on a description of historic monuments contained in the 2004 LHM. Among other things, the court found that the historical monument described in the 2010 LHM as being within a two-kilometer radius of Orlea meant that the historical monument encompassed the entire two-kilometer area and, on that basis, cancelled that endorsement. This annulment frustrated the pending application for approval of the urbanism plan for the Project area.[894]

1266.    The LHM 2015 was adopted and the Alburnus Maior archaeological site is listed as being in Roșia Montană, within the entire two-kilometre radius, and the refinements that were included in the 2004 LHM were all removed.[895]

1267.    The court challenge of ADC 9/2011 was ultimately upheld by the Ploiești Court of Appeal <u>on 16 February 2022</u>.[896]

*iii.    The Tribunal's analysis*

1268.    The Tribunal has examined the evidence above and the Parties' arguments in this respect and considers the following.

1269.    *First*, the Tribunal reiterates its considerations and findings that none of Respondent's acts in connection with the 2010 LHM appear to be tainted with the purpose of terminating the Project. Specifically, the 2010 LHM reflected the invalidation of ADC 4/2004 and the lack of an ADC for Orlea. And it is not the role of the Tribunal to decide whether the court's decision to annul the ADC following a challenge by the NGO is legally or factually correct. In fact, the Government defended the ADCs in court. In this context, nothing wrongful can be attributed to Respondent and no allegation of a denial of justice in these court proceedings has been made.

1270.    *Second*, the Tribunal must nonetheless examine if there is any evidence that proves the contrary when the alleged errors of the 2010 LHM (for example for Orlea) were not

---

[893] Exh. C-965 (Vlad Alexandrescu, at the festivity of AFCN: FânFest, the biggest activist cultural event from Romania, Agerpres.ro, dated 15 January 2016).

[894] Exh. C-211 (Brasov Court of Appeal decision, dated 10 March 2016); Exh. C-1721 (Brasov Court of Appeal Certificate).

[895] Exh. C-1267 (Minister of Culture Order No. 2828, dated 24 December 2015, published in the Official Gazette of Romania, Part I, No.113, dated 15 February 2016); Schiau Opinion I, para. 304; Exh. C-1285 (2015 List of Historical Monuments Map).

[896] Exh. R-694 (Ploiești Court of Appeal, Decision No. 187, dated 16 February 2022).

corrected in the 2015 LHM or when the Cârnic massif was not declassified in the latter. In this connection, the Tribunals reiterates and points to the following facts.

1271.    *In connection with the process for correction and declassification:* The LHM amendment process involved three entities: the Ministry of Culture, the NIH and the Alba Directorate. As noted above, the declassification process for Cârnic began on 6 November 2012 by a request from Alba Directorate to the NIH (see para. 1254).[897] RMGC had not made any request for declassification earlier. The Ministry of Culture informed the Alba Directorate that an expert historical study was required.[898] To the contrary, the Alba Directorate stated that the study underling ADC 9/2011 was sufficient.[899] Following a court challenge by an NGO, ADC 9/2011 was subsequently annulled on 30 January 2014. This challenge was upheld by the Ploieşti Court of Appeal on 16 February 2022.[900] The Tribunal therefore considers that:

- There is no evidence before the Tribunal to show that the suspension of declassification process was wrongful. In fact, it appears that this process could not continue while the court challenge was pending.

- More importantly, Claimants have not alleged that the court proceedings leading to the successful challenge to ADC 9/2011 were in any way tainted by a denial of justice or otherwise in violation of the two BITs.

- Therefore, the Tribunal does not find that Respondent's continued inclusion of Cârnic in the 2015 LHM (and thus failure to amend the 2015 LHM) constituted an abuse of power.

1272.    *In connection with the correction of the LHM for Orlea:* It is recalled that the Alba Directorate agreed with RMGC about not including the 2km radius around the Roşia Montană archaeological site. Instead, the NIH took the opposite view on the basis that the Alburnus Maior archaeological site was originally included in the 1991 LHM but then mistakenly divided in the 2004 LHM. A number of letters were exchanged on this topic from 2011 onwards.[901] This correspondence continued into 2013 with the Alba

---

[897] Exh. C-1332 (Alba Culture Directorate Letter No. 1185 to National Heritage Institute dated 6 November 2012).
[898] Exh. C-1328 (Ministry of Culture Letter No. 4587 to Alba Culture Directorate dated 23 November 2012).
[899] Exh. C-1329 (Alba Culture Directorate Letter No. 1301 to the Ministry of Culture dated 28 December 2012).
[900] Exh. R-694 (Ploieşti Court of Appeal, Decision No. 187, dated 16 February 2022).
[901] Exhs R-554 (Letter from NIH to Ministry of Culture, dated 26 July 2011), C-1331 (National Heritage Institute Letter No. 3316 to Alba Culture Directorate, dated 30 July 2012), R-555 (National Commission of Historical Monuments meeting agenda, dated 21 May 2012), C-1324 (National Heritage Institute Letter No. 2748 to Alba Culture Directorate, dated 1 June 2012), C-1326 (Alba Culture Directorate Letter No. 502 to National Heritage Institute, dated 1 June 2012), C-1325 (National Heritage Institute Letter No. 2675 to Alba Culture Directorate, dated 31 May 2012), C-1327 (Letter No. 546 from Alba Culture Directorate to National Heritage Institute, dated 29 June 2012), R-556 (Letter from NIH to Ministry of Culture, dated 30 July 2012).

Directorate's request to the NIH to declassify Cârnic and correct the Orlea entries.[902] The NIH responded on 17 April 2013.[903]

1273.   A meeting was held with RMGC and several ministries to discuss the procedure to declassify Cârnic and modify the Orlea entries on 28 May 2013. At that meeting, and subsequently in writing, RMGC was asked to submit a written request for information on the status of these procedures.[904] It did not do so until 10 June 2014 (more than a year later).[905] The NIH responded to RMGC on 8 July 2014.[906]

1274.   In August 2014, RMGC filed a complaint against NIH in relation to the correction of Orlea in the 2010 LHM. The Ministry of Culture then requested that the NIH explain its position, which it did, in a 16-page document, on 2 September 2014.[907] This document noted that there were some clerical errors but also other more substantive matters that required further archaeological investigation. The first error that is recorded is stated as follows:

> *The corrections made in order to provide the correctness of protection of the archaeological sites are as follows: There was introduced the protection of the entire locality on a 2-km range as requested for the validation of the list of historical monuments from 1991 – 1992, correcting the error that reduced the protected area to only 10%.*[908]

1275.   Six further errors are then identified.

1276.   For the Tribunal, this document is a document prepared by professional archaeologists, raising a number of pending issues that needed to be resolved. None of these issues appear to be somehow invented or fabricated. What is more, Claimants have not attempted to refute them. Instead, RMGC subsequently filed a court complaint against the NIH in December 2014 requesting a correction of the list.[909] The court dismissed the procedural and admissibility objections raised by NIH and the other defendants and

---

[902] Exh. R-557 (Letter from Alba Directorate to Ministry of Culture, dated 26 March 2013).

[903] Exh. R-558 (Letter from NIH to National Commission of Historical Monuments, dated 17 April 2013).

[904] Exh. C-1404 (Minutes of Inter-Ministerial Work Group Meeting, dated 28 May 2013), p. 2; Exh. C-1001 (Government notification to RMGC, dated 12 June 2013).

[905] Exh. C-1389 (RMGC Letter No. 48482 to Director of the National Heritage Institute and Minister of Culture Hunor, dated 10 June 2014).

[906] Exh. C-1333 (Letter No. 2872 from the National Heritage Institute to RMGC, dated 8 July 2014).

[907] Exh. C-2361 (National Patrimony Institute Point of View - The technical and legal substantiation on the state of the archaeological sites in Roşia Montană, dated 2 September 2014).

[908] Exh. C-2361 (National Patrimony Institute Point of View - The technical and legal substantiation on the state of the archaeological sites in Roşia Montană, dated 2 September 2014), p. 15.

[909] Exh. C-1349 (RMGC's Statement of Claim filed in case No. 7352/2/2014 of the Bucharest Court of Appeals, dated 10 December 2014).

ordered the case to proceed to the merits.[910] RMGC then decided to waive the claim on 16 October 2015.[911] The proceedings were terminated on 21 March 2016 when the Bucharest Court of Appeal found that the 2015 LHM rendered the issue moot.[912] The 2015 LHM adopted the NIH's position in relation to Orlea. Again, Claimants have not made any allegations of denial of justice as far as these proceedings are concerned.

1277.    Thereafter, the NIH continued to work to delimit the archaeological site. On 28 December 2016, the NIH sent a 42-page report to the Roșia Montană Mayoralty to enable the latter to prepare the urbanism plans.[913] The NIH explained why the 2015 LHM included a 2km radius around the site as follows:

> *The delimitation of the site by a 2 km radius around the locality, established upon its classification in 1992, comes under the category of generic delimitations, applied in cases where, at the time of classification, the extent of the historical monument is not sufficiently known and, consequently, a broad outline becomes required, defined geometrically and meant to provide for the appropriate protection of all its elements. Considering the extensive archaeological research carried out at the Roșia Montană site in the period 1999 - 2006, the results of which are relevant for the delimitation issue and also well documented, it is now possible to propose a determination of the site limits according to these results.*[914]

1278.    This suggests that the LHM can be modified, if necessary, after archaeological research is conducted. In fact, Claimants admit that they needed to conduct further research to procure an ADC for Orlea. RMGC received approval for archaeological research in February 2013. The work was scheduled to begin in 2014 but was never performed. The fact that Claimants submit in the context of these proceedings that research would not have helped because of Respondent's political decision to reject the Project is not something that had been alleged at the time. In fact, their Annual Information Form for 2013, filed on 12 March 2014, states that:

> *RMGC is required to obtain archaeological discharge certificates ("ADC") for various parts of the Project's proposed footprint. In order to obtain such certificates, RMGC is required to conduct extensive programmes of preventative archaeology in order to ensure that*

---

[910] Exh. R-213 (Bucharest Court of Appeal decision, dated 7 April 2015).

[911] Exh. C-1729 (Hearing Minutes in case file No. 7352/2/2014 of Bucharest Court of Appeal, the Administrative and Fiscal Contentious Division, dated 17 November 2015).

[912] Exh. C-1722 (Certificate from Bucharest Court of Appeal in case file No. 7352/2/2014, dated 21 March 2016).

[913] Exh. C-2370 (Letter from the Minister of Culture to the Prime Minister and Mayor of Roșia Montană, dated 11 January 2017).

[914] Exh. C-2370 (Letter from the Minister of Culture to the Prime Minister and Mayor of Roșia Montană, dated 11 January 2017), p. 4.

*valuable historical relics in the area are uncovered and preserved. This archaeological review of the historical mining activity at Roşia Montană is a critical step in the granting of the construction permits to build the Project. RMGC currently holds ADCs for the proposed Carnic, Cetate and Jig open-pits. As mining at the Orlea open-pit is not scheduled to commence until year eight of the Roşia Montană mine life, **RMGC will commence the application process for an ADC for Orlea in due course.**[915]* (emphasis added)

1279.    Given the transparency and seriousness of the process and the agreement of Claimants that further research was required, the Tribunal cannot find fault with Respondent in this regard. The public comments made by officials on social media do not change this conclusion.

1280.    In light of the foregoing, the Tribunal cannot find any wrongdoing on the part of the Ministry of Culture or anyone else on the part of Respondent in connection with the 2015 LHM.

*iv.*     <u>*The conclusion*</u>

1281.    The Tribunal cannot find any wrongdoing on the part of the Ministry of Culture or anyone else on the part of Respondent in connection with the 2015 LHM.

c)   The UNESCO application and inscription

*i.*     <u>*The issue*</u>

1282.    The Parties disagree on whether the decisions leading to the UNESCO inscription were the result of Respondent's alleged decision on 9 September 2013 not to proceed with the Project.

*ii.*     <u>*The facts*</u>

1283.    A brief summary of the facts has already been set out above (see paras 179-188). The Tribunal will nonetheless repeat and supplement these facts before proceeding with its analysis.

1284.    The inclusion of Roşia Montană in the UNESCO World Heritage List had been considered and rejected before, including <u>in 2013</u>.[916] <u>In September 2013</u>, Minister of Culture Barbu testified before the Special Commission the following:

---

[915] Exh. C-1811 (Gabriel Resources, 2013 Annual Information Form, dated 12 March 2014), p. 28.
[916] Memorial, Sec. VIII.A.5; Gligor WS I, paras 136-140.

> [...] *the adoption of Draft Law does not violate any provision of the Romanian law. On the contrary, the benefits for Romania are great, especially in terms of preserving the national heritage. Moreover, without a company to invest in the national heritage in Roșia Montană, the Romanian State does not have the necessary funds to protect the area.*
>
> [...] *such a step should be initiated by the inhabitants of the area, and that, as well as that, for the time being a classification with UNESCO is not realistic expectation because the area is not properly preserved.*[917] (emphasis added)

1285.    In its report of November 2013, the Special Commission recommended that the Ministry of Culture initiate a public debate on the advisability and eligibility of Roșia Montană to be included in the UNESCO World Heritage List. It specifically stated the following:

> *An important aspect is the hypothesis of classifying Roșia Montană locality on the UNESCO list. Some of the consulted experts, as well as the representatives of the Ministry of Culture underline it is impossible to propose today that the Roșia Montană locality is included on the UNESCO tentative list, because it does not present exceptional elements, or unique elements. The underground galleries, if they will be preserved, may constitute an element, but not unique. In addition, the underground Roman galleries considered for prospective inclusion on the UNESCO list should be first valorized and included in a touristic circuit, before filing a request for classification with UNESCO.* Referring to this aspect, during the hearings, the Ministry of Culture specified that these conditions could be met in 10 years. In addition, according to the norms issued by the United Nations Educational, Scientific and Cultural Organization, the first condition for a monument to be approved on the tentative UNESCO list is that the local authorities in the area expressly request this classification to the Ministry of Culture. This has not happened so far. Other experts, quoted during the hearings of the Commission, said that Roșia Montană has the potential to become a UNESCO site and that it should be preserved. This is also confirmed by a 2010 report drafted by the British Archaeological Institute, at the request of the Ministry of Culture. During the meetings between the RM Special Commission members and the local authorities in the area, the latter affirmed that they know, from the Ministry of Culture, *that a future registration of the Roșia Montană area on the UNESCO tentative list would bring no direct economic advantages, meaning, no national or international budgets for rehabilitation or reservation of the heritage in the area, but would contribute to the creation of a touristic circuit, but the exploitation of this circuit will not create the necessary funds for the conservation of this cultural*

---

[917] Exh. C-557 (Parliamentary Special Commission Report, dated November 2013), p. 4.

*heritage. Despite this, the UNESCO classification may create financial advantages by accessing funds from the Regional Operational Program. The opinions expressed with regard to the inclusion of the locality on the UNESCO list are divergent and there is so far no endorsement from the state institutions (the Commission for Historical Monuments or the Archaeological Commission, the Commission for Public Fora Monuments or the Commission for Museums and Collections), regarding the inclusion of Roşia Montană on the list. The Commission recommends the Ministry of Culture to initiate a public debate on the advisability and eligibility of Roşia Montană to be included on the UNESCO Heritage list.*[918] (emphasis added)

1286.  <u>On 11 January 2016</u>, Minister of Culture Vlad Alexandrescu publicly stated that the Ministry was considering the inclusion of Roşia Montană as a UNESCO World Heritage Site.[919] He announced that the State would initiate such a process on his Facebook page on 5 February 2016.[920]

1287.  <u>On 18 February 2016</u>, the State, through the Ministry of Culture, applied to UNESCO to have the entire "Roşia Montană Mining Cultural Landscape" declared a UNESCO World Heritage Site.[921] This had the effect of adding the site to Romania's UNESCO "Tentative List" of Romanian World Heritage reflecting Romania's commitment to preserving the site in accordance with the standards of the World Heritage Convention.[922] The subject of Romania's application included the historical monument of Alburnus Maior – Roşia Montană as listed on the 2015 LHM, which covered the entire Project footprint.[923] As summarized on UNESCO's website, Romania's application stated that the "*cultural landscape is threatened by irreversible changes following the ending of traditional mining operations* […] *and the proposed resumption of open cast mining with modern quarrying techniques would inevitably entail the quasi-total and irreversible destruction of the cultural heritage and its setting*".[924] It is not disputed that Romania's application triggered special protections under Romanian law.[925]

1288.  <u>On 25 November 2016</u>, the Ministry of Culture sent a letter to the Prime Minister and the Mayor of Roşia Montană, emphasizing that the delimitation of the Roşia Montană Historic Monument must be reflected in the urban development plan in light of the

---

[918] Exh. C-557 (Parliamentary Special Commission Report, dated November 2013), pp 42-43.

[919] Exh. C-1355 (Interview with Vlad Alexandrescu, dated 11 January 2016).

[920] Exh. C-1365 (Facebook Post – Vlad Alexandrescu, dated 5 February 2016).

[921] Exh. C-1275 (UNESCO Application, dated 18 February 2016); Memorial, para. 50.

[922] Memorial, paras 603-604.

[923] Exh. C-1892 (Nomination for Inclusion in the World Heritage list, Roşia Montană Mining Landscape); Exh. C-897 (Ministry of Culture website: Cultura.ro, The Roşia Montană file was submitted to UNESCO, dated 5 January 2017); Memorial, para. 609.

[924] Exh. C-1275 (Screenshot of UNESCO website).

[925] Exh. C-2350 (GO No. 47/2000).

application UNESCO and that, according to the law, cultural properties must be given priority over mining.[926]

1289.  On 28 December 2016, the Ministry of Culture sent a letter to the Mayor's Office of the Municipality of Roşia Montană and the Cultural Department of Alba County, transmitting the delineation of the area of the designated historical monument. The documents refer to the previously issued ADCs but suggested that a different approach could now be considered.[927]

1290.  On 5 January 2017, Romania submitted the Roşia Montană file to UNESCO in support of its application.[928]

1291.  On 28 June 2018, Romania formally requested the World Heritage Committee to defer consideration of its application until the settlement of the present arbitration case.[929] The UNESCO Committee granted Romania's request for deferral stating as follows:[930]

> *In compliance with paragraph 159 of the Operational Guidelines, refers the nomination of Roşia Montană Mining Landscape, Romania, back to the State Party, due to the ongoing international arbitration, and to implement the measures required to ensure the protection and management of the potential OUV* [outstanding universal value] *of the property as identified by ICOMOS and encourages the State party to work in close cooperation with the Advisory Bodies to this end.*

1292.  On 31 January 2020, the Ministry of Culture issued a press release quoting Minister of Culture Bogdan Gheorghiu announcing that "*with close communication and consultation with the Romanian Prime Minister, Mr. Ludovic Orban,*" Romania gave notice to UNESCO that it decided "*to resume the procedure*" to list Roşia Montană as a UNESCO World Heritage Site. In the same press release, the Minister stated that "*by registration in the UNESCO List, the legal protection regime already established is not changed*".[931] The Ministry of Culture further confirmed this in a press release on 5 February 2020, which described steps taken to implement urbanism plans in the area of Roşia Montană to protect the historical monuments and to complete classification procedures for additional buildings and structures. It quoted Minister of Culture Cheorghiu stating that

---

[926] Exh. C-2517 (Letter from the Minister of Culture to the Prime Minister and Mayor of Roşia Montană, dated 25 November 2016).

[927] Exh. C-2370 (Letter from the Minister of Culture to the Prime Minister and Mayor of Roşia Montană, dated 11 January 2017).

[928] Exh. C-897 (Ministry of Culture website: Cultura.ro, The Roşia Montană file was submitted to UNESCO, dated 5 January 2017); Jennings Report I, para. 137.

[929] Exh. C-1918 (Letter from Permanent Delegation of Romania to UNESCO, dated 28 June 2018); Exh. C-1917 (Ministry of Culture press release, dated 28 June 2018).

[930] Exh. C-1920 (World Heritage Committee, Decisions adopted by the 42nd Session, dated 4 July 2018), p. 6.

[931] Exh. C-2982 (Ministry of Culture Press Release, dated 31 January 2020).

"[t]*he preservation of the Roşia Montană heritage is a pressing necessity not just an intangible concept that will wait for resolution in international forums.*"[932] On 28 February 2020, the Ministry of Culture mentioned in a letter to the UNESCO World Heritage Committee that RMGC's License is still valid and that "*RMGC has not met to date but may still meet the requirements under Romanian law to obtain the environmental and other permits necessary for the Roşia Montană mining project.*" The letter also stated:

> With respect to the 'special law' to which you refer, legislative amendments were proposed in 2013 that would have facilitated and expedited the regulatory approval process for the Roşia Montană mining project. These proposed amendments were rejected by the Romanian Parliament in 2014. **However, the rejection of the Roşia Montană Law does not mean that the mining license is not valid.**[933] (emphasis added)

1293.    On 27 July 2021, the site was inscribed in UNESCO's World Heritage List and simultaneously onto the List of World Heritage in Danger. The UNESCO announcement stated that it was inscribed on the List of World Heritage in Danger "*pending the removal of threats to its integrity posed by possible extractive activities*" as well as "*due to threats posed by plans to resume mining which would damage a major part of the inscribed Mining Landscape.*"[934] On the same date, the Ministry of Culture announced the news of the UNESCO inscription and Romania's President, Prime Minister and Deputy Prime Minister also made public statements concerning the topic.[935]

*iii.    The Tribunal's analysis*

1294.    The Tribunal has examined the evidence above and the Parties' arguments in this respect and considers the following.

1295.    *First*, the Tribunal has already determined, in connection with its consideration of the principal and first alternative claims, that the process leading to and including the rejection of the Draft Law was not unlawful. Accordingly, Claimants' argument in connection with their second alternative claim that the decisions leading to the registration of UNESCO were the result of the Government's decision of 9 September 2013 not to proceed with the Project must be rejected.

---

[932] Exh. C-2983 (Ministry of Culture Press Release, dated 5 February 2020).

[933] Exh. R-693 (Letter from Minister of Culture to UNESCO World Heritage Centre and ICOMOS Evaluation Unit, dated 28 February 2020), p. 2.

[934] Exh. C-2984 (UNESCO's announcement, dated 27 July 2021), pp 2-3.

[935] Exh. C-2985 (Ministry of Culture Press Release, dated 27 July 2021); Exh. C-2987 (President Klaus Iohannis Facebook Post, dated 27 July 2021); Exh. C-2988 (Interview of Prime Minister Flori Cîtu, Jurnalul de Seara, Digi24 TV, dated 27 July 2021); Exh. C-2989 (Deputy Prime Minister Dan Barna, Facebook Post, dated 27 July 2021).

1296.   *Second, and in any event*, the Tribunal finds nothing unlawful with Romania's UNESCO proposal. As seen above, the Romanian nomination of Roșia Montană for inscription on the UNESCO World Heritage List was made in 2016, followed by the submission of the nomination dossier to UNESCO in January 2017 (see paras 1287 *et seq.*).[936] The application was then withdrawn in June 2018 and resubmitted in January 2020.[937] Romania's actions in this regard occurred approximately three to seven years after the rejection of the Draft Law by the Parliament. At that time, the Commission itself proposed to hold public consultations on the possibility of classifying Roșia Montană to UNESCO. This was also pointed out by the experts themselves. It is clear from the documents that the reason for this was the idea that Claimants might not pursue the Project, or the Project implementation might not proceed. The idea was to somehow secure funding and development of the area in such a scenario. Indeed, inclusion on the World Heritage List gives States access to international assistance, including financial assistance.[938] The proposal itself was therefore not unreasonable.

1297.   *Third, and nevertheless,* the Tribunal must also examine Claimant's argument that the UNESCO listing makes it impossible for the Project to go ahead. Claimants specifically argue the following:

> *In this case, the indisputable effect of the UNESCO application was that it gave rise to a further layer of protection to the subject historical monument, in accord with a legally required program for protection and management of the site to be incorporated into the urbanism plan for the area, that is fundamentally incompatible with RMGC's mining license, with the ADCs issued (and re-issued in the case of Cârnic) by the Ministry of Culture, and with the entire Roșia Montană Project.*[939]

1298.   The Tribunal points to the fact that Claimants do not provide a legal analysis to justify how a "*further layer of protection*" is "*fundamentally incompatible with RMGC's mining licence*". Instead, they argued the following:

> *Even if one were to assume that the 2015 LHM was not a permanent obstacle for the Roșia Montană Project because recognition of the valid and binding ADCs remained a possibility, at least theoretically, the State's nomination to list the Roșia Montană Mining Landscape as a UNESCO World Heritage site was a different matter because the UNESCO application triggered a separate set of protections that were*

---

[936] Exh. C-1892 (Nomination for Inclusion in the World Heritage list, Roșia Montană Mining Landscape).

[937] Exh. C-2982 (Ministry of Culture Press Release, dated 31 January 2020).

[938] Exh. R-691 (UNESCO, Convention Concerning the Protection of the World Cultural and Natural Heritage, 16 November 1972), Art. 22(f).

[939] Claimants' Observations on New Evidence, dated 29 October 2021, para. 14.

> *required under Romanian law to be reflected in the urbanism plan for the area.*[940]

1299.   The only evidence that Claimants cite to support this allegation is the legal opinion of Claimants' expert, Professor Podaru, who states the following:

> *As noted, for UNESCO World Heritage sites (starting from the application phase), the urbanism plans are elaborated locally based on the special management and protection program approved by the Government in view of the site and are approved by Government decision.*[941]

1300.   What Professor Podaru suggests on this point is that the UNESCO listing requires a government approved special management and protection program.

1301.   In light of the foregoing, the Tribunal must assess, if possible, whether and how this listing affects the License, obtaining the Construction Permit, or more generally, the continuation of the Project. In this regard, the Tribunal considers the following.

- Starting with the UNESCO Convention itself, under this Convention, States are required to make "reasonable endeavours" and enjoy broad discretion in adopting measures for the protection and conservation of cultural heritage.[942] No other specific obligations of cultural protection are required of States when cultural and natural heritage is inscribed on the World Heritage List.

- When Romania reactivated the UNESCO application, it stated to UNESCO that "*RMGC has not met to date but may still meet the requirements under Romanian law to obtain the environmental and other permits necessary for the Roşia Montană mining project*".[943] It seems clear, and Claimants do not argue otherwise, that the UNESCO Convention itself does not create an obstacle to the Project or that the UNESCO listing is not incompatible with the Roşia Montană License. In fact, as

---

[940] Claimants' Observations on New Evidence, dated 29 October 2021, para. 30.

[941] Podaru Opinion I, para. 357.

[942] Exh. R-691 (UNESCO, Convention Concerning the Protection of the World Cultural and Natural Heritage, dated 16 November 1972), Art. 5 ("*To ensure that effective and active measures are taken for the protection, conservation and presentation of the cultural and natural heritage situated on its territory, each State Party to this Convention shall endeavour, in so far as possible, and as appropriate for each country: (a) to adopt a general policy which aims to give the cultural and natural heritage a function in the life of the community and to integrate the protection of that heritage into comprehensive planning programmes;* [...]"). See also Article 6.1. Furthermore, the Guidelines to the UNESCO do not appear to mandate States to take any additional measures.

[943] Exh. R-693 (Letter from Minister of Culture to UNESCO World Heritage Centre and ICOMOS Evaluation Unit, dated 28 February 2020), p. 2.

Respondent explained to UNESCO, the Roșia Montană License had been extended in 2019 for five years.[944]

- As far as any other possible impact resulting from the UNESCO listing is concerned, Claimants do not cite to any authority as to how the listing would impact the Construction Permit itself. Instead, Respondent submits, and Claimants do not attempt to rebut, that, under Romanian Law, Claimants' rights under the Roșia Montană License would have to be taken into consideration prior to any approval of urban plans for the UNESCO site.[945] What this appears to suggest is that any urban plans (PUG or PUZ) reflecting the UNESCO listing would have to take into account Claimants' rights. In any event, none were prepared or submitted to State authorities so far. As far as the ADCs are concerned, with the exception of the ones that were challenged by NGOs, including that for Cârnic, Claimants hold eleven ADCs. There is no evidence that these ADCs are affected by the UNESCO listing. Likewise, there is no evidence that Claimants took steps to apply and secure the required missing ADCs. As such, the Tribunal cannot point to anything to support the allegation that Claimants would not be able to obtain the declassification of the Roșia Montană area from the LHM.

1302. It appears that there is no evidence to support Claimants' assertion that the UNESCO listing created impediments that were fatal to the continuation of the Project.

1303. Therefore, the Tribunal cannot deduce from Romania's request to put Roșia Montană on the UNESCO World Heritage List a politically motivated act to derail the Project.

### iv.    *The conclusion*

1304. The Tribunal cannot deduce from Romania's request to put Roșia Montană on the UNESCO World Heritage List a politically motivated act to derail the Project.

### 3.    The conclusion

1305. In sum, the Tribunal recalls its findings in connection with the post-2013 events, namely that:

---

[944] Exh. R-693(Letter from Minister of Culture to UNESCO World Heritage Centre and ICOMOS Evaluation Unit, dated 28 February 2020).

[945] Exh. C-11 (Mining Law No. 85/2003), Art. 41(2) ("[w]*ithin 90 days from receiving the notification provided under paragraph (1)* [*i.e.* the notification of entry into force of the exploitation licenses by the competent authorities to the county councils, the local councils and the county prefectures competent in the areas where the granted perimeters are located]*, the county councils and the local councils will modify and/or update the existing territorial management plans and the own–planning documentation so as to allow the carrying out of all the operations necessary to the performance of the mining activities granted under concession.*").

- It cannot accept Claimants' theory that what followed the rejection of the Draft Law were not *bona fides* acts on the part of the Romanian authorities to advance the Project, at least with respect to the further meetings that took place at the TAC.

- It cannot point to any wrongfulness on the part of the Ministry of Culture or others from Respondent's side in connection with the 2015 LHM.

- It cannot deduce from Romania's request to put Roșia Montană on the UNESCO World Heritage List a politically motivated act to derail the Project.

1306.  Accordingly, the Tribunal does not find that Respondent: acted arbitrarily, discriminatorily, or inconsistently; denied Claimants due process; contradicted specific representations made to Claimants or Claimants reasonable expectations; abused its powers; failed to provide physical protection and security to Claimants; treated Claimants and/or Claimants' investments differently than other investors in similar circumstances; failed to honour any of the promises it made with respect to Claimants' investments; or deprived Claimants of the reasonable use of Claimants' investments and the resulting benefits.

1307.  The Tribunal cannot conclude that there has been a breach of any of the provisions of the UK-Romania and/or Canada-Romania BITs. The Tribunal therefore rejects Claimants' second alternative claim.

### d.  The conclusion on the second alternative claim

1308.  Therefore, the Tribunal decides that

*Claimants' second alternative claim is rejected.*

### 6.  Causation considerations

1309.  Having rejected Claimants' three alternative claims, the Tribunal should end its analysis here. However, the Tribunal considers it important to address, albeit briefly, certain aspects of causation that arise in the present case in two ways: <u>first</u>, in the allegations regarding the social license, and <u>second</u>, in the presentation of Claimants' three alternative claims regarding timing.

1310.  *In relation to social license:* The Parties, and in particular Respondent, have argued in their pleadings that the Project lacks a social license. Respondent presented the issue of the social license as one of causation (in terms of liability) and argued that because the Project lacked a social license, there could be no connection between the alleged misconduct and the breach. The Tribunal did not address the Parties' contentions in this regard for the following reasons.

1311. *First*, the arguments relating to the social license – however one may characterize that concept – become relevant only to the extent that Claimants can demonstrate a breach of an obligation and a causal link to a loss of their investment, i.e. the question would be whether the absence of a social license made the realization of the Project impossible in any event. The Tribunal has already found that there was no breach, so that further examination of the social license issue is unnecessary.

1312. *Second*, and in any event, the Tribunal addressed certain elements in its analysis that are important to its conclusions and that are also raised as part of the Parties' arguments on the social license. In particular, both at the outset and as part of its findings on Claimants' three alternative claims, the Tribunal stated that the nature of the Project, with its social, public, political and other elements, made the case a difficult and not a simple one, and therefore brought in the interests of many stakeholders. This ultimately explains how things turned out, for better or for worse.

1313. *In relation to Claimants' presentation of their three alternative claims:* The Tribunal considers that in this case, and in the manner in which it has been pleaded, there is an insurmountable causation hurdle in respect of Claimants' three alternative claims due to the different dates given by Claimants for the breaches of the treaty obligations. The Tribunal deliberated on this point in detail, posed questions to the Parties for clarification and sought to gain clarity on the causal link between these dates and the alleged breaches and the resulting damage to Claimants' investment, given the importance of the case and its far-reaching implications for all interested parties.

1314. With respect to the principal and first alternative claims and the alleged date of breach, i.e., on or after 9 September 2013, the Tribunal found no evidence that anyone on Claimants' or Respondent's side considered that the Project was terminated and that Claimants had suffered a loss as of that date. It was not until several years later that Claimants stated that, with hindsight, the Project was terminated on that date. Claimants obviously have the right to argue "in hindsight", but this makes it very difficult to prove causation. Indeed, Claimants would have been required to inform the Toronto Stock Exchange that there had been a serious impediment to their investment on 9 September 2013. Instead, they continued to report that the rejection of the Draft Law was unproblematic.

1315. Also, with respect to the second alternative claim and the alleged date of breach, i.e., 27 July 2021, the Tribunal does not find that Claimants have proven a causal link between the actions of the State following the rejection of the Draft Law and any injury to Claimants' investment, whether at the time the site was inscribed as a UNESCO protected area or otherwise.

1316.   Accordingly, the Tribunal does not find that Claimants would have established the causal connection necessary to prove their case.

### 7. The conclusion on liability

1317.   Claimants have maintained throughout these proceedings that they only realized in 2015, with the benefit of hindsight, that Respondent had taken a political decision to block the realization of the Project. Claimants did not, however, particularize any date for the breach of Respondent's treaty obligations on the basis of this alleged political decision until late in the proceedings and only after persistent questioning from the Tribunal. The dates for the breaches that were then given by Claimants were 9 September 2013 for its principal and first alternative claims, and 27 July 2021 for its second alternative claim. These dates of the alleged breaches were difficult to reconcile with Claimants' valuation date for their losses, which they had fixed at the outset of the proceedings as 29 July 2011, a date that is both anterior to the Canada-Romania BIT coming into force as well as outside the limitation period prescribed by the same treaty, but a date coinciding with a peak in the gold price.

1318.   As the Tribunal has stated already, Claimants were entitled to plead that Respondent's principal breaches were only discoverable with the benefit of hindsight some two years after the alleged consummation of those breaches. But there is an obvious difficulty pertaining to the factual credibility of such a case theory: all the facts now pleaded to establish Respondent's breach of its treaty obligations around 9 September 2013 were known to Claimants at the time. And at the time, Claimants made no regulatory disclosure to the effect that their investment had been in any way impaired and, to the contrary, issued press releases that were generally very supportive of the Government's efforts to progress the Project.

1319.   To put the matter differently, Claimants do not rely upon any new evidence that surfaced in the subsequent years that could serve to cast the acts and omissions of Respondent leading up to 9 September 2013 in a new light. There was no evidential revelation, for instance, that somehow joined the disparate acts of disparate public authorities and officials into a coordinated effort to block any further progress of the Project. What the contemporaneous evidence shows, and nothing has come to light since to diminish its significance, is that these disparate public authorities and officials were seeking to perform their respective regulatory mandates as best they could in the challenging circumstances. Their performance was by no means perfect and undoubtedly there were delays occasioned by incompetence or lack of resources, but there is simply no evidence to suggest that their efforts were pretextual with the objective of blocking the progress of the Project.

1320.   The Tribunal recognizes the fact that Claimants made substantial investments in this Project that regrettably did not materialize. It is important to recall, however, that it did not materialize for the Government either as Claimants' joint venture partner in the Project. This is not a case where a State has abused its sovereign powers to profit from the efforts and capital of private investors at the expense of those investors. Nor is it a case where a State has intervened to transfer a lucrative project from one private investor to a more favored one. This is a case where the environmental, social, cultural and economic challenges facing a massive mining project have proven so far to be insurmountable in circumstances where blame cannot be fairly attributed to any one party or any one cause.

1321.   In light of the above, the Tribunal, ***by majority***, decides to

   ***reject Claimants' claims on the merits.***

1322.   Accordingly, and subject to the Tribunal's consideration in paragraph 1194 above, the Tribunal need not address the question of whether the BIT claims are excluded by the Canada-Romania BIT's provisions regarding environmental and taxation measures (see para. 773 above). Further, any other claim or argument not specifically addressed herein is rejected.

## V.     Arbitration and Legal Costs

### 1.   The issue

1323.   The issue is the allocation of the arbitration and legal costs in these proceedings.

1324.   ***The Tribunal notes that, in light of its decision on liability, the decision on arbitration and legal costs is also taken by majority.***

1325.   ***Claimants*** request that the Tribunal award Claimants (i) their full costs of these proceedings totalling USD 63,805,919, and (ii) interest on the amount of costs awarded from the date of the Award up through the date of payment.[946] In their Reply Submissions on Costs, Claimants request that the Tribunal award their full costs of these proceedings, including the additional USD 155,291 for White & Case's legal fees to prepare the two costs submissions, thus totaling USD 63,961,210, plus interest from the date of the Award up through the date of payment.[947]

1326.   ***Respondent*** requests that Claimants bear their own costs, and to fully indemnify, jointly and severally, Respondent for its costs, including legal fees and expenses, incurred in connection with this arbitration, in the amount of RON 60,568,106.64, EUR 2,309,548.68, and USD 2,907,283.41. Respondent requests in addition that, regardless of the outcome of the case, the Tribunal order Claimants to (i) compensate Respondent for its legal fees of RON 4,309,024.99 and expenses of RON 230,722.69, incurred in connection with Claimants' unsuccessful provisional measures applications; (ii) compensate Respondent for its legal fees and expenses of RON 6,981,231.30 (legal fees) and RON 24,305.64 and USD 169,160 (expenses), incurred to defend against Claimants' belated alternative claims; (iii) bear their own costs in relation thereto; and (iv) pay simple interest on the amounts awarded to Respondent, at a risk-free rate as from the date of the Award.[948]

### 2.   The Parties' positions

#### a.   Claimants

1327.   Claimants submit that Respondent should bear all costs of this proceeding. Specifically, ICSID tribunals often apply the principle of "costs follow the event" to award the successful party its costs, and the *Chorzow Factory* general principle that reparation must

---

[946] Claimants' Submission on Costs, dated 16 December 2022 ("C-Costs"), para. 18.

[947] Claimants' Reply Submission on Costs, dated 6 January 2023 ("C-Reply Costs"), para. 24.

[948] Respondent's Submission on Costs, dated 16 December 2022 ("R-Costs"), paras 2, 25-27. See also Respondent's Reply Submission on Costs, dated 6 January 2023 ("R-Reply Costs"), para. 20.

wipe out all consequences of the treaty breach. As the record establishes that Romania breached the BITs and caused tremendous losses to Claimants, and as the successful party, Claimants should receive the costs they reasonably incurred for this arbitration.[949]

1328.    Further, Claimants' costs in this case are reasonable. When assessing the reasonableness of claimed costs, tribunals have considered factors such as the length of the proceedings, the volume of the evidentiary record, the complexity of the disputed issues, and the amount of compensation requested. Applying these factors, Claimants' costs are reasonable, the case record being massive, the disputed issues complex and technical, Claimants two separate juridical entities, and the stakes high. In other large complex cases lasting many years, tribunals have awarded substantial costs to successful claimants. In this case, there can be no question that Claimants presented their claims vigorously and in good faith thus justifying an award of their costs as incurred. Moreover, a number of additional factors at issue in this case aggravated Claimants' costs, which likewise should be taken into account when assessing the reasonableness of Claimants' claim in this respect: (i) access to classified and confidential documents; (ii) VAT reassessment; (iii) protecting RMGC's witnesses from retaliation; (iv) document production; (v) Respondent's additional jurisdictional objection; (vii) Respondent's abusive Rejoinder, (viii) Respondent's request to bifurcate the hearing; (ix) Respondent's "rebuttal" expert reports; (x) Respondent's reactivated UNESCO application; (xi) non-disputing parties submissions and transparency.[950]

1329.    Accordingly, Claimants quantify their costs as follows:

-    Total professional fees (attorneys, witness, and expert fees): USD 61,557,860

-    Total administrative costs: USD 972,979

-    Total arbitration costs paid to ICSID: USD 1,275,080.[951]

1330.    In their Reply Submission on Costs, Claimants point to the fact that Respondent acknowledges that costs should follow the event and reiterate that Respondent is the losing party and should bear all the costs.[952] They further submit that Respondent's request for costs as the losing party is baseless. Specifically, (i) Respondent misrepresents the necessity for and outcome of Claimants' provisional measures requests, and (ii) the Tribunal directed questions in PO No. 27 to both Parties and Claimants presented their case fully in their Memorial and there is no basis to award to Respondent any of the costs it incurred to address questions that the Tribunal directed to

---

[949] C-Costs, paras 2-6.
[950] C-Costs, paras 7-16.
[951] C-Costs, para. 17.
[952] C-Reply Costs, paras 2-7.

both Parties; and (iii) submissions regarding alternative measures of damages and the effect of Romania's UNESCO inscription do not provide any basis for Respondent to recover costs.[953]

1331.    Claimants opposed these costs submissions as unnecessary, but the Tribunal ordered them at Respondent's insistence. Claimants accordingly request that the Tribunal award their full costs of these proceedings, including the additional USD 155,291 for White & Case's legal fees to prepare the two costs submissions, thus totaling USD 63,961,210, plus interest from the date of the Award up through the date of payment.[954]

### b.  Respondent

1332.    Respondent submits that Claimants should be held responsible for the costs of this arbitration and for Respondent's legal fees and expenses.[955]

1333.    According to Respondent, the guiding principle in ICSID arbitration is that costs follow the event and accordingly the prevailing party should be reimbursed its reasonable costs. When exercising their discretion to allocate costs, ICSID tribunals have also taken into account the circumstances of the case, including "*the procedural conduct of the parties, and in particular whether such conduct delayed the proceedings or increased costs unnecessarily.*"[956]

1334.    Applying these principles, the Tribunal should make an award of full costs in Respondent's favor and order Claimants to bear their own costs. Specifically: (i) Claimants have failed to establish the Tribunal's jurisdiction; (ii) even if the Tribunal were to find that it does have jurisdiction over some claims, Claimants struggled throughout the proceedings and failed to articulate a cogent factual and legal case or to establish a breach of the BITs, they have failed to establish a causal link between the alleged breaches of the BITs and their purported damages, and their quantification of their alleged damages is fundamentally divorced from reality. Respondent on the other hand acted diligently and efficiently throughout the proceedings to defend against unmeritorious claims, as reflected in its legal fees and expenses which are reasonable. The award of the entirely of Respondent's costs is therefore justified.[957]

1335.    Respondent specifically claims the following:

---

[953] C-Reply Costs, paras 7-23.
[954] C-Reply Costs, para. 24.
[955] R-Costs, para. 2.
[956] R-Costs, paras 3-4.
[957] R-Costs, paras 5-8.

- Respondent's share of ICSID/Tribunal fees: USD 1,050,000

- Legal fees and expenses: EUR 90,095.22, RON 58,789,118.30 and USD 40,162.50

- Experts' fees and expenses: EUR 2,219,453.46, RON 1,778,988.34 and USD 1,817,120.91.[958]

1336.   In addition, and irrespective of the outcome of the case, the Tribunal should order Claimants to bear the additional costs that Respondent incurred because of Claimants' conduct in the course of arbitration. When allocating costs, the Tribunal should specifically take into account Claimants' three unsuccessful provisional measures applications and their failure to present their case in a timely and efficient manner (specifically, they have continuously altered their case theory and claims including in their answers to the Tribunal's PO No. 27 questions following the Hearing of December 2019).[959]

1337.   In its Reply Submission on Costs, Respondent submits that Respondent should not bear Claimants' unreasonable costs.[960] Specifically, Claimants' legal fees and expenses are not reasonable: they are unjustifiably high by any standard. Indeed, there is no justification for the disparity between the Parties' legal fees and expenses. The size and complexity of this case do not justify the amount of Claimants' legal fees and expenses. Claimants' attempt to justify their excessively high fees by reference to four factors considered by other tribunals to assess the reasonableness of costs fails. These factors do not support Claimants' position. Claimants also fail to defend their excessively high fees. Finally, their distorted description of the record must be corrected.[961]

1338.   Respondent reiterates that Claimants' procedural conduct (including unsuccessful requests for provisional measures), warrants, in any event, a cost order against them.[962]

### 3. The Tribunal's analysis

1339.   The issue before the Tribunal in relation to the legal costs and the arbitration costs concerns the allocation of such costs and, in relation to the legal costs claimed by each Party, their reasonableness. To decide, the Tribunal will first set out the relevant rules and principles on this matter.

---

[958] R-Costs, para. 9.
[959] R-Costs, paras 11-24.
[960] R-Reply Costs, paras 3-4.
[961] R-Reply Costs, paras 5-17.
[962] R-Reply Costs, paras 18-19.

### a. The legal framework

1340.  The legal framework for the allocation of the arbitration costs is set out in Article 61(2) of the ICISD Convention and ICSID Arbitration Rule 28(1).

1341.  Pursuant to Article 61(2) of the ICSID Convention,

> [i]*n the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*

1342.  ICSID Arbitration Rule 28(1) provides that,

> [w]*ithout prejudice to the final decision on the payment of the cost of the proceeding, the Tribunal may, unless otherwise agreed by the parties, decide: (a) at any stage of the proceeding, the portion which each party shall pay, pursuant to Administrative and Financial Regulation 14, of the fees and expenses of the Tribunal and the charges for the use of the facilities of the Centre; (b) with respect to any part of the proceeding, that the related costs (as determined by the Secretary-General) shall be borne entirely or in a particular share by one of the parties.*

1343.  Further, Article XIII(9) of the Canada-Romania BIT provides that

> [a] *tribunal may award, separately or in combination, only: (a) Monetary damages and any applicable interest; (b) Restitution of property, in which case the award shall provide that the disputing Contracting Party may pay monetary damages and any applicable interest in lieu of restitution. A tribunal may also award costs in accordance with the applicable arbitration rules.*

1344.  The UK-Romania BIT does not address costs for investor-State arbitrations.

1345.  In view of the applicable legal framework, it is undisputed and the Parties agree that the Tribunal has a wide discretion in deciding on the allocation of costs. At the same time, the Parties also agree that, in principle, the "costs follow the event" approach should apply, i.e. that the Tribunal should be guided by its conclusions on jurisdiction and liability. Respondent also considers that the Tribunal should take into account the procedural conduct of the Parties when making its decision.

### b. The arbitration costs

1346.   The costs of the arbitration proceedings, including the Tribunal's fees and expenses, the administrative fees of the ICSID and direct expenses are as follows:

- **Tribunal's fees and expenses**

    Prof. Pierre Tercier                    USD 1,092,741.28

    Prof. Zachary Douglas            USD 446,254.57

    Prof. Horacio Grigera Naón     USD 631,750.00

    Ms. Teresa Cheng                USD 58,500.00

- **Tribunal Assistant's fees and expenses**    USD 25,666.77
- **ICSID administrative costs**    USD 316,000.00
- **Direct expenses**    USD 304,235.41
- **Total**    USD 2,875,148.03

1347.   The above arbitration costs have been paid out of the advances made by the Parties in equal parts.[963] As a result, each Party's share of the costs of arbitration amounts to USD USD 1,437,574.01.

### c. The legal costs

1348.   The legal costs claimed by each Party are as follows:

- Claimants:

    o   Professional fees (attorneys, witness, and expert fees): USD 61,713.151[964]

    o   Administrative costs: USD 972,979

    o   Total: USD 62,686,130

---

[963] The remaining balance will be reimbursed to the Parties in proportion to the payments that they advanced to ICSID.
[964] The total amount of professional fees stated in Claimants' Submission on Costs, USD 61,557,860, plus the USD 155,291 added in Claimants' Reply Submission on Costs.

- Respondent:

  o Legal fees and expenses: EUR 90,095.22, RON 58,789,118.30 and USD 40,162.50

  o Experts' fees and expenses: EUR 2,219,453.46, RON 1,778,988.34 and USD 1,817,120.91

  o Total: EUR 2,309,548.68, RON 60,568,106.64 and USD 1,857,283.41

### d. The allocation of the costs

1349. In the present case, the Tribunal has:

- Dismissed Claimants' provisional measures applications;

- Dismissed Respondent's objections to the Tribunal's jurisdiction and to the admissibility of the claims;

- Dismissed Claimants' claims on liability.

1350. In all cases, the Tribunal considers that both Parties have presented serious and reasonable claims and defenses. It does not consider that any claim or defense was frivolous, regardless of whether such claim or defense was rejected or not.

1351. Furthermore, the Tribunal notes that both Parties could have presented their arguments more efficiently, both in terms of content, length and timing. Indeed, some claims and arguments were made late and, at the same time, the presentation of the claims and defenses and the relevant applications were numerous, lengthy, repetitive, and not always helpful in determining the core issues of this case.

1352. Both Parties have advocated for the application of the costs follows the event principle. The relevant event is that all Claimants' claims have ultimately been dismissed. Whilst Respondent did raise jurisdiction and admissibility objections that were ultimately rejected, these were not bifurcated and addressed in a separate phase of the proceedings. This limited the time and expense associated with pleading and deciding those issues.

1353. Given the ultimate result and the Parties' agreement that costs should follow the event, the Tribunal considers that Claimants should be liable to make a contribution to Respondent's arbitration and legal costs.

1354. *First*, in relation to the arbitration costs, the Tribunal finds that Respondent is entitled to the full reimbursement of its arbitration costs (i.e. the amounts paid to ICSID to cover

the ICSID Secretariat's costs as well as the Tribunal's fees an expenses) in the amount of USD 1,437,574.01.[965]

1355.    *Second*, in relation to Respondent's legal costs, the Tribunal must first assess whether such costs are reasonable. In this case there is a massive disparity between the legal costs incurred by Claimants (approximately USD 62.6 million) and those incurred by Respondent (approximately USD 17.5 million)[966]. In these circumstances, it would be difficult for Claimants to maintain that Respondent's costs were exorbitant or not reasonably incurred, and they have not sought to do so. The Tribunal can thus proceed on the basis that Respondent's legal costs were reasonable in the circumstances.

1356.    The Tribunal considers, in the exercise of its discretion, that it would be appropriate in this case for Claimants to reimburse Respondent for half of its legal costs in the amount of EUR 1,154,774.34, RON 30,284,053.32 and USD 928,641.70. The Tribunal also considers that it is appropriate to award simple interest as requested by Respondent, i.e., simple interest at a risk-free rate as represented by the rate of interest on a three-month US Treasury bill as from the date of this Award and until full payment.

### 4.  The conclusion

1357.    In light of the foregoing, the Tribunal, ***by majority***, decides that

> ***Claimants shall reimburse Respondent for its arbitration costs (i.e., USD 1,437,574.01) and for half of its legal costs (i.e., EUR 1,154,774.34, RON 30,284,053.32, and USD 928,641.70). Simple interest at a risk-free rate as represented by the rate of interest on a three-month US Treasury bill as from the date of this Award and until full payment.***

---

[965] However, any costs arising out of the redaction process of the Award will be borne by both Parties in equal parts.

[966] Calculated applying currency conversion rates at the date of the Award.

## C.     AWARD

1358.     For the reasons set forth above the Arbitral Tribunal decides the following:

>   **1.     *Unanimously rejects Respondent's objections to the Tribunal's jurisdiction and to the admissibility of the claims.***
>
>   **2.     *By majority:***
>
>   >   **a.     *Rejects Claimants' claims on the merits under the Canada-Romania BIT and under the UK-Romania BIT.***
>   >
>   >   **b.     *Orders Claimants to reimburse Respondent for the costs of the arbitration proceedings in the amount of USD 1,437,574.01, together with simple interest at a risk-free rate as represented by the rate of interest on a three-month US Treasury bill as from the date of this Award and until full payment.***
>   >
>   >   **c.     *Orders Claimants to reimburse Respondent for a portion of its legal costs in the amount of EUR 1,154,774.34, RON 30,284,053.32, and USD 928,641.70, together with simple interest at a risk-free rate as represented by the rate of interest on a three-month US Treasury bill as from the date of this Award and until full payment.***
>   >
>   >   **d.     *Rejects all other claims made by the Parties.***

[ *Signed* ]

_____
Prof. Horacio A. Grigera Naón
Arbitrator

Date: 8 March 2024

(subject to the attached dissenting opinion)

[ *Signed* ]

_____
Prof. Zachary Douglas KC
Arbitrator

Date: 8 March 2024

[ *Signed* ]

_____
Prof. Pierre Tercier
President of the Tribunal

Date: 8 March 2024