# Exhibit 21

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**ADRIA GROUP B.V. AND ADRIA GROUP HOLDING B.V.**

Claimants

and

**REPUBLIC OF CROATIA**

Respondent

**ICSID Case No. ARB/20/6**

---

# DECISION ON INTRA-EU JURISDICTIONAL OBJECTION

---

*Members of the Tribunal*
Sir Christopher Greenwood GBE, CMG, KC, President of the Tribunal
Dr Charles Poncet, Arbitrator
Mr J Christopher Thomas KC, Arbitrator

*Secretary of the Tribunal*
Dr Laura Bergamini

*Date of dispatch to the Parties:* 31 October 2023

REPRESENTATION OF THE PARTIES

*Representing Adria Group B.V. and Adria Group Holding B.V.*:

Dr Michael Bühler
Mr Charles Kaplan
Ms Nicole Dolenz
Mr Stanislas Walch
Orrick, Herrington & Sutcliffe LLP
61 rue des Belles Feuilles
75116 Paris
France

*Representing the Republic of Croatia*:

Mr David Pawlak
Mr Daniel Purisch
Ms Michelle Boyle
David A. Pawlak LLC
Ul. Marokanska 21C
03-977 Warsaw
Poland

  and

Mr Constantinos Salonidis
Mr Andrew Loewenstein
Ms Christina Hioureas
Ms Eva Paloma Treves
Foley Hoag LLP
1717 K Street NW
Washington, DC 20036-5342
United-States of America

  and

Ms Sanja Dumbović, Deputy State Attorney General
Dr Jadranka Osrečak, Deputy Municipal State Attorney in Zagreb seconded to the State Attorney's Office of the Republic of Croatia
Ms Marijana Bertović Đurović, Deputy Municipal State Attorney in Zagreb seconded to the State Attorney's Office of the Republic of Croatia
State Attorney's Office of the Republic of Croatia
Gajeva 30a
10000 Zagreb
Croatia

i

**TABLE OF CONTENTS**

TABLE OF SELECTED ABBREVIATIONS AND DEFINED TERMS ................................... IV

I.  INTRODUCTION AND PARTIES .............................................................. 1

II. PROCEDURAL HISTORY ...................................................................... 3

III. THE BIFURCATION AGREEMENT AND THE PARTIES' REQUESTS FOR RELIEF 11

    A.  The Bifurcation Agreement .............................................................. 11

    B.  The Parties' Requests for Relief in the Initial Jurisdictional Phase ............................ 12

IV. BACKGROUND AND PARTIES' TIMELINE OF KEY EVENTS ................................... 14

    A.  Factual Background .................................................................... 14

    B.  Events Timeline relating to the Respondent's Preliminary Objection ......................... 15

V.  KEY TREATY PROVISIONS ................................................................... 17

VI. THE SUBMISSIONS OF THE PARTIES .......................................................... 30

    A.  The Respondent ....................................................................... 30

        (1)  The Termination Treaty Argument .............................................. 31

        (2)  The MS Declaration Argument .................................................. 33

        (3)  The Sunset Clause ............................................................ 37

        (4)  Good Faith .................................................................. 37

        (5)  Applicable Law .............................................................. 38

    B.  The Claimants ........................................................................ 38

        (1)  The Irrelevance of EU Law to the Present Case ................................... 39

        (2)  The Termination Treaty ....................................................... 40

        (3)  The Member States Declaration ................................................ 41

        (4)  The Sunset Clause ............................................................ 42

        (5)  The Alleged Waiver of the Claimants' Claims by the Netherlands ..................... 42

        (6)  Whether the Preliminary Objection was made in Good Faith .......................... 43

    C.  The European Commission .............................................................. 43

    D.  The Kingdom of the Netherlands ........................................................ 44

VII. THE TRIBUNAL'S ANALYSIS AND DECISIONS ................................................ 46

    A.  The Issue of Good Faith ................................................................ 46

    B.  Applicable Law ....................................................................... 46

        (1)  Article 42(1) of the ICSID Convention ........................................... 46

        (2)  The Role of European Union Law ................................................ 48

(3)   The Different Elements of International Law ............................................... 52

C.   The Relationship between Different Arguments in Support of the Preliminary
Objection ............................................................................................................... 57

D.   The Judgments of the CJEU and the Effects of EU Law .............................................. 58

(1)   The Position of the European Commission ......................................................... 58

(2)   The Judgments of the CJEU ................................................................................ 59

(3)   The Effect of EU Law on the BIT as a Matter of International Law .................... 64

a.   Was the BIT Terminated in Whole or in Part as a Result of the Achmea
Judgment? ................................................................................................. 64

b.   Primacy and the Application of Article 30 VCLT ....................................... 67

E.   The Termination Treaty ............................................................................................. 72

(1)   The Retroactive Effect of the Termination Treaty and the Offer of Arbitration .. 75

(2)   The Termination Treaty as a Subsequent Agreement or Subsequent Practice by
the Parties to the BIT ............................................................................................ 78

(3)   The Termination Treaty as "Confirmation" of Prior Developments regarding
Article 9 of the BIT ............................................................................................... 83

F.   The Member States' Declaration ................................................................................ 83

(1)   The Status of the MS Declaration ....................................................................... 84

(2)   The Core Provisions of the MS Declaration ........................................................ 85

(3)   Did the MS Declaration Terminate the BIT or Article 9 thereof ? ....................... 86

(4)   Did the Member States' Declaration Suspend Article 9? ..................................... 87

(5)   The Member States' Declaration and the Interpretation of the BIT .................... 88

(6)   The Effect of the Declaration that the Arbitration Clauses were Inapplicable ..... 89

VIII.  COSTS ............................................................................................................................ 94

A.   Claimants' Cost Submission ...................................................................................... 94

B.   Respondent's Cost Submission .................................................................................. 94

C.   The Tribunal's Decision on Costs .............................................................................. 95

IX.   DECISION ..................................................................................................................... 97

### TABLE OF SELECTED ABBREVIATIONS AND DEFINED TERMS

| | |
|---|---|
| *Achmea* Judgment | Judgment of the Court of Justice of the European Union in *Slowakische Republik v. Achmea BV*, Case C-284/16 dated 6 March 2018 |
| Adria | Adria Group B.V. |
| Adria Holding | Adria Group Holding B.V. |
| Agrokor | Agrokor d.d. |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings in force as of 10 April 2006 |
| Bifurcation Agreement | Parties' agreement to bifurcate the proceedings into a separate preliminary phase addressing the Respondent's preliminary objection to the Tribunal's jurisdiction based upon (i) the entry into force of the Agreement for the Termination of Bilateral Investment Treaties between the Member States of the European Union; (ii) the joint statement of the Republic of Croatia and the Netherlands transmitted to ICSID on 27 November 2020; and (iii) the jurisprudence of the Court of Justice of the European Union in regard to the validity of offers by Member States of the European Union to arbitrate disputes arising under investment treaties with investors from other Member States of the European Union |
| BIT or the Treaty | Agreement on Encouragement and Reciprocal Protection of Investments between the Republic of Croatia and the Kingdom of the Netherlands dated 28 April 1998 (entered into force on 1 June 1998) |
| BIT States | Republic of Croatia and the Kingdom of the Netherlands |
| C-[#] | Claimants' Exhibit |

iv

| | |
|---|---|
| C-Mem. or the Counter-Memorial | Claimants' Counter-Memorial dated 17 March 2022 |
| CJEU | European Court of Justice and Court of Justice of the European Union |
| CL-[#] | Claimants' Legal Authority |
| Claimants | Adria Group B.V. and Adria Group Holding B.V. |
| Claimants' PHB | Claimants' Post-Hearing Brief dated 16 November 2022 |
| Claimants' Reply PHB | Claimants' Reply Post-Hearing Brief dated 30 November 2022 |
| EC Brief | European Commission non-disputing party brief, 17 March 2022 |
| 2018 EC Communication | European Commission published its Communication to the European Parliament and the Council: Protection of intra-EU investment, COM 547(2018) dated 19 July 2018 |
| EU | European Union |
| EU Treaties | Treaty on the European Union and Treaty on the Functioning of the European Union |
| Hearing | Hearing on the Preliminary Objection on 20 and 21 September 2022 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| Joint Statement | Joint Statement of the Contracting Parties to the Agreement on Encouragement and Reciprocal Protection of Investments between the Republic of Croatia and the Kingdom of the Netherlands, dated 18 November 2020 |

| | |
|---|---|
| *Komstroy* Judgment | Judgment of the Court of Justice of the European Union in *Republic of Moldova v. Komstroy LLC*, Case No. C-741/19, of 2 September 2021 |
| Mem. or the Memorial | Respondent's Memorial dated 22 December 2021 |
| MS | European Union Member States |
| MS Declaration or Declaration | Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union dated 15 January 2019 |
| Preliminary Objection | Croatia's preliminary objection to the Tribunal's jurisdiction as defined in the Bifurcation Agreement dated 9 September 2021 |
| R-[#] | Respondent's Exhibit |
| Rej. or the Rejoinder | Claimants' Rejoinder on Jurisdiction dated 6 July 2022 |
| Reply | Respondent's Reply on Jurisdiction dated 9 May 2022 |
| Respondent or Croatia | Republic of Croatia |
| Respondent's PHB | Respondent's Post-Hearing Brief dated 16 November 2022 |
| Respondent's Reply PHB | Respondent's Reply Post-Hearing Brief dated 30 November 2022 |
| RL-[#] | Respondent's Legal Authority |
| Request | Claimants' Request for Arbitration dated 14 February 2020 |
| The Netherlands | The Kingdom of the Netherlands |
| Mr Todorić | Mr Ivica Todorić |
| TEU | Treaty on the European Union |

| | |
|---|---|
| TFEU | Treaty on the Functioning of the European Union |
| Termination Treaty | Agreement for the Termination of Bilateral Investment Treaties between the Member States of the European Union dated 5 May 2020 and entered into force on 29 August 2020 |
| Transcript, Day [#], p. [#] | Transcript of the Hearing |
| Tribunal | Arbitral tribunal constituted on 3 May 2021 |
| VCLT | Vienna Convention on the Law of Treaties |

## I.    INTRODUCTION AND PARTIES

1.    This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Agreement on Encouragement and Reciprocal Protection of Investments between the Republic of Croatia and the Kingdom of the Netherlands dated 28 April 1998, which entered into force on 1 June 1998 (the "**BIT**" or "**Treaty**") and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**").

2.    The Claimants are Adria Group B.V. ("**Adria**"), a company incorporated under the laws of the Kingdom of the Netherlands, and Adria Group Holding B.V. ("**Adria Holding**"), a company also incorporated under the laws of the Kingdom of the Netherlands (together, the "**Claimants**").

3.    The Respondent is the Republic of Croatia ("**Croatia**" or the "**Respondent**").

4.    The Claimants and the Respondent are collectively referred to as the "**Parties**."  The Parties' representatives and their addresses are listed above on page (i).

5.    This dispute relates to the Claimants' alleged investments in Agrokor d.d. ("**Agrokor**") a private limited company incorporated under the laws of Croatia, operating in numerous sectors such as agriculture, food and beverages, retail, asset trading and hospitality.

6.    Based on the Parties' agreement to bifurcate this proceeding dated 9 September 2021 (the "**Bifurcation Agreement**"), this ruling addresses the Respondent's preliminary objection to the Tribunal's jurisdiction based upon (i) the entry into force of the Agreement for the Termination of Bilateral Investment Treaties between the Member States of the European Union dated 5 May 2020 (the "**Termination Treaty**"); (ii) the joint statement of the Respondent and the Kingdom of the Netherlands regarding the inapplicability of the BIT's disputes resolution clause transmitted to ICSID on 27 November 2020 (the "**Joint Statement**"); as well as (iii) the jurisprudence of the Court of Justice of the European

Union (the "**CJEU**") in regard to the validity of offers by Member States of the European Union (the "**EU**") to arbitrate disputes arising under investment treaties with investors from other Member States of the European Union (the "**Preliminary Objection**").[1]

7.    The present decision therefore determines only this Preliminary Objection. It does not consider any other objection to jurisdiction or admissibility which might be made by the Respondent. Moreover, any summary of the "facts" is taken from the Request for Arbitration and is presented only by way of explanation of the background. It is not a finding of fact, or a pre-emption of any finding of fact, on the part of the Tribunal.

8.    While the issue before the Tribunal at this stage is confined to the single Preliminary Objection, the complex nature of that issue is made clear both by the extensive submissions of the Parties and the non-disputing parties and by the fact that the Parties submitted a total of 340 legal authorities to which the European Commission added a further 29 which had not already been introduced by one of the Parties.

---

[1]  The Bifurcation Agreement is annexed to Procedural Order No. 1 as Annex B. The principal provisions are set out at para. 53, below.

## II.    PROCEDURAL HISTORY

9.      On 14 February 2020, ICSID received a request for arbitration dated the same date from the Claimants against Croatia (the "**Request**").  The Request was accompanied by Exhibits CX-0001 to CX-0012 and Legal Authorities CL-0001 to CL-0003.

10.     On 2 March 2020, the Secretary-General of ICSID registered the Request in accordance with Article 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of ICSID's Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

11.     By letter of 27 April 2020, ICSID took note of the Parties' agreement to constitute the Tribunal in accordance with Article 37(2)(a) of the ICSID Convention as follows: the Tribunal would consist of three arbitrators, one to be appointed by each Party and the third, presiding arbitrator to be appointed by agreement of the Parties.  On the same date, the Claimants appointed Dr Charles Poncet as arbitrator in this case.

12.     On 30 April 2020, ICSID informed the Parties that Dr Poncet accepted his appointment as arbitrator and transmitted his declaration under Arbitration Rule 6(2) together with disclosures that he subsequently complemented.

13.     By letter of 12 June 2020, the Claimants requested a confirmation from the Respondent "that the current status quo of Mr Todorić's de facto confinement will not be negatively impacted, that it does not intend to bring any criminal charges against Mr. Todorić at this time and more generally, that no further actions will be taken to aggravate the pending dispute" and urged the Centre to direct the Respondent to refrain from aggravating the dispute.[2]  By letter of the same date, the Centre noted that the Claimants had not filed a request for provisional measures yet and a corresponding application to the Secretary-

---

[2] Claimants' letter of 12 June 2020.

General pursuant to Rule 39(5) of the ICSID Rules of Procedure for Arbitration Proceedings ICSID in force as of 10 April 2006 ("**Arbitration Rules**").

14.   On 22 June 2020, the Respondent responded to the Claimants' letter of 12 June 2020, rejecting the demands made by the Claimants, and submitted Exhibit RX-0001.

15.   On 29 June 2020, the Respondent appointed Mr J Christopher Thomas, KC, as arbitrator in this case.  ICSID informed the Parties that Mr Thomas accepted his appointment on 1 July 2020 and transmitted his declaration under Arbitration Rule 6(2) with disclosures.

16.   On 3 December 2020, the Respondent transmitted to the Centre a letter dated 27 November 2020 from Croatia's Minister of Foreign and European Affairs, D Sc Gordan Grilić Radman, to Croatia's State Attorney General, Ms Zlata Hrvoj-Šipek, including the "*Joint Statement of the Contracting Parties to the Agreement on Encouragement and Reciprocal Protection of Investments between the Republic of Croatia and the Kingdom of the Netherlands*" dated 18 November 2020 (the already defined **Joint Statement**).[3]  In the Joint Statement, Croatia and the Netherlands informed the tribunal that they "*share[d a] common understanding with respect to the BIT, as ... expressed in Article 4(1) of the Termination Treaty*" and that they had intentions "*in line with the above-mentioned Termination Treaty*."

17.   Following exchanges between the Parties and ICSID, on 30 April 2021, the Parties informed the Centre that they had appointed Sir Christopher Greenwood GBE, CMG, KC, as President of the Tribunal.

18.   On 3 May 2021, ICSID informed the Parties that Sir Christopher accepted his appointment and transmitted his declaration under Arbitration Rule 6(2) together with disclosures.

19.   The Tribunal is composed of Sir Christopher Greenwood, GBE, CMG, KC, a national of the United Kingdom, President, appointed by agreement of the Parties; Dr Charles Poncet,

---

[3] Also submitted as Exhibit **R-0016**.

a national of Switzerland, appointed by the Claimants; and Mr J Christopher Thomas, KC, a national of Canada, appointed by the Respondent.

20.    On 3 May 2021, the Secretary-General, in accordance with Arbitration Rule 6(1), notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Dr Laura Bergamini, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

21.    On 9 September 2021, the Parties transmitted their joint comments on draft Procedural Order No. 1 (circulated by the Tribunal on 5 August 2021) and informed the Tribunal that they agreed on having the proceedings bifurcated in an initial jurisdictional phase addressing the Preliminary Objection (the "**Initial Jurisdictional Phase**").

22.    In accordance with Arbitration Rule 13(1), the Tribunal held a first session with the Parties on 14 September 2021, by videoconference.

23.    Following the first session, on 21 September 2021, the Tribunal issued Procedural Order No. 1 concerning procedural matters.  Procedural Order No. 1 provides, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006 and sets out a schedule for the Initial Jurisdictional Phase.

24.    On 4 and 5 November 2021, within the time limit indicated by the Tribunal, the European Commission (the "**EC**") and the Kingdom of the Netherlands (the "**Netherlands**") filed their applications for leave to intervene as non-disputing parties pursuant to Arbitration Rule 37(2).

25.    On 22 November 2021, the Parties submitted their observations on the EC's and the Netherlands' applications for leave to intervene as non-disputing parties.

26.    On 24 November 2021, the Tribunal granted the EC's and the Netherlands' applications.

27.    On 22 December 2021, the Respondent filed its Memorial in the Initial Jurisdictional Phase, along with Exhibits R-0002 through R-0016 and Legal Authorities RL-0001 through RL-0035 (the "**Memorial**").[4]

28.    On 17 March 2022, the Netherlands and the EC submitted their respective submissions as non-disputing parties ("**Netherlands Brief**" and "**EC Brief**").  The EC's submission was accompanied by numerous annexes.

29.    On the same date, the Claimants filed their Counter-Memorial on Jurisdiction, along with Exhibits C-0013 through C-0024 and Legal Authorities CL-0004 through CL-0126 (the "**Counter-Memorial**").[5]

30.    On 9 May 2022, the Respondent filed its Reply in the Initial Jurisdictional Phase, along with Exhibits R-0017 through R-0031 and Legal Authorities RL-0036 through RL-0080 (the "**Reply**").

31.    By letter of 23 May 2022, the Respondent requested that the Tribunal direct the Claimants to abstain from making public disclosures regarding the arbitration that might risk further aggravating the dispute and to provide any relevant information regarding possible third-party funding.  The Respondent's letter was accompanied by Exhibits R-0017, R-0032 and R-0033 as well as Legal Authorities RL-0081 through RL-0085.

32.    On 3 June 2022, the Claimants submitted their response to the Respondent's request of 23 May 2022, along with Appendix A.

33.    On 8, 10, 13, and 15 June 2022, the Parties exchanged further observations on the Respondent's request of 23 May 2022.

---

[4] The Respondent submitted Exhibit **RX-0001** with its letter of 22 June 2020.

[5] The Claimants submitted Exhibits **CX-0001** to **CX-0012** and Legal Authorities **CL-0001** to **CL-0003** with the Request.

34. On 19 June 2022, following exchanges between the Parties and the Tribunal on the format and venue for the hearing of the Initial Jurisdictional Phase, the Tribunal confirmed that the hearing would take place in-person in London.

35. On 27 June 2022, the Tribunal issued Procedural Order No. 2 deciding the Respondent's request of 23 May 2022.

36. On 6 July 2022, the Claimants filed their Rejoinder on Jurisdiction along with Legal Authorities CL-0127 through CL-0189 (the "**Rejoinder**").

37. On 11 July 2022, the Claimants made two requests concerning the organization of the hearing, and on 29 July 2022, the Parties transmitted to the Tribunal their comments on the draft procedural order on the organization of the hearing transmitted by the Tribunal on 18 July 2022.

38. On 2 August 2022, the Parties and the President of the Tribunal, on behalf of the Tribunal, held a pre-hearing organizational meeting by videoconference.

39. On 3 August 2022, the Tribunal issued Procedural Order No. 3 concerning the organization of the hearing.

40. On 30 August 2022, the Parties submitted a joint chronology of facts relevant to the Preliminary Objection, as provided in paragraph 17 of Procedural Order No. 3.

41. On 31 August 2022, each Party submitted a list of substantive issues that it considered relevant for the adjudication of the Preliminary Objection.

42. A hearing on the Preliminary Objections was held at the IDRC in London on 20 and 21 September 2022 with certain participants connecting remotely from different locations (the "**Hearing**"). The following persons participated in the Hearing:

*Tribunal*:
    Sir Christopher Greenwood GBE, CMG, KC        President
    Dr Charles Poncet                            Arbitrator
    Mr J Christopher Thomas KC                    Arbitrator

*ICSID Secretariat*:
    Dr Laura Bergamini                     Secretary of the Tribunal

*For the Claimants*:
    Dr Michael Buhler                     Orrick Rambaud Martel
    Mr Charles Kaplan                   Orrick Rambaud Martel
    Ms Nicole Dolenz                    Orrick Rambaud Martel
    Mr Stanislas Walch                  Orrick Rambaud Martel
    Prof Dr Kirsten Schmalenbach        University of Salzburg
    Dr Astrid Reisinger Coracini         University of Vienna
    Ms Christabelle El Zeinaty          Orrick Rambaud Martel

*For the Respondent*:
    Mr Andrew Loewenstein            Foley Hoag LLP
    Mr David Pawlak                   David A. Pawlak LLC
    Mr Daniel Purisch                  David A. Pawlak LLC
    Mr Constantinos Salonidis         Foley Hoag LLP
    Ms Christina Hioureas            Foley Hoag LLP
    Ms Samanta Kolenovic          Foley Hoag LLP
    Ms Yara Zhu                       Foley Hoag LLP

*Court Reporter*:
    Ms Diana Burden                    Court Reporter

43.     The Parties' counsel presented opening statements on the first day of the Hearing and closing arguments on the second Hearing day. On the first Hearing day, counsel for the Respondent submitted a demonstrative exhibit in the form of a table listing the rulings "*rendered after the Achmea Judgment in intra-EU cases in chronological order*." The Parties addressed the table during their closing arguments and, at the end of the Hearing, the Tribunal requested the Parties to attempt to update and agree on the table. The Tribunal also gave directions to the Parties regarding the filing of post-hearing submissions.

44.     On 5 October 2022, the Parties informed the Tribunal that they had reached an agreement on the corrections to be entered into the transcripts.

45.     On 16 November 2022, the Parties filed their respective Post-Hearing Briefs (the "**Respondent's PHB**" and the "**Claimants' PHB**"). The Respondent's submission was accompanied by Exhibits R-0035S through R-0040S, Legal Authorities RL-0086S through

RL-0120S, and an updated version of the table of cases submitted as a demonstrative at the Hearing on 21 September 2022 ("**Respondent's Table on Post *Achmea* Decisions**"). The Claimants' PHB was accompanied by Legal Authorities CL-0190S through CL-0220S.

46.    On 17 November 2022, the Claimants submitted their table of decisions and awards post-*Achmea* in intra-EU cases and a redline showing the differences from the Respondent's table.

47.    On 18 November 2022, the Respondent provided comments on the document submitted by the Claimants as CL-0195S.

48.    On 23 November 2022, the Claimants confirmed that they did not seek to exclude Respondent's Table on *Post Achmea* Decisions from the record.

49.    On 30 November 2022, the Parties submitted their Reply Post-Hearing Briefs (the "**Respondent's Reply PHB**" and the "**Claimants' Reply PHB**"). In its Reply (fns. 11 and 25) the Respondent identified alleged errors in the English translations of two new authorities submitted by the Claimants, CL-0198S and CL-199S.

50.    On 6 December 2022, the Respondent submitted two amended versions of CL-0205S and CL-0206S and their translations, containing material allegedly omitted from the translations submitted by the Claimants with their PHB.

51.    The Respondent and the Claimants filed their costs submissions on 14 and 15 December 2022, respectively.

52.    On 27 December 2022, the Claimants informed the Tribunal that the Parties disagreed as to the English translation of the Claimants' authorities CL-0198S and CL-0199S (original in Dutch) and provided details on the Parties' divergent views.

53.    On 4 January 2023, the Respondent submitted comments on the Claimants' letter of 27 December 2022, together with certified translations of passages of the Claimants' authorities and a translator's declaration addressing the alleged Claimants' mistranslations.

54.    On 11 January 2023, the Claimants responded to the Respondent's letter of 4 January 2023 and resisted the Respondent's request that the Tribunal strike the Claimants' original translations of CL-0198S and CL-0199S from the record.

## III.    THE BIFURCATION AGREEMENT AND THE PARTIES' REQUESTS FOR RELIEF

### A.    THE BIFURCATION AGREEMENT

55.    As mentioned above, on 9 September 2021 the Parties informed the Tribunal that they had agreed to bifurcate the proceedings with an Initial Jurisdictional Phase devoted solely to the Respondent's Preliminary Objection to the Tribunal's jurisdiction.  The Bifurcation Agreement reads as follows:

> *1. The Parties have agreed to the bifurcation, into a separate preliminary phase (the "Initial Jurisdictional Phase"), of Respondent's objection to the Tribunal's jurisdiction based upon (i) the entry into force of the Agreement for the Termination of Bilateral Investment Treaties between the Member States of the European Union ("Termination Treaty") (entered into force for the Kingdom of the Netherlands, on 31 March 2021, and for the Republic of Croatia on 25 October 2021); (ii) the joint statement of Respondent and the Netherlands affirming the inapplicability of the BIT's disputes clause ("Joint Statement"), which was transmitted to ICSID on 27 November 2020; as well as (iii) the jurisprudence of the Court of Justice of the European Union in regard to the validity of offers by Member States of the European Union to arbitrate disputes arising under investment treaties with investors from other Member States of the European Union ("Preliminary Objection").*

> *2.    The Parties have further agreed that the Initial Jurisdictional Phase is without prejudice to Respondent's rights to advance further jurisdictional objections, including in view of the particulars of any Memorial submitted by Claimants, in Respondent's Counter-Memorial (or otherwise as may be agreed) and to seek bifurcation in respect of any such objections, as would normally apply under the applicable ICSID Rules. Claimants reserve their right to object to any request for bifurcation that may be made with Respondent's Counter-Memorial (or otherwise as may be agreed).*

> *3.    The procedural timetable for the Initial Jurisdictional Phase is set forth in Annex B. If a further phase is necessary, the Parties will promptly seek to agree on an additional procedural timetable*

*upon the issuance of the Tribunal's decision that constitutes the conclusion of the Initial Jurisdictional Phase.*[6]

**B.    THE PARTIES' REQUESTS FOR RELIEF IN THE INITIAL JURISDICTIONAL PHASE**

56.    In the Reply, the Respondent requested that the Tribunal:

   i.    Declare that the Tribunal has no jurisdiction over the Claimants' claims;

   ii.    Dismiss the Claimants' claims;

   iii.    Award the Respondent all fees and costs, including legal costs, that the Respondent has incurred in relation to this arbitration, with interest;

   iv.    Grant the Respondent any other relief that the Tribunal deems fit.[7]

57.    In their Counter-Memorial, the Claimants requested that the Tribunal:

   i.    Declare that the Tribunal has jurisdiction over the Claimants' claims;

   ii.    Award the Claimants all fees and costs, including legal costs, that the Claimants have incurred in relation to the Initial Jurisdictional Phase;

---

[6] Annex B to Procedural Order No. 1.

[7] Reply, para. 196; see also Memorial, para. 105 and Respondent's Reply PHB, para. 36.

       iii.     Proceed with this arbitration to allow the Claimants to present their case and request for relief on the merits without undue delay.[8]

---

[8] Counter-Memorial, para. 180; see also Rejoinder, para. 123, Claimants' PHB, para. 93, and Claimants' Reply PHB, para. 32.

## IV.     BACKGROUND AND PARTIES' TIMELINE OF KEY EVENTS

58.     The present section addresses the factual background to the proceedings insofar as that is relevant to the issues relating to the Preliminary Objection.  Most of the facts are agreed between the Parties. This section is set out in order to aid understanding of the issues. Nothing said here constitutes a finding by the Tribunal regarding any disputed issue of fact.

### A.     FACTUAL BACKGROUND

59.     The factual background as alleged by the Claimants (see para. 7, above) is as follows.

60.     Agrokor was originally established in 1976 by Mr Todorić and registered as a joint stock company, 100% owned by Mr Todorić, who also served as its Chief Executive Officer, in 1989.[9]  It grew into a multi-billion euro retail conglomerate.  In 2014 it was decided to take the company public.   To that end, two companies, Adria and Adria Holding, were incorporated in the Netherlands.  Mr Todorić transferred his (by then 95.52%) shareholding to Adria which in turn transferred it to Adria Holding.[10]  Adria Holding then invested over 183 million euros in Agrokor, the share capital of which was increased.[11]  Agrokor was to be taken public by means of three IPOs, the first of which was issued in 2016.[12]

61.     The Claimants allege that, although the precise details of the IPO plan were not made public, a number of very senior officials in Croatia became privy to that information and "*conspired to orchestrate a takeover of Agrokor*".[13]  These officials allegedly made serious false accusations regarding Agrokor and engaged in systematic harassment of Mr Todorović.[14]

---

[9] Request, para. 35.
[10] Request, para. 36.
[11] Request, para. 37.
[12] Request, paras. 40-42.
[13] Request, para. 43.
[14] Request, paras. 44-50.

62.     On that basis, the Claimants maintain that the Respondent violated: (i) the obligation, under Article 6 of the BIT, not to deprive them of their investment, directly or indirectly, except in the public interest, under due process of law, in a non-discriminatory fashion and subject to the payment of just compensation; and (ii) the duty, under Article 3 of the BIT, to accord the investment fair and equitable treatment and ensure that it enjoyed full protection and security.[15]

## B.    EVENTS TIMELINE RELATING TO THE RESPONDENT'S PRELIMINARY OBJECTION

63.     The timeline of events relevant to the determination of the Preliminary Objection is mostly agreed between the Parties.  The table of relevant facts jointly produced by the Parties on 30 August 2022 is reproduced below:[16]

| No. | Date | Event | Exh. No. |
|---|---|---|---|
| 1. | 28 April 1998 | Signature of the Croatia-Netherlands BIT. | CL-1 |
| 2. | 1 June 1998 | Entry into force of the Croatia-Netherlands BIT. | CL-1 |
| 3. | 1 July 2013 | Croatia's accession to the European Union. | N/A |
| 4. | 6 Mar. 2018 | The CJEU issues the *Achmea* Judgment. | RL-30 |
| 5. | 26 Apr. 2018 | Letter by the Dutch Minister for Trade and Development Cooperation to the Speaker of the Lower House of the Dutch Parliament providing the Dutch Cabinet's "appraisal of [the CJEU's *Achmea* Judgment] and an assessment of the consequences of the decision". | R-6 |
| 6. | 31 Oct. 2018 | The BGH sets aside the *Achmea* award, ruling that there was no arbitration agreement. | ECL-14 |
| 7. | Between Nov. 2018 and June 2019 | EU Member States establish an *ad hoc* Special Group to address the effects of the *Achmea* Judgment and prepare the draft text of a plurilateral agreement to terminate intra-EU BITs. | R-14 |
| 8. | 15 Jan. 2019 | Declaration of 22 EU Member States on the Legal Consequences of the Judgment of the CJEU in *Achmea* and on Investment Protection in the European Union. | R-8 |

---

[15] Request, paras. 51-54.

[16] On 19 September 2022, the Respondent submitted a revised version of the chronology of the facts, detailing its position on certain relevant facts already included in the table.

| 9. | 24 Oct. 2019 | EU Member States' Ambassadors and Permanent Representatives reach agreement on the Termination Treaty. | **R-12** |
| 10. | 4 Nov. 2019 | Full text of the Termination Treaty becomes publicly available. | **R-13, R-11** |
| 11. | 14 Feb. 2020 | Claimants file Request for Arbitration with ICSID. | **N/A** |
| 12. | 2 Mar. 2020 | ICSID registration of Claimants' Request for Arbitration. | **N/A** |
| 13. | 5 May 2020 | Signature of the Termination Treaty by 23 EU Member States, including the Netherlands and Croatia. | **R-15** |
| 14. | 29 Aug. 2020 | Entry into force of the Termination Treaty, after ratification by Denmark and Hungary. | **R-2** |
| 15. | 25 Oct. 2020 | Entry into force of the Termination Treaty for Croatia. | **R-2** |
| 16. | 18 Nov. 2020 | Joint statement of Croatia and the Netherlands regarding Article 9 of the Croatia-Netherlands BIT. | **R-16** |
| 17. | 3 Dec. 2020 | Croatia and the Netherlands communicate to ICSID their Joint Statement on the Tribunal's lack of jurisdiction. | **R-16** |
| 18. | 31 Mar. 2021 | Entry into force of the Termination Treaty for the Netherlands. | **R-2** |

64.    In its Memorial, the Respondent also identifies 19 July 2018 as a relevant date because of the publication of the EC Communication "*to the European Parliament and the Council: Protection of intra-EU investment, COM 547(2018)*" (the "**2018 EC Communication**"). According to the Respondent, in the 2018 EC Communication the EC declared that the principles enunciated in the *Achmea* Judgment imply that all investor-State arbitration clauses in intra-EU BITs are inapplicable, and that any arbitration tribunal established on the basis of those clauses lacks jurisdiction due to the absence of a valid arbitration agreement.[17]    In their Counter-Memorial, the Claimants argue that the 2018 EC Communication has no binding effect, is irrelevant as a matter of international law, and cannot qualify as a withdrawal of the Respondent's arbitration offer in the BIT.[18]

---

[17] Memorial, paras. 24, 25, 98; and **Exhibit R-0007**, pp. 3-4 of the pdf.
[18] Counter-Memorial, para. 29.

## V.    KEY TREATY PROVISIONS

65.    For ease of reference and to simplify the summary of the Parties' arguments, the Tribunal
sets out in this section certain treaty and other provisions to which the Parties, in developing
their positions on the Preliminary Objection, make extensive reference.

>    *(i)    ICSID Convention*

>    *Article 25*

>    *(1) The jurisdiction of the Centre shall extend to any legal dispute
arising directly out of an investment, between a Contracting State
... and a national of another Contracting State, which the parties to
the dispute consent in writing to submit to the Centre. When the
parties have given their consent, no party may withdraw its consent
unilaterally.*

>    *Article 42*

>    *(1) The Tribunal shall decide a dispute in accordance with such
rules of law as may be agreed by the parties. In the absence of such
agreement, the Tribunal shall apply the law of the Contracting State
party to the dispute (including its rules of conflict of laws) and such
rules of international law as may be applicable.*

>    *(ii)  BIT[19]*

>    *Article 9*

>    *(1) Disputes between one Contracting Party and a national of the
other Contracting Party concerning an obligation of the former
under this agreement in relation to an investment of the latter, shall
at the request of the national concerned be submitted to the
International Centre for Settlement of Investment Disputes, for
settlement by arbitration or conciliation under the Convention on
the Settlement of Investment Disputes between States and Nationals*

---

[19] Exhibit **CL-0001**.

*of other States, opened for signature at Washington on 18 March 1965...*

*(3) Each Contracting Party hereby gives its unconditional consent to the submission of disputes as referred to in Paragraph 1 of this Article to international arbitration in accordance with the provisions of this Article.*

*(4) A legal person which is a national of one Contracting Party and which before such a dispute arises is controlled by nationals of the other Contracting Party shall in accordance with Article 25 (2) (b) of the Convention for the purpose of the Convention be treated as a national of the other Contracting Party.*

*Article 14*

*(2) Unless notice of termination has been given by either Contracting Party at least six months before the date of the expiry of its validity, the present Agreement shall be extended tacitly for periods of ten years, whereby each Contracting Party reserves the right to terminate the Agreement upon notice of at least six months before the date of expiry of the current period of validity.*

*(3) In respect of investments made before the date of the termination of the present Agreement the foregoing Articles shall continue to be effective for a further period of fifteen years from that date.* ("**Sunset Clause**")

*(4) Subject to the period mentioned in paragraph (2) of this Article, the Kingdom of the Netherlands shall be entitled to terminate the application of the present Agreement separately in respect of any of the parts of the Kingdom.*

> *(iii)* Declaration of the Representatives of the Governments of the Member States of 15 January 2019 on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union (the "**MS Declaration**" or the "**Declaration**")[20]

---

[20] Exhibit **R-0008**.

*Preamble*

*Union law takes precedence over bilateral investment treaties concluded between Member States.\*   As a consequence, all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to Union law and thus inapplicable.  They do not produce effects including as regards provisions that provide for extended protection of investments made prior to termination for a further period of time (so-called sunset or grandfathering clauses).  An arbitral tribunal established on the basis of investor-State arbitration clauses lacks jurisdiction, due to a lack of a valid offer to arbitrate by the Member State party to the underlying bilateral investment Treaty.*

*[\*Footnote: With regard to agreements concluded between Member States, see judgments in Matteuci, 235/87, EU:C:1988:460, paragraph 21; and Budĕjovicky Budar, EU:C:2009:521, C-478/07, paragraphs 98 and 99 and Declaration 17 to the Treaty of Lisbon on primacy of Union law.  The same result follows also under general public international law, in particular from the relevant provisions of the Vienna Convention on the Law of Treaties and customary international law (lex posterior).*

*...*

*Declaration*

*Taking into account the foregoing, Member States declare that they will undertake the following actions without undue delay:*

*(1) By the present declaration, Member States inform investment arbitration tribunals about the legal consequences of the Achmea judgment, as set out in this declaration, in particular all pending intra-EU investment arbitration proceedings brought either under bilateral investment treaties concluded between Member States or under the Energy Charter Treaty.*

*(2) In cooperation with a defending member State, the Member State, in which an investor that has brought such an action is established, will take the necessary measures to inform the investment arbitration tribunals concerned of those consequences.  Similarly, defending Member States will request the courts, including in any third country, which are to decide in proceedings*

*relating to an intra-EU investment arbitration award, to set these awards aside or not to enforce them due to a lack of valid consent.*

*(3) By the present declaration, Member States inform the investor community that no new intra-EU investment arbitration proceedings should be initiated.*

*...*

*(5) In light of the Achmea judgment, member States will terminate all bilateral investment treaties concluded between them by means of a plurilateral treaty or, where that is mutually recognized as more expedient, bilaterally.*

*...*

*(iv)* Agreement for the Termination of Bilateral Investment Treaties between the Member States of the European Union dated 5 May 2020 and entered into force on 29 August 2020 (the already defined "**Termination Treaty**")[21]

*Article 2*

*Termination of Bilateral Investment Treaties*

*(1) Bilateral Investment Treaties listed in Annex A are terminated according to the terms set out in this Agreement.*

*(2) For greater certainty, Sunset Clauses of Bilateral Investment Treaties listed in Annex A are terminated in accordance with paragraph 1 of this Article and shall not produce legal effects.*

*Article 3*

*Termination of possible effects of Sunset Clauses*

*Sunset Clauses of Bilateral Investment Treaties listed in Annex B are terminated by this Agreement and shall not produce legal effects, in accordance with the terms set out in this Agreement.*

---

[21] Exhibit **RL-0032**.

*Article 4*

*Common provisions*

*(1) The Contracting Parties hereby confirm that Arbitration Clauses are contrary to the EU Treaties and thus inapplicable. As a result of this incompatibility between Arbitration Clauses and the EU Treaties, as of the date on which the last of the parties to a Bilateral Investment Treaty became a Member State of the European Union, the Arbitration Clause in such a Bilateral Investment Treaty cannot serve as legal basis for Arbitration Proceedings.*

*(2) The termination in accordance with Article 2 of Bilateral Investment Treaties listed in Annex A and the termination in accordance with Article 3 of Sunset Clauses of Bilateral Investment Treaties listed in Annex B shall take effect, for each such Treaty, as soon as this Agreement enters into force for the relevant Contracting Parties, in accordance with Article 16.*

*Article 5*

*New Arbitration Proceedings*[22]

*Arbitration Clauses shall not serve as legal basis for New Arbitration Proceedings.*

*Article 6*

*Concluded Arbitration Proceedings*

*(1) Notwithstanding Article 4, this Agreement shall not affect Concluded Arbitration Proceedings. Those proceedings shall not be reopened.*

*(2) In addition, this Agreement shall not affect any agreement to settle amicably a dispute being the subject of Arbitration Proceedings initiated prior to 6 March 2018.*

*(v)* Vienna Convention on the Law of the Treaties, 1969 (the "**VCLT**")[23]

---

[22] New Arbitration Proceedings are defined in Article 1(6) as "*any Arbitration Proceedings initiated on or after 6 March 2018* [the date of the *Achmea* Judgment]".

[23] Exhibit **RL-0005**.

The VCLT entered into force between the Netherlands and Croatia in 1992, before the adoption of the BIT and is therefore applicable to the BIT.  The following provisions are particularly relevant:

*Article 5*

*Treaties constituting international organizations and treaties adopted within an international organization*

*The present Convention applies to any treaty which is the constituent instrument of an international organization and to any treaty adopted within an international organization without prejudice to any relevant rules of the organization.*

*Article 7*

*Full powers*

*...*

*(2) In virtue of their functions and without having to produce full powers, the following are considered as representing their State:*

*(a) Heads of State, Heads of Government and Ministers for Foreign Affairs, for the purpose of performing all acts relating to the conclusion of a treaty;*

*(b) heads of diplomatic missions, for the purpose of adopting the text of a treaty between the accrediting State and the State to which they are accredited;*

*(c) representatives accredited by States to an international conference or to an international organization or one of its organs, for the purpose of adopting the text of a treaty in that conference, organization or organ.*

*Article 26*

*"Pacta sunt servanda"*

*Every treaty in force is binding upon the parties to it and must be performed by them in good faith.*

*Article 27*

*Internal law and observance of treaties*

*A party may not invoke the provisions of its internal law as justification for its failure to perform. a treaty. This rule is without prejudice to article 46.*

*Article 28*

*Non-retroactivity of treaties*

*Unless a different intention appears from the treaty or is otherwise established, its provisions do not bind a party in relation to any act or fact which took place or any situation which ceased to exist before the date of the entry into force of the treaty with respect to that party.*

*Article 30*

*Application of successive treaties relating to the same subject matter*

*(1) Subject to Article 103 of the Charter of the United Nations, the rights and obligations of States Parties to successive treaties relating to the same subject matter shall be determined in accordance with the following paragraphs.*

*(2) When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.*

*(3) When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty…*

*Article 31*

*General Rule of Interpretation*

*(1) A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*

23

*(2) The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:*

*(a) Any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty; ...*

*(3) There shall be taken into account, together with the context:*

*(a) Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;*

*(b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;*

*(c) any relevant rules of international law applicable in the relations between the parties.*

*(4) A special meaning shall be given to a term if it is established that the parties so intended.*

*Article 37*

*Revocation or modification of obligations or rights of third States*

*(1) When an obligation has arisen for a third State in conformity with article 35, the obligation may be revoked or modified only with the consent of the parties to the treaty and of the third State, unless it is established that they had otherwise agreed.*

*(2) When a right has arisen for a third State in conformity with article 36, the right may not be revoked or modified by the parties if it is established that the right was intended not to be revocable or subject to modification without the consent of the third State.*

*Article 42*

*Validity and continuance in force of treaties*

*1. The validity of a treaty or of the consent of a State to be bound by a treaty may be impeached only through the application of the present Convention.*

*2. The termination of a treaty, its denunciation or the withdrawal of a party, may take place only as a result of the application of the provisions of the treaty or of the present Convention. The same rule applies to suspension of the operation of a treaty.*

### Article 54

*Termination of or withdrawal from a treaty under its provisions or by consent of the parties*

*The termination of a treaty or the withdrawal of a party may take place:*

*(a) in conformity with the provisions of the treaty; or*

*(b) at any time by consent of all the parties after consultation with the other contracting States.*

### Article 57

*Suspension of the operation of a treaty under its provisions or by consent of the parties*

*The operation of a treaty in regard to all the parties or to a particular party may be suspended:*

*(a) in conformity with the provisions of the treaty; or*

*(b) at any time by consent of all the parties after consultation with the other contracting States.*

### Article 59

*Termination or suspension of the operation of a treaty implied by conclusion of a later treaty*

*(1) A treaty shall be considered as terminated if all the parties to it conclude a later treaty relating to the same subject matter and:*

*(a) it appears from the later treaty or is otherwise established that the parties intended that the matter should be governed by that treaty; or*

*(b) the provisions of the later treaty are so far incompatible with those of the earlier one that the two treaties are not capable of being applied at the same time.*

*(2) The earlier treaty shall be considered as only suspended in operation if it appears from the later treaty or is otherwise established that such was the intention of the parties.*

### Article 65

*Procedure to be followed with respect to invalidity, termination, withdrawal from or suspension of the operation of a treaty*

*(1) A party which, under the provisions of the present Convention, invokes either a defect in its consent to be bound by a treaty or a ground for impeaching the validity of a treaty, terminating it, withdrawing from it or suspending its operation, must notify the other parties of its claim. The notification shall indicate the measure proposed to be taken with respect to the treaty and the reasons therefor.*

*(2) If, after the expiry of a period which, except in cases of special urgency, shall not be less than three months after the receipt of the notification, no party has raised any objection, the party making the notification may carry out in the manner provided in article 67 the measure which it has proposed.*

*(3) If, however, objection has been raised by any other party, the parties shall seek a solution through the means indicated in Article 33 of the Charter of the United Nations.*

*(4) Nothing in the foregoing paragraphs shall affect the rights or obligations of the parties under any provisions in force binding the parties with regard to the settlement of disputes.*

*(5) Without prejudice to article 45, the fact that a State has not previously made the notification prescribed in paragraph 1 shall not prevent it from making such notification in answer to another party claiming performance of the treaty or alleging its violation.*

### Article 67

*Instruments for declaring invalid, terminating, withdrawing from or suspending the operation of a treaty*

26

*(1) The notification provided for under article 65, paragraph 1, must be made in writing.*

*(2) Any act of declaring invalid, terminating, withdrawing from or suspending the operation of a treaty pursuant to the provisions of the treaty or of paragraphs 2 or 3 of article 65 shall be carried out through an instrument communicated to the other parties. If the instrument is not signed by the Head of State, Head of Government or Minister for Foreign Affairs, the representative of the State communicating it may be called upon to produce full powers.*

*Article 70*

*Consequences of the termination of a treaty*

*(1) Unless the treaty otherwise provides or the parties otherwise agree, the termination of a treaty under its provisions or in accordance with the present Convention:*

*(a) releases the parties from any obligation further to perform the treaty;*

*(b) does not affect any right, obligation or legal situation of the parties created through the execution of the treaty prior to its termination.*

*(2) If a State denounces or withdraws from a multilateral treaty, paragraph 1 applies in the relations between that State and each of the other parties to the treaty from the date when such denunciation or withdrawal takes effect.*

*Article 72*

*Consequences of the suspension of the operation of a treaty*

*(1) Unless the treaty otherwise provides or the parties otherwise agree, the suspension of the operation of a treaty under its provisions or in accordance with the present Convention:*

*(a) releases the parties between which the operation of the treaty is suspended from the obligation to perform the treaty in their mutual relations during the period of the suspension;*

27

*(b) does not otherwise affect the legal relations between the parties established by the treaty.*

*(2) During the period of the suspension the parties shall refrain from acts tending to obstruct the resumption of the operation of the treaty.*

(*vi*) Treaty on the Functioning of the European Union (the "**TFEU**")[24]

*Article 267*

*The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:*

*(a) the interpretation of the Treaties;*

*(b) the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union;*

*Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give a judgement, request the Court to give a ruling thereon.*

*Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.*

*If such a question is raised in a case pending before a court or tribunal of a Member State with regard to a person in custody, the Court of Justice of the European Union shall act with the minimum of delay.*

*Article 344*

*Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.*

---

[24] Exhibit **RL-0018**.

*(vii)* Treaty on European Union (the "**TEU**")[25]

*Article 4*

*... (3) Pursuant to the principle of sincere cooperation, the Union and the Member States shall, in full mutual respect, assist each other in carrying out tasks which flow from the Treaties.*

*The Member States shall take any appropriate measure, general or particular, to ensure fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the Union.*

*The Member States shall facilitate the achievement of the Union's tasks and refrain from any measure which could jeopardise the attainment of the Union's objectives.*

*Article 19*

*(1) The Court of Justice of the European Union shall include the Court of Justice, the General Court and specialised courts. It shall ensure that in the interpretation and application of the Treaties the law is observed. Member States shall provide remedies sufficient to ensure effective legal protection in the fields covered by Union law. ...*

---

[25] Exhibit **RL-0019**.

## VI.    THE SUBMISSIONS OF THE PARTIES

### A.    THE RESPONDENT

66.    The Respondent's Preliminary Objection focuses on the jurisdiction *ratione voluntatis* of the Tribunal.  The Respondent argues that the Tribunal has no jurisdiction over the dispute because the Claimants could not avail themselves of the arbitration offer expressed by Croatia in Article 9 of the BIT, this provision being inapplicable following the judgment of the Court of Justice of the European Union in *Slowakische Republik v. Achmea BV*, Case C-284/16 dated 6 March 2018 (the "***Achmea* Judgment**").  Specifically, the Respondent maintains the following.

(1)    The Termination Treaty deprives the Tribunal of jurisdiction because it: (**a**) terminates the BIT and the arbitration offer therein with *ex tunc* effect; and (**b**) contains the agreement of Croatia and the Netherlands (the "**BIT States**") on the interpretation and the application of Article 9 of the BIT pursuant to Article 31(3)(a) and (b) VCLT (the "**Termination Treaty Argument**");

(2)    The MS Declaration deprives the Tribunal of jurisdiction because it: (**a**) contains (like the Joint Statement) the BIT States' agreement on the interpretation and the application of Article 9 of the BIT pursuant to Article 31(3)(a) and (b) VCLT; (**b**) expresses the BIT States' agreement that the arbitration offer in Article 9 of the BIT is contrary to the EU Treaties and that EU Treaties prevail over the BIT under Article 30(3) VCLT; (**c**) expresses the BIT States' agreement to suspend the applicability of Article 9 of the BIT; and (**d**) informs EU investors of the withdrawal by EU Members States (including the BIT States) of the arbitration offer set in intra-EU BITs (the "**MS Declaration Argument**"); and

(3)    The Sunset Clause in Article 14(3) of the BIT does not confer jurisdiction upon the Tribunal (the "**Sunset Clause Argument**").

30

(1)    **The Termination Treaty Argument**[26]

67.    The Respondent's principal argument is that the Termination Treaty has the effect of depriving the Tribunal of jurisdiction.[27]

68.    The Respondent traces the origins of the Termination Treaty to the judgment of the Court of Justice of the European Union (the already defined "**CJEU**") in *Achmea*.[28]  In that judgment (which is discussed in greater detail in paragraphs 148 to 153, below), the CJEU held that Articles 267 and 344 of the TFEU precluded an arbitration provision in an international agreement between EU Member States.[29]  Shortly afterwards, the European Commission presented a Communication to the European Parliament and Council which informed them that the judgment had "*confirmed that investor-State arbitration clauses in intra-EU BITs are unlawful*".[30]  There followed discussions amongst the EU Member States which led, first, to the adoption of the MS Declaration in January 2019,[31] and later to the Termination Treaty,[32] which was signed on 5 May 2020.[33]  The Termination Treaty entered into force between Croatia and the Netherlands on 25 October 2020.[34]  On 27 November 2020, Croatia and the Netherlands sent to the Centre, for the attention of the Tribunal, a Joint Statement (the already defined "**Joint Statement**")[35] which informed the Tribunal of the terms of the MS Declaration and the Termination Treaty and stated that the

---

[26] Memorial, paras. 10-83; Reply, paras. 22-116; Transcript, Day 1, p. 43:18; Respondent's PHB, paras. 9-47; Respondent's Reply PHB, paras. 24-35.

[27] Memorial, Heading II.

[28] *Slovak Republic v. Achmea BV*, Case C-284-16, Judgment of 6 March 2018 (Exhibit **RL-0030**).

[29] Memorial, paras. 12-22.

[30] Communication from the Commission to the European Parliament and Council: Protection of Intra-EU Investment, COM (2018) 547, 19 July 2018 (Exhibit **R-0007**).

[31] The relevant parts of the Declaration are set out at para. 65, above. There were actually three Declarations: one, signed by twenty-two States (including Croatia and the Netherlands) (Exhibit **R-0008**), one signed by five States (Exhibit **R-0009**) and one issued by Hungary alone (Exhibit **R-0010**).  Only the first declaration is relevant to the present proceeding and references to the MS Declaration are to that declaration.

[32] Exhibit **RL-0032**.

[33] Exhibit **R-0015**.

[34] Exhibit **R-0002**.

[35] Exhibit **R-0016.**

two States shared the "*common understanding with respect to the BIT*" that Article 9 could not serve as the basis for jurisdiction in the present proceeding.

69.    First, the Respondent maintains that "the Termination Treaty reaffirms the interpretive agreement of Croatia and the Netherlands that Article 9 of the BIT is incompatible with the EU Treaties and thus inapplicable."[36]   Croatia refers to Article 31(3)(a) VCLT as establishing that a subsequent agreement between the parties to a treaty regarding its application or interpretation shall be taken into account in the interpretation of the treaty. According to Croatia, the Termination Treaty is such an agreement.   The reference in its preamble to the "*common understanding*" of the parties to the Termination Treaty that clauses such as Article 9 of the BIT cannot serve as the basis for jurisdiction in an arbitration indicates that the Treaty is a subsequent agreement, or subsequent practice, regarding the interpretation or application of the BIT.   That reflected the MS Declaration and "*memorialises the Member States' view that the interpretation set out therein is a necessary legal consequence of the application of EU law, and the EU Treaties in particular*."[37]   According to Croatia, this is an authentic interpretation of the BIT which the Tribunal is obliged to follow.   In the alternative, Croatia argues that the Termination Treaty is part of the subsequent practice of the Parties, within the meaning of Article 31(3)(b) VCLT, which again should be taken into account in the interpretation of the BIT.[38]

70.    Secondly, the Respondent contends that, in any event, the Termination Treaty removes any jurisdiction which Article 9 of the BIT might have provided.   Croatia argues that the parties to a treaty have the power to terminate that treaty with retrospective effect if they agree to do so.   In this context it invokes Article 54(b) and Article 70(1) VCLT (the texts of which appear at paragraph 65, above).   The language of the Termination Treaty makes clear that the parties to that Treaty, which include the parties to the BIT, agreed to terminate the BIT

---

[36] Memorial, para. 52. See also Reply, paras. 51-64.
[37] Memorial, para. 57; Reply, paras. 85-102.
[38] Reply, paras. 103-116.

with retroactive effect.[39]  In doing so, they also exercised the general authority of States to control international law claims by their nationals.[40]

71. The Respondent denies that the BIT conferred any acquired rights upon the Claimants. Croatia argues that the Claimants have failed to establish that the notion of acquired rights had become part of customary international law[41] or that, even if it had, it extended to a right to pursue arbitration proceedings when the Claimants were on notice of the common understanding of the BIT States before they instituted arbitration proceedings.[42]

72. The Respondent maintains that Article 25(1) of the ICSID Convention is irrelevant in this context, because it does not preclude the withdrawal of an offer to arbitrate after arbitration proceedings have been commenced when that withdrawal takes place by agreement between the parties to a BIT.[43]

**(2)    The MS Declaration Argument**

73. The Respondent's second argument is that, even before the Claimants initiated arbitration proceedings, the offer of arbitration originally contained in Article 9(1) of the BIT had been withdrawn.[44]  As the Respondent states in the Memorial:

> *The Tribunal also lacks jurisdiction due to the absence of any party consent to submit this dispute to ICSID arbitration, as required under Article 25(1) of the ICSID Convention.  No arbitration agreement was ever formed because the offer to arbitrate in Article 9 of the BIT was invalid under EU law and, in any event, was withdrawn by Respondent prior to its acceptance by Claimants.*

---

[39] Memorial, paras. 67-72; Respondent's PHB, paras. 22-26.

[40] Memorial, paras. 70-81; Reply, paras. 65-74.

[41] Reply, paras. 45-50; Respondent's PHB, paras. 19-20.

[42] Respondent's PHB, para. 20, citing *Addiko Bank AG and Addiko Bank d.d. v. Republic of Croatia*, ICSID Case No. ARB/17/37, Decision on Croatia's Jurisdictional Objection Related to the Alleged Incompatibility of the BIT with the EU *Acquis* of 12 June 2020, para. 278 (Exhibit **RL-0033**).

[43] Reply, paras. 27-31; Respondent's PHB, paras. 21-25.

[44] Memorial, paras. 84-104; Reply, paras. 117-179.

> *These facts were fully known to Claimants when they purported to commence this arbitration.*[45]

74.     The first limb of this argument is that Article 9 of the BIT ceased to be applicable from the accession of Croatia to the EU on 1 July 2013. The Respondent adds that "[t]*he incompatibility of Article 9 became manifest with the CJEU's* Achmea *Judgment on 6 March 2018*"[46] and that "Achmea *is definitive in establishing that Articles 267 and 344 of the TFEU preclude arbitration clauses in intra-EU BITs*".[47]

75.     The Respondent relies on Article 30 VCLT (the text of which appears at paragraph 65, above). It argues that this provision applies whenever there is a conflict between two treaties concluded between the same States. It maintains that the reference in Article 30(1) to treaties having "*the same subject-matter*" does not add an extra requirement. The TFEU came into force between Croatia and the Netherlands after the BIT and therefore constitutes *lex posterior*. The CJEU has determined that clauses such as Article 9(1) of the BIT conflict with the TFEU. On this basis Croatia argues that under Article 30 VCLT, the TFEU must take priority and the BIT is inapplicable to the extent of the conflict.

76.     According to Croatia, pursuant to what it describes as "*the paramount duty*" of sincere cooperation under Article 4 TEU, all EU Member States must give effect to the *Achmea* Judgment's pronouncement with the result that "*the offer to arbitrate in Article 9 of the BIT became invalid upon Croatia's EU accession in 2013*" and the "*invalidity of that offer was well understood no later than 6 March 2018* Achmea *Judgment and was confirmed repeatedly by the BIT Contracting States thereafter*".[48]

77.     The Respondent finds that confirmation in the following developments:

---

[45] Memorial, para. 84.
[46] Memorial, para. 88 (emphasis omitted).
[47] Memorial, para. 90.
[48] Memorial, para. 95.

(1)    the statement by the Dutch Government in April 2018 in which it stated that the effect of the judgment is that the Netherlands would have to terminate its intra-EU BITs;[49]

(2)    the Communication by the European Commission of 19 July 2018 that the judgment meant that all dispute settlement clauses in intra-EU BITs were inapplicable;[50]

(3)    the MS Declaration of 19 January 2019;[51] and

(4)    the draft text of the Termination Treaty, which became public by 1 December 2019.[52]

78.    In the Memorial, the Respondent states that these developments put the Claimants on notice well before they purported to initiate the proceeding.[53]  In its Reply, the Respondent developed its argument, relying on the effect of the MS Declaration.  As stated in the Reply:

> *Just as the effect of the Termination Treaty is an issue of first impression, so too is the prospective effect of the withdrawal of jurisdiction in the Member States Declaration.  To date, no investment treaty tribunal in proceedings initiated after the Member States Declaration was issued has ruled on the effect of that withdrawal on its jurisdiction.*[54]

79.    The Respondent contends that the MS Declaration was a declaration that arbitration clauses in intra-EU BITs are inapplicable "*as a matter of international law*".[55]  The Respondent rejects the Claimants' suggestion that the Declaration dealt only with inapplicability

---

[49] Letter by the Netherlands Minister for Trade and Development Cooperation to Parliament, 26 April 2018 (Exhibit **R-0006**).

[50] Exhibit **R-0007**.  See note 30, above.

[51] Exhibit **R-0008**.  See para. 65, above.

[52] Exhibits **R-0011** and **R-0013**.  The Memorial gives the date of 1 December 2019 but the agreed chronology states that the draft became public on 4 November 2019.

[53] Memorial, paras. 100-104.

[54] Reply, para. 118.

[55] Reply, para. 121 and paras. 122-140.

according to EU law but spelled out the consequences under international law[56] and adds that the text of the Declaration is entirely coherent in "*confirming that particular provisions contained in intra-EU BITs were presently inapplicable, while declaring their intent to terminate intra-EU BITs in their entirety at a later date*".[57]

80.    The Respondent also argues that the effect of the MS Declaration on arbitration provisions such as Article 9 of the BIT was clear and placed beyond doubt that the Netherlands and Croatia, as signatories to the Declaration, stated that the offer to arbitrate in Article 9 was no longer applicable.  Since that statement was made before the Claimants sought to initiate arbitration, no issue arises under Article 25(1) of the ICSID Convention, as the offer of arbitration had been withdrawn before it was accepted.[58]

81.    Croatia argues that the parties to a treaty have the power, by consent – expressed in whatever form they choose – to render a provision in a treaty between them inapplicable.[59] The effect of the BIT States doing so by signing the MS Declaration was that Article 9 ceased to have effect as an offer which the Claimants could accept.  It was unnecessary for the BIT States to "*terminate, suspend, or amend the treaty to alter its effects*".[60]  According to Croatia, the MS Declaration also produced effects as an authentic interpretation of the BIT.[61]  Alternatively, it operated as a suspension of the operation or application of Article 9 pursuant to Article 57(b) VCLT (the text of which appears at paragraph 65, above).[62] Any purported reliance by the Claimants on Article 9 after the adoption of the MS Declaration was therefore unreasonable.[63]

---

[56] Reply, paras. 125-135.

[57] Reply, para. 138.

[58] Reply, paras. 141-154.

[59] Reply, paras. 155-162.

[60] Reply, para. 175.

[61] Reply, paras. 176-179.

[62] Reply, paras. 180-188; Respondent's PHB, paras. 84-91; Respondent's Reply PHB, paras. 12-23.

[63] Reply, paras. 189-195.

### (3)    The Sunset Clause

82.    Article 14(1) of the BIT provides that the BIT shall expire after fifteen years.  However, Article 14 then contains a "*sunset clause*", the terms of which are:

> *(2) Unless notice of termination has been given by either Contracting Party at least six months before the date of expiry of its validity, the present Agreement shall be extended tacitly for periods of ten years, whereby each Contracting Party reserves the right to terminate the Agreement upon notice of at least six months before the date of expiry of the current validity.*
>
> *(3) In respect of investments made before the date of the termination of the present Agreement the foregoing Articles shall continue to be effective for a further period of fifteen years from that date.*

83.    The Respondent argues that Article 14(3) does not assist the Claimants, because (a) it applies only in the case of unilateral termination under Article 14(2) and not in a case such as the present where the BIT States agree to terminate the BIT; and (b) in any event the MS Declaration and the Termination Treaty both expressly provide that the inapplicability of the arbitration provision and, in the case of the Termination Treaty, the termination of the BIT, take effect irrespective of the sunset clause.[64]

### (4)    Good Faith

84.    Responding to the allegation by the Claimants (see paragraph 100, below) that, in advancing the Preliminary Objection, the Respondent was seeking to delay the proceeding by a wholly unmeritorious argument which had already been rejected by numerous arbitration tribunals, Croatia strenuously denied that it was doing anything of the kind and replied that the allegation was both unmerited and irrelevant.[65]

---

[64] Respondent's PHB, paras. 92-98.
[65] Reply, paras. 11-19.

(5)    **Applicable Law**

85.    The Respondent did not address the issue of applicable law under a separate heading but its pleadings clearly reflect a rejection of the Claimants' argument (see paragraphs 87 to 90, below) that EU law is irrelevant to the Preliminary Objection.  The Respondent maintains that the EU Treaties and the obligations to which they give rise form part of international law.  In this context, it refers to Article 5 VCLT, which includes treaties that are the constituent instruments of international organizations within the scope of the VCLT and thus of international law instruments.  It adds that both the MS Declaration and the Termination Treaty take effect within international law.  Accordingly, in the view of the Respondent, the relevant EU Treaty provisions, the *Achmea* Judgment, the MS Declaration and the Termination Treaty all form part of the applicable law.

B.    **THE CLAIMANTS**

86.    The Claimants contend that:-

(1)    EU law and the *Achmea* judgment are irrelevant to the decision on the Preliminary Objection as the applicable law is public international law;

(2)    the Termination Treaty did not affect the arbitration agreement which was formed before it entered into force;

(3)    the MS Declaration and the other acts to which the Respondent refers did not withdraw or negate the offer of arbitration contained in Article 9(1) of the BIT which was validly accepted when the Claimants instituted the arbitration proceedings;

(4)    in any event, the "*sunset clause*" in Article 14(3) of the BIT is applicable;

(5)    the Respondent has not acted in good faith in putting forward its Preliminary Objection.

(1)      **The Irrelevance of EU Law to the Present Case**[66]

87.    The Claimants maintain that the jurisdiction of the Tribunal is exclusively derived from the BIT and the ICSID Convention, together with the agreement concluded when the Claimants accepted the offer of arbitration contained in Article 9 of the BIT:

> *Accordingly, the question of jurisdiction has to be approached by analysing these two international treaties and interpreting them in accordance with the VCLT, not on the basis of* Achmea *and the exclusive-EU law perspective expressed in it.*[67]

88.    According to the Claimants, EU law is a legal order of its own, distinct from public international law.[68] They rely on the observation of the tribunal in *Cube Infrastructure* that "*EU law is only one among several regional, and many national, legal systems and it is international law that regulates relations between these different legal systems*".[69] The BIT and the ICSID Convention are not part of EU law and EU law has no hierarchical supremacy over them. The CJEU in *Achmea* did not refer to principles of international law and its judgment has to be regarded as situated within what the CJEU itself has described as a new legal order.[70]

89.    The Claimants add that Articles 19(1) TEU and 267 TFEU do not prohibit arbitration clauses such as Article 9 of the BIT in any event. Neither Article 9 of the BIT, nor Article 25 of the ICSID Convention require the interpretation or application of EU law (the concern of the CJEU in *Achmea*). Moreover, the language of Article 9(1) is plain so that no need to interpret it in the light of EU law can arise. The Claimants also maintain that it

---

[66] Counter-Memorial, paras. 34-83; Claimants' PHB, paras. 3-18; Claimants' Reply PHB, paras. 3-15.

[67] Counter-Memorial, para. 35, citing *United Utilities (Tallin) B.V. and Aktsiaselts Tallina Vesi v. Republic of Estonia*, ICSID Case No. ARB/14/24, Award of 21 June 2019, para. 532 (Exhibit **CL-0070**).

[68] Claimants' Reply PHB, paras. 5-6.

[69] *Cube Infrastructure Fund SICAV and Others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum of 19 February 2019, para. 130 (Exhibit **CL-0063**).

[70] Claimants' PHB, paras. 5 and 7-11.

is open to the Tribunal to reach its own interpretation of the provisions of EU law since, unlike the CJEU, the Tribunal is situated within the international, not the EU legal order.[71]

90.    According to the Claimants, EU law cannot produce the effect of impliedly terminating the BIT under Article 59 VCLT or of superseding it on the basis of a clash between two inconsistent treaties pursuant to Article 30 VCLT.  Indeed, the Claimants deny that Article 30 is applicable at all since the EU Treaties and the BIT do not, in their submission, have the same subject-matter.[72]

**(2)    The Termination Treaty**[73]

91.    The Claimants' response to Croatia's Termination Treaty argument centres on Article 25(1) of the ICSID Convention.  Once the offer to arbitrate contained in Article 9(1) of the BIT was accepted by the Claimants (which happened when they initiated arbitration proceedings) it could not unilaterally be withdrawn.[74]  Since the Termination Treaty entered into force between Croatia and the Netherlands more than a year after the initiation of arbitration proceedings, its termination of the BIT could not affect the already existing arbitration agreement concluded when the Claimants accepted the offer of arbitration.  Moreover, a proper interpretation of the Termination Treaty and, in particular, the use of the formula in Article 5 that "*Arbitration Clauses shall not serve as legal basis for New Arbitration Proceedings*" (emphasis added) was consistent with the view that the Treaty was not meant to have retroactive effect.

92.    Nor could the Termination Treaty amount to a subsequent agreement regarding the interpretation of the BIT.  The Claimants maintain that the complete excision of Article 9 (the terms of which, they say, were, in any event, perfectly clear) could not amount to an interpretation but had to be seen as an attempt to modify or amend the BIT, something

---

[71] Claimants' PHB, para. 14.

[72] Claimants' PHB, paras. 16-18, relying on *Theodoros Adamakopoulos, Ilektra Adamantidou, Vasileios Adamopoulos and Others v. Republic of Cyprus*, ICSID Case No. ARB/15/49, Decision of 7 February 2020, para. 185 (Exhibit **RL-0099-S**), and Claimants' Reply PHB, paras. 7-15.

[73] Counter-Memorial, paras. 109-141; Rejoinder, paras. 12-97; Claimants' PHB, paras. 81-92; Claimants' Reply PHB, paras. 22-29.

[74] Claimants' PHB, paras. 81-83.

which could not affect the existing arbitration agreement.[75]  In addition, the BIT should be seen as having conferred rights upon the Claimants which had already vested.

93.     Finally, the Claimants dispute that the draft treaty could have had any effect, since a treaty produces legal effects only when it enters into force, either definitively or on the basis of provisional application.[76]  They note that even after the text was signed (which was after the Claimants initiated this proceeding) the Termination Treaty was not applied provisionally by either Croatia or the Netherlands.

**(3)     The Member States Declaration[77]**

94.     The Claimants maintain that the MS Declaration "is merely a political statement of intent … which was not intended, and could not have been intended, to have legal effects on the BIT".[78]  They say that this is clear from the language used and, in particular, the fact that the Declaration states that the signatory States "inform the investor community that no new investment arbitration proceeding <u>should</u> be instituted" (emphasis added) pending the adoption of the Termination Treaty envisaged in the Declaration.  According to the Claimants, the use of the word "should" indicates that the States intended to advise investors, not to direct them that arbitration proceedings were prohibited.[79]

95.     The Claimants also draw attention to the fact that the MS Declaration was signed by the ambassadors to the EU of the signatory States.  They maintain that this fact reinforces the political character of the Declaration, since the ambassadors lacked full powers (as defined in Article 7 VCLT) and could not create binding legal obligations.  In this context, the Claimants cite the following observation by the tribunal in *Addiko*, that the MS Declaration could not "*constitute* stricto senso *a new agreement between the relevant States, given that*

---

[75] Claimants' PHB, paras. 84-86.

[76] Claimants' PHB, paras. 91-92.

[77] Counter-Memorial, paras. 84-108; Rejoinder, paras. 98-122; Claimants' PHB, paras. 19-80; Claimants' Reply PHB, paras. 16-21.

[78] Claimants' PHB, para. 20.

[79] Claimants' PHB , para. 27.

*it was signed by plenipotentiaries rather than being ratified in accordance with the appropriate procedures for ratification of international agreements*".[80]

96.    In addition, the Claimants contend that the debates on the Termination Treaty in national parliaments show that the States had no intention to withdraw the offers of arbitration in the various BITs until the adoption of the Termination Treaty: "*prior to this arbitration, it was not once suggested by the* [Member States] *during their respective* [Termination Treaty] *parliamentary debates that, pursuant to the* [MS Declaration], *the offers to arbitrate had legally been 'withdrawn'*"[81].    According to the Claimants, the MS Declaration was not discussed in national parliaments at the time of its adoption.

97.    Nor, according to the Claimants, could the MS Declaration have had the effects suggested by Croatia.  In particular, the Claimants deny that the Declaration could have suspended Article 9 of the BIT.  There is no indication in the text of the Declaration that the signatories agreed, as required by Article 57(b) VCLT, to suspend any treaty provisions.

### (4)    The Sunset Clause[82]

98.    The Claimants maintain that the "sunset clause" in Article 14(3) of the BIT is applicable to any termination (or suspension) of the BIT whether that was agreed by the BIT States or not.    Accordingly, they contend that the clause would have the effect that, for investments made prior to the termination or suspension, the provisions of the BIT continued to apply for a period of fifteen years after termination or suspension.

### (5)    The Alleged Waiver of the Claimants' Claims by the Netherlands[83]

99.    The Claimants reject the Respondent's argument that the Netherlands was free to waive their claims.    They argue that the BIT had the effect of creating vested rights for Netherlands investors with investments in Croatia.    The practice on which the Respondent

---

[80] *Addiko*, note 42, above, para. 289.

[81] Claimants' PHB, para. 35.

[82] Rejoinder, paras. 115-122; Claimants' PHB, para. 78.

[83] Counter-Memorial, paras. 142-179; Claimants' Reply PHB, paras. 30-31.

relies is described as relating to very different circumstances. Instead, the Claimants rely upon arbitral authorities which establish that a claimant which claims under a treaty like the BIT is pursuing a claim of its own, not one which in reality belongs to the State of its nationality.[84]

### (6)    Whether the Preliminary Objection was made in Good Faith[85]

100.    The Claimants allege that the Preliminary Objection is not made in good faith, since, they maintain, the Respondent has been aware at all times that the objection is misconceived and doomed to fail. They contend that the real purpose (apart from attempting "*to show the European Commission that* [Croatia] *is trying as hard as possible to vindicate the EU's (unfortunate and misconceived) policy vendetta against intra-European Investor-State Dispute Settlement*)[86] is to buy time. In this context, they refer to what they describe as "*persistent State abuse against Claimants' CEO, Mr Todorić*".[87]

### C.    THE EUROPEAN COMMISSION

101.    The European Commission, which was permitted to file submissions as a non-disputing party (see paragraph 26, above), supports the Respondent's conclusion that the Tribunal lacks jurisdiction "*on the grounds that there was no valid consent to arbitration*"[88] but it does so on somewhat different grounds.

102.    The European Commission argues as follows:

(1)    the applicable law, in accordance with Article 42 of the ICSID Convention, is the law of Croatia, which includes EU law. Alternatively, if the issue of jurisdiction is

---

[84] The Claimants rely, in particular, upon two NAFTA cases: *Corn Products International Inc. v. The United Mexican States*, ICSID Case No. ARB(AF)/04/1, Decision on Responsibility of 15 January 2008, para. 174 (Exhibit **CL-0037**); *Cargill Incorporated v. United Mexican States,* ICSID Case No. ARB(AF)/05/2, Award of 18 September 2009, para. 426 (Exhibit **CL-0039**).

[85] Counter-Memorial, paras. 7-33.

[86] Counter-Memorial, para. 7.

[87] Counter-Memorial, para. 9.

[88] EC Brief, para. 84.

to be decided under international law, EU law forms part of international law and "*primacy of the EU Treaties is a special rule of conflict under international law*";[89]

(2)    Article 9 of the BIT is incompatible with EU law and has been so since the accession of Croatia to the EU in July 2013;[90]

(3)    the BIT (or at least Article 9) has therefore impliedly been terminated pursuant to Article 59 VCLT;[91]

(4)    alternatively, EU law prevails over Article 9 BIT under the rules of general international law on conflicting treaties;[92] and

(5)    the MS Declaration and the Termination Treaty are subsequent agreements which confirm the interpretation of the BIT States that Article 9 ceased to be applicable before the initiation of the present proceeding.[93]

## D.    THE KINGDOM OF THE NETHERLANDS

103.    The Netherlands was also invited to make submissions as a non-disputing party (see paragraph 26, above).  The Netherlands begins by observing that the BIT entered into force on 1 June 1999 and was terminated on 31 March 2021.  It recalls the judgment of the CJEU in *Achmea*, then sets out the steps taken by the Netherlands and Croatia in light of that judgment.  It underlines its common understanding with Croatia, expressed in the MS Declaration, the Joint Statement of the two States to the Tribunal and the Termination Treaty that EU law has primacy over intra-EU BITs and that, "*as a consequence, all investor-State arbitration clauses contained in intra-EU BITs are contrary to Union law*

---

[89] EC Brief, para. 22.
[90] EC Brief, paras. 13-25.
[91] EC Brief, paras. 26-44.
[92] EC Brief, paras. 45-60.
[93] EC Brief, paras. 61-83.

*and are thus inapplicable*".[94]  In addition, the Netherlands avers that the "*sunset clause*" in the BIT is inapplicable.

104.    In addition to the joint actions with Croatia and other EU Member States, the Netherlands refers to certain unilateral statements made by its government which clarify its view that Article 9 of the BIT cannot confer jurisdiction on the Tribunal.

---

[94] Netherlands Brief, p. 3.

## VII.    THE TRIBUNAL'S ANALYSIS AND DECISIONS

### A.    THE ISSUE OF GOOD FAITH

105.    Before turning to the substance of the arguments for and against the Preliminary Objection, the Tribunal must briefly address the Claimants' submission that the Respondent has not acted in good faith in advancing its Preliminary Objection.

106.    The Tribunal sees no substance in this argument whatsoever.  It does not accept that the Respondent must have known that the Preliminary Objection could not succeed.  As will be discussed below, although there has been a large body of arbitral case-law since the CJEU gave its judgment in *Achmea* that has rejected the argument that EU law deprives tribunals of jurisdiction in intra-EU cases, that case-law has to be set in the context of national decisions and judgments of the CJEU to opposite effect.  Moreover, the present case raises certain issues which have not been addressed in any publicly available ruling. The Tribunal considers that the Respondent was perfectly entitled (indeed, by the provisions of the Termination Treaty, required) to advance the Preliminary Objection.

107.    Nor is the Tribunal impressed by the argument that the Respondent acted only to buy time against the background of national proceedings against the Claimants' CEO, Mr Todorić. The Tribunal notes that the Claimants agreed to the bifurcation of the proceeding so as to address the intra-EU Preliminary Objection in a first phase and they would presumably not have done so had they considered that bifurcation was a ruse to gain time for the Respondent.

108.    The Tribunal reminds the Parties that allegations of bad faith are not a matter lightly to be made and trusts that they will bear this in mind in the future.

### B.    APPLICABLE LAW

#### (1)    Article 42(1) of the ICSID Convention

109.    Although this argument was not raised by either Party, the European Commission contends that Article 42(1) of the ICSID Convention (see paragraph 65, above) requires the Tribunal

to apply the law of the State party, i.e. Croatia, together with such rules of international law as may be applicable.[95]  Since EU law is part of the law of Croatia, it must therefore form part of the applicable law.[96]  The Commission relies upon the awards in *Zhinvali v. Georgia*[97] and *JSW v. Czech Republic*.[98]

110.  The Tribunal does not agree with this reading of Article 42 of the ICSID Convention.  The first sentence of that Article makes clear that it concerns the law to be applied in deciding a "*dispute*".  The Tribunal considers that this language makes clear that Article 42(1) is addressing the law applicable to determining the merits of a case and not the separate issue of jurisdiction.  That is the prevailing view today both in the case-law and the principal commentaries.[99]  The Tribunal considers that the correct position is as stated by the tribunal in *B3 Croatian Courier Coöperatief UA v. Croatia* (another case brought under the Croatia-Netherlands BIT):

> ... *Article 42 of the ICSID Convention ... refers to the choice of law for the merits of the dispute and not for jurisdiction. This conclusion has been repeatedly confirmed by other investment arbitration tribunals constituted on the basis of the ICSID Convention.  This Tribunal considers that the reference in Article 42(1) of the ICSID Convention to "dispute" ("The Tribunal shall decide a dispute") should be interpreted on the basis of Article 31 of the VCLT so as to refer to the substantive dispute between the parties.  In contrast, it will be Article 25 of the ICSID Convention and the relevant provisions of the consent instrument – in this case, Article 9 of the Treaty – that will be pertinent for the Tribunal's jurisdiction.  The Tribunal notes in this respect that Article 25's placement within the body of the ICSID Convention (i.e. in Chapter II, Jurisdiction of the Centre) further underscores the fact that it is Article 25, as opposed*

---

[95] EC Brief, paras. 19-20.

[96] EC Brief, para. 21.

[97] *Zhinvali Development Ltd. v. Republic of Georgia*, ICSID Case No. ARB/00/1, Award of 24 January 2003 (Exhibit **ECL-0011**).

[98] *Jürgen Wirtgen, Stefan Wirtgen, Gisela Wirtgen and JSW Solar (zwei) GmbH & Co. KG v. Czech Republic*, PCA Case No. 2014-03, Award of 11 October 2017 (Exhibit **ECL-0012**).

[99] See, in particular, *Schreuer's Commentary on the ICSID Convention* (3rd ed., 2022), pp. 803-806, paras. 3-15 of the commentary on Article 42(1) and the cases cited therein.  The third edition was published after the filing of written arguments in the present proceeding but a similar view is taken in the second edition, p. 551, para. 4 of the commentary on Article 42 (Exhibit **CL-0024**).

> *to Article 42(1) of the ICSID Convention, that should be the starting point of the Tribunal's assessment of its own jurisdiction.*[100]

111.   The awards on which the Commission relies for the contrary proposition do not assist it. In *Zhinvali*, which addressed both jurisdiction and merits in the same ruling, "*the Parties have shared common ground in acknowledging the governing role of the law of Georgia*".[101]   The *JSW* arbitration was an *ad hoc* arbitration and not subject to the ICSID Convention.

112.   In the present case jurisdiction is said to be based upon a bilateral investment treaty and the ICSID Convention, a multilateral treaty, both of which are governed by international law and must be interpreted and applied in accordance with the rules of international law. The Tribunal therefore holds that it must apply public international law to determine whether or not it has jurisdiction.

### (2)     The Role of European Union Law

113.   That raises the question of the relationship between public international law and European Union law.  The Claimants contend that EU law is an entirely separate legal order distinct from international law and therefore irrelevant to the question of jurisdiction.[102]

114.   The constituent instruments of the EU are treaties, concluded under, and in accordance with, international law and registered with the United Nations under Article 102(1) of the Charter of the United Nations.[103]   They are, therefore, international law instruments and form part of the rules of international law which the Tribunal holds to be applicable to determining the question of jurisdiction.[104]   Accordingly, the Tribunal cannot accept the rigid distinction between EU law and international law for which the Claimants argue.

---

[100] *B3 Croatian Courier Coöperatief UA v. Republic of Croatia,* ICSID Case No. ARB/15/5, Award of 5 April 2019, para. 511 (Exhibit **CL-0067**).

[101] *Zhinvali*, note 97, above, para. 296.

[102] See, in particular, Counter-Memorial, paras. 35-49, and Claimants' PHB, paras. 3-6.

[103] The TEU appears at 1757 UNTS p. 3 and the TFEU at 2703 UNTS p. 3.

[104] That has been the view taken in numerous investor-State arbitration awards.

115.    Nevertheless, the Tribunal has to recognise that EU law differs from the rest of international law in a number of important ways.  It has its own tribunal, the Court of Justice of the European Union (the already defined **"CJEU"**), to which the States parties to the EU Treaties have entrusted the power to interpret the Treaties with results binding for those States.  The CJEU has, over the years, created a body of law (the "***acquis communautaire***" or "***acquis***") which in many ways more closely resembles constitutional law than international law.  In its seminal judgment in *van Gend en Loos*, delivered in 1963, the Court (then known as the Court of Justice of the European Communities) held that "*the Community constitutes a new legal order of international law*".[105]  The following year, in *Costa v. ENEL*, the Court held that "[b]*y contrast with ordinary international treaties, the EEC Treaty has created its own legal system which, on the entry into force of the Treaty, became an integral part of the legal systems of the Member States and which their courts are bound to apply.*"[106]

116.    From these beginnings the Court developed a jurisprudence regarding the supremacy, effects and interpretation of EU law which is markedly different from the rules of general international law.  Thus, the CJEU does not rely on the principles of treaty interpretation set out in the VCLT when it interprets the provisions of the EU Treaties.  Similarly, in its pronouncements on the primacy of EU law, it draws upon EU constitutional principles and not the general law of treaties.

117.    The Tribunal considers that EU law possesses a dual character.  On the one hand, it creates certain legal obligations which take effect within international law, and on the other, it constitutes a legal order of its own.  As the *Vattenfall* tribunal put it:

> *... the corpus of EU law derives from treaties that are themselves a part of, and governed by, international law, and contains other rules that are applicable on the plane of international law, while also containing rules that operate only within the internal legal order of*

---

[105] *NV Algemene Transport- en Expeditie Onderneming Van Gend en Loos v. Netherlands Inland Revenue Administration*, Case 26/62, Judgment of 5 February 1963, p. 12 (Exhibit **CL-0104**).
[106] *Flaminio Costa v. E.N.E.L.*, Case No. 6/64, Judgment of 15 July 1964, p. 593 (Exhibit **CL-0106**).

> *the EU and, at least arguably, are not a part of international law...*[107]

118.    In the opinion of the Tribunal, the EU Treaties are part of the international law obligations between the Member States.  The Tribunal must therefore consider any conflict between those Treaties and the obligations arising from them for Croatia and the Netherlands and the obligations of those States under the BIT and the ICSID Convention.  However, how any such conflict is to be resolved is a matter for the rules of general international law.  While the CJEU has taken the view that EU law prevails over obligations of the Member States under international law, at least as between themselves, that principle is part of EU law as a separate legal order.  The Claimants are correct in saying that the Tribunal sits outside that order and derives its *compétence de la compétence* from international law, not EU law.

119.    That conclusion requires a consideration of how the Tribunal should treat the judgments of the CJEU relied upon by the Respondent, the Netherlands and the European Commission in the present case.  The Commission contends:

> *Judgments of the CJEU contain an authoritative and binding interpretation of the relevant provisions of EU law for all Member States <u>and</u> any investor established in those states.  Those judgments are also binding, as part of international law applicable to the dispute, upon arbitral tribunals established for the purposes of resolving an intra-EU dispute.*[108]

In support, the Commission cites the 2018 decision of the arbitration tribunal in *Vattenfall*[109] and the 2019 decision of the arbitration tribunal in *BayWa.*[110]

---

[107] *Vattenfall AB and Others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue of 30 August 2018, para. 146 (Exhibit **CL-0058**).

[108] EC Brief, para. 4 (emphasis in original).

[109] *Vattenfall*, note 107, above, paras. 148 and 150.

[110] *BayWa r.e. Renewable Energy GmbH v. Kingdom of Spain,* ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, para. 280 (Exhibit **CL-0077**).

120.    That goes too far.  There is no concept of binding precedent in EU law and, more importantly, the Tribunal is not an institution of the EU or one of its Member States. Neither of the arbitral decisions relied upon by the Commission supports its suggestion that judgments of the CJEU are binding upon an ICSID arbitration tribunal.

121.    Nevertheless, the *Vattenfall* and *BayWa* decisions do support the principle that judgments of the CJEU on the interpretation of the EU Treaties, like the Treaties themselves, form part of international law.  The point was put in these terms by the *Vattenfall* tribunal:

> *Since the* [CJEU] *is empowered by the EU Treaties to give preliminary rulings on the interpretation of EU law, including the EU Treaties (see Article 19 TEU and Article 267 TFEU), the Tribunal considers the* [CJEU] *Judgment's interpretation of the EU Treaties likewise to constitute a part of the relevant international law.*[111]

122.    The Tribunal agrees with the *Vattenfall* tribunal's formulation.  While the Tribunal is not formally bound by a judgment of the CJEU, it must defer to the interpretation given by the CJEU to the EU Treaties.  Since the States party to those Treaties have entrusted the CJEU with the power to give definitive rulings on the interpretation of those Treaties, it is not open to the Tribunal to substitute its own views on what the relevant provisions of the EU Treaties mean.  The Tribunal cannot, therefore, accept the suggestion made by the Claimants at the Hearing, and repeated in their post-hearing brief, that the Tribunal "*could interpret the EU Treaties in a manner different from that of the CJEU in* Achmea".[112]

123.    That does not mean, however, that the Tribunal must accept the CJEU's views about the primacy of EU law over other international law obligations.  If a provision of EU law, as interpreted by the CJEU, conflicts with an obligation of an EU Member State under another treaty, that conflict must be resolved by the Tribunal applying the rules of general international law.  That is particularly true in relation to obligations arising under a multilateral treaty, such as the ICSID Convention, the parties to which include States which

---

[111] *Vattenfall*, note 107, above, at para. 148.
[112] Claimants' PHB, para. 14.  See also Transcript, Day 2, pp. 357:24 to 358:4.

are not members of the EU.  Even in the case of a bilateral treaty between two EU Member States, if that treaty creates rights for third parties, the question whether the third parties can be deprived of those rights because of EU law is not one which can be answered by EU law alone.

### (3)    The Different Elements of International Law

124.    There are several different elements of international law which the Tribunal must consider.

125.    The first element is the ICSID Convention, a multilateral treaty governed by international law to which 158 States were parties at the time of writing.  That number included all the Member States of the EU except Poland.  However, the parties to the ICSID Convention also include a further 132 States which are not Member States of the EU.

126.    The ICSID Convention entered into force between Croatia and the Netherlands on 22 October 1998.

127.    Article 25(1) of the ICSID Convention provides for the jurisdiction of the Centre, and therefore of an ICSID arbitration tribunal, in the following terms:

> *The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State ... and a national of another Contracting State, <u>which the parties to the dispute consent in writing to submit to the Centre.</u> When the parties have given their consent, no party may withdraw its consent unilaterally.* (Emphasis added)

128.    While this formulation contains a number of elements, the only one pertinent to the Preliminary Objection is the requirement that the parties to the dispute, i.e. the Contracting State and the investor from another Contracting State, consent in writing to submit the dispute to the Centre.

129.    There are a number of ways in which such consent may be given but the one most commonly found today is where the Contracting State party to the dispute has concluded a treaty with the State of nationality of the investor and that treaty contains provision for

ICSID arbitration.  As Professor Paulsson has explained,[113] the arbitration clause operates as an offer by each State party to the treaty to investors possessing the nationality of the other State (or States) party to the treaty to submit to the jurisdiction of the Centre any dispute covered by the terms of the arbitration clause.  When a qualifying investor files with the Centre a request for arbitration against the first State,[114] it accepts that State's offer and an agreement between them to submit the case to the Centre comes into being, thus satisfying Article 25's requirement of consent in writing by both parties to the dispute.

130.    The second element, therefore, is the BIT between Croatia and the Netherlands.  Article 9 of that treaty (the text of which is set out at paragraph 65, above) is, subject to what is said below about the effect of EU law, an offer by Croatia to investors possessing the nationality of the Netherlands to submit a legal dispute arising out of an investment to the Centre.  Its terms are unequivocal.  Article 9(1) sets out the type of case which can be submitted to arbitration and Article 9(3) provides that:

> *Each Contracting Party hereby gives its unconditional consent to the submission of disputes as referred to in Paragraph 1 of this Article to international arbitration in accordance with the provisions of this Article.*

131.    Like the ICSID Convention, the BIT is a treaty between States and is governed by international law but the only parties to this treaty are both Member States of the European Union.

132.    The third element is the agreement said to have been formed in early 2020 when the Claimants filed their request for arbitration which was then registered by ICSID.  As explained above, and subject to what follows, that act amounted to an acceptance of the offer contained in Article 9(1) of the BIT and thus brought into being an arbitration agreement between the Claimants and the Respondent.  Since the Claimants accepted the

---

[113] Paulsson, "Arbitration without Privity", 10 *Foreign Investment Law Journal* (1995), p. 232 (Exhibit **RL-0010**).

[114] It is sometimes suggested that the critical act is not the deposit of the request but the registration of the case by the Centre.  In the present case, it makes no difference which interpretation is accepted since both dates fall after the date of the MS Declaration and before the Termination Treaty entered into force.

offer contained in the BIT, the terms of that agreement were the same as those of the BIT itself. However, the parties are different. The parties to the BIT are the States of Croatia and the Netherlands, whereas the parties to the arbitration agreement are the Claimants and Croatia. While the arbitration agreement is not a treaty, it is an agreement governed by international law in that it takes its force from the provisions of Article 25 of the ICSID Convention and the BIT.

133.   The fourth element is EU law in the form of the relevant provisions of the TFEU and the TEU (set out at paragraph 65, above), as interpreted by the CJEU in *Achmea* and later cases, notably *Komstroy*.[115]   One of the central issues in this case is whether, as the Respondent maintains, the effect of these provisions is that the offer to arbitrate made in Article 9(1) of the BIT was withdrawn before it could be accepted by the Claimants, with the result that no arbitration agreement ever came into being and the consent requirement of Article 25(1) of the ICSID Convention was therefore not satisfied. In support of this argument, the Respondent relies upon the MS Declaration. The Declaration, as its name suggests, is a political instrument, not a treaty, but Croatia argues that it nevertheless had the effect of making clear that the offer of arbitration in Article 9(1) of the BIT was no longer applicable before the request for arbitration was filed.

134.   The fifth element is the Termination Treaty (the relevant provisions of which are set out in paragraph 65, above), a treaty governed by international law. The Termination Treaty was signed on 5 May 2020, after the request for arbitration had been filed and the case had been registered by ICSID. It entered into force between Croatia and the Netherlands on 31 March 2021.[116]   According to the Respondent, even if there had still been an offer to arbitrate in existence at the time that the request for arbitration was made, the Termination Treaty abrogated it with retroactive effect. Alternatively, the Termination Treaty operates to confirm that the offer of arbitration had already been withdrawn.

---

[115] *Republic of Moldova v. Komstroy LLC*, Case C-741/19, Judgment of 2 September 2021 (Exhibit **RL-0035**).

[116] The Termination Treaty entered into force for Croatia on 25 October 2020 and for the Netherlands on 31 March 2021. The latter date is therefore the date on which it entered into force between them.

135.   A sixth element is the international law of treaties.  For most purposes (in particular treaty interpretation) the law is considered to have been codified in the VCLT.  The VCLT applies to treaties entered into after the VCLT came into force for the parties to those treaties.  It therefore applies to the BIT, which came into force on 1 June 1998, after the VCLT entered into force for Croatia[117] and the Netherlands.[118]  While the VCLT is not applicable to all of the other treaty provisions in issue, the relevant parts of the VCLT are considered to be declaratory of customary international law and can be applied as such.

136.   Finally, there are the rulings of various arbitration tribunals and national courts addressing the question of jurisdiction in intra-EU investment arbitrations in the light of developments in EU law.  The Respondent, in a table helpfully compiled for the Tribunal, has identified sixty such rulings.  The Claimants submitted comments on this Table but have not taken issue with it in any fundamental respect.

137.   The overwhelming majority of the arbitral rulings upheld jurisdiction on the basis that the relevant arbitration clause continued to be valid and effective as an offer of arbitration, notwithstanding the position under EU law.[119]  The decisions of national courts, by contrast, have upheld the intra-EU jurisdictional objection. Nevertheless, the Tribunal does not consider that this body of arbitral jurisprudence, impressive though it may be, is sufficient to dispose of the Preliminary Objection.

138.   First, of the arbitral rulings identified by the Parties, thirty-nine concern arbitration proceedings brought under the Energy Charter Treaty (the "**ECT**").  The ECT is a multilateral treaty to which many of the parties are not EU Member States.  An arbitration brought by an investor from one EU Member State against another EU Member State thus

---

[117] 12 October 1992.

[118] 9 April 1985.

[119] The solitary exception amongst the arbitral awards is that in *Green Power K/S and SCE Solar Don Benito APS v. Kingdom of Spain* , SCC Case No. V2016/135, Award of 16 June 2022 (Exhibit **CL-0171**), which held that "*the primacy of EU law ... precluded the unilateral offer to arbitrate in Article 26* [Energy Charter Treaty]", para. 476. The arbitration proceeding in *Raiffeisenbank International AG and Raiffeisenbank Austria d.d. v. Republic of Croatia*, PCA Case No. 2020-15, was terminated by agreement between the parties following decisions of the German courts (Exhibits **RL-0091-S** and **RL-0092-S**) (the seat of the arbitration was in Frankfurt).

implicates obligations owed to States which are not members of the EU. That raises issues which do not appear in a case brought under an intra-EU BIT.[120] In addition, the ECT contains a provision on conflicts with other treaties (Article 16), which has no counterpart in the BIT. While the CJEU has opined that the *Achmea* Judgment is applicable to ECT cases and thus cannot be the basis for jurisdiction in an intra-EU case,[121] all but one of the arbitral tribunals which have ruled on this matter have taken a different view.[122] A number of the arbitral rulings on the ECT contain observations of a more general application which are of importance in the present case but the decisions themselves have sufficient differences from the present case that, quite apart from the absence of any concept of binding precedent in international law, they cannot be regarded as decisive.

139.    Secondly, even the rulings in cases where jurisdiction was asserted under a BIT are not necessarily decisive for the outcome of the present case. That is because in none of them was the request for arbitration made after the adoption by twenty-two EU Member States of the MS Declaration.[123] While there are many other issues which are common to the present case and the cases in which those rulings were given – and on those the Tribunal has found the earlier rulings of considerable assistance – the fact that the request for arbitration in the present case post-dates the adoption of the MS Declaration is a matter on which the earlier cases cannot offer much guidance.

140.    Lastly, there are the judgments of some national courts. In France the Court of Appeal of Paris has annulled two awards on the basis of the rule of EU law identified by the CJEU in

---

[120] See, e.g., *Landesbank Baden-Württemberg and Others v. Kingdom of Spain*, ICSID Case No. ARB/15/45, Decision on the "Intra-EU" Jurisdictional Objection of 25 February 2019, paras. 146-153 (Exhibit **CL-0064**).

[121] *Komstroy*, note 115, above.

[122] The exception is *Green Power*, note 119, above.

[123] The Claimants have helpfully provided a Table (Exhibit **CL-0195S**) in which they give details of twenty-six cases (other than the present one) in which an intra-EU claim was made after the date of the MS Declaration. At that time none of these had resulted in a decision on the intra-EU issue. While the present decision was being finalised, reports appeared that the tribunal in *JCDecaux SA v. Czech Republic*, ICSID Case No. ARB/20/33, had given a decision on jurisdiction on 28 July 2023. That decision is not, however, publicly available.

*Achmea*.[124]  In both cases the seat of the arbitration was in France, and the Court of Appeal applied EU law as part of the *lex arbitri*.  The German courts have declared inadmissible an arbitration, with its seat in Germany, on the basis that EU law was supreme within the German legal system.[125]  A German court has also declared inadmissible on the same ground an ICSID arbitration proceeding.[126]  These judgments were, however, based in large part on the primacy of EU law within national law, a consideration which does not apply to the present Tribunal.

141.  The Tribunal therefore treats the issue before it as one of first impression.  It is conscious, that its decision may, as a consequence, have wider repercussions and it has therefore endeavoured to set out its reasoning in some detail.

### C.    THE RELATIONSHIP BETWEEN DIFFERENT ARGUMENTS IN SUPPORT OF THE PRELIMINARY OBJECTION

142.  As set out in the previous section, the Respondent advances two grounds on which the Tribunal should conclude that it lacks jurisdiction: the first based upon the Termination Treaty, the second upon the MS Declaration.  These are advanced as discrete arguments but in practice there is a considerable degree of overlap between them.  Moreover, both require consideration of the *Achmea* Judgment and other judgments of the CJEU.  While the Respondent does not advance, as a principal argument, the thesis that, even without the Termination Treaty and the MS Declaration, the effect of EU law is to withdraw or nullify the effect of Article 9 of the BIT, its submissions certainly support that thesis and it may

---

[124] *The Republic of Poland v. Slot Group a.s. and CEC Praha*, Paris Court of Appeal, Judgment of 19 April 2022 (Exhibit **RL-0093-S**) (concerning the award issued in PCA Case No. 2017-10) and *The Republic of Poland v. Strabag SE and Others*, Paris Court of Appeal, Judgment of 19 April 2022  (Exhibit **RL-0094-S**) (concerning the award issued in ICSID Case No. ADHOC/15/1).

[125] *Raiffeisenbank International AG and Raiffeisenbank Austria d.d. v. Republic of Croatia*, PCA Case No. 2020-15 (judgment of the Federal Supreme Court of 17 November 2021 declaring the proceedings inadmissible (Exhibit **RL-0092-S**)).

[126] *RWE AG v. Kingdom of the Netherlands* ICSID Case No. ARB/21/4 (judgment of the Cologne Higher Regional Court of 1 September 2022 declaring the proceedings inadmissible (Exhibit **RL-0098-S**)).  The Berlin Higher Regional Court in *Mainstream Renewable Power and Others v. Federal Republic of Germany*, ICSID Case No. ARB/21/26 (judgment of the Berlin Higher Regional Court of 28 April 2022 (Exhibit **R-0036-S**)), however, refused to make such a declaration.  While the Tribunal was finalising its Decision in the present case, the Federal Supreme Court of Germany, in judgment dated 27 July 2023, upheld the decision in *RWE* and reversed that in *Mainstream*.

be said to form a stepping stone in the MS Declaration argument. Moreover, the European Commission raises this thesis as its first line of argument.

143.   The Tribunal will therefore proceed as follows. It will first (Part D) examine the case-law of the CJEU and consider whether EU law, as thus interpreted, has the effect of nullifying in some way the offer of arbitration in Article 9 of the BIT. Then it will examine the Respondent's argument based upon the Termination Treaty (Part E). Following that, it will discuss the argument based upon the MS Declaration and other instances of State practice relied upon by the Respondent (Part F).

### D.   THE JUDGMENTS OF THE CJEU AND THE EFFECTS OF EU LAW

### (1)   The Position of the European Commission

144.   It appears that, for some time prior to March 2018, the European Commission had considered that intra-EU BITs were contrary to EU law.[127] In its non-disputing-party brief in the present proceeding, the Commission makes clear its view that both the arbitration provision of the Croatia-Netherlands BIT and its substantive provisions infringe fundamental principles of EU law.[128]

145.   The position of the European Commission has, however, undergone a considerable evolution over time. In its intervention in the *Eastern Sugar* arbitration, it maintained that intra-EU BITs were inconsistent with EU law but added:

> *... the effective prevalence of the EU acquis does not entail, at the same time, the automatic termination of the concerned BITs or, necessarily, the nonapplication of all their provisions.*
>
> *Without prejudice to the primacy of Community law, to terminate these agreements, Member States would have to strictly follow the*

---

[127] See, e.g., the submissions of the European Commission in *Eastern Sugar B.V. v. The Czech Republic*, SCC Case No. 088/2004, Partial Award of 27 March 2007, para. 119 (Exhibit **CL-0036**). This view was not accepted by any of the arbitration tribunals which considered it; in addition to *Eastern Sugar*, see *European American Investment Bank AG v. The Slovak Republic*, PCA Case No. 2010-17, Award on Jurisdiction of 22 October 2012 (Exhibit **CL-0042**).
[128] EC Brief, paras. 36-41,

> *relevant procedure provided for this in regard in the agreements themselves.  Such termination cannot have a retroactive effect.*[129]

146.    Following the judgment in *Achmea*, however, the Commission took what one tribunal has described as "*a Copernican turn*"[130] and maintained that, since the judgment applied *ex tunc*, arbitration clauses in treaties (both bilateral and multilateral) were inapplicable in an intra-EU context with effect from the date at which both EU States party to the treaty had become EU Member States.  It is that position which the European Commission advances in the present case,[131] arguing that the incompatibility of the BIT with EU law means that the BIT, or at least Article 9 thereof, has been terminated with effect from the date that Croatia acceded to the EU.[132]  In order to assess that argument, it is necessary to review the case law of the CJEU.

**(2)      The Judgments of the CJEU**

147.    Although not concerned with BITs, it is useful to begin with the 2009 judgment of the CJEU in *Budějovicky Budvar v. Rudolf Ammersin GmbH*.[133]  That case concerned a bilateral treaty between Austria and the Czechoslovak Socialist Republic regarding protection of indications of source, designations of origin and other designations referring to the source of agricultural and industrial products.  It entered into force in 1981, before either State had joined the EU.  The case was a reference for a preliminary ruling under Article 234 of the EC Treaty (the forerunner of Article 267 of the TFEU).  The CJEU decided that the EU law on the matters covered by the bilateral agreement was exhaustive and therefore "*precludes the application of a system of protection laid down by agreements between two Member States*".[134]  In other words a bilateral agreement between two member

---

[129] Cited in *Eastern Sugar*, note 127, above, at para. 119.

[130] *LSG Building Solutions GmbH and Others v. Romania*, ICSID Case No. ARB/18/19, Decision on Jurisdiction, Liability and Principle of Reparation of 11 July 2022, para. 538 (Exhibit **RL-0096-S**).

[131] EC Brief, para. 28.

[132] EC Brief, paras. 30-34.

[133] *Budějovicky Budvar národní podnik v. Rudolf Ammersin GmbH*, Judgment of the Grand Chamber of 8 September 2009, Case C-478/07 (Exhibit **ECL-0021**).

[134] *Budějovicky*, note 133, dispositif, para. 2.

States was precluded if it conflicted with, or dealt with matters exhaustively regulated by, EU law.

148.    Of more immediate importance is the 2018 judgment of the CJEU Grand Chamber in *Achmea*.[135]   The case was a reference from the Bundesgerichtshof in Germany under Article 267 of the TFEU.  It concerned an arbitration award given by a non-ICSID tribunal with its seat in Germany.[136]   The Bundesgerichtshof sought a ruling on the following questions:

> *(1) Does Article 234 TFEU preclude the application of a provision in a bilateral investment protection agreement between member States of the European Union (a so-called intra-EU BIT) under which an investor of a Contracting State, in the event of a dispute concerning investments in the other Contracting State, may bring proceedings against the latter State before an arbitral tribunal where the investment protection agreement was concluded before one of the Contracting States acceded to the European Union but the arbitral proceedings are not to be brought until after that date ?*
>
> *If Question 1 is answered in the negative:*
>
> *(2) Does Article 267 TFEU preclude the application of such a provision ?*
>
> *...*

149.    The CJEU judgment begins by emphasising three central principles of EU law, namely the autonomy of EU law, its primacy over the law of EU Member States and the principle of sincere or loyal co-operation between Member States:

> *32.  ... it should be recalled that, according to settled case-law of the Court, an international agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the EU legal system, observance of which is ensured by the Court. That principle is enshrined in particular in Article 344 TFEU, under*

---

[135] *Achmea* Judgment, note 28, above.  See also the opinion of the Advocate-General at Exhibit **CL-0116**.

[136] *Eureko BV v. Slovak Republic,* PCA Case No. 2008-13, Award on Jurisdiction, Arbitrability and Suspension of 26 October 2010 (Exhibit **CL-0041**).

*which the Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties (Opinion 2/13 (Accession of the EU to the* [European Convention on Human Rights]*) of 18 December 2014, EU:C:2014:2454, paragraph 201 and the case-law cited therein).*

*33. Also, according to settled case-law of the Court, the autonomy of EU law with respect both to the law of the Member States and to international law is justified by the essential characteristics of the EU and its law, relating in particular to the constitutional structure of the EU and the very nature of that law.  EU law is characterized by the fact that it stems from an independent source of law, the Treaties, by its primacy over the laws of the Member States, and by the direct effect of a whole series of provisions which are applicable to their nationals and to the Member States themselves.  Those characteristics have given rise to a structured network of principles, rules and mutually independent legal relations binding the EU and its Member States reciprocally and binding its Member States to each other (see to that effect Opinion 2/13 (Accession of the EU to the* [European Convention on Human Rights]*) of 18 December 2014, EU:C:2014:2454, paragraphs 165 to 167 and the case-law cited therein).*

*34. EU law is thus based on the fundamental premiss that each Member State shares with all the other Member States, and recognizes that they share with it a set of common values on which the EU is founded, as stated in Article 2 TEU.  That premiss implies and justifies the existence of mutual trust between the Member States that those values will be recognized, and therefore that the law of the EU will be respected.  It is precisely in that context that the Member States are obliged, by reason inter alia of the principle of sincere co-operation set out in the first paragraph of Article 4(3) of the TFEU, to ensure in their respective territories the application of and respect for EU law, and to take for those purposes any appropriate measure, whether general or particular, to ensure the fulfilment of the obligations arising out of the Treaties or resulting from the acts of the institutions of the EU (Opinion 2/13 (Accession of the EU to the* [European Convention on Human Rights]*) of 18 December 2014, EU:C:2014:2454, paragraphs 168 and 173 and the case-law cited therein).*

150.    The CJEU noted that, in order to preserve these characteristics of EU law, the Treaties had established a judicial system designed to ensure consistency and uniformity in the

interpretation of EU law.  A central feature of that system was the ability of national courts to seek preliminary rulings from the CJEU under Article 267 TFEU.  The CJEU considered that:

> *40. Even if ...* [a tribunal established under the BIT], *despite the very broad wording of Article 8(1) of the BIT, is called on to rule only on possible infringements of the BIT, the fact remains that in order to do so it must, in accordance with Article 8(6) of the BIT, take account in particular of the law in force of the contracting party concerned and other relevant agreements between the contracting parties.*

> *41. Given the nature and characteristics of EU law ... that law must be regarded both as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States.*

> *42. It follows that on that twofold basis the arbitral tribunal referred to in Article 8 of the BIT may be called on to interpret or indeed apply EU law, particularly the provisions concerning the fundamental freedoms, including the freedom establishment and free movement of capital.*

151.    The CJEU held that while an arbitral tribunal established under the BIT might therefore have to interpret and apply EU law, it was not an EU judicial institution and could not request rulings from the CJEU.  Nor was it sufficient to dispose of this objection that, because the arbitration had its seat in an EU Member State and was thus subject to the control of the courts of that State, a German court could request a preliminary ruling.  In light of these considerations, the CJEU concluded that the investor-State dispute clause in the Netherlands-Slovak BIT had an adverse effect on the autonomy of EU law[137] and ruled:

> *Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on Encouragement and Reciprocal Protection of Investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those*

---

[137] *Achmea* Judgment, para. 59.

> *Member States may, in the event of a dispute concerning the investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.*[138]

152. It is important to note the limits of the CJEU's *Achmea* Judgment. The European Commission now takes the view that both the arbitration clause of an intra-EU BIT and the substantive provisions of that treaty are incompatible with EU law.[139] The CJEU in *Achmea* did not, however, make any pronouncement on the compatibility of substantive provisions with EU law.[140] What it held was that the fact that an investor-State arbitration tribunal *might* be called upon to apply EU law and could not refer a question regarding that law to the CJEU was what conflicted with the TFEU.

153. Although a preliminary ruling by the CJEU is formally binding only on the national court which requested the ruling and there is no doctrine of binding precedent in EU law, the *Achmea* Judgment has to be treated as an authoritative interpretation of the relevant rules of EU law and thus as applicable to the present BIT. Accordingly, the Tribunal will treat the *Achmea* ruling as meaning that EU law precluded Article 9 of the BIT from the date when Croatia acceded to the EU, namely 1 July 2013, fifteen years after the BIT entered into force.

154. The CJEU further developed its jurisprudence in a number of later cases. Three require brief comment. In *Opinion1/17* of 30 April 2019,[141] the CJEU distinguished *Achmea* and held that the reasoning therein did not apply to a tribunal created by agreement between the EU and a non-EU State (under the CETA between the EU and Canada).[142] In *Komstroy*, the CJEU, in an *obiter dictum*, stated that the reasoning in *Achmea* applied to intra-EU

---

[138] *Achmea* Judgment, para. 62.

[139] EC Brief, paras. 37-38 and 42; see also Communication from the Commission to the European Parliament and the Council, "Protection of Intra-EU Investment," 19 July 2018, COM (2018) 547, p. 2 (Exhibit **R-0007**).

[140] The Preamble to the Termination Treaty expressly provides that "*this Agreement is without prejudice to the question of compatibility with the EU Treaties of substantive provisions of intra-EU bilateral investment treaties*" (Preamble, para. 9).

[141] Opinion 1/17 concerning the EU Canada Comprehensive Economic and Trade Agreement (Exhibit **CL-0117**).

[142] *Opinion 1/17*, note 141, paras. 126-128.

arbitrations under the Energy Charter Treaty.[143]  Finally, in *Micula*, the CJEU held that the reasoning in *Achmea* was applicable to an ICSID arbitration if it took place between an EU Member State and an investor from another EU Member State.[144]

155.    This jurisprudence has been accompanied by other developments, most importantly the MS Declaration and the Termination Treaty, the relevant provisions of which are set out at paragraph 65, above.

### (3)    The Effect of EU Law on the BIT as a Matter of International Law

#### a.    *Was the BIT Terminated in Whole or in Part as a Result of the* Achmea *Judgment?*

156.    As already stated, the European Commission puts forward as its "*long-standing and consistent view*"[145] that, in light of the *Achmea* Judgment, the BIT was terminated with effect from 1 July 2013 (the date on which Croatia became an EU Member State).  In doing so, it relies on Article 59 VCLT, which provides for termination or suspension of a treaty implied by the conclusion of a later treaty (for the text, see paragraph 65, above).

157.    That submission is, of course, very different from the view of the Commission at the time of the *Eastern Sugar* case.[146]   Even after the "*Copernican turn*" in the Commission's position which followed,[147] the Commission appears to have envisaged that termination would be carried out in the future and was not already a *fait accompli*.  The press release issued by the Commission at the same time as it issued the Communication to the European Parliament and the Council regarding Investment Protection on 19 July 2018[148] stated that, following the judgment in *Achmea*, "[t]*he treaties* [i.e. the intra-EU BITs] *should therefore*

---

[143]*Komstroy*, note 115, paras. 64-65.

[144] *European Commission v.European Food SA, Starmill SRL, Multipack SRL, Scandic Distilleries SA, Ioan Micula, Viorel Micula and Others* ("**Micula**"), Case C-638/19 P, Judgment of 25 January 2022, paras. 138-145 (Exhibit **ECL-0009**).

[145] EC Brief, para. 30

[146] See para. 144, above.

[147] *LSG Building*, note 130, above, para. 538.

[148] See note 139, above.

*be legally terminated in order to ensure legal certainty*".[149]  It is also the case that the *Achmea* Judgment makes no mention of termination of a BIT.

158.  However, what makes the Commission's submission that the BIT was terminated by effect of EU law untenable is that it cannot be reconciled with the practice of the States parties to the BIT.  It is the intention of the parties to conflicting treaties which is decisive in this regard, not the view of the European Commission, no matter how authoritative the Commission's view may be on matters of EU law.  The *travaux préparatoires* of what became Article 59 VCLT, cited by both the Respondent and the European Commission, contain the following statement:

> *The present article ... is not concerned with the* priority *of treaty provisions which are incompatible, but with cases where it clearly appears that the intention of the parties in concluding the later treaty was either definitively or temporarily to supersede the régime of the earlier treaty by that of the later one.  In these cases the present article terminates or suspends the operation of the earlier treaty altogether, so that it is either no longer in force or no longer in operation.  In short, the present article is confined to cases of termination or of the suspension of the operation of a treaty implied from entering into a subsequent treaty.*[150]

159.  In other words, the question is whether the parties to the two treaties intended, by the adoption of the later treaty, to abrogate or suspend the earlier treaty.  In the present case, there is no evidence that either Croatia or the Netherlands addressed this issue when the later treaty – the TFEU – entered into force between them in 2013.  There is, however, ample material to demonstrate that once the CJEU had raised this issue, the parties to the BIT did not take the view that the TFEU had impliedly terminated the BIT.

160.  The Netherlands Government, in its statement to Parliament following the *Achmea* Judgment made clear that the Government considered that, in light of the judgment, it was

---

[149] European Commission Fact Sheet, "Commission provides guidance on protection of cross-border EU investments – Questions and Answers", p. 2 (Exhibit **EC-0002**) (emphasis added).
[150] Waldock Report II, p. 404 (Exhibit **ECL-0016**); ILC Commentary to Draft Article 41, Yearbook of the International Law Commission, 1966, vol. II, p. 32, para. 4 (**RL-0004**).

necessary to terminate its intra-EU BITs and explained how it proposed to do that.[151]  The Dutch Government thus envisaged *future* termination; there is no suggestion that the BIT had already been terminated.

161.    The same is true of the multilateral instruments to which Croatia and the Netherlands are party.  Thus, the MS Declaration stated, in paragraph (5), that:

> *In light of the* Achmea *judgment, Member States will terminate all bilateral investment treaties concluded between them by means of a plurilateral treaty or, where that is mutually recognized as more expedient, bilaterally.* [Emphasis added.]

That plan was carried into effect by the Termination Treaty, Article 1 of which provided that "*Bilateral Investment Treaties listed in Annex A are terminated according to the terms set out in this Agreement*".  Article 4(2) provided that termination of a listed BIT was to take effect on the date when the Termination Treaty entered into force between the States party to that BIT.  Annex A, which includes the BIT between Croatia and the Netherlands, is headed "*List of Bilateral Investment Treaties that are Terminated by this Agreement*".  One cannot terminate something which has already been terminated.  Since the BIT was expressly stated to have been terminated *by* the Termination Treaty, it follows that it was terminated only when that Treaty entered into force between the Netherlands and Croatia, namely on 31 March 2021.

162.    Nor does the Tribunal accept the alternative submission that, even if the BIT as a whole was not terminated, the arbitration clause was.  Neither the MS Declaration nor the Termination Treaty uses the language of termination (other than the references to future termination) when speaking of the arbitration clauses in intra-EU BITs.  Instead, they refer to such clauses being "*inapplicable*".

---

[151] Letter by the Netherlands' Minister for Trade to Parliament, note 49, above, p. 2.

163.  The Tribunal therefore concludes that neither the BIT as a whole, nor Article 9 thereof, was terminated until the entry into force of the Termination Treaty between Croatia and the Netherlands on 25 March 2021.

164.  That leaves the question whether the BIT or Article 9, was suspended by virtue of the principle in Article 59 VCLT.  Again, the statements by the BIT States, particularly the MS Declaration and the Termination Treaty speak of "*inapplicability*", not suspension of Article 9.  The Tribunal considers that these statements are insufficient to demonstrate an intention to suspend Article 9, let alone the entire BIT (see further paragraphs 223 to 228, below).

### b.  *Primacy and the Application of Article 30 VCLT*

165.  Since there has been neither termination nor suspension of the BIT under Article 59 VCLT, it is necessary to consider, on the basis that the BIT and the TFEU both continued in force after Croatia acceded to the EU and after the CJEU gave its judgment in *Achmea*, whether, as the Respondent and the European Commission argue, the latter has primacy over the former so as to render the offer of arbitration in Article 9 of the BIT ineffective.

166.  One basis on which it is suggested (particularly by the European Commission) is the principle of EU law that EU law has primacy over national law.  That principle is enshrined in Declaration No. 17 annexed to the Final Act of the Intergovernmental Conference which adopted the Treaty of Lisbon in 2017, although the principle which it states is of greater antiquity.  The Declaration reads:

> *The Conference recalls that, in accordance with well settled case law of the Court of Justice of the European Union, the Treaties and the law adopted by the Union on the basis of the Treaties have primacy over the law of Member States under the conditions laid down by the said case law.*[152]

---

[152] Declaration on Article 55(2) of the Treaty on European Union, para. 17 (Exhibit **ECL-0027**). The Conference annexed an opinion of the Council Legal Service to the effect that the principle of primacy was applicable notwithstanding that it was not expressly mentioned in the Treaties.

167.    The Tribunal does not consider this declaration, important as it is in other contexts, to be relevant to the issues in the present case.  The declaration states the primacy of EU law over the laws of the Member States, but this Tribunal is concerned (at the present stage of the proceeding) not with the laws of either the Netherlands or Croatia but with international agreements to which they are party.  Those agreements may form part of the national law of either or both States and, if they do, then EU Law has primacy over them *in their capacity as part of the relevant national law*.  But the Tribunal is concerned with the status and effect of the agreements as part of international law.  The fact that, in a State with a monist approach to the relationship between treaties and national law, or in a case where a treaty has been incorporated into national law by other means, that treaty becomes part of national law does not alter its character as an international agreement or the effects which it has under international law.[153]  Thus, the fact that EU law has primacy over an agreement such as the BIT insofar as the BIT is part of the law of Croatia and/or the Netherlands, does not mean that it must enjoy the same primacy over the BIT in international law and it is with the BIT's effects in international law that the Tribunal is concerned.

168.    The CJEU has, however, also taken the view that EU law prevails as a matter of international law over international agreements between Member States.[154]  That was also the view expressed, obiter, by the arbitral tribunal in *Electrabel*.[155]  That principle is said to be reinforced by Article 351 TFEU.  That provision expressly preserves the position of treaties concluded by EU Member States with non-EU Member States before accession to the EU and is therefore said by some impliedly to subject treaties between EU Member States to the primacy of EU law.  The Tribunal considers that this approach strains the interpretation of Article 351.

169.    Insofar as the CJEU has expressed the view that EU law prevails over international agreements concluded between Member States, it is at this point that the dual character of

---

[153] For that reason, rulings of national courts applying the principle of primacy of EU law, such as those cited in notes 124 and 125, above, are not conclusive in the present proceeding.

[154] See *Budějovicky Budvar*, note 133, above.

[155] *Electrabel S.A. v. The Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability of 30 November 2012, paras. 4.167-168 (Exhibit **CL-0043**).

EU law referred to in paragraph 117, above, becomes important.  The principle enunciated by the CJEU in *Budějovicky Budvar* (discussed at paragraph 147, above) is, in the opinion of the Tribunal, one of those principles of EU law which has a constitutional character, rather than forming part of international law. To establish the primacy of one treaty over another, it is necessary to turn to general international law, not simply to rely upon principles of the EU constitutional order adopted without any reference to international law as such.

170.    The Tribunal turns, therefore, to Article 30 VCLT.  That provision addresses the issue of incompatible provisions in "*successive treaties relating to the same subject matter*".[156] Article 30(3) provides that:

> *When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under Article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty*
> *...*

171.    The Respondent and the European Commission contend that this provision applies to the relationship between the BIT and the EU Treaties and thus establishes that, as a matter of international law, the BIT applies only to the extent that it is compatible with the EU Treaties.

172.    This view has not attracted support from the many arbitration tribunals which have considered the issue.  For example, the *EURAM* tribunal held that:

> *... the two treaties do not have the same overall subject matter. When asking* "with what issues do the rules of the two treaties deal?" *it is evident that the treaties do not deal with the same issues.  The* [European Community Treaty] *deals with the creation of an internal market, the BIT with the fostering of international flows of investment by protecting the rights of the investors.*[157]

---

[156] Article 30(1) VCLT.  The full text is set out at para. 65, above.

[157] *European American Investment Bank AG*, note 127, above, para. 178.

173.    The Respondent and the Commission, however, maintain that the reference in Article 30(1) VCLT to "*successive treaties relating to the same subject matter*" was not intended to add a requirement of a threshold character; in their view, the mere fact of incompatibility between two sets of treaty provisions is sufficient to establish the application of Article 30. The Commission, in particular, criticises the arbitral rulings to the contrary for failing to engage with the *travaux préparatoires* of the VCLT which, the Commission maintains, show that the original draft of what became Article 30 contained no reference to "*same subject matter*" and that this was added in order to clarify the text without intending to alter the substance.[158]  This view has gained some support from commentators.[159]

174.    The Tribunal is not persuaded by this argument.  Treaty interpretation, according to Article 31 VCLT, begins with the text and context.  Article 32VCLT provides that the *travaux préparatoires* are merely a supplementary means of interpretation, recourse to which should be made only:

> *... to confirm the meaning resulting from the application of Article 31, or to determine the meaning when the interpretation according to Article 31: (a) leaves the meaning ambiguous or obscure; or (b) leads to a result which is manifestly absurd or unreasonable.*

But there is nothing ambiguous or obscure about the meaning of Article 30(1) VCLT which results from the application of the general rule of interpretation in Article 31.  Nor could it be suggested that that meaning leads to a result which is manifestly absurd or unreasonable. Moreover, the interpretation proposed by the Respondent and the European Commission would leave the words "*relating to the same subject matter*" in Article 30(1) VCLT devoid of any meaning and it is a general principle of treaty interpretation that such a result should be avoided.  In addition, the extracts from the *travaux* on which the Respondent and the Commission rely do not support such an extreme interpretation.

---

[158] EC Brief, para. 35.
[159] See, e.g., Orakhelashvili, Commentary on Article 30, in Corten and Klein, *The Vienna Convention on the Law of Treaties*, p. 765 at p. 777 (Exhibit **ECL-0030**).

175.    The TFEU and TEU are not remotely similar to the BIT.  They are constituent instruments of an institution which is an international organisation but also a union of States with a customs union and much more.  They address the governance and functioning of the institution and set out the legal regimes for free movement of goods, persons, services and capital, as well as much else.  By contrast, the BIT has far more limited goals and provisions.  It addresses only the reception and treatment of investment by investors of one BIT State in the territory of the other and provides for investor-State and State to State arbitration as the means of enforcing the standards which it requires.

176.    The European Commission makes clear in its submission (and in other statements) that it considers that the substantive standards laid down in the BIT deal with matters which are also regulated by the EU Treaties and are therefore incompatible with those Treaties.  But that view has not been endorsed either by the CJEU or the Member States.  The judgments of the CJEU in *Achmea* and later cases found the arbitration clauses of intra-EU BITs (and the arbitration provision of the ECT insofar as it was applied in an intra-EU case) incompatible with specified provisions of the TFEU, because a tribunal established under one of those clauses might be called upon to rule on the interpretation or application of a rule of EU law without being able to seek the guidance of the CJEU.  That, the CJEU held, would endanger the uniformity and autonomy of EU law.  It has not held that the substantive provisions of intra-EU BITs address the same issues as the EU Treaties, nor has it found any incompatibility between them.  As for the views of the Member States, the MS Declaration does not address the relationship between the substantive provisions of the BITs and the EU Treaties, while the Termination Treaty expressly states that it is "*without prejudice to the question of compatibility with the EU Treaties of substantive provisions of intra-EU bilateral investment treaties*".[160]

---

[160] Preamble, para. 9.

177.    The Tribunal therefore agrees with the body of arbitral rulings on the non-applicability of Article 30 VCLT.[161]

178.    Accordingly, the Tribunal concludes that the application of EU law by itself did not amount to a withdrawal of the offer to arbitrate in Article 9 of the BIT.  Nor does the Tribunal consider that EU law produces that effect by way of interpretation of the BIT.  Article 31(3) VCLT (which is considered in more detail below) requires the Tribunal to "*take into account*" in the interpretation of the BIT (a) any subsequent agreement between the parties regarding the interpretation of the treaty, (b) subsequent practice which establishes the agreement of the parties regarding the BIT's interpretation, and (c) any relevant rules of international law applicable in the relations between the parties.  Since Croatia joined the EU in 2013, EU law has formed part of the rules of international law applicable between Croatia and the Netherlands (thus falling within Article 31(3)(c) VCLT) and could also be relevant as a subsequent agreement under Article 31(3)(a) VCLT or even as subsequent practice under Article 31(3)(b).  However, for the reasons given in paragraphs 200 to 212, below, the excision of an entire clause in a treaty goes far beyond the interpretation of that treaty.

179.    That leaves the question whether the acts of Member States subsequent to the *Achmea* Judgment, when taken together with EU law, amount to such a withdrawal.  It is to that question which the Tribunal will now turn.

### E.    THE TERMINATION TREATY

180.    Croatia's principal argument is that even if, *quod non*, the offer to arbitrate contained in Article 9(1) of the BIT had still been capable of acceptance at the time that the request for

---

[161] In addition to *EURAM*, para. 170, above, see, e.g., *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Principles of Quantum of 12 March 2019, para. 352 (Exhibit **CL-0066**); *B3 Croatian Courier*, note 100, above, paras. 555-556; *Eskosol SpA in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection Based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes of 7 May 2019, paras. 140 and 146 (Exhibit **CL-0068**); and *Magyar Farming Company Ltd. and Others v. Hungary* (ICSID Case No. ARB/17/27), Award of 13 November 2019, paras. 231-236 (Exhibit **CL-0076**).

arbitration was filed, the effect of the Termination Treaty was to negate any effect which Article 9(1) might have had. According to the Respondent:

> *The BIT cannot serve as a legal basis for the arbitration. That conclusion may be reached in various ways, but perhaps most straightforwardly via the application of the* [Termination Treaty] *following its entry into force between both parties to the BIT.*[162]

181. Several points are clear from the text of the Termination Treaty. First, the parties to the Termination Treaty considered that "*in compliance with the obligation of Member States to bring their legal orders in conformity with Union law, they must draw the necessary consequences from Union law as interpreted in the judgment of the CJEU in Case C-284/16* Achmea (Achmea *judgment*)".[163] This statement demonstrates that the parties to the Termination Treaty were acting to give effect to *Achmea* but it is difficult to read the statement as compatible with the thesis that *Achmea* had already put an end to the intra-EU BITs.

182. Secondly, the parties to the Termination Treaty intended the Treaty to cover all arbitration proceedings under intra-EU BITs, whether arising under ICSID or other arbitration regimes. That is expressly stated in paragraph 7 of the Preamble to the Treaty.

183. Thirdly, Article 2(1) of the Termination Treaty expressly terminates the BITs listed in Annex A, a list which encompasses all of the intra-EU BITs between those EU Member States which became party to the Termination Treaty (including the present BIT). This provision would be meaningless if, as the European Commission contends, those BITs had already been terminated as an automatic effect of the *Achmea* Judgment.

184. Fourthly, it is clear that the parties to the Termination Treaty intended termination to have retroactive effect. Article 5 of the Treaty provides that "*Arbitration clauses* [in any of the listed BITs] *shall not serve as a legal basis for New Arbitration Proceedings*". "*New Arbitration Proceedings*" are defined in Article 1(6) as "*any Arbitration Proceedings*

---

[162] Respondent's PHB, para. 9.

[163] Preamble, para. 4.

*initiated on or after 6 March 2018*", the date of the *Achmea* Judgment.  Only in arbitration proceedings concluded before that date would the final award or settlement agreement be allowed to stand,[164] although transitional provisions were made for proceedings commenced before 6 March 2018 but not yet concluded.[165]

185.  Fifthly, the Termination Treaty was intended to override any sunset clauses in the listed BITs.  That was expressly provided in Article 2(2).

186.  Lastly, Article 4(1) confirms that arbitration clauses in intra-EU BITs are incompatible with the EU Treaties and, in the case of a State which became a Member State after the conclusion of the BIT, with effect from the date on which that State joined the EU, with the result that "*the Arbitration Clause in such a Bilateral Investment Treaty cannot serve as legal basis for Arbitration Proceedings*".

187.  The BIT between Croatia and the Netherlands is listed in Annex A and the Termination Treaty entered into force for the two States on 31 March 2021.  The parties to a bilateral treaty have the power to terminate that treaty if they so wish and the Tribunal accepts that the BIT between Croatia and the Netherlands was terminated by the Termination Treaty on 31 March 2021, when the Termination Treaty entered into force between Croatia and the Netherlands.  The question is what effect that termination had upon the proceedings commenced by the Claimants in February 2020.

188.  The Respondent maintains that the effect of the Termination Treaty can be considered in three ways: first, that it terminated the BIT with retrospective effect so that any offer to arbitrate which might have been extant at the time that the request for arbitration was filed was retroactively nullified; secondly, that the Termination Treaty was an agreement between the parties to the BIT subsequent to the BIT and must therefore be taken into account by virtue of Article 31(3) VCLT; and thirdly, that the Termination Treaty confirms

---

[164] Article 6.

[165] Articles 8 and 9.  Those proceedings would not, however, be allowed to continue but the claimants therein would be offered a "*structured dialogue*".

prior developments which deprived Article 9 of the BIT of effect.  The Tribunal will consider these three arguments in turn.

### (1)    The Retroactive Effect of the Termination Treaty and the Offer of Arbitration

189.    The Respondent maintains that the States party to a treaty remain the "masters" of the treaty and are free to terminate it with effect from the date of their choosing.  It relies upon Article 70 VCLT (the text of which appears at paragraph 65, above).  Article 70(1)(b) provides, as a general rule, that termination "*does not affect any right, obligation or legal situation of the parties created through the execution of the treaty prior to its termination*" but this is qualified by the opening words of Article 70(1) "[u]*nless … the parties otherwise agree*".  Croatia maintains that the language of the Termination Treaty manifests a clear agreement by the parties to the BIT that termination does affect rights, obligations and legal situations created prior to the termination.

190.    The problem with this argument is that it cannot be reconciled with the second sentence of Article 25(1) of the ICSID Convention which provides that "[w]*hen the parties have given their consent* [to the jurisdiction of the Centre] *no party may withdraw its consent unilaterally*".

191.    The Tribunal agrees with the decision on this point of the arbitral tribunal in *Magyar Farming v. Hungary*, which concerned the BIT between the United Kingdom and Hungary.  The tribunal held:

> *213. The Respondent submits that the Contracting States are the masters of the treaty.  In general, the Tribunal agrees with this statement. Indeed, when the Contracting States are in agreement, they may even go as far as to terminate the treaty.  That said, the UK and Hungary have not terminated the BIT pursuant to the rules of Section 3 of the VCLT.  Even if they had done so by virtue of the 2019 Declarations, however, the Claimants accepted the BIT's offer to arbitrate prior to its purported termination.  Pursuant to Article 25 of the ICSID Convention* "[w]hen the parties [i.e. the investor and the State] have given their consent, no party may withdraw its consent unilaterally." *Indeed, it is common ground between the*

75

*parties that the relevant time for determining jurisdiction is the date of initiation of the arbitration.*

*214. Thus, the consent to arbitrate, in the sense of a meeting of the minds, which is perfected by the investor's acceptance of the State's offer to arbitrate expressed in the BIT would not be retroactively invalidated by a subsequent termination of the BIT. In other words, even if the Tribunal were to regard the 2019 Declarations as an agreement to terminate the BIT,* quod non*, that agreement could not have invalidated the consent to arbitrate because it was entered after the consent was formed.*[166]

192.    While the *Magyar Farming* case was concerned with the MS Declarations, not the Termination Treaty, the passage cited is just as applicable to the argument that the Termination Treaty operated to terminate the BIT with retroactive effect. For the reasons already noted and further elaborated below, such termination could not affect a consent which had already been perfected by the Claimants' acceptance of the offer to arbitrate.

193.    The Respondent maintains that the second sentence of Article 25(1) of the ICSID Convention applies only where consent is withdrawn unilaterally. It argues that the withdrawal of consent here was not unilateral but accomplished by agreement between the two parties to the BIT, namely the Netherlands and Croatia.

194.    That argument misunderstands Article 25. The term "*parties*" in the second sentence of that Article refers not to the parties to the BIT but to the parties to the dispute. Those parties are the Claimants and Croatia. As explained in paragraph 132, above, when the offer of acceptance contained in the BIT is accepted by an investor, both parties to the dispute have given their consent and a written agreement to arbitrate has come into being between them. The word "*unilaterally*" in the second sentence of Article 25(1) has to be understood in that context; it refers to withdrawal by one party to the dispute without the consent of the other party to the dispute. That is what happened here. The fact that Croatia, in withdrawing its consent to arbitrate, acted in agreement with the Netherlands, which is

---

[166] *Magyar Farming Company Ltd.*, note 161, above, paras. 213-214.

not a party to the dispute, does not deprive the withdrawal of its unilateral character in the sense of Article 25(1).

195.  It must also be recalled that, while Croatia and the Netherlands may well be regarded as the "*masters*" of the BIT, they are not the masters of the ICSID Convention but rather only two out of 158 States party to that Convention.  They cannot, therefore, set aside the legal effect of provisions of the ICSID Convention, including Article 25(1).

196.  Nor is the Tribunal convinced by the Respondent's reference to instances in which a State has taken control of the claims of its nationals.  Croatia referred to a number of such instances.  First, it cited the Treaty of Peace between Japan and the United States under the terms of which the United States is said to have required United States nationals with claims against Japan arising out of the Second World War to submit those claims to the United States Government which would pay such part of them as it chose from confiscated Japanese assets.  Croatia also referred to similar practice regarding the termination of other conflicts.  Secondly, Croatia invoked the Algiers Accords by which the United States and Iran established the Iran-United States Claims Tribunal and the United States required United States nationals with certain claims against Iran to pursue those claims before the Tribunal and not before the courts of the United States.

197.  Neither of these instances is comparable to the present case.  In neither of them had any of the affected claims already been presented to arbitration pursuant to a multilateral treaty like ICSID.  There was no equivalent of the commitment under Article 25(1) of the ICSID Convention.

198.  Croatia also draws attention to the fact that agreement was reached on the draft of the Termination Treaty on 24 October 2019[167] and became public on 4 November 2019[168] with the result that the Claimants were on notice that the BIT would be terminated and the Netherlands and Croatia regarded Article 9 as inapplicable before they filed their request

---

[167] See the chronology at para.63, above, and Exhibit **R-0012**.
[168] See the chronology at para.63, above, and Exhibits **R-0011** and **R-0013**.

for arbitration.  However, a draft treaty is exactly that – a draft.  It creates no binding legal obligation and cannot, in and of itself, affect the rights and obligations arising under the BIT.

199.   The Tribunal accordingly rejects the first variant of Croatia's argument based upon the Termination Treaty.  If there was, at the time of the request for arbitration, a valid offer of arbitration on the part of Croatia (a matter considered below), the Termination Treaty could not, consistent with Croatia's obligations under the ICSID Convention, withdraw or nullify that offer in a way which would remove a jurisdiction which had already been established.

### (2)   The Termination Treaty as a Subsequent Agreement or Subsequent Practice by the Parties to the BIT

200.   The Respondent also advances a second, separate argument regarding the significance of the Termination Treaty.  According to this argument, the Termination Treaty represents a subsequent agreement by the parties to the BIT or subsequent practice of the parties to the BIT for the purposes of interpretation or application of the BIT and thus falls within Article 31(3)(a) or (b) VCLT.

201.   In light of this argument, it is useful to set out the full text of Article 31 once more:

*General Rule of Interpretation*

*(1) A treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose.*

*(2) The context for the purpose of the interpretation of a treaty shall comprise, in addition to the text, including its preamble and annexes:*

*(a) Any agreement relating to the treaty which was made between all the parties in connection with the conclusion of the treaty; ...*

*(3) There shall be taken into account, together with the context:*

*(a) Any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions;*

*(b) any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation;*

*(c) any relevant rules of international law applicable in the relations between the parties.*

*(4) A special meaning shall be given to a term if it is established that the parties so intended.*

202. The Tribunal does not rule out the possibility that a multilateral agreement addressing the future of over 100 bilateral treaties might constitute the subsequent agreement between the parties to one of those BITs regarding the application or interpretation of that BIT envisaged by Article 31(3)(a) VCLT, or amount to the subsequent practice described in Article 31(3)(b). Nor is the Tribunal deterred from so finding by the fact that the Termination Treaty makes no mention of either Article 31(3)(a) or (b). International law is not so formalistic as to require express reference to a particular provision of the VCLT for the principle stated in that provision to be applicable.

203. Nevertheless, it is difficult to see the Termination Treaty as falling within the scope of either Article 31(3)(a) or (b). It is concerned not with the interpretation of the BIT but with its termination and the effects of that termination. Even if one accepts that the Termination Treaty addresses the application of the BIT and shall therefore be "*taken into account*" according to the chapeau of Article 31(3), it is important to understand the purpose of which it is to be taken into account. Article 31(3) forms part of a provision which addresses the interpretation of a treaty.[169] It follows that the purpose for which an agreement regarding the *application* of a treaty is to be taken into account is the *interpretation* of that treaty. Similarly, subsequent practice of the parties to a treaty (especially a bilateral treaty) falls within Article 31(3)(b) only if it establishes the agreement of the parties regarding the interpretation of that treaty.

---

[169] Articles 31 to 33 VCLT constitute Part III, Section 3 of the Convention, entitled "*Interpretation of Treaties*". Article 31 is entitled "*General Rule of Interpretation*".

204.    The issue before the Tribunal turns on the provisions of Article 9 of the BIT.  Yet the Termination Treaty offers no guidance, let alone authoritative guidance, on the interpretation of Article 9.  The only provision of the Termination Treaty which might be thought to do so is Article 4(1), which provides:

> *The Contracting Parties hereby confirm that Arbitration Clauses are contrary to the EU Treaties and thus inapplicable.  As a result of this incompatibility between Arbitration Clauses and the EU Treaties, as of the date on which the last of the parties to a Bilateral Investment Treaty became a Member State of the European Union, the Arbitration Clause in such a Bilateral Investment Treaty cannot serve as legal basis for Arbitration Proceedings.*

205.    Article 9 of the BIT is an arbitration clause in an intra-EU BIT; its only effect is to provide for arbitration between one of the two EU Member States which are party to it and investors of the other Member State.  Accordingly, its only application was, and could be, of an intra-EU nature. The effect of Article 4(1) of the Termination Treaty would therefore be to deprive it of any effect at all.  That is not an interpretation of Article 9.

206.    It is true that there are several instances in which the subsequent agreement or practice of States parties to a treaty has resulted in an interpretation of a treaty provision which is not the one which would first occur to a reader of the text and might even appear counter-intuitive.[170]  However, these have fallen far short of excising an entire provision from the text of the treaty.  The Respondent cites the ILC's Commentary to its Draft Conclusion 7 that:

> *"States and International Courts are generally prepared to accord parties a rather wide scope for the interpretation of a treaty by way of subsequent agreement.  This scope may even go beyond the ordinary meaning of the terms of the treaty.[171]*

---

[170] See the discussion in Greenwood, "Rethinking the Substantive Standards of Protection under Investment Treaties: response to the Report", in *Flaws and Presumptions: Rethinking Arbitration Law and Practice in a New Seat* (Mauritius International Arbitration Conference, 2010), p. 373 (Exhibit **RL-0016**).

[171] 2018 Draft Conclusions on Subsequent Agreements and Subsequent Practice in relation to the Interpretation of Treaties, UN Doc A/73/10, p. 59 (Exhibit **RL-0029**), cited in the Respondent's PHB, para. 35.

However, the Draft Conclusion to which this is a comment states that "[t]*he possibility of amending or modifying a treaty by subsequent practice of the parties has not been generally recognized*".[172]

207.    To take two examples cited by the Parties in the present case.  The tribunal in *ADF v. United States of America* accepted that the interpretation by the three NAFTA Parties and the Free Trade Commission of the reference in Article 1105 of NAFTA to "*treatment in accordance with international law*" as meaning the international minimum standard of treatment under customary international law was a valid and authentic interpretation which it should follow.[173]  But that interpretation, although at odds with the views which had been adopted by some earlier tribunals, was perfectly reconcilable with the title ("*Minimum Standard of Treatment*") of the provision and its text and certainly did not involve anything comparable to deleting that provision from the treaty.

208.    The same is true of the example given by the International Law Commission ("ILC") and cited by the Respondent in its Post-Hearing Brief regarding the Convention on International Civil Aviation.  The ILC, in its 2018 Draft Conclusions on Subsequent Agreements and Subsequent Practice in relation to the Interpretation of Treaties,[174] stated:

> *... whereas the ordinary meaning of the terms of Article 5 of the 1944 Convention on International Civil Aviation does not appear to require a charter flight to obtain permission to land while* en route*, long-standing State practice requiring such permission has led to general acceptance that this provision is to be interpreted as requiring permission.*[175]

Again, however, that is a far cry from "interpreting" a provision in such a way that it effectively falls out of the treaty altogether.

---

[172] 2018 Draft Conclusion 7(3), note 171, above, p. 51.

[173] *ADF Group Inc. v. United States of America*, ICSID Case No. ARB(AF)/00/1, Award of 9 January 2003, paras. 175-182 (Exhibit **ECL-0036**).  It must be recalled that NAFTA expressly made decisions of the Free Trade Commission binding upon arbitration tribunals.

[174] 2018 Draft Conclusions, note 171, above.

[175] 2018 Draft Conclusions, note 171, above, p. 54; Respondent's PHB, para. 37.

209.   Probably the most striking example is the acceptance over time of an interpretation through practice of Article 27(3) of the United Nations Charter.   Article 27 requires that the adoption of a resolution on a non-procedural matter by the Security Council requires the "*concurring votes*" of the five permanent members of the Council.   Since 1950, however, the practice within the United Nations was that such a resolution could be adopted provided that none of the five permanent members actually voted against it, thus equating an abstention with a "*concurring vote*".   That interpretation of Article 27(3) was eventually endorsed by the International Court of Justice.[176]

210.   It is, of course, important to recall the context.   The approach to Article 27(3) of the Charter was the result of many years of practice by an international organisation interpreting its own constituent instrument in a highly political context.   It is rather different from the case of States interpreting a bilateral treaty.   There has been far more caution in a case of that kind.   Moreover, even the practice in respect of Article 27(3) does not treat that provision as a whole as devoid of effect.

211.   The Tribunal agrees with the view expressed by the tribunal in *AS PNB Banka v. Latvia* that "[d]*eleting a clause in its entirety cannot be described as interpretation*".[177]   That tribunal also held that "*obliteration of a provision in its entirety would not constitute an 'application' of that treaty*".[178]

212.   The Tribunal therefore rejects the Respondent's second argument regarding the Termination Treaty.

---

[176] *Namibia Advisory Opinion*, discussed in Nolte, "Treaties and their Practice: Symptoms of their Rise or Decline", in Collected Courses of the Hague Academy of International Law vol. 392, pp. 352-353 (Exhibit **RL-0012**).

[177] *AS PNB Banka, Grigory Guselnikov and Others v. Republic of Latvia*, ICSID Case No. ARB/17/47, Decision on the Intra-EU Objection of 14 July 2021, para. 581 (Exhibit **CL-0095**).

[178] *AS PNB Banka*, note 177, above, para. 576.

(3)    **The Termination Treaty as "Confirmation" of Prior Developments regarding Article 9 of the BIT.**

213.    The Respondent's third argument is that the Termination Treaty acts as confirmation of prior developments which had already had the effect of preventing Article 9(1) from constituting a valid offer of arbitration in the present case.

214.    There is a circularity to this argument.  If, as Croatia maintains, it was already established that the offer of arbitration in Article 9 had been deprived of any effect before the Claimants purported to accept it, then the Termination Treaty is irrelevant and an unnecessary exercise.  On the other hand, if that was not already established, then the Tribunal cannot see how the adoption of the Termination Treaty, after the filing of the request for arbitration, can make any difference given the clear rule in Article 25(1) of the ICSID Convention and the decision of the Tribunal in the immediately preceding paragraphs that the Termination Treaty cannot be regarded as interpreting the BIT.

F.    THE MEMBER STATES' DECLARATION

215.    The Tribunal therefore turns to the Respondent's second argument, namely that, even before the Claimants sought to initiate the present proceeding, the MS Declaration[179] had made clear that the offer of arbitration made in Article 9 of the BIT was no longer applicable.  In developing this argument, Croatia has placed the principal emphasis on the Declaration.  It does, however, set the Declaration in the context of the effect of EU law in the light of the *Achmea* Judgment.  The Tribunal has already considered – and rejected – the argument that EU law on its own negated the effect of the offer to arbitrate (paragraphs 156 to 178, above); it must now examine the effect of the MS Declaration when taken together with EU law.

216.    The arguments relating to the MS Declaration differ from those concerning the Termination Treaty in two important respects.  First, the MS Declaration is not a treaty and

---

[179] There were in fact three declarations.  The one quoted in this ruling was concluded by the representatives of twenty-two EU Member States, while separate declarations were made by five other Member States and by Hungary. Since Croatia and the Netherlands were both party to the first declaration, it is not necessary here to consider the other two.

its status is a matter of dispute between the Parties. Secondly, whereas the Termination Treaty was signed and entered into force for the Netherlands and Croatia after the Claimants had deposited their request for arbitration, the Declaration was adopted on 15 January 2019, more than a year before the request for arbitration was made; it does not, therefore, fall foul of the last sentence of Article 25(1) of the ICSID Convention in the way that the Termination Treaty did.

### (1)    The Status of the MS Declaration

217.    The Parties agree that the Declaration does not qualify as an international treaty but disagree on its possible legal relevance under international law. According to the Respondent, an instrument such as the Declaration, even though not legally binding as such, can nevertheless have "*legal salience under international law,* inter alia "*through controlling the interpretation, application, and status of treaty obligations*."[180] In particular, the Respondent argues that by the Declaration "*Croatia and the Netherlands mutually agreed that they were not bound to arbitrate investment disputes with the other State's nationals,*"[181] and that the Declaration "*produced legal effects*" under Articles 31(3), 30 and 57(b)[182] VCLT.[183]

218.    The Claimants contend instead that the MS Declaration is a "*mere agreement*" between EU Member States, which "*does not constitute a 'lex' to which rules of interpretation as lex specialis or lex posterior may apply.*"[184] According to the Claimants, the MS Declaration is a "*political declaration*" and a "*political statement of intent,*" laying down the Member States' future "*action plan*" to terminate intra-EU BITs that "*was not intended, and could not have been intended to have legal effects on the BIT*" under international law.[185] The Claimants also maintain that, since the MS Declaration was concluded only

---

[180] Respondent's Reply PHB, para. 12.

[181] Respondent's PHB, para. 51.

[182] Respondent's PHB, paras. 67; Respondent's Reply PHB, paras. 17-20; see also Reply, paras. 180-188.

[183] Reply, paras. 176-188; Respondent's PHB, paras. 85-86.

[184] Claimants' Rejoinder, paras. 72 and 102.

[185] Claimants' PHB, paras. 19, 20, 22 ss; see also Counter-Memorial, paras. 105, 118.

by the Permanent Representatives of the Member States to the EU, without the full powers described in Article 7 VCLT,[186] it could not produce legal effects with regard to the BIT.

219.    The Tribunal considers that the MS Declaration is a political statement and is not legally binding as such.  It is nevertheless an act which is attributable to the Member States whose representatives signed it.  Since the Declaration is not a treaty, the question of whether the signatories should have possessed full powers is irrelevant.  Each representative was an official of his or her State and that State is responsible for their actions as a matter of international law.  The Tribunal considers that the MS Declaration is important as a statement of the position of the States concerned and their future intentions.  As such, it may be of legal significance.  What that significance is remains to be determined.

### (2)    The Core Provisions of the MS Declaration

220.    The most pertinent provisions of the MS Declaration have already been set out at paragraph 65, above, but it is useful to recall the following:

(1)    the preamble recites the conclusion of the CJEU in Achmea, states that Member States are "*bound to draw all necessary consequences from that judgment pursuant to their obligations under Union law*," and goes on to provide:

> *Union law takes precedence over all bilateral investment treaties concluded between Member States.  As a consequence, all investor-State arbitration clauses contained in bilateral investment treaties concluded between Member States are contrary to Union law and thus inapplicable.  They do not produce effects including as regards provisions that provide for extended protection of investments made prior to termination for a further period of time (so-called sunset or grandfathering clauses).  An arbitral tribunal established on the basis of investor-State arbitration clauses lacks jurisdiction, due to a lack of a valid offer to arbitrate by the Member State party to the underlying bilateral investment Treaty.*

---

[186] See para. 65, above.

(2)   Paragraph 1 of the Declaration informed investment arbitration tribunals about the legal consequences of *Achmea* as set out in the Declaration in relation to all pending arbitrations;

(3)   Paragraph 3 provided that "*Member States inform the investor community that no new intra-EU investment arbitration proceeding should be brought*"; and

(4)   Paragraph 5 provided that Member States will terminate all bilateral investment treaties concluded between them by means of a plurilateral treaty (unless they considered a bilateral arrangement more expedient); and

(5)   Paragraph 8 provided that Member States would use their best efforts to ratify such a plurilateral treaty no later than 6 September 2019.[187]

### (3)   Did the MS Declaration Terminate the BIT or Article 9 thereof ?

221.   The Tribunal considers that the language of the MS Declaration clearly envisages that the intra-EU BITs would be terminated by a future treaty (or treaties).  The Declaration cannot therefore itself amount to a termination of the BIT.

222.   Nor does the Tribunal consider that the Declaration terminated Article 9 of the BIT while leaving the remainder of the BIT in place.  The Declaration describes arbitration clauses in intra-EU BITs as being "*inapplicable*" and the sunset clauses as not producing effects. These are important statements, but they are not in the language of termination.  Moreover, had the signatories to the Declaration considered that the Declaration had terminated the arbitration clauses, it is difficult to see why they did not say so in the Termination Treaty. Instead, the Termination Treaty provides for the termination of the intra-EU BITs on the Treaty entering into force for the parties to each BIT.  There is no suggestion that that provision applied only to parts of the BITs with other parts already having been terminated.

---

[187] In fact, the Termination Treaty was not signed until 5 May 2020 and was ratified by Croatia on 25 October 2020 and by the Netherlands on 31 March 2021.

**(4)     Did the Member States' Declaration Suspend Article 9?**

223.     The Respondent argues that the MS Declaration had the effect of suspending Article 9. Article 57 VCLT provides for the possibility of suspension of a provision of a treaty by agreement between the Parties.  If, therefore, Croatia and the Netherlands had agreed to suspend the BIT as a whole or Article 9 thereof, then that agreement would, in principle, have been effective (although its precise effects might be a matter for debate).

224.     The Claimants deny that the MS Declaration could have suspended Article 9, since the Declaration was a purely political act performed by persons who lacked the authority to conclude a treaty and therefore to suspend a provision of a treaty.  They rely upon an observation of the arbitration tribunal in *Fynerdale* that

> *International law is formalistic in respect of the conclusion of international treaties as well as in respect of their termination.  A political commitment prescribing the result of a process, not yet finalized, is not sufficient to achieve the inapplicability of the treaty in question.*[188]

The Claimants maintain that the same argument is equally applicable to suspension of a part of a treaty.

225.     The Tribunal is hesitant about this point.  Neither the BIT nor the general international law on treaties lays down formal requirements for a mutually agreed suspension of a bilateral treaty.  So long as the agreement of the parties to that treaty to suspend a provision is made clear, then international law will give effect to it (although the parties will need to comply with any requirements which their own national law may impose for the suspension of a treaty obligation).

226.     However, the MS Declaration is not clear on this point.  It declares that arbitration clauses in intra-EU BITs are "*inapplicable*" and informs the investor community that "*no new intra-EU investment arbitration proceeding should be initiated*".  While it might be

---

[188] *Fynerdale Holdings B.V. v. The Czech Republic*, PCA Case No. 2018-18, Award of 29 April 2021, para. 290 (Exhibit **CL-0094**), cited at Claimants' PHB, para. 49.

possible to read those statements as evincing an intention to suspend all arbitration clauses in intra-EU BITs pending the adoption of the treaty to terminate the BITs, the word suspension nowhere appears.  On the contrary, the language of the Declaration suggests that the States which signed it did not consider suspension to be necessary, because they regarded the judgment in *Achmea* as establishing that such clauses had already lacked any effect since the date on which both parties to the relevant BIT became Member States (in the case of the present BIT, 1 July 2013, when Croatia became an EU Member State).

227.    Moreover, in this context it is important to recall that the BIT is not simply a matter of the bilateral rights and obligations of the two States.  BITs are designed to confer rights upon investors (as defined in each BIT), entitling them to specified standards of treatment and giving them the power to bring claims to enforce that entitlement without being dependent upon their State of nationality.[189]   The Tribunal considers that, at the very least, the existence of those rights means that clarity is required before they can be taken to be suspended and that any instrument which is said to have that effect should be construed, in case of doubt, *contra proferentem* and thus against any suggestion of the suspension of the relevant treaty provisions.

228.    The Tribunal will return to the question of the rights of investors vis-à-vis those of the States parties to the BIT below.  It does, however, reject the argument that the Declaration had the effect of suspending Article 9 of the BIT.

### (5)    The Member States' Declaration and the Interpretation of the BIT

229.    The Respondent also argues that the MS Declaration, like the Termination Treaty, constitutes a subsequent agreement between the parties to the BIT or subsequent practice establishing their agreement regarding its interpretation.   As with the Respondent's argument regarding the Termination Treaty, this argument relies upon Article 31(3)(a) and (b) VCLT.  It fails for the same reason as the Tribunal has already rejected it in relation to the Termination Treaty.  The Declaration is not an interpretation of the BIT but rather a

---

[189] See *Corn Products*, note 84, above, para. 174

statement that an entire provision of the BIT has lost all meaning and effect.  As the tribunal in *AS PNB Banka* held (see paragraph 211, above), that is not an interpretation.

**(6)    The Effect of the Declaration that the Arbitration Clauses were Inapplicable**

230.    The fact remains, however, that before the Claimants sought to initiate the present arbitration, the BIT States, through the MS Declaration which they had both signed, had stated that they did not consider the offer of arbitration in Article 9 to be applicable and advised that no new arbitration proceedings should be brought.[190]  The question which the Tribunal must therefore decide is whether that statement amounted to an effective withdrawal by agreement of the offer of arbitration.

231.    The Claimants maintain that the statements in the MS Declaration do not amount to a withdrawal.  They point in particular to the language of paragraph 3, in which the Member States "<u>*inform*</u> *the investor community that no new intra-EU investment arbitration proceeding <u>should</u> be initiated*" (emphasis added).  According to the Claimants, the use of the words "*inform*" and "*should*" (in the French text, "*devrait*") is not the language of requirement but merely of advice.  The Tribunal is not persuaded by this argument.  It ignores the statement in the preamble that intra-EU BIT arbitration clauses are no longer applicable.  The signatory States made clear that they did not consider such clauses could provide a basis for arbitration in the future.  The fact that they did not use mandatory language in paragraph 3 is immaterial; the Declaration is not a legally binding instrument so it would not be a suitable vehicle for prohibiting an investor from bringing future proceedings.

232.    The language of the Declaration is not that of withdrawal.  Since the Declaration sets out the consequences of the *Achmea* Judgment, the signatories evidently considered themselves already to have been released from the offers of arbitration.  However, whether or not they were right in coming to that conclusion, the statement in the Declaration amounted to a clear indication that they no longer considered themselves bound by the

---

[190] The same view appears in the statement by the Dutch Government to Parliament and in the Joint Statement submitted to the Tribunal in November 2020.

offers of arbitration made in the BITs.  The question is whether that was sufficient to negate the offer of arbitration made in the BIT.

233.    Before addressing that question, the Tribunal wishes to add two other observations on the MS Declaration.  The Tribunal also notes that in addition to using the word "*should*", the Declaration's statement that the Member States "*will undertake*" certain actions bears upon the issue presented in this case in three ways.

234.    First, the undertaking to inform tribunals "*about the legal consequences of the* Achmea *judgment*", the undertaking of the Member State of the investor that has brought an investor-State arbitration to cooperate with the defending Member State to inform tribunals of those consequences, and the undertaking of defending Member States to "*request the courts, including in any third country … to set these awards aside or not to enforce them due to a lack of valid consent*" are all undertakings pertaining to communicating the effects under EU law of the *Achmea* Judgment.  But the wording of those undertakings implicitly recognises that irrespective of the discharge of such undertakings, tribunals and reviewing and enforcing courts might disagree as to what the legal consequences of *Achmea* actually are.  The Member States did not purport to have the power to bind such tribunals and courts.

235.    Secondly, while the Declaration speaks of set aside and non-enforcement applications before "*courts*", it is silent as to any undertaking of a Member State with respect to arbitrations arising under the ICSID Convention.  There is, for example, no concomitant undertaking to request an ICSID *ad hoc* annulment committee to annul an award for a lack of valid consent.  The Tribunal considers that there is a good reason for this.  Article 25, as already discussed, creates a binding arbitration agreement when, in the context of a BIT, the claimant accepts the State's prior offer in writing with its own written consent to arbitration.  As the Tribunal has already held (paragraphs 189 to 195, above), once that second consent is given, the offer of arbitration cannot unilaterally be withdrawn.[191]  As

---

[191] The Tribunal is not to be taken as suggesting that once an offer in a BIT has been accepted, no jurisdictional objections can be advanced by a respondent. Rather, the point is that the issue of jurisdiction *ratione voluntatis* is

for enforcement proceedings before the courts of a Contracting State, under the *sui generis* regime created by Article 54 of the ICSID Convention, a court should not admit and give any effect to a statement from a Member State as to the consequences of the *Achmea* Judgment due to the highly circumscribed role of a court requested to recognise an ICSID award and to enforce the award's pecuniary obligations.  Put simply, once the court of a Contracting State has been presented with a duly certified copy of the award, it is obliged to recognise the award and to enforce its pecuniary obligations.  It has no power to review the award.

236.    Lastly, the foregoing observations underscore the significance of the Tribunal's earlier distinctions drawn between the rules of public international law applicable in the context of this ICSID proceeding and the rules of EU law applicable when an intra-EU BIT arbitral award is considered by a court of an EU Member State.

237.    To return to the question of whether the MS Declaration was sufficient to negate the offer of arbitration made in the BIT, the Tribunal considers that it is necessary to examine the object and purpose of the BIT and the nature of the rights and obligations to which it gives rise.

238.    The object and purpose of the BIT is set out in the preamble, which provides that the BIT States:

> *Desiring to strengthen their traditional ties of friendship and to extend and intensify the economic relations between them particularly with respect to investments by the nationals of one Contracting Party in the territory of the other Contracting Party,*
>
> *Recognizing that agreement upon the treatment to be accorded to such investments will stimulate the flow of capital and technology*

---

largely if not completely disposed of by the claimant's acceptance of the offer in writing and the arbitration agreement is formed. There may be other objections, such as the argument that the offer made by the respondent does not comprehend the kind of dispute which the claimant seeks to put before the tribunal, which a respondent might choose to raise. Article 25(1) does not preclude a respondent from bringing such objections.

> *and the economic development of the Contracting Parties and that*
> *fair and equitable treatment of investments is desirable,*

have agreed upon the terms set out in the BIT.  The object and purpose of the BIT was thus to encourage investment by investors from one of the BIT States in the territory of the other.  That was to be achieved by prescribing the conditions of treatment of such investments.

239.    The BIT thus went on to lay down substantive provisions for the protection of investments, including (in Article 3) the requirement of fair and equitable treatment referred to in the preamble.  It also provides for procedural protection in the form of the right of recourse to arbitration for investors (Article 9(1)), enabling investors to enforce through arbitration proceedings the substantive provisions of the BIT.  In that context, the Tribunal recalls the terms of Article 9(3):

> *Each Contracting Party hereby gives its unconditional consent to*
> *the submission of disputes as referred to in paragraph 1 of this*
> *Article to international arbitration in accordance with the*
> *provisions of this Article.*

240.    The BIT was, therefore, far more than just an exchange of rights and obligations at the inter-State level.  It conferred rights directly upon those who qualified as investors of one of the BIT States with investments in the territory of the other.  The Tribunal does not agree with the notion that investors were merely the recipients of benefits, control of which remained with the BIT States.  That approach belongs to an earlier era of international law in which States were considered to be the only "*subjects*" of international law.  Nor does it agree that, in advancing a claim under Article 9 of the BIT, an investor is pursuing the claim of the State.  The Tribunal agrees with the analysis of the Tribunal in *Corn Products* that "*an investor which brings a claim is seeking to enforce what it asserts are its own rights under the Treaty and not exercising a power to enforce rights which are actually*

*those of the State*".[192]   The Treaty in that case was the North American Free Trade Agreement, which had three parties, but the logic applies equally to a BIT.

241.   In short, by means of the BIT, the Netherlands and Croatia agreed to offer their nationals an inducement to invest in each other's territory by conferring upon them substantive rights regarding the treatment of those investments and the procedural right to enforce those substantive rights through arbitration, consent to which was given unconditionally.

242.   The Tribunal considers that where an investor of one BIT State invested in the other BIT State while the BIT was treated by both States as being in full force, that investor cannot be retroactively deprived of the right to rely upon the unconditional consent to arbitration given by each State in Article 9 of the BIT, even if both States subsequently took the view that this offer had been negated by the effects of EU law.

243.   It follows that if an investor of the Netherlands, acting in reliance on these guarantees, made a qualifying investment in the territory of Croatia, they were entitled to do so on the assumption that those guarantees would not be withdrawn in a manner not provided for in the BIT itself.

244.   The Tribunal therefore rejects the argument that the effect of the MS Declaration was to negate the offer of arbitration made in Article 9 of the BIT.  In coming to that conclusion, the Tribunal makes no determination whether or not the present case is indeed one in which investors of the Netherlands (as defined in the BIT) made investments in Croatia prior to the MS Declaration.  That is not a matter which falls within the scope of the Preliminary Objection and the agreement to bifurcate; nor has it yet been fully pleaded by the Parties.

---

[192]    *Corn Products*, note 84, above, para. 174.

## VIII. COSTS

### A. CLAIMANTS' COST SUBMISSION

245. The Claimants seek total legal fees and expenses for the Initial Jurisdictional Phase, quantified in EUR 1,181,190 in their statement of costs of 15 December 2022. The Claimants' claim breaks down as follows:[193]

| Component | Total Amount |
|---|---|
| Lead counsel's legal fees and costs between January 2020 and November 2022 (Orrick Herrington & Sutcliffe) | EUR 1,001,190.83 |
| Co-counsel's legal fees and costs between January 2020 and November 2022 (Prof. Dr. Kirsten Schmalenbach and Dr. Astrid Reisinger Coracini) | EUR 180,000 |

246. The Claimants also seek the recovery of the administrative costs paid to the Centre (namely, USD 250,000).[194]

### B. RESPONDENT'S COST SUBMISSION

247. The Respondent seeks recovery in full of its legal fees and expenses, with interest. In its statement of costs, the Respondent quantifies its fees and expenses in EUR 1,715,042.50, broken down as follows.

---

[193] In their statement of costs, the Claimants list all invoices issued in relation to the case in the relevant period, with an indication of the lawyers' applicable hourly rates, when appropriate.

[194] Claimants' Submission on Costs, 15 December 2022.

| Component | Total Amount |
|---|---|
| Legal representation and advice<br>• Preliminary Phase<br>• Jurisdiction<br>• Merits | EUR   255,794.00<br>EUR  1,264,667.28<br>EUR   174,689.00 |
| Subtotal | EUR  1,695,150.28 |
| Travel expenses (transportation, accommodation) | EUR   14,073.95 |
| Other expenses/translation/printing | EUR   5,818.27 |
| Subtotal | EUR   19,892.22 |

248.  The Respondent also seeks reimbursement of the advances made to ICSID (namely, USD 250,000).[195]

### C.    THE TRIBUNAL'S DECISION ON COSTS

249.  Article 61(2) of the ICSID Convention provides:

> *In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*

250.  This provision gives the Tribunal discretion to allocate all costs of the arbitration, including attorney's fees and other costs, between the Parties as it deems appropriate.

251.  The Tribunal has carefully considered whether to make an order for costs in respect of the present phase of the proceedings but has decided that it would not be appropriate to do so.

---

[195] Respondent's Submission on Costs, 14 December 2022.

It has instead decided that it will deal with all questions of costs once the case is concluded. It has, however, placed on record the amount of costs incurred, both by the Centre and by the Parties, in respect of the present phase so that a Party may, if it wishes, argue at the conclusion of the case that the costs of the present phase should fall differently from those of the remaining phase or phases of the case.

**IX.    DECISION**

252.    For the reasons set forth above, the Tribunal unanimously decides as follows:

(1)    The Respondent's Preliminary Objection to jurisdiction is dismissed;

(2)    The question of costs is reserved to the final award;

(3)    The Parties shall consult on the schedule for the remainder of the case and submit their proposals to the Secretary by 21 November 2023.

[Signed]

_____

Charles Poncet
Arbitrator

Date: 30 October 2023

[Signed]

_____

J Christopher Thomas
Arbitrator

Date: 30 October 2023

[Signed]

_____

Christopher Greenwood
President of the Tribunal

Date: 30 October 2023