# Exhibit 23

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the arbitration proceeding between

**LSG BUILDING SOLUTIONS GMBH, GREEN SOURCE CONSULTING GMBH, SOLLUCE ROMANIA 1 B.V., RISEN ENERGY SOLAR PROJECT GMBH, CORE VALUE INVESTMENTS GMBH & CO. KG GAMMA, CORE VALUE CAPITAL GMBH, SC LJG GREEN SOURCE ENERGY BETA S.R.L., ANINA PRO INVEST LTD., GIUST LTD., AND PRESSBURG UK GMBH**

Claimants

and

**ROMANIA**

Respondent

**ICSID CASE NO. ARB/18/19**

---

# DECISION ON JURISDICTION, LIABILITY AND PRINCIPLES OF REPARATION

---

***Members of the Tribunal***
Prof. Juan Fernández-Armesto, President of the Tribunal
Judge O. Thomas Johnson, Jr., Arbitrator
Prof. Dr. Pierre-Marie Dupuy, Arbitrator

***Secretary of the Tribunal***
Ms. Aïssatou Diop

***Assistant to the Tribunal***
Ms. Sofia de Sampaio Jalles

*Date of dispatch to the Parties*: 11 July 2022

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

# <u>REPRESENTATION OF THE PARTIES</u>

*Representing LSG Building Solutions GmbH,*
*Green Source Consulting GmbH,*
*Solluce Romania 1 B.V., Risen Energy Solar*
*Project GmbH, Core Value Investments*
*GmbH & Co KG Gamma,*
*Core Value Capital GmbH, SC LJG Green*
*Source Energy Beta SRL, Anina Pro Invest*
*Ltd, Giust Ltd, Pressburg UK GmbH*:

*Representing Romania*:

Mr. Kenneth R. Fleuriet
Mr. Charles B. Rosenberg
Ms. Jessica Beess und Chrostin
KING & SPALDING LLP
1700 Pennsylvania Ave N.W., Suite 200
Washington, D.C. 20006
United States of America

Ms. Amy Roebuck Frey
Mr. Marc-Olivier Langlois
Ms. Héloïse Hervé
KING & SPALDING LLP
12, cours Albert 1er
75008 Paris
French Republic

Mr. Reginald R. Smith
Mr. Kevin D. Mohr
KING & SPALDING LLP
1100 Louisiana Street, Suite 4000
Houston, TX 77002
United States of America

Mr. Adrian Câciu
MINISTER OF FINANCE OF ROMANIA
MINISTRY OF FINANCE
16 Libertății Boulevard, Sector 5
050706 Bucharest
Romania

Mr. Peter M. Wolrich
Mr. Geoffroy Lyonnet
Ms. Marie-Claire Argac
Ms. Lisa Arpin-Pont
Mr. Jeremy Bocock
Ms. Charlotte Fromont
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
6 Avenue Vélasquez
75008 Paris
French Republic

Ms. Susan Maples
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Ave
New York, NY 10178
United States of America

Mr. Gelu Titus Maravela
Ms. Alina Popescu
Ms. Alexandra Rimbu
MPR PARTNERS | MARAVELA, POPESCU & ASOCIAȚII
6A Barbu Delavrancea Street, Building C, Ground Floor, 1st District
011355 Bucharest
Romania

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

# TABLE OF CONTENTS

**REPRESENTATION OF THE PARTIES**.................................................................. ii

**TABLE OF CONTENTS** ......................................................................................... iii

**GLOSSARY OF TERMS AND ABBREVIATIONS** ................................................ iv

**LIST OF CASES** .................................................................................................... viii

**I.**    **INTRODUCTION** ............................................................................................ 1

**II.**    **PROCEDURAL HISTORY** ............................................................................ 2

**III.**   **FACTS**............................................................................................................. 8

**IV.**   **REQUEST FOR RELIEF** ............................................................................. 54

**V.**    **JURISDICTIONAL OBJECTIONS** ............................................................. 56

      **V.1.**  **MULTIPLE CLAIMANTS OBJECTION**                 58

      **V.2.**  **OBJECTION TO JURISDICTION OVER CLAIMS OF ANINA AND GIUST**   77

      **V.3.**  **INTRA-EU OBJECTION**                           92

**VI.**   **LIABILITY**.................................................................................................... 162

      **VI.1. CLAIMANTS' POSITION**                       163

      **VI.2. RESPONDENT'S POSITION**                 175

      **VI.3. DECISION OF THE TRIBUNAL**             186

**VII.**  **REPARATION** ............................................................................................. 254

      **VII.1.**    **CLAIMANTS' POSITION**               254

      **VII.2.**    **RESPONDENT'S POSITION**           265

      **VII.3.**    **DECISION OF THE TRIBUNAL**        273

**VIII. DECISION** ...................................................................................................... 285

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

## GLOSSARY OF TERMS AND ABBREVIATIONS

| | |
|---|---|
| **Acquisition Quota** | Annual mandatory quotas for the acquisition of GCs |
| **Alicus** | Witness statement of Mr. Viorel Alicus |
| **Alpha PV Facility** | PV plant CEF Slobozia, belonging to the Alpha Project Company |
| ***Amicus Curiae* Brief** | Commission's *Amicus Curiae* submission of 24 January 2020 |
| **Anina** | Anina Pro Invest Ltd |
| **ANRE** | Romanian National Energy Regulatory Authority |
| **ANRE Accreditations** | Accreditations issues by ANRE to Claimants' PV Facilities |
| **Annual Mandatory Quota** | Maximum share of RES-E in the gross final consumption that can benefit from the GC support scheme |
| **Arbitration Rules** | ICSID Rules of Procedure for Arbitration Proceedings |
| **Art(s).** | Article(s) |
| **Beta** | SC LJG Green Source Energy Beta SRL |
| **Beta PV Facility** | PV plant CEF Izvoarele, belonging to Beta |
| **BGH** | German Bundesgerichtshof (Supreme Court) |
| **CD-*x*** | Claimants' demonstrative exhibit |
| **C-I** | Claimants' Memorial on the Merits |
| **C-II** | Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction |
| **C-III** | Claimants' Rejoinder on Jurisdiction |
| **CJEU** | Court of Justice of the European Union |
| **C-Komstroy** | Claimants' submission on the *Komstroy* Judgment of 12 November 2021 |
| **Claimants** | LSG Building Solutions GmbH, Green Source Consulting GmbH, Solluce Romania 1 B.V., Risen Energy Solar Project GmbH, Core Value Investments GmbH & Co KG Gamma, Core Value Capital GmbH, SC LJG Green Source Energy Beta SRL, Anina Pro Invest Ltd, Giust Ltd, and Pressburg UK GmbH |
| **Core Value** | CVC and CVI |
| **C-PHB** | Claimants' Post-Hearing Brief |
| **CVC** | Core Value Capital GmbH |
| **CVI** | Core Value Investments GmbH & Co KG Gamma |
| **Doc. C-*x* / CL-*x*** | Claimants' factual documents and legal authorities |
| **Doc. R-*x* / RL-*x*** | Respondent's factual documents and legal authorities |
| **DPS** | Document production schedule |

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

| | |
|---|---|
| **EC** or **Commission** | European Commission |
| **EC Decision** | Decision of the European Commission on State Aid of 13 July 2011 |
| **ECA** | Economic Consulting Associates |
| **ECA Report** | Report prepared by ECA of October 2016 |
| **ECSC** | European Coal and Steel Community |
| **ECT** or **Treaty** | Energy Charter Treaty |
| **Edwards I** and **II** | First and Second Expert Reports of Mr. Richard Edwards |
| **EEC** | European Economic Community |
| **EGO** | Emergency Government Ordinance |
| **EIU** | Energy-intensive user |
| **EU** | European Union |
| **EUR** | Euro |
| **Euratom** | European Atomic Energy Community |
| **FET** | Fair and Equitable Treatment |
| **FiT** | Feed-in Tariffs |
| **FiP** | Feed-in Premium |
| **Flores I** and **II** | First and Second Expert Reports of Dr. Daniel Flores |
| **Frăsinet 2** | PV plant CEF Frăsinet 2, belonging to Solar Frăsinet |
| **Frăsinet 3** | PV plant CEF Frăsinet 3, belonging to Solar Mostistea |
| **Frăsinet Project Companies** | Solar Frăsinet and Solar Mostistea |
| **Gamma PV Facility** | PV plant CEF Izvoarele, belonging to the Gamma Project Company |
| **GC** or **Green Certificate** | Green Certificates |
| **GCPA** | Green certificate purchase agreement |
| **GD** | Romanian Government Decision |
| **Generator** | Producer of RES-E |
| **Giust** | Giust Ltd |
| **Green Source** | Green Source Consulting GmbH |
| **ha.** | Hectare |
| **Hearing** | Hearing on jurisdiction and the merits held from 15 to 23 February 2021 |
| **Hofmann** | Witness statements of Ms. Anna Hofmann |
| **ICSID** or **Centre** | International Centre for Settlement of Investment Disputes |

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

| | |
|---|---|
| **ICSID Convention** | Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 |
| **IRR** | Internal rate of return |
| **Jones I** and **II** | First and Second Expert Reports of Mr. Wynne Jones |
| **Kyoto Protocol** | Kyoto Protocol to the United Nations Framework Convention on Climate Change |
| ***Komstroy* Judgment** | Judgment of the CJEU in case C 741/19, *Republic of Moldova v. Komstroy* |
| **Lim** | Witness statement of Mr. HyungHoon Lim |
| **Lipkovich I** and **II** | First and Second Witness statements of Mr. Gerhard Lipkovich |
| **LSG** | LSG Building Solutions GmbH |
| **Manicuta I** and **II** | First and Second Witness Statements of Ms. Maria Manicuta |
| **MoU** | Memorandum of understanding |
| **MWh** and **MWp** | Megawatt per hour and Megawatt-peak |
| **NDP Application** | Commission's non-disputing party submission of 5 February 2019 |
| **NREAP** | National Renewable Energy Action Plan |
| **OPCOM** | Romanian gas and electricity market operator |
| **Para(s).** | Paragraph(s) |
| **Parties** | Claimants and Respondent |
| **PO** | Procedural Order |
| **P(p).** | Page(s) |
| **PPA** | Power purchase agreement |
| **Pressburg** | Pressburg UK GmbH |
| **Pressburg Partners** | Pressburg Partners GmbH |
| **PV** | Photovoltaic |
| **Raiffeisen** | Raiffeisen International Bank AG |
| **RD-*x*** | Respondent's demonstrative exhibit |
| **REIO** | Regional Economic Integration Organisation |
| **Request** | Claimants' Request for Arbitration |
| **RES** | Renewable energy sources |
| **RES-E** | Electricity produced from renewable energy sources |
| **Risen** | Risen Energy Solar Project GmbH |
| **Risen Energy** | Risen Energy (Hong Kong) Co., Ltd. |

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

| | |
|---|---|
| **R-Komstroy** | Romania's submission on the *Komstroy* Judgment of 12 October 2021 |
| **Romania** or **Respondent** | Romania |
| **RON** | Romanian Leu |
| **Roques I** and **II** | First and Second Expert Reports of Dr. Fabien Roques |
| **R-I** | Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction |
| **R-II** | Respondent's Reply to Jurisdictional Objections and Rejoinder on the Merits |
| **R-PHB** | Respondent's Post-Hearing Brief |
| **Samsung** | Samsung C&T Corp. |
| **Solluce** | Solluce Romania 1 B.V. |
| **SPA** | Share-purchase agreement |
| **Tahan** | Witness statement of Mr. Ferry Tahan |
| **Termination Treaty** | Agreement for the termination of bilateral investment treaties between the Member States of the European Union |
| **TEU** or **Treaty of Maastricht** | Treaty on the European Union |
| **TFEU** | Treaty on the Functioning of the European Union |
| **Theuer I** and **II** | First and Second Witness statements of Mr. Rolf Theuer |
| **Tr. Day [#] [Speaker(s)] [p. l.]** | Transcript of the Hearing |
| **Transelectrica** | Transelectrica S.A., the TSO |
| **Tribunal** | Arbitral Tribunal constituted on 24 January 2019 |
| **TSO** | Transmission and system operator |
| **VCLT** | Vienna Convention on the Law of Treaties |
| **2001 Directive** | Directive 2001/77/EC of the European Parliament and of the Council of 27 September 2001 on the promotion of electricity produced from renewable energy sources in the internal electricity market |
| **2009 Directive** | Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC |

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)

Decision on Jurisdiction, Liability and Principles of Reparation

# LIST OF CASES

| | |
|---|---|
| ***Antin*** | *Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar B.V. (formerly Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.) v. Kingdom of Spain* (ICSID Case No. ARB/13/31), Award, dated 15 June 2018 (CL-23) |
| ***Abaclat*** | *Abaclat and others v. Argentine Republic* (ICSID Case No. ARB/07/5), Decision on Jurisdiction and Admissibility, dated 4 August 2011 (CL-157) and Dissenting Opinion of Prof. Georges Abi-Saab, dated 28 October 2011 (RL-111) |
| ***Adamakopoulos*** | *Theodoros Adamakopoulos and others v. Republic of Cyprus* (ICSID Case No. ARB/15/49), Statement of Dissent of Professor Marcelo G. Kohen, dated 7 February 2020 (RL-39) and Decision on Jurisdiction, dated 7 February 2020 (RL-40) |
| ***AES Summit*** | *AES Summit Generation Limited and AES-Tisza Erömü Kft. v. Hungary* (ICSID Case No. ARB/07/22), Award, dated 23 September 2010 (CL-45/RL-3) |
| ***Alemanni*** | *Giovanni Alemanni and others v. Argentine Republic* (ICSID Case No. ARB/07/8), Decision on Jurisdiction and Admissibility, dated 17 November 2014 (CL-156/ RL-30) |
| ***Ambiente Ufficio*** | *Ambiente Ufficio S.p.A. and others v. Argentine Republic*, Decision on Jurisdiction and Admissibility, dated 8 February 2013 (CL-154) |
| ***BayWa*** | *BayWa r.e. AG v. Kingdom of Spain* (ICSID Case No. ARB/15/16), Decision on Jurisdiction, Liability and Directions on Quantum, dated 2 December 2019 (RL-217) |
| ***Blusun*** | *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic* (ICSID Case No. ARB/14/3), Award, dated 27 December 2016 (CL-19) |
| ***Burlington*** | *Burlington Resources, Inc. v. Republic of Ecuador* (ICSID Case No. ARB/08/5), Decision on Reconsideration and Award, dated 7 February 2017 (CL-105) |
| ***Burimi*** | *Burimi SRL and Eagle Games SH.A v. Republic of Albania* (ICSID Case No. ARB/11/18), Award, dated 29 May 2013 (CL-165) |
| ***Cavalum*** | *Cavalum SGPS, S.A. v. Kingdom of Spain* (ICSID Case No. ARB/15/34), Decision on Jurisdiction, Liability and Directions on Quantum, dated 31 August 2020 (CL-249) |
| ***CEAC*** | *CEAC Holdings Limited v. Montenegro*, (ICSID Case No. ARB/14/8), Award, dated 26 July 2016 (RL-162) |

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

| | |
|---|---|
| ***Charanne*** | *Charanne B.V. & Constr. Invs. S.à.r.l. v. Kingdom of Spain*, SCC Arb. No. 062/2012, Award, dated 21 January 2016 (CL-15) |
| ***CMS*** | *CMS Gas Transmission Company v. Argentine Republic* (ICSID Case No. ARB/01/8), Award, dated 12 May 2005 |
| ***Cube*** | *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain* (ICSID Case No. ARB/15/20), Decision on Jurisdiction, Liability and Partial Decision on Quantum, dated 19 February 2019 (CL-81) |
| ***Duke Energy*** | *Duke Energy Electroquil Partners and Electroquil S.A. v. Republic of Ecuador* (ICSID Case No. ARB/04/19), Award, dated 18 August 2008 (CL-214) |
| ***Eastern Sugar*** | *Eastern Sugar B.V. v. Czech Republic,* SCC Case No. 088/2004, Partial Award, dated 27 March 2007 (CL-36) |
| ***EDF*** | *EDF (Services) Limited v. Romania* (ICSID Case No. ARB/05/13), Award, dated 8 October 2009 (CL-61) |
| ***Eiser*** | *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à r.l. v. Kingdom of Spain* (ICSID Case No. ARB/13/36), Award, dated 4 May 2007 (CL-20) |
| ***El Paso*** | *El Paso Energy International Company v. Argentine Republic* (ICSID Case No. ARB/03/15), Award, dated 31 October 2011 (CL-60) |
| ***Electrabel*** | *Electrabel S.A. v. Hungary* (ICSID Case No. ARB/07/19), Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 (CL-13) |
| ***Enron*** | *Enron Creditors Recovery Corporation (formerly Enron Corporation) and Ponderosa Assets, L.P. v. Argentine Republic* (ICSID Case No. ARB/01/3), Award, dated 22 May 2007 (CL-74) |
| ***Eskosol*** | *Eskosol S.p.A. in liquidazione v. Italian Republic* (ICSID Case No. ARB/15/50), Decision on Italy's Request for Termination and Intra-EU Jurisdictional Objection, dated 7 May 2019 (CL-147) |
| ***ESPF*** | *Eskosol S.p.A. in liquidazione v. Italian Republic* (ICSID Case No. ARB/16/5), Award, dated 14 September 2020 (CL-250) |
| ***Greentech*** | *Greentech Energy Systems A/S et al. v. Italy*, SCC Arb. No. 2015/095, Award, dated 23 December 2018 (CL-27) |
| ***H&H Entreprises*** | *H&H Enterprises Investments, Inc. v. Arab Republic of Egypt* (ICSID Case No. ARB/09/15), Decision on Respondent's Objections to Jurisdiction, dated 5 June 2012 (CL-161) |

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

| **Hydro Energy** | *Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain* (ICSID Case No. ARB/15/42), Decision on Jurisdiction, Liability and Directions on Quantum, dated 9 March 2020 (RL-225) |
|---|---|
| **InfraRed** | *InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain* (ICSID Case No. ARB/14/12), Award, dated 2 August 2019 (CL-174) |
| **Isolux** | *Isolux Infrastructure Netherlands, B.V. v. Kingdom of Spain*, SCC V2013/153, Award, dated 12 July 2016 (RL-85) |
| **Kruck** | *Mathias Kruck and others v. Kingdom of Spain* (ICSID Case No. ARB/15/23), Decision on the Respondent's Request for Reconsideration of the Tribunal's Decision dated 19 April 2021, dated 6 December 2021 (CL-252) |
| **KT Asia** | *KT Asia Investment Group B.V. v. Republic of Kazakhstan* (ICSID Case No. ARB/09/8), Award, 17 October 2013 (CL-163) |
| **Lemire** | *Joseph C. Lemire v. Ukraine* (ICSID Case No. ARB/06/18), Decision on Jurisdiction and Liability, dated 14 January 2010 (CL-86) and Award, dated 28 March 2011 (RL-304) |
| **Liman** | *Liman Caspian Oil BV and NCL Dutch Investment BV v. Republic of Kazakhstan* (ICSID Case No. ARB/07/14), Award, dated 22 June 2010 (CL-196) |
| **LG&E** | *LG&E Energy Corp., LG&E Capital Corp. and LG&E International Inc. v. Argentine Republic* (ICSID Case No. ARB/02/1), Decision on Liability, dated 3 October 2006 (CL-75) |
| **Masdar** | *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain* (ICSID Case No. ARB/14/1), Award, dated 16 May 2018 (CL-22) |
| **MOX Plant** | *MOX Plant Case (Ireland v. United Kingdom)*, Permanent Court of Arbitration, 2002-01, Order No. 3, dated 24 June 2003 |
| **NextEra** | *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain* (ICSID Case No. ARB/14/11), Decision on Jurisdiction, Liability and Quantum Principles, dated 12 March 2019 (CL-85) |
| **Novenergia** | *Novenergia II – Energy & Envir. (SCA), SICAR v. Kingdom of Spain*, SCC Arb. 2015/063, Final Award, dated 15 February 2018 (CL-21) |
| **OI European** | *OI European Group B.V. v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB/11/25), Award, dated 10 March 2015 (QE-43) |

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

| | |
|---|---|
| **OperaFund** | *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain* (ICSID Case No. ARB/15/36), Award, dated 6 September 2019 (CL-173) |
| **Plama** | *Plama Consortium Limited v. Republic of Bulgaria* (ICSID Case No. ARB/03/24), Decision on Jurisdiction, 8 February 2005 (CL-34) |
| **PV Investors** | *The PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction, dated 13 October 2014 (CL-172) and Final Award, dated 28 February 2020 (CL-201) |
| **Quiborax** | *Quiborax S.A. and Non-Metallic Minerals S.A. v. Plurinational State of Bolivia* (ICSID Case No. ARB/06/2), Award, dated 16 September 2015 (CL-108) |
| **Rompetrol** | *The Rompetrol Group N.V. v. Romania* (ICSID Case No. ARB/06/3), Decision on Respondent's Preliminary Objections on Jurisdiction and Admissibility, dated 18 April 2008 (CL-159) |
| **RREEF** | *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v. Kingdom of Spain* (ICSID Case No. ARB/13/30), Decision on Jurisdiction, dated 6 June 2016 (CL-16), Decision on Responsibility and on the Principles of Quantum, dated 30 November 2018 (CL-26) and Award, dated 11 December 2019 (CL-202) |
| **Rusoro** | *Rusoro Mining Ltd. v. Bolivarian Republic of Venezuela* (ICSID Case No. ARB(AF)/12/5), Award, dated 22 August 2016 (RL-191) |
| **RWE** | *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v. Kingdom of Spain* (ICSID Case No. ARB/14/34), Decision on Jurisdiction, Liability, and Certain Issues of Quantum, dated 30 December 2019 (RL-172) |
| **Saluka** | *Saluka v. Czech Republic*, UNCITRAL-PCA, Partial Award (CL-62) |
| **SolEs** | *SolEs Badajoz GmbH v. Kingdom of Spain* (ICSID Case No. ARB/15/38), Award, dated 31 July 2019 (CL-150) |
| **Stadtwerke** | *Stadtwerke München GmbH, RWE Innogy GmbH, and others v. Kingdom of Spain* (ICSID Case No. ARB/15/1), Award, dated 2 December 2019 (RL-196) |
| **STEAG** | *STEAG GmbH v. Kingdom of Spain* (ICSID Case No. ARB/15/4), Decision on Jurisdiction, Liability and Principles of Quantum, dated 8 September 2020 (CL-251) |
| **SunReserve** | *SunReserve Luxco Holdings S.à.rl. (Luxembourg), SunReserve Luxco Holdings II S.à.rl. (Luxembourg), SunReserve Luxco Holdings III S.à.rl. (Luxembourg) v. The Italian Republic*, SCC Case No. V 2016/32, Final Award, dated 25 March 2020 (RL-241) |

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

| | |
|---|---|
| ***Tecmed*** | *Técnicas Medioambientales Tecmed, S.A. v. United Mexican States* (ICSID Case No. ARB(AF)/00/2), Award, dated 29 May 2003 (CL-63) |
| ***Thunderbird*** | *International Thunderbird Gaming Corporation v. The United Mexican States*, UNCITRAL, Separate Opinion of Thomas Wälde, dated 1 December 2005 (CL-218) |
| ***Tokios Tokelès*** | *Tokios Tokelès v. Ukraine* (ICSID Case No. ARB/02/18), Decision on Jurisdiction and Dissent, dated 29 April 2004 (CL-164) |
| ***TSA Spectrum*** | *TSA Spectrum de Argentina, S.A. v. Argentine Republic* (ICSID Case No. ARB/05/5), Award, dated 19 December 2008 (RL-149) |
| ***Vattenfall*** | *Vattenfall AB and others v. Federal Republic of Germany* (ICSID Case No. ARB/12/12), Decision on the *Achmea* Issue, dated 31 August 2018 and (CL-6) and (CL-225) |
| ***WA Investments*** | *WA Investments Europa Nova Ltd. v. Czech Republic*, PCA Case No. 2014-19, Award, dated 25 May 2019 (RL-214) |
| ***Waste Management*** | *Waste Management, Inc. v. United Mexican States* (ICSID Case No. ARB(AF)/00/3), Award, dated 30 April 2004 (CL-64) |
| ***Watkins*** | *Watkins Holdings S.à.r.l. and others v. Kingdom of Spain* (ICSID Case No. ARB/15/44), Award, dated 21 January 2020, (CL-200) |

# I.   <u>INTRODUCTION</u>

1.   This case concerns a dispute submitted to the International Centre for Settlement of Investment Disputes ["**ICSID**" or the "**Centre**"] on the basis of the Energy Charter Treaty which entered into force on 16 April 1998 [the "**ECT**" or "**Treaty**"] and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 [the "**ICSID Convention**"].

**1.   THE PARTIES**

2.   The claimants consist in four companies incorporated under the laws of Austria: LSG Building Solutions GmbH ["**LSG**"], Green Source Consulting GmbH ["**Green Source**"], Core Value Investments GmbH & Co. KG Gamma ["**CVI**"] and Core Value Capital GmbH ["**CVC**"]; two companies incorporated under the laws of Cyprus: Anina Pro Invest Ltd. ["**Anina**"] and Giust Ltd. ["**Giust**"]; two companies incorporated under the laws of Germany: Risen Energy Solar Project GmbH ["**Risen**"] and Pressburg UK GmbH ["**Pressburg**"]; one company incorporated under the laws of Netherlands: Solluce Romania 1 B.V. ["**Solluce**"]; and one company incorporated under the laws of Romania: SC LJG Green Source Energy BETA S.R.L ["**Beta**"] [together, the "**Claimants**"].

3.   The Respondent is Romania.

4.   Claimants and Respondent are collectively referred to as the "**Parties**". The Parties' representatives and their addresses are listed above on page (ii) *supra*.

**2.   THE DISPUTE**

5.   The dispute arose from allegations of an alteration and discontinuation by Respondent of an incentive scheme that it had put in place to encourage renewable energy production and induce Claimants to invest in the Romanian renewable energy sector. According to Claimants, the measures allegedly were unlawful and led to the destruction of Claimants' investments in Romania, in violation of Part III of the ECT, in particular Art. 10, which protects Claimants and their investments. As a consequence, the Claimants request full compensation for damages caused by Romania's supposed breaches.

6.   Respondent argues that the Tribunal lacks jurisdiction over the dispute and over some of the Claimants. Respondent contends that, in any event, Romania has not breached its obligations under the ECT, and Claimants are not entitled to damages.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

# II.  **PROCEDURAL HISTORY**

**1.  REQUEST FOR ARBITRATION**

7.  On 23 May 2018, ICSID received a Request for Arbitration from Claimants against Respondent [the "**Request**"].

8.  On June 12, 2018, the Secretary-General of ICSID registered the Request in accordance with Art. 36(3) of the ICSID Convention and notified the Parties of the registration. In the Notice of Registration, the Secretary-General invited the Parties to proceed to constitute an arbitral tribunal as soon as possible in accordance with Rule 7(d) of the ICSID Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings.

**2.  CONSTITUTION OF THE ARBITRAL TRIBUNAL**

9.  The Parties agreed to constitute the Tribunal in accordance with Art. 37(2)(a) of the ICSID Convention as follows: the Tribunal would consist of three arbitrators, one arbitrator to be appointed by each Party and the third, presiding arbitrator to be appointed by agreement of the two co-arbitrators in consultation with the Parties.

10.  The Tribunal is composed of:

-  Professor Juan Fernández-Armesto, a national of the Kingdom of Spain, President, appointed by the co-Arbitrators in consultation with the Parties;

-  Judge O. Thomas Johnson, a national of the United States, appointed by Claimants; and

-  Professor Dr. Pierre-Marie Dupuy, a national of the French Republic, appointed by Respondent.

11.  On 24 January 2019, the Secretary-General, in accordance with Rule 6(1) of the ICSID Rules of Procedure for Arbitration Proceedings [the "**Arbitration Rules**"], notified the Parties that all three arbitrators had accepted their appointments and that the Tribunal was therefore deemed to have been constituted on that date. Ms. Aïssatou Diop, ICSID Legal Counsel, was designated to serve as Secretary of the Tribunal.

**3.  FIRST SESSION**

12.  In accordance with ICSID Arbitration Rule 13(1), the Tribunal held its first session with the Parties on 18 March 2019 by telephone conference.

13.  Following the first session, on 28 March 2019, the Tribunal issued Procedural Order ["**PO**"] No. 1 recording the agreement of the Parties on procedural matters and decisions of the Tribunal on disputed issues. Procedural Order No. 1 sets out the agreed procedural schedule and provides, *inter alia*, that:

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- The applicable Arbitration Rules would be those in effect from 10 April 2006;

- The procedural language would be English; and

- The place of proceeding would be Paris.

### 4.    EUROPEAN COMMISSION APPLICATION

14. On 5 February 2019, the European Commission ["**EC**" or "**Commission**"] filed an application for leave to intervene in the proceeding to address the legal consequences of the Court of Justice of the European Union's ["**CJEU**"] *Achmea* Judgment and the Declaration signed by 22 European Union ["**EU**"] Member States on 15 January 2019, as they relate to this Tribunal's jurisdiction under the ECT. Specifically, the EC requested leave to file an *amicus curiae* submission, have access to the case file to the extent necessary for its intervention, attend hearings, and present oral arguments, should the Tribunal and the Parties deem that useful [the "**NDP Application**"].

15. In accordance with the timetable annexed to Procedural Order No. 1, each party filed observations on the NDP Application on 19 April 2019. Claimants opposed the EC's requests but conceded that in the event that the Tribunal decided to allow it, the EC's intervention should be limited, and security posted by the EC for additional costs incidental to its intervention. Respondent supported the EC's requests and asked that the Tribunal grant the EC ample access to the proceeding.

16. On 13 May 2019, the Tribunal issued its Decision on the EC's Application in the form of Procedural Order No. 2, granting the Commission's request to file a written submission as an NDP in accordance with Arbitration Rule 37(2) on the EU law issues on 24 January 2020, if the proceeding was not bifurcated, or on 27 December 2019, if the proceeding was bifurcated. Additionally, the Tribunal:

- Rejected the EC's request to access the case file, subject to the possibility of requesting specific documents;

- Postponed its decision on the EC's request to attend and present oral arguments at the hearing; and

- Rejected *pro tem* the Claimants' request to order the EC to bear the costs associated with its intervention in the proceeding.

17. Accordingly, as the proceeding was not bifurcated (*see* paragraph 21 *infra*), on 24 January 2020, the Commission filed an *amicus curiae* submission ["***Amicus Curiae Brief***"], together with annexes EC-1 to EC-24, inviting the Tribunal to decline jurisdiction.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

5.     **MAIN SUBMISSIONS**

    A.    **Claimants' Memorial**

18.    In accordance with the procedural calendar, as amended on 15 July 2019, Claimants filed their Memorial on the Merits on 25 July 2019 ["**C-I**"], together with:

      -    The Witness Statement of Mr. Rolf Theuer ["**Theuer I**"], the Witness Statement of Ms. Anna Hofmann ["**Hofmann**"], the Witness Statement of Mr. Gerhard Lipkovich ["**Lipkovich I**"], the Witness Statement of Mr. HyungHoon Lim ["**Lim**"] and the Witness Statement of Mr. Ferry Tahan ["**Tahan**"];

      -    The Expert Report of Dr. Fabien Roques of Compass Lexecon ["**Roques I**"] and the Expert Report of Mr. Richard Edwards of FTI Consulting ["**Edwards I**"];

      -    Exhibits C-32 to C-293; and

      -    Legal Authorities CL-52 to C-129.

    B.    **Request for Bifurcation**

19.    In accordance with the procedural calendar annexed to Procedural Order No. 1, Respondent filed a Request for Bifurcation on 14 August 2019, together with Legal Authorities RL-14 through RL-35, regarding three objections: an EU Law Objection, a multi-party objection and a nationality objection.

20.    Claimants filed a Response to the Request for Bifurcation on 11 September 2019, together with Exhibit C-294 and Legal Authorities CL-130 through CL-170.

21.    On 16 September 2019, the Tribunal decided that a hearing on bifurcation would not be necessary and vacated the hearing day reserved for that purpose. The Tribunal issued its Decision on Bifurcation in the form of Procedural Order No. 3 on 9 October 2019. The Tribunal decided not to grant the Request for Bifurcation in the interest of procedural economy and efficiency. Simultaneously, the Tribunal issued an amended procedural calendar.

    C.    **Respondent's Counter-Memorial**

22.    In accordance with the procedural calendar, as revised on 4 February 2020, Respondent filed its Counter-Memorial on the Merits and Memorial on Jurisdiction on 22 February 2020 ["**R-I**"], together with:

      -    The Witness Statement of Ms. Maria Manicuta ["**Manicuta I**"], the Witness Statement of Mr. Viorel Alicus ["**Alicus**"];

      -    The Expert Report of Mr. Wynne Jones of Frontier Economics ["**Jones I**"] with exhibits WJ-1 to WJ-55, the Expert Report of Dr. Daniel Flores of Quadrant Economics ["**Flores I**"] with exhibits QE-1 to QE-38;

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

-     Exhibits R-1 to R27; and

-     Legal Authorities RL-36 to RL-224.

### D.    **Document production**

23.    The Parties exchanged document production requests ["**DPRs**"] in accordance with the procedure set forth in Procedural Order No. 1. Subsequently, each Party submitted its responses and objections to the other Party's DPS. This was followed by each Party submitting its reply to the other Party's objections and application to the Tribunal to decide on contested DPS. On 21 April 2020, the Tribunal issued Procedural Order No. 4, deciding each Party's DPRs.

### E.    **Claimants' Reply**

24.    In accordance with the procedural calendar, as amended on 22 June 2020, Claimants filed a Reply on the Merits and Counter-Memorial on Jurisdiction on 3 July 2020 ["**C-II**"], together with:

-     The Second Witness Statement of Mr. Gerhard Lipkovich ["**Lipkovich II**"] and the Second Witness Statement of Mr. Rolf Theuer ["**Theuer II**"];

-     The Second Expert Report of Dr. Fabien Roques of Compass Lexecon ["**Roques II**"] with annexes FR-104 to FR-159 and the Second Expert Report of Mr. Richard Edwards of FTI Consulting ["**Edwards II**"] with appendices 4b, 5 to 9 and annexes RE-198 to RE-237;

-     Exhibits C-295 to C-312; and

-     Legal Authorities CL-171 to CL-240.

### F.    **Respondent's Rejoinder**

25.    On 30 October 2020, Respondent filed a Reply on Jurisdiction and Rejoinder on the Merits ["**R-II**"], together with:

-     The Second Witness Statement of Ms. Maria Manicuta ["**Manicuta II**"];

-     The Second Expert Report of Mr. Wynne Jones ["**Jones II**"] with exhibits WJ-56 to WJ-113 and the Second Expert Report of Dr. Daniel Flores ["**Flores II**"] with exhibits QE-39 to QE-86;

-     Exhibits R-28 to R-48; and

-     Legal Authorities RL-225 to RL-312.

### G.    **Claimants' Rejoinder**

26.    On 21 December 2020, Claimants filed a Rejoinder on Jurisdiction ["**C-III**"] together with Exhibits C-313 to C-316 and Legal Authorities CL-241 to CL-251.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

6.    <u>HEARING</u>

27.    In advance of the hearing, the Tribunal held a pre-hearing organizational meeting and, on 27 January 2021, issued Procedural Order No. 5 concerning the organization of the hearing.

28.    A hearing on jurisdiction and the merits was held remotely by Zoom from 15 to 23 February 2021 [the "**Hearing**"]. In addition to the Members of the Tribunal the Secretary of the Tribunal and the Assistant to the Tribunal, the following persons participated in the Hearing:

<u>For Claimants</u>
| | |
|---|---|
| Ms. Amy Roebuck Frey | King & Spalding |
| Mr. Marc-Olivier Langlois | King & Spalding |
| Ms. Héloïse Hervé | King & Spalding |
| Mr. Kenneth R. Fleuriet | King & Spalding |
| Mr. Rami Chahine | King & Spalding |
| Ms. Jessica Beess und Chrostin | King & Spalding |
| Mr. Reginald R. Smith | King & Spalding |
| Mr. Kevin D. Mohr | King & Spalding |

<u>For Respondent</u>
| | |
|---|---|
| Mr. Peter M. Wolrich | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Mr. Geoffroy Lyonnet | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Ms. Marie-Claire Argac | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Ms. Lisa Arpin-Pont | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Ms. Matilde Flores | Curtis, Mallet-Prevost, Colt & Mosle LLP |
| Mr. Gelu Maravela | Maravela & Asociaţii |
| Ms. Alina Popescu | Maravela & Asociaţii |
| Mr. Ioan Roman | Maravela & Asociaţii |

<u>Court Reporter</u>
| | |
|---|---|
| Mr. Trevor McGowan | The Court Reporter Ltd. |

<u>Interpreters</u>
Mr. Felix Tomschizek
Ms. Alexandra Mladin

29.    During the Hearing, the following persons were examined:

<u>On behalf of Claimants</u>
*Witnesses*
| | |
|---|---|
| Ms. Anna Hoffman | Green Source Consulting GmbH |
| Mr. Rolf Theuer | Pressburg Partners |

*Experts*
| | |
|---|---|
| Dr. Fabien Roques | Compass Lexecon |
| Mr. Richard Edwards | FTI Consulting |

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

*On behalf of Respondent*
*Witnesses*
Mr. Viorel Alicus                    Romanian Energy Regulatory Authority
Ms. Maria Manicuta                   Romanian Energy Regulatory Authority
*Experts*
Dr. Daniel Flores                    Quadrant Economics
Mr. Wynne Jones                      Frontier Economics

**7.   POST-HEARING PHASE**

30.   Following the Hearing, the Tribunal issued Procedural Order No. 6 on 2 March 2021 regarding the post-Hearing phase of the arbitration.

31.   In accordance with P.O. No. 6, Claimants and Respondent filed simultaneous post-hearing briefs on 31 May 2021 ["**C-PHB**" and "**R-PHB**", respectively], and simultaneous submissions on costs on 30 June 2021.

**8.   KOMSTROY SUBMISSIONS**

32.   On 3 September 2021, Romania requested that the Tribunal authorize the submission of a new exhibit to the record: the Judgment of the CJEU in case C-741/19, *Republic of Moldova v. Komstroy* ["***Komstroy* Judgment**"]. On 10 September 2021, Claimants opposed Romania's request.

33.   On 20 September 2021, the Tribunal decided to admit the *Komstroy* Judgment into the record and granted the Parties an opportunity to provide comments regarding the *Komstroy* Judgment.

34.   Accordingly, Romania filed its comments on 12 October 2021 ["**R-Komstroy**"] and Claimants on 12 November 2021 ["**C-Komstroy**"].

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

# III.  FACTS

35.    The general background of this case is not disputed by the Parties: as part of its international commitments to reduce greenhouse gas emissions, Romania created a support scheme for investments in the production of electricity from renewable energy sources based on the award of tradable "green certificates" ["**Green Certificates**" or "**GC**"]. Claimants are ten project developers, who invested in five solar photovoltaic [or "**PV**"] plants in the south of Romania between 2011 and 2013 and benefitted from the GC support scheme.

36.    The dispute between the Parties revolves around the changes enacted by Romania to its GC support scheme first in 2013-2014 and later between 2017-2018.

37.    Claimants allege that they were induced to invest in Romania on the basis of specific guarantees contained in Romania's GC program, which ensured a certain revenue for Claimants' PV plants for 15 years. And that from mid-2013 to 2018, Romania changed the "rules of the game" and took a series of harmful measures that had a devastating impact on the value of Claimants' investments, in violation of Romania's obligations under the ECT[1].

38.    Romania, on the other hand, denies that it ever induced Claimants to invest on the guarantee that its support scheme would not be amended. Romania claims that considering the disproportion between the high level of support afforded to solar PV investments and the drop in the actual cost of such investments, Claimants should have expected that Romania would intervene to rebalance the support scheme. Romania submits that the measures it adopted were proportionate, reasonable, and addressed legitimate public policy concerns[2].

39.    In the following sections, the Tribunal will first explain why Romania decided to implement a scheme to support renewable energies (**1.**) and the main features of this scheme prior to 2013 (**2.**). The Tribunal will then outline Claimants' investments in Romania (**3.**). Thereafter, the Tribunal will describe the measures adopted by Romania in 2013 and 2014 (**4.**), and briefly mention the relevant events of 2015-2016 (**5.**). Lastly, the Tribunal will turn to the measures adopted by Romania in 2017 and 2018 (**6.**).

**1.    BACKGROUND TO THE ROMANIAN RES SUPPORT SCHEME**

40.    Romania is located at the crossroads of central, eastern, and southern Europe.

41.    From 1948 to 1989, Romania was under Communist rule. After ousting Nicolae Ceaușescu, in 1990 Romania held free elections and started its transition to a democracy and market-based economy[3]. Around that same time, Romania began efforts to join the European Union ["**EU**"] and formally applied for membership on

---

[1] C-I, paras. 13-15; C-PHB, paras. 2-6.
[2] R-II, para. 13.
[3] C-I, para. 60; **Doc. C-33**, p. 3.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

22 June 1995[4]. In preparation for its accession, Romania implemented a series of reforms[5], including with regards to its energy policy[6].

42.   The turn of the 21st century was accompanied by an increased concern for climate change, an issue that started to be placed on the political agendas. Greenhouse gas emissions – which are primarily generated by burning fossil fuels (*e.g.*, coal, oil, natural gas, etc.) to produce energy in power plants, cars, or homes – came to be seen as one of the main drivers of climate change[7]. The fight to reduce greenhouse gas emissions thus gained momentum among the international community[8].

### A.   The Kyoto Protocol

43.   The first important development came with the Kyoto Protocol to the United Nations Framework Convention on Climate Change [the "**Kyoto Protocol**"], an international treaty that imposes national targets to reduce greenhouse gas emissions[9], which Romania signed and ratified[10] in 1999 and 2001, respectively.

44.   The Kyoto Protocol provides, *inter alia*, that States parties to the Protocol must "implement and/or further elaborate policies and measures" such as "[r]esearch on, and promotion, development and increased use of, new and renewable forms of energy"[11]. This is because renewable sources of energy [or "**RES**"] (*e.g.*, wind, solar, geothermal, or biomass) generate much lower levels of greenhouse gas than fossil fuels.

### B.   The 2001 Directive

45.   The EU quickly followed-through and in 2001 issued Directive 2001/77/EC "on the promotion of electricity produced from renewable energy sources in the internal electricity market" [the "**2001 Directive**"], pursuant to which it recognized the need to promote RES to comply with the Kyoto Protocol and to protect the environment[12].

46.   EU Member States were required to transpose the provisions of this Directive by 2003 and to encourage greater consumption of electricity from renewable energy sources [or "**RES-E**"][13]. The Directive further instructed Member States to establish national indicative RES targets in terms of a percentage of electricity consumption for the next 10 years and set out an indicative target of a 12% share of RES in the EU's gross energy consumption by 2010[14].

---

[4] **Doc. C-53**.
[5] **Doc. C-54**, pp. 121-124.
[6] **Doc. C-54**, pp. 80-83; **Doc. C-64**, p. 3.
[7] **Roques I**, paras. 3.2-3.3; **Jones I**, paras. 2.5.b, 3.2-3.3.
[8] **Roques I**, paras. 3.7-3.9.
[9] **Doc. C-55**, Art. 3.1.
[10] **Doc. C-56**; **Doc. C-57**.
[11] **Doc. C-55**, Art. 2.1(a)(iv); **Doc. C-57**, Art. 2.
[12] **Doc. C- 59/FR-15**, Recitals 1 and 3.
[13] **Doc. C-59/FR-15**, Arts. 3.1 and 9.
[14] **Doc. C-59/FR-15**, Art. 3.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

47. Furthermore, although EU State aid rules remained applicable, the Directive recognized the possibility for Member States to implement support schemes to encourage investments in RES-E[15].

## C. Romania's efforts to comply with the 2001 Directive

48. Following the adoption of the 2001 Directive, all EU Member States took steps to promote RES-E[16]. Even though the 2001 Directive was not binding upon it, Romania also adopted a series of measures to align itself with the European renewable energy targets[17].

49. Historically, Romania had covered its energy needs through the domestic production of coal, oil, and gas[18]. Production of energy from renewable sources, other than hydropower (which was widespread), was practically inexistent until 2008[19]:

| Structure of power generation in 2004 – 2011 (MW) | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 |
| TOTAL generation, of which: | 6477 | 6818 | 7172 | 7011 | 7376 | 6584 | 6939 | 7069 |
| *coal fired plants, of which: | 2673 | 2687 | 3079 | 3051 | 3136 | 2625 | 2185 | 2944 |
| °lignite | 2173 | 2182 | 2553 | 2422 | 2534 | 2171 | 2129 | 2497 |
| °hard coal | 500 | 505 | 526 | 629 | 602 | 454 | 356 | 447 |
| *hydrocarbons | 1282 | 1182 | 1314 | 1264 | 1015 | 821 | 758 | 918 |
| *water | 1889 | 2317 | 2093 | 1817 | 1947 | 1794 | 2338 | 1707 |
| *nuclear | 633 | 632 | 641 | 878 | 1277 | 1342 | 1327 | 1341 |
| *wind | - | - | 0 | 1 | 1 | 2 | 31 | 138 |
| *biomass | - | - | - | - | - | - | - | 21 |
| *photovoltaic | - | - | - | - | - | - | - | 0 |

Source: Transelectrica – "Annual Report"

50. Thus, in April 2003, Romania passed Government Decision ["GD"] 443/2003 regarding the promotion of electricity generated from renewable sources of energy[20], transposing the 2001 Directive. Romania set out to achieve by 2010:

- A 30% share of RES-E on the national gross consumption of electricity, and

- An 11% share of RES-E on the national gross consumption of energy.

51. Only a few months later, Romania issued GD 890/2003 approving an "Energy Roadmap", which foresaw that Romania's energy development would pass by the large-scale use of RES[21].

---

[15] **Doc. C-59/FR-15**, Recital 12 and Art. 4.
[16] **Roques I**, para. 3.24.
[17] In a report of that same year regarding "Romania's progress towards accession", the EU noted that "[w]hile Romania has achieved a certain level of alignment further progress is still needed. The national authorities should now focus on […] improved energy efficiency; the greater use of renewable energy […]." (**Doc. C-54**, pp. 83-84).
[18] C-I, para. 62; **Doc. C-33**, p. 8.
[19] **Doc. C-33**, p. 8; **Roques I**, para. 3.28.
[20] **Doc. C-60**.
[21] **Doc. C-74**, p. 2.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

52. By the end of 2003, Romania issued GD 1535/2003, adopting a Strategy for Promoting Renewable Energy Sources[22]. Romania reiterated its commitment to reach a share of 30% of RES-E on the national gross consumption of electricity, and an 11% share of RES-E in the total consumption of energy. In addition, Romania set as general objectives[23]:

> "- promoting the private investments and creating the conditions to facilitate the access of the foreign capital on the market of the renewable energy sources; […]
>
> - creating the conditions for Romanian participation to the European market of "Green Certificates" for the energy from renewable sources."

53. Accordingly, in November 2004, Romania adopted GD 1892/2004, which established the first system for promoting the production of RES-E through a mandatory quota system[24] combined with the trading of Green Certificates[25] – which will be analyzed in further detail in section 2 *infra*.

2007 access to the EU

54. When in January 2007 Romania finally acceded to the EU, it became bound by the 2001 Directive and formally undertook to reach a 33% (and no longer a 30%) share of RES-E in the national gross consumption of electricity by 2010[26].

55. Yet, by 2008, there were only 23 RES producers in Romania and there was no installed photovoltaic capacity whatsoever[27] – making such target ambitious to achieve[28].

**D.    RES support schemes**

**a.    The need for support schemes**

56. In the first decade of the 21st century the technology behind renewable sources of energy, other than hydro-electric power[29], was incipient. The upfront costs of investing in renewable energy solar or wind plants were considerably higher than those of conventional energy plants[30]. This fact, coupled with technological

---

[22] **Doc. C-61**, p. 5.
[23] **Doc. C-61**, p. 14.
[24] Defined as "a mechanism to promote the production of electricity from renewable energy sources through the purchase by the suppliers of mandatory electricity quotas produced from these sources for sale to consumers in the country. The amount of electricity purchased is proven on the basis of the green certificates purchased." (**Doc. C-76**, p. 1).
[25] **Doc. C-76**, Arts. 1 and 3. See also **Doc. C-75**, p. 8.
[26] **Doc. C-62**, p. 2.
[27] **Doc. C-78**, slides 9 and 12; C-I, para. 12.
[28] **Roques II**, Figure 1.
[29] See **Jones I**, paras. 2.5.g.i, 3.5 and 3.11.
[30] **Roques I**, paras. 2.11 and 4.5-4.9; **Doc. C-74**, p. 5; **CD-2**, slide 5. See also **Doc. C-64**, p. 5.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

limitations and the reliance on natural elements, did not make renewable energy attractive to investors[31].

57.     Therefore, when the EU passed the 2001 Directive it recognized that renewable energy producers would have difficulties competing against conventional energy generators and would need incentives to enter the market[32]. This required State intervention through the creation of support schemes for producers of RES[33]. As explained by Claimants' regulatory expert, Dr. Roques[34]:

> "The renewable support schemes implemented in Europe generally consisted in ensuring that renewable producers receive remuneration above the electricity market price which would attract investment and help achieving the RES development targets underlying such schemes."

58.     The objective of RES support schemes is to achieve the required RES deployment – to meet RES targets – at a minimum cost. The European Commission assesses support schemes using two main criteria[35]:

-       Effectiveness: the ability of the support scheme to deliver an increased share of consumed RES-E, through increased deployment of RES-E; and

-       Efficiency: the comparison between the level of support and the production cost; in other words, the extent to which the support scheme achieves deployment of RES-E at a minimum cost for consumers.

59.     Given that the EU has granted its Member States broad discretion on how to reach their RES targets, support schemes have varied throughout Europe[36]. There are broadly four categories of incentives[37]:

-       <u>Price-based market instruments</u>, which include feed-in tariffs ["**FiT**"] and price premia ["**FiP**"]; in the case of FiT, the RES producer receives a fixed price for the production of electricity, which is defined *ex ante* and applies over a predetermined period, irrespective of the price of electricity on the wholesale market; in the case of FiP, the RES producer receives the wholesale market price plus a premium that is defined *ex ante*;

-       <u>Quantity-based market instruments</u>, which contrary to price-based incentives, ensure a set volume of RES consumption over a period, instead of a RES production price; this is the case of Green Certificates (GC) that are awarded to producers of RES-E and which electricity suppliers are obligated to purchase;

---

[31] **Roques I**, para. 2.11; **Doc. C-64**, p. 6.
[32] **Doc. C-59/FR-15**, Recitals 12-19; **Roques I**, para. 4.5.
[33] **Jones I**, paras. 2.5.d and 3.11; **RD-2**, slide 4.
[34] **Roques I**, paras. 2.16 and 4.35.
[35] **Doc. FR-28**, pp. 8-9; **Roques I**, para. 4.7; **Jones I**, para. 3.36.
[36] **Roques I**, para. 4.35; **Jones I**, para. 3.32.
[37] **Roques I**, para. 2.16; **Jones I**, paras. 2.5.e and 3.12 *et seq*; **Doc. C-75**, p. 6; **Doc. FR-28**, pp. 4-5. See also **Doc. C-59**, Recital 14.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 26 of 299

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

-    Investment subsidies, such as soft loans, grants, etc.; and

-    Fiscal incentives, including tax rebates, levies on non-renewable sources, etc.

60.    In a 2008 report on the RES-E support schemes throughout the EU, the Commission noted that there were 27 different national support schemes. The majority of EU Member States (including Spain, Italy, and Germany) had opted for price-based incentives, sometimes mixed with other types of schemes[38]. Nevertheless, Romania – like seven other Member States (*e.g.*, Poland or Sweden)[39] – introduced quota obligations through a Green Certificates scheme, which is the object of the present arbitration.

61.    In its 2008 report the Commission further noted that[40]:

> "Comparing the two main types of support schemes, namely quota obligations and feed-in tariffs, historic observations from EU Member States suggest that feed-in tariffs achieve greater renewable energy penetration, and do so at lower costs for consumers."

62.    The Commission also observed that Member States were "continuously fine-tuning existing policy measures with the aim of improving the performance of these measures"[41].

### b.    Differences in support schemes

63.    In recent years, multiple investors in RES have started investment arbitrations against different EU Member States based on changes to their support schemes – the most well-known ones against the Kingdom of Spain and the Republic of Italy. Considering that most of these cases concerned FiT or FiP schemes[42], it is worth explaining what differentiates them from GC schemes.

FiT scheme

64.    In a FiT scheme, the producer of RES-E [or "**Generator**"] is shielded from market variations in the price of electricity. Upon commissioning of the plant, Generators are given access to a fixed preferential tariff for the production of electricity, defined *ex ante*, which applies over a pre-determined period. The Generator will sell its electricity output to a designated counterparty, who will pay a fixed price per megawatt per hour ["**MWh**"] of RES-E, regardless of the actual market price of electricity. The counterparty is compensated for the cost of electricity paid above market price from the proceeds of a levy or surcharge on the end consumers' bills[43]. Different tariffs may apply to different eligible technologies.

---

[38] **Doc. C-75**, p. 7; **Doc. FR-28**, pp. 5-6; **Roques I**, Figure 8; **Jones I**, para. 3.35.
[39] **Doc. C-75**, p. 7; **Doc. FR-28**, p. 5; **Roques I**, Figure 8; **Jones I**, para. 3.35.
[40] **Doc. FR-28**, p. 8.
[41] **Doc. FR-28**, p. 6.
[42] Annex A to C-PHB; Annex 1 to R-PHB.
[43] See **Roques I**, paras. 4.35.a, 4.36-4.37 and **Jones I**, paras. 3.14-3.18.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

65.    Contrary to other support schemes, Generators under FiT schemes are not affected by variations in supply and demand of electricity, given that they are always guaranteed a fixed tariff for the electricity they produce.

FiP scheme

66.    Unlike FiT and like GC, a FiP scheme exposes the Generators of RES-E to the electricity market price risk. The Generator sells its output in the electricity market at the wholesale market price, but is entitled to receive a premium, defined *ex ante*, for each MWh of generated RES-E. The total remuneration for the Generator can be unconstrained or capped from above and/or from below. This exposure to the market gives an incentive for Generators to produce electricity when their output is the most valuable[44].

GC scheme

67.    Similarly, under a GC scheme, RES-E Generators bear the electricity market price risk: Generators sell the electricity they produce at market prices, in the same manner as conventional electricity generators; they are, however, compensated by receiving a pre-defined number of GCs per MWh of generated electricity[45].

68.    This is a quota obligation incentive scheme[46], which operates through trading of GCs between suppliers and demanders of RES-E[47]:

-    On the supply side, regulators periodically allocate a number of GCs per MWh of generated electricity to the RES-E Generators that meet the eligibility criteria;

-    On the demand side, regulators set a purchase obligation (quota) for retail suppliers to procure a percentage of their electricity from RES in a given period; this translates into the obligation for these suppliers to acquire a number of GCs per MWh of electricity sales, throughout a defined period (usually a year); the costs of this purchase are then passed on to the final consumer, through the wholesale price or a fee added to the consumers' bill;

-    The GCs are traded on organized markets or through bilateral trades, where retail suppliers have the obligation to acquire GCs from RES-E Generators (or from intermediaries, who may have acquired GCs from Generators)[48]; generally, if retail suppliers fail to purchase the required number of GCs in each period (*i.e.*, to meet their quotas) they pay a penalty price in respect of each GC that they failed to acquire (such penalty will usually be higher than the maximum GC price, to deter suppliers from not meeting their quotas)[49].

---

[44] See **Roques I**, paras. 4.35.a, 4.36-4.37 and **Jones I**, paras. 3.19-3.21, 3.42-3.43.
[45] **Roques I**, para. 4.40; **Doc. C-64**, p. 88.
[46] **CD-1**, slide 65; **Jones I**, para. 3.22.
[47] **Roques I**, para. 4.39; **Jones I**, paras. 3.22-3.24.
[48] **Jones I**, para. 3.26.
[49] **Jones I**, para. 3.27.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

69. This trading mechanism is what drives the price of the GCs, which is determined by a delicate market equilibrium between supply and demand of RES-E[50]:

- If supply of RES-E is insufficient (*i.e.*, if there is not enough generation of RES-E and there are not sufficient GCs on the market) and there is plenty of demand (*i.e.*, if the retail suppliers' quota obligations have not been met and there is demand for GCs), the GC price will go up;

- If supply of RES-E exceeds demand (and therefore there are more GCs on the market than demand for them), the GC price will go down.

70. Regulators can add several features to GC schemes, *e.g.*[51]:

- By setting minimum and maximum prices for GCs, to prevent the GC price from falling below or rising above certain thresholds, thereby ensuring a minimum revenue for investors and limiting the costs of the support scheme for end consumers, respectively[52];

- By placing expiration dates on the GCs awarded to Generators; or

- By awarding a different number of GCs per MWh depending on the type of RES technology (wind, solar, etc.); this is known as "banding" and ensures that less mature technologies receive a higher number of GCs, making them attractive to new investors despite their higher costs and risks; by contrast, if regulators were to award the same number of GCs regardless of technology, they would incentivize investment in the most efficient technology at the time.

* * *

71. Comparing the different support schemes, the remuneration received by Generators of RES-E per MWh of electricity relative to the market price is as follows[53]:

- <u>FiT</u>: Generators will obtain a fixed revenue regardless of the market price of electricity;

- <u>FiP</u>: Generators will obtain the market electricity price plus a fixed premium, where the total remuneration can be unconstrained or capped from above and/or from below;

- <u>GC</u>: Generators will obtain the market price of electricity plus the price of the GCs, which is determined by the trading of GCs.

---

[50] **Roques I**, paras. 4.40-4.42. See also **Doc. C-63**, para. 25.
[51] **Roques I**, paras. 4.47 *et seq*; **Jones I**, paras. 3.24, 3.34.
[52] See also **Doc. C-85**, slide 3.
[53] **Roques I**, para. 4.36 and Figure 7; **Doc. C-64**, p. 88.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

72.  A GC system involves greater risks for investors when compared to a FiT scheme, given that both the price of electricity and the price of the GCs are subject to market variations[54].

## 2.  THE ROMANIAN GC SCHEME PRIOR TO 2013

73.  Of the different schemes available, Romania chose to implement a system of mandatory quotas combined with the trading of GCs[55] to encourage investment in RES-E.

### A.    The Romanian electricity market and main regulatory players

74.  To understand the Romanian GC scheme, it is necessary to comprehend how the Romanian electricity market works. Electricity is supplied by generators, who own plants where they generate electric energy that they provide to the grid[56]. Transelectrica S.A. ["**Transelectrica**"], the transmission and system operator [or "**TSO**"], manages and operates the electricity transmission system[57]. Distributors[58] oversee the distribution of electric energy into the wholesale market, where retail suppliers[59] sell electricity to consumers on the regulated and competitive markets[60]. The market is managed by **OPCOM**, the gas and electricity market operator[61].

75.  Additionally, since the GC support scheme constitutes a market intervention in which State administrative and regulatory bodies play a crucial role[62], it is worth mentioning who these are. Both the legislative and executive branches set the Romanian energy policy through the adoption of various laws and regulations[63]:

-    The Parliament enacts ordinary laws and Government Ordinances (normative acts enacted on the basis of a special law passed by the Parliament); and

-    The Government adopts decisions (the so-called "GD") that consist of normative acts that determine how the law will be implemented, and, in cases of urgency, Emergency Government Ordinances ["**EGO**"], which must be justified by the Government and approved by the Parliament within 30 days.

76.  Until 2013, the Ministry of Economy[64] was in charge of drawing up and implementing the national energy strategy[65]. In 2013 a subdivision of the Ministry

---

[54] **Doc. C-63**, para. 24.
[55] Initially, Romania's scheme also provided for FiT (see **Doc. C-83**, Art. 4(1)). However, this was later abandoned.
[56] *E.g.*, Hidroelectrica, Nuclearelectrica, Electrocentrale Bucuresti, etc.
[57] **Doc. C-33**, pp. 10-11; **Doc. C-45**.
[58] *E.g.*, ENEL Distributia Banat, E.ON Moldova Distribue, etc.
[59] *E.g.*, ENEL Energie, E.ON Moldova Furnizare, etc.
[60] **Doc. C-33**, p. 10; **Doc. C-91**, slide 4.
[61] **Doc. C-33**, p. 11; **Doc. C-91**, slide 4.
[62] **Jones I**, para. 3.31.
[63] **Doc. C-38**, Arts. 73-79, 108 and 115(1), (4) and (5); C-I, paras. 65-66.
[64] Formerly designated as Ministry of Economy, Trade and Business Environment.
[65] **Doc. C-33**, p. 11.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

of Economy – the Agency for Energy – took that role until finally, in April 2013, the Ministry of Energy was created[66].

77. Since 2014 the Ministry of Energy has the power to draw up and implement Romania's national energy strategy and governmental energy policies[67]. The Ministry of Economy retains some competence, such as governing electricity transportation and the partial exemptions enjoyed by energy-intensive users from the GC support scheme[68].

78. Both Ministries are supported by the National Energy Regulatory Authority ["**ANRE**"] created in 1998, which since 2012[69]:

> "[…] is an autonomous administrative body under Parliamentary control, entirely self-financed and independent as regards its decision-making process, organisation and functioning, whose scope of activity is to issue, approve and monitor the implementation of the national-wide binding regulatory framework required for the proper functioning of the electricity, heat and natural gas sectors and markets in terms of efficiency, competition, transparency and consumer protection."

79. The ANRE has the power to enact orders and decisions, which are binding normative acts[70].

## B. The implementation of a GC scheme in Romania

80. In its GD 1535 of 2003, the Romanian Government set the creation of conditions for Romania to participate in the European market of GCs as one of the objectives of its RES strategy[71].

81. Hence, in 2004, the GC scheme was officially introduced in Romania through GD 1892/2004[72] (subsequently amended and supplemented[73]), which created an obligatory quota system combined with the trading of GCs, as support for the production of RES-E.

82. GD 1892/2004 defined a Green Certificate as "a document evidencing a quantity of [one] MWh of electricity produced from renewable energy sources"[74].

83. The beneficiaries of the support scheme were installations producing electricity from RES (the so-called "Generators"), put into operation or upgraded starting in

---

[66] C-I, para. 67.
[67] **Doc. C-42**.
[68] **Doc. C-39**; **Doc. C-40**; **Doc. C-41**.
[69] **Doc. C-44**, p. 2. *See* also **Doc. C-33**, p. 11.
[70] **Doc. C-44**, pp. 3-4.
[71] **Doc. C-61**.
[72] **Doc. C-76**. See also **Doc. C-64**, p. 83.
[73] See, *e.g.*, GD 958/2005 (**Doc. C-77**).
[74] **Doc. C-76**, Art. 2(b).

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

2004[75]. Significantly, hydroelectric power plants with installed capacity of over 10 MW were excluded from the benefits of this scheme[76].

84. Pursuant to this system, Transelectrica, as the TSO, was in charge of monthly issuing GCs to Generators for the amount of electricity produced and supplied to the grid. Generators were entitled to one GC per MWh of electricity supplied to the grid, irrespective of the type of RES technology employed. In turn, electricity suppliers had the obligation to buy annually a defined number of GCs from Generators, equal to the product of the value of the mandatory annual quota and the amount of electricity supplied annually to end-users[77].

85. ANRE, on the other hand, oversaw whether electricity suppliers were fulfilling their quotas, and established the minimum and maximum trading value of GCs – which were set at EUR 24/GC and EUR 42/GC, respectively.

86. This system, however, did not prove sufficient to attract investments in RES-E and to meet the renewable energy targets defined by the EU[78].

### a.    Law 220/2008

87. Therefore, on 27 October 2008, the Romanian Parliament enacted Law no. 220/2008[79] ["**Law 220/2008**"] in order to accelerate the production of RES-E[80]. This Law, with its further amendments between 2009 and 2012, defined the legal framework for the GC support scheme on which Claimants allegedly relied upon when making their investments[81].

88. Law 220/2008 provided that Generators could benefit from the support scheme if they commissioned their plants before the end of 2014. Such scheme would be applied for a period of "15 years for electricity produced by new power groups", from the moment they started to produce RES-E[82].

89. Under this scheme, Transelectrica remained in charge of monthly granting GCs to Generators[83].

90. However, contrary to GD 1892/2004, Law 220/2008 introduced a banding system, pursuant to which each type of renewable energy technology received a different number of GCs per MWh; thus, while solar PV plants were granted four GCs per MWh of RES-E fed into the power grid, small hydro-electric producers obtained

---

[75] **Doc. C-76**, Art. 1(2).
[76] **Doc. C-76**, Art. 1(2).
[77] **Doc. C-76**, Arts. 5 and 6.
[78] **Doc. C-36**, p. 2; **Doc. C-78**, slides 9-12.
[79] **Doc. C-83**.
[80] **Doc. C-64**, p. 8; **Doc. C-36**, pp. 2-3.
[81] **Roques I**, para. 5.4; **Lipkovich I**, paras. 4, 13-14; **Theuer I**, para. 15. See also **Jones I**, paras. 5.9 *et seq* and **Doc. C-307**, p. 6.
[82] **Doc. C-83**, Art. 3(2)(a) and 3(3).
[83] **Doc. C-83**, Art. 5(1).

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 32 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

only one GC[84]. This sought to encourage investment in less mature technologies, other than hydro-electric power, which was already widely available in Romania.

91.    Law 220/2008 established that Generators would sell their electricity on the wholesale electricity market at market price[85]; they could then obtain an additional income from the sale of their GCs to electricity suppliers either[86]:

-    On a centralized GC market, administered by OPCOM; or

-    By entering into bilateral contracts for the sale of GCs [so-called "green certificate purchase agreements" or "**GCPAs**"].

92.    Furthermore, the Romanian Parliament changed the way in which the GC trading values would be established: ANRE was no longer responsible for setting those values; in fact, they were now enacted in the law itself. Thus, Law 220/2008 provided that GCs would trade between a minimum of EUR 27/GC and a maximum of EUR 55/GC for the period between 2008 and 2014[87], adjusted annually in line with consumer price indices[88]. The Law also established that for the period of 2015-2030 the minimum trading value could not be less than the minimum trading value for 2014[89].

National targets

93.    The Romanian Parliament set Romania's national targets for RES-E in the national consumption of electricity for the years 2010, 2015 and 2020 at 33%, 35% and 38%, respectively[90]. To help meet these targets, Romania introduced two concepts[91]:

94.    (i) The concept of an annual mandatory quota, corresponding to the maximum share of RES-E that could benefit from the GC scheme ["**Annual Mandatory Quota**"][92] (excluding electricity produced by hydroelectric power plants with an installed capacity of over 10 MW). This Quota was set at[93]:

-    A maximum of 5.26% for 2008,

-    A maximum of 6.28% for 2009,

-    A maximum of 8.30% for 2010 to 2012,

-    Increasing up to a maximum of 16.8% by 2020.

[84] **Doc. C-83**, Art. 5(2).
[85] **Doc. C-83**, Art. 14(1).
[86] **Doc. C-83**, Art. 9. See also **Doc. C-63**, para. 21.
[87] **Doc. C-83**, Art. 10(1).
[88] **Doc. C-83**, Art. 10(3).
[89] **Doc. C-83**, Art. 10(4).
[90] **Doc. C-83**, Art. 4(3).
[91] **Doc. C-83**, Art. 4.
[92] **Doc. C-83**, Art. 4(5), (6) and Appendix.
[93] **Doc. C-83**, Appendix.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

95.    (ii) The concept of annual mandatory quotas for the acquisition of GCs ["**Acquisition Quota**"], which required electricity suppliers to purchase yearly a defined number of GCs. The number of GCs would be determined each year by ANRE[94]. Furthermore, ANRE was in charge of imposing, and Transelectrica of collecting[95], penalties for suppliers of electricity who failed to meet their Acquisition Quota. The penalty was established at EUR 70 for each unpurchased GC[96].

96.    Considering State aid rules in force in the EU, Romania notified Law 220/2008 to the Commission and requested approval of its support scheme. Pending such approval – which would only be given in 2011 – Romania continued to grant only one GC per MWh of electricity produced to all RES-E Generators[97].

**b.    The 2009 Directive**

97.    Before the target year of 2010, established under the 2001 Directive, had been reached, the EU saw the need for further action to support the development of renewable energy, not just in the electricity sector[98]. This led the EU to adopt Directive 2009/28/EC in April 2009 ["**2009 Directive**"][99]. The 2009 Directive[100]:

-       Set a target of 20% of energy from renewable sources in the Community's gross final consumption of energy – not just electricity – for 2020; and

-       Assigned Romania a mandatory RES target of at least 24% in its total consumption of energy – not just electricity – for 2020.

98.    The 2009 Directive established that Member States should adopt "National Renewable Energy Action Plans", setting out their national targets for the share of energy from renewable sources consumed in electricity, transport, and heating and cooling in 2020, and the measures to be taken to achieve such targets[101]. Additionally, the Directive once again encouraged Member States to implement support schemes to reach their RES targets[102].

**c.    Law 139/2010**

99.    In July 2010, the Romanian Parliament enacted Law no. 139/2010, transposing the 2009 Directive, and amending and supplementing Law 220/2008 ["**Law 139/2010**"][103]. In its statement of reasons, the Parliament stated that[104]:

---

[94] **Doc. C-83**, Art. 4(7).
[95] **Doc. C-83**, Art. 11(4).
[96] **Doc. C-83**, Art. 11(2).
[97] **Doc. C-63**, paras. 1, 6-7.
[98] **Doc. C-87/FR-21**, Recitals 7-14 and Art. 1; **Roques I**, para. 3.16; **Jones I**, para. 3.7.
[99] **Doc. C-87/FR-21**.
[100] **Doc. C-87/FR-21**, Art. 3 and Annex I.
[101] **Doc. C-87/FR-21**, Art. 4.
[102] **Doc. C-87/FR-21**, Art. 3.
[103] **Doc. C-89** and **Doc. C-90**, p. 1.
[104] **Doc. C-90**, p. 2.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 34 of 299

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

"[…] this law contributes to the strengthening of the business environment by the increase of trust of possible investors in the stability of the E-RES support scheme."

100. Law 139/2010 introduced some significant changes to Law 220/2008:

- <u>First</u>, although it still provided that new Generators of RES-E would benefit from the support scheme for 15 years, Generators could now qualify to obtain support from the GC scheme until the end of 2016[105] – two years more than established in Law 220/2008;

- <u>Second</u>, it increased the maximum share of RES-E that could benefit from the GC support scheme (*i.e.*, the Annual Mandatory Quotas defined under Law 220/2008) as follows[106]:

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Law 220/2008 | 8.3% | 8.3% | 8.3% | 9% | 10% | 10.8% | 12% | 13.2% | 14.4% | 15.6% | 16.8% |
| Law 139/2010 | 8.3% | 10% | 12% | 14% | 15% | 16% | 17% | 18% | 19% | 19.5% | 20% |

- <u>Third</u>, it increased the number of GCs available for solar PV plants from four to six GCs per MWh of electricity produced and delivered to the grid[107];

- <u>Fourth</u>, it extended the duration for which the GC price would be trading between a minimum of EUR 27/GC and a maximum of EUR 55/GC until 2025 (instead of 2014), indexed annually to European inflation[108]; and

- <u>Lastly</u>, it increased the penalty for suppliers of electricity who failed to meet their Acquisition Quota from EUR 70 to EUR 110 for each unpurchased GC[109]; this penalty would be collected by Transelectrica and allocated to an "Environment Fund" to finance further production of energy from renewable sources[110].

---

[105] **Doc. C-89**, Art. I, para. 14 (Art. 3(3)).
[106] **Doc. C-83**, Appendix; **Doc. C-89**, Art. I, para. 15.4. See also **Doc. C-63**, Table 3, p. 6; C-I, para. 136.
[107] **Doc. C-89**, Art. I, para. 17 (Art. 5(2)(e)).
[108] **Doc. C-89**, Art. I, para. 24 (Art. 10(1)).
[109] **Doc. C-89**, Art. I, para. 25 (Art. 11(2)).
[110] **Doc. C-89**, Art. I, para. 25 (Art. 11(5)).

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 35 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

101. Thus, by early 2011, the GC support scheme could be summarized as follows[111]:



### d.    The Romanian National Renewable Energy Action Plan

102. Under the 2009 Directive, Romania's mandatory target for 2020 was ambitious: it had to achieve at least a 24% share of energy from RES in its gross total energy consumption. However, Romania was free to decide how to reach such target, between electricity, transport, and heating and cooling.

103. In September 2010[112], Romania adopted its National Renewable Energy Action Plan ["**NREAP**"][113] and set its RES electricity target at 43% by 2020[114]. The NREAP described in detail Romania's GC scheme[115] and recognized that further legislative incentives might be needed to make investment in RES-E more attractive[116]. In particular, the NREAP acknowledged that Romania would need to guarantee a minimum GC price over a reasonable period, so that investments in RES could be recovered[117].

### C.    State aid decision and subsequent regulation

### a.    Romania's application to the Commission

104. In accordance with State aid rules, Romania submitted Law 220/2008 with its subsequent amendments to approval by the Commission[118].

105. In its application, Romania explained that it expected to have between 100 and 500 beneficiaries of the GC support scheme[119]. The estimated total value of the support

---

[111] Scheme prepared by the Arbitral Tribunal on the basis of **Docs. C-83**, **C-89** and **C-63**, Figure 1, p. 7. See also **Doc. C-265**, Figure 1, p. 4.
[112] See **Doc. C-307**, p. 5.
[113] **Doc. C-64**.
[114] **Doc. C-64**, Tables 3.2 and 3.5, p. 28.
[115] **Doc. C-64**, pp. 83 *et seq*.
[116] **Doc. C-64**, pp. 14 and 16.
[117] **Doc. C-64**, p. 16.
[118] **Doc. C-63**, para. 1. See also **Doc. C-307**; **Doc. C-311**; **Doc. C-312**.
[119] **Doc. C-307**, para. 18; **Doc. C-63**, para. 16.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 36 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

scheme budget would be RON 80.713 billion (approximately EUR 19.5 billion) for the whole duration of the scheme[120].

106. Among the requested information, the Commission wanted Romania to demonstrate that the GC scheme would not result in an overcompensation for renewable energy Generators. Romania explained that after performing an analysis of the internal rates of return ["**IRR**"] calculated for each type of technology, the results (ranging from 9.9% to 11.8%) showed the absence of overcompensation at the aggregate level[121]. For Generators of RES-E from solar energy, Romania calculated an IRR of 11.6%[122] and explained that[123]:

> "The resulting IRR values for solar […], slightly higher compared to other technologies, reflect the need to stimulate the development of production based on this resource in Romania. It is specified that so far, in Romania no investments have been made in solar power plants and since even after the issuance of the initial version of Law no. 220/2008 no solar power plant projects had appeared, it was considered that the level of support with 4 CV did not cover the costs and a reasonable profit, and the support was increased to 6 CV; under these conditions, it has been considered that this technology involves increased risks and as a result, for its development, it is necessary to ensure a higher IRR than for other technologies."

The risk of overcompensation

107. Romania undertook to monitor (through ANRE) the costs/revenues of the Generators benefitting from the GC scheme and to implement measures to mitigate the risk of overcompensation for renewable energy.

108. If it were to find the existence of overcompensation, ANRE would suggest to the Government measures to reduce the number of GCs for the economic operators entering the GC scheme after the announcement of such measures[124] – *i.e.*, Romania did not envision implementing measures with a retroactive effect.

**b.    The EC Decision**

109. On 13 July 2011, the Commission issued its decision ["**EC Decision**"] approving the Romanian GC scheme. As to whether the support scheme consisted of State aid, the Commission noted that although the GC scheme did not on its own involve State resources, the State did provide free GCs to green electricity Generators[125]. However, the transactions on GC markets were carried out between private entities, without State resources – the State was only responsible for establishing minimum and maximum prices for GCs[126]. In any event, the Commission concluded that it was not necessary to take a definitive position on the existence of State aid, because

---

[120] **Doc. C-312**, p. 3; **Doc. C-63**, para. 11.
[121] **Doc. C-307**, pp. 38-39.
[122] **Doc. C-311**, p. 12; **Doc. C-63**, para. 33.
[123] **Doc. C-311**, p. 13.
[124] **Doc. C-307**, p. 39; **Doc. C-63**, para. 37.
[125] **Doc. C-63**, paras. 48-49.
[126] **Doc. C-63**, para. 50.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

even if State aid were involved, the measures were compatible with the internal market[127].

110. On that same day, the Commission issued a press release in which it explained that it had found Romania's support scheme in line with EU State aid rules[128]:

> "[…] in particular, because it creates clear incentives for an increased use of renewable energy, while containing safeguards to limit distortions of competition. The scheme is designed to assist Romania in reaching by 2020 the mandatory national renewable energy target set under EU legislation."

### c.    ANRE Order 45/2011

111. To implement the GC support scheme, now approved by the EU Commission, ANRE issued a series of regulations regarding, *inter alia*, the accreditation of Generators, the issuance of GCs, the organization of the GC market, etc.[129].

112. In October 2011, ANRE issued Order no. 45/2011 ["**ANRE Order 45/2011**"], approving a methodology for setting the electricity suppliers' Acquisition Quotas[130] – *i.e.*, the number of GCs that suppliers were required to purchase for each MWh of electricity sold to end consumers. The Acquisition Quota corresponded to the ratio between the total number of GCs issued and the final electricity consumption in the year of analysis.

113. Pursuant to the methodology defined by ANRE, in December of each year ANRE[131]:

- Projected the total number of GCs to be issued for the following year, by estimating the amount of RES-E that would be produced and would benefit from the GC scheme; this depended on the power installed in the different types of available RES power plants and the ones to be put into operation in the following year, and the average capacity factor[132] by type of technology[133]; and

---

[127] **Doc. C-63**, paras. 54-55.
[128] **Doc. C-95**.
[129] **Doc. C-75**, slide 9. These include ANRE Orders no. 42/2011, no. 43/2011, no. 44/2011, no. 45/2011, and no. 06/2012.
[130] **Doc. C-101**. See also **Jones I**, para. 5.10(c).
[131] **Doc. C-101**. See also **Jones I**, para. 5.10(c).
[132] Defined as: "[…] the ratio between the electricity delivered from the plant during the analysis period and the electricity that would be produced if the plant was operating throughout the duration at installed power, expressed as a percentage." (**Doc. C-101**, Art. 5(1)(c)). Additionally, pursuant to Art. 6 of the Order, "(1) For existing power plants/generating sets, the capacity factors used in the calculations will be the average annual outputs of each plant/group over the last 3 years of operation. (2) For the power plants / groups to be commissioned during the following year, the capacity factors used in the calculations shall be the same as those used for the authorization of the promotion system, depending of the type of technology, and for the estimation of the electricity produced, the installed electrical powers and the start-up time of the power plants / groups shall be considered." (**Doc. C-101**, Art. 6).
[133] **Doc. C-101**, Art. 5(1).

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 38 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

-    Estimated the gross electricity consumption for the following year.

114.    Based on these two factors, ANRE estimated the Acquisition Quota, as follows[134]:

> "The estimated quota for purchase of green certificates in the year t-1 for the following year t shall be calculated as the ratio of the total number of GCs expected to be issued in the following year, and the final consumption of electricity estimated for the same period of time, expressed as a percentage."

115.    This methodology applied from November 2011 until July 2014[135].

### d.    EGO 88/2011

116.    In line with the commitments undertaken before the EU Commission, in October 2011, the Romanian Government passed its Emergency Ordinance no. 88/2011 ["**EGO 88/2011**"][136], with the aim of imposing safeguards against overcompensation to mitigate the impact of the support scheme on the price of energy for end consumers[137]. This EGO amended and supplemented Law 220/2008 (as amended and supplemented in 2010) in several important aspects[138]:

-    <u>First</u>, it introduced the concept of overcompensation, defined as a[139]:

> "[…] situation when, considering the specific average technical and economic indicators achieved for a period of minimum 3 years for each technology, from the cost-benefit analysis performed for the set of generation capacities using the same technology, it results an [IRR] higher by 10% than the value considered for the relevant technology when authorizing the promotion system."

> (*Pro memoria*, at the time of EGO 88/2011 the IRR considered for solar PV plants was 11.6%);

-    <u>Second</u>, it set out that ANRE would monitor the costs/revenues of Generators for overcompensation, and, if needed, would propose measures to reduce the number of GCs allocated to Generators; however, such measures would only be applicable to Generators who "begin production of electricity" after the measures were adopted[140] – in other words, it would <u>not</u> apply to Generators who were already producing at the time of adoption of any measures;

-    <u>Third</u>, it established that Generators needed to be "accredited" by ANRE in order to benefit from the support scheme, and that the commissioning of their plants had to be completed by the end of 2016[141]; and

---

[134] **Doc. C-101**, Art. 10.
[135] **Roques I**, fn. 98 and Appendix C, para. A.6.
[136] **Doc. C-97**.
[137] **Doc. C-98**, pp. 2 and 4.
[138] **Doc. C-97**. See also **Jones I**, para. 5.10(b).
[139] **Doc. C-97**, Art. I, para. 1 (Art. 2(af)) [Emphasis added].
[140] **Doc. C-97**, Art. I, para. 23 (Arts. 29(2) and (3)).
[141] **Doc. C-97**, Art. I, paras. 4 (Art. 3(3)) and 8 (Art. 4(6)).

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- Lastly, it determined that GCs issued to Generators would expire 16 months after their date of issuance – after which they could no longer be traded[142].

### e.    Law 134/2012

117. In July 2012, the Romanian Parliament enacted Law no. 134/2012 ["**Law 134/2012**"][143] by which it approved EGO 88/2011[144]. In its statement of reasons, the Parliament noted that[145]:

> "[…] the trading of green certificates allows all renewable energy producers who satisfy the conditions stipulated by the law to benefit indirectly from the guaranteed demand for the produced energy for a higher price than the market price, which is likely not to discourage renewable energy producers from investing in technologies specific to this type of energy."

118. Law 134/2012 again envisaged the possibility for Romania to reduce the number of GCs for solar PV plants accredited after 1 January 2014, in case of overcompensation[146].

119. Additionally, Romania announced that it would create a guarantee fund managed by OPCOM ["**Guarantee Fund**"]. This Guarantee Fund would buy any unsold GCs – which under EGO 88/2011 were valid for 16 months – resulting from the unfulfilled Acquisition Quotas, at least at the minimum legal GC price. In turn, the Fund would be funded by the penalties paid by the suppliers of electricity who failed to meet their Acquisition Quotas in each quarter[147].

### 3.    CLAIMANTS' INVESTMENTS IN ROMANIA

120. In the early phases of the promotion of RES, Romania, like most EU Member States, chose to support a mix of technologies[148]: due to its location in south-eastern Europe, Romania is able to exploit different sources of renewable energy with substantial potential for electricity generation, including solar electricity[149].

121. However, at the start of the millennium, there was only limited deployment of solar PV plants in Europe, mainly because it was a very costly technology[150]. In its 2011 State aid submission to the EC, Romania explained that until then "no investments" had been made in solar PV plants, and that in 2010 it had amended its Law 220/2008, increasing the level of support from four to six GCs per MWh of

---

[142] **Doc. C-97**, Art. I, para. 9 (Art. 6(9)).
[143] **Doc. C-109**.
[144] **Doc. C-109**, Art. I.
[145] **Doc. C-110**.
[146] **Doc. C-109**, Art. I, para. 14.
[147] **Doc. C-109**, Art. I, para. 8.
[148] **Doc. FR-16**, p. 17; **Roques I**, para. 4.10.
[149] **Doc. C-33**, p. 28.
[150] **Jones I**, paras. 4.4, 4.9-4.11. The installed capacity throughout Europe only began to grow in 2008.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

electricity supplied to the grid[151], hoping to attract further investment in this technology.

122. In parallel, however, the cost of solar PV plants began to fall, mainly due to a significant drop in the price of modules between 2008 and 2013[152]. This fall in prices, coupled with an interesting support scheme, attracted new investors to solar energy in Romania.

123. Claimants are ten project developers who invested in five solar PV plants in southern Romania[153] after 2010, at different points in time. These five PV plants are[154]:

-   CEF Slobozia, a PV facility of 45 Megawatt-peak ["**MWp**"][155] installed capacity in Giurgiu, Romania ["**Alpha PV Facility**"];

-   CEF Izvoarele, a PV plant of 20 MWp installed capacity in Giurgiu, Romania ["**Beta PV Facility**"];

-   CEF Izvoarele, a PV plant of 50 MWp installed capacity also in Giurgiu, Romania ["**Gamma PV Facility**"];

-   CEF Frăsinet 2, a PV facility of 9.5 MWp installed capacity in Călăraşi, Romania ["**Frăsinet 2**"]; and

-   CEF Frăsinet 3, a PV plant of 5.4 MWp installed capacity also located in Călăraşi, Romania ["**Frăsinet 3**"].



---

[151] **Doc. C-311**, p. 13.
[152] **Jones I**, para. 4.10; **RD-2**, slide 5.
[153] C-I, paras. 13 and 172; R-I, para. 513; **CD-1**, slide 99.
[154] **Edwards I**, Table 1-2 and Figure 1-1.
[155] Claimants explain that: "Megawatt peak ("**MWp**") typically refers to the production capacity of a PV plant in direct current (DC), while megawatt ("**MW**") refers to the production capacity of a PV plant after the inversion to alternating current (AC). The difference is usually fairly small (a few percent), and only relevant to technical issues that are not material in this dispute." (C-I, fn. 13).

Case 1:19-cv-01618-TSC   Document 113-27   Filed 03/13/25   Page 41 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

124. These five PV plants can be divided into two sets of projects[156]:

- On the one hand, the Alpha, Beta, and Gamma PV Facilities, located in the Giurgiu county and initially developed by Claimants LSG Building Solutions GmbH ["**LSG**"] and Green Source Consulting GmbH ["**Green Source**"], before selling a portion of their shares to Claimants Solluce Romania 1 B.V. ["**Solluce**"], Core Value Capital GmbH ["**CVC**"], Core Value Investments GmbH & Co KG Gamma ["**CVI**"], and Risen Energy Solar Project GmbH ["**Risen**"], in this latter case through Claimant SC LJG Green Source Energy Beta SrL [the "**Beta**"] (**A.**);

- On the other hand, the Frăsinet 2 and 3 plants ["**Frăsinet PV Facilities**"], located in the Călăraşi county and developed by Claimants Anina Pro Invest Limited ["**Anina**"], Giust Limited ["**Giust**"], and Pressburg UK GmbH ["**Pressburg**"] (**B.**).

125. Claimants acknowledge that the seven Claimants that invested in the Alpha, Beta, and Gamma PV Facilities are unrelated to the three Claimants that invested in the Frăsinet PV Facilities[157].

126. In the following sections, the Tribunal will describe how each of the ten Claimants came to invest in Romania.

## A.   **The Alpha, Beta and Gamma PV Facilities**

### a.   **January 2011: Green Source and LSG's investment in Romania**

127. LSG is a limited liability company incorporated in Austria[158] that specializes in electrical and infrastructure engineering, and develops projects in different market sectors, including renewable energy. Besides investing in Romania, LSG developed projects in several other European countries[159].

128. Green Source, on the other hand, is a limited liability company incorporated in Austria, founded in 2006 by Canadian and German investors. The company operates in the central and eastern European renewable markets, with a focus on PV projects[160]. In the words of Ms. Anna Hofmann, one of the company's co-founders[161]:

> "[Green Source's] core mission is to develop energy projects in Central and Eastern Europe, with a focus on ground-mounted PV parks. Working alone or with other developers, we buy or lease the land for each project; prepare the necessary project documents, including grid access and construction permit applications; and conclude the engineering, procurement, and construction, financing, and other contracts. We then sell all or part of the project to outside

---

[156] C-I, paras. 173-174; **CD-1**, slide 99; C-PHB, paras. 57 and 151.
[157] C-PHB, para. 59.
[158] **Doc. C-2**.
[159] C-I, para. 28; **Lipkovich I**, paras. 5-6.
[160] C-I, para. 29; **Hofmann**, paras. 5-6.
[161] **Hofmann**, para. 6.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

investors just before the project begins construction or, in some cases, operation."

129. In 2010, before the Commission had even approved the Romanian GC support scheme, the founders of LSG and Green Source decided to join forces to invest in a renewable energy project in Romania[162].

130. LSG and Green Source agreed to incorporate a local company to hold and develop a PV facility. The project would pass through the acquisition or lease of land by the local company, followed by the obtainment of the necessary permits and authorizations for construction and operation of the PV facility. Thereafter, both companies intended to sell their interests in the project to outside investors, who would reimburse them for their expenses, with a profit. LSG would be in charge of the engineering, procurement and construction ["**EPC**"], while both companies would act as operations and maintenance providers[163].

131. Although initially LSG and Green Source had intended to develop a single PV project, they eventually decided to develop two more[164]. Thus, in January 2011, LSG and Green Source incorporated three companies in Romania, in which they each held 50% of the shares[165]:

-    LJG Green Source Energy Alpha SA [the "**Alpha Project Company**"][166];

-    The Beta Project Company – one of the Claimants in this arbitration[167]; and

-    LJG Green Source Energy Gamma SA [the "**Gamma Project Company**"][168].

Alpha

132. When in January 2011, Green Source and LSG registered the Alpha Project Company in Romania, they each held 50% of the company's shares.

133. In January 2011, LSG arranged for the Alpha Project Company to purchase a 62-hectare ["**ha.**"] plot to accommodate a 25 to 30 MW PV facility[169].

134. In April 2011, Green Source entered discussions with banks potentially interested in financing the PV project and with investors potentially interested in acquiring the totality or a share of the Alpha Project Company. Green Source also prepared a series of proposals describing the project for potential outside investors[170]. One of

---

[162] **Lipkovich I**, paras. 10-11; **Hofmann**, paras. 9, 13-14.
[163] **Lipkovich I**, para. 18; **Hofmann**, paras. 14-16.
[164] **Lipkovich I**, para. 17; **Hofmann**, para. 15.
[165] **Lipkovich I**, para. 19; **Hofmann**, para. 15.
[166] **Doc. C-138**.
[167] **Doc. C-8**.
[168] **Doc. C-140**.
[169] **Doc. C-141**; **Hofmann**, para. 17.
[170] **Hofmann**, paras. 18-20.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 43 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

these investors would be Samsung C&T Corp., through its subsidiary Solluce, as will be seen in further detailed in section b *infra*.

135.   In August 2011, the Alpha Project Company obtained approval to connect a 45 MW PV plant to the electric grid from Enel Distributie Muntenia, the local energy distributor[171]. Therefore, in February 2012, the Alpha Project Company acquired an additional 37 ha. plot of land to accommodate a further 17 MW of operations[172].

Beta and Gamma

136.   Given investors' interest in the Romanian PV sector, Green Source and LSG decided to develop two other PV projects, Beta and Gamma, in parallel to the Alpha project. Thus[173]:

- In April 2012 Beta acquired a 44 ha. plot of land for the Beta PV Facility; and

- Between July and September 2012, the Gamma Project Company purchased a 96 ha. plot of land for the Gamma PV Facility, with the help of Risen, one of the Claimants in this arbitration, as will be seen in section c *infra*.

137.   LSG prepared all the applications for the administrative permits and authorizations necessary to build and operate these PV Facilities[174].

138.   LSG and Green Source were particularly aware of the need to build and accredit the Alpha, Beta, and Gamma PV Facilities before the deadline of 1 January 2014 to be entitled to receive six GCs per MWh of RES-E[175].

**b.   May 2012: Solluce's investment in Romania**

139.   Solluce is a business entity incorporated in the Netherlands, which is a subsidiary of Samsung C&T Corp. ["**Samsung**"][176]. Samsung, founded in South Korea in 1938, is at the origin of the Samsung Group, a multinational conglomerate[177].

140.   At the time of its investment in Romania, Samsung covered two main areas of business: engineering and construction, on the one hand, and trading and investment, on the other. It is in this latter that solar power falls. Since 2007 Samsung has been actively involved in the PV industry, having developed PV projects in several central and eastern European countries[178].

---

[171] **Doc. C-142**.
[172] **Doc. C-143**; **Hofmann**, para. 17.
[173] **Lipkovich I**, para. 19.
[174] **Lipkovich I**, para. 21.
[175] **Lipkovich I**, para. 23; **Hofmann**, para. 32. See also **Tahan**, para. 11.
[176] **Doc. C-4**; C-I, para. 31.
[177] **Lim**, para. 4; C-I, para. 31.
[178] **Lim**, paras. 4-6; C-I, para. 31.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

141. In May 2011, Samsung started discussing with LSG and Green Source the possibility of investing in the PV project that they were developing in Romania[179].

142. By the end of the summer 2011, LSG and Green Source had already acquired the first plot of land that would be used in the Alpha project, obtained the construction permit for the first phase of construction, and secured permission to connect to the electricity grid from Enel Distributie Muntenia, the local electricity distributor[180]. Thus, during the second half of 2011, Samsung worked with Green Source and LSG to[181]:

- Complete the development of the PV facility;

- Identify potential off-takers for the project's electricity and purchasers for the plant's GCs – including by entering into negotiations with off-takers for long-term GCPAs; and

- Identify lenders who would be willing to fund the project.

143. In October 2011, Green Source, LSG, and Samsung agreed that Samsung would buy a majority share of the Alpha Project Company, of which Green Source and LSG would remain minority shareholders[182].

144. In April 2012, LSG and Green Source broke ground on the Alpha project. That same month, the Alpha Project Company entered into a binding term sheet with Enel Trade S.p.A. governing the terms of a power purchase agreement ["**PPA**"] and a GCPA[183]. Finally, by 15 May 2012, the Alpha Project Company secured all necessary approvals and permits to construct the 45 MW Alpha PV Facility[184].

145. Therefore, on 22 May 2012, Green Source, LSG, Samsung, and its Dutch subsidiary Solluce – Claimant in this arbitration – signed an investment agreement with the Alpha Project Company[185]. The parties agreed that Solluce would become a shareholder in the Alpha Project Company through a combination of share capital increase and share sale transfers that would ultimately result in Solluce holding a 78% share in the capital of the Company and Green Source and LSG remaining each with an 11% share[186].

146. Solluce started by acquiring a 62.3% in the Alpha Project Company, for EUR 14.18 million, and, in January 2013, increased its participation to 78%, with a further EUR 8.6 million investment[187].

---

[179] **Lim**, para. 7.
[180] **Lim**, para. 9.
[181] **Lim**, paras. 15-16.
[182] **Lim**, para. 17; **Hofmann**, para. 23.
[183] **Lim**, para. 19.
[184] **Lim**, para. 19; **Hofmann**, para. 25.
[185] **Doc. C-166**.
[186] **Doc. C-166**, Recitals (B) – (K). See also **Hofmann**, para. 26; **Lim**, para. 20.
[187] **Lim**, paras. 20-22; **Hofmann**, para. 27.

31

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 45 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

147. In January 2013, the Alpha Project Company signed a GCPA with Enel Trade Romania, pursuant to which Enel committed to purchase all the GCs generated by the Alpha PV Facility for ten years at the following price[188]:

- EUR 43 until 31 December 2014;
- EUR 32.55 or the Minimum Price (as defined in Annex 1)whichever is higher after 1 January 2015 until 31 December 2017;
- EUR 33 or the Minimum Price whichever is higher after 1 January 2018 until the end of the Term of this Agreement.

148. On 6 February 2013, the Alpha Project Company entered into a facilities agreement pursuant to which a group of international banks led by UniCredit agreed to fund EUR 64.3 million of construction costs and RON 95.6 million of related VAT[189].

**c.    January 2013: Risen's investment in Romania**

149. Risen, a company incorporated in Germany[190], is a subsidiary of Risen Energy (Hong Kong) Co., Ltd. ["**Risen Energy**"], a Chinese hi-tech enterprise specialized in the production and sale of PV modules, listed on the Shenzen Stock Exchange[191].

150. Therefore, on 20 April 2012, Green Source, LSG, and Risen Energy executed a "project investment contract", pursuant to which Risen Energy agreed to loan Green Source and LSG EUR 900,000 to purchase land for the Gamma PV Facility – the construction of which was scheduled to begin in July 2012[192]. Pursuant to this contract, Green Source and LSG had to repay the loan by 15 July 2012, after which, Risen Energy would fund the Gamma Project Company through a bridge loan until the PV Facility was complete and could be sold to a third party. In exchange, Risen Energy would be the module supplier for the Beta and Gamma PV Facilities[193].

151. On 24 January 2013, Risen – Claimant in this arbitration and a subsidiary of Risen Energy – entered into

- A share purchase agreement with Green Source and LSG[194], and

- Two share transfer agreements, one with Green Source[195] and another one with LSG[196],

pursuant to which Risen acquired 90% of Beta's shares from Green Source and LSG for EUR 900,000 – an amount which was offset against the outstanding sums owed by LSG and Green Source for the Gamma Project Company loan[197]. Green

---

[188] **Doc. C-167**, Clauses 4 and 6.1.
[189] **Lim**, para. 23; **Hofmann**, para. 28.
[190] **Doc. C-5**.
[191] **Doc. C-267**.
[192] **Doc. C-171**; **Hofmann**, para. 35.
[193] **Doc. C-171**.
[194] **Doc. C-173**.
[195] **Doc. C-174**.
[196] **Doc. C-175**.
[197] **Hofmann**, para. 37.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Source and LSG each retained a 5% share of the capital of Beta. In addition, Risen Energy lent Beta EUR 9.1 million to finance construction[198].

152. On 20 February 2013, Risen entered into a module supply agreement with Beta for the price of EUR 12.8 million[199].

**d.    June 2013: CVC and CVI's investment in Romania**

153. In September 2012, Green Source decided to approach Mr. Tahan. Mr. Tahan is the founder of Core Value Capital GmbH [one of the Claimants in this arbitration and previously defined as "CVC"], a Vienna-based investment fund in renewable energies[200] that has invested exclusively in solar power plants since its creation in 2013[201].

154. Mr. Tahan was interested in the project and presented this opportunity also to Mr. Viktor Falk, an Austrian national and one of CVC's most important investors[202].

155. By early 2013, Mr. Tahan informed Green Source that CVC would be interested in investing in the Beta and Gamma Project Companies and started to perform a financial and legal due diligence[203].

156. In February 2013, Core Value Investments GmbH [one of the Claimants in this arbitration, previously defined as "CVI" and together with CVC "**Core Value**"] was established as a limited partnership in Austria. CVI's shares are held by BDO Financial Advisory Services GmbH in trust for an investment vehicle that belongs to Mr. Falk[204].

157. However, as will be seen in further detail in section 4 *infra*, at the same time rumors started to circulate that Romania might enact changes to its GC support scheme. Mr. Tahan testified in this arbitration that, although the prospect of the changes to the GC scheme concerned Core Value, they were confident that Beta and Gamma would remain bankable and could succeed even if the rumored changes took place[205].

158. On 15 May 2013, the Beta and Gamma Project Companies each signed a memorandum of understanding ["**MoU**"] with Tinmar-Ind S.A. and S.C. Lord Energy S.R.L., regarding the future sale of the projects' electricity and GCs[206]. These MoU set out the terms pursuant to which the parties intended to enter into a service agreement and a GCPA. They provided that the projects would sell all their

---

[198] **Hofmann**, para. 37.
[199] **Hofmann**, para. 37.
[200] **Hofmann**, para. 36; **Tahan**, paras. 2 and 7.
[201] **Tahan**, para. 4.
[202] **Tahan**, para. 8.
[203] **Hofmann**, para. 36; **Tahan**, para. 8.
[204] **Tahan**, para. 5.
[205] **Tahan**, paras. 9-11. See also **Hofmann**, para. 38.
[206] **Doc. C-225**; **Doc. C-226**. See also **Hofmann**, para. 39; **Tahan**, para. 13.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

electricity to Tinmar-Ind S.A. at a fixed price of RON 140 per MWh, and that Tinmar would also purchase 80% of the projects' GCs at the OPCOM market price, while Lord Energy S.R.L would act as GC broker in return for 10% of the GC price[207].

159. As will be seen in section 4 *infra*, two weeks thereafter, on 4 June 2013, the Romanian Government issued EGO no. 57/2013, a measure that, according to Claimants, represented a first change in the GC support scheme for the worse[208]. Irrespective of this, the Core Value Claimants did not abandon their project to invest in the Beta and Gamma Project Companies[209].

Failed investment in Beta

160. Therefore, on 6 June 2013, Core Value entered into a framework agreement with Green Source, LSG, Risen, and Risen Energy, with a view of acquiring 55% of the share capital of Beta. Pursuant to this agreement[210]:

- CVI would purchase 50% of the shares of Beta from Risen for a price of EUR 1.45 million; and

- CVC would purchase 5% of the shares of Beta from Green Source and LSG (2.5% from each) for a total price of EUR 145,000.

161. In parallel, Green Source and LSG signed separate share transfer agreements with Risen to purchase back 20% of Beta's shares, for an amount that would be set-off against the amounts due under the call options specified in the January 2013 share purchase agreement[211].

162. However, when the condition subsequent of the framework agreement of 6 June 2013 was not met, CVI's 50% share in Beta reverted to Risen on 18 March 2014[212].

163. Later, in February 2015, Risen acquired all of the remaining shares in Beta held by Green Source, LSG, and CVC. Therefore, Risen is currently the sole shareholder of Beta[213].

Investment in the Gamma Project Company

164. Additionally, on 26 June 2013, the Core Value Claimants entered into a share purchase and investment agreement with LSG and Green Source, pursuant to which CVI became a 76% shareholder of the Gamma Project Company and CVC a 3% shareholder[214]. In return, LSG and Green Source each received EUR 3.55

---

[207] **Doc. C-225**; **Doc. C-226**. See also **Hofmann**, para. 39; **Tahan**, para. 13.
[208] **Hofmann**, para. 40; **Tahan**, para. 14.
[209] **Tahan**, para. 14.
[210] **Doc. C-227**. See also **Tahan**, para. 15; **Hofmann**, para. 41.
[211] **Hofmann**, para. 41.
[212] **Doc. C-235**. See also **Hofmann**, para. 42; **Tahan**, para. 18; C-PHB, para. 153.
[213] **Doc. C-236**. See also **Tahan**, para. 18.
[214] **Doc. C-228**. See also **Tahan**, paras. 4-5 and 16.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

million[215], while they each retained a 10.5% share in the Gamma Project Company. The Gamma Project Company received RON 1,000 for the newly issued shares and CVI agreed to grant a EUR 18.16 million shareholder loan to the Gamma Project Company[216].

165.   In July 2013, the Gamma Project Company obtained approval to connect a 50 MW PV plant to the electric grid from Enel Distributie Muntenia, the local energy distributor[217].

### B.   **The Frăsinet PV Facilities**

### a.   **Pressburg**

166.   Pressburg is a company incorporated under the laws of Germany[218] and an affiliate of Pressburg Partners GmbH ["**Pressburg Partners**"]. Founded in 2009, Pressburg Partners is a privately held investment firm based in Vienna that focuses on developing and investing in renewable energy assets and technology[219].

167.   According to Mr. Rolf Theuer's testimony, founder of Pressburg Partners, starting in 2010, Pressburg Partners worked with a research analyst and with the law firms DLA Piper and Wolf Theiss to understand and monitor the Romanian support scheme. Upon the approval of the GC support scheme by the Commission, Pressburg Partners gained increased interest in investing in Romania[220].

168.   Pressburg Partners started to look for PV projects in which to invest. However, these were scarce, given that most local developers had advanced little at that stage. Finally, in July 2012 Pressburg Partners met Mr. Gheorghe Cătălin-Liviu[221].

### b.   **Anina and Giust**

169.   Anina[222] and Giust[223] are two companies incorporated in Cyprus in September and November 2011, respectively[224], whose sole shareholder is Mr. Cătălin-Liviu, a Romanian entrepreneur[225].

---

[215] Green Source and LSG each received EUR 3.42 million from CVI and EUR 135,000 from CVC (**Doc. C-228**, Clause 3).
[216] **Tahan**, para. 16.
[217] **Doc. C-232**.
[218] **Doc. C-11**.
[219] **Theuer I**, paras. 2 and 7-8.
[220] **Theuer I**, paras. 11-17.
[221] **Theuer I**, paras. 19-20.
[222] **Doc. C-9**.
[223] **Doc. C-10**.
[224] **Doc. C-9; Doc. C-10; Edwards I**, Table 1.1.
[225] C-I, fn. 17; **Doc. R-1**, p. 20; **Doc. R-2**, p. 19; **Doc. R-5**, p. 20; **Doc. R-6**, p. 19; **Edwards I**, para. 3.34.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

170. Mr. Theuer explains that, in 2012, Mr. Cătălin-Liviu had been developing a portfolio of PV projects throughout Romania, two of which were in an advanced development stage in the southern county of Călăraşi: the Frăsinet PV Facilities[226].

171. The Frăsinet 2 plant was owned entirely by Solar Electric Frăsinet S.R.L. ["**Solar Frăsinet**"], a special purpose vehicle, in turn owned at 95% by Giust – while the remaining 5% were the property of Mr. Cătălin-Liviu[227].

172. In turn, the Frăsinet 3 plant was owned entirely by Solar Electric Mostistea S.R.L. ["**Solar Mostistea**" and together with Solar Frăsinet, the "**Frăsinet Project Companies**"], a special purpose vehicle, in turn owned at 95% by Anina. The remaining 5% were again the property of Mr. Cătălin-Liviu[228].

173. According to Mr. Theuer's testimony, Mr. Cătălin-Liviu had initially planned to develop the two projects through to the permitting stage and then to sell them to outside investors for them to complete and operate. However, Mr. Cătălin-Liviu eventually agreed to build and operate the Frăsinet PV Facilities with Pressburg[229].

**c.    September 2012: Pressburg, Anina, and Giust SPAs**

174. Therefore, on 19 September 2012, Pressburg entered into two share purchase agreements ["**SPA**"][230]:

- An SPA with Mr. Cătălin-Liviu and Giust pursuant to which Pressburg acquired 50% of Solar Frăsinet's shares in return for a nominal payment of RON 10 per share and a promise to provide a shareholder loan of EUR 2.2 million; Giust retained the remaining 50% of Solar Frăsinet's shares[231]; and

- An SPA with Mr. Cătălin-Liviu and Anina pursuant to which Pressburg acquired 50% of Solar Mostistea's shares in return for a nominal payment and a promise to provide a shareholder loan of EUR 1.25 million; Anina retained the remaining 50% of Solar Mostistea's shares[232].

175. On 20 September 2012, each of the Frăsinet Project Companies entered into EPC and operation and management agreements with Alpine-Energie Deutschland GmbH, contingent on the project companies entering into a binding term sheet with the Raiffeisen International Bank AG ["**Raiffeisen**"]. Alpine-Energie was willing to pre-finance part of the EPC price until Raiffeisen disbursed the loan[233].

---

[226] **Theuer I**, para. 20.
[227] **Doc. C-123**, Art. 1.2; **Theuer I**, para. 20; C-I, para. 37.
[228] **Doc. C-124**, Art. 1.2; **Theuer I**, para. 20; C-I, para. 37.
[229] **Theuer I**, para. 21.
[230] **Theuer I**, para. 22.
[231] **Doc. C-123**.
[232] **Doc. C-124**.
[233] **Doc. C-123**; **Doc. C-124**; **Theuer I**, para. 23.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 50 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

176. The Frăsinet Project Companies commenced construction in November 2012[234] and by January 2013 construction was near completion[235].

\* \* \*

177. The structure of Claimants' projects can be summarized as follows (as of 2015)[236]:



178. The Alpha, Beta, Gamma, and the Frăsinet Project Companies shall be referred to as the "**Operating Companies**".

### C.    June to December 2013: Accreditation of PV Facilities

179. To benefit from the GC support scheme, Generators first had to obtain an accreditation granted by ANRE. This accreditation consisted of an individual decision for each plant, specifying the period, the number of GCs, and the date from which the Generator would receive monthly GCs from Transelectrica[237]. Significantly, Law 134/2012 envisaged the possibility for Romania to reduce the number of GCs for solar PV plants accredited after 1 January 2014, in case of overcompensation[238]. Therefore, all Claimants had interest in accrediting their PV Facilities before January 2014 to benefit from six GCs per MWh.

180. Throughout 2013, ANRE issued all the necessary licenses and accreditations for the five PV Facilities of Claimants:

- ANRE issued the Frăsinet PV Facilities' preliminary accreditation on 29 March 2013[239], and the Facilities were each permitted to start production on 29 May 2013 and 3 June 2013[240]; on 21 June 2013, ANRE issued the final

---

[234] **Theuer I**, para. 23.
[235] **CD-1**, slide 110.
[236] Diagram prepared by the Arbitral Tribunal. Claimants are highlighted in red. See also **Edwards I**, Table 1-1 and Figures 3-1 and 3-2; **Flores I**, Figure 1; **RD-4**, slide 5.
[237] **Doc. C-312**, p. 2.
[238] **Doc. C-109**, Art. I, para. 14.
[239] **Theuer I**, para. 26.
[240] **Theuer I**, para. 31.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 51 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

accreditation, granting six GCs per MWh until 31 May 2028[241]; however, as will be seen in section 4.A *infra*, two of these GCs were deferred;

- ANRE issued the establishment permit for the Alpha PV Facility on 27 February 2013 and the operating license on 2 August 2013[242]; on this latter date, ANRE granted the Alpha Project Company its final accreditation for six GCs per MWh of RES-E until 19 June 2028[243]; again, as will be explained in section 4.A *infra*, two of these GCs were deferred;

- ANRE issued the establishment permit for the Beta PV Facility on 14 August 2013[244] and the operating license on 25 September 2013[245]; two days later, Beta obtained its accreditation for six GCs per MWh until 27 September 2028[246]; again, two of these GCs were deferred;

- ANRE issued the establishment permit for the Gamma PV Facility on 11 September 2013 and the operating license on 20 December 2013[247]; on that same day, ANRE issued the final accreditation for the Gamma Project Company, giving it the right to obtain six GCs per MWh until 27 September 2028[248], again with deferral of two of these GCs.

**4.    2013-2014 MEASURES**

*Pro memoria*

181. By late 2012, the Romanian GC support scheme had the following characteristics:

- New Generators of RES-E could qualify until the end of 2016 for the GC support scheme, from which they would benefit for 15 years;

- Solar PV plants accredited prior to 2014 were entitled to receive six GCs per MWh;

- Suppliers of electricity were obligated to purchase annually a number of GCs; the penalty for failing to meet the Acquisition Quota amounted to EUR 110 per unpurchased GC;

- Generators and suppliers of electricity could trade GCs on the GC market or through bilateral contracts (also known as GCPAs); GCs had a validity of 16 months, after which they could no longer be traded; and

---

[241] **Doc. C-216**; **Doc. C-217**. See also **Theuer I**, para. 33.
[242] **Doc. C-223**.
[243] **Doc. C-224**; **Lipkovich I**, paras. 24-25.
[244] **Doc. C-229**.
[245] **Doc. C-230**.
[246] **Doc. C-231**; **Lipkovich I**, paras. 24, 26.
[247] **Doc. C-233**.
[248] **Doc. C-234**; **Lipkovich I**, paras. 24, 26.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- Although the prices of GCs fluctuated according to market competition, they could not fall below EUR 27/GC or rise above EUR 55/GC, indexed annually to European inflation.

182.  While, in 2011, Romania had no installed PV capacity[249], by 2013, it had approximately 1,100 MW of capacity in the pipeline (1,341% higher than projected in Romania's NREAP)[250], and was well placed to meet its 2020 target of a 43% share of RES in the total electricity consumption (defined in its NREAP[251]), by as early as 2015[252].

### Rumors of changes to the GC support scheme

183.  In late 2012 and early 2013, rumors started to circulate among RES-E Generators that Romania might enact changes to the GC support scheme, through a potential new amendment of Law 220/2008[253].

184.  Preoccupied with these rumors, the Romanian Photovoltaic Industry Association held a meeting with the Deputy Minister of Energy[254] in February 2013. According to a report prepared by this Association after the meeting, the Deputy Minister explained that it was necessary to adjust the GC scheme in order to "rebalance the ratio between the RES-E producers and consumers" and due to complaints "from the large industrial consumers regarding the increased price of electricity" caused by the impact of the GCs[255]. However, the Association noted that the Ministry had explained that[256]:

> - eventual amendment to the Law 220/2008 will not be *retroactive*;
>
> - necessity to find a way to ensure the functionality of all electricity production facilities irrespective of the source;
>
> - eventual readjustment should be done in order to ensure sustainability of the support scheme;
>
> - rules should not be changed during the *game*;
>
> - the manner in which the readjustment should be done, not established yet.

185.  The rumors were officially confirmed when, in March 2013, the Deputy Minister of Energy formally announced a future change to the GC law[257]. According to the Deputy Minister, Romania was caught in an impasse, having to consider, on the one hand, the concerns of domestic and industrial consumers with higher electricity prices and, on the other, those of investors who had risked and invested in RES-E[258].

---

[249] **Doc. C-311**, p. 13.
[250] C-I, para. 12; **Flores I**, Figure 6; **Doc. C-64**, p. 197.
[251] **Doc. C-64**, Tables 3.2 and 3.5, p. 28.
[252] **Doc. FR-103**, Table and Figure 19 prepared by Dr. Fabien Roques.
[253] **Doc. C-177**; **Doc. C-178**; **Theuer I**, para. 27; **Hofmann**, para. 38; **Lim**, para. 24; **Tahan**, para. 9.
[254] At the time, the Minister of Energy was still a branch of the Ministry of Economy (C-I, para. 217).
[255] **Doc. C-177**, p. 1.
[256] **Doc. C-177**, p. 1.
[257] **Doc. C-179**, p. 1.
[258] **Doc. C-179**, p. 1; **Doc. C-183**, p. 2.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

The ANRE Overcompensation Report

186. On 29 March 2013, ANRE published a report "on the overcompensation analysis of the green certificates support system for renewable energy sources for the year 2012" [the "**Overcompensation Report**"][259]. ANRE had performed a cost-benefit analysis at the aggregated level for different types of RES-E technology and had reached the conclusion that there was an overcompensation in the number of GCs for wind, PV, and small hydro facilities. For solar PV plants ANRE estimated that Generators were being overcompensated by obtaining three GCs per MWh in excess[260].

A.  **First attempt to control the cost of the GC scheme for consumers: EGO 57/2013**

Draft EGO 57/2013

187. Only a few days later, on 2 April 2013, the Romanian Government issued a draft EGO pursuant to which Law 220/2008 would be amended and supplemented with the aim of[261]:

> "[…] stopping the effect of the uncontrolled growth of prices for final customers of electricity that can block also the investments in production of electricity from renewable sources and therefore making inapplicable the Law 220/2008, as well as to maintain predictable the legal framework for promoting electricity produced from renewable sources and to maintain the competitiveness of key energy-intensive sectors, elements aimed at the general public and being considered emergencies and extraordinary, the regulation of which can not be postponed […]." [Emphasis added]

188. Pursuant to this draft, from 1 July 2013 to 30 June 2016 a certain number of GCs issued per MWh would be "temporarily postponed" – *i.e.*, the number of GCs would be temporarily reduced – depending on the type of RES-E technology. For instance, solar Generators would see two out of their six GCs deferred[262]. The recovery of the deferred GCs would be done gradually, following a methodology which was to be defined in a GD upon ANRE's proposal[263].

189. On that same day, the Romanian Deputy Minister of Energy was quoted by the media explaining that[264]:

> "The scheme will return on its course starting 2017. The investor has some revenues (from green certificates) that will not be generated now, but from 2017," said Nita, quoted by

and

---

[259] **Doc. C-182/R-9**.
[260] **Doc. C-182/R-9**.
[261] **Doc. C-185**.
[262] **Doc. C-185**, Art. I(2).
[263] **Doc. C-185**, Art. I(2). See also **Doc. C-186**.
[264] **Doc. FR-48**.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

> "Romania's support scheme is the most generous, but we can't make everyone happy, we can't risk an exit of large industrial producers from Romania," said Nita, quoted by Mediafax newswire.

EGO 57/2013

190. Despite protests by various actors in the renewable energy sector, including the Romanian Photovoltaic Industry Association[265], on 4 June 2013, the Romanian Government formally issued EGO no. 57/2013 ["**EGO 57/2013**"][266].

191. In the recitals the Government explained that it adopted this EGO[267]:

> "[…] to cease the effect of uncontrolled growth of prices for end consumers of energy, which may result into a blockage of investments in the production of energy from renewable sources field and, implicitly, the inapplicability of provisions of Law no. 220/2008, as republished, with subsequent amendments and supplementing, as well as to maintain the predictability of the legislative background concerning the promotion of energy from renewable energy sources, as well as to maintain the competitivity of main economic sectors that are great energy consumers, whereas not taking any immediate measures would have irreversible consequences on the competitiveness of industrial products and would result into the relocation outside Romania of large production units, would result into price increases over the estimated index, into social consequences by the sudden growth of energy price invoiced above bearable limits, into the overcompensation of producers of energy from renewable resources in contradiction with the decision for the approval of the state aid scheme, would influence the operational safety of the national energy system and would influence the estimated budget allotted for the implementation of the support scheme and resources intended for the operation of the support scheme, thus resulting into the blocking of investments in this area, aspects that refer to the general public interest and that are considered emergency and extraordinary situations, whose regulation cannot be delayed, according to art. 115 par. (4) of the Constitution of Romania, as republished, the Government of Romania adopts this emergency ordinance." [Emphasis added]

192. Claimants in this arbitration recognize that the measure was not as harmful as they, and other investors, initially feared[268]. Yet, EGO 57/2013 introduced some significant modifications to Law 220/2008:

193. First, as already announced in the draft EGO, Romania deferred the issuance of two out of the six GCs per MWh awarded to PV plants between 1 July 2013 and 31 March 2017 (instead of 2016, as provided in the draft EGO), to decrease the expected GC revenue of PV plants[269]. These deferred GCs were expected to be recovered gradually by PV facilities between 1 April 2017 and 31 December 2020,

---

[265] **Doc. C-183**, p. 2; **Doc. C-187**; **Doc. C-192**; **Doc. C-193**; **Doc. C-194**; **Doc. C-195**.
[266] **Doc. C-196**.
[267] **Doc. C-196**, p. 1.
[268] C-I, para. 225; **Tahan**, para. 14.
[269] **Doc. C-196**, Art. I(3). See also **Roques I**, para. 6.28.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 55 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

at the latest[270]. This measure would apply to any PV plants accredited by ANRE after the enactment of the EGO – *i.e.*, after 4 June 2013[271].

194. <u>Second</u>, for PV plants above 5 MW (which was the case of all of Claimants' plants), the issuance of GCs for electricity beyond the projection that Generators made to the grid operator in the day-ahead hourly forecast was prohibited[272]. This meant that if the Generators' actual production was higher than predicted, Generators would receive only the projected number of GCs. Claimants say that this rule provoked additional balancing costs[273].

195. <u>Third</u>, EGO 57/2013 provided that GCs could only be traded between Generators of RES-E and electricity suppliers on the centralized market managed by OPCOM[274] – thus casting doubts on the validity of GCPAs entered into between Generators and energy traders.

196. <u>Lastly</u>, EGO 57/2013 proposed to exempt a percentage (to be defined) of the electricity consumed by energy-intensive users ["**EIUs**"] from the support scheme. However, this exemption was conditioned on the approval of the Commission[275].

197. These changes to the GC scheme were met with significant dissatisfaction by renewable energy Generators, who submitted several complaints to the Commission throughout 2013 and 2014[276].

198. *Pro memoria*: All of Claimants' PV Facilities received their accreditations from ANRE on or after 21 June 2013, *i.e.*, <u>after</u> the Government passed EGO 57/2013.

199. Although ANRE's accreditations granted Claimants' PV Facilities six GCs per MWh of RES-E, two of these GCs were automatically deferred in accordance with EGO 57/2013[277]. According to Claimants, this measure reduced the cash flows that their PV facilities were expected to receive[278].

GD 994/2013

200. In December 2013, the Romanian Government passed GD 994/2013 pursuant to which it decreased the number of GCs for new PV plants from six to three, starting on 1 January 2014[279] – a possibility already envisaged by Law 134/2012. According to ANRE, the goal of this measure was "to avoid overcompensation"[280].

---

[270] **Doc. C-196**, Art. I(3).
[271] **Doc. C-196**, Art. I(13)(3).
[272] **Doc. C-196**, Art. I(1). See also **Doc. C-197**, Art. 3(6)(f).
[273] C-I, para. 227.
[274] **Doc. C-196**, Art. I(7)(9).
[275] **Doc. C-196**, Art. I(7)(8).
[276] **Doc. C-265**, para. 3.
[277] See C-I, paras. 234, 237, 245, 246.
[278] **Lim**, para. 30; **Theuer I**, para. 30.
[279] **Doc. C-203**. As explained by Mr. Wynne Jones: "Such new plants were not subject to GC deferral; rather, they were not eligible to receive the same number of GCs as existing plants" (**Jones I**, para. 6.6).
[280] **Doc. C-78**, slide 15.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 56 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

201. This measure, however, did not affect Claimants, since their PV Facilities had all been accredited before the end of 2013.

### B.    The approval of EGO 57/2013: Law 23/2014

202. On 14 March 2014, the Romanian Parliament enacted Law No. 23/2014 ["**Law 23/2014**"], approving EGO 57/2013 with certain amendments[281]. In its statement of reasons, the Parliament declared that it was faced with an "extraordinary" and "emergency" situation, caused, in part, by the "uncontrolled increase in prices for end consumers of energy"[282]:

> "Considering the effect of uncontrolled increase in prices for end consumers of energy, the assumptions concerning the exceeding in 2013 of connection and balancing of the national energy system capacities, the negative impact on the competitivity in the industrial sector and the overlapping of price increases with cumulated effects over the energy price liberalization calendar, the taking of measures to maintain the predictability of the legal framework concerning the promotion of energy from renewable sources is an extraordinary situation whose regulation cannot be delayed.
>
> The emergency situation consists in the existing problems related to the over-compensation of producers that benefit from the support scheme and the creation of a competitive undue advantage as well as signals related to the impossibility of the energy-intensive industry to bear any additional increases in the electricity price. Moreover, the emergency situation is imposed by the need of a preventive action, as the accreditation of new units from renewable sources influences the price and the connection capacities which will be cumulated for the next 10-15 years." [Emphasis added]

203. The Romanian Parliament went further than EGO 57/2013:

204. First, Law 23/2014 introduced a new methodology for setting the GC Annual Mandatory Quotas (*i.e.*, the maximum share of RES-E in the gross electricity consumption eligible to benefit from the GC scheme). *Pro memoria*, Law 139/2010 had defined the following Annual Mandatory Quotas[283]:

| | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Law 139/2010 | 8.3% | 10% | 12% | 14% | 15% | 16% | 17% | 18% | 19% | 19.5% | 20% |

205. Law 23/2014 departed from these targets and established that starting in 2014, the Annual Mandatory Quotas would be set each year by the Government, upon ANRE's proposal. The maximum share of RES-E eligible to benefit from the GC scheme would henceforth depend on the achievement of Romania's RES targets under EU law and "on the impact on the end consumer"[284]:

---

[281] **Doc. C-238**. See also **Jones I**, para. 6.1.a.
[282] **Doc. C-240**.
[283] **Doc. C-89**, Art. I, para. 15(4)(4). See also **Doc. C-63**, Table 3, p. 6.
[284] **Doc. C-238**, Art. I(3)(1³)(4¹).

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 57 of 299

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

> "Starting with 2014, ANRE monitors each year annual quota of energy produced from renewable energy sources that benefits from the promotion systems through green certificates and, <u>depending on the achievement degree of the national target and on the impact on the end consumer</u>, estimates, publishes on its own website and informs the Government by 30 June of the current year about the <u>level of the mandatory annual quota of energy produced from renewable energy sources that benefits from the promotion systems through green certificates for the next year.</u>" [Emphasis added]

206. <u>Second</u>, Law 23/2014 reduced the GC validity, from 16 to 12 months from their date of issuance by Transelectrica[285]. Thus, after one year any untraded GCs would lose their validity.

207. <u>Third</u>, Law 23/2014 repealed the measures adopted in Law 134/2012 for the establishment of a Guarantee Fund managed by OPCOM that would buy any GCs that failed to be bought by electricity suppliers[286]. Any GCs unsold within 12 months would thus automatically lose their validity.

<u>ANRE information note</u>

208. Three days after the adoption of Law 23/2014 ANRE published an information note with its calculation of the Annual Mandatory Quota (the maximum share of RES-E of the gross final electricity consumption eligible to benefit from the GC scheme)[287]. For 2014, ANRE proposed to set the Annual Mandatory Quota at 11.1% (instead of the 15% initially defined by Law 139/2010) since[288]:

- The most recent progress report to the EU on the achievement of the binding RES targets showed that Romania had exceeded its national objectives (in 2010 Romania had almost achieved the national target undertaken for 2020 of 24% of RES in its final gross consumption of energy); and

- This would maintain the impact of GCs in the end consumer's invoice at the level registered in the second semester of 2013, *i.e.*, approximately RON 35/MWh (approximately EUR 7.9/MWh).

<u>GD 224/2014</u>

209. On 28 March 2014, the Romanian Government passed GD 224/2014, in which it confirmed that the Annual Mandatory Quota for 2014 was set at 11.1%[289].

C. **Exemption of energy-intensive users**

210. Since 2013, EIUs had declared their dissatisfaction with the costs of the Romanian GC support scheme. In November 2013, the Association of Big Industrial Energy Consumers had claimed that the amount paid by EIUs in eco-taxes was threatening

---

[285] **Doc. C-238**, Art. I(8)(5¹)(9).
[286] **Doc. C-238**, Art. I(12).
[287] **Doc. FR-51b**.
[288] **Doc. FR-51b**; **Roques I**, para. 6.16; **Jones I**, para. 6.8.
[289] **Doc. C-253**.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 58 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

the future of local industry[290]. This had led the Romanian Government to adopt EGO 57/2013 and the Parliament to enact Law 23/2014 – which specifically provided for a partial exemption (with contours yet to be defined) of EIUs from the GC scheme.

211. In March 2014, Alro Steel – one of Romania's biggest electricity consumers – voiced its difficulty to "survive" on the Romanian market if the Government did not reduce the level of ecotaxes payable by EIUs[291]. This was echoed by ArcelorMittal, who threatened to abandon Romania[292].

GD 495/2014

212. Faced with these pressures, on 11 June 2014, the Government adopted its Decision no. 495/2014 ["**GD 495/2014**"] to "create a State aid scheme" partially exempting EIUs from the GC support scheme[293]. In early July 2014, Romania submitted its planned aid scheme to the approval of the Commission[294].

EC's approval of State aid

213. In its submission to the EU, Romania explained that the State aid measure would benefit around 300 EIUs, who mainly produced energy-intensive goods (*e.g.*, ferrous and non-ferrous metal producers, paper industries, chemical industry, cement producers, etc.)[295]. These accounted for approximately 20% of Romania's gross final consumption of electricity and were the largest generators of jobs in the country, providing directly approximately 760,000 jobs and indirectly approximately 1,500,000[296]. Consequently, Romania argued, the relocation of these EIUs to another country would have a significantly adverse impact on its economy[297].

214. The partial exemption implied that, until the end of 2024, when calculating the Acquisition Quota, a part of the electricity supplied to EIUs would be excluded (under ANRE Order 45/2011 the Quota was calculated as the ratio between the total number of GCs estimated for a given year and the estimated final electricity consumption)[298]. The EIUs benefitting from the exemption would only have to pay (*i.e.*, cover the cost of) the GCs for a small percentage of their electricity consumption, depending on their electro-intensity, namely[299]:

-    15% in the case of electro-intensities greater than 20%,

---

[290] **Doc. C-245**.
[291] **Doc. C-246** and **Doc. C-247**.
[292] **Doc. C-244**, p. 213.
[293] **Doc. C-243**.
[294] **Doc. C-248**, para. 1.
[295] **Doc. C-248**, paras. 45-46. See also **Doc. C-249**.
[296] **Doc. C-248**, paras. 10-11. See also **Doc. C-249**.
[297] **Doc. C-248**, para. 11.
[298] **Doc. C-248**, paras. 13 and 29.
[299] **Doc. C-248**, para. 18. See also **Doc. C-249**.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- 40% in the case of an electro-intensity between 10%-20%, and

- 60% in the case of an electro-intensity between 5%-10%.

215. In other words, EIUs would be exempted from the payment of GCs corresponding to 85%, 60% or 40% of the electricity they consumed, depending on the intensity of their electric consumption[300].

216. In October 2014, the EC approved the partial exemption for EIUs, finding the State aid measure compatible with the internal market[301]. This exemption applied to approximately nine TW per year (out of a total electricity consumption of approximately 50 TW per year)[302].

217. Claimants argue in this arbitration that the cost of this exemption was neither borne by the State budget nor by other end-consumers – rather, it fell entirely on the shoulders of renewable energy producers[303].

### D.    New methodology for calculating Acquisition Quotas

218. On 26 June 2014, ANRE issued its Order No. 49/2014, defining a new methodology for setting the Acquisition Quotas for electricity suppliers[304] (modifying the initial methodology set out in ANRE Order 45/2011[305]). This new methodology was further amended by ANRE's Order No. 144/2014[306].

### 5.    2015-2016: SCRUTINY OF THE 2013-2014 MEASURES

### A.    Report of the Romanian Court of Accounts

219. In early 2015, the Romanian Court of Accounts issued an audit report which analyzed the Romanian electricity market between 2010 and 2014. The Court of Accounts noted that there was a growing number of unpurchased GCs – the outstanding amount had exponentially increased from 406 GCs in 2010 to 76,552 GCs in 2014[307].

220. The Court observed that, although the Environment Fund Administration had issued invoices to collect penalties for the unpurchased GCs in the amount of RON 57,040,000, only RON 2,181,000 had been recovered. This led the Court of Accounts to conclude that the Environment Fund Administration had[308]:

---

[300] **Doc. C-248**, para. 19.
[301] **Doc. C-248**, p. 14.
[302] **Doc. C-248**, paras. 14, 31; **CD-1**, slide 121.
[303] C-I, para. 266; **CD-1**, slide 121.
[304] **Doc. C-250**.
[305] See **Roques I**, para. 6.15; **Jones I**, para. 6.9.
[306] **Doc. C-251**. See also **Doc. C-265**, para. 20.
[307] **Doc. C-261**.
[308] **Doc. C-261**.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 60 of 299

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

"[…] <u>not pursued with celerity the collection of the revenues</u> representing the equivalent value of the unpurchased green certificates, thus registering a <u>low degree of collection of these revenues, of only 3.82%</u>." [Emphasis added]

### B.    EU Commission's decision of May 2015

221.    By 2015, Romania had 514 solar PV plants and a total of 698 RES-E Generators[309]. RES-E power plants benefitting from the GC support scheme accounted for approximately 14% of the total electricity produced (8.18 TWh)[310]. But many of these Generators were disillusioned by the changes introduced by Romania to its GC scheme and voiced their concerns to the Commission[311].

222.    On 4 May 2015, the EC issued a decision regarding the changes introduced by Romania to its GC scheme in 2014[312] (except for the changes concerning the EIUs, which were the object of a separate decision). The Commission noted that[313]:

> Romania provided a table with all the amendments done to the law since 2011 and for each amendment their opinion on whether it affects the support scheme or not. In the view of the Romanian authorities some amendments can be clearly considered administrative changes. For the rest of the amendments introduced in 2013, Romania considered they needed to be notified, as tightening of criteria for granting the support.

223.    The Commission recognized that the amendments enacted by Romania did indeed "tighten the criteria for granting the support" and found that "their effect can be the reduction of the support for the producers" of RES-E[314].

224.    The Commission further acknowledged that for most types of RES technologies the amendments would have "a negative impact on the [IRR] of the beneficiaries"[315]. As far as solar PV plants were concerned, the IRR was no longer 11.6% as initially forecasted, but rather 8.3%[316].

225.    However, despite manifesting its disappointment with the fact that Romania had put the amendments to its GC scheme into effect prior to the Commission's final decision, the Commission ultimately decided "not to raise objections to the aid on the grounds that it is compatible with the internal market"[317].

---

[309] **Doc. C-78**, slide 12.
[310] **Doc. C-78**, slide 13.
[311] **Doc. C-265**, para. 3
[312] **Doc. C-265**.
[313] **Doc. C-265**, para. 22.
[314] **Doc. C-265**, para. 26.
[315] **Doc. C-265**, para. 29.
[316] **Doc. C-265**, Table 1, p. 7.
[317] **Doc. C-265**, p. 20.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

## C.    **Complaints by civil society**

Complaints by RES-E Generators

226.  In November 2015, several Romanian renewable energy associations, including the Romanian Photovoltaic Industry Association, wrote a letter to the Vice-President of the European Commission for Energy Union asking for the Commission's support. These associations asked the Commission to back an amendment to the Romanian GC support scheme, to guarantee that RES-E investors would not lose further value of their investments. These associations warned that[318]:

> "[…] the practice of the Romanian authorities will bring the renewable sector into financial collapse.
>
> Now the financial collapse is evident and a recent study (executive summary attached to this letter) done for the Romanian Wind Energy Association by Ernst & Young using publicly available financial data shows that the wind producers have lost in 2014 about half a billion EUR, and the industry expects that this figure will rise in 2015 and 2016 if no corrective actions to the legislation will be implemented. The same financial situation characterizes the results of other technologies present in Romania, which are all actually today losing money, in total contradiction with the IRR figure communicated in November 2014 by the Romanian Authorities […]."

Ambassadors' letter

227.  In September 2016, the Ambassadors of Austria, Denmark, France, Germany, Italy, and Spain to Romania wrote a letter to the Romanian Prime Minister expressing their concern regarding the changes to the RES support scheme[319].

228.  The Ambassadors warned that the measures adopted by Romania were making the GC market ever less attractive and would likely bring about defaults and bankruptcies, putting in jeopardy investments of several billion euros[320]. Therefore, the Ambassadors encouraged Romania to reach a balanced solution with foreign companies, in a way that could preserve its "international reputation […] as an attractive country for foreign investments"[321].

GD 1015/2015

229.  By the end of 2015, the Romanian Government set the Annual Mandatory Quota at 12.1% of the final gross energy consumption for 2016[322] (again a small increase with regard to the previous year, but well below the 17% defined under Law 139/2010).

---

[318] **Doc. C-263**.
[319] **Doc. C-269**.
[320] **Doc. C-269**.
[321] **Doc. C-269**, p. 2.
[322] **Doc. C-255**.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)

Decision on Jurisdiction, Liability and Principles of Reparation

### D.    ECA Report of October 2016

230.  In October 2016, Economic Consulting Associates ["**ECA**"] – a consulting firm commissioned by the Romanian Ministry of Energy[323] – issued its final report on potential changes to the Romanian RES legislation ["**ECA Report**"][324]. After analyzing the initial GC scheme and its subsequent modifications, ECA reached the following conclusions[325]:

> "The GC scheme began with a probably over-generous payout to generators, based on expectations of high IRRs, likely compounded by higher wholesale market price expectations. This led to high generator expectations and rapid investment. This inevitably had a cost to be borne by consumers.
>
> Subsequent policy adjustments to reduce the impact on consumers had the effect of negatively impacting generator cash flows, with an additional adverse effect of many certificates being unsaleable, because demand had reduced faster than supply."

231.  Asked to propose alternative policy solutions, ECA found that[326]:

> "In terms of policy measures, this means playing off reasonable expectations of generators against reasonable cost expectations of consumers. The negative cash flows faced by generators generally in recent years (which is unevenly split with some generators facing a disp[rop]ortionate share of unsold GCs and so a much worse income than others) will almost certainly have to be alleviated to the extent that policy changes against their reasonable expectations were instituted, but this can only be done at the expense of consumers (or taxpayers).
>
> The most likely policy combinations will see improved cash flow for generators, but at a reduced return as compared to initial expectations; for consumers it would be through delaying payments into later years. To achieve positive but steady cash flows requires a combination of increasing the quota and either forced banking of certificates (through deferred trading of them) or voluntary banking by extending the tradable life of certificates. The "targeted obligation" methodology in combination with extended reinsertion of deferred GCs indicates positive cash flows are just about achieved from 2017 or 2018 for all technology and year-of-accreditation groups with the exception of wind plant accredited in 2014 and 2015 (comprising under 12% of wind capacity). Even this case, however, requires a substantial increase in the impact of the GC scheme as a proportion of consumer bills, peaking at over 11% in 2017, while real MIRRs for many technology-year groups remain under 4.5%.
>
> Should such an impact on consumers be deemed unacceptable then a similar approach could be adopted but a reduced minimum price of certificates added to the mix. […]"

---

[323] **Jones I**, para. 6.102.
[324] **Doc. C-284**.
[325] **Doc. C-284**, p. 85.
[326] **Doc. C-284**, pp. 85-86.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 63 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Target for 2017

232. In November 2016, ANRE recognized that the measures adopted by Romania to avoid overcompensation had reduced investors' interest in RES-E and had led to an oversupply of GCs[327].

233. Nevertheless, by the end of 2016, the Romanian Government reduced the Annual Mandatory Quota for 2017 to 8.3%[328] from 12.1% in 2015, and again well below the 18% threshold provided for under Law 139/2010. In a June 2016 report to the Government, ANRE had alerted that such a reduction of the Quota might prevent Romania from reaching the target of 24% of RES in the gross final energy consumption for 2020 and might also contribute to the insolvency of several RES-E producers[329]:

> "However, ANRE mentions that, by setting the E-RES mandatory quota benefitting from the promotion system through green certificates to 8.3%, […] it risks not contributing to reaching the national target in 2020 of 24% energy from renewable sources in the gross final energy consumption, as result of the possible decrease of E-RES producers' gains and, therefore, to enhance the risk of insolvency thereof."

234. Notwithstanding ANRE's warning, the Government set the Annual Quota for 2017 at 8.3% (which in fact was ANRE's proposal).

## 6. **2017-2018 MEASURES**

### A. **EGO 24/2017**

235. Faced with the conclusions of the ECA Report[330], in March 2017, the Romanian Government passed EGO No. 24/2017[331] ["**EGO 24/2017**"], the first of the second set of measures which are the object of the present arbitration.

236. In its statement of reasons, the Government declared that it wished to ensure "the stability of the business environment, and maintain and pursue the development of investments in the field of renewable energy production in Romania"[332]; that said, EGO 24/2017 introduced some additional amendments to Law 220/2008[333].

237. <u>First</u>, the Government extended the GC deferral period for solar PV plants accredited before 31 December 2013 (*i.e.*, all of Claimants' PV Facilities) until 31 December 2024 (initially, the deferral period was meant to last only until 2017)[334]. This meant that solar PV plants would continue to receive only four (and not six, as originally provided for) GCs per MWh until the end of 2024. The

---

[327] **Doc. C-78**, slide 15.
[328] **Doc. C-256**.
[329] **Doc. C-252**.
[330] **Jones I**, para. 6.102.
[331] **Doc. C-270**.
[332] **Doc. C-271**.
[333] See **Doc. C-272**; **Jones I**, para. 6.104.
[334] **Doc. C-270**, Art. I(11)(2$^5$).

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 64 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

deferred GCs would be recovered from 1 January 2025 until 31 December 2030, in equal monthly instalments[335].

238. <u>Second</u>, the Government again modified the methodology for calculating the Acquisition Quotas for electricity suppliers. The annual Acquisition Quota was now to be set on the basis of[336]:

- A fixed quantity of GCs, equal to the aggregate number of GCs estimated to be issued until the end of the GC scheme, divided by the number of years remaining until 2031; and

- A maximum cost for consumers of EUR 11.1/MWh.

239. The Government set the GC demand for 2017-2018 at 14,910,140 GCs[337].

240. <u>Third</u>, EGO 24/2017 altered the minimum and maximum prices at which GCs could be traded until 2032: EUR 29.4/GC and EUR 35/GC, respectively[338] (*pro memoria*, under Law 139/2010, Romania had set the GC minimum and maximum prices at EUR 27/GC and EUR 55/GC, respectively, until 2025). These prices also ceased to be indexed to European inflation.

241. <u>Fourth</u>, EGO 24/2017 lowered the penalty to be paid by electricity suppliers who failed to meet their Acquisition Quotas, from EUR 110 to EUR 70 per unpurchased GC[339].

242. <u>Lastly</u>, the Government confirmed that GCs could only be traded between the Generator, as seller, and the electricity supplier, as purchaser[340]. Additionally, the Government restricted the sale of GCs to the regulated OPCOM market by deciding that[341]:

- GCPAs concluded after the entry into force of EGO 24/2017 would only have a maximum validity until 31 August 2017;

- GCPAs concluded before the entry into force of EGO 24/2017 would produce effects until their expiry but could not be renewed; and

- After the entry into force of EGO 24/2017, it would be forbidden to sign addenda to existent GCPAs to increase the number of traded GCs.

---

[335] **Doc. C-270**, Art. I(11)(2[6]).
[336] **Doc. C-270**, Art. I(8).
[337] **Doc. C-270**, Art. VII.
[338] **Doc. C-270**, Art. XIII.
[339] **Doc. C-270**, Art. XVII.
[340] **Doc. C-270**, Arts. I(18)(5) and XII.
[341] **Doc. C-270**, Arts. X and XI.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 65 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

243. <u>Finally</u>, the Government decided to extend the validity of GCs issued after 2017 until 31 March 2032 (reversing the previous decision by Parliament, which in Law 23/2014 had reduced the validity period of GCs to 12 months)[342].

### B.   **Claimants' notification of dispute and request for arbitration**

244. As a result of these latest measures, on 28 August 2017, each of the Claimants notified Romania of a legal dispute arising out of the ECT and offered to amicably settle this dispute[343]. There is no evidence in this arbitration that Romania ever responded to Claimants' offer – and, in any case, no resolution was achieved[344].

245. Therefore, on 23 May 2018, Claimants filed a request for arbitration against Romania, arguing that the measures adopted by Romania starting in 2014 severely impacted the profitability of Claimants' investments, by directly and indirectly reducing the demand for the sale of GCs and artificially driving down GC prices[345]. Claimants added, referring to the 2017 measures, that[346]:

> "As a result of these recently adopted measures, the GC market for renewable energy producers has become even more moribund and artificially depressed, and it will remain so in years to come. The consequence is that the value of Claimants' investments in Romania has been substantially destroyed."

### C.   **Law 184/2018**

246. While this arbitration was already ongoing, the Romanian Parliament enacted Law No. 184/2018 ["**Law 184/2018**"], approving EGO 24/2017, but introducing certain amendments[347].

247. <u>First</u>, the Parliament decided that two out of six GCs granted to solar PV plants would continue to be deferred, but only until 31 December 2020[348] – and no longer until the end of 2024, as envisaged in EGO 24/2017.

248. <u>Second</u>, Law 184/2018 repealed the measure adopted in 2013 which provided that no GCs would be granted to the quantity of electricity sold as a positive imbalance[349] (*i.e.*, electricity sold in excess of the hourly quantities notified to Transelectrica on the day-ahead market[350]). Thus, starting in August 2018, each RES-E MWh produced by an eligible plant received the corresponding number of GCs[351].

---

[342] **Doc. C-270**, Arts. I(3)(3³)(b) and IX.
[343] **Doc. C-21**; **Doc. C-22**; **Doc. C-23**; **Doc. C-24**.
[344] Request for Arbitration, para. 61.
[345] C-I, paras. 15, 291.
[346] Request for Arbitration, para. 44.
[347] **Doc. C-199/R-19**.
[348] **Doc. R-19**, Art. I(9).
[349] **Doc. C-199/R-19**, Art. I(5).
[350] **Roques I**, para. 6.34.
[351] **Roques I**, para. 6.35.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

249. Third, the Parliament introduced a new methodology for calculating the Acquisition Quotas, based on the final electricity consumption in the previous year and a predetermined maximum annual average consumer impact, which could not be exceeded[352]:

- EUR 11.7/MWh in 2018;

- EUR 12.5/MWh in 2019;

- EUR 13/MWh in 2021 and 2021; and

- EUR 14.5/MWh from 2022 onwards.

250. Lastly, Law 184/2018 required electricity suppliers to purchase at least 50% of their mandatory Acquisition Quota on the OPCOM-operated GC spot market[353].

ANRE Order 157/2018

251. Accordingly, on 27 July 2018, ANRE once again updated its methodology for establishing the Acquisition Quotas[354].

**D. EGO 114/2018**

252. Claimants take issue with a final measure adopted by Romania after the start of this arbitration: EGO 114/2018[355].

253. The ANRE generally charges an annual monetary contribution to economic operators that carry out activities in the electrical, thermal power, and natural gas sectors. In line with previous years, on 20 December 2018, the ANRE set the contribution of license holders at 0.1% of their turnover[356].

254. However, on 28 December 2018, the Romanian Government passed EGO 114/2018, increasing this contribution: RES-E Generators became obliged to pay 2% of their turnover to cover for the regulator's budget[357].

---

[352] **Doc. C-199/R-19**, Art. I(8).
[353] **Doc. C-199/R-19**, Art. I(14).
[354] **Doc. WJ-55**.
[355] See C-I, para. 290; C-PHB, para. 173.
[356] **Doc. C-277**.
[357] **Doc. C-274**.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

# IV.  REQUEST FOR RELIEF

255.  In the following sections, the Tribunal reproduces the Parties' prayers for relief as set out in their main Written Submissions.

**1.  CLAIMANTS' REQUEST FOR RELIEF**

256.  In their Memorial, Reply, Rejoinder on Jurisdiction, and Post-Hearing Brief Claimants request the following relief[358]:

> "a. a declaration that the Tribunal has jurisdiction under the ICSID Convention and the Energy Charter Treaty;
>
> b. a declaration that Romania has violated the Energy Charter Treaty and international law with respect to Claimants' investments;
>
> c. compensation to Claimants for all damages they have suffered, as set forth in Claimants' submissions and as may be further developed and quantified in the course of this proceeding;
>
> d. all costs of this proceeding, including (but not limited to) Claimants' attorneys' fees and expenses, the fees and expenses of Claimants' experts, and the fees and expenses of the Tribunal and ICSID;
>
> e. pre-award and post-award compound interest at the highest lawful rate from the Date of Assessment until Romania's full and final satisfaction of the Award (including any Award on costs); and
>
> f. any other relief the Tribunal deems just and proper."

**2.  RESPONDENT'S REQUEST FOR RELIEF**

257.  In its Rejoinder and Post-Hearing Brief, Respondent requests that the Tribunal[359]:

> "i. Hold that it lacks jurisdiction over the present dispute or, in the alternative, hold that Claimants' claims are inadmissible, and dismiss all of Claimants' claims in their entirety;
>
> ii. In the event that it finds that it has jurisdiction over the present dispute, hold that it lacks jurisdiction over the two Claimants, Anina Pro Invest Ltd and Giust Ltd, and dismiss the claims of Anina Pro Invest Ltd and Giust Ltd on this basis;

---

[358] C-II, para. 702; C-III, para. 259; C-PHB, para. 315. Claimants' request for relief in the Memorial is practically identical, save for minor wording differences (see C-I, para. 415).

[359] R-PHB, para. 444. See also R-II, para. 1113 and R-I, para. 1159. Respondent's request for relief in the Rejoinder is practically identical to that of the Post-Hearing Brief, save for minor wording differences. Respondent's prayers for relief in the Counter-Memorial are identical to the ones of the Rejoinder save for two requests regarding damages.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

iii. In the event that the Tribunal finds that it has jurisdiction over the present dispute, hold that Romania has not breached its obligations under the ECT and dismiss all of Claimants' claims in their entirety on this basis;

iv. In the event that the Tribunal finds that Romania has breached its obligations under the ECT, reject Claimants' damage claims for alleged lost profits in their entirety;

v. In the event that the Tribunal were to consider awarding damages for alleged lost profits to Claimants using the DCF method, reject the DCF calculations proposed by Claimants and adopt the corrected DCF calculation proposed by Romania, which further confirms that no damages are due;

vi. In the event that the Tribunal awards any damages to Claimants, reject Claimants' interest claim, as formulated by Claimants, and award only post-award, simple interest at a risk-free rate;

vii. Order Claimants, jointly and severally, to pay all of Romania's costs and fees incurred in connection with this Arbitration, including, but not limited to, the Tribunal's fees and expenses, ICSID costs, experts' fees and expenses, witnesses' expenses, and attorneys' fees and expenses; and

viii. Grant any additional remedies to the benefit of Romania that the Tribunal may consider to be appropriate."

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

# V.    <u>JURISDICTIONAL OBJECTIONS</u>

258.  Claimants argue that pursuant to Art. 25 of the ICSID Convention and Art. 26 of the ECT there are five basic requirements for jurisdiction[360]:

-   Claimants must be covered "Investors" that are nationals or companies of a Contracting Party to the ECT and of a Contracting State to the ICSID Convention;

-   Respondent must be a "Contracting Party" to the ECT and a "Contracting State" to the ICSID Convention;

-   The dispute must arise directly out of a covered "Investment";

-   The dispute must be a legal dispute concerning an alleged breach of Part III of the ECT; and

-   The Parties must have consented to ICSID Convention arbitration.

259.  It is Claimants' position that these requirements are met in the present case, given that[361]:

-   Claimants are each a protected "Investor" of a Contracting Party to the ECT and a "National of another Contracting State" to the ICSID Convention;

-   Romania is a "Contracting Party" to the ECT and a "Contracting State" to the ICSID Convention;

-   Claimants own covered "Investments";

-   This is a legal dispute relating to Part III of the ECT; and

-   Claimants offered to settle this dispute amicably and the Parties consented to ICSID Convention arbitration.

260.  Respondent, on the other hand, challenges the Tribunal's jurisdiction on three grounds[362]:

-   <u>First</u>, Respondent argues that it has not given its consent to arbitrate the claims of all ten Claimants in one proceeding (**V.1.**);

-   <u>Second</u>, Respondent finds that the Tribunal lacks jurisdiction over two of the Claimants, Anina and Giust, since the ultimate shareholder of these Claimants is a Romanian national; thus, the jurisdictional requirements of the ECT and

---

[360] C-I, para. 23.
[361] C-I, paras. 24 *et seq*.
[362] R-I, paras. 4-7; R-II, paras. 5-12; R-PHB, para. 6.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

the ICSID Convention are not met with regards to these two Claimants (**V.2**); and

-    <u>Third</u>, Respondent submits that the arbitration clause of the ECT is inapplicable to the present intra-EU dispute (**V.3**).

261.    In the following sections, the Tribunal will examine Respondent's jurisdictional objections. For each of these objections, the Tribunal will start by summarizing Respondent's position, followed by Claimants' position, and finally make its decision.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

# V.1. <u>MULTIPLE CLAIMANTS OBJECTION</u>

1. <u>RESPONDENT'S POSITION</u>

262.   Romania submits that consent is the cornerstone of investment arbitration, and that Romania has not consented to arbitrate a collective action brought by multiple claimants under either the ICSID Convention or the ECT (**A.**). In any case, if express consent to arbitration with multiple claimants were found to exist, Romania argues that only claims by multiple claimants that constitute a single dispute may be brought against a respondent State (**B.**)[363].

## A.   <u>Romania never consented to arbitrate multiple claims with multiple claimants</u>

263.   Romania argues that consent to arbitrate, as the cornerstone of investment arbitration, must be "clear and unambiguous". Additionally, consent cannot be presumed, as it must be in writing[364]. Romania does not dispute that multi-party arbitration may take place. However, for this to happen, Respondent must have given its explicit consent in writing to that effect[365]. Indeed, most rules of arbitration permit multiple parties only if all the parties have clearly consented thereto, in a binding arbitration agreement[366].

264.   Romania therefore affirms that a State's consent to arbitration in a treaty must include explicit language expressly allowing multiple claimants to bring claims against it; otherwise, no collective arbitration can go forward. Thus, if the treaty contains no offer of multi-party arbitration, there is no acceptance of it and there can be no arbitration agreement with the necessary mutual consent to multi-party arbitration[367].

265.   It is Romania's position that it has never consented, either under the ICSID Convention or the ECT, to the adjudication of multiple claims brought by ten different Claimants in one single arbitration[368]. Romania contends that the texts of both the ICSID Convention and the ECT demonstrate that the scope of consent thereunder covers only disputes involving one investor and one respondent State. This is supported by the use of the singular throughout these texts, which must be given a meaning[369].

266.   According to Romania, interpreting the ICSID Convention and the ECT in accordance with Art. 31(1) of the Vienna Convention on the Law of Treaties requires taking into consideration the distinction made by signatory States when using the singular form of "investor", "party", "investment" or any other relevant

---

[363] R-II, para. 352; R-PHB, para. 36.
[364] R-II, paras. 353-355; R-PHB, para. 38.
[365] R-II, paras. 356-357.
[366] R-II, paras. 358-364.
[367] R-II, para. 366.
[368] R-PHB, para. 37.
[369] R-II, paras. 369-371; R-PHB, paras. 39-43.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)

Decision on Jurisdiction, Liability and Principles of Reparation

word[370]. Additionally, neither the ICSID Convention nor the ECT contain a provision that extends the singular to the plural[371].

**B.   If there were express consent, only cases involving a single dispute may proceed**

267.   Romania argues that if the Tribunal were to find that the ICSID Convention and the ECT provide express consent in writing to multi-party arbitration, then nonetheless only cases involving one single dispute may proceed[372]. Romania's argument rests on three elements:

268.   *One*, in the *Alemanni* case the tribunal found that only a "single dispute" may be brought by multiple claimants against a respondent State[373]. According to Respondent, the "single dispute" test is appropriate since a State, absent an agreement to that effect, may not be forced to defend itself with respect to several different disputes brought in one single arbitration[374]. Romania notes that the *Alemanni* test requires that the "interest represented on each side of the dispute" be identical in "all essential respects" "for all those involved on that side of the dispute"[375].

269.   *Two*, Art. 5 of the Resolution on Equality of Parties before International Investment Tribunals of the Institute of International Law ["**IIL Resolution**"] – which has persuasive value of doctrine[376] – provides that where several investors seek to institute their claims in a single proceeding against the same State, the tribunal must be satisfied that the claim as a whole advances a single dispute, and that the interest represented by the claimants is in all respects identical[377].

270.   *Three*, the *Abaclat* and *Ambiente Ufficio* tribunals have recognized that the multiple claims brought by claimants can only go forward if they meet the "identity or homogeneity requirement"[378].

\* \* \*

271.   Romania argues that Claimants' claims do not meet the *Alemanni* single dispute test nor the *Abaclat* homogeneity test[379]:

272.   <u>First</u>, Romania notes that Claimants' claims concern five different PV plants, located in different Romanian regions. These distinct plants have different outputs. This leads to different amounts of GCs being received at any given time. Each plant has different contractual obligations for the sale of electricity and GCs, through

[370] R-II, paras. 372-373.
[371] R-II, paras. 374-379; R-PHB, para. 44.
[372] R-II, para. 388; R-PHB, para. 45.
[373] R-II, para. 389; R-PHB, para. 46.
[374] R-II, para. 391.
[375] R-II, paras. 398-399; R-PHB, para. 46, quoting *Alemanni*, para. 292.
[376] R-II, para. 402.
[377] R-II, para. 400; R-PHB, para. 47.
[378] R-II, paras. 405-408, quoting *Abaclat*, para. 541.
[379] R-II, paras. 410 and 417; R-PHB, paras. 48, 50.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

different GCPAs and PPAs entered into by the plants. Finally, the financing arrangements entered into by each project company for each plant have different counterparties and different commercial terms[380].

273. <u>Second</u>, Claimants made their respective investments at different points in time. Therefore, the investments were not all subject to the same regulatory measures. This results in very different liability determinations, since the various Claimants will have had different alleged legitimate expectations, depending on the applicable law and regulations at the time of the investment[381].

274. <u>Third</u>, Romania avers that Claimants do not have similar types of claims against Romania. Some Claimants are direct owners of a PV power plant (*e.g.*, Beta), while others are only shareholders in parent companies of the operational entities (*e.g.*, CVC and CVI)[382].

275. <u>Finally</u>, Romania argues that there is no unity or identity in the quantum determinations for each claim, since the quantum calculations are necessarily plant-specific and claimant-specific. The shareholding interest held in the relevant plant by each Claimant, as well as the amount of capital that each Claimant extended to the plants in the form of shareholder loans are different[383].

276. Romania asserts that this is not the paradigm single dispute situation where ten joint owners of a single plot of land are suing for the expropriation of that plot of land. Romania contends that there are concrete factual differences among Claimants and there is a clear lack of identity of Claimants' interests in all essential respects[384].

277. <u>For these reasons</u>, Romania requests that the Tribunal dismiss the claims brought by Claimants[385].

**2.   CLAIMANTS' POSITION**

278. Claimants aver that Respondent's objection is meritless and devoid of legal support: Romania consented to arbitrate multiple claims with multiple claimants in one arbitration under the ICSID Convention and the ECT (**A.**), and Romania's contentions regarding a "single" or "homogenous" dispute are baseless. In any case, Claimants have brought a single dispute (**B.**)[386].

---

[380] R-II, para. 411; R-PHB, paras. 51-53.
[381] R-II, para. 412; R-PHB, para. 54.
[382] R-II, para. 413; R-PHB, para. 55.
[383] R-II, para. 414; R-PHB, para. 56.
[384] R-II, para. 416; R-PHB, para. 57.
[385] R-II, para. 418; R-PHB, para. 57. Romania argues that Claimants' attempt to bring a collective action is inappropriate also for reasons of competition law. Indeed, several Claimants are unrelated competitors and are sharing sensitive information in this proceeding, which could constitute an infringement of EU and Romanian competition law – although there is nothing to be asked from the Tribunal in this respect, other than to find that it lacks jurisdiction over this collective action (R-II, paras. 419-421).
[386] C-II, para. 224; C-PHB, para. 45.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

### A.   No restriction to multi-party arbitration

279.   Claimants agree that consent is the cornerstone of arbitration. However, they submit that, in the present case, Romania's consent to arbitrate Claimants' claims is clear and unambiguous[387].

280.   First, Claimants argue that under Art. 26 of the ECT Romania has given its "unconditional consent" to arbitrate disputes. ECT and other investor-State tribunals have confirmed repeatedly that[388]:

> "[…] a joint acceptance of a state's offer by a multitude of claimants cannot result in the tribunal losing jurisdiction that it would have if the claimants had commenced separate arbitrations."

281.   Second, Claimants note that the ICSID Secretariat has expressly confirmed that multi-party arbitration is permitted under the ICSID Convention and Rules. In fact, ICSID's 2018 proposal to revise its Arbitration Rules did not include an express rule on this point, because the ICSID Convention and Rules already permit multiparty claims and ancillary claims. To clarify this point, ICSID merely proposed to amend its Arbitration Rules to define a "party" as including several claimants or respondents[389].

282.   Third, Claimants submit that it is common for investment treaties to use the singular and plural forms interchangeably, as is the case of the ECT[390]. Additionally, tribunals have recognized that the singular in international conventions can be used to include the plural. Thus, the use of the singular form in the ICSID Convention cannot serve to exclude multi-party arbitration[391].

283.   Fourth, and in any event, permitting multi-party arbitration is consistent with the object and purpose of the ICSID Convention and the ECT, which is to permit investors to enforce their rights[392].

284.   Fifth, Claimants contend that there is no restriction in the ICSID Convention or the ECT against "multi-party" claims. Multi-party arbitrations are a common practice in investment treaty arbitration, including under the ECT and ICSID Convention[393].

285.   Claimants aver that this is not an issue of jurisdiction, but one of procedure: whether the Tribunal is able to decide all of Claimants' claims in a single proceeding. There is no doubt that the Tribunal can do so, and it would be less efficient and more costly for the Parties not to have all the claims resolved in one proceeding;

---

[387] C-III, para. 197.
[388] C-II, para. 230; C-PHB, para. 46.
[389] C-III, para. 199.
[390] C-II, para. 234; C-III, para. 200.
[391] C-III, paras. 201-202.
[392] C-III, para. 200.
[393] C-II, para. 225; C-III, para. 203; C-PHB, para. 47.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 75 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

otherwise, Romania would see multiple cases brought against it, by different investors, in relation to the same subject matter[394].

286. <u>Lastly</u>, Claimants submit that there is no case law supporting Romania's view regarding consent. Tribunals have consistently recognized that a State's consent under a BIT is wide enough in scope to cover multi-party arbitration[395].

## B. **Claimants' dispute can and should proceed in a single arbitration**

Claimants' claims are homogeneous

287. Claimants argue that the proper standard for assessing whether multi-party claims are sufficiently similar is the one adopted by the *Abaclat*, *Ambiente Ufficio* and *PV Investors* tribunals, all of which accepted multi-party claims after finding that the claimants had invoked the same treaty protections, had challenged the same measures from the host State, and had requested the same type of relief[396].

288. According to Claimants, that standard is met here, given that Claimants are a small number of investors who[397]:

-   Invested in RES in the same type of technology (PV plants) and under the same regulatory regime (Romania's GC support scheme);

-   Complain of the same measures taken by Romania;

-   Invoke the same two ECT provisions (violation of the fair and equitable treatment and the impairment clauses) as the basis of their legal claims;

-   Claim the same type of relief and use the same approach to the calculation of compensation.

289. Claimants submit that the present case is even more homogenous than *PV Investors*, for two reasons[398]:

290. *One*, the present case involves ten Claimants, many of which have shared interests in the same investments. In fact, while there are ten named Claimants, they are part of only two groups of companies and hold investments in only two groups of PV plants (the two Frăsinet plants, on the one hand, and the three Alpha, Beta, and Gamma plants on the other). By contrast, the *PV Investors* case involved 88 claimants, forming 14 corporate groups, that had invested in over 65 different PV plants[399].

---

[394] C-II, para. 225; C-PHB, para. 47.
[395] C-III, paras. 205-206.
[396] C-PHB, para. 48. See also C-II, paras. 257-260.
[397] C-II, para. 264; C-PHB, paras. 49, 62-71 and 205.
[398] C-PHB, para. 49.
[399] C-PHB, paras. 50 and 57. See also C-II, para. 261.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

291. Claimants recognize that the three Claimants that invested in the Frăsinet plants (Pressburg, Anina, and Giust) are unrelated to the seven Claimants that invested in the Alpha, Beta, and Gamma plants (LSG, Green Source, Solluce, Risen, Beta, Core Value Capital, and CVI Gamma). However, Claimants submit that this is an insufficient reason to require their claims to be resolved in two separate arbitrations. No tribunal has ever required all claimants to jointly own exactly the same investment in order to conclude that the claims are sufficiently similar or that the dispute is essentially identical. Claimants aver that the relevant question is how homogenous the claims and disputes are, and in this case, they are essentially identical among the limited number of investors and investments[400].

292. *Two*, several Claimants invested jointly in the same plants, and it would not make sense to separate their claims into different arbitrations. LSG and Green Source are partners in their three plants with Solluce, Risen, and the Core Value Claimants, respectively. It would not make sense to advance claims in separate arbitrations. By contrast, in the *PV Investors* case there were 14 groups of claimants truly unrelated, who did not jointly invest in the same plants with other claimants[401].

293. In any case, Claimants note that minor variations in fact patterns between the different Claimants and their investments (*e.g.*, the timing of the investment, the different strategies of investors, the compensation owed to each Claimant, etc.), while potentially relevant to the merits and/or quantum of the case, are irrelevant to jurisdiction generally and to the issue of consent specifically[402].

No case of mass claims

294. Claimants aver that the *Alemanni* test relied upon by Respondent is inapposite: the tribunal, faced with claims from 183 unrelated Italian individuals and legal entities, created a test to determine whether mass claims are "essentially identical". However, the *Alemanni* tribunal conflated merits issues in its jurisdictional analysis, and ultimately did not apply its own test[403].

295. Claimants accept that the situation of mass claims arguably demands a somewhat stricter test than a situation of multi-party claims, due to the sheer number of claimants involved. However, a "mass claims" test is inappropriate here, since this is a case involving a small number of mostly related investors[404].

296. Claimants submit that the very limited number of cases in which an objection like the one raised by Respondent has ever been discussed involve dozens, hundreds or even thousands of investors, in so-called "mass arbitrations" – and even in those cases tribunals have rejected this objection[405]. Significantly, the *Adamakopoulos* tribunal, which analyzed a case involving 956 unrelated investors, arising out of

---

[400] C-PHB, para. 59.
[401] C-PHB, paras. 51 and 58.
[402] C-II, paras. 261-263; C-PHB, paras. 61-70.
[403] C-II, paras. 247-248; C-PHB, para. 52.
[404] C-PHB, para. 53.
[405] C-II, para. 240.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

two different investment treaties, applied the *Alemanni* test and still found that the claims were "in all essential respects" the same[406].

297.   In the present case, Claimants argue that there is no doubt that their "interests" are the same in all the essential respects of the case[407].

298.   <u>In light of the above</u>, Claimants submit that the Tribunal may and should decide Claimants' multi-party dispute in this single arbitration, and thereby dismiss Respondent's objection[408].

**3.   DECISION OF THE TRIBUNAL**

299.   The Parties discuss whether multiple Claimants can bring a claim against Romania.

300.   The Parties do not dispute, and the Tribunal agrees, that consent is the cornerstone of arbitration, and that a State can only be bound to arbitrate disputes to which it has given its consent. The Tribunal must determine whether Romania gave its consent to arbitrate a dispute with multiple claimants both under the ECT and under the ICSID Convention (**A.**). The Tribunal will further assess whether Claimants' claims are sufficiently homogeneous that they can be solved in a single proceeding (**B.**).

**A.   <u>Romania consented to arbitrate multi-party claims</u>**

301.   Pursuant to Art. 26 of the ECT, as a Contracting Party to the ECT, Romania gave its unconditional consent to submit disputes relating to protected investments to international arbitration under the ICSID Convention[409]:

> "(1) <u>Disputes between a Contracting Party</u> and <u>an Investor of another Contracting Party relating to an Investment</u> of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.
>
> (2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, <u>the Investor party to the dispute may choose to submit it for resolution</u>: [...] (c) in accordance with the following paragraphs of this Article.
>
> (3) (a) Subject only to subparagraphs (b) and (c), <u>each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration</u> or conciliation in accordance with the provisions of this Article. [...]

---

[406] C-PHB, paras. 52, 54.
[407] C-II, paras. 252-253; C-PHB, para. 54.
[408] C-PHB, paras. 71 and 205.
[409] **Doc. CL-1**, Art. 26(1) to (4).

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

> (4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), <u>the Investor shall further provide its consent in writing for the dispute to be submitted to</u>:
>
> (a) (i) <u>The International Centre for Settlement of Investment Disputes</u>, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention […]" [Emphasis added]

302. Art. 26(5) of the ECT further determines that the unconditional consent given by Romania, as Contracting Party, and that of an investor, when choosing to submit a dispute to the Centre, satisfy the requirement for written consent of the Parties to a dispute for the purposes of Art. 25(1) of the ICSID Convention[410], which provides as follows[411]:

> "(1) The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, <u>between a Contracting State</u> (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and <u>a national of another Contracting State</u>, which the parties to the dispute consent in writing to submit to the Centre. <u>When the parties have given their consent, no party may withdraw its consent unilaterally</u>." [Emphasis added]

303. The above provisions demonstrate that Romania gave its unconditional and irrevocable consent to submit disputes concerning an alleged breach of its obligations under the ECT to the jurisdiction of the Centre.

304. Romania, however, argues that it did not consent to arbitrate a claim with multiple claimants because[412]:

- Neither the ECT nor the ICSID Convention include explicit language that expressly allows multiple investors to bring claims against a respondent State; and

- The texts of both the ICSID Convention and the ECT demonstrate that the scope of consent thereunder covers only disputes involving one investor and one respondent State.

305. Claimants, on the other hand, aver that this is not a question of consent or jurisdiction, given that Romania's consent is unconditional and not limited in any way. Rather, Claimants submit that this is a question of procedure, and the ICSID

---

[410] **Doc. CL-1**, Art. 26(5)(a).
[411] ICSID Convention, Art. 25(1).
[412] R-PHB, paras. 37 *et seq*.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Convention empowers the Tribunal to decide all of Claimants' claims in a single proceeding[413].

306. Irrespective of whether this objection is considered a matter of jurisdiction, admissibility or procedure, insofar as Respondent has framed its objection as an issue of consent, the Tribunal will determine whether the scope of Romania's consent under the ECT and the ICSID Convention is broad enough to cover proceedings brought by the multiple Claimants in this case. Considering that none of these treaties refers explicitly to multi-party arbitration, the Tribunal must interpret the relevant provisions of the ECT (**a.**) and the ICSID Convention (**b.**).

<u>Rules on treaty interpretation</u>

307. Pursuant to Art. 31 of the Vienna Convention on the Law of Treaties ["**VCLT**"] the Tribunal must interpret a treaty in "good faith" and in accordance with the "ordinary meaning to be given to its terms" in their "context" and in light of the treaty's "object and purpose"[414]. In addition to the text, the context for the purpose of the interpretation of a treaty shall comprise[415]:

> "(a) Any agreement relating to the treaty which was made between all the parties in connexion with the conclusion of the treaty;
>
> (b) Any instrument which was made by one or more parties in connexion with the conclusion of the treaty and accepted by the other parties as an instrument related to the treaty."

308. Furthermore, a tribunal construing the terms of a treaty should also take into account "[a]ny subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions", as well as "[a]ny subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation"[416].

309. Finally, in accordance with Art. 32 of the VCLT, "[r]ecourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion" only "to confirm the meaning" resulting from the textual approach required by Art. 31, or in the event the textual approach leaves a meaning "ambiguous or obscure" or would lead to a result that is "manifestly absurd or unreasonable"[417].

**a.    Interpretation of the ECT**

310. According to Romania, the provisions of Art. 26 of the ECT show that the respondent State's consent is limited to arbitrations brought by a single Investor in relation to one Investment against one Contracting Party, as demonstrated by the

---

[413] C-PHB, paras. 45-47.
[414] **Doc. CL-33**, Art. 31(1).
[415] **Doc. CL-33**, Art. 31(2).
[416] **Doc. CL-33**, Art. 31(3).
[417] **Doc. CL-33**, Art. 32.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

use of the singular throughout the text ("[d]isputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment [...]")[418]. Absent explicit language that clearly allows multiple claimants to bring claims against the State, no collective arbitration can go forward[419].

311.    The Tribunal is unconvinced that a reading of Art. 26 of the ECT in accordance with the VCLT interpretation rules leads to the conclusion that Romania has not consented to multi-party arbitrations.

312.    <u>First</u>, an interpretation of Art. 26 in good faith, in accordance with the "ordinary meaning" of the text, which can be ascertained in light of the context and the Treaty's object and purpose, leads to the opposite conclusion. The ECT uses the singular and plural forms throughout the text interchangeably, referring either to "Investor" or to "Investors" without distinction; it also refers to "Investment" or "Investments" indistinctively. If Romania's argument were correct, claims relating to multiple investments of a single investor would equally be barred, which cannot be the correct interpretation of Art. 26, considering that Art. 1(6) provides in unequivocal terms that "[a] change in the form in which assets are invested does not affect their character as investments and the term 'Investment' includes all investments [...]"[420].

313.    The Tribunal coincides with the following finding of the *PV Investors* tribunal[421]:

> "[...] the Tribunal does not see how the reference in Article 26 to 'an Investor' in the singular would bar jurisdiction over a multiplicity of claimants. Quite apart from the fact that elsewhere in Part III the Treaty uses 'Investors' in the plural (see, *e.g.*, Article 10 of the ECT), the Tribunal does not believe that the use of the singular in the dispute settlement clause means that the individual disputes have to be heard separately. What matters is that disputes between one of the Contracting Parties and an investor be adjudged in their individual dimension, i.e., in the same way as they would be in an ECT arbitration with a single claimant."

314.    Furthermore, the Tribunal sees no reason to construe the silence of Art. 26 regarding multi-party arbitrations as limiting the scope of the consent given by the Contracting Party.

315.    <u>Second</u>, a broader interpretation of the scope of consent is consistent with the context, as well as with the object and purpose of the ECT, which *inter alia* aims at protecting foreign energy investments. As noted by the tribunal in *PV Investors*, consent in investment treaty arbitration has a peculiar nature: the host State extends a standing offer to arbitrate to an indefinite number of previously unidentified investors falling within the jurisdictional requirements of the treaty; if there is

---

[418] R-I, paras. 300-303; R-PHB, paras. 42-43.
[419] R-II, para. 366.
[420] **Doc. CL-1**, ECT, Art. 1(6).
[421] **Doc. CL-172**, *PV Investors*, para. 99.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 81 of 299

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

consent by the host State, the fact that the offer is then accepted by one single claimant or multiple claimants jointly is immaterial[422].

316. <u>Finally</u>, subsequent practice in the application of the ECT further confirms that multi-party claims fall within the scope of consent of the Contracting Parties to the ECT. There have been numerous arbitrations conducted under the ECT involving multiple claimants[423] (to name but a few, *Hydro Energy*, *Watkins*, *OperaFund*, *InfraRed*[424], etc.).

317. If Romania's interpretation were correct, in the vast majority of these arbitrations, respondent States, Contracting Parties to the ECT, should have objected to claims brought by multiple claimants on the basis that they had not consented to arbitrate such claims. Likewise, the tribunals deciding such disputes should have determined *sua sponte*, in application of the *Kompetenz-Kompetenz* principle, that they lacked jurisdiction to decide the dispute, due to the alleged lack of consent by the respondent States[425]. In fact, however, Romania has not pointed to a single case in which a tribunal declined jurisdiction on the basis that the Contracting Party to the ECT had not given its consent to multi-party arbitration.

318. <u>In sum</u>, the Tribunal concludes that Romania gave its unconditional consent to arbitrate claims with multiple claimants under Art. 26 of the ECT.

### b. Interpretation of the ICSID Convention

319. Like the ECT, the ICSID Convention lacks an explicit reference to the Contracting State's consent to arbitrate multi-party claims. Respondent avers that the use of the singular form in Art. 25(1) of the ICSID Convention ("a national of another Contracting State") limits the scope of the Convention to single-party disputes[426].

320. The Tribunal is not persuaded by Romania's position.

321. <u>First</u>, the Tribunal should begin by interpreting the relevant provisions in good faith in accordance with the "ordinary meaning" of the terms. As noted by the *Alemanni*[427] tribunal, there is no reason to conclude that the wording of Art. 25(1) cannot encompass a plurality of investors. Likewise, there is[428]:

> "[…] no reasonable basis for implying into the text as it stands of Article 25(1) the additional words 'but only one'."

---

[422] **Doc. CL-172**, *PV Investors*, para. 100.
[423] In *PV Investors* the tribunal noted: "[…] investment treaty arbitration practice is replete with examples of proceedings which have involved more than one claimant." (**Doc. CL-172**, para. 103).
[424] **Doc. RL-225**, *Hydro Energy*; **Doc. CL-200**, *Watkins*; **Doc. CL-173**, *OperaFund*; **Doc. CL-174**, *InfraRed*.
[425] See also **Doc. CL-172**, *PV Investors*, para. 104.
[426] R-II, paras. 368-371; R-PHB, paras. 39-40.
[427] **Doc. CL-156**, *Alemanni*, para. 270.
[428] **Doc. CL-156**, *Alemanni*, para. 271.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

322. As noted by the *Adamakopoulos* tribunal[429],

> "[…] while [the ICSID Convention] does not expressly provide for individual claims to be brought on a multi-party basis, neither does it preclude such claims from being so brought."

323. <u>Second</u>, when considering the terms "a national of another Contracting State" in their context and in light of the object and purpose of the ICSID Convention, it becomes clear that a restrictive interpretation of this provision is not appropriate. As previously mentioned, "context" for treaty interpretation shall comprise any agreement or instrument related to the conclusion of the treaty. The 2018 Working Paper with "Proposals for Amendments of the ICSID Rules", prepared by the ICSID Secretariat after receiving topics for rule amendments from Contracting States and the public, sheds light on the present discussion[430].

324. Schedule 7 to this Working Paper, entitled "Multiparty Claims and Consolidation" explains that multi-party claims are those "[…] brought by two or more claimants that initiate a single proceeding by jointly filing a single Request for arbitration". Schedule 7 affirms in unequivocal terms that the ICSID Convention already permits multi-party claims[431]:

> "The <u>ICSID Convention</u>, [Arbitration Rules] and [Additional Facility Arbitration Rules] <u>already permit multiparty claims</u> and ancillary claims, including counter-claims. As a result, the proposed amendments to the Rules related to these mechanisms are minimal." [Emphasis added]

325. Thus, ICSID merely proposed to amend its Arbitration Rules to define a "party" as including several claimants or respondents[432].

326. <u>Third</u>, pursuant to Art. 31(3) of the VCLT, a tribunal construing the terms of a treaty may also consider "any subsequent practice in the application of the treaty which establishes the agreement of the parties regarding its interpretation".

327. In this regard, the Tribunal notes that multi-party claims have been generally accepted under the ICSID Convention[433]. Among the cases that have recognized that the ICSID Convention permits multi-party claims are the *Abaclat*[434], *Ambiente Ufficio*[435] or *Alemanni*[436]. The tribunal in *Ambiente Ufficio* pointed out that[437]:

> "[…] a look at ICSID's case list reveals that 38 out of the 398 reported cases include the phrase "and others" on the claimant's side, i.e. they are multi-party

[429] **Doc. RL-40**, *Adamakopoulos*, para. 200.
[430] **Doc. CL-137**, p. 1, para. 4.
[431] **Doc. CL-137**, p. 833, para. 4.
[432] **Doc. CL-137**, p. 835, para. 20.
[433] **Doc. RL-103**, Schreuer, p. 163, para. 278.
[434] **Doc. CL-157**.
[435] **Doc. CL-154.**
[436] **Doc. CL-156**.
[437] **Doc. CL-154**, *Ambiente Ufficio*, paras. 135 and 141.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

cases. Already this simple fact manifests that multi-party arbitration is a common feature in ICSID arbitration.

[…] it is evident that multi-party arbitration is a generally accepted practice in ICSID arbitration, and in the arbitral practice beyond that, and that the institution of multi-party proceedings therefore does not require any consent on the part of the respondent Government beyond the general requirements of consent to arbitration."

328.  This view is supported by the ICSID Working Paper, which notes that[438]:

"In practice, Tribunals have consistently found that the ICSID Convention and [Arbitration Rules], and the [Additional Facility Arbitration Rules], allow multiparty proceedings and current procedural rules have accommodated such claims."

329.  Lastly, in accordance with Art. 32 of the VCLT,

"[r]ecourse may be had to supplementary means of interpretation, including the preparatory work of the treaty and the circumstances of its conclusion".

The *travaux préparatoires* show that multi-party procedures were already anticipated by the drafters of the ICSID Convention[439] and thus confirm what could be inferred from the interpretation of the ICSID Convention in accordance with Art. 31 of the VCLT, *i.e.*, that a Contracting State's consent to arbitrate under the Convention should not be interpreted restrictively to exclude multi-party claims.

330.  In view of the above, the Tribunal concludes that consent to arbitrate under the ICSID Convention includes consent to arbitrate claims brought by multiple claimants.

## B.  **Homogeneity threshold**

331.  Romania submits that even if the Tribunal were to consider that Romania somehow consented under the ECT and the ICSID Convention to arbitrate claims by multiple claimants in one single arbitration, the Tribunal would still be required to dismiss those claims because they do not constitute a "single dispute" in application of the "single dispute test" set forth by the *Alemanni* tribunal[440].

332.  Claimants, on the other hand, argue that the proper standard for assessing whether multi-party claims are sufficiently similar is the one adopted by the *Abaclat*, *Ambiente Ufficio* and *PV Investors* tribunals, all of which accepted multi-party claims after finding that the claimants had invoked the same treaty protections, had challenged the same measures from the host State, and had requested the same type of relief[441].

---

[438] **Doc. CL-137**, p. 833, paras. 6-7.
[439] *History of the ICSID Convention*, Vol. II, part 1, pp. 400, 413.
[440] R-PHB, para. 45.
[441] C-PHB, para. 48. See also C-II, paras. 257-260.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

333. The Tribunal has found that Romania consented to arbitrate claims brought by multiple claimants. As pointed out by Romania, a different question is whether the present multi-party claims have been properly submitted and can be adjudicated in a single proceeding. According to the ICSID 2018 Working Paper, tribunals considering whether a multi-party claim can proceed have considered various factors, in particular whether the multiple claims have a factual connection or whether a single dispute exists[442].

334. The *Abaclat*[443] (2011) and *Ambiente Ufficio*[444] (2013) tribunals have both found that claims brought by multiple claimants could only go forward if they could "be considered identical or at least sufficiently homogeneous". For the *Abaclat* tribunal majority, a case involving initially 180,000 and later 60,000 claimants[445]:

> "The only relevant question is whether Claimants have homogeneous rights of compensation for a homogeneous damage caused to them by potential homogeneous breaches by Argentina of homogeneous obligations provided for in the BIT."

335. Prof. Georges Abi-Saab, who dissented from the *Abaclat* majority on the possibility of bringing "collective mass claims actions" in the ICSID context, did recognize that "limited multiparty arbitrations" were possible to the extent they permitted "an individual, detailed and adversarial examination of every claim and claimant"[446].

336. In *Ambiente Ufficio* the tribunal also stressed the importance that there be a link among claimants in terms of the treaty claim they jointly submit in the arbitration[447]:

> "[…] [Claimants] are right to point out that they complain about the same illegality which the Respondent is said to have committed against them all. They base their claim on the same provisions of the Argentina-Italy BIT as well as the ICSID Convention and they have made identical prayers of relief, i.e. indemnification under the BIT for the acts allegedly committed by the Respondent. In addition, they claim that the factual background on the basis of which the Claimants seek to establish their claim is virtually the same for all Claimants.
>
> 162. In contrast, the fact – which Respondent has highlighted repeatedly and intensively – that there are certain differences between the Claimants as to the dates and the series of bonds under which the different security entitlements were acquired, or regarding the currency or interest rate which would apply to them, etc., are not relevant here since they relate to the *contractual* claims the Claimants may have, but not to the *treaty* claims with which the Tribunal is dealing here." [Emphasis added]

---

[442] **Doc. CL-137**, p. 834, paras. 11-13.
[443] **Doc. CL-157**, *Abaclat*, para. 540.
[444] **Doc. CL-154**, *Ambiente Ufficio*, paras. 159-161.
[445] **Doc. CL-157**, *Abaclat*, para. 541.
[446] **Doc. RL-111**, *Abaclat*, Dissenting Opinion of Prof. Georges Abi-Saab, paras. 170-171.
[447] **Doc. CL-154**, *Ambiente Ufficio*, paras. 161-162.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

337. The majority of the tribunal in the more recent *Alemanni* (2014) case (involving 183 Italian individuals and legal entities), invoking the decisions in *Abaclat* and *Ambiente Ufficio*, decided to go further and to strengthen the requirement, by establishing that a "single dispute" is necessary to meet the requirement of Art. 25(1) of the ICSID Convention[448]:

> "In searching, therefore, for an element that more satisfactorily defines the link that must exist between a group of claimants and between their claims, in the absence of consent by the respondent to the hearing of their claims together, the Tribunal has come to the conclusion that the answer lies in the notion of a 'dispute'. To go back to basics, the jurisdiction created by Article 25(1) of the ICSID Convention 'extends to' (which in context means, is confined to) 'any legal dispute arising directly out of an investment'. ICSID tribunals have always treated this requirement with deliberate importance. They have considered whether the parties are in fact in dispute; whether the dispute is a legal dispute; whether the dispute arises out of an investment; and whether it arises 'directly' out of an investment. The cases are listed in Schreuer's Commentary at pp. 93 ff. The rubric in Article 25(1) contains however a further condition which may not be as immediately obvious, namely that it must be 'a' dispute. The focus on 'a' dispute is continued in both the ICSID Institution Rules (Article 2) and the ICSID Arbitration Rules (Rule 1)." [Emphasis added]

338. The *Alemanni* tribunal went on to point out that the dispute settlement clause of the BIT applicable in that particular case also referred to "any dispute", "a dispute" and "the dispute", which would lead to the conclusion that a "single dispute" would be necessary for the claims of the multiple claimants to proceed[449]. However, ultimately the *Alemanni* tribunal did not apply its own test.

339. Recently, the tribunal in *Adamakopoulos* (2020), a case involving 956 claimants, decided to apply the *Alemanni* standard in order to determine whether the claims could be regarded as a "single dispute". It went on to find that[450]:

> "In the view of the Tribunal there is 'substantial unity' or similarity in the claims that are being made and the breaches alleged. The claims arise out of the actions by the Republic of Cyprus in respect of the Laiki Bank and the Bank of Cyprus in 2013 as a consequence of the economic crisis Cyprus faced in the early 2000s. The Claimants were deposit holders or bondholders in one or both of these banks. With respect to the bondholders, it is claimed, the actions taken by Cyprus had the same effect – the bonds were made worthless either by being transferred into equity in the case of Bank of Cyprus bonds or through the demise of the Laiki Bank. In the case of deposit holders in both banks, they were all subject to the same 'haircut'. Uninsured deposits, that is those over $100,000, were 'bailed-in'. In short, all of the claims are about the measures that were taken against the two banks, which in key respects are identical measures." [Emphasis added]

---

[448] **Doc. CL-156/RL-30**, *Alemanni*, para. 292.
[449] **Doc. CL-156/RL-30**, *Alemanni*, para. 292.
[450] **Doc. RL-40**, *Adamakopoulos*, para. 210.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

340. Furthermore, in 2019, the Institute of International Law adopted a resolution on Equality of Parties (previously defined as the "IIL Resolution"), which provides that where several investors seek to institute their claims in a single arbitration against the same State, when determining its jurisdiction, the tribunal must be satisfied that the "claim as a whole advances a single dispute", in the sense that "the interest represented by the claimants is in all respects identical"[451]:

> "(a) Each claimant individually satisfies the jurisdictional requirements (both of the instrument of consent and, where applicable, Article 25 of the ICSID Convention) in order to bring its claim; and
>
> (b) The claim as a whole advances a single dispute, in that the interest represented by the claimants is in all respects identical, so that the respondent is not prejudiced by having to defend itself against claims that differ materially in the interest to be vindicated.
>
> The tribunal may hold a claim brought by multiple claimants to be inadmissible if it finds that the manner in which the claim is brought would adversely affect the tribunal's ability to ensure that both sides of the dispute are treated with equality in the presentation of their case or in their defence of the claims."

341. While the Tribunal is not entirely convinced that the *Alemanni* test of a "single dispute" should be applied in the present case (for the main reason that the BIT applicable in *Alemanni* referred only to a "dispute", while Art. 26 of the ECT refers in general to "disputes"), all the relevant legal authorities point to the fact that there must be a certain degree of homogeneity between multiple claimants who seek to bring joint claims against a host State (whether it is called a "single dispute", an "identical interest" or an "identity" between claims).

342. Indeed, it would seem unfair to have a State fight off in a single arbitration claims by multiple claimants relating to a completely heterogeneous set of facts and treaty claims. Ultimately, as noted by the tribunal in the *PV Investors* case (2014), there must be a "sufficient connection" between the different claimants "to justify hearing [their] claims in one single arbitration"[452].

343. The Tribunal must start by establishing the proven facts (**a.**) so it can then make its determination (**b.**).

**a.    Proven facts**

Claimants' investments in Romania

344. Claimants are ten project developers who invested in five solar PV plants in southern Romania[453] after 2010, at different points in time. These five PV plants

---

[451] **Doc. RL-124**, IIL Resolution, Art. 5(2).
[452] **Doc. CL-172**, *PV Investors*, para. 117.
[453] C-I, paras. 13 and 172; R-I, para. 513; **CD-1**, slide 99.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

are[454]:

- The Alpha PV Facility, a PV facility of 45 MWp installed capacity in Giurgiu, Romania;

- The Beta PV Facility, a PV plant of 20 MWp installed capacity in Giurgiu, Romania;

- The Gamma PV Facility, a PV plant of 50 MWp installed capacity also in Giurgiu, Romania;

- Frăsinet 2, a PV facility of 9.5 MWp installed capacity in Călăraşi, Romania; and

- Frăsinet 3, a PV plant of 5.4 MWp installed capacity also located in Călăraşi, Romania.

345. These five PV plants can be divided into two sets of projects[455]:

- <u>On the one hand</u>, the Alpha, Beta, and Gamma PV Facilities, located in the Giurgiu county and initially developed by Claimants LSG and Green Source, before selling a portion of their shares to Claimants Solluce, Core Value, and Risen, in this latter case through Claimant Beta;

- <u>On the other hand</u>, the Frăsinet PV Facilities, located in the Călăraşi county and developed by Claimants Anina, Giust, and Pressburg.

346. Claimants acknowledge that the seven Claimants that invested in the Alpha, Beta, and Gamma PV Facilities are unrelated to the three Claimants that invested in the Frăsinet PV Facilities[456].

<u>Claimants' prayers for relief in this arbitration</u>

347. In this arbitration Claimants jointly request *inter alia* the following relief:

- A declaration that the Tribunal has jurisdiction under the ICSID Convention and the ECT;

- A declaration that Romania has violated the ECT and international law with respect to Claimants' investments; and

- Compensation to Claimants for all damages they have suffered, as set forth in Claimants' submissions.

---

[454] **Edwards I**, Table 1-2 and Figure 1-1.
[455] C-I, paras. 173-174; **CD-1**, slide 99; C-PHB, paras. 57 and 151.
[456] C-PHB, para. 59.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

348. Claimants jointly argue that Romania breached Art. 10(1) of the ECT, *inter alia* by failing to accord Fair and Equitable Treatment to Claimants' investments, and by unreasonably impairing their investments.

### b.    Claimants' claims are sufficiently connected

349. Romania contends that there are concrete factual differences among Claimants and there is a clear lack of identity of Claimants' interests in all essential respects[457]. In particular:

-    Claimants' claims concern five different PV plants, located in different Romanian regions, with different outputs and amounts of GCs being received at any given time, as well as different financial arrangements;

-    Claimants made their respective investments at different points in time;

-    Claimants do not have similar types of claims against Romania, since some Claimants are direct owners of PV Facilities (Beta), while others are only shareholders in parent companies; and

-    There is no unity or identity in the quantum determinations for each claim, since the quantum calculations are necessarily plant-specific and claimant-specific.

350. Claimants, on the contrary, argue that they are a small number of investors who[458]:

-    Invested in RES in the same type of technology (PV plants) and under the same regulatory regime (Romania's GC support scheme);

-    Complain of the same measures taken by Romania;

-    Invoke the same two ECT provisions (violation of the fair and equitable treatment and the impairment clauses) as the basis of their legal claims; and

-    Claim the same type of relief and use the same approach to the calculation of compensation.

351. Applying the sufficient connection or homogeneity standard developed by the *Abaclat*, *Ambiente Ufficio* and *PV Investors* tribunals, the Tribunal finds that Claimants' claims are sufficiently homogeneous and can be brought in a single arbitration.

352. <u>First</u>, Claimants are a group of investors in the exact same sector of economic activity, RES-E and particularly PV plants. Although Claimants have invested in five different PV Facilities, several Claimants held interests across the same PV

---

[457] R-II, para. 416; R-PHB, para. 57.
[458] C-II, para. 264; C-PHB, paras. 49, 62-71 and 205.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 89 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Facilities. Furthermore, Claimants' allegations with respect to their investments relate to the same set of measures adopted by Romania: the Disputed Measures.

353. <u>Second</u>, Claimants bring their claims under the same Treaty, the ECT, and invoke the same Treaty protections, by claiming that Romania violated Art. 10(1) of the ECT.

354. <u>Third</u>, all Claimants seek the same remedy: compensation for damages. The only difference lies in the quantification of the remedy, because the valuation of damages is asset-specific (since each plant had a different output and was consequently entitled to a different number of GCs). It is not uncommon that investments cover several assets, and thus, multiple valuations are involved in the quantum phase – this does not give rise to distinct claims or disputes. Hence, the multiplicity of damage quantifications should have no bearing on the possibility for Claimants to bring their claims in a single proceeding[459].

355. Overall, the Tribunal finds that it would be inefficient for the Claimants in this case to start separate arbitrations against Romania for almost the exact same factual background, same Disputed Measures, same alleged violations of the ECT and same requests for relief. The Tribunal considers that Romania is not prejudiced by having to defend itself in this case, since the interest to be vindicated does not differ materially[460].

356. That said, the Tribunal will make sure to ascertain whether the jurisdictional requirements are satisfied for each of these individual Claimants[461] and whether the provisions of the Treaty have been breached in respect of each of them (if any).

* * *

357. <u>In view of the above</u>, the Tribunal concludes that Romania has consented to arbitrate the present dispute with multiple Claimants. Consequently, the Tribunal rejects Romania's jurisdictional objection.

---

[459] See **Doc. CL-154**, *Ambiente Ufficio*, para. 162; **Doc. CL-157**, *Abaclat*, para. 543; **Doc. RL-40**, *Adamokopoulos*, para. 219.
[460] **Doc. RL-124**, Art. 5(2)(b).
[461] See **Doc. RL-124**, Art. 5(2)(a); **Doc. RL-40**, *Adamokopoulos*, para. 202.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

# V.2. <u>OBJECTION TO JURISDICTION OVER CLAIMS OF ANINA AND GIUST</u>

## 1. <span style="font-variant: small-caps">Respondent's position</span>

358. Romania submits that the Tribunal should decline jurisdiction over and dismiss the claims brought by Anina and Giust because these two Claimants do not meet the nationality requirements of both the ICSID Convention and the ECT (**A.**)[462]. Additionally, Romania considers that, pursuant to Art. 17 of the ECT, it may validly deny Anina and Giust the benefits of the ECT (**B.**)[463].

### A. <u>Anina and Giust do not meet the necessary nationality requirements</u>

#### a. **Nationality requirements under Art. 25 of the ICSID Convention**

359. Romania notes that Art. 25(1) of the ICSID Convention includes a nationality requirement to the effect that a national of a given Contracting State may bring claims under the ICSID Convention only against another Contracting State – in other words, such national may not bring claims against its own Contracting State[464]. Thus, Romania affirms that this Tribunal cannot entertain a claim by a claimant that has the nationality of the host Contracting State[465].

360. Romania argues that under Art. 31(1) of the VCLT the Tribunal must interpret the terms of the ICSID Convention in light of its object and purpose. Romania observes that the Preamble of the ICSID Convention makes it clear that the object and purpose of the ICSID Convention is to foster foreign, cross-border investment, and to facilitate the resolution of international (not domestic) disputes[466]. Thus, the terms "national of another Contracting State" in Art. 25 of the ICSID Convention must not be interpreted in such a way as to allow a national to effectively sue its own State[467].

361. Romania avers that if an entity that is wholly owned and controlled by a national of the host Contracting State were allowed to sue that State, the object and purpose of the ICSID Convention would be undermined[468].

362. It is Romania's position that, in the present case, allowing Anina and Giust to sue Romania would violate the object and purpose of the ICSID Convention, and would thus be inconsistent with the rules of treaty interpretation of the VCLT. This is because Anina and Giust, although incorporated in Cyprus, are entirely owned, controlled, and operated by a Romanian national, Mr. Cătălin-Liviu. Additionally,

---

[462] R-II, para. 422; R-PHB, para. 60.
[463] R-II, para. 423.
[464] R-II, para. 426; R-PHB, para. 61.
[465] R-PHB, para. 62.
[466] R-II, paras. 427-429; R-PHB, para. 63.
[467] R-II, paras. 433-434; R-PHB, para. 63.
[468] R-II, para. 464; R-PHB, para. 63.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 91 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Romania asserts that Anina and Giust do not conduct business nor maintain a proper registered office in Cyprus[469].

363. This leads Romania to submit that Anina and Giust are merely flow-through entities, that have been used by a Romanian national to invest in Romania and now sue his own State. Thus, the claims brought by Anina and Giust are effectively domestic claims[470].

364. Lastly, Romania argues that the *Tokios Tokelės* decision on jurisdiction is inapposite. It was reached by a majority of the tribunal, with a strong dissenting opinion by its president, Prof. Prosper Weil. This decision did not take into consideration the object and purpose of the ICSID Convention, and thereby failed to correctly interpret this treaty in accordance with the VCLT[471]. Cases that followed the steps of the majority in *Tokios Tokelės* were equally wrong[472].

**b.    Nationality requirements under Art. 26 of the ECT**

365. Furthermore, Romania argues that Anina and Giust do not meet the nationality requirements of the ECT[473].

366. Romania submits that like the ICSID Convention, Art. 26 of the ECT makes it clear that only disputes between a Contracting Party and a foreign investor may be brought[474]. Moreover, the ECT's object and purpose is to foster foreign investment in the energy sector and to afford protection to international investors, not domestic investors. Therefore, Romania contends that ECT claims can only be brought by entities that are genuinely foreign. Accordingly, entities that are owned and controlled by a national of the host State must not be allowed to bring claims under the ECT against said host State[475].

367. Romania argues that just as the signatories of the ICSID Convention did not intend it to be used for domestic disputes, ECT Contracting Parties did not intend it to apply to their own nationals. Accordingly, foreign entities owned and controlled by nationals of the host State should not be allowed to bring claims against said host State under the ECT[476].

368. As mentioned above, Romania asserts that Anina and Giust are wholly owned, controlled, and operated by a Romanian national. Romania submits that the evidence on the record shows that they are empty shells created by a Romanian national to circumvent the principle that no national may sue his own State in the

---

[469] R-II, paras. 437 and 459; R-PHB, para. 64.
[470] R-II, paras. 458 and 463; R-PHB, para. 65.
[471] R-II, paras. 440-441. See also R-II, paras. 438-439.
[472] R-II, paras. 442 *et seq*.
[473] R-PHB, para. 67.
[474] R-II, para. 467; R-PHB, para. 68.
[475] R-II, paras. 467-469; R-PHB, para. 69.
[476] R-II, para. 471.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

international legal order. Thus, Anina and Giust do not meet the nationality requirement of the ECT[477].

369. <u>In view of the above</u>, Romania requests that the Tribunal dismiss the claims brought by Claimants Anina and Giust against Romania, for lack of jurisdiction, since Claimants fail to satisfy the nationality requirements of the ICSID Convention and the ECT[478].

## B.    Art. 17 of the ECT enables Romania to deny benefits

370. Furthermore, Romania avers that Art. 17 of the ECT grants host States the right to deny ECT benefits to claimants that are either third country controlled, or host State controlled. This provision must be interpreted in a manner that is consistent with the ECT's object and purpose, which consists in affording protection to international investors in the energy field. Therefore, Art. 17 allows respondent States to deny ECT benefits to entities that are not foreign owned[479].

371. Contrary to Claimants' submission, Romania contends that Art. 17 of the ECT can be invoked retrospectively. Applying Art. 17 in a solely prospective manner would deprive this provision of its *effet utile*. This is because no State would be able or willing to preventively deny benefits to entities the existence of which it ignores, unless it engaged in a monitoring activity of all foreign entities. This would place an unreasonable burden on States, given the dissymmetry of information between putative investors and States[480].

372. Moreover, Romania suggests that denial of benefits clauses are meant to prevent free riders from benefiting from protections afforded in a given treaty. Applying them prospectively only would defeat the object and purpose of such clauses[481].

373. <u>In sum</u>, Romania concludes that Art. 17 of the ECT should be applied retrospectively and wishes to deny benefits to Anina and Giust since they are 100% owned, controlled, and operated by a Romanian national[482].

## 2.    CLAIMANTS' POSITION

374. Claimants sustain that Romania's objection is without merit because Anina and Giust qualify as investors under both the ICSID Convention and the ECT (**A.**)[483]. In any case, Romania cannot deny Anina and Giust the benefits of the ECT (**B.**).

---

[477] R-II, paras. 476-477; R-PHB, para. 70.
[478] R-PHB, paras. 66, 71, 73-74.
[479] R-II, paras. 479-486.
[480] R-I, para. 494; R-II, paras. 488-489, 491.
[481] R-II, para. 490.
[482] R-II, para. 515.
[483] C-III, paras. 228-229; C-PHB, para. 73.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

### A.    **Anina and Giust qualify as investors**

375.  Claimants note that Romania urges the Tribunal to disregard the proven, undisputed Cypriot nationality of Anina and Giust and instead to consider them as Romanian nationals, based only on the fact that their upstream shareholder is Romanian. Claimants aver that there is no legal basis for Romania's position, either under the ICSID Convention (**a.**) or the ECT (**b.**)[484].

### a.    **Nationality requirement of the ICSID Convention**

376.  Claimants contend that with regard to the ICSID Convention, Art. 25(1) specifies that jurisdiction extends to any legal dispute between a Contracting State and a national of another Contracting State. Art. 25(2)(b) defines "national of another Contracting State" to include companies having "the nationality of a Contracting State other than the State party to the dispute"[485]. Claimants argue that it is undisputed that Anina and Giust are incorporated in Cyprus and have the nationality of Cyprus, another Contracting State. Nothing further is required; Anina and Giust therefore meet the nationality requirements of Art. 25(2) of the ICSID Convention[486].

377.  Claimants disagree with Romania's argument that in light of the ICSID Convention's object and purpose, the Tribunal should look for the true owner of the claimant, and that Anina and Giust are "shams used by a Romanian national" for the purpose of trying to get around the nationality requirement of the ICSID Convention. Claimants argue that this is patently untrue, and that Romania has provided no evidence to support this claim. Claimants note that Romania acknowledges that Anina and Giust acquired the interests in the Frăsinet plants in 2012, well before any dispute arose. Claimants submit that it is only in cases of perceived treaty-shopping that tribunals have been willing to look beyond the nationality of the named claimants, to the upstream shareholders[487].

378.  Claimants argue that, as juridical persons incorporated in another Contracting State that invested in and hold an investment in Romania, Anina and Giust are entitled to bring their claims against Romania. The ICSID Convention does not require that Anina and Giust satisfy any additional requirements[488]. Claimants point to the opinion of the tribunal's majority in *Tokios Tokelės*, which has been cited in many other decisions[489].

379.  Claimants further aver that cases of "foreign control" are inapposite, because there is no reference to "control" in the first limb of Art. 25(2)(b) of the ICSID Convention, which applies to the present case[490].

---

[484] C-III, para. 228; C-PHB, para. 74.
[485] C-III, para. 230; C-PHB, para. 75.
[486] C-III, paras. 231 and 242; C-PHB, para. 75.
[487] C-III, para. 231; C-PHB, para. 76.
[488] C-III, para 231; C-PHB, para. 77.
[489] C-III, paras. 232-233; C-PHB, para. 78.
[490] C-III, paras. 239-241; C-PHB, para. 80.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

### b.    Nationality requirement of the ECT

380.  Claimants submit that Romania's position is also untenable in light of the clear language of Art. 1(7)(a) of the ECT, which defines "Investor" as "a company or other organization organized in accordance with the law applicable in that Contracting Party". Claimants argue that under the ordinary meaning of those terms, an investor need only be incorporated or organized in a Contracting's Party's territory. Nothing more is required. Because Anina and Giust are properly organized in accordance with the laws of Cyprus, they are covered "investors" for purposes of the ECT[491].

381.  Claimants point out that ECT tribunals unanimously have found that if a corporate claimant is incorporated under the laws of a Contracting State, the tribunal should not look further into the corporate structure[492].

382.  <u>In light of the above</u>, Claimants conclude that Anina and Giust meet the nationality requirements of the ICSID Convention and the ECT. Therefore, Romania's objection should be rejected[493].

### B.    <u>Romania cannot deny Anina and Giust the benefits of the ECT</u>

383.  Claimants contend that Romania cannot invoke Art. 17 of the ECT to deny Anina and Giust the advantages of the Treaty.

384.  The plain language of the Treaty contradicts Romania's position. The terms "third state" in Art. 17(1) of the ECT clearly refer to a State that is not a Contracting Party to the ECT. It does not refer to the host State, which is necessarily a Contracting Party to the ECT. Thus, Art. 17(1) of the ECT has no application in this dispute, because Anina and Giust are owned and controlled by a Romanian citizen, and Romania is not a third State[494].

385.  In any case, Claimants aver that Romania's argument must also fail because its invocation of Art. 17 of the ECT is untimely. Every ECT tribunal that has considered Art. 17 has held that a State may not invoke the denial of benefits clause after a dispute has arisen, or at least after it is submitted to arbitration[495]. A *jurisprudence constante* demonstrates that Romania's objection has no merit[496].

386.  <u>For the foregoing reasons</u>, Claimants submit that the Tribunal has jurisdiction over Anina and Giust[497] and that Romania's objection should be dismissed[498].

---

[491] C-III, para. 243; C-PHB, para. 81.
[492] C-III, paras. 244-245; C-PHB, para. 82.
[493] C-III, para. 246.
[494] C-III, paras. 248-249; C-PHB, paras. 84-86.
[495] C-III, para. 253; C-PHB, para. 87.
[496] C-III, paras. 255 *et seq*.
[497] C-PHB, para. 88.
[498] C-III, para. 258.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 95 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

3.    **DECISION OF THE TRIBUNAL**

387.    The Parties do not discuss that Anina and Giust, two companies incorporated in Cyprus in 2011[499], have as sole shareholder Mr. Catalin-Liviu, a Romanian national[500].

388.    Romania argues that given that they are owned and controlled by a Romanian national, Anina and Giust do not meet the nationality requirements under the ICSID Convention and the ECT, and that, consequently, the Tribunal lacks *ratione personae* jurisdiction to hear their claims. Claimants hold the opposite view.

389.    The Tribunal must once again interpret the relevant provisions of the ICSID Convention (**A.**) and the ECT (**B.**), in light of the principles established in Arts. 31 and 32 of the VCLT, previously defined in paras. 307-309 *supra*.

A.    **Anina and Giust qualify as investors under the ICSID Convention**

a.    **Interpretation of Art. 25(2)(b) of the ICSID Convention**

390.    Claimants argue that Anina and Giust qualify as investors because they have the nationality of Cyprus, another Contracting State to the ICSID Convention, and nothing further is required by Art. 25(2)(b) of the ICSID Convention[501].

391.    Romania, on the contrary, submits that pursuant to Art. 31(1) of the VCLT, the Tribunal must interpret the terms of the ICSID Convention in light of its object and purpose; and that if entities – such as Anina and Giust – that are wholly owned and controlled by a national of the host Contracting State were allowed to sue that State, the object and purpose of the ICSID Convention would be undermined[502].

392.    Art. 25(1) of the ICSID Convention provides that the jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a "Contracting State" and a "national of another Contracting State". Art. 25(2) goes on to define "national of another Contracting State", *inter alia*, as:

> "(b) any juridical person which had the nationality of a Contracting State other than the State party to the dispute on the date on which the parties consented to submit such dispute to conciliation or arbitration and any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention."

393.    Therefore, for the Centre's jurisdiction to extend to an investor, in accordance with Art. 25(1) of the ICSID Convention, the investor must be:

---

[499] **Doc. C-9**; **Doc. C-10**; **Edwards I**, Table 1.1.
[500] C-I, fn. 17; R-I, para. 428. See also **Doc. R-1**, p. 20; **Doc. R-2**, p. 19; **Doc. R-5**, p. 20; **Doc. R-6**, p. 19; **Edwards I**, para. 3.34.
[501] C-III, paras. 231 and 242; C-PHB, para. 75.
[502] R-III, para. 464; R-PHB, para. 63.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- A juridical person;

- Which has the nationality of a Contracting State other than the State party to the dispute;

- On the date on which the parties consented to submit such dispute to arbitration.

394. An interpretation of the terms of the treaty in "good faith", in accordance with the "ordinary meaning to be given to its terms" in their "context" shows that the ICSID Convention sets a single limit to the jurisdiction of the Centre: the investor must have the "nationality" of a Contracting State other than the State party to the dispute at the time of submitting the dispute to arbitration.

<u>Nationality requirement</u>

395. However, the ICSID Convention does not define the concept of "nationality"[503].

396. Prof. Schreuer explains that under traditional international law, there are several possible criteria for the determination of a juridical person's nationality; the most widely used test looks at the place of incorporation or registered office[504]. Prof. Schreuer goes on to explain that even though they amply debated the concept of corporate nationality (hesitating between including criteria either of seat or place of incorporation or looking at the "controlling interest" behind the company), the drafters of the ICSID Convention ultimately chose not to define the term. Instead, they left it to the Contracting States to delimit the concept of corporate nationality in their bilateral and multilateral treaties.

397. Nevertheless, according to Prof. Schreuer[505]:

"A systematic interpretation of Art. 25(2)(b) would militate against the use of the control test for a corporation's nationality. The second clause of Art. 25(2)(b) provides that a juridical person, even though it possesses the nationality of the host State, may be treated as a foreign investor by way of a special agreement 'because of foreign control'. By relying on control for the exception to host State nationality, the provision implies that host State nationality is not based on control. Therefore, it is clear that the control test cannot be applied to explain the word 'nationality' in the second clause of Art. 25(2)(b). It is unlikely that the word 'nationality' used earlier on in the same sentence in a more general context has a different meaning."

398. Rather than looking at who holds a controlling interest in the company, investment tribunals and legal doctrine have consistently found that the place of incorporation of the juridical person is sufficient to satisfy the nationality requirement under Art. 25(2) of the Convention[506]. Mr. Aron Broches, former Secretary-General of ICSID and one of the architects of the ICSID Convention, observed that "it is fair

---

[503] **Doc. RL-146**, p. 340.
[504] **Doc. RL-103**, p. 279, para. 694.
[505] **Doc. RL-103**, pp. 279-280, para. 697.
[506] **Doc. RL-103**, p. 281, para. 699.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

to concede that [Art. 25(2)(b)] implicitly assumes that incorporation is a criterion of nationality"[507].

399. Likewise, in *Soabi*, a 1984 decision signed by Mr. Broches himself, the tribunal noted that to determine the nationality of an investor under the ICSID Convention, most States applied either the criterion of the registered office or that of the place of incorporation.

400. In *Rompetrol*, a case against Romania, the tribunal found that[508]:

> "It does not, in the Tribunal's view, require any extended discussion to conclude that, within the framework of Article 25(2)(b) of the Convention, it is open to the Contracting Parties to a BIT to adopt incorporation under their own law as a necessary and also sufficient criterion of nationality for purposes of ICSID jurisdiction, without requiring in addition an examination of ownership and control, of the source of investment funds, or of the corporate body's effective seat. Incorporation in a given jurisdiction is a widely used criterion internationally for determining the nationality of corporate bodies, and States determine corporate nationality by a wide variety of criteria in a wide variety of contexts, as indeed the Respondent acknowledged at the oral hearing."

401. Likewise, in *H&H Entreprises*, the tribunal considered that the claimant in that case was a "legal entity incorporated in the State of California" and thus fulfilled "the objective criteria for *ratione personae* provided for in Article 25(2)(b) of the ICSID Convention"[509].

Application to the facts

402. In the present case, Anina and Giust are both juridical persons, incorporated in Cyprus in September and November 2011, respectively[510], which continued to be incorporated in Cyprus on the date the Parties consented to submit the dispute to arbitration (May 2018), as demonstrated by the certificates issued by the Cypriot Registrar of Companies and marshalled into the record of this arbitration as exhibits C-9 and C-10.

403. Considering that Cyprus is a Contracting State to the ICSID Convention, other than the State party to the present dispute (Romania), Anina and Giust meet the nationality requirement under the ICSID Convention.

**b.    Counter-arguments by Romania**

404. Romania argues that in light of the ICSID Convention's object and purpose, the Tribunal should look beyond the nationality of Anina and Giust, because even though they are incorporated in Cyprus, they are entirely owned, controlled, and

---

[507] **Doc. RL-146**, p. 360.
[508] **Doc. CL-159**, *Rompetrol*, para. 83.
[509] **Doc. CL-161**, *H&H Entreprises*, para. 68.
[510] **Doc. C-9**; **Doc. C-10**.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 98 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

operated by a Romanian national, they do not conduct business in Cyprus and they only conduct business in Romania[511].

405. Claimants disagree that in light of the ICSID Convention's object and purpose, the Tribunal should look for the true owner of the claimant; it is only in cases of perceived treaty-shopping that tribunals have been willing to look beyond the nationality of the named claimants, to the upstream shareholders[512].

*Tokios Tokelės*

406. Looking beyond the nationality of Anina and Giust would amount to "piercing the corporate veil" between these legal entities and their shareholder.

407. The Parties have amply debated the seminal *Tokios Tokelės* case (2004) and whether the Tribunal should follow the opinion of the tribunal majority or the dissenting opinion of its chairman, Prof. Prosper Weil[513]:

- While Romania argues that the tribunal majority's decision is flawed, and that the Tribunal should look to Prof. Weil's opinion and interpret Art. 25 of the Convention in light of its object and purpose;

- Claimants contend that Prof. Weil's opinion is an outlier and disregards the Convention's express desire of leaving the Contracting Parties to agree on any nationality requirements.

408. *Tokios Tokelės* is an ICSID case that involves certain Ukrainian nationals who had a corporation in Lithuania – constituted six years before the entry into force of the BIT – which in turn owned a Ukrainian subsidiary operating a publishing business in Ukraine. The Lithuanian claimant sued Ukraine under the Lithuania-Ukraine BIT, alleging that the State had seized the assets of its Ukrainian subsidiary. Ukraine opposed jurisdiction on the grounds that the Lithuanian company was not a genuine foreign investor, because it was owned and controlled by Ukrainian nationals and the company did not maintain substantial business activity in Lithuania. Ukraine requested the tribunal to pierce the corporate veil to determine that the real nationality of the investors was Ukrainian, and accordingly, dismiss the case for lack of jurisdiction[514].

409. *Tokios Tokelės* synthetizes the *status quaestionis* regarding investments made by companies controlled by nationals of the host State:

- While the majority of the tribunal upheld jurisdiction, finding that ICSID tribunals had consistently applied a test of incorporation when determining the nationality of a corporate person, without anything else being required[515];

---

[511] R-PHB, para. 64.
[512] C-III, para. 231; C-PHB, para. 76.
[513] **Doc. CL-164**, *Tokios Tokelės*, Decision on Jurisdiction and Dissent.
[514] **Doc. CL-164**, *Tokios Tokelės*, Decision on Jurisdiction and Dissent.
[515] **Doc. CL-164**, *Tokios Tokelės*, Decision on Jurisdiction, paras. 40-52.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 99 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- The Chairman, Prof. Weil, issued a dissenting opinion, arguing, *inter alia*, that[516]:

> "[t]he ICSID mechanism and remedy are not meant for, and are not to be construed as, allowing – and even less encouraging – nationals of a State party to the ICSID Convention to use a foreign corporation, whether preexistent or created for that purpose, as a means of evading the jurisdiction of their domestic courts and the application of their national law".

410. The *Tokios Tokelès* decision and the dissenting opinion offer the two alternative solutions to the subject-matter.

411. However, Prof. Weil's dissent has not been followed in treaty practice. In fact, the tendency in ICSID arbitrations has been exactly the opposite[517]: the principles laid down by the *Tokios Tokelès* majority have been followed by many other investment tribunals. According to Prof. Schreuer[518]:

> "The President's Dissenting Opinion reflects a particular appreciation of the ICSID Convention's object and purpose. But it is not supported by the text of Art. 25. The majority decision, on the other hand, is respectful of the clear terms of the parties' consent to use ICSID as expressed in the Lithuania-Ukraine BIT. The majority declared that they would be loath to undermine the basic principle that the cornerstone of ICSID's jurisdiction is party consent."

### *TSA Spectrum*

412. Romania has also sought to rely on the decision in *TSA Spectrum* to aver that the Tribunal should look beyond Anina and Giust's corporate structure[519]. The question put before the *TSA Spectrum* tribunal was whether TSA Spectrum, an Argentinian company, could institute arbitration under the ICSID Convention against the Republic of Argentina, by application of the second limb of Art. 25(2)(b) of the ICSID Convention[520], which provides that an "Investor of a Contracting State" is:

> "(b) [...] any juridical person which had the nationality of the Contracting State party to the dispute on that date and which, because of foreign control, the parties have agreed should be treated as a national of another Contracting State for the purposes of this Convention."

413. In other words, under the second limb of Art. 25(2)(b) of the ICSID Convention, a juridical person, even though it has the nationality of the host State, may be treated as a foreign investor by way of a special agreement "because of foreign control".

414. In *TSA Spectrum*, the applicable framework explicitly required the tribunal to establish who exerted control over the Argentinian subsidiary, in order to assess whether such company had standing to bring a claim. This discussion, however, is

---

[516] **Doc. CL-164**, *Tokios Tokelès*, Dissent, para. 30.
[517] **Doc. CL-163**, *KT Asia*, para. 121.
[518] **Doc. RL-103**, p. 290, para. 733.
[519] R-I, paras. 408 *et seq*.; R-II, para. 456.
[520] **Doc. RL-149**, *TSA Spectrum*, para. 122.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

of no assistance in the present case, not only because Anina and Giust did not have the nationality of Romania when the dispute started, but also because there is no allegation that Anina and Giust should be treated as nationals of another Contracting State due to foreign control.

\* \* \*

415. Ultimately, as pointed out by Claimants, ICSID tribunals do not pierce the corporate veil, because the nationality of the upstream shareholders is irrelevant to the nationality requirement in Art. 25(2) of the ICSID Convention[521].

416. The Contracting States to the ICSID Convention could have imposed an additional requirement of control, effectively barring corporations controlled by nationals of the State party to the dispute from submitting disputes to arbitration[522]; however, they did not do so.

417. Romania has not provided any compelling evidence that would justify piercing the corporate veil and disregarding Anina and Giust's nationality, and there seems to be no reason to do so. Anina and Giust were incorporated in Cyprus in September and November 2011, respectively, and acquired their interests in the Frăsinet Project Companies in 2012, long before the present investment dispute arose. There is no evidence of fraud or of an abuse of treaty.

## B.    Anina and Giust qualify as investors under the ECT

### a.    Interpretation of Art. 1(7) of the ECT

418. As previously noted, the drafters of the ICSID Convention left it to the Contracting States to set the parameters of nationality in their bilateral and multilateral treaties[523].

419. Romania submits that like the ICSID Convention, the ECT's object and purpose is to foster foreign investment in the energy sector and to afford protection to international investors. Thus, ECT claims can only be brought by entities that are genuinely foreign. Accordingly, entities that are owned and controlled by a national of the host State must not be allowed to bring claims under the ECT against said host State[524].

420. Claimants, on the other hand, aver that Romania's position is untenable in light of Art. 1(7)(a) of the ECT. Under the ordinary meaning of the terms of this provision, an investor need only be incorporated or organized in a Contracting's Party's territory; nothing else is required.

421. Art. 26 of the ECT provides that disputes between a "Contracting Party" and an "Investor of another Contracting Party" relating to an "Investment of the latter in

---

[521] **Doc. CL-161**, *H&H Entreprises*, para. 68; **Doc. CL-165**, *Burimi*, paras. 131-132.
[522] **Doc. RL-103**, p. 279, paras. 695-696.
[523] **Doc. CL-163**, *KT Asia*, para. 121.
[524] R-II, paras. 467-469; R-PHB, para. 69.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

the Area of the former" may be submitted to arbitration[525]. "Investor of a Contracting Party" is a term defined under Art. 1(7)(a) of the ECT[526]:

"'Investor' means: (a) with respect to a Contracting Party: […] (ii) a company or other organization organized in accordance with the law applicable in that Contracting Party;"

422. Therefore a "company […] organized in accordance with the law applicable in that Contracting Party" can be considered an "Investor of another Contracting Party" for purposes of Art. 26 of the ECT. Contrary to other treaties, the ECT contains no additional requirements, such as that of "seat" or "permanent seat"[527].

423. An interpretation of this provision, in good faith in accordance with the ordinary meaning to be given to its terms, demonstrates that for a Cypriot company to qualify as a protected investor under the ECT, it must simply be "organized in accordance with the law applicable" in Cyprus.

Case-law

424. Investment tribunals interpreting Art. 1(7) of the ECT have consistently found that it is irrelevant who owns or controls the company at any material time[528]; it is equally irrelevant whether the company is "in fact, an enterprise from an economic point of view"[529]; all that matters is that the investor is constituted in accordance with the law applicable in the Contracting Party[530].

425. Ultimately, this Tribunal concurs with the opinion of the *Saluka* tribunal, although it is not an ECT case[531]:

"240. The Tribunal has some sympathy for the argument that a company which has no real connection with a State party to a BIT, and which is in reality a mere shell company controlled by another company which is not constituted under the laws of that State, should not be entitled to invoke the provisions of that treaty. Such a possibility lends itself to abuses of the arbitral procedure, and to practices of 'treaty shopping' which can share many of the disadvantages of the widely criticised practice of 'forum shopping.'

241. However that may be, the predominant factor which must guide the Tribunal's exercise of its functions is the terms in which the parties to the Treaty now in question have agreed to establish the Tribunal's jurisdiction. In the present context, that means the terms in which they have agreed upon who is an investor who may become a claimant entitled to invoke the Treaty's

---

[525] **Doc. CL-1**, Art. 26.
[526] **Doc. CL-1**, Art. 1(7)(a).
[527] For instance, in *CEAC v. Montenegro* the BIT defined investor as a legal entity not only incorporated, constituted or otherwise duly organized according to the laws and regulations of one Contracting Party, but also "having its seat" in the territory of that same Contracting Party (**Doc. RL-162**, *CEAC*). The tribunal found that CEAC did not have a registered office in Cyprus and therefore declined jurisdiction.
[528] **Doc. CL-34**, *Plama*, para. 128.
[529] **Doc. RL-85**, *Isolux*, para. 667.
[530] **Doc. CL-15**, *Charanne*, para. 414.
[531] **Doc. CL-62**, *Saluka*, paras. 240-241.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

arbitration procedures. The parties had complete freedom of choice in this matter, and they chose to limit entitled 'investors' to those satisfying the definition set out in Article 1 of the Treaty. The Tribunal cannot in effect impose upon the parties a definition of 'investor' other than that which they themselves agreed. That agreed definition required only that the claimant-investor should be constituted under the laws of (in the present case) The Netherlands, and it is not open to the Tribunal to add other requirements which the parties could themselves have added but which they omitted to add."

<u>Application to the facts</u>

426. In the present case, Art. 3 of the Cypriot Companies Law provides that[532]:

"Any seven or more persons, or, where the company to be formed will be a private company, any one or more persons, associated for any lawful purpose may, by subscribing their names to a memorandum of association and otherwise complying with the requirements of this Law in respect of registration, form an incorporated company, with limited liability."

427. As proven by the affidavit of one of Romania's lawyers, the registers of both Anina and Giust are kept in the Trade Registry in Cyprus and available for public access[533]. Claimants have marshalled into the record the certificates of incorporation of Anina and Giust, by which the Cypriot Registrar of Companies attests that these two companies have been incorporated "under the Companies Law" as limited liability companies[534].

428. It follows that Anina and Giust are companies organized in accordance with the law applicable in Cyprus, a Contracting Party to the ECT; consequently, they qualify as investors under Art. 1(7) of the ECT.

**b.    Art. 17 of the ECT is not applicable to the present case**

429. Art. 17 of the ECT is a denial of benefits clause, under which a Contracting Party reserves the right to deny the advantages of Part III of the ECT (regarding "Investment Promotion and Protection") to certain entities and investments. In particular, Art. 17(1) provides that a Contracting Party may deny the Treaty's protections to[535]:

"a legal entity if citizens or nationals of a third state own or control such entity and if that entity has no substantial business activities in the Area of the Contracting Party in which it is organized;"

430. According to Romania, a "realistic" application of the ECT, taking into consideration its object and purpose, leads to the conclusion that respondent States may deny benefits to legal entities owned or controlled by their own nationals.

---

[532] **Doc. RL-161**, p. 30.
[533] **Doc. R-8**, para. 39.
[534] **Doc. C-9**; **Doc. C-10**.
[535] **Doc. CL-1**, Art. 17(1).

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Romania wishes to rely on Art. 17 to deny benefits to Anina and Giust, since they are entirely owned, controlled and operated by a Romanian national[536].

431. Claimants, on the contrary, argue that Art. 17 is not applicable to the present case, since it only concerns "third states", *i.e.*, States that are not Contracting Parties to the ECT. In any case, Claimants argue that the denial of benefits clause cannot be invoked retrospectively[537].

432. The Tribunal decides in favor of Claimants.

433. Nothing in Art. 17 of the ECT suggests that respondent States may deny ECT benefits to legal entities that are owned or controlled by citizens or nationals of the host State, when such host State is a Contracting Party to the ECT. A plain reading of Art. 17, in "good faith" and in accordance with the "ordinary meaning" of its terms, shows that this provision applies to legal entities which are owned or controlled by citizens or nationals of "third states". Under the ECT, a "third state" is any State that is not a Contracting Party to the ECT. This becomes clear in Art. 1(7) of the ECT, which distinguishes between investors of a "Contracting Party", on the one hand, and investors of a "third state", on the other hand.

434. The *Charanne* tribunal made the exact same finding[538]:

> "To adopt the argument of Spain would amount to denial of benefits whenever an investor, legal entity incorporated under the applicable law of a Contracting Party in accordance with Article 1(7)(a)(ii), was controlled by citizens or nationals of the State receiving the investment. However, the drafters of the ECT did not intend to include this hypothesis in the denial of benefits clause of Article 17, which relates to the situation of a legal entity controlled by shareholders of a third country (a third country being a country not party to the ECT)." [Emphasis added]

435. This is further supported by the object and purpose of the ECT, which is to confer certain benefits upon investors of Contracting Parties to this multilateral instrument. *A contrario*, third states do not necessarily benefit from those protections, in application of the general rules regarding third States reflected in Art. 34 of the VCLT[539]:

> "A treaty does not create either obligations or rights for a third State without its consent."

436. Having reached this conclusion, the issue of whether the denial of benefits clause can or not be invoked retrospectively has become moot.

* * *

---

[536] See R-II, paras. 479-515.
[537] C-PHB, paras. 84-87.
[538] **Doc. CL-15**, *Charanne*, para. 416.
[539] **Doc. CL-33**, Art. 34.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

437. <u>In view of the above</u>, the Tribunal confirms that it has jurisdiction *ratione personae* over Anina and Giust and dismisses Romania's objection.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

# V.3. <u>INTRA-EU OBJECTION</u>

1. <u>RESPONDENT'S POSITION</u>

438. Romania avers that the Tribunal lacks jurisdiction over the present dispute because the arbitration clause of the ECT is inapplicable to intra-EU disputes. Romania submits that its objection is based exclusively on international law[540]: the Tribunal must determine whether intra-EU disputes are within the scope of the ECT arbitration clause (Art. 26); this requires the Tribunal to interpret the ECT in accordance with the rules of interpretation of the VCLT (**A.**)[541].

439. Romania avers that if the Tribunal were to find that it has jurisdiction under the ECT, next the Tribunal would be called upon to address, as a matter of international law, the interrelationship of concurrent treaties signed by the same parties (the ECT and the EU Treaties). In particular, the Tribunal must establish whether Art. 26 of the ECT ceased to apply to intra-EU disputes as a result of the entry into force of the Treaty of Lisbon (**B.**). If the ECT and EU Treaties are found to be in conflict, the conflict must be resolved under international law pursuant to the applicable conflict-resolving rules (**C.**)[542].

440. Romania contends that, in any event, the Tribunal should decline to exercise jurisdiction on the ground that its award would be unenforceable in the EU and potentially elsewhere (**D.**)[543].

A. <u>Intra-EU disputes are outside the scope of Art. 26 of the ECT</u>

441. Romania notes that the Tribunal's jurisdiction over this dispute stems from the arbitration clause of Art. 26 of the ECT. Thus, the Tribunal must first determine whether the present intra-EU dispute falls within the scope of this provision. To do so, the dispute must meet the three conditions for jurisdiction under Art. 26(1) of the ECT[544]:

- That the investor has "another" nationality or citizenship than that of the respondent State to the dispute;

- That the investment has a cross-border character with respect to the "Area" of the respondent to the dispute; and

- That the obligation allegedly breached is an obligation "of" the respondent Contracting Party under Part III of the ECT.

---

[540] R-II, para. 28; R-PHB, para 7.
[541] R-II, paras. 6, 20; R-PHB, para. 7.
[542] R-II, paras. 6, 21-22; R-PHB, para. 7.
[543] R-II, paras. 8, 23; R-PHB, paras. 7-9.
[544] R-II, para. 61.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

442. Romania submits that intra-EU disputes fail to meet any of these three conditions[545].

443. <u>First</u>, there is no diversity of citizenship between EU investors and EU Member States. When EU investors invest in other EU Member States, they do so as EU citizens[546].

444. <u>Second</u>, intra-EU investments are not cross-border investments. This is because the EU's internal market is an area without internal frontiers[547].

445. <u>Third</u>, with respect to intra-EU investments, obligations under Part III of the ECT (including, *inter alia*, the fair and equitable treatment ["**FET**"] obligation) are not obligations "of" EU Member States. Rather, they are obligations "of" the EU because competence over intra-EU foreign investments has been transferred by the Member States to the EU[548].

446. <u>As a result</u>, for failure to meet any one or all three of the conditions for jurisdiction, intra-EU disputes are outside the scope of the arbitration clause in Art. 26 of the ECT, and the Tribunal must decline jurisdiction over the present dispute[549].

### B.   If found to cover intra-EU disputes, Art. 26 of the ECT has ceased to apply after the Treaty of Lisbon

447. Romania submits that if the Tribunal were to find that this intra-EU dispute is within the scope of the arbitration clause of Art. 26 of the ECT, it must then determine whether, pursuant to Art. 41 of the VCLT, the Treaty of Lisbon constitutes an agreement to modify the ECT, with the effect of disapplying the arbitration clause in Art. 26 of the ECT as between EU Member States[550].

448. Romania argues that if the Tribunal were to find that Romania has had any intra-EU obligations under Part III of the ECT, those obligations would necessarily have become obligations "of" the EU and not "of" Romania pursuant to the Lisbon Treaty. As a result, the third condition for jurisdiction under Art. 26 of the ECT would not be met as of the entry into force of the Lisbon Treaty, and the Tribunal should decline jurisdiction[551].

### C.   If interpreted as applying to intra-EU disputes, Art. 26 of the ECT conflicts with the TFEU and must be disapplied

449. Respondent avers that if the Tribunal were to find that this dispute is within the scope of the ECT arbitration clause, it must then examine whether there is a treaty conflict between the ECT and the Treaty on the Functioning of the European Union

---

[545] R-PHB, para. 10.
[546] R-PHB, para. 10.
[547] R-PHB, para. 10.
[548] R-II, paras. 63-64; R-PHB, para. 10.
[549] R-PHB, para. 10.
[550] R-PHB, para. 11.
[551] R-PHB, para. 11.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

["**TFEU**"] (**a.**). And if the Tribunal finds that there is a treaty conflict, then the Tribunal must determine which treaty prevails under the applicable conflict-resolving rules of international law (**b.**).[552]

### a.    There is a conflict between Art. 26 of the ECT and Arts. 267 and 344 of the TFEU

450.  According to Romania, to determine whether a treaty conflict exists, the Tribunal must ascertain whether Romania can comply simultaneously with its obligations under Art. 26 of the ECT, on the one hand, and under Arts. 267 and 344 of the TFEU, on the other[553].

451.  Romania avers that the nature of the obligations under Arts. 344 and 267 of the TFEU has been defined by the Court of Justice of the European Union [previously defined as "**CJEU**"] in its settled case law, including the *Achmea* Judgment[554]. According to Romania, an international agreement is incompatible with Arts. 267 and 344 of the TFEU if it displays the three following characteristics[555]:

   -    The international agreement allows a court or tribunal to interpret or apply the EU Treaties;

   -    Such court or tribunal is outside the EU judicial system and thus does not qualify under Art. 267 of the TFEU as a court or tribunal of an EU Member State; and

   -    Decisions rendered by such court or tribunal are not subject to a review by a court or tribunal of an EU Member State or by the CJEU.

452.  Romania argues that Art. 26 of the ECT has all the characteristics of incompatibility under the *Achmea* standard[556].

453.  Therefore, it is Romania's position that there is a clear treaty conflict between the ECT and the TFEU[557].

454.  Romania avers that pursuant to Arts. 267 and 344 of the TFEU, Romania and all the other States relevant to this arbitration cannot submit an intra-EU dispute to a dispute resolution mechanism outside of the EU judicial system that would result in an arbitral tribunal interpreting or applying the EU Treaties. Art. 26 of the ECT is precisely that type of mechanism and therefore is not compatible with the TFEU[558].

---

[552] R-PHB, para. 12.
[553] R-PHB, para. 13.
[554] R-PHB, para. 13.
[555] R-II, para. 183.
[556] R-II, paras. 186-197; R-PHB, para. 13.
[557] R-PHB, para. 13.
[558] R-PHB, para. 13.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

455. Romania argues that its conclusion is shared by the EC and most EU Member States (including all the States in which Claimants are incorporated – all of which are parties to the ECT and the EU Treaties)[559].

Opinion of the Advocate General of the CJEU and the *Komstroy* Judgment

456. Romania further points out to the recent opinion of the Advocate General of the CJEU, Mr. Maciej Szpunar, of 3 March 2021, and the subsequent Judgment of the CJEU, of 2 September 2021, in case C-741/19 between the Republic of Moldova and Komstroy [previously defined as the "***Komstroy* Judgment**"].

457. Regarding the Opinion, Respondent notes that the Advocate General:

- Confirmed that the standard of incompatibility established in the *Achmea* Judgment applies to Art. 26 of the ECT;

- Observed that, since the EU Treaties establish rules of international law, an ECT arbitral tribunal may be called upon to interpret and apply the EU Treaties pursuant to Art. 26(6) of the ECT;

- Noted that an ECT arbitral tribunal cannot refer preliminary questions on the interpretation of the EU Treaties to the CJEU pursuant to Art. 267 of the TFEU and is thus outside the EU judicial system;

- Found that it is irrelevant that the ECT is a multilateral treaty to which the EU is a party; and

- Concluded that the arbitration of intra-EU disputes under the ECT is incompatible with the EU Treaties and that such disputes could be brought in the national courts of EU Member States.

458. Respondent notes that the *Komstroy* Judgment also confirmed that the *Achmea* Judgment standard of incompatibility applies to Art. 26 of the ECT, as arbitral tribunals constituted in accordance with such provision[560]:

- Are required to interpret, and even apply, EU law;

- Do not constitute a component of the judicial system of an EU Member State within the meaning of Art. 267 of the TFEU; and

- Although their decisions may be subject to review by intra-EU courts in certain cases (*ad-hoc* tribunals), such review is limited in scope and does not constitute the kind of review requested for its compatibility.

---

[559] R-PHB, para. 14.
[560] R-Komstroy, paras. 12-15.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

459. Romania finds that the Opinion of the Advocate General and the *Komstroy* Judgment are highly relevant to the present dispute because[561]:

- The Advocate General has clearly and expressly confirmed that the standard of incompatibility of the *Achmea* Judgment applies to Art. 26 of the ECT; this is so irrespective of the factual background of the case brought before the CJEU, since the Advocate General is presenting an opinion of principle;

- There is a debate as to whether a tribunal in establishing its jurisdiction must rely on the law in force when it renders its award or when the arbitration commences; this question does not arise in the present case as the law has not changed since the commencement of this arbitration (at the time when Claimants submitted their Request for Arbitration, the TFEU and the *Achmea* Judgment were all in force); the Advocate General's Opinion is just another element that confirms the correctness of Romania's interpretation of the law; and

- The CJEU has confirmed in the *Komstroy* Judgment that intra-EU arbitration clauses are incompatible with EU Treaties, even if enshrined in mixed agreements to which the EU is a party.

460. Romania further argues that, by means of the *Komstroy* Judgment, the CJEU has not created any new law; the *Komstroy* Judgment simply clarifies the meaning and application of existing treaty provisions and judgments of the CJEU itself[562].

461. Romania submits that in light of the *Achmea* and the *Komstroy* Judgments, the analysis of the EU Commission (including its *Amicus Curiae* Brief before the Tribunal), the Declaration of the EU Member States who are parties to the ECT and the TFEU, and the recent Opinion of the Advocate General, the ECT and the TFEU are clearly conflicting[563].

**b.    The TFEU prevails over the ECT under conflict-resolving rules**

462. Romania submits that given that a treaty conflict has been established, the Tribunal must determine which treaty prevails under the applicable conflict-resolving rules of international law. In the ECT and the TFEU, Art. 16 and Art. 351, respectively, establish those rules[564].

Art. 16 of the ECT

463. First, Romania argues that the Tribunal must turn to Art. 16, the ECT's conflict-resolving clause.

464. Romania avers that the Tribunal must first determine whether Art. 16 can be applied at all given that it is incompatible with Art. 4(3) of the TEU because it allows for

---

[561] R-PHB, paras. 15-17; R-Komstroy, para. 17.
[562] R-Komstroy, para. 28.
[563] R-PHB, para. 18.
[564] R-PHB, para. 19.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

derogation from the EU Treaties[565]. If the Tribunal were to find that Art. 16 of the ECT can be applied, then the Tribunal must determine whether the precondition for the application of Art. 16 is met, *i.e.*, whether the two conflicting treaties relate to the same subject-matter[566].

465. If the Tribunal finds that Art. 16 does not apply either because it is incompatible with Art. 4(3) of the TEU or because its same-subject matter precondition is not met, then the Tribunal must resolve the conflict based exclusively on Art. 351 of the TFEU[567].

466. If, to the contrary, the Tribunal finds that Art. 16 does apply, the Tribunal must then determine whether the provisions of the ECT or those of the TFEU are more favorable to the investor or the investment, since the most favorable treaty prevails under Art. 16 of the ECT. According to Romania, the provisions of the TFEU are more favorable and thus prevail over Art. 26 of the ECT (for instance, the judicial system under the TFEU provides predictability in the application of the rule of law, whereas the ISDS system produces contradictory decisions by different tribunals). Thus, if Art. 16 applies, the TFEU prevails[568].

Art. 351 of the TFEU

467. Romania submits that under the conflict-resolving rule in Art. 351 of the TFEU, the TFEU prevails over the ECT in the relations of EU Member States, pursuant to the settled case law of the CJEU[569].

468. In short, Romania argues that[570]:

-   If Art. 16 of the ECT applies and provides that the TFEU prevails, both conflict-resolving rules would give priority to the same treaty, namely the TFEU, and the TFEU must prevail over the ECT;

-   If Art. 16 does not apply at all, then the TFEU must prevail over the ECT pursuant to Art. 351 of the TFEU, which would be the only applicable *lex specialis* conflict-resolving rule; and

-   If Art. 16 does apply but is found to provide that the ECT prevails, then the two applicable conflict-resolving rules would not give priority to the same treaty; it is in that case only that the Tribunal must turn to the general conflict-resolving rule under Art. 30 of the VCLT in order to resolve the conflict.

---

[565] R-PHB, para. 20.
[566] R-PHB, para. 20.
[567] R-PHB, para. 20.
[568] R-PHB, para. 20.
[569] R-PHB, para. 21.
[570] R-PHB, para. 22.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Art. 30 of the VCLT

469. Romania notes that Art. 30 of the VCLT applies only if the conflicting treaties relate to the same subject-matter.

470. Art. 16 of the ECT can only apply if the conflicting treaties concern the same subject-matter; otherwise, Art. 16 will be found not to apply. Thus, if the Tribunal needs to resolve the conflict pursuant to Art. 30 of the VCLT, it will necessarily have found already that the treaties concern the same subject-matter[571].

471. Romania argues that under Art. 30 of the VCLT, the treaty that is *lex posterior* prevails. Romania avers that the TFEU is the later treaty and thus also prevails in application of Art. 30 of the VCLT[572]. The TFEU postdates the ECT and this is unaffected by the fact that the conflicting obligations in the TFEU existed in older versions of EU Treaties that predated the ECT. In fact, those older versions have been superseded by later amending treaties. The only EU treaties that are now applicable and that were applicable at all times relevant to the present dispute are the TEU and the TFEU, as amended by the Treaty of Lisbon[573]. Additionally[574]:

- The *lex posterior* rule in Art. 30 of the VCLT by its express terms gives priority to the "later treaty" and not to later incompatible provisions; thus, there is no basis under Art. 30 for determining the *lex posterior* according to the date when the conflicting obligations were originally adopted instead of the date of the applicable conflicting treaty;

- To take the view that the conflicting obligations were frozen at the time of their original adoption would require dividing up the conflicting treaty so that different provisions in the same treaty would have different dates; amended provisions would be *lex posterior*, while unamended provisions in the same treaty would be *lex priori*; nothing in the VCLT suggests this;

- The amended treaty, and not the original one, is the applicable treaty among the State parties to the treaty; the TFEU as amended by the 2007 Treaty of Lisbon is the applicable treaty among EU Member States, and older versions are no longer applicable; as a result, for purposes of the *lex posterior* rule, the date of the TFEU is that of the 2007 Treaty of Lisbon; it is thus the later treaty under Art. 30 of the VCLT, irrespective of whether the conflicting obligations existed in prior versions of EU treaties that predated the ECT; and

- To find otherwise, in this case, would bind Romania to versions of the EU treaties that it was never a party to, which cannot be accepted under international law.

---

[571] R-PHB, para. 23.
[572] R-PHB, para. 23.
[573] R-PHB, paras. 24-26.
[574] R-PHB, paras. 27-30.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

472. In sum, Romania submits that the TFEU is the later treaty pursuant to the *lex posterior* rules. As a result, it must prevail over the ECT if the conflict is resolved pursuant to Art. 30 of the VCLT[575].

### D.    The Tribunal should decline jurisdiction on grounds of unenforceability

473. Finally, Romania submits that the Tribunal has a duty to render an enforceable award. Thus, should the Tribunal find that it has jurisdiction, it should nonetheless decline to exercise it given that an award rendered in this arbitration would be unenforceable in the EU and potentially elsewhere[576]. The courts of the EU Member States will not enforce an ICSID award rendered in an intra-EU dispute, given that such award would violate Arts. 267 and 344 of the TFEU[577].

\* \* \*

474. Romania notes that the previous intra-EU decisions on which Claimants rely to argue that Romania's arguments have been rejected by other international arbitral tribunals are inapposite. Those decisions adopted inconsistent reasoning, were incorrectly decided and, in any case, are not binding on the Tribunal since there is no *stare decisis* in international arbitration[578].

475. In sum, Romania requests that the Tribunal find that it lacks jurisdiction over this intra-EU dispute.

476. Romania recalls that States and/or the EU, and not investors, are the contracting parties to the treaties here in question. Most EU Member States have signed a formal Declaration in which they agreed with the EC that Art. 26 of the ECT does not cover intra-EU disputes. Those States have further indicated in the same Declaration that, if applied to intra-EU disputes, Art. 26 would negatively affect the autonomy of the EU and would be in conflict with the EU Treaties. These same States agreed that Art. 26, if so interpreted, would have to be disapplied. They further stated that any award applying Art. 26 of the ECT to intra-EU disputes would be unenforceable in the courts of all EU Member States. Thus, those Member States have expressly stated how they understand the treaties that they themselves entered into[579] – and this Tribunal should consider the will of the State parties to the treaties.

### 2.    CLAIMANTS' POSITION

477. Claimants note that no less than 34 arbitral tribunals constituted under the ECT unanimously rejected the argument that the ECT's dispute resolution provisions do

---

[575] R-PHB, para. 31.
[576] R-PHB, para. 33.
[577] R-II, paras. 337-350.
[578] R-II, paras. 31-39.
[579] R-II, para. 30; R-PHB, paras. 34-35.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

not apply to "intra-EU" disputes – including 26 tribunals that have issued their decisions after the CJEU's decision in *Achmea*[580].

478. According to Claimants, Romania's argument contains three fundamental errors[581]:

- First, the ECT does not recognize or permit an "intra-EU" objection (**A.**);

- Second, the ECT does not conflict with EU law; even if it did, the ECT would prevail over EU law (**B.**); and

- Third, the *Achmea* Judgment does not apply to ECT, while the *Komstroy* Judgment is not relevant to the Tribunal's determination of its jurisdiction over this dispute (**C.**).

**A.    The ECT does not recognize or permit an "intra-EU" objection**

479. Claimants aver that, properly interpreted, the ECT does not envision or permit an "intra-EU" objection. The ECT exclusively governs and determines the Tribunal's jurisdiction. Since it derives from a binding instrument of international law, the Tribunal's jurisdiction does not arise from and is not subject to the EU legal order[582].

480. Claimants argue that, under Art. 26(3)(a) of the ECT, Romania gave its unconditional consent to arbitrate disputes. The only question is whether Art. 26(3), interpreted in accordance with Art. 31 of the VCLT, grants the Tribunal jurisdiction to hear the dispute. And in the present case it does (as several arbitral tribunals have recognized). There is no need for interpretation when treaty terms are clear[583].

481. It is Claimants' position that the Contracting Parties to the ECT could not have intended for Art. 26(3) of the ECT to exclude intra-EU disputes. If the Contracting Parties had wished to exclude intra-EU disputes from the scope of Art. 26(3), they could have included a disconnection clause in the ECT, much as they did in relation to the Svalbard archipelago[584]. More importantly, the fact that the Commission tried, but failed to include a disconnection clause providing for an intra-EU exception during the negotiation of the ECT conclusively proves that intra-EU disputes are included within the scope of Art. 26(3)[585].

482. <u>Accordingly</u>, Claimants submit that Romania's intra-EU objection fails on the plain and express terms of Art. 26(3) of the ECT[586].

---

[580] C-PHB, para. 10.
[581] C-PHB, para. 11.
[582] C-PHB, para. 12.
[583] C-PHB, paras. 13-14; C-Komstroy, paras. 3-9.
[584] C-PHB, paras. 16-17.
[585] C-PHB, para. 18.
[586] C-PHB, para. 19.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

### B.  The ECT does not conflict with EU Law (but even if it did, ECT would prevail)

483. Furthermore, Claimants contend that, contrary to Romania's position, there is no conflict between the ECT and EU law, particularly between Art. 26 of the ECT and Arts. 267 and 344 of the TFEU. Claimants note that ECT tribunals have uniformly and repeatedly rejected Romania's argument[587].

484. Claimants argue that there is little overlap – and certainly no conflict – between the ECT and EU law. Claimants' claims in this arbitration are based on the ECT and the interpretation of its standards under public international law. Claimants are not asserting any claims under or based on EU law. Thus, this Tribunal is not called upon to apply or interpret EU law. At most, EU law is relevant as part of the factual matrix of the dispute, like any other relevant domestic law[588].

485. In any case, Claimants assert that if there was a conflict between the ECT and EU law – *quod non* – the ECT would prevail. This is because the Tribunal is bound to operate within its own legal sphere and apply its own rules for resolving the conflict[589]. Claimants note that Art. 16 of the ECT is the relevant applicable provision. Art. 16 privileges the "more favorable" provision to the investor in case of treaty conflict. Claimants submit that forcing an investor to litigate before a host country's local courts is less favorable than affording an investor the choice of resorting to international arbitration. Having a choice is always better than not having a choice[590].

486. <u>Therefore</u>, Claimants submit that Romania's objection must fail even if there were a conflict between the ECT and EU law (which there is not)[591].

### C.  The *Achmea* and *Komstroy* Judgments are irrelevant

487. It is Claimants' position that the *Achmea* Judgment, the Opinion of the Advocate General of the CJEU in case C-741/19 between the Republic of Moldova and Komstroy, and the subsequent *Komstroy* Judgment, are all unavailing[592].

488. <u>First</u>, the opinions of the Advocate General of the CJEU on matters of EU law, as well as CJEU's Judgments in this regard[593], are entirely irrelevant to any issue before this Tribunal, including its jurisdiction. The Tribunal's jurisdiction is governed by the ECT, a binding instrument of public international law. The Tribunal is a creature of public international law, and its jurisdiction is not and may not be governed nor impacted by developments within the regional legal order of

---

[587] C-PHB, paras. 20-22.
[588] C-PHB, para. 23.
[589] C-PHB, para. 24.
[590] C-PHB, para. 25.
[591] C-PHB, para. 26.
[592] C-PHB, paras. 35-36; C-Komstroy, para. 45.
[593] C-Komstroy, para. 10.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 115 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

the EU[594]. In any case, Claimants contend that the Advocate General's Opinion is not reliable since it reveals incomplete and contradictory reasoning[595].

489. <u>Second</u>, the *Komstroy* Judgment has no conflict analysis under international law, something which this Tribunal would be required to do in order to determine whether any conflict exists[596]. Claimants aver that the CJEU did not undertake an international law analysis to ascertain the meaning of the ECT, and it did not employ or even refer to the international principles of treaty interpretation or the VCLT[597]. Claimants further contend that the *Komstroy* Judgment has been criticized as improper[598] and has been considered irrelevant by several arbitral tribunals[599].

490. In any event, Claimants argue that even if the *Komstroy* Judgment had some bearing on how this Tribunal is to view its jurisdiction (*quod non*), Romania's jurisdictional objection would be bound to fail. A tribunal's jurisdiction is determined by reference to the date on which judicial proceedings are instituted, which is recognized as the date on which the request for arbitration is filed[600]. Therefore, the Tribunal would still have jurisdiction, because the *Komstroy* Judgment has no automatic effect on EU Member States' international commitments under the ECT: their unconditional consent to arbitration under ECT remains in effect unless and until EU Member States remove any conflict created by the *Komstroy* Judgment, by amending or withdrawing from the ECT[601].

\* \* \*

491. <u>In conclusion</u>, Claimants submit that the ECT applies to intra-EU disputes, as unanimously decided by at least 34 ECT arbitral tribunals, and Romania's objection should be dismissed[602].

## 3.   DECISION OF THE TRIBUNAL

492. Romania argues that the Tribunal lacks competence over the present dispute because the arbitration clause of the ECT is inapplicable to intra-EU disputes[603]. According to Romania, the Tribunal should analyze this objection pursuant to the following tree of arguments[604]:

-   <u>First</u>, Romania avers that intra-EU disputes are outside the scope of Art. 26 of the ECT, since they fail to meet the necessary conditions;

---

[594] C-PHB, para. 36; C-Komstroy, para. 15.
[595] C-PHB, para. 43.
[596] C-Komstroy, para. 20.
[597] C-Komstroy, para. 20.
[598] C-Komstroy, para. 42.
[599] Claimants' submission of 13 December 2021.
[600] C-PHB, para. 41.
[601] C-Komstroy, para. 37.
[602] C-PHB, para. 44.
[603] R-II, para. 22; R-PHB, para 7.
[604] R-II, p. 8.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- **Second**, if the Tribunal were to find that intra-EU disputes fall within the scope of Art. 26 of the ECT, Romania submits that, pursuant to Art. 41 of the VCLT, the Treaty of Lisbon constitutes an agreement to modify the ECT, with the effect of disapplying the arbitration clause in Art. 26 of the ECT between EU Member States;

- **Third**, if the Tribunal were to interpret that Art. 26 of the ECT applies to intra-EU disputes, Art. 26 conflicts with Arts. 267 and 344 of the TFEU, and must be disapplied; indeed, the TFEU prevails over the ECT under conflict-resolving rules; and

- **Finally**, if the Tribunal were to find that it has jurisdiction, the Tribunal should decline to exercise such jurisdiction given that an award rendered in this arbitration would be unenforceable in the EU and potentially elsewhere.

493. Claimants disagree and submit that the ECT does not recognize or permit an "intra-EU" objection. In any event, Claimants contend that the ECT does not conflict with EU law, and even if it did, the ECT should prevail over EU law, as unanimously decided by at least 34 ECT tribunals.

494. Upon careful examination of the Parties' submissions, the Tribunal finds that Claimants and Romania have validly given their consent to adjudicate this investment dispute through ICSID arbitration. In short, the Centre's jurisdiction and the Tribunal's competence derive from such consent, this consent remains in force, and, consequently, Romania's intra-EU objection must be dismissed.

495. The Tribunal will first turn to the facts underlying Romania's jurisdictional objection and provide *pro memoria* a chronology of events (**3.1**). The Tribunal will then address Romania's tree of arguments, establishing the reasons that support its decision to dismiss this jurisdictional objection (**3.2**).

### 3.1    CHRONOLOGY OF RELEVANT EVENTS

496. The present dispute opposes Romania and Claimants, which consist in ten companies incorporated under the laws of Austria, Cyprus, Germany, the Netherlands and Romania. All of these States are Members of the EU.

497. The Tribunal will summarize chronologically a number of events which are relevant for the adjudication of Romania's jurisdictional objection.

### A.    1952-1958: The creation of the European Communities

498. In 1952, six European countries, including the Netherlands and West Germany, created the European Coal and Steel Community ["**ECSC**"] by signing the Treaty of Paris. Five years later, in 1957, building on the success of the ECSC, these six founding countries signed two other treaties (known as the Treaties of Rome), establishing the European Economic Community ["**EEC**"] and the European Atomic Energy Community ["**Euratom**"]. This gave rise to the "European Communities".

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

### B. 1966-1975: ICSID Convention

499.    The ICSID Convention entered into force for the Netherlands on 14 October 1966, for Germany on 18 May 1969, for Austria on 24 June 1971, and for Romania on 12 October 1975.

### C. 1992: Treaty of Maastricht

500.    In 1992, the members of the European Communities concluded the Treaty on the European Union ["**TEU**" or "**Treaty of Maastricht**"], thereby merging the three communities into one. The Treaty, which entered into force on 1 November 1993, officially created the "European Union".

### D. 1995: Austria accedes to the EU

501.    In 1994, Austria signed and ratified the Treaty of Accession to the EU, and officially acceded to the EU in 1995.

### E. 1994-1998: ECT

502.    After the end of the Cold War, Western and Eastern European States began to negotiate a framework to promote East-West cooperation in the energy sector[605]. This led to the signature on 17 December 1991 of a "European Energy Charter", a non-binding declaration of principles negotiated among more than 50 States (including some non-European States, such as Canada, the United States, Australia and Japan) and the European Communities[606].

503.    However, before this European Energy Charter was even signed, the Charter Conference had already begun negotiating an agreement to implement its principles and objectives on a binding basis – this project became the ECT[607].

504.    After long negotiations, on 17 December 1994, more than 50 States and the "European Communities"[608] signed the ECT in Lisbon, with the goal of ensuring[609]:

> "[…] the creation of a 'level playing field' for energy sector investments throughout the Charter's constituency, with the aim of reducing to a minimum the non-commercial risks associated with energy-sector investments."

---

[605] **Doc. CL-216**, paras. 2.06-2.07.

[606] **Doc. CL-216**, para. 2.07.

[607] **Doc. CL-216**, para. 2.08.

[608] **Doc. CL-1**, p. 224. As explained by Dr. Crina Baltag, "When the European [Energy] Charter [predecessor of the ECT] was concluded in 1991, there were three European Communities […]. Between the conclusion of the European [Energy] Charter in 1991 and the signature of the ECT in 1994, the Member States of the European Communities created the EU. […] With the establishment of the EU, the TEU changed the name of the EEC to the European Community (EC). The TEU also established the concept of citizenship of the EU for persons holding the nationality of the Member States. […] In 1994, the ECT was signed by the European Communities […]. With the entry into force of the Treaty on the Functioning of the European Union in December 2009 (TFEU), EU replaced and succeeded the EC." (C. Baltag, *The Energy Charter Treaty, The Notion of Investor*, Kluwer Law International (2012), pp. 58-60).

[609] **Doc. CL-1**, p. 14; **Doc. CL-216**, para. 2.08.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

505. Romania, Germany, Austria, the Netherlands and Cyprus ratified the ECT on 10 March 1996[610], 14 March 1997[611], 12 August 1997[612], 11 December 1997[613] and 2 January 1998[614], respectively. When submitting their ratification instrument to the ECT Secretariat in 1998, the European Communities expressly affirmed that[615]:

> "The European Communities and their Member States have both concluded the Energy Charter Treaty and are thus internationally responsible for the fulfilment of the obligations contained therein, in accordance with their respective competences.
>
> The Communities and the Member States will, if necessary, determine among them who is the respondent party to arbitration proceedings initiated by an Investor of another Contracting Party. In such case, upon the request of the Investor, the Communities and the Member States concerned will make such determination within a period of 30 days."

506. A footnote to this latter statement reads that "[t]his is without prejudice to the right of the investor to initiate proceedings against both the Communities and their Member States"[616].

507. The ECT entered into force on 16 April 1998.

### F.    **2004: Cyprus accedes to the EU**

508. On 1 May 2004, the largest single enlargement of the EU took place, leading the so-called A10 countries, including Cyprus, to join the EU.

### G.    **2006-2007: The Commission's position in *Eastern Sugar***

509. The issue of the compatibility between intra-EU BITs and EU law was raised for the first time in the case of *Eastern Sugar v. Czech Republic*[617]. The partial award rendered in 2007 appears to be the first published investment arbitration award addressing this issue.

510. *Eastern Sugar* was an UNCITRAL arbitration seated in Paris, under the Czech-Netherlands BIT of 1991. The Dutch investor, Eastern Sugar, alleged that certain regulatory measures adopted by the Czech Republic between 2000 and 2003 had breached the underlying BIT. The Czech Republic raised the objection that upon the Republic's accession to the EU in May 2004, the EU Treaties had superseded the intra-EU BIT, since both agreements regulated the same subject-matter.

---

[610] **Doc. C-15**.
[611] **Doc. C-19**.
[612] **Doc. C-18**.
[613] **Doc. C-17**.
[614] **Doc. C-20**.
[615] **Doc. EC-15**, p. 1.
[616] **Doc. EC-15**, fn. 1.
[617] **Doc. CL-36**, *Eastern Sugar*.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

511.  The *Eastern Sugar* tribunal dismissed the jurisdictional objection raised by the Czech Republic, noting that the BIT had not been expressly terminated by the Accession Treaty of the Czech Republic, nor by the Contracting States pursuant to the termination procedure of the BIT[618].

512.  During this arbitration, the Czech Republic consulted the EC, who filed an opinion in January 2006. In its opinion, which is reproduced in the *Eastern Sugar* partial award[619], the EC stated the following:

> "a) EC law prevails in a Community context as of accession
>
> Given that the rights and obligations of membership come into force on accession rather than on signature or ratification, the applicable date can be considered as 1 May 2004.
>
> Based on ECJ jurisprudence Article 307 EC is not applicable once all parties of an agreement have become Member States. Consequently, such agreements cannot prevail over Community law.
>
> For facts occurring after accession, the BIT is not applicable to matters falling under Community competence. Only certain residual matters, such as diplomatic representation, expropriation and eventually investment promotion, would appear to remain in question.
>
> Therefore, where the EC Treaty or secondary legislation are in conflict with some of these BITs' provisions – or should the EU adopt such rules in the future – Community law will automatically prevail over the non-conforming BIT provisions.
>
> As you mention correctly, the application of intra-EU BITs could lead to a more favourable treatment of investors and investments between the parties covered by the BITs and consequently discriminate against other Member States, a situation which would not be in accordance with the relevant Treaty provisions.
>
> The [C]ommission therefore takes the view that intra-EU BITs should be terminated in so far as the matters under the agreements fall under Community competence.
>
> b) Effect on existing BITs
>
> However, the effective prevalence of the EU acquis does not entail, at the same time, the automatic termination of the concerned BITs or, necessarily, the non-application of all their provisions.
>
> Without prejudice to the primacy of Community law, to terminate these agreements, Member States would have to strictly follow the relevant

---

[618] **Doc. CL-36**, *Eastern Sugar*, paras. 143-146 and 153.
[619] **Doc. CL-36**, *Eastern Sugar*, para. 119.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)

Decision on Jurisdiction, Liability and Principles of Reparation

procedure provided for this in regard in the agreements themselves. Such termination cannot have a retroactive effect.

c) Dispute settlement procedures

As mentioned above, Community law, including the jurisdiction of the Court of Justice, in principle prevails from the date of accession. However, the transitional situation until the BITs are formally terminated may result in complex questions of interpretation with regard to jurisdiction in particularly [sic] with regard to pending arbitration procedures but also in relation to rules such as Article 13 in the BIT between the Czech Republic and the Netherlands, which provides for an extended application of the agreement in a certain period after termination.

In so far as conflicts between Member States are concerned, it follows from Article 292 EC that the Member States cannot apply the settlement procedures provided for in the BITs in so far as the dispute concerns a matter falling under Community competence.

On the other hand, if the dispute concerns an investor-to-state claim under a BIT, the legal situation is more complex. Since Community law prevails from the time of accession, the dispute should be decided on basis of Community law (which indirectly also follows from Article 8(6) first bullet point in the agreement between the Czech Republic and the Netherlands). However, it may be argued that the private investor could continue to rely on the settlement procedures provided for in the agreement until formal termination of the BIT if the dispute concerns facts which occurred before accession. The primacy of Community law should in such instance be considered by the arbitration instance.

The primacy of EU law and its definite interpretation by the European Court of Justice would not necessarily preclude a legal instance (arbitration) in another jurisdiction arriving at a different conclusion, even in an international agreement between two Member States.

In particular, in order to avoid any legal problem with regard to an arbitration procedure, existing BITs between Member States should, as mentioned above, therefore be terminated. The formal termination can only be done according to the provisions of the agreement in question. I would note that this principle would not only apply to the Czech BIT with the Netherlands, which would seem to have given rise to a significant amount of litigation, but also those of the Czech Republic with 21 other Member States. Without prejudice to the primacy of Community law, termination of the BIT would take effect according to the respective provisions of each such BIT." [Emphasis added]

513.  The view of the Commission was that, although EU law prevails over international agreements between Member States, accession to the EU does not entail the automatic termination of BITs. Moreover, the Commission noted that Member States should terminate these agreements, as far as those BITs interfere with EU

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

competences, by "strictly" following the relevant procedure. The Commission further acknowledged that "such termination cannot have a retroactive effect"[620].

514. This opinion was ratified in a Note of the EC dated November 2006 (from the Internal Market Services DG to the Economic and Financial Committee), by which the Commission recommended that Member States "exchange notes to the effect that such [intra-EU] BITs are no longer applicable, and also formally rescind such agreements"[621].

### H.    2007: Romania accedes to the EU

515. Romania signed and ratified the Accession Treaty in 2005, and officially acceded to the EU on 1 January 2007.

### I.    2009: Treaty of Lisbon

516. The last substantial EU reform was implemented through the "**Treaty of Lisbon**", which was signed in December 2007 and entered into force in December 2009. The Treaty of Lisbon amended the two treaties which formed the constitutional basis of the EU: it amended the Treaty of Maastricht (or TEU), and it replaced the Treaty of Rome with the Treaty for the Functioning of the European Union ["**TFEU**"].

### J.    2011-2013: Claimants' investment in Romania

517. Claimants' investment in Romania is explained in detail under section **III.3** *supra*. For the purposes of this section, the Tribunal notes the following:

- In January 2011, LSG and Green Source incorporated the Alpha, Beta and Gamma Project Companies[622];

- In September 2011, Giust and Anina incorporated Solar Frăsinet and Solar Mostistea, respectively[623];

- In May 2012, Solluce acquired a 62.3% share in the Alpha Project Company[624];

- In September 2012, Giust and Anina each entered into a SPA with Pressburg, under which Pressburg acquired 50% of each of the Frăsinet Project Companies[625];

---

[620] This position was reiterated by the EC and the Netherlands in the *Achmea* arbitration (see **Doc. CL-39**, *Achmea* Jurisdiction, paras. 156, 180 and 187).
[621] **Doc. CL-36**, *Eastern Sugar*, para. 126.
[622] **Lipkovich I**, para. 19; **Hofmann**, para. 15.
[623] **Edwards I**, Table 1.1; **Doc. C-123**, Art. 1.2; **Doc. C-124**, Art. 1.2; **Theuer I**, para. 20; C-I, para. 37.
[624] **Doc. C-166**; **Lim**, paras. 20-22; **Hofmann**, para. 27.
[625] **Doc. C-123**; **Doc. C-124**; **Theuer I**, para. 22.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- In January 2013, Risen entered into a SPA with Green Source and LSG, pursuant to which Risen acquired 90% of Beta[626]; and

- In June 2013, CVI, CVC, LSG and Green Source entered into a SPA pursuant to which Core Value acquired a 79% share in the Gamma Project Company[627].

### K.    **March 2018: The *Achmea* Judgment**

#### a.    **Background**

518. The *Achmea* Judgment concerns a preliminary ruling submitted to the CJEU on 23 May 2016 by the German Bundesgerichtshof (Supreme Court) ["**BGH**"][628], after the BGH was asked to decide an appeal from the Slovak Republic regarding an application to set aside the award rendered in the UNCITRAL arbitration between Achmea B.V. ["**Achmea**"], a Dutch insurance company, and Slovakia, under the Czechoslovakia-Netherlands BIT (in force since March 1992)[629].

#### b.    **Arbitration**

519. Following the liberalization of the insurance market in the Slovak Republic in 2004[630], Achmea established a subsidiary in Slovakia to market private health insurance products[631]. In 2006, the Slovak Republic reversed the liberalization process of the insurance sector, allegedly affecting Achmea's investment[632].

520. Achmea initiated an arbitration against the Slovak Republic pursuant to the Czechoslovakia-Netherlands BIT (in force since October 1992[633]) and the UNCITRAL Rules. The parties agreed on Frankfurt as the seat of the arbitration.

521. On 28 October 2010 the tribunal in the *Achmea* arbitration issued a partial award on jurisdiction, dismissing Slovakia's jurisdictional objections according to which:

- The Czechoslovakia-Netherlands BIT had been terminated or was inapplicable pursuant to Arts. 59 and 30 of the VCLT, because of Slovakia's accession to the EU in 2004[634]; and

- The Czechoslovakia-Netherlands BIT was incompatible with the EU Treaties, the autonomy of the EU legal order and the supremacy of EU law[635].

---

[626] **Edwards I**, para. 3.24.
[627] **Edwards I**, para. 3.32.
[628] **Doc. C-30**, *Achmea* Judgment, para. 13.
[629] **Doc. CL-39**, *Achmea* Jurisdiction, para. 46
[630] **Doc. CL-39**, *Achmea* Jurisdiction, paras. 7 and 51-53.
[631] **Doc. CL-39**, *Achmea* Jurisdiction, paras. 7 and 51-53.
[632] **Doc. CL-39**, *Achmea* Jurisdiction, para. 54.
[633] **Doc. CL-39**, *Achmea* Jurisdiction, para. 46.
[634] **Doc. CL-39**, *Achmea* Jurisdiction, paras. 265 and 277.
[635] **Doc. CL-39**, *Achmea* Jurisdiction, paras. 278-283.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

522. On 7 December 2012, the tribunal issued its final award, finding Slovakia liable for breaching the FET standard and the free transfer of payments provision of the Czechoslovakia-Netherlands BIT[636].

### c.    Set aside proceeding

523. During an action to set aside the award in the German courts, the Slovak Republic raised doubts as to the compatibility of the arbitral clause in Art. 8 of the Czechoslovakia-Netherlands BIT[637] with Arts. 18, 267 and 344 of the TFEU[638]. Although the BGH did not consider such an incompatibility to exist[639], in light of the fact that the CJEU had not yet had the chance to rule on the questions raised by the Slovak Republic, the BGH decided to stay the set aside proceedings and refer certain questions to the CJEU for a preliminary ruling[640].

### d.    The *Achmea* Judgment

524. On 6 March 2018, the CJEU (Grand Chamber) issued its ruling on the *Achmea* case, after hearing submissions from Achmea, the Slovak Republic, the Advocate General, the Commission and 15 EU Member States. The CJEU found that[641]:

> "Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept."

525. The CJEU thus found that arbitral clauses in intra-EU BITs that provide jurisdiction to investment arbitration tribunals such as in the Czechoslovakia-Netherlands BIT are precluded by Arts. 267 and 344 of the TFEU.

526. According to the CJEU, an international agreement cannot affect the allocation of powers fixed by the EU Treaties or the autonomy of the EU legal system, observance of which is ensured by the CJEU[642]. The CJEU additionally recalled that EU law is characterized by the fact that it stems from an independent source of law, has primacy over the domestic laws of Member States, and its provisions have

---

[636] **Doc. RL-81**, *Achmea* Award, paras. 278-286.

[637] Significantly, Art. 8(6) of the Czechoslovakia-Netherlands BIT provides that: "The arbitral tribunal shall decide on the basis of the law, taking into account in particular though not exclusively: the law in force of the Contracting Party concerned; the provisions of this Agreement, and other relevant agreements between the Contracting Parties; the provisions of special agreements relating to the investment; the general principles of international law." (**Doc. C-30**, *Achmea* Judgment, para. 4).

[638] **Doc. C-30**, *Achmea* Judgment, para. 14.

[639] **Doc. C-30**, *Achmea* Judgment, paras. 15-23.

[640] **Doc. C-30**, *Achmea* Judgment, para. 23.

[641] **Doc. C-30**, *Achmea* Judgment, para. 62.

[642] **Doc. C-30**, *Achmea* Judgment, para. 32.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

a direct effect on nationals and Member States[643]. National courts and tribunals and the CJEU have an obligation to ensure the full application and respect of EU law in all Member States[644]. To ensure the uniform interpretation of EU law, courts and tribunals of Member States can request a preliminary ruling from the CJEU, pursuant to Art. 267 of the TFEU[645].

527. In light of these principles, the CJEU examined whether arbitral tribunals in arbitrations based on intra-EU BITs apply or interpret EU law. The CJEU found that, although investment arbitration tribunals are called upon to rule on alleged breaches of the Czechoslovakia-Netherlands BIT provisions, to do so they must, in accordance with Art. 8(6) of the Czechoslovakia-Netherlands BIT, take into account "the law in force in the Contracting [State] concerned" and "other relevant agreements between the Contracting [States]". As EU law forms a part of the law in force in every Member State and derives from an international agreement between Member States[646], it follows that investment arbitration tribunals may be called upon to interpret or apply EU law[647].

528. In answering the second question – whether an investment tribunal is a court or tribunal of a Member State within the meaning of Art. 267 of the TFEU – the CJEU concluded that an investment arbitration tribunal does not form part of the judicial system of the respective Member States and therefore does not qualify as a court or tribunal of a Member State for the purposes of Art. 267 of the TFEU[648].

529. The CJEU also turned to the subsidiary question: whether an award made by an investment arbitration tribunal is subject to review by a court of a Member State, which would ensure that the questions of EU law addressed by the tribunal can be submitted to the CJEU through a reference for a preliminary ruling[649].

530. The CJEU acknowledged that, whilst in the case under review German law permitted the German court to request a preliminary ruling from the CJEU, such judicial review could only be exercised if and to the extent that the national law in question so permits[650].

531. Therefore, in light of the foregoing characteristics of an investment arbitration tribunal, the CJEU concluded that[651]:

> "[B]y concluding the BIT, the Member States parties to it established a mechanism for settling disputes between an investor and a Member State which could prevent those disputes from being resolved in a manner that

---

[643] **Doc. C-30**, *Achmea* Judgment, para. 33.
[644] **Doc. C-30**, *Achmea* Judgment, para. 36.
[645] **Doc. C-30**, *Achmea* Judgment, para. 37.
[646] **Doc. C-30**, *Achmea* Judgment, paras. 40-41.
[647] **Doc. C-30**, *Achmea* Judgment, para. 42.
[648] **Doc. C-30**, *Achmea* Judgment, paras. 45-46 and 48-49.
[649] **Doc. C-30**, *Achmea* Judgment, para. 50.
[650] **Doc. C-30**, *Achmea* Judgment, para. 53.
[651] **Doc. C-30**, *Achmea* Judgment, para. 56.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 125 of 299

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

ensures the full effectiveness of EU law, even though they might concern the interpretation or application of that law." [Emphasis added]

532. In addition, the CJEU added that BITs concluded between two Member States without participation of the EU that provide the possibility to submit investment disputes to a body which does not form part of the EU judicial system[652]:

> "[C]all into question not only the principle of mutual trust between the Member States but also the preservation of the particular nature of the law established by the Treaties, ensured by the preliminary ruling procedure provided for in Article 267 TFEU, and is not therefore compatible with the principle of sincere cooperation referred to in paragraph 34 above [which references Article 4(3) TEU].
>
> In those circumstances, Article 8 of the BIT has an adverse effect on the autonomy of EU law."

533. Based on this reasoning, the CJEU concluded that[653]:

> "Consequently, the answer to Questions 1 and 2 is that Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the BIT, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept."

534. In view of the answers to Questions 1 and 2, the CJEU found that there was no need to answer Question 3[654].

### L.    **May 2018: Claimants' Request for Arbitration**

535. On 23 May 2018, Claimants filed their Request for Arbitration against Romania.

### M.    **July 2018: The EC's post-*Achmea* position**

536. In July 2018, following the *Achmea* Judgment, the EC issued a communication to the European Parliament and the Council noting that[655]:

> "Following the Achmea judgment, the Commission has intensified its dialogue with all Member States, underlined them to take action to terminate the intra-EU BITs, given their incontestable incompatibility with EU law. The Commission will monitor the progress in this respect and, if necessary, may decide to further pursue the infringement procedures. […]
>
> This implies that all investor-State arbitration clauses in intra-EU BITS are inapplicable and that any arbitration tribunal established on the basis of such

---

[652] **Doc. C-30**, *Achmea* Judgment, paras. 58-59.
[653] **Doc. C-30**, *Achmea* Judgment, para. 60.
[654] **Doc. C-30**, *Achmea* Judgment, para. 61.
[655] **Doc. RL-10**, pp. 2-3.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

clauses lacks jurisdiction due to the absence of a valid arbitration agreement. As a consequence, national courts are under the obligation to annul any arbitral award rendered on that basis and to refuse to enforce it. Member States that are parties to pending cases, in whatever capacity, must also draw all necessary consequences from the *Achmea* judgment. Moreover, pursuant to the principle of legal certainty, they are bound to formally terminate their intra-EU BITs." [Emphasis added]

537. However, the EC went further and made a specific finding regarding the ECT, even though the *Achmea* Judgment contained no reference to the ECT[656]:

"The Achmea judgment is also relevant for the investor-State arbitration mechanism established in Article 26 of the Energy Charter Treaty as regards intra-EU relations. This provision, if interpreted correctly, does not provide for an investor-State arbitration clause applicable between investors from a Member States of the EU and another Member States of the EU. Given the primacy of Union law, that clause, if interpreted as applying intra-EU, is incompatible with EU primary law and thus inapplicable. Indeed, the reasoning of the Court in Achmea applies equally to the intra-EU application of such a clause which, just like the clauses of intra-EU BITs, opens the possibility of submitting those disputes to a body which is not part of the judicial system of the EU. The fact that the EU is also a party to the Energy Charter Treaty does not affect this conclusion: the participation of the EU in that Treaty has only created rights and obligations between the EU and third countries and has not affected the relations between the EU Member States." [Emphasis added]

538. The position of the Commission in 2018 is significantly different from that which it held in 2006 in *Eastern Sugar*. Although in 2006, the Commission called Member States to formally terminate their intra-EU BITs, it considered that "[s]uch termination cannot have retroactive effect", so that investors could continue to rely on BITs as instruments to protect their investments. In 2018, the Commission took a Copernican turn: it held that arbitral tribunals in pending arbitrations were required, as a matter of law, to decline jurisdiction and that national courts "are under an obligation to annul any arbitral award" – and that this would apply to any agreements between Member States (not only BITs), including multilateral agreements such as the ECT.

## N.   2019: The EU Member States' Declarations

539. On 15 January 2019, 22 EU Member States (including Romania) issued a joint "Declaration of the representatives of the Governments of the Member States, on the legal consequences of the judgment of the Court of Justice in *Achmea* and on investment protection in the European Union"[657].

540. The Declaration was not signed by all EU Member States due to divergences regarding the application of the *Achmea* Judgment to the ECT; consequently, two

---

[656] **Doc. RL-10**, pp. 3-4.
[657] **Doc. RL-11**.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

additional declarations were issued on 16 January 2019: one signed jointly by Finland, Luxembourg, Malta, Slovenia and Sweden[658], and another by Hungary[659].

541. The declaration of 15 January 2019 expressed the position that EU law takes precedence over intra-EU BITs, and consequently, all arbitral clauses providing for investor-State arbitration in such BITs are contrary to EU law and are thus inapplicable and do not produce effects, with the result that arbitral tribunals established on the basis of such clause lack jurisdiction on account of an invalid offer of consent in the treaty[660]. Regarding the application of the *Achmea* Judgment to the ECT, the declaration expressed that[661]:

> "Arbitral tribunals have interpreted the Energy Charter Treaty as also containing an investor-State arbitration clause applicable between Member States. Interpreted in such a manner, that clause would be incompatible with the Treaties and thus would have to be disapplied. […]
>
> Beyond actions concerning the Energy Charter Treaty based on this declaration, <u>Member States together with the Commission will discuss without undue delay whether any additional steps are necessary to draw all the consequences from the *Achmea* judgment in relation to the intra-EU application of the Energy Charter Treaty</u>." [Emphasis added]

542. More skeptical, the 16 January 2019 declaration by Finland, Luxembourg, Malta, Slovenia and Sweden indicated the following[662]:

> "The Achmea case concerns the interpretation of EU law in relation to an investor-state arbitration clause in a bilateral investment treaty between Member States. <u>The Member States note that the *Achmea* judgment is silent on the investor-state arbitration clause in the Energy Charter Treaty.</u> A number of international arbitration tribunals post the *Achmea* judgment have concluded that the Energy Charter Treaty contains an investor-State arbitration clause applicable between EU Member States. This interpretation is currently contested before a national court in a Member State. Against this background, the Member States underline the importance of allowing for due process and consider that <u>it would be inappropriate, in the absence of a specific judgment on this matter, to express views as regards the compatibility with Union law of the intra EU application of the Energy Charter Treaty.</u>" [Emphasis added]

543. Similarly, Hungary declared that[663]:

> "8. […] in its view, the *Achmea* judgment concerns only the intra-EU bilateral investment treaties. The *Achmea* judgment is silent on the investor-state

---

[658] **Doc. RL-82**.
[659] **Doc. C-1/Doc. RL-83**.
[660] **Doc. RL-11**, p. 1.
[661] **Doc. RL-11**, pp. 2 and 4.
[662] **Doc. RL-82**, p. 3.
[663] **Doc. C-1/Doc. RL-83**, p. 3.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

arbitration clause in the [ECT] and it does not concern any pending or prospective arbitration proceedings initiated under the ECT.

9. Against this background, Hungary underlines the importance of allowing for due process and considers that it is inappropriate for a Member State to express its view as regards the compatibility with Union law of the intra-EU application of the ECT. The ongoing and future applicability of the ECT in intra-EU relations requires further discussion and individual agreement amongst the Member States."

### O.    2018-2020: ECT decisions after the *Achmea* Judgment

544.    Following the CJEU's *Achmea* Judgment, at least 25 investment arbitration tribunals decided that the CJEU's findings in such case did not extend to the ECT's dispute resolution provision[664].

### P.    January 2020: EC's *Amicus Curiae* Brief

#### a.    Background

545.    On 24 January 2020, the EC filed its *Amicus Curiae* Brief in the current proceedings, in accordance with the calendar set out in Procedural Order No. 2. In its *Amicus Curiae* Brief, the EC invited the Tribunal to decline jurisdiction on the grounds that Romania did not validly consent to arbitration[665].

#### b.    Application of Art. 26 of the ECT to intra-EU disputes

546.    The EC submits that the question of whether Art. 26 of the ECT constitutes a valid arbitration offer from one EU Member State to investors of all other EU Member States is a hotly debated topic in arbitral practice[666]. But, in its opinion, the rules of customary international law on treaty interpretation favor the conclusion that the ECT does not apply in intra-EU situations[667].

547.    The EC considers that investment tribunals, which have been entrusted with their mission by the EU Member States as Contracting Parties to the ECT, owe deference to interpretative declarations made by those same EU Member States.

548.    According to the EC[668]:

"A system of dispute resolution introduced in a situation covered by Union law but set up outside the system of effective legal protection established by the Treaties, unjustifiably calls, or risks calling into question that principle of mutual trust. Union law already protects all forms of cross border intra-EU investment, throughout the entire life cycle of that investment. There is simply

---

[664] C-III, para. 193.
[665] *Amicus Curiae* Brief, para. 81.
[666] *Amicus Curiae* Brief, para. 3.
[667] *Amicus Curiae* Brief, para. 34.
[668] *Amicus Curiae* Brief, para. 17.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

> no space – or need, for that matter – for a separate avenue providing other substantive rights or protection than those afforded by the Union legal order."

549. The EC further submits that the ordinary meaning of the terms of Art. 26 of the ECT, when read in their proper context, must be understood as excluding EU investors investing in the "Area" of the EU: they are investors investing in their own economic area.

550. According to the EC, the EU is a Regional Economic Integration Organisation ["**REIO**"], as defined in Art. 1(2) and (3) of the ECT. The EC submits that it is recognized by the common practice of the international community, through the REIO clause, that the EU and the EU Member States, when acting together on the international scene – like in the case of the ECT – only create legal obligations *vis-à-vis* third countries[669].

551. Therefore, it is entirely within the general rule of interpretation under Art. 31 of the VCLT to conclude that an investor from one EU Member State investing in another Member State is not covered by the notion of "Investor" making an investment in the "Area" of "another Contracting Party", and thus falls outside the scope of the dispute resolution mechanism provided for in Art. 26 of the ECT.

552. The EC argues that the Tribunal has an obligation, pursuant to Art. 31(3)(c) of the VCLT, to consider the statement made by the European Communities to the ECT Secretariat when submitting their ratification to the ECT (see para. 505 *supra*). According to the EC, when stating that the "Communities and the Member States will, if necessary, determine among them who is the respondent party to arbitration proceedings initiated by an Investor of another Contracting Party", the Member States considered that only investors from other Contracting Parties (*i.e.*, outside the EU) could bring a case against the EU or the EU Member States.

553. Considering this statement together with the context and purpose of the ECT, there is no reason to conclude that Art. 26 of the ECT applies to intra-EU disputes.

554. The EC emphasizes that this interpretation is shared both by the home State of the investors and the host State in this case. The Arbitral Tribunal cannot ignore the clear will of the relevant Contracting Parties.

### c.    The TFEU must prevail in case of conflict with the ECT

555. The EC submits that, if the Tribunal were to find that Art. 26 of the ECT applies to intra-EU disputes, such provision would be in conflict with Arts. 267 and 344 of the TFEU and, in accordance with the hierarchy of norms that characterizes the EU's legal order, it would have to be set aside, or "disapplied" in intra-EU disputes, for four reasons.

556. <u>First,</u> because the CJEU confirmed in the *Achmea* Judgment that the TFEU prohibits Member States from offering to resolve intra-EU investor-State disputes

---

[669] *Amicus Curiae* Brief, paras. 23, 26, 37.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 130 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

before international arbitration tribunals. The EC submits that these considerations also apply to the ECT[670]:

- EU law is international law applicable between all EU Member States;

- EU law is covered by the term "applicable rules and principle of international law" used in Art. 26(6) of the ECT, and is explicitly recognized as binding under the ECT in an intra-EU context in Art. 1(3) of the ECT;

- Arbitral tribunals are not "national courts or tribunals" within the meaning of Art. 267 of the TFEU; and

- There is no full review of the award by a court in a Member State.

557. <u>Second</u>, the principle of primacy extends to any intra-EU application of multilateral treaties, even where third countries are parties to those treaties[671]. The EC argues that Art. 16(2) of the ECT does not reverse the primacy of EU law and give precedence to the ECT. Instead[672]:

- Art. 16(2) of the ECT is a rule of construction, not a conflict rule; the applicable rule on resolving a conflict between the ECT and the EU Treaties is the primacy of EU law; and

- Even if Art. 16(2) of the ECT could be interpreted as a conflict rule, it would yield to the primacy of the EU Treaties, which is a special and mandatory conflict rule applicable to all conflicting treaties, whenever concluded: EU law forbids Member States from setting aside the rules arising out of the EU Treaties by concluding an international agreement or convention.

558. <u>Third</u>, regarding intra-EU relations, the TFEU regulates its relationship with EU Member States' other *inter se* international obligations in favor of the absolute precedence of EU law in case of conflict. This includes Member States' obligations under multilateral treaties[673].

559. <u>Finally</u>, the EC argues that the sunset or grandfather clause set forth in Art. 47(3) of the ECT cannot operate to "cure" the fact that a particular situation (*i.e.*, intra-EU application) never benefitted from that protection in the first place[674].

560. <u>In light of the above</u>, the EC considers that the Tribunal should decline jurisdiction in the current proceedings.

---

[670] *Amicus Curiae* Brief, para. 60.
[671] *Amicus Curiae* Brief, para. 70.
[672] *Amicus Curiae* Brief, paras. 73-75.
[673] *Amicus Curiae* Brief, para. 79.
[674] *Amicus Curiae* Brief, para. 80.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

### Q.   May 2020: Termination Treaty

561. On 5 May 2020, 23 EU Member States (including Germany, the Netherlands, Cyprus and Romania) signed an "Agreement for the termination of bilateral investment treaties between the Member States of the European Union" [the "**Termination Treaty**"][675].

562. The Termination Treaty is an international agreement that purports to terminate all intra-EU BITs, together with their sunset clauses, "as soon as this Agreement enters into force for the relevant Contracting Parties", *i.e.*, 30 days after their ratification by the particular EU Member State. However, the Termination Treaty expressly provides that[676]:

> "[it] addresses intra-EU bilateral investment treaties; it does not cover intra-EU proceedings on the basis of Article 26 of the Energy Charter Treaty. The European Union and its Member States will deal with this matter at a later stage." [Emphasis added]

### R.   2021: The *Komstroy* Judgment

#### a.   Background

563. The *Komstroy* Judgment concerns a request for a preliminary ruling submitted to the CJEU on 24 September 2019 by the *Cour d'appel de Paris* ["**Court of Appeal**"], after it was asked – for the second time – to set aside the award rendered in an UNCITRAL arbitration between Energoalians (predecessor in law of Komstroy) and the Republic of Moldova, under the ECT[677].

564. The background for the *Komstroy* Judgment arises from a series of contracts concluded between 1999 and 2000: Energoalians, a Ukrainian distributor, signed a contract with Ukrenegro, a Ukrainian State-owned enterprise, for the purchase of electricity. Energoalians resold this energy to Derimen, a company registered in the British Virgin Islands, which in turn resold that electricity to Moldtranselectro, a Moldavian State-owned company. In May 2000, Derimen assigned to Energoalians a claim it had against Moldtranselectro for payments due for the purchase of electricity. Moldtranselectro settled this debt in part, by assigning to Energoalians certain claims that it held[678].

#### b.   Arbitration

565. After unsuccessfully attempting to collect these claims before Moldovan and Ukrainian courts, Energoalians initiated an *ad hoc* arbitration procedure against the Republic of Moldova, arguing a breach of certain undertakings under the ECT during Energoalians' attempt to obtain payment of the assigned claims. In October 2013, the arbitral tribunal seated in Paris issued its award, holding that it had

---

[675] **Doc. CL-184**.
[676] **Doc. CL-184**, p. 6.
[677] **Doc. RL-314**, *Komstroy* Judgment.
[678] **Doc. RL-314**, *Komstroy* Judgment, paras. 8-11.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

jurisdiction and finding Moldova liable for breaching its obligations under the ECT[679].

### c.     First set aside proceeding

566.   During an action to set aside the award in the French courts, Moldova invoked a breach of a compulsory public policy provision, arguing that the arbitral tribunal lacked jurisdiction[680].

567.   By a decision of 12 April 2016, the Paris Court of Appeal annulled the arbitral award on the ground that the tribunal had wrongly declared that it had jurisdiction ["**Annulment**"]. The Court of Appeal found that the dispute between Energoalians and the Republic of Moldova concerned a claim that was assigned to Energoalians, for the sale of electricity and that in the absence of any economic contribution by Energoalians in Moldova, such claim could not be regarded as an "investment", within the meaning of the ECT[681].

### d.     Appeal on a point of law

568.   Komstroy, as successor in law to Energoalians, lodged an appeal on a point of law before the French *Cour de cassation* ["**Court of Cassation**"]. On 28 March 2019, the Court of Cassation set aside the Annulment, after finding that the Court of Appeal had interpreted the concept of investment by adding conditions which were not provided for in the ECT. The Court of Cassation referred the parties back to the Court of Appeal, sitting in a different composition[682].

### e.     Second set aside proceeding

569.   During a second action to set aside the award, Moldova submitted that the arbitral tribunal should have declined jurisdiction for three reasons[683]:

- <u>First</u>, Moldova alleged that the claim acquired by Energoalians from Derimen was not an investment within the meaning of the ECT;

- <u>Second</u>, even if the claim could constitute an investment, it was not an investment of a company of a Contracting Party to the ECT, as Derimen was a company registered in the British Virgin Islands;

- <u>Third</u>, that the claim related to a transaction for the sale of electricity that was not made in the "Area" of Moldova, as the electricity was sold and transported only to the border between Ukraine and Moldova, on the Ukrainian side.

---

[679] **Doc. RL-314**, *Komstroy* Judgment, paras. 12-13.
[680] **Doc. RL-314**, *Komstroy* Judgment, para. 14.
[681] **Doc. RL-314**, *Komstroy* Judgment, para. 15.
[682] **Doc. RL-314**, *Komstroy* Judgment, para. 16.
[683] **Doc. RL-314**, *Komstroy* Judgment, para. 17.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

570. The Court of Appeal decided to stay the proceedings and refer the following questions to the CJEU for a preliminary ruling[684]:

> "[(1)] Must [Article 1(6) ECT] be interpreted as meaning that a claim which arose from a contract for the sale of electricity and which did not involve any economic contribution on the part of the investor in the host State can constitute an "investment" within the meaning of that article?
>
> [(2)] Must [Article 26(1) ECT] be interpreted as meaning that the acquisition, by an investor of a Contracting Party, of a claim established by an economic operator which is not from one of the States that are Contracting Parties to that treaty constitutes an investment?
>
> [(3)] Must [Article 26(1) ECT] be interpreted as meaning that a claim held by an investor, which arose from a contract for the sale of electricity supplied at the border of the host State, can constitute an investment made in the area of another Contracting Party, in the case where the investor does not carry out any economic activity in the territory of that latter Contracting Party?"

571. It is somewhat uncertain why the Court of Appeal (during the second set aside proceeding) decided to resort to a preliminary ruling: the parties to the *Komstroy* case do not involve EU Member States (Moldova is not a member of the EU and Komstroy is a Ukrainian investor) and the questions referred to a preliminary ruling do not affect any issues related to intra-EU disputes.

### f.    The preliminary ruling procedure

572. During the preliminary ruling procedure, the CJEU heard submissions from Komstroy, the Republic of Moldova, the Council of the EU, the EC, the Advocate General and nine EU Member States, including Germany and the Netherlands.

573. Both Germany and the Netherlands supported the position that the CJEU's reasoning in the *Achmea* Judgment could apply to the compatibility of the dispute settlement mechanism provided for in Art. 26 of the ECT.

Opinion of the Advocate General

574. The Advocate General, Mr. Maciej Szpunar, delivered his opinion to the CJEU on 3 March 2021. The Advocate General started by analyzing the jurisdiction of the CJEU, because the case was unprecedented[685]:

-    The questions raised by the Court of Appeal concerned the interpretation of certain provisions of the ECT which had never been analyzed by the CJEU; and

---

[684] **Doc. RL-314**, *Komstroy* Judgment, para. 20.
[685] **Doc. RL-313**, paras. 1-3.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

-       The dispute did not concern EU Member States (since it was between Moldova and a Ukrainian company) and therefore appeared to be unconnected with the EU.

575.    Although the Advocate General acknowledged that CJEU case-law would lead to the conclusion that the CJEU had no jurisdiction over this matter, he argued that where a provision can apply both to situations falling within the scope of EU law and to situations falling outside its scope, it is clearly in the EU's interest that such provision be interpreted uniformly[686].

576.    According to the Advocate General, the Court of Appeal was asking the CJEU to interpret provisions of an international agreement (the ECT) that are not interpreted uniformly and which could, in principle, also be applied to situations in the EU legal order. Thus, the Advocate General found that the CJEU should assume jurisdiction to answer the questions referred for a preliminary ruling[687].

577.    The Advocate General further considered that, following the *Achmea* Judgment, the CJEU should take this opportunity to examine the implications of the *Achmea* Judgment on the applicability of Art. 26 of the ECT. Whilst examining this question, the Advocate General submitted that the dispute settlement mechanism provided for in Art. 26 of the ECT, insofar as it allows recourse to an arbitral tribunal, undoubtedly leads to a similar result as in *Achmea*, for several reasons[688]:

-       <u>First</u>, Art. 26 allows disputes which may involve the interpretation of EU law to be brought before an investment arbitration tribunal; and

-       <u>Second</u>, the arbitral tribunal established under Art. 26 of the ECT falls outside the EU judicial system and is not entitled to make a reference to the CJEU for a preliminary ruling as it cannot be regarded as a "court or tribunal of a Member State", within the meaning of Art. 267 of the TFEU.

578.    This led the Advocate General to conclude that Art. 26 of the ECT had an adverse effect on the autonomy of EU law and was incompatible with EU law.

**g.    The *Komstroy* Judgment**

(i)    <u>CJEU's jurisdiction to consider the questions raised by the Court of Appeal</u>

579.    On 2 September 2021, the CJEU found that it had jurisdiction to hear the case as the agreement to join the ECT was an act of an EU institution and[689]:

-       In accordance with Art. 267 of the TFEU, the Court has jurisdiction to interpret the acts of the institutions, bodies, offices or agencies of the EU; and

---

[686] **Doc. RL-313**, paras. 28 *et seq.*
[687] **Doc. RL-313**, para. 45.
[688] **Doc. RL-313**, paras. 73-76.
[689] **Doc. RL-314**, *Komstroy* Judgment, paras. 22-38.

121

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- An agreement concluded by the Council, pursuant to Arts. 217 and 218 of the TFEU constitutes an act of an EU institution; this grants the CJEU jurisdiction to give a preliminary ruling on the interpretation of said agreement.

580. The CJEU acknowledged that, in principle, it seemed that the CJEU did not have jurisdiction to interpret an international agreement in the context of a dispute not covered by EU law. However, the CJEU found that, where a provision of an international agreement can apply both to situations falling within the scope of EU law and to situations falling outside its scope, such provision should be interpreted uniformly, whatever the circumstances in which it is to apply. The CJEU noted that the questions raised by the Court of Appeal could be relevant for a case falling directly within the scope of EU law.

581. Additionally, the CJEU observed that the parties to the dispute agreed that the seat of the arbitration was Paris. The CJEU found that the establishment of the seat of arbitration on the territory of a Member State entails the application of EU law. Courts of the underlying Member State are obliged to ensure compliance with EU law, in accordance with Art. 19 of the TEU[690].

582. <u>Therefore</u>, the CJEU concluded that it had jurisdiction to provide answers to the questions referred to it by the Court of Appeal.

(ii) <u>Consideration of the first question</u>

583. When addressing the first question, the CJEU found it necessary to specify which disputes between one Contracting Party and an investor of another Contracting Party concerning an investment made by the latter in the area of the former may be brought before an arbitral tribunal pursuant to Art. 26 of the ECT[691].

584. To answer this question, the CJEU reiterated the principles that it applied in the *Achmea* Judgment[692]:

- An international agreement cannot affect the allocation of powers laid down by the European treaties, and hence, the autonomy of the EU legal system, observance of which is ensured by the Court;

- EU law is characterized by the fact that it stems from an independent source of law (the European treaties), by its primacy over the laws of the Member States and by the direct effect of a series of provisions which are applicable to the Member States and to their nationals;

- National courts, tribunals and the CJEU have an obligation to ensure the full application of EU law in all Member States; and

---

[690] **Doc. RL-314**, *Komstroy* Judgment, paras. 32-34.
[691] **Doc. RL-314**, *Komstroy* Judgment, para. 40.
[692] **Doc. RL-314**, *Komstroy* Judgment, paras. 42 *et seq*.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 136 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- To this end, the system includes the preliminary ruling procedure provided for in Art. 267 of the TFEU, allowing the CJEU to exercise its exclusive jurisdiction to interpret EU law.

585. In light of these principles, the CJEU sought to answer the same questions as the ones raised in the *Achmea* Judgment, arriving to the following conclusion:

586. <u>First</u>, in accordance with Art. 26(6) of the ECT, an arbitral tribunal constituted under the ECT is to rule on disputed issues in accordance with the ECT and with the applicable rules and principles of international law. As the ECT itself is an act of EU law, the CJEU concluded that an arbitral tribunal constituted under the ECT is required to interpret, and even apply, EU law[693].

587. <u>Second</u>, a tribunal constituted under the ECT does not constitute a component of the judicial system of a Member State, in this case the French Republic. This means that arbitral tribunals are not subject to mechanisms capable of ensuring the full effectiveness of the EU rules. If an arbitral tribunal were to be considered a court of a Contracting Party to the ECT, it would have been included within the courts referred to in Art. 26(2)(a) of the ECT and thus Art. 26(2)(c) of the ECT would lose any effectiveness. Thus, arbitral tribunals cannot be classified as a court or tribunal "of a Member State" within the meaning of Art. 267 of the TFEU and; therefore, are not entitled to make a reference to the CJEU for a preliminary ruling[694].

588. <u>Third</u>, the CJEU argued that it remained to be ascertained whether an award made by an arbitral tribunal is, in accordance with Art. 19 of the TEU, subject to review by a court of a Member State, and whether such review is capable of ensuring full compliance with EU law. The CJEU acknowledged that the case at hand permitted a judicial review, as the parties to the dispute had chosen to submit the dispute to an *ad hoc* arbitration tribunal, with a seat of the arbitration in Paris. However, the CJEU submitted that such judicial review could be carried out only insofar as the domestic law of the Member State permitted it[695].

589. As such, the CJEU found that in light of the characteristics of an investment arbitration tribunal, it should be concluded – by analogy with the *Achmea* Judgment – that[696]:

> "[…] if the provisions of Article 26 ECT allowing such a tribunal to be entrusted with the resolution of a dispute were to apply as between an investor of one Member State and another Member State, it would mean that, by concluding the ECT, the European Union and the Member States which are parties to it established a mechanism for settling such a dispute that <u>could exclude the possibility that that dispute, notwithstanding the fact that it concerns the interpretation or application of EU law, would be resolved in a manner that guarantees the full effectiveness of that law</u>." [Emphasis added]

---

[693] **Doc. RL-314**, *Komstroy* Judgment, paras. 48-50.
[694] **Doc. RL-314**, *Komstroy* Judgment, paras. 51-53.
[695] **Doc. RL-314**, *Komstroy* Judgment, paras. 54-57.
[696] **Doc. RL-314**, *Komstroy* Judgment, para. 60.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 137 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

590. The CJEU stressed that, although the ECT may require Member States to comply with the arbitral mechanisms set forth in the ECT in their relations with investors "from third States" who are also Contracting Parties to the ECT as regards investments made by the latter in those Member States, preservation of the autonomy and of the particular nature of EU law precluded the same obligations under the ECT from being imposed on Member States as between themselves[697].

591. <u>Therefore</u>, the CJEU concluded that[698]:

> "In the light of the foregoing, it must be concluded that Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State."

592. Following this interpretation, the CJEU provided its answer to the first question, by stating that Art. 1(6) and Art. 26(1) of the ECT must be interpreted as meaning that:

- The acquisition of a claim by an investor of a Contracting Party to the ECT,

- Arising from a contract for the supply of energy, which is not connected with an investment,

- Held by an investor of a third State,

- Against a public entity of another Contracting Party to the ECT,

does not constitute an "investment" within the meaning of those provisions[699]. Having reached this decision, the CJEU found that there was no need to answer the second and third questions submitted for preliminary ruling the Paris Court of Appeal[700].

**S.    2022: ECT decisions after the *Komstroy* Judgment**

593. Since the CJEU's *Komstroy* Judgment, several investment arbitration tribunals constituted under the ECT have been asked to reconsider their decisions on jurisdiction by EU Member States. So far, these tribunals have all concluded that the *Komstroy* Judgment did not warrant a reconsideration of their decisions[701].

---

[697] **Doc. RL-314**, *Komstroy* Judgment, para. 65.
[698] **Doc. RL-314**, *Komstroy* Judgment, para. 66.
[699] **Doc. RL-314**, *Komstroy* Judgment, paras. 67-85.
[700] **Doc. RL-314**, *Komstroy* Judgment, para. 86.
[701] **Doc. CL-252**, *Kruck*; **Doc. CL-253**, referring to *Landesbank*. See also *Rockhopper v. Italy*; *Beheer v. Spain*; *Cavalum v. Spain*; *Infracapital v. Spain* (available in Investment Arbitration Reporter, https://www.iareporter.com/).

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

**T.    2022: Romania ratifies the Termination Treaty**

594.  On 22 February 2022, Romania ratified the Termination Treaty, which entered into force on 24 March 2022[702].

**3.2    DISCUSSION**

595.  The Parties discuss whether the Centre has jurisdiction and the Tribunal competence over this dispute.

596.  Upon careful examination of the Parties' submissions and the Commission's *Amicus Curiae* Brief, the Tribunal finds that Claimants and Romania have validly consented to this investment dispute being adjudicated through arbitration and that such consent remains in force. Thus, Romania's Intra-EU Objection must be dismissed.

597.  The Tribunal's conclusion is supported by the following findings:

  -    Romania has given its unconditional consent to arbitration (**A.**);

  -    The present dispute falls within the scope of Art. 26 of the ECT (**B.**);

  -    Art. 26 of the ECT has not ceased to apply as a result of the Treaty of Lisbon (**C.**);

  -    Art. 26 of the ECT does not conflict with the TFEU (**D.**); and

  -    The potential unenforceability of the award is immaterial (**E.**).

598.  These conclusions are reinforced by several customary international law doctrines (**F.**).

**A.    Consent to arbitration**

599.  The Tribunal has already established, in section **V.1.3.A** *supra*, that, under Art. 26 of the ECT and Art. 25(1) of the ICSID Convention, Romania gave its unconditional consent to submit disputes concerning an alleged breach of its obligations under the ECT to the jurisdiction of the Centre. Romania's offer was perfected on 23 May 2018, when Claimants filed their Request for Arbitration against Romania. Pursuant to Art. 25(1) of the ICSID Convention, once consent has been given it becomes irrevocable (**a.**). Furthermore, any future termination of or withdrawal from the ECT can only operate *ex nunc* (**b**).

---

[702] Status of the Agreement for the Termination of Bilateral Investment Treaties between Member States of the European Union, available at: https://www.consilium.europa.eu/en/documents-publications/treaties-agreements/agreement/?id=2019049&DocLanguage=en.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

### a.    Consent to arbitration was perfected on 23 May 2018

600.  The present Arbitral Tribunal is an international arbitration tribunal, constituted under the ICSID Convention and the ECT – two international multilateral treaties validly entered into by Romania, Germany, Austria, Cyprus and the Netherlands.

601.  Pursuant to Art. 41(1) of the ICSID Convention:

> "The Tribunal shall be the judge of its own competence."

602.  The Tribunal is thus in charge of establishing the jurisdiction of the Centre and its own competence. The Centre's jurisdiction and the Tribunal's competence derive directly from the Parties' consent.

603.  Art. 25(1) of the ICSID Convention provides that consent must be given in writing:

> "The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State […] and a national of another Contracting State, <u>which the parties to the dispute consent in writing to submit to the Centre</u>. […]." [Emphasis added]

604.  The Parties in this case have consented in writing to submit this dispute to the jurisdiction of the Centre and the competence of the Tribunal.

(i)    <u>Consent by Romania</u>

605.  On 16 April 1998, when the ECT entered into force, Romania, who had ratified this Treaty on 10 March 1996[703], gave its express and unconditional consent in writing to submit disputes relating to protected investments to international arbitration under the ICSID Convention, pursuant to Art. 26 of the ECT[704]:

> "(1) <u>Disputes between a Contracting Party</u> and <u>an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former</u>, <u>which concern an alleged breach of an obligation of the former under Part III</u> shall, if possible, be settled amicably.
>
> (2) If such disputes can not be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, <u>the Investor party to the dispute may choose to submit it for resolution</u>: […] (c) in accordance with the following paragraphs of this Article.
>
> (3) (a) Subject only to subparagraphs (b) and (c), <u>each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration</u> or conciliation in accordance with the provisions of this Article. […]

---

[703] **Doc. C-15**.
[704] **Doc. CL-1**, Art. 26(1) to (4).

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

> (4) In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), <u>the Investor shall further provide its consent in writing for the dispute to be submitted to</u>:
>
> > (a) (i) <u>The International Centre for Settlement of Investment Disputes</u>, established pursuant to the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, 18 March 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party party to the dispute are both parties to the ICSID Convention; […]."
> > [Emphasis added]

606. Art. 26 constitutes an offer of consent by the Contracting Parties to the ECT[705] that can be accepted by any "Investor of another Contracting Party" to the ECT. Particularly relevant is Art. 26(3) which states that:

> "Subject only to subparagraphs (b) and (c), each <u>Contracting Party</u> hereby <u>gives</u> its <u>unconditional consent to the submission of a dispute to arbitration</u> […]." [Emphasis added]

607. As noted by the *Eskosol* tribunal, the central question in interpreting Art. 26(3) is thus the scope of the covered "disputes", for which Romania has provided its "unconditional" consent to ICSID arbitration[706]. The scope of "dispute" is described in Art. 26(1) of the ECT, which will be analyzed in further detail in section B. *infra*.

608. Art. 26(5) of the ECT further determines that the unconditional consent given by Romania, as Contracting Party, and that of an investor, when choosing to submit a dispute to the Centre, satisfies the requirement for written consent of the Parties to a dispute for the purposes of Art. 25(1) of the ICSID Convention[707], which provides that[708]:

> "(1) <u>The jurisdiction of the Centre shall extend to any legal dispute</u> arising <u>directly out of an investment</u>, <u>between a Contracting State</u> (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and <u>a national of another Contracting State</u>, which the <u>parties to the dispute consent in writing</u> to submit to the Centre. […]" [Emphasis added]

No withdrawal from ECT

609. Art. 47 of the ECT provides that after five years from the date on which the ECT has entered into force for a Contracting Party, such Contracting Party may notify the Depository of its withdrawal from the Treaty[709].

---

[705] C. BALTAG, *The Energy Charter Treaty, The Notion of Investor*, Kluwer Law International (2012), p. 17, fn. 82.
[706] **Doc. CL-147**, *Eskosol*, para. 84.
[707] **Doc. CL-1**, Art. 26(5)(a).
[708] ICSID Convention, Art. 25(1).
[709] **Doc. CL-1**, Art. 47.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

610. Romania does not allege that it has withdrawn or initiated the procedure to withdraw from the ECT.

<u>No invalidity of relevant treaties</u>

611. Romania is not pleading that the ICSID Convention is invalid, neither in part nor as a whole. Romania, Germany, Austria, Cyprus and the Netherlands validly concluded the ICSID Convention and its application to the present case is undisputed.

612. Romania, Germany, Austria, Cyprus and the Netherlands validly signed the ECT, and Romania is not arguing that this Treaty is affected by the causes for invalidity established in the VCLT (Arts. 46 *et seq*. of the VCLT).

<u>No termination of relevant treaties</u>

613. Romania is also not arguing that the ECT or the ICSID Convention have been terminated.

614. None of the EU Member States, nor the EU for that matter, have taken steps to terminate the ECT, or to amend it by withdrawing their offer to ICSID arbitration; on the contrary, the Termination Treaty expressly provides that[710]:

> "[it] addresses intra-EU bilateral investment treaties; <u>it does not cover intra-EU proceedings on the basis of Article 26 of the Energy Charter Treaty.</u> The European Union and its Member States will deal with this matter at a later stage." [Emphasis added]

615. Art. 42 of the VCLT, concerning the "Validity and continuance in force of treaties", provides that[711]:

> "1. The validity of a treaty or of the consent of a State to be bound by a treaty may be impeached only through the application of the present Convention.
>
> 2. The termination of a treaty, its denunciation or the withdrawal of a party, may take place only as a result of the application of the provisions of the treaty or of the present Convention. The same rule applies to suspension of the operation of a treaty."

616. Termination of a treaty under the VCLT is also subject to a specific procedure, set out in Art. 65[712]:

> "Procedure to be followed with respect to invalidity, termination, withdrawal from or suspension of the operation of a treaty
>
> 1. A party which, under the provisions of the present Convention, invokes either a defect in its consent to be bound by a treaty or a ground for impeaching

---

[710] **Doc. CL-184**, p. 6.
[711] **Doc. CL-33**, Art. 42.
[712] **Doc. CL-33**, Art. 65.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

the validity of a treaty, terminating it, withdrawing from it or suspending its operation, must notify the other parties of its claim. The notification shall indicate the measure proposed to be taken with respect to the treaty and the reasons therefor.

2. If, after the expiry of a period which, except in cases of special urgency, shall not be less than three months after the receipt of the notification, no party has raised any objection, the party making the notification may carry out in the manner provided in article 67 the measure which it has proposed.

3. If, however, objection has been raised by any other party, the parties shall seek a solution through the means indicated in Article 33 of the Charter of the United Nations.

4. Nothing in the foregoing paragraphs shall affect the rights or obligations of the parties under any provisions in force binding the parties with regard to the settlement of disputes.

5. Without prejudice to article 45, the fact that a State has not previously made the notification prescribed in paragraph 1 shall not prevent it from making such notification in answer to another party claiming performance of the treaty or alleging its violation."

617. As noted by the arbitral tribunal in *Achmea*[713]:

"In the view of the Tribunal, it is therefore clear from the text of the VCLT that the invalidity or termination of a treaty must be invoked, according to the Article 65 procedure. The VCLT does not provide for the automatic termination of treaties by operation of law (with the exception of treaties that conflict with rules of *jus cogens*)."

618. The Tribunal has no doubt that, in accordance with Arts. 42 and 65 of the VCLT, the ECT – and Romania's consent to arbitration embedded therein – was validly entered into in 1998, and that it continues to be in force to this day.

(ii)    Consent by Claimants

619. On 23 May 2018, Claimants submitted their Request for Arbitration. In doing so, they accepted Romania's offer to arbitrate under the ECT, in writing, as required by Art. 25(1) of the ICSID Convention.

620. At that time (and the situation has not changed in the meantime), the ICSID Convention and the ECT were international treaties concluded by Romania, which had not been invalidated or terminated in accordance with the requirements of the VCLT (which, as Romania acknowledges, codifies international customary law[714]). The unconditional offer to arbitration made by Romania remains valid until this day.

---

[713] **Doc. CL-39**, *Achmea* Jurisdiction, para. 235.
[714] R-I, fn. 5.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 143 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

621. Consequently, when Claimants accepted Romania's offer to arbitrate on 23 May 2018 by filing the Request for Arbitration, consent was perfected.

\* \* \*

622. Once consent was perfected on 23 May 2018, it became irrevocable under Art. 25(1) *in fine* of the ICSID Convention:

> "When the parties have given their consent, <u>no party may withdraw its consent unilaterally</u>." [Emphasis added]

623. The present Intra-EU Objection is incompatible with the obligation assumed by Romania when it ratified the ICSID Convention and accepted the prohibition embedded in Art. 25(1). If the Tribunal were to accept Romania's objection, it would permit Respondent to unilaterally withdraw its consent, once it had been validly accepted by the investor.

**b.   Future termination of or withdrawal from the ECT can only operate *ex nunc***

624. The Termination Treaty provides that the EU and Member States will deal with the issue of termination or amendment of the ECT "at a later stage"[715]. One of the consequences of the *Komstroy* Judgment may be that, to comply with the CJEU's ruling, EU Member States are required to adopt a decision to terminate or to withdraw from the ECT.

<u>Termination</u>

625. Art. 70 of the VCLT provides for the consequences of the termination of a treaty[716]:

> "1. Unless the treaty otherwise provides or the parties otherwise agree, the termination of a treaty under its provisions or in accordance with the present Convention:
>
> (a) Releases the parties from any obligation further to perform the treaty;
>
> (b) <u>Does not affect any right, obligation or legal situation of the parties created through the execution of the treaty prior to its termination</u>." [Emphasis added]

626. Termination operates *ex nunc*: its effects apply from the moment the treaty is terminated, but not retroactively.

627. If and when Romania, Germany, Austria, Cyprus and/or the Netherlands decide to terminate the ECT, in accordance with international law, such termination will operate *ex nunc* and will "not affect any right, obligation or legal situation of the parties created through the execution of the treaty prior to its termination".

---

[715] **Doc. CL-184**, p. 6.
[716] **Doc. CL-33**, Art. 70(1).

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

628. Since in the present case consent to investment arbitration was locked in 2018 "through the execution of the treaty", any eventual future termination will not affect Claimants' present "right or legal situation": the right to have the investment dispute adjudicated by an ICSID Tribunal.

<u>Withdrawal</u>

629. Likewise, pursuant to Art. 47 of the ECT, any withdrawal from the ECT only takes effect one year after the notification of withdrawal. Furthermore, the provisions of the Treaty continue to apply for a period of 20 years, irrespective of the withdrawal[717]:

> "The provisions of this Treaty shall continue to apply to Investments made in the Area of a Contracting Party by Investors of other Contracting Parties or in the Area of other Contracting Parties by Investors of that Contracting Party as of the date when that Contracting Party's withdrawal from the Treaty takes effect for a period of 20 years from such date."

## B. **Interpretation of Art. 26(1) of the ECT**

630. The Tribunal has already found that pursuant to Art. 26(3) of the ECT, Romania has given its unconditional consent to submit a "dispute" to ICSID Arbitration. Romania contends that to fall within the scope of Art. 26(3), the present "dispute" must meet all three conditions set forth in Art. 26(1), which provides that[718]:

> "Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably."

631. Romania argues that, by their nature, "intra-EU" disputes do not meet any of the three conditions of Art. 26(1)[719]:

- First, that the investor must have "another" nationality or citizenship than that of the respondent to the dispute (**a.**);

- Second, that the investment must have a cross-border character with respect to the "Area" of the respondent to the dispute (**b.**); and

- Third, that the obligation allegedly breached must be an obligation "of" the respondent Contracting Party under Part III of the ECT (**c.**).

632. The Tribunal is unconvinced.

---

[717] **Doc. CL-1**, Art. 47(3).
[718] **Doc. CL-1**, Art. 26(1).
[719] R-II, para. 61; R-PHB, para. 10.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

633. An interpretation of Art. 26(1) of the ECT, in accordance with the VCLT interpretation rules defined in paras. 307-309 *supra*, leads to the conclusion that the present dispute falls within its scope.

### a.    Claimants are Investors of another Contracting Party

634. First, Romania argues that there is no diversity of citizenship between EU investors and EU Member States, because when EU investors invest in other EU Member States they do so as EU citizens. Accordingly, Claimants do not meet the first requirement of Art. 26(1) of the ECT[720].

635. The terms that the Tribunal must interpret are "Investor of another Contracting Party". Pursuant to Art. 31 of the VCLT, the ECT is to be interpreted and applied in accordance with the "ordinary meaning" of its terms, in their context. As explained by the International Court of Justice, this means that "[i]f the relevant words in their natural and ordinary meaning make sense in their context, that is the end of the matter"[721]. It is only if[722]:

> "[…] the words in their natural and ordinary meaning are ambiguous or lead to an unreasonable result, then, and then only, must the Court, by resort to other methods of interpretation, seek to ascertain what the parties really did mean when they used these words."

636. In the present case, there are no ambiguous terms. On the contrary, the Contracting Parties themselves clearly defined what they understood by "Investor" and "Contracting Party".

"Investor"

637. Art. 1(7)(a) of the ECT defines "Investor" with respect to a Contracting Party as follows[723]:

> "(i) a natural person having the citizenship or nationality of or who is permanently residing in that Contracting Party in accordance with its applicable law;
>
> (ii) a company or other organization organized in accordance with the law applicable in that Contracting Party."

638. Since in the present case Claimants are not natural persons, the relevant factor is a company "organized in accordance with the law applicable in that Contracting Party".

639. According to Art. 26(7), investor is also the company owned or controlled at all relevant times by Investors of another Contracting State.

---

[720] R-PHB, para. 10.
[721] **Doc. CL-171**, Advisory Opinion of the ICJ, p. 8.
[722] **Doc. CL-171**, Advisory Opinion of the ICJ, p. 8.
[723] **Doc. CL-1**, Art. 1(7)(a).

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

<u>"Contracting Party"</u>

640. Art. 1(2) of the ECT defines a "Contracting Party" as "a state or Regional Economic Integration Organization which has consented to be bound by this Treaty and for which the Treaty is in force"[724]. Therefore, a Contracting Party is either a State party to the Treaty **or** an REIO (as the EU).

<u>"Another"</u>

641. The only word that has been not defined by the Contracting Parties themselves is "another", which in this case is used as an adjective. In this sense, "another" can be defined as "different or distinct from the one first considered"[725] – *i.e.*, different from the Contracting Party to the dispute.

<u>Analysis</u>

642. The ordinary meaning of the words used, in their context, does not leave room for discussion: for the first requirement of Art. 26(1) of the ECT to be met, the investor must be:

- A company "organized in accordance with the law applicable",

- In "a state which has consented to be bound by [the ECT] and for which [the ECT] is in force", and

- That is different or distinct from the State that is involved in the dispute.

Nothing else is required.

643. In the present case, Claimants (except for Beta) are all companies organized in accordance with the law applicable in States that have consented to be bound by the ECT and are distinct from Romania:

- LSG[726], Green Source[727], CVI[728] and CVC[729] are all companies duly organized in accordance with Austrian law;

- Solluce is a company duly organized in accordance with Dutch law [730];

- Risen[731] and Pressburg[732] are both companies duly organized in accordance with German law; and

---

[724] **Doc. CL-1**, Art. 1(2).
[725] Merriam-Webster Dictionary, available at: https://www.merriam-webster.com/.
[726] **Doc. C-2**.
[727] **Doc. C-3**.
[728] **Doc. C-6**.
[729] **Doc. C-7**.
[730] **Doc. C-4**.
[731] **Doc. C-5**.
[732] **Doc. C-11**.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- Anina[733] and Giust[734] are both companies duly organized in accordance with Cypriot law.

644. Although Beta is a company incorporated under the law of Romania[735], it has been owned and controlled at all relevant times (*i.e.*, before a dispute between it and Romania arose) by Investors of another Contracting Party; therefore, pursuant to Art. 26(7) of the ECT[736], it shall, for the purpose of Art. 25(2)(b) of the ICSID Convention, be treated as a "national of another Contracting State".

645. As pointed out by the *Stadtwerke* tribunal[737], the fact that Claimants, by virtue of conducting their activities within the EU, are operating to some degree under EU law, does not mean that they were created or organized under EU law – rather, they were created and are organized under the laws of their respective States (Germany, Austria, Cyprus and the Netherlands).

646. In sum, a plain reading of Art. 26(1) of the ECT, in accordance with the ordinary meaning of its terms, leads to the conclusion that Claimants qualify as "Investors of another Contracting Party".

   **b.    There are Investments of Investors of a Contracting Party in the Area of another Contracting Party**

647. Romania further contends that intra-EU investments are not cross-border investments because the EU's internal market is an "area without internal frontiers", as defined in Art. 26 of the TFEU[738]. This means that investments made in Romania are investments made in the EU, with the result that the second condition of Art. 26(1) is not satisfied. This argument has been supported by the Commission in its *Amicus Curiae* Brief[739].

648. The Tribunal must turn to the interpretation of the terms "Investment of the latter in the Area of the former".

649. Art. 1(10) of the ECT defines the term "Area" as follows:

   "'Area' means with respect to a state that is a Contracting Party:

      (a) the territory under its sovereignty, it being understood that territory includes land, internal waters and the territorial sea; and

---

[733] **Doc. C-9**.
[734] **Doc. C-10**.
[735] **Doc. C-8**.
[736] **Doc. CL-1**, Art. 26(7): "An Investor other than a natural person which has the nationality of a Contracting Party party to the dispute on the date of the consent in writing referred to in paragraph (4) and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party, shall for the purpose of article 25(2)(b) of the ICSID Convention be treated as a 'national of another Contracting State' […]".
[737] **Doc. RL-196**, *Stadtwerke*, para. 128.
[738] R-PHB, para. 10.
[739] *Amicus Curiae* Brief, paras. 40-41.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 148 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

<blockquote>
(b) subject to and in accordance with the international law of the sea: the sea, sea-bed and its subsoil with regard to which that Contracting Party exercises sovereign rights and jurisdiction.

<u>With respect to a Regional Economic Integration Organization which is a Contracting Party</u>, Area means the Areas of the member states of such Organization, under the provisions contained in the agreement establishing that Organization." [Emphasis added]
</blockquote>

650. Romania argues that the second prong of this provision, concerning the REIO, shows that the Contracting Parties viewed the Area of the EU as one single zone, deprived of internal borders[740].

651. The Tribunal is unconvinced.

652. Romania's reading of Art. 1(10) obviates the first prong of this provision and concentrates solely on the part concerning the REIO. Yet, Art. 1(10) clearly provides that "Area" with respect to a "[S]tate that is a Contracting Party [includes] the territory under its sovereignty […]". Thus, Art. 1(10) clearly distinguishes between the "Area" when the Contracting Party is a State, and when it is a REIO. There is no reason to read the Areas of EU Member States and the EU in Art. 1(10) of the ECT as interchangeable terms.

653. What is relevant when interpreting Art. 26(1) is to determine who the Contracting Party in question is, against whom the claim has been filed. As demonstrated by the wording:

<blockquote>
"Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter <u>in the Area of the former</u>" [Emphasis added]
</blockquote>

in Art. 26(1) of the ECT, the relevant Area is that of the Contracting Party to the dispute. Since in the present case the Contracting Party to the dispute is Romania, what is relevant is that the investment is made in the territory of Romania.

654. <u>In the present case,</u> there is no contention between the Parties that Claimants have made "Investments" in the territory of Romania. Nothing else is required by Art. 26(1) of the ECT.

655. If the EU were the respondent Contracting Party to the dispute, or if the EU Member States were not Contracting Parties to the ECT in their own right, and only the EU were a Contracting Party, the conclusion might be different[741] – but this is not the case.

---

[740] R-I, para. 35.
[741] See **Doc. CL-172**, *PV Investors*, paras. 179-180.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Case-law

656. Although the decisions of other arbitral tribunals are not binding, the Tribunal finds it compelling that several other investment tribunals have reached this exact same conclusion.

657. In *PV Investors*, the tribunal observed that it was unable to follow Spain's argument regarding the need for a diversity of Areas[742]:

> "While it is true that the second sentence of Article 1(10) of the ECT defines Area with respect to a REIO as 'the Areas of the member states of such Organization', the first sentence of Article 1(10) of the ECT defines Area *with respect to a state that is a Contracting Party* as the territory under the state's sovereignty. In the Tribunal's view, the two components of the definition must be clearly distinguished and correctly related to the notion of Area that is referred to in Article 26."

658. Likewise, in *Charanne*, the Tribunal found that Spain's argument[743]:

> "[…] ignores that, although the EU is a Contracting Party of the ECT, the States that compose it have not ceased to be Contracting Parties as well. Both the EU, as its Member States, may have legal standing as Respondent in an action based on the ECT.
>
> Article 1(10) of the ECT, in order to define the concept of 'area' refers to both the territory of the Contracting States (Article 1(10)(a)) and the EU territory (Article 1(10) second paragraph). Therefore, it appears reasonable to deduce that, in referring to investments made "in the territory" of a contracting party, Article 26(1) refers to both, in the case of a EU member State, to the territory of a national State as well as the territory of the EU. There is no rule in the ECT according to which a different interpretation can be inferred.
>
> To know if the term 'territory' refers to one or the other depends on the content of the claim and the entity against which the claim is directed. An investor may well sue the EU based on allegedly unlawful acts committed by it. In this case, it could be considered that for the purposes of Article 26 of the ECT, the dispute is related to an investment made in the territory of the EU. […]"

659. The *Isolux* tribunal observed that[744]:

> "[…] the fact that the '*area*' of the EU, according to ECT Article 1.10, covers the territories of the Netherlands and the Kingdom of Spain, does not prevent each of them from retaining an '*area*' as well within the scope of the ECT. Only an interpretation of ECT Article 26.1 allows determining what 'area' should be referred to in order to verify that the requirement of diversity of territories is met.

---

[742] **Doc. CL-172**, *PV Investors*, para. 178.
[743] **Doc. CL-15**, *Charanne*, paras. 429-431.
[744] **Doc. RL-85**, *Isolux*, paras. 634, 636.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

> […]
>
> Article 26.1 refers to disputes between '*a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former*'. This clearly implies that the area in question is the territory of the Contracting Party against which the investor is acting. […]"

660. To name only a few, the tribunals in *InfraRed*[745], *Eskosol*[746], *RWE*[747] and *Vattenfall*[748] have all reached similar decisions.

### c.    The dispute concerns obligations of Romania under Part III of the ECT

661. In the present case, Claimants invoke an alleged breach by Romania of Art. 10(1) of the ECT, a provision which falls under Part III of the ECT. Consequently, the present dispute concerns "an alleged breach of an obligation" of Romania under Part III of the ECT.

662. Romania, however, submits that obligations under Part III of the ECT cannot be obligations "of" EU Member States, but rather "of" the EU, because competence has been transferred by EU Member States to the EU[749].

663. The terms that the Tribunal must interpret are:

> "Disputes between a Contracting Party and an Investor of another Contracting Party […] which concern an alleged breach of an obligation of the former under Part III [of the ECT]". [Emphasis added]

664. To sustain its argument that obligations under Part III of the ECT are not obligations "of" EU Member States, but rather of the EU, Romania[750] points to the fact that the EU is the only REIO signatory of the ECT and that Art. 1(3) of the ECT defines an REIO as[751]:

> "[…] an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters." [Emphasis added]

665. Romania's argument, however, can be rapidly disposed of.

666. First, as noted by the *Eskosol* tribunal, Art. 1(3) of the ECT alludes only in abstract to "certain matters" competence of which have been transferred to the EU, without defining what such matters might be. Consequently[752]:

---

[745] **Doc. CL-174**, *InfraRed*, paras. 263-265.
[746] **Doc. CL-147**, *Eskosol*, para. 90.
[747] **Doc. RL-172**, *RWE*, paras. 327-328.
[748] **Doc. CL-6**, *Vattenfall*, paras. 181-183.
[749] R-PHB, para. 10.
[750] R-II, paras. 63-64.
[751] **Doc. CL-1**, Art. 1(3).
[752] **Doc. CL-147**, *Eskosol*, para. 88.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

> "[...] nothing in this Article remotely suggests a shared understanding, as of the date the ECT entered into force, that either the entirety of Part III's substantive obligations, or the entirety of Part V's procedural obligations with respect to dispute settlement, were the contemplated subjects of such an exclusive transfer. If such a wholesale transfer of exclusive competence for major parts of the ECT, among a large group of the ECT's original Contracting Parties, already had been completed or was directly contemplated as of the ECT's entry into force, one would expect that this major development would have been expressly referenced somewhere."

667. The fact that Art. 1(3) provides that members of an REIO can transfer competence "over certain matters" to the REIO, cannot lead to the conclusion that the EU Member States decided to transfer precisely their competences and obligations under Part III of the ECT to the EU[753].

668. <u>Second</u>, nothing in the text of the ECT leads to conclude that the EU Member States, as Contracting Parties to the ECT, decided to transfer their competence over the obligations in Part III of the ECT to the EU.

669. On the contrary, when they submitted their instrument of ratification with the ECT Depository, the European Communities already foresaw the possibility that liability might be attributed to either them or their Member States[754]:

> "The <u>European Communities and their Member States</u> have both concluded the Energy Charter Treaty and <u>are</u> thus <u>internationally responsible for the fulfilment of the obligations</u> contained therein, in accordance with their respective competences.
>
> The Communities and the Member States will, <u>if necessary, determine among them who is the respondent party to arbitration proceedings</u> initiated by an Investor of another Contracting Party. In such case, upon the request of the Investor, the Communities and the Member States concerned will make such determination within a period of 30 days." [Emphasis added]

670. By making the above declaration, the EU (as the successor of the European Communities) and Romania (as a Member State) acknowledged that both were internationally responsible for honoring substantive obligations contained in the ECT; and that, if a dispute arose, and if deemed necessary, they would determine amongst themselves who would be the respondent party. If, as Romania suggests, Part III obligations had been assigned to the REIO, it would have been incumbent upon Romania to have agreed with the EU that the latter be the respondent – this, however, did not happen.

671. <u>Finally</u>, the Tribunal observes that Art. 17 of the ECT concerns the "Non-application of Part III in certain circumstances". In this denial of benefits clause the Contracting Parties could have inserted the exception which Romania and the

---

[753] See also **Doc. RL-196**, *Stadwerke*, para. 131.
[754] **Doc. EC-15**.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Commission now invoke: that Part III will not apply between Investors of EU Member States and EU Member States.

672. However, they chose not to do so.

\* \* \*

673. <u>In view of the above</u>, the Tribunal concludes that the present dispute falls within the scope of Art. 26(1) of the ECT.

### d.    Absence of a disconnection clause

674. The Tribunal's conclusion is further supported by the fact that the ECT contains no disconnection clause, excluding the application of some provisions to certain parties of the treaty. As observed by numerous investment arbitral tribunals[755], the EU and its Member States could have inserted a carve-out to Art. 26, excluding application of the Investor-State dispute resolution clause to disputes between EU Member States; yet they did not do so.

675. Romania and the Commission have countered that disconnection clauses are uncommon; thus, the decision on consent should not be measured against the existence of such clauses[756].

676. The Tribunal is not convinced by Romania and the Commission's argument, for two reasons.

677. <u>First</u>, the Contracting Parties to the ECT inserted a disconnection clause with regards to the Svalbard Treaty, which provides that[757]:

> "In the event of a conflict between the treaty concerning Spitsbergen of 9 February 1920 (the Svalbard Treaty) and the Energy Charter Treaty, the treaty concerning Spitsbergen shall prevail to the extent of the conflict, without prejudice to the positions of the Contracting Parties in respect of the Svalbard Treaty. In the event of such conflict or a dispute as to whether there is such conflict or as to its extent, Article 16 and Part V of the Energy Charter Treaty shall not apply."

678. As noted by the tribunals in *PV Investors*[758] and *Masdar*[759]:

> "It would seem striking that the Contracting Parties made an express exception for the Svalbard Treaty, which concerns an archipelago in the Arctic, but somehow omitted to specify that the ECT's dispute-settlement system did not apply in all of the EU member states' relations. Compared to the Svalbard Treaty Exception, an exception with regard to the intra-EU relations would be

---

[755] See, *e.g.*, **Doc. CL-16**, *RREEF*, paras. 84-85; **Doc. CL-19**, *Blusun*, para. 280(3); **Doc. CL-27**, *Greentech*, para. 338.
[756] R-II, paras. 86 *et seq*.; *Amicus Curiae* Brief, paras. 48-50.
[757] **Doc. CL-1**, p. 135.
[758] **Doc. CL-172**, *PV Investors*, para. 183.
[759] **Doc. CL-22**, *Masdar*, para. 311, citing to *PV Investors*.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

of much greater significance. It would be extraordinary that an essential component of the Treaty, such as investor-State arbitration, would not apply among a significant number of Contracting Parties without the Treaty drafters addressing this exception."

679. <u>Second</u>, as observed by the *Vattenfall*[760] and *Blusun* tribunals[761], during the negotiation of the ECT, the EU proposed the insertion of a disconnection clause[762], but this clause was ultimately dropped from the draft treaty. As noted by the *Vattenfall* tribunal, this leads to conclude that[763]:

> "[…] a disconnection clause was intentionally omitted from the ECT. The absence of such a clause confirms that the ECT was intended to create obligations between Member States of the EU, including in respect of potential investor-State dispute settlement."

### C. **Art. 26 of the ECT has not ceased to apply**

680. Romania submits that if the Tribunal were to find that this intra-EU dispute is within the scope of the arbitration clause of Art. 26 of the ECT, it must then determine whether, pursuant to Art. 41 of the VCLT, the Treaty of Lisbon constitutes an agreement to modify the ECT, with the effect of disapplying the arbitration clause as between EU Member States[764].

681. As a first point of order the Tribunal must establish whether the Treaty of Lisbon collides with Art. 26 of the ECT in a way that is to be interpreted as a modification of the latter and it will find that it does not (**a.**). But, even if it did, the Tribunal does not find that an *inter se* agreement under Art. 41 of the VCLT exists (**b.**).

#### a. **No modification of Art. 26 of the ECT through the Treaty of Lisbon**

682. Nothing in the Treaty of Lisbon suggests that the EU Member States or the EU had the intention of modifying Art. 26 of the ECT. In fact, the Treaty of Lisbon does not even mention the ECT.

683. Romania counters first, that the modification is implicit and, second, indirect:

684. <u>First</u>, Romania points to Arts. 206 and 207 of the TFEU, transferring the EU Member States' competence over foreign direct investment to the EU. Romania argues that this transfer of competence excludes the possibility of concurrent power on the part of the EU Member States[765]. According to Romania[766]:

---

[760] **Doc. CL-6**, *Vattenfall*, paras. 203 and 205.
[761] **Doc. CL-19**, *Blusun*, para. 280(4).
[762] **Doc. C-25**, p. 2.
[763] **Doc. CL-6**, *Vattenfall*, para. 206.
[764] R-II, paras. 138 *et seq.*; R-PHB, para. 11.
[765] R-I, paras. 102-106.
[766] R-I, para. 106.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

> "The logical consequence of this is that, since Part III of the [ECT] relates to 'Investment Promotion and Protection,' it cannot apply as between EU Member States since it now falls within the exclusive competence of the EU."

685. Art. 206 of the TFEU provides that[767]:

> "By establishing a customs union in accordance with Articles 28 to 32, the <u>Union shall contribute</u>, in the common interest, <u>to</u> the harmonious development of world trade, <u>the progressive abolition of restrictions</u> on international trade and <u>on foreign direct investment</u>, and the lowering of customs and other barriers." [Emphasis added]

686. Therefore, pursuant to this provision, the EU is committed to abolishing restrictions on foreign direct investment and does so by establishing a customs union.

687. In turn, Art. 207 of the TFEU determines, in its relevant part, that[768]:

> "1. <u>The common commercial policy shall be based on uniform principles</u>, particularly with regard to changes in tariff rates, <u>the conclusion of tariff and trade agreements relating to trade in goods and services</u>, and the commercial aspects of intellectual property, <u>foreign direct investment</u>, the achievement of uniformity in measures of liberalisation, export policy and measures to protect trade such as those to be taken in the event of dumping or subsidies. The common commercial policy shall be conducted in the context of the principles and objectives of the Union's external action.
>
> 2. The <u>European Parliament and the Council</u>, acting by means of regulations in accordance with the ordinary legislative procedure, <u>shall adopt the measures defining the framework for implementing the common commercial policy</u>.
>
> 3. <u>Where agreements with one or more third countries or international organisations need to be negotiated and concluded, Article 218 shall apply</u>, subject to the special provisions of this Article." [Emphasis added]

688. The Tribunal does not see how any of these provisions could be read so as to entail that Art. 26 of the ECT has ceased to apply. The fact that the EU gained competence to negotiate and conclude agreements concerning foreign direct investment on behalf of the EU Member States does not mean that existing treaties were amended or that their provisions, particularly in terms of investor-State dispute settlement, ceased to be applicable.

689. <u>Second</u>, Romania argues, alternatively, that the Treaty of Lisbon did not *strictu sensu* modify the terms of the ECT, but it modified the manner in which the ECT has to be applied. Romania argues that the third condition of Art. 26(1) of the ECT would no longer be met (*i.e.*, that the dispute must concern an alleged breach of an obligation "of" a Contracting Party under Part III of the ECT), since the Part III obligations would now be obligations "of" the EU, based on the transfer of

---

[767] **Doc. C-28**, Art. 206.
[768] **Doc. C-28**, Art. 207.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

competence in Arts. 206 and 207 of the TFEU. From this point of view, says Romania, it would not even be necessary to demonstrate that there was a modification of the ECT that complied with Art. 41 of the VCLT, and there would be no reason for the Treaty of Lisbon to refer to the ECT. The result would simply be that Art. 26 of the ECT is no longer applicable to intra-EU disputes[769].

690. There is no basis for Romania's conclusion.

691. As noted, Arts. 206 and 207 of the TFEU cannot be read as suggested by Romania; these rules do not support the proposition that EU Member States transferred their competences under Part III of the ECT to the EU. A transfer of this kind would necessarily require a modification of the Treaty and, as will be seen below, such modification never occurred.

**b.    No valid *inter se* agreement to modify Art. 26 of the ECT**

692. Art. 41 of the VCLT concerns "Agreements to modify multilateral treaties between certain of the parties only" (so-called *inter se* agreements) and provides that[770]:

> "1. Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if:
>
>> (a) The possibility of such a modification is provided for by the treaty; or
>>
>> (b) The modification in question is not prohibited by the treaty and:
>>
>>> (i) Does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations;
>>>
>>> (ii) Does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.
>
> 2. Unless in a case falling under paragraph l(a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides."

693. In accordance with this rule, a multilateral treaty can be modified between certain parties only if:

- The possibility of such modification is provided for by the treaty (Art. 41(1)(a)) (**i.**); or

- The possibility of modification is not prohibited and such modification (i) does not affect the enjoyment of the other parties' rights under the treaty, (ii) does not relate to a provision whose derogation would be incompatible with the effective execution of the object and purpose of the treaty; and (iii)

---

[769] R-II, para. 159. See also R-PHB, para. 11.
[770] **Doc. CL-33**, Art. 41.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

the parties wishing to modify the treaty notify the remaining parties to the treaty of their intention to conclude the agreement and modify the treaty (unless the treaty provides that such notification is unnecessary) (Arts. 41(1)(b) and 41(2)) (**ii.**).

694. Romania submits that the Treaty of Lisbon, signed in 2007 by EU Member States, constitutes an *inter se* "agreement to modify" the ECT, in particular with respect to the intra-EU application of Part III and Art. 26 of the ECT[771].

695. The Tribunal is unconvinced by Romania's argument that the Treaty of Lisbon constituted an *inter se* agreement to modify the ECT.

(i)    <u>Art. 41(1)(a)</u>

696. Under Art. 41(1)(a) of the VCLT, the first alternative for the valid existence of an *inter se* agreement is that the treaty itself permits this possibility.

697. In the ECT, only Art. 42 permits amendments to said Treaty and reads as follows[772]:

"(1) Any Contracting Party may propose amendments to this Treaty.

(2) The text of any proposed amendment to this Treaty shall be communicated to the Contracting Parties by the Secretariat at least three months before the date on which it is proposed for adoption by the Charter Conference.

(3) Amendments to this Treaty, texts of which have been adopted by the Charter Conference, shall be communicated by the Secretariat to the Depository which shall submit them to all Contracting Parties for ratification, acceptance or approval."

698. The Parties agree that this provision does not allow the conclusion of amendments only between certain Contracting Parties to the ECT; in other words, the ECT does not contemplate the possibility of concluding *inter se* agreements to modify the Treaty's provisions.

(ii)    <u>Arts. 41(1)(b) and 41(2)</u>

699. Since the ECT does not permit *inter se* agreements, the validity of such agreements requires that the conditions established in Arts. 41(1)(b) and 41(2) of the VCLT be met. This implies that the Treaty of Lisbon can only constitute a valid *inter se* agreement between EU Member States which modifies Art. 26 of the ECT, if the following requirements are met:

-    The modification in question must not be prohibited by the ECT;

-    The modification cannot affect the rights and obligations of other Contracting Parties under the ECT;

---

[771] R-I, para. 99.
[772] **Doc. CL-1**, Art. 42 (Art. 42(4) is omitted).

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 157 of 299

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- The modification of Art. 26 cannot be incompatible with the effective execution of the object and purpose of the ECT as a whole; and

- The EU Member States must have notified the other Contracting Parties to the ECT of their intention to conclude the Treaty of Lisbon in order to modify Art. 26 of the ECT.

700. As previously noted, nothing in the Treaty of Lisbon suggests that the EU Member States or the EU had the intention of modifying Art. 26 of the ECT. The Treaty of Lisbon does not even mention the ECT.

701. In any case, it is undisputed that, when concluding the Treaty of Lisbon, neither the EU Member States, nor the EU for that matter, notified the other Contracting Parties to the ECT of their intention to modify Art. 26 of the ECT.

702. Romania submits that notification is not a "strict condition" under Art. 41 of the VCLT and that failure to notify cannot result in the nullity of the *inter se* agreement, in a situation in which the conditions of Art. 41(1)(b) of the VCLT are satisfied[773].

703. Romania's argument is not convincing. The requirement of Art. 41(2) of the VCLT is clear and does not leave a margin for derogation. As noted by the International Law Commission, in a report prepared in 2006, an *inter se* agreement must be notified to the other contracting parties to a treaty to give time for those parties to react. The goal of notification is thus to protect the interests of the other parties, in the same manner as paragraphs (i) and (ii) of Art. 41(1)(b)[774]. It is unclear why this would not be a "strict" condition.

Case-law

704. The *SolEs*[775], *Vattenfall*[776] and *Eskosol*[777] tribunals reached the exact same conclusion as this Tribunal. In particular, the *Eskosol* tribunal decided to reject Italy's Art. 41 argument not because the requirements of Art. 41(1)(b) were allegedly not met, as put forward by Eskosol, but rather "at a more fundamental level"[778]:

> "[…] which is that nothing in the Lisbon Treaty even purported to be an exercise of powers to 'conclude an agreement to modify' the ECT as among EU Member States, which must be the starting point of any Article 41(1) analysis. Nothing in the Lisbon Treaty refers to the ECT at all, much less expresses an intent to modify the ECT's reach or application. In that scenario, as the *Vattenfall* tribunal observed, '[i]t is unclear what precise modification of the ECT is alleged to have taken place.' Nor is there any suggestion that in enacting the Lisbon Treaty, the EU followed the procedures set out in Article 41(2) for advance notification of other ECT Contracting Parties of

---

[773] R-I, paras. 95-98; R-II, paras. 153-155.
[774] **Doc. CL-176**, paras. 316-318.
[775] **Doc. CL-150**, *SolEs*, para. 251.
[776] **Doc. CL-6**, *Vattenfall*, para. 221.
[777] **Doc. CL-147**, *Eskosol*, para. 150.
[778] **Doc. CL-147**, *Eskosol*, para. 150.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

their intention to conclude an agreement which henceforth would legally modify ECT obligations among EU Member States."

705. <u>In sum</u>, the Tribunal concludes that the Treaty of Lisbon did not modify Art. 26 of the ECT, with the effect that this provision ceased to apply between EU Member States.

### D.   No conflict between Art. 26 of the ECT and the TFEU

706. Romania argues that if the Tribunal were to find that this dispute is within the scope of the ECT arbitration clause, it must then examine whether there is a treaty conflict between the ECT and the TFEU. According to Romania, to determine whether a treaty conflict exists, the Tribunal must ascertain whether Romania can comply simultaneously with its obligations under Art. 26 of the ECT, on the one hand, and under Arts. 267 and 344 of the TFEU, on the other[779]. Romania relies on the *Komstroy* Judgment to argue that such a conflict exists[780].

707. Romania submits that if the Tribunal finds that there is a treaty conflict, then it must determine which treaty prevails under the applicable conflict-resolving rules of international law[781]. In doing so, the Tribunal must first turn to the specific conflict-resolving rules in each of the treaties, *i.e.*, Art. 16 of the ECT and Art. 351 of the TFEU; if these rules each give priority to the same treaty, said treaty must prevail. If those rules are found to give priority to different treaties, then the prevailing treaty must be determined pursuant to the *lex posterior* rule in Art. 30 of the VCLT[782].

708. Claimants, on the contrary, argue that there is no conflict between the ECT and EU law[783]. Furthermore, Claimants find that the CJEU's interpretation of the EU Treaties is not relevant to the Tribunal's assessment of its jurisdiction, which is governed solely by Art. 26(1) to (5) of the ECT and the ICSID Convention[784].

709. The Tribunal finds that there is no conflict between the ECT and EU law, as confirmed by Art. 30 of the VCLT; the application of Art. 16 of the ECT would in any case give priority to the ECT (**a.**). The Tribunal further finds that the *Komstroy* Judgment is irrelevant to the Tribunal's decision on jurisdiction (**b.**).

#### a.   ECT and EU law can co-exist

710. Romania argues that there is a conflict between Art. 26 of the ECT, on the one hand, and Arts. 267 and 344 of the TFEU, on the other. According to Romania, the Tribunal must analyze such conflict in light of Art. 16 of the ECT and Art. 351 of the TFEU; and subsidiarily, if these rules lead to contradictory results, in light of Art. 30 of the VCLT.

---

[779] R-PHB, para. 13.
[780] R-Komstroy, paras. 11 *et seq*.
[781] R-I, para. 123; R-PHB, para. 12.
[782] R-PHB, para. 19.
[783] C-PHB, para. 20.
[784] C-Komstroy, paras. 10 *et seq*.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Art. 351 of the TFEU is not applicable

711. As a preliminary point, the Tribunal notes that, contrary to Romania's suggestion[785], Art. 351 of the TFEU is not applicable to the present case. This provision establishes that[786]:

> "The rights and obligations arising from agreements concluded before 1 January 1958 or, for acceding States, before the date of their accession, <u>between one or more Member States on the one hand, and one or more third countries on the other</u>, shall not be affected by the provisions of the Treaties.
>
> To the extent that such agreements are not compatible with the Treaties, the Member State or States concerned shall take all appropriate steps to eliminate the incompatibilities established. Member States shall, where necessary, assist each other to this end and shall, where appropriate, adopt a common attitude.
>
> In applying the agreements referred to in the first paragraph, Member States shall take into account the fact that the advantages accorded under the Treaties by each Member State form an integral part of the establishment of the Union and are thereby inseparably linked with the creation of common institutions, the conferring of powers upon them and the granting of the same advantages by all the other Member States." [Emphasis added]

712. This provision is irrelevant for the present discussion. It concerns agreements between EU Members States and "third states", which were concluded prior to the Member State's accession to the EU. Therefore, this provision does not concern agreements concluded between EU Member States, which is the subject of the present discussion.

713. The *Vattenfall* tribunal reached this exact same conclusion[787]:

> "A plain reading of Article 351 TFEU does not support the outcome sought by Respondent or the EU. Article 351 TFEU relates to agreements between EU Member States and 'third states', i.e., non-EU Member States."

Art. 16 of the ECT and Art. 30 of the VCLT

714. Art. 16 of the ECT provides that[788]:

> "Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, <u>whose terms in either case concern the subject matter of Part III or V of this Treaty,</u>
>
> (1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and

---

[785] R-PHB, paras. 20-22.
[786] **Doc. C-28**, Art. 351.
[787] **Doc. CL-6**, *Vattenfall*, para. 225.
[788] **Doc. CL-1**, Art. 16.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

> (2) <u>nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty,</u>
>
> <u>where any such provision is more favourable to the Investor or Investment.</u>"
> [Emphasis added]

715. Art. 16 applies when two or more Contracting Parties enter into a subsequent international agreement "whose terms in either case concern the subject matter of Part III or V of this Treaty". In such case, the provisions of the ECT will prevail over those of the subsequent treaty to the extent that they are more favorable to the Investor.

716. Art. 30 of the VCLT, on the other hand, provides that[789]:

> "1. Subject to Article 103 of the Charter of the United Nations, the <u>rights and obligations of States parties to successive treaties relating to the same subject-matter</u> shall be determined in accordance with the following paragraphs.
>
> 2. When a treaty specifies that it is subject to, or that it is not to be considered as incompatible with, an earlier or later treaty, the provisions of that other treaty prevail.
>
> 3. <u>When all the parties to the earlier treaty are parties also to the later treaty but the earlier treaty is not terminated or suspended in operation under article 59, the earlier treaty applies only to the extent that its provisions are compatible with those of the later treaty.</u>
>
> 4. When the parties to the later treaty do not include all the parties to the earlier one:
>
> > (a) As between States parties to both treaties the same rule applies as in paragraph 3;
> >
> > (b) As between a State party to both treaties and a State party to only one of the treaties, the treaty to which both States are parties governs their mutual rights and obligations." [Emphasis added]

717. Pursuant to this provision, if there are successive treaties that relate to "the same subject-matter", the earlier treaty, "applies only to the extent that its provisions are compatible" with those of the later treaty.

718. To apply either Art. 16 of the ECT or Art. 30 of the VCLT, the TFEU must be considered a "subsequent" or "successive treaty" to the ECT, and both treaties must "concern" or "relate to" the same "subject-matter". The Tribunal will however find that the ECT and the TFEU do not deal with the same subject-matter (**i.**).

719. But even assuming that they did, the incompatibility standard of Art. 30 of the VCLT is not met (**ii.**); furthermore, the provisions of the ECT are, in any case, more

---

[789] **Doc. CL-33**, Art. 30 (Art. 30(5) is omitted).

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

favorable to the investor and should be given precedence in accordance with Art. 16 of the ECT (**iii.**).

(i)    The ECT and the TFEU do not deal with the same subject-matter

720.    Assuming for the sake of the argument that the ECT and the TFEU can be considered "successive treaties" (with the earlier treaty being the ECT and the later treaty being the TFEU), the Tribunal is unconvinced that the ECT and the TFEU concern the same subject-matter. A comparison of the content of the ECT and of the TFEU shows that these treaties do not relate to the same subject-matter.

721.    First, the ECT is a multilateral treaty whose objective is to govern the co-operation between Contracting Parties (not only EU Member States) in the energy field[790], with specific goals such as "the most efficient exploration, production, conversion, storage, transport, distribution and use of energy"[791].

722.    The TEU and the TFEU, on the other hand, have a much broader purpose: these treaties were concluded to create an internal market, and then evolved to foster political integration between Members States in the areas of common foreign and security policy and judicial and home affairs.

723.    Second, the ECT and the TFEU do not share the same substantive protections. The ECT not only promotes investments in the energy field, but also protects such investments from expropriation without prompt and adequate compensation, from measures which are arbitrary and discriminatory, or from treatment that is unfair and unequitable. Furthermore, the ECT allows investors to resort to international arbitration in case these protections are infringed.

724.    On the contrary, the TFEU not only does not contain specific protections for investors in the energy field, but it also does not allow investors to resort to arbitration in case they consider that the ECT protections have been violated.

Case-law

725.    Several investment arbitral tribunals have reached this same conclusion.

726.    In *Eskosol*, after discussing extensively what could be understood by the terms "successive treaties relating to the same subject matter" in Art. 30(1) of the VCLT, the tribunal concluded that[792]:

> "The Tribunal thus arrives at the same place as several prior tribunals, even if it adopts Italy's suggestion to examine the 'same subject matter' issue by way of the ILC's 2006 Report on Fragmentation. For example, similarly to the analysis of VCLT Article 59 by the *EURAM v. Slovak Republic* tribunal, the Tribunal considers that a good faith interpretation of VCLT Article 30 does not support the conclusion that two treaties deal with the same subject matter

---

[790] **Doc. CL-1**, Art. 2.
[791] **Doc. CL-1**, Preamble.
[792] **Doc. CL-147**, *Eskosol*, paras. 146-147.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

simply because they may apply simultaneously to the same set of facts. Two different treaties may apply simultaneously to the same set of facts, or even share very broadly stated goals (such as 'integration' or 'cooperation' with other States) but approach the achievement of those goals from different perspectives. The Tribunal likewise agrees with the *EURAM* tribunal that the subject matter of a treaty 'is inherent in the treaty itself and refers to the issues with which its provisions deal, *i.e.* its topic or substance.' Using those standards, however, the Tribunal likewise sees no reason to depart from consistent case law finding that the EU Treaties deal with a different subject matter than investment treaties. As noted above, the topic or substance of the EU Treaties was the creation of a common market between EU Member States, governed by EU law, whereas the topic or substance of the ECT was the creation of a broader multilateral network of energy cooperation, liberalization and investment, including through embracing certain reciprocal undertakings as a matter of international law. Moreover, although the 'same subject matter' test in Article 30 is stated in terms of treaties as a whole, the key parts of the ECT for present purposes (ECT Parts III and V) address very specific topics of investment promotion and protection, and involve substantive and procedural protections that are not coincident with (or arguably, even of the same nature as) those offered under the EU Treaties' internal market provisions, which Italy itself admits 'do not "deal" technically with promotion and protection of investments.' Not surprisingly given these different regimes, the content of the standards is far from coextensive. The mere fact that protections under both regimes could be afforded in certain circumstances to the same investors – at least in the context of direct rather than indirect investment – does not conclusively demonstrate that the ECT and the EU Treaties themselves have the same subject matter for purposes of international law.

For these reasons, the Tribunal concludes that the EU Treaties, and in particular the Lisbon Treaty, are not 'successive treaties relating to the same subject matter' within the meaning of VCLT Article 30(1)."

727. Similarly, in *Novernergia* the tribunal found that[793]:

"[…] as has been held by multiple investment treaty tribunals, the ECT and EU law do not regulate the same subject matter. Arbitral tribunals have repeatedly held that '[*a*]*s regards the substantive protections in* […] *the ECT,* […] *the ECT and EU law* [do not] *share the same subject-matter*', and that '*the EU Treaties and the EU law rooted in, and flowing from them do not relate to the same subject matter as BITs or multilateral treaties for the protection of foreign investment*'."

728. In *Greentech*, the tribunal sided with the *Electrabel* tribunal, finding that it was[794]:

"[…] not persuaded that VCLT Article 30 is applicable to the ECT and the Lisbon Treaty at all, insofar as Respondent has not demonstrated that the ECT and the Lisbon Treaty are 'successive treaties relating to the same subject-matter', as VCLT Article 30(1) would require. The Tribunal's position here is

---

[793] **Doc. CL-21**, *Novenergia*, para. 439.
[794] **Doc. CL-27**, *Greentech*, para. 346.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 163 of 299

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

consistent with that of the *Electrabel* tribunal in finding that the ECT and EU law do not have the same subject matter."

729. Likewise, in *Masdar* the tribunal observed that[795]:

"It is uncontested that investor protections and judicial remedies afforded by EU law differ from the ECT scheme in a number of ways, notably, in that, pursuant to Article 26 of the ECT, an Investor has a right to bring claims directly against a Contracting Party in arbitration proceedings."

730. Finally, in *OperaFund* the tribunal considered that[796]:

"[…] there is also no basis for Respondent's argument that the EU Treaty by virtue of the accession of Malta superseded the ECT. There is no identity of subject matter, the ECT provides for very different remedies against Spain than the TFEU, not at least the possibility to access an investment tribunal in case of breaches and it contains guarantees against uncompensated expropriation as well as against violations of FET, FPS and other standards which are not contained in the TFEU. Furthermore, the lack of a disconnection clause is important; it cannot be presumed that such a clause is implicit. Rather, the ECT fully applies and provides jurisdiction in the present case."

(ii)   <u>No incompatibility between Arts. 267 and 344 of the TFEU, and Art. 26 of the ECT</u>

731. Even assuming, *arguendo*, that the ECT and the EU Treaties could be considered "successive treaties relating to the same subject-matter" (*quod non*), the second requirement for the application of Art. 30(3) of the VCLT is also not met: there is no incompatibility between Art. 26 of the ECT and Arts. 267 and 344 of the TFEU.

732. Art. 267 of the TFEU provides as follows[797]:

"The Court of Justice of the European Union shall have jurisdiction to give preliminary rulings concerning:

(a) the interpretation of the Treaties;

(b) the validity and interpretation of acts of the institutions, bodies, offices or agencies of the Union;

Where such a question is raised before any court or tribunal of a Member State, that court or tribunal may, if it considers that a decision on the question is necessary to enable it to give judgment, request the Court to give a ruling thereon.

---

[795] **Doc. CL-22**, *Masdar*, para. 327.
[796] **Doc. CL-173**, *OperaFund*, para. 383.
[797] **Doc. C-28**, Art. 267.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

> Where any such question is raised in a case pending before a court or tribunal of a Member State against whose decisions there is no judicial remedy under national law, that court or tribunal shall bring the matter before the Court.

> If such a question is raised in a case pending before a court or tribunal of a Member State with regard to a person in custody, the Court of Justice of the European Union shall act with the minimum of delay."

733.  Art. 344 of the TFEU establishes that[798]:

> "Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein."

734.  Art. 267 of the TFEU sets up the preliminary ruling procedure, which as Romania argues[799]:

> "[…] creates, within the EU judicial system, a dialogue between the CJEU and the EU Member States' courts and tribunals on matters of interpretation and application of the EU Treaties."

735.  The Tribunal does not dispute that this provision is mandatory for EU Member States, nor that it guarantees the CJEU's exclusive jurisdiction within the EU regarding EU law matters. Likewise, Art. 344 deals with the submission of disputes concerning the interpretation or application of the EU Treaties, and its goal is to guarantee that the CJEU has the last word on the interpretation of the European Treaties (which do not include the ECT).

736.  There is, however, no conflict between the ECT's dispute settlement provision and Arts. 267 and 344 of the TFEU:

737.  First, these provisions concern the settlement of different types of disputes[800]. While Art. 26 of the ECT concerns the "Settlement of Disputes between an Investor and a Contracting Party" regarding the interpretation and application of the ECT, Arts. 267 and 344 of the TFEU deal with the settlement of disputes related to the interpretation and application of the EU Treaties.

738.  Second, Romania and the CJEU – in the *Komstroy* Judgment – take issue with Art. 26(6) of the ECT and submit that pursuant to this provision an arbitral tribunal constituted under the ECT may be required to interpret or apply EU law[801]. Art. 26(6) of the ECT provides that[802]:

---

[798] **Doc. C-28**, Art. 344.
[799] R-I, para. 129.
[800] **Doc. CL-16**, *RREEF*, para. 79.
[801] R-I, para. 153; R-Komstroy, para. 13; **Doc. RL-314**, *Komstroy* Judgment, para. 50.
[802] **Doc. CL-1**, Art. 26(6).

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

> "A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."

739. Romania argues that EU law is derived from the EU Treaties and thus forms part of international law[803].

740. However, in the present case the Tribunal will not interpret or apply Romanian or EU law, and will not express a view on the legality under such laws of measures adopted by Romania or the EU authorities. The Tribunal is also not entrusted with the task of judging whether Romania has breached its obligations under the TEU or the TFEU. The Tribunal will simply consider and establish municipal law as a matter of fact, following the prevailing interpretation given to municipal law by the courts or authorities of Romania and the EU, including the decisions of the CJEU.

741. In fact, the Tribunal is only in charge of determining whether by enacting certain measures Romania breached its international obligations under a specific instrument: the ECT. Nothing more, nothing else.

742. <u>Finally</u>, the Tribunal's finding is supported by the absence of a disconnection clause in the ECT. If, when negotiating the ECT, Contracting Parties considered that the ECT and EU law could be (or come to be) in conflict, they could (or, rather, should) have inserted a disconnection clause into the ECT, with the purpose of avoiding potential conflicts[804]. However, they did not do so.

<u>Case-law</u>

743. Although not always analyzing the same argumentative line put forward by Romania in this arbitration, several tribunals have reached the conclusion that there is no incompatibility between EU law and the ECT.

744. In *Antin* the tribunal, analyzing Art. 26(6) of the ECT, found that[805]:

> "[…] nothing in the text, context, purpose and object of the ECT suggests that the inclusion of the reference to 'rules and principles of international law' in the applicable law clause was intended to mean that the treaties creating the EEC and the EU and allocating competences among European institutions and their Member States, the EU's internal legislation, as subsequently interpreted by the CJEU, could be interpreted in a manner such that a development in the EU's *acquis* could be employed to undermine the prior consents to submit to arbitration under the ECT given by each of the EU Member States and the EU itself. The alleged problem of incompatibility between EU law and the ECT, if there is one, is to be sorted out by the EU and the EU States counterparties to the ECT.
>
> […]

---

[803] R-I, para. 153.
[804] **Doc. CL-15**, *Charanne*, para. 438.
[805] **Doc. CL-23**, *Antin*, paras. 224 and 226.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

In sum, the Tribunal does not find anything within the provisions of EU law, as invoked and pleaded by Spain, that overrides the rights granted in Article 26 of the ECT regarding the settlement of disputes."

745. Likewise, the *Kruck* tribunal noted that[806]:

"[…] it is far from being 'manifest' that a treaty concluded by the EU itself, alongside its Member States, without any reservation or any declaration of how the express provisions of that treaty were to be interpreted and applied, should be regarded as incompatible with EU law."

746. Similarly, in its 2018 award the *Greentech* tribunal found[807]:

"[…] no inconsistency, however, between the ECT and EU law, in accord with prior ECT jurisprudence. The Tribunal here refers to the contention by Respondent and the EC that the ECT and TFEU Article 344 are in conflict. TFEU Article 344 provides that EU member states 'undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of settlement other than those provided for therein.' The Tribunal considers that Claimants are correct in their assertion that Article 344 relates to disputes involving Member States or EU institutions, not investor-State disputes. Nor does the present arbitration concern the interpretation or application of the EU treaties, but instead concerns rights and obligations under the ECT. Thus, the Tribunal finds no inconsistency between the ECT and TFEU Article 344."

747. In *Novenergia*, the tribunal found that[808]:

"[…] there is no incompatibility between the dispute resolution mechanism in Article 26 ECT and EU law. In the words of the *Charanne v. The Kingdom of Spain* tribunal, '*there is no rule of EU law preventing EU Member States from resolving through arbitration their disputes with investors of other Member States [,] [n]either is there any rule of EU law preventing an arbitration tribunal from applying EU law to resolve such a dispute*'.

Article 344 TFEU is not applicable to ECT disputes, as it refers to disputes between EU Member States themselves, not disputes between EU Member States and private parties such as investors. This conclusion is clearly supported by the wording of Article 344 TFEU, EU legal documents, as well as investment treaty tribunals."

748. In *InfraRed*, the tribunal found that[809]:

"[…] Respondent did not make a satisfactory demonstration of any incompatibility or conflict between any EU legal provisions and the ECT provisions applicable here, whether as regards the jurisdictional issues or the merits of this dispute. On the jurisdictional question, the ECJ implicitly upheld the validity and applicability of international agreements referring intra-EU

---

[806] See **Doc. CL-252**, *Kruck*, para. 34, referring to its Decision on Jurisdiction and Admissibility, para. 290.
[807] **Doc. CL-27**, *Greentech*, para. 350.
[808] **Doc. CL-21**, *Novenergia*, paras. 440-441.
[809] **Doc. CL-174**, *InfraRed*, para. 272.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)

Decision on Jurisdiction, Liability and Principles of Reparation

disputes to non-EU decision-making bodies '*provided that the autonomy of the EU and its legal order are respected*.' The Respondent failed to demonstrate that recourse to arbitration to resolve a dispute between an investor from an EU member state and another EU member state would jeopardize the autonomy of the EU. The Tribunal is not aware of – and the Respondent did not invoke – a recourse in international arbitration for aggrieved investors under EU law similar to the one created by Article 26 ECT. As regards the merits of this dispute, Respondent invoked a plethora of EU regulations, treaty provisions, guidelines and other instruments (especially pertaining to state aid) but – in the Tribunal's view – failed to show any incompatibility thereof with the investor-protection regime contained at Articles 10 ECT and following."

749. Finally, although in *Eskosol* the tribunal found that there was no need to determine whether the provisions of the Treaty of Lisbon were incompatible with those of the ECT, given that it had already concluded that the treaties were not "successive treaties relating to the same subject-matter", the tribunal nevertheless noted that such incompatibility[810]:

> "[…] would be unlikely given [the tribunal's] conclusion in Section V.B.1.a above that the ECT does not command application of EU law in order to resolve disputes. As the Tribunal discusses further below in Section V.B.2, in the context of the *Achmea* Judgment, it is entirely possible to have two coexisting systems of law applicable to a particular fact scenario, in which the State conduct's may be adjudged independently by different authorities assessing obligations owed under different bodies of law. Indeed, this is frequently the case for States that are party to investment treaties, and as such have undertaken obligations to foreign investors governed by international law, separate from whatever obligations they already may owe such investors under their own domestic laws. The two regimes (international law and domestic law) exist independently, with neither necessarily usurping the role of the other."

750. In view of the above, the Tribunal concludes that there is not conflict between the ECT and EU law.

(iii)   The ECT is more favorable than the TFEU

751. Art. 16 of the ECT applies when two or more Contracting Parties (in this case, the EU Member States) enter into a subsequent international agreement (in this case, the TFEU) "whose terms in either case concern the subject matter of Part III or V of this Treaty". Therefore, for this provision to apply, the Tribunal must assume, for the sake of the argument, that Arts. 267 and 344 of the TFEU concern the same subject-matter as Part III or V of the ECT. In such case, the ECT's provisions will prevail over those of the TFEU to the extent that they are more favorable to the Investor.

752. Assuming, *arguendo*, that Art. 26 of the ECT and Arts. 267 and 344 of the TFEU concern the same subject-matter, the Tribunal finds that Art. 26 must prevail

---

[810] **Doc. CL-147**, *Eskosol*, para. 147.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

because it is more favorable than the TFEU. Indeed, contrary to the TFEU, Art. 26 of the ECT grants the Investor the possibility of choosing between:

-    The "courts or administrative tribunals of the Contracting Party party to the dispute" (Art. 26(2)(a)); or

-    International arbitration, either *ad hoc* or administered (Art. 26(2)(b) and Art. 26(4)).

753.  Having the choice of resorting to local tribunals or to international arbitration is more favorable than not having the opportunity of resorting to arbitration at all[811].

**b.    The *Komstroy* Judgment is irrelevant to the Tribunal's determination**

754.  Romania argues that in the *Komstroy* Judgment, the CJEU confirmed that the *Achmea* standard of incompatibility applies between the ECT and the EU Treaties. In other words, the *Komstroy* Judgment shows that Art. 26 of the ECT, if interpreted as applying to intra-EU disputes, is incompatible with the EU Treaties. According to Romania, this Judgment resolves the issue of whether there is a conflict, and the Tribunal has no option but to recognize that there is one[812].

755.  The Tribunal finds that the CJEU's *Komstroy* Judgment is irrelevant to the Tribunal's determination on jurisdiction.

756.  <u>First</u>, the Tribunal notes that the *Komstroy* Judgment has one particularity, which the CJEU itself recognized: none of the parties to the *Komstroy v. Moldova* arbitration was an EU Member State or a national of an EU Member State. Accordingly, when referring the case for a preliminary ruling to the CJEU, the Paris Court of Appeal never asked about the compatibility of Art. 26 of the ECT and the TFEU. The questions referred to the CJEU were the following[813]:

"[(1)] Must [Article 1(6) ECT] be interpreted as meaning that a claim which arose from a contract for the sale of electricity and which did not involve any economic contribution on the part of the investor in the host State can constitute an "investment" within the meaning of that article?

[(2)] Must [Article 26(1) ECT] be interpreted as meaning that the acquisition, by an investor of a Contracting Party, of a claim established by an economic operator which is not from one of the States that are Contracting Parties to that treaty constitutes an investment?

[(3)] Must [Article 26(1) ECT] be interpreted as meaning that a claim held by an investor, which arose from a contract for the sale of electricity supplied at the border of the host State, can constitute an investment made in the area of another Contracting Party, in the case where the investor does not carry out any economic activity in the territory of that latter Contracting Party?"

---

[811] **Doc. CL-22**, *Masdar*, para. 332.
[812] R-Komstroy, paras. 18-20.
[813] **Doc. RL-314**, *Komstroy* Judgment, para. 20.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

757. This is precisely why the CJEU's conclusion concerning the alleged incompatibility between Art. 26(2)(c) of the ECT and intra-EU disputes was not set out in the operative part of the *Komstroy* Judgment; on the contrary, the operative part only answers the questions referred by the Paris Court of Appeal[814]:

> "On those grounds, the Court (Grand Chamber) hereby rules:
>
> Article 1(6) and Article 26(1) of the Energy Charter Treaty, signed at Lisbon on 17 December 1994, approved on behalf of the European Communities by Council and Commission Decision 98/181/EC, ECSC, Euratom of 23 September 1997, must be interpreted as meaning that the acquisition, by an undertaking of a Contracting Party to that treaty, of a claim arising from a contract for the supply of electricity, which is not connected with an investment, held by an undertaking of a third State against a public undertaking of another Contracting Party to that treaty, does not constitute an 'investment' within the meaning of those provisions."

758. Therefore, the CJEU's finding that

> "Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State"[815]

is nothing more than an *obiter dictum*. Additionally, the CJEU's decision contains no conflict analysis under international law, or interpretation of the relevant treaties under the principles of international law established in the VCLT – the legal framework under which the Tribunal operates.

759. <u>Second</u>, the Tribunal has already determined why it considers that there is no conflict between EU law and the ECT. Since the Tribunal is the judge of its own competence, the Tribunal is not bound by the CJEU's *obiter dictum*.

760. As noted by the *Eskosol* tribunal with regards to the *Achmea* Judgment[816]:

> "[…] the *Achmea* Judgment, accepted as a valid decision concerning certain intra-EU BITs in the European legal order, does not disturb [the tribunal's] jurisdiction to decide a dispute in the international legal order under the ECT."

761. The same reasoning can be transposed to the *Komstroy* Judgment. This is because, as well explained by the *Eskosol* tribunal, the international legal system is a general system without any central authority, composed of different and independent legal sub-systems that sometimes interact. Although this international legal system is bound by general principles of international law, below the level of general principles there are various sub-systems, with no clear hierarchy between the different norms established in each sub-system. The EU Treaties are one such sub-system, which vests dispute resolution authority in various organs, including the Commission and the CJEU. The ECT, in conjunction with the ICSID Convention,

---

[814] **Doc. RL-314**, *Komstroy* Judgment, last paragraph.
[815] **Doc. RL-314**, *Komstroy* Judgment, para. 66.
[816] **Doc. CL-147**, *Eskosol*, para. 154.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

is another sub-system, which vests dispute resolution authority in arbitral tribunals such as this one. And each authority is empowered in its sub-system to render decisions within its sphere, such as the CJEU's *Achmea* or *Komstroy* Judgments under the EU Treaties, and the awards of various arbitral tribunals under the ECT[817]. Thus, Romania may simultaneously be subject to obligations arising from the decisions of the CJEU and decisions of arbitral tribunals under the ECT and the ICSID Convention. And as noted by the *Eskosol* tribunal[818]:

> "[…] the bottom line is that in a case of contradiction, each legal order remains bound by its own rules, for purposes of its own judgments. The CJEU's conclusions regarding the EU legal order are addressed to EU Member States and European institutions, and they accordingly may have no choice but to take steps consistent with the CJEU's ruling, including submitting arguments to international tribunals based on the EU legal order. But the CJEU's conclusions derived from EU law do not alter this Tribunal's mandate to proceed under the legal order on which its jurisdiction is founded, namely the ECT."

762. Third, Romania argues that[819]:

> "The Tribunal, which must decide in accordance with rules of international law, must therefore follow the CJEU when determining the nature of Romania's international obligations under the EU Treaties, including the scope and meaning of Articles 344 and 267 of the TFEU. If the Tribunal departs from the authoritative interpretation of the EU Treaties provided by the CJEU, it would be failing to apply the applicable law in this Arbitration. This would be a clear violation of its mandate and of international law."

763. Assuming *ad arguendum* that the CJEU has the monopoly of interpretation of the EU Treaties, this does not mean that the CJEU has the monopoly of interpretation over the ECT. The ECT is a multilateral treaty, to which the EU is a party, but it is not an "EU Treaty" in the meaning of either Art. 19 of the TEU or Art. 267 of the TFEU.

764. Finally, even if the *Komstroy* Judgment decision had the weight which Romania wishes to ascribe to it, it was issued several years after the Parties' consent to arbitration had been locked. Therefore, the *Komstroy* Judgment cannot retroactively invalidate Romania's consent to arbitrate.

Comity

765. Romania argues that at the very least, mutual respect and comity, which should prevail between international judicial institutions, should lead the Tribunal to accept the findings of the CJEU with regard to the interpretation of the EU Treaties[820].

---

[817] **Doc. CL-147**, *Eskosol*, para. 181.
[818] **Doc. CL-147**, *Eskosol*, para. 184.
[819] R-Komstroy, para. 9.
[820] R-Komstroy, para. 10.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

766. Romania refers to the dissenting opinion of Prof. Marcelo Kohen in the *Adamakopoulos* case, in which the arbitrator explained that he owed due respect to the existence of other international courts and tribunals, "bearing in mind considerations of mutual respect and comity which should prevail between judicial institutions"[821] – and referring to the tribunal's order in the *MOX Plant* arbitration[822].

767. The Tribunal finds that reasons of comity are irrelevant to the determination of jurisdiction.

768. Comity is normally exercised through the suspension of proceedings rather than the declining of jurisdiction – as happened in the *MOX Plant* case[823]. Furthermore, comity is exercised by tribunals whenever there is another pending judicial proceeding whose determination is expected to have direct impact on the analyzed issues – as in the *MOX Plant* case[824]. However, the Tribunal observes that Romania has not argued that there are pending proceedings of which the CJEU is seized that would have a direct bearing on the current case, and which could justify the suspension of these proceedings in order to avoid delivering two conflicting judgments on the same issue.

\* \* \*

769. In view of the above, the Tribunal concludes that there is no conflict between Art. 26 of the ECT and Arts. 267 and 344 of the TFEU.

### E.    Potential unenforceability is immaterial

770. As an alternative argument, Romania contends that, if the Tribunal finds that it has jurisdiction, it should nonetheless decline to exercise it given that an award rendered in this arbitration would be unenforceable in the EU and potentially elsewhere[825].

771. Claimants, on the other hand, argue that Romania's suggestion that the award would be unenforceable if the Tribunal did not uphold Romania's objection is speculative, and also irrelevant: the Tribunal's task is simply to determine its jurisdiction and decide the merits of the dispute, regardless of any post-award enforcement issues[826].

772. The Tribunal finds that the potential unenforceability of a future award has no bearing on the decision on jurisdiction in the present proceedings.

773. While the Tribunal agrees that arbitrators must make every effort to ensure that their awards are enforceable, this acknowledgment does not amount to a prohibition for arbitral tribunals to issue decisions which may face difficulties at the enforcement

---

[821] **Doc. RL-39**, *Adamakopoulos* Dissenting Opinion, para. 82.
[822] **Doc. RL-39**, *Adamakopoulos* Dissenting Opinion, para. 82, citing to "*MOX Plant Case (Ireland v. United Kingdom)*, Order No. 3, 24 June 2003, para. 28" ["***MOX Plant***"]; available at: https://pca-cpa.org.
[823] *MOX Plant*, para. 29.
[824] *MOX Plant*, para. 28.
[825] R-II, paras. 339 *et seq.*; R-PHB, para. 33; R-Komstroy, para. 23.
[826] C-II, paras. 217 *et seq.*; C-III, paras. 185 *et seq.*

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

stage. Simply because there is a risk connected to the enforcement of a subsequent award does not mean that the Tribunal should abandon the mission which the Parties entrusted to it.

774. In fact, a failure to adjudicate the case might be regarded as a denial of justice or as a manifest excess of power under Art. 52(1)(b) of the ICSID Convention.

775. For the reasons established above, the Tribunal can and should uphold its competence to decide the present dispute. As noted by the *Vattenfall* tribunal, the "enforceability of this decision is a separate matter which does not impinge upon the Tribunal's jurisdiction"[827].

\* \* \*

776. In view of the above, the Tribunal rejects Romania's intra-EU jurisdictional objection.

## F.    **Additional argument: acquired rights and estoppel**

777. The Tribunal's conclusions have been reached on the basis of the applicable rules of international law, and specifically of the VCLT, which all the Parties recognize as applicable in the present case.

778. The Tribunal's conclusions are reinforced by the customary international law doctrines of acquired rights, estoppel and, to the extent that they exist, legitimate expectations.

779. The respect for vested rights forms part of the generally accepted principles of international law[828], as does the rule that a State is estopped from resiling from a representation on which another party has relied[829].

780. When Claimants made their alleged investments in Romania, the publicly available information regarding the validity or applicability of Art. 26 of the ECT was as follows:

  - Prior to November 2006, the Commission had offered no view on intra-EU BITs, nor on the ECT;

  - In November 2006, the Commission for the first time recommended that Member States[830]:

    "exchange notes to the effect that such [intra-EU] BITs are no longer applicable, and also formally rescind such agreements",

---

[827] **Doc. CL-6**, *Vattenfall*, para. 230.
[828] *Case concerning certain German interests in Polish Upper Silesia (Germany v. Poland)*, Judgment, 25 August 1925, 1926 P.C.I.J. (ser. A) No. 7; available at: https://www.icj-cij.org.
[829] C. KOTUBY and L. SOBOTA, *General Principles of Law and International Due Process: Principles and Norms Applicable in Transnational Disputes*, Oxford University Press (2017), p. 125.
[830] **Doc. CL-36**, *Eastern Sugar*, para. 126.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

however, it said nothing with respect to the validity of the ECT, a multilateral treaty, signed by the EU itself;

- The Commission indicated that States should terminate the intra-EU BITs by "strictly" following the relevant procedures, in accordance with international law;

- The Commission explicitly recognized that if such termination occurred, it "cannot have retroactive effect", so that in pending investor-State arbitration, investors would be able to rely on investment arbitration procedures[831];

- Romania and the other Members States took no notice of the Commission's recommendation and made no public announcement regarding the validity or applicability of Art. 26 of the ECT.

781. In these circumstances, when Claimants invested in Romania between 2011 and 2013, they would be aware (or can be assumed to have been aware) of the Commission's recommendation to Member States that intra-EU BITs should be terminated, and also of the Commission's assurances that the termination would be carried out strictly following the procedure established in the BITs and in the VCLT, and that such termination would not have retroactive effects. They would also presumably be aware that the Commission's recommendation did not extend to the ECT.

782. The situation remained unchanged for many years, until the CJEU issued the *Achmea* Judgment. However, the *Achmea* Judgment is a particular decision, which concerns only intra-EU BITs and does not mention the ECT. Thus, when Claimants submitted their Request for Arbitration in May 2018 and consent was perfected, Claimants were entitled to proceed on the assumption that Art. 26 of the ECT was in full force and effect, as Romania had not made any public statement raising any doubt about its validity or effect. The EC's post-*Achmea* position, in which it extrapolated the CJEU's conclusions in *Achmea* to the ECT was only published in July 2018. Likewise, the EU Member States' Declaration, the Termination Treaty and the *Komstroy* Judgment are all posterior to Claimants' decision to start this arbitration.

783. <u>In sum</u>, in May 2018, Claimants acquired a vested right: once consent had been locked, Claimants were entitled to the settlement of their investment dispute under the ECT through ICSID arbitration – the method of adjudication offered by Romania and accepted by the investors.

784. Art. 25(1) *in fine* of the ICSID Convention ("[w]hen the parties have given their consent, no party may withdraw its consent unilaterally") was inserted precisely to bar unilateral withdrawals of consent, made *ex post* by States, trying to evade the agreed dispute settlement procedure. Its purpose is to thwart jurisdictional objections such as the present one. And since it is unequivocal that Romania gave

---

[831] **Doc. CL-36**, *Eastern Sugar*, para. 119.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

its consent to arbitration, the consequence is that the Centre has jurisdiction, and the Tribunal has competence to adjudicate the present dispute.

785. As pointed out by Romania, States are indeed the "masters of their treaties"[832]. It is for them to decide the fate of the agreements they have executed. If EU Member States wish to terminate or withdraw from the ECT, because they now come to the conclusion that it is no longer in their interest to remain bound by this instrument, they enjoy the prerogative to do so, provided that they comply with the Treaty's rules and the VCLT. If this happens, arbitral tribunals are duty bound to respect the decision, and to declare their lack of jurisdiction. What is not permissible is for States to adopt shortcuts that disregard the international rule of law, in a brazen attempt to evade their responsibilities under international law.

---

[832] R-II, para. 30.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

# VI.  LIABILITY

787. Claimants take issue with certain measures adopted by Romania within the framework of its GC support scheme, first between 2013-2014 and then between 2017-2018 [the "**Disputed Measures**"]. These include EGO 57/2013, Law 23/2014, GD 495/2014, EGO 24/2017, Law 184/2018 and EGO 114/2018[833]. Claimants argue that the Disputed Measures changed the GC support scheme to the detriment of RES-E investors. In particular[834]:

- The 2013 Measures impacted the GC supply, by reducing the number of GCs granted to RES-E Generators;

- The 2014 Measures dramatically impacted the GC demand by shifting the basis for determining the GC Acquisition Quotas from the long term Annual Mandatory Quotas to variable and annual calculations based on consumer protection; and

- The 2017-2018 Measures mitigated some (though not all) of the effects of the previous changes.

788. Claimants submit in this arbitration that by adopting the Disputed Measures, Romania breached its obligation to accord fair and equitable treatment ["**FET**"] to Claimants' investments, and unreasonably impaired Claimants' "management, maintenance, use, and enjoyment" of their investments, in both cases in violation of Art. 10(1) of the ECT[835] (**1.**).

789. Romania argues that Claimants' claims are meritless, since Romania has not breached its obligations under the ECT and has acted reasonably and proportionally in the public interest, within its right to regulate[836] (**2.**).

790. The Tribunal will start by summarizing the Parties' positions, and then make its decision (**3.**).

---

[833] C-PHB, para. 173.
[834] C-PHB, para. 174.
[835] C-I, para. 18.
[836] R-I, para. 9.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

# VI.1. <u>CLAIMANTS' POSITION</u>

791. Claimants argue that, starting in 2010, Romania introduced significant incentives to its GC program to induce foreign investment in RES-E. In the following months, Romania made substantial improvements to the incentives regime to incorporate greater stability and make it even more attractive. However, starting in the middle of 2013, Romania started to enact the Disputed Measures, which eviscerated the program's benefits[837] (**1.**).

792. Claimants submit that, by adopting the Disputed Measures, Romania breached two obligations under Art. 10(1) of the ECT[838]:

- The obligation to afford FET to Claimants' investments (**2.**); and

- The obligation to refrain from impairing Claimants' investments through unreasonable measures (**3.**).

793. Claimants aver that a State's regulatory power may not be used to undermine legitimate investor expectations created by the State to induce investment, or to fundamentally alter or dismantle a legal or regulatory regime upon which investors relied, without incurring liability under the ECT[839]. In this case, Claimants aver that there is neither any legal defense nor any valid justification for Romania's conduct (**4.**).

## 1.    ROMANIA INDUCED FOREIGN INVESTMENT

794. It is Claimants' position that between 2010 and 2012 Romania fixed the basis of its GC incentive program such as to ensure the value of the GCs issued, to attract foreign investment in RES-E:

795. <u>First</u>, Romania introduced a banding system, pursuant to which PV Generators were entitled to receive six GCs per each MWh of electricity produced and provided to the grid. Accordingly, Romania promised Claimants six GCs per each MWh of electricity produced[840].

796. <u>Second</u>, Romania guaranteed the demand for GCs, by[841]:

- Defining Annual Mandatory Quotas, which broadly corresponded to the percentage of total electricity consumption from RES needed to meet its international and domestic goals; the framework guaranteed that the Annual Mandatory Quotas would increase every year from 2008 until reaching 20% in 2020; and

---

[837] C-I, paras. 4-6, 15; C-PHB, paras. 2-5.
[838] C-PHB, para. 175.
[839] C-PHB, para. 92.
[840] C-I, paras. 9 and 13.
[841] C-I, para. 5.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

-    Calculating the GC Acquisition Quotas for electricity suppliers based on the Annual Mandatory Quotas, a measure which ensured that every GC issued to a renewable energy plant would be bought by an electricity supplier.

797.    According to Claimants, because of these targets and quotas, an investor contemplating investing in Romania could readily predict the prices and sales of GCs over time, for the full 15-year period of the GC program[842].

798.    <u>Third</u>, Romania defined minimum and maximum trading values for the GCs, ranging between EUR 27 and EUR 55, indexed to inflation. Coupled with the formulas that allowed investors to calculate the GC supply and the GC demand over time, investors could model how the GCs would trade over the course of the 15-year incentive period[843].

799.    <u>Finally</u>, Romania designed safeguards to avoid that awarded GCs would go unsold. It defined penalties on electricity suppliers that failed to fulfil their Acquisition Quotas and promised to establish a Guarantee Fund that would buy any unsold GCs[844].

800.    Claimants submit that these characteristics of the GC incentive program can be simplified into one essential element: Romania guaranteed the demand for GCs in such a way as to allow investors to accurately predict the prices at which GCs would be sold over the course of 15 years[845]. According to Claimants, these projections were fundamental to investors' decisions to invest, because they guaranteed a stream of revenues sufficient to recover the significant upfront investment costs required to construct renewable energy plants.

The Disputed Measures constituted an about-face

801.    Claimants argue that starting in mid-2013, Romania dismantled the predictable incentive program it had created.

802.    <u>First</u>, Romania decided to withhold two out of six GCs owed to PV Generators for seven years, thereby curtailing a significant proportion of their expected revenues[846].

803.    <u>Second</u>, Romania forcefully drove down the demand for GCs by[847]:

-    Dismantling the pre-existing regulatory framework and arbitrarily reducing the Annual Mandatory Quotas (which had been enshrined in the law); and

---

[842] C-I, para. 5.
[843] C-I, para. 6.
[844] C-I, para. 7.
[845] C-I, para. 8.
[846] C-I, para. 291.
[847] C-I, para. 292.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- Reneging on its promise to establish a Guarantee Fund that would act as a buyer of last resort for unsold GCs.

804. According to Claimants, this led to a significant and persistent GC oversupply, with a significant number of GCs expiring or remaining unsold. This, in turn, led the GCs to the floor trading value. In fact, prior to Romania's regulatory about-face, GCs were trading at the price cap of EUR 57.39. Nowadays, GCs trade at the minimum value of EUR 29.4[848].

805. <u>Third</u>, Romania also reduced the revenues expected by PV Generators by excluding from the application of the support scheme the "positive imbalances" (*i.e.*, the quantities of RES delivered by PV plants over five MW that exceed the quantities reported through the hourly physical notifications submitted by Generators to the TSO). Given the intermittent nature of PV plants, this had a significant impact on certain producers, which had to either forfeit their entitlement to GCs or report higher amounts of electricity to the TSO, and then pay higher balancing costs because of a lower actual production[849].

806. <u>Finally</u>, Romania further depressed the Generators' revenues by increasing their annual contribution to the ANRE by 200%, given that RES Generators must now hand over to the ANRE 2% of their annual turnover[850].

## 2. ROMANIA FAILED TO TREAT CLAIMANTS' INVESTMENTS FAIRLY AND EQUITABLY

807. Claimants argue that the FET standard is generally intended to ensure "treatment in an even-handed and just manner, conducive to fostering the promotion and protection of foreign investment and stimulating private initiative"[851].

808. According to Claimants, most investment tribunals have described the FET standard as containing as least six specific normative elements[852]:

- The requirement of stability, predictability and consistency of the legal framework;

- The principle of legality;

- The protection of investor confidence or legitimate expectations;

- Procedural due process and protection against denial of justice;

- Substantive due process or protection against discrimination and arbitrariness; and

---

[848] C-I, para. 292.
[849] C-I, para. 293.
[850] C-I, para. 296.
[851] C-I, para. 316.
[852] C-I, para. 316.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

-    The requirement of reasonableness and proportionality.

809.    Claimants submit that recent ECT decisions evaluating the behavior of EU Member States that have made changes to their renewable energy legislative and regulatory frameworks have also held that "significant alterations" to those frameworks violate the FET provision of Art. 10(1) of the ECT[853].

810.    Claimants contend that the FET standard in Art. 10(1) is autonomous and goes beyond the minimum standard of treatment under international law[854]. Claimants note that Romania argues the contrary, but only relies on non-ECT cases involving BITs or NAFTA that do not contain the same level of FET protection[855].

811.    Claimants submit that when Romania adopted the Disputed Measures, it violated the FET standard in at least three ways[856]:

-    By violating Claimants' legitimate expectations (**A.**);

-    By fundamentally modifying the essential characteristics of the GC support scheme (**B.**); and

-    By acting without transparency and consistency (**C.**).

## A.    Legitimate expectations

### a.    The standard of legitimate expectations

812.    Claimants argue that the jurisprudence of ECT tribunals has repeatedly recognized that a frustration of the investor's legitimate expectations constitutes a breach of the FET standard[857]. In fact, legitimate expectations *is* one of the major components of the FET standard under Art. 10(1) of the ECT[858]. These legitimate expectations place limits on the State's sovereign right to regulate[859].

813.    According to Claimants, investment treaty jurisprudence has established a three-step approach to determine whether a host State has breached the FET standard by frustrating an investor's legitimate expectations. A host State will be liable if[860]:

-    It has induced the investments by creating legitimate expectations on the part of the investor;

-    The investor reasonably relied on the host State's representations when deciding to invest; and

---

[853] C-I, para. 316.
[854] C-II, paras. 480-492; C-PHB, paras. 216-217.
[855] C-II, paras. 481 *et seq.* and 554 *et seq.*
[856] C-I, para. 317; C-PHB, paras. 91 and 176.
[857] C-II, para. 512; C-PHB, para. 218.
[858] C-II, para. 516.
[859] C-II, para. 518; C-PHB, para. 177.
[860] C-I, para. 320; C-II, paras. 513-515; C-PHB, para. 178.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

-     The host State subsequently failed to honor the expectations it created.

814. Claimants aver that investment tribunals have found that if a host State induces an investment by leading investors to believe that a certain legal or regulatory framework will remain in place for a defined period, the State will be bound to maintain the conditions that led to that inducement[861]. Tribunals have also found that the element of inducement can take many forms – including a "promise", a "guarantee", a "commitment", an "assurance", or otherwise – and can be found in a variety of sources, including[862]:

-     Statutory commitments,

-     Repeated statements from the State,

-     The investment context,

-     The State's conduct, and/or

-     A specific undertaking.

815. Claimants submit that numerous tribunals have found that specific commitments and stabilization clauses are not required to generate legitimate expectations[863]. Thus, legitimate expectations can be created on the basis of a general legal framework, particularly in the RES sector, where laws and regulations often are enacted for the sole purpose of attracting foreign investors[864].

816. Even those tribunals that have required a "specific commitment" have been careful to note that such commitments can take many forms and derive from many sources, including a sufficiently clear and specific incentives regime[865]. The key is whether the State intended to induce and attract investment by its conduct, rather than the specific "form" the inducement takes[866].

**b.    Romania created legitimate expectations on the part of Claimants**

817. Claimants submit that the features of the GC program induced Claimants' investment, because PV plants are long-term, capital-intensive projects, requiring 86% of total investment costs to be sunk upfront. The expected sales of GCs represented approximately 80-90% of the plant's revenue. Therefore, for investors like Claimants to invest in these projects, the long-term price of GCs must be predictable[867]. According to Claimants, Romania's regime gave Claimants all the

---

[861] C-II, para. 519; C-PHB, para. 179.
[862] C-PHB, paras. 179, 222-224.
[863] C-II, para. 525-526; C-PHB, paras. 220-221, 224, 253, 260.
[864] C-II, para. 533.
[865] C-II, paras. 527-531; C-PHB, para. 225.
[866] C-II, para. 521; C-PHB, paras. 227, 260-261.
[867] C-PHB, para. 180.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

elements they needed to be able to predict the revenues their plants would generate, and Claimants relied thereon when deciding to invest[868].

818. Claimants argue that it is undoubtable that Romania created legitimate expectations on the part of Claimants in three ways[869]:

819. First, by including specific, detailed provisions in the legislation and regulations that established and implemented the GC support scheme (including Law 139/2010, ANRE Order 45/2010, EGO 88/2011, Law 134/2012[870]). Additionally, the statements of reasons that accompanied Law 220/2008 and Law 139/2010 confirmed that the object and purpose of the scheme was to establish a coherent framework, to promote private investment and to increase the trust of potential investors in the stability of the support scheme[871].

820. Claimants submit that Romania deliberately designed its incentive regime for the purpose of leading Claimants (and other PV investors) to legitimately expect that if they invested in Romania's RES sector and received the ANRE accreditation prior to the end of 2013[872]:

- They would receive six immediately marketable GCs for each MWh of electricity produced for a period of 15 years;

- They would be able to sell those GCs on a guaranteed and self-balancing market, with prices fluctuating within the prescribed lawful range;

- Romania would ensure GC demand by calculating Acquisition Quotas based on pre-determined, long-term Annual Mandatory Quotas so that Claimants could reliably calculate GC prices;

- Romania would ensure GC demand by enforcing penalties on defaulting GC buyers; and

- Romania would secure GC prices by enforcing the minimum and maximum GC trading range, indexed to inflation.

821. Second, Romania also created legitimate expectations through its own description of the GC support scheme, delivered to the European Commission, and through its active promotion of the regime to the financial markets[873].

822. Third, legitimate expectations were also created by Romania's decision to grant accreditation certificates to each of Claimants' plants, which confirmed that each plant would receive six GCs per MWh of electricity generated for 15 years[874]. This

---

[868] C-PHB, para. 180.
[869] C-PHB, para. 215.
[870] C-PHB, paras. 230 and 263.
[871] C-PHB, paras. 117, 232.
[872] C-II, paras. 539-540; C-PHB, paras. 177, 181, 214 and 262.
[873] C-PHB, paras. 119-120, 233.
[874] C-PHB, paras. 235 and 270-271.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

shows that Romania vetted and approved each of Claimants' investments for inclusion in the incentive regime. This is not a case where an investor is seeking to take advantage of a law of general application[875].

823. <u>Finally</u>, Claimants submit that the specific manner in which the scheme operated and the ceiling price that was consistently achieved prior to the completion of Claimants' investments – and particularly in 2012 – underscored the legitimacy of Claimants' expectations[876].

### c. Romania frustrated Claimants' legitimate expectations

824. Claimants argue that after their investment, Romania undermined the above representations and frustrated Claimants' expectations by modifying the GC incentive program through the adoption of the Disputed Measures, thereby[877]:

- decreasing the number of GCs to which Claimants were entitled (by deferring many of Claimants' GCs and restricting the issuance of some GCs);

- repeatedly and systematically decreasing demand for GCs;

- failing to enforce Acquisition Quotas or the lawful GC prices; and

- generally disturbing the market's self-balancing properties, such that the market no longer operates in predictable ways.

825. <u>In sum</u>, Claimants argue that this is a case where investors relied on very specific provisions describing rights and obligations under a detailed incentive regime, sinking tremendous upfront capital costs to build PV plants in time to benefit from the regime, and securing Romania's specific approval that each individual plant is entitled to the benefits of the regime for a stated duration[878].

826. By enacting the Disputed Measures, which undermined Claimants' legitimate expectations, Romania denied Claimants the benefits of the program that existed when Claimants invested. Consequently, Romania violated Art. 10(1) of the ECT[879].

### B. Fundamental change to the regulatory framework

### a. The applicable standard

827. Claimants further aver that Art. 10(1)'s FET standard protects Claimants against drastic or discriminatory, fundamental, or total and unreasonable changes to the legal or regulatory regime, even in the absence of a specific commitment by the

---

[875] C-II, para. 534; C-PHB, para. 236.
[876] C-PHB, para. 243.
[877] C-II, para. 543; C-PHB, para. 182.
[878] C-PHB, para. 236.
[879] C-PHB, para. 182.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

host State to the stability of that legal regime[880] – as recognized by Romania itself[881].

828. Claimants note that ECT tribunals have repeatedly found that host States have an obligation to maintain the fundamental stability and essential characteristics of a legal regime relied upon by investors, particularly in the context of long-term investments[882].

829. Thus, Claimants submit that a host State may not fundamentally change the nature of its incentive regime or alter its essential features, without incurring liability under the ECT to investors who invested in reliance on the regime's original essential characteristics[883].

**b.    The Disputed Measures fundamentally changed the GC incentive program**

830. It is Claimants' position that Romania drastically and fundamentally changed its GC incentive program, removing key features that existed when Claimants invested. The regime changed from one based on predictable supply and demand to one in which supply and demand have no predictability[884].

831. First, Romania repeatedly reduced the number of GCs to which Claimants were entitled (based on both the legal framework and the ANRE accreditations), by[885]:

-    First, temporarily deferring some of those GCs;

-    Then, twice changing the reintroduction date of the deferred GCs;

-    Capping the electricity production on the basis of which GCs would be granted; and

-    Shortening the GCs' validity period.

832. Second, Romania dramatically curtailed GC demand by[886]:

-    Shifting the basis for determining Acquisition Quotas from the long-term Annual Mandatory Quotas specified in Law 129/2010 to amorphous and shifting annual calculations, purportedly based on consumer protection;

-    Reducing the penalty of suppliers who failed to meet their Acquisition Quotas; and

---

[880] C-II, paras. 558-567; C-PHB, paras. 183, 272.
[881] C-PHB, paras. 183, 272.
[882] C-PHB, para. 183.
[883] C-PHB, para. 281.
[884] C-PHB, para. 184.
[885] C-PHB, paras. 184, 273.
[886] C-PHB, paras. 184, 274-276.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 184 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- Exempting EIUs from a significant portion of their GC purchase obligations.

833. Claimants put particular emphasis on the 2014 Measures, which, according to them, removed the key principle of pegging the GC demand to the long-term Annual Mandatory Quota trajectory[887]. Once Romania began to base GC demand on the cost impact on end-consumers, the definition of the Acquisition Quotas became disconnected from the RES-E targets defined by the 2011 GC framework[888].

834. This not only changed the basis for calculating demand, but also radically altered the long-term predictability of the GC scheme. By eliminating the long-term Annual Mandatory Quotas that had been enshrined in the original legal regime and replacing them with annual and discretionary ones, Romania introduced uncertainty for investors, who could no longer predict what the Annual Mandatory Quotas (and thus the demand for GCs) would be from one year to the next[889].

835. Claimants submit that as a result of the changes in the way supply and demand were to be calculated, GC demand plummeted, and so did the expected GC price, because Romania interfered with the market's ability to self-balance[890]. This in turn, led to the collapse of the GC market and a massive liquidity crisis, as it became impossible to sell a significant portion of the GCs[891].

836. <u>Third</u>, Romania took direct measures to reduce the GC price by reducing its ceiling price[892].

837. <u>Therefore</u>, Claimants conclude that Romania's Disputed Measures fundamentally altered the nature of the GC incentive program to Claimants' detriment. Even if the Tribunal were to find that there is no breach of legitimate expectations, the Tribunal should still find that Romania breached Art. 10(1) of the ECT through its drastic and fundamental modification of the GC incentive program[893].

## C.   **Transparency and consistency**

838. Claimants contend that Romania also breached the FET standard by failing to treat Claimants' investments transparently and consistently. Claimants note that the duty to act transparently and consistently is a standalone obligation under Art. 10(1) of the ECT[894].

839. Claimants submit that transparency requires that investors be informed of government decisions before they are imposed, so that the investors can react and adapt to such changes. It also requires that there be no ambiguity or opacity in the treatment of investments, and that the legal framework that will apply to an

---

[887] C-PHB, paras. 186 and 274.
[888] C-PHB, para. 274.
[889] C-PHB, para. 275.
[890] C-PHB, paras. 185 and 277.
[891] C-PHB, para. 278.
[892] C-PHB, para. 185.
[893] C-PHB, paras. 187 and 279-282.
[894] C-PHB, para. 188.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

investment be readily apparent. Accordingly, an arbitrary reversal of an established framework will constitute a violation of FET[895].

840.   Claimants find that Romania fulfilled its duty of transparency when it enacted the GC regime, because it established the program through clear terms in legislation and explained how the scheme would function to the European Commission and the investment community[896].

841.   However, it is Claimants' position that Romania breached its duty of transparency by reversing course and making changes to the legal framework, after Claimants had relied on its original terms and when they could no longer adapt. Romania's repeated modifications to the GC program also led to confusion and uncertainty as to the scope and operation of the program in the future. The Annual Mandatory Quotas now change annually, when originally, they were based on Quotas established by law until 2030[897].

842.   <u>Thus</u>, Claimants conclude that the regime is no longer transparent, and Romania should be found to have breached Art. 10(1) of the ECT[898].

## 3.   ROMANIA UNREASONABLY IMPAIRED CLAIMANTS' INVESTMENTS

843.   Claimants further aver that Romania impaired Claimants' "management, maintenance, use, and enjoyment" of their investments through unreasonable measures in violation of Art. 10(1) of the ECT[899].

### A.   Standard of unreasonable impairment

844.   Claimants submit that arbitral tribunals have held that the ECT's use of the phrase "shall *in no way* impair" means that the magnitude of the impairment is not decisive: "any negative impact or effect" will violate this Treaty standard[900].

845.   Claimants argue that a measure is unreasonable if it is taken without due consideration of the potential negative effects it will have on foreign investors, as found by the tribunal in *Greentech v. Italy*. That tribunal went on to conclude that the State's unilateral reduction of RES incentives in a situation where the State prioritized the interests of end-consumers over the interests of RES producers, whose investments it had induced, amounted to an impairment of the claimants' investments (resulting in a 6-8% reduction in value of their investments) through unreasonable measures[901].

---

[895] C-PHB, para. 189.
[896] C-PHB, para. 190.
[897] C-PHB, para. 190.
[898] C-PHB, para. 190.
[899] C-PHB, para. 191.
[900] C-PHB, para. 191.
[901] C-PHB, para. 191.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

### B.    The Disputed Measures impaired Claimants' investment

846.  Claimants contend that the Disputed Measures impaired Claimants' "management, maintenance, use, and enjoyment" of their investments, resulting in a 50% reduction in value on average[902].

847.  Claimants find that Romania's Disputed Measures were unreasonable because their stated justifications were conjured and, even if true, were foreseeable[903].

848.  Additionally, Romania did not consider the interest of investors like Claimants who had sunk their capital into the construction of PV plants in exchange for receiving the benefits of the GC program[904].

849.  <u>Accordingly</u>, Claimants argue that Romania breached the impairment clause contained in Art. 10(1) of the ECT[905].

### 4.    NO LEGAL DEFENSE NOR VALID JUSTIFICATION FOR DISPUTED MEASURES

850.  Claimants submit that there is no valid justification for the Disputed Measures. These were merely the result of a policy shift toward placating electricity suppliers and pandering to consumers, once the Romanian government changed and the new administration determined that it was no longer necessary to support RES Generators[906].

851.  Claimants aver that it was not necessary to modify the GC support scheme to protect consumers, to safeguard the Romanian economy or to address overcompensation. Even if this were true, Romania already had anticipated and had provided for a mechanism to address such circumstances in the original GC scheme[907].

852.  It is Claimants' position that Romania made a deliberate policy choice when it implemented a support scheme to enable it to meet its aggressive EU targets. Romania knew that consumers would bear the costs of the program, and, as a result, crafted the program to limit that cost burden. Contrary to Romania's contention, the cost of the GC scheme to consumers had not increased dramatically by the end of 2012 or the beginning of 2013. The costs were consistent with, and in fact lower than, the costs that Romania budgeted when it submitted the scheme for approval of the European Commission[908].

853.  Claimants argue that there are doubts as to whether there was overcompensation in 2012. Even if overcompensation had occurred, however, it would not have been unexpected and it would not have justified the Disputed Measures. Law 134/2012 expressly anticipated the possibility that overcompensation might occur at some

---

[902] C-PHB, para. 192.
[903] C-PHB, para. 192.
[904] C-PHB, para. 192.
[905] C-PHB, para. 192.
[906] C-PHB, para. 244.
[907] C-PHB, paras. 245 and 290.
[908] C-PHB, paras. 247-248.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

point, and it included a specific mechanism that Romania could invoke if overcompensation in fact occurred[909].

---

[909] C-PHB, para. 251.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

# VI.2.  **RESPONDENT'S POSITION**

854. Romania argues that contrary to Claimants' allegations, Respondent has neither breached its obligation to accord FET to Claimants' investments (**1.**), nor unreasonably impaired Claimants' management, maintenance, use, enjoyment, or disposal of their investments (**2.**). Therefore, Romania submits that Claimants' claims must be dismissed in their entirety[910].

## 1.   NO BREACH OF FET PROVISION

855. Romania argues that the Tribunal cannot grant any FET protections that go beyond the purview of Romania's FET obligations. Romania submits that the applicable FET standard under the ECT must be the standard of treatment under customary international law[911].

856. Romania basis its position on the fact that the term "FET" is not defined in the ECT. It thus must refer to the definition of FET in existing international law, *i.e.*, the customary international law standard, and not whatever different standards various tribunals may seek to devise. A different interpretation would make it impossible for States to know whether they are breaching the ECT[912].

857. Romania avers that the customary international law standard protects investors against egregious, arbitrary, or discriminatory acts of States. It does not include the protection of the legitimate expectations of investors. Accordingly, Claimants' legitimate expectations claims exceed the scope of the FET protection and must be dismissed on this ground alone[913].

858. As to Claimants' alternative "significant alteration" claim, significant alterations will violate the customary international law standard only if such alterations are egregious, arbitrary, or discriminatory. Since Romania's measures were reasonable and justified, they cannot be viewed as egregious, arbitrary, or discriminatory[914].

859. Thus, Romania argues that Claimants' FET claims must be dismissed in their entirety in application of the customary international law definition of FET[915].

### A.   **Claimants have failed to substantiate legitimate expectation claims**

860. Romania contends that if, nevertheless, the Tribunal were to depart from the FET standard under customary international law and find that legitimate expectations

---

[910] R-I, para. 508.
[911] R-PHB, paras. 80-81.
[912] R-PHB, para. 81.
[913] R-PHB, para. 82.
[914] R-PHB, para. 82.
[915] R-PHB, para. 83.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

are protected by Art. 10(1) of the ECT, Claimants' claims should still be dismissed[916].

### a.    Standard for legitimate expectations

861.    Romania argues that Claimants allege that the GC scheme as it existed in 2011 had certain specific features and that they could legitimately expect would not change in the future. Hence, to succeed in their legitimate expectation claims, Claimants must demonstrate that the GC scheme as it existed in 2011 was stabilized and could not change[917].

862.    Romania submits that since Romania did not agree to or promise stabilization of the features of the GC scheme as it existed in 2011, Claimants could not legitimately expect that such features could not change. States always have the right and the duty to modify their laws in the public interest[918]. Romania submits that, as recognized by the tribunal in *RWE v. Spain*, a modification of the law, in the absence of clear stabilization, cannot constitute a potential breach of international law[919].

863.    Romania notes that, contrary to a commercial contract, a law is a sovereign legislative act. A State always has the right to amend, adapt or change its legislation in the exercise of its sovereign legislative powers, unless it has expressly agreed not to do so[920].

864.    Additionally, the FET provision in the ECT does not constitute a stabilization provision that prevents States from modifying the law. It is also not a contract between the State and foreign investors[921].

### b.    No basis for Claimants' alleged legitimate expectations

865.    Romania argues that Claimants have failed to meet their burden of proving that, at the time of their respective investments, they each had a legitimate expectation that Romania would not further modify the GC scheme.

866.    First, Romania contends that Claimants have failed to establish precisely when each Claimant made its investments and to identify what exactly they relied on[922]. In fact, each Claimant invested at different times, in different projects and in reliance on different legislations. Several Claimants invested when there were already rumors of changes in the law or even after the enactment of EGO 57/2013. In such cases, Claimants cannot argue that they could legitimately expect that the law would not change[923].

---

[916] R-PHB, para. 84.
[917] R-PHB, para. 85.
[918] R-PHB, para. 86.
[919] R-PHB, para. 86.
[920] R-PHB, para. 87.
[921] R-PHB, paras. 88, 120.
[922] R-PHB, paras. 90, 127.
[923] R-PHB, paras. 90, 128.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

867. In the case of LSG and Green Source, if, as contented by Ms. Hofmann, the companies invested in 2011, this was even before the GC scheme had been approved by the European Commission and before PV producers were receiving six GCs per MWh[924].

868. <u>Second</u>, Claimants have failed to establish any basis for the existence of legitimate expectations that the GC scheme would remain unchanged. There is no stabilization provision in the law and there is no stabilization agreement between the State and any of the Claimants[925].

869. In the absence of a stabilization provision in the law or a stabilization clause in a contract, there can only be legitimate expectations of stabilization if the State made a clear and specific representation, promise or assurance to the investor that the law will not change[926]. However, – as recognized by Ms. Hofmann at the hearing – there are no documents, minutes of meetings or letters issued by Romania to any of the Claimants containing any promise or assurance that the GC scheme would not be modified. Thus, there is nothing that could be construed as a specific commitment by Romania as to the immutability of the GC scheme[927].

870. Besides, Claimants were aware at the times of their respective investments that the GC scheme had already changed several times since its inception in 2004, and there was nothing that indicated that it could not change again[928].

871. Romania also disagrees with Claimants' six alleged sources of specific commitments by Romania not to change its GC scheme[929]:

- *One*, the accreditation certificates do not contain any specific commitment that the GC scheme as it existed in 2011 would not be changed; in any case, the certificates were issued after Claimants made their investments and Claimants could not have relied upon them when making their investment[930];

- *Two*, Law 134/2012 does not contain a specific commitment by Romania not to change its GC scheme; this Law does not contain any stabilization or guarantee to existing investors; it was adopted at the request of the EU Commission to ensure that in case of overcompensation, Romania would adapt its GC scheme[931];

- *Three*, Art. 4(4) of Law 220/2008, as amended by Law 139/2010, did not provide predictability to or a guarantee of GC demand; additionally, nothing

---

[924] R-PHB, paras. 130-131.
[925] R-PHB, paras. 91, 132-134.
[926] R-PHB, paras. 118, 135.
[927] R-PHB, paras. 91, 136.
[928] R-PHB, paras. 91, 186.
[929] R-PHB, paras. 137-138.
[930] R-PHB, paras. 139 and 189 *et seq*.
[931] R-PHB, paras. 140-141.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

in this Law suggests that the Annual Mandatory Quotas could not be changed[932];

- *Four*, the presentations of the GC scheme by ANRE, OPCOM and the Ministry of Economy cannot create any legitimate expectation that the law would not change; these were only general presentations of the GC scheme as it existed at the time; they did not contain any suggestion, let alone a promise or an assurance, that the scheme was immutable – on the contrary[933];

- *Five*, the statement of reasons of Law 139/2010 could not give rise to legitimate expectations; statements of reasons are drafted by the initiators of the draft law when they submit the law proposal for parliamentary debate; the initial reasons for adopting a law often change in the course of the debate and what matters is what the adopted law says; in any case, none of the statements of reasons indicates any intention to freeze the GC scheme; in particular, the will to set a "stable" framework is not inconsistent with the making of necessary changes in the public interest[934];

- *Six*, Dr. Roques' labelling of Romania's GC scheme as an *ex ante* scheme cannot form a basis for Claimants' alleged legitimate expectation of stabilization, for the main reason that the dichotomy between *ex ante* / *ex post* schemes is unsupported and it is unclear why the alleged *ex ante* nature of the scheme would amount to a stabilization of said scheme[935].

872. <u>Third</u>, none of the documents prepared by Claimants or on which Claimants rely states that the GC scheme was frozen or that its features would not change[936].

873. Rather, they expressly contemplate regulatory risks – as acknowledged by Ms. Hofmann at the hearing. Significantly, LSG and Green Source never indicated to prospective investors that the GC scheme as it existed in 2011 was stabilized and could not change[937].

874. Likewise, the Claimants who participated in the Frăsinet projects have also failed to submit any evidence that they considered that the GC scheme was frozen. In fact, the binding term sheet signed between Pressburg UK and Raiffeisen Bank for the financing of the Frăsinet projects expressly contemplated the inclusion of a mechanism to mitigate adverse changes to Romania's RES regulation with a negative impact on the project's cash flows and profitability[938].

875. <u>Lastly</u>, Romania avers that the Claimants who knew that the law was about to change or had actually changed before they invested cannot claim that they had a

---

[932] R-PHB, paras. 146 *et seq*.
[933] R-PHB, para. 159.
[934] R-PHB, paras. 161-163.
[935] R-PHB, paras. 164-169.
[936] R-PHB, paras. 93, 172.
[937] R-PHB, paras. 93, 173-177.
[938] R-PHB, para. 178.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 192 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

basis to expect legitimately that the GC scheme was stabilized in 2011. In particular[939]:

- Risen initially invested in Beta amidst rumors of impending regulatory changes; it further invested in 2015 after many of the Disputed Measures had been adopted by Romania[940];

- CVI and CVC waited until after the adoption of EGO 57/2013 before deciding whether to invest in the Gamma Project Company[941]; and

- LSG and Green Source had not obtained the financing for Gamma prior to EGO 57/2013; they decided to "move forward" with their investments after the adoption of EGO 57/2013[942].

876. <u>Considering the above</u>, even if the Tribunal were to find that legitimate expectations could be protected by Art. 10(1) of the ECT, Claimants' legitimate expectation claims must be dismissed[943].

## B. <u>No significant alteration of the regulatory framework</u>

877. Romania contends that ECT tribunals have correctly and consistently found that, in the absence of stabilization, changes by a State to a regulatory or incentives regime rise to the level of a breach of FET <u>only</u> if the changes are discriminatory, drastic, fundamental, or a subversion of the regulatory regime[944]. Moreover, tribunals generally give due deference to a State's obligation to legislate in the public interest[945].

878. Romania submits that Claimants have not proven that the Disputed Measures rise to this high threshold. This is because these Measures were a reasonable and proportionate response to the issues facing Romania at the time[946], namely[947]:

- The sudden drop in the costs of building solar plants;

- The surge in solar investment;

- The low level of electricity consumption;

- The excessive costs to consumers; and

- The risk of overcompensation of solar RES-E Generators.

---

[939] R-PHB, para. 94.
[940] R-PHB, paras. 94, 180.
[941] R-PHB, paras. 94, 181-182.
[942] R-PHB, paras. 94, 183-185.
[943] R-PHB, para. 95.
[944] R-PHB, paras. 97, 120, 122.
[945] R-PHB, para. 97.
[946] R-PHB, para. 98.
[947] R-PHB, para. 205.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

879. Romania explains that the GC scheme was first implemented in 2004, as part of Romania's efforts to tackle climate change. One of the ways to contribute to the RES targets imposed at the EU level, was to increase the production of RES-E. However, the cost of these renewable technologies, especially that of solar, was so high that it could not compete with traditional fossil fuels[948].

880. According to Romania, the GC scheme as it existed in 2011 was based on three objectives[949]:

- Romania needed to meet the 24% renewable energy target set by the EU;

- The level of support needed to be sufficient to encourage investment, but not excessive as this would be unreasonable and would violate EU law; and

- It needed to ensure that the burden on consumers was maintained at a reasonable level.

881. Romania submits that the appropriate level of support is inherently tied to the development costs of each of the supported technologies. In Law 139/2010, Romania increased the level of support for each RES-E technology by granting a higher number of GCs, based on the development costs for each of these technologies at the time (for instance, solar producers were granted six GCs per MWh). By 2012, when the first solar RES-E Generators started coming to Romania, the cost of building a solar plant had dropped dramatically and was no longer in line with the level of support for solar plants in Law 139/2010[950].

882. Romania argues that the unexpected drop in solar PV prices led to an unexpected surge in solar PV investment – while in 2010 there were four solar producers, in 2013 there were almost 400. Romania explains that because of the large additional number of solar RES-E Generators, the supply of GCs increased dramatically. At the same time, electricity consumption was lower than expected, which meant that the cost of the additional GCs was spread across fewer megawatt-hours. All of this led to an increase in end consumers' electricity bills[951].

883. Romania avers that the increase in the consumers' electricity bills was a serious cause of concern, which could lead to social unrest. Additionally, Romania was concerned that the EIUs would leave Romania, something which would have been devastating for Romania's economy[952].

884. On the other hand, it became apparent that existing RES-E Generators, such as Claimants, had not paid the high development costs on which the level of support

---

[948] R-PHB, paras. 99-100.
[949] R-PHB, para. 100.
[950] R-PHB, para. 101.
[951] R-PHB, paras. 102, 216-219.
[952] R-PHB, paras. 103, 220-223.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

for solar RES-E was based. They were in fact being overcompensated, due to the fall in development costs[953].

885. According to Romania, it is against this background that it decided to intervene to restore balance to the GC scheme. The Disputed Measures were not discriminatory, drastic, fundamental or a subversion of the regulatory regime. The essential characteristics of the GC scheme remained in place for investors accredited prior to 2014, such as Claimants, who will receive six GCs per MWh over 15 years[954].

886. Romania submits that the modification of the Annual Mandatory Quota was a proportional, non-discriminatory, and justified response to the evolving realities of the implementation of the GC scheme[955].

887. Romania concludes that its GC scheme has been successful for all concerned[956]:

- Romania will no doubt have met its 2020 target of 24% RES;

- The burden on consumers was successfully managed;

- The EIUs did not leave Romania; and

- The RES-E Generators continue to operate profitably in Romania; in particular, Romania did not reduce the number of GCs allotted to Claimants and none of Claimants' GCs was cancelled; Claimants are still operating in Romania with an IRR in excess of their cost of capital.

888. In sum, Romania cannot be held liable for taking measures to address serious public concerns. Claimants' claims of significant alteration of the GC scheme must be dismissed[957].

## C.  **Claimants' claim for lack of transparency and consistency must fail**

### a.  **No standalone FET claim**

889. Romania submits that "transparency and consistency" should not give rise to independent claims under the ECT's FET obligation. In any case, concepts such as transparency and consistency should be interpreted restrictively[958].

890. Romania argues that none of the authorities cited by Claimants in support of their proposition that the ECT would allow a separate FET claim for breach of a host State's transparency and consistency obligation, concerned the ECT. In fact,

---

[953] R-PHB, para. 104.
[954] R-PHB, para. 105.
[955] R-PHB, para. 105.
[956] R-PHB, para. 106
[957] R-PHB, paras. 106-108.
[958] R-I, para. 1042.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

tribunals have tended to view transparency and consistency as being linked to legitimate expectations[959].

891. In any case, Romania submits that in interpreting and applying the concept of transparency and consistency, tribunals should not set an unattainable standard for States, which would be overly burdensome and limit their ability to legislate[960]. In fact, Art. 20 of the ECT, entitled "Transparency", provides that transparency shall be limited to the publication of laws or regulations that might affect matters covered by the ECT[961].

    **b.    No violation of transparency and consistency obligation**

892. Romania argues that even if the Tribunal were to consider that transparency and consistency could constitute a separate independent FET obligation, Romania's conduct in this case could not be viewed as violating such obligation[962]. Romania notes that Claimants refer to three sets of measures to justify their claim; yet, none could constitute a breach of any duty to act transparently:

893. <u>First</u>, Claimants refer to the fact that[963]:

- In February 2013, the Minister of Energy announced that the changes to the legal regime would not be retroactive; however, according to Respondent, general political statements such as those of the Minister of Energy have "the least legal value" and are "unable to generate the legitimate expectations protected under the FET standard";

- In March 2013, ANRE indicated that the contemplated reduction in the number of GCs would only concern future projects starting in 2014; yet, Respondent avers that the changes it implemented were not retroactive and the actual reduction of the number of GCs did indeed only apply to new plants; existing investors, such as Claimants, only experienced a temporary deferral of two of their six GCs; in any event, these changes should not have come as a surprise to investors, since the obligation on Romania to closely monitor the GC scheme and enact measures to avoid overcompensation, such as limiting the number of GCs, was part of the scheme approved by the Commission in 2011; moreover, the changes were not adopted abruptly and Claimants were well aware of the potential changes ahead of their adoption (a draft EGO 57/2013 was even published).

894. <u>Second</u>, Claimants complain that the changes to the methodology for calculating the GC acquisition quota represented a policy shift and that the calculations became discretionary on the part of ANRE and were no longer linked to the Annual Mandatory Quotas under Law 220/2008. However, Respondent submits that the only binding target was the achievement in 2020 of the 24% renewable energy

---

[959] R-I, paras. 1043-1044.
[960] R-I, paras. 1045-1053.
[961] R-I, para. 1054.
[962] R-I, para. 1042.
[963] R-I, paras. 1058-1060.

Case 1:19-cv-01618-TSC   Document 113-27   Filed 03/13/25   Page 196 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

target under the 2009 Directive. The target trajectory set out in Law 220/2008 was only indicative and could be adjusted by Romania if necessary. Moreover, there was no policy shift, since consumer impact was always a relevant factor for Romania[964].

895. <u>Finally</u>, Claimants complain that, in December 2018, Romania allegedly "dramatically" increased the annual ANRE contributions from 0.1% of the company's turnover to 2% of the company's turnover. Romania, however, notes that ANRE is an autonomous agency, "entirely self-financed and independent as regards its decision-making process, organisation and functioning". The contribution payable to ANRE is set on an annual basis. The fact that it was set at a certain level for several years does not entitle Claimants to expect that it would remain unchanged. Moreover, the increase applied to all ANRE license holders alike, not only PV plants. In any event, such increase could not possibly constitute a lack of transparency or consistency capable of rising to the high level of a FET breach[965].

## 2. NO IMPAIRMENT OF CLAIMANTS' INVESTMENTS

### A. Threshold for Claimants' claim

896. Romania avers that a finding that a State has unreasonably impaired an investor's management, maintenance, use, enjoyment or disposal of its investment is subject to a high threshold[966].

897. Romania argues that non-impairment provisions are very close to FET provisions, as recognized by several investment tribunals[967]. Like FET, a breach of non-impairment provisions is also subject to a very high standard. Romania submits that, contrary to Claimants' allegation, it is not correct to suggest that any negative impact or effect constitutes impairment[968].

898. Rather, Romania argues that, as noted in *Electrabel v. Hungary*, a "breach of this standard requires the impairment caused by the discriminatory or unreasonable measure to be significant". Likewise, the *WA Investments Europa Nova Ltd. v. Czech Republic* tribunal found that the impairment needed to be substantial in order to constitute a treaty breach[969].

899. In addition, Romania argues that such impact must relate to the "management, maintenance, use, enjoyment or disposal" of the foreign investor's investment, must be attributable to the State's measure and, finally, must result from a measure that is unreasonable or discriminatory[970]. According to Romania, a great number of

---

[964] R-I, para. 1061.
[965] R-I, paras. 1062-1063.
[966] R-I, para. 1067.
[967] R-I, paras. 1068-1069.
[968] R-I, paras. 1071-1074.
[969] R-I, para. 1074, citing to **Doc. CL-13**, *Electrabel*, para. 7.152, and **Doc. RL-214,** *WA Investments*, para. 683..
[970] R-I, para. 1075.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

tribunals and authorities have found that "unreasonable" and arbitrary are judged by the same, high standard[971].

### B.    Claimants have not met their burden of proof

900.    Romania submits that pursuant to Art. 10(1) of the ECT, a successful impairment claim would require Claimants to show cumulatively that[972]:

- Romania's actions were unreasonable (which should be interpreted as analogous to arbitrary and disproportionate), and

- Romania's actions had a significant impact on Claimants' management, maintenance, use, enjoyment or disposal of their investments.

901.    Respondent contends that Claimants' impairment claims fail on both counts[973].

902.    First, Claimants' allegations that Romania unilaterally withdrew prior representations that it had made to Claimants in the form of legislation and regulations, must fail because, as demonstrated above, there are no such commitments in this case[974].

903.    Second, Claimants' allegation that Romania failed to balance the interests of foreign investors against the interests of end-consumers must likewise be rejected. Romania did not disregard the interests of PV investors. Although investors like Claimants were being overcompensated, Romania only proposed to temporarily defer two of the six GCs for existing plants. By contrast, new investors would only receive three GCs[975].

904.    Additionally, the partial exemption of EIUs was justified and necessary to avoid the bankruptcy or forced delocalization of large industry actors, which could have had disastrous consequences on the Romanian economy[976].

905.    Finally, the fact that Romania did not enforce penalties against energy suppliers that failed to meet the Acquisition Quotas could not constitute an unreasonable measure impairing Claimants' investments. At least some of the companies in question were in financial difficulty, including bankruptcy. The level of compliance was close to 100% and there is no suggestion that Romania's failure to enforce penalties against the small number of companies that were unable to meet their GC purchase obligations had any significant impact on the GC market or on any of the Claimants[977].

---

[971] R-I, paras. 1076-1083.
[972] R-I, para. 1085.
[973] R-I, para. 1085.
[974] R-I, para. 1087.
[975] R-I, paras. 1088-1089.
[976] R-I, para. 1090.
[977] R-I, para. 1091.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

906. <u>In conclusion</u>, Romania argues that it tried to strike a balance, limiting Claimants (and other investors') profits, caused mainly because declining PV costs made the initial level of support to PV investors excessive. This is not sufficient to justify a claim that Romania acted unreasonably or impaired the "management, maintenance, use, enjoyment or disposal" of Claimants' investments[978].

907. In particular, Romania argues that Claimants have failed to indicate what aspects of their investments were allegedly impaired, in a way that amounts to a deprivation. In fact, Claimants continue to operate their PV Plants in Romania freely and profitably, and Claimants' investments remain profitable despite the Disputed Measures[979].

---

[978] R-I, paras. 1092-1094.
[979] R-I, para. 1095.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

# VI.3.  <u>DECISION OF THE TRIBUNAL</u>

908.  Claimants argue that by adopting the Disputed Measures Romania violated Art. 10(1) of the ECT, not only by breaching its obligation to accord FET to Claimants' investments, but also by unreasonably impairing the "management, maintenance, use, and enjoyment" of Claimants' investments. In particular, Claimants submit that Romania breached Art. 10(1) when it modified the essential characteristics of the GC scheme, thereby[980]:

-    Violating Claimants' legitimate expectations;

-    Fundamentally altering the GC support scheme; and

-    Acting without transparency and creating heightened instability.

909.  Romania, on the other hand, argues that under the ECT, the FET standard is that of customary international law, which only protects investors against egregious, arbitrary or discriminatory acts of the State. Furthermore, Romania argues that non-impairment provisions are equally subject to a very high standard. In any case, Romania considers that Claimants' claims are meritless since the Disputed Measures were reasonable and justified[981].

910.  The Tribunal must start by establishing the proven facts (**1.**) and the applicable law (**2.**). Thereafter, the Tribunal must analyze the proven facts in light of the applicable law in order to determine whether Romania breached its obligations under the ECT (**3.**), and will distinguish between two groups of Claimants: those who invested prior to EGO 57/2013 (**4.**) and those who did so thereafter (**5.**). The Tribunal will finally reach its conclusion (**6.**).

## 1.   <span style="font-variant:small-caps">Proven facts</span>

911.  The proven facts are described chronologically and in detail in section **III** *supra*. In the present section, the Tribunal will adopt a different approach: it will describe the legal and regulatory regime at the time of Claimants' investments, and thus establish what each Claimant knew (or could have known).

912.  Since Claimants are ten project developers, who invested after 2010, but at different points in time, in five solar PV plants in southern Romania[982], the regulatory and legal framework in place at the time of each investment was different.

### A.    The original GC support scheme

913.  The GC support scheme was first introduced in Romania in 2004[983]. Through GD 1892/2004, Romania created an obligatory quota system combined with the

---

[980] C-PHB, paras. 91 and 176.
[981] R-PHB, paras. 79-82.
[982] C-I, paras. 13 and 172; R-I, para. 513; **CD-1**, slide 99.
[983] **Doc. C-76**, Art. 1(1).

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

trading of GCs[984]: Generators of RES electricity would sell their electricity on the wholesale electricity market, at market price, and obtain an additional income from the sale of their GCs to electricity suppliers. The goal of this quota system was twofold:

- On the one hand, to encourage investment in RES-E, by awarding Generators of RES-E one tradable GC for each MWh of RES-E produced[985]; and

- On the other hand, to compel suppliers of electricity to source a quota of the electricity sold to final customers from RES-E by purchasing a certain number of GCs[986].

914.  Unlike other incentive schemes for the production of RES-E, the GC promotion system did not foresee an active role for the State: GCs were freely traded between Generators and suppliers, either on a centralized GC market or through bilateral contracts. State intervention was limited to the pricing of GCs: ANRE – the energy regulator – was in charge of establishing a minimum and maximum trading value[987], which, in 2004, were set at EUR 24/GC and EUR 42/GC, respectively.

915.  This system, however, did not prove sufficient to attract investments in RES-E[988]. Therefore, in October 2008, Romania enacted Law 220/2008, reforming its legal and regulatory framework[989].

Law 220/2008

916.  Law 220/2008 retained the general dual funding structure; the remuneration earned by Generators would continue deriving from two sources:

- From the sale of electricity on the wholesale electricity market, at market price[990], and

- From the sale of GCs to electricity suppliers, either on a centralized GC market administered by OPCOM or by entering into bilateral contracts for the sale of GCs (so-called GCPAs)[991].

917.  To provide a greater incentive for investments, in Law 220/2008, Romania clearly and explicitly established the number and value of GCs to which solar energy Generators would be entitled, the duration of the scheme and how the quota system would operate:

---

[984] **Doc. C-76**, Art. 1(2).
[985] **Doc. C-76**, Art. 1.
[986] **Doc. C-76**, Arts. 5 and 6.
[987] **Doc. C-76**, Art. 7.
[988] **Doc. C-36**, p. 2; **Doc. C-78**, slides 9-12.
[989] **Doc. C-36**, pp. 2, 4; **Doc. C-78**, slides 9-12.
[990] **Doc. C-83**, Art. 14(1).
[991] **Doc. C-83**, Art. 9. See also **Doc. C-63**, para. 21.

Case 1:19-cv-01618-TSC     Document 113-27     Filed 03/13/25     Page 201 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

918. <u>First</u>, Romania introduced a "banding system", pursuant to which PV Generators which qualified for the GC scheme would receive four (and no longer only one) GCs per MWh[992].

919. <u>Second</u>, the new Law provided that solar Generators which were able to commission their power-plants before the end of 2014, would benefit from the GC support scheme for 15 years from the date they started to produce RES-E[993].

920. <u>Third</u>, to ensure that the scheme was sufficiently attractive, Law 220/2008 provided that the value of GCs would no longer be set by ANRE but would instead be incorporated into the law itself; thus, GCs would trade between a minimum price of EUR 27/GC and a maximum of EUR 55/GC for the period between 2008 and 2014[994]. Additionally, these values would be annually adjusted to Romanian inflation[995] and, between 2015-2030, GCs would have to trade at least at the same value as that applicable in 2014[996].

921. <u>Fourth</u>, to guarantee that the minimum value of EUR 27/GC was obtained, Romania created annual Acquisition Quotas for electricity suppliers, to be "established and made public by ANRE"[997]. Suppliers that failed to meet their Acquisition Quotas would face a penalty of EUR 70 for each unpurchased GC[998].

<u>Law 139/2010</u>

922. In July 2010, Romania once again modified its promotion scheme, with the goal of[999]:

> "[…] strengthening […] the business environment by the increase of trust of possible investors in the stability of the E-RES support scheme."

923. <u>First</u>, given the lack of investment in solar energy, Law 139/2010 increased the number of GCs available for PV plants from four to six GCs per MWh, and extended the deadline for Generators to qualify for the support scheme until 2016[1000].

924. <u>Second</u>, the Law also clarified how the annual Acquisition Quota of GCs would work[1001]: in December of each year, ANRE was ordered to publish an estimated Acquisition Quota for the following year,

---

[992] **Doc. C-83**, Art. 5(2)(f).
[993] **Doc. C-83**, Art. 3(1)(c), 3(2)(a) and 3(3).
[994] **Doc. C-83**, Art. 10(1).
[995] **Doc. C-83**, Art. 10(3).
[996] **Doc. C-83**, Art. 10(4).
[997] **Doc. C-83**, Art. 4(7).
[998] **Doc. C-83**, Art. 11(2) and (4).
[999] **Doc. C-90**, p. 2.
[1000] **Doc. C-89**, Art. I, paras. 14 and 17 (Arts. 3 and 5).
[1001] **Doc. C-89**, Art. I, para. 15 (Art. 4(8)).

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

> "[…] based on the information regarding the estimated [RES-E] for the next year and the final energy consumption estimated for the next year"[1002].

925. This provisional Acquisition Quota was then to be adjusted by ANRE in March, incorporating actual data[1003]. Based on this Acquisition Quota, electricity suppliers could then calculate the number of GCs they had to acquire annually from RES-E Generators[1004]:

> "Art. 7. – The suppliers of electricity have the obligation to purchase yearly a number of green certificates equal to the multiplication of the value of [the Acquisition Quota][1005] for green certificates for the year in question, as per the provisions of art. 4 par. (7) and the amount of electricity expressed in MWh, supplied annually to end consumers."

926. Thus, in accordance with this provision, the number of GCs that electricity suppliers had to purchase was the result of multiplying:

**Acquisition Quota x electricity supplied to end consumers**

927. <u>Third</u>, Law 139/2010 increased the penalty for suppliers of electricity which breached their Acquisition Quota from EUR 70 to EUR 110 for each unpurchased GC[1006].

928. <u>Finally</u>, Law 139/2010 extended, from 2014 to 2025, the period during which the GC value would be trading between a minimum of EUR 27/GC and a maximum of EUR 55/GC,[1007]. More importantly, Law 139/2010 established that these values would no longer be annually indexed to Romanian inflation, but rather to European inflation[1008].

<u>The Romanian National Renewable Energy Action Plan</u>

929. In 2009, the EU passed a Directive which established that Member States should adopt "National Renewable Energy Action Plans", setting out their 2020 targets for the share RES energy used in electricity, transport and heating and cooling, and the measures to achieve such targets[1009]. In September 2010[1010], Romania adopted its

---

[1002] **Doc. C-89**, Art. I, para. 15 (Art. 4(7)).
[1003] **Doc. C-89**, Art. I, para. 15 (Art.(7) to 4(9)).
[1004] **Doc. C-89**, Art. I, para. 19 (Art. 7).
[1005] The English translation is incorrect: it refers to "[…] the multiplication of the <u>value of mandatory annual quota for green certificates</u> for the year in question". The mistranslation could give rise to the mistake of thinking that the legislator was referring to the "Annual Mandatory Quota", established in Art. 4(4) of Law 220/2008, as modified by Law 139/2010. However, the Romanian original refers to "*valoarea cotei anuale obligatorii **de achiziție de certificate** verzi stabilite pentru anul respectiv*". These are the Acquisition Quotas, defined in Art. 4(7) of Law 220/2008, as modified by Law 139/2010: "*cota anuală obligatorie **de achiziție** de certificate*" (see **Doc. C-89** in English and Romanian).
[1006] **Doc. C-89**, Art. I, para. 25 (Art. 11(2)).
[1007] **Doc. C-89**, Art. I, para. 24 (Art. 10(1) and 10(5)).
[1008] **Doc. C-89**, Art. I, para. 24 (Art. 10(1)-(5)).
[1009] **Doc. C-87/FR-21**, Art. 4.
[1010] See **Doc. C-307**, p. 5.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

NREAP[1011], which described in detail the GC scheme[1012] and expressly acknowledged the need to create legislative incentives to stimulate investments in RES-E[1013].

Submission of the scheme to approval of the European Commission

930. In accordance with State aid rules, Romania submitted Law 220/2008 and Law 139/2010 to the approval of the European Commission[1014].

## B.    Green Source and LSG's investment in Romania

931. In January 2011, Green Source and LSG incorporated the Alpha, Beta and Gamma Project Companies in Romania, with the goal of developing PV facilities[1015]. The plan consisted in the Project Companies acquiring or leasing land in Romania and obtaining the necessary permits and authorizations for construction and operation of PV facilities. Thereafter, LSG and Green Source intended to sell their interests in the Project Companies to outside investors, who would reimburse them for their expenses, with a profit[1016].

932. That same month, LSG arranged for the Alpha Project Company to purchase a 62 ha. plot of land to accommodate a 25 to 30 MW PV facility[1017].

933. At the time of this investment, Romania was still waiting for the European Commission's approval of its GC support scheme. Nevertheless, any new PV Generator knew (or could have known by analyzing the Romanian legal and regulatory framework) that, if and when the GC support scheme was approved by the Commission, a generator:

- Was entitled to qualify for the support scheme until 2016 and benefit from such scheme for 15 years;

- Was entitled to obtain six GCs per MWh of electricity produced and delivered to the grid[1018]; and

- Was entitled to trade these GCs with electricity suppliers on the centralized market of GCs and on the GC bilateral contract market, through GCPAs[1019], at the minimum value of EUR 27/GC, indexed annually to European inflation[1020].

[1011] **Doc. C-64**.
[1012] **Doc. C-64**, pp. 83 *et seq*.
[1013] **Doc. C-64**, p. 16.
[1014] **Doc. C-63**, para. 1. See also **Doc. C-307**; **Doc. C-311**; **Doc. C-312**.
[1015] **Lipkovich I**, para. 19; **Hofmann**, para. 15.
[1016] **Lipkovich I**, para. 18; **Hofmann**, paras. 14-16.
[1017] **Doc. C-141**; **Hofmann**, para. 17.
[1018] **Doc. C-89**, Art. I, para. 17 (Art. 5).
[1019] **Doc. C-89**.
[1020] **Doc. C-89**, Art. I, para. 24 (Art. 10(1) and 10(5)).

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

934. PV Generators also knew that there would be demand for GCs, since electricity suppliers would be subject to yearly Acquisition Quotas, forcing them to acquire a certain number of GCs every year[1021]; and that if electricity suppliers failed to meet their Acquisition Quotas, they would be subject to a penalty of EUR 110 for each unpurchased GC[1022].

Evidence

935. In February 2011 (only a month after incorporating the Alpha, Beta and Gamma Project Companies), Green Source and LSG prepared several investment proposals for potential investors in the Alpha, Beta and Gamma Project Companies. In these proposals Green Source and LSG noted that[1023]:

> "Romania is about to introduce a quota obligation system, a mechanism used to promote the production of [RES-E] by means of the acquisition by suppliers of electricity, of a number of [GCs] according to the mandatory quota imposed by law."

936. One of these investment proposals is particularly telling, because it shows precisely what Green Source and LSG understood from the GC support scheme at the time of their investment – including the risks associated with such investment[1024]:

937. Green Source and LSG explained to potential investors that the scheme entitled solar Generators to six GCs per MWh produced and obliged electricity suppliers to buy a certain number of GCs per MWh of total electricity sold; if electricity suppliers failed to acquire the required GCs, they would face a penalty of EUR 110 per GC; Green Source and LSG added that RES-E Generators were able to sell their GCs to electricity suppliers through GCPAs or on the GC centralized market, and that although the price of GCs fluctuated, it would never be lower than EUR 27/GC nor higher than EUR 55/GC, adjusted by inflation[1025].

938. Furthermore, Green Source and LSG understood that supply and demand of GCs in the market would work as follows[1026]:

> "Supply of Green Certificates is generated by renewable energy producers; demand is set by the quota, as in the table below, where the right column shows the quota as published by the latest amendment:

---

[1021] **Doc. C-89**, Art. I, para. 15 (Art. 4(7) to 4(9)).
[1022] **Doc. C-89**, Art. I, para. 25 (Art. 11(2)).
[1023] **Doc. C-144**, p. 5; **Doc. C-145**, p. 7; **Doc. C-146**, p. 4.
[1024] **Doc. C-145**.
[1025] **Doc. C-145**, pp. 7-9.
[1026] **Doc. C-145**, pp. 8-9.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

| Year | Annual obligatory share according to Law 220/2008 (%) | Annual obligatory share according to the Law amending and supplementing Law 220/2008 (%) |
|---|---|---|
| 2008 | 5.26 | |
| 2009 | 6.28 | |
| 2010 | 8.30 | 8.3 |
| 2011 | 8.30 | 10.0 |
| 2012 | 8.30 | 12.0 |
| 2013 | 9.00 | 14.0 |
| 2014 | 10.00 | 15.0 |
| 2015 | 10.80 | 16.0 |
| 2016 | 12.00 | 17.0 |
| 2017 | 13.20 | 18.0 |
| 2018 | 14.40 | 19.0 |
| 2019 | 15.60 | 19.5 |
| 2020 | 16.80 | 20 |

Source: NREAP

Supply is determined by the number of E-RES projects on the market. Own assessments and estimates due to market intelligence was confirmed by the Business Monitor Romania Power Report from Q4 2010 where the real quota of supply and demand is forecast as opposed to the mandatory quota (in the table above):

| | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2020 |
|---|---|---|---|---|---|---|---|---|---|
| **SUPPLY** | | | | | | | | | |
| | Business Monitor | Business Monitor | Business Monitor | Business Monitor | Business Monitor | Business Monitor | Business Monitor | Business Monitor | extrapol. |
| Total electricity generation, TWh | 65 | 57,5 | 56 | 58,1 | 60,3 | 62,8 | 65,9 | 67,7 | 67,7 |
| Total electricity sold | 41,8 | 39,1 | 38,7 | 39,5 | 40,9 | 42,6 | 44,5 | 46,5 | 49,1 |
| E-RES generation in % of total generation | 0,5 | 0,9 | 1,8 | 2,6 | 3,3 | 3,5 | 3,6 | 3,8 | 6,8 |
| | | | | | | | | | |
| **DEMAND** | | | | | | | | | |
| E-RES quota of total electricity sold | 5,26 | 6,28 | 8,3 | 10 | 12 | 14 | 15 | 16 | 20 " |

939. The above forecast of how supply for GCs would grow and how demand was set, led Green Source and LSG to estimate that GCs would be trading at the maximum ceiling value until 2020. According to Green Source and LSG, this information could also be inferred from the NREAP adopted by Romania in 2010[1027].

940. As to the risks associated with investing in Romania's RES-E sector, Green Source and LSG recognized that on the basis of the experiences in Spain, the Czech Republic and France, a regulatory risk could not be excluded. Nevertheless, the risk in Romania was considerably lower because Romania had "learned from other country's mistakes". Therefore, Romania's scheme was not based on FiT, but rather on a quota system that regulated the price through supply and demand[1028].

941. Finally, Green Source and LSG made a series of assumptions, which led them to estimate that the GC prices would be trading near the maximum until 2016 and near the minimum starting in 2021[1029]:

"Returns primarily depend on the scenario for the Green Certificates pricing mechanism. As supply of energy produced by renewable sources from 2011 till 2016 will definitely be lower than the demand created by the quota, we assume the maximum price during that period. As the upper band and the lower band are inflation adjusted, the prices grow from 2011 till 2016. Starting in 2017, supply is assumed to exceed demand of Green Certificates for the first time. Demand and supply will be almost equal in 2016, so 60 is assumed

---

[1027] **Doc. C-145**, p. 9.
[1028] **Doc. C-145**, pp. 11-12.
[1029] **Doc. C-145**, p. 13.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

to be the price equilibrium. From there the gap between supply and demand will grow, and in 2021 the price equilibrium will for the first time be lower than the minimum price set by the law. So from 2021 the price will equal the minimum price.

Demand is regulated by law. Supply needs to be estimated. Until 2015 these estimates were taken from Business Monitor and compared with the aggregated E-RES project volume (both forecasts are almost the same). From 2016 until 2025 the supply and demand curve are extrapolated. The table below shows the results of the calculations:

|  | Year | GC Price | Turnover |
|---|---|---|---|
| 1 | 2011 | 55.00 | 5,077,300 |
| 2 | 2012 | 56.10 | 5,169,040 |
| 3 | 2013 | 57.22 | 5,262,615 |
| 4 | 2014 | 58.37 | 5,358,061 |
| 5 | 2015 | 59.53 | 5,455,102 |
| 6 | 2016 | 60.00 | 5,494,300 |
| 7 | 2017 | 56.33 | 5,188,222 |
| 8 | 2018 | 51.56 | 4,790,404 |
| 9 | 2019 | 45.28 | 4,266,652 |
| 10 | 2020 | 38.49 | 3,700,366 |
| 11 | 2021 | 32.91 | 3,234,994 |
| 12 | 2022 | 33.57 | 3,290,038 |
| 13 | 2023 | 34.24 | 3,345,916 |
| 14 | 2024 | 34.92 | 3,402,628 |
| 15 | 2025 | 35.62 | 3,460,875 |

"

### C.    The EC Decision

942.  On 13 July 2011, the European Commission adopted the EC Decision and gave its green light to the GC support scheme[1030]. From this moment on, investors in RES-E knew that if they met the necessary requirements, they could benefit from the GC support scheme enacted in Law 220/2008, as modified by Law 139/2010.

### D.    Giust and Anina's investment

943.  In September 2011, Giust and Anina incorporated the Romanian project companies Solar Frăsinet and Solar Mostistea, respectively[1031]. Claimants have provided scarce evidence with regards to Giust and Anina. In particular, there seems to be no evidence on the record that reflects their assessment of the Romanian GC scheme at the time of their investment.

### E.    ANRE Order 45/2011

944.  A month thereafter, in October 2011, ANRE issued Order no. 45/2011, approving a methodology for setting the electricity suppliers' annual Acquisition Quotas[1032]. This Order defined the Acquisition Quotas as follows[1033]:

---

[1030] **Doc. C-63**, para. 20.
[1031] **Doc. C-121**; **Doc. C-122**; **Edwards I**, Table 1.1; **Theuer I**, para. 20; C-I, para. 37; **Doc. C-123**, Art. 1.2; **Doc. C-124**, Art. 1.2.
[1032] **Doc. C-101**. See also **Jones I**, para. 5.10(c).
[1033] **Doc. C-101**, Art. 3(2)(c) and (d).

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 207 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

> "c) mandatory yearly quota for purchase of green certificates [*i.e., Acquisition Quotas*] - the quota for purchase of green certificates required for electricity suppliers for the year of analysis, based on acquired values, which is published on the website www.anre.ro by 1 March of the year following the year of analysis and for which non-compliance penalties shall apply;"

945. Pursuant to the methodology defined by ANRE, in December of each year[1034]:

- ANRE estimated the total number of GCs to be issued, by estimating the amount of RES-E that would be produced and benefit from the GC scheme in the following year; this depended on the power installed in the different types of available RES power plants and the ones to be put into operation in the following year, and the average capacity factor[1035] by type of technology[1036]; and

- ANRE estimated the gross electricity consumption for the following year.

946. On the basis of these two factors, ANRE estimated the Acquisition Quota[1037].

### F. EGO 88/2011

947. Following certain recommendations made by the European Commission, in that same month of October 2011, the Romanian Government passed EGO 88/2011[1038], imposing safeguards against overcompensation to mitigate the impact of the support scheme on the price of energy for end consumers[1039]. This EGO defined "overcompensation" as a[1040]:

> "[…] situation when, considering the specific average technical and economic indicators achieved for a period of minimum 3 years for each technology, from the cost-benefit analysis performed for the set of generation capacities using the same technology, it results an [IRR] higher by 10% than the value considered for the relevant technology when authorizing the promotion system."

> (At the time of EGO 88/2011, the IRR considered for solar PV plants was 11.6%)

---

[1034] **Doc. C-101**. See also **Jones I**, para. 5.10(c).
[1035] Defined as: "[…] the ratio between the electricity delivered from the plant during the analysis period and the electricity that would be produced if the plant was operating throughout the duration at installed power, expressed as a percentage." (**Doc. C-101**, Art. 5(1)(c)). Additionally, pursuant to Art. 6 of the Order, "(1) For existing power plants/generating sets, the capacity factors used in the calculations will be the average annual outputs of each plant/group over the last 3 years of operation. (2) For the power plants / groups to be commissioned during the following year, the capacity factors used in the calculations shall be the same as those used for the authorization of the promotion system, depending on the type of technology, and for the estimation of the electricity produced, the installed electrical powers and the start-up time of the power plants / groups shall be considered." (**Doc. C-101**, Art. 6).
[1036] **Doc. C-101**, Art. 5(1).
[1037] **Doc. C-101**, Art. 10.
[1038] **Doc. C-97**.
[1039] **Doc. C-98**, pp. 2 and 4.
[1040] **Doc. C-97**, Art. I, para. 1 (Art. 2(af)) [Emphasis added].

Case 1:19-cv-01618-TSC     Document 113-27     Filed 03/13/25     Page 208 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

948. The EGO set out that ANRE would monitor the costs/revenues of Generators for overcompensation, and, if needed, would propose measures to reduce the number of GCs allocated to Generators; however, such measures would only be applicable to Generators who "begin production of electricity" after the measures were adopted[1041] – in other words, it would <u>not</u> apply to Generators who were already producing at the time of adoption of any measures.

949. Importantly, the EGO also determined that GCs issued to Generators would expire 16 months after their date of issuance[1042].

**G.    Solluce's investment in Romania**

950. Since May 2011, Samsung had been discussing with LSG and Green Source the possibility of investing in the PV projects that they were developing in Romania[1043].

951. In October 2011, Green Source, LSG, and Samsung agreed that Samsung would buy a majority share of the Alpha Project Company, of which Green Source and LSG would remain minority shareholders[1044].

952. In January 2012, Samsung, LSG and Green Source prepared a joint proposal for other potential banks who might be willing to finance the Alpha Project Company. Much like the proposals prepared by LSG and Green Source in February 2011, this proposal noted that, since October 2011, PV Generators were entitled to six GCs per MWh produced, which they could sell through GCPAs or on the centralized GC market. Samsung followed the same assumptions as LSG and Green Source as to how demand and supply would work[1045].

953. Furthermore, the investment proposal explained that in the case of the Alpha Project Company, electricity would be sold via a 10-year PPA with Enel Energie S.A. and GCs would be sold via a 10-year GCPA with Enel Trade S.p.A[1046].

954. In April 2012, LSG and Green Source broke ground on the Alpha project. That same month, the Alpha Project Company entered into a binding term sheet with Enel Trade S.p.A. governing the terms of a PPA and a GCPA[1047]. Finally, by 15 May 2012, the Alpha Project Company secured all necessary approvals and permits to construct the 45 MW Alpha PV Facility[1048].

955. Consequently, on 22 May 2012, Green Source, LSG, Samsung, and its Dutch subsidiary, Solluce, signed an investment agreement with the Alpha Project Company[1049]. The parties agreed that Solluce would become a shareholder in the

---

[1041] **Doc. C-97**, Art. I, para. 23 (Arts. 29(2) and (3)).
[1042] **Doc. C-97**, Art. I, para. 9 (Art. 6(9)).
[1043] **Lim**, para. 7.
[1044] **Lim**, para. 17; **Hofmann**, para. 23.
[1045] **Doc. C-161**, pp. 10-11.
[1046] **Doc. C-161**, pp. 10-12.
[1047] **Lim**, para. 19.
[1048] **Lim**, para. 19; **Hofmann**, para. 25.
[1049] **Doc. C-166**.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Alpha Project Company through a combination of share capital increase and share sale transfers that would ultimately result in Solluce holding a 78% share in the capital of the Company and Green Source and LSG remaining each with an 11% share[1050].

956.   In May 2012, Solluce started by acquiring a 62.3% in the Alpha Project Company, for EUR 14.18 million.

957.   On 14 January 2013, the Alpha Project Company signed a GCPA with Enel Trade Romania, pursuant to which Enel committed to purchase all the GCs generated by the Alpha PV Facility for ten years at the following price[1051]:

> The value of the Green Certificates to be paid by the Buyer, pursuant to this Agreement ("Price") shall be as follows:
>
> - EUR 43 until 31 December 2014;
>
> - EUR 32.55 or the Minimum Price (as defined in Annex 1) whichever is higher after 1 January 2015 until 31 December 2017;
>
> - EUR 33 or the Minimum Price whichever is higher after 1 January 2018 until the end of the Term of this Agreement.
>
> The Price is exclusive of any Taxes which are to be incurred by each of the Parties in accordance with the Applicable Law.

958.   Thereafter, in January 2013, Solluce increased its participation in the Alpha Project Company to 78%, with a further EUR 8.6 million investment[1052].

### H.   Law 134/2012

959.   In July 2012, the Romanian Parliament enacted Law 134/2012[1053] by which it approved EGO 88/2011[1054]. In its statement of reasons, the Parliament noted that[1055]:

> "[…] the trading of green certificates allows all renewable energy producers who satisfy the conditions stipulated by the law to benefit indirectly from the guaranteed demand for the produced energy for a higher price than the market price, which is likely not to discourage renewable energy producers from investing in technologies specific to this type of energy."

960.   Law 134/2012 envisaged the possibility for Romania to reduce the number of GCs for solar PV plants accredited after 1 January 2014, in case of overcompensation[1056]. Additionally, Romania announced that it would create a Guarantee Fund managed by OPCOM, which would buy any unsold GCs, at least

---

[1050] **Doc. C-166**, Recitals (B) – (K). See also **Hofmann**, para. 26; **Lim**, para. 20.
[1051] **Doc. C-167**, Clauses 4 and 6.1.
[1052] **Lim**, paras. 20-22; **Hofmann**, para. 27.
[1053] **Doc. C-109**.
[1054] **Doc. C-109**, Art. I.
[1055] **Doc. C-110**.
[1056] **Doc. C-109**, Art. I, para. 14.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 210 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

at the minimum GC trading value. The Fund would be funded by the penalties paid by the suppliers of electricity who failed to meet their Acquisition Quotas[1057].

## I.  Pressburg's investment in Romania

961.  That same month of July 2012, the German firm Pressburg Partners entered into negotiations for the acquisition of the Frăsinet Project Companies with Mr. Gheorghe Cătălin-Liviu, owner of Anina and Giust.

962.  In this context, Pressburg contacted the Raiffeisen Bank, to obtain financing for the construction of two PV facilities. Raiffeisen Bank prepared a binding term sheet for Pressburg in August 2012, in which it described its understanding of the Romanian GC scheme[1058]:

> According to the Romanian renewable energy system, the producers of electricity from PV power plants receive six green certificates for each MWh delivered into the power grid. The price for each green certificate has to be within a fixed, annually inflation adjusted range (EUR 27 to EUR 55). Additionally, a PPA for the sale of green certificates will be signed with Enel or OMV, in form and substance satisfactory to RBI.

963.  In September 2012, Giust and Anina each entered into a SPA with Pressburg, under which Pressburg acquired 50% of each of the Frăsinet Project Companies[1059].

964.  On 20 September 2012, each of the Frăsinet Project Companies entered into EPC and operation and management agreements with Alpine-Energie, contingent on entering into a binding term sheet with the Raiffeisen Bank.

965.  Raiffeisen Bank eventually entered into a Senior Facilities Agreement with the Frăsinet Project Companies in December 2012. In this Agreement, Raiffeisen reiterated its understanding that the Project Companies would be able to trade their GCs not only on the centralized market managed by OPCOM, but also through off-market GCPAs[1060].

966.  This Senior Facilities Agreement also contained an annex with the conditions precedent the Bank required before draw-down. Probably prompted by Law 134/2012, the Bank included among these conditions a written confirmation that the Frăsinet Project Companies would be entitled to receive six GCs per MWh produced[1061].

## J.  Risen's investment in Romania

967.  In April 2012, Green Source, LSG and the Chinese hi-tech company Risen Energy executed a "project investment contract", pursuant to which Risen Energy agreed to loan Green Source and LSG EUR 900,000 to purchase land for the Gamma PV

---

[1057] **Doc. C-109**, Art. I, para. 8.
[1058] **Doc. C-123**, p. 25 of the PDF / **Doc. R-35**, p. 1.
[1059] **Doc. C-123**; **Doc. C-124**; **Theuer I**, para. 22.
[1060] **Doc. C-127**, p. 42.
[1061] **Doc. C-127**, p. 170.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Facility – the construction of which was scheduled to begin in July 2012[1062]. Pursuant to this contract, Green Source and LSG had to repay the loan by 15 July 2012, after which, Risen Energy would fund the Gamma Project Company through a bridge loan until the PV Facility was complete and could be sold to a third party. In exchange, Risen Energy would be the module supplier for the Beta and Gamma PV Facilities[1063].

968. On 24 January 2013, Risen – Claimant in this arbitration and a subsidiary of Risen Energy – entered into

- A share purchase agreement with Green Source and LSG[1064], and

- Two share transfer agreements, one with Green Source[1065] and another one with LSG[1066],

pursuant to which Risen acquired 90% of Beta's shares from Green Source and LSG for EUR 900,000 – an amount which was offset against the outstanding sums owed by LSG and Green Source for the Gamma Project Company loan. Green Source and LSG each retained a 5% share of the capital of Beta. In addition, Risen Energy lent Beta EUR 9.1 million to finance construction[1067].

969. Although it is true that at the time of Risen's actual investment, rumors had just started to circulate that there might be changes to the GC support scheme[1068], whether and to what extent the support scheme would be modified was completely unknown.

**K.    2013 Disputed Measure: EGO 57/2013**

970. On 4 June 2013, the Romanian Government issued EGO 57/2013[1069]. In the recitals, the Government explained that it adopted this EGO[1070]:

> "[…] to <u>cease the effect of uncontrolled growth of prices for end consumers of energy</u>, which may result into a blockage of investments in the production of energy from renewable sources field and, implicitly, the inapplicability of provisions of Law no. 220/2008, as republished, with subsequent amendments and supplementing, as well as to maintain the predictability of the legislative background concerning the promotion of energy from renewable energy sources, as well as to <u>maintain the competitivity of main economic sectors that are great energy consumers, whereas not taking any immediate measures would have irreversible consequences on the competitiveness of industrial products and would result into the relocation outside Romania of large</u>

---

[1062] **Doc. C-171**; **Hofmann**, para. 35.
[1063] **Doc. C-171**.
[1064] **Doc. C-173**.
[1065] **Doc. C-174**.
[1066] **Doc. C-175**.
[1067] **Hofmann**, para. 37.
[1068] See section III.4 *supra*.
[1069] **Doc. C-196**.
[1070] **Doc. C-196**, p. 1.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

production units, would result into price increases over the estimated index, into social consequences by the sudden growth of energy price invoiced above bearable limits, into the overcompensation of producers of energy from renewable resources in contradiction with the decision for the approval of the state aid scheme, would influence the operational safety of the national energy system and would influence the estimated budget allotted for the implementation of the support scheme and resources intended for the operation of the support scheme, thus resulting into the blocking of investments in this area, aspects that refer to the general public interest and that are considered emergency and extraordinary situations, whose regulation cannot be delayed, according to art. 115 par. (4) of the Constitution of Romania, as republished, the Government of Romania adopts this emergency ordinance." [Emphasis added]

971. Claimants in this arbitration recognize that the measure was not as harmful as they, and other investors, initially feared[1071]. Yet, EGO 57/2013 introduced some significant modifications to Law 220/2008:

972. First, Romania deferred the issuance of two out of the six GCs per MWh awarded to PV plants between 1 July 2013 and 31 March 2017, to decrease the expected GC revenue of PV plants[1072]. These deferred GCs were expected to be recovered gradually by PV facilities between 1 April 2017 and 31 December 2020, at the latest[1073]. This measure would apply to any PV plants accredited by ANRE after the enactment of the EGO – *i.e.*, after 4 June 2013[1074].

973. Second, for PV plants above 5 MW (which was the case of all of Claimants' plants), the issuance of GCs for electricity beyond the projection that Generators made to the grid operator in the day-ahead hourly forecast was prohibited[1075]. This meant that if the Generators' actual production was higher than predicted, Generators would receive only the projected number of GCs.

974. Third, EGO 57/2013 provided that GCs could only be traded between Generators of RES-E and electricity suppliers on the centralized market managed by OPCOM[1076] – thus casting doubts on the validity of GCPAs entered into between Generators and energy traders.

975. Lastly, EGO 57/2013 proposed to exempt a percentage (to be defined) of the electricity consumed by EIUs from the support scheme. However, this exemption was conditioned on the approval of the European Commission[1077].

---

[1071] C-I, para. 225; **Tahan**, para. 14.
[1072] **Doc. C-196**, Art. I(3). See also **Roques I**, para. 6.28.
[1073] **Doc. C-196**, Art. I(3).
[1074] **Doc. C-196**, Art. I(13)(3).
[1075] **Doc. C-196**, Art. I(1). See also **Doc. C-197**, Art. 3(6)(f).
[1076] **Doc. C-196**, Art. I(7)(9).
[1077] **Doc. C-196**, Art. I(7)(8).

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

## L.    Accreditations of PV Facilities

976. On 21 June 2013, ANRE issued the final accreditations for the Frăsinet PV Facilities to be able to operate and benefit from the GC support scheme, granting them six GCs per MWh until 31 May 2028[1078].

977. The Alpha Project Company obtained its final accreditation a few weeks thereafter, on 2 August 2013, obtaining six GCs per MWh of RES-E until 19 June 2028[1079]. On 27 September 2013, Beta obtained its final accreditation for six GCs per MWh until 27 September 2028[1080].

978. That said, although all PV Facilities received an accreditation entitling them to six GCs per MWh, EGO 57/2013 had been approved a few weeks before, and in accordance with this law two out of the six GCs per MWh were immediately deferred until 2017-2020.

## M.    Core Value's investment in Romania

979. In September 2012, Green Source had approached Mr. Tahan, the founder of one of the Core Value companies, as a potential investor for the Gamma Project Company. By early 2013, the Core Value companies had expressed interest in investing in the Beta and Gamma Project Companies and started to perform a financial and legal diligence[1081]. But around that same time, rumors started to circulate among RES-E Generators that Romania might enact changes to the GC support scheme, through a new amendment of Law 220/2008[1082].

980. Mr. Tahan testified in this arbitration that, although the prospect of the changes to the GC scheme concerned Core Value, they were confident that Beta and Gamma would remain bankable and could succeed even if the rumored changes took place[1083]. Mr. Tahan has admitted that Core Value chose to wait for the issuance of EGO 57/2013 before investing[1084].

981. Hence, on 26 June 2013 (*i.e.*, 22 days after the adoption of EGO 57/2013 and with full knowledge that two out of the six GC's were to be deferred), CVI, CVC, LSG and Green Source entered into a Share Purchase and Investment Agreement pursuant to which[1085]:

- CVI acquired a 76% share in Gamma for EUR 6.8 million;

- CVC acquired a 3% share in Gamma for EUR 0.3 million;

---

[1078] **Doc. C-216**; **Doc. C-217**. See also **Theuer I**, para. 33.
[1079] **Doc. C-224**; **Lipkovich I**, paras. 24-25.
[1080] **Doc. C-231**; **Lipkovich I**, paras. 24, 26.
[1081] **Hofmann**, para. 36; **Tahan**, para. 8.
[1082] **Doc. C-177**; **Doc. C-178**; **Theuer I**, para. 27; **Hofmann**, para. 38; **Lim**, para. 24; **Tahan**, para. 9.
[1083] **Tahan**, paras. 9-11. See also **Hofmann**, para. 38.
[1084] **Tahan**, paras. 10-11.
[1085] **Edwards I**, para. 3.32, Figure 3-1.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 214 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- LSG retained a 10.5% share in Gamma;

- Green Source retained a 10.5% share in Gamma.

982. On 20 December 2013, ANRE issued the final accreditation for the Gamma Project Company, giving it the right to obtain six GCs per MWh until 27 September 2028[1086]. Again, two out of those six GCs were immediately deferred.

### N.    <u>2014 Disputed Measures: Law 23/2014</u>

983. Beyond EGO 57/2013, Claimants take issue with the following Disputed Measures, which they claim were unlawful and impacted Claimants' investments[1087]:

<u>Law 23/2014</u>

984. On 14 March 2014, the Romanian Parliament enacted Law 23/2014, approving EGO 57/2013 with certain amendments[1088]. In its statement of reasons, the Parliament declared that it was faced with an "extraordinary" and "emergency" situation, caused, in part, by the "uncontrolled increase in prices for end consumers of energy"[1089]:

> "<u>Considering the effect of uncontrolled increase in prices for end consumers of energy</u>, the assumptions concerning the exceeding in 2013 of connection and balancing of the national energy system capacities, the negative impact on the competitivity in the industrial sector and the overlapping of price increases with cumulated effects over the energy price liberalization calendar, <u>the taking of measures to maintain the predictability of the legal framework concerning the promotion of energy from renewable sources is an extraordinary situation whose regulation cannot be delayed.</u>
>
> <u>The emergency situation consists in the existing problems related to the over-compensation of producers that benefit from the support scheme</u> and the creation of a competitive undue advantage as well as signals related to the <u>impossibility of the energy-intensive industry to bear any additional increases in the electricity price</u>. Moreover, the emergency situation is imposed by the need of a preventive action, as the accreditation of new units from renewable sources influences the price and the connection capacities which will be cumulated for the next 10-15 years." [Emphasis added]

985. Through Law 23/2014, the Romanian Parliament went further than EGO 57/2013:

- It reduced the validity of GCs from 16 to 12 months from their date of issuance[1090]; thus, after one year, any untraded GCs would become worthless;

---

[1086] **Doc. C-234**; **Lipkovich I**, paras. 24, 26.
[1087] C-PHB, para. 173.
[1088] **Doc. C-238**. See also **Jones I**, para. 6.1.a.
[1089] **Doc. C-240**.
[1090] **Doc. C-238**, Art. I(8)(5$^1$)(9).

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- It repealed the measures adopted in Law 134/2012 for the establishment of a Guarantee Fund managed by OPCOM that would buy any GCs that failed to be bought by electricity suppliers[1091]; hence, any GCs unsold within 12 months would simply lose their validity.

GD 495/2014

986. Pressured by EIUs to reduce the costs of the GC support scheme, three months later, on 11 June 2014, the Romanian Government adopted GD 495/2014 to "create a State aid scheme" partially exempting EIUs from the GC support scheme[1092]. In early July 2014, Romania submitted its planned aid scheme to the approval of the European Commission[1093].

987. The partial exemption implied that, until the end of 2024, when calculating the Acquisition Quota, a part of the electricity supplied to EIUs would be excluded (under ANRE Order 45/2011, the Quota was calculated as the ratio between the total number of GCs estimated for a given year and the estimated final electricity consumption)[1094]. EIUs would be exempted from the payment of GCs corresponding to 85%, 60% or 40% of the electricity they consumed, depending on the intensity of their electric consumption[1095].

988. In October 2014, the European Commission approved the partial exemption for EIUs, finding the State aid measure compatible with the internal market[1096]. This exemption applied to approximately nine TW per year (out of a total electricity consumption of approximately 50 TW per year)[1097].

## O. 2017 Disputed Measures: EGO 24/2017

989. Three years later, in March 2017, the Romanian Government passed EGO 24/2017[1098] to ensure "the stability of the business environment, and maintain and pursue the development of investments in the field of renewable energy production in Romania"[1099]. EGO 24/2017 introduced some additional amendments to Law 220/2008[1100]:

990. <u>First</u>, the Government extended the GC deferral period for solar PV plants accredited before 31 December 2013 (*i.e.*, all of Claimants' PV Facilities) until 31 December 2024 (initially, the deferral period was meant to last only until 2017)[1101]. This meant that solar PV plants would continue to receive only four (and not six, as originally provided for) GCs per MWh until the end of 2024. The

---

[1091] **Doc. C-238**, Art. I(12).
[1092] **Doc. C-243**.
[1093] **Doc. C-248**, para. 1.
[1094] **Doc. C-248**, paras. 13 and 29.
[1095] **Doc. C-248**, para. 19.
[1096] **Doc. C-248**, p. 14.
[1097] **Doc. C-248**, paras. 14, 31; **CD-1**, slide 121.
[1098] **Doc. C-270**.
[1099] **Doc. C-271**.
[1100] See **Doc. C-272**; **Jones I**, para. 6.104.
[1101] **Doc. C-270**, Art. I(11)(2$^5$).

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

deferred GCs would be recovered from 1 January 2025 until 31 December 2030, in equal monthly instalments[1102].

991. <u>Second</u>, the Government again modified the methodology for calculating the Acquisition Quotas for electricity suppliers. The annual Acquisition Quota was now to be set on the basis of[1103]:

- A fixed quantity of GCs, equal to the aggregate number of GCs estimated to be issued until the end of the GC scheme, divided by the number of years remaining until 2031; and

- A maximum cost for consumers of EUR 11.1/MWh.

992. The Government set the GC demand for 2017-2018 at 14,910,140 GCs[1104].

993. <u>Third</u>, EGO 24/2017 altered the minimum and maximum prices at which GCs could be traded until 2032: EUR 29.4/GC and EUR 35/GC, respectively[1105]. These prices also ceased to be indexed to inflation.

994. <u>Fourth</u>, EGO 24/2017 lowered the penalty to be paid by electricity suppliers who failed to meet their Acquisition Quotas, from EUR 110 to EUR 70 per unpurchased GC[1106].

995. <u>Fifth</u>, the Government confirmed that GCs could only be traded between the Generator, as seller, and the electricity supplier, as purchaser[1107]. Additionally, the Government restricted the sale of GCs to the regulated OPCOM market by deciding that[1108]:

- Existing GCPAs would continue to produce effects until their expiry, but could not be renovated nor increased, but

- The maximum duration of future GCPAs could not exceed 31 August 2017 (*i.e.*, approximately five months);

996. <u>Finally</u>, the Government decided to extend the validity of GCs issued after 2017 until 31 March 2032 (reversing the previous decision by Parliament which, in Law 23/2014, had reduced the validity period of GCs to 12 months)[1109].

---

[1102] **Doc. C-270**, Art. I(11)(2⁶).
[1103] **Doc. C-270**, Art. I(8).
[1104] **Doc. C-270**, Art. VII.
[1105] **Doc. C-270**, Art. XIII.
[1106] **Doc. C-270**, Art. XVII.
[1107] **Doc. C-270**, Arts. I(18)(5) and XII.
[1108] **Doc. C-270**, Arts. X and XI.
[1109] **Doc. C-270**, Arts. I(3)(3³)(b) and IX.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

### P.    2018 Disputed Measures: Law 184/2018

997. While this arbitration was already ongoing, the Romanian Parliament enacted Law 184/2018, approving EGO 24/2017 with some amendments[1110]:

998. <u>First</u>, the Parliament decided that two out of six GCs granted to solar PV plants would continue to be deferred, but only until 31 December 2020[1111] – and no longer until the end of 2024, as envisaged in EGO 24/2017.

999. <u>Second</u>, Law 184/2018 repealed the measure adopted in 2013 which provided that no GCs would be granted to the quantity of electricity sold as a positive imbalance[1112] (*i.e.*, electricity sold in excess of the hourly quantities notified to Transelectrica on the day-ahead market[1113]). Thus, starting in August 2018, each RES-E MWh produced by an eligible plant received the corresponding number of GCs[1114].

1000. <u>Third</u>, the Parliament introduced a new methodology for calculating the Acquisition Quotas, based on the final electricity consumption in the previous year and a predetermined maximum annual average consumer impact, which could not be exceeded[1115]:

- EUR 11.7/MWh in 2018;

- EUR 12.5/MWh in 2019;

- EUR 13/MWh in 2021 and 2021; and

- EUR 14.5/MWh from 2022 onwards.

1001. <u>Lastly</u>, Law 184/2018 required electricity suppliers to purchase at least 50% of their mandatory Acquisition Quota on the OPCOM-operated GC spot market[1116].

### Q.    EGO 114/2018

1002. Finally, on 28 December 2018, the Romanian Government passed EGO 114/2018, pursuant to which RES-E Generators became obliged to pay 2% of their turnover to cover for the regulator's budget[1117].

---

[1110] **Doc. C-199/R-19**.

[1111] **Doc. R-19**, Art. I(9).

[1112] **Doc. C-199/R-19**, Art. I(5).

[1113] **Roques I**, para. 6.34.

[1114] **Roques I**, para. 6.35.

[1115] **Doc. C-199/R-19**, Art. I(8).

[1116] **Doc. C-199/R-19**, Art. I(14).

[1117] **Doc. C-274**.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

2.  <u>APPLICABLE LAW</u>

1003. Art. 10 of the ECT concerns the "promotion, protection and treatment of investments". Art. 10(1) of the ECT provides that[1118]:

> "(1) <u>Each Contracting Party shall</u>, in accordance with the provisions of this Treaty, <u>encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area</u>. Such <u>conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment</u>. Such Investments shall also enjoy the most constant protection and security and <u>no Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal</u>. In <u>no case shall such Investments be accorded treatment less favourable than that required by international law</u>, including treaty obligations. Each Contracting Party shall observe any obligations it has entered into with an Investor or an Investment of an Investor of any other Contracting Party." [Emphasis added]

1004. Pursuant to Art. 31(1) of the VCLT[1119], the Tribunal must interpret the terms of Art. 10(1) of the ECT in good faith, in accordance with the ordinary meaning to be given to the terms of the Treaty in their context and in light of the Treaty's object and purpose[1120].

1005. A plain reading of Art. 10(1) of the ECT shows that this provision can be divided into at least four separate obligations[1121]:

- The first is the Contracting Parties' general obligation, defined in the first sentence of Art. 10(1) (**A.**):

> "Each Contracting Party shall […] encourage and create stable, equitable, favourable and transparent conditions for Investors of other Contracting Parties to make Investments in its Area."

- The second and third are two special cases encompassed in the general obligation[1122]: the obligation to provide FET (**B.**) – and within this obligation enters the discussion of whether investors are entitled to rely on any legitimate expectations (**C.**) – and the prohibition of impairment by unreasonable or discriminatory measures (**D.**):

> "Such conditions shall include a commitment to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment."

---

[1118] **Doc. CL-1**.
[1119] Romania is not a party to the VCLT, but nevertheless refers to the VCLT to the extent that it is considered to codify customary international law (R-I, fn. 5).
[1120] **Doc. CL-33**, Art. 31(1) of the Vienna Convention on the Law of Treaties.
[1121] See also **Doc. CL-200**, *Watkins*, para. 482.
[1122] See also **Doc. CL-250**, *ESPF*, para. 751.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

> "[N]o Contracting Party shall in any way impair by unreasonable or discriminatory measures their management, maintenance, use, enjoyment or disposal."

- Finally, the fourth obligation establishes a floor, by requiring that the host State respect the minimum standard of treatment for aliens as established by customary international law (**E.**):

> "In no case shall such Investments be accorded treatment less favourable than that required by international law […]"

### A.    Obligation to encourage and create stable conditions

1006. Under the first sentence of Art. 10(1), Romania, as a Contracting Party to the ECT, undertook to "encourage and create":

- stable,

- equitable,

- favourable, and

- transparent

conditions, in order to encourage protected investors to make investments in the Romanian territory[1123].

1007. A general obligation along the lines of the first sentence of Art. 10(1) of the ECT is not commonly found in the text of other bilateral or multilateral investment treaties. To promote investments, many treaties invoke a duty for host States to provide "equitable" or "favorable" conditions[1124]; but the requirement that the host State afford "stable" or "transparent" conditions is seldom found. The ECT differs from other traditional FET provisions because it makes an explicit reference to the concept of stability.

Stable legal framework

1008. Of special relevance for the present case is Romania's obligation to "create and encourage stable conditions" for the benefit of protected investments.

1009. In accordance with its Foreword, the ECT is a "unique instrument for the promotion of international cooperation in the energy sector"[1125] – a sector of strategic importance, which directly affects the performance of all economic activities and

---

[1123] **Doc. CL-216**, para. 2.32.
[1124] The requirement to encourage and create "favorable" conditions for investors is by far the most common. By way of example, it can be found in the Thailand-United Arab Emirates BIT (**Doc. CL-175**, Art. 3(1)), in the Laos-Pakistan BIT (**Doc. CL-190**, Art. 2(1)), or in the Albania-Azerbaijan BIT (**Doc. CL-243**, Art. 2(1)), all in the record of this arbitration.
[1125] **Doc. CL-1**, ECT, Foreword, p. 3.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

the day-to-day life of citizens; sovereign nations develop their own energy policies and the energy sector is subject to extensive regulation and supervision by the State.

1010. Likewise, Art. 2 of the ECT, entitled "Purpose of the Treaty", provides that[1126]:

> "This Treaty establishes a legal framework in order to promote long-term cooperation in the energy field, based on complementarities and mutual benefits, in accordance with the objectives and principles of the Charter."

1011. The "Charter" to which this provision alludes to is the European Energy Charter adopted in 1991, a document which precedes and nourishes the interpretation that must be given to the ECT. Significantly, the requirement of stability and legal security was already present in the European Energy Charter[1127]:

> "In order to promote the international flow of investments, the <u>signatories will at national level provide for a stable, transparent legal framework for foreign investments</u>, in conformity with the relevant international laws and rules on investment and trade.
>
> They affirm that it is important for the signatory States to negotiate and ratify legally binding agreements on promotion and protection of investments which <u>ensure a high level of legal security and enable the use of investment risk guarantee schemes</u>." [Emphasis added]

1012. While the European Energy Charter of 1991 referred to a "stable, transparent <u>legal framework</u>", the ECT amplified the requirement to "stable, equitable, favourable and transparent <u>conditions</u>". "Conditions" is a wider term, which for certain encompasses the legal framework, but also extends to other areas. For the purposes of adjudicating the present dispute, the only relevant "condition" is the Romanian "legal framework" – and it is to this concept that the Tribunal will refer.

<u>The importance of a stable legal framework</u>

1013. In a highly regulated sector as energy, legal security and regulatory stability are permanent concerns for the investors[1128]. The reason is easy to understand. As explained by Rudolph Dolzer[1129]:

> "[T]he willingness of foreigners to invest is linked to the degree of stability in a host state, and stability is one factor for an investor to determine the location of its investment."

1014. The energy sector requires that investors make long-term capital commitments, which are sunk into fixed assets and cannot be removed from the host State. Once the investment has been made, the investor becomes bound to the host State,

---

[1126] **Doc. CL-1**, ECT, Art. 2.

[1127] **Doc. CL-1**, Concluding Document of the Hague Conference on the European Energy Charter, p. 218.

[1128] **Doc. CL-20**, *Eiser*, para. 379 (Both Parties have relied on the findings of the *Eiser* award, although it has been annulled in 2020, for reasons unconnected with the argument now under discussion. To the extent it is persuasive, the Tribunal will also rely on the *Eiser* award.)

[1129] **Doc. CL-71**, p. 23.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

exposed to unexpected changes in the legal and regulatory framework on which it relied upon when making its investment[1130]. The purpose of Art. 10(1) of the ECT is to assuage investors' fears: the Contracting States undertake to promote a "stable" legal framework, which will permit the investor to reap the benefits of the investment in accordance with the expectations it had at the time when the investment was made. The ECT places greater emphasis on stable conditions for investments than other treaties[1131].

1015. That said, the undertaking to "create and encourage stable conditions for investments" is not absolute. Legislation and regulation are by nature dynamic and States enjoy a sovereign right to amend their laws and regulations and to adopt new ones in furtherance of the public interest[1132]. But the obligation to promote stable conditions does limit the State's powers of regulation in one aspect: the host State must act in the public interest, exercising these powers reasonably, proportionally, transparently and consistently, and abstaining from arbitrary or discriminatory measures[1133]. In making the judgement whether States have trespassed this threshold, tribunals must take into consideration all relevant factors and circumstances, including the magnitude of the change, the economic impact upon the investor's enterprise, the abruptness of the change, the public interest involved, whether external circumstances justify the change and the history of legislative change in the relevant sector.

## B.    FET

1016. The second sentence of Art. 10(1) of the ECT is of Laconic brevity and Delphic obscurity: Romania commits "to accord at all times to Investments of Investors of other Contracting Parties fair and equitable treatment".

1017. What constitutes "fair and equitable treatment"?

1018. The ECT, like most investment treaties, does not provide a definition of this protection. And the Parties discuss what the precise nature of the FET obligation under the ECT is:

- On the one hand, Romania submits that the applicable FET standard under the ECT must be the minimum standard of treatment under customary international law, which only protects investors against egregious, arbitrary or discriminatory acts of States[1134];

- On the other hand, Claimants aver that absent a clear and express link to the international minimum standard, FET provisions such as that contained in the ECT are to be interpreted as an independent and self-contained treaty

---

[1130] See **Doc. CL-20**, *Eiser*, para. 382.
[1131] **Doc. CL-201**, *PV Investors*, para. 566.
[1132] **Doc. CL-201**, *PV Investors*, para. 570; **Doc. CL-45/RL-3**, *AES Summit*, paras. 9.3.29-9.3.30.
[1133] **Doc. CL-249**, *Cavalum*, para. 406; **Doc. CL-20**, *Eiser*, para. 320; **Doc. CL-150**, *SolEs*, para. 318.
[1134] R-PHB, paras. 80-82.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

standard, which affords greater protection to covered investments than the international minimum standard[1135].

1019. In this question, the Tribunal sides with Claimants: as will be seen in further detail in section E *infra*, nothing in the ECT suggests that its drafters had the intention to equate the modern FET standard and the old, customary minimum standard of treatment of aliens. To the contrary, in the ECT, the international minimum standard operates as a floor, while the FET standard affords additional protection.

1020. The context of Art. 10(1) ("[s]uch conditions shall include a commitment…") shows that the commitment to accord FET is intertwined with the State's more general obligation to "encourage and create stable, equitable, favourable and transparent" conditions for investments[1136]. The scope of protection granted by the FET commitment is thus related to these conditions. As several tribunals have recognized, FET is inseparable from stability and predictability[1137].

1021. The Parties do not discuss that the obligation to provide FET binds the State as a whole. It can be breached by the conduct of any branch of government:

- The executive or administrative branch (or its separate agencies) can breach FET by means of administrative acts that directly target the investment;

- The enactment of laws or regulations of general application (be it by Parliament or by the Government), can also breach FET by radically or arbitrarily modifying the applicable legal framework to the detriment of the investment; or

- The State's judicial system as a whole can also disregard the FET obligation by committing a denial of justice which affects the investment.

1022. The standard is breached when there is an action or omission by the State which violates a certain threshold of propriety, causing harm to the investor, and with a causal link between the action or omission and the harm suffered[1138]. The threshold of propriety requires that the host State act transparently and with due process and that it refrains from taking arbitrary or discriminatory measures, avoiding intentional harassment and denial of justice.

1023. Whether this has happened must be determined by the Tribunal in light of the Treaty and all the relevant circumstances of the case. In evaluating the State's conduct, the Tribunal must balance the investor's right to be protected from improper State conduct against other legally relevant interests and countervailing factors, such as

---

[1135] C-II, para. 480.
[1136] **Doc. CL-15**, *Charanne*, para. 477; **Doc. CL-249**, *Cavalum*, para. 402; **Doc. RL-1**, *Electrabel*, para. 7.73. The *Antin* tribunal found that "[r]egardless of how the relationship between stability of the legal framework and the obligation to accord FET is conceived, it seems clear that, in the context of the ECT, the concepts are associated in a manner that merits their joined assessment." (**Doc. CL-23**, *Antin*, para. 533).
[1137] **Doc. CL-75**, *LG&E*, Decision on Liability, para. 125; **Doc. CL-86**, *Lemire*, para. 284; **Doc. CL-87**, *CMS*, para. 274; **Doc. CL-20**, *Eiser*, para. 379. See also **Doc. CL-66**, p. 147.
[1138] **Doc. CL-86**, *Lemire*, para. 284.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

the State's right to regulate or the investor's duty to perform an appropriate pre-investment due diligence review[1139].

## C.    Legitimate expectations within the FET standard

1024. The Parties discuss whether the FET standard under the ECT encompasses an obligation to protect the legitimate expectations of investors:

-    While Claimants argue that the protection of an investor's legitimate expectations is widely recognized as one of the elements of FET, including under the ECT[1140],

-    Romania submits that tribunals should be particularly cautious when interpreting the FET standard to encompass an obligation to protect legitimate expectations, since under customary international law, States have no obligation to protect legitimate expectations[1141].

1025. The Tribunal notes that Art. 10(1) of the ECT, like most investment treaties[1142], does not refer to "legitimate expectations" as such. It is also true that the concept of legitimate expectations has so far not been recognized as an obligation of States under customary international law[1143].

1026. Nevertheless, in international investment law, a long line of cases has recognized this principle as a sub-category of the FET standard[1144]. Likewise, ECT tribunals (including the recent awards in *InfraRed*[1145], *Watkins*[1146] or *PV Investors*[1147]) have repeatedly acknowledged that to assess whether there has been a breach of the FET standard under Art. 10(1) of the ECT, arbitrators must consider whether there has been a frustration of the legitimate expectations of investors[1148].

### a.    Elements of legitimate expectations

1027. Tribunals have come to establish the elements of this concept:

---

[1139] **Doc. CL-86**, *Lemire*, para. 285; **Doc. CL-174**, *InfraRed*, paras. 361-363.

[1140] C-I, paras. 316-319.

[1141] R-I, paras. 540-543; R-II, paras. 539-543; R-PHB, para. 82.

[1142] **Doc. CL-67**, p. 90. Potestà notes that "the concept [of legitimate expectations] has no explicit anchoring in the text of the applicable investment treaties". In fact, only certain investment treaties, mainly concluded by the United States and Canada, refer to "investment-backed expectations".

[1143] **Doc. RL-189**, *Obligation to Negotiate Access to the Pacific Ocean (Bolivia v. Chile)*, para. 162.

[1144] **Doc. CL-67**, p. 91; **Doc. CL-60**, *El Paso*, paras. 355-356; **Doc. CL-218**, *Thunderbird*, Separate Opinion, para. 30; **Doc. RL-189**, *Obligation to Negotiate Access to the Pacific Ocean (Bolivia v. Chile)*, para. 162.

[1145] **Doc. CL-174**, *InfraRed*, para. 365.

[1146] **Doc. CL-200**, *Watkins*, para. 483.

[1147] **Doc. CL-201**, *PV Investors*, para. 565.

[1148] **Doc. CL-13**, *Electrabel*, paras. 7.74-7.75; **Doc. CL-15**, *Charanne*, para. 486; **Doc. CL-21**, *Novernergia*, para. 545; **Doc. CL-23**, *Antin*, para. 535.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 224 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

1028. <u>First</u>, as repeatedly recognized by tribunals[1149], any expectation must be assessed at the time of making the investment. The investor must also demonstrate that it exercised appropriate due diligence when analyzing the legal and regulatory framework.

1029. <u>Second</u>, as noted by numerous tribunals[1150], an investor's expectations must be analyzed objectively, considering all relevant circumstances, and not subjectively. In other words, the Tribunal must determine what a prudent investor could have expected in the same circumstances, taking into account the information that the investor had or ought to have had at the time of making the investment.

1030. <u>Third</u>, it is well established in arbitral jurisprudence that an investor can only base its claim of legitimate expectations on representations of the host State upon which the investor relied when making the investment[1151].

1031. <u>Fourth</u>, the legitimacy or reasonableness of the investor's expectations must be assessed in conjunction with other elements. Particularly important are the investor's own conduct, and the political, socioeconomic, cultural and historical conditions in the host State. It must also be balanced against the State's sovereign right to regulate within its borders[1152].

**b.    Sources of legitimate expectations**

1032. The Parties have argued extensively over the sources of legitimate expectations:

- Romania submits that legitimate expectations can only arise from a clear representation by the host State, in the form of a specific commitment or a stabilization clause in the law or in a contract[1153]; in particular, Romania contends that general statements in the law cannot give rise to a legitimate expectation of immutability of the regulation[1154];

- Claimants, in turn, submit that numerous tribunals have found that specific commitments and stabilization clauses are not required to generate legitimate expectations of stability, particularly when a host State induces investments by leading investors to believe that a certain legal or regulatory framework will remain in place for a defined period[1155].

---

[1149] **Doc. CL-13**, *Electrabel*, para. 7.76; **Doc. CL-21**, *Novernergia*, paras. 532-538; **Doc. CL-23**, *Antin*, para. 537; **Doc. CL-86**, *Lemire*, paras. 264-265; **Doc. CL-201**, *PV Investors*, para. 575; **Doc. CL-200**, *Watkins*, para. 517.

[1150] **Doc. CL-13**, *Electrabel*, para. 7.76; **Doc. CL-15**, *Charanne*, para. 495; **Doc. CL-23**, *Antin*, para. 536; **Doc. RL-85**, *Isolux*, paras. 777-778; **Doc. CL-150**, *SolEs*, para. 312; **Doc. CL-201**, *PV Investors*, paras. 573-574. See also **Doc. CL-200**, *Watkins*, para. 517; **Doc. RL-241**, *SunReserve*, para. 697.

[1151] **Doc. CL-63**, *Tecmed*, para. 154; **Doc. CL-214**, *Duke Energy*, para. 340; **Doc. CL-64**, *Waste Management*, para. 98; **Doc. CL-74**, *Enron*, para. 262.

[1152] **Doc. CL-67**, Michele Potestà, "Legitimate Expectations in Investment Treaty Law: Understanding the Roots and the Limits of a Controversial Concept, ICSID Review, Vol. 28, No. 1", p. 89.

[1153] R-I, para. 585; R-II, para. 554.

[1154] R-PHB, para. 133.

[1155] C-PHB, paras. 220-222.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

1033. Scholars[1156] and tribunals[1157] have explained that a State can create two types of potential expectations *vis-à-vis* foreign investors:

-   The first type refers to specific representations made, or assurances given by the State to an investor (or a narrow class of investors or potential investors), to induce foreign investment; these representations or assurances then, undisputedly, become binding upon the State;

-   The second type relates to the State's general legislative and regulatory framework; the questions whether the investor relied on the expectation of stability of this framework when deciding to invest, and whether a reform of the framework results in a breach of the investor's regulatory legitimate expectations, are two far more controversial issues.

1034. The *RWE*[1158] and *Masdar*[1159] tribunals have noted that there are differing schools of thought as to whether general laws and regulations can give rise to a legitimate expectation:

-   Whilst one school considers that legitimate expectations may result from general statements included in laws or regulations;

-   The other school rejects such proposition and submits that any underlying commitment needs to be specifically addressed to the investor.

1035. Supporting the first school of thought, the *Masdar* tribunal explained that[1160]:

> "[…] leading commentators state that the starting point to determine an investor's legitimate expectations is the '*legal order*' or '*legal framework*' of the host State at the time in which the investor made its investment […]. If the general legislation is to be regarded as a source of an investor's legitimate expectations, the investor must demonstrate that it has exercised appropriate due diligence and that it has familiarised itself with the existing laws".

1036. More recently, the *Cube* tribunal found that, in cases where the industry is highly regulated[1161]:

> "[…] it is enough that a regulatory regime to be established with the overt aim of attracting investments by holding out to potential investors the prospect that the investments will be subject to a set of specific regulatory principles that will, as a matter of deliberate policy, be maintained in force for a finite length of time. Such regimes are plainly intended to create expectations upon which investors will rely; and to the extent that those expectations are objectively

---

[1156] **Doc. CL-67**, Michele Potestà.
[1157] **Doc. RL-172**, *RWE*, para. 453; **Doc. CL-22**, *Masdar*, paras. 489 *et seq*.
[1158] **Doc. RL-172**, *RWE*, para. 453.
[1159] **Doc. CL-22**, *Masdar*, paras. 489 *et seq*.
[1160] **Doc. CL-22**, *Masdar*, paras. 491 and 494.
[1161] **Doc. CL-81**, *Cube*, para. 388.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

> reasonable, they give rise to legitimate expectations when investments are in fact made in reliance upon them."

1037. In the same line, the tribunal in *SolEs* concluded that under Art. 10(1) of the ECT[1162]:

> "[…] an investor's legitimate expectations can also arise from provisions of law and regulations and from statements made by or on behalf of the State for the purpose of inducing investment by class of investors."

1038. But this position is not unanimous: the *Charanne* tribunal supported the second school of thought[1163]:

> "[…] in the absence of a specific commitment toward stability, an investor cannot have a legitimate expectation that a regulatory framework such as that at issue in this arbitration is to not be modified at any time to adapt to the needs of the market and to the public interest."

1039. In the same line, the *RWE* tribunal concluded that[1164]:

> "[…] a representation in the form of domestic law cannot correctly be elided with a specific promise or contract commitment: a law remains a norm of general application (greater or lesser), and only applies whilst it remains in force."

### c.    Overlap with the obligation to maintain stable regulatory conditions

1040. The discussion regarding the sources of legitimate expectations adopts special characteristics in the ECT context, because under Art. 10(1) host States are specifically required to promote stable conditions for investors.

1041. As the *Eiser* and *SolEs* tribunals have found, such commitment is relevant, not only by itself, but also to frame the investor's legitimate expectations[1165]:

> "[The FET obligation] necessarily embraces an obligation to provide <u>fundamental stability in the essential characteristics of the legal regime relied upon by investors in making long-term investments</u>." [Emphasis added]

1042. The obligation to provide FET under the ECT thus extends to a commitment to safeguard the "fundamental stability in the essential characteristics of the legal regime" on which the investor relied when making the investment. Art. 10(1) fosters in investors the legitimate expectation that the host State will not "drastically and abruptly revise the regime, on which their investment depended, in a way that destroy[s] its value"[1166].

---

[1162] **Doc. CL-150**, *SolEs*, para. 313.
[1163] **Doc. CL-15**, *Charanne*, para. 510.
[1164] **Doc. RL-172**, *RWE*, para. 461; see also **Doc. CL-19**, *Blusun*, para. 371.
[1165] **Doc. CL-150**, *SolEs*, para. 315.
[1166] **Doc. CL-20**, *Eiser*, para. 387.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 227 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

1043. And, in fact, in the present case, both Parties recognize that the Art. 10(1) FET standard protects investors against drastic or discriminatory, fundamental or total and unreasonable changes to the legal and regulatory regime, even in the absence of a specific commitment by the host State to the stability of the legal regime[1167].

1044. The expectation is reinforced when the host State had presented the regulatory regime as an inducement to attract investments; in these situations, once the investment has been made, the State is precluded from eviscerating the regime to the investor's detriment[1168]:

> "[…] in determining whether the Claimants had a legitimate expectation, it must take account of the accepted principle that Romania is free to amend its laws and regulations absent an assurance to the contrary. However, in this case the Tribunal finds that Romania's conduct had included an element of inducement that required Romania to stand by its statements and conduct […]
>
> [I]t cannot be fair and equitable for a state to offer advantages to investors with the purpose of attracting investment […] and then maintain the formal shell of the regime but eviscerate it of all (or substantially all) content."

### d.    The State's right to regulate

1045. But the ECT obligation to preserve the "fundamental stability" of the regulatory regime does not equate with immutability.

1046. An investor in a sector as regulated as energy cannot reasonably expect that the host State will refrain from using its sovereign power to regulate[1169]. As observed by the *Electrabel* and *SolEs* tribunals[1170]:

> "[…] the assessment of a legitimate expectations claim requires 'a weighing of the Claimant's legitimate and reasonable expectations on the one hand and the Respondent's legitimate regulatory interests on the other'."

1047. States are entitled to exercise their sovereign powers to modify laws and regulations, including in the energy sector; but they must do so in a proportionate manner that does not interfere with the investor's legitimate expectations[1171]. As the *Eiser* tribunal said (quoting *Charanne*) regarding proportionality of regulatory modifications[1172]:

> "[…] the proportionality requirement is fulfilled inasmuch as the modifications are not random or unnecessary, provided that they do not

---

[1167] C-PHB, para. 183; R-II, para. 758; R-PHB, paras. 120-121.
[1168] **Doc. CL-50**, *Micula*, paras. 686-687.
[1169] **Doc. CL-20**, *Eiser*, para. 387.
[1170] **Doc. CL-2**, *Electrabel*, para. 165; **Doc. CL-150**, *SolEs*, para. 318.
[1171] **Doc. CL-15**, *Charanne*, para. 517; **Doc. CL-20**, *Eiser*, para. 370.
[1172] **Doc. CL-20**, *Eiser*, para. 370. See also **Doc. CL-15**, *Charanne*, para. 517 ("As for proportionality, the Arbitral Tribunal considers that this criterion is satisfied as long as the changes are not capricious or unnecessary and do not amount to suddenly and unpredictably eliminate the essential characteristics of the existing regulatory framework.")

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

suddenly and unexpectedly remove the essential features of the regulatory framework in place."

1048. The tribunal in *Antin* made a similar finding, linking the requirement of proportionality of regulatory modifications to the State's general obligation to provide regulatory stability[1173]:

> "[…] considering the context, object and purpose of the ECT, the Tribunal concludes that the <u>obligation under Article 10(1) of the ECT to provide FET</u> to protected investments <u>comprises an obligation to afford fundamental stability in the essential characteristics of the legal regime relied upon by the investors in making long-term investments</u>. This does not mean that the legal framework cannot evolve or that a State Party to the ECT is precluded from exercising its regulatory powers to adapt the regime to the changing circumstances in the public interest. It rather <u>means that a regulatory regime specifically created to induce investments in the energy sector cannot be radically altered —i.e., stripped of its key features—</u> as applied to existing investments in ways that affect investors who invested in reliance on those regimes." [Emphasis added]

1049. Art. 10(1) of the ECT thus entitles an investor to legitimately expect that, when a State has induced investments by creating a legal regime that has certain essential features embodied in laws and regulations, the State will not drastically change the essential characteristics which existed at the time of the investment.

### D. <u>Unreasonable or discriminatory measures</u>

1050. Romania has also assumed the obligation not to "impair by unreasonable or discriminatory measures [the] management, maintenance, use, enjoyment or disposal" of protected investments. A literal interpretation of the rule shows that, for a measure to amount to a violation of this provision, it suffices that it be either unreasonable <u>or</u> discriminatory; it need not be both.

1051. Any unreasonable or discriminatory measure may, by definition, also be said to be unfair and inequitable. The reverse is not true, though. A government measure may fall short of the FET standard, for reasons other than the measure's discriminatory or unreasonable character[1174].

<u>Unreasonable measures</u>

1052. Are "unreasonable measures" and "arbitrary measures" synonymous[1175]?

1053. In *EDF v. Romania*, Professor Schreuer, appearing as an expert, defined as "arbitrary"[1176]:

---

[1173] **Doc. CL-23**, *Antin*, para. 532.
[1174] **Doc. CL-86**, *Lemire*, para. 259.
[1175] See **Doc. RL-215**.
[1176] **Doc. CL-61**, *EDF*, para. 303.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

"a. a measure that inflicts damage on the investor without serving any apparent legitimate purpose;

b. a measure that is not based on legal standards, but on discretion, prejudice or personal preference;

c. a measure taken for reasons that are different from those put forward by the decision maker;

d. a measure taken in willful disregard of due process and proper procedure."

And the *EDF* tribunal accepted his definition in the tribunal's analysis and ultimately rejected the claim that Romania had adopted arbitrary measures[1177].

1054. The ECT, however, does not refer to "arbitrary measures." It prohibits "unreasonable measures", *i.e.*, measures adopted by the host State that are irrational in themselves or result from an irrational decision-making process. All arbitrary measures are, by definition, unreasonable, because rational State action cannot result in the substitution of the rule of law by prejudice, preference or bias[1178]. The opposite is not necessarily true: an irrational decision-making process may result in an unreasonable measure, but the content of the measure does not have to be arbitrary (although in most cases, unreasonable decision-making will result in arbitrary results).

1055. Irrespective of the minor semantical differences, in investment arbitration treaties the term "unreasonable" is often used interchangeably with the terms "unjustified" or "arbitrary".

Discriminatory measures

1056. Art. 10(1) of the ECT also prohibits Romania from adopting discriminatory measures against a protected investment. Discrimination is a relative standard, which requires a comparative analysis between the measures applied to the protected investment and the measures applied to investments in similar situations.

1057. Discrimination means unequal or different treatment. But this, in itself, is insufficient. To amount to discrimination, the protected investment must be treated differently from similar cases without reasonable justification[1179], such that the host State "exposes the claimant to sectional or racial prejudice"[1180] or "target[s] [c]laimants' investments specifically as foreign investments"[1181].

**E.   Minimum threshold of treatment**

1058. Finally, Art. 10(1) of the ECT provides for a minimum standard of treatment that must be observed by Romania: investments of protected investors cannot be

---

[1177] **Doc. CL-61**, *EDF*, para. 303.
[1178] **Doc. CL-86**, *Lemire*, paras. 262-263.
[1179] **Doc. CL-62**, *Saluka*, para. 313.
[1180] **Doc. CL-64**, *Waste Management*, para. 98.
[1181] **Doc. CL-75**, *LG&E*, para. 147.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

accorded "treatment less favourable than that required by international law, including treaty obligations".

1059. In the present case, the Parties discuss the relationship between the FET standard included in the ECT and the minimum standard of treatment under international law. Respondent invokes the NAFTA and certain other free-trade agreements entered into by the US, in which the FET standard equates with the customary international law minimum standard of treatment of aliens[1182].

1060. However, nothing in the ECT suggests that its drafters had the intention to equate the modern FET standard and the old, customary minimum standard of treatment of aliens. On the contrary: the reference to "in no case shall […] be accorded" treatment less favorable than that required by international law in the fourth sentence of Art. 10(1) suggests precisely that the protection afforded under the ECT goes beyond the minimum standard of protection[1183]. As noted by the tribunal in *SunReserve*[1184]:

> "[…] the fourth sentence of Article 10(1) ECT indicates that the customary international law minimum standard does get incorporated into the ECT, but only as the bare minimum threshold that the host State's treatment of investments must meet."

## 3.  OVERVIEW

1061. Claimants submit that when it modified the essential characteristics of its GC incentive scheme after Claimants invested, Romania breached Art. 10(1) of the ECT, undermined their legitimate expectations, acted without transparency and consistency, and impaired their investments through unreasonable or discriminatory measures[1185].

1062. Romania, on the contrary, argues that Claimants have failed to provide evidence of any specific commitment by Romania that the GC scheme in place when Claimants invested would not change. In the absence of such specific commitment, a finding of a breach of FET is subject to a particularly high standard, in light of the State's inherent sovereign right to amend its legislation and the deference owed to States when legislating in the public interest. Romania submits that its legislative and regulatory acts were justified and proportionate in light of the circumstances[1186].

1063. The Tribunal decides partially in favor of Claimants and partially in favor of Romania.

---

[1182] NAFTA Notes of Interpretation of Certain Chapter 11 Provisions – NAFTA Free Trade Commission, 31 July 2001, Provision B.2: "The concepts of "fair and equitable treatment" and "full protection and security" do not require treatment in addition to or beyond that which is required by the customary international law minimum standard of treatment of aliens."
[1183] See **Doc. CL-196**, *Liman Caspian*, para. 263; **Doc. CL-202**, *RREEF*, para. 263; **Doc. CL-173**, *OperaFund*, para. 425.
[1184] **Doc. RL-241**, *SunReserve*, para. 673.
[1185] C-PHB, paras. 91 and 176.
[1186] R-I, para. 815.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

1064. In the absence of a stability clause, States may amend their legal and regulatory frameworks, in light of the public interest. Nevertheless, the FET standard embodied in Art. 10(1) of the ECT protects investors against drastic, fundamental and unreasonable changes to the essential characteristics of a legal and regulatory regime. Thus, when making their long-term investments, investors are entitled to expect that the essential characteristics of the legal and regulatory regime on which they are reasonably relying upon will remain stable.

1065. Since any expectation of stability must be assessed at the time of making the investment and Claimants did not all make their investments at the same time, the Tribunal must distinguish between two groups:

- On the one hand, those Claimants which invested for the first time prior to the enactment of EGO 57/2013, *i.e.*, all Claimants except Core Value ["**Group A**"] (**4.**);

- On the other, the Core Value Claimants that consciously chose to wait for the enactment of EGO 57/2013 to make their investment ["**Group B**"] (**5.**).

## 4.   GROUP A: CLAIMANTS EXCEPT CORE VALUE

1066. The Tribunal finds that when it created the GC support scheme, Romania sought to attract investment in RES-E by establishing a clearly defined framework, which permitted investors in the Romanian PV sector to foresee that a PV plant would be legally entitled to receive, for 15 years, certain clearly defined streams of income. More importantly, Romania formalized these essential characteristics in a specific commitment given to the PV Facilities owned by Group A Claimants (**A.**).

1067. Nevertheless, the Tribunal sides with Romania that, in the absence of a stabilization clause, any diligent investor knew that the GC market was an artificial construct, created by regulation, and that Romania, in the exercise of its sovereign and regulatory powers and to protect public interest, could and would alter the conditions under which the market operates (**B.**).

1068. Finally, the Tribunal finds that by adopting certain Disputed Measures, Romania drastically altered the essential characteristics of the GC scheme and unreasonably impaired the investments owned by Group A Claimants, in breach of Romania's commitments under Art. 10(1) of the ECT (**C.**).

### A.    The Essential Characteristics of the regulatory regime

1069. Group A Claimants invested in Romania at different times and in different projects:

- In January 2011, LSG and Green Source incorporated the Alpha, Beta and Gamma Project Companies[1187];

---

[1187] **Lipkovich I**, para. 19; **Hofmann**, para. 15.

Case 1:19-cv-01618-TSC     Document 113-27     Filed 03/13/25     Page 232 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- In September 2011, Giust and Anina incorporated Solar Frăsinet and Solar Mostistea, respectively[1188];

- In May 2012, Solluce acquired a 62.3% share in the Alpha Project Company[1189];

- In September 2012, Giust and Anina each entered into a SPA with Pressburg, under which Pressburg acquired 50% of each of the Frăsinet Project Companies[1190];

- In January 2013, Risen entered into a SPA with Green Source and LSG, pursuant to which Risen acquired 90% of Beta (and, thereby, control of the company)[1191].

1070. Thus, Group A Claimants made their investments in Romania between January 2011 and January 2013. At the time, Romania's regulatory regime, enshrined in Law and approved by the European Commission, provided legal certainty to prospective investors. There was a clearly defined framework, which permitted investors in the Romanian PV sector to foresee that a PV plant would be legally entitled to receive, for 15 years, <u>two</u> clearly defined streams of income:

- <u>First</u>, the PV plant would be entitled to the sale of electricity on the wholesale electricity market, at the price which would result from offer and demand, without any Government support[1192];

- <u>Additionally</u>, (and <u>crucially</u>) the PV plant would be entitled to six GCs for each MWh of electricity produced and delivered to the grid[1193], which could be sold either on the GC market or through GCPAs, at a minimum price which the Law specifically said could not fall below EUR 27/GC indexed annually to European inflation [these traits will be referred to as the "**Essential Characteristics**" of the GC support scheme].

1071. Group A Claimants' entitlement to these two streams of income is derived from two factors:

- Romania approved a regulatory regime, with the specific purpose of promoting investments in RES-E (**a.**); and

- Romania enshrined the Essential Characteristics in the letter of a Law, that was in force when Group A Claimants made their investments (**b.**).

---

[1188] **Edwards I**, Table 1.1; **Doc. C-123**, Art. 1.2; **Doc. C-124**, Art. 1.2; **Theuer I**, para. 20; C-I, para. 37.
[1189] **Doc. C-166; Lim**, paras. 20-22; **Hofmann**, para. 27.
[1190] **Doc. C-123; Doc. C-124; Theuer I**, para. 22.
[1191] **Edwards I**, para. 3.24.
[1192] **Doc. C-83**, Art. 14(1).
[1193] **Doc. C-83**, Art. 9. See also **Doc. C-63**, para. 21.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

1072. There is ample evidence that Group A Claimants relied on the Republic's promise when making their investments (**c**).

1073. The regulatory promise was subsequently formalized in a specific administrative act, performed by ANRE: the issuance of the accreditation certificate for each of the PV Facilities owned by Group A Claimants – a document which acknowledged that the specific PV plant would be entitled to benefit from the Essential Characteristics of the GC support scheme [the "**Specific Commitment**"] (**d.**).

### a.    The purpose of the regulatory regime was to attract investments in RES-E

1074. After creating the GC support scheme in 2004 through a Government Decision, Romania then codified the framework in two laws, issued in 2008 (Law 220/2008) and in 2010 (Law 139/2010). The purpose of these rules was to attract long-term investment in RES-E, which in turn would permit Romania to meet its European targets.

1075. Consequently, any investor who, between 2011 and 2013, decided to invest in the RES-E sector, and who carried out a diligent review of the legal and regulatory framework, would find that since 2004 Romania had carried out a number of actions to promote such investments:

1076. <u>First</u>, the statement of reasons that accompanied the parliamentary debate of Law 220/2008, established that the purpose of this Law was *inter alia* to[1194]:

-    Provide a "uniform and coherent legal framework to promote renewable energy resources";

-    Create a "[s]pecific regulatory framework to stimulate the increase of renewable energy production"; and

-    Establish a promotion system for the production of RES-E, by "promoting private investments and creating conditions for an easy access to foreign capital on the market of renewable energy sources".

1077. <u>Second</u>, in the statement of reasons of Law 139/2010, Romania declared that the aim of said Law was to[1195]:

> "contribute […] to the strengthening of the business environment by the increase of trust of possible investors in the stability of the E-RES support scheme."

---

[1194] **Doc. C-36**, p. 4.
[1195] **Doc. C-90**, p. 2.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

1078. Third, Art. 23 of Law 220/2008 (as amended by Law 139/2010) provided that, if the RES-E production did not reach the requisite level, the Government would adopt additional incentive measures to increase investments in the sector[1196]:

> "If within 2 years the level of mandatory annual quotas for electricity produced from renewable sources, which benefit from the promotion system, is not met, the Government shall take incentive measures for investments in order to meet the dispositions of this law."

1079. Fourth, since its inception in 2004, the GC support scheme for PV plants was gradually improved, because the initial levels of support were insufficient to attract sufficient capital:

- While in 2004, Generators of solar energy were entitled to only one GC per MWh produced,

- In 2008, Romania amended the law to grant four GCs per MWh of solar electricity produced, and then again

- In 2010, the support was increased to six GCs per MWh of solar electricity.

1080. Significantly, when submitting the GC scheme for approval of the European Commission, Romania explained that it expected an IRR of 11.6% for solar Generators because[1197]:

> "The resulting IRR values for solar […], slightly higher compared to other technologies, reflect the need to stimulate the development of production based on this resource in Romania. It is specified that so far, in Romania no investments have been made in solar power plants and since even after the issuance of the initial version of Law no. 220/2008 no solar power plant projects had appeared, it was considered that the level of support with 4 CV did not cover the costs and a reasonable profit, and the support was increased to 6 CV; under these conditions, it has been considered that this technology involves increased risks and as a result, for its development, it is necessary to ensure a higher IRR than for other technologies." [Emphasis added]

1081. Fifth, when in September 2010 Romania adopted its National Renewable Energy Action Plan (NREAP), it expressly acknowledged the need to create legislative incentives to stimulate investments in RES-E; this included the need to guarantee a minimum GC price over a reasonable period, so that investments in RES-E could be recovered[1198]:

---

[1196] **Doc. C-83**, Art. 23 and **Doc. C-89**, Art. I, para. 40 (Art. 23).
[1197] **Doc. C-311**, p. 13.
[1198] **Doc. C-64**, p. 16 [Emphasis added].

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

> - Creation of legislative incentives for stimulating investments in eligible renewable sources:
>   - ♦ incentives during the investment stage – facilities granted by the Law on investments;
>   - ♦ incentives during the operational stage – the green certificate system for electricity;
>   - ♦ guaranteeing the minimum price for the Green Certificate over a reasonable duration, so that the investment may be recovered;
>   - ♦ facilities granted for the connection to the system of producers of energy from renewable sources.

1082. Significantly, the NREAP did not speak about guaranteeing a maximum price, nor a pricing mechanism that resulted in an intermediate price; on the contrary, it only referred to a guaranteed minimum price.

1083. <u>Finally</u>, between 2011 and 2013, officials from the Romanian State, including from the regulator ANRE and the market operator OPCOM, made a number of presentations promoting the Essential Characteristics of the GC support scheme[1199]. By way of example, ANRE represented the following[1200]:



1084. <u>Summing up</u>, there is extensive evidence which proves that Romania created the GC support scheme endowed with certain Essential Characteristics to incentivize investment in RES-E in general, and in PV plants in particular. Romania equally represented, through its promotion actions, that the Essential Characteristics of the support scheme would remain stable.

**b.     The Essential Characteristics were guaranteed by legislation**

1085. The wording of Law 139/2010 of July 2010, which modified Law 220/2008, shows that Romania guaranteed that PV Generators would benefit from the Essential Characteristics. This constituted a regulatory promise, made to any future investors in RES-E.

---

[1199] See **Doc. C-75**, slides 15-17; **Doc. C-92**, slide 9; **Doc. C-93**, slides 10-11; **Doc. C-94**, slide 13; **Doc. C-112**, slides 13-14.
[1200] **Doc. C-92**, slide 9.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

1086. Law 139/2010 provides in unequivocal terms that the promotion scheme "shall be applied" for 15 years to new PV Generators who are accredited by ANRE[1201]:

> "Art. 3. - (1) The system of promoting electricity produced from renewable sources of energy, hereinafter promotion system, implemented by this law shall be applied for the electricity supplied into the electric grid and/or to the consumers, produced from: […] c) solar energy; […]
>
> (2) The promotion system set up by this law shall be applied for a period of: a) 15 years, for electricity produced according to the provisions of par. (1), in new power groups/plants; […]
>
> (3) The promotion system shall be applied to the producers, holders of production capabilities mentioned in par. (2), qualified by ANRE in this field, starting with the date when they begin to produce electricity and receive green certificates for electricity, as per art. 5, should the commissioning, respectively refurbishments of stations /groups are made until the end of 2016." [Emphasis added]

1087. Law 139/2010 also clearly establishes that these PV Generators "benefit" from six GCs for each MWh of RES-E produced and delivered to the grid[1202]:

> "Art. 5. - (1) The transmission and system operator issues green certificates to the producers on a monthly basis, for the amount of electricity produced from renewable sources of energy and delivered to the suppliers and/or end consumers.
>
> (2) The producers of energy from renewable sources benefit from a number of green certificates for the electricity produced and delivered according to the provisions of par. (1), including for the amount of electricity produced in the trial operating period of electric groups/plants, as follows: […] e) 6 green certificates for each 1MWh produced and delivered by the producers of electricity from solar energy." [Emphasis added]

1088. The law defines these GCs as "titles" that can be traded on the market "according to the legal framework"[1203]:

> "*green certificate* – title which certifies the production from renewable sources of energy of a amount of electricity. The green certificate can be traded in a distinct manner from the electricity that it represents on an organized market, according to the legal framework."

1089. In accordance with the law, PV Generators were authorized to trade their GCs not only on the centralized market, but also on the so-called "green certificate bilateral contract market" – without any limitations, as evidenced by the use of the wording "shall trade" and "as well as"[1204]:

---

[1201] **Doc. C-89**, Art. I, para. 14 (Art. 3).
[1202] **Doc. C-89**, Art. I, para. 17 (Art. 5).
[1203] **Doc. C-89**, Art. I, para. 5 (Art. 2(g)).
[1204] **Doc. C-89**, Art. I, para. 23 (Art. 9).

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

> "Art. 9 - (1) The <u>producers of electricity</u> from renewable sources of energy and the <u>suppliers</u> <u>shall trade the green certificates</u> on the <u>centralized market</u> of green certificates, <u>as well as on the green certificate bilateral contract market</u>." [Emphasis added]

<u>The value of GCs</u>

1090. GCs are a legal and regulatory construct, which is intrinsically worthless: a PV Generator, who receives GCs will not find anyone interested in buying these titles, except if the regulation creates demand, *e.g.*, by forcing certain players in the electricity market to purchase a certain number of titles. To assuage investors' fears, Romania decided to give GCs an intrinsic value, and to formalize this guarantee in a law approved by Parliament. Law 139/2010 guaranteed that until 2025, Generators would be able to trade their GCs at the minimum value of EUR 27/GC, indexed annually to European inflation, and that after 2025, the minimum trade value could not be lower than the one applied in 2025, indexed annually to inflation[1205]:

> "Art. 10. - (1) <u>For the 2008-2025 period</u>, the trade value for green certificates on the markets mentioned in art. 9 par. (1) <u>varies between</u>:
>
> a) <u>a minimum trade value of 27 euros/certificate</u>; and
>
> b) a maximum trade value of 55 euros/certificate.
>
> (2) […].
>
> (3) <u>Starting 2011, the trade values mentioned in par. (1) are indexed annually by ANRE according to the average inflation parameter in the month of December last year, calculated at a level of UE 27, officially communicated by EUROSTAT</u>.
>
> (4) […].
>
> (5) <u>After 2025, the trade value for green certificates shall be the one set on the green certificate market but it cannot be lower than the minimum trade value applied in 2025, indexed annually</u> as per the provisions of par. (3)." [Emphasis added]

1091. The wording used by the Romanian Parliament leaves no margin for discretion: as long as they qualified for the promotion scheme in accordance with ANRE's regulations, PV Generators were entitled:

- To benefit for 15 years from six GCs per MWh produced and delivered to the grid, and

---

[1205] **Doc. C-89**, Art. I, para. 24 (Art. 10).

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- To sell the GCs on the centralized market or through GCPAs, at the guaranteed minimum value of EUR 27/GC indexed annually to European inflation.

Approval by the EU

1092. The scheme was approved by the European Commission, one year after the enactment of Law 139/2010. The Commission noted that if Romania planned to make changes to this scheme, it would have to notify the Commission, which would have to reassess the scheme[1206].

1093. Summing up, Romania explicitly made a regulatory promise: it enacted the Essential Characteristics in the form of legislation, with the result that investors, who invested while such legislation was in force, could reasonably expect that the Essential Characteristics formalized in the law would be respected and remain unchanged at least during the 15-year guaranteed duration of the scheme.

**c. Claimants relied on the regulatory promise**

1094. There is ample contemporary evidence proving that Group A Claimants and similarly diligent investors, who assessed Romania's legal and regulatory framework and exercised appropriate due diligence, were aware of the existence of the regulatory promise, and that their decision to invest was influenced by the expectation that, if they met the necessary requirements, they would benefit from the Essential Characteristics of the scheme, and that no radical changes would be introduced during the lifetime of their investment:

1095. First, in their proposals to potential financers of the Alpha Project Company, LSG, Green Source and Solluce indicated that RES-E Generators were entitled to benefit from the GC support scheme established in Law 220/2008 and subsequently amended. LSG, Green Source and Solluce explained that[1207]:

> "The electric power can be sold on the electricity wholesale market or via a bilateral contract with an electricity buyer. In addition to the buyer, a photovoltaic electricity producer will receive 6 GCs from the Energy Regulator ANRE per MWh fed into the grid. These GCs can then be sold via the GC exchange Platform operated by Opcom S.A. or by via a bilateral contract. […]
>
> The prices of Green Certificates are established by daily supply and demand during trading sessions on the platform of the OPCOM exchange. Prices are set in EUR but paid in RON. The reference exchange rate for the pair EUR RON is set by the end of each year for the upcoming year. Contracts usually cover a period of 12 months. The law stipulates that prices must lie within a range of EUR 27-EUR 55 per Green Certificate. The range will be inflation adjusted with the base year 2011." [Emphasis added]

---

[1206] **Doc. C-63**, paras. 76-77.
[1207] **Doc. C-161**, pp. 10-11.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

1096. Second, Raiffeisen Bank, one of the banks that granted financing to build several of Claimants' plants, provided a contemporaneous analysis of its understanding of the Romanian GC scheme. In a draft binding term sheet prepared for Pressburg in August 2012, Raiffeisen Bank noted that[1208]:

> According to the Romanian renewable energy system, the producers of electricity from PV power plants receive six green certificates for each MWh delivered into the power grid. The price for each green certificate has to be within a fixed, annually inflation adjusted range (EUR 27 to EUR 55). Additionally, a PPA for the sale of green certificates will be signed with Enel or OMV, in form and substance satisfactory to RBI.

1097. Thus, in August 2012, Raiffeisen Bank, a bank prepared to grant financing for the development of RES-E in Romania, included in its term sheets, as one of the factors which mitigated the credit risk, that PV Generators were entitled to receive six GCs for each MWh delivered into the power grid and to sell them through GCPAs, and that the trade value of each of these GCs would not be less than EUR 27/GC, annually adjusted for inflation.

1098. Third, Raiffeisen Bank eventually entered into a Senior Facilities Agreement with the Frăsinet Project Companies in December 2012. In this Agreement, Raiffeisen reiterated its understanding that the Project Companies would be able to trade their GCs not only on the centralized market managed by OPCOM, but also through off-market GCPAs[1209]:

> | *Tradable Green Certificates* | means the tradable green certificates to be received by each Borrower for the energy produced by the Projects under the Romanian regulatory framework which are either to be traded: |
> |---|---|
> | | (a) on the centralised market managed and regulated by OPCOM (which is the Romanian energy market operator) or by any other authorised market operator; or |
> | | (b) off-market through bilateral contracts entered into between a Borrower and a supplier of energy to end consumers. |
> | | The term *"Tradable Green Certificate"* refers to a single certificate. |

1099. This Senior Facilities Agreement also contains a "Schedule 2", with the conditions precedent the Bank required before draw-down. Among these, the Bank expected to receive a written confirmation that the Frăsinet Project Companies would be entitled to receive six GCs[1210]:

> | (m) | Written confirmation of the Borrowers to the Agent, confirming that, to the best of their knowledge, the number of Green Certificates under the RES Regulation has not been decreased below six (6) and the RES Regulation has not been amended in a way to reduce the number of Green Certificates granted or to be granted to the Borrowers in relation to the Projects |
> |---|---|

---

[1208] **Doc. C-123**, p. 25 of the PDF / **Doc. R-35**, p. 1.
[1209] **Doc. C-127**, p. 42.
[1210] **Doc. C-127**, p. 170.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

1100. Fourth, Maconis, a finance advisory firm, which in February 2013, performed a valuation of the Alpha Project Company, had the same understanding. Under its key assumptions regarding "revenues", Maconis noted that[1211]:

> ➤ The power plant revenues stem from two main sources
>   • Revenues from Green Certificates sales
>   • Revenues from electricity sales
> ➤ According to the current legislation, for each MWh of electricity delivered to the grid, the Company shall receive 6 Green Certificates.
> ➤ The Company has concluded a ten-year Green Certificates Purchase Agreement with Enel Trade. An extension of the GCPA is envisaged after year 10. Negotiations for extension are scheduled for year 5.
> ➤ The respective prices of the GCs according to the GCPA are displayed to the left.
> ➤ The electricity sales revenues are to be formed by the Day ahead Market price of the relevant delivery hour. A service fee of 6% is deducted, according to the Service Agreement with Enel. The resulting forecast prices are exhibited to the left.

1101. Maconis' statement proves that when valuing investments in the Romanian PV sector, three factors were key:

- The ability of PV Generators to obtain revenues both from the sale of electricity and from the sale of GCs;

- The PV Generators' entitlement to six GCs for each MWh of electricity delivered to the grid; and

- The capacity of PV Generators to conclude GCPAs for the forward sale of GCs, thus locking-in a defined stream of income.

1102. Finally, in December 2012, Green Source and LSG prepared a proposal for potential investor in the Alpha, Beta and Gamma Project Companies. This proposal contained a risk assessment[1212]. This risk assessment shows that Green Source and LSG understood that the investment in the Romanian RES-E sector was accompanied by a "regulatory risk", which could imply changes to the compensation scheme, the number of GCs, etc.; nevertheless, according to Green Source and LSG, this risk was mitigated by the possibility for Generators to enter into GCPAs, which guaranteed the sale of a number of GCs at a pre-established price.

1103. Furthermore, Green Source and LSG saw no risk that the GC minimum trading value would be lower than EUR 27/GC annually adjusted for inflation, since this value was "legally binding". In any case, the possibility for Generators to enter into GCPAs guaranteed that they would always receive, at least, the minimum trading value[1213]:

| Pricing of GCs | The risk that the worst case pricing scenario will not be kept. | Operation | The minimum GC price is legally binding, and cannot be lower. The GC Purchase Agreements further guarantee the minimum legal price. |
|---|---|---|---|

---

[1211] **Doc. RE-57**, p. 19. See also **Doc. RE-66**, slides 14 and 20, which is Maconis' valuation report for Beta.
[1212] **Doc. C-135**, p. 11.
[1213] **Doc. C-135**, p. 11.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

### d.    The regulatory promise was converted into a Specific Commitment

1104. An important feature of the GC support scheme was that it was not to be applied indiscriminately to all Generators of RES-E[1214], but only to those that "qualified" for the scheme. Back in 2008, Law 220/2008 had provided that ANRE would be in charge of "qualifying" the Generators that benefitted from the support scheme by means of a regulation[1215], which had to be passed within 90 days[1216].

1105. In Law 139/2010[1217], the Romanian Parliament went further by establishing that Generators had to qualify for the GC support scheme by the end of 2016[1218]:

> "The promotion system shall be applied to the producers, [...], qualified by ANRE in this field, starting with the date when they begin to produce electricity and receive green certificates for electricity, as per art. 5, should the commissioning, respectively refurbishments of stations/groups are made until the end of 2016."

1106. In October 2011, the Romanian Government enacted EGO 88/2011, in which the term "qualification" was replaced by that of "accreditation"[1219], providing that "in order to benefit from the [GC] promotion system" Generators had to receive an "accreditation decision issued by ANRE"[1220].

1107. Consequently, Group A Claimants knew, when they invested in Romania, that in order to receive an "accreditation" from ANRE they had to put their PV Facilities into operation before 2016[1221]. They also knew that if their PV Facilities received an "accreditation" from ANRE, they would benefit from the regulatory promise made by Romania in its legal and regulatory framework[1222].

---

[1214] The scheme only applied to RES-E generated from some specific sources of energy (hydro, wind, solar, geothermal, etc.). It also did not apply to hydroelectric power plants with more than 10 MW of electric output. Moreover, the number of Generators that could benefit from the GC support scheme was capped by the Annual Mandatory Quotas (*i.e.*, the maximum amount of RES-E that could benefit from the scheme).

[1215] **Doc. C-83**, Art. 5(3).

[1216] **Doc. C-83**, Art. 22(2). This regulation is not in the case record.

[1217] **Doc. C-89**, Art. I, para. 15 (Art. 4(6)).

[1218] **Doc. C-89**, Art. I, para. 14 (Art. 3(3)).

[1219] See also **Doc. C-99**, p. 2.

[1220] **Doc. C-97**, Art. I, paras. 1(al) and 4, and Art. II(1). 1107. By late October 2011 ANRE passed a "Regulation for the accreditation of producers of electricity from renewable energy sources for the application of the promotion system through green certificates" (**Doc. R-28**), defining the regulatory framework for the accreditation of those Generators that wished to benefit from the GC support scheme.

[1221] **Doc. R-28**, Art. 10.

[1222] **Lipkovich I**, paras. 16 and 23: "It was very important that we complete each plant and receive its accreditation in time to secure the right to receive six GCs per MWh, as stated in the legal framework. [...] as long as our plants were built and accredited before that January 1, 2014, they would legally be entitled to six GCs. As indicated below, we successfully completed and secured accreditation for the Alpha, Beta, and Gamma facilities before the end of 2013."; **Hofmann**, para. 32: "Because we successfully completed the project and secured final accreditation well before the end of 2013, we believed that Romania's GC program in force at that time and as reflected in the accreditation certificate would apply to the project for fifteen years. The economic viability and success of the project depended on it."

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

The ANRE Accreditations

1108. This is exactly what happened: between June 2013 and September 2013, the Frăsinet, Alpha and Beta PV Facilities each obtained their accreditations from ANRE ["**ANRE Accreditations**"]. By issuing these administrative acts, Romania specifically represented to Group A Claimants' PV Facilities that they would be entitled to "the application of the green certificates promotion scheme" and to receive six GCs per MWh until 2028. In other words, Romania converted the regulatory promise into a "**Specific Commitment**", formalized in an administrative act addressed to the investors.

1109. The wording of the ANRE Accreditations follows a standard model and is straightforward. This is, for example, the text of the June 2013 decision pursuant to which ANRE accredited the Frăsinet 2 PV Facility, owned by the Solar Frăsinet project company[1223] (the other PV Facilities received equivalent documents):



1110. This decision contains an appendix, which expressly indicates that the Frăsinet 2 PV Facility will be entitled to receive six GCs per MWh of RES-E produced and delivered to the grid until May 2028, on the basis of Law 220/2008 as subsequently amended and supplemented[1224]:

---

[1223] **Doc. C-216** [Emphasis added].
[1224] **Doc. C-216** [Emphasis added].

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

| | | | | | | | APPENDIX |
|---|---|---|---|---|---|---|---|
| Accredited power plant | Accredited electric groups | Installed power/group (W) | Installed power/ plant (MW) | Type of RES$^1$ | Number of GC for each 1 MWh E-RES$^3$ according to the law$^4$ | Measured data sent to the TSO$^5$ | Expiry of the application of the GC promotion system |
| CEF Frasinet 2 | PF 1 ÷ 30600 | 240 | 8.28$^2$ | solar energy | 6 | E$_{LRE}$ | 31.05.2028 |

NOTE:
$^1$Value set depending on the total electrical power installed in invertors;
$^2$RES – Renewable Energy Sources;
$^3$E-RES –Energy produced by a RES and delivered to the electric grid and/or consumers, with guaranteed access to the electric grid according to art. 2 let. ak) of Law no. 220/2008, republished, with subsequent amendments and supplementing;
$^4$According to art. 6 par. (2) let. f) of Law 220/2008, republished, with subsequent amendments and supplementing;
$^5$ By the application of the formula at art. 10, par. (2) from the Regulation on the issue of green certificates, as approved by ANRE Order no. 43/2011, E$_{LC}$ and E$_C$ are zero.
    Key:    E$_{LRE}$ – energy produced by RES and delivered to the grid;
               E$_{LC}$ – energy produced by RES and delivered to consumers connected to plant's bars, including for own consumption locations on the same location as the power plant, other than those related to own technological consumption;
               E$_C$ – energy consumed from the electric grid during the operation of the power plant.

\* \* \*

[On 21 June 2013, the same Accreditation was granted to Frăsinet 3 PV Facility, owned by the project company Solar Mostistea, which in turn is owned by Pressburg and Anina[1225]:

Art. 1. – It is hereby approved the accreditation of CEF Frasinet 3, which is the property of S.C. SOLAR ELECTRIC MOSTISTEA S.R.L., holder of the energy production license no. 1265 of 19.06.2013, for the application of the green certificates promotion system, according to the Appendix part herein.

| Accredited power plant | Accredited electric groups | Installed power/group (W) | Installed power/ plant (MW) | Type of RES$^1$ | Number of GC for each 1 MWh E-RES$^2$ according to the law$^4$ | Measured data sent to the TSO$^5$ | Expiry of the application of the GC promotion system |
|---|---|---|---|---|---|---|---|
| CEF Frasinet 3 | PF 1 ÷ 21912 | 245 | 4.5816$^1$ | solar energy | 6 | E$_{LRE}$ | 31.05.2028 |

ANRE also granted an Accreditation on 2 August 2013 to the Alpha PV Facility, owned by the Alpha Project company, which is the property of Solluce, LSG and Green Source[1226]:

Art. 1. – It is hereby approved the accreditation of CEF Slobozia which is the property of S.C. LJG Green Source Energy Alpha S.A., holder of the production licence no. 1309 of 02.08.2013, for the application of the green certificates promotion system, according to the Appendix part herein.

| Accredited power plant | Installed power in electric groups (W) | Accredited installed power/plant (MW) | Type of RES$^1$ | Number of GC for each 1 MWh E-RES$^2$ according to the law$^3$ | Measured data sent to the TSO$^4$ | Expiry of the application of the GC promotion system |
|---|---|---|---|---|---|---|
| CEF Slobozia | 195 600 x 230 | 45.00 | solar | 6 | E$_{LRE}$ | 19.06.2028 |

---

[1225] **Doc. C-217** [Emphasis added].
[1226] **Doc. C-224** [Emphasis added].

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Finally, on 27 September 2013, the Beta PV Facility, owned by Beta, which in turn is owned by Risen, also obtained its ANRE Accreditation[1227]:

Art. 1. – It is hereby approved the accreditation of CEF Izvoarele which is the property of S.C. LJG GREEN SOURCE ENERGY BETA S.R.L., holder of the production license no. 1354 of 25.09.2013, for the application of the green certificates promotion system, according to the Appendix part herein.

| Accredited power plant | Installed power in electric groups (W) | Accredited installed power/plant (MW) | Type of RES² | Number of GC for each 1 MWh E-RES³ according to the law⁴ | Measured data sent to the TSO⁵ | Expiry of the application of the GC promotion system |
|---|---|---|---|---|---|---|
| CEF Izvoarele | PFV 82776x240 | 19.36⁵ | solar | 6 | E_LRE | 27.09.2028 |

1111. The ANRE Accreditations constitute Specific Commitments, *i.e.*, self-contained administrative acts, specifically addressed to the Group A Claimants, which confirm that their PV Facilities met the necessary requirements and were entitled to benefit from the Essential Characteristics of the GC support scheme[1228]. By issuing these Accreditations to Group A Claimants' PV Facilities, Romania converted its regulatory promise, enshrined in a legal and regulatory framework of general application, into a Specific Commitment. And pursuant to this Specific Commitment, Group A Claimants, who had already relied on the regulatory promise to make their investments, confirmed their expectation that the Essential Characteristics of the GC scheme, as they existed at the time they made their investment, would remain stable.

\* \* \*

1112. In view of the above, a reasonable and diligent PV Generator, who, between January 2011 and January 2013, decided to invest in the Romanian PV sector, could legitimately assume that Romania's legal and regulatory framework offered investors a GC scheme with certain Essential Characteristics. Further to the market price for the sale of the electricity, the PV Generator would be entitled to receive, for a period of 15 years, a second stream of income, equal to the sale of:

- Six GCs for each MWh of RES-E produced and delivered to the grid,

- On the centralized GC market or through GCPAs,

- For a minimum guaranteed price of at least EUR 27/GC, adjusted for European inflation.

1113. In the present case, each Group A Claimant invested up to January 2013, at a time when the legal and regulatory framework enacted in Law 220/2008 and modified by Law 139/2010 remained in force. Each of the PV Facilities owned by the Group A Claimants was put into operation and received an ANRE Accreditation in 2013, a Specific Commitment by which the Romanian State confirmed to investors that

---

[1227] **Doc. C-231** [Emphasis added].
[1228] This is different from the Spanish registration in the *Registro administrativo de instalaciones de producción de energía eléctrica* (RAIPRE), which is merely a registration that must be read in conjunction with the law.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

their PV Facilities would benefit from the Essential Characteristics of the regulatory regime[1229].

1114. Thus, Group A Claimants could and did reasonably expect that their PV Facilities would benefit from the Essential Characteristics of the GC support scheme from the moment they started operating and for 15 years.

### B.   Ancillary characteristics of the regulatory regime

1115. Claimants make a wider argument.

1116. They submit that the legal framework was designed in such a way that investors could reliably predict GC supply and demand, which in turn allowed them to predict that GCs would be trading at or near their ceiling value. Any Disputed Measure which affected supply and demand for GCs, and therefore affected the stability and predictability of the GC market, gives rise to a breach of the ECT. Claimants were entitled to legitimately expect that they would receive significantly more than the minimum income[1230].

1117. Romania, in turn, submits that the GC support scheme was a highly regulated market, in which Romania had to balance three underlying, competing objectives[1231]:

- To achieve the 24% RES target by 2020;

- To give reasonable support to investors; and

- To avoid an unreasonable impact on end consumers.

1118. Romania argues that the level of support is inherently tied to the development costs of each of the supported technologies; and that, in 2012, the cost of building solar energy plants dropped significantly, leading to an unexpected surge in solar PV investment, which in turn led to a drastic increase in GC supply. At the same time, electricity consumption was lower than expected. According to Romania, this led to an increase in end consumers' electricity bills, which pushed Romania to intervene to balance the different interests at stake[1232]. Romania submits that any investor investing in such a regulated and subsidized scheme knew or ought to have known about the specific nature of such a scheme[1233].

---

[1229] **Doc. C-216**; **Doc. C-217**; **Doc. C-224**; **Doc. C-231**.
[1230] C-I, para. 334; C-PHB, paras. 95, 130 *et seq.*, 170-172, 214, 230 *et seq.*; **Lipkovich II**, para. 20; **Theuer II**, para. 4; **CD-1**, slides 66 and 73-80.
[1231] R-PHB, paras. 100 and 254.
[1232] R-PHB, paras. 102-105.
[1233] R-PHB, para. 254.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Discussion

1119. The Tribunal has already found that States have a sovereign right to regulate in furtherance of the public interest and tribunals must balance such right against the legitimate expectations that investors may have.

1120. In the present case, the Tribunal (by majority) concurs with Romania that any diligent investor knew that it was investing in a heavily regulated market and that a regulatory risk existed: at any stage, the State might intervene, reacting to the evolving realities of the electricity and GC markets. Romania's aim was not only to promote investments in RES-E, but also to protect its consumers from unreasonable burden. Any diligent investor should have assumed that Romania's goal was to support investment in RES-E, at a reasonable cost to consumers[1234].

1121. A GC support scheme operates through trading of GCs between suppliers and demanders of RES-E[1235]. However, the GC market neither arises nor balances itself spontaneously; it is a highly intervened upon and regulated market, product of a conscious decision of the Romanian legislator:

- It is legislation that creates supply of GCs, by allocating a number of GCs per MWh of generated electricity to eligible RES-E Generators;

- It is legislation that creates demand for GCs, by imposing a purchase obligation for electricity suppliers; and

- It is also legislation which defines all other relevant characteristics of the GC market.

1122. Furthermore, contrary to the Spanish experience, the Romanian legal and regulatory framework contains no provision guaranteeing a "reasonable rate of return" for investors, nor any other similar commitment.

1123. There is no support in Romania's legal and regulatory framework for the proposition that the GC support scheme guaranteed a defined level of either supply (**a.**) or demand (**b.**) for GCs, which in turn would allow investors to predict that GCs would be trading at or near the maximum value. Claimants' alleged expectations on how demand, supply and prices would perform seem to be based on an over-optimistic evaluation of Romania's regulatory scheme.

---

[1234] This has been recognized by Mr. Roques in his second report (**Roques II**, para. 7.2). The NREAP provides that the price of the GC trading is incurred by the final consumer, but that the legislator will take into account the price of electricity and the consumers' payment capacity when setting the value of the mandatory quotas (**Doc. C-64**, p. 90; see also p. 18). Likewise, the statement of reasons of EGO 88/2011, which precedes the first Disputed Measures, reminds the need to decrease the impact of the price of energy on consumers (**Doc. C-89**, Section 4.3).
[1235] **Roques I**, para. 4.39; **Jones I**, paras. 3.22-3.24.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

a.    **No predictability of supply**

1124. The GC supply resulted from the total installed capacity of electricity produced by RES-E power-plants that qualified for the GC support scheme. Hence, the GC supply depended on the success of the GC scheme itself: the more investment is channeled into RES-E, the more GCs there were on the market and the larger the supply.

1125. This was recognized by Ms. Anna Hoffman at the Hearing, when she said that Green Source had calculated supply "by estimating the number of power plants which would come on the market"[1236]. GC supply was not a factor that could be accurately predicted, since it depended on an exogenous factor: the decision of individual investors to build power-plants to produce RES-E and to qualify for the GC support scheme[1237].

1126. This is precisely why the GC legal framework did not contemplate a ceiling for the number of GCs that would be created and put on the market. Romania excluded certain types of Generators of RES-E from the benefits of the GC scheme (such as large hydro power-plants) and established a deadline until when RES-E Generators could qualify for the support scheme (2016). Within these parameters, there was however no limit on the number of power-plants that could qualify for and benefit from the GC support scheme.

1127. Romania of course had certain expectations regarding the amount of investment it would attract and the potential beneficiaries of the scheme – and conveyed these expectations in internal presentations[1238] or to the European Commission[1239]. But these expectations, without any regulatory underpinning, could not and did not create a legitimate expectation for investors.

1128. In sum, the Romanian legal and regulatory framework did not provide any certainty as to how GC supply would evolve; it could not have done so, since, as noted by Ms. Maria Mânicuță, ANRE's director, this depended on a number of variables that were not under Romania's control[1240].

b.    **Demand was only guaranteed to meet GC minimum trading value**

1129. Claimants submit that they and third-party experts in the industry (such as Pöyry, RedPoint or InvestEast) were able to project the demand of GCs over the years[1241] because Romania guaranteed that[1242]:

---

[1236] HT, Day 3, p. 64, ll. 13-16 (Hoffman).
[1237] See also **Roques I**, para. 4.40.
[1238] HT, Day 3, p. 63, l. 15 – p. 64, l. 9 (Hoffman); **Doc. C-105**; **Doc. C-106**, slide 10.
[1239] **Doc. C-307**, para. 18; **Doc. C-63**, para. 16.
[1240] **Mânicuță I**, paras. 22, 28 and 40.
[1241] C-PHB, paras. 158-172; **Lipkovich II**, para. 20; **Lim**, para. 11; HT, Day 3, p. 62, ll. 10-24 (Hoffman).
[1242] C-I, para. 331; **Lipkovich I**, paras. 14-16, 20;

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)

Decision on Jurisdiction, Liability and Principles of Reparation

- The Acquisition Quotas imposed on electricity suppliers, the basis of the demand for GCs, were based on so-called "Renewable Energy Targets" pre-defined in the Law for the period 2008 through 2020;

- Electricity suppliers who failed to meet their purchase obligations were subject to a penalty of EUR 110 for each unpurchased GC; and

- A Guarantee Fund would be created and act as a "buyer of last resort" for any unsold GCs.

1130. According to Claimants, Romania guaranteed a level of demand because it fixed certain annual "Renewal Energy Targets", which served as the basis for calculating the Acquisition Quotas and therefore drove demand; this in turn allowed prospective investors to readily predict GC prices[1243].

(i)    Annual Mandatory Quotas

1131. The concept of "Renewable Energy Targets" as such does not appear in the GC legal or regulatory framework. What Claimants seem to refer to, when they mention "Renewable Energy Targets", are in fact the "Annual Mandatory Quotas" – a concept first introduced in Law 220/2008[1244] and then defined in Law 139/2010[1245]:

> "j$^2$) *mandatory annual quotas for the amount of electricity produced from renewable sources which benefit from the promotion system* – the amount of electricity produced from renewable sources in the final gross consumption of electricity, for which there is a mandatory quota system in place, except for the electricity produced in 10 MW or higher hydroelectric plants."

1132. These Annual Mandatory Quotas were set in Art. 4(4) of Law 220/2008, as amended by Law 139/2010, as follows[1246]:

> "(4) The annual mandatory quotas for electricity produced from renewable sources of energy which benefit from the promotion system of green certificates for the 2010-2020 period are the following: 2010 - 8,3%; 2011 - 10%; 2012 - 12%; 2013 - 14%; 2014 - 15%; 2015 - 16%; 2016 - 17%; 2017 - 18%; 2018 - 19%; 2019 - 19,5%; 2020 - 20%.

> (5) Annual mandatory quotas for electricity produced from renewable sources of energy which benefit from the green certificate promotion system for the 2020-2030 period shall be set by the designated ministry and shall be approved by Government decision and shall not be lower than the quota set for year 2020."

1133. These Annual Mandatory Quotas did not serve as the basis for calculating the Acquisition Quotas which electricity suppliers had to meet. Their purpose was quite different: they represented the maximum share of the total electricity consumption

---

[1243] C-II, paras. 339 *et seq.*; C-PHB, paras. 95, 131 and 230.
[1244] **Doc. C-83**, Arts. 4(5) and 4(6) and Appendix.
[1245] **Doc. C-89**, Art. I, para. 6 (Art. 2(j$^2$)).
[1246] **Doc. C-89**, Art. I, para. 15 (Art. 4(4)-(5)).

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

that could originate in RES-E sources and benefit from the GC support system, as precisely defined in ANRE Order 45/2011 of October 2011[1247]:

> "d) the <u>mandatory yearly quota of electricity produced from renewable sources of energy</u> [*i.e., Annual Mandatory Quotas*] - the <u>maximum share of electricity produced from renewable sources</u> (minus electricity produced in hydroelectric power plants with installed capacity exceeding 10 MW) <u>in the gross final consumption of electricity and which can be supported by the promotion system</u> established by Law no. 220/2008, reissued, with the subsequent amendments and additions;" [Emphasis added]

1134. This <u>maximum</u> percentage of total electricity consumption, which in a given year can benefit from the GC support scheme was established by law and increased annually from 8.3% in 2010 to 20% in 2020 (and thereafter the percentage was to be established by the Government).

(ii)    <u>Acquisition Quotas</u>

1135. The relevant instrument for defining the demand for GCs are not the Annual Mandatory Quotas, but the "Acquisition Quotas". Romania's regulatory regime provides that demand for GCs is created by electricity suppliers being obliged to meet certain annual Acquisition Quotas, *i.e.*, to purchase a certain number of GCs, in relation to the electricity supplied to end users.

1136. How are these annual Acquisition Quotas determined?

1137. Romanian legislation does not define the Acquisition Quotas *a priori*. There are no fixed percentages of Acquisition Quotas for each year enshrined in legislation. The Law simply provides that these Quotas will be calculated by ANRE and will be "based on the information" regarding the RES-E and final energy consumption forecasted for the following year. The precise procedure is described in Arts. 4(7) to 4(9) of Law 220/2008, as amended by Law 139/2010, which provide that the Acquisition Quotas for the following year are established by ANRE, at the beginning of December of each year[1248]:

> "(7) In the first decade of December, <u>ANRE publishes</u> on its webpage the <u>annual mandatory quota for the acquisition of green certificates</u> estimated for issue in the following year <u>based on the information regarding the estimated electricity produced from renewable sources of energy for the next year</u> and the <u>final energy consumption estimated for the next year</u>.
>
> (8) <u>ANRE elaborates within 3 months of this law coming into force a methodology for establishing the annual quotas [for the acquisition]</u>[1249] of green certificates, approved by order of the president of ANRE.

---

[1247] **Doc. C-101**, Art. 3(2)(c) and (d).
[1248] **Doc. C-89**, Art. I, para. 15 (Art. 4(7) to 4(9)).
[1249] The translation into English does not contain the word acquisition, although the original Romanian version of the Law does (see fn. 1005 *supra*).

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 250 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

(9) By 1 March this year, <u>ANRE shall adjust the annual mandatory quota for the acquisition of green certificates related to last year</u>, based on last year's effective results and shall publish it on its webpage." [Emphasis added]

(iii)    <u>Relationship between both concepts</u>

1138. Law 220/2008, as modified by Law 139/2010, thus distinguished between two concepts (with similar names but with starkly different effects):

- Annual Mandatory Quotas, which represent the maximum amount of RES-E that can benefit from the GC support scheme and are defined in the Law (*i.e.*, 2010 - 8,3%; 2011 - 10%; 2012 - 12%; 2013 - 14%; 2014 - 15%; 2015 - 16%; 2016 - 17%; 2017 - 18%; 2018 - 19%; 2019 - 19,5%; 2020 - 20%); and

- Acquisition Quotas, which determine the actual number of GCs that electricity suppliers must purchase, and which are set annually by ANRE.

1139. Contrary to Claimants' contention[1250], the Annual Mandatory Quotas did not serve as the basis to calculate the Acquisition Quota, but rather represented the "limit […] on the Acquisition Quotas that ANRE could mandate that suppliers must meet"[1251].

<u>ANRE Order 45/2011</u>

1140. The Tribunal's understanding is supported by ANRE Order 45/2011 of October 2011, which develops the methodology for the calculation of the yearly Acquisition Quotas. This Order was in force, and known to investors, at the time of their investments[1252].

1141. The starting point of the Order is the acknowledgement that there is a difference between Acquisition Quotas and Annual Mandatory Quotas[1253]:

"c) <u>mandatory yearly quota for purchase of green certificates</u> [*i.e., Acquisition Quotas*] - the <u>quota for purchase of green certificates required for electricity suppliers</u> for the year of analysis, based on acquired values, which is published on the website www.anre.ro by 1 March of the year following the year of analysis and for which non-compliance penalties shall apply;

d) <u>mandatory yearly quota of electricity produced from renewable sources of energy</u> [*i.e., Annual Mandatory Quotas*] - the <u>maximum share of electricity produced from renewable sources</u> (minus electricity produced in hydroelectric power plants with installed capacity exceeding 10 MW) <u>in the gross final consumption of electricity and which can be supported by the promotion system</u> established by Law no. 220/2008, reissued, with the subsequent amendments and additions;" [Emphasis added]

---

[1250] **C-II**, paras. 341 and 346 *et seq.*
[1251] **Jones I**, para. 5.19.
[1252] HT, Day 3, p. 46, ll. 4-7 (Hoffman).
[1253] **Doc. C-101**, Art. 3(2)(c) and (d).

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 251 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

1142. Note that the Annual Mandatory Quota is clearly defined as the "maximum" share of RES-E in the gross final consumption that can benefit from the GC support scheme – not as the basis for calculating the Acquisition Quota.

1143. Under ANRE Order 45/2011, in December of each year, ANRE performed the following calculations[1254]:

- It estimated the total number of GCs to be issued, by forecasting the amount of RES-E that would be produced and benefit from the GC scheme in the following year; this in turn depended on the number of existing or new power plants and the average capacity factor[1255] by type of technology[1256]; and

- It also estimated the gross electricity consumption for the following year.

1144. Based on these two factors, ANRE established the Acquisition Quota for the following year, as the percentage of estimated gross energy that required support under the GC scheme[1257].

1145. If the estimated Acquisition Quota was <u>lower</u> than the Annual Mandatory Quota (*i.e.*, the maximum amount of RES-E that could benefit from the GC scheme, as defined in Law 139/2010), then the Acquisition Quota was confirmed[1258]. But if it was <u>higher</u>, the Acquisition Quota would be reduced to the percentage of the Annual Mandatory Quota set out in the Law.

1146. A diligent investor in RES-E could easily foresee that, if this reduction indeed occurred, it would have important consequences for the GC market[1259]:

- The number of GCs awarded would exceed the number of GCs that had to be purchased, and

- This over-supply in the market would imply that prices of GCs gravitated toward the minimum guaranteed value.

---

[1254] **Doc. C-101**. See also **Jones I**, para. 5.10(c).

[1255] Defined as: "[…] the ratio between the electricity delivered from the plant during the analysis period and the electricity that would be produced if the plant was operating throughout the duration at installed power, expressed as a percentage." (**Doc. C-101**, Art. 5(1)(c)). Additionally, pursuant to Art. 6 of the Order, "(1) For existing power plants/generating sets, the capacity factors used in the calculations will be the average annual outputs of each plant/group over the last 3 years of operation. (2) For the power plants / groups to be commissioned during the following year, the capacity factors used in the calculations shall be the same as those used for the authorization of the promotion system, depending of the type of technology, and for the estimation of the electricity produced, the installed electrical powers and the start-up time of the power plants / groups shall be considered." (**Doc. C-101**, Art. 6).

[1256] **Doc. C-101**, Art. 5(1).

[1257] **Doc. C-101**, Art. 10.

[1258] **Doc. C-101**, Art. 13(2).

[1259] **Alicus**, para. 15.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Foreseeability

1147. Was it foreseeable for investors that the Acquisition Quota in a certain year could exceed the Annual Mandatory Quota, resulting in over-supply and falling prices?

1148. In May 2011, ANRE prepared a presentation, on which Claimants rely to define their alleged expectations[1260]. It contains a series of graphs and tables, which clearly differentiate between[1261]:

- The maximum RES-E generated that can benefit from the GC promotion scheme in the final gross power consumption, *i.e.*, the Annual Mandatory Quotas; and

- The Acquisition Quota that must be fulfilled by electricity suppliers.

1149. The graph below shows on the right-side column the national RES-E (including supported and non-supported RES-E) targets defined by Romania in the gross power consumption, in line with its commitments at EU level. The Annual Mandatory Quotas (*i.e.*, the supported RES-E) appear on the left side column (defined as "Maximum supported RES-E quotas"). The percentages shown are in line with the levels established in Art. 4(4) of Law 220/2008 as modified by Law 139/2010[1262]:



1150. The graph below displays in the middle column these same Annual Mandatory Quotas, (defined as "RES-E max. quota promoted by the 220 Law"); and on the left-side column the forecasted Acquisition Quotas ("RES-E quota suppl. acc. to notified scenarios")[1263]:

---

[1260] C-II, paras. 350, 383; C-PHB, para. 120.
[1261] **Doc. C-93**, slides 9, 12, 13 and 18.
[1262] **Doc. C-93**, slide 9.
[1263] **Doc. C-93**, slide 18.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 253 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation



1151. The graphs prove that ANRE did not hide from prospective investors the existence of two concepts (Acquisition Quotas and Annual Mandatory Quotas) and the differences between both.

1152. The estimated progression of Acquisition Quotas and Annual Mandatory Quotas is also telling: although the former are generally inferior to the latter, in two years (2015 and 2016), the Acquisition Quotas actually exceed the Annual Mandatory Quotas, leading, in accordance with the ANRE methodology, to the Acquisition Quotas being reduced to the percentage of the Annual Mandatory Quotas.

1153. Using this graph and the ANRE methodology as steppingstones, a diligent investor could have induced the possibility that the cap could become operative not only in 2015 and 2016, but also in other circumstances. For example, if there was a substantial increase in GCs (following investment surges in RES-E) and a substantial reduction in electricity consumption (due to an economic crisis or to the high price of electricity), this could lead to the Acquisition Quotas for other years exceeding the Annual Mandatory Quota and being reduced accordingly – again with the consequence of over-supply of GCs and prices stumbling towards the guaranteed minimum value.

### c.    Conclusion

1154. <u>Summing up</u>, the legal and regulatory framework enacted by Romania did not guarantee that the market price of GCs was predictable, nor that GCs would be trading near or at the ceiling price. It did not include a price fixing mechanism or any assurances as to how demand and supply for GCs would evolve.

1155. Investors could only trust that the Essential Characteristics would remain stable (*i.e.*, that Generators would receive at least six GCs per MWh produced, which they would be able to sell in their entirety on the market or through GCPAs at the minimum value of EUR 27/GC indexed to European inflation), and that Romania would create sufficient demand in the GC market to achieve this result. There was, however, no guarantee, explicit or implicit, that the regulatory framework would create a demand for GCs which enabled sellers to obtain the maximum trade value.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

### C.  **Romania's breach of Art. 10(1) of the ECT**

1156. The Tribunal has already established that, in accordance with Art. 10(1) of the ECT:

- A drastic or fundamental change of the essential characteristics of a legal or regulatory regime can give rise to a breach of the FET standard; a protected investor can legitimately expect that, when a State has promoted investments by creating a legal regime that has certain essential features embodied in laws and regulations, the State will not drastically change the essential characteristics which existed at the time of the investment;

- The FET standard can also be breached if the State adopts unreasonable measures that impair the management, maintenance, use, enjoyment, or disposal of protected investments; a measure is unreasonable if it is arbitrary or results from an irrational decision-making process[1264].

1157. The Tribunal finds that several of the Disputed Measures radically altered the Essential Characteristics of the legal and regulatory framework on which Claimants reasonably relied upon when making their investments, in breach of Art. 10(1) of the ECT. Romania backtracked on its regulatory promise and the Specific Commitments given to the Group A Claimants in three ways:

- By deferring a number of GCs to which Claimants were entitled (a**.**);

- By limiting the capacity of Generators to enter into GCPAs and trade their GCs (b**.**); and

- By altering the guaranteed minimum trading value of GCs, particularly, by ceasing to index such value to European inflation (c**.**).

1158. The Tribunal additionally finds that Romania's decisions to defer a number of GCs and to cease to index the minimum trade value to inflation also breached the ECT by constituting an unreasonable impairment of Group A Claimants' investments [a**.(ii.)**and c**.(ii.)**].

1159. Finally, the Tribunal will address Romania's counterarguments (**d.**).

### a.  **Deferral of GCs**

1160. The Tribunal has already found that Romania unequivocally committed to grant Group A Claimants' PV Facilities six GCs per MWh of electricity produced and delivered to the grid. This commitment was enshrined in the text of Law 139/2010, and later ratified *vis-à-vis* the Group A Claimants through the ANRE Accreditation, a Specific Commitment addressed to their PV Facilities.

---

[1264] See section VI.3.1.3 *supra*.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

(i)  <u>Romania radically changed its legal framework</u>

1161. However, despite its repeated assurances, Romania backtracked from its commitment.

1162. On 4 June 2013, Romania adopted EGO 57/2013, deferring the issuance of two out of the six GCs per MWh awarded to PV plants between 1 July 2013 and 31 March 2017, to decrease the expected GC revenue of PV plants[1265]. These deferred GCs were expected to be recovered gradually by PV facilities between 1 April 2017 and 31 December 2020, at the latest[1266].

1163. This measure applied to any PV plants accredited by ANRE after the enactment of the EGO – *i.e.*, after 4 June 2013[1267] – and therefore affected each of Group A Claimants' PV Facilities, which had obtained their accreditations after 4 June 2013. Thus, despite having an accreditation explicitly affording the right to six GCs per MWh, Group A Claimants saw two out of their six GCs deferred without compensation.

1164. In March 2017, the Romanian Government passed EGO 24/2017[1268] and, retroactively, extended the GC deferral period for solar PV plants accredited before 31 December 2013 until 31 December 2024 (instead of 31 March 2017)[1269]. This meant that PV plants would continue to receive only four GCs per MWh until the end of 2024. The deferred GCs would be recovered from 1 January 2025 (instead of 1 April 2017) until 31 December 2030, in equal monthly instalments[1270]. This once again affected all of Group A Claimants' PV Facilities, which had all been accredited before 31 December 2013.

1165. Finally, in 2018, the Romanian Parliament passed Law 184/2018, shortening the deferral period until 31 December 2020[1271] – and no longer until the end of 2024, as envisaged in EGO 24/2017.

1166. Therefore, Romania effectively deferred from mid-2013 until early 2021 two out of six GCs to which Group A Claimants' PV Facilities were entitled. Significantly, these measures were not accompanied by any provision for the payment of compensation to affected PV Generators. Consequently, the revenues which these PV Generators came to expect were also deferred. This had, for over six years, a direct impact on the minimum income to which Group A Claimants were entitled.

---

[1265] **Doc. C-196**, Art. I(3). See also **Roques I**, para. 6.28.
[1266] **Doc. C-196**, Art. I(3).
[1267] **Doc. C-196**, Art. I(13)(3).
[1268] **Doc. C-270**.
[1269] **Doc. C-270**, Art. I(11)(2$^5$).
[1270] **Doc. C-270**, Art. I(11)(2$^6$).
[1271] **Doc. R-19**, Art. I(9).

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

(ii)  Unreasonable impairment of Claimants' investments

1167. As to the reasonableness of this measure, Romania submits that its decision was reasonable, because its purpose was to[1272]:

- Address the risk of overcompensation *(a.)*, and

- Curb the cost of the GC scheme for end-consumers *(b.)*.

1168. The Tribunal sees the matter differently.

1169. *(a.)* The risk of overcompensation was not an issue of which Romania became aware for the first time in 2013; the European Commission and Romania had identified such risk since 2010. Despite this awareness, Romania chose to disassociate the right to receive six tradable GCs from the level of compensation. Romania could have limited the right to receive GCs by establishing a cap at a specific level of compensation; it could also have approved legislation, reducing the number of GCs, if the return earned by investors exceeded certain thresholds. But the legal and regulatory regime in place at the time Group A Claimants made their investments contained no provisions to address the return earned by investors.

1170. In fact, when submitting its application for State aid to the Commission, Romania undertook to monitor (through ANRE) the costs/revenues of the Generators benefitting from the GC scheme and to implement measures to mitigate the risk of overcompensation. If it were to find the existence of overcompensation, ANRE would suggest to the Government measures to reduce the number of GCs for new Generators of RES-E[1273] – *i.e.*, Romania stated that it would not implement measures with a retroactive effect.

1171. *(b.)* As to the second reason, the Tribunal accepts that, when electricity prices charged to end consumers suffer substantial and unexpected rises, States may have a legitimate right to intervene in the electricity market and to impair the income received by electricity Generators, seeking the moderation of price increases and the avoidance of windfall profits. In such exceptional circumstances, Romania would be entitled to adopt measures, which could include the deferral of GCs awarded to RES-E Generators. But for the measure to be fair and reasonable, the deferral must at least be accompanied by compensation, remunerating the investor for the postponement in the collection of the guaranteed minimum income. This did not happen in the present case.

* * *

1172. In view of the above, the Tribunal concludes that by enacting EGO 57/2013, EGO 24/2017 and Law 184/2018, Romania breached Art. 10(1) of the ECT: these amendments implied a drastic and fundamental change of the Essential

---

[1272] R-PHB, para. 256.
[1273] **Doc. C-307**, p. 39; **Doc. C-63**, para. 37.

243

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 257 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Characteristics of the regulatory regime, which unreasonably impaired Group A Claimants' investments.

### b.    Limitations to GCPAs

1173. Since its inception, the Romanian GC support scheme foresaw that Generators of RES-E and suppliers of electricity would be able to trade GCs in the centralized GC market or through bilateral contracts – so-called GCPAs. This possibility was enshrined in Art. 7(1) of GD 1892/2004[1274], as well as in Art. 9(1) of Law 220/2008[1275], as modified by Law 139/2010[1276]:

> **23. Article 9 shall be modified and shall read:**
> "Art. 9 - (1) The producers of electricity from renewable sources of energy and the suppliers shall trade the green certificates on the centralized market of green certificates, as well as on the green certificate bilateral contract market.

1174. Neither Law 220/2008 nor Law 139/2010 restricted the investors' ability to conclude GCPAs, permitting such agreements to be negotiated both with suppliers and traders of energy.

1175. Consequently, when investing in Romania's RES-E sector, Group A Claimants reasonably expected that the revenues of their PV Facilities would derive:

-    Not only from the sale of GCs on the centralized GC market, operated by OPCOM,

-    But also from the sale of GCs through GCPAs.

1176. There is evidence that the possibility of concluding GCPAs made the GC support scheme more attractive to Group A Claimants, by reducing their investment risk: the more GCPAs were concluded, the more predictable the future income of the PV Facilities became, because the GCPAs fixed the number of GCs sold, the duration of the sale and the price[1277] – whilst on the open GC market all these variables were unknown.

<u>Romania radically changed its legal framework</u>

1177. Romania, however, changed the rules of the game when it adopted EGO 57/2013 and thereafter EGO 24/2017, laws which initially limited and subsequently prohibited Generators from entering into GCPAs:

1178. <u>First</u>, EGO 57/2013 established that GCs could only be traded between Generators of RES-E and electricity suppliers on the centralized market managed by OPCOM

---

[1274] **Doc. C-76**.
[1275] **Doc. C-83**.
[1276] **Doc. C-89**.
[1277] **Doc. C-135**, p. 11; **Doc. C-123**, p. 25 of the PDF / **Doc. R-35**, p. 1; **Doc. C-127**, p. 42; **Doc. RE-57**, p. 19; **Doc. C-135**, p. 11; **Lipkovich II**, para. 18.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 258 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

– thus casting doubts on the validity of GCPAs in general, and of GCPAs signed with energy traders (as opposed to electricity suppliers) in particular[1278]:

> "The trading of green certificates <u>is allowed only</u> to <u>energy producers</u> from renewable energy sources and to <u>economic operators provided at art. 8 par. (1)</u>, in a transparent, centralized and non-discriminating manner, <u>on centralized markets managed by the commercial operator of the energy market</u>." [Emphasis added]

1179. <u>Second</u>, four years later, EGO 24/2017 confirmed that GCs could only be traded between the Generator, as seller, and the electricity supplier, as purchaser – to the exclusion of energy traders[1279]. Furthermore, EGO 24/2017 imposed further restrictions on GCPAs[1280]:

-   Existing GCPAs would continue to produce effects until their expiry, but could not be renovated nor increased and; additionally,

-   The maximum duration of future GCPAs could not exceed 31 August 2017 (*i.e.*, approximately five months).

<u>Impact</u>

1180. In January 2013, the Alpha Project Company had concluded a GCPA with Enel Trade, a subsidiary of Enel[1281]. Enel Trade was an energy trader and not an electricity supplier. Under this agreement, Enel Trade committed to purchase all the GCs generated by the Alpha PV Facility for ten years at the following price[1282]:

> -   EUR 43 until 31 December 2014;
> -   EUR 32.55 or the Minimum Price (as defined in Annex 1)whichever is higher after 1 January 2015 until 31 December 2017;
> -   EUR 33 or the Minimum Price whichever is higher after 1 January 2018 until the end of the Term of this Agreement.

1181. As a consequence of the measures adopted by Romania, the Parties agree that the GCPA signed between the Alpha Project Company and Enel Trade became void[1283].

1182. Furthermore, Claimants *de facto* were prohibited from signing new GCPAs or renewing the ones that were already in force[1284].

### c.    Changes to the minimum trading value

1183. In the 2011 EC Decision, the European Commission noted that, although the Romanian GC scheme did not involve State resources, and the transactions on the

---

[1278] **Doc. C-196**, Art. I(7)(9).
[1279] **Doc. C-270**, Arts. I(18)(5) and XII.
[1280] **Doc. C-270**, Arts. X and XI.
[1281] **Doc. RE-99**.
[1282] **Doc. C-167**, Clauses 4 and 6.1.
[1283] C-I, para. 236; C-II, paras. 632-634; R-II, para. 840.
[1284] See C-I, fn. 534.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

GC market were carried out between private entities, the State was still responsible for establishing minimum and maximum trading values for GCs[1285].

1184. The minimum trading value is a crucial element of any GC scheme: GCs are a legal and regulatory construct and, absent a minimum price established by law, in and of themselves, they have no inherent value. To provide any certainty to investors, the State had to impose a minimum trading value.

1185. The initial regulatory scheme, approved in 2004, assigned to ANRE the competence to determine the minimum and maximum trading values[1286]. But this structure left too much discretion in the hands of the regulatory agency, and in 2008, Romania decided to give more legal certainty to the beneficiaries of the GC scheme, by introducing the minimum and maximum trading values directly into the legislation. Law 220/2008 defined that between 2008 and 2014, GCs would be trading between:

- A minimum of EUR 27/GC, and

- A maximum of EUR 55/GC[1287], and

- That these values would be adjusted annually in line with Romanian consumer price indices[1288].

The Law added that for the period of 2015-2030, the minimum trading value could not be less than the minimum trading value for 2014[1289].

1186. In Law 139/2010, Romania went a step further by[1290]:

- Extending the duration for which GCs would be trading between the minimum of EUR 27/GC and the maximum of EUR 55/GC until 2025 (instead of 2014), and

- Establishing that trading values would be indexed annually to European inflation (and no longer to Romanian consumer price indices).

1187. Consequently, when making their investments, Group A Claimants expected that their PV Facilities would be able to trade their GCs <u>at least</u> at EUR 27/GC, annually indexed to European inflation (although this value could be higher, depending on demand and supply).

(i)    <u>Romania radically changed the legal framework</u>

1188. However, in EGO 24/2017, Romania fundamentally altered this Essential Characteristic of the regulatory regime, by not only modifying the minimum and

---

[1285] **Doc. C-63**, para. 50.
[1286] **Doc. C-76**, Art. 7(2).
[1287] **Doc. C-83**, Art. 10(1).
[1288] **Doc. C-83**, Art. 10(3).
[1289] **Doc. C-83**, Art. 10(4).
[1290] **Doc. C-89**, Art. I, para. 24 (Art. 10(1)).

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

maximum GC trading values but, most importantly, by removing the indexation to European inflation[1291]:

- The minimum and maximum trading values ceased to be indexed to European inflation, and were *de facto* frozen as of 2017;

- The minimum trading value was nominally raised from EUR 27/GC to EUR 29.4/GC; in fact, however, there was no increase in the value at all: since trading values had until then been indexed to inflation, the original minimum trading value of EUR 27/GC applicable in 2013 had already increased up to EUR 29.4/GC by 2017[1292]; and

- The maximum trading value of GCs was nominally reduced from EUR 55/GC to EUR 35/GC.

1189. This measure radically altered Romania's Essential Characteristics, by reducing the minimum income that Group A Claimants could reasonably expect to receive when selling their GCs and by transferring the risk of erosion of income due to inflation to the RES-E Generators.

(ii)  Unreasonable impairment

1190. The indexation to European inflation was an important component of the GC trading value. In 2011, Romania even submitted this specific element of the regulatory scheme to approval by the European Commission[1293].

1191. Romania's 2017 decision to cease indexing the minimum and maximum GC trading values to European inflation and to apply this amended rule to existing investments, impaired Group A Claimants' investments:

- By reducing the minimum income that these Claimants had predictably foreseen when making their investments; and

- By transferring to Group A Claimants the risk that between 2017 and 2028 (the date of finalization of the support scheme) inflation would erode GC income.

1192. The Tribunal notes that in this arbitration Romania has failed to offer any explanation justifying its decision to cease indexing trading values to European inflation. EGO 24/2017[1294], and the statement of reasons thereto[1295], also do not contain any explanation. The absence of any attempt at justification reinforces the

---

[1291] **Doc. C-270**, Art. XIII.
[1292] **Edwards I**, Appendix 4, "GC Power and Pricing"; **Docs. RE-141** to **RE-144**.
[1293] **Doc. C-311**, p. 10, para. 9: "Eur Inflation: 2% per year, for the entire duration of the analysis, considering that in the ongoing projects and according to the models presented by investors regarding the bankability of projects, the use of an inflation index between 1.5% and 2% was found; the value was used only for the purpose of updating the minimum and maximum price limits of green certificates, according to the law."
[1294] **Doc. C-270**, Art. XIII.
[1295] **Doc. R-18**, p. 13, Art. XIII.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Tribunal's opinion that this measure was devoid of rationale and, therefore, unreasonable.

\* \* \*

1193. <u>In view of the above</u>, the Tribunal finds that by adopting EGO 24/2017, Romania breached Art. 10(1) of the ECT, by radically altering the Essential Characteristics of the legal and regulatory framework on which Group A Claimants reasonably relied when making their investments, and by unreasonably impairing Group A Claimants' investments.

### d.    Romania's counterarguments

1194. Romania has put forth two main counterarguments:

1195. <u>First</u>, Romania argues that in the absence of a stabilization clause in the law, Claimants could not legitimately expect that the features of the GC scheme as it existed in 2011 would not change; States have the right and duty to modify their laws in the public interest[1296].

1196. <u>Second</u>, Romania denies that there was a radical or fundamental change to the GC regulatory scheme; the essential characteristics of the GC scheme, as it existed in 2011, have remained the same[1297]:

- PV Generators will receive six GCs per MWh of electricity produced for 15 years, and

- Electricity suppliers are still under a mandatory obligation to purchase GCs for each MWh of electricity supplied to end consumers.

1197. The Tribunal remains unconvinced.

1198. It is undisputed that Romanian Law lacks any stabilization clause and that Romania never promised to Group A Claimants that the GC support scheme would be frozen. Nevertheless, the GC support scheme, as it existed in 2011, had certain Essential Characteristics, reflected in Romania's regulatory promise, which was then converted into a Specific Commitment.

1199. It is true that the Disputed Measures did not change the general thrust of the GC support scheme as it existed in 2011 (*i.e.*, that Generators receive a number of GCs, which electricity suppliers have the obligation to purchase, at a minimum trading value); but the Tribunal has found that certain Disputed Measures altered the Essential Characteristics of the GC support scheme, on which Group A Claimants relied when making their investments, and unreasonably impaired Claimants' protected investments.

---

[1296] R-PHB, paras. 86-88.
[1297] R-PHB, paras. 105 and 282.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

1200. *Ad absurdum*, if Romania were entitled to alter even the Essential Characteristics, the GC support scheme would become meaningless: Generators would only be entitled to an undefined number of GCs, which electricity suppliers had the obligation to purchase at an undefined price and in an undefined market. As previously noted, GCs in and of themselves are devoid of any value. Were it not for the State's guarantee that PV investors would be able to sell six GCs per MWh of electricity produced and delivered to the grid, at a certain minimum trading value for 15 years, either on the market or on the basis of bilateral agreements, the GC support scheme would be neither stable nor attractive for investors – which were precisely Romania's goals when enacting the GC scheme as an incentive to attract investment[1298].

1201. Furthermore, PV plants are long-term, capital-intensive projects, which require a significant up-front investment; to take the plunge, investors require a minimum degree of predictability as to their potential return on investment – in this case, this was guaranteed by a certain minimum income. If the State could backtrack on its regulatory promise (later converted into a Specific Commitment), investors would have no predictability whatsoever as to their potential rates of return and, in turn, no incentive to invest.

1202. In such a regulated environment, it was neither fair nor equitable for the State to induce investments in RES-E by making a regulatory promise that a scheme would apply for 15 years and to change its Essential Characteristics, to the detriment of the investors, when the investors had already committed their sunk costs.

1203. In sum, the Essential Characteristics of the GC support scheme, reflected in the regulatory promise, which was later converted into a Specific Commitment, were fundamental to the decision to invest in the Romanian PV industry, since these Characteristics guaranteed that the stream of income resulting from the investment was reasonably foreseeable.

* * *

1204. In view of the above, the Tribunal concludes that by enacting EGO 57/2013, EGO 24/2017 and Law 184/2018, Romania breached Art. 10(1) of the ECT in two ways:

- By drastically altering the Essential Characteristics of the regulatory regime on which Group A Claimants relied when making their investments, and

- By unreasonably impairing Group A Claimants' investments.

  [For the avoidance of doubt, the Essential Characteristics of the GC scheme did not include any guarantees regarding supply or demand (including the penalty that had to be paid by electricity suppliers who failed to meet their GC purchase obligations, or guarantees regarding balancing costs), or the contribution to be

---

[1298] **Doc. C-90**, p. 2. In the statement of reasons for Law 139/2010 Romania explained that "[…] this law contributes to the strengthening of the business environment by the increase of trust of possible investors in the stability of the E-RES support scheme."

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 263 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

paid to ANRE. Therefore, the Tribunal finds that when it enacted Disputed Measures that changed other features of the legal and regulatory framework but did not affect the Essential Characteristics of the GC scheme, Romania did not breach Art. 10(1) of the ECT. Equally, the Tribunal finds no sign of unfair or unequitable treatment in the increase in contribution to ANRE, established in EGO 114/2018.]

## 5.   GROUP B: CORE VALUE CLAIMANTS

1205. Contrary to Group A Claimants, the Core Value Claimants invested after the first and most controversial Disputed Measure had been adopted – EGO 57/2013. Indeed, Mr. Tahan has testified that Core Value chose to wait for the issuance of EGO 57/2013 before investing[1299].

1206. Although the timing of this investment has consequences (**A.**), it does not affect the Tribunal's finding regarding a breach of Art. 10(1) of the ECT (**B.**).

### A.   Consequences of the timing of Core Value's investments

1207. The Tribunal has previously found that any expectation of stability must be assessed at the time of making the investment – not when the investor started to prospect the market or to discuss the possibility of investing[1300]. As the tribunal in *Electrabel* found when assessing a breach of FET under the ECT[1301]:

> "Fairness and consistency must be assessed against the background of information that the investor knew and should reasonably have known at the time of the investment and of the conduct of the host State."

1208. Thus, any breach of Romania's obligation to accord FET *vis-à-vis* a particular investor must be assessed on the basis of the information that the investor had at the time of making the investment.

1209. In the present case, it is uncontroversial that Core Value chose to wait for the enactment of EGO 57/2013, before investing in Romania's RES-E sector. It follows that Core Value knew that two out of six GCs to which their PV Facility would be entitled would be deferred from the moment of their investment until 31 March 2017[1302].

1210. Therefore, Romania's commitments *vis-à-vis* Core Value were not the same as those *vis-à-vis* Group A of Claimants.

1211. When it invested in the Gamma Project Company, Core Value already knew that until 31 March 2017, the Company would only be able to trade four GCs per MWh at the minimum value of EUR 27/GC, indexed to European inflation. And that the Gamma Project Company would obtain, in a deferred manner and without any compensation, the two other GCs to which they had been entitled under the previous

---

[1299] **Tahan**, paras. 10-11.
[1300] **Doc. RL-85**, *Isolux*, para. 783.
[1301] **Doc. RL-1**, *Electrabel*, paras. 7.77-7.78.
[1302] **Doc. C-196**, Art. I, para. 3 (Art. 6(2^1)).

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 264 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

regulatory framework. What Core Value could not anticipate is that, after it had invested, Romania would renege on its commitment to reinstate the deferred GCs, but would extend the GC deferral period first until December 2024 (EGO 24/2017)[1303] and then until December 2020 (Law 184/2018)[1304].

1212. The ANRE Accreditation for the Gamma PV Facility, issued after the enactment of EGO 57/2013 and after Core Value's investment[1305], still referred to the Plant's entitlement to receive six GCs. But this Specific Commitment could not and did not change Core Value's legitimate expectations: Core Value already knew that, in accordance with EGO 57/2013, two of the six GCs to which they had been entitled under the previous legislation, would be deferred until 2017.

Core Value's additional argument

1213. Core Value, like the Group A Claimants, argue that Romania's legal framework guaranteed the demand and supply for GCs, and thus that investors could predict that GCs would be trading near or at the maximum ceiling.

1214. The Tribunal is unconvinced.

1215. There is no evidence that the Core Value investors ever considered that the Romanian legal framework incorporated assurances regarding the fluctuation of supply, demand or GC market prices.

1216. In fact, in a memorandum prepared in April 2013 (prior to Core Value's investment), the law firm CMS alerted Core Value that the GC support scheme had a series of potential risks[1306] – including system limitations, potential confrontations with conventional producers of energy, or the social pressure created by end consumers due to the increase in electricity prices. Particularly significant was the risk that an excess of GCs could flood the market[1307]:

> 2.1.6    Excess of green certificates on the market
>
> It is expected that in 1-2 years there will be a significant number of renewable energy generation capacities in Romania and the green certificates market will be saturated. Such saturation will force the prices of the green certificates to drop significantly. This is one of the main reasons for which at the moment there are very few electricity suppliers on the market that sign long term green certificates sale-purchase agreement.

1217. Therefore, the Core Value investors were aware that a saturation of GC supply was imminent, and (shortly after their investment) would lead to a drop in GC prices to their guaranteed minimum level.

---

[1303] **Doc. C-270**, Art. I(11)(2$^5$).
[1304] **Doc. R-19**, Art. I.9.
[1305] **Doc. C-234**; **Lipkovich I**, paras. 24, 26.
[1306] **Doc. C-290**, pp. 4-5.
[1307] **Doc. C-290**, p. 5.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

## B. Romania breached Art. 10(1) of the ECT vis-á-vis Core Value

1218. As previously noted, when it invested in the Gamma Project Company, Core Value knew that until 31 March 2017, the Company would only be able to trade four GCs per MWh at the minimum value of EUR 27/GC, indexed to European inflation. And that the Gamma Project Company would obtain, in a deferred manner and without any compensation, the two other GCs to which they had been entitled under the previous regulatory framework.

1219. What Core Value could not anticipate is that Romania would renege on its commitment to reinstate the deferred GCs in 2017, and instead extend the GC deferral period first until December 2024 (EGO 24/2017) [1308] and then until December 2020 (Law 184/2018)[1309]. Thus, the fact that two GCs continued to be deferred between 2017 and late 2020 constituted a breach of Core Value's legitimate expectation.

1220. Furthermore, in 2017, the Romanian Government passed EGO 24/2017 pursuant to which it altered the minimum and maximum values at which GCs could be traded and ceased to index such values to European inflation[1310]. Generators were also *de facto* prohibited from signing new GCPAs or renewing the ones that were already in force[1311].

1221. The Tribunal's conclusions regarding a radical alteration of the legal framework and the unreasonable impairment of Group A Claimants' investments can be extended to the Core Value Claimants.

1222. In view of the above, the Tribunal finds that Romania breached Art. 10(1) of the ECT *vis-à-vis* the Core Value investors when it enacted EGO 24/2017 and Law 184/2018.

## 6. CONCLUSION

1223. The Tribunal finds that Romania drastically altered the essential characteristics of the GC scheme and unreasonably impaired Group A Claimants' investments, in breach of its obligations under Art. 10(1) of the ECT. Romania breached its Commitments and disrupted the minimum income that Group A Claimants reasonably expected under a stable legal and regulatory framework in three ways:

- By enacting EGO 57/2013, EGO 24/2017 and Law 184/2018, in which it deferred two out of the six GCs to which the PV Facilities were entitled;

- By adopting EGO 57/2013 and EGO 24/2017, which limited the capacity of the Operating Companies to enter into GCPAs and trade their GCs; and

---

[1308] **Doc. C-270**, Art. I(11)(2$^5$).
[1309] **Doc. R-19**, Art. I(9).
[1310] **Doc. C-270**, Art. XIII.
[1311] **Doc. C-270**, Arts. X and XI.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- By adopting EGO 24/2017, which altered the guaranteed minimum trading value of GCs, by ceasing to index such value to European inflation.

1224. The Tribunal additionally found that the decisions to defer a number of GCs and to cease to index the minimum trade value to inflation unreasonably impaired Group A Claimants' investments.

1225. As regards the Group B Claimants, the Tribunal finds that Romania breached Art. 10(1) of the ECT *vis-à-vis* the Core Value investors:

- By enacting EGO 24/2017 and Law 184/2018, in which it extended the deferral of two out of the six GCs to which the PV Facilities were entitled from 2017 until December 2020;

- By adopting EGO 24/2017, which limited the capacity of the Operating Companies to enter into GCPAs and trade their GCs; and

- By adopting EGO 24/2017, which altered the guaranteed minimum trading value of GCs, by ceasing to index such value to European inflation.

1226. The Tribunal additionally found that EGO 24/2017 and Law 184/2018 unreasonably impaired Group B Claimants' investments.

1227. Having reached the conclusion that Romania breached Art. 10(1) of the ECT, the Tribunal finds that there is no need to address Claimants' subsidiary arguments of lack of transparency and consistency, which are subsumed in the FET standard.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

# VII. <u>REPARATION</u>

1228. Claimants are seeking two types of relief[1312]:

- A declaration that Romania has violated the ECT and international law with respect to Claimants' investments; and

- Compensation for all damages they have suffered, as set forth in Claimants' submissions.

1229. The Tribunal will summarize each Party's position on damages (**1.** and **2.**), and will then establish the principles for the quantification of damages (**3.**).

# VII.1. <u>CLAIMANTS' POSITION</u>

1230. Claimants submit that, as a result of Romania's breaches of the ECT, Claimants are unable to earn the returns they reasonably expected when they invested in Romania, they can barely service the debt that they took on to develop the PV Facilities and, as a consequence, the value of their investments has declined precipitously[1313].

## 1. STANDARD OF COMPENSATION

1231. Claimants argue that in the absence of any specific provisions on compensation in the ECT, the Tribunal must look at customary international law to determine the standard of compensation. According to Claimants, the principle is that of full compensation, first established in the *Chorzów Factory* case, amply followed by tribunals thereafter[1314] and incorporated in the ILC's Draft Articles on State Responsibility[1315].

1232. Claimants aver that they are entitled to full compensation calculated as of the date of the Award or a reasonable proxy [the "**Date of Assessment**"]. Claimants point out that there are two common approaches to select the Date of Assessment[1316]:

- An "*ex ante*" valuation, which values damages as of the date of the illegal action and ignores subsequent changes in the investments, market conditions and the legal framework; and

---

[1312] C-II, para. 702; C-III, para. 259; C-PHB, para. 315. Claimants' request for relief in the Memorial is practically identical, save for minor wording differences (see C-I, para. 415).
[1313] C-II, para. 654.
[1314] C-I, paras. 388-394.
[1315] C-I, para. 395.
[1316] C-I, para. 397.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 268 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- An "*ex post*" valuation, which values damages as of the date of the award, considering all of the information available to the Tribunal bearing on the quantum of loss.

1233. Claimants submit that in cases involving illegal State action, tribunals enjoy a "large margin of appreciation" in deciding which valuation methodology is most appropriate based on the circumstances of the case. According to Claimants, numerous decisions and commentators have endorsed the *ex post* methodology[1317].

1234. In this case, Claimants submit that an *ex post* valuation is particularly appropriate, because the GC regulatory regime has repeatedly changed since 2013. Hence, an *ex ante* valuation at the date of each breach would be extremely complex. Additionally, Law 184/2018 potentially mitigated the impact of certain of the earlier changes to the GC scheme, and thus an *ex ante* valuation at the date of each breach would risk overstating the Claimants' losses[1318].

## 2. QUANTUM OF COMPENSATION

1235. Claimants seek as damages the diminution in the fair market value of their investments – calculated according to the discounted cash flow ["**DCF**"] method – caused by Romania's violations of the ECT[1319]. Pursuant to the DCF valuation method[1320]:

> "[…] the value of an entity at a point in time is calculated by assessing the expected stream of cash flows that the entity is expected to generate and discounting those cash flows at an appropriate cost of capital."

1236. Claimants have submitted two valuation reports prepared by Mr. Richard Edwards, from FTI Consulting, who appeared at the Hearing. Mr. Edwards calculates the quantum of compensation that Romania owes to Claimants based on the difference between[1321]:

- The fair market value of Claimants' investments in Romania after the introduction of the Disputed Measures [the "**Actual Position**" or "**As is Scenario**"]; and

- The fair market value that Claimants' investments in Romania would have had if Romania had not introduced the Disputed Measures [the "**Counterfactual Position**" or "**But for Scenario**"].

1237. Mr. Edwards values Claimants' (except Beta) equity interest and shareholder loans in the operating companies that own the PV Facilities in Romania (*i.e.*, the Alpha Project Company, Beta, the Gamma Project Company, and the Frăsinet Project Companies, jointly the "**Operating Companies**"). With respect to Beta,

---

[1317] C-I, para. 397.
[1318] C-I, para. 398.
[1319] C-I, para. 399.
[1320] **Edwards II**, para. 2.1; C-II, para. 658.
[1321] C-I, para. 401; **Edwards I**, paras. 2.8, 4.3 and 4.8; **CD-3**, slide 5; C-PHB, para. 193.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 269 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Mr. Edwards values the loss suffered by the company itself, *i.e.*, the value of its lost profits[1322] (Mr. Edwards has not valued Risen's losses, since Risen is a 100% shareholder of Beta[1323]).

1238. According to Mr. Edwards, it is appropriate to use the DCF method (as opposed to other methods of valuation) in the present case because the performance of solar PV plants is relatively predictable. The DCF method also allows the valuer to ensure that[1324]:

- The specific characteristics of particular assets or companies are properly reflected in the valuation;

- The effect on value of various changes (such as the Disputed Measures) to the financial performance of the assets is isolated, in order to properly assess losses caused by the Disputed Measures; and

- The impact of the Disputed Measures is not conflated with other factors.

1239. Mr. Edwards has performed DCF calculations for Claimants' investments in each of the Operating Companies, in the Actual and Counterfactual Positions, considering both historical and prospective cash flows[1325].

## A.  **Mr. Edwards' First Expert Report**

### a.  **The Actual Position**

1240. The Actual Position consists of the historical cash flows of Claimants' investments (from 2013 to the Date of Assessment) and the future cash flows that they will receive in the actual world for a period of 25 years (since the Operating Companies are expected to operate beyond the 15 years of the GC regime[1326]). Specifically, Mr. Edwards[1327]:

- Forecasted the wholesale electricity revenues of the PV Facilities by projecting electricity production based on the actual historical performance of the PV Facilities, and applying a forecast of the wholesale electricity price less an estimate of Balancing Costs;

- Forecasted the amount and timing of GC related revenues by calculating the number of GCs each PV Facility is expected to sell in each year and estimating the average price at which GCs are expected to be sold (whether through GCPAs or in the market);

---

[1322] C-I, para. 401; **Edwards I**, paras. 4.4 and 4.9.
[1323] **Edwards I**, para. 1.15; **Edwards II**, para. 1.19.
[1324] C-I, para. 403; **Edwards I**, paras. 4.14-4.50; **Edwards II**, paras. 2.1-2.12; **CD-3**, slide 7. See also C-II, para. 658.
[1325] **Edwards I**, paras. 4.51 *et seq*.
[1326] **Edwards I**, para. 5.5.
[1327] **Edwards I**, paras. 2.10 and 5.1 *et seq*.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- Forecasted the PV Facilities' costs based on historical cost information, and thereby derived cash flow forecasts over the estimated operating lives of the PV Facilities;

- Discounted the forecast cash flows to the Date of Assessment using a cost of capital based on his estimate of the unlevered cost of equity of the Operating Companies, and added an estimate of the present value of the interest tax shield each PV Facility could benefit from; this yields the enterprise value of each of the Operating Companies; and

- Calculated the value of Claimants' investments in each Operating Company by deducting the actual net third party debt of each Company on the Date of Assessment.

1241. In his first report, Mr. Edwards concluded that the actual value of Claimants' investments in the Operating Companies, including of Beta itself, on the Date of Assessment, was approximately EUR 145.6 million in aggregate[1328].

**b.    The Counterfactual Position**

1242. Mr. Edwards' assessment of the Counterfactual Position assumes that Claimants are successful in their case as pleaded. In the Counterfactual Position the Disputed Measures have not been adopted and the regulatory framework in place is that in force at the time that Claimants made their investments[1329].

1243. Like for the Actual Position, Mr. Edwards used a DCF analysis to estimate the value of Claimants' investments in the Counterfactual Position. Specifically, in his first expert report, Mr. Edwards[1330]:

- Forecasted the wholesale electricity revenues of the PV Facilities by using the same electricity production, market price forecasts, and Balancing Costs as in the Actual Position;

- Forecasted the amount and timing of the GC related revenues assuming that (i) no GCs would have been deferred (other than in respect of Core Value's investments in Gamma), (ii) GC market prices would have evolved as set out in Dr. Roques's regulatory expert report, and (iii) GCPAs in place prior to the Disputed Measures would have governed the prices and volumes of GCs sold by the Operating Companies;

- Forecasted the PV Facilities' costs like in the Actual Position but adjusting for costs that were introduced as part of, or were affected by, the Disputed Measures;

- Discounted the forecast cash flows to the Date of Assessment using the same unlevered cost of equity as in the Actual Position, and added an estimate of

---

[1328] **Edwards I**, paras. 2.12 and 5.83, Table 5-9.
[1329] **Edwards I**, paras. 2.13 and 6.1.
[1330] **Edwards I**, paras. 2.13 and 6.1 *et seq.*

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

the value of the interest tax shield, to give the counterfactual enterprise value of each of the Operating Companies; and

- Calculated the value of the Claimants' investments in each Operating Company by deducting an estimate of net third party debt that takes into account the additional cash flows that the Operating Companies would have earned prior to the Date of Assessment absent the Disputed Measures.

1244. In his first report, Mr. Edwards estimated that absent the Disputed Measures, the value of Claimants' investments in the Operating Companies, including the value of Beta itself, would have been approximately EUR 299.5 million in aggregate[1331]:

| Table 2-2: Value of the Claimants' investments in the Counterfactual Position (EUR millions) | | |
|---|---|---|
| Claimant | Company | Value of Claimants' investments |
| LSG | Alpha | 9.0 |
| | Gamma | 14.2 |
| Green Source | Alpha | 7.9 |
| | Gamma | 14.1 |
| Solluce | Alpha | 56.3 |
| CVI | Gamma | 90.9 |
| CVC | Gamma | 2.9 |
| Anina | Frasinet 3 | 7.6 |
| Giust | Frasinet 2 | 13.0 |
| Pressburg | Frasinet 3 | 7.5 |
| | Frasinet 2 | 13.0 |
| Beta | Beta | 63.1 |
| **Total** | | **299.5** |
| *Note: The value of Beta's investment in the Counterfactual Position is equal to the enterprise value of Beta in the Counterfactual Position plus the value of its additional cash in the Counterfactual Position.* | | |
| *Source: Table 6-11.* | | |

### c.    Historical and future losses

<u>Historical damages</u>

1245. For the damages from the historical effects of Romania's Disputed Measures (*i.e.*, prior to the Date of Assessment), Mr. Edwards[1332]:

- First calculates the historical cash flows of the Operating Companies relying upon their financial statements and trial balances (the Actual Position);

- Then calculates the additional cash that the Operating Companies would have held on the Date of Assessment but for the Disputed Measures (the Counterfactual Position).

1246. Mr. Edwards then incorporates the amount of additional cash into his DCF models through a reduction of outstanding net debt in the Counterfactual Position[1333].

<u>Future damages</u>

1247. To assess the impact of the reduced future cash flows, Mr. Edwards:

---

[1331] **Edwards I**, para. 2.15, Table 2-2 and para. 6.68, Table 6-11; **Edwards II**, Table 1-1[A].
[1332] C-I, para. 406.
[1333] C-I, para. 406.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- First forecasts the financial performance of the Operating Companies from 1 July 2019 onwards in both the Actual and Counterfactual Positions;

- Then discounts the cash flows to present value at an unlevered cost of capital, which determines the "enterprise" value of each Operating Company, in both the Actual and Counterfactual Positions as of the Date of Assessment;

- Except for Beta, Mr. Edwards deducts the third-party debt held by each Operating Company, to determine the value of the investment in each Operating Company, in both the Actual and Counterfactual Positions, as of the Date of Assessment;

- Finally, reflects each Claimant's proportional shareholding and contribution to shareholder loans to derive the value of each Claimant's investment.

### d. Valuation

<u>Claimants except Beta</u>

1248. Considering the Actual and Counterfactual Positions, Mr. Edwards concluded in his first report that the losses incurred by the Claimants who invested in Alpha, Gamma, Frăsinet 2, and Frăsinet 3 amounted to EUR 126.3 million. This is the difference between the aggregate value in the Counterfactual Position (EUR 236.3 million) and the aggregate value in the Actual Position (EUR 110.1 million)[1334]:

| Table 2-3: The Claimants' losses on their investments in Alpha, Gamma, Frasinet 2, and Frasinet 3 (EUR millions) | | | | |
|---|---|---|---|---|
| Claimant | Company | Value of investments in Counterfactual Position [A] | Value of investments in Actual Position [B] | Loss [C] =[A]−[B] |
| LSG | Alpha | 9.0 | 4.7 | 4.3 |
|  | Gamma | 14.2 | 6.1 | 8.1 |
| Green Source | Alpha | 7.9 | 3.6 | 4.3 |
|  | Gamma | 14.1 | 6.0 | 8.1 |
| Solluce | Alpha | 56.3 | 25.9 | 30.5 |
| CVI | Gamma | 90.9 | 46.3 | 44.5 |
| CVC | Gamma | 2.9 | 1.1 | 1.8 |
| Anina | Frasinet 3 | 7.6 | 3.1 | 4.5 |
| Giust | Frasinet 2 | 13.0 | 5.1 | 7.9 |
| Pressburg | Frasinet 3 | 7.5 | 3.0 | 4.5 |
|  | Frasinet 2 | 13.0 | 5.1 | 7.9 |
| **Total** |  | **236.3** | **110.1** | **126.3** |
| *Source: Table 7-1.* | | | | |

<u>Beta</u>

1249. As Beta is itself a Claimant in this matter, the loss it has suffered as a result of the Disputed Measures is equal to its enterprise value in the Counterfactual Position less its enterprise value in the Actual Position, plus any additional cash it would have earned in the period prior to the Date of Assessment[1335]:

---

[1334] **Edwards I**, para. 2.16, Table 2-3 and para. 7.2, Table 7-1; C-I, para. 407.
[1335] **Edwards I**, para. 2.17, Table 2-4 and para. 7.3, Table 7-2; C-I, para. 407.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

| Table 2-4: Beta's loss (EUR millions) | | |
|---|---|---|
| | Calculation | Loss |
| Enterprise value in Counterfactual Position | [A] | 38.2 |
| *less* the enterprise value in Actual Position | [B] | 35.6 |
| *plus* the value of additional cash that would have been earned prior to the Date of Assessment | [C] | 24.9 |
| **Loss incurred by Beta** | **[A]-[B]+[C]** | **27.6** |
| *Source: Table 7-2.* | | |

<u>Total lost profits</u>

1250. This led Mr. Edwards to conclude in his first report that Claimants had lost a total of approximately EUR 153.8 million[1336]:

| Table 1-1: The Claimants' losses on their investments in the Romanian Plants as set out in my First Report (EUR millions) | | | | |
|---|---|---|---|---|
| Claimant | Company | Value of investments in Counterfactual Position [A] | Value of investments in Actual Position [B] | Loss calculated in my First Report [C] =[A]-[B] |
| LSG | Alpha | 9.0 | 4.7 | 4.3 |
| | Gamma | 14.2 | 6.1 | 8.1 |
| Green Source | Alpha | 7.9 | 3.6 | 4.3 |
| | Gamma | 14.1 | 6.0 | 8.1 |
| Solluce | Alpha | 56.3 | 25.9 | 30.5 |
| CVI | Gamma | 90.9 | 46.3 | 44.5 |
| CVC | Gamma | 2.9 | 1.1 | 1.8 |
| Anina | Frasinet 3 | 7.6 | 3.1 | 4.5 |
| Giust | Frasinet 2 | 13.0 | 5.1 | 7.9 |
| Pressburg | Frasinet 3 | 7.5 | 3.0 | 4.5 |
| | Frasinet 2 | 13.0 | 5.1 | 7.9 |
| Beta[(1)] | Beta | 63.1 | 35.6 | 27.6 |
| **Total** | | | | **153.8** |

e.   **Common assumptions in Counterfactual and Actual Positions**

1251. Mr. Edwards has made some assumptions regarding certain variables that he expected would remain the same both in the Counterfactual and Actual Positions[1337]:

- Mr. Edwards forecasted the future power production based on the average of the five full years of historical production date for 2014 to 2018, which Mr. Edwards then adjusted downward to account for the future annual degradation of the PV modules of 0.7%;

- Mr. Edwards used the historical price of electricity up to the Date of Assessment and relied on the forecasts of price of electricity set out in Dr. Roques' regulatory report for 2019 through 2031;

- Mr. Edwards followed the "Adjusted Present Value" ["**APV**"] method, which first computes the value of the PV projects assuming that they are all-equity financed (*i.e.*, "unlevered"), and then considered the consequences of debt financing; according to Claimants, this APV method is similar to the common "Weighted Average Costs of Capital" ["**WACC**"] valuation, but more

---

[1336] **Edwards II**, Table 1-1.
[1337] C-I, para. 404. See also C-II, para. 662.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

appropriate for investments that have project debt financing because it correctly takes into account the interest "tax shield";

- Mr. Edwards forecasted operating costs that are largely fixed by extrapolating from historical costs (adjusted for certain "one-off" events), projecting them to increase with expected inflation; and

- Mr. Edwards forecasted inflation based on the IMF inflation forecasts for the Euro area through 2024 and assumed inflation would remain at 2% thereafter.

**f.    Differences in the Counterfactual and Actual Positions**

1252. Mr. Edwards relied on Dr. Roques' forecasts regarding price and volume of GCs in the Counterfactual and Actual Positions for 2019 through 2031. To assess the impact of the Disputed Measures, Mr. Edwards' DCF models in the Counterfactual and Actual Positions differ in the following aspects[1338]:

GC deferral

- In the Actual Position, the PV Facilities are expected to receive four GCs per MWh until 31 December 2020 and six GCs per MWh thereafter, as well as recovering the deferred GCs between 2021 and 2030;

- The Counterfactual Position includes no deferral: the PV Facilities would have received six GCs per MWh.

1253. However, for Core Value's investment in the Gamma Project Company after EGO 57/2013, Mr. Edwards assumes the deferral of two GCs per MWh until April 2017, which would be recovered between 1 April 2017 and 31 December 2020.

GC cap and balancing costs

- In the Actual Position, Claimants lost GCs and incurred balancing costs;

- In the Counterfactual Position, Mr. Edwards assumes that Claimants would have lost no GCs and incurred normal balancing costs.

1254. However, for Core Value's investment in Gamma after EGO 57/2013, Mr. Edwards assumes that Gamma would have received GCs only for 90% of its electricity production throughout the entire GC period but incurred normal balancing costs.

Destruction of GC market

- In the Counterfactual Position, Mr. Edwards assumes that the PV Facilities could have sold all their GCs before the end of the GC program; Mr. Edwards also assumes that the price of GCs would have evolved in line with experts' expectations at the time of investment;

---

[1338] C-I, para. 405.

261

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- In the Actual Position, all the GCs will be sold, but the price of GCs will remain at the price floor until 2025 and only marginally increase to below the EUR 35 price cap thereafter; furthermore, Claimants had to agree to certain commercial terms relating to the sale of electricity in order to facilitate the sale of their GCs.

ANRE contribution

- In the Actual Position, Mr. Edwards calculates the ANRE contribution as 2% of the operating companies' turnover;

- In the Counterfactual Position, Mr. Edwards assumes that the Generators' contribution to ANRE remained at its prior level of 0.1% of turnover.

**B.   Mr. Edwards' Second Expert Report**

1255. Dr. Flores, Respondent's expert, has criticized Mr. Edwards' valuation, arguing *inter alia* that a DCF analysis was not appropriate, as it had too many elements of uncertainty. Dr. Flores concludes that Claimants are actually better off by almost EUR 70 million as a result of the Disputed Measures[1339]. According to Mr. Edwards, Dr. Flores' calculation is largely a function of two adjustments to Mr. Edwards' calculations[1340]:

- Reducing the market price of GCs in the Counterfactual Position to the minimum trading value in all years; and

- Applying a 25% cut to all Counterfactual revenues (applied in conjunction with his GC market price assumption of the minimum trading value) to reflect what Dr. Flores describes as a "high level of uncertainty" in the Counterfactual Scenario.

**a.   Probability-weighted scenarios**

1256. Claimants and Mr. Edwards recognize that there is indeed an element of uncertainty in the Counterfactual Position, which is the GC market price, because it is not possible to know precisely how the GC supply and demand balance in the GC market would have evolved over time[1341].

1257. To account for this uncertainty, in his second expert report Mr. Edwards has considered three distinct scenarios, with several possible GC market outcomes, and has assigned different probabilities to these scenarios[1342]:

- <u>High Case</u>: in this scenario, GC supply and demand are balanced every year and the GC market price remains at or close to the maximum trading value

---

[1339] **Edwards II**, paras. 1.5-1.6; C-PHB, para. 199.
[1340] **Edwards II**, para. 1.8; CD-3, slide 18.
[1341] C-II, para. 663; C-PHB, para. 194; **Edwards II**, para. 1.12.
[1342] C-PHB, para. 195; **CD-3**, slides 9 and 10; **Edwards II**, paras. 1.13-1.15.

*LSG Building Solutions GmbH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

every year (according to Mr. Edwards, this is Dr. Roques' favored scenario); Mr. Edwards attributes a 30% probability to this price scenario;

- <u>Central Case</u>: in this scenario, there is GC oversupply in 2014 to 2018 with the GC market price at the minimum value, returning to the maximum value when the market rebalances starting in 2019 (according to Mr. Edwards, this is similar to the scenario presented by ANRE to the European Commission in 2011); Mr. Edwards ascribes a 45% probability to this price scenario;

- <u>Low Case</u>: in this scenario, there would be a structural oversupply throughout the whole GC scheme and the GC market price would be at the minimum value every year (according to Mr. Edwards, this is the scenario similar to that considered most likely by Mr. Jones – Romania's regulatory expert); Mr. Edwards assigns a 25% probability to this price scenario.

1258. Mr. Edwards maintains that a DCF valuation is the most suitable method to value Claimants' losses. Mr. Edwards notes that despite criticizing the DCF method, Dr. Flores has not provided an alternative valuation methodology[1343].

**b.    Adjustments to calculations**

1259. In his second expert report, Mr. Edwards performs a series of adjustments, which impact the total loss suffered by Claimants, namely[1344]:

- Changing the Date of Assessment from 30 June 2019 (first report) to 30 June 2020 (second report) and updating the calculations to reflect certain new information provided by Claimants, which together increase losses by EUR 1.5 million;

- Correcting two minor errors in his calculations relating to working capital and the 2025 GC price in the Actual Position, which together reduce losses by EUR 1.6 million;

- Reflecting bank loan prepayment terms when calculating interest payments that would have been saved in the Counterfactual Scenario, which reduces losses by EUR 1.1 million;

- Adjusting his calculation of tax in respect of interest deductibility, which reduces losses by EUR 0.1 million; and

- Modelling Counterfactual GC revenues using the three probability-weighted scenarios, which reduces losses by EUR 9.8 million.

---

[1343] **Edwards II**, paras. 2.3-2.4.
[1344] **Edwards II**, para. 1.20.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

### c.    Updated valuation

1260. Mr. Edwards' revised estimate of the losses incurred by Claimants as a result of the Disputed Measures is EUR 142.7 million, which is EUR 11.2 million lower than the losses calculated in his first report[1345]:

| Table 1-4: Updated calculation of the Claimants' losses (EUR millions) | | |
|---|---|---|
| Company | Loss calculated in my First Report | Change | Revised estimate of loss |
| Alpha | 39.1 | 7.2 | 46.3 |
| Beta | 27.6 | (2.6) | 25.0 |
| Gamma | 62.4 | (6.8) | 55.6 |
| Frasinet 2 | 15.8 | (5.6) | 10.1 |
| Frasinet 3 | 9.0 | (3.3) | 5.7 |
| **Total** | **153.8** | **(11.2)** | **142.7** |
| *Source: Appendix 4b: RE2 Tables for report.* | | |

### C.    Summary of Claimants' losses

1261. Claimants' losses are summarized by Mr. Edwards as follows, as of the Date of Assessment (30 June 2020)[1346]:

| My calculation of the Claimants' losses (EUR m) | | | | |
|---|---|---|---|---|
| Scenario | High Case | Central Case | Low Case | Probability weighed loss |
| Probability | 30% | 45% | 25% | |
| Alpha | 52.5 | 52.5 | 27.5 | 46.3 |
| Beta | 45.0 | 25.8 | (0.5) | 25.0 |
| Gamma | 102.9 | 59.3 | (7.7) | 55.6 |
| Frasinet 2 | 16.3 | 10.1 | 2.7 | 10.1 |
| Frasinet 3 | 9.3 | 5.7 | 1.4 | 5.7 |
| **Total** | **226.0** | **153.4** | **23.5** | **142.7** |

1262. Mr. Edwards explains that this is the probability-weighted average of the loss under each of the three GC market price scenarios[1347]. This loss represents an average 50% reduction in the value of Claimants' investments as a result of the Disputed Measures[1348].

### 3.    INTEREST

1263. As part of the compensation for damages, Claimants ask for pre- and post-award interest at the highest lawful rate, from the Date of Assessment until full satisfaction of the Award, based on international commercial rates[1349].

---

[1345] **Edwards II**, Table 1-4 (see also **Edwards I**, para. 2.12 and Table 2-1; **Edwards II**, Table 1-1 [B]).
[1346] C-PHB, para. 195; **CD-3**, slide 16.
[1347] **CD-3**, slide 16.
[1348] C-PHB, para. 196; **CD-3**, slide 17.
[1349] C-I, para. 409; C-PHB, para. 315.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

1264. Claimants further request that any award of interest be compounded, which is the generally accepted standard for compensation in international investment arbitration[1350]. According to Claimants, compound interest is appropriate to place Claimants in the same position in which they would have been had the award been made immediately after the cause of action arose, while it prevents Respondent's unjust enrichment[1351].

# VII.2. RESPONDENT'S POSITION

## 1. CLAIMANTS MUST PROVE COMPENSATION WITH SUFFICIENT CERTAINTY

1265. Romania does not deny that under international law, the full reparation standard should apply. Romania submits, however, that such standard requires a reasonable or sufficient degree of certainty. In other words, damages, and particularly lost profits, may not be awarded if they are remote, uncertain or speculative[1352].

1266. Romania argues that multiple investment tribunals have refused to award lost profits when such profits were not sufficiently certain[1353]. Romania further submits that arbitral tribunals and scholars have held that the requirement of sufficient certainty applies not only to the existence of the lost profits but also to their amount[1354]; it follows that a forward-looking methodology, such as DCF, can only be applied when the damages claims for lost profits are not speculative and are sufficiently certain[1355].

1267. Therefore, it is Romania's position that Claimants' claims for damages can be upheld only if the Tribunal finds that[1356]:

- The existence of each Claimants' lost profits is reasonably certain and not speculative; and

- The quantum of the damage claimed is also reasonably certain and not speculative.

## 2. CLAIMANTS' CLAIMS FOR LOST PROFITS ARE UNCERTAIN AND SPECULATIVE

1268. Romania submits that Claimants' claims for damages are uncertain and speculative; Claimants have also failed to demonstrate that their alleged lost profits were caused by each of the Disputed Measures. Consequently, such claims must be rejected[1357].

---

[1350] C-I, paras. 410-411.
[1351] C-I, paras. 413-414.
[1352] R-I, paras. 1114-1116; R-PHB, para. 353.
[1353] R-I, paras. 1117-1126.
[1354] R-I, paras. 1126-1128; R-PHB, para. 354.
[1355] R-I, para. 1115.
[1356] R-I, para. 1129.
[1357] R-I, para. 1131; R-PHB, para. 356.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

To support its position, Romania has filed two expert reports by Dr. Flores, from Quadrant Economics.

### A.  Claimants' alleged lost profits have not been demonstrated with sufficient certainty

#### a.  The uncertainty of Claimants' projections and assumptions

1269. Romania notes that to calculate their alleged lost profits Claimants make projections and assumptions over long periods of time, concerning GC prices, the amount and prices of electricity sold, operating costs, etc. Romania argues that Claimants' GC price projections are extremely uncertain yet represent the largest part of Claimants' alleged lost profits claims[1358].

1270. Romania's position is that, in the absence of the Disputed Measures, GC prices would have been at or close to the minimum because of either or both the surge in solar RES-E investment or the existence of an overhang[1359].

1271. Romania points out that Mr. Edwards' probability-weighted scenarios assign the highest weightings (30% to the high case and 45% to the central case, for a combined weighting of 75%) to the two scenarios that project the legal maximum GC price for almost all the duration of the GC scheme. Thus, Mr. Edwards' Counterfactual cash flows reflect a world in which GC prices would have traded close to the legal maximum. Yet, Romania submits that these weightings have no evidentiary support and are actually contradicted by the evidence in the record[1360].

1272. In any case, Romania avers that Claimants' probability-weighting of the different GC price scenarios cannot eliminate the lack of certainty as to the GC prices; it is in fact artificial, since any number of possible combinations of GC prices could be derived from Claimants' probability-weighted GC pricing calculation[1361].

#### b.  Claimants do not satisfy any of the four criteria for sufficient certainty of damages

1273. Romania argues that tribunals applying international law have looked to four criteria to determine whether a claim for lost profits is sufficiently certain as to its existence and amount, *i.e.*[1362]:

-   (i) Is there a track record of profitable performance that precedes the date of the alleged breach by the State?

-   (ii) Is the projection period too long?

---

[1358] R-PHB, paras. 358-360.
[1359] R-PHB, para. 364.
[1360] R-PHB, para. 366.
[1361] R-PHB, paras. 361-363.
[1362] R-PHB, paras. 367-368.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- (iii) Have the prices of the goods or services in question been established with sufficient certainty?

- (iv) Is there a great disparity of valuations between the quantum experts?

1274. Romania argues that the application of these four criteria to the present case confirms the insufficient certainty of Claimants' claims for lost profits[1363]:

1275. (i) Romania submits that tribunals require a track record of performance because it demonstrates that the investment was profitable in the past for a significant period. Romania observes, however, that none of the five PV Facilities had any track record of profitability before the first Disputed Measure (EGO 57/2013) was adopted, since none of the PV Facilities had received their operating licenses or final accreditations at the time[1364].

1276. (ii) Romania argues that the longer a projection period is, the more uncertainty there is, particularly in the absence of a track record of profitable performance. In this case, the Counterfactual Position spans over a period of 26 years. Likewise, the future cash flows in the Actual Position span through 19 years. It is Romania's position that these periods are too long for any projection of lost profits to be estimated with sufficient certainty under international law[1365]. High prices for a key commodity such as electricity, are known to create significant political, social, and economic instability. The risk of such instability creates significant uncertainty for long projections of profitability[1366].

1277. (iii) Romania reiterates that Claimants' projections of GC prices are speculative and not sufficiently certain. Consequently, the third criterion is not met either[1367].

1278. (iv) Romania submits that tribunals often look at the valuations of the damages experts. If there is a significant disparity in the experts' findings, tribunals tend to refuse to award lost profits due to lack of certainty. In this case, Mr. Edwards found damages for the ten Claimants in the amount of EUR 142.7 million, while Dr. Flores found that Claimants had not suffered any damages at all. This is a further proof that Claimants' alleged lost profits are highly speculative[1368].

### B. Claimants have not demonstrated that the Disputed Measures caused damages to each of the Claimants

1279. Romania submits that Claimants have failed to establish a causal link between the Disputed Measures and their alleged lost profits. Claimants have not demonstrated that each of the alleged breaches caused a specific damage to each of the ten Claimants. Instead, Claimants combine the alleged effects of all of Romania's Disputed Measures into one calculation of alleged lost profits for each of the five

---

[1363] R-PHB, para. 367.
[1364] R-PHB, paras. 370-371.
[1365] R-PHB, paras. 372-374.
[1366] R-PHB, para. 375.
[1367] R-PHB, para. 378.
[1368] R-PHB, paras. 379-380.

Case 1:19-cv-01618-TSC    Document 113-27    Filed 03/13/25    Page 281 of 299

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

PV Facilities and then apportion those alleged lost profits to each of the Claimants based on their shareholding in the Operating Companies as of the Date of Assessment[1369].

1280. According to Romania, Claimants have adopted a "take it all or leave it all" approach to calculate their alleged lost profits. This is because Claimants know they cannot calculate the alleged damages for each Disputed Measure without making the uncertainty and speculation even more obvious[1370].

### C.    The DCF methodology is not appropriate and must in any case be corrected

1281. Romania's position is that the DCF methodology is inappropriate in this case due to the lack of sufficient certainty in Claimants' alleged lost profits. Methodologies cannot transform speculative damage claims into sufficiently certain damage claims[1371]. Dr. Flores argues that the DCF is unreliable because it requires projections of four sets of cash flows, three of which are unknown or extremely uncertain[1372]:

-    The Actual cash flows for 2013-2020 are known;

-    The Counterfactual cash flows for 2013-2020 are unknown/uncertain;

-    The Actual cash flows for 2020-2038 are unknown/uncertain; and

-    The Counterfactual cash flows for 2020-2038 are equally unknown/uncertain.

1282. If the Tribunal nonetheless considers that it has a basis for considering an award of damages for lost profits using the DCF methodology, Romania and Dr. Flores submit that six corrections must be made to Claimants' DCF calculation. Romania contends that once those corrections are made – leading to a proper application of the DCF methodology – it is clear that none of the ten Claimants suffered any lost profits as a result of the Disputed Measures[1373].

First correction: Applying a 25% discount to But For revenue

1283. If the Tribunal considers that it may have a basis for awarding lost profits using the DCF methodology, Romania and Dr. Flores submit that the Tribunal should make a 25% downward adjustment to Claimants' Counterfactual historical and future cash flows in order to account for the uncertainties inherent to the Counterfactual Position to the extent possible[1374]. According to Dr. Flores, this 25% discount is

---

[1369] R-PHB, paras. 382-383.
[1370] R-PHB, paras. 386-387.
[1371] R-PHB, paras. 393-394, 441; **RD-4**, slide 40.
[1372] **RD-4**, slide 13.
[1373] R-II, para. 1099; R-PHB, paras. 397-398 and 442; **RD-4**, slides 19 and 40.
[1374] R-PHB, paras. 402 and 408.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

equivalent to adding a 4%-5% risk premium to the PV Facilities' But For cash flows[1375]. This adjustment reflects[1376]:

- The fact that there are risks beyond that of GC prices in the Counterfactual "historical" cash flows, and

- The risks in the electricity sector but for the Disputed Measures in both the historical and the future cash flows.

1284. Indeed, it is Romania's position that Claimants have not accounted for several risks and uncertainties inherent to Claimants' Counterfactual Position[1377]:

- Mr. Edwards has not made any adjustment for macroeconomic risks in the Counterfactual historical cash flows for the 2013-2020 period; it is not reasonable to assume that macroeconomic factors would have remained the same absent the Disputed Measures[1378]; indeed, there is no certainty that inflation, unemployment, GDP, and exchange rates would have been the same in Romania in 2013-2020 had the Disputed Measures not been enacted;

- Mr. Edwards has likewise not accounted for any risk specific to the Romanian electricity sector in the Counterfactual Position in both the historical and future cash flows; the Disputed Measures sought to address serious social and economic issues in Romania; had they not been enacted, serious consequences would likely have resulted; an acquirer in the but-for world would view the cash flows as riskier as a result of the protests and the threat of a significant loss of end consumers.

Second correction: Applying legal minimum But For GC market price

1285. Romania argues that the evidence in the record shows that the GC market price would be at or close to the legal minimum from 2013 onwards, regardless of the Disputed Measures. Consequently, Claimants' DCF calculations must be corrected to apply the legal minimum GC market price in the Counterfactual Position. Mr. Edwards' decision to assign the highest probability weighting to the two scenarios that project the legal maximum GC price for all or almost all the duration of the GC scheme is not based on objective evidence[1379].

Third correction: Applying Mr. Edwards' spot market approach for Beta's and Gamma's GC sales

1286. Romania explains that in his modelling of the Actual Position, Mr. Edwards does not use the spot market prices to derive the "Actual" price for Beta's and Gamma's GC sales. Rather, he assumes that Beta and Gamma have been bundling GCPAs and PPAs in the actual world. Based on this alleged bundling, Mr. Edwards

---

[1375] **Flores I**, paras. 78-86; **Flores II**, paras 75-80; **RD-4**, slide 27.
[1376] R-PHB, para. 407.
[1377] R-PHB, paras. 403-404.
[1378] **RD-4**, slide 12.
[1379] R-PHB, paras. 409-417.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

discounts the GC spot market price in the future period, which reduces Beta's and Gamma's revenues in the Actual Position and thus increases their alleged lost profits[1380].

1287. Romania argues, however, that Claimants have not provided any evidence that any such bundling arrangements ever existed[1381]. Thus, Mr. Edwards' use of discounted bundled GC prices is unsupported and must be rejected. It is thus necessary to correct Claimants' DCF calculations by using the spot market approach for Beta's and Gamma's GC sales[1382].

Fourth correction: Correcting the proportion of Alpha's GCs sold on the spot market

1288. Romania explains that Mr. Edwards assumes that Alpha's GCs beyond those sold under a GCPA with E.ON would be stockpiled until 2028, when the GCPA expires. In other words, Mr. Edwards assumes that Alpha will sell none of its available GCs on the spot market until 2028, even though Alpha could sell them on the spot market long before[1383].

1289. Romania submits that a more reasonable assumption would be that Alpha will sell as many GCs as possible on the spot market while stockpiling enough GCs to meet its future GCPA obligations. Evidence from the historical Actual Position shows that Beta and Gamma sold GCs on the spot market that were not being sold under GCPAs. There is no reason to assume that Alpha would not do the same[1384].

Fifth correction: Calculating damages of Beta by reference to Risen's investment

1290. Romania notes that for all Claimants except Beta, the damages calculation has been made at the level of the shareholder of the project, and not the Operating Company. For the Beta project, Claimants make the damage calculation at the level of the Operating Company, *i.e.*, Beta, instead of at the level of its shareholder, *i.e.*, Risen[1385], arguing that Risen is the 100% shareholder of Beta.

1291. Romania argues that this approach compensates Risen for alleged lost profits to which it is not entitled. Indeed, Risen invested amidst the rumors of the first Disputed Measures and made further significant investments in Beta after the 2013 and 2014 Disputed Measures had been enacted. Therefore, Beta's damages must be assessed by reference to the shareholder and not the Operating Company[1386].

---

[1380] R-PHB, para. 423.
[1381] R-PHB, paras. 424-425.
[1382] R-PHB, para. 426.
[1383] R-PHB, para. 427.
[1384] R-PHB, para. 428.
[1385] R-PHB, para. 429.
[1386] R-PHB, para. 430.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Sixth correction: Removing FTI's prepayment of third-party debt assumption

1292. Romania explains that Mr. Edwards has assumed, with no evidence, that the excess revenues that Claimants would allegedly have received under the Counterfactual Position would have been used to prepay debt. Mr. Edwards considers that Claimants have been denied the ability to make alternative investments with this additional cash that they would allegedly have received[1387].

1293. Romania avers that this approach contravenes the principle that interest should not compensate Claimants for risks to which an awarded amount is not subject. It is impossible to know for certain what each individual Claimant could have done with the excess cash. Therefore, Claimants' assumption regarding the prepayment of third-party debt is entirely unsupported[1388].

\* \* \*

1294. Romania and Dr. Flores argue that once the above corrections have been applied, it is clear that none of the ten Claimants suffered any damages as a result of the Disputed Measures[1389]:

| | Individual Change | Cumulative Change | Corrected Damages |
|---|---|---|---|
| | | (€ Millions) | |
| | (1) | (2) | (3) |
| **Damages According to FTI** | - | - | 142.7 |
| 1. Apply a Discount to But-for Revenue | (131.8) | (131.8) | 10.9 |
| 2. Apply the Legal Minimum But-for GC Market Price | (80.7) | (201.3) | (58.6) |
| 3. Apply FTI's Spot Market Approach for Beta's and Gamma's GC Sales | (7.0) | (208.3) | (65.6) |
| 4. Correct the Proportion of Alpha's GCs Sold on the Spot Market | (3.6) | (212.0) | (69.3) |
| 5. Calculate Damages of Beta by Reference to Risen's Investment | (14.2) | (209.5) | (66.8) |
| 6. Remove FTI's Prepayment of Third-Party Debt Assumption | (10.8) | (212.3) | (69.6) |
| **Damages after Corrections** | | | **(69.6)** |

### D.    Claimants' investments remain profitable

1295. Romania contends that it is false that Claimants' investments have been "destroyed" or rendered valueless. In fact, all five PV Facilities continue to operate to this day and are making reasonable rates of return, in excess of their cost of capital[1390]. This again demonstrates that Claimants' alleged lost profits are speculative and uncertain[1391].

1296. It is Romania's position that it is just as likely that Claimants would have made less profits or possibly even gone out of business if the Disputed Measures had not been

---

[1387] R-PHB, para. 434.
[1388] R-PHB, para. 436; **RD-4**, slide 35.
[1389] R-PHB, paras. 398-399; **RD-4**, slide 36.
[1390] **RD-4**, slides 39-40.
[1391] R-II, para. 1112; R-PHB, para. 437.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

enacted. This could have happened if the EIUs delocalized or if there was extended social unrest or political upheaval[1392].

1297. Furthermore, it is possible that in the future, new regulations could generate a higher rate of return for Generators. Thus, if Claimants were awarded lost profits long into the future based on their DCF assumptions and if future changes benefited them, there would be double recovery. This further illustrates the uncertainty of Claimants' alleged lost profits[1393].

## 3.  INTEREST

1298. If the Tribunal were to award lost profits, Romania argues that Claimants' request for pre- and post-award compound interest at the highest lawful rate should be rejected. Claimants are only entitled to simple interest at the six-month or one-year EURIBOR rate for post-award interest, beginning to run 60 days from the date of the Award until payment is made[1394].

1299. First, Romania submits that Claimants should only be entitled to simple interest. There is no uniform practice on awarding simple or compound interest in international investment law, and both arbitral tribunals and commentators have repeatedly found that simple interest provides appropriate compensation[1395].

1300. Second, Romania avers that Claimants are only entitled to a risk-free EURIBOR rate, such as the six-month or one-year EURIBOR rate[1396]. Claimants have provided two incorrect alternatives in their damages model, both of which include risk. It is Romania's position that the interest on an award should be the risk-free rate[1397].

1301. Finally, Romania contends that no pre-award interest should be granted to Claimants in this case, particularly for the period between June 2013 and the rendering of the Award. This is because liability, if any, will not be determined until the Award is rendered. This is not a case in which there has been a failure to make a payment of a certain sum on a particular date and liability is not at issue. When liability is not determined until the date of the award, there is no legal right to interest claimed before that date[1398].

---

[1392] R-PHB, para. 439.
[1393] R-PHB, para. 440.
[1394] R-II, paras. 1101 and 1110.
[1395] R-II, paras. 1102 *et seq*.
[1396] R-II, para. 1106.
[1397] R-II, para. 1104; **RD-4**, slide 35.
[1398] R-II, paras. 1107-1109.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

# VII.3. DECISION OF THE TRIBUNAL

### 1.   APPLICABLE STANDARD

1302. The Tribunal has concluded that Romania is liable for breach of Art. 10(1) of the ECT, on account of Romania's decision to alter the essential characteristics of the GC support scheme, on which Claimants had relied when making their investments, and to unreasonably impair the enjoyment of Claimants' investments.

1303. The investors are claiming reparation for the damage caused by Romania's breach of its obligations under Art. 10(1), through the payment to the injured investor of an amount which (as inspired by Art. 36(2) of the Draft Articles on Responsibility of States for Internationally Wrongful Acts ["**ILC Draft Articles**"]) includes[1399]:

> "[A]ny financially assessable damage including loss of profits insofar as it is established".

1304. The ECT does not provide any rule regarding the appropriate redress which an investor can seek in such a case.

1305. This is in contrast with Art. 13 of the ECT, which prohibits nationalization or expropriation without the payment of prompt, adequate, and effective "compensation", and sets out rules for its calculation[1400]. In cases of expropriation, the ECT establishes that compensation will be equal to the "fair market value" of the affected investment[1401].

1306. This principle, however, is of little use in the present case, since the finding of the Tribunal is not one of expropriation, and the breach has not resulted in the total loss or deprivation of an asset: to this day, Claimants (except Beta) remain shareholders of the Operating Companies, which still own and operate the PV Facilities, while Beta continues to operate as a going concern. Consequently, compensation cannot be based on the fair market value of the assets.

1307. The silence of Art. 10(1) of the ECT does not mean that its breach by a host State is to be left without redress. The purpose of the compensation must be to repair the

---

[1399] **Doc. CL-104**, ILC Draft Articles, Art. 36(2): "The compensation shall cover any financially assessable damage including loss of profits insofar as it is established".

[1400] **Doc. CL-1**, Art. 13: "Investments of Investors of a Contracting Party in the Area of any other Contracting Party shall not be nationalized, expropriated or subjected to a measure or measures having effect equivalent to nationalization or expropriation (hereinafter referred to as "Expropriation") except where such Expropriation is: […] accompanied by the payment of prompt, adequate and effective compensation. Such compensation shall amount to the fair market value of the Investment expropriated at the time immediately before the Expropriation or impending Expropriation became known in such a way as to affect the value of the Investment (hereinafter referred to as the "Valuation Date"). Such fair market value shall at the request of the Investor be expressed in a Freely Convertible Currency on the basis of the market rate of exchange existing for that currency on the Valuation Date. Compensation shall also include interest at a commercial rate established on a market basis from the date of Expropriation until the date of payment."

[1401] **Doc. CL-1**, Art. 13(1).

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

damage suffered by the investor, by reestablishing the financial situation that, in all likelihood, Claimant would have enjoyed, had the State not incurred in a breach of its international commitments. The *quaestio vexata* is how the economic harm sustained by the investor is to be measured[1402].

Methodology

1308. The Parties have discussed the methodology that a Tribunal should use to value such a claim for compensation:

-    Claimants generally accept that damages cannot be awarded if they are excessively remote, uncertain or speculative and propose to use a discounted cashflow ["**DCF**"] methodology, since it has mechanisms to manage uncertainty[1403];

-    Romania in turn submits that Claimants' claims for alleged lost profits are uncertain and speculative, since Claimants have failed to demonstrate with reasonable certainty that their alleged lost additional profits would actually have been earned; Romania further argues that using a DCF methodology is inappropriate when lost profits are speculative or uncertain[1404].

1309. Under Art. 36(2) of the ILC Draft Articles (which apply to inter-State international responsibility, but can be applied by analogy and transposed to relations between a State and a foreign investor insofar as it concerns the objective of reparation[1405]), damage is due "insofar as it is established". This means that the existence of a damage must be proven with reasonable certainty, even if the precise quantification of such damage may be subject to some degree of approximation[1406], especially in cases where the claimant is trying to prove loss of profits; as expressed by the tribunal in *Lemire*[1407]:

> "[…] it is a commonly accepted standard for awarding forward looking compensation that damages must not be speculative or uncertain, but proved with reasonable certainty; the level of certainty is unlikely, however, to be the same with respect to the conclusion that damages have been caused, and the precise quantification of such damages. Once causation has been established, and it has been proven that the *in bonis* party has indeed suffered a loss, less certainty is required in proof of the actual amount of damages; for this latter determination Claimant only needs to provide a basis upon which the Tribunal can, with reasonable confidence, estimate the extent of the loss."

---

[1402] **Doc. RL-304**, *Lemire* (Award), para. 147.
[1403] C-II, paras. 659-661.
[1404] R-PHB, paras. 3, 356, 394.
[1405] See J. CRAWFORD, "Investment Arbitration and the ILC Articles on State Responsibility", *ICSID Review Foreign Investment Law Journal*, Vol. 25, Issue 1, Spring 2010, pp. 127-199; P.-M. DUPUY, Concluding Remarks, "ARSIWA – a Reference Text Partially Victim of its Own Success?", *ICSID Review, Special Issue on 20th Anniversary of ARSIWA*, 2022, to be published.
[1406] **Doc. RL-280**, B. Sabahi, L. Hoder, p. 500; **Doc. RL-194**, *Crystallex* (Award), paras. 867-868;
[1407] **Doc. RL-304**, *Lemire*, para. 246.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

1310. To ascertain the existence of a damage, the investor who seeks reparation must prove that there is a direct causal link between the State's wrongful act and the damage suffered[1408]: Art. 31(1) of the ILC Draft Articles (applied by analogy) limits compensation to the "injury <u>caused</u> by the internationally wrongful act"[1409].

1311. As to the calculation of the damage suffered and amount of compensation owed, the Tribunal has a degree of flexibility to define the appropriate financial methodology[1410] for the determination of a financial amount which, delivered to the investor, produces the equivalent economic value which, in all probability, the investor would have enjoyed, but for the State's breach[1411].

<u>DCF</u>

1312. Among the different methodologies available to tribunals is DCF, based on the prediction of a future stream of cash flow which an enterprise is expected to generate, which is then discounted at a given rate[1412]. This methodology has been acknowledged and frequently applied in the recent practice of investment arbitration, although it has occasionally been rejected by tribunals as giving way to overly speculative damages[1413]. Its primary purpose is to establish the value of the enterprise generating the cash flow. DCF methodology is especially relevant in cases of expropriation, when compensation will be equal to the "fair market value" of the affected investment. If the investment is a cash flow generating enterprise, one of the alternative methodologies to establish its value is DCF.

1313. DCF analysis can also be used to establish the appropriate amount of compensation, in situations where the breach committed by the host State does not consist in an expropriation, but rather in some other breach of the State's international obligations. In such cases, an investor may obtain full reparation of the loss suffered, if the compensation awarded is the difference between:

- The actual enterprise value of the investment, reduced as a consequence of the State's breach (the so-called "As Is" scenario), and

- The hypothetical value which the enterprise would have attained, under the assumption that the State had not incurred in breach (the so-called "But For" scenario).

1314. The addition of the "As Is" enterprise value plus the compensation paid by the State would wipe out the consequences of the breach, because the investor would be put

---

[1408] **Doc. RL-290**, T. Wälde, B. Sbahi, p. 1093.

[1409] **Doc. CL-104**, ILC Draft Articles, Commentaries 9-10 to Art. 31.

[1410] **Doc. RL-222**, S. Ripinsky & K. Williams, p. 212: "The customary rule of full compensation is of a very general nature and it does not offer a conceptual framework for the recovery of damages that would be comparable in specificity to the 'value' approach generally applicable in expropriation cases. […] The generality of the customary rule provides tribunals with flexibility as to what the precise methodology for assessing damages should be in a specific case."

[1411] **Doc. RL-304**, *Lemire* (Award), para. 152.

[1412] **Edwards I**, para. 4.18;

[1413] **Doc. RL-222**, S. Ripinsky & K. Williams, pp. 201 *et seq*.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

in the same financial situation it would have found itself, but for the State's breach of its international obligations.

1315. A DCF methodology, however, cannot always be applied, and while in certain circumstances it returns meaningful valuations, in other cases, it is inappropriate. DCF works properly if all, or a significant part, of the following criteria are met[1414]:

- The enterprise has an established historical record of financial performance;

- There are reliable projections of its future cash flow, ideally in the form of a detailed business plan adopted *in tempore insuspecto*, prepared by the company's officers and verified by an impartial expert;

- The price at which the enterprise will be able to sell its products or services can be determined with reasonable certainty;

- The business plan can be financed with self-generated cash, or, if additional cash is required, there must be no uncertainty regarding the availability of financing;

- It is possible to calculate a meaningful WACC, including a reasonable country risk premium, which fairly represents the political risk in the host country;

- The enterprise is active in a sector with low regulatory pressure, or, if the regulatory pressure is high, its scope and effects must be predictable: it should be possible to establish the impact of regulation on future cash flows with a minimum of certainty.

1316. As the tribunal in *Rusoro* noted[1415]:

> "DCF is not a friars' balm which cures all ailments. It is simply a financial technique, in which an expert is able to estimate with reasonable certainty a number of future parameters (income, expenses, investments), and then discount the net income at an appropriate rate. If the estimation of those parameters is incorrect, the results will not represent the actual fair market value of the enterprise."

1317. A DCF analysis necessarily depends on a number of assumptions, made by the expert, of what will occur in the future or what would have occurred absent regulatory action[1416]. But potential uncertainty, inherent in any DCF analysis, can be dealt with by taking conservative estimates of cash flow projections and applying a higher discount rate[1417].

---

[1414] **Doc. QE-43**, *OI European*, paras. 658-660; **Doc. RL-191**, *Rusoro*, para. 759.
[1415] **Doc. RL-191**, *Rusoro*, para. 760.
[1416] **Flores I**, para. 5.
[1417] **Doc. RL-222**, S. Ripinsky & K. Williams, p. 211.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

### 2. DAMAGE SUFFERED BY CLAIMANTS

1318. Claimants argue that as a result of the Disputed Measures, the enterprise value of their investments in Romania, calculated applying a DCF methodology, was reduced by approximately 50%. Claimants calculate that the difference between the actual enterprise value (the "As Is Scenario") and the hypothetical enterprise value, which such investments would have attained, absent Romania's breach (the "But For Scenario"), is EUR 142.7 million, and they claim this amount as compensation for damages.

1319. All Claimants (except Beta, whose particular situation is addressed in section 3 *infra*) hold their investments through Operating Companies incorporated in Romania.

Reflective loss

1320. Protected investors who hold shares in companies incorporated in the host State, can be harmed in two ways:

- The host State can expropriate their shareholding or directly impair the investors' rights as shareholders (*e.g.*, by depriving them of their voting rights);

- But alternatively, the host State can also indirectly harm the investor, by injuring the company in which the investor holds an interest (*e.g.*, by the State expropriating or impairing an asset owned by the company); this loss, known as reflective loss, is normally expressed as a decline in the value of the shares owned by the investor.

1321. In the present case, Romania has not caused direct injury to Claimants' shareholding, as Claimants remain the rightful shareholders of the Operating Companies. Their alleged damage is the reduction in the value of their equity interest in the Operating Companies[1418]. Thus, Claimants' (except Beta) loss can be defined as the difference (if any) between:

- The actual value of Claimants' equity rights in the Operating Companies; and

- The hypothetical value of these equity rights, if Romania had not adopted those Disputed Measures that breached the ECT.

1322. The actual value of each Claimant's equity rights is in turn calculated by establishing the As Is and the But For enterprise values of the respective Operating Company, and multiplying these figures by the percentage of equity held by the relevant investor.

---

[1418] **Edwards I**, paras. 4.6-4.8, 4.60.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Date of Assessment

1323. The Parties' experts agree that the date of assessment of the damage [the "**Date of Assessment**"] is a legal matter[1419]. Claimants argue that there are two common approaches[1420]:

- An *ex ante* valuation, which values damages as of the date of the illegal action and ignores subsequent changes in the investments, market conditions, and the legal framework; and

- An *ex post* valuation, which values damages as of the date of the award, considering all of the information available to the Tribunal bearing on the quantum of loss.

1324. Claimants have instructed Mr. Edwards to adopt an *ex post* valuation, that considers all of the developments in the regulatory framework cumulatively, and therefore Mr. Edwards has adopted a Date of Assessment at or close to the date of his reports (in his first report, 30 June 2019, and in his second report, 30 June 2020)[1421].

1325. Romania and Dr. Flores generally accept Claimants' Date of Assessment. Dr. Flores suggests, however, that one way of accounting for the uncertainty in the "historical" But For Scenario is by moving the Date of Assessment backwards and discounting all future cash flows with the discount rate that appropriately captures the risks of the Operating Companies under each scenario. Dr. Flores argues that instead of valuing the Operating Companies as of 30 June 2019, Mr. Edwards could have valued the Operating Companies at the time when the As Is and the But For Scenarios diverged in 2013 with the enactment of EGO 57/2013[1422].

1326. The Tribunal agrees with Claimants that, in this case, it is reasonable to use an *ex post* valuation, since this is not a case of expropriation, and furthermore there was not a single breach of the ECT, but rather a number of Disputed Measures that breached the Treaty from 2013 to 2018. Therefore, freezing the valuation at the time of the first breach – the deferral of GCs through the adoption of EGO 57/2013 – would not properly account for the subsequent breaches. As noted by the *Quiborax* tribunal, using actual information is better suited to place the investor in the situation it would have been in but for the breach, than using projections based on information available on the date of the breach, as it allows to closer reflect reality[1423].

1327. In view of the above, the Tribunal establishes the Date of Assessment at 31 December 2021, as a reasonable proxy for the date of this Decision.

---

[1419] **Edwards I**, para. 4.10; **Flores I**, para. 81.
[1420] C-I, para. 397.
[1421] C-I, para. 398; **Edwards I**, paras. 1.15 and 4.11.
[1422] **Flores I**, paras. 80-81; **Flores II**, paras. 28 and 32.
[1423] **Doc. CL-108**, *Quiborax*, para. 379. See also **Doc. CL-105**, *Burlington*, para. 335.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

Definition of But For Scenario

1328. In Claimants' valuation[1424]:

- The As Is Scenario includes the historical cash flows actually received by each Operating Company from 2013 through the Date of Assessment, and the future cash flows that each Operating Company will supposedly receive after the Date of Assessment, assuming that the Disputed Measures continue to apply;

- While the But For Scenario reflects the cash flows that each Operating Company would supposedly have received from 2013 onwards in the absence of all the Disputed Measures, and

- The damage is the amount which, as of the Date of Assessment, sets-off both streams of cash flows.

1329. Romania has not suggested an alternative valuation methodology; instead, it has applied certain corrections to Claimants' valuation.

1330. The Tribunal in principle agrees with Claimants' valuation methodology, but finds that certain adjustments must be made, because Claimants have made their quantum valuation based on the hypothesis that all Disputed Measures amounted to a breach of Romania's obligations under Art. 10(1) of the ECT. But the Tribunal has found that the totality of the Disputed Measures did not amount to a breach of the Treaty, and that Romania only breached its obligations when it failed to guarantee the stability of the Essential Characteristics of the GC support scheme, and thus deprived the Operating Companies of the minimum income which they were expecting.

1331. The necessary consequence is that Claimants' calculation of damages must be adjusted to take into account the actual findings of the Tribunal.

1332. The But For Scenario must reflect the cash flows (as of the Date of Assessment) which each Operating Company would have received or expected to receive, if Romania had guaranteed that for 15 years (2013 to 2028) Claimants' PV Facilities would benefit without interruption from:

- Six GCs per MWh of RES-E produced,

- For which a minimum price of at least EUR 27/GC, adjusted for European inflation, was guaranteed,

- Which could be sold either on the centralized GC market or through GCPAs.

---

[1424] See **Edwards I**, paras. 2.8-2.18; **Edwards II**, para. 1.4.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

1333. Under the Tribunal's But For Scenario, the Operating Companies would have sold all their GCs at least at the minimum price, adjusted for European inflation, in the same year in which such GCs were issued.

1334. Given this decision, there is no reason to apply the discount of 25% suggested by Dr. Flores, to account for revenue variability, since the scenario contemplated by the Tribunal already accounts for the fact that Romania did not commit to guarantee more than the minimum GC price, adjusted for inflation.

Group B Claimants

1335. Romania's Commitments *vis-à-vis* Group B Claimants were not the same as those *vis-à-vis* Group A Claimants, and this requires that the But For Scenario be adapted:

- When they invested in the Gamma Project Company, Group B Claimants already knew that until 31 March 2017, the Company would only be able to trade four GCs per MWh at the minimum value of EUR 27/GC, indexed to European inflation;

- Core Value, however, could not anticipate that, after it had invested, Romania would extend the deferral until December 2020 (under EGO 24/2017 and then Law 184/2018), would *de facto* prohibit the trading of GCs through GCPAs, and would alter the minimum and maximum trade values of GCs, ceasing to index such values to European inflation (under EGO 24/2017).

\* \* \*

1336. Summing up, the Tribunal finds that the following principles should guide the calculation of the reparation:

- Claimants' loss can be defined as the difference (if any) between (i) the actual value of each Claimant's equity rights in the respective Operating Company in the As Is Scenario and (ii) the hypothetical value of these equity rights in the But For Scenario, *i.e.*, assuming that Romania had not adopted those of the Disputed Measures that breached the ECT;

- An accurate assessment of the As Is and But For enterprise values must consider the characteristics of each Operating Company, and the extent to which its cash flows have been impacted by Romania's failure to guarantee its Commitments; for these purposes, Group A and Group B Claimants must receive separate treatment;

- In the But For Scenario the Operating Companies must be assumed (i) to have received from 2013 through 2028 the income from the sale of six GCs per MWh (with no deferral), (ii) to have been able to sell all these GCs either through GCPAs or in the GC market in the same year they obtained said GCs, (iii) at the minimum price of EUR 27/GC, adjusted yearly for European inflation since 2013 (or at a higher price, if so established in a GCPA); and

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

- The But For Scenario should include those Disputed Measures, which, in the Tribunal's finding, did not breach Art. 10(1) of the ECT.

## 3.   DAMAGE SUFFERED BY BETA

1337. Contrary to the other nine Claimants, Beta is both an Operating Company and a claimant. In this case, the damage is calculated as the difference between[1425]:

- The actual enterprise value of Beta; and

- The hypothetical enterprise value Beta would have reached, had Romania not adopted the Disputed Measures that breached the ECT.

    Risen

1338. Beta was at all relevant times controlled by Risen, a protected foreign investor under the ECT[1426] and also a claimant in this arbitration (who is, however, not claiming any damages).

1339. Romania argues that Risen invested prior to the first regulatory changes, when there already were rumors that such changes would occur, and that it made further significant investments in Beta after the enactment of the 2013 and 2014 Disputed Measures. Thus, awarding damages to Beta would effectively compensate its sole shareholder Risen for alleged damages to which it is not entitled due to the timing of its investment[1427].

1340. The Tribunal is not convinced.

1341. Art. 26(7) of the ECT reads as follows[1428]:

> "An Investor other than a natural person which has the nationality of a Contracting Party part to the dispute on the date of the consent in writing referred to in paragraph (4) and which, before a dispute between it and that Contracting Party arises, is controlled by Investors of another Contracting Party, shall for the purpose of article 25(2)(b) of the ICSID Convention be treated as a 'national of another Contracting State' and shall for the purpose of article 1(6) of the Additional Facility Rules be treated as a 'national of another State'" [Emphasis added]

1342. Beta, a Romanian company which made an investment in a PV Facility, was controlled by Risen, an "Investor of another Contracting Party". The control existed

---

[1425] **Edwards I**, para. 4.9.
[1426] As noted by the Tribunal in para. 642 *supra*, although Beta is a company incorporated under the law of Romania, it has been owned and controlled at all relevant times (*i.e.*, before a dispute between it and Romania arose) by Investors of another Contracting Party; therefore, pursuant to Art. 26(7) of the ECT, it shall, for the purpose of Art. 25(2)(b) of the ICSID Convention, be treated as a "national of another Contracting State".
[1427] R-PHB, para. 430.
[1428] **Doc. CL-1**, Art. 26(7).

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

before the adoption of the first Disputed Measures[1429] and well before the dispute between Beta and Romania arose. Beta has at all relevant times been a protected investor under the ECT (and also under Art. 25.2(b) of the ICSID Convention), and as such it is entitled to claim, on its own behalf, the totality of the damage which it has suffered, caused by Romania's breach of its international obligations.

## 4. TRIBUNAL'S QUESTION 9(L)

1343. After the Hearing, the Tribunal asked the Parties to address the following question in their post-Hearing briefs[1430]:

> "Assume that the Tribunal considers that some of the measures adopted by Romania violate the treaty and others do not. How should the Tribunal approach the calculation of damages?"

Claimants' position

1344. In response, Claimants reiterated their position that all the Disputed Measures violated the ECT. Claimants contended that the Parties' experts could present their views in their quantum valuations on the impact of any combination of Measures that the Tribunal determines to be unlawful. However, Claimants considered that the different Measures all had "knock-on" effects on the supply-demand balance. Therefore, any new valuation would require a re-assessment by the regulatory experts and not just an adjustment to the quantum model[1431]. Claimants thus concluded that[1432]:

> "[…] if the Tribunal determines that some of the challenged measures violate the ECT and some do not, the most practical way forward would be for the Tribunal to issue a partial award containing its liability findings and further instructions the Parties' regulatory and quantum experts to present the impact of the Tribunal's liability findings on their regulatory and quantum assessments. Claimants' counsel has found this type of exercise to work well in past cases, especially when the instructions to the experts are clear and the scope of any additional reports is limited. With clear instructions and a narrow scope, the Parties' experts should even be able to submit a joint report on the impact on quantum."

Respondent's position

1345. Romania, in turn, answered that if the Tribunal were to find that only some Disputed Measures violated the ECT, the Tribunal would have no way of determining the damages allegedly caused[1433]. Claimants have not provided a calculation of alleged lost profits caused by each individual Disputed Measure. According to Romania, Claimants have chosen not to make such calculations, although they had the

---

[1429] **Edwards I**, para. 1.8; **Flores I**, paras. 17, 23 and 137.
[1430] Procedural Order No. 6, para. 9(l).
[1431] C-PHB, paras. 304-309.
[1432] C-PHB, para. 310.
[1433] R-PHB, para. 391.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

opportunity of doing so; therefore, they have not met their burden of proof and their claims must be rejected on that basis[1434].

Discussion

1346. The Tribunal has indeed found that only certain specific Disputed Measures amounted to a violation of Romania's obligations under the ECT. The Tribunal is also satisfied that these Measures caused a certain damage to Claimants' investments, for which Romania is liable. But the Parties' damages valuations are unhelpful, since both Claimants' and Respondent's calculations are based on premises that are different from the findings adopted by this Tribunal.

1347. Romania's proposed solution – an outright dismissal of Claimants' claims for damages – is neither reasonable nor fair; Romania has acted in contravention of its international commitments, and through its conduct has impaired Claimants' investments, with the consequence that Claimants are entitled to reparation.

1348. Scholars and arbitral tribunals have held that international investment tribunals have the power to determine the most suitable and practical form of remedy permissible under the applicable investment treaty[1435]. In the present case, nothing in the ECT curtails the Tribunal's power to determine the proper remedy for a breach of Art. 10(1) of the ECT.

1349. Moreover, in recent years, a number of investment tribunals deciding disputes under the ECT have found that they lacked the necessary instruments to decide the quantification of damages (*e.g.*, *RREEF*[1436], *Cube*[1437], *NextEra*[1438], *Cavalum*[1439], *STEAG*[1440], *RWE*[1441], *BayWa*[1442], *Hydro Energy*[1443], to name but a few cases). As

---

[1434] R-PHB, para. 391.

[1435] **Doc. RL-290**, T. Wälde, B. Sabahi, pp. 1061-1062: "To the extent this inherent power to determine the proper remedy is not limited by treaty, advocates and tribunals should therefore think not only of monetary damages as they usually do, but about the most suitable and practical forms of remedy permissible under the applicable investment treaty. The *Goetz v Burundi* tribunal's both flexible and effective procedure in this respect merits greater attention. The Goetz tribunal did not render a final award initially, but only a decision on liability, finding the government responsible for indirect expropriation. It postponed its decision on compensation, giving the parties time to agree on compensation within four months and also the government to consider reissuing a free zone certificate (ie the closest solution to full restitution). Ultimately, the government paid the compensation and also reissued the certificate. The tribunal then embodied the settlement agreement (consisting of both cash and a reissued certificate) in an award."

[1436] **Doc. CL-26**, *RREEF*, paras. 592 *et seq.*

[1437] **Doc. CL-81**, *Cube*, paras. 531-532.

[1438] **Doc. CL-85**, *NextEra*, paras. 678-680.

[1439] **Doc. CL-249**, *Cavalum*, paras. 701 *et seq.*

[1440] **Doc. CL-251**, *STEAG*, paras. 821-822.

[1441] **Doc. RL-172**, *RWE*, paras. 729 *et seq.*

[1442] **Doc. RL-217**, *BayWa*, para. 616.

[1443] **Doc. RL-225**, *HydroEnergy*, paras. 761 *et seq.*

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

noted by the *RREEF* tribunal, in these and other similar cases, tribunals were confronted with an option[1444]:

- Either they could appoint their own expert;

- Or they could ask the Parties to provide an alternative calculation, taking into consideration the tribunal's findings on liability.

1350. The Tribunal finds the second solution both fairer – giving both Parties an opportunity to review their calculations on the basis of the Tribunal's liability findings – and more economical than the first.

1351. The Tribunal trusts that the Parties, assisted by their experts, will be able to calculate the impact of Romania's breach of its obligations under Art. 10(1) of the ECT, on the basis of the premises established by the Tribunal. The Tribunal hopes that the Parties will agree on a calculation, taking into consideration the guidelines provided. The Tribunal, nevertheless, stands ready to provide its support and, if agreement remains impossible, to issue a binding decision.

1352. The Tribunal will in due course address a letter to the Parties with further instructions, including a calendar for consultation, and failing agreement, of submissions to the Tribunal on this issue.

\* \* \*

1353. Further to its decision on quantum, the Tribunal reserves its decisions on interest and costs of the arbitration.

---

[1444] **Doc. CL-26**, *RREEF*, para. 595, referring to *Perenco Ecuador Limited v. Republic of Ecuador* (ICSID Case No. ARB/08/6), Interim Decision on the Environmental Counterclaim, 11 August 2015, paras. 585-587 and to *Saint-Gobain Performance Plastics Europe v. Bolivarian Republic of Venezuela*, (ICSID Case No. ARB/12/13), Decision on Liability and the Principles of Quantum, 30 December 2016, para. 907.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

# VIII. **DECISION**

1354. For the reasons set forth above, the Arbitral Tribunal rules as follows:

1.  Declares that the Tribunal has jurisdiction under the ICSID Convention and the Energy Charter Treaty over all Claimants and their claims;

2.  Declares that Romania has breached Art. 10(1) of the ECT with respect to Claimants' investments;

3.  Directs the Parties to attempt to reach an agreement on the quantum of damages to be paid by Romania to Claimants;

4.  Reserves its decision on damages, interest and costs for a future decision.

*LSG Building Solutions GbmH and others v. Romania*
(ICSID Case No. ARB/18/19)
Decision on Jurisdiction, Liability and Principles of Reparation

_____
Judge O. Thomas Johnson
Arbitrator
(subject to my Dissenting
Opinion)
Date: 11 July 2022

_____
Prof. Dr. Pierre-Marie Dupuy
Arbitrator

Date: 11 July 2022

_____
Prof. Juan Fernández-Armesto
President of the Tribunal
Date: 11 July 2022

286