# Exhibit 25

# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

In the annulment proceeding between

**RENERGY S.à r.l.**

(Respondent on Annulment/Claimant)

**and**

**Kingdom of Spain**

(Applicant on Annulment / Respondent)

**(ICSID Case No. ARB/14/18)**

---

## DECISION ON ANNULMENT

---

***Members of the* ad hoc *Committee***
Prof. Dr. Dário Moura Vicente, President of the *ad hoc* Committee
Mr. Pierre Bienvenu, Ad. E., Member of the *ad hoc* Committee
Mr. Alvaro Galindo, Member of the *ad hoc* Committee

***Secretary of the Committee***
Ms. Anneliese Fleckenstein

Date of dispatch to the Parties: 14 August 2024

**REPRESENTATION OF THE PARTIES**

*The Kingdom of Spain*

Ms. María Andrés Moreno
Ms. Lorena Fatas Perez
Ms. Inés Guzman Gutiérrez
Ms. Lourdes Martínez de Victoria Gómez
Ms. Amparo Monterrey Sánchez
Ms. Elena Oñoro Sainz
Ms. Marina Porta Serrano
Ms. Amparo Sanchez Aguilar

Abogacía General del Estado
C/ Marqués de la Ensenada, 14-16
28004 Madrid
Spain

*RENERGY S.à r.l.*

Mr. Alberto Fortún Costea
Dr. José Ángel Rueda García
Mr. Borja Álvarez Sanz
Mr. José Ángel Sánchez Villegas
Ms. Lucía Pérez-Manglano Villalonga
Mr. Joan Cervantes i Gómez
Mr. Asier Imaz Madina
Mr. Ignacio López Ibarra
Ms. Inmaculada Romero Vázquez

Cuatrecasas, Gonçalves Pereira
C/ Almagro, 9
28010 Madrid
Spain

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................... 1

II.    PROCEDURAL HISTORY .................................................................................. 2

III.   SPAIN'S REQUEST FOR ANNULMENT OF THE AWARD ....................... 7

    A.   MANIFEST EXCESS OF POWERS ............................................................................ 8
       a)   Jurisdiction over the Dispute ................................................................... 8
       b)   Disregard of EU law applicable to the merits of the dispute ................. 11
    B.   FAILURE TO STATE REASONS .............................................................................. 13
    C.   SPAIN'S *PETITA* ................................................................................................ 15

IV.   RENERGY'S POSITION ................................................................................... 15

    A.   MANIFEST EXCESS OF POWERS .......................................................................... 16
    B.   FAILURE TO STATE REASONS .............................................................................. 20
    C.   RENERGY'S *PETITA* ......................................................................................... 21

V.    THE EXPERTS' REPORTS .............................................................................. 21

    A.   PROFESSOR GOSALBO BONO'S REPORT .............................................................. 21
    B.   PROFESSOR PIET EECKHOUT'S REPORT ............................................................. 23

VI.   THE COMMITTEE'S ANALYSIS ................................................................... 24

    A.   THE APPLICABLE LEGAL STANDARDS ................................................................ 24
       a)   No Review of the Award on the Merits .................................................. 25
       b)   Legal Standards for Manifest Excess of Powers .................................... 26
       c)   Legal Standards for Failure to State Reasons ......................................... 28
    B.   THE ALLEGED EXCESS OF POWERS BY THE TRIBUNAL ...................................... 29
       A)   Jurisdiction ............................................................................................. 29
       B)   Merits ..................................................................................................... 45
       C)   Conclusion .............................................................................................. 48
    C.   THE ALLEGED FAILURE TO STATE REASONS IN THE AWARD ............................ 48
       A)   Jurisdiction ............................................................................................. 48
       b)   Merits ..................................................................................................... 52
       c)   Conclusion .............................................................................................. 53
    D.   CONCLUSION .................................................................................................... 54

VII.  COSTS .................................................................................................................. 54

    A.   SPAIN'S SUBMISSIONS ...................................................................................... 54
    B.   RENERGY'S SUBMISSIONS ................................................................................. 55
    C.   THE COSTS OF THE PROCEEDINGS ..................................................................... 57
    D.   THE COMMITTEE'S DECISION ON COSTS ........................................................... 57

VIII. DECISIONS AND ORDERS .............................................................................. 61

## Table of Abbreviations and Defined Terms

| | |
|---|---|
| *Achmea* | Judgment of the CJEU (Grand Chamber) of 6 March 2018, *Slowakische Republik v. Achmea* BV, case C 284/16, ECLI:EU:C:2018:158, RL-111. |
| AcS | Applicant's Closing Statement dated 18 January 2024 |
| AfA | Spain's Application for Annulment dated 2 September 2022 |
| AoS | Applicant's Opening Statement dated 17 January 2024 |
| Applicant | Kingdom of Spain |
| Award | Award rendered on 6 May 2022 in ICSID Case No. ARB/14/18 |
| BIT | Bilateral Investment Treaty |
| C- | Claimant's Exhibit |
| CcS | Claimant's Closing Statement dated 18 January 2024 |
| CJEU | Court of Justice of the European Union |
| CL- | Claimant's Legal Authority |
| Claimant | Renergy S.à r.l. |
| C-MoA | Renergy S.à r.l.'s Counter-Memorial on Annulment dated 16 June 2023 |
| Committee | *Ad hoc* Committee appointed to decide on the Request for Annulment of the Award |
| CoS | Claimant's Opening Statement on Annulment dated 17 January 2024 |
| EC | European Commission |
| ECT | Energy Charter Treaty dated 17 December 1994 |
| Eeckhout Report | Expert Report by Professor Dr. Piet Eeckhout filed by Renergy on 28 September 2023 |
| EU | European Union |
| EU Treaties | Treaty on European Union and Treaty on the Functioning of the European Union |
| FET | Fair and Equitable Treatment |
| Gosalbo Report | Expert Report by Professor Dr. Gosalbo Bono filed by Spain on 16 June 2023 |
| ICSID | International Centre for Settlement of Investment Disputes |
| ICSID Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings |
| ICSID Convention | Convention on the Settlement of Investment Disputes between States and Nationals of Other States dated 18 March 1965 |

| | |
|---|---|
| *Komstroy* | Judgment of the CJEU (Grand Chamber) of 2 September 2021, *République de Moldavie v Komstroy LLC*, case C 741/19, ECLI:EU:C:2021:655, RL-156. |
| MoA | Spain's Memorial on Annulment dated 5 May 2023 |
| R- | Respondent's Exhibit |
| RD 661/2007 | Royal Decree 661/2007, of 25 May 2007, which regulates the activity of electricity production under the special regime |
| REIO | Regional Economic Integration Organization |
| RejoA | Renergy S.à r.l.'s Rejoinder on Annulment dated 30 November 2023 |
| RF1 | Spain's regulatory framework for renewable energy production laid down in Law No. 54/1997 as amended before Regional Act No. 1/2012 |
| Renergy's Resubmitted Statement of Costs | Renergy's Resubmitted Statement of Costs dated 25 March 2024 |
| Respondent | Kingdom of Spain |
| Respondent on Annulment | Renergy S.à r.l. |
| Respondent's Statement on Costs | Respondent's Statement on Costs dated 19 February 2024 |
| RL- | Respondent's Legal Authority |
| RoA | Spain's Reply Memorial on Annulment dated 30 October 2023 |
| Spain | The Kingdom of Spain |
| TEE | Tax on the environmental effects caused inter alia by wind farms as introduced by Regional Act 1/2012 |
| TEU | Treaty on European Union, dated 7 February 1992, as amended |
| TFEU | Treaty on the Functioning of the European Union, dated 25 March 1957, as amended |
| Tribunal | Arbitral Tribunal that rendered the Award |
| TVPEE | Tax on the Value of the Production of Electrical Energy |
| VCLT | Vienna Convention on the Law of Treaties, dated 23 May 1969 |

# I.    INTRODUCTION

1.      The present proceedings concern a request for the annulment of the Award rendered on **6 May 2022** (hereinafter the "**Award**") by an Arbitral Tribunal composed of Judge Bruno Simma, acting as President, Professor Dr. Christoph Schreuer and Professor Dr. Philippe Sands KC, acting as Co-Arbitrators (hereinafter the "**Tribunal**").

2.      The Award decided a dispute submitted to the International Centre for Settlement of Investment Disputes (hereinafter "**ICSID**"), based on the Energy Charter Treaty (hereinafter "**ECT**") and the ICSID Convention, which opposed Renergy S.à r.l., (hereinafter "**Renergy**" or "**Claimant**") to the Kingdom of Spain (hereinafter "**Applicant**", "**Respondent**" or "**Spain**") (ICSID Case No. ARB/14/18), collectively referred to hereinafter as the "**Parties**".

3.      The dispute concerned compensation sought by Renergy, pursuant to the ECT, for losses arising from investments made in the renewable energies sector and the alleged breach by Spain, as the host State of such investments, of its obligations under the ECT in their respect.

4.      In its Award, the Tribunal granted the following relief:

(a)     A declaration that the Tribunal had jurisdiction over the claims submitted by the Claimant, except for the claims related to the TVPEE and TEE under Article 10(1) ECT;

(b)     A declaration that Respondent had breached its obligations under Article 10(1) ECT to provide fair and equitable treatment to the Claimant (this ruling was made by majority, with Arbitrator Sands dissenting);

(c)     A determination that the Respondent pay damages to the Claimant in the amount of EUR 32,896,240.00, together with interest at the Spanish 10-year bond yield rate, compounded monthly, from 21 June 2014 until the date of payment (this ruling was made by majority, with Arbitrator Sands dissenting);

(d)     A determination that the Claimant and the Respondent shall bear each 50% of the arbitration costs;

(e)     A determination that the Claimant and the Respondent shall bear each their own expenses; and

(f)     A determination that any claim, request or defence of the Parties that had not been expressly accepted in Section X of the award were dismissed.

## II.    PROCEDURAL HISTORY

5.      On **2 September 2022**, Spain filed before ICSID an application for the annulment of the Award (hereinafter "**AfA**"). The AfA was filed pursuant to Article 52(5) of the ICSID Convention and Rule 50 of the ICSID Rules of Procedure for Arbitration Proceedings (hereinafter the "**ICSID Arbitration Rules**"). In its AfA, Spain requested that the enforcement of the Award be stayed provisionally pursuant to Article 52(5) of the ICSID Convention.

6.      The *ad hoc* Committee (hereinafter the "**Committee**") was constituted on **11 November 2022** and the annulment proceeding was deemed to have begun as of that date pursuant to ICSID Arbitration Rules 6, 52(2), and 53. Ms. Anneliese Fleckenstein, ICSID Legal Counsel, was designated to serve as Secretary of the Committee.

7.      On **11 January 2023**, the Committee held a First Session by video conference. An audio recording of the session was distributed to the Members of the Committee as well as to the Parties. Participating in the session were:

*Members of the* ad hoc *Committee*

Prof. Dr. Dário Moura Vicente, President of the *ad hoc* Committee
Mr. Pierre Bienvenu, Ad. E., Member of the *ad hoc* Committee
Mr. Alvaro Galindo, Member of the *ad hoc* Committee

*ICSID Secretariat*

Ms. Anneliese Fleckenstein, Secretary of the Committee

*Participating on behalf of RENERGY S.à r.l.:*
Mr. José Ángel Rueda García, Cuatrecasas

2

Mr. Joan Cervantes i Gómez, Cuatrecasas
Mr. Aiser Imaz Madina, Cuatrecasas
Ms. Nerea Rodríguez Vidal, Cuatrecasas

*Participating on behalf of the Kingdom of Spain*:
Ms. Lourdes Martínez de Victoria, Abogacía General del Estado
Ms. María Andrés Moreno, Abogacía General del Estado
Ms. Inés Guzmán, Abogacía General del Estado
Ms. Elena Onõro, Abogacía General del Estado

8.    During the First Session, the Committee and the Parties considered: (i) The draft procedural order circulated by the Secretary of the Committee on 28 November 2022; and (ii) The Parties' comments and respective positions on the draft procedural order submitted on 12 December 2022.

9.    Among other items on the agenda, the Parties confirmed the proper constitution of the Committee and the timetable for the proceeding.

10.    On **13 January 2023**, the Committee issued **Procedural Order No. 1** governing the procedural matters of the annulment proceeding, including the subsequent schedule of written and oral pleadings.

11.    On **1 February 2023**, Spain filed an *Application for Continuation of the Stay of Enforcement of the Award* (hereinafter the "**Application on Stay**").

12.    On **22 February 2023**, Renergy filed an *Opposition to Application for Continuation of the Stay of Enforcement of the Award* ("**Opposition on Stay**").

13.    On **8 March 2023**, Spain filed a *Reply on Continuation of the Stay of Enforcement of the Award* (hereinafter the "**Reply on Stay**").

14.    On **22 March 2023**, Renergy filed a *Rejoinder on Continuation of the Stay of Enforcement of the Award* (hereinafter the "**Rejoinder on Stay**").

15.    On **24 March 2023**, the Committee decided not to hold a hearing on continuation of the stay of enforcement of the Award.

16.     On **18 April 2023**, the Committee granted a request from Spain to file an Expert Report on the following conditions: (i) The report should be strictly limited to the grounds for annulment of the award invoked by Spain in the proceeding; (ii) The same possibility would be granted to Renergy, should it wish to do so; (iii) The filing and discussion of the reports should not impact on the overall duration of the proceeding, as provided for in PO 1; and (iv) The resulting costs would be taken into account in the final allocation of the costs of the annulment proceeding.

17.     On **1 May 2023**, the Committee notified the Parties that, for Spain to be able to comply with the public procurement procedure to which it is subject, Spain was allowed to submit its Expert Report by 16 June 2023 and Renergy could submit a Reply Report by 17 July 2023. The Parties were further allowed to refer to and comment upon each other's expert reports respectively in the Reply and Rejoinder, as well as in their submissions at the hearing.

18.     On **5 May 2023**, Spain filed a *Memorial on Annulment* (hereinafter "**MoA**").

19.     On **12 May 2023**, the Committee issued a *Decision on the Stay of Enforcement of the Award*. The Committee decided that the stay of enforcement of the Award should be lifted subject to Renergy formally undertaking, in a letter to be addressed to the Committee, to: (i) Inform the Committee of any amounts collected from Spain under the Award; (ii) Refrain from either distributing or using those amounts; and (iii) Deposit any such amounts in an escrow account to be set up immediately upon such collection. The Committee reserved the issue of costs on this request to the Committee's final decision on the AfA.

20.     On **16 June 2023**, Renergy filed a *Counter-Memorial on Annulment* (hereinafter "**C-MoA**").

21.     On **16 June 2023**, Spain filed an Expert Report by Professor Dr. Ricardo Gosalbo Bono.

22.     On **23 June 2023**, the Procedural Calendar set out in Annex B to Procedural Order No. 1 was amended by the Committee as agreed by the Parties.

23. On **28 September 2023**, Renergy filed an Expert Report by Professor Dr. Piet Eeckhout pursuant to the Procedural Calendar as amended on 23 June 2023.

24. On **30 October 2023**, Spain filed a *Reply on Annulment* (hereinafter "**RoA**") pursuant to the Procedural Calendar as amended on 23 June 2023.

25. On **30 November 2023**, Renergy filed a *Rejoinder on Annulment* (hereinafter "**RejoA**") pursuant to the Procedural Calendar as amended on 23 June 2023.

26. On **11 December 2023**, the Committee issued, after hearing the Parties, **Procedural Order No. 2** on the organisation of the hearing.

27. On **8 January 2024**, the Committee issued, after hearing the Parties, **Procedural Order No. 3** on certain requests of the Respondent on Annulment concerning the removal of exhibits from the record of the proceedings on grounds of their non-compliance with Procedural Order No. 1.

28. An in-person hearing took place in London on **17 and 18 January 2024**. The following persons attended that hearing:

> *Members of the* ad hoc *Committee*
> Prof. Dr. Dário Moura Vicente, President of the *ad hoc* Committee
> Mr. Pierre Bienvenu, Ad. E., Member of the *ad hoc* Committee
> Mr. Alvaro Galindo, Member of the *ad hoc* Committee
>
> *ICSID Secretariat*
> Ms. Anneliese Fleckenstein, Secretary of the Committee
>
> *Participating on behalf of RENERGY S.à r.l.*:
> Mr. Alberto Fortún Costea, Cuatrecasas
> Dr. José Ángel Rueda García, Cuatrecasas
> Mr. Joan Cervantes i Gómez, Cuatrecasas
> Mr. Ignacio López Ibarra, Cuatrecasas
>
> *Participating on behalf of the Kingdom of Spain*:
> Ms. María Andrés Moreno, General State Attorney's Office
> Ms. Inés Guzmán Gutiérrez, General State Attorney's Office
> Ms. Amparo Monterrey Sánchez, General State Attorney's Office

*Expert Witnesses*

Professor Dr. Ricardo Gosalbo Bono
Professor Dr. Piet Eeckhout

*Court Reporters*

Ms. Celina Rinaldi (Spanish Court Reporter)
Mr. Maximiliano Pessoni (Spanish Court Reporter)
Ms. Chanelle Maliff (English Court Reporter)

*Interpreters*

Ms. Anna Sophia Chapman (English-Spanish Interpreter)
Ms. Amalia de Klemm (English-Spanish Interpreter)
Ms. Roxana Dazin (English-Spanish Interpreter)

*Technical Support*

Ms. Gina Pollard (Technician, Sparq, Inc.)

29.    On **19 February 2024**, the Parties filed revised Hearing Transcripts agreed upon by them.

30.    The Parties also filed their submissions on costs on **19 February 2024**.

31.    On the same date, the European Commission (hereinafter the "**EC**" or the "**Commission**") filed an Application for Leave to Intervene as a Non-Disputing Party in the present Annulment Proceeding pursuant to Rule 37(2) of the ICSID Arbitration Rules.

32.    Pursuant to the Committee's instructions, the Parties filed their observations on the EC's Application on **27 February 2024**.

33.    On **1 March 2024**, the Committee held deliberations on the merits of the AfA.

34.    On **11 March 2024**, the Committee issued **Procedural Order No. 4,** whereby the EC's application of 27 February 2024 was dismissed, and the Parties were allowed to complement their submissions on costs, considering the EC's application and their observations thereto.

35.     On **25 March 2024**, Spain requested permission to file an additional document, namely, a copy of the European's Court of Justice´s Judgement of 14 March 2024. On the same date, Renergy objected to that request and resubmitted its statement of costs.

36.     On **27 March 2024**, the Parties were notified of the Committee's decision to reject Spain's request of 25 March 2024, and Renergy confirmed the validity of its statement of costs filed on 25 March.

37.     On **1 April 2024,** Spain informed the Committee that it did not wish to resubmit its statement on costs.

38.     On **10 July 2024**, Spain requested permission to introduce into the record two additional documents, namely: (i) An Agreement on the interpretation and application of the Energy Charter Treaty between the European Union, the European Atomic Energy Community and their Member States, dated June 26, 2024; and (ii) A Declaration on the legal consequences of the judgment of the court of justice in *Komstroy* and common understanding on the non-applicability of article 26 of the Energy Charter Treaty as a basis for intra-EU arbitration proceedings, dated June 26, 2024.

39.     On **10 July 2024**, Renergy objected to that request, on ground of the delay to the rendering of the Decision on Annulment that the filing of such new documents would necessarily entail.

40.     On **15 July 2024**, the Committee unanimously rejected Spain's request.

41.     The proceeding was closed on **16 July 2024**.

## III.   SPAIN'S REQUEST FOR ANNULMENT OF THE AWARD

42.     Spain requests the annulment of the Award under Article 52(1)(b) and (c) of the ICSID Convention on the following two grounds:

> (a) The Tribunal has manifestly exceeded its powers; and

(b) The grounds on which the Award is based have not been stated.[1]

## A.    MANIFEST EXCESS OF POWERS

43.    Spain submits that the Tribunal has manifestly exceeded its powers by:

(a) Going beyond its jurisdiction, in contravention of EU law;

(b) Omitting the law applicable to the dispute and, in particular, failing to apply EU law to the merits of the dispute; and

(c) Failing to apply EU law to the merits of the dispute due to the misapplication of EU law.[2]

### a)    Jurisdiction over the Dispute

44.    According to Spain, the Tribunal has manifestly exceeded its powers, first and foremost, by overstepping its jurisdiction. Spain considers that, according to the case-law of the CJEU and its Member States, and as a result of the application of international law, "there is no possibility of investment arbitration between a company of an EU Member State and a Member State".[3]

45.    In support of this contention, Spain submits that for an ICSID arbitral tribunal to have jurisdiction over a dispute, three conditions must be met under Article 25 of the ICSID Convention:

(a) The dispute must involve a Contracting State and a national of another Contracting State;

(b) Such dispute must arise directly from an investment; and

---

[1] MoA, ¶ 58.

[2] *Id.*, ¶ 59.

[3] *Id.*, ¶ 77.

(c) Consent must be given in writing by an investor and the host State of the investment.[4]

46.  In the present case, Spain considers that "the Renergy Tribunal did not meet either the condition *rationae personae* or the condition *rationae voluntatis*".[5]

47.  In support of this contention, Spain submits that:

> (a) "[B]oth parties to the dispute are Member States of the European Union, and therefore part of a Regional Economic Integration Organisation [hereinafter "**REIO**"], as defined in Article 1(3) ECT, so that plaintiff and defendant are both part of the same contracting party";[6]

> (b) "[N]either the Kingdom of Spain nor the Kingdom of Luxembourg, from which the claimant originates, have consented to submit the present dispute to investment arbitration".[7]

48.  Moreover, Spain claims that "EU law applies within the EU territory. Thus, in the event of a conflict between the rules of a Member State and EU law, the *principle of primacy* gives precedence to EU law".[8]

49.  This principle, according to Spain, "also applies to rules that Member States endow themselves with by means of international agreements or treaties, i.e. it applies in the context of public international law".[9]

50.  Therefore, Spain concludes, "Article 26 ECT cannot be applied in intra-EU relations".[10]

---

[4] *Id.*, ¶ 80.

[5] *Id.*, ¶ 81.

[6] *Id.*, ¶ 82.

[7] *Id.*

[8] *Id.*, ¶ 83. Footnote omitted.

[9] *Id.*, ¶ 88.

[10] *Id.*, ¶ 91.

51.    The dispute in question concerns, in Spain's view, "purely intra-EU relations and does not affect any third country or its investors. It follows that, in accordance with the conflict rules established and accepted between the EU Member States, Article 26 ECT is not applicable in this case and therefore cannot have given rise to a valid arbitration agreement".[11]

52.    In the present case, Spain notes, the Claimant is incorporated in Luxembourg and "[b]oth the Kingdom of Luxembourg and the Kingdom of Spain are EU Member States, also Contracting Parties to the ECT, and were so at the time of the negotiation, ratification and entry into force of the ECT".[12]

53.    The said inapplicability of Article 26 ECT as a matter of EU law means, according to Spain, that "neither the Kingdom of Spain nor any other Member State has made a valid offer for arbitration to investors from other EU Member States, and there is no valid arbitration agreement between Renergy and the Kingdom of Spain".[13]

54.    Neither Spain nor Luxembourg could therefore be bound under Part III of the ECT "insofar as their integration into the European Union implied the acceptance of the primacy of EU law and the cession of their competences to the EU in this matter".[14]

55.    The introduction of a disconnection clause is accordingly not necessary according to Spain.[15]

56.    In view of the above, this Committee must, as contended by Spain, "correct the incorrect determination of the applicable law by the Tribunal in Renergy. The application of the CJEU's position in its *Achmea* judgment to the present case is undisputed: clauses such as

---

[11] *Id.*, ¶ 92.

[12] *Id.*, ¶ 108.

[13] *Id.*, ¶ 112.

[14] *Id.*, ¶ 118.

[15] *Id.*, ¶ 131.

Article 26(6) ECT cannot apply between Member States of the Union, as is the case here".[16]

57.   In fact, according to Spain, in the underlying arbitration the Tribunal made "an erroneous and biased interpretation of EU law which led it to conclude, contrary to the most basic principles of EU law, that it had jurisdiction to hear the present case".[17]

58.   In conclusion, Spain submits that "the Renergy Tribunal has manifestly exceeded its powers by declaring its jurisdiction when it had none".[18]

59.   This conclusion was reiterated in Spain's Reply Memorial on Annulment[19] and in its Opening Statement at the hearing.[20]

b)   **Disregard of EU law applicable to the merits of the dispute**

60.   Spain also submits that the Tribunal manifestly exceeded its powers by "totally disregarding the application of EU law which is applicable international law".[21]

61.   According to Spain, EU Law had to be applied, with important consequences, to assess the merits of the case, "notably in order to analyze Claimant's legitimate expectations regarding both the nature of renewable energy incentives as State Aid (as a limit to the possibilities on obtaining of those incentives) and the possibility of obtaining such incentives for electricity produced by such means, under EU Environmental law".[22]

62.   However, Spain argues that "the Tribunal failed to consider the implications of the State Aid regulations on the investor's legitimate expectations. Needless to say, such an approach shows that the scope and content of the EU regulation on State aid was not even

---

[16] *Id.*, ¶ 252.

[17] *Id.*, ¶ 260.

[18] *Id.*, ¶ 293.

[19] RoA, ¶ 161.

[20] AoS, slide 31.

[21] MoA, ¶ 294.

[22] AfA, ¶ 37.

taken into consideration. For example, by simply ignoring the State Aid issue the Tribunal did not consider that the recovery of the latter is a consequence expressly foreseen pursuant to EU Law in the case of unlawful State Aid".[23]

63.     In fact, "even if one considers that the State aid rules are not applicable under Article 16(2) ECT because they are more unfavourable than Part III of the ECT and that neither party considers that the State aid rules are more favourable to the investor than the ECT rules, it cannot be forgotten that such aid must be repaid even if it is granted".[24]

64.     Accordingly, Spain submits, the Tribunal has exceeded its powers in that it "manifestly errs in determining the applicable law because, considering that the present case relates to State aid, the use of a subterfuge not to apply this Special Scheme is a serious error in a clear case of exceeding its powers"[25]

65.     In this respect, Spain contends that if EU law had been applied, "the Court in Renergy would have had to consider, among other questions, (i) whether RD 661/2007 had been notified to the European Commission and (ii) what impact such non-notification would have on investors' expectations".[26]

66.     According to Spain, Royal Decree 661/2007, on which Renergy relied, "violated State Aid regulations, as it had not been notified to the European Commission", as is highlighted by the European Commission in its Decision on this issue.[27]

67.     But even if the subsidies had been notified correctly and were therefore in principle in conformity with the TFEU, there would be, according to Spain, "another important consequence for the shaping of legitimate expectations. Member States retain at all times

---

[23] *Id.*, ¶ 41.

[24] MoA, ¶ 304.

[25] *Id.*, ¶ 305.

[26] *Id.*, ¶ 313.

[27] *Id.*, ¶ 340.

the possibility to modify and terminate State Aid schemes in order to avoid situations of over-remuneration and to address unexpected events".[28]

68.    In sum, according to Spain, "the Renergy Award does not apply EU law to the merits of the case and ignores the important consequences that its application would have. It has been demonstrated above that the application of EU law would have had very important consequences not only for the jurisdiction of the Court but also for the merits of the case. In short, the failure to apply the applicable rules amounts to a clear excess of powers that must give rise to the annulment of the award".[29]

69.    This conclusion was restated in Spain's Reply Memorial on Annulment[30] and in its Opening[31] and Closing Statements[32] at the hearing.

### B.    FAILURE TO STATE REASONS

70.    Spain also submits that the Award should be annulled because it "failed to comply with its essential obligation to state reasons".[33]

71.    In fact, Spain "invoked in the underlying arbitration that EU law is applicable to the dispute and affects both the merits of the dispute and the determination of the Tribunal's lack of jurisdiction"[34].

72.    Moreover, "a proper determination of the Claimant's legitimate expectations needed to include a verification of whether the allegedly promised subsidies are lawful under European Union law, which is the international law applicable to the merits of the case".[35]

---

[28] *Id.*, ¶ 341.

[29] *Id.*, ¶ 346.

[30] RoA, ¶ 239.

[31] AoS, slide 53.

[32] *Id.*, slide 33.

[33] MoA, ¶ 358.

[34] *Id.*, ¶ 370.

[35] *Id.*, ¶ 371.

73.     In Spain's view, the Award does not give a proper answer to these issues, incurring the invoked ground for annulment. This is allegedly so, according to Spain, for four main reasons.

74.     *First*, the Tribunal "states that it needs to establish its reading of a judgment of the Court of Justice of the European Union, and, without giving any reason, in the same paragraph states that it is not for it to establish precisely what the Court of Justice of the European Union intended. This absence of reasons constitutes a manifest excess of powers, as it is carried out in such a sensitive matter as the determination of jurisdiction and its effects by the *Kompetenz-Kompetenz* principle".[36]

75.     *Second*, the Tribunal "states that in the light of the Achmea judgment it can be concluded that the arbitration clause of the ECT is incompatible with the principle of sincere cooperation embodied in Article 4(3) of the Treaty on European Union, and consequently that Articles 267 and 344 preclude the arbitration clause".[37] Yet, contrary to this statement, the Tribunal "concludes that judgments of the Court of Justice of the European Union only have an intra-EU effect".[38] Regrettably, Spain adds, "the Court [*recte*: Tribunal] offers no reason why it considers that judgments of the Court of Justice of the European Union have effect only within the European Union".[39]

76.     *Third*, "the Renergy Tribunal also fails to explain the reasons on which it bases its conclusions when explaining the more favourable nature of the Energy Charter Treaty for the purposes envisaged under Article 16 ECT".[40]

77.     *Fourth*, "when applying the rule of conflict constituted by the principle of primacy, the Renergy Tribunal analyses Article 25 ECT. However, the analysis of Article 1(3) ECT and the binding and obligatory nature of the decisions taken by the institutions of the European

---

[36] *Id.*, ¶ 374.

[37] *Id.*, ¶ 375.

[38] *Id.*, ¶ 376.

[39] *Id.*, ¶ 377.

[40] *Id.*, ¶ 379.

Union in matters governed by this treaty, as established in Article 1(3) ECT, is completely neglected".[41]

## C.     SPAIN'S *PETITA*

78.     In light of the foregoing, Spain requests that the Committee:

    (a) Annul the Award in its entirety pursuant to Article 52(1)(b) ISCID Convention, "for manifestly exceeding its powers by improperly declaring its jurisdiction over an intra-EU dispute and for grossly and improperly misapplying fundamental rules for the shaping of investors' legitimate expectations, such as European Union law";

    (b) Annul the Award in its entirety pursuant to Article 52(1)(e) ISCID Convention, for failure to state reasons;

    (c) Order Renergy to pay the full procedural costs.[42]

## IV.    RENERGY'S POSITION

79.     In its Counter-Memorial on Annulment, Renergy submits in essence that:

    (a) The Tribunal did not incur in any excess of power; rather, it correctly ascertained jurisdiction over the dispute and applied the proper law, which is not EU Law;[43] and

    (b) The Tribunal justified in detail the reasons behind its factual and legal findings in the award: no failure to state reasons under article 52(1)(e) can be deemed to exist.[44]

---

[41] *Id.*, ¶ 383.

[42] *Id.*, ¶ 387; RoA, ¶ 273.

[43] C-MoA, ¶¶ 19-100.

[44] *Id.*, ¶¶ 101-145.

A.    **MANIFEST EXCESS OF POWERS**

80.    In respect of the alleged manifest excess of powers, Renergy submits that annulling the Award on the ground of a manifest excess of powers would be "unfeasible and wrong" for several reasons:[45]

   (a) *First,* "[t]he Tribunal's analysis of its jurisdiction followed the ECT. There is no other proper law to reach that finding";

   (b) *Second,* "[c]ontrary to Spain's arguments, it is reasonable to conclude that Spain and Luxembourg are 'other Contracting Parties' vis-à-vis each other under the ECT";

   (c) *Third,* "[t]he Tribunal's analysis of the applicable law is consistent with other precedents. 101 other decisions cannot be manifestly wrong";

   (d) *Fourth,* "[t]o support its application for annulment, Spain relies on several judgments and decisions that the Tribunal did not consider *ratione temporis*. It follows that they are inadmissible and irrelevant".

81.    In fact, according to Renergy:[46]

   (a) "An ECT tribunal that applied the ECT instead of EU law to establish its jurisdiction cannot have exceeded the powers the ECT conferred upon that tribunal";

   (b) "The Tribunal's confirmation of its jurisdiction under the ECT irrespective of the CJEU's *Achmea* and *Komstroy* judgments is fully reasonable"; and

   (c) "The Tribunal provided a reasonable explanation that, if the ECT provisions and EU law conflicted (*quod non*), the Tribunal would still establish its

---

[45] *Id.,* ¶ 30.

[46] *Id.,* ¶ 31.

jurisdiction. Spain's arguments do not show an egregious mistake" in this respect.

82.    In particular, Renergy notes, "[t]he Tribunal found that it could establish its jurisdiction under the ECT alone, and it did. Since it had no need to supplement the ECT, Article 26(6) ECT required it to declare its jurisdiction without further analysis of EU Law".[47]

83.    Moreover, Renergy argues, the "Tribunal's analysis started on whether the requisites provided by the ECT to establish jurisdiction were met in the present case. Since they were, the Tribunal found no need of EU Law 'to supplement the Treaty'. Accordingly, the intra-EU objection failed on its basic premise. Since Spain has not proven how the Tribunal's decision departs from the ECT, its allegation of annulment must be dismissed".[48]

84.    The Tribunal, Renergy goes on to say, "knew very well that, from an international law perspective, it was not a jurisdictional body subject to the laws of a[n] EU Member State. Instead, it was placed at the same level as the CJEU or other arbitration tribunals because of its international character. Thus, it found that all the foregoing led to the ECT being 'as a matter of principle, ignorant of, and unaffected by, judgments and evolving legal interpretations in another legal order such as the EU, as well as in national legal orders, no matter how forcefully those orders argue their applicability'".[49]

85.    The Tribunal, according to Renergy, "carefully scrutinized the CJEU's decisions and, in the exercise of its power to determine its own jurisdiction, concluded that EU Law could not prevent the intra-EU application of Article 26(1) ECT".[50]

---

[47] *Id.*, ¶ 34.

[48] *Id.*, ¶ 40.

[49] *Id.*, ¶ 43. Footnote omitted.

[50] *Id.*, ¶ 47.

86.    In particular, Renergy notes, the Tribunal considered that the ECT lacked a disconnection clause. Spain, according to Renergy, has not proven why the Tribunal's arguments on this point constitute a manifest excess of powers.[51]

87.    To the contrary, "the Tribunal's conclusions on the conflict of laws, and particularly on the principle of primacy, went far beyond the minimum standard of reasonableness to oppose any manifest excess of powers. Whether Spain agrees with the Tribunal's reasons is irrelevant for the Committee".[52]

88.    Renergy further observes that the Award "reaches the same tenable solution (i.e., that the intra-EU objection is dismissed) as at least 78 other cases. Spain's argument that all 101 other decisions (decisions on jurisdiction, decisions on reconsideration, awards and decisions on annulment) are wrong is unsustainable as a matter of law and unsurmountable as a matter of proving that there is an excess manifest of power which would invalidate the Award".[53]

89.    Regarding the merits of the dispute, Renergy contends that the Tribunal "did not fail to apply the proper law when it decided to not apply EU State Aid Rules to the merits of the dispute. Spain's argument fails at its basic premise because the Tribunal was not given enough evidence to ascertain that RF1 constituted State aid".[54]

90.    Moreover, "the Tribunal found that the application of EU State Aid Rules would harm the investors' rights, it understood that Article 16(2) ECT barred its application. Spain cannot seriously contend that this is '*something no reasonable person could accept*'".[55]

91.    However, Renergy adds, "even if, contrary to the Tribunal's finding, EU State Aid Rules were applicable to the merits of the dispute, Spain cannot rely on said EU State Aid Rules

---

[51] *Id.*, ¶ 51.

[52] *Id.*, ¶ 58.

[53] *Id.*, ¶ 67.

[54] *Id.*, ¶ 80.

[55] *Id.*, ¶ 82.

to excuse its breach of the ECT. It follows then that Renergy would still have a right to compensation under the ECT. Thus, the Award's dispositive part would remain intact".[56]

92.   In fact, Renergy notes, "in the Tribunal's words, 'EU law is an integral part of the Respondent's internal legal system within which the Claimant invested.' Even if the Disputed Measures had been adopted to comply with EU Law (*quod non*), Spain could not rely on EU Law to excuse its breach of the ECT. In accordance with Articles 27 VCLT and 32 of the Articles on Responsibility of States for Internationally Wrongful Acts ("ARSIWA"), States may not rely on their internal law as justification for failure to comply with their obligations".[57]

93.   In conclusion, Renergy contends that "Spain has failed to prove that the Tribunal acted manifestly outside the scope of its mandate either in its jurisdictional analysis or in its analysis on the merits of the case. The decisions reached by the Tribunal are not manifestly unreasonable. Spain is requesting the Committee to revise the Award and agree with its own interpretation. However, the revision that Spain is claiming does not fall within the scope of annulment of the Award under Article 52(1)(b) of the ICSID Convention".[58]

94.   In the same vein, Renergy submits in its Rejoinder on Annulment that "[t]he decisions reached by the Tribunal are neither manifestly unreasonable, nor departed 'from a legal principle or legal norm which is clear and cannot give rise to divergent interpretations.' Spain and Mr. Gosalbo are requesting the Committee to revise the Award and agree with its own interpretation. However, the revision that Spain is claiming does not fall within the scope of annulment of the Award under Article 52(1)(b) of the ICSID Convention".[59]

95.   This argument was restated by Renergy in its Opening Statement at the hearing.[60]

---

[56] *Id.*, ¶ 92.

[57] *Id.*, ¶ 93.

[58] *Id.*, ¶ 100.

[59] RejoA ¶ 118.

[60] CoS, slides 3 and 17 ff.

## B.    FAILURE TO STATE REASONS

96.    In respect to the Award's alleged failure to state reasons, Renergy submits that Spain's request based on Article 52(1)(e) ICSID Convention is baseless and must also fail.[61]

97.    In particular, according to Renergy, "in reality, Spain is not alleging a failure to state reasons in the Award, but rather a disagreement with the Tribunal's reasoning. Therefore, this ground for annulment should be completely dismissed". In any event, the Tribunal's reasoning is clear and straightforward.[62]

98.    According to Renergy, "the Tribunal gave plenty of reasons when asserting the applicability of the EU State Aid Rules to the determination of Renergy's legitimate expectations. Spain's assertions are just a vulgar attempt to turn the annulment proceeding into a second instance for the Committee to review the correctness of the Award".[63]

99.    Moreover, contrary to Spain's contentions, the Award does not incur in contradictions, explains why the CJEU's judgments only have effects intra-EU, provides reasons why the ECT is more favorable to the investor, and "can be followed from point A to point B in its analysis on Article 1(3) ECT over the application of EU Law's principle of primacy as a conflict rule".[64]

100.    "The reality", Renergy submits, "is that Spain does not agree with the reasoning and conclusions reached by the Tribunal. Unfortunately for Spain, not agreeing with the Award is not a ground for annulment".[65]

---

[61] C-MoA, ¶ 101.

[62] *Id.*, ¶ 119.

[63] *Id.*, ¶ 124.

[64] *Id.*, ¶ 128.

[65] RejoA, ¶ 142.

101.    Given its failure to meet the legal standard for annulment under Article 52(1)(e) of the ICSID Convention, this ground of the Application must therefore also fail according to Renergy.[66]

## C.    RENERGY'S *PETITA*

102.    For the foregoing reasons, Renergy requests that the Committee render a Decision:

> (a) Dismissing Spain's Application for Annulment of the Award in its entirety; and

> (b) Ordering Spain to pay Renergy's legal fees and all annulment costs (including Committee members' fees, ICSID fees and all related expenses) incurred in these proceedings.[67]

# V.    THE EXPERTS' REPORTS

## A.    PROFESSOR GOSALBO BONO'S REPORT

103.    With the Committee's permission, granted in the abovementioned terms, Spain filed an Expert Report by Professor Dr. Ricardo Gosalbo Bono, which concludes as follows:[68]

> (a) "The ad hoc Committee in RENERGY has competence to decide on its own competence and on the grounds for annulment of the RENERGY arbitral Award, which I believe falls entirely within the scope of Article 52 of the ICSID Convention. In the present case, Article 26 of the ECT required the RENERGY arbitral Tribunal to assess its competence under international law, i.e. EU law. Articles 267 and 344 TFEU made Article 26 ECT inapplicable to *intra-EU* investment disputes. The *Achmea, Komstroy* and subsequent EU judgments are applicable to the ECT and, in particular, to the RENERGY award because the CJEU interprets EU law *ex tunc* (from the outset)."

---

[66] *Id.*, ¶ 155.

[67] C-MoA, ¶ 146; RejoA, ¶ 156; CoS, slide 46; CcS, slide 15.

[68] *Gosalbo Report,* ¶ 148.

(b) "The *intra-EU* dispute that is the subject of the RENERGY Award was fully within the scope of EU law. The contested measures not only transposed the Renewable Energy Directive into Spanish law, but the initial Spanish aid scheme also constituted unlawful state aid under EU law. The compensation recognized in RENERGY award is also considered to be a state aid that must be approved by the European Commission. RENERGY benefits from a full, strong and effective protection in its intra-EU investments under EU law but does not benefit from EU's protection as of legitimate expectations."

(c) "EU law prevails over the ECT as a matter of *jus cogens/lex superior*/principle of primacy.[sic] recognized by customary international law, as stated in Article 30 of the VCLT."

(d) "Art. 16 of the ECT is not applicable because it refers to the reciprocal interpretation of two treaties and does not contain a rule for the case of conflicting treaties and, in any event, it has been superseded by the Lisbon Treaty: in accordance with Article 30(4)(a) of the VCLT, the *inter se* obligations between Member States under the 1994 ECT have been superseded by the Lisbon Treaty. The ECT and EU Treaties contradict each other, they have the same object and, consequently, the ECT does not apply to *intra-EU* investment disputes in all cases."

(e) "Even if *intra-EU* investments would have been included in the scope of application of the ECT at an early stage (*quod non*), this would no longer be the case as the dispute concerns matters that have become the exclusive competence of the EU. Articles 1(2), 1(3), 1(10) and 36(7) of the TEC recognize the transfer of competence from the Member States to the EU and its consequences, *inter alia*, in relation to disconnection clauses. The CJEU has also held that the exclusive competence of the EU prevents Member States from exercising their own reserved competences *inter se*, outside the provisions of the Treaty."

(f) "[…] RENERGY is not entitled to invoke legitimate expectations under EU law. Nor can it invoke Article 70 VCLT, which regulates the consequences of

22

the termination of a treaty, as this provision does not relate to the rights of individuals relying on Article 26 of the ECT."

(g) "No EU investor (and no jurist either, not even those not specialized in the field) can ignore the fundamental basis of the EU's highly developed legal regime of economic integration. […] The fundamental characteristics of EU legal system (primacy/*lex superior*, direct effect) have been extensively addressed by the CJEU for decades, long before the problem of BITs or the ECT entered into by Member States."

(h) "Given that EU law operates as both international law and domestic law, it would be unfortunate and legally objectionable if the Green Power Award were to be interpreted in such a way as to differentiate between ICSID and other arbitrations on the basis that the former is delocalized and domestic law does not apply to any part of an ICSID arbitration."

## B. PROFESSOR PIET EECKHOUT'S REPORT

104. In response, and as previously allowed by the Committee, Renergy filed an Expert Report by Professor Dr. Piet Eeckhout, which conveys, in essence, the following opinion on the issues under discussion:

(a) "The EU and its Member States are each full ECT Contracting Parties, bound by all of the ECT's provisions."

(b) "The ECT, properly interpreted, applies in an intra-EU context. No ECJ case law is capable of modifying this."

(c) "The constitutional EU law issue, articulated in *Achmea* and *Komstroy* is just that: an issue of EU law. It had no relevance to the jurisdiction of the *Renergy* Tribunal. The Tribunal was right to characterise this as an internal EU law issue."

(d) "The Tribunal's jurisdiction was simply not governed by EU law; it was governed by the relevant provisions of the ECT and of the ICSID Convention."

(e) "Cases of conflict between the ECT and EU law are subject to the relevant international law rules and principles, none of which give precedence to EU law over the ECT."

(f) "The primacy of EU law over the laws of the EU Member States is *not* an international conflict rule. It does *not* mean that, on the international plane, the EU Treaties prevail over other treaties [or] agreements concluded between EU Member States."

(g) "EU State aid law was irrelevant for the *Renergy* Tribunal, and not within its jurisdiction. There is no EU judicial or executive authority for the proposition that the 2007 regime constituted State aid; and there is no authority for the proposition that the Award constitutes State aid."

105. In light of the above, Professor Eeckhout concluded his analysis of the issues raised by the present proceeding with the following assertions:[69]

(a) "The Tribunal was correct to find that the ECT applies in intra-EU relations";

(b) "The Tribunal was correct to find that EU law, and in particular the EU constitutional law issue, did not affect its jurisdiction";

(c) "EU law, in case of conflict, does not prevail over the ECT"; and

(d) "The Tribunal was correct not to apply EU State aid law".

## VI.  THE COMMITTEE'S ANALYSIS

### A.  THE APPLICABLE LEGAL STANDARDS

106. In its analysis of Spain's request for the annulment of the Award, and Renergy's opposition thereto, the Committee will base itself on the following standards, which derive from the

---

[69] *Eeckhout Report,* ¶ 145.

ICSID Convention and, as will be seen, have been consistently applied by other *ad hoc* committees in their decisions on requests for annulment of arbitral awards.

**a)     No Review of the Award on the Merits**

107.    Pursuant to Article 53(1) of the ICSID Convention:

> "The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention."

108.    In light of the *principle of finality* of arbitral awards enshrined in this provision, annulment proceedings must be distinguished from appeals, in that they may not involve a review of the merits of awards, or their modification, by *ad hoc* committees called upon to decide annulment requests.

109.    This view was upheld, *inter alia,* by the *ad hoc* Committee in *Tidewater v. Venezuela*, which found that:

(a) Under the ICSID Arbitration Rules, no appreciation is allowed in annulment proceedings of the quality of reasons of the award;[70]

(b) No examination of the merits of the award is allowed in such proceedings either. In fact, an *ad hoc* committee must not re-assess the merits of the case, which it would do notably "if it discarded the Tribunal's exercise of discretion in fixing the amount of compensation and replaced it by its own discretion;"[71] and

(c) An *ad hoc* committee must therefore "abstain from scrutinizing whether the Tribunal has established the facts correctly, has interpreted the applicable law correctly and has subsumed the facts as established correctly under the law as interpreted."[72]

---

[70] *Tidewater Investment SRL and Tidewater Caribe, C.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Annulment, 27 December 2016, ¶ 168, RL-0178.

[71] *Id.*, ¶ 171.

[72] *Id.*, ¶ 172.

110.   More recently, the same view was shared by the *ad hoc* Committee that decided the request for annulment of the arbitral award rendered in *Antin v. Spain*, which specifically held that an annulment committee cannot review *de novo* the facts, evidence and criteria used by an arbitral tribunal in its award of damages.[73]

### b)   Legal Standards for Manifest Excess of Powers

111.   Article 52(1)(b) of the ICSID Convention provides for the annulment of an arbitral award when two conditions are met:

> (a) The arbitral tribunal has exceeded its powers; and
>
> (b) Such excess is manifest.

112.   ICSID *ad hoc* committees have held that there may be an excess of powers if a tribunal "incorrectly concludes that it has jurisdiction when in fact jurisdiction is lacking, or when the Tribunal exceeds the scope of its jurisdiction."[74]

113.   However, since an arbitral tribunal is the judge of its own competence, in order to annul an award on the basis of its determination of the scope of its own jurisdiction, the excess of powers must be manifest.[75]

114.   The manifest nature of an excess of powers has been interpreted by most *ad hoc* committees to mean an excess that is "obvious, clear or self-evident."[76] This is in line with the abovementioned exceptional and limited character of an annulment, as opposed to an appeal.[77]

---

[73] *Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar B.V. (formerly, Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.) v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Decision on Annulment, 30 July 2021, ¶ 168, CL-0328 [hereinafter: "*Antin v. Spain*, Decision on Annulment"].

[74] *Updated Background Paper on Annulment for the Administrative Council of ICSID*, 5 May 2016, ¶ 87, RL-0176, citing several decisions from *ad hoc* committees [hereinafter: ICSID Updated Background Paper on Annulment].

[75] *Id.*, ¶ 88.

[76] *Id*., ¶ 83.

[77] *Antin v. Spain,* Decision on Annulment, ¶ 151, CL-0328.

115.    An error that is manifest must be one that would be "readily apparent without a need to resort to extensive argumentation and analysis to reveal it."[78]

116.    While an annulment claim must be resolved on its own merits, the fact that an arbitral tribunal has arrived, in the award under consideration, at the same conclusions as other tribunals in similar situations can be an indication that an alleged excess of powers is not manifest.

117.    For this purpose, arbitral *jurisprudence constante* constitutes a relevant authority, with persuasive value, as to how other adjudicative bodies have treated similar matters. Taking such jurisprudence into account moreover contributes to the predictability of the decisions of arbitral tribunals and *ad hoc* annulment committees and the consistency of the case-law of investor-State dispute settlement mechanisms.

118.    Thus, for example, in *Antin v. Spain*, the fact that fifty-six other tribunals shared the *Antin* Arbitral Tribunal's views was held by the *ad hoc* Committee as sufficient to show that the Tribunal's reasoning was tenable, and not clearly or self-evidently wrong.[79]

119.    In any event, and without prejudice to the importance of consistency in decisions rendered by *ad hoc* committees in proceedings for annulment of arbitral awards, a committee should only annul an award for an error that is obvious on the face of it. A committee should not make its own findings of fact or law apart from what is established in the award.[80]

120.    As stated by the *ad hoc* Committee in *TECO v. Guatemala*:

> "[I]n determining whether a tribunal has committed a manifest excess of powers, an annulment committee is not empowered to verify whether a tribunal's jurisdictional analysis or a tribunal's application of the law was correct, but only whether it was tenable as a matter of law. Even if a committee might have a

---

[78] *Id.*, ¶ 152.

[79] *Id.*, ¶ 154.

[80] *Id.*, ¶ 169.

different view on a debatable issue, it is simply not within its powers to correct a tribunal's interpretation of the law or assessment of the facts."[81]

121. A tribunal's failure to apply the proper law may also constitute a manifest excess of powers if it amounts to a complete disregard of that law, or if the tribunal acts *ex aequo et bono* without permission of the parties to do so.[82]

122. However, according to some *ad hoc* committee's decisions, an erroneous application of the law does not amount to a manifest excess of powers by the arbitral tribunal, unless a gross or egregious misapplication or misinterpretation of the law has occurred.[83]

### c)    Legal Standards for Failure to State Reasons

123. Pursuant to a well-settled understanding of this provision, Article 52(1)(e) of the ICSID Convention only concerns a failure to state *any reasons*; not the failure to state *correct* or *convincing* reasons.[84]

124. As noted by the *MINE v. Guinea ad hoc* Committee:

> "[T]he requirement that an award has to be motivated implies that it must enable the reader to follow the reasoning of the Tribunal on points of fact and law. It implies, and only that. The adequacy of the reasoning is not an appropriate standard of review under paragraph (1)(e), because it almost inevitably draws an *ad hoc* Committee into an examination of the substance of the tribunal's decision,

---

[81] *TECO Guatemala Holdings LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment, 5 April 2016, ¶ 78, RL-0240.

[82] *Hussein Nuaman Soufraki v. The United Arab Emirates,* ICSID Case No. ARB/02/7, Decision of the *ad hoc* Committee on the Application for Annulment, 5 June 2007, ¶¶ 41-45, RL-0089.

[83] ICSID Updated Background Paper on Annulment, ¶ 93.

[84] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, ¶ 64, CL-0452. See, along the same lines, more recently, the Decision on Annulment rendered on 18 March 2022 by the *ad hoc* Committee in *NextEra v. Kingdom of Spain*, ICSID Case No. ARB/14/11, CL-0330, stating, in ¶ 128, that: "The Committee finds that it must not engage in an assessment of the 'correctness' of the Tribunal's reasoning or whether it was 'appropriate or convincing.'"  See also the decision rendered on 28 March 2022 by the *ad hoc* Committee in *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, CL-0329, stating, in ¶ 320, that: "the Committee agrees with the notion that the ability to follow the reasoning, does not imply a right or ability to review the adequacy of the reasons."

in disregard of the exclusion of the remedy of appeal by Article 53 of the Convention."[85]

125.    According to the same Committee, that requirement "is satisfied as long as the award enables one to follow how the tribunal proceeded from Point A. to Point B. and eventually to its conclusion, even if it made an error of fact or of law."[86]

126.    Considering the abovementioned *principle of finality*, as laid down in the ICSID Convention, an annulment committee is limited in its ability to characterise a tribunal's reasoning as deficient, inadequate or otherwise faulty, and cannot substitute its own judgment to that of the arbitral tribunal.[87]

### B.    THE ALLEGED EXCESS OF POWERS BY THE TRIBUNAL

### a)    Jurisdiction

127.    The Tribunal based its finding that it had jurisdiction over the claims submitted by Renergy, in essence, on the following reasoning:

(a)    *First,* the relevant legal instruments from which Spain's consent to arbitrate can be derived are, in the premises, the ECT and the ICSID Convention;

(b)    *Second,* the requirements for a tribunal to have jurisdiction contained in those instruments, namely in Article 26 ECT and Article 25 ICSID Convention, are "clear, specific, and self-sufficient";

(c)    *Third,* those requirements have been met in the instant case, since: (i) There is a dispute between the Parties; (ii) The Respondent is a Contracting Party to the

---

[85] *Maritime International Nominees Establishment (MINE) v. Government of Guinea*, ICSID Case No. ARB/84/4, Decision on the Application by Guinea for Partial Annulment of the Arbitral Award, 6 January 1988, ¶ 5.08, RL-0179.

[86] *Id.*, ¶ 5.09. See also the Decision on Annulment rendered on 16 March 2022 by the *ad hoc* Committee in *SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38, Decision on Annulment, 16 March 2022, CL-0331, at ¶ 83, stating that: "While a failure to state reasons can take many forms, the ultimate question is whether the Committee is satisfied that the Tribunal's award is possible to follow 'from Point A. to Point B.'. If so, there can be no basis for annulment on this ground."

[87] *Antin v. Spain*, Decision on Annulment, ¶ 234.

ECT in the sense of Article 1(2) ECT; (iii) The Claimant is a national of another Contracting Party to the ECT; (iv) The Claimant is an Investor in the sense of Article 1(7) ECT; (v) The investments of the Claimant are, in their entirety or in part, Investments in the sense of Article 1(6) ECT, and the dispute relates to them; (vi) The investments lie in the Area of the Respondent in the sense of Article 1(10) ECT; (vii) The Claimant alleges violations by the Respondent of Part III of the ECT; (viii) The Claimant has made an attempt for amicable settlement and more than three months had elapsed between this attempt and the Request; (ix) There was no evidence that the dispute had been submitted to the courts of the Respondent, or that any other applicable, previously agreed dispute settlement procedure was applied; and (x) The Claimant provided ICSID with its written consent to arbitration.[88]

128.    In light of the above, the Tribunal saw no need to resort to EU law, as claimed by Spain, in order to determine its jurisdiction.[89]

129.    Notwithstanding that, the Tribunal noted that, even from an internal EU law perspective, it was doubtful that the *Achmea* and *Komstroy* judgments, which Spain invoked to deny the Tribunal's jurisdiction over the dispute, could mean that the obligations of EU Member States under the ECT are void, invalidated, or could not have been validly entered into.[90]

130.    It is furthermore uncertain, according to the Tribunal, that the CJEU itself assumes that its judgments do have, or could have, such an effect.[91]

---

[88] See Award, ¶ 343.

[89] *Id.*

[90] *Id.*, ¶ 356.

[91] *Id.*

131.    Consequently, the Tribunal observed, "it is not apparent whether EU law, as interpreted by the *Achmea* and *Komstroy* Judgments, from an EU-internal point of view, has the legal consequences for an ECT Tribunal that the Respondent attributes to it."[92]

132.    Moreover, as the Tribunal noted:

> "[F]rom the perspective of international law, the Achmea and Komstroy Judgments cannot mean that the obligations of EU Member States under the ECT are void, invalidated, or could not have been validly entered into, even if performing them would violate EU law. In addition, from that same perspective, a judgment of the CJEU cannot direct a tribunal impanelled under the ECT to 'leave unapplied' the arbitration clause under which it is constituted."[93]

133.    Accordingly, the Tribunal concluded:

> "In light of the above, from the perspective of this Tribunal, independent of whatever the CJEU intended to cover with the Achmea and Komstroy Judgments, there can thus be no direct conflict of laws (i.e. a situation in which the Tribunal has to choose between two contradicting applicable rules) between EU law and the ECT as regards Article 26 ECT, unless the Tribunal were to apply EU law to its decision on jurisdiction and considered itself subject to EU law. However, as the Tribunal has determined above, it will not and does not have to apply EU law to that decision and it is not subject to EU law."[94]

134.    In view of these excerpts of the Award, it is unequivocal that the Tribunal:

(a)  Addressed Spain's jurisdictional objection based on the relevance of EU law;

(b)  Rejected that objection in a reasoned decision; and

(c)  Did so based on a reasoning that is, in this Committee's view, entirely tenable.

135.    Spain strongly disagrees with that decision, and considers that it was rendered in error, but it is beyond this Committee's jurisdiction, as defined by the ICSID Convention, to assess

---

[92] *Id.,* ¶ 357.

[93] *Id.,* ¶ 360.

[94] *Id.,* ¶ 361.

whether such an error, if any, was incurred by the Tribunal, and, consequently, to annul the Award on such ground.

136.    This conclusion is largely confirmed by the fact that a significant number of decisions rendered by tribunals and *ad hoc* committees have reached similar conclusions to those of the Tribunal in this case in respect of the jurisdictional issues that it decided.

137.    Although this Committee is conscious, as noted above, that each request for annulment of an arbitral award should be examined on its own merits, and that it is thus not bound to follow prior decisions when ruling on the annulment request before it, it cannot ignore previous decisions of other tribunals and committees, which will be briefly mentioned hereafter.

138.    The jurisdictional issues raised in these proceedings were first dealt with at length in the *Vattenfall Decision on the Achmea Issue*, according to which the arbitral tribunal's assessment of its own jurisdiction should be made "under the ICSID Convention, interpreted in the light of general principles of international law, and the instrument(s) containing the consent to arbitration".

139.    Thus, for the *Vattenfall* Tribunal, the starting point in respect of the said issues should be Article 26 ECT, which sets out the terms of the Contracting Parties' agreement to arbitrate.[95]

140.    Moreover, according to the *Vattenfall* tribunal, the principles of international law relevant to the interpretation and application of Article 26 ECT are primarily those set out in the VCLT.[96]

141.    The *Vattenfall* tribunal accordingly declared that "the law applicable to the assessment of its jurisdiction is the ECT, in particular Article 26 thereof, in conjunction with Article 25

---

[95] *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018, ¶ 128, CL-0283 [hereinafter: "*Vattenfall Decision*"].

[96] *Id.*, ¶ 132.

of the ICSID Convention. These treaties are to be interpreted in accordance with general principles of international law, in particular as set out in the VCLT."[97]

142. Considering the wording of Article 26 of the ECT, the *Vattenfall* Tribunal could therefore not accept the submission that intra-EU arbitrations had been carved out from the application of Article 26 of the ECT.[98]

143. The notion that the source of an arbitral tribunal's competence, when constituted under the ECT and the ICSID Convention, is international law has been upheld in many other ICSID arbitral awards and preliminary decisions on jurisdictional issues. Such is the case, for example, of:

(a) The *RREEF v. Spain* Decision on Jurisdiction, of 2016, which noted that "this Tribunal has been established by a specific treaty, the ECT, which binds both the EU and its Member States on the one hand and non-EU States on the other hand […]. The Tribunal observes, however, that should it ever be determined that there existed an inconsistency between the ECT and EU law – quod non in the present case – and absent any possibility to reconcile both rules through interpretation, the unqualified obligation in public international law of any arbitration tribunal constituted under the ECT would be to apply the former. This would be the case even were this to be the source of possible detriment to EU law. EU law does not and cannot 'trump' public international law."[99]

(b) The *Eiser v. Spain* Award, of 2018, according to which "[t]he Tribunal's jurisdiction is derived from the express terms of the ECT, a binding treaty under international law. The Tribunal is not an institution of the European legal order and is not subject to the requirements of that legal order. However, the Tribunal

---

[97] *Id.*, ¶ 166.

[98] *Id.*, ¶ 188.

[99] *RREEF Infrastructure (G.P.) Limited and RREEF Pan- European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, ¶¶ 74, 87, CL-0205 [hereinafter: "*RREEF Decision on Jurisdiction*"], stating also that the "ECT is the 'constitution' of the Tribunal".

need not address the possible consequences that might arise in a case of a conflict between its role under the ECT and the European legal order, because no such conflict has been shown to exist here."[100]

(c) The *Novenergia v. Spain* Award, of 2018, according to which "this Tribunal's jurisdiction is based exclusively on the explicit terms of the ECT. As is evident, the Tribunal is not constituted on the basis of the European legal order and it is not subject to any requirements of such legal order."[101]

(d) The *LBBW v. Spain* Decision on Jurisdiction, of 2019, which held that "[a] judgment of the CJEU in response to a reference from a national court for a preliminary ruling is binding only upon the court making the reference. EU law has no concept of stare decisis, so such a judgment would not bind other courts. […] This Tribunal, however, derives its authority not from national or EU law but from an international agreement and from the rules of public international law. There is therefore no question of it being bound by the CJEU *Achmea* Judgment […]."[102]

(e) The *Rockhopper v. Italy* Decision on the Intra-EU objection, of 2019, which held that "a proper reading of the *Achmea* does not lead to the conclusion that it is in any way a relevant consideration for the investor-State arbitration mechanism established in Article 26 of the ECT as regards intra-EU relations."[103]

---

[100] *Eiser Infrastructure Limited Energia Solar Luxembourg S.a.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Final Award, 15 February 2018, ¶ 199, CL-0276.

[101] *Novenergia II – Energy & Environment (SCA), (Grand Duchy of Luxembourg), SICAR v. the Kingdom of Spain*, SCC Arb. No. 2015/063, Final Award, 15 February 2018, ¶ 461, CL-0465.

[102] *Landesbank Baden-Württemberg and others v. Kingdom of Spain*, ICSID Case No. ARB/15/45, Decision on the "Intra-EU" Jurisdictional Objection, 25 February 2019, ¶ 102, CL-0299 [hereinafter: "*LBBW* Decision"].

[103] *Rockhopper Italia S.p.A., Rockhopper Mediterranean Ltd. and Rockhopper Exploration Plc v. Italian Republic*, ICSID Case No. ARB/17/14, Decision on the Intra-EU Jurisdictional Objection, 26 June 2019, ¶ 173, CL-0387.

(f) The *Eskosol v. Italy* Decision on Italy's Request of Immediate Termination and Italy's Jurisdictional Objection Based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes, of 2019,[104] which declared that "[a] second and independent reason why the *Achmea* Judgment does not preclude this Tribunal from exercising jurisdiction – even *arguendo*, if it were deemed to extend to ECT cases as a matter of EU law – is that the decisions of the CJEU with respect to EU law are not binding on an international investment tribunal empaneled under a different legal order."

(g) The *ESPF v. Italy* Award, of 2020, stating that "the instrument that gives rise to the Tribunal's jurisdiction in this arbitration"  is the ECT.[105]

(h) The *Kruck v. Spain* Decision on Jurisdiction and Admissibility, of 2021, holding that: "The Tribunal is established under the ICSID Convention, pursuant to the dispute settlement provisions of the ECT and the consent of the parties to this arbitration. It is axiomatic that the competence of the Tribunal is determined by those instruments."[106].

(i) The *Infracapital v. Spain* Decision on Jurisdiction, Liability and Directions on Quantum, of 2021, which declared that "the ordinary meaning of the terms of Article 26, '*in their context*' and '*in the light of its object and purpose*' as required interpretation under the VCLT leads to conclude that the jurisdiction of the Tribunal derives from the ECT itself."[107]

---

[104] *Eskosol S.p.A. in liquidazione v. Italian Republic,* ICSID Case No. ARB/15/50, Decision on Italy's Request of Immediate Termination and Italy's Jurisdictional Objection Based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes, 7 May 2019, ¶ 178, CL-0385.

[105] *ESPF Beteiligungs GmbH, ESPF Nr.2 Austria Beteiligungs GmbH, and Infraclass Energie 5 GmbH & Co. KG v. Italian Republic,* ICSID Case No. ARB/16/5, Award, 14 September 2020, ¶ 273, CL-0394.

[106] *Mathias Kruck and others v. Kingdom of Spain*, ICSID Case No. ARB/15/23, Decision on Jurisdiction and Admissibility, 29 April 2021, ¶ 280, CL-0375.

[107] *Infracapital F1 S.à r.l. and Infracapital Solar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/16/18, Decision on Jurisdiction, Liability and Directions on Quantum, 13 September 2021, ¶ 294, CL-0377.

(j) The *Sevilla Beheer v. Spain* Decision on Jurisdiction, Liability and the Principles of Quantum, of 2022, which concluded that: "In the preceding paragraphs the Tribunal has established that: (1) the jurisdictional requirements of Article 26(1)-(3) of the ECT and Article 25 of the ICSID Convention are satisfied (subject to the validity of the Respondent's Intra-EU Objection); (2) the ECT does not exclude, either expressly or by implication, intra-EU investor-State disputes from the application of its Article 26(3); (3) the TFEU does not seem to contain an explicit prohibition to refer investor-State disputes to arbitration under an investment treaty; (4) even if there was a prohibition (i.e., a conflict between EU law and the ECT), EU law would not have been able to displace the terms of Article 26 of the ECT (under which this Tribunal was constituted) either by virtue of Article 30 or Article 41 of the VCLT. The Intra-EU Objection is therefore rejected."[108]

144. Reference should also be made here to the *Antin v. Spain ad hoc* Committee's decision, which confronted issues similar to those raised in the present proceeding. According to that decision, "on their plain and ordinary reading, the ECT provides the Tribunal with the jurisdiction to entertain claims against Spain (a Contracting Party) by investors of Luxembourg and the Netherlands (both Contracting Parties) related to investments made by the Claimants in Spain."[109]

145. The ECT's purpose does not, therefore, according to the *Antin* Committee, support Spain's interpretation thereof. In fact, as the *Antin* Committee noted, nothing in Article 2 of the ECT suggests the exclusion of claims by investors who are nationals of an EU Member State who is also a party to the ECT against another EU Member State.[110]

---

[108] *Sevilla Beheer B.V. and others v. Kingdom of Spain*, ICSID Case No. ARB/16/27, Decision on Jurisdiction, Liability and the Principles of Quantum, 11 February 2022, ¶ 678, CL-0380.

[109] *Antin v. Spain,* Decision on Annulment, ¶ 236.

[110] *Id.*, ¶ 237 b.

146.    According to the *Antin* Committee, an arbitral tribunal's jurisdiction arises from the express terms of the ECT, which is binding on the State parties and the EU:

> "The EU treaties creating the EEC and the EU cannot be interpreted in a manner that undermines the prior consents to submit to arbitration under the ECT given by each of the EU Member States and the EU itself. The alleged problem of incompatibility between EU law and the ECT, if there is one, is to be sorted out by the EU and the EU States counterparties to the ECT."[111]

147.    Moreover, in *Antin*, as in the present case, the arbitral tribunal stated clearly and comprehensibly in its award why EU law did not bar its jurisdiction. Accordingly, the *Antin* Committee concluded that "[w]hile Spain may dispute the soundness of the Tribunal's premises and findings such criticisms do not give rise to a ground for annulment."[112]

148.    The same fundamental line of reasoning has prevailed in other decisions rendered by *ad hoc* committees on annulment requests concerning ICSID arbitral awards that had rejected Spain's "intra-EU objection" to their jurisdiction. This was notably the case of the decisions rendered in the following proceedings:

(a)    *NextEra Energy v. Spain*, in which the *ad hoc* Committee found that "the Tribunal did not exceed its powers by upholding jurisdiction to hear the case under Art. 26 of the ECT despite Spain's intra-EU objection. The Tribunal's decision was tenable as a matter of law and it could not be deemed a gross or egregious misapplication of the law that a reasonable person could not accept such that it would amount to a non-application of the law;"[113] and

(b)    *SolEs Badajoz v. Spain*, in which the *ad hoc* Committee noted that it "has not been able to identify a gross or egregious error in the Tribunal's interpretation and application of Article 26 and other related provisions of the ECT in the establishment of the Tribunal's jurisdiction pursuant to the ECT. Accordingly,

---

[111] *Id.*, ¶ 237 d.

[112] *Id.*, ¶ 239.

[113] *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Annulment, 18 March 2022, ¶ 231, RL-0330.

the Committee considers that the Tribunal did not exceed its powers within the meaning of Article 52(1)(b) of the ICSID Convention."[114]

(c) *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.ÀR.L. v. Spain*, where the *ad hoc* Committee found that "properly construed, Article 26 of the ECT applies to claims by any investor from a Contracting Party (including an investor from an EU member State) against another EU member State."[115]

(d) *InfraRed Environmental Infrastructure GP Limited and others v. Spain,* in which the *ad hoc* Committee decided that "the Committee does not find that the Award fails the test of Article 52(1)(b) of the ICSID Convention as there is no manifest excess of powers when the Tribunal refused to decline its jurisdiction and the solution was not in itself unreasonable."[116]

(e) *Cube Infrastructure v. Spain*, in which the *ad hoc* Committee held: "Spain's arguments do not affect the conclusion that as a matter of international law, EU law does not have primacy. The provisions invoked by Spain are provisions of EU law and their scope and relevance must be determined insofar as EU law is applicable and relevant. They do not serve as a means of elevating EU law and equating it with international law. Insofar as the interpretation of the ECT is concerned, this is not a question to be addressed at the level of EU law. As a multilateral treaty, the ECT and the determination of the scope of jurisdiction of disputes submitted on the basis thereof is to be determined on the basis of international law;"[117]

---

[114] *SolEs Badajoz GmbH v. Kingdom of Spain,* ICSID Case No. ARB/15/38, Decision on Annulment, 16 March 2022, ¶ 128, CL-0331.

[115] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.ÀR.L. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Annulment, 10 June 2022, ¶ 75, CL-0332 [hereinafter: "*RREEF Decision on Annulment"*].

[116] *InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain,* ICSID Case No. ARB/14/12, Decision on Annulment, 10 June 2022, ¶ 496, CL-0333.

[117] *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain,* ICSID Case No. ARB/15/20, Decision on Annulment, 28 March 2022, ¶ 211, CL-0329.

(f) The *9REN v. Spain* Decision on Annulment, stating that: "It was therefore to the ECT alone that the 9REN Tribunal owed its existence, and which accordingly determined its jurisdiction".[118]

149. The issue of whether the ECT's investor-State dispute settlement provisions apply in intra-EU relations was also addressed by Professor Eeckhout in his Report, who placed that issue in the realm of public international law, and not of EU law.[119] According to this expert:

> "It is beyond doubt or debate that, where the EU acts under international law, as it did when becoming a Contracting Party to the ECT, it is bound by the relevant rules and principles of international law. This includes, first and foremost, the principle of pacta sunt servanda (as codified in inter alia the Vienna Convention on the Law of Treaties; hereafter "VCLT"). The EU must respect its international obligations. In this regard, EU law is in many ways a kind of municipal (or domestic) law." [120]

150. An important distinction in respect of the applicability of EU law to the determination of an arbitral tribunal's jurisdiction in respect of investment disputes was, to be sure, made in the *Green Power* Award, rendered in 2022[121], which Spain claims has accepted the arguments it is making in these proceedings.[122]

151. In that case, the arbitral tribunal found that it had no jurisdiction to hear claims brought under the ECT by two Danish companies against Spain. This was so, as the tribunal noted, because claimants had opted to conduct the proceedings under the SCC Rules, instead of the ICSID Rules, as they could have done under Article 26(4)(a)(i) ECT; and, upon the

---

[118] *9REN Holding S.à. r.l. v. Kingdom of Spain,* ICSID Case No. ARB/15/15, Decision on Annulment, 17 November 2022, ¶ 243, CL-0334 [hereinafter: *9REN v. Spain*].

[119] *Eeckhout Report*, ¶ 10.

[120] *Id.*

[121] *Green PowerPartners K/S and SCE Solar Don Benito APS v. the Kingdom of Spain,* Arbitration No. SCC-2016/135, Award, 16 June 2022, RL-248 [hereinafter: *Green Power v. Spain*].

[122] MoA, ¶ 191.

claimants' proposal in a letter dated 21 October 2016, the seat of the arbitration had been located in Stockholm, Sweden.[123]

152.   Both parties agreed, according to the tribunal, that this choice of the arbitral tribunal's seat attracted the application of Swedish arbitration law, particularly the SAA, as the *lex arbitri*.[124]

153.   Moreover, as the tribunal noted, since the parties had not explicitly agreed on the law governing the arbitration agreement, and neither the ECT nor the SCC Rules, to which the parties had agreed, determined the law applicable to the arbitration agreement, it followed that, pursuant to Section 48 SAA, Swedish law, *i.e.* the law of the seat, was applicable to the determination of jurisdictional matters.[125]

154.   The selection of the seat in Sweden, an EU Member State, also triggered the application of EU law, which is part of the law in force in every EU Member State, including Sweden.[126]

155.   This reasoning cannot, however, be transposed to the case under consideration in this proceeding. In fact, unlike the *Green Power* tribunal, which was seated in a Member State of the EU, the Tribunal in the present case functioned exclusively under the ICSID Convention and Rules. Accordingly, the Tribunal was subject neither to the law of an EU Member State, as its *lex arbitri*, nor to the control of the courts of such a State, as the *Green Power* Tribunal was.

156.   This distinction had already been alluded to in the *Vattenfall Decision on the Achmea Issue*, which stated:

---

[123] *Green Power v. Spain*, ¶ 162.

[124] *Id*.

[125] *Id.*, ¶ 165.

[126] *Id.*, ¶ 166.

> "in cases where the investor opts for another forum, such as an *ad hoc* UNCITRAL Arbitration or arbitration under the SCC Rules, that tribunal's jurisdiction may be circumscribed by the local arbitration law of the place of arbitration".[127]

157. The said distinction was again clearly made by the *Green Power* Tribunal itself, which stated:

> "The question of whether or not EU law applies to the determination of jurisdiction and, if so, the extent to which it does so, does not arise in the same manner in the circumstances of this arbitration as in ICSID proceedings."[128]

158. The relevance of this distinction was also stressed by Professor Piet Eeckhout, both in his Report[129] and in his answer to questions from the Committee at the hearing, in which he stated: [130]

> "I would say is that the difference between the case before the tribunal in Green Power and this case is of course that that was not a case under the ICSID Convention, it was before the Swedish Chamber of Commerce, and it was clear that also Swedish law applied to the question of jurisdiction. And as EU law is a part of Swedish law, I think the tribunal could have been really very short and simply stated that as a result of the case law of the European Court of Justice, Swedish law precludes its jurisdiction."

159. The same distinction applies in respect of the Svea Court of Appeal's and the Swedish Supreme Court's judgments in *Novenergia*[131] and of the Paris Court of Appeal's judgements in *Strabag v. Poland*[132] and *Slot v. Poland*,[133] equally invoked by Spain.[134]

---

[127] *Vattenfall* Decision, ¶ 127.

[128] *Green Power v. Spain*, ¶ 441.

[129] *Eeckhout Report,* ¶ 71.

[130] Hearing Transcript, Day 2, 68:8 to 68:18.

[131] Svea Court of Appeal, Judgment in case T 4658-18, Novenergia, 13 December 2022, RL-0251.

[132] Paris Court of Appeal, Judgement in case No. 48-2022, Strabag v. Poland, 19 April 2022, RL-0245.

[133] Paris Court of Appeal, Judgement in case No. 49-2022, Strabag v. Poland, 19 April 2022, RL-0246.

[134] MoA, ¶¶ 204-211 and 218-248.

160.    In fact, none of those judgements concerned arbitrations exclusively subject to the ICSID Convention and Rules, but rather arbitrations that had as their *lex arbitri* the law of a Member State of the EU and were thus subject to the control of EU Member States' courts.

161.    As has been noted by other ICSID *ad hoc* committees,[135] while EU law may affect the jurisdiction of arbitral tribunals in proceedings subject to the law of EU Member States as their *lex arbitri* and to the control of jurisdictional bodies that are subject to EU law, such as the courts of EU Member States, the same cannot be said in respect of delocalized arbitration proceedings, such as those conducted exclusively under the ICSID Convention and Rules, in respect of which the jurisdiction of an arbitral tribunal must be assessed primarily pursuant to international law.

162.    Accordingly, no tenable argument can be drawn from the said judgements to impugn the determination of the Tribunal's jurisdiction in *Renergy v. Spain.*

163.    This conclusion is not contradicted by Spain's argument based on the EU's characterization as a REIO, as defined in Article 1(3) ECT.[136]

164.    As has been recognised by a significant series of previous decisions rendered by other arbitral tribunals cited in the Award,[137] the fact that the EU, as a REIO, is also a Contracting Party of the ECT does not per se exclude a tribunal's jurisdiction in disputes involving EU Member States.

165.    In fact, under the VCLT's general principles of treaty interpretation, the EU's participation in the ECT as a Contracting Party thereto cannot, by itself, imply a carveout of its Member States from the treaty's dispute resolution clause, namely the offer to arbitrate contained therein; nor does it imply that the ECT was not intended to apply among those States. For this to happen, an express agreement aimed at modifying the ECT *inter se* would be

---

[135] See, e.g., *9REN v. Spain*, ¶¶ 235-238.

[136] MoA, ¶ 82.

[137] *See* Award, ¶ 367.

required under Article 41 VCLT, as well as compliance with the conditions stated therein. None of this has occurred in the premises.[138]

166.    As acknowledged by the *RREEF ad hoc* committee, a judicial assertion by the CJEU would be insufficient to operate such a modification of an international treaty:

> "The Committee is fully conscious of the desire of the CJEU to state that EU law should be interpreted and applied consistently and that it is so charged with that responsibility. However, that objective could, in the Committee's view, only be achieved by a subsequent amendment to the ECT provisions, adding a disconnection clause or by permitting other customarily acceptable declarations and acceptances by other parties to the ECT. It should not, with respect, be made by a unilateral judicial assertion by the CJEU that it alone has the monopoly to finally interpret the ECT provisions which has a direct impact on third-party investors who have relied on the plain and clear provisions of the ECT and unconditional consent to arbitration given by the Contracting States. The Committee is therefore not persuaded that the Komstroy Judgment provides support to suggest that the Tribunal had acted in excess of its powers."[139]

167.    The *Renergy* Tribunal addressed this matter in detail, and concluded that, in light of the ECT's *travaux préparatoires,* absent a disconnection clause expressly agreed upon with the other Contracting Parties to the ECT, a Member State of the European Union is not exempted from its obligations under the ECT.[140]

168.    Moreover, the Tribunal also noted that the VCLT's general rules on treaty interpretation do not provide a basis to conclude that intra-EU claims are removed from the ECT dispute settlement mechanism.[141]

169.    As the Tribunal stressed, the definition of "Area" in Article 1(10) ECT does not preclude the applicability of the dispute settlement provisions contained in Article 26 ECT in respect of disputes between a Contracting Party and an investor of another Contracting Party, even if both of these Parties are EU Member States, notably because if there is a conflict between

---

[138] This point is equally made in *Silver Ridge Power BV v. Italian Republic,* ICSID Case No. ARB/15/37, Award, 26 February 2021, ¶¶ 226-231, CL-390.

[139] *RREEF Decision on Annulment*, ¶ 97.

[140] Award, ¶¶ 368 and 410.

[141] *Id.*, ¶ 370.

an investor and a State that is a Contracting Party of the ECT, the Area within the meaning of Article 26(1) ECT is the Area of that State.[142]

170.   Spain's case for an "implicit disconnection clause" in the ECT, which was also made by its Expert,[143] is thus incapable of leading to the annulment of the Award on grounds of a manifest excess of powers.

171.   In particular, in the opinion of the Committee, the existence of such an implicit disconnection clause cannot be derived, as contended by Spain's Expert,[144] and subsequently by Spain in its Closing Statements at the hearing,[145] from the Statement originally submitted by the European Communities to the ECT Secretariat in 1997 pursuant to Article 26(3)(b)(ii) ECT, and replaced in 2019 by a new Statement made by the European Union, the European Atomic Energy Community (Euratom) and their Member States.[146]

172.   In fact, section 2 of the Statement reads as follows (in its 2019 version):

> "The European Union, Euratom and their Member States are internationally responsible for the fulfilment of the obligations contained within the Energy Charter Treaty, in accordance with their respective competences."

173.   This sentence confirms, as noted by Professor Piet Eeckhout, that the EU and each of its Member States were accepted as "full contracting Parties" of the ECT.[147]

174.   Accordingly, as concluded by the same Expert, "EU law cannot affect the validity of an EU Member State's offer to arbitrate under Article 26(3) ECT".[148] The Committee agrees with that conclusion.

---

[142] *Id.*, ¶ 407.

[143] *Gosalbo Report*, ¶ 18.

[144] *Id.*, ¶ 19.

[145] AcS, slide 10.

[146] Statement submitted to the Energy Charter Treaty (ECT) Secretariat pursuant to Article 26(3)(b)(ii) of the ECT replacing the statement made on 17 November 1997 on behalf of the European Communities, RL-0229.

[147] *Eeckhout Report*, ¶ 24.

[148] *Id.*, ¶ 69.

175.    No manifest excess of powers can therefore be held to have been committed by the Tribunal, as claimed by Spain, when it assessed its own jurisdiction.

**b)    Merits**

176.    Regarding the merits of the dispute, Spain contends that the Tribunal also exceeded its powers by "totally disregarding" EU law, which, in the Applicant's view, had to be applied to assess Renergy's alleged legitimate expectations regarding the renewable energy incentives granted by Spain as host State of its investments.[149]

177.    However, and contrary to Spain's contention, the Award confirms that the Tribunal did consider the implications of EU law in reaching its conclusion that Spain "breached its obligations under Article 10(1) ECT to provide fair and equitable treatment to the Claimant"[150], and in particular, when assessing the existence of legitimate expectations of the Claimant that were worthy of protection under that provision.

178.    In addressing this issue, the Tribunal took a three-step approach:

(a)    *First,* it determined which rules of EU law the Respondent sought to have applied in the dispute, i.e., EU State Aid Rules, specifically Article 108(3) TFEU, and agreed that these were the only rules of EU law that could potentially be relevant to the merits of the case.[151]

(b)    *Second,* it established that, in order for EU State Aid Rules to be applied to the case, Article 16(2) ECT would have to be considered, since, pursuant to the conflict of laws rule contained in that provision, "applicable rules and principles of international law shall not operate to derogate from any provision of Part III

---

[149] MoA, ¶¶ 77, 294.

[150] Award, ¶ 1072.

[151] *Id.*, ¶ 588.

of the ECT, where such ECT provision is more favourable to the investor or the investment". [152]

(c) *Third,* the Tribunal noted that "[n]either Party asserts that the EU State Aid Rules are more favourable to the investor or the investment than Part III of the ECT, and the Tribunal agrees they are not. To the contrary, the Respondent invokes the EU State Aid Rules precisely for the very purpose of preventing the Claimant from enjoying protection under Part III of the ECT". As a result, the Tribunal concluded that, pursuant to Article 16(2) ECT, EU State Aid Rules could not be applied to the case. [153]

179. In light of the above, and considering that there were no other rules of EU law whose application would appear to have or were suggested by the Parties to have, any relevance to the outcome of the case on the merits, the Tribunal declared that it did not need to take a position on the general applicability of EU law pursuant to Article 26(6) ECT. [154]

180. Additionally, the Tribunal considered whether Spain was, in any event, precluded from invoking its "State Aid argument" and its own alleged breach of Article 108(3) TFEU for not having notified such aid to the European Commission. Here again, the Tribunal reasoned (by a majority) in several steps:

(a) *First,* it acknowledged that there was force to the argument that RF1 constituted State aid. This held true, in particular, "if one deems binding, or at least affords deference to, the EC's assessment in this respect, given that the EC qualified RF1 as State aid in its submissions in this arbitration and, arguably, also in an *obiter dictum* in the EC State Aid Decision". [155]

---

[152] *Id.,* ¶ 589.

[153] *Id.*

[154] *Id.,* ¶ 590.

[155] *Id.,* ¶ 646.

(b) *Second*, the Tribunal found that "if RF1 was in fact State aid, it seems difficult to avoid the conclusion that RF1 was unlawful under EU law for not having been notified to the EC, in violation of Article 108(3) TFEU". However, the Tribunal considered that it did not need to take a position on either of these questions because "even if RF1 was unlawful under Article 108(3) TFEU, the Tribunal finds that this would not preclude investors from having had legitimate expectations with respect to RF1";[156]

(c) *Third,* the Tribunal noted that "even assuming *arguendo* that, in principle, EU law forms part of the applicable law, Article 16(2) ECT would preclude the application of any rule of EU law pursuant to which the Tribunal is bound to the EC's alleged ruling" whereby no legitimate expectations existed in respect of RF1. This was so because binding the Tribunal to such a ruling would be "more unfavourable to investors than Part III of the ECT itself, pursuant to which legitimate expectations did in fact exist in relation to RF1";[157]

(d) *Fourth,* the Tribunal recalled that "it is a general principle of public international law, to which the Tribunal fully subscribes, that a host State may not rely on its internal law as a ground for non-fulfilment of its international obligations;"[158]

(e) *Fifth*, the Tribunal pointed out that "it is striking that while the Respondent has now taken the stance, albeit very late in this arbitration, that RF1 was in fact State aid that needed to be notified to the EC, the Respondent appears not to have made such notification until this very day. The Tribunal has great difficulty with the Respondent's argument that its own continued failure to

---

[156] *Id.*.

[157] *Id.*, ¶ 648.

[158] *Id.*, ¶ 649.

notify RF1, which the Respondent itself acknowledges is illegal, should go to the detriment of the Claimant."[159]

181. For the above reasons, the Tribunal found that Spain's failure to notify RF1 to the EC "does not automatically precludes [*sic*] the Claimant from holding legitimate expectations with respect to RF1."[160]

182. These findings, which go the very heart of the dispute between the Parties, illustrate the critical path followed by the Tribunal in the reasoning that ultimately led it to conclude that Spain had, in the premises, breached its obligation to provide fair and equitable treatment to the Renergy, as required by Article 10(1) ECT.

183. In light of the above, the Committee must conclude that Spain has not demonstrated that the Tribunal's decision on the merits constitutes a manifest excess of powers within the meaning of Article 52(1)(b) of the ICSID Convention, or an interpretative error of such an egregious character that it should be characterized as a manifest excess of powers, and hence, determine the annulment of the Award under that provision.

### c) Conclusion

184. Considering the above, Spain's request for annulment on grounds that the Tribunal has manifestly exceeded its powers in assuming jurisdiction over the dispute must be dismissed.

### C. THE ALLEGED FAILURE TO STATE REASONS IN THE AWARD

### a) Jurisdiction

185. Spain further contends that the Award failed to state reasons in relation to the applicability of EU law, which, it submits, should apply to the determination of the Tribunal's jurisdiction.

---

[159] *Id.,* ¶ 652.

[160] *Id.,* ¶ 653.

186. However, as appears from the Committee's consideration of Spain's first ground of annulment, the Tribunal has dealt expressly with the issue of the applicability of EU law and its interrelation with the ECT in respect of its own jurisdiction, and provided reasons for its conclusions in respect of the issue of the applicability of EU law and its relation with the ECT in the determination of the Tribunal's jurisdiction, in respect of which this Committee has not identified any internal contradiction.

187. The Tribunal's reasoning in this respect has been summarized above and need not be restated in full here.[161]

188. In brief, the Tribunal found that it did not have to apply EU law to its decision on jurisdiction, and was not subject to EU law because:

  (a) Articles 26 ECT and 25 ICSID Convention provided the basis for its jurisdiction and the conditions laid down therein for the exercise of such jurisdiction were met in the instant case;[162]

  (b) The Tribunal was not a court in the sense of the EU Treaties, could not request a preliminary ruling from the CJEU, and its decisions are not subject to review by national courts of the EU.[163]

189. Contrary to Spain's contention, the principle of primacy of EU law does not undermine this view, according to the Tribunal, because "the Tribunal is not necessarily convinced, and did not hear sufficient argument to the effect, that the principle was ever intended to have a reach, or could have a reach, broader than the resolution of conflicts between EU law and the law of EU Member States".[164]

---

[161] See, above, ¶¶ 124-131.

[162] Award, ¶ 343.

[163] *Id.,* ¶ 355.

[164] *Id.,* ¶ 398.

190. This finding was corroborated by Renergy's Expert, who also remarked that "primacy of EU law is confined to the relationship between EU law and the laws of the Member States"; and that the latter mean their internal laws, not international treaties.[165]

191. The Committee is moreover unpersuaded that, as claimed by Spain,[166] the Award is flawed by an internal contradiction concerning the possible significance of the *Achmea* and *Komstroy* judgements of the CJEU in respect of EU Member States' obligations under the ECT, and that such a contradiction, if it existed, should be characterized as a failure to state reasons, in that, according to a well-known formulation, "it becomes impossible to understand the motives that led such tribunal to adopt its solution."[167]

192. In fact, the exercise undertaken by the Tribunal in this respect is, in the Committee's view, perfectly straightforward:

(a) *First,* in order to determine the merit of Spain's allegation that the Tribunal lacked jurisdiction pursuant to EU law, as construed by the CJEU in those judgments, the Tribunal declared that it would seek to state its own understanding thereof, despite the fact that it was not for it to "determine with certainty what the CJEU meant where its findings are not entirely clear";[168]

(b) *Second,* the Tribunal stated that, in its view, the *Achmea* judgment's meaning was that "from an EU-internal point of view, the arbitration clause of the ECT is incompatible with the '*principle of sincere cooperation*' embodied in Article 4(3) TEU, and as a consequence, Articles 267 and 344 TFEU 'preclude' the clause";[169]

---

[165] *Eeckhout Report,* ¶ 108.

[166] MoA, ¶¶ 373-376, referring to ¶¶ 353,355 of the Award.

[167] *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v. Argentine Republic*, ICSID Case No. ARB/09/1, Decision on Argentina's Application for Annulment, 29 May 2019, ¶ 209, CL-0444.

[168] Award, ¶ 353.

[169] *Id*., ¶ 355.

(c) *Third,* the Tribunal nevertheless expressed doubts that those judgments, even from an EU-internal point of view, could mean that the obligations of EU Member States under the ECT are void, invalidated, or could not have been validly entered into, as Spain seemed to argue,[170] and that EU law, as interpreted by those judgments, has, from an EU-internal point of view, the legal consequences for an ECT Tribunal that the Respondent attributes to it;[171]

(d) *Fourth*, the Tribunal asserted that, in any event, "from the perspective of international law, the *Achmea* and *Komstroy* judgments cannot mean that the obligations of EU Member States under the ECT are void, invalidated, or could not have been validly entered into", and that the CJEU "cannot direct a tribunal impanelled under the ECT", such as the *Renergy* Tribunal, "to '*leave unapplied'* the arbitration clause under which it is constituted."[172]

193. This reasoning is not only internally coherent, but also consistent with the Tribunal's earlier assertion that it was not bound to resort to EU law in order to determine its own jurisdiction, which is based on Articles 26 ECT and 25 ICSID Convention.[173]

194. In sum, despite having determined its own jurisdiction on the basis of international law, which the Tribunal deemed to be the proper angle of analysis of that issue for a jurisdictional body constituted under the ECT and the ICSID Convention, the Tribunal sought to determine whether its conclusions would be different if the issue was considered from the angle of EU law, as Spain had urged it to; and concluded that this was not the case. There is, therefore, no contradiction in the Tribunal's reasoning.

---

[170] *Id*., ¶ 356.

[171] *Id*., ¶ 357.

[172] *Id*., ¶ 360.

[173] *Id*., ¶ 343.

195.   A converging analysis can be found in the Expert Report of Professor Piet Eeckhout, who, when addressing the issue of whether the *Achmea* judgement precluded intra-EU arbitration under the ECT, observes:

> "The ECJ is incapable of making rulings under international law as to the validity of an international agreement between two Member States, because that is not within its jurisdiction [...]. In other words, what the Court found is that there is an incompatibility between EU law and a provision such as Article 8 of the Netherlands-Slovakia BIT. It did not rule on the consequences of that incompatibility under international law, contrary to what Professor Gosalbo Bono suggests. [...] Crucially, the incompatibility with EU law needs to be removed through action on the international plane: the relevant Member States need to either modify the incompatible treaty, or terminate it, or withdraw from it."[174]

196.   In light of the above, the Committee must reject Spain's claim according to which the Tribunal has failed to give reasons for its findings on the issue of the applicability of EU law to its jurisdiction. To the contrary: (i) The Tribunal has expressly considered this issue and reached a reasoned and consistent conclusion; (ii) Such decision is in line with decisions of other tribunals and *ad hoc* committees that have dealt with the same issue previously; and (iii) Its reasoning is supported, in convincing terms, by an eminent authority on EU law acting as Expert before this Committee.

**b)   Merits**

197.   The same must be said in respect of the merits of the dispute, regarding which, as noted above, the Tribunal followed a precise and logical line of reasoning in order to conclude that Spain had breached its fair and equitable treatment obligations under the ECT.[175]

198.   To summarise, the Tribunal found that:

(a) The ECT provides a more favourable legal framework for investors than EU law;[176] and

---

[174] *Eeckhout Report,* ¶ 45.

[175] See, above, ¶¶ 175-178.

[176] Award, ¶ 382.

(b) Pursuant to Article 16(2) ECT, other applicable rules and principles of international law may not operate to derogate from any provision of Part III of the ECT where such provision is more favourable to the investor or the investment.[177]

199.   These views were also aligned with, and supported by, the expert opinion of Renergy's Expert, who noted:

> "EU competition and State aid policy ensure that distortions of competition caused by anti-competitive behaviour or government subsidies are combatted. But none of this means that there is no room left for the ECT provisions, particularly those on investor protection. The additional protection of those provisions (for example the protection offered by the 'fair and equitable treatment' rule) is complemented by strong remedies, particularly as regards financial compensation. Those remedies are arguably stronger than the ones for which EU law provides: it is only where a Member State has committed a 'sufficiently serious' breach of EU law that an investor from another Member State is entitled to compensation ('Member State liability')."[178]

200.   In light of the above, the Award simply cannot be said to omit sufficient reasons in respect of its determinations on the merits of the dispute, nor to be based upon contradictory reasons in this respect.

201.   While the Committee recognizes that Spain strongly disagrees with the Tribunal's reasons, it does not fall within the Committee's remit, in the context of annulment proceedings, to express a view as to the adequacy or persuasiveness of the Tribunal's reasons once it has confirmed their sufficiency in light of the applicable standard.

### c)    Conclusion

202.   Spain's request for annulment on grounds that the Tribunal has failed to state reasons in respect of the merits of the dispute must therefore also be dismissed.

---

[177] *Id.*, ¶ 589.

[178] *Eeckhout Report,* ¶ 77.

**D.    CONCLUSION**

203.    In view of the above, the Committee finds that:

(a) No grounds for annulment of the Award exist in the present case;

(b) Spain's application for annulment must therefore be dismissed.

## VII.  COSTS

**A.    SPAIN'S SUBMISSIONS**

204.    According to its submission on costs of 19 February 2024, the costs incurred by Spain, and for which it seeks recovery, are, in sum, as follows:[179]

| CATEGORY | AMOUNT |
|---|---|
| ICSID fees and Advanced Payments | 746.350,65 EUR |
| Legal fees directly incurred by Spain | 750.000 EUR |
| Translations | 10.835,21 EUR |
| Travel Expenses | 4.082,96 EUR |
| Other expenses | 38.197,85 EUR |
| TOTAL AMOUNT | 1.549.466,67 EUR |

205.    Spain moreover asks the *ad hoc* Committee that Renergy be ordered to pay all the costs of the proceedings.[180]

206.    Spain further requests that Renergy be ordered to pay interest on the foregoing sums, at a compound rate of interest to be determined by the Committee, until the date of full satisfaction of the Committee's decision.[181]

207.    In deciding how to allocate the costs of the proceedings, Spain submits that the Committee "should be guided by the principle that '*costs follow the event*' if there are no indications

---

[179] Respondent's Statement on Costs, ¶ 18.

[180] *Id.*, ¶ 19.

[181] *Id.*, ¶ 20.

that a different approach should be called for". Spain further notes that such an approach has also been followed by previous *ad hoc* committees, which have decided to allocate the costs to the losing party.[182]

## B.    RENERGY'S SUBMISSIONS

208.    In its Resubmitted Statement of Costs of 25 March 2024, Renergy has, in turn, stated that it incurred costs in the following amounts:[183]

| DESCRIPTION | AMOUNT |
|---|---|
| Attorneys' fees (Cuatrecasas) | EUR 540,905.23 |
| Fees and expenses of Prof. Piet Eeckhout | EUR 36,179.00 |
| Other expenses | EUR 9,467.08 |
| TOTAL | EUR 586,551.31 |

209.    Renergy moreover submits that, in the event Spain's Application for Annulment of the Award is dismissed, Spain must:

(a)    Bear the full costs of the annulment proceedings (including the fees and expenses incurred by the *ad hoc* Committee and ICSID);

(b)    Bear its own legal costs and expenses in their entirety; and

(c)    Reimburse Renergy for its legal costs and expenses as described in its Statement of Costs.[184]

210.    In this sense, Renergy invokes "the well-established arbitral practice of applying the 'costs follow the event' rule," which has been endorsed by *ad hoc* committees in decisions rendered in *OperaFund v. Spain*, *SolEs v. Spain*, *Cube v. Spain*, *NextEra v. Spain*, *RREEF v. Spain*, and *Hydro v. Spain*.

---

[182] *Id.*, ¶ 6.

[183] Renergy's Resubmitted Statement of Costs, ¶ 10.

[184] *Id.*, ¶ 12.

211.  In conclusion, Renergy submits, "the dismissal of Spain's application for the annulment of the Award rendered on May 6, 2022, must necessarily entail that it be ordered to bear the totality of the costs related to these annulment proceedings, including the Committee, ICSID and Renergy's costs and expenses (as well as its own legal costs and expenses)."

212.  Renergy additionally submits that "[t]he Committee should not turn a blind eye to Spain's defiance of the decisions of every other *ad hoc* committees, but instead address it by imposing a post-award interest rate of the costs ordered against Spain in this proceeding to assure that Spain has an incentive to comply with this decision."[185]

213.  Therefore, Renergy requests the Committee "to order Spain to pay post-award interest on the sums of the costs described above, at the same compound rate of interest granted in the Award (Spanish 10-year bond yield rate, compounded monthly), until the date of full satisfaction of the Committee's decision."[186]

214.  In conclusion, Renergy requests that the Committee issue a Decision:[187]

> "(i) Dismissing in its entirety Spain's application for annulment of the Award;
>
> (ii) Ordering the Applicant on Annulment to bear the entirety of the costs of these annulment proceedings (including the Committee's members' fees, ICSID fees and all related expenses);
>
> (iii) Ordering the Applicant for Annulment to bear the entirety of its own legal costs and expenses;
>
> (iv) Ordering the Applicant on Annulment to pay Renergy EUR 586,551.31 for the costs that it has incurred in these proceedings; and
>
> (v) Ordering the Applicant on Annulment to pay post-award interest on the sum indicated in sub-paragraph (iv) above, at the same compound rate of interest granted in the Award (Spanish 10-year bond yield rate, compounded monthly), until the date of full satisfaction of the Committee's decision."

---

[185] *Id.*, ¶ 21.

[186] *Id.*, ¶ 24.

[187] *Id.*, ¶ 25.

### C.  THE COSTS OF THE PROCEEDINGS

215.  The costs of the annulment proceeding, including the Committee's fees and expenses, ICSID's administrative fees and direct expenses, are as follows:

    (a)  Committee Members' fees and expenses: 321,782.07.

    (b)  ICSID administrative fees: 94,000.

    (c)  Other expenses: 83,830.09.

### D.  THE COMMITTEE'S DECISION ON COSTS

216.  In respect of the allocation of the costs of arbitral (and annulment) proceedings, Article 61(2) of the ICSID Convention provides the following guidance:

> "In the case of arbitration proceedings, the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award."

217.  This provision, together with ICSID Arbitration Rule 47(1)(j), both of which are applicable to annulment proceedings by virtue of ICSID Arbitration Rule 53, gives the present Committee considerable discretion in the allocation of the costs of the proceedings.

218.  In the exercise of that discretion, the Committee shall take the "costs follow the event" principle, which both Parties invoked in their submissions, as a starting point of its assessment of how costs should be allocated between the Parties, without prejudice to taking into account other aspects of the proceeding and the dispute.

219.  This mitigated version of the "costs follow the event" rule has been followed in the practice of ICSID tribunals and *ad hoc* committees in the exercise of their discretion under Article

61(2) of the ICSID Convention, as noted, with approval, by a leading authority in the field.[188]

220.　The Committee is moreover mindful that such mitigated version of the "costs follow the event" rule has been extended by several *ad hoc* committees to the apportionment of the parties' own legal fees and expenses.[189]

221.　In applying this standard to the present case, the following points are particularly relevant:

222.　*First*, the fact that, as concluded above, Spain's request for the annulment of the Award must be denied in its entirety.

223.　*Second,* the fact that the outcome of certain procedural incidents was either unfavourable to Spain, or increased the costs of the proceeding, or both, must also be considered by the Committee.

224.　Such was the case of Renergy's request that the Committee lift the stay of enforcement of the Award pending the decision on the AfA, which the Committee decided in favour of Renergy, despite Spain's opposition thereto.[190]

225.　Such was also the case of Spain's request for permission to file an Expert Report, which was opposed by Renergy, *inter alia*, on the ground that the filing of expert reports would increase the overall costs of these proceedings. Although the Committee granted Spain's request, it expressly stated in its decision on that request that the resulting costs would be considered in the final allocation of the costs of the annulment proceeding.[191]

---

[188] See *Schreuer's Commentary on the ICSID Convention,* 3rd ed., Cambridge University Press, 2022, vol. II, p. 1650, referring, as relevant considerations in this regard, to "other factors such as the behavior of the parties during the proceedings, the novelty and complexity of the issues, whether claims had been frivolous or abusive, or other public policy considerations".

[189] *See* ICSID Updated Background Paper on Annulment, ¶ 65.

[190] Decision on the Stay of Enforcement of the Award, of 12 May 2023, ¶ 53.

[191] Committee's Decision of 18 April 2023.

226.    Such was, finally, the case of Spain's requests for the filing of additional documents after both Parties had filed their costs submissions and at a moment when the Committee had already held deliberations on the AfA. These requests were opposed by Renergy and, after careful consideration, the Committee decided to reject them.[192]

227.    *Third,* and notwithstanding the above, the nature and complexity of the dispute, as well as the conduct of the Parties in the proceeding, must be considered by the Committee in the allocation of costs.

228.    In this respect, the Committee is mindful that the issues under discussion, particularly those related to the Tribunal's jurisdiction, and the applicability of EU law, present a high degree of complexity, and have been the object of divergent decisions by courts and tribunals of high standing.

229.    It is moreover the case that the Tribunal's Award on Liability and Quantum was rendered by majority, that a Dissenting Opinion was issued by Professor Philippe Sands, KC, stating, *inter alia,* that he did not support all of the reasons upon which the Majority's conclusions on jurisdiction, including in relation to the issue of applicable law,[193] and that this issue constituted the gist of Spain's allegations of excess of powers and failure to state reasons.

230.    Although the reasons for that dissent were not spelled out by Professor Philippe Sands in such a way that the Committee could consider them in its assessment of Spain's application, it nevertheless suggests that, even if, by itself, the dissent would not provide a justification to seek the annulment of the Award, Spain's application cannot be deemed frivolous.

231.    In addition to the above, the Committee notes that both Parties have complied forthwith, in all instances, with its orders and decisions, and that their conduct during the proceedings was overall correct.

---

[192] Committee's Decision of 27 March 2024; Committee's Decision of 15 July 2024.

[193] Prof. Philippe Sands' Dissent on Liability and Quantum, 22 April 2022, ¶ 2.

232.    In light of the abovementioned circumstances, the Committee, exercising its discretion, decides the following in respect of the apportionment of costs:

    (a)    Spain shall bear its own legal costs and expenses;

    (b)    Spain shall reimburse Renergy 85% of its costs, in the amount of EUR 498,568.61;

    (c)    Renergy shall bear the remaining 15% of its costs;

    (d)    If payment of the above-mentioned amount is not made by Spain within sixty days from the notification of the present decision, the amount payable shall be increased by interest at the Spanish 10-year bond yield rate compounded monthly until the date of payment; and

    (e)    Spain shall bear all costs of the proceedings, including the Committee's fees and expenses and ICSID's costs.

## VIII. DECISIONS AND ORDERS

233.   For the foregoing reasons, the Committee unanimously decides the following:

(a)  Spain's Application for Annulment is dismissed;

(b)  Spain shall bear all the costs of the proceedings, including the fees and expenses of the Committee and ICSID's administrative fees and direct expenses, as reflected in ICSID's final financial statement, and pay 85% of Renergy's costs up to the amount of EUR 498,568.61;

(c)  This amount shall be increased by interest at the Spanish 10-year bond yield rate compounded monthly until the date of payment, if such payment is not made within sixty days from the notification of the present decision.

_____                    _____
Mr. Pierre Bienvenu, Ad. E.                 Mr. Alvaro Galindo
Member of the *ad hoc* Committee            Member of the *ad hoc* Committee

Date: 31 / July 2024                        Date:



_____
Prof. Dr. Dário Moura Vicente
President of the *ad hoc* Committee
Date:

 

Mr. Pierre Bienvenu, Ad. E.
Member of the *ad hoc* Committee

Date:

 

Mr. Alvaro Galindo
Member of the *ad hoc* Committee

Date: 24 JULY 2024

 

Prof. Dr. Dário Moura Vicente
President of the *ad hoc* Committee

Date:

63

_____          _____
      Mr. Pierre Bienvenu, Ad. E.                      Mr. Alvaro Galindo
    Member of the *ad hoc* Committee              Member of the *ad hoc* Committee
Date:                                          Date:


_____
      Prof. Dr. Dário Moura Vicente
    President of the *ad hoc* Committee
Date:  24 July 2024

64