# Exhibit 26

**ICSID**

INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

## BayWa r.e. AG

### v.

### Kingdom of Spain

## (ICSID Case No. ARB/15/16)
### Annulment Proceeding

I hereby certify that the attached document is a true copy of the English version of the *ad hoc* Committee's Decision on Annulment dated May 8, 2023.

Meg Kinnear
Secretary-General

Washington, D.C., May 8, 2023



# INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

In the annulment proceeding between

**BayWa r.e. AG (formerly BayWa r.e. renewable energy GmbH and BayWa r.e. Asset Holding GmbH)** (Respondent on Annulment / Claimant)

**and**

**Kingdom of Spain**

(Applicant on Annulment / Respondent)

**(ICSID Case No. ARB/15/16)**

---

# DECISION ON ANNULMENT

---

### *Members of the* **ad hoc** *Committee*

Prof. Dr. Dário Moura Vicente, President of the *ad hoc* Committee
Ms. Bertha Cooper-Rousseau, Member of the *ad hoc* Committee
Mr. Baiju S. Vasani, Member of the *ad hoc* Committee

### *Secretary of the Committee*
Ms. Anneliese Fleckenstein

---

*Date of dispatch to the Parties: 8 May 2023*

## REPRESENTATION OF THE PARTIES

*The Kingdom of Spain*

Ms. María del Socorro Garrido Moreno
Ms. María Andrés Moreno
Ms. Gabriela Cerdeiras Megías
Ms. Lorena Fatás Pérez
Mr. Rafael Gil Nievas
Ms. Inés Guzmán Gutiérrez
Ms. María de Lourdes Martínez de Victoria Gómez
Ms. Amparo Monterrey Sánchez
Ms. Elena Oñoro Sainz
Abogacía General del Estado
Departamento de Arbitrajes Internacionales
Subdirección General de Asuntos
de la Unión Europea e Internacionales
c/ Marqués de la Ensenada, 14-16
28004, Madrid
Spain

*BayWa r.e. AG*

Mr. Alberto Fortún Costea
Dr. José Ángel Rueda García
Prof. Miguel Gómez Jene
Mr. Borja Álvarez Sanz
Mr. Gustavo Antonio Mata Morreo
Mr. Antonio María Hierro Viéitez
Mr. José Ángel Sánchez Villegas
Ms. Soledad Peña Plaza
Ms. Lucía Pérez-Manglano Villalonga
Ms. Nerea Rodríguez Vidal
Cuatrecasas, Gonçalves Pereira
Calle Almagro, 9
28010, Madrid
Spain

# TABLE OF CONTENTS

Table of Abbreviations and Defined Terms ................................................................ iv

I.   Introduction ..................................................................................................... 1

II.  Procedural History ........................................................................................... 2

III. Spain's Request for Annulment of the Award .............................................. 8

A.   Manifest Excess of Powers ...................................................................... 8

a)   Jurisdiction over the Dispute ............................................................ 8

b)   Failure to apply EU law .................................................................. 11

B. Failure to state reasons ............................................................................ 12

C. Serious departure from a fundamental rule of procedure ....................... 13

D. Spain's *Petita* ........................................................................................ 16

IV.  BayWa's Position ........................................................................................... 17

A.   Manifest Excess of Powers .................................................................... 17

B.   Failure to state reasons .......................................................................... 20

C.   Serious departure from a fundamental rule of procedure ..................... 22

D.   BayWa's *Petita* ................................................................................... 25

V.   The European Commission's Submission as Non-Disputing Party ............. 25

a)   The EC's Submission ....................................................................... 25

b)   BayWa' Comments on the European Commission's Submission ..... 26

VI.  The Committee's Analysis ............................................................................ 28

A.   The Applicable Legal Standards ............................................................ 28

a)   No Review of the Award on the Merits ........................................... 28

b)   Legal Standards for Manifest Excess of Powers ............................. 29

c)   Legal Standards for Failure to State Reasons .................................. 32

d)   Legal Standards for Serious Departure from a Fundamental Rule of Procedure ........ 33

B.   Analysis of the BayWa Award (1): Manifest Excess of Powers by the Tribunal ............ 33

C.   Analysis of the BayWa Award (2): Failure to State Reasons in the Award .................... 48

D.   Analysis of the BayWa Award (3): Serious Breach of a Fundamental Procedural Rule . 50

E.   Conclusion .................................................................................................... 54

VII.   Costs ............................................................................................................... 54

A.   Spain's Submissions .................................................................................... 54

B.   BayWa's Submissions .................................................................................. 55

C.   The Costs of the Proceedings ...................................................................... 56

D.   The Committee's Decision on Costs ............................................................ 56

VIII.   Decisions and Orders .................................................................................... 57

**Table of Abbreviations and Defined Terms**

| | |
|---|---|
| *Achmea* | Judgment of the CJEU (Grand Chamber) of 6 March 2018, *Slowakische Republik v. Achmea* BV, case C 284/16, ECLI:EU:C:2018:158, RL-111. |
| AcS | Applicant's Closing Statement |
| AfA | Spain's Application for Annulment dated 24 May 2021 |
| AoS | Applicant's Opening Statement |
| Applicant on Annulment | Kingdom of Spain |
| Award | Award rendered on 25 January 2021 in ICSID Case No. ARB/15/16 |
| BayWa | BayWa r.e. AG |
| BIT | Bilateral Investment Treaty |
| C- | Claimant's Exhibit |
| CcS | Claimant's Closing Statement |
| CJEU | Court of Justice of the European Union |
| CL- | Claimant's Legal Authority |
| Claimant | BayWa r.e. AG |
| C-MoA | BayWa's Counter-Memorial on Annulment dated 22 February 2022 |
| Committee | *Ad hoc* Committee appointed to decide on the request for annulment of the Award |
| CoS | Claimant's Opening Statement |
| Decision on Jurisdiction | Decision on Jurisdiction, Liability and Directions on Quantum rendered on 2 December 2019 in ICSID Case No. ARB/15/16 |
| EC | European Commission |
| ECT | Energy Charter Treaty |
| EU | European Union |
| EU Treaties | Treaty on European Union and Treaty on the Functioning of the European Union |
| FET | Fair and Equitable Treatment |
| ICSID | International Centre for Settlement of Investment Disputes |
| ICSID Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings |
| ICSID Convention | Convention on the Settlement of Investment Disputes between States and Nationals of Other States dated 18 March 1965 |

iv

| Komstroy | Judgment of the CJEU (Grand Chamber) of 2 September 2021, *République de Moldavie v Komstroy LLC*, case C 741/19, ECLI:EU:C:2021:655, RL-156. |
|---|---|
| MoA | Spain's Memorial on Annulment dated 22 November 2021 |
| NDP | Non-Disputing Party |
| R- | Respondent's Exhibit |
| RD 661/2007 | Royal Decree 661/2007, of 25 May 2007, which regulates the activity of electricity production under the special regime |
| REIO | Regional Economic Integration Organization |
| RejoA | BayWa's Rejoinder on Annulment dated 22 June 2022 |
| Respondent | Kingdom of Spain |
| Respondent on Annulment | BayWa r.e. AG |
| RL- | Respondent's Legal Authority |
| RoA | Spain's Reply on Annulment dated 22 April 2022 |
| Spain | The Kingdom of Spain |
| TEU | Treaty on European Union |
| TFEU | Treaty on the Functioning of the European Union |
| Tribunal | Arbitral Tribunal that rendered the Award |
| TVPEE | Tax on the Value of the Production of Electrical Energy |
| VCLT | Vienna Convention on the Law of Treaties, dated 23 May 1969 |

# I. INTRODUCTION

1. These proceedings concern a request for the annulment of the Award rendered on 25 January 2021 (hereinafter the "**Award**") by the Arbitral Tribunal composed of Judge James R. Crawford, acting as President, Dr. Horacio Grigera Naón and Ms. Loretta Malintoppi, acting as Co-Arbitrators (hereinafter the "**Tribunal**").

2. That Award decided a dispute submitted to the International Centre for Settlement of Investment Disputes (hereinafter "**ICSID**"), based on the Energy Charter Treaty (hereinafter "**ECT**") and the ICSID Convention, which opposed BayWa r.e. AG, formerly BayWa r.e. renewable energy GmbH and BayWa r.e. Asset Holding GmbH, (hereinafter "**BayWa**" or "**Claimant**") to the Kingdom of Spain (hereinafter "**Applicant**", "**Respondent**" or "**Spain**") (ICSID Case No. ARB/15/165), collectively referred to hereinafter as the "**Parties**".

3. The dispute concerns compensation sought by BayWa, pursuant to the ECT, for losses allegedly arising from investments made in the renewable energies sector and the alleged breach by Spain of its obligations under the ECT with respect to those investments.

4. In its Award, which incorporated its Decision on Jurisdiction, Liability and Directions on Quantum, rendered by majority on 2 December 2019, the Tribunal granted the following relief:

   (a) A declaration that, in the circumstances, the clawing back by Spain, in and after 2013, of subsidies earlier paid at levels in excess of the amounts that would have been payable under the Disputed Measures, had they been in force in previous years, was in breach of the obligation of stability under Article 10.1, first and second sentences, of the ECT Spain has violated the FET standard in Article 10(1) of the ECT with respect to the Claimant's investments;

   (b) A declaration that there was no other breach of the ECT;

   (c) A determination that Respondent shall pay the Claimant **EUR 22.006 million** in compensation. Interest shall be payable on the sum awarded, computed at the six-month EURIBOR rate, compounded semi-annually, from 13 July 2013 up to the date of payment of the Award; and

(d)     A determination that each Party shall carry its own legal representation costs, while the ICSID costs are to be shared equally between the Parties.

## II. PROCEDURAL HISTORY

5.     On 24 May 2021, ICSID received from the Kingdom of Spain an application for the annulment of the Award (hereinafter "**AfA**"). The AfA was filed pursuant to Article 52(5) of the ICSID Convention and Rule 50 of the ICSID Rules of Procedure for Arbitration Proceedings (hereinafter the "**ICSID Arbitration Rules**"). In its AfA, Spain requested that the enforcement of the Award be stayed provisionally pursuant to Article 52(5) of the ICSID Convention.

6.     On 28 May 2021, the Secretary-General registered the AfA pursuant to ICSID Arbitration Rule 50(2). She also informed the Parties that, pursuant to Article 52(3) of the ICSID Convention, the Chairman of the Administrative Council of ICSID would proceed with the appointment of an *ad hoc* committee. Finally, the Secretary-General confirmed the provisional stay of enforcement of the Award pursuant to ICSID Arbitration Rule 54(2).

7.     On 20 July 2021, the Secretary-General notified the Parties that the Chairman of the ICSID Administrative Council would proceed to appoint Prof. Dr. Dário Moura Vicente, a national of Portugal, Ms. Bertha Cooper-Rousseau, a national of The Bahamas, and Mr. Baiju S. Vasani, a national of the United Kingdom and the United States.

8.     The *ad hoc* Committee (hereinafter the "**Committee**") was constituted on 16 August 2021 and the annulment proceeding was deemed to have begun as of that date pursuant to Arbitration Rules 6, 52(2), and 53. Mr. Francisco Grob, ICSID Legal Counsel, was designated to serve as Secretary of the Committee.

9.     On 16 September 2021, the Committee held a First Session by video conference. An audio recording of the session was distributed to the Members of the Committee as well as to the Parties. Participating in the session were:

> *Members of the* ad hoc *Committee*
> Prof. Dr. Dário Moura Vicente, President of the *ad hoc* Committee

2

Ms. Bertha Cooper-Rousseau, Member of the *ad hoc* Committee
Mr. Baiju S. Vasani, Member of the *ad hoc* Committee

*ICSID Secretariat*

Ms. Mercedes Cordido-Freytes de Kurowski, Secretary of the *ad hoc* Committee
Mr. Federico Salon-Kajganich, ICSID Paralegal

*Participating on behalf of BayWa*

Mr. Alberto Fortún Costea, Cuatrecasas Gonçalves Pereira
Dr. José Ángel Rueda García, Cuatrecasas Gonçalves Pereira
Ms. Laura Díaz Vallespinós, Cuatrecasas Gonçalves Pereira

*Participating on behalf of the Kingdom of Spain*

Mr. Rafael Gil Nievas, Abogacía General del Estado
Ms. Elena Oñoro Sainz, Abogacía General del Estado

10.  During the First Session, the Committee and the Parties considered (i) the draft procedural order circulated by the Secretary of the Committee on 26 August 2021 and (ii) the Parties' comments and respective positions on the draft procedural order submitted on 13 September 2021.

11.  Among other items on the agenda, the Parties confirmed the proper constitution of the Committee and the timetable for the proceeding.

12.  On 27 September 2021, the *ad hoc* Committee issued **Procedural Order No. 1** governing the procedural matters of the annulment proceeding, including the subsequent schedule of written and oral pleadings.

13.  On 30 September 2021, Spain filed a *Memorial on the Stay of Enforcement of the Award* (hereinafter the "**Memorial on Stay**").

14.  On 21 October 2021, BayWa filed a *Counter-Memorial on Stay of Enforcement of the Award* ("**Counter-Memorial on Stay**").

15.  On 22 October 2021, the European Commission ("**EC**") filed with the ICSID Secretariat an *Application for Leave to Intervene as Non-Disputing Party* pursuant to ICSID Arbitration Rule 37(2) (hereinafter the "**EC's Application**").

16. On 4 November 2021, Spain filed a *Reply on the Stay of Enforcement of the Award* (hereinafter the "**Reply on Stay**").

17. On 5 November 2021, each party filed observations on the EC's Application.

18. On 18 November 2021, BayWa filed a *Rejoinder on* Stay of *Enforcement of the Award* (hereinafter the "**Rejoinder on Stay**").

19. On 22 November 2021, Spain filed a *Memorial on Annulment* (hereinafter "**MoA**").

20. On 20 December 2021, the Committee issued **Procedural Order No. 2**, with a Decision on the Stay of Enforcement of the Award. The Committee decided that the stay of enforcement of the Award should be lifted and reserved the issue of costs on this request to the Committee's final decision on the AfA.

21. On the same date, the Committee issued **Procedural Order No. 3**, with a Decision on the European Commission's Application to intervene as a Non-Disputing Party (hereinafter "**NDP**") pursuant to ICSID Arbitration Rule 37(2), granting in part the EC's application.

22. On 28 January 2022, the EC filed a written submission as NDP, as allowed by the Committee in Procedural Order No. 3.

23. On 22 February 2021, BayWa filed a *Counter-Memorial on Annulment* (hereinafter "**C-MoA**").

24. On 3 March 2022, BayWa submitted its *Comments on the European Commision's Amicus Curiae Brief*, as allowed by the Committee in Procedural Order No. 3.

25. On 22 April 2022, Spain filed a *Reply Memorial on Annulment* (hereinafter "**RoA**").

26. On 8 June 2022, the Centre informed the Parties that Ms. Anneliese Fleckenstein, ICSID Legal Counsel, would serve as Secretary of the *ad hoc* Committee, replacing Mr. Francisco Grob.

27. On 22 June 2022, Spain filed a request for leave to introduce two new legal authorities into the record. On 29 June 2022, BayWa submitted its comments on Spain's request.

4

28.  The Committee decided that request on 1 July 2022, by accepting, pursuant to Section 15.3 of Procedural Order No. 1, the incorporation of the new authorities into the record, which were filed as documents RL-239 and RL-240, and granted the Parties ten days to submit simultaneous written submissions on the new authorities, which Spain did on 19 July 2022.

29.  On 22 June 2022, BayWa filed a *Rejoinder on Annulment* (hereinafter "**RejoA**").

30.  On 22 July 2022, the Committee held a pre-hearing organizational meeting with the Parties by video conference.

31.  On 25 July 2022, the Committee issued **Procedural Order No. 4** regarding the organization of the hearing.

32.  On 19 and 28 July 2022, Spain requested leave to introduce six new legal authorities into the record, and moreover requested the Committee to reconsider its previous decision of 20 December 2021, and grant the EC leave to intervene at the hearing. On 5 August 2022, BayWa submitted its comments on Spain's requests.

33.  The Committee decided those requests on 11 August 2022. It accepted, pursuant to Section 15.3 of Procedural Order No. 1, the incorporation of the new authorities into the record, which were filed as documents RL-241 to RL-246, and granted the Parties 20 days to submit simultaneous written submissions on the new authorities, which both did on 31 August 2022. The Committee rejected Spain's request to modify its decision on the EC's role as NDP.

34.  On 30 August 2022, BayWa filed a request for leave to introduce three new legal authorities into the record. On 6 September 2022, Spain submitted its comments on BayWa's request.

35.  The Committee decided those requests on the same date and accepted the incorporation of the new authorities into the record, which BayWa filed as documents CL-387 to CL-389 on 6 September 2022.

36.  On 12 September 2022, both Parties filed new requests for the introduction of new documents into the record. On 19 September 2022, both Parties submitted their comments on each other's requests.

37.   On 23 September 2022, the Committee decided both requests, and allowed each Party to introduce one new document, which they did on 26 September 2022, respectively as documents R-527 and CL-390. Spain's request to introduce documents that predated the Award was rejected by the Committee, considering that none of them were either objectively or subjectively supervening documents. Parties were allowed to submit their comments on those documents at the hearing.

38.   A Remote Hearing took place on 27 and 28 September 2022 by video conference, using the Zoom platform. The following persons attended the Hearing:

*Members of the* ad hoc *Committee*

Prof. Dr. Dário Moura Vicente, President of the *ad hoc* Committee
Ms. Bertha Cooper-Rousseau, Member of the *ad hoc* Committee
Mr. Baiju S. Vasani, Member of the *ad hoc* Committee

*ICSID Secretariat*

Ms. Anneliese Fleckenstein, Secretary of the *ad hoc* Committee
Mr. Federico Salon-Kajganich, ICSID Paralegal

*Participating on behalf of BayWa*

Mr. Alberto Fortún Costea (Counsel, Cuatrecasas)
Dr. José Ángel Rueda García (Counsel, Cuatrecasas)
Mr. Borja Álvarez Sanz (Counsel, Cuatrecasas)
Ms. Lucía Pérez-Manglano Villalonga (Counsel)
Ms. Elisa Salcedo Sánchez (Paralegal, Cuatrecasas)
Ms. Inmaculada Romero Vázquez (Assistant, Cuatrecasas)

*Participating on behalf of the Kingdom of Spain*

Ms. María del Socorro Garrido Moreno (State Attorney´s Office)
Ms. Lorena Fatás Pérez (State Attorney´s Office)
Ms. Elena Oñoro Sainz (State Attorney´s Office)
Mr. Juan Quesada Navarro (State Attorney´s Office)
Mr. Javier Comerón Herrero (State Attorney´s Office)

*Court Reporters*

Ms. Lisa Gulland (English Court Reporter)
Mr. Dante Rinaldi (Spanish Court Reporter)

*Interpreters*

Ms. Amalia de Klemm (English-Spanish Interpreter)

Ms. Cynthia Abad Quintaié (English-Spanish Interpreter)
Ms. Sonia Berah (English-Spanish Interpreter)

*Tech Support*

Ms. Gina Pollard (Tech, Sparq Inc.)

39. At the end of the Hearing, Counsel for the Parties declared that they did not wish to file Post-Hearing Submissions, and the Committee was of the opinion that they would not be required.

40. The Parties filed their submissions on costs on 25 November 2022.

41. On 20 December 2022, the Kingdom of Spain sought leave to introduce into the record a judgment of the Svea Court of Appeal dated 13 December 2022 and a judgement rendered by the Swedish Supreme Court on 14 December 2022, and requested that the Parties be granted the opportunity to submit observations on both judgments. This request was reiterated on 29 December 2022.

42. On 29 December 2022, BayWa asked the Committee to reject the Kingdom of Spain's request in its entirety. In the event that the Committee admitted the judgments in the record, BayWa reserved the right to request from the Committee an order enjoining the Kingdom of Spain to post security for costs.

43. Having considered both Parties' positions on the issue, the Committee decided to reject the Kingdom of Spain's Request, considering: (i) the advanced stage of the proceeding; (ii) the fact that the decisions invoked by the Kingdom of Spain relate to arbitration proceedings not subject to ICSID rules; and (iii) if the Committee were to allow those decisions to be incorporated into the file, it would, as a matter of equal treatment, have to allow other decisions that BayWa might also wish to incorporate in the file, which could indefinitely delay the rendering of a decision.

44. The proceeding was closed on 21 April 2023.

### III. SPAIN'S REQUEST FOR ANNULMENT OF THE AWARD

45. Spain requests the annulment of the Award on three grounds, which are summarily described in the following:

   (a) Manifest excess of powers by the Tribunal;

   (b) Failure to state reasons; and

   (c) Serious breach of a fundamental rule of procedure.

### A. MANIFEST EXCESS OF POWERS

46. Spain submits that the BayWa Tribunal manifestly exceeded its powers by:

   (a) Deciding an intra-EU dispute on which it has no jurisdiction;

   (b) Failure to apply EU law as the proper law or subsidiarily failure to apply EU law properly.

#### a) Jurisdiction over the Dispute

47. According to Spain, the Tribunal has manifestly exceeded its powers by deciding an intra-EU dispute. [1] In fact, in Spain's view:

   (a) EU law must be considered applicable to this arbitration according to Article 26(6) ECT, as genuine international law applicable between the Contracting Parties;

   (b) A consistent interpretation of Article 26(3) ECT with the basic principles of EU law (such as the principle of primacy of the EU legal framework, the principle of competence of the CJEU or the EU regulations of State Aid as a matter of public order), precludes the Tribunal from having jurisdiction over the dispute;

   (c) Claimant is incorporated in Germany, while Respondent is the Kingdom of Spain. Both are EU Member States. Claimant is an investor from a State that, like Spain, is part of a Regional Economic Integration Organization (a "**REIO**") as defined by Article 1(3)

---

[1] AfA, ¶¶ 22-33; MoA, ¶¶ 44-89; RoA, ¶¶ 44-202; AoS, slides 3-34; AcS, slides 30-47.

ECT. Since the EU is a Contracting Party of the ECT as defined by its Article 1(2), Claimant is not from *"another Contracting Party"*, as is required by Article 26(1), but rather from the same Contracting Party as the Respondent.

48. In support of these arguments, Spain submits that in its judgment of 6 March 2018, in *Slowakische Republik v. Achmea BV* (hereinafter "***Achmea***"),[2] the CJEU adopted the view that Articles 267 and 344 of the TFEU have always prohibited EU Member States from offering to resolve intra-EU investor-State disputes before international arbitral tribunals. This is so not only with regard to bilateral investment treaties but also with regard to multilateral treaties, such as the ECT. Judgments of the EU Court of Justice form part of EU law, and hence of international law, as recognized by other arbitral tribunals.

49. Spain notes that the CJEU has categorically stated in *République de Moldavie v. Komstroy LLC* (hereinafter "***Komstroy***")[3] that the *Achmea* doctrine is applicable to bilateral treaties as well as to the ECT. Moreover, as the CJEU judgment in the *PL Holdings* case points out, a judgment of the CJEU interpreting the TFEU is deemed to take effect from the date of the TFEU itself, *i.e.*, *ex tunc*. Therefore, at the point in time when the BayWa Arbitral Tribunal was making its decision on the intra-EU objection, the *Achmea* doctrine was fully applicable to the ECT.[4]

50. According to Spain, in the case of a conflict between the ECT and the EU law, EU Member States have agreed to a specific rule for the resolution of treaty conflict, which is the primacy of EU law over Member States' other international obligations *inter se*. In other words, primacy of EU law is a special rule of conflict pursuant to international law. The principle of primacy of EU law applies equally to domestic law and intra-EU international treaties, even where third countries are also Parties to those treaties. Therefore, pursuant to

---

[2] Judgment of the CJEU (Grand Chamber) of 6 March 2018, *Slowakische Republik v. Achmea BV*, case C-284/16, ECLI:EU:C:2018:158, RL-111.

[3] Judgment of the CJEU (Grand Chamber) of 2 September 2021, *République de Moldavie v Komstroy LLC*, case C-741/19, ECLI:EU:C:2021:655, RL-156.

[4] RoA, ¶¶ 61.

the conflict rule inherent in the TFEU, Article 26 of the ECT cannot apply in intra-EU relations.[5]

51.   Spain further contends that the existence of an "*implicit disconnection clause*" in the ECT is to be inferred from the central role that the principle of autonomy plays in European Union law. This is evidenced, in the area in question, by the Treaty of Lisbon granting the European Union exclusive competence for direct investment. [6]

52.   In fact, Spain submits, disconnection is "inherent to the process of regional integration and does not require acceptance or express act of any member state or third state, and is effected solely by the fact that the EU has a legal system in the area to which the convention refers, which must always be applied as a matter of priority".[7]

53.   Disconnection from an international convention requires no further convention; primary or secondary EU Community law or a declaration to that effect is sufficient to bring it about.[8]

54.   Such a disconnection clause would moreover result, in Spain's view, from the transferral of competence operated by Member States to the EU in matters covered by the ECT, namely internal market, environment and energy.[9]

55.   "No EU Member State", Spain argues, "can bind itself into *inter se* obligation in breach of the EU law. Just because this would be in breach of the objective of the EU (art. 3 TEU), and of the obligation of cooperation of all EUMS with the EU object and purpose (art. 4 TEU)".[10]

---

[5] AfA, ¶ 32.

[6] RoA, ¶ 109.

[7] RoA, ¶ 196.

[8] RoA, ¶ 197.

[9] AoS, slides 9-13; AcS, slides 41-46.

[10] AcS, slide 46.

56. Para. 248 of the Award would therefore be "manifestly wrong" insofar as it states that "[t]he mere fact that the EU is party to the ECT does not entail that EU Member States did not have competence to enter into inter se obligations in the Treaty".[11]

57. Consequently, Spain considers that the Arbitral Tribunal lacked jurisdiction to settle an intra-EU dispute under the ECT and that, in declaring otherwise, it exceeded its powers.[12]

58. Such excess is manifest, according to Spain, because: (i) the fact that the Tribunal was faced with an intra-EU dispute is notorious; (ii) Spain challenged the jurisdiction of the Tribunal on every occasion possible; (iii) the EC has also questioned the jurisdiction of the Tribunal.[13]

**b) Failure to apply EU law**

59. Moreover, the Kingdom of Spain submits that there has been a gross or egregious misapplication of EU law, such as to give rise to grounds for annulment under Article 52(1)(b) of the ICSID Convention.[14]

60. According to Spain, the Tribunal has failed to apply the applicable law in the field of jurisdiction and, by failing to do so, has committed a manifest excess of power which must bring about the annulment of the Award and the decisions preceding it.[15]

61. But even if the Tribunal were to dismiss the jurisdictional objection regarding intra-EU arbitration, EU law would still have to be applied, with important consequences, to assess the merits of the case, notably in order to analyze Claimants' legitimate expectations regarding both the nature of renewable energy incentives as State aid (as a limit to the

---

[11] *Ibid.*

[12] RoA, ¶ 45.

[13] RoA, ¶¶ 114-118.

[14] AfA, ¶ 41.

[15] RoA, ¶ 130.

possibilities on obtaining those incentives) and the possibility of obtaining such incentives for electricity produced by such means, under EU Environmental law.

62. However, Spain contends that the Award: (i) failed to properly consider, when analyzing the merits of the dispute, the implications of the State aid regulations on the investors' legitimate expectations; and (ii) considers a clawing back by Spain after 2013, which was non-existent. The Tribunal approached wrongly the *State aid* issue when considering whether the disputed measures were or were not retroactive.[16]

63. Further, Spain argues that, when adopting the State aid scheme failed to notify it to the European Commission. It is common ground that the notification to the European Commission did not happen in a timely manner. As a result, legitimate expectations were excluded as a matter of EU law.[17]

## B. FAILURE TO STATE REASONS

64. Although not raised in its AfA, Spain added to its grounds for annulment the Tribunal's alleged failure to state reasons in the Memorial on Annulment submitted on 22 November 2022 and raised this in its Opening and Closing Statements at the hearing.

65. In fact, Spain notes, the Award devotes paragraphs 247-251 and 262-283 to attempting to demonstrate that there is jurisdiction for hearing intra-EU disputes.

66. However, Spain considers that "the weak and clumsy reasoning of the Court has already been displayed, as there is manifest overreach here".[18]

67. With regard to the applicability of the ECT, Spain submits that the Award's reasoning is "entirely insufficient and, in practice, restricts itself to pointing out that the non-existence of a disconnection clause determines that the ECT is applicable between EU Member States

---

[16] AfA, ¶ 39.

[17] AfA, ¶ 42.

[18] MoA, ¶ 103.

and that the distribution of competences between the EU and the Member States shall not impinge on the full application of the ECT".[19]

68.   Moreover, according to Spain, the Award is based on the false reasoning that *Achmea* has no effect on the application of ECT Article 16, purely on the grounds that *Achmea* refers to a bilateral investment treaty. However, the CJEU declared in *Komstroy* that the same pronouncements made by *Achmea* for a bilateral treaty are applicable to the ECT.[20]

69.   The Award is thus, according to Spain, based on a "false premise", namely that *Achmea* is only applicable to BITs, whereas, pursuant to the CJEU's *Komstroy* ruling, it is also applicable to the ECT.[21] This being so, the Tribunal's jurisdiction was pre-empted.[22]

70.   In this respect, Spain notes that, as the precedents it invokes demonstrate, the mere expression of reasons in the Award is not sufficient, unless those reasons are *adequate*; frivolous or contradictory reasons do not serve to support the Award; and there is also a failure to state reasons when the Tribunal omits to rule on relevant issues raised by the Parties.[23]

71.   According to Spain, as there is an absolute failure to apply the EU Treaties and the applicable EU law and, on the other hand, a complete lack of justification as to why the Tribunal has not applied the relevant law, the award failed to state reasons and must be annulled in accordance with Article 52(1)(e) of the ICSID Convention.[24]

C. SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE

72.   Spain considers that in the BayWa case there has been a serious departure from fundamental rules of procedure, specifically from Respondent's *right to be heard* and equal

---

[19] MoA, ¶ 105; AoS, slide 38.

[20] MoA, ¶ 107.

[21] AcS, slide 7.

[22] AcS, slide 8.

[23] RoA, ¶ 227; AoS, slides 39 and 40.

[24] RoA, ¶ 232.

treatment of the Parties, that must lead to the annulment of the Award. In particular, the Tribunal:

(a) Unfoundedly rejected the incorporation into the record by Spain of the *Declaration of the Representatives of the Governments of the Member States*, of 15 January 2019, on the *Achmea* Judgment; and

(b) Improperly denied the European Commission´s intervention as *amicus curiae* on key matters of Spain´s defense.[25]

73. Spain contends that, by unfoundedly rejecting the incorporation into the record of the said Declaration, the Tribunal not only missed the opportunity to obtain a very valuable insight of said issues, but also deprived the Kingdom of Spain of its right to rely on this document in the arbitration to present its case.[26]

74. The Declaration was adopted on 15 January 2019. On 28 January 2019, Spain sent a letter to the Arbitral Tribunal requesting to introduce it into the file of the arbitral proceedings, in accordance with paragraph 16.3 of Procedural Order No. 1, and requesting that the Parties could make submissions on it. Therefore, Spain could not have produced (or commented on) such a document earlier during the arbitration proceedings.[27]

75. The Arbitral Tribunal allegedly stripped Spain of this right without providing any justification as to why.[28]

76. Nevertheless, after having rejected Spain´s filing of the Declaration of the Representatives of the Governments of the Member States by the Arbitral Tribunal's letter of 6 February 2019, the Arbitral Tribunal allowed by letters of 17 May 2019 and 5 June 2019 the filing

---

[25] AfA, ¶ 53; AoS, slide 63.

[26] AfA, ¶ 60.

[27] RoA, ¶ 259.

[28] RoA, ¶ 260.

of other legal authorities that had also recently been issued, as well as the formulation of submissions by the Parties on them.[29]

77.   Moreover, the Tribunal improperly rejected, according to Spain, the petition of the European Commission to intervene as *amicus curiae* on matters at issue that were key to the Respondent's defense.[30]

78.   The Tribunal's decisions on this issue denied Spain, according to its claims, the benefit of the European Commission's intervention, which would have provided the Tribunal with authoritative clarification and confirmation of Spain's obligations as a Member State of the European Union in regard to the relevant matters at issue in the case. As a consequence, Spain was also denied the possibility to make submissions on the European Commission's arguments that would have been provided on core disputed issues or the possibility to rely on them.[31]

79.   The discretion that the Arbitral Tribunal may have cannot be invoked, Spain adds, as an argument to seriously infringe a very basic right of the parties to be heard in any judicial or arbitration proceeding.[32]

80.   In Spain's view, this represents a violation of the equality of the parties, since the Tribunal prevented the entry into the file of very conclusive evidence that supported the lack of jurisdiction of the Tribunal as argued by Spain. These efforts by the Arbitral Tribunal to disallow certain evidence in the arbitration were not seen with respect to any of the evidence that sought to support the Claimants' contentions.[33]

---

[29] RoA, ¶ 261.

[30] AfA, ¶ 63.

[31] AfA, ¶ 68.

[32] RoA, ¶ 238.

[33] RoA, ¶ 270.

81. Spain therefore believes that there has been a serious departure from fundamental rules of procedure – the equality of the parties and the right to be heard – and that the Award should be annulled on this ground.[34]

## D. SPAIN'S *PETITA*

82. Based on the foregoing, Spain requests that the *ad hoc* Committee:

   (a) Completely annul the Award pursuant to Article 52(1)(b) ISCID Convention, as the arbitral Tribunal exercised manifest excess of powers when it heard a dispute between investors from one EU Member State (Germany) and a State that is also a member of the EU;

   (b) Completely annul the Award pursuant to Article 52(1)(e) ISCID Convention, due to its failing to state the reasons why the Tribunal believes that it has jurisdiction to hear a dispute between an alleged investor from one EU State and a State that is also a member of the EU;

   (c) Completely annul the Award pursuant to Article 52(1)(d) ICSID Convention, due to a serious breach of fundamental rules of procedure as the Tribunal did not allow the Kingdom of Spain to adduce a significant document for its defence and rejected the involvement of the European Commission as *amicus curiae* with regard to a matter that is equally key to its defence.[35]

83. Spain moreover requests that the Respondents on Annulment be ordered to pay the full costs of these proceedings, including the fees and expenses.[36]

---

[34] AfA, ¶ 69; RoA, ¶ 273.

[35] MoA, ¶ 141; RoA, ¶ 274.

[36] AfA, ¶ 73.

## IV. BAYWA'S POSITION

84.     According to BayWa, Spain's challenge of the Award merely seeks a *de novo* review of
        the arguments that the Parties pleaded before the Tribunal in writing as well as orally; Spain
        is therefore relitigating the case.[37]

### A.   MANIFEST EXCESS OF POWERS

85.     BayWa submits that the Tribunal did not incur an excess of powers, let alone manifest,
        when it confirmed that it had jurisdiction to hear BayWa's claims under the ECT.[38]

86.     In fact, according to BayWa:

        (a)  At most, Spain's Memorial on Annulment could show a disagreement with the
             interpretation of the Tribunal. Spain may consider that the Tribunal wrongly interpreted
             the applicable law, but an error in the interpretation of the proper law would not
             constitute a valid ground of annulment.

        (b)  Annulling the Award on the ground of a manifest excess of powers would be unfeasible
             and wrong, since: (i) the Tribunal's analysis of its jurisdiction and determination of the
             irrelevance of the *Achmea* judgment was reasonable; (ii) to build its request, Spain is
             compelled to rely on new evidence and arguments that the Tribunal did not consider
             *ratione temporis*; and (iii) the exercise that Spain proposes demonstrates that any
             excess of power was neither manifest, obvious, clear or self-evident.

87.     In fact, BayWa notes, the Tribunal carried out a detailed analysis of the ECT in line with
        Article 31 VCLT to fix the original scope of the treaty. In doing so, the Tribunal concluded
        that nothing in the text of the ECT excludes issues arising between EU Member States,
        notably because no disconnection clause exists in it. Member States to the EU signed the
        ECT without qualification or reservation. The Tribunal's holding confirms that the ECT

---

[37] C-MoA, ¶ 4; RejoA, ¶ 5.

[38] C-MoA, ¶¶ 12-51; RejoA, ¶¶ 45-107; CoS, slides 10-36; CcS, slide 4.

had *inter se* application prior to the TFEU, and, therefore, cannot be manifestly unreasonable.

88. Moreover, in analysing whether its jurisdiction under the ECT was excluded by subsequent developments at the EU level, the Tribunal took into account the rules of international law and the relations between successive treaties. In this sense, the Tribunal's reasoning is sound and reasonable, notably in that it concluded that the conditions required by Article 41 VCLT for parties to a multilateral treaty to conclude an agreement to modify a treaty as between themselves had not been met in the case of the EU Member States signatories of the ECT.

89. Also, the Tribunal analysed the content of the decision to check its applicability to BayWa's case. In this respect, the Tribunal outlined the distinctions between the *Achmea* case and the case at hand. The former concerned a bilateral treaty between Member States, not a multilateral treaty such as the ECT, and an agreement not concluded by the EU but rather by Member States. The Tribunal concluded, after careful scrutiny, that nothing in the *Achmea* decision prevented the intra-EU application of Article 26(1) ECT.

90. The fact that at least 68 awards and decisions (rendered by the most renowned arbitrators in the investment arbitration arena) have dismissed the intra-EU objection is clear and solid proof that the Tribunal did not act "*manifestly exceeding its powers*," and that the Tribunal's decision was — to say the least — entirely "*reasonable*" as required under Article 52(1)(b).

91. The *Komstroy* decision, on which Spain relies, which post-dates the Award, would not make the Award unreasonable as all the post-*Komstroy* awards and decisions issued so far have rejected the intra-EU objection as well.

92. The fact that the European Commission questions the jurisdiction of all arbitral tribunals means that the executive branch of the European Union, to which Spain belongs, disagrees with the criterion established by international tribunals. But this fact in no way can reverse a decision on jurisdiction, or justify that a decision on jurisdiction holding against Spain and the EC constitutes an "*obvious*", "*clear*" or "*self-evident*" excess of jurisdiction.

93. Spain's argument about the prevalence of EU law is wrong in BayWa's view. Spain argues that "there is a uniform and consistent practice that, once the EU considers that it has its own law on a subject, EU law supersedes bilateral and multilateral conventions on the same subject for intra-EU relations."[39] This allegation is however, according to BayWa, in contravention of Article 16 ECT, as well as other treaties, and, in any event, it is an argument that the Tribunal considered and dismissed in the Award.

94. Even admitting that Spain's arguments were correct, none of the above makes obvious or self-evident that the Tribunal exceeded its powers in assuming jurisdiction over the Parties' intra-EU dispute. The latter has been held by the committees that have analyzed the exact same ground of annulment in the "Spanish ECT saga".

95. Moreover, BayWa notes, Spain's claim regarding the existence of a disconnection clause must fail. In this respect, the Tribunal determined that: (i) in accordance with the definition of "Contracting Party" provided by Article 1(2) ECT, EU Member States and the EU are all Contracting Parties, and it would take an express provision or clear understanding between the negotiating parties to achieve another result; (ii) there is no such express provision (or "*disconnection clause*") in the ECT; (iii) the ECT's *travaux préparatoires* seem to point against a disconnection clause.

96. For BayWa, Spain cannot withdraw its consent to arbitration unless the ECT and ICSID Conventions are renegotiated.

97. The Tribunal's decision cannot be considered manifestly unreasonable, since: (i) it complies with the contextual objective of the ECT; and (ii) it has been adopted by a large majority of international tribunals when confronted with the same issue.

98. Spain has thus failed, according to BayWa, to prove that the Tribunal acted manifestly outside the scope of its mandate in its jurisdictional analysis. The decision on jurisdiction

---

[39] RoA, ¶ 182.

reached by the Tribunal is not manifestly unreasonable. Spain is simply seeking, BayWa contends, that this Committee revise the Award and agree with its own interpretation.

99.    However, the revision Spain is claiming does not fall within the scope of annulment. Therefore, there is no basis to annul the Award under Article 52(1)(b).

### B. FAILURE TO STATE REASONS

100.  In respect to the Award's alleged failure to state reasons, BayWa considers that Spain tries (and fails) to explain why, in its view, the Tribunal failed to state its reasons when it dismissed the intra-EU objection.[40]

101.  BayWa notes that annulment for failure to state reasons occurs only in *manifest cases*: the award must contain no reasons on a particular finding that is indispensable to apprehend the tribunal's reasoning.[41]

102.  Spain's request for annulment is, according to BayWa, not based on a lack of reasons but, rather, on a disagreement with the intrinsic validity of the motives provided by the Tribunal when rejecting the intra-EU objection.[42]

103.  According to BayWa, Spain expands the implications of the requirement that an award must permit the reader "*to follow how the tribunal proceeded from Point A to Point B*", and seeks to improperly rewrite Article 52(1)(e) by adding that the ground for annulment is not only one of "*failure to state reasons*", but rather one of failure to state what Spain considers sufficient or adequate reasons. This position is untenable.[43]

---

[40] C-MoA, ¶ 52; RejoA, ¶ 108; CoS, slides 37-46.

[41] C-MoA, ¶ 58.

[42] C-MoA, ¶ 60.

[43] C-MoA, ¶ 64.

104. The Tribunal, BayWa observes, gave reasons for rejecting Spain's intra-EU objection. Indeed, Spain criticizes its allegedly "*clumsy*" and "*weak*" reasoning, but it does not question its existence.[44]

105. BayWa contends that the Tribunal's reasons were not frivolous or contradictory, as they allow the reader to understand the decision it reached. Indeed, the Tribunal concluded that: (i) the absence of a disconnection clause in the ECT was indicative of its application of the ECT between EU Member States; and (ii) the CJEU's decision in *Achmea* did not pre-empt the Tribunal's jurisdiction because, in *Achmea*, the CJEU referred to "*a bilateral treaty concluded between Member States, not a multilateral treaty such as the ECT*" and was discussing "*an agreement which was concluded not by the EU but by Member States, whereas the ECT was concluded also by the EU and its terms are opposable to the EU*".[45]

106. Spain (like any other reader) is perfectly able to follow how the tribunal proceeded from Point A to Point B and eventually to its conclusion.[46] In reality, BayWa contends, Spain takes issue with the correctness of the Tribunal's reasoning, but not with its logic or congruence, which it is able to understand and even criticize.[47]

107. However, even if Spain disagrees with the Tribunal's reasons for dismissing the intra-EU objection (which is perfectly legitimate) or even if the Tribunal incurred an error of fact or law (*quod non*), these would not be valid grounds for annulment under Article 52(1)(e).[48]

108. BayWa moreover submits that the Committee should dismiss Spain's arguments relating to the "insufficiency" or inadequacy" of the Tribunal's reasoning for dismissing the intra-EU objection.[49]

---

[44] C-MoA, ¶ 68.

[45] C-MoA, ¶ 69.

[46] CcS, slides 20-24.

[47] RejoA, ¶ 122.

[48] RejoA, ¶ 123.

[49] RejoA, ¶ 127.

109. But even if the Committee considered that an Award could be annulled under Article 52(1)(e) for providing "insufficient" or "inadequate" reasons, Spain has not proved that the Tribunal's reasoning was either "insufficient" or "inadequate."[50]

110. Spain's AfA under Article 52(1)(e) must, therefore, be dismissed according to BayWa. Spain has not discharged its burden to prove that the Tribunal provided no reasons for dismissing the intra-EU objection or that, due to its frivolity or contradictory nature, it is manifestly impossible to follow the Tribunal's reasoning.[51]

## C. SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE

111. According to BayWa, Spain's contentions in respect of the alleged departure of the Tribunal from a fundamental rule of procedure merely reflect its disconformity with the Tribunal's discretional and rightful decisions on the admissibility of new evidence. There has been no serious departure from a fundamental rule of procedure in the present case.[52]

112. A *de novo* review of a tribunal's discretional decision to admit or exclude a piece of evidence from the record is completely outside of the scope of annulment under Article 52. As a matter of fact, Spain's request is an unprecedented one.[53]

113. According to BayWa, the Tribunal exercised its discretionary powers under ICSID Rule 34(1) and Section 16.3 of Procedural Order No. 1 and refused the admission of further evidence considering that a new piece of evidence, submitted at a late stage of the proceeding, would add nothing to Spain's case.[54]

114. In fact, the Tribunal considered the Parties' positions and, on February 6, 2019, decided not to admit into the record the *Declaration of the Representatives of the Governments of the Member States*, of 15 January 2019, on the Achmea Judgment, noting that "*the Tribunal*

---

[50] RejoA, ¶ 128.

[51] C-MoA, ¶ 80.

[52] C-MoA, ¶ 82; CoS, slides 47-61; CcS, slides 27-34.

[53] C-MoA, ¶ 86.

[54] C-MoA, ¶ 95.

*considers that pursuant to section 16.3 of Procedural Order No. 1 no exceptional circumstances exist to admit the proposed document at this advanced stage of the proceedings".*

115. Spain has not discharged its burden to prove that the alleged violation of the right to be heard was "*serious*".

116. Most annulment committees follow a settled criterion, whereby a "serious" departure must have a material impact on the outcome of the award.[55]

117. In no case, according to BayWa, would the Declaration have had any impact on the outcome of the case. The Declaration is nothing more than a political statement without any normative or interpretative value issued by some EU Member States. Other tribunals that admitted the Declaration into their cases deemed it irrelevant for the analysis of the intra-EU objection, which they have ultimately rejected.[56]

118. In any event, BayWa contends that, by failing to promptly raise an objection, Spain waived its right to request annulment of the Award under Article 52(1)(d).[57]

119. Regarding Spain's claims that the Tribunal breached its right to be heard by not allowing the intervention of the EC as *amicus curiae*, BayWa considers that this alleged irregularity falls outside the scope of the annulment grounds under the ICSID Convention.[58]

120. The right to be heard is breached, according to BayWa, when a party is prevented from presenting its case. The EC's request to intervene was limited to the question whether the Tribunal had jurisdiction to hear the case. This issue, however, was one that Spain was able to address *in extenso*. [59]

---

[55] RejoA, ¶ 140(ii).

[56] C-MoA, ¶ 101.

[57] C-MoA, ¶ 102.

[58] C-MoA, ¶ 105.

[59] C-MoA, ¶ 107.

121. Furthermore, the Tribunal set a hearing to discuss specifically all issues related to jurisdiction. In that hearing, Spain was able to argue its intra-EU objection at length. As a result, it is impossible to even entertain the idea that the absence of the EC in the BayWa proceedings impeded Spain from arguing its jurisdictional objection.[60]

122. Additionally, the Tribunal's decision to deny the EC's request to intervene fell within its discretionary power. Thus, whichever way Spain tries to put it, the reality is that the Tribunal was fully entitled to reject the EC's application to intervene in the proceedings.[61]

123. Moreover, given that Spain's position was "*indistinguishable*" from the EC's position, it is impossible to sustain that the participation of the EC would have resulted in a substantially different Award.[62]

124. Finally, Spain has admitted that "the Arbitral Tribunal did not violate established procedure" when it rejected the admission of the Declaration and that the "Tribunal has not violated any procedural rule in deciding to disallow the intervention of the European Commission as Amicus Curiae, so there was no flaw in the Tribunal's procedure". Such admissions should, in BayWa's view, lead the ad hoc Committee to dismiss the ground without further ado.[63]

125. In conclusion, the Tribunal did not seriously depart from a fundamental rule of procedure when it rejected to admit the Declaration into the record based on ICSID Rule 34(1) and Section 16.3 of Procedural Order No. 1 and refused to accept the intervention of the EC as an *amicus curiae*. Accordingly, the AfA based on Article 52(1)(d) must be dismissed.[64]

---

[60] C-MoA, ¶ 108.

[61] C-MoA, ¶ 111.

[62] C-MoA, ¶ 112.

[63] RejoA, ¶ 138.

[64] C-MoA, ¶ 114.

### D. BayWa's *Petita*

126. For the foregoing reasons, BayWa requests that the Committee:

   (a)   Render a decision dismissing Spain's request for annulment of the Award in its entirety; and

   (b)   Order Spain to pay BayWa's legal fees and all annulment costs (including Committee members' fees, ICSID fees and all related expenses) incurred in these proceedings.[65]

## V. The European Commission's Submission as Non-Disputing Party

### a) The EC's Submission

127. The EC concluded its submission as a NDP as follows:[66]

   (a) The CJEU (Grand Chamber) held in C-741/19 *République de Moldavie* that Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between an EU Member State and an investor of another EU Member State concerning an investment made by the latter in the first Member State;

   (b) In other words, when such an intra-EU dispute arises, there is no "*unconditional consent to the submission of a dispute to international arbitration*" pursuant to Article 26(3) ECT, and there is no procedure for the investor to provide its consent and thereby perfect the offer to arbitrate, such as that set out in Article 26(4) ECT;

   (c) A tribunal, such as the Tribunal in the present proceedings, that purports to be established under Article 26(4) ECT, was improperly established and therefore lacked jurisdiction;

   (d) The CJEU finding constitutes a binding and final interpretation of Article 26 ECT, for the contracting parties concerned (here: Spain and Germany), Claimant, the Tribunal and the *ad hoc* Committee;

---

[65] C-MoA, ¶ 115; RejoA, ¶156; CoS, slide 76; CcS, slide 35.

[66] European Commission, *Written Submission as Non-Disputing Party*, 28 January 2022, ¶¶ 95-103.

(e) As with any authentic interpretation and any interpretation by an international court, that interpretation applies *ex tunc*;

(f) In conclusion, Spain did not validly consent to investor-State arbitration in relation to disputes brought by investors from an EU Member State such as the Claimant, and the Tribunal lacked the competence to hear the case;

(g) Moreover, by failing to apply provisions of EU law, the Tribunal failed to apply the applicable law, and thereby committed a manifest excess of power;

(h) Thus, the conclusions in point 87 [that under EU law, no legitimate expectations concerning the clawing back by Spain in and after 2013 could arise, and thus there was no breach of the obligation of stability under Article 10.1, first and second sentences, ECT] must lead to the annulment of the Award;

(i) Finally, Spain may not pay the Award until the EC has taken a final decision on the compatibility of such a payment. That is an obligation not only under EU law, but also under international law applicable between the Parties.

### b) BayWa's Comments on the European Commission's Submission

128. Although allowed by the Committee to do so in its Procedural Order No. 3,[67] Spain did not comment on the EC's Submission.

129. In its comments on the EC's submission, BayWa, in essence, holds that the EC (like Spain) treats these annulment proceedings as if they were an appeal. In fact, according to BayWa:[68]

(a) First, the EC's remarks intend to prove that the Tribunal's decision was wrong. In this effort, pages 2 to 12 of the *amicus curiae* brief are devoted to explain the *Komstroy* judgment, which not only deals with the intra-EU objection in *dictum*, but was also rendered after the Award and, therefore, is irrelevant to establishing whether the Tribunal committed a manifest excess of power;

---

[67] See Procedural Order No. 3, ¶ 55(b)(ii).

[68] See *BayWa's Comments on the European Commision's Amicus Curiae Brief*, 3 March 2022, ¶¶ 11-24.

(b)    Second, the EC has failed to address the core issue on annulment (*i.e.*, whether the Tribunal's establishment of jurisdiction was unreasonable) (*quod non*). Rather, the EC has focused on presenting old and new substantive arguments in support of the failed notion that (i) the ECT applies to intra-EU arbitrations as part of the internal legal order of the EU and that (ii) any conflict between the ECT and the EU Treaties must be solved in favor of the latter as primary EU law. These are matters that were finally and conclusively adjudicated by the Tribunal;

(c)    Third, whether right or wrong, the Tribunal concluded that the wording of Article 26(1) ECT confirmed that the Tribunal had jurisdiction over all disputes (i) between a contracting party which is a Member State of the EU (*i.e.*, Spain) and an investor of another contracting party also part of the EU (*i.e.*, a national from Germany), and (ii) concerning an alleged breach of the obligations of the former (*i.e.*, Spain) under Part III ECT. That is not an unreasonable conclusion;

(d)    Fourth, no EU institution, be it the CJEU or the EC, has the authority to decide on the scope of application of the ECT. The "*masters of the treaties*" that the EC is referring to in its submission are, for the purposes of the ECT, neither the EU nor its Member States, but all the contracting parties. Then, it results that the authority to decide on the ECT's scope of application resides in all the contracting parties. Any declaration directed to alter the universal meaning of the ECT, if made only by the EU countries, would be unilateral in nature and therefore not binding. The CJEU is not compelling – and cannot compel – the EC or the Member States to breach their international obligations;

(e)    Fifth, when BayWa initiated the arbitration proceedings, it had legitimately relied upon Spain's consent to arbitration as it appears on Spain's ratification of the ECT and controlled by Article 26(1)-(4) ECT. In this context, the arguments raised by Spain and the EC seek only to withdraw the former's consent to arbitrate under the ECT. This is contrary to both the ECT and the Vienna Convention on the Law of the Treaties;

(f)    Sixth, the Committee should give deference to the Tribunal's decision on jurisdiction. In case of doubt the question of jurisdiction shall be resolved in *favorem validitatis sententiae*;

27

(g) Seventh, the *amicus curiae* brief shows that the Tribunal examined the arguments, facts and evidence submitted by the Parties and, in the exercise of its power to determine its own jurisdiction, it disagreed with the interpretation endorsed by Spain (and the EC) and sided with all investment tribunals that have decided on the intra-EU objection to date. The EC may disagree with the Tribunal. However, in order to annul an award under Article 52(1) of the ICSID Convention, a "*mere disagreement*" is certainly not enough;

(h) Eighth, pages 12 to 16 of the *amicus curiae* brief are dedicated to the impact of EU State aid rules on the legitimate expectations of investors, which is beyond the scope of the request for annulment submitted by Spain, as Spain did not formulate any ground of annulment of Article 52(1) on the basis of state aid law. Moreover, the Committee should take note that the EC also intends to act as an appellate body, which is evident in its conclusive remark that an annulment is due since "*the Arbitral Tribunal has committed several errors in law*";

(i) In sum, the *amicus curiae* brief derails, in BayWa's view, the narrow assessment with which this Committee has been tasked under Article 52 and would require a *de novo* revision of the substance of the intra-EU objection, which is proscribed.

## VI. THE COMMITTEE'S ANALYSIS

### A. THE APPLICABLE LEGAL STANDARDS

130. In its analysis of Spain's request for annulment of the Award, the Committee bases its powers on the following standards, which *ad hoc* committees constituted under the ICSID Convention have repeatedly applied in their decisions and are consistent with the Convention.

#### a) No Review of the Award on the Merits

131. According to Article 53(1) of the ICSID Convention:

> "The award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided for in this Convention."

28

132. Annulment proceedings must therefore be distinguished from appeals, since they do not involve a review of the merits of the award, or the possibility of its modification.

133. This view was upheld, *inter alia,* by the *ad hoc* committee in *Tidewater v. Venezuela*, which stressed that:

    (a) Under ICSID Rules, no appreciation is allowed in annulment proceedings of the quality of reasons of the award;[69]

    (b) No examination of the merits of the award is allowed in such proceedings either. In fact, an *ad hoc* committee must not re-assess the merits of the case, which it would do notably "*if it discarded the Tribunal's exercise of discretion in fixing the amount of compensation and replaced it by its own discretion*;"[70] and

    (c) An *ad hoc* committee must therefore "*abstain from scrutinizing whether the Tribunal has established the facts correctly, has interpreted the applicable law correctly and has subsumed the facts as established correctly under the law as interpreted.*"[71]

134. More recently, the same view was shared by the *ad hoc* committee that decided the request for annulment in *Antin v. Spain*, which specifically held that an annulment committee cannot review *de novo* the facts, evidence and criteria used by the tribunal in its award of damages.[72]

        **b) Legal Standards for Manifest Excess of Powers**

135. Article 52(1)(b) of the ICSID Convention provides for the annulment of an award when: (i) a tribunal has *exceeded its powers*; and (ii) such excess is *manifest*.

---

[69] *Tidewater Investment SRL and Tidewater Caribe, C.A. v. The Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Annulment dated December 27, 2016, ¶ 168, RL-163.

[70] *Id.*, ¶ 171.

[71] *Tidewater Investment SRL and Tidewater Caribe, C.A. v. The Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Annulment dated December 27, 2016, ¶ 172, RL-163.

[72] *Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar B.V. (formerly, Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.) v. Kingdom of Spain,* ICSID Case No. ARB/13/31, Decision on Annulment, dated July 30, 2021 (hereinafter "*Antin v. Spain,* Decision on Annulment"), ¶ 168, CL-244.

136. The manifest nature of an excess of powers has been interpreted by most *ad hoc* committees to mean an excess that is "*obvious, clear or self-evident*."[73] This is in line with the exceptional and limited character of an annulment as opposed to an appeal.[74]

137. *Ad hoc* committees have also held that there may be an excess of powers if a tribunal "incorrectly concludes that it has jurisdiction when in fact jurisdiction is lacking, or when the Tribunal exceeds the scope of its jurisdiction."[75]

138. However, as the Tribunal is the judge of its own competence, in order to annul an award on the basis of its determination of the scope of its own jurisdiction, the excess of powers must be manifest.[76]

139. An error that is manifest must necessarily be one that would be "readily apparent without a need to resort to extensive argumentation and analysis to reveal it."[77]

140. While an annulment claim must be resolved based on its own merits, the fact that a tribunal has arrived at the same conclusion as other tribunals in similar situations might be an indication that an alleged excess of powers is not manifest.

141. For this purpose, an arbitral *jurisprudence constante* provides a persuasive, reasoned, and documented analytical framework as to how other adjudicating bodies have treated similar matters. In *Antin v. Spain*, the fact that 56 other tribunals agreed with the Tribunal's views was held by the *ad hoc* committee as sufficient to show that the tribunal's reasoning was tenable and not clearly or self-evidently wrong.[78]

---

[73] ICSID, *Updated Background Paper on Annulment for the Administrative Council of ICSID*, May 5, 2016, ¶ 83, CL-318.

[74] *Antin v. Spain,* Decision on Annulment, ¶ 151.

[75] ICSID, *Updated Background Paper on Annulment for the Administrative Council of ICSID*, May 5, 2016, ¶ 87, citing several decisions from *ad hoc* committees.

[76] *Id.*, ¶ 88.

[77] *Antin v. Spain,* Decision on Annulment, ¶ 152.

[78] *Id.*, ¶ 154.

142. In any event, and without prejudice to the importance of consistency in decisions rendered by *ad hoc* committees in proceedings for annulment of arbitral awards, a committee can only annul the tribunal's award on damages if the tribunal has made an error that is discernible from the face of the award. A committee should not make its own findings of fact or law apart from what is clearly established in the award.[79]

143. As stated in the decision of the *TECO v. Guatemala* annulment committee:

> "[I]n determining whether a tribunal has committed a manifest excess of powers, an annulment committee is not empowered to verify whether a tribunal's jurisdictional analysis or a tribunal's application of the law was correct, but only whether it was tenable as a matter of law. Even if a committee might have a different view on a debatable issue, it is simply not within its powers to correct a tribunal's interpretation of the law or assessment of the facts."[80]

144. A Tribunal's failure to apply the proper law may also constitute a manifest excess of powers if it amounts to a complete disregard of that law, or the Tribunal acts *ex aequo et bono* without agreement of the parties to do so. However, according to some *ad hoc* Committee's decisions, an erroneous application of the law does not amount to a manifest excess of powers by the arbitral tribunal, unless a gross or egregious misapplication or misinterpretation of the law has occurred.[81]

---

[79] *Id.*, ¶ 169.

[80] *TECO Guatemala Holdings LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment, at ¶ 78, RL-0175.

[81] *ICSID, Updated Background Paper on Annulment for the Administrative Council of ICSID, 5 May 2016.*, ¶ 93, CL-318.

### c) Legal Standards for Failure to State Reasons

145. According to a well-settled understanding, Article 52(1)(e) of the ICSID Convention concerns a failure to state any reasons; not the failure to state correct or convincing reasons.[82]

146. As noted by the *MINE v. Guinea* committee:

> "[T]he requirement that an award has to be motivated implies that it must enable the reader to follow the reasoning of the Tribunal on points of fact and law. It implies that, and only that. The adequacy of the reasoning is not an appropriate standard of review under paragraph (1)(e), because it almost inevitably draws an ad hoc Committee into an examination of the substance of the tribunal's decision, in disregard of the exclusion of the remedy of appeal by Article 53 of the Convention."[83]

147. According to the same Committee, that requirement "is satisfied as long as the award enables one to follow how the tribunal proceeded from Point A. to Point B. and eventually to its conclusion, even if it made an error of fact or of law."[84]

148. Considering the *principle of finality* set out in the ICSID Convention, an annulment committee is limited in its ability to characterise a tribunal's reasoning as deficient,

---

[82] *Compañía de Aguas del Aconquija S.A. and Vivendi Universal v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, July 3, 2002, ¶ 64, RL-230. See, along the same lines, more recently, the decision rendered on 18 March 2022 by the *ad hoc* Committee in *NextEra*, stating, in ¶ 128, that: "*The Committee finds that it must not engage in an assessment of the 'correctness' of the Tribunal's reasoning or whether it was 'appropriate or convincing.'*" See also the decision rendered on 28 March 2022 by the *ad hoc* Committee in *Cube v. Spain*, stating, in ¶ 320, that: "*the Committee agrees with the notion that the ability to follow the reasoning, does not imply a right or ability to review the adequacy of the reasons.*"

[83] *Maritime International Nominees Establishment (MINE) v. Government of Guinea*, ICSID Case No. ARB/84/4, Decision on the Application by Guinea for Partial Annulment of the Arbitral Award, ¶ 5.08, RL-129 (hereinafter "*MINE*").

[84] *Id.*, ¶ 5.09. See also the decision rendered on 16 March 2022 by the *ad hoc* Committee in *SolEs*, at ¶ 83, stating that: "*While a failure to state reasons can take many forms, the ultimate question is whether the Committee is satisfied that the Tribunal's award is possible to follow 'from Point A. to Point B.'. If so, there can be no basis for annulment on this ground.*"

inadequate or otherwise faulty, and cannot substitute its own judgment for that of the tribunal.[85]

### d) Legal Standards for Serious Departure from a Fundamental Rule of Procedure

149. Pursuant to Article 52(1)(d) of the ICSID Convention, a "serious departure from a fundamental rule of procedure" may determine the award's annulment.

150. In light of this provision, a dual analysis is required from *ad hoc* committees: (i) the rule of procedure at stake must be *fundamental* (e.g., equal treatment of the parties or the right to be heard); and (ii) the departure from such rule must be *serious*.[86]

151. Whether such a departure has occurred requires a fact-specific analysis, involving an examination of the proceeding before the Tribunal.[87]

### B. Analysis of the BayWa Award (1): Manifest Excess of Powers by the Tribunal

### (i) The BayWa Award

152. Regarding its own jurisdiction, and Spain's objection thereto, the Tribunal noted that this raised two distinct questions: (i) whether the ECT had *inter se* application prior to the adoption of the TFEU; and (ii) whether the TFEU changed anything in this regard. Since the CJEU in *Achmea* relied on the TFEU as the basis for its conclusion, it is principally relevant to the second issue.[88]

---

[85] *Antin v. Spain*, Decision on Annulment, ¶ 234.

[86] See ICSID, *Updated Background Paper on Annulment for the Administrative Council of ICSID*, May 5, 2016, ¶ 99, RL-0125.

[87] *Id.*, ¶ 100.

[88] *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, December 2, 2019, ¶ 245, RL-125 (hereinafter "*BayWa, Decision on Jurisdiction*").

153. **In respect to the first question**, the Tribunal considered that "on its face there is nothing in the text of the ECT that carves out or excludes issues arising between EU Member States".[89]

154. Indeed, as the Tribunal observed:[90]

(a) There is no indication of any *inter se* exclusion in the Charter.

(b) Article 1(2) of the ECT defines "Contracting Party" as "a *State or Regional Economic Integration Organization which has consented to be bound by this Treaty and for which the Treaty is in force*".

(c) In accordance with this definition, both EU Member States and the EU are Contracting Parties to the ECT;

(d) *Prima facie* at least, a treaty applies equally between its parties. It would take an express provision or clear understanding between the negotiating parties to achieve another result;

(e) There is no such express provision (or "*disconnection clause*") in the ECT.

155. The Tribunal held that the mere fact that the EU is party to the ECT does not entail that EU Member States did not have competence to enter into *inter se* obligations in the ECT. Although Article 1(3) ECT defines a REIO, nothing in Article 1, nor any other provision in the ECT, suggests that the EU Member States had then transferred exclusive competence over all matters of investment and dispute resolution to the EU.[91]

156. Pursuant to Article 6 of the VCLT, every State possesses capacity to conclude treaties and is bound by those obligations pursuant to the principle of *pacta sunt servanda.* No limitation on the competence of the EU Member States was communicated at the time that the ECT was signed.[92]

---

[89] *Id.*, ¶ 247.

[90] *Id.*, ¶ 247(1)-(3).

[91] *Id.*, ¶ 248.

[92] *Id.*, ¶ 249.

157.  The Tribunal noted that Article 46 of the VCLT provides that a State may not invoke provisions of its internal law regarding competence to conclude treaties to invalidate a treaty unless it was a manifest violation of a rule of fundamental importance. While EU law operates on both the internal and international plane, a similar principle must apply. Even if, as a matter of EC law, the EC then had exclusive competence over matters of internal investment, the fact is that Member States to the EU signed the ECT without qualification or reservation.[93]

158.  For these reasons the Tribunal held that the ECT had *inter se* application prior to the TFEU.[94]

159.  **In respect of the second question,** *i.e.*, whether this position has changed since the adoption of the TFEU, the Tribunal noted that:

> "The Tribunal begins by observing that the source of its competence is the ECT, a valid multilateral treaty to which all EU Member States and the EU itself are parties and which is governed by international law."[95]

160.  The starting point, according to the Tribunal, is thus Article 26(6) of the ECT,[96] which provides that:

> "A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."

161.  Article 26(6), the Tribunal noted, "is an unexceptionable provision, which would have had to be implied if it had not been expressed".[97]

---

[93] *Id.*, ¶ 249.

[94] *Id.*, ¶ 251.

[95] *Id.*, ¶ 262.

[96] *Id.*, ¶ 263.

[97] *Id.*, ¶ 267.

162. The relationship between the ECT and the TFEU should be considered, according to the Tribunal, in light of VCLT Article 41, entitled "*Agreement to modify multilateral treaties between certain of the parties only*".[98]

163. Pursuant to VCLT Article 41:

> "(1) Two or more of the parties to a multilateral treaty may conclude an agreement to modify the treaty as between themselves alone if: (a) the possibility of such a modification is provided for by the treaty; or (b) the modification in question is not prohibited by the treaty and: (i) does not affect the enjoyment by the other parties of their rights under the treaty or the performance of their obligations; (ii) does not relate to a provision, derogation from which is incompatible with the effective execution of the object and purpose of the treaty as a whole.
>
> (2) Unless in a case falling under paragraph 1 (a) the treaty otherwise provides, the parties in question shall notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides."

164. In respect of this provision, the Tribunal noted that:

> "A priori, it is capable of applying to the abrogation inter se by the TFEU of the ECT, provided the conditions laid down by Article 41, to the extent that they reflect the customary international law of treaty modification, have been met. But in the Tribunal's view, there are two ways in which they have not been met. First, it is not suggested that the parties to the TFEU notified the other parties of the intended modification to the ECT. Secondly, it is very doubtful whether the abrogation inter se of the ECT as between EU

---

[98] *Id.*, ¶ 274.

Member States is compatible 'with the effective execution of the object and purpose of the [ECT] as a whole'."[99]

165.  In view of the above, the Tribunal stated that "if it were free to do so, [it] would hold that under international law the TFEU did not modify *inter se* the provisions of the ECT, either as to substance (Part III, notably Article 10) or as to jurisdiction (Part V, notably Article 26)".[100]

166.  Nevertheless, for the Tribunal "international law allows the States parties to a regime treaty to establish their own international courts with jurisdiction over and authority to bind the Member States on issues of international law affecting them. It also allows those States to establish the priority of the regime treaty over other sources of international law, at least so long as peremptory norms are not implicated." [101]

167.  Reverting to para. 60 of the *Achmea* ruling of the CJEU, according to which "Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States", the Tribunal noted that:

> "If this dictum were to be applied to the ECT, it would authoritatively establish, as between Germany and Spain, that the TFEU modifies Article 16 of the ECT on an inter se basis. But the CJEU in Achmea was considering a bilateral treaty "concluded between Member States", not a multilateral treaty such as the ECT. Secondly, the CJEU was discussing "an agreement which was concluded not by the EU but by Member States", whereas the ECT was concluded also by the EU and its terms are opposable to the EU."[102]

---

[99] *Id.*, ¶ 276.

[100] *Id.*, ¶ 280.

[101] *Id.*, ¶ 280.

[102] *Id.*, ¶ 282.

168. For these reasons, the Tribunal concluded that its jurisdiction was not pre-empted by the *Achmea* decision.[103]

**(ii) Analysis**

169. In this Committee's view, no manifest excess of powers in respect of the determination of the Tribunal's jurisdiction can be determined to have occurred in this case.

170. In fact, the Tribunal addressed Spain's jurisdictional objection based on the relevance of EU law, and, in a reasoned decision, concluded that:

   (a) It was to the ECT alone that the *BayWa* Tribunal owed its existence, and accordingly determined its jurisdiction; and

   (b) Such jurisdiction was not pre-empted by EU law, even as interpreted by the *Achmea* decision.

171. It has not been demonstrated in the present proceedings that the Tribunal's decision in this respect is an interpretative error of such an egregious character that it should be characterized as a *manifest excess of power*, and hence, determine the annulment of the Award under the abovementioned provision of the ICSID Convention.

172. Spain contests the Tribunal's assertion that "*there is nothing in text of the ECT that carves out or excludes issues arising from Member States*". This interpretation is, according to Spain, in breach of Articles 267 and 344 TFEU, as well as the object and purpose of the EU Treaties.[104]

173. This purportedly lead to the conclusion that there is an "implicit disconnection clause", whereby "the dispute settlement mechanism provided for in Article 26 ECT is not applicable to intra-EU disputes".[105]

---

[103] *Id.*, ¶ 283.

[104] AoS, slide 15.

[105] AoS, slide 17.

174. This would, according to Spain, also be a consequence of the principle of autonomy of EU law,[106] and that "*foreign direct investment is an exclusive competence of the EU*".[107]

175. The point was, however, addressed by the Tribunal in its Decision on Jurisdiction, which reads:

> "Pursuant to Article 6 of the VCLT, every State possesses capacity to conclude treaties and is bound by those obligations pursuant to the principle of pacta sunt servanda. No limitation on the competence of the EU Member States was communicated at the time that the ECT was signed. Article 46 of the VCLT provides that a State may not invoke provisions of its internal law regarding competence to conclude treaties to invalidate a treaty unless it was a manifest violation of a rule of fundamental importance. While EU law operates on both the internal and international plane, a similar principle must apply. Even if, as a matter of EC law, the EC then had exclusive competence over matters of internal investment, the fact is that Member States to the EU signed the ECT without qualification or reservation. The inter se obligations in the ECT are not somehow invalid or inapplicable because of an allocation of competence that Spain argues can be inferred from a set of (mostly later) EU laws and regulations dealing with investment."[108]

176. According to the Tribunal, the fact that the EU has certain competences in foreign investment matters, and that its courts and tribunals also have specific competences in controlling the application of EU law, does not mean that, in the absence of a reservation or disconnection clause expressly agreed upon with the other States Parties to the ECT, a

---

[106] AoS, slide 26.

[107] AoS, slide 27.

[108] *BayWa*, Decision on Jurisdiction, ¶ 249.

Member State of the Union can evade its obligations under the ECT, as this would be contrary to the VCLT.[109]

177. Regarding Spain's "transfer of competences" argument, the Tribunal explained that it cannot be deemed compatible with Article 46 of the VCLT, in that this provides that, in principle, a State "*may not invoke provisions of its internal law regarding competence to conclude treaties as invalidating its consent*".[110]

178. In any event, the Tribunal pointed out that "the ECT was concluded also by the EU and its terms are opposable to the EU".[111]

179. Although the Committee is well aware that each request for annulment of an arbitral award should be examined independently from previous ones involving other parties, and is thus not bound to follow the decisions rendered in them, it cannot ignore, when assessing the case at hand, the previous jurisprudence of other tribunals and committees.

180. It is noteworthy, in this respect, that a significant number of decisions rendered by tribunals and *ad hoc* committees have upheld similar conclusions to those of the *BayWa* Tribunal in respect of the jurisdictional issues that it decided.

181. The jurisdictional issues raised in these proceedings have been extensively dealt with in the *Vattenfall* decision on the *Achmea* issue, according to which a tribunal's assessment of its jurisdiction is to be made:

> "under the ICSID Convention, interpreted in the light of general principles of international law, and the instrument(s) containing the consent to

---

[109] *Id.*, ¶ 249.

[110] *Id.*, ¶ 249.

[111] ¶ 282, citing, in footnote 309, to similar effect, the Award rendered in *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain,* (ICSID Case No. ARB/14/1), ¶ 682, CL-291, and *Vattenfall AB et al. v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue (hereinafter "*Vattenfall*"), ¶¶ 161-165, CL-320.

arbitration. For the Tribunal, the starting point is Article 26 ECT, setting out the terms of the agreement to arbitrate."[112]

182. According to the *Vattenfall* tribunal, the principles of international law "*relevant to the interpretation, application, and other aspects of treaties*," namely ECT Article 26, are primarily those set out in the VCLT.[113]

183. The *Vattenfall* tribunal accordingly concluded that:

"the law applicable to the assessment of its jurisdiction [is] the ECT, in particular Article 26 thereof, in conjunction with Article 25 of the ICSID Convention. These treaties are to be interpreted in accordance with general principles of international law, in particular as set out in the VCLT."[114]

184. Taking into account the wording of Article 26 of the ECT, the *Vattenfall* tribunal could not agree that intra-EU arbitrations have been carved out from the application of Article 26 of the ECT.[115]

185. The notion that the source of a tribunal's competence, when constituted under the ECT and the ICSID Convention, is international law has been subsequently upheld in other ICSID arbitral awards and *ad hoc* committees' decisions on jurisdiction:

(a) *LBBW* Decision on Jurisdiction: "*A judgment of the CJEU in response to a reference from a national court for a preliminary ruling is binding only upon the court making the reference. EU law has no concept of stare decisis, so such a judgment would not bind other courts. […] This Tribunal, however, derives its authority not from national or EU law but from an international agreement and from the rules of public*

---

[112] *Vattenfall* Decision, ¶ 128.

[113] *Id.*, ¶ 132.

[114] *Id.*, *Vattenfall* Decision, ¶ 166.

[115] *Id.*, ¶ 188.

international law. There is therefore no question of it being bound by the CJEU Achmea
Judgment […];"[116]

(b) *Eiser* Award: "*The Tribunal's jurisdiction is derived from the express terms of the ECT,
a binding treaty under international law. The Tribunal is not an institution of the
European legal order and is not subject to the requirements of that legal order.
However, the Tribunal need not address the possible consequences that might arise in
a case of a conflict between its role under the ECT and the European legal order,
because no such conflict has been shown to exist here*;"[117]

(c) *Rockhopper* Decision on Intra-EU Objection: "*a proper reading of the Achmea does
not lead to the conclusion that it is in any way a relevant consideration for the investor-
State arbitration mechanism established in Article 26 of the ECT as regards intra-EU
relations*;"[118]

(d) *Novenergia* Award: "*this Tribunal's jurisdiction is based exclusively on the explicit
terms of the ECT. As is evident, the Tribunal is not constituted on the basis of the
European legal order and it is not subject to any requirements of such legal order*;"[119]

(e) *OperaFund* Award: "*all substantive provisions of the ECT remain fully applicable and
EU law is not part of the applicable substantive law in this case*;"[120] and

(f) *RREEF* Decision on Jurisdiction: "*However, this Tribunal has been established by a
specific treaty, the ECT, which binds both the EU and its Member States on the one
hand and non-EU States on the other hand. ... The Tribunal observes, however, that
should it ever be determined that there existed an inconsistency between the ECT and
EU law – quod non in the present case – and absent any possibility to reconcile both*

---

[116] *Landesbank Baden-Württemberg et al. v. Spain*, ICSID Case No. ARB/15/45, Decision on the "Intra-EU"
Jurisdictional Objection ("*LBBW* Decision"), ¶ 102, CL-387.

[117] *Eiser Infrastructure Limited Energia Solar Luxembourg S.a.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36,
Award, ¶ 199, CL-217.

[118] *Rockhopper Exploration Plc, Rockhopper Italia S.p.A. and Rockhopper Mediterranean Ltd v. Italian Republic*,
ICSID Case No. ARB/17/14, Decision on the Intra-EU jurisdictional objection ("*Rockhopper* Decision"), ¶ 173, CL-
352.

[119] *Novenergia II – Energy & Environment (SCA), SICAR v. Kingdom of Spain*, SCC Arb. No. 2015/063, Final Award,
¶ 461, CL-227.

[120] *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No. ARB/15/36,
Award, ¶ 330, CL-319.

*rules through interpretation, the unqualified obligation in public international law of any arbitration tribunal constituted under the ECT would be to apply the former. This would be the case even were this to be the source of possible detriment to EU law. EU law does not and cannot 'trump' public international law.*"[121]

186. Reference should also be made here to the *Antin v. Spain ad hoc* committee decision on annulment, which settled issues similar to those under discussion in the present proceedings:

   (a)   According to that decision, "*on their plain and ordinary reading, the ECT provides the Tribunal with the jurisdiction to entertain claims against Spain (a Contracting Party) by investors of Luxembourg (also a Contracting Party) related to investments made by the Claimants in Spain.*"[122]

   (b)   The ECT's purpose does not support Spain's interpretation thereof. Nothing in Article 2 of the ECT, captioned "*Purpose of the Treaty*," "*suggests the exclusion of claims by investors who are nationals of an EU Member State who is also a party to the ECT against another EU Member State.*"[123]

   (c)   According to the Committee, the Tribunal's jurisdiction arises from the express terms of the ECT, which is binding on the State parties and the EU: "*The EU treaties creating the EEC and the EU cannot be interpreted in a manner that undermines the prior consents to submit to arbitration under the ECT given by each of the EU Member States and the EU itself. The alleged problem of incompatibility between EU law and the ECT, if there is one, is to be sorted out by the EU and the EU States counterparties to the ECT.*"[124]

---

[121] *RREEF Infrastructure (G.P.) Limited and RREEF Pan- European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, ¶¶ 74, 87 CL-166 (hereinafter "*RREEF, Decision on Jurisdiction*"), stating also that the "*ECT is the 'constitution' of the Tribunal*".

[122] *Infra. Servs. Lux. S.à.r.l. and Energia Termosolar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/13/13 – Annulment Proceeding, Decision on Annulment (hereinafter "*Antin v. Spain,* Decision on Annulment"), ¶ 236.

[123] *Antin v. Spain,* Decision on Annulment, ¶ 237 b.

[124] *Id.*, ¶ 237 d.

(d)     Moreover, the Committee held that the Tribunal had "*stated clearly and comprehensibly its reasons for concluding that EU Law would not apply to bar its jurisdiction. While Spain may dispute the soundness of the Tribunal's premises and findings, such criticisms do not give rise to a ground for annulment.*"[125]

187.   The same fundamental line of reasoning has prevailed in decisions rendered by *ad hoc* committees on annulment requests concerning ICSID arbitral awards, namely:

(a)     *Cube Infrastructure v. Spain*, in which the *ad hoc* committee held: "*Spain's arguments do not affect the conclusion that as a matter of international law, EU law does not have primacy. The provisions invoked by Spain are provisions of EU law and their scope and relevance must be determined insofar as EU law is applicable and relevant. They do not serve as a means of elevating EU law and equating it with international law. Insofar as the interpretation of the ECT is concerned, this is not a question to be addressed at the level of EU law. As a multilateral treaty, the ECT and the determination of the scope of jurisdiction of disputes submitted on the basis thereof is to be determined on the basis of international law;*"[126]

(b)     *NextEra Energy v. Spain*, in which the *ad hoc* committee found that "*the Tribunal did not exceed its powers by upholding jurisdiction to hear the case under Art. 26 of the ECT despite Spain's intra-EU objection. The Tribunal's decision was tenable as a matter of law and it could not be deemed a gross or egregious misapplication of the law that a reasonable person could not accept such that it would amount to a non-application of the law;*"[127] and

(c)     *SolEs Badajoz v. Spain*, in which the *ad hoc* committee noted that it "*has not been able to identify a gross or egregious error in the Tribunal's interpretation and application of Article 26 and other related provisions of the ECT in the*

---

[125] *Id.*, ¶ 239.

[126] *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain,* ICSID Case No. ARB/15/20, Decision on Annulment, dated March 28, 2022, ¶ 211, CL-380.

[127] *NextEra*, ¶ 231.

> *establishment of the Tribunal's jurisdiction pursuant to the ECT. Accordingly, the Committee considers that the Tribunal did not exceed its powers within the meaning of Article 52(1)(b) of the ICSID Convention.*"[128]

(d) *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.ÀR.L. v. Spain*, where the *ad hoc* committee held that "*properly construed, Article 26 of the ECT applies to claims by any investor from a Contracting Party (including an investor from an EU member State) against another EU member State.*"[129]

(e) *InfraRed Environmental Infrastructure GP Limited and others v. Spain,* in which the ad hoc committee decided that *"the Committee does not find that the Award fails the test of Article 52(1)(b) of the ICSID Convention as there is no manifest excess of powers when the Tribunal refused to decline its jurisdiction and the solution was not in itself unreasonable.*"[130]

188. An important distinction in respect of the source of an arbitral tribunal's jurisdiction was made in the *Green Power* (Arbitration No. SCC-2016/135) decision by the Arbitral Tribunal, which stated:

(a) "*[T]he Claimants could have opted for an ICSID arbitration under Article 26(4)(a)(i) ECT, given that both Denmark and Spain are – and were at the time the arbitration commenced – parties to the ICSID Convention. The Claimants opted instead to conduct the proceedings under the SCC Rules and, upon the Claimants' proposal in a letter dated 21 October 2016, the seat of the arbitration was set in Stockholm. Both Parties agree that this determination of the seat attracts the*

---

[128] *SolEs Badajoz GmbH v. Kingdom of Spain,* ICSID Case No. ARB/15/38, Decision on Annulment, dated March 16, 2022, ¶ 128, CL-382.

[129] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.ÀR.L. v. Spain*, ICSID Case No. ARB/13/30, Decision on Annulment, 10 June 2022, ¶ 75, CL-384.

[130] *InfraRed Environmental Infrastructure GP Limited and others v. Spain,* ICSID Case No. ARB/14/12, Decision on Annulment, 10 June 2022, ¶ 496, CL-383.

*application of Swedish arbitration law, particularly the SAA, as the applicable* lex arbitri;"[131]

(b)  "*In point of fact, the application of this* lex arbitri *and the control exercised by the Swedish courts was one of the considerations for which the Claimants opted for a SCC arbitration in Stockholm*;"[132]

(c)  "*As the Parties have not explicitly agreed on the law governing the arbitration agreement and neither the ECT nor the SCC Rules, to which the Parties have agreed, determines the law applicable to the arbitration agreement, if follows that, pursuant to Section 48 SAA, Swedish law, i.e. the law of the seat, is applicable to the determination of jurisdictional matters*;"[133]

(d)  "*The selection of the seat in Sweden, an EU Member State, also attracts the application of EU law, which is part of the law in force in every EU Member State, including Sweden*;"[134]

(e)  "*The question of whether or not EU law applies to the determination of jurisdiction and, if so, the extent to which it does so, does not arise in the same manner in the circumstances of this arbitration as in ICSID proceedings*."[135]

189.  In light of the above, the reasoning that led to the conclusion arrived at by the SCC No. 2016/135 Tribunal in respect of its own jurisdiction cannot be transposed, as Spain contends, to the assessment of the *BayWa* Tribunal's jurisdiction.

190.  This point has been acknowledged, most recently, in the *Cavalum* Decision on Jurisdiction, which states the following:

---

[131] *Green Power K/S and SCE Solar Don Benito v. Kingdom of Spain,* Arbitration No. SCC-2016/135, Award of 16 June 2022, ¶ 162, RL-240.

[132] *Id.*, ¶ 163.

[133] *Id.*, ¶ 165.

[134] *Green Power K/S and SCE Solar Don Benito v. Kingdom of Spain,* SCC-2016/135, Award of 16 June 2022 *Id.*, ¶ 166, RL-240.

[135] *Id.*, ¶ 441.

> "the Green Power arbitration was conducted under the Rules of the Stockholm Chamber of Commerce and Swedish law, and that the Tribunal treated Swedish law as the law applicable to jurisdiction. Notably, the Green Power tribunal expressly stated that different considerations would be applicable to ICSID arbitrations."[136]

191. A particular problem arises in connection with Spain's argument based on the EU's characterization as a "*REIO*" as defined in Articles 1(2) and 1(3) of the ECT.

192. However, as has been recognised in the *jurisprudence constante* of other arbitral tribunals on which the Award relies,[137] the fact that the EU, as "*REIO*," is also a Contracting Party of the ECT did not bar the Tribunal's jurisdiction.

193. In fact, under the VCLT's general principles of treaty interpretation, the EU's participation in the ECT as a Contracting Party thereto cannot, by itself, imply a carveout of its Member States from the Treaty's dispute resolution clauses and that, accordingly, ECT was not intended to apply among the EU Member States. For this to happen, according to the *BayWa* Tribunal, an *express provision* would have to be inserted in the ECT, which is not (yet) the case.[138]

194. The same fundamental line of reasoning was followed by the RREEF *ad hoc* committee, which stated:

> "The Committee is fully conscious of the desire of the CJEU to state that EU law should be interpreted and applied consistently and that it is so charged with that responsibility. However, that objective could, in the Committee's view, only be achieved by a subsequent amendment to the ECT provisions, adding a disconnection clause or by permitting other

---

[136] See *Cavalum SGPS, S.A. v. Kingdom of Spain*, ICSID Case No. ARB/15/34, Procedural Order No. 6, 7 September 2022, ¶ 56, CL-390-ENG.

[137] See *e.g.* ¶ 230.

[138] *Cavalum SGPS, S.A. v. Kingdom of Spain*, ICSID Case No. ARB/15/34, Procedural Order No. 6, 7 September 2022, ¶ 247(2), CL-390-ENG.

customarily acceptable declarations and acceptances by other parties to the
ECT. It should not, with respect, be made by a unilateral judicial assertion
by the CJEU that it alone has the monopoly to finally interpret the ECT
provisions which has a direct impact on third-party investors who have
relied on the plain and clear provisions of the ECT and unconditional
consent to arbitration given by the Contracting States. The Committee is
therefore not persuaded that the Komstroy Judgment provides support to
suggest that the Tribunal had acted in excess of its powers."[139]

195. Considering the above, Spain's request for annulment on grounds that the Tribunal has
manifestly exceeded its powers in assuming jurisdiction over the dispute must be
dismissed.

## C.  ANALYSIS OF THE BAYWA AWARD (2): FAILURE TO STATE REASONS IN THE AWARD

196. Spain further contends that the Award failed to state reasons in relation to the applicability
of EU law, which it argues should apply to the determination of the Tribunal's jurisdiction.

197. Spain's argument cannot, however, be accepted. The Tribunal has dealt expressly with the
issue of the applicability of EU law and its interrelation with the ECT in respect of its own
jurisdiction.[140]

198. The Tribunal's reasoning can be broadly summarized as follows:

   (a)    Its source of competence is the ECT;[141]

   (b)    The question then becomes what the ECT and the relevant rules of international
          law have to say about the application of EU law;[142]

---

[139] *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.ÀR.L. v. Spain*, ICSID
Case No. ARB/13/30, Decision on Annulment, 10 June 2022, ¶ 97, CL-384.

[140] *BayWa*, Decision on Jurisdiction, ¶¶ 262-283.

[141] *Id.*, ¶ 262.

[142] *Id.*, ¶ 268.

(c) The TFEU is not an international agreement concerning the subject matter of Part III or V of the ECT. Article 16 of the latter therefore does not resolve potential conflicts between the TFEU and the ECT;[143]

(d) The relevant provision is thus Article 41 VCLT, which *a priori* is capable of applying to the abrogation *inter se* by the TFEU of the ECT, provided the conditions laid down by it have been met;[144]

(e) This is however not the case, because: (i) it is not suggested that the parties to the TFEU notified the other parties of the intended modification to the ECT; and (ii) it is very doubtful whether the abrogation *inter se* of the ECT as between EU Member States is compatible with the effective execution of the object and purpose of the ECT as a whole;[145]

(f) Thus, under international law the TFEU did not modify *inter se* the provisions of the ECT. The question nevertheless arises as to whether *Achmea* compels the contrary conclusion;[146]

(g) The CJEU in *Achmea* was considering a bilateral treaty concluded between Member States, not a multilateral treaty such as the ECT;[147] and

(h) The Tribunal's jurisdiction is therefore not pre-empted by the *Achmea* decision.[148]

199. In light of the above, it is excessive to state that the Tribunal has failed to give reasons for its findings on the issue of the applicability of EU law to its jurisdiction. To the contrary, the Tribunal expressly considered this issue, and reached a conclusion that is in line with the case law of other tribunals that have dealt with the same issue previously, most notably in the abovementioned *Vattenfall* case.

---

[143] *Id.*, ¶ 271.

[144] *Id.*, ¶ 274.

[145] *Id.*, ¶ 276.

[146] *BayWa*, Decision on Jurisdiction, ¶ 280.

[147] *Id.*, ¶ 282.

[148] *Id.*, ¶ 283.

200. There is also no contradictory reasoning in the Award regarding this issue, at least to the point that "*it becomes impossible to understand the motives that led such tribunal to adopt its solution.*"[149] The Tribunal was clear in stating that its jurisdiction rests upon the ECT, and that EU law, as interpreted by the CJEU in *Achmea* did not preempt it in light of its previous considerations.[150]

201. In conclusion, the Award cannot be held to omit sufficient reasons in respect of the issue of the applicable law, nor to be based in its conclusion upon contradictory reasons.

202. Although such reasons may be subject, *arguendo*, to legitimate criticism from Spain's point of view, this Committee is barred from debating their accuracy or soundness, since the possible flaws of the latter do not constitute, under the ICSID Convention, a ground for the annulment of the Award.

### D. ANALYSIS OF THE BAYWA AWARD (3): SERIOUS BREACH OF A FUNDAMENTAL PROCEDURAL RULE

203. As mentioned above, Spain holds that the Tribunal breached its right to be heard and the principle of equal treatment of the Parties, respectively because the Tribunal: (i) unfoundedly rejected the incorporation into the record of the abovementioned Declaration of the Representatives of the Governments of the EU Member States of 15 January 2019, on the *Achmea* Judgment; and (ii) improperly denied the European Commission´s intervention as *amicus curiae* on key matters of Spain's defense.

204. Regarding the former, the Tribunal's Decision on Jurisdiction, Liability and Directions on Quantum, which is an integral part of the Award,[151] states the following:

> "On 28 January 2019, the Respondent requested the Tribunal to introduce as an additional legal authority a Declaration of the Representatives of the Governments of the Member States of 15 January 2019, on the legal

---

[149] *Teinver v. Argentina*, Decision on Annulment, ¶ 209.

[150] *BayWa*, Decision on Jurisdiction, ¶ 283.

[151] *Id.*, ¶ 5.

consequences of the judgment of the Court of Justice in Achmea and on Investment Protection in the European Union. The declaration was signed by 22 EU Members. By invitation of the Tribunal, the Claimants filed their response on 6 February 2019, opposing the production. The Tribunal issued its decision on 6 February 2019, stating that pursuant to Section 16.3 of Procedural Order No. 1, no exceptional circumstances existed to admit the proposed document at an advanced stage of the proceedings. It therefore denied the request."[152]

205. Section 16.3 of Procedural Order No. 1 issued by the Tribunal stated the following:

"Neither party shall be permitted to submit additional or responsive documents after the filing of its respective last written submission, unless the Tribunal determines that exceptional circumstances exist based on a reasoned written request followed by observations from the other party."[153]

206. Rule 34(1) of ICSID's Rules of Procedure for Arbitration Proceedings, as in force at the time of the proceedings, states that:

"The Tribunal shall be the judge of the admissibility of any evidence adduced and of its probative value."

207. By the time Spain's request was made and the Tribunal's decision was taken, two hearings on jurisdiction and the merits had already been held, respectively on 6-10 November 2017 and 22-23 May 2018. The proceedings were therefore unequivocally in an advanced stage.

208. The request might nevertheless have been deferred, had the Tribunal determined that exceptional circumstances existed, which justified the filing of the Declaration. The Tribunal found that no such circumstances existed.

---

[152] *Id.*, ¶ 57.
[153] See C-569-ENG, Section 16.3.

209. This Committee is satisfied that the Tribunal properly used its discretion under Article 34(1) of the said Rules and Section 16.1 of the Procedural Order No. 1 issued by the Tribunal on 29 December 2015.

210. In any event, it is undemonstrated in these proceedings how the said Declaration might have had a material impact on the outcome of the Award.

211. Even admitting that the annulment applicant does not have the burden of proving that the result would have been different but for the alleged breach of a procedural rule, as Spain contends, it should still "*demonstrate that the observance of the rule had the potential of causing the Tribunal to render an award substantially different from what it actually decided*", as stated by the *ad hoc* Committee in *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, cited by Spain.[154]

212. Such demonstration has not been made in the instant case. The Committee therefore finds that no serious departure from a fundamental rule of procedure can be imputed to the Tribunal in this respect.

213. Regarding Spain's contention that its right to be heard was breached due to the Tribunal's refusal to allow the EC as a NDP in the proceedings, regard must be had to Rule 37(2) of ICSID's Rules of Procedure for Arbitration Proceedings, pursuant to which:

> "After consulting both parties, the Tribunal may allow a person or entity that is not a party to the dispute (in this Rule called the "non-disputing party") to file a written submission with the Tribunal regarding a matter within the scope of the dispute. In determining whether to allow such a filing, the Tribunal shall consider, among other things, the extent to which:
> (a) the non-disputing party submission would assist the Tribunal in the determination of a factual or legal issue related to the proceeding by

---

[154] *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on Annulment, 30 December 2015, at ¶ 78, RL-161.

bringing a perspective, particular knowledge or insight that is different from that of the disputing parties;

(b) the non-disputing party submission would address a matter within the scope of the dispute;

(c) the non-disputing party has a significant interest in the proceeding.

The Tribunal shall ensure that the non-disputing party submission does not disrupt the proceeding or unduly burden or unfairly prejudice either party, and that both parties are given an opportunity to present their observations on the non-disputing party submission."

214. It is clear from this provision that the Tribunal enjoys considerable discretion in deciding whether or not to allow a NDP into the proceedings, namely on the issue of whether the person or entity at stake would "*bring a perspective, particular knowledge or insight that is different from that of the disputing parties*".

215. The Tribunal found that this was not the case. As stated in the Award:

"After receiving observations from the Parties, the Tribunal issued, on 4 April 2017, Procedural Order. No. 6, by which it rejected the EC's Second Application ("PO6"). The Tribunal was not convinced that a submission by the EC would add to the sum total of available information as to intra-EU jurisdiction under the ECT in the terms of Rule 37(2)(a), while it would most likely cause additional costs to the Parties."[155]

216. And the Tribunal went on to quote its PO 6, in which it stated:

"The questions [on which the EC seeks to intervene] have been extensively discussed in a number of published awards, and have been well ventilated

---

[155] *BayWa*, Decision on Jurisdiction, ¶ 31.

in the literature. The parties in the present case are fully capable of presenting the legal issues at stake."[156]

217. In light of the above, it is clear that the Tribunal exercised the discretion conferred upon it by ICSID's Rules of Procedure for Arbitration Proceedings and, in a reasoned decision, concluded that the factors to be considered in respect of the admission of a NDP did not justify it.

218. In particular, it is noteworthy that the Tribunal was persuaded that Parties were fully capable of presenting the legal issues on which the EC sought to intervene in the proceedings, notably those concerning its own jurisdiction.

219. In fact, Spain had ample opportunity throughout the proceedings to state its case on those issues. Its right to be heard cannot therefore be deemed to have been breached by virtue of the non-admission of the EC as a NDP into the proceedings.

220. The Committee is therefore satisfied that no departure from a fundamental rule of procedure has occurred in this respect either.

### E. Conclusion

221. In view of the above, the Committee finds that no grounds for annulment of the Award exist in the present case. Spain's application must therefore be rejected.

## VII. Costs

### A. Spain's Submissions

222. In its submission on costs of 25 November 2022, Spain asks the *ad hoc* Committee that BayWa be ordered to pay all the costs of the proceedings.[157]

---

[156] PO 6, ¶ 34.

[157] Kingdom of Spain's Submission on Costs, ¶ 9.

223. The costs incurred by Spain are, in sum, as follows:[158]

   (a)   ICSID fees and advance payments: EUR 21,506.30 and EUR 416,164.35;

   (b)   Legal fees directly incurred by the Applicant: EUR 650,000;

   (c)   Translations: EUR 3,409.48;

   (d)   Printing Expenses: EUR 800.57;

   (e)   Courier Expenses: EUR 37.12;

   (f)   Total amount: EUR 1,091,917.81.

224. Spain further requests that BayWa be ordered to pay interest on the foregoing sums, at a reasonable compound rate of interest to be determined by the Committee, until the date of full satisfaction of the Committee's decision.[159]

### B. BAYWA'S SUBMISSIONS

225. In its submission on costs of 25 November 2022, BayWa has, in turn, argued that:

   (a)   "[F]ollowing the rejection of Spain's application for annulment of the Award, Spain must: i) bear the full costs and expenses incurred by the *ad hoc* Committee and ICSID, and ii) reimburse BayWa for its legal costs and expenses";[160]

   (b)   This would be the result of applying the well-established rule according to which "*costs follow the event*".[161]

226. Accordingly, BayWa requested the Committee to order that Spain should bear the entirety of the costs of these annulment proceedings including the Committee members' fees, ICSID fees and all related expenses.

---

[158] *Id.*, ¶ 8.

[159] *Id.*, ¶ 10.

[160] BayWa's Submission on Costs, ¶ 11.

[161] *Id.*, ¶ 12.

227. The costs incurred by BayWa are, in sum, as follows:[162]

    (a)    Attorneys' fees: EUR 365,352.50;

    (b)    Other expenses (including translations, photocopies, courier services and meals in meetings): EUR 6,906.49;

    (c)    Total: EUR 372,258.99.

## C. THE COSTS OF THE PROCEEDINGS

228. The costs of the annulment proceeding, including the Committee's fees and expenses, ICSID's administrative fees and direct expenses, are as follows:

    (a) Committee Members' fees and expenses: US 205,068.75.

    (b) ICSID administrative fees: US 84,000.00.

    (c) Other expenses: US 42,746.48.

## D. THE COMMITTEE'S DECISION ON COSTS

229. Article 61(2) of the ICSID Convention provides that:

> "In the case of arbitration proceedings, the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award."

230. This provision, together with ICSID Arbitration Rule 47(1)(j), applicable by virtue of ICSID Arbitration Rule 53, gives the Committee discretion to allocate all costs of the proceedings, including Counsel's fees and other costs, between the Parties, as it deems appropriate.

---

[162] *Id.*, ¶ 9.

231. In the instant case, and as stated above, Spain's application for annulment must be entirely dismissed.

232. Moreover, the Committee decided to lift the stay of enforcement of the Award pending decision on the AfA, contrary to what was requested by Spain. The outcome of this procedural step was therefore also unfavourable to Spain.

233. However, the issues under discussion in these proceedings, in particular that of the Tribunal's jurisdiction, present a high degree of complexity, and have been the object of divergent decisions by courts and tribunals of high standing. Therefore, albeit unsuccessful, Spain's application for annulment cannot be deemed as futile or unsubstantiated.

234. In addition to the above, the Committee notes that both Parties have complied forthwith in all instances with its orders and decisions, and that their conduct during the proceedings was entirely correct.

235. In light of the abovementioned circumstances, the Committee, exercising its discretion, decides the following in respect of the apportionment of costs:

   (a)   Spain shall bear its own legal costs and expenses;
   (b)   Spain shall reimburse BayWa 85% of its legal fees, in the amount of EUR 310,549.63;
   (c)   BayWa shall bear 15% of its legal fees, and all of its other expenses;
   (d)   If payment of the above-mentioned amount is not made by Spain within sixty days from the notification of the present decision, the amount payable shall be increased by interest at the rate of 4,5% compounded annually; and
   (e)   Spain shall bear all costs of the proceedings, including the Committee's fees and expenses and ICSID's costs.

## VIII.  DECISIONS AND ORDERS

236. For the foregoing reasons, the Committee unanimously decides the following:

   (a)  Spain's application for annulment is dismissed;

(b) Spain shall bear all the costs of the proceedings, including the fees and expenses of the Committee and ICSID's administrative fees and direct expenses, as reflected in ICSID's final financial statement, and pay 85% of Claimant's legal fees;

(c) This amount shall be increased by interest at the rate of 4,5% compounded annually if payment is not made within sixty days from the notification of the present decision.

 

_____

Ms. Bertha Cooper-Rousseau

Member of the *ad hoc* Committee

Date: 2/5/2023

 

_____

Mr. Baiju S. Vasani

Member of the *ad hoc* Committee

Date:

 

_____

Prof. Dr. Dário Moura Vicente

President of the *ad hoc* Committee

Date:

(b) Spain shall bear all the costs of the proceedings, including the fees and expenses of the Committee and ICSID's administrative fees and direct expenses, as reflected in ICSID's final financial statement, and pay 85% of Claimant's legal fees;

(c) This amount shall be increased by interest at the rate of 4.5% compounded annually if payment is not made within sixty days from the notification of the present decision.

Ms. Bertha Cooper-Rousseau
Member of the *ad hoc* Committee
Date:

Mr. Baiju S. Vasani
Member of the *ad hoc* Committee
Date: 2/5/23

Prof. Dr. Dário Moura Vicente
President of the *ad hoc* Committee
Date:

59

(b) Spain shall bear all the costs of the proceedings, including the fees and expenses of the Committee and ICSID's administrative fees and direct expenses, as reflected in ICSID's final financial statement, and pay 85% of Claimant's legal fees;

(c) This amount shall be increased by interest at the rate of 4,5% compounded annually if payment is not made within sixty days from the notification of the present decision.

Ms. Bertha Cooper-Rousseau

Member of the *ad hoc* Committee

Date:

Mr. Baiju S. Vasani

Member of the *ad hoc* Committee

Date:

Prof. Dr. Dário Moura Vicente

President of the *ad hoc* Committee

Date:   2/5/2023

60