# Exhibit 27

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

### HYDRO ENERGY 1 S.À R.L. AND HYDROXANA SWEDEN AB

### V.

### KINGDOM OF SPAIN

### (ICSID CASE NO. ARB/15/42)

### ANNULMENT PROCEEDING

I hereby certify that the attached document is a true copy of the English version of the *ad hoc* Committee's Decision on the Kingdom of Spain's Application for Annulment dated 20 March 2023.

Martina Polasek
Acting Secretary-General

Washington, D.C., 20 March 2023

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

**Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB**

Respondents on Annulment

v.

**Kingdom of Spain**

Applicant on Annulment

**(ICSID Case No. ARB/15/42)**

**Annulment Proceeding**

---

**DECISION ON THE KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

*Members of the ad hoc Committee*

Ms. Wendy J. Miles KC, President of the *ad hoc* Committee

Dr. José Antonio Moreno Rodríguez, Member of the *ad hoc* Committee

Prof. Dr. Jacomijn J. van Haersolte-van Hof, Member of the *ad hoc* Committee

*Secretary of the ad hoc Committee*

Mr. Paul Jean Le Cannu

---

20 March 2023

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding

**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

**REPRESENTATION OF THE PARTIES**

*Representing Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB:*

Mr. Jeffrey Sullivan KC
Mr. Theo Tyrrell
Ms. Ceyda Knoebel
Gibson, Dunn & Crutcher UK LLP
Telephone House
2-4 Temple Avenue,
London, EC4Y 0HB
United Kingdom

*Representing the Kingdom of Spain:*

Mr. José Manuel Gutiérrez Delgado
Ms. María del Socorro Garrido Moreno
Ms. Gabriela Cerdeiras Megías
Ms. Lorena Fatás Pérez
Ms. Lourdes Martínez de Victoria Gómez
Ms. Amparo Monterrey Sánchez
Ms. Elena Oñoro Sainz
Mr. Francisco Javier Peñalver Hernández
Ms. María Eugenia Cediel Bruno
Mr. Javier Comerón Herrero
Mr. Juan Antonio Quesada Navarro
Ms. Ana María Rodriguez Esquivias
Abogacía General del Estado
Ministry of Justice of the Government of Spain
c/Marqués de la Ensenada, 14-16, 2ª planta
28004, Madrid
Spain

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding

**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

## TABLE OF CONTENTS

I.  **INTRODUCTION** ................................................................................................. 1

II.  **PROCEDURAL HISTORY** ................................................................................ 3

III.  **MANIFEST EXCESS OF POWERS (ARTICLE 52(1)(b))** ......................... 20

A.  **Standard of Review for Manifest Excess of Powers** ................................. 20

    i.  *The Applicant's Position* ........................................................................ 20

    ii.  *The Claimants' Position* ......................................................................... 27

    iii.  *The Committee's Analysis* ...................................................................... 35

B.  **Application of the Standard to Failure to Apply Proper Law to Jurisdiction** ................. 43

    i.  *The Applicant's Position* ........................................................................ 43

    ii.  *The Claimants' Position* ......................................................................... 62

    iii.  *The Committee's Analysis* ...................................................................... 75

C.  **Application of the Standard to Failure to Apply Proper Law to the Merits** ................. 111

    i.  *The Applicant's Position* ........................................................................ 111

    ii.  *The Claimants' Position* ......................................................................... 120

    iii.  *The Committee's Analysis* ...................................................................... 129

IV.  **FAILURE TO STATE REASONS (ARTICLE 52(1) (e))** ........................... 140

A.  **Standard of Review for Failure to State Reasons** ................................... 140

    i.  *The Applicant's Position* ........................................................................ 140

    ii.  *The Claimants' Position* ......................................................................... 142

    iii.  *The Committee's Analysis* ...................................................................... 146

B.  **Application of the Standard for Failure to State Reasons** ...................... 148

    i.  *The Applicant's Position* ........................................................................ 149

    ii.  *The Claimants' Position* ......................................................................... 154

*iii.* ***The Committee's Analysis*** ......................................................................157

**V.    COSTS DECISION**.................................................................................**159**

**VI.   DECISIONS AND ORDERS** ..................................................................**161**

**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

**TABLE OF DEFINED TERMS AND SELECTED ABBREVIATIONS**

| | |
|---|---|
| Annulment Application | Application for annulment of the award rendered on 5 August 2020 in the arbitration proceedings (ICSID Case No. ARB/15/42) between Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB and the Kingdom of Spain |
| Applicant or Respondent or Spain | Kingdom of Spain |
| Arbitration | Underlying arbitration in *Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain* (ICSID Case No. ARB/15/42) |
| ICSID Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings, in force as of 10 April 2006 |
| Award | Tribunal's Award rendered on 5 August 2020, which incorporated the Decision on Jurisdiction, Liability and Directions on Quantum issued on 9 March 2020, as Annex A |
| C-[#] | Claimants' exhibit |
| CL-[#] | Claimants' legal authority |
| Claimants or Hydro Entities | Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB |
| Committee or *ad hoc* Committee | Committee comprised of Ms. Wendy J. Miles KC, a national of New Zealand, President; Dr. José Antonio Moreno Rodríguez, a national of Paraguay; and Prof. Dr. Jacomijn J. van Haersolte-van Hof, a national of the Netherlands |
| Counter-Memorial on Annulment | Claimants' Counter-Memorial on Annulment dated 14 June 2021 |
| 2020 Decision | Tribunal's Decision on Jurisdiction, Liability and Directions on Quantum issued on 9 March 2020 |
| Decision on Stay of Enforcement of the Award | Committee's Decision on Stay of Enforcement of the Award dated 26 March 2021 |
| Decision on the Disqualification Proposal | Committee's Decision on the Proposal to Disqualify Ms. Wendy J. Miles, QC dated 13 December 2021 |
| Decision on the Request to Reconsider Stay | Committee's Decision on the Respondent's Request for Reconsideration of Refusal to Stay Enforcement of the Award dated 16 August 2022 |
| EC | European Commission |

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

| | |
|---|---|
| EC's First Application | EC's Application for Leave to Intervene as Non-Disputing Party in the Annulment Proceedings dated 14 January 2021 |
| EC's Second Application | EC's Application for Leave to Intervene as Non-Disputing Party in the Annulment Proceedings dated 16 July 2021 |
| ECT | Energy Charter Treaty |
| Hearing | Hearing on Annulment held remotely on Zoom, on 11 February 2022 |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States, dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| Memorial on Annulment | Applicant's Memorial on Annulment dated 12 April 2021 |
| R-[#] | Applicant/Respondent's exhibit |
| RD | Royal Decree |
| REIO | Regional Economic Integration Organization |
| Rejoinder on Annulment | Claimants' Rejoinder on Annulment dated 20 September 2021 |
| Reply Memorial on Annulment | Applicant's Reply Memorial on Annulment dated 2 August 2021 |
| RL-[#] | Applicant/Respondent's legal authority |
| TFEU | Treaty on the Functioning of the European Union, 2012/C 326/01, p 47 |
| Transcript, page, line | Transcript of the Hearing (as revised by the Parties on 9 March 2022) |
| Tribunal | Arbitral tribunal comprised of Lord Collins of Mapesbury, LL.D., F.B.A. (President), Professor Rolf Knieper and Mr. Peter Rees, QC |

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

## I. INTRODUCTION

1. This case concerns an application for annulment (the "**Annulment Application**") of the award rendered on 5 August 2020 in the arbitration proceedings (ICSID Case No. ARB/15/42) between Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB (the "**Claimants**" or "**Hydro Entities**") and the Kingdom of Spain (the "**Applicant**", or the "**Respondent**" or "**Spain**") (the "**Award**").

2. The Award was rendered by a tribunal comprised of Lord Collins of Mapesbury, LL.D., F.B.A. (President), Professor Rolf Knieper and Mr. Peter Rees, QC (the "**Tribunal**").

3. The dispute in the original proceeding was submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**") on the basis of the Energy Charter Treaty, which entered into force on 16 April 1998, including between the Grand Duchy of Luxembourg, the Kingdom of Sweden and the Kingdom of Spain (the "**ECT**"), and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 14 October 1966 (the "**ICSID Convention**").

4. The dispute related to the Respondent's measures that modified the regulatory and economic regime applicable to producers of hydropower generation energy, which allegedly negatively impacted the Claimants' investment (equity and debt interests) in various Spanish companies that own and operate 33 hydropower generation plants in Spain with a total installed production capacity of 106.788 megawatts.[1]

5. In the arbitration, the Claimants alleged that the Respondent breached its obligations pursuant to: (i) Article 13 of the ECT, by means of the indirect expropriation of their investment; and (ii) Article 10(1), by failing (a) to accord fair and equitable treatment, (b) not to impair by unreasonable or discriminatory measures the management, maintenance, use, enjoyment or disposal of the Claimants' investment, and (c) to accord the most constant protection and security.[2] The Claimants sought

---

[1] Decision on Jurisdiction, Liability and Directions on Quantum, ¶ 5, RL-0122 ("**2020 Decision**").

[2] 2020 Decision, ¶ 6.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

compensation for damage caused as a result of the Respondent's alleged violations of the ECT.[3]

6. On 9 March 2020, the Tribunal issued a *Decision on Jurisdiction, Liability and Directions on Quantum* (the "**2020 Decision**"). In the 2020 Decision, having declared its jurisdiction over the claims in the arbitration, the Tribunal dismissed the ECT Article 13(1) claim, and declared and directed that the Respondent might (or would) be in breach of ECT Article 10(1), if and to the extent that the remuneration of each of the plants in the Ondina and Xana portfolios failed to accord with a reasonable post-tax rate of return in the small-hydro market in Spain on the basis of WACC plus 1%, with the risk-free rate being the Spanish 10 year bond rate of 4.398%.[4] The Tribunal directed the Parties to endeavour to agree on a post-tax reasonable rate of return calculated using the WACC as at June 2013 and post-tax holding IRRs for the plants.[5]

7. On 5 August 2020, the Tribunal issued the Award, stipulating that the 2020 Decision constitutes an integral part of the Award as incorporated as Annex A.[6]

8. In the Award, the Tribunal ordered the Respondent to pay to the Claimants EUR 30,875,000, together with interest from 1 June 2013 until the date of payment at the rate of one-year EURIBOR plus 1%, established and compounded annually.[7] The Tribunal further ordered the Claimants and Respondent each to bear their own legal costs and other expenses and equally to bear the fees and expenses of the members of the Tribunal and charges for the use of the facilities of ICSID.[8]

9. Following the Award, the Respondent invoked three grounds for annulment: (i) that the Tribunal manifestly exceeded its powers (Article 52(1)(b) of the ICSID Convention) by failing to apply the proper law to its decision on jurisdiction; (ii) that the Tribunal manifestly exceeded its powers (Article 52(1)(b) of the ICSID

---

[3]  2020 Decision, ¶ 6.

[4]  2020 Decision, ¶ 770(1)-(3).

[5]  2020 Decision, ¶ 770(4).

[6]  Award, ¶ 9.

[7]  Award, ¶ 162(1).

[8]  Award, ¶ 162(2)-(3).

Convention) by failing to apply the proper law to the merits; and (iii) that the Award failed to state the reasons on which it is based (Article 52(1)(e) of the ICSID Convention). The primary basis for each ground arises out of the approach to European Union ("**EU**") law reflected in the Award.

10. This Decision on Annulment is not a reconsideration of substantive arguments in the arbitration as to the interpretation, application and/or effect of EU law. It is, within the scope of this Committee's mandate, a decision as to whether the Tribunal exceeded its mandate in this particular Award, informed by the information available to the Tribunal in the underlying Arbitration, based on the narrow grounds for annulment permitted under the ICSID Convention, and as to whether or not the Tribunal failed to state reasons in the Award.

## II. PROCEDURAL HISTORY

11. On 30 September 2020, the Applicant filed its *Application for Annulment of the Award* ("**Annulment Application**"), accompanied by Annexes 01 to 11. The Applicant requested, among other things: (i) a provisional stay of enforcement of the Award in accordance with ICSID Convention Article 52(5) and ICSID Arbitration Rule 54(2); and (ii) the continuation of the stay of enforcement of the Award until the Committee renders its Decision on the Application for Annulment.[9]

12. On 6 October 2020, the Secretary General of ICSID registered the Annulment Application and informed the Parties of the provisional stay of the Award pursuant to ICSID Arbitration Rule 54(2).

13. On 1 December 2020, the Claimants' original counsel, Mr. Manish Agrawal of Three Crowns, informed the Secretariat that his firm would no longer be acting as counsel for the Hydro Entities in these Annulment proceedings. He further informed the Secretariat that all further correspondence in connection with these proceedings for the Hydro Entities' attention should be directed to Mr. Jeffrey Sullivan and Mr. Theo Tyrrell of Gibson, Dunn & Crutcher UK LLP. Further to the Secretariat's invitation, Gibson, Dunn & Crutcher UK LLP provided on 2 December 2020 the powers of

---

[9] Annulment Application, ¶ 52.

attorney confirming its authorization to act on behalf of the Hydro Entities for the purposes of these annulment proceedings.

14. On 14 December 2020, the *ad hoc* Committee was constituted in accordance with Article 52(3) of the ICSID Convention. Its members are Ms. Wendy J. Miles KC, a national of New Zealand, President; Dr. José Antonio Moreno Rodríguez, a national of Paraguay; and Prof. Dr. Jacomijn J. van Haersolte-van Hof, a national of the Netherlands (the "**Committee**").

15. On 30 December 2020, the Parties confirmed by email that they agreed: (i) to file their written submissions on the continuation of the stay of enforcement of the Award in the English language; and (ii) to extend the 30-day deadline until the Committee has reached a final decision on the stay.

16. On 14 January 2021, the Committee, through its Secretary, circulated a Draft Procedural Order No. 1 to the Parties in preparation for the first session.

17. On 14 January 2021, the European Commission ("**EC**") submitted its *Application for Leave to Intervene as Non-Disputing Party in the Annulment Proceedings* ("**EC's First Application**") seeking the Committee's permission to intervene in the present annulment proceedings, pursuant to Rule 37(2) of the ICSID Arbitration Rules.

18. On 15 January 2021, the Applicant filed its *Submission in Support of the Continuation of the Stay of Enforcement of the Award*, together with Exhibits R-0005, R-0253, R-0382 to R-0385 and Legal Authorities RL-0001, RL-0069, RL-0117, RL-0118, RL-0120, and RL-0126 to RL-0144.[10]

19. On 20 January 2021, the Committee invited the Parties to provide their observations on the *EC's First Application*.

---

[10] The Applicant also filed corrected versions of the Submission of the Kingdom of Spain in support of the Continuation of the Stay of Enforcement of the Award and of the Consolidated List of Exhibits.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

20.      On 29 January 2021, the Claimants filed their *Response to Spain's Request for a Permanent Stay of Enforcement*, together with Annex A, Exhibit C-186 and Legal Authorities CL-159 to CL-184.[11]

21.      On 3 February 2021, the Parties jointly submitted a revised version of Draft Procedural Order No. 1.

22.      On the same date, the Parties filed their Observations on the *EC's First Application.*[12]

23.      On 8 February 2021, the first session of the *ad hoc* Committee took place via Zoom.

24.      On 12 February 2021, the Applicant filed its *Reply in Support of the Continuation of the Stay of Enforcement of the Award*, together with Exhibit R-0386 and Legal Authorities RL-0147 to RL-0157.[13]

25.      On 26 February 2021, the Claimants filed their *Rejoinder to the Kingdom of Spain's Submission in Support of Continuing the Provisional Stay of Enforcement of the Award*, together with an Updated Annex A and Exhibits C-189 to C-194.[14]

26.      On 3 March 2021, the Committee issued Procedural Order No. 1 ("**PO1**"), which recorded the Parties' agreements and the Committee's decisions on procedural matters. Among other things, having heard the Parties' general positions as to the admissibility of further evidence in annulment proceedings pursuant to Article 44 of the ICSID Convention and Rule 24 of the ICSID Arbitration Rules, the Committee incorporated in PO1 the following provision:

---

[11]   The Respondents on Annulment also filed Legal Authorities RL-0001, RL-0074, RL-0139, and RL-0144.

[12]   Along with its observations, the Applicant filed a list of legal authorities and Legal Authorities RL-0002, RL-0145, and RL-0146. In addition to their observations, the Respondents on Annulment filed Exhibits C-0187 and C-0188, as well as Legal Authorities CL-0167, CL-0185 to CL-0203, RL-0048, and RL-0123, and the relevant index.

[13]   This exhibit and these legal authorities were uploaded to Box on 15 February 2021. The Applicant also uploaded Exhibits R-005 and R-0253 and Legal Authorities RL-0001, RL-0002, RL-0010, RL-0048, RL-0069, RL-0074, RL-0094, RL-0105, RL-0117, RL-0118, and RL-0120.

[14]   The Claimants also submitted Legal Authorities CL-0159 to CL-0161, CL-0164 to CL-0167, CL-0171 to CL-0181, CL-0183, CL-0184, CL-0196, CL-0204 to CL-0206, RL-0001, RL-0134, RL-0135, RL-0138, RL-0147, RL-0151, RL-0152, and RL-0155.

15.2    Given the nature of an annulment proceeding, the Committee expects that the Parties will primarily refer to the evidentiary record of the arbitration proceeding and it *does not expect to receive new witness statements or expert reports*.

15.3    In principle, no new factual evidence (including new witness statements) or expert evidence shall be admitted in this proceeding without leave of the Committee. Should either Party wish to introduce such new document(s) or other evidence, other than legal authorities, that Party shall file a request to the Committee to that effect as soon as possible, indicating if applicable whether the new documents or evidence constitute rebuttal evidence. The Committee will promptly decide on the admissibility of these new documents and/or evidence, and *shall only admit them if it determines in its discretion and with due regard to Section 15.2 above that exceptional circumstances exist*, after hearing from the other Party.

15.4    Any request to introduce new document(s) or other evidence shall specify the issue(s) that the new document(s) or evidence is intended to address; if the proposed new document(s) or evidence is an expert report, the request shall specify why the new documents(s) or evidence is presented in the form of an expert report and not in the form of submissions by counsel in the relevant pleading.

…

15.7.    Should the Respondent seek leave to file new evidence, including new expert evidence, with its Memorial on Annulment, the Respondent is requested to do so as soon as possible, and at the latest four weeks before the filing of the Memorial, i.e. by Monday, 15 March 2021.

…

15.9. Neither Party shall be permitted to submit additional or responsive documents after the filing of its respective last written submission, unless the Committee *determines that exceptional circumstances exist based on a reasoned written request* followed by observations from the other Party.  [Emphasis added.]

27.    On 5 March 2021, the Applicant filed a *Request Pursuant to Section 15 of Procedural Order No. 1*, to submit "[o]*ne report / declaration on European Union Law ('EU*

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding

**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

*Law') by a University Professor, that addresses the relevant rules and principles of EU Law for purposes of Article 52(1)(b) and (e) of the ICSID Convention …".*[15]

28.  On 12 March 2021, the Claimants filed their Response to the Applicant's *Request Pursuant to Section 15 of Procedural Order No. 1*, accompanied by a Consolidated Index and Legal Authorities CL-0202, CL-203, CL-0207 through CL-0217, RL-0123, and RL-0124.

29.  On 26 March 2021, the Committee issued its *Decision on Stay of Enforcement of the Award*, deciding that (i) the stay of enforcement of the Award should not be continued; (ii) requiring the Claimants, on or before 30 April 2021, to provide a binding and unconditional undertaking to repay any monies recovered in the event that the Annulment Application is successful;[16] and (iii) reserving costs.[17]

30.  On 31 March 2021, the Committee in Procedural Order No. 2 ("**PO2**") issued its Decision in response to the Applicant's *Request Pursuant to Section 15 of Procedural Order No. 1*. The Committee denied the Applicant's Request for authorisation to file with its upcoming submission a report / declaration on EU law by a university professor and reserved costs.

31.  On 8 April 2021, the Claimants filed their binding and unconditional undertaking to repay any monies recovered in the event that the Annulment Application is successful, in accordance with the Tribunal's Decision on the Applicant's *Request for a Continuation of the Stay of Enforcement*, dated 26 March 2021.

32.  On 12 April 2021, the Applicant submitted its *Memorial on Annulment* in Spanish accompanied by Consolidated Indices of Exhibits and Legal Authorities, Exhibit

---

[15]  Spain's letter of 5 March 2021, ¶ 2.

[16]  The terms of the undertaking were as follows: "Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB (the 'Hydro Parties') hereby confirm that they undertake to promptly repay the Kingdom of Spain any and all amounts received in satisfaction of the Award rendered on 5 August 2020 (the 'Award') to the extent that the annulment application is successful. The Hydro Parties further confirm that they undertake not to disburse or transfer any amounts received in satisfaction of the Award to their investors or to any other third party while the annulment proceeding is ongoing (or thereafter to the extent the annulment application is successful)" (Decision on Stay of Enforcement of the Award, ¶ 122). *See also* Claimants' Rejoinder to the Kingdom of Spain's Submission in Support of Continuing the Provisional Stay of Enforcement of the Award, fn 140.

[17]  Decision on Stay of Enforcement of the Award, ¶ 122.

**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

R-0387 and Legal Authorities RL-0158 through RL-0192.  The English translation of the *Memorial on Annulment* was filed on 4 May 2021 in accordance with the Parties' agreement of 27 April 2021 and the Committee's instructions of 29 April 2021.

33.    On 26 April 2021, the Committee in Procedural Order No. 3 ("**PO3**") issued its *Decision on the European Commission's Application for Leave to Intervene as Non-Disputing Party* in the Annulment Proceedings.  The Committee decided that due to its premature nature the *EC's First Application* was not allowed at that time.[18]

34.    On 14 June 2021, the Claimants submitted their *Counter-Memorial on Annulment* accompanied by Annex A to the Counter-Memorial on Annulment, Consolidated Indices of Exhibits and Legal Authorities, Exhibits C-191 through C-0205, and Legal Authorities CL-0218 through CL-0283.[19]

35.    On 16 July 2021, the EC resubmitted its *Application for Leave to Intervene as Non-Disputing Party in the Annulment Proceedings* in near identical terms as the original application of 14 January 2021 (the "**EC's Second Application**").

36.    On 22 July 2021, the Committee invited the Parties to provide their observations on the *EC's Second Application*, directing the Parties to focus on points that were not raised in the EC's First Application.

37.    On 2 August 2021, the Applicant submitted its *Reply Memorial on Annulment* accompanied by Consolidated Indices of Exhibits and Legal Authorities, Exhibits R-0388 through R-0390, and Legal Authorities RL-0193 through RL-0241.[20]  The

---

[18]    PO3, ¶ 69.

[19]    The Claimants also submitted Exhibits C-0001, C-0186 to C-0194, and R-0033, R-0380 and R-0381, and Legal Authorities CL-0003, CL-098, CL-0102, CL-0110 to CL-0113, CL-0117, CL-0135, CL-0136, CL-0138, CL-0139, CL-0146 to CL-0148, CL-0159 to CL- 0217 as well as RL-0001, RL-0010, RL-0049, RL-0069, RL-0074, RL-0105, RL-0114, RL-0116, RL-0118, RL-0119, RL-0123, RL-0124, RL-0161 to RL-0167, RL-0169 to RL-0172, RL-0175 to RL-0182, RL-0184 to RL-0192.

[20]    In addition to R-0388 to R-0390, the Applicant uploaded the following exhibits to Box on 2 August 2021: R-0001, R-0003, R-0005, R-0031 to R-0033; R-0047, R-0057 to R-0059, R-0063, R-0064, R-0067, R-0069, R-0071, R-0075, R-0080, R-0086, R-0092, R-0105, R-0160, R-0171, R-0253, R-0380 to R-0387. In addition to Legal Authorities RL-0193 to RL-0241, the Applicant also uploaded Legal Authorities RL-0001 to RL-0003, RL-0006, RL-0010, RL-0015, RL-0017, RL-0027, RL-0034, RL-0048, RL-0060, RL-0069, RL-0074, RL-0075, RL-0077, RL-0078, RL-0081, RL-0094, RL-0105 to RL-0107, RL-0109 to RL-0111, and RL-0117 to RL-0192.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

English translation of the *Reply Memorial on Annulment* was submitted on 23 August 2021, along with a corrected version of the Spanish version.

38. On 5 August 2021, the Parties filed their observations on the *EC's Second Application*.

39. On 1 September 2021, further to the Committee's query of 26 August 2021, the Parties informed the Committee that they agreed that, in light of the ongoing COVID-19 restrictions in place in Europe, the hearing on annulment ("**Hearing**") should be held virtually (in whole) rather than in-person. The Committee had no objection to the Parties' joint proposal.

40. On 14 September 2021, the Committee and the Parties held a pre-hearing organizational meeting in preparation for the hearing scheduled to take place on 19 October 2021, with 20 October 2021 held in reserve for the Committee's deliberations.

41. On 20 September 2021, the Committee issued Procedural Order No. 4 ("**PO4**") on the Organization of the Hearing.

42. On the same date, the Claimants filed their *Rejoinder on Annulment* accompanied by Annex A, Consolidated Indices of Exhibits and Legal Authorities, Exhibits C-0206 to C-0211, and Legal Authorities CL-0288 through CL-0310.[21]

43. On 24 September 2021, the Committee in Procedural Order No. 5 ("**PO5**") issued its *Decision on the European Commission's Resubmitted Application for Leave to Intervene as Non-Disputing Party*. The Committee decided not to allow the *EC's Second Application*,[22] because it failed to meet the requirements of Arbitration Rule 37(2). In particular, the Committee considered that:

---

[21] In addition to the exhibits and legal authorities mentioned in paragraph 42, the Claimants also uploaded Exhibits R-0033 and R-0380, and Legal Authorities CL-0003, CL-0098, CL-0102, CL-0110, to CL-0112, CL-0117, CL-0135, CL-0136, CL-0138, CL-0139, CL-0146 to CL-0148, CL-0159 to CL-0287, as well as RL-0001, RL-0010, RL-0048, RL-0049, RL-0073, RL-0074, RL-0060, RL-0069, RL-0074, RL-0105 to RL-0107, RL-0110, RL-0111, RL-0123, RL-0124, RL-0134, RL-0135, RL-0137 to RL-0139, RL-0144, RL-0147, RL-0151, RL-0152, RL-0154, RL-0155, RL-0162, RL-0166 to RL-0169, RL-0173, RL-0176, RL-0178, RL-0180 to R-0182, RL-0185 to RL-0188, RL-0194, RL-0197 to RL-0201, RL-0203 to RL-0209, RL-0211 to RL-0227 and RL-0241.

[22] PO5, ¶ 30.

    a.   on the basis of the pleadings, it appeared that the EC legal representatives would not add to that which is already available through the Kingdom of Spain's own legal representatives in the Annulment proceedings, thus failing to offer a different legal perspective, knowledge or insight on the legal issue before the Annulment Committee (PO5, ¶ 20);

    b.   the manner in which the EC considers EU law should be applied in intra-EU investment treaty arbitration is not within the scope of the dispute in the Annulment proceedings (PO5, ¶ 23); and

    c.   given that the EC is not the decision-making body appointed to determine the Annulment Application pursuant to Article 52 of the ICSID Convention, the alleged interest that the EC has in the dispute was not a valid interest for the purposes of Rule 37(2)(c), if nothing else because it would subrogate the EC for this Committee (PO5, ¶ 27).

44.    On 18 October 2021, two days prior to the scheduled Hearing, the Applicant submitted a *Disqualification Proposal* in respect of the President of the Committee, along with Annexes 1 to 35, which followed the President's disclosure on 15 October 2021 of a potential new arbitral nomination by Claimants' counsel in unrelated proceedings. These Annulment proceedings were suspended in accordance with ICSID Arbitration Rules 53 and 9(6) and the Hearing postponed pending the outcome of the *Disqualification Proposal.*

45.    On 21 October 2021, the Claimants submitted their *Reply to Spain's Disqualification Proposal* dated 18 October 2021, along with an Index to the Claimants' Reply to Spain's Disqualification Proposal, and Appendices 1 to 16.

46.    On 27 October 2021, the President of the Committee submitted her observations in connection with the *Disqualification Proposal*.

47.    On 3 November 2021, the Applicant filed its Additional Observations, along with its Consolidated List of Annexes, and Annexes 36 to 44. The Claimants filed their *Observations on Spain's Disqualification Proposal* dated 18 October 2021, their

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

Consolidated Index to the Claimants' Reply and Observations to Spain's Disqualification Proposal, and Appendix 17.

48.     On 13 December 2021, the unchallenged Committee members, Prof. Dr. van Haersolte-van Hof and Dr. Moreno Rodríguez issued their *Decision on the Proposal to Disqualify Ms. Wendy J. Miles, QC* ("**Decision on the Disqualification Proposal**"). The unchallenged Committee members rejected the *Disqualification Proposal*, having determined that, in their view, a third party undertaking a reasonable evaluation of the relevant facts and circumstances would not conclude that they evidence a manifest lack of the qualities required pursuant to Article 14(1) of the ICSID Convention.[23]

49.     On 22 December 2021 and 17 January 2022, following consultation with the Parties, the Committee confirmed that the remote Hearing would proceed on Friday, 11 February 2022, with Saturday, 12 February 2022 being reserved for deliberations or, in the unlikely event that it was necessary, for an additional two hours for further Committee questions.

50.     On 28 January 2022, the Committee issued an amended version of PO4 on the Organization of the Hearing.  In particular, the Committee amended paragraphs 24 and 25 of PO4 and included a provision on applications for additional documents "*until the conclusion of the Hearing*":

> 31.     As contemplated in paragraph 15.9 of PO1,
>
> > '15.9.     Neither Party shall be permitted to submit additional or responsive documents after the filing of its respective last written submission, unless the Committee determines that exceptional circumstances exist based on a reasoned written request followed by observations from the other Party.
> >
> > > 15.9.1.     Should a Party request leave to file additional or responsive documents, that Party may not annex the documents that it seeks to file to its request.
> > >
> > > 15.9.2.     If the Committee grants such an application for submission of an additional or responsive document, the Committee shall ensure

---

[23]     Decision on the Disqualification Proposal, ¶ 78.

that the other Party is afforded sufficient opportunity to make its observations concerning such a document.'

32.  The Committee had previously directed that any such application had to be made no later than 5 October 2021 and the Committee was to rule on all outstanding requests by 11 October 2021. No request has been received by the date of this amended version of Procedural Order No. 4 and any such application will now be entirely within the discretion of the Committee until the conclusion of the Hearing.

51.  On 7 February 2022, the Applicant requested that the Committee reconsider its 26 March 2021 Decision on the Applicant's *Request for a Continuation of the Stay of Enforcement* (the "**Request to Reconsider Stay**").[24] It did so on the basis of new information that it submitted "*shows there is substantial risk that the* [Applicant] *would be unable to recoup payment of the Award should it be paid to Claimants and subsequently annulled*".[25] The Committee through its Secretary invited the Claimants to submit their comments on the request by 25 February 2022.

52.  On 8 February 2022, the Applicant sought leave pursuant to paragraph 15.9 of PO1, to include three new authorities:[26]

(i)  12 November 2021 Order of the *Svea* Court of Appeal concerning the *Greentech and others v Italian Republic* Award, withdrawing the stay (the "***Svea* Order**");

(ii)  26 October 2021 CJEU Judgment in Case C-109/20, *Republic of Poland v. PL Holdings Sàrl*; and

(iii)  25 January 2022 CJEU Judgment in Case C-638/19 P, *European Commission v European Food S.A. and others* (together with (ii) the "***PL Holdings* and *European Food* CJEU Judgments**").

53.  On 9 February 2022, the Claimants objected to the inclusion of the *Svea* Order and *PL Holdings* and *European Food* CJEU Judgments. In the event that the new authorities

---

[24]  The Applicant filed Annexes 1 and 2 with its Request to Reconsider Stay.

[25]  Applicant's Request to Reconsider Stay, ¶ 4.

[26]  Spain's New Authorities Application dated 8 February 2022.

were included, the Claimants requested an opportunity to respond to their substance, either in writing or via oral submissions at the Hearing, as well as an opportunity to submit responsive authorities.

54.    Also on 9 February 2022, given the imminent Hearing, the Committee notified the Parties through its Secretary that it would preliminarily include the Applicant's three new authorities on the basis that:[27]

a.    the Claimants were permitted to apply to submit up to three responsive authorities;

b.    the Parties were to be prepared to discuss at the Hearing the scope of the Committee's authority to take account of any new authorities that either post-date the Award or otherwise were not before the Tribunal; and

c.    the Committee would reserve its position as to the relevance and/or admissibility of the new authorities, and any other authorities not before the Tribunal, and the basis and scope of their relevance (if any), to its Decision on Annulment.

55.    On 9 February 2022, the Claimants sought leave pursuant to paragraph 15.9 of PO1, to include three responsive authorities:[28]

(i)    *Mathias Kruck and others v Kingdom of Spain*, ICSID Case No. ARB/15/23, Decision on Spain's Request for Reconsideration, 6 December 2021;

(ii)    *Cavalum SGPS, S.A. v Kingdom of Spain*, ICSID Case No. ARB/15/34, Decision on Spain's Request for Reconsideration, 10 January 2022; and

(iii)    *Infracapital F1 S.a.r.l. and Infracapital Solar B.V. v Kingdom of Spain*, ICSID Case No. ARB/16/18, Decision on Spain's Request for Reconsideration, 1 February 2022 (together, the "**New ICSID Reconsideration Decisions**").

---

[27]    Committee's Direction by email, dated 9 February 2022.

[28]    Claimants' New Authorities Application, dated 9 February 2022.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

56.  On 10 February 2022, further to the Committee's invitation, the Applicant submitted its response to the inclusion of the New ICSID Reconsideration Decisions.  On the same date, the Committee through its Secretary confirmed that it would accept the New ICSID Reconsideration Decisions subject to the terms of the Committee's email of 9 February 2022.

57.  On 11 February 2022, prior to the Hearing, the Applicant informed the Committee that the Parties were including in the legal authorities bundle for the Hearing the *Svea* Order, the *PL Holdings* and *European Food* CJEU Judgments, and the New ICSID Reconsideration Decisions, subject to the Committee's terms.  These were labelled CL-311, CL-312, CL-313, RL-0242, RL-0243 and RL-0244.[29]

58.  The Hearing proceeded via video link on 11 February 2022, commencing at 11:12 GMT.

59.  The Applicant was represented at the hearing by:

> State Attorney's Office, Kingdom of Spain:
>
> Ms. Maria del Socorro Garrido Moreno
>
> Ms. Gabriela Cerdeiras Megias
>
> Ms. Lourdes Martínez de Victoria Gómez
>
> Ms. Amparo Monterrey Sánchez
>
> Mr. Javier Comerón Herrero

60.  The Claimants were represented at the hearing by:

> Gibson, Dunn & Crutcher LLP, London:

---

[29]  *Greentech Energy Systems A/S and others v Italian Republic*, SCC Case No. V 2015/095, Order of the *Svea* Court of Appeal, dated 12 November 2021, RL-0243; *Republic of Poland v PL Holdings Sàrl*, Case No. C-109/20, Judgment of the CJEU, dated 26 October 2021, RL-242; *European Commission v European Food and others*, Case No. C-638-19 P, Judgment of the CJEU, dated 25 January 2022, RL-0244; *Mathias Kruck and others v Kingdom of Spain*, ICSID Case No. ARB/15/23, Decision on the Respondent's Request for Reconsideration of the Tribunal's Decision dated 19 April 2021, dated 6 December 2021, CL-0311; *Cavalum SGPS, S.A. v Kingdom of Spain*, ICSID Case No. ARB/15/34, Decision on the Kingdom of Spain's Request for Reconsideration, dated 10 January 2022, CL-0312; *Infracapital F1 S.à r.l. and Infracapital Solar B.V. v Kingdom of Spain*, ICSID Case No. ARB/16/18, Decision on the Respondent's Request for Reconsideration Regarding the Intra-EU Objection and the Merits, dated 1 February 2022, CL-0313.

Mr. Jeff Sullivan KC

Ms. Ceyda Knoebel

Mr. Theo Tyrrell

Mr. Horatiu Dumitru

61. During the hearing, the Parties submitted demonstrative exhibits: the Applicant submitted its Opening Statement slides; and the Claimants submitted demonstrative exhibits CD-1 to CD-4 (including its Opening Statement slides (CD-1) and Sur-Rebuttal slides (CD-4)).

62. The Hearing concluded at 18:21 GMT.

63. On 17 February 2022, the Committee through its Secretary invited the Parties to submit their corrections to the hearing transcript ("**Transcript**") (if any) within 21 days, i.e., by Thursday, 10 March 2022, in accordance with paragraph 19.3 of PO1 and paragraph 34 of the amended version of PO4. The Parties submitted the agreed corrected versions of the Transcript in both languages on 9 March 2022.

64. On 25 February 2022, the Claimants filed their Response to Spain's *Request to Reconsider Stay* of 7 February 2022, together with Annexes A and B.

65. On 10 March 2022, the Parties jointly submitted their agreed amendments to the Transcript.

66. On 1 April 2022, the Claimants sought leave pursuant to paragraph 15.9 of PO1 and paragraph 32 of PO4, to include three further new authorities, all post-dating the Hearing: [30]

    (i)     *SolEs Badajoz GmbH v Kingdom of Spain*, ICSID Case No. ARB/15/38, Decision on Annulment, 16 March 2022;

---

[30] Claimants' New Authorities Application, dated 1 April 2022.

(ii) *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Annulment, 18 March 2022; and

(iii) *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Annulment, 28 March 2022 (together with the decisions at paragraph 69 below, the "**New ICSID Annulment Decisions**").

67.     On 8 April 2022, the Applicant provided its response to the inclusion of the three New ICSID Annulment Decisions.

68.     On 6 May 2022, the Applicant requested the Committee's permission pursuant to PO1, paragraph 15.9, to introduce to include two more new authorities, also post-dating the Hearing:[31]

(i) Judgment of the Paris Court of Appeal No.48/2022, dated 19 April 2022; and

(ii) Judgment of the Paris Court of Appeal No.49/2022, dated 19 April 2022 (together the "**Paris Judgments**").

69.     On 16 June 2022, the Claimants requested the Committee's permission to include two further new authorities, also post-dating the Hearing:[32]

(i) *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Annulment, 10 June 2022; and

(ii) *InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*, ICSID Case No. ARB/14/12, Decision on Annulment, 10 June 2022 (together with the decisions at paragraph 66 above, the "**New ICSID Annulment Decisions**").

---

[31]     Spain's New Authorities Application, dated 6 May 2022, ¶ 1.

[32]     Claimants' New Authorities Application, dated 16 June 2022.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

70.     On 27 June 2022, the Applicant provided its response to the inclusion of the two further New ICSID Annulment Decisions.

71.     On 27 June 2022, in the same letter as its response to the New ICSID Annulment Decisions, the Applicant also requested leave to include two final new authorities, again post-dating the Hearing:[33]

(i)     Opinion 1/20 of the Court of Justice of the European Union, 16 June 2022 (the "**CJEU Opinion 1/20**"); and

(ii)    *Green Power K/S and SCE Solar Don Benito v Kingdom of Spain*, SCC Case No. 2016/135, Award, 16 June 2022 (the "***Green Power* SCC Award**").

72.     On 4 July 2022, the Claimants submitted their joint response to the inclusion of the Paris Judgments and the CJEU Opinion 1/20 and the *Green Power* SCC Award.

73.     On 16 August 2022, the Committee notified the Parties that it rejected the Applicant's 7 February 2022 *Request to Reconsider Stay*.[34]  It did so on the grounds that the Request was made pursuant to Arbitration Rule 53(4), which provides for reconsideration in the event that a stay is granted.  The Committee did not grant a stay in these proceedings and, therefore, Arbitration Rule 53(4) is not applicable.  No new application was made pursuant to the Article 52 of the ICSID Convention.

74.     The Committee further explained in its *Decision on the Request to Reconsider Stay* that the Claimants had provided reassurance that they considered the existing undertaking (referred to in paragraphs 29 and 31 above), to apply in light of the 'new information' that formed the basis of the Applicant's Request (i.e., sale of shares to a third party) and provided further reassurance in that respect.[35]  The Claimants further noted that no funds had been recovered on the Award to date, which was an additional factor in the Committee's decision, as was the imminency of this Decision on Annulment.[36]

---

[33]    Spain's New Authorities Application, dated 27 June 2022, ¶ 12.

[34]    Decision on the Respondent's Request for Reconsideration of Refusal to Stay Enforcement of the Award ("**Decision on the Request to Reconsider Stay**"), ¶ 35.

[35]    Decision on the Request to Reconsider Stay, ¶ 33.

[36]    Decision on the Request to Reconsider Stay, ¶ 34.

**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

75.    On 6 September 2022, the Committee through the Secretariat notified its intention, in the interest of procedural fairness, to treat the New ICSID Annulment Decisions, the Paris Judgments, CJEU Opinion 1/20 and the *Green Power* SCC Award in the same manner as the *Svea* Order, the *PL Holdings* and *European Food* CJEU Judgments and the New ICSID Reconsideration Decisions (as preliminarily included immediately prior to the Hearing).[37]   To that end, the Committee through its Secretary invited the Parties to submit: (i) the proposed new authorities with the appropriate reference number at their earliest convenience; and (ii) any further comments they might have in respect of the new authorities in writing by 19 September 2022.

76.    The Parties were further invited to submit their statements of costs also by 19 September 2022.

77.    On 7 September 2022, the Committee received nine new authorities.   These were labelled CL-0314 to CL-0318 and RL-0245 to RL-0248.[38]

78.    On 19 September 2022, the Committee received further substantive comments from the Parties in relation to the New ICSID Annulment Decisions, the Paris Judgments, CJEU Opinion 1/20 and the *Green Power* SCC Award.

79.    On 21 September 2022, the Secretariat notified the Parties on behalf of the Committee that the proceedings were closed.

80.    Section III below briefly summarises the Parties' positions on the first and second annulment grounds, both falling within alleged manifest excess of powers, followed by

---

[37]   At ¶¶ 54-56 above.

[38]   *SolEs Badajoz GmbH v Kingdom of Spain*, ICSID Case No. ARB/15/38, Decision on Annulment, dated 16 March 2022, CL-0314 ("***SolEs v Spain***"); *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Annulment, dated 18 March 2022, CL-0315 ("***NextEra v Spain***"); *Cube Infrastructure Fund SICAV and others v Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Annulment, dated 28 March 2022, CL-0316 ("***Cube v Spain***"); *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Annulment, dated 10 June 2022, CL-0317; *InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*, ICSID Case No. ARB/14/12, Decision on Annulment, dated 10 June 2022, CL-0318; *Strabag SE and others v Republic of Poland*, ICSID Case No. ADHOC/15/1, Paris Court of Appeal, Judgment No. 48/2022, dated 19 April 2022, RL-0245; *Slot Group a.s. v Republic of Poland*, PCA Case No. 2017-10, Paris Court of Appeal, Judgment No. 49/2022, dated 19 April 2022, RL-0246; Opinion 1/20 of the Court of Justice of the European Union (CJEU) issued on 16 June 2022, RL-0247; Green Power Partners K/S and SCE Solar Don Benito APS v Kingdom of Spain, SCC Case V 2016/135, Final Award, dated 16 June 2022, RL-0248.

the Committee's analysis. Section IV briefly summarises the Parties' positions on the third annulment ground, failure to state reasons, again followed by the Committee's analysis. Costs are addressed in Section V. The Committee's decision is stated in Section VI.

81. Preliminarily, the ICSID Convention, Article 52(2) and (3), includes the following threshold requirements for an Annulment Application:

> 2. The application shall be made within 120 days after the date on which the award was rendered except that when annulment is requested on the ground of corruption such application shall be made within 120 days after discovery of the corruption and in any event within three years after the date on which the award was rendered.

> 3. On receipt of the request the Chairman shall forthwith appoint from the Panel of Arbitrators an ad hoc Committee of three persons. None of the members of the Committee shall have been a member of the Tribunal which rendered the award, shall be of the same nationality as any such member, shall be a national of the State party to the dispute or of the State whose national is a party to the dispute, shall have been designated to the Panel of Arbitrators by either of those States, or shall have acted as a conciliator in the same dispute. The Committee shall have the authority to annul the award or any part thereof on any of the grounds set forth in paragraph (1).

82. The Award was issued on 5 August 2020. The Annulment Application was submitted on 30 September 2020, some 54 days after the Award. Accordingly, the Annulment Application was submitted well within the 120-day requirement of Article 52(2) of the ICSID Convention.

83. As set out at paragraph 14 above, the three-member *ad hoc* Committee in this Annulment Application was appointed by the Chairman of the Administrative Council in accordance with Article 52(3).

84. None of the members of the *ad hoc* Committee was a member of the Tribunal which rendered the Award. The Parties are Luxembourger, Swedish and Spanish. The Tribunal members, Lord Collins of Mapesbury (President) and Mr. Peter Rees QC are British, and Professor Rolf Knieper is German. The members of the *ad hoc* Committee are

Paraguayan, Dutch and New Zealand nationals. None was designated to the Panel of Arbitrators by Luxembourg, Sweden or Spain and none acted as conciliator in the disputes between the Parties.

85.     Accordingly, the Annulment Application meets the threshold requirements at Article 52(2) and (3).

## III.     MANIFEST EXCESS OF POWERS (ARTICLE 52(1)(b))

86.     The Applicant's first two grounds in its Annulment Application arise out of alleged excess of powers pursuant to Article 52(1)(b), based on the Tribunal's alleged failure to apply EU law, first to jurisdiction and secondly to merits. Part A below considers the standard of review for excess of powers in relation to both grounds. Part B deals with the application of the standard to alleged excess of powers in respect of jurisdiction and Part C deals with its application in respect of the merits.

### A.  Standard of Review for Manifest Excess of Powers

#### i.     The Applicant's Position

87.     As a starting point to the standard of review, the Applicant submitted that it was not using the Annulment proceedings "*as appeal proceedings nor re-arbitrating the dispute*" and "*is not attempting to have this ad hoc Committee correct the mistaken understanding of the … Tribunal on the disputed measures*".[39]

88.     The Applicant's position as to the Committee's standard of review for Article 52(1)(b) is set out at paragraphs 52 to 67 of its Memorial, at paragraphs 9 to 12 and 18 to 38 of its Reply Memorial and at the hearing, on Transcript pages 77 to 84.

89.     In its written submissions, the Applicant relied on the language of the Updated ICSID Background Paper, as well as prior ICSID annulment decisions, as the source of the applicable standard of review on annulment. In its Memorial, the Applicant specifically relied on the ICSID Convention *travaux preparatoires*,[40] and 11 prior ICSID annulment

---

[39]   Reply Memorial on Annulment, ¶ 40.

[40]   Memorial on Annulment, ¶ 52 and fn 49.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

decisions from 2007 to 2017,[41] including *Soufraki v UAE*,[42] *MCI v Ecuador*,[43] *Pey Casado v Chile*,[44] *Iberdrola v Guatemala*,[45] *Klöckner v Cameroon*,[46] *Sempra v Argentina*,[47] *Tza Yap Shum v Peru*,[48] *Amco v Indonesia I*,[49] *Enron v Argentina*,[50] *Venezuela Holdings v Venezuela*,[51] and *Occidental v Ecuador*[52].

90.     The Applicant further referred the Committee to the Updated ICSID Background Paper, paragraph 83, which states that:[53]

> [t]he "manifest" nature of the excess of powers has been interpreted by most *ad hoc* committees to mean an excess that is obvious, clear or self-evident, and which is discernable without the need for an elaborate analysis of the award.

---

[41]   Memorial on Annulment, ¶¶ 53-67 fns 50-70.

[42]   *Hussein Nuaman Soufraki v United Arab Emirates*, ICSID Case No. ARB/02/7, Decision of the *ad hoc* Committee on the Application for Annulment of Mr. Soufraki, dated 5 June 2007, RL-0124 ("***Soufraki v UAE***").

[43]   *M.C.I. Power Group L.C. and New Turbine Inc. v Republic of Ecuador*, ICSID Case No. ARB/03/6, Decision on Annulment, dated 19 October 2009, RL-0175 ("***MCI v Ecuador***").

[44]   *Victor Pey Casado and Foundation "Presidente Allende" v Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Application for Annulment of the Republic of Chile, dated 18 December 2012, RL-0165 ("***Pey Casado v Chile***").

[45]   *Iberdrola Energía, S.A. v Republic of Guatemala*, ICSID Case No. ARB/09/5, Decision on the Remedy for Annulment of the Award Submitted by Iberdrola Energía, S.A., dated 13 January 2015, RL-0164 ("***Iberdrola v Guatemala***").

[46]   *Klöckner Industrie-Anlagen GmbH and others v United Republic of Cameroon and Société Camerounaise des Engrais S.A.,* ICSID Case No. ARB/81/2, Decision on the Application for Annulment Submitted by Klöckner Against the Arbitral Award, dated 3 May 1985, RL-0176 ("***Klöckner v Cameroon***").

[47]   *Sempra Energy International v Argentine Republic*, ICSID Case No. ARB/02/16, Decision on the Argentine Republic's Application for Annulment of the Award, dated 29 June 2010, RL-0125 ("***Sempra v Argentina***").

[48]   *Mr. Tza Yap Shum v Republic of Peru*, ICSID Case No. ARB/07/6, Decision on Annulment, dated 12 February 2015, RL-0177 ("***Tza Yap Shum v Peru***").

[49]   *Amco Asia Corporation and others v Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision on the Application for Annulment, dated 16 May 1986, RL-0178 ("***Amco v Indonesia I***").

[50]   *Enron Creditors Recovery Corp. and Ponderosa Assets, L.P. v Argentine Republic*, ICSID Case No. ARB/01/3, Decision on the Application for Annulment of the Argentine Republic, dated 30 July 2010, RL-0179 ("***Enron v Argentina***").

[51]   *Venezuela Holdings B.V. and others v Bolivarian Republic of Venezuela*, ICSID Case No. ARB/07/27, Decision on Annulment, dated 9 March 2017, RL-0180 ("***Venezuela Holdings v Venezuela***").

[52]   *Occidental Petroleum Corporation & Occidental Exploration and Production Company v Republic of Ecuador*, ICSID Case No. ARB/06/11 Decision on Annulment of the Award, dated 2 November 2015, RL-0163 ("***Occidental v Ecuador***").

[53]   Reply Memorial on Annulment, ¶ 21.

> However, some *ad hoc* Committees have interpreted the meaning of "manifest"
> to require that the excess be serious or material to the outcome of the case.

91.   It argued that the standard of review under Article 52(1)(b) permits the Committee to
      determine that the Tribunal exceeded its powers if it contravened the Parties' consent
      to arbitration, including by not applying the proper law of the arbitration.[54] This is
      because, the Applicant submitted, consent is predicated upon the Tribunal applying the
      proper law.[55]

92.   As to the meaning of 'manifest' excess in relation to the application of proper law, the
      Applicant referred to previous annulment decisions that describe this variously as:

      a.   "*so gross or egregious as substantially to amount to failure to apply the
           proper law*";[56]

      b.   "*sufficiently clear and serious*";[57]

      c.   "[s]*uch gross and consequential misinterpretation or misapplication of the
           proper law which no reasonable person … could accept* [which] *needs to
           be distinguished from simple error – even a serious error – in the
           interpretation of the law which in many national jurisdictions may be the
           subject of ordinary appeal*";[58]

      d.   "*egregiously wrong interpretation of the proper law*";[59]

      e.   "*an error in application of the law can be so egregious as to equate to
           non-application of the relevant law*";[60]

---

[54]   Memorial on Annulment, ¶ 52 and fn 48.

[55]   Memorial on Annulment, ¶ 52 and fn 49.

[56]   Memorial on Annulment, ¶ 53, citing to *Soufraki v UAE*, RL-0124.

[57]   Memorial on Annulment, ¶ 53, citing to *Pey Casado v Chile*, RL-0165.

[58]   Memorial on Annulment, ¶ 54, citing to *Soufraki v UAE*, RL-0124.

[59]   Memorial on Annulment, ¶ 54, citing to *Soufraki v UAE*, RL-0124.

[60]   Memorial on Annulment, ¶ 55, citing to *Iberdrola v Guatemala*, ¶ 97, RL-0164 (which in turn relies on
       *Soufraki v UAE*, RL-0124).

f.     "*a fundamental error in identifying and applying the applicable law*";[61]

g.    "*not one of inadvertence*";[62]

h.    "[a]*s a general proposition, this Committee would not wish totally to rule out the possibility that a manifest error of law may, in an exceptional situation, be of such egregious nature as to amount to a manifest excess of powers*";[63]

i.    "*'manifest' does not prevent that in some cases an extensive argumentation and analysis may be required to prove that the misuse of powers has in fact occurred*";[64] and

j.    "*[i]n exceptional circumstances, … a gross or egregious error of law could be construed to amount to a failure to apply the proper law, and could give rise to the possibility of annulment*".[65]

93.    The Applicant further submitted that manifest excess of powers also occurs if a tribunal applies standards not included in the relevant treaty provision.[66]

94.    As to the scope of review, the Applicant submitted that the "*concept of the 'powers' of a tribunal goes further than its jurisdiction and refers to the scope of the task which the parties have charged the tribunal to perform in discharge of its mandate, and the manner in which the parties have agreed that task is to be performed*".[67]

---

[61]   Memorial on Annulment, ¶ 57, citing to *Sempra v Argentina*, RL-0125.

[62]   Reply Memorial on Annulment, ¶ 28, citing to *Mr. Patrick Mitchell v Democratic Republic of Congo*, ICSID Case No. ARB/99/7, Decision on the Application for Annulment of the Award, dated 1 November 2006, RL-0182 ("**Mitchell v Congo**").

[63]   Reply Memorial on Annulment, ¶ 30, citing to *Sempra v Argentina*, RL-0125.

[64]   Reply Memorial on Annulment, ¶ 33, citing to *Occidental v Ecuador*, RL-0163.

[65]   Reply Memorial on Annulment, ¶ 33, citing to *Occidental v Ecuador*, RL-0163.

[66]   Memorial on Annulment, ¶ 60.

[67]   Reply Memorial on Annulment, ¶ 32, citing to *Helnan International Hotels A/S v Arab Republic of Egypt*, ICSID Case No. ARB/05/19, Decision of the ad hoc Committee, dated 14 June 2010, RL-0173 ("**Helnan v Egypt**").

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

95.     At the oral hearing, the Applicant reiterated, referring again to the annulment decisions in *Enron v Argentina*, *Amco v Indonesia I*, *Klöckner v Cameroon*, *Sempra v Argentina* and *Occidental v Ecuador*, that:[68]

> a tribunal exceeds its powers when it exceeds its jurisdiction, either by excess or defect, or when it fails to apply the applicable law. Spain also argues that ***manifest errors of law can lead to annulment*** and has cited on the slide five arbitral precedents confirming this position. [Emphasis added.]

96.     In relation to excess of powers in respect of jurisdiction, it appeared from the Applicant's written submissions and hearing demonstratives that it considered gross error in law to be a ground for review. At the hearing, the Applicant clarified that:[69]

> there is a lack of application of the applicable law, that is to say the law of the European Union in terms of jurisdiction. There is ***no mistaking the application of the European law as if it had been applied incorrectly, but it was completely ignored by the Tribunal to determine whether they have jurisdiction***, and that is the jurisdiction of the European Union. And ***also the Tribunal is not consistent*** when saying that the international law, that the European Union law is international law and then saying it is not international law applicable to a strictly European dispute.
>
> The Tribunal is completely inconsistent in that respect, and also -- and as also stated in our opinion by the President during Claimants' opening, even at paragraph 502 of the decision ***the Tribunal is also issuing their own judgment on the European law and its compatibility with the ECT***. In the application in connection with the Energy Charter the ***inconsistency is incomplete in our opinion***. First they are saying European law is international law, then they obviate international law that would be applicable to the members of the Union and then they issue an opinion whether it is consistent, compatible or not, with the Energy Charter. [Emphasis added.]

97.     Although not entirely clear from the Transcript, it does appear that the Applicant maintains that, in certain circumstances, a manifest error of law could lead to annulment if it were so gross (or in the Applicant's words, so "*inconsistent*") as to constitute failure to apply proper law at all.

---

[68]     Transcript, pp 16-17, and Applicant's Demonstrative at slide 6.

[69]     Transcript, pp 155-156.

98. As to the Claimant's post-Hearing New ICSID Annulment Decisions submitted in support of the Claimants' arguments as to the standard of review, the Applicant argued that these should not be taken into account because they "*are not binding and in international arbitration there is no doctrine of precedent*".[70] The Applicant further pointed out that the Claimants had, throughout the proceedings, opposed the Applicant's inclusion of new evidence in the form of legal authorities, including on 3 February 2021, 5 August 2021 and 9 February 2022.[71]

99. In relation to the first three New ICSID Annulment Decisions, all of which dealt with proceedings involving Spain and similar issues of EU law, the Applicant submitted that:

   a. "[t]*he fact that Spain has raised the same grounds for annulment does not mean that the facts or the arguments are identical*";[72]

   b. "[e]*ach arbitration proceeding is unique and the Claimants' approach is extremely simplistic and erroneous*";[73]

   c. in response to the Claimants' allegation that the New ICSID Annulment Decisions would provide this Committee "*the benefit of reviewing three other ICSID ad hoc committees' approaches to issues that are substantively similar to the issues before this Committee*",[74] that the Committee "*is an independent Committee and constituted as its name indicates '*ad hoc*'*";[75]

   d. as such, this "*means that it is not obliged either to review the opinions of other Committees or to follow their criteria*";[76]

---

[70] Applicant's Submission on New Authorities, dated 19 September 2022, ¶ 6.

[71] Applicant's Response to Claimants' Application of 1 April 2022, dated 8 April 2022, ¶ 5.

[72] Applicant's Response to Claimants' Application of 1 April 2022, dated 8 April 2022, ¶ 7.

[73] Applicant's Response to Claimants' Application of 1 April 2022, dated 8 April 2022, ¶ 7.

[74] Applicant's Response to Claimants' Application of 1 April 2022, dated 8 April 2022, ¶ 8.

[75] Applicant's Response to Claimants' Application of 1 April 2022, dated 8 April 2022, ¶ 9.

[76] Applicant's Response to Claimants' Application of 1 April 2022, dated 8 April 2022, ¶ 9.

e.  "[f]*ollowing the approach of the annulment Committees without taking into account the specific circumstances of the case is a serious error that is intolerable in the ICSID system*";[77]

f.  in relation to the *Cube v Spain* decision in particular, the Applicant indicated its wish "*to highlight and presume the independence and professionalism of Ms. Haersolte-van Hof as a member of the Committee in Cube when issuing the Decision in the present annulment proceedings*",[78] noting that "[n]*either the facts in* Cube *are the same nor the arguments*";[79] and

g.  it "*rejects Claimants' allegations in respect of the legal authorities they seek to introduce and respectfully requests the honourable Committee not to permit Claimants to introduce them into the record*".[80]

100.  As to the two New ICSID Annulment Decisions subsequently submitted by the Claimants, the Applicant further argued that:

a.  it was notable "*how belligerent Claimants have been throughout all this annulment proceeding against the possibility of any evidence to be included into the record of this proceeding*";[81]

b.  the argument that, "[t]*he fact that Spain has raised similar grounds for annulment does not mean that the facts or the arguments are identical*";[82]

c.  "*each arbitration proceeding is unique*" and therefore "*the Claimants' approach is extremely simplistic and erroneous*";[83]

---

[77]  Applicant's Response to Claimants' Application of 1 April 2022, dated 8 April 2022, ¶ 9.

[78]  Applicant's Response to Claimants' Application of 1 April 2022, dated 8 April 2022, ¶ 10.

[79]  Applicant's Response to Claimants' Application of 1 April 2022, dated 8 April 2022, ¶ 10.

[80]  Applicant's Response to Claimants' Application of 1 April 2022, dated 8 April 2022, ¶ 11.

[81]  Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 5.

[82]  Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 8.

[83]  Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 8.

    d.  this "*is an independent Committee and constituted as its name indicates* 'ad hoc'",[84] which "*means that it is not obliged either to review the opinions of other Committees or to follow their criteria*";[85] and

    e.  "[f]*ollowing the approach of the annulment Committees without taking into account the specific circumstances of the case is a serious error that is intolerable in the ICSID system*".[86]

101.    In sum, the Applicant objected to the New ICSID Annulment Decisions on the grounds of relevance to this Committee's decision as it must decide on the basis of the particular Award and Arbitration in front of it. The Applicant did not object to the New ICSID Annulment Decisions on the grounds that they were not before the Tribunal in the underlying Arbitration or because they post-dated the Award; the sole timing point they took issue with was their inclusion only after the Hearing on the grounds of procedural fairness.

*ii.    The Claimants' Position*

102.    Before turning to the two particular grounds for annulment, and the standard of review in respect of each, the Claimants set out their position as to the "*General Legal Standards*" applicable to annulment.[87] In this regard, the Claimants submitted that: (i) annulment is not an appeal or a retrial; (ii) new arguments or materials should not be considered on annulment; and (iii) the Committee has discretion to annul the Award.

---

[84]   Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 10.

[85]   Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 10.

[86]   Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 10.

[87]   Counter-Memorial on Annulment, ¶¶ 17-31.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

103.   In written submissions,[88] and at the hearing,[89] the Claimants emphasised that, "*annulment under the ICSID Convention is not a form of appeal*",[90] noting that Article 53 of the ICSID Convention:[91]

> expressly excludes all appeals and instead provides a limited set of post-award remedies which are designed to prevent flagrant cases of abuse of the decision-making process itself, and that is the annulment remedy set out in article 52 of the Convention.  Article 52 has five grounds for annulment, and they are directed solely at the process by which the Tribunal arrived at the Award.  The annulment standards are not concerned with the substantive correctness of the award.

104.   The Claimants emphasised that annulment is an exceptional remedy,[92] confined to the five grounds listed in Article 52(1), "*each of which concerns the integrity of the arbitral process*".[93]  In that regard, the Claimants also relied on the Updated ICSID Background Paper, paragraph 71, which reads as follows:[94]

> the drafting history of the ICSID Convention demonstrates that assuring the finality of ICSID arbitration awards was a fundamental goal for the ICSID system. As a result, annulment was designed purposefully to confer a limited scope of review which would safeguard against 'violation of the fundamental principles of law governing the Tribunal's proceedings.' The remedy has thus been characterized as one concerning 'procedural errors in the decisional process' rather than an inquiry into the substance of the award.

105.   The Claimants' position as to the Committee's standard of review specifically for Article 52(1)(b) is comprehensively set out at paragraphs 34 to 69 of its Counter-Memorial, at paragraphs 25 to 38 of its Rejoinder and at pages 80 to 85 of the Transcript.

---

[88]   Counter-Memorial on Annulment, ¶ 18.

[89]   Transcript, pp 77-78.

[90]   Transcript, p 77, ll 18-19.

[91]   Transcript, pp 77-78.

[92]   Counter-Memorial on Annulment, ¶ 17.

[93]   Counter-Memorial on Annulment, ¶ 20.

[94]   Counter-Memorial on Annulment, ¶ 17; Updated ICSID Background Paper, ¶ 71, RL-0123.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

106. The Claimants submitted that "*it is well established that the annulment procedure is not a remedy against what a party may regard as an incorrect decision*",[95] and that the Applicant cannot "*establish an annullable error by claiming the Tribunal's interpretation or application of the law was simply (in its view) incorrect*".[96]

107. They also referred to the Updated ICSID Background Paper, paragraph 72, which states that:[97]

> The drafting history of the ICSID Convention also demonstrates that annulment "is not a procedure by way of appeal requiring consideration of the merits of the case, but one that merely calls for an affirmative or negative ruling based upon one [of the grounds for annulment]." It does not provide a mechanism to appeal alleged misapplication of law or mistake in fact. The Legal Committee confirmed by a vote that even a "manifestly incorrect application of the law" is not a ground for annulment.

108. The Claimants further referred to a number of prior annulment decisions that align with the position as set out in the Updated ICSID Background Paper, including *MTD v Chile*,[98] *Soufraki v UAE*[99] and *Teinver v Argentina*.[100] They specifically relied on *Alapli v Turkey*,[101] *Lucchetti v Peru*[102] and *MCI v Ecuador*[103] to support their submissions that the Committee "*is not empowered to substitute its own views on the merits of the case*".[104] The Claimants' argument that annulment proceedings are not an

---

[95] Counter-Memorial on Annulment, ¶ 19.

[96] Counter-Memorial on Annulment, ¶ 19.

[97] Counter-Memorial on Annulment, ¶ 18.

[98] *MTD Equity Sdn. Bhd. and MTD Chile S.A. v. Republic of Chile*, ICSID Case No. ARB/01/07, Decision on Annulment, dated 21 March 2007, CL-0219 ("***MTD v Chile***").

[99] *Soufraki v UAE*, RL-0124.

[100] *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v Argentine Republic*, ICSID Case No. ARB/09/1, Decision on Argentina's Application for Annulment, dated 29 May 2019, CL-0216 ("***Teinver v Argentina***").

[101] *Alapli Elektrik B.V. v Republic of Turkey,* ICSID Case No. ARB/08/13, Decision on Annulment, dated 10 July 2014, CL-0227 ("***Alapli v Turkey***").

[102] *Industria Nacional de Alimentos, S.A. and Indalsa Perú, S.A. (formerly Empresas Lucchetti, S.A. and Lucchetti Peru, S.A.) v Republic of Peru*, ICSID Case No. ARB/03/4, Decision on Annulment, dated 5 September 2007, CL-0209 ("***Lucchetti v Peru***").

[103] *MCI v Ecuador*, RL-0175.

[104] Counter-Memorial on Annulment, ¶ 23.

appeal underscored its firm opposition to the Committee's consideration of new arguments or new materials that were not before the Tribunal in the underlying arbitration.[105]  The Claimants further pointed out that the Committee's power to annul is in any event discretionary; it may choose not to exercise it even if it were to find it has grounds to do so.[106]

109.   The Claimants acknowledged that a tribunal may act outside its mandate by either: (i) exceeding its jurisdiction; or (ii) failing to apply proper law.[107]  They referred to the decision on annulment in *El Paso v Argentina*, which states that:[108]

> The manifest excess of powers of an arbitral tribunal may take place when a Tribunal is resolving jurisdictional issues or issues concerning the merits of the case. This can happen when a tribunal rules on matters that the parties did not submit for its decision; when it did not to apply the proper law; or when it did not apply the law agreed on by the parties. In these cases, the excess of powers must be 'manifest.'

110.   They submitted that, so far as jurisdiction is concerned, a tribunal may exceed its powers by acting *ultra vires* (outside its powers) or *infra petita* (failing properly to exercise its powers).[109]

111.   Specifically as to the applicable standard of review, the Claimants reiterated that tribunals have authority to determine their own jurisdiction and that for an *ad hoc* committee to conduct a *de novo* review of that decision "*would turn* [an] *annulment into an appeal*".[110]  They pointed out that "*reasonable minds might differ*" but that

---

[105]   Counter-Memorial on Annulment, ¶¶ 25- 28.

[106]   Counter-Memorial on Annulment, ¶¶ 29-31.

[107]   Counter-Memorial on Annulment, ¶ 36.

[108]   Counter-Memorial on Annulment, ¶ 36, citing to *El Paso Energy International Company v Argentine Republic*, ICSID Case No. ARB/03/15, Decision of the *ad hoc* Committee on the Application for Annulment of the Argentine Republic, ¶ 138, CL-0213 ("***El Paso v Argentina***").

[109]   Counter-Memorial on Annulment, ¶ 37.

[110]   Counter-Memorial on Annulment, ¶ 38.

deference must be paid to the tribunal.[111]  The task on annulment is to consider whether the tribunal's jurisdictional analysis was "*tenable as a matter of law*".[112]

112.    In this regard, the Claimants relied on prior annulment decisions, including *El Paso v Argentina*, *Azurix v Argentina*, *OI European Group v Venezuela*, *Micula v Romania*, *Cortec Mining v Kenya* and *Tenaris v Venezuela II*.[113]

113.    They set out the reasoning in *Azurix v Argentina*, in their written submissions and again at the Hearing as follows:[114]

> Article 52(1)(b) does not provide a mechanism for de novo consideration of, or an appeal against, a decision of a tribunal under Article 41(1) after the tribunal has given its final award.  The Committee is rather of the view that it is only where the tribunal has manifestly acted without jurisdiction that an ad hoc committee can intervene under Article 52(1)(b). … If, on the other hand, reasonable minds might differ as to whether or not the tribunal has jurisdiction, that issue falls to be resolved definitively by the tribunal in exercise of its power under Article 41 before the award is given, rather than by an ad hoc committee under Article 52(1)(b) after the award has been given.

114.    The Claimants emphasised that in order for the Applicant to succeed, it must "*prove that the Tribunal's jurisdictional analysis was untenable*".[115]  They referred to the annulment decision in *Micula v Romania*, which they submitted stated the provisions on proper law as "*essential elements of the parties' agreement to arbitrate and*

---

[111]    Counter-Memorial on Annulment, ¶ 41.

[112]    Counter-Memorial on Annulment, ¶ 42, citing *OI European Group B.V. v Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Decision on the Application for Annulment of the Bolivarian Republic of Venezuela, dated 6 December 2018, CL-0237 ("***OI European Group v Venezuela***").

[113]    Counter-Memorial on Annulment, ¶¶ 36-47, citing to *El Paso v. Argentina*, CL-0213; *Azurix Corp v Argentine Republic*, ICSID Case No. ARB/01/12, Decision on the Application for Annulment of the Argentine Republic, dated 9 September 2009, CL-0221 ("***Azurix v Argentina***"); *OI European Group v Venezuela*, CL-0237; *Ioan Micula and others v Romania*, ICSID Case No. ARB/05/20, Decision on Annulment, dated 26 February 2016, CL-0167 ("***Micula v Romania***"); *Cortec Mining Kenya Limited, Cortec (Pty) Limited and Stirling Capital Limited v Republic of Kenya*, ICSID Case No. ARB/15/29, Decision on Application for Annulment, dated 19 March 2021, CL-0271 ("***Cortec Mining v Kenya***"); *Tenaris S.A. and Talta - Trading e Marketing Sociedade Unipessoal Lda. v Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/23, Decision on Annulment, dated 28 December 2018, CL-0239 ("***Tenaris v Venezuela II***"), and Transcript, p 87.

[114]    Counter-Memorial on Annulment, ¶¶ 39-40 and Transcript, pp 87-88.

[115]    Counter-Memorial on Annulment, ¶ 43.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding

**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

*constitute part of the parameters for the tribunal's activity*".[116]  According to that *ad hoc* committee, "[n]*on-application of the law agreed to by the parties [...] goes against the parties' agreement to arbitrate and may constitute an excess of powers*".[117]

115. The Claimants further submitted that the recent decision in *Cortec Mining v Kenya* recognised there is a high bar to finding manifest excess of powers based on failure to apply applicable law.[118]

116. As opposed to failure to apply proper law, the Claimants firmly submitted that "*the mere misapplication of the applicable law – even if serious – is not a valid ground for annulment*".[119]  They relied on *Teinver v Argentina* and *Tenaris v Venezuela II*, both of which distinguished between failure to apply and error.[120]  They submitted that the Applicant "*must establish that the Tribunal completely disregarded the law agreed to by the Parties*".[121]

117. In relation to the prior annulment decisions in *Klöckner v Cameroon*, *Iberdrola v Guatemala*, *Amco v Indonesia I* and *Sempra v Argentina*, which the Applicant submitted "*suggested that a gross misapplication of the law could, in very limited and extreme circumstances, be a basis*" for annulment,[122] the Claimants distinguished these as a "*small minority of ICSID annulment decisions*", which are "*controversial and have been criticised*".[123]  As to the Applicant's further reliance on *Enron v Argentina*, the Claimants said that "[m]*uch like the Sempra decision, the 'muddled' Enron decision*

---

[116]  Counter-Memorial on Annulment, ¶ 44.

[117]  Counter-Memorial on Annulment, ¶ 44.

[118]  Counter-Memorial on Annulment, ¶ 45.

[119]  Counter-Memorial on Annulment, ¶ 46.

[120]  Counter-Memorial on Annulment, ¶¶ 46-47.

[121]  Counter-Memorial on Annulment, ¶ 48.

[122]  Counter-Memorial on Annulment, ¶¶ 49-55.

[123]  Counter-Memorial on Annulment, ¶ 49.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

*has been severely criticised*".[124] They referred to a comment by Professor Schreuer that the:[125]

> reasoning of the *ad hoc* Committee [in *Enron*] is truly baffling. The Tribunal had correctly identified the governing law. It had also correctly identified the relevant rule and had applied it. But the *ad hoc* Committee found an excess of powers because it disagreed with the way the Tribunal had interpreted that rule
>
> …
>
> If one is to take the annulments in *Sempra* and *Enron* as an indication of current practice, an *ad hoc* committee can annul an award whenever it disagrees with the way a tribunal interprets an applicable rule.

118. The Claimants pointed out that reference by the *ad hoc* committee in *Soufraki v UAE* to "*gross and consequential*" misapplication of the proper law, which "*no reasonable person … could accept*", remains theoretical as "[t]*o date, no annulment committee has ever overtly applied this standard and found that a gross misapplication of law constitutes an annullable error*".[126]

119. At the Hearing, the Claimants responded to the Committee's question whether it considered a misapplication of law could ever be so egregious as to give rise to a valid ground of annulment, stating that:[127]

> The Claimants' position is that errors of law do not give rise to a valid ground for annulment under article 52(1)(b), and we have set that out in our submissions. I thought that point had been accepted by Spain in its Reply. I will check that at the break but we thought that point had been accepted and they no longer were advancing a misapplication of the law in this case. If they are, our position was set out in our Counter Memorial. That does not give rise to a ground for annulment. That would turn the Annulment Committee into an appellate body.

---

[124] Counter-Memorial on Annulment, ¶ 56, citing to C. H. Schreuer, "From ICSID Annulment to Appeal, Half Way Down the Slippery Slope, The Law and Practice of International Courts and Tribunals", Vol. 10 (2011), pp 219-221, CL-0276 ("***Schreuer***"); R. D. Bishop & S. M. Marchili, Annulment under the ICSID Convention (2012), p. 117, ¶¶ 6.287 et seq., CL-0277.

[125] Schreuer, pp 220-221, CL-0276.

[126] Counter-Memorial on Annulment, ¶ 49.

[127] Transcript, pp. 95-96.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

> …
>
> If there is a misapplication of law which is so egregious, can it give rise to a valid ground for annulment? Again, our position is no. I think there are cases which say that theoretically that is possible, but if you look at the cases there has never been a single decision where an ad hoc committee has found an application of law which is so egregious as to give rise to the non-application, and I don't think that is a case Spain has made. But our position is that that is not a valid ground for annulment.

120.    They subsequently reiterated that their:[128]

> position on that is clear. The cases are very clear. I think it is only one or two cases that suggest it is even possible. No *ad hoc* committee has ever annulled an award on the basis that there has been an egregious misapplication of the law. It would be the first time if this Committee did that, but we say it is not for the Committee's mandate and that is confirmed by paragraph 72 of the ICSID Background Paper on Annulment (slide 3).

121.    As to the meaning of manifest, the Claimants referred to similar descriptions as the Applicant, such as "*clear*", "*obvious*", "*self-evident*", "*without need for an extensive analysis of the award*".[129] They referred also to additional annulment decisions in:

    a.    *CDC v Seychelles*, which refers to the excess as being "*plain on its face*";[130]

    b.    *AES v Hungary*, which stated that it "*must be able to 'be discerned with little effort and without deeper analysis*'";[131] and

    c.    *Pey Casado v Chile II*, which required it to be "*textually obvious and substantively serious*" and "*sufficiently clear and serious*".[132]

---

[128]    Transcript, p.178, l 19 to p 179, l 3.

[129]    Counter-Memorial on Annulment, ¶ 60, citing *CDC Group plc v Republic of the Seychelles*, ICSID Case No. ARB/02/14, Decision on Annulment, dated 29 June 2005, ¶ 41, RL-0186 ("***CDC v Seychelles***"); *Soufraki v UAE,* ¶¶ 39-40, RL-0124; *Total S.A. v Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Annulment, dated 1 February 2016, ¶ 175, RL-0185 ("***Total v Argentina***"); *Alapli v Turkey*, ¶ 77, CL-0227; *Daimler Financial Services A.G. v Argentine Republic*, ICSID Case No. ARB/05/1, Decision on Annulment, dated 7 January 2015, ¶ 186, CL-0229 ("***Daimler v Argentina***"); *Teinver v Argentina*, ¶ 59, CL-0216.

[130]    Counter-Memorial on Annulment, ¶ 62.

[131]    Counter-Memorial on Annulment, ¶ 63.

[132]    Counter-Memorial on Annulment, ¶¶ 64-65, citing *Víctor Pey Casado and President Allende Foundation v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on Annulment, 8 January 2020, ¶ 198, CL-0225.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

122.  The Claimants then referred to four annulment decisions making the corollary point: that if the position taken by the tribunal was "*tenable*" or "*not unreasonable*",[133] then it could not be annulled.  They surmised that "[e]*ven if the Tribunal's determinations* [on jurisdiction and the applicable law] *are debatable, or even if the Committee believes they may be 'incorrect as a matter of law', that is not sufficient*" for annulment.[134]  The Claimants finally concluded that the ICSID Convention "*imposes a high standard, which fully accords with the limited nature of review in ICSID annulment proceedings*".[135]

123.  The Claimants submitted that the reasoning in the New ICSID Annulment Decisions "*is highly relevant and applicable to the present proceeding*".[136]  They submitted that the relevant committees considered "*Spain's arguments on the relevance of EU law to the underlying disputes*",[137] and dealt with "*Spain's attempts to introduce new arguments and evidence that was not before those underlying tribunals*".[138] Specifically as to the standard applicable under Article 52(1)(b), the Claimants referred to reasoning in the New ICSID Annulment Decisions in relation to the applicable standard of review both to manifest excess of powers and to failure to state reasons.[139]

### iii.  The Committee's Analysis

124.  The starting point, as agreed by the Parties, is that the annulment remedy under the ICSID Convention is not a right of appeal.

---

[133]  Counter-Memorial on Annulment, ¶ 66, citing *Lucchetti v Peru*, ¶ 112, CL-0209; *Fraport AG Frankfurt Airport Services Worldwide v Republic of the Philippines*, ICSID Case No. ARB/03/25, Decision on the Application for Annulment of Fraport, dated 23 December 2010, ¶ 44, RL-0161 ("**Fraport v Philippines**"); *Duke Energy International Peru Investments No. 1, Ltd. v Republic of Peru*, ICSID Case No. ARB/03/28, Decision of the *ad hoc* Committee, dated 1 March 2011, ¶ 99, RL-0181 ("**Duke Energy v Peru**"); *TECO Guatemala Holdings, LLC v Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment, dated 5 April 2016, ¶ 78, CL-0214 ("**TECO v Guatemala**").  *See also* Rejoinder on Annulment, ¶¶ 22-23.

[134]  Counter-Memorial on Annulment, ¶ 67.

[135]  Counter-Memorial on Annulment, ¶ 68.

[136]  Claimants' submission on New Authorities dated 19 September 2022, ¶ 23.

[137]  Claimants' submission on New Authorities dated 19 September 2022, ¶ 24.

[138]  Claimants' submission on New Authorities dated 19 September 2022, ¶ 25.

[139]  Claimants' submission on New Authorities dated 19 September 2022, ¶¶ 30-35.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

125. <u>First</u>, the underlying principle is one of finality of awards, which is central to dispute resolution within the ICSID Convention. The Committee finds, as the Parties accepted in their submissions,[140] that finality of the Award is derived from three sources of law or analysis:

    a. *ICSID Convention, Article 53*, which expressly states that awards are binding on the parties and not subject to any appeal or remedy, except by limited remedy of annulment based on one or more of five *Article 52* grounds, (i) the Tribunal was not properly constituted, (ii) the Tribunal has manifestly exceeded its powers; (iii) there was corruption on the part of a member of the Tribunal, (iv) there has been a serious departure from a fundamental rule of procedure, or (v) the award has failed to state the reasons on which it is based;

    b. *The Updated ICSID Background Paper*, cited to by the Parties as offering additional guidance to the Committee,[141] which emphasises that "*the finality of ICSID arbitration awards was a fundamental goal for the ICSID system*" and that:[142]

> annulment was designed purposefully to confer a limited scope of review which would safeguard against "violation of the fundamental principles of law governing the Tribunal's proceedings" [and] [t]he remedy has thus been characterized as one concerning "procedural errors in the decisional process" rather than an inquiry into the substance of the award.

    And which, by reference to the drafting history, demonstrates "*that annulment 'is not a procedure by way of appeal requiring consideration of the merits of the case, but one that merely calls for an affirmative or negative ruling based upon one* [of the grounds for annulment] '";[143] and

---

[140] Reply Memorial on Annulment, ¶ 129 (ICSID Convention); Memorial on Annulment, ¶ 52; and Reply Memorial on Annulment, ¶ 24 (Updated ICSID Background Paper). Memorial on Annulment, ¶¶ 53-67 and Reply Memorial on Annulment, ¶¶ 25-33 (prior ICSID committee decisions); Counter-Memorial on Annulment, ¶¶ 17-20 (ICSID Convention); Counter-Memorial on Annulment, ¶ 17 (Updated ICSID Background Paper); Counter-Memorial on Annulment, ¶¶ 39-49 (prior ICSID committee decisions).

[141] Counter-Memorial on Annulment, ¶ 17.

[142] Updated ICSID Background Paper, ¶ 71, RL-0123.

[143] Updated ICSID Background Paper, ¶ 72, RL-0123.

Case 1:21-cv-01248-RJL   Document 33-11   Filed 03/21/23   Page 45 of 172

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT

> c. *prior ICSID annulment committee decisions*, including dissenting opinions to those decisions, mostly considered in the Updated ICSID Background Paper and forming the basis for the analysis therein.

126.  <u>Secondly</u> in terms of standard (and scope) of review for excess of powers, the limited remedy requires an excess that is "*manifest*", pursuant to Article 52(1)(b).  Article 52(1)(b) itself provides limited assistance as to the meaning of the term or its interplay with the standard of review, save to require that the excess of powers be "*manifest*".

127.  As to the meaning of "*manifest*", the Parties are largely in agreement.  They accept that the term imposes a high threshold and requires an excess of powers that is "*clear*", "*self-evident*" and "*obvious*".  They further agree that the same high threshold applies to excess of powers in respect of jurisdiction as to merits.

128.  The Updated ICSID Background Paper, and prior ICSID annulment decisions discussed therein, adopt a fairly standard approach to the meaning of "*manifest*", and it accords with the various descriptions cited by the Applicant and the Claimants in their submissions (as summarised above).

129.  The term "*manifest*" is treated as a high threshold to reinforce the primary principle that annulment is not a procedure by which parties may relitigate prior legal arguments, supplemented or not by post-Award arguments, evidence and/or authorities.  It is a narrow and limited remedy available for review of procedural aspects of the decision-making process, based on five identified grounds.

130.  The Parties appear to agree that an erroneous or improper application of the law will not constitute a manifest excess of powers.[144]

131.  In the Committee's view, misapplication or misapprehension of the proper law do not constitute an excess of powers.  Numerous *ad hoc* Committees have expressly recognised that there is no basis for annulment due to an incorrect decision by a

---

[144]  Transcript, p 17, ll 13-16, p 80, ll 22-24, pp 95-96; Rejoinder on Annulment, ¶¶ 29-30; Reply on Annulment, ¶¶ 22-34, 182; Counter-Memorial on Annulment, ¶¶ 46-48; Memorial on Annulment, ¶ 54 and fn 50.

tribunal.[145] The Updated ICSID Background Paper makes clear that even a "*manifestly incorrect application of the law*" is not a ground for annulment.[146]

132. The Updated ICSID Background Paper further explains that, "[w]*here the parties agree on applicable law, a disregard of this law would likely be equivalent to a derogation from the mandate conferred on the Tribunal by the parties*".[147] It refers to annulment decisions agreeing that "*a Tribunal's complete failure to apply the proper law or acting* ex aequo et bono *without agreement of the parties to do so as required by the ICSID Convention could constitute a manifest excess of powers*".[148] It goes on to observe that:[149]

> *ad hoc* Committees have taken different approaches to whether an error in the application of the proper law may effectively amount to non-application of the proper law. Some *ad hoc* Committees have concluded that gross or egregious misapplication or misinterpretation of the law may lead to annulment,[150] while others

---

[145] Counter-Memorial on Annulment, ¶ 23.

[146] Updated ICSID Background Paper, ¶ 72, RL-0123.

[147] Updated ICSID Background Paper, ¶ 92, RL-0123.

[148] Updated ICSID Background Paper, ¶ 93, RL-0123, citing *Amco v Indonesia I*, ¶¶ 23, 28, RL-0178; *Amco Asia Corporation and others v Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision on Annulment the Applications by Indonesia and Amco respectively for Annulment and Partial Annulment of the Arbitral Award of 5 June 1990 and the Application by Indonesia for Annulment of the Supplemental Award of 17 October 1990, dated 17 December 1992, ¶ 7.28, CL-0284 ("*Amco v Indonesia II*"); *Klöckner v Cameroon*, ¶ 79, RL-0176; *Maritime International Nominees Establishment (MINE) v Republic of Guinea*, ICSID Case No. ARB/84/4, Decision on the Application by Guinea for Partial Annulment of the Arbitral Award, dated 14 December 1989, ¶ 5.03, RL-0162 ("*MINE v Guinea*"); *Enron v Argentina*, ¶ 218, RL-0179 (quoting *Azurix v Argentina*, ¶ 136, CL-0221 (footnotes omitted)), RL-0179; *MTD v Chile*, ¶ 44, CL-0219; *CMS Gas Transmission Company v Argentine Republic*, ICSID Case No. ARB/01/8, Decision of the *Ad Hoc* Committee on the Application for Annulment of the Argentine Republic, dated 25 September 2007, ¶ 49, CL-0220 ("*CMS v Argentina*"); *Soufraki v UAE*, ¶ 85, RL-0124 (quoting *Amco v Indonesia I*, ¶ 23, RL-0178); *Daimler v Argentina*, ¶ 153, CL-0229; *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on Annulment, dated 30 December 2015, ¶ 58, CL-0230 ("*Tulip v Turkey*"); *EDF International S.A., SAUR International S.A. and León Participaciones Argentinas S.A. v Argentine Republic*, ICSID Case No. ARB/03/23, Decision on Annulment, dated 5 February 2016, ¶ 191, CL-0232 ("*EDF v Argentina*"); *Total v Argentina*, ¶ 195, RL-0185; *Adem Dogan v Turkmenistan*, ICSID Case No. ARB/09/9, Decision on Annulment, dated 15 January 2016, ¶ 98 ("*Dogan v Turkmenistan*"); *Micula v Romania*, ¶ 127, CL-0167; *Antoine Abou Lahoud and Leila Bounafeh-Abou Lahoud v Democratic Republic of the Congo*, ICSID Case No. ARB/10/4, Decision on the Application for Annulment of the Democratic Republic of the Congo, date 29 March 2016, ¶ 118 ("*Lahoud v Congo*"); *TECO v Guatemala*, ¶¶ 283, 311, CL-0214.

[149] Updated ICSID Background Paper, ¶ 93, RL-0123.

[150] Citing to *Soufraki v UAE*, ¶ 86, RL-0124; *Sempra v Argentina*, ¶ 164, RL-0125; *MCI v Ecuador*, ¶¶ 43, 51, RL-0175 (quoting *Soufraki v UAE*, ¶ 86, RL-0124); *Malaysian Historical Salvors, SDN, BHD v Malaysia*,

have found that such an approach comes too close to an appeal.[151] Similarly, *ad hoc* Committees have discussed whether application of a law different from that purportedly applied by the Tribunal could be considered a manifest excess of powers.[152] These discussions have led *ad hoc* Committees to observe that **there is sometimes a fine line between failure to apply the proper law and erroneous application of the law**.[153] In this connection, one issue discussed by some *ad hoc* Committees concerns which rules of law apply when consent to arbitration is based on an arbitration clause in a bilateral investment treaty.[154] [Emphasis added.]

133. The Committee does not consider that the "*fine line*" observed in prior annulment decisions, as summarised in the Updated ICSID Background Paper, is an issue in the current proceedings. The Applicant appears not to be claiming erroneous application as opposed to failure to apply. The approach it appears to be taking would align with the scenario described in the annulment decision in *Soufraki v UAE* as follows:[155]

> Misinterpretation or misapplication of the proper law may, in particular cases, be so gross or egregious as substantially to amount to failure to apply the proper law. Such gross and consequential misinterpretation or misapplication of the proper law which no reasonable person ("*bon père de famille*") could accept needs to be distinguished from simple error – even a serious error – in the interpretation of the law which in

---

ICSID Case No. ARB/05/10, Decision on the Application for Annulment, dated 16 April 2009, ¶ 74, RL-0232 ("**MHS v Malaysia**"); *AES Summit Generation Limited and AES-Tisza Erömü Kft v. The Republic of Hungary*, ICSID Case No. ARB/07/22, Decision of the ad hoc Committee on the Application for Annulment, dated 29 June 2012, ¶¶ 33-34, CL-0223 (quoting *Soufraki v UAE*, ¶ 86, RL-0124); *Caratube International Oil Company LLP v Republic of Kazakhstan*, ICSID Case No.ARB/08/12,Decison on the Annulment Application, dated 21 February 2014, ¶ 81, RL-0160 ("**Caratube v Kazakhstan**") (quoting *Soufraki v UAE*, ¶ 86, RL-0124); *Dogan v Turkmenistan*, ¶ 105; *Micula v Romania*, ¶ 130, CL-0167; *Lahoud v Congo*, ¶ 121.

[151] Citing to *MINE v Guinea*, ¶¶ 5.03-5.04, RL-0162; *MTD v Chile*, ¶ 47, CL-0219; *CMS v Argentina*, ¶¶ 50-51, CL-0220 (quoting *MINE v Guinea*, ¶¶ 5.03-5.04, RL-0162; *MTD v Chile*, ¶ 47, CL-0219); *Sempra v Argentina*, ¶ 206, RL-0125; *Impregilo S.p.A. v Argentine Republic*, ICSID Case No. ARB/07/17, Decision of the ad hoc Committee on the Application for Annulment, dated January 24, 2014, ¶ 131, RL-0184 ("**Impregilo v Argentina**"); *El Paso v Argentina*, ¶ 144, CL-0213; *Occidental v Ecuador*, ¶ 56, RL-0163.

[152] Citing to *MTD v Chile*, ¶ 47, CL-0219; *CMS v Argentina*, ¶ 51, CL-0220 (quoting *MTD v Chile*, ¶ 47, CL-0219); *Azurix v Argentina*, ¶ 136, fn 118, CL-0221 (citing *MTD v Chile*, ¶ 47, CL-0219); *Sempra v Argentina*, ¶ 163, fn 44, RL-0125 (citing *MTD v Chile*, ¶ 47, CL-0219); *Occidental v Ecuador*, ¶ 55, RL-0163.

[153] Citing to *Klöckner v Cameroon*, ¶ 60, RL-0176; *Enron v Argentina*, ¶¶ 68, 220, RL-0179; *Azurix v Argentina*, ¶ 47, CL-0221; *Iberdrola v Guatemala*, ¶ 98, RL-0164; *Dogan v Turkmenistan*, ¶¶ 106-108.

[154] Citing to *Enron v Argentina*, RL-0179; *CMS v Argentina*, CL-0220; *Sempra v Argentina*, RL-0125.

[155] *Soufraki v UAE*, ¶ 86, RL-0124.

> many national jurisdictions may be the subject of ordinary appeal as distinguished from, *e.g.*, an extraordinary writ of *certiorari*.

134. The Committee accepts that such gross or egregious application of proper law was not found to exist in the *Soufraki v UAE* annulment decision, or in any other annulment decision to date. However, it further notes that failure to apply the proper law at all, however achieved, could constitute manifest excess of powers.

135. The Updated ICSID Background Paper clearly distinguishes between misapplication and failure, noting that "[t]*he drafting history of the ICSID Convention shows that a Tribunal's failure to apply the proper law could constitute a manifest excess of powers, but that erroneous application of the law could not amount to an annullable error, even if it is manifest*".[156] But it does not preclude a misapplication or misinterpretation of proper law that is so gross or egregious *as to give rise to a failure* to apply the proper law at all, so as to fall into the first category.

136. It is the route not the result that is different. In both cases, the excess of powers ground is failure to apply proper law. In that regard, the Updated ICSID Background Paper notes that "*failure to apply the proper law has been invoked in 44 out of 52 annulment decisions*" and has "*led to two partial and two full annulments*".[157] However it is arrived at, it is plain that "*manifest*" excess of powers on the basis of failure to apply proper law in any circumstances is rare and plainly subject to a high threshold.

137. The fact that no prior annulment decision to date has found that threshold to have been met due to failure to apply proper law through egregious or gross misapplication or misinterpretation, does not preclude any annulment committee from doing so. It merely reinforces that the threshold is high and that manifest excess of powers should not in any circumstances permit an appeal on a point of law. That high threshold to non-application of the proper law, including but not limited through egregious or gross misapplication, is applied below.

---

[156] Updated ICSID Background Paper, ¶ 90, RL-0123.

[157] Updated ICSID Background Paper, ¶ 94, RL-0123.

138. The aforementioned analysis as to the standard of review of excess of powers is based on the ICSID Convention Articles 53 and 52, the Updated ICSID Background Paper and the prior ICSID annulment decisions discussed therein, as relied on by the Parties prior to and at the Hearing.

139. For completeness, the New ICSID Annulment Decisions warrant brief further mention. All five of the New ICSID Annulment Decisions specifically involved Spain, renewable energy and arguments of excess of powers for failure to apply EU law. They all post-dated the Hearing and therefore form part of the broader group of post-Hearing authorities that the Committee decided, in the interest of procedural fairness, to permit the Parties to add to the record in the Annulment proceedings on the basis that the Committee would reserve its position as to relevance and/or admissibility and the basis and scope of their relevance (if any), to its Decision on Annulment.[158] To the extent that the New ICSID Annulment Decisions were tendered specifically in support of arguments by the Parties as to the applicable standard of review in annulment, the Committee's position is as follows:[159]

    a. the standard of review in ICSID annulment proceedings, as considered by annulment committees in prior annulment decisions, may be relevant to this Committee's consideration of the applicable standard in its own decision;

    b. the fact that the New ICSID Annulment Decisions post-date the underlying Award in these proceedings does not affect their relevance to the Committee's consideration of the applicable standard for its own decision, as it also post-dates the Award;[160]

    c. to the extent that they were tendered in support of the standard of review in annulment proceedings, the fact that the New ICSID Annulment Decisions were only submitted after the Hearing was ameliorated by the Committee having provided full and proper opportunity for the Parties to make substantive

---

[158] See above, ¶¶ 54.c and 66-78.

[159] The Committee's position on all other post-Award decisions is discussed further below at ¶¶ 212-217.

[160] This distinguishes the New ICSID Annulment Decisions from the remaining post-Hearing authorities, discussed at ¶¶ 212-217 below.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

submissions in respect of those decisions in the intervening months prior to its decision;

d. the New ICSID Annulment Decisions are, in the event, of limited additional assistance to the Committee in respect of the standard of review in annulment proceedings for excess of mandate, because they largely restate the position in the Updated ICSID Background Paper and/or existing ICSID annulment decisions that was fully traversed in the Parties' earlier submissions;[161] and

e. while the New ICSID Annulment Decisions specifically deal with renewable energy claims against Spain involving issues as to EU law, this is not relevant to the standard of review, which is based on general procedural principles. If anything, this goes to substantive considerations, which the Committee does not consider to be relevant to its decision on annulment.

140. The Committee has reached its decision in respect of its scope of mandate – which is largely undisputed between the Parties – on the basis of the ICSID Convention, the Updated ICSID Background Paper, and the ICSID annulment decisions considered therein. It has reviewed and considered the New ICSID Annulment Decisions insofar as they pertain to the scope of the standard of review and concluded that these do not

---

[161] For example, Claimants' submission on New Authorities dated 19 September 2022 at ¶¶ 30-31 relating to manifest excess of powers: (i) ¶ 30 refers to the reasoning in *Cube v Spain*, ¶ 176, CL-0316, which relies on the Updated ICSID Background Paper; (ii) ¶ 31 refers to the reasoning in *NextEra v Spain* ¶¶ 76, 80 and 81, CL-0315, as to excess of powers being 'patent', 'clear', 'evident' or 'easy to understand', where in the broader discussion the decision relies on C. H. Schreuer and others, "The ICSID Convention: A Commentary", ¶ 135 and the reasoning in the earlier decision in *TECO v Guatemala*, ¶ 78, CL-0214, and affirms the reasoning in *Lucchetti v Peru*, ¶ 112, CL-0209 and *Alapli v Turkey*, ¶ 82, CL-0227. As to failure to state reasons: (i) ¶¶ 32-33 refer to the reasoning in *NextEra v Spain*, at ¶ 126, CL-0315, which refers to C. H. Schreuer and others, "The ICSID Convention: A Commentary", ¶¶ 308-309, and the surrounding discussion affirms the reasoning in *MINE v Guinea* ¶¶ 5.03 and 5.04, RL-0162; *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, dated 3 July 2002, ¶ 64, CL-0218 ("***Vivendi v Argentina I***"); *Soufraki v UAE*, ¶ 124, RL-0124 and *CEAC v Montenegro*, ¶ 139, and to *NextEra v Spain* at ¶ 132, CL-0315, which relies on the reasoning in *CMS v Argentina* ¶ 81, CL-0220; *Azurix v Argentina*, ¶ 654, CL-0221; and *Enron v Argentina*, ¶ 75, RL-0179; (ii) ¶ 34 refers to *SolEs v Spain* ¶ 82, CL-0314, which follows a discussion at ¶¶ 79-81, affirming the reasoning in *TECO v Guatemala*, CL-0214; *Wena Hotels Limited v Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Decision on the Application by the Arab Republic of Egypt for Annulment of the Arbitral Award, dated 5 February 2002, RL-0166 ("***Wena Hotels v Egypt***"); *MINE v Guinea*, RL-0162; *Vivendi v Argentina I*, CL-0218; *Soufraki v UAE*, RL-0124; *Pey Casado v Chile*, RL-0165; *Sempra v Argentina*, RL-0125; *CMS v Argentina*, CL-0220; *Enron v Argentina*, RL-0179; *Amco v Indonesia II*, CL-0284; and *Klöckner v Cameroon*, RL-0176.

add anything material to or substantially change its existing analysis based on the materials and arguments before it prior to and during the Hearing.

### B.  Application of the Standard to Failure to Apply Proper Law to Jurisdiction

141.  The Committee turns now to apply that standard of review to the question whether or not this Tribunal manifestly exceeded its powers.

142.  The Applicant and Claimants set out their positions as to the failure to apply proper law to jurisdiction in written submissions, and at the oral Hearing in their opening demonstratives.  In support of their arguments as to the Tribunal's substantive failure to apply the proper law, both Parties sought to rely on authorities that post-dated the Award or were not otherwise before the Tribunal at the time of its Award (hereafter collectively the "**Post-Award Decisions**"). [162]   The Parties' respective positions (including as to the relevance of the Post-Award Decisions to the Decision on Annulment) are summarised below, followed by the Committee's analysis.

### i.   The Applicant's Position

143.  The Applicant's primary ground for annulment is excess of powers by the Tribunal in assuming jurisdiction as a consequence of failing to apply the proper law.   The Applicant requested that the Committee determine that the Tribunal "*declared it had jurisdiction in excess of the authorised powers under applicable rules*". [163]

144.  The Applicant's case on failure to apply proper law as to jurisdiction was structured around five primary points:

      a.   that EU law is the proper law in the arbitration;

---

[162]  The Post-Award Decisions include, but are not limited to, the new authorities submitted immediately prior to or following the Hearing, namely the *Svea* Order, the *PL Holdings* and *European Food* CJEU Judgments, the ICSID Reconsideration Decisions, the Paris Judgments, CJEU Opinion 1/20 and the *Green Power* SCC Award.  They also include (but again are not limited to) the Advocate General Saugmandsgaard Øe Opinion, dated 29 October 2020, the Advocate General Szpunar Opinion, dated 3 March 2021 (together, the "**New AG Opinions**"), and *Republic of Moldova v* Komstroy *LLC*, CJEU Case C-741/19, Judgment, dated 2 September 2021, CL-0302 ("***Komstroy* CJEU Judgment**").

[163]  Reply Memorial on Annulment, ¶ 40.

     b.     that pursuant to EU law the ECT does not apply to disputes among EU Member States;

     c.     that the *Achmea* judgment succinctly summarises the EU law position;

     d.     that the *Achmea* judgment was not properly analysed by the Tribunal; and

     e.     that the Award therefore incorrectly analysed jurisdiction as a matter of proper law.

145.    <u>First</u>, in relation to EU law as proper law, the Applicant acknowledged that the 2020 Decision, as incorporated in the Award, referred to its objection to the jurisdiction on the basis of EU law, including the principle of primacy of EU law over the national law of Member States.[164]  According to the Applicant, "*the* principle of prevalence *applies within the context of Public International Law*" and "[t]*he CJEU has thus declared in that regard: 'since the bilateral instruments at issue now concern two Member States, their provisions cannot apply in the relations between those States if they are found to be contrary to the rules of the [EU Treaties]*'".[165]

146.    The Applicant submitted that the principle is derived from two provisions of the Treaty for the Functioning of the European Union ("**TFEU**")[166] provisions, (i) the right of EU Member State national courts to submit EU law questions to the CJEU (Article 267); and (ii) the prohibition on EU Member States "*submitting a dispute that affects the way in which EU Treaties are construed or applied to dispute resolution methods other than their national Courts*" (Article 344).[167]  It is further submitted that the effect of those provisions is that "*Member States may not submit to arbitration any disputes that will require arbitral tribunals to construe or apply EU law*".[168]

---

[164]  Memorial on Annulment, ¶ 68.

[165]  Memorial on Annulment, ¶ 70, citing to *Budějovický Budvar, národní podnik v Rudolf Ammersin GmbH*, CJEU Case No. C-478/07, Judgment, dated 8 September 2009, ¶ 98, RL-0119.

[166]  Consolidated version of the Treaty on the Functioning of the European Union (2012/C 326/01), RL-0001.

[167]  Memorial on Annulment, ¶¶ 73-74.

[168]  Memorial on Annulment, ¶ 74.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

147. The Applicant referred to the TFEU, CJEU judgments, Advocates General opinions, EU Directives and other instruments that it had relied on in the arbitration, to support its submissions as to the meaning, scope and effect of EU law. It also sought to rely on additional Post-Award Decisions, including national court judgments, CJEU judgments, Advocates General opinions and at least one arbitral award.

148. Secondly, regarding the application of the ECT to intra-EU disputes, the Applicant submitted that it had "*consistently explained*" that the ECT "*was never conceived to include disputes brought between various EU Member States*".[169] Instead, "*the ECT objective was to create an environment of cooperation on the energy sector between the European Union and Soviet bloc States*",[170] and was not "*an instrument that might serve to amend rules and principles governing EU Law but rather that it served to preserve the principle of autonomy of the Union and precedence of EU Law*".[171]

149. The Applicant's submissions as to the timing of the EC having assumed exclusive jurisdiction state both:

    a. that "***at the time of signing the ECT***, Member States of the European Community, as it was known at the time, ***had no legal capacity to accept mutual obligations for internal market matters*** as this was an area in which they had transferred sovereignty to the then European Community";[172] and

    b. that "[t]*he line between the respective liability of the EU and its Member States vis-à-vis the ECT is **a dynamic line and fluctuates over time (the EU has currently acquired exclusive competence on direct foreign investment, exercised through autonomous decision making and judicial institutions)***".[173]

150. The Applicant further submitted that because the EU is itself a Contracting Party to the ECT (as a Regional Economic Integration Organisation (REIO)), an investment by an EU Member State into another EU Member State "*is made in the territory of the same*

---

[169] Memorial on Annulment, ¶ 75.

[170] Memorial on Annulment, ¶ 77.

[171] Memorial on Annulment, ¶ 77.

[172] Memorial on Annulment, ¶ 86. [Applicant's emphasis underlined; emphasis added in bold.]

[173] Memorial on Annulment, ¶ 92. [Emphasis added.]

*Contracting Party*".[174]   Accordingly, "*arbitration among Member States cannot be deemed to be included within the scope of Article 26 ECT*".[175]

151.   In its Reply Memorial, the Applicant reiterated that "*a literal reading of Article 26 ECT requires that such disputes necessarily occur between a 'Contracting Party' and an 'investor of another Contracting Party'*", which "*inevitably excludes instances of disputes in which an investor of an EU State challenges another EU Member State under Article 26 ECT, as one cannot differentiate the Contracting Parties*".[176] Moreover, in order to construe the ECT in accordance with the TFEU, "*one finds that the* [EU] *Member States never consented to submission of intra-EU disputes to arbitration: they neither intended to consent to this nor could they have done so*".[177]

152.   The Applicant explained that EU Member States "*ceded their sovereign competences over their internal market (including the energy market, characterised by free competition guaranteed by mechanisms such as monitoring State Aid) and on judicial system matters*".[178]   Relations between EU Member States are governed by a principle of 'mutual trust', which cannot be eliminated by another judicial regime "*given that such disputes only have an internal dimension governed by European Law, which prevails over any other international law and must be heard by the national courts of Member States and the European Union Court of Justice, pursuant to Articles 267 and 344 TFEU*".[179]   Therefore, it submitted, even if it were possible to construe Article 26 to cover intra-EU disputes, "*to do so would contravene EU Treaties and would have to be resolved in favour of EU Law, as a matter of International Law*".[180]

---

[174]   Memorial on Annulment, ¶ 82 and Reply Memorial on Annulment, ¶ 44 (noting that Articles 1, 10, 16, 25 and 36 of the ECT "*also support this literal interpretation*").

[175]   Memorial on Annulment, ¶ 82.

[176]   Reply Memorial on Annulment, ¶ 44.

[177]   Reply Memorial on Annulment, ¶ 46.

[178]   Reply Memorial on Annulment, ¶ 48.

[179]   Memorial on Annulment, ¶ 91.

[180]   Memorial on Annulment, ¶ 89.

46

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

153. The Applicant relied again on the TFEU, EU Directive and CJEU judgments as the source of applicable international law.[181] It submitted that the CJEU "*repeatedly ruled that international agreements (including multilateral agreements affecting third countries) do not apply to EU Member States if they contravene EU Law*", as confirmed by the United Nations International Law Commission in 2006.[182] The Applicant relied on the EU Directive submitted to the ECT Secretariat in March 1998, which "*notified the existence of an implicit disconnection ECT clause*", as supporting its position.[183]

154. Thirdly, regarding the *Achmea* judgment, the Applicant submitted that it reviewed "*whether or not an Arbitral Tribunal deciding international investment related arbitration proceedings … can be deemed compatible with EU Law and concluded that the principles* [of EU law] *were not upheld and, therefore, that an arbitral tribunal was not compatible with EU law*".[184] The conclusion was based on the following steps:[185]

   a. arbitral tribunals are not part of the EU court system and cannot be categorized as a Member State court able to raise a preliminary issue before the CJEU;

   b. disputes before investment protection tribunals may "*affect the application or interpretation of EU legislation and, for that reason, must be dealt with by the EU court system*";

   c. "*by including an arbitration clause, Member States agree to step aside from the jurisdiction of their own Courts and, therefore, from the EU legal appeal system*"; and

   d. there is "*no way of ensuring that disputes submitted to arbitration will be decided in a manner that guarantees full efficacy of EU law*".

---

[181] *See* eg, Memorial on Annulment, ¶ 113; Reply Memorial on Annulment, ¶ 53.

[182] Reply Memorial on Annulment, ¶ 49.

[183] Memorial on Annulment, ¶ 92.

[184] Memorial on Annulment, ¶ 99.

[185] Memorial on Annulment, ¶ 99.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

155. Consequently, the Applicant submitted that, as explained in the *Achmea* judgment, Member States cannot have agreed to consent to arbitrate investment protection claims.

156. Fourthly, as to the application of the relationship between EU law (including *Achmea*) and the ECT, the Applicant submitted that the Tribunal exceeded its powers because the *Achmea* judgment "*applies directly to this case as it called for EU Law to be applied*" and "*was unfortunately not properly analysed by the Tribunal in the underlying arbitration*".[186]

157. At this point, the Applicant acknowledged that ICSID tribunals must decide disputes "*in accordance with the ECT and according to applicable rules and principles of International Law*",[187] and further submitted that Article 26 of the ECT "*provides that EU Law is the International Law applicable to the underlying arbitration*".[188]

158. It submitted that the *Achmea* judgment, a ruling by the CJEU exercising its Articles 267 and 344 TFEU exclusive competence, determined that as between EU Member States "*clauses such as Article 26(6) ECT cannot apply*".[189] Therefore, the Applicant submitted, by not following the *Achmea* ruling, the Tribunal failed to apply the proper law on this issue.[190]

159. The Applicant submitted that *"[m]ultiple additional sources also confirm that the* Achmea *judgment applies*",[191] setting out four particular instruments in support. The following two were before the Tribunal in the underlying arbitration:

a. 19 July 2018 *Communication from the Commission to the European Parliament and the Council* ("**19 July 2018 EC Communication**"),[192] which stated that *Achmea* "*ruled that the investor-to-State arbitration clauses laid down in intra-EU*

---

[186] Memorial on Annulment, ¶ 103.

[187] Memorial on Annulment, ¶ 105, and fns 103-104, citing to the ICSID Convention, Article 42, RL-0159, and the ECT, Article 26(6), RL-0006.

[188] Memorial on Annulment, ¶ 106.

[189] Memorial on Annulment, ¶ 106.

[190] Memorial on Annulment, ¶ 106.

[191] Memorial on Annulment, ¶ 107.

[192] European Commission, Communication from the Commission to the European Parliament and the Council - Protection of intra-EU investment, 19 July 2018, RL-0110.

BITs undermine the system of legal remedies provided for in the EU Treaties and thus jeopardise the autonomy, effectiveness, primacy and direct effect of Union law and the principle of mutual trust between the Member States" and "*is also relevant for the investor-State arbitration mechanism established in Article 26 of the Energy Charter Treaty as regards intra-EU relations*", because that provision "*if interpreted correctly, does not provide for an investor-State arbitration clause applicable between investors from a Member State of the EU and another Member State of the EU*";[193] and

b.  15 January 2019 Declaration of the Representatives of the Governments of the Member States ("**15 January 2019 MS Declaration**"),[194] by which almost all Member States (including Spain) signed a political declaration "*in which they absolutely clearly declared that arbitration clauses such as that provided in the ECT may not be construed as consenting to submit intra-EU disputes to arbitration*",[195] and that the juridical value of that declaration is "*irrefutable within the framework of international law, as stated by the ICJ in the Nuclear Tests (Australia -v- France)*" case.[196]

160.  The two remaining instruments that the Applicant relied on in its written submissions (the New AG Opinions), post-date the Award and were not available to the Tribunal in the underlying arbitration, therefore falling into the group of Post-Award Decisions (discussed below).

161.  In its Reply, the Applicant summarised that the "*contradiction between EU Law and an interpretation of Article 26 ECT declaring jurisdiction of an arbitral tribunal to hear an intra-EU dispute occurs because that interpretation breaches Articles 267 and 344 TFEU, as it breaches the principles of prevalence and independence of EU Law*".[197] It

---

[193]  Memorial on Annulment, ¶ 108.

[194]  Declaration of the Representatives of the Governments of the Member States, of 15 January 2019 on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, RL-0111.

[195]  Memorial on Annulment, ¶ 113.

[196]  Memorial on Annulment, ¶ 115.

[197]  Reply Memorial on Annulment, ¶ 51, see also ¶ 52.

submitted that this "*is the only interpretation that harmonises the ECT with EU Law* [and] *is additionally consistent with Articles 30 and 59* [of the] *Vienna Convention*".[198]

162. <u>Fifthly</u>, the Applicant submitted that the Tribunal "*incorrectly and in a biased manner construed* [EU law] *and eventually concluded it had jurisdiction to hear this matter, thereby contravening the most basic principles of* [EU law]",[199] by:

    a.    concluding that the literal wording of the ECT does not support the argument put forward by the Respondent "*as it does not establish differentiated treatment for* [EU] *Member States*", at paragraph 470 of the 2020 Decision;[200]

    b.    omitting that the EU Member States "<u>*made that distinction when signing a number of treaties forming*</u>" EU law, which includes the 'principle of prevalence';[201] [Applicant's emphasis]

    c.    "<u>*fail*</u>[ing] <u>*to note that literal application of the terms of the treaty leads to an identical solution, bearing in mind the reference to the*</u> [REIO] <u>*and to the concept of REIO territories*</u>";[202] [Applicant's emphasis]

    d.    referring to those definitions but "*subsequently fail*[ing] *to include these in its analysis*", at paragraph 470 of the 2020 Decision;[203]

    e.    stating that "*neither the context of the ECT or its intended purpose supported the position*" of the Respondent, at paragraph 471 of the 2020 Decision;[204]

    f.    denying the "*existence of an implicit disconnection clause, turning to Article 16 ECT and refus*[ing] *to accept that the* [EU] *Member States had in any case agreed*

---

[198]  Reply Memorial on Annulment, ¶ 53.

[199]  Memorial on Annulment, ¶ 118.

[200]  Memorial on Annulment, ¶ 119, citing to 2020 Decision, ¶ 470.

[201]  Memorial on Annulment, ¶ 119.

[202]  Memorial on Annulment, ¶ 119.

[203]  Memorial on Annulment, ¶ 119, citing to 2020 Decision, ¶ 470.

[204]  Memorial on Annulment, ¶ 120, citing to 2020 Decision, ¶ 471.

that the norms of [EU law] *must prevail*", at paragraph 471 of the 2020 Decision;[205]

g.  "*kick*[ing] *out one of the most basic principles of* [EU law]: *the* principle of prevalence";[206]

h.  ignoring "*the fact that the Member States have provided themselves with a specific dispute rule that prevails in the internal relations by virtue of the* principle of prevalence *and … applies to other international treaties*";[207]

i.  "*refuting the principle of prevalence*", having "*confirmed that it had not even the slightest interest in even studying the legal basis of EU Law*";[208]

j.  "*rul*[ing] *that the Achmea judgment did not apply and vaguely conclud*[ing] *that although the CJEU judgment must be given due regard by Arbitral Tribunals, that it was not binding on them, with no further explanation*", at paragraph 500 of the 2020 Decision;[209] and

k.  "*contradict*[ing] *itself when recognising the likelihood that if the CJEU were to analyse compatibility of the ECT and EU law, that it would apply the Achmea judgment to the ECT dispute resolution mechanism*" and going on to "*conclude that no part of the Achmea judgment content removed the jurisdiction of the … Tribunal*", at paragraph 493 of the 2020 Decision.[210]

163.  The Applicant concluded that the Tribunal's aforementioned conclusions are "*wrong and have no basis in law*" because: (i) the *Achmea* judgment determines "*whether or not the arbitral tribunal may construe EU law*";[211] (ii) this claim required the Tribunal

---

[205]  Memorial on Annulment, ¶ 120, citing to 2020 Decision, ¶ 471.

[206]  Memorial on Annulment, ¶ 121.

[207]  Memorial on Annulment, ¶ 121.

[208]  Memorial on Annulment, ¶ 121.

[209]  Memorial on Annulment, ¶ 124, citing to 2020 Decision, ¶ 500.

[210]  Memorial on Annulment, ¶ 124, citing to 2020 Decision, ¶ 493.

[211]  Memorial on Annulment, ¶ 125.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

to analyse "*legislation on State Aid and specifically Articles 107 and 108 TFEU*",[212] (iii) the Award is "*firm and final*"[213] with "*no possible review by the CJEU*";[214] and (iv) therefore the Tribunal should have "*declared its absence of jurisdiction*".[215]

164. As to the ECT nationality requirement, the Applicant submitted that the Tribunal erred at paragraph 464 of the 2020 Decision when it concluded that: (i) "*Article 20 TFEU establishes a separate category of EU citizenship for citizens of EU Member States*"; (ii) Article 20 "*does not create dual nationality*"; and (iii) "*Article 25(2)(a) ICSID Convention does not apply to companies and it is not implicated in the declaration that legal entities established under the law of a given Member State should be treated in the same way as individuals who are nationals of Member States, for the purposes of Article 25*".[216]  On the contrary, the Applicant submitted, "*it is precisely by virtue of their condition as EU citizens that the* [Claimants] *were able to invest in Spain without discrimination insofar as nationality*", based on Article 54 of the TFEU.[217]

165. In its Reply Memorial, the Applicant reiterated that: (i) a literal reading of the ECT Article 26 excludes intra-EU disputes; (ii) if construed in accordance with the objective and purpose of the TFEU, then EU Member States cannot have consented to arbitration pursuant to Article 26; and (iii) Member States also could not have consented because they had ceded sovereign competencies over their internal market.[218]

166. At paragraphs 55 to 176 of its Reply, the Applicant reiterated the Tribunal's "*numerous and serious errors*" in the Award that it alleges led it "*wrongly declaring jurisdiction with regard to an intra-EU dispute*".[219]  It referred in particular to paragraph 495 of the 2020 Decision in the context of manifest excess by incorrectly declaring jurisdiction.[220]

---

[212] Memorial on Annulment, ¶ 125.

[213] Memorial on Annulment, ¶ 126.

[214] Memorial on Annulment, ¶ 127.

[215] Memorial on Annulment, ¶ 127.

[216] Memorial on Annulment, ¶ 130, referring to 2020 Decision, ¶ 464, RL-0122.

[217] Memorial on Annulment, ¶¶ 131-132.

[218] Reply Memorial on Annulment, ¶¶ 42-48.

[219] Reply Memorial on Annulment, ¶ 56.

[220] Reply Memorial on Annulment, ¶ 57 and fn 55.

167.  The Applicant submitted that the Tribunal's determination in the 2020 Decision that "*the fact that the EU law (or a substantial part of it) is international law or that the CJEU judgements form part of international law, is not in any way conclusive*"[221] because the "*question continues to be whether EU law and CJEU judgements form part of the applicable international law*", was preceded by a "*fragment*[ed] *... analysis of the ECT to minimally sustain and provide a legal basis for the Tribunal's statements*".[222]  It gave the example of paragraph 470 of the 2020 Decision, regarding the regulation of Contracting Parties and the REIO under Articles 1(3) and 1(10) of the ECT having no effect on Article 26.[223]

168.  According to the Applicant, the Tribunal, having acknowledged that EU law forms part of international law, failed to acknowledge the specific conflict rules in EU law and, in particular, the principle of prevalence.[224]  It submitted further that the Tribunal, having raised questions whether or not EU law forms part of international law, "*instead of providing an express and reasoned response to the question raised, in the following paragraph* [paragraph 496] *it goes on to an entirely different issue ... regarding the EU juridical system itself, without any explicit response to the question as to whether, in effect*" EU law does or does not "*form part of applicable international law*".[225]

169.  The Applicant elaborated that the Tribunal's consideration of "*any implicit disconnection clause in the ECT*", at paragraph 502(9) of the 2020 Decision, "*started out from a mistaken premise*" as it "*limit*[ed] *that analysis of the ECT wording to a fragmented or divided consideration ... without considering* [EU law]*, even as a reference*".[226]  In this regard it stated that:[227]

> The Award in which regard annulment is sought expressly sets out that **no disconnection clause of any kind exists**, neither express not implicit, in the mutual

---

[221]  Reply Memorial on Annulment, ¶ 57.

[222]  Reply Memorial on Annulment, ¶¶ 57-58.

[223]  Reply Memorial on Annulment, ¶ 58.

[224]  Reply Memorial on Annulment, ¶ 60.

[225]  Reply Memorial on Annulment, ¶ 61.

[226]  Reply Memorial on Annulment, ¶ 69.

[227]  Reply Memorial on Annulment, ¶ 69.

> relations between certain specific parties [2020 Decision, paragraph 471], in other words, ***refusing to analyse the true concept of contracting parties in the ECT*** which, one should recall, recognises the nature of the [REIO] as a contracting party and also deemed each of the national states comprising that regional organisation to be a territory. The [Award] affords no value to any of this. [Emphasis added.]

170. The Applicant submitted in its Reply that, as a consequence, the Award "*fails to acknowledge the principle of prevalence that exists in EU Law*", responding to the Claimants' submissions as follows:[228]

    a. an agreement to create a tribunal responsible for interpreting its provisions is "*not in principle incompatible with EU Law*" provided "*there is due regard for the autonomy of the EU and its juridical system*";[229]

    b. "*repeated (and incorrect) practice of various tribunals, some of whom have additionally generally based their reasoning on precedents laid down by others, cannot alter the terms in which the European Union and sovereign Member States acquired commitments on dispute resolution under the scope of an international agreement such as the* ECT",[230] noting a dissenting opinion in *Theodoros Adamakopoulos*,[231] and recognising the Committee "*as the ultimate guarantor of the integrity of the ICSID Convention arbitral system*";[232]

    c. the Claimants "***failed to debate the principle of prevalence equally applying at the level of international relations***",[233] whereas the Applicant "*since the start of proceedings, insisted that the treaties must be construed in accordance with the Vienna Convention*";[234] [Applicant's emphasis]

---

[228] Reply Memorial on Annulment, ¶ 70.

[229] Reply Memorial on Annulment, ¶ 89.

[230] Reply Memorial on Annulment, ¶ 94.

[231] Reply Memorial on Annulment, ¶ 95.

[232] Reply Memorial on Annulment, ¶ 93.

[233] Reply Memorial on Annulment, ¶ 106.

[234] Reply Memorial on Annulment, ¶ 99.

d.   based on the application of the VCLT, "[i]*f one finds there is conflict between the ECT and EU Law, then one must turn to the rules of international public law to resolve this. Article 30 Vienna Convention includes the 'lex posteriori' rules for dispute resolution. Nevertheless, Spain considers that rule to be residual given that EU Law already has a special dispute rule. For the aforesaid reasons it is even harder to comprehend the conclusions of the Tribunal*" at the 2020 Decision, paragraph 500;[235]

e.   the Claimants' *Achmea* judgment rebuttal "*only serves to confirm what is obvious in instances concerning intra-EU disputes: protection mechanisms for foreign investments cannot be deemed to have been conceived to cover investments of an investor of a Member State in another Member State*",[236]

f.   the Claimants' reference to "*absence of valid consent*" (2020 Decision paragraph 502(8)) is incorrect as *Achmea* did not remove jurisdiction but rather confirmed it had never existed,[237] based on general principles as to the effect of Articles 267 and 344 TFEU;[238]

g.   consent was dealt with incorrectly in the Award because "*the Tribunal declared it was not bound by pronouncements of the* [CJEU]*, as if EU law did not form part of binding International Law applicable to this dispute*",[239] and that the AG's Opinions rebut the Claimants' position;[240] and

h.   the Claimants' reliance on other sources is met by "*no fewer than **65 declarations** that appear attached to founding treaties of the European Union*".[241] [Applicant's emphasis]

---

[235]   Reply Memorial on Annulment, ¶ 99.

[236]   Reply Memorial on Annulment, ¶ 118.

[237]   Reply Memorial on Annulment, ¶ 121.

[238]   Reply Memorial on Annulment, ¶ 124.

[239]   Reply Memorial on Annulment, ¶ 125.

[240]   Reply Memorial on Annulment, ¶¶ 131-139.

[241]   Reply Memorial on Annulment, ¶ 143.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

171.   The Applicant reiterated that the ECT "*was not conceived to govern intra-EU disputes*", including "*according to the general rule laid down in Article 31 (1) Vienna Convention*".[242]  It further reiterated that the Tribunal "*made a mistake when analysing the wording, subject and end purpose of the ECT, with the dramatic consequence of wrongly allocating itself jurisdiction over an intra-EU dispute,*" [243] referring to "*fragmented analysis*"[244] in relation to Articles 1(2), 1(3), 1(10) 25 and 36(7) of the ECT, as compared to Article 26.[245]

172.   The Applicant admitted finding it "*hard to understand how the Arbitral Tribunal can conclude*" that the EU is a Contracting Party and REIO, yet decide that this "*does not mean that in the context of Article 26 (1) ECT that the Territory means the territory of the EU overall*", given the scope of Article 1(3) and 1(10).[246]

173.   The Applicant further criticised the Award for not answering "*the crucial question posed by Spain*", which it described as being:

> How is it possible for the EU and all its Member States, who developed the ECT to foster international relations with third States and not among themselves, to oblige themselves to submit intra-EU disputes to arbitration in open contradiction of EU law that binds them under the principle of prevalence?[247]
>
> [Applicant's emphasis]

174.   As to the manifest nature of the alleged failures, the Applicant summarised that the Tribunal failed: (i) to clarify why it failed to apply EU law after stating that it was international law; (ii) literally to construe Article 26 ECT in accordance with its "*subject and end purpose*"; (iii) systematically to interpret Articles 1, 10, 16, 25, 26 and 36 ECT in accordance with the ECT "*subject and end purpose*"; (iv) to evaluate the context in which the ECT was drawn up; (v) to apply the principles of prevalence and autonomy of EU law, the EU treaties and their interpretation by the CJEU; and (vi) by rendering

---

[242]   Reply Memorial on Annulment, ¶ 146.

[243]   Reply Memorial on Annulment, ¶ 146.

[244]   Reply Memorial on Annulment, ¶ 152.

[245]   Reply Memorial on Annulment, ¶¶ 152-154.

[246]   Reply Memorial on Annulment, ¶ 162.

[247]   Reply Memorial on Annulment, ¶ 164.

an Award "*granting compensation that contravenes European legislation on State Aid*".[248]

175. It again referred to what it described as the Tribunal's "*fragmented analysis*" in relation to Articles 1(2), 1(3), 1(10) 25 and 36(7) of the ECT, as compared to Article 26, describing that as "*manifest*".[249]

176. The Applicant sought to rely on other Post-Award Decisions with its written submissions and immediately prior to the Hearing, submitting that "*in the last few months (and as has been occurring for years) various European Union agents that have had occasion to deal with the consequences of* Achmea *have come into alignment with the Kingdom of Spain's position*".[250] The Applicant relied in particular on the New AG Opinion of M. Szpunar in that:[251]

> I am of the opinion that the dispute settlement mechanism provided for in Article 26 of the ECT, in that it allows recourse to an arbitral tribunal, certainly leads to a result similar to the dispute settlement mechanism at issue in the *Achmea* judgment, which was held to be incompatible with Union law.

177. The Applicant submitted that those conclusions "*remain unchanged by Opinion 1/17, on CETA*",[252] stating that the Advocate General "*expressly rebuts this*" suggestion and concludes that:[253]

> the dispute settlement mechanism provided for in Article 26 of the ECT is, in my view, incompatible with Union law, in that it allows an arbitral tribunal outside the Union's judicial system to hear a dispute between an investor from one Member State and another Member State, interpreting or applying Union law and thereby calls into question the principle of mutual trust between Member States and the preservation of the specific character of the law established by the Treaties, at the same time as it

---

[248] Reply Memorial on Annulment, ¶ 166.

[249] Reply Memorial on Annulment, ¶¶ 152-154.

[250] Reply Memorial on Annulment, ¶ 131.

[251] Reply Memorial on Annulment, ¶ 135; *Republic of Moldova v Komstroy LLC*, CJEU Case No. C-741/19, Opinion of the Advocate General Mr. Maciej Szpunar, dated 3 March 2021, ¶ 73, RL-0188.

[252] Reply Memorial on Annulment, ¶ 139.

[253] Reply Memorial on Annulment, ¶ 139; *Republic of Moldova v Komstroy LLC*, CJEU Case No. C-741/19, Opinion of the Advocate General Mr. Maciej Szpunar, dated 3 March 2021, ¶ 89, RL-0188.

> undermines the autonomy of Union law. To this extent, therefore, Article 26 of the ECT is not intended to apply within the Union legal order.

178. In addition to the New AG Opinions, *Komstroy* CJEU Judgment and CJEU Opinion 1/17, immediately prior to the Hearing, the Applicant further sought to rely on the *Svea* Order and the *PL Holdings* and *European Food* CJEU Judgments, and following the Hearing it sought to rely on several Post-Hearing Decisions, namely the Paris Judgments, CJEU Opinion 1/20 and the *Green Power* SCC Award. These are all Post-Award Decisions.

179. At the Hearing, the Applicant submitted in relation specifically to the *Svea* Order and *PL Holdings* and *European Food* CJEU Judgments that:[254]

> particularly the legal authorities submitted by the Kingdom of Spain, added to the record, are indeed later documents post-Award, but they are in reference to documents that had already been submitted to the Arbitral Tribunal stemming from the Achmea judgment, and therefore the Kingdom of Spain believes these are documents that ***this Committee is certainly entitled to take into account***. [Emphasis added.]

180. In light of the Claimants' arguments to the contrary (as summarised below), the Committee invited the Applicant to clarify its position at the Hearing and it further stated that:[255]

> since the documents that these new legal authorities are putting forward actually stem from a judgment that had been presented to the Arbitral Tribunal, and even though the format of the documents is new because they come after the Award, but the contents are not new, and therefore we believe this committee can take them into account, particularly in relation with jurisdiction, which is a tremendously important matter and the fact that this Tribunal has no jurisdiction.
>
> We believe that these documents corroborate, as Achmea had already demonstrated, corroborate the lack of jurisdiction of the Tribunal and the Tribunal should have realised that. And therefore these are new, new facts as to the substance, and

---

[254] Transcript p 8, ll 1-18.

[255] Transcript p 11, l 13 – p 12, l 14.

therefore the position of the Kingdom of Spain is that they should be taken into account.

181.  The Applicant subsequently submitted that the Post-Award Decisions are material to the outcome of these proceedings and sufficiently relevant,[256] including because they "*are related to the* Komstroy *Judgement, already in the record and analyzed by Claimants in its last written submission*".[257]  In particular:

a.  as to the *Svea* Order and *PL Holdings* and *European Food* CJEU Judgments, the Applicant described these as "*related to the* Komstroy *Judgement, already in the record and analyzed by Claimants in its last written submission*",[258] and as being "*in reference to documents that had already been submitted to the* Arbitral *Tribunal stemming from the* Achmea *judgment*",[259] which "*this Committee is certainly entitled to take into account*";[260]

b.  as to the Paris Judgments, the Applicant submitted that "*the Paris Court of Appeal heavily relies on the holdings of the CJEU in* Achmea *and* PL Holdings*",[261] both of which "*have been invoked and explained by the Kingdom of Spain in this proceedings and their application as a matter of jurisdiction is outcome determinative*",[262] and the Paris Judgments reiterate "*the solution reached the CJEU*" and inform "*the nature of the case law of the CJEU as a consistent chain of case law is also a relevant characteristic to be taken into account*";[263]

c.  as to CJEU Opinion 1/20 and the *Green Power* SCC Award, the Applicant submitted that these are "*new confirmation by the CJEU itself and the unanimous confirmation for the very first time by an SCC arbitration tribunal*

---

[256]  Spain's New Authorities Application, dated 8 February 2022, ¶ 4.

[257]  Spain's New Authorities Application, dated 8 February 2022, ¶ 5; *Komstroy* CJEU Judgment, ¶ 66, CL-0302.

[258]  Spain's New Authorities Application, dated 8 February 2022, ¶ 5.

[259]  Transcript, p 8, ll 13-16.

[260]  Transcript, p 8, ll 17-18.

[261]  Spain's New Authorities Application, dated 6 May 2022, ¶ 13.

[262]  Spain's New Authorities Application, dated 6 May 2022, ¶ 13.

[263]  Spain's New Authorities Application, dated 6 May 2022, ¶ 14.

**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

of the lack of jurisdiction of an arbitral tribunal to hear intra-EU disputes under the ECT",[264] and therefore their "*extraordinary relevance*" means that it was the Applicant's "*duty to seek leave to introduce them into the record*", despite the "*advanced stage of the deliberations*";[265]

d. specifically as to the CJEU Opinion 1/20, the Applicant further submitted that it "*confirmed the applicability, relevance and binding nature of the* Komstroy *judgement which confirms the* Achmea *judgement*",[266] including by recalling the *Komstroy* CJEU Judgment findings in relation to the scope of EU Member State ECT negotiations and the interpretation of the ECT, Article 26,[267] and "*confirms the applicability of* Achmea *and* Komstroy *to the case at hand and so confirms what the Kingdom of Spain has explained from the very beginning of this annulment proceeding: that, with due respect, the Tribunal lacked jurisdiction to hear intra-EU disputes*";[268]

e. specifically as to the *Green Power* SCC Award, the Applicant sought to invoke the following substantive reasoning: (i) that "*EU Law must be regarded when dealing with the intra-EU objection*",[269] (ii) that the CJEU in the *Achmea* judgment "*sitting as Grand Chamber, clarified that EU Law was to be applied in order to address the validity of offers to arbitrate intra-EU disputes*", "*explained that articles 267 and 344 TFUE … are incompatible with intra-EU arbitration clauses*" and "*highlighted the relevance of the "rationale" behind its holdings which is the autonomy of EU Law*",[270] and (iii) that "*since* Komstroy *there should be no doubts so as to the lack of jurisdiction of arbitral tribunals to hear intra-EU disputes regardless of the seat of the arbitration*";[271]

---

[264] Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 13.

[265] Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 14.

[266] Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 17.

[267] Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 18.

[268] Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 20.

[269] Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 23.

[270] Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 25.

[271] Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 26.

f. further as to the *Green Power* SCC Award, it confirms "*the interpretation handed down in* Achmea *and* Komstroy" and that "*the rulings of the CJEU have interpretative value and as such interpretation have* ex tunc *effects*",[272] because: (i) its "*line of interpretation is likely to be followed by other SCC tribunals*",[273] (ii) it "*should be upheld by ICSID tribunal and Committee's hearing cases analogous to* Green Power",[274] (iii) it "*demonstrates the manifest excess of power that arbitral tribunals such as the Tribunal in HydroEnergy have repeatedly incurred by declaring their jurisdiction beyond the powers conferred by the parties to the dispute*",[275] (iv) the "*conclusions reached*" therein mean that "*it is absolutely essential*" that it "*be introduced into the record so that the ad hoc Committee can assess it during its deliberations*",[276] (v) it is the first arbitral award "*that, by carrying out an in-depth analysis of the nature and status of the Parties in dispute (i.e. a European investor vs. an EU Member State) as members of a REIO such as the European Union*",[277] (vi) the tribunal has "*for the purposes of the ECT, ... declared the lack of jurisdiction of an Arbitral Tribunal to hear an intra-EU dispute*",[278] and (vii) the award "*breaks with the defense argument of the claimants in the cases brought against the Kingdom of Spain under the ECT, that no Tribunal has so far declared its lack of jurisdiction and therefore Spain's arguments in defense of the jurisdictional objection cannot be taken into account*";[279] and

g. finally, as to the *Green Power* SCC Award, the Committee must "*take into consideration the conclusions reached ... in order to avoid serious inconsistencies in this type of investment arbitration*",[280] as its failure to do so

---

[272] Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 28.

[273] Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 30.

[274] Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 30.

[275] Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 31.

[276] Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 32.

[277] Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 33.

[278] Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 33.

[279] Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 34.

[280] Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 35.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

"*would inexorably lead to the untenable contradiction ... depending on whether the investor (claimants) have gone to one Arbitration Chamber or another*".[281]

### ii.   The Claimants' Position

182.   The Claimants' overall position is that: (i) the scope of annulment review is very limited and there are no grounds here; (ii) the Applicant seeks to introduce unpermitted new arguments; (iii) the Application is part of a broader litigation strategy by the Applicant to delay enforcement; (iv) "*EU law has no relevance to the assessment of jurisdiction under the ECT*"; and (v) the Applicant's annulment grounds are "*scant*" and "*confused*".[282]

183.   As to excess of powers in respect of jurisdiction, the Claimants submitted that the Applicant's EU law arguments were addressed by the Parties in the arbitration and by the Tribunal in the Award, including in the course of "*two rounds of pleadings on the Intra-EU Objection*", a four day hearing on jurisdiction, merits and quantum, and post-hearing briefs and additional submission.[283] They referred specifically to the Applicant's arguments in the arbitration that: the Claimants were not qualifying investors "*of another Contracting Party*";[284] EU investors are already and otherwise protected within the EU legal system;[285] the principle of primacy applies;[286] the principle of primacy is reflected in the ECT Articles 1(3) and 36(7);[287] as the investors are from within the EU, there is no jurisdiction under Article 25 of the ICSID Convention;[288] the *Achmea* judgment confirms the lack of jurisdiction and is binding;[289] EU law must be taken into account pursuant to the choice of law provision

---

[281]   Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 35.

[282]   Counter-Memorial on Annulment, ¶¶ 5-14.

[283]   Counter-Memorial on Annulment, ¶ 73.

[284]   Counter-Memorial on Annulment, ¶ 72.

[285]   Counter-Memorial on Annulment, ¶ 74(i).

[286]   Counter-Memorial on Annulment, ¶ 74(ii).

[287]   Counter-Memorial on Annulment, ¶ 74(iii).

[288]   Counter-Memorial on Annulment, ¶ 74(iv).

[289]   Counter-Memorial on Annulment, ¶ 74(v).

in the ECT at Article 26(6);[290] and it would contravene EU law provisions in the TFEU, particularly Article 344, to permit intra-EU proceedings.[291]

184. The Claimants then set out their responses to the Applicant's arguments in the arbitration, including that: (i) the ECT must be interpreted in accordance with the VCLT, the ordinary meaning of Article 26(1) is clear and unambiguous and demonstrates unconditional consent and the Claimants' home State and the Applicant are both Contracting Parties to the ECT; [292] (ii) the argument that the ECT is incompatible with EU law is irrelevant because the claims are not based on EU law;[293] (iii) nothing in the ECT text excludes intra-EU disputes and the ECT cannot be amended by the subjective intention of the EU and its Member States;[294] (iv) the REIO definition does not alter Article 26;[295] (v) Article 344 of the TFEU is irrelevant and does not prevent EU member States from submitting non-EU law disputes to other fora;[296] (vi) there is no disconnection clause in the ECT;[297] (vii) the Claimants are not dual nationals in contravention of Article 25(2)(a) because the concept of EU nationality does not exist and companies are not juridical persons for the purposes of Article 25(2)(b); [298] (viii) *Achmea* does not apply in the context of the ECT based on the judgment and because the tribunal must uphold the ECT as its constituent document; [299] and (ix) all prior arbitral tribunals have rejected the intra-EU objection.[300]

---

[290] Counter-Memorial on Annulment, ¶ 74(vi).

[291] Counter-Memorial on Annulment, ¶ 74(vii).

[292] Counter-Memorial on Annulment, ¶ 75(i).

[293] Counter-Memorial on Annulment, ¶ 75(ii).

[294] Counter-Memorial on Annulment, ¶ 75(iii).

[295] Counter-Memorial on Annulment, ¶ 75(iv).

[296] Counter-Memorial on Annulment, ¶ 75(v).

[297] Counter-Memorial on Annulment, ¶ 75(vi).

[298] Counter-Memorial on Annulment, ¶ 75(vii).

[299] Counter-Memorial on Annulment, ¶ 75(viii).

[300] Counter-Memorial on Annulment, ¶ 75(ix).

185.    The Claimants also referred to the EC's 3 December 2018 *Amicus Curiae* Submission ("**EC *Amicus Curiae* Submission**") addressing EU law issues that it considered to be relevant.[301]

186.    As to the Tribunal's consideration of the Applicant's EU law arguments, the Claimants referred to the 2020 Decision as summarising the Parties' positions over 17 pages and analysing and setting out its findings over a further 23 pages.[302] They submitted that the 2020 Decision:

    a.    dealt with the Applicant's arguments pursuant to the ECT Articles 1(2), 1(3) and 1(10) as to nationality, REIO and Area definitions, finding nationality and determining the REIO and Area points to be irrelevant;[303]

    b.    found intra-EU disputes to be within its competence,[304] "[h]*aving already determined that EU law was not relevant to jurisdiction*";[305]

    c.    specifically explained why the *Achmea* judgment was not relevant on the basis that it "*is a decision on the constitutional order of the EU in support of the policy of European integration, rather than an orthodox application of the rules of treaty interpretation*";[306]

    d.    found there to be "*no conflict between Article 26(1)-(3) of the ECT and Articles 267 and 344 of the TFEU such as to bring the principles codified in Article 30 VCLT into play*", so there was no need to consider the Article 16 ECT arguments;[307]

---

[301]   Counter-Memorial on Annulment, ¶ 76.

[302]   Counter-Memorial on Annulment, ¶ 77.

[303]   Counter-Memorial on Annulment, ¶¶ 78-79.

[304]   Counter-Memorial on Annulment, ¶¶ 80-89.

[305]   Counter-Memorial on Annulment, ¶¶ 80-83, citing in particular to 2020 Decision, ¶ 502(4).

[306]   Counter-Memorial on Annulment, ¶¶ 83-84.

[307]   Counter-Memorial on Annulment, ¶ 85.

e.  found the 15 January 2019 MS Declaration was a "*political declaration without legal force*";[308]

f.  observed that the results of other ECT cases "*have been in the same sense*";[309] and

g.  rejected the argument that the ECT contained an implicit disconnection clause "*disapplying its dispute resolution provisions for intra-EU disputes*".[310]

187.  The Claimants concluded that in light of the Tribunal's "*clear and detailed reasoning as to why it assumed jurisdiction*", the annulment analysis can stop at that point.[311]

188.  However, they proceeded to respond in detail to the Applicant's arguments, having preliminarily clarified that (i) it is for the Tribunal to determine its own jurisdiction and the Committee is not permitted to conduct a *de novo* review of that and can only annul "*if it were to determine that, based on the record before the Tribunal, its findings were untenable*",[312] and (ii) it "*cannot consider any new arguments (and supporting documents) raised by* [the Applicant] *for the first time on annulment*".[313] Their specific responses were:

a.  EU law is not applicable to the question of jurisdiction under the ECT, "*consistent with a long line of ECT cases that similarly found that EU law is not relevant to the question of jurisdiction*",[314] and the Applicant's objection "*hinges entirely on its argument that, pursuant to Article 26(6) of the ECT, the Tribunal should have applied EU law to the question of jurisdiction*";[315]

---

[308]  Counter-Memorial on Annulment, ¶ 86.

[309]  Counter-Memorial on Annulment, ¶ 87.

[310]  Counter-Memorial on Annulment, ¶ 88.

[311]  Counter-Memorial on Annulment, ¶ 90.

[312]  Counter-Memorial on Annulment, ¶ 91.

[313]  Counter-Memorial on Annulment, ¶ 92.

[314]  Counter-Memorial on Annulment, ¶ 99.

[315]  Counter-Memorial on Annulment, ¶ 93, and discussion at ¶¶ 93-100, citing to *Vattenfall AB and others v Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, dated 31 August

b.  that prior arbitral awards dealing with the intra-EU objection provide a *jurisprudence constante*, and there are "*zero cases that agree with* [the Applicant's] *position*";[316] and

c.  that the Applicant's EU law arguments regarding the Tribunal's jurisdiction are without merit, because:

> i.  the fact that EU law does not take primacy over the provisions of the ECT and Article 26(1) of the ECT is not incompatible with the TFEU, Articles 267 and 344, and the Applicant's position in this regard is unsupported by authority and analysis on the basis of public international law principles, because EU law is not relevant to the question of jurisdiction, which is "*interpreted in accordance with the principles of treaty interpretation under the* [VCLT]";[317]

---

2018, ¶ 121, CL-0148 ("***Vattenfall v Germany***"); *Landesbank Baden-Württemberg and others v Kingdom of Spain*, ICSID Case No. ARB/15/45, Decision on Objection to Jurisdiction, dated 25 February 2019, ¶ 159, CL-0242 ("***Landesbank v Spain***"); *Foresight Luxembourg Solar 1 S.À.R.L and other v Kingdom of Spain*, SCC Arbitration V (2015/150), Final Award and Partial Dissenting Opinion of Arbitrator Raúl Vinuesa, dated 14 November 2018, ¶ 218, CL-0236 ("***Foresight v Spain***"); *Eskosol S.p.A. in liquidazione v Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Italy's Jurisdictional Objection based on Inapplicability of the Energy Charter Treaty to Intra-EU Disputes, dated 7 May 2019, ¶ 113, CL-0177; *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, dated 6 June 2016, ¶¶ 74-75, 79-80 and 87, CL-0112 ("***RREEF v Spain***").

316 Counter-Memorial on Annulment, ¶¶ 101-108.

317 Counter-Memorial on Annulment, ¶¶ 109(i) and 111-120, citing among others to *Charanne B.V. and Construction Investments S.A.R.L. v Kingdom of Spain*, SCC Case No. 062/2012, Final Award, dated 21 January 2016, RL-0049; *RREEF v Spain*, CL-0112; *Isolux Infrastructure Netherlands, B.V. v Kingdom of Spain*, SCC Case No. V2013/153, Final Award and Dissenting Opinion, dated 12 July 2016, RL-0069; *Novenergia II - Energy & Environment (SCA) (Grand Duchy of Luxembourg), SICAR v Kingdom of Spain*, SCC Case No. 2015/063, Final Award, dated 15 February 2018, CL-0138; *Masdar Solar & Wind Cooperatief U.A. v Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, dated 16 May 2018, CL-0146; *Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar B.V. (formerly Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.) v Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, dated 15 June 2018, CL-0147; *Foresight v Spain*, CL-0236; *Cube Infrastructure Fund SICAV and others v Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, dated 19 February 2019, CL-0241; *Landesbank v Spain*, CL-0242; *9REN Holding S.a.r.l v Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, dated 31 May 2019, CL-0249; *NextEra Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Quantum Principles, dated 12 March 2019, CL-0243; *InfraRed Environmental Infrastructure GP Limited and others v Kingdom of Spain*, ICSID Case No. ARB/14/12, Award, dated 2 August 2019, CL-0252; *SolEs Badajoz GmbH v Kingdom of Spain*, ICSID Case No. ARB/15/38, Award, dated 31 July 2019, CL-0197; *OperaFund Eco-Invest SICAV PLC and Schwab Holding v Kingdom of Spain*, ICSID Case No. ARB/15/36, Award, dated 6 September 2019, CL-0253;

    ii.   ECT terms do not support the Applicant's EU law arguments, including as to Articles 1(2), 1(3), 26(1), 26(3), and 36(7);[318]

    iii.   the *Achmea* judgment was properly considered and analysed (over 17 pages of the Award) by the Tribunal who concluded that it was irrelevant because it "*is a decision on the constitutional order of the EU*", it is "*hard to read the* Achmea *ruling as a normal case of treaty interpretation*", the Tribunal cannot find the ECT Article 26 to be incompatible with the TFEU Articles 267 and 344 "*on any normal basis of interpretation under customary international law codified in the VCLT*", and that it reached the right conclusion "*supported by the fact that the jurisdiction of an international tribunal must be evaluated as of the date when the parties gave their consent to submit the dispute to arbitration*" which was almost two and a half years before the *Achmea* judgment;[319] and

    iv.   the Applicant's nationality point was bound to fail and the Tribunal was correct to hold that Article 25(2)(a) does not apply to companies.[320]

189.    The Claimants then proceeded to set out why they considered that, even if there were an excess of powers, it was not manifest because it was not "*plainly obvious*", and the

---

*BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, dated 2 December 2019, RL-0116; *Stadtwerke München GmbH and others v Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, dated 2 December 2019, RL-0118; *RWE Innogy GmbH and RWE Innogy Aersa S.A.U. v Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability, and Certain Issues of Quantum, dated 21 January 2020, CL-0255; *Wattkins Holdings S.à r.l. and others v Kingdom of Spain*, ICSID Case No. ARB/15/44, Award, dated 21 January 2020, CL-0256; *PV Investors v Kingdom of Spain*, PCA Case No. 2012-24, Final Award, dated 28 February 2020, CL-0258; *Portigon AG v Kingdom of Spain*, ICSID Case No. ARB/17/15, Decision on Jurisdiction, dated 20 August 2020 (not public); *Cavalum SGPS, S.A. v Kingdom of Spain*, ICSID Case No. ARB/15/34, Decision on Jurisdiction, Liability and Directions on Quantum, dated 31 August 2020, CL-0264 ("**Cavalum v Spain**"); *FREIF Eurowind Holdings Ltd. v Kingdom of Spain*, SCC Case No. V 2017/060, Final Award, dated 8 March 2021, CL-0270; *Eurus Energy Holdings Corporation v Kingdom of Spain*, ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, dated 17 March 2021, RL-0189; *Mathias Kruck and others v Kingdom of Spain*, ICSID Case No. ARB/15/23, Decision on Jurisdiction and Admissibility, dated 19 April 2021, CL-0273; and *Vattenfall v Germany*, CL-0148.

[318]   Counter-Memorial on Annulment, ¶¶ 109(ii) and 121-127.

[319]   Counter-Memorial on Annulment, ¶¶ 109(iii) and 128-151.

[320]   Counter-Memorial on Annulment, ¶¶ 109(iv) and 152-154.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

Applicant was asking the Committee to "*look well beyond the text of the Decision on Jurisdiction*".[321]

190. The Claimants pointed out that the Applicant's submissions contain "*various references to how the Tribunal made errors in the application of the law and in EU law in particular*", including in its "*Reply, paragraphs 57, 58, 64, 70 and other places as well*".[322] The Claimants submitted that "[e]*rrors in the application of the law are not a valid annulment ground and* [it] *believe*[s] *that is a point Spain accepts*".[323]

191. Specifically as to Post-Award Decisions, the Claimants submitted at the Hearing that the Committee:[324]

> **cannot take into account any documents that postdate the Award** that Spain relies on to argue that the Tribunal manifestly exceeded its powers or failed to state reasons.
>
> …
>
> It is not just documents that postdate the Award but **any documents that were not put to the Tribunal**, so even if they pre-date the Award, if Spain had not relied on those documents as part of its case before the underlying Tribunal, they should not be considered by the Annulment Committee either.
>
> …
>
> Just to be clear, that does not include things like cases, authorities as to the ICSID annulment standard, which I think of course would not normally be before the Tribunal, but can properly be before this Committee to outline the standards … [Emphasis added.]

192. The Claimants further submitted at the Hearing that:[325]

> Because it is not an appeal, the Committee should only consider the evidence and arguments that were made before the Tribunal and nothing else. You are reviewing

---

[321] Counter-Memorial on Annulment, ¶¶ 155-158.

[322] Transcript, p 80, ll 18-21.

[323] Transcript, p 80, ll 22-24 ; Hearing Recording (floor), 01:54:31 – 01:54:39 (Mr. Sullivan).

[324] Transcript, p 9, ll 3-25.

[325] Transcript, p 81, ll 6-11.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

the Award, the Award is written in the context of the arguments that were in fact made to the Tribunal.

193. The Claimants pointed out that the Applicant "*relies on over 80 new documents or authorities to support its EU law arguments that were not before the Tribunal*".[326] It confirmed that they do not "*all postdate the Award*",[327] but that in their view "*it makes no difference whether they predate or postdate the Award*"[328] because the relevant "*question is: were they before the Tribunal, and if they were not before the Tribunal this Committee should not consider them in order to impeach the Tribunal's Award*".[329] None of those 80 new documents, in the Claimants' submission, "*include authorities that the Parties rely on to describe the annulment standards*",[330] which would be materials that the Claimants confirmed they would not object to.

194. As to the *Komstroy* CJEU Judgment, given that it was submitted by the Claimants with their Response Memorial, the Committee specifically invited the Claimants to clarify its position in relation to that and related decisions. The Claimants responded to confirm that:[331]

> the Committee should not consider *Komstroy* or any documents, whether they pre-date or postdate the Award, that was not before the Tribunal.
>
> The reason *Komstroy* was put in by the Claimants was it came out just before our final submission and obviously we anticipated that Spain would want to address it, as we have seen throughout the proceedings Spain was addressing post-Award developments, and that is why we put it in and addressed it just to cut that off, but our position is that the Committee should not be considering any documents that were not put before the Tribunal that would pre-date or postdate the Award.

---

[326] Transcript, p 82, ll 18-20.

[327] Transcript, p 82, ll 20-21 ; Hearing Recording (floor), 01:56:59 – 01:57:02 (Mr. Sullivan).

[328] Transcript, p 82, ll 22-24.

[329] Transcript, p 82, l 24 to p 83, l 2.

[330] Transcript, p 83, ll 3-8.

[331] Transcript, p 10, l 24 to p 11, l 12. *See* also: Transcript, p 125, l 19 to p 126, l 6.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

195.   As to the *Svea* Order and *PL Holdings* and *European Food* CJEU Judgments, submitted immediately prior to the Hearing, the Claimants submitted that:[332]

   a.   "[n]*umerous ICSID annulment committees have also similarly held that an annulment committee's task is limited to consideration of the record that was before the original tribunal*";

   b.   "[g]*iven the limited nature of the annulment remedy, it would be improper to review or criticise the Tribunal's application of the law or its factual findings based on new evidence or new arguments introduced for the very first time at the annulment stage*"; and

   c.   they "ipso *facto, are new authorities that were not before the Tribunal*", and Spain is asking the Committee to allow them to be introduced to the record "*in order to impugn the Tribunal's decisional process*", which "*is not permitted under the ICSID Convention*".

196.   The Claimants referred the Committee to paragraph 32 of PO2, which it submitted "*rejected Spain's attempt to add new expert evidence on EU law (alleged to be relevant to practically the same issues as here)*" stating as follows:[333]

   [I]nsofar as EU law is relevant to the Annulment Application, the Kingdom of Spain has confirmed that all of the necessary law was previously put to the Tribunal during the arbitration.  Indeed this appears to be the very basis for its Annulment Application: that it put the EU law principles and rules to the Tribunal and that the Tribunal failed

---

[332]   Claimants' Response to Spain's Application, dated 9 February 2022, section 3.

[333]   Claimants' Response to Spain's Application, dated 9 February 2022, section 3, citing to C. H. Schreuer and others, "The ICSID Convention: A Commentary", 2nd ed. (2009), p 902, CL-0275;  *UAB E energija (Lithuania) v Republic of Latvia*, ICSID Case No. ARB/12/33, Decision on Annulment, dated 8 April 2020, ¶ 106, CL-0217 ("*a committee 'must determine the reasonableness of the Tribunal's approach in light of the evidence and submissions which were before the Tribunal and not on the basis of new evidence*"); *Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar B.V. (formerly Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.) v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Decision on Annulment, dated 30 July 2021, ¶ 159, CL-0294 ("**Antin v Spain**") ("*the Tribunal's decision should be evaluated on the basis of the arguments and evidence raised before the Tribunal … it would not be appropriate to impugn the Tribunal's Award on the basis of authorities or documents rendered post-Award. Moreover, the fact that Spain has to rely on further authorities not before the Tribunal suggests that the Tribunal's decision was not obviously or manifestly incorrect.*'").

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

to apply or misapplied that law, giving rise to manifest excess of powers and/or failure to give reasons. [Claimants' emphasis].

197. According to the Claimants, given the Applicant's "*statement that all necessary law was put before the Tribunal*", it "*cannot now claim that exceptional circumstances exist justifying the admission*" of Post-Award Decisions.[334]

198. As to the Paris Judgments, tendered after the Hearing, the Claimants distinguished these from the New ICSID Annulment Decisions on the basis that, "[u]*nlike the Claimant's application filed on 16 June 2022, seeking to add two new authorities which address the ICSID annulment standards, Spain seeks to add its New Legal Authorities in order to argue that the Tribunal somehow erred in its findings on jurisdiction and applicable law*".[335] They again referred to the Committee's decision in PO2, paragraph 32.[336]

199. The Claimants submitted that the Paris Judgments were not before the Tribunal and therefore, "[a]*s the Claimants have maintained throughout this Annulment Proceeding, Spain should be precluded from submitting new arguments and new evidence that were not presented to the Hydro Tribunal in the underlying Arbitration*".[337]

200. According to the Claimants, "*Spain is asking this Committee to find that the* Hydro *Tribunal committed an annullable error based on documents and legal arguments that were never put to the* Hydro *Tribunal, which reflect developments that occurred after the* Hydro *Tribunal rendered the Award*".[338] They submitted that this position was "*untenable*" and that "*Spain must establish that an annullable error was committed based on arguments, evidence and authorities that were actually before the* Hydro

---

[334] Claimants' Response to Spain's Application, dated 9 February 2022, section 3.

[335] Claimants' Response to Spain's Application, dated 4 July 2022, p 2.

[336] Claimants' Response to Spain's Application, dated 4 July 2022, p 2.

[337] Claimants' Response to Spain's Application, dated 4 July 2022, p 2, citing to Counter-Memorial on Annulment, Section II.B; Rejoinder on Annulment, Section II.

[338] Claimants' Response to Spain's Application, dated 4 July 2022, p 2.

Case 1:21-cv-01645-RJL Document 133-31 Filed 03/22/23 Page 80 of 172

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT

*Tribunal*".[339]  They reiterated that "[a]*nnulment proceedings are not an opportunity for a losing party to advance a new case in order to establish an annullable error*".[340]

201.  The Claimants further contended that the Applicant failed to articulate how the Paris Judgments assisted the Committee "*in assessing Spain's arguments in relation to an alleged manifest excess of powers under Article 52(1)(b) of the ICSID Convention*", and that they have "*no relevance to this Committee's annulment mandate under the ICSID Convention*".[341]  They submitted that Spain "*makes only a passing reference to how one of these* [Paris Judgments] *was 'administrated by ICSID'*", and that this "*is an attempt by Spain to mislead the Committee*" because the Paris Court of Appeal decision in *Strabag v Poland* involved "*an ad hoc arbitration seated in Paris and administered under the ICSID Additional Facility Rules*", and Poland "*is not a Contracting State to the ICSID Convention, and the ICSID annulment standards therefore did not apply*".[342]  For this reason, the Claimants submitted that "[i]*t thus has no relevance to the issues before this Committee*".[343]

202.  The Claimants submitted that, instead, the Applicant "*is in fact trying to use the* [Paris Judgments] *Authorities to try to argue that the Tribunal's decision as regards its finding on EU law was 'wrong' (it was not)*",[344] in "*an attempt to re-open the jurisdictional phase of the proceedings and re-argue the underlying jurisdictional issues, which is impermissible in the context of ICSID annulment proceedings*".[345]

203.  The Claimants also argued that the Applicant is wrong to allege that the Paris Judgments were rendered in the context of annulment proceedings that are "*analogous*" to the present Annulment proceedings because they "*were decided pursuant to principles of French civil procedure and EU law, not within the annulment framework of the ICSID*

---

[339]  Claimants' Response to Spain's Application, dated 4 July 2022, p 2.

[340]  Claimants' Response to Spain's Application, dated 4 July 2022, p 2.

[341]  Claimants' Response to Spain's Application, dated 4 July 2022, p 3.

[342]  Claimants' Response to Spain's Application, dated 4 July 2022, p 3.

[343]  Claimants' Response to Spain's Application, dated 4 July 2022, p 3.

[344]  Claimants' Response to Spain's Application, dated 4 July 2022, p 3.

[345]  Claimants' Response to Spain's Application, dated 4 July 2022, pp 3-4.

*Convention*"[346], and because "[u]*nlike the appeals dealt with by the French courts, this Committee is not hearing an appeal*". [347]   The Claimants reiterated that "*the Committee's mandate is limited to determining whether the Award falls foul of the narrow annulment standards under the ICSID Convention*".[348]

204. The Claimants further reiterated that the Paris Judgments are irrelevant to the Committee's review under Article 52(1)(b) of the ICSID Convention "*as regards how an underlying ICSID tribunal exercised its powers in relation to jurisdiction*" because they:[349]

  a. "*are decisions from French domestic courts, which are, at best, EU law authorities. The Tribunal (and Committee) is not constituted under EU law or subject to the regional rules of the EU legal order and the decisions of its courts*"; and

  b. "*were rendered in relation to set aside proceedings regarding awards rendered pursuant disputes heard under intra-EU BITs, and say nothing whatsoever in relation to the intra-EU application of the ECT*".

205. As to the CJEU Opinion 1/20 and *Green Power* SCC Award, the Claimants submitted that the Applicant was relying on those legal authorities "*to re-open the jurisdictional phase of the proceedings and re-argue the underlying jurisdictional issues, which is impermissible in the context of ICSID annulment proceedings*",[350] and in particular:

  a. in relation to CJEU Opinion 1/20, "*it is a decision issued by the CJEU and has simply no relevance whatsoever as to how the* Hydro *Tribunal exercised its powers in the underlying Arbitration*";[351] and

---

[346] Claimants' Response to Spain's Application, dated 4 July 2022, p 4.

[347] Claimants' Response to Spain's Application, dated 4 July 2022, p 4.

[348] Claimants' Response to Spain's Application, dated 4 July 2022, p 4.

[349] Claimants' Response to Spain's Application, dated 4 July 2022, p 4.

[350] Claimants' Response to Spain's Application, dated 4 July 2022, p 4.

[351] Claimants' Response to Spain's Application, dated 4 July 2022, p 3.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

    b.    in relation to the *Green Power* SCC Award, "*the decision was rendered by a tribunal hearing a dispute under the rules of the* [SCC] *and the arbitration was seated in Stockholm, Sweden*", and as such "*the arbitration was heard under a different set of rules, and has no bearing on the Committee's scope of review under Article 52(1) of the ICSID Convention*".[352]

206.    The Claimants further argued that the CJEU Opinion 1/20 and *Green Power* SCC Award are "*irrelevant to the issue of an ICSID* ad hoc *committee's review under Article 52(1)(b) of the ICSID Convention as regards how an underlying ICSID tribunal exercised its powers in relation to jurisdiction*",[353] because:

    a.    CJEU Opinion 1/20 "*stems from a reference by Belgium to the CJEU as regards the compatibility of the intra-EU application of the arbitration provisions of the future modernised ECT with the European Treaties*",[354] and the CJEU "*considered that the request was premature in light of the then uncertainty around the scope of the future text of Article 26 of the 'modernised' ECT*",[355] and as such, its "*comments about the intra-EU application of the current ECT, which is what Spain seeks to draw attention to, are not substantively relevant to the reference*",[356] and in any event, "*an Opinion from the CJEU is not binding on an ICSID ad hoc committee*";[357] and

    b.    the *Green Power* tribunal "*specifically distinguished its decision from arbitrations governed by the ICSID Convention, being very careful to note the crucial difference of the fact that it was seated in an EU Member State, unlike ICSID tribunals*".[358]

---

[352]  Claimants' Response to Spain's Application, dated 4 July 2022, p 3.

[353]  Claimants' Response to Spain's Application, dated 4 July 2022, p 4.

[354]  Claimants' Response to Spain's Application, dated 4 July 2022, p 4.

[355]  Claimants' Response to Spain's Application, dated 4 July 2022, p 4.

[356]  Claimants' Response to Spain's Application, dated 4 July 2022, p 4.

[357]  Claimants' Response to Spain's Application, dated 4 July 2022, p 4.

[358]  Claimants' Response to Spain's Application, dated 4 July 2022, p 4.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

207. Further, regarding the *Green Power* tribunal, according to the Claimants its "*finding that it had to apply Swedish law as part of the* lex arbitri *to the question of jurisdiction has no relevance to an ICSID tribunal's jurisdictional analysis (or an ICSID* ad hoc *Committee's review under Article 52(1) of the ICSID Convention)*",[359] and that this constitutes a "*crucial distinction, which the* Green Power *tribunal repeats throughout its decision when it distinguishes its own reasoning and jurisdictional review from that of ICSID tribunals*".[360]

208. The Claimants further referred specifically to the *Green Power* tribunal "*dismissing the relevance of the* SolEs Badajoz *ICSID* ad hoc *committee's decision on annulment*" and observing at paragraph 441 of that decision that:[361]

> the [SolEs Badajoz v Spain] Committee **reviewed an award rendered under the ICSID Convention, not one having its seat in an EU Member State**, as is the case in the present arbitration. **The question of whether or not EU law applies to the determination of jurisdiction and, if so, the extent to which it does so, does not arise in the same manner in the circumstances of this arbitration as in ICSID proceedings**. [Claimants' emphasis]

209. The Claimants submitted that the *Green Power* tribunal thereby "*has itself explained why its jurisdictional analysis is inapposite in the context of ICSID ECT arbitrations*".[362]   They objected to the Committee's reliance on that award accordingly.

      *iii.*    *The Committee's Analysis*

      a.    <u>Scope of Committee's Review</u>

210. In these Annulment proceedings, the Applicant and the Claimants have sought to rely on Post-Award Decisions, which include various additional judicial, quasi-judicial and arbitral decisions.  The Committee had decided, in the interest of procedural fairness,

---

[359] Claimants' Response to Spain's Application, dated 4 July 2022, p 4.

[360] Claimants' Response to Spain's Application, dated 4 July 2022, pp 4-5.

[361] Claimants' Response to Spain's Application, dated 4 July 2022, p 5.

[362] Claimants' Response to Spain's Application, dated 4 July 2022, p 5.

to permit the Parties to add them to the record in the Annulment proceedings, but to reserve its position as to relevance and/or admissibility and the basis and scope of their relevance (if any), to its Decision on Annulment.[363]   The sub-category of New ICSID Annulment Decisions, specifically relied upon by the Claimants in support of its arguments as to the relevant standard of review in ICSID annulment proceedings, are dealt with at paragraph 139 above.   The Committee's position as to the remaining Post-Award Decisions is set out below.

211.   The remaining Post-Award Decisions include, but are not limited to, the New AG Opinions, the *Komstroy* CJEU Judgment, the CJEU Opinion 1/17, the Additional ICSID Reconsideration Decisions, the *Svea* Order, the *PL Holdings* and *European Food* CJEU Judgments, the Paris Judgments, the CJEU Opinion 1/20 and the *Green Power* SCC Award.   These decisions are relied on by the Parties in support of their arguments as to how the Tribunal ought to have discharged its substantive mandate in deciding matters of EU law in its Award in the underlying arbitration.

212.   The Committee's jurisdiction on annulment is limited to reviewing the Tribunal's exercise of its mandate based on the information before the Tribunal at the date of the Award.   The Committee considers that the scope of its review is as succinctly stated by Professor Schreuer:[364]

> Annulment is concerned with the dispute that was put before the tribunal. It is not an opportunity to raise new arguments on the merits or introduce new contemporaneous evidence … an *ad hoc* committee may not impeach a tribunal for not addressing in its award arguments or evidence that were not put before it.

213.   The Annulment Application centres on the Tribunal's approach to the Parties' and the EC's arguments in the Arbitration in respect of EU law, as were put to the Tribunal at the time. EU law arguments that arise out of or are based on Post-Award Decisions, which were not before the Tribunal at the date of the Award, are not relevant to this Committee's review.

---

[363]   See above, ¶¶ 54(c) and 66-78.

[364]   C. H. Schreuer and others, "The ICSID Convention: A Commentary", 2nd ed. (2009), p 902, CL-0275.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

214.    The Committee recognises that the Applicant has argued in respect of the Post-Award Decisions that their "*contents are not new*".  Instead, it argued that the Post-Award Decisions, "*as Achmea had already demonstrated, **corroborate the lack of jurisdiction of the Tribunal and the Tribunal should have realised that***".[365]  The Applicant sought to use the Post-Award Decisions to "*reconfirm*" the effect and scope of *Achmea*, as it and the EC had put to the Tribunal in the underlying Arbitration, as opposed to providing any additional or new legal grounds in support of its arguments on annulment.

215.    If indeed the Post-Award Decisions did no more than reconfirm the legal position at the time of the Arbitration, on the basis of the arguments put by Spain (and the EC) to the Tribunal based on authorities existing at the time of the Award, then the Post-Award Decisions would add nothing new for this Committee to consider.  If, on the other hand, the Post-Award Decisions, individually or collectively, introduced a genuinely new or additional argument or line of legal reasoning, or extended the application of *Achmea* beyond the position at the time of the Award, then they would fall outside the scope of this Annulment proceeding.

216.    As set out above, this Committee may not impeach the Tribunal for not addressing arguments that were not put before it.

217.    The Parties accept that annulment is not an appeal; this Committee's jurisdiction is limited to considering whether or not the Tribunal manifestly exceeded its powers on the basis of those arguments, law and evidence that were before it at the time of its Award.  Irrespective of whether the Post-Award Decisions contain new arguments, facts or legal reasoning, or instead merely corroborate existing arguments, facts or legal reasoning, the Tribunal did not have those decisions before it.

218.    Accordingly, the Committee accepts the position of the Claimants, that it cannot take into account the Post-Award Decisions to support either side's argument in its consideration as to whether the Tribunal's reasoning on EU law: (i) was substantively wrong or flawed or (ii) was substantively right or at least a reasonable approach.

---

[365]   Transcript p 12. [Emphasis added.]

219.    The Committee does not consider that the Additional ICSID Reconsideration Decisions relied on by the Claimants, should be treated any differently to the other Post-Award Decisions. These are not decisions rendered in annulment proceedings; all three relate to ongoing substantive ICSID claims against Spain. Therefore, they cannot be said to be relevant to the ICSID standard of review on annulment. The basis for their relevance, according to the Claimants, is that they inform the Committee as to the reasonableness of the Tribunal's reasoning on EU law in the Award in favour of the Claimants. The Committee does not consider this to be materially different from the Applicant's argument that its Post-Award Decisions inform the Committee as to the unreasonableness of that reasoning against the Applicant. Accordingly, the Committee applies the same logic to all Post-Award Decisions, [366] and therefore the ICSID Reconsideration Decisions are also to be treated as outside the scope of its review.

220.    The Committee refers to the Applicant's argument that the Additional ICSID Reconsideration Decisions are irrelevant due to lack of binding precedent in arbitration. Whilst the Committee generally agrees that there is no binding precedent in arbitration, this does not aid the Applicant. Moreover, its position in respect of the non-binding nature of arbitration awards and decisions is not entirely consistent with its reliance on the *Green Power* SCC Award.

221.    The *Green Power* SCC Award appears to be the first public arbitration decision that determined the effect of EU law in the Applicant's favour. In that regard, the Applicant expressed a sense of "*tremendous injustice*" that it "*has had to face over all these years, having to allocate countless material and human resources to defend itself against claims presented by those who, being European investors and subject to the European legal system, had no legal standing to resort to international arbitration as a dispute resolution mechanism under article 26.3 of the ECT*".[367] However, a sense of injustice is not a sufficient basis for this Committee to take a different position in respect of one Post-Award Decision in the form of an arbitral award that supports the Applicant's EU law arguments, whilst rejecting, at the Applicant's urging, all other arbitration decisions

---

[366]    Save for the New ICSID Annulment Decisions as discussed at ¶ 139 above (and indeed any post-Award ICSID annulment decisions), given their potential relevance to this Committee's own standard of review.

[367]    Applicant's Response to Claimants' Application of 16 June 2022, dated 27 June 2022, ¶ 37.

that did not. This is particularly so in light of the *Green Power* SCC Award being outside the ICSID Convention and Rules, to which these Annulment proceedings and the underlying Award relate.

222. The Committee does acknowledge the merit in the Applicant's argument that there is a public policy benefit in maintaining a level of consistency across arbitration decisions. In this regard, the Committee refers to the statement in *Saipem v Bangladesh*, Decision on Jurisdiction of 21 March 2007, that:[368]

> it must pay due consideration to earlier decisions of international tribunals. It believes that, subject to compelling contrary grounds, it has a duty to adopt solutions established in a series of consistent cases. It also believes that, subject to the specifics of a given treaty and of the circumstances of the actual case, it has a duty to seek to contribute to the harmonious development of investment law and thereby to meet the legitimate expectations of the community of States and investors towards certainty of the rule of law.

223. However, this Committee's role remains to review the Award on the basis of the information before the Tribunal at the time it rendered its decision. Therefore, the Committee does not consider the *Green Power* SCC Award to be within the scope of its review. Nor does it accept the Applicant's argument that failure to consider it would compromise any duty it may have to "*adopt solutions established in a series of consistent cases*".[369] The same logic applies to all arbitral awards and decisions that were not before the Tribunal, including those relied upon by the Claimants (save for the New ICSID Annulment Decisions, insofar as they pertain to the applicable standard in annulment, as discussed at paragraph 139 above).

224. It would make no sense for this Committee to adopt a different position only in respect of the *Green Power* SCC Award, as opposed to a growing body of ICSID awards that go in a different direction, given that it was rendered under a different international law convention (the New York Convention on the Enforcement of Foreign Arbitral Awards, 1958 as opposed to the ICSID Convention), had its juridical seat in an EU Member

---

[368] *Saipem S.p.A. v People's Republic of Bangladesh*, ICSID Case No. ARB/05/7, Decision on Jurisdiction and Recommendation on Provisional Measures, dated 21 March 2007, ¶ 67 ("***Saipem v Bangladesh***").

[369] *Saipem v Bangladesh*, ¶ 67.

State and was administered under different arbitral rules (SCC Rules as opposed to ICSID Rules).

225. Based on the analysis above, the Committee shall limit its substantive review of the *Hydro* Award to the decision in respect only of arguments and authorities that were before the Tribunal at the time of the Award. As to the scope of those arguments as tendered by the Applicant, the EC and the Claimants in the underlying Arbitration, these are as follow.

### 1. The Respondent's EU Law Arguments: Jurisdiction

226. The Respondent's arguments arising out of EU law in relation to jurisdiction are summarised in the Award.[370] The Respondent has not challenged the accuracy of this summary in the Annulment proceedings.

227. First, the Respondent submitted that the dispute in the arbitration was an "*intra-EU*" dispute between an EU Member State and investors of another Member State, which pursuant to the ECT, Article 26, "*should not be construed as consenting to the submission of intra-EU disputes to arbitration as this would contravene EU law and specifically Articles 267 and 344 of the* [TFEU]".[371] It reiterated its submissions in further pleadings in the arbitration.[372]

228. Secondly, the Respondent objected to jurisdiction *ratione personae* on the grounds that the "*Claimants are not 'investors of* another *Contracting Party' as required under Article 26 of the ECT because they are incorporated in Luxembourg and Sweden which are EU Member States and the Respondent is also an EU Member State; besides, Luxembourg, Sweden and Spain were members of the EU at the time they entered into*

---

[370] 2020 Decision, ¶¶ 170-196 (jurisdiction) and ¶ 378 (merits).

[371] Memorial on Annulment, ¶ 5.

[372] Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction, ¶¶ 47-54, 98, R-0380; Respondent's Rejoinder on the Merits and Reply on Jurisdiction, ¶ 5, R-0381.

the ECT".[373] Specifically, the Respondent submitted that "*the ECT does not apply to disputes relating to 'intra-EU' investments*".[374]

229. The Respondent's main three points in support of its jurisdictional objection, as summarised in the Award, were:

   (a)  that "*the EU system confers particular protection upon the EU-national investor, which is of preferential application over the provisions of the ECT*";[375]

   (b)  that "*the prevalence of EU law among EU Member States is reflected in the literal interpretation, context and purpose of the ECT*";[376] and

   (c)  that "*commentators also support the Respondent's position*".[377]

   2.  The EC *Amicus Curiae* Submission on EU Law: Jurisdiction

230. On 3 December 2018, with the leave of the Tribunal, the EC submitted a 25 page *amicus curiae* brief relating to the application and effect of EU law on the Tribunal's jurisdiction in the arbitration.

231. The EC first submitted that the Respondent's "*contested measure falls squarely within the scope of EU law*" for two reasons: (a) it "*transposes into Spanish law the Directive on Renewable Energy*" and (b) "*the support granted by Respondent constitutes State aid in the sense of Article 107(1) TFEU*".[378] On that basis, it proceeded to argue in relation to the Tribunal's jurisdiction that there is "*general agreement that* [EU law]*, as international law applicable between EU Member States, is part of the law to be applied*

---

[373] 2020 Decision, ¶ 171; Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction, ¶¶ 47-49, 98, R-0380; Respondent's Rejoinder on the Merits and Reply on Jurisdiction, ¶¶ 76-77, 122, R-0381. *See also* Respondent's Comments to *Amicus Curiae* Submission, ¶¶ 33, 37, C-0188.

[374] 2020 Decision, ¶ 171; Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction, ¶¶ 47, 98.

[375] 2020 Decision, ¶ 172; Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction, ¶¶ 55-63.

[376] 2020 Decision, ¶ 172; Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction, ¶¶ 64-86.

[377] 2020 Decision, ¶ 172; Respondent's Counter-Memorial on the Merits and Memorial on Jurisdiction, ¶¶ 87-97.

[378] EC *Amicus Curiae* Submission, ¶ 2, C-0201.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

by this Arbitral Tribunal",[379] and that the ECT, Article 1(3), "*recognizes that acts of EU law are binding on EU Member States as a matter not only of EU law, but also of the ECT itself*".[380] It noted that EU law provided the Claimants with "*complete, strong and effective protection of their investment*".

232. The EC cited three primary instruments in support:

    *a.* TFEU, Articles 267 and 344, which it submitted the CJEU in *Achmea* found "*must be interpreted as <u>precluding a provision in an international agreement concluded between Member States [...]</u> under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept*";[381] [EC's emphasis]

    *b.* Commission Decision SA.40348, 10 November 2017 ("**2017 EC Decision**"), which "*sets out that the contested measure does not violate the investment protection provisions under the Energy Charter Treaty, and that Article 26 ECT does not apply intra-EU*";[382] and

---

[379] EC *Amicus Curiae* Submission, ¶ 3, C-0201, citing to *Electrabel S.A. v Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction , Applicable Law and Liability, dated 30 November 2012, ¶¶ 4.122, 4.189, and 4.195; *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v Italian Republic*, ICSID Case No. ARB/14/3, Award, dated 27 December 2016, ¶ 278, RL-0075. See *Republic of Slovakia v Achmea*, Case C-284/16, CJEU Judgment, dated 6 March 2018, ¶ 41, RL-0105: "*Given the nature and characteristics of EU law ..., that law must be regarded both as forming part of the law in force in every Member State and as deriving from an international agreement between the Member States*". See also *Van Gend en Loos v Nederlandse Administratis der Belastingen*, Case 26/62, Judgement, dated 5 February 1963, p 12, RL-0137: "*the Community constitutes a new legal order of international law*".

[380] EC *Amicus Curiae* Submission, ¶ 3, C-0201. ETC, Article 1(3), C-0001: "'*Regional Economic Integration Organization' means an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters*".

[381] EC *Amicus Curiae* Submission, ¶ 4, C-0201 citing *Republic of Slovakia v Achmea*, Case C-284/16, CJEU Judgment, dated 6 March 2018, RL-0105.

[382] EC *Amicus Curiae* Submission, ¶ 4, C-0201, citing Commission Decision SA.40348 of 10 November 2017, summary published in the *Official Journal of the European Union*, OJ C 442, 22.12.2017, p. 1 (accessible on-line via the EUR-Lex website; see http://eur-lex.europa.eu/homepage.html?locale=en), whereas the full text was published at https://ec.europa.eu/competition/state_aid/cases/258770/258770_1945237_333_2.pdf

    *c.*    19 July 2018 EC Communication, which sets out that the ECT, Article 26, "*if interpreted correctly, does not provide for an investor-State arbitration clause applicable between investors from a Member State[] of the EU and another Member State[] of the EU. Given the primacy of Union law, that clause, if interpreted as applying intra-EU, is incompatible with EU primary law and thus inapplicable [...] and that any arbitration tribunal established on [...its] basis [...] lacks jurisdiction due to the absence of a valid arbitration agreement. [...] Indeed, the reasoning of the Court in Achmea applies equally to the intra-EU application of such a clause which, just like the clauses of intra-EU BITs, opens the possibility of submitting those disputes to a body which is not part of the judicial system of the EU. The fact that the EU is also a party to the Energy Charter Treaty does not affect this conclusion: the participation of the EU in that Treaty has only created rights and obligations between the EU and third countries and has not affected the relations between the EU Member States*".[383]

233.    Based on those, and other instruments, authorities and events, the EC submitted that: (i) the ECT, Article 26 does not apply intra-EU and the Tribunal lacks jurisdiction;[384] (ii) there was no violation of the ECT substantive investment protection provisions;[385] and (iii) any award granting damages to the Claimants could not be enforced.[386]

234.    The EC concluded that:

    61.    Should your Tribunal have any doubts as to the position put forward by the Commission, it should refer the questions discussed in this brief to the Court of Justice. Following the judgment in *Achmea*, a direct reference from your Tribunal is inadmissible. However, this Arbitral Tribunal can rely on a competent judge of a Member State as *juge d'appui*. As the Court of Justice held in *Nordsee*:

        "In that context attention must be drawn to the fact that if questions of Community law are raised in an arbitration resorted to by

---

[383]  EC *Amicus Curiae* Submission, ¶ 4, C-0201, citing COM(2018)547 final, pages 3-4, attached as Annex 1 to the EC's request for leave to intervene.

[384]  EC *Amicus Curiae* Submission, ¶¶ 6-49, C-0201.

[385]  EC *Amicus Curiae* Submission, ¶¶ 50-53, C-0201.

[386]  EC *Amicus Curiae* Submission, ¶¶ 54-60, C-0201.

Case 1:21-cv-01248-RJL Document 33-1 Filed 03/22/23 Page 92 of 172

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

> agreement the ordinary courts may be called upon to examine them
> [...] in the context of their collaboration with arbitration tribunals, in
> particular in order to assist them in certain procedural matters or to
> interpret the law applicable [...]."
>
> 62.    Thus, to the extent that the tribunal had any doubts about the impact of the
> *Achmea* judgment on the Energy Charter Treaty as presented above, this could be a
> rapid way of creating legal certainty for all actors involved.[387]

235.    The Tribunal refers to the EC *Amicus Curiae* Submission at paragraph 453 of the Award,
noting that:

> The European Commission's *amicus curiae* submission dated 3 December 2018
> supports the Respondent's position, and in particular refers to *(1)* Commission
> Decision SA.40348 of 10 November 2017 that the contested measures did not
> violate the investment protection provisions of the ECT and that Article 26 ECT
> does not apply intra-EU; and *(2)* the Commission communication "Protection of
> Intra-EU Investment" of 19 July 2018 to the same effect.

236.    As noted in the Award, and recognised in the Annulment proceedings, the EC's position
on EU law supports the Respondent's EU law arguments in relation to jurisdiction in
the arbitration.  These arguments form the basis for the jurisdictional argument in the
Annulment Application, and the Committee has carefully reviewed the EC *Amicus
Curiae* Submission, which forms part of the record in the Annulment proceedings.

### 3.    The Claimants' EU Law Arguments: Jurisdiction

237.    The Claimants responded to the Respondent's arguments as to the application of EU
law to jurisdiction, as summarised in the Award.[388]

238.    As to the application of EU law to jurisdiction, in the Claimants' Memorial in the
arbitration, they submitted that:

---

[387]    EC *Amicus Curiae* Submission, ¶¶ 61-62, C-0201.

[388]    2020 Decision, ¶¶ 197-225 (jurisdiction).

a.  "*Spain is a 'Contracting Party' to the ECT, as the ECT entered into force with respect to Spain on 16 April 1998*";[389]

b.  "*each of the Claimants is an 'investor of another Contracting Party', as they are companies incorporated under the laws of Luxembourg (Hydro Energy) and Sweden (Hydroxana), States for which the ECT entered into force on 16 April 1998*";[390]

c.  "*the dispute relates to an 'investment' in the area of Spain, as the Claimants hold shareholding and debt interests in Spanish companies that own and operate hydropower generation installations, as well as interests in those installations, claims to money, and rights conferred by law (including those conferred by RD 661)*";[391]

d.  "*the Parties have consented to the arbitration of this dispute under the ECT, as Spain has given its 'unconditional consent to the submission of a dispute to international arbitration' pursuant to Article 26(3) of the ECT and the Claimants have consented in writing to this arbitration by filing their Request for Arbitration pursuant to Article 26(4) of the ECT*"; [392] and

e.  "*the Claimants sought to resolve the dispute by negotiation before commencing arbitration, consistent with Article 26(1) of the ECT*".[393]

239.  The Claimants further argued that "*the jurisdictional requirements of Article 25 of the ICSID Convention have been met in this case, as they submit a legal dispute between a Contracting State and nationals of other Contracting States arising out of their investments in the hydropower generation sector in Spain, which they and Spain have consented in writing to submit to the Centre*".[394]

---

[389]  2020 Decision, ¶ 198, citing Claimants' Memorial on the Merits, ¶¶ 185-186, C-0205.

[390]  2020 Decision, ¶ 198, citing Claimants' Memorial on the Merits, ¶¶ 187-188, C-0205.

[391]  2020 Decision, ¶ 198, citing Claimants' Memorial on the Merits, ¶¶ 189-192, C-0205.

[392]  2020 Decision, ¶ 198, citing Claimants' Memorial on the Merits, ¶¶ 193-195, C-0205.

[393]  2020 Decision, ¶ 198, citing Claimants' Memorial on the Merits, ¶¶ 199-201, C-0205.

[394]  2020 Decision, ¶ 199, citing Claimants' Memorial on the Merits, ¶¶ 203-212, C-0205.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

240. The Claimants further addressed the Respondent's objections in their Reply Memorial in the arbitration on the basis that: (i) "*the argument that the ECT is incompatible with EU law is irrelevant because the Claimants do not base their claims on breaches of EU law and, in any event, non-EU courts and tribunals are not precluded from applying or interpreting EU law*";[395] (ii) "*nothing in the text, context or purpose of the ECT suggests the exclusion of intra-EU disputes*";[396] and (iii) "*the commentators cited by the Respondent are of no assistance to its position*".[397]

### 4. The Tribunal Approach to EU Law: Jurisdiction

241. At paragraphs 446 to 502 of its 2020 Decision, the Tribunal considered the Respondent's and EC's arguments on EU law in relation to jurisdiction. The Tribunal summarised the jurisdiction issues before it, including in relation to the application of EU law, at paragraphs 450 to 452 as follows:

> 450. The first main point is that, on the proper interpretation of the principal provisions of the ECT, the Tribunal has no jurisdiction. The second main point, with some overlap with the first point, is that intra-EU disputes are outside the competence of the Tribunal.

> 451. Within the first point may be included the arguments that *(1)* the Tribunal lacks jurisdiction under Article 25 of the ICSID Convention because the Claimants hold dual Luxembourg-European and Swedish-European nationality; and *(2)* that Article 26 ECT does not generate obligations between the EU Member States, because the Member States of the then European Community were unable to contract obligations between them as regards the Internal Market (as it is an area in which they had transferred their sovereignty to the then European Community) and for this reason the EU is a Contracting Party to the ECT.

> 452. Within the second main point, that intra-EU disputes are outside the competence of the Tribunal, are the arguments that *(1)* the *Achmea* ruling applies to multilateral

---

[395] 2020 Decision, ¶ 200, citing Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 378-382, C-0191.

[396] 2020 Decision, ¶ 200, citing Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 383-400, C-0191.

[397] 2020 Decision, ¶ 200, citing Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction, ¶ 401, C-0191.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

treaties such as the ECT; *(2)* EU law is international law; *(3)* EU law is paramount and displaces any other national or international provision; *(4)* EU law (such as the law relating to issues in the arbitration) applies to claims in the arbitration; and *(5)* the Tribunal would be interfering with the EU judicial system.

242. The Tribunal proceeded to consider both jurisdiction and choice of law provisions under both the ECT and the ICSID Convention.[398]

243. As to ECT jurisdiction provisions, the Tribunal referred to a Contracting Party's unconditional consent to arbitrate at Article 26(1) to (3), in particular Article 26(3)(a), and the provisions defining 'Contracting Party' and 'REIO', and its effect, including Articles 1(2), 1(3), 16 and 38.[399] As to ECT governing law provision, the Tribunal referred to Article 26(6), which provides that it "*shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law*".[400]

244. In relation to consent, it further set out that the ECT provides, where there arise "*Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former*" which cannot be settled amicably, that the Investor party may submit it to a form of dispute resolution including ICSID arbitration "*if the Contracting Party of the Investor and the Contracting Party to the dispute are both parties to the ICSID Convention*" then "*each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration ... in accordance with the provisions of this Article*".[401]

245. As to ICSID Convention jurisdiction provisions, the Tribunal referred to the scope of the Centre's jurisdiction over disputes between "*a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State*" (Article 25(1)),[402] and the Tribunal's

---

[398] 2020 Decision, ¶¶ 455-462.

[399] 2020 Decision, ¶¶ 457-458.

[400] 2020 Decision, ¶ 456.

[401] 2020 Decision, ¶ 456.

[402] 2020 Decision, ¶ 459.

competence to rule on its own jurisdiction (Article 41(1)).[403] As to ICSID Convention governing law provision, the Tribunal referred to Article 42(1), which provides that it "*shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable*".[404]

246.  The Tribunal concluded on the basis of the ECT and ICSID Convention jurisdiction provisions that "[t]*he combined effect of these provisions on the face of their wording is that the Tribunal has jurisdiction where the investor is a national of a Contracting State and the respondent State is a Contracting State*".[405]

247.  The Tribunal proceeded specifically to consider the Respondent's EU versus Member State nationality argument pursuant to ECT Articles 1(2) and 26(1), and its argument as to the meaning and effect of the 'REIO' and 'Area' provisions at ECT Articles 1(3), 1(10), 25 and 36(7).[406] It concluded that "*these provisions do not assist the Respondent in its objections to jurisdiction*",[407] because:[408]

> 470.   … Article 26(1) plainly means that the "*[i]nvestment … in the Area of the former*", i.e. the Contracting Party, is an investment in the national territory of the respondent State. The fact that the EU is also a Contracting Party and a "Regional Economic International Organization" does not mean in the context of Article 26(1) that the Area is the territory of the EU as a whole, which would simply make no sense. Nor can it in itself bar the Tribunal's jurisdiction; nor can the Tribunal's jurisdiction be removed by the fact that the ECT recognises that competence may be transferred to such an Organization, or the fact that in certain circumstances the Organization may vote instead of the Member States.

---

[403]   2020 Decision, ¶ 460.

[404]   2020 Decision, ¶ 461.

[405]   2020 Decision, ¶ 462.

[406]   2020 Decision, ¶¶ 463-471.

[407]   2020 Decision, ¶ 470.

[408]   2020 Decision, ¶¶ 470-471.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

> Article 25 does not prevent REIO members from agreeing to other obligations under a different treaty regime, such as the ECT.
>
> 471.  Nor is there anything express or implied in these provisions which could amount to a "disconnection clause", i.e. a provision that disapplies certain provisions of a treaty in mutual relations between certain parties.

248.  The Tribunal then specifically considered the *Achmea* ruling in the context of the TFEU Articles 267, 344 and 351,[409] including in relation to conflict of laws and general interpretation principles in the VCLT, Articles 30 and 31, noting that:[410]

> [b]oth Parties have relied on the VCLT, although several parties to the ECT are not, or (like the EU) cannot be, parties to the VCLT, but the provisions relied on by them codify customary international law relating to the interpretation of treaties.

249.  The Tribunal discussed the approach of the *Achmea* ruling to the question whether or not TFEU Article 344 precludes the application of bilateral investment protection agreement provision for arbitration between EU Member States.[411] It referred in particular to the opinion of M. Wathelet, "*that Articles 267 TFEU and 344 TFEU were to be interpreted as not precluding the application of an investor-State dispute settlement mechanism established by means of a bilateral investment agreement concluded before the accession of one of the Contracting States to the European Union*".[412]

250.  The Tribunal then set out what it described as the eight "*crucial steps in the legal reasoning*" in *Achmea*, summarised below:[413]

a.  "*[a]n international agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the EU legal system*";

---

[409]  2020 Decision, ¶¶ 472-485.

[410]  2020 Decision, ¶ 474.

[411]  2020 Decision, ¶¶ 477-485.

[412]  2020 Decision, ¶ 478, citing to *Slovak Republic v Achmea BV*, Case C-0284/16, Opinion of Advocate General Wathelet, ¶ 43, CL-0117.

[413]  2020 Decision, ¶ 481.

b. that autonomy principle "*is enshrined in particular in Article 344 TFEU*";

c. "[t]*he autonomy of EU law with respect both to the law of the member States and to international law is justified by the essential characteristics of the EU and its law, relating in particular to the constitutional structure of the EU and the very nature of that law*";

d. "*EU law is characterised by the fact that it stems from an independent source of law, the Treaties, by its primacy over the laws of the Member States*";

e. "[t]*hose characteristics have given rise to a structured network of principles, rules and mutually interdependent legal relations binding the EU and its Member States*";

f. "*Member States are obliged, by reason, inter alia, of the principle of sincere co-operation, to ensure the application of and respect for EU law*";

g. "*it is for the national courts and tribunals and the CJEU to ensure the full application of EU law in all Member States and to ensure judicial protection of the rights of individuals under that law*"; and

h. "[t]*he EU judicial system has as its keystone the preliminary ruling procedure provided for in Article 267 TFEU*".

251. After summarising the steps in the *Achmea* ruling legal reasoning, the Tribunal then set out the eight steps that the CJEU followed in the "*application of those principles*" as follows:[414]

a. in determining possible infringements of the BIT, the tribunal "*might … be called on to interpret or indeed to apply EU law*";

b. the tribunal "*was not part of the judicial system of the Netherlands or Slovakia*";

---

[414] 2020 Decision, ¶ 482.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

    c.    consequently, the tribunal "*could not be classified as a court or tribunal 'of a member state' within the meaning of Article 267 TFEU*";

    d.    the tribunal decision is final and it was permitted to choose its seat and applicable law;

    e.    as the tribunal chose to sit in Germany, "*German law was applicable to the procedure*" but limited to review on "*validity of the arbitration agreement under the applicable law*" and "*public policy of the recognition or enforcement*";

    f.    in arbitration under the BIT, "*Member States agree to remove from the jurisdiction of their own courts, and hence from the system of judicial remedies in the fields covered by EU law, disputes which may concern the application or interpretation of EU law*", which contrasts with "*commercial arbitration, where the requirements of efficient arbitration proceedings justify limited review of arbitral awards by the courts of the Member States, provided that the fundamental provisions of EU law can be examined in the course of that review and, if necessary, be the subject of a reference for a preliminary ruling*";

    g.    consequently, the BIT "*could prevent those disputes from being resolved in a manner that ensured the full effectiveness of EU law, even though they might concern the interpretation or application of that law*"; and

    h.    as to multilateral treaties, the CJEU concluded that "*an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the Court of Justice, is not in principle incompatible with EU law*".

252.    The Tribunal concluded by reciting in full the operative part of the *Achmea* ruling and referring to the subsequent 15 and 16 January 2019 declarations by 28 EU Member States as to its legal consequences,[415] noting that Spain (and others) "*expressed the view that the ruling applied also to international agreements concluded by the EU, including*

---

[415]   2020 Decision, ¶¶ 483-484.

the ECT, which were an integral part of the EU legal order and must therefore be compatible with the Treaties".[416]

253. Having considered the *Achmea* ruling in some detail, the Tribunal provided its "*two reasons for supposing that the CJEU did not express the view that investor-State dispute resolution procedures in a multilateral agreement such as the ECT were outside the scope of its intra-EU ruling*", as being:[417]

   a. "*its reference to the BIT being concluded 'not by the EU but by Member States', that it was mainly directing itself to agreements with third States*"; and

   b. "*the citation of previous rulings*" concerning agreements concluded by the EU (or European Community) in Opinion 1/09, Opinion 1/91, and Opinion 2/13.[418]

254. The Tribunal stated that Opinion 1/09 and Opinion 2/13 (setting out paragraphs 182 to 184 of the latter) find that "[t]*he competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions*".[419]

255. Against those Opinions, the Tribunal observed that:[420]

> there is at least the possibility, and perhaps the probability, particularly as a result of the citation of Ruling 1/09 on the EPC, and the use of the term 'international agreement' in the *dispositif* … that if the compatibility of the ECT with the TFEU arose before the CJEU, it would apply the *Achmea* ruling to the dispute resolution mechanism under the ECT.

---

[416] 2020 Decision, ¶ 484, citing to 15 January 2019 MS Declaration, p 2, RL-0111.

[417] 2020 Decision, ¶ 490.

[418] 2020 Decision, ¶ 490; Opinion 1/91 (EEA Agreement - I), EU:C:1991:490, dated 14 December 1991, ¶¶ 40 and 70; Opinion 1/09 (Agreement creating a unified patent litigation system) of 8 March 2011, EU:C:2011:123, ¶¶ 74 and 76; and Opinion 2/13 (Accession of the EU to the ECHR), EU:C:2014:2454, dated 18 December 2014, ¶¶ 182-183).

[419] 2020 Decision, ¶ 492.

[420] 2020 Decision, ¶ 493.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

256.    The Tribunal then described "*three fundamental points about EU law*" as follows:[421]

    a.    first, the "*European Union 'constitutes a new legal order of international law for the benefit of which the states have limited their sovereign rights, albeit within limited fields, and the subjects of which comprise not only Member States but also their nationals'*",[422] which the Tribunal in *Electrabel v Hungary*:

        i.    found to be "*international law because it is rooted in international treaties as legal instruments under public international law*",[423] and "*part of the international legal order, without any material distinction between the EU Treaties and the 'droit dérivé'*";[424]

        ii.    based on a formula that "*the corpus of EU law derives from treaties that are themselves a part of, and governed by, international law, and contains other rules that are applicable on the plane of international law, while also containing rules that operate only within the internal legal order of the EU and, at least arguably, are not a part of international law ...*";[425]

        iii.    however, although "*EU* [law] *(or most of it) is international law, or that the rulings of the CJEU are part of international law is not in any sense conclusive*", the "*question still remains as to whether EU law and the rulings of the CJEU are part of the applicable international law*";[426]

---

[421]    2020 Decision, ¶ 494.

[422]    2020 Decision, ¶ 494.

[423]    2020 Decision, ¶ 494, citing to *Electrabel S.A. v Hungary*, ICSID Case No. ARB/07/19, Award, dated 25 November 2015, ¶¶ 4.119 *et seq.*, RL-0048.

[424]    2020 Decision, ¶ 494.

[425]    2020 Decision, ¶ 494, citing to *Vattenfall v Germany*, ¶ 146, CL-0148.

[426]    2020 Decision, ¶ 495. [Emphasis added.]

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

b. secondly, "*it is a fundamental principle of EU law that the EU has created its own legal system, which is an integral part of the legal system of Member States and which their courts are bound to apply*";[427] and

c. thirdly, "*the system of references under what is now Article 267 TFEU is designed to ensure the proper application and uniform interpretation of EU law in all the Member States between national courts, in their capacity as courts responsible for the application of EU law, and the CJEU*".[428]

257. Against those three 'fundamental points', the Tribunal explained that it considered that "*is hard to read the Achmea ruling as a normal case of treaty interpretation*".[429] It preferred the view that it is "*a decision on the constitutional order of the EU in support of the policy of European integration, rather than an orthodox application of the rules of treaty interpretation*".[430] The Tribunal concluded that in its view:[431]

> the ruling of the CJEU is entitled to the greatest respect from an international arbitral tribunal. But such a tribunal is not in any sense bound by the ruling. Nor, consequently, can the Tribunal find that, on any normal basis of interpretation under customary international law codified in the VCLT, the dispute resolution provisions of the ECT are incompatible with Articles 267 and 344 TFEU.

258. Finally in its discussion of *Achmea*, the Tribunal noted that the ruling did not say that the agreement to arbitrate was "*void, or incompatible with the TEC/TFEU*", but instead "*precluded*", which the Tribunal concluded left "*open the question of the effect of preclusion, and in particular whether its effect is that any such provision ceased to have effect, or whether Member States should modify or abrogate the BITs between them*".[432]

259. Following its consideration of the Respondent's and EC's positions on EU law as to jurisdiction, the Tribunal proceeded to summarise 18 points by way of conclusions, at

---

[427] 2020 Decision, ¶ 496.

[428] 2020 Decision, ¶ 497.

[429] 2020 Decision, ¶ 498.

[430] 2020 Decision, ¶ 500.

[431] 2020 Decision, ¶ 500.

[432] 2020 Decision, ¶ 501.

paragraph 502(1) to (18). These points form the basis for several arguments raised in the Annulment Application and are discussed in detail in the Committee's analysis below.

b. The Committee's Review

260. Taking into account the arguments and authorities that were before the Tribunal in the underlying Arbitration (as broadly summarised above), this Committee's review to determine whether or not the Tribunal exceeded its powers by failing to apply the law in relation to jurisdiction is set out below.

261. The starting point is the Parties' acceptance in the Arbitration and in these Annulment proceedings, that the Tribunal is competent to determine its own jurisdiction.

262. This power is not unlimited;[433] as set out in the Updated ICSID Background Paper. Indeed, the Tribunal is "*expected to observe the parties' arbitration agreement*" and if it goes beyond its scope, "*it in effect surpasses the mandate granted to it by the parties*".[434] In particular:[435]

> This means that the Tribunal has the power to decide whether it has jurisdiction to hear the parties' dispute based on the parties' arbitration agreement and the jurisdictional requirements in the ICSID Convention. In light of this principle, the drafting history suggests —and most *ad hoc* Committees have reasoned— that in order to annul an award based on a Tribunal's determination of the scope of its own jurisdiction, the excess of powers must be "manifest."

---

[433] Updated ICSID Background Paper, ¶ 85.

[434] Updated ICSID Background Paper, ¶¶ 85 and 88, RL-0123, citing *Enron v Argentina*, ¶ 69, RL-0179 (citing *Azurix v Argentina*, ¶ 67, CL-0221); *Azurix v Argentina*, ¶ 67, CL-0221; *Soufraki v UAE*, ¶ 50, RL-0124; *SGS Société Générale de Surveillance S.A. v Republic of Paraguay*, ICSID Case No. ARB/07/29, Decision on Annulment, dated 19 May 2014, ¶ 114 ("***SGS v Paraguay***").

[435] Updated ICSID Background Paper, ¶¶ 19 and 88, RL-0123; *MTD v Chile*, ¶ 54, CL-0219; *Azurix v Argentina*, ¶¶ 64-66, CL-0221 (quoting *Lucchetti v Peru*, ¶¶ 101-102, CL-0209); *Soufraki v UAE*, ¶¶ 118-119, RL-0124 ("*the requirement that an excess of power must be 'manifest' applies equally if the question is one of jurisdiction*"); *Lucchetti v Peru*, ¶ 101, CL-0209; *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Decision of the ad hoc Committee, dated 25 March 2010, ¶ 96, CL-0211; *SGS v Paraguay*, ¶ 114; *Kılıç İnşaat İthalat İhracat Sanayi ve Ticaret Anonim Şirketi v Turkmenistan*, ICSID Case No. ARB/10/1, Decision on Annulment, dated 14 July 2015, ¶ 56 ("***Kılıç v Turkmenistan***"); *Total v Argentina*, ¶ 176, RL-0185; *TECO v Guatemala*, ¶ 219, CL-0214.

263.    The ICSID Convention, Article 25(1) prescribes the "*mandatory requirements that must be fulfilled for a Tribunal to have jurisdiction*".[436]  As noted in the Updated ICSID Background Paper:[437]

> These jurisdictional requirements require: (i) 'a legal dispute;' (ii) 'arising directly out of an investment;' (iii) 'between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State);' (iv) 'and a national of another Contracting State;' (v) 'which the parties to the dispute consent in writing to submit to the Centre.' The parties cannot agree to derogate from these criteria.

264.    The ICSID Convention, Article 41(1), requires a tribunal to decline jurisdiction where a mandatory requirement is not met.[438]  The Updated ICSID Background Paper considers how *ad hoc* committees addressed this up to 2016 as follows:[439]

> *Ad hoc* Committees have held that there may be an excess of powers if a Tribunal incorrectly concludes that it has jurisdiction when in fact jurisdiction is lacking,[440] or when the Tribunal exceeds the scope of its jurisdiction.[441] It has been recognized, in the inverse case, that a Tribunal's rejection of jurisdiction when jurisdiction exists also amounts to an excess of powers.[442]
>
> ...

---

[436]    Updated ICSID Background Paper, ¶ 85, RL-0123.

[437]    Updated ICSID Background Paper, ¶ 85, RL-0123.

[438]    Updated ICSID Background Paper, ¶ 85, RL-0123.

[439]    Updated ICSID Background Paper, ¶¶ 87, 89, RL-0123.

[440]    *Vivendi v Argentina I*, ¶ 86, CL-0218; *Mitchell v Congo*, ¶¶ 47-48, 67, RL-0182; *CMS v Argentina*, ¶ 47, CL-0220 (quoting *Klöckner v Cameroon*, ¶ 4, RL-0176); *Azurix v Argentina*, ¶ 45, CL-0221 (quoting *Klöckner v Cameroon*, ¶ 4, RL-0176); *Lucchetti v Peru*, ¶ 99, CL-0209; *MCI v Ecuador*, ¶ 56, RL-0175 (quoting *Lucchetti v Peru*, ¶ 99, CL-0209); *Occidental v Ecuador*, ¶¶ 49-51, RL-0163; *Tulip v Turkey*, ¶ 55, CL-0230; *EDF v Argentina*, ¶ 191, CL-0232; *Total v Argentina*, ¶ 242, RL-0185; *Dogan v Turkmenistan*, ¶ 105; *Micula v Romania*, ¶ 125, CL-0167; *Lahoud v Congo*, ¶ 118; *TECO v Guatemala*, ¶ 77, CL-0214.

[441]    *Klöckner v Cameroon*, ¶ 4, RL-0176; *Soufraki v UAE*, ¶ 42, RL-0124; *Occidental v Ecuador*, ¶¶ 49-51, RL-0163; *Tulip v Turkey*, ¶ 55, CL-0230; *Total v Argentina*, ¶ 242, RL-0185; *Dogan v Turkmenistan*, ¶ 105; *Micula v Romania*, ¶ 125, CL-0167; *Lahoud v Congo*, ¶ 118; *TECO v Guatemala*, ¶ 77, CL-0214.

[442]    *Vivendi v Argentina I*, ¶ 86, CL-0218; *Soufraki v UAE*, ¶ 43, RL-0124 (quoting *Vivendi v Argentina I*, ¶ 86, CL-0218); *Lucchetti v Peru*, ¶ 99, CL-0209; *Fraport v Philippines*, ¶ 36, RL-0161 (citing *Vivendi v Argentina I*, ¶ 86, CL-0218); *MHS v Malaysia*, ¶ 80, RL-0232; *Helnan v Egypt*, ¶ 41, RL-0173 (citing *Soufraki v UAE*, ¶ 44, RL-0124; *Vivendi v Argentina I*, ¶ 86, CL-0218); *Caratube v Kazakhstan*, ¶ 75, RL-0160 (quoting *Vivendi v Argentina I*, ¶ 115, CL-0218); *MHS v Malaysia*, ¶ 80, RL-0232); *Tulip v Turkey*, ¶ 55, CL-0230; *Dogan v Turkmenistan*, ¶ 105; *Micula v Romania*, ¶ 126, CL-0167.

> The issue of lack or excess of jurisdiction has been ruled on in 30 annulment decisions and has led to one full and one partial annulment.[443] In addition, the non-exercise of an existing jurisdiction has been decided in 13 decisions and has resulted in one full and 2 partial annulments.[444]

265.  Therefore, the fact that the Tribunal proceeded to determine its own jurisdiction is not an excess of powers.  To the contrary, it was required by its mandate to do so.

266.  As also accepted by the Parties, the Tribunal is entitled to determine the law applicable to the dispute, including the law applicable to its decision on jurisdiction.  Again, the fact that the Tribunal did so in its Award is not an excess of its powers.

267.  Turning then to the manner in which the Tribunal both determined its own jurisdiction *and* determined the law applicable to jurisdiction, based on the arguments and authorities before it in the underlying Arbitration, the Committee identifies five critical steps leading to the Tribunal's finding of jurisdiction.  At least three of those steps involved a thorough consideration and analysis of the application of EU law to the question of jurisdiction.

268.  First, the Tribunal determined which provisions of law would apply to choice of jurisdiction and to choice of law, based on "*the express wording of the jurisdiction and choice of law provisions*".[445]  It proceeded to set these out in the Award, including seven provisions from the ECT and three from the ICSID Convention.

269.  According to the Tribunal, the ECT provisions concerning jurisdiction are:

a.  Article 26(1): "*Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably*".

---

[443]  *Mitchell v Congo*, ¶ 67, RL-0182 (annulled in full on two grounds: manifest excess of powers and failure to state the reasons); *Occidental v Ecuador*, ¶ 590, RL-0163 (partially annulled on this ground).

[444]  *Vivendi v Argentina I*, CL-0218 (partial); *Helnan v Egypt*, RL-0173 (partial); *MHS v Malaysia*, RL-0232 (full).

[445]  2020 Decision, ¶ 455.

b.    Article 26(2): "*If such disputes cannot be settled ... the Investor party to the dispute may choose to submit it for resolution ...*"

c.    Article 26(3)(a): "*… each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article*".

d.    Article 1(2): "'*Contracting Party' means a state or Regional Economic Integration Organisation which has consented to be bound by this Treaty and for which the Treaty is in force*".

e.    Article 1(3): "'*Regional Economic Integration Organisation' means an organisation constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters*".

f.    Article 16:

> Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,
>
> (1)    nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and
>
> (2)    nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty,
>
> where any such provision is more favourable to the Investor or Investment.

270.    The ECT provision concerning choice of law is ECT Article 26(6): "*A tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law*".

271.    The ICSID Convention provisions are Articles 25(1) and 41(1) on jurisdiction and Article 42(1) on choice of law:

> The Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties. In the absence of such agreement, the Tribunal shall apply the law of the Contracting State party to the dispute (including its rules on the conflict of laws) and such rules of international law as may be applicable.

272.   As these provisions are contained in the ECT and ICSID Convention, under which the Arbitration was commenced, the Tribunal did not exceed its powers in identifying them as being "*the express wording of the jurisdiction and choice of law provisions*".[446]   The Applicant does not appear to suggest otherwise.

273.   <u>Secondly</u>, the Tribunal considered the interrelationship between the provisions and their respective roles and concluded that ECT Article 26(6) and ICSID Convention Article 42(1) are choice of law provisions and did not determine jurisdiction.  This is critical to the first ground for annulment because the Applicant argues that EU law applies to jurisdiction through the ECT Article 26(6) choice of law provision.

274.   At paragraph 502(1) to (4) of the Award, it set out its decision on this point and it warrants setting it out in full:

> (1)   The Tribunal is "the judge of its own competence": ICSID Convention, Article 41(1).

> (2)   The question of jurisdiction must be distinguished from the question of applicable law, or choice of law.  As indicated above, Article 42(1) provides that the "Tribunal shall decide a dispute in accordance with such rules of law as may be agreed by the parties."

> (3)   In the present case Article 26(6) ECT provides that the "tribunal established ... shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law."

> (4)   The issues in dispute are those concerning alleged breaches of obligations under the ECT relating to investments: Article 26(1) ECT. Accordingly, ***Article 42(1) of the ICSID Convention and Article 26(6) of the ECT do not***

---

[446]   2020 Decision, ¶ 455.

> *determine jurisdiction, and are not relevant for present purposes.*[447]
> [Emphasis added.]

275.   The Tribunal's conclusions at paragraph 502(1) and (2) are not in issue in the Annulment proceedings.  It is the step at paragraph 502(4), the Tribunal's decision that ICSID Convention Article 42(1) and ECT Article 26(6) "*do not determine jurisdiction, and are not relevant for present purposes*", that the Applicant takes issue with.

276.   The Applicant's primary argument on annulment is that pursuant to ECT Article 26(6) and ICSID Convention Article 42(1), the law governing jurisdiction is international law, which includes EU law as explained in the CJEU ruling in *Achmea*.  It argued that, as a consequence of the Tribunal's failure to apply international law (necessarily to include EU law) in its determination as to jurisdiction, the Tribunal therefore wrongly determined its own jurisdiction in manifest excess of its powers.

277.   The Award language is precise.  The Tribunal does not, at paragraph 502(4), state that it did not apply international law (or indeed EU law) to the question of jurisdiction.  It simply states that ECT and ICSID Convention choice of law provisions "***do not determine jurisdiction**, and are not relevant for present purposes*".[448] [Emphasis added]

278.   The Tribunal implicitly rejected the Applicant's argument in the Arbitration that international law and henceforth EU law must apply to the determination of its jurisdiction through the application of ECT Article 26(6) and ICSID Convention Article 42(1).  Instead, it based its jurisdiction analysis on the express jurisdiction provisions in those treaties.

279.   Thirdly, in accordance with its conclusion as to which treaty provisions were applicable to its jurisdiction (ECT Article 26(1) to (3) and ICSID Convention Article 25), the Tribunal proceeded to analyse those provisions (including in relation to ECT Articles 1(2), 1(3), 1 (10) and 16).

280.   The Tribunal's conclusions on the basis of this analysis are at paragraph 502(5) to (10) as follows:

---

[447]   2020 Decision, ¶ 502(1)-(4).

[448]   2020 Decision, ¶ 502(4). [Emphasis added.]

    (5)    By virtue of Article 25(1) of the ICSID Convention jurisdiction exists where *(1)* there is a legal dispute which *(2)* arises directly out of an investment, *(3)* between a Contracting State and a national of another Contracting State, and *(4)* which the parties to the dispute consent in writing to submit to the Centre.

    (6)    By virtue of Article 26(1)-(3) of the ECT: *(1)* where there arise disputes between a Contracting Party and an investor of another Contracting Party relating to an investment of the latter in the area of the former, *(2)* which cannot be settled amicably, *(3)* the investor party may submit it to ICSID arbitration, *(4)* if the Contracting Party of the investor and the Contracting Party to the dispute are both parties to the ICSID Convention.

    (7)    There is plainly a dispute between the Claimants and the Respondent which arises out of an investment in Spain, and the Contracting Parties of the investors, Luxembourg and Sweden, are parties to the ECT and to the ICSID Convention, as is the Respondent.

    (8)    Accordingly the Respondent has given "its unconditional consent to the submission of [the] dispute to international arbitration" (Article 26(3)(a) of the ECT), and the Claimants have taken advantage of that consent.

    (9)    For the reasons given above there is nothing in the combination of the ECT and EU law which could give rise to an implication of a "disconnection" clause.

    (10)    The EU itself is a separate party to the ECT.

281. The Tribunal's analysis that led to the conclusions at paragraph 502(5) to 502(10) is set out at paragraphs 463 to 501 of the 2020 Decision. In the course of its analysis, the Tribunal considered the Applicant's arguments as effect of the ECT nationality requirements and REIO provisions and how they related to ICSID Convention Article 25 and ECT Article 26(1) to (3).

282. As to the Applicant's nationality requirement argument, the Tribunal set out its analysis at paragraphs 463 to 464. At paragraph 463, the Tribunal summarised the Applicant's argument as follows:

    [T]he Tribunal lacks jurisdiction under Article 25 of the ICSID Convention because *(1)* the Claimants hold dual Luxembourg-European and Swedish-European nationality; *(2)* Article 20 TFEU establishes that all citizens of an EU Member State

simultaneously hold European nationality; *(3)* the EU and the Member States made an express declaration regarding Article 25 ECT to clarify that legal persons incorporated in accordance with the legislation of any Member State should be treated in the same way as natural persons who are nationals of the Member States; *(4)* Article 25(2)(a) of the ICSID Convention precludes natural persons with dual nationality from filing an arbitration claim; and *(5)* accordingly, because the Claimants hold dual nationality, they do not meet the jurisdictional requirement of Article 25(2)(a) of the ICSID Convention.

283. At paragraph 464, the Tribunal rejected the argument on the basis of Article 25 of the ICSID Convention. Its reasoning was twofold:

   a. "*Article 20 TFEU establishes a separate category of EU citizenship for nationals of EU Member States*" and "*does not create dual nationality*"; and

   b. "*Article 25(2)(a) of the ICSID Convention does not apply to corporations and is not engaged by the declaration that legal persons incorporated in accordance with the legislation of any member State should be treated in the same way as natural persons who are nationals of the Member States for the purposes of Article 25 ECT*".

284. This analysis led to the conclusion at paragraph 502(5) of the 2020 Decision, that pursuant to Article 25(1) of the ICSID Convention, jurisdiction exists because there is a legal dispute arising out of an investment between a Contracting State and a national of another Contracting State. The Tribunal rejected the nationality argument based on the plain meaning of Article 25 of the ICSID Convention. As the Tribunal explained at paragraph 502(4), the issues in dispute concern alleged breaches of obligations under the ECT relating to investments (ECT Article 26(1)), and ICSID Convention Article 42(1) and ECT Article 26(6) do not determine jurisdiction and in its view were not relevant for that purpose.

285. The Tribunal plainly considered the Applicant's nationality argument before rejecting it. Ultimately, it preferred Claimants' analysis as summarised at paragraphs 215 to 218 of the Award, that the Claimants are not dual nationals because the concept of "*EU*

Case 1:21-cv-01247-RJL Document 33-1 Filed 03/21/22 Page 111 of 172

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

*nationality*" does not exist, and they are not natural persons but companies, to which Article 25(2)(a) of the ICSID Convention does not apply.[449]

286. The Applicant criticised the Tribunal's reasoning in this respect as being fragmented and divided. Its criticism centres on the absence of EU law analysis at this stage of the analysis. However, having determined that the choice of law provisions at ECT Article 26(6) and ICSID Convention Article 42(1) did *not* apply to jurisdiction, there was no apparent basis for it to do so at that stage.

287. Instead, the Tribunal decided to interpret and apply the express language of ICSID Convention Article 25 to determine whether or not the nationality requirement was met and did so in a reasoned and reasonable manner. It is not for this Committee to substitute its own judgment or alternative reasons in those circumstances.

288. As to the Applicant's arguments as to the interpretation of 'REIO' and 'Area' in the ECT in relation to the EU, the Tribunal set out its analysis at paragraphs 465 to 471. At paragraph 465, the Tribunal summarised the Applicant's argument as follows:

> These points are linked, although the REIO point arises also as a subset of the intra-EU argument, but it is convenient to deal with them together. The Respondent says that: *(1)* the ECT acknowledges the special nature of the EU as an international organisation constituted by States to which they have transferred competence over certain matters in an irrevocable and binding way; and *(2)* when the ECT was signed, the Member States of the then European Community were unable to contract obligations between them as regards the Internal Market as it is an area in which they had transferred their sovereignty to the then European Community. For that reason, the EU is a Contracting Party, the relevant Area is that of the EU and not of an EU Member State and accordingly Article 26 ECT does not generate any obligations between the Member States.

289. The Tribunal proceeded to set out in full ECT Articles 1(2), 1(3), 1(10), 25 and 36(7), as relied on by the Applicant. Then, at paragraph 470, it concluded that "*these*

---

[449] The Claimants submitted that they were instead "juridical persons" for purposes of Article 25(2)(b) of the ICSID Convention, which does not contain any stipulation against dual corporate nationality. 2020 Decision, ¶ 217.

*provisions do not assist the Respondent in its objections to jurisdiction*", and set out six reasons for that conclusion:

a.   Article 26(1) "*plainly means*" an investment in the "*national territory of the respondent State*";

b.   the fact that the EU is also a Contracting Party and an REIO "*does not mean in the context of Article 26(1) that the Area is the territory of the EU as a whole, which would simply make no sense*";

c.   the fact that the EU is also a Contracting Party and an REIO cannot in itself bar the Tribunal's jurisdiction;

d.   the Tribunal's jurisdiction cannot be removed because the ECT recognises that competence can be transferred to an REIO;

e.   the Tribunal's jurisdiction cannot be removed because in certain circumstances the REIO may vote instead of the Member States; and

f.   Article 25 does not prevent REIO members from agreeing to other obligations under a different treaty regime such as the ECT.

290.   The Tribunal further concluded at paragraph 471 that there is nothing "*express or implied in these provisions which could amount to a 'disconnection clause', i.e. a provision that disapplies certain provisions of a treaty in mutual relations between certain parties*".

291.   The Tribunal therefore rejected the Applicant's REIO argument based on the language of ECT Articles 1(2), 1(3), 1(10), 25 and 36(7).  As the Tribunal explained at paragraph 502(4) of the 2020 Decision, the issues in dispute concern alleged breaches of obligations under the ECT relating to investments (ECT Article 26(1)), and ICSID Convention Article 42(1) and ECT Article 26(6) do not determine jurisdiction and are not relevant to this analysis.

292.   The Applicant objected to this element of the analysis also on the basis that it failed to apply EU law and was 'fragmented' and 'divided'.  However, the Tribunal interpreted

ECT terms, including Articles 1(2), 1(3), 1(10), 25 and 36(7), based on its preliminary decision as to the law governing its jurisdiction, namely ICSID Convention Article 25 and ECT Article 26(1)-(3).

293. <u>Fourthly</u>, having determined that it had jurisdiction on the basis of ICSID Convention Article 25 and ECT Article 26(1)-(3), the Tribunal then proceeded to consider the Applicant's EU law arguments on the basis of TFEU Articles 267 and 344, as interpreted and applied in the *Achmea* ruling, in order to ascertain whether or not the effect of those provisions was to displace its jurisdiction under the ECT and ICSID Convention.

294. At paragraphs 472 to 501, and 502(11) to (17), the Tribunal set out its analysis culminating in its conclusion that TFEU Articles 267 and 344 did not displace its jurisdiction. In doing so, it carefully considered the Applicant's and the EC's EU law arguments relating to jurisdiction, including but not limited to those explained and applied in the CJEU *Achmea* judgment.

295. The Tribunal began by setting out TFEU Articles 267 and 344 as relevant, and then provided a detailed summary of the *Achmea* ruling and its interpretation and application of TFEU Articles 267 and 344. It also referred to the 15 and 16 January 2019 declarations by 28 Member States following the *Achmea* ruling.

296. From paragraph 486, the Tribunal provided its conclusions regarding the Applicant's TFEU Articles 267 and 344 and *Achmea* ruling arguments as to jurisdiction. It first acknowledged that EU competence in the field of international relations to enter into an international agreement providing for binding arbitration "*is not in principle incompatible with EU law, provided that the autonomy of the EU and its legal order is respected*".[450] It then proceeded to conclude that:

    a.    the CJEU in the *Achmea* ruling "*did not express the view that investor-State dispute resolution procedures in a multilateral agreement such as the ECT were outside the scope of its intra-EU ruling*";[451]

---

[450]  2020 Decision, ¶ 489.

[451]  2020 Decision, ¶ 490.

b.   the fact that EU law "*(or most of it)*", including the rulings of the CJEU, is international law, is not conclusive because it must be "*part of the applicable international law*";[452]

c.   the EU legal system is an integral part of the legal system of Member States and their courts are bound by it,[453] and TFEU Article 267 is designed to ensure proper application and uniform interpretation of EU law in Member States between national courts;[454]

d.   "*it is hard to read the* Achmea *ruling as a normal case of treaty interpretation*" because:

   i.   "*Article 267 is simply the latest iteration ... of the power (and in some cases the duty) of national courts to make references to the Court of Justice*", and

   ii.  "*Article 344 ... simply prevents Member States from submitting disputes concerning the interpretation or application of the Treaties to any method of settlement other than those provided for in the Treaties*";[455]

e.   ICSID arbitration is "[t]*he residual remedy for a national of an EU Contracting State who wishes to complain of a breach by another EU Contracting State*" of the ECT and national courts will only be engaged at the time of enforcement;[456]

f.   it is "*impossible to see how, on the face of Articles 267 and 344 TFEU, and in accordance with normal rules of treaty interpretation, the effect of Article 26(3) ECT is to prevent national courts from making references to the CJEU or to allow Member States to submit disputes concerning the interpretation or application of*

---

[452]   2020 Decision, ¶ 495.

[453]   2020 Decision, ¶ 496.

[454]   2020 Decision, ¶ 497.

[455]   2020 Decision, ¶ 498.

[456]   2020 Decision, ¶ 499.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

the Treaties to any method of settlement other than those provided for in the EU Treaties";[457] and

g.   the Tribunal could not, "*on any normal basis of interpretation under customary international law codified in the VCLT*" find the ECT dispute resolution provisions to be incompatible with TFEU Articles 267 and 344.[458]

297.   In relation to TFEU Articles 267 and 344, the Tribunal finally concluded at paragraph 502(11) and (12) that:

> (11)   There is no conflict between Article 26(1)-(3) of the ECT and Articles 267 and 344 of the TFEU such as to bring the principles codified in Article 30 VCLT into play.

> (12)   It is therefore not necessary to decide whether the effect of Article 16 of the ECT is that, even if there were an inconsistency between Articles 267 and 344 of the TFEU (and their predecessors) and the ECT, there would be no derogation from the dispute resolution provisions in Part V of the ECT.

298.   From paragraph 500, the Tribunal explained its reasoning in relation to the *Achmea* ruling in particular, describing it as "*a decision on the constitutional order of the EU in support of the policy of European integration, rather than an orthodox application of the rules of treaty interpretation*".[459]  Having acknowledged that the ruling of the CJEU "*is entitled to the greatest respect from an international arbitral tribunal*", the Tribunal concluded that it "*is not in any sense bound by the ruling*".[460]

299.   The Tribunal noted that the *Achmea* ruling "*says that the agreement to arbitrate is precluded (paragraph 60 and the dispositif), not that it is void, or incompatible with the TEC/TFEU, and consequently the ruling leaves open the question of the effect of preclusion, and in particular whether its effect is that any such provision ceased to have effect, or whether Member States should modify or abrogate the BITs between them*".[461]

---

[457]   2020 Decision, ¶ 499.

[458]   2020 Decision, ¶ 500.

[459]   2020 Decision, ¶ 500.

[460]   2020 Decision, ¶ 500.

[461]   2020 Decision, ¶ 501.

300.     On the basis of its analysis of the *Achmea* ruling, the Tribunal summarised its conclusions at paragraph 502(13) to (15) as follows:

> (13)     There is nothing in the *Achmea* ruling which could deprive a Tribunal so constituted of jurisdiction. Neither it, nor the decisions which it cites on multilateral agreements, suggest that Member States had no *capacity* to enter into agreements such as the ECT.

> (14)     The fact that the Tribunal, as a creature of international law, and not national law, cannot make a reference to the CJEU, does not deprive it of jurisdiction under international law. Nor can the plain meaning of the jurisdictional provisions of the ECT and the ICSID Convention be affected by the CJEU's interpretation of Articles 267 and 344 of the TFEU.

> (15)     The declaration of the majority of the Member States of January 2019 is a political declaration without legal force and does not affect the jurisdiction of the Tribunal; and in particular, as a declaration by only some of the parties to the ECT it cannot, for the purposes of the rules codified in Article 31 of the VCLT, be regarded as a subsequent agreement between the parties regarding its interpretation or application, or as practice establishing agreement.

301.     The Tribunal did consider EU law, and in particular TFEU Articles 267 and 344 and the CJEU *Achmea* ruling, in determining its jurisdiction pursuant to ECT Article 26(1). Having done so, it determined that EU law did not deprive it of jurisdiction under the ECT. The Applicant may not agree with that decision, or the steps in the Tribunal's reasoning to reach it, or indeed the sequencing of those steps, but it is a reasoned decision that applied international law as interpreted and analysed by the Tribunal.

302.     Fifthly, having determined that TFEU Articles 267 and 344 and the *Achmea* ruling did not deprive it of jurisdiction under the ECT, the Tribunal proceeded to make two further general observations about EU law and the principle of primacy at paragraph 502(16) and (17):

> (16)     The fact that EU law is international law for at least some purposes does not affect the conclusion that, on the plain meaning of the ECT and the ICSID Convention, the Tribunal has jurisdiction. It is true that EU law is international law because it is rooted in international treaties, but it does not follow that all of EU law is

international law for all purposes, or that it will necessarily be the applicable law in all circumstances.

(17)    The fact that EU law has primacy under the principle in *Costa v ENEL* does not affect the position. The principle is concerned with primacy over national law and not international law, whether customary law or treaty law. As the Opinion of the Council Legal Service, quoted in the Declaration on which the Commission relies, put it: "... the law stemming from the Treaty, an independent source of law, could not, because of its special and original nature, be overridden by domestic legal provisions, however framed, without being deprived of its character as Community law and without the legal basis of the Community itself being called into question."

303.    These two final observations further demonstrate the Tribunal's specific consideration of the Applicant's principle of primacy of EU law argument.   Having already determined its jurisdiction pursuant to ECT Article 26(1) and ICSID Convention Article 25(1), and having determined that TFEU Articles 267 or 344 (including as interpreted by the CJEU in the *Achmea* ruling), did not deprive it of that jurisdiction, the Tribunal proceeded further to consider the effect of EU law as international law, explaining that the EU law primacy under the principle in *Costa v ENEL* was limited to primacy over national and not international law.

304.    The Applicant has expressed its frustration that this outcome rejects its firm position that the principle of primacy is concerned with primacy over international law, whether customary law or treaty.  The Tribunal expressly rejected that position, having reasoned that the principle "*is concerned with primacy over national law*" within the EU Member States.  At the heart of the Applicant's objection is the Tribunal's decision to prefer the Claimants' arguments in this respect.  That is, that the effect of TFEU Articles 267 and 344 and the *Achmea* ruling was ***not*** to deprive the Tribunal of jurisdiction under ECT Article 26(6) and that the principle of primacy did not apply to change that.

305.    The Tribunal reached that conclusion based on its consideration of the Applicant's arguments and set out its reasons and reasoning as summarised above.  The fact that subsequent events have occurred since the Award, including but not limited to further EC declarations, opinions and CJEU judgments including specifically dealing with jurisdiction under the ECT (which the *Achmea* ruling did not do) is irrelevant to the

reasoning of this Tribunal as at the date of its Award on 5 August 2020 and, therefore, irrelevant to this Committee's review of that Award.

306. The Applicant's disagreement with the outcome of the 2020 Decision, and the approach by the Tribunal in reaching that outcome, is not in itself a basis for annulment on the ground of manifest excess of powers. Ultimately, the Tribunal applied international law to its jurisdictional analysis, primarily the treaty law provisions ICSID Convention Article 25(1) and ECT Article 26(1)-(3). Its conclusion that the CJEU's interpretation of the effect of TFEU Articles 267 and 344 outside the context of the ECT, pursuant to the *Achmea* ruling, did not deprive it of jurisdiction was reasoned on the basis of international law. Throughout its reasoning, the Tribunal considered each of the Applicant's EU law arguments and rejected them.

307. This is not a failure to apply proper law to jurisdiction. It is the application of the international treaty law provisions in the ECT and ICSID Convention. It is just not the application that the Applicant considers to be correct. And 'correctness' is not within the standard of review of this Committee.

308. Finally in relation to the first ground for review, the Committee acknowledges that whilst a failure to apply proper law is a ground for annulment, an (unqualified) error of law in the application of proper law is not. The Committee considers there to be a distinction between an error in the application or interpretation of proper law (even a serious error) and an error so gross or egregious as to constitute failure to apply proper law, in the *Soufraki v UAE* sense. The Applicant's position, as the Committee understands it, is that the Tribunal failed to apply proper law entirely, possibly as a consequence of gross or egregious misapplication or misinterpretation of that proper law.

309. For the sake of completeness, the Committee finds further that the Tribunal did not, in the current case, make an error in its application of international treaty provisions in the ECT and ICSID Convention to the issue of its jurisdiction, so as to constitute so gross or egregious an error of law so as to constitute a failure to apply the law.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

### C. Application of the Standard to Failure to Apply Proper Law to the Merits

310. The Applicant's second ground for manifest excess of powers arises out of its allegation that the Tribunal further failed to apply proper law to the merits, i.e., EU State aid law, in relation to the Claimants' legitimate expectations. This section deals with that second ground.

311. The Applicant and Claimants set out their positions as to the failure to apply proper law to the merits in written submissions, at the oral Hearing and in their opening demonstratives. The Parties' respective positions are summarised below, followed by the Committee's analysis.

#### i. The Applicant's Position

312. The Applicant submitted that a second ground for annulment arises out of the Tribunal's failure to apply EU law to the merits, which it submits "*is the applicable International Law*" pursuant to ECT Article 26(6).[462]

313. It argued that in the arbitration it "*robustly invoked EU Law*"[463] as an element of international law, and explained that "*application of EU law to the merits of the matter has fundamental consequences as it affects core EU principles, even such a basic EU law institution as State Aid*".[464] It submitted that "*the subsidies the claimant sought to have set in stone in those proceedings are in fact deemed to be State Aid and therefore subject to requirements of EU law*",[465] relying on *Electrabel v Hungary.*[466]

314. The Applicant submitted in the Annulment proceedings that:[467]

> State Aid is subject to requirements of Articles 107 and 108 TFEU and implementing regulations. Regulations related to State Aid imply (i) that the implementation of any state aid regime requires notification and prior authorisation by the European

---

[462] Memorial on Annulment, ¶ 135.

[463] Memorial on Annulment, ¶ 137.

[464] Memorial on Annulment, ¶ 137.

[465] Memorial on Annulment, ¶ 139.

[466] Memorial on Annulment, ¶ 138.

[467] Memorial on Annulment, ¶ 148.

> Commission, which is the only competent institution; also, (ii) that the granting of such State Aid may not in any event cause distortion in competition, and may only be provided to achieve a level playing field.

315. It argued that EU Member States are obliged to keep in mind EC Directives on State aid,[468] and that the "*end purpose sought by subsidies for renewable energies under EU Law is to render the production of renewable energies competitive in the market*", or "*to guarantee what is known as a level playing field for producers of renewable energies with regard to traditional energy producers*", but not to "*give rise to over-remuneration scenarios that could distort competition in the internal electricity market*", and "*any over-remuneration scenario that arises must be corrected by the Member State concerned*". [469]

316. As to the effect of the Tribunal's decision in relation to State aid, at paragraphs 9 to 14 of its Memorial on Annulment, the Applicant summarised that the Tribunal:

   a. "*emphatically concluded*" that Spain was entitled to adopt regulatory measures as necessary to guarantee its public interest;[470]

   b. ruled that at the time of the investments the Claimants could not have had any other rights than the right to receive a "*reasonable rate of return on their investment*";[471]

   c. determined that "*one must first ascertain whether the rate of return obtained is reasonable in order to then evaluate whether the measures Spain adopted did or did not amount to a breach of legitimate expectations of the Claimants*";[472]

   d. concluded that "*there is no general principle prohibiting retroactivity of legislation although one must nevertheless evaluate, according to the particular*

---

[468] Memorial on Annulment, ¶ 145.

[469] Memorial on Annulment, ¶ 146.

[470] Memorial on Annulment, ¶ 9, citing to 2020 Decision, ¶¶ 582, 611-630, 673 and 676(3), RL-0122.

[471] Memorial on Annulment, ¶ 11, citing to 2020 Decision, ¶ 695, RL-0122.

[472] Memorial on Annulment, ¶ 11, citing to 2020 Decision, ¶ 696, RL-0122.

> context, the unreasonable character, the breach of legitimate expectations or the destruction of acquired rights";[473] and therefore

e. "*concluded Claimants would be entitled to compensation if the prospective remuneration (without reference to past remuneration) from the facilities was not in accordance with a reasonable rate of return*".[474]

317. The Applicant submitted that "*if EU Law had been applied to the merits of the dispute*", then the Tribunal "*would have found that the alleged expectations of investors were not lawful*" at all, and that "*the principle of proportionality necessarily applied*".[475]  It submitted that, as a result:[476]

> [a]ll in all, EU Law had extremely important consequences for resolving the merits of this dispute. The HydroEnergy award, nevertheless, failed to conduct the analysis that EU law required and directly failed to acknowledge this relevant applicable Law, as we shall see. This alone must lead to annulment of the Award.

> The HydroEnergy Award failed to apply EU Law to the merits of the matter and also failed to consider the significant consequences of doing so.

318. The Applicant criticised the Award reasoning in relation to EU State aid law as being "*very short, to say the least*".[477]  It then referenced the Tribunal's reasoning on EU law in relation to jurisdiction, noting in that regard that the Tribunal "*did not question that EU Law (as primary and secondary legislation) and CJEU judgements are International Law*",[478] and that it concluded at paragraph 502(16) that:[479]

> The fact that EU law is international law for at least some purposes does not affect the conclusion that, on the plain meaning of the ECT and the ICSID Convention, the Tribunal has jurisdiction. It is true that EU law is international law because it is rooted

---

[473] Memorial on Annulment, ¶ 12, citing to 2020 Decision, ¶¶ 676(7) and 684, RL-0122.

[474] Memorial on Annulment, ¶ 12, citing to 2020 Decision, ¶ 697, RL-0122.

[475] Memorial on Annulment, ¶¶ 159 and 161.

[476] Memorial on Annulment, ¶¶ 162-163.

[477] Memorial on Annulment, ¶ 165, citing to 2020 Decision, ¶¶ 495, 502, RL-0122.

[478] Memorial on Annulment, ¶ 165, citing to 2020 Decision, ¶¶ 495, 502, RL-0122.

[479] Memorial on Annulment, ¶ 165, citing to 2020 Decision, ¶ 502(16), RL-0122.

in international treaties, but it does not follow that all of EU law is international law for all purposes, or that it will necessarily be the applicable law in all circumstances.

319. The Applicant further referred to the Tribunal's reasoning at paragraph 502(17) of the Award, which noted again in the context of jurisdiction that:[480]

> The fact that EU law has primacy under the principle in *Costa v ENEL* does not affect the position. The principle is concerned with primacy over national law and not international law, whether customary law or treaty law. As the Opinion of the Council Legal Service, quoted in the Declaration on which the Commission relies, put it: "*... the law stemming from the Treaty, an independent source of law, could not, because of its special and original nature, be overridden by domestic legal provisions, however framed, without being deprived of its character as Community law and without the legal basis of the Community itself being called into question*".

320. The Applicant submitted in relation to EU State aid law that the Tribunal "*assumed that such a conflict existed (having nevertheless previously denied there was such a conflict) and deemed it was impossible to concurrently apply ECT and EU Law due to the first prevailing over the second (not realising, as already stated and set out above, the principle of prevalence of EU Law)*".[481]

321. It further submitted that the Tribunal recognised the EC "*Directive recited that the need for support schemes in favour of renewable energy sources was recognised in the Community guidelines for State aid for environmental protection*",[482] and nevertheless: (i) "*failed to effectively apply that legislation to the merits of the matter and did not consider the very significant effects of applying that Law in terms of legitimate expectations*"; and (ii) failed to "*evaluate the effect of the principle of proportionality*".[483]

---

[480] Memorial on Annulment, ¶ 166, citing to 2020 Decision, ¶ 502(17), RL-0122.

[481] Memorial on Annulment, ¶ 167.

[482] Memorial on Annulment, ¶ 168, citing to 2020 Decision, ¶ 86, RL-0122.

[483] Memorial on Annulment, ¶ 168.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

322.    As a consequence, according to the Applicant, "*not applying the relevant applicable law amounts to manifestly exceeding powers and must lead to annulment of the award*" as the Tribunal "*would have reached different conclusions had it considered the legislation on State Aid*".[484]

323.    In its Reply Memorial, the Applicant reiterated that the "*Tribunal failed to correctly apply the law to decide the merits of the matter and did not even set out its arguments in that regard, dismissing that application at paragraph 502*"[485] and that such "*breach amounts to manifest excessive powers for the purposes of Article 52(1)(b) ICSID Convention and failure to state reasoning in accordance with Article 52(1)(e) of the Convention*".[486]

324.    The Applicant clarified that it did not "*invoke incorrect application of EU law as if the Tribunal had applied it but did so incorrectly, but rather that it was not even applied*" in excess of its powers.[487]  It explained that as an international dispute, the starting point for the Tribunal's reasoning should be Article 38 of the Statute of the International Court of Justice, and that it should apply treaty law, which it submitted included EU State aid law and international custom.[488]

325.    In that context, the Applicant argued that the Claimants' legitimate expectations "*must include verifying whether the promised subsidy was lawful according to law applicable to the dispute and in accordance with national law*".[489]  As the "*EU system of State Aid derives from the TFEU, from an international treaty, and therefore its nature as international Law cannot be disputed*",[490] based on the provisions of TFEU Article 107 and 108 "*there is a general prohibition on State Aid*",[491] and that "[s]*uch aid may be*

---

[484]    Memorial on Annulment, ¶ 169.

[485]    Reply Memorial on Annulment, ¶ 180.

[486]    Reply Memorial on Annulment, ¶ 180.

[487]    Reply Memorial on Annulment, ¶ 182.

[488]    Reply Memorial on Annulment, ¶¶ 185-195.

[489]    Reply Memorial on Annulment, ¶¶ 255-270.

[490]    Reply Memorial on Annulment, ¶ 255.

[491]    Reply Memorial on Annulment, ¶¶ 256-258.

**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

*authorised after review of compatibility with EU Law, but without express authorisation such State Aid is, in principle, unlawful*".[492]

326. According to the Applicant:[493]

> The Award and the preliminary decision failed to consider this issue despite it having been extensively debated in the Arbitration, to the point that the European Commission decision in that regard was adduced. The HydroEnergy Tribunal Award and Decision, manifestly failing to take the TFEU into consideration either as Law or as a fact, did not in any way analyse this issue, and as a result they failed to apply applicable law, which is simply EU law.

327. It submitted that the Claimants "*could not have had legitimate expectations*", based on the awards in *Electrabel* and *JSW*,[494] which "*concluded that in that scenario, based on an interpretation in accordance with EU Law, that Article 10 ECT is not breached, in that another rule of International Law exists and that it is, furthermore, recognised in Article 1(3) ECT, by virtue of which any legitimate expectations are excluded*".[495]

328. Finally, the Applicant submitted that State aid decisions form "*part of EU Law and, therefore, of the International Law applicable between the State of origin and the host State, as a result of the law applicable to this dispute*",[496] and the Tribunal "*obliterated all the EU Law, including the Law on State Aid, when it came to evaluating legitimate expectations of the Claimants*".[497] In particular, the Award "*not only ignore*[d] *the fact that there was no rights to tariffs being set in stone under applicable Law in Spain on State Aid but also failed to give any form of explanation on that issue and thereby incur grounds for annulment under both Article 51 (1) (b)* [sic] *and under Article 52 (1) (e)*".[498]

---

[492] Reply Memorial on Annulment, ¶ 258.

[493] Reply Memorial on Annulment, ¶ 260.

[494] Reply Memorial on Annulment, ¶ 267.

[495] Reply Memorial on Annulment, ¶ 267.

[496] Reply Memorial on Annulment, ¶ 268.

[497] Reply Memorial on Annulment, ¶ 268.

[498] Reply Memorial on Annulment, ¶ 269.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

329. At the oral Hearing, the Applicant further clarified its starting point that ECT Article 26(6) means that the governing law as to merits is international law, which includes EU law. It submitted that the content of applicable EU law included the "*PV investors' petition to take legal action against Spain due to the implementation of some measures challenged in this arbitration proceeding*" and the EC's "*Decision on State Aid of November 2017*".[499]

330. The Applicant submitted that it fully addressed the relevant EC Decision on State aid "*in its Rejoinder at the hearing and in the Post Hearing Briefs*".[500] It submitted that it "*highlighted the relevance of the European Commission Decision for the resolution of the underlying arbitration*", but the "*Decision has not been taken into account by the Tribunal to resolve the dispute*".[501] According to the Applicant, the Decision on State Aid "*itself forms part of EU law pursuant to* [TFEU] *article 288 ... and therefore of international law applicable to this dispute*", and the Tribunal was "*obliged by the European Commission Decision conclusion*".[502] It submitted that the Tribunal instead "*obliterated EU law including the law on State Aid when it came to draft its Decision*".[503]

331. In relation to Royal Decree 661/2007 in particular, it referred the Committee to the 2020 Decision, paragraphs 4 and 107, where the Tribunal referred to the Decree but "*does not declare that it is illegal, because it is compensated with the new measures, so it is not necessary to assess if it is illegal or not until an arbitral tribunal declares to grant damages*".[504]

332. In the Annulment proceeding, the Applicant relied on arguments and documents relating to its State aid argument that were not before the Tribunal, including in oral submissions at the Hearing. In particular, the Applicant referred to (i) "*the importance of the arguments used before the Arbitral Tribunal by the Kingdom of Spain is further*

---

[499] Transcript, pp 52-54.

[500] Transcript, p 53, ll 1-3.

[501] Transcript, p 53, ll 3-8.

[502] Transcript, p 53, ll 9-16.

[503] Transcript, p 53, ll 16-18.

[504] Transcript, p 53, l 24 to p 54, l 3.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

reinforced by the European Commission Decision issued in 2021 in which it agreed to open a dossier on State Aid in the decision of the case of Antin",[505] which it submitted made clear that the 2007 Spanish renewables scheme "*was an unlawful state aid*";[506] (ii) a January 2022 decision of the CJEU sitting as the Grand Chamber, which it submitted "*set aside the judgment of the General Court which annulled the 2015 Commission's Decision in Micula v Romania case*";[507] and (iii) the Applicant having given notice of the Award "*to the European Commission, which has started a proceeding similar to the one conducted in the Antin v Spain and the Micula v Romania cases*".[508]

333. The Applicant submitted that EU law should have been applied to the merits: (i) to decide the scope of investor rights; (ii) to analyse legitimate expectations; and (iii) to apply the principle of proportionality.[509] It argued that the Award failed to apply EU State aid law, even though it "*sustained that EU law was applicable international law to the merits according to paragraph 26(6) of the ECT, and the Tribunal had the knowledge of it*".[510] According to the Applicant:[511]

> the Decision makes no pronouncement on whether European Union law applied to the merits of the case. Not a single reference. The Decision, when deciding on the merits, failed to include any mention in that regard.

334. It further submitted that the Tribunal summarised the Applicant's "*arguments regarding legitimate expectations and right of investors taking into account EU law*", but "*did not consider them in resolving the dispute*" and "*did not give reasons*".[512] Instead it:

---

[505] Transcript, p 55, ll 17-22.

[506] Transcript, p 56, ll 4-5.

[507] Transcript, p 56, l 25 to p 57, l 3.

[508] Transcript, p 57, ll 4-8.

[509] Transcript, p 57, ll 12-19.

[510] Transcript, pp 68-71.

[511] Transcript, p 68, ll 17-22.

[512] Transcript, p 68, l 23 to p 69, l 3.

a. "*recognised in paragraph 502(16) that EU law is international law*";[513]

b. "*failed to explain why it does not apply to the merits of the dispute taking into account the literal wording of article 26(6) ECT*";[514]

c. was contradictory at paragraph 495 where the Tribunal "*merely stated that 'the point that EU* [law] *(or most of it) is international law, or that the ruling of the Court of Justice of the European Union are part of international law is not in any sense conclusive'*";[515]

d. whereas at paragraph 502(4) "*the Tribunal declared that 'Article 42(1) of the ICSID Convention and article 26(6) of the ECT do not determine jurisdiction, and are not relevant for present purposes' … it did not analyse in any part of the Decision why it did not apply EU law to the merits of the dispute according to article 26(6) of the ECT*";[516]

e. in acknowledging at paragraph 502(2) that "'*the question of jurisdiction must be distinguished from the question of applicable law' …* [the Tribunal] *did not explain in any part of the Decision why EU law did not apply to the merits*";[517] and

f. in the arbitration the Applicant "*requested on numerous occasions the application of EU law and State Aid legislation to the dispute*".[518]

335. The Applicant concluded that:[519]

> there is simply no statement of reasons as to why European Union law, being international law, is not the international law that applies to the merits of the case. In other words, the Tribunal leaves basic issues on deciding law applicable to the merits

---

[513] Transcript, p 69, ll 5-6.

[514] Transcript, p 69, ll 7-9.

[515] Transcript, p 69, ll 13-17.

[516] Transcript, p 70, ll 1-9.

[517] Transcript, p 70, ll 12-16.

[518] Transcript, p 70, ll 17-20.

[519] Transcript, p 71, ll 2-10.

of this dispute unexplained. This must lead to the annulment of its decision with regard to Articles 52(1)(e) and 48(3) of the ICSID Convention.

336. At the oral Hearing, the Applicant responded to the Claimants' suggestion in Reply that it had abandoned its proportionality argument in relation to failure to apply EU law to the merits. It confirmed that it had not, referring the Committee to its Rejoinder on the Merits and Reply on Jurisdiction, paragraphs 731-737, where it submitted it had put the point to the Tribunal in the underlying arbitration.[520]

337. According to the Applicant in the Annulment proceedings, "*EU law would have affected yet another level of the Tribunal's analysis, which is the principle of proportionality*" because the "*subsidies regime is subject to a very specific limitation*" being the "*achievement of a level playing field*", and reminded the Committee that the EC "*expressly stated that the aid must be proportionate to the end sought*".[521]

338. The Applicant further submitted that, "[b]*y applying EU law the Tribunal would then have been obliged to apply the principle of proportionality, which is compulsory under that legislative framework, and gone on to check whether the compensation recognised duly complied with that principle*".[522] It finally noted that "*Member States can amend and/or terminate State Aid regimes at any time to avoid over-compensation scenarios*", and therefore "*if EU law had been applied to the merits of the dispute*" then the "*Tribunal would have found that the alleged expectations of investors were not lawful*".[523]

*ii. The Claimants' Position*

339. In response on excess of powers by failing to apply proper law as to merits, in their Counter-Memorial, the Claimants raised three primary points:

---

[520] Transcript, p 61, ll 8-19.

[521] Transcript, p 61, ll 8-19.

[522] Transcript, p 61, l 21 to p 62, l 1.

[523] Transcript, p 62, ll 2-9.

a. that the Applicant's submissions on applicable law were "*contradictory*",[524] in that it asserted that the EC "is '*the only institution with competences to decide in matters of State Aid*',[525] yet at the same time, asserted that the Tribunal "*committed an annullable error because it failed to apply EU State aid law to find that 'the claim brought by the [Claimants] seeking to continue subsidies constituting State aid indefinitely was incompatible with EU law*'",[526] and it cannot argue that "*the Tribunal is precluded from applying EU law (including on State aid) because it is within the exclusive competence of the EC institutions (and lacked jurisdiction in this case because it was required to apply EU law), yet at the same time argue that the Tribunal's failure to apply EU State aid law constitutes an annullable error due to the Tribunal's failure to apply the 'correct' applicable law*";[527]

b. that "*the assessment of the Claimants' expectations is a question of fact, not a matter of applicable law*";[528] and

c. that an argument that the Tribunal's reasoning is "*incorrect*" is not a sufficient basis for annulment.[529]

340. The Claimants set out in some detail their submission as to the Tribunal's analysis on law applicable to the merits. They, like the Applicant, referred almost exclusively to the provisions at paragraph 502(16) and 502(17), within the section of the 2020 Decision dealing with jurisdiction.[530] Based on those paragraphs, the Claimants submitted that the Tribunal had concluded "*that EU law is not the applicable law to the merits of the dispute* [and] *that is the end of the matter for the purposes of* [the Applicant's] *EU law based arguments*".[531]

---

[524] Counter-Memorial on Annulment, ¶¶ 12 and 160.

[525] Counter-Memorial on Annulment, ¶ 12.

[526] Counter-Memorial on Annulment, ¶¶ 12 and 159-165.

[527] Counter-Memorial on Annulment, ¶¶ 12 and 160.

[528] Counter-Memorial on Annulment, ¶ 13.

[529] Counter-Memorial on Annulment, ¶ 14.

[530] Counter-Memorial on Annulment, ¶¶ 166-177.

[531] Counter-Memorial on Annulment, ¶ 178.

341.   The Claimants proceeded nevertheless to deal with the Applicant's primary points on the law applicable to the merits submitting as follows: (i) that EU State aid law is irrelevant to deciding the scope of investors' rights;[532] (ii) that EU State aid rules and the Claimants' legitimate expectations is a question of fact and not law;[533] and (iii) as to the principle of proportionality, that the Tribunal had already determined that EU law was not applicable and, in any event, on the Applicant's own case the determination of State aid and proportionality can only be done by EU institutions.[534]

342.   The Claimants further submitted in relation to proportionality that:

   a.   the Tribunal was "*not required to apply State aid law, nor its 'compulsory' principles 'under the legislative framework', i.e. EU law as it had already determined that EU law was not applicable*";[535]

   b.   "*whether an 'aid' is to be considered 'proportional' is a determination that, on Spain's own case on annulment, can only be done by EU institutions*" and therefore "*the Tribunal could not be criticised for not having done something that Spain confirms it was not permitted to do in the first place*";[536]

   c.   the Tribunal did perform a proportionality analysis based on the terms of the ECT itself and it accepted Spain's case on this point in its 2020 Decision, paragraphs 573 and 574;[537]

   d.   based on that analysis, the Tribunal "*directed the Parties to provide further information on the rate of return earned by the Claimants in order to decide if Spain's measures were proportional and consistent with Spain's case that the Claimants legitimately expected—and were entitled to receive—a 'reasonable return' only*";[538] and

---

[532]   Counter-Memorial on Annulment, ¶¶ 181-185.

[533]   Counter-Memorial on Annulment, ¶¶ 186-193.

[534]   Counter-Memorial on Annulment, ¶¶ 194-198.

[535]   Counter-Memorial on Annulment, ¶ 194.

[536]   Counter-Memorial on Annulment, ¶ 194.

[537]   Counter-Memorial on Annulment, ¶ 195.

[538]   Counter-Memorial on Annulment, ¶ 197.

       e.    "[g]*iven that the Tribunal accepted Spain's case on proportionality, Spain cannot establish how its alleged failure to apply EU State aid law would have had any impact on the outcome of the Award (or the decision on Jurisdiction) (as it is required to do)*".[539]

343.    In their Rejoinder, the Claimants reiterated they considered it to be "*difficult to respond to Spain's case on applicable law as Spain's case relied on contradictory points, alleging that the Tribunal either (i) failed to apply EU State aid law, or (ii) that it did apply EU State aid law, but it applied it incorrectly, or (iii) that, although EU State aid law was part of the applicable law, the Tribunal was in fact prohibited from applying EU State aid law because that is an exclusive competence of the EC*".[540]

344.    The Claimants further submitted in their Rejoinder that:

       a.    the Applicant had "*abandoned several of* [its] *arguments and now suggests that its case is limited to an allegation that the Tribunal 'incorrectly decid[ed] the Law applicable to this case'*", because "*the subsidies in question were unauthorised State aid and therefore the Claimants could have no legitimate expectation of receiving them under EU State aid law*";[541]

       b.    the Applicant has taken an inconsistent approach in other arbitration cases;[542]

       c.    the Tribunal has determined that EU law is not part of the applicable law under Article 26(6);[543]

       d.    "[a]*pplying Article 26(6), multiple ECT tribunals hearing intra-EU disputes (including the Hydro Tribunal) have found that EU law is not part of the law applicable to determining whether or not a state has breached its obligations under Part III of the ECT*";[544]

---

[539] CounterMemorial on Annulment, ¶ 198.

[540] Rejoinder on Annulment, ¶ 135.

[541] Rejoinder on Annulment, ¶ 136.

[542] Rejoinder on Annulment, ¶ 138.

[543] Rejoinder on Annulment, ¶¶ 139-146.

[544] Rejoinder on Annulment, ¶ 143.

    e.    "*the only rules and principles of international law that could be 'applicable' to determining a dispute under the ECT are customary rules of international law, such as the rules on treaty interpretation*" and "*EU law is neither customary international law nor is it a general principle of international law*";[545]

    f.    the Applicant "*ignores that the Committee's role is to determine if the Tribunal's determination that EU law is not part of the applicable law was a 'tenable' finding*" and that "[g]*iven that the Tribunal's finding is consistent with a vast body of ECT case law, its finding is indeed tenable*";[546] and

    g.    "[r]*ather than addressing the legal standards applicable to annulment with respect to its applicable law arguments*", the Applicant "*makes an entirely new argument, suggesting that so-called 'international custom' somehow makes EU law part of the applicable law under the ECT*", which is "*plainly wrong*" and "*cannot be considered by the Committee in any event*" because "*a tribunal cannot commit a manifest excess of powers by failing to consider an argument that was never before it*".[547]

345.  As to the Applicant's argument that "*the EU may disconnect itself from international conventions and apply EU Law with prevalence over those conventions*" as a result of "*international custom*" or "*repeated practice*", the Claimants submitted that:[548]

    a.    it "*starts with a false premise: that 'custom' or 'repeated practice' in relation to <u>other</u> treaties play a role in the interpretation of the ECT*";[549] [Applicant's emphasis]

    b.    it is unsupported by authority and "*inconsistent with the most basic notions of international law*" including the "*principle of pacta sunt servanda enshrined in Article 26 of the VCLT*";[550]

---

[545] Rejoinder on Annulment, ¶ 144.

[546] Rejoinder on Annulment, ¶ 145.

[547] Rejoinder on Annulment, ¶ 146.

[548] Rejoinder on Annulment, ¶ 147.

[549] Rejoinder on Annulment, ¶ 151.

[550] Rejoinder on Annulment, ¶ 149.

c. "*[a]s a matter of public international law, Spain cannot simply opt out of its treaty obligations because, in its unilateral view, those obligations somehow conflict with EU law or because it might wish to apply EU law instead of those treaty obligations*";[551]

d. the Applicant "*has confused (or deliberately attempted to conflate) (i) the relevance of state practice with respect to a particular treaty for the purposes of interpreting <u>that</u> particular treaty with (ii) the concept of customary international law*";[552] [Applicant's emphasis]

e. the EU law question before the Tribunal was "a *question of <u>interpretation</u> of Article 26(1) of the ECT*", which is "*governed by the VCLT*" and the "*Parties agree that international treaties, including the ECT, are interpreted in accordance with the principles of treaty interpretation under the VCLT*", as opposed to "*custom*" and "*repeated practice*" with no reference to the VCLT;[553] [Applicant's emphasis]

f. the Applicant "*appears to argue that, based on what it refers to as a 'repeated practice' of allegedly applying of EU law rather than the express terms of certain treaties other than the ECT, EU law somehow takes primacy over the provisions of the ECT (or perhaps that EU law is the applicable law under the ECT—Spain's case is not entirely clear)*", citing "*numerous international treaties in an attempt to support its claim*";[554]

g. however, the "*VCLT makes clear that any state practice relevant to one treaty (i.e., not the ECT) has no relevance to the interpretation of an entirely different treaty*" at Article 31(3);[555]

---

[551] Rejoinder on Annulment, ¶ 150.

[552] Rejoinder on Annulment, ¶ 151.

[553] Rejoinder on Annulment, ¶ 152.

[554] Rejoinder on Annulment, ¶ 153.

[555] Rejoinder on Annulment, ¶ 155.

h. therefore, "*under the VCLT, so-called 'repeated practice' can only be relevant as a tool of interpretation if that practice is with respect to the particular treaty in question (i.e., the ECT)*", so "*the only repeated practice that is relevant to the interpretation of the ECT is repeated practice in the application of the ECT*";[556] and

i. the Applicant "*offers no evidence of consistent practice in the application of the ECT to show that EU law is part of the applicable law*" and "*ECT tribunals have routinely rejected this notion*" so "*to the extent any repeated practice is relevant with respect to the ECT itself, it is a repeated practice of rejecting Spain's argument that EU law forms part of the applicable law*".[557]

346. As to the relevance of EU State aid law to the merits, the Claimants further submitted in reply that:

a. the Applicant's argument that the Tribunal "*should have applied EU State aid law 'to evaluat[e]' the legitimate expectations of the Claimants and its failure to do so constitutes a ground for annulment*" has no merit, because the Applicant:[558]

i. "*is not claiming EU State aid law should not have been applied as such, but that it should have been considered as part of the factual matrix of assessing the Claimants' expectations*", which is "*not a controversial proposition*";[559] and

ii. that "*does not make the internal law (in this case EU law) part of the applicable law*" but rather "*makes EU law part of the factual matrix*", and therefore not a valid ground for annulment;[560]

---

[556] Rejoinder on Annulment, ¶ 156.

[557] Rejoinder on Annulment, ¶ 158.

[558] Rejoinder on Annulment, ¶ 159.

[559] Rejoinder on Annulment, ¶ 161.

[560] Rejoinder on Annulment, ¶ 161.

b.  the Applicant never made the argument in the underlying arbitration that "*EU State aid law meant that the Claimants could not have had a legitimate expectation to receive the renewable energy subsidies under RD 661/2007*", but only "*informed the Tribunal that it had notified its new subsidy regime (i.e., not RD 661/2007—the regime in which the Claimants invested), to the EC for State aid review*";[561]

c.  it is "*unclear how the Tribunal can now be said to have failed to apply EU law on the basis of an argument that was never before it*";[562]

d.  the Tribunal accepted the Applicant's "*key argument regarding legitimate expectations was that the Claimants could only expect a reasonable rate of return on their investments*", which is "*fatal to its claim that the Award should be annulled for an alleged failure to apply the law*" because it cannot establish that "*there would have been any different outcome*";[563]

e.  if analysed by the Tribunal, the Applicant's argument would fail because neither the Applicant nor the Claimants "*had any concern at the time that the RD 661/2007 subsidy regime in which the Claimants invested constituted State aid and thus required notification (which is precisely why Spain never notified that regime)*", and it is therefore "*disingenuous for Spain to claim the Claimants could have had no legitimate expectation in circumstances where neither Spain nor the EC believed the subsidies to constitute State aid*", as is clear from the pleadings in the arbitration;[564]

f.  on the Applicant's own case, "*EU State aid law did not apply to the subsidy regime when the Claimants made their investments in 2011 (i.e., three years before Elcogás was issued)*" and the Tribunal "*could not have found the*

---

[561]  Rejoinder on Annulment, ¶¶ 163-164.

[562]  Rejoinder on Annulment, ¶ 164.

[563]  Rejoinder on Annulment, ¶ 165.

[564]  Rejoinder on Annulment, ¶ 166.

> *Claimants had no legitimate expectations at the time of their investment due to EU State aid law, as Spain now claims it should have on annulment*";[565]

    g.    the Applicant's claims that the investments were unlawful, that the "*Award entirely omitted consideration of the legality of the investment*"; and that "[i]*t is impossible to comprehend how one can so blatantly infringe EU law*", are "*opportunistic*" and "*contradictory to* [its] *own submissions before the Tribunal*";[566] and

    h.    the Tribunal "*ultimately accepted Spain's legitimate expectations argument and found that the Claimants did not have a legitimate expectation to the full subsidies for the lifetime of their investment but instead that* 'the Claimants were entitled to expect that the Respondent would not significantly modify the legal framework applicable to the investors as provided for in Spanish law when the investments were made, but not necessarily for their operational lifetimes'".[567]

347. As to the proportionality point, in its Reply, the Claimants submitted that the Applicant "*seems to have abandoned its argument on proportionality in its Memorial on Annulment that, had the Tribunal applied EU State aid law, it* 'would then have been obliged to apply the principle of proportionality, which is compulsory under that legislative framework' *and* 'gone on to check whether the compensation recognised duly complied with that principle.*'"[568]

348. The Claimants finally submitted in both rounds of written submissions and at the oral Hearing that, even if EU State aid law were applicable law as to the merits of the dispute, the Tribunal did not need to apply it in the manner that the Applicant "*now claims because it never made any arguments about the relevance of EU State aid law to the Claimants' legitimate expectations*" and "*the Tribunal accepted Spain's case on legitimate expectations in any event*".[569]

---

[565] Rejoinder on Annulment, ¶ 168.

[566] Rejoinder on Annulment, ¶ 168.

[567] Rejoinder on Annulment, ¶ 169.

[568] Rejoinder on Annulment, ¶ 170.

[569] Rejoinder on Annulment, ¶ 173.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

### iii.   The Committee's Analysis

349.   The Committee has taken into account all of the Parties' written and oral submissions, including but not limited to as summarised above, and sets out its analysis below.

350.   Preliminarily, in order for the Committee to consider whether or not the Tribunal failed to apply the proper law as to the merits, the Applicant needed precisely to state which aspects of the merits case it alleges to have been governed by EU law, and the basis upon which it put that precise argument to the Tribunal in the underlying Arbitration. Moreover, the Applicant must show that in making its decision, the Tribunal failed to apply EU State aid law, as put before it, and that this failure was manifest.   The Applicant has not satisfactorily furnished any of those elements of its Annulment Application insofar as it pertains to the second ground.

351.   On that basis alone, it is this Committee's decision to dismiss that aspect of the Applicant's Application.

352.   For the sake of completeness, the Committee proceeds to set out below a brief summary of the EU state aid arguments as put forward to the Tribunal by the Respondent and by the EC (through a written *amicus curiae* submission in the Arbitration), and the Claimants' arguments in response, followed by a brief analysis of the Tribunal's approach to EU State aid law, as these form the basis for its analysis.   The Committee then considers the nature of those arguments in the context of the Application for Annulment.   Consistent with its approach in relation to new documents and arguments relating to the Applicant's first ground, the Committee has disregarded the Applicant's new arguments and documents relating to its State aid argument that were not before the Tribunal,[570] for the purpose of the Committee's review.

#### 1.   The Respondent's EU Law Arguments: Merits

353.   The Respondent raised EU State aid arguments as informing the "*legitimate expectations regarding both the nature of renewable energy incentives as State Aid (as a limit to the possibilities on obtaining of those incentives) and the possibility of*

---

[570] See ¶ 332 above.

*obtaining such incentives for electricity produced by such means, under EU Environmental law*".[571]

354.   The Respondent submitted in the arbitration that the Claimants' expectations in reliance on other "*essential elements*" of the Spanish regulatory framework were not legitimate, including because the "*Claimants could also not reasonably have expected unlimited profits based on EU regulations of State aid*".[572]

### 2.   The EC *Amicus Curiae* Submission on EU Law: Merits

355.   The EC *Amicus Curiae* Submission made no reference to the application and effect of EU law on the merits, save to submit that the Respondent's "*contested measure falls squarely within the scope of EU law*" for two reasons: (a) it "*transposes into Spanish law the Directive on Renewable Energy*" and (b) "*the support granted by Respondent constitutes State aid in the sense of Article 107(1) TFEU*".[573]   On that basis, it proceeded to set out the EC arguments in relation to the effect of EU law on the Tribunal's jurisdiction only.

### 3.   The Claimants' EU Law Arguments: Merits

356.   The Claimants submitted in the arbitration that "*the regime in which they invested never gave rise to any concerns of State aid (e.g. there is no finding by any EU institution that the RD 661/2007 feed-in remuneration regime constituted incompatible EU state aid law)*" and that, as a consequence, "*the Respondent errs in arguing that an investor should have known that the Special Regime could constitute illegal State aid and therefore would have to be repealed*".[574]

---

[571]   Annulment Application, ¶ 38.

[572]   2020 Decision ¶ 378; Respondent's Rejoinder on the Merits and Reply on Jurisdiction, ¶¶ 988-990, R-0381.

[573]   EC *Amicus Curiae* Submission, ¶ 2, C-0201.

[574]   2020 Decision ¶ 362; Claimants' Post-Hearing Brief, ¶¶ 70-74, C-0198. *See also* Claimants' Reply on the Merits and Counter-Memorial on Jurisdiction, ¶¶ 266-268, C-0191.

4. The Tribunal Approach to EU Law: Merits

357.  The Award "*consider*[s] *the Spanish regulatory framework against the background of* [EU] *policy*",[575] in the context of the Respondent's arguments regarding EU State aid law and the Claimants' legitimate expectations in the context of breach of ECT Article 10(1), in detail from paragraphs 70 to 122, dealing in particular with RD 661/2007 at paragraphs 102-110. This is in the context of the section of the Award dealing with the factual background under the general heading: "*The Position when the Claimants Acquired the Plants in 2011*".[576]

358.  The Award sets out the Respondent's arguments in the arbitration as to the effect of the existing regulatory framework at paragraphs 378 and 445. In particular, the Tribunal noted:

  a.  the Respondent's rejection of "*the Claimants' references to other 'essential elements' of the Spanish regulatory framework because such elements have not been recognized in any award and they did not exist during the Claimants' investment; therefore, they are not admissible*",[577] and in relation to the RD 661/2007 regime that "*they knew that the Government had limited the subsidized hours to other renewable energy sectors*" and "[t]*he Claimants could also not reasonably have expected unlimited profits based on EU regulations of State aid*";[578] and

  b.  the Respondent's argument that the "*Claimants objectively could not be unaware of the purpose of the subsidies for renewable energies (reaching a* level playing field) *and the limits derived from EU legislation on State aid to avoid market distortion, such as the energy market*", that "[t]*hese limits prevent the Claimants from having expectations that they had acquired a right to receive public subsidies*" and that "[n]*either the Claimants nor their parent companies*

---

[575]  2020 Decision, ¶ 70.

[576]  2020 Decision, Section III.B.

[577]  2020 Decision, ¶ 378, referring to Respondent's Rejoinder on the Merits and Reply on Jurisdiction, ¶¶ 988-990, R-0381.

[578]  2020 Decision, ¶ 378, referring to Respondent's Rejoinder on the Merits and Reply on Jurisdiction, ¶¶ 989-990, R-0381.

> *could have been unaware of these regulations or have expected the subsidies to remain unchanged for 25 or 30 years even if they distort the energy market*".[579]

359.    Ultimately, the Tribunal accepted the Respondent's case as to the effect of that regulatory framework, including "*limits derived from EU legislation on State aid to avoid market distortion*", on the Claimants' legitimate expectations.   It concluded that:[580]

> The Tribunal therefore accepts the Respondent's submission that HgCapital could not have been unaware of the fact that RD 661/2007 might be amended beyond the compulsory revisions every four years under Article 44(3), since they had already experienced a revision after three years which, in addition, HgCapital had claimed to be a breach of the duties established under the ECT; and the Claimants invested after the 2010 changes, in May and December 2011, with the knowledge and conviction that RD 661/2007 could be amended without Article 44(3) representing a commitment to the contrary.

360.    In its finding as to liability under ECT Article 10(1), the Tribunal concluded that, "*the Claimants did not receive any specific commitments or assurances in the legislation or otherwise that there would be no changes in the RD 661/2007 regime*".[581]  It found that, "*on the contrary, the Claimants must have known that change was legally and politically possible, even though they took the commercial view that there was a low regulatory risk, especially for small-hydro*".[582]

361.    However, the Tribunal further determined that "*it does not follow that the Respondent was free to make radical changes to the regime without incurring liability under Article 10(1) ECT, nor that the Claimants had no legitimate expectations protected by the ECT and international law*".[583]   Instead, it found that in this particular case, "*although the*

---

[579]   2020 Decision, ¶ 445.

[580]   2020 Decision, ¶ 630.

[581]   2020 Decision, ¶ 673.

[582]   2020 Decision, ¶ 673.

[583]   2020 Decision, ¶ 675.

*Claimants recognised and accepted some risk of change, the overall effect*" of the regulatory measures:[584]

> is to amount to such a radical change in the renewables regime as to breach the FET obligation of stability (or the legitimate expectation of stability) of the overall legal framework, by dismantling the entire legal framework going back in different forms to 1998.

362.    The Tribunal reasoned that "*breach of the obligation of stability would, in the present context, not give rise to any damage unless the regulatory measures caused damage, for example as a result of impermissible retroactivity or disappointing the Claimants' legitimate expectations*".[585]  It noted the importance of the "*close connection in this type of case between the issues of liability and the issues of damages*".[586]  It concluded, the compensation principle in the *Chorzów Factory* case required it to "*as far as possible, wipe out all the consequences of the illegal act and reestablish the situation which would, in all probability, have existed if that act had not been committed*", in order to "*determine the amount of compensation due for an act contrary to international law*".[587]

363.    In this regard, the Tribunal concluded that:[588]

> [i]n the case of a subsidy regime, an investor claimant is not automatically entitled to the difference between the subsidies before the unlawful act (but for) and those after it (actual) in a case where the respondent State could have enacted, and would have enacted, measures which would have reduced the subsidies in the same or similar ways.

364.    Rather, the Tribunal determined, it was required "*to assess what would have happened if the disputed measures had not been enacted, and the answer must be that Spain would*

---

[584]   2020 Decision, ¶ 682.

[585]   2020 Decision, ¶ 684.

[586]   2020 Decision, ¶ 685.

[587]   2020 Decision, ¶ 686, citing to *Case Concerning the Factory at Chorzów* (Germany v Poland) (Merits), PCIJ Series A No 17 (1928), p 47, CL-0076. *See* Claimants' Memorial on the Merits, ¶¶ 327 *et seq*, C-0205, and Respondent's Rejoinder on the Merits and Reply on Jurisdiction, ¶ 1204, R-0381.

[588]   2020 Decision, ¶ 687.

Case 1:21-cv-01247-RJL Document 13-31 Filed 03/22/25 Page 142 of 172

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT

have enacted some measures to deal with the tariff deficit".[589]  The Tribunal accepted that the "*Claimants had, when they made their investments, a legitimate expectation of a reasonable return on their investments, and that any modifications would be reasonable and equitable*".[590]  However, it considered that the real question that would "*determine whether the Claimants are entitled to compensation is whether the remuneration of the facilities going forward (without reference to past remuneration) accords with a reasonable rate of return*".[591]

365.  Ultimately, the Tribunal followed the approach adopted by the tribunal in *RREEF v Spain*, that the Claimants were "*entitled to compensation for unreasonable return on their investments – if established*", but could not "*claim full compensation for the total decrease in their profits as a result of the adoption of the new regime by the Respondent*".  Their damages would be limited to "*compensation to the extent that such decrease is below the threshold of a reasonable return*".[592]

366.  On that basis the Tribunal declared that the Respondent would be "*in breach of ECT, Article 10(1), if and to the extent that the remuneration of each of the plants in the Ondina and Xana portfolios failed to accord with a reasonable post-tax rate of return in the small-hydro market in Spain on the basis of WACC plus 1%, with the risk-free rate being the Spanish 10 year bond rate of 4.398%*".[593]  Based on the subsequent valuation reports, analysis and consideration by the Tribunal in the Award dated 5 August 2020, it found such remuneration to so fail to accord, and ordered the Respondents to pay to the Claimants the sum of EUR 30,875,000 in damages.[594]

5.  The Committee's Analysis: EU Law on Merits and Annulment

367.  The Applicant's allegation, as summarised at the oral Hearing, is that the Tribunal should have applied EU State aid law: (i) to determine the scope of investors' rights;

---

[589]  2020 Decision, ¶ 688.

[590]  2020 Decision, ¶ 695.

[591]  2020 Decision, ¶ 697.

[592]  2020 Decision, ¶ 698.

[593]  2020 Decision, ¶ 770(3).

[594]  Award, ¶ 162(1).

(ii) to analyse the investor legitimate expectations; and (iii) in relation to the principle of proportionality.  All three points appear to lead, if anywhere, to the single merits issue as to Claimants' legitimate expectations for the purpose of determining breach of fair and equitable treatment pursuant to Article 10(1) ECT.

368.    In the Annulment proceedings, the Applicant characterised the scope of investors' rights in terms of legitimate expectations (e.g., at the oral Hearing, in summarising its case as to the failure to apply the proper law to the scope of investors' rights, the Applicants stated that EU State aid law "*limits prevent the Claimant from having expectations that it had acquired a right to receive public subsidies*").[595]  In the Applicant's written submissions on State aid in the Arbitration it focused on the scope of investors' rights in the context of their knowledge, and therefore legitimate expectations, as to the effect of State aid and its impact on their return on investment. The Tribunal in the Award, having dismissed the Claimants' expropriation claim pursuant to ECT Article 13(1), and other ECT Article 10(1) claims in respect of discrimination and full protection and security, granted relief on the basis of ECT Article 10(1) breach of fair and equitable treatment arising out of the Claimants' legitimate expectation of a reasonable rate of return.[596]

369.    As to proportionality, the Applicant referred the Committee to paragraphs 731 to 734 of its Rejoinder on the Merits and Reply on Jurisdiction in the underlying arbitration, which form part of the Applicant's argument that the State measures that were the subject-matter of the dispute were required to maintain the essential elements of the remuneration system in support of renewable energies.  The proportionality point was raised in the context of the Applicant's point that "[p]*ublic aid must cease once the threshold of the rate of return is reached*",[597] in relation to the Applicant's legitimate expectations argument.

370.    Accordingly, the Committee's consideration of the Tribunal's alleged excess of powers in failing to apply the proper law to the merits is and should be limited to the Tribunal's

---

[595]    Transcript, p 59, ll 2-4.

[596]    2020 Decision, ¶¶ 164, 770 and Award, ¶ 124.

[597]    Respondent's Rejoinder on the Merits and Reply on Jurisdiction, Section IV(I)(2.3), R-0381.

consideration of the impact of EU State aid law decision on the Claimants' legitimate expectations.

371.  As to the applicable law, there are several references in the Award to the law applicable to the interpretation and application of ECT Article 10(1) substantive protections, including as to fair and equitable treatment and the Claimants' legitimate expectations:

a.  at paragraph 540, that "*the ECT standards are to be interpreted in accordance with the principles of customary international law codified in the VCLT, including its reference in Article 31(3)(c) to general international law, and against the background of the purposes of the ECT*";[598]

b.  at paragraph 604, that *"*[w]*hether there was a commitment which could give rise to a legitimate expectation is in the first instance a question of international law. But in considering whether there was such a commitment and whether it was reasonable to rely on it, it is necessary to look at it in the context of Spanish law, and the advice which an investor took or should have taken on the nature of the commitment if any*";[599] and

c.  at paragraph 675, that "*it does not follow that the Respondent was free to make radical changes to the regime without incurring liability under Article 10(1) ECT, nor that the Claimants had no legitimate expectations protected by the ECT and international law*".[600]

372.  As the Claimants have submitted in these Annulment proceedings, the Applicant did not claim that "*EU State aid law should not have been applied as such, but that it should have been considered as part of the factual matrix of assessing the Claimants' expectations*", and did "*not make the internal law (in this case EU law) part of the applicable law*", but rather made "*EU law part of the factual matrix*", and that was "*not a controversial proposition*" as between the Parties.[601]

---

[598]  2020 Decision, ¶ 540.

[599]  2020 Decision, ¶ 604.

[600]  2020 Decision, ¶ 675.

[601]  Rejoinder on Annulment, ¶ 161.

373. This appears to be the position as far as the Committee is able to ascertain from the submissions in the Annulment proceedings. Neither the Applicant nor the Claimants appear expressly to have asked the Tribunal to apply EU State aid law as the governing law to determine the application and effect of ECT Article 10(1) in relation to the Claimants' legitimate expectations. Instead, the Parties presented any arguments relating to the effect of EU State aid law on the Claimants' legitimate expectations as part of the factual matrix, and the Tribunal treated them the same way.

374. For example, the Applicant presented its case as to the content, effect and meaning of EU State aid law insofar as it informed, or should have informed, the Claimants' legitimate expectations. It did so at length and comprehensively, including but not limited to making arguments as to the effect of proportionality on legitimate expectations within an EU Member State. In its Rejoinder on the Merits and Reply on Jurisdiction in the Arbitration, referred to in its oral opening in relation to proportionality, the Applicant specifically presented its State aid arguments within an overarching section IV, entitled "*FACTS: THE CLAIMANT HAS PRESENTED A SKEWED VIEW OF REALITY TO SUPPORT ITS CLAIM*".[602]

375. The Tribunal dealt with the argument as a matter of fact accordingly. In the 2020 Decision at section III, the Tribunal summarised the "*FACTUAL BACKGROUND*", including a subsection entitled "*The Position when the Claimants Acquired the Plants in 2011*", in which it considered "*the Spanish regulatory framework against the background of* [EU] *policy*", from paragraphs 70 to 122.

376. As summarised above at paragraph 358, the 2020 Decision summarises the Applicant's arguments in the Arbitration as to the effect of that existing regulatory framework at paragraphs 378 and 445. The Tribunal accepted the Respondent's case as to the effect of that regulatory framework, including "*limits derived from EU legislation on State aid to avoid market distortion*",[603] on the Claimants' legitimate expectations.

---

[602] Respondent's Rejoinder on the Merits and Reply on Jurisdiction, Section IV, R-0381. [The Spanish version was filed as R-0380.]

[603] 2020 Decision, ¶ 445.

377.   Ultimately, based on the factual matrix as to the Spanish regulatory framework against the background of EU policy, the Tribunal found that the Respondent presented compelling arguments that EU State aid regulations and decisions, including in relation to other arbitration awards and proceedings, supported its defence that the Claimants were not entitled legitimately to expect a return on their investment over and above such reasonable rate of return as would be permissible under EU State aid law.

378.   As to principle of proportionality, the Applicant submitted in these Annulment proceedings that the Tribunal was required to have "*gone on to check whether the compensation recognised duly complied with that principle*".[604] However, as the Claimants pointed out in response, the Tribunal performed a proportionality analysis based on the terms of the ECT within the meaning of ECT Article 10(1) and recognised as follows:[605]

> The requirement of proportionality is part of the reasonableness standard and of the fair and equitable treatment standard.
>
> A measure must be suitable to achieve a legitimate policy objective, necessary for that objective, and not excessive considering the relative weight of each interest involved, and a balancing or weighing exercise so as to ensure that the effects of the intended measure remain proportionate with regard to the affected rights and interests.

379.   This approach seems to be consistent with what the Applicant requested of the Tribunal in the underlying Arbitration. Whether the effect of EU State aid law is achieved as a matter of fact or as a matter of law, the point is that it was successful in limiting the amount of damages payable to a reasonable return on their investment.

380.   Specifically in this regard the Tribunal held, agreeing with the *RREEF v Spain* tribunal, that:[606]

---

[604]   Memorial on Annulment, ¶ 161.

[605]   Counter-Memorial on Annulment, ¶ 195, citing 2020 Decision, ¶¶ 573-574.

[606]   2020 Decision, ¶ 695.

*(1)* the Claimants had a legitimate expectation of receiving a reasonable return for their investment through special means such as the FiT, designed to attract investments in a sector which was unattractive at market prices; *(2)* the Claimants could legitimately expect a return for their investment at a reasonable rate significantly above a mere absence of financial loss, taking into account the cost of money on capital markets for such investments as well as other objectives; *(3)* the Claimants were entitled to expect that the Respondent would not significantly modify the legal framework applicable to the investors as provided for in Spanish law when the investments were made, but not necessarily for their operational lifetimes; and *(4)* the Claimants had, when they made their investments, a legitimate expectation of a reasonable return on their investments, and that any modifications would be reasonable and equitable.

381. In its 2020 Decision, the Tribunal did not award damages to the Claimants. Instead, and taking into account the effect of the factual matrix including as to EU State aid law, the Tribunal directed the Parties to provide further information on the Claimants' rate of return in order for it to be able to ascertain whether or not the measures were indeed proportional. In accordance with the Applicant's submission, having obtained that information, it proceeded in the Award to find that the Claimants could legitimately expect and receive by way of compensation a "*reasonable return*".[607]

382. The Tribunal declared that the Respondent would be "*in breach of ECT, Article 10(1), if and to the extent that the remuneration of each of the plants in the Ondina and Xana portfolios failed to accord with a reasonable post-tax rate of return in the small-hydro market in Spain on the basis of WACC plus 1%, with the risk-free rate being the Spanish 10 year bond rate of 4.398%*".[608] Subsequently and based on the subsequent valuation reports, analysis and consideration by the Tribunal in the Award dated 5 August 2020, the Tribunal ordered the Respondent to pay to the Claimants the sum of €30 million in damages, against an initial claim of €132 million.[609]

383. In the circumstances, the Applicant has not established any failure by the Tribunal to apply EU State aid law as governing law in relation to breach of ECT Article 10(1), as

---

[607] 2020 Decision, ¶ 695.

[608] 2020 Decision, ¶ 770(3).

[609] Award, ¶¶ 158, 162.

EU State aid law was put forward only as part of the factual matrix against which breach of ECT Article 10(1) was considered. Such approach was not a manifest excess of powers and is not a ground to set aside the Award.

## IV. FAILURE TO STATE REASONS (ARTICLE 52(1) (e))

### A. Standard of Review for Failure to State Reasons

#### i. *The Applicant's Position*

384. As to the standard of review for failure to state reasons pursuant to Article 52(1)(e), the Applicant set out its position at paragraphs 171 to 181 of its Memorial on Annulment and paragraphs 273 to 295 of its Reply.

385. The Applicant submitted that:

 a. "*Annulment Committees have uniformly ruled that the minimum requirement established in Articles 48(3) and 52(1)(e) of the ICSID Convention is that the ruling must permit the reader 'to follow how the tribunal proceeded from Point A. to Point B '*";[610]

 b. "*supporting reasons must be more than a matter of nomenclature and must constitute an appropriate foundation for the conclusions reached through such reasons*";[611]

 c. the "*task of ad hoc committees, pursuant to Article 52(1)(e), is to decide whether the Tribunal's reasoning is comprehensive and consistent*";[612]

---

[610] Memorial on Annulment, ¶ 172, citing to *MINE v Guinea*, ¶ 5.09, RL-0162. According to Spain "[t]*his same strategy has been followed by the great majority of ICSID annulment commissions*". See also, e.g. *Duke Energy v Peru*, ¶ 203, RL-0181; *Wena Hotels v Egypt*, ¶ 79, RL-0166; *Tza Yap Shum v Peru*, ¶ 112, RL-0177; *Iberdrola v Guatemala*, ¶ 119, RL-0164; *Fraport v Philippines*, ¶ 249, RL-0161; *Impregilo v Argentina*, ¶ 181, RL-0184; *Total v Argentina*, ¶ 267, RL-0185. See also C. H. Schreuer and others, "The ICSID Convention: A commentary", 2nd ed. (2009), p 824, RL-0158 ("*The award must be supported by a consistent and logical line of reasoning sufficient to enable an informed reader, in particular the parties, to understand the tribunal's motives*").

[611] Memorial on Annulment, ¶ 172, citing to: *Amco v Indonesia I*, ¶ 43, RL-0178.

[612] Memorial on Annulment, ¶ 173.

d. "*an (alleged) absence of reasons for a particular aspect of an award, or otherwise insufficient, inadequate or possibly contradictory reasons*", noting that distinctions must be drawn "*between finding, on the one hand, reasons which are reasonably comprehensible and consistent, demonstrating, on the whole, a logical and discernable line of thinking, and, on the other hand, 'circumstances [where] there is a significant lacuna in the Award, which makes it impossible for the reader to follow the reasoning on this point*'";[613]

e. reasons "[are] *of particular importance in investor-state arbitration, because [t]he statement of reasons guarantees procedural legitimacy and validity*";[614]

f. "[e]*ven short of a total failure, some defects in the statement of reasons could give rise to annulment*" and therefore "*insufficient or inadequate reasons as well as contradictory reasons can spur an annulment. Insufficient or inadequate reasons refer to reasons that cannot, in themselves, be a reasonable basis for the solution arrived at*";[615]

g. the requirement for reasoning "*is in particular not satisfied by either contradictory or frivolous reasons*";[616]

h. Articles 48(3) and 52(1)(e) "*impose the obligation on a tribunal to consider problems, arguments and evidence submitted*";[617]

---

[613] Memorial on Annulment, ¶ 173, citing *Sempra v Argentina*, ¶ 167, RL-0125.

[614] Memorial on Annulment, ¶ 174, citing to *Tidewater Investment SRL and Tidewater Caribe, C.A. v Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Annulment, dated 27 December 2016, ¶¶ 164, 166, RL-0168 ("***Tidewater v Venezuela***").

[615] Memorial on Annulment, ¶ 175, citing to *Soufraki v UAE*, ¶¶ 122-123, RL-0124; *Klöckner v Cameroon*, ¶ 144, RL-0176; *Mitchell v Congo*, ¶ 21, RL-0182; *Pey Casado v Chile*, ¶ 86, RL-0165.

[616] Memorial on Annulment, ¶ 176, citing to *MINE v Guinea*, ¶ 5.09, RL-0162; *Klöckner v Cameroon*, ¶ 116, RL-0176; *Soufraki v UAE*, ¶ 125, RL-0124; *Pey Casado v Chile*, ¶ 281, RL-0165; *Tidewater v Venezuela*, ¶ 170, RL-0168; *TECO v Guatemala*, ¶ 90, RL-0183 (also CL-0214); *Caratube v Kazakhstan*, ¶ 185, RL-0160; *CDC v Seychelles*, ¶ 70, RL-0186; *Venezuela Holdings v Venezuela*, ¶ 189, RL-0180; C. H. Schreuer and others, "The ICSID Convention: A Commentary", 2nd ed. (2009), p 1011.

[617] Memorial on Annulment, ¶ 180.

    i. "[t]he fact of a tribunal *'failing to deal with a specific issue put before it'* or *'not considering certain significant items of proof or evidence' when ruling is the equivalent of not stating reasons and can justify an annulment*";[618] and

    j. in circumstances where a "*Tribunal failed to deal with questions raised by Guinea, the answer to which might have affected the Tribunal's conclusion*",[619] its damages decision was annulled.

    *ii.   The Claimants' Position*

386. The Claimants' position as to the Committee's standard of review for Article 52(1)(e) is set out at paragraphs 202 to 210 of the Counter-Memorial, paragraphs 177 to 181 of its Rejoinder on Annulment and at pages 66 to 68 of the Transcript.

387. In its Counter-Memorial, the Claimants submitted that the Committee needs "*to keep in mind the foundational annulment principle that the ICSID Convention favours the finality of awards and makes clear that there are no rights of appeal against awards rendered pursuant to the Convention*".[620]  It referred to the annulment decisions in:

    a. *Hydro v Albania*, which stated that committees "*must be especially cautious when considering this ground for annulment not to venture into territory that would implicate an appeal, for example, by requiring the examination of the adequacy or correctness of the reasoning of the Tribunal in rendering the Award*",[621] and  "*ad hoc committees should not impose a particular mode of expression on tribunals, but should defer to their chosen way of expressing the motivation for their decisions*";[622]

    b. *MINE v Guinea*, where the committee found that the provision of reasons upon which the award is based "*must enable the reader to follow the reasoning of the*

---

[618] Memorial on Annulment, ¶ 180, citing to: Updated ICSID Background Paper, ¶ 104, RL-0123.

[619] Memorial on Annulment, ¶ 180, citing to *MINE v Guinea*, ¶ 6.99, RL-0162.

[620] Counter-Memorial on Annulment, ¶ 202.

[621] Counter-Memorial on Annulment, ¶ 202; *Hydro S.r.l. and others v Republic of Albania*, ICSID Case No. ARB/15/28, Decision on Annulment, dated 2 April 2021, ¶¶ 106-107, CL-0272 ("***Hydro v Albania***").

[622] Counter-Memorial on Annulment, ¶ 206; *Hydro v Albania*, ¶ 111, CL-0272.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

Tribunal on points of fact and law", and "*implies that, and only that*", and that "*the requirement to state reasons is satisfied as long as the award enables one to follow how the tribunal proceeded from Point A. to Point B. and eventually to its conclusion, even if it made an error of fact or of law*", and a committee "*must strike a balance, and search for intelligibility in the award as a whole, particularly with respect to outcome-determinative questions or analytical units, while recognizing that arbitral tribunals need discretion in how to express the motivation for their decisions*";[623]

c.  *Teinver v Argentina*, which stated the award should "*express[] the minimum requirement that a good faith reader of the award can understand the motives that led the Tribunal to adopt its decisions*", and that tribunals have "*no duty to follow the parties in the detail of their arguments*"; [624]

d.  *El Paso v Argentina*, which stated that "*it is obvious to this Committee that it cannot annul an award because one of the parties involved in the case disagrees with the reasons given by the arbitral tribunal*";[625]

e.  *Churchill Mining v Indonesia*, which stated that tribunals are "*entitled to be terse*" and "[i]*t is commonly accepted by ad hoc committees that tribunals may state their reasons succinctly or at length and that Article 52(1)(e) allows arbitrators a discretion as to the way they express their reasoning*", and there is, for instance, "*no need for a Tribunal to provide reasons on issues which have become irrelevant to the outcome of the case*";[626]

f.  *Vivendi v Argentina I and II*, which stated that "*[t]ribunals must be allowed a degree of discretion as to the way in which they express their reasoning*",[627] and

---

[623]  Counter-Memorial on Annulment, ¶¶ 203-204; *MINE v Guinea*, ¶¶ 5.08-5.09, RL-0162; *Hydro v Albania*, ¶ 130, CL-0272.

[624]  Counter-Memorial on Annulment, ¶ 205; *Teinver v Argentina*, ¶¶ 209-210, CL-0216.

[625]  Counter-Memorial on Annulment, ¶ 205, fn 301; *El Paso v Argentina*, ¶ 221, CL-0213.

[626]  Counter-Memorial on Annulment, ¶ 206, fn 302; *Churchill Mining PLC and Planet Mining Pty Ltd v Republic of Indonesia*, ICSID Case No. ARB/12/14 and ARB/12/40, Decision on Annulment, dated 18 March 2019, ¶¶ 243 and 254, CL-0286 ("***Churchill Mining v Indonesia***").

[627]  Counter-Memorial on Annulment, ¶ 206; *Vivendi v Argentina I*, ¶ 64, CL-0218.

may "*further explain, clarify, or supplement the reasoning given by the Tribunal rather than annul the decision*";[628]

g.   *Wena Hotels v Egypt*, which stated that the tribunal's "*reasons may be implicit in the considerations and conclusions contained in the award, provided they can be reasonably inferred from the terms used in the decision*".[629]

h.   *Amco v Indonesia II*, which stated that a tribunal "*is sometimes laconic in its reasons or not totally clear in its reasoning [...] does not constitute failure to state reasons*",[630] rather, the tribunal's "*[s]tatements have to be read in context*" and the "*'reasons' for a position or a statement may be found in the developments that follow*";[631]

i.   *Cortec Mining v Kenya*, that "*[t]he reasoning on a particular issue or issues need not be expressly stated, so long as it can reasonably be inferred from the award as a whole*", and "*[w]here possible, an annulment committee should interpret an award in a manner that validates its reasoning. The committee itself may, if needed, explain the reasons supporting the tribunal's conclusion*";[632] and

j.   *Micula v Romania*, that where missing on a particular point, it is entirely appropriate for an *ad hoc* committee to "*reconstruct the reasons*".[633]

388.   The Claimants further referred to the Updated ICSID Background Paper that "*if a Tribunal's failure to address a particular question submitted to it might have affected*

---

[628] Counter-Memorial on Annulment, ¶ 208; *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v Argentine Republic*, ICSID Case No. ARB/97/3, Decision on the Argentine Republic's Request for Annulment of the Award rendered on 20 August 2007, dated 10 August 2010, ¶ 248, CL-0285 ("***Vivendi v Argentina II***").

[629] Counter-Memorial on Annulment, ¶ 207, *Wena Hotels v Egypt*, ¶ 81, RL-0166.

[630] Counter-Memorial on Annulment, ¶ 207; *Amco v Indonesia II*, ¶ 7.56, CL-0284.

[631] Counter-Memorial on Annulment, ¶ 207; *Amco v Indonesia II*, ¶ 7.57, CL-0284.

[632] Counter-Memorial on Annulment, ¶ 208; *Cortec Mining v Kenya*, ¶ 228(b) and (d), CL-0271.

[633] Counter-Memorial on Annulment, ¶ 208; *Micula v Romania*, ¶ 138, CL-0167.

the Tribunal's ultimate decision, this could, in the view of some ad hoc Committees, amount to a failure to state reasons and could warrant annulment".[634]

389.    In their Rejoinder, the Claimants reiterated that "*the settled jurisprudence by annulment committees confirms that a review of an alleged failure to state reasons does not invite an examination into the accuracy, persuasiveness, sufficiency or adequacy of reasons, but their existence*", noting that the overwhelming majority of annulment committees rejected annulment claims on this ground.[635]

390.    It referred additionally to the annulment decision in *Antin v Spain*, where the committee accepted that "*a tribunal is not required to state every reason explicitly, nor is it required to address all the parties' arguments individually*".[636]

391.    The Claimants then proceeded to consider the nine decisions relied on by the Applicant, which they submitted are either: "*at odds with settled case law*", "*outdated and have been widely criticised and discredited*" or "*inapplicable to the circumstances of this case*", including *Klöckner v Cameroon*, *MINE v Guinea*, *Mitchell v Congo*, *CMS v Argentina*, *Enron v Argentina*, *Pey Casado v Chile*, *TECO v Guatemala*, *Tidewater v Venezuela*, and *Venezuela Holdings v Venezuela*.[637]

392.    At the hearing, the Claimants referred the Tribunal to ICSID Convention Article 48(3) "*the award shall deal with every question submitted to the Tribunal, and shall state the reasons upon which it is based*".[638]  They further explained why "*the relevant precedent that sustain Spain's argument of the applicable standard*", including *Amco v Indonesia I*, *Klöckner v Cameroon* and *Soufraki v UAE*, do not require the Tribunal to deal with every question submitted to it, but rather that it "*provided the minimum standard or reasoning that is to be required of an ICSID award*".[639]

---

[634]    Counter-Memorial on Annulment, ¶ 209; Updated ICSID Background Paper, ¶ 104, RL-0123.

[635]    Rejoinder on Annulment, ¶ 177.

[636]    Rejoinder on Annulment, ¶ 178; *Antin v Spain*, ¶ 232, CL-0294.

[637]    Rejoinder on Annulment, ¶ 180.

[638]    Tr, p 66, ll 17-21.

[639]    Tr, p 67, l 2 to p 68, l 5.

### iii.   *The Committee's Analysis*

393.   The third second ground invoked in the Annulment Application is that the Award failed to state the reasons on which it is based as prescribed by Article 52(1)(e).  The language of the relevant provision offers limited assistance as to the standard of review, requiring only that the 'failure' to state reasons be a failure "*on which* [the award] *is based*". The ICSID Convention Article 48(3) similarly requires that "*the award shall deal with every question submitted to the Tribunal, and shall state the reasons upon which it is based*".

394.   The Updated ICSID Background Paper provides some additional guidance, suggesting that "*if a Tribunal's failure to address a particular question submitted to it might have affected the Tribunal's ultimate decision, this could, in the view of some* ad hoc *Committees, amount to a failure to state reasons and could warrant annulment*".[640]

395.   The Updated ICSID Background Paper notes in relation to failure to state reasons that it was "*originally included in the ground of a 'serious departure from a fundamental rule of procedure'*",[641] but that it "*subsequently became a stand-alone ground*".[642] According to the Paper, prior ICSID annulment committees "*have explained that the requirement to state reasons is intended to ensure that parties can understand the reasoning of the Tribunal, meaning the reader can understand the facts and law applied by the Tribunal in coming to its conclusion*".[643]

---

[640]   Updated ICSID Background Paper, ¶ 104, RL-0123.

[641]   Updated ICSID Background Paper, ¶ 102, RL-0123, cross-referencing to ¶ 8 and the ILC Draft.

[642]   Updated ICSID Background Paper, ¶ 102, RL-0123.

[643]   Updated ICSID Background Paper, ¶ 105, RL-0123, citing to *MINE v Guinea*, ¶ 5.09, RL-0162 ("*the requirement to state reasons is satisfied as long as the award enables one to follow how the tribunal proceeded from Point A. to Point B. and eventually to its conclusion, even if it made an error of fact or of law*"); *Vivendi v Argentina I*, ¶ 64, CL-0218; *Wena Hotels v Egypt*, ¶ 81, RL-0166; *Compagnie d'Exploitation du Chemin de Fer Transgabonais v Gabonese Republic*, ICSID Case No. ARB/04/5, Decision of the ad hoc Committee on the Application for Annulment of the Gabonese Republic, dated 11 May 2010, ¶ 88; *El Paso v Argentina*, ¶ 220, CL-0213; *Kılıç v Turkmenistan*, ¶ 64; *Iberdrola v Guatemala*, ¶ 124, RL-0164; *Joseph C. Lemire v Ukraine*, ICSID Case No. ARB/06/18, Decision on Ukraine's Application for Annulment of the Award, dated 8 July 2013, ¶ 277; *Libananco Holdings Co. Ltd. v Republic of Turkey*, ICSID Case No. ARB/06/8, Decision on Annulment, dated 22 May 2013, ¶ 192, CL-0226; *Occidental v Ecuador*, ¶ 66, RL-0163; *Tulip v Turkey*, ¶¶ 98, 104, CL-0230; *Total v Argentina*, ¶ 267, RL-0185; *Dogan v Turkmenistan*, ¶¶ 261-263; *Micula v Romania*, ¶¶ 136, 198, CL-0167; *Lahoud v Congo*, ¶ 131; and *TECO v Guatemala*, ¶¶ 87, 124, CL-0214.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

396.  The Committee is informed by the approach of prior annulment committees in reiterating that review of an award for failure to state reasons cannot venture into appeal territory.

397.  As to the form of reasons, the committee in *Hydro v Albania* explained, "*ad hoc committees should not impose a particular mode of expression on tribunals, but should defer to their chosen way of expressing the motivation for their decisions*".[644]  Tribunals are entitled to be "*terse*".[645]  In *MINE v Guinea*, it sufficed that reasons "*enable the reader to follow the reasoning of the Tribunal on points of fact and law*".  In *Teinver*, the committee required that the reasons "*express*[] *the minimum requirement that a good faith reader of the award can understand the motives that led the Tribunal to adopt its decisions*".[646]

398.  As to the comprehensiveness of reasons, the committee in *Antin v Spain* considered that "*a tribunal is not required to state every reason explicitly, nor is it required to address all the parties' arguments individually*".[647]  It summarised the position as follows:[648]

> [T]he principle is that an award should only be annulled under Article 52(1)(e) where there are gaps in the tribunal's reasoning so large as to make it impossible to follow. An award may contain various errors, omissions, inconsistencies or contradictions but even then, annulment cannot be justified unless they meet the high threshold required. An annulment committee is not authorized to qualify a tribunal's reasoning as deficient, superficial or otherwise faulty and to substitute its own judgement for the tribunal's. This accords with the principle of finality set out in the ICSID Convention, and prevents parties from sieving through an award with a fine-toothed comb for any errors or logical inconsistencies, however minor, in the hopes of annulling a tribunal's award.

399.  The committee in *Cortec Mining v Kenya* considered its role to be to "*interpret an award in a manner that validates its reasoning*", and if necessary to "*explain the*

---

[644]  *Hydro v Albania*, ¶ 111, CL-0272.

[645]  *Churchill Mining v Indonesia*, ¶ 254, CL-0286.

[646]  *Teinver v Argentina*, ¶ 209, CL-0216.

[647]  *Antin v Spain*, ¶ 232, CL-0294.

[648]  *Antin v Spain*, ¶ 234, CL-0294.

reasons supporting the tribunal's conclusion".[649]  It further considered that "[t]*he reasoning on a particular issue or issues need not be expressly stated, so long as it can reasonably be inferred from the award as a whole*".[650]  The *Vivendi v Argentina II* committee similarly accepted its own role to "*further explain, clarify, or supplement the reasoning given by the Tribunal rather than annul the decision*".[651]

400.  Based on its review of the language of the ICSID Convention, Articles 52(1)(e) and 48(3), guided by the Updated ICSID Background Paper and informed by the approach in prior annulment decisions, the Committee understands its role in respect of reviewing the reasons in the Award to be limited.  Its role is to consider whether or not the instrumental reasons upon which the Award is based are set out and permit the reader "*to follow how the tribunal proceeded from Point A. to Point B.*".[652]  Provided that they are, it is not for this Committee to second guess or undermine them or critique their logic or elegance.

401.  In summary, it is not for the Committee to examine the correctness, robustness or persuasiveness of the reasons set forth by the Tribunal in the Award.  For an award to be annulled, the Committee must be satisfied that the Tribunal's award is impossible to follow "*from Point A. to Point B.*".[653]

### B.  Application of the Standard for Failure to State Reasons

402.  As to the final ground in the Application, the Applicant submits that the Tribunal failed to state reasons in the Award when deciding applicable law both in relation to jurisdiction and merits.  The Applicant broadly submitted that the 2020 Decision failed to "*state any reasons for circumventing the importance of the legislation invoked as applicable, i.e. EU Law*".[654]

---

[649]  *Cortec Mining v Kenya*, ¶ 228(d), CL-0271.

[650]  *Cortec Mining v Kenya*, ¶ 228(b), CL-0271.

[651]  *Vivendi v Argentina II*, ¶ 248, CL-0285.

[652]  *MINE v Guinea*, ¶ 5.09, RL-0162.

[653]  *MINE v Guinea*, ¶ 5.09, RL-0162.

[654]  Memorial on Annulment, ¶ 7.

### i.  The Applicant's Position

403.  The Applicant set out its position as to the Tribunal's failure to state reasons in excess of mandate at paragraphs 182 to 202 of the Memorial on Annulment, paragraphs 296 to 333 of the Reply and at the Hearing.

404.  In essence, the Applicant's objection was based on the Tribunal's alleged failure to state reasons in the Award when determining the applicable law to jurisdictional issues and to the merits.

405.  As to jurisdiction, as discussed above, the Applicant's primary objection is that the first ground for annulment is the substantive decision by the Tribunal "*to apply ECT legal provisions rather than applying EU Law in the issue of hierarchy between the ECT and EU law (prevalence issue), when this case exclusively concerns EU territory as a single contracting party (e.g. issues related to the disconnection clause, REIO and EU Law, non-applicability of principles established in the Achmea judgment as forming part of EU Law)*".[655]

406.  Its secondary ground as to jurisdiction is that the Award failed to state reasons upon which it is based because the Tribunal:

a.  "*appears to implicitly accept the importance of* [EU law] *legislation for the Kingdom of Spain, because it gets close to the disputed issue adduced by the respondent on applying EU law as part of international law applicable to this dispute*";[656]

b.  nevertheless fails "*to set out a reasoned response to this argument*" and to "*expressly resolve the issue*";[657]

c.  makes "*no express mention of the negative response of the Arbitral Tribunal on the application of EU law to this matter, in the underlying arbitration, leaving*

---

[655]  Memorial on Annulment, ¶ 184.

[656]  Memorial on Annulment, ¶ 183.

[657]  Memorial on Annulment, ¶ 183.

this to somehow be inferred from the wording at paragraph 495 in the Tribunal decision";[658]

d.   "*far from setting out a reasoned conclusion and, more seriously still, far from stating any conclusion*", it "*merely states that the* disputed *issue 'is in no way conclusive'*";[659]

e.   "*includes an indirect question on the application of EU law as alleged, whilst once again failing to set out any response: 'Nevertheless, in the opinion of this Tribunal, saying that EU law (or a substantial portion thereof) is deemed international law, or that CJEU judgements form part of international law, none of this is conclusive. The issue is still whether or not EU law and CJEU judgements form part of applicable international law'*";[660]

f.   failed "*to state reasons and justify its position in this regard has resulted in conduct that constitutes the ground for annulment*";[661]

g.   failed "<u>*to respond to the correctly formulated question on applying EU law as the international law applicable to the merits of this dispute*</u>";[662] [Applicant's emphasis]

h.   "*even forgets to do so when referring to Article 26(6) ECT and only mentions the point when stating that neither the cited principle nor Article 42(1) ICSID Convention serve to decide jurisdiction and that they are not significant for the purpose*";[663]

---

[658]   Memorial on Annulment, ¶ 183.

[659]   Memorial on Annulment, ¶ 183.

[660]   Memorial on Annulment, ¶ 183.

[661]   Memorial on Annulment, ¶ 185.

[662]   Memorial on Annulment, ¶ 187.

[663]   Memorial on Annulment, ¶ 187.

i.     "*says nothing about application to the merits of this dispute and this amounts to a blatant omission of the reasons underlying the (implicit) conclusion*";[664] and

j.     makes "*an omission to state reasons which, in turn, is an inconsistency of omission given that the Tribunal fails to properly address one of the disputed issues and neither resolves the issue clearly, concisely and expressly, nor, on that same basis, does it sufficiently improperly state the legal basis and reasoning*".[665]

407.   In summary, the Applicant argued at paragraphs 188 and 189 of the Memorial that:[666]

> All in all, even though the Tribunal appears, in paragraph 495 of its Decision, to deal with the issue of whether European Union treaties can be deemed "rules of international law" in the sense of Article 26 (6) ECT - not only does it fail to state reasoning but even fails to give an express response on the issue. This is because the only possible response must be as inferred from paragraph 502 (4) where the Tribunal refutes the importance of this principle for jurisdictional purposes, yet without contemplating the scope of the same principle insofar as law applicable to the merits of the dispute. The negative conclusion of the Tribunal, i.e. that EU law does not in effect apply for resolving the underlying arbitration is inferred, but not the reasons for that conclusion. Nor are they set out, as alleged, in any of the Tribunal's direct, clear and express affirmations. All this clearly and manifestly constitutes the ground for annulment provided in Article 52(e).

> In other words, the Tribunal leaves basic issues on deciding law applicable to the merits of this dispute unexplained and overall this must lead to annulment of its decision.

408.   As to merits, as discussed above, the Applicant's primary objection is that the Tribunal "*failed to apply/incorrectly applied EU Law as International Law, inter alia, regarding the existence of incompatibilities between EU Law and the ECT, or on the question of compensation (EU Law on State Aid)*".[667]  Its secondary position is that it failed "*to*

---

[664]   Memorial on Annulment, ¶ 187.

[665]   Memorial on Annulment, ¶ 187.

[666]   Memorial on Annulment, ¶¶ 188-189.

[667]   Memorial on Annulment, ¶¶ 190-197.

*state reasons why Articles 107 and 108 TFEU were not applied to the merits of the matter*".[668]

409.    In that regard, it submitted that the Tribunal "*fails to set out even minimum reasoning to explain the reasons why the importance of Articles 107 and 108 TFEU was radically ignored despite the arguments and evidence adduced*".[669]

410.    It further submitted that it "*emphatically insisted throughout the proceedings on the need to consider State Aid legislation*", comprising the rules established in EU treaties and in particular TFEU Articles 107 and 108, and the Tribunal "*makes no reference at all to analysing application of the state aid regime to the disputed subsidies*" in "*blatant error*".[670]    According to the Applicant:[671]

> That omission is manifestly clear given that not a single reference to the issue can be found in the ratio decidendi of the Tribunal's Decision. As already stated, this omission means there is a clear lack of reasoning and an obvious omissive inconsistency in the approach to resolving this essential issue of the dispute.

411.    The Applicant likened the Tribunal's approach to that discussed in *Soufraki v UAE*, on the basis that that Award "*does not set out grounds or give any reasoning*" and that the Tribunal's "*declarations on EU Law ... are surprisingly inconsistent*" as it "*attempts to allude somewhat to EU Law when suggesting its apparent importance in relation to the merits of the matter but then, surprisingly, fails to set out a response to those issues and only states the irrelevance, in the opinion of the Tribunal, of Article 26(6) ECT on jurisdiction*".[672]

412.    The Applicant took the Tribunal's applicable law findings in relation to jurisdiction finding "*no conflict between Article 26(1)(3) ECT and Articles 267 and 344 TFEU*", and argued that "*at stroke, the Tribunal not only leaves application of EU law out of the dispute, but does so without giving any reasons*", because it "*considers that not*

---

[668]    Memorial on Annulment, ¶¶ 190-197.

[669]    Memorial on Annulment, ¶ 190.

[670]    Memorial on Annulment, ¶ 191.

[671]    Memorial on Annulment, ¶ 191.

[672]    Memorial on Annulment, ¶ 196.

*dealing with the significance of EU law on state aid, nor with its importance for deciding and for the scope of legitimate expectations, is sufficiently justified by the Tribunal's conclusion that there is no conflict between the ECT and the aforementioned TFEU principles on this point*".[673]

413. The Applicant argued that as a result, "*the Tribunal forgets, and thereby equally infringes*" the Applicant's right "*to be given sufficient, proper, reasoned, consistent and comprehensive explanation of the iter discursivo applied by the Tribunal when reaching its conclusions*". [674] It submitted that "*the conclusions given by the Tribunal at paragraph 502 in the Decision do not give an organised explanation of the reasons why, on the one hand, the Arbitral Tribunal considers the disconnection clause does not exist and nor is it possible to follow the iter discursivo that led the Tribunal to such a conclusion*".[675]

414. As to the allegation that the Award failed to state reasons why the EC Decision was not evaluated in relation to State aid, the Applicant submitted that the Tribunal did not "*offer even a single line to explain its evaluation of the* [EC] *Decision, notwithstanding the specific nature of that document, which analyses the same regulatory framework subject of the arbitration proceedings and the fact that the European Commission is the only competent institution on State Aid*", and that "*only reference to the* [EC] *position in the Tribunal ruling was set out in paragraphs 453 and 454 of the Tribunal Decision in relation to the EU issue, not adding anything further*".[676]

415. Critically, the Applicant submitted that the Tribunal "*ignore*[d] *the fact that EU law on state aid in relation to legitimate expectations plays its part alongside the ECT (especially in Article 10 ECT on the CJEU)*".[677]

416. The Applicant reiterated its position in its Reply and at the Hearing.

---

[673] Memorial on Annulment, ¶ 196.

[674] Memorial on Annulment, ¶ 196.

[675] Memorial on Annulment, ¶ 197.

[676] Memorial on Annulment, ¶ 198.

[677] Memorial on Annulment, ¶ 199.

### ii.   *The Claimants' Position*

417.   The Claimants set out their position in response as to the Tribunal's alleged failure to state reasons in excess of mandate at paragraphs 211 to 226 of the Counter-Memorial on Annulment, paragraphs 182 to 199 of the Rejoinder and at the Hearing.

418.   They submitted that a "*plain reading of the Decision on Jurisdiction reveals that Spain's objections are meritless*" and that although the Applicant "*may not agree with the Tribunal's reasons, there is no doubt that the Tribunal provided them*", and the "correctness *or* adequacy *of the Tribunal's reasons, with which* [the Applicant] *primarily takes issue, cannot serve as grounds for annulment*". [678] [Claimants' emphasis].

419.   In their Rejoinder the Claimants summarised the Applicant's complaints as to the Tribunal's alleged failure to state reasons as failures to state: (i) "*why Articles 107 and 108 TFEU were not applied to the merits of the matter*";[679] and (ii) "*why the European Commission reasoning [in the 2017 EC Decision] was not evaluated within the Ruling on State Aid*".[680]

420.   They submitted that the Tribunal "*clearly provided its reasons for the conclusion that EU law is not part of the applicable international law under Article 26(6), even though it may be considered as international law for other purposes*" and that finding "*is dispositive of Spain's remaining complaints on the basis of EU State aid law*".[681]  They further submitted that it is immaterial that the Applicant deemed its own State aid arguments 'essential' and was unsatisfied with how the Tribunal dealt with them for the purpose of failure to provide reasons.  In particular, they submitted that "*there can be no basis for annulment for the Tribunal's alleged lack of application of Articles 107 and 108 TFEU or supposed failure to consider the EC's 2017 Decision on State aid—*

---

[678]   Counter-Memorial on Annulment, ¶ 200.

[679]   Counter-Memorial on Annulment, ¶ 211, referring to Memorial on Annulment, Section IV.B.(2.1).

[680]   Counter-Memorial on Annulment, ¶ 211, referring to Memorial on Annulment, Section IV.B.(2.2).

[681]   Rejoinder on Annulment, ¶ 212.

*a decision, which … could not have had any impact on the legitimate expectations of the Claimants in any event*".[682]

421. The Claimants worked through the Award findings in respect of applicable law in relation to jurisdiction, at paragraphs 456, 461, 494 and 502. They submitted that it followed from those paragraphs that the Tribunal "*did not consider that EU law or EU State aid constitute part of the applicable law for the purposes of Article 26(6) ECT*".[683] Accordingly, based on the annulment decisions in *Cortec Mining v Kenya* and *Wena Hotels v Egypt*, they submitted that it does not help the Applicant that the reasoning may have been incomplete, "*so long as it can reasonably be inferred from the award as a whole*",[684] as a tribunal's "*reasons may be implicit in the considerations and conclusions contained in the award, provided they can be reasonably inferred from the terms used in the decision*".[685]

422. As to the Tribunal's reasoning in relation to TFEU Articles 107 and 108, the Claimants submitted that the "*argument is rooted in* [the Applicant's] *incorrect assertion that EU State Aid law is part of the applicable law*", which it is not and therefore there is "*no need for a Tribunal to provide reasons on issues which have become irrelevant to the outcome of the case*".[686]

423. As to the Tribunal's reasoning in relation to the 2017 EC Decision, the Claimants submitted that "*notwithstanding the specific nature of that document, which analyses the **same** regulatory framework subject of the arbitration proceedings*" and the fact that the arguments "*seem to be based on the mistaken belief that the Tribunal ought to have addressed every single argument made and dealt with every single document relied on by the Parties, even if they had become completely irrelevant to its findings*",[687]

---

[682] Rejoinder on Annulment, ¶ 213.

[683] Counter-Memorial on Annulment, ¶ 218.

[684] Counter-Memorial on Annulment, ¶218, citing to *Cortec Mining v Kenya*, ¶ 228(b), CL-0271.

[685] Counter-Memorial on Annulment, ¶218, *Wena Hotels v Egypt*, ¶ 81, RL-0166. *See also Continental Casualty Company v Argentine Republic*, ICSID Case No. ARB/03/9, Decision on the Application for Partial Annulment of Continental Casualty Company and the Application for Partial Annulment of the Argentine Republic, dated 16 September 2011, ¶ 101, CL-0222, quoting *Wena Hotels v Egypt*, ¶ 81, RL-0166.

[686] Counter-Memorial on Annulment, ¶221; *Churchill Mining v Indonesia*, ¶ 243, CL-0286.

[687] Counter-Memorial on Annulment, ¶¶ 222-223.

**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

[Claimants' emphasis] and that in the Claimants' submission tribunals are "*entitled to be terse*"[688] and have "*no duty to follow the parties in the detail of their arguments*".[689] They submitted that "[i]*n light of the Tribunal's conclusion on the applicable law to the exclusion of EU state aid rules, it obviously was not necessary for the Tribunal to deal with the EC's 2017 Decision and Spain's related EU State aid arguments separately*".[690]

424. In addition, the Claimants submitted that Spain's claims about the relevance of the 2017 EC Decision were misguided and inconsistent with its case before the Tribunal as the New Regime replaced Spain's Original Regime pursuant to which the Claimants invested.[691]

425. In the Rejoinder, the Claimants submitted that the Applicant's arguments are premised on an "*erroneous belief that EU State aid law is part of the applicable law under Article 26(6) of the ECT*", the Applicant "*did not in fact make the arguments about EU State aid law that it now makes an annulment*" and the Tribunal's "*findings on the relevance of EU State aid law must be viewed in that context*".[692] They reiterated their submissions that "*when its reasoning is read in its entirety, the reasons for why the Tribunal determined that EU State aid law was not relevant to the merits of the dispute are clear*", due to its findings as to EU law in the jurisdiction section of the Award.[693]

426. The Claimants referred in the Rejoinder to the Award in *Cavalum v Spain*, which stated that:[694]

> it is clear that neither Spain nor the [EC] ever had any concern that the RD 661/2007 regime was contrary to State aid rules, and that is confirmed by the EC's Decision on State Aid of

---

[688] Counter-Memorial on Annulment, ¶ 223, citing *Churchill Mining v Indonesia*, ¶ 254, CL-0286: see also *ibid.*: "*It is commonly accepted by ad hoc committees that tribunals may state their reasons succinctly or at length and that Article 52(1)(e) allows arbitrators a discretion as to the way they express their reasoning*".

[689] Counter-Memorial on Annulment, ¶ 223, citing *Teinver v Argentina*, ¶ 210, CL-0216.

[690] Counter-Memorial on Annulment, ¶ 223.

[691] Counter-Memorial on Annulment, ¶ 224.

[692] Rejoinder on Annulment, ¶ 183.

[693] Rejoinder on Annulment, ¶ 184.

[694] *Cavalum v Spain*, ¶ 611, CL-0264.

10 November 2017. In the light of its conclusions, the Tribunal does not consider that Spain's State aid argument arises, but if it had arisen, the Tribunal would have dismissed it on the basis that there is no necessary connection between an investor's legitimate expectation of a reasonable rate of return and a failure by the State to notify state aid, and that in any event it was not now open to Spain in the light of its prior conduct to raise it.

### iii. *The Committee's Analysis*

427. Insofar as the Applicant seeks to annul the Award for failure to state reasons in respect of the Tribunal's decision on the law applicable to its jurisdiction, the Award plainly includes reasons, which the Committee considers can be followed from Point A to Point B. In particular, the Tribunal set out its reasons for deciding to apply ECT Articles 26(1)-(3) and ICSID Article 25 to its determination of jurisdiction, followed by detailed consideration of the Applicant's various arguments challenging jurisdiction pursuant to ECT Articles 1(2), 9(3), 1(10), 16 and TFEU Articles 267 and 344, the *Achmea* ruling and the effect of the principle of primacy in *Costa v ENEL*. The Committee does not need to recite those points here.

428. The Tribunal rejected the Applicant's argument that the application of EU law, including the principle of primacy, meant that it did not have jurisdiction under the ECT in respect of an intra-EU dispute and clearly stated its reasons for doing so.

429. The Tribunal's decision on jurisdiction is not the decision that the Applicant argued for or the decision that it considers to be the correct one. Accordingly, the reasons that led to that decision do not accord with the Applicant's view of the correct analysis or correct reasons. But the Committee has no mandate to review 'correctness' of decisions or reasons; that would put it in the role of an appeal body, which it plainly is not.

430. For the purposes of annulment pursuant to Article 25, it suffices that the Award (within the 2020 Decision) contains reasons for its decision on jurisdiction. It is not for this Committee to evaluate those reasons, only to identify whether or not there exists a failure to provide reasons. In relation to the question of applicable law in relation to jurisdiction, the Committee reiterates that the Award contains reasons, those reasons enable one to follow how the Tribunal proceeded from Point A to Point B, and accordingly, the merits of those reasons is not a basis for annulment of the Award.

431.  In relation to the Tribunal's decision on the law applicable to the merits, the Applicant argues that the Tribunal "*ignore*[d] *the fact that EU law on state aid in relation to legitimate expectations plays its part alongside the ECT (especially in Article 10 ECT on the CJEU)*".[695]  The Applicant's position appears to be that the Award should contain independent reasons that show the choice of law analysis in respect of TFEU 107 and 108, along the same lines as the Tribunal's legal reasoning in respect of TFEU Article 267 and 344 in respect of jurisdiction.

432.  As set out above, the Parties treated EU State aid law, including TFEU 107 and 108, as part of the factual matrix that informed the legitimate expectations of the Claimants and their ensuing rights to compensation pursuant to ECT Article 10(1).  Accordingly, neither Party has been able to demonstrate to this Committee where in the written or oral submissions in the underlying Arbitration it was put to the Tribunal that TFEU 107 and 108 constituted the law applicable to the Tribunal's decision in respect of breach of the ECT Article 10(1).

433.  Both TFEU 107 and 108 were certainly raised, but in the context of the factual matrix not as the governing law of the merits.

434.  The Tribunal provided reasons in relation to the State aid arguments in the context of the factual matrix, as were put to it.  This is set out in detail above and is considered by the Committee to be reasoning for the purpose of its decision on annulment.  That said, because the Parties and the Tribunal treated EU State aid law as part of the factual matrix, and not as a matter of governing law at all, any review of its reasoning as to the facts falls outside the scope of the Applicant's Annulment Application and the mandate of the Committee.

435.  Accordingly, for the aforementioned reasons, the Tribunal rejects the ground for annulment on the basis of failure to state reasons.

---

[695] Memorial on Annulment, ¶ 199.

## V.   COSTS DECISION

436.   Finally, the Tribunal received the Parties' respective submissions as to costs on 19 September 2022, seeking cost reimbursement pursuant to Article 61(2) of the ICSID Convention and Rule 47(1)(j) of the ICSID Arbitration Rules.

437.   Both Parties referred to 'costs follow the event' as being a principle to guide the Committee's decision on costs.[696]  The Applicant further referred to having been compelled to bring the proceedings as a member of the EU.[697] The Claimants submitted that if the Committee were to annul the Award, that each Party should bear its own costs,[698] yet if it were not to do so that the Claimants should recover their costs.[699]

438.   The Parties further agree that the ICSID Convention and Rules permit the Committee to exercise its discretion in respect of costs allocation.[700]

439.   The Applicant seeks costs in the sum of EUR 1,080,066.58, including EUR 600,000 legal fees incurred by the Kingdom of Spain and the remainder in other fees and expenses.[701]

440.   The Claimants incurred a similar amount of legal fees in the sum of £627,637, with disbursements of £1,742.18.  The Claimants broadly itemised its costs by work task.[702]

441.   The costs of the proceeding, including the fees and expenses of the Committee, ICSID's administrative fees and direct expenses, amount to (in USD):

| | |
|---|---:|
| Committee Members' fees and expenses | 452,512.50 |
| Ms. Wendy J. Miles KC | 212,125.00 |
| Dr. José Antonio Moreno Rodríguez | 147,375.00 |
| Prof. Dr. Jacomijn J. van Haersolte-van Hof | 93,012.50 |
| ICSID's administrative fees | 126,000.00 |
| Direct expenses | 69,737.59 |
| **Total** | 648,250.09 |

---

[696]  Applicant's Submission on Costs, ¶ 6; Claimants' Submission on Costs, ¶ 13.

[697]  Applicant's Submission on Costs, ¶ 7.

[698]  Claimants' Submission on Costs, ¶ 14.

[699]  Claimants' Submission on Costs, ¶ 16.

[700]  Applicant's Submission on Costs, ¶ 4; Claimants' Submission on Costs, ¶ 9.

[701]  Applicant's Submission on Costs, ¶ 19.

[702]  Claimants' Submission on Costs, ¶ 4.

442. The above costs have been paid out of the advances made by the Applicant pursuant to the ICSID Administrative and Financial Regulations.[703]

443. The Committee recognises that the Tribunal in the underlying Award did not award costs in favour of either Party[704], despite the Claimants prevailing in at least some of their claims and obtaining a sizeable award of damages.[705]  The Committee considers these Annulment proceedings to be a separate proceeding in which the Claimants have entirely prevailed, and accordingly that a costs award in their favour is appropriate in the Annulment.

444. The Parties' legal costs are broadly proximate and appear to be relatively reasonable for an application of this magnitude.  It is a proceeding that is clearly important to both Applicant and Claimants, but costs appear to have been relatively well managed. The Committee considers that the Parties have conducted the proceedings in an efficient manner.

445. The Claimants have prevailed in all respects of the Annulment Application.  Given that both Applicant and Claimants accepted that 'costs follow the event' is a principle to guide the Committee's costs, that is the Committee's starting point.  As noted, the Claimant's legal costs in the sum of £627,637, with disbursements of £1,742.18 are reasonable and proportionate.  The Committee does not consider the conduct of the Claimants to have been inefficient or in any way disproportionate in respect of costs.  Accordingly, the Committee does not propose to make any adjustment to the sum recovered and awards the Claimants their full legal costs and disbursements in the Annulment Application.  In addition, the costs of the proceeding as stated above at paragraph 441 shall be borne in full by the Applicant.

---

[703] The ICSID Secretariat will provide the Parties with a Final Financial Statement of the case fund.  The remaining balance will be reimbursed to the Applicant.

[704] Award, ¶ 159.

[705] Award, ¶ 162(1).

## VI.    DECISIONS AND ORDERS

446.    For the reasons stated above, the Committee:

a.    Decides to disregard all new arguments and new materials submitted by both Parties, save for materials relating to the scope of review on annulment;

b.    Rejects Spain's Application for Annulment in its entirety;

c.    Decides that there will be an order of costs in favour of the Claimants in the sum of £627,637 for legal fees and £1,742.18 for disbursements; and

d.    Decides that the Applicant shall bear the costs of the annulment proceeding in their entirety.

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding

**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

---

Dr. José Antonio Moreno Rodríguez
Member of the *ad hoc* Committee
Date:

Prof. Dr. Jacomijn J. van Haersolte-van Hof
Member of the *ad hoc* Committee
Date:

Ms. Wendy J. Miles, KC
President of the *ad hoc* Committee
Date: 17 March 2023

162

*Hydro Energy 1 S.à r.l. and Hydroxana Sweden AB v. Kingdom of Spain*
(ICSID Case No. ARB/15/42) – Annulment Proceeding
**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

_____          _____
Dr. José Antonio Moreno Rodríguez          Prof. Dr. Jacomijn J. van Haersolte-van Hof
Member of the *ad hoc* Committee          Member of the *ad hoc* Committee
Date: March 16, 2023                      Date:

_____
Ms. Wendy J. Miles, KC
President of the *ad hoc* Committee
Date:

162

**DECISION ON KINGDOM OF SPAIN'S APPLICATION FOR ANNULMENT**

|  |  |
|---|---|
| _____ | _____ |
| Dr. José Antonio Moreno Rodríguez | Prof. Dr. Jacomijn J. van Haersolte-van Hof |
| Member of the *ad hoc* Committee | Member of the *ad hoc* Committee |
| Date: | Date: |
|  | 16/3/23 |

_____

Ms. Wendy J. Miles, KC
President of the *ad hoc* Committee
Date: