# Exhibit 28



INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES

1818 H STREET, NW | WASHINGTON, DC 20433 | USA
TELEPHONE +1 (202) 458 1534 | FACSIMILE +1 (202) 522 2615
WWW.WORLDBANK.ORG/ICSID

# C E R T I F I C A T E

## ESPF BETEILIGUNGS GMBH, ESPF NR. 2 AUSTRIA BETEILIGUNGS GMBH, AND INFRACLASS ENERGIE 5 GMBH & CO. KG

v.

## ITALIAN REPUBLIC

### (ICSID Case No. ARB/16/5)

### Annulment Proceeding

I hereby certify that the attached document is a true copy of the *ad hoc* Committee's Decision on Annulment dated 31 July 2023.

Meg Kinnear
Secretary-General

Washington, D.C., 31 July 2023

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

---

In the annulment proceeding between

**ESPF BETEILIGUNGS GMBH, ESPF NR. 2 AUSTRIA BETEILIGUNGS GMBH, AND INFRACLASS ENERGIE 5 GMBH & CO. KG**

Annulment Respondents

and

**ITALIAN REPUBLIC**

Applicant on Annulment

**ICSID Case No. ARB/16/5
Annulment Proceeding**

---

DECISION ON ANNULMENT

---

***Members of the ad hoc Committee***
Prof. Dr. Jacomijn J. van Haersolte-van Hof, President of the *ad hoc* Committee
Prof. D. Brian King, Member of the *ad hoc* Committee
Dr. Ucheora Onwuamaegbu, Member of the *ad hoc* Committee

***Secretary of the ad hoc Committee***
Ms. Natalí Sequeira, ICSID Secretariat

31 July 2023

**COUNSEL FOR THE PARTIES**

*Representing ESPF Beteiligungs GmbH,*
*ESPF Nr. 2 Austria Beteiligungs GmbH*
*InfraClass Energie 5 GmbH & Co. KG:*
*Annulment Respondents*

Mr. Ken Fleuriet
King & Spalding LLP
1700 Pennsylvania Avenue NW
Suite 900
Washington, DC 20006
United States of America

Ms. Amy Frey
McDermott Will & Emery AARPI
23 rue de l'Université
75007 Paris
France

*Representing the Italian Republic:*
*Applicant on Annulment*

Avv. Giacomo Aiello
Avv. Pietro Garofoli
Avv. Laura G.V. Delbono
Avvocatura Generale dello Stato
Via dei Portoghesi 12
00186 Rome
Italy

Prof. Avv. Maria Chiara Malaguti
Prof. Ludovica Chiussi Curzi
External Consultants to the
Avvocatura Generale dello Stato
Italy

TABLE OF CONTENTS

I.    INTRODUCTION AND PARTIES ................................................................ 1

II.   PROCEDURAL HISTORY ......................................................................... 3

III.  SCOPE OF ANNULMENT AND RECORD BEFORE THE *AD HOC* COMMITTEE ............... 9

      A.  Italy's Position ................................................................................. 9

      B.  ESPF's Position ............................................................................... 12

      C.  The *ad hoc* Committee's Analysis ...................................................... 19

IV.   MANIFEST EXCESS OF POWERS ............................................................ 24

      A.  Standard of Review for Manifest Excess of Powers ............................... 25

          (1)  Italy's Position ........................................................................ 25

          (2)  ESPF's Position ....................................................................... 27

          (3)  The *ad hoc* Committee's Analysis ............................................. 31

      B.  Application of the Standard to the Tribunal's Exercise of Jurisdiction ....... 34

          (1)  Italy's Position ........................................................................ 35

               (a)  No consent to arbitrate ...................................................... 35

               (b)  EU law is part of the applicable law ..................................... 39

               (c)  Correct construction of Article 26 of the ECT ......................... 41

               (d)  The Komstroy judgment and its implications .......................... 42

               (e)  The Green Power award ..................................................... 43

          (2)  ESPF's Position ....................................................................... 43

               (a)  Overwhelming jurisprudence constante .................................. 43

               (b)  Clear and express terms ..................................................... 46

               (c)  Article 344 of the TFEU does not affect consent ..................... 47

               (d)  No modification through the EU Member States' Declaration ....... 48

               (e)  The ECT does not contain an express or implied disconnection clause ....... 49

               (f)  No other carve-out from jurisdiction ...................................... 51

ii

(g)   No modification of the ECT to exclude intra-EU arbitration ................................. 52

(h)   EU law is not applicable law under the ECT ........................................... 53

(i)   Even if EU law were relevant, the ECT would prevail under Article 16 of the ECT ............................................................................................................. 56

(j)   Neither the Komstroy judgment nor subsequent decisions by EU Member State courts give rise to a manifest excess of powers because they did not exist and were never before the Tribunal, and, in any event, are irrelevant and also precluded by Article 16 of the ECT .......................................................................................... 57

(k)   The Paris Court of Appeals judgments ........................................ 59

(l)   The Green Power award .......................................................... 60

(3)   The *ad hoc* Committee's Analysis ........................................... 60

(a)   Article 26 of the ECT – Consent ........................................... 62

(b)   Disconnection clause ............................................................ 64

(c)   Other indicators .................................................................. 67

(d)   Modification ....................................................................... 68

(e)   EU law as part of the applicable law ..................................... 69

(f)   The Komstroy judgment and other decisions .......................... 71

(g)   Manifest ............................................................................. 72

V.      FAILURE TO STATE REASONS ....................................................... 73

A.  Standard of Review for Failure to State Reasons ....................................... 73

(1)   Italy's Position ....................................................................... 73

(2)   ESPF's Position ...................................................................... 75

(3)   The *ad hoc* Committee's Analysis ........................................... 79

B.  Application of the Standard to State Reasons ........................................... 81

(1)   Italy's Position ....................................................................... 81

(2)   ESPF's Position ...................................................................... 85

(a)   The Award thoroughly explained the circumstances in which a balancing test is inapplicable as a matter of law ................................................................. 86

     (b)   The Tribunal thoroughly explained its findings on the existence of legitimate expectations ............................................................................................ 87

     (c)   The Tribunal thoroughly explained why Italy breached ESPF's legitimate expectations ............................................................................................ 89

     (d)   The Award states reasons for the majority's conclusion on the impairment clause claim ............................................................................................ 91

     (e)   Italy's discussion on investment treaty jurisprudence is misleading ...................... 91

   (3)   The *ad hoc* Committee's Analysis ................................................................ 93

VI.    SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE.................... 97

  A.  Standard of Review for Serious Departure from a Fundamental Rule of Procedure ............ 97

   (1)   Italy's Position ........................................................................................ 97

   (2)   ESPF's Position......................................................................................... 99

   (3)   The *ad hoc* Committee's Analysis ............................................................ 100

  B.  Application of the Standard For a Serious Departure From a Fundamental Rule of Procedure 103

   (1)   Italy's Position ...................................................................................... 103

   (2)   ESPF's Position...................................................................................... 104

   (3)   The *ad hoc* Committee's Analysis ............................................................ 105

VII.   COSTS ......................................................................................................... 109

  A.  Italy's Submissions......................................................................................... 109

  B.  ESPF's Submissions........................................................................................ 109

  C.  The *ad hoc* Committee's Decision on Costs ..................................................... 111

VIII.  DECISION ................................................................................................... 113

TABLE OF ABBREVIATIONS

| | |
|---|---|
| *Achmea* judgment | Judgment rendered by the Court of Justice of the European Union in *Slovak Republic v. Achmea BV*, Case C-284/16 on 20 April 2018 |
| *ad hoc* Committee | *ad hoc* Committee constituted on 3 May 2021, comprised of Prof. Dr. Jacomijn van Haersolte-van Hof, President, Prof. D. Brian King, and Dr. Ucheora Onwuamaegbu |
| Annulment Respondents or ESPF or Claimants | ESPF, ESPF 2, and ICE 5, collectively |
| Applicant or Italy | Italian Republic |
| Application | Application for annulment of the Award rendered on 14 September 2020 in the ICSID arbitration Case No. ARB/16/5 between ESPF, ESPF 2, and ICE 5 and Italy filed by Italy on 11 January 2021 |
| Award | Tribunal's award rendered on 14 September 2020, which incorporated the Partial Dissenting Opinion of Prof. Laurence Boisson de Chazournes |
| *Belenergia* award | Award rendered in *Belenergia S.A. v. Italian Republic* (ICSID Case No. ARB/15/40) on 6 August 2019 |
| CJEU | Court of Justice of the European Union |
| EC | European Commission |
| EC's Application | Application for Leave to Intervene as a Non-Disputing Party pursuant to ICSID Arbitration Rule 37(2) filed by the EC on 1 July 2021 |
| ECT | The Energy Charter Treaty, which entered into force on 16 April 1998 for Germany, Austria and Italy |
| ESPF | ESPF Beteiligungs GmbH, an institutional fund incorporated under the laws of Germany and a subsidiary of European Solar Power Fund Nr. 1 GmbH & Co. KG |
| ESPF 2 | ESPF Nr. 2 Austria Beteiligungs GmbH, an institutional fund incorporated under the laws of |

| | |
|---|---|
| | Austria and a subsidiary of European Solar Power Fund Nr. 2 GmbH & Co. KG |
| EU | European Union |
| EU Member States' Declaration | Declaration of the Representatives of the Governments of the EU Member States of 15 January 2019 on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the EU |
| FET | Fair and Equitable Treatment |
| *Green Power* award | Award rendered in *Green Power Partners K/S and SCE Solar Don Benito APS v. Kingdom of Spain* (SCC Arbitration V (2016/135)) on 16 June 2022 |
| GSE | *Gestore dei Servizi Energetici* |
| Hearing | Hearing on annulment held in Paris on 30 September 2022 |
| ICSID or Centre | International Centre for Settlement of Investment Disputes |
| ICSID Convention | The Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 18 May 1969 for Germany, on 24 June 1971 for Austria, and on 28 April 1971 for Italy |
| ICSID Rules | ICSID Rules of Procedure for Arbitration Proceedings (effective as of April 10, 2006) |
| ICE 5 | InfraClass Energie 5 GmbH & Co. KG, a retail fund established under the laws of Germany |
| Italy's Brief on Stay | Brief on the Stay of Enforcement of the Award filed by Italy on 26 May 2021 |
| *Komstroy* judgment | Judgment rendered by the Court of Justice of the European Union (Grand Chamber) in *Republic of Moldova v. Komstroy LLC*, ECLI:EU:C:2021:655, Case C-741/19 on 2 September 2021 |
| Opposition | Opposition to Italy's Request for Continuation of the Stay of Enforcement of the Award filed by ESPF on 9 June 2021 |

| Parties | ESPF, ESPF 2, ICE 5 and Italy, collectively |
|---|---|
| Pre-Hearing Conference | Pre-hearing organizational meeting between the Parties and the President of the *ad hoc* Committee held by videoconference on 14 September 2022 |
| Post-Hearing Awards | The *Belenergia* award and the *SunReserve* award, collectively |
| PO1 | Procedural Order No. 1 issued by the *ad hoc* Committee on 9 July 2021 |
| REIO | Regional Economic Integration Organization |
| Request for Continuation of the Stay | Request for the stay of the Award contained in the Application |
| *SunReserve* award | Award rendered in *SunReserve Luxco Holdings SRL, et al. v. Italian Republic* (SCC Case No. 132/2016) on 25 March 2020 |
| *Spalmaincentivi* Decree | Law Decree No. 91/2014, 24 June 2014, converted into law by Law No. 116/2014 of 11 August 2014 |
| TEU | Treaty of the European Union |
| TFEU | Treaty on the Functioning of the European Union |
| Tribunal | Arbitral tribunal comprised of Mr. Henri C. Alvarez (Canadian), President, Dr. Michael C. Pryles (Australian), and Prof. Laurence Boisson de Chazournes (French, Swiss) |
| USSR | Union of Soviet Socialist Republics |
| VCLT | Vienna Convention on the Law of Treaties |
| WTO | World Trade Organization |
| WTO Agreement | Marrakesh Agreement Establishing the World Trade Organization |

## I.    INTRODUCTION AND PARTIES[1]

1.    This annulment proceeding concerns an application for annulment (the "**Application**") of the award rendered on 14 September 2020 in the arbitration proceeding between ESPF Beteiligungs GmbH, ESPF Nr. 2 Austria Bitterlings GmbH and InfraClass Energie 5 GmbH & Co. KG and the Italian Republic (ICSID Case No. ARB/16/5) (the "**Award**"), issued by a tribunal composed of Mr. Henri C. Alvarez, a national of Canada (President), Dr. Michael C. Pryles, a national of Australia, and Professor Laurence Boisson de Chazournes, a national of France and Switzerland (the "**Tribunal**").

2.    The applicant on annulment is the Italian Republic ("**Italy**" or the "**Applicant**").

3.    The respondents on annulment are ESPF Beteiligungs GmbH ("**ESPF**"), an institutional fund incorporated under the laws of Germany and a subsidiary of European Solar Power Fund Nr. 1 GmbH & Co. KG; ESPF Nr. 2 Austria Beteiligungs GmbH ("**ESPF 2**"), an institutional fund incorporated under the laws of Austria and a subsidiary of European Solar Power Fund Nr. 2 GmbH & Co. KG; and InfraClass Energie 5 GmbH & Co. KG ("**ICE 5**"), a retail fund established under the laws of Germany (collectively, "**ESPF**", the "**Claimants**", or the "**Annulment Respondents**").

4.    Italy and the Annulment Respondents will be referred to collectively as the "**Parties**". The Parties' representatives and their addresses are listed above on page (i).

5.    The Award decided a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Energy Charter Treaty (the "**ECT**"), which entered into force on 16 April 1998 for Germany, Austria and Italy, and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force on 18 May 1969 for Germany, on 24 June 1971 for Austria, and on 28 April 1971 for Italy (the "**ICSID Convention**").

6.    The dispute in the original arbitration proceeding related to ESPF's investments in Italy's renewable energy sector and arose from the legislative, regulatory and contractual measures implemented by Italy as of 2005 in order to encourage investments in the solar energy industry.

---

[1] The summary of the facts included in this Decision is not intended to be an exhaustive descriptions of the Parties' submissions.  The objective is instead to provide the relevant context for the *ad hoc* Committee's analysis and findings. The *ad hoc* Committee has carefully considered all the submissions made by the Parties.

7.      In the Award, the majority of the Tribunal found that Italy breached all three aspects of Article 10(1) of the ECT, namely: (i) the obligation to accord fair and equitable treatment ("**FET**") to investors; (ii) the impairment clause (pursuant to which Italy may not in any way impair by unreasonable or discriminatory measures the management, maintenance, use, enjoyment or disposal of investments); and (iii) the umbrella clause (pursuant to which Italy must observe any obligations it has entered into with an investor or an investment of an investor).

8.      Prof. Boisson de Chazournes partially dissented, considering that: (i) the regulations in question could not be construed as "specific assurances" of immutability creating legitimate expectations; (ii) there was no breach of the impairment clause (reducing the cost of electricity to consumers and reducing incentives to producers would be considered as a rational policy goal); and (iii) the incentive program (regulations) could not be construed as an obligation "entered into with" the investors.  She further concluded that the scope of the rights reflected in some "Agreements" did not go beyond that of the regulatory regime (*i.e.*, there was no breach of the umbrella clause).[2]

9.      The majority of the Tribunal awarded damages in the amount of €16,000,000 in favor of ESPF, together with interest at the rate of 12-month Euribor plus 4% compounded annually from 1 January 2015 until payment in full by Italy.[3]  ESPF was awarded 60% of its reasonable legal fees and other expenses (€1,758,577).[4]  The Tribunal also ordered Italy to pay for the expended portion of ESPF's advances to ICSID.[5]

10.     Italy applied for annulment of the Award on 11 January 2021 on the basis of Article 52 of the ICSID Convention and Rule 50 of the ICSID Rules of Procedure for Arbitration Proceedings (the "**ICSID Rules**"), alleging that (i) the Tribunal lacked jurisdiction *ratione materiae* over this intra-EU claim, thus manifestly exceeding its powers by failing to apply EU law and exercising jurisdiction over inadmissible claims; and (ii) the Tribunal failed to consider key evidence, legal authorities (e.g., the award in *Belenergia v. Italy*, rendered on 6 August 2019 in ICSID Case No. ARB/15/40 (the "***Belenergia* award**")[6] and the award in *SunReserve v. Italy*, rendered on 25 March

---

[2] **ELA-081**, Award, 14 September 2020 ("**Award**"), ¶¶ 645, 709, 828, reflecting Prof. Boisson de Chazournes' Partial Dissenting Opinion.

[3] *Id.*, ¶¶ 915, 951.

[4] *Id.*, ¶ 951.

[5] *Id.*

[6] **ILA-002**, *Belenergia S.A. v. Italian Republic*, ICSID Case No. ARB/15/40, Award, 6 August 2019 ("**Belenergia Award**").

2020 in SCC Case No. 132/2016 (the "***SunReserve* award**")[7] (jointly referred to as the "**Post-Hearing Awards**")), and post-hearing submissions on Italy's interpretation and application of the FET standard, thus tainting the procedural integrity of the Award.

## II.    PROCEDURAL HISTORY

11.    On 11 January 2021, Italy filed the Application.

12.    The Application contained a request that enforcement of the Award be stayed, and further that the *ad hoc* Committee rule that the stay be maintained until the Application itself was decided (the "**Request for Continuation of the Stay**"), pursuant to Article 52(5) of the ICSID Convention and ICSID Rules 54(1) and (4).

13.    The ICSID Secretary-General registered the Application on 20 January 2021 and, pursuant to the mandatory terms of ICSID Rule 54(2), informed the Parties of the provisional stay of enforcement of the Award.

14.    The *ad hoc* Committee was constituted on 3 May 2021 in accordance with Article 52(3) of the ICSID Convention and ICSID Rules 6, 52(2), and 53.  The Members of the *ad hoc* Committee are Prof. Dr. Jacomijn van Haersolte-van Hof, a national of the Netherlands, President, Prof. D. Brian King, a national of the United States of America, and Dr. Ucheora Onwuamaegbu, a national of the United Kingdom and Nigeria (the "***ad hoc* Committee**").  The members of the *ad hoc* Committee were appointed by the Chairman of ICSID's Administrative Council.

15.    On 7 May 2021, the *ad hoc* Committee invited the Parties to confer regarding the timetable for the exchange of written submissions on Italy's Request for Continuation of the Stay.

16.    The Parties agreed on a schedule for submissions in relation to Italy's Request for Continuation of the Stay, including that, after the first-round submissions were filed, Italy could request second-round submissions, if it so wished.

17.    On 17 May 2021, the *ad hoc* Committee confirmed the schedule agreed upon by the Parties.  As previously communicated to the Parties on 7 May 2021, the *ad hoc* Committee decided to maintain

---

[7] **ILA-004**, *SunReserve Luxco Holdings SRL, et al. v. Italian Republic*, SCC Case No. 132/2016, Award, 25 March 2020.

the provisional stay of enforcement until it had the opportunity to consider the Parties' submissions and rule on the issue.

18.     In accordance with the schedule agreed upon by the Parties, Italy filed its Brief on the Stay of Enforcement of the Award on 26 May 2021 ("**Italy's Brief on Stay**").

19.     ESPF filed its Opposition to Italy's Request for Continuation of the Stay on 9 June 2021 (the "**Opposition**").

20.     On 10 June 2021, Italy informed the *ad hoc* Committee that, although it opposed most statements made in the Opposition, it believed that the Parties had exhaustively pleaded their positions in their submissions and that the *ad hoc* Committee had been fully briefed.  In the interest of time, and to promote the expedited administration of the proceedings, Italy expressly confirmed that it did not consider a second round of briefing necessary.

21.     On 17 June 2021, the *ad hoc* Committee held its first session by videoconference.  On 25 June 2021, the *ad hoc* Committee circulated a draft Procedural Order No. 1 and invited the Parties to submit their final comments.

22.     On 1 July 2021, the European Commission ("**EC**") filed before the *ad hoc* Committee an Application for Leave to Intervene as a Non-Disputing Party pursuant to ICSID Arbitration Rule 37(2) (the "**EC's Application**").

23.     On 9 July 2021, the *ad hoc* Committee issued its Decision on the Continuation of the Provisional Stay of Enforcement of the Award.  In that Decision, the *ad hoc* Committee recalled that, as the moving party seeking to continue the provisional stay, Italy bore the burden of establishing the circumstances that – as specified in Article 52(5) – "require" the continued stay of enforcement, albeit that insofar as ESPF raised any positive allegations to rebut Italy's position, it needed to substantiate and where necessary prove these allegations.  Ultimately, the applicable test involves a balancing of the Parties' respective interests and risks of harm.

24.     On this basis, the *ad hoc* Committee considered the concrete circumstances identified by the Parties and considered, *inter alia*, that solvency as such is insufficient to justify a finding that a State is entitled to the continuation of a stay.  Further, the fact that by applying for annulment Italy was exercising a legal right does not suffice to satisfy the burden on Italy of making a showing of the existence of relevant circumstances requiring the continuation of the stay.

25.    The *ad hoc* Committee moreover recalled that but for the showing of circumstances dictating otherwise, the structure of the Convention provides that awards are immediately binding and enforceable. General considerations that States are typically solvent are not sufficient and should be distinguished from the scenario in which the lifting of a stay would result in an appreciable risk that a payment would be irrevocable. As to the payment of interest, the argument that interest "cures" the investor's potential inconvenience of waiting is overly broad.

26.    Consequently, the *ad hoc* Committee found that Italy had failed to make the necessary showing that, in the present case, there was a concrete risk of non-recoupment if the stay of enforcement was lifted. In light of this decision, there was no need for the *ad hoc* Committee to consider ESPF's alternative plea that, should the *ad hoc* Committee continue the stay, it should require Italy to provide security.

27.    On the same day, the *ad hoc* Committee issued Procedural Order No. 1 recording the agreement of the Parties on procedural matters and the *ad hoc* Committee's decision on disputed issues ("**PO1**"). PO1 provided, *inter alia*, that the procedural language would be English, and that the place of the annulment proceeding would be Paris, France. PO1 further set out the agreed procedural calendar for this proceeding.

28.    Also on 9 July 2021, the *ad hoc* Committee invited the Parties to submit their observations on the EC's Application simultaneously by 30 July 2021.

29.    On 30 July 2021, the Parties simultaneously submitted their observations on the EC's Application.

30.    On 13 October 2021, the *ad hoc* Committee issued its Decision on the EC's Application for Leave to Intervene as Non-Disputing Party and rejected the EC's Application. The *ad hoc* Committee considered that a determination at that stage about whether the EC's intervention would bring a different perspective that would assist the *ad hoc* Committee, and whether this would address a matter within the scope of the Parties' dispute, would be premature. In addition, it considered that, while the *ad hoc* Committee was reluctant to opine in general terms on the nature and scope of the mandate of the EC and its policies, the EC referred to itself as "the guardian of the Treaties,"[8] which suggests a policy interest in submitting its Application but equally suggests that the EC sees

---

[8] Application for Leave to Intervene as Non-Disputing Party filed by the European Commission, 1 July 2021, ¶ 6.

a role for itself in evaluating the issue that forms the present dispute which is subject to the jurisdiction of this Committee.

31.     The *ad hoc* Committee also rejected the EC's alternative request to be invited as an expert witness on European Union ("**EU**") law, reasoning that the EC's stated interest was also difficult to align with the alternative request to allocate a role to the EC as an independent expert on EU law.

32.     On 18 October 2021, Italy filed its Memorial on Annulment.

33.     On 17 February 2022, ESPF filed its Counter-Memorial on Annulment.

34.     On 21 April 2022, Italy filed its Reply on Annulment.

35.     On 22 April 2022, the Parties were informed that the ICSID facilities in Paris would not be available due to major renovations in the World Bank building.  In view of the limited availability of other suitable facilities in Paris on the scheduled hearing dates, the Centre tentatively booked a hearing venue in London.

36.     On 13 June 2022, the Parties confirmed their agreement to hold an in-person hearing at the Hôtel du Louvre in Paris.

37.     On 23 June 2022, ESPF filed its Rejoinder on Annulment.

38.     On 6 September 2022, the *ad hoc* Committee circulated a draft procedural order regarding the organization of the hearing for the Parties to discuss and revert to the *ad hoc* Committee with their comments.

39.     On 9 September 2022, Italy filed a request for the *ad hoc* Committee to admit into the record the award in *Green Power v. Spain*,[9] rendered on 16 June 2022 in SCC Arbitration V (2016/135) (the "***Green Power* award**").

40.     Following an invitation by the *ad hoc* Committee, ESPF submitted its response to Italy's request on 13 September 2022, urging the *ad hoc* Committee to deny Italy's request.  In the alternative, ESPF requested leave to introduce new authorities into the record pertaining to the relevance of the *Green Power* award.

---

[9] **ILA-052**, *Green Power Partners K/S and SCE Solar Don Benito APS v. Kingdom of Spain*, SCC Arbitration V (2016/135), Award, 16 June 2022.

6

41.    Also on 13 September 2022, the Parties submitted their comments on the draft procedural order regarding the organization of the hearing.

42.    A pre-hearing organizational meeting between the Parties and the President of the *ad hoc* Committee was held by videoconference on 14 September 2022 at 12:00 PM EDT (the "**Pre-Hearing Conference**"), to discuss any outstanding procedural, administrative, and logistical matters in preparation for the hearing.   The following persons participated in the Pre-Hearing Conference:

Member of the *ad hoc* Committee
Prof. Dr. Jacomijn J. van Haersolte-van Hof        President of the *ad hoc* Committee

ICSID Secretariat
Ms. Natalí Sequeira                    Secretary of the *ad hoc* Committee

On behalf of Italy
Mr. Giacomo Aiello                    *Avvocatura dello Stato*
Ms. Ludovica Chiussi Curzi                *Avvocatura dello Stato*

On behalf of ESPF
Mr. Kenneth R. Fleuriet                King & Spalding
Ms. Amy Roebuck Frey                McDermott Will & Emery

43.    During the Pre-Hearing Conference, the Parties and the President discussed the draft of Procedural Order No. 2 and the Parties' respective positions where no prior agreement had been reached.

44.    A recording of the Pre-Hearing Conference was made and deposited in the archives of ICSID.  It was made available to the Parties and the *ad hoc* Committee.

45.    On 15 September 2022, the *ad hoc* Committee issued its decisions on the Parties' requests.  The *ad hoc* Committee (i) granted Italy leave to introduce the *Green Power* award into the record; (ii) granted ESPF leave to submit a maximum of three new legal authorities in response; and (iii) invited both Parties to submit simultaneous comments on the admissibility, relevance and weight of the new legal authorities.

46.    Pursuant to the *ad hoc* Committee's decision, on 16 September 2022, the Parties submitted the new legal authorities.

47.     On 20 September 2022, the *ad hoc* Committee issued Procedural Order No. 2 concerning the organization of the hearing.

48.     On 23 September 2022, the Parties submitted their respective comments on the new legal authorities submitted on 16 September 2022.

49.     On 30 September 2022, the *ad hoc* Committee held an in-person hearing in Paris (the "**Hearing**"). The following persons were present at the Hearing:

Members of the *ad hoc* Committee

| | |
|---|---|
| Prof. Dr. Jacomijn J. van Haersolte-van Hof | President of the *ad hoc* Committee |
| Prof. D. Brian King | Member of the *ad hoc* Committee |
| Dr. Ucheora Onwuamaegbu | Member of the *ad hoc* Committee |

ICSID Secretariat

| | |
|---|---|
| Ms. Natalí Sequeira | Secretary of the *ad hoc* Committee |

On behalf of Italy

| | |
|---|---|
| Mr. Giacomo Aiello | *Avvocatura dello Stato* |
| Ms. Laura Delbono | *Avvocatura dello Stato* |
| Dr. Ludovica Chiussi Curzi | *Avvocatura dello Stato* |
| Ms. Linda Paglierani (trainee) | *Avvocatura dello Stato* |
| Ms. Greta Grasso (trainee) | *Avvocatura dello Stato* |

On behalf of ESPF

| | |
|---|---|
| Mr. Kenneth R. Fleuriet | King & Spalding |
| Ms. Amy Roebuck Frey | McDermott Will & Emery |
| Ms. Violeta Valicenti | King & Spalding |
| Ms. Naomi Agbessi (trainee) | King & Spalding |
| Ms. Ariane Machavoine | King & Spalding |

Court Reporters

| | |
|---|---|
| Ms. Laurie Carlisle | Court Reporter (on-site) |
| Ms. Diana Burden | Court Reporter (remote editing) |

Technicians

| | |
|---|---|
| Mr. Mathieu Duval | Encore Global |
| Mr. Charly Laffiche | Encore Global |

50.     As agreed at the end of the Hearing, on 6 October 2022, the *ad hoc* Committee transmitted a list of questions to the parties.

51.    On 28 October 2022, the Parties simultaneously filed their Post-Hearing Briefs, addressing the questions posed by the *ad hoc* Committee.

52.    The Parties simultaneously filed their submissions on costs on 10 May 2023.

53.    The proceeding was closed on 30 May 2023.

### III.    SCOPE OF ANNULMENT AND RECORD BEFORE THE *AD HOC* COMMITTEE

### A.    ITALY'S POSITION

54.    Italy invokes three grounds for annulment, relating to two issues, or what Italy has referred to as two "deficiencies":  the Tribunal's decision to uphold jurisdiction notwithstanding the intra-EU objection raised by Italy; and its treatment of the Post-Hearing Awards.[10]  Italy has also referred to these issues as "grounds",[11] but at the Hearing clarified that it invokes three grounds for annulment.[12]  As will be discussed below, the first ground pertains to the first issue, while the second and third annulment grounds pertain to the second issue.  In this Decision, the *ad hoc* Committee shall use the term "grounds" for the three respective (legal) annulment grounds invoked by Italy, recognizing that the second and third grounds relate to the same issue and that there is some overlap in the arguments and terminology relating thereto.

55.    The first issue which Italy identifies is, as already noted, the Tribunal's allegedly erroneous decision to exercise jurisdiction over a claim on which it had no competence.  In doing so, Italy asserts, the Tribunal manifestly exceeded its powers.  The second issue relates to the Tribunal's decision on the merits, and more specifically to the treatment of the Post-Hearing Awards and the Parties' arguments related thereto.  In this context, Italy argues that the Tribunal (i) failed to provide reasons and, at the same time, (ii) seriously departed from a fundamental rule of procedure.

56.    The question of the scope of annulment remedy has been debated by the Parties primarily in the context of the first annulment ground, the alleged manifest excess of powers relating to the Tribunal's jurisdictional decision.  A related issue, which has also been addressed primarily in relation to the first annulment ground but, as a matter of principle, pertains to any annulment

---

[10] Italy's Memorial on Annulment, 18 October 2021 ("**Italy's Memorial on Annulment**"), ¶ 4.

[11] Applicant's Reply on Annulment, 21 April 2022 ("**Italy's Reply on Annulment**"), ¶ 7.

[12] Hearing Transcript, p. 13, lines 21-23.

ground, is the issue of the *ad hoc* Committee's remit as far as the record is concerned. This issue was addressed in Italy's written submissions and in particular in its Post-Hearing Brief. It pertains, in particular, to paragraph 15.3 of Procedural Order No. 1, which distinguishes "between legal authorities pertaining to the scope of the annulment proceeding and other documents outside the record of the original arbitration proceeding." According to Italy, all the documents that it has introduced in the annulment proceedings constitute legal authorities "pertaining to the scope of the annulment" regardless of whether they were part of the record in the original arbitration proceeding or postdate the Award.

57.   According to Italy, the factual and legal evidence before the *ad hoc* Committee is the same as in the underlying proceedings. Therefore, the question to be asked is whether any new authorities introduced during the annulment proceeding are substantially relevant to decide any of the grounds invoked.

58.   The *ad hoc* Committee will address the issue of the proper scope of the record before it in the present Section of this Decision.

59.   Italy acknowledges that the *ad hoc* Committee can only base its decision on the record before the original Tribunal, and that the *ad hoc* Committee is neither empowered to engage in fact-finding nor to re-evaluate the evidence and the arguments upon which the Tribunal has already ruled.[13] However, Italy submits that this does not imply that the *ad hoc* Committee is prevented from reviewing the Tribunal's handling of the record to assess whether the Tribunal failed to address the Parties' arguments properly. Italy subscribes to the *Consortium v. Morocco ad hoc* committee's view that *ad hoc* committees "must in certain cases be able to pass judgment on the findings of facts of the Arbitral Tribunal, to the extent – but only to the extent – that its conclusions have a bearing on the merits of a particular cause for [annulment]."[14]

---

[13] Italy's Memorial on Annulment, ¶ 169, citing **ILA-035**, *Bernhard Friedrich Arnd Rudiger von Pezold, et al. v. Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Decision on Annulment, 21 November 2018 ("***Bernhard von Pezold* Decision on Annulment**"), ¶ 239; **ILA-013**, *Adem Dogan v. Turkmenistan,* ICSID Case No. ARB/09/9, Decision on Annulment, 15 January 2016 ("***Dogan* Decision on Annulment**"), ¶¶ 129, 138, 149, 214; **ILA-036**, *Alapli Elektrik B.V. v. Republic of Turkey,* ICSID Case No. ARB/08/13, Decision on Annulment, 10 July 2014, ¶ 234.

[14] Italy's Memorial on Annulment, ¶ 170, citing **ILA-037**, *Consortium R.F.C.C. v. Kingdom of Morocco,* ICSID Case No. ARB/00/6, Excerpts of Decision on Annulment, 18 January 2006, ¶ 225 (Italy's translation).

60.    Responding to ESPF's argument that by submitting legal authorities that were not in the record before the Tribunal, Italy "'flagrantly violated' the agreed procedures" of PO1,[15] Italy notes that PO1 does not prevent the Parties from putting forward legal authorities pertaining to the scope of the annulment proceeding.[16]  Italy further submits that the legal authorities which it submitted fall into that category, because they relate to the wrongful upholding of jurisdiction by the Tribunal.[17] Italy also submits that a party that requests the annulment of an award under Article 52 of the ICSID Convention cannot be prevented from introducing arguments relating to the interpretation and application of Article 52 that best support its position.[18] Therefore, Italy concludes, the introduction of the legal authorities used in support of its argument for the Award's annulment was not precluded or prohibited under PO1.

61.    Italy contends that it did not put forward documents setting out new facts or new arguments.[19]  It points out that ESPF itself submitted legal authorities post-dating the Award without seeking the *ad hoc* Committee's permission to introduce them, demonstrating that its "protest relating to Italy's document is not genuine."[20]

62.    Italy adds that these legal authorities enable the *ad hoc* Committee to acquire a better understanding of the "gravity of the Tribunal's mistakes" and the "legal effects that the Tribunal's mistakes have set in motion."[21]  In particular, Italy submits that the *Green Power* award is of "extraordinary relevance" as it concerned a dispute between an EU investor and another EU Member State in which the tribunal concluded that it lacked jurisdiction given the intra-EU nature of the dispute.[22] .

63.    At the Hearing, the *ad hoc* Committee raised a number of questions, which it subsequently transmitted to the Parties in writing.[23]  The *ad hoc* Committee asked the Parties to (i) identify the documents that in their view properly form part of the record and those that do not; and (ii) specify how they distinguish between legal authorities that go to the scope of annulment versus those that

---

[15] Annulment Respondents' Counter-Memorial on Annulment, 17 February 2023 ("**ESPF's Counter-Memorial on Annulment**"), ¶ 72.

[16] Italy's Reply on Annulment, ¶¶ 9-10.

[17] *Id.*, ¶ 11.

[18] *Id.*, ¶ 12, citing **ELA-121**, *RSM Production Corporation v. Saint Lucia*, ICSID Case No. ARB/12/10, Decision on Annulment, 29 April 2019 ("***RSM* Decision on Annulment**"), ¶ 153.

[19] *Id.*, ¶ 13.

[20] *Id.*, ¶ 14.

[21] *Id.*, ¶¶ 15-17.

[22] Italy's Email of 9 September 2022.

[23] Tribunal's letter to the Parties of 6 October 2022, p. 2.

11

do not.  Furthermore, the *ad hoc* Committee asked how it should deal with new arguments that were raised during the annulment proceeding, in particular insofar as new authorities, such as the *Green Power* award, involve and address arguments which ESPF submits are new and were not raised by Italy in the underlying arbitration.

64.    In response to the *ad hoc* Committee's questions, Italy submits that legal authorities pertaining to the scope of the annulment proceedings should be distinguished from other authorities that did not form part of the record in the original arbitration.[24]  This distinction requires a substantive not formalistic assessment, Italy argues,[25] and the date of such authorities is not decisive.[26]  Rather, to enable a meaningful exchange between the Parties, they may need to rely on newly-introduced legal authorities that support their respective arguments in the annulment proceeding.[27]  Specifically, Italy contends that it did not submit the *Green Power* award to introduce new facts or arguments, but rather to provide further support to the arguments it made in the underlying proceedings.[28]

## B.    ESPF'S POSITION

65.    ESPF contends that the scope of annulment is limited and conceived in the ICSID Convention as an "extraordinary and narrowly circumscribed" remedy.[29]

66.    First, ESPF recalls the plain wording of Article 53 of the ICSID Convention, which states that "[t]he award shall be binding on the parties and shall not be subject to any appeal or to any other remedy except those provided in this Convention."[30]  Therefore, ESPF reasons, *ad hoc* committees are not competent to review the substantive factual or legal conclusions of ICSID awards.  Neither are *ad hoc* committees permitted to address new arguments or new legal authorities that were not

---

[24] Italy's Post-Hearing Brief, 28 October 2022 ("**Italy's Post-Hearing Brief**"), ¶ 2.

[25] *Id.*, ¶ 3.

[26] *Id.*, ¶ 4.

[27] *Id.*, ¶ 9.

[28] *Id.*, ¶ 11.

[29] ESPF's Opening Presentation, slides 28-30; ESPF's Counter-Memorial on Annulment, ¶ 25, citing **ELA-082**, A. Broches, *Observations of the Finality of ICSID Awards*, ICSID Review – Foreign Investment Law Journal, Vol. 6, No. 2, Fall 1991, pp. 324-327; **ELA-083**, J. Paulsson, *ICSID's Achievements and Prospects*, ICSID Review – Foreign Investment Law Journal, Vol. 6, No. 2, Fall 1991, p. 392.

[30] ESPF's Opening Presentation, slide 19.

raised before the underlying arbitral tribunal, as doing so would cross the line between annulment and appeal.[31]

67.  Contrary to appellate courts, *ad hoc* committees are empowered to invalidate an award in whole or in part or leave it intact, but are not authorized to rectify substantive errors found in the award or in any way change its contents.[32]  The drafting history of the ICSID Convention confirms that *ad hoc* committees are neither appellate bodies nor concerned with a substantive review of awards.[33] On the contrary, the grounds for annulment provided for in Article 52 of the ICSID Convention are limited to "whether an arbitral tribunal acted within the scope of its authority and whether it respected proper procedures."[34]

---

[31] Annulment Respondents' Post-Hearing Brief, 28 October 2022 ("**ESPF's Post-Hearing Brief**"), ¶ 4; ESPF's Opening Presentation, slide 20.

[32] ESPF's Counter-Memorial on Annulment, ¶¶ 27-28, citing **ELA-084**, R.D. Bishop and S.M. Marchili, *Annulment under the ICSID Convention* (OUP 2021), pp. 22-23; **ELA-085**, W. M. Reisman, *The Breakdown of the Control Mechanism in ICSID Arbitration*, Duke Law Journal, Vol. 4, 1989, p. 748.

[33] ESPF's Counter-Memorial on Annulment, ¶¶ 29-30, citing **ELA-088**, *Blusun S.A., Amco Asia Corporation, et al. v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision on the Application for Annulment, 16 May 1986; **ELA-087**, *Klöckner v. Republic of Cameroon*, ICSID Case No. ARB/81/2, Decision on Annulment, 3 May 1985; **ELA-082**, A. Broches, *Observations on the Finality of ICSID Awards*, ICSID Review – Foreign Investment Law Journal, Vol. 6, No. 2, Fall 1991, pp. 358-359; **ELA-083**, J. Paulsson, *ICSID's Achievements and Prospects*, ICSID Review – Foreign Investment Law Journal, Vol. 6, No. 2, Fall 1991, p. 386; **ELA-085**, W. M. Reisman, *The Breakdown of the Control Mechanism in ICSID Arbitration*, Duke Law Journal, Vol. 4, 1989, p. 740, 760; **ELA-086**, ICSID, *Updated Background Paper on Annulment for the Administrative Council of ICSID*, 5 May 2016, ¶ 73; **E-052**, Report of Secretary-General Ibrahim F.I. Shihata to the Administrative Council at its Twentieth Annual Meeting, 2 October 1986, p. 4.

[34] ESPF's Counter-Memorial on Annulment, ¶ 31, citing **ELA-091**, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Decision on Annulment, 13 April 2020 ("***Blusun* Decision on Annulment**"), ¶¶ 147-149; **ELA-017**, *Tenaris S.A. & Talta – Trading E Marketing Sociedade Unipessoal Lda. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/23, Decision on Annulment, 28 December 2018 ("***Tenaris* Decision on Annulment**"), ¶¶ 43-44; **ILA-035**, *Bernhard von Pezold* Decision on Annulment, ¶¶ 120-122; **ELA-038**, *Duke Energy International Peru Investments No. 1, Ltd. v. Republic of Peru*, ICSID Case No. ARB/03/28, Decision on Annulment, 1 March 2011 ("***Duke Energy* Decision on Annulment**"), ¶ 89; **ILA-011**, *Hussein Nuaman Soufraki v. United Arab Emirates*, ICSID Case No. ARB/02/7, Decision of the *ad hoc* Committee on the Application for Annulment of Mr. Soufraki, 5 June 2007 ("***Soufraki* Decision on Annulment**"), ¶¶ 20, 24; **ELA-089**, *Mr. Patrick Mitchell v. Democratic Republic of Congo*, ICSID Case No. ARB/99/7, Decision on the Application for Annulment of the Award, 1 November 2006, ¶¶ 19-20; **ILA-044**, *CDC Group plc v. Republic of Seychelles*, ICSID Case No. ARB/02/14, Decision on Annulment, 29 June 2005 ("***CDC* Decision on Annulment**"), ¶¶ 34-37; **ILA-015**, *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, ¶¶ 62, 64; **ILA-043**, *Wena Hotels Ltd. v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Decision on Annulment, 28 January 2002 ("***Wena* Decision on Annulment**"), ¶ 18; **ELA-083**, J. Paulsson, *ICSID's Achievements and Prospects*, ICSID Review – Foreign Investment Law Journal, Vol. 6, No. 2, Fall 1991, p. 388.

68.     ESPF further refers to the practice of *ad hoc* committees, which in its view confirms that they are not appellate bodies.[35]  There is no appeal even on issues of jurisdiction.[36]  Notably, ESPF refers to the *ad hoc* committee's decision in *Tenaris v. Venezuela*, which held that "the Committee has no competence to substitute its own judgements on the jurisdiction of the Tribunal or on the merits for the judgments of the Tribunal."[37]

69.     Hence, ESPF submits, the *ad hoc* Committee has limited jurisdiction and is not empowered to function as a court of appeal and conduct a *de novo* review of the present dispute, be it on jurisdiction or merits.[38]  In particular, ESPF contends there is no legal basis for this Committee to engage in a *de novo* review of the Tribunal's decision on Italy's intra-EU objection.  The question of the ECT Contracting Parties' intent when concluding the ECT is a question of fact that led to the Tribunal's rejection of the intra-EU objection.  ESPF further notes that it is not possible for this *ad hoc* Committee to reconsider the Tribunal's conclusion, because that would require a *de novo* review and its own interpretative analysis of the ECT, as well as a consideration of facts not before it, all of which is prohibited.[39]  Instead, ESPF argues that the role of the *ad hoc* Committee is simply to serve as a "guardian[] of procedural uniformity and propriety and of due process"[40] and "to reconcile finality of the award with the need to prevent flagrant cases of excess of jurisdiction and injustice,"[41] but not to opine on matters of substance, much less engage in a *de novo* review.[42]

---

[35] ESPF's Counter-Memorial on Annulment, ¶¶ 49-51, citing **ELA-091**, *Blusun* Decision on Annulment, ¶¶ 148, 206; **ELA-095**, *Teinver S.A., Transportes de Cercanías S.A. and Autobuses Urbanos del Sur S.A. v. Argentine Republic,* ICSID Case No. ARB/09/1, Decision on Annulment, 29 May 2019 ("***Teinver* Decision on Annulment**"), ¶ 47; **ILA-035**, *Bernhard von Pezold* Decision on Annulment, ¶ 239; **ELA-017**, *Tenaris* Decision on Annulment, ¶¶ 43-44; **ELA-035**, *Standard Chartered Bank (Hong Kong) Limited v. Tanzania Electric Supply Company Limited,* ICSID Case No. ARB/10/20, Decision on Annulment, 22 August 2018 ("***Standard Chartered* Decision on Annulment**"), ¶¶ 59-61; **ELA-094**, *Poštová banka, a.s. and ISTROKAPITAL SE v. Hellenic Republic*, ICSID Case No. ARB/13/8, Decision on Annulment, 29 September 2016, ¶ 128; **ELA-089**, *Mr. Patrick Mitchell v. Democratic Republic of Congo*, ICSID Case No. ARB/99/7, Decision on the Application for Annulment of the Award, 1 November 2006, ¶ 19; **ILA-043**, *Wena* Decision on Annulment, ¶ 18; **ELA-093**, *Amco Asia Corporation and others v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision on the Application by Parties for Annulment and Partial Annulment of the Arbitral Award of 5 June 1990 and the Application by Respondent for Annulment of the Supplemental Award of 17 October 1990, 17 December 1992, ¶ 1.17; **ILA-040**, *Maritime International Nominees Establishment v. Government of Guinea*, ICSID Case No. ARB/84/4, Decision on Annulment, 22 December 1989 ("***MINE* Decision on Annulment**"), ¶ 4.04.

[36] Hearing Transcript, p. 96, lines 18-22.

[37] **ELA-017**, *Tenaris* Decision on Annulment, ¶¶ 43-44.  See also ESPF's Opening Presentation, slide 21.

[38] Hearing Transcript, p. 96, lines 1-4.  See also ESPF's Opening Presentation, slide 22.

[39] ESPF's Post-Hearing Brief, ¶ 11.  See also ESPF's Opening Presentation, slide 23.

[40] ESPF's Counter-Memorial on Annulment, ¶ 25.

[41] Id., ¶ 42.  See also id., ¶ 43, citing **ELA-086**, ICSID, Updated Background Paper on Annulment for the Administrative Council of ICSID, 5 May 2016, p. 2.

[42] ESPF's Opening Presentation, slide 4; ESPF's Post-Hearing Brief, ¶ 7.

Finally, ESPF recalls that Italy has accepted the limited nature of ICSID annulment in the *Blusun v. Italy* case.[43]

70.    Second, and relatedly, ESPF posits that annulment is based on the grounds exclusively and exhaustively prescribed in Article 52 of the ICSID Convention, a fact which has been confirmed by nearly every annulment committee.[44]    ESPF emphasizes that the exhaustiveness of the annulment grounds laid out in Article 52(1) of the Convention is of even greater relevance when it comes to the review of jurisdictional decisions.[45]    Committees have confirmed that the exhaustive nature of Article 52(1) is applicable to jurisdictional decisions, including on the intra-EU objection. ESPF refers to the *RREEF v. Spain ad hoc* committee, which held that:

> "[t]he Committee therefore agrees with the Claimants that *ad hoc* committees do not have the power to reconsider ICSID tribunals' jurisdictional decisions *de novo*. Any attempt to establish a ground under Article 52 must be scrupulously examined to ensure that it is not a

---

[43] ESPF's Counter-Memorial on Annulment, ¶ 52, citing **ELA-091**, *Blusun* Decision on Annulment, ¶¶ 148, 206.

[44] Hearing Transcript, p. 100, lines 1-9; ESPF's Opening Presentation, slide 24, citing **ILA-020**, *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Annulment, 1 February 2016 ("***Total*** **Decision on Annulment**"), ¶ 163; **ILA-018**, *Impregilo S.p.A. v. Argentine Republic*, ICSID Case No. ARB/07/17, Decision of the *ad hoc* Committee on the Application for Annulment, 24 January 2014, ¶ 118.  See also ESPF's Counter-Memorial on Annulment, ¶ 60, citing **ELA-098**, C. Schreuer, *Three Generations of ICSID Annulment Proceedings*, *in* Annulment of ICSID Awards (E. Gaillard & Y. Banifatemi, eds., JurisNet, LLC 2004); **ELA-085**, W. M. Reisman, *The Breakdown of the Control Mechanism in ICSID Arbitration*, Duke Law Journal, Vol. 4, 1989, pp. 740; **ILA-035**, *Bernhard von Pezold* Decision on Annulment, ¶ 238; **ELA-103**, *TECO Guatemala Holdings, LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment, 5 April 2016 ("***TECO*** **Decision on Annulment**"), ¶ 73; **ILA-012**, *EDF International S.A., SAUR International S.A and León Participaciones Argentinas S.A. v. Argentine Republic*, ICSID Case No. ARB/03/23, Decision on Annulment, 5 February 2016 ("***EDF*** **Decision on Annulment**"), ¶ 67; **ELA-102**, *El Paso Energy International Company v. Argentine Republic*, ICSID Case No. ARB/03/15, Decision of the *ad hoc* Committee on the Application for Annulment of the Argentine Republic, 22 September 2014, ¶ 137; **ELA-101**, *Victor Pey Casado and Foundation "Presidente Allende" v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Application for Annulment of the Republic of Chile, 18 December 2012, ¶ 89; **ELA-100**, *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Decision on the Argentine Republic's Request for Annulment of the Award, 29 June 2010, ¶ 74; **ELA-037**, *CMS Gas Transmission Company v. Argentine Republic*, ICSID Case No. ARB/01/8, Decision of the *ad hoc* Committee on the Application for Annulment of the Argentine Republic, 25 September 2007 ("***CMS*** **Decision on Annulment**"), ¶ 43; **ILA-037**, *Consortium R.F.C.C. v. Kingdom of Morocco*, ICSID Case No. ARB/00/6, Excerpts of Decision on Annulment, 18 January 2006, ¶ 222 (Italy's translation); **ILA-015**, *Compañía de Aguas del Aconquija S.A. and Vivendi Universal v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, ¶ 62; **ILA-043**, *Wena* Decision on Annulment, ¶ 18; **ELA-093**, *Amco Asia Corporation and others v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision on the Application by Parties for Annulment and Partial Annulment of the Arbitral Award of June 5, 1990 and the Application by Respondent for Annulment of the Supplemental Award of Oct. 17, 1990, 17 December 1992, ¶ 1.17; **ELA-099**, *Klöckner Industrie-Anlagen GmbH, et al. v. United Republic of Cameroon and Société Camerounaise des Engrais*, ICSID Case No. ARB/81/2, Decision on Annulment, 17 May 1990, ¶ 4.24.

[45] Hearing Transcript, p. 98, lines 9-25.

'backdoor' attack on the tribunal's decision on its substantive jurisdiction."[46]

71.    Third, ESPF contends that, in any event, annulment is discretionary, meaning that it is not automatic even when an annullable error is found. This is mandated by the plain language of Article 52(3) of the ICSID Convention, which states that committees "shall have the authority to annul the award."[47] Hence, the ICSID Convention grants *ad hoc* committees the authority to annul an award where annullable error is present, rather than mandating that they do so.

72.    According to ESPF, this confirms the importance of finality and that annulment, being an exceptional remedy, requires an error to be sufficiently grave and outcome-determinative to warrant setting aside an award. In support of its position, ESPF refers to the *Blusun v. Italy ad hoc* committee's decision:

> "The *ad hoc* committee has discretion. An *Ad Hoc* Committee retains a measure of discretion in its ruling on applications for annulment. This is clearly implied in the Convention through the use of terms, such as 'manifest,' 'serious' and 'fundamental.' This discretion is not unlimited and should not be exercised to the point of defeating the object and purpose of the remedy of annulment. The *Ad Hoc* Committee may refuse to exercise its authority to annul an Award if and when annulment is clearly not needed to remedy procedural injustice and annulment would unwarrantably erode the binding force and finality of ICSID Awards."[48]

73.    Fourth, ESPF submits that the annulment record is limited to the record before the original Tribunal, a position that, it notes, Italy seems to accept.[49] Consequently, "any documents dated after the date of the Award (14 September 2020) would not have been before the underlying Tribunal, and thus should not be considered."[50] Exhibits and legal authorities submitted for the first time in this annulment proceeding should likewise not be considered, in ESPF's view.[51]

---

[46] **ELA-166**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Annulment, 10 June 2022, ¶¶ 18-19. See also **ELA-165**, *InfraRed Environmental Infrastructure GP Limited and others v. Kingdom of Spain*, ICSID Case No. ARB/14/12, Decision on Annulment, 10 June 2022 ("**InfraRed Decision on Annulment**"), ¶ 399.

[47] Hearing Transcript, p. 99, lines 5-9; ESPF's Opening Presentation, slide 26.

[48] **ELA-091**, *Blusun* Decision on Annulment, ¶ 148 (emphasis omitted). See also **ELA-162**, *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Kingdom of Spain*, ICSID Case No. ARB/14/11, Decision on Annulment, 18 March 2022 ("***NextEra* Decision on Annulment**"), ¶ 498; ESPF's Opening Presentation, slide 27.

[49] ESPF's Counter-Memorial on Annulment, ¶ 53. See also Italy's Memorial on Annulment, ¶ 169.

[50] ESPF's Post-Hearing Brief, ¶ 2.

[51] *Id.*, ¶¶ 2-3.

74.     ESPF adds that:

> "[t]o do otherwise would transgress the limited mandate of the annulment committee and expand the annulment process well beyond questions of fundamental fairness and of the integrity of the underlying proceeding.  In light of these limitations, numerous annulment committees have considered that an annulment committee's review is limited to the factual exhibits, legal authorities, and arguments that were before the original tribunal.  Indeed, it would be difficult to conclude that an arbitral tribunal committed an error with respect to evidence or an argument that it never had the opportunity to consider."[52]

75.     In its Rejoinder on Annulment, ESPF expanded its submissions on this issue and referred to additional annulment decisions concluding that the record on annulment is limited to the record before the original tribunal.[53]  Moreover, ESPF submits that recent annulment authorities continue to follow this principle, including in relation to the issue at stake here, namely the intra-EU objection.[54]

76.     Furthermore, according to ESPF, Italy's introduction of new authorities into the proceedings would be a blatant violation of Section 15.3 of PO1, which provides that "no new supporting documents outside the record of the original arbitration proceeding shall be admitted in this annulment proceeding."  PO1 further states that, "[s]hould either party wish to introduce supporting documents outside the record of the original arbitration (other than legal authorities pertaining to the scope of the annulment proceeding), that party shall file a request as soon as possible to that effect with the *ad hoc* Committee, and at the latest three weeks before the filing of the relevant pleading."[55]  Italy made no such application, ESPF notes, but nonetheless included 13 new legal authorities with its submissions on annulment, thereby violating these agreed procedures.[56]

---

[52] ESPF's Counter-Memorial on Annulment, ¶ 53.  See also **ILA-035**, *Bernhard von Pezold* Decision on Annulment, ¶ 239.

[53] Annulment Respondents' Rejoinder on Annulment, 23 June 2022 ("**ESPF's Rejoinder on Annulment**"), ¶ 28, citing **ELA-112**, *UP and C.D Holding Internationale (formerly Le Chèque Déjeuner) v. Hungary*, ICSID Case No. ARB/13/35, Decision on Annulment, 11 August 2021, ¶ 159; **ILA-035**, *Bernhard von Pezold* Decision on Annulment, ¶ 239; **ELA-161**, *Central European Aluminum Company (CEAC) Holdings Limited v. Montenegro*, ICSID Case No. ARB/14/08, Decision on Annulment, 1 May, 2018, ¶ 80; **ELA-155**, *Tidewater Investment SRL and Tidewater Caribe, C.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Annulment, 27 December 2016, ¶ 208; **ELA-038**, *Duke Energy* Decision on Annulment, ¶ 99.

[54] ESPF's Rejoinder on Annulment, ¶ 29, citing **ELA-163**, *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Annulment, 28 March 2022, ¶¶ 94-95, 98; **ELA-162**, *NextEra* Decision on Annulment, ¶ 233.

[55] Procedural Order No. 1, 9 July 2021, Section 15.3.

[56] ESPF's Opening Presentation, slide 15.

77. ESPF takes issue with Italy's argument that the scope of annulment, as also referred to in PO1, allows a party to submit new legal authorities as long as they "relate" to a party's claims on annulment.[57]  PO1 is not an open-ended invitation to allow evidence or authorities on issues of jurisdiction and liability that did not form part of the record before the Tribunal.[58]  New authorities never introduced by Italy in the arbitration or unavailable at the time, by definition, cannot demonstrate any deficiency in the Award or in the Tribunal's decision-making process, precisely because they were not available to be considered by the Tribunal.[59]

78. ESPF further disputes Italy's allegation that ESPF's protest is not genuine, because it too submitted 14 new legal authorities.  ESPF responds that three of those authorities relate to the applicable standard on annulment, while the remaining 11 relate to the meaning of "manifest", as that term is used in Article 52(2)(1) of the ICSID Convention,[60] and that in any event, these authorities were submitted in response to Italy's unauthorized submissions.

79. ESPF has offered to withdraw these 14 authorities, should the *ad hoc* Committee strike Italy's new authorities that are, according to ESPF, unrelated to the annulment standards.  At the Hearing and in its Post-Hearing Brief,[61] ESPF has identified the exhibits and legal authorities submitted for the first time in this annulment proceeding that, it says, are not properly before this *ad hoc* Committee.

80. In relation to Italy's request to introduce the *Green Power* award into the record, ESPF disputes Italy's contention that the award is of extraordinary relevance because it deals with the intra-EU objection; that objection has been raised in numerous other proceedings.[62]  ESPF submits that, as a tribunal's jurisdiction is determined as of the date of the request for arbitration, the *Green Power* award, which was issued more than five years later, could not retroactively deprive the Tribunal of jurisdiction in any event.[63]

---

[57] ESPF's Rejoinder on Annulment, ¶ 30.

[58] *Id.*, ¶ 31.

[59] *Id.*, ¶ 37.

[60] *Id.*, ¶ 40.

[61] ESPF's Opening Presentation, slide 15; ESPF's Post-Hearing Brief, ¶ 2, referring to its annotated version – filed with its Post-Hearing Brief – of the Chronological List of Documents jointly submitted by the Parties on 21 October 2022 identifying those documents that were part of the underlying arbitration, those submitted only in the annulment proceeding, and those submitted in both proceedings.

[62] ESPF's Letter of 13 September 2022, p. 2.

[63] *Id.*, p. 2; Hearing Transcript, p. 118, line 16-p. 119, line 2; ESPF's Opening Presentation, slide 14.

81.     Referring to the *Cube v. Spain ad hoc* committee's decision, ESPF reiterates that post-award legal developments are outside the limited mandate of this *ad hoc* Committee.[64]

82.     ESPF further submits that the *Green Power* award is irrelevant, noting that the SCC tribunal itself ruled that the intra-EU objection required consideration because the tribunal was seated in the EU, and expressly distinguished the scenario in which the ICSID Convention applies.  In its letter of 23 September 2022, ESPF referred in this context to the *Cavalum v. Spain*[65] and *Infracapital v. Spain*[66] decisions.  ESPF submits that these reactions to the *Green Power* award are in line with pre-existing jurisprudence confirming that the ECT and the ICSID Convention exclusively govern an ICSID tribunal's jurisdiction, and argues that the tribunal's analysis in the *Green Power* award is "unpersuasive" and "faulty and illogical as a matter of international law."[67]

83.     Finally, ESPF refers to the fact that Italy waited nearly three months after the *Green Power* award was published to request that it be added to the record, and submits that Italy could have been expected to act sooner.[68]

## C.     THE *AD HOC* COMMITTEE'S ANALYSIS

84.     As a starting point, the *ad hoc* Committee notes its agreement with the Parties that the ICSID Convention favors the finality of awards and provides only limited exceptions to that principle in the interest of fundamental procedural integrity.  In addition – and this is not disputed by the Parties, at least in principle – an annulment application is not an appeal.  Article 53 of the ICSID Convention makes clear that there is no appeal against awards rendered pursuant to the Convention and that the only remedies are the ones set forth in the Convention itself.

85.     Furthermore, and before addressing the specific grounds and facts invoked in this case, the *ad hoc* Committee notes that annulment proceedings can and should be limited to the record in the underlying arbitration.   To do otherwise would fly in the face of the nature of annulment proceedings, which are neither a review of the merits nor an appeal.  It is fundamentally unsound

---

[64] ESPF's Letter of 13 September 2022, p. 2.

[65] **ELA-174**, *Cavalum SGPS, S.A. v. Kingdom of Spain*, ICSID Case No. ARB/15/34, Procedural Order No. 6 on the Kingdom of Spain's Request for Reconsideration of the Tribunal's Decision on Jurisdiction of 31 August 2020 and 10 January 2022, 7 September 2022.

[66] **ELA-173**, *Infracapital F1 S.à.r.l. and Infracapital Solar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/16/18, Decision on Respondent's Second Request for Reconsideration, 19 August 2022.

[67] ESPF's Letter of 23 September 2022, pp. 2-5.

[68] *Id.*, p. 3.

to hold a tribunal and its work product to a standard that was not in existence at the time of its decision. This is especially pertinent for a review of a decision on jurisdiction, as the basis for jurisdiction needs to be decided on the facts, circumstances and law applicable and in place at the time of the registration of the request for arbitration.

86.     In this context, reference is made to *Von Pezold v. Zimbabwe*, where the *ad hoc* committee stated that an ICSID annulment proceeding is not a "retrial and accordingly it is based on the record before the tribunal,"[69] and *UP and CD Holding v. Hungary*, where the committee agreed:

> "that, as a general rule and in light of the nature of an annulment proceeding, it is not authorized to entertain evidence or arguments which were not put forward before the Tribunal. It also agrees that 'it cannot exclude' that there could be some instances where a Committee may need to review or address new evidence or arguments. Looking at the grounds for annulment invoked and the claims put forward, the Committee sees no basis to depart from the general rule. Thus, the Committee will analyze all claims put forward by the Parties based solely on the evidence on the record and arguments presented to the Tribunal."[70]

87.     It was on this basis that the present *ad hoc* Committee issued PO1, which provides in pertinent part:

> "15.2    Given the nature of an annulment proceeding, the Committee expects that the parties will rely on the *evidentiary record* of the arbitration proceeding, and it *does not expect* to receive new witness statements or expert reports.
>
> 15.3    In principle, no new supporting documents outside the record of the original arbitration proceeding shall be admitted in this annulment proceeding. Should either party wish to introduce supporting documents outside the record of the original arbitration (*other than legal authorities pertaining to the scope of the annulment proceeding*), *that party shall file a request* as soon as possible to that effect with the Committee, and at the latest three weeks before the filing of the relevant pleading. If the Committee determines that exceptional circumstances exist based on a reasoned written request followed by observations from the other party, it can admit supporting documents submitted by a party after that party's last submission. The parties shall not submit documents outside the arbitration

---

[69] **ILA-035**, *Bernhard von Pezold* Decision on Annulment, ¶ 239.

[70] **ELA-112**, *UP and C.D Holding Internationale (formerly Le Chèque Déjeuner) v. Hungary*, ICSID Case No. ARB/13/35, Decision on Annulment, 11 August 2021, ¶ 159. See also **ELA-031**, C. Schreuer, *The ICSID Convention: A Commentary* (2d Ed. 2009), ¶ 36: "It is an accepted principle of international adjudication that jurisdiction will be determined by reference to the date on which judicial proceedings are instituted. This means that on that date all jurisdictional requirements must be met. It also means that events taking place after that date will not affect jurisdiction"; **ELA-095**, *Teinver* Decision on Annulment, ¶ 86, citing C. Schreuer, *The ICSID Convention: A Commentary* (2d Ed. 2009), ¶ 108: "a party may not present new arguments on fact and law that it failed to put forward in the original arbitration proceeding."

record in advance of the Committee's determination in accordance with the above.

15.4     Any request to introduce new document(s) shall *specify the issue(s)* that the new document(s) is intended to address.

15.5     The Committee will promptly decide on the admissibility of these new documents after *hearing* from the *other* party." (emphasis added)

88.     The *ad hoc* Committee first notes that the above-quoted sections of PO1 and their underlying rationale extend to the record as a whole, *i.e.*, new evidence and new legal authorities.  In some cases, new factual developments or new insights or arguments in relation thereto lead annulment applicants to seek to submit new documents, generally exhibits or witness or expert statements.  What is specific for the many cases involving intra-EU disputes, often relating to renewable energy investments, is that the new documents that parties (and often the State parties involved) seek to submit are legal authorities, such as decisions of the Court of Justice of the European Union ("**CJEU**") and/or documents of a hybrid nature, e.g., the EU Member States' Declaration, decisions or agreements of the EU Member States, or decisions of the EC.

89.     *Ad hoc* committees have typically declined to admit new documents of that type into annulment proceedings.  As the committee in *Antin v. Spain* held:

> "[T]he Committee notes that the Tribunal's decision should be evaluated on the basis of the arguments and evidence raised before the Tribunal. As the Claimants have pointed out, Spain relies significantly on documents that post-date the Award (e.g. a 2018 European Commission communication, a 2019 declaration by EU Member States, a 2020 opinion by the Advocate-General of the European Court of Justice). In the Committee's view, it would not be appropriate to impugn the Tribunal's Award on the basis of authorities or documents rendered post-Award. Moreover, the fact that Spain has to rely on further authorities not before the Tribunal suggests that the Tribunal's decision was not obviously or manifestly incorrect."[71]

90.     Indeed, Italy accepts that an *ad hoc* committee is limited to the record before the tribunal:

> "It is well-established that an *ad hoc* Committee can only base its decision on the record before the tribunal, and cannot be seised with requests to admit new evidence or to second guess the probative value of the evidence before the tribunal.  That the Committee must rely solely on the record before the Tribunal entails two connected consequences: first, the

---

[71] **ELA-125**, *Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar B.V. (formerly Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.) v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Decision on Annulment, 30 July 2021 ("**Antin Decision on Annulment**"), ¶ 159.

> Committee's task is not to engage in fact-finding; second, the Committee's task is not to re-evaluate the evidence or the arguments that the tribunal has assessed already."[72]

91.     However, in apparent contradiction to the underlying rationale of PO1, Italy suggests that it is permitted to submit new legal authorities relating to the (substantive) question of whether the Tribunal correctly upheld jurisdiction, on the ground that PO1 allows the Parties to submit "legal authorities pertaining to the scope of the annulment proceeding."[73]

92.     This interpretation cannot be sustained.  The exception identified in PO1 follows from the rationale underlying it, namely that the Parties are entitled to argue the – procedural – scope of the remit of the *ad hoc* Committee and to rely on new authorities to do so.  The interpretation invoked by Italy would deprive PO1 of any meaningful content as it would equate the substance of the case with the scope of review.  That would make an annulment tantamount to an appeal.

93.     The authorities relied on by ESPF,[74] therefore, also need to be distinguished from the new authorities relied on by Italy, as they do purport to support an argument relating to the scope of annulment review, namely the meaning and scope of the concept of "manifest" in relation to a review of a tribunal's alleged excess of powers.

94.     As will be further addressed in relation to the first annulment ground, the new authorities pertaining to the jurisdiction of the Tribunal should not have been submitted without seeking prior authorization, and their submission relates to admissibility, not weight as Italy argues.[75]

95.     Insofar as in this specific case Italy argues that decisions and developments in the law are a mere confirmation of a situation already in existence, it is difficult to see that it has a legitimate interest in relying on such new authorities.  That matter, however, needs to be reviewed in the context of the relevant annulment ground, in this case manifest excess of powers in relation to the Tribunal's decision on jurisdiction.

96.     The *ad hoc* Committee sees no basis to treat the *Green Power* award differently.  Italy posits that the decision is of "extraordinary relevance" as it concerned a dispute between an EU investor and

---

[72] Italy's Memorial on Annulment, ¶ 169.

[73] Italy's Reply on Annulment, ¶ 10.

[74] ESPF's Counter-Memorial on Annulment, pp. 3-5; ESPF's Opening Presentation, slides 45-48.  See also ESPF's Post-Hearing Brief, section 1.

[75] Italy's Reply on Annulment, ¶ 16.

another EU Member State in which the tribunal concluded that it lacked jurisdiction given the intra-EU nature of the dispute.  The *ad hoc* Committee is not persuaded by this argument.  There are numerous decisions involving European investors and EU Member States.  That circumstance does not make the *Green Power* award extraordinary.  Insofar as the argument is that the decision is extraordinary because it goes against the tide of other decisions, that might be true, but it is difficult to see why that would assist Italy in arguing that the *Green Power* award should inform the *ad hoc* Committee's decision.

97.     In light of the importance placed by the parties on the scope of the record in an annulment proceeding, and to ensure that Italy was provided ample opportunity to make its position clear in relation to this issue, the *ad hoc* Committee gave the Parties the opportunity to reply in writing to the *ad hoc* Committee's questions raised at the Hearing in relation to the scope of the record.  Italy's argument that a substantive rather than a formalistic approach should guide the *ad hoc* Committee[76] does not lead to a different conclusion in relation to the scope of the record generally or in relation to the *Green Power* award specifically.

98.     Insofar as Italy seeks to argue that new legal authorities should be allowed in order to ensure "a meaningful exchange" between the Parties that supports their respective arguments in the annulment proceedings, this would lead to a completely open-ended debate, inconsistent with the limitations set out above, and notably the principle that the only new legal authorities permissible are those that go to the scope of annulment.  The scope of an annulment proceeding cannot be equated with the underlying legal question before the tribunal.  The fact that annulment decisions may directly or indirectly address substantive legal issues does not justify the inclusion of authorities in the record if they were not in the original record before the tribunal.  This limitation, which Italy appears to consider "formalistic", is in the view of the *ad hoc* Committee a vital feature to ensure a sensible annulment system, *i.e.*, one that does not lead to an endless opportunity to re-open the substantive debate between the parties.

99.     Insofar as Italy submits that the *Green Power* award was not produced to introduce new facts or legal arguments, but merely to provide support for the old arguments submitted in the underlying arbitration proceedings, the *ad hoc* Committee sees even less scope for considering Italy's new legal authorities, because it is difficult to understand what interest Italy would have in admitting these authorities; after all, on its own view, they would be merely cumulative.  Italy's argument

---

[76] Italy's Post-Hearing Brief, ¶ 3.

also appears somewhat inconsistent with its earlier point that the *Green Power* award should be considered of "extraordinary relevance", which seems to be premised on the notion that the *Green Power* award comes to a different substantive outcome in comparison with other and earlier arbitral decisions.

100.    The *ad hoc* Committee agrees with ESPF that limiting the annulment record to the record before the tribunal is of particular significance insofar as jurisdiction is concerned, because a tribunal's jurisdiction is determined by reference to the date of the registration of the request for arbitration.[77]

101.    Finally, the *ad hoc* Committee notes that it has not been presented with any persuasive argument why the *Green Power* award might intrinsically be of such relevance, weight or importance so as to justify a deviation from the principles and considerations set out above.  ESPF has submitted a number of arguments why, in fact, the *Green Power* award is unpersuasive, faulty and illogical as a matter of international law.  Given the *ad hoc* Committee's conclusion that there is no basis to accept this authority in the record, the Committee will refrain from expressing any definitive views on ESPF's arguments in this respect, other than noting the fact that the present proceeding is an ICSID case having no legal seat, whereas the *Green Power* award involved an SCC tribunal seated in an EU State, which arguably makes the analysis *prima facie* distinguishable from the present case and proceedings.

## IV.    MANIFEST EXCESS OF POWERS

102.    Italy argues that the Tribunal has exceeded its powers by mistakenly exercising its jurisdiction over intra-EU claims, namely claims brought by EU nationals against another EU country,[78] and by failing to apply EU law.[79]  The gist of Italy's submission is that the EU countries did not consent to ECT-based arbitration over claims brought by EU investors.  In other words, the arbitration clause in Article 26 of the ECT does not apply to intra-EU investment claims.[80]

---

[77] **ELA-031**, C. Schreuer, *The ICSID Convention: A Commentary* (2d Ed. 2009), ¶ 36: "It is an accepted principle of international adjudication that jurisdiction will be determined by reference to the date on which judicial proceedings are instituted. This means that on that date all jurisdictional requirements must be met. It also means that events taking place after that date will not affect jurisdiction".

[78] Italy's Memorial on Annulment, ¶ 32.

[79] Italy's Reply on Annulment, ¶ 18.

[80] Italy's Memorial on Annulment, ¶ 36.

## A.    STANDARD OF REVIEW FOR MANIFEST EXCESS OF POWERS

### (1)    Italy's Position

103.    As to the applicable standard under Article 52(1)(b) of the ICSID Convention, Italy argues that if a tribunal exercises its jurisdiction over a claim falling outside its competence, it exceeds its powers manifestly.[81]  In this context, Italy refers to the decision of the *ad hoc* committee in *Glencore v. Colombia*, where that committee remarked that:

> "[t]he most obvious instance of an excess of power by a tribunal is the decision of an issue which falls outside the jurisdiction of the tribunal under the ICSID Convention or the relevant BIT (or other instrument conferring jurisdiction)."[82]

104.    Similarly, Italy continues, applying the wrong law can amount to a manifest excess of powers, as can the mistaken application of an applicable law, since "[c]onsent to arbitration is anchored to the parties' stipulation on the applicable law."[83]  In addition, Italy submits that an excess of powers, when it comes to jurisdiction, can even result from "a gross misapplication of the applicable law."[84] Ultimately, it is immaterial to distinguish whether the Tribunal has applied an inapplicable law (Article 26 of the ECT) or, instead, has misapplied the proper law so grossly that it established competence where it had none.[85]

105.    Italy accepts that an annullable excess of powers must also be manifest, but it argues that there is no more manifest excess than that of a tribunal deciding on the merits of a case over which it had, or could exercise, no jurisdiction.[86]  Italy disputes ESPF's allegation that even if the Tribunal erred in exercising jurisdiction, such excess of powers would not necessarily be "manifest" within the meaning of Article 52(1)(b) of the Convention.[87]

---

[81] *Id.*, ¶ 43.

[82] **ILA-010**, *Glencore International A.G. and C.I. Prodeco S.A. v. Republic of Colombia*, ICSID Case No. ARB/16/6, Decision on Annulment, 22 September 2021, ¶ 228.

[83] Italy's Memorial on Annulment, ¶ 46, citing **ILA-011**, *Soufraki* Decision on Annulment, ¶ 45; **ILA-012**, *EDF* Decision on Annulment, ¶ 19.

[84] Italy's Memorial on Annulment, ¶ 47, citing **ILA-013**, *Dogan* Decision on Annulment, ¶ 105.

[85] Italy's Memorial on Annulment, ¶ 48.

[86] *Id.*, ¶ 49.  See also Hearing Transcript, p. 34, lines 3-5.

[87] Italy's Reply on Annulment, ¶ 20.

106.    In this context, Italy refers to the decision of the Paris Court of Appeal in *Poland v. Strabag*, setting aside two arbitral awards that had (in the court's view) mistakenly upheld jurisdiction over two intra-EU disputes, in which the court relied upon the primacy of EU law.[88]

107.    Italy takes issue with ESPF's argument seeking to dismiss the manifest nature of any excess of powers here by referring to other arbitral decisions rejecting intra-EU objections, suggesting that an error cannot have been manifest if it has been overlooked by several tribunals.[89] Italy submits that decisions of other tribunals are not material in assessing whether the Tribunal has manifestly exceeded its powers in this case.[90]

108.    Italy further argues that "arbitration case law is not governed by the rule of precedent and the decisions of other Tribunals bear no authority on subsequent cases.  This Committee has the autonomy to establish its own views on whether Article 26 of the ECT gives jurisdiction to hear intra-European Union disputes."[91]  In its Post-Hearing Brief, Italy clarifies that while there is no rule of *stare decisis* in international adjudication, and investment tribunals are not formally bound by previous decisions,[92] this does not imply that investment arbitration tribunals are prevented from relying on previous decisions when deemed appropriate after engaging with their reasoning.  In this context, Italy submits that when tribunals reach opposite conclusions from previous decisions that dealt with similar matters, they should "provide a comprehensible reasoning as to why a specific decision can or cannot be followed."[93]

109.    In its Post-Hearing Brief, in response to the *ad hoc* Committee's questions, Italy further addressed the scope of an *ad hoc* committee's review of jurisdiction.  In its Memorial on Annulment, Italy had referred to the standard of review as "*de novo*".[94]  In its Post-Hearing Brief, Italy clarified that this term designates that the *ad hoc* Committee should review the Tribunal's jurisdictional decision without any deference to previous decisions, and added that in doing so Italy is not treating the *ad hoc* Committee as a court of appeal.[95]  Then again, Italy submits that reference to a decision such

---

[88] *Id.*, ¶ 22, citing **ILA-050**, *Republic of Poland v. Strabag, et al.*, Paris Court of Appeal No. RG 20/13085, 19 April 2022, ¶¶ 90-91.

[89] Italy's Reply on Annulment, ¶ 24.

[90] *Id.*, ¶ 25.

[91] *Id.*, ¶ 26.

[92] Italy's Post-Hearing Brief, ¶¶ 17-18.

[93] *Id.*, ¶ 19.

[94] Italy's Memorial on Annulment, ¶ 7.

[95] Italy's Post-Hearing Brief, ¶¶ 14-15.

as the *Green Power* award would be useful to shed light on the manifestness of the Tribunal's alleged excess of powers here.[96]

**(2)    ESPF's Position**

110.    ESPF argues that Italy advances the wrong legal standard.  It notes that Italy accepts that Article 52(1)(b) of the ICSID Convention imposes a dual test, namely an excess of powers, which was manifest.[97]

111.    ESPF accepts that an excess of powers may exist if a tribunal exercises jurisdiction that it does not have or if it fails to apply the correct law.[98]  However, ESPF argues that even if one of these errors has been committed, that alone does not amount to a manifest excess of powers.  The threshold for applying the "manifest" criterion is very high.[99]  For an error to be "manifest," the misapplication of a legal rule must be "of such a nature or degree as to constitute objectively (regardless of the Tribunal's actual or presumed intentions) its effective non-application."[100]  In sum, ESPF argues that "for a predicate error to constitute a 'manifest' excess of power, the error must attain such a 'gross and consequential' level that 'no reasonable person ("*bon père de famille*") could accept' it."[101]

112.    ESPF submits that the alleged error identified by Italy "does not come anywhere close to reaching this level."[102]  According to ESPF, the Tribunal's assumption of jurisdiction is not incorrect; on the contrary, the Tribunal reached the same conclusions with respect to the intra-EU jurisdictional objection and irrelevance of EU law that "have been reached by dozens of ECT tribunals to date."[103]  Furthermore, ESPF adds that "[e]ven assuming for the sake of argument that Italy were correct that the Tribunal erred in exercising its jurisdiction – which it is not – Italy would still need to demonstrate that the error was manifest, which it cannot, because every ECT tribunal considering

---

[96] *Id.*, ¶ 12.

[97] ESPF's Counter-Memorial on Annulment, ¶ 84; ESPF's Opening Presentation, slides 32-35; Hearing Transcript, p. 101, lines 20-24 and p. 102, lines 6-10.

[98] ESPF's Counter-Memorial on Annulment, ¶ 85.

[99] *Id.*, ¶ 86; ESPF's Opening Presentation, slide 34.

[100] ESPF's Counter-Memorial on Annulment, ¶ 86.

[101] *Id.*, ¶ 88; ESPF's Rejoinder on Annulment, ¶ 67; Hearing Transcript, p. 102, line 13-p. 103, line 1 and p. 187, lines 10-12.

[102] ESPF's Counter-Memorial on Annulment, ¶ 89; ESPF's Opening Presentation, slide 42.

[103] ESPF's Counter-Memorial on Annulment, ¶ 89.

this issue to date has reached the same conclusion."[104]  ESPF maintains that there is not a single ECT decision supporting Italy's position.

113.  In its Post-Hearing Brief, ESPF addresses the impact, if any, of the *Green Power* award and submits that, even if the *ad hoc* Committee were permitted to conduct the type of review for which Italy erroneously advocates, Italy has not put forth any evidence that calls into question the Tribunal's conclusion on jurisdiction.  The *Green Power* award reached an incorrect factual conclusion on the intention of the ECT Contracting Parties.[105]  It is Italy's burden to establish its case and, if it were obvious that the Tribunal had committed an error, Italy should demonstrate it with conclusive contemporaneous evidence of the ECT Contracting Parties' intent, rather than political statements and court or other decisions that emerged later.[106]

114.  ESPF refers to the *CMS v. Argentina* annulment decision as an illustration of how exacting the standard is.  The *CMS ad hoc* committee found two significant errors of law in the award but, nevertheless, concluded that there was no "manifest" excess of powers:[107]

> "The Committee recalls, once more, that it has only a limited jurisdiction under Article 52 of the ICSID Convention. In the circumstances, the Committee cannot simply substitute its own view of the law and its own appreciation of the facts for those of the Tribunal.  <u>Notwithstanding the identified errors and lacunas in the Award, it is the case in the end that the Tribunal applied Article XI of the Treaty. Although applying it cryptically and defectively, it applied it. There is accordingly no manifest excess of powers.</u>"[108] (emphasis added in Counter-Memorial on Annulment)

115.  ESPF submits that, in the present case, the Tribunal applied the correct law to the Parties' dispute and the issue of its jurisdiction, and that its application of that law was correct.  There are no *lacunas* or defects in the Award.[109]

---

[104] *Id*.  See also ESPF's Opening Presentation, slides 45-48; Hearing Transcript, p. 105, lines 5-20, p. 106, lines 11-24, p. 190, lines 2-24.

[105] ESPF's Opening Presentation, slide 90.

[106] ESPF's Post-Hearing Brief, ¶ 11.  See also ESPF's Opening Presentation, slide 88; Hearing Transcript, p. 107, line 17-p. 108, line 23.

[107] ESPF's Counter-Memorial on Annulment, ¶ 91.

[108] *Id.*, citing **ELA-037**, *CMS* Decision on Annulment, ¶ 136.

[109] ESPF's Counter-Memorial on Annulment, ¶ 92.

116.    ESPF submits that the ordinary meaning of "manifest" is obvious or clear. Annulment committee practice shows that a "manifest" excess of powers requires textual "obviousness" and "self-evidence" that is "plain on its face."[110]

117.    Recent jurisprudence reflects the same approach, including *Blusun v. Italy*, in which Italy was the annulment respondent and accepted that the meaning of manifest is "obvious and cannot depend on an elaborate or searching analysis of the award."[111]

118.    Still in relation to the "manifest" standard, ESPF refers to the decision of the *Teinver v. Argentina ad hoc* committee in support of the proposition that the existence of other awards reaching the same conclusion as the underlying tribunal almost by definition means that an error is not "manifest".[112]

119.    ESPF submits that the dual standard equally applies in relation to jurisdiction, contrary to what Italy asserts. In support thereof, it refers to the decision of the *InfraRed v. Spain ad hoc* committee, which held that:

> "[e]ven in matters of jurisdiction where excess of powers exists (and the lack of jurisdiction being 'the most obvious example of an excess of powers'), '*the view that any jurisdictional mistake is necessarily a*

---

[110] *Id.*, ¶ 94; ESPF's Opening Presentation, slide 35, citing **ELA-086**, ICSID, Updated Background Paper on Annulment for the Administrative Council of ICSID, 5 May 2016, ¶ 83. See also **ELA-117**, *Compañía Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on the Argentine Republic's Request for Annulment of the Award rendered on 20 August 2007, 10 August 2010, ¶ 245 ("must be 'evident'"); **ELA-119**, *Helnan International Hotels A/S v. Arab Republic of Egypt*, ICSID Case No. ARB/05/19, Decision on Annulment, 14 June 2010 ("**Helnan Decision on Annulment**"), ¶ 55 ("obvious or clear"); **ELA-036**, *M.C.I. Power Group, L.C. and New Turbine, Inc. v. Republic of Ecuador*, ICSID Case No. ARB/03/6, Decision on Annulment, 19 October 2009, ¶ 49 ("self- evident"); **ELA-118**, *Rumeli Telekom A.S., et al. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Decision on Annulment, 25 March 2010 ("**Rumeli Decision on Annulment**"), ¶ 96 ("evident on the face of the award"); **ELA-116**, *Azurix Corp v. Argentine Republic*, ICSID Case No. ARB/01/12, Decision on Annulment, 1 September 2009 ("**Azurix Decision on Annulment**"), ¶ 68 ("obvious"); **ILA-011**, *Soufraki* Decision on Annulment, ¶ 39 ("obviousness"); **ELA-111**, *Repsol YPF Ecuador, S.A. v. Empresa Estatal Petróleos del Ecuador (Petroecuador)*, ICSID Case No. ARB/1/10, Decision on Annulment, 8 January 2007, ¶ 36 ("obvious by itself"); **ILA-044**, *CDC* Decision on Annulment, ¶ 41 ("plain on its face").

[111] ESPF's Counter-Memorial on Annulment, ¶¶ 95-96, citing **ELA-091**, *Blusun* Decision on Annulment, ¶ 264. See also **ELA-0017**, *Tenaris* Decision on Annulment, ¶ 74.

[112] ESPF's Counter-Memorial on Annulment, ¶ 97, citing **ELA-095**, *Teinver* Decision on Annulment, ¶ 59 (emphasis added). See also ESPF's Counter-Memorial on Annulment, ¶¶ 98-99, citing **ELA-121**, *RMS* Decision on Annulment, ¶ 179; **ELA-021**, *Suez, Sociedad General de Aguas de Barcelona S.A. and Interagua Servicios Integrales de Agua S.A. v. Argentine Republic*, ICSID Case No. ARB/03/17, Decision on Respondent's Application for Annulment, 14 December 2018, ¶ 176; **ELA-035**, *Standard Chartered* Decision on Annulment, ¶¶ 181, 183; **ELA-038**, *Duke Energy* Decision on Annulment, ¶ 99; **ILA-044**, *CDC* Decision on Annulment, ¶ 41; **ILA-043**, *Wena* Decision on Annulment, ¶ 25.

*manifest excess of powers is not supported by the text of Article 52(1) of the ICSID Convention.*'"[113]

120.    Similarly, the *Total v. Argentina ad hoc* committee held that there is no support in the ICSID Convention for the proposition that different standards shall be applied to issues of jurisdiction.[114] ESPF submits that the relevant standard is whether the Tribunal's decision on jurisdiction was "tenable", not whether or not the Tribunal issued a correct decision.[115] Specifically, ESPF refers to *ad hoc* committee decisions such as those in *Antin v. Spain*, *Cube v. Spain, NextEra v. Spain*, *SolEs v. Spain*, and *InfraRed v. Spain*, which have applied the same standard when assessing whether a tribunal has manifestly exceeded its powers in the context of the intra-EU objection.[116]

121.    The present case, according to ESPF, is vastly clearer because "not a single ECT tribunal has ever accepted the *intra*-EU objection" and, in any case, the existence of "so many awards rejecting it [the intra-EU objection] would mean, by definition, that the Tribunal did not commit a 'manifest' error."[117] Decisions of other *ad hoc* committees on the intra-EU objection are probative as to whether a tribunal's decision is "tenable" and, therefore, not a "manifest" excess of powers.[118] The fact that over 40 ECT tribunals have rejected the intra-EU objection to jurisdiction is fatal to Italy's case on annulment.[119] Indeed, if this *ad hoc* Committee were to accept Italy's view, it would mean that every tribunal that upheld its jurisdiction under the ECT in intra-EU disputes has been wrong "in a way that it is obvious and evident."[120]

122.    ESPF submits that the single annulment authority Italy invokes in support of its position on the legal standard in Article 52(1) of the ICSID Convention, *Helnan v. Egypt*, actually assists ESPF's case.[121] Nothing in that decision supports the view that a tribunal may look outside its constitutive instruments and consider other treaties or bodies of law (EU law) when determining its own jurisdiction.

---

[113] **ELA-165**, *InfraRed* Decision on Annulment, ¶ 423.

[114] ESPF's Rejoinder on Annulment, ¶ 70, citing **ILA-020**, *Total* Decision on Annulment, ¶ 176.  See also Hearing Transcript, p. 105, line 23-p. 106, line 5.

[115] Hearing Transcript, p. 104, lines 7-13.

[116] ESPF's Rejoinder on Annulment, ¶ 72; ESPF's Opening Presentation, slides 40, 51; Hearing Transcript, p. 108, line 24-p. 109, line 25.

[117] ESPF's Counter-Memorial on Annulment, ¶ 100, citing **ELA-125**, *Antin* Decision on Annulment, ¶¶ 154, 156, 158.

[118] ESPF's Rejoinder on Annulment, ¶ 73.

[119] *Id.*, ¶ 74; Hearing Transcript, p. 104, lines 2-6 and p. 106, line 10-p. 107, line 8.

[120] ESPF's Counter-Memorial on Annulment, ¶ 101; Hearing Transcript, p. 191, lines 2-7.

[121] ESPF's Rejoinder on Annulment, ¶¶ 77-79, citing **ELA-119**, *Helnan* Decision on Annulment, ¶ 40.

123.    At the Hearing, in reply to the *ad hoc* Committee's questions, ESPF submitted that annulment is not an opportunity to reassess the original tribunal's conclusions on jurisdiction any more than it is an opportunity to reassess the original tribunal's conclusions on the merits.[122]  In this context, ESPF referred to the decision of the *RREEF v. Spain ad hoc* committee, which held "[i]n respect of jurisdiction, this means that ad hoc committees should not conduct *de novo* inquiries of any sort."[123]

124.    In sum, ESPF contends that Italy has not shown that the Tribunal committed an error in its reasoning on jurisdiction, much less a "manifest" excess of powers within the meaning of Article 52(1)(b) of the ICSID Convention.[124]

**(3)    The *ad hoc* Committee's Analysis**

125.    The *ad hoc* Committee notes – and this is not disputed by the Parties – that the standard imposed by Article 52(1)(b) of the ICSID Convention is twofold, requiring (i) an excess of powers, which is (ii) manifest.

126.    Where the Parties are not fully aligned is whether an alleged failure by the Tribunal to determine its jurisdiction properly is subject to a different and more onerous standard, sometimes referred to as a *de novo* review.  In particular, it is not entirely clear from the submissions whether Italy is of the view that a genuinely different standard applies in relation to jurisdiction, or whether its submission is that the fundamental nature of a decision regarding jurisdiction entails that an incorrect decision necessarily fulfils the standard imposed by the word "manifest" in Article 52(1)(b) of the ICSID Convention.  Italy's clarification in its Post-Hearing Brief suggests that, in using the terminology *de novo* review, it was not so much advocating a different level of scrutiny but rather urging the *ad hoc* Committee to review the Tribunal's jurisdictional decision without any reference to previous decisions, *i.e.*, legal authorities.[125]  This point will be further addressed below.

127.    ESPF insists (i) that the twofold test applies also in relation to jurisdiction, in support of which it invokes the *UP and C.D Holding v. Hungary* decision, where the *ad hoc* committee considered that there is no textual basis for the proposition that there are some scenarios in which the manifest requirement could be obviated; (ii) that the alleged error identified by Italy "does not come

---

[122] Hearing Transcript, p. 96, line 23-p. 97, line 3.
[123] *Id.*, p. 97, lines 3-8; ESPF's Post-Hearing Brief on Annulment, ¶¶ 6-7.  See also ESPF's Opening Presentation, slide 22.
[124] ESPF's Rejoinder on Annulment, ¶ 79.
[125] Italy's Post-Hearing Brief, ¶ 20.

anywhere close to reaching this level";[126] and (iii) that even if, for the sake of argument, Italy were correct that the Tribunal erred in exercising its jurisdiction, "Italy would still need to demonstrate that the error was manifest, which it cannot, because every ECT tribunal considering this issue to date has reached the same conclusion" as the Tribunal.[127]  At the Hearing, in recognition of the publication of the *Green Power* award, ESPF slightly rephrased its position by referring to the "numerous" ECT tribunals and ICSID *ad hoc* committees which have rejected the intra-EU objection, both before and after the judgment in *Moldova v. Komstroy*, rendered on 2 September 2021 in CJEU Case C-741/19 (the "***Komstroy* judgment**"),[128] and the issuance of the *Green Power* award.[129]

128. In evaluating these submissions, the *ad hoc* Committee first notes that Italy's critique of the Tribunal's decision in relation to jurisdiction is closely interwoven with its arguments in relation to the applicable law (whether to the merits or to the decision in relation to jurisdiction, as will be discussed below).  In that context, the *ad hoc* Committee agrees with the approach applied by the *ad hoc* committee in *Adem Dogan v. Turkmenistan*, which considered that, in rare cases, "an error of law may … be so egregious that it amounts to a failure to apply the proper law."[130]

129. The same *ad hoc* committee went on to hold as follows:

> "[W]hen deciding issues relating to its jurisdiction, in particular, a gross misapplication of the applicable law by a Tribunal can amount to a manifest excess of powers.  This would be the case when such misapplication leads a tribunal to conclude that it has jurisdiction when jurisdiction is lacking or when a tribunal exceeds the scope of its jurisdiction."[131]

130. That brings the *ad hoc* Committee to the next step in the analysis, being whether there is a fundamentally different standard of review in relation to jurisdictional decisions.  As noted above, ESPF advocates an explicit two-tier review, whereby the second tier, the potential manifestness, may be informed by the existence of a *jurisprudence constante*.  Italy's position is more ambivalent: on the one hand, it submits that decisions of other tribunals are not material in assessing whether

---

[126] ESPF's Counter-Memorial on Annulment, ¶ 89.

[127] *Id*.

[128] **ILA-001**, *Republic of Moldova v. Komstroy LLC*, Court of Justice of the European Union (Grand Chamber), ECLI:EU:C:2021:655, Case C-741/19, Judgment of 2 September 2021 ("***Komstroy* judgment**").

[129] ESPF's Opening Presentation, slides 45-48.

[130] **ILA-013**, *Dogan* Decision on Annulment, ¶ 105.

[131] *Id*.

the Tribunal has exceeded its powers in this case,[132] while in its Post-Hearing Brief it submits that, although there is no rule of *stare decisis* in international adjudication and investment arbitration, and investment tribunals are not formally bound by previous decisions,[133] this does not imply that investment tribunals are prevented from relying on previous decisions when deemed appropriate and after engaging with their reasoning. Indeed, Italy submits that reference to other decisions may be useful "to shed light on the manifestness of the Tribunal's excess of powers."[134]

131.    Thus, while Italy takes issue with the explicit two-tier approach, both Parties invoke, to a greater or lesser extent, the findings of other tribunals and *ad hoc* committees – many of which address legal and factual issues similar to those at stake in the present case – as relevant for determining whether there is a manifest excess of powers. In fact, Italy's latest submission seems to suggest that it, too, ultimately embraces an approach whereby the "manifestness", *i.e.*, the second tier, may be informed by referencing other tribunals' or committees' decisions.[135]

132.    The *ad hoc* Committee agrees with the proposition that there is no textual basis in the Convention for distinguishing between certain types of alleged excesses of powers or for applying a structurally different test to particular subsets of facts and circumstances. Then again, jurisdiction and the correct attribution thereof is a fundamental building block in arbitral decision-making, and this might arguably augur for a more searching review. Nevertheless, the prism through which the parties' arguments must be reviewed, also in relation to jurisdiction and the applicable law, is the two-step standard prescribed by Article 52(1)(b) of the ICSID Convention.

133.    Consequently, the *ad hoc* Committee will first consider whether an excess of powers has been demonstrated in the present case in relation to what Italy calls the intra-EU objection.

134.    As a next step, the *ad hoc* Committee may then be required to consider whether the requirement of "manifestness" has been met.

135.    In performing this analysis, the *ad hoc* Committee begins by noting that both Parties invoke numerous decisions in support of their submissions. In many instances, the same decision relevant to the first step, *i.e.*, the existence (or not) of an excess of powers, is also relevant for the second

---

[132] Italy's Reply on Annulment, ¶ 25.

[133] Italy's Post-Hearing Brief, ¶¶ 17-18.

[134] *Id.*, ¶ 12.

[135] *Id.*, ¶¶ 18-19.

step, *i.e.*, the "manifest" requirement. Consequently, while the structure set out above suggests a clean division between the two steps of the analysis, in fact the lines are more blurred.

136. With that caveat, and without prejudice to the considerations below in relation to specific aspects of the review as to whether an excess of powers has been demonstrated in relation to the Tribunal's jurisdictional decision, the *ad hoc* Committee accepts as a general proposition that, while decisions of other *ad hoc* committees and tribunals are not decisive, their existence (to the extent consistent with the underlying Tribunal's holdings) may well mean that no "manifest" error exists. As the *Teinver v. Argentina ad hoc* committee considered, "the fact that a tribunal has relied to make its decision on tangible solutions adopted in several previous cases may be considered as an indication that an excess of powers is not manifest."[136]

137. This perspective is particularly relevant in the present case, involving the intra-EU objection. While, after *Green Power v. Spain*, it can no longer be said that "not a single ECT tribunal has ever accepted the intra-EU objections," the position remains that there is a long and relatively homogenous line of arbitral decisions that have dismissed the intra-EU jurisdictional objections and upheld the jurisdiction of the respective ECT tribunals – constituting, in the words of the *Antin v. Spain ad hoc* committee (citing the *Infrared v. Spain* tribunal), "a persuasive, reasoned and documented analytical framework."[137] It is within this framework that the present *ad hoc* Committee will assess whether the Tribunal manifestly exceeded its powers by finding that it had jurisdiction over the Parties' dispute.

## B.   APPLICATION OF THE STANDARD TO THE TRIBUNAL'S EXERCISE OF JURISDICTION

138. The parties have deployed multi-layered arguments on the question of whether the Tribunal exceeded its powers by upholding jurisdiction over an intra-EU dispute and, if so, whether that error was "manifest." The *ad hoc* Committee will summarize those arguments in some detail below before moving to its own analysis.

---

[136] **ELA-095**, *Teinver* Decision on Annulment, ¶ 59.

[137] **ELA-125**, *Antin* Decision on Annulment, ¶ 154, citing **ELA-063**, *InfraRed Envt'l Infra. GP Ltd. et al. v. Kingdom of Spain*, ICSID Case No. ARB/14/12, Award, 2 August 2019 ("***InfraRed* Award**"), ¶ 260.

**(1)    Italy's Position**

*(a)  No consent to arbitrate*

139.    Italy's key contention is that, by upholding jurisdiction based on Article 26 of the ECT, the Tribunal manifestly exceeded its powers.[138]  Italy submits that in light of the *Komstroy* judgment in September 2021:

> "The trite platitude that, since the ECT is different from intra-EU BITs, the effects of *Achmea* do not concern the ECT, no longer holds – if it ever did. …  Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State. … EU law precludes the application of Article 26 of the ECT to intra-EU claims, and the age of plausible deniability regarding this assertion has ended."[139]

140.    Italy posits that the ECT was never intended to regulate energy policy inside the internal market, that is, in the relationship between EU Member States, as the EC, having conceived the ECT, is best placed to verify.[140]  Italy submits that the ECT was inapplicable *ab initio* to intra-EU disputes or, in the alternative, ceased to apply to them after the conclusion of the Lisbon Treaty.[141]  The Tribunal, therefore, committed a manifest error when in declined to consider EU law as part of the applicable law in the proceedings, much less grant it primacy over the ECT.[142]

141.    Italy submits that when the EU and its EU Member States concluded the ECT, they accepted the possibility of arbitration between non-EU investors and EU Member States, and between EU investors and non-EU Member States.[143]  However, the EU could not have consented to anything more, because the distribution of powers between the EU and its Member States did not allow them to do so.[144]  In particular, agreeing to arbitrate disputes between EU investors and Member States would have breached the already existing obligations now codified in Articles 3(2), 19, and 267 of the Treaty of the European Union ("**TEU**") and Article 344 of the Treaty on the Functioning of the

---

[138] Italy's Memorial on Annulment, ¶ 32.

[139] *Id.*, ¶ 38.  See also *id.*, ¶ 8.

[140] *Id.*, ¶ 56.

[141] *Id.*, ¶ 57.

[142] *Id.*, ¶ 58.

[143] *Id.*, ¶ 59.

[144] *Id.*, ¶ 60.

European Union ("**TFEU**").  These obligations are, moreover, essential components of the unity and integrity of the EU's legal order.[145]

142.    Italy acknowledges that, at the time of the conclusion of the ECT, the EU and its Member States shared the competencies required to become parties to the treaty and intended to do so.  However, "with respect to all or some of the ECT obligations, Italy does not owe performance to a subset of the ECT membership, because to them it owes *other* international obligations, pre-existing, more comprehensive and more specific."[146]  Italy submits that, as the judgment issued in *Slovakia v. Achmea* rendered on 20 April 2018 in CJEU Case C-284/16 (the "*Achmea* **judgment**")[147] confirmed, EU law precludes Member States from agreeing to *inter se* arbitration, as this would contravene the principle of autonomy of EU law.  The *Achmea* judgment confirms that this has *always* been the case.[148]

143.    Italy submits that there is nothing surprising about that result.  The principal purpose of the ECT is to promote energy development in the former Union of Soviet Socialist Republics (the "**USSR**"), and not among EU Member States.[149]

144.    Italy proceeds to criticize the Tribunal's conclusion that there is no "disconnection clause" in the ECT, *i.e.*, a clause which limits the scope of a treaty by excluding application of the relevant treaty to a particular subset of situations, in this case excluding intra-EU disputes from the ECT.  Italy says that rather than focusing on the absence of an explicit or implicit disconnection clause in the ECT, a proper application of the Vienna Convention on the Law of Treaties ("**VCLT**") requires considering whether the ECT *precludes* an intra-EU exception, not the other way around.[150]  Italy submits that the autonomy and primacy of EU law allows the EU and its Member States to apply EU law rather than international law where EU matters are concerned, regardless of the existence or not of an explicit disconnection clause.[151]  The ultimate interpreter of EU law is the CJEU, which enjoys a judicial monopoly to determine its scope and content.[152]

---

[145] Italy's Post-Hearing Brief, ¶ 23.

[146] Italy's Memorial on Annulment, ¶ 61 (emphasis in the original).

[147] **ILA-005**, *Slovak Republic v. Achmea BV*, Court of Justice of the European Union, Case C-284/16, Judgment of 20 April 2018.

[148] Italy's Post-Hearing Brief, ¶ 23.

[149] Italy's Reply on Annulment, ¶ 36.

[150] Italy's Memorial on Annulment, ¶ 62.

[151] Italy's Reply on Annulment, ¶ 40.

[152] *Id.*, ¶ 43.

145. EU Member States and the EU, when they conclude an international agreement, "must observe 'the requirement of unity in the international representation of the Community.'"  Referring to the CJEU's Opinion 1/17, Italy adds that "provisions establishing investor-State dispute settlement can only operate vis-à-vis third countries, since within the EU the legal principle of mutual trust (*i.e.*, the conviction that the courts of another Member States are capable and fair) precludes their application, just like within a single jurisdiction."[153]

146. Italy further contends that the ECT, being a treaty aiming at fostering international relations between the EU and third States, cannot be interpreted as allowing arbitration between EU Member States and investors, which would be "in blatant contradiction to EU law."[154]  Italy submits that a simple comparison between the purpose of the EU Treaties and that of the ECT establishes that the EU treaties prevail over the ECT.[155]  Moreover, Article 16 of the ECT "does not entail promoting forum shopping at the expense of the integrity of the EU legal order."[156]

147. Article 16 of the ECT ensures investors that, when the ECT and another international source afford substantive rights of the same nature, they are not precluded from benefiting from the more favorable one.[157]  That is said to be the case here, on the ground that "EU law, within the Internal Market, is a vastly superior source of procedural and substantive rights for EU citizens and companies."[158]  Similarly, Articles 24 and 25 of the ECT clarify that the ECT does not result in the automatic extension of its internal privileges to third parties.[159]

148. Furthermore, Italy argues, the ECT is part of EU law and, therefore, has a direct effect domestically.[160]  Italy refers to the World Trade Organization ("**WTO**") agreement as the closest comparator for the design of the ECT.  Like the ECT, the Marrakesh Agreement Establishing the WTO ("**WTO Agreement**") does not contain a disconnection clause, and yet its obligations are inapplicable as between EU Member States.[161]

---

[153] Italy's Memorial on Annulment, ¶ 63, citing **ILA-024**, CJEU, Opinion 1/17 of 30 April 2019, EU:C:2019:341, ¶¶ 120-129.

[154] Italy's Reply on Annulment, ¶ 41.

[155] *Id.*, ¶¶ 43-44.

[156] *Id.*, ¶ 44.

[157] Italy's Memorial on Annulment, ¶ 64.

[158] *Id.*, ¶ 67.

[159] *Id.*, ¶ 65.

[160] *Id.*, ¶ 68.

[161] *Id.*, ¶ 75.

149.    The Tribunal disregarded the ECT's context by fixating on the literal meaning of its provisions.[162] Italy argues that the Tribunal "degraded the context and purpose, which form part of the holistic rule of interpretation of treaties of Article 31(1) VCLT, to supplementary means of interpretation (Article 32 VCLT)," even though "context and purpose in fact must concur to determine the clear meaning of a provision, *together* with its ordinary meaning."[163]  Furthermore, referring to Article 32(a) of the VCLT, Italy argues that if one assumes that that the ordinary meaning of a provision and its contextual meaning are in contradiction, as the Tribunal seemed to do, Article 31(1) of the VCLT provides no hierarchy, allowing recourse to supplementary means of interpretation such as the circumstances of the treaty's conclusion.[164]

150.    In the alternative to its primary assertion that Article 26 of the ECT never provided for intra-EU arbitrations, Italy submits that the EU Member States could and did modify their commitments under the ECT by means of the Lisbon Treaty, which entered into force in 2009[165] and which does not provide for investment arbitration.[166]  Italy argues that the only reason why the EU and its Member States concluded the ECT as a "mixed" agreement (*i.e.*, entered into by them all) is that at the time, the EU held exclusive competence over trade and shared competence over other matters including energy, while the Member States remained competent over foreign direct investment.[167] Pursuant to Article 207 of the TFEU, the EU assumed exclusive competence over foreign direct investment.[168]

151.    The Lisbon Treaty represents *lex posterior* and, therefore, pursuant to Articles 30(3) and 30(4)(a) of the VCLT, the ECT only applies to the extent its provisions are compatible with the Lisbon Treaty.[169]  Italy argues that the failure of the EU Member States to issue a notification pursuant to Article 41(2) of the VCLT does not render the modification inexistent or invalid.[170]  In its Post-Hearing Brief, Italy explains that parties to a multilateral treaty like the ECT can modify the treaty as between themselves, as long as the modification does not affect the rights of other parties and is compatible with the ECT's object and purpose.  Such modification does not require specific

---

[162] *Id.*, ¶ 79.
[163] *Id.*, ¶ 80.
[164] *Id.*, ¶ 81.
[165] *Id.*, ¶ 85.
[166] *Id.*, ¶ 86.
[167] Italy's Post-Hearing Brief, ¶ 25.
[168] *Id.*, ¶ 29; Hearing Transcript, p. 21, lines 5-9.
[169] Italy's Post-Hearing Brief, ¶ 34.
[170] Italy's Memorial on Annulment, ¶ 86.

agreement or notification.[171]   In any event, Italy says, "all ECT parties have consented to [the ECT's] special application within the EU," namely the non-intra-EU application of Article 26 of the ECT, as reflected by the legally binding subsequent practice of the ECT parties.[172]

152.   Italy also invokes the EU Member States' declaration on the effects of the *Achmea* judgment on investment protection and arbitration issued on 15 January 2019 (the "**EU Member States' Declaration**").[173]   Italy notes the three EU states implicated in the current dispute, being Italy, Germany and Austria, signed that Declaration.   Furthermore, Germany and Austria sent letters to the underlying Tribunal advising it of the Declaration and its implication.[174]

153.   On all of these grounds, Italy contends that Article 26 of the ECT does not provide for arbitration between EU nationals and EU Member States.   By holding otherwise, the Tribunal committed a manifest excess of powers.

*(b)  EU law is part of the applicable law*

154.   Alternatively, Italy submits that the Tribunal should have declined to exercise jurisdiction, even after the initial mistake of entertaining the claim under Article 26 of the ECT, because the applicable law includes EU law, and, therefore, the primacy of EU law should have been respected.[175]   As Italy puts it in its Post-Hearing Brief, "[a]fter the Lisbon Treaty, the ECT can be considered as EU law, and must be interpreted according to the key principles of such legal system."[176]   By failing to accord primacy to EU law, Italy says, the Tribunal manifestly failed to apply the applicable law and thereby committed annullable error.

155.   Italy begins by arguing that "Article 26(6) of the ECT refers to the 'applicable rules … of international law', and EU law applies in the relationship between Member States and within each Member State's jurisdiction."[177]   Italy refers to the *Electrabel v. Hungary* decision in support of the proposition that the fact that EU law is also applied within the national legal order of each EU

---

[171] Italy's Post-Hearing Brief, ¶ 33.

[172] Italy's Memorial on Annulment, ¶ 88, citing **ILA-026**, *Hassan v. United Kingdom,* European Court of Human Rights (GC), Application No. 29750/09, Judgment of 16 September 2014, ¶ 101.

[173] **ILA-006**, Declaration of the Representatives of the Governments of the EU Member States of 15 January 2019 on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union.

[174] Italy's Memorial on Annulment, ¶ 91.

[175] *Id.*, ¶ 94.

[176] Italy's Post-Hearing Brief, ¶ 36.

[177] Italy's Memorial on Annulment, ¶ 95.

Member State does not deprive it of its international legal nature. EU law remains international law.[178] Italy further argues that:

> "[i]n the decision of 13 October 2021, with which it [the *ad hoc* Committee] rejected the EC Application to Intervene, the Committee confirmed that 'the questions that comprise the present dispute', and on which it exercises jurisdiction, hinge on an interpretation and application of the Treaties of the EU. Therefore, in the Committee's view, the EC characterisation of itself as 'the guardian of the treaties' 'provides a sufficient basis to reject' its request to intervene."[179]

156. Italy proceeds to submit that "questions of EU law are central 'questions that comprise the present dispute,'" and that the Tribunal's "faulty appraisal and understanding of EU law" results in the annullability of the Award.[180] Awards such as the present one, dismissing the relevance of EU law to the tribunals' jurisdiction, need "radical rethinking".[181]

157. Even tribunals that upheld jurisdiction over ECT-based intra-EU claims are said by Italy to have shown signs of hesitation, which in hindsight reveals their mistakes.[182] The correct construction of EU law, which the Tribunal, Italy and the *ad hoc* Committee are under a duty to accept, has been authoritatively stated by the EU Member States, the EC, and the CJEU.[183]

158. Furthermore, since EU law is part of the applicable law, the Tribunal's failure to heed the binding judgments of the CJEU, and in particular the *Achmea* judgment, was an annullable error.[184] The judicial system of the EU is inherently incompatible with the possibility of Member States establishing a parallel dispute settlement mechanism which may concern the interpretation and application of EU law.[185] And indeed, the CJEU has interpreted Article 344 of the TFEU to preclude such a mechanism.[186] The Tribunal was incorrect in concluding that, since Article 344 of

---

[178] *Id.*, ¶¶ 95-96, citing **ILA-021**, *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Decision on Jurisdiction, Applicable Law and Liability, 30 November 2012 ("***Electrabel* Decision on Jurisdiction**"), ¶ 4.124; Decision on the EC's Application for Leave to Intervene as Non-Disputing Party of 13 October 2021, ¶ 49.

[179] Italy's Memorial on Annulment, ¶ 96.

[180] *Id.*, ¶ 98.

[181] *Id.*, ¶ 104.

[182] Id., ¶ 99, citing **ILA-028**, *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017, ¶ 199.

[183] Italy's Memorial on Annulment, ¶ 101; Italy's Reply on Annulment, ¶ 31.

[184] Italy's Memorial on Annulment, ¶ 102.

[185] Italy's Post-Hearing Brief, ¶ 39.

[186] *Id.*, ¶ 40.

the TFEU only refers expressly to inter-State disputes, the provision does not apply to investor-State arbitration.[187]

159.    Any forum deciding on the effects of EU law must ensure that it decides in accordance with the case law of the CJEU.[188]  This is supported by the fact that, "[w]hen the ECT was concluded, the role of the CJEU was accepted."[189]  The correctness of this view has been borne out by the subsequent statements of Italy, Germany and Austria, and then the CJEU itself.[190]  In its Reply on Annulment, Italy queries how EU law could have been deemed "not relevant" by the Tribunal, especially given that the subject matter of this dispute, *i.e.*, incentives for renewable energy, is regulated by EU Directive 28/2009.[191]

160.    The only possible conclusion, in Italy's view, is that EU law formed part of the applicable law and precluded the Tribunal's jurisdiction.  The Tribunal ignored the applicable law in that regard, thereby manifestly exceeding its powers.

### (c)  Correct construction of Article 26 of the ECT

161.    The operation of EU law is premised upon the uniform interpretation and application of EU law throughout the EU, which is achieved through a system in which the binding interpretation and application of EU law "is reserved to a composite system made up of domestic courts … and the EU judiciary."[192]  To this effect, Article 267 of the TFEU provides for the possibility of requesting preliminary rulings from the CJEU on points of EU law that matter for the administration of

---

[187] Italy's Memorial on Annulment, ¶ 105.  See also Italy's Reply on Annulment, ¶ 37.

[188] Italy's Memorial on Annulment, ¶ 108.

[189] *Id.*, ¶ 109, citing **ILA-022**, EC Declaration regarding Annex ID of the ECT – Statement sent by Council and Commission on 17 November 1997.

[190] Italy's Memorial on Annulment, ¶ 111.

[191] In the Annulment proceeding, Italy raised the importance of the system of State aid law in general terms, but did not point to examples where in the underlying arbitration it had invoked State aid as an argument, let alone how the decision of the Tribunal would have given rise to a ground for annulment on that basis.  See Italy's Reply on Annulment, ¶ 32; Hearing Transcript, p. 173, lines 1-7: "The issue of jurisdiction is the very heart of this dispute, as the investors tried to obtain economic incentives, [which] stems from the enforcement of the EU Directive. The substantial position derived of the investors to gain incentives, it's completely linked to the EU Directives"; and lines 12-25: "we would breach the EU rules on State aid and we would be fined by the EU Commission. So it's worth recalling that without such EU legal source, Italy would have never been able to grant incentives to the photovoltaic sector, something that more or less all the European countries did during that period without breaching the rules on State aid. Once demonstrated that the very rights at stake somehow depend from the EU, one cannot overlook the very Directive monitoring to avoid[] extra profits. As you can see, EU law is everywhere in this case"."

[192] Italy's Memorial on Annulment, ¶ 117.

domestic proceedings, while Article 344 of the TFEU precludes EU Member States from submitting intra-EU disputes to tribunals outside the EU legal system.[193]

162. Italy underlines the importance of the preliminary ruling procedure for the existence and effectiveness of EU law, as well as the importance of Article 267 of the TFEU for safeguarding the uniform interpretation of EU law across the EU Member States.[194]  Italy submits that "[t]he EU legal order's autonomy is a general principle of EU law" and "a source of legal obligations for the Member States."[195]

163. Investment arbitrations between EU nationals and EU Member States would contravene these obligations, such that "neither the EU nor the Member States could have consented to it."[196]  Otherwise, this would imply that EU Member States and the EU could have committed themselves to a breach of EU law and to the binding interpretation of EU law by bodies outside the EU legal order.[197]  The *Achmea* judgment already clarified the legal position in this regard.[198]  Italy disputes ESPF's and the Tribunal's view that the scope of the *Achmea* judgment is limited to intra-EU BITs, and thus not applicable in a situation such as the ECT, which is a treaty also signed by the EU.[199]

164. Italy rebuts ESPF's argument that failure to apply the proper law rarely justifies annulment, by pointing out that cases of the gravity of the present one are rare.  Here, an entire body of law clearly pointing to the absence of jurisdiction has been completely disregarded by the Tribunal, resulting in an obvious excess of powers.[200]

*(d) The Komstroy judgment and its implications*

165. Italy submits that the law has not changed as a result of the *Komstroy* judgment.  Rather, that decision merely confirmed existing law in holding that the ECT's arbitration clause does not apply to intra-EU disputes, and that any contrary interpretation is "legally wrong".  The *Komstroy*

---

[193] *Id.*, ¶ 118.

[194] *Id.*, ¶ 119, citing **ILA-027**, *Consorzio Italian Management and Catania Multiservizi SpA v. Rete Ferroviara Italiana SpA*, Court of Justice of the European Union (GC), Case C-561/19, Judgment of 6 October 2021, ¶ 27.

[195] Italy's Memorial on Annulment, ¶ 120.

[196] *Id.*, ¶ 121.

[197] *Id.*, ¶ 122, citing **ILA-005**, *Slovak Republic v. Achmea BV*, Court of Justice of the European Union, Case C-284/16, Judgment of 20 April 2018, ¶¶ 32, 42.

[198] Italy's Memorial on Annulment, ¶ 122.

[199] *Id.*, ¶¶ 123-126.

[200] *Id.*, ¶¶ 46-48; Italy's Reply on Annulment, ¶ 34.

judgment confirms that the Tribunal exercised jurisdiction in the arbitration only pursuant to a manifest mistake, consisting of the gross misapplication of the ECT.[201]

166.    In its papers, Italy describes the *Komstroy* judgment, which it reads as holding that "[i]n the relationship between two parties, the ECT is tantamount to a bilateral instrument, and effectively corresponds to a bilateral investment treaty."[202]  Consequently, *inter se*, the EU Member States have conferred the interpretation and application of the ECT exclusively to the CJEU.[203]

167.    Italy recognizes that the *ad hoc* Committee should make its determination "in light of the evidence and submissions which were before the Tribunal."[204]  However, the relevant argument was already fully developed when Italy submitted to the Tribunal its request for termination of the proceedings in the wake of the EU Member States' Declaration.  Subsequent developments, such as the *Komstroy* judgment, do not constitute new evidence.[205]  By dismissing Italy's objections relating to EU law, the Tribunal has exercised a competence it did not have and, as a result, manifestly exceeded the powers conferred upon it by the ECT's arbitration clause.[206]

### (e)  The Green Power award

168.    In relation to the *Green Power* award, Italy submits that the award marks overdue recognition that intra-EU disputes cannot be brought before tribunals under Article 26 of the ECT.  Italy underlines the paramount relevance of this award as well as its similarity with the present dispute.[207]

## (2)    ESPF's Position

### (a)  Overwhelming jurisprudence constante

169.    As an initial and overarching point, ESPF submits that in light of the overwhelming *jurisprudence constante* rejecting the intra-EU objection, there is no excess of powers, much less a "manifest"

---

[201] Italy's Memorial on Annulment, ¶ 115, citing **ILA-001**, *Komstroy* judgment, ¶ 66.

[202] Italy's Memorial on Annulment, ¶¶ 127-136, citing **ILA-001**, *Komstroy* judgment, ¶ 28.

[203] Italy's Memorial on Annulment, ¶ 136.

[204] *Id.*, ¶ 137.

[205] *Id.*, citing **ILA-016**, *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Decision on Annulment, 23 December 2010, ¶ 44.

[206] Italy's Memorial on Annulment, ¶ 138.

[207] Italy's Letter of 23 September 2022, ¶¶ 15-16.  See also Hearing Transcript, pp. 25-28.

one.[208]  At the time the Tribunal considered the objection, there was no authority in international law accepting it.

170.    Notwithstanding one outlier in an SCC arbitration, *Green Power v. Spain*, no ICSID tribunal has accepted the objection.  In its written submissions and at the Hearing, ESPF reviewed the numerous cases in which ECT tribunals, including all ICSID tribunals that have addressed this matter, have rejected the intra-EU objection, and in fact unanimously.[209]  Consequently, a decision in line with

---

[208] ESPF's Opening Presentation, slide 42.

[209] ESPF's Counter-Memorial on Annulment, ¶ 109; ESPF's Rejoinder on Annulment, ¶¶ 74-75, 82; ESPF's Opening Presentation, slides 45-48.  See also **ELA-033/ILA-021**, *Electrabel* Decision on Jurisdiction; **ELA-032**, *Electrabel S.A. v. Republic of Hungary*, ICSID Case No. ARB/07/19, Award, 25 November 2015; **ELA-050**, *PV Investors v. Kingdom of Spain*, PCA Case No. 2012-14, Preliminary Award on Jurisdiction, 13 October 2014; **ILA-029**, *Charanne B.V. and Constr. Invs. S.à.r.l. v. Kingdom of Spain*, SCC Arb. No. 062/2012, Award, 21 January 2016; **ELA-049**, *RREEF Infra. (G.P.) Ltd. and RREEF Pan-European Infra. Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016; **ILA-030**, *Isolux Infra. Netherlands, B.V. v. Kingdom of Spain*, SCC Arb. No. 2013/153, Award, 12 July 2016; **ELA-051**, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v. Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016; **ILA-028**, *Eiser Infrastructure Limited and Energía Solar Luxembourg S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/36, Award, 4 May 2017; **ELA-052**, *Novenergia II – Energy & Env't (SCA), SICAR v. Kingdom of Spain*, SCC Arb. 2015/063, Final Award, 15 February 2018; **ELA-053**, *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018; **ELA-054**, *Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar B.V. (formerly Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.) v. Kingdom of Spain*, Award, 15 June 2018; **ELA-055**, *Vattenfall AB, et al. v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the *Achmea* Issue, 31 August 2018 ("**Vattenfall** Decision"); **ELA-056**, *Foresight Lux. Solar 1 S.à.r.l., et al. v. Kingdom of Spain*, SCC Arb. No. 2015/150, Final Award, 14 November 2018; **ELA-057**, *RREEF Infra. (G.P.) Ltd. and RREEF Pan-European Infra. Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018; **ELA-122**, *Greentech Energy Systems A/S et al. v. Italian Republic*, SCC Arb. No. 2015/095, Award, 23 December 2018 ("**Greentech** Award"); **ELA-048**, *Cube Infra. Fund SICAV et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Jurisdiction, Liability and Partial Decision on Quantum, 19 February 2019 ("**Cube** Decision on Jurisdiction"); **ELA-058**, *Landesbank Baden Württemberg et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/45, Decision on the "*Intra*-EU" Jurisdictional Objection, 25 February 2019 ("**LBBW** Decision"); **ELA-060**, *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Termination and *Intra*-EU Jurisdictional Objection, 7 May 2019 ("**Eskosol** Decision"); **ELA-162**, *NextEra* Decision on Annulment; **ELA-123**, *9REN Holding S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019; **ELA-061**, *Rockhopper Italia S.p.A. et al. v. Italian Republic*, ICSID Case No. ARB/17/14, Decision on the *Intra*-EU Jurisdictional Objection, 26 June 2019 ("**Rockhopper** Decision"); **ELA-062**, *SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38, Award, 31 July 2019; **ELA-063**, *InfraRed* Award; **ELA-064**, *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No. ARB/15/36, Award, 6 July 2019; **ELA-065**, *Stadtwerke München GmbH et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019; **ELA-066**, *BayWa r.e. Renewable Energy GmbH and BayWa r.e. Asset Holding GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 ("**BayWa** Decision"); **ELA-067**, *RWE Innogy GmbH & RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability, and Certain Issues of Quantum, 30 December 2019; **ELA-068**, *Watkins Holding S.à.r.l. et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/44, Award, 21 January 2020; **ELA-069**, *PV Investors v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020; **ELA-070**, *Hydro Energy 1 S.à.r.l. and Hydroxana Sweden AB v. Kingdom of Spain*, ICSID Case No. ARB/15/42, Decision on Jurisdiction, Liability and Directions on Quantum, 9 March 2020; **ELA-071**, *Cavalum SGPS, S.A. v. Kingdom of Spain*, ICSID Case No. ARB/15/34, Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020; **ELA-081**, Award; **ELA-072**, *STEAG GmbH v. Kingdom of Spain*,

44

this consistent line of cases – such as the one made by the Tribunal – cannot constitute an excess of power, much less a "manifest" excess.

171.  ESPF submits that Italy cannot simply write off the weight of that overwhelming authority by claiming that it is "immaterial whether other tribunals have committed the same mistake"[210] or that these cases contain "debatable findings".[211]  On the contrary,[212] the fact that there is not a single

---

ICSID Case No. ARB/15/4, Decision on Jurisdiction, Liability and Instructions on Quantification of Damages, 8 October 2020; **ELA-075**, *FREIF Eurowind Holdings Ltd. v. Kingdom of Spain*, SCC Case No. 2017/060, Final Award, 8 March 2021; **ELA-076**, *Eurus Energy Holdings Corp. v. Kingdom of Spain*, ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, 17 March 2021; **ELA-124**, *Mathias Kruck et al v. Spain*, ICSID Case No. ARB/15/23, Decision on Jurisdiction and Admissibility, 19 April 2021; *ČEZ, a.s. v. Republic of Bulgaria*, ICSID Case No. ARB/16/24, Decision on Jurisdiction, 2 March 2021, see **E-062**, D. Charlotin, *ICSID tribunal rejects intra-EU objection in ECT case against Bulgaria*, IA REPORTER, 4 March 2021; **ELA-158**, *Infracapital F1 S.à.r.l. and Infracapital Solar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/16/18, Decision on Jurisdiction, Liability and Directions on Quantum, 13 September 2021; *Amlyn Holding B.V. v. Kingdom of Croatia*, ICSID Case No. ARB/16/28, Final Award, 22 October 2021, see **E-061**, V. Djanic, *ICSID tribunal finds discrete ECT breach in intra-EU case against Croatia, but claimant is awarded no damages due to lack of causation*, IA REPORTER, 28 October 2021; *Landesbank Baden-Württemberg and others v. Kingdom of Spain*, ICSID Case No. ARB/15/45, Decision Dismissing Respondent's Request for Reconsideration of the Tribunal's Decision on the *Intra*-EU Objection, 11 November 2021, see **E-058**, D. Charlotin, *ICSID Tribunal Hearing Claims by State-Owned German Banks Against Spain Declines to Reconsider* Intra-*EU Decision in Light of the CJEU's* Komstroy *Decision*, IA REPORTER, 13 December 2021; **ELA-157**, *Mathias Kruck et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/23, Decision on the Respondent's Request for Reconsideration of the Tribunal's Decision dated 19 April 2021, 6 December 2021 ("***Kruck* Decision**"); **ELA-159**, *Rockhopper Exploration Plc, Rockhopper Italia S.p.A. and Rockhopper Mediterranean Ltd v. Italian Republic*, ICSID Case No. ARB/17/14, Decision Dismissing the Italian Republic's Request for Reconsideration of the Tribunal's Decision on the *Intra*-EU Jurisdictional Objection, 13 September 2021; **ELA-160**, *Cavalum SGPS, S.A. v. Spain*, ICSID Case No. ARB/15/34, Decision on the Kingdom of Spain's Request for Reconsideration, 10 January 2022; *Mainstream Renewable Power Ltd and others v. Federal Republic of Germany*, ICSID Case No. ARB/21/26, Decision on Respondent's Application under ICSID Arbitration Rule 41(5), 18 January 2022, see **E-063**, L. Bohmer, *Analysis: Rule 41(5) Decision Surfaces in German ECT Wind Power Arbitration, Revealing That ICSID Tribunal Found That Neither the Intra-EU Nature of The Dispute, Nor the German Nationality Of Some Of The Claimants Warranted An Early Dismissal Of The Case*, IA REPORTER, 31 January 2022; **ELA-135**, *Infracapital F1 S.à.r.l. and Infracapital Solar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/16/18, Decision on Respondent's Request for Reconsideration regarding the Intra-EU Objections and the Merits, 1 February 2022; **ELA-171**, *Sevilla Beheer B.V. and others v. Kingdom of Spain*, ICSID Case No. ARB/16/27, Decision on Jurisdiction, Liability and The Principles of Quantum; **ELA-167**, *SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38, Decision on Annulment, 16 March 2022; **ELA-163**, *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Annulment, 28 March 2022; **ELA-170**, *RENERGY S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/14/18, Award, 6 May 2022; **ELA-165**, *InfraRed* Decision on Annulment; **ELA-166**, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Annulment, 10 June 2022; **ELA-175**, *LSG Building Solution GmbH et al. v. Romania*, ICSID Case No. ARB/18/19, Decision on Jurisdiction, Liability and Principles of Reparation, 11 July 2022; **ELA-173**, *Infracapital F1 S.à.r.l. and Infracapital Solar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/16/18, Decision on Respondent's Second Request for Reconsideration, 19 August 2022; **ELA-174**, *Cavalum SGPS, S.A. v. Kingdom of Spain*, ICSID Case No. ARB/15/34, Procedural Order No. 6 on the Kingdom of Spain's Request for Reconsideration of the Tribunal's Decisions on Jurisdiction of 31 August 2020 and 10 January 2022, 7 September 2022.

[210] ESPF's Counter-Memorial on Annulment, ¶ 110.

[211] ESPF's Rejoinder on Annulment, ¶ 88.  See also Italy's Reply on Annulment, ¶ 27.

[212] See Section (a) above.

ECT tribunal in the context of an ICSID arbitration that accepted the intra-EU objection proves that the Tribunal committed no error, and in any event that the (alleged) error was not "manifest".[213]

172. ESPF argues that, in light of this overwhelming *jurisprudence constante*, it is immediately apparent that there is no annullable error here. Accordingly, there is no need to consider the specific arguments about the scope of the ECT's arbitration clause advanced by Italy. Nonetheless, ESPF proceeded to address each of those arguments in turn in its papers and oral submissions.

### (b) Clear and express terms

173. ESPF first addresses Article 26(3) of the ECT, which provides that "each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article." ESPF submits that the Tribunal correctly determined that the clear and unambiguous terms of Article 26(3) of the ECT establish Italy's unconditional consent to international arbitration, including intra-EU arbitrations.[214] ESPF argues that "unconditional" means "unconditional", and nothing in Article 26 of the ECT suggests a carve-out for intra-EU disputes.[215]

174. The VCLT requires a tribunal to interpret the express terms of the treaty and determine their "ordinary meaning".[216] ESPF refers to statements of the International Court of Justice and the International Law Commission in support of its argument that a treaty's express terms should be given priority.[217] In addition, investor-State arbitration tribunals have regularly confirmed the primacy of the text of the treaty over other potential sources of interpretation.[218]

175. ESPF further submits that Italy's contention that the Tribunal ignored the ECT's object and purpose, and that Italy's description thereof should override the clear and express terms of Article 26(3) of the ECT, is wholly unsupported. In ESPF's view, Italy is simply rearguing a point it

---

[213] ESPF's Counter-Memorial on Annulment, ¶ 110, citing **ELA-095**, *Teinver* Decision on Annulment, ¶ 59; **ILA-020**, *Total* Decision on Annulment, ¶ 185; **ELA-107**, *Caratube International Oil Company LLP v. Republic of Kazakhstan*, ICSID Case No. ARB/08/12, Decision on Annulment, 21 February 2014, ¶ 163; **ILA-011**, *Soufraki* Decision on Annulment, ¶ 39; **ILA-044**, *CDC* Decision on Annulment, ¶ 41. See also ESPF's Rejoinder on Annulment, ¶ 113.

[214] ESPF's Counter-Memorial on Annulment, ¶ 106.

[215] ESPF's Rejoinder on Annulment, ¶ 85.

[216] ESPF's Opening Presentation, slide 53; ESPF's Counter-Memorial on Annulment, ¶¶ 113-114 and footnote 188; ESPF's Rejoinder on Annulment, ¶¶ 90-91.

[217] ESPF's Opening Presentation, slide 53.

[218] *Id.*, slide 54, citing **ELA-130**, *RSM Production Corp. v. Grenada*, ICSID Case No. ARB/05/14, Award, 13 March 2009, ¶ 383.

already unsuccessfully made before the Tribunal, which it is not authorized to do.  Even if the *ad hoc* Committee were to entertain the argument, it should be rejected as the rules of treaty interpretation codified in the VCLT militate against an interpretation that disregards the plain and unambiguous terms of a treaty provision.[219]

176.    Moreover, while ESPF acknowledges that the ECT was conceived in partial consideration of the need for economic recovery in Eastern Europe and the then-USSR, nothing in the ECT limits the purpose of the Treaty to that one.[220]  Other ECT tribunals have considered and rejected the argument that any intention to facilitate economic recovery in Eastern Europe could override the plain language of the ECT with respect to the consent by all Contracting Parties to settle disputes through international arbitration.[221]

*(c)  Article 344 of the TFEU does not affect consent*

177.    ESPF proceeds to submit, in relation to Italy's argument that Article 26 of the ECT would be in conflict with Article 344 of the TFEU, that Italy is not entitled to re-argue this issue.  For the sake of completeness, ESPF argues that there is no conflict between Article 344 of the TFEU and Article 26 of the ECT.[222]

178.    Indeed, on ESPF's case, it never requested the Tribunal to interpret or apply the EU treaties, nor was there any need for it to do so, and, therefore, no conflict could have arisen.[223]  But even if that were otherwise, Italy has failed to explain why such conflict leads to the conclusion that the Tribunal lacked jurisdiction.  Pursuant to Article 30 of the VCLT, Article 16 of the ECT constitutes a *lex specialis*, providing the investor with the right to choose the dispute resolution mechanism under which it would pursue its rights.  Article 26(3) of the ECT thus prevails over any conflicting EU law.  Finally, ESPF submits that, in any event, Italy has not supported its assertion that EU investors can benefit from the allegedly more favorable treatment afforded by EU law.[224]

---

[219] ESPF's Rejoinder on Annulment, ¶ 90.

[220] *Id.*, ¶ 91.

[221] *Id.*, ¶ 92.  See also **ELA-063**, *InfraRed* Award, ¶ 266; **ELA-058**, *LBBW* Decision, ¶¶ 118-119.

[222] ESPF's Rejoinder on Annulment, ¶ 95.

[223] *Id.*, ¶ 96, citing **ELA-081**, Award, ¶ 338.  See also ESPF's Post-Hearing Brief, ¶ 17.

[224] ESPF's Rejoinder on Annulment, ¶ 101.

*(d)  No modification through the EU Member States' Declaration*

179.    As to the argument that the EU Member States' Declaration would impact Italy's unconditional consent to arbitrate, ESPF once again submits that Italy essentially (and impermissibly) seeks to re-argue the point.  The Tribunal considered the argument and correctly concluded that the EU Member States' Declaration was not binding on the Tribunal; disagreement is no ground for annulment.[225]  Even if the *ad hoc* Committee were to consider the argument, ESPF submits that it is unsupported for four reasons.

180.    First, as the Tribunal observed, Italy's position on intra-EU arbitration, also adopted in the EU Member States' Declaration, conflicts with the plain terms of the ECT.  Any such exception would be properly described as a modification of the Treaty, the specific requirements for which the EU Member States' Declaration does not meet.[226]  Second, as the Tribunal found, it could not consider the EU Member States' Declaration as relevant context, because it does not meet the temporal requirement contained in Article 31(2)(b) of the VCLT.[227]  Third, the EU Member States' Declaration could likewise not be considered as relevant context under Article 31(3)(a) of the VCLT, since the Declaration did not amount to "an agreement" that was shared among all ECT Contracting Parties.[228]  Fourth, other rules of treaty interpretation, such as Article 26 of the VCLT endorsing the rule of *pacta sunt servanda*, prevented the Tribunal from treating the EU Member States' Declaration as a modification of the ECT.[229]

181.    ESPF emphasizes its view that Italy fails to rebut these points and instead simply states that the "ECT could not be understood as consent to submit intra-EU disputes to arbitration."[230]  ESPF submits that not only are the Tribunal's considerations correct, but also that even if they were not, the Tribunal obviously and carefully "endeavored" to apply the applicable rules of treaty interpretation and, therefore, any alleged error could not amount to a manifest excess of powers.[231]

---

[225] ESPF's Counter-Memorial on Annulment, ¶ 140; ESPF's Rejoinder on Annulment, ¶ 103.
[226] ESPF's Counter-Memorial on Annulment, ¶ 141; ESPF's Rejoinder on Annulment, ¶ 104.
[227] ESPF's Counter-Memorial on Annulment, ¶ 142; ESPF's Rejoinder on Annulment, ¶ 105.
[228] ESPF's Counter-Memorial on Annulment, ¶ 143; ESPF's Rejoinder on Annulment, ¶ 106.
[229] ESPF's Counter-Memorial on Annulment, ¶ 145; ESPF's Rejoinder on Annulment, ¶ 107.
[230] Italy's Reply on Annulment, ¶ 38.
[231] ESPF's Rejoinder on Annulment, ¶ 108.

*(e) The ECT does not contain an express or implied disconnection clause*

182.   ESPF next takes issue with Italy's argument that there is a carve-out, or implied disconnection clause, in the ECT that excludes intra-EU disputes from the jurisdictional scope of ECT tribunals.[232] By "disconnection clause", Italy means a passage in which the ECT which has the effect of precluding the application of the ECT to intra-EU disputes.[233]

183.   Italy argues that a disconnection clause should be implied into the text of the ECT, such that intra-EU disputes would be excluded from the scope of Italy's unconditional consent to arbitrate in Article 26 of the Treaty.   In response, ESPF says that Italy made the same argument in the arbitration, and the Tribunal rightly rejected it.[234]   The Tribunal correctly considered that, given the plain terms of the ECT, it was not permitted to disregard those terms and assume or imply the existence of a disconnection clause that would introduce a massive carve-out for intra-EU disputes.[235]

184.   As for Italy's argument that Articles 16, 24, and 25 of the ECT do not describe the duties of EU Member States towards EU investors, ESPF submits that Article 16 is a conflicts rule and not a disconnection clause, as the Tribunal correctly explained.   While Articles 24 and 25 of the ECT recognize "different (preferential) treatment among parties to an [Economic Integration Agreement]" and grant "preferential treatment" to EU members of the ECT "by virtue of the [Economic Integration Agreement]," these provisions do "not address the issue of the obligations owed by one EU Member to the investors of another EU Member."[236]   The Tribunal, ESPF says, was right on this point as well.

185.   ESPF notes that in addition to the arguments that it already raised itself in the arbitration, Italy has also submitted in this proceeding arguments raised by the EC in its submission in the arbitration. ESPF submits that Italy is not permitted to raise these arguments at this stage.   Even if they were to be considered, it contends that these arguments lacked merit.[237]

---

[232] Italy's Memorial on Annulment, ¶¶ 66-90; ESPF's Rejoinder on Annulment, ¶ 109-117.

[233] Italy's Memorial on Annulment, ¶ 62.

[234] ESPF's Counter-Memorial on Annulment, ¶ 112.

[235] *Id.*, ¶ 113.

[236] *Id.*, ¶ 121, citing **ELA-081**, Award, ¶¶ 279-282.

[237] ESPF's Counter-Memorial on Annulment, ¶ 122.   See also Italy's Memorial on Annulment, ¶ 66.

186.	First, contrary to Italy and the EC's position, ESPF submits that Articles 1(3) and 36(7) of the ECT do not support the existence of an implied disconnection clause.  Article 1(3) simply contains a definition of a Regional Economic Integration Organization ("**REIO**"), and Article 36(7) regulates the voting rights of a REIO.  The latter provision does not give the EU, as a REIO, the right to trump the votes of EU Member States and, in fact, confirms the autonomy of these States to exercise their individual rights as ECT Contracting Parties.[238]

187.	Another argument only addressed by the EC, and thus not properly within the scope of this annulment proceeding in ESPF's submission, is Italy's alternative argument that supplementary means of interpretation support the view that no disconnection clause is needed in the context of a multilateral treaty that includes EU Member States.  Italy refers to the WTO Agreement, as to which it says there is an implicit understanding in the international community that the Agreement excludes intra-EU disputes.[239]  ESPF responds argues that the WTO Agreement has no relevance to the present dispute given the plain and unambiguous text of the ECT.  Furthermore, the claim that the WTO has no intra-EU function is highly doubtful, in its view.[240]

188.	In addition, ESPF refers to the *travaux préparatoires* of the ECT in support of the argument that the ECT does not contain a disconnection clause.  During the negotiations of the ECT, the EC proposed a disconnection clause, which was rejected by non-EU States, demonstrating that the absence of a disconnection clause was intentional.[241]  Moreover, the fact that the ECT contains a disconnection clause in relation to the Svalbard Treaty, but is entirely silent on the much more significant subject of intra-EU disputes, is fatal to Italy's position in ESPF's view.[242]  In further support of this argument, ESPF also refers to the *InfraRed v. Spain* annulment decision, in which a similar argument made by Spain was rejected.[243]

189.	In its Rejoinder on Annulment, ESPF submits that Italy "appears to have abandoned the vast majority of its arguments that various provisions of the ECT imply a disconnection clause" and

---

[238] ESPF's Counter-Memorial on Annulment, ¶¶ 122-123, citing **E-053**, Energy Charter Treaty and Related Documents, September 2004 ("**ECT**"), Article 1.

[239] Italy's Memorial on Annulment, ¶ 81.  See also *id.*, ¶¶ 75-77.

[240] ESPF's Counter-Memorial on Annulment, ¶ 125; ESPF's Rejoinder on Annulment, ¶ 114.

[241] ESPF's Counter-Memorial on Annulment, ¶¶ 124-127, citing **E-054**, Claim by Denmark on behalf of the Faroe Islands against the European Union regarding Measures on Atlanto-Scandian Herring and Northeast Atlantic Mackerel initiated on 4 November 2013; **E-055**, Note for the Attention of Ambassador Rutten from Secretary General Clive Jones, 19 February 1993; **ELA-063**, *InfraRed* Award, ¶ 271.

[242] ESPF's Rejoinder on Annulment, ¶ 114.

[243] *Id.*, ¶ 116, citing **ELA-165**, *InfraRed* Decision on Annulment, ¶ 502.

only retains the suggestion that EU law is more favorable than the ECT, which allegedly gives rise to the "necessary implication of [an] implicit disconnection clause under Article 16 ECT."[244]  ESPF responds that this point has rightly been rejected by the Tribunal.[245]  ESPF submits that Article 26(2) of the ECT allows investors to choose the forum in which they prefer to seek relief.  In Article 26(3) of the ECT, Italy provided its unconditional consent to international arbitration and, in Article 16 of the ECT, Italy expressly agreed that in the event of a conflict between the ECT and any prior or subsequent treaties (such as the EU treaties), the more favorable treaty would prevail.  Thus, Italy was aware and accepted the possibility of forum shopping.[246]

### (f)  No other carve-out from jurisdiction[247]

190.    ESPF next moves to Italy's argument in its Memorial on Annulment that "[i]ntra-EU investors are not really foreign" within the EU internal market.[248]  ESPF's initial response is that Italy did not raise that argument in the arbitration and, therefore, it is not properly within the scope of this annulment proceeding.

191.    ESPF proceeds to submit that Italy was an ECT Contracting Party at all relevant times, and each of the Claimants in the original arbitration was an investor of another ECT Contracting Party at all relevant points in time.  ESPF argues that there is no such thing as EU nationality.  Italy was the respondent in the arbitration, and its conduct, not the EU's, was at issue.[249]

192.    In its Rejoinder on Annulment, ESPF submits that as Italy did not respond to ESPF's rebuttal on this point, it must be considered to have accepted ESPF's position.[250]

---

[244] ESPF's Rejoinder on Annulment, ¶ 111.  See also Italy's Reply on Annulment, ¶ 44.

[245] ESPF's Rejoinder on Annulment, ¶ 111.

[246] *Id.*, ¶¶ 109-117.

[247] ESPF's Counter-Memorial on Annulment, ¶¶ 128-132, citing **E-053**, ECT, Articles 1(7)(a)(ii) and 1(10).

[248] Italy's Memorial on Annulment, ¶ 54.

[249] ESPF's Counter-Memorial on Annulment, ¶¶ 128-132.

[250] ESPF's Rejoinder on Annulment, ¶118.

*(g)  No modification of the ECT to exclude intra-EU arbitration*[251]

193.    In relation to the purported impact of the Lisbon Treaty, ESPF submits that Italy's arguments are alternative, and both cannot stand at once.   Either the ECT never accommodated intra-EU arbitration, or the Lisbon Treaty modified the ECT to that effect.[252]

194.    On the latter point, ESPF argues that the Tribunal was correct to reject Italy's suggestion that the Lisbon Treaty modified the ECT.[253]  ESPF refers in particular to the Tribunal's review of the requirements imposed by Article 41 of the VCLT and its conclusion that they had not been met:

> "The Lisbon Treaty grants to the EU a new competence over foreign direct investment. However, EU law, either in the Lisbon Treaty or elsewhere, does not provide for international arbitration between an investor and a host state. In addition, EU law does not grant investors the same substantive protections granted in Part III of the ECT, in particular fair and equitable treatment. This suggests that the Lisbon Treaty was not intended to be 'an agreement to modify the [ECT] as between themselves alone,' as contemplated by Article 41 of the VCLT. The Lisbon Treaty addresses energy specifically, but there is no reference made to the ECT in the Lisbon Treaty and it is common ground that there is no equivalent in EU law of Article 26 of the ECT. <u>One would expect that States intending to modify a treaty with a subsequent agreement would at least refer to it; a clear intention is required to do so pursuant to Article 41(2). In addition, such intention must be notified. Article 41(2) requires parties purporting to modify a treaty inter se to 'notify the other parties of their intention to conclude the agreement and of the modification to the treaty for which it provides.' Neither the EU nor its Member States expressed such an intention, much less notified it as required.</u>"[254]

195.    ESPF argues that while States are free to modify treaties, they have to follow the legal requirements for doing so.[255]  As the Tribunal considered, a modification without notice is "neither permitted under customary international law nor consistent with the rule of law."[256]  ESPF notes Italy's contention that, as the modification was not prohibited by the ECT and did not "affect the position of the other State parties or undermine the treaty's object and purpose,"[257] the modification was

---

[251] ESPF's Counter-Memorial on Annulment, ¶¶ 133-139, citing **ELA-081**, Award, ¶¶ 306-309; **ELA-066**, *Baywa* Decision, ¶¶ 276-280.

[252] ESPF's Post-Hearing Brief, ¶ 13.

[253] ESPF's Counter-Memorial on Annulment, ¶ 135; ESPF's Rejoinder on Annulment, ¶ 134.

[254] ESPF's Counter-Memorial on Annulment, ¶ 135, citing **ELA-081**, Award, ¶¶ 308-309 (emphasis added in Counter-Memorial on Annulment).

[255] ESPF's Counter-Memorial on Annulment, ¶ 136.

[256] **ELA-081**, Award, ¶ 326.  See also ESPF's Counter-Memorial on Annulment, ¶ 137.

[257] Italy's Memorial on Annulment, ¶ 87.

effective.[258]  ESPF responds that the Tribunal had no need to consider this argument, because it had already concluded that the modification requirements had not been satisfied.[259]  In any event, there are strong indications that the alleged modification advanced by Italy is in fact contrary to the ECT's object and purpose and is, therefore, not permitted under Article 41(b) of the VCLT.[260]

196.    ESPF continues that it is not clear whether Italy maintains its position that the Lisbon Treaty modified the ECT, because in response to ESPF's showing that the Lisbon Treaty did not modify the ECT, Italy merely provided the "limited explanation" that the European Community was "in a process of integration" that culminated with the Lisbon Treaty in 2007, and had the Tribunal "compared the aim and purpose of the ECT with the aim and purpose of the EU Treaties, and even more so as of the Treaty of Lisbon, it would have resulted evident [*sic*] that the EU Treaties prevail over the ECT."[261]  ESPF submits that this new argument should be rejected as baseless.  The Tribunal did not interpret EU law or infringe on the CJEU's ability to do so in deciding the dispute before it in accordance with international law.  In addition, the aim and purpose of a treaty cannot override its clear terms.[262]

*(h) EU law is not applicable law under the ECT*[263]

197.    ESPF's next submission is to dispute Italy's argument that EU law is applicable law under Article 26(6) of the ECT.  Even if EU law were applicable, no provision would have led the Tribunal to reject jurisdiction in ESPF's view.[264]

198.    First, ESPF argues that the question of applicable law was not contested during the main written phase of the arbitration.  It was only after the hearing on the merits, when Italy sought to comment on the *Achmea* judgment, that it argued that EU law formed part of the reference to "applicable rules and principles of international law" found in Article 26(6) of the ECT, and applied to both "the validity of the arbitration agreement and [a case's] merits."[265]  ESPF adds that in the Award,

---

[258] ESPF's Counter-Memorial on Annulment, ¶ 138.

[259] *Id.*, ¶ 135; ESPF's Rejoinder on Annulment, ¶ 134.

[260] ESPF's Counter-Memorial on Annulment, ¶ 138; ESPF's Rejoinder on Annulment, ¶ 136.

[261] ESPF's Rejoinder on Annulment, ¶ 135, citing Italy's Reply on Annulment, ¶ 43.

[262] ESPF's Rejoinder on Annulment, ¶ 136.

[263] ESPF's Counter-Memorial on Annulment, ¶¶ 148-151, citing **RLA-033**, *Electrabel* Decision, ¶ 4.166; **ELA-081**, Award, ¶ 401; **E-029**, Italy's Submission on the *Achmea* Award, 30 March 2018, ¶¶ 5-6.

[264] ESPF's Counter-Memorial on Annulment, ¶ 148.

[265] ESPF's Counter-Memorial on Annulment, ¶ 150.  See also ESPF's Rejoinder on Annulment, ¶ 120.

the Tribunal explained that EU law was not relevant because it was not involved or implicated.[266] In relation to jurisdiction, the Tribunal devoted 25 pages of its Award to considering, and rejecting, Italy's claim that the *Achmea* judgment applied to ECT disputes and deprived the Tribunal of jurisdiction.[267]

199.    In particular, the Tribunal found that, unlike the BIT tribunal in *Achmea*, there was no conceivable scenario under which an ECT tribunal would be applying EU law.[268]  The reference in Article 26(6) of the ECT to "rules and principles of international law" is a typical reference to laws generally

---

[266] ESPF's Counter-Memorial on Annulment, ¶ 151.

[267] *Id.*, ¶ 152; ESPF's Rejoinder on Annulment, ¶ 121.

[268] ESPF's Counter-Memorial on Annulment, ¶ 152, citing *Mainstream Renewable Power Ltd and others v. Federal Republic of Germany*, ICSID Case No. ARB/21/26, Decision on Respondent's Application under ICSID Arbitration Rule 41(5), 18 January 2022, see **E-063**, L. Bohmer, *Analysis: Rule 41(5) Decision Surfaces in German ECT Wind Power Arbitration, Revealing That ICSID Tribunal Found That Neither the Intra-EU Nature of The Dispute, Nor the German Nationality Of Some Of The Claimants Warranted An Early Dismissal Of The Case*, IA REPORTER, 31 January 2022; *Amlyn Holding B.V. v. Republic of Croatia*, ICSID Case No. ARB/16/28, Final Award, 22 October 2021, see **E-061**, V. Djanic, *ICSID tribunal finds discrete ECT breach in intra-EU case against Croatia, but claimant is awarded no damages due to lack of causation*, IA REPORTER, 28 October 2021; **ELA-158**, *Infracapital F1 S.à r.l. and Infracapital Solar B.V. v. Kingdom of Spain*, ICSID Case No. ARB/16/18, Decision on Jurisdiction, Liability and Directions on Quantum, 13 September 2021; **ELA-124**, *Mathias Kruck et al v. Spain*, ICSID Case No. ARB/15/23, Decision on Jurisdiction and Admissibility, 19 April 2021; **ELA-076**, *Eurus Energy Holdings Corp. v. Kingdom of Spain*, ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, 17 March 2021; **ELA-075**, *FREIF Eurowind Holdings Ltd. v. Kingdom of Spain*, SCC Case No. 2017/060, Final Award, 8 March 2021; *ČEZ, a.s. v. Republic of Bulgaria*, ICSID Case No. ARB/16/24, Decision on Jurisdiction, 2 March 2021, see **E-062**, D. Charlotin, *ICSID tribunal rejects intra-EU objection in ECT case against Bulgaria*, IA REPORTER, 4 March 2021; **ELA-081**, Award, ¶¶ 388-389; **ELA-072**, *STEAG GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/4, Decision on Jurisdiction, Liability and Instructions on Quantification of Damages, 8 October 2020; **ELA-071**, *Cavalum SGPS, S.A. v. Kingdom of Spain*, ICSID Case No. ARB/15/34, Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020; **ELA-070**, *Hydro Energy 1 S.à.r.l. and Hydroxana Sweden AB v. Kingdom of Spain*, ICSID Case No. ARB/15/42, Decision on Jurisdiction, Liability and Directions on Quantum, 9 March 2020; **ELA-069**, *PV Investors v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020; **ELA-068**, *Watkins Holding S.à.r.l. et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/44, Award, 21 January 2020; **ELA-067**, *RWE Innogy GmbH & RWE Innogy Aersa S.A.U. v. Kingdom of Spain*, ICSID Case No. ARB/14/34, Decision on Jurisdiction, Liability, and Certain Issues of Quantum, 30 December 2019; **ELA-066**, *BayWa* Decision; **ELA-065**, *Stadtwerke München GmbH et al. v. Kingdom of Spain*, ICSID Case No. ARB/15/1, Award, 2 December 2019; **ELA-064**, *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No. ARB/15/36, Award, 6 July 2019; **ELA-063**, *InfraRed* Award; **ELA-062**, *SolEs Badajoz GmbH v. Kingdom of Spain*, ICSID Case No. ARB/15/38, Award, 31 July 2019; **ELA-061**, *Rockhopper* Decision; **ELA-123**, *9REN Holding S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/15/15, Award, 31 May 2019; **ELA-060**, *Eskosol* Decision; **ELA-059**, *NextEra Energy Global Holdings B.V. and NextEra Energy Spain Holdings B.V. v. Spain*, ICSID Case No. ARB/14/11, Decision on Jurisdiction, Liability and Quantum Principles, 12 March 2019; **ELA-058**, *LBBW* Decision; **ELA-048**, *Cube* Decision on Jurisdiction; **ELA-122**, *Greentech* Award; **ELA-057**, *RREEF Infra. (G.P.) Ltd. and RREEF Pan-European Infra. Two Lux S.à.r.l. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Responsibility and on the Principles of Quantum, 30 November 2018; **ELA-056**, *Foresight Lux. Solar 1 S.à.r.l., et al. v. Kingdom of Spain*, SCC Arb. No. 2015/150, Final Award, 14 November 2018; **ELA-055**, *Vattenfall* Decision; **ELA-054**, *Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar B.V. (formerly Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.) v. Kingdom of Spain*, ICSID Case No. ARB/13/31, Award, 15 June 2018; **ELA-053**, *Masdar Solar & Wind Cooperatief U.A. v. Kingdom of Spain*, ICSID Case No. ARB/14/1, Award, 16 May 2018.

applicable to all States, *i.e.*, general or customary international law.[269]  It is not a reference to the peculiar legal system of a regional legal order such as the EU, nor could it plausibly be when half of the ECT's Contracting States are not members of the EU.  Furthermore, even if EU law could be included in Article 26(6)'s reference to "rules and principles of international law," the Tribunal noted that no issue of EU law – including the CJEU's reasoning in the *Achmea* judgment – was "applicable" to the dispute before it, and thus EU law did not form part of the "*applicable* rules and principles of international law"[270] (emphasis added in Counter-Memorial on Annulment).  All of these findings were correct, ESPF argues, and in any event cannot be impugned on annulment.

200.    ESPF proceeds to argue that other tribunals have taken an even stricter approach and found that Article 26(6) of the ECT does not apply to a tribunal's assessment of its jurisdiction at all, which is instead governed by Article 26(1)-(5) of the ECT.  Furthermore, notwithstanding its correct determination that EU law was not applicable, the Tribunal thoroughly reviewed the *Achmea* judgment and distinguished it, in a manner consistent with that of every other ECT tribunal that has considered the question.[271]  As such, the Tribunal's conclusions cannot amount to an excess of powers nor justify annulment.[272]

201.    ESPF contends that Italy failed to engage with ESPF's explanation as to why Article 26(6) of the ECT does not include EU law.[273]  Italy only posits that EU law is relevant, on the basis that the subject matter of the dispute, *i.e.*, incentives for renewable energy, is regulated by EU Directive 28/2009, and that the relationship between the ECT and EU law in investment-related matters is often addressed by the CJEU.[274]  ESPF argues that this misconstrues its position, as ESPF acknowledges that EU law was relevant to certain factual aspects of the underlying case.  However, the case does not involve an allegation of wrongdoing under EU law.[275]  In support of its position, ESPF refers to recent annulment decisions in which *ad hoc* committees have continued to reject

---

[269] ESPF's Counter-Memorial on Annulment, ¶ 154; ESPF's Rejoinder on Annulment, ¶¶ 121, 124.

[270] ESPF's Counter-Memorial on Annulment, ¶¶ 154-155.

[271] *Id.*, ¶ 155, citing **ELA-055**, *Vattenfall* Decision, ¶¶ 114-116.

[272] ESPF's Counter-Memorial on Annulment, ¶¶ 156-158, citing **ELA-0081**, Award, ¶¶ 335-336; **ILA-020**, *Total* Decision on Annulment, ¶¶ 181-183.

[273] ESPF's Rejoinder on Annulment, ¶ 124.

[274] *Id.*, ¶ 125.

[275] *Id.*, ¶ 126.

the intra-EU objection[276] and in doing so have rejected the applicability of EU law,[277] thus confirming there has been no manifest excess of powers by the Tribunal here.[278]

202.    Finally, in response to Italy's contention that all claims against EU Member States concerning incentives regimes are barred as incompatible State aid, ESPF submits that this is a new argument and unsupported.  Italy never claimed that the incentives at issue were unlawful State aid, and this is evident from the Award.[279]

> (i)  *Even if EU law were relevant, the ECT would prevail under Article 16 of the ECT*

203.    ESPF further argues that, even if EU law were part of the applicable law and the *ad hoc* Committee were to revisit the Tribunal's conclusion to the contrary, "there still would be no manifest excess of power."  Article 16  of the ECT dictates that the ECT's dispute resolution provisions would prevail over any conflicting and less favorable rule of EU law.[280]

204.    A fundamental principle in treaty interpretation is that the specific provision trumps the general provision, and Article 16 of the ECT is such a *lex specialis*.  It reflects the Contracting Parties' agreement on the relationship between the ECT and prior or subsequent international agreements in the event of a conflict – including a conflict in relation to "any right to dispute resolution" – and provides that the more favorable rule to the investor or the investment shall prevail.[281]  Even if EU law were applicable and the *ad hoc* Committee were to find that the Tribunal erred, this would not amount to a finding that the Tribunal manifestly exceeded its powers.  This is because, even in that scenario, Article 16 of the ECT would have resolved any conflict in relation to a right to dispute resolution in favor of the ECT.[282]  In ESPF's submission, it is indisputable that having a choice

---

[276] *Id.*, ¶ 127.

[277] *Id.*, ¶¶ 128-132.

[278] *Id.*, ¶ 133.

[279] ESPF's Post-Hearing Brief, ¶ 20, citing **ELA-081**, Award, ¶ 401: "The Tribunal agrees with the Claimants that Italian law is relevant to this dispute only as a matter of fact or background context, and that it should not influence the legal standards that the Tribunal applies to determine whether the Respondent violated the ECT.  Whether or not the Challenged Measures complied with domestic law is irrelevant for the Tribunal's purposes. The Tribunal observes that EU law is not invoked or implicated in this ECT arbitration, and thus does not form part of the governing international law applicable to the issues before the Tribunal."

[280] ESPF's Counter-Memorial on Annulment, ¶ 159.

[281] *Id.*, ¶ 160, citing **ELA-131**, Vienna Convention on the Law of Treaties, 23 May 1969, Article 30(2).  See also ESPF's Counter-Memorial on Annulment, ¶ 163, citing **ELA-081**, Award, ¶¶ 289-290, 301-302.

[282] ESPF's Counter-Memorial on Annulment, ¶¶ 161-162.

between two fora (international arbitration or domestic litigation) is more favorable than not having a choice at all.[283]  In any event, it is not for the *ad hoc* Committee to revisit or reconsider the Tribunal's interpretation of Article 16.[284]

205.    The Tribunal's decision in this respect is also consistent with other tribunals, notably the *Eskosol v. Italy* tribunal, ESPF says.  The *Eskosol* award underlined that the favorability of a particular dispute resolution mechanism is very much "in the eye of the beholder."[285]

> *(j)    Neither the Komstroy judgment nor subsequent decisions by EU Member State courts give rise to a manifest excess of powers because they did not exist and were never before the Tribunal, and, in any event, are irrelevant and also precluded by Article 16 of the ECT*

206.    ESPF next disputes Italy's argument that the *Komstroy* judgment "vindicates" Italy's position that the ECT does not apply to intra-EU disputes and proves that the Tribunal made a manifest error that justifies annulment.[286]  In doing so, it makes the following points.

207.    First, the *Komstroy* judgment was rendered a year after the Tribunal issued its Award.  Therefore, it was never before the Tribunal and could not have formed part of its analysis.  As the *Antin v. Spain ad hoc* committee considered, "it would not be appropriate to impugn the Tribunal's Award on the basis of authorities or documents rendered post-Award."[287]

208.    Second, the *Komstroy* judgment amounts to a statement of *obiter dicta*, under EU law, that purports to extend the reasoning of the *Achmea* judgment to the ECT (despite the fact that *Komstroy* was not an intra-EU dispute).  This demonstrates that (i) the Tribunal was correct to distinguish the *Achmea* judgment on the basis that it did not concern the ECT; and (ii) at most, the *Komstroy* judgment is an EU law development that gives rise to a conflict, which must be dealt with by applying Article 16 of the ECT – a point that the *Komstroy* judgment does not address.[288]

---

[283] *Id.*, ¶ 163

[284] *Id.*, ¶ 164.

[285] ESPF's Counter-Memorial on Annulment, ¶¶ 165-166, citing **ELA-060**, *Eskosol* Decision, ¶¶ 100-102.

[286] ESPF's Counter-Memorial on Annulment, ¶ 167.

[287] Id., ¶¶ 168-169, citing **ELA-125**, *Antin* Decision on Annulment, ¶ 159.

[288] ESPF's Counter-Memorial on Annulment, ¶ 169.

209.    Third, five ECT tribunals have considered the impact of the *Komstroy* judgment and have concluded that it was irrelevant and had no impact on their jurisdiction.[289]  In *Kruck v. Spain*, for example, the tribunal accepted that the *Komstroy* judgment appeared to present a conflict between the ECT and the EU treaties, but held that resolution of the conflict was governed by Article 16 of the ECT.[290]

210.    Thus, these five cases further confirm that the Tribunal did not exceed its powers, much less "manifestly", and that nothing about the *Komstroy* judgment changes the jurisdictional analysis, even if it could be credibly applied retroactively (which it cannot).[291]  At most, the new EU law development espoused in the *Komstroy* judgment can be said to amount to a new fact that was unknown to the Tribunal.  If Italy truly considered this a fact "of such a nature as decisively to affect the award," then the proper procedure would have been for Italy to seek revision of the Award by filing a request before the original arbitral Tribunal.[292]

211.    Furthermore, ESPF argues, Italy's attempt to retroactively deprive the Tribunal of jurisdiction violates the accepted principle of international adjudication that "jurisdiction will be determined by reference to the date on which judicial proceedings are instituted."[293]  Moreover, even as a matter of EU law, the *Komstroy* judgment has no direct effect on the validity of international legal

---

[289] **ELA-135**, *Infracapital F1 S.à.r.l. and Infracapital Solar B.V. v. Kingdom of Spain,* ICSID Case No. ARB/16/18, Decision on Respondent's Request for Reconsideration Regarding the Intra-EU Objection and the Merits, 1 February 2022, ¶¶ 107, 116, 111-113; **ELA-160**, *Cavalum SGPS, S.A. v. Spain,* ICSID Case No. ARB/15/34, Decision on the Kingdom of Spain's Request for Reconsideration, 10 January 2022, ¶¶ 170-181; **ELA-157**, *Kruck* Decision, ¶¶ 31, 40-42, 44, 46-48; **ELA-159**, *Rockhopper Exploration Plc, Rockhopper Italia S.p.A. and Rockhopper Mediterranean Ltd v. Italian Republic*, ICSID Case No. ARB/17/14, Decision on the Italian Republic's Request for Reconsideration of 29 September 2021, 20 December 2021, ¶ 51; **E-058**, D. Charlotin, *ICSID Tribunal Hearing Claims by State-Owned German Banks Against Spain Declines to Reconsider* Intra-*EU Decision in Light of the CJEU's* Komstroy *Decision*, IA REPORTER, 13 December 2021; **E-057**, S. Perry, *Spain Fails to Reopen Intra-EU Objection After Komstroy*, Global Arbitration Review, 6 December 2021, pp. 1-2.

[290] ESPF's Counter-Memorial on Annulment, ¶¶ 170-183, citing **ELA-157**, *Kruck* Decision, ¶¶ 31, 40, 41, 42, 44, 46-48.

[291] ESPF's Counter-Memorial on Annulment, ¶ 183.

[292] *Id.*, ¶ 184.

[293] ESPF's Counter-Memorial on Annulment, ¶¶ 185-188, citing **ELA-031**, C. Schreuer, The ICSID Convention: A Commentary (2d Ed. 2009), p. 92; **ELA-133**, M. Hwang and A. Chang, *Government of the Lao People's Democratic Republic v. Sanum Investments Ltd A Tale of Two Letters*, *in* M. Kinnear and C. McLachlan (eds), ICSID Review – Foreign Investment Law Journal, 2015, p. 518; **ELA-135**, *Infracapital F1 S.à.r.l. and Infracapital Solar B.V. v. Kingdom of Spain,* ICSID Case No. ARB/16/18, Decision on Respondent's Request for Reconsideration Regarding the Intra-EU Objection and the Merits, 1 February 2022, ¶ 115; **E-059**, CJEU, Joined Cases C-402/05 P and C-415/05 P, ECLI:EU:C:2008:461 – Kadi, ¶¶ 286-88; **E-060**, Judgment of the Court, Case C-327/91, *France v. Commission*, 9 August 1994, ¶ 14.

instruments and, therefore, cannot be used to alter or modify the ECT or remove an ECT tribunal's jurisdiction.[294]

212.   ESPF also contends that Italy has failed to rebut ESPF's arguments and has instead merely submitted that new authorities, such as the *Komstroy* judgment, are not new but confirm what the Tribunal should have known.   ESPF submits that to the contrary, the *Komstroy* judgment, as a matter of fact, constitutes an EU law-based development that post-dates the Award and was never before the Tribunal.[295]   Insofar as Italy seeks to argue that the *Komstroy* judgment is not new because it simply extends the CJEU's conclusions in the *Achmea* judgment, ESPF notes that this does not help Italy, as the Tribunal did consider the *Achmea* judgment.[296]   Other ICSID tribunals and *ad hoc* committees have confirmed the irrelevance of the *Komstroy* judgment, including the *Cube v. Spain ad hoc* committee, which refused to consider the *Komstroy* judgment as evidence of a manifest excess of powers because, as here, the decision post-dated the *Cube v. Spain* award.[297]

### (k)   The Paris Court of Appeals judgments

213.   In relation to the Paris Court of Appeal judgments submitted by Italy,[298] ESPF argues these are outside the scope of this annulment proceeding for the same reasons as the *Komstroy* judgment: they post-date the Award and were never before the Tribunal.   Nevertheless, for the sake of completeness, ESPF submits that these decisions are even more irrelevant to this proceeding than the *Komstroy* judgment, and that they in no way support Italy's claim that the Tribunal manifestly exceeded its powers for two main reasons.[299]

214.   First, the judgments concerned claims arising out of a BIT, rather than the ECT, a multilateral treaty to which EU Member States and the EU itself are parties.   Second, the Paris Court of Appeals derives its authority from the internal laws of France and, in exercising this authority, refused to

---

[294] ESPF's Rejoinder on Annulment, ¶ 146.

[295] ESPF's Rejoinder on Annulment, ¶ 148.

[296] *Id.*, ¶¶ 140-159.

[297] *Id.*, ¶ 151.

[298] **IL-050**, *Republic of Poland v. Strabag et al.*, 19 April 2022, Paris Court of Appeal N° RG 20/13085; **IL-051**, *Republic of Poland v. Slot et al.*, 19 April 2022, Paris Court of Appeal N° RG 20/14581 (setting aside two arbitral awards on the ground that the tribunal lacked jurisdiction over intra-EU disputes).

[299] ESPF's Rejoinder on Annulment, ¶ 160.

consider international law, whereas this *ad hoc* Committee is constituted under and must apply international law.[300]

### (l) The Green Power award

215.    ESPF submits that the *Green Power* award is irrelevant and also faulty and illogical as a matter of international law, and advances three main arguments in this respect.  First, ESPF contends that the *Green Power* tribunal misapplied international law on treaty interpretation.  There is no authority in international law for the proposition that the ordinary meaning of a treaty text can evolve or turn on the specific facts of a particular dispute.  While Article 31(2) of the VCLT allows a tribunal to consider extrinsic evidence under certain circumstances, this supplementary means of interpretation is only permissible when the result of the Article 31 exercise "leaves the meaning [of a treaty provision] ambiguous or obscure,"[301] which was not the situation in the *Green Power* case.

216.    Second, the tribunal incorrectly interpreted and applied the so-called EU law principle of "primacy".  The principle of primacy under EU law only means that EU law prevails over the laws of EU Member States.  There is no support for the *Green Power* tribunal's finding that EU law as a *lex superior* prevails over the *lex specialis* provision in Article 16 of the ECT.[302]

217.    Third and finally, the tribunal failed to take appropriate account of the drafting history of the ECT, including the negotiating parties' refusal to allow the EC to include a carve-out for intra-EU matters.[303]

218.    On all of the bases set out above, ESPF urges this *ad hoc* Committee to reject Italy's contention that by upholding jurisdiction, the Tribunal manifestly exceeded its powers within the meaning of Article 52(1)(b) of the ICSID Convention.

### (3)    The *ad hoc* Committee's Analysis

219.    The key issue that the *ad hoc* Committee must decide in relation to the first annulment ground is whether the Tribunal committed an annullable error by finding that it had jurisdiction under Article 26 of the ECT, notwithstanding the intra-EU nature of the dispute.  The Tribunal's decision is said

---

[300] *Id.*, ¶¶ 161-164.
[301] ESPF's Letter of 23 September 2022, p. 4, section 1.
[302] *Id.*, section 2.
[303] *Id.*, section 3.

by Italy to constitute a manifest excess of powers, committed through taking jurisdiction where it had none, and by applying the wrong law to reach that result.  Italy thus challenges the Tribunal's legal interpretation of Article 26.

220.    As already surveyed above, Article 52(1)(b) of the ICSID Convention establishes a two-part test: there must be an excess of powers by the tribunal, and it must be "manifest".  The Parties are essentially in agreement that taking jurisdiction where none exists would be an excess of powers, as would applying the wrong law.  As for the requirement of manifestness, the Parties also seem to agree – and in any event, the law is clear that – "manifest" means "obvious", "clear on the face of the award," and "self-evident rather than the product of elaborate interpretation one way or the other."[304]

221.    The test for annullable error under Article 52(1)(b) is thus a stringent one, and intentionally so.  Annulment proceedings are not an appeal, and so the correctness or not of the underlying tribunal's legal analysis cannot be, impugned.  The decided cases establish that so long as the tribunal's decision on a legal issue is tenable, it will not be disturbed on annulment.  The *ad hoc* committee in *Duke Energy v. Peru* put it, rightly in this *ad hoc* Committee's view, as follows:

> "An *ad hoc* committee will not therefore annul an award if the tribunal's disposition on a question of law is *tenable*, even if the committee considers that it is incorrect as a matter of law….  Without reopening debates on questions of fact, a committee can take into account the facts of the case as they were in the record before the tribunal to check whether it could come to its solution, however debatable. *Is the opinion of the tribunal so untenable that it cannot be supported by reasonable arguments?* A debatable solution is not amenable to annulment, since the excess of powers would not then be 'manifest.'"[305]

222.    As summarized above, the parties in this case have deployed multiple arguments on the first part of the analysis:  whether the Tribunal committed an excess of powers by upholding jurisdiction.  The *ad hoc* Committee will evaluate those arguments in detail in the following subsections.  Then, in the final subsection, we will consider the "manifest" requirement.  That will of course be necessary only to the extent that we are persuaded that any excess of powers occurred.

---

[304] See Italy's Memorial on Annulment, ¶¶ 49-51; ESPF's Rejoinder on Annulment, ¶¶ 73-75.  See also **ILA-043**, *Wena* Decision on Annulment, ¶ 25; **ELA-116**, *Azurix* Decision on Annulment, ¶ 68; **ELA-118**, *Rumeli* Decision on Annulment, ¶ 96.

[305] **ELA-038**, *Duke Energy* Decision on Annulment, ¶ 99 (emphasis added).  See also **ELA-087**, *Klöckner v. Republic of Cameroon*, ICSID Case No. ARB/81/2, Decision on Annulment, 3 May 1985, ¶ 52; **ELA-119**, *Helnan* Decision on Annulment, ¶ 55.

*(a)  Article 26 of the ECT – Consent*

223.    The Tribunal found that it had jurisdiction under the ECT, which, as Italy accepts, is a binding international treaty.[306]  However, Italy argues that "the EU countries did not consent to ECT-based arbitration over claims brought by EU investors. In other words, the arbitration clause of the ECT (Article 26) does not apply to intra-EU investment claims."[307]

224.    ESPF, on the other hand, submits that Italy gave unconditional consent to arbitrate pursuant to Article 26(3) of the ECT,[308] including in relation to intra-EU arbitration,[309] and that there is no carve-out for intra-EU disputes.[310]

225.    The starting point of the Committee's analysis therefore is Article 26(3) of the ECT, which states that "each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article."

226.    Before addressing the Parties' arguments in relation to this issue, and in order to contextualize these arguments, it is instructive to recall the essence of the Tribunal's findings in relation to jurisdiction. The Tribunal focused its analysis on the text of the ECT and interpreted the relevant provisions of the ECT, including Article 26, in accordance with the rules of customary international law as codified in the VCLT.[311]  The Tribunal referred to the preamble of the VCLT, which confirms that the principles of free consent, good faith and the *pacta sunt servanda* are universally recognized, and to the fact that the VCLT addresses, amongst other issues, how States express consent.[312]  The Tribunal considered that international law as expressed in treaties should be capable of being known and certain.[313]

---

[306] **ELA-081**, Award, ¶ 270.

[307] Italy's Memorial on Annulment, ¶ 36.

[308] ESPF's Counter-Memorial on Annulment, ¶ 106.

[309] Id.

[310] ESPF's Rejoinder on Annulment, ¶ 85.

[311] **ELA-081**, Award, ¶ 273.

[312] *Id.*, ¶ 274.

[313] *Id.*, ¶ 275.

227.     Article 31(1) of the VCLT (which Italy cites in support of its arguments)[314] provides that "[a] treaty shall be interpreted in good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose."

228.     Italy does not dispute the applicability of the rules contained in the VCLT; rather, it submits that the Tribunal applied the VCLT incorrectly or selectively.[315]  In particular, Italy submits that the Tribunal disregarded the VCLT's "compulsory reference" to the context of a treaty, and instead "fixated" on the literal meaning of the words in the ECT.[316]

229.     The issue of consent, and whether the absence of an explicit exception or carve-out is required, or whether by virtue of interpretative considerations an exception or carve-out should be read into the arbitration clause contained in Article 26 of the ECT, is central to the dispute between the Parties and to this annulment proceeding.  Arguably the dispute could be described as whether the glass is half full or half empty.

230.     Also, there is an element of "ships passing in the night," with Italy, on the one hand, focusing on a wide range of considerations, many of which are based on EU law and presented through the prism of EU court decisions.  Italy also refers to policy considerations, such as the desire to remedy what Italy characterizes as "fundamental criticism and widespread contestation onto the system of resolution of disputes between investors and States."[317]  ESPF, on the other hand, presents a more rigidly structured argumentation by reference to international law, consistent with its emphasis on the plain text of the ECT.

231.     In addressing the Parties' arguments, the *ad hoc* Committee is mindful of and respects this difference in approach.  Having said that, and given the undisputed relevance of the rules of interpretation reflected in the VCLT, the *ad hoc* Committee agrees with ESPF that the first level of treaty interpretation is the review of the express terms of the treaty and the determination of their "ordinary meaning".[318]  As the tribunal in *RSM v. Grenada* found, Article 31 of the VCLT, read in conjunction with Articles 32 and 33 of the VCLT, sets out "an interpretive structure in which

---

[314] Italy's Memorial on Annulment, ¶ 78.

[315] *Id.*, ¶ 78.

[316] *Id.*, ¶ 79.  See also *id.*, ¶ 82, where Italy stresses the importance of considering a provision in its context and in light of its purpose.

[317] Italy's Memorial on Annulment, ¶ 34.

[318] ESPF's Opening Presentation, slide 53; ESPF's Counter-Memorial on Annulment, ¶¶ 113-114 and footnote 188; ESPF's Rejoinder on Annulment, ¶¶ 86, 90-91.

subsequent practice and the other two methods of treaty interpretation, subjective and teleological, are supplementary in nature.  They are to be used to assist in the interpretation when the textual method is insufficient."[319]

232.   It is effectively common ground between the parties that there is no explicit carve-out for particular kinds of disputes from the arbitration provision contained in Article 26 of the ECT.  Italy acknowledges this when it argues that "[a]s it often happens when a matter is presupposed or taken for granted, there is *not a passage in which the ECT proclaims its non-application* inside the Internal Market in so many words."[320]

233.   Rather, the question that faced the Tribunal is whether by reference to the object and purpose of this provision, and/or by virtue of other provisions and limitations contained in or flowing from the ECT, an implicit exception or carve-out exists that excludes intra-EU disputes from the arbitration mechanism contained in Article 26.

234.   In the following subsections, the *ad hoc* Committee will review Italy's specific arguments in relation to the limitations allegedly flowing from the provisions and structure of the ECT, bearing in mind however that the starting point is the ordinary meaning of Article 26 of the ECT.

*(b)  Disconnection clause*

235.   Italy argues that, rather than focusing on the absence of an explicit or implicit disconnection clause, a proper application of the VCLT requires consideration of whether the ECT precludes an intra-EU prohibition, not the other way around.  First, the *ad hoc* Committee notes that, in its view, this argument mischaracterizes the interpretation rules of the VCLT.  As stated above, the primary benchmark is the wording.  Secondary tools, such as considering the object and purpose of a treaty, serve a subsidiary role.

236.   In other words, the effect of the VCLT's interpretation model is that the glass is half-full, not half-empty.  The burden is on the party disputing the wording's ordinary meaning to show that despite the clear text, a different meaning is warranted based on the object and purpose of the treaty or some other criterion recognized in the VCLT.  The *ad hoc* Committee disagrees therefore with Italy's argument that the Tribunal's interpretation reflects a tendency "to replace interpretation of

---

[319] **ELA-0130**, *RSM Production Corp. v. Grenada*, ICSID Case No. ARB/05/14, Award, 13 May 2009, ¶ 383.
[320] Italy's Memorial on Annulment, ¶ 62 (emphasis added).

norms with mere reading of the clauses."[321]  While there may be more to it, as we have said above, the starting point of interpretation is the text of the treaty.  Here, the text of Article 26 is clear, providing for unconditional consent to arbitrate on the part of the Contracting Parties, with no carve-outs.

237.    Italy, in arguing that indeed there is more to it, has referred primarily to the object and purpose of the ECT, namely (in its submission) to promote energy development in the former USSR, not among EU Member States themselves.[322]  While ESPF acknowledges that the ECT was conceived in partial consideration of the need for economic recovery in Eastern Europe and the then-USSR, it argues that nothing in the ECT limits the purpose of the Treaty to that sole objective.[323]  ESPF also refers to other ECT tribunals that have held that any intention to facilitate economic recovery in Eastern Europe could not be deemed to override the – explicit – language of the ECT with respect to the consent by all Contracting Parties to settle disputes through international arbitration.[324]

238.    The *ad hoc* Committee agrees with ESPF's position, as also reflected in the cited cases.  While the facilitation of economic recovery and the promotion of energy development in the former Eastern Bloc may indeed have been a driver for the conclusion of the ECT, that in itself does not justify restricting an explicit, unconditional provision extending the right to arbitration to all covered investors, be they nationals of an EU Member State or not.

239.    Article 344 of the TFEU does not affect the above, nor does Article 16 of the ECT.  Article 344 of the TFEU provides that EU Member States undertake not to submit a dispute concerning the interpretation or application of the EU treaties to any method of settlement other than those provided for in the Treaty.  As the Tribunal considered, in this case there was no conflict between Article 344 of the TFEU and the ECT.  ESPF's claim was based solely on Italy's alleged breaches of the ECT, and the Tribunal was not called upon to interpret the EU treaties nor had any need to do so in order to reach its findings under the ECT.[325]

---

[321] *Id*.

[322] Italy's Reply on Annulment, ¶ 36.

[323] ESPF's Rejoinder on Annulment, ¶ 91.

[324] ESPF's Rejoinder on Annulment, ¶ 92.  See also **ELA-063**, *InfraRed* Award, ¶ 266; **ELA-058**, *LBBW* Decision, ¶¶ 118-119; **ELA-048**, *Cube* Decision on Jurisdiction, ¶¶ 134-138.

[325] See **ELA-081**, Award, ¶ 338; ESPF's Rejoinder on Annulment, ¶ 96.

240.     Article 16 of the ECT likewise does not affect the conclusion above.  This provision, which Italy submits has the effect that the Lisbon Treaty must prevail over the terms of the ECT, provides:

> "Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty,
>
> (1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and
>
> (2) nothing in such terms of the other agreement shall be construed to derogate from any provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty,
>
> where any such provision is more favourable to the Investor or Investment."

241.     In the underlying arbitration, Italy argued that EU law is more favorable to the investor, on the ground that it is a more developed and complex legal system than the ECT.[326]  In its Memorial on Annulment, Italy argued that EU investors derive more favorable protection from EU law and, therefore, should not be required to "worry about the ECT curtailing their privileges."[327]  Similarly, Italy invokes Articles 24 and 25 of the ECT, arguing that these provisions clarify that the ECT does not affect the functioning of the internal market by forcing the automatic extension of its internal privileges to third parties.

242.     The *ad hoc* Committee cannot follow Italy in this reasoning.  As ESPF argues, Article 16 of the ECT dictates that the ECT's dispute resolution provisions prevail over any conflicting and less favorable rule of EU law.[328]  This is not a case of being restricted by the ECT (the scenario Italy describes), but rather of an investor benefiting from the arbitration provision contained therein and being able to choose its remedy.  As the Tribunal considered, Article 16 of the ECT does not create a hierarchy among international agreements but rather contemplates that rights under multiple agreements may exist, and that in such circumstances the investor may choose which rights to

---

[326] See **ELA-081**, Award, ¶ 229.

[327] Italy's Memorial on Annulment, ¶ 64.

[328] See ESPF's Counter-Memorial on Annulment, ¶¶ 159-160; ESPF's Rejoinder on Annulment, ¶¶ 97-98.

pursue and how.[329]  Italy, pursuant to Article 26 of the ECT, has given its unconditional consent to arbitration before an international tribunal, and it is bound thereby.[330]

243.  In relation to consent, Italy has also invoked the EU Member States' Declaration to argue that this instrument affects its consent to arbitrate. [331]  The *ad hoc* Committee notes that Italy's argumentation in relation to this issue is relatively undeveloped,[332] while ESPF has, as set out above,[333] comprehensively reiterated its arguments in the underlying arbitration, on the basis of which the Tribunal dismissed Italy's argument.  It is not the task of the *ad hoc* Committee to reassess the Tribunal's analysis, but rather simply to review the alleged grounds for annulment. Italy has failed to allege, let alone demonstrate, why and how, in light of the articulate review of the EU Member States' Declaration in the Award and the rejection of its relevance, this Declaration, whatever its precise legal significance, could constitute a basis for annulment. Consequently, the requirement that any excess of powers be manifest is moot.

*(c)  Other indicators*

244.  Italy next submits that EU Member States are not expected to be treated in the same way as other ECT Contracting States.  In this context and by reference to Articles 1(3) and 36(7) of the ECT, dealing with REIOs and their voting rights, Italy argues that, on the one hand, EU Member States are not expected to extend the preferential treatment of their internal market to the entire ECT membership, and, on the other hand, EU citizens are not degraded to mere foreign investors.[334]

245.  ESPF submits that there is no basis for the contention that Articles 1(3) and 36(7) of the ECT mandate different rights for EU States or investors.  Article 1(3) of the ECT simply contains a definition of a REIO, and Article 36(7) regulates the voting rights of a REIO.  The latter provision does not give the EU, as a REIO, the right to trump the votes of EU Member States; on the contrary, it in fact confirms the autonomy of these States to exercise their individual rights as ECT Contracting Parties.[335]

---

[329] See **ELA-081**, Award, ¶ 301.

[330] See *id.*, ¶ 302.

[331] Italy's Reply on Annulment, ¶ 38.

[332] See Section (a) above.

[333] See Section (d) above.

[334] See Italy's Memorial on Annulment, ¶ 66.

[335] See **E-053**, ECT, Article 1.

246.    As with Italy's arguments in relation to the EU Member States' Declaration, and those arguments in relation to Article 16 of the ECT, it is not entirely clear how Italy's observations in relation to these provisions of the ECT support its allegation that the Tribunal's decision constitutes a manifest excess of powers.  This is especially significant in relation to the REIO argument, which, as ESPF observes, was not argued by Italy in the underlying arbitration but rather formed part of the submissions of the EC.  In any event, the argument fundamentally goes back to the point addressed above – namely, that Italy seeks to argue that the unconditional consent to arbitrate laid down in Article 26 of the ECT is somehow impacted by the allegedly greater economic benefits for EU Member States and investors stemming from the functioning of the internal market.  In the Committee's view, the functioning of and the benefits potentially created by the internal market have no bearing on the unconditionality of the commitment laid down in Article 26 of the ECT to extend the benefit of arbitration to investors from all ECT Contracting States.

247.    Italy furthermore seeks to draw an analogy with the WTO Agreement in support of its argument that the ECT, or at least the arbitration agreement contained in Article 26 of the ECT, is not deemed applicable between EU Member States.[336]  It is not apparent to the *ad hoc* Committee that this analogy is apt, nor has Italy provided persuasive support for the proposition that the WTO Agreement, even if it were relevant, lacks an intra-EU function.  Be that as it may, Italy failed to raise this argument in the underlying arbitration, where it was only addressed by the EC, which in itself is sufficient reason to reject this as a potentially relevant consideration in these annulment proceedings.  Finally, Italy has not established why, even if its comments about the WTO are correct and were relevant, they would justify the conclusion that the Tribunal's reliance on the unequivocal text of Article 26 of the ECT was unjustified or constituted an excess of powers.

### (d)  Modification

248.    As an alternative to its argument that, at the time of conclusion of the ECT, the EU and its Member States could not have consented to arbitration between EU investors and EU Member States, because the distribution of powers between the EU and its Member States did not allow them to do so, Italy submits that, in any event, the EU Member States could and did modify their commitments under the ECT by means of the Lisbon Treaty, which entered into force in 2009.[337]

---

[336] Italy's Memorial on Annulment, ¶¶ 75-77.

[337] See *id.*, ¶ 85.

249.  For the reasons stated above, insofar as there was allegedly an internal impediment to issuing consent, that does not absolve the EU or its Member States of the unequivocal commitment laid down in Article 26 of the ECT *vis-à-vis* investors.[338]  As also stated above, the negotiation history was not part of the Parties' arguments in the underlying arbitration, and thus did not inform the Tribunal's decision, and thus on that basis already cannot support annulment.

250.  Furthermore, while Italy is entitled to make alternative arguments, there is tension between the position that there never was consent, and the proposition that consent existed but was withdrawn and modified by the EU Member States in their internal relationship, by virtue of the conclusion of the Lisbon Treaty many years later.  Italy argues that the European Community was still in the process of integration at the time the ECT was concluded, but whatever the implication of this argument may be, the Tribunal dealt with it by referring to the requirements of Article 41 of the VCLT, which stipulate the requirements for treaty modification, and which had not been met.  Italy essentially invokes the aim and purpose of the ECT in comparison with the aim and purpose of the EU treaties as alleged support for the notion that the EU treaties prevail over the ECT.  As ESPF submits,[339] this limited explanation cannot discharge Italy's burden of proving that the Tribunal exceeded its powers when it concluded that the Lisbon Treaty did not constitute a modification of the ECT, let alone that it did so manifestly.

*(e)  EU law as part of the applicable law*

251.  In the alternative, "premised on the abstract applicability of Article 26 ECT to intra-EU disputes" Italy submitted in its memorials that the Tribunal should have declined to exercise jurisdiction because the applicable law includes EU law, which must be interpreted according to the key principles of EU law, and in particular the primacy of EU law.[340]  Later, at the Hearing and in its Post-Hearing Brief, Italy appeared to modify its argument somewhat by submitting that after the Lisbon Treaty, the ECT can be considered as part of EU law and must be interpreted according to the key principles of that legal system.[341]

252.  The *ad hoc* Committee notes that this revised argument appears inconsistent with the argument on the primacy of EU law as presented in the underlying arbitration.  At least until the Hearing, Italy's

---

[338] See Section IV.B(3)(a) above.

[339] See ¶ 196 above.

[340] Italy's Memorial on Annulment, ¶ 94.

[341] Italy's Post-Hearing Brief, ¶ 36.

position appears to have been that the Tribunal and the *ad hoc* Committee should, by virtue of Article 26(6) of the ECT, be guided by the findings of the CJEU and in particular its *Achmea* judgment.[342]  There is no substantiated support for the notion that Italy has ever invoked in the arbitration, or in the initial stages of the annulment, substantive provisions of EU law such as provisions concerning incentives barring incompatible State aid to argue that Article 26(6) would have been triggered.  The notion that the ECT constitutes EU law and that that in itself dictates the applicability of the concept of the primacy of EU law is difficult to align with the structure of Article 26 of the ECT.

253.    Article 26(6) of the ECT refers to the "applicable rules of international law."  Italy argues (in particular by relying on the *Electrabel v. Hungary* decision) that EU law is a system of international law that is incorporated by Article 26(6).[343]  Italy also submits that questions of EU law are central to the present dispute.[344]

254.    ESPF, however, disputes that the reference in Article 26(6) of the ECT to "rules and principles of international law" has the effect of making EU law applicable.  Rather, it submits that the phrase is a typical reference to laws generally applicable to all States, *i.e.*, general or customary international law.[345]

255.    In the underlying arbitration, the Tribunal extensively discussed the *Achmea* judgment, on the basis of which Italy had argued that intra-EU arbitration agreements are incompatible with EU law.[346]  The Tribunal found that, unlike the BIT tribunal in *Achmea*, there was no conceivable scenario under which an ECT tribunal would be applying EU law.[347]  Furthermore, even if EU law could be included in Article 26(6)'s reference to "rules and principles of international law," the Tribunal noted that no issue of EU law – including the CJEU's reasoning in the *Achmea* judgment – was "applicable" to the dispute before it, and thus EU law did not form part of the "applicable rules and principles of international law."[348]

---

[342] Italy's Memorial on Annulment, ¶¶ 94 *et seq.*; Italy's Reply on Annulment, ¶¶ 40 *et seq.*

[343] Italy's Memorial on Annulment, ¶ 95, citing **ILA-021**, *Electrabel* Decision on Jurisdiction, ¶ 4.124.

[344] Italy's Memorial on Annulment, ¶ 98.

[345] ESPF's Counter-Memorial on Annulment, ¶ 154.

[346] **ELA-081**, Award, ¶¶ 317-339.

[347] *Id.*, ¶¶ 312, 335-339.

[348] *Id.*, ¶ 338.

256.    The *ad hoc* Committee agrees that, on its face, the reference in Article 26(6) of the ECT is to public international law, and the Tribunal has extensively analyzed why in the present case it was not called upon to decide issues of EU law.[349]  The reference to the *Electrabel v. Hungary* decision does not justify a different conclusion.  If anything, the decision and the specific quote referenced by Italy[350] addresses the opposite scenario – namely, that while EU law is applied within the national legal order, that does not detract from the fact that the EU treaties (and the body of law flowing therefrom) constitute a form of international law and the legal rules created under the treaties can apply directly within the different national legal orders.

257.    The *Electrabel* decision, therefore, cannot be invoked to support the opposite notion that EU law forms part of the applicable rules and principles of international law as referred to in Article 26(6) of the ECT.  In any event, the issue is moot, since the Tribunal was not called on to apply EU law.  Similarly, Italy is not assisted by the present *ad hoc* Committee's Decision on the EC's Application for Leave to Intervene as Non-Disputing Party of 13 October 2021.  In that decision, the *ad hoc* Committee referred to the fact that the interpretation and application of the treaties of the EU formed part of the Parties' debate, but this reference in no way constitutes an opinion or decision of the *ad hoc* Committee as to the legal nature and/or significance of these treaties for the present dispute.[351]

*(f)   The Komstroy judgment and other decisions*

258.    Italy has submitted the *Komstroy* judgment in support of its submission that "[i]n the relationship between two parties, the ECT is tantamount to a bilateral instrument, and effectively corresponds to a bilateral investment treaty."[352]  As considered above,[353] the *ad hoc* Committee will refrain from considering legal authorities, other than those addressing the scope of annulment, that were not before the Tribunal.  The *Komstroy* judgment was rendered a year after the Tribunal issued the Award and, regardless of its exact scope and meaning, will therefore be disregarded for the purposes of this annulment proceeding.  For completeness' sake, the *ad hoc* Committee notes that

---

[349] *Id.*, ¶ 335-338.

[350] Italy's Memorial on Annulment, ¶ 95, citing **ILA-021**, *Electrabel* Decision on Jurisdiction, ¶ 4.124.

[351] Decision on the EC's Application for Leave to Intervene as Non-Disputing Party of 13 October 2021, ¶ 49.

[352] Italy's Memorial on Annulment, ¶¶ 127-136, citing **ILA-001**, *Komstroy* judgment, ¶ 45.  See also Italy's Reply on Annulment, ¶ 28.

[353] See Section III.C above.

the same applies to the arguments and authorities conditionally submitted by ESPF, which were said to rebut the relevance of the *Komstroy* judgment for these annulment proceedings.

259.    Similarly, insofar as Italy has referred to a number of court judgments, notably the Paris Court of Appeal judgments, for the reasons outlined above, these will be disregarded by the *ad hoc* Committee as well.

260.    Lastly, Italy has invoked the *Green Power* award.  Procedurally, the *Green Power* award is in a slightly different position, because Italy requested leave to submit it, which the *ad hoc* Committee granted, while allowing ESPF to submit rebuttal authorities.  The Committee also requested the Parties to make submissions on the admissibility, relevance and weight of these authorities. However, the *ad hoc* Committee added an explicit caveat that leave to submit authorities and make submissions in relation thereto was "without prejudice" to the *ad hoc* Committee's decision on the admissibility, relevance and weight of these authorities.[354]

261.    Having considered the debate between the Parties, the *ad hoc* Committee sees no reason to treat the *Green Power* award, the rebuttal decisions and the Parties' comments and arguments in relation thereto any differently, and will not take these into consideration for purposes of this annulment proceeding.  In essence, Italy appears to submit that this decision is more important than other legal authorities, presumably implying that it is of such importance that the general notion that an *ad hoc* committee is limited to the record before the underlying tribunal does not apply.  Even if a rule existed to this effect, and the *ad hoc* Committee is not persuaded that it does, Italy has failed to show that the *Green Power* award meets necessary threshold.  The fact that there is a single decision, even assuming that it is comparable, reflecting a different approach in relation to one or more legal issues than multiple other decisions, does not in and of itself render the former of "paramount relevance", justifying a different approach than outlined above in relation to the other newly submitted authorities.

### (g)  Manifest

262.    ESPF has argued extensively that in light of the overwhelming *jurisprudence constante* rejecting the intra-EU objection, there is no excess of powers, much less a "manifest" one.[355]  Meanwhile, Italy has presented its case largely in conjunction with its substantive arguments, positing that the

---

[354] Email from the Committee of 15 September 2022.
[355] ESPF's Opening Presentation, slide 42.  See also Section (a) above.

alleged deficiencies in the Award are manifest.[356]  The *ad hoc* Committee has already found above, however, that Italy has not met the first threshold under Article 52(1)(b) of the ICSID Convention, because it has not shown any excess of powers by the Tribunal.

263.    In responding to ESPF's arguments, Italy contests the relevance of the numerous decisions in which tribunals have decided along the lines of the Tribunal in this arbitration.   There is some inconsistency in Italy's position, since at the same time it relied heavily on the *Green Power* award as an allegedly decisive trigger establishing annullable error on the Tribunal's part.[357]

264.    However that may be, the *ad hoc* Committee accepts that, while recognizing that there is no strict rule of precedent in international (investment) arbitration,[358] a consistent line of cases addressing an issue in a consistent way is typically decisive in undermining a claim of an alleged manifest excess of powers.[359] In any event, in light of the conclusion in the previous paragraphs that Italy has not made a showing of an excess of powers in relation to the Tribunal's decision on jurisdiction, the requirement that any excess of powers be manifest is moot.

265.    Consequently, for the reasons considered above, the *ad hoc* Committee concludes that Italy has not demonstrated that the Tribunal has exceeded its powers, much less manifestly so.

## V.    FAILURE TO STATE REASONS

### A.    STANDARD OF REVIEW FOR FAILURE TO STATE REASONS

### (1)    Italy's Position

266.    The second issue, which Italy submits justifies the annulment of the Award, is the alleged failure of the Tribunal to engage with the Post-Hearing Awards.  These are the awards in the *Belenergia* and the *SunReserve* cases, which the Tribunal permitted Italy to submit after the merits hearing.[360]

---

[356] Italy's Memorial on Annulment, ¶ 4.

[357] Italy's Reply on Annulment, ¶ 27.

[358] **ELA-165**, *InfraRed* Decision on Annulment, ¶ 504.

[359] See **ELA-095**, *Teinver* Decision on Annulment, ¶ 59; **ELA-021**, *Suez, Sociedad General de Aguas de Barcelona S.A. and Interagua Servicios Integrales de Agua S.A. v. Argentine Republic*, ICSID Case No. ARB/03/17, Decision on Respondent's Application for Annulment, 14 December 2018, ¶ 176; **ELA-121**, *RSM* Decision on Annulment, ¶ 179.  See also ESPF's Rejoinder on Annulment, ¶ 73; ESPF's Counter-Memorial on Annulment, ¶¶ 97-100.

[360] **ILA-002**, *Belenergia* Award; **ILA-004**, *SunReserve Luxco Holdings SRL, et al. v. Italian Republic*, SCC Case No. 132/2016, Award, 25 March 2020.  See also **ELA-081**, Award, ¶¶ 63, 69.

Italy claims that the Award failed to analyze or take into account properly these two awards, which is said to constitute a failure to state reasons (the second issue) and a departure from a fundamental rule of procedure (the third issue), both grounds for annulment under Article 52(1)(d) and (e) of the ICSID Convention.[361]  Italy notes that these two annulment grounds, while formally autonomous under Article 52, are often linked to each other, and that they are in the present case.[362] The failure to state reasons can be characterized as a serious departure from a fundamental rule of procedure.[363]

267.    Italy submits that the issue in annulment is not the correctness of the reasons "but their minimum adequacy."[364]  The standard has coalesced around "a test of intelligibility and salience: the reasons must afford to the reader an understandable explanation of each issue decided by the tribunal."[365] Not only an absolute absence of reasons is annullable; even "some defects in the statement of reasons could give rise to annulment."[366]

268.    Italy refers to the oft-cited test provided in *MINE v. Guinea* that:

> "the requirement to state reasons is satisfied as long as the award enables one to follow how the tribunal proceeded from Point A. to Point B. and eventually to its conclusion, even if it made an error of fact or of law. This minimum requirement is in particular not satisfied by either contradictory or frivolous reasons."[367]

269.    Italy acknowledges that ICSID tribunals are not under an obligation to mention in their decisions every authority cited in relation to a particular argument.[368]  Rather, the test is a substantive one and requires a review of whether the award:

> "contains reasons relating to the specific argument that the authority seeks to support.  It is possible that the argument is adequately discussed without making an express reference to the authority. Conversely, it is possible that

---

[361] Italy's Memorial on Annulment, ¶¶ 10-13.

[362] *Id.*, ¶ 171.

[363] *Id.*, ¶ 173.

[364] *Id.*, ¶ 175.

[365] *Id.*, ¶ 176, citing **ILA-015**, *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, ¶ 64.

[366] Italy's Memorial on Annulment, ¶ 175, citing **ILA-011**, *Soufraki* Decision on Annulment, ¶ 122.

[367] Italy's Memorial on Annulment, ¶ 177, citing **ILA-040**, *MINE* Decision on Annulment, ¶ 5.09.

[368] Italy's Reply on Annulment, ¶ 56.

the reference to the authority is perfunctory and does not sustain genuine reasoning on the point."[369]

270.    Italy contends that the scrutiny of whether a tribunal has dealt adequately with the parties' arguments requires a weighing of the references to authorities.  Depending on the significance of an authority, a mere reference to it, or a simple recap of the submitted authorities, may not suffice.[370]

271.    Furthermore, Italy argues that "[w]ith respect to prior decisions on the same standards and the same conduct, a reinforced duty of reasoning is obviously expected, in light of the salience of these authorities," and in this context refers to the "desirable method of operation" discussed by UNCITRAL Working Group III.[371]  Italy clarifies that it is not contending that the Tribunal was required to respond to every legal authority put forward or deemed important by Italy.[372]  Also, in arguing that a "reinforced duty of reasoning" applies, Italy is not seeking to impose an additional threshold beyond the standard of Article 52 of the ICSID Convention.[373]

272.    Rather, in Italy's submission, "reasons must be measured upon the importance of the issues and documents on which the reasons are due."[374]  In this case, Italy contends that the Post-Hearing Awards were vital and outcome-determinative, and the Tribunal majority's failure to engage in any substantive way with them amounts to an annullable flaw in the Award.[375]

## (2)    ESPF's Position

273.    ESPF submits that Italy advances the wrong legal standard.  The Tribunal was under no obligation to respond to every legal authority and argument that Italy believes was important.  Rather, the Tribunal was required to explain the reasons for its outcome-determinative conclusions, which it did.[376]

---

[369] Italy's Memorial on Annulment, ¶ 178.

[370] *Id.*, ¶ 179.

[371] *Id.*, ¶ 180, citing **ILA-042**, United Nations Commission on International Trade Law Working Group III (Investor-State Dispute Settlement Reform), *Possible reform of investor-State dispute settlement (ISDS): Consistency and related matters*, Note by the Secretariat, 28 August 2018, Document A/CN.9/WG.III/WP.150, ¶ 38.

[372] Italy's Reply on Annulment, ¶ 50.

[373] *Id.*, ¶¶ 50-51.

[374] *Id.*, ¶ 53.

[375] Italy's Reply on Annulment, ¶ 54.

[376] ESPF's Counter-Memorial on Annulment, ¶ 194; ESPF's Rejoinder on Annulment, ¶ 169.

274.     As with the other annulment grounds, the scope of review pursuant to Article 52(1)(e) of the ICSID Convention is narrow and the threshold is high.[377]  ESPF posits that a failure to state reasons within the meaning of Article 52(1)(e) only occurs when (i) the conclusion that allegedly lacks reasons is "outcome determinative"; and (ii) it is "impossible" to understand how the tribunal arrived at its conclusion.[378]  Furthermore, ESPF refers to the standard adopted by the *ad hoc* committee in *MINE v. Guinea*, which, as Italy recognizes, is that if the reader of an award is able "to follow how the tribunal proceeded from Point A to Point B, and eventually to its conclusion, even if [the tribunal] made an error of fact or of law," then the annulment standard is not met.[379]

275.     ESPF argues that there is no support for Italy's argument that, in the present case, the Tribunal was under a reinforced duty of reasoning with respect to prior decisions addressing the same standard or the same conduct.[380]  No *ad hoc* committee has ever endorsed such standard, which would essentially impose a system of precedent in investment arbitration.[381]  In fact, the note prepared by the Secretariat of UNCITRAL Working Group III, referenced by Italy in its submissions, addresses the "*reform* of investor-State dispute settlement (ISDS)" – which makes clear that no such duty exists under the state of the law at present.[382]

276.     ESPF contends that tribunals may permissibly agree with, take issue with, consider but disregard or ignore decisions of other tribunals.[383]  In addition, *ad hoc* committees have rejected claims that tribunals would be obliged to respond to each of the parties' arguments and legal authorities.[384]  The decided cases do not require an award to contain reasons on every aspect of a particular dispute; instead, the inquiry is whether an informed reader can understand how the Tribunal reached its

---

[377] ESPF's Counter-Memorial on Annulment, ¶ 195.

[378] *Id.*, ¶ 196.  See also **ELA-094**, *Poštová banka, a.s. and ISTROKAPITAL SE v. Hellenic Republic*, ICSID Case No. ARB/13/8, Decision on Annulment, 29 September 2016, ¶ 143; **ELA-138**, *Sociedad Anónima Eduardo Vieira v. Republic of Chile*, ICSID Case No. ARB/04/7, Decision on Annulment, 10 December 2010, ¶ 355; **ELA-037**, *CMS* Decision on Annulment, ¶ 127.

[379] ESPF's Counter-Memorial on Annulment, ¶ 196.

[380] *Id.*, ¶ 197.

[381] ESPF's Rejoinder on Annulment, ¶ 169.

[382] ESPF's Counter-Memorial on Annulment, ¶ 198, citing **ILA-042**, United Nations Commission on International Trade Law Working Group III (Investor-State Dispute Settlement Reform), *Possible reform of investor-State dispute settlement (ISDS): Consistency and related matters*, Note by the Secretariat, 28 August 2018, Document A/CN.9/WG.III/WP.150, ¶ 37 (emphasis added).

[383] ESPF's Counter-Memorial on Annulment, ¶ 199.

[384] *Id.*, ¶ 200, citing **ILA-010**, *Glencore International A.G. and C.I. Prodeco S.A. v. Republic of Colombia*, ICSID Case No. ARB/16/6, Decision on Annulment, 22 September 2021, ¶ 237; **ELA-095**, *Teinver* Decision on Annulment, ¶ 210; **ELA-103**, *TECO* Decision on Annulment, ¶ 249; **ILA-036**, *Alapli Elektrik B.V. v. Republic of Turkey*, ICSID Case No. ARB/08/13, Decision on Annulment, 10 July 2014, ¶ 124.

conclusions.[385]  Nor is there any duty for a tribunal to state "reasons for its reasons" or to "cite legal authorities … in support of its reasons."[386]

277.    ESPF proceeds to dispute Italy's argument that the "colossal weight" of the *SunReserve* and *Belenergia* awards required the Tribunal to consider and explain why it was not convinced by them. That they will not bear that weight is said to flow from the cases holding that an award need not contain reasons on every aspect of a particular dispute or distinguish specific legal authorities that were not or could not have been decisive to the outcome of the case.[387]  Indeed, ESPF submits, Italy itself recognized the correct legal standard, which contains no heightened duty of reasoning, in the *Blusun v. Italy* case.[388]  Moreover, in the present case, Italy accepts that "only those" omissions in an award that render the "reasoning insufficient on an outcome-determinative point" can be fatal to the award; but Italy cannot demonstrate that any shortcoming in the Tribunal's reasoning with respect to *SunReserve* and *Belenergia* would have led to a different outcome here.[389]

278.    In any event, ESPF says, the Award is not based on *SunReserve* or *Belenergia*, and Italy has not demonstrated that Article 52(1) of the ICSID Convention required the Tribunal to give reasons with respect to those awards or to explain how they affected (or not) the Tribunal's analysis.[390]  ESPF refers in this regard to the *Kılıç v. Turkmenistan* case, where Turkmenistan claimed that the tribunal had not adequately explained why it was not persuaded by the *Rumeli v. Kazakhstan* and *Sistem v. Kyrgyzstan* decisions, which addressed similar issues.  The *Kılıç v. Turkmenistan ad hoc* committee concluded that the award had addressed those decisions, but that, in any event, "the Tribunal had no obligation to adopt the views of the *Rumeli* and *Sistem* tribunals."[391]  According to ESPF, it

---

[385] ESPF's Counter-Memorial on Annulment, ¶ 200.

[386] ESPF's Rejoinder on Annulment, ¶ 169.

[387] *Id*.

[388] ESPF's Counter-Memorial on Annulment, ¶ 201.

[389] ESPF's Rejoinder on Annulment, ¶ 175.

[390] ESPF's Rejoinder on Annulment, ¶ 172.

[391] ESPF's Rejoinder on Annulment, ¶ 173, citing **ELA-140**, *Kılıç İnşaat İthalat İhracat Sanayi ve Ticaret Anonim Şirketi v. Turkmenistan*, ICSID Case No. ARB/10/1, Decision on Annulment, 14 July 2015, ¶ 118 referring to *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Award, 29 July 2008 and *Sistem Mühendislik In aat Sanayi ve Ticaret A. v. Kyrgyz Republic*, ICSID Case No. ARB(AF)/06/1, Award, 9 September 2009.

follows that a tribunal's election not to explain why it disagreed with the conclusions of other tribunals may not be considered a failure to state reasons.[392]

279.   ESPF furthermore argues that *ad hoc* committees have accorded tribunals a degree of discretion as to the way in which they express their reasoning.  Where it is necessary to provide reasons, they may be stated succinctly or at length, and different legal traditions differ in their modes of expressing reasons.[393]  Moreover, *ad hoc* committees are tasked with reviewing the absence of reasons and not the quality or correctness of the reasons given by a tribunal.[394]

280.   As for Italy's suggestion that the Award might have been written before the Post-Hearing Awards were received, or that the Tribunal had already made up its mind when it accepted them into the record, ESPF notes that Italy has no way of knowing whether this assumption is valid or not.[395]  The fact that the Tribunal had been deliberating for more than one year when it received the Parties' comments on those awards is hardly determinative.[396]  In fact, the Tribunal took note of those decisions and the Parties' positions thereon in the Award.  Italy's suggestion that the Tribunal should have changed its (supposedly) already-determined conclusion or augmented its reasoning in light of the Post-Hearing Awards is unfounded.  In support, ESPF refers to Professor Schreuer, who describes the standard of Article 52(1)(e) of the ICSID Convention as a minimum requirement, which does not call for tribunals to "strain every sinew in an attempt to convince the losing party that its decision was the right one."[397]  The benchmark which Italy must satisfy, ESPF submits, is that a reader of the award cannot comprehend how the tribunal reached its results.  It has failed to

---

[392] ESPF's Rejoinder on Annulment, ¶ 174, citing **ILA-012**, *EDF* Decision on Annulment, ¶¶ 346, 349; **ELA-105**, *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on Annulment, 30 December 2015 ("***Tulip* Decision on Annulment**"), ¶¶ 98, 150; **ELA-140**, *Kılıç İnşaat İthalat İhracat Sanayi ve Ticaret Anonim Şirketi v. Turkmenistan*, ICSID Case No. ARB/10/1, Decision on Annulment, 14 July 2015, ¶ 133; **ELA-172**, *Tza Yap Shum v. Republic of Peru*, ICSID Case No. ARB/07/6, Decision on Annulment, 12 February 2015, ¶ 119; **ELA-118**, *Rumeli* Decision on Annulment, ¶ 84; **ELA-038**, *Duke Energy* Decision on Annulment, ¶ 217.

[393] ESPF's Counter-Memorial on Annulment, ¶ 203, citing **ILA-015**, *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, ¶ 64.

[394] ESPF's Counter-Memorial on Annulment, ¶ 204.

[395] ESPF's Rejoinder on Annulment, ¶ 176.

[396] *Id.*, ¶¶ 176-177.

[397] ESPF's Rejoinder on Annulment, ¶ 177, citing **ELA-031**, C. Schreuer, *The ICSID Convention: A Commentary* (2d Ed. 2009), ¶ 342.

do so.  Instead, what Italy actually invokes in this case is disagreement with the outcome rather than any absence of reasoning.[398]

281.   ESPF further submits that insofar as Italy was of the view that the Tribunal had failed to address the question presented to it in respect of the Post-Hearing Awards, it should have requested a supplementary decision from the Tribunal pursuant to Article 50 of the ICSID Convention.[399]

**(3)      The *ad hoc* Committee's Analysis**

282.   The cornerstone of Italy's arguments in relation to the Tribunal's alleged failure to provide reasons, hinges on the allegedly reinforced duty of reasoning said to be is triggered by the existence of prior decisions on the same standards or the same conduct.[400]  The *ad hoc* Committee agrees with ESPF that no such reinforced standard applies.  Rather, the Tribunal was required to explain the reasons for its outcome-determinative conclusions.  Illustrative in this regard is the decision of the *ad hoc* committee in *Adem Dogan v. Turkmenistan*, which, in declining to annul, noted that the tribunal had "properly stated the reasons for each important step in its decision making process."[401]

283.   Reference can also be made to the annulment decision in *MINE v. Guinea*, where the *ad hoc* committee, in setting out its oft-quoted standard requiring the reader of an award to be able "to follow how the tribunal proceeded from Point A. to Point B. and eventually to its conclusion," specifically concluded that annulment would *not* be warranted "even if [the tribunal] made an error of fact or of law."[402]  Indeed, both Parties recognize that annulment is not intended to be an avenue for reviewing the substantive correctness of a tribunal's factual or legal conclusions.  This agreed (and correct) position is difficult to square Italy's arguments on the alleged failure to state reasons, which seem to rest on the notion that an allegedly superficial or inadequate consideration of case law could justify annulment.

284.   As considered in relation to the first ground for annulment, there is some tension in Italy's arguments in relation to the impact, if any, of case law for the purposes of annulment review.  First, the *ad hoc* Committee agrees with ESPF that the note prepared by the Secretariat of UNCITRAL

---

[398] ESPF's Rejoinder on Annulment, ¶¶ 178-180, citing **ELA-162**, *NextEra* Decision on Annulment, ¶¶ 128-130, 217-219, 351.

[399] ESPF's Rejoinder on Annulment, ¶ 182.

[400] Italy's Memorial on Annulment, ¶ 180.

[401] **ILA-013**, *Dogan* Decision on Annulment, ¶ 265.

[402] **ILA-040**, *MINE* Decision on Annulment, ¶ 5.09.

Working Group III – which in any event addresses the "reform of investor-State dispute settlement (ISDS)," and not the present state of practice – provides no support for the proposition that Italy endorses:

> "From an historical viewpoint, consistency and coherence are not features built in to the ISDS regime. Decisions are made by arbitral tribunals established on an ad hoc basis, with no formal obligation with regard to the principle of precedent."[403]

285.   Second, Italy's argument regarding the alleged existence of a reinforced duty to reason is at odds with Italy's own acknowledgement that it is possible that an argument can be adequately addressed without making an express reference to the authority invoked in its support,[404] as well as Italy's recognition that tribunals are not under an obligation to mention in their decisions every authority cited to them in relation to a particular argument.[405]

286.   Ultimately, what Italy's argument boils down to is a contention in relation to the weight and significance of two specific authorities and the quality of the Tribunal's reasoning in relation thereto, against the background of other authorities, and also against the background of the related argument (discussed in Section VI below) that the procedural context in which the authorities were included in the record illustrates or implies a procedural impropriety.   The *ad hoc* Committee concludes that the Tribunal's decision, insofar as it involves the reasoning regarding the *Belenergia* and *SunReserve* awards,[406] can only be reviewed within the confines of the limited standard in an annulment review which, as set out by Italy itself, has coalesced around a "test of intelligibility and salience: the reasons must afford to the reader an understandable explanation of each issue decided by the tribunal."[407]

---

[403] **ILA-042**, United Nations Commission on International Trade Law Working Group III (Investor-State Dispute Settlement Reform), *Possible reform of investor-State dispute settlement (ISDS): Consistency and related matters*, Note by the Secretariat, 28 August 2018, Document A/CN.9/WG.III/WP.150, ¶ 37.

[404] Italy's Memorial on Annulment, ¶ 178.

[405] Italy's Reply on Annulment, ¶ 56.

[406] See Section V.B(3) below.

[407] Italy's Memorial on Annulment, ¶ 176, citing **ILA-015**, *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, ¶ 64.

**B.    APPLICATION OF THE STANDARD TO STATE REASONS**

**(1)    Italy's Position**

287.    Italy, in its Memorial on Annulment, first addressed whether the Tribunal (or rather the majority thereof) frustrated Italy's right to be heard, resulting in a serious departure from a fundamental rule of procedure, before addressing the Tribunal's alleged failure to state reasons.  In its Reply on Annulment, Italy reversed the sequence and first addressed the ground of failure to state reasons. As will be discussed below, Italy's arguments in relation to these second and third grounds for annulment are intertwined.  Since Italy ultimately appears to have favored the latter sequence, and additionally because the alleged failure to provide reasons pertains to the entire Award and not only to the majority's decision,[408] this ground will be addressed first.

288.    The Post-Hearing Awards were, in Italy's submission, "vitally important to Italy and carried immense value for the administration of the Arbitration, because the respective legal and factual elements of the three arbitrations were virtually identical," but those awards came to the opposite conclusion from that of the Tribunal below, namely that Italy's conduct was lawful as a matter of international law.[409]

289.    While Italy is of the view that a "genuine consideration" of these awards and the arguments relating thereto by the Tribunal would have led to a different outcome, it stresses that it does not seek a modification of the Tribunal's finding on the merits; rather, it submits that the "procedural impropriety" demonstrated by the Tribunal in its handling of these key decisions affects the validity of the Award and has wider implications for the legitimacy of the system of dispute settlement administered by the Centre.[410]  Similarly, Italy argues that in relation to what it considers to be outcome-determinative issues on the merits, specifically as regards balancing and legitimate expectations, the Award has a blind spot with respect to the Post-Hearing Awards and related submissions.  However, Italy is not contending that the Award was wrong on those issues (although

---

[408] As will be discussed below in Section V.B(3), Italy's arguments insofar as they relate to the alleged failure to provide reasons in relation to the Post-Hearing Awards involve precisely those aspects of the decision of the majority of the Tribunal where it deviates from the findings contained in the Post-Hearing Awards, which are also the elements of the decision from which Prof. Boisson de Chazournes dissents.

[409] Italy's Memorial on Annulment, ¶ 141.

[410] *Id.*, ¶¶ 142-144.

Italy considers that it was), but rather that the Award's reasoning on those issues is marred by a failure to use the minimum deliberative diligence and put forward sufficient reasoning.[411]

290. The existence of contradictory awards regarding identical measures under identical ECT standards, Italy submits, undermines legal certainty and clarity.[412]  Although the Tribunal expressly acknowledged the need to ensure that international law expressed in treaties is capable of being known and certain, it achieved quite the opposite result.[413]

291. Italy discusses the Post-Hearing Awards in considerable detail and contrasts the findings of the two tribunals to those of the Tribunal in the present case.[414]  While the Tribunal admitted the Post-Hearing Awards into the record, the Award "makes no genuine reference" to them;[415] they were not considered "meaningfully",[416] but rather "name-dropped".[417]  In this context, and in relation to the fact that some of ESPF's investments were made after the tariffs had already started to decrease, Italy highlights the statement in the Award that this constituted "'a fact that the *Belenergia v. Italy* tribunal considered significant'.  Yet, the Tribunal's majority concluded that the legitimate expectations existed, the exact opposite of what the tribunal found in *Belenergia v. Italy*.  This conclusion is a non-conclusion."[418]

292. Italy argues that the Tribunal's treatment of the *SunReserve* award is marginally more tangible, but similarly perfunctory.[419]  It points to a number of passages in the Award in which the Tribunal explicitly states that it disagreed with the approach of the *SunReserve* award, which Italy argues constitutes "a passing reference … but no discernible reason to justify the opposite outcome."[420]  It juxtaposes this reasoning to the Award's extensive discussion of the *Blusun v. Italy*, *CEF v. Italy*

---

[411] Italy's Reply on Annulment, ¶ 91.

[412] Italy's Memorial on Annulment, ¶ 145.

[413] *Id.*, ¶ 146.

[414] *Id.*, ¶¶ 147-158.

[415] *Id.*, ¶ 161.

[416] *Id.*, ¶ 162.

[417] *Id.*, ¶ 163.

[418] *Id.*, ¶ 164.  See also *id.*, ¶¶ 203 and 205-206.

[419] *Id.*, ¶ 165.

[420] *Id.*, ¶ 165.

and *Greentech v. Italy* decisions, all of which (like the Award itself) found a violation of the relevant treaty standards.[421]

293.    Italy proceeds to argue that the Tribunal's treatment of the Post-Hearing Awards is so superficial that it might as well be absent altogether.[422]  The two proceedings in which the Post-Hearing Awards were delivered and the one before the Tribunal were, essentially, the same legal dispute, albeit lodged by different investors.[423]  Contradictory decisions impact and endanger the legitimacy of the investment arbitration system as a whole, a matter highlighted by the efforts of UNCITRAL Working Group III.  As the Working Group noted, "[i]nconsistency was considered more of a concern where the same investment treaty standard or same rule of customary international law was interpreted differently *in the absence of justifiable ground for the distinction*."[424]

294.    Italy contends that by failing to include an explanation to account for the different outcomes reached in identical cases, the Tribunal failed to meet the standard of procedural propriety.[425]  Italy argues that nothing about the present case justified a different outcome than in *Belenergia* or *SunReserve*, and the fact that the Tribunal reached a contrary conclusion amounts to a lack of reasons.[426]

295.    Italy further alleges that "[t]he Award was irreversibly decided, if not even written, before the Post-hearing Awards were introduced into the Arbitration."[427]  The Tribunal, according to Italy, left the reasoning and conclusions "virtually untouched" after receiving the two awards, and, therefore, its conclusions were not the result of deliberation.[428]

296.    Furthermore, according to Italy, the reasoning provided by the Tribunal is circular and sometimes contradictory, as it is not clear "on which authority or reasoning the Tribunal held [the Post-Hearing

---

[421] Italy's Memorial on Annulment, ¶ 167; **ELA-091**, *Blusun* Decision on Annulment; **ELA-073**, *CEF Energia B.V. v. Italian Republic*, SCC Arb. No. 2015/158, Award, 16 January 2019; **ELA-122**, *Greentech* Award.

[422] Italy's Memorial on Annulment, ¶ 189.

[423] Italy's Memorial on Annulment, ¶¶ 191-192, citing **ILA-042**, United Nations Commission on International Trade Law, Working Group III, *Possible Reform of Investor-State Dispute Settlement (ISDS): Consistency and Related Matters,* Note by the Secretariat, 28 August 2018, Document A/CN.9/WG.III/WP.150, ¶ 7; **ILA-047**, United Nations Commission on International Trade Law, Fifty-first Session New York, Report of Working Group III on the work of its thirty-fifth session, 14 May 2018, Document A/CN.9/935, ¶ 21.

[424] Italy's Memorial on Annulment, ¶ 192 (emphasis added).

[425] *Id.*, ¶ 193.

[426] *Id.*, ¶ 195.

[427] *Id.*, ¶ 197.

[428] *Id.*, ¶ 197.

Awards] to be wrong and worth discarding, alongside with Italy's submission that accompanied them."[429]

297. Italy next responds to ESPF's arguments that the Award contains sufficient reasons why the majority of the Tribunal decided not to engage in a balancing exercise when determining Italy's responsibility under Article 10 of the ECT, and why it ruled that Italy created legitimate expectations for energy investors (contrary to the *Belenergia v. Italy* tribunal). Italy submits that by "extract[ing] from the Award the arguments that the majority offers to support its points on balancing and legitimate expectations … [ESPF] turn[s] a matter of procedural fairness into a matter of merits."[430] It contends that "the Award should have contained sufficient reasons for the reader to understand how the Post-Hearing Awards and the submissions of the Parties made in two dedicated procedural incidents had featured in the deliberation or at least had been handled in coming to the findings of the majority."[431] According to Italy, the problem here is not what is in the Award, but "what is missing from it."[432]

298. Italy further contends that ESPF has not pointed to anything in the Award capable of demonstrating that "the Tribunal cared to distinguish the Post-Hearing Awards and engaged with the related submissions."[433] Moreover, a mere mention of the Post-Hearing Awards in the summarized procedural history section of the Award does not suffice.[434]

299. Italy also argues that it is not appropriate to characterize sections of the Award in which the Tribunal explains its conclusions on the (lack of) balancing and on legitimate expectations as somehow constituting consideration of the Post-Hearing Awards themselves.[435] Italy takes issue with "the Annulment Respondents tak[ing] pains to dissect the Post-Hearing Awards and Italy's submissions on them, with the purpose of showing how the Award can be read *as if* it addressed *Belenergia* and *SunReserve*."[436] Similarly, in referencing Prof. Boisson de Chazournes's Partial

---

[429] Italy's Memorial on Annulment, ¶ 198.

[430] Italy's Reply on Annulment, ¶ 64.

[431] *Id.*, ¶ 64.

[432] Id.

[433] *Id.*, ¶ 65.

[434] *Id.*

[435] *Id.*, ¶¶ 66-68.

[436] *Id.*, ¶ 72. See also *id.*, ¶¶ 73-74.

Dissenting Opinion, ESPF attempts to read into the Award "a conversation about, and with, the Post-Hearing Awards that is simply not there."[437]

300.     Finally, as to the Award's conclusion on whether there was impairment, Italy disputes ESPF's comment that the Tribunal concluded that the flaw, even found to exist, was not outcome-determinative.[438]  Italy contends this argument is circular as it presupposes that ESPF is correct and Italy is wrong with regard to the determination of the FET standard.[439]

## (2)     ESPF's Position

301.     ESPF submits that the relevant question is not, as Italy claims, whether the Tribunal distinguished the Post-Hearing Awards (which in any event it did), but whether the Tribunal explained how it reached its own outcome-determinative conclusions.  The Award meets this standard, in ESPF's view.  It thoroughly provides the reasons for the conclusions that led to its finding that Italy breached Article 10(1) of the ECT, namely the majority's findings (i) that a balancing exercise is not applicable in this case as a matter of law; (ii) on the existence of ESPF's legitimate expectations; and (iii) that Italy's Law Decree No. 91/2014, 24 June 2014, converted into law by Law No. 116/2014 of 11 August 2014 ("*Spalmaincentivi* Decree"), breached those legitimate expectations.[440]

302.     ESPF disputes that the Post-Hearing Awards themselves would constitute "outcome determinative issues."[441]  In addition, the fact that the Award more frequently cites pleadings from the Parties that predate the Post-Hearing Awards, rather than the awards themselves or the Parties' pleadings thereon, in fact underscores that the Tribunal did engage with the actual arguments made.  It was not required to do more.[442]

303.     ESPF proceeds to address these overarching points in greater detail, as summarized below.

---

[437] *Id.*, ¶ 74.

[438] ESPF's Counter-Memorial on Annulment, ¶ 260: "Finally, even if reasons were lacking with respect to the majority's conclusion on the impairment clause (which they are not), that would not be sufficient to lead to annulment of the Award, because the majority's finding on the impairment clause was not outcome-determinative. The majority already had found the same conduct of Italy to have violated the ECT's FET standard—which the majority noted was a "separate and distinct standard of protection"—and thus even if the ESPF majority had found Italy's conduct not to have violated the impairment clause, the Award's result and the compensation awarded to ESPF would not change."

[439] Italy's Reply on Annulment, ¶ 81.

[440] ESPF's Counter-Memorial on Annulment, ¶ 215.

[441] ESPF's Rejoinder on Annulment, ¶ 185.

[442] *Id.*, ¶ 186.

> (a) *The Award thoroughly explained the circumstances in which a balancing test is inapplicable as a matter of law*

304.  ESPF disputes Italy's assertion that the Award's "treatment" of the *SunReserve* award is "perfunctory". Italy relied on the *SunReserve* award for the proposition that an assessment of legitimate expectations under Article 10(1) of the ECT requires a tribunal to balance any such expectations against the host State's right to regulate. ESPF notes that this issue was not an outcome-determinative one, because the Tribunal could have applied a balancing test and still reached the same conclusion that Italy violated the ECT.[443]

305.  The relevant question on annulment is not, as Italy claims, whether the Tribunal adequately explained how it distinguished the *SunReserve* award on this point, and it is not even whether the Tribunal was correct in finding that no balancing exercise was warranted. Rather, the sole question for this ground for annulment is whether the Award contains reasons allowing an informed reader to understand how the Tribunal concluded that Article 10(1) of the ECT did not require a balancing exercise between an investors' legitimate expectations and the State's right to regulate.[444]

306.  In ESPF's submission, there is no serious question that the Award meets this standard.[445] The Tribunal noted that States may agree to limit their right to regulate their domestic affairs by entering into an international treaty, such as the ECT. Referring to numerous cases, the Tribunal considered that where a State makes a specific promise or commitment or undertakes a specific obligation to an investor, it limits the exercise of its right to regulate domestic affairs by assuming obligations towards foreign investors.[446]

307.  The Tribunal made express reference to Italy's arguments on the *SunReserve* award with respect to a balancing exercise, and it explained why it rejected that approach.[447] According to ESPF, the majority's reasoning was also "directly responsive to Italy's submission on *SunReserve.*"[448] In

---

[443] ESPF's Counter-Memorial on Annulment, ¶ 217; ESPF's Rejoinder on Annulment, ¶ 187; Hearing Transcript, p. 161, line 2-p. 162, line 6.

[444] ESPF's Opening Presentation, slide 106.

[445] ESPF's Counter-Memorial on Annulment, ¶ 218; ESPF's Rejoinder on Annulment, ¶ 187; ESPF's Opening Presentation, slide 107.

[446] ESPF's Counter-Memorial on Annulment, ¶ 219.

[447] ESPF's Rejoinder on Annulment, ¶ 187; ESPF's Opening Presentation, slide 111; Hearing Transcript, p. 162, lines 1-6.

[448] ESPF's Counter-Memorial on Annulment, ¶¶ 220-221, citing **ELA-081**, Award, ¶¶ 421-422.

these circumstances, there is no merit to Italy's argument that the majority "disagreed" with the *SunReserve* award without explaining why.[449]

> (b) *The Tribunal thoroughly explained its findings on the existence of legitimate expectations*

308.   In response to Italy's argument that the Tribunal failed to explain why its finding that Italy's renewables regulatory scheme could give rise to legitimate expectations "point in the precisely opposite direction from those of the *Belenergia* award,"[450] ESPF submits that the Award "provided extensive reasons on why it concluded that ESPF had legitimate expectations that the specific tariffs for which their PV plants qualified, as set out in the applicable *Conto Energia* Decree, and reiterated in the *Gestore dei Servizi Energetici* ("**GSE**") Letters and GSE Agreements, would remain unchanged for 20 years."[451]

309.   While not required to distinguish the *Belenergia* award or respond point-by-point to Italy's arguments, a full reading of the Award, ESPF contends, shows that the Tribunal thoroughly considered and opined on the case and Italy's submissions on it.  The majority reasoned that a clear and specific commitment is required to create an enforceable legitimate expectation and concluded that there is no reason why that cannot be made in the regulation itself, where a regulation is intended to induce investment and did do so.[452]

310.   The majority considered that the *Conto Energia* regime met these requirements and discussed the terms of these Decrees in some detail, along with the existence of ESPF's legitimate expectations on the basis thereof.[453]  ESPF submits that, as the majority concluded, the *Conto Energia* Decrees indeed "satisf[y] the requisite degree of specificity needed in order for legitimate expectations to arise from legislation."[454]  Similarly, the majority observed, correctly in ESPF's submission, that the *Conto Energia* Decrees contained no indication that tariffs could or would be modified, and

---

[449] ESPF's Counter-Memorial on Annulment, ¶¶ 220-222, citing **ELA-081**, Award, ¶ 421-422; ESPF's Rejoinder on Annulment, ¶ 188.

[450] ESPF's Counter-Memorial on Annulment, ¶ 223.

[451] *Id.*, ¶¶ 223-242, citing **ELA-081**, Award, ¶¶ 509, 510, 512, 515-519, 525-526, 530, 534, 536, 538, 544, 566; **ILA-002**, *Belenergia* Award, ¶¶ 583-584, 595.

[452] ESPF's Counter-Memorial on Annulment, ¶ 224.

[453] *Id.*, ¶ 225.

[454] *Id.*

that there was no discretion to alter the terms of the payments or to pay something other than the tariffs set out in the Decrees.[455]

311.    Furthermore, the majority also took note of contemporaneous reports from law firms and industry associations describing the benefits of the *Conto Energia* program, including that the tariffs under the *Conto Energia* Decrees were held constant or fixed for 20 years, which it found to "reflect a broad understanding in the PV sector and amongst industry advisors consistent with the Claimants' understanding and expectation."[456]  The majority further observed that there is no suggestion in the regime that, once an investor qualified for a specific tariff, this would not remain constant for a 20-year period.[457]  This was, ESPF contends, full and robust reasoning well in excess of what was required.

312.    ESPF proceeds to address Italy's assertion that the Award fails to explain why it came to the opposite conclusion than the *Belenergia v. Italy* tribunal, which had held that there was no stabilization clause.  According to ESPF, Italy mischaracterizes the majority's finding.  The majority did not explicitly disagree with the *Belenergia v. Italy* tribunal but found that a stabilization clause, as such, was not necessary to create legitimate expectations when Italy otherwise had made a specific commitment against changes.  Once again, this was a reasoned and reasonable conclusion.[458]

313.    ESPF submits that against this background, there was no need for the majority to evaluate whether or not the *Conto Energia* Decrees amounted to a stabilization clause.  The majority thoroughly explained its conclusions and did more than what was required by specifically addressing the arguments Italy made in relation to the *Belenergia* award.[459]

314.    ESPF adds that contrary to Italy's suggestion, the *ESPF* majority, like the *Belenergia v. Italy* tribunal, accepted that the GSE Letters and GSE Agreements did not give rise to legitimate expectations, because they "were issued *after* and thus not before the Claimants made their Investments."[460]  However, the majority observed that the GSE Letters and GSE Agreements "*confirm*[*ed*] the Claimants' legitimate expectations which arose from their review of *Conto* I at

---

[455] *Id.*, ¶ 226.

[456] *Id.*, ¶ 228.

[457] *Id.*, ¶ 229.

[458] *Id.*, ¶ 231.

[459] *Id.*, ¶ 232.

[460] **ELA-081**, Award, ¶ 517(emphasis in original).

the time of [their] first investment."[461] The majority went on to explain that these agreements "further confirmed" ESPF's "entitlement" to "specific rates and duration" of feed-in tariffs set forth in the applicable *Conto Energia* Decrees.[462]   According to ESPF, there can, therefore, be no serious question that the Tribunal adequately provided its reasons for its treatment of the GSE Letters and GSE Agreements.

315.   ESPF continues that Italy also erroneously asserts that the Tribunal reassured the Parties that it shared the methodology of the *Belenergia v. Italy* tribunal, which put weight on the timing of the investment, but then reached the opposite view.   The majority, however, never purported to claim that it shared the methodology of the *Belenergia v. Italy* tribunal and instead followed a much more nuanced approach.   Namely, it considered that, while Italy provided for the reduction of tariffs depending on the specific timing of the investment, the specific tariff (whether reduced or not) would remain stable for a 20-year period.[463]

316.   According to ESPF, the Award also deals with the argument made by Italy in its submissions on the *Belenergia* award, by reference to a 2017 decision of the Constitutional Court that a prudent investor "could have anticipated" that Italy's regulatory regime would change.   The majority rejected this because the decision was published in January 2017 and, as such, could not have affected ESPF's expectations when investing from 2009 to 2012.[464]   The Award also responds thoroughly to Italy's claims that due diligence was "[c]entral" to *Belenergia*'s reasoning, and that ESPF's due diligence did not include an "accurate assessment of the legislation on PV incentives."[465]

       *(c)   The Tribunal throroughly explained why Italy breached ESPF's legitimate expectations*

317.   ESPF explains that after concluding that ESPF had a legitimate expectation of tariff stability, the majority then considered whether Italy breached the ECT by undermining that expectation.   The majority found, in contrast with the findings of the tribunals in *Belenergia v. Italy* and *SunReserve*

---

[461] *Id.*, ¶ 517 (emphasis added).

[462] *Id.*, ¶ 518.

[463] ESPF's Counter-Memorial on Annulment, ¶¶ 240-242.

[464] *Id.*, ¶ 240.

[465] *Id.*, ¶ 241.

*v. Italy*, that by unilaterally decreasing the tariffs for which ESPF's PV plants qualified pursuant to the *Spalmaincentivi* Decree, Italy violated ESPF's legitimate expectations.[466]

318.     Furthermore, ESPF adds, the Award provided clear and compelling reasons as to why the majority found that Italy's argument that the *Spalmaincentivi* Decree was a reasonable and proportionate measure was not pertinent.  As the majority concluded, once measures violate established legitimate expectations, the concepts of the proportionality and reasonableness of these measures are not relevant.[467]

319.     In addition, the majority considered that the tariff reduction was significant, with reasoning which was directly responsive to *Belenergia* and *SunReserve*, and to Italy's submissions on those cases.  As the Award notes, "[g]iven the modest effect of the Spalmaincentivi Decree on electricity prices and consumption, the majority of the Tribunal is not persuaded that the incentive system was at risk absent the adoption of the Decree."[468]

320.     The majority also addressed Italy's view that the Decree provided investors with "advance notice" of the tariff reduction, such that any changes were "predictable".[469]  The majority rejected this argument, explaining that the *Destinazione Italia* Decree was adopted well after ESPF had made its investment.  Moreover, while the *Spalmaincentivi* Decree provided investors with three different options for implementing the tariff reductions, each involved a decrease in the specific tariffs, and as a result, was not reasonable or proportionate.[470]

321.     Finally, ESPF rebuts Italy's argument that the Award's alleged "passing reference" to the *SunReserve* award in paragraph 644 simply "mentions disagreement" without providing reasons.  Paragraph 644 falls under a short section with the heading "Conclusions on Legitimate Expectations (FET) claims."  This section is a recap of 37 pages of reasoning – totaling almost 100 paragraphs – as to why the majority found that Italy breached ESPF's legitimate expectations.[471]

---

[466] *Id.*, ¶ 243.

[467] *Id.*, ¶ 245.

[468] *Id.*, ¶ 249, citing **ELA-081**, Award, ¶ 584.

[469] ESPF's Counter-Memorial on Annulment, ¶ 250.

[470] *Id.*, ¶ 251.

[471] *Id.*, ¶¶ 252-253.

Italy also neglects the next paragraph, in which the majority's decision as set out in the preceding 37 pages is summarized.[472]

> ### (d) The Award states reasons for the majority's conclusion on the impairment clause claim

322.    ESPF next takes issue with Italy's claim that, in assessing ESPF's impairment clause claim, the Tribunal majority erred in finding "that there is no requirement that the impairment be 'significant' in order for a claim to succeed."  ESPF notes that the majority explained that this finding was based on both "the ECT's clear language [providing] that *any* impairment will be sufficient to establish a breach" and the fact that "[t]he majority of the authorities cited to it and those that it finds most persuasive have adopted this interpretation."    Thus, the Award states reasons for this conclusion on the impairment clause claim.[473]

323.    Italy complains that had the Tribunal considered the *SunReserve* and *Belenergia* awards "on top of the *Blusun* and *Eskosol* one[s]" then the outcome "would have tipped … the other way," but ESPF argues that this does not constitute a failure to state reasons but merely a complaint about the correctness of the majority's reasons.[474]  Furthermore, ESPF notes that even if reasons were lacking with respect to the majority's conclusion on the impairment clause (which they are not), that would not be sufficient to lead to annulment of the Award, because the majority's finding on the impairment clause was not outcome-determinative.  The majority had already found the same conduct by Italy to have violated the ECT's FET standard.[475]

> ### (e) Italy's discussion on investment treaty jurisprudence is misleading

324.    Finally, ESPF takes issue with Italy's argument that if the Award were left standing, Italy would be held "*at the same time and for the same conduct*, in compliance with Article 10 ECT and in breach of Article 10 ECT." Not only is there no rule of precedent in investment arbitration, ESPF says, but Italy is also incorrect in pretending that the Award is an outlier.[476]  Referring to the five publicly available final awards concerning Italy and the *Conto Energia* regime, ESPF submits that

---

[472] *Id.*, ¶¶ 255-256.

[473] *Id.*, ¶ 258 (emphasis added).

[474] *Id.*, ¶ 259.

[475] *Id.*, ¶¶ 258-260, citing **ELA-081**, Award, ¶¶ 645, 698-700.

[476] ESPF's Counter-Memorial on Annulment, ¶ 261, citing Italy's Memorial on Annulment, ¶¶ 145-146.

*Blusun v. Italy* is distinguishable on the facts, and that the Tribunal's findings are largely consistent with two other two decisions, namely *Greentech v. Italy* and *CEF v. Italy*.[477]

325.  The *Greentech v. Italy* tribunal rejected Italy's arguments that the State's right to regulate must be balanced against an investor's legitimate expectations. The *CEF v. Italy* tribunal, though it endorsed the application of a balancing test in the absence of a stabilization clause, concluded with respect to one of the three PV plants at issue that the test weighed in the claimant's favor, with the specificity of the investor's legitimate expectations being the decisive factor.[478]

326.  On the existence of legitimate expectations and the breach of the FET standard, both the *Greentech v. Italy* and *CEF v. Italy* tribunals concluded that Italy had given repeated and precise assurances to specific investors that the tariffs would remain fixed for 20 years. On that basis, the majorities in these cases accepted that these assurances gave rise to legitimate expectations on the part of the investors.[479]

327.  ESPF points out that in relation to the impairment clause claim, the *Greentech v. Italy* majority addressed the specific argument Italy seeks to make here, namely whether the harm caused to the investors' solar plants was significant enough to amount to an impairment and thereby trigger liability under the ECT. Like the *ESPF* majority, the *Greentech v. Italy* majority relied on the ECT's reference to "in any way impair" to conclude that an impairment need not be "significant" to rise to a violation of this provision.[480] Similarly, although the *CEF v. Italy* tribunal did not agree that Italy's measures impaired the claimant's investment, the tribunal rejected Italy's view that regulatory changes must render an investment unprofitable before they can rise to the level of a treaty breach.[481]

328.  ESPF submits that Italy neglected to inform the *ad hoc* Committee of these key findings from *Greentech v. Italy* and *CEF v. Italy*, undermining the suggestion that the Award is an outlier.[482]

---

[477] ESPF's Counter-Memorial on Annulment, ¶¶ 262-263.

[478] *Id.*, ¶¶ 265-266.

[479] *Id.*, ¶¶ 267-268, citing **ELA-081**, Award, ¶ 586; **ELA-122**, *Greentech* Award, ¶¶ 445-449, 450-453, 461; **ELA-073**, *CEF Energia B.V. v. Italian Republic*, SCC Arb. No. 2015/158, Award, 16 January 2019, ¶¶ 217, 237-238, 243-245.

[480] ESPF's Counter-Memorial on Annulment, ¶ 269, citing **ELA-122**, *Greentech* Award, ¶ 461.

[481] ESPF's Counter-Memorial on Annulment, ¶ 270.

[482] *Id.*, ¶ 272.

329. In conclusion, ESPF submits that Italy offers no legal support for its complaint that the Award contains insufficient reasons for the reader to understand how the Post-Hearing Awards, and the submissions of the Parties in relation to them, had featured in the deliberation or been handled by the majority in coming to its conclusions.[483]  Notably, ESPF submits, Italy does not contend that the Tribunal failed to address the underlying issues that led to its finding of liability, such as whether Italy had created legitimate expectations on the part of investors like ESPF and whether its right to regulate should be balanced against those expectations.  There is thus no dispute that the Tribunal considered and explained how the issues that led to contrary holdings in the *SunReserve* and *Belenergia* cases did not alter its conclusion on Italy's liability.  Consequently, ESPF submits, the high threshold for annulment under Article 52(1) of the ICSID Convention has not been met.[484]

**(3)    The *ad hoc* Committee's Analysis**

330. In its Memorial on Annulment, Italy summarizes its position in relation to the Tribunal's alleged failure to provide reasons in relation to the two Post-Hearing Awards as follows:

> "Italy's case is simple. There should be reasons in the Award to explain why the Tribunal completely disregarded two authorities of immense relevance, and Italy's arguments relying thereon, even if the Arbitration was reopened precisely to make sure the deliberation could draw on them. These reasons are not there."[485]

331. Furthermore, in its Reply on Annulment, Italy clarifies that it does not fault the Tribunal for providing frivolous or inadequate reasons, but rather for providing "none with respect to certain central issues and questions."[486]  There is said to be no meaningful discussion of the Post-Hearing Awards, notwithstanding the fact that the Tribunal re-opened the proceedings in order to accept them into the record (see also below in relation to the third annulment ground).[487]

332. The key concepts here are "relevance", "arguments relying thereon," and "issues and questions." The crux of the matter is that Italy questions the Tribunal's assessment of the relevance of authorities as well as the parties' arguments in relation thereto, in the context of deciding the issues and questions before the Tribunal.  The *ad hoc* Committee finds Italy's complaints to be misplaced.

---

[483] ESPF's Rejoinder on Annulment, ¶ 170.

[484] *Id.*, ¶ 172.

[485] Italy's Memorial on Annulment, ¶ 181.

[486] Italy's Reply on Annulment, ¶ 58.

[487] See Section VI.B(3) below.

333. First, Italy's argument that the Award maintains a "silence" in relation to the Post-Hearing Awards is unsupported and inconsistent with Italy's other arguments. Elsewhere in its submissions, Italy admits that the Award contains numerous references to the Post-Hearing Awards, although it characterizes those references as superficial[488] or not reflecting a genuine engagement with them.[489]

334. Second, insofar as Italy argues that the Post-Hearing Awards are not just "any" legal authorities, but rather authorities of particular "significance",[490] this cannot assist Italy either. The evaluation of evidence and legal authorities, including the weight (if any) to be given to particular authorities, lies squarely within the prerogative of the Tribunal.[491]

335. Furthermore, the debate around the quality of the reasons or the lack thereof underlines that, in essence, Italy's complaints relate to the "issues and questions" before the Tribunal, and the Tribunal's assessment of them. These are matters of substance, not procedure, that are not reviewable in an annulment proceeding. Italy appears to be attempting to elide that distinction by seeking to elevate the consideration of the Post-Hearing Awards to an obligation in itself or, at least, to an obligation more onerous or profound than referring to those decisions and considering their relevance and persuasiveness – which is what the Tribunal did here.

336. The *ad hoc* Committee recalls the test identified by the committee in *Vivendi v. Argentina*, being that where annulment is sought on the basis of a lack of reasons, an annulment committee must consider whether there has been a failure to address each issue necessary to the conclusions the tribunal reached.[492] The key word here is "issue": it is not (as Italy acknowledges) an obligation to reference or distinguish every legal authority put forward by a party.[493]

337. In the present case, Italy states that it drew the Post-Hearing Awards to the Tribunal's attention and argued their relevance.[494] In response, Italy says, the Tribunal provided reasoning that is "elliptic

---

[488] Italy's Memorial on Annulment, ¶ 189.

[489] *Id.*, ¶ 196.

[490] Italy's Reply on Annulment, ¶ 61.

[491] **ELA-163**, *Cube Infrastructure Fund SICAV and others v. Kingdom of Spain*, ICSID Case No. ARB/15/20, Decision on Annulment, 28 March 2022, ¶ 362.

[492] **ILA-015**, *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002, ¶ 64.

[493] Italy's Memorial on Annulment, ¶ 178; Italy's Reply on Annulment, ¶ 56.

[494] See **ILA-007**, Italy's Brief Comments on the *Belenergia* Award and Its Consequences on This Case, 13 September 2019; **ILA-008**, Brief Note on the Relevance of the *SunReserve* Award for the ESPF Case, 24 April 2020.

and, sometimes, contradictory."[495] To illustrate this point, Italy refers primarily to the fact that the *Belenergia v. Italy* tribunal came to a different conclusion in relation to the relevance of the timing of the underlying investments.[496]

338.    The *ad hoc* Committee recalls Italy's submission that, while a "genuine consideration" of these awards and the arguments relating thereto would have led to a different outcome, it does not seek a modification of the Tribunal's findings on the merits.[497]  Italy stresses this point both in relation to the alleged failure to provide reasons and the alleged "procedural impropriety" of the Tribunal's handling of the Post-Hearing Awards (addressed in Section VI below).[498]  Nevertheless, stating that it is not basing its annulment case on the contention that the Award is wrong does not negate the fact that generally, both in relation to the second and third grounds for annulment, Italy's arguments amount to an effort to re-argue substantive findings – in particular by reference to the two Post-Hearing Awards, which it claims represent the better view in relation to the alleged breach of Article 10(1) of the ECT.

339.    Different tribunals may come to different conclusions on the same or similar facts; that does not render any one decision annullable.  What matters for purposes of an annulment application are the issues that the tribunal had to evaluate, on the basis of the arguments and authorities presented by the parties.  The issue before the Tribunal here was the alleged breach of the FET standard contained in Article 10(1) of the ECT, and more specifically (i) whether the FET analysis required a balancing exercise; (ii) the existence or not of legitimate expectations on ESPF's part; and (iii) whether Italy's *Spalmaincentivi* Decree breached those legitimate expectations.[499]  It is undisputed, or at least not reasonably disputable, that the Tribunal made reasoned findings on each of these key issues, which then led to a finding (by the majority) of liability on Italy's part.

340.    As ESPF submits, the Tribunal made specific reference to Italy's arguments on the *SunReserve* award in evaluating Italy's case that an assessment of legitimate expectations under Article 10(1) of the ECT requires a tribunal to balance any such expectations against the host State's right to regulate.  The Tribunal explained why it rejected that approach and, in doing so, expressly referred

---

[495] Italy's Memorial on Annulment, ¶ 198.

[496] *Id.*, ¶¶ 202-203.

[497] Italy's Memorial on Annulment, ¶ 143; Italy's Reply on Annulment, ¶ 91.

[498] Italy's Memorial on Annulment, ¶¶ 142-144.

[499] **ELA-081**, Award, ¶ 200.

to the *SunReserve* award.[500]  Thus, not only did the Tribunal assess the issue at stake, it did so explicitly in the context of the legal authority invoked by Italy.  It is difficult to see what more the Tribunal could or should have done.  As already noted, Italy itself submits that it is not seeking a re-evaluation of the merits.  Yet it appears to the *ad hoc* Committee that this is precisely what this argument entails.

341.    The second element of the Tribunal's decision that Italy impugns as lacking reasons is the majority's findings on the existence of ESPF's legitimate expectations.  Italy points out that the *Belenergia v. Italy* tribunal came to the opposite conclusion on the question of whether an investor could have derived legitimate expectations from the language contained in the *Conto Energia* Decrees and the GSE Letters and GSE Agreements.  Here in particular, it is important to note that the Tribunal was not under any obligation to justify why its decision differed from that reached in a legal authority submitted by one of the Parties.  The Tribunal was only required to provide reasons for its decisions on the issues before it.

342.    The majority concluded that ESPF had a legitimate expectation that its PV plants would receive the specific tariffs in the *Conto Energia* Decrees for 20 years, and it provided reasons for that conclusion.  The key issue for the Tribunal was the requisite degree of specificity of the Decrees; it found that the Decrees' language, combined with the absence of any indication that, once granted, tariffs could or would be modified, sufficed to give rise to a legitimate expectation of tariff stability. In this regard, the reasoning of the Tribunal simply differed from that of the *Belenergia v. Italy* tribunal,[501] which focused on the absence of a stabilization clause.  The Tribunal, by contrast, did not find this aspect decisive, given its conclusion that the wording of the relevant regulations was sufficient to constitute a specific commitment.  The Tribunal was free to take that view, and it did not fail to provide reasons in doing so.

343.    In relation to the breach of legitimate expectations, the issue on which the Award and the decision in *Belenergia v. Italy* part ways is whether the *Spalmaincentivi* Decree – the effect of which was to reduce the applicable tariffs – was reasonable and proportionate.[502]  The Tribunal's majority considered that question but concluded that these concepts were not relevant.[503]  Once again, this

---

[500] *Id.*, ¶ 421.

[501] **ILA-002**, *Belenergia* Award, ¶ 508.

[502] See **ELA-081**, Award, ¶ 566; **ILA-007**, Italy's Brief Comments on the *Belenergia* Award and Its Consequences on This Case, 13 September 2019.

[503] **ELA-081**, Award, ¶¶ 583 *et seq*.

is simply an instance of the Tribunal reaching a different outcome than the one advanced by Italy, not a failure to provide reasons.

344.    As ESPF's submissions in particular show, the Tribunal's decision was even more comprehensive on each of these points.  But there is no need nor in fact authority in the context of this annulment review to re-assess the substantive analysis of the Tribunal.[504]

345.    Finally, the *ad hoc* Committee notes that similar to Italy's arguments in relation to the alleged manifest excess of powers, the core of the argument on the alleged absence of reasons focuses on the supposed importance of one or more particular legal authorities.  This is striking, given Italy's recognition that inconsistency with other decisions is not as such a ground for annulment.[505]  It does not assist Italy to argue that it is in fact ESPF which seeks to invoke the precedential value of certain decisions,[506] nor to conduct a word count of the number of times a particular authority is referenced.

346.    The dispositive point is that the Tribunal was tasked with deciding issues, not engaging in an exercise of relying upon or distinguishing particular legal authorities.  It was for Italy to show that the Tribunal failed to provide reasons for its decisions on the substantive issues before it.  The *ad hoc* Committee finds that Italy has failed to make that showing.

## VI.    SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE

### A.    STANDARD OF REVIEW FOR SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE

#### (1)    Italy's Position

347.    As stated above,[507] Italy submits that this annulment ground, while formally autonomous under Article 52 of the ICSID Convention, is often linked to the ground of failure to state reasons.[508]  In support, Italy refers to Article 35 of the ILC Model Rules on Arbitration, which lists both grounds together, and submits that the duty to state reasons is a fundamental rule of procedure, with the

---

[504] **ILA-035**, *Bernhard von Pezold* Decision on Annulment, ¶ 239.

[505] Italy's Reply on Annulment, ¶ 85.

[506] *Id.*, ¶ 86.

[507] See Section V.A(1) above.

[508] Italy's Memorial on Annulment, ¶ 171.

result that a failure to give reasons can be characterized as a serious departure therefrom.  As to the standard applicable to the ground laid down in Article 52(1)(d) of the ICSID Convention, Italy submits the following.

348.    The annulment of an ICSID award pursuant to Article 52(1)(d) of the ICSID Convention first requires the existence of a fundamental rule of procedure, and then a finding of a serious departure from that rule by the tribunal.[509]  Italy argues that one such fundamental rule is the right to be heard, which includes the parties' right to state their claims or defenses and produce all arguments and evidence in support thereof.[510]  Italy submits that it is fair to assume that all rules concerned with the essential fairness of the proceedings, including the rule that parties must be heard, are fundamental.[511]

349.    Furthermore, deliberations must have occurred and need to have included consideration by the arbitrators of the dispositive issues.[512]  In this context, by reference to the annulment decision in *Continental Casualty v. Argentina*, Italy argues that, while a tribunal need not address every issue presented by a party, "a failure by a tribunal to consider one of the *questions* submitted *to* it for decision, such as a specific defence raised by the respondent, may in certain circumstances amount to a serious departure from a fundamental rule of procedure."[513]

350.    Separately, the seriousness of the departure must be assessed.  Italy refers in particular to *MINE v. Guinea*, in which the *ad hoc* committee referred to the relevant criteria as "both quantitative and qualitative … : the departure must be substantial and be such as to deprive a party of the benefit or protection which the rule was aimed to provide."[514]

351.    Italy proceeds to take issue with ESPF's reference to the *Tulip v. Turkey ad hoc* committee's view, which limits potential breaches of the right to be heard to the "refus[al] to allow the presentation of an argument or a piece of evidence."[515]  Such a narrow interpretation of the scope of the right to be heard would, Italy says, reduce this right to a formality.[516]  For the reasons further addressed below,

---

[509] *Id.*, ¶ 182.

[510] *Id.*, ¶ 184, citing **ILA-043**, *Wena* Decision on Annulment, ¶ 57.

[511] Italy's Memorial on Annulment, ¶ 186.

[512] Id.

[513] Italy's Memorial on Annulment, ¶ 187 (emphasis in the Memorial on Annulment).

[514] *Id.*, ¶ 188, citing **ILA-040**, *MINE* Decision on Annulment, ¶ 5.05.

[515] Italy's Reply on Annulment, ¶ 101, citing **ELA-105**, *Tulip* Decision on Annulment, ¶ 82.

[516] Italy's Reply on Annulment, ¶ 101.

Italy argues that the absence in the Award of any meaningful discussion of the Post-Hearing Awards and Italy's submissions on them amounts to a *de facto* violation of the right to be heard.[517]

**(2)    ESPF's Position**

352.    ESPF notes that Article 52(1)(d) of the ICSID Convention permits annulment on the basis "that there has been a serious departure from a fundamental rule of procedure."  The inclusion of both "serious" and "fundamental" establishes the highly restrictive character of this provision.  Cases and literature consistently require the fulfilment of both elements.[518]

353.    Furthermore, according to ESPF, these two requirements must be met concurrently.  Therefore, mere proof of procedural impropriety does not suffice.  In the same vein, the ordinary meaning of the terms used in this Article suggests that a violation must be exceptional and the concerned rule must be fundamental.

354.    ESPF continues by noting that, as ICSID's Updated Background Paper on Annulment observes, the drafting history of the ICSID Convention reveals that the ground of a "serious departure from a fundamental rule of procedure" refers to principles of natural justice and excludes the interpretation and application of ordinary arbitration rules.[519]  The phrase "fundamental rules of procedure" was explained by the drafters as a reference to foundational procedural principles, particularly the right to be heard.[520]  The drafting history further indicates that this ground is concerned with the integrity and fairness of the arbitral process.  *Ad hoc* committees have also confirmed that deliberations among members of the tribunal and the right to be heard (including the right to be listened to) are fundamental rules of procedure.[521]  However, ESPF notes that Italy has not provided a single example of an ICSID award that was annulled on the basis that a tribunal did not engage in any required level of deliberation.[522]

355.    Referring to the decision of the *ad hoc* committee in *Wena Hotels v. Egypt*, ESPF submits that a departure "must have caused the Tribunal to reach a result substantially different from what it

---

[517] *Id.*, ¶ 102.

[518] ESPF's Counter-Memorial on Annulment, ¶ 275.

[519] ESPF's Counter-Memorial on Annulment, ¶ 277, citing **ELA-086**, ICSID, *Updated Background Paper on Annulment for the Administrative Council of ICSID*, 5 May 2016, ¶ 98; **ELA-092**, ICSID, *History of the ICSID Convention*, Vol. I-IV (1970), p. 15 of the PDF; **ILA-020**, *Total* Decision on Annulment, ¶ 314.

[520] ESPF's Counter-Memorial on Annulment, ¶ 277.

[521] Id.

[522] ESPF's Rejoinder on Annulment, ¶ 192.

would have awarded had such rule been observed."[523]  In other words, according to ESPF, the departure must have been outcome determinative.

356.  ESPF further addresses Italy's argument that the Tribunal violated the alleged duty to deliberate with respect to the Post-Hearing Awards.  It argues that Italy has failed to identify a rule on the necessary extent of tribunal deliberations, or to show that the Tribunal committed any serious violation of such a rule.[524]

**(3)    The *ad hoc* Committee's Analysis**

357.  The starting point is the text of Article 52(1)(d) of the ICSID Convention, which provides that annulment is permitted on the basis "that there has been a serious departure from a fundamental rule of procedure."  As ICSID's Updated Background Paper on Annulment sets out, this ground is concerned with the integrity and fairness of the arbitral process.[525]

358.  As both Parties recognize, Article 52(1)(d) of the ICSID Convention refers to both "serious" and "fundamental" as components of the standard.  Based on these words, *ad hoc* committees have generally adopted what ICSID's Updated Background Paper on Annulment calls "a dual analysis," by considering both key concepts of "serious departure" and "fundamental rules of procedure"; or, in other words, requiring that both components must be met.[526]

359.  Not every departure from a rule of procedure, even a fundamental rule, justifies annulment.  The reference to "seriousness", whether as a distinct or intrinsic component of the applicable standard, therefore necessitates an assessment of (i) the relevant rule of procedure; and (ii) the facts and circumstances that potentially constitute the basis of a breach.

360.  While the Parties present the applicable standard in slightly different terms, there is not really much difference between their positions – the divide is really in the application of the standard, which will be addressed below.  In particular, there cannot be much debate that, in general, the right to be

---

[523] ESPF's Counter-Memorial on Annulment, ¶ 278, citing **ILA-043**, *Wena* Decision on Annulment, ¶ 58 (emphasis omitted).

[524] ESPF's Rejoinder on Annulment, ¶ 191.

[525] **ELA-086**, ICSID, Updated Background Paper on Annulment for the Administrative Council of ICSID, 5 May 2016, ¶ 98.

[526] *Id*., ¶ 99.

heard constitutes a fundamental rule of procedure.[527]  The real question is whether, in the concrete circumstances at issue, the Tribunal committed a serious breach of that rule.  In Italy's words, the question is whether there was "a *de facto* violation of the right to be heard" as a result of the alleged absence in the Award of any discussion of the Post-Hearing Awards and Italy's submissions on them, resulting in a "refusal to listen" to what was presented.[528] This requires a review of the concrete facts and circumstances invoked by Italy, which will be discussed below.[529]

361.    Before turning to the application of the standard, however, two further aspects should be addressed.  First, Italy submits that a component of the duty to treat parties with essential fairness is that *ad hoc* committees must guarantee compliance with the rule that deliberations must have occurred and must not be "abusive".[530]  ESPF, meanwhile, refers to the decision of the *ad hoc* committee in *Total v. Argentina*, which itself refers to the requirement of deliberations among members of the tribunal as a fundamental rule of procedure.  There thus appears to be agreement between the parties that a requirement of deliberations exists.  ESPF proceeds to argue, however, that Italy has not even attempted to articulate the level or scope of deliberation that is required, nor has Italy pointed to a single example of an ICSID award being annulled on that basis.[531]

---

[527] *Id.*, ¶ 99, citing e.g. **ELA-013**, *TECO* Decision on Annulment, ¶ 184; **ILA-020**, *Total* Decision on Annulment, ¶¶ 309, 314; **ELA-105**, *Tulip* Decision on Annulment, ¶¶ 80, 145; **ELA-108**, *Occidental Petroleum Corporation and Occidental Exploration and Production Company v. Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment, 2 November 2015, ¶ 60; **ILA-045**, *Iberdrola Energia S.A. v. Republic of Guatemala I*, ICSID Case No. ARB/09/5, Decision on Annulment, 13 January 2015, ¶ 105; **ELA-109**, *Malicorp Limited v. Arab Republic of Egypt*, ICSID Case No. ARB/08/18, Decision on Annulment, 3 July 2013, ¶¶ 29, 36; **ELA-101**, *Victor Pey Casado and Foundation "Presidente Allende" v. Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Application for Annulment of the Republic of Chile, 18 December 2012, ¶¶ 261-271; **ILA-016**, *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Decision on Annulment, 23 December 2010, ¶ 197; **ILA-044**, CDC Decision on Annulment, ¶ 49; **ILA-043**, *Wena* Decision on Annulment, ¶ 57; **ELA-087**, *Klöckner v. Republic of Cameroon*, ICSID Case No. ARB/81/2, Decision on Annulment, 3 May 1985, ¶¶ 89-92; **ELA-093**, *Amco Asia Corporation and others v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision on the Application by Parties for Annulment and Partial Annulment of the Arbitral Award of June 5, 1990 and the Application by Respondent for Annulment of the Supplemental Award of Oct. 17, 1990, ¶¶ 9.05-9.10.

[528] Italy's Reply on Annulment, ¶ 102.

[529] See Section VI.B(3) below.

[530] Italy's Memorial on Annulment, ¶ 168, citing **ILA-045**, *Iberdrola Energia S.A. v. Republic of Guatemala I*, ICSID Case No. ARB/09/5, Decision on Annulment, 13 January 2015, ¶ 105: "This Committee [understands] that [a] fundament[al] rule of procedure [is one] that establish[es] a minimum standard to be respected as a matter of international law, as it was defined in *Wena Hotels v. Egypt*. In general, the following hypotheses have been recognized as breaches of fundamental rules: (i) a lack of impartiality and uneven treatment of the parties, (ii) a breach of the right to be heard, (iii) a lack or abuse of the arbitrators' deliberation, (iv) the breach of evidentiary rules and (v) the breach of rules on standing" (Italy's translation).

[531] ESPF's Rejoinder on Annulment, ¶ 192, citing **ILA-020**, *Total* Decision on Annulment, ¶ 314.

362.    There can be no doubt that, again in general terms, deliberation is a fundamental building block of due process and as such constitutes a fundamental rule of procedure.[532]  However, as with the general right to be heard, to use Italy's phraseology, the proof of the pudding is in the eating: it is not a general concept that is at issue, but rather whether there has been a *de facto* breach of the requirement of deliberation.  The *ad hoc* Committee agrees with ESPF that it would have been for Italy to be more specific on what level of deliberation was required and not met.

363.    Furthermore, insofar as Italy invokes "a lack or abuse of the arbitrators' deliberation,"[533] this does not assist Italy much, because as the discussion of the application of the standard below demonstrates, this is not a situation in which there is an allegation that one or more tribunal members have simply failed to engage in deliberation.  Instead, the debate relates to the level and scope of deliberation and engagement by the arbitrators (see header III.2 of Italy's Memorial on Annulment: "The Tribunal's failure to *engage* with the *Belenergia* and *SunReserve* awards taints the procedural integrity of the Award"; and "the tribunal must give *meaningful* consideration [to] the parties' submissions").[534] An allegation of "abuse" would require even more specific and concrete support, and there is no suggestion that Italy relies on anything more than an alleged failure to engage.

364.    Second, Italy's reliance on inadequate or insufficient deliberation is interwoven with its allegation that the Tribunal, in its handling of the Post-Hearing Awards, did not provide reasons.  While indeed it is conceivable that the two grounds overlap, they are distinct and Italy must show that the requirements have been met for each ground individually.  Italy accepts this, and states that it is not seeking to "blur two distinct grounds."[535]  Nevertheless, by integrating the discussion of the two grounds, Italy makes it sometimes difficult to distinguish them and, in particular, whether, despite the *ad hoc* Committee's rejection of the claim that the Tribunal failed to provide reasons, there is still scope to conclude that it breached a fundamental rule of procedure.

---

[532] **ELA-086**, ICSID, *Updated Background Paper on Annulment for the Administrative Council of ICSID*, 5 May 2016, ¶ 99 n. 190, citing e.g. **ELA-087,** *Klöckner v. Republic of Cameroon*, ICSID Case No. ARB/81/2, Decision on Annulment, 3 May 1985, ¶ 84; **ILA-044,** *CDC* Decision on Annulment, ¶ 58; **ILA-045,** *Iberdrola Energia S.A. v. Republic of Guatemala I*, ICSID Case No. ARB/09/5, Decision on Annulment, 13 January 2015, ¶ 105; **ILA-020***, Total* Decision on Annulment, ¶ 309, 314.

[533] Italy's Memorial on Annulment, ¶ 168, citing **ILA-045,** *Iberdrola Energia S.A. v. Republic of Guatemala I*, ICSID Case No. ARB/09/5, Decision on Annulment, 13 January 2015, ¶ 105.

[534] Italy's Memorial on Annulment, ¶ 187 (emphasis added).

[535] *Id.*, ¶ 173.

365.    Perhaps the most explicit guidance on how to approach Italy's allegation of a distinct breach of a rule of procedure is found in paragraph 105 of the Reply on Annulment, where Italy submits that the request to annul the Award on this basis "is an expansion of its request to do so for failure to state reasons," as it "impeaches the Tribunal's pre-Award conduct: there are no reasons in the Award because there was no deliberation on a particular set of documents and submissions."[536]

366.    To sum up, in applying the standard for a serious breach of a fundamental rule of procedure, the *ad hoc* Committee will consider (i) whether Italy has shown that there was no deliberation on the Post-Hearing Awards and the Parties' arguments in relation to them; and (ii) if so, whether this results in a serious violation of the right to be heard.  In doing so, the Committee will bear in mind that the factual predicate for Italy's submission is the alleged absence in the Award of any meaningful discussion of the Post-Hearing Awards and Italy's submissions about them.

## B.    APPLICATION OF THE STANDARD FOR A SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE

### (1)    Italy's Position

367.    As discussed above, Italy submits that, even though it was given the opportunity to introduce the Post-Hearing Awards and comment on them, the Tribunal did not afford a genuine right to Italy to submit its arguments and authorities, and failed to deliberate on the full case before it. Consequently, Italy submits that the Award merely pays lip service to Italy's right to have its defense heard in the proceedings.[537]  Italy submits that "perhaps" the process of deliberation had already concluded when the Parties made their submissions on the Post-Hearing Awards, a possibility which Italy qualifies as "an educated guess."[538]  Whatever the reason, Italy says, by failing to accord a genuine chance for Italy to have its case and views heard and considered, and by failing to carry out meaningful deliberations on the substance of Italy's submissions, the Tribunal departed seriously from a fundamental rule of procedure.[539]

368.    With respect to the requirement that the alleged departure be "serious", Italy submits that seriousness is "inherent to the scenario at hand."[540]  As Italy puts it, "[b]y ignoring, as if they had

---

[536] Italy's Reply on Annulment, ¶ 105 (emphasis omitted).

[537] Italy's Memorial on Annulment, ¶ 209; Italy's Reply on Annulment, ¶ 102.

[538] *Id.*, ¶ 210.

[539] *Id.*, ¶¶ 211-212.

[540] *Id.*, ¶ 213.

not occurred, the Post-Hearing Awards and Italy's comments thereon, the Tribunal maintained its findings on Article 10 ECT in the face of contrary overwhelming arguments made by other contemporary tribunals and corresponding to the position of a party in the dispute."[541] The Tribunal "apparently deliberated its decision, ignoring the substantial and critical part of the proceedings which revolved around the post-hearing awards, and undoubtedly drafted the Award as if they had not taken place."[542] This, Italy says, establishes a serious violation of its due process rights.

**(2)     ESPF's Position**

369.    ESPF submits that Italy's argument that the Award should be annulled on the basis that the Tribunal seriously departed from a fundamental rule of procedure is merely "a re-hash of the same complaints that Italy has raised under the guise of an alleged failure to state reasons," and that Italy has failed to meet the far more demanding legal standard required to establish a serious departure from a fundamental rule of procedure.[543] ESPF disputes Italy's contentions that the Tribunal did not afford Italy the right to be heard and failed to deliberate on all of Italy's arguments and authorities.[544] The Tribunal re-opened the proceedings to allow Italy to submit the Post-Hearing Awards as well as its comments thereon, and the Award confirms that the Tribunal considered these materials. Thus, far from paying "lip service to … Italy's right to have its defense heard," the Tribunal "went out of its way to respect Italy's right to be heard."[545] The fact that Italy is dissatisfied with the Tribunal's findings is not a breach of any fundamental right, much less a serious one.[546]

370.    According to ESPF, Italy cannot credibly contend that it was denied its right to be heard. This is not a case where a tribunal has refused to allow the presentation of an argument or piece of evidence; instead, Italy's complaint relates to how the Tribunal dealt with the materials it received.[547] There is no fundamental rule of procedure requiring a tribunal to address every argument or piece of evidence proffered by the parties.[548] The Tribunal provided Italy with a full

---

[541] Id.

[542] Hearing Transcript, p. 39, lines 7-11.

[543] ESPF's Rejoinder on Annulment, ¶ 190.

[544] ESPF's Counter-Memorial on Annulment, ¶ 280.

[545] ESPF's Rejoinder on Annulment, ¶¶ 281-282.

[546] ESPF's Counter-Memorial on Annulment, ¶ 279.

[547] *Id.*, ¶ 283, citing **ELA-105**, *Tulip* Decision on Annulment, ¶ 82.

[548] ESPF's Counter-Memorial on Annulment, ¶¶ 288-289, citing **ELA-148**, *Perenco Ecuador Ltd. v. Republic of Ecuador and Empresa Estatal Petróleos del Ecuador (Petroecuador)*, ICSID Case No. ARB/08/6, Decision on Annulment, 28 May 2021, ¶ 125; **ILA-012**, *EDF* Decision on Annulment, ¶ 349; **ELA-105**, *Tulip* Decision on Annulment, ¶ 150; **ILA-018**, *Impregilo S.p.A. v. Argentine Republic*, ICSID Case No. ARB/07/17, Decision on

and fair opportunity to present its case on the Post-Hearing Awards.[549]  Indeed, the Award expressly "summarized the procedural history leading to the admission of the Post-Hearing Awards and the Parties' comments on them" and noted Italy's reliance on them.[550]

371.    ESPF submits that Italy mischaracterizes the procedural history when it suggests that the Tribunal had closed the proceeding to new evidence.  In fact, the proceeding was open until the Tribunal formally closed it on 26 May 2020, which was after it received the Parties' further written submissions, including those on the Post-Hearing Awards.[551]  ESPF submits that Italy's allegation that the Tribunal failed to deliberate about those Awards is not credible and amounts to speculation.[552]  ESPF disputes Italy's characterization of the Tribunal's assessment of the *SunReserve* award as "ticking the box" and argues that Italy has not supported its allegation that a wider standard of review by the *ad hoc* Committee is appropriate here.[553]

372.    Moreover, ESPF argues that the Partial Dissenting Opinion of Prof. Boisson de Chazournes confirms that the Tribunal deliberated on the Post-Hearing Awards.  Had the Tribunal not deliberated on the FET test used in the *SunReserve* award, Prof. Boisson de Chazournes would have had no need to voice dissent on the test adopted and applied by the majority.[554]

373.    Finally, as to the second prong of the standard prescribed by Article 52(1)(d) of the ICSID Convention, namely that the alleged breach was serious, ESPF submits that Italy has not even made an effort to meet this standard, which in any event it cannot.[555]

### (3)    The *ad hoc* Committee's Analysis

374.    As stated above, Italy's submissions largely address the failure to provide reasons and a serious departure from a fundamental rule of procedure as an integrated framework.  Although the *ad hoc*

---

Annulment, 24 January 2014, ¶ 174; **ELA-039**, *Joseph Charles Lemire v. Ukraine*, ICSID Case No. ARB/06/18, Decision on Ukraine's Application for Annulment of the Award, 8 July 2013, ¶ 277; **ILA-041**, *Continental Casualty Company v. Argentine Republic*, ICSID Case No. ARB/03/9, 16 September 2011, ¶ 97; **ELA-116**, *Azurix* Decision on Annulment, ¶ 244.

[549] ESPF's Counter-Memorial on Annulment, ¶ 283.

[550] *Id.*, ¶ 284.

[551] ESPF's Rejoinder on Annulment, ¶ 195.

[552] ESPF's Counter-Memorial on Annulment, ¶ 286.

[553] ESPF's Rejoinder on Annulment, ¶ 198.

[554] ESPF's Counter-Memorial on Annulment, ¶ 287.

[555] *Id.*, ¶¶ 290-291, citing **ELA-106**, *OI European Group B.V. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/11/25, Decision on Annulment, 6 December 2018, ¶ 248.

Committee has already rejected failure to provide reasons as a ground for annulment, it will here address whether, nevertheless, Italy has demonstrated a serious departure from a fundamental rule of procedure.  As also considered above,[556] taking Italy's submissions as the starting point, in order to arrive at such a conclusion, the *ad hoc* Committee would need to be persuaded that (i) there was no deliberation on the Post-Hearing Awards; and that (ii) this resulted in a *de facto* violation of the right to be heard, as reflected by the absence in the Award of any meaningful discussion of the Post-Hearing Awards and Italy's submissions thereon.

375. The *ad hoc* Committee notes that the determination of such a breach would not necessarily complete the required analysis.  In particular, Italy would still need to satisfy the second component of the test, namely that there has been a "serious departure" from the fundamental rule of procedure. That said, the *ad hoc* Committee is not persuaded by ESPF's argument that the only way for Italy to prevail on the "seriousness" component is to establish that the Tribunal would have reached a different outcome had it deliberated (or considered more fully) the Post-Hearing Awards.  That is one possibility, but conceivably there are other means of satisfying the requirement that the breach be "serious".  In all events, however, the burden of demonstrating sufficient seriousness is a considerable one.

376. In the present case, Italy has not addressed the "seriousness" requirement as an explicit and distinct component of the annulment ground.  That is problematic, because as a matter of law, it is a separate requirement that must be shown to exist.  In addition, the failure to address this requirement separately is compounded by the nature of the breach complained of, which is not only interwoven with the alleged failure to provide reasons but is difficult to pinpoint.  Put another way, Italy has been less than clear in explaining what, on its case, the Tribunal should have done differently.

377. On the one hand, Italy has emphatically argued that it is not seeking modification of the Tribunal's findings on the merits,[557] while, on the other hand, its arguments are directed at the level of engagement of the Tribunal with the Post-Hearing Awards and the Parties' submissions on them, which effectively amounts to taking issue with the substance of the Tribunal's decision.  Italy's dissatisfaction lies in the substantive evaluation of those authorities and the submissions thereon, and thus ultimately with the findings on the merits by the Tribunal – *i.e.*, exactly what it professes not to impugn.

---

[556] See ¶ 366 above.
[557] Italy's Memorial on Annulment, ¶ 143.

378.    Italy disclaims any argument that it had no chance to introduce the Post-Hearing Awards or to submit its views thereon.[558]  Italy also acknowledges that the Award contains references to those authorities and the Parties' submissions in relation to them.[559]  A refusal to allow the introduction of new authorities could, in some circumstances, constitute a breach of the requirement to follow due process in respect of the parties' right to be heard.  Similarly, the failure to consider key arguments or defenses, whether presented on the basis of legal authorities or otherwise, might constitute a failure to provide a fair hearing to the parties.  These scenarios relate to procedural conduct, and whether either would be sufficient to justify annulment would turn on the specific circumstances of the case at hand.

379.    These situations must be distinguished, however, from a review which relates to the substance of a decision and the "genuineness" of a tribunal's engagement with an issue or argument.  The evaluation of the facts and the law is the prerogative of a tribunal and, subject to a possible right to appeal – which is not provided for in the ICSID system – cannot be complained of in an annulment proceeding.  In the ICSID system, as under the arbitration laws of most national legal systems, an error of law or an improper weighing of the evidence is simply not an annulment ground.[560]

380.    This conclusion is not affected by Italy's claim that the Tribunal reached its conclusion without "proper" deliberation.[561]  While deliberation is a vital feature of due process, that does not justify a granular and substantive review by an annulment committee of how a tribunal conducted its decision-making process.[562]  Such a review would almost certainly entail an impermissible trespass into the merits of the dispute and might also risk intruding upon the confidentiality of the tribunal's deliberations.  And a granular or substantive review would be especially inapposite in the present case.  Here, there is ample evidence of engagement in the Award itself, as illustrated by the numerous references to the Post-Hearing Awards, and more importantly to the issues addressed in those authorities.  In addition, the engagement of the Tribunal, insofar as this would be at stake, is established by the Partial Dissenting Opinion, which addresses the standard applicable to the establishment of legitimate expectations and argues for the balancing and weighing exercise

---

[558] Italy's Reply on Annulment, ¶ 97.

[559] *Id.*, ¶ 103.

[560] **ELA-155**, *Tidewater Investment SRL and Tidewater Caribe, C.A. v. Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Annulment, 27 December 2016, ¶¶ 128-129; **ELA-035**, *Standard Chartered* Decision on Annulment, ¶ 282.

[561] Italy's Reply on Annulment, ¶ 105.

[562] **ELA-035**, *Standard Chartered* Decision on Annulment, ¶¶ 59-61.

adopted in the *SunReserve* award.[563]  This, too, shows that the Tribunal engaged with the authorities and the issues put forward by Italy in its defense.  And in any event, as discussed in the context of the alleged failure to provide reasons,  the Tribunal was tasked with deciding issues, not engaging in a referencing or distinguishing exercise with respect to the legal authorities put before it.

381.    On all of these grounds, the *ad hoc* Committee finds that Italy has not demonstrated that the Tribunal breached a fundamental rule of procedure, let alone that it committed any serious breach.

---

[563] **ELA-081**, Award, ¶ 645.

## VII.   Costs

### A.   Italy's Submissions

382.   Italy submitted the following breakdown of costs:

| Attendances (personal attendances, telephone, letters out/e-mail) | €150,000 | US$164,625 |
|---|---|---|
| Legal fees | €200,000 | US$219,500 |
| Attendance at hearing (travel, hotel, others: translation, meals) | €4,000 | US$4,390 |
| Total | €404,000[564] | US$388,515 |

### B.   ESPF's Submissions

383.   ESPF submits that, pursuant to articles 52(4) and 61(2) of the ICSID Convention and ICSID Arbitration Rule 28(1), *ad hoc* committees enjoy wide discretion to allocate fees, expenses and costs between the parties.[565]   ESPF argues that the costs follow the event rule is the prevailing and correct approach.[566]   ESPF argues that it should prevail in this proceeding and be awarded its costs.[567]

384.   Moreover, Italy is said to have abused its right to request annulment by seeking an appeal[568] and forced ESPF to incur legal fees and expenses defending against arguments that (i) had been briefed before and rejected by the Tribunal, and (ii) were not well-founded under the ICSID Convention

---

[564] The Committee notes that there is an arithmetical error in the total amount of Italy's costs in euros reflected in the breakdown (€150,000 +€200,000 +€4,000 = €354,000, instead of €404,000). This discrepancy between the total amount of costs in euros (€) and US dollars (US$) does not affect the Committee's conclusions concerning the costs of the proceeding.

[565] ESPF's Cost Submission, ¶ 3.

[566] *Id.*

[567] *Id.*, ¶ 4.

[568] *Id.*

or in international law.  The *ad hoc* Committee, it argues, should award ESPF the entirety of its claimed fees and expenses to wipe out the consequences of Italy's misconduct.[569]

385.    ESPF further argues that neither should it have to contribute to the costs of the proceedings[570] and that no *ad hoc* committee has ever required a successful annulment respondent to reimburse costs of the proceeding to the applicant.[571]

386.    Finally, ESPF submits that its legal fees and expenses of €807,321.13 – as summarized in the table below – are reasonable given the many issues raised by Italy, the complexity of the arguments, and duration of the proceeding.[572]

---

[569] *Id.*, ¶ 5.

[570] *Id.*, ¶ 6, citing **ELA-036**, *M.C.I. Power Group, L.C. and New Turbine, Inc. v. Republic of Ecuador*, ICSID Case No. ARB/03/6, Decision on Annulment, 19 October 2009, ¶ 88.

[571] ESPF's Cost Submission, ¶ 6.

[572] *Id.*, ¶ 10 and Annex A.

**King & Spalding**

| PHASE | HOURS SPENT | LEGAL FEES |
|---|---|---|
| From inception to Counter-Memorial on Annulment | 542.0 | € 354,827.50 |
| Rejoinder on Annulment | 225.4 | € 172,724.00 |
| Hearing and Post-Hearing Brief | 184.7 | € 173,390.50 |
| **TOTAL** | **952.1** | **€ 700,942.00** |

**McDermott Will & Emery**

| PHASE | HOURS SPENT | LEGAL FEES |
|---|---|---|
| Hearing & Post-Hearing Brief | 100.3 | € 96,380.10 |
| **TOTAL** | **100.3** | **€ 96,380.10** |

**ESPF's Costs and Expenses**

| CATEGORY | AMOUNT |
|---|---|
| Travel Costs | € 2,751.58 |
| Translation Costs | € 3,094.18 |
| Other Costs (*e.g.*, duplication and document delivery) | € 4,153.27 |
| **TOTAL** | **€ 9,999.03** |

387.    Consequently, ESPF requests that the Committee (i) order Italy to reimburse all legal fees and expenses incurred by ESPF in this proceeding, and (ii) declare that Italy remains responsible for all of the other costs of this proceeding, including the costs and expenses of ICSID as well as the fees and expenses of the Members of the Committee.[573]  ESPF also requests that Italy be ordered to pay post-decision interest on the foregoing sums at a compound commercial rate to be determined by the Committee until the date of Italy's full satisfaction of the order on costs.[574]

## C.    THE *AD HOC* COMMITTEE'S DECISION ON COSTS

388.    Article 61(2) of the ICSID Convention provides in relevant part that:

---

[573] *Id.*, ¶ 11.

[574] *Id.*, ¶ 12.

> "the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award."

389.   This provision, together with ICSID Arbitration Rule 47(1)(j) (applied by virtue of ICSID Arbitration Rule 53) gives the *ad hoc* Committee discretion to allocate all costs of the proceeding, including attorney's fees and other costs, between the Parties as it deems appropriate.

390.   Both Parties have requested that the other party be ordered to pay all the costs of the proceeding, including legal fees, expenses and ICSID costs, with interest.  While Italy has simply presented its costs, ESPF has also argued that its costs are reasonable.  In this context, ESPF has argued that relevant factors to determining whether legal fees and expenses are reasonable typically include the length of the proceeding, the complexity of the case, the amount in dispute, and the efficiency with which a party presents its case.[575]

391.   ESPF has submitted that the prevailing and correct approach of annulment committees is that "costs follow the event."[576] The *ad hoc* Committee considers that this is indeed the appropriate starting point in relation to awarding the costs of these proceedings.  While potentially other factors may need to be taken into account, which may lead to some adjustment, in this case the *ad hoc* Committee does not see any reason to do so.

392.   In assessing the expenses incurred by the parties, the *ad hoc* Committee notes that while the costs incurred by ESPF are higher than Italy's,[577] they have been presented clearly and transparently, and the Committee does not find the costs or expenses disproportionate to the issues presented. Consequently, Italy shall bear the costs of representation incurred by ESPF, as well as the costs of the annulment proceeding.

393.   Both Parties have claimed interest, and while Italy has not elaborated on its request at all, ESPF has requested post-decision interest until the date of Italy's full satisfaction of the *ad hoc* Committee's order on costs "at a compound, commercial rate of interest to be determined by the

---

[575] ESPF's Cost Submission, ¶ 8.

[576] *Id.*, ¶ 3, citing **ELA-013**, *TECO* Decision on Annulment, ¶ 375.

[577] *See* ¶ 382 n. 564 and ¶ 386 *supra.* The discrepancy between Italy's total amount of costs in euros (€) and in US dollars (US$) due to the arithmetic error indicated in n. 564 *supra* does not affect the *ad hoc* Committee's conclusions concerning the costs of the proceeding.

Committee."[578]  The *ad hoc* Committee considers that the rate which was adopted by the Tribunal is the appropriate rate, namely 12-month EURIBOR plus 4% compounded annually from the date of this decision until payment.

394.    The costs of the proceeding, including the fees and expenses of the *ad hoc* Committee, ICSID's administrative fees and direct expenses, amount to (in US$):

### *ad hoc* Committee Members' Fees and Expenses

| | |
|---|---|
| Prof. Dr. Jacomijn van Haersolte-van Hof | 117,975.38 |
| Prof. D. Brian King | 65,943.30 |
| Dr. Ucheora Onwuamaegbu | 67,269.90 |
| ICSID's administrative fees | 126,000.00 |
| Direct expenses | 44,300.55 |
| **Total** | **US$ 421,489.13** |

395.    The above costs have been paid out of the advances made by Italy pursuant to Administrative and Financial Regulation 14(3)(e).[579]

396.    Accordingly, the *ad hoc* Committee orders Italy to bear all costs of the proceeding, including the fees and expenses of the Committee, ICSID's administrative fees and direct expenses in the amount of US$421,489.13 and to cover ESPF's legal fees and expenses in the amount of €807,321.13.

## VIII.    DECISION

397.    For the reasons set forth above, the *ad hoc* Committee decides as follows:

(1)    the Application for Annulment of the Award of 14 September 2020 submitted by the Italian Republic is rejected in its entirety;

(2)    Italy shall bear all costs of the annulment proceeding, including the fees and expenses of the *ad hoc* Committee, ICSID's administrative fees and direct expenses;

---

[578] ESPF's Cost Submission, ¶ 12.

[579] The remaining balance in the case account will be reimbursed to the Applicant.

(3)    Italy is directed to pay to ESPF the principal sum of €807,321.13 for ESPF's legal fees and expenses; and

(4)    If payment is not made in full by 30 days of the date of dispatch of this Decision in the above amounts referenced in ¶ 397 (2) and (3), or any outstanding portion thereof, shall accrue interest at the six-month EURIBOR rate, compounded semi-annually until full payment.

_____

**Prof. D. Brian King**
Member of the *ad hoc* Committee

**Date:**  27 July 2023

_____

**Dr. Ucheora Onwuamaegbu**
Member of the *ad hoc* Committee

**Date:**

_____

**Prof. Dr. Jacomijn J. van Haersolte-van Hof**
President of the *ad hoc* Committee

**Date:**

115

_____

Prof. D. Brian King
Member of the *ad hoc* Committee


Date:

_____

Dr. Ucheora Onwuamaegbu
Member of the *ad hoc* Committee


Date: 28 July 2023


_____

Prof. Dr. Jacomijn J. van Haersolte-van Hof
President of the *ad hoc* Committee


Date:

116

_____          _____

Prof. D. Brian King                         Dr. Ucheora Onwuamaegbu
Member of the *ad hoc* Committee            Member of the *ad hoc* Committee


Date:                                       Date:


_____

Prof. Dr. Jacomijn J. van Haersolte-van Hof
President of the *ad hoc* Committee


Date:   28 July 2023


117