# Exhibit 29

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the annulment proceeding between

**OPERAFUND ECO-INVEST SICAV PLC AND SCHWAB HOLDING AG**
(Respondents on Annulment)

and

**KINGDOM OF SPAIN**
(Applicant on Annulment)

**ICSID Case No. ARB/15/36**
**Annulment Proceeding**

---

# DECISION ON ANNULMENT

---

***Members of the Committee***
Mr. Timothy J. Feighery, President of the *ad hoc* Committee
Mr. Milton Estuardo Argueta Pinto, Member of the *ad hoc* Committee
Prof. Fausto de Quadros, Member of the *ad hoc* Committee

***Secretary of the Committee***
Ms. Luisa Fernanda Torres

*Date of Dispatch to the Parties:* 2 March 2023

## REPRESENTATION OF THE PARTIES

*Representing Kingdom of Spain:*

Ms. María del Socorro Garrido Moreno
Ms. María Andrés Moreno
Ms. Gabriela Cerdeiras Megías
Ms. Ana Fernández Daza
Ms. Lorena Fatás Pérez
Mr. José Manuel Gutierrez Delgado
Ms. Inés Guzmán Gutierrez
Ms. Lourdes Martínez de Victoria
Ms. Amparo Monterrey Sánchez
Ms. Elena Oñoro Sainz
Mr. Luis Vacas Chalfoun


Abogacía General del Estado
International Arbitration Department
C/Marqués de la Ensenada, 14-16
2d. Floor
28004, Madrid
Spain

*Representing OperaFund and Schwab:*

Mr. Alberto Fortún Costea
Dr. José Ángel Rueda García
Prof. Miguel Gómez Jene
Mr. Borja Álvarez Sanz
Mr. Gustavo Antonio Mata Morreo
Mr. José Ángel Sánchez Villegas
Ms. Soledad Peña Plaza
Ms. Lucía Pérez-Manglano Villalonga
Mr. Ignacio María Hernández Suárez
Mr. Joan Cervantes Gómez
Ms. Inmaculada Romero Vázquez


Cuatrecasas, Gonçalves Pereira
Calle Almagro, 9
28010, Madrid
Spain

TABLE OF CONTENTS

I.    INTRODUCTION AND PARTIES ................................................................. 1

II.   PROCEDURAL HISTORY .......................................................................... 2

III.  THE PARTIES' REQUESTS FOR RELIEF ................................................ 13

IV.   THE GROUNDS FOR ANNULMENT ....................................................... 16

   A.   Overview .............................................................................................. 16

   B.   The Role of the Committee ................................................................... 19

   C.   First Ground: Manifest Excess of Powers ............................................ 20

     1.   The Parties' Positions ................................................................... 20

       a.   Spain's Position ...................................................................... 20

       b.   Opera Fund and Schwab's Position ......................................... 51

     2.   The Non-Disputing Party's Submission ........................................ 73

       a.   Article 26 of the ECT Does not Apply Intra-EU and the Tribunal Lacked Jurisdiction ............................................... 73

       b.   Failure to Apply EU Law ......................................................... 76

     3.   The Committee's Analysis ............................................................. 78

       a.   The Standard ........................................................................... 78

       b.   Manifest Excess of Powers by Declaring Jurisdiction ............ 80

       c.   Manifest Excess of Powers by Failure to Apply the Applicable Law: EU Law .................................................. 87

       d.   Manifest Excess of Powers by Misapplication of the Applicable Law ......... 91

   D.   Second Ground: Failure to State Reasons ............................................. 91

     1.   The Parties' Positions ................................................................... 91

       a.   Spain's Position ...................................................................... 91

       b.   OperaFund and Schwab's Position ......................................... 114

     2.   The Committee's Analysis ............................................................. 127

       a.   The Standard ........................................................................... 127

       b.   Failure to State Reasons on the Determination of the Applicable Law ...... 130

       c.   Failure to State Reasons on the Conclusions of Liability ......... 132

       d.   Failure to State Reasons on Quantification of Damages ........... 149

   E.   Third Ground: Serious Departure from a Fundamental Rule of Procedure .............. 159

     1.   The Parties' Positions ................................................................... 159

       a.   Spain's Position ...................................................................... 159

    b. OperaFund and Schwab's Position ................................................................ 167

  2. The Committee's Analysis .................................................................................. 179

    a. The Standard ............................................................................................. 179

    b. Serious Violations of Fundamental Rules of Procedure ........................... 181

**V.** COSTS ........................................................................................................................ 193

 A. The Parties' Positions .................................................................................................. 193

  1. Spain's Position .................................................................................................. 193

  2. OperaFund and Schwab's Position ..................................................................... 194

 B. The Costs of the Proceeding ........................................................................................ 195

 C. The Committee's Analysis ........................................................................................... 196

**VI.** DECISION ................................................................................................................... 197

## TABLE OF SELECTED ABBREVIATIONS

| | |
|---|---|
| Application for Annulment | Kingdom of Spain's Application for Annulment, dated 25 February 2020 |
| Applicant | Kingdom of Spain |
| Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| Award | Award rendered on 6 September 2019 in the arbitration proceeding captioned *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No. ARB/15/36, as rectified by the Tribunal's Decision on Rectification of the Award dated 28 October 2019 |
| CJEU | Court of Justice of the European Union |
| C-[#] | OperaFund and Schwab's Exhibit |
| CL-[#] | OperaFund and Schwab's Legal Authority |
| C-Mem. Ann. | OperaFund and Schwab's Counter-Memorial on Annulment, dated 22 January 2021 |
| C-Mem. Stay | OperaFund and Schwab's Counter-Memorial in Opposition to the Request for the Continuation of the Stay of Enforcement of the Award, dated 31 July 2020 |
| Committee | Ad Hoc Committee constituted on 17 June 2020 |
| EC | European Commission |
| EC Application | European Commission's Application for Leave to Intervene as a Non-Disputing Party, dated 3 December 2020 |
| EC Submission | European Commission's Written Submission, dated 12 March 2021 |
| ECT | Energy Charter Treaty |
| EU | European Union |

iv

| | |
|---|---|
| FET | Fair and Equitable Treatment |
| ICJ | International Court of Justice |
| ICSID Convention | Convention on the Settlement of Investment Disputes Between States and Nationals of Other States dated 18 March 1965 |
| ICSID or the Centre | International Centre for Settlement of Investment Disputes |
| Mem. Ann. | Kingdom of Spain's Memorial on Annulment, dated 23 October 2020 |
| Mem. Stay | Kingdom of Spain's Memorial in Support of the Continuation of the Stay of Enforcement of the Award, dated 16 July 2020 |
| OperaFund | OperaFund Eco-Invest SICAV PLC |
| RD | Royal Decree |
| RDL | Royal Decree-Law |
| REIO | Regional Economic Integration Organization |
| R-[#] | Kingdom of Spain's Exhibit |
| RL-[#] | Kingdom of Spain's Legal Authority |
| Rej. Ann. | OperaFund and Schwab's Rejoinder on Annulment, dated 1 June 2021 |
| Rej. Stay | OperaFund and Schwab's Rejoinder in Opposition to the Request for the Continuation of the Stay of Enforcement of the Award, dated 30 September 2020 |
| Reply Ann. | Kingdom of Spain's Reply on Annulment, dated 29 March 2021 |
| Reply Stay | Kingdom of Spain's Reply in Support of the Continuation of the Stay of Enforcement of the Award, dated 15 September 2020 |
| Respondents on Annulment | OperaFund Eco-Invest SICAV PLC and Schwab Holding AG |

| Schwab | Schwab Holding AG |
|---|---|
| Spain | Kingdom of Spain |
| TFEU | Treaty on the Functioning of the European Union |
| Tr. Ann., Day [#] (ENG/SPA), [page:line] [Speaker(s)] | Transcript of the Hearing on Annulment (as jointly revised by the Parties on 30 July 2021) |
| Tribunal | Arbitral Tribunal in the original arbitration proceeding composed of Professor Dr. Karl-Heinz Böckstiegel (President), Professor MMag. Dr. August Reinisch and Professor Philippe Sands, Q.C. |
| TVPEE | Tax on the Value of the Production of Electrical Energy |
| VCLT | Vienna Convention on the Law of Treaties |

## I.    INTRODUCTION AND PARTIES

1.    This proceeding concerns the application by the Kingdom of Spain for the annulment of the award rendered on 6 September 2019 in the arbitration proceeding captioned *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No. ARB/15/36, as rectified by the Tribunal's Decision on Rectification of the Award dated 28 October 2019 (the "**Award**").  The Award was rendered by the Arbitral Tribunal composed of Professor Dr. Karl-Heinz Böckstiegel (President), Professor MMag. Dr. August Reinisch and Professor Philippe Sands, Q.C. (the "**Tribunal**").  Professor Philippe Sands issued a Dissent on Liability and Quantum.

2.    The Award resulted from a dispute submitted to the International Centre for Settlement of Investment Disputes ("**ICSID**" or the "**Centre**") on the basis of the Energy Charter Treaty ("**ECT**"), which entered into force for Spain and the Swiss Confederation on 16 April 1998 and for the Republic of Malta on 28 August 2001, and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States, which entered into force for Spain on 17 September 1994, for the Republic of Malta on 3 December 2003, and for the Swiss Confederation on 14 June 1968 (the "**ICSID Convention**").

3.    The Applicant on Annulment is the Kingdom of Spain (the "**Applicant on Annulment**," the "**Applicant**" or "**Spain**").

4.    The Respondents on Annulment are OperaFund Eco-Invest SICAV PLC ("**OperaFund**"), a company incorporated under the laws of the Republic of Malta, and Schwab Holding AG ("**Schwab**"), a company incorporated under the laws of the Swiss Confederation (together the "**Respondents on Annulment**").

5.    The Applicant and the Respondents on Annulment are collectively referred to as the "**Parties**," and the term "**Party**" is used to refer to either the Applicant or the Respondents on Annulment.  The Parties' representatives and their addresses are listed above on page (i), *supra*.

1

6.     The dispute in the underlying arbitration related to an investment in the photovoltaic sector in Spain.[1]  The dispute arose out of regulatory measures implemented by Spain modifying the economic regime for renewable energy investments in Spain.  On jurisdiction, the Tribunal concluded that it had jurisdiction over the claims submitted by OperaFund and Schwab, except for the claim concerning the Tax on the Value of the Production of Electrical Energy ("**TVPEE**").[2]  On liability, the majority of the Tribunal found Spain liable for breach of the fair and equitable treatment standard ("**FET**") in Article 10(1) of the ECT,[3] and ordered Spain to pay OperaFund and Schwab damages assessed at EUR 29.3 million, together with pre-Award and post-Award interest.[4]  Professor Philippe Sands appended a Dissent on Liability and Quantum.

7.     On 8 October 2019, OperaFund and Schwab filed a Request for Rectification of the Award, which was registered on 10 October 2019.  They requested the Tribunal to rectify a clerical error concerning the currency of the compensation awarded.  Without objection from Spain, on 28 October 2019, the Tribunal issued its Decision and rectified the clerical error.

8.     Spain seeks the annulment of the Award under Article 52(1)(b), (d) and (e) of the ICSID Convention.

## II.     PROCEDURAL HISTORY

9.     On 25 February 2020, Spain submitted an Application for Annulment of the Award ("**Application for Annulment**"), accompanied by Annexes 1 to 24.  In its Application for Annulment, Spain requested, among other things: (i) a provisional stay of enforcement of the Award in accordance with Article 52(5) of the ICSID Convention and Rule 54(2) of the ICSID Rules of Procedure for Arbitration Proceedings ("**ICSID Arbitration Rules**");

---

[1] **RL-0118**, *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No. ARB/15/36, Award, 6 September 2019 ["**Award**"], ¶ 173.

[2] **RL-0118**, Award, ¶ 746(1).

[3] **RL-0118**, Award, ¶ 746(2).

[4] **RL-0118**, Award, ¶ 746(3), (5)-(6); Decision on Rectification, ¶ 12.

and (ii) the continuation of the stay of enforcement of the Award until the Committee renders its Decision on the Application for Annulment.[5]

10.     On 3 March 2020, the Secretary General of ICSID registered the Application for Annulment and notified the Parties of the registration, in accordance with ICSID Arbitration Rule 50(2)(a) and (b); and informed the Parties of the provisional stay of enforcement of the Award pursuant to ICSID Arbitration Rule 54(2).

11.     The *ad hoc* Committee was constituted in accordance with Article 52(3) of the ICSID Convention.  Its members are Mr. Timothy J. Feighery, a U.S. and Irish national, President; Mr. Milton Estuardo Argueta Pinto, a Guatemalan national; and Professor Fausto de Quadros, a Portuguese national, (the "**Committee**"), all appointed by the Chairman of the ICSID Administrative Council.

12.     On 17 June 2020, in accordance with ICSID Arbitration Rules 6(1) and 53, the Secretary General notified the Parties that all three members of the Committee had accepted their appointments and that the Committee was therefore deemed to have been constituted on that date.  Ms. Luisa Fernanda Torres, ICSID Legal Counsel, was designated to serve as Secretary of the Committee.

13.     On 1 July 2020, the Parties informed the Committee of their agreed Procedural Calendar for submissions concerning the stay of enforcement of the Award.  The Parties further agreed to extend the deadline in ICSID Arbitration Rule 54(2) until 45 days after conclusion of the Parties' written submissions on the stay of enforcement.[6]  On 2 July 2020, the Committee confirmed the Procedural Calendar agreed by the Parties.

14.     On 16 July 2020, Spain filed its Memorial in Support of the Continuation of the Stay of Enforcement of the Award, accompanied with Annexes 25 to 39 ("**Memorial on Stay**").

---

[5] Application for Annulment, ¶¶ 84, 85(a) and (b).

[6] That 45-day deadline fell on 16 November 2020, as 14 November 2020 was a Saturday. *See* 2006 ICSID Administrative and Financial Regulation 29(2).

15.     On 23 July 2020, the Committee held the First Session with the Parties by video conference.

16.     On 27 July 2020, the Committee issued **Procedural Order No. 1**, which embodied the Parties' agreements on procedural matters and the Committee's decisions on the disputed issues.  It established, *inter alia*, that the applicable Arbitration Rules would be those in effect from 10 April 2006, that the procedural languages would be English and Spanish, and that the place of proceeding would be Washington, DC, as the seat of the Centre.  It also issued the Procedural Calendar for this annulment proceeding.

17.     On 31 July 2020, OperaFund and Schwab submitted their Counter-Memorial in Opposition to the Request for the Continuation of the Stay of Enforcement of the Award, accompanied by Legal Authorities CL-0248 to CL-0273, and RL-0080 ("**Counter-Memorial on Stay**").

18.     On 15 September 2020, Spain filed its Reply in Support of the Continuation of the Stay of Enforcement of the Award, together with Exhibits BQR-0013 to BQR-0014, R-0364 to R-0371, and Legal Authorities RL-0150 to RL-0162 ("**Reply on Stay**").[7]

19.     On 30 September 2020, OperaFund and Schwab filed their Rejoinder in Opposition to the Request for the Continuation of the Stay of Enforcement of the Award, together with Legal Authorities CL-0274 to CL-0275 ("**Rejoinder on Stay**").

20.     On 23 October 2020, Spain filed its Memorial on Annulment, together with Exhibits R-0372 to R-0389, Legal Authorities RL-0163 to RL-0199, selected Exhibits and Legal Authorities from the original arbitration proceeding, and an Expert Report by Professor Ricardo Gosalbo Bono, accompanied by Exhibits RGB-0001 to RGB-0028 ("**Memorial on Annulment**").

---

[7] On 7 October 2020, Spain submitted a corrected consolidated set of Exhibits (BQR-0013 to BQR-0014, R-0357 to R-0371) and Legal Authorities (RL-0001, RL-0118 to RL-0162) to adapt the Annexes it had previously submitted to the nomenclature required by Procedural Order No. 1. Exhibits R-0357 to R-0363 corresponded to renumbered versions of Annexes previously submitted with the Application for Annulment and the Memorial on Stay; and Legal Authorities RL-0118 to RL-0149 corresponded to renumbered versions of Annexes previously submitted with the Application for Annulment and the Memorial on Stay.

21.    On 6 November 2020, Spain requested an extension to submit the English translation of the Memorial on Annulment. On the same day, the Committee invited OperaFund and Schwab to submit their observations, which they provided on 9 November 2020.

22.    On 9 November 2020, the Committee issued a revised Procedural Calendar ("**Calendar Revision No. 1**") which reflected the amendments resulting from the Parties' communications of 6 and 9 November 2020, respectively.

23.    On 16 November 2020, the Committee issued its Decision on Stay of Enforcement of the Award.  The Committee decided as follows:

> "*For the reasons set forth above, the Committee unanimously decides to:*
>
> *(1) Reject Spain's request for a continuation of the stay of enforcement of the Award;*
>
> *(2) Orders that the stay of enforcement of the Award currently in place be lifted;*
>
> *(3) Reserves the right to modify this Decision if requested by either Party upon a modification of the prevailing circumstances; and*
>
> *(4) Reserves the decision on costs for a later stage of the proceedings.*"

24.    On 3 December 2020, the European Commission ("**EC**") filed an Application for Leave to Intervene as a Non-Disputing Party, pursuant to ICSID Arbitration Rule 37(2), together with Annex 1 ("**EC Application**"). The EC Application was communicated to the Parties and the Committee on the same day.

25.    On 8 December 2020, pursuant to ICSID Arbitration Rules 37(2) and 53, the Committee invited the Parties to provide their observations on the EC Application.

26.    On 8 January 2021, OperaFund and Schwab filed their observations on the EC Application, together with Exhibits C-0355 to C-0357 and Legal Authorities CL-0276 to CL-0294, as well as certain Legal Authorities from the original arbitration proceeding.  On the same

date, Spain filed its observations on the EC Application, together with Legal Authority RL-0200, as well as certain Legal Authorities from the original arbitration proceeding.

27. On 13 January 2021, the Committee invited the Parties to provide a second-round of submissions regarding the EC Application. In making these second-round submissions, the Committee invited the Parties to address "*the question of whether the points on which the EC seeks to intervene (identified in the EC Application) fall within the scope of the grounds for annulment in Article 52(1) of the ICSID Convention.*"

28. On 22 January 2021, OperaFund and Schwab filed their Counter-Memorial on Annulment, together with Exhibits C-0358 to C-0361 and Legal Authorities CL-0295 to CL-0319, as well as certain Exhibits, Legal Authorities and an Expert Report (CER-5 Brattle Rebuttal Expert Report dated 2 October 2018 with Annexes 1 to 3) from the original arbitration proceeding ("**Counter-Memorial on Annulment**").

29. In their Counter-Memorial on Annulment, OperaFund and Schwab requested that the Committee declare in a Procedural Order that the First Gosalbo Report was inadmissible "*and that Spain* [was] *barred from filing new expert reports or new evidence with its second memorial unless there are exceptional circumstances that could justify it and the Committee so approves it beforehand.*"[8]

30. On 29 January 2021, Spain submitted its Reply Observations on the EC Application, together with Legal Authorities RL-0201 to RL-0203. On the same date, OperaFund and Schwab submitted their Reply Observations on the EC Application.

31. On 27 February 2021, the Committee issued **Procedural Order No. 2** concerning the EC Application for Leave to Intervene as a Non-Disputing Party pursuant to ICSID Arbitration Rule 37(2). The Committee granted the EC Application in part as follows:

> "*For the reasons stated above, the Committee hereby:*
>
> a) ***Allows*** *the EC to file a written submission as a non-disputing party, in accordance with ICSID Arbitration Rule 37(2), on*

---

[8] C-Mem. Ann., ¶ 239(i). *See also, id.*, ¶¶ 31-36.

> *whether the Tribunal manifestly exceeded its powers by finding jurisdiction, and/or by failing to apply the proper law;*
>
> b) ***Decides*** *that the EC shall file its submission no later than **12 March 2021**, with a translation into Spanish to follow no later than 15 March 2021, and that the submission shall be limited to 25 pages, with no exhibits or annexes;*
>
> c) ***Rejects*** *the EC's request to have access to the documents filed in the case;*
>
> d) ***Rejects*** *the EC's request to attend the hearing;*
>
> e) ***Rejects*** *OperaFund and Schwab's request to condition the EC's intervention on the provision of an undertaking or on the provision of a guarantee or security for any costs of this proceeding;*
>
> f) ***Decides*** *that the Parties shall present their observations on the EC written submission in the course of their currently scheduled second round submissions (Reply on Annulment and Rejoinder on Annulment, respectively);*
>
> g) ***Decides*** *that this Procedural Order shall be communicated to the European Commission, which shall not communicate it to third parties or use it outside of this annulment proceeding.*"

32. On 12 March 2021, the EC filed its written submission pursuant to ICSID Arbitration Rule 37(2) ("**EC Submission**"). The EC Submission was communicated to the Parties and the Committee on the same day. On 15 March 2021, the EC filed the translation of its written submission, which was also communicated to the Parties on the same day.

33. On 29 March 2021, Spain filed its Reply on Annulment, together with Exhibits R-0390 to R-0391, Legal Authorities RL-0204 to RL-0267, selected Exhibits and Legal Authorities from the original arbitration proceeding, and a Second Expert Report of Professor Ricardo Gosalbo Bono, accompanied by Exhibits RGB-0029 to RGB-0049 ("**Reply on Annulment**").

34. As part of its Reply on Annulment, Spain opposed OperaFund and Schwab's request to declare inadmissible the First Gosalbo Report, arguing that "*Professor Gosalbo's Report*

7

*does not constitute any violation of PO No. 1 […], paragraph 15 […] which exempts the need to request express authorisation from the ad hoc Committee with respect to the legal authorities.*"[9]

35. On 20 May 2021, the Committee invited the Parties to confer concerning the format of the Hearing on Annulment scheduled for 19-20 July 2021 (with 21 July 2021 in reserve) (the "**Hearing on Annulment**"), including the possibility of convening the Hearing remotely by video conference with reference to the provisions of Sections 10.2 and 18.2 of Procedural Order No. 1 in that regard.  Each Party provided its observations concerning the subject on 27 May 2021, with Spain agreeing to the remote format, and OperaFund and Schwab arguing that the Hearing could be disposed of, but agreeing to the remote format, if held.

36. On 1 June 2021, having heard the Parties, the Committee ruled as follows:

> "*The Committee has taken note of the Parties communications of 27 May 2021. It observes that pursuant to ICSID Arbitration Rule 29 '[e]xcept if the parties otherwise agree, the proceeding shall comprise two distinct phases: a written procedure followed by an oral one.' As there is no agreement between the Parties to dispose of the oral Hearing, the Committee confirms that the Hearing will take place on the scheduled dates 19-20 July 2021 (with 21 July 2021 in reserve), as established in Procedural Order No. 1, Annex A (REV 1). The Committee further notes the Parties' agreement as to the virtual format, and it thus confirms that the Hearing will be virtual.* […].
>
> *Finally, the Committee observes that it will revert to the Parties separately on the issue of the admissibility of expert submissions, prior to the Pre-Hearing Conference.*"

37. On 1 June 2021, OperaFund and Schwab filed their Rejoinder on Annulment, together with Exhibits C-0362 to C-0365, Legal Authorities CL-0320 to CL-0336, as well as certain Exhibits, Legal Authorities and an Expert Report (CER-2 Brattle Quantum Report dated

---

[9] Reply Ann., ¶ 167. *See also*, *id.*, ¶ 166.

26 October 2016, and CER-1-BRR-47, CER-2-BQR-75) from the original proceeding ("**Rejoinder on Annulment**").

38.    As part of their Rejoinder on Annulment, OperaFund and Schwab reiterated the request that the Committee "[i]*ssue a Procedural Order whereby it declares that Gosalbo's Reports cannot be admitted*."[10]

39.    On 3 June 2021, the Committee invited the Parties to provide further briefing on the procedural question of admissibility of the Gosalbo Reports.  Pursuant to the Committee's invitation: (i) on 10 June 2021, Spain filed further observations, together with Legal Authority RL-0268; (ii) on 14 June 2021, OperaFund and Schwab filed reply observations, together with Legal Authorities CL-0337 and CL-0338; and (iii) on 16 June 2021, Spain filed rejoinder observations (and later submitted a revised version with a clerical correction on 17 June 2021).

40.    On 23 June 2021, the Committee issued **Procedural Order No. 3**, where it ruled on the admissibility of expert submissions, as follows:

> "*For the reasons stated above, the Committee hereby:*
>
> *(a) determines that the Gosalbo Reports are inadmissible;*
>
> *(b) determines that the Eeckhout Expert Declaration and the Bermann Expert Declaration are inadmissible;*
>
> *(c) rejects Spain's request that Prof. Gosalbo attend the hearing;*
>
> *(d) without prejudice to the above decisions, permits the Parties to rely on the entirety of their written submissions made during the written procedure, including excerpts taken from and footnotes referencing the Gosalbo Reports, the Eeckhout Expert Declaration and the Bermann Expert Declaration, in the remainder of this procedure;*

---

[10] Rej. Ann., ¶ 271(i). *See also, id.*, ¶¶ 7, 27.

> *(e) determines to assess costs at the conclusion of the Annulment Proceeding.*"

41.    The purpose of the Committee's decision was to preserve intact the written submissions of both Parties while rejecting the Gosalbo Reports, the Eeckhout Expert Declaration and the Bermann Expert Declaration. As underlined by the Committee at Section IV.B. *infra*, one of its important roles is to ensure the integrity of the process, which includes applying the principle that an annulment proceeding concerns the record before the Tribunal, and that it is not an opportunity to raise new evidence or new arguments on the merits. Consistent with this principle, the Committee will not assess the probative value of evidence or argument that was not before the Tribunal.

42.    On 23 June 2021, the Committee circulated a draft procedural order concerning the organization of the Hearing on Annulment in preparation for the Pre-Hearing Organizational Conference ("**Pre-Hearing Conference**"). The Parties submitted their comments on the draft procedural order on 28 June 2021.

43.    On 29 June 2021, pursuant to Section 17.1 of Procedural Order No. 1, the Committee held the Pre-Hearing Conference with the Parties by video conference.

44.    On 30 June 2021, the Committee issued **Procedural Order No. 4** concerning the organization of the Hearing on Annulment.

45.    On 13 July 2021, the Parties jointly submitted the Electronic Hearing Bundle for the Hearing on Annulment.

46.    The Hearing on Annulment was held by video conference on 19 July 2021. The following persons were present:

*Committee*:
Mr. Timothy J. Feighery                    President
Prof. Milton E. Argueta Pinto              Member
Prof. Fausto de Quadros                    Member

*ICSID Secretariat*:
Ms. Luisa Fernanda Torres                  Secretary of the Committee

10

*OperaFund and Schwab*:
| | |
|---|---|
| Mr. Alberto Fortún | Cuatrecasas, Gonçalves Pereira |
| Mr. José Ángel Rueda García | Cuatrecasas, Gonçalves Pereira |
| Mr. Borja Álvarez Sanz | Cuatrecasas, Gonçalves Pereira |
| Mr. Gustavo Mata Morreo | Cuatrecasas, Gonçalves Pereira |
| Mr. José Ángel Sánchez Villegas | Cuatrecasas, Gonçalves Pereira |
| Ms. Ana Martínez Valls | Cuatrecasas, Gonçalves Pereira |
| Ms. Lucía Pérez-Manglano Villalonga | Cuatrecasas, Gonçalves Pereira |
| Ms. Elisa Salcedo Sánchez | Cuatrecasas, Gonçalves Pereira, Paralegal |
| Ms. Inmaculada Romero Vázquez | Cuatrecasas, Gonçalves Pereira, Assistant |
| Mr. Gonzalo Arnejo Meijueiro | Cuatrecasas, Gonçalves Pereira, IT |
| Mr. Alex Boss | Party Representative |
| Mr. Dominik Milani | Party Representative |
| Mr. Jorge Frey | Party Representative |

*Kingdom of Spain*:
| | |
|---|---|
| Ms. Socorro Garrido Moreno | *Abogacía General del Estado*, *Ministerio de Justicia* |
| Ms. Ana Fernández Daza | *Abogacía General del Estado*, *Ministerio de Justicia* |
| Ms. Gabriela Cerdeiras Megías | *Abogacía General del Estado*, *Ministerio de Justicia* |
| Mr. José Manuel Gutiérrez Delgado | *Abogacía General del Estado*, *Ministerio de Justicia* |
| Mr. Juan Quesada Navarro | *Abogacía General del Estado*, *Ministerio de Justicia* |
| Mr. Javier Comerón Herrero | *Abogacía General del Estado*, *Ministerio de Justicia* |

*Court Reporters*:
| | |
|---|---|
| Mr. Trevor McGowan | Caerus Reporting Ltd. (English) |
| Ms. Georgina Vaughn | Caerus Reporting Ltd. (English) |
| Mr. Paul Pelissier | D-R Esteno (Spanish) |
| Ms. Marta Rinaldi | D-R Esteno (Spanish) |

*Interpreters*:
| | |
|---|---|
| Mr. Jesús Getan Bornn | Interpreter |
| Ms. Anna Sophia Chapman | Interpreter |
| Ms. Amalia de Klemm | Interpreter |

*Technical Support*:
| | |
|---|---|
| Mr. Mike Young | Sparq |
| Ms. Marisela Vázquez Marrero | ICSID, Paralegal |

47.    During the Hearing on Annulment, the Parties submitted various demonstrative exhibits, as follows:

- Spain: AD-001 (Opening Statement).

- OperaFund and Schwab: OD-001 (Opening Statement).

48. During its opening argument at the Hearing on Annulment, Spain requested "*in line with EU Commission requests*" that the Committee suspend the proceeding until the CJEU rendered an opinion requested by Belgium on the compatibility of intra-EU arbitration under the ECT with EU law.[11]  OperaFund and Schwab opposed.[12]

49. On 20 July 2021, the Committee declined the request for suspension.

50. On 30 July 2021, the Parties submitted their agreed corrections to the transcript of the Hearing on Annulment.

51. On 3 August 2021, OperaFund and Schwab filed a request to submit a new legal authority, pursuant to Section 15.6 of Procedural Order No. 1.  On 4 August 2021, the Committee invited Spain to provide its observations on this application.  Spain filed its observations on 11 August 2021, opposing the application.

52. On 18 August 2021, having considered both Parties' arguments, the Committee rejected OperaFund and Schwab's request to submit a new legal authority.

53. On 10 September 2021, Spain filed a request to submit a new legal authority, pursuant to Section 15.6 of Procedural Order No. 1.  On the same day, the Committee invited OperaFund and Schwab to provide their observations on this application.  OperaFund and Schwab filed their observations on 17 September 2021, opposing the application.

54. On 20 October 2021, having considered both Parties' arguments, the Committee rejected Spain's request to submit a new legal authority.

---

[11] Tr. Ann., Day 1 (ENG), 9:11-15 (Ms. Garrido).  In its Written Submission of 12 March 2021, the EC had advised the Committee of pending cases before the CJEU and had urged the Committee to suspend the proceedings until the CJEU has ruled on the matters. EC Submission, ¶¶ 111-113.

[12] Tr. Ann., Day 1 (ENG), 67:25-68:16 (Mr. Fortún).  In addition, in their Rejoinder on Annulment, OperaFund and Schwab had challenged the admissibility of the request for suspension on numerous grounds.  *See*, Rej. Ann., ¶ 12, Annex 2, ¶¶ 33-41.

55.    On 10 May 2022, Spain filed a request to submit six new documents, pursuant to Section 15.6 of Procedural Order No. 1.  On 12 May 2022, the Committee invited OperaFund and Schwab to provide their observations on this application.  OperaFund and Schwab filed their observations on 23 May 2022, opposing the application.

56.    On 31 May 2022, having considered both Parties' arguments, the Committee rejected Spain's request of 10 May 2022.

57.    On 24 June 2022, Spain filed a request to submit two new documents, pursuant to Section 15.6 of Procedural Order No. 1, and further asking the Committee to reconsider its previous decisions of 20 October 2021 and 31 May 2022.  On 27 June 2022, the Committee invited OperaFund and Schwab to provide their observations on this application.  OperaFund and Schwab filed their observations on 6 July 2022.

58.    On 18 July 2022, having considered both Parties' arguments, the Committee rejected Spain's requests of 24 June 2022.

59.    On 7 November 2022, the Parties filed their respective Statements of Costs.  OperaFund and Schwab's Statement of Costs was accompanied with Legal Authorities CL-0339 to CL-0343.

60.    The proceeding was closed on 14 February 2023.

## III.    THE PARTIES' REQUESTS FOR RELIEF

61.    In the Reply on Annulment, Spain ultimately formulates its request for relief as follows:

> "*502. By virtue of the foregoing, the Kingdom of Spain respectfully requests the ad hoc Committee to annul the Award on the basis of the grounds and arguments set out in this Memorial and, in particular, that:*
>
> > *a) Annul the Award in its entirety under Article 52(1)(b) of the ICSID Convention, on the grounds that the Tribunal manifestly exceeded its powers by entering into the case and improperly declaring its jurisdiction over an intra-EU dispute;*

*b) [A]nnul the Award in its entirety under Article 52(1)(b) of the ICSID Convention, on the grounds that the Tribunal manifestly exceeded its powers by disregarding the application of applicable international law, including the ECT itself, and totally disregarding the application of all EU law;*

*c) Annul the Award in its entirety under Article 52(1)(b) of the ICSID Convention on the grounds that the Tribunal manifestly exceeded its powers by manifestly misapplying the applicable law to be taken into account in assessing legitimate expectations;*

*d) Annul the Award in its entirety under Article 52(1)(d) of the ICSID Convention for serious breach of essential procedural requirements insofar as the Tribunal committed multiple procedural breaches in relation to the evidentiary activity and the evaluation of evidence in the Arbitration;*

*e) Annul the Award in its entirety under Article 52(1)(d) of the ICSID Convention, for serious breach of essential procedural requirements insofar as the Tribunal committed multiple procedural violations relating to the treatment of the European Commission's amicus curiae;*

*f) Annul the Award in its entirety under Article 52(1)(d) of the ICSID Convention, for serious breach of essential procedural requirements insofar as the Tribunal committed multiple procedural breaches involving a lack of impartiality and unequal treatment of the parties in violation of the Kingdom of Spain's rights of defence and right to be heard;*

*g) Annul the Award in its entirety under Article 52(1)(d) of the ICSID Convention, for serious breach of essential procedural requirements insofar as the Tribunal committed multiple procedural breaches relating to the burden and evaluation of evidence developed in relation to the method of quantification of Damages and its application;*

*h) [A]nnul the Award in its entirety under Article 52(1)(e) of the ICSID Convention for failure to state reasons why it disregards the application of applicable international law, including the ECT itself, and why it disregards the application of all EU law altogether;*

14

*i) Annul the Award in its entirety under Article 52(1)(e) of the ICSID Convention for failure to state reasons in the findings on liability which determines that there are serious deficiencies in the Award as to the interpretation of how Article 10(1) of the ECT is to be applied;*

*j) Annul the Award in its entirety under Article 52(1)(e) of the ICSID Convention, for repeated [f]ailure to state reasons in relation to the evidentiary activity and the evaluation of the evidence developed in the Arbitration;*

*k) Annul the Award in its entirety under Article 52(1)(e) of the ICSID Convention, for [f]ailure to state reasons concerning the Claimants' expectations regarding the immutability of the regulatory framework under which they made their investment and the alleged breach thereof;*

*l) Annul the Award under Article 52(1)(e) of the ICSID Convention, insofar as it relates to the determination of Damages, insofar as there is a clear failure to state reasons for the Tribunal's assessment;*

*m) Orders the OperaFund parties to pay all the costs of the proceedings.*

*503. In the event that the Annulment Committee considers that the facts described above constitute a ground for annulment on a ground of Article 52(1) of the ICSID Convention other than those alleged, the Kingdom of Spain requests the Committee to proceed to annul the Award on that ground as well. […].*"[13]

---

[13] Reply Ann., ¶¶ 502-503.  In the Memorial on Annulment, Spain had initially formulated its request for relief as follows:

"*477. By virtue of the foregoing, the Kingdom of Spain respectfully requests that the Committee:*

*a) Completely annul the OperaFund Award under Article 52 (1) (b) of the ICSID Convention, for having incurred in a manifest excess of powers by improperly declaring its jurisdiction over an intra-EU dispute and for grossly and unduly failing to apply a fundamental regulation for the configuration of the legitimate expectations of investors, as is the Law of the European Union.*

*b) Completely annul the OperaFund Award under Article 52 (1) (e) of the ICSID Convention, for lack of expression of reasons in the determination of the applicable law, in the determination of the liability of the Kingdom of Spain, which it declares without offering a minimum reasoning that can be understood, as well as in the determination of the compensation due, which is contradictory with its own conclusions regarding liability.*

15

62.    In their Rejoinder on Annulment, OperaFund and Schwab formulate their request for relief as follows:

> "*271. In light of the foregoing, OperaFund respectfully requests that the Committee:*
>
> *(i)* […]
>
> *(ii) Render a Final Decision*
>
> > *a. dismissing Spain's request for annulment of the Award; and*
> >
> > *b. ordering Spain to pay OperaFund's legal fees and all annulment costs (including Committee members' fees, ICSID fees and all related expenses) incurred in these proceedings.*"[14]

## IV.    THE GROUNDS FOR ANNULMENT

### A.    OVERVIEW

63.    Spain submits that the Award must be annulled on three grounds: (i) manifest excess of powers (Article 52(1)(b) of the ICSID Convention); (ii) serious departure from a fundamental rule of procedure (Article 52(1)(d) of the ICSID Convention); and (iii) failure to state reasons (Article 52(1)(e) of the ICSID Convention).[15]   Spain takes the view, however, that "*the categorisation of the various facts within a given ground for annulment*

---

> *c) Completely annul the OperaFund Award under Article 52 (1) (d) of the ICSID Convention, for serious breach of the fundamental rules of procedure that have been set out above.*
>
> *d) The OperaFund Parties pay all the costs of the procedure.*
>
> *478. Should the Annulment Committee consider that the facts described in this Memorial constitute a ground for annulment based on a cause of Article 52.1 of the ICSID Convention other than those alleged, the Kingdom of Spain requests that the Committee also proceed to annul the award on the basis of said cause alternative to those alleged.*"  (Mem. Ann., ¶¶ 477-478).

[14] Rej. Ann., ¶ 271.  In their Counter-Memorial on Annulment, OperaFund and Schwab had initially formulated their request for relief as follows:

> "*In light of the foregoing, OperaFund respectfully requests that the Committee:*
>
> *(i)* […]
>
> *(ii) on the annulment, render a Final Decision dismissing Spain's request for annulment of the Award and ordering Spain to pay OperaFund's legal fees and all annulment costs (including Committee members' fees, ICSID fees and all related expenses) incurred in these proceedings.*" (C-Mem. Ann., ¶ 239).

[15] Application for Annulment, ¶ 17; Mem. Ann., ¶¶ 2, 5, 7; Reply Ann., ¶¶ 7-8; 18-19.

*is not restrictive, and does not preclude the ad hoc Committee from finding that those facts fit within a different ground for annulment under Article 52 of the ICSID Convention.*"[16]

64.    Spain denies that its annulment application amounts to an appeal, or that it has raised "*new issues.*"[17]  Spain agrees that an annulment proceeding is not an appeal, and that it does not constitute "*a way to proceed to a review of the case already adjudicated.*"[18]  The disagreement lies, Spain submits, on "*the scope that should be given to the grounds for annulment*" in Article 52 of the ICSID Convention.[19]  In its view, the grounds for annulment are to be interpreted "*not broadly, but also not narrowly.*"[20]  According to Spain, Professor Philippe Sands' dissent underscores the force of this annulment application.[21]

65.    For their part, OperaFund and Schwab argue that Spain has not established any valid ground for annulment.[22]  For OperaFund and Schwab, the "*frivolity*" of Spain's application is demonstrated by the fact that Spain has sought to annul all 20 awards in which it has been held liable.[23]

66.    OperaFund and Schwab's position is that Spain has used this annulment proceeding to "*re-litigate […] a series of jurisdictional objections, factual conclusions, and arguments on the merits that were fully briefed before, settled, and squarely rejected by the Tribunal.*"[24]  For example, Spain has reiterated allegations already rejected on the intra-EU objection, EU law on State Aid, and legitimate expectations that "*the Tribunal squarely rejected.*"[25]

---

[16] Reply Ann., ¶ 5.

[17] Reply Ann., ¶¶ 17, 20, 49; Tr. Ann., Day 1 (ENG), 9:20-25 (Ms. Garrido).

[18] Reply Ann., ¶ 24.

[19] Reply Ann., ¶ 24.

[20] Tr. Ann., Day 1 (ENG), 10:3-6 (Ms. Garrido).

[21] Reply Ann., ¶ 22.

[22] C-Mem. Ann., ¶¶ 7-11, 21; Rej. Ann., ¶ 14.

[23] Rej. Ann., ¶ 3.  *See also*, Tr. Ann., Day 1 (ENG), 67:17-24 (Mr. Fortún).

[24] C-Mem. Ann., ¶ 3.

[25] C-Mem. Ann., ¶ 30.

In their view, Spain has not accepted that it lost, and it seeks a "*de novo review*" of the intra-EU objection and of the merits.[26]

67.    OperaFund and Schwab submit that an annulment proceeding is not an appeal,[27] and that it is strictly limited to the grounds set forth in Article 52(1) of the Convention, which must be narrowly interpreted.[28]    They contend that by contrast with an appeal, an *ad hoc* committee may not amend or replace an award (as to jurisdiction or the merits), and that annulment is concerned with the "*legitimacy of the process*," not with its "*substantive correctness*."[29]

68.    Moreover, OperaFund and Schwab argue that Spain bases its arguments on a "*biased and incorrect version of the facts of the case*," and "*most of the time*" fails to advance specific references to the Award or the file in the arbitration.[30]    Furthermore, Spain introduces new evidence (*e.g.* the Gosalbo Reports), new arguments (*e.g.* on valuation date), and new claims (*e.g.* on State aid), which is not permissible under the ICSID Convention.[31]

69.    Instead, they argue that this Committee "*should primarily focus on the Award and materials submitted during the Arbitration* […]."[32]    An annulment process must "*take as their premise the record before the Tribunal*;"[33] and the Committee "*should only analyze the dispute as presented in the pleadings before the tribunal*."[34]    New defenses on jurisdiction are not admissible at the annulment stage.[35]

70.    The Parties' respective positions on the grounds for annulment are summarized in the different sections that follow.    The Committee notes, however, that it has considered the

---

[26] C-Mem. Ann., ¶¶ 3, 4, 21.  *See also*, Rej. Ann., ¶ 4; Tr. Ann., Day 1 (ENG), 67:1-5, 69:20-23 (Mr. Fortún).

[27] C-Mem. Ann., ¶¶ 21, 23-25; Rej. Ann., ¶ 16.  *See also*, Tr. Ann., Day 1 (ENG), 70:21-24 (Mr. Fortún).

[28] C-Mem. Ann., ¶ 22.

[29] C-Mem. Ann., ¶ 24; Rej. Ann., ¶¶ 18-19.  *See also*, Tr. Ann., Day 1 (ENG), 69:13-16 (Mr. Fortún).

[30] C-Mem. Ann., ¶ 5; Rej. Ann., ¶ 2.  *See also*, C-Mem. Ann., ¶¶ 12-19.

[31] C-Mem. Ann., ¶¶ 22, 26, 31.  *See also*, Rej. Ann., ¶ 21.

[32] C-Mem. Ann., ¶ 5.  *See also*, Tr. Ann., Day 1 (ENG), 68:17-19 (Mr. Fortún).

[33] C-Mem. Ann., ¶ 24 (citing **CL-0297**, *MTD Equity Sdn Bhd. & MTD Chile S.A. v. The Republic of Chile*, ICSID Case No. ARB/01/7, Decision on Annulment, 21 March 2007 ["***MTD***"], ¶ 31).  *See also,* Rej. Ann., ¶ 19.

[34] C-Mem. Ann., ¶ 27; Tr. Ann., Day 1 (ENG), 69:17-18 (Mr. Fortún).

[35] Rej. Ann., ¶ 20.

Parties' arguments in their written and oral submissions in their entirety, irrespective of whether an argument is referred to expressly in the summaries of the Parties' positions in this Decision.

## B.    THE ROLE OF THE COMMITTEE

71.    Having read and heard the Parties' extensive written and oral submissions, the Committee begins its analysis by setting forth its role as an *ad hoc* annulment committee under the ICSID Convention.  The Committee is in agreement with Spain that "*annulment under the ICSID Convention is an exceptional remedy that is delimited by the specific grounds provided for in the Convention, and that annulment is not and appeal*."[36]

72.    ICSID's Background Paper on Annulment further develops these principles noting that the drafting history of the article, "*confirmed by ICSID Secretary-Generals in Reports to the Administrative Council of ICSID*," and decisions of *ad hoc* committees have "*clearly established that: (1) the grounds listed in Article 52(1) are the only grounds on which an award may be annulled; (2) annulment is an exceptional and narrowly circumscribed remedy and the role of an ad hoc Committee is limited;* [and] *(3) ad hoc Committees are not courts of appeal, annulment is not a remedy against an incorrect decision, and an ad hoc Committee cannot substitute the Tribunal's determination on the merits for its own* […]."[37]

73.    With respect to the principle that *ad hoc* committees are not courts of appeal, the Committee agrees with OperaFund and Schwab when they cite Professor Schreuer's commentaries to the ICSID Convention submitting that an implication of this principle is that an annulment proceeding is only "*concerned with the **legitimacy of the process** of the decision, it is **not concerned with its substantive correctness***."[38]

---

[36] Tr. Ann., Day 1 (ENG), 9:21-25 (Ms. Garrido).

[37] **R-0390**, Updated Background Paper on Annulment for the ICSID Administrative Council, 5 May 2016, ["**ICSID Background Paper on Annulment**"], ¶¶ 73-74.

[38] C-Mem. Ann., ¶ 24(ii) (emphasis in original).

74.     As noted *supra*, ¶ 41 the Committee also agrees with the further implication that an annulment proceeding concerns "*the record before the Tribunal;*"[39] it is not an opportunity to raise new evidence or new arguments on the merits.[40]   It is incumbent upon the Committee to ensure the integrity of the process in this regard, and therefore it will not rely on evidence or arguments that were not part of the record before the Tribunal.

75.     The Committee also recognizes that, as Spain articulated in its oral submission, "*annulment under the ICSID Convention is ultimately the last remedy to ensure the integrity of the arbitral process.*"[41]   This fact is further reason for the Committee's careful assessment of the alleged grounds of annulment.

76.     The Committee will be guided by these principles in undertaking its analysis and rendering its decision.

## C.    FIRST GROUND: MANIFEST EXCESS OF POWERS

### 1.    The Parties' Positions

#### a.    Spain's Position

77.     Spain submits that the Tribunal manifestly exceeded its powers in two ways: (i) by acting beyond its jurisdiction in contravention of European Union ("**EU**") law; and (ii) by failing to apply EU law as the substantive law of the case.[42]

78.     More specifically, Spain submits that a manifest excess of powers occurred because:

---

[39] C-Mem. Ann., ¶ 24(ii) (citing **CL-0297**, *MTD*, ¶ 31; **RL-0132**, *Iberdrola Energía, S.A. v. Republic of Guatemala*, ICSID Case No. ARB/09/5, Decision on Annulment, 13 January 2015 ["***Iberdrola***"], ¶ 74).

[40] **CL-0295**, Schreuer, C. *et al*., *The ICSID Convention: A Commentary* (2nd ed.), Cambridge: Cambridge University Press (2009), Article 52, p. 902, ¶ 12.

[41] Tr. Ann., Day 1 (ENG), 10:7-12 (Ms. Garrido).

[42] Mem. Ann., ¶¶ 53, 131; Reply Ann., ¶¶ 26, 34-36 (relying *e.g.* on **RL-0185**, *Amco Asia Corporation and Others. v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision on the Application for Annulment, 16 May 1986 ["***Amco***"], ¶ 23; **RL-0183**, *Klöckner Industrie-Anlagen GmbH and Others v. United Republic of Cameroon and Société Camerounaise des Engrais S.A.*, ICSID Case No. ARB/81/2, Decision on the Application for Annulment, 3 May 1985 ["***Klöckner***"], ¶ 22); Tr. Ann., Day 1 (ENG), 5:23-6:2 (Ms. Garrido).

- "*the Tribunal had no jurisdiction over a claim brought by intra-European Union* […] *corporations against an EU Member State*;"[43]

- "*under Article 10(1) of the* [ECT] *the Tribunal's determination of liability for breach of the fair and equitable treatment ('FET') obligation was inconsistent and contradictory, unreasonable and without foundation, and failed to apply the appropriate law, in particular the EU State Aid Act*;"[44] and

- "*even if EU law* [was] *understood to have been applied (quod non) there* [was] *an incorrect use of the applicable law*" because (i) "*the assessment of legitimate expectations must include whether a subsidy is lawful under the law applicable to the investment in question and under domestic law,*" and (ii) under EU law "*there could be no expectation of subsidy petrification*" in a situation "*when EU law qualifies such subsidies as State aid and EU law itself indicates that individuals are not entitled to claim State Aid.*"[45]

(i)    The Standard

79.    Spain submits that a tribunal exceeds its powers when it acts contrary to the Parties' consent.[46]  The "*powers*" to which Article 52(1)(b) of the ICSID Convention refers are those relating to jurisdiction and applicable law.[47]  Thus, a manifest excess of powers may take place, *inter alia*, when a tribunal (i) lacks jurisdiction, exceeds its jurisdiction or decides on matters not raised by the Parties;[48] or (ii) "*does not apply the appropriate law,*"[49] "*manifestly errs in determining the applicable law,*" or "*manifestly errs in interpreting the law applicable to the dispute.*"[50]

80.    Spain observes that *ad hoc* committees have taken different approaches to the interpretation of the elements of the standard.  Relying on the Updated Background Paper on Annulment, Spain notes that:

---

[43] Reply Ann., ¶ 9.

[44] Reply Ann., ¶ 10.

[45] Reply Ann., ¶ 11.

[46] Mem. Ann., ¶ 55.  *See also*, Reply Ann., ¶ 41 (relying on **RL-0180**, *Helnan International Hotels A/S v. Arab Republic of Egypt*, ICSID Case No. ARB/05/19, Decision of the *ad hoc* Committee, 14 June 2010 ["***Helnan***"], ¶¶ 40-41, 55).

[47] Reply Ann., ¶ 28.

[48] Mem. Ann., ¶¶ 55, 116; Reply Ann., ¶ 64; Tr. Ann., Day 1 (ENG), 11:2-4 (Ms. Garrido).

[49] Mem. Ann., ¶ 55.  *See also*, Reply Ann., ¶ 176.

[50] Reply Ann., ¶ 64.

> "The 'manifest' nature of the excess of powers has been interpreted by most ad hoc Committees to mean an excess that is obvious, clear or self-evident, and which is discernable without the need for an elaborate analysis of the award. However, some ad hoc Committees have interpreted the meaning of 'manifest' to require that the excess be serious or material to the outcome of the case."[51]

> "[…] ad hoc Committees have taken different approaches to whether an error in the application of the proper law may effectively amount to non-application of the proper law. Some ad hoc Committees have concluded that gross or egregious misapplication or misinterpretation of the law may lead to annulment, while others have found that such an approach comes too close to an appeal."[52]

81.    Spain takes issue with the contention that the views of some *ad hoc* committees should prevail over others, and submits that, instead, this *ad hoc* Committee "*has to form its own opinion on the […] Award bearing in mind all the approaches of the different applicable precedents.*"[53] In arbitration there is no "*doctrine of case law precedent.*"[54]

82.    Relying on *Occidental*, Spain submits that "*manifest excess of powers*" is a "*polysemic concept*" that refers both to (i) situations in which "*a tribunal adjudicates disputes not included in the powers granted by the parties;*" and (ii) situations in which "*a tribunal having jurisdiction adopts an erroneous decision that exceeds its powers*."[55] According to Spain, "*an excess of powers will be manifest even if it may require some analysis,*"[56] or "*extensive argumentation when it is material to the outcome of the case.*"[57]

83.    For Spain, failure to apply the applicable law takes place when a tribunal (i) ignores the applicable law; or (ii) when "*its erroneous interpretation or misapplication of the law is*

---

[51] Reply Ann., ¶ 30 (quoting **R-0390**, ICSID Background Paper on Annulment, ¶ 83).

[52] Reply Ann., ¶ 31 (quoting **R-0390**, ICSID Background Paper on Annulment, ¶ 93).

[53] Reply Ann., ¶ 32.

[54] Reply Ann., ¶ 32.

[55] Mem. Ann., ¶ 68 (relying on **RL-0167**, *Occidental Petroleum Corporation & Occidental Exploration and Production Company v. The Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment of the Award, 2 November 2015 ["***Occidental***"], ¶¶ 48-50).

[56] Reply Ann., ¶ 157.  *See also,* Reply Ann., ¶¶ 42, 46 (relying on **RL-0167**, *Occidental*, ¶ 59; **RL-0169**, *Víctor Pey Casado and Foundation "Presidente Allende" v. Republic of Chile*, ICSID Case No. ARB/98/2 – Annulment, Decision on the Application for Annulment, 18 December 2012 ["***Pey Casado***"], ¶ 70).

[57] Tr. Ann., Day 1 (ENG), 10:16-18 (Ms. Garrido).

*'so gross or egregious as substantially to amount to failure to apply the proper law.'*"[58] Relying on *Soufraki*, Spain submits that "*gross and consequential misinterpretation or misapplication of the proper law which no reasonable person* [...] *could accept needs to be distinguished from simple error – even a serious error – in the interpretation of the law* [...]*."*[59]  However, Spain also puts forward the proposition that numerous decisions of annulment committees "*openly maintain that an inadequate understanding of the applicable law may lead to an error in the determination of the applicable law, which may constitute a ground for annulment* [...]*."*[60]

84.     Spain further submits that a tribunal manifestly exceeds its powers when it fails to apply the proper treaty provision and instead applies standards not included in that provision.[61] Spain adds that even if a tribunal has correctly identified the applicable law, a manifest excess of powers may still take place if the tribunal "*did not effectively apply the principles it had recognized.*"[62]  Therefore, Spain says, an *ad hoc* committee must consider not only what the tribunal claims to have done, but what the tribunal actually did.[63]

(ii)    Manifest Excess of Powers by Declaring Jurisdiction

85.     While there is a significant amount of overlap, Spain organizes its positive arguments concerning the intra-EU objection and the Tribunal's alleged excess of powers by going beyond its jurisdiction around four main themes in its Memorial on Annulment, as follows: (i) the ECT does not apply to intra-EU disputes; (ii) EU law and its primacy; (iii) the *Achmea* Judgment; and (iv) EU law and the ECT.[64]

---

[58] Mem. Ann., ¶ 56 and Reply Ann., ¶ 46 (relying *inter alia* on **RL-0084/RL-0121**, *Hussein Nuaman Soufraki v. The United Arab Emirates*, ICSID Case No. ARB/02/7, Decision on the Application for Annulment, 5 June 2007 ["***Soufraki***"], ¶ 86).  *See also*, Reply Ann., ¶¶ 38-39, 42 (relying on **RL-0133**, *Enron Creditors Recovery Corp. and Ponderosa Assets, L.P. v. The Argentine Republic*, ICSID Case No. ARB/01/3, Decision on the Application for Annulment, 30 July 2010 ["***Enron***"], ¶ 67; **RL-0122**, *Sempra Energy International v. Argentine Republic*, ICSID Case No. ARB/02/16, Decision on the Application for Annulment, 29 June 2010 ["***Sempra***"], ¶¶ 164-165; **RL-0167**, *Occidental*, ¶ 56).

[59] Mem. Ann., ¶ 57 (relying on **RL-0084/RL-0121**, *Soufraki*, ¶ 86).

[60] Reply Ann., ¶ 171.  *See also*, Tr. Ann., Day 1 (ENG), 11:12-18 (Ms. Garrido).

[61] Mem. Ann., ¶¶ 63-64 (relying on **RL-0133**, *Enron*, ¶ 377).

[62] Mem. Ann., ¶ 58.  *See also, id.*, ¶ 61; Reply Ann., ¶ 35 (relying on **RL-0183**, *Klöckner*, ¶ 79).

[63] Mem. Ann., ¶ 58 (relying on **RL-0132**, *Iberdrola*, ¶ 97).

[64] Mem. Ann., § IV(A)(2), (2.1) to (2.4).

23

86.    Spain's Reply on Annulment follows these themes (although not in the same order), as does Spain's oral submission at the Hearing on Annulment.  Spain's rebuttal arguments and critique to the Award concerning the intra-EU jurisdictional objection are summarized in the fifth section of its Memorial on Annulment ("*The OperaFund Decision fails when analyzing the lack of jurisdiction*") (Section IV.A.(2)(2.5)) and mostly throughout its Reply on Annulment and in the Hearing on Annulment.

87.    The Committee will proceed to summarize Spain's positive arguments first, followed by its rebuttal arguments beginning with the paragraphs immediately below that address several overarching points and issues.

88.    According to Spain, the dispute in the underlying arbitration was an intra-EU dispute because OperaFund is incorporated in Malta, which, like Spain, is an EU Member State.[65]  Thus, for Spain, the dispute "*concerns relations purely within the EU, at least as regards the Claimant OperaFund* [...]*, based in Malta* [...]."[66]  Recognizing, however, that this proceeding involves a joint claim on the part of a Maltese company in addition to a Swiss company, Spain remarked at the Hearing on Annulment that it was "*not against the Arbitral Tribunal hearing the Swiss case, but not Malta. So it would be a partial hearing of the case.*"[67]

89.    In Spain's submission, the Tribunal manifestly exceeded its powers "*in declaring its jurisdiction over an intra-EU dispute*" while committing "*numerous and serious errors* [...] *concern*[ing] *the determination and interpretation of jurisdiction and applicable law* [...]."[68]  For Spain, the Award addressed its intra-EU jurisdictional objection in an

---

[65] Reply Ann., ¶ 51.

[66] Mem. Ann., ¶ 81.  *See also*, Mem. Ann., ¶ 124 (stating that "[t]*he dispute in question concerns purely intra-EU relations and does not affect any third country or its investors*"); and Tr. Ann., Day 1 (ENG), 12:6-7 (Ms. Garrido) (arguing that the dispute at issue here is "*pure and absolutely European*," and adding that OperaFund is incorporated in an EU Member State).

[67] Tr. Ann., Day 1 (ENG), 131:22-132:24 (Ms. Garrido).  Spain did add, however, that the fact that case combined a joint claim by an intra-EU investor and a non-EU investor did not mean that the Tribunal could abrogate itself competence to hear the intra-EU dispute.  Tr. Ann., Day 1 (ENG), 147:21-25 (Ms. Garrido).

[68] Reply Ann., ¶ 65.  *See also,* Tr. Ann., Day 1 (ENG), 12:1-4 (Ms. Garrido).

"*incorrect way;*"[69] and the "*Tribunal should have declared its lack of jurisdiction and by not doing so it incurred a manifest excess in the exercise of its powers.*"[70]

90.  Spain observes that underlying this ground for annulment is its "*understanding that EU law* [was] *applicable to the dispute*" and that "*the elements of the dispute must necessarily include the delimitation of the Arbitral Tribunal's jurisdiction.*"[71]

91.  Spain denies that this ground amounts to an appeal, and submits that it only asks this Committee to find that the "*Tribunal declared its jurisdiction beyond what it was entitled to under the applicable rules.*"[72]  That said, Spain requests that the Committee undertake its analysis "*with open eyes*" and that it reaches its "*own conclusions in an independent manner,*"[73] keeping in mind the opinion of the EC and the Court of Justice of the European Union ("**CJEU**").[74]

92.  Spain also submits that OperaFund and Schwab's attempt to oppose the annulment by reference to other arbitral decisions that have rejected the intra-EU objection must fail, because those other decisions "*cannot alter the terms on which a Treaty attributes jurisdiction to an Arbitral Tribunal.*"[75]  In any event, Spain highlights that its position is supported by the dissenting opinion of Professor Marcelo G. Kohen in *Adamakopoulos*,[76] and invites this *ad hoc* Committee to have "*the courage* […] *to critically analyse whether the arbitration system under the ICSID Convention and the ECT is really intended to resolve purely internal EU disputes.*"[77]

---

[69] Mem. Ann., ¶ 71.

[70] Mem. Ann., ¶ 130.

[71] Reply Ann., ¶ 52.

[72] Reply Ann., ¶ 49.

[73] Tr. Ann., Day 1 (ENG), 7:16-20 (Ms. Garrido).

[74] Tr. Ann., Day 1 (ENG), 7:21-25 (Ms. Garrido).

[75] Reply Ann., ¶¶ 84-85.

[76] Reply Ann., ¶ 86 (referring to **RL-0243**, *Theodoros Adamakopoulos and Others v. Republic of Cyprus*, ICSID Case No. ARB/15/49, Decision on Jurisdiction, Statement of Dissent of Professor Marcelo G. Kohen, 7 February 2020).

[77] Reply Ann., ¶ 88.

(a)    *The ECT Does not Apply to Intra-EU disputes*

93.    Spain submits that the "*the proper application of customary rules of International Law*" on treaty interpretation mandates the conclusion that the ECT (including its Article 26) does not apply intra-EU,[78] and asserts that the Tribunal failed to "*carr*[y] *out an analysis of all of the rules of interpretation provided for in Article 31 of the Vienna Convention on the* [Law] *of Treaties.*"[79]

94.    For Spain, a "*literal, historical and teleological*" interpretation of the ECT shows that it was not conceived for intra-EU arbitration.[80]  This interpretation of Article 26 of the ECT is the only one that harmonizes the ECT with EU law, and "*is also consistent with Articles 30 and 59 of the VCLT.*"[81]

95.    Spain argues that: (i) the text of Article 26 of the ECT excludes intra-EU disputes because it requires a dispute between a "*Contracting Party*" and an "*investor of another Contracting Party,*" and such diversity is not present in an intra-EU scenario;[82] (ii) the ECT specifically recognizes the EU as a Regional Economic Integration Organization ("**REIO**");[83] and (iii) the object and purpose of the ECT show that EU Member States neither wanted, and could not in any event, consent to intra-EU arbitration because "*the ECT shows that it was driven, precisely by the EU, to promote energy development in the former Soviet republics, not among EU Member States,*" and the EU Member States had "*ceded sovereign competences in the internal market* […] *and in the judicial system when they acceded to the* [EU]."[84]  Thus, neither the EU Member States, nor the EU "*were able to assume rights or obligations contrary to EU law when signing the ECT.*"[85]

---

[78] Mem. Ann., ¶¶ 75, 83; Tr. Ann., Day 1 (ENG), 13:9-12 (Ms. Garrido).

[79] Mem. Ann., ¶¶ 75, 120.  *See infra*, ¶¶ 107 *et seq*.

[80] Mem. Ann., ¶ 87.

[81] Reply Ann., ¶ 62.

[82] Reply Ann., ¶ 53.  *See also*, Tr. Ann., Day 1 (ENG), 15:8-15 (Ms. Garrido).

[83] Tr. Ann., Day 1 (ENG), 14:19-22 (Ms. Garrido).

[84] Reply Ann., ¶¶ 55-57.  *See also*, Tr. Ann., Day 1 (ENG), 14:4-18 (Ms. Garrido).

[85] Reply Ann., ¶ 57.

(b)   *EU Law and Its Primacy*

96.    Spain contends that "*EU Law applies in the territory of the Union, in each Member State*" and that "[i]*n the event of a conflict between the rules of a Member State and European Union law, the **principle of primacy** gives preference to EU law*."[86]  For Spain, it appears that while "*EU law applies in the territory of the Union*," because the EU Member States bind themselves via international treaties, the rules contained in those treaties are subject to the principle of primacy: "[i]*n what matters here, the **principle of primacy** of EU law also applies to the rules that Member States endow themselves through international agreements or treaties, that is, it applies in the context of Public International Law*."[87]

97.    Spain asserts that the CJEU has exclusive jurisdiction to determine the scope and content of EU law.[88]   According to Spain, this exclusivity seeks to guarantee the uniform interpretation of EU law, and it falls from two provisions of the Treaty on the Functioning of the European Union ("**TFEU**"): (i) Article 267, which authorizes the highest court of a EU Member State to submit preliminary questions on EU law to the CJEU, with such rulings being binding on the courts of that Member State;[89] and (ii) Article 344 of the TFEU which "*prohibits Member States from submitting a dispute that affects the interpretation or application of the EU Treaties to a method of dispute resolution other than their national courts.*"[90]  Therefore, Spain says, EU Member States cannot submit to arbitration "*disputes that may require arbitral tribunals to interpret or apply EU law.*"[91]

(c)   *The Achmea Judgment*

98.    For Spain, the *Achmea* Judgment confirms that the EU Treaties have always prohibited intra-EU arbitration in view of Articles 267 and 344 of the TFEU,[92] both in BITs and

---

[86] Mem. Ann., ¶ 91 (emphasis in original).

[87] Mem. Ann., ¶ 92 (emphasis in original).

[88] Mem. Ann., ¶ 93.

[89] Mem. Ann., ¶ 96.  *See also*, Reply Ann., ¶¶ 60-61.

[90] Mem. Ann., ¶ 97.  *See also,* Reply Ann., ¶¶ 60-61.

[91] Mem. Ann., ¶ 97.

[92] Mem. Ann., ¶¶ 90, 99.

multilateral treaties.[93]   The CJEU rulings are part of EU law, and as such, are also international law.[94]   In particular, Spain emphasizes that in the *Achmea* Judgment, the CJEU held that:

> "*Articles 267 and 344 TFEU must be interpreted as precluding a provision in an international agreement concluded between Member States, such as Article 8 of the Agreement on encouragement and reciprocal protection of investments between the Kingdom of the Netherlands and the Czech and Slovak Federative Republic, under which an investor from one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter Member State before an arbitral tribunal whose jurisdiction that Member State has undertaken to accept.*"[95]

99.    Spain submits that the CJEU reasoned that: (i) the EU Treaties had established a judicial system designed to guarantee a coherent and uniform interpretation of EU law; (ii) it was up to the local courts and the CJEU to guarantee the application of EU law in all EU Member States; (iii) the cornerstone of this judicial system was the preliminary ruling procedure contemplated in Article 267 of the TFEU which established a dialogue between the CJEU and EU Member States, and (iv) EU law was part of the legislation in force in each EU Member State and derived from an international agreement between the EU Member States.[96]

100.    Furthermore, Spain argues, the CJEU concluded that: (i) an arbitral tribunal was not part of the EU judicial system, nor could it submit a preliminary question to the CJEU; (ii) disputes "*regarding investment protection may affect the application or interpretation of EU Law and, therefore, should be subject to the EU judicial system;*" (iii) an arbitration clause deviates from the EU system and therefore provides "*no guarantee that disputes submitted to arbitration will be resolved in such a way as to ensure the full effectiveness of*

---

[93] Mem. Ann., ¶¶ 90.  Spain also adds that the CJEU has "*confirmed*" the *Achmea* Judgment reasoning "*under an international treaty to which the* [EU] *itself is a party.*"  Mem. Ann., ¶ 106 (citing **RL-0174**, CJEU, Opinion 1/17 of the Plenary Session, CETA, 30 April 2019).

[94] Mem. Ann., ¶ 90.

[95] Mem. Ann., ¶ 102 (quoting **RL-0104**, CJEU, Case C-284/16, *Slovak Republic/Achmea BV.*, Judgment, 6 March 2018 ["***Achmea* Judgment**"], ¶ 62).

[96] Mem. Ann., ¶ 103 (citing **RL-0104**, *Achmea* Judgment, ¶¶ 35-37, 41).

*EU Law*;" and (iv) pursuant to Article 8(7) of the BIT at issue in *Achmea*, the decision of that tribunal was final and judicial review by national courts could only be exercised "*to the extent permitted by national law*."[97]  According to Spain, the CJEU stressed that to be contrary to EU law "*it is not necessary that an arbitral tribunal actually applies and interprets EU law; it suffices that such a tribunal may do so*."[98]

101.    Spain submits that the *Achmea* Judgment is applicable both to intra-EU BITs and to multilateral treaties such as the ECT, and  contends that its position is supported by the EC and by the EU Member States Declarations of January 2019.[99]  While recognizing that these declarations were issued after the underlying arbitration proceeding had begun, Spain submits that they still constitute evidence of excess of jurisdiction, pursuant to Articles 31 and 33 of the VCLT.[100]  Further, Spain adds that other EU actors (such as the Advocate General) also support the view that the conclusions in the *Achmea* Judgment also apply to ECT cases.[101]

102.    More particularly, Spain submits that the *Achmea* Judgment applies to the present case because: (i) this case involves the application of EU law; and (ii) the Award cannot be reviewed by the EU judicial system.[102]  This is so because: (i) pursuant to Article 42 of the ICSID Convention, ICSID tribunals "*are called upon to resolve the dispute by applying the rules agreed by the parties*;"[103]  (ii) Article 26(6) of the ECT requires that the dispute be resolved "*in accordance with the ECT and the applicable rules and principles of*

---

[97] Mem. Ann., ¶ 104 (citing **RL-0104**, *Achmea* Judgment, ¶¶ 45, 48, 51, 55, 56).

[98] Tr. Ann., Day 1 (ENG), 19:19-21 (Ms. Garrido).

[99] Mem. Ann., ¶¶ 90, 111-113 (citing **RL-0172**, EC Communication to the European Parliament and Council on the Protection of Intra-EU Investment, COM (2018) 547/2, 19 July 2018; and **RL-0114**, Declaration of Representatives of the Member States on the Legal Consequences of the Judgment of the Court of Justice in the Achmea Case and on the Protection of Investments in the European Union, 15 January 2019).  *See also*, Tr. Ann., Day 1 (ENG), 21:5-17 (Ms. Garrido).

[100] Mem. Ann., ¶ 113.  *See also*, Reply Ann., ¶ 130.

[101] Reply Ann., ¶¶ 120-127 (citing **RL-0248**, Opinion of Advocate General Henrik Saugmandsgaard Øe, Joined Cases C-798/18 and C-799/18, 29 October 2020; and **RL-0251**, Opinion of Advocate General Mr. Maciej Szpunar, Case C-741/19, *Republic of Moldova v. Komstroy Company*, 3 March 2021).

[102] Mem. Ann., ¶ 107.  *See also*, Reply Ann., ¶¶ 115-117; Tr. Ann., Day 1 (ENG), 19:6–20:10 (Ms. Garrido).

[103] Mem. Ann., ¶ 109.

*International Law*;"[104] and (iii) EU law is international law.[105]  Moreover, the present dispute involves a basic institution of EU law (State Aid) and as such involves the application of EU law.[106]  Thus, Spain argues, EU law was applicable law to the dispute in the underlying arbitration.[107]

(d)    *EU Law and the ECT*

103.   Spain's fundamental position is that Article 26 of the ECT does not apply intra-EU, but even if it did (*quod non*), intra-EU application would violate the EU Treaties and the conflict should be resolved in favor of EU law.[108]  Thus, for Spain, a conflict between the ECT and EU law must be resolved in accordance with the principle of primacy of EU law, which is a "*special conflict rule*" agreed upon among EU Member States.[109]  For Spain, "[t]*he principle of the primacy of EU law applies equally to domestic law and international treaties within the EU, even when third countries are also parties to those treaties.*"[110]  Spain also argues that under Article 351 of the TFEU any international agreement contrary to EU law is inapplicable to EU Member States.[111]

104.   Spain further explains that the principle of primacy "*also applies to the rules that Member States endow themselves through international agreements or treaties, that is, it applies in the context of Public International Law.*"[112]

105.   Spain thus concludes that, because EU law is part of international law and is binding on all EU Member States, the inapplicability of Article 26 of the ECT as a matter of EU law

---

[104] Mem. Ann., ¶ 109.

[105] Mem. Ann., ¶ 110.  *See also*, Tr. Ann., Day 1 (ENG), 19:6-21 (Ms. Garrido).

[106] Reply Ann., ¶ 116.

[107] Mem. Ann., ¶ 110. For Spain, the Tribunal's conclusion to the contrary constituted an "*improper determination of the applicable law*," which must be corrected by the *ad hoc* Committee. *Id*.

[108] Tr. Ann., Day 1 (ENG), 13:9-16 (Ms. Garrido).

[109] Mem. Ann., ¶ 80.

[110] Mem. Ann., ¶ 80.

[111] Reply Ann., ¶ 58.

[112] Mem. Ann., ¶ 92.

means that neither Spain, nor the investors' home State "*at least as far as Malta is concerned*" made a valid offer of arbitration to investors from other EU Member States.[113]

        (e)   *Spain's Rebuttal Arguments: The OperaFund Award Fails When Analyzing the Lack of Jurisdiction*

106.    As noted above, Spain's rebuttal arguments and critique concerning the Tribunal's findings on the intra-EU jurisdictional objection begin in the fifth section (Section IV.A.(2)(2.5)) of its Memorial on Annulment ("*The OperaFund Decision fails when analyzing the lack of jurisdiction*") and more thoroughly throughout its Reply on Annulment, as well as in its oral submissions at the Hearing on Annulment. A careful review of Spain's pleadings reveals that Spain centers its critique of the Award on the following arguments: (i) the Tribunal's failure to apply rules of treaty interpretation; (ii) the Tribunal's dismissal of the *Achmea* Judgment and EU law; (iii) the Tribunal's failure to apply the principle of primacy of EU law; and (iv) the manifest nature of the Tribunal's excess of powers. Spain's arguments are summarized in the following paragraphs.

        (1)   The Tribunal's Failure to Apply Rules of Treaty Interpretation

107.    In Spain's submission, the Tribunal failed to carry out an analysis pursuant to "*all the rules*" of interpretation provided for in Article 31 of the VCLT, and instead, asserted:

> "[…] *there is no need to 'reinvent the wheel' and start a new examination of all the details regarding the intra-EU objection. The Tribunal agrees with all the recent conclusions of other tribunals to the effect that, also after the Achmea Judgment of the Court of Justice of the EU, the intra-EU objection is not justified, and the Tribunal has indeed jurisdiction in the present case*. […]"[114]

108.    For Spain, the above statement is enough to annul the Award, as it is unacceptable for a Tribunal resolve such a significant objection "*without a detailed and brief analysis of the peculiarities of this issue*."[115]

---

[113] Mem. Ann., ¶¶ 78, 88.

[114] Mem. Ann., ¶ 75 (quoting from **RL-0118**, Award, ¶ 380).

[115] Mem. Ann., ¶ 76.

109. Spain submits that the Tribunal only focused on the absence of an explicit disconnection clause, failing to recognize that the reference to REIO in Articles 1(3) and 1(10) of the ECT renders such a disconnection clause superfluous.[116]   The REIO clause "*implies*" that international obligations are only created *vis-à-vis* third countries.[117]   Moreover, Spain says, the Tribunal also failed to recognize "*the lack of jurisdiction of the EU Member States to enter into obligations between themselves as a result of the transfer of competences to the EU*, […] *acknowledged in Article 1(3) of the ECT*."[118]

110. Furthermore, Spain asserts that the Tribunal also failed to take into account the context and purpose of the ECT, in particular, that the EU and its Member States had acted as a single unit when negotiating the ECT.[119]   International treaties are to be interpreted in good faith, and taking into account their historical context – which in the case of the ECT reveals that at the time of signing the ECT the EU Member States "*had no intention of binding each other*" and "*reveals the existence of*" an "*implicit*" disconnection clause in the ECT, made "*more notorious*" after the signing of the Lisbon Treaty.[120]   In Spain's view, the Award "*hardly provided an answer*" with respect to the arguments relating to the ECT's object and purpose.[121]

111. According to Spain, the Tribunal's conclusion that the lack of a disconnection clause shows no real intention to exclude intra-EU disputes from the ECT is "*wrong and false*."[122]   It "*was based on an erroneous premise*" as it was limited to the text of the ECT and the conclusions in *Vattenfall*, without referring to EU law.[123]   Moreover, Spain says, because OperaFund and Schwab have not refuted the arguments on the existence of an "*implied*"

---

[116] Tr. Ann., Day 1 (ENG), 15:16–16:19 (Ms. Garrido).

[117] Tr. Ann., Day 1 (ENG), 16:15-17 (Ms. Garrido).

[118] Mem. Ann., ¶ 77.

[119] Tr. Ann., Day 1 (ENG), 17:1-5 (Ms. Garrido).

[120] Mem. Ann., ¶ 121.

[121] Reply Ann., ¶ 72.

[122] Tr. Ann., Day 1 (ENG), 21:18-22 (Ms. Garrido).

[123] Reply Ann., ¶ 73. *See also*, Mem. Ann., ¶ 119.

disconnection clause in the ECT, there is a "*tacit admission*" of this ground for annulment.[124]

112.    Furthermore, for Spain, the Award's conclusion that the text of the ECT did not establish a differentiated treatment for the EU Member States failed to recognize that such distinction followed both from (i) the EU treaties (which prevail over the ECT under the principle of primacy); and from (ii) the literal application of the ECT, "*if the reference to the 'Regional Economic Integration Organisation'(REIO) is taken into account.*"[125]

113.    According to Spain, on a literal interpretation, when two disputing parties belong to the same REIO, it cannot be said that the dispute involves a State and an investor of "*another Contracting Party.*"[126]    Furthermore, Spain states that it argued in the arbitration that Article 36(7) of the ECT granted the EU a "*special status*" as an REIO, allowing it to act as a "*single bloc*," and that Article 1(3) and the EU Declaration pursuant to Article 26(3)(b)(iii) of the ECT, recognized the EU power to make decisions binding on EU Member States, thereby demonstrating that the ECT was not intended to regulate intra-EU relations.[127]

114.    Spain refutes OperaFund and Schwab's contention that Spain's interpretation of Article 26 of the ECT in accordance with its text, object and purpose (i) introduces new arguments and (ii) reargues points raised in the arbitration.[128]    For Spain, OperaFund and Schwab do not even identify the alleged "*new*" arguments introduced in the annulment phase.[129] Spain submits that in the arbitration it argued that the literal, historical and teleological interpretation of the ECT supports the conclusion that it does not apply to intra-EU arbitration, and that the same reasoning was reiterated in the Memorial on Annulment.[130]

---

[124] Reply Ann., ¶ 106.
[125] Mem. Ann., ¶ 118.
[126] Reply Ann., ¶ 135.
[127] Reply Ann., ¶¶ 134, 137.
[128] Reply Ann., ¶ 133.
[129] Reply Ann., ¶ 158.
[130] Reply Ann., ¶ 134.  *See also*, *id*., ¶ 143.

115.    Instead of addressing these arguments, Spain says, OperaFund and Schwab limit their contentions to giving prevalence to the contents of the Award.[131]  But the Award, Spain says, "*barely addresses*" the issue; and it fails to analyze the ECT according to its text, object and purpose.[132]  Instead, Spain says, the Award simply ignores that "*EU Member States were neither able nor willing to submit intra-EU disputes to arbitration through the ECT.*"[133]

116.    Spain observes that, to the extent OperaFund and Schwab's grievance related to "*new*" arguments concerns the references to the 2018 EC communication,[134] or to the 2019 EU Member States Declarations,[135] the 2018 EC Communication says nothing different from one issued in 2015, and the 2019 declarations are simply one element to allow the Committee to determine the "*authentic interpretation*" of Article 26 of the ECT pursuant to Article 31 of the VCLT.[136]

> (2)    The Tribunal's Dismissal of the *Achmea* Judgment and EU Law

117.    Spain submits that the Tribunal "*totally ignore*[d]" the conclusions of the *Achmea* Judgment without providing any reasoning of its own; rather, the Award made general references to other arbitral decisions, which "*reveals the excess of jurisdiction*" as the Tribunal upheld "*jurisdiction without a specific analysis of such a fundamental issue.*"[137]

118.    According to Spain, the Tribunal dismissed the intra-EU objection on the grounds that: (i) the *Achmea* Judgment did not apply to this case which was based on the ECT (and not on an intra-EU BIT); and (ii) the underlying arbitration in *Achmea* was not comparable to the arbitration here, with the latter being situated in a public international law context and not

---

[131] Reply Ann., ¶¶ 141-142, 150.

[132] Reply Ann., ¶¶ 151-152.

[133] Reply Ann., ¶¶ 153-154.

[134] **RL-0172**, EC Communication to the European Parliament and Council on the Protection of Intra-EU Investment, COM (2018) 547/2, 19 July 2018.

[135] **RL-0114**, Statement by the Representatives of the Member States on the Legal Consequences of the Judgment of the Court of Justice in the Achmea case and on the Protection of Investments in the European Union, 15 January 2019.

[136] Reply Ann., ¶ 159 (referring to **R-0245**, European Commission, Press Release, "*Commission asks Member States to terminate their intra-EU bilateral investment treaties,*" 18 June 2015).

[137] Mem. Ann., ¶ 129.

in the national or regional context.[138]  In Spain's view, the Tribunal focused the distinctions on the fact that the *Achmea* tribunal had to take into account the German Procedural Code as applicable regulations, and on the place of arbitration (noting that the OperaFund case was "*based*" in Washington DC).[139]

119.    Spain contends that neither of these elements was relevant to the applicable analysis: what was relevant to the *Achmea* analysis, Spain asserts, was (i) whether the Tribunal was required to interpret EU law – which was the case here as "*the tribunal had to analyse the norms on State Aid and, specifically, Articles 107 and 108 TFEU*;"[140] and (ii) whether the arbitral decision could be reviewed by the CJEU – a review not possible in the case at hand "*as the arbitral tribunals are unable to raise any question for a preliminary ruling*."[141] Spain contends that the Tribunal further ignored that the dividing line between the national/regional context and the public international law context was "*extremely thin*" and that the "*former should […] be considered to be included in the latter*."[142]

120.    Spain further adds that the Tribunal also misinterpreted Article 344 of the TFEU as encompassing only disputes between two or more EU Member States, an error demonstrated by the *Achmea* Judgment in which the CJEU applied this provision in the context of an arbitration initiated by an investor against a State.[143]

121.    According to Spain, OperaFund and Schwab's efforts to deny the relevance of the *Achmea* Judgment are "*vain*."[144]  For Spain, the application of the *Achmea* Judgment to ECT cases is "*unquestionable*," and the issue is of great relevance here, as the Tribunal focused almost exclusively on this point to dismiss the application of the *Achmea* Judgment to the case.[145] Spain argues that, contrary to OperaFund and Schwab's contentions: (i) the *Achmea* Judgment is based on general principles (in particular on Article 267 and 344 of the TFEU),

---

[138] Mem. Ann., ¶ 117 (citing **RL-0118**, Award, ¶¶ 381, 384); Reply Ann., ¶ 66.

[139] Mem. Ann., ¶ 125.

[140] Mem. Ann., ¶ 126.

[141] Mem. Ann., ¶ 128.  *See also,* Tr. Ann., Day 1 (ENG), 20:16–21:9 (Ms. Garrido).

[142] Reply Ann., ¶ 66.

[143] Reply Ann., ¶ 70.

[144] Reply Ann., § IV(A)(2)(2.3)(d).

[145] Reply Ann., ¶¶ 107, 112, 114.

not on the specific terms of the underlying BIT; and (ii) the multilateral nature of the ECT does not alter the analysis.[146]

122.    Contrary to OperaFund and Schwab's suggestion, Spain denies that its position is that the "*OperaFund* [Tribunal] *lacked jurisdiction as of Achmea.*"[147]   Spain argues that its position has been that the Tribunal always lacked jurisdiction over intra-EU disputes, and does not contend that the arbitration agreement was "*retroactively*" rendered ineffective by the *Achmea* Judgment.[148]   Instead, in Spain's view, it has long been held by the CJEU that judgments resolving "*preliminary rulings*" apply to facts taking place prior to the judgment; and in any event, the *Achmea* Judgment does nothing new.[149]

123.    Spain also submits that the Award concludes more generally and without any reasoning that EU law is irrelevant to the determination of jurisdiction, holding that "*it is clear that EU law does not prevail over any of the provisions of the ECT relevant to the present arbitration*;"[150] as if having rejected the applicability of the *Achmea* Judgment relieved the Tribunal from analyzing other questions regarding the applicability of EU law to this proceeding.[151]   Furthermore, Spain says, the Tribunal further erred in its analysis of Article 16(2) of the ECT to conclude that EU law "*does not form part of the substantive law applicable to this case*."[152]

124.    In this regard, Spain takes issue with OperaFund and Schwab's contention that EU law is irrelevant to jurisdiction, and that the principle of primacy of EU law is not binding on an ECT tribunal.   According to Spain, despite OperaFund and Schwab's allegations that these conclusions are correct and supported by the reasoning in the Award (paragraphs 381-383),

---

[146] Reply Ann., ¶ 113.  *See also,* Spain's arguments summarized *supra*, ¶¶ 101-102.
[147] Reply Ann., ¶ 108.
[148] Reply Ann., ¶ 108.
[149] Reply Ann., ¶ 111.
[150] Reply Ann., ¶ 68 (citing **RL-0118**, Award, ¶ 327).
[151] Reply Ann., ¶ 68.
[152] Reply Ann., ¶ 68 (citing **RL-0118**, Award, ¶ 330).

in fact, the Tribunal declined to apply EU law to the jurisdictional issues without offering any reasoning.[153]

125.    Thus, Spain contends that in the Award, the Tribunal both (i) erred in its determination of jurisdiction "*by disregarding in absolute terms the relevance and applicability of* [EU] *law*;"[154] and (ii) made an "*erroneous and biased*" interpretation of EU law that led it to uphold jurisdiction.[155]  According to Spain, the Tribunal:

> "[…] *manifestly exceeded its powers because it did not apply EU law (which led, in turn, to erroneously assert its jurisdiction) and in the very few partial and tangential mentions it made of EU law, it made ostentatious errors whose seriousness should be grounds for annulment because they affect a vital element of the arbitration system, namely the jurisdiction of the Tribunal.*"[156]

126.    Spain submits that the applicable law to this case is determined by application of Article 26(6) of the ECT, which provides that the Tribunal "*shall decide **the issues in dispute** in accordance with this Treaty and applicable rules and principles of international law*;" thereby referring to "*questions of jurisdiction, merits and quantum.*"[157]  Therefore, Spain says, given that jurisdiction was an "*issue in dispute*," it should have been resolved pursuant to Article 26(6) of the ECT.[158]  Moreover, Spain argues, the applicable law provision in Article 26(6) refers not only to the ECT, but also to "*applicable rules and principles of international law*," and EU law is international law.[159]

                    (3)    The Tribunal's Failure to Apply the Principle of Primacy of EU Law

127.    For Spain, even if Article 26 of the ECT could be interpreted as encompassing intra-EU disputes (*quod non*), there would then be a conflict with EU law, and such conflict must be

---

[153] Reply Ann., ¶¶ 78-79.
[154] Reply Ann., ¶ 66.
[155] Mem. Ann., ¶ 117.
[156] Reply Ann., ¶ 74.
[157] Reply Ann., ¶¶ 80-81 (emphasis in original).
[158] Reply Ann., ¶ 81.
[159] Reply Ann., ¶ 82.

resolved in favor of EU law.[160]   According to Spain, this "*conflict is not addressed at all in the Award*."[161]

128.    Spain submits that the principles of "*mutual trust*," "*autonomy and uniform application of EU Law*" guaranteed by the powers conferred to the CJEU are violated if intra-EU arbitration is allowed.[162]   This conflict between intra-EU arbitration and EU law is recognized by the CJEU, the EC and the "*Member States of the* [EU] *involved in the underlying dispute*."[163]

129.    According to Spain, the Award also errs when it relies on Article 16 of the ECT to dismiss the proposition that EU law prevails in case of conflict.[164]   Spain denies that the conflict between the ECT and EU law should be resolved by application of Article 16 of the ECT, arguing that this provision does not establish a conflict resolution rule.[165]   For Spain, the Tribunal "*contradicted itself in a flagrant way*" in its analysis under Article 16 of the ECT, the right understanding of which would have led to the conclusion that the Tribunal lacked jurisdiction.[166]

130.    Spain submits that the Tribunal ignored that EU Member States have endorsed a "*specific conflict rule*" that prevails in intra-EU relations, namely, the principle of primacy of EU law;[167] which confirms that the Tribunal "*did not show interest in even studying the grounds of EU Law*."[168]   For Spain, the principle of primacy compels the conclusion that EU law prevails "*over other international obligations of Member States to each other*," and "*applies equally to domestic law and international treaties within the EU, even when*

---

[160] Mem. Ann., ¶¶ 78, 88; Tr. Ann., Day 1 (ENG), 13:12-16, 17:18-21 (Ms. Garrido).

[161] Mem. Ann., ¶ 82.

[162] Mem. Ann., ¶¶ 79, 89.

[163] Reply Ann., ¶ 59 (referring *inter alia* to **RL-0172**, EC Communication to the European Parliament and Council on the Protection of Intra-EU investment, COM (2018) 547/2, 19 July 2018; **RL-0114**, Statement by the Representatives of the Member States on the Legal Consequences of the Judgment of the Court of Justice in the Achmea Case and on the Protection of Investments in the European Union, 15 January 2019; and various judgments of the CJEU at **RL-0104**, **RL-0106** to **RL-0108** and **RL-0174**).

[164] *See* Mem. Ann., ¶ 119.

[165] Reply Ann., ¶ 92.

[166] Tr. Ann., Day 1 (ENG), 22:12-20 (Ms. Garrido).

[167] Mem. Ann., ¶¶ 122, 123.  *See also*, Reply Ann., ¶ 69.

[168] Mem. Ann., ¶ 122.

*third countries are also parties to those treaties*."[169]  As a result, "*Article 26 of the ECT cannot be applied in intra-community relations*."[170]

131.  According to Spain, contrary to OperaFund and Schwab's contention, the "*Tribunal does not expressly and directly address the applicability, meaning and relevance of the principle of primacy* […] *much less does it refer* […] *to the evidence provided*" by Spain.[171]

132.  Spain insists that any international agreement entered into by a EU Member State must be interpreted in accordance with the EU Treaties (including Article 267 and 344 of the TFEU), and if such harmonious interpretation is not possible, the international agreement must be disapplied.[172]  For Spain, both Article 267 and Article 344 of the TFEU demonstrate the conflict between intra-EU arbitration and EU law.[173]  Thus, if Article 26(3) of the ECT is interpreted as encompassing intra-EU arbitration, it would conflict with EU law, and such conflict must be resolved in favor of EU law, in accordance with the principle of primacy of EU law.[174]  In the alternative, Spain says, if the conflict is to be resolved under the principles of Article 30 of the VCLT, EU law would also prevail as *lex posterior* as the principle of primacy of EU law was codified in 2007 in Declaration 17 to the Lisbon Treaty.[175]

> (4)  The Manifest Nature of the Tribunal's Excess of Powers

133.  Finally, Spain argues that the Tribunal's excess of powers is "*manifest*," for at least the following reasons: (i) the Tribunal could have observed that it was faced with an intra-EU dispute since the Request for Arbitration, which was a "*notorious*" fact;[176] (ii) Spain invoked the intra-EU objection since the onset of the original arbitration, and therefore, the

---

[169] Mem. Ann., ¶ 123.
[170] Mem. Ann., ¶ 124.
[171] Reply Ann., ¶ 90.
[172] Reply Ann., ¶ 92.
[173] Reply Ann., ¶¶ 97-105.
[174] Reply Ann., ¶ 92.
[175] Reply Ann., ¶ 92.
[176] Reply Ann., ¶ 161.

matter was contested since the start and intensely disputed by the Parties;[177] and (iii) the EC, which is the "*highest guarantor of the application of the EU Treaties*" also questions the Tribunal's jurisdiction.[178]

134.    Towards the end of its Reply on Annulment, Spain summarizes the specific ways in which it alleges that the Tribunal "*manifestly exceeded its jurisdiction*," arguing that the Tribunal did so:[179]

- "*by failing to clarify and reason why it did not apply EU law*;"

- "*by failing to give a literal interpretation of Article 26 of the ECT, in accordance with the object and purpose of the Treaty*;"

- "*by failing to give a systematic interpretation of Articles 1, 10, 16, 25, 26 and 36 of the ECT, in accordance with the object and purpose of the Treaty*;"

- "*by failing to assess, in view of the interpretation of the above Articles*;"

- "*by failing to apply the principles of the primacy and autonomy of EU law, the EU Treaties and the interpretation made of them by the CJEU, thereby ignoring […] that a clause such as […] Article 26 of the ECT cannot be applied to […] [EU] Member States […] in intra-EU disputes, as such an interpretation is contrary to EU law*;"

- "*[…] by rendering an Award whose award of compensation is contrary to European State Aid law*."

       (iii)  Manifest Excess of Powers by Failure to Apply the Applicable Law: EU Law

135.    Spain submits that EU law was the applicable law, the Tribunal failed to apply it, and as a result, it committed a manifest excess of powers.[180]

136.    More particularly, according to Spain, the Tribunal in the present case: (i) failed to apply EU law to Article 26 of the ECT, and therefore improperly found it had jurisdiction; (ii) based its decision on the merits on Article 10(1) of the ECT, but "*it did not apply the*

---

[177] Reply Ann., ¶ 162.

[178] Reply Ann., ¶ 163.

[179] Reply Ann., ¶ 155.

[180] Reply Ann., ¶ 181. *See also, id.*, ¶ 252; Tr. Ann., Day 1 (ENG), 23:5-6 (Ms. Garrido).

*international standard correctly;*"[181] and (iii) "*committed a manifest excess of powers by wil[l]fully refusing to apply and disregarding EU law on State Aid to a dispute over subsidies granted by a Member State to investors.*"[182]

137. At the Hearing on Annulment, Spain clarified that, while it was contesting jurisdiction only *vis-à-vis* the investor incorporated in Malta (an EU Member State), it was maintaining that "*EU law must be applied*" to the case.[183] Put another way, according to Spain, even for the Swiss investor, "*when solving the dispute,* [the Tribunal] *would have had to take into account the EU law on the merits, because of the application of Article 26(6).*"[184]

138. Spain recalls that annulment committees have concluded that there is an excess of powers when a "*tribunal manifestly fails to determine the applicable law;*"[185] or when the tribunal "*does not apply the appropriate law.*"[186] In its view, in this case the Tribunal did "*not correctly identify the law applicable to the dispute and when interpreting this law, it manifestly fail*[ed]" thereby incurring an "*excess of powers.*"[187]

139. Spain opposes OperaFund and Schwab's contention that the alleged excess of powers cannot be manifest because it is based on arguments and evidence not presented in the arbitration.[188] According to Spain, during the arbitration it invoked EU law (i) as the applicable law to the dispute and (ii) as determinative of the Tribunal's lack of jurisdiction.[189] Spain observes that the Award recorded Spain's allegation that:

> "*Since the Tribunal must resolve disputes in accordance with the ECT and other principles and rules of international law in accordance with Article 26 (6) of the ECT, the Tribunal must apply EU Law and the ECT under equal conditions. By virtue of the*

---

[181] Mem. Ann., ¶ 67. *See also*, Reply Ann., ¶ 165 (arguing that the Tribunal manifestly exceeded its powers "*by disregarding the applicable law when resolving […] that the jurisdiction of the Tribunal should be resolved in accordance with the ECT and not EU law.*")

[182] Reply Ann., ¶ 253.

[183] *See* Tr. Ann., Day 1 (ENG), 132:21-133:4 (Ms. Garrido).

[184] Tr. Ann., Day 1 (ENG), 149:3-8 (Ms. Garrido).

[185] Mem. Ann., ¶ 133.

[186] Reply Ann., ¶ 176.

[187] Mem. Ann., ¶ 145.

[188] Reply Ann., ¶ 166.

[189] Mem. Ann., ¶ 134. *See also*, Tr. Ann., Day 1 (ENG), 23:7-10 (Ms. Garrido).

> *principle of primacy, EU Law and not the ECT is the international law that must be applied to resolve this dispute.*"[190]

(a)   *EU Law is the Applicable Law*

140.   According to Spain, EU law was the applicable law not only for the question of jurisdiction, but also for the assessment of the facts and the merits of the case.[191]   Spain submits that EU law is international law, and the principle of primacy of EU law is a long-standing principle of EU law.[192]   Further, given its status in international law, and with reference to Article 38 of the Statute of the International Court of Justice ("**ICJ**"), Spain asserts that the Award "*failed to respect and properly apply any of the sources of international law to the dispute.*"[193]

141.   *First,* Spain argues that pursuant to the law of treaties, EU law (including the EU Treaties and the rules derived from them) is international law.[194]   Those EU Treaties have established the primacy of EU law; and the law of treaties allows treaties to establish primacy over others.[195]   Therefore, EU law was not only applicable international law, but also "*international law applicable to the dispute with primacy over the ECT.*"[196]   This is also supported by the principle of *lex posterior* in the VCLT (as the Lisbon Treaty is posterior to the ECT),[197] as well as by the terms of Article 26(6) of the ECT.[198]   This is so because Article 26(6) of the ECT provides that "[a] *tribunal established under paragraph (4) shall decide the issues in dispute in accordance with this Treaty and applicable rules and principles of international law,*" and the principles of autonomy and primacy of EU law are "*applicable rules and principles of international law.*"[199]

---

[190] Mem. Ann., ¶ 134 (quoting **RL-0118**, Award, ¶ 305).

[191] Reply Ann., ¶ 177.

[192] Reply Ann., ¶ 176.

[193] Reply Ann., ¶ 182.

[194] Reply Ann., ¶ 183.

[195] Reply Ann., ¶¶ 184-185.

[196] Reply Ann., ¶ 187.

[197] Reply Ann., ¶ 188.

[198] Reply Ann., ¶¶ 188-189.

[199] Reply Ann., ¶¶ 189-190.

142.    Spain takes the view that the question of the applicability of EU law under Article 26(6) of the ECT has been "*settled*" by the decision in *Eurus*, which in its view recognizes that EU law is international law and part of the applicable law under Article 26(6).[200]

143.    *Second*, Spain argues that bilateral and regional custom are also sources of international law pursuant to Article 38 of the ICJ Statute.[201]   Specifically, Spain contends that the autonomy and primacy of EU law are customary international law.[202]   According to Spain, it is an "*international custom*" that, in intra-EU matters, EU law applies with primacy over international treaties, even if such other treaties do not contain a disconnection clause.[203] Spain submits that this is a practice accepted by all EU Member States and also third States.[204]   It follows, Spain argues, that "*the EU can dissociate itself from international conventions and apply EU law with primacy to these conventions*," whether this conventions are "*past or future international conventions*."[205]   For Spain, "[d]*isconnection is inherent to the process of regional integration and does not require the acceptance* […] *of any member state or third state*," nor does it require another convention, community law or declaration.[206]   It results simply from "*the fact that the EU has a legal system in the area to which the convention refers*" which must be given priority.[207]

144.    *Third,* Spain submits that EU Member States committed to respecting the State Aid regime, which is part of the core of the EU;[208] suggesting that ignoring this regime amounts to a failure to apply "*General Principles of Law*."[209]

---

[200] Reply Ann., ¶ 168 (relying on **RL-0252**, *Eurus Energy Holdings Corporation v. Kingdom of Spain*, ICSID Case No. ARB/16/4, Decision on Jurisdiction and Liability, 17 March 2021 ["*Eurus*"], ¶¶ 232-236).  *See also*, Tr. Ann., Day 1 (ENG), 31:15-21 (Ms. Garrido) (referring also to **RL-0137/CL-0284**, *Baywa R.E. Renewable Energy GMBH and Other v. Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019 ["***Baywa***"]).

[201] Reply Ann., ¶¶ 199, 204.

[202] Reply Ann., ¶¶ 208, 213.

[203] Reply Ann., ¶¶ 209-210.  *See also*, *id*., ¶¶ 214-245.

[204] Reply Ann., ¶¶ 226, 233.

[205] Reply Ann., ¶ 246.

[206] Reply Ann., ¶¶ 247-248.

[207] Reply Ann., ¶ 247.

[208] Reply Ann., ¶ 250.

[209] Reply Ann., ¶ 250.

(b)    *The Tribunal Failed to Apply EU Law*

145.    Spain asserts that the Tribunal failed to apply EU law to the merits.[210]  According to Spain, the Tribunal concluded that there was a distinction between the applicable law to jurisdiction and to the substance, and held that "*all substantive provisions of the ECT remain fully applicable and EU Law is not part of the applicable substantive law in this case.*"[211]

146.    For Spain, this conclusion lacks "*justified and sufficient reasoning*;" is inconsistent with other arbitral decisions that have accepted that EU law is part of the applicable international law; and "*is manifestly wrong.*"[212]  The Award refuses to apply applicable law, "*does not give reasons,*" and is contradictory when it refuses to apply EU law considering it "*purely national law.*"[213]

147.    According to Spain, the Tribunal reached the conclusion that EU law was not applicable law on the basis of two "*false*" and "*wrong*" premises: (i) a "*narrow approach contained in the Vattenfall decision*" by tribunals who "*have opted for arguing that EU law is a special regime of international law*" that did not fit within the concept of "*applicable rules and principles of international law*" in Article 26(6) of the ECT; and (ii) the notion that Article 16 of the ECT was the only applicable conflict rule.[214]

148.    In response, Spain argues these are not a "*unanimous*" view, nor is it the one espoused by Spain, who considers that in the context of a multilateral treaty "*it is sufficient that the other treaty is binding on* [the] *disputing parties.*"[215]  According to Spain, pursuant to Article 26(6) of the ECT, EU law applies because it is a "*source of international law.*"[216] Under Article 38 of the ICJ Statute, EU law (the EU Treaties and derived rules) is treaty

---

[210] Reply Ann., ¶ 177.

[211] **RL-0118**, Award, ¶ 330; Mem. Ann., ¶ 135.

[212] Mem. Ann., ¶¶ 136-137.  *See also*, Reply Ann., ¶ 251.

[213] Reply Ann., ¶ 251.

[214] Tr. Ann., Day 1 (ENG), 23:12–24:10 (Ms. Garrido).

[215] Tr. Ann., Day 1 (ENG), 24:11-15 (Ms. Garrido).

[216] Tr. Ann., Day 1 (ENG), 28:6-7 (Ms. Garrido).

law;[217] the autonomy and primacy of EU law is "*international customary law;*"[218] and EU law qualifies even under "*general principles of law*," as the principle of *pacta sunt servanda* supports the view that State Aid law should have been applied.[219]

149.  Spain submits that the Tribunal contradicted itself because on the one hand it considered that there was an identity of subject matter between the EU Treaties and the ECT to apply Article 16(2) of the ECT as the conflict rule (Award, paragraph 328), while elsewhere it expressly stated that such identity of subject matter did not exist (Award, paragraph 383).[220]  Moreover, even if Article 16 of the ECT applied, the Tribunal erred by ignoring the final clause of the article; namely, "*where any such provision is  more favourable to the Investor or* [the] *Investment.*"[221]  According to Spain, a comparison between the ECT and the EU legal system shows that the latter is more favourable to the investment and the investor.[222]

150.  Furthermore, according to Spain, prior to concluding that EU law was inapplicable, the Tribunal was required (and failed) to examine why an "*integrated interpretation*" of the ECT in accordance with EU law was not possible.  Instead, Spain says, the Tribunal merely relied on the fact that the ECT was signed by the EU and the EU Member States to displace the applicability of EU law.[223]

151.  Spain further emphasizes that even with the dismissal of the intra-EU jurisdictional objection, EU law remained applicable to the merits, and in particular to the assessment of the investor's legitimate expectations in connection with the State Aid nature of the renewable energy incentives at issue and EU environmental law.[224]  Spain asserts that the Award failed to apply EU State Aid law to the analysis of the facts and to the merits, and

---

[217] Tr. Ann., Day 1 (ENG), 28:8-23 (Ms. Garrido).

[218] *See* Tr. Ann., Day 1 (ENG), 29:8-30:18 and 30:25-31:4 (Ms. Garrido)

[219] Tr. Ann., Day 1 (ENG), 30:14-18 and 31:5-14 (Ms. Garrido).

[220] Tr. Ann., Day 1 (ENG), 24:19-25:9 (Ms. Garrido).

[221] Tr. Ann., Day 1 (ENG), 25:10-26:4 (Ms. Garrido).

[222] Tr. Ann., Day 1 (ENG), 26:5-27:17 (Ms. Garrido).

[223] Reply Ann., ¶ 179.

[224] Reply Ann., ¶ 178; Tr. Ann., Day 1 (ENG), 32:11-23 (Ms. Garrido).

"*did so without even arguing properly why*."[225]  Instead, the Tribunal omitted the analysis of the State Aid rules and "*decisively and erroneously resolve*[d] *the issue*" on the basis that EU law was not part of the applicable substantive law.[226]

152.  Spain submits that the application of the entire EU legal framework on State Aid (which is also international law)[227] "*was* […] *mandatory*."[228]  For Spain (i) "*there is no distinction between the rules of EU Law and International Law, depending on whether or not they appear in the Constitutive Treaties of the European Union*;" and EU law is "*as a whole and in its entirety, International Law*;"[229] (ii) the Tribunal's reasoning "*disregard*[s] *that the primacy of EU Law extends to the rules of International Law*,"[230] which results from Article 351 of the TFEU;[231] and (iii) the Tribunal "*disregarded the fact that the rules on State Aid are included in the* [TFEU]*, specifically in its Articles 107 and 108*," that is, they derive from an international treaty and are therefore international law.[232]

153.  Furthermore, Spain contends that the application of EU law had "*fundamental consequences*" to the merits.[233]  In Spain's submission, "*if the State Aid regulations had been taken into consideration, the conclusions reached by the Tribunal would have been different*."[234]

154.  In short, Spain submits that under EU law, State Aid is in principle illegal unless expressly authorized, and therefore, absent such authorization, there is no right to State Aid.  As the Spanish subsidy scheme at issue in the underlying arbitration constituted State Aid, but was not notified to or authorized by the EC, it was "*illegal*" and there could be no

---

[225] Tr. Ann., Day 1 (ENG), 32:8-10, 32:23-33:1, 34:19-22, 35:23-36:3 (Ms. Garrido).

[226] Mem. Ann., ¶ 139.  *See also*, Reply Ann., ¶ 191.

[227] Tr. Ann., Day 1 (ENG), 36:4-8 (Ms. Garrido).

[228] Reply Ann., ¶ 191.

[229] Mem. Ann., ¶ 137.  *See also, id.*, ¶ 144.

[230] Mem. Ann., ¶ 138.  *See also, id.*, ¶ 144.

[231] Mem. Ann., ¶ 140.

[232] Mem. Ann., ¶ 139.  *See also, id.*, ¶ 144; Tr. Ann., Day 1 (ENG), 36:4-10 (Ms. Garrido).

[233] Tr. Ann., Day 1 (ENG), 32:13-14 (Ms. Garrido).

[234] Mem. Ann., ¶ 147.

expectation "*to consolidate a result that was not authorized by law at the time of the investment.*"[235]

155.    Spain relies on *Baywa* for the proposition that "[i]*n principle, an investor cannot have a legitimate expectation of treatment which is unlawful under the law of the host State, provided that the host State law itself is not inconsistent with the treaty under which the tribunal exercises its jurisdiction* [...]."[236]   Therefore, Spain says, "*if EU Law had been applied* [...] *the Tribunal* [...] *would have had to consider, among other questions (i) whether RD 661/2007 had been notified to the European Commission and (ii) what impact such lack of notification would have on the legitimate expectations of investors.*"[237]

156.    For Spain, the ECT cannot be interpreted in the sense that "*respect for European regulations as a whole (and in the matter of State Aid in particular)*" constitutes a violation of that treaty, because EU law is part of the applicable international law.[238]   And even if EU law were to be considered domestic law, no "*expectation of fair and equitable treatment*" could be based on a breach of the mandatory rules of State Aid law, as recognized by the EC State Aid Decision of 10 November 2017.[239]

157.    This issue is "*especially serious*," Spain argues, because the Tribunal had before it the EC's assessment to the effect that the measures at issue constituted State Aid, and that application of the ECT "*would create the risk of a substantive conflict*" between the ECT and EU law.[240]   The EC State Aid Decision was "*res judicata*" and was "*binding under the*

---

[235] Tr. Ann., Day 1 (ENG), 36:11-37:9 (Ms. Garrido).

[236] Mem. Ann., ¶ 148 (quoting **RL-0137/CL-0284**, *Baywa*, ¶ 569(a)).

[237] Mem. Ann., ¶ 149.

[238] Mem. Ann., ¶ 141.

[239] Tr. Ann., Day 1 (ENG), 34:23-35:8 (Ms. Garrido), referring to **RL-0080**, Decision C(2017) 7384 of the European Commission, regarding the Support for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste (S.A. 40348 (2015/NN), 10 November 2017 ["**EC State Aid Decision**"]).

[240] Mem. Ann., ¶ 143.

*ECT*,"[241] and the Tribunal ignored it.[242]  Indeed, the Tribunal failed to address both the EC's assessment and Spain's arguments.[243]

158.   Spain takes issue with OperaFund and Schwab's allegation that numerous other awards or decisions ruled in a similar fashion as the Award at issue here.[244]  Spain notes that other arbitral decisions are "*not binding*;" that there is no rule of temporal preference among arbitral awards; and that the cases relied upon "*lack similarity*" to the case at hand.[245]  In any event, Spain adds, in recent years a number of awards or decisions have partially or totally rejected claims against Spain.[246]  Spain therefore submits that should the Committee conclude that indeed there was "*an error in the determination of the applicable law*," the annulment should succeed.[247]

(iv)   <u>Manifest Excess of Powers by Misapplication of the Applicable Law</u>

159.   In the alternative, Spain submits that there was a "*gross misapplication of EU law*" which qualifies as a ground for annulment under Article 52(1)(b) of the ICSID Convention.[248]  Spain reiterates that the EU State Aid regime derives from the TFEU, and its character of "*international law*" is undisputable.[249]  Referring to Articles 107 and 108 of the TFEU, Spain contends that under EU law there is a general prohibition of State Aid, and that, while State Aid can be authorized, absent such express authorization State Aid is "*in principle, illegal*."[250]  It follows, Spain says, that it is not possible to claim the existence of a right to State Aid.[251]

---

[241] Tr. Ann., Day 1 (ENG), 34:11-16 (Ms. Garrido).

[242] Tr. Ann., Day 1 (ENG), 35:6-17 (Ms. Garrido).

[243] Mem. Ann., ¶ 146.

[244] Reply Ann., ¶ 173.

[245] Reply Ann., ¶¶ 171-172, 174.  *See also*, Tr. Ann., Day 1 (ENG), 11:7-8 (Ms. Garrido).

[246] Reply Ann., ¶ 173.

[247] Reply Ann., ¶ 173.

[248] Reply Ann., ¶ 254.

[249] Reply Ann., ¶¶ 255 and 263-265.

[250] Reply Ann., ¶ 266.

[251] Reply Ann., ¶ 267.

160.    Even though this issue was extensively debated in the arbitration, including by introducing the EC State Aid Decision, the Award failed to consider this matter.[252]  Instead, Spain says, the Award "*completely ignored the importance of the State Aid legal regime,*"[253] and failed to consider it in the analysis on legitimate expectations.[254]

161.    Spain argues that the subsidy regime that OperaFund and Schwab invoked in the arbitration was established under Directive 2001/77, and, in accordance with the State Aid guidelines and Article 4 of this Directive, those grants constituted State Aid that had to be communicated to and approved by the EC.[255]  According to Spain, it was a matter of record that the notification to the EC was not made.[256]  It follows, Spain says, that the regime in RD 661/2007 was illegal because it was not notified to the EC, and "*no one can expect to consolidate a result that was not authori*[z]*ed by law at the time of the investment*."[257]  Put another way, for Spain, "*legitimate expectations*" to that regime were "*excluded.*"[258]

162.    Spain contends that the EC State Aid Decision was part of EU law, and as such, constituted "*international law applicable*" between the investor's home-State and the host-State, and its conclusions were binding on the Tribunal.[259]  However, Spain claims, the Tribunal dismissed EU law in its entirety (including State Aid law) as "*highly irrelevant,*" and determined that this issue was a matter to be resolved internally between the EU and its Member States.[260]  Moreover, Spain asserts, the Tribunal did not consider any of the reasoning of the EC when deciding on the matter of legitimate expectations.[261]

---

[252] Reply Ann., ¶ 268.  *See also, id.*, ¶ 255 (referring to **RL-0080**, Decision C(2017) 7384 of the European Commission, regarding the Support for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste (S.A. 40348 (2015/NN), 10 November 2017).

[253] Reply Ann., ¶ 259.

[254] Reply Ann., ¶ 260.

[255] Reply Ann., ¶ 269.

[256] Reply Ann., ¶ 274.

[257] Reply Ann., ¶ 271.

[258] Reply Ann., ¶ 275.

[259] Reply Ann., ¶ 276.  *See also, id.*, ¶ 261.

[260] Reply Ann., ¶ 276.

[261] Reply Ann., ¶ 261.

163.    Furthermore, although Spain's main position is that EU law on State Aid was part of the applicable international law, it also argues that "*even if it were to be considered as a fact, the Award completely disregard*[ed] *the legality of the investment in accordance with the law applicable in Spain in order to assess legitimate expectations*" and failed to give any explanation in that regard.[262]  Put another way, "*even if EU law were to be considered as national law,*" the Tribunal could not "*consider alleged expectations of fair and equitable treatment* [...] *potentially based on a breach of applicable mandatory rules such as the State Aid rules.*"[263]

164.    In sum, according to Spain "*by manifestly misapplying EU law in both respects, the Tribunal has manifestly exceeded its powers for the purposes of Article 52(1)(b) of the ICSID Convention* [...]."[264]

165.    Spain denies OperaFund and Schwab's contention that it is contradictory to submit on the one hand that EU law has been disregarded, and on the other that it has been wrongly applied.  Spain submits that because EU law was applicable to "*multiple issues,*" on certain occasions it was "*completely ignored*" (*e.g.*, in the dismissal of the intra-EU objection); and on others it was "*not properly interpreted*" (*e.g.*, by failing to recognize the State Aid nature of the incentives at issue).[265]

166.    Spain further denies that in presenting its arguments on this ground it has reformulated its original case in the underlying arbitration, arguing that: (i) in its memorials it submitted that the EU State Aid regime was applicable, and introduced the EC State Aid Decision on the record; (ii) Spain emphatically invoked EU law as applicable to the dispute;[266] and (iii) since the start of the underlying arbitration, it submitted that the claim constituted a "*disguised attempt to obtain State Aid in a manner that does not comply with EU law.*"[267]

---

[262] Reply Ann., ¶ 278.
[263] Reply Ann., ¶ 261.
[264] Reply Ann., ¶ 279.
[265] Reply Ann., ¶ 178.
[266] Reply Ann., ¶¶ 255-256.
[267] Reply Ann., ¶ 258.

167.    Lastly, elsewhere in the pleadings, Spain also appears to criticize the Tribunal for "*not apply*[ing] *the international standard* [of Article 10(1) of the ECT] *correctly*," in that it recognized that the ECT did not preclude a sovereign State right to regulate, yet it penalized the exercise of such right.[268]

### b.    Opera Fund and Schwab's Position

168.    OperaFund and Schwab submit that there are no grounds to annul the Award on the basis of a manifest excess of powers.[269]  They argue that Spain has not met its burden to show that the Tribunal acted "*manifestly outside the scope of its mandate*" in the jurisdictional analysis and in its determination of the applicable law.[270]

169.    For OperaFund and Schwab, Spain's contentions on this ground are "*either (i) irrelevant because they were already presented during the Arbitration and soundly dismissed by the Tribunal; (ii) unrelated to the Tribunal's jurisdiction or to any failure to apply the law (i.e., the only proper grounds for annulment under Article 52(1)(b) of the ICSID Convention); or (iii) inadmissible at the annulment stage because Spain did not present them beforehand in the arbitration.*"[271]   In their view, the *ad hoc* Committee should only review the record before the Tribunal.[272]

170.    Addressing the hybrid nature of the facts here, which involve an EU investor and a non-EU investor, OperaFund and Schwab agree with Spain that the jurisdictional objection has only been raised with respect to the Maltese investor (not against the Swiss), but they submit that Spain has also claimed that EU law overrides all provisions of the ECT (including Article 26), and that proposition is "*wrong*."[273]  As to the applicable law ground,

---

[268] Mem. Ann., ¶ 67.

[269] C-Mem. Ann., § 3.2, ¶ 110; Tr. Ann., Day 1 (ENG), 71:6-8 (Mr. Fortún).

[270] C-Mem. Ann., ¶ 110; Rej. Ann., ¶ 102.

[271] C-Mem. Ann., ¶ 38.  *See also*, C-Mem. Ann., ¶ 111; Rej. Ann., ¶ 23.

[272] Rej. Ann., ¶ 27 (citing **CL-0300**, *Consortium R.F.C.C. v. Kingdom of Morocco*, ICSID Case No. ARB/00/6, Decision on Annulment, 18 January 2006 ["*R.F.C.C.*"], ¶ 225; **CL-0301**, *Bernhard von Pezold and others v. Republic of Zimbabwe*, ICSID Case No. ARB/10/15, Decision on Annulment, 21 November 2018 ["*Pezold*"], ¶ 239; **RL-0130**, *Fraport AG Frankfurt Airport Services Worldwide v. Republic of the Philippines*, ICSID Case No. ARB/03/25, Decision on Annulment, 23 December 2010 ["*Fraport*"], ¶ 45; **CL-0302**, *UAB E Energija v. Republic of Latvia*, ICSID Case No. ARB/12/33, Decision on Annulment, 8 April 2020 ["*UAB*"], ¶ 106).

[273] Tr. Ann., Day 1 (ENG), 137:6-12 (Mr. Fortún).

OperaFund and Schwab submit that Spain's position that EU law applies to both the intra-EU and the non-intra-EU portions of the dispute is "*wrong*" as well, because "[EU] *law cannot be applied to a third party,*" as Switzerland is not a EU Member State.[274]  Spain's contention would lead to a situation in which the Tribunal would have to resolve the merits applying EU law as a fact to the Swiss investor and as applicable law to the Maltese investor, which is "*not possible under international law,*" would contravene Article 46 of the ECT, and "*would be totally absurd.*"[275]

(i)    <u>The Standard</u>

171.    OperaFund and Schwab contend that the ground expressed in Article 52(1)(b) of the ICSID Convention "*encompasses situations where a tribunal (i) exceeds (or fails) to exercise its jurisdiction; or (ii) fails to identify and apply the law applicable to the dispute, and (iii) it does so in a **manifest** manner.*"[276]  The requirement that the excess be "*manifest,*" they argue, applies equally to findings of jurisdiction, liability or damages.[277]  In OperaFund and Schwab's view, significantly, the Parties are in agreement on these points.[278]

172.    However, according to OperaFund and Schwab, Spain mischaracterizes the applicable legal standard under Article 52(1)(b) of the ICSID Convention.[279]  They take the view that: (i) "*the excess of power must be self-evident rather than the product of elaborate interpretation,*"[280] and (ii) "*an error in the application of the proper law, even if it leads to a manifestly incorrect application of the law, is not a ground for annulment.*"[281]

---

[274] Tr. Ann., Day 1 (ENG), 137:13-138:1 (Mr. Fortún).

[275] Tr. Ann., Day 1 (ENG), 138:2-11 (Mr. Fortún).

[276] C-Mem. Ann., ¶ 41 (emphasis in original).

[277] C-Mem. Ann., ¶ 44 (referring to **RL-0121/RL-0084**, *Soufraki*, ¶¶ 118-119; **CL-0303**, *Industria Nacional de Alimentos S.A. and Indalsa Perú S.A. (Previously Luchetti) v. The Republic of Peru*, ICSID Case No. ARB/03/4, Decision on Annulment, 5 September 2007 ["***Luchetti***"], ¶ 101; **CL-0297**, *MTD*, ¶ 54).

[278] Rej. Ann., ¶ 32; Tr. Ann., Day 1 (ENG), 71:9-13 (Mr. Fortún).

[279] C-Mem. Ann., ¶ 40.

[280] C-Mem. Ann., ¶ 46 (citing **RL-0131**, *Wena Hotels Ltd. v. Arab Republic of Egypt*, ICSID Case No. ARB/98/4, Decision on Annulment, 5 February 2002 ["***Wena***"], ¶ 25.)

[281] C-Mem. Ann., ¶ 54 (citing **CL-0295**, Schreuer *et al.*, *The ICSID Convention: A Commentary* (2nd ed.), Cambridge: Cambridge University Press (2009), Article 52, p. 902, ¶ 13).

173.    OperaFund and Schwab submit that the word "*'manifest' has been found to set the height of the applicable legal standard*,"[282] and that according to most *ad hoc* committees that term "*should at once be textually obvious and substantially serious*."[283]    According to OperaFund and Schwab, the first condition requires that the excess of powers "*can be discerned with little effort and without deeper analysis*."[284]    As to the second, in connection with a misinterpretation or misapplication of the proper law, the defect has to be "*so gross or egregious as substantially to amount to a failure to apply the proper law*," and it must be "[s]*uch gross and consequential misinterpretation or misapplication of the proper law which no reasonable person* […] *could accept needs to be distinguished from simple error - even a serious error - in the interpretation of the law* […]."[285]    Moreover, "*a manifest excess of power will only exist 'where the action in question is clearly capable of making a difference to the result of the case*.'"[286]

174.    While OperaFund and Schwab agree that a decision on jurisdiction may trigger the annulment of an award, they argue that this can only do so "*where it is obvious that a tribunal lacked or exceeded its jurisdiction*;" that is, "*if its decision was **unreasonable**,*"[287] or "*'manifestly' wrong or arbitrary*."[288]    Recalling that the Tribunal is the judge of its own competence, OperaFund and Schwab submit that the Committee "*cannot revise the Tribunal's competence over its competence*."[289]    Moreover, relying on *Fraport* and *UAB*,

---

[282] C-Mem. Ann., ¶ 43.

[283] C-Mem. Ann., ¶ 44 (relying on **RL-0121/RL-0084**, *Soufraki*, ¶ 40); **RL-0192**, *Impregilo S.p.A. v. Argentine Republic*, ICSID Case No. ARB/07/17, Decision on Annulment, 24 January 2014 ["***Impregilo***"], ¶ 128). *See also*, Tr. Ann., Day 1 (ENG), 71:22-72:6 (Mr. Fortún).

[284] C-Mem. Ann., ¶ 45 (referring to **CL-0295**, Schreuer, C. *et al*., *The ICSID Convention: A Commentary* (2nd ed.), Cambridge: Cambridge University Press (2009), Article 52, p. 938, ¶ 135).

[285] C-Mem. Ann., ¶ 48 (referring to **RL-0121/RL-0084**, *Soufraki*, ¶ 86).  *See also, id*., ¶ 102.

[286] C-Mem. Ann., ¶ 49 (relying on **CL-0305**, *Adem Dogan v. Turkmenistan*, ICSID Case No. ARB/09/9, Decision on Annulment, 15 January 2016 ["***Adem Dogan***"], ¶ 123; **CL-0319/RL-0256**, *Compañía de Aguas del Aconquija S.A. and Vivendi Universal S.A. v. Argentine Republic*, ICSID Case No. ARB/97/3, Decision on Annulment, 3 July 2002 ["***Vivendi***"], ¶ 86; **RL-0187**, *Duke Energy International Peru Investments No. 1, Ltd. v. Republic of Peru*, ICSID Case No. ARB/03/28, Decision on Annulment, 1 March 2011 ["***Duke***"], ¶ 229); Tr. Ann., Day 1 (ENG), 72:7-9 (Mr. Fortún).

[287] C-Mem. Ann., ¶ 50 (emphasis in original) (relying on **RL-0166**, *Azurix Corp. v. The Argentine Republic*, ICSID Case No. ARB/01/12, Decision on Annulment, 1 September 2009 ["***Azurix***"], ¶¶ 68-69; **RL-0130**, *Fraport*, ¶ 44). *See also*, Rej. Ann., ¶ 33(ii).

[288] Rej. Ann., ¶ 33(ii).  *See also*, Tr. Ann., Day 1 (ENG), 71:15-17 (Mr. Fortún).

[289] Rej. Ann., ¶ 33(ii)

they argue that the reasonability of the Tribunal's approach to jurisdiction must be determined "*in light of the evidence and submissions which were before the Tribunal and not on the basis of new evidence.*"[290]

175.   Concerning a failure to apply the proper law, OperaFund and Schwab submit that, contrary to Spain's view, "*the incorrect application or interpretation of the law cannot give rise to annulment.*"[291]   While in some "*exceptional circumstances*" some "*isolated decisions*" have held that "*gross or egregious misapplication of the law*" may lead to annulment, such "*exceptional circumstances*" do not exist here.[292]

176.   According to OperaFund and Schwab, Spain's submissions overlook: (i) that "*an error in the application of the proper law, even if it leads to a manifestly incorrect application of the law, is not a ground for annulment;*"[293] and there is a difference between failure to apply the law and misinterpreting the law;[294] (ii) that all the decisions relied upon by Spain are distinguishable from the present one;[295] (iii) that a "*tribunal's failure to identify or describe the rules of treaty interpretation that it applied to a question of law is not a ground for annulment under Article 52(1)(b).*"[296]

177.   More broadly, OperaFund and Schwab submit that, while their interpretation of the standard is largely favored by most *ad hoc* committees, Spain's is based on cherry-picked isolated decisions that Spain twists and misinterprets.[297]   Moreover, they contend that, while Spain relies on some decisions that have led to an annulment, it fails to explain why the circumstances of those cases are similar to the present one.[298]   Instead, according to

---

[290] C-Mem. Ann., ¶ 51 (relying on **RL-0130**, *Fraport*, ¶ 45; **CL-0302**, *UAB*, ¶ 106).

[291] Rej. Ann., ¶ 33(i).

[292] Rej. Ann., ¶ 33(i).

[293] C-Mem. Ann., ¶ 54 (relying on **RL-0121/RL-0084**, *Soufraki*, ¶ 85; **RL-0129**, *Maritime International Nominees Establishment (MINE) v. Government of Guinea*, ICSID Case No. ARB/84/4, Decision on Annulment, 14 December 1989 ["***MINE***"], ¶ 5.4; **CL-0307**, *Antoine Abou Lahoud and Leila Abou Lahoud v. La Republique Democratique du Congo*, ICSID Case No. ARB/10/4, Decision on Annulment, 29 March 2016 ["***Lahoud***"], ¶ 119).

[294] C-Mem. Ann., ¶ 55 (relying on **CL-0308**, *Amco Asia Corporation and Others v. Republic of Indonesia*, ICSID Case No. ARB/81/1, Decision on Annulment and Partial Annulment, 17 December 1992 ["***Amco II***"], ¶ 7.8).

[295] C-Mem. Ann., ¶¶ 57-58.

[296] C-Mem. Ann., ¶ 59 (relying on **CL-0303**, *Luchetti*, ¶ 101).

[297] Rej. Ann., ¶ 35.

[298] Rej. Ann., ¶¶ 36-37.

OperaFund and Schwab, the reality is that most applications for annulment on the "*manifest excess of powers*" ground fail, as shown by the fact that as of 2016, out of 52 annulment decisions, only 2 had upheld the ground of "*lack or excess of jurisdiction,*" and only 4 upheld "*failure to apply the proper law*."[299]

178. Finally, OperaFund and Schwab contend that it is Spain's burden to demonstrate that the ground has been met.[300]

(ii)   <u>There is No Manifest Excess of Jurisdiction</u>

179. OperaFund and Schwab submit that Spain has not demonstrated any manifest excess of power in connection with the intra-EU objection, and that the attempt to relitigate the objection should fail.[301] They argue that Spain has not proven "*beyond 'uncertainty' or 'doubt'*" that the Tribunal exceeded its jurisdiction;[302] nor has Spain shown that the "*Tribunal's decision regarding the intra-EU objection was unreasonable, manifestly wrong, or arbitrary as required under Article 52(1)(b)*."[303]

180. Instead, OperaFund and Schwab contend that the Tribunal's dismissal of the intra-EU jurisdictional objection was "*completely reasonable and grounded of the facts and the law*."[304] According to OperaFund and Schwab, the Tribunal reached the conclusion that Article 26 of the ECT allows arbitration of intra-EU disputes and does not conflict with EU law after a review and assessment of both Parties' arguments and the most recent arbitral decisions at the time.[305] The Tribunal (and other 32 tribunals as well) "*explicitly rejected*" Spain's contentions that: (i) under Article 26 of the ECT jurisdiction is to be determined on the basis of EU law, and that (ii) even if Article 26 could be understood as encompassing intra-EU disputes there would be a conflict with EU law to be resolved in

---

[299] Rej. Ann., ¶ 36.

[300] C-Mem. Ann., ¶ 41.

[301] C-Mem. Ann., ¶ 97; Rej. Ann., ¶¶ 5, 39.

[302] Rej. Ann., ¶ 44.

[303] Rej. Ann., ¶ 51. *See also, id.*, ¶ 63.

[304] C-Mem. Ann., § 3.2.2; Rej. Ann., ¶ 5.

[305] C-Mem. Ann., ¶ 61 (referring to **RL-0118**, Award, § VII.A and ¶¶ 378-388); Rej. Ann., ¶ 5; Tr. Ann., Day 1 (ENG), 73:4-74:21 (Mr. Fortún).

favor of the latter.[306]  They further remark that the intra-EU objection has been dismissed in "*every*" case.[307]  This shows, they say, that the Tribunal's conclusions were "*entirely reasonable*" and that no "*manifest*" excess of powers is present here.[308]

181.    In addition, OperaFund and Schwab remark, the case at hand is "*not a pure intra-EU dispute as Schwab is a Swiss investor*,"[309] and the "*intra-EU discussion is alien for a Swiss investor like Schwab.*"[310]

182.    OperaFund and Schwab contend that Spain, rather than presenting a ground for annulment, simply contests the Tribunal's decision, but "*a disagreement does not prove any manifest excess of powers.*"[311]

183.    Finally, according to OperaFund and Schwab, Spain's allegations under this ground rely on certain materials that were not available in the underlying arbitration proceeding, when the only "*relevant parameter*" to evaluate the ground under Article 52(1)(b) of the ICSID Convention should be the "*the Award itself and the conduct of the arbitrators,*" and "*new evidence is not admissible.*"[312]

(a)    *No Showing of "Unreasonableness"*

184.    OperaFund and Schwab argue that Spain has failed to show that that the dismissal of the intra-EU objection was "*unreasonable.*"[313]  This is demonstrated, they say, by (i) the other 28 Spain cases that had rejected the same objection as of the date of the Counter-Memorial on Annulment;[314] (ii) the fact that at the time of the Award, the objection had already been dismissed by the tribunals in 6 Spain cases (*Charanne*, *RREEF*, *Isolux*, *Eiser*, *Masdar*, and *Novenergia*) on similar grounds (*e.g.* inapplicability of the *Achmea* Judgment);[315] (iii) a

---

[306] C-Mem. Ann., ¶¶ 62-63; Rej. Ann., ¶ 42 (i).

[307] Rej. Ann., ¶ 5 (citing Annex 1).

[308] C-Mem. Ann., ¶¶ 63-64; Rej. Ann., ¶ 45.  *See also*, Tr. Ann., Day 1 (ENG), 72:12-20 (Mr. Fortún).

[309] Rej. Ann., ¶ 29.

[310] Rej. Ann., ¶ 38.

[311] Tr. Ann., Day 1 (ENG), 74:22-75:2 (Mr. Fortún).

[312] Rej. Ann., ¶ 41.

[313] C-Mem. Ann., ¶ 66.

[314] C-Mem. Ann., ¶ 67 and n. 83 (citing cases).

[315] C-Mem. Ann., ¶ 68 (referring to **RL-0118**, Award, ¶¶ 378, 380).

review of the Award which refutes Spain's contention that the Tribunal did not perform an analysis of the intra-EU objection and merely referred to other cases without analysis.[316] For OperaFund and Schwab, the Tribunal "*was humble*" and "*did not need to delve into creative theories because the issue was settled.*"[317]  Furthermore, according to OperaFund and Schwab, Spain had several opportunities during the arbitration to comment on all the awards that had dealt with the intra-EU objection issued before the Award in this case, and the Tribunal carefully analyzed those awards and showed "*continuous interest in understanding the Parties' view on such decisions.*"[318]

185.    OperaFund and Schwab add that even if the reasons to dismiss the intra-EU objection are considered "*insufficient,*" that is not enough in itself to annul the Award under Article 52(1) of the ICSID Convention.[319]

186.    Furthermore, OperaFund and Schwab contend, the fact that the Tribunal did not agree with Spain's position on the intra-EU objection while "*at least 33 tribunals*" did, does not make the decision a "*manifestly arbitrary or unreasonable decision.*"[320]

187.    While remarking that Spain has failed to present the "*different matters related to the Tribunal's reasoning on jurisdiction,*" OperaFund and Schwab go on to submit that the Tribunal's ruling on the following points was "*entirely reasonable*": (i) the validity of the arbitration agreement perfected by the Parties under Article 26(1) of the ECT; (ii) that in an ECT dispute, EU law does not prevail to exclude intra-EU jurisdiction; and (iii) that the *Achmea* Judgment did not deprive the Tribunal of jurisdiction under the ECT.[321]

188.    As to point (i), the validity of the arbitration agreement under Article 26(1) of the ECT, OperaFund and Schwab submit that:

---

[316] C-Mem. Ann., ¶ 69.

[317] Tr. Ann., Day 1 (ENG), 74:3-6 (Mr. Fortún).

[318] C-Mem. Ann., ¶ 69 (referring to exchanges by the Tribunal Members with the Parties at the hearing on the merits and questions posed to the Parties after the hearing on the merits to answer in Post-Hearing Briefs, citing **C-355**, Tr. Merits, Day 1, 197:16–204:5, 64:1–64:4, 87:21–88:15 and **RL-0118**, Award, ¶ 379).

[319] C-Mem. Ann., ¶ 70.

[320] Tr. Ann., Day 1 (ENG), 80:20-25 (Mr. Fortún).

[321] C-Mem. Ann., ¶ 76, and §§ 3.2.2.1 to 3.2.2.3.

- *First*, contrary to Spain's submissions, the Tribunal did interpret Article 26 of the ECT under the VCLT, explicitly mentioning that Articles 31-33 of the VCLT were "*applicable to the construction of the ECT and the ICSID Convention*,"[322] and was not required to repeat each time it analyzed an ECT provision that it was doing so under the VCLT.[323]

- *Second*, the Tribunal provided a "*reasonable and sound interpretation*" of Article 26(1) of the ECT as it carefully analyzed the previous decisions in other 5 Spain cases on the issue, and the Parties' arguments (including remarks on those decisions);[324] and "*processed*" the Parties' and the EU Commission's arguments on the interpretation of Article 26(1).[325]  Only after "*careful analysis of Article 26*" the Tribunal concluded that it agreed with the prior decisions and that "*there was no need to list again all the arguments*" made in those decisions.[326]

- *Third*, contrary to Spain's submissions, the January 2019 communication is simply a declaration by some EU Member States, and not a source of EU law, as the Tribunal itself noted in a letter of 11 February 2019.[327]  Thus, it was not "*manifestly unreasonable*" to conclude that this communication cannot have an interpretive effect "*on the scope and content of EU law regarding investment protection and treaties concluded, inter alia, between EU member states*."[328]  Notably, Malta did not subscribe to this declaration.[329]  And even if had been signed by all the EU Member States or if it were a source of EU law, it would still *not* be a joint interpretation issued by *all* the ECT Contracting Parties (only ones empowered to do so).[330]

- *Fourth*, the Tribunal concluded (as many others) that the absence of an explicit disconnection clause confirmed the ECT Contracting Parties' intention to apply Article 26 of the ECT intra-EU; and Spain's allegation that international custom supports the conclusion that the ECT has an implicit disconnection clause is "*wrong*."[331]

- *Fifth*, the Tribunal rejected Spain's contention that the definitions in Article 1(2) and 1(3) of the ECT prevented the intra-EU application of the ECT, simply following *jurisprudence constante*.[332]

---

[322] C-Mem. Ann., ¶ 78 (citing **RL-0118**, Award, ¶ 323).  *See also*, Tr. Ann., Day 1 (ENG), 75:3-7 (Mr. Fortún).

[323] C-Mem. Ann., ¶ 78.

[324] C-Mem. Ann., ¶ 79 (citing **RL-0118**, Award, ¶ 380).

[325] C-Mem. Ann., ¶ 79 (citing **RL-0118**, Award ¶¶ 336-341, 355-358, 372-375).

[326] C-Mem. Ann., ¶ 79 (citing **RL-0118**, Award, ¶ 380).

[327] C-Mem. Ann., ¶ 82.

[328] C-Mem. Ann., ¶ 83.

[329] Tr. Ann., Day 1 (ENG), 73:15-20 (Mr. Fortún).

[330] C-Mem. Ann., ¶ 83.

[331] Tr. Ann., Day 1 (ENG), 76:7-23 (Mr. Fortún).

[332] Tr. Ann., Day 1 (ENG), 76:24-77:5 (Mr. Fortún).

189.    As to point (ii), on the non-application of EU law, OperaFund and Schwab argue that the "*Tribunal conducted a thorough analysis that took into consideration all the evidence on record and the Parties' arguments regarding the relationship between the ECT and EU law.*"[333]    More particularly, they submit that:

- *First*, the Tribunal respected the difference between applicable substantive law (governed by Article 26(6) of the ECT), and the law to be applied to jurisdiction (governed by Article 26(3) and 26(4) of the ECT, and Article 25 of the ICSID Convention); and thus concluded that Article 26(6) of the ECT would not be applicable to the jurisdictional objection.[334]

- *Second*, while Spain "*wrongly*" – according to OperaFund and Schwab – submitted that Article 267 and Article 344 of the TFEU prevented intra-EU arbitration, the Tribunal concluded that those provisions did not conflict with Article 26 of the ECT because they do not share the same subject matter.[335]

- *Third*, the Tribunal explained that the principle of primacy of EU law is not binding on an ECT tribunal, and does not exclude the intra-EU application of the ECT, with reasoning that was "*sound and reasonable*": (i) the *Achmea* Judgment makes no mention of the ECT, and its reasoning does not extend to ECT arbitrations;[336] (ii) there was no basis for the contention that by virtue of the accession of Malta the EU Treaties superseded the ECT, because the ECT and TFEU are two very different treaties;[337] (iii) the lack of a disconnection clause implies that the ECT provides jurisdiction in this case;[338] and (iv) per Articles 53 and 54 of the ICSID Convention Spain is bound by the Award with no appeal option outside the ICSID system.[339]

- *Fourth*, the Tribunal disagreed with Spain's contention that in case of conflict between EU law and the ECT the former would prevail, highlighting that: (i) the principle of primacy of EU law was not *lex posterior*; and (ii) Article 16 of the ECT would be the *lex* applicable to resolve the conflict, and its application would result in favor of intra-EU arbitration.[340]

- *Fifth*, Spain has failed to show that the Tribunal's conclusion that there is no incompatibility between EU law and the ECT is "*manifestly wrong or unreasonable*,"

---

[333] C-Mem. Ann., ¶ 87.

[334] Tr. Ann., Day 1 (ENG), 75:15-24 (Mr. Fortún).

[335] Tr. Ann., Day 1 (ENG), 77:19-78:6 (Mr. Fortún).

[336] C-Mem. Ann., ¶ 86 (i) (citing **RL-0118**, Award, ¶¶ 381-382).

[337] C-Mem. Ann., ¶ 86 (ii) (citing **RL-0118**, Award, ¶ 383).

[338] C-Mem. Ann., ¶ 86 (iii) (citing **RL-0118**, Award, ¶ 383).  OperaFund and Schwab submit that Spain has failed to address this point.  Rej. Ann., ¶ 47.

[339] C-Mem. Ann., ¶ 86 (iv) (citing **RL-0118**, Award, ¶¶ 386-387).

[340] Tr. Ann., Day 1 (ENG), 78:23-79:15 (Mr. Fortún).

and in any event, pursuant to Article 16 of the ECT, the ECT would prevail over EU law.[341]

190.    As to point (iii), on the *Achmea* Judgment, OperaFund and Schwab submit that:

- *First*, the Award "*makes clear*" that the *Achmea* Judgment does not prevent the intra-EU application of Article 26(1) of the ECT,[342] and remarks that this judgment makes no mention of the ECT and its reasoning does not extend to ECT arbitrations, as the case arose under a BIT and the UNCITRAL rules.[343]

- The Tribunal clearly outlined the distinctions between the *Achmea* case and the present one, including that, unlike in the present case, in *Achmea* (i) the BIT called for application of national law; (ii) the local courts had competence to review the validity of the award; and (iii) it was in the course of that review process that the German courts had submitted the preliminary question to the CJEU.[344]    It follows, OperaFund and Schwab argue, that the BIT at issue in *Achmea* was a "*completely different type of treaty*," applying a different body of law, and applying only to EU Member States;[345] and that Spain mischaracterizes the Award in saying that it totally ignored the *Achmea* Judgment.[346]    Instead, the Tribunal "*carefully scrutinized the Achmea decision*" and concluded that it did not prevent intra-EU application of Article 26(1) of the ECT.[347]

- *Second*, the Tribunal ruled that EU law was not relevant to the arbitration given that the Tribunal was "*placed in a public international law context and not in a national or regional context;*" and therefore, it cannot be said that the Tribunal denied any relevance to the *Achmea* Judgment.[348]

- *Third*, even if EU law were relevant (which the Tribunal denied) and even if the *Achmea* Judgment applied to intra-EU ECT arbitrations, Spain has not explained how the *Achmea* Judgment could apply retroactively to an arbitration agreement entered into before that judgment was rendered.[349]

- *Fourth*, Spain has failed to explain why the Tribunal's conclusion that the *Achmea* Judgment has no bearing on ECT arbitrations was "*unclear*" or "*unreasonable;*"[350] and recently an *ad hoc* committee has confirmed an intra-EU BIT award even in light of

---

[341] Rej. Ann., ¶ 49.  *See also*, Tr. Ann., Day 1 (ENG), 80:15-18 (Mr. Fortún).

[342] C-Mem. Ann., ¶ 90 (citing **RL-0118**, Award, ¶ 380).

[343] C-Mem. Ann., ¶ 91 (citing **RL-0118**, Award, ¶ 384); Rej. Ann., ¶ 42 (iii); Tr. Ann., Day 1 (ENG), 78:8-18 (Mr. Fortún).

[344] C-Mem. Ann., ¶ 92 (citing **RL-0118**, Award, ¶¶ 384-385); Tr. Ann., Day 1 (ENG), 78:18-22 (Mr. Fortún).

[345] C-Mem. Ann., ¶ 93.

[346] C-Mem. Ann., ¶ 93.

[347] C-Mem. Ann., ¶ 96.

[348] C-Mem. Ann., ¶ 94 (citing **RL-0118**, Award, ¶ 384).

[349] C-Mem. Ann., ¶ 95.

[350] Rej. Ann., ¶ 47.

the *Achmea* Judgment, which further confirms that the OperaFund Tribunal's conclusion in the Award was not "*manifestly wrong or arbitrary.*"[351]

191.   OperaFund and Schwab repeatedly assert that whether the Tribunal's conclusions on the issues above were right or wrong is "*irrelevant*" because an annulment under Article 52(1)(b) is only concerned with whether they are "*manifestly unreasonable*" which they were not.[352]

192.   That said, while recalling that it is not a matter for discussion in an annulment, OperaFund and Schwab also submit that Spain's contentions on EU law are "*wrong*" or at least "*controversial*," as demonstrated by the decisions of every other tribunal facing the intra-EU objection and the opinions of scholars and experts on the field of EU law.[353]

(b)   *No Showing of "Manifest"*

193.   For OperaFund and Schwab, Spain has also failed to show that the alleged excess of power was "*manifest*,"[354] as demonstrated by the amount of pages Spain devoted in its Memorial on Annulment to the alleged excess, which is incompatible with the proposition that the excess is "*self-evident.*"[355]   Instead, OperaFund and Schwab argue that "*the Tribunal's finding on jurisdiction is reasonable and sound (what really matters under Article 52 of the ICSID Convention) and also fully correct (as demonstrated by the solid corpus of jurisprudence [...].*"[356]

(c)   *The Tribunal's Decision Should Receive Deference*

194.   Lastly, OperaFund and Schwab contend that the Tribunal's decision on jurisdiction should receive deference.[357]   They emphasize that this *ad hoc* Committee is not a court of appeal, and "*it does not have the authority to substitute its judgment on jurisdictional requirements,*"

---

[351] Rej. Ann., ¶ 48 (referring to **CL-0325**, GAR, *Intra-EU award against Hungary Upheld*, 26 May 2021).

[352] C-Mem. Ann., ¶¶ 87, 96.

[353] Rej. Ann., ¶¶ 24-25.

[354] C-Mem. Ann., ¶¶ 64, 71; Rej. Ann., ¶ 42(ii).

[355] C-Mem. Ann., ¶ 72.

[356] C-Mem. Ann., ¶ 73.

[357] C-Mem. Ann., ¶¶ 64, 74 (citing **RL-0166**, *Azurix*, ¶ 67; **RL-0147**, *Enron Corporation and Ponderosa Assets, L.P. v. Argentine Republic*, ICSID Case No. ARB/01/3, Decision on the Argentine Republic's Request for a Continued Stay of Enforcement of the Award, 7 October 2008 ["***Enron, Stay***"]); Rej. Ann., ¶ 42(ii).

*the interpretation of law, and/or the assessment of facts, for that of the Tribunal.*"[358]  It is their view that even if this *ad hoc* Committee finds that the Tribunal's answers "*are not convincing, as far as they are tenable and not arbitrary* […] *in case of doubt the question of jurisdiction shall be resolved in favorem valitatis sententiae.*"[359]

195.    Moreover, OperaFund and Schwab submit, Spain's opinions are not more authorized than those of the Tribunal (or of other tribunals and scholars).[360]  Spain is not empowered to provide an authentic interpretation of EU law.[361]  The Tribunal was constituted under the ECT and the ICSID Convention, and Spain's allegations on the intra-EU objection are the minority view.[362]

(iii)    <u>There is No Manifest Excess of Powers in Applying International Law to the Dispute</u>

196.    OperaFund and Schwab submit that Spain has not established a manifest excess of powers in connection with the applicable law,[363] and that the Tribunal's decision to apply international law to the dispute does not constitute an excess of powers.[364]  For OperaFund and Schwab, the applicable law in this case was the ECT, not EU law, and therefore, an Award holding Spain liable for breach of Article 10 of the ECT cannot be annulled on grounds of failure to apply the proper law.[365]

197.    According to OperaFund and Schwab, Spain's partisan view that EU law was the applicable law and should prevail over the ECT is "*irrelevant.*"[366]  It is also "*irrelevant*" whether the Tribunal's conclusion on this point was correct (or not), because Article 52(1)(b) is concerned only with "*whether the disregard or misapplication of the applicable*

---

[358] C-Mem. Ann., ¶ 75 (quoting **CL-0257**, *Bolivarian Republic of Venezuela v. Tenaris S.A. & Talta – Trading E Marketing Sociedade Unipessoal LDA*, ICSID Case No. ARB/12/23, Decision on Annulment, 28 December 2018 ["**Tenaris**"], ¶ 64).

[359] C-Mem. Ann., ¶ 75.  *See also*, Rej. Ann., ¶ 46.

[360] Rej. Ann., § 2.2.2.

[361] Rej. Ann., ¶ 52.

[362] Rej. Ann., ¶ 54.

[363] C-Mem. Ann., ¶ 98.

[364] C-Mem. Ann., ¶ 109.

[365] Rej. Ann., ¶ 88; Tr. Ann., Day 1 (ENG), 81:18-24 (Mr. Fortún).

[366] Rej. Ann., ¶ 6.

*law was manifestly unreasonable (quod non)*."[367]  Put another way, it is enough to establish that the Tribunal's conclusions were "*reasonable*," and the Committee should not and cannot decide who is right or wrong.[368]

198.  Moreover, even if Spain's allegations on the applicability of EU law were correct, that would not lead to an annulment as "*a wrong application of the law would not be a valid ground for annulment.*"[369]

(a)  *The Tribunal Identified the Applicable Law and Explained that EU Law was Not Relevant*

199.  OperaFund and Schwab argue that the Tribunal devoted an entire section of the Award to identifying the applicable law, and clearly explained that EU law was not relevant to the issue of legitimate expectations.[370]  The Tribunal reasoned that: (i) Article 26(6) of the ECT was the key provision in establishing the applicable law, which required application of the "*ECT and the applicable rules and principles of international law;*"[371] (ii) the Parties were in agreement that domestic law was to be regarded as fact, with the only issue in dispute being the role of EU law as international law (Spain's contention) or domestic law (OperaFund and Schwab's contention);[372] (iii) there was a distinction between jurisdictional matters and matters pertaining to the merits to be respected also in connection with EU law;[373] (iv) Article 16 of the ECT was the critical provision to resolve any eventual conflict between the ECT and EU law;[374] and even if EU law were applicable it would not prevail over the ECT;[375] and (v) as a result of the above, "*all substantive provisions of the*

---

[367] C-Mem. Ann., ¶ 109.

[368] Rej. Ann., ¶ 8.

[369] Rej. Ann., ¶ 66; Tr. Ann., Day 1 (ENG), 83:1-5 (Mr. Fortún).

[370] C-Mem. Ann., ¶ 99 (referring to **RL-0118**, Award, § VI, ¶¶ 322-330); Rej. Ann., ¶ 71.

[371] C-Mem. Ann., ¶ 99(i) (referring to **RL-0118**, Award, ¶ 322).

[372] C-Mem. Ann., ¶ 99(ii) (referring to **RL-0118**, Award, ¶¶ 323-325).

[373] C-Mem. Ann., ¶ 99(iii).

[374] C-Mem. Ann., ¶ 99(iv) (referring to **RL-0118**, Award, ¶¶ 328-329).

[375] Rej. Ann., ¶ 81.

*ECT remain fully applicable and EU law is not part of the applicable substantive law in this case.*"[376]

200.    It follows, OperaFund and Schwab argue, that the Tribunal "*carefully assessed Spain's invocation of EU law and dismissed it by applying Articles 26(6) and 16(2) of the ECT,*" which cannot amount to a manifest excess of powers.[377]   The "*Tribunal's holding that EU law did not prevail over the ECT and was not relevant to assess OperaFund's legitimate expectations is fully reasonable.*"[378]   Moreover, OperaFund and Schwab submit that, *a fortiori*, for a Swiss investor like Schwab, EU law is by no means international law because Switzerland is not an EU Member State.[379]

201.    OperaFund and Schwab further take issue with Spain's allegations that the Tribunal contradicted itself by denying that EU law was applicable and by considering it purely domestic law.[380]   In their view, the Tribunal's finding – that even if EU law were applicable under Article 26(6) of the ECT as "*applicable rules and principles of international law*" it would not prevail over the ECT in light of Article 16(2) of the ECT – "*is perfectly consistent with the fact that the application of the ECT is sufficient to adjudicate the dispute.*"[381]

(b)    *Spain's Allegations Do not Meet the Relevant Standard*

202.    OperaFund and Schwab submit that, under the relevant standard, what would be required is "(i) [a] *manifest disregard of* [sic] *misapplication of the rule of conflict that an international tribunal is called upon to apply when different legal systems interact; or (ii) a manifest disregard or misapplication of rule of law pointed by the rule of conflict;*" and only an "*obvious and egregious disregard or misapplication of those rules*" could lead to

---

[376] C-Mem. Ann., ¶ 99(v) (referring to **RL-0118**, Award, ¶ 330).

[377] C-Mem. Ann., ¶ 100.

[378] C-Mem. Ann., ¶ 108.

[379] C-Mem. Ann., ¶ 100.  *See also*, Rej. Ann., ¶ 6.

[380] Rej. Ann., ¶ 68.

[381] Rej. Ann., ¶ 68 (referring to **RL-0118**, Award, ¶ 327).

annulment under Article 52(1)(b).[382]   On the basis of this standard, they argue, Spain's allegations lack merit.[383]

203.   According to OperaFund and Schwab (i) the Tribunal identified the conflict rule in the ECT (Article 16), and on that basis rejected the contention that EU law prevailed over the ECT;[384] (ii) over 20 arbitral tribunals in similar cases against Spain did not apply EU law to the merits of the dispute,[385] which demonstrates that, if this were an error, it would not be "*manifest*" but only a "*mere disagreement*;"[386] and (iii) the Tribunal's decision not to apply EU law does not infringe on the autonomy of the EU legal order, because the ECT is an international agreement and therefore "*a Member State's law cannot be determinative of the Tribunal's assessment of the application of the ECT and international law to the facts of the case*."[387]

204.   OperaFund and Schwab observe that the relevant standard is not whether the Tribunal's applicable law determination was right or wrong, but whether it was "*reasonable*."[388]   For OperaFund and Schwab, the Award's conclusion that under Article 26(6) of the ECT, the provisions of the ECT remained fully applicable, and that EU law (including EU State Aid law) was not part of the applicable law was "*not manifestly arbitrary or unreasonable*."[389] They explain that:

   - Although Spain submits that EU law qualifies as "*principles and rules of international law*" under Article 26(6) of the ECT, the Committee should not forget that one of the Claimants in the arbitration was Swiss.[390]

---

[382] C-Mem. Ann., ¶ 101.

[383] C-Mem. Ann., ¶ 103.

[384] C-Mem. Ann., ¶ 103.

[385] C-Mem. Ann., ¶ 104 and n. 134 (citing cases).

[386] C-Mem. Ann., ¶ 104; Rej. Ann., ¶ 85.

[387] C-Mem. Ann., ¶ 105.

[388] Tr. Ann., Day 1 (ENG), 89:3-8 (Mr. Fortún).

[389] Tr. Ann., Day 1 (ENG), 83:19-23, 88:22-25 (Mr. Fortún).

[390] Tr. Ann., Day 1 (ENG), 83:25-84:11 (Mr. Fortún).

- Many other arbitral tribunals do not consider EU law as part of the "*rules and principles of international law*" including, for example, *Eskosol*.[391]

- If anything, EU law should be considered as a fact, and that is what the Tribunal did.[392]

- The central question in the arbitration was whether Spain had breached its obligations under the ECT, and the Claimants never asked for compensation under EU law.[393]

- A State cannot invoke its internal law or domestic decisions to justify a breach of international law.[394]

205.   OperaFund and Schwab take issue with Spain's contention that the applicability of EU law (as international law) under Article 26(6) of the ECT was "*clearly settled*" by the *Eurus* award, observing that the findings of the *Eurus* tribunal "*are non-determinative for this annulment proceeding and do not prove that the Tribunal exceeded its powers when deciding not to apply the applicable law to the merits of the dispute.*"[395]

206.   OperaFund and Schwab argue further that: (i) other 20 tribunals have reached the conclusion that EU law did not apply to the merits; (ii) the *Eurus* tribunal disregarded the CJEU's finding in Opinion 1/17 of 30 April 2019 that Chapter 8 of CETA was compatible with EU law because the CETA tribunals would treat EU law as a fact; and (iii) in any event, the *Eurus* tribunal's applicable law finding had no impact on the conclusion on liability, which was based on Article 10(1) of the ECT and arbitral case law (not EU law).[396]

207.   OperaFund and Schwab's position is that the Tribunal "*did not fail to apply the applicable law*" but instead, "*dismissed Spain's defenses or found them irrelevant after careful consideration.*"[397] They remark, for example, that:

---

[391] Tr. Ann., Day 1 (ENG), 85:20-86:17 (Mr. Fortún) (referring to **CL-0310**, *Eskosol S.p.A. in liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Intra- EU Objection, 7 May 2019, ["***Eskosol***"], ¶ 121).

[392] Tr. Ann., Day 1 (ENG), 84:17-19 (Mr. Fortún).

[393] Tr. Ann., Day 1 (ENG), 87:10-15, 88:12-13 (Mr. Fortún) (referring to **RL-0118**, Award, ¶¶ 1, 381, 383).

[394] Tr. Ann., Day 1 (ENG), 90:9-11 (Mr. Fortún).

[395] Rej. Ann., ¶ 84.

[396] Rej. Ann., ¶¶ 85-87.

[397] Tr. Ann., Day 1 (ENG), 93:8-10 (Mr. Fortún).

- The Tribunal considered Spain's allegations on State Aid, and did not find any specific provision of EU law dispositive of the merits.[398]  The Award considered those arguments as "*a fact*," and indeed Spain itself and the EC treated EU law as a fact when arguing why the challenged measures were proportional.[399]

- The Tribunal rejected Spain's allegation that had the Claimants correctly analyzed EU State Aid law, they would have concluded that the incentives were "*illegal state aid*" and should not have had legitimate expectations.[400]

- The Tribunal also rejected Spain's proportionality defense, based on the EC State Aid Decision of November 2017.[401]

208.    OperaFund and Schwab further argue that, contrary to Spain's contentions, the Tribunal did not disregard that the rules on State Aid are included in the TFEU, but instead, concluded that EU law did not apply to the merits.[402]  They further submit that the *ad hoc* Committee should not consider the new arguments on State Aid that Spain incorporated through the Gosalbo Expert Report.[403]

209.    Moreover, according to OperaFund and Schwab, Spain misleads the *ad hoc* Committee in arguing that the *Baywa* tribunal held that the subsidies at issue here constitute State Aid, which that tribunal did not do.[404]  Nor did that tribunal find that "*EU law prevented or excused in any manner Spain's liability*," and instead, "*it declared Spain's violation of the ECT*."[405]

210.    Finally, OperaFund and Schwab also note that the annulment decisions relied upon by Spain in favor of this ground for annulment do not assist *(Amco I*, *Klöckner*, *Sempra* and *Venezuela Holdings*), as the scenarios in those cases are distinguishable from the case at hand.[406]

---

[398] Tr. Ann., Day 1 (ENG), 85:5-10 (Mr. Fortún) (referring to **RL-0118**, Award, ¶¶ 454, 461, 464, 538).

[399] Tr. Ann., Day 1 (ENG), 89:9-90:8 (Mr. Fortún) (referring to **RL-0118**, Award, ¶ 479).

[400] Tr. Ann., Day 1 (ENG), 91:15-24 (Mr. Fortún) (referring to **RL-0118**, Award, ¶ 487).

[401] Tr. Ann., Day 1 (ENG), 92:18-23 (Mr. Fortún) (referring to **RL-0118**, Award, ¶ 555).

[402] C-Mem. Ann., ¶ 106.

[403] C-Mem. Ann., ¶ 107.

[404] C-Mem. Ann., ¶ 108 (quoting **CL-0284/RL-0137**, *Baywa*, ¶ 569(h)).

[405] C-Mem. Ann., ¶ 108 (referring to **CL-0284/RL-0137**, *Baywa*, ¶ 629).

[406] Rej. Ann., ¶¶ 72-77.

(c)     *Spain's Arguments on the Applicability of EU Law Are Wrong*

211.    While recalling that it is not a matter for the annulment stage, OperaFund and Schwab further submit that Spain's arguments on EU law are "*wrong*" or at least "*controversial*," and therefore do not amount to a "*manifest excess of powers*."[407]    EU law is either "*irrelevant or not applicable*" in an ECT case, a conclusion shared by almost every tribunal that has analyzed the issue.[408]    The proper applicable law to the claim was the ECT (not EU law).[409]

212.    According to OperaFund and Schwab, Spain's reliance on Article 38 of the ICJ Statute, State practice and the principle of primacy of EU law, as well as Articles 107 and 108 of the TFEU is "*irrelevant*" in the context of a claim under the ECT.[410]    Moreover, they argue that it is "*highly doubtful*" that the principles of autonomy and primacy of EU law constitute "*international custom*;" and that it is "*utterly wrong*" to allege that EU law on State Aid constitutes international custom.[411]    In any event, OperaFund and Schwab submit, Spain has failed to demonstrate "*why and how*" an international custom could "*reverse the application and interpretation*" of Articles 10, 16 and 26 of the ECT by the Tribunal.[412]

213.    For OperaFund and Schwab, Spain's allegation that there is a "*uniform and consistent practice*" favoring the primacy of EU law is "*wrong*," contravenes Article 16 of the ECT, and was in any event already considered and dismissed in the Award.[413]    Pursuant to Article 16 of the ECT, they argue, should there be a conflict between EU law and the ECT, it would be resolved in favor of the ECT and the "*highest protection to the investor.*"[414]

---

[407] Rej. Ann., ¶ 24.

[408] Rej. Ann., ¶ 25.

[409] Rej. Ann., ¶ 65.

[410] Rej. Ann., ¶ 78.

[411] Rej. Ann., ¶ 79.

[412] Rej. Ann., ¶ 80.

[413] Rej. Ann., ¶ 82 (referring to **RL-0118**, Award, ¶¶ 322-331).

[414] Rej. Ann., ¶ 83.

214.    In sum, the contention that EU law is the applicable law is the "*minority and wrong*," and "*if anything, EU law should be treated as a fact.*"[415]

> (d)    *The ECT is Binding on Spain and the EU and in Case of Conflict the ECT Prevails*

215.    According to OperaFund and Schwab, on the question of applicable law, two more issues further confirm the conclusion that the Award is valid: (i) the ECT is a multilateral treaty binding on Spain and the EU; and (ii) in case of conflict, the ECT prevails.[416]

216.    *First,* OperaFund and Schwab contend that Spain cannot unilaterally decide not to comply with its obligations under the ECT or propose an interpretation that would lead to fragmentation of the treaty, in light of the principle in Article 27 of the VCLT pursuant to which neither Spain nor the EU could impose its internal laws to justify a treaty violation.[417]

217.    OperaFund and Schwab argue, moreover, that it is wrong to suggest that Articles 107 and 108 of the TFEU (which only impose obligations between EU Member States) prevail over the investment protection standards in Article 10 of the ECT.[418]

218.    *Second,* OperaFund and Schwab submit that as to the relation between the ECT and EU law: (i) the ECT offers protections not found in EU law; (ii) there is no identity of subject matter between the two regimes; (iii) the Lisbon Treaty did not establish the principle of primacy of EU law, which instead was established in 1964 in the case *Costa v. ENEL*, and thus, as the ECT entered into force in 1998, the ECT is *lex posterior*; (iv) the principle of primacy of EU law is not a rule of conflict of treaties; and (v) Article 16 of the ECT is the only applicable rule of conflict, and under that rule the ECT prevails, as the ECT is more favorable (as the Award rightly found).[419]

---

[415] Rej. Ann., ¶ 91.

[416] Tr. Ann., Day 1 (ENG), 94:25-95:3 (Mr. Fortún).

[417] Tr. Ann., Day 1 (ENG), 95:11-18 (Mr. Fortún).

[418] Tr. Ann., Day 1 (ENG), 96:5-13 (Mr. Fortún).

[419] Tr. Ann., Day 1 (ENG), 97:9-99:4 (Mr. Fortún).

(iv)   The Misapplication or Wrong Interpretation of the Law Would Not Constitute a Manifest Excess of Power

219.    OperaFund and Schwab also oppose Spain's subsidiary argument that the Tribunal incurred in a "*gross misapplication of EU law.*"[420]

220.    In their view, the "*gross misapplication of proper law*" does not warrant an annulment under Article 52(1) of the ICSID Convention.[421]  According to OperaFund and Schwab, the decision in *Soufraki*, on which Spain relies, only accepts *obiter dicta* that gross or egregious misapplication of the law may amount to failure to apply the proper law, and it is a minority view.  Most *ad hoc* committees have held that the incorrect interpretation or application of that law cannot support an annulment.[422]  Moreover, *Soufraki* requires that the excess be "*textually obvious and substantively serious,*" which is not the case here.[423]

221.    Moreover, OperaFund and Schwab submit, Spain has not established either a gross misapplication of the ECT, nor a gross misapplication of EU law.[424]  Instead, Spain contends that the Tribunal ignored EU State Aid law, a misleading submission given that the Tribunal indeed rejected the applicability of EU law to the dispute, thereby rejecting Spain's State Aid argument.[425]

222.    According to OperaFund and Schwab, Spain's arguments are based on various false premises given that: (i) Articles 107 and 108 of the TFEU do not establish obligations on private companies, and it would have been Spain who would be in breach of its obligations by failing to notify the EC of the renewables remuneration regime under which the investment was made;[426] (ii) Spain has never notified the original regulatory regime as State Aid to the EC, and until 2014 Spain itself considered that it had no obligation to do

---

[420] Rej. Ann., ¶ 93 (quoting Reply Ann., ¶ 254).

[421] Rej. Ann., ¶¶ 93, 101.  *See also*, Tr. Ann., Day 1 (ENG), 83:3-6 (arguing that an "*error in the application of the law*" is not a ground for annulment either) (Mr. Fortún).

[422] Rej. Ann., ¶ 94.

[423] Rej. Ann., ¶ 94.

[424] Rej. Ann., ¶¶ 95, 101.

[425] Rej. Ann., ¶ 95 (referring to **RL-0118**, Award, ¶¶ 322-331).

[426] Rej. Ann., ¶ 97.

so – only the new regulatory regime has been notified as State Aid;[427] (iii) the original regime under which the Claimants invested has never been declared illegal, and therefore, the Award cannot be contrary to EU law;[428] and (iv) Spain's new arguments on State Aid incorporated in the annulment proceeding should be disregarded, as this Committee should issue its ruling on annulment on the basis of the "*evidence and submissions*" that were in front of the Tribunal.[429]

223.    In any event, OperaFund and Schwab also submit that they disagree with Spain's interpretation of EU law and State Aid law.[430]  They argue that:

- It is "*wrong*" to argue that the 2017 EC State Aid Decision is binding on investors or ICSID tribunals.[431]

- The 2017 EC State Aid Decision, only confirmed that the new regulatory regime for renewable energy enacted in 2013 was compatible with EU law for purposes of competition law, and the investors had nothing to challenge that decision for, nor legal standing to do so.[432]

- Articles 107 and 108 of the TFEU only impose obligations on the EU Member States, and not on the beneficiaries of State Aid, and as such, it is "*reasonable*" to conclude that they are not dispositive in adjudicating a dispute for alleged breach of the ECT standards.[433]

(v)    The European Commission's Non-Disputing Party Submission Should Receive No Weight

224.    OperaFund and Schwab also ask the Committee to give no weight to the EC's Written Submission.[434]  In short, they argue that, in direct contradiction with ICSID Arbitration Rule 37(2):

---

[427] Rej. Ann., ¶ 98.

[428] Rej. Ann., ¶ 99.

[429] Rej. Ann., ¶ 100.

[430] Tr. Ann., Day 1 (ENG), 93:11-15 (Mr. Fortún).

[431] Tr. Ann., Day 1 (ENG), 93:16-18 (Mr. Fortún) (referring to **RL-0080**, Decision C(2017) 7384 of the European Commission, regarding the Support for Electricity Generation from Renewable Energy Sources, Cogeneration and Waste (S.A. 40348 (2015/NN), 10 November 2017).

[432] Tr. Ann., Day 1 (ENG), 93:20-94:5 (Mr. Fortún).

[433] Tr. Ann., Day 1 (ENG), 94:11-20 (Mr. Fortún).

[434] Rej. Ann., Annex 2, ¶ 2.

225.   *First*, the submission "*does not provide the Committee with a perspective, particular knowledge or insight that is different from that of the disputing parties*," because it has repeated almost verbatim many of the arguments put forward by Spain, showing that the Commission is nothing but a "*partisan ally*" of Spain.[435]

226.   *Second*, the submission "*addresses matters that are not within the scope of the dispute*."[436] In particular, the arguments based on EU law, the *Achmea* Judgment and Articles 264 and 344 of the TFEU "*go back to the substance of the failed intra-EU objection*" and not to whether in upholding jurisdiction the Tribunal "*manifestly exceeded its powers*," *i.e.* whether it reached conclusions "*arbitrary*" or "*unreasonable*."[437]   The EC's EU law considerations are thus "*inapposite*" at this stage, because this annulment proceeding is not an appeal, and a *de novo* review of the intra-EU objection is not permissible.[438]   While the EC may disagree with the Tribunal's conclusions on jurisdiction, that disagreement is not enough to annul the Award under Article 52(1) of the ICSID Convention.[439]   Finally, the EC has submitted "*new substantive arguments*" on the intra-EU objection supported on material that was never before the Tribunal, which is inadmissible.[440]

227.   *Third*, the submission "*disrupt*[ed] *the proceedings, unduly burden*[ed] *and unfairly prejudice*[d] *OperaFund's position as the Award creditor*."[441]

228.   *Finally*, as reflected *supra*, ¶ 48, OperaFund and Schwab also opposed the EC's request that this annulment proceeding be suspended until the CJEU rendered an opinion requested by Belgium on the compatibility of the intra-EU application of the ECT with EU law.[442] They argued *inter alia* that: (i) the Commission had no legal standing to make such request;[443] (ii) the suspension would be highly disruptive to the calendar, in contravention

---

[435] Rej. Ann., Annex 2, ¶¶ 2, 4, 18.
[436] Rej. Ann., Annex 2, ¶ 2.
[437] Rej. Ann., Annex 2, ¶ 21.  *See also, id.*, ¶¶ 25-27.
[438] Rej. Ann., Annex 2, ¶¶ 22-24, 32.
[439] Rej. Ann., Annex 2, ¶ 30.
[440] Rej. Ann., Annex 2, ¶ 31.
[441] Rej. Ann., Annex 2, ¶ 2.
[442] Rej. Ann., Annex 2, § IV.
[443] Rej. Ann., Annex 2, ¶¶ 37, 41.

of ICSID Arbitration Rule 37(2);[444] and (iii) the request was in any event baseless, because an annulment "*takes as its premise the record before the Tribunal,*" and "[t]*he outcome of Belgium's application to the CJEU does not affect the question that has been submitted before the Committee, which is whether the Tribunal's establishment of jurisdiction under Article 26 ECT was unreasonable and, as a result, a manifest excess of powers (quod non).*"[445]  As indicated above, this *ad hoc* Committee dismissed the procedural request for suspension (*see supra*, ¶ 49).

### 2. The Non-Disputing Party's Submission

229.    Pursuant to the Committee's Procedural Order No. 2, the EC was authorized to file a written submission in this annulment proceeding as a non-disputing party on the issues of "*whether the Tribunal manifestly exceeded its powers by finding jurisdiction and/or by failing to apply the proper law.*"[446]  The EC's position in its written submission before this Committee is summarized in the paragraphs below.

### a. Article 26 of the ECT Does not Apply Intra-EU and the Tribunal Lacked Jurisdiction

230.    The EC first submits that to the extent it contests the jurisdiction of the Tribunal, it is irrelevant whether Spain has raised the point or not, because international courts and tribunals have an obligation to review arguments challenging jurisdiction brought before them.[447]

231.    According to the EC, the Award should be annulled under Article 52(1)(b) of the ICSID Convention because the "*Tribunal manifestly exceeded its powers by finding that the intra-EU application of the ECT was compatible with the EU Treaties, and that the findings of the CJEU in Achmea did not apply to the ECT.  It should have found the contrary and declined jurisdiction.*"[448]

---

[444] Rej. Ann., Annex 2, ¶ 40.

[445] Rej. Ann., Annex 2, ¶¶ 38-39, 41.

[446] Procedural Order No. 2, ¶ 76(a).

[447] EC Submission, ¶ 38.

[448] EC Submission, ¶ 90.

232.    The EC "*profoundly disagrees*" with each of the Tribunal's findings on this issue, which it considers "*untenable as a matter of public international law*."[449]  More particularly, the EC submits:

233.    *First*, that the lack of a disconnection clause in the ECT was irrelevant,[450] because:

- As a matter of "*customary treaty law*" the use of the REIO clause in Articles 1(3) and 1(10) of the ECT rendered such a clause superfluous.[451]  REIO clauses recognize the EU and its Member States as a single entity of public international law.[452]  It is a "*rule of customary international law that the use of the REIO clause signals to the other contracting parties that the relations inter se of the EU and the EU Member States are governed not by the international agreement but on the basis of EU law*."[453]

- The ECT was signed by the EU Member States and the EU because "*for reasons internal to its own legal order*," the EU could not sign alone, not because the intention was to apply the ECT between them.[454]

- The rule of interpretation in Article 31 of the VCLT gives no pre-eminence to the ordinary meaning, and all of its provisions must be applied together.  Thus, the terms of the treaty must be "*read in the wider context of the ECT and the status as EU Member States (and therefore as members of a REIO that, by virtue of Article 1(3) ECT, is also a party to the ECT) of many of the Contracting Parties.*"[455]  That context clearly indicates that the ECT was not intended to bind EU Member States *inter se*, and the same conclusion follows form the text of the ECT, in particular Articles 1(3) and 36(7).[456]

- An investor from an EU Member State investing in another EU Member State is not an "*Investor*" making an investment in the "*Area*" of "***another** Contracting Party*" as required by Article 26 of the ECT, as they are investing in "*their own economic area.*"[457]

---

[449] EC Submission, ¶ 44.

[450] EC Submission, § 4.4.1.

[451] EC Submission, ¶ 45.  *See also, id*., ¶ 69.

[452] EC Submission, ¶ 46.

[453] EC Submission, ¶ 51.  *See also, id.*, ¶ 70.

[454] EC Submission, ¶ 57.

[455] EC Submission, ¶ 59.

[456] EC Submission, ¶¶ 62-63.

[457] EC Submission, ¶ 64 (emphasis in original).

234. *Second,* that the *Achmea* Judgment applies to Article 26 of the ECT and to ICSID arbitration, because:[458]

- The operative part of the judgment is the interpretation of Article 19 of the TEU and Articles 267 and 344 of the TFEU and the principle of autonomy of EU law, and that interpretation precludes intra-EU arbitration under Article 26 of the ECT.[459]

- The operative part of the judgment is drafted in non-specific terms referring to "*a*" provision in "*an*" international agreement between EU Member States.[460]

- The reasoning of the CJEU applies equally to intra-EU arbitration under the ECT, given that: (i) EU law is international law applicable between EU Member States; (ii) EU law constitutes "*applicable rules and principles of international law*" in the sense of Article 26 of the ECT; (iii) arbitral tribunals are not national courts or tribunals within the meaning of Article 267 of the TFEU (and in this respect, it makes no difference if the tribunal is sitting under a BIT, the ECT, UNCITRAL, SCC or ICSID); and (iv) there is no full review of the award by a court in an EU Member State, and as such "*any pronouncements that such an arbitral tribunal could make pose a threat to the integrity of the EU legal order.*"[461] The "*legal issue*" is the same.[462]

- The findings in the rulings of the CJEU are binding on arbitration tribunals.[463]

- As the role of the CJEU in a procedure under Article 267 of the TFEU is to give a binding interpretation of EU law, the *Achmea* Judgment stated the law to be applied "*ex tunc and erga omnes*," while also stating that the *Achmea* Judgment "*states the law as it always has been*" and must be applied including in pending cases.[464]

235. *Third*, that EU law prevails over Article 26 of the ECT in case of conflict, because:[465]

- By acceding to the EU, and/or ratifying the Lisbon Treaty, Spain and Malta concluded an *inter-se* agreement pursuant to Article 41 of the VCLT putting an end to the application between them of Article 26 of the ECT.[466]

- In the alternative, EU law takes precedence over the ECT in case of conflict. This follows from the principle of primacy of EU law codified in Declaration 17 of the

---

[458] EC Submission, § 4.4.2.

[459] EC Submission, ¶ 75.

[460] EC Submission, ¶ 80.

[461] EC Submission, ¶¶ 81, 83, 85.

[462] EC Submission, ¶ 88.

[463] EC Submission, ¶ 77.

[464] EC Submission, ¶ 87.

[465] EC Submission, § 4.4.3.

[466] EC Submission, ¶¶ 93, 98.

Lisbon Treaty, which is a "*written and express conflict rule*" that post-dates Article 16 of the ECT.[467]  That principle of primacy of EU law extends to intra-EU application of multi-lateral treaties, even if third countries are part to those treaties.[468]  The principle of primacy of EU law extends to national and international law.[469]

- Article 16(2) of the ECT cannot undermine the principle of primacy because: (i) it is only a rule of construction, not a conflict resolution rule; (ii) even if it were a conflict rule, it would yield to the principle of primacy of EU law, which is a "*special and mandatory*" conflict rule, that is also "*later in time*."[470]

236.    *Finally*, as reflected *supra*, ¶ 48, the Commission (and later Spain) also urged this *ad hoc* Committee to suspend the present annulment proceeding until the CJEU rendered an opinion requested by Belgium on the compatibility of intra-EU arbitration under the ECT with the EU Treaties,[471] a procedural matter that this Committee ruled upon by letter of July 2021 (*see supra*, ¶ 49).

### b.    Failure to Apply EU Law

237.    The EC notes that Spain submitted in the arbitration that, on the basis of Article 26(6) of the ECT, EU law was applicable both to establish jurisdiction and to the merits, but the Tribunal only decided whether EU law was applicable to the merits.[472]  The EC asserts that it explained in its written submission to the Tribunal why EU law was applicable substantive law.[473]  However, the Tribunal failed to engage in an analysis of the critical question whether EU law constituted "*applicable rules and principles of international law*" within the meaning of Article 26(6) of the ECT, and instead limited its finding to saying that the ECT prevails in the event of conflict between EU law and the ECT, which was "*entirely irrelevant*."[474]

238.    For the EC, the "*only plausible*" reading of the ECT is the finding in *Electrabel* that EU law forms part of the "*rules and principles of international law applicable to the Parties'*

---

[467] EC Submission, ¶¶ 99-101.

[468] EC Submission, ¶ 103.

[469] EC Submission, ¶ 107.

[470] EC Submission, ¶¶ 105-106.

[471] EC Submission, ¶¶ 111-114.

[472] EC Submission, ¶¶ 11, 13.

[473] EC Submission, ¶ 17.

[474] EC Submission, ¶¶ 19-20.

dispute under Article 26(6)."[475]  The EC submits that when referring to "*applicable rules* […] *of international law*," Article 26(6) of the ECT echoes the sources of international law mentioned in Article 38 of the ICJ Statute.   Article 38 of the ICJ Statute includes international conventions, and the EU Treaties are such; and further the CJEU has decided that EU law is "*public international law applicable between EU Member States.*"[476] Moreover, secondary law such as the European Parliament Directives and EC Decisions, also must be treated as international law applicable between Malta and Spain.[477]  Finally, the EC contends that the interpretation of EU law by the CJEU is binding upon the parties in an intra-EU dispute, EU Member States, and tribunals established under the ICSID Convention.[478]

239.   It follows, the EC argues, that "*by refusing to apply EU law, as interpreted by the CJEU, the Tribunal has failed to apply the proper law to the merits of the case.*"[479]  Had it done so, that "*could have led to a different outcome*" because:  (i) the State Aid rules in Articles 107 and 108 of the TFEU applied to the initial and amended Spanish support schemes, which was a crucial element to deciding on legitimate expectations; (ii) the EC State Aid Decision and its findings on reasonable profits, legitimate expectations and Article 10 of the ECT would apply; and (iii) in enacting the challenged measures Spain acted to apply EU law, and as a result, the general principle of protection of legitimate expectations "*as interpreted by the CJEU*" applied to those measures.[480]

240.   According to the EC, the Tribunal committed a "*manifest error*" that is ground for annulment, as it disregarded the findings in paragraph 159 to 166 of the EC State Aid Decision, which was part of the law to be applied by the Tribunal.[481]

---

[475] EC Submission, ¶ 21.

[476] EC Submission, ¶¶ 22-24.

[477] EC Submission, ¶ 26.

[478] EC Submission, ¶¶ 28, 30.

[479] EC Submission, ¶ 34.

[480] EC Submission, ¶¶ 35-36.

[481] EC Submission, ¶ 91.

### 3. The Committee's Analysis

#### a. The Standard

241. The Committee is mindful of its role as an annulment committee within the ICSID system, as explained in Section IV.B *supra*.

242. In its first ground for annulment of the underlying arbitration Award under Article 52(1)(b) of the ICSID Convention, Spain contends that the Tribunal "*manifestly exceeded its powers* […] *(1) by hearing an intra-EU dispute, in breach of EU law and (2) by not applying European Union law, which is applicable law under Article 26(6) of the ECT, to the merits of the dispute.*"[482]  The Committee notes that while Spain describes these bases in different terms at different times,[483] the Committee understands Spain to assert that the Tribunal manifestly exceeded its powers when it determined its jurisdiction to decide the dispute (notwithstanding the intra-EU nature of the matter and in contravention of EU law), and when it made its determination that EU law was not part of the applicable substantive law of the case.

243. The Parties agree that a manifest excess of power may exist when the Tribunal exceeds its jurisdiction or has no jurisdiction, or when it does not apply the appropriate law.[484]  Spain does not, however, differentiate the standard whether the alleged excess of powers concerns applicable law or jurisdiction.

244. The Parties agree that the word "*manifest*" means, at least, "*obvious*" and "*clear*."[485]  They also rely on the same passage of the *Soufraki* annulment decision, providing further elucidation of the standard concerning claims of a failure to apply the proper law:

> "*Misinterpretation or misapplication of the proper law may, in particular cases, be so gross or egregious as substantially to amount*

---

[482] Reply Ann., ¶ 26.

[483] *See e.g.*, Mem. Ann. ¶ 53 ("*1. By going beyond its jurisdiction in contravention of EU law; 2. By omitting the regulations applicable to the dispute and, in particular, by not applying EU law.*")  *See also*, Tr. Ann., Day 1 (ENG), 12:1-4 ("[W]*e must start by denouncing that the OperaFund Award manifestly exceeded its powers when it declared its jurisdiction to hear an intra-EU dispute*"); and Tr. Ann., Day 1 (ENG), 23:4-6 ("*With this, I am going to analyse the existence of manifest excess of power now by not applying the appropriate law, which is EU law.*") (Ms. Garrido).

[484] *See e.g.,* Mem. Ann., ¶ 55 and C-Mem. Ann., ¶ 41.

[485] *See* Tr. Ann., Day 1 (ENG), 10:15 (Ms. Garrido) and Tr. Ann., Day 1 (ENG), 71:24 (Mr. Fortún).

> *to failure to apply the proper law. Such gross and consequential misinterpretation or misapplication of the proper law which no reasonable person ('bon père de famille') could accept needs to be distinguished from simple error – even a serious error – in the interpretation of the law which in many national jurisdictions may be the subject of ordinary appeal as distinguished from, e.g., an extraordinary writ of certiorari.*"[486]

245.    In the Committee's view the adjectives used and shared by the Parties in their submissions – "*obvious*," "*clear*," "*gross*," "*egregious*," "*no reasonable person*" – adequately capture the sense of the standard to be applied.

246.    OperaFund and Schwab agree that a case of excess of power in relation to jurisdiction "*may trigger the annulment of any award, but only where it is obvious that a tribunal lacked or exceeded its jurisdiction; in other words, if its decision was* **unreasonable**."[487]   In the Committee's view, this standard is not unique to excesses of powers concerning jurisdiction; as the quoted language above from the *Soufraki* annulment decision shows, it is also applicable to excesses of powers concerning the applicable law.

247.    Considering the submissions of the Parties and the above considerations, the Committee determines that a "*manifest excess of power*" requires a finding on the part of the Committee that the tribunal's determination of its jurisdiction, and separately in its determination of the law to be applied, erred clearly and obviously, and in an egregious or unreasonable manner.

248.    To be clear, this formulation does not permit an annulment based on a conclusion that reasonable minds can differ.   The Committee agrees with the annulment committee of *Klöckner I* where it states:

> "*It is possible to have different opinions on these delicate questions, or even, as do the Application for Annulment or the Dissenting Opinion, to consider the Tribunal's answers to them not very convincing, or inadequate. But since the answers seem tenable and not arbitrary,* **they do not constitute the manifest excess of powers which alone would justify annulment under Article 52(1)(b). In any**

---

[486] *See* Mem. Ann., ¶ 57 and C-Mem. Ann., ¶ 48 (referring to **RL-0084/RL-0121**, *Soufraki*, ¶ 86) .
[487] C-Mem. Ann., ¶ 50 (emphasis in original).

> *case, the doubt or uncertainty that may have persisted in this regard throughout the long preceding analysis should be resolved 'in favorem validitatis sententiae' and lead to rejection of the alleged complaint.*"[488]

249.    The Committee will assess Spain's claims that the Tribunal manifestly exceeded its powers on the basis of the above guidelines.

250.    Before analyzing the issues to be determined, the Committee notes that in Section IV.C.1 *supra*, the Committee has undertaken an exhaustive summary of the Parties' positions, and those of the EC, on the points at issue.  In rendering its conclusions, the Committee will not repeat this exercise.  The Committee will, however, focus on the specific errors identified by Spain that, in Spain's view, warrant annulment on the basis of a manifest excess of powers.

### b.    *Manifest Excess of Powers by Declaring Jurisdiction*

251.    In Section IV.A.(2)(2.5) of its Memorial on Annulment, Spain sets forth the specific grounds on which it relies for its claim that the Tribunal manifestly exceeded its power by declaring its jurisdiction over the dispute.   In Section IV.A.(2)(2.4) of its Reply on Annulment, Spain does similarly, except that the grounds are considerably different than the grounds identified and described in its Memorial on Annulment.  The Committee will focus on what it considers to be Spain's main arguments in light of OperaFund and Schwab's responses.

252.    Spain's main argument, and indeed the focus of the Tribunal's determination of its jurisdiction in the Award, is as follows:

> "*In the underlying arbitration, the Tribunal made an erroneous and biased interpretation of EU Law that led it to conclude, contrary to the most basic principles of EU Law, that it had jurisdiction to hear this matter. The Tribunal rejects the jurisdictional objection raised by the Kingdom of Spain for essentially two reasons. First, because it is understood that the doctrine emanating from the Achmea judgement is not applicable to the present case since the jurisdiction is based on the ECT and not on a BIT between two EU Member*

---

[488] **RL-0183**, *Klöckner*, ¶ 52(e) (emphasis in original).

> *States.   And secondly, by understanding that given the notorious differences between the underlying arbitrations in the Achmea case and in the present case, they are not comparable, since the present arbitration is situated in the context of Public International Law and not in the national or regional context.*"[489]

253.    Thus, in Spain's view, the Tribunal erred by ignoring the import of the *Achmea* Judgment by distinguishing it from the present case on the bases that: (i) the *Achmea* case was founded on a BIT, while the present case was based on the ECT; and (ii) the present arbitration is situated in the context of Public International Law and not in the national or regional context.

254.    In OperaFund and Schwab's view, the Tribunal "*clearly outlined the distinction between the Achmea case and the case at hand,*"[490] and the BIT at issue was "*a completely different type of treaty applying only to EU parties and applying a different body of law than the ECT.*"[491]

255.    The Committee understands the gravamen of Spain's contention to be that the Tribunal failed to give any weight to the *Achmea* Judgment, thereby manifestly exceeding its jurisdiction; in other words, if the Tribunal had adopted the *Achmea* Judgment, it would have declined jurisdiction on the basis of the intra-EU objection and EU law.  The question now is whether the Tribunal's decision not to do so constitutes a manifest excess of powers; that is, whether it "*clearly and obviously, and in an egregious or unreasonable manner*" exceeded its powers.[492]

256.    The Committee decides that it has not, for the following reasons.

257.    The record of the underlying arbitration reflects a comprehensive hearing and examination of the issues presented by the Parties, including post-hearing briefs focused on the core

---

[489] Mem. Ann., ¶ 117.

[490] C-Mem. Ann., ¶ 92.

[491] C-Mem. Ann., ¶ 93.

[492] *Supra*, ¶ 247.

issues presented here. In its Award, the Tribunal set forth substantive reasons why it decided to reject the determinations of the *Achmea* Judgment.

258. Its first reason is "*that in the present case, jurisdiction is based on the ECT, while the Achmea Case it was alleged to be based only on a BIT between two EU Member States*."[493] As noted above, Spain contends that this ground is inadequate. Standing alone, it may, or may not be; the fact is, however, that the Tribunal set forth a number of additional reasons upon which its decision was built, and the Committee must assess all of the Tribunal's reasonings in its assessment.

259. The Tribunal further observed that the *Achmea* Judgment "*makes no mention of the ECT and the reasoning of the Court does not cover or apply to arbitrations based on the ECT*."[494] On this basis, the Tribunal stated its agreement "*with the reasoning provided by the Vattenfall tribunal*," that "*correctly found that there was nothing in the ECT to indicate the parties had intended to carve-out intra-EU disputes while it would have been a 'simple matter' to include such a carve-out but there was no indication that this had been intended*."[495]

260. The Tribunal stated, with reference to *Vattenfall*, that "*it is also telling that the ECT lacks a 'disconnection clause' providing that it would not apply as to between EU member states*," and added tellingly that the "*EU has included such clauses in other treaties to which it is a party and the negotiating history of the ECT reveals that an EU proposal to include such a clause was dropped from the draft treaty*."[496]

261. The Tribunal concluded on this issue that "*neither Achmea (explicitly limiting its scope to intra-EU BITs and leaving an assessment of the ECT open) nor EU law generally (Article 344 TFEU, being limited to inter-state disputes) prevents member states to agree on investment arbitration in the framework of the ECT*."[497]

---

[493] **RL-0118**, Award, ¶ 381.

[494] **RL-0118**, Award, ¶ 381.

[495] **RL-0118**, Award, ¶ 381.

[496] **RL-0118**, Award, ¶ 381.

[497] **RL-0118**, Award, ¶ 382.

262.   Spain's further contention is that the Tribunal erred by finding that the present case and the *Achmea* case were not comparable on the basis that the "*present arbitration is situated in the context of Public International Law and not in the national or regional context.*"[498]

263.   However, in paragraphs 384-386 of the Award, the Tribunal recounts the elements of the *Achmea* case that characterizes its national or regional nature, and contrasts the international nature of the present case, which is under the ICSID Convention.   In concluding, the Tribunal emphasizes that the "*Achmea Judgment contains no reference to the ICSID Convention or to ICSID Arbitration.*"[499]

264.   The Tribunal concludes as follows:

> "[…] *Therefore, and in view of the above-mentioned determinative differences between the Achmea Case and the present one, the Achmea Judgment cannot be understood or interpreted as creating or supporting an argument that, by its membership in the EU, Spain is not bound by the ICSID Convention.*
>
> *In view of the above considerations, the present Tribunal, as all recent arbitration decisions dealing with the disputed measures in Spain, concludes that the intra-EU objection is not justified and that it does have jurisdiction.*"[500]

265.   The question before this annulment Committee on the issues raised by Spain is not whether the Tribunal was right or wrong by its decision not to follow the jurisprudence set forth in the *Achmea* Judgment; the question is whether, in doing so, the Tribunal manifestly exceed its powers.

266.   On the basis of this record, the Committee concludes that the Tribunal clearly did not manifestly exceed its powers.  Each and every one of the reasons the Tribunal put forward in explaining its rationale is, at least, reasonable.  In the Committee's view it is more than that: the Tribunal's reasons are fully supportive of the position it has taken.

---

[498] Mem. Ann., ¶ 117.
[499] **RL-0118**, Award, ¶ 387.
[500] **RL-0118**, Award, ¶¶ 387-388.

267.    While there are certainly counter arguments to the Tribunal's positions, and Spain has identified them in this proceeding as well as in the underlying arbitration, the fact that Spain holds firm to them is not a basis for a finding of a manifest excess of powers. The Committee appreciates that this particular issue – the intra-EU objection as it pertains to the ECT – has been the subject of many tribunals and annulment committees. The Tribunal in this case has, on numerous instances in its Award, recalled and relied on the findings of other tribunals who have dismissed the intra-EU objection in support of its positions.[501] The Committee cannot disregard these cases, and finds that they provide additional support for the Committee's conclusion that the Tribunal's decision to assert jurisdiction over the underlying matter was not a manifest excess of power.

268.    Spain's second main argument is set forth as follows:

> "*The tribunal in OperaFund, when considering that the literal wording of the ECT does not protect the position of the Kingdom of Spain, due to not establishing a differentiated treaty for the Member States of the European Union, (i) obviated that such a distinction has been made by the Member States, which have signed a series of treaties that make up EU Law and that prevail over the ECT according to the principle of primacy and (ii) ignored that the literal application of the terms of the treaty leads to the same solution, if the reference to the 'Regional Economic Integration Organisation' (REIO) is taken into account.*"[502]

269.    By these objections, the Committee understands Spain to object to the Tribunal's concluding that the "*literal wording*" of the ECT "*does not protect the position*" of Spain, by "*not establishing a differentiated treaty for the* [EU] *Member States*;" a distinction, which Spain submits was "*made by the Member States*" by entering into treaties that constitute EU law which prevails over the ECT "*according to the principle on primacy.*" Spain further objects that the Tribunal "*ignored that the literal application of the terms of the treaty leads to the same solution* [*i.e.*, upholding of the intra-EU objection] *if the reference to* [...] *(REIO) is taken into account.*"[503]

---

[501] *See, e.g.*, **RL-0118**, Award, ¶¶ 378, 379, 381 and 388.

[502] Mem. Ann., ¶ 118; *see also*, *id.*, ¶¶ 75 and 83-86.

[503] Mem. Ann., ¶ 118.

270.    In the Committee's view, Spain's complaints with respect to the above issues amount to its differences of opinion with the outcome of the Award; in other words, its assertions do not meet the high bar of constituting a manifest excess of powers.

271.    Furthermore, in asserting that the Tribunal engaged in only a "*literal*" interpretation of the ECT, Spain ignores the fact that the Tribunal made it clear that "*Articles 31-33 of the VCLT reflect the relevant rules of interpretation of international treaties under customary international law, and these are applicable to the construction of the ECT and the ICSID Convention.*"[504]  Spain has not provided any evidence for its assertions in this regard.

272.    Relatedly, Spain argues that the Tribunal "*has not carried out an analysis of all of the rules of interpretation provided for in Article 31 of the* [VCLT]*, but has limited itself to indicate that: '(…) it is not necessary to 'reinvent the wheel' and initiate a new examination of all the details relating to the* [intra-EU objection].  *The Tribunal agrees with all the recent* [conclusions] *of other tribunals to the effect that*, [also] *after the Achmea Judgment of the Court of Justice* [of the EU], *the intra-*[EU] *objection is not justified and* [the Tribunal] *does have jurisdiction in* [the present] *case*.'"[505]

273.    Spain follows by asserting that "*this expression by itself would be sufficient cause to uphold the annulment of the award as it is not admissible for an objection of such significance to be resolved by the Tribunal without a detailed and brief analysis of the peculiarities of the issue.*"[506]  The Committee does not agree.

274.    As noted above, in the paragraphs of the Award that follow the above paragraphs just quoted, the Tribunal provided its specific and detailed reasons for rejecting the jurisdictional objection.[507]  These reasons are, in the Committee's view, fully supportive of the position in the Tribunal's conclusion.

---

[504] **RL-0118**, Award, ¶ 323.

[505] Mem. Ann., ¶ 75.

[506] Mem. Ann., ¶ 76.

[507] **RL-0118**, Award, ¶¶ 381–388.

275.    Moreover, Spain ignores the context within which the Tribunal made its comments concerning no need to "*re-invent the wheel*."  Before making that comment, the Tribunal noted its awareness of the decisions by other tribunal's addressing similar ECT and ICSID cases, and noted that in a Procedural Order issued after the hearing on the merits, it invited the Parties to, among other things, "*identify what they consider to be, in comparison to the present case, the common denominators and main differences of the factual and legal background in the following cases*," and identified the *Charanne B.V., Eiser Infrastructure, Isolux Infrastructure, Novenergia II,* and *Masdar Solar* cases.[508] The Tribunal later invited the Parties to *"extend these comments in their second Post-Hearing Briefs ('PHBs') also to the Vattenfall Decision, which had been issued in the meanwhile."*[509]

276.    As reflected in the Award, both Parties argued their positions in light of these cases and particularly the *Vattenfall* case.[510]  These cases, quite clearly, dealt in detail with the issues raised by Spain and raised again in this case, including its arguments concerning the interpretation of the applicable treaties, the relevance of the REIO provisions of the ECT, its arguments in favor of an implicit disconnection clause, and the issue of primacy under EU law – and these are all issues that Spain, and indeed OperaFund and Schwab, addressed with the Tribunal throughout the arbitration.

277.    Mindful of this, the critical question before the Tribunal, as shaped by the Parties' submissions, was the impact of the *Achmea* Judgment on the question of the intra-EU objection.[511]   On this issue, as determined and explained above, the Committee has concluded that the Tribunal's analysis was clear, logical and reasonable, and even though

---

[508] **RL-0118**, Award, ¶ 378.

[509] **RL-0118**, Award, ¶ 379.

[510] *See* **RL-0118**, Award, ¶¶ 348, 358, 362 and 363.

[511] The Committee recognizes that the *Komstroy* Judgment of 2 September 2021 was rendered after the Tribunal completed its work.  Consequently, on 20 October 2021, the Committee denied Spain's application to enter the *Komstroy* Judgment into the record of this annulment proceeding, which Spain had argued was of "*paramount relevance*" as it dealt with the question of whether the findings of the *Achmea* Judgment also applied in the ECT context.  In ruling on that procedural application, the Committee stated that "*it* [was] *difficult for the Committee to see how a judgment, of any kind, rendered long after an arbitration award has been issued, could be 'outcome determinative' to a follow-on annulment proceeding*."  Committee's Letter, 20 October 2021, pp. 2, 4.

Spain has raised reasonable counter arguments, it cannot be said that the Tribunal manifestly exceeded its powers.

278.     In this context, the Committee concludes that it was not unreasonable for the Tribunal make clear its agreement with "*all the recent conclusions of other tribunals*,"[512] and "*to shortly indicate the major determinative reasons on which it relies for this conclusion*."[513]

> **c.    Manifest Excess of Powers by Failure to Apply the Applicable Law: EU Law**

279.     As with the first ground of annulment under Article 52(1)(b) of the ICSID Convention, the Committee must determine whether the Tribunal manifestly exceeded its powers, this time by determining that EU law was not the law applicable to the case; in other words, whether the Tribunal "*clearly and obviously, and in an egregious or unreasonable manner*" exceeded its powers for failing to apply EU law as the law of the case.[514]   Again, the Committee concludes that the Tribunal did not manifestly exceed its powers.

280.     At the outset of its analysis in the Award, the Tribunal notes points of agreement between the Parties: *First*, that pursuant to Article 26(6) of the ECT, "*the Tribunal shall decide this dispute in accordance with the ECT and applicable rules and principles of international law*."[515] *Second*, that "*Articles 31-33 of the VCLT reflect the relevant rules of interpretation of international treaties under customary international law and these are applicable to the construction of the ECT and the ICSID Convention*."[516]   *Third*, that the Tribunal is "*not bound by Spanish domestic law, which the Tribunal shall consider as a fact*."[517]   *Fourth* and last, that the Parties agree that while EU law is part of the domestic law of any EU Member State, "*the Respondent also contends that that EU law is also applicable international law*."[518]

---

[512] **RL-0118**, Award, ¶ 380.

[513] **RL-0118**, Award, ¶ 380.

[514] *Supra*, ¶ 247.

[515] **RL-0118**, Award, ¶ 323.

[516] **RL-0118**, Award, ¶ 323.

[517] **RL-0118**, Award, ¶ 324.

[518] **RL-0118**, Award, ¶ 325.

281.   Turning then to the issue of applicable law, the core of the Tribunal's analysis focuses on the language of the ECT itself.  It begins by noting the agreement of the Parties that "*Article 26(6) of the ECT is the provision ruling on the substantive law applicable for this Tribunal.*"[519]  It then states that "[e]*ven if, as Respondent argues, in addition to the ECT itself, this provision would make EU law applicable as part of the 'applicable rules and principles of international law,' in the view of the Tribunal it is clear that EU law does not prevail over any provisions of the ECT relevant in the present arbitration.*"[520]

282.   The Tribunal cites Article 16(2) of the ECT to support its conclusion, [521] and states that this section of the Article "*makes it expressly clear that Parts III and IV of the ECT – which are precisely those dealing with Investment Promotion and Protection and Dispute Settlement relevant for this arbitration – remain fully applicable.*"[522]  In this context, the Tribunal noted that "*insofar as the Member States of the ECT wanted to carve out certain matters from application of the ECT, they did so expressly.*"[523]

283.   The Tribunal followed this observation by stating that "*without the need to repeat the details of the reasoning,* [it] *agrees with* […] *the Vattenfall Tribunal in its interpretation of international law and in particular, the law of treaties codified under the VCLT, that, to the extent that the EC or EU Member States saw an incompatibility between EU law and the ECT negotiation, the conflict would have to be resolved by applying the lex specialis in Article 16 of the ECT.*"[524]

284.   Because the Tribunal cited specific language of the *Vattenfall* decision, it is important to relay the language in question here:

> "*The Tribunal therefore finds that Article 16 ECT is lex specialis as a conflicts of law rule in the present case. In the Tribunal's view, Article 16 poses an insurmountable obstacle to Respondent's*

---

[519] **RL-0118**, Award, ¶ 327.

[520] **RL-0118**, Award, ¶ 327.

[521] **RL-0118**, Award, ¶ 327.

[522] **RL-0118**, Award, ¶ 328.

[523] **RL-0118**, Award, ¶ 329.

[524] **RL-0118**, Award, ¶ 329 (citing **CL-0223**, *Vattenfall AB and others v. Federal Republic of Germany*, ICSID Case No. ARB/12/12, Decision on the Achmea Issue, 31 August 2018 ["***Vattenfall***"] , ¶ 229).

> *argument that EU law prevails over the ECT. The application of Article 16 confirms the effectiveness of Article 26 and the Investor's right to dispute resolution, notwithstanding any less favorable terms under the EU treaties. If the Contracting Parties to the ECT intended a different result, and in particular if they intended for EU law to prevail over the terms of the ECT for EU Member States, it would have been necessary to include explicit wording to that effect in the Treaty. The need for such a provision is reinforced by the existence of Article 16 ECT, since it points to the opposite result.*"[525]

285.  On the basis of this cogent analysis, the Tribunal concludes that "*all substantive provisions of the ECT remain fully applicable and EU law is not part of the applicable law in this case.*"[526]

286.  The Committee has taken pains to review and layout the Tribunal's analysis and conclusions, and having done so considers that its analysis is well-founded on the provisions of the ECT, methodical and logical, and that its conclusions are reasonable and naturally flow from its analysis.  Moreover, the Tribunal's position on these issues is not isolated; it was preceded by numerous previous tribunals.  While the Committee has assessed this case on its own merits, it cannot ignore the similar conclusions of other tribunals.  For all of these reasons, the Committee concludes that the Tribunal did not manifestly exceed its powers in reaching its conclusion that EU law was not the substantive law of the case.

287.  This is not to say that the Tribunal was correct in an absolute way; Spain has every belief that the Tribunal was not correct in reaching this conclusion.  However, belief, or even correctness, is not the standard that is before us in this procedure.

288.  At the same time, Spain has failed to persuade the Committee that there are grounds here under Article 52(1)(b) of the ICSID Convention that warrant annulment.  For the most part, Spain reargued issues that had been addressed in the underlying arbitration.  The Committee will not re-address such issues as this is not a role of an annulment committee.  For the purpose of illustration, however, the Committee references the language of Article

---

[525] **CL-0223**, *Vattenfall*, ¶ 229.
[526] **RL-0118**, Award, ¶ 330.

16(2) of the ECT, and Spain's argument that the Tribunal "*fails to explain why the possibility of resorting to international arbitration should hypothetically be considered as more favourable for investor protection.*"[527]    This issue was fully addressed in the underlying arbitration and argued by OperaFund and Schwab; in the underlying arbitration, this issue was not hypothetical, it was a very real issue for OperaFund and Schwab.

289.    At other times, Spain asserts its position as if it was established law, as opposed to arguments designed to persuade.  A core argument of Spain is that the Tribunal's reasoning disregarded "*that the **primacy** of EU Law extends to the rules of International Law,*"[528] and that "*contrary to what was alleged by the Tribunal, the principle of **primacy** obviously extends to the norms of International Law.*"[529]    Spain later properly moderated these two statements, by arguing at the Hearing on Annulment that "*the application of EU law also requires taking into account* [...] *the principle of primacy, pursuant to which EU law takes precedence over any other rule in the **relations between Member States***, *such as is the case here*."[530]

290.    The language "*EU law takes precedence over any other rule in the relations between the Member States*" is critical.  Few, if any, would object to this statement; indeed it is a cannon of EU law.  The problem arises when efforts are made to apply the principle beyond the legal confines of the EU, such as in multilateral treaties, like the ECT, involving non-EU nationals, as is the case here.  Spain has provided no explanation as to how the EU principle of primacy may be applied within an ECT case where nationals of non-EU Members are Parties to the dispute without fragmenting the ECT itself.[531]

---

[527] **AD-001**, Spain Opening Statement, Hearing on Annulment, 19 July 2021, p. 37 (emphasis removed).

[528] Mem. Ann., ¶ 138 (emphasis in original).

[529] Mem. Ann., ¶ 144 (emphasis in original).

[530] Tr. Ann., Day 1 (ENG), 18:8-13 (Ms. Garrido) (emphasis added).

[531] *See* Tr. Ann., Day 1 (ENG), 132:13-24 (Ms. Garrido).

> **d.    Manifest Excess of Powers by Misapplication of the Applicable Law**

291.    Spain contends that the Tribunal "*manifestly misappl*[ied]"[532] the applicable law by failing to apply EU State Aid law as applicable international law, or "*as a fact*."[533]  Spain asserts that "*even if EU law were to be considered as national law,* [the Tribunal] *cannot consider alleged expectations of fair and equitable treatment that are potentially based on a breach of applicable mandatory rules such as the State Aid rules.*"[534]

292.    As the Committee has determined, the Tribunal's analysis on the issue of applicable law is founded on the provisions of the ECT; it is methodical and logical, and its conclusions reasonably flow from its analysis.  On this basis, the Committee sees no persuasive reason why it should annul the Tribunal's unanimous decision on this issue.  Spain's extension of its argument – the Tribunal's alleged failure to properly apply EU State Aid law as applicable international law or as a fact – must fail for the same reasoning.

293.    The Tribunal's determination that "*EU law does not prevail over any provisions of the ECT relevant in the present arbitration,*"[535] makes it clear that, as expressed succinctly by OperaFund and Schwab, "*the Tribunal reasoned and correctly justified its finding that EU State aid law matters were not relevant for its assessment of OperaFund's legitimate expectations under Article 10(1) of the ECT.*"[536]  For these reasons, Spain's arguments are unavailing.

## D.    SECOND GROUND: FAILURE TO STATE REASONS

### 1.    The Parties' Positions

#### a.    Spain's Position

294.    Spain argues that the Award should be annulled pursuant to Article 52(1)(e) of the ICSID Convention.[537]  According to Spain, the Award fails to state reasons with regard to (i) the

---

[532] Reply Ann., ¶ 279.
[533] Reply Ann., ¶ 278.
[534] Reply Ann., ¶ 261
[535] **RL-0118**, Award, ¶ 327.
[536] C-Mem. Ann., ¶ 136.
[537] Mem. Ann., ¶ 405.

applicability of EU law; (ii) its conclusions on liability for breach of the ECT; and (iii) the quantification of damages.[538]

(i)    The Standard

295.    Spain submits that, pursuant to Article 48(3) of the ICSID Convention, a tribunal must "*address all the issues referred to it*" and indicate the reasons for its conclusions; and pursuant to Article 52(1)(e) an award must be annulled "*if it has not indicated the reasons on which it is based.*"[539]

296.    For Spain, the standard requires, at minimum, that "*the ruling allows the reader to 'follow how the tribunal proceeded from Point A. Point B,*'"[540] that the addressees of the award be able "*to understand the process leadings to its conclusions*;"[541] and that the reasons provided "*constitute an appropriate foundation for the conclusions reached […].*"[542] The reasons must be "*sufficiently relevant.*"[543]   Accordingly, Spain submits, the Committee's task is to determine if the Tribunal provided a "*comprehensive and consistent reasoning*;"[544] and that requirement is not satisfied "*by either contradictory or frivolous reasons.*"[545]   For Spain, as the committee in *Pey Casado* held, "*as long as there is no express rationale for the conclusions with respect to a pivotal or outcome-determinative point, an annulment must follow, whether the lack of rationale is due to a complete absence of reasons or the result of frivolous or contradictory explanations.*"[546]

297.    Spain further argues that, in certain cases, "*inadequate reasons*" amount to failure to state reasons, when those reasons "*[…] are so inadequate that the coherence of the reasoning*

---

[538] Mem. Ann., ¶ 151.

[539] Mem. Ann., ¶ 152.  *See also, id.,* ¶ 405; Reply Ann., ¶ 377.

[540] Mem. Ann., ¶ 153 (quoting **RL-0129**, *MINE*, ¶ 5.09, and other cases).  *See also,* Reply Ann., ¶¶ 392, 410.

[541] Reply Ann., ¶ 405 (quoting **RL-0128**, *Tidewater Investment SRL and Tidewater Caribe, C.A. v. The Bolivarian Republic of Venezuela*, ICSID Case No. ARB/10/5, Decision on Annulment, 27 December 2016 ["**Tidewater**"], ¶ 172).  *See also*, Reply Ann., ¶ 401 (relying on **RL-0191**, *TECO Guatemala Holdings LLC v. Republic of Guatemala*, ICSID Case No. ARB/10/23, Decision on Annulment, 5 April 2016 ["**TECO**"], ¶ 87).

[542] Mem. Ann., ¶ 153 (quoting **RL-0185**, *Amco*, ¶ 43).  *See also*, Reply Ann., ¶ 388.

[543] Reply Ann., ¶ 383 (relying on **RL-0183**, *Klöckner*, ¶ 120).

[544] Mem. Ann., ¶ 154 (citing **RL-0122**, *Sempra*, ¶ 167).  *See also*, Reply Ann., ¶ 422.

[545] Mem. Ann., ¶ 157 (quoting **RL-0129**, *MINE*, ¶ 5.09, and other cases); Reply Ann., ¶ 382 (relying on **RL-0183**, *Klöckner*, ¶ 116); Reply Ann., ¶ 392 (relying on **RL-0129**, *MINE*, ¶ 5.09).

[546] Reply Ann., ¶ 400 (quoting **RL-0169**, *Pey Casado*, ¶ 86).

*is seriously affected.*"[547]  In addition, relying on *Klöckner*, Spain emphasizes that "*it is not for the Committee to imagine what might or should have been the arbitrators' reasons, any more than it should substitute 'correct' reasons for possibly 'incorrect' reasons, or deal 'ex post facto' with questions submitted to the Tribunal* […]."[548]

298.    Spain contends that under the ICSID Convention tribunals have an obligation to "*deal with the problems, arguments and evidence presented*," and a tribunal's failure to address "*a specific question referred to it*" or "*certain relevant evidence*" is equivalent to failure to state reasons.[549]  Thus, for Spain, as the committee in *Klöckner* held, a tribunal's failure to deal with "*every question submitted to*" it must lead to an annulment.[550]  Spain further observes that, while the committee in *MINE* understood that "*failure to respond to each of the arguments presented by the parties*" does not constitute a ground for annulment, it recognized that the "*relevance of those arguments for the final resolution of the dispute*" matters because failure to deal with questions "*the answer to which might have affected the Tribunal's conclusion*" does amount to a failure to state reasons.[551]

299.    In short, according to Spain, an examination of prior annulment decisions supports the conclusions that: (i) the mere expression "*of an opinion is not an expression of reasons*, *if it does not detail the reasoning that has allowed the Tribunal to reach* […] *a conclusion*;" (ii) a "*mere expression of reasons is not sufficient to render the Award valid* […] *if they are not adequate*;" (iii) "*frivolous or contradictory reasons do not serve to support the Award*;" and (iv) a failure to state reasons also takes place when a tribunal "*omits to rule on relevant issues raised by the parties*."[552]

---

[547] Reply Ann., ¶ 395 (relying on **RL-0190**, *Mr. Patrick Mitchell v. The Democratic Republic of Congo*, ICSID Case No. ARB/99/7, Decision on the Application for Annulment, 1 November 2006 ["***Mitchell***"], ¶ 21).

[548] Reply Ann., ¶ 386 (relying on **RL-0183**, *Klöckner*, ¶ 151).

[549] Mem. Ann., ¶ 161.

[550] Reply Ann., ¶ 382 (quoting **RL-0183**, *Klöckner*, ¶ 115).

[551] Reply Ann., ¶ 393 (relying on **RL-0129**, *MINE*, ¶ 6.99).

[552] Reply Ann., ¶ 407.

(ii)   Failure to State Reasons on the Determination of the Applicable Law

300.   Spain submits that the Tribunal's reasoning for its failure to apply EU law to the merits is "*insufficient and inadequate*."[553]  Spain contends that although it argued in the arbitration that EU law was applicable law to jurisdiction and the merits, the Award failed to give a "*due answer to these questions*;" and instead rejected without a "*minimum*" of analysis the primacy of EU law, and concluded that the ECT was applicable and that EU law was not part of the applicable law to the substance.   According to Spain, the decision to reject the application of EU law in general, and State Aid law in particular, is in "*clear and completely irrational contradiction*" with previous findings in the Award, and "*lacks any motivation whatsoever*."[554]

301.   For Spain, the Tribunal left "*unexplained*" a number of "*basic questions*," in particular: (i) why Articles 107 and 108 of the TFEU were not applied to the merits; and (ii) why the reasoning of the EC State Aid Decision was not assessed.[555]  Spain says that the Tribunal kept "*silent*" about the EU State Aid regime when assessing the Claimants' legitimate expectations, even though Spain had asked the Tribunal to make a decision on this issue.[556]

302.   *First*, according to Spain, the Tribunal did not offer a "*minimally reasoned explanation*" for its decision to "*radically ignore*" the relevance of Articles 107 and 108 of the TFEU, despite Spain's strong insistence during the proceeding that the State Aid regulations had to be considered.[557]   For Spain, the reasoning of the Tribunal on this point is "*not only radically wrong*" but also "*practically non-existent*;" and the statements on matters of EU law in the Award are "*strikingly inconsistent, if not simply non-existent*."[558]

303.   *Second*, Spain submits, the Tribunal "*does not devote a line*" to assessing the EC State Aid Decision, even though (i) this decision constitutes an analysis of the regulatory framework

---

[553] Reply Ann., ¶ 416.

[554] Mem. Ann., ¶¶ 163-164; Reply Ann., ¶ 414.  *See also, id.*, ¶ 417.

[555] Mem. Ann., ¶¶ 165-176.

[556] Reply Ann., ¶ 412.

[557] Mem. Ann., ¶¶ 166-167.

[558] Mem. Ann., ¶¶ 170-171.

at issue in the arbitration by the only competent institution on matters of State Aid, namely, the EC;[559] and (ii) Spain had requested the introduction of the decision on the record of the arbitration highlighting its importance.[560]

304.    Spain concludes by adding that OperaFund and Schwab's contention that no failure to state reasons exists because EU law on State Aid does not prevail over the applicable rules and principles of international law fails, for the same reasons presented under the ground for manifest excess of power (*supra*, Section IV.C.1.a).[561]

(iii)    Failure to State Reasons on the Conclusions on Liability

305.    Spain submits that on the question of the Fair and Equitable Treatment ("**FET**") standard and legitimate expectations, the Award "*lacks the most basic reasoning*" and provides only a "*superficial analysis*" despite the complexity of the dispute.[562]    For Spain, the decision on liability is "*not supported by valid, sufficient and adequate reasons, but is riddled with inconsistencies, unjustified relevant aspects and contradictions.*"[563]    In particular, Spain argues that the Award fails to state reasons with regard to: (i) its interpretation of Article 10(1) of the ECT; (ii) the existence of legitimate expectations; and (iii) the content of those expectations, the manner in which Spain breached them, and the assessment of the disputed measures.[564]

306.    Spain denies that its submissions merely amount to a showing of disagreement with the findings in the Award, nor does it accept that its allegations under this ground amount to an appeal.    Spain submits that, instead, it is asking the Committee to determine whether the Award failed to present "*sufficiently pertinent reasons*" for its finding that Spain breached Article 10(1) of the ECT.[565]    Spain takes the view that, contrary to OperaFund and

---

[559] Mem. Ann., ¶ 173.

[560] Mem. Ann., ¶ 174.

[561] Reply Ann., ¶ 415.

[562] Mem. Ann., ¶ 177.

[563] Reply Ann., ¶ 452.

[564] Reply Ann., ¶ 418.

[565] Reply Ann., ¶¶ 420, 424.

Schwab's contentions, the Committee's task is to determine whether the reasoning is "*comprehensible and consistent,*" not merely "*readable.*"[566]

(a)    *The Deficiencies in Reasoning on the FET Standard*

307.    Spain submits that the Award addresses the FET standard in the ECT at paragraphs 480-490 and 508-513, exhibiting a "*remarkable*" lack of reasons, as demonstrated by Professor Phillipe Sands' dissent.[567]

308.    According to Spain, the Award does not provide "*reasoning clear enough*" to allow the Parties to understand why "*if the State retains the regulatory power to accommodate the regulation to the economic situation for reasons of general interest (Point A), a State could not, for those same reasons, modify the regulation in a substantial manner, altering its essential characteristics (Point B).*"[568]  Spain contends that the Award does not allow it to understand "*how far the regulatory power that the State maintains*" goes, and where the "*necessary respect for legitimate expectations begins.*"[569]  Moreover, Spain argues, the Award is "*plagued with inconsistencies and obscurities*" in the analysis of the facts *vis-à-vis* the notion of legitimate expectations.[570]

309.    Lastly, Spain argues that, contrary to OperaFund and Schwab's contentions, paragraphs 424-426, or 480-485 do not address the applicable standard, do not contain an analysis of Article 10(1) of the ECT, or its purpose, and provide "*no way of knowing the specific evidence by which the* [Tribunal] *concludes that the FET standard is unrelated to discrimination, and inextricably linked to the frustration of legitimate expectations.*"[571]

---

[566] Reply Ann., ¶¶ 422-423.

[567] Mem. Ann., ¶¶ 178-179 (citing **RL-0119**, *OperaFund Eco-Invest SICAV PLC and Schwab Holding AG v. Kingdom of Spain*, ICSID Case No. ARB/15/36, Professor Phillippe Sands' Dissenting Opinion, 6 September 2019 ["**Sands Dissent**"], ¶¶ 2, 3, 23).

[568] Mem. Ann., ¶ 180.

[569] Mem. Ann., ¶ 181.

[570] Mem. Ann., ¶ 182.

[571] Reply Ann., ¶¶ 426, 429. *See also*, Tr. Ann., Day 1 (ENG), 43:19-44:17 (Ms. Cerdeiras).

(b) *Lack of "Valid Reasoning" for Finding a Breach of Legitimate Expectations*

310.    Spain contends that the failure to state reasons on this issue falls from paragraph 480 of the Award, in which the Tribunal stated that it would "*only focus on those issues that it considers determining for its decision in this case,*" but failed to provide the criteria for its determination of what issues were relevant.[572]

311.    According to Spain, the Award only relies on RD 661/2007 as the basis for the Claimants' legitimate expectations, but it fails to analyze other elements discussed by Spain that "*necessarily*" had to be taken into account, such as the principle of hierarchy of norms, the successive regulatory changes in the electricity system, the case law of the Supreme Court prior to and contemporaneous with the making of the investment, and the State Aid regime.[573]    Moreover, Spain argues, the Award not only disregarded Spain's arguments, but also the evidence on the record, simply resting on the notion that it was "*hard to imagine a more explicit stabilization assurance*" than Article 44(3) of RD 661/2007.[574] Spain complains that the Award proceeds "[a]*s if once the existence of an alleged specific commitment ha*[d] *been affirmed, the whole procedure can simply be dismissed.*"[575]    In Spain's submission, the Award simply goes from stating what the disputed issues on the matter of FET and legitimate expectations were to stating its conclusion, without explaining the path followed to reach that conclusion.[576]

312.    More particularly, Spain submits that the Award incurs in "*multiple contradictions and failures or gaps in reasoning*" with regard to several points,[577] namely: (i) its conclusion that Article 44(3) of RD 661/2007 contained a stability commitment;[578] (ii) its conclusions

---

[572] Mem. Ann., ¶ 183.

[573] Reply Ann., ¶ 426.  *See also, id.*, ¶¶ 435, 438-440.

[574] Reply Ann., ¶¶ 431-433.

[575] Reply Ann., ¶ 435.

[576] Reply Ann., ¶¶ 428, 434.

[577] Mem. Ann., ¶ 184.

[578] Mem. Ann., § IV (B) (3.2) (a).

on the matter of the Claimants' due diligence;[579] and (iii) its conclusions about the content of legitimate expectations and the assessment of the disputed measures.[580]

> (1)   Lack of Reasons for the Award's Conclusions on Article 44(3) of RD 661/2007

313.  *First*, Spain argues that in connection with the nature of RD 661/2007, the Award fails to explain "*how could it be*" that a regulation of inferior hierarchy in the legal order to a Law ("Act") could freeze an entire legal system and prevent Parliament from exercising sovereign functions to modify the Law ("Act");[581] a matter which other tribunals have addressed.[582]  Thus, for Spain the Award did not "*adequately analyse*[]" the *"nature of the regulatory norm*" that served as the "*cornerstone*" of its decision on liability.[583]

314.  *Second*, as to the content of Article 44(3) of RD 661/2007, Spain submits that the Tribunal's statements at paragraph 485 of the Award recognizing the existence of a "*stabilisation promise*" in that article applicable to the Claimants, is "*manifestly contradictory*" as shown by Professor Sands' dissent.[584]  In particular, the contradiction lies in that the Tribunal "*acknowledges the legislative power of the State*" while at the same time states that it has "*no doubt that Article 44 (3) contained a promise of stabilization.*"[585]  According to Spain, it was contradictory for the Tribunal to find that RD 661/2007 "*was clear in offering a guarantee of immutability to investors,*" while also acknowledging that "*a reasonable investor should expect the possibility of changes in the supposedly immutable regime.*"[586]

315.  Furthermore, Spain argues that the Award fails to take account of an essential aspect of the wording of Article 44(3) of RD 661/2007, which demonstrates that the article only had a

---

[579] Mem. Ann., § IV (B) (3.2) (b).

[580] Mem. Ann., § IV (B) (3.3).

[581] Mem. Ann., ¶ 191.

[582] Mem. Ann., ¶ 192.

[583] Mem. Ann., ¶ 194.

[584] Mem. Ann., ¶ 195.

[585] Mem. Ann., ¶¶ 196-197 (referring to **RL-0119**, Sands Dissent, ¶¶ 19-20).  *See also*, Tr. Ann., Day 1 (ENG), 48:15-19 (Ms. Cerdeiras).

[586] Mem. Ann., ¶ 198.

limited scope and "*does not refer to any revision of the remuneration regime;*"[587] a matter that Spain explained in its written and oral submissions in the arbitration, and that other tribunals have recognized.[588]

316.    *Third*, Spain contends that the Award contains "*serious contradictions and shortcomings*" in connection with the background of RD 661/2007 and its relationship with Law 54/1997.[589]    Spain argues that the Award omits any analysis of the "*previous and subsequent regulations*" to RD 661/2007, and also omits reference to Law 54/1997 and the remainder of the Spain's legal system, despite having asserted that Law 54/1997 provided the general framework.[590]    According to Spain, given that the legal regime for renewable energy investments had been subject to modifications prior to the Claimants' investments, even before 2010 any investor should have been aware that the regime was not "*frozen*."[591]    These issues, Spain says, were "*widely argued*" in the underlying arbitration, but the Award does not address them.[592]

317.    Spain emphasizes in particular that a predecessor to RD 661/2007, namely RD 436/2004 contained a provision similar to Article 44(3) of RD 661/2007, which was not an obstacle for the 2004 regime being revised.[593]    It follows, Spain argues, that the changes prior to RD 661/2007 should have alerted a reasonable investor not to consider Article 44(3) of RD 661/2007 as a guarantee that the regime would be frozen.[594]    But despite the relevance of this point, Spain argues, the Award "*does not offer any reasoning in this regard, either to reject it or to admit it.*"[595]    In addition, Spain contends, the Award also omits any analysis of RD 1578/2008, which introduced a new feed-in tariff for photovoltaic facilities, another

---

[587] Mem. Ann., ¶¶ 200-201.

[588] Mem. Ann., ¶¶ 201-204.  *See also*, Tr. Ann., Day 1 (ENG), 46:22-47:5 (Ms. Cerdeiras).

[589] Mem. Ann., ¶ 206.

[590] Mem. Ann., ¶¶ 207-208 (referring to **RL-0119**, Sands Dissent, ¶ 19).

[591] Mem. Ann., ¶¶ 210-211.

[592] Mem. Ann., ¶ 227.  *See also*, Tr. Ann., Day 1 (ENG), 47:25-48:2, 48:23-49:1 (Ms. Cerdeiras).

[593] Mem. Ann., ¶¶ 213-218.

[594] Mem. Ann., ¶ 219.

[595] Mem. Ann., ¶ 220.

modification which "*empirically proved*" that the regime was not "*immutable,*" as other tribunals have recognized.[596]

318.   *Fourth*, Spain submits that although Law 54/1997 was the fundamental norm of superior rank to RD 661/2007, the Award "*barely mentions it*" and when it does, the Award "*does not properly analyse*" the content of this Law or its relationship with the regulations derived from it.[597]

319.   Spain submits that it argued in the arbitration that because Law 54/1997 on the Electricity Sector regulated the entire electrical system, all regulations were required to respect the principles established in this law, namely, the principle of economic sustainability of the system and the mandate of a reasonable rate of return, which set the rights and expectations of any investor in the renewable energy sector in Spain.[598]   Spain further contends that no investor could be unaware of the existence of these principles, and submits that it provided in the arbitration numerous documents to demonstrate that: (i) the principle of sustainability of the system existed prior to the Claimants' investments; (ii) it alerted operators since 2006 that the State would act in situations of over-remuneration or unsustainability of the system; and (iii) in 2008 it alerted of the need of modifications to address the tariff deficit.[599]   According to Spain, it is "*shocking*" that the Award does not mention any of the elements provided by Spain to demonstrate that the principle of economic sustainability was an inherent feature of the regulation of the electricity system, nor does the Award explain why it was not to expect that, based on this principle, Spain would adopt measures to avoid the collapse of the system.[600]

320.   Spain further argues that Law 54/1997 established "*the principle of reasonable rate of return as the objective of the system,*"[601] which was reflected in the preamble of RD

---

[596] Mem. Ann., ¶¶ 222-223.

[597] Mem. Ann., ¶¶ 228-230.  *See also*, Tr. Ann., Day 1 (ENG), 45:15-18, 46:11-14 (Ms. Cerdeiras).

[598] Mem. Ann., ¶ 232.

[599] Mem. Ann., ¶¶ 235-248.

[600] Mem. Ann., ¶ 249.

[601] Mem. Ann., ¶ 250.

661/2007.[602]  It further submits that since 2005 the Supreme Court has established that the subsidy regime for renewable energy was not immutable and that the only guarantee was the reasonable rate of return.[603]  According to Spain, apart from the failure to state reasons, the Award's conclusion on this point is "*erroneous*" in that the principle of reasonable rate of return did not set a limit, but rather, imposed on Spain "*the obligation to guarantee* [such] *reasonable rate of return*," which was "the *only legitimate expectation to which investors could aspire*;"[604] as other tribunals have recognized.[605]

321.    *Fifth*, Spain contends that the Award makes selective and partial references to certain awards, while ignoring others that do not favor the positions endorsed by the Award.[606] According to Spain, the Award's reliance on a mere reference to the awards that preceded it to support its conclusions amounts to a "*manifest lack of expression of motives*," and also ignores "*the freedom of each* [a]*rbitral* [t]*ribunal to decide the dispute submitted to* [it]" and the "*possibility that a certain arbitration doctrine may be altered* […]."[607]

322.    Moreover, Spain argues, the Award also lacks reasons for its departure from the decisions of the Spanish Supreme Court which had rejected the existence of a "*petrification clause*" of the "*economic incentives regime of the Spanish electricity system*;"[608] and does not take these decisions into consideration when assessing the merits of the dispute.[609]  In addition, Spain says, the Award also "*unjustifiably deviates*" from arbitral doctrine to the effect that "*the provisions of the general legislation applicable to a plurality of persons or a category of persons do not create legitimate expectations that there will be no changes in the law*."[610]

323.    *Sixth*, according to Spain, the reasons for the Award's conclusion that there was a "*radical change that breached the stability conditions established in RD 661/2007*" are also

---

[602] Mem. Ann., ¶ 251.

[603] Mem. Ann., ¶ 252.

[604] Mem. Ann., ¶ 253.

[605] Mem. Ann., ¶¶ 254-262.

[606] Mem. Ann., ¶ 263.

[607] Mem. Ann., ¶ 264.

[608] Mem. Ann., ¶ 265.

[609] Mem. Ann., ¶ 265 (referring to **RL-0119**, Sands Dissent, ¶ 21).  *See also*, Tr. Ann., Day 1 (ENG), 48:9 (Ms. Cerdeiras).

[610] Mem. Ann., ¶ 266 (referring to **RL-0119**, Sands Dissent, ¶ 22).

"*insufficient*," as the Award does not analyze "*the specific way in which these measures represented, de facto, a radical change.*"[611]  In Spain's submission, the Award fails to explain which were the "*fundamental aspects*" of the regulatory regime existing at the time of the Claimants' investment that were "*supposedly significantly altered*" by the new regime, and instead, relies on the conclusion of the *Eiser* award (which has been annulled in its entirety).[612]

324.    *Finally*, Spain submits that the Tribunal's conclusion that the registration in the "*Registro Administrativo de Instalaciones de Producción en Régimen Especial*" ("**RAIPRE**") was an important element to assess the investor's legitimate expectations is "*inconsistent because it lacks sufficient reasoning.*"[613]  In particular, Spain submits that the Tribunal supported this finding on the decision of the *Masdar* tribunal, although it had earlier acknowledged that the two cases were not comparable on the facts.[614]  Moreover, for Spain, the Tribunal's conclusion that the registration in the RAIPRE gave investors the right to the benefits of RD 661/2007 (and not to be subject to regulatory changes) entails a "*tautology*" as neither the *Masdar* decision, nor the registration in the RAIPRE "*by themselves*" support the conclusion that "*there was an absolute guarantee of freezing in the face of future regulatory changes.*"[615]  Furthermore, Spain argues, the Award also fails to address the legal nature of the RAIPRE as an administrative record.[616]

(2)    Lack of Reasons for the Award's Conclusions on the Issue of Due Diligence

325.    Spain argues that it provided evidence in the arbitration to demonstrate that any diligent investor investing in the Spanish renewable energy sector could not reasonably consider that the regime established in a Royal Decree would remain indefinitely unchanged.[617]  This included, Spain argues, precedents showing constant changes in the renewable energy

---

[611] Mem. Ann., ¶ 267.  *See also*, Tr. Ann., Day 1 (ENG), 50:25 (Ms. Cerdeiras).

[612] Mem. Ann., ¶¶ 268-269.  *See also*, Tr. Ann., Day 1 (ENG), 51:19 (Ms. Cerdeiras).

[613] Mem. Ann., ¶ 185.

[614] Mem. Ann., ¶ 185 (referring to **RL-0118**, Award, ¶ 483).

[615] Mem. Ann., ¶ 186 (referring to **RL-0118**, Award, ¶ 484).

[616] Reply Ann., ¶ 427; Tr. Ann., Day 1 (ENG), 45:21-46:10 (Ms. Cerdeiras).

[617] Reply Ann., ¶ 443.

regime carried out through Royal Decrees, the case law of the Supreme Court confirming that there was no right to the "*inalterability*" of the regime, the views of the energy sector, and principles of EU law on State Aid that must be weighed by any investor making an investment in Europe.[618]   However, Spain says, the Award "*ignores*" the Respondent's allegations to conclude that the Claimants did perform due diligence.[619]

326.   According to Spain, the Award's conclusions on the matter of due diligence lack "*valid and sufficient reasoning*" because they are based (i) on the erroneous conclusion that Article 44(3) of RD 661/2007 entailed a "*promise of stabili*[z]*ation*;" and (ii) on a "*biased interpretation*" of this provision, that ignores the evidence on the record.[620]

327.   Spain contends that the Award's conclusion that "*there is no lack of due diligence* [by] *the* [C]*laimants*" ignores the evidence offered by Spain, and instead relies on two legal opinions by the Cuatrecasas Law Firm which are "*not useful*" for these purposes.[621] According to Spain, this is particularly serious given the dissenting arbitrator's observation that the majority was ignoring the Respondent's evidence.[622]

328.   Spain submits that the Award offers no reasons for its reliance on the two Cuatrecasas reports, which are "*invalid*" to justify any legitimate expectations by the Claimants, given that they were not addressed to the Claimants; they contained a disclaimer clause making clear that they were for the exclusive use of Deutsche Bank; and they make no mention of the risk of modification of RD 661/2007.[623]   Nor does to the Award explain (i) why the Cuatrecasas Law Firm should be considered "*the most competent*" party to opine on the matter;[624] (ii) why there is no conflict of interest in Cuatrecasas' double involvement first advising the bank and then the Claimants;[625] and (iii) what are the reasons for the conclusion that "*it is not possible to argue that any other measure to obtain information*

---

[618] Reply Ann., ¶¶ 444-445.

[619] Reply Ann., ¶ 447.

[620] Mem. Ann., ¶ 272.

[621] Mem. Ann., ¶¶ 275-276.

[622] Mem. Ann., ¶ 281 (referring to **RL-0119**, Sands Dissent, ¶ 25).

[623] Mem. Ann., ¶ 277.  *See also*, Reply Ann., ¶¶ 448-449; Tr. Ann., Day 1 (ENG), 49:8-14 (Ms. Cerdeiras).

[624] Mem. Ann., ¶ 278.

[625] Mem. Ann., ¶ 279.

*would have given rise to the expectation that the State would issue the measures that would later be issued in 2014.*"[626]

329.    Moreover, for Spain, it was contradictory for the Tribunal to acknowledge that lack of due diligence would vitiate an investor's legitimate expectations, to then "*exempt*" the Claimants from that requirement, by admitting the Cuatrecasas opinions as due diligence.[627]

330.    Furthermore, according to Spain, the Award's conclusion that it had not been shown that "*any other measure to obtain information would have warned […] that the State would issue new measures,*" collide with procedural elements that support the opposite conclusion.[628]    A "*more in-depth legal analysis,*" of those elements would have resulted in a different conclusion from the one reached by the Award.[629]

331.    In particular, Spain argues that the Award: (i) ignores without "*valid reasons*" that by the time of the Claimants' investments and thereafter, the reiterated case law of the Spanish Supreme Court demonstrated that an investor could not have an expectation beyond the "*reasonable rate of return*" contemplated in Article 30(4) of the Electricity Law, focusing on formalities such as the norms that were challenged on the judgments, while ignoring that the principles that followed from the judgments applied to any regulatory changes, and in contradiction with other arbitral awards that have recognized that the Supreme Court case law could not be ignored by any investor;[630] (ii) fails to address numerous documents on the record of the arbitration that showed that the actors in the sector (including business associations, other investors in the renewable energy sector, legal and consultancy firms, and "*scientific doctrine*") considered that the legal framework was mutable;[631] and (iii) "*omit*[s] *any reasoning*" regarding the Respondent's refutation of the documents relied

---

[626] Mem. Ann., ¶ 280.

[627] Tr. Ann., Day 1 (ENG), 49:8-20 (Ms. Cerdeiras).

[628] Mem. Ann., ¶ 283.

[629] Mem. Ann., § IV (B)(3.2)(b)(ii).  *See also*, Tr. Ann., Day 1 (ENG), 50:5-16 (Ms. Cerdeiras).

[630] Mem. Ann., ¶¶ 284-285, 289, 298.  *See also, id.* ¶¶ 284-305.

[631] Mem. Ann., ¶¶ 306-308.

upon by the Claimants to support their view that the Government had committed to freezing the regime in RD 661/2007.[632]

> (3) Lack of Reasons for the Awards' Conclusions on the Content of Legitimate Expectations and the Assessment of the Disputed Measures

332. Spain contends that the Award also suffers from "*absence of reasons and internal contradictions*" in connection with the determination of the content of the Claimants' legitimate expectations, and the analysis of each of the measures in dispute (namely, RD 1565/2010, RDL 14/2010, Law 15/2012, RDL 2/2013, RDL 9/2013, Law 24/2013, RD 413/2014, and Ministerial Order 1045/2014).[633]   It also contains "*unsubstantiated assertions*" and "*presumptions*" that ignore the evidence on the record, without providing "*sufficient reasons*" for doing so.[634]

333. Spain submits that, in order to determine whether the Claimants had legitimate expectations, the Award limits its analysis to Article 44(3) of RD 661/2007, but ignores Law 54/1997 on the Electricity Sector, as well as other regulatory and case law developments that were relevant, and that if they had been analyzed, would have resulted in different expectations, as shown by Professor Sands' dissenting opinion.[635]

334. Spain also argues that, although the Award "*concludes that Respondent breached the legitimate expectations of Claimants and therefore breached the FET commitment provided in Article 10(1) ECT, by enacting the Disputed Measures, (i.e. RD 1565/2010, RD 14/2010, Act 2/2011; RD-Law 2/2013; RD-Law 9/2013, Act 24/2013, RD 413/2014, and MO IET/1045/2014),*"[636] it "*does not bother to state how it comes to* [that] *conclusion*"

---

[632] Mem. Ann., ¶ 309.

[633] Mem. Ann., ¶¶ 311, 313 (referring to **RL-0119**, Sands Dissent, ¶ 23).

[634] Mem. Ann., ¶ 331.

[635] Mem. Ann., ¶ 314 (referring to **RL-0119**, Sands Dissent, ¶¶ 19-20).

[636] Mem. Ann., ¶ 317 (quoting **RL-0118**, Award, ¶ 490).

for "*each of the disputed measures*" as also shown by Professor Sands' dissenting opinion.[637]  For the Applicant, it is "*impossible to follow the reasoning of the decision*."[638]

335.    Finally, Spain takes the view that the Award (i) dispenses with any serious comparative analysis of the regulations before and after 2013, which would have been necessary to determine if the changes to regime were "*truly radical*" and "*could therefore violate*" the Claimants' legitimate expectations;[639]  (ii) fails to explain what it considered a "*total, radical, unreasonable or unexpected change*" and on what basis the Disputed Measures constituted such type of change;[640] (iii) fails to provide detailed reasons to dismiss arguments made by Spain in its written and oral submissions in the arbitration that showed that the "*essential elements*" of the regime were maintained;[641] and (iv) also "*obliterates*" Spain's submissions on the concept of "*reasonable return*," which constituted a fundamental principle under the Electricity Law, and the "*true guarantee and legitimate expectation*" of investors in the renewable energy sector, as also recognized by judgments of the Spanish Supreme Court since 2005-2006.[642]

(c)    *Conclusion*

336.    By way of conclusion, Spain submits that the Award determines that the Claimants' legitimate expectations were breached, on the basis of a finding of a "*stabili*[z]*ation clause*" in Article 44(3) of RD 661/2007, which lacks "*valid reasoning*" and contains "*contradictions and obscurities*."[643]

337.    The Applicant argues that reiterated arbitral case law has found that the FET standard does not deprive a State of its regulatory powers, and "*attend to the lack of reasonableness of the change when determining whether legitimate expectations have been violated, and not*

---

[637] Mem. Ann., ¶ 318 (referring to **RL-0119**, Sands Dissent, ¶¶ 22, 43).  *See also*, Reply Ann., ¶ 441.

[638] Mem. Ann., ¶ 319.

[639] Mem. Ann., ¶ 320.

[640] Mem. Ann., ¶ 321.

[641] Mem. Ann., ¶¶ 322-325.

[642] Mem. Ann., ¶¶ 326-330.

[643] Mem. Ann., ¶ 335.

*only to the possible damages derived from the regulatory changes*."[644]  It also submits that by the time of the Award in this case, two other awards in disputes involving Spain (*Charanne* and *Isolux*) had dismissed the existence of a commitment of immutability of the Spanish regulatory framework, and the Award provides no reasoning for its departure from the view taking in those awards.  Instead, the Award relies on the awards in *Eiser, Masdar and Novenergía*, without reasoning why it prefers their approach.[645]

338.  In this regard, Spain emphasizes that as the *Eiser* award has been annulled on grounds of improper constitution of the tribunal, due to "*close ties to the Brattle Group*" by a member of that tribunal, it should be attributed no authority, and that other "*awards that thoughtlessly relied on its considerations should be called into question*."[646]  Spain adds that the Brattle Group also appeared in the underlying arbitration in the *OperaFund* case, and suggests that the *Eiser* annulment decision should be considered when assessing the credibility of "*any award*" based (even in part) on the Brattle Group's opinions.[647]

(iv)  Failure to State Reasons on the Quantification of Damages

339.  Spain argues that "*there is an indisputable inconsistency between the Award's award of damages and the damages actually calculated, which constitutes a ground for annulment of the Award under Article 52(1)(d) and 52(1)(e) of the ICSID Convention, or, as the case may be, under Article 52(1)(b) of the ICSID Convention*."[648]  Referring to the conclusions of the committee in *Amco*, Spain submits that *ad hoc* committees "*can and should descend to precise aspects of the quantification of damages* […]."[649]

340.  According to Spain, despite OperaFund and Schwab's contentions that the Award devotes 24 pages to quantum, the reality is that only 17 paragraphs out of 117 were devoted to the Tribunal's decision, which avoids the most important issues, and the rest is devoted to

---

[644] Mem. Ann., ¶¶ 333-334 (referring to **RL-0179**, *PV Investors v. Spain*, PCA Case No. 2012-14, Final Award, 28 February 2020, ¶¶ 580-582, and other authorities cited therein).

[645] Mem. Ann., ¶¶ 337-338.

[646] Mem. Ann., ¶¶ 339-341.

[647] Mem. Ann., ¶¶ 339, 341.

[648] Reply Ann., ¶ 501.

[649] Reply Ann., ¶¶ 389-391 (relying on **RL-0185**, *Amco*, ¶¶ 97, 106, 110).

summaries of the Parties' position.[650]  In Spain's view, an "*adequate motivation*" should state the decision, but also explain why it accepts the Claimants' position and rejects the Respondent's, refer to the evidence relied upon, and explain why the Respondent's evidence does not disprove the Claimants' allegations, or why the case law invoked by the Respondent is not applicable.[651]

341.   More particularly, Spain submits that the Award fails to state reasons with regard to: (i) the appraisal method used to determine damages (Discounted Cash Flow ("**DCF**"));[652] (ii) the conclusion that the 2013 and 2014 measures were "*retroactive*;"[653]  (iii) the valuation date;[654]  (iv) the useful life of the plants;[655]  (v) regulatory risk and the impact of the Disputed Measures; [656]  (vi) the illiquidity rate; [657] (vii) the discount rate; [658] and (viii) the minorities discount.[659]

(a)   *Lack of Reasoning for the Appraisal Method (DCF)*

342.   Spain argues that the Award fails to provide reasons for its choice of the DCF method, or for its decisions on some of the main assumptions and projections used for the calculations under that method.[660]

343.   According to the Applicant, the Award accepts the DCF methodology proposed by the Claimants without explaining why it rejected Spain's arguments that such methodology was invalid for the present case, and relying instead on generalist references to other awards.[661]   Contrary to OperaFund and Schwab's allegations, all the Award does is summarize the Parties' positions, and devotes merely a paragraph to some of the most

---

[650] Tr. Ann., Day 1 (ENG), 59:18-25 (Ms. Fernández-Daza).

[651] Tr. Ann., Day 1 (ENG), 59:10-17 (Ms. Fernández-Daza).

[652] Mem. Ann., § IV(B)(4)(4.1).

[653] Mem. Ann., § IV(B)(4)(4.2).

[654] Mem. Ann., § IV(B)(4)(4.3).

[655] Mem. Ann., § IV(B)(4)(4.4).

[656] Mem. Ann., § IV(B)(4)(4.5).

[657] Mem. Ann., § IV(B)(4)(4.6).

[658] Mem. Ann., § IV(B)(4)(4.7).

[659] Mem. Ann., § IV(B)(4)(4.8).

[660] Reply Ann., ¶ 464.  *See also*, Tr. Ann., Day 1 (ENG), 60:6-24 (Ms. Fernández-Daza).

[661] Mem. Ann., ¶ 345.

relevant issues on the question of the method, simply stating a decision without providing any reasoning for it.[662]   Spain emphasizes that the Award fails to provide a "*detailed analysis of why it accepts the Claimant's argument, on what evidence it has relied, why it dismisses the Respondent's allegations, why the evidence provided by the latter is insufficient and why the doctrine or case law invoked by […] Spain does not apply.*"[663] According to Spain, a "*mere expression of an opinion (the choice of the DCF method) cannot be considered as an expression of reasons.*"[664]

344.   Spain submits that in the arbitration it argued that the DCF methodology was not appropriate in this case for a number of reasons, namely that: (i) this involved a "*capital-intensive business with a significant asset base*;" (ii) "*almost all of its costs are tangible infrastructure investment costs; there are no relevant intangibles to value*;" (iii) cash flows were highly dependent on "*volatile and unpredictable exogenous elements*;" (iv) the forecasts were projected over a "*long time horizon*;" and (v) there was a "*lack of sufficient financial history to support a minimally robust future projection of cash flows.*"[665] However, none of these were discussed by the Award.[666]

345.   Furthermore, Spain argues, the Award: (i) ignores Spain's argument that the investment was made under the regulatory framework of a reasonable rate of return under Law 54/1997, and "*was not limited*" to RD 661/2007, seemingly concluding that "*if the legitimate expectation* [was] *RD 661/2007,*" the DCF method was the only applicable quantum methodology;[667] (ii) bases its decision on certain awards, while ignoring others that have endorsed the view that the only legitimate expectation was one of a reasonable rate of return and that adopted other valuation methods;[668] (iii) concludes that the DCF is the generally recognized method and that the plants had an operating history, ignoring that the core issue in dispute was a different one, namely, whether the DCF method was

---

[662] Reply Ann., ¶ 456.

[663] Reply Ann., ¶ 456.  *See also, id.*, ¶ 458.

[664] Reply Ann., ¶ 457.

[665] Reply Ann., ¶ 459.

[666] Reply Ann., ¶ 460.

[667] Mem. Ann., ¶¶ 346, 353.  *See also*, Reply Ann., ¶ 463 (arguing that the Award "*lack of reasoning on the merits also entails a lack of reasoning on the method chosen for its quantification.*")

[668] Mem. Ann., ¶¶ 347, 354.

adequate in the scenario of a "*regulated and guarantee-based sector*;"[669] (iv) fails to explain why in the But-For-Scenario the Internal Rate of Return ("**IRR**") of the Project was 8.1%, and why in that scenario the market value of the Plants was 1.7 higher than their acquisition price, and could not be reconciled with their book value in June 2014;[670] and (v) ignores the warnings by the Respondent's experts in the arbitration that Brattle's calculations under the DCF method produced speculative results that should be discarded.[671]  According to Spain, all these issues were raised by Spain during the arbitration, and were rejected in the Award without explanation, analysis or reasoning, which must lead to an annulment under Article 52(1)(e) of the ICSID Convention.[672]

346.    Finally, Spain argues that a tribunal can only award damages after analyzing each of the assumptions and projections in the damages models, which "*cannot be an internal process of the Tribunal but must be set out in the Award* […]."[673]  Instead, Spain says, the Award failed to "*explain its decision on some of the main assumptions and projections of the application of the DCF method, and when it did so, it failed to provide the reasoning required under Article 48 of the ICSID Convention*."[674]

(b)    *Lack of Reasoning for the Conclusion that the 2013-2014 Measures Were "Retroactive"*

347.    Spain further takes issue with the conclusions at paragraph 683 of the Award.[675]  In particular, Spain submits that, although the alleged retroactive nature of the Disputed Measures was one of the main areas of disagreement among the Parties, the Tribunal did not rule on this matter, but instead concluded in the quantum section that the 2013-2014 measures had been applied retroactively, without "*substantiating*" this conclusion.[676] According to Spain, the Award's assertion that on this matter it preferred the approach in

---

[669] Mem. Ann., ¶ 349.

[670] Mem. Ann., ¶¶ 350-351.

[671] Mem. Ann., ¶ 355.

[672] Mem. Ann., ¶ 356.

[673] Reply Ann., ¶ 462.

[674] Reply Ann., ¶ 464.

[675] Mem. Ann., ¶ 357.

[676] Mem. Ann., ¶¶ 362-363.  *See also*, Tr. Ann., Day 1 (ENG), 61:1-10 (Ms. Fernández-Daza).

*Masdar* to those of other tribunals (such as *Antin*, *Novenergia* or *Eiser*) was insufficient, as it does not explain why the Tribunal preferred that approach over the others.[677]

(c)    *Lack of Reasoning in the Determination of the Valuation Date (20 June 2014)*

348.    Referring to paragraph 683 of the Award, Spain also submits that the Award concluded that the date of valuation must be the date that yields the greater quantification of damages, and on that basis determined that the date of valuation would be 20 June 2014.[678] However, Spain argues, the Award incurred in a "*clear contradiction*," because the evidence (in particular, statements by the Claimants' experts at the hearing on the merits) indicated that a post-June 2014 valuation date would increase the damages.[679]

(d)    *Lack of Reasoning in the Determination of the Useful Life of the Plants in the But-For Scenario*

349.    According to Spain, the Award did not provide reasons for its decision on the useful life of the plants in the But-For scenario.[680] Referring to paragraph 684 of the Award, Spain submits that the Award concluded that the useful life of the plants in the But-For scenario would be of 35 years (as argued by the Claimants), without reasoning, and without addressing the Respondent's expert's arguments in favor of a 30 year useful life.[681] Spain submits that the Award is based on documents that do not prove the useful life chosen in the Award, or contradict it, as the documents relied upon by the Tribunal actually confirm Spain's position or at least were inconsistent with the Claimants' view adopted by the Award.[682] Nor does the Award reason, Spain argues, why the Claimants' experts documentary sources were more appropriate than the evidence provided by the Respondent's expert.[683]

---

[677] Reply Ann., ¶¶ 469-471.

[678] Mem. Ann., ¶¶ 364-365.

[679] Mem. Ann., ¶ 367. *See also*, Reply Ann., ¶ 472; Tr. Ann., Day 1 (ENG), 61:11-19 (Ms. Fernández-Daza).

[680] Mem. Ann., ¶ 373.

[681] Mem. Ann., ¶¶ 369-370. *See also*, Reply Ann., ¶¶ 475-476; Tr. Ann., Day 1 (ENG), 61:20-62:11 (Ms. Fernández-Daza).

[682] Mem. Ann., ¶¶ 371-372. *See also*, Reply Ann., ¶ 477.

[683] Mem. Ann., ¶ 372. *See also*, Reply Ann., ¶¶ 477-478.

(e)   *Lack of Reasoning for the Conclusions on Regulatory Risk and the Impact of the Disputed Measures*

350.   According to Spain, the Award also lacks reasoning for its refusal to apply a higher discount rate in the But-For scenario, which is a rate that varies depending on the position taken on the matter of regulatory risk.[684]

351.   Referring to paragraph 685 of the Award, Spain argues that the Award adopted the Claimants' position on the question of regulatory risk, supporting that conclusion only with a citation to the Claimants' Second Expert Report, thereby demonstrating a "*glaring lack of reasoning*" given the complexity of the subject.[685] In Spain's view the Award only makes clear that in the Tribunal's view the actual scenario entails a higher regulatory risk than the But-For scenario, but it never explains why.[686]

352.   More particularly, Spain submits that the Tribunal failed to "*adequately*" deal with a number of factors,[687] namely: (i) the existence of regulatory risk at the time of the investment;[688] (ii) the extensive evidence presented by the Respondent's expert to the effect that the Spanish Electricity System is more stable after the Disputed Measures, and that such measures assisted to avoid increase in the Tariff Deficit;[689] and (iii) that regulatory risk also affects the But-For scenario during the historical period.[690]

353.   For Spain, instead of reasoning why it found Brattle's treatment on the matter of regulatory risk appropriate, the Award reversed the burden of proof to criticizing the findings of the Respondent's expert; a reversal which necessarily supports a finding of failure to state reasons.[691]

---

[684] Mem. Ann., ¶¶ 374-375.

[685] Mem. Ann., ¶¶ 377-379.

[686] Reply Ann., ¶ 483.  *See also*, Tr. Ann., Day 1 (ENG), 62:19-25 (Ms. Fernández-Daza).

[687] Mem. Ann., ¶ 380.

[688] Mem. Ann., ¶ 381 (citing **RL-0119**, Sands Dissent, ¶¶ 27-28).

[689] Mem. Ann., ¶ 383.

[690] Mem. Ann., ¶¶ 385-386.  *See also,* Reply Ann., ¶ 485.

[691] Reply Ann., ¶¶ 481-482.

354.    Finally, Spain argues, the Award does not explain what the discrepancy in the question of regulatory risk means for the case, except for the reference to the discount rate.  It is only by looking at the expert reports, that it follows that the assessment of regulatory risk impacts the risk premium, a component of the discount rate, assessed by Brattle at 1.2% in the actual scenario and 0.8% in the But-For.  However, Spain says, the Award fails to even fix these amounts, nor does it explain why it chose those percentages and not others, a non-trivial question that had an impact of US$17.9 million.[692]

(f)    *Lack of Reasoning on the Illiquidity Rate*

355.    Spain further submits that, although the experts disagreed about the illiquidity rate to be used in the quantification of damages, the Award does not rule on the matter.[693]

356.    Spain takes issue with OperaFund and Schwab's contention that a ruling on this issue was not necessary because the Award had already dismissed the Respondent's expert's valuation method and its DCF calculations.  It submits that the dismissal of its expert's valuation alone did not make Brattle's calculations correct, and that even if the Tribunal adopted the Brattle model, it was required to analyze the assumptions and estimates of the model over which the Parties disagreed, including the illiquidity rate.[694]  The cost of this unreasoned decision, Spain says, was of US$ 5.9 million.[695]

(g)    *Lack of Reasoning Regarding the Discount Rate*

357.    Spain also contends that, although the experts disagreed on the key concept of the discount rate to be applied under a DCF methodology, the Award adopted the Claimants' expert discount rate without providing "*any reasoning or analysis on this issue.*"[696]  Spain notes, in particular, that the Award does not rule on the experts' disagreement over certain elements of the mathematical formula of the Capital Assets Pricing Model ("**CAPM**"), yet the resulting damages figure implies that the Claimants' expert's position on each of the

---

[692] Reply Ann., ¶¶ 486-487.

[693] Mem. Ann., ¶¶ 388-390.

[694] Reply Ann., ¶¶ 489-492.

[695] Reply Ann., ¶ 494.

[696] Mem. Ann., ¶¶ 391-393, 397.  *See also*, Tr. Ann., Day 1 (ENG), 64:2-9 (Ms. Fernández-Daza).

variables was adopted, without reasoning.[697]  According to Spain, the difference between the experts on the variables of risk free parameters and the market risk premium amounted to US$ 2.8 million.[698]

(h)    *Lack of Reasoning Regarding the Minorities Discount*

358.    Finally, Spain contends that, although the Respondent's expert advocated for the need to account for Schwab's status as a minority shareholder in the vehicle company owning the Palma Sol Plant, by applying a "*minority discount rate*" to the damages attributable to Schwab,[699] the Award "*does not say a word*" on the issue, and simply adopts the Claimants' position without reasoning.[700]

**b.    OperaFund and Schwab's Position**

359.    OperaFund and Schwab submit that there are no grounds to annul the Award under Article 52(1)(e) of the ICSID Convention on the basis of failure to state reasons, and that Spain's allegations are nothing but a disagreement with the Award, which is a "*detailed and properly reasoned*" decision.[701]  However, the question in annulment is whether the Tribunal reasoned its findings, not whether those findings are correct; and therefore, even if Spain or the Committee disagree with the Tribunal's reasoning, the Award must be confirmed.[702]

360.    OperaFund and Schwab further contend that the Award (unanimous as to jurisdiction and by majority as to liability and quantum), "*carefully recollects and analyzes the claims and facts submitted by both Parties*," "*processes the Parties' allegations and the awards and decisions invoked by each side*" and "*provide*[s] *its detailed reasoning and findings*."[703]  Further, OperaFund and Schwab ask the Committee to bear in mind that this Award was reached after a "*sophisticated*" procedure that lasted almost 4 years, and involved several

---

[697] Mem. Ann., ¶¶ 395-397.

[698] Reply Ann., ¶¶ 496-497.

[699] Mem. Ann., ¶¶ 398-402.

[700] Mem. Ann., ¶¶ 398, 403.  *See also*, Reply Ann., ¶¶ 498-499; Tr. Ann., Day 1 (ENG), 64:9 (Ms. Fernández-Daza).

[701] C-Mem. Ann., ¶ 113.  *See also, id*., ¶ 182; Rej. Ann., ¶ 270; Tr. Ann., Day 1 (ENG), 99:13-21 (Mr. Mata).

[702] Tr. Ann., Day 1 (ENG), 120:3-5, 120:17-121:2 (Mr. Mata).

[703] C-Mem. Ann., ¶ 117.

rounds of pleadings, a written *amicus curiae* submission by the EC, a 5-day hearing, submissions by factual witnesses and experts, and two rounds of Post-Hearing Briefs.[704]

(i)    The Standard

361.    According to OperaFund and Schwab, Spain "*mischaracterizes the applicable legal standard*" under Article 52(1)(e),[705] which is "*high and stringent.*"[706]  In their view, the standard is as follows:

362.    *First*, the burden is on Spain to show that the reasoning is "*contradictory, frivolous, incomprehensible or completely absent,*" and that this is "*manifest on the face of the Award.*"[707]  The "*manifest*" element "*requires that the award contains **no reasons** on a particular finding that is indispensable to apprehend the tribunal's reasoning.*"[708]  And an *ad hoc* committee should construe an award "*in a way that results in consistency as opposed to readily find contradictions.*"[709]  Thus, Spain must show either a "*complete lack of reasons*" or that "*it is impossible to infer the Tribunal's reasoning.*"[710]

363.    *Second*, the duty to state reasons is a "*minimum requirement*" that requires nothing more than "*reasons sufficient to explain*" the tribunal's motives to the parties, but does not entail an "*obligation to convince the losing party.*"[711]  It "*requires that tribunals render decisions that are intelligible and permit both parties to understand how the tribunal proceeded from Point A to Point B in its findings.*"[712]

364.    This said, OperaFund and Schwab also submit that as stated by the committee in *Wena* "[the] *goal* [of Article 52(1)(e)] *does not require that each reason be stated expressly. The*

---

[704] C-Mem. Ann., ¶¶ 115-116.

[705] C-Mem. Ann., § 3.3.1.

[706] C-Mem. Ann., ¶¶ 119, 133.

[707] C-Mem. Ann., ¶¶ 120-121 (relying on **RL-0167**, *Occidental*, ¶¶ 65, 67).  *See also*, Rej. Ann., ¶¶ 183, 187.

[708] C-Mem. Ann., ¶ 121 (emphasis in original).

[709] C-Mem. Ann., ¶ 121 (relying on **CL-0312**, *Daimler Financial Services v. Republic of Argentina*, ICSID Case No. ARB/05/1, Decision on Annulment, 7 January 2015 ["**Daimler**"], ¶ 81).

[710] C-Mem. Ann., ¶ 121.

[711] C-Mem. Ann., ¶¶ 122, 133.  *See also*, Rej. Ann., ¶¶ 183, 188.

[712] C-Mem. Ann., ¶¶ 123-125 (relying on **RL-0129**, *MINE*, ¶¶ 5.08-5.09 and **RL-0131**, *Wena*, ¶ 79).  *See also*, Rej. Ann., ¶ 183; Tr. Ann., Day 1 (ENG), 100:6-9 (Mr. Mata).

115

*Tribunal's reasons may be implicit in the considerations and conclusions contained in the award, provided they can be reasonably inferred from the terms used in the decision.*"[713]

365. *Third*, contrary to Spain's submissions, the standard under Article 52(1)(e) does not call for "*sufficient or adequate reasons.*"[714] Thus, neither "*inadequate*" nor "*insufficient*" reasons may lead, by themselves, to annulment.[715] Nor are *ad hoc* committees called to examine the "*quality of the reasoning*," or to determine "*whether the reasoning is superficial, deficient or otherwise faulty*," because that would entail an examination of the substance of the award, in disregard of the distinction between annulment and appeal.[716] Instead, an *ad hoc* committee's task is to determine whether there is a "*total absence of reasons*" or if the award's reasoning is "*genuinely contradictory*" or "*so lacking in coherence that a reader cannot follow it.*"[717] Moreover, as long as there is a statement of reasons, an award cannot be annulled even if the reasons provided are "*incorrect, unconvincing or non-exhaustive*," and "*even if* [the award] *made an error of fact or of law.*"[718] According to OperaFund and Schwab, the relevant analysis is whether "*the tribunal appreciated the arguments and the evidence submitted by the parties*" even if the conclusions are incorrect.[719]

366. This said, OperaFund and Schwab finally contend that even if the Committee were to adopt Spain's view of the standard, namely that "*inadequate*" or "*insufficient*" reasons constitute a ground for annulment (*quod non*), the Award would in any event not be annullable because "*it contains reasons that go well beyond the minimum requirement of reasoning* […].*"[720]

---

[713] Rej. Ann., ¶ 267 (quoting **RL-0131**, *Wena*, ¶ 81).

[714] C-Mem. Ann., ¶ 126. *See also*, Rej. Ann., ¶¶ 184-185.

[715] Rej. Ann., ¶¶ 187-188.

[716] C-Mem. Ann., ¶¶ 127, 129, 133.

[717] C-Mem. Ann., ¶¶ 130, 133 (quoting **CL-0257**, *Tenaris*, ¶ 110).

[718] C-Mem. Ann., ¶ 131 (quoting **CL-0272**, *Ioan Micula, Viorel Micula and Others v. Romania*, ICSID Case No. ARB/05/20, Decision on Annulment, 26 February 2016 ["***Micula***"], ¶ 135, **RL-0129**, *MINE*, ¶ 5.09, and other cases). *See also*, Tr. Ann., Day 1 (ENG), 101:1-3 (Mr. Mata).

[719] C-Mem. Ann., ¶ 132 (relying on **RL-0123**, *Standard Chartered Bank (Hong Kong) Limited v. Tanzania Electric Supply Company Limited (TANESCO)*, ICSID Case No. ARB/10/20, Decision on Annulment, 22 August 2018 ["***Standard Chartered***"], ¶ 61).

[720] Rej. Ann., ¶ 189.

(ii)    The Tribunal "Justified" Its Decision to Reject the Invocation of EU Law on State Aid to Assess Legitimate Expectations

367.    OperaFund and Schwab submit that Spain has failed to demonstrate that the Tribunal's reasoning on this matter is "*non-existent, frivolous or contradictory*,"[721] or so "*incomprehensible, that it is impossible to infer the Tribunal's reasoning*."[722] They contend that "*on the face of the Award*" it is "*clear*" that the Tribunal "*reasoned and correctly justified*" its conclusion that EU law on State Aid was not relevant to the assessment of the Claimants' legitimate expectations under Article 10(1) of the ECT.[723]

368.    *First*, OperaFund and Schwab contend that Section VI.A of the Award is devoted to deciding the dispute over Spain's invocation of EU law as applicable law to the substance,[724] and that the Tribunal's reasoning in that section is "*clear, straightforward and easy to follow*."[725]  The Tribunal concluded that "*all substantive provisions of the ECT remain fully applicable and EU law is not part of the applicable substantive law in this case*,"[726] and according to OperaFund and Schwab, the key elements of the reasoning can be summarized as follows: (i) that the key provision establishing the applicable law in an ECT dispute is Article 26(6) of the ECT; (ii) that the Parties' common position was that Spanish law should be regarded as a fact and that the disputed issue concerned the role of EU law; (iii) that the distinction between jurisdictional and merits matters was to be respected in connection with EU law; (iv) that EU law does not prevail over any provision of the ECT relevant in the arbitration (including Part III), in application of Article 16(2) of the ECT; (v) and therefore, OperaFund and Schwab argue, "*the Tribunal rejected Spain's allegation that EU State Aid law could invalidate or negate OperaFund's legitimate expectations for this would imply a prevalence of EU law over Part III of the ECT that is categorically proscribed under Article 16(2) of the ECT*."[727]

---

[721] C-Mem. Ann., ¶ 145.

[722] Rej. Ann., ¶ 195.

[723] C-Mem. Ann., ¶ 136.

[724] C-Mem. Ann., ¶¶ 137-141; Rej. Ann., ¶ 192; Tr. Ann., Day 1 (ENG), 101:23-25 (Mr. Mata).

[725] C-Mem. Ann., ¶ 139.

[726] C-Mem. Ann., ¶ 141 (quoting **RL-0118**, Award, ¶ 330).

[727] C-Mem. Ann., ¶ 140 (referring to **RL-0118**, Award, ¶¶ 322-329); Tr. Ann., Day 1 (ENG), 102:5-19 (Mr. Mata).

369.    According to OperaFund and Schwab, the Tribunal was under no obligation to address the provisions of the TFEU on State Aid, because "*by deciding that EU law was not part of the applicable substantive law to the case, the Tribunal had already disposed of all arguments relating to the* [TFEU] *or those based on the decision by the* [EC] *on state aid*."[728]

370.    *Second*, OperaFund and Schwab take the view that at paragraph 487 of the Award, the Tribunal explained that "*its finding on the reasonability of OperaFund's legitimate expectations was not rebutted by Spain's allegation that OperaFund should have been aware of the existence of regulatory risk based on Spain's (unsubstantiated) argument that* [the] *Feed-in incentives granted under RD 661/2007 were 'state aid.*'"[729] OperaFund and Schwab emphasize that in that paragraph the Tribunal held that its conclusion that the Claimants' expectations were legitimate was not rebutted by "*Respondent's views on EU state aid law.*"[730] In OperaFund and Schwab's view, paragraph 487 of the Award shows that the "*Tribunal, after assessing the evidence taken in this case, relied particularly on the categorical terms under which the Spanish Feed-in regulations assured the stability of the Feed-in incentives(Article 44(3) of RD 661/2007) and reasoned that, based on said categorical terms, OperaFund was not under an obligation to inquire whether the Feed-in incentives would constitute (or nor) EU State Aid law.*"[731]

371.    In any event, OperaFund and Schwab submit that even if the Tribunal gave "*insufficient reasons*" for its decision to disregard EU law on State aid (*quod non*), that would not lead to an annulment; and even if the Disputed Measures constituted State aid (*quod non*), the payments under Regulatory Framework I were compatible with EU law.[732]

(iii)    The Tribunal "Justified" Its Conclusions on Liability

372.    OperaFund and Schwab contend that Spain's allegations on this matter merely constitute a "*disapproval*" of the reasoning in the Award, and an attempt to relitigate arguments already

---

[728] Tr. Ann., Day 1 (ENG), 102:25-103:9 (Mr. Mata).

[729] C-Mem. Ann., ¶ 142.

[730] Rej. Ann., ¶ 194 (quoting **RL-0118**, Award, ¶ 487).

[731] C-Mem. Ann., ¶ 143.

[732] Rej. Ann., ¶ 194.

rejected by the Tribunal.[733]  In their view, a "*plain reading*" of the Award demonstrates that the interpretation of the FET standard in Article 10(1) of the ECT, and the finding that Spain breached the Claimants' legitimate expectations were reasoned, "*properly explained*" and "*fully consistent.*"[734]

373.   OperaFund and Schwab remark that the Tribunal devoted 60 pages of the Award (pages 124-194) to analyzing whether Spain had breached the FET obligation, which included: (i) defining the scope of the FET standard; (ii) summarizing the Parties' submissions; (iii) references to the relevant case law; and (iv) a "*detailed analysis of its conclusions after applying the FET standard to the facts of the case.*"[735]

(a)   *The Tribunal Reasoned Its Interpretation of the FET Standard*

374.   According to OperaFund and Schwab, the Award's formulation of the FET standard and its application to the facts of the case is "*clearly*" expressed in the Award, Spain has not shown that the analysis was "*contradictory, frivolous or incomprehensible,*" and in any event, an "*incomplete*" analysis might not lead to an annulment.[736]

375.   OperaFund and Schwab submit that the Award "*properly reasons*" its formulation of the FET standard,[737] at paragraphs 481-485 of the Award.[738]  In particular, OperaFund and Schwab emphasize that that Tribunal held that:[739]

> "[…] *There is no question as to the State's right to regulate, which has not been challenged. There is no dispute that the laws changed in the past and would change in the future. This was expressly contemplated and accounted for within Article 44(3) of RD 661/2007, which laid out the consequences of such changes. Taken in this context, Article 44(3) of RD 661/2007 contained an express stability commitment that served its purpose of inducing investment in part by shielding investors in Claimants' position from legislative*

---

[733] C-Mem. Ann., ¶ 147.

[734] Rej. Ann., ¶ 196.

[735] Rej. Ann., ¶¶ 201-204.

[736] Rej. Ann., ¶ 206.

[737] C-Mem. Ann., § 3.3.3.1.

[738] C-Mem. Ann., ¶ 149.  *See also* Rej. Ann., ¶ 203; Tr. Ann., Day 1 (ENG), 104:8-18, 105:1-5 (Mr. Mata).

[739] C-Mem. Ann., ¶ 153 (quoting, **RL-0118**, Award, ¶ 485).

*or regulatory changes (including the ones complained of in this matter). The Tribunal, thus, respects the legislative authority of the Respondent State by giving effect to each of the terms in Article 44(3) of RD 661/2007, including its assurance that 'revisions […] shall not affect facilities for which the functioning certificate had been granted […].'"*

376.    It follows, OperaFund and Schwab argue, that the Tribunal "*reasoned that the State's right to regulate is utterly respected where an ECT tribunal, seized with an investment dispute where an investor establishes that its investment is protected by* [a] *stabilization clause like Article 44(3) of RD 661/2007, gives effect to such promise of stability.*"[740]

377.    Moreover, OperaFund and Schwab contend, the Tribunal's reasoning that the State's right to regulate is not an unfettered right is also found at paragraphs 509-511 of the Award. There, the Tribunal concludes that dismantling, for "*already existing investments,*" a system of incentives put in place to induce investment "*can hardly be considered reasonable, especially when considering the legislator's express statement that the old regime should continue to apply to existing registered investments in spite of possible future changes.*"[741]

378.    According to OperaFund and Schwab, contrary to Spain's allegations, the "*intrinsic validity of the interpretation of the FET standard*" in Article 10(1) of the ECT may not be called into question by the Committee, because an annulment is not an opportunity for a *de novo* review of the merits.[742]  If reasons were stated, annulment may not follow, and it is "*irrelevant*" if the reasons were "*correct, convincing or exhaustive.*"[743]

379.    Finally, OperaFund and Schwab remark that the Tribunal aptly summarized the Parties' positions on the interpretation of the FET standard, including Spain's arguments on the "*hierarchy of norms*" and "*successive regulatory changes*" (which Spain claims were not addressed in the Award), and submit that "*as long as a tribunal correctly summarizes the*

---

[740] C-Mem. Ann., ¶ 154.

[741] C-Mem. Ann., ¶ 156 (quoting **RL-0118**, Award, ¶ 511).  *See also,* Rej. Ann., ¶ 203.

[742] Rej. Ann., ¶¶ 198-199.

[743] Rej. Ann., ¶ 199.

*arguments of the parties and addresses all the claims, there is no need to explicitly address in the Award each and every argument raised in support of a particular claim.*"[744]

(b)   *The Tribunal's Findings on Breach of Legitimate Expectations are Properly Explained*

380.   OperaFund and Schwab contend that the Award "*properly justified*" the decision to uphold the FET claim;[745] and that Spain has failed to show that the reasoning is "*absent or contradictory.*"[746]  They submit that Spain's allegation constitute nothing more than a reiteration of arguments about the interpretation of the framework in RD 661/2007 already rejected, and submissions as to why Spain is not convinced by the Award's reasoning.[747]

381.   More particularly, OperaFund and Schwab submit that:

(i)   although Spain argues that the Award does not reason why Article 44(3) of RD 661/2007 amounts to a stability commitment, indeed paragraphs 482 to 485 of the Award contain that reasoning;[748]

(ii)   contrary to Spain's submission that the Award fails to assess the "*nature of RD 661/2007,*" paragraph 481 of the Award highlights that the "*Tribunal considers that it is crucial to establish whether RD 661/2007 itself contained a stability promise or otherwise whether the assurances were indeed given by appropriate high-level organs of the state*;"[749]

(iii)   despite Spain's allegations that the Tribunal failed to analyze the relationship between RD 661/2007 and Law 54/1997 on the Electricity Sector, "*the Award clearly reasoned (para. 487) that investors were not under an obligation to inquire the possibility of future changes affecting **existing installations** precisely because the immediately applicable Feed-in regulation (RD 661/2007) stated in categorical terms that said changes **would not affect existing installations***;"[750]

---

[744] Rej. Ann., ¶ 204 (referring to **RL-0118**, Award, ¶¶ 480-490, and **CL-0333**, *Rumeli Telekom A.S. and Telsim Mobil Telekomunikasyon Hizmetleri A.S. v. The Republic of Kazakhstan*, ICSID Case No. ARB/05/16, Decision of the *Ad Hoc* Committee, 25 March 2010 ["**Rumeli**"], ¶ 84).

[745] C-Mem. Ann., § 3.3.3.2.

[746] Rej. Ann., ¶ 207.

[747] C-Mem. Ann., ¶¶ 158-159.

[748] C-Mem. Ann., ¶ 162.

[749] C-Mem. Ann., ¶ 163 (quoting **RL-0118**, Award, ¶ 481).

[750] C-Mem. Ann., ¶ 164 (emphasis in original).

(iv)    while Spain complains that the Award only refers to awards that found Spain liable, ignoring others, those other decisions referred to by Spain post-date the Award, and therefore could not have been addressed by the Tribunal;[751]

(v)     contrary to Spain's contentions, the Tribunal provided reasons for why Spain had effected a "*radical change*" in the system at paragraphs 512 and 513 of the Award;[752]

(vi)    the Tribunal carefully considered the Parties' positions and the Parties' evidence on the matter of the Claimants' due diligence, as reflected in paragraphs 486-487 of the Award;[753]

(vii)   the Tribunal provided a "*clear justification*" for its rejection of Spain's invocation of the decisions of the Spanish Supreme Court at paragraph 491 of the Award.[754]

382.    According to OperaFund and Schwab, the reality is that both Spain and Professor Sands disagree with the "*intrinsic validity*" of the Award's interpretation of Article 44(3) of RD 661/2007 or the extent of the Claimants' due diligence, but that does not mean that the Award failed to reason.[755]

383.    OperaFund and Schwab further argue that the Tribunal "*properly identified the content of the legitimate expectations and assessed the Disputed Measures.*"[756]   In particular, they submit that the Award: (i) "*clearly identifies*" that the Claimants' legitimate expectations arose out of the "*stabilization assurance*" in Article 44(3) of RD 661/2007, as shown by paragraphs 482 to 485 of the Award;[757] and further details the content of this assurance at paragraph 512 of the Award, in holding that RD 661/2007 put in place a "*Feed-in*" regime "*fixing feed-in values according to the cost of money on capital markets at that point in time, and provided that those values would be updated annually according to inflation;*" and "*set*[ting] *remuneration for the lifetime of the plant;*"[758]   and (ii) concludes that the

---

[751] C-Mem. Ann., ¶ 165.

[752] C-Mem. Ann., ¶ 166.

[753] C-Mem. Ann., ¶¶ 167-168; Rej. Ann., ¶ 212.

[754] C-Mem. Ann., ¶ 169; Rej. Ann., ¶ 211.

[755] Tr. Ann., Day 1 (ENG), 107:3-8, 140:11-14 (Mr. Mata).

[756] C-Mem. Ann., § 3.3.3.3.  *See also, id.*, ¶ 174.

[757] C-Mem. Ann., ¶ 172.

[758] C-Mem. Ann., ¶ 172 (quoting **RL-0118**, Award, ¶ 512).

"*definitory elements of the assured framework were radically altered*" by the Disputed Measures.[759]

384.    Finally, OperaFund and Schwab observe that Spain's complains about the value accorded to evidence or the depth of the evidentiary analysis fall outside of the scope of an annulment proceeding.[760]  They submit that the Tribunal "*did not have to explain why it preferred to rely on certain evidence and not on the documents Spain believes to be more relevant.*"[761]

### (iv)    The Tribunal "Justified" Its Findings on Quantum

385.    OperaFund and Schwab contend that here, too, Spain's allegations constitute a "*disagreement*" with the Tribunal's conclusions, and do not constitute a ground for annulment;[762] but rather a "*covert appeal of the damages part of the Award.*"[763]  They submit that the Award contains 24 pages (pages 219-253) of "*reasoning on damages,*" in which the Tribunal "*went through the main issues in discussion between the parties' experts both in their reports and in the hearing,*" "*summarize*[d] *the parties' arguments to show the reader on what points their conclusion is based,*" and "*establishe*[d] *its conclusions.*"[764]  OperaFund and Schwab insist that the standard is not whether the reasons are "*insufficient*" or "*inadequate,*" but "*whether the Tribunal explained from A to B why it decided that the DCF method was applicable and why the assumptions it considered were supported by the evidence.*"[765]  More particularly, OperaFund and Schwab submit:

386.    *First*, that contrary to Spain's contentions, the Tribunal devoted an entire section of the Award (Section IX.B) to explaining why the DCF method was appropriate, reasoned at paragraph 621 why it did not share the Respondent's criticisms of this method as speculative,[766] and explained at paragraph 685 of the Award that the Asset Based Valuation

---

[759] C-Mem. Ann., ¶ 173 (referring to **RL-0118**, Award, ¶ 513).

[760] Rej. Ann., ¶¶ 209-210 (referring to **RL-0192**, *Impregilo*, ¶ 176).

[761] Rej. Ann., ¶ 211.

[762] C-Mem. Ann., ¶ 175.

[763] Tr. Ann., Day 1 (ENG), 108:19 (Mr. Mata).

[764] Rej. Ann., ¶¶ 214-215.

[765] Rej. Ann., ¶ 223.

[766] C-Mem. Ann., ¶¶ 176-177.  *See also*, Rej. Ann., ¶¶ 226, 232; Tr. Ann., Day 1 (ENG), 109:6-17 (Mr. Mata).

("**ABV**") approach endorsed by Spain's experts was "*unable to isolate the impact of the Disputed Measures*."[767]

387.  OperaFund and Schwab highlight that the Tribunal explained that it accepted the DCF method because it was "*generally recognized*" and because it considered it "*the most appropriate technique to calculate damages arising from breaches of international law affecting investments in going concerns*;"[768] it did cite "*evidence*" to support its conclusions, namely the awards in *CMS*, *ADC*, *Enron* and *National Grid*;[769] and it "*had previously summarized the Claimant's arguments and evidence*" supporting this conclusion, and referred to the expert reports, at paragraphs 610-616 of the Award.[770] Moreover, OperaFund and Schwab argue, the Award explained that it adopted the DCF method because it agreed with the Claimants and their expert that the "*Plants had a sufficient operational track record of profitability and there* [wa]*s no reason to doubt that they would have benefitted from stable feed-in remuneration under RD 661/2007, but for Respondent's wrongful measures*."[771]

388.  *Second*, that contrary to Spain's contentions, paragraph 683 of the Award shows that the Tribunal properly reasoned its choice of June 2014 as the valuation date, and why the 2012/2013 measures were considered "*temporary*."[772]  In particular, the Tribunal explained that June 2014 was "*the date when the Respondent, through MO IET/1045/2014, defined the economic parameters of the New Regulatory Regime*" which "*defined the injury to Claimants*;"[773] and "*explained that, considering that the 2012/2013 measures were replaced retroactively by the 2013/2014 measures, the full reparation principle (the*

---

[767] C-Mem. Ann., ¶ 177; Rej. Ann., ¶ 232; Tr. Ann., Day 1 (ENG), 110:15-18 (Mr. Mata).

[768] Rej. Ann., ¶ 228 (quoting **RL-0118**, Award, ¶ 621); Tr. Ann., Day 1 (ENG), 109:18-24 (Mr. Mata).

[769] Rej. Ann., ¶ 228 (citing **RL-0118**, Award, ¶ 621 and n. 1302); Rej. Ann., ¶ 230.

[770] Rej. Ann., ¶¶ 228, 230.

[771] Rej. Ann., ¶ 229 (quoting **RL-0118**, Award, ¶ 621); Tr. Ann., Day 1 (ENG), 110:7-14 (Mr. Mata).

[772] C-Mem. Ann., ¶ 178.

[773] C-Mem. Ann., ¶ 178 (quoting **RL-0118**, Award, ¶ 683); Rej. Ann., ¶ 238; Tr. Ann., Day 1 (ENG), 111:23-112:16 (Mr. Mata).

*cornerstone of damages quantification) required considering the damaging effect of the former as temporary.*"[774]

389.    On the valuation date, OperaFund and Schwab submit that the Award incurs in no contradiction.  They explain that Spain's argument hinges on the allegation that the Claimants' expert testified at the hearing on the merits that the amount of damages would probably be higher if the valuation date was the date of the Award.  This is inconsequential, they argue, because while the date of the Award as a valuation date would have probably resulted in higher damages, the Claimants had chosen June 2014 because that was the date that "*defined the injury,*" and the Claimants "*had the right to choose the valuation date.*"[775] Indeed, for OperaFund and Schwab, what is contradictory is for Spain to raise arguments arising out of the valuation date, when during the arbitration, Spain argued that the date of valuation was uncontroversial.[776]

390.    On the matter concerning the 2012/2013 measures, OperaFund and Schwab further submit that Spain is confusing the substantive issue (*i.e.* whether the measures were retroactive), with a different damages issue (*i.e.* how to quantify the retroactive effect of the Disputed Measures).   They say that: (i) the first issue was resolved at paragraph 513 of the Award;[777] and (ii) on the damages issue, the Tribunal explained that it was more appropriate to take the retroactive effect of the new measures into account because "*the measures before June 2014 – although temporary – caused damage.*"[778]

391.    *Third*, that contrary to Spain's submissions, paragraph 684 of the Award contains the Tribunal's reasoning for its choice of the 35-year useful life parameter in the Claimants' experts' But-For scenario, and provides the following reasons: (i) a study by the EC, (ii) the lease agreement of the ECO 3 PV Plant, (iii) the technical conclusions by an independent expert report of ATA, and (iv) the fact that Article 36 of RD 661/2007 set an FIT "*for the first 25 years*" of operation, which makes clear that the State expected the

---

[774] C-Mem. Ann., ¶ 178.

[775] Rej. Ann., ¶¶ 240-241.

[776] Rej. Ann., ¶ 242 (citing **RL-0118**, Award, ¶ 641).

[777] Rej. Ann., ¶ 234.

[778] Rej. Ann., ¶¶ 235-236 (quoting **RL-0118**, Award, ¶ 683); Tr. Ann., Day 1 (ENG), 113:10-114:19 (Mr. Mata).

useful life to exceed 25.[779]  According to OperaFund and Schwab, in reality, Spain is taking issue with the "*technical correctness*" of the Tribunal's conclusions, which goes beyond the scope of an annulment under Article 52(1)(e).[780]

392.  *Fourth*, that while Spain submits that the Award makes no finding on regulatory risk, the illiquidity rate, the discount rate, and the minorities discount, the Award had already discarded the Respondent's experts ABV method, and explained at paragraphs 686 to 688 of the Award that the Respondent's experts DCF calculations were unpersuasive, and that the Claimants' experts figures and values were the appropriate starting point.[781] Furthermore, the Tribunal did not need to "*engage itself in an independent calculation of certain economic values like regulatory risk, illiquidity rates, discount rates or minority discounts*" and it was appropriate for it to rely on expert's work.[782]

393.  More particularly, OperaFund and Schwab submit that:

(i)   The Tribunal reasoned its decision on regulatory risk, as it acknowledged both Parties' positions at paragraphs 653 to 664 of the Award, and concluded in favor of the Claimants' experts approach explaining that "*Respondent's expert, Accuracy, distorts the impact of the Disputed Measures*" and that "*the Tariff Deficit was caused by Respondent's policies.*"[783]

(ii)  The Tribunal reasoned its decision on the illiquidity and discount rates, as paragraph 685 of the Award explains that the Tribunal's rejection of Spain's assessment on regulatory risk necessarily carried with it the rejection of Spain's views on illiquidity and discount rates.[784]

(iii) The Tribunal had no obligation to deal with the minority discount, and in any case, this issue did not affect the amount of damages.[785]  The minority discount issue was never raised by Spain in its oral and written pleadings, but rather, it was only briefly mentioned by the Respondent's expert in its second report;[786] and in any event, it was "*wholly irrelevant*" to the award on damages, as neither Spain nor its experts ever

---

[779] C-Mem. Ann., ¶ 179; Rej. Ann., ¶¶ 245-248; Tr. Ann., Day 1 (ENG), 114:20-115:23 (Mr. Mata).

[780] Rej. Ann., ¶¶ 244, 249.

[781] C-Mem. Ann., ¶ 180; Rej. Ann., ¶ 250.

[782] C-Mem. Ann., ¶ 181.  *See also*, Rej. Ann., ¶ 256.

[783] Rej. Ann., ¶¶ 252-255 (quoting **RL-0118**, Award, ¶ 685); Tr. Ann., Day 1 (ENG), 117:1-22 (Mr. Mata).

[784] Rej. Ann., ¶ 261; Tr. Ann., Day 1 (ENG), 117:25-118:21 (Mr. Mata).

[785] Rej. Ann., ¶ 269.

[786] Rej. Ann., ¶¶ 263-264; Tr. Ann., Day 1 (ENG), 118:25-119:7 (Mr. Mata).

quantified the alleged impact of that minority discount.[787]  Moreover, it is clear that the Tribunal decided to follow the Claimants' expert DCF approach, which contains no reference to the minority discount; and the Tribunal was not required to explain why it rejected each of the Respondent's experts assumptions.[788]  Finally, even if the minority discount issue had been relevant, Spain could have asked for a supplementary decision under Article 49(2) of the ICSID Convention, which it did not.[789]

394.  Lastly, according to OperaFund and Schwab, Spain's reliance on the decisions in *Teco* and *Pey Casado* is misplaced.  In OperaFund and Schwab's view, neither case supports Spain's position, as (i) unlike in *Pey Casado*, the present case involves no contradiction in the reasoning to determine the method of calculation;[790] and (ii) in *Teco* the award was annulled because the Tribunal "*failed to address **in any way** the expert testimonies within its analysis*," while in the present case the Award "*constantly referred to the Parties' expert reports.*"[791]

### 2.  The Committee's Analysis

#### a.  The Standard

395.  Article 52(1)(e) of the ICSID Convention sets forth as a ground of annulment an award's failure to state the reasons on which it is based.  The ICSID Background Paper on Annulment notes that "[a]*d hoc Committees have explained that the requirement to state reasons is intended to ensure that parties can understand the reasoning of the Tribunal, meaning the reader can understand the facts and law applied by the Tribunal in coming to its conclusion*."[792]  With regards to the Parties' expectations of this ground for annulment, they each cite the language of the *MINE* committee (cited also by the ICSID Background Paper on Annulment),[793] describing a "*minimum requirement*" that an award should enable the parties to follow how the tribunal proceeded "*from Point A to Point B.*"[794]

---

[787] Rej. Ann., ¶ 265.

[788] Rej. Ann., ¶¶ 266-267 (quoting **RL-0118**, Award, ¶¶ 685, 687); Tr. Ann., Day 1 (ENG), 119:16-23 (Mr. Mata).

[789] Rej. Ann., ¶ 268.

[790] Rej. Ann., ¶¶ 217-219.

[791] Rej. Ann., ¶¶ 220-222 (emphasis in original).

[792] **R-0390**, ICSID Background Paper on Annulment, ¶ 105.

[793] *See* **R-0390**, ICSID Background Paper on Annulment, n. 203.

[794] *See* **RL-0129**, *MINE*, ¶ 5.09.  *See also,* Mem. Ann., ¶ 153; C-Mem. Ann., ¶¶ 123-125, and Rej. Ann., ¶ 183.

396.    The complete paragraph referenced by the Parties of the *MINE* decision reads as follows: "*In the Committee's view, the requirement to state reasons is satisfied as long as the award enables one to follow how the tribunal proceeded from Point A. to Point B. and eventually to its conclusion, even if it made an error of fact or of law. This minimum requirement is in particular not satisfied by either contradictory or frivolous reasons*."[795]

397.    The Committee is in agreement with this view of the *MINE* annulment committee, and indeed the many other annulment committees that have adopted this view. The Committee is of the view that the requirement to state reasons is not intended to be a high bar; it is a minimum requirement that may be met absent contradictory or frivolous reasons. Moreover, it does not impose on a tribunal an unrealistic requirement; as Claimants quote from Professor Schreuer, "*the duty to state reasons refers only to a **minimum requirement**. It does **not** call for tribunals to strain every sinew in an attempt to convince the losing party that the decision was the right one*."[796]

398.    On a similar point, the Parties depart on the issue of the adequacy of reasons. For example, Spain supports the view of the *Patrick Mitchell* annulment committee that reasons can be "*so inadequate that the coherence of the reasoning is seriously affected*."[797] For their part, OperaFund and Schwab contend that "'*inadequate' reasons do not lead, by themselves, to the annulment of an award. The reasons must be absent or so contradictory, frivolous or incomprehensible, that it is impossible to infer the Tribunal's reasoning*."[798] The Committee notes that the language of Article 52(1)(e) of the ICSID Convention makes no reference to adequacy. Furthermore, as observed by the *MINE* annulment committee, "[t]*he adequacy of the reasoning is not an appropriate standard of review under paragraph (1)(e), because it almost inevitably draws an ad hoc Committee into an examination of the substance of the tribunal's decision, in disregard of the exclusion of the remedy of appeal by Article 53 of the Convention*."[799] The Committee agrees, and concludes that the ground

---

[795] **RL-0129**, *MINE*, ¶ 5.09.

[796] C-Mem. Ann., ¶ 122 (emphasis in original) (quoting **CL-0295**, Schreuer, C. *et al*., *The ICSID Convention: A Commentary* (2nd ed.), Cambridge: Cambridge University Press (2009), Article 52, ¶ 342).

[797] Reply Ann., ¶ 395 (relying on **RL-0190**, *Mitchell*, ¶ 21).

[798] Rej. Ann., ¶ 187 (relying on **RL-0129**, *MINE*, ¶ 5.08; **RL-0167**, *Occidental*, ¶ 65).

[799] **RL-0129**, *MINE*, ¶ 5.08. *See also,* C-Mem. Ann., ¶ 124.

of failure to state reasons must not to be used to seek to correct an award; so long as the award meets the minimum requirement, an error of fact or law in the reasons will not result in an annulment.

399.    The Committee considers also that the work of ICSID annulment committees, as reflected in the Background Paper on Annulment, provides further insight into the intended purpose of this ground; namely, that the ground "*is intended to ensure that the parties can understand the reasoning of the Tribunal* [...] *in coming to its conclusion.*"[800]

400.    In the Committee's view, this purpose is of significant importance.  The implication is that the standard must reflect the fact that the most important readers of the award – the parties – are highly sophisticated and informed readers, who have participated closely in every phase of the underlying case.  In the present case, this includes, among other things, post-hearing briefs ordered by the Tribunal specifically to address cases that are similarly situated in terms of the issues of law and fact.  The point here is that, in assessing claims of a failure to state reasons, the Committee must understand the Award, and may not be satisfied with a simple reading of the text of the Award.  This approach is akin to that of other *ad hoc* committees that "*have suggested that they have discretion to further explain, clarify or infer the reasoning of the Tribunal rather than annul an award.*"[801]

401.    Referencing the *MINE* annulment committee decision once again, Spain argues that, while a "*failure to respond to each of the arguments presented by the parties* [does] *not constitute the ground for annulment,*" the *MINE* committee determined that where "*the Tribunal failed to deal with questions* [...] *the answer to which might have affected the Tribunal's conclusion,*" the "[f]*ailure to address these questions constituted a failure to state the reasons on which that conclusion was based.*"[802]   In accepting and applying this standard

---

[800] **R-0390**, ICSID Background Paper on Annulment, ¶ 105, citing *e.g.* **RL-0129**, *MINE*; **CL-0319/RL-0256**, *Vivendi I*; **RL-0131**, *Wena*; **CL-0318**, *El Paso Energy International Company v. Argentine Republic*, ICSID Case No. ARB/03/15, Decision on Annulment, 22 September 2014 ["*El Paso*"]; **RL-0132**, *Iberdrola*; **RL-0167**, *Occidental*; **RL-0168**, *Tulip Real Estate and Development Netherlands B.V. v. Republic of Turkey*, ICSID Case No. ARB/11/28, Decision on Annulment, 30 December 2015 ["*Tulip*"]; **RL-0193**, *Total S.A. v. Argentine Republic*, ICSID Case No. ARB/04/01, Decision on Annulment, 1 February 2016 ["*Total*"]; **CL-0305**, *Adem Dogan*; **CL-0272**, *Micula*; **CL-0307**, *Lahoud*; **RL-0191**, *TECO*.

[801] **R-0390**, ICSID Background Paper on Annulment, ¶ 106.

[802] Reply Ann., ¶ 393 (relying on **RL-0129**, *MINE*, ¶ 6.99).

to the present case, the Committee relies further on the language of *MINE* in its examination of the issue, and agrees that such a conclusion may result where a "*failure to deal with a question may render the award unintelligible.*"[803]

402.    With these principles in mind, the Committee moves to assess the arguments of the Parties.

### b.    Failure to State Reasons on the Determination of the Applicable Law

403.    Spain's main arguments in respect of its claim that the Award failed to state reasons for its decision to deny EU law as the law applicable to the case may be summarized by two statements in its Reply on Annulment.  First, "[a]*s indicated above, the Tribunal concluded that it was not necessary to apply EU law to the merits of the case.  The Kingdom of Spain disagrees and considers that such a decision amounts to a* [f]*ailure to state reasons for the purpose of the ICSID Convention.*"[804]  Second, after referring to some of Spain's merits arguments that were not accepted by the Tribunal, Spain states "[i]*t must therefore be concluded that the reasons given by the Tribunal for non-application of EU law to the merits of the case are insufficient and inadequate, as they cannot, in themselves, be a reasonable basis for reaching the decision contained in the Award.*"[805]

404.    Spain's position reflects a sense of absolute incredulity that there could be any conclusion other than its own on the applicable law question, and as a result any other view must be "*a clear and completely irrational contradiction,*" and therefore "*lacks any motivation.*"[806]  Fundamentally, Spain's complaint is not one of reasons stated, it is rather a complaint about the Tribunal's decision itself.

405.    As the Committee has determined with regards to the applicable standard for Article 52(1)(e) of the ICSID Convention, the Committee may not act as a court of appeal.  In addition, issues of sufficiency are not part of the grounds, and Spain has provided no basis

---

[803] **RL-0129**, *MINE*, ¶ 5.13.
[804] Reply Ann., ¶¶ 412-413.
[805] Reply Ann., ¶ 416.
[806] Reply Ann., ¶ 414.

to make an argument that there was a failure by the Tribunal to address an issue that might have rendered the Award unintelligible.

406.     More importantly, however, is the Committee's conclusion that in rendering its decision that EU law was not the substantive law of the case, the Tribunal clearly met the requisite standard for stating reasons.  In the previous section (Section IV.C.3.c *supra*, on "Manifest Excess of Powers by Failure to Apply the Applicable Law: EU Law") the Committee examined the Tribunal's reasons and logic in detail, and its conclusions apply here to its examination of reasons.  Specifically, the Committee finds that the Tribunal's analysis and conclusions are well-founded on the provisions of the ECT, that its approach is methodical and logical, and that its conclusions are reasonable and naturally flow from its analysis.  Mindful that the arbitration did not take place in a vacuum, but rather in the midst of numerous other similar cases that the Tribunal and the Parties readily recognized and utilized, the Tribunal's position on the EU law issue was also not isolated.  Its conclusions were clearly informed by the work of other tribunals, and the Tribunal's references to these cases elucidate the logic of the stated reasons.  In short, the Committee has no doubts that the Award "*enables one to follow how the tribunal proceeded from Point A. to Point B. and eventually to its conclusion, even if it made an error of fact or of law.*"[807]

407.     With this in mind, the Committee must reject Spain's claims that the Award failed to state reasons by not addressing Articles 107 and 108 of the TFEU, and the EU State Aid regime.[808]  It is abundantly clear to the Committee that given the Tribunal's focus on the ECT and its conclusion that EU law was "*not part of the applicable substantive law in this case,*"[809] there was simply no need to address those or other EU law questions on the issue of the law to be applied.  The Committee is mindful OperaFund and Schwab's invocation of Professor Schreuer's treatise, that "[t]*he duty to state reasons refers only to a **minimum***

---

[807] **RL-0129**, *MINE*, ¶ 5.09.

[808] Mem. Ann., ¶¶ 166-167 and ¶¶ 170-171.

[809] **RL-0118**, Award, ¶ 330.

*requirement. It does **not** call for tribunals to strain every sinew in an attempt to convince the losing party that the decision was the right one.*"[810]

### c.    Failure to State Reasons on the Conclusions of Liability

408.    Spain states that while the Award "*analyses in greater or less detail the FET standard under the ECT and relevant concepts such as legitimate expectations,*" the Award nonetheless "*lacks the most basic reasoning and constitutes a superficial analysis of a dispute as complex as the one before the Tribunal, which entails the need for its annulment.*"[811]    Spain contends in the main that the Award is deficient in its reasoning regarding the FET standard in Article 10(1) of the ECT, and that it lacks "*valid reasoning*" for finding a breach of legitimate expectations.    Each of these main contentions will be addressed in turn, along with the sub-parts of Spain's arguments.

### (i)    The Claim of Deficiencies in Reasoning on the FET Standard

409.    Spain summarizes its basis for annulment under Article 52(1)(e) of the ECT as follows: "*The OperaFund award addresses its position on the FET standard set out in the ECT in paragraphs 480-490 and 508-513.    The lack of reasons offered by the Arbitral Tribunal in its conclusions on liability and quantum is remarkable, as in a masterful and forceful manner Professor Philippe Sands exposes in his dissenting opinion when he points out that, in his opinion, the decisions of the majority are 'entirely unsupported by evidence on the record, and reached without reasoning or explanation.*'"[812]    The Committee is cognizant of the fact that the Tribunal's decision on the issue that Spain violated Article 10 of the ECT (FET) is a decision of the Majority of the Tribunal, with Professor Sands dissenting, and will address the issues arising from the dissent in turn.

410.    In assessing this and the associated arguments put forward by Spain, the Committee must focus on the language of the Award itself to determine whether these paragraphs show a logical progression on the part of the Award that "*enables one to follow how the tribunal*

---

[810] C-Mem. Ann., ¶ 122 (emphasis in original) (quoting **CL-0295**, Schreuer, C. *et al.*, *The ICSID Convention: A Commentary* (2nd ed.), Cambridge: Cambridge University Press (2009), Article 52, ¶ 342).

[811] Mem. Ann., ¶ 177.

[812] Mem. Ann., ¶ 178.

*proceeded from Point A. to Point B. and eventually to its conclusion, even if it made an error of fact or of law.*"[813]

411.    After restating the Parties' positions and those of the EC, the Award begins the section devoted to the analysis of the FET claim by noting that the "*Tribunal will only focus on those issues which it considers determinative for its decision in the present case.*"[814]

412.    With regards to this point, the Committee is unaware of any submission by Spain in the arbitration under Article 49(2) of the ICSID Convention to request the Tribunal to decide any question which the Tribunal had omitted in the Award.[815]   Furthermore, in the Committee's view, there was no failure by the Tribunal to address an issue that might have rendered the Award unintelligible.

413.    At the core of the Tribunal's interpretation of the FET standard was its statement that "[l]*egitimate expectations require reasonable reliance of investors on host state acts; the more specific they are directed towards the investors the more likely they can be considered to be reasonable and thus protected.*"[816]

414.    Applying this interpretation to the facts at hand, the Tribunal "*consider*[ed] *that it* [was] *crucial to establish whether RD 661/2007 itself contained a stability promise or otherwise whether the assurances were indeed given by appropriate high-level organs of the state.*"[817]

415.    In its application of the standard established, the Tribunal examined the operative language of Article 44(3) of RD 661/2007, quoting it as follows:

> "*The revisions of the regulated tariff and the upper and lower limits indicated in this section shall not affect facilities for which the commissioning certificate had been granted prior to January 1 of the*

---

[813] **RL-0129**, *MINE*, ¶ 5.09.

[814] **RL-0118**, Award, ¶ 480.

[815] The Committee notes the Claimants' 8 October 2019 request for rectification of the Award under Article 49(2) of the ICSID Convention, and the decision granting the rectification on 28 October 2019.

[816] **RL-0118**, Award, ¶ 481.

[817] **RL-0118,** Award, ¶ 481.

*second year following the year in which the revision had been performed.*"[818]

416. The Tribunal then noted that in view of this provision, the RAIPRE registration "*is an important additional element in order to assess the legitimate expectations of the investors.*"[819] The Tribunal tells the reader why this is so at paragraph 484 of the Award.

417. In the meantime, the Tribunal refers to the *Masdar* tribunal (one of the "*similar arbitrations*" mentioned above) "*which expressly left open the possibility that Article 44(3)'s stabilization promise could constitute a 'specific commitment'* […]," and observes that "[s]*uch a stabilization promise could be perfected by the registration of the RE plants to receive the preferential FIT under RD 661/2007,*" noting further that the *Masdar* tribunal "*did not need to decide whether the legislative commitment alone could give rise to legitimate expectations, because there were other commitments.*"[820] In the Committee's view, the reference to *Masdar* was a clear indication by the Tribunal that it was aligned with the analysis of the *Masdar* tribunal.

418. The Tribunal then confirmed that the Claimants were eligible and took the necessary steps to register in the RAIPRE under RD 661/2007. It then stated its view that the "*formal registration led to the investors' entitlement to receive the benefits under RD 661/2007 (including not being subject to regulatory change.)*"[821] Thus, addressing the question it posed at paragraph 481, it determined, in paragraph 484, that "*RD 661/2007 itself contained a stability promise.*" Thus, the Committee understands that the Tribunal's decision was fundamentally based on the *crucial* fact of the Claimants' eligibility for and registration in the RAIPRE under Article 44(3) of RD 661/2007; in other words, that in the Tribunal's view, once it was clear that the Claimants were entitled to the "*stabilization assurance*" of Article 44(3),[822] Spain's failure to maintain that stability assurance resulted in a violation of the FET provision of Article 10(1) of the ECT.

---

[818] **RL-0118**, Award, ¶ 482.

[819] **RL-0118**, Award, ¶ 483.

[820] **RL-0118**, Award, ¶ 483.

[821] **RL-0118**, Award, ¶ 484.

[822] **RL-0118**, Award, ¶ 485.

419. The Tribunal confirmed the basis of its conclusion and further develops its reasoning in the paragraphs that follow from paragraph 484. The Tribunal stated that it had "*no doubt that the stabilization assurance given in Article 44(3) is applicable for the investments by Claimants*," and that "*it is hard to imagine a more explicit stabilization assurance than the one mentioned in Article 44(3)*."[823] It reiterated the relevant language of Article 44(3) of RD 661/2007, emphasizing the language that "*revisions* [...] *shall not affect facilities for which the functioning certificate had been granted.*"[824]

420. The Award quotes from the *Novenergia* tribunal – which included an extensive review of the FET standard under Article 10(1) of the ECT – that "*RD 661/2007 was so adamantly clear that its understanding by common readers did not require a particularly sophisticated analysis.*"[825] On this basis, the Tribunal states that it "*agrees that investors could perfect a right to the remuneration set forth by the Spanish legislator, and this is consistent with the Spanish legislator's express intention: changes in law were, indeed, contemplated within the express text of RD 661/2007 by its reference to 'revisions,' and the contemplated effect of such changes were that these 'shall not affect facilities for which the functioning certificate has been granted.'*"[826]

421. In relation to this section of the Award, Spain poses a conundrum to highlight an alleged "*obscurity*" of the Award's reasoning, namely, "*why, if the State retains the regulatory power to accommodate the regulation to the economic situation for reasons of general interest (Point A), a State could not, for those same reasons, modify the regulation in a substantial manner, altering its essential characteristics (Point B).*"[827] Spain continues by asserting that "[t]*his obscurity,* [...] *prevents really knowing the opinion of the majority on how far the regulatory power that the State maintains and (on) where the necessary respect for legitimate expectations begins* [...]."[828]

---

[823] **RL-0118**, Award, ¶ 485.

[824] **RL-0118**, Award, ¶ 485.

[825] **RL-0118**, Award, ¶ 485.

[826] **RL-0118**, Award, ¶ 485.

[827] Mem. Ann., ¶ 180.

[828] Mem. Ann., ¶ 181.

422.    In the Committee's view, there is no obscurity in the Award's reasoning.  The Tribunal is simply saying here that it is taking the regulator as its word.  Specifically, in the context of Article 44(3) of RD 661/2007, the Award is respecting the regulator's ability to regulate, including by changing the law (as done in Article 44(3), which states that there will be "*revisions of the regulated tariff and the upper and lower limits indicated in this section*") and that the regulator can legislate stability in the law (as done in Article 44(3), which states "[…] *this section shall not affect facilities for which the commissioning certificate had been granted prior to January 1 of the second year following the year in which the revision had been performed*").[829]

423.    This is confirmed by the Tribunal when it states:

> "*There is no question as to the State's right to regulate, which has not been challenged.  There is no dispute that the laws changed in the past and would change in the future.  This was expressly contemplated and accounted for within Article 44(3) of RD 661/2007, which laid out the consequences of such changes.  Taken in this context, Article 44(3) of RD 661/2007 contained an express stability commitment that served its purpose of inducing investment in part by shielding investors in Claimants' position from legislative or regulatory changes (including the ones complained of in this matter).  The Tribunal, thus, respects the legislative authority of the Respondent State by giving effect to each of the terms in Article 44(3) of RD 661/2007, including its assurance that 'revisions […] shall not affect facilities for which the functioning certificate had been granted[.]'  The Claimants must have been able to rely on the measures aimed at encouraging the use of renewable and other new technologies and at inducing and protecting their investment.*"[830]

424.    To further elucidate its reasoning, the Tribunal proceeded to note other similar cases that shared its interpretation of Article 44(3), namely, *Novenergia* and *Antin*.  These cases were very familiar to the Tribunal and the Parties, and indeed *Novenergia* was included in the questions posed by the Tribunal to the Parties in post-hearing briefing,[831] and was heavily quoted by the Tribunal in paragraphs 485 and 486 in support of the Award.

---

[829] **RL-0118**, Award, ¶ 482.

[830] **RL-0118**, Award, ¶ 485.

[831] **RL-0118**, Award, ¶ 378.

425.    At this point in the Award's reasoning, the Tribunal addresses the import of Claimants' due diligence.  Here, the Tribunal clearly states the importance it attached to the operative terms of RD 661/2007 for the Claimants' investment, and as a consequence the Tribunal states that "*it is not determinative how relevant Claimants' reliance on the Cuatrecasas Due Diligence Report of October 2007 was*."[832]  Nonetheless, the Tribunal notes that RD 661/2007 was "*the only regulation analyzed by that Report, which – while prepared for the benefit of Deutsche Bank as the developer – was later shared with Claimants*."[833]  Quoting again from *Novenergia*, the Tribunal states its agreement that "'*an adequate due diligence prior to making its investment', was met when it held that the investor did, in fact, 'carry out a reasonable analysis of the Spanish regulatory framework prior to its investment.*'"[834]

426.    The Tribunal then stated its agreement with the tribunal in *Antin* as follows:

> "[The Tribunal] *must consider when the investment was made, what the circumstances were at the time and the information that the investor had or should reasonably have had, had it acted with the requisite degree of diligence (considering its expertise).  In carrying out this assessment, tribunals must attempt to place themselves at the time of the investment and consider the information and conditions available at such time, and to refrain from appraising the investor's expectations with the benefit of hindsight.*"[835]

427.    It also stated its agreement with the *Antaris* tribunal "*that the absence of 'real due diligence' on the part of the investors would vitiate a legitimate expectations claim*."[836]

428.    Immediately after this, the Tribunal states as follows: "*However, the Tribunal does not see a lack of due diligence by the Claimants.  Both Claimants did what could be expected under the circumstances and at the time of their investments by a prudent investor*."[837]   These

---

[832] **RL-0118**, Award, ¶ 486.

[833] **RL-0118**, Award, ¶ 486.

[834] **RL-0118**, Award, ¶ 486.

[835] **RL-0118**, Award, ¶ 486.

[836] **RL-0118**, Award, ¶ 486.

[837] **RL-0118**, Award, ¶ 487.

sentences are the subject of considerable criticism by Spain,[838] and by Professor Sands in his Dissent.[839]

429.    However, having examined the Award carefully and in detail, it is abundantly clear to the Committee that the finding by the Tribunal was that the specific language of Article 44(3) of RD 661/2007 <u>itself</u> permitted the Claimants to "*perfect a right to the remuneration set forth by the Spanish legislator, and this is consistent with the Spanish legislator's expressed intention*;"[840] and that the importance of the Claimants' due diligence requirement – that is, a "*minimum exercise of due diligence to confirm their expectation*"[841] – was determined to be satisfied by the Tribunal, stating that: "*Claimants' reliance on a Legal Opinion by Cuatrecasas was also sufficient at least in confirming their expectations, because the Tribunal cannot see what other better means of information they could have obtained than that provided by what seems to have been the most competent law firm for these matters in Spain*."[842]  Spain itself recognizes this as "[t]*he key to the OperaFund case* […]."[843]

430.    For this same reason, the Award ignored the answer given by the Claimants and bank witnesses during the hearing on the merits to the questions raised by Arbitrator Sands as to "*whether they had inquired about possible future changes of the regulations*," because "[t]*here was no need for such an enquiry by Claimant, because Article 44(3) expressly excluded such changes by the words 'shall not affect facilities for which the commissioning certificate had been granted*'"[844]  Consistently, the Tribunal made it clear that its conclusion in this regard was "*not altered by Respondent's arguments related to the alleged understanding of other participants in the RE market (many of which have brought claims*

---

[838] *See e.g.*, Mem. Ann., ¶ 281.

[839] **RL-0119**, Sands Dissent, ¶ 25.

[840] **RL-0118**, Award, ¶ 485.

[841] **RL-0119**, Sands Dissent, ¶ 24.

[842] **RL-0118**, Award, ¶ 487.  The Award also makes it clear here that the Tribunal saw no conflict of interest in the Cuatrecasas firm acting first for Deutsche Bank and later for the Claimants, and that the "*Claimants had no reason to think that the Report for Deutsche Bank was incorrect or was outdated by the time they became aware of it.*"  *Id.*

[843] Mem. Ann., ¶ 195.

[844] **RL-0118**, Award, ¶ 487.

*against Spain), Respondent's views on EU state Aid law, and the Claimants' internal documents that Respondent argues show awareness of regulatory risk.*"[845]

431.    Significantly, having established that the Claimants met their burden of proving their claim of legitimate expectations, the Award underlines that "*it has not been shown and cannot be argued that any further steps to achieve information would have resulted in an expectation that new measures which later were issued in 2014 were to be issued by the State which would fundamentally withdraw the assurances and benefits provided by the State such as in RD 661/2007.*"[846]

432.    Finally, the Tribunal states that it is "*not persuaded by Respondent's contention that the reasonable expectation varies between rates of returns of 1.5 and 2% both in the case of Deutsche Bank and in the case of Claimants.  Deutsche Bank and Claimants planned to invest in the plants with 6.7 – 8.2% return range, by staggering PV plants to legitimately optimize FIT remuneration.*"[847]  For the Tribunal, "*RD 661/2007, however, put an end to the difference in remuneration, and fundamentally changed and assured the profitability of the investments.*"[848]  The Tribunal thereafter states that it "*is aware and shares the views of*" the tribunals of *Antin*, *Masdar*, *Novenergia*, and *Eiser* "*which also rejected Spain's defense based on the 'reasonable return' argument,*" and that "*Antin and Eiser rejected Spain's defense based on the Tariff Deficit.*"[849]

433.    This is the reasoning of the Award on the FET issue and specifically the issue of legitimate expectations.  The Committee has taken pains to scrutinize every sentence of the Tribunal's decision, and in that process concludes that the Award does not fail to state the reasons on which it is based.  It is clear that based on the evidence before it, the majority determined that the terms of Article 44(3) of RD 661/2007 provided a specific assurance of stability that the Claimants could legitimately rely upon.  That determination informed the majority's further decisions, including the appropriate level of due diligence.  The

---

[845] **RL-0118**, Award, ¶ 487.

[846] **RL-0118**, Award, ¶ 487.

[847] **RL-0118**, Award, ¶ 488.

[848] **RL-0118**, Award, ¶ 488.

[849] **RL-0118**, Award, ¶ 489.

Committee sees in the Award a logical progression through the issues, all the while adhering to its core decision on a recognition of a specific assurance under the regulation and the Claimants' eligibility and registration. The Award enables the reader "*to follow how the tribunal proceeded from Point A. to Point B. and eventually to its conclusion*"[850] in a cohesive and supported progression.

434. It is worth highlighting once again the language of the *MINE* annulment committee, that requirement to state reasons is a "*minimum requirement*,"[851] "*that it must enable the reader to follow the reasoning of the Tribunal on points of fact and law. It implies that, and only that. The adequacy of the reasoning is not an appropriate standard of review under paragraph (1)(e), because it almost inevitably draws an ad hoc Committee into an examination of the substance of the tribunal's decision, in disregard of the exclusion of the remedy of appeal by Article 53 of the Convention. A Committee might be tempted to annul an award because that examination disclosed a manifestly incorrect application of the law, which, however, is not a ground for annulment.*"[852]

435. In large part, and considering the substance of the Award, Spain's complaints are two-fold: first, that it "*profoundly*"[853] disagrees with the Award's conclusion, and second, that the reasoning is inadequate in the sense that it does not address issues that Spain would like to see developed. Neither of these bases are grounds for annulment under Article 52(1)(e) of the ICSID Convention.

436. For all of the above reasons, the Committee must reject Spain's contention that the Award should be annulled for a failure to state reasons for its conclusion that the Claimants' legitimate expectations were protected under the ECT.

---

[850] **RL-0129**, *MINE*, ¶ 5.09.

[851] **RL-0129**, *MINE*, ¶ 5.09.

[852] **RL-0129**, *MINE*, ¶ 5.08.

[853] Reply Ann., ¶ 420.

(ii) <u>The Claim of Lack of "Valid Reasoning" for Finding a Breach of<br>Legitimate Expectations</u>

437.    Spain contends that the Award's failure to express reasons is a result of the fact that, in paragraph 480, the Award states that the "*Tribunal will only focus on those issues which it considers determinative for its decision in the present case,*" without "*providing any indication of the criteria according to which it comes to consider some issues as relevant and others as irrelevant.*"[854]    As a result, Spain alleges that the "*criterion of relevance of the issues examined by this Tribunal remains unknown for* […] *Spain, which generates, in turn, a situation of defencelessness for this party due to being unaware of the reasons why certain issues are ignored from the reasoning of the Tribunal.*"[855]

438.    Based on this, Spain seeks to analyze each of the "*different elements*" that make up the Tribunal's decision on the issue of legitimate expectations.    The Committee will address each element addressed by Spain in the subsections that follow, mindful of its decision that the Award did not fail to state the reasons for its decisions.

(a)    *Lack of Reasons for the Award's Conclusions on Article<br>44(3) of RD 661/2007*

439.    Spain asserts that the Award did "*not adequately analy*[z]*e*[]" the "*nature of the regulatory norm*" that served as the "*cornerstone*" of the decision.    It cites this as a "*clear example of insufficiency in the reasons given.*"[856]    Spain's complaint here is one of alleged inadequacy and insufficiency.    As the Committee has stressed, these issues go to the merits of the Award and are not appropriate to be examined under Article 52(1)(e) of the ICSID Convention.

440.    Next, Spain submits that the Tribunal's statements at paragraph 485 of the Award, recognizing the existence of a "*stabilisation promise*" are "*manifestly contradictory*" as shown by Professor Sands' dissent.[857]    In particular, for Spain, the contradiction lies in that the Tribunal "*acknowledges the legislative power of the State*"  while at the same time

---

[854] Mem. Ann., ¶ 183.
[855] Mem. Ann., ¶ 183.
[856] Mem. Ann., ¶ 194.
[857] Mem. Ann., ¶ 195.

states that it has "*no doubt that Article 44 (3) contained a promise of stabilization*."[858] Thus, according to Spain, it was contradictory for the Tribunal to find that RD 661/2007 "*was clear in offering a guarantee of immutability to investors*," while also acknowledging that "*a reasonable investor should expect the possibility of changes in the supposedly immutable regime*."[859]

441.  As the Committee has determined, there was no contradiction; the Tribunal was taking the Royal Decree as it was written.  It recognized the Royal Decree's ability to make revisions to the regulated tariff, and to grant exceptions to the revisions.  Having done so, the Award determined that the "*Claimants must have been able to rely on the measures aimed at encouraging the use of renewable and other new technologies and at inducing and protecting their investment*."[860]  Spain's contention that the language of Article 44(3) of RD 661/2007 has a "*limited literal scope*" was, as Spain acknowledges, subject to argument in the underlying arbitration and Spain's complaint seeks to revise the issue in this proceeding.[861]  The Committee does not consider such an examination appropriate in this proceeding.[862]

442.  Spain contends that the Award contains "*serious contradictions and shortcomings*" in connection with the background of RD 661/2007 and its relationship with Law 54/1997.[863]  Spain argues that the Award omits any analysis of the "*previous and subsequent regulations*" to RD 661/2007, and also omits reference to Law 54/1997 and the remainder of the Spain's legal system, despite having asserted that Law 54/1997 provided the general framework.[864]  According to Spain, given that the legal regime for renewable energy investments had been subject to modifications prior to the Claimants' investments, even

---

[858] Mem. Ann., ¶¶ 196-197 (referring to **RL-0119**, Sands Dissent, ¶¶ 19-20).  *See also*, Tr. Ann., Day 1 (ENG), 48:15-19 (Ms. Cerdeiras).

[859] Mem. Ann., ¶ 198.

[860] **RL-0118**, Award, ¶ 485.

[861] Mem. Ann., ¶¶ 200-201 (emphasis in original).

[862] The Committee recalls the explanation of Professor Schreuer, that "*the duty to state reasons refers only to a minimum requirement.  It does not call for tribunals to strain every sinew in an attempt to convince the losing party that the decision was the right one*."  *See* C-Mem. Ann., ¶ 122.

[863] Mem. Ann., ¶ 206.

[864] Mem. Ann., ¶¶ 207-208 (referring to **RL-0119**, Sands Dissent, ¶ 19).

before 2010 any investor should have been aware that the regime was not "*frozen*."[865] These issues, Spain says, were "*widely argued*" in the underlying arbitration, but the Award does not address them.[866]

443.    The Committee considers these and the associated arguments to be complaints about the Tribunal's decision rather than a complaint of process under Article 52(1)(e) of the ICSID Convention.  Again, the issue in this proceeding is not one of right or wrong on the merits; it  concerns the reasons stated in the Award.  The basic reasoning of the Award is founded on the specific language of Article 44(3) of RD 661/2007 which, in the Tribunal's view and reasoning, established a commitment explicit enough, by its terms, that the reliance on other laws and regulations was unnecessary.

444.    Spain contends that the Award makes selective and partial references to certain awards, while ignoring others that do not favor the positions endorsed by the Award.[867]  According to Spain, the Award's reliance on a mere reference to the awards that preceded it to support its conclusions amounts to a "*manifest lack of expression of motives*," and also ignores "*the freedom of each* [a]*rbitral* [t]*ribunal to decide the dispute submitted to* [it]" and the "*possibility that a certain arbitration doctrine may be altered* […]."[868]

445.    The Committee considers this argument to be without merit.  It is a fundamental role of a tribunal to assess the evidence before it and come to a decision.  In stating its reasons for an award, it is typical for a tribunal to put forward the evidence that it finds compelling, and this is what the present Tribunal did.  That the Award included references to other, similarly-situated awards (with most involving Spain as respondent) is, in the Committee's view, wholly appropriate.  As discussed several times, the cases complained of by Spain were very well known to Spain, the Claimants and the Tribunal, and the cases most important to the Award were the subject of extensive merits briefing and post-hearing

---

[865] Mem. Ann., ¶¶ 210-211.

[866] Mem. Ann., ¶ 227.  *See also*, Tr. Ann., Day 1 (ENG), 47:25-48:2, 48:23-49:1 (Ms. Cerdeiras).

[867] Mem. Ann., ¶ 263.

[868] Mem. Ann., ¶ 264.

briefs. These cases, as invoked by the Parties and the Tribunal, are part of the record of the case, and to act as though they play no role is to be untrue to the record.

446.    Spain also argues that the Award lacks reasons for its departure from the decisions of the Spanish Supreme Court which had rejected the existence of a "*petrification clause*" of the "*economic incentives regime of the Spanish electricity system;*"[869] and does not take these decisions into consideration when assessing the merits of the dispute.[870]

447.    In the Committee's view, the Award addressed this issue adequately as follows:

> "*The Tribunal need not and does not take any view as to the correctness of the decisions of the Spanish Supreme Court, which the Parties agree the Tribunal must accept as fact. The majority agrees with Claimants' view that the cited Supreme Court decisions that were issued before Claimants' investment concerned issues and laws that are not relevant to the interpretation of Article 44(3) of RD 661/2007, and cannot be applied by analogy. The later occurring Supreme Court judgments are no relevant to the question of Claimants' expectations at the time of investment in 2008 and 2009. Finding them irrelevant, the Tribunal makes no statement whatsoever as to the correctness of those decisions.*"[871]

448.    Citing Professor Sands, Spain contends that the Award also "*unjustifiably deviates*" from the view that "*the provisions of the general legislation applicable to a plurality of persons or a category of persons do not create legitimate expectations that there will be no changes in the law.*"[872]    In the passage referenced, Professor Sands references "*relevant ICSID case-law, not least the jurisprudence;*" however, Professor Sands states, at the same time, that "[t]*he proposition that an investor's expectation could be based on a specific guarantee in legislation is not of itself problematic.*"[873]    In the Committee's view, this is precisely how the Award expressed and saw Article 44(3) of RD 661/2007: a specific guarantee in legislation.

---

[869] Mem. Ann., ¶ 265.

[870] Mem. Ann., ¶ 265 (referring to **RL-0119**, Sands Dissent, ¶ 21). *See also*, Tr. Ann., Day 1 (ENG), 48:9 (Ms. Cerdeiras).

[871] **RL-0118**, Award, ¶ 491.

[872] Mem. Ann., ¶ 266 (referring to **RL-0119**, Sands Dissent, ¶ 22).

[873] **RL-0119**, Sands Dissent, ¶ 17.

449.    Spain contends that the Award failed to explain which were the "*fundamental aspects*" of the regulatory regime existing at the time of the Claimants' investment that were "*supposedly significantly altered*" by the new regime, and instead relies on the *Eiser* award which has been annulled in its entirety.[874]  Spain's contention is, once again, a complaint that the Tribunal expressed its reasons by reference to other contemporaneous and similarly-situated arbitrations.  Again, these cases formed part of the record of the arbitration at issue, and there can be no ambiguity or confusion as to what the Tribunal is communicating.  Paragraphs 488-490 of the Award succinctly and adequately indicated what the Claimants stood to lose by the new regime.

450.    Finally, Spain argues that the Tribunal's conclusion that the RAIPRE registration was an important element to assess the investor's legitimate expectations is "*inconsistent because it lacks sufficient reasoning*."[875]  In the Committee's view, these issues are adequately addressed in the Award at paragraphs 483-485, and are elucidated at *supra*, ¶¶ 416-418.

(b)    *Lack of Reasons for the Award's Conclusions on the Issue of Due Diligence*

451.    As described *supra*, ¶¶ 325-331, Spain argues that it provided evidence in the arbitration to demonstrate that any diligent investor investing in the Spanish renewable energy sector could not reasonably consider that the regime established in a Royal Decree would remain indefinitely unchanged.[876]  It contends that the Award's conclusions on the matter of due diligence lack "*valid and sufficient reasoning*" because they are based (i) on the erroneous conclusion that Article 44(3) of RD 661/2007 entailed a "*promise of stabili*[z]*ation*;" and (ii) on a "*biased interpretation*" of this provision, that ignores the evidence on the record.[877]

452.    As the Committee has determined, the Tribunal's reasoning on these issues did not fail to state the reasons on which the Award was based.[878]

---

[874] Mem. Ann., ¶¶ 268-269.

[875] Mem. Ann., ¶ 185.

[876] Reply Ann., ¶ 443.

[877] Mem. Ann., ¶ 272.

[878] *Supra*, ¶¶ 425-433.

453. Similarly, the Committee has already addressed Spain's contentions that the Award offers no reasons for its reliance on the two Cuatrecasas reports, for why there is no conflict of interest in Cuatrecasas' involvement first advising the bank and then the Claimants, and that they make no mention of the risk of modification of RD 661/2007.[879]  Furthermore, the Committee determines that the reasons for the conclusion that "*it is not possible to argue that any other measure to obtain information would have given rise to the expectation that the State would issue the measures that would later be issued in 2014*"[880] would not impact either the Award or the Committee's decision on annulment.

454. Spain also contends that it was contradictory for the Tribunal to acknowledge that a lack of due diligence would vitiate an investor's legitimate expectations, but to then "*exempt*" the Claimants from that requirement by admitting the Cuatrecasas opinions as due diligence.[881]  The Committee has addressed this issue in detail *supra*, ¶¶ 429-430.

455. Spain asserts that the Award ignores without "*valid reasons*" that by the time of the Claimants' investments and thereafter, the reiterated case law of the Spanish Supreme Court demonstrated that an investor could not have an expectation beyond the "*reasonable rate of return*" contemplated in Article 30(4) of the Electricity Law, focusing on formalities such as the norms that were challenged on the judgments, while ignoring that the principles that followed from the judgments applied to any regulatory changes, and in contradiction with other arbitral awards that have recognized that the Supreme Court case law could not be ignored by any investor.[882]

456. The issues concerning the case law of the Spanish Supreme Court and the expectation of a "*reasonable rate of return*" were addressed by the Award, as has been analyzed by the Committee *supra*, ¶¶ 446-447.

457. Finally, Spain claims that the Award failed to address numerous documents on the record of the arbitration that showed that the actors in the sector (including business associations,

---

[879] *Supra*, ¶¶ 425-433.

[880] Mem. Ann., ¶ 280 (referring to **RL-0118**, Award, ¶ 487).

[881] Tr. Ann., Day 1 (ENG), 49:8-20 (Ms. Cerdeiras).

[882] Mem. Ann., ¶¶ 284-285, 289, 298.  *See also, id.* ¶¶ 284-305.

other investors in the renewable energy sector, legal and consultancy firms, and "*scientific doctrine*") considered that the legal framework was mutable,[883] and "*omit*[s] *any reasoning*" regarding the Respondent's refutation of the documents relied upon by the Claimants to support their view that the Government had committed to freezing the regime in RD 661/2007.[884]

458.    In the Committee's view, these complaints are fundamentally complaints about the decision rendered by the Tribunal and specifically the core fact that the Tribunal found in Article 44(3) of RD 661/2007 a promise of stability for which the Claimants were eligible and which they triggered, and as such are not the subject of an analysis under Article 52(1)(e) of the ICSID Convention.

(c)    *Lack of Reasons for the Award's Conclusions on the Content of Legitimate Expectations and the Assessment of the Disputed Measures*

459.    Spain contends that the Award also suffers from "*absence of reasons and internal contradictions*" in connection with the determination of the content of the Claimants' legitimate expectations, and the analysis of each of the measures in dispute (namely, RD 1565/2010, RDL 14/2010, Law 15/2012, RDL 2/2013, RDL 9/2013, Law 24/2013, RD 413/2014, and Ministerial Order 1045/2014).[885]    It also argues that the Award contains "*unsubstantiated assertions*" and "*presumptions*" that ignore the evidence on the record, without providing "*sufficient reasons*" for doing so.[886]    In the Committee's view, these and Spain's associated arguments[887] do not demonstrate a failure to state reasons.

460.    The Tribunal's examination of these issues is set forth in Section VIII.B.2. of the Award. In the Committee's view, the Tribunal's reasons for finding a breach of stable conditions are logical and understandable.    Again, the Tribunal relies on findings of similarly-situated

---

[883] Mem. Ann., ¶¶ 306-308.

[884] Mem. Ann., ¶ 309.

[885] Mem. Ann., ¶¶ 311, 313 (referring to **RL-0119**, Sands Dissent, ¶ 23).

[886] Mem. Ann., ¶ 331.

[887] *See supra*, ¶¶ 332-335.

cases that the Parties were very familiar with, and these references inform rather than obscure the reasons.

461. Again, the core of the Tribunal's decision is its determination that the Claimants' legitimate expectations "*arise*[] *out of the stabilization assurance contained in Article 44(3) of RD 661/2007, under which OperaFund's PV Plants qualified to be protected and exempted (as **existing installations**) from future regulatory changes. This is clearly stated in paragraphs 482-485 of the Award*."[888]

462. Further as explained by OperaFund and Schwab, "*the Award explains in further detail the content of said assurance of stability: (1) RD 661/2007 put in place a Feed-in regime 'fixing feed-in values according to the cost of money on capital markets at that point in time, and provided that those values would be updated annually according to inflation' and (2) 'RD 661/2007 set remuneration for the lifetime of the plant.*'"[889]

463. The Tribunal then clearly stated that "[t]*hese expectations were clearly and fundamentally changed by the Disputed Measures, for which Claimants have claimed damages and over which the Tribunal has jurisdiction,*"[890] following up by identifying each of the Disputed Measures, "*which breached the stable conditions promised by RD 661/2007.*"[891]

464. The Tribunal then confirmed its concurrence with the *Eiser* tribunal's finding that "*the ECT did protect Claimants against the total and unreasonable change that they experienced,*" and the *Novenergia* tribunal finding that the "*radical changes enacted by the Kingdom of Spain in 2013 and 2014 have definitely abolished the fixed long-term FIT and have done so retroactively*."[892]   It concluded its reasons by noting that the tribunal in *Greentech*, "*expressly relying on Eiser and Novenergia, concluded that these Spanish regulatory changes were 'radical and unexpected' and 'constituted a fundamental change*

---

[888] C-Mem. Ann., ¶ 172 (emphasis in original).

[889] C-Mem. Ann., ¶ 172 (referring to **RL-0118**, Award, ¶ 512).

[890] **RL-0118**, Award, ¶ 513.

[891] **RL-0118**, Award, ¶ 513.

[892] **RL-0118**, Award, ¶ 513.

*to the legal and regulatory framework that crossed the line from a non-compensable regulatory measure to a compensable breach of the FET standard in the ECT.*"[893]

465.    Invoking once again the *MINE* committee, this Committee concludes that "*the* [A]*ward enables one to follow how the tribunal proceeded from Point A. to Point B. and eventually to its conclusion, even if made an error of fact or of law.*"[894]  It is neither contradictory nor frivolous.  The Committee thus concludes that the Award on the issue of breach regarding stable conditions has not failed to state the reasons on which it is based.

### d.    Failure to State Reasons on Quantification of Damages

466.    Fundamentally, Spain argues that "*there is an indisputable inconsistency between the Award's award of damages and the damages actually calculated, which constitutes a ground for annulment of the Award under Article 52(1)(d) and 52(1)(e) of the ICSID Convention, or, as the case may be, under Article 52(1)(b) of the ICSID Convention.*"[895]  Referring to the conclusions of the committee in *Amco*, Spain submits that *ad hoc* committees "*can and should descend to precise aspects of the quantification of damages* […].*"[896]

467.    Spain submits that the Award fails to state reasons with regard to: (i) the appraisal method used to determine damages (DCF);[897] (ii) the conclusion that the 2013 and 2014 measures were "*retroactive*;"[898] (iii) the valuation date;[899] (iv) the useful life of the plants;[900] (v) regulatory risk and the impact of the Disputed Measures;[901] (vi) the illiquidity rate;[902] (vii)

---

[893] **RL-0118**, Award, ¶ 513.
[894] **RL-0129**, *MINE*, ¶ 5.09.
[895] Reply Ann., ¶ 501.
[896] Reply Ann., ¶¶ 389-391 (relying on **RL-0185**, *Amco*, ¶¶ 97, 106, 110).
[897] Mem. Ann., § IV(B)(4)(4.1).
[898] Mem. Ann., § IV(B)(4)(4.2).
[899] Mem. Ann., § IV(B)(4)(4.3).
[900] Mem. Ann., § IV(B)(4)(4.4).
[901] Mem. Ann., § IV(B)(4)(4.5).
[902] Mem. Ann., § IV(B)(4)(4.6).

the discount rate; [903] and (viii) the minorities discount. [904]   The Committee will address each of these allegations in turn.

(i)    Lack of Reasoning for the Appraisal Method (DCF)

468.    Spain argues that the Award fails to provide reasons for its choice of the DCF method, or for its decisions on some of the main assumptions and projections used for the calculations under that method. [905]

469.    As the Committee understands Spain's position, its main complaint against the Tribunal's reasoning on the appraisal method is that it failed to provide a "*detailed analysis of why it accepts the Claimant's argument, on what evidence it has relied, why it dismisses the Respondent's allegations, why the evidence provided by the latter is insufficient and why the doctrine or case law invoked by* [...] *Spain does not apply*." [906]   According to Spain, a "*mere expression of an opinion (the choice of the DCF method) cannot be considered as an expression of reasons* [...]." [907]

470.    The Committee does not agree with Spain's characterizations of the Tribunal's analysis. The Committee views Section IX.B. of the Award, which addressed the "*Appropriateness of DCF Valuation vs. ABV Valuation*," as a whole, within which the Tribunal summarized and assessed the positions of each of the Parties on this issue. [908]   In the last paragraph of this section, the Tribunal set forth its decision.  It begins by stating its disagreement with Spain's contention that the DCF method "*is excessively speculative, and therefore, inappropriate for this case*." [909]   Citing *CMS* and *ADC*, the Tribunal found that the DCF method is "*generally recognized and used as the most appropriate technique to calculate*

---

[903] Mem. Ann., § IV(B)(4)(4.7).

[904] Mem. Ann., § IV(B)(4)(4.8).

[905] Reply Ann., ¶ 464.  *See also*, Tr. Ann., Day 1 (ENG), 60:6-24 (Ms. Fernández-Daza).

[906] Reply Ann., ¶ 456.  *See also, id.*, ¶ 458.

[907] Reply Ann., ¶ 457.

[908] **RL-0118**, Award, ¶¶ 610-620.

[909] **RL-0118**, Award, ¶ 621.

*damages arising from breaches of international law affecting investments in going concerns.*"[910]

471.  The Tribunal briefly explained the basic working of the DCF method which compares "*the actual free cash flows that the SPVs obtained or will obtain because of the Respondent's ECT breaches ('Actual' scenario) with the free cash flows that they would have obtained in the absence of the breach ('But-For' scenario).*"[911]  The Tribunal further concluded that the "*Claimants' Plants had a sufficient operational track record of profitability and there is no reason to doubt that they would have benefitted from stable feed-in remuneration under RD 661/2007, but for Respondent's wrongful measures.*"[912]  On the basis of the Tribunal's analysis at Section IX.B, the Committee concludes that the Award's reasoning on the decision to apply the DCF methodology in this case is clear and follows a logical course, and consequently the Award did not fail to state reasons on which it was based.

472.  Spain argues that in the arbitration it argued that the DCF methodology was not appropriate in this case for a number of reasons set forth by it,[913] but that none of these were discussed by the Award.[914]  As the Committee has stated on numerous times, the duty to state reasons is a minimum requirement and does not require the Tribunal convince the losing Party. The Committee has determined that the Award's reasoning meets the requirements of Article 52(1)(e) of the ICSID Convention and Spain's complaints encroach on matters that are inappropriate for an annulment proceeding; namely the adequacy of the reasons and an examination of the substance of the Tribunal's decision itself.

473.  For these reasons the Committee must also reject Spain's arguments that: (i) the Tribunal "*ignored the Respondent's argument regarding the Claimants' expectation,*" and that the "*Tribunal addresses the issue only from the perspective of RD 661/2007 in its analysis;*"[915]

---

[910] **RL-0118**, Award, ¶ 621 (relying on **CL-0111**, *ADC Affiliate Limited and ADC & ADMC Management Limited v. The Republic of Hungary*, ICSID Case No. ARB/03/16, Award, 2 October 2006 ["***ADC***"], ¶ 502, and **CL-0112**, *CMS Gas Transmission Company v. The Republic of Argentina*, ICSID Case No. ARB/01/08, Award, 12 May 2005 ["***CMS***"], ¶ 411).

[911] **RL-0118**, Award, ¶ 621.

[912] **RL-0118**, Award, ¶ 621.

[913] Reply Ann., ¶ 459.

[914] Reply Ann., ¶ 460.

[915] Mem. Ann., ¶ 346.

(ii) that the Award bases its decision on certain awards, while ignoring others that have endorsed the view that the only legitimate expectation was one of a reasonable rate of return and that adopted other valuation methods;[916] (iii) the Award fails to explain why in the But-For-Scenario the IRR of the Project was 8.1%, and why in that scenario the market value of the Plants was 1.7 higher than their acquisition price, and could not be reconciled with their book value in June 2014;[917] and (iv) that the Award ignores the warnings by the Respondent's experts in the arbitration that Brattle's calculations under the DCF method produced speculative results that should be discarded.[918]

474.    Finally, Spain argues that a tribunal can only award damages after analyzing each of the assumptions and projections in the damages models, which "*cannot be an internal process of the Tribunal but must be set out in the Award* […]."[919]  Instead, Spain says, the Award failed to "*explain its decision on some of the main assumptions and projections of the application of the DCF method, and when it did so, it failed to provide the reasoning required under Article 48 of the ICSID Convention* […]."[920]

475.    The Committee must first underline that its obligation in this proceeding is to determine whether Spain's request for annulment of the underlying Award, on the specific grounds asserted by Spain (namely, Articles 52(1)(b), (d) and (e) of the ICSID Convention), is founded.  It is not to undertake an analysis of Article 48 of the ICSID Convention.  Article 48 of the ICSID Convention issues may be addressed at the specified time under Article 49(2) of the ICSID Convention.[921]

(ii)    Lack of Reasoning for the Conclusion that the 2013-2014 Measures were "Retroactive"

476.    Spain submits that, although the alleged retroactive nature of the Disputed Measures was one of the main areas of disagreement among the Parties, the Tribunal did not rule on this

---

[916] Mem. Ann., ¶¶ 347, 354.

[917] Mem. Ann., ¶¶ 350-351.

[918] Mem. Ann., ¶ 355.

[919] Reply Ann., ¶ 462.

[920] Reply Ann., ¶ 464.

[921] **RL-0129**, *MINE*, ¶ 5.12.

matter, but instead concluded in the quantum section that the 2013-2014 measures had been applied retroactively, without "*substantiating*" this conclusion.[922]   According to Spain, the Award's assertion that on this matter it preferred the approach in *Masdar* to those of other tribunals (such as *Antin*, *Novenergía* or *Eiser*) was insufficient, as it does not explain why the Tribunal preferred that approach over the others.[923]

477.   The Committee disagrees with Spain's position.  As explained twice by OperaFund and Schwab,[924] the issue of retroactivity was established by the Tribunal at paragraph 513 of the Award, where it determined that the "*radical changes enacted by* […] *Spain in 2013 and 2014 have definitely abolished the fixed long-term FIT and have done so retroactively.*"[925]   In the quantum section, the Tribunal gave effect to that finding.  It explained that "[w]*hile the Antin, Novenergia, and Eiser tribunals awarded damages from June 2014 onward, the Masdar tribunal took the retroactive effect of new measures into account to achieve full compensation*," and held that, "[a]*s the measures before June 2014 – although temporary – caused damage, the present Tribunal considers that the latter approach is more appropriate in this case*."[926]   The Tribunal's reference to the *Masdar* tribunal provides the explanation why "*the latter approach* [was] *more appropriate*": "*to achieve full compensation*."   The Committee sees no failure to state reasons.

(iii)   Lack of Reasoning in the Determination of the Valuation Date (20 June 2014)

478.   Spain submits that the Award concluded that the date of valuation must be the date that yields the greater quantification of damages, and on that basis determined that the date of valuation would be 20 June 2014.[927]   However, Spain argues, the Award incurred in a "*clear contradiction*," because the evidence (in particular, statements by the Claimants'

---

[922] Mem. Ann., ¶¶ 362-363.  *See also*, Tr. Ann., Day 1 (ENG), 61:1-10 (Ms. Fernández-Daza).

[923] Reply Ann., ¶¶ 469-471.

[924] *See* C-Mem. Ann., ¶ 178 and Rej. Ann., ¶¶ 233-236.

[925] Rej. Ann., ¶ 234 (quoting **RL-0118**, Award, ¶ 513).

[926] **RL-0118**, Award, ¶ 683.

[927] Mem. Ann., ¶¶ 364-365.

*life of the PV Plants is a maximum of 30 years*."   However, it also acknowledges that OperaFund and Schwab's expert (Brattle) "*used 35 years*."[936] The Tribunal stated that it considered that "*it* [was] *more appropriate to accept Brattle's assumption that the PV plants could operate for 35 years in the But-For scenario*."   It then gave its reasons for this decision as follows: *"(1) a study about PV plants published by the EC, (2) ECO 3's Plant's 25-year land lease agreement, which [...] supports Claimants' expectation of a 35-year useful life for the plants, and (3) conclusions reached by ATA about Claimants' PV Plants' useful life of 35 years*."[937]

483.   The Award thus clearly and succinctly sets forth the reasons for its decision of a 35-year life for the plants, and has not failed to state reasons.   Spain's related arguments seek to review the substance of the Tribunal's decision or the adequacy of the reasons, both of which are inappropriate in an annulment proceeding.

(v)   Lack of Reasoning for the Conclusions on Regulatory Risk and the Impact of the Disputed Measures

484.   Spain submits that the Tribunal failed to "*adequately*" deal with a number of factors,[938] namely: (i) the existence of regulatory risk at the time of the investment;[939] (ii) the extensive evidence presented by the Respondent's expert to the effect that the Spanish Electricity System is more stable after the Disputed Measures, and that such measures assisted to avoid increase in the Tariff Deficit;[940] and (iii) that  regulatory risk also affects the But-For scenario during the historical period.[941]

485.   As the Committee has stated numerous times, it is not its purpose on this ground for annulment to assess the adequacy of the Award's reasoning; it is to assess whether the Award "*has failed to state the reasons*."[942]   It is also appropriate at this time to reiterate that it is generally accepted by annulment committees that "*the requirement to state*

---

[936] **RL-0118**, Award, ¶ 684.

[937] **RL-0118**, Award, ¶ 684.

[938] Mem. Ann., ¶ 380.

[939] Mem. Ann., ¶ 381 (citing **RL-0119**, Sands Dissent, ¶¶ 27-28).

[940] Mem. Ann., ¶ 383.

[941] Mem. Ann., ¶¶ 385-386.  *See also,* Reply Ann., ¶ 485.

[942] ICSID Convention, Article 52(1)(e).

*reasons is satisfied as long as the award enables one to follow how the tribunal proceeded from Point A. to Point B. and eventually to its conclusion, even if it made an error of fact or of law.*"[943]

486.    In the Committees opinion, the Award meets this "*minimum requirement.*"[944]   A proper understanding of the Tribunal's reasoning must include its recitations of the Parties' views on the issues, which are set forth at paragraphs 653-664 of the Award.   With this in mind, the Committee agrees with OperaFund and Schwab that "*either the Tribunal followed Spain's interpretation of the Disputed Measures and agreed that the new model had lower regulatory risk or it followed the Claimants' interpretation of the Disputed Measures and concluded that the new model had a higher regulatory risk.*"[945]   The Award makes it clear that the Tribunal, "[f]*inding Respondent's calculation unpersuasive* [...] *consider*[ed] *it appropriate to start its calculation by Brattle's final table submitted with Claimants'* [...] *last post-hearing brief.*"[946]   Thereafter, the Tribunal made an adjustment, based on the fact that it had determined that it had no jurisdiction regarding the tax of the TVPEE, by making the appropriate deduction agreed upon by the experts of both Parties, leading to a final damage amount for OperaFund and Schwab of EUR 29.3 million.[947]

487.    The Committee pays particular attention to the Tribunal's statement that "*Respondent's expert, Accuracy, distorts the impact of the Disputed Measures by alleging that the But-For scenario would have been associated with high risk and large discounts, while the Disputed Measures would have rendered the Actual scenario 'safe'* [...].*"[948] Given the Tribunal's decision on the FET and legitimate expectations claims, it is not surprising that the Tribunal considered Accuracy's assessment that the But-For scenario would have been associated with "*high risk and large discounts*" a distortion.   The impact of this position of Spain was clearly significant to the Tribunal's quantum assessment, as will also be a factor

---

[943] **RL-0129**, *MINE*, ¶ 5.09.

[944] **RL-0129**, *MINE*, ¶ 5.09.

[945] Rej. Ann., ¶ 252.

[946] **RL-0118**, Award, ¶ 687.

[947] **RL-0118**, Award, ¶ 688.   The Decision on Rectification of the Award dated 28 October 2019, rectified paragraphs 688 and 746(3) of the Award, to correct the currency to be EUR.   *See* Decision on Rectification, ¶ 12.

[948] **RL-0118**, Award, ¶ 685.

on the below issues of illiquidity discounts, the discount rate and the minorities discount raised by Spain.

488.    The Committee finds further that in this context, where the Tribunal is assessing the positions of the Parties' quantum experts, the Committee sees no reversal of the burden of proof.  Paragraph 686 of the Award demonstrates an effort on the part of the Tribunal to narrow the differences between the experts to arrive at what the Tribunal believed to be an appropriate damages amount.

489.    The Committee concludes that the Award does not lack reasoning on this issue, and that Spain's associated arguments are not issues of a failure to state reasons, but rather challenges to the substance of the Award.

(vi)    Lack of Reasoning on the Illiquidity Rate and Discount Rates

490.    Spain contends that although the experts disagreed about the illiquidity rate to be used in the quantification of damages, the Award does not rule on the matter.[949]  It submits that the dismissal of its expert's valuation alone did not make Brattle's calculations correct, and that even if the Tribunal adopted the Brattle model, it was required to analyze the assumptions and estimates of the model over which the Parties disagreed, including the illiquidity rate.[950]

491.    As explained above, the Committee sees no reversal of the burden of proof, but instead sees an effort on the part of the Tribunal to narrow the differences between the experts to arrive at what the Tribunal believed to be an appropriate damages amount.  As also explained above, the Tribunal found that the position of Accuracy, Spain's quantum expert, "*distorts the impact of the Disputed Measures by alleging that the But-For scenario would have been associated with high risk and large discounts* […]."[951]  Having rejected this proposition, the Tribunal progressed to make its decision on quantum.  The Committee sees no failure to state reasons on quantum on the basis of these issues.

---

[949] Mem. Ann., ¶¶ 388-390.
[950] Reply Ann., ¶¶ 489-492.
[951] **RL-0118**, Award, ¶ 685.

(vii)  <u>Lack of Reasoning Regarding Minorities Discount</u>

492.  Finally, Spain contends that, although its expert advocated for the need to account for Schwab's status as a minority shareholder in the vehicle company owning the Palma Sol Plant, by applying a "*minority discount rate*" to the damages attributable to Schwab,[952] the Award "*does not say a word*" on the issue, and simply adopts the Claimants' position without reasoning.[953]  It contends that, by doing so, the Tribunal violated Article 48 of the ICSID Convention.[954]

493.  The requirement of Article 48(3) of the ICSID Convention that, "[t]*he award shall deal with every question submitted to the Tribunal and shall state the reasons upon which it is based,*" is separate and distinct from Article 52(1)(e) of the ICSID Convention, which requires only that the award "*state the reasons on which it is based*."  As stated in the *MINE* annulment proceeding, "[t]*he requirement that the award should deal with every question submitted to the Tribunal* [...] *was not expressly made a ground of annulment.  In fact, the only explicit provision dealing with the subject which was added to the draft of the Convention was Article 49(2) which provides, among other things, that upon the timely request of a party a tribunal may after notice to the other party 'decide any question which it had omitted to decide in the award.'*"[955]  Spain did not avail of this procedure.

494.  More importantly, however, is the fact that Spain failed to raise this issue in any of its merits briefs, thus denying the Tribunal the Parties views on the legal basis for the claim.  As acknowledged by Spain, this issue was only raised by its expert, Accuracy, and during the hearing on the merits and only in a passing manner.[956]  On this basis, the Committee agrees with OperaFund and Schwab's invocation of the *Wena* annulment committee decision that "[an] *award cannot be challenged under Article 52(1)(e) for a lack of reasons*

---

[952] Mem. Ann., ¶¶ 399-402.

[953] Mem. Ann., ¶¶ 398, 403.  *See also*, Reply Ann., ¶¶ 498-499; Tr. Ann., Day 1 (ENG), 64:9 (Ms. Fernández-Daza).

[954] Reply Ann., ¶ 500.

[955] **RL-0129**, *MINE*, ¶ 5.11.

[956] **R-0381**, Tr. Merits, Day 4, 31:22-25 and 32:1-4, and 149:4-7; Mem. Ann., ¶¶ 402-403; Reply Ann., ¶ 499.

*in respect of allegations and arguments, or parts thereof, that have not been presented during the proceeding before the Tribunal.*"[957]

495.    To conclude on this ground of annulment, the Committee determines that the Award did not fail to state the reasons on which its decisions were based.

E.    **THIRD GROUND: SERIOUS DEPARTURE FROM A FUNDAMENTAL RULE OF PROCEDURE**

1.    **The Parties' Positions**

a.    ***Spain's Position***

496.    Spain submits that the Award must be annulled on the ground that the Tribunal repeatedly committed serious violations of fundamental rules of procedure.[958]

(i)    The Standard

497.    Spain argues that pursuant to Article 52(1)(d) of the ICSID Convention, an award must be annulled when there is a serious departure from a fundamental rule of procedure.    The deviation is "*serious*" if the party is deprived from the protection of the rule, and the procedural rule is "*essential*" when it forms part of the minimum standard of "*due process*" or refers to impartiality.[959]    Thus, an award must be annulled if the principles of international law that form the concept of "*due process*," including the right to be heard, have not been respected.[960]

498.    According to Spain, the rights of a party to be heard and to have a "*full and fair*" opportunity to present its case are "*fundamental*" rules of procedure, which encompass the right to present arguments and evidence with "*comparatively equal opportunity.*"[961]    Such right to be heard is violated when (i) a party is not able to present all the arguments and

---

[957] Rej. Ann., ¶ 264 (quoting **RL-0131**, *Wena*, ¶ 82).

[958] Mem. Ann., ¶¶ 406, 418.

[959] Mem. Ann., ¶ 407.

[960] Reply Ann., ¶ 282.

[961] Mem. Ann., ¶¶ 408-409.  *See also*, Reply Ann., ¶¶ 285-286, 288-289 (citing **RL-0168**, *Tulip*, ¶ 146; and **RL-0130**, *Fraport*, ¶¶ 185, 202).

evidence it considers relevant;[962] (ii) a party does not have the opportunity to respond to the claims and evidence presented by the other party;[963] or (iii) a tribunal denies a request for production of documents in an unjustified manner, and thereafter concludes that there was an absence of evidence.[964]  Spain further emphasizes that failure to observe the rules on burden of proof, in particular, the rule pursuant to which the burden of proof falls on the claimant, warrants annulment.[965]

499.    Additional situations that constitute violations of a fundamental rule of procedure according to Spain include: "(i) *the lack of impartiality and unequal treatment of the parties,* […], *(iii) the absence or abuse of deliberation by the arbitrators; (iv) the violation of rules of proof and (v) the violation of rules of legal standing*."[966]

500.    In Spain's submission, an applicant for annulment is only required to show the severity of the breach, and does not need to demonstrate that the result of the arbitration would have been different absent the violation.[967]  It is sufficient to show "*the clear possibility that, in the absence of the procedural violation, there would have been a difference in some relevant aspect of the dispute.*"[968]

501.    Finally, relying on *Teco*, Spain emphasizes that a serious breach of a fundamental rule of procedure cannot be justified on the basis of the Tribunal's discretionary powers.[969]

---

[962] Mem. Ann., ¶ 411 (citing **RL-0168**, *Tulip*, ¶¶ 80, 82).

[963] Mem. Ann., ¶¶ 412-413 (citing **RL-0130**, *Fraport*, ¶¶ 200, 202; **RL-0169**, *Pey Casado*, ¶¶ 247-248, 263-264).

[964] Mem. Ann., ¶¶ 414-416.

[965] Mem. Ann., ¶ 420.

[966] Mem. Ann., ¶ 417 (citing **RL-0132**, *Iberdrola*, ¶ 105).  *See also*, Reply Ann., ¶¶ 283-284 (referring to **R-0390/RL-0120**, ICSID Background Paper on Annulment, ¶ 98).

[967] Mem. Ann., ¶ 418 (citing **RL-0169**, *Pey Casado*, ¶ 78).  *See also*, Reply Ann., ¶¶ 294-295; Tr. Ann., Day 1 (ENG), 38:14-20 (Ms. Cerdeiras).

[968] Reply Ann., ¶ 294.

[969] Reply Ann., ¶ 297 (citing **RL-0191**, *TECO*, ¶ 196).

(ii) The Tribunal Committed Serious Violations of Fundamental Rules of Procedure

(a) *Breach of Right to be Heard and Principles on Burden of Proof*

502. Spain contends that the underlying basis for this claim is that the Tribunal seriously deviated from Spain's right to be heard.[970]  In Spain's submission, the Tribunal hindered its right to be heard by failing to comply with fundamental rules of procedure as to burden of proof, and rules on incorporation and assessment of the evidence.[971]  For Spain, the violations are, individually or as a whole, "*serious*," and had "*direct impact*" on the Tribunal's reasoning leading to the finding of liability in this case.[972]  More particularly:

503. *First*, according to Spain, the Award's references to the evidentiary activity at the hearing on the merits are scarce and "*almost non-existent*."[973]  The Award only refers to the evidence given by a few banking witnesses, ignoring the testimony of Spain's witnesses (Mr. Montoya) and experts (Servert and Accuracy).[974]  Contrary to OperaFund and Schwab's suggestions, the Award's references to this evidence are only contained in the summaries of the Parties' positions, and not in the Tribunal's reasoning on liability.[975]

504. *Second*, Spain argues that the Award also fails to assess the testimony of the Claimants' witnesses,[976] and instead accepts as valid the Claimants' allegation that they invested on the basis of the immutability of the RD 661/2007 regime, even though  that assertion had been contradicted by the Claimants' own witnesses.[977]  Spain submits that the Claimants had the burden to establish that they invested relying on the RD 661/2007 regime, had legitimate expectations that they would be remunerated according to that regime, and that those expectations were supported by due diligence on the regulatory framework.[978]

---

[970] Mem. Ann., ¶ 418.

[971] Mem. Ann., ¶¶ 421, 456.

[972] Mem. Ann., ¶ 456.  *See also*, Reply Ann., ¶ 346.

[973] Mem. Ann., ¶ 423.

[974] Mem. Ann., ¶¶ 424, 427-429.  *See also*, Reply Ann., ¶ 317.

[975] Tr. Ann., Day 1 (ENG), 41:1-6 (Ms. Cerdeiras).

[976] Mem. Ann., ¶ 430.

[977] Mem. Ann., ¶ 431.

[978] Mem. Ann., ¶ 437.

However, Spain argues, in total disregard of the principles of burden of proof, the Award concludes that the lack of due diligence was irrelevant to the formation of legitimate expectations.[979]

505.  Referring to paragraphs 486 and 487 of the Award, Spain's first grievance is that the Award contradictorily states that the 2007 due diligence report prepared by Cuatrecasas for Deutsche Bank was irrelevant to the formation of legitimate expectations, to then rely on that same report to conclude that the Claimants had indeed exercised due diligence.[980]

506.  Spain further contends that, although the Claimants failed to conduct due diligence about the Spanish regulatory framework (as recognized by the Professor Sands' dissent), the Award concludes that the 2007 Cuatrecasas report (and another of 2006) for Deutsche Bank was sufficient for those purposes, ignoring assertions made by the Claimants' witnesses at the hearing on the merits.[981]  Spain emphasizes that the reports at issue were prepared for a third party, not the Claimants; and notes that the Award fails to analyze the impact that regulatory changes, the regulatory context and the case law of the Supreme Court at the time of the investment (2008-2009) could have had on the conclusions on those reports.[982]

507.  Moreover, Spain further submits that instead of drawing negative consequences for the Claimants as a result of the lack of due diligence, the Tribunal reversed the burden of proof by asking Spain to demonstrate that "*any further steps to achieve information would have resulted in an expectation that new measures which later were issued in 2014 were to be issued by the State which would fundamentally withdraw the assurances and benefits provided by the State such as in RD 661/2017* […]."[983]  In Spain's submission, the Award should "*not have placed on the Respondent the burden of proving how the successive regulatory changes, as well as the reiterated case law of the Supreme Court, and the statements of the industry could affect the trust that OperaFund placed in the report issued*

---

[979] Reply Ann., ¶ 300 (citing **RL-0118**, Award, ¶ 487).

[980] Mem. Ann., ¶¶ 432-434.

[981] Mem. Ann., ¶¶ 439-440.  *See also*, Reply Ann., ¶¶ 301, 306, 339.

[982] Reply Ann., ¶¶ 302-305.

[983] Mem. Ann., ¶ 447 (citing **RL-0118**, Award, ¶ 487).

*in favour of Deutsche Bank.*"[984]  In any event, Spain argues that it did demonstrate during the arbitration that in-depth analysis would have led to a different understanding of the regulatory framework to that held by the Claimants, providing references to case law of the Supreme Court, documents showing the opinion of the sector, and through the very same Cuatrecasas' reports upon which the Claimants relied.[985]

508.  In sum, according to Spain, the Award's reliance on the Cuatrecasas' legal opinions to support the content, scope and legitimacy of the Claimants' expectations was "*tantamount*" to a denial of Spain's right to be heard.[986]

509.  *Third,* Spain argues that the Award "*fails to make any assessment*" of a number of evidentiary elements for which a ruling was "*essential,*" including: (i) documents demonstrating the possibility of regulatory changes; (ii) previous regulatory developments which demonstrated that the regulatory framework was subject to modification; and (iii) case law of the Supreme Court prior or after the investment which established that there was no right to immutability of tariffs.[987]

510.  Spain insists that, although it was for the Claimants to establish the fundamental facts underlying their claim, Spain provided evidence that undermined the content and scope of the Claimants' alleged legitimate expectations, that the Award did not assess.[988]

511.  In response to OperaFund and Schwab's allegations in connection with this ground, Spain emphasizes that its grievance is not that its evidence was "*improperly assessed*" by the Tribunal (which Spain admits is part of the "*discretional competence*" of the Tribunal). Rather, according to Spain, the violation of its right to be heard is premised on the Tribunal's "*absolute absence*" or "*absolute omission*" of an assessment of evidence.[989] Spain observes that despite the "*enormous amount of evidence*" produced by it, paragraphs 480-490 and 508-513 of the Award make findings on liability in "*complete absence of an*

---

[984] Reply Ann., ¶ 305.
[985] Mem. Ann., ¶¶ 448-452.  *See also*, Reply Ann., ¶ 305.
[986] Reply Ann., ¶ 309.
[987] Reply Ann., ¶ 318.
[988] Reply Ann., ¶ 337.
[989] Reply Ann., ¶¶ 330, 333.

*exhaustive and conclusive analysis of*" that evidence.[990]   Moreover, Spain adds, the Tribunal's discretion in the assessment of the evidence does not excuse an improper reversal of the burden of proof.[991]

512.   *Finally*, referring to OperaFund and Schwab's allegation that a violation of a fundamental rule of procedure must be invoked in the arbitration in order to form the basis of an annulment, Spain contends that the shortcomings at issue here were not alleged in the written and oral phases of the arbitration because "*at that time no* […] *departure had occurred*."[992]   The violation occurred, Spain argues, when the Tribunal omitted the assessment of the evidence in the Award, and as such it could only be invoked during the annulment stage.[993]

> (b)   *Breach of a Fundamental Rule of Procedure in the Treatment of the European Commission's Arguments*

513.   Spain argues that the Tribunal also violated fundamental rules of procedure with its treatment of the EC's arguments in its intervention as a non-disputing Party.[994]   Spain's grievance is that the Tribunal "*does not* […] *make a minimum reference to the value*" of the EC's arguments on the applicability of EU law on matters of jurisdiction and legitimate expectations.[995]   Put another way, Spain complains that, while it did summarize the content of the EC's intervention, the Award fails to make an assessment of the EC's submissions on EU law and its applicability to the dispute.[996]   Spain submits that the Award does not explain how it came to the conclusion that EU law was not applicable international law, or why it rejected the EC's arguments with regard to the Tribunal's lack of jurisdiction in an intra-EU conflict, and instead refers constantly to the reasoning of other tribunals in cases not comparable to the present one.[997]

---

[990] Reply Ann., ¶¶ 331-332.  *See also, id.*, ¶ 345.

[991] Reply Ann., ¶¶ 334-335 (citing **RL-0191**, *TECO*, ¶ 196).

[992] Tr. Ann., Day 1 (ENG), 41:17-20 (Ms. Cerdeiras).

[993] Tr. Ann., Day 1 (ENG), 41:21 (Ms. Cerdeiras).

[994] Mem. Ann., ¶¶ 458, 464; Reply Ann., ¶ 348.

[995] Mem. Ann., ¶ 460.

[996] Reply Ann., ¶ 349.

[997] Mem. Ann., ¶¶ 461-462.

514. For Spain, the above amounts to a breach of its right to be heard, as the Award fails to assess and provide any reasoning addressing Spain's arguments on the applicability of EU law to jurisdiction and the merits.[998]

        (c)   *Breach of a Fundamental Rule of Procedure in the Treatment of the EU Member States Declaration of January 2019*

515. Spain further submits that the Tribunal committed a serious breach of a fundamental rule of procedure by failing to take into consideration or analyze the Declaration of EU Member States dated 15 January 2019, despite having admitted it into the record; thereby incurring in a failure to "*properly assess the evidence.*"[999]  For Spain, this constitutes a breach of its right to be heard, and demonstrates lack of impartiality and unequal treatment of the Parties.[1000]

        (d)   *Breach of a Fundamental Rule of Procedure in Connection with Lack of Impartiality and Unequal Treatment*

516. In Spain's submission, the Award obliterates Spain's allegations during the proceeding, and reveals "*hostility*" towards Spain,[1001] and "*unequal*" and "*discriminatory*" treatment of the Parties.[1002]  Spain contends that lack of impartiality can be inferred from a decision that repeatedly makes findings in favor of one of the Parties without factual support;[1003] and argues that, in this case, the unequal treatment of the Parties is shown in: (i) the Award's handling of the matter of due diligence, in particular, its forgiveness of the Claimants' lack of evidence and its decision to reverse the burden of proof against Spain;[1004] (ii) the Award's disregard of the conflict of interest with respect of counsel for the Claimants as

---

[998] Reply Ann., ¶ 350.

[999] Mem. Ann., ¶¶ 465-467.  *See also*, Reply Ann., ¶¶ 351-353.

[1000] Reply Ann., ¶ 353.

[1001] Mem. Ann., ¶ 469.

[1002] Mem. Ann., ¶¶ 470, 476.

[1003] Mem. Ann., ¶ 468.

[1004] Mem. Ann., ¶¶ 472-473.

highlighted by Professor Sands;[1005] and (iii) the Award's disregard for the testimony of the Respondent's witness (Mr. Montoya) and expert (Mr. Servert).[1006]

(e)  *Breach of a Fundamental Rule of Procedure in Quantification of Damages*

517.  Finally, Spain contends that the Award breached fundamental rules of procedure in connection with the burden of proof concerning the calculation of damages.  The breach occurred, Spain says, because the Award simply accepted (without reasoning) the DCF methodology endorsed by the Claimants and their application of that methodology with "*all its speculations*," thereby placing on Spain the burden to rebut the Claimants' calculation.[1007]  More particularly, Spain argues that:

518.  *First*, although the Claimants failed to demonstrate, as they were required to, that the DCF method was the appropriate methodology, the Tribunal accepted their contentions, deciding instead that Spain had failed to show that the method was speculative.[1008] However, it was not for the Respondent to demonstrate that the method was not suitable, but rather, it was for the Claimants to show that the method, its assumptions and projections, were appropriate.[1009]

519.  *Second*, rather than analysing the Claimants' assumptions and projections under their proposed DCF methodology, the Award focused on criticizing the Respondent's experts' analysis and arguments.[1010]

520.  Spain submits that, in proceeding in the way it did, the Tribunal seriously violated not only the rules of procedure pertaining to burden of proof, but also the rules on the standard of evidence required to support its decision.[1011]  For Spain, the Award is not supported by

---

[1005] Mem. Ann., ¶ 474 (citing **RL-0119**, Sands Dissent, ¶ 47).

[1006] Mem. Ann., ¶ 475.

[1007] Reply Ann., ¶¶ 356, 358.

[1008] Reply Ann., ¶¶ 361-368 (referring to **RL-0118**, Award, ¶ 685).  *See also*, Tr. Ann., Day 1 (ENG), 55:21-56:14 (Ms. Fernández-Daza).

[1009] Reply Ann., ¶ 374.

[1010] Reply Ann., ¶¶ 369-370.  *See also*, Tr. Ann., Day 1 (ENG), 56:15-57:5 (Ms. Fernández-Daza).

[1011] Reply Ann., ¶ 374.

minimum evidence to demonstrate the quantification of damages chosen; and while the Tribunal enjoys discretion to assess evidence, such discretion is not unlimited as it would turn into arbitrariness.[1012]

521.    For Spain, all this created an imbalance between the Parties, and constituted a "*serious*" and "*fundamental*" breach that had a direct impact on the amount of compensation awarded.[1013]    Had this procedural violation not occurred, Spain argues, there is a "*high probability*" that a different decision on quantum would have been reached.[1014]

### b.    *OperaFund and Schwab's Position*

522.    OperaFund and Schwab submit that there are no basis to annul the Award on grounds of a serious departure from a fundamental rule of procedure.[1015]    In short, they argue that: (i) Spain's right to be heard was never compromised during the arbitration; (ii) Spain has failed to show that the alleged departures led to a "*substantially different result*" in the case; and (iii) Spain is barred from claiming the alleged procedural violations in the annulment context because it never raised them during the arbitration.[1016]

### (i)    The Standard

523.    OperaFund and Schwab submit that the ground under Article 52(1)(d) of the ICSID Convention requires: (i) that the procedural rule alleged to be breached be "*fundamental*;" (ii) that the Tribunal departs from it; and (iii) that the departure be "*serious*."[1017]    They further contend that in order to establish a departure from a fundamental rule of procedure, the complaining party must have raised the objection during the arbitration, in particular at

---

[1012] Tr. Ann., Day 1 (ENG), 57:11-22 (Ms. Fernández-Daza).

[1013] Reply Ann., ¶¶ 375-376.

[1014] Reply Ann., ¶ 376.

[1015] C-Mem. Ann., § 3.4, ¶ 186; Rej. Ann., ¶¶ 108, 179.

[1016] Rej. Ann., ¶¶ 180-182.  *See also*, Rej. Ann., ¶ 158.

[1017] C-Mem. Ann., ¶ 187.

the hearing.[1018]  Moreover, they say, the serious departure is to be "*found in the manner in which the Tribunal proceeded, not on the content of its decision.*"[1019]

524.    OperaFund and Schwab do not dispute that: (i) the rules on burden of proof; (ii) the right to be heard; (iii) the right to an independent and impartial tribunal and (iv) the right of equality of arms are "*fundamental*" rules of procedure.[1020]  However, they disagree with Spain on what constitutes a "*departure*" from such rules, what is a "*serious*" one, and on whether any such departure occurred in the arbitration.[1021]  For OperaFund and Schwab, Spain mischaracterizes the notion of "*serious departure*" and ignores that this proceeding is not an appeal.[1022]  In particular, OperaFund and Schwab submit:

525.    *First*, that there can be a departure from the rules on burden of proof when a tribunal "*ignores the evidence,*" but not when "*an applicant disagrees with the tribunal's conclusions reached after the assessment and weighing of the evidence.*"[1023] It is in the Tribunal's discretion (not the Committee's) to evaluate the elements of proof and determine their relevance.[1024]

526.    *Second*, that while there can be a departure from the right to be heard or the right to equal treatment when a party "*cannot present all relevant arguments and evidence,*" or "*does not have the opportunity to respond adequately to the arguments and evidence presented by the other* [party];" that does not mean that a tribunal is required to "*accord the same weight to the evidence provided by both parties.*"[1025]

527.    *Third*, that "*there may be a 'departure' from the right to have an impartial tribunal when it has been established on reasonable grounds 'the appearance of dependence or bias' of*

---

[1018] C-Mem. Ann., ¶ 193; Rej. Ann., ¶ 106(i).

[1019] Rej. Ann., ¶ 106 (ii).  *See also*, Rej. Ann., ¶ 118 (referring to **CL-0319/RL-0256**, *Vivendi*, ¶ 83; **RL-0187**, *Duke*, ¶ 169; **CL-0305**, *Adem Dogan*, ¶ 29).

[1020] C-Mem. Ann., ¶ 188; Rej. Ann., ¶ 105.

[1021] C-Mem. Ann., ¶ 188; Rej. Ann., ¶ 105.

[1022] C-Mem. Ann., ¶ 184.

[1023] C-Mem. Ann., ¶ 189.

[1024] C-Mem. Ann., ¶ 190 (referring to **RL-0192**, *Impregilo*, ¶ 176).

[1025] C-Mem. Ann., ¶¶ 191-192 (referring to **CL-0316**, *CEAC Holdings Limited v. Montenegro*, ICSID Case No. ARB/14/08, Decision on Annulment, 1 May 2018 ["***CEAC***"], ¶ 110).  *See also*, Rej. Ann., ¶ 106 (iii).

*a member of the Tribunal, and that this established appearance could have had a material effect on the award*;"[1026] but that "*lack of impartiality cannot be inferred from an arbitral decision that consistently makes findings in favor of one of the parties, or from the language used by the tribunal*."[1027]

528. *Fourth*, that a departure is considered "*serious*" only when two requirements are met: (i) there is "*actual material prejudice*;" and (ii) the violation caused a "*substantially different result*" in the case.[1028]

529. *Finally*, OperaFund and Schwab submit that Spain's reliance on the four cases in which annulment committees have annulled ICSID awards on grounds of serious departure from a fundamental rule of procedure (*Fraport*, *Amco II*, *Pey Casado* and *Teco*) does not assist Spain.[1029]

(ii)    Spain Never Raised a Procedural Objection During the Arbitration

530. OperaFund and Schwab remark that before this annulment proceeding, Spain never argued that the Tribunal had undermined its due process rights, including its right to be heard and its right to present arguments or evidence, and that the failure to raise such an objection during the arbitration has consequences.[1030]   According to OperaFund and Schwab, it is well established that pursuant to ICSID Arbitration Rule 27, failure to raise the procedural objection during the arbitration "*forfeits the right to raise such an issue in the annulment context*."[1031]

---

[1026] C-Mem. Ann., ¶ 194 (referring to **CL-0058**, *EDF International and Others v. Argentine Republic*, ICSID Case No. ARB/03/23, Decision on Annulment, 5 February 2006 ["***EDF***"], ¶ 109).

[1027] C-Mem. Ann., ¶ 194.

[1028] C-Mem. Ann., ¶¶ 195-196 (referring to **RL-0192**, *Impregilo*, ¶ 64; **RL-0130**, *Fraport*, ¶¶ 245-246; **CL-0292**, Background Paper on Annulment for the Administrative Council of ICSID, 10 August 2012, ¶ 101; **RL-0131**, *Wena*, ¶ 58).  *See also*, Rej. Ann., ¶ 106 (iv).

[1029] Rej. Ann., ¶ 107.

[1030] Rej. Ann., ¶¶ 109-110; C-Mem. Ann., ¶ 193.

[1031] Rej. Ann., ¶¶ 110-114 (referring to **RL-0183**, *Klöckner*, ¶ 88; **RL-0194**, *CDC Group plc v. Republic of the Seychelles*, ICSID Case No. ARB/02/14, Decision of Annulment, 29 June 2005 ["***CDC***"], ¶¶ 51-53; **CL-0327**, *Churchill Mining PLC and Planet Mining PTY LTD v. Republic of Indonesia*, ICSID Case No. ARB/12/14 and ARB/12/40, Decision on Annulment, 18 March 2019 ["***Churchill***"], ¶ 182).  *See also*, Rej. Ann., ¶ 182; Tr. Ann., Day 1 (ENG), 121:23-122:17 (Mr. Mata).

(iii)  Spain Complains About the Content of the Award, not The Manner in which the Tribunal Proceeded

531.  OperaFund and Schwab further submit that, contrary to Spain's contentions, the annulment application here is based on allegations about the Tribunal's "*treatment*" and "*weighing*" of the evidence, and seeks a "*de novo review of the probative value of evidence*" in the arbitration.  As such, it falls outside the scope of the ground for annulment in Article 52(1)(d) of the ICSID Convention, which concerns the Tribunal's way of proceeding, not the content of the decision.[1032]

(iv)  The Tribunal Did Not Depart from a Fundamental Rule of Procedure

532.  According to OperaFund and Schwab, none of Spain's criticisms constitutes a "*departure*" from a "*fundamental rule of procedure*," let alone a "*serious*" one.[1033]

533.  As a general matter, OperaFund and Schwab emphasize that "[a] *'serious departure' from the right to be heard is found when a party cannot present all relevant arguments and evidence, or […] does not have the opportunity to respond adequately to the arguments and evidence presented by the other*," none of which occurred in this case, as "*Spain was allowed to submit all the arguments and evidence that it deemed necessary*."[1034] They reiterate that Spain's arguments on this ground really concern the Tribunal's "*treatment of the evidence*,"[1035] constitute an improper attempt to have the Committee "*revisit and reverse the Tribunal's assessment of the eviden*ce;"[1036] and disregard that the annulment phase is not an appeal.[1037]  That the Tribunal did not side with Spain does not amount to a departure from a fundamental rule of procedure.[1038]

---

[1032] Rej. Ann., ¶¶ 116-119 (referring to **CL-0319/RL-0256**, *Vivendi*, ¶ 83; **RL-0187**, *Duke*, ¶ 169; **CL-0305**, *Adem Dogan*, ¶ 29).  *See also*, Tr. Ann., Day 1 (ENG), 122:18-123:6 (Mr. Mata).

[1033] C-Mem. Ann., ¶ 238.

[1034] Rej. Ann., ¶ 122.  *See also, id*., ¶¶ 127-130, 137.

[1035] Rej. Ann., ¶ 122.

[1036] C-Mem. Ann., ¶ 198.

[1037] C-Mem. Ann., ¶ 238.

[1038] Tr. Ann., Day 1 (ENG), 127:17-20 (Mr. Mata).

534.   Moreover, OperaFund and Schwab allege, the alleged departures (which did not exist) would not be "*serious*" in any event, because Spain has not shown that they caused "*material prejudice*" or led to a "*substantially different result*."[1039]

(a)   <em>The Tribunal Did Not Ignore the Evidence</em>

535.   OperaFund and Schwab deny that the Tribunal ignored the evidence taken at the hearing on the merits, and submit that, instead, the Tribunal "*carefully assessed and weighed in the evidence under its legitimate decision-making powers.*"[1040]  They content that all of Spain's criticisms under this heading are directed at the "*Tribunal's judgement of the evidence*," a matter beyond the ground for annulment in Article 52(1)(d) of the ICSID Convention.[1041] More particularly:

536.   *First*, according to OperaFund and Schwab, the Tribunal had no obligation to make additional reference to the evidentiary activity at the hearing on the merits, did not ignore the Respondent's evidence, and instead used its "*decision-making powers to evaluate the evidence [...] and grounded its factual and legal findings on the evidence that it found more relevant, compelling, convincing or persuasive.*"[1042]  A tribunal is not required to "*explicitly state all the reasons for is decision in the award*," nor does it have to "*address every single argument or evidence made by a party*," and therefore, the Tribunal had no obligation to make reference to all of Spain's experts and witnesses.[1043]  Furthermore, the Tribunal had no obligation to provide reasons for which it found some evidence more convincing than other.[1044]

537.   *Second*, OperaFund and Schwab submit that Spain has not been able to refer to a piece of evidence practiced or showed at the hearing on the merits that was (i) not considered by

---

[1039] Tr. Ann., Day 1 (ENG), 123:7-13 (Mr. Mata).

[1040] C-Mem. Ann., § 3.4.2.1.

[1041] C-Mem. Ann., ¶ 208.

[1042] C-Mem. Ann., ¶ 200.

[1043] C-Mem. Ann., ¶ 201.  *See also*, Tr. Ann., Day 1 (ENG), 123:19-124:17 (Mr. Mata).

[1044] Tr. Ann., Day 1 (ENG), 124:18-20 (Mr. Mata).

the Tribunal, (ii) which led to a "*substantially different result*," with "*material prejudice*" to Spain.[1045]

538.    *Third*, OperaFund and Schwab deny that the Award is written as if Spain's witness (Mr. Montoya) and experts (Mr. Servert and Accuracy) did not exist.  To the contrary, they argue, the Award referred to Mr. Montoya, Mr. Servert and Accuracy's written statement and reports, and to their hearing interventions various times, the Tribunal asked them questions at the hearing on the merits, and "*thoroughly*" analyzed Accuracy's report.[1046]

539.    *Fourth*, OperaFund and Schwab take issue with Spain's reliance on Professor Sands' Dissenting Opinion, and submit that Spain misrepresents the opinion.  In any event, they argue, the opinion is "*irrelevant*" in the context of annulment, because: (i) the Committee's function is not to settle a difference between the majority and a dissenter;[1047] and (ii) Professor Sands' dissent concerns the assessment of the evidence, a matter in which the Committee cannot intervene.[1048]

540.    *Finally*, OperaFund and Schwab contend that Spain's allegation that the Tribunal started its analysis from the premise that Spain was liable has no basis and has not been proved.[1049]

(b)    *The Tribunal Respected the Principles on Burden of Proof*

541.    OperaFund and Schwab do not dispute that them, as the Claimants, had the burden to prove that the Respondent breached the ECT, but dispute Spain's contention that the Tribunal reversed the burden of proof.[1050]  According to OperaFund and Schwab, Spain's allegations are based on a mischaracterization of the Award and do not rise to the level of a "*serious departure from a fundamental rule of procedure*."[1051]

---

[1045] C-Mem. Ann., ¶ 202.
[1046] C-Mem. Ann., ¶ 203; Rej. Ann., ¶ 124.  *See also*, Tr. Ann., Day 1 (ENG), 124:22-125:7 (Mr. Mata).
[1047] C-Mem. Ann., ¶¶ 204-205.
[1048] C-Mem. Ann., ¶ 205.
[1049] C-Mem. Ann., ¶ 207.
[1050] C-Mem. Ann., ¶ 209.  *See also*, Rej. Ann., ¶ 138; Tr. Ann., Day 1 (ENG), 125:25-126:1 (Mr. Mata).
[1051] C-Mem. Ann., ¶ 210.

542.    *First*, OperaFund and Schwab argue that Spain's allegations go beyond Article 52(1)(d) of the ICSID Convention, because they center on the Tribunal's conclusions on due diligence and legitimate expectations, and not on the manner in which the proceeding was conducted.[1052]

543.    *Second*, OperaFund and Schwab emphasize that pursuant to ICSID Arbitration Rule 34(1), "[t]*he Tribunal shall be the judge of the admissibility of any evidence adduced and of its probative value*;" and therefore, it was "*solely*" for the Tribunal to determine whether the Claimants had discharged their burden of proof after considering and analyzing the totality of the evidence.[1053]  Moreover, they argue, "*there is no 'fundamental rule of procedure' imposing a given standard or burden of proof on a tribunal*;" and tribunals have discretion on the "*standard of proof*" to apply, because it is for them to assess the "*probative value of* [the] *evidence*."[1054] It follows that a Committee may only scrutinize whether the procedure was conducted according to the basic rules of procedure, but may not re-evaluate the weight given by the Tribunal to the evidence, which is a matter within the Tribunal's discretion.[1055]

544.    *Third*, even if the Committee could re-evaluate the weight of the evidence (*quod non*), OperaFund and Schwab argue, Spain has not established that the Tribunal seriously departed from a fundamental rule of procedure in the weighing of the evidence.[1056] According to OperaFund and Schwab:

(i)    the Tribunal placed on the Claimants the burden to establish that Spain had breached the ECT (which they proved);[1057]

(ii)    the Tribunal based its findings of reasonable and legitimate expectations of stability on a number of documents and testimonial evidence on the record, which confirmed that the Claimants had discharged their burden of proof;[1058]

(iii)    once the Tribunal was convinced that Article 44(3) of RD 661/2007 contained an "*explicit stabilization assurance*," it was logical to shift the burden to Spain to show

---

[1052] Rej. Ann., ¶¶ 120, 136.

[1053] Rej. Ann., ¶ 140.

[1054] Rej. Ann., ¶ 142.

[1055] Rej. Ann., ¶ 143.  *See also*, Tr. Ann., Day 1 (ENG), 125:19-24 (Mr. Mata).

[1056] Rej. Ann., ¶ 145.

[1057] Rej. Ann., ¶ 146.

[1058] Rej. Ann., ¶¶ 147-148.

otherwise, and the Tribunal found that the Respondent's arguments and evidence confirmed that on the matter of due diligence the "*Claimants did what could be expected under the circumstances and at the time of their investments by a prudent investor*;"[1059]

(iv)    the Tribunal did not assess the Claimants evidence in isolation, and instead, confronted it with the Respondent's arguments and evidence, including witness testimonies and experts offered, as shown by paragraphs 480-490 at Section VIII.B.1.d of the Award,[1060] and the majority devoted a whole section to explain its disagreement with the dissenting opinion;[1061]

(v)    contrary to Spain's contention, the Tribunal did not "*deprive*" Spain of a ruling on the question whether additional due diligence would have corroborated or disproved the Claimants' expectations of stability, and instead provided a direct answer at paragraph 487 of the Award, stating that it "*cannot be argued that any further steps to achieve information would have resulted in an expectation that new measures which later were issued in 2014 were to be issued by the State which would fundamentally withdraw the assurances and benefits provided by the State such as in RD 661/2017*."[1062]

545.    *Fourth*, OperaFund and Schwab specifically deny that the Tribunal "*exempt*[ed]" the Claimants from their burden of establishing their legitimate expectation of stability of the regime.[1063]    In their submission, the Claimants presented "*overwhelming evidence*" supporting their "*legitimate expectations of stability*" at the time of the investment, which was summarized in Section VIII.B.1(a) of the Award, and Spain was simply unable to persuade the Tribunal that more due diligence would have led to a different conclusion.[1064]

546.    *Fifth*, according to OperaFund and Schwab, contrary to Spain's submissions, there is no contradiction in paragraphs 486 to 487 of the Award, which simply show that the Tribunal concluded that in light of the "*explicit stabilization assurance* […] *mentioned in Article 44(3)*," the Claimants' reliance on the Cuatrecasas due diligence report was appropriate and reasonable.[1065]    Moreover, OperaFund and Schwab deny that the Tribunal failed to analyze the Cuatrecasas 2007 report, observing that at the hearing on the merits the

---

[1059] Rej. Ann., ¶ 149 (referring to **RL-0118**, Award, ¶ 487).

[1060] Rej. Ann., ¶¶ 150-151.

[1061] Rej. Ann., ¶ 153 (referring to **RL-0118**, Award, § VIII.B.1.e).

[1062] Rej. Ann., ¶¶ 156-157 (referring to **RL-0118**, Award, ¶ 487).

[1063] Rej. Ann., ¶ 123.

[1064] Rej. Ann., ¶ 123.

[1065] C-Mem. Ann., ¶ 212.

Tribunal asked various questions about it, and the Award devotes several pages to describing and analyzing its content.[1066]

547.   *Sixth*, OperaFund and Schwab also deny that the Award reversed the burden of proof to require Spain to demonstrate that no due diligence had been carried out.  Instead, they argue, the Tribunal assessed the Claimants' due diligence and the content of RD 661/2007, and concluded that the Claimants' reliance on the Cuatrecasas report was "*sufficient at least in confirming their expectations, because the Tribunal cannot see what other better means of information they could have obtained*."[1067]

548.   *Seventh*, OperaFund and Schwab further deny that during the arbitration Spain demonstrated that a more exhaustive due diligence would have led to a different understanding of the regulatory framework.[1068]  OperaFund and Schwab remark that the Tribunal concluded that the "*radical changes*" implemented by Spain were not foreseeable.[1069]  They add that the Tribunal specifically addressed the Supreme Court decisions,[1070] and considered that the case law of the Supreme Court was irrelevant to the issue whether more in-depth due diligence would have been useful to predict the "*radical changes*," because: (i) the decisions issued prior to the investment related to topics unrelated to the interpretation of Article 44(3) of RD 661/2007; (ii) the post-investment decisions could not be taken into consideration to determine the expectations at the time of the investment;[1071] and (iii) the Parties agreed that the Tribunal was not bound by Spanish law which was only to be considered as a fact.[1072]  In any event, they argue, Spain's disagreement with the Tribunal's conclusions on this issue does not constitute a ground for annulment, even if the Tribunal's findings were incorrect (*quod non*).[1073]

---

[1066] C-Mem. Ann., ¶ 213 (referring to **RL-0118**, Award ¶¶ 486-487 and Tr. Merits, Day 2, 73:8-75:13 (Reinisch)).
[1067] C-Mem. Ann., ¶ 214 (referring to **RL-0118**, Award, ¶ 487).
[1068] C-Mem. Ann., ¶ 215.
[1069] C-Mem. Ann., ¶ 216 (referring to **RL-0118**, Award, ¶ 513).
[1070] Rej. Ann., ¶ 125 (referring to **RL-0118**, Award, ¶¶ 218, 237, 259, 284, 448-478 and "*specifically*," ¶ 491).
[1071] C-Mem. Ann., ¶¶ 217-218 (referring to **RL-0118**, Award, ¶ 491).
[1072] C-Mem. Ann., ¶ 220 (referring to **RL-0118**, Award, ¶ 324).
[1073] C-Mem. Ann., ¶¶ 218-219.

549. Moreover, OperaFund and Schwab argue, the Tribunal did not disregard the other evidence presented by Spain concerning the "*mutability of the legal framework*," devoted several pages to summarizing Spain's arguments, and while it might have failed to mention some of the documentary evidence submitted by Spain, that was "*reasonable*" in light of the volume of evidence submitted in the arbitration.[1074] The Tribunal did not have an obligation to make a reference to each piece of evidence, nor was the Tribunal required to give the same weight to the evidence provided by both Parties.[1075]

(c) *The Award Contains No Inconsistency that Amounts to a Violation of the Right to be Heard*

550. OperaFund and Schwab deny that the Tribunal "*applied a legal framework* […] *different from that argued by the parties*," and submits that the Award is rooted in the application and interpretation of the ECT.[1076]

551. As to Spain's contention that its right to be heard was harmed because Spain could not foresee that the Tribunal would fail to consider the Respondent's evidence, OperaFund and Schwab argue that this complain simply reflects a "*dissatisfaction with the weight accorded by the Tribunal to the evidence that it submitted during the arbitral proceedings*," and not a departure from the right to be heard.[1077]

(d) *The Tribunal Interpreted Correctly the European Commission's Intervention*

552. OperaFund and Schwab contend that while initially Spain did not indicate which fundamental rule of procedure was breached in connection with the analysis of the EC's intervention, it ultimately argued that the grievance was based on an alleged breach of Spain's right to be heard, which OperaFund and Schwab deny.[1078]

---

[1074] C-Mem. Ann., ¶ 221. *See also*, Rej. Ann., ¶ 125.

[1075] C-Mem. Ann., ¶¶ 222-223.

[1076] Rej. Ann., ¶ 132. *See also*, Rej. Ann., ¶ 137.

[1077] Rej. Ann., ¶¶ 133-134.

[1078] C-Mem. Ann., ¶ 225; Rej. Ann., ¶¶ 160, 166.

553. OperaFund and Schwab argue that: (i) the Tribunal noted in the Award that EU law does not prevail over the ECT;[1079] (ii) the Tribunal summarized the EC's intervention in the Award, which "*implies*" that the Tribunal did consider it in its analysis;[1080] (iii) even if the Tribunal had not considered the EC's arguments (*quod non*), it has not been established that this led to a "*substantially different result*;"[1081] and (iv) although the EC was not a party to the arbitration, it was afforded an ample opportunity to present its views about applicable law, the intra-EU objection and the legitimate expectations in writing and at the hearing on the merits (after the *Achmea* Judgment and the 2017 EC State Aid Decision),[1082] an oral intervention that proved "*particularly worthless*."[1083]   In admitting the EC intervention and summarizing its arguments in the Award, "*by definition*" the Tribunal afforded Spain the right to be heard in relation to the EC's arguments.[1084]

554. Furthermore, OperaFund and Schwab submit that, apart from being untrue, Spain's allegation that the Award failed to assess the EC's submission demonstrates that in reality the complaint here relates to an alleged failure to state reasons, and as such cannot constitute the basis for annulment under Article 52(1)(d) of the ICSID Convention.[1085]

555. All in all, for OperaFund and Schwab, Spain's allegations on this issue simply constitute an attempt to relitigate the issues because Spain disagrees with the conclusions in the Award.[1086]

(e)   *The Tribunal Analyzed Correctly the EU Member States Declaration of January 2019*

556. OperaFund and Schwab contend that, here too, Spain initially failed to indicate which fundamental rule of procedure was breached in connection with the analysis of the EU Member States Declaration of January 2019, but ultimately argued that the complaint was

---

[1079] C-Mem. Ann., ¶ 226.

[1080] C-Mem. Ann., ¶ 227 (referring to **RL-0118**, Award, ¶¶ 316-321); Rej. Ann., ¶ 163.

[1081] C-Mem. Ann., ¶ 228; Rej. Ann., ¶ 165.

[1082] C-Mem. Ann., ¶ 229; Rej. Ann., ¶ 162.

[1083] C-Mem. Ann., ¶ 230.

[1084] Rej. Ann., ¶ 161.

[1085] Rej. Ann., ¶ 164.

[1086] C-Mem. Ann., ¶ 231.

grounded on an infringement of Spain's right to be heard.[1087]    Contrary to Spain's submission, OperaFund and Schwab argue that Spain's right to be heard "*remained intact*" throughout the arbitration in general, and in particular in connection with the EU Member States Declaration of January 2019.[1088]    "*Spain was given more than a full, fair, and comparatively equal opportunity to present evidence, even at a stage in the proceedings when no more evidence was warranted.*"[1089]

557.    OperaFund and Schwab contend that the Tribunal did consider the Declaration in question, as shown by the fact that the Tribunal admitted the Declaration into the record 8 months after the hearing on the merits, allowed the Parties an opportunity to brief on its relevance, and mentions it multiple times when summarizing the Parties' arguments in the Award.[1090] The fact that the Award does not mention the Declaration in its reasoning does not mean that the Tribunal did not consider it.[1091]    Moreover, they argue, while the Award does not "*explicitly analyze*" the Declaration, the Tribunal's ruling of 11 February 2019 admitting the document into the record, explained that the Tribunal was not "*minded to consider this declaration as a source of EU law,*" but specified that "*the document formed part of 'the materials consequent upon the Achmea* [Judgment], *the effect of which* [was] *an important issue to be decided by the Tribunal.*'"[1092]

558.    Finally, in any event, OperaFund and Schwab argue, Spain has not shown that mention of the Declaration would have led to a "*substantially different result.*"[1093]

       (f)    *There are No Basis for Spain's Allegation of Lack of Impartiality*

559.    OperaFund and Schwab contend that Spain fails to "*cite*" any basis for its contention that the Tribunal's lack of impartiality is shown in the way it addressed the Parties' arguments

---

[1087] C-Mem. Ann., ¶ 233; Rej. Ann., ¶ 168.

[1088] Rej. Ann., ¶ 168.

[1089] Rej. Ann., ¶ 173.

[1090] C-Mem. Ann., ¶ 234 (referring to **RL-0118**, Award, ¶¶ 104-106, 307, 349-351, 364-365, 367); Rej. Ann., ¶¶ 169-171.

[1091] C-Mem. Ann., ¶ 234.

[1092] C-Mem. Ann., ¶ 235 (referring to **C-0361**, Tribunal's Letter, 11 February 2019).

[1093] C-Mem. Ann., ¶ 236; Rej. Ann., ¶ 172.

in the arbitration, obliterating Spain's allegations.[1094]   They also remark that, after the Memorial on Annulment, the Reply on Annulment no longer replicates this allegation and provides no further support for it, thereby demonstrating the "*frivolity*" of this contention.[1095]

(g)   *The Tribunal Did Not Seriously Depart from a Fundamental Rule of Procedure in Relation to Quantum*

560.   Finally, OperaFund and Schwab deny that the Tribunal imposed on Spain the burden to rebut the Claimants' damages calculations thereby reversing the burden of proof, and argue that Spain's allegations are based on a "*gross misrepresentation*" of the Award.[1096] According to OperaFund and Schwab, the Tribunal reviewed the evidence presented by the Claimants in support of the adoption of the DCF methodology, and was convinced by the "*overwhelming number of authorized scholars and cases that endorsed*" it.[1097]  Moreover, they argue, arbitral case law admits a "*certain amount of discretion*" in the quantification of damages, and the Tribunal exercised such discretion in full abidance with the applicable rules of procedure.[1098]

**2.    The Committee's Analysis**

*a.    The Standard*

561.   Spain's third ground for annulment is based on Article 52(1)(d) of the ICSID Convention: that there has been a serious departure from a fundamental rule of procedure.  Having examined the Parties' respective positions on the standard to be applied on this annulment ground, the Committee will proceed to set forth the standard that will be applied by the Committee.

562.   To begin, the Committee agrees with Professor Schreuer that two requirements are necessary to trigger an annulment under this ground, namely, that the "*departure from the*

---

[1094] C-Mem. Ann., ¶ 237.

[1095] Rej. Ann., ¶ 104.  *See also*, Tr. Ann., Day 1 (ENG), 126:6-17 (Mr. Mata).

[1096] Rej. Ann., ¶ 174.

[1097] Rej. Ann., ¶ 176.

[1098] Rej. Ann., ¶¶ 177-178.

*rule must be serious and the rule concerned must be fundamental.*"[1099]  In terms of these two elements – "*serious*" and "*fundamental*" – the Committee agrees with Spain that a departure is "*serious*" "*if a party is deprived of the protection afforded by the relevant procedural rule.*"[1100]  The Committee recognizes the ICSID Background Paper on Annulment identification of equal treatment of the parties, the right to be heard, an independent and impartial tribunal, and the treatment of evidence and burden of proof as "*fundamental rules.*"[1101]

563.    The Parties disagree on the impact of a serious departure from a fundamental rule of procedure.  In Spain's view, an "[a]*pplicant for annulment does not have the obligation to demonstrate that the result of the arbitration would have been different if the violated rule of procedure had been respected, but only the severity of the breach.*"[1102]  OperaFund and Schwab contend that a departure is "*serious*" only when there is "*actual material prejudice*" and the violation caused a "*substantially different result*" in the case.[1103]

564.    The Committee is aware of the differences among annulment committees on this issue.[1104]  In this Committee's view, given that Article 52(1)(d) of the ICSID Convention was and is intended to be a ground for annulment, and that annulment is considered to be an extraordinary remedy in the ICSID system, the sanction for a serious departure from a fundamental rule of procedure must result in an annulment, full or partial as the case may be.  Thus, the applicant in an annulment proceeding must demonstrate that the departure would have resulted in a substantially different result.

---

[1099] **CL-0295**, Schreuer, C. *et al.*, *The ICSID Convention: A Commentary* (2nd ed.), Cambridge: Cambridge University Press (2009), p. 980, ¶ 280.

[1100] Mem. Ann., ¶ 407.

[1101] **R-0390**, ICSID Background Paper on Annulment, ¶ 99.

[1102] Mem. Ann., ¶ 418 (citing **RL-0169**, *Pey Casado*, ¶ 78).  *See also*, Reply Ann., ¶¶ 294-295; Tr. Ann., Day 1 (ENG), 38:14-20 (Ms. Cerdeiras).

[1103] C-Mem. Ann., ¶¶ 195-196 (referring to **RL-0192**, *Impregilo*, ¶ 64; **RL-0130**, *Fraport*, ¶¶ 245-246; **CL-0292**, Background Paper on Annulment for the Administrative Council of ICSID, 10 August 2012, ¶ 101; **RL-0131**, *Wena*, ¶ 58).  *See also*, Rej. Ann., ¶ 106(iv).

[1104] *See, e.g.*, **RL-0168**, *Tulip*, ¶¶ 73-79 and **RL-0131**, *Wena*, ¶ 58.

565.    Spain contends, relying on the *Teco* case, that a serious breach of a fundamental rule of procedure cannot be justified on the basis of the Tribunal's discretionary powers.[1105]  As stated, the Committee agrees with Spain.  To be clear, the Committee agrees with *Teco* that "*a tribunal's discretion cannot be without limits and, in any event, must be exercised within the confines of due process. A tribunal's serious breach of a fundamental rule of procedure cannot be justified in light of a tribunal's discretion*."[1106]

566.    Finally, the Committee agrees with OperaFund and Schwab when they state that there can be a departure from the rules on burden of proof when a tribunal "*ignores the evidence*," but not when "*an applicant disagrees with the tribunal's conclusions reached after the assessment and weighing of the evidence*."[1107]  It is in the Tribunal's discretion (not the Committee's) to evaluate the elements of proof and determine their relevance.

567.    With these guidelines in mind, the Committee moves to assessing the positions of the Parties.

### b.    *Serious Violations of Fundamental Rules of Procedure*

#### (i)    Breach of Right to be Heard and Principles on Burden of Proof

568.    As the Committee's summary of Spain's positions reveals,[1108] Spain has made numerous, overlapping and often repetitious allegations of serious violations of fundamental rules of procedure.  It asserts that the Tribunal hindered its right to be heard by failing to comply with fundamental rules of procedure as to burden of proof, and rules on incorporation and assessment of the evidence.[1109]  The Committee will address the main arguments on each ground.

569.    The Committee first notes OperaFund and Schwab's argument that "*Spain never argued that the Tribunal had undermined its right to present arguments or evidence that it deemed*

---

[1105] Reply Ann. ¶ 297 (citing **RL-0191**, *TECO*, ¶ 196).

[1106] **RL-0191**, *TECO*, ¶ 196.

[1107] C-Mem. Ann., ¶ 189.

[1108] *See supra,* ¶¶ 496-521.

[1109] Mem. Ann., ¶¶ 421, 456.

*necessary for its defense*,"[1110] and that "*under ICSID Rule 27, the alleged victim of the due process violation forfeits the right to raise such an issue in the annulment context*."[1111]  For its part, Spain contends that the shortcomings it identifies were not alleged in the written and oral phases of the arbitration because "*at that time no* […] *departure had occurred*."[1112]  The violation occurred, Spain argues, when the Tribunal omitted the assessment of the evidence in the Award, and as such it could only be invoked during the annulment stage.[1113]

570.    The Committee agrees with Spain's holistic view of how ICSID Arbitration Rule 27 should be interpreted and applied in the context of an annulment proceeding.  As stated succinctly by the annulment committee in *Fraport*, "*the objecting party must know of the conduct of the tribunal and have a reasonable opportunity to raise its objection*."[1114]  Spain's claims of serious violations of fundamental rules of procedure are largely, if not exclusively, complaints concerning the Tribunal's treatment (and alleged non-treatment) of the evidence making the Award itself.  To the extent that this is the case, for the Committee there is no issue of waiver on the part of Spain.

571.    The Committee further observes that because these issues concern the treatment of evidence, the Committee notes its agreement with OperaFund and Schwab's assessment of the role of a tribunal under ICSID Arbitration Rule 34(1), as expressed by the tribunal in *Alpha*, which states that "[i]*t is generally understood that 'the probative force of the evidence presented is for the Tribunal to determine,' there being no 'strict judicial rules of evidence' binding upon international arbitration tribunals*."[1115]  Thus, the Committee's focus shall be on the procedural aspects of the Award's treatment of burden of proof, and not its determinations of the evidence.

---

[1110] Rej. Ann., ¶ 109.

[1111] Rej. Ann., ¶ 110.

[1112] Tr. Ann., Day 1 (ENG), 41:17-20 (Ms. Cerdeiras).

[1113] Tr. Ann., Day 1 (ENG), 41:21 (Ms. Cerdeiras).

[1114] **RL-0130**, *Fraport*, ¶ 207.  *See also*, **CL-0327**, *Churchill*, ¶¶ 181-182.

[1115] Rej. Ann., ¶ 139 (citing **RL-0170**, *Alpha Projektholding GmbH v. Ukraine*, ICSID Case No. ARB/07/16, Award, 8 November 2010 ["*Alpha*"], ¶ 238); *see also* **CL-0295**, Schreuer, C. *et al.*, *The ICSID Convention: A Commentary* (2nd ed.), Cambridge: Cambridge University Press (2009), p. 992, ¶ 323.

572.  With respect to the issue of burden of proof, Spain asserts that while Claimants had the burden of proving their claims that they made their investment on the basis of RD 661/2007, that they held legitimate expectations that they would be remunerated according to that regime, and that those expectations were supported by due diligence;[1116] instead, the Award concluded that the lack of due diligence was "*irrelevant to the formation of legitimate expectations*."[1117]

573.  The Committee has analyzed the Award on the key issues of legitimate expectations and breach regarding stable conditions.[1118]  As the Committee has found earlier, it is clear that the majority determined that the terms of Article 44(3) of RD 661/2007 provided a specific assurance of stability that Claimants could – and did according to the record of the case – legitimately rely upon.  The Committee has recognized in its analysis of Section IV.D.2 *supra* that this determination informed the Majority's further decisions, including the appropriate level of due diligence and the issue of burden of proof.[1119]

574.  OperaFund and Schwab's arguments, in their briefs and at the hearing on the merits, that they relied "*in particular on the text of RD 661/2007 and on the Cuatrecasas Memo*"[1120] for their investments and their legitimate expectations of remuneration under that regime, persuaded the Tribunal.  This is the key decision of the Award, and is made clear by the Tribunal's statement that it had "*no doubt that the stabilization assurance given in Article 44(3) is applicable for the investments by Claimants.  Indeed, it is hard to imagine a more explicit stabilization assurance than the one mentioned in Article 44(3): 'revisions […] shall not affect facilities for which the functioning certificate had been granted*.'"[1121]

575.  By contrast, the Tribunal made it clear that counterarguments raised by Spain did not overcome the evidence put forward by OperaFund and Schwab.  Thus, for example, at paragraph 487 of the Award, the Tribunal specified that the Claimants' "*reliance on RD*

---

[1116] Mem. Ann., ¶ 437.

[1117] Reply Ann., ¶ 300 (citing **RL-0118**, Award, ¶ 487).

[1118] *See supra*, ¶ 433.

[1119] *See supra*, ¶ 433.

[1120] *See, e.g.*, **RL-0118**, Award, ¶ 429.

[1121] **RL-0118**, Award, ¶ 485.

*661/2007 is not changed by the answer given by Claimants and bank-witness during the hearing to the question raised by Arbitrator Sands whether they had inquired about possible future changes of the regulations*."[1122]   Explaining why that was the case, the Tribunal stated that "[t]*here was no need for such an enquiry by Claimant, because Article 44(3) expressly excluded such changes by the words 'shall not affect facilities for which the commissioning certificate had been granted.*'"[1123]

576.    Spain contends that the Tribunal "*reverse*[d] *the burden of proof and place*[d] *the burden on* […] *Spain to prove a negative fact: 'it has not been shown and cannot be argued that any further steps to achieve information would have resulted in an expectation that new measures which later were issued in 2014 were to be issued by the State which would fundamentally withdraw the assurances and benefits provided by the State such as in RD 661/2017.*'"[1124]   The Committee does not read this sentence as reversing the burden of proof.   As noted above, the critical determinative for the Award was *"the stabilization assurance given in Article 44(3),*"[1125] and the Claimants' reliance on that stabilization assurance.   The Claimants' evidence of this stabilization assurance and their reliance on it – by the words of the Royal Decree itself, the pleadings and the evidence the Claimants provided in the hearing – satisfied, for the Majority, their burden of proof.   In the Committee's view, the Tribunal is simply saying here that Spain did not set forth evidence that would have overcome the Claimants' showing.

577.    Considering all of the above, the Committee concludes that as a matter of procedure the Award reflects a careful analysis of the evidence put forward to it by the Parties, and a determination that the Claimants carried their burden of proof, while the Respondent was unable to overcome the Claimants' evidentiary showing.   On this basis, the Committee sees no serious departure from the rules on burden of proof.

---

[1122] **RL-0118**, Award, ¶ 487.

[1123] **RL-0118**, Award, ¶ 487.

[1124] Mem. Ann., ¶ 447 (referring to **RL-0118**, Award, ¶ 487).

[1125] **RL-0118**, Award, ¶ 485.

578.    With specific reference to the issue of due diligence in the context of the Claimants' burden of proof, the Committee refers to its earlier decision concerning due diligence.[1126]  There, the Committee determined that the finding by the Tribunal was that the specific language of Article 44(3) of RD 661/2007 <u>itself</u> permitted the Claimants to "*perfect a right to the remuneration set forth by the Spanish legislator, and this is consistent with the Spanish legislator's express intention.*"[1127]   Thus, with this decision*,* the importance of the Claimants' due diligence requirement – that is, a "*minimum exercise of due diligence to confirm their expectation*"[1128] – was determined to be satisfied by the Tribunal through the "*Claimants' reliance on a Legal Opinion by Cuatrecasas* [which] *was also sufficient at least in confirming their expectations, because the Tribunal cannot see what other better means of information they could have obtained than that provided by what seems to have been the most competent law firm for these matters in Spain*."[1129]

579.    The Award thus makes it clear that the Majority concluded that the Claimants met their burden of proving a satisfactory level of due diligence under the specific circumstances of the case.

580.    With this in mind, Spain's further arguments – that "*Claimants did not request a Due Diligence to analyse the regulatory framework and its risk of being modified,*"[1130] and that the Tribunal "*omit*[ed] *in its reasoning the assertions made by the Claimants' witnesses at the hearing and considers that the Report prepared by Cuatrecasas in October 2007 for Deutsche Bank was sufficient*"[1131] – amount to grievances concerning the outcome, not any procedural failure of the Award.

581.    In sum, the Committee concludes that the Award reflects the fact that the Tribunal determined that the Claimants satisfied their due diligence requirement; in other words,

---

[1126] *See supra*, ¶ 429.

[1127] **RL-0118**, Award, ¶ 485.

[1128] **RL-0119**, Sands Dissent, ¶ 24.

[1129] **RL-0118**, Award, ¶ 487. The Award also makes it clear here that the Tribunal saw no conflict of interest in the Cuatrecasas firm acting first for Deutsche Bank and later for the Claimants, and that the "*Claimants had no reason to think that the Report for Deutsche Bank was incorrect or outdated* […]." *Id*.

[1130] Mem. Ann., ¶ 439.

[1131] Mem. Ann., ¶ 440.

that the Tribunal determined that the Claimants had met their burden of proving an adequate level of due diligence. On this basis, the Committee sees no ground to conclude that there was a serious departure from a fundamental rule of procedure relating to the Tribunal's treatment of the burden of proof.

582. Turning now to Spain's assertions of serious violations of its right to be heard, Spain makes a broad allegation that, in its view, the Award's references to the evidentiary activity at the hearing on the merits are scarce and "*almost non-existent*," and that the Award ignores the testimony of its witnesses and experts. It further contends that the Award's references to this evidence are only contained in the summaries of the Parties' positions, and not in the Tribunal's reasoning on liability.[1132]

583. The Committee cannot assess a violation of the right to be heard on the basis of a tally of references in the Award. The overall context of the Award is critical. On the issue of the Award's summaries of the Parties' positions, the Committee is of the view that an important purpose of such summaries is to confirm that the tribunal has in fact heard the Parties.[1133] The Committee sees no violation on these broad allegations.

584. Spain claims that serious violations of its right to be heard took place on the basis that the Award "*fail*[ed] *to make any assessment*" of certain "*evidentiary elements on which, by their nature and the debate raised by the parties, it was essential that it should rule* [...]."[1134] The elements identified by Spain are (i) the numerous documents provided by the Claimants showing the possibility of regulatory changes, (ii) previous regulatory developments which showed that the regulatory framework was substantially amendable, and (iii) the constant case law of the Supreme Court of Spain which before, during or after the investments "*clearly established* [...] *that no one could claim to have a right to immutability of tariffs*."[1135]

---

[1132] *See supra*, ¶ 503.

[1133] *See* **RL-0118**, Award, ¶ 568.

[1134] Reply Ann., ¶ 318.

[1135] Reply Ann., ¶ 318.

585.  Spain explains that its issue "*is not a matter of complaining that* [Spain's] *evidence has not been properly assessed* [...] *on the contrary it is a matter of complaining about the absolute absence or ab initio of such assessments.*"[1136]

586.  The Committee disagrees with Spain as a matter of fact.  It does, however, agree with OperaFund and Schwab's view that:

> "[T]*he Tribunal devoted 20 pages of the Award to summarize Spain's evidence which intended to prove that there was no breach of OperaFund's legitimate expectations.  Moreover, the Tribunal also specifically addressed the Supreme Court decisions, despite their lack of relevance for the present dispute.  Indeed, the Tribunal noted that* '[t]*he majority agree*[d] *with Claimants' view that the cited Spanish Supreme Court decisions that were issued before Claimants' investment concerned issues and laws that are not relevant to the interpretation of Article 44(3) of RD 661/2007, and cannot be applied thereto by analogy.*'"[1137]

587.  In the Committee's view, these arguments do not amount to a serious departure from a fundamental rule of procedure.

> (ii)  <u>Breach of a Fundamental Rule of Procedure in the Treatment of the European Commission's Arguments</u>

588.  Spain's grievance on this issue is that the Tribunal "*does not* […] *make a minimum reference to the value*" of the EC's arguments on the applicability of EU law on matters of jurisdiction and legitimate expectations.[1138]  It complains that while the Award summarized the content of the EC's intervention, it failed to make an assessment of the EC's submissions on EU law and its applicability to the dispute.[1139]  It submits that the Award does not explain how it came to the conclusion that EU law was not applicable international law, or why it rejected the EC's arguments with regard to the Tribunal's lack of jurisdiction in an intra-EU conflict.[1140]  It contends that these shortcomings amount to a

---

[1136] Reply Ann., ¶ 330.

[1137] Rej. Ann., ¶ 125.

[1138] Mem. Ann., ¶ 460.

[1139] Reply Ann., ¶ 349.

[1140] Mem. Ann., ¶ 461.

breach of its right to be heard, as the Award fails to assess and provide any reasoning addressing Spain's arguments on the applicability of EU law to jurisdiction and the merits.[1141]

589.    In the Committee's view, Spain seeks to expand the boundaries of this ground for annulment beyond its intended limits.  As explained by Schreuer:

> "*The practice, as outlined above, would indicate that the right to be heard is an important procedural principle that will be applied carefully in a decision on annulment. Each party must be given the opportunity to address every formal motion before the tribunal and every legal issue raised by the case. This principle must apply even if the answer appears obvious to the tribunal. The failure to refer to every argument put forward by the parties will not, in and of itself, indicate a violation of the right to be heard and is more properly considered in the light of the obligations to address questions, in Art. 48(3), or to state reasons, in Art. 52(1)(e).*"[1142]

590.    With this framework in mind, the Committee agrees with the analysis of the annulment committee in *MTD*, where the respondent argued as follows:

> "*[I]n holding that there was a lack of fair and equitable treatment, the Tribunal fails to consider or otherwise respond to abundant evidence presented by the Parties with respect to material issues in dispute that would have affected significantly its holding on liability as well as its assessment of compensation. For example, the Tribunal fails to consider expert evidence presented by both Parties on a range of issues, including the substantive interpretation of the Foreign Investments Contracts and the DL 600, a key element to its determination with regard to fair and equitable treatment. Furthermore, there are numerous instances throughout the Award where the Tribunal simply recounts the important arguments presented by each party but never analyzes or makes determinations regarding such questions. Accordingly, the Tribunal seriously departs from its fundamental obligation to accord the parties the right to be heard, and the Award should be annulled.*"[1143]

---

[1141] Reply Ann., ¶ 350.

[1142] **CL-0295**, Schreuer, C. *et al.*, *The ICSID Convention: A Commentary* (2nd ed.), Cambridge: Cambridge University Press (2009), p. 990, ¶ 317.

[1143] **CL-0297**, *MTD*, ¶ 56.

591.    The *MTD* annulment committee determined as follows:

>    "*Under Article 52 there is a distinction between a departure from a fundamental rule of procedure and a failure to give reasons for a decision. Failure to give reasons is a separate ground for annulment and there is no reason to think that it is duplicated under the rubric of Article 52(1)(d). Conceivably an award might recite the arguments of the parties in such a defective or inaccurate way as to evidence a failure to hear the arguments in the first place. But it cannot be suggested that this was the case here.*"[1144]

592.    There is no dispute that the Tribunal afforded the Parties the "*opportunity to address every formal motion before the tribunal and every legal issue raised by the case.*"[1145]    Moreover, the Committee concludes that the Award does not "*recite the arguments of the parties in such a defective or inaccurate way as to evidence a failure to hear the arguments in the first place.*"[1146]    This is not, however, the nature of Spain's complaints; the gravamen of Spain's claim is of one seeking reasons.    As the Committee has made its determination on that ground of annulment, there is no need for any further analysis.

>    (iii)    <u>Breach of a Fundamental Rule of Procedure in the Treatment of the EU Member States Declaration of January 2019</u>

593.    Spain contends that the Tribunal committed a serious breach of a fundamental rule of procedure by failing to take into consideration or analyze the Declaration of EU Member States dated 15 January 2019, despite having admitted it into the record.    Spain contends first that this constitutes a failure to "*properly assess the evidence,*"[1147] and later in its Reply on Annulment, it argued that it constituted a breach of Spain's right to be heard as well as a lack of impartiality and unequal treatment of the Parties.[1148]

594.    The Committee is convinced that there was no serious breach of a fundamental rule in the Award's treatment of the Declaration.    Indeed, as OperaFund and Schwab demonstrate, the

---

[1144] **CL-0297**, *MTD*, ¶ 57.

[1145] **CL-0295**, Schreuer, C. *et al*., *The ICSID Convention: A Commentary* (2nd ed.), Cambridge: Cambridge University Press (2009), p. 990, ¶ 317.

[1146] **CL-0297**, *MTD*, ¶ 57.

[1147] Mem. Ann., ¶¶ 465-467.  *See also*, Reply Ann., ¶¶ 351-353.

[1148] Reply Ann., ¶ 353.

Tribunal did consider the Declaration in question, as shown by the fact that: (i) the Tribunal admitted the Declaration into the record 8 months after the hearing; (ii) it allowed the Parties an opportunity to brief on its relevance; and (iii) mentions the Declaration multiple times when summarizing the Parties' arguments in the Award.[1149]  The Committee agrees with OperaFund and Schwab that the fact that the Award does not mention the Declaration in its reasoning does not mean that the Tribunal did not consider it.[1150]

595.   For these reasons, the Committee does not see any serious departure by the Award of a fundamental rule of procedure in its treatment of the Declaration.

(iv)   <u>Breach of a Fundamental Rule of Procedure in Connection with Lack of Impartiality and Unequal Treatment</u>

596.   Spain contends that the Award reveals "*hostility*" towards Spain,[1151] and "*unequal*" and "*discriminatory*" treatment of the Parties.[1152]  It finds the alleged lack of impartiality from: (i) the Award's handling of the matter of due diligence, in particular, its forgiveness of the Claimants' lack of evidence and its decision to reverse the burden of proof against Spain;[1153] (ii) the Award's disregard of the conflict of interest with respect of counsel for the Claimants as highlighted by Professor Sands;[1154] and (iii) the Award's disregard for the testimony of the Respondent's witness (Mr. Montoya) and expert (Mr. Servert).[1155]

597.   The Committee must reject Spain's claims.  First, as OperaFund and Schwab point out in their Rejoinder on Annulment and at the Hearing on Annulment, Spain did not raise, let alone support, these allegations in its Reply on Annulment or at the Hearing on Annulment.[1156]  Second, with respect to its original claims, the Committee has assessed, *supra,* Spain's allegations of the Award's handling of the evidence, due diligence and the

---

[1149] C-Mem. Ann., ¶ 234 (referring to **RL-0118**, Award, ¶¶ 104-106, 307, 349-351, 364-365, 367); Rej. Ann., ¶¶ 169-171.

[1150] C-Mem. Ann., ¶ 234.

[1151] Mem. Ann., ¶ 469.

[1152] Mem. Ann., ¶¶ 470, 476.

[1153] Mem. Ann., ¶¶ 472-473.

[1154] Mem. Ann., ¶ 474 (citing **RL-0119**, Sands Dissent, ¶ 47).

[1155] Mem. Ann., ¶ 475.

[1156] Rej. Ann., ¶ 104.  *See also*, Tr. Ann., Day 1 (ENG), 126:6-17 (Mr. Mata).

alleged reversal of the burden of proof, and did not find a serious departure from a fundamental rule of procedure. The Committee's findings there stand here.

598. Spain's claim that the Award disregards the alleged conflict of interest is simply not true. The Award addressed this issue with reasons[1157] (if not satisfactory reasons in Spain's view or the view of Professor Sands) and therefore Spain has put forward no basis for a claim of a serious departure from a fundamental rule of procedure. Finally, Spain has wholly failed to explain or show how it is that its observation that the Award "*briefly mentions the Claimants' witnesses*" but "*does not make any mention of the witness (Mr. Carlos Montoya) and the expert provided by the Kingdom of Spain (Mr. Jorge Servert),*"[1158] constitutes a serious departure from a fundamental rule of procedure.

(v) Breach of a Fundamental Rule of Procedure in Quantification of Damages

599. Spain makes two arguments in support of its claim that the Award seriously departed from a fundamental rule of procedure in the quantification of damages. It expressed these arguments most cogently at the Hearing on Annulment as follows: first, that the Award improperly reversed the burden of proof, and placed it on Spain, in relation to the decision to apply the appropriate methodology.[1159] Second, Spain asserts that the Award's decision was not supported "*by a minimum of evidence that at least proves with all probability or at least with a very high probability that the quantification of the damage was that and only that.*"[1160]

600. With respect to its first argument, Spain relies on a statement of the Tribunal in paragraph 621 of the Award, as follows: "*The Tribunal does not agree with Respondent's allegation that the DCF method, as shown in doctrine and arbitral precedents, is excessively speculative and, therefore, inappropriate for this case.*"[1161] As explained by Spain, "*the Tribunal does not agree with Respondent's allegation, that's what it's saying. And yet it*

---

[1157] **RL-0118**, Award, ¶ 487.

[1158] Mem. Ann., ¶ 475.

[1159] Tr. Ann., Day 1 (ENG), 55:21-56:14 (Ms. Fernández-Daza).

[1160] Tr. Ann., Day 1 (ENG), 57:11 (Ms. Fernández-Daza).

[1161] **RL-0118**, Award, ¶ 621.

*should be OperaFund that should be demonstrating that the DCF method is appropriate both to show that there were damages and then to quantify them.*"[1162]

601.   However, the Award shows quite clearly that OperaFund and Schwab did in fact put forward their arguments in favor of the DCF methodology that they preferred, and further, their criticism of the asset based valuation methodology preferred by Spain.[1163]   By the same token, the Award is clear that Spain had an equal opportunity to criticize the DCF method, and argue in favor of an asset based valuation methodology.[1164]   Having heard the Parties, the Tribunal determined in favor of the DCF method, but not before explaining to Spain what its decision was on the subject, and why it did so.[1165]

602.   The Committee concludes that there was no reversal of the burden of proof by the Award, and therefore no serious departure from a fundamental rule of procedure.

603.   The Committee turns now to Spain's second argument, that the Award's decision was not supported by sufficient evidence.   Spain, however, does not itself appear to have an actionable sense – other than what might be done – of what a minimum standard of proof means in this context.   Spain states that "*where the quantification of damages is concerned,* […] *we know that the Tribunal is free to assess the evidence as it sees fit,*" but that "*such discretion for the Tribunal cannot be totally unlimited because it would then verge on the arbitrary.*"[1166]   In light of this and the above, the Committee's view is that there was no serious departure of a fundamental rule of procedure.

---

[1162] Tr. Ann., Day 1 (ENG), 56:10-14 (Ms. Fernández-Daza).

[1163] **RL-0118**, Award, ¶¶ 610–616.

[1164] **RL-0118**, Award, ¶¶ 617–620.

[1165] **RL-0118**, Award, ¶¶ 621, 685.

[1166] Tr. Ann., Day 1 (ENG), 57:17-22 (Ms. Fernández-Daza).

## V.    COSTS

### A.    THE PARTIES' POSITIONS

#### 1.    Spain's Position

604.    In its statement of 7 November 2022, Spain submits that it has incurred a total of EUR 960,115.7 as costs in this annulment proceeding.[1167]

605.    Spain submits the following break-down of its costs for legal fees and other expenses (excluding the advances made to ICSID):[1168]

| Description | | Amount |
|---|---|---|
| Legal fees directly incurred by the Kingdom of Spain | EUR | 180,000.00 |
| Translations | EUR | 4,994.51 |
| Other expenses | EUR | 51,680.32 |
| **Total** | **EUR** | **236,674.83** |

606.    In turn, Spain submits the following break-down for "ICSID Fees and Advance Payments" made to ICSID to cover the costs of the proceedings:[1169]

| Description | | Amount |
|---|---|---|
| Lodging Fee | EUR | 23,359.90 |
| Advance Payments | EUR | 700,080.97 |
| **Total** | **EUR** | **723,440.87** |

607.    Spain submits that OperaFund and Schwab "*shall pay all the costs of the proceedings*" and asks the Committee to render a "*decision on costs according to the ICSID Convention, Regulations and Rules, including Applicant's cost amounting to 960.115,7 EUR.*"[1170] Spain further requests that OperaFund and Schwab be "*ordered to pay post-award interest on the foregoing sums, at a compound rate of interest to be determined by the Committee, until the date of full satisfaction of the Committee's decision.*"[1171]

---

[1167] Spain Costs, ¶ 1.

[1168] Spain Costs, ¶¶ 4-7, 8.

[1169] Spain Costs, ¶¶ 2-3, 8.

[1170] Spain Costs, ¶ 9. *See also*, Mem. Ann., ¶ 477(d); Reply Ann., ¶ 502 (m).

[1171] Spain Costs, ¶ 10.

### 2. OperaFund and Schwab's Position

608. In their statement of 7 November 2022, OperaFund and Schwab submit that that they have incurred a total of EUR 462,110.65 as costs in this annulment proceeding.[1172]

609. OperaFund and Schwab submit the following break-down of costs for legal fees and other expenses:[1173]

| Description | | Amount |
|---|---|---|
| Cuatrecasas Fees | EUR | 456,149.00 |
| Other Expenses[1174] | EUR | 5,961.65 |
| **Total** | **EUR** | **462,110.65** |

610. OperaFund and Schwab submit that the amount of legal fees is reasonable, considering the grounds for annulment, the written submissions, "*the undue submission of an expert report from the applicant and the discussion on its admissibility,*" the hearing, and Spain's various requests for submission of additional documents into the record.[1175]

611. According to OperaFund and Schwab, pursuant to Article 61(2) of the ICSID Convention and ICSID Arbitration Rule 47(1)(j) (applicable pursuant to Article 52(4) of the ICSID Convention and Arbitration Rule 53), the Committee has discretion regarding the allocation of costs.[1176] They argue that "*following the rejection of Spain's application for annulment of the Award, Spain i) must bear the full costs and expenses incurred by the ad hoc Committee and ICSID, and ii) must reimburse OperaFund for its legal costs and expenses.*"[1177] They therefore request that the Committee issues a decision: "[o]*rdering the Respondent to bear the entirety of the costs of these annulment proceedings (including the Committee members' fees, ICSID fees and all related expenses);*" and "[o]*rdering the*

---

[1172] OperaFund and Schwab Costs, ¶ 9.

[1173] OperaFund and Schwab Costs, ¶¶ 6, 8-9.  No advance payments to ICSID were made by OperaFund and Schwab.

[1174] OperaFund and Schwab specify that the "Other Expenses" entry corresponds to translations, photocopies, virtual services, taxis, meals, and others.  OperaFund and Schwab Costs, ¶ 8.

[1175] OperaFund and Schwab Costs, ¶ 7.

[1176] OperaFund and Schwab Costs, ¶ 10.

[1177] OperaFund and Schwab Costs, ¶ 11.  *See also, id.*, ¶ 19.

*Respondent to pay OperaFund **EUR 462,110.65** for the costs that it has incurred in these proceedings.*"[1178]

612.    OperaFund and Schwab urge the Committee to apply the principle of costs follow the event in the allocation of costs.  However, they support their claim on the basis of argument and new legal authorities, including argument based on a case – the *Antin* annulment decision – that was denied leave to be included into the record of this case because the request did not meet the requirements of Section 15.6 of Procedural Order No. 1.[1179]

### B.    THE COSTS OF THE PROCEEDING

613.    The costs of the annulment proceeding, including the fees and expenses of the *ad hoc* Committee, ICSID's administrative fees and direct expenses, amount to (in US$):

| Description | Amount |
|---|---|
| Committee' Fees and Expenses | |
| Mr. Timothy J. Feighery<br>Mr. Milton Estuardo Argueta<br>Prof. Fausto de Quadros | US$ 299,362.00<br>US$  55,812.50<br>US$ 152,875.00 |
| ICSID's Administrative Fees | US$ 126,000.00 |
| Direct Expenses | US$ 61,029.92 |
| **Total** | **US$ 695,079.42** |

614.    The above costs have been paid out of the advances made by Spain (as Applicant on Annulment).[1180]  As a result, the expended portion of the advances to cover the above costs of the annulment proceeding was US$ 695,079.42 (disbursed from Spain's advances).

---

[1178] OperaFund and Schwab Costs, ¶ 20(ii)-(iii).  *See also*, C-Mem. Ann., ¶ 239(ii); Rej. Ann., ¶ 271(ii)(b).

[1179] Letter dated 18 August 2021 from the *ad hoc* Committee to the Parties.

[1180] The ICSID Secretariat will provide the Parties with a Final Financial Statement of the case fund.  The remaining balance shall be reimbursed to Spain based on the payments that it advanced to ICSID.

### C.    THE COMMITTEE'S ANALYSIS

615.    The Committee notes that the Parties agree that in the event either prevail, the other Party or Parties shall be responsible for all of the costs of the annulment.[1181]   The Committee sees no reason to depart from the Parties' intent.

616.    The Committee also refers to Article 61(2) of the ICSID Convention which provides:[1182]

> "*In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*"

617.    This provision (reflected also in Arbitration Rule 47(1)(j)) gives the Committee full discretion with regards to the allocation of costs.  With this in mind, the Committee notes that its invitation to the Parties in regard to their Statements of Costs was clear.  It invited "*respective Statements of Costs, consisting of summary statements listing their respective costs in this annulment proceeding.*"[1183]   However, OperaFund and Schwab exceeded this invitation by, among other things, including with their Statement of Costs "*five new legal authorities as well as an updated list of legal authorities* […]."[1184]

618.    OperaFund and Schwab acknowledge in their "Statement of Costs" that "*the Committee did not admit the Antin decision into the record,*"[1185] and yet they provided significant argument and sought to rely on it, and to bring other committee decisions as new legal authorities into the record of this case.  OperaFund and Schwab claimed the right to do so arguing that "*the Committee can 'take judicial notice of, refer to, or rely on, any relevant*

---

[1181] *See* Spain Costs, ¶ 9; OperaFund and Schwab Costs, ¶ 20.

[1182] Pursuant to Article 52(4) of the ICSID Convention, Article 61(2) of the ICSID Convention "*shall apply mutatis mutandi to proceedings before the Committee.*"

[1183] Email dated 24 October 2022 from the *ad hoc* Committee to the Parties.

[1184] Email dated 7 November 2022 from Counsel to OperaFund and Schwab.

[1185] OperaFund and Schwab Costs, ¶ 13.

*legal principles or judicial or arbitral decisions in accordance with the principle of jura novit curia.*"[1186]

619.    In the Committee's view, the general principles recited by OperaFund and Schwab are not designed to replace the procedural agreements made in arbitration.  Specifically in this case, the provisions of  Section 15.6 of Procedural Order No. 1, which as the Parties well know, governs the submission additional documents and requires exceptional circumstances as well as notice to the other Party.  OperaFund and Schwab have failed to meet these requirements, and by consequence the Committee will not consider their arguments relating to these additional sources, nor will the Committee accept OperaFund and Schwab's "updated list of legal authorities."[1187]

## VI.    DECISION

620.    For the reasons set forth above, the Committee:

(i)    Rejects Spain's application for annulment;

(ii)    Decides that Spain shall (a) bear all of the Costs of the Proceeding, including the expenses and fees of the Committee, ICSID's administrative fees and direct expenses, as reflected in ICSID's final statement, and (b) pay OperaFund and Schwab EUR 462,110.65 of their costs in this annulment proceeding.

---

[1186] OperaFund and Schwab Costs, ¶ 13.

[1187] Email dated 7 November 2022 from Counsel to OperaFund and Schwab.

_____          _____
Milton Estuardo Argueta Pinto                                       Fausto de Quadros
Member of the *ad hoc* Committee                            Member of the *ad hoc* Committee
Date:                                                                            Date:

_____
Timothy J. Feighery
President of the *ad hoc* Committee
Date:          FEB 2 4 2023

198



Milton Estuardo Argueta Pinto
Member of the *ad hoc* Committee
Date:         FEB 2 3 2023

Fausto de Quadros
Member of the *ad hoc* Committee
Date:

Timothy J. Feighery
President of the *ad hoc* Committee
Date:

_____
Milton Estuardo Argueta Pinto
Member of the *ad hoc* Committee
Date:

Fausto de Quadros
Member of the *ad hoc* Committee
Date:    **MAR 0 1 2023**

_____
Timothy J. Feighery
President of the *ad hoc* Committee
Date:

200