# Exhibit 30

**INTERNATIONAL CENTRE FOR SETTLEMENT OF INVESTMENT DISPUTES**

In the annulment proceeding between

**RREEF INFRASTRUCTURE (G.P.) LIMITED AND**

**RREEF PAN-EUROPEAN INFRASTRUCTURE TWO LUX S.À R.L.**

("Claimants")

and

**KINGDOM OF SPAIN**

("Spain")

**ICSID Case No. ARB/13/30**

---

# DECISION ON ANNULMENT APPLICATION

---

***Members of the ad hoc Committee***
Professor Lawrence Boo, President
Professor Enrique Barros Bourie, Member
Ms Bertha Cooper-Rousseau, Member

***Secretary of the ad hoc Committee***
Mr Gonzalo Flores

*Date of dispatch to the parties*: *10 June 2022*

**REPRESENTATION OF THE PARTIES**

*Representing RREEF Infrastructure (G.P.)*
*Limited and RREEF Pan-European Infrastructure*
*Two Lux S.à r.l.*:

Mr Jeff Sullivan
Mrs Stephanie Collins
Ms Helen Elmer
Mr Theo Tyrrell
Gibson, Dunn & Crutcher UK LLP
Telephone House 2-4 Temple Avenue
London EC4Y 0HB
United Kingdom

*Representing the Kingdom of Spain*:

Ms. María del Socorro Garrido Moreno
Ms. Gabriela Cerdeiras Megías
Ms. Lorena Fatás Pérez
Mr. Rafael Gil Nievas
Ms. Lourdes Martínez de Victoria Gómez
Ms. Amparo Monterrey Sánchez
Ms. Elena Oñoro Sainz
Mr. Francisco Javier Peñalver Hernández
Mr. Alberto Torró Molés
 Abogacía General del Estado International
Arbitration Division
c/ Marqués de la Ensenada, 14-16, 2d.
Floor 28004, Madrid
Spain

**TABLE OF CONTENTS**

I.   THE PARTIES.................................................................................................................. 1

II.  PROCEDURAL HISTORY................................................................................................ 2

III. THE PARTIES' REQUESTS FOR RELIEF ................................................................... 6

IV.  THE PARTIES' POSITIONS AND THE COMMITTEE'S ANALYSIS............................ 6

    A.   Manifest Excess of Powers .................................................................................. 7

        (1)  Applicable Standard.................................................................................... 7

            a.   Spain's Position ................................................................................... 7

            b.   Claimants' Position ............................................................................. 7

            c.   Committee's Analysis ......................................................................... 9

        (2)  Excess of Jurisdiction............................................................................... 12

            a.   Spain's Position ................................................................................. 12

            b.   Claimants' Position ........................................................................... 16

            c.   Committee's Analysis ....................................................................... 18

        (i)  Jurisdiction over the First Claimant......................................................... 18

        (ii) EU Investor v EU State Disputes ............................................................. 20

          •   Whether Luxembourg is "another Contracting Party" under the ECT....................... 20

          •   Achmea and EU States Declarations 2019 ....................................... 28

          •   CJEU's Recent Komstroy Judgment.................................................. 31

        (3)  Failure to Apply or Misapplication of the Appropriate Law ...................35

            a.   Spain's Position ................................................................................. 35

            b.   Claimants' Position ........................................................................... 38

            c.   Committee's Analysis ....................................................................... 39

          •   Application of EU Law ...................................................................... 40

          •   EU State Aid ....................................................................................... 41

          •   The legitimate expectations of the Claimants .................................. 42

          •   The scope of investors' rights........................................................... 44

          •   The proportionality of the Award ..................................................... 47

          •   Recent EC Decision on State Aid – Antin Award ........................... 48

    B.   Failure to State Reasons on Which the Award is Based................................. 50

            a.   Spain's Position ................................................................................. 50

            b.   Claimants' Position ........................................................................... 50

            c.   The Committee's analysis ................................................................. 51

V.   COSTS........................................................................................................................... 52

VI.  DECISION ..................................................................................................................... 54

| TABLE OF KEY ABBREVIATIONS / DEFINED TERMS | |
|---|---|
| 1997 Statement or Statement | Statement submitted by the European Communities to the Secretariat of the Energy Charter pursuant to Article 26(3)(b)(ii) of the Energy Charter Treaty, dated 9 March 1998 |
| Achmea Judgment | *Slovak Republic v Achmea BV*, Case C-284/16, CJEU Judgment dated 6 March 2018 |
| Annulment Application | Spain's application dated 8 April 2020 for annulment of the Award |
| Annulment Rejoinder | Claimants' Rejoinder on Annulment dated 29 April 2021 |
| Annulment Reply | Spain's Reply on Annulment dated 18 March 2021 |
| Antin | *Infrastructure Services Luxembourg S.à.r.l. and Energía Termosolar B.V. (formerly Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energía Termosolar B.V.) v Kingdom of Spain* (ICSID Case No ARB/13/31), Award rendered on 15 June 2018 and rectified on 29 January 2019 |
| Arbitration Rules or ICSID Arbitration Rules | ICSID Rules of Procedure for Arbitration Proceedings 2006 |
| Award | Award rendered on 11 December 2019 in the original arbitration proceeding |
| CJEU | Court of Justice of the European Union |
| Claimants or RREEF Parties | First and Second Claimants |
| Claimants' Request | Claimants' request dated 19 August 2021 for a new legal authority to be admitted into the record |
| Committee | *Ad hoc* annulment committee constituted on 17 July 2020 comprising Professor Lawrence Boo Geok Seng (President), Professor Enrique Barros Bourie (member), and Ms Bertha Cooper-Rousseau (member) |
| Community Guidelines | Community guidelines on State aid for environmental protection (EC Communication 2008/C 82/01) dated 1 April 2008 |
| Convention or ICSID Convention | Convention on the Settlement of Investment Disputes between States and Nationals of Other States dated 18 March 1965 |
| Counter-Memorial | Claimants' Counter-Memorial on Annulment dated 7 January 2021 |
| Decision on Responsibility | Decision on Responsibility and on the Principles of Quantum dated 30 November 2018 issued by the Tribunal |

| TABLE OF KEY ABBREVIATIONS / DEFINED TERMS | |
|---|---|
| Declaration of 15 January 2019 | Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, dated 15 January 2019 |
| Declaration of 16 January 2019 | Declaration of the Representatives of the Governments of the Member States on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, dated 16 January 2019 |
| EC | European Commission |
| EC's Application | EC's application for leave to intervene as non-disputing party in the annulment proceedings dated 23 December 2020 |
| EC's Decision | EC's decision on "State aid SA.54155 (2021/NN) – Arbitration award to Antin – Spain" (EC Communication 2021/C 450/02) dated 5 November 2021 |
| EC's Submission | EC's written submission dated 30 March 2021 addressing the sole question of whether Article 26 of the ECT applies to disputes between parties to whom EU law applies |
| ECT | Energy Charter Treaty |
| EEAG | Guidelines on State aid for environmental protection and energy 2014-2020 (EC Communication 2014/C 200/01) dated 28 June 2014 |
| EU | European Union |
| First Claimant | RREEF Infrastructure (G.P.) Limited |
| Gosalbo Observations | Expert Observations to the Counter-Memorial submitted by Professor Ricardo Gosalbo Bono dated 11 March 2021 |
| Gosalbo Report | Expert Report submitted by Professor Ricardo Gosalbo Bono dated 25 October 2020 |
| ICSID | International Centre for Settlement of Investment Disputes |
| ICSID Background Paper | Updated Background Paper on Annulment for the Administrative Council of ICSID dated 5 May 2016 |
| ILC | International Law Commission |
| ILC Report on Draft VCLT | ILC Draft Articles on the Law of Treaties |
| Komstroy Judgment | *Republic of Moldova v Komstroy LLC*, Case C-741/19, JCEU Judgment dated 2 September 2021 |

| TABLE OF KEY ABBREVIATIONS / DEFINED TERMS | |
|---|---|
| MAL | UNCITRAL Model Law on International Commercial Arbitration |
| Memorial | Spain's Memorial on Annulment dated 29 October 2020 |
| Opposition | Claimants' Opposition to Spain's Request for a Permanent Stay of Enforcement dated 24 July 2020 |
| Parties | Claimants and Spain |
| RD 661/2007 | Royal Decree 661/2007 |
| REIO | Regional Economic Integration Organisation (as defined in the ECT) |
| Rejoinder | Claimants' Rejoinder to Spain's Reply, dated 20 August 2020 |
| Reply | Spain's Reply to the Claimants' Opposition, dated 12 August 2020 |
| Second Claimant | RREEF Pan-European Infrastructure Two Lux S.à r.l. |
| Spain | Kingdom of Spain |
| State Aid Decision | Decision dated 10 November 2017 and issued by the EC on the 'State Aid Framework for Renewable Sources' of the Kingdom of Spain |
| Sur-Rejoinder | Spain's Sur-Rejoinder to the Claimants' Rejoinder, dated 28 August 2020 |
| TFEU | Treaty on the Functioning of the European Union |
| Tribunal | Arbitral tribunal in the original arbitration constituted on 31 July 2014 comprising Professor Alain Pellet (President), Professor Robert Volterra (appointed by the Claimants), and Professor Pedro Nikken (appointed by Spain) |
| VCLT | Vienna Convention on the Law of Treaties |

## I.   THE PARTIES

1.   This proceeding concerns an application for annulment ("**Annulment Application**") of the Award rendered on 11 December 2019 in the original arbitration proceeding *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v Kingdom of Spain* (ICSID Case No. ARB/13/30) ("**Award**").

2.   The claimants are RREEF Infrastructure (G.P.) Limited ("**First Claimant**"), a private limited liability company incorporated in 2005 under the laws of Jersey, and RREEF Pan-European Infrastructure Two Lux S.à r.l. ("**Second Claimant**"), a private limited liability company incorporated in 2006 under the laws of Luxembourg (together, "**Claimants**").

3.   The applicant in the annulment proceedings is the Kingdom of Spain.

4.   The main proceeding had been instituted by the Claimants under the Energy Charter Treaty dated 17 December 1994 ("**ECT**"), which entered into force on 16 April 1998 for the United Kingdom,[1] Luxembourg and Spain,[2] and the Convention on the Settlement of Investment Disputes between States and Nationals of Other States ("**ICSID Convention**"), which entered into force on 18 January 1967 for the United Kingdom, 29 August 1970 for Luxembourg and 17 September 1994 for Spain.[3]

5.   The Claimants and Spain are collectively referred to as the "**parties**". The parties' representatives and their addresses are listed above on page i.

---

[1] Including Jersey.

[2] Signed by the same three States on 17 December 1994.

[3] Signed on 26 May 1965 by the United Kingdom, 28 September 1965 by Luxembourg and 21 March 1994 by Spain.

## II. PROCEDURAL HISTORY

| Date | Event |
|---|---|
| 8 April 2020 | ICSID received from Spain the Annulment Application for the annulment of the Award. In its Annulment Application, Spain also requested a stay of the enforcement of the Award. |
| 15 April 2020 | The Secretary-General of ICSID registered the Annulment Application, in accordance with Rule 50(2)(a) of the ICSID Arbitration Rules. Together with the notice of registration, the Secretary-General informed the parties of the provisional stay of the Award, in accordance with Rule 54(2) of the ICSID Arbitration Rules. |
| 17 July 2020 | The Secretary-General, in accordance with Rule 52(2) of the ICSID Arbitration Rules, notified the parties that all members of the *ad hoc* Committee had accepted their appointments, and that the Committee was therefore deemed to have been constituted, and the annulment proceedings to have begun, as of 17 July 2020, pursuant to Rules 6(1) and 53 of the ICSID Arbitration Rules. |
| | The Committee is composed of Professor Lawrence Boo Geok Seng, a national of Singapore, as president; Professor Enrique Barros Bourie, a national of Chile, as member; and Ms Bertha Cooper-Rousseau, a national of The Bahamas, as member.[4] All three members of the Committee were appointed by the Chair of the ICSID Administrative Council, in accordance with Article 52(3) of the ICSID Convention. |
| | On the same date, the parties were notified that Mr Gonzalo Flores, Deputy Secretary-General of ICSID, had been appointed as Secretary of the Committee. |
| 24 July 2020 | The Claimants filed their *Opposition to Spain's Request for a Permanent Stay of Enforcement* ("**Opposition**"). |
| 29 July 2020 | The Committee directed that the provisional stay of the enforcement of the Award would be maintained until it has had an opportunity to review all of the parties' submissions and to issue a further decision on the matter, thereby extending the time limit under Rule 54(2) of the ICSID Arbitration |

---

[4] Professor Boo Geok Seng was appointed to the ICSID Panel of Arbitrators by Singapore, Professor Barros Bourie was appointed to the ICSID Panel of Arbitrators by Chile; and Ms Cooper-Rousseau was appointed to the ICSID Panel of Arbitrators by The Bahamas.

| Date | Event |
|------|-------|
|  | Rules. The Committee also invited Spain to file its Reply to the Claimants' Opposition ("**Reply**") by 10 August 2020. |
| 30 July 2020 | Spain requested an extension until 12 August 2020 to file its Reply and sought confirmation from the Committee that the Reply could be filed in Spanish. Spain also confirmed that it would make submissions in Spanish during the first session. |
|  | On the same date, the Claimants confirmed that they had no objections to Spain's request for extension, and that they would make submissions in English during the first session. |
|  | On the same date, the Committee invited Spain to file its Reply by 12 August 2020 in view of the parties' agreement and noted the parties' comments regarding the languages that would be used during the first session. |
| 12 August 2020 | Spain filed its Reply. |
| 13 August 2020 | The Claimants requested leave to file further submissions in response to Spain's Reply. |
| 14 August 2020 | Spain agreed for the Claimants to file further submissions, provided that it too could file further submissions thereafter. |
| 17 August 2020 | The Claimants agreed for both sides to file further submissions, as requested, provided that each side was granted the same amount of time for such further submissions. |
| 18 August 2020 | The Committee directed the Claimants to file their Rejoinder to Spain's Reply ("**Rejoinder**") by 20 August 2020, and Spain to file its Sur-Rejoinder ("**Sur-Rejoinder**") by 28 August 2020. |
| 20 August 2020 | The Claimants filed their Rejoinder. |
| 28 August 2020 | Spain filed its Sur-Rejoinder. It also agreed to make its submissions in English during the first session, if the hearing on the stay of enforcement of the Award was to be held in a separate session, and without prejudice to making submissions in Spanish during such hearing. |
|  | The Committee directed that the first session would be held on 3 September 2020 only in English, and that the hearing on the issue of stay of the Award would be held on 17 September 2020, in English and Spanish, with simultaneous interpretation in both languages. |

| Date | Event |
|---|---|
| 3 September 2020 | The Committee held the first session by video conference, with the parties and ICSID Secretariat in attendance. |
| 8 September 2020 | The Committee issued Procedural Order No. 1, which provides, *inter alia*, that the applicable ICSID Arbitration Rules are those in force as of 10 April 2006, and that the procedural languages are English and Spanish. |
| 17 September 2020 | The Committee held the Hearing on Stay of Enforcement of the Award by video conference, with the parties and ICSID Secretariat in attendance. |
| 28 October 2020 | The Committee issued its Decision on Stay of Enforcement of the Award. |
| 29 October 2020 | Spain filed its Memorial on Annulment ("**Memorial**") in Spanish, including an Expert Report submitted by Professor Ricardo Gosalbo Bono in English ("**Gosalbo Report**"). |
| 12 November 2020 | Spain filed the English translation of its Memorial together with the Spanish translation of the Expert Report submitted by Professor Ricardo Gosalbo Bono. |
| 23 December 2020 | The European Commission ("**EC**") filed an application for leave to intervene as non-disputing party in the annulment proceedings ("**EC's Application**"), pursuant to Rules 37(2) and 53 of the ICSID Arbitration Rules. |
| 7 January 2021 | The Claimants filed their Counter-Memorial on Annulment in English ("**Counter-Memorial**"). |
| 15 January 2021 | The parties each filed observations on the EC's Application. |
| 21 January 2021 | The Claimants filed the Spanish translation of their Counter-Memorial. |
| 10 March 2021 | The Committee issued its Decision on the European Commission's Application for Leave to Intervene as Non-Disputing Party in the Annulment Proceedings, granting leave to the EC to submit a written submission addressing the sole question of whether Article 26 of the ECT applies to disputes between parties to whom European Union ("**EU**") law applies. |
| 18 March 2021 | Spain filed its Reply on Annulment ("**Annulment Reply**") in Spanish including the Second Expert Report submitted by Professor Ricardo Gosalbo Bono in English. |
| 30 March 2021 | The EC filed a written submission ("**EC's Submission**") in accordance with Rules 37(2) and 53 of the ICSID Arbitration Rules. |

| Date | Event |
|---|---|
| 1 April 2021 | Spain filed the English translation of its Annulment Reply together with the Spanish translation of the Second Expert Report submitted by Professor Ricardo Gosalbo Bono. |
| 29 April 2021 | The parties each filed observations on the EC's Submission. <br><br> On the same date, the Claimants also filed their Rejoinder on Annulment ("**Annulment Rejoinder**") in English, including an Expert Opinion of Professor Piet Eeckhout. |
| 13 May 2021 | The Claimants filed the Spanish translation of their Annulment Rejoinder. |
| 17 May 2021 | The Claimants filed the Spanish translation of the Expert Opinion of Professor Piet Eeckhout. |
| 28 May 2021 | The Committee held a pre-hearing organisational meeting by video conference, with the parties and ICSID Secretariat in attendance. |
| 30 May 2021 | The Committee issued Procedural Order No. 2 concerning the hearing on annulment. |
| 10-11 June 2021 | The Committee held the Hearing on Annulment by video conference, with the parties and ICSID Secretariat in attendance. |
| 2 August 2021 | The parties each filed a statement of costs and comments on the *travaux préparatoires* of the ECT. |
| 19 August 2021 | The Claimants requested for a new legal authority to be admitted into the record ("**Claimants' Request**"). |
| 2 September 2021 | The Committee invited Spain to file its observations on the Claimants' Request by 8 September 2021. |
| 8 September 2021 | Spain filed its observations, stating that it did not object to the Claimants' Request provided that Spain was permitted to add two other documents to the record as well. |
| 17 September 2021 | The Claimants filed its reply to Spain's observations. |
| 11 March 2022 | The proceedings were declared closed. |

### III.  THE PARTIES' REQUESTS FOR RELIEF

6.  Spain in its Annulment Reply dated 18 March 2020 requests the Committee to:[5]

> a)  *Annul the REEF* [sic] *Award in its entirety under Article 52(1)(b) of the ICSID Convention, for manifestly exceeding its powers by improperly declaring its jurisdiction over an intra-EU dispute, and*

> b)  *Annul the REEF* [sic] *Award in its entirety under Article 52(1)(b) of the ICSID Convention for failure to apply EU law to the merits of the dispute.*

> c)  *The RREEF Parties shall pay all the costs of the proceedings.*

7.  Spain also requests that if the Committee "*considers that the facts described* [...] *constitute a ground for annulment on a ground of Article 52(1) of the ICSID Convention other than those alleged,* [...] *the Committee* [...] *proceed to annul the Award on that ground as well*".[6]

8.  The Claimants request in their Annulment Rejoinder dated 29 April 2021 that the Committee:[7]

> a)  *strike out Spain's new jurisdictional objection in respect of the First Claimant;*

> b)  *disregard all new arguments and new evidence, specifically including the new expert testimony on EU law;*

> c)  *reject Spain's Application for Annulment of the Award in its entirety;*

> d)  *order Spain to pay the Claimants' full legal fees and costs incurred in these Proceedings; and*

> e)  *order any other and further relief the Committee deems necessary or appropriate.*

### IV.  THE PARTIES' POSITIONS AND THE COMMITTEE'S ANALYSIS

9.  The Committee will first deal with Spain's request for annulment under Article 52(1)(b) of the ICSID Convention for manifest excess of powers in Part A, followed by Spain's request under Article 52(1)(e) for the Award's failure to state reasons in Part B.

---

[5] Annulment Reply, para. 282.

[6] Annulment Reply, para. 283.

[7] Annulment Rejoinder, para. 204.

### A.  MANIFEST EXCESS OF POWERS

#### (1)  Applicable Standard

##### a.  Spain's Position

10.  According to Spain, there is manifest excess of powers when a tribunal acts "*in contravention of*" the parties' consent or without their consent, such as when the tribunal does not apply the appropriate law, exceeds its jurisdiction, does not have jurisdiction or rules on matters not raised by the parties.[8] In particular, Spain contends that "*failure to apply the law in force occurs when the tribunal disregards the applicable law, or its misinterpretation or misapplication of the law is* 'so gross or egregious as substantially to amount to failure to apply the proper law'",[9] and cites case law to support its position, including precedents referred to in the Updated Background Paper on Annulment for the Administrative Council of ICSID ("**ICSID Background Paper**"). [10] It also highlights in this regard that the various interpretations of the ICSID Convention provisions made by different *ad hoc* committees have equal value and that therefore the Claimants are incorrect in suggesting that some interpretations are of less value.[11]

11.  It also argues that an *ad hoc* committee should review not only what a tribunal has stated it has done, but also what the tribunal actually did, citing case law including *Iberdrola v Guatemala*, *Klöckner v Cameroon* and *Sempra v Argentina*.[12]

##### b.  Claimants' Position

12.  The Claimants argue that the Committee "*would need to find that the Tribunal obviously (and on the face of the Award) acted outside the scope of its mandate under the ICSID Convention*" for there to be manifest excess of powers.[13] In particular, they explain that for there to be 'manifest' excess of powers, such excess must be clear, obvious and self-evident, such that extensive

---

[8] Memorial, para. 58.

[9] Memorial, para. 59.

[10] Annulment Reply, paras. 28-46.

[11] Annulment Reply, para. 31.

[12] Memorial, paras. 61-63: RL-0162, *Iberdrola Energía, S.A. v Republic of Guatemala*, ICSID Case No. ARB/09/5, Decision on the Remedy for Annulment of the Award Submitted by Iberdrola Energía, S.A., 13 January 2015, para. 97; RL-0176, *Klöckner Industrie-Anlagen GmbH and others v United Republic of Cameroon and Société Camerounaise des Engrais S.A.*, ICSID Case No. ARB/81/2, Decision on the Application for Annulment Submitted by Klöckner Against the Arbitral Award Rendered on October 21, 1983, 3 May 1985, para. 79; RL-0124, *Sempra Energy International v Argentine Republic*, ICSID Case No. ARB/02/16, Decision on the Argentine Republic's Application for Annulment of the Award, 29 June 2010, para. 208.

[13] Counter-Memorial, para. 37.

analysis of the award is not required, as opposed to a situation where the tribunal's approach was tenable or not unreasonable. In this regard, they contend that the excess of powers must in addition be consequential.[14]

13. In respect of Spain's argument that there was excess of jurisdiction, the Claimants contend that *ad hoc* committees do not have the power to reassess a tribunal's jurisdictional decision *de novo*, referring to the *kompetenz-kompetenz* principle under Article 41(1) of the ICSID Convention.[15] They also add that Spain must prove that the Tribunal's jurisdictional analysis was untenable for Spain's case in this regard to succeed.[16]

14. As for Spain's argument that the Tribunal failed to apply the proper law, the Claimants adopt the position that Spain must prove that the Tribunal "*completely disregarded the law agreed to by the Parties*".[17] They further clarify that misapplication of the applicable law is not a valid ground for annulment, even if such misapplication is serious, citing *Teinver v Argentina* and *Tenaris v Venezuela (II)*.[18] They also point out that the case law cited by Spain in this regard has been either controversial or at odds with the provisions of the ICSID Convention, and therefore not well received by subsequent *ad hoc* committees,[19] or irrelevant to the present case.[20]

15. The Claimants also argue that the burden of proof is on the party requesting annulment, which is Spain in this case.[21]

---

[14] Counter-Memorial, paras. 62-70.

[15] Counter-Memorial, paras. 39-43.

[16] Counter-Memorial, paras. 44-45.

[17] Counter-Memorial, paras. 46 and 49.

[18] Counter-Memorial, paras. 47 and 48: CL-0309, *Teinver S.A. and others v Argentine Republic*, ICSID Case No. ARB/09/1, Decision on Argentina's Application for Annulment, 29 May 2019, para. 60; CL-0303, *Tenaris S.A. & Talta - Trading e Marketing Sociedade Unipessoal Lda.v Bolivarian Republic of Venezuela*, ICSID Case No. ARB/12/23, Decision on Annulment, 28 December 2018, para. 69.

[19] Counter-Memorial, paras. 51-61.

[20] Annulment Rejoinder, paras. 38-39.

[21] Counter-Memorial, para. 36; Annulment Rejoinder, para. 35.

### c. Committee's Analysis

16. Article 52(1)(b) of the ICSID Convention, which sets out the relevant grounds for annulment, provides as follows:

**Article 52**

*(1) Either party may request annulment of the award by an application in writing addressed to the Secretary-General on one or more of the following grounds:*

*[...]*

*(b) that the Tribunal has manifestly exceeded its powers;*

*[...]*

17. Spain has asserted that the Tribunal had acted in excess of powers in that the Tribunal had improperly exercised jurisdiction over an intra-EU dispute. Put simply, Spain is in fact saying that the Tribunal had erred in upholding its own jurisdiction. In its oral submission, Spain voiced the view that "[t]*he ICSID Background Paper makes clear that there is an excess of power if a tribunal incorrectly concludes that it has jurisdiction when in fact jurisdiction is lacking, as was the case with the RREEF Award*".[22] The Committee does not agree that this statement, lifted from a summary of the various views expressed in the ICSID Background Paper, suggests that *ad hoc* committees have the power to review jurisdictional decisions *de novo*. A plain reading of the passage points quite to the opposite.

18. Article 41(1) of the Convention makes it abundantly clear that: "*The Tribunal shall be the judge of its own competence.*" This enshrines the principle of *kompetenz-kompetenz* in the ICSID system, as part of the ICSID Convention. In arbitrations outside the ICSID regime, an arbitral tribunal's rulings on jurisdiction are almost always subject to judicial review by the court of the seat of arbitration through the process of either judicial review against such a ruling[23] or setting aside;[24] or by the court of the place at which enforcement is sought through refusal of enforcement on the basis that the tribunal lacked jurisdiction. This is not so under the Convention, where the <u>only</u> recourse against an ICSID award is annulment under the grounds

---

[22] Transcript (English), 10 June 2021, p. 10, lines 9-13.

[23] See, e.g., Article 16(3) of the UNCITRAL Model Law on International Commercial Arbitration ("**MAL**").

[24] See, e.g., Article 34 of MAL.

set out in Article 52. Further, Article 54 of the Convention, which mandates that Contracting States recognise and enforce the pecuniary obligations, is silent as to any possible grounds for refusal of enforcement.

19. The Committee therefore agrees with the Claimants that *ad hoc* committees do not have the power to reconsider ICSID tribunals' jurisdictional decisions *de novo*. Any attempt to establish a ground under Article 52 must be scrupulously examined to ensure that it is not a 'back door' attack on the tribunal's decision on its substantive jurisdiction, *viz.* whether there is party consent to arbitrate and the jurisdictional requirements under the Convention are met.[25] The burden to show that such a ground is established must necessarily lie with the applicant, Spain in this instance.

20. Spain's argument is expressed in terms of the exercise of 'excess of power' by the Tribunal which led to its holding that it has jurisdiction over intra-EU investor-State disputes, asserting that the Tribunal had failed to apply EU law (being a corpus of international law applicable to it) when considering its jurisdiction and that such failure amounts to a 'manifest excess of power'.

21. It is not in issue between the parties that to succeed, an applicant has to show that a tribunal had acted in 'excess of its powers'. What is debated is the standard of proof required to show that the tribunal had 'manifestly exceeded' its powers, *viz.* the threshold above which any excess becomes 'manifest'.

22. The Committee notes that aside from Article 52(1)(b) of the ICSID Convention, the term 'manifest' is also used in Article 36(3), which provides that the Secretary-General shall not register a request for arbitration if he finds that the dispute is "*manifestly outside the jurisdiction of the Centre*" (emphasis added). Given that the Secretary-General does not exercise jurisdiction, and that parties may not present arguments at that stage, the term 'manifest' can only refer to a defect that is obvious, or so evident on a first reading of the document without need for further investigation or inquiry. This interpretation accords with the plain meaning of the term, and the Committee has no difficulty accepting this is as a right interpretation to adopt for Article 52(1)(b) but not necessarily the only meaning in its context.

---

[25] See Articles 25 and 26 of the ICSID Convention.

23.  Spain has submitted that "*ad hoc committees have also considered that an excess of powers can be 'manifest' […] when it is material to the outcome of the case*".[26] The Claimants do not dispute this,[27] and the ICSID Background Paper also confirms this point, albeit that such a view has been adopted by a minority of committees.[28] The Committee also notes that most of the decisions adopting this approach have not excluded the fact that any defect so found should be egregious as well.[29] In other words, the interpretations attributed to 'manifest' are not mutually exclusive. To succeed, the applicant must be able to demonstrate that the excess of powers in this instance was so evident on a first reading of the decision, without need for further investigation or inquiry, and that it was this lapse that had led the tribunal to uphold its jurisdiction. Failing such, the annulment application must fail.

24.  It follows from the above that manifest excess of powers relating to the applicable law, as Spain is asserting in its application, should be one of wrongly applying a system of law and a disregard for the applicable law, and not the Tribunal's misunderstanding and/or misapplication of the applicable law. Such an approach accords with the drafting history of the ICSID Convention as well as with earlier ICSID decisions (where there is some controversy regarding errors of law being considered as 'manifest excess of powers' under Article 52(1)(b)), as set out in the ICSID Background Paper.[30]

25.  The Committee recognises that it is at times difficult to identify a clear boundary between disregard for the applicable law and erroneous application thereof. This is where it might be helpful to recall that ICSID annulment is positively concerned with legitimacy of procedure, and that such legitimacy derives from the parties' agreement, including the law applicable to the dispute. Therefore, the threshold for annulment will only be reached if the treatment of the agreed or applicable law constitutes such a flagrant disregard of the whole process, and until then (and not before) it cannot be said that the arbitral award has lost its legitimacy.

26.  The Committee also wishes to add that annulment proceedings are not occasions to inquire into the merits of the underlying dispute between the parties. This has consequences for both

---

[26] Transcript (English), 10 June 2021, p. 9, lines 15-19.

[27] Counter-Memorial, para. 67.

[28] RL-0122, ICSID Background Paper, para. 83.

[29] See, e.g., RL-0123, *Hussein Nuaman Soufraki v United Arab Emirates*, ICSID Case No. ARB/02/7, Decision of the *ad hoc* Committee on the Application for Annulment of Mr Soufraki, 5 June 2007, para. 40; RL-0223, *Patrick Mitchell v Democratic Republic of the Congo*, ICSID Case No. ARB/99/7, Decision on the Application for the Annulment of the Award, 1 November 2006, para. 57.

[30] RL-0122, ICSID Background Paper, paras. 90-93.

prongs of Spain's challenge based on manifest excess of powers. In respect of jurisdiction, this means that *ad hoc* committees should not conduct *de novo* inquiries of any sort as set out at paragraph 17 above. The prohibition from inquiring into underlying merits also means that it is not open for this Committee to criticise the Tribunal's application of the law based on new arguments or evidence not put before the Tribunal.

27.   The Committee further notes that there are divergent views concerning the status of prior ICSID case decisions. The Committee agrees with Spain that each case must be considered independently from previous cases involving different parties. While it is desirable for there to be consistent ICSID case decisions, for there to be some certainty, there is no doctrine of *stare decisis* or order of precedents that the Committee is bound to follow. The Committee is bound to uphold the provisions of the Convention and the underlying rationale and principles of the Rules made thereunder. Each ICSID tribunal and *ad hoc* committee therefore has the duty to parties to consider each case separately and independently. As such the fact that 67 other cases ruled in a certain manner does not mean that this Committee is bound to do likewise. Accordingly, the Committee, while acknowledging that many tribunals as well as three *ad hoc* committees have ruled against Spain in, for instance, rejecting its assertion that the intra-EU disputes arising under the ECT cannot be referred to arbitration under Article 26 of the ECT, has the duty to consider the matter afresh. It is for this reason that the Committee permitted the limited intervention by the EC to address the Committee on the same issue, notwithstanding that the Tribunal had in the main proceeding declined to do so. The Committee also allowed the admission of post-hearing case decisions which Spain said have some bearing on the grounds of annulment advanced by Spain.

28.   With these general observations in the background, the Committee will examine each of the specific grounds advanced by Spain.

### (2)   Excess of Jurisdiction

#### a.   *Spain's Position*

29.   Spain adopts the position that "*the excess of powers due to the excess of jurisdiction incurred by the RREEF Award occurs both because of the incorrect determination of the applicable law and because of its incorrect interpretation*".[31]

---

[31] Memorial, para. 127.

30.     Spain contends that the ECT does not apply within the EU, and that this is evident regardless of whether the ECT provisions are interpreted from a literal, historical or teleological perspective.[32] It points out that the Claimants are "*investors from states that are part of a regional economic integration organisation (REIO) as defined in Article 1.3 ECT. Therefore, since the EU is a contracting party to the ECT defined in Article 1(2), they cannot be considered as 'another contracting party' but as the same contracting party as the Respondent.*"[33] It also argues that "*the* [ECT] *sets as determining criteria for the configuration of a dispute under Article 26 of the ECT the 'Area' in which the investment is made and the diversity of Contracting Parties. Neither of these criteria is met in the case of an intra-EU dispute, which entails the lack of jurisdiction of the Tribunal to resolve such a dispute.*"[34]

31.     Spain highlights that the EU member States did not want to consent to intra-EU disputes being submitted to arbitration under the ECT "*because the process leading up to the signing of the ECT shows that it was driven, precisely by the EU, to promote energy development in the former Soviet republics, not among the EU member states themselves*", and that they also could not consent because they "*ceded sovereign competences in the internal market* [...] *and in the judicial system when they acceded to the* [EU] [which resulted in them being unable] *to assume rights or obligations contrary to EU law when signing the ECT*".[35] In support of its position, Spain refers to rulings of the Court of Justice of the European Union ("**CJEU**") as well as confirmations from the EC and the United Nations International Law Commission.[36]

32.     According to Spain, Article 26(6) of the ECT "*incorporates the principle of 'iura novit curia' into the ECT, directing the Arbitral Tribunal to determine and specify the international standard applicable to the procedure for resolving* [...] *all '***issues in dispute***', thus including questions of jurisdiction*" (emphasis in original), and therefore EU law should have been interpreted and applied as international law to determine jurisdiction.[37] Spain argues that this is so because fundamental freedoms (free movement of capital, freedom of establishment, freedom to provide services and free movement of workers) are affected in any intra-EU investment, and also because the dispute implicates State aid. It points out that the Tribunal did not explain why

---

[32] Memorial, paras. 107 and 109-112.

[33] Memorial, para. 108.

[34] Annulment Reply, paras. 53 and 135-150.

[35] Annulment Reply, paras. 54-56.

[36] Annulment Reply, paras. 57-58.

[37] Annulment Reply, para. 80.

it did not then apply EU law, even though the Tribunal did accept that EU law is international law.[38]

33. Spain further adopts the position that the principle of primacy, which forms part of "*international custom*", accords preference to EU law over rules of EU member States, including those that flow from international agreements or treaties, in the event of any conflict.[39] It argues that Article 344 of the Treaty on the Functioning of the European Union ("**TFEU**") "*prohibits Member States from submitting a dispute concerning the interpretation or application of the EU Treaties to a method of dispute settlement other than their national courts*", which means that "*Member States may not submit to arbitration disputes which may require the interpretation or application of EU law by arbitral tribunals*",[40] and points out that its position is "*the only one that harmonises the ECT with EU law*" while being consistent with the Vienna Convention on the Law of Treaties ("**VCLT**").[41] In support of its position, Spain cites *Slovakia v Achmea*,[42] in which the CJEU in its judgment ("**Achmea Judgment**")[43] "*addressed* [...] *the prohibition of Member States under Articles 267 and 344 of the TFEU to submit to dispute resolution mechanisms outside the European Union's judicial system disputes that require the interpretation or application of EU law*".[44]

34. Spain contends that the Achmea Judgment is "*directly applicable*" to the present case and that accordingly "*Article 26(4) of the ECT does not cover intra-EU disputes*".[45] It adds that the Achmea Judgment's applicability to the case is also supported by the EC in its Communication COM(2018) 547 on the Protection of intra-EU investment,[46] the EU member States themselves in a joint political declaration,[47] and advocate generals of the CJEU.[48][49] Spain also stresses that

---

[38] Memorial, para. 126; Annulment Reply, para. 81.

[39] Memorial, paras. 75-76, 113, 120, 122 and 125; Annulment Reply, paras. 59-60.

[40] Memorial, para. 81; Annulment Reply, para. 60.

[41] Annulment Reply, para. 61.

[42] Memorial, paras. 82-89: RL-0116, *Slovak Republic v Achmea BV*, Case C-284/16, CJEU Judgment, 6 March 2018.

[43] RL-0116, *Slovak Republic v Achmea BV*, Case C-284/16, CJEU Judgment, 6 March 2018.

[44] Memorial, para. 82; Annulment Reply, paras. 68-69.

[45] Memorial, paras. 91 and 115; Annulment Reply, paras. 113-127.

[46] RL-0167, Communication from the Commission to the European Parliament and the Council on the Protection of intra-EU investment, COM(2018) 547, 19 July 2018.

[47] RL-0168, Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in Achmea and on Investment Protection in the European Union, 15 January 2019 ("**Declaration of 15 January 2019**").

[48] RL-0224, Opinion of Advocate General Saugmandsgaard Øe delivered on 29 October 2020; RL-0227, Opinion of Advocate General Szpunar delivered on 3 March 2021.

[49] Memorial, paras. 95-99; Annulment Reply, paras. 119-127.

unlike what the Claimants allege, submissions on the Achmea Judgment were made in the main proceeding,[50] and moreover the Achmea Judgment supports its arguments previously made rather than introducing a new one.[51]

35. Spain argues that an express disconnection clause is not necessary as well: its submissions in this regard are summarised below at paragraphs 61 and 73.

36. According to Spain, the Tribunal made "*blatant errors whose seriousness should be grounds for annulment because they affect a vital element of the arbitration system, namely the jurisdiction of the Tribunal*".[52] Spain argues that there is manifest excess of powers by emphasising that the Tribunal knew the dispute was intra-EU from the start, that the intra-EU objection was raised by Spain from the outset, and that even the EC "*questions the jurisdiction of the* RREEF *Award Tribunal because it is an intra-EU dispute*".[53] In this regard, it also responds to the Claimants' position by clarifying that it is not invoking any new arguments[54] and explaining that previous *ad hoc* "[c]*ommittees have understood that an excess of powers will be manifest even if it may require some analysis*", citing *Pey Casado v Chile*.[55] As to the Claimants' argument that there is *jurisprudence constante*, Spain underscores that the rulings of previous tribunals, "*which do not deserve the value of precedent, cannot prevent the validity of the principles of European Union law*".[56]

37. In addition, Spain stresses that its objections also extend to the First Claimant, because the First Claimant is a "[British] *territory subject to international law*",[57] and also because "*if the award is annulled, it would be impossible to determine whether* part of *it should survive and what percentage* […] *should survive*".[58]

---

[50] Annulment Reply, para. 97.

[51] Annulment Reply, paras. 108-112.

[52] Annulment Reply, para. 74.

[53] Annulment Reply, para. 157.

[54] Annulment Reply, paras. 154-156.

[55] Annulment Reply, para. 153: RL-0163, *Víctor Pey Casado and President Allende Foundation v Republic of Chile*, ICSID Case No. ARB/98/2, Decision on the Application for Annulment of the Republic of Chile, 18 December 2012, para. 70.

[56] Annulment Reply, paras. 83-87.

[57] Memorial, paras. 116-118.

[58] Annulment Reply, paras. 160-165.

### b. *Claimants' Position*

38. The Claimants emphasise in the first place that Spain's jurisdictional objections regarding the First Claimant should be struck out, as such objections are being raised for the first time during these annulment proceedings. They point out that this is admitted by Spain itself, and stress that Spain has moreover sought to support the objection with new evidence, even though case law and scholarly opinion indicate that "*an award cannot be annulled on the basis of new evidence and new arguments*".[59] In this regard, the Claimants also contend that unlike what Spain claims, it is possible for the Committee to issue a partial annulment of the Decision on Jurisdiction as the appropriate remedy, in the event that it finds manifest excess of powers in respect of jurisdiction assumed by the Tribunal over the Second Claimant.[60]

39. In respect of Spain's submissions concerning the Second Claimant, the Claimants respond that the Second Claimant is not part of the EU, does not follow EU law except with regard to "*customs duties and quantitative restrictions*", and therefore cannot be considered an intra-EU investor. They also point out that neither Professor Gosalbo nor the EC has been able to identify any legal basis to support the contrary position.[61]

40. The Claimants argue that, as the Tribunal made clear, the law applicable to jurisdictional questions is the ECT itself, adding that "*EU law says nothing on the interpretation of the obligations under Part III of the ECT*".[62] They stress that EU law not being applicable to questions of jurisdiction is "*dispositive of Spain's Intra-EU Objection, as all of its arguments hinge on the assertion that EU law is applicable to the question of jurisdiction*".[63] In response to Spain's submissions, the Claimants also point out the following:

   i. The term 'issues in dispute' in Article 26(6) of the ECT refers only to disputes which concern an alleged breach of an obligation under Part III of the ECT, and therefore does not cover jurisdictional issues.[64]

   ii. As the case may be, Spain's various 'literal, historical or teleological' arguments regarding the ECT (see paragraph 30 above) either were not raised in the main

---

[59] Counter-Memorial, paras. 71-89; Annulment Rejoinder, paras. 43-48 and 53-58.

[60] Annulment Rejoinder, para. 59.

[61] Annulment Rejoinder, paras. 63-74.

[62] Counter-Memorial, paras. 111-112; Annulment Rejoinder, paras. 90 and 96.

[63] Annulment Rejoinder, paras. 88 and 92.

[64] Annulment Rejoinder, para. 95.

proceeding, or do not constitute grounds for annulment, or are otherwise irrelevant to annulment.[65]

    iii.  EU State aid law is not relevant to the dispute, and in fact Spain's submissions thereon in the main proceeding run counter to its annulment submissions.[66]

41.    The Claimants further emphasise that the Award is consistent with case law in respect of Spain's arguments as to (i) the relevance of Article 26(6) to the question of jurisdiction, and (ii) the intra-EU nature of the dispute.[67] In this regard, the Claimants submit that the precedents it refers to do not 'alter the terms' of the ECT, but instead "*confirm that, under the plain meaning of the terms of the ECT, arbitral tribunals have jurisdiction to hear intra-EU disputes*".[68]

42.    Notwithstanding the above, the Claimants point out that Spain's EU law arguments, whether concerning the 'principle of primacy', Article 267 or Article 344 of the TFEU, are entirely unsupported by legal authorities, involve material which is new (and thus cannot be considered in these annulment proceedings) and/or simply irrelevant.[69] They also submit that:

    i.  The relevant EU law provisions are not posterior to the ECT, and therefore Spain's argument is erroneous that EU law prevails by virtue of being *lex posterior*.[70]

    ii.  Article 351 of the TFEU "*confirms that EU law cannot invalidate treaties which the Member States have concluded on their own*".[71]

    iii.  Article 16 of the ECT "*requires that, where two or more Contracting Parties have entered into an international agreement whose terms concern the same subject matter, the treaty which is more favourable to the investor will prevail*".[72]

---

[65] Annulment Rejoinder, para. 144.

[66] Annulment Rejoinder, para. 145.

[67] Counter-Memorial, paras. 113-116, 118-123 and 174-175; Annulment Rejoinder, paras. 80-84, 89, 99-100, 138-141 and 145.

[68] Annulment Rejoinder, para. 85.

[69] Counter-Memorial, paras. 126-135; Annulment Rejoinder, paras. 105-106, 109-116 and 142.

[70] Annulment Rejoinder, paras. 107-108.

[71] Annulment Rejoinder, paras. 119-120.

[72] Annulment Rejoinder, para. 121.

43.     In respect of the Achmea Judgment and materials relating to it that Spain cites, the Claimants contend that these are irrelevant, and refer to case law in support of their position.[73] They point out that these arguments were already addressed by the Tribunal in its Award.[74] The Claimants also clarify that "*the CJEU has* never *ruled on the compatibility of Article 26 of the ECT with EU law* [which essentially means that] *the ECT remains valid and binding as a matter of EU law*" (emphasis in original).[75]

44.     As regards Spain's 'harmonisation' argument (see paragraph 33 above), the Claimants contend that the prerequisite for this is that there be "*same subject-matter*" between the EU Treaties and the ECT, which is not the case here.[76] They further argue that even if there were excess of powers, this could not have been manifest given the consistency of the Tribunal's ruling with *jurisprudence constante*, and the volume of Spain's annulment submissions, which includes new material not raised in the main proceeding.[77]

45.     On a related note, the Claimants also point out that several parts of the EC's Submission are "*outside the scope of the limited mandate that the Committee permitted the EC to make a written submission on*" and submit that these parts should be disregarded.[78]

### c.  *Committee's Analysis*

### (i)  *Jurisdiction over the First Claimant*

46.     There is no dispute between the parties that Spain did not raise any issue of jurisdiction as regards the First Claimant in the arbitration before the Tribunal and raised it for the first time in these annulment proceedings.[79] For this reason, the Committee considers that Spain's request for annulment relating to the First Claimant on the basis of excess of jurisdiction must be rejected as inadmissible, given that annulment proceedings are not the right occasion for a party to present new arguments on an issue of substantive jurisdiction which lies within the province of the Tribunal under Article 41 of the Convention.

---

[73] Counter-Memorial, paras. 136-162; Annulment Rejoinder, paras. 125-134, 143 and 146.

[74] Annulment Rejoinder, para. 143.

[75] Annulment Rejoinder, paras. 123-124.

[76] Annulment Rejoinder, paras. 135-137.

[77] Counter-Memorial, paras. 171-173; Annulment Rejoinder, paras. 147-151.

[78] Annulment Rejoinder, paras. 154-155.

[79] Memorial, para. 116; Annulment Reply, para. 160; Counter-Memorial, para. 81; Annulment Rejoinder, paras. 43-50.

47.   The Committee's position is also supported by Rule 41(1), which provides: "*Any objection that the dispute or any ancillary claim is not within the jurisdiction of the Centre or, for other reasons, is not within the competence of the Tribunal shall be made as early as possible.*" The only exception to this, is if "*the facts on which the objection is based are unknown to the party at that time*".

48.   The fact that the First Claimant is an entity of the Bailiwick of Jersey, part of the Channel Islands, a dependency of the United Kingdom, is public knowledge and could not have been lost on Spain. In making this assertion, Spain relies on Protocol 3 to the 1972 Treaty of Accession of the United Kingdom[80] that Jersey is "*not outside the European Union in the sense that it is excluded*".[81]

49.   Spain has however made no assertion that this 'fact' of Jersey "*not* [being] *outside the European Union*" was unknown to it at the time the arbitration was afoot. It is also not open to Spain to suggest that the issue of Jersey's position "*not* [being] *outside the European Union*" is a fact that it could not have known. This is made clearer in its Annulment Reply, where Spain makes the point that:

> *If the Kingdom of Spain has now clarified that the conclusion would be the same if the proceedings had been initiated only by the Jersey entity - quod non - it is because, following the Achmea judgment, this is more than obvious. Obviously, such a conclusion would have been the same prior to that judgment, but the express confirmation of the Court of Justice of the European Union has obliged the Kingdom of Spain to make that clear in these proceedings as well.*[82]

50.   The position taken by Spain is that it accepts not only that the Achmea Judgment did not in fact change anything materially, but also that the relevant facts themselves did not change, and more importantly, that such facts were known to the parties. Indeed, the relevant EU legal documents (which here constitute relevant facts) have always been publicly available, and if Spain, as it contends, considers these applicable to the First Claimant all along, then it should have raised the same, in accordance with Rule 41(1). Further, a failure to raise such an objection also means that Spain did not afford the Tribunal an opportunity to address the

---

[80] Gosalbo Report, Exhibit 10: Documents concerning the accession to the European Communities of the Kingdom of Denmark, Ireland, the Kingdom of Norway and the United Kingdom of Great Britain and Northern Ireland, Official Journal of the European Union, 27 March 1972, p. 164.
[81] Gosalbo Report, para. 31.
[82] Annulment Reply, para. 164.

19

matter. It is therefore quite improper for it to now suggest that the Tribunal had committed a 'manifest' excess of power by upholding jurisdiction in relation to the First Claimant's claims, when it withheld such a matter from the Tribunal in the first place. The Committee wishes to make clear that it takes no view on Spain and its expert's opinion as to the Bailiwick of Jersey's position in the EU, in particular whether the Bailiwick of Jersey have assumed obligations under Articles 267 and 344 of the TFEU by the fact that it was not expressly "*excluded*" by the United Kingdom's accession.[83]

51.    It follows that Spain's objection against the First Claimant based on jurisdictional excess must necessarily fail.

### (ii) *EU Investor v EU State Disputes*

52.    Spain makes the same propositions that it made before the Tribunal, *viz*.:

    i.    The Second Claimant (i.e. RREEF Pan-European Infrastructure Two Lux S.à r.l) is not an investor entitled to invoke Article 26 of the ECT on the basis that Luxembourg is not "*another Contracting Party*" as required under Article 26 of the ECT.

    ii.    EU law has primacy over the Convention.

    iii.    EU law provides that the CJEU is the judicial institution competent to examine any question relating to the application of treaties and acts including those concluded by EU member States.

    iv.    Articles 267 and 344 of the TFEU preclude a provision in international treaties concluded between member States which provides for arbitration by an investor from a member State against another member State.

- **<u>Whether Luxembourg is "another Contracting Party" under the ECT</u>**

53.    Spain relies on Article 1(2) and (3) read with Article 26(1) of the ECT:

### *Article 1: Definitions*

[…]

---

[83] References to the Channel Islands in Protocol 3 of the Accession of the United Kingdom of Great Britain and Northern Ireland appears to be limited to the EC's "*rules on customs matters and quantitative restrictions*", with a provision that assures that the "*rights enjoyed by Channel Islanders* […] *shall not be affected by the Act of Accession*".

> (2) *"Contracting Party" means a state or Regional Economic Integration Organization which has consented to be bound by this Treaty and for which the Treaty is in force.*
>
> (3) *"Regional Economic Integration Organization" means an organization constituted by states to which they have transferred competence over certain matters a number of which are governed by this Treaty, including the authority to take decisions binding on them in respect of those matters.*
>
> [...]
>
> ### Article 26: Settlement of Disputes between an Investor and a Contracting Party
>
> [...]
>
> (1) *Disputes between a Contracting Party and an Investor of another Contracting Party relating to an Investment of the latter in the Area of the former, which concern an alleged breach of an obligation of the former under Part III shall, if possible, be settled amicably.*

54. Spain submits that when the EU acts collectively as a REIO in international relations, it represents the member States as a "*single entity of public international law*"[84] and hence members States are bound by the treaty obligations to other Contracting Parties. In its view, when members States and the EU enter into a treaty, the obligations of a member State operate only *vis-à-vis* third countries, and not between or amongst the member States *inter se*. In this regard, Article 1(3) of the ECT recognised the EU as being the only REIO signatory to the treaty to have been "*transferred competence*" and the "*authority to take* [binding] *decisions*" in respect of certain matters governed by the ECT.

55. Spain's position is supported in this respect by the views of the EC as a non-disputing party, which takes the position that Contracting Parties to the ECT were aware of the special features of the EU as a REIO and that the accession by the EU as REIO and its members create international obligations only *vis-à-vis* third countries, a feature which it describes as "*recognized by international custom*".[85]

---

[84] Transcript (English), 10 June 2021, p. 14, line 19.

[85] EC's Submission, para. 40.

56. Spain also points out that as both the EU and its member States are Contracting Parties of the ECT, the 'Area' as used in Article 26(1) of the ECT must be read to be a reference to an area outside the territories of the EU on the basis that Article 1(10) provides the following definition:

> (10)    *"Area" means with respect to a state that is a Contracting Party:*
>
> *(a)* [...]
>
> *(b)* [...]
>
> *With respect to a Regional Economic Integration Organisation which is a Contracting Party, Area means the Areas of the member states of such Organisation, under the provisions contained in the agreement establishing that Organisation.*

57. Spain argues that the term 'Area' as applied to the EU means that the investment made by the Second Claimant in Spain does not give the Second Claimant the right to invoke Article 26 of the ECT against Spain as both Luxembourg and Spain are within the same 'Area' as defined in Article 1(10).

58. Spain criticises the Tribunal for failing to address this objection and for simply focusing on the absence of a disconnection clause in the ECT.[86]

59. The Committee notes that the Tribunal indeed did not specifically address this. However, the Tribunal's approach is quite understandable. First, the argument advanced by Spain assumes that there is a well-established international custom that whenever the EU acts together with its member States, obligations assumed by the member States operate only *vis-à-vis* non-EU States. Apart from the EC's Submission, there is no material before the Tribunal and before this Committee that the international community dealing with the EU has accepted such an 'international custom'. Second, the definitions of 'Area', 'REIO' and 'Contracting Party' read simply and literally are not as clear as Spain has made them out to be. The definitions appear to contemplate a situation where a REIO is a Contracting Party without the concurrent participation of its member States. Where the REIO and its member States are all Contracting Parties, the internal inconsistencies relating to the areas of investment and conflicts with the respective competences of the members States and the REIO must necessarily be reconciled by a provision in the treaty to make clear which provision(s) of the ECT do not apply. The

---

[86] Transcript (English), 10 June 2021, p. 16, line 16 - p. 17, line 8.

Tribunal's focus on the absence of a disconnection clause is therefore fully justifiable and the parties had been given the opportunity to ventilate their views before the Tribunal.

60. The Claimants raised in the arbitration the absence of a disconnection clause in the ECT which could have made clear that intra-EU disputes are excluded from the application of the arbitration process in Article 26. Spain's response was then that a disconnection clause is not necessary or superfluous as it is implicit in Article 26 of the ECT. The Tribunal considered the arguments and ruled that:

> *If one or more parties to a treaty wish to exclude the application of that treaty in certain respect or circumstances, they must either make a reservation (excluded in the present case by Article 46 of the ECT) or include an unequivocal disconnection clause in the treaty itself. The attempt to construe an implicit clause into Article 26 of the ECT is untenable, given that that article already contains express exceptions to the* "unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article" *that had been agreed amongst the States Party.*[87]

61. Spain maintains that an explicit disconnection clause is superfluous, essentially because EU law operates autonomously and, in a certain sense, works such that any conflicting legal provisions are displaced automatically.[88]

62. The Committee observes that the very nature of a disconnection clause is precisely to delineate with exactness the scope of application of a treaty in relation to Contracting Parties. It is therefore rather odd to suggest that disconnection could be implicit because doing so would instead promote ambiguity.

63. Professor Gosalbo, who was called as expert witness on behalf of Spain, indicated that the ECT provides in Article 1(3) that the EU as a REIO has by definition "*the authority to take decisions binding on* [member States] *in respect of* [certain matters over which competence has been transferred to the REIO, i.e. the EU]".[89] He then suggested that in respect of investor-State disputes under Article 26 of the ECT, the EU and its member States submitted a statement in

---

[87] RL-0120, *RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. v Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, 6 June 2016, para. 85.

[88] Annulment Reply, para. 248; Transcript (English), 10 June 2021, p. 33, lines 19-25.

[89] Gosalbo Report, p. 23, para. 42.

1997 ("**1997 Statement**")[90] showing that they envisaged that Article 26 should be used for claims by third-country investors and not EU investors.[91] He also drew attention to the fact that Article 36(7) of the ECT provides that the EU and its members States shall vote at the Energy Charter Conference as a single block.[92]

64.  Unfortunately, none of the provisions cited by Professor Gosalbo can support the assertion that the EU member States which are also signatory to the ECT have transferred specific competence over investor-State disputes to the EU. The argument that Article 36(7) of the ECT shows that the EU always acted as a single block is similarly unsupported. In fact, a plain and simple reading of Article 36(7) shows that a REIO may vote on behalf of its member States, but that the REIO "*shall not exercise its right to vote if its member states exercise theirs, and vice versa*". Accordingly, while the EU as REIO could act as a block, member States are always free to withdraw their mandate for the EU to act on their behalf.

65.  Professor Gosalbo's suggestion that the 1997 Statement envisaged that the Article 26 provision was intended for claims by third-country investors and not EU investors is rather puzzling. This Statement was made pursuant to Article 26(3)(b)(ii) which requires that the Contracting Parties under Annex 1D (i.e. those who do not give unconditional consent if a matter has previously been submitted for resolution either to the courts or administrative tribunals of the Contracting Party party to the dispute or in accordance with an agreed dispute settlement procedure) provide a written statement of their policies, practices and conditions in this regard to the Secretariat or the deposit of their instrument of accession in accordance with Article 41.

In that Statement, the EU declared that that:[93]

> *The European Communities and their Member States have both concluded the Energy Charter Treaty and are thus internationally responsible for the fulfilment of the obligations contained therein, in accordance with their respective competences.*
>
> *The Communities and the Member States will, if necessary, determine among them who is the respondent party to arbitration proceedings initiated by an Investor of another Contracting Party. In such case, upon*

---

[90] PE-06, Statement submitted by the European Communities to the Secretariat of the Energy Charter pursuant to Article 26(3)(b)(ii) of the Energy Charter Treaty, Official Journal of the European Communities, L 69/115, 9 March 1998.

[91] Gosalbo Observations, p. 31, para. 66.

[92] Gosalbo Report, p. 25, para. 43.

[93] PE-06, 1997 Statement.

*the request of the Investor, the Communities and the Member States concerned will make such determination within a period of 30 days.*

*[...]*

*Any case brought before the Court of Justice of the European Communities by an investor of another Contracting Party in application of the forms of action provided by the constituent treaties of the Communities falls under Article 26(2)(a) of the Energy Charter Treaty. Given that the Communities' legal system provides for means of such action, the European Communities have not given their unconditional consent to the submission of a dispute to international arbitration or conciliation.*

66. The Statement acknowledges that both the EU and its member States entered into the ECT and accordingly both are responsible for the obligations thereunder in accordance with their respective competences. It also makes clear that should any dispute be brought against the EU, the EU and its member States would then decide who the respondent party would be. This statement is consistent with the observation made at paragraph 64 above that the EU and its member States both independently entered into binding obligations under the ECT. Interestingly, the footnote to this part of the Statement clarifies that: "*This is without prejudice to the right of the investor to initiate proceedings against both the Communities and their Member States.*"[94]

67. It seems clear that the EU anticipated that claims made could be directed at both the EU (as REIO) and/or at a member State, even though the Statement was primarily addressing claims made against the EU as a REIO. A crucial aspect of the Statement lies in the declaration that if any case is brought by any investor against the EU before the CJEU upon the investor's election under Article 26(2)(a) of the ECT, there would be no "*unconditional consent to the submission of a dispute to international arbitration*".[95] This Statement does not in the Committee's view support Spain's position that the EU member States made clear that disputes arising out of the ECT obligations are not referrable to international arbitration. On the contrary, it makes clear that any investor (whether from an EU member State or from outside the EU) retains the right to choose the mode and path of dispute resolution given to it under Article 26(2) of the ECT.

---

[94] PE-06, 1997 Statement, fn. 1.
[95] RL-0001, ECT, Article 26(3)(a).

68. It appears to the Committee that the EU could have at that time made a similar statement to the effect that investors from EU States could only bring their claims before the CJEU or such available dispute settlement within the EU. Absent such, the unconditional consent by each Contracting Party to arbitration should therefore remain undisturbed by any 'implicit' disconnection clause.

69. The Claimants in their oral submissions referred to the *travaux préparatoires* of the ECT to suggest that the proposal by the EU to introduce in the ECT text a disconnection clause was eventually "*rejected*".[96] Spain in its post-hearing submissions drew attention to the European Community's proposal to draft Article 27 of the ECT and the response by Secretary General Clive Jones dated 19 February 1993,[97] and the draft version of the ECT as of 9 February 1993.[98] The draft proposal to amend Article 27 as proposed by the European Community reads: "*In their mutual relations, Contracting Parties which are members of the EC shall apply Community rules and shall not therefore apply the rules arising from this Agreement except insofar as there is no Community rule governing the particular subject concerned.*"[99]

70. In the Committee's view, this proposed draft, if added, would have operated as a disconnection clause and exempted EU member States from many of the obligations in the ECT, including Article 26.

71. The response of the Secretary General is indeed telling. He said: "[The proposal] *is not easy to understand, given the existence of* [Article] *27(6). The Community should be asked to explain its concerns; otherwise suspicions will certainly be aroused.*"[100]

72. Spain accepts that its proposal was not accepted but submits that the text of draft Article 27(6) which eventually became Article 25 renders the proposal unnecessary. It points out both texts contain the opening words "*The provisions of this Treaty shall not be so construed as to oblige*" suggest this:[101]

Draft Article 27(6), 9 February 1993 –

---

[96] Transcript (English), 11 June 2021, p. 76, line 22 - p. 77, line 21.

[97] CL-0366, Note for the Attention of Ambassador Rutten, 19 February 1993.

[98] CL-0364, Note from the Secretariat attaching Revised Draft of Basic Agreement for the European Energy Charter, 9 February 1993.

[99] CL-0366, Note for the Attention of Ambassador Rutten, 19 February 1993, p. 2.

[100] CL-0366, Note for the Attention of Ambassador Rutten, 19 February 1993, p. 1.

[101] Spain's Submission on Costs and Comments on the ECT "*Travaux Préparatoires*", paras. 29-32.

> *(6) The provisions of this Agreement shall not be construed so as to oblige any Contracting Party to extend to another Contracting Party the benefit of any treatment, preference or privilege resulting from the former's membership in any existing or future customs union or free trade area.*

Under Article 25 of the ECT –

> *The provisions of this Treaty shall not be so construed as to oblige a Contracting Party which is party to an Economic Integration Agreement (hereinafter referred to as "EIA") to extend, by means of most favoured nation treatment, to another Contracting Party which is not a party to that EIA, any preferential treatment applicable between the parties to that EIA as a result of their being parties thereto.*

73.   Spain therefore suggests that by these opening words, some aspects of the ECT would not be applicable, namely those relating to "*Economic Integration(s)*" and "*custom union(s) or free trade area(s)*" and that the principle of primacy of EU law between member States would be encompassed within "*any preferential treatment*" or "*privilege*".[102]

74.   The Committee cannot understand the logic of this submission. The texts of both draft Article 27(6) and the final Article 25 of the ECT seek merely to limit the privileges and preferential treatment under the EIA to member States. They do not say that Article 26 is not applicable or that the EU law has primacy over the terms and obligations of the ECT. Contrary to what Spain is suggesting, the response of Secretary General Clive Jones could not be interpreted to support this position, as he had bluntly said "*suspicions will certainly be aroused*" if the EC could not explain the object of the proposal. The fact that the proposal was debated and rejected is a matter of record and requires no further consideration.[103]

75.   The Committee is of the view that properly construed, Article 26 of the ECT applies to claims by any investor from a Contracting Party (including an investor from an EU member State) against another EU member State. If indeed the EU had not so intended, it did not make clear its position at the time of or shortly after ratifying the ECT as it did in the 1997 Statement in relation to the matters which investors bring before the CJEU.

---

[102] Spain's Submission on Costs and Comments on the ECT "*Travaux Préparatoires*", para. 32.

[103] CL-0367, OECD Memorandum, European Energy Charter Treaty Plenary of 7-11 March 1994, 15 March 1994, p. 4.

- **Achmea and EU States Declarations 2019**

76.    The EC has drawn the Committee's attention to the Declaration of the Representatives of the Governments of the Member States on the Legal Consequences of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union dated 15 January 2019 ("**Declaration of 15 January 2019**"),[104] in which member States, reacting to the Achmea Judgment, declared that they would undertake to:

> 2.    [...] *request the courts, including in any third country, which are to decide in proceedings relating to an intra-EU investment arbitration award, to set these awards aside or not to enforce them due to a lack of valid consent.*
>
> 3.    [...] *inform the investor community that no new intra-EU investment arbitration proceeding should be initiated.*
>
> 4.    [...] *take steps under their national laws governing such undertakings, in compliance with Union law, so that those undertakings withdraw pending investment arbitration cases.*
>
> 5.    [...] *terminate all bilateral investment treaties concluded between them by means of a plurilateral treaty or, where that is mutually recognised as more expedient, bilaterally.*
>
> [...]

77.    Spain and the EC submit that in the interpretation of treaties, subsequent agreements by parties reflect a more accurate understanding of what they intended when the treaty was entered into. They rely on Article 31(3) of the VCLT: "*There shall be taken into account, together with the context: (a) any subsequent agreement between the parties regarding the interpretation of the treaty or the application of its provisions* [...]".[105]

78.    The EC in its written submission suggests that the *travaux préparatoires* of the VCLT intended for such subsequent agreements to have *ab initio* effect as of the date of entry into force of the treaty. It cites the International Law Commission ("**ILC**") Draft Articles on the Law of Treaties ("**ILC Report on Draft VCLT**") comments on draft Article 27 (which eventually became Article 31 of the VCLT).[106]

---

[104] RL-0168, Declaration of 15 January 2019.
[105] RL-0012, VCLT.
[106] EC's Submission, paras. 25-26.

28

79.     The concept of having the original makers of the instrument explaining or clarifying what they meant is of course a tool of interpretation that could be resorted to when ambiguity or alternative meanings may be ascribed to the treaty provisions. This starting point of interpretation of treaty provision as in any agreement is "*to endeavour to give effect to them in their natural and ordinary meaning in the context in which they occur. If the relevant words in their natural and ordinary meaning make sense in their context, that is an end of the matter*"[107].

80.     The ILC Report on Draft VCLT in its commentary on draft Article 27 points out that:

> *(11) The article as already indicated is based on the view that the text must be presumed to be the authentic expression of the intentions of the parties; and that, in consequence, the starting point of interpretation is the elucidation of the meaning of the text, not an investigation* ab initio *into the intentions of the parties.*[108]
>
> [...]
>
> *(14) [...] an agreement as to the interpretation of a provision reached after the conclusion of the treaty represents an authentic interpretation by the parties which must be read into the treaty for purposes of its interpretation.*[109]

81.     Article 31 of the VCLT directs that treaty provisions and terms be interpreted in good faith with their ordinary meaning "*in their context*" in the light of the treaty's "*object and purpose*" as ascertained from the preamble, the annexes and any other instruments made in connection with the treaty. It is an interpretation approach that is generally accepted and uncontroversial. The key word in this context is "*interpretation*" of the intention of the parties at the time the treaty was concluded and not an avenue to substitute or re-write the provisions of the treaty.

82.     Spain submits that the Declaration of 15 January 2019 is an interpretative declaration between the States making such declaration, which in the case of Spain and the United Kingdom creates bilateral reciprocal obligations within the sole competence of those two States, requiring no consent from those who did not sign the document. As discussed at paragraph 50 above, this Committee does not accept that Spain should be permitted belatedly to raise such an issue with regard to the First Claimant, which is a dependency of the British crown and to which EU

---

[107] CL-0214, ILC Report on Draft VCLT, Commentary on Article 27, para. 12 quoting I.C.J Advisory Opinion Competence of the General Assembly for the Admission of a State to the United Nations (I.C.J. Reports 1950), p. 8.

[108] CL-0214, ILC Report on Draft VCLT, Commentary on Article 27, para. 11.

[109] CL-0214, ILC Report on Draft VCLT, Commentary on Article 27, para. 14

Treaties extend in accordance with Article 355(3) of the TFEU. As for the Second Claimant, the Grand Duchy of Luxembourg in fact signed a different declaration dated 16 January 2019 ("**Declaration of 16 January 2019**"),[110] limiting its position only to investment arbitration proceedings brought under bilateral investment treaties, thus excluding the type of proceedings brought under the ECT. On these purely formal bases, Spain's reliance on both these declarations to support its assertion (i.e. that the Tribunal lacks jurisdiction on the ground that the investors' States had agreed that claims by its investors are not referrable under Article 26 of the ECT to ICSID arbitration) must necessarily fail.

83. More substantively, these declarations were drawn up as a consequence of the CJEU's decision in the Achmea Judgment to elevate EU member States' obligations under EU law over those arising from other treaties. They are clearly not an interpretation of the ECT or of provisions of other treaties earlier ratified by EU member States.

84. In particular, the Declaration of 15 January 2019 containing the statement that "*An arbitral tribunal established on the basis of investor-State arbitration clauses lacks jurisdiction, due to a lack of a valid offer to arbitrate by the Member State party to the underlying bilateral investment Treaty*"[111] stands in stark contrast to the clear and express consent given under Article 26(3) of the ECT, where 'each Contracting Party' (i.e. including each of the EU member States and the EU as REIO) has given its offer to arbitrate by "*its unconditional consent to the submission of a dispute to international arbitration*".

85. This disturbing statement is fortunately mitigated by the observation that arbitral tribunals have interpreted the ECT as containing an investor-State arbitration clause applicable between member States that "*would be incompatible with the* [EU] *Treaties and thus would have to be disapplied*".[112] In other words, the signatory States acknowledge that they would for that reason henceforth 'disapply' such obligations to arbitrate under Article 26 of the ECT in order to give primacy to their TFEU obligations. Nothing in the Declaration of 15 January 2019 indicates that it is an interpretation of Article 26 of the ECT or that it was never the intention of the EU member States for Article 26 to apply to intra-EU investor-State arbitrations. If indeed

---

[110] Gosalbo Report, Exhibit 19: Declaration of the Representatives of the Governments of the Member States on the Enforcement of the Judgment of the Court of Justice in *Achmea* and on Investment Protection in the European Union, 16 January 2019.

[111] RL-0168, Declaration of 15 January 2019, p. 1.

[112] RL-0168, Declaration of 15 January 2019, p. 2.

that was the intention of the EU member States when it concluded the ECT, there would then be no necessity to 'disapply'.

86. In the Committee's view, the Declaration of 15 January 2019 would at its highest serve as an express reservation limiting its applicability prospectively. To allow it to apply retrospectively would prejudice investors (as third-party beneficiaries of such promises made by host States) who had relied on them when they made their investments.

87. The Declaration of 16 January 2019 (to which Luxembourg. the Second Claimant's home state, is signatory) is even clearer. The EU member States who are signatories to this merely stated their position in relation to bilateral investment treaties and take no stand with regard to the investor-State arbitrations arising out of the ECT, pending any further CJEU decision on the claims arising out of the ECT. It contains no statement with regard to any lack of jurisdiction of intra-EU investor-State arbitral tribunals under the ECT. Like the Declaration of 15 January 2019, it does not and cannot be said to be an instrument that could assist in the interpretation of Article 26 of the ECT.

88. In the Committee's view, both declarations therefore do not displace the consent given by the ECT signatory States, including the EU member States, under Article 26 of the ECT. The Tribunal had made its decision on jurisdiction quite justifiably, not relying on any internal EU mechanisms and preferences but independently on the provisions of the ECT. Its decision is more than tenable and fully supportable. There can be no suggestion that it had done so in excess of powers.

- ### CJEU's Recent Komstroy Judgment

89. The Committee has been urged by Spain to consider the recent CJEU decision in *Republic of Moldova v Komstroy LLC* ("**Komstroy Judgment**").[113] As this decision was released only on 2 September 2021 and is concerned with the specific issue of intra-EU disputes being arbitrated under Article 26 of the ECT (the same provision under which this arbitration was commenced), the Committee decided that it would be appropriate to consider the judgment's implications.

90. In the Komstroy Judgment, the proceedings before the CJEU arose from an application by the Republic of Moldova to vacate the arbitral award made against it by an *ad hoc* arbitral tribunal seated in Paris constituted under the UNCITRAL Rules of Arbitration in accordance with Article

---

[113] *Republic of Moldova v Komstroy LLC*, Case C-741/19, CJEU Judgment, 2 September 2021.

26(3)(b) of the ECT. The dispute appears to have arisen out of the supply and sale of electricity from an Ukrainian producer through a chain of intermediaries (including one which was incorporated in the British Virgin Islands) in accordance with DAF Incoterms, in which delivery was to take place at the border between Ukraine and Moldova, on the Ukrainian side. Failing to obtain redress before the Moldovan and Ukrainian courts, Komstroy, the successor in law of the Ukrainian producer Energoalians, commenced the arbitration asserting Moldova's failure to comply with its international undertakings. By judgment of 12 April 2016, the Paris Court of Appeal annulled the arbitral award on the ground that the arbitral tribunal had wrongly declared that it had jurisdiction. The French Court of Cassation, by judgment of 28 March 2018, set aside the Paris Court of Appeal judgment of 12 April 2016, on the ground that that court had interpreted the concept of 'investment' by adding a condition to it which was not provided for in the ECT, and referred the parties back to the Paris Court of Appeal sitting in a different composition.

91. The Paris Court of Appeal decided to stay the proceedings and referred the matter to the CJEU for a preliminary ruling on whether the subject matter in dispute *viz.* sale of electricity was an 'investment'; whether the element of 'economic contribution' would be required to constitute an 'investment'; whether acquisition of interest from a non-contracting State constitutes an investment and whether delivery at the producer's border constitutes an investment in 'the area of another Contracting State'.

92. Before the CJEU, the Hungarian, Finnish and Swedish governments and Komstroy were of the view that the CJEU did not have jurisdiction to provide answers to the questions referred because EU law is inapplicable to the dispute at issue in the main proceedings as the parties to that dispute are external to the EU. The CJEU's response to this was that:[114]

> i. The referring court had sought an interpretation of Articles 1(6) and 26(1) of the ECT, which could be relevant to situations falling within the scope of EU law. It would be in the interest of the EU "*in order to forestall future differences of interpretation, that provision should be interpreted uniformly, whatever the circumstances in which it is to apply*".[115] Such could come where an application to set aside an award was pending

---

[114] Komstroy Judgment, paras. 28-32.
[115] Komstroy Judgment, para. 29.

before a court of a member State or where proceedings were bought before a court of a member State in accordance with Article 26(2)(a) of the ECT.

ii.  The parties had elected to commence arbitration in Paris under the UNCITRAL Arbitration Rules, rendering French law the *lex fori*. This therefore entailed the application of EU law.

93.  The CJEU then went on to rule on the first question posed and held that the dispute of a mere supply contract and commercial transaction cannot, in itself, constitute an 'investment' within the meaning of Article 1(6) of the ECT, regardless of whether an economic contribution is necessary in order for a given transaction to constitute an investment.[116] It further ruled that "*the acquisition, by an undertaking of a Contracting Party to that treaty, of a claim arising from a contract for the supply of electricity, which is not connected with an investment, held by an undertaking of a third State against a public undertaking of another Contracting Party to that treaty, does not constitute an 'investment' within the meaning of those provisions*".[117]

94.  The CJEU did not deem it necessary to consider the other two questions. In its discussions, it instead spent considerable effort in addressing the question of intra-EU investor-State disputes under the ECT and acknowledged that the case before it did not involve parties from member States.[118] Reiterating its position taken in the Achmea Judgment, the CJEU emphasised that:

> In order to ensure that those specific characteristics and the autonomy of the legal order thus created are preserved, the Treaties have established a judicial system intended to ensure consistency and uniformity in the interpretation of EU law. In accordance with Article 19 TEU, it is for the national courts and tribunals and the Court to ensure the full application of that law in all the Member States and to ensure effective judicial protection of the rights of individuals under that law, the Court having exclusive jurisdiction to give the definitive interpretation of that law.[119]

95.  Holding that arbitral tribunals constituted under Article 26(4) and (6) of the ECT are not a 'court or tribunal of a Member State', the CJEU went on to state that:

> the exercise of the European Union's competence in international matters cannot extend to permitting, in an international agreement, a provision according to which a dispute between an investor of one

---

[116] Komstroy Judgment, para. 79.
[117] Komstroy Judgment, para. 85.
[118] Komstroy Judgment, para. 41. Ukraine and the Republic of Moldova are not member States of the EU.
[119] Komstroy Judgment, para. 45.

> *Member State and another Member State concerning EU law may be removed from the judicial system of the European Union such that the full effectiveness of that law is not guaranteed.*[120]

96.   It reasoned that:

> *It follows that, although the ECT may require Member States to comply with the arbitral mechanisms for which it provides in their relations with investors from third States who are also Contracting Parties to that treaty as regards investments made by the latter in those Member States, preservation of the autonomy and of the particular nature of EU law precludes the same obligations under the ECT from being imposed on Member States as between themselves.*

> *In the light of the foregoing, it must be concluded that Article 26(2)(c) ECT must be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State.*[121]

97.   On the Committee's reading of the Komstroy Judgment, the Court is not in fact dealing with a case whose facts had required it to consider the specific question of the scope of Article 26 and its application to intra-EU investor-State claims. The Committee is fully conscious of the desire of the CJEU to state that EU law should be interpreted and applied consistently and that it is so charged with that responsibility. However, that objective could, in the Committee's view, only be achieved by a subsequent amendment to the ECT provisions, adding a disconnection clause or by permitting other customarily acceptable declarations and acceptances by other parties to the ECT.[122] It should not, with respect, be made by a unilateral judicial assertion by the CJEU that it alone has the monopoly to finally interpret the ECT provisions which has a direct impact on third-party investors who have relied on the plain and clear provisions of the ECT and unconditional consent to arbitration given by the Contracting States. The Committee is therefore not persuaded that the Komstroy Judgment provides support to suggest that the Tribunal had acted in excess of its powers.

---

[120] Komstroy Judgment, para. 62.

[121] Komstroy Judgment, paras. 65-66.

[122] See, e.g., Agreement for the termination of Bilateral Investment Treaties between Member States of the European Union, L 169, 29 May 2020. This agreement expressly excludes the ECT, as specified in the preamble, which states that "*this Agreement addresses intra-EU bilateral investment treaties; it does not cover intra-EU proceedings on the basis of Article 26 of the Energy Charter Treaty. The European Union and its Member States will deal with this matter at a later stage*": https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:22020A0529(01)&from=EN

98.    This is even more so if the arbitration is one that is submitted under the ICSID Convention which has no national juridical seat and thus not subject to national court supervision. ICSID awards are therefore not subject to setting aside or vacatur provisions of national laws. Contracting Parties to the Convention have each undertaken to uphold and enforce awards made thereunder unconditionally.[123]

99.    Spain and the EC may have found themselves presently in a 'surreal' situation, in which a treaty signed with the intention to promote unified policies regarding energy production and trade is being used to limit their competence to determine their own intra-EU policies. The Committee is sympathetic to their position. Nevertheless, given the unconditional consent of Contracting Parties to arbitration,[124] an ICSID tribunal is not in any position to resolve this contradiction, much less an *ad hoc* committee with limited competence to review the procedure and/or award on narrowly circumscribed grounds of annulment.

100.   Therefore, even if this Committee agrees with the diagnosis of Spain, it does not follow that the solution is the total or partial annulment of the award. On the contrary, the right thing is what both Spain and the European Union are already doing: to renegotiate the ECT to make it more compatible with the intra-European policies.[125]

### (3)    Failure to Apply or Misapplication of the Appropriate Law

#### a.    *Spain's Position*

101.   According to Spain, the Tribunal did not apply the international standard correctly by basing its decision on the substance of Article 10(1) of the ECT.[126] In this regard, it contends that "*there are numerous decisions of Annulment Committees that openly maintain that an inadequate*

---

[123] See Article 54 of the ICSID Convention.

[124] Save for the exceptions mentioned above.

[125] See, e.g., Working Document dated 2 March 2020 from the European Commission to the Trade Policy Committee (Services and Investment) regarding the Energy Charter Treaty Modernisation: Draft EU proposal: https://www.politico.eu/wp-content/uploads/2020/03/Proposal_Treaty.pdf?utm_source=POLITICO.EU&utm_campaign=75bec6754f-EMAIL_CAMPAIGN_2020_03_25_06_46&utm_medium=email&utm_term=0_10959edeb5-75bec6754f-189693589.

See also, regarding investment disputes settlement, the proposal to create a Multilateral Investment Court to adjudicate controversies over the ECT, including the Decision of the Energy Charter Conference dated 6 October 2019, regarding Adoption by Correspondence — Policy Options for Modernisation of the ECT: https://www.energycharter.org/fileadmin/DocumentsMedia/CCDECS/2019/CCDEC201908.pdf.

[126] Memorial, para. 70.

*understanding of the applicable law may lead to an error in the determination of the applicable law, which may constitute a ground for annulment of the arbitral award*".[127]

102. Specifically, Spain argues that EU law had to be applied "*to determine the scope of investors' rights*",[128] and that such law should have been applied to analyse the true legitimate expectations of the Claimants. It explains that the EC, which is "*the only institution with competence to decide on State Aid, has already categorically declared that* [...] *the subsidies claimed by* [the Claimants] *in the arbitration* [...] *are State Aid*".[129] It submits that the relevant State aid scheme had not been notified to the EC, which meant that such scheme infringed the State aid rules, and that therefore the Claimants had no legitimate expectations, given that legitimate expectations are excluded in such a case of illegality.[130]

103. Spain also adopts the position that EU member States are obliged to take into account the Guidelines on State aid for environmental protection and energy (as adopted by EC Communications 2008/C 82/01 and 2014/C 200/01), which state that subsidies and balance sheet exemptions should be phased out from 2000 onwards;[131] that EU member States "*retain at all times the possibility of modifying and terminating State Aid regimes to avoid situations of over-remuneration and to deal with unexpected events*";[132] and that the principle of proportionality in respect of State aid guidelines for environmental protection means that "*the aid amount must be limited to the minimum needed to achieve the environmental protection sought*".[133] It points out that had the Tribunal taken these elements into account, the outcome of the main proceeding would have been different.[134] Further, it reiterates that the Tribunal "*did not question that EU law* [...] *was international law*", but nonetheless "*preferred to ignore European Union law, which it did not apply to the substance of the case*".[135]

104. Spain refers to its previous arguments made in relation to the primacy of EU law, adding that EU law is also autonomous and further arguing that it is not necessary for a disconnection

---

[127] Annulment Reply, para. 172.

[128] Memorial, para. 143.

[129] Memorial, para. 139.

[130] Memorial, paras. 144-148.

[131] Memorial, para. 137.

[132] Memorial, paras. 138 and 149.

[133] Memorial, para. 151, citing R-0088, Community guidelines on State aid for environmental protection, EC Communication 2008/C 82/01, 1 April 2008 ("**Community Guidelines**"), para. 31.

[134] Memorial, paras. 150, 152 and 161.

[135] Memorial, paras. 156-160.

clause to be expressly stipulated, "*both in relation to past treaties and in relation to future treaties*".[136] In its words, disconnection is "*inherent to the process of regional integration and does not require the acceptance or express act of any member state or third state and is carried out solely by the fact that the EU has a legal system in the area to which the convention refers, which must always be applied as a matter of priority*".[137] Spain contends that these three elements have become customary international law "*through practice*", citing other international conventions to support its position, and submits that the situation is the same as regards *opinio iuris*.[138] Therefore, it concludes, EU law is part of international law and "*must be applied not only to decide on the jurisdiction of the Tribunal, but also to assess the facts and merits of the dispute*".[139]

105.   Similarly, Spain points out that general principles of law make it clear that the Award should have taken into account EU law, since EU law constitutes rules that must be respected by EU member States.[140]

106.   In the alternative, Spain submits that there has been a "*gross misapplication of EU law*" because "*the substance of the dispute affected a basic institution of EU law, such as State Aid*", and yet the Award "*completely ignored the importance of the State Aid legal regime*".[141] It also stresses that this is not the first time it is making this submission.[142]

107.   In response to the Claimants' arguments, Spain clarifies that it "*is not asserting contradictory claims by pointing out that EU law has been disregarded on the one hand, and wrongly applied on the other, given that the relevance of EU law to the issues in dispute is not unique but concerns multiple issues, both jurisdictional and substantive*".[143] In reply to the precedents referred to by the Claimants, it emphasises that there is no hierarchy amongst arbitral awards, no binding value of precedents and no "*rule of temporal preference*",[144] contending instead that "*cases that are being invoked* [by the Claimants] *as precedents lack similarity and applicability*".[145] As

---

[136] Annulment Reply, paras. 183-250.
[137] Annulment Reply, para. 248.
[138] Annulment Reply, paras. 183-250.
[139] Annulment Reply, para. 178.
[140] Annulment Reply, paras. 251-254.
[141] Annulment Reply, paras. 255-279.
[142] Annulment Reply, para. 263.
[143] Annulment Reply, para. 179.
[144] Annulment Reply, para. 173.
[145] Annulment Reply, para. 175.

regards Professor Gosalbo's report, Spain argues that such report "*does not constitute factual evidence [...] but is an expert report comparable to a legal authority aimed at providing light to the Committee on specific and controversial rules in the underlying arbitration*".[146]

### b. Claimants' Position

108. According to the Claimants, the starting point to determine the law applicable to the merits is Article 42(1) of the Convention and Article 26(6) of the ECT. In this regard, they point out that there is no reference in the ECT to national laws or EU law, and submit that where the ECT is silent, customary international law and general principles of international law should be applicable.[147]

109. The Claimants contend that Spain's submissions are contradictory and unclear. They point out the following in response:[148]

    i. Article 351 of the TFEU "*confirms that EU law cannot invalidate treaties which the Member States have concluded on their own*".[149]

    ii. Article 16 of the ECT "*requires that, where two or more Contracting Parties have entered into an international agreement whose terms concern the same subject matter, the treaty which is more favourable to the investor will prevail*".[150]

    iii. Spain's argument on 'international custom' was never made in the main proceeding and is moreover erroneous because it is based on the false premise that "'*custom' or 'repeated practice' in relation to <u>other</u> treaties play a role in the interpretation of the ECT*" (emphasis in original). Interpretation of Article 26 of the ECT, which constitutes the main issue, requires application of the VCLT instead.[151]

    iv. In respect of Spain's stated alternative case that the Tribunal misapplied EU law, "*this is not a matter of advancing an alternative argument. Spain is asserting annulment on two contradictory bases.*"[152] The Claimants further argue that misapplication of the law

---

[146] Annulment Reply, para. 167.
[147] Annulment Rejoinder, paras. 165-169.
[148] Counter-Memorial, paras. 177-178; Annulment Rejoinder, paras. 156-164.
[149] Annulment Rejoinder, paras. 119-120.
[150] Annulment Rejoinder, paras. 121-122.
[151] Annulment Rejoinder, paras. 172-181.
[152] Annulment Rejoinder, para. 182.

is also not a valid ground for annulment under Article 52(1)(b), citing the ICSID Background Paper,[153] and contend that "*Spain is not actually asserting that the Tribunal misapplied the law, but rather, that it should have appreciated the facts differently than it did*", which is not a valid ground for annulment either.[154]

v. Spain's argument that State aid law should have been considered was not made in the main proceeding and in fact runs counter to its previous position on State aid, and therefore the Tribunal could not have misapplied EU law in this respect since the argument was never put before it. The Claimants also point out that the issue of legitimate expectations is a question of fact, not applicable law, and that in any event, having accepted Spain's case on legitimate expectations, the Tribunal did not need to analyse the Claimants' legitimate expectations concerning State aid law.[155]

110. The Claimants argue that any excess of powers by the Tribunal could not have been 'manifest' because the Tribunal's conclusions are in line with case law.[156] On the contrary, they emphasise that Spain has not shown why the Tribunal's conclusions in this regard are untenable and consequential, such as to warrant annulment.[157]

## c. *Committee's Analysis*

111. A failure to apply the proper law could be a ground for annulment under Article 52(1)(b) of the ICSID Convention. In general terms, different *ad hoc* committees have established that a manifest excess of powers only occurs when the tribunal *completely fails* to apply the proper law, e.g. when parties agree on the applicable law, and the tribunal disregards such law. In contrast, an *error* in the application of the proper law does not always satisfy Article 52(1)(b)'s threshold. Many committees have stated that an error only amounts to a manifest excess of powers if it consists in a *gross or egregious misapplication or misinterpretation* of the applicable law.[158]

---

[153] Annulment Rejoinder, para. 183.

[154] Annulment Rejoinder, para. 185.

[155] Annulment Rejoinder, paras. 191-200.

[156] Counter-Memorial, paras. 190-195 and 207-210; Annulment Rejoinder, paras. 198-199.

[157] Counter-Memorial, paras. 179-180; Annulment Rejoinder, para. 153.

[158] RL-0123, *Hussein Nuaman Soufraki v The United Arab Emirates*, ICSID Case No. ARB/02/7, Decision of the *Ad Hoc* Committee on the Application for Annulment of Mr. Soufraki, 5 June 2007, para. 86; RL-0124, *Sempra Energy International v Argentine Republic*, ICSID Case No. ARB/02/16, Decision on the Argentine Republic's Request for Annulment of the Award, 29 June 2010, paras. 164-165; RL-0175, *M.C.I. Power Group, L.C. and New Turbine, Inc. v Republic of Ecuador*, ICSID Case No. ARB/03/6, Decision on Annulment, 19 October 2009, para. 43; RL-0161, *Occidental Petroleum Corporation and Occidental*

112. As mentioned, if the challenging party claims an error in the application or interpretation of the proper law, it must clearly demonstrate that such error had a material or significant impact on the outcome of the case.

- **Application of EU Law**

113. In the Committee's view, the Tribunal did not disregard EU law. The Tribunal's Decision on Responsibility and on the Principles of Quantum dated 30 November 2018 ("**Decision on Responsibility**") provides an illustration of this:

> *if there is an incompatibility or discrepancy between the ECT on the one hand and EU law on the other hand, the former must prevail. This being said, the Tribunal also noted in its Decision on Jurisdiction that "to the extent possible, in case two treaties are, equally or unequally, applicable, they must be interpreted in such a way as not to contradict each other." Moreover, the present Tribunal agrees with the Respondent that "EU Law reflects the common understanding of 28 countries in such an important matters* [sic] *as legitimate expectations [and, more generally, the interpretation of the ECT], that cannot be disregarded by the Tribunal [...]"*[159]

114. The above makes clear the Tribunal did not disregard EU law. On the contrary, the Tribunal stated in no uncertain terms that EU law "*cannot be disregarded by the Tribunal*". Spain considers the first sentence of the passage to be an indication that "*the Tribunal preferred to ignore European Union law*".[160] The Committee does not agree with this assessment. That sentence, far from ignoring EU law, is in fact an exercise of legal reasoning, which any tribunal must do in the event of conflict between different applicable laws or norms. The same can be said regarding the following statement made by the Tribunal in the same decision: "*If the EU or any of its Member States have violated the laws of State responsibility because it is a party to treaties that contain incompatible commitments, that is a matter for it to resolve.*"[161]

115. The Committee is also satisfied that the Tribunal's analysis that followed thereafter is coherent with the statements quoted above. When assessing the different elements encompassed in Spain's obligation to accord Fair and Equitable Treatment under Article 10 of the ECT, the

---

*Exploration and Production Company v Republic of Ecuador*, ICSID Case No. ARB/06/11, Decision on Annulment of the Award, 2 November 2015, para. 56.

[159] RL-0121, Decision on Responsibility, para. 210.

[160] Memorial, para. 157.

[161] RL-0121, Decision on Responsibility, para. 212.

Tribunal clearly stated that such obligation must not be read in isolation but rather analysed according to the specific legal regime under which the investment was made.[162]

116. In this case, the Claimants' investments were made under several legal instruments, including Royal Decree 661/2007 ("**RD 661/2007**"), which were put in place to create a regulatory framework compatible with EU regulations concerning renewable energy. The Tribunal in fact set out an exhaustive description of the Spanish energy regime, which had undergone changes to satisfy Spain's obligations under international instruments, such as the EU's Directive 2001/77/EC on the promotion of electricity produced from renewable sources.[163]

117. In light of the above, it could hardly be said that the Tribunal disregarded or 'ignored' EU law or its application when deciding the merits of the dispute. Contrary to what Spain argues, the Tribunal applied a law that was assumed to be compatible with EU law. Therefore, the Committee is unable to conclude that the Tribunal manifestly exceeded its powers by misapplying or failing to apply the proper law.

- **EU State Aid**

118. Turning then to the issue of State aid, to which the parties dedicated much attention in their submissions. In the Committee's view, EU law on State aid was not applicable to the dispute, and even if it was, it would have not been of consequence to the eventual outcome of the case (and therefore any excess would not be 'manifest').

119. Spain's position on this was based on the documents submitted in the arbitration after the hearing on the merits, primarily the decision issued by the EC on the 'State Aid Framework for Renewable Sources' of the Kingdom of Spain ("**State Aid Decision**").[164] This latter document analysed whether Spain's scheme of subsidies was compatible with the Guidelines on State aid for environmental protection and energy 2014-2020 (EC Communication 2014/C 200/01) ("**EEAG**")[165] and concluded that it was.

---

[162] RL-0121, Decision on Responsibility, Part (VI)(C). See, e.g., para. 314.

[163] RL-0121, Decision on Responsibility, Part (IV)(A).

[164] RL-0147, Decision of the European Commission regarding the support for electricity generation from renewable energy sources, cogeneration and waste, State Aid SA.40348 (2015/NN), 10 November 2017.

[165] R-0089, Guidelines on State Aid for environmental protection and energy 2014-2020, Communication from the European Commission (2014/C 200/01), Official Journal of the European Union, 28 June 2014.

120. Relying on this document, Spain maintains that EU law had to be applied to determine (i) the legitimate expectations of the Claimants, (ii) the scope of investors' rights, and (iii) the proportionality of the compensation to be awarded. It argues that a proper application of EU law would have led the Tribunal to conclude that the ECT is compatible with EU law on State aid.

121. The only reference that the Tribunal made to the State aid regime concerned the nature of the dispute: "*there can be no doubt that the present case bears, at least in part, upon the payment of subsidies or State aid*".[166] While it is true that the Decision on Responsibility does not expressly consider Spain's submissions on State aid, the Committee is not convinced that the outcome would have been different if such submissions had been considered, for the reasons that follow.

- **The legitimate expectations of the Claimants**

122. Contrary to the requirements of EU State aid rules, RD 661/2007 was not notified to the EC. According to Spain, this means that the scheme under which the Claimants invested was unlawful, and any expectations were therefore precluded.[167]

123. Spain cites *BayWa v Spain*[168] to support the argument that the subsidies granted to the Claimants constituted State aid, and *Blusun v Italy*[169] to make the point that the legality of subsidies should be considered when analysing investors' expectations. Neither of these cases assists Spain's position, *viz.*:

   i. Although *Baywa* did qualify the subsidies granted by Spain to energy producers as State aid, it also stated that "[i]*n an international forum such as the present one, a host State may not rely on its domestic law as a ground for non-fulfilment of its international*

---

[166] RL-0121, Decision on Responsibility, para. 249.

[167] In this matter, the EC wrote that "*where a Member State grants State aid to investors, without respecting the notification* [...] *obligation of Article 108(3) TFEU, legitimate expectations with regard to those State aid payments are excluded*": RL-0147, State Aid Decision, para. 158. The EC cited the case law of the CJEU which stated: "*In view of the mandatory nature of the supervision of State aid by the Commission under Article [108] of the Treaty, undertakings to which aid has been granted may not, in principles,* [sic] *entertain a legitimate expectation that the aid is lawful unless it has been granted in compliance with the procedure laid down in that article. A diligent businessman should normally be able to determine whether that procedure has been followed.*": RL-0147, State Aid Decision, footnote 64.

[168] RL-0152, *BayWa r.e. AG v Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019.

[169] RL-0117, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016.

*obligations*".[170] In other words, the application of domestic law cannot alter the way in which international obligations are to be interpreted or fulfilled.

ii. The reason why *Blusun* considered the legality of subsidies was not to dismiss the investors' expectations, but to recognise their trust in the system, notwithstanding that the subsidies were unlawful. In fact, *Blusun* considered that if subsidies are granted unlawfully, and the State needs to modify them, the State must have "*due regard to the reasonable reliance interests of recipients who may have committed substantial resources on the basis of the earlier regime*".[171]

124. The duty to notify State aid is incumbent on member States. Both Spain[172] as well as the EC[173] recognise this. This being the case, why then should the risk of non-compliance be transferred to investors, here the Claimants? As the tribunal in *Cavalum v Spain* stated, "*there is no necessary connection between an investor's legitimate expectation of a reasonable rate of return and a failure by the State to notify state aid*".[174]

125. Moreover, the TFEU assigns the consequence of an unlawful scheme to Spain itself. If the EC finds that a State aid scheme notified pursuant to Article 108 is not compatible with the internal market, the State concerned is obliged to abolish or alter such aid. Article 108(2) goes so far as to provide:

> "*If the State concerned does not comply with this decision within the prescribed time, the Commission or any other interested State may [...] refer the matter to the Court of Justice of the European Union direct.*"[175]

---

[170] RL-0152, *BayWa r.e. AG v Kingdom of Spain*, ICSID Case No. ARB/15/16, Decision on Jurisdiction, Liability and Directions on Quantum, 2 December 2019, para. 569(a).

[171] RL-0117, *Blusun S.A., Jean-Pierre Lecorcier and Michael Stein v Italian Republic*, ICSID Case No. ARB/14/3, Award, 27 December 2016, para. 319(5).

[172] R-0451, Spain's Counter-Memorial on the Merits dated 15 July 2016, para. 708.

[173] The State Aid Decision concluded that the new scheme constituted State aid within the meaning of Article 107(1) of the TFEU: RL-0147, State Aid Decision, para. 88. Since Spain notified the EC (on 22 December 2014) of the aid after it started implementing the scheme (on 11 June 2014), the EC found that "*Spain has therefore breached the stand-still obligation provided for in Article 108(3) TFEU* [to notify]": RL-0147, State Aid Decision, para. 89.

[174] CL-0352, *Cavalum SGPS, S.A. v Kingdom of Spain*, ICSID Case No. ARB/15/34, Decision on Jurisdiction, Liability and Directions on Quantum, 31 August 2020, para. 611.

[175] RL-0144, Consolidated versions of the Treaty on European Union and the Treaty on the Functioning of the European Union (2012/C 326/01), Official Journal of the European Union, 26 October 2012, Article 108(2).

126. Here, RD 661/2007 under which the Claimants made their investments was not notified, so it was not qualified by the EC as State aid. The State Aid Decision only assessed the notified scheme, which was applicable in Spain since 11 June 2014.[176]

127. In this regard, although the State Aid Decision did not assess RD 661/2007 *per se*, it dealt with the possibility of an arbitral award granting compensation to an investor based on that regime and established that such compensation would constitute State aid by itself.[177] According to the EC, in this scenario, Spain would still be subject to the obligations under Article 108.

128. In view of the above, the omission to notify the subsidies is only attributable to Spain alone and cannot affect the Claimants' expectations. It follows that the Tribunal would not need to analyse the Claimants' rights as investors with reference to EU law.

- **The scope of investors' rights**

129. Spain maintains that EU law was relevant to determine the scope of investors' rights. It explains that under the State aid regime, EU member States always retain the possibility to modify or even terminate a particular scheme to avoid situations of over-remuneration or deal with unexpected events. [178] In this case, Spain had to replace the scheme to keep up with technological changes and economic circumstances.[179] Accordingly, since the possibility was always open to Spain to put an end to the scheme or replace it (as Spain did), the Claimants never had an everlasting right to State aid subsidies.

130. The competence of Spain to modify the investment regime was extensively addressed by the Tribunal, particularly in Part (VI)(C)(b)(1) under 'Stability and Predictability'.[180] The Tribunal stated that (i) respect for the stability principle had to be addressed according to the standard under the ECT, (ii) Claimants did not have an acquired right to an immutable regime, (iii) under RD 661/2007, Spain had the power to modify the regime, and (iv) Spain also had the obligation

---

[176] RL-0147, State Aid Decision, para. 156: "*As Spain has decided to replace the premium economic scheme with the notified aid measure it is not relevant for the scope of this decision to assess whether the originally foreseen payments under the previous schemes would have been compatible or not.*"

[177] RL-0147, State Aid Decision, para. 165.

[178] Memorial, para. 149.

[179] See RL-0160, Response from the European Commission 2520/2014 to the request for investigation by Miguel Angel Martínez Aroca (Spanish), on behalf of the National Association of Renewable Energy Producers and Investor (ANPIER), 29 February 2016.

[180] RL-0121, Decision on Responsibility, paras. 314-330.

"*to create a stable environment* [that] *excludes any unpredictable radical transformation in the conditions of the investments*".[181]

131. The question then was whether the modifications put in place by Spain constituted an 'unpredictable radical transformation in the conditions of the investments'. For this purpose, the Tribunal analysed the conditions under which the investments were made and concluded that "*the guarantee of 'reasonable return' or 'reasonable profitability' was the main specific commitment of Spain* vis-à-vis *the investors*".[182] This was the criterion adopted to determine the scope of investors' rights.

132. The same criterion guaranteeing reasonable return or profitability had been adopted by Spain in accordance with Article 30(4) of Law 54/1997 and is present in the pledge found in the preamble of RD 661/2007, as well as in the Renewable Energy Plan 2011-2020. In other words, such criterion was present in Spain's national laws, which in any case should have been consistent with EU law.

133. Separately, the compatibility of the criterion with EU law was also confirmed by the State Aid Decision. Indeed, the new scheme notified and submitted for authorisation by the EC maintained the provision for reasonable profitability to beneficiaries and was declared consistent with the State aid regime.[183] Although what specifically counts as reasonable return might have changed due to Spain's measures, there is no doubt that investors could legitimately expect a return on their investments at a reasonable rate.

134. It follows from the foregoing that the relevant issue is the extent to which Spain could modify the support system without breaching its international obligations.

135. The State Aid Decision made clear that there was no violation of the Fair and Equitable Treatment standard. In this regard, the EC stated that when a member State grants public aid to investors without fulfilling the duty to notify, legitimate expectations concerning those payments are excluded. As a result, "*based on the principle of interpretation in conformity, the*

---

[181] RL-0121, Decision on Responsibility, para. 315.

[182] RL-0121, Decision on Responsibility, para. 384.

[183] According to the State Aid Decision, the "*specific remuneration is paid as a premium in addition to income generated from the market. It aims at helping the technologies supported to compete on an equal footing with other technologies on the market at a reasonable rate of return*": RL-0147, State Aid Decision, para. 31.

*principle of fair and equitable treatment cannot have a broader scope than the Union law notions of legal certainty and legitimate expectations in the context of a State aid scheme*".[184]

136. The above statement by the EC cannot however bind the Tribunal in its decision. The Tribunal is fully competent to decide the dispute and the EC's statement has no binding effect on the award. Further, the EC did not mention anything about the contents of the Fair and Equitable Treatment standard. It merely declared that no investor could have legitimate expectations from illegal State aid. Yet the illegality in this case arose from Spain's omission to notify State aid, even though the obligation to do so was Spain's obligation under EU law. Any failure to notify the regime is therefore attributable to Spain, and not any investor. This is the reason why, in the Committee's view, State aid could not impact the rights of the Claimants as investors.

137. The only relevance that the State aid regime could have had relates to the eventual duty of member States to modify their specific regimes to ensure consistency with the EEAG. This would have precluded investors from relying on a member State's conduct and thereby foreclosed claims relating to legitimate expectations. However, this argument fails because Spain did not notify the scheme, and so there was no reason for the Claimants to expect that such scheme would undergo modifications according to the State aid system.

138. Finally, it should be noted that the reasons why Spain had to submit the measure for authorisation by the EC was because the new regime (i) selects potential beneficiaries, (ii) confers a benefit over regular market returns, and (iii) is likely to distort competition on the electricity market.[185] As a result, the State Aid Decision had to assess the compatibility of the new scheme (including the reasonable rate of return) with the EEAG.[186]

139. This means that the new scheme did not pose any risk to the stability of the internal market. There is no necessary relationship between the compatibility of a regulation with internal market rules, and treaty standards to which Spain is subject under international law (in the more usual sense of the term excluding the EU context). In other words, a change in legislation can be in line with internal market rules and yet incompatible with the Fair and Equitable Treatment standard of the ECT.

---

[184] The EC distinguished between intra- and extra-EU law disputes, but the analysis resulted in the same conclusion: "*the fair and equitable treatment provision of the ECT is respected since no investor could have, as a matter of fact, a legitimate expectation stemming from illegal State aid*": RL-0147, State Aid Decision, para. 164.

[185] RL-0147, State Aid Decision, paras. 85-88.

[186] RL-0147, State Aid Decision, para. 93.

140. To determine the reasonable return ensured by Spain, the Tribunal did consider the possibility for Spain to modify the regime to deal with changes in the cost of electricity and competitiveness between energy producers. [187] It concluded that Spain did retain such possibility. In this sense, it is reasonable to expect that the decision on legitimate expectations would have been the same if the Tribunal had expressly considered the EEAG. Ultimately, in both the old and new regimes, the investors were entitled to a reasonable return, such that they would be conferred a benefit above normal market returns from the market.

141. In any event, the Committee considers that Spain has not demonstrated that the Tribunal would have decided differently if the EEAG had been taken into account.

- **The proportionality of the Award**

142. Finally, Spain submits that the Tribunal should have verified if the Award respected the proportionality framework under EU law. According to the Community guidelines on State aid for environmental protection (EC Communication 2008/C 82/01) ("**Community Guidelines**"), "[a]*id is considered to be proportional only if the same result could not be achieved with less aid*". [188] In Spain's view, this is the measure that the Tribunal should have applied.

143. The Community Guidelines provide guidance on preventing market distortions. The proportionality sought is a reference to the magnitude of the interference with competition on the electricity market. According to the Community Guidelines, "*the aid amount must be limited to the minimum needed to achieve the environmental protection sought*". [189]

144. In this regard, the Tribunal's task is not to prevent distortions within the EU market, but to assess whether the measures adopted by Spain were coherent with the Fair and Equitable Treatment standard, including as regards stability, transparency, non-discrimination, proportionality and reasonableness.

145. In the Committee's view, it is beyond the remit of the Tribunal's jurisdiction to consider whether the compensation awarded with regard to the principles listed above (i.e. stability, transparency, non-discrimination, proportionality and reasonableness) exceeds the proportionality framework of the State aid regime and EU law, including that outlined in the

---

[187] RL-0121, Decision on Responsibility, para. 385.
[188] R-0088, Community Guidelines, para. 30.
[189] R-0088, Community Guidelines, para. 31.

Community Guidelines. The Tribunal's considerations on the relevance of EU law in this respect seem reasonable. It explained:

> The Tribunal also recalls that when States (or, for that matter, international organisations) enter into incompatible commitments, the law of treaties does not offer any solution in terms of hierarchy between the treaties at stake: the issue must be dealt with on the ground of the law of State (and international organisation) responsibility. Such an issue is beyond the jurisdiction of this Tribunal and could only been [sic] settled by means of negotiations or other means of peaceful settlement of dispute. If the EU or any of its Member States have violated the laws of State responsibility because it is a party to treaties that contain incompatible commitments, that is a matter for it to resolve.[190]

146. The Committee is also cognisant that the issue of whether the Community Guidelines should have been taken into account when awarding compensation was not raised before the Tribunal at the relevant time. Moreover, the Committee is not persuaded that Spain has discharged its burden to prove that the relevant decisions would have been different otherwise.

147. In conclusion, the Committee agrees that the Tribunal had no obligation to apply the proportionality framework of the State aid regime to determine the extent of the award. In any event, Spain has not proven that the decision would otherwise have been different.

- **Recent EC Decision on State Aid – Antin Award**

148. On 8 September 2021, Spain drew the Committee's attention to the EC's decision on "State aid SA.54155 (2021/NN) – Arbitration award to Antin – Spain" (EC Communication 2021/C 450/02) ("**EC's Decision**").[191] This decision was released after the annulment hearing, and as it is concerned with the specific issue of State aid arising from a similar case *Antin v Spain* ("**Antin**"), [192] the Committee has decided that it would be appropriate to consider that decision's implications (if any).

149. *Antin* relates to the same regulatory measures that were at issue in the underlying arbitration and in fact the Claimants and the *Antin* investors were co-investors in one of the renewables projects at issue in this arbitration. The tribunal in *Antin* awarded the *Antin* investors damages

---

[190] RL-0121, Decision on Responsibility, para. 212.
[191] https://eur-lex.europa.eu/legal-content/EN/TXT/PDF/?uri=CELEX:52021AS54155.
[192] *Infrastructure Services Luxembourg S.à.r.l. and Energia Termosolar B.V. (formerly Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.) v Kingdom of Spain*, ICSID Case No ARB/13/31, where the Award was rendered on 15 June 2018 and rectified on 29 January 2019.

on the basis that Spain had failed to accord fair and equitable treatment to the investors' investments by making regulatory changes to the remuneration scheme for renewable installations through legal acts adopted since July 2013, i.e. Royal Decree-Law 9/2013, Law 24/2013, Royal Decree 413/2014 and Order IET 1045/2014, as compared with the remuneration scheme that was in force at the time of the investment was originally made, i.e. Law 54/1997 and Royal Decree 661/200. The tribunal ordered payment of EUR 101 million (as rectified from EUR 112 million) plus interest.

150. The EC, after examining the *Antin* award, indicated that the advantage granted to the investors was granted "*exclusively (and thereby selectively)*" and was thus State aid; [193] that the compensation would strengthen the *Antin* investors as compared to other undertakings competing in intra-EU trade and therefore "*has the effect of compensating for the withdrawal of unlawful aid, i.e. of the 2007 scheme*".[194] In reaching this view, the EC took the view that Spain as the member State had failed to present arguments that could justify the measure under Articles 107(2) and/or 107(3) of the TFEU and had possibly breached the EU treaties by the aid measure and non-compliance with State aid guidelines. The EC also observed that as not all investors benefitting from the 2007 scheme have access to international arbitration to claim damages under the ECT (and in particular Spanish investors, who were excluded from such possibility), the *Antin* award had introduced discrimination based on nationality and was thus incompatible with Article 18 of the TFEU.

151. In relation to proportionality, the EC considered that the aid stemming from the award to the aid received under the 2013 scheme, as well as the rate of return, would increase above the levels commonly observed in the industry concerned and considered proportionate.

152. Referring then to the EEAG, the EC observed that the aid did not target any market failure to justify it as required under Section 3.2.2 of the EEAG,[195] and that Spain did not demonstrate the effect of the aid or show the counterfactual comparing the levels of activity with aid and without aid.

153. The Committee notes that the observations made in the EC's Decision were clearly aimed at Spain as the party accountable for any breach of EU laws, policies, and guidelines. The EC

---

[193] EC's Decision, para. 79.
[194] EC's Decision, paras. 87-88.
[195] EC's Decision, para. 137.

enjoined Spain from paying the compensation awarded by the tribunal and unilaterally declared that Spain is not obliged to pay the same "*irrespective of Articles 53 to 55 of the ICSID Convention*" on the basis that such payment would violate EU treaties.[196] The underlying basis and logic advanced by the EC is again that EU law and treaties have primacy over the ECT (as well as, it appears, the ICSID Convention), a view the Tribunal had quite correctly rejected and with which the Committee agrees.[197] The EC's Decision cannot supplant Spain's obligations under the ECT and obliterate the rights of the Claimants. As such, even if the same were available and placed before the Tribunal, it is highly unlikely for the Tribunal to reach a decision different from that made.

### B. FAILURE TO STATE REASONS ON WHICH THE AWARD IS BASED

#### a. Spain's Position

154. Spain confirmed during the hearing that it was also seeking annulment based on the Award's failure to state reasons, under Article 52(1)(e) of the ICSID Convention.[198] In particular, it submits that the Tribunal "*directly concluded the absence of conflict between the ECT and EU law without any further consideration*",[199] and that "*by failing to give any reason as to why the Award so flagrantly ignores EU law on State Aid, the Award falls under the ground for annulment in Article 52(1)(e)*".[200]

#### b. Claimants' Position

155. The Claimants point out that Spain asserts this annulment ground (i.e. Article 52(1)(e) of the Convention) for the first time in its Annulment Reply. They stress that Spain has neither provided any analysis nor requested any relief in this respect, and that in fact, Spain makes clear in its Annulment Reply that it is seeking annulment under Article 52(1)(b) (manifest excess of powers) only. In this regard, the Claimants again explain that the Tribunal did not need to examine EU law because (i) such law was not applicable, (ii) the Tribunal had already decided in Spain's favour in respect of legitimate expectations, and (iii) Spain never even made the relevant argument before the Tribunal in the main proceeding.[201] During the hearing, the

---

[196] EC's Decision, p. 21.
[197] RL-0121, Decision on Responsibility, para. 210.
[198] Transcript (English), 11 June 2021, p. 86, lines 11-13.
[199] Transcript (English), 10 June 2021, p. 40, lines 22-24.
[200] Annulment Reply, paras. 280-281.
[201] Annulment Rejoinder, paras. 161 and 201-203.

Claimants also added that they "*don't think it would be appropriate to allow Spain to amend their case at this stage*".[202]

### c. *The Committee's analysis*

156. The Committee notes that during the hearing, Spain referred to paragraph 164 of the Memorial as well as paragraphs 283 and 284 of the Annulment Reply, where Spain reserved the right to supplement and/or modify the grounds for annulment, and also requested the Committee to annul the Award on any ground the Committee considers as having been constituted by facts described.[203] Notwithstanding this, it is clear to the Committee that this request for annulment on the basis of Article 52(1)(e) should be dismissed, if only because due process requires that each party be given a fair opportunity to be heard. This, unfortunately, was not possible here because Spain brought up its arguments only towards the end of the annulment proceeding, which means that the Claimants were hardly afforded an opportunity to respond meaningfully. In other words, in contrast with Spain's request for annulment under Article 52(1)(b) already dealt with above in Part A, there is a threshold issue here as to whether Spain's request under Article 52(1)(e) should even be admitted in the first place, before any further determination.

157. The Committee agrees with the Claimants that "*there's been no exposition as to the law on failure to state reasons,* [and] *how the Tribunal's findings should be applied to the law*",[204] and considers that this ground for annulment was in fact not specifically pleaded in any of Spain's written submissions. In the Committee's view, it is not sufficient to reserve rights to modify the grounds of annulment without actually making out what alternative grounds of annulment were being relied on (as Spain did in its written submissions). This state of affairs only exacerbated the situation because it means that even if the Claimants had an opportunity to respond, it would not be clear what case exactly they had to respond to. To be clear, a reservation of right cannot stand to be of any utility if no such right exists in the first instance.

158. In this regard, Rule 50(1)(c) stipulates that an application for annulment shall "*state in detail* [...] *the grounds on which it is based*", while Rule 31(3) read in conjunction with Rule 53 provides that a memorial shall contain "*a statement of the relevant facts; a statement of law; and the submissions*". An applicant for annulment is given the right to specify the grounds it seeks to rely on in its application under Rule 50(1) and arguably under Rule 31(3) if a memorial

---

[202] Transcript (English), 11 June 2021, p. 84, lines 21-23.
[203] Transcript (English), 11 June 2021, p. 31, lines 3-13.
[204] Transcript (English), 11 June 2021, p. 84, line 25 - p. 85, line 3.

for annulment is directed to be filed. Not having done so in its Annulment Application and Memorial, the Committee finds that Spain cannot be permitted to pursue this ground any longer.

159. For the above reasons, the Committee is satisfied that Spain's request for annulment pertaining to Article 52(1)(e) should be dismissed.


# V.   COSTS

160. Article 61(2) of the ICSID Convention provides:

> *(2) In the case of arbitration proceedings the Tribunal shall, except as the parties otherwise agree, assess the expenses incurred by the parties in connection with the proceedings, and shall decide how and by whom those expenses, the fees and expenses of the members of the Tribunal and the charges for the use of the facilities of the Centre shall be paid. Such decision shall form part of the award.*

161. This provision, which applies *mutatis mutandis* to annulment proceedings by virtue of Article 52(4) of the ICSID Convention, gives the Committee discretion to allocate all costs of the annulment, including legal fees and other costs, between the parties as it deems appropriate.[205]

162. Costs fall into two categories: (i) the costs of the proceedings themselves, namely the costs incurred by ICSID, and the fees and expenses of the *ad hoc* committee members; and (ii) the costs of representation incurred by the parties, together with the expenses which the parties have incurred.

163. The Committee considers that, in the absence of exceptional circumstances, a party which has been wholly unsuccessful in an application for annulment should normally bear the entire costs of the proceedings (including the fees and expenses of the Committee and the costs of ICSID) and the reasonable costs and expenses of the successful party. The Committee sees no exceptional circumstances in the present case which would warrant a different decision.

164. In fact, the parties have both made submissions on costs on the basis that costs should follow the event. On that basis, as Spain has failed to establish any grounds for annulment, it should bear its own costs, the reasonable costs of the Claimants and the costs of the proceedings.

---

[205] See also Rule 47(1)(j) in conjunction with Rule 53 of the ICSID Arbitration Rules.

165. The Claimants have submitted a statement of costs amounting in aggregate to GBP 791,385.23 comprising GBP 749,323.34 as legal fees rendered by Gibson, Dunn & Crutcher UK LLP and expenses of GBP 42,061.89.[206]

166. The legal fees incurred relate to work done in reviewing the Annulment Application, opposing the stay of enforcement, intervention by the EC as non-disputing party, preparing the Counter-Memorial, responding to a new expert report on EU law and to the EC's Submission, attending conferences and the oral hearing as well as addressing the Committee's queries. In the Committee's view the Claimants' fees appear to be fairly reasonable and are in fact less than Spain's claim for legal fees of EUR 1,412,000 (approximately GBP 1.18 million).[207]

167. The expenses claimed by the Claimants of GBP 42,061.89 included the fees of their expert in preparing the report on EU law and his attendance, translation services, travelling and printing and copying expenses. It is very close to Spain's expenses of EUR 40,192.64 (approximately GBP 33,624.13).[208]

168. In the Committee's view, the Claimants' claim for costs and expenses are fair and reasonable and should be allowed in full.

169. The total costs of the proceedings (in US dollars) are as follows:

| | |
|---|---|
| ICSID Administrative Fees : | **USD 126,000** |
| Fees and expenses of the Committee members: | **USD 265,361.69** |
| Other direct expenses: | **USD59,746.85** |
| Total: | **USD 451,108.54** |

170. The above costs have been paid out of the advances made by Spain, which is the party seeking annulment, in accordance with Regulation 14(3)(e) of the Administrative and Financial Regulations. Spain has advanced a total of USD 549,868.00. Spain shall bear the entirety of these costs, with any sum remaining from the advances to be refunded by ICSID to Spain.

---

[206] Claimants' Statement of Costs and Submissions on the *Travaux Préparatoires*, para. 4.

[207] Spain's Submission on Costs and Comments on the ECT "*Travaux Préparatoires*", paras. 14 and 20.

[208] Spain's Submission on Costs and Comments on the ECT "*Travaux Préparatoires*", para. 20.

## VI. DECISION

**For the reasons set out above,**

The Committee hereby unanimously –

    I.    Dismisses in its entirety Spain's application for annulment of the Award dated 11 December 2019.

    II.    In accordance with ICSID Arbitration Rule 54(3), the stay of enforcement of the Award terminates with immediate effect.

    III.    Orders Spain to pay the Claimants' full legal fees and expenses incurred in these annulment proceedings amounting in all to GBP 791,385.23;

    IV.    Orders Spain to bear all of the costs of the proceedings, including the fees and expenses of the *ad hoc* Committee members, ICSID Administrative Fee and direct expenses (as reflected in ICSID's final financial statement); and

    V.    All other claims and requests are dismissed.

_____
Prof. Enrique Barros Bourie
Member of the *ad hoc* Committee

Date:

_____
Ms. Bertha Cooper Rousseau
Member of the *ad hoc* Committee

Date:

_____
Prof. Lawrence GS Boo
President of the *ad hoc* Committee

Date: 22 March 2022

_____
Prof. Enrique Barros Bourie
Member of the *ad hoc* Committee

Date: 21.3.2022

_____
Ms. Bertha Cooper Rousseau
Member of the *ad hoc* Committee

Date:

_____
Prof. Lawrence GS Boo
President of the *ad hoc* Committee

Date:

_____
Prof. Enrique Barros Bourie
Member of the *ad hoc* Committee

Date:

_____
Ms. Bertha Cooper Rousseau
Member of the *ad hoc* Committee

Date: May 11, 2022

_____
Prof. Lawrence GS Boo
President of the *ad hoc* Committee

Date: