# Exhibit 33



**FEDERAL COURT OF JUSTICE**

**JUDGMENT**

I ZB 75/22

Handed down on:

July 27, 2023

Ms. Hemminger

Court Employee

as Clerk of the Court

in the proceedings

for a declaration of the inadmissibility of the arbitration proceedings

ECLI:DE:BGH:2023:270723BIZB75.22.0

At the hearing on May 17, 2023, the First Civil Section of the German Federal Court of Justice, composed of Presiding Judge Prof. Dr. Koch, Judge Feddersen, Judges Pohl and Dr. Schmaltz, and Judge Odörfer

decided:

Regarding the appeal on points of law by the Respondent, the judgment of the 19th Civil Section of the Cologne Higher Regional Court of September 1, 2022 is dismissed regarding costs and to the extent that it ruled against the Respondent with regard to Application 2.

To the extent of the dismissal, Application 2 for a declaration of inadmissibility of any arbitration proceedings between the Applicant and the Respondent on the basis of Art. 26 (3) and (4) of the Energy Charter Treaty (ECT) is hereby dismissed as inadmissible.

One third of the costs of the proceedings will be borne by the Applicant and two thirds by the Respondent.

The value of the subject matter of the appeal is determined to be €30 million.

Grounds:

1          A. The Applicant is the Kingdom of the Netherlands (hereinafter "the Netherlands"). The Respondent has its registered office in the Federal Republic of Germany (hereinafter "Germany"). It invests, inter alia, in the generation of conventional electricity from coal.

2          The Respondent claims that its investments in the coal-fired power station located in the territory of the Applicant at G in the harbor of E.

have been damaged as a result of the Applicant's regulatory decision to phase out coal-fired power generation by 2030. It therefore filed a petition with another arbitration applicant on January 20, 2021 to initiate arbitration proceedings against the Applicant on the basis of the Energy Charter Treaty at the International Centre for Settlement of Investment Disputes (hereinafter "ICSID" or "the Centre"). The proceedings were registered on February 2, 2021 under reference no. ICSID ARB/21/4; the arbitral tribunal was constituted on June 2, 2021. The arbitration claimants quantified their claims at €1.4 billion.

3        The Energy Charter Treaty is a multilateral agreement on cooperation in the energy sector which was ratified by 49 states, as well as the European Union (EU) and the European Atomic Energy Community (Euratom) and which entered into force on April 16, 1998. Since that date, the Energy Charter Treaty has also been in force in Germany (Federal Law Gazette, II 1998 p. 3009; hereinafter "ECT") after approval by means of a law dated December 20, 1996 (Federal Law Gazette, II 1997 p. 4) and, after ratification on December 11, 1997, in the Netherlands as well.

4        In Art. 10 of the ECT, the contracting parties guarantee the promotion and protection of investments by creating stable, equitable, favorable, and transparent conditions for investors from other contracting states. Art. 13 of the ECT grants protection against expropriation without compensation, among other things. Both provisions can be found in Part III of the Energy Charter Treaty. According to Art. 26 of the ECT, an investor from a contracting state can file an arbitration claim against another Contracting State for any violations of the Energy Charter Treaty. An excerpt from this provision reads as follows:

(1)    Disputes between a Contracting Party and an investor of another Contracting Party relating to an investment by the latter in the area of the former, which concern an alleged breach of an obligation of the former under Part III will, if possible, be settled amicably.

(2)    If such disputes cannot be settled according to the provisions of paragraph (1) within a period of three months from the date on which either party to the dispute requested amicable settlement, the Investor party to the dispute may choose to submit it for resolution in the following way:

    a)   to the courts or administrative tribunals of the Contracting Party to the dispute;

    b)   in accordance with any applicable, previously agreed dispute settlement procedure; or

    c)   in accordance with the following paragraphs.

(3)   (a) Subject only to subparagraphs (b) and (c), each Contracting Party hereby gives its unconditional consent to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article. ...

(4)   In the event that an Investor chooses to submit the dispute for resolution under subparagraph (2)(c), the Investor will further provide its consent in writing for the dispute to be submitted to:

    (a) i) The International Centre for Settlement of Investment Disputes, established in accordance with the Convention on the Settlement of Investment Disputes between States and Nationals of other States opened for signature at Washington, March 18, 1965 (hereinafter referred to as the "ICSID Convention"), if the Contracting Party of the Investor and the Contracting Party to the dispute are both Parties to the ICSID Convention; ...

(5)   a) The consent given in Para. 3 together with the written consent of the investor in accordance with Para. 4 will be considered to satisfy the requirement

    i) Written consent of the Parties to a dispute for the purposes of Chapter II of the ICSID Convention and for the purposes of the additional facility...

(6)   A tribunal body established under Para. 4 will decide on the issues under dispute in accordance with this Treaty and applicable rules and principles of international law....

5         The International Centre for Settlement of Investment Disputes (hereinafter referred to as the "ICSID Convention") was established by means of the Convention of March 18, 1965 for the settlement of investment disputes between states and nationals of other states. Its purpose is to provide conciliation and arbitration facilities for the settlement of investment disputes between contracting states and nationals of other contracting states in accordance with the provisions of the Convention (Art. 1, ICSID Convention). The German Bundestag approved the ICSID Convention by means of a law dated

February 25,1969 (Federal Law Gazette II p. 369; hereinafter "InvStreitBeilG"); the Convention entered into force on May 18, 1969 (Federal Law Gazette II p. 1191). The Netherlands signed the ICSID Convention on May 25, 1966; it entered into force there on October 14, 1966.

6          By means of its applications filed with the Higher Regional Court on May 10, 2021, the Applicant sought a declaration of inadmissibility regarding the arbitration proceedings instituted under ICSID ARB/21/4 (Application 1), as well as of any arbitration proceedings in accordance with in accordance with Article 26 (3) and (4), ECT (Application 2). The Higher Regional Court granted the applications (Cologne Higher Regional Court, judgment dated September 1, 2022 - 19 SchH 15/21, juris). The Respondent's appeal on points of law is directed against this, and the Applicant has asked that it be dismissed.

7          B. The Higher Regional Court essentially stated in the grounds for its decision:

8          In accordance with Section 13 of the German Courts Constitution Act (GVG) in conjunction with Section 40 (2)(1)(1) of the Administrative Courts Procedure Code (VwGO), recourse to the ordinary courts was available regarding the application in accordance with Section 1032 (2) of the German Code of Civil Procedure (ZPO).  It was stated that the subject matter, local, and international jurisdiction existed pursuant to Sections 1062 (1) (2), ZPO. In the absence of a domestic place of arbitration, it was stated that the location of the Respondent's registered office was decisive, which resulted in the Court having jurisdiction.

9          It was stated that Application 1 had been filed in due time before the constitution of the arbitration. Its admissibility was not precluded by the closed legal system of the ICSID Convention. In this case, it was stated that it was not the arbitration action under the ICSID Convention on which a decision had to be made, but rather on whether an effective arbitration agreement existed based on the provision under Article 26 of the ECT, which also existed under European Union law, as the basis of the

arbitration proceedings. It was stated that it was up to the national courts to ensure that European Union law was in full effect. It was stated that a determination at an early stage that the arbitration agreement would not be effective under European Union law was possible in accordance with the provision for procedural economy under Section 1032 (2) ZPO and would also be admissible for the ICSID proceedings.

10          It was also stated that Application 1 had merit. There was no valid arbitration agreement. The arbitration clause in Art. 26 (2 (c), (3) and (4) of the ECT was allegedly incompatible with European Union law in intra-EU disputes according to the case law of the Court of Justice of the European Union. It is true that arbitration proceedings under the ICSID Convention are in principle not subject to the control of national courts. The monopoly of jurisdiction of the Court of Justice of the European Union, however, precludes an irrevocably binding interpretation and application of European Union law by the arbitral tribunal. This also applies to arbitration proceedings that take place outside the European Union and to ICSID arbitration proceedings. For European Union law to be effective, it was stated that it must also be possible to assert in advance the preliminary question of the inadmissibility of the arbitration proceedings as a result of a violation of European Union law.

11          It was stated that Application 2 was also admissible and with merit. For an application to be made pursuant to Section 1032 (2), ZPO, an actual dispute does not yet have to have occurred. The only requirement – the need for general legal protection – existed.

12          C. The appeal on points of law is admissible (Section 574 (1)(1), ZPO in conjunction with Section 1065 (1)(1), Section 1062 (1)(2)(1), Section 1032 (2), ZPO) and is also otherwise admissible (Section 574 (2), ZPO). It proves to be partially justified. The Higher Regional Court rightly held that the first application for a declaration of the inadmissibility of the arbitration proceedings was admissible (cf. C I) and justified (see C II). A referral to the Court of Justice of the European Union is not necessary (see C III). Application 2 for a declaration of inadmissibility of any arbitration proceedings between the Parties, on the other hand, is inadmissible, contrary to the opinion of the Higher Regional Court (see C IV).

13          Application 1 in accordance with Section 1032 (2), ZPO is admissible. The question of whether recourse to the ordinary courts is available is not subject to

review by the appellate court (cf. C I 1). The German courts have international jurisdiction to make a decision on the application (cf. C I 2). The application was filed in a timely manner (cf. C I 3) and is also admissible (cf. C I 4). There is also a need for legal protection for the application (cf. C I 5).

14          (1) The question of whether recourse to the ordinary courts is available in accordance with Section, 13 GVG, and Section 40(2) (1), VwGO is not subject to review by the appellate court in the dispute in accordance with Section 17a (5) GVG.

15          a) The Higher Regional Court assumed that recourse to the ordinary courts was available in accordance with Section 13 GVG. The case concerned secondary claims by a private investor against a party to an international treaty, for which it was stated that the ordinary courts had jurisdiction in accordance with the special provision in Section 40 (2)(1)(1), VwGO.

16          b) In accordance with Section 17a (5), GVG, the court that rules on an appeal against a decision on the merits does not examine whether the legal action being taken is admissible. The provision also applies to judgments that qualify as res judicata (see MünchKomm, ZPO/Pabst, 6th ed., Section 17a GVG margin note 25). This is the situation here. In its judgment, the Higher Regional Court expressly affirmed the civil-law remedy and also considered the application to be admissible and justified in all other respects in accordance with Section 1032 (2), ZPO.

17          c) The admissibility of the legal action is also not to be reviewed by this Court as an exception. If the court of first instance, contrary to Section 17a (3)(2), GVG, has not ruled on the admissibility of the legal action in advance by means of a decision, but only in the decision on the merits, Section 17a (5) GVG is not applicable (see Federal Court of Justice (BGH), judgment dated September 23, 1992 - I ZB 3/92, BGHZ 119, 246 [juris margin note 15] – Examination of the legal action; judgment dated November 3, 2021 - XII ZB 289/21, NZFam 2022, 63 [juris margin note 9], including further references). A preliminary decision of this kind, however, was not necessary in this case. The response to the appeal rightly points out that there is no need for an

explicit denial of the civil-law action by the Respondent in the first-instance proceedings and thus the objection pursuant to Section 17a (3)(2) GVG, which is necessary for there to be an obligation to make a preliminary decision, is lacking.

18          aa) If the Parties have not objected to the admissibility of the legal action taken and the court of first instance was therefore allowed to refrain from a preliminary decision in accordance with Section 17a (3) GVG, the appellate court is bound by the jurisdiction, even if only tacitly affirmed, even in doubtful cases (see BGH, decision dated September 18, 2008 - V ZB 40/08, NJW 2008, 3572 [juris 13 et seq, 16 f.]; Jacobs in Stein/Jonas, ZPO, 23rd ed., Section 17a GVG margin note 24). The objection must be made expressly and within the time limit in accordance with Section 282 (3) ZPO (cf. Wittschier in Musielak/Voit, ZPO, 20th ed., Section 17a GVG margin note 12; with regard to the validity of Section 282 (3) ZPO see BGH, judgment dated February 25, 1993 - III ZR 9/92, BGHZ 121, 367 [juris margin note 15]; judgment dated November 18, 1998 - VIII ZR 269/97, NJW 1999, 651 [juris margin note 7]; Zöller/Lückemann, ZPO, 34th ed., Section 17a GVG margin note 6). The appeal does not have to be expressly designated as such; however, a submission is required that clearly disputes the admissibility of the legal action (VGH Baden-Württemberg, WissR 2020, 209 [juris margin note 3]; Kissel/Mayer, GVG, 10th ed., Section 17 margin note 27, both including additional references). This is lacking in this case.

19          bb) In its response to the application dated July 9, 2021, and therefore within the time limit set forth in Section 282 (3)(2) ZPO, the Respondent did not expressly and unambiguously challenge the admissibility of recourse to the ordinary courts pursuant to Section 17a (2), ZPO. The formulation of the submissions referred to by the appeal on points of law shows that no objection was made to the admissibility of recourse to the Higher Regional Court and, thus, the competition between national courts. Rather, the argument concerned the question of whether an action pursuant to Section 1032 (2), ZPO is possible at all before the national courts. The Respondent did mention Section 13, GVG, according to which – among other things – civil disputes must be referred to the ordinary courts in cases where neither the

jurisdiction of administrative authorities or administrative courts is established or special courts
are appointed or admitted on the basis of the provisions of German federal law. It then
submitted, however, under the heading "The provisions of Sections 1025 et seq. are not
applicable to ICSID arbitration proceedings" with regard to the relationship between civil law
disputes before the ordinary courts and international law disputes before an international arbitral
tribunal. In a later submission, the Respondent confirmed that it was generally concerned with an
"exclusion of state jurisdiction in ICSID arbitration proceedings". Thus, from an overall
perspective, it targeted the inadmissibility of the application pursuant to Section 1032 (2) ZPO
before a national court, which was intended to support its sole application for dismissal of the
applications primarily for their being inadmissible. It was definitely not a matter of referring the
case to another national court on the grounds of the inadmissibility of the legal action taken,
which it therefore did not alternatively request.

20          2. The German courts have international jurisdiction in accordance with Section 1025
(2), ZPO for the application filed in accordance with Section 1032 (2), ZPO.

21          a) The international jurisdiction of the German courts is to be examined ex oficio in
appeal proceedings. This examination is not excluded by Section 576 (2), ZPO. The same applies
to the appeal proceedings as to the procedure for an appeal on points of law, in which Section
545 (2) ZPO does not preclude the review of international jurisdiction (see BGH, judgment dated
August 13, 2009 - I ZB 43/08 [2009] WRP 1559 [juris, (10); judgment dated September 22, 2016 -
- V ZB 125/15, RIW 2017, 138 [juris (8); with regard to Section 545 (2) ZPO cf. only BGH,
judgment dated July 14, 2022 - I ZR 121/21, GRUR 2022, 1675 [juris (29) = WRP 2022, 1519 –
Google third-party information, including additional references).

22          b) The international jurisdiction for the application pursuant to Section 1032 (2), ZPO results in the case in dispute from the analogous application of Section 1025 (2), ZPO.

23          aa) In accordance with Section 1032 (2), ZPO, an application for a declaration of the admissibility or inadmissibility of arbitration proceedings may be filed with the Court until the arbitral tribunal has been constituted. In accordance with Section 1025 (2), ZPO, the provisions of Sections 1032, 1033, and 1050, ZPO are still applicable if the place of arbitration is abroad or has not yet been determined.

24          bb) Section 1025 (2) ZPO thus regulates the international jurisdiction of the German courts for - inter alia - proceedings brought pursuant to Section 1032 (2) ZPO (see Geimer, IZPR, 8th ed., margin note 1258 f.; MünchKomm.ZPO/Münch loc. cit. Section 1025 margin note 18; Schlosser in Stein/Jonas loc. cit. Section 1062 margin note 4, Section 1025 margin note 6; Voit in Musielak/Voit loc. cit. Section 1062 margin note 1, Section 1025 margin note 5; aA Kröll, IHR 2005, 142, 144). Insofar as the Respondent asserts that the inclusion of Section 1032 (2) ZPO in Section 1025 (2 ZPO is a legislative oversight, it does not succeed. It is true that the explanatory memorandum to the Act only refers to the arbitration defense in legal proceedings before the national courts in accordance with Section 1032 (1) ZPO (cf. Government Draft of an Act to Reorganize Arbitration Law dated July 12, 1996, BT-Drucks. 13/5274, pg. 31). No resulting possibly intended exclusion of Section 1032 (2 and 3 ZPO with the application of Section 1025 (2), ZPO is, however, reflected in the law. With regard to the interpretation of a statutory provision, however, the objective intention of lawmakers expressed in it is decisive, as it results from the wording of the statutory provision and the context in which it is placed. The interpretation, which is to be based primarily on the objective meaning and purpose of the law, cannot be bound by grounds that were set out in the legislative process but not been expressed in the wording of the law (see BGH, judgment dated June 6, 2019 - I ZR 67/18, GRUR 2019, 970 [juris, (66)] = WRP 2019, 1304 – contingency fee for insurance advisors, including additional references).

Case 1:19-cv-01618-TSC     Document 113-37     Filed 03/13/25     Page 12 of 54
USCA Case #23-7032     Document #2014693     Filed: 08/30/2023     Page 19 of 62

11

25   cc) The international jurisdiction of German courts does not follow directly from the wording of Section 1025 (2), ZPO. The arbitration proceedings initiated by the Respondent are neither taking place "abroad" within the meaning of this provision (case 1) nor is the place of the arbitration proceedings "not yet determined" (case 2).

26   (1) The arbitration was initiated by the Respondent before the Centre. In accordance with Art. 2 (1) of the ICSID Convention, the headquarters of the Centre are at the headquarters of the International Bank for Reconstruction and Development and are therefore in Washington D.C., United States of America. In accordance with Art. 62 f. in Section VII of the ICSID Convention, the arbitration proceedings take place at the location of the headquarters of the Centre, which is to be distinguished from the arbitral tribunal (cf. Schöbener/Markert, ZVglRWiss 2006, 65, 73), unless otherwise agreed to by the Parties.

27   (2) It does not follow from this, however, this that the place of arbitration that is relevant pursuant to Section 1025 (2), ZPO is in the USA and thus abroad.

28   Contrary to what the title of Section VII of the ICSID Convention - "Place of Proceedings" - might suggest, Art. 62 f. of the ICSID Convention only establish the venue at the location where the arbitral tribunal actually holds its hearings. This venue is not to be equated with the place of arbitration as the legal domicile of the arbitration proceedings, which serves to anchor the arbitration proceedings in a certain legal system (cf. BT-Drucks. 13/5274, p. 47; BeckOK.ZPO/ Wilske/Markert, 48th edition [as at March 1, 2023], Section 1043 margin note 1; MünchKomm.ZPO/Münch loc. cit. Section 1043 margin note 3 and 5; Zöller/Geimer loc. cit. Section 1043 margin note 1 and 4).

29          This corresponds to the prevalent view in national and international literature on the
ICSID Convention, according to which investor-state arbitration proceedings brought pursuant
to this Convention take place in a delocalized manner (cf. Kern, Arbitration Board and General
Clause, 2017, pp. 62, 78; Bertolini, The Implementation of ISDS Decisions in Germany, 2019, p.
92; Köster, Investment Protection in Europe, 2022, p. 16 f.; Schütze/Thümmel, Arbitration Board
and Proceedings, 7th ed., Section 25 (6; Happ in Schütze, Institutional Arbitration, 3rd ed,
Chapter XV, Section II (13, Section IV Rule 13 ICSID Arbitration Rules (5; Sasson in
Fouret/Gerbay/Alvarez, The ICSID Convention, Regulations and Rules, A Practical
Commentary, Art. 62 (7.03 f.; Schütze in Wieczorek/Schütze, ZPO, 5th ed., Section 1025
margin note 56b; Gaillard, ICSID Review - Foreign Investment Law Journal 1988, 136, 138 f.;
Berger, SchiedsVZ 2017, 282, 289; von Marschall, RIW 2021, 785, 787; Nikolov, EuR 2022,
496, 501; Seelmann-Eggebert, SchiedsVZ 2023, 32, 35 f.; aA Semler, SchiedsVZ 2003, 97,
101).

30          Arbitral awards issued by ICSID arbitral tribunals are therefore neither domestic nor foreign
arbitral awards pursuant to Sections 1060 f., ZPO, but rather arbitral awards sui generis (see
Semler, SchiedsVZ 2003, 97, 99; by Marschall, RIW 2021, 785, 787). Contrary to the principle
applicable in commercial arbitration that there are no private arbitration proceedings that are
detached from any national legal system (cf. Geimer loc. cit. margin note 3718 with additional
references; MünchKomm.ZPO/Münch loc. cit. Section 1025 margin note 11; Schütze in
Wieczorek/Schütze loc. cit. Section 1043 margin notes 6 f.), an investment dispute before the
Centre results in a national arbitral proceeding as an exception (Köster loc. cit. p. 16 f.).

31          (3) There is also no case of a "not yet determined" place of arbitration (Section 1025
(2)(2), ZPO. The wording "not yet determined" refers to a merely temporary situation. In
accordance with Section 1043, (1)(1), ZPO, the Parties may reach an agreement on the place of
arbitration. In the absence of such an agreement, the place of arbitration is determined by the
arbitral tribunal (Section 1043, (1)(2), ZPO).

Until such a determination has been made, there is a state of suspense without the possibility of a territorial connection. This state of suspense is governed by the provision in Section 1025 (2) (2), ZPO (cf. MünchKomm .ZPO/Münch loc. cit. Section 1025 margin note 24).

32          Such a (temporary) state of limbo does not exist in the dispute. In an ICSID arbitration, no place of arbitration is determined, rather only a venue. A later determination of the place of arbitration by the arbitral tribunal is therefore ruled out from the outset.

33          dd) The provision pursuant to Section 1025 (2) ZPO, however, is to be applied accordingly, at least insofar as it refers to the provision of Section 1032, ZPO, if there is no domestic place of arbitration (similarly BeckOK.ZPO/Wolf/Eslami, 48th edition [as at September 1, 2022], Section 1032 margin note 39; rejecting BeckOK.ZPO/ Wilske/Markert loc. cit. Section 1062 margin note 2.4 including additional references).

34          (1) The analogous application of a provision requires an unplanned regulatory gap and a comparable interest situation (settled case law; see only BGH, judgment dated November 7, 2019 - I ZR 42/19, GRUR 2020, 429 [juris, margin note 32] = WRP 2020, 452 - Sports betting in restaurants, including additional evidence). These requirements are fulfilled.

35          (2) Insofar as the delocalized and thus anational ICSID investment arbitration proceedings are not covered by the wording of the law, there is an unplanned gap in the law. There is no indication that lawmakers intended to exclude this particular constellation from the 10th Book of the ZPO.

36          (a) In accordance with Section 1025 (1), ZPO, the provisions of the 10th Book of the ZPO are applicable if the place of the arbitration proceedings is in Germany pursuant to Section 1043 (1), ZPO. For some provisions of the 10th Book ZPO, inter alia the arbitration defense pursuant to Section 1032 (1), ZPO, as well as the declaratory proceedings relevant here pursuant to

Section 1032 (2) ZPO, the provision of Section 1025 (2) ZPO - as already explained - opens up a further scope of application if the place of arbitration is abroad or has not yet been determined (cf. Schlosser in Stein/Jonas loc. cit. Section 1062 margin note 4, Section 1025 margin note 6; Voit in Musielak/Voit loc. cit. Section 1025 marginal notes 5 to 7).

37         (b) With the three groups of cases resulting from Section 1025 (1) and (2) ZPO – "place of arbitration in Germany", "place of arbitration abroad" and "place of arbitration not yet determined" – all constellations for international commercial arbitration within the meaning of the UNCITRAL Model Law serving as the basis for the arbitration reform were covered (cf. BT-Drucks. 13/5274, p. 24; on the scope of application of the model law, cf. Melis in Kronke/Melis/Kuhn, Manual of International Commercial Law, 2nd ed., Part P margin note 230).

38         (c) German lawmakers deliberately chose to extend the 10th Book of the ZPO beyond the scope of the UNCITRAL Model Law to all arbitration proceedings (cf. BT-Drucks. 13/5274, p. 25 and 31). This covers all national and international private law arbitration proceedings and not only commercial law arbitration proceedings (cf. Kulick/Scheu in Fouret, Enforcement of Investment Treaty Arbitration Awards, 2nd ed., p. 385, 389; Lachmann, Manual for Arbitration Practice, 3rd ed., margin note 190; MünchKomm.ZPO/Münch loc. cit. in preliminary to Section 1025 margin note 23 f., Section 1029 margin note 93). Despite its close connection to international law, international investment arbitration between private investors and states is also considered a special form here (regarding arbitration proceedings based on a bilateral investment protection treaty, cf. BGH, judgment dated March 3, 2016 - I ZB 2/March 15, 2016 - I ZB 2/15, SchiedsVZ 2016, 328 [juris margin note 15]; decision dated October 1, 31, 2018 - I ZB 2/15, SchiedsVZ 2019, 46 [juris margin note 16]; Decision dated November 17, 2021 - I ZB 16/21, IWRZ 2022, 129 [juris margin notes 8, 34]; Raeschke-Kessler in Prütting/Gehrlein, ZPO, 14th ed., Section 1061 margin note 11; Köster loc. cit. p. 30; Schwab/Walter, Arbitration, 7th ed., Chapter 41 margin note 22; cf. also BeckOK.ZPO/

Wolf/Eslami loc. cit. Section 1025 margin note 9a; MünchKomm.ZPO/Münch loc. cit. preliminary to Section 1025 margin notes 18 to 22), which also includes ICSID investment arbitration proceedings (cf. Herdegen, International Commercial Law, 13th ed, Section 23 margin note 97; Kern loc. cit. p. 66 to 88; Schöbener/Markert, ZVglRWiss 2006, 65, 68 to 70 including additional evidence; openly Schwab/Walter loc. cit. chapter 41 margin note 5, fn. 42; also Raeschke-Kessler in the publication by Schlick, 2015, p. 57 f., 75; in general Pirrung, Arbitration under the World Bank Convention for Investment Disputes, 1972, p. 183 to 192 including additional references).

39          (d) Insofar as the appeal on points of law argues that lawmakers intended to make a conclusive provision for ICSID proceedings by amending Section 2.2, InvStreitBeilG in the course of the new regulation of arbitration law through the law dated December 22, 1997 (Federal Law Gazette I p. 3224), this is not valid.

40          Before the reform of the arbitration law, the provision stated that the provisions on the procedure for the declaration of the enforceability of domestic arbitration awards, which in accordance with Section 1044 (1) (1) ZPO (old version) also applied to foreign arbitral awards, applied accordingly to the procedure for the determination of the admissibility of the mandatory enforcement of an ICSID arbitral award. The provisions on the procedure for the declaration of enforceability of foreign arbitral awards (Section 1025 (4), Sections 1061 to 1065, ZPO are now, however, expressly applicable.

41          This amendment is only one of many necessary consequential adjustments to already existing provisions to bring them into line with the new provisions of Book 10 of the ZPO (cf. BT-Drucks. 13/5274, p. 68). It does not change the fact that Art. 2, InvStreitBeilG still only regulates the post-arbitral phase after the award has been made and that the corresponding application of the provisions of Book 10 of the ZPO only concerns the enforcement of ICSID awards.

Statements on the (non-)applicability of Section 1025 (2), ZPO (and Section 1032 (2), ZPO) to ICSID arbitration proceedings cannot be inferred from this, particularly in view of the deliberate extension of the scope of the application of the Book 10 of the ZPO beyond the UNCITRAL Model Law to all arbitration proceedings (cf. BT-Drucks 13/5274, pp. 25 and 31).

42        (e) At least for the declaratory proceedings pursuant to Section 1032 (2) ZPO that are at issue here, the existing regulatory gap in Section 1025 (2) ZPO also becomes apparent when considering the provisions on geographical jurisdiction in Section 1062 (1) and (2) ZPO, which, with the delimitation of only the domestic place of arbitration, open up a basically global scope of application.

43        Section 1062 (1)(2)(1) ZPO regulates the jurisdiction of the Higher Regional Court designated in the arbitration agreement or, in the absence of such a designation, in whose district the place of arbitration is located, for decisions on applications concerning the determination of the admissibility or inadmissibility of arbitration proceedings (Section 1032 ZPO). If in this case there is no German place of arbitration, the Higher Regional Court in whose district the Respondent has its registered office or usual place of residence or in whose district the assets of the Respondent or the object claimed by the arbitral action or affected by the measure are located, alternatively the Court of Appeal, will have jurisdiction to rule (Section 1062 (2) ZPO).

44        Taking into account the legal concept of the dual function of geographical jurisdiction, this provision suggests that Section 1025 (2) ZPO for international jurisdiction – like Section 1062 (2) ZPO for geographical jurisdiction – is always applicable (accordingly), despite the positive wording ("abroad", "not yet determined"), if there is "no German place of arbitration."

45          In case of doubt, if there are no special rules on jurisdiction, international jurisdiction is indirectly derived from the provisions on geographical jurisdiction (also known as the "dual function"; on Section 32 ZPO, cf. BGH, decision dated June 28, 2007 - I ZR 49/04, BGHZ 173, 57 [juris (23] - Cambridge Institute, including additional references; generally, Roth in Stein/Jonas loc. cit. before Section 12 margin note 32, 32b; Zöller/Schultzky loc. cit. Section 1 margin note 8). As far as a German court has geographical jurisdiction in accordance with these provisions, it also has international jurisdiction in accordance with German law (see MünchKomm.ZPO/Patzina loc. cit. Section 12 margin note 90).

46          Section 1025 (2), ZPO does contain a special provision for international jurisdiction. The provision, however, must be interpreted in accordance with Section 1062 (2), ZPO. If Section 1062 (2), ZPO provides for a geographical jurisdiction of the Court of Appeal as an alternative for the declaratory proceedings pursuant to Section 1032 (2), ZPO in cases where – as in this case – there is "no German place of arbitration," a lack of international jurisdiction in this case reveals an unintended loophole.

47          (3) The characteristic of a comparable interest situation requires the assumption that lawmakers would have arrived at the same result in a weighing of interests according to the principles that guided it when enacting the standards referred to (BGH, GRUR 2020, 429 [juris, margin note 34] – sports betting in restaurants). This is the situation here.

48          According to the intention of lawmakers, which manifested itself in the wording of the law, the German courts should be able to be referred to in the cases listed in Section 1025 (2), ZPO even if the arbitration proceedings take place abroad (cf. BT-Drucks. 13/5274, p. 31). The interest expressed therein in a global jurisdiction of the German courts in the cases mentioned is given in delocalized arbitration proceedings under the ICSID Convention as well as in arbitration proceedings with place of arbitration abroad. This can be seen in particular in Section 1032 (1), ZPO on arbitration objections in lawsuits before the national court, which is expressly referred to in the explanatory memorandum to the law.

In the case of ICSID arbitration proceedings, this defense, with the possible consequence of the inadmissibility of the action, is also only opened up through the corresponding application of Section 1025 (2), ZPO. If the defense of the (ICSID) arbitration agreement does not lead to the inadmissibility of the action before the national court due to the lack of applicability of Section 1032 (1), ZPO (via Section 1025 (2), ZPO), this would contradict the sense and purpose of arbitration agreements, also within the scope of application of the ICSID Convention.

49          3. The application pursuant to Section 1032 (2), ZPO was filed with the Higher Regional Court in due time.

50          a) The deciding factor with regard to the timeliness of the application in accordance with Section 1032 (2) ZPO, which can be filed until the arbitral tribunal has been constituted, is the receipt by the Court, not the serving of the application on the opposing party (cf. BGH, judgment dated June 30, 2011 - III ZB 59/10, GRUR 2012, 95 [juris margin notes 10] including additional references; MünchKomm.ZPO/Münch loc. cit. Section 1032 margin note 30; Voit in Musielak/Voit loc. cit. Section 1032 margin note 10). A non-permanent arbitral tribunal is formed pursuant to Section 1032 (2), ZPO if all arbitrators have been appointed and the arbitrators have not only been nominated but have also accepted their office (cf. BGH, judgment dated February 9, 2023 - I ZB 62/22, NJOZ 2023, 497 [juris margin note 15] including additional references).

51          b) Accordingly, the time limit was observed here. The application was received by the Higher Regional Court on May 10, 2021 and thus before the formation of the arbitral tribunal on June 2, 2021.

52          4. The application pursuant to Section 1032 (2), ZPO is also admissible. In the context of an application of this kind, the national court examines whether an effective arbitration agreement exists, whether it is enforceable, and whether the subject matter of the arbitration proceedings is subject to the arbitration agreement (BGH, judgment dated September 19, 2019 - I ZB 4/19, SchiedsVZ 2020, 50 [juris, margin note 11] including additional evidence). In the present context, the national court can also perform this examination with a view to

ICSID arbitration proceedings that have already been initiated, which according to Article 41 (1) of the ICSID Convention, provide for a genuine competence of the arbitral tribunal to decide on its jurisdiction. The blocking effect of the ICSID arbitration regarding proceedings before the national courts (see C I 4 b) does not apply here by way of exception because the application of European Union law takes precedence (see C I 4 c and d).

53          a) The Higher Regional Court assumed that the admissibility of the application was not precluded by the fact that the procedural rules of the ICSID Convention in conjunction with the Investment Disputes Settlement Act do not provide for a review in accordance with Section 1032 (2), ZPO. It was stated that arbitration proceedings under the ICSID Convention were in principle not subject to review by national courts. This did not affect the admissibility of the application under Section 1032 (2), ZPO, however, because the Court did not decide on the admissibility and merits of the arbitration claim, instead on the question of whether there was an effective arbitration agreement in place as a basis of the arbitration proceedings – in this case also as a result of the European Union provision in Article 26, ECT.

54          The fact that the proceedings are based on the regulation of international commercial law in the field of investment protection on the basis of an international treaty does not preclude analyzing the Applicant's request on the basis of the fact that European Union law takes precedence. Nor did the fact that the Court of Justice of the European Union had not made any statements on the national procedural rules and their applicability in the case of ICSID arbitration proceedings prevent a decision in accordance with Section 1032 (2), ZPO. It was up to the national court to give full effect to European Union law by interpreting its legal provisions accordingly. Precisely because Section 1032 (2), ZPO is a provision that serves the purpose of procedural economy, the early determination of the invalidity of the arbitration agreement under European Union law in this case must be made in these proceedings. The result stands up to legal scrutiny.

55          b) Proceedings before the national courts are, however, in principle blocked, at least from the time of the initiation of ICSID arbitration proceedings, by the arbitral tribunal's jurisdiction pursuant to Article 41 (1) of the ICSID Convention, which takes precedence in this respect because it is more specific.

56          aa) The ICSID Convention under international law has the rank of a simple federal law in the German legal system on the basis of the 1969 implementing law pursuant to Article 59.2 (1) of the Basic Law. The provisions of the Treaty are given domestic validity by the order to apply the law pursuant to Article 59.2 (1) of the Basic Law (see BVerfGE 141, 1 [juris, margin note 45 f.]; von Arnauld, International Law, 5th ed, margin note 509; BeckOK.GG/Pieper, 55th edition [as of May 15, 2023], Art. 59 margin note 41; Nettesheim in Dürig/Her-zog/Scholz, GG, 90th supplementary edition February 2020, Art. 59 margin note 177 f.; on the ICSID Convention cf. Seelmann-Eggebert, SchiedsVZ 2023, 32, 36). In the case of a conflict of laws, the lex-posterior principle and the lex-specialis principle apply to domestic laws of the same rank (cf. BVerfGE 141, 1 [juris, margin note 49 f.]). The principle of the Basic Law's commitment to international law requires that, insofar as possible, national laws must be interpreted in such a way that a conflict with the Federal Republic of Germany's obligations under international law does not arise. Thus, within the framework of applicable methodological principles, a law that is friendly to international law must in principle be chosen from among several possible interpretations of a law, (BVerfGE 141, 1 [juris margin notes 71]; von Arnauld loc. cit. margin note 517, 525 f.; BeckOK.GG/Pieper loc. cit. art. 59 margin note 38, 44). This does not, however, result in a constitutional obligation to comply with every provision of international law without restriction (BVerfGE 141, 1 [juris margin note 69]).

57          bb) The ICSID Convention has a closed legal system with its own procedural rules. Whereas under national arbitration law and the UNCITRAL Model Law, both from the pre-arbitral phase up to the formation of the arbitral tribunal, and from the arbitral phase during the arbitration proceedings to the post-arbitral phase after the award has been made, the national courts can be called upon to monitor and support the

arbitration proceedings (cf. for example Section 1032 (2), Section 1033, Section 1040 (3 (2) and

Sections 1059 to 1061, ZPO) and have the final decision-making jurisdiction (cf. BGH, GRUR

2012, 95 [juris margin notes 11]; Schütze in Wieczorek/Schütze loc. cit. Section 1032 margin note

17), the ICSID Convention deliberately deviates from any involvement of the national courts of this

kind.

58          cc) To clarify the question of the jurisdiction of the Centre pursuant to Article 25 of the

ICSID Convention and, consequently, the question of the jurisdiction of the arbitral tribunal, the

arbitral tribunal alone is the competent forum in accordance with Article 41 (1), of the ICSID

Convention, at any rate as of the time of the registration of an ICSID arbitration – in this case,

as of February 2, 2021.

59          (1) In accordance with Art. 25 (1) (1) of the ICSID Convention, the jurisdiction of the

Centre will extend to all disputes between a Contracting State and a national of another

Contracting State which are directly related to an investment, if the Parties have consented in

writing to submit the dispute to the Centre.

60          From the submission of the request for arbitration (Art. 36 (1), ICSID Convention) until

its registration, the Secretary General of the Centre is responsible, in accordance with Art. 36 (3

(1) ICSID Convention, for the preliminary examination as to whether the dispute obviously does

not fall within the Centre's jurisdiction according to Art. 25, ICSID Convention (also known as

"screening power"; cf. Escher, RIW 2001, 20, 23 f.; Escobar in Fouret/Gerbay/Alvarez loc. cit.

Art. 36 paras. 4.23, 4.35; Kern loc. cit. p. 60 including additional references; Schöbener/Markert,

ZVglRWiss 2006, 65, 76 f.). The Secretary General's power to refuse registration is defined so

narrowly that it does not interfere with the jurisdiction of the arbitral tribunal (cf. von Wobeser in

Fouret/Gerbay/Alvarez loc. cit. art. 41 margin note 4.184).

61          This jurisdiction of the arbitral tribunal is established by Art. 41 (1), ICSID Convention,

according to which the arbitral tribunal itself decides on its jurisdiction. In doing so, it may,

irrespective of a positive

preliminary examination by the Secretary-General, still deny the jurisdiction of the Centre (cf. Pirrung loc. cit. p. 94 f., 97; Schöbener/Markert, ZVglRWiss 2006, 65, 77 including additional evidence; von Wobeser in Fouret/Gerbay/Alvarez loc. cit. Art. 41 margin note 4.184). In such a case, the effective formation of the arbitral tribunal remains, even if the effectiveness of the Parties' consent to ICSID arbitration is disputed and it should turn out to be ineffective (cf. Kriebaum in Schreuer's Commentary on the ICSID Convention, 3rd ed., Art. 41 margin note 7 f.). The decision as to whether the jurisdictional requirements of Art. 25 of the ICSID are fulfilled therefore lies in principle solely with the arbitral tribunal according to Art. 41 (1 ICSID Convention (cf. Kern loc. cit. p. 60; von Wobeser in Fouret/Gerbay/Alvarez loc. cit. Art. 41 (4.182, 4.184).

62          (2) Accordingly, Art. 41 (1) ICSID Convention applies in derogation from Section 1040, ZPO, which provides for the (provisional) jurisdiction of the arbitral tribunal in interaction with Section 1032 (2), ZPO only as of the formation of the arbitral tribunal (cf. BeckOK.ZPO/Wolf/Eslami loc. cit. Section 1032 margin note 2; Schütze in Wieczorek/ Schütze loc. cit. 2; Schütze in Wieczorek/ Schütze loc. cit. Section 1032 margin note 8), and at any rate from the moment of the commencement of the arbitration proceedings (cf. Kriebaum in Schreuer's Commentary on the ICSID Convention loc. cit. Art. 41 margin note 25 and margin notes 83 to 85; Kryvoi, International Centre for Settlement of Investment Disputes (ICSID), 4th ed, margin note 208; Pirrung loc. cit. p. 97; von Wobeser in Fouret/Gerbay/Alvarez loc. cit. Art. 41 margin note 4.179; Steinbrück/Krahé, IPRax 2023, 36, 38 f.). According to No. 6 (2), Rules of Procedure for the Institution of Conciliation and Arbitration Proceedings, an ICSID arbitration is deemed to be commenced as soon as it is registered. Whether Art. 41 (1) of the ICSID already applies in the period from the filing of the request for arbitration until its registration does not need to be decided in the dispute, because registration has already taken place.

63          (3) From a systematic point of view, the seamless connection to the preliminary examination by the Secretary General of the Centre, which is thereby ensured, favors the jurisdiction of the arbitral tribunal at least from the time of the initiation of the proceedings as a result of their registration.

In accordance with Art. 36 (3) (1) of the ICSID Convention, this extends from the filing of the application to the registration and is concluded therein. The decisive point in time for the Centre and the arbitral tribunal to examine whether the requirements of Art. 25, ICSID have been met is therefore the registration; subsequent changes are irrelevant (see Banifatemi/Edson in Fouret/Gerbay/Alvarez loc. cit. Art. 25 margin note 2.09 including additional references; Kriebaum in Schreuer's Commentary on the ICSID Convention loc. cit. Art. 41 margin notes 83 to 85).

64          The meaning and purpose of the Convention, which is designed to create the greatest possible detachment from national law and national courts (cf. Pearsall in Fouret loc. cit. p. 117, 118; Sasson in Fouret/ Gerbay/Alvarez loc. cit. Art. 62 margin note 7.04; Happ in Schütze loc. cit. 7.04; Happ in Schütze loc. cit. XV. chapter, section II margin note 13; Kern loc. cit. p. 65; Kröll, NJW 2023, 819, 820), favors complete decision-making power within the ICSID system from the filing of the application, and in any case from the initiation of the proceedings.

65          Contrary to the mandatory provision for commercial arbitration in Section 1040 (3 (2) ZPO (cf. BGH, judgment dated July 24, 2014 - III ZB 83/13, BGHZ 202, 168 [juris [10] with corrigendum; Schroeter, SchiedsVZ 2004, 288, 290; on the corresponding provision in Art. 16 (3 (2) UNCITRAL Model Law cf. Melis in Kronke/Melis/Kuhn loc. cit. part P margin note 279), in ICSID arbitration there is in principle no subsequent review of the jurisdiction decision by national courts and thus no jurisdiction over a final decision by national courts. According to the more specific and therefore fundamentally more important provisions of the ICSID Convention, the examination of jurisdiction is to be carried out exclusively within the framework of the arbitration proceedings themselves (cf. Pirrung loc. cit. p. 116; Schöbener/Marker loc. cit. 116; Schöbener/Markert, ZVglRWiss 2006, 65, 74; Berger, SchiedsVZ 2017, 282, 290; Raeschke-Kessler, SchiedsVZ 2018, 1, 6; Kröll, NJW 2023, 819, 820 f.; Seelmann-Eggebert, SchiedsVZ 2023, 32, 36; Steinbrück/Krahé, IPRax 2023, 36, 38). This also satisfies the priority of international treaties, which lawmakers considered self-evident when reforming the arbitral procedure (cf. BT-Drucks. 13/5274, p. 31).

66          dd) Therefore, the jurisdiction of the arbitral tribunal pursuant to Article 41.1 of the ICSID

Convention, when the provisions of the ICSID Convention are considered in isolation, precludes

the proceedings pursuant to Section 1032 (2), ZPO because proceedings have already been

initiated. According to the database available on the ICSID website (icsid.worldbank.org), the

arbitration proceedings were registered on February 2, 2021 under file number ICSID ARB/21/4

and were thus initiated, whereas the application pursuant to Section 1032 (2), ZPO was only

received by the Higher Regional Court in May 2021.

67          ee) Since the arbitration proceedings have already been initiated, the significance of

the provision of Article 26 (1) of the ICSID Convention, according to which the consent of the

Parties to arbitration under the Convention is at the same time deemed to be a waiver of any

other remedy, unless otherwise declared, is not decisive. This provision applies directly only for

the time until the submission of the request to the Centre (cf. Alexandrov in Schreuer's

Commentary on the ICSID Convention loc. cit. Art. 26 (6; Haridi in Fouret/Gerbay/Alvarez loc.

cit. Art. 26 margin note 2.258 f.).

68          c) The blocking effect of Article 41.1 of the ICSID Convention, however, does not

exceptionally prevent the admissibility of an application pursuant to Section 1032 (2), ZPO in

the special constellation of the dispute of an intra-EU investor-state arbitration under the ICSID

Convention on the basis of Article 26 of the ECT because of the primacy of application of

European Union law – even over international law.

69          aa) According to the established case law of the Court of Justice of the European Union,

European Union law originates from an autonomous source, the Treaties, and takes precedence

over the law of the Member States. The autonomy of the European Union's legal system exists

both vis-à-vis the law of the Member States and vis-à-vis international law (cf. ECJ, Opinion of April

30, 2019 - Gut 1/17, EuGRZ 2019, 191 [juris (109) - CETA Agreement EU-Canada, with citations;

on the supremacy over public international law, cf. also ECJ, decision dated September 3,

2008 - C-402/05, C-415/05, [2008] ECR I-6351 = EuGRZ 2008, 480 [juris (281 to 285] - Kadi and Al Barakaat Foundation v Council and Commission). The primacy of the application of European Union law requires national courts, which have to apply the provisions of European Union law within their jurisdiction, to ensure the full effectiveness of these provisions. For that purpose, as applicable, they must not apply any conflicting national provision on the basis of their own decision-making power, without requesting or awaiting the prior elimination of that provision by legislative means or by another constitutional procedure (cf. ECJ, judgment dated December 4, 2018 - C-378/17, NZA 2019, 27 [juris (35] - Minister for Justice and Equality and Commissioner of a Garda Síochána, including additional evidence; judgment dated September 2, 2021 - C-741/19, SchiedsVZ 2022, 34 [juris margin notes 43] - Komstroy; cf. also BVerfGE 126, 286 [juris margin notes 53]; Nettesheim in Grabitz/Hilf/ Nettesheim, EU Law, 48th Supplementary Edition August 2012, Art. 288 TFEU margin notes 47 to 53).

70          bb) According to the similarly established case law of the Court of Justice of the European Union, Articles 267 and 344 TFEU are to be interpreted as precluding a provision in an international agreement entered into by two Member States under which an investor of one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter before an arbitral tribunal to whose jurisdiction that Member State has submitted (cf. ECJ, decision dated March 6, 2018 - C-284/16, SchiedsVZ 2018, 186 [juris (32, 60] - Achmea; ECJ, SchiedsVZ 2022, 34 [juris (42] - Achmea). March 2018 - C-284/16, SchiedsVZ 2018, 186 [juris (32, 60] - Achmea; ECJ, SchiedsVZ 2022, 34 [juris (42 to 46] - Komstroy; ECJ, decision dated October 6, 26, 2021 - C-109/20, EuZW 2021, 1097 [juris (44] - PL Holdings; decision dated January 25, 2022 C638/19, RIW 2022, 219 [juris (138] - European Food; Opinion dated June 16, 2022 - C-1/20, juris (47 with (20 - Modernized Energy Charter Treaty; Decision of September 21, 2022 - C333/19, BeckRS 2022, 26460 (33 - Romatsa).

71          An ICSID arbitral award is to be regarded as incompatible with European Union law, in particular with Articles 267 and 344 TFEU, if the arbitration clause underlying the arbitration proceedings calls into question the preservation of the specific nature of European Union law guaranteed by the preliminary decision procedure in violation of the principles of loyal cooperation and autonomy of European Union law (cf. ECJ, RIW 2022, 219 [juris (142) - European Food; BeckRS 2022, 26460 (41 f. - Romatsa). An arbitral award that is thus incompatible with European Union law cannot have any effect and thus cannot be enforced. A court of a Member State dealing with the enforcement of an ICSID award of this kind is obliged not to apply the award and consequently may not enforce it under any circumstances (cf. ECJ, BeckRS 2022, 26460, (43 f. - Romatsa [in French]; for the translation of the operative part, cf. OJ C 24 of January 23, 2023, p. 14).

72          cc) According to these principles, in the intra-EU context, a national court review of an ICSID arbitral award following a declaration of enforceability proceedings is mandatory for reasons of European Union law – contrary to the regulatory system of the ICSID Convention (cf. C I 4 c c [1]). In this case, however, the principle of effectiveness ("effet utile") requires that, when deciding on the admissibility of an upstream remedy such as Section 1032 (2), ZPO, Article 41 (1) of the ICSID Convention – which simple federal German law provides via the implementing law – is not applied to give effect to European Union law as soon as possible (cf. C I 4 c c [2]).

73          (1) According to the case law of the Court of Justice of the European Union, judicial review of an ICSID award in an intra-EU investor-state constellation, such as here, is mandatory in the downstream declaration of enforceability proceedings.

74          (a) The "European Food" and "Romatsa" judgments show that the Court of Justice of the European Union considers its jurisdiction under Articles 267, 344 TFEU for the downstream phase of the enforcement of an arbitral award to be unaffected by the ICSID Convention. Notwithstanding the complete exclusion of a review of an ICSID award by the national courts provided for in Articles 53, 54 of the ICSID Convention, the national courts are obliged to disapply an award that is incompatible with Union law and consequently may not enforce it under any circumstances (cf. ECJ, BeckRS 2022, 26460 (43 et seq. - Romatsa; cf. also ECJ, RIW 2022, 219 [juris (142] - European Food; on the annulment of an intra-EU ICSID award, cf. Court of Cassation of the Grand Duchy of Luxembourg, judgment dated July 14, 2022 - CAS-2021-00061 (26 to 40 and 43, www.italaw.com/sites/default/files/case-documents/italaw170526.pdf- last accessed on June 3, 2023).

75          (b) Such a downstream control over ICSID arbitral awards in the intra-EU context is not precluded by Art. 2 (4), InvStreitBeilG, according to which the application to determine the admissibility of enforcement may only be rejected if the arbitral award has been set aside in proceedings pursuant to Art. 51 or Art. 52, ICSID Convention. The primacy of application of European Union law (margin note 69 above) requires that this national provision be left inapplicable in the intra-EU context for being a conflicting national provision.

76          (2) If a downstream control of ICSID awards by the German courts are therefore mandatory for reasons in accordance with European Union law, notwithstanding Articles 53, 54 of the ICSID Convention and Article 2 (4) of the InvStreitBeilG, the primacy of application of European Union law according to the principle of effectiveness ("effet utile") is also to be extended to the upstream declaratory proceedings in accordance with Section 1032 (2), ZPO, and its admissibility must be affirmed.

77                  (a) The principle of effectiveness requires, according to the established case law of the

Court of Justice of the European Union, that the applicable national legislation does not render

practically impossible or excessively difficult the exercise of the rights conferred by the European

Union's legal system. This must be assessed in the light of the position of the provision in the

proceedings as a whole, the course of the proceedings, and the specific features of the

proceedings before the various national bodies (ECJ, judgment dated November 11, 2015 - C-

505/14, EuZW 2016, 57 [juris (40 f.] - Klausner Holz; judgment dated March 5, 2019 - C-349/17,

EuZW 2019, 379 [juris (137 f.] - Eesti Pagar; judgment dated April 7, 2022 - C-116/20, juris (100 f.

- Avio Lucos, both with additional references). Where a provision of national law precludes the

application of a national remedy, it must be disapplied if the national remedy is otherwise capable

of giving full effect to European Union law (cf. ECJ, judgment dated June 19, 1990 - C-213/89,

paragraph 1). June 1990 - C-213/89, [1990] ECR I-2433 = NJW 1991, 2271 [juris (23] -

Factortame and others; judgment dated July 13, 2006 - C-295/04 to C-298/04, [2006] ECR I-6619

= EuZW 2006, 529 [juris (62] - Manfredi and others; cf. also Hess, European Civil Procedure Law,

2nd ed, Section 11 margin note 11.9).

78                  (b) For reasons of procedural economy, national lawmakers have deliberately created a

special remedy in Section 1032 (2), ZPO which (at least initially) precedes the arbitration

proceedings. The procedure is a German peculiarity and has no counterpart in the UNCITRAL

Model Law (cf. BT-Drucks. 13/5274, p. 38; Saenger/Saenger, ZPO, 9th ed., Section 1032 margin

note 13; on the advantages and disadvantages cf. Steinbrück, The Support of Foreign Arbitration

Proceedings by National Courts, 2009, pp. 347 to 350). A final decision on an application pursuant

to Section 1032 (2), ZPO is binding on the (national) courts in subsequent court proceedings, in

particular in proceedings for the dismissal or the declaration of enforceability pursuant to Sections

1059 to 1061, ZPO, and in legal proceedings with regard to the arbitration defense pursuant to

Section 1032 (1), ZPO (cf. BGH, judgment dated

May 6, 2021 - I ZB 71/20, juris margin note 16; BeckOK.ZPO/Wolf/Eslami loc. cit. Section 1032

margin note 42; Voit in Musielak/Voit loc. cit. Section 1032 margin note 13 f.; Zöller/Geimer loc.

cit. Section 1032 margin note 24, Section 1040 margin note 4 and Section 1059 margin note 39).

For the Parties, the remedy pursuant to Section 1032 (2), ZPO provides an opportunity to save

time and costs, if, for example, the arbitration proceedings are not initiated at all or are not

pursued further upon determination of the inadmissibility, the arbitral tribunal is convinced of the

inadmissibility or, in any case, the later court proceedings are simplified and accelerated by the

determined result.

79          (c) Article 41 (1) of the ICSID Convention, which precludes the application of Section

1032 (2), ZPO with these effects, must remain inapplicable in intra-EU investor-state arbitration

proceedings (cf. Steinbrück/Krahé, IPRax 2023, 36, 41; critically, Wilske/Markert/Ebert,

SchiedsVZ 2022, 111, 130) to give full effect to European Union law at an early stage.

80          The upstream control intended by German lawmakers with Section 1032 (2), ZPO can, in

the intra-EU context, bindingly anticipate the downstream control required under European Union

law also in the context of ICSID arbitration proceedings (cf. ECJ, BeckRS 2022, 26460 (43 f. -

Romatsa; supra (73 to 75). A determination of the inadmissibility of the arbitration proceedings in

accordance with Section 1032 (2), ZPO prevents the (later) declaration of enforceability of an

ICSID award in Germany due to the binding effect of this decision.

81          An application of Section 1032 (2), ZPO furthermore takes into account the case law of

the Court of Justice of the European Union, according to which Member States are obliged, as

soon as a dispute is brought before an arbitral tribunal on the basis of an obligation contrary to

European Union law, to examine before that arbitral tribunal or before the competent court the

validity of the

arbitration clause or the ad hoc arbitration agreement on whose basis that body was called to rule (cf. ECJ, EuZW 2021, 1097 [juris (52) - PL-Holdings).

82          To the extent that the Applicant complains in this proceeding that the case law of the Court of Justice of the European Union does not give rise to an obligation under European Union law to create a sui generis domestic remedy for a declaration of inadmissibility of the arbitration proceedings, it overlooks the fact that national law already provides for such a remedy in Section 1032 (2), ZPO, which is also applicable via Section 1025 (2), ZPO.

83          (d) The primacy of application of European Union law is not achieved by an impermissible interpretation of national law against the law (on this limit cf. ECJ, EuZW 2016, 57 [juris (32) – Klausner Holz; ECJ, judgment dated February 11, 2021 – C-760/18, NZA 2021, 333 [juris (67) – M. V. and others, including additional evidence; BGH, judgment dated July 29, 2021 – I ZR 135/20, GRUR 2021, 1320 [juris margin note 36] = WRP 2021, 1290 – Bottle Deposit III, including additional references). The admissibility of the application pursuant to Section 1032 (2), ZPO results from the wording of Section 1032 (2), ZPO, given the inapplicability of Art. 41 (1) ICSID Convention as required by European Union law (on the primacy of application of European Union law, cf. margin note 69 above). The provisions in Art. 2 f. InvStreitBeilG in this respect cover only the downstream phase after the ICSID award has been issued; statements on the upstream phase and the applicability of Section 1032 (2), ZPO cannot be inferred from these provisions.

84          d) The primacy of European Union law over Art. 41, ICSID Convention is not exceptionally excluded pursuant to Art. 351 (1), TFEU.

85          aa) In accordance with Article 351 (1), TFEU, the rights and obligations arising from agreements entered into before January 1, 1958 or, in the case of subsequently acceding States, before the date of their accession, between one or more Member States on the one hand and one or more third-party countries on the other, are not affected by the Treaties. The purpose of the regulation is to

protect member states from breaches of international law vis-à-vis third countries which would be caused by the primacy of European Union law, and thus takes into account the maxim "pacta sunt servanda" (cf. Schmalenbach in Calliess/Ruffert, EUV/AEUV, 6th ed., Art. 351 TFEU margin note 1; Streinz/Kokott, EUV/AEUV, 3rd ed., Art. 351 TFEU margin note 1).

86          bb) According to its wording, the provision of Article 351.1, TFEU is not directly applicable in the case at hand. For the Applicant, as a founding member of the European Economic Community, the relevant date is January 1, 1958. The same applies to the Respondent with headquarters in Germany, another founding member of the European Economic Community. The ICSID Convention entered into force for the Applicant in 1966 and for Germany in 1969, and the Energy Charter Treaty, in 1998.

87          cc) According to the case law of the Court of Justice of the European Union, an analogous application of Article 351 (1), TFEU to cases in which rights and obligations from agreements are affected which – as in this case – were entered into after the relevant dates stated in the provision, but which concern a subject area for which the European Union only acquired jurisdiction later due to an increase in jurisdiction, is ruled out (cf. ECJ, judgment dated October 28, 2022 - C-435/22, NJW 2023, 349, paras. 115 to 127 - PPU). Contrary to a widespread opinion in the literature (cf. Lorenzmeier in Grabitz/Hilf/ Nettesheim loc. cit. Art. 351 TFEU margin notes 24 to 28; Schmalenbach in Calliess/Ruffert loc. cit. Art. 351 TFEU margin notes 6 to 9; on the Energy Charter Treaty cf. Köster loc. cit. p. 176 f.), Article 351 (1), TFEU, which, if its content is fulfilled, may allow for derogations from European Union law, including primary law, is to be interpreted narrowly as an exceptional provision. It only covers agreements entered into before January 1, 1958 or, in the case of subsequently acceded states, before the date of their accession (cf. ECJ, NJW 2023, 349, Paras. 119 et seq. and 126 - PPU). The current wording of the provision was adopted in the Treaty of Amsterdam and subsequently not changed in the Treaties of Nice and Lisbon, although transfers of jurisdiction as a result of

developments in the European Union's jurisdiction were known in each case. Nevertheless, a transfer of jurisdiction to the European Union was not standardized as a further possible connecting factor (cf. ECJ, NJW 2023, 349, paras. 123 to 125 - PPU).

88          5. The legal protection requirement for the application pursuant to Section 1032 (2), ZPO is present.

89          a) The Higher Regional Court assumed that the Applicant's need for legal protection, which is necessary for the application, arises already from its status as a party in the arbitration proceedings initiated by the Respondent. This assessment is not objected to as a matter of law.

90          b) Like any procedural remedy, an application made pursuant to Section 1032 (2), ZPO posits a need for legal protection. As a rule, this already results from the possible status as a party in the arbitration proceedings (cf. BGH, judgment dated November 8, 2018 - I ZB 21/18, NJW 2019, 857 [juris margin note 15]). The (subsequent) formation of the arbitral tribunal does not remove the need for legal protection for the application pursuant to Section 1032 (2) ZPO. In Section 1032 (2) and (3), ZPO, the law assumes a subsequent concurrence of the national and arbitration proceedings in the case of an admissible application filed before the formation of the arbitral tribunal (cf. BGH, GRUR 2012, 95 [juris margin note 11]; on the continuing need for legal protection in the case of an arbitral award made in the meantime, cf. BGH, judgment dated May 11, 2017 - I ZB 75/16, NJW 2017, 3723 [juris margin note 10, 14]).

91          There is no need, however, for legal protection if the plaintiff or applicant cannot achieve its objective by simpler or less expensive means or by means of the requested measure (for an application for a court judgment cf. BGH, judgment dated February 10, 2016 - IV AR (VZ) 8/15, NJW-RR 2016, 445 [juris margin note 10]; for an application for an injunction under trademark law cf. BGH, judgment dated October 15, 2020 - I ZR 210/18, GRUR 2020,

1311 [juris margin note 27] = WRP 2021, 42 - Vorwerk, including additional references; on

compulsory enforcement law cf. BGH, judgment dated October 13, 2022 - I ZB 69/21, GRUR

2023, 105 [juris margin note 13] including additional references).

92          c) Accordingly, the need for legal protection exists in the case at hand. Application 1 refers

to actual arbitration proceedings in which the Applicant is the Respondent. The declaratory

proceedings in accordance with Section 1032 (2), ZPO are also not objectively pointless; above all,

they are not invalidated by the rendering of a legal opinion, but instead have legal and factual

effects. In particular, a declaration of the inadmissibility of the arbitration proceedings pursuant to

Section 1032 (2), ZPO prevents the subsequent declaration of enforceability of an ICSID award in

Germany (cf. margin note 80 above).

93          Furthermore, an upstream declaratory decision by the highest German court can have a

strong signaling effect for other national courts bound by European Union law in recognition or

enforceability declaration proceedings (cf. Scheu/Nikolov, Arbitration International 2020, 253, 267

to 269). In non-EU countries as well, such a decision on enforceable declaration proceedings may

be binding, despite the binding effect of an ICSID award provided for in Art. 53, 54 ICSID

Convention on the "doctrine of comity" (also "mutual sovereign respect", cf.

Gibbons/Myers/Dolzer, RIW 2004, 899; Späth, IPrax 2006, 184 and 185 f.) (cf. US District Court

for the District of Columbia, judgment dated 29 June 2021 - Civil Action No. 20-817 - Infrared

Environmental Infrastructure GP Ltd. v. Spain, https://casetext.com/case/infrared-envtl-

infrastructure-gp-ltd-v-kingdom-of-spain - last accessed on June 3, 2023, where "considerations of

comity" are explicitly addressed; on the inconsistent case law of the US District Court for the

District of Columbia in this respect, cf. Hindelang/ Naßl/Jena, Achmea goes to Washington,

VerfBlog, 2023/4/19; cf. also Scheu/Nikolov, Arbitration International 2020, 253, 271 f.;

Steinbrück/Krahé, EuZW 2022, 357, 364 f.; van der Beck, Investment Protection by Arbitration

Boards in the European Union, 2022, p. 255 f.; on the dangers of possible

enforcement proceedings in non-EU countries such as the USA pursuant to Art. 54 ICSID Convention, cf. COM [2022] 523 final dated October 5,2022, p. 1).

94          Also, an at least factual-direct effect on an ICSID arbitration that has already been initiated is not excluded (cf. Steinbrück/Krahé, IPRax 2023, 36, 38; van der Beck loc. cit. p. 259). An arbitral tribunal is obliged to work towards an effective award (cf. BGH, judgment dated May 5, 1986 - III ZR 233/84, BGHZ 98, 32 [juris (15]; Schroeter, SchiedsVZ 2004, 288, 296; Spohnheimer in Festschrift Käfer, 2009, pp. 357, 371, 373 f.). The non-observance of a prior final court decision on the inadmissibility of the arbitration proceedings in accordance with Section 1032 (2), ZPO leads – in the case of a domestic arbitral award – to nullity (cf. BGH, judgment dated October 11, 2018 - I ZB 9/18, SchiedsVZ 2019, 150 [juris (6] ; Saenger/Saenger loc. cit. Section 1032 (17; Voit in Musielak/Voit loc. cit. Section 1032 (14 et seq.), and at least to annulment (cf. MünchKomm.ZPO/Münch loc. cit. Section 1032 (40; Schroeter, SchiedsVZ 2004, 288, 295 et seq.). This does not apply to an (anational) ICSID award. In such a case, however, the award is not to be declared bindingly enforceable in Germany.

95          In addition, the arbitral tribunal must take into account that the European Commission has the means to practically enforce the case law of the Court of Justice of the European Union against arbitral awards in intra-EU investor-state arbitration proceedings. As the decision in the "European Food" case (ECJ, RIW 2022, 219) shows, compliance with an arbitral award that is contrary to EU law may constitute impermissible state aid pursuant to Art. 107 f. TFEU, which in turn may lead to infringement proceedings against the Respondent Member State pursuant to Article 108(2) (2), TFEU in conjunction with Article 258 f. TFEU (cf. von Marschall, RIW 2022, 228, 230; van der Beck loc. cit. p. 262 f., 266; cf. also Rösch, Intra-European Investment Law, 2017, p. 162 f.).

96          Nor can an objection be made that arbitral tribunals per se are inaccessible with regard to the ineffectiveness of the arbitration agreement based on European Union law against an at least factual-direct effect on intra-EU investor-state arbitration proceedings. In the arbitration Green Power Partners v. Spain, an arbitral tribunal constituted under the Arbitration Rules of the Institute of Arbitration of the Stockholm Chamber of Commerce (SCC) unanimously held that a Member State's consent to arbitration agreement was invalid pursuant to Article 26, ECT in an intra-EU dispute due to a violation of European Union law and accordingly denied its jurisdiction (cf. award dated June 16, 2022 - SCC case no. V. [2016/135] Paras. 170, 411 f., 468 f., 476 to 478; on this Lavranos/Lath/Varma, SchiedsVZ 2023, 38, 41 f.; cf. also US District Court for the District of Columbia, Decision dated March 29, 2023 - civil case no. 21-3249, Blasket Renewable Investments v. Spain, https://jusmundi.com/en/ document/pdf/decision/en-aes-solar-and-others-pv-investors-v-the-kingdom-of-spain-memorandum-opinion-of-the-united-states-district-court-for-the-district-of-columbia-wednesday-29th-march-2023 - last accessed on June 3, 2023, according to which an [UNCITRAL] arbitral tribunal in an intra-EU investor-state arbitration is bound by the interpretation of European Union law by the Court of Justice of the European Union on the basis of Article 26, ECT).

97          II. The application pursuant to Section 1032 (2), ZPO also has merit. The arbitration proceedings are inadmissible for lack of an effective arbitration agreement. The entry into a valid arbitration agreement between the Parties is precluded by the fact that the arbitration clause in Art. 26 (2 (c), ECT is not applicable to investment disputes in the intra-EU context according to the case law of the Court of Justice of the European Union (cf. C II 3 and 4). The arbitration agreement cannot be based on Art. 25, ICSID Convention either (cf. C II 5).

98          1. The Higher Regional Court held that Application 1 had merit because there was no effective arbitration clause. The arbitration clause in Art. 26 (2) (c) (3) (4) of the

ECT was not valid in intra-EU disputes in accordance with the case law of the Court of Justice of the European Union. The Court of Justice of the European Union has ruled that arbitration proceedings under the ICSID Convention are incompatible with European Union law. Arbitration proceedings, however, under the ICSID Convention were in principle not subject to review by the national courts. In accordance with Art. 26 and 41 of the ICSID Convention, the arbitral tribunal would have to decide exclusively on a possible lack of consent by the Applicant as a result of incompatibility with European Union law by way of jurisdiction. This would mean, however, that the arbitral tribunal would have the final binding decision on the interpretation and application of European Union law, which would be contrary to the Court of Justice's monopoly on jurisdiction.

99          It was stated that this also applies to arbitration proceedings with a place of arbitration outside the European Union and to ICSID arbitration proceedings. According to the case law of the Court of Justice of the European Union, the Energy Charter Treaty itself is a legal act of the European Union. The arbitral tribunal therefore had to interpret and apply European Union law – irrespective of the specifically agreed arbitration rules and thus also according to the ICSID Convention – even though it was not part of the judicial system of the European Union. As a result, the full effectiveness of European Union law was no longer guaranteed. For it to be effective, it must be possible to assert the preliminary question of the inadmissibility of the arbitration proceedings as a result of a violation of European Union law in advance. In view of the similar facts, it was irrelevant that the Energy Charter Treaty was a multilateral agreement and not a bilateral investment protection agreement as in the decision in the "Achmea" case.

100          The involvement of the Court was not sufficiently ensured by a possible annulment proceeding pursuant to Section 1059, ZPO. In the absence of a domestic arbitral award, however, this provision was not applicable here anyway. For a thus merely possible refusal of recognition and declaration of enforceability in Germany, the award, which might be contrary to European Union law, remained in existence and an effective basis for enforcement abroad. This stands up to legal scrutiny.

101        2. The law applicable to the arbitration agreement is decisive for the examination of the effectiveness of the arbitration agreement (cf. Steinbrück loc. cit. p. 379). The arbitration agreement statute to be applied independently is determined by the (analogous) application of Art. V (1 lit. a UNC (cf. BGH, judgment dated November 26, 2020 - I ZR 245/19, SchiedsVZ 2021, 97 [juris margin note 48, 51]). Accordingly, the law chosen by the Parties prevails. The effectiveness of the arbitration agreement on arbitration proceedings initiated on the basis of the Energy Charter Treaty is therefore determined according to the Parties' intention, in particular in accordance with Art. 26 (2)(3)(4), ECT (cf. Rösch loc. cit. p.176).

102        3. According to the by-now established case law of the Court of Justice of the European Union, Articles 267 and 344, TFEU are to be interpreted as precluding a provision in an international agreement between Member States under which an investor of one of those Member States may, in the event of a dispute concerning investments in the other Member State, bring proceedings against the latter before an arbitral tribunal to whose jurisdiction that Member State has submitted, if a corresponding arbitration scheme is liable to result in such investment disputes not being resolved in a manner which ensures the full effectiveness of European Union law (cf. ECJ, EUs 2021, 1097 [juris margin note 44 f.] - PL Holdings; RIW 2022, 219 [juris (138 f.] - European Food; Becks 2022, 26460 (33 f. - Robatas; cf. also BGH, IWRZ 2022, 129 [juris margin note 10, 20 f.]).

103        a) The Court of Justice of the European Union has justified its case law by stating that an international agreement may not affect the attribution of jurisdiction set forth in the Treaties and thus the autonomy of the Union's legal system, the observance of which the Court of Justice ensures. This principle is specifically anchored in Article 344, TFEU, according to which Member States agree not to settle disputes concerning the interpretation or application of the Treaties other than as provided herein. On the basis of mutual trust, it is incumbent on the Member States, in accordance with the principle of loyal cooperation set forth in Article 4(3)(1) TEU, to take the necessary steps in their

respective territories, in particular to ensure the application and observance of European Union law and, to that end, to take all appropriate measures, whether general or particular, to ensure the fulfilment of the obligations arising from the Treaties or resulting from actions taken by the institutions of the European Union. The Treaties have established a judicial system under which, in accordance with Article 19, TEU, it is up to the national courts and the Court of Justice to ensure the full application of European Union law in all Member States and the protection of the rights which individuals derive from it. The key element of the court system designed in this way is the preliminary ruling procedure provided for in Art. 267, TFEU, which is intended to ensure the uniform interpretation of European Union law by establishing a court-to-court dialogue precisely between the Court of Justice and the courts of the Member States (cf. ECJ, Scheid's 2018, 186 [juris margin notes 32 to 37] - Aechmea; EuGRZ 2019, 191 [juris margin notes 109 to 111] - EU-Canada CETA Agreement; Scheid's 2022, 34 [juris margin notes 42 to 46] - Komstroy; cf. also BGH, IWRZ 2022, 129 [juris margin notes 10]).

104        b) This case law must be taken into account in this dispute. This is not contradicted by the fact that the provisions in Article 26 (2)(3)(4) ECT (also) constitute provisions of international law. According to the case law of the Court of Justice of the European Union, the Energy Charter Treaty has a dual nature as an agreement under international law and as a legal act of the European Union, because the European Union itself is a party to the agreement (cf. ECJ, Scheid's 2022, 34 [juris (23, 49 f.] - Komstroy; on this, Köster loc. cit. p. 131 to 135).

105        4.The dispute settlement mechanism in Art. 26 (2 (c) ECT violates Union law according to these principles for intra-EU investor-state arbitration as in the dispute. Due to its incompatibility in particular with Articles 267, 344 TFEU, there is no effective consent and thus no offer by the claimant to conclude an arbitration agreement (cf. BGH, Scheid's 2019, 46 [juris (28]; Supreme Court of Lithuania, EuZW 2022, 567 margin note 79).

106         a) This is not contradicted by any factual findings to the contrary. Insofar as the Higher Regional Court stated that both Parties had agreed to ICSID dispute settlement and that the Applicant had submitted a "standing offer" in accordance with Article 26 (3) of the ECT, this merely refers to the factual situation, but does not touch upon the disputed question of the validity of the offer in accordance with Article 26 (3) of the ECT. The latter is instead a question of law.

107         b) According to the case law of the Court of Justice of the European Union, whether the option for an investor to bring legal action before an arbitral tribunal made available in an investment protection agreement between Member States is compatible with European Union law depends, firstly, on whether the disputes on which the arbitral tribunal has to rule relate to the interpretation or application of European Union law. If the answer is in the affirmative, it depends secondly on whether the arbitral tribunal can be regarded as a court or tribunal entitled to make a referral pursuant to Article 267, TFEU or, thirdly, whether the award is subject to review by a court of a Member State, which ensures that the questions of European Union law which the arbitral tribunal might have to deal with could possibly be referred to the Court of Justice of the European Union by way of preliminary ruling proceedings (cf. ECJ, SchiedsVZ 2018, 186 [juris margin notes 39, 43, and 50] - Achmea; RIW 2021, 661 [juris margin notes 48, 51, and 54] - Komstroy; BGH, IWRZ 2022, 129 [juris (11) with citations; Scheu/Nikolov, Arbitration International 2020, 253, 256 f.).

108         This case law also applies to intra-EU investor-state arbitration under the ICSID Convention. The Court of Justice of the European Union does not differentiate between the individual arbitration rules that Art. 26 (2) (c) sets forth in conjunction with (4)(a)(b)(c) of the ECT and which also cover ICSID arbitration (cf. ECJ, Opinion dated June 16, 2022 - C-1/20, juris (47 with paras. 20, 25 - Modernized Energy Charter Treaty; so also, Steinbrück/Krahé, IPRax 2023, 36, 40 f.; likewise, already van der Beck loc. cit. p. 270 f., 393). From the judgments

in the "European Food" and "Romatsa" cases, it is clear that the case law also refers to ICSID arbitration proceedings (cf. ECJ, RIW 2022, 219 [juris (137 to 145) - European Food; BeckRS 2022, 26460 (33 to 43 - Romatsa). Insofar as these judgments held that the consent of the state is "now irrelevant" (cf. ECJ, RIW 2022, 219 [juris (145) - European Food; BeckRS 2022, 26460 (40 - Romatsa), this is solely due to the particularity of the case constellation there, namely Romania's later accession to the European Union; this does not result in a restriction of the case law with regard to arbitration proceedings under the ICSID Convention.

109        c) According to these standards, the dispute settlement mechanism in accordance with Art. 26 (2) (c) ECT in the case at issue is contrary to European Union law.

110        aa) The ICSID Arbitral Tribunal must (also) interpret and apply European Union law to the merits of the underlying investment dispute.

111        In accordance with Art. 42 (1) (1) of the ICSID Convention (a conflict of laws rule, cf. Lörcher, SchiedsVZ 2005, 11, 17), the ICSID Arbitral Tribunal will decide on the merits of the case primarily in accordance with the legal rules agreed upon by the Parties. If the state party to the dispute has declared its consent to the Centre's jurisdiction in a bilateral or multilateral investment protection treaty, the arbitral tribunal will primarily have to take into account the regulations laid down therein (cf. Escher, RIW 2001, 20, 24; Schöbener/ Markert, ZVglRWiss 2006, 65, 101 f.). According to the findings of the Higher Regional Court, the Respondent based its arbitration action on breaches of obligations under Part III of the Energy Charter Treaty. According to Art. 26 (6), ECT, an arbitral tribunal established pursuant to Art. 26 (4) ECT will decide on the issues in dispute in accordance with the Energy Charter Treaty and the applicable rules and principles of international law.

112        According to the case law of the Court of Justice of the European Union, the Energy Charter Treaty has a dual nature as an agreement under international law

and as a legal act of the European Union, because the European Union itself is a party to the Agreement. Accordingly, the arbitral tribunal's decision on the merits is in any case also made according to European Union law and not only according to international law (cf. ECJ, SchiedsVZ 2022, 34 [juris (23, 49 f.] - Komstroy; on this, Köster loc. cit. p. 131 to 135).

113        bb) According to the case law of the Court of Justice of the European Union, an ICSID arbitral tribunal does not belong to the judicial system of the European Union because it is not a court entitled to make submissions (cf. ECJ, RIW 2022, 219 [juris (141 f.] - European Food; BeckRS 2022, 26460 (36 et seq. - Romatsa; on an UNCITRAL arbitral tribunal under the Energy Charter Treaty cf. ECJ, SchiedsVZ 2022, 34 [juris (51 to 53] - Komstroy; on this, Nikolov, EuR 2022, 496, 497).

114        cc) According to the case law of the Court of Justice of the European Union, an ICSID award is not subject to sufficient review by a court of a Member State with regard to its compatibility with European Union law in view of Articles 53, 54 of the ICSID Convention (cf. ECJ, RIW 2022, 219 [juris margin note 142 to 144] - European Food; BeckRS 2022, 26460 (37 to 39 - Romatsa).

115        The (limited) review in the enforceability declaration procedure required by the case law of the Court of Justice of the European Union by way of exception also in the case of ICSID arbitral awards (cf. above paras. 73 to 75) does not lead to a different assessment. This merely brings them into line with investment arbitral awards under other arbitration rules, for which such a limited review, however, is not sufficient either (on UNCITRAL proceedings under the Energy Charter Treaty cf. ECJ, SchiedsVZ 2022, 34 [juris margin notes 54 to 59] - Komstroy; on this, Nikolov, EuR 2022, 496, 497).

116        5.The arbitration agreement cannot be based on Article 25 (1) (1) of the ICSID Convention. The ICSID Convention itself does not

establish its own arbitration agreement and does not contain the necessary consent (cf. Banifatemi/Edson in Fouret/Gerbay/Alvarez loc. cit. Art. 25 (2.76; Escher, RIW 2001, 20, 23; Kryvoi loc. cit. (38; Pirrung loc. cit. p. 74). In Article 7 of the preambles to the ICSID Convention, the Contracting States have declared that the simple ratification, acceptance, or approval of the Convention by a Contracting State does not imply its obligation to submit a particular dispute to conciliation or arbitration without its consent. Accordingly, Art. 25 (1) (1), ICSID Convention on the jurisdiction of the Centre also presupposes written consent (cf. also Art. 25 (4) (3), ICSID Convention, according to which the notification provided for in this Article does not constitute the consent required under (1); Escher, RIW 2001, 20, 23). Accordingly, Article 26 (5) (a) of the ICSID Convention contains the declaratory statement that the consent of the host state pursuant to Article 26.3 of the ICSID Convention and the consent of the investor pursuant to Article 26.4 of the ICSID Convention are deemed to satisfy the requirement of written consent of the Parties to the dispute pursuant to Chapter II (Articles 25 to 27) of the ICSID Convention.

117        III A referral to the Court of Justice of the European Union in accordance with Article 267 (3) TFEU is not required (cf. ECJ, judgment dated October 6, 1982 - 283/81, [1982] ECR 3415 [juris (21) = NJW 1983, 1257 - Cilfit et al.; judgment dated October 1, 2015 - C-452/14, GRUR Int. 2015, 1152 [juris (43) - Doc Generici; judgment dated October 6, 2021 - C-561/19, NJW 2021, 3303 [juris (32 f.) - Consorzio Italian Management and Catania Multiservizi).

118        1. The dispute does not raise any questions regarding the interpretation of European Union law that is relevant to the decision and which has not already been clarified by the case law of the Court of Justice or which cannot be answered beyond any doubt. In particular, the question of whether an intra-EU investor-state ICSID arbitration on the basis of Art. 26 (2 (c), (3 (a), (4 (a) ECT is incompatible with Union law has been clarified (cf. ECJ, RIW 2022, 219 [juris (137 to 145) - European Food; BeckRS 2022, 26460 (33 to 43 - Romatsa; cf.

also, Steinbrück/Krahé, IPRax 2023, 36, 41; also, Wackernagel, EuZW 2022, 574, 576).

119        The question of whether the principle of the effectiveness of European Union law, which has been sufficiently clarified in the case law of the Court of Justice of the European Union, as well as the obligation of the Member States pursuant to Article 19 (1) (2) TEU, require an examination of the admissibility of intra-EU investor-state arbitration proceedings on the basis of the Energy Charter Treaty as early as possible, can also be answered without any doubt. The related question of whether the Respondent state in the dispute can have the inadmissibility of the ICSID arbitration determined in the special German proceedings in accordance with Section 1032 (2), ZPO before the constitution of the arbitral tribunal, on the other hand, concerns national procedural law and is not subject to interpretation by the Court of Justice.

120        2. A referral to the Court of Justice of the European Union is also not required because the Court considers the prerequisites of an ultra vires action to be met (on the necessity of a referral in such a case, cf. BVerfG, NJW 2023, 425 [juris margin note 139]; E. Klein in Benda/Klein, Verfassungsprozessrecht, 4th ed. Klein, DVBl. 2023, p. 779, 780). The Court of Justice of the European Union has not acted ultra vires with its judgments on the invalidity of arbitration agreements in bilateral and multilateral investment protection treaties.

121        a) An ultra vires review can only be considered if a violation of jurisdiction by the European institutions is sufficiently qualified (cf. BVerfGE 126, 286 [juris (61)]; 154, 17 [juris (110)], including additional evidence). The mandate of the Court of Justice of the European Union to exercise jurisdiction, which is connected to the allocation of functions pursuant to Article 19.1 (2) TEU, ends where an interpretation of the Treaties is no longer comprehensible and is therefore objectively arbitrary (BVerfGE 154, 17 [juris, margin note 112]; on the present constellation, cf. Steinbrück/Krahé, EuZW 2022, 357, 360 f.). In the attribution of jurisdiction, the

principle of proportionality must be observed as a corrective measure to protect the jurisdictions of the Member States (cf. BVerfGE 154, 17 [juris (119, 123]).

122    b) The Court has already rejected an ultra vires action by the Court of Justice of the European Union in the "Achmea" case (cf. BGH, SchiedsVZ 2019, 46 [juris margin notes 60 to 71]). The decisions of the Court of Justice following the "Achmea" decision are also not based on an objectively arbitrary interpretation of the treaties.

123    aa) The allegation that the Court of Justice of the European Union, in its decision in the "Komstroy" case, ruled on a legal dispute that was completely external to the European Union and declared an international agreement binding on the Member States and the Union (the Energy Charter Treaty) to be "inapplicable", although its competences in accordance with Article 267 (1) TFEU were limited to the "validity" and the "interpretation" of European Union law (according to Karpenstein/Sangi, NJW 2021, 3228 margin note 7), is not valid.

124    The Court of Justice of the European Union was duly addressed in the proceedings by the Paris Appeals Court in its referral requesting a preliminary ruling pursuant to Article 267, TFEU on the Energy Charter Treaty. There is also no exceeding of jurisdiction in the statement made in an obiter dictum on the inapplicability of Art. 26 (2 (c), ECT in the intra-EU context (cf. ECJ, SchiedsVZ 2022, 34 [juris margin notes 64 to 66] - Komstroy). The Court of Justice of the European Union has the power to interpret international agreements entered into by the Union (cf. ECJ, judgment dated February 27, 2018 - C-266/16, juris (45 et seq. - Western Sahara Campaign UK, with further references). It limited itself to an interpretation of Art. 26, ECT solely in the intra-EU context and did not declare unlimited inapplicability or amend or repeal provisions of the agreement contrary to the mechanism provided for in Art. 34 and 36, ECT.

125    bb) Equally unsuccessful is the objection that the Court of Justice of the European Union is not responsible for the statements made only as obiter dictum due to the lack of a question being submitted for a preliminary referral in accordance with

Art. 267 TFEU (cf. in this respect Wilske/Markert/Ebert, SchiedsVZ 2022, 111, 128 f.; critically, Schwalb/Weiler, SchiedsVZ 2022, 38 f.; for the ultra vires act Lavranos/Lath/Varma, SchiedsVZ 2023, 38, 42 f.). The operative part of the judgment in the "Komstroy" case, in accordance with the questions referred for a preliminary ruling, only includes the interpretation of the concept of investment in Article 1 (6) and Article 26 (1), TFEU; the binding effect only extends to this (cf. Wegener in Calliess/Ruffert loc. cit. Art. 267, TFEU, margin note 50). Therefore, the Court of Justice of the European Union was not prevented from making further statements within the framework of an obiter dictum.

126        In addition, the Court of Justice of the European Union has subsequently repeatedly referred to its statements in the "Komstroy" case and thereby confirmed them, irrespective of the specific facts of the referral proceedings at that time. In particular, in its Opinion 1/20 on Article 26, ECT, it made a general reference to the decision in the "Komstroy" case, irrespective of a specific arbitration order (Opinion of June 16, 2022 - C-1/20, juris (47 with (20 - Modernized Energy Charter Treaty).

127        cc) Nor has the Court of Justice of the European Union disregarded Article 351 (1), TFEU and the legal idea expressed therein that the Member States and not the Court of Justice must remedy incompatibilities between international agreements and European Union law. The Court of Justice has comprehensibly rejected an analogous application of Article 351 (1), TFEU in view of the necessary narrow interpretation of the derogating provision (cf. ECJ, NJW 2023, 349, margin notes. 115 to 127 - PPU; margin notes 84 to 87 above).

128        dd) Nor do the judgments of the Court of Justice of the European Union violate general rules of international law (Article 25 of the Basic Law) or the Vienna Convention of May 23, 1969 on the Law of Treaties (Federal Law Gazette II 1985 p. 926; hereinafter "Vienna Convention"), in particular Article 27 of the Vienna Convention. According to this,

a contracting party may not invoke its domestic law to justify its breach of an international treaty.

129        In accordance with Article 3 (b) of the Vienna Convention, which is an expression of general customary international law, the provisions of the Vienna Convention are also applicable to non-Parties – such as the European Union (cf. ECJ, decision dated February 25, 2010 - C-386/08, ECR 2010 I-1-189 = EuZW 2010. February 2010 - C-386/08, [2010] ECR I-1289 = EuZW 2010, 264 [juris margin notes 40 to 42] - Brita, including additional evidence; decision dated February 27, 2018 - C266/16, juris (58 - Western Sahara Campaign UK; decision dated October 20, 2022 - C-111/21, NJW 2022, 3701 [juris margin note 22] - Laudamotion). Art. 26 f. of the Vienna Convention are also part of customary international law. By joining the European Union, however, the Member States have limited their power of disposition under international law and have waived among themselves the exercise of rights under international treaties that conflict with European Union law. Accordingly, customary international law conflicting with European Union law cannot exist between Member States (cf. BGH, judgment dated January 24, 2019 - I ZB 2/15, juris margin note 7; cf. also BGH, SchiedsVZ 2019, 46 [juris (40 et seq.]; Paris Appeals Court, judgment dated April 19, 2022 - no. 48/2022, RG-NR 20/13085 margin note 90) and the nationals of the Member States involved cannot rely on older obligations of the Member States under international law that are in conflict with European Union law (cf. BGH, SchiedsVZ 2019, 46 [juris margin note 41]).

130        ee) An accusation of arbitrariness cannot be justified by the fact that the Court of Justice treats investment arbitration differently from commercial arbitration, which is also regularly admissible under European Union law. This unequal treatment is objectively justified because the arbitral obligation of the host state in investment arbitration proceedings is based on its standing offer from its consent given in advance to other contracting states in an international treaty and not – as in commercial arbitration – on the exercising of party autonomy in the individual case vis-à-vis the respective investor (cf. ECJ, SchiedsVZ 2018, 186 [juris margin note 55] - Achmea; SchiedsVZ 2022, 34 [juris (59] - Komstroy).

131         This is not contradicted by the decision in the "PL-Holdings" case. The ad hoc

arbitration agreement challenged there was in fact aimed at circumventing the obligations

arising for the Member State pursuant to Article 4 (3), TEU and Articles 267, 344, TFEU as

interpreted in the decision in the "Achmea" case (cf. ECJ, EuZW 2021, 1097 [juris margin notes

47, 56] - PL Holdings).

132         ff) Insofar as there is an objection to the encroachment on concluded facts without

transitional regulations, this is the recognized consequence of the ex tunc interpretation of

European Union law by the Court of Justice of the European Union (cf. ECJ, EuZW 2021, 1097

[juris margin notes 58 to 61] - PL Holdings, including additional references; cf. also BVerfGE

126, 286 [juris margin notes 83] including additional references).

133         gg) The objection that the decisions on investment arbitration lack a proportionality test

also cannot justify an ultra vires act.

134         (1) The objection does not concern the principle of proportionality as a corrective

measure to protect Member State jurisdictions, which must also be observed in the allocation of

jurisdiction of the European Union in accordance with Article 5.1 (2) and (4), TEU

(*Bundesverfassungsgerichtsgesetz* (BVerfGE – Federal Constitutional Court) 154, 17 [juris,

margin notes 119, 123]). The decisions of the Court of Justice on intra-EU investment arbitration

proceedings concern the delimitation of the jurisdiction of, on the one hand, national courts and,

on the other hand, arbitral tribunals in the interpretation and application of European Union law.

135         (2) Irrespective of this, there are no indications that the judgments of the Court of Justice

of the European Union in the matter do not satisfy the principle of proportionality in the review of

acts of the institutions of the European Union, which is also recognized as an unwritten element of

European Union law (on this, BVerfGE 154, 17 [juris, margin notes 124 to 126], including

additional references), in order to achieve the legitimate objective of ensuring the coherence, full

validity, and autonomy of European Union law.

136          (a) In particular, the fact that the interpretation of the Energy Charter Treaty is only binding on the Member States and thus on some of Contracting Parties does not prevent it from being appropriate. The binding interpretation by the Court of Justice of the European Union can and may refer solely to the internal context of the European Union (cf. Article 19 (1) (1) (2) (3), TEU). In this area, however, its interpretation is binding on everyone and can thus achieve its objective of ensuring the coherence and uniformity of European Union law (cf. in this respect ECJ, EuGRZ 2019, 191 [juris margin note 111] - CETA Agreement EU-Canada).

137          (b) With regard to the opinion of the Court of Justice of the European Union that arbitral tribunals are not to be classified as courts or tribunals pursuant to Article 267 TFEU (cf. ECJ, SchiedsVZ 2018, 186 [juris margin notes 37, 43, 46] - Achmea), there is no lack of necessity because there may also be gaps in the submission of questions of interpretation to the national courts. In this respect, there are possibilities for remedy in individual cases. Under European Union law, infringement proceedings in accordance with Art. 258 f. TFEU (cf. ECJ, decision dated October 4, 2018 - C-416/17, EuZW 2018, 1038 [juris tenor 2 and margin notes 105 to 114] - Commission v. France; Wegener in Calliess/Ruffert loc. cit. 35 f.) and, domestically, a constitutional court review based on the standard of Article 101 (1) (2) of the Basic Law (cf. BVerfG, EuGRZ 2022, 350 [juris (41 to 47] f.; Wegener in Calliess/Ruffert loc. cit. art. 267 TFEU, margin note 36, including additional references. A comparable review in the case of arbitral tribunals entitled to make submissions, on the other hand, would not be possible.

138          (c) The decisions of the Court of Justice are also not inappropriate because of conflicting economic and foreign policy concerns. Art. 26 (2) (a), ECT expressly provides for the possibility of recourse to national courts. The Court has already stated that investors are not denied effective legal protection (Article 2 (1) in conjunction with Article 20 (3) of the Basic Law; Article 47 EU Charter of Fundamental Rights) (cf. BGH, SchiedsVZ 2019, 46 [juris, margin note 72]), but rather, with a view to the principle of mutual trust, are granted before the courts of the Member States (cf. EuGH, EuZW 2021, 1097

[juris margin note 68] - PL Holdings; Paris Appeals Court, judgment dated April 19, 2022 - no. 48/2022, RG-NR 20/13085 margin notes 92 to 95; cf. also BGH, IWRZ 2022, 129 [juris margin note 41]; Langenfeld, EuR 2022, 399, 404; van der Beck loc. cit. p. 370, 373, etc.). On the international level, there is also the possibility to appeal to the European Court of Human Rights (cf. Lavranos/Lath/Varma, SchiedsVZ 2023, 38, 46).

139         IV. Contrary to the opinion of the Higher Regional Court, Application 2 is inadmissible.

140         1. The Higher Regional Court assumed that it was irrelevant that so far only the ICSID ARB/21/4 arbitration proceedings were before the court, which had been initiated by acceptance of the offer in accordance with Article 26 (3) ECT. It was also irrelevant that an arbitration agreement would only be entered into if the Respondent accepted this "standing offer," which the Respondent denied with regard to further disputes. As a result of the provision of the Applicant's "standing" offer of arbitration in the Energy Charter Treaty, which is currently still valid, the Respondent could declare acceptance at any time and thereby initiate arbitration proceedings on an ineffective basis under EU law. This does not stand up to legal scrutiny.

141         2. Within the scope of an application pursuant to Section 1032 (2), ZPO, the national court examines whether an effective arbitration agreement exists, whether it is enforceable and whether the subject matter of the arbitration proceedings is subject to the arbitration agreement (BGH, SchiedsVZ 2020, 50 [juris, margin note 11]). It follows from this scope of examination that, as a minimum requirement for an admissible application pursuant to Section 1032 (2), ZPO, an arbitration agreement between the Parties must be presented (cf. Anders in Anders/Gehle, ZPO, 81st ed., Section 1032 margin note 3; BeckOK.ZPO/ Wolf/Eslami loc. cit. Section 1032 margin note 2; Schlosser in Stein/Jonas loc. cit. Section 1032 margin note 38). A simple potential or future arbitration agreement between the Parties is not sufficient.

142        It is disputed how far in advance of an actual arbitration the application is admissible, in particular whether an individualized arbitration which can be delimited in terms of subject matter must be apparent (cf. Munich Higher Regional Court, judgment dated August 26, 2015 - 34 SchH 2/14, juris margin notes 20, 22; Saenger/Saenger loc. cit. Section 1032 margin note 14; Hilger, NZG 2003, 575, 576; cf. also Schlosser in Stein/Jonas loc. cit. Section 1032 margin note 38, 40; Spohnheimer loc. cit. p. 357, 366), or whether an abstract review of the validity of contractual arbitration clauses is possible (so KG, SchiedsVZ 2012, 337, 338; OLG Frankfurt, SchiedsVZ 2015, 47 [juris margin notes 21 f.]; BeckOK.ZPO/Wolf/Eslami loc. cit. Section 1032 margin notes 6, 26 to 32; MünchKomm.ZPO/ Münch loc. cit. Section 1032 margin note 33; Voit in Musielak/Voit loc. cit. Section 1032 margin note 12; Seiler in Thomas/Putzo, ZPO, 44th ed. Section 1032 margin note 5).

143        3. This issue does not need to be decided upon here. Application 2 is inadmissible because there is no arbitration agreement between the Parties as alleged by the Applicant (which is, moreover, possibly invalid).

144        In this dispute, only the "standing offer" in accordance with Article 26(3), ECT of the Applicant is present. The acceptance of this offer by the Respondent with the submission of the Request for Arbitration in the ICSID ARB/21/4 proceedings did not establish an arbitration agreement covering any dispute under the Energy Charter Treaty.

145        Insofar as the Applicant wishes to have it clarified as a precautionary measure that the Respondent cannot bring about an effective arbitration agreement by a possible future acceptance of the "standing offer" – with regard to a different subject matter of the dispute – this question does not concern an actual arbitration agreement and the arbitration proceedings potentially arising therefrom, but only a potential arbitration agreement and is therefore not covered by the scope of the review of an application pursuant to Section 1032 (2), ZPO.

146        The minimum requirement of an arbitration agreement that is in any event alleged cannot be dispensed with in view of the special features of intra-EU investor-state arbitration. The principle of effectiveness of

European Union law (cf. supra margin note 77) requires an examination of the admissibility of intra-EU investor-state arbitration on the basis of the Energy Charter Treaty at the earliest stage possible. This, however, is already ensured by the fact that the legal remedy set forth in Section 1032 (2), ZPO arises as soon as an arbitration agreement exists.

147        D. Accordingly, the appeal on points of law is to be dismissed as lacking in merit with regard to Application 1. With regard to Application 2, the contested judgment on the appeal on points of law is to be set aside and the application for a declaratory judgment is to be dismissed as inadmissible. In this respect, the Court can make a decision based on the merits because the judgment is dismissed only because of a violation of the law when applying the law to the factual situation that has been established and, according to the latter, the matter is ready for a final decision (Section 577 (5) (1) ZPO).

148        The decision on costs is based on Section 92 (1) (1), ZPO.

149        The value of the subject matter of the appeal is set at €30 million.

150        The value of the subject matter of the appeal in a proceeding pursuant to Section 1032 (2), ZPO is to be set at one fifth of the value of the main case value. according to the Court's established practice (cf. BGH, SchiedsVZ 2020, 50 [juris, margin note 26]; NJOZ 2023, 497 [juris, margin note 22]).

151        Based on the amount of compensation claimed in the Request for Arbitration for the two arbitration claimants in the amount of €1.4 billion, the Court, assuming equal participation of the arbitration claimants, considers a value of €140 million to be appropriate for Application 1 (one fifth of €700 million for the Respondent here as one of the two arbitration claimants). In accordance with Section 48 (1) (1) GKG, Section 3, ZPO, half of the value of Application 1, i.e. a further €70 million, is to be assessed for Application 2 and added to the value of the subject matter in accordance with Section 39 (1) GKG. In accordance with Section 39 (2) GKG, however, the value in dispute will be a maximum of €30 million, unless a lower maximum value is determined.

If one of several objects that are the subject of dispute already exceeds the maximum value, the aggregation in accordance with Section 39 (1) GKG does not lead to an increase (see BGH, judgment dated April 6, 2010 - II ZR 130/08, juris, margin note 1).


Koch                              Feddersen                              Pohl

          Schmaltz                              Odörfer


Lower court:

Cologne Higher Regional Court, judgment dated 09/01/2022 - 19 SchH 15/21 -



# Certificate of Accuracy

| Original File Name | Translated File Name |
|---|---|
| Decision (German).pdf | Decision (English).DOCX |

August 28, 2023

We, Translate.One, hereby certify that to the best of our knowledge and belief the document attached to this letter is a true and accurate translation of the original document.

For all certified translations, Translate.One follows an ISO 9001:2015 certified process. A fully vetted professional translator who is a native speaker of the target language and expert in the subject matter translates the documents. Thereafter, an equally qualified linguist edits the translations, which are then sent back to the lead translator for finalization. As a final step, the project manager and quality control specialist reviews the final translation for completeness.

*Elizabeth Wozniak*
Elizabeth Wozniak
Senior Project Manager
Translate.One

Translate.One
3200 Cobb Galleria Parkway
Suite 200
Atlanta, GA 30339
412.261.1101
translate.one