# EXHIBIT A



EUROPEAN
COMMISSION

Brussels, 24.3.2025
C(2025) 1781 final

**SENSITIVE**[*]**:** *COMP Operations*

**COMMISSION DECISION**

**of 24.3.2025**

**on the measure State aid SA.54155 (2021/NN) implemented by Spain – Arbitration award to Antin**

(Text with EEA relevance)

(Only the English text is authentic)

---

[*]     Distribution only on a 'Need to know' basis - Do not read or carry openly in public places. Must be stored securely and encrypted in storage and transmission. Destroy copies by shredding or secure deletion. Full handling instructions https://europa.eu/!db43PX

**EN**                                                                                                           **EN**

COMMISSION DECISION

of 24.3.2025

on the measure State aid SA.54155 (2021/NN) implemented by Spain – Arbitration award to Antin

(Text with EEA relevance)

(Only the English text is authentic)

THE EUROPEAN COMMISSION,

Having regard to the Treaty on the Functioning of the European Union, and in particular Article 108(2), first subparagraph, thereof,

Having regard to the Agreement on the European Economic Area, and in particular Article 62(1), point (a), thereof,

Having called on interested parties to submit their comments pursuant to the provisions cited above[1] and having regard to their comments,

Whereas:

## 1.     PROCEDURE

(1)     By electronic notification of 17 April 2019, Spain notified to the Commission, pursuant to Article 108(3) of the Treaty on the Functioning of the European Union ('TFEU'), the arbitration award issued on 15 June 2018 by the Arbitration Tribunal (the 'Tribunal'), established under the auspices of the International Centre for Settlement of Investment Disputes ('ICSID'), in the arbitration proceedings *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.* (together 'Antin') *vs Spain*[2]. The award made in conclusion of those proceedings, as amended on 29 January 2019 by the Tribunal's rectification decision[3], orders payment to Antin of compensation of EUR 101 million, together with interest on this sum and contribution to the costs of the arbitration proceedings, to be paid by Spain due to Spain's breach of the Energy Charter Treaty (the 'ECT')[4] (the 'Award').

---

[1]     OJ C 450, 5.11.2021, p. 5.
[2]     ICSID Case No ARB/13/31. Details available here: https://icsid.worldbank.org/cases/case-database/case-detail?CaseNo=ARB/13/31.
[3]     See footnote 2.
[4]     The ECT is an international agreement applicable to the energy sector. It was signed in December 1994, among others, by the European Union ('Union'), as well as by Spain, the Netherlands and Luxembourg, and it entered into force in April 1998 see Council and Commission Decision 98/181/EC/ECSC/Euratom of 23 September 1997 (OJ L 69, 9.3.1998, p. 1). The ECT's provisions include the protection of investment, trade in energy materials and products, transit and dispute settlement. The Union withdrew from the ECT in June 2024, see Council decision 2024/1638 of 30 May 2024. Spain also withdrew from the ECT in April 2024.

(2)    By notifying the Award, Spain acted in accordance with its obligation pursuant to Article 108(3) TFEU, which is also recalled in the Commission Decision of 10 November 2017 in case SA.40348[5] (the '2017 Commission Decision').

(3)    By letter dated 19 July 2021, the Commission informed Spain that it had decided to initiate the procedure laid down in Article 108(2) TFEU in respect of the Award (the 'Opening Decision').

(4)    The Opening Decision was published in the *Official Journal of the European Union*[6]. The Commission called on interested parties to submit their comments on the Opening Decision.

(5)    The Commission received comments from 23 interested parties, including from Antin. Spain did not submit comments on the Opening Decision. By letters dated 1 February 2022 and 25 November 2022, the Commission forwarded these comments to Spain, which was given the opportunity to react. Spain transmitted its comments by letters dated 20 April 2022, 3 January 2023, 27 November 2023 and 29 January 2024.

(6)    Further information was submitted by Spain on 6 March 2025.

(7)    On 4 March 2025, the Spanish authorities exceptionally agreed to waive their rights deriving from Article 342 TFEU, in conjunction with Article 3 of Council Regulation No 1/1958[7], and to have this Decision adopted and notified in English.

## 2.    BACKGROUND IN CONNECTION WITH INTRA-EU ARBITRATION[8]

(8)    As consistently considered by the Commission[9] and held by the Court[10], intra-EU investor-State arbitration mechanisms arising from Bilateral Investment Treaties ('BITs') and the ECT are contrary to EU law, and in particular with Article 19(1) of the Treaty on the European union ('TEU'), Articles 267 and 344 TFEU and the principle of autonomy of the EU legal order.

(9)    On 6 March 2018, the Court of Justice held in its *Achmea* judgment that investor-State arbitration clauses in intra-EU BITs are incompatible with the EU Treaties, and in particular with Articles 267 and 344 TFEU, because such clauses have an adverse effect on the autonomy of Union law[11].

(10)    The reasoning set out in the *Achmea* judgment is equally applicable to the intra-EU application of the ECT as stated by the Court of Justice in the *Komstroy* judgment[12].

---

[5]    Commission Decision C(2017) 7384 final of 10 November 2017 in State aid SA.40348 (2015/NN) – Spain - Support for electricity generation from renewable energy sources, cogeneration and waste (OJ 2017/C 442/01), recital 165.

[6]    OJ C 450, 5.11.2021, p. 5.

[7]    Council Regulation No 1 determining the languages to be used by the European Economic Community (OJ 17, 6.10.1958, p. 385).

[8]    See also 2017 Commission Decision, section 3.5.3.

[9]    See for example section 3.5.3 of the 2017 Commission Decision, and recital 160 of the Opening Decision.

[10]    See, to that effect, the judgment of the Court of Justice (Grand Chamber) of 6 March 2018, in Case C-284/16, *Slowakische Republik v Achmea BV*, EU:C:2018:158 (the '*Achmea* judgment') and the judgment of 2 September 2021, *République de Moldavie v Komstroy LLC*, C-741/19, EU:C:2021:655 (the '*Komstroy* judgment').

[11]    See paragraphs 58 to 60 of the *Achmea* judgment.

[12]    See paragraphs 65 and 66 of the *Komstroy* judgment.

In this judgment, the Court of Justice held that a provision such as Article 26 of the ECT is intended, in reality, to govern bilateral relations between two of the Contracting Parties to the ECT, in an analogous way to the provision of the BIT at issue in the case giving rise to the *Achmea* judgment[13]. The Court added that intra-EU arbitration proceedings initiated according to Article 26 of the ECT would remove from the jurisdiction of Member States' courts, and, hence, from the system of judicial remedies which the second subparagraph of Article 19(1) TEU requires them to establish in the fields covered by Union law, disputes which may concern the application or interpretation of that law[14]. The Court found that Article 26(2), point (c), of the ECT must therefore be interpreted as not being applicable to disputes between a Member State and an investor of another Member State concerning an investment made by the latter in the first Member State[15].

(11)    In the *Romatsa* order, the Court of Justice further held that an arbitral award delivered in proceedings between a Member State and an investor from another Member State, on the basis of an arbitral clause provided for in an international agreement, is incompatible with EU law, in particular with Articles 267 and 344 TFEU, and therefore cannot produce any effect, and cannot be executed[16]. Such an award cannot therefore have any effect and cannot therefore be enforced in order to pay the compensation awarded by that award. In such a case, a court of a Member State may not in any case proceed with the enforcement of such award in order to enable its beneficiaries to obtain the payment of damages which it awarded them[17].

(12)    The Commission and the Member States took several actions to implement or otherwise ensure the effectiveness of the judgments of the Court of Justice.

(13)    On 15 January 2019, Member States signed a declaration on the consequences of the judgment of the Court of Justice in *Achmea* and on investment protection in the European Union[18].

(14)    On 5 May 2020, 23 Member States signed an agreement for the termination of intra-EU BITs, which entered into force on 29 August 2020[19]. The other Member States terminated their intra-EU BITs bilaterally, so that all intra-EU BITs have been formally removed from the legal order[20].

(15)    On 26 June 2024, the EU and Member States signed a declaration on the legal consequences of the judgment of the Court of Justice in *Komstroy* and common understanding on the non-applicability of Article 26 of the Energy Charter Treaty as a basis for intra-EU arbitration proceedings. They also closed negotiations on the text of a formal international agreement between themselves designed to put an end to the

---

[13]    See paragraph 64 of the *Komstroy* judgment.
[14]    See paragraph 59 of the *Komstroy* judgment.
[15]    See paragraph 66 of the *Komstroy* judgment.
[16]    Order of the Court of justice 21 September 2022, *Romatsa and Others*, C-333/19, EU:C:2022:749, paragraphs 42 to 44.
[17]    Order of the Court of justice 21 September 2022, *Romatsa and Others*, C-333/19, EU:C:2022:749, paragraph 44; See also judgment of 14 March 2024, *European Commission v United Kingdom of Great Britain and Northern Ireland*, Case C-516/22, EU:C:2024:231, paragraphs 85 to 87.
[18]    See https://finance.ec.europa.eu/system/files/2019-01/190117-bilateral-investment-treaties_en.pdf .
[19]    Agreement for the termination of Bilateral Investment Treaties between the Member States of the European Union (OJ L 169, 29.5.2020, p. 1–41).
[20]    In December 2024, the Commission referred the United Kingdom to the Court of Justice for failure to terminate its intra-EU BITs with six EU Member States, OJ C/2025/1222 of 3 March 2025.

continuation of intra-EU arbitration proceedings that are contrary to Union law[21]. In particular, the declaration and the agreement clarify, for the benefit of courts and arbitral tribunals, that the arbitration clause provided in the ECT does not apply – and has never applied – to relations between an EU investor and another Member State.

(16)  For the sake of completeness, the Commission notes that on 27 June 2024, the Union and Euratom notified their withdrawal from the ECT to the depositary of the ECT[22], since it was found that in the absence of any substantial modifications, the ECT is no longer compatible with the principles of the Paris Agreement, the requirements of sustainable development and the fight against climate change, as well as with modern standards of investment protection. In addition, as explained in the explanatory memorandum of the proposal for the decision of withdrawal, the ECT is incompatible with the principle of autonomy of Union law, as it does not include some of the safeguards identified by the Court of Justice in the CETA opinion[23] in order to conclude that the arbitration awards would not have the '*effect of preventing the EU institutions from operating in accordance with the EU constitutional framework*'[24]. Spain also notified its withdrawal from the ECT in April 2024. The withdrawals take effect one year from the date of their notification to the depositary.

## 3.    BACKGROUND ON SPANISH RENEWABLE SUPPORT MEASURES

(17)  In this section, the Commission provides, by way of background, a short description of the Spanish renewables schemes that led to the arbitration proceedings and, finally, the Award.

(18)  In 2007, Spain put in place a premium economic scheme aimed at fostering electricity production from renewable energy sources ('RES'), which was governed by Royal Decrees 661/2007, and 1578/2008 as well as Royal Decree - Law 6/2009 (the '2007 Scheme') in order to transpose Directive 2001/77/EC of the European Parliament and of the Council[25], the first Union renewable energy Directive. Spain did not notify this scheme to the Commission, despite the explicit reminder in recital 12 of that Directive that Articles 87 and 88 EC (now Articles 107 to 108 TFEU) apply to support schemes which Member States put in place to transpose the Directive. As a result, the 2007 Scheme was never authorised by the Commission under State aid rules.

---

[21]    Agreement on the interpretation and application of the Energy Charter Treaty between the European Union, the European Atomic Energy Community and their Member States, COM(2024) 257 final.

[22]    See, to this effect, Council Decision (EU) 2024/1638 of 30 May 2024 on the withdrawal of the Union from the Energy Charter Treaty (OJ L, 2024/1638, 5.6.2024), and Council Decision (EU) 2024/1677 of 30 May 2024 on the approval of the withdrawal of the European Atomic Energy Community from the Energy Charter Treaty (OJ L, 2024/1677, 13.6.2024). Besides the Union and the Euratom, some Member States have already withdrawn or are planning to withdraw from the ECT. Italy unilaterally withdrew in 2015. France withdrew from the ECT with effect from 8 December 2023, Germany with effect from 20 December 2023, Poland with effect from 29 December 2023, Luxembourg with effect from 17 June 2024, Spain with effect from 16 April 2024, Slovenia with effect from 14 October 2024, Portugal with effect from 2 February 2025, Ireland with effect from 27 April 2025, the Netherlands with effect from 28 June 2025 and Denmark with effect from 4 September 2025.

[23]    Opinion 1/17 of the Court of 30 April 2019, EU-Canada CET Agreement (CETA).

[24]    COM/2023/447 final, referring to Opinion 1/17 (CETA), paras. 152 to 161.

[25]    Directive 2001/77/EC of the European Parliament and of the Council of 27 September 2001 on the promotion of electricity produced from renewable energy sources in the internal electricity market (OJ L 283, 27.10.2001, p. 33).

(19)    In 2012 and 2013, Spain amended the 2007 Scheme, within the framework of the second Union renewable energy Directive 2009/28/EC of the European Parliament and of the Council[26]. Article 3(3) of that Directive recalled the obligation to notify support schemes as State aid measures. First, Law 15/2012 eliminated the remuneration for electricity generated with natural gas. In 2013, Spain adopted further amendments. The scheme amended in 2013 is governed by Royal Decree-Law 9/2013, Law 24/2013, Royal Decree 413/2014 and Orders IET/1045/2014 and IET/1459/2014 (the '2013 Scheme'). The 2013 Scheme maintains the essential characteristics of the 2007 Scheme and applies a different methodology for the calculation of the remuneration to renewables installations compared to the 2007 Scheme. Pursuant to its obligations under Article 108 TFEU, although in a belated fashion, Spain notified the 2013 Scheme to the Commission on 22 December 2014. In the 2017 Commission Decision, the Commission concluded that the 2013 Scheme complied with the guidelines on State aid for environmental protection and energy 2014-2020 ('EEAG')[27] and was therefore compatible with the internal market. That decision also assessed payments made under the 2007 Scheme to plants that continued to receive support under the 2013 Scheme.

## 3.1.    The 2007 Scheme

(20)    In 2007, 2008 and 2009, Spain adopted Royal Decrees 661/2007, 1578/2008, and Royal Decree - Law 6/2009, which put in place the 2007 Scheme. Operators of RES generators could choose between two options to benefit from support under the 2007 Scheme. The first option consisted in receiving a fixed tariff per kWh of energy produced (feed-in-tariff option), updated annually by reference to the consumer price index. The second option consisted in selling electricity on the market and receiving a premium per kWh of electricity sold on top of the market price (premium option).

(21)    Both the tariff under the feed-in-tariff option and the premium under the premium option were calculated on the basis of typical costs and revenues of standard renewables installations. The Spanish authorities estimated both the initial investment costs and the operating and maintenance costs of the standard installations, as well as the market price.

(22)    The profitability for solar-thermoelectric was set to up to 8 % for facilities that chose tariffs and between a 7 % and 11 % return for those participating in the wholesale market and getting a premium[28].

(23)    Furthermore, concentrated solar power ('CSP') installations were entitled to receive the tariff / premium under the 2007 Scheme also for the electricity generated from fossil fuels/natural gas, when used in combination with RES in order to ensure stable production and supply, as long as the share of such electricity did not exceed 12 % of the total electricity produced in case of the tariff and 15 % of the total electricity produced in case of the premium[29].

---

[26]    Directive 2009/28/EC of the European Parliament and of the Council of 23 April 2009 on the promotion of the use of energy from renewable sources and amending and subsequently repealing Directives 2001/77/EC and 2003/30/EC (OJ L 140, 5.6.2009, p. 16–62).

[27]    Communication from the Commission - Guidelines on State aid for environmental protection and energy 2014-2020 (OJ C 200, 28.6.2014, p. 1–55).

[28]    Award, paragraph 91.

[29]    See Article 2 (1) of Royal Decree 661/2007.

(24)     In order to obtain the support under the 2007 Scheme, potential beneficiaries had to submit an application to the Spanish Directorate General of Energy Policy and Mining.

(25)     The scheme was financed through network access charges imposed on electricity consumers and network users by the Electricity Sector Law 54/1997 (amended in 2013 by Law 24/2013) and Royal Decree 2017/1997. The Spanish authorities submit that payment of the network access charges was mandatory for consumers and network users. They also submit that the 2007 Scheme constituted State aid within the meaning of Article 107(1) TFEU, and refer, in particular, to recital 158 of the 2017 Commission Decision.

(26)     In particular, Article 17, paragraphs (1) and (3) of the Electricity Sector Law 54/1997 provided that the Spanish government was to adopt the provisions necessary for the implementation of the system of network access charges. The charges are fixed based on the costs of the system's regulated activities. These include the permanent costs of the electricity system and the costs of diversification and security of supply. The Spanish government was to establish the methodology for the calculation of the charges. Article 4.g.1 of Royal Decree 2017/1997 includes among the costs of diversification and security of supply those arising from the 2007 Scheme.

(27)     Royal Decree 2017/1997 entrusted the Comisión Nacional de Energía (National Energy Commission), a State body which has been incorporated into the National Commission of Markets and Competition ('CNMC') with the transfer to the relevant beneficiaries, by means of subsequent settlements, of the funds collected for the purposes of covering the permanent costs of the electricity system and the costs of diversification and security of supply. The annexes to the decree also defined the beneficiaries of the settlements, the applicable mathematic formulas and regulated the settlement procedure itself, according to predetermined objective parameters.

(28)     The legal framework of the financing mechanism of the 2007 Scheme is the same as the one assessed by the Court in the *Elcogás* case[30].

### 3.2.    The 2013 Scheme

(29)     As mentioned in recital (19), as of 2012, Spain introduced several legal acts that amended the 2007 Scheme.

(30)     Royal Decree Law 2/2013 of 1 February 2013, among other things, cancelled the mechanism for updating the feed-in tariffs in accordance with the consumer price index, replacing it with a lower index.

(31)     Subsequently, Spain adopted the following legal acts that established the 2013 Scheme[31]: Royal Decree-Law 9/2013 of 12 July 2013, Law 24/2013 of 26 December

---

[30]     Order of the Court of 22 October 2014, *Elcogás SA v Administración del Estado and Iberdrola SA*, Case C-275/13, EU:C:2014:2314. At paragraph 23 of this order, the Court found that the compensation mechanism at issue was imputable to the State since it was established and regulated by Law 54/1997 and Royal Decree 2017/1997. Relying on the same legal basis, the Court also concluded that the compensation mechanism for extra costs was financed through State resources. In particular, the Court observed that a Ministerial Decree fixed annually the amount of the network access charges, that the latter were imposed on all domestic final consumers and network users. Moreover, the National Energy Commission, a State body, administered the funds thus collected and did not enjoy any discretion in that regard. The financing mechanism of the 2007 Scheme is essentially the same as the one examined by the Court.

2013 on the electricity sector, Royal Decree 413/2014 of 6 June 2014 and Orders IET/1045/2014 and IET/1459/2014.

(32)    The 2013 Scheme is organised in six-year regulatory periods. The first regulatory period ran from 14 July 2013 to 31 December 2019. The second started on 1 January 2020.

(33)    The 2013 Scheme provided support to (i) co-generation installations, (ii) renewables installations, and (iii) other installations using at least 70 % waste to energy sources and black liquor[32].

(34)    The following two types of facilities are eligible for support under the 2013 Scheme:

(a)    facilities that are awarded aid under this scheme following the entry into force of Royal Decree 413/2014 on 11 June 2014 ('newly supported facilities');

(b)    facilities that were already entitled to or were already receiving support under the 2007 Scheme when Royal Decree-Law 9/2013 entered into force on 14 July 2013 ('previously supported facilities').

(35)    The aid under the 2013 Scheme is granted in the form of a premium in addition to income generated from the market. It aims to help the supported technologies to compete on an equal footing with other technologies on the market at a reasonable rate of return, which was calculated at 7.398 % for previously supported facilities[33] and 7.503 % for newly supported facilities. The premium is made up of two components: compensation for investments and, if applicable, compensation for operations.

(36)    In order to determine the amount of aid to be paid, facilities are classified under one of the various types of standard facilities on the basis of their individual characteristics. The compensation benchmarks applicable to each standard facility are established by ministerial order and include: type of technology, power generation capacity, start date of operation, lifetime, electricity system/location of the facility, standard revenue generated by selling the electricity in the market, standard operating costs required to carry out the activity and hours of operation (with a minimum and maximum value). The compensation to which an individual facility is entitled is calculated on the basis of the standard facility's compensation benchmarks and the features of the individual facility itself (such as the real number of running hours).

(37)    The 2013 Scheme is partly financed from the general State budget and partly from the network access tariffs and charges imposed on electricity consumers, also called 'electricity system revenues'. This financing mechanism was introduced by Laws 15/2012, 17/2012, and 24/2013.

(38)    The main differences between the 2007 Scheme and the 2013 Scheme can be summarised as follows:

---

[31]    For an exhaustive list of the 2013 Scheme's legal basis, see Section 2.1 of the 2017 Commission Decision.

[32]    For details on the eligible technologies, see recital 14 of the 2017 Commission Decision.

[33]    This rate was applicable to the first regulatory period (2014 to 2019). From the second regulatory period onwards, the rate is 7.09 %, if no use is made of the second additional provision of Royal Decree-Law 17/2019, to maintain the profitability of the previous period.

(a) under the 2013 Scheme, renewable energy producers are entitled to obtain a premium in addition to the market price of the electricity produced by them, rather than being able to choose between a feed-in tariff or a premium as was the case under the 2007 Scheme;

(b) the 2013 Scheme abolished support for electricity produced using fossil fuels/natural gas, starting as of 1 January 2013[34];

(c) the 2013 Scheme foresees a higher number of standard facilities than the 2007 Scheme. Only one standard facility (Caso Tipo ('CT')) was provided for in Royal Decree 661/2007 (i.e. in the 2007 Scheme) versus 20 standard facilities (Instalaciones Tipo ('IT')) identified by Royal Decree 413/2014 (i.e. in the 2013 Scheme). Unlike the 2007 Scheme, the 2013 Scheme takes into account the differences between various technologies as well the year in which the plants started to operate, as described in recital (36);

(d) under the 2013 Scheme, any of the compensation parameters described in recital (36) may be reviewed every six years (each regulatory period), including the reasonable return for the remaining lifetime of the standard facilities, whereas under the 2007 Scheme once set, the compensation parameters remained fixed other than the fact of being linked to the consumer price index;

(e) under both the 2007 Scheme and the 2013 Scheme, the support is proportionate to the amount of electricity generated. However, while under the 2007 Scheme the support is directly and exclusively proportionate to the amount of electricity generated, the 2013 Scheme establishes a number of equivalent operating hours according to the capacity of the installation. Only those hours are remunerated.

### 3.3.  The 2017 Commission Decision

(39) As mentioned in recital (19), in the 2017 Commission Decision, the Commission approved the 2013 Scheme as compatible with the internal market.

(40) All facilities that originally benefitted from the 2007 Scheme could automatically benefit from the 2013 Scheme. When assessing the compatibility of the 2013 Scheme in the 2017 Commission Decision, the Commission took into account the sum of payments made by previously supported facilities under the 2007 Scheme and the 2013 Scheme in order to verify the absence of overcompensation[35].

(41) More specifically, the Commission assessed the proportionality of the aid granted to previously supported facilities under paragraph 131(a) of the EEAG based on the cash flow calculations of 21 standard facilities, which were representative of the various technologies and installation types supported by the 2013 Scheme (see recital 120 of the 2017 Commission Decision). Those include past sales income (including those deriving from the 2007 Scheme for previously supported facilities), the expected future sales income, the initial investment costs, the operating costs and the compensation to be granted to each facility both for operations and for investments. For all examples provided, the Commission verified that the aid did not exceed what is required to recover the initial investment costs and the relevant operational costs,

---

[34] Award, paragraphs 139 and 140.
[35] See recitals 4 and 156 of the 2017 Commission Decision.

plus a margin of reasonable return, based on the past and estimated costs and market prices (7.503 % before tax for newly supported facilities and 7.398 % for previously supported facilities). In the 2017 Commission Decision, the Commission found that those rates of return appeared to be in line with those applicable to similar measures (renewable energy and high efficiency cogeneration projects) the Commission had approved and did not lead to overcompensation. The Commission reached the same conclusion concerning future revision of the compensation parameters as future payments would be calculated to keep the net present value of the investment at zero[36].

## 4. ANTIN'S INVESTMENT

### 4.1. The Andasol plants

(42)    The Andasol-1 plant and Andasol-2 plant are two CSP installations, each with a capacity of 49.9 MW, located in Granada, southern Spain (together, "Andasol plants"). They are owned and operated by Andasol-1 Central Termosolar UNO S.L. and Andasol-2 Central Termosolar DOS (together, the "Andasol companies").

(43)    The construction of the Andasol plants was completed in 2008 and 2009. The Andasol 1 plant received its final commissioning certificate on 25 November 2008 and was registered in the administrative register of electricity production facilities on 24 April 2009, while the Andasol 2 plant received its commissioning certificate on 5 June 2009 and was entered in the administrative register on 22 December 2009[37].

(44)    The Andasol plants benefitted from support under the 2007 Scheme. According to data provided by Spain, the Andasol plants received a premium from their launch until the end of 2010 and again in 2012, while in 2011 and in 2013 they received support in the form of a feed-in tariff.

(45)    The Andasol plants were also equipped with three heaters and a liquefied natural gas reservoir to allow them to use natural gas in their electricity production and thereby increase their solar-to-electric conversion efficiency and the reliability of their production[38]. As such, they were entitled to the tariff / premium under the 2007 Scheme also for the electricity generated using natural gas.

(46)    According to the information submitted by Spain, the Andasol plants have continued to produce electricity and to receive support under the 2013 Scheme. The Andasol plants were automatically registered under the 2013 Scheme as previously supported facilities, as happened with all facilities that originally benefitted from the 2007 Scheme. The aid granted to the Andasol plants under the 2013 Scheme was based on the standard installation IT-00606 for Andasol 1 and IT-00607 for Andasol 2.

(47)    Spain provided the calculation of the gross income that the Andasol plants would have received as support under the 2007 Scheme had it continued unchanged and compared it with the support received by the plants between 2014 and 2020 under the 2013 Scheme. Table 1 shows the differences in revenue additional to market revenues between the 2007 Scheme and the 2013 Scheme. The positive values reflect higher income under Royal Decree 413/2014 (that is to say, under the 2013 Scheme)

---

[36]    See recital 120 of the 2017 Commission Decision.
[37]    Award, paragraph 110.
[38]    Award, paragraphs 70 and 72.

than the income that would have been obtained under Royal Decree 661/2007 (that is to say, under the 2007 Scheme).

*Table 1 – Difference in revenue additional to market revenues between the 2007 Scheme and the 2013 Scheme*

| | Difference in revenue additional to market (EUR) | | | | | | |
|---|---|---|---|---|---|---|---|
| | **2014** | **2015** | **2016** | **2017** | **2018** | **2019** | **2020** |
| **Andasol 1** (IT-00606) | -1 897 689 | 5 912 667 | 34 684 | -225 050 | 4 697 699 | -489 111 | 7 748 070 |
| **Andasol 2** (IT-00607) | -5 373 068 | 2 679 859 | -3 420 095 | -4 243 563 | 355 343 | 284 299 | -1 769 847 |

Source: Spanish authorities

(48)    Table 1 shows that, in the period from 2014 to 2020, the Andasol 1 plant received approximately EUR 15 million more than it would have obtained under the 2007 Scheme, whereas the Andasol 2 plant received EUR 11 million less than it would have obtained under the 2007 Scheme.

(49)    The calculations are based on the actual production of the Andasol plants between 2014 and 2020, according to the CNMC.

(50)    Spain submitted that the Andasol plants are operating with a volume of energy in line with their production capacity. Table 2 sets out the energy generation data for both plants, between 1 November 2009 and 31 December 2020, as submitted by Spain:

*Table 2 - Annual energy discharged from the Andasol 1 and Andasol 2 plants*

| | **Andasol 1 (GWh)** | **Andasol 2 (GWh)** |
|---|---|---|
| 2009[39] | 9.6 | 7.8 |
| 2010 | 127.3 | 123.4 |
| 2011 | 155.6 | 157.9 |
| 2012 | 141.3 | 160.7 |
| 2013 | 134.1 | 132.1 |
| 2014 | 150.5 | 146.5 |
| 2015 | 118.6 | 113.7 |

---

[39]    Data are only available for November and December 2009, and the reported energy input corresponds only to this period.

**EN**                    10                    **EN**

| | | |
|---|---|---|
| 2016 | 138.9 | 135.0 |
| 2017 | 147.7 | 146.2 |
| 2018 | 123.7 | 124.1 |
| 2019 | 148.3 | 124.0 |
| 2020 | 103.6[40] | 128.8 |

Source: Spanish authorities based on information from the CNMC

## 4.2.   Antin's investment in the Andasol plants

(51)   Antin is the claimant in the arbitration proceedings *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. vs Spain.* Antin Infrastructure Services Luxembourg S.à.r.l. was established on 22 March 2011 in Luxembourg.  Antin Energia Termosolar B.V. was established on 27 June 2011 in the Netherlands, and is wholly owned by the Antin Infrastructure Services Luxembourg S.à.r.l. Both were the vehicles of Antin Infrastructure Partners, a private venture capital fund established in France, used for the investment in Spain[41]. Antin Infrastructure Partners states on its website, at the time of drafting this Decision, that it manages seven funds that invest in infrastructure in Europe and North America, and target investments in the energy and environment, digital, transportation and social sectors with the objective of generating attractive risk-adjusted returns for investors[42]. Antin Infrastructure Partners states that it believes that '*an active approach to value creation offers the best way to manage infrastructure investments*' and that they '*work closely with* [its] *management teams to improve* [their] *portfolio companies' operations, financial performance, service quality and health and safety conditions*'[43].

(52)   In 2011, Antin invested in the acquisition of a 45 % shareholding of the Andasol companies. More specifically, at the time, Antin Infrastructure Services Luxembourg S.a.r.l. owned 100 % of the shares in Antin Energia Termosolar B.V., which in turn owned 45 % of the shares in each of the two Andasol companies. RREEF Pan-European Infrastructure Two Lux S.à r.l. ('RREEF') and the Spanish conglomerate Actividades de Construcción y Servicios, S.A. ('ACS') owned the remainder of the shareholdings of the Andasol companies, with respectively 45 % and 10 % shareholding in the Andasol companies[44].

(53)   In the arbitration proceedings, Antin claimed that it invested approximately EUR 139.5 million, based on the expectation that the Andasol plants would generate regular and sustainable income that would allow Antin to service its debt and obtain

---

[40]   Spain explained that this reduction is due to a smaller generation in the period March-June 2020, which corresponds to the lockdown due to COVID-19 crisis and that in the third and fourth quarters of 2020 production recovered to normal levels, even exceeding those of the previous year.
[41]   Award, paragraphs 2 and 249.
[42]   See https://www.antin-ip.com/who-we-are, lastly accessed on 3 March 2025.
[43]   See https://www.antin-ip.com/who-we-are, lastly accessed on 3 March 2025.
[44]   Award, paragraph 261.

**EN**                                    11                                    **EN**

a return on its investment[45]. At the time of Antin's investment, the Andasol plants were benefitting from the 2007 Scheme.

(54)     In August 2017, Antin sold its investment in the Andasol plants, selling the assets to Cubico Sustainable Investments Limited at a price of approx. EUR 75.2 million[46].

## 5.    DESCRIPTION OF THE MEASURE

### 5.1.    Initiation of arbitration proceedings

(55)     The Award notified by Spain was rendered by the Tribunal following a dispute brought to arbitration by Antin in November 2013 against Spain.

(56)     In initiating the proceedings under the ECT, Antin claimed that the changes in the Spanish legal framework applicable to the Andasol plants, in which Antin had invested, caused serious and substantial damages to its investments and were contrary to Spain's obligations under the ECT, in particular, the principle of fair and equitable treatment laid down in Article 10(1) ECT. Antin claimed to have invested in the Andasol plants in reliance of the 2007 Scheme[47].

(57)     In the arbitration proceedings, Spain raised the lack of jurisdiction of the Tribunal to hear a dispute, such as the one at issue, between an investor of a Member State of the Union and another Member State[48].

(58)     On 14 November 2014, the Commission filed an application to intervene in the arbitration proceedings as a non-disputing party, which was dismissed by the Tribunal on 14 December 2014 on the ground that such application was premature. On 9 December 2015, the Commission filed a second application to intervene. In 2016, the Tribunal decided to authorise the Commission to make a written submission upon the condition that the Commission provide a written undertaking that it would comply with any decision on costs ordered by the Tribunal. The Commission informed the Tribunal that it was not in a position to provide such costs undertaking and therefore that it would not file a written submission[49].

(59)     The Tribunal also rejected Spain's requests to submit to the arbitration proceedings (i) the *Achmea* judgment and, (ii) the 2017 Commission Decision[50].

### 5.2.    The Tribunal's findings in the arbitration proceedings

(60)     The Tribunal concluded that Spain had breached Article 10(1) ECT by failing to accord fair and equitable treatment to Antin's investments[51]. That finding is based on the regulatory changes to the remuneration scheme for renewable installations that were brought about by legal acts that Spain adopted from July 2013 onwards, that is to say Royal Decree-Law 9/2013, Law 24/2013, Royal Decree 413/2014 and Order IET 1045/2014, compared to the scheme that was in force at the time of Antin's investment, that is to say  Law 54/1997 and Royal Decree 661/2007[52].

---

[45]     Award, paragraph 359.
[46]     Award, paragraph 46.
[47]     Award, paragraphs 509 to 510.
[48]     Award, paragraph 171.
[49]     Award, paragraphs 59 to 68.
[50]     Award, paragraphs 51 to 53, 56 to 58.
[51]     Award, paragraph 748 and Section VIII.c).
[52]     Award, Section VIII.c) and paragraphs 572 and 573.

(61)    The Tribunal awarded to Antin compensation in the amount of EUR 112 million to be paid by Spain. On 24 July 2018, Spain submitted a request for rectification of the Award to the Secretary-General of ICSID. Following this, on 29 January 2019, the Tribunal issued a new decision rectifying the amount of the awarded compensation from EUR 112 to 101 million.

(62)    The Tribunal also held that Spain was to pay interest on this compensation from 20 June 2014 to the date of the Award (that is from 15 June 2018) at the rate of 2.07 %, compounded monthly, and interest from the date of the Award to the date of payment at the rate of 2.07 %, compounded monthly. In addition, the Tribunal held that Spain was to pay to Antin EUR 563 256,17 (USD 635 431,70) as a contribution to the payment of their share of the costs of the proceedings and EUR 2 840 661.41 (GBP 2 447 008,61) as a contribution to the payment of their legal representation costs and expenses[53].

(63)    Regarding the calculation of the compensation, the Tribunal accepted only the part of the Antin's claim relating to damages for loss of future cash flows (that is after June 2014)[54]. The Tribunal considered the discounted cash flow ('DCF') approach adopted by Antin and its experts to be appropriate. Concerning the operational life of the Andasol plants, the Tribunal deemed that, for purposes of the calculation of damages, the useful life of the Andasol plants was to be 25 years. The Tribunal thus deducted from the EUR 137 million claimed for those losses the amount of EUR 36 million corresponding to the difference between the operational life claimed by Antin (35 to 40 years) and the life that the Tribunal found acceptable (25 years) and concluded that the remaining EUR 101 million was a fair compensation[55].

**5.3.    Beneficiary of the measure**

(64)    Spain submitted that the beneficiary of the notified measure is Antin, since that party was claimant in the proceedings that led to the Award and thus the party entitled to compensation set out therein[56]. While the Award[57] states that Antin sold its investment in the Andasol companies to Cubico Sustainable Investments Limited, Cubico Sustainable Investments Limited was not a party to the arbitration proceedings and the Award provides the right to compensation exclusively to Antin and it does not provide any right to compensation to Cubico Sustainable Investments Limited.

**5.4.    Legal basis of the measure**

(65)    Spain indicated that the legal base for the notified measure is the Award, the ECT and the ICSID Convention, as well as the '*Instrument of ratification of the Energy Charter Treaty and the Energy Charter Protocol on Energy Efficiency and Related Environmental Aspects, done in Lisbon on 17 December 1994*' which was published in the Official State Gazette of 17 March 1998[58].

---

[53]    Award, paragraph 748.
[54]    Award, paragraphs 691, 714 and 725 (as rectified for clerical mistake by the Tribunal's rectification decision of 29 January 2019).
[55]    Award, paragraph 725 (as rectified for clerical mistake by the Tribunal's rectification decision of 29 January 2019).
[56]    Award, paragraph 2. See also the Defined Terms at paragraph 748 of the Award.
[57]    Award, paragraph 46.
[58]    Spain signed the ECT on 17 December 1994, ratified it on 11 December 1997, and the ECT entered into force with respect to Spain on 16 April 1998. Spain also explained that in accordance with Article 96(1)

### 5.5.    Objective of the measure

(66)    According to Spain, the objective of the notified measure is to compensate Antin for the regulatory changes made by Spain to the support scheme for renewable installations that were brought about by legal acts that Spain adopted and that amended the 2007 Scheme and put in place the 2013 Scheme (see recital 60). The Spanish authorities also submitted that the notified measure has no incentive effect.

### 5.6.    Form of support, budget and financing of the measure

(67)    The form of support will consist in the payment of the compensation amount calculated by the Tribunal in the Award, the pre-award interests, as well as the post-award interests, which will have to be recalculated on the basis of the date of actual payment (see recitals (61) and (62)).

(68)    At the time of notification, Spain estimated the total amount at EUR 114 900 983 of which EUR 101 000 000 corresponds to the amount recognised by the Award; EUR 8 686 086 is pre-award interest (for the period 20 June 2014 to 15 June 2018); EUR 1 810 978 is the post-award interest (for the period 15 June 2018 to 31 March 2019); EUR 563 256 corresponds to the costs of the proceedings and EUR 2 840 661 corresponds to Antin's legal costs.

(69)    The Spanish authorities explained that the payment would be financed from the general budget of the Spanish State. The payment will not be directly charged to the costs of the electricity system and therefore will not fall directly on the electricity end consumers through their electricity bill.

### 5.7.    Cumulation

(70)    Spain submitted that the Andasol plants continue to receive support under the 2013 Scheme. In fact, Spain calculated the possible impact that the Award would have on the profitability achieved by Antin's investment in the Andasol plants, as shown in Table 4, based on the parameters set out in Table 3:

*Table 3 - Simulation parameters for which 45 % of Antin ownership is applied*

|  | Total investment | Antin's investment (45 %) | Lifetime | Revenue 2009/10-2020 | Revenue 2021-2037 | Expenditure 2009/10-2037 |
|---|---|---|---|---|---|---|
|  | EUR | EUR | Years | EUR | EUR | EUR |
| **Andasol 1** | 318 126 771 | 143 157 047 | 25 | Actual* | IT-0606/20606 | IT-0606/20606 |
| **Andasol 2** | 318 126 771 | 143 157 047 | 25 | Actual | IT-0607/20607 | IT-0607/20607 |

Source: Spanish authorities.
*Actual data based on CNMC information

*Table 4 - Impact of the Award on 45 % of Andasol plants*

of the Spanish Constitution, '*International treaties validly concluded, once officially published in Spain, shall form part of the internal legal order*'.

| IRR | Antin's investment (45 %) | Without Award | With Award, without interest | With Award, with interest |
|---|---|---|---|---|
| | EUR | IRR | IRR | IRR |
| Andasol 1 | 143 157 047 | 7.44 % | 8.84 % | 9.03 % |
| Andasol 2 | 143 157 047 | 7.27 % | 8.96 % | 9.18 % |

Source: Spanish authorities

(71)    Spain explained that the use of actual income values for both plants explains why the internal rate of return ("IRR") is different from the return of 7.398 %, which was deemed reasonable by the 2017 Commission Decision for the previously supported facilities.

**5.8.    Antin's attempts to enforce the Award and Spain's opposition**

(72)    Antin has been trying to enforce the Award in the United States, Australia, and the United Kingdom.

(73)    On 27 July 2018, Antin initiated proceedings in the United States seeking the recognition and enforcement of the Award before the United States District Court for the District of Columbia (Civil Action No. 1:18-cv-1753 (EGS)). Those proceedings were stayed by order of that Court on 28 August 2019 pending the outcome of the annulment proceeding of the Award initiated by Spain before the ICSID Annulment Committee. On 22 March 2019, the Commission, on behalf of the Union, was granted leave to intervene as *amicus curiae* in those proceedings in the United States. In its submission, the Commission emphasised that the Tribunal lacked jurisdiction and also underlined that the State aid rules meant that no payment could be made under the Award unless and until it has been authorised by the Commission as compatible with the internal market. More specifically, on the first point the Commission explained that the ECT does not apply to intra-EU disputes, such that the arbitration proceedings leading to the Award lacked an essential pre-requisite, i.e. a valid agreement to arbitrate, because Spain had never made any offer to arbitrate with investors from the Netherlands or Luxembourg such as the claimants. In other words, the proceedings lacked a legal basis and the Tribunal did not have jurisdiction to hear the dispute. The Commission also submitted that the district court hearing the case should accord the highest level of deference to the Court of Justice's judgment in *Komstroy* on the interpretation of the ECT and the EU Treaties. On the second point, the Commission brought the nature and content of the Opening Decision to the attention of the district court, including the obligation not to pay the compensation detailed in the Award before any final decision from the Commission, and the fact that this obligation applies irrespective of Articles 53 to 55 of the ICSID Convention. The stay on proceedings was lifted in January 2025. On 18 February 2025, the Commission filed a supplemental amicus curiae brief in order to take account of the ruling of 16 August 2024 by the D.C. Circuit of the Court of Appeals in parallel proceedings and the Declaration on the legal consequences of the judgment of the Court of Justice in *Komstroy* and common understanding on the non-applicability of Article 26 of the ECT as a basis for intra-EU arbitration, made on 26 June 2024 by

**EN**                                              15                                              **EN**

the Union and Member States[59]. In that submission, the Commission also took the opportunity to explain that basic principles of treaty interpretation would compel the same conclusion as that reached by the Court of Justice in *Komstroy*: Spain's standing offer to arbitrate in Article 26 does not extend to EU investors. The proceedings before the United States District Court for the District of Columbia are pending at the time of this Decision.

(74)    Antin also initiated proceedings to enforce the Award in Australia. On 25 June 2021, the Full Federal Court of Australia recognised the Award as binding on Spain. This Court also rejected a request by the Commission to intervene, on behalf of the Union, into those proceedings as *amicus curiae*. Spain filed an appeal to the High Court of Australia, the highest Australian court. The High Court of Australia delivered its judgment on 12 April 2023 dismissing Spain's appeal and confirming the recognition of the Award in Australia. Also in those proceedings, the Commission's request to submit an *amicus curiae* brief on behalf of the Union was refused. Based on this formal recognition of the Award, Antin is currently engaged, before the competent court in Australia, in the next step towards enforcement of the Award. Those proceedings are pending at the time of this Decision.

(75)    Antin has also filed an application to register the Award before the courts in the United Kingdom and the Award has been registered. On 24 May 2023, the High Court of England & Wales dismissed Spain's application to set aside the registration order. Spain appealed against that judgment to the Court of Appeal, which dismissed the appeal on 22 October 2024. On 31 January 2025, the Supreme Court of the United Kingdom granted Spain permission to appeal the Court of Appeal's ruling. The deadline for Spain to file this appeal has not expired at the time of this Decision.

(76)    In reaction to Antin's attempts to enforce the Award in Australia, the United States, and the United Kingdom, Spain initiated proceedings before the courts of Luxembourg against Antin, Antin being incorporated in that Member State. More specifically, Spain has requested the *Tribunal d'arrondissement de et à Luxembourg* to order Antin to cease any action designed to obtain recognition or execution of the Award, in particular, in third countries, because such recognition or execution would manifestly violate rules of public order. Spain also asked the Luxembourgish court to order penalty payments against Antin in case of non-compliance with the order to cease any such action. The Commission has intervened in those proceedings on the basis of Article 29 of Council Regulation (EU) 2015/1589[60]. The proceedings are pending at the time of this Decision.

## 6.    GROUNDS FOR INITIATING THE PROCEDURE

(77)    The Commission adopted the Opening Decision on 19 July 2021, setting out its preliminary assessment that the Award constituted State aid for the reasons summarised in Section 4.1 of the Opening Decision, notably because it has the effect of compensating for the withdrawal of unlawful State aid[61]. In the Opening Decision,

---

[59]    See    https://energy.ec.europa.eu/document/download/740e62fc-a0d1-4a5b-9d00-01357802c307_en?filename=Inter%20se%20Declaration%20-%20all%20languages%20-%20260624.pdf (lastly accessed on 3 March 2025).

[60]    Council Regulation (EU) 2015/1589 of 13 July 2015 laying down detailed rules for the application of Article 108 of the Treaty on the Functioning of the European Union (OJ L 248, 24.9.2015, p. 9).

[61]    *See* Opening Decision, recital (88).

the Commission raised doubts in connection with the compatibility of the measure with the internal market on the basis of two independent grounds: the first doubt related to a breach of EU law by the measure, and the second related to the non-compliance of the notified measure with the compatibility criteria laid down under the State aid guidelines applicable to operating aid to energy from renewable sources[62].

(78)     First, concerning the doubts as regards a breach of EU law, the Commission recalled, in the Opening Decision (see recital (94)), the judgment of the Court of Justice according to which '*State aid which contravenes provisions or general principles of EU law cannot be declared compatible with the internal market*'[63]. In the Opening Decision, the Commission considered, on a preliminary basis, that, in the present case, the Award may violate provisions of the EU Treaties[64]. More specifically, given that the intra-EU Award was adopted based on the investor-State arbitration mechanism set out in Article 26 ECT, the Commission considered, on a preliminary basis, that the Award could be in breach of Article 19(1) TEU, Articles 267 and 344 TFEU, and the general principles of Union law of mutual trust and autonomy[65]. The Commission also noted, on a preliminary basis, that the Court of Justice's reasoning in the *Achmea* judgment[66] applies also to the ECT and thus national courts shall be under the obligation to set aside any arbitration award rendered on that basis and to refuse to enforce it[67].

(79)     Additionally, the Commission expressed doubts in connection with the Award's compatibility with the internal market in so far as it could create a discrimination based on nationality among the 2007 Scheme investors based on their ability to access international arbitration or not[68]. The Commission considered, on a preliminary basis, that such discrimination on the basis of nationality would not be compatible with Union law, and in particular with Article 18 TFEU[69].

(80)     Second, concerning the doubts in connection with the measure's compatibility with the possible relevant State aid guidelines, the Commission pointed to the 2008 Environmental Aid Guidelines[70] ('EAG 2008') and the EEAG[71].

(81)     Firstly, the Commission had doubts that the measure fulfilled the conditions laid down in the EAG 2008. The Commission questioned whether a retroactive compensation of lost future cash flows and interest on those amounts (that is to say, the compensation awarded) can be qualified as development of an economic activity or having an incentive effect within the meaning of the EAG 2008[72]. Furthermore, the Commission expressed its doubts as to whether the aid is proportionate and whether it does not unduly distort competition and trade between Member States[73].

---

[62]     *See* Opening Decision, recital (95).
[63]     Judgment of the Court of Justice of 22 September 2020, Case C-594/18 P, *Austria v Commission (Hinkley Point C)*, EU:C:2020:742, paragraph 44.
[64]     Opening Decision, Section 4.3.1.
[65]     Opening Decision, recital (99).
[66]     *See* the *Achmea* judgment.
[67]     *See* Opening Decision, recital (98).
[68]     *Ibid*., recitals (101)-(102).
[69]     *Ibid*., recitals (101) to (102).
[70]     Community guidelines on State aid for environmental protection, OJ C 82, 1.4.2008, p. 1.
[71]     See footnote 27.
[72]     *See* Opening Decision, recitals (108) to (118).
[73]     *Ibid*., recitals (119) to (131).

(82)    Secondly, in a similar vein, the Commission had doubts that the measure fulfilled the conditions laid down in the EEAG. The Commission questioned whether the aid develops an economic activity, whether it has an incentive effect and is necessary to develop the economic activity of producing electricity from renewable sources, whether it is proportionate and whether it does not unduly distort competition and trade between Member States[74].

## 7.    COMMENTS FROM THIRD PARTIES OTHER THAN ANTIN

(83)    Following the Commission's invitation to submit comments pursuant to Article 108(2) TFEU, the Commission received submissions from 23 respondents. These 23 respondents included intra-EU and third country investors ('investors'), one Member State and a non-governmental organisation ('NGO').

(84)    A summary of the comments submitted by these third parties, insofar as they are relevant for the State aid assessment, is provided below (grouped by topic). These comments will be addressed in the relevant parts of the assessment (see Section 10).

### 7.1.    Comments on the existence of aid

#### 7.1.1.    *Comments claiming that the Award does not constitute State aid*

(85)    *Firstly*, several third parties (mainly investors) argue that the Award does not constitute State aid within the meaning of Article 107(1) TFEU because it compensates for a measure that does not constitute State aid.

(86)    More specifically, these third parties submit that, (1) in order for compensation for damages granted pursuant to national law to constitute State aid, it must compensate for the grant of unlawful or incompatible State aid[75]; and that (2) an arbitration award is only capable of constituting State aid, if the underlying scheme for which the award compensates constitutes either unlawful or incompatible State aid.

(87)    In this context, those third parties argue that the Award reinstates the remuneration scheme that was in force at the time of Antin's investment, that is Law 54/1997 (the schemes from 1997 to 2007, including the 2007 Scheme, are together referred in the below as the 'Old Schemes'[76]) and should be assessed only as part of this scheme rather than as a separate measure. Consequently, those third parties consider that since the Old Schemes do not constitute State aid, the Award does not constitute aid either.

(88)    In particular, those third parties claim that the Old Schemes did not entail the grant of State resources because the classification of a measure as State aid must be considered on the basis of the case-law prevailing at the time of the grant of the aid. They argue that according to the case-law applicable at the time of the establishment of the Old Schemes, the mechanism for granting the support under the Old Schemes

---

[74]    *Ibid.*, recitals (132)-(153).

[75]    Judgment of 27 September 1988, in case C-106-120/87, *Asteris* v *Greece*, EU:C:1988:457, paragraphs 23 and 24; Judgment of 12 December 2016, in case C-164/15 P, *Commission* v *Aer Lingus*, EU:C:2016:990, paragraph 72; Judgment of 1 July 2010, in case T-62/08, *ThyssenKrupp Acciai Special Terni* v *Commission*, EU:T:2010:268, paragraphs 59 and 60; Judgment of 1 July 2010, in case T-53/08, *Italy* v *Commission*, EU:T:2010:267, paragraphs 51 and 52.

[76]    In the submissions of third parties and Antin, the term 'Old Scheme' is used to describe the support scheme that was established by the Law 54/1997 of 27 November 1997 on the Electricity Sector and Royal Decree 2818/1998 of 23 December 1998, and was further amended in 2004 and 2007 and was in force until its repeal in 2013.

did not involve State resources. Those third parties claim that the financing mechanism of the Old Schemes, which was in their view introduced in 1997 and in any case no later than 2007, did not involve State resources under the case-law applicable during their implementation and until 2014[77]. In these third parties' view, the case-law prevailing in 2014[78] is not relevant for the assessment of the Old Schemes, which were no longer in force as of 2014.

(89)    *Secondly*, the third parties claim that even if the Award is to be assessed separately from the Old Schemes, it does not entail State aid, because the only underlying reason for its grant is the damage suffered by Antin due to Spain's conduct in breach of the ECT and compensating for this damage does not confer an advantage on Antin. In this regard, the third parties further argue that the fact that the compensation is awarded under international rules (the ECT) instead of national rules does not change its nature and that in any case, the Award is in line with the relevant national rules on damages compensation. Some third parties also argue that the ECT forms part of national law, because when each Member State ratified the ECT, they each individually acceded to the ECT which thereby became part of their national laws.

(90)    *Thirdly*, in the view of some third parties, if Antin's 45 % shareholding in each of the Andasol companies is considered a pure financial investment because Antin does not manage the Andasol companies, then Antin is not an undertaking and thus the grant of the Award to Antin does not fall within the scope of the State aid rules[79].

### 7.1.2.   Comments concerning the standstill obligation

(91)    Several third parties argue that, since the Award does not entail State aid, the standstill obligation under Article 108(3) TFEU does not apply. According to the same third parties, even if it were to be considered that the Award entails State aid, the standstill obligation cannot apply either, because the Tribunal was under no obligation to suspend its proceedings.

### 7.1.3.   Comments claiming that, even if the Old Schemes entail State aid, they constitute existing aid

(92)    *Firstly*, several third parties allege that even if the Old Schemes did constitute State aid, it would be existing aid (because the 10-year limitation period has expired) which means, in their view, that the Award does not compensate for unlawful or incompatible State aid, and therefore does not constitute State aid.

(93)    In particular, some third parties argue that if the limitation period would be counted from the day of Antin's individual grants under the Old Schemes (which would be in their view, 24 April or 22 December 2009), it expired at the very latest on 24 April or 22 December 2019. Based on this, those third parties allege that even if the Old Schemes constituted aid, Antin's individual grants constitute existing aid. Those third parties further argue that since compensation for damages constitutes State aid

---

[77]    The third parties cite notably the judgment of the Court of 13 March 2001 in C-379/98, *PreussenElektra*, EU:C:2001:160.

[78]    Order of the Court of 22 October 2014 in C-275/13, *Elcogás SA v Administración del Estado and Iberdrola SA.*, EU:C:2014:2314.

[79]    Judgment of 10 January 2006, Case C-222/04, *Ministero dell'Economia e delle Finanze v Cassa di Risparmio di Firenze SpA, Fondazione Cassa di Risparmio di San Miniato and Cassa di Risparmio di San Miniato SpA,, EU:C:2006:8, paragraph 111.*

only if it compensates for unlawful or incompatible aid[80], the fact that Antin's grants under the Old Schemes constitute existing aid means that the Award does not constitute State aid.

(94)     _Secondly_, those third parties allege that even if it was to be considered that the Award amounts to State aid, the fact that the Old Schemes (namely, the individual grants to Antin under the Old Schemes) constituted existing aid means that the Award also constitutes existing aid. In their view, that is because otherwise the same benefit would not be subject to recovery if it would be granted under the Old Schemes, but would be subject to recovery if it would be granted in the form of an award. Those third parties finally consider that the fact that the aid granted under the Old Schemes constitutes existing aid means that the aid linked to the Award also constitutes existing aid which cannot be recovered based on their reading of Article 17 of Council Regulation (EU) 2015/1589[81].

(95)     _Thirdly_, some third parties argue that the Award is inextricably linked with the Old Schemes and thus it should be considered that the aid was granted in 1997, when the schemes were first established, or in 1998 at the latest, when they were first implemented by Royal Decree 2818/1998. In the view of those third parties, the limitation period expired in 2008, whereas the modifications to the Old Schemes in 2004 and 2007 are not substantive alterations, affecting the compatibility assessment and are not liable to change the qualification of the aid from existing to new.

_7.1.4._     _Comments claiming that the aid was granted when Antin received the grant under the Old Schemes and not when the Award was issued_

(96)     Several third parties argue that, based on the _Asteris_ case-law[82], the damage compensation is intrinsically linked to the underlying measure for which the Award compensates.

(97)     In particular, those third parties argue that the Award and the underlying measure are intrinsically linked and that the aid entailed in the Award was granted when Antin received the grants under the Old Schemes. Following this, those third parties claim that the Award is merely a declaration that the right to receive the aid under the Old Schemes has been revived. In their view, given that the Award has been granted in order to restore the rights established under the Old Schemes, it is not correct to consider that the aid has been granted with the issuance of the Award.

(98)     Some third parties contend that a decision of an arbitration tribunal requiring one party to pay sums already owed but not yet paid should not be considered as a decision to grant new State aid.

_7.1.5._     _Comments claiming that the Award is not imputable to Spain_

(99)     Several third parties contend that the Award's imputability cannot be premised on Spain's accession to the ICSID Convention or the ECT because, in their view, the Opening Decision does not suggest that the underlying scheme is the ICSID Convention or the ECT, but only the Award.

---

[80]     Judgment of 28 June 2019, T-624/15, T-694/15 and T-704/15, _European Food and Others_ v _Commission_, EU:T:2019:423, paragraph 103.
[81]     See footnote 60.
[82]     Judgment of the Court of 27 September 1988, in joined cases 106 to 120/87, _Asteris AE and others v Hellenic Republic and European Economic Community_, EU:C:1988:457.

**EN**                                                         20                                                         **EN**

(100)    Moreover, those third parties claim that in view of Spain's obligations under international law, it cannot choose not to pay the Award. Specifically, they argue that if legal obligations exist, compliance with them cannot be considered to require a 'decision' to comply with them.

*7.1.6.    Comments claiming that the Award is imputable to Spain*

(101)    One third party reiterates the Commission's assessment in recital (82) of the Opening Decision that the payment of the Award is imputable to Spain, because Spain voluntarily agreed to enter the ICSID Convention and the ECT. This third party also considers that according to the case-law of the Court of Justice[83], any payment of the Award by Spain would not stem from a valid arbitration agreement, nor from a valid obligation to pay the Award as per Spain's conventional commitments and would thus be entirely imputable to Spain.

*7.1.7.    Comments claiming that the Award is not liable to distort competition*

(102)    Several third parties claim that the aid granted by the Award is not liable to distort competition and affect trade between Member States because Antin sold its plants in August 2017 and has not been investing in renewable energy infrastructure since then.

*7.1.8.    Comments claiming that the payment of the Award constitutes State aid*

(103)    One third party claims that the payment of the Award would constitute State aid, because it would lead to compensation for the damage caused by the withdrawal of the unlawful aid scheme assessed in the 2017 Commission Decision. Moreover, this third party argues that the payment of the Award would fulfil all the conditions laid down in Article 107(1) TFEU, since the compensation advantage would be available only to Antin and is to be financed through State resources, that is from the Spanish budget. In its view, the Award is also liable to distort competition in the internal market, since the companies of the Antin group are investing in the RES sector, which has been liberalised at Union level. One third party claims that an award that amounts to reinstating an unlawful aid measure to the benefit of selected undertakings is State aid.

**7.2.    Comments on the compatibility of the aid**

*7.2.1.    Comments claiming that the aid should be declared incompatible because it is not in line with the EU Treaties*

(104)    One third party claims that the Award may violate provisions of the EU Treaties, namely Article 18 TFEU, which prohibits any discrimination on the grounds of nationality, because other Spanish investors in the same situation as Antin, as well as investors from other Member States, do not have access to the arbitration mechanism provided for in Article 26 of the ECT. In addition, according to that party, in light of the *Komstroy* judgment, Article 26 of the ECT must be interpreted as not applying to disputes between a Member State and an investor from another Member State concerning an investment made by that investor in the first Member State.

(105)    Another third party claims that if the Commission finds an infringement of Union secondary legislation, it is obliged to declare the aid incompatible with the internal

---

[83]    Judgment of the Court of Justice (Grand Chamber) of 2 September 2021, Case C-741/19, *République de Moldavie v Komstroy LLC*, EU:C:2021:655 and Judgment of the Court (Grand Chamber) of 26 October 2021, Case C-109/20, *Republiken Polen v PL Holdings Sàrl*, EU:C:2021:875.

market without any further assessment[84]. In its view, the Award was adopted on an illegal basis according to case-law[85] that suggests that Member States are obliged to challenge the validity of the constitution of arbitral tribunals and the validity of any awards resulting from intra-EU investment arbitration procedures. The aid granted on this basis may thus not be found compatible with the internal market and there is no need to examine the compatibility of the aid under Article 107(3), point (c), TFEU or State aid guidelines.

7.2.2. *Comments claiming that even if the Komstroy judgment applies to the ECT, it does not mean that the Award constitutes incompatible State aid subject to recovery*

(106)   Several third parties claim that even if neither the *Komstroy* judgment nor *Opinion 1/20*[86] justify or confirm the application of the *Achmea* principle to ECT awards, this would not automatically result in them being considered incompatible State aid subject to recovery.

(107)   In particular, several third parties argue that when the *Komstroy* judgment stated that the *Achmea* principle also applies to the ECT, it was, in their opinion, an *obiter dictum*, which does not have legal force and the statement was based on a theoretical case that would never be subject to Union law.

(108)   Moreover, those third parties claim that the Court of Justice in its *Opinion 1/20* declined to rule on whether the draft modernised ECT is compatible with Union law and thus did not rule on whether any potential compensation under the ECT could constitute State aid.

(109)   Some third parties also argue that even if the *Achmea* principle applies, it does not automatically mean that the Award is to be considered as incompatible State aid, because if lower-ranking Union law (here the ECT) contradicts Union primary law (here the *Achmea* principle combined with the State aid rules), the conflicting provisions must be reconciled, instead of it being assumed that Union primary law automatically overrules other Union law based on the ECT.

7.2.3. *Comments claiming that the Award does not entail discrimination on the basis of nationality*

(110)   Several third parties claim that since the Award should be considered as part of the Old Schemes, it does not lead to any discrimination, as all the investors that fulfil the conditions set out in this scheme can benefit from it. In the view of those third parties, the Commission's argument that the discrimination among the different investors (especially against Spanish investors) consists in the fact that not all investors that benefitted from the Old Schemes have access to international arbitration under the ECT, is based on the false assumption that the ECT forms part of the Old Schemes or that the ECT can be considered on its own a State aid scheme. Those third parties also add that it is not precluded that Spanish investors may seek compensation for damages according to provisions of national law or according to any other dispute resolution mechanism they might have agreed to.

---

[84]   Judgment of the Court of Justice of 22 September 2020, Case C-594/18 P, *Austria v Commission (Hinkley Point C)*, EU:C:2020:742, paragraph 100.

[85]   Judgment of the Court of Justice (Grand Chamber) of 2 September 2021, Case C-741/19, *République de Moldavie v Komstroy LLC*, EU:C:2021:655 and Judgment of the Court (Grand Chamber) of 26 October 2021, Case C-109/20, *Republiken Polen v PL Holdings Sàrl*, EU:C:2021:875.

[86]   Opinion of the Court of Justice of 16 June 2022, pursuant to Article 218(11) TFEU (Modernised Energy Charter Treaty), Case Avis 1/20, EU:C:2022:485.

**EN**                                                    22                                                    **EN**

(111) Moreover, those third parties contend that even if the ECT is considered to be part of the Old Schemes, the Commission's argument regarding discrimination on the basis of nationality should be read as implying a discrimination on the basis of the investor's place of establishment. That kind of discrimination does not, in their view, infringe any provisions of the EU Treaties and State aid is by definition discriminatory in this sense, as it is granted to beneficiaries established in the Member State that grants the aid.

(112) Finally, those third parties argue that if the Award is to be examined as *ad hoc* aid, separately from the Old Schemes, there is no discrimination, because a comparison cannot be conducted with another grant.

*7.2.4.* *Comment claiming that arbitral awards do not necessarily undermine the primacy of Union law*

(113) Some third parties in their written observations claim that the normal notification procedure for State aid ensures the legality of arbitral awards under Union law (precisely, according to the third-parties, it preserves the 'autonomy' of EU law, 'consistency and uniformity in the interpretation of EU law', the 'rights of individuals', the supervision of the Court of Justice and the 'effectiveness of EU law') because when a Member State complies with the notification procedure, it is possible to preserve the powers of review of the Court of Justice concerning the compatibility of an arbitral award with Union law.

(114) In their view, the Court of Justice should have considered in its *Achmea* judgment that since Member States are bound to comply with their obligations arising from Article 108(3) TFEU, the notification brings this case within the fold of Union law and thus under the purview of Union courts.

*7.2.5.* *Comments claiming that the measure has incentive effect*

(115) Several third parties contend that Antin actively managed and thus exercised sufficient control over the Andasol companies and thus Antin and the Andasol companies do constitute one economic unit which in turn, in their view, implies that Antin was engaged in renewable electricity generation. Following this, those third parties argue that the aid entailed in the Award should be considered also to have been granted to the renewable activities of the Andasol Companies and the fact that those companies fulfilled the incentive effect by having applied for aid when they became registered under the Old Schemes also means that Antin meets the incentive effect criterion. Those third parties point to the fact that since the beneficiaries of the Old Schemes were considered to fulfil the conditions at the time of their establishment, they are considered to fulfil the conditions also throughout the lifetime of the plant, therefore also in 2013 and in 2018, depending on the moment of granting of the Award.

(116) Some third parties also argue that the Andasol companies constitute Special Purpose Vehicles and thus the Member State's admission to grant the aid is inherent in their establishment. In addition, in the case of Antin and the Andasol companies are to be considered as constituting one economic unit, the fact that Antin, having purchased the Andasol companies in 2011, sold them again in 2017 does not matter.

(117) Moreover, several third parties claim that the incentive effect should not be assessed under section 3.2.4.2. of the EEAG, as the Commission suggests in the Opening Decision, because the Award is part of the Old Schemes and not an individually

notifiable aid and the capacity of the Andasol plants does not exceed 250 MW, as required in point 20 of the EEAG.

(118) Some third parties claim that an arbitral award does not necessarily lack incentive effect because it is decided after the investment has been carried out because, in its view, it forms part of the aid that was promised in the first place and created legitimate expectations on the basis of which the commercial viability of the investment was determined.

*7.2.6.* *Comments claiming that the aid is compatible under EAG 2001, EAG 2008 and EEAG*

(119) Several third parties claim that, contrary to the Commission's assessment, the Award can be assessed under the EAG 2008, if it is to be considered as part of the Old Schemes. In the view of those third parties, Antin may be considered to carry out the activity of the Andasol companies, namely the generation of renewable energy, and thus form a 'single undertaking' with the Andasol companies. By acquiring 45 % of the Andasol companies, it exercises joint management control over the Andasol companies together with RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l.

(120) Moreover, those third parties argue that it is artificial to maintain that the investor is involved in the renewable energy production if it forms an economic unit with the plant or manages the plant, since the plant operating company is only a vehicle for receiving the support, while it is the investor who assumes all the risks and takes the important decisions for the operation of the plant. Thus, when the Commission authorises aid to the renewable plant operating company, the aid must be considered to benefit the generation of renewable energy irrespective of whether the profits are paid to the plant operating company or directly to the shareholder. In the view of those third parties, it appears, in any case that in the Commission's decision-making practice, many aid recipients have not necessarily had shareholding or management control over the plants and an ownership of a minimum percentage of shares of the project plant has never been a condition for granting aid in the field of renewable energy. Finally, those third parties point out that the fact that some support is technically directed to the production of electricity from natural gas does not affect the compatibility assessment, because the use of natural gas is limited in time, is related to efficiency considerations and has been authorised in many instances by the Commission's decisions.

(121) Some third parties claim that the Old Schemes corrected a market failure, whereby insufficient investment would go to RES technologies in the absence of support. In their view, this was in line with the 2001 Environmental Aid Guidelines[87] ('EAG 2001'). Those parties generally argue that Spain and the Commission recognised the Old Schemes as appropriate policy instruments to attract RES capacity in an efficient and effective way.

(122) Specifically, those parties claim that the Old Schemes only compensated for the difference between the production cost of renewable energy and the market price over the lifetime of the plant because the targeted after-tax project returns of 7 % - 9.5 % on average for RES installations under the Old Schemes are compatible with

---

[87]    Community guidelines on State aid for environmental protection, OJ, C 37, 4.2.2001, p. 3.

EAG 2001 as they would not have entailed overcompensation[88]. Following this, those parties argue that Spain's targeted returns under the Old Schemes are in line with the returns that the Commission has routinely authorised for other RES support schemes under the EAG 2001.

(123) Moreover, the same parties claim that the Old Schemes would have been compatible with the EAG 2008 and the EEAG. In particular, those parties contended that the Old Schemes had an incentive effect which induced substantial investment in Spanish RES which was necessary for Spain to be able to reach long-term renewable targets.

(124) Some third parties argue that the aid granted based on the Award is proportional under the EAG 2008, given that Spain's targeted rate of return for 2008 to 2013 was 7 % - 10 %, thus below the range of returns of 10 % - 13 %, that the Commission authorised during the same period for other RES support schemes.

(125) In the case that the assessment is conducted under the EEAG, those third parties claim that while the aid was not granted in a competitive bidding process, according to point 128 of the EEAG, the aid is still compatible if it does not result in overcompensation. They also claim that the 2017 Commission Decision did not set a maximum rate of return and thus for this reason, in their view, it cannot be precluded that a rate of return of 9 % is within the 10 – 11 % range of rates of return authorised by the Commission in the period 2014-2020 and would make the aid compatible.

(126) In addition, those third parties claim that the aid does not unduly distort competition and trade. The Andasol companies do not have low productivity levels and are financially sound and the grant of the aid to Antin does not result in significant market power, alteration of trade flows, changing the dynamics of competition or keeping an investment firm afloat. Moreover, those investors do not agree with the Commission's view that Antin received an additional benefit under the Award to that received by other beneficiaries, because the compensation to Antin does not preclude that other investors could also seek compensation for damages under national law that could be even higher than that of Antin's compensation.

7.2.7.   *Comments claiming that the Award and the 2013 Scheme are compatible with EAG 2001, EAG 2008 and EEAG*

(127) Some parties in their written observations claimed that the Award is compatible with EAG 2001 as a replacement of the aid that Spain granted under the Old Schemes, which in their view was compatible under the same guidelines. Specifically, those third parties argue that since the aid under the 2013 Scheme is much lower than the support under the Old Schemes, the Award replaces only a portion of the difference between the financial support under the Old Schemes and the 2013 Scheme and the Old Schemes did not themselves provide overcompensation. In those parties' view, it follows that the Award does not overcompensate Antin. Based on that reasoning, the parties argue that the aid under the Award is proportionate. Those parties argue, along similar lines, that a bunch of sample awards (having similar legal basis like the

---

[88]    In support of this claim, the third party assesses three analyses developed by Spanish government institutions (namely, the CNE Report 3/2007, the IDAE, Economic Framework for the Development of Renewable Energy – Investment Cost, Returns and Incentives to the CSP industry, Conference organised by the CNE About Actual Development and Evolution of Renewable Energy in Spain, Madrid, 11 December 2007, and the CNMC October 2018 report assessing the WACC for Spanish renewable investments).

Award) do not result in overcompensation for the beneficiaries and are proportionate under the EAG 2001.

(128) Furthermore, those third parties argue that the Award does benefit RES because it provides an important signalling effect to prospective RES investors, as Spain's potential payment of the Award would show that Spain is willing to comply with its international obligations under the ECT and would have a positive impact on legal certainty and predictability. Additionally, the fact that awards are paid to investors and not to RES installations, in those third parties' opinion, reflects economic reality.

### 7.2.8. *Comments claiming that the Award can be assessed under Article 107(3), point (c), TFEU*

(129) Some third parties argue that even if the compatibility assessment of the Award should be carried out considering the Award on a standalone basis, the Commission has in cases of compensation for damages for earlier closures of fossil fuel plants assessed the compatibility of the aid directly on the basis of Article 107(3), point (c), TFEU because the Award of compensation could not fit into the relevant aid guidelines.

### 7.2.9. *Comments claiming that the aid is incompatible with the EEAG*

(130) One third party is of the opinion that the relevant granting moment would be the date on which the Tribunal issued the Award, that is 15 June 2018, and thus, the compatibility of the measure with the internal market should be assessed under the EEAG.

(131) Moreover, that party claims that the aid does not comply with points 23 and 31 of the EEAG, since the execution of the Award would not result in an increased contribution to the Union's environmental objectives. The purpose of granting the aid would be Spain's compliance with its international obligations under the ECT. In the view of that party, the measure does not fulfil the incentive effect requirements laid down in point 49 of the EEAG, because Antin's installations continued to produce energy from renewable sources, despite the reduction in the amount of support as a result of the modifications to the 2007 Scheme. Finally, that party argues that the measure is not proportionate according to point 69 of the EEAG, because the remuneration stemming from the Award was calculated according to the DCF method and exceeds the reasonable rate of return on investment set by Spain under the operating aid scheme for RES generators. This element also confirms, according to the third party, the discriminatory nature of the notified measure, which is not available to all investors and thus increases Antin's internal rate of return beyond the normal rates of return observed in the renewable energy sector in Spain.

### 7.2.10. *Other comments raised by third parties*

(132) Several third parties argue that in this case the notifying authority does not want the notified measure to be authorised and, in their view, Spain may abuse the notification procedure and infringe the principles of good administration and sincere cooperation by claiming that certain information is not at its disposal. Those third parties contend that in this way Spain prevents the notified aid measure from being authorised by the Commission. Furthermore, several third parties claim that investors have legitimate expectations that the ECT arbitration clause is valid and that the awards issued by the established arbitration tribunals under the ECT are binding both as a matter of Union law and international law due to (i) the Union's accession to the ECT for more than 25 years (in 1994) without having attached any reservations as to the intra-EU

arbitration clause, (ii), the *Achmea* principle, established in March 2018, representing a novel interpretation of Union law and not having retroactive effect[89], (iii) the fact that a significant number of arbitration cases involving EU investors and Member States have taken place on the basis of the application of the arbitration clause in Article 26 of the ECT without the Commission invoking the prohibition of intra-EU arbitration clauses, (iv) the principle of legal certainty, (v) and, in line with the settled case-law setting out that an aid beneficiary has legitimate expectations when it has been irrevocably engaged in a project for which aid has been granted a long while before the Commission assessed the aid measure.

(133)    Several other third parties contend that the approach followed by Spain and the Commission in these proceedings creates a precedent which, in their view, will be harmful to the rule of law and the investment climate within the Union. In addition, those parties claim that the Commission's position set out in the Opening Decision would lead to frictions with global institutions (such as the World Bank), third country judiciaries as well as a consortium of over 50 renewable energy investors.

## 8.    COMMENTS FROM ANTIN

### 8.1.    Comments on the existence of the aid

#### 8.1.1.    *Comments claiming that the Award does not entail State aid*

(134)    Antin refers to the considerations of the Commission in recitals (73) to (77) of the Opening Decision, according to which, based on the *Asteris* judgment, in order for compensation for damages granted pursuant to national law to constitute State aid, it must compensate for the grant of unlawful or incompatible State aid. In its view, if the compensation (here in the form of the Award) compensates for a measure granted pursuant to national law (here the ECT, which became part of the national law with Spain's ratification of the ECT) which either does not constitute State aid, or constitutes existing aid, then that measure does not conflict with Union (State aid) law and thus the compensation for that measure does not constitute aid. On the basis of these considerations, Antin argues that the Award is only capable of constituting State aid, if the Old Schemes constituted either unlawful or incompatible State aid. Moreover, Antin argues that the Award should in any case be assessed as part of the Old Schemes, because it confirms its pre-existing right to receive funding under the Old Schemes. Since the Old Schemes did not constitute State aid, the Award does not constitute aid either.

(135)    In particular, Antin claims that the Old Schemes did not entail the granting of State resources because the classification of a measure as State aid must be considered on the basis of the prevailing case-law at the time of granting the aid. According to the case-law applicable at the time of the introduction of the Old Schemes, the mechanism for granting the support under the Old Schemes did not involve State resources. Antin claims that the financing mechanism of the Old Schemes, which was introduced as early as 1997 and, in any case, no later than 2007, did not involve State resources under the case-law applicable during its implementation and until

---

[89]    Judgment of 19 December 2012, C-288/11, *Mitteldeutsche Flughafen AG* v *Commission*, EU:C:2012:821; Judgment of 24 October 2002, Case C-82/01 P, *Aéroports de Paris* v *Commission of the European Communities,* EU:C:2002:617.

2014[90]. More specifically, Antin argues that the role of CNMC was limited to collecting the network access charges and distributing them to the beneficiaries. CNMC had no discretion to distribute the funds for purposes other than those prescribed by law or to change the level of payments, thus the relevant funds did not at any point come under the ownership or at the disposal of CNMC. Therefore, there is no State control over the funds. According to Antin, the case-law prevailing in 2014[91] is not relevant for the assessment of the Old Schemes, which were no longer in force as of 2014. Finally, even if the Old Schemes were to be assessed on the basis of the case-law prevailing at the time of the adoption of this Decision, they did not involve State resources, because their financing mechanism is similar to the one assessed by the Court of Justice in the *EEG* case[92].

(136)    Moreover, Antin claims that even if the Award is to be assessed separately from the Old Schemes, it does not entail State aid, because the only underlying reason for its grant is the damage suffered by Antin due to Spain's conduct in breach of the ECT and thus does not confer an advantage to Antin in the light of the *Asteris* judgment. The compensatory nature of the Award is furthermore confirmed by the fact that the dispute settlement procedures under article 26 of the ECT concern only the investors and not the beneficiaries of the Old Schemes. Namely, as regards Antin, the Award has been granted to the investors (Antin) and not to the beneficiaries of the Old Schemes, that is, the Andasol companies. Antin further argues that the fact that the compensation is awarded under international rules (that is to say the ECT) instead of national rules does not change its nature as compensation for damages and that in any case, the Award is in line with the relevant national rules on damages compensation.

(137)    Finally, Antin claims that its shareholding rights of 45 % in each of the Andasol companies are considered a pure financial investment because Antin does not manage the Andasol companies, therefore Antin is not an undertaking and thus the grant of the Award to Antin does not fall within the scope of the State aid rules.

*8.1.2.    Comments claiming that the Award is not imputable to Spain*

(138)    Antin contends that since the Old Schemes did not involve State resources, there is no State aid and the assessment of the imputability is not relevant. However, if the Award is to be assessed separately from the Old Schemes, the Award's imputability cannot be premised on Spain's accession to the ICSID Convention or the ECT because, in its view, the Commission has not suggested in the Opening Decision that the underlying scheme is the ICSID Convention or the ECT. On the contrary, as it can be inferred from recitals (10) and (36) to (44) of the Opening Decision, it has assumed that the Award is either an *ad hoc* measure itself or it is reinstating the Old Schemes.

(139)    Moreover, Antin claims that in view of Spain's obligations under international law, it cannot choose not to pay the Award. Specifically, it argues that if legal obligations exist, compliance with them cannot be considered to require a 'decision' to comply with them. In Antin's view, the fact that Spain specifically requested the

---

[90]    According to Antin, this is the *PreussenElektra* case-law (see Judgment of the Court of 13 March 2001 in C-379/98, *PreussenElektra*, EU:C:2001:160).

[91]    According to Antin, this is the *Elcogas* case law (see Order of the Court of 22 October 2014, *Elcogás SA v Administración del Estado and Iberdrola SA*, Case C-275/13, EU:C:2014:2314).

[92]    Judgment of 28 March 2018, *Germany v Commission*, in case C-405/16, EU:C:2019:268

Commission not to approve the Award when notifying it, proves that Spain does not have any decision-making discretion over its payment.

*8.1.3.    Comments claiming that the Award is not liable to distort competition*

(140)    Antin claims that if the Award is to be assessed separately from the Old Schemes, it is not liable to distort competition or affect trade between Member States, because Antin sold its investment in the Andasol plants in August 2017 and since then has not been investing in the energy sector in the Union nor does it hold any shareholding positions in any other company that is active in this sector in the Union.

*8.1.4.    Comments claiming that even if the Old Schemes entailed State aid, it constitutes existing aid*

(141)    Antin alleges that even if the Old Schemes did constitute State aid, it would be existing aid (because the 10-year limitation period has expired) which means, in its view, that the Award does not compensate for unlawful or incompatible State aid.

(142)    In particular, Antin argues that the Award is inextricably linked with the Old Schemes and thus it should be considered that the aid was granted in 1997, when the first scheme was established, or in 1998 at the latest, when it was first implemented by Royal Decree 2818/1998. In its view, the limitation period expired in 2008, whereas the modifications to the Old Schemes in 2004 and 2007 are not substantive alterations that could affect the compatibility analysis and do not justify a change in the qualification of the aid from existing to new.

(143)    Moreover, Antin claims that even if it is considered that the amendments to the Old Schemes, which were introduced in 2004 and 2007, would have an impact on the compatibility of the schemes, the aid would be still existing, since the limitation period expired in 2014 and 2017 respectively, thus before the notification of the Award to the Commission in 2019.

(144)    Antin claims that, since according to the *Asteris* case-law, compensation for damages constitutes State aid only if it compensates for unlawful or incompatible aid, the fact that the grants to Antin under the Old Schemes constitute existing aid means that the Award does not constitute State aid. Alternatively, even if it were considered that the Award constitutes State aid, the fact that the Old Schemes (or rather the individual grants to Antin under the Old Schemes) constituted existing aid means that the Award also constitutes existing aid.

*8.1.5.    Comments claiming that if the Award entails aid, that aid is lawful*

(145)    Antin argues that, since the Award does not entail State aid, the standstill obligation does not apply, but even if it were to be considered that the Award entails State aid, the Tribunal had no obligation to suspend its proceedings.

*8.1.6.    Comments claiming that the aid was granted when Antin received the grant under the Old Schemes*

(146)    Antin claims that given that the Award has been granted in order to restore the rights established under the Old Schemes, the aid was granted when Antin received the grant under the Old Schemes. It is not correct, in its view, to consider that the aid has been granted with the adoption by the Tribunal of the decision to issue the Award[93].

---

[93]    Antin refers to the General Court's judgment of 18 June 2019, Cases T-624/15, T-694/15 and T-704/15, *European Food and Others v Commission*, EU:T:2019:423, where it considered that the aid linked to

Additionally, Antin argues that if the request in legal proceedings for payment of a portion of State aid not received must be considered as part of that underlying aid and not as separate aid, the judgment granting the right to receive that portion cannot be considered as granting separate aid either[94]. Accordingly, it cannot be deemed that the judgment grants new aid or that the date of the adoption of the judgment is the granting date of any aid.

## 8.2.    Comments on the compatibility of the aid

### 8.2.1.    Comments claiming that the Award does not constitute incompatible State aid

(147)    Antin claims that when the Court of Justice, in the *Komstroy* judgment, has stated that arbitration awards under the ECT are invalid, this was an *obiter dictum*, which does not have legal force and the statement was based on a theoretical case that would never be subject to Union law. In addition, Antin claims that the Court of Justice in its *Opinion 1/20*, did not rule on whether the draft modernised ECT is compatible with Union law and whether any potential compensation under the ECT for a measure could constitute State aid.

(148)    Antin also claims that the application of the *Achmea* principle in this case cannot automatically lead to the incompatibility of the Award with the internal market. This is so, in its view, because if lower-ranking Union law (here the ECT) contradicts Union primary law (here the *Achmea* principle combined with the State aid rules), the conflicting provisions must be reconciled, instead of it being assumed that Union primary law automatically overrules other Union law based on the ECT.

(149)    Furthermore, Antin claims that any interpretation of the case-law suggesting that the arbitration clause of the ECT breaches provisions of Union primary law would contradict the principle of legal certainty and the legitimate expectations of the investors in this case, as the Commission has been a signatory to the ECT since 1994, without any reservations regarding the arbitration clause. Antin argues that, when the ECT was negotiated prior to its signature in 1994, the Union at first requested that a clause be included stating that the arbitration clause of the ECT is not applicable to intra-EU disputes, however it dropped that request upon the Union's signature in 1994. The Commission then argued during the negotiations on the revision of the ECT that such a clause should be included in the revised ECT. In Antin's view, this approach demonstrated that the principle established by the *Achmea* judgment reflects a novel interpretation, which cannot have a retroactive effect. Antin also contends that the legitimate expectations that the arbitration is valid are based on the number of cases where EU investors have obtained awards against a Member State based on Article 26 of the ECT without the Commission objecting or challenging them (by initiating State aid or infringement procedures). In this regard, Antin also points to the serious economic repercussions that the investors would incur in case of non-validity of the arbitration clause, given the large number of investments made in good faith.

(150)    Moreover, Antin argues that its legitimate expectations are based on the fact that the Commission did not initiate a formal investigation regarding the Old Schemes before Spain's notification of the Award in 2019, even though it was aware of the

---

the Micula award had been granted on the day of the repeal of the underlying scheme since it was the repeal that had given rise to the right to receive the Micula award.

[94]    Antin refers to the Judgment of the Court (Grand Chamber) of 12 January 2023, Joined Cases C-702/20 and C-17/21, *SIA 'DOBELES HES' and Sabiedrisko pakalpojumu regulēšanas komisija,* EU:C:2023:1.

schemes[95]. In addition, already as of 2011, before the Old Schemes were repealed in 2013 or the Award was issued in June 2018, Antin was irrevocably engaged in RES infrastructure projects and, consequently, it had legitimate expectations as regards its right to invoke the arbitration clause of the ECT[96].

8.2.2.  *Comments claiming that the Award does not entail discrimination on the basis of nationality*

(151)  Antin claims that the Award should be considered as part of the Old Schemes and thus, it does not lead to any discrimination, as all the investors that fulfil the relevant conditions can benefit from it. In Antin's view, the Commission's argument that discrimination among the different investors (especially against Spanish investors) consists in the fact that not all investors that benefitted from the Old Schemes have access to international arbitration under the ECT, is based on the false assumption that the ECT forms part of the Old Schemes or that the ECT can be on its own a basis for granting aid. Antin adds that it is not precluded that Spanish investors may seek compensation for damages according to provisions of national law or according to any other dispute resolution mechanism they might have agreed to.

(152)  Antin also contends that even if the ECT is considered to be part of the Old Schemes, the Commission's argument on discrimination on the basis of nationality rather implies a discrimination on the basis of the investor's place of establishment. This kind of discrimination does not, in its view, infringe any provisions of the Treaties. State aid is, by definition, discriminatory, as it is granted to companies established in the Member State that grants the aid.

(153)  Finally, Antin argues that if the Award is to be examined as *ad hoc* aid, separately from the Old Schemes, there is no discrimination, because no comparison can be conducted with another grant.

8.2.3.  *Comments claiming that the Old Schemes are compatible under EAG 2001, EAG 2008 and EEAG*

(154)  In Antin's view, if the Award is considered to entail State aid, its compatibility should not be assessed against the Guidelines that were in force at the time the Award was issued. On the contrary, the Commission should assess the Award as part of the Old Schemes and apply the Guidelines that were in force when the aid was granted to Antin under the Old Schemes.

(155)  Antin claims that the Award facilitates the economic activity of renewable energy generation and is not merely a result of Spain's compliance with its obligations under the ICSID Convention. In its view, if the Award is considered as confirming the pre-

---

[95]  Antin points to pages 10, 22 and 28 of Commission Communication COM(2005) 627 'The Support of Electricity from Renewable Energy Sources' of 7 December 2005, to Commission Decision C(2013) 7743 final of 4 February 2014 on SA.36559 (C3/2007), OJ L 205, 12.07.2014 and to recital (107) of the 2017 Commission decision.

[96]  Antin refers to the following judgements: Judgment of the General Court of 15 November 2018, *World Duty Free Group, SA, formerly Autogrill España, SA v Commission*, T-219/10 RENV, EU:T:2018:784; Judgement of the General Court of 15 November 2018, *Deutsche Telekom AG v Commission*, T-207/10, EU:T:2018:786; Judgment of the General Court of 15 November 2018, *Banco Santander, SA v Commission*, Case T-227/10, EU:T:2018:785; Judgment of the General Court of 15 November 2018, *Axa Mediterranean Holding, SA v Commission*, T-405/11, EU:T:2018:780; Judgment of the General Court of 15 November 2018, *Banco Santander, SA and Santusa Holding, SL v Commission*, Case T-399/11 RENV, EU:T:2018:787.

existing right to receive aid under the Old Schemes, the aid is granted for renewable energy investments. In addition, even if the Award is considered on a standalone basis, Spain's compensation obligation under the ICSID Convention has been (and may only be) triggered due to Antin's production of renewable energy. Therefore, the production of renewable energy is the only relevant underlying activity for the purposes of assessing compatibility of the compensation amount.

(156)   Antin claims that it carries out RES activity, because it may be considered to carry out the activity of the Andasol companies, namely the generation of renewable energy, and thus form a 'single undertaking' with the Andasol companies. By acquiring 45 % of the Andasol companies, it exercises joint management control with RREEF Infrastructure (G.P.) Limited and RREEF Pan-European Infrastructure Two Lux S.à r.l. Moreover, in Antin's view it is artificial to maintain that the investor is involved in the renewable energy production only if it forms an economic unit with the plant or manages the plant, since the plant operating company is only a vehicle for receiving the support, while the investor assumes all the risks and takes the important decisions for the operation of the plant. Thus, when the Commission authorizes aid to the renewable plant operating company, the aid must be considered to benefit the generation of renewable energy irrespective of whether the profits are paid to the plant operating company or directly to the shareholder. According to Antin, in any case it appears that in the Commission's decision-making practice, many aid recipients have not necessarily had shareholding or management control over the plants and an ownership of a minimum percentage of shares of the project plant has never been a condition for granting aid in the field of renewable energy. Finally, Antin argues that in the case that Antin and the Andasol companies constitute one economic unit, the fact that Antin, having purchased the Andasol companies in 2011, sold them again in 2017, is not relevant. Any compensation has to be given to Antin, since it paid for the Andasol companies' market value on the assumption that it would receive the full aid amount.

(157)   In this regard, Antin points out that the fact that some support is technically directed to the production of electricity from natural gas does not affect the compatibility assessment, because the use of natural gas is limited in time and is related to efficiency considerations. Furthermore, almost all aid beneficiaries under the Old Schemes and the 2013 Scheme use gas to some extent during short intervals and the Commission has also authorised in many instances aid for gas-fired powered plants.

(158)   With reference to the incentive effect, Antin claims that as long as it fulfilled the requirements set out in the Old Schemes, it should be considered that the Award also has an incentive effect.

(159)   Antin claims that the Old Schemes are compatible under the EAG 2001, because Spain's targeted returns under the Old Schemes are in line with the returns that the Commission routinely authorised for other RES support schemes between 2001 and 2009 under the EAG 2001. This assessment is not affected by the amendments to the scheme, which were introduced in 2004 and 2007.

(160)   In Antin's view, the Old Schemes are also proportional under the EAG 2008, given that Spain's targeted rate of return for 2008 to 2013 was 7 % - 10 %, thus below the range of return of 10 % - 13 %, that the Commission authorised during the same period for other RES support schemes.

(161)   In the case that the assessment is conducted under the EEAG, Antin argues that the incentive effect should not be assessed under section 3.2.4.2. of the EEAG, because

the Award is part of the Old Schemes and not individually notifiable aid and the capacity of the Andasol plants does not exceed 250 MW, as required in point 20 of the EEAG. In addition, as regards the proportionality, Antin argues that the fact that the aid is granted through an arbitration award and not through a competitive bidding process cannot render the aid incompatible. Antin contends that the Award was calculated on the basis of the remuneration that Antin should have received under the Old Schemes (that is, the same that Antin would have received as if the Old Schemes would have been in place). It is thus composed of the market price and a premium multiplied by the number of years in question and the fact that the premiums have been accumulated into one amount does not change the nature of the compensation. Antin argues that while the aid is not granted in a competitive bidding process, according to point 128 of the EEAG, the aid is still compatible, if it does not result in overcompensation and that the 2017 Commission Decision did not set a maximum rate of return, it cannot be precluded that a rate of return of 9 % would be authorised by the Commission, given its decisional practice in the period 2014 to 2020.

(162)    In addition, Antin claims that the aid does not unduly distort competition and trade, because it does not result in significant market power, alteration of trade flows, changing the dynamics of competition or keeping an investment firm afloat. In particular, Antin contends that itself and the Andasol companies do not have low productivity levels and are financially sound. In addition, the aid linked to the Award does not result in giving Antin unreasonable rates of return as they remain within the rates of return nor does it last unreasonably long (it lasts only for its lifetime) and it does not entail any risks of cross subsidisation or technological neutrality. Finally, the aid linked to the Award does not give Antin or the Andasol companies increased market shares.

(163)    Finally, Antin claims that even if the compatibility assessment of the Award is to be carried out considering the Award on a standalone basis, the Commission has in cases on compensation for damages for early closures of fossil fuel plants assessed compatibility of the aid directly on the basis of Article 107(3) TFEU, if the compensation could not fit into the relevant aid guidelines.

### 8.3.    Other comments

(164)    Antin contends that Spain has not notified the Award for the purpose of it being authorised and may thus abuse the notification procedure and infringe the principles of good administration and sincere cooperation by not providing the necessary information and by preventing the notified aid measure from being authorised by the Commission.

## 9.    COMMENTS OF SPAIN TO THE COMMENTS OF THIRD PARTIES

(165)    The Spanish authorities sent their response to the comments submitted by third parties on 3 January 2023, 27 November 2023 and 29 January 2024.

### 9.1.    Comments in relation to comments regarding the existence of aid

(166)    In response to the third-party arguments that the Award does not entail State aid, Spain reiterates the Commission's reasoning in the 2017 Commission Decision, where the Commission recalled (in recital (165)), that any compensation which an arbitration tribunal were to grant to an investor on the basis that Spain has modified the premium economic scheme (the 2007 Scheme) by the notified scheme (the 2013 Scheme) would constitute in and of itself State aid.

(167)    Moreover, Spain reiterated that according to case-law the aid is granted on the date on which the arbitration award is issued, because the right to compensation for the loss which the arbitration applicants allege to have suffered as a result of the repeal of a State aid scheme was granted only by the arbitration award[97].

## 9.2.    Comments in relation to comments regarding the compatibility of aid

(168)    In response to the third-party comments regarding the relevance of the *Komstroy* judgment, Spain observed that the Court of Justice has confirmed that the aid granted on the basis of an intra-EU award issued by an arbitration tribunal under the ECT is not compatible with the Union law, because such an arbitration tribunal is not part of the judicial system of the Union, contrary to Article 19 (1) TEU, as well as Articles 267 and 344 TFEU[98].

## 9.3.    Comments in relation to comments regarding the existence of aid

(169)    In response to the third party arguments that the abolition or reduction of incentives that gave rise to the compensation in the Award did not constitute State aid and would in any event have been existing aid, the Spanish authorities recalled that in the *Micula* judgment, which, to a large extent, is similar to this case, the Court rejected the view that aid amounting to compensation contained in an arbitral award made on the basis of an intra-EU BIT triggered by the repeal of the scheme in question could be regarded as having been granted at the time of the repeal of the scheme in question. Conversely, the Court clarified that the beneficiary acquires the right to receive the aid on the basis of the award at the time when the award is granted[99].

(170)    In addition, the Spanish authorities mentioned that the Court of Justice has held that an award, in so far as it is incompatible with Union law, and in particular with Articles 267 and 344 TFEU, cannot have any effect or be enforced[100]. Spain further argues that the same principle applies in this case and aid cannot be granted in a way contrary to Articles 267 and 344 TFEU.

(171)    Responding to the claims made by third parties concerning the relevance of the *Asteris* judgment, the Spanish authorities argue that compensation for aid not paid under the Common Agricultural Policy which has been found to be illegal by Union Courts cannot be equated with an intra-EU investment arbitration award under the ECT. In this respect, the Spanish authorities pointed to the *Micula case* in which the Court clarified the character of intra-EU investment arbitration as a dispute settlement system outside the national judicial systems of Member States before classifying such an award as State aid.

(172)    Moreover, in response to the third-party allegations that the 2007 Scheme constituted together with previous schemes existing aid, the Spanish authorities argue that the 2017 Commission Decision analysed the entire compensation received by the beneficiaries under both the 2007 Scheme and the 2013 Scheme.

---

[97]    Spain refers to judgment of 25 January 2022, C-638/19 P, *European Food and Others v Commission*, EU:C:2022:50.

[98]    Spain refers to the *Komstroy* and *Achmea* judgments.

[99]    Spain refers to the judgment of 25 January 2022, C-638/19 P, *European Food and Others v Commission*, EU:C:2022:50, paragraph 125.

[100]    Order of the Court of 21 September 2022, C-333/19, *Romatsa and Others*, EU:C:2022:749, paragraphs 42 to 44.

(173) Further, the Spanish authorities, responding to the third-party comments that questioned the Award's imputability to Spain, endorse the Commission's reasoning set out in the Opening Decision.

(174) In response to the arguments raised by third parties in connection with the effect of the measure on the internal market, the Spanish authorities explain that the Court in *Micula*[101] set out that intra-EU arbitration awards granted by a mechanism outside the Union judicial system amount to aid incompatible with the internal market, which makes their impact on the market irrelevant. In any event, the Spanish authorities argue that the 2017 Commission Decision showed that both the 2007 and the 2013 Scheme could distort competition in the internal market.

(175) Responding to the third-party arguments concerning the Award granting aid, the Spanish authorities make reference to case-law[102] confirming that the decisive factor for determining the date on which the aid was granted is the acquisition of the right to receive the aid by the recipients and the corresponding undertaking by the State to grant the aid.

(176) Responding to third parties' comments in connection with the relevance of the *Dobeles Hes* ruling[103], the Spanish authorities argue that the case-law on this point was delivered in the context of a preliminary rule as a result of a dispute relating to State aid before national administrative courts. According to Spain, such rulings on claims for compensation under national courts are not relevant for the present proceedings and there is a distinction between an order to pay a price recognised by a national rule and an investment arbitration award which recognises sums on account of the application of a national rule amended or repealed. Therefore, in the view of the Spanish authorities, the third-party claims concerning Member States' national courts are not applicable in the context of investment arbitration awards.

## 9.4.   Comments in relation to comments regarding the compatibility of aid

(177) In response to observations from third parties concerning the relevance of the *Komstroy* judgment and *Opinion 1/20*, the Spanish authorities explain that the case-law provided authoritative interpretations of the ECT, and specifically Article 26 thereof, which clarify that the dispute settlement mechanism through arbitration cannot be applicable to intra-EU disputes because it would infringe Articles 267 and 344 TFEU. The Spanish authorities stress that the Court held that this principle is also applicable to the ECT.

(178) In response to a third party's claims that the Award as well as the 2013 Scheme amount to compatible aid in line with the Commission applicable guidelines, the Spanish authorities argue that intra-EU arbitration awards based on the ECT are manifestly incompatible with Union law. Further, the Spanish authorities explain that as a result of the case-law[104] on the granting moment of arbitral awards, in this case

---

[101]   Spain refers to the judgment of 25 January 2022, C-638/19 P, *European Food and Others v Commission*, EU:C:2022:50.

[102]   Judgment of 25 January 2022, C-638/19 P, *European Food and Others v Commission*, EU:C:2022:50, paragraphs 123 to 125.

[103]   Judgment of the Court (Grand Chamber) of 12 January 2023, Joined Cases C-702/20 and C-17/21, *SIA 'DOBELES HES' and Sabiedrisko pakalpojumu regulēšanas komisija*, EU:C:2023:1.

[104]   Judgment of 25 January 2022, *European Food and Others v Commission*, C-638/19 P, EU:C:2022:50, paragraphs 118, 123 to 126 and 152.

**EN**                                      35                                      **EN**

any claims about possible compatibility of the Award with guidelines predating that date (namely, EAG 2001 and EAG 2008) are flawed.

(179)   Additionally, responding to the third-party's claims about the Award's proportionality with EEAG, the Spanish authorities argue that the analysis provided is flawed and lacks credibility. Moreover, the Spanish authorities argue that the Award, contrary to that third party's view, lacks any incentive effect and does not result in any benefits for renewable energy sources, while the Award may also distort competition in the internal market, at odds with EEAG.

### 9.5.   Comments on other third-party comments

(180)   Responding to third-party comments concerning their legitimate expectations, the Spanish authorities argue that the Commission's assessment in this case cannot be altered by relying on investors' expectations. Additionally, Spain submits that according to case-law, fundamental principles of Union law, such as legal certainty and legitimate expectations, cannot preclude the adoption by Member States of measures to reduce or abolish previously granted incentives[105].

(181)   Moreover, in response to the observations raised by third-parties in respect of the existence of abuse in the notification process, the Spanish authorities argue that they complied with their notification obligation under Article 108(3) TFEU to ensure the Commission's exclusive competence to review State aid and the Commission's guidance to suspend payment of arbitral awards in the absence of State aid authorisation set out in the 2017 Commission Decision.

(182)   Responding to the claims raised by a third party arguing that the 2007 Scheme was compatible aid in line with the Commission applicable guidelines, the Spanish authorities argue that such an assessment is irrelevant for the purposes of the present proceedings which assess the compatibility of the Award.

### 10.   ASSESSMENT OF THE MEASURE

#### 10.1.   Existence of aid

(183)   Article 107(1) TFEU provides that 'aid granted by a Member State or through State resources in any form whatsoever which distorts or threatens to distort competition by favouring certain undertakings or the production of certain goods shall, in so far as it affects trade between Member States, be incompatible with the internal market'.

(184)   A measure constitutes State aid within the meaning of Article 107(1) TFEU, if it fulfils four cumulative conditions. First, the measure must be imputable to the State and financed through State resources. Second, the measure must confer an advantage to a beneficiary. Third, the measure must favour certain undertakings or economic activities (that is the advantage must be selective). Fourth, the measure must have the potential to affect trade between Member States and to distort, or threaten to distort, competition in the internal market.

---

[105]   Judgment of the Court of 15 April 2021, *Federazione nazionale delle imprese elettrotecniche ed elettroniche (Anie) and Others (C-798/18), Athesia Energy Srl and Others (C-799/18) v Ministero dello Sviluppo economico, Gestore dei servizi energetici (GSE) SpA*, joined Cases C-798/18 and C-799/18EU:C:2021:280; judgment of the Court 11 July 2019, *Agrenergy and Fusignano Due*, C-180/18, C-286/18 and C-287/18, EU:C:2019:605; judgment of the Court of 10 September 2009, *Plantanol GmbH & Co. KG v Hauptzollamt Darmstadt*, C-201/08, EU:C:2009:539.

(185)    In the Opening Decision (recitals (71) to (88)), the Commission concluded, on a preliminary basis, that the Award constitutes State aid within the meaning of Article 107(1) TFEU. For the reasons explained below in the remainder of Section 10.1, the Commission concludes that the Award, and in any event the implementation, payment, or execution of the Award (the 'Implementation'), constitutes State aid within the meaning of Article 107(1) TFEU.

### 10.1.1.    Imputability and State resources

*Imputability*

(186)    According to the case-law of the Union Courts, for a selective advantage to constitute aid within the meaning of Article 107(1) TFEU, it must, *inter alia*, be imputable to the State[106]. It must also be noted that, where an advantage is granted by a public authority, that advantage is, by definition, attributable to the State[107].

(187)    As explained in recital (65), Spain signed the ECT on 17 December 1994, ratified it on 11 December 1997, and the ECT entered into force with respect to Spain on 16 April 1998. As also explained by Spain, in accordance with Article 96(1) of the Spanish Constitution, international treaties that are validly concluded become part of the internal legal order, once officially published in Spain. Spain's ratification of the ECT was published in the Spanish Official State Gazette on 17 March 1998 ('*Instrument of ratification of the Energy Charter Treaty and the Energy Charter Protocol on Energy Efficiency and Related Environmental Aspects, done in Lisbon on 17 December 1994*', see also recital (65)). Spain signed the ICSID Convention on 21 March 1994 and ratified it on 17 September 1994. Spain's ratification of the ICSID Convention was published in the Spanish Official State Gazette on 13 September 1994 ('*Instrument of Ratification of the Convention on the settlement of investment disputes between States and Nationals of other States, adopted in Washington on March 18, 1965*').

(188)    The Tribunal issued the Award on the basis of its interpretation of those treaties, that Spain had signed and ratified, and that had thus become part of the Spanish legal order from the date of their publication in the Spanish Official State Gazette. Spain voluntarily decided to sign and ratify the ECT and the ICSID Convention, and to incorporate them into Spanish national law (see recital (187) and section 5.4). The issuance of the Award has therefore been rendered possible by Spain's decision to sign and ratify the ECT and the ICSID Convention: the fact that the Tribunal should have declined jurisdiction – because, according to the case-law of the Court of Justice, Article 26 ECT does not apply intra-EU – does not alter that fact. The Award is imputable to Spain.

(189)    In any event, the Commission notes that the Implementation of the Award is imputable to Spain also for the reasons below (see recitals (190)-(191)) .

(190)    Because the Award violates Articles 267 and 344 TFEU, 19 TEU and the general principles of autonomy and mutual trust, the Award cannot produce any effect in the EU legal order, and Spain may not implement it. Any Implementation in spite of that

---

[106]    Judgment of 5 April 2006, *Deutsche Bahn AG v Commission*, T-351/02, EU:T:2006:104, paragraph 101.

[107]    Judgment of 15 December 2021, *Oltchim* v *Commission*, T-565/19, EU:T:2021:904, paragraph 160. Judgment of the General Court of 2 October 2024, Cases T-624/15 RENV and T-694/15 RENV, *European Food SA and Others v European Commission*, EU:T:2024:659, paragraph 206.

prohibition would directly involve an autonomous decision of the Spanish authorities. That holds true if Spain voluntarily pays out on the Award, and if Spain would attempt initially to oppose the recognition and execution of the Award before a court of a Member State or a third country, and either fails to prevent seizure of assets or takes the decision to pay the Award in order to prevent measures of asset discovery and ultimately seizure of assets not protected by sovereign immunity[108]. The Commission also notes, for the sake of completeness, that the recognition or execution of the Award by a Spanish Court would equally be attributable to Spain as the acts of all State organs, including the national courts, are imputable to the State.

(191)    For those same reasons, the General Court held in *Micula* that the State is necessarily 'involved' if it pays the compensation provided for in an arbitral award[109]. The Commission also notes, for the sake of completeness, that the recognition or execution of the Award by a Spanish court would equally be attributable to Spain as the acts of all State organs, including the national courts, are imputable to the State.

(192)    None of the arguments raised by the interested third parties call into question this conclusion that the Award, and in any event its Implementation, is imputable to Spain.

(193)    First, contrary to the argument raised by some third parties, the fact that the Award was rendered by an investor-State arbitration tribunal and not a domestic court does not alter the Commission's finding of imputability of the aid and does not prevent the Award, and in any event its Implementation, from being imputable to Spain. Indeed, the Tribunal asserted its jurisdiction to deliver the Award based on its interpretation of Article 26 ECT and the ICSID Convention, which the Tribunal can refer to only because Spain decided to sign and ratify those acts of international law. Moreover, accepting a reasoning which results in a lack of imputability in this context would effectively allow Member States to escape State aid scrutiny as long as they rely on investor-State arbitration or they enter into an international obligation to grant a certain State aid measure[110]. Such reasoning adversely affects the effectiveness of Union law, and in particular Article 107 TFEU, and thus has to be rejected.

(194)    Second, as regards the arguments of third parties set out in recitals (99) and (138), that the Award's imputability cannot be premised on Spain's accession to the ICSID Convention or the ECT because the Opening Decision does not suggest that the underlying scheme is the ICSID Convention or the ECT, the Commission considers that this argument is irrelevant to the question of whether the Award, and in any event its Implementation, is imputable to Spain. The individual nature of the measure does not prevent it from resulting from the (albeit improper) application by an investor-State arbitration tribunal of international agreements voluntarily entered into by Spain. The Opening Decision (in recital 82) clearly referred to Spain's voluntary agreement to enter into the ICSID Convention and the ECT in its preliminary assessment of the imputability of the aid measure.

---

[108]    Judgment of the General Court of 2 October 2024, Cases T-624/15 RENV and T-694/15 RENV, *European Food SA and Others v European Commission*, EU:T:2024:659, paragraphs 201 to 221.

[109]    *Ibidem*.

[110]    See, in this regard, judgment of the General Court of 2 October 2024, Cases T-624/15 RENV and T-694/15 RENV, *European Food SA and Others v European Commission*, EU:T:2024:659, paragraph 217.

(195)  Third, the Commission notes that the third parties' claim (see recitals (100) and (139)) according to which the Award is not imputable to Spain because, due to its obligations under international law, Spain would have no discretion as to the payment of the Award, is not well-founded, for the reasons set out in recital (193). Firstly, this reasoning cannot be accepted as this would effectively allow all Member States to escape State aid scrutiny, as long as they enter into an international obligation to grant a certain State aid measure[111]. Secondly, as recalled in recital (11), the case-law considers that an arbitral award delivered in proceedings between a Member State and an investor from another Member State, such as in the present case, is incompatible with Union law and therefore cannot produce any effect and cannot be executed[112]. Consequently, Spain is required to set aside the Award and cannot be considered as being under an obligation to pay, implement or execute it[113]. Thirdly, the only situation where the case-law recognises that a measure taken by a Member State is not imputable to the Member State is the situation where Union law requires the Member State to put in place the measure, without leaving any discretion to the Member State. That is manifestly not the case here. In light of the above, the Commission concludes that the Award, and in any event its Implementation, is imputable to Spain.

*State resources*

(196)  According to settled case-law, only advantages granted directly or indirectly through State resources can constitute State aid within the meaning of Article 107(1) TFEU[114].

(197)  In this case, the Award contains an obligation for Spain to pay: (i) the total compensation amount calculated by the Tribunal in the Award (i.e., EUR 101 million as compensation for having breached Article 10(1) ECT by failing to accord fair and equitable treatment to Antin's investments); (ii) the pre-award interests; and (iii) the post-award interests, which will have to be recalculated on the basis of the date of actual payment (see Section 5.6).

(198)  At the time of notification, Spain estimated that the pre-award interest amounted to EUR 8 686 086 for the period 20 June 2014-15 June 2018; and that the post-award interest amounted to EUR 1 810 978 is for the period 15 June 2018-31 March 2019.

(199)  The Spanish authorities explained that if the Award was to be paid, such payment would be financed from the general budget of the Spanish State, and that such payment will not be directly charged to the costs of the electricity system and therefore will not fall directly on the electricity end consumers through the electricity bill (see Section 5.6).

---

[111]  Judgment of the General Court of 2 October 2024, Cases T-624/15 RENV and T-694/15 RENV, *European Food SA and Others v European Commission*, EU:T:2024:659, paragraph 217.

[112]  Order of the Court of Justice 21 September 2022, *Romatsa and Others*, C-333/19, EU:C:2022:749, paragraphs 42 to 44.

[113]  Judgment of the General Court of 2 October 2024, Cases T-624/15 RENV and T-694/15 RENV, *European Food SA and Others v European Commission*, EU:T:2024:659, paragraph 214.

[114]  Judgment of the Court of Justice of 24 January 1978, *Van Tiggele*, 82/77, ECLI:EU:C:1978:10, paragraphs 25 and 26; Judgment of the General Court of 12 December 1996, Air France v Commission, T-358/94, ECLI:EU:T:1996:194, paragraph 63.

(200)   No payment by Spain has taken place at the time of this Decision, not least because it would be contrary to Union law. However, as a result of the attempts by Antin to enforce the Award, there is a serious risk that Spain will have to invest State resources in the payment of the Award. Such risk suffices for the finding of the presence of State resources[115]. In that context, the Court of Justice has held that it is irrelevant for the finding of State resources whether such use of State resources would violate Union law or national law. What is decisive is that the measure has produced effects[116]. As the aid entails a risk of direct payment by Spain, from Spain's budget, the Commission considers that the Award, and in any event its Implementation, which consists of a direct payment, is financed by State resources.

*Conclusion on imputability and State resources*

(201)   Based on the foregoing, the Commission concludes that the Award, and in any event its Implementation, is imputable to the Spanish State and is financed through State resources within the meaning of Article 107(1) TFEU.

*10.1.2.   Advantage and selectivity*

*Economic advantage*

(202)   An advantage, within the meaning of Article 107(1) TFEU, is any economic benefit which an undertaking would not have obtained under normal market conditions, that is to say in the absence of the State intervention[117]. The precise form of the measure is irrelevant in establishing whether it confers an economic advantage on the undertaking[118].

(203)   In that regard, in order to assess whether a Member State has conferred an advantage on a given undertaking, the financial situation of the undertaking following the measure should be compared with its financial situation if the measure had not been taken[119].

---

[115]   See to that effect the judgment of the Court of 19 December 2019 in Case C-385/18, A*rriva Italia Srl, Ferrotramviaria SpA, Consorzio Trasporti Aziende Pugliesi (CO.TRA.P) v Ministero delle Infrastrutture e dei Trasporti*, EU:C:2019:1121, notably paragraphs 35-36, where the Court explained the following: "(*35*) *In the second place, as regards the requirement that the advantage is granted directly or indirectly through State resources, it must be noted that the circumstance that, according to the referring court, the sum of EUR 70 million was not paid out of the budget of the Italian State and is therefore not an item of expenditure for the budget of that Member State does not mean in itself that such a sum cannot be classified as 'State resources', in particular where Article 1(867) of the Stability Law for 2016 created a potential burden on the budget of the Italian State. (36) In that regard, it is apparent from the case-law of the Court that, from the moment when the right to receive support, provided through State resources, is conferred on the beneficiary under the applicable national legislation, the aid must be considered to be granted, so that the actual transfer of the resources in question is not decisive (see, to that effect, judgment of 21 March 2013, Magdeburger Mühlenwerke, C-129/12, EU:C:2013:200, paragraph 40).*"
[116]   Judgment of the Court of 26 September 2024, C-790/21 P and C-791/21 P, *Covestro and Others* v *Commission*, paragraph 172, ECLI:EU:C:2024:792, with further references.
[117]   Judgment of the Court of 11 July 1996, Case C-39/94, *SFEI and Others*, EU:C:1996:285, paragraph 60; Judgment of the Court of Justice of 29 April 1999, Case C-342/96, *Spain v Commission*, EU:C:1999:210, paragraph 41.
[118]   Judgment of the Court of Justice of 24 July 2003, *Altmark Trans*, C-280/00, EU:C:2003:415, paragraph 84.
[119]   See, to that effect, judgment of the Court of Justice of 2 July 1974, *Italy* v *Commission*, 173/73, EU:C:1974:71, paragraph 13.

(204)    Moreover, the concept of 'advantage', which is intrinsic to the classification of a measure as State aid, is an objective one, irrespective of the motives of the persons responsible for the measure in question. Accordingly, the nature of the objectives pursued by State measures and their grounds of justification have no bearing whatsoever on whether such measures are to be classified as State aid. Article 107(1) TFEU does not distinguish between the causes or the objectives of State aid, but defines them in relation to their effects[120].

(205)    In the case at hand, it is clear that, with the Award, or in any event its Implementation, the financial situation of Antin is improved compared to its financial situation without it. More specifically, the Tribunal awarded Antin EUR 101 million plus interest (estimated by Spain as EUR 8 686 086 for pre-award interest for the period 20 June 2014-15 June 2018, plus EUR 1 810 978 for the post-award interest for the period 15 June 2018-31 March 2019 – see Section 5.6).

(206)    Moreover, the Award granted to Antin a right which, not only would Antin not have obtained under the normal market conditions, but which has financial value. This financial value could also be transferred to other beneficiaries, against suitable payment[121].

(207)    Under normal market conditions, i.e. without an Award handed down by an arbitration tribunal on the basis of Spain's signature and ratification of the ECT (and the ICSID Convention), Antin would not have been entitled to any compensation such as that obtained as a result of the Award, and there would be no title on the basis of which to seek Implementation[122].

(208)    Contrary to what Antin argues, the Award does not constitute compensation for unlawful action by Spain, which, according to the case-law of the Court, and in particular the *Asteris* judgment, would not constitute an economic advantage. Antin claims that the modification and replacement of the 2007 Scheme by the 2013 Scheme violated Article 10 ECT. However, that argument fails, for two reasons.

(209)    First, as set out in recitals (157) to (166) of the 2017 Commission Decision, the modification and replacement of the 2007 Scheme by the 2013 Scheme has neither violated the general principles of Union law of legitimate expectations and legal certainty, nor Article 10 ECT. The General Court has confirmed in the *Aquind* judgment the view taken by the Commission that Article 10 ECT has the same content as the general principles of Union law of legitimate expectations and legal certainty, and cannot have a broader or different meaning, which would put into question the autonomy of the EU legal order[123].

---

[120]    See, to that effect, judgment of the Court (Grand Chamber) of 25 January 2022, Case C-638/19 P, *European Commission v European Food SA and Others,* EU:C:2022:50, paragraph 122 and cited case-law.

[121]    The Commission observes that, in some instances, arbitral awards granted because of the regulatory changes made by Spain to the 2007 Scheme, have been transferred to other undertakings which were not party to the arbitration proceedings and which can be considered as the successors in title of the award, in particular to the company Blasket Renewables, see Civil Case No. 21-3249, *Blasket Renewable Invs. v. The Kingdom of Spain*, 665 F. Supp. 3d 1, (D.D.C. 2023).

[122]    Judgment of the Court of Justice of 24 July 2003, *Altmark Trans*, C-280/00, EU:C:2003:415, paragraph 84.

[123]    Judgment of the General Court of 8 February 2023, *Aquind* v *Commission*, Case T-295/20, EU:T:2023:52, paragraphs 145 to 153.

(210)   Second, as the Court of Justice held in the *Anie* judgment, Article 10 ECT only applies in relation to investors from 'other' contracting parties, which excludes EU investors[124].

(211)   Therefore, the argument of Antin, according to which it is necessary to establish that the 2007 Scheme constitutes unlawful State aid in order for the Award to constitute State aid, is based on an erroneous premise.

(212)   In any event, in this regard, it should be borne in mind that, in accordance with the case-law of the Union Courts, where national legislation has established 'State aid' within the meaning of Article 107(1) TFEU, the payment of a sum claimed before the courts in accordance with that legislation also constitutes such aid[125]. Indeed, while the case-law considers that a distinction must be drawn between claims for compensation for damage resulting from unlawfulness and an action for the payment of amounts due under legislation[126], where sums claimed before the courts, even formally as compensation, correspond to the payment of an advantage which the applicant is seeking pursuant to legislation, the action does not seek compensation for harm distinct from that consisting of the complete non-payment of the advantage to which the applicant considered he or she was entitled under that legislation[127]. The recipient of aid cannot circumvent the effective application of the rules on State aid by obtaining, without relying on Union law on State aid, a judgment granting compensation whose effect would enable it, definitively, to continue to implement the aid in question over a number of years[128].

(213)   In this case, firstly, as explained in recitals (61) to (63) of this Decision, the compensation awarded to Antin by virtue of the Award is calculated as the present value of all the cash flows that the investor would have received during the lifetime of the plant (25 years), had the 2007 Scheme not been revoked by Spain. The Award has therefore the effect of compensating Antin for the repeal of the 2007 Scheme. In other words, the payment of the compensation awarded by the Tribunal has the effect of re-establishing the situation claimants would have found themselves in if the 2007 Scheme, which constitutes unlawful State aid, had remained in place.

(214)   Moreover, secondly, for the reasons set out below, the 2007 Scheme constitutes State aid within the meaning of Article 107(1) TFEU, which is furthermore unlawful.

---

[124]   Judgment of the Court of 15 April 2021 in joined Cases C-798/18 and C-799/18, *Federazione nazionale delle imprese elettrotecniche ed elettroniche (Anie) and Others*, paragraphs 67 to 71.

[125]   See, to that effect, judgment of 12 January 2023, *DOBELES HES*, C-702/20 and C-17/21, EU:C:2023:1, paragraph 65; and and the judgment of the General Court of 2 October 2024, cases T-624/15 RENV and T-694/15 RENV, *European Food SA and Others v European Commission*, EU:T:2024:659, paragraph 174.

[126]   See, to that effect, judgment of 27 September 1988, *Asteris and Others*, 106/87 to 120/87, EU:C:1988:457, paragraphs 25 and 26 and the case-law cited. See also the judgment of the General Court of 2 October 2024, cases T-624/15 RENV and T-694/15 RENV, *European Food SA and Others v European Commission*, EU:T:2024:659, paragraph 172.

[127]   See, to that effect, judgment of 12 January 2023, *DOBELES HES*, C-702/20 and C-17/21, EU:C:2023:1, paragraphs 61 and 62) See also the judgment of the General Court of 2 October 2024, cases T-624/15 RENV and T-694/15 RENV, *European Food SA and Others v European Commission*, EU:T:2024:659, paragraph 173.

[128]   See, to that effect and by analogy, judgment of 11 November 2015, *Klausner Holz Niedersachsen*, C-505/14, EU:C:2015:742, paragraphs 42 to 44 and the judgment of the General Court of 2 October 2024, cases T-624/15 RENV and T-694/15 RENV, *European Food SA and Others v European Commission*, EU:T:2024:659, paragraph 175.

(a)  Beneficiaries of the 2007 Scheme are compensated at a rate exceeding the returns that they would normally have received from the market in the absence of the 2007 Scheme. The scheme therefore provides an advantage. In fact, the Royal Decree introducing the 2007 scheme set out that 'With regard to technologies in need of a boost in view of their limited development, such as biogas or solar-thermoelectric, profitability shall rise to 8 % for facilities that choose to supply distributors and between 7 % and 11 % return for those participating in the wholesale market.' The 2007 Scheme thus increases profitability of such investments above market returns, hence to provide an advantage. The 2007 Scheme therefore provided an advantage within the meaning of Article 107(1) TFEU.

(b)  The 2007 Scheme favoured only the generation of electricity from renewable sources, high efficiency cogeneration and waste by the selected beneficiaries. The advantage granted by the 2007 Scheme was therefore selective.

(c)  Support under the 2007 Scheme was imputable to the State as it was established by law and implementing decrees (see recital (20)).

(d)  The financing mechanism of the 2007 Scheme (see recitals (20) to (28)) involves State resources. As Spain noted, the financing mechanism of the 2007 Scheme is essentially the same as the one assessed by the Court of Justice in the *Elcogás* order, relating to the costs of the electricity system in Spain, and found to be financed by State resources[129]. Therefore, the same considerations as put forward in the *Elcogás* order apply to the present case. It is the State that adopts the necessary provisions for the implementation of the system of the network access charges and that sets the methodology for the calculation of the charges, which are borne – as mandatory costs – by all electricity consumers and network users. In addition, the charges system is managed by a State body, the Spanish regulator CNMC. The State also defines the beneficiaries of the settlements, as well as the applicable mathematical formulas, and regulates the settlement procedure itself, according to predetermined objective parameters. In addition, since the *Elcogás* order, the Court of Justice has held that funds financed through compulsory charges imposed by the legislation of the Member State, managed and apportioned in accordance with the provisions of that legislation, may be regarded as State resources within the meaning of Article 107(1) TFEU even if they are managed by entities separate from the public authorities[130]. The Court has held that a decisive criterion for classifying a tariff supplement as a levy constituting State resources was that that price supplement constituted a charge unilaterally imposed by law which the consumers were required to pay. Spain has confirmed (see recital (25)) that consumers were required by law to finance the costs of the 2007 Scheme. Thus, the 2007 Scheme was financed by State resources.

(e)  Electricity has been a sector open to competition and widely traded between Member States. The 2007 Scheme was therefore likely to distort competition on the electricity market and affect trade between Member States.

---

[129]  Order of the Court of 22 October 2014, *Elcogás SA v Administración del Estado and Iberdrola SA*, Case C-275/13, EU:C:2014:2314, see notably paragraphs 24-33.

[130]  Judgment of the Court of 28 March 2019, *Federal Republic of Germany v European Commission*, Case C-405/16 P. EU:C:2019:268, paragraph 58 with further references.

**EN**                                            43                                            **EN**

(215)    Based on the above, it must therefore be concluded that the 2007 Scheme constituted State aid within the meaning of Article 107(1) TFEU. In addition, since the 2007 Scheme was implemented by Spain without having been notified to, and authorised by, the Commission, it constituted unlawful aid (see recital (18)). The Commission notes that this conclusion is not disputed by the Spanish authorities (see recital (25)).

(216)    In any event, the compensation for lost profits alone as granted by the Award, and in any event its Implementation, constitutes an economic advantage not available under normal market conditions and in absence of the Award. Moreover, since the Award is contrary to Union law for the reasons explained in Section (10.4.1), the Award has not been granted under normal market conditions. Therefore, irrespective of the qualification of the 2007 Scheme as State aid, the Award and in any event its Implementation, constitutes an advantage[131].

(217)    Therefore, the Commission concludes that the compensation awarded by the Tribunal constitutes an economic advantage in favour of Antin that Antin would not have obtained under normal market conditions. Antin could also transfer the right to compensation and thus the economic advantage arising from the Award to another party. For this reason, the Commission considers that the Award, and in any event its Implementation, shall be regarded as an economic advantage for Antin.

(218)    For the sake of completeness, the Commission adds that the Award constitutes an advantage for Antin, even if the Award as such contravenes Union law and cannot be executed under Union law. The decisive factor in determining whether a measure is State aid, and in particular for ascertaining whether that measure gives rise to more favourable treatment for a beneficiary than for others is the effects produced by the measure[132]. Accordingly, the fact that a measure is contrary to provisions of Union law other than Articles 107 and 108 TFEU does not mean that it cannot be classified as State aid, as long as it produces effects and has not been either repealed or declared unlawful and, therefore, inapplicable[133]. In this case, the Award exists and as such has never been repealed. Despite the fact that the Award is contrary to Union law (see Section 10.4), the Award remains liable to have an impact, as also illustrated by the ongoing proceedings engaged by Antin (see section 5.8).

(219)    In relation to arguments alleging (see recitals (85) to (88) and (134) to (135)) that the Award is only capable of constituting State aid if the underlying scheme for which the Award compensates constitutes either unlawful or incompatible State aid (and that because the 2007 Scheme did not constitute State aid, the Award does not constitute State aid either), the Commission notes that this argument cannot stand since the concept of 'advantage', which is intrinsic to the classification of a measure as State aid, is an objective one, irrespective of the motives of the persons responsible for the measure in question, and that Article 107(1) TFEU does not distinguish between the causes or the objectives of State aid, but defines them in relation to their effects (see recital (204)).

---

[131]    See to that effect Joined Cases T-624/15 RENV, T-694/15 RENV and T-704/15 RENV, EU:T:2024:659, paragraph 166.

[132]    See, to that effect, judgment of 15 November 2011, *Commission and Spain v Government of Gibraltar and United Kingdom*, C-106/09 P and C-107/09 P, EU:C:2011:732, paragraph 87 and the case-law cited).

[133]    Judgment of the Court of Justice of 16 December 2016, *Commission v Aerlingus and Ryanair*, Joined cases C-164/15 P, C-165/15 P, EU:C:2016:990, paragraphs 68-69.

(220) Moreover, the Commission recalls that in this case the underlying scheme, amendment of which is compensated for by the Award are not the Old Schemes as referred to by third parties, encompassing different measures starting in 1997, but specifically the 2007 Scheme. The Award applied the DCF method to compare the situation under the 2007 Scheme without modifications to the situation including the disputed measures, which are the changes introduced in 2012-13.[134] Any measure or changes introduced prior to the 2007 Scheme thus had no impact on the Award procedure beyond the provisions contained in the 2007 scheme. Measures prior to the 2007 Scheme thus were not subject to the procedure that led to the Award.

(221) The Commission also recalls that the 2007 Scheme constituted State aid within the meaning of Article 107(1) TFEU (see recital (214)).

(222) In any event, those arguments cannot put into question the finding that the Award constitutes an economic advantage, as set out in recital(217).

(223) Furthermore, as ruled by the General Court in the *Micula* judgment it is irrelevant for the classification of the compensation granted by the arbitral tribunal, whether or not that compensation corresponded to compensation for the withdrawal of unlawful or incompatible aid, the only relevant question in that regard being whether the compensation granted was capable of constituting State aid within the meaning of Article 107(1) TFEU. According to the General Court in the *Micula* judgment, the advantage enjoyed by the applicants in that case was the payment of the compensation granted pursuant to the arbitral award[135]. Therefore, in the present case, the arguments regarding potential compatibility of the 2007 Scheme, had it been notified to the Commission for approval, are thus not relevant.

*Economic advantage granted to an undertaking*

(224) The Commission notes that the Award, and in any event its Implementation, grants an advantage to Antin, which is, contrary to what is argued by Antin and third parties in their comments (see recitals (90) and (137)), an undertaking that exercises an economic activity within the meaning of Article 107(1) TFEU.

(225) The Court of Justice has consistently defined undertakings as entities engaged in an economic activity, regardless of their legal status and the way in which they are financed[136]. The classification of a particular entity as an undertaking thus depends entirely on the nature of its activities and more specifically whether these are economic. Moreover, the Court of Justice has consistently held that any activity consisting in offering goods and services on a market is an economic activity.

(226) In this case, as recalled in recital (52), Antin Infrastructure Services Luxembourg S.à.r.l. is a company established in Luxembourg. Antin Energia Termosolar B.V. is a company established in the Netherlands and is wholly owned by Antin Infrastructure Services Luxembourg S.à.r.l. Both companies were the vehicles of Antin

---

[134]   Award, paragraph 538.
[135]   Judgment of the General Court of 2 October 2024, cases T-624/15 RENV and T-694/15 RENV, *European Food SA and Others v European Commission*, EU:T:2024:659, paragraphs 162 and 164.
[136]   Judgment of the Court of Justice of 12 September 2000, *Pavlov and Others*, Joined Cases C-180/98 to C-184/98, EU:C:2000:428, paragraph 74; Judgment of the Court of Justice of 10 January 2006, *Cassa di Risparmio di Firenze SpA and Others*, C-222/04, EU:C:2006:8, paragraph 107. See also the Commission Notice on the notion of State aid as referred to in Article 107(1) of the Treaty on the Functioning of the European Union, OJ C 262, 19.7.2016, p. 1.

**EN**                                           45                                           **EN**

Infrastructure Partners, a private venture capital fund established in France, used for the investment in Spain[137].

(227)    Since Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V are companies that have been active in investing, notably in the energy sector in Spain with the objective of generating attractive risk-adjusted returns for investors, it must be considered that they have been offering services on a market and therefore engaging in an economic activity. They are thus undertakings within the meaning of Article 107(1) TFEU.

*Selectivity*

(228)    To fall within the scope of Article 107(1) TFEU, a State measure must favour 'certain undertakings or the production of certain goods'. Hence, not all measures that grant an undertaking an economic advantage fall under the notion of State aid, but only those which confer an economic advantage in a selective way upon certain undertakings or categories of undertakings or to certain economic sectors.

(229)    According to settled case-law, where an individual aid is at issue, the identification of the economic advantage is, in principle, sufficient to support the presumption that a measure is selective. This is so, regardless of whether there are operators on the relevant markets that are in a comparable situation[138].

(230)    In this case, the Award, and in any event its Implementation, grants a compensation only to Antin (see recitals (61) and (62)). The advantage granted by the Award, or in any event its Implementation is selective, since it is awarded only to certain undertakings, specifically to Antin, while other undertakings in a comparable legal and factual situation within that sector or other sectors are not eligible for aid and thus will not receive the same advantage.

(231)    It is not relevant whether other investors could (or did) receive similar awards, as argued by some third parties (see section 7.2.3). First, each award constitutes a separate measure, which is based on a separate legal act, based on a separate legal assessment, giving a separate and independent legal right to the beneficiary. Second, not all beneficiaries of the 2007 Scheme were in a position to obtain identical or even comparable awards. In particular, investors established in Spain were not covered by the protection claimed by foreign investors under the ECT, and even those which were found to be covered by the scope of the ECT did not all receive identical awards. Third, and in any event, all those investors were active in the field of renewable energy, and therefore, the Award would remain selective, just like the 2007 Scheme and the 2013 Scheme were selective.

*Conclusion on advantage and selectivity*

(232)    Based on above, the Commission concludes that the Award, and in any event its Implementation, confers a selective advantage to Antin within the meaning of Article 107(1) TFEU.

*10.1.3.    Distortion of competition and effect on trade*

(233)    A measure granted by the State is considered to distort or threaten to distort competition when it is liable to improve the competitive position of the recipient

---

[137]    Award, paragraphs 2 and 249.
[138]    Judgment of 4 June 2015, *Commission v MOL*, C-15/14 P, EU:C:2015:362, paragraph 60.

compared to other undertakings with which it competes[139]. A distortion of competition within the meaning of Article 107 TFEU is thus assumed as soon as the State grants a financial advantage to an undertaking in a liberalised sector where there is, or could be, competition[140]. An advantage granted to an undertaking that distorts competition will normally also be liable to affect trade between Member States. Trade between Member States is affected where a measure strengthens the competitive position of the beneficiary undertaking as compared with other undertakings competing in intra-Union trade[141].

(234)    In this case, the beneficiaries of the Award, and in any event its Implementation, Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V, are undertakings (see recital ((227)), which exercise an economic activity consisting of investing, notably in infrastructure and energy in the Union (see recital (51)). The energy and investment sectors are liberalised sectors where there is intra-EU competition. Thus, any advantage granted to Antin is liable to distort competition and to strengthen the competitive position of Antin as compared with other undertakings competing in intra-Union trade.

(235)    Consequently, the Commission concludes that the Award, and in any event the Implementation of the Award, is liable to affect trade between Member States and to distort, or threaten to distort, competition in the internal market.

*10.1.4.    Conclusion on existence of aid*

(236)    In view of the above, the Commission concludes that the Award, and in any event the Implementation of the Award, constitutes State aid under the meaning of Article 107(1) TFEU.

**10.2.    New aid**

(237)    Some third parties claim in their comments that if the Award is to be regarded as constituting aid, it would not constitute 'new aid' within the meaning of Article 1(c) of Council Regulation (EU) 2015/1589. According to them, the Award should be considered as existing aid within the meaning of Article 1(b)(iv) of Council Regulation (EU) 2015/1589, because the Award cannot be considered as granting aid separate from the 2007 Scheme and, since the aid to Antin under the 2007 Scheme constitutes existing aid, the Award should also be considered as existing aid (see section 7.1.3).

(238)    However, this argument misinterprets the scope of the formal investigation, which relates to the compensation received by Antin under the Award. Any considerations as to whether the 2007 Scheme constitutes existing aid are not decisive for finding existing aid in the Award, for which the limitation period started, according to Article 17(2) of Council Regulation (EU) 2015/1589, from the moment of the adoption of the Award (that is 15 June 2018). There was no right to any payment under the 2007 Scheme for Antin in addition to the payments that had been received prior to the amendment of the scheme in 2013. If any such payment were to occur, it

---

[139]    Judgment of 17 September 1980, *Philip Morris*, 730/79, EU:C:1980:209, paragraph 11; judgment of 15 June 2000, *Alzetta*, Joined Cases T-298/97, T-312/97 etc., EU:T:2000:151, paragraph 80.

[140]    Judgment of 15 June 2000, *Alzetta*, Joined Cases T-298/97, T-312/97 etc., EU:T:2000:151, paragraphs 141 to 147; judgment of 24 July 2003, *Altmark Trans*, C-280/00, EU:C:2003:415.

[141]    Judgment of 15 May 2019, *Achema AB and Others v Valstybinė kainų ir energetikos kontrolės komisija (VKEKK)*, C-706/17, EU:C:2019:407, paragraph 92 and the case-law cited.

would thus only be based on the Award, not on any pre-existing rights. The Award and, in any event its Implementation, thus constitutes new aid.

(239) The Commission recalls that this finding is consistent with the Court of justice's findings in the *Micula* case whereby it hold that '*the right to the compensation in question was granted solely by the arbitral award issued by that court, which, having upheld the claim brought by the arbitration applicants, not only found the existence of that right, but also quantified the amount thereof'*[142]. In that case, the Court indeed stated that *'the right to compensation for the loss which the arbitration applicants allege to have suffered as a result of the repeal, allegedly in breach of the BIT, of the tax incentives scheme at issue was granted only by the arbitration award. It was only upon the conclusion of the arbitral proceedings brought for that purpose by the arbitration parties, on the basis of the arbitration clause in Article 7 of the BIT, that the arbitration applicants were able to obtain actual payment of that compensation'*[143]. The Court thus found that '*the General Court erred in law when it held [..] that the State aid covered by the decision at issue was granted on the date of repeal of the tax incentives scheme at issue*'[144]. In the present case, contrary to the allegations of certain third parties, it would be erroneous to consider that the aid at issue was granted by the adoption of the 2007 Scheme.

(240) In addition, as it has already been demonstrated in section 10.1 of this Decision, the Award fulfils itself the conditions for the existence of State aid and its classification as State aid is not dependent on the classification of the 2007 Scheme.

(241) As regards the argument that the Award cannot be considered as granting aid separate from the 2007 Scheme (see recitals (146) and (176)), on the basis of the *Dobeles Hes* judgment[145], the Commission notes that that case is factually different from this case and thus not comparable. More specifically, the Court ruled in *Dobeles Hes* that the establishment as such of State aid cannot result from a judicial decision, as distinct from the tariff advantage established by the national legislation, in the sense that where national legislation establishing a statutory right to a higher payment for electricity generated from renewable energy sources constitutes 'State aid', within the meaning of Article 107(1) TFEU, legal proceedings seeking full entitlement to that right must be regarded as requests for payment of the portion of that State aid not received, and not as requests for the grant by the court seized of a separate State aid[146]. However, in this case, the compensation awarded by the Tribunal does not derive from a right that had already been established in the Spanish legislation regardless to the Award. To the contrary, the Award compensates Antin for the withdrawal of an unlawful aid scheme and the right for compensation derives directly from the Award. In addition, an arbitration tribunal is not a national court. Also for that reason, the *Dobeles Hes* judgment cannot apply here.

(242) As a final point, the limitation period under Article 17(2) of Regulation 2015/1589 starts to run, in the case of an aid scheme, not – as claimed by the interested parties – as of the putting into effect of the aid scheme. Rather, as is clear from the wording of

---

[142] Judgment of the Court (Grand Chamber) of 25 January 2022, Case C-638/19 P, *European Commission v European Food SA and Others,* EU:C:2022:50, paragraph 125.

[143] Ibid, paragraph 124.

[144] Ibid, paragraph 127.

[145] Judgment of the Court (Grand Chamber) of 12 January 2023, Joined Cases C-702/20 and C-17/21, *SIA 'DOBELES HES' and Sabiedrisko pakalpojumu regulēšanas komisija*, EU:C:2023:1.

[146] See paragraph 79 of the judgment.

that provision, it starts to run from the day the aid under the aid scheme is awarded. That is the day on which the company acquires the right to the individual payment, i.e. the day on which this payment is due. As a result, for payments that would have become due after the amendment in 2013, the limitation period could start to run the earliest on the day the payments would have been due[147].

### 10.3.   Unlawfulness of the aid

(243)   Article 108(3) TFEU requires that the Member State concerned shall not put its proposed measure into effect until the Commission procedure has resulted in a final decision.

(244)   According to well-established case-law, the decisive factor for establishing the date on which the right to receive State aid was conferred on its beneficiaries by a particular measure is the acquisition by those beneficiaries of a definitive right to receive that aid and to the corresponding commitment, by the State, to grant that aid. It is at that date that such a measure is liable to distort competition and affect trade between Member States, within the meaning of Article 107(1) TFEU[148].

(245)   In this case, the Award was delivered on 15 June 2018, and rectified for clerical mistakes on 29 January 2019. As the Award delivered on 15 June 2018 ordered Spain to pay to Antin compensation of EUR 101 million (as rectified on 29 January 2019), together with interest on this sum, Antin was conferred the right to receive the compensation ordered in the Award on that date. Based on the Tribunal's finding that the ECT applied to the dispute at hand, Article 26, paragraph (8)  ECT means that Spain is bound by the outcome of the arbitration proceedings and the right for Antin to receive the aid under the Award was therefore conferred on 15 June 2018 and the aid was thus granted under the Award on this same date (that is to say, on 15 June 2018 (see also Section 10.2)).

(246)   Spain notified the Award on 17 April 2019 and, based on the information currently available, Spain has not paid it, implemented it, or executed it.

(247)   Since the aid was granted on 15 June 2018 before being approved by the Commission, the Commission therefore considers that the aid resulting from the Award, and in any event its Implementation, is unlawful.

(248)   For completeness, the Commission notes that, contrary to the claim raised by third parties, Spain's notification is not 'abusive'. By notifying the aid at issue, Spain acted in accordance with its obligation under Article 108(3) TFEU, which, by definition, cannot be considered as an abuse of law.

(249)   In any event, the Implementation of the Award after the adoption of this Decision would also constitute unlawful aid.

### 10.4.   Compatibility of aid

(250)   Given that the Award, and in any event its Implementation, constitutes State aid within the meaning of Article 107(1) TFEU, such measure shall be prohibited unless

---

[147]   Judgment of the Court of 8 December 2011, *France Télécom v Commission*, C-81/10 P, paragraph 82; Judgment of the Court (Grand Chamber) of 12 January 2023, Joined Cases C-702/20 and C-17/21, *SIA 'DOBELES HES' and Sabiedrisko pakalpojumu regulēšanas komisija,* EU:C:2023:1, paragraphs 108 to 110.

[148]   Judgment of the Court (Grand Chamber) of 25 January 2022, Case C-638/19 P, *European Commission v European Food SA and Others,* EU:C:2022:50, paragraph 123.

it can be deemed compatible with the internal market pursuant to Article 107(2) or Article 107(3) TFEU.

(251) At the outset, the Commission recalls that when assessing the compatibility of a measure with the internal market under Articles 107(2) and 107(3) TFEU, the burden of proof is the principal responsibility of the Member State[149]. At present, Spain has not presented any arguments that could justify the measure under Article 107(2) or Article 107(3) TFEU.

(252) Nevertheless, for the sake of completeness, in the Opening Decision, in addition to reminding that the burden of proof of the compatibility was lying on Spain, the Commission considered it appropriate to undertake a compatibility assessment of its own motion and expressed its preliminary doubts as to the compatibility of the measure with the internal market in relation to (i) a possible breach of EU law by the aid measure (recitals (96) to (102) of the Opening Decision), and (ii) the non-compliance of the aid measure with the compatibility criteria under the State aid guidelines applicable to operating aid to energy from renewable sources (see recitals (108) to (154) of the Opening Decision).

(253) For the reasons set out below, the Commission maintains its conclusion that the Award, and in any event its Implementation, is not compatible with the internal market because it violates Union law.

*10.4.1. Breach of Union law*

(254) According to settled case-law of the Court of Justice, 'State aid which, as such or by reason of some modalities thereof, contravenes provisions or general principles of EU law cannot be declared compatible with the internal market […]. Indeed, where the modalities of an aid measure are so indissolubly linked to the object of the aid that it is impossible to evaluate them separately, their effect on the compatibility or incompatibility of the aid viewed as a whole must therefore of necessity be determined in the light of the procedure prescribed in Article 108 TFEU'[150].

(255) At the outset, the Commission recalls that the Union courts consider that an international agreement cannot affect the allocation of powers fixed by the Treaties or, consequently, the autonomy of the Union legal system, observance of which is ensured by the Court[151]. That principle is enshrined in particular in Article 344 TFEU, by virtue of which the Member States undertake not to submit a dispute concerning the interpretation or application of the Treaties to any method of dispute settlement other than those provided for in the Treaties[152].

(256) In order to ensure that the specific characteristics and the autonomy of the EU legal order are preserved, the Treaties have established a judicial system intended to ensure consistency and uniformity in the interpretation of Union law[153]. In that context, in accordance with Article 19(1) TEU, it is for the national courts and tribunals and the Court of Justice to ensure the full application of Union law in all

---

[149] Judgment of the Court of First Instance of 12 September 2007, Case T-68/03, *Olympiaki Aeroporia Ypiresies v Commission*, EU:T:2007:253, paragraph 34.

[150] Judgment of the Court of Justice of 31 January 2023, Case C-284/21 P, *Commission v Anthony Braesch and others,* EU:C:2023:58, paragraphs 96 and 97 (see also the referenced case-law).

[151] See the *Achmea* judgment, paragraph 32 and case-law cited. See also the *Komstroy* judgment, paragraph.42.

[152] See the *Achmea* judgment, paragraph 32. See also paragraph 42 of the *Komstroy* judgment.

[153] See the *Achmea* judgment, paragraph 35. See also the *Komstroy* judgment, paragraph 45.

**EN**       **EN**

Member States and to ensure judicial protection of the rights of individuals under that law[154]. The judicial system as thus conceived has as its keystone the preliminary ruling procedure provided for in Article 267 TFEU, which, by setting up a dialogue between one court and another, and specifically between the Court of Justice and the courts and tribunals of the Member States, has the object of securing uniform interpretation of EU law, thereby serving to ensure its consistency, its full effect and its autonomy as well as, ultimately, the particular nature of the law established by the Treaties[155].

(257)   As explained in recitals (9) to (11), according to the case-law of the Court of Justice, Article 19 TEU and Articles 267 and 344 TFEU as well as the general principle of the autonomy of the EU legal order preclude a provision contained in an international agreement under which an investor of one Member States party to that agreement may, in the event of a dispute concerning investments in another Member State party to that agreement, bring proceedings against the latter Member State before an arbitral tribunal, the jurisdiction of which that Member State has undertaken to accept[156].

(258)   Indeed, by concluding such an agreement, the Member States party to it consent to remove from the jurisdiction of their own courts and, therefore, from the system of judicial remedies which the second subparagraph of Article 19(1) TEU requires them to establish in the fields covered by Union law disputes which may concern the application or interpretation of Union law. Such an agreement is therefore liable to lead to a situation in which those disputes are not settled in a manner which guarantees the full effectiveness of Union law[157].

(259)   In this case, the Award concerns a dispute between a Member State and two investors of two other Member States and was adopted in the context of proceedings initiated on the basis of the investor-State arbitration mechanism laid down in Article 26 of the ECT.

(260)   As explained in recital (10) of the Opening Decision and as held by the Court of Justice in the *Komstroy* judgment, the ECT is, by virtue of the act approving its conclusion by the Union and in accordance with Article 216 TFEU, part of the Union legal order such that the ECT itself is an act of Union law[158]. Therefore, any tribunal constituted under the ECT would be required to interpret, and even apply, Union law[159].

(261)   Moreover, as stated by the Court in the *Komstroy* judgment, an *ad hoc* tribunal, such as the Tribunal that adopted the Award, is not part of the judicial system of a Member State. It therefore means that it cannot be classified as a court or tribunal of a Member State within the meaning of Article 267 TFEU and is not therefore entitled to make a reference to the Court of Justice seeking a preliminary ruling on the interpretation of Union law[160]. As a result of the incompatibility with Union law that

---

[154]   See the *Achmea* judgment, paragraph 36. See also the *Komstroy* judgment, paragraph 45.

[155]   See the *Achmea* judgment, paragraph 37. See also the *Komstroy* judgment, paragraph 46.

[156]   See the *Achmea* judgment and the *Komstroy* judgment; Order of the Court of 21 September 2022, *Romatsa and Others*, C-333/19, EU:C:2022:749.

[157]   Order of the Court of 21 September 2022, *Romatsa and Others*, C-333/19, EU:C:2022:749, paragraph 34 and the case-law cited.

[158]   See the *Komstroy* judgment, paragraph 23.

[159]   See the *Komstroy* judgment, paragraph 50.

[160]   See the *Komstroy* judgment, paragraphs 52 and 53.

**EN**                                    51                                    **EN**

would ensue if an investor from one Member State was able to trigger that arbitration mechanism in a dispute concerning an investment made by it in another Member State, the Court of Justice found that Article 26 ECT must be interpreted as not applying to such a situation, i.e. an intra-EU dispute.

(262)    Based on the above, and contrary to the argument raised by several interested third parties in their written submissions, it must be considered that the proceedings leading to the handing down of the Award lacked a legal basis. Article 26 ECT is not applicable to a dispute such as the one at hand between a Member State and investors of other Member States concerning an investment made by the latter in the first Member State. Spain never made any offer to arbitrate such disputes. There is therefore no agreement to arbitrate and a tribunal established on the basis of a provision that does not apply is not properly constituted. The Tribunal that was nonetheless established in this case suffers from the defects identified by the Court in *Komstroy*. It was constituted under Article 37(2)(b) of the ICSID Convention which made the ICSID Convention applicable to the judicial review of its decisions, including the Award. Articles 52, 53 and 54 of the ICSID Convention provide only for limited review of the decisions concerning, in particular, the jurisdiction of the Tribunal. In this context, it must be considered that the Award rendered by the Tribunal is not subject to review by a court of a Member State capable of ensuring full compliance with Union law.

(263)    Therefore, even setting aside the fact that it is null because lacking a legal basis, the Award must be regarded as incompatible with Union law. It cannot have any effect and cannot be enforced in order to receive payment of the compensation awarded[161].

(264)    In view of the above, the Commission concludes that the Award, and in any event its Implementation, breach Union law, and in particular Article 19(1) TEU, and Articles 267 and 344 TFEU, as well as the general principle of the autonomy of the EU legal order.

*10.4.2.    Non-application of Article 351 TFEU*

(265)    Article 351 TFEU provides that '[t]he rights and obligations arising from agreements concluded […] for acceding States, before the date of their accession, between one or more Member States on the one hand, and one or more third countries on the other, shall not be affected by the provisions of the Treaties'.

(266)    According to settled case-law, the purpose of the first paragraph of Article 351 TFEU is to make clear, in accordance with the principles of international law, that the application of the EU Treaties does not affect the duty of the Member State concerned to respect the rights of non-member countries under a prior agreement and to perform its obligations thereunder[162]. The first paragraph of Article 351 TFEU has, therefore, the aim of protecting the rights of third countries by permitting the Member States concerned to perform their obligations under a prior international

---

[161]    Order of 21 September 2022, *Romatsa and Others*, C-333/19, EU:C:2022:749, paragraphs 42-43; Declaration on the legal consequences of the judgment of the Court of Justice in *Komstroy* and common understanding on the non-applicability of Article 26 of the Energy Charter Treaty as a basis for intra-EU arbitration proceedings, OJ L, 2024/2121, 6.8.2024.

[162]    Judgment of 15 September 2011, *Commission v Slovakia*, C-264/09, EU:C:2011:580, paragraph 41 and the case-law cited and judgment of 2 October 2024, *European Food SA and Others v European Commission*, T-624/15 RENV and T-694/15 RENV, EU:T:2024:659, paragraph 74.

agreement[163]. On the other hand, it does not authorise the Member States to exercise rights under such agreements in their internal relations within the Union[164].

(267)    The case-law further considers that, for a rule of Union law to be deprived of effect as a result of an international agreement, pursuant to the first paragraph of Article 351 TFEU, two conditions must be fulfilled: the agreement must have been concluded before the entry into force of the EU Treaties in the Member State concerned and the third State concerned must derive from it rights which it can require that Member State to respect[165].

(268)    In the present case, as explained in footnote (4), the ECT was signed by the Union and Spain in December 1994 (and on 17 December 1991 by Luxembourg and the Netherlands, the Member States where Antin is established), and entered into force, following ratification, in April 1998. Spain signed the ICSID on 21 March 1994 with entry into force, following ratification, on 17 September 1994. For Luxembourg, the ICSID Convention entered into force on 29 August 1970, and for the Netherlands on 14 October 1966. The ECT and ICSID were therefore concluded after 1958 (the relevant date for the application of Article 351 TFEU to Luxembourg and the Netherlands) and after Spain joined the Union in 1986. The first condition laid down in Article 351 TFEU is therefore not met under any possible constellation.

(269)    In addition, Article 26 ECT is, according to the *Komstroy* judgment, intended to govern bilateral relations[166]. Similarly, the ICSID Convention, despite its multilateral nature, is intended to govern bilateral relations between the contracting parties in an analogous way to a bilateral treaty. Although third States which have concluded the ICSID Convention could have an interest in Spain complying with its obligations vis-à-vis another Member State by enforcing, in accordance with the provisions of that convention, an arbitral award falling within its scope, such a purely factual interest cannot be equated with a 'right', within the meaning of the first paragraph of Article 351 TFEU, capable of justifying the application of that provision[167]. The second condition laid down in Article 351 TFEU is therefore also not met by either the ECT or the ICSID Convention.

(270)    As a result, it must be concluded that Article 351 TFEU is not relevant to this case and that the Commission's conclusion in recital (264) that the Award, and in any event its Implementation, breaches Union law is not altered by Article 351 TFEU.

### 10.4.3.    *Absence of legitimate expectations*

(271)    Several interested third parties claim in their written comments that a decision of the Commission finding that the Award is not compatible with the internal market because of its non-compliance with EU law would breach the principle of the protection of legitimate expectations.

(272)    The principle of the protection of legitimate expectations is a fundamental principle of Union law that allows any economic operator whom an institution has caused to

---

[163]    Judgment of 2 October 2024, *European Food SA and Others v European Commission*, T-624/15 RENV and T-694/15 RENV, EU:T:2024:659, paragraph 76 and the case-law cited.

[164]    *Ibid*., paragraph 77 and the case-law cited.

[165]    *Ibid*., paragraph 80 and the case-law cited.

[166]    See the *Komstroy* judgment, paragraph 64.

[167]    Judgment of 2 October 2024, *European Food and Others v Commission,* T-624/15 RENV, T-694/15 RENV and T-704/15 RENV, EU:T:2024:659, paragraph 106 and the case-law cited.

entertain expectations which are justified to rely thereon[168]. However, if a prudent and alert economic operator could have foreseen the adoption by the institutions of a measure likely to affect his or her interests, that person cannot plead that principle if the measure is adopted[169].

(273)    According to settled case-law, the right to rely on the principle of the protection of legitimate expectations presupposes that three conditions are satisfied. First, precise, unconditional and consistent assurances originating from authorised, reliable sources must have been given to the person concerned by the authorities. Precise, unconditional and consistent information, in whatever form it is given, constitutes such an assurance. Second, those assurances must be such as to give rise to a legitimate expectation on the part of the person to whom they are addressed. Third, the assurances given must comply with the applicable rules[170].

(274)    As regards the first condition, the Commission never provided assurances that could have led Antin to legitimately expect that the Award does not constitute State aid or that, in any event, the Commission would consider the Award, and in any event its Implementation, as lawful and compatible State aid.

(275)    On the contrary, the Commission set out clearly in the 2017 Commission Decision, that is before the Award was granted, that '*any compensation which an Arbitration Tribunal were to grant to an investor on the basis that Spain has modified the premium economic scheme by the notified scheme would constitute in and of itself State aid*'[171]. Since the arbitration tribunals are not competent to declare State aid compatible with the internal market - it is an exclusive competence of the Commission-, a prudent and alert economic operator could have expected that any such award granting compensation would constitute notifiable State aid pursuant to Article 108(3) TFEU and be subject to the standstill obligation. Therefore, investors were not given precise, unconditional and consistent information such as to give rise to a legitimate expectation on their part.

(276)    Moreover, the Commission notes that no legitimate expectations can arise for acts of the Union that would be in breach of Union law. As explained in recitals (10) to (12), the Award, and in any event its Implementation, contravene Article 19(1) TEU as well as Articles 267 and 344 TFEU and the general principle of autonomy of the EU legal order. Therefore, no legitimate expectations can arise from the measure.

(277)    Based on the above, the Commission considers that the principle of legitimate expectations does not alter the conclusion that the Award, and in any event its Implementation, are contrary to Union law, and are therefore incompatible with the internal market.

*10.4.4.    Conclusion on the compatibility of the aid*

(278)    On the basis of the above considerations, the Commission concludes that the Award, and in any event its Implementation, contravenes provisions of Union law, namely Article 19(1) TEU and Articles 267 and 344 TFEU, as well as the general principle

---

[168]    Judgment of 2 October 2024, *European Food and Others v Commission,* T-624/15 RENV, T-694/15 RENV and T-704/15 RENV, EU:T:2024:659, paragraph 228 and the case-law cited.

[169]    Judgment of 2 October 2024, *European Food and Others v Commission,* T-624/15 RENV, T-694/15 RENV and T-704/15 RENV, EU:T:2024:659, paragraph 229 and the case-law cited.

[170]    *Ibid*., paragraph 230 and the case-law cited.

[171]    Recital 165 of the 2017 Commission Decision.

of autonomy of the EU legal order. Without it being necessary to consider whether the aid entails a discrimination on the basis of nationality in breach of Article 18 TFEU or whether it is compatible with the State aid guidelines applicable to aid to energy from renewable sources, it must be concluded that the measure is not compatible with the internal market and therefore cannot be authorised.

## 11.    PREVENTION OF IMPLEMENTATION OF THE AWARD AND RECOVERY

(279)    According to the TFEU and the established case-law of the Union Courts, the Commission is competent to decide that the Member State concerned shall alter or abolish aid when it has found that it is incompatible with the internal market[172]. The Union Courts have also consistently held that the obligation on a Member State to abolish aid regarded by the Commission as being incompatible with the internal market is designed to re-establish the previously existing situation[173].

(280)    In this context, the Union Courts have established that this objective is attained once the recipient has repaid the amounts granted by way of unlawful aid, thus forfeiting the advantage which it had enjoyed over its competitors on the internal market, and the situation prior to the payment of the aid is restored[174].

(281)    In line with the case-law, Article 16(1) of Council Regulation (EU) 2015/1589[175] states that 'where negative decisions are taken in cases of unlawful aid, the Commission shall decide that the Member State concerned shall take all necessary measures to recover the aid from the beneficiary.'

(282)    As ruled by the Court of Justice, unlawful aid must also be recovered from the company which carries on the economic activity of the undertaking which initially benefited from the advantage associated with the grant of State aid and which, therefore, retains the actual benefit of it[176]. In this regard, the Court of Justice held that '*in the context of their task of recovering the aid, and in order to ensure the full effectiveness of a Commission recovery decision specifically identifying the beneficiary of the aid and to effectively eliminate the distortion of competition caused by the competitive advantage linked to the receipt of the aid, the national authorities and courts are required to identify an undertaking other than that identified in that recovery decision, where the advantage linked to the aid in question has actually been transferred to that other undertaking, after the adoption of that recovery decision*'[177].

(283)    In this case, it follows from the preceding observations that Spain shall recover any payment of the aid made to Antin or to any third party that has acquired or may acquire the Award, or any right thereunder. However, based on the information available to the Commission, while the Award itself has been handed down, and thus

---

[172]    Judgment of 12 July 1973, *Commission v Germany*, 70/72, EU:C:1973:87, paragraph 13.

[173]    Judgment of 21 March 1990, *Belgium v Commission*, C-142/87, EU:C:1990:125, paragraph 66.

[174]    Judgment of 17 June 1999, *Belgium v Commission*, C-75/97, EU:C:1999:311, paragraphs 64 and 65.

[175]    See footnote 60.

[176]    Judgment of 16 January 2025, *Scai Srl v Regione Campania*, Case C-588/23, EU:C:2025:23, paragraph 40; Judgment of 7 March 2018, *SNCF Mobilités* v *Commission*, C-127/16 P, EU:C:2018:165, paragraphs 104 and 106.

[177]    Judgment of 16 January 2025, *Scai Srl v Regione Campania*, Case C-588/23, EU:C:2025:23, paragraph 46.

the aid at issue has been granted to Antin[178], Spain has not paid, executed, or implemented that Award. Therefore, based on the information available to the Commission, no State aid has been effectively paid and there is no need for recovery if Spain continues not to pay any compensation under the Award in the future.

(284)    In this context, in addition to not paying, implementing, or executing the Award, Spain shall ensure that no payment, implementation or execution, of the Award is otherwise effected from the date of adoption of this Decision. If any such payment, execution or implementation does take place, Spain shall recover any monies effectively transferred as a result of that payment, implementation or execution[179]. In this regard, Spain shall recover any payment of the aid made under the Award to Antin and any third party that has acquired or may acquire the Award, or any right thereunder.

(285)    In order to comply with its obligations under Article 108(3) TFEU Spain shall also take all appropriate measures to prevent Antin, and any third party that has acquired or may acquire the Award, or any right thereunder, from seeking recognition, enforcement and execution of the Award, whether in Member States of the Union or in third countries.

(286)    Moreover, it shall be noted that it follows from the principle of sincere cooperation laid down in Article 4(3) TEU that the Member States, and in particular the national courts, have to take all measures that are necessary to guarantee the application and effectiveness of EU law, and in particular the rules of Union law on State aid laid down in Articles 107 and 108 TFEU[180]. As a result of this same principle of sincere cooperation, national courts have to take all measures that are necessary to guarantee the application and effectiveness of Article 19(1) TEU, Articles 267 and 344 TFEU, and the principle of autonomy of the EU legal order[181]. Therefore, in this case, the principle of sincere cooperation requires national courts of the Member States, including non-Spanish national courts, to not recognise, execute, or implement the Award, and to take all measures necessary to prevent the recognition, execution, or implementation of the Award (for example, by ordering undertakings established under their jurisdiction to cease any action designed to seek recognition or execution of the Award in other jurisdictions, and ordering them to pay penalty payments in case of non-compliance with the order to cease any such action).

---

[178]    See also Section 10.3 of this Decision.

[179]    In order to comply with its obligations under Article 108(3) TFEU Spain shall also take all appropriate measures to prevent Antin, and any third party that may acquire or has acquired the Award, or any right thereunder, from seeking recognition, enforcement and execution of the Award in Member States of the Union or in third countries.

[180]    Judgment of 14 March 2024, *European Commission v United Kingdom of Great Britain and Northern Ireland*, C-516/22, EU:C:2024:231, paragraphs 93 to 99.

[181]    It is in this context that a Dutch court (the *Rechtbank Amsterdam*), in proceedings *Koninkrijk Spanje v. AES SOLAR ENERGY COÖPERATIEF U.A.,AMPERE EQUITY FUND B.V.*, (i) declared that an intra-EU award delivered on the grounds of a breach by Spain of the ECT constituted unlawful state aid under Union law so long as the EU Commission had not approved it; (ii) declared that the recovery of damages under that award would be contrary to Union law as long as the state aid proceedings remained pending; and (iii) ordered the defendants to pay to Spain any amount that Spain may be ordered to pay to the defendant (or any successor in title), on the conditions: that enforcement of the award results in an actual payment by Spain, and that the European Commission has not yet ruled on whether the award amounts to unlawful state aid under Union law.

## 12.    CONCLUSION

The Commission concludes that the Award, and in any event its Implementation, entails State aid which is not compatible with the internal market because it is based on an interpretation of the ECT in breach of the Union law. Therefore, Spain shall recover any payment of the aid, including from any third party that has acquired or may acquire the Award, or any right thereunder. In addition to not paying, implementing, or executing the Award, Spain shall ensure that no payment, execution, or implementation of the Award shall otherwise be effected from the date of adoption of this Decision, and shall recover any monies effectively transferred as a result of that payment, implementation or execution. In order to comply with its obligations under Article 108(3) TFEU, Spain shall also take all appropriate measures to prevent Antin, and any third party that has acquired or may acquire the Award, or any right thereunder, from seeking recognition, enforcement and execution of the Award, whether in Member States of the Union or in third countries,

HAS ADOPTED THIS DECISION:

### Article 1

The award rendered by the arbitration tribunal established under the auspices of the International Centre for Settlement of Investment Disputes in the arbitration proceedings *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. vs Spain* in favour of Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V.  (ICSID Case No ARB/13/31) constitutes State aid within the meaning of Article 107(1) of the Treaty on the Functioning of the European Union which is incompatible with the internal market.

In any event, the payment, implementation or execution of the award rendered by the arbitration tribunal established under the auspices of the International Centre for Settlement of Investment Disputes in the context of the arbitration proceedings *Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. vs Spain* in favour of Antin Infrastructure Services Luxembourg S.à.r.l. and Antin Energia Termosolar B.V. constitutes State aid within the meaning of Article 107(1) of the Treaty on the Functioning of the European Union which is incompatible with the internal market.

### Article 2

The Kingdom of Spain shall not pay out any of the aid referred to in Article 1 and shall ensure that no payments of the aid referred to in Article 1 shall be effected from the date of adoption of this Decision.

### Article 3

The Kingdom of Spain shall take all appropriate measures to prevent Antin Infrastructure Services Luxembourg S.à.r.l., Antin Energia Termosolar B.V, and any third party that has acquired or may acquire the award referred to in Article 1, or any right thereunder, from seeking recognition, enforcement or execution of the award, whether in Member States of the European Union or in third countries.

**EN**

**EN**

*Article 4*

The Kingdom of Spain shall recover any payment of the aid referred to in Article 1 to Antin Infrastructure Services Luxembourg S.à.r.l., Antin Energia Termosolar B.V, and to any third party that has acquired or may acquire the award referred to in Article 1, or any right thereunder, including payment resulting from forced execution arising in third countries.

*Article 5*

This Decision is addressed to the Kingdom of Spain.

If the decision contains confidential information which should not be published, please inform the Commission within fifteen working days of the date of receipt. If the Commission does not receive a reasoned request by that deadline, you will be deemed to agree to publication of the full text of the decision. Your request specifying the relevant information should be sent electronically to the following address:

European Commission
Directorate-General Competition
State Aid Greffe
B-1049 Brussels
Stateaidgreffe@ec.europa.eu

Done at Brussels, 24.3.2025

*For the Commission*

*Valdis DOMBROVSKIS*
*Member of the Commission*

CERTIFIED COPY
For the Secretary-General

Martine DEPREZ
Director
Decision-making & Collegiality
EUROPEAN COMMISSION

**EN**                                              58                                              **EN**